IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| SIMPSON VENTURES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No. 306CV-901-WKW |
| v. | ) | |
| | ) | Demand for Jury Trial |
| MID-WEST METAL PRODUCTS | ) | |
| COMPANY, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| MID-WEST METAL PRODUCTS | ) | |
| COMPANY, INC., | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SIMPSON VENTURES, INC., | ) | |
| | ) | |
| Counterdefendant. | ) | |

## DEFENDANT'S MOTION TO COMPEL AND FOR
## EXTENSION OF EXPERT DISCLOSURE DEADLINES

Defendant Mid-West Metal Products, Inc. ("Mid-West Metal"), by counsel, does hereby

respectfully request the following:

(1)    That the Court issue an order that compels Plaintiff Simpson Ventures, Inc.
("Simpson Ventures") to respond to Interrogatory Numbers 14 through 28.

(2)    That the Court issue an order that extends Mid-West Metal's deadlines for its
expert reports and disclosures, to a date that allows such experts a reasonable
amount of time to review and incorporate Simpson Venture's responses to
Interrogatory Numbers 14 through 28.

In support of these Motions, Mid-West Metal submits the following.

1.    After the parties filed their Rule 26(f) Report of the Parties' Planning Meeting on

January 26, 2007, and well into May 2007, the parties engaged in good faith efforts to try to

resolve this matter by agreement. In mid-May, 2007, it was concluded that those efforts were not going to be successful.

2.      On June 4, 2007, Mid-West Metal served its first set of Interrogatories on Simpson Ventures. Specifically, Mid-West Metal served 28 Interrogatories.

3.      Simpson Ventures' responses to the Interrogatories were due by July 9, 2007. On or about June 29, 2007, Mid-West Metal agreed to Simpson Ventures' request for an 11-day extension of time to respond, and to thus allow Simpson Ventures to and including July 20, 2007. On or about July 19, 2007, Simpson Ventures requested an additional 3-day extension (to July 23, 2007) to respond – to which Mid-West Metal unconditionally agreed.

4.      On the night of July 23, 2007 (8:08pm), Simpson Ventures' served its responses to Mid-West Metal's Interrogatories. A true and accurate copy of those responses are attached hereto as "Exhibit 1."

5.      Simpson Ventures chose to provide substantive responses to the first 13 Interrogatories. However, in response to Interrogatories 14 through 28, Simpson Ventures' asserted only one objection – that the total number of Interrogatories submitted supposedly exceeded the numerosity limitation that the parties had stipulated to in the Report of Parties' Planning Meeting.

6.      On July 25, 2007, Mid-West Metal's counsel wrote to Simpson Venture's counsel to request that Simpson Venture withdraw that objection, and promptly supplement its reasons – and explained why Simpson Venture's position was not correct. Further, Simpson Ventures was asked to agree to an extension of deadlines for Mid-West Metal to make its expert witness disclosures (August 1 on infringement/validity issues, and August 15 on damages issues), to a date that would allow those experts to review Simpson Ventures' supplemental responses, and

complete their analysis and reports accordingly. Because of the looming August 1 expert deadline, Simpson Ventures was asked to respond to this request by the close of business on July 26, 2007. Simpson Ventures did not respond, and as of the date of this filing, has still not responded. A true and accurate copy of Mid-West Metal's letter of July 25, 2007, is attached hereto as "Exhibit 2."

### Simpson Venture's Objection to Mid-West Metal's Interrogatories is Improper

7.      Mid-West Metal respectfully submits that Simpson Ventures' refusal to respond to Interrogatories 14 through 28 is improper, because the premise upon which that objection is made is incorrect.

8.      The parties had agreed in the Report of the Parties' Planning Meeting that each party could serve 30 interrogatories, including subparts. The total number of Interrogatories that Mid-West Metal has submitted is in fact 28. Simpson Ventures' objection is thus necessarily premised on the position that Mid-West Metal has submitted too many subparts.

9.      Mid-West Metal could not locate any reported decisions from this Court addressing this particular "subparts" issue. However, other authorities and courts that have addressed similar such arguments make it clear that Mid-West Metal has not violated the numerosity limitation on the interrogatories here. As the Advisory Committee Notes to the 1993 Amendments to FRCP 33(a) make clear, the purpose of the rule is to prevent adding to an interrogatory areas of inquiry that are discrete[1] from the subject of the interrogatory, and to thus do an end-run around the numerosity limitation. Id. ("Parties cannot evade this presumptive limitation through the device of joining as subparts questions that seek information about discrete separate subjects. However, a question asking about communications of a particular

---

[1] The New Oxford American Dictionary defines discrete as "individually separate and distinct."

type should be treated as a single interrogatory even though it requests that the times, place,

persons present, and contents be stated separately for each such communication."). See also

WRIGHT & MILLER, 8A FEDERAL PRACTICE AND PROCEDURE §2168.1 (1994 Ed.)

("an interrogatory containing subparts directed at eliciting details concerning a common theme

should be considered a single question"); Ginn, et al. v. Gemini, Inc., et al., 137 F.R.D. 320

(D.Nev. 1991). In Ginn, the court was applying a local rule's numerosity limitation. The court

held there that "legitimate discovery efforts should not have to depend on linguistic acrobatics,

nor should they sap the court's limited resources to resolve hypertechnical disputes. The Court

therefore holds that interrogatory subparts are to be counted as part of but one interrogatory . . .

if they are logically or factually subsumed within and necessarily related to the primary

question." Id. at 322.

      10.    Here, it is clear that for each of Mid-West Metal's 28 Interrogatories, the details

that are requested therein are related to the common subject or theme of the interrogatory. They

are logically and factually subsumed within and necessarily related to the primary question

presented in each. They do not constitute separate topics, subjects, or themes, are not "discrete"

subparts, and thus constitute a singular interrogatory. The numerosity limitation that the parties

agreed to has not been exceeded.

      11.    It should also be noted that Simpson Ventures' own conduct demonstrates that its

interpretation of the subparts numerosity limitation is overly rigid and hypertechnical.

Specifically, a simple review of the Interrogatories that it served on Mid-West Metal

demonstrates that it far exceeded the numerosity limitation – assuming for the sake of argument

(only) that its rigid and technical interpretation were adopted (which it should not be). A true

and accurate copy of Mid-West Metal's responses to Simpson Venture's discovery requests is

4

attached hereto as "Exhibit 3." Mid-West Metal did not assert any objection to those requests based on the numerosity limitation. Nonetheless, Simpson Ventures seeks to hold Mid-West Metal to a standard that it has already violated itself.

12.    Finally, by proceeding to choose which Interrogatories it wanted to respond to, and those to which it would object as too numerous, Simpson Ventures has waived its right to assert any such numerosity objection. Allahverdi v. Regents of the University of New Mexico, 228 F.R.D. 696, (D.N.M. 2005) ("When a party believes that another party has asked too many interrogatories, th[at] party . . . should object to all interrogatories or file a motion for protective order. The responding party should not answer some interrogatories and object to the ones to which it does not want to respond. By answering some and not answering others, the Defendants waive this objection."). Indeed, pursuant to this Court's Guidelines to Civil Discovery Practice, Simpson Ventures should have moved for a protective order if it truly felt there was a violation of the numerosity limitation – "if a party considers the number or breadth of interrogatories to be burdensome in the context of a particular case, it may of course move to a protective order." Guidelines at IV(A).

13.    Simpson Ventures has not objected to the information requested in Interrogatories 14 through 28 on any other basis. Nor could it reasonably do so. The information requested is clearly pertinent to the claims and defenses presented in this patent infringement case, as well as the damages claims being presented. The issues presented in any patent infringement case are complex. This point is particularly noteworthy in light of the fact that the parties did not request a separate schedule for claims construction (i.e., Markman hearing), infringement contention charts, and/or invalidity contention charts - as is typical for most patent infringement cases – but instead chose to attempt to address these issues through the normal avenues of written discovery.

Moreover, these requests seek information that only Simpson Ventures can provide, and the most efficient way to acquire such is through interrogatories.

14.     For all of these reasons, Mid-West Metal respectfully requests that this Court enter an order compelling Simpson Ventures to respond in full to Interrogatories 14 through 28.

### Mid-West Metal Needs Additional Time for its Experts' Disclosures

15.     Pursuant to the Report of the Parties' Planning Meeting of January 26, 2007, the parties had agreed to a schedule for expert witness disclosures – Simpson Ventures would have until May 25, 2007, and Mid-West Metal would have until July 25, 2007.

16.     Because the parties had engaged in good faith settlement efforts that concluded in mid-May 2007, Simpson Ventures requested on May 21, 2007 an extension of time to submit its expert reports. Mid-West Metal easily agreed to that extension. Simpson Ventures agreed that the extension would be reciprocal – that "what was good for the goose would be good for the gander." However, the Court then mooted Simpson Ventures' need for this agreement, when it entered its Scheduling Order of May 22, 2007, on this case. The Court therein gave Simpson Ventures a 30-day extension of time for its expert disclosures, *sua sponte* – to and including June 25, 2007. The Court did not therein extend the time for Mid-West Metal's disclosures – and the deadline remained set at July 25, 2007. A true and accurate copy of the parties' correspondence is attached hereto as "Exhibit 4."

17.     On or about July 18, 2007, Mid-West Metal requested Simpson Ventures' agreement to a similar 30-day extension of its expert witness deadline – to and including August 25, 2007. Simpson Ventures refused to accommodate that request – chastising Mid-West Metal for not being diligent, and stating that it was concerned about the discovery cutoff date of September 30, 2007. Simpson Ventures instead would only agree to a 1-week extension for

6

Mid-West Metals' expert disclosures on liability (August 1, 2007), and to a 3-week extension for Mid-West Metal's expert disclosures on damages (August 15, 2007). A true and accurate copy of the parties' correspondence is attached hereto as "Exhibit 5." Those dates have not yet passed.

18.    Mid-West Metal did not receive Simpson Ventures' responses to its written discovery requests until the night of July 23, 2007 (the date that Simpson Ventures had repeatedly asked to be moved back, and to which Mid-West Metal had repeatedly agreed without condition). The actual documents responsive to Mid-West Metal's discovery requests were not delivered until July 26, 2007, and the volume is such (close to 3,000 pages) that they are still being reviewed by counsel. As explained above, Simpson Ventures has refused to provide any information to Interrogatories 14 through 28, citing its objection based solely on the numerosity limitation.

19.    Mid-West Metal needs an additional period of time within which to make its expert disclosures. First, Mid-West Metal's experts' work (and the incurring of related expenses) was not commenced until after the parties had first determined that further efforts at settlement discussions would not be productive. That was not until after late May 2007. Simpson Ventures even cited to the same reason as a basis for requesting Mid-West Metal's agreement to an extension of its expert disclosures (which Mid-West Metal easily agreed to) – but which was then mooted when the Court entered its Scheduling Order giving Simpson Ventures a 30-day extension. Second, the discovery that was promptly commenced after settlement discussions concluded, includes information that is important to the work and analysis that the experts are conducting in this patent infringement litigation – indeed, Simpson Ventures has never objected on the basis that the discovery requests seek information that is not relevant

to the claims or defenses presented in this case. Even the partial production that has occurred was delayed – again, by Mid-West Metal's agreement to Simpson Venture's requests for extension – until just this week. Further, as explained above, Simpson Ventures has now refused to provide any substantive responses to Interrogatories 14 through 28. These interrogatories are on topics that are important to Mid-West Metal's experts analysis and work, on both liability and damages issues.

20.    The trial in this case is not scheduled until the March 10, 2008 term. There would be no prejudice to that trial setting if this Court were to enter an Order allowing Mid-West to obtain the information that it has requested and is entitled to, by compelling Simpson Ventures to respond in full to Interrogatories 14 through 28, and to do so promptly – within 14 days, for example. In addition, there would be no prejudice to the trial setting if this Court were to allow Mid-West Metal an additional period of time for its experts to review the supplemental information provided pursuant to Interrogatories 14 through 28, and incorporate such into their analysis and work – to within 7 days after production of such for Mid-West Metal's liability expert, and to within 21 days after production for such for Mid-West Metal's damages experts. To the extent Simpson Ventures has concerns about the September 30, 2007, discovery cut off date, Mid-West Metal has no objection to extending that deadline to a new date – as has been already communicated to Simpson Ventures.

WHEREFORE, premises considered, the Defendants respectfully requests:

(1)    That the Court issue an order that compels Plaintiff Simpson Ventures, Inc. ("Simpson Ventures") to respond to Interrogatory Numbers 14 through 28.

(2)    That the Court issue an order that extends Mid-West Metal's deadlines for its expert reports and disclosures, to a date that allows such experts a reasonable amount of time to review and incorporate Simpson Venture's responses to Interrogatory Numbers 14 through 28.

8

Respectfully submitted,

s/ Brett A. Ross
BRETT A. ROSS (ASB-6771-O76B)
GREGORY A. BROCKWELL (ASB-9949-R49B)

OF COUNSEL:

CARR ALLISON
100 Vestavia Parkway
Birmingham, AL 35216
(205) 822-2006
(205) 822-4058 (Direct Facsimile)
E-mail:bar@carrallison.com
        gab@carrallison.com

*Pro Hac Vice:*
James M. Hinshaw
Bingham McHale LLP
2700 Market Tower
10 W. Market Street
Indianapolis, Indiana 46204-4900
(317) 635-8900

Attorneys for Defendant Mid-West Metal
  Products Company, Inc.

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following on this the 27th day of July, 2007:

Robert T. Meadows, III
Capell & Howard, P.C.
3120 Frederick Road
P. O. Drawer 2268
Opelika, Alabama 36803

Arthur A. Gardner
Gardner, Groff, Santos & Greenwald, P.C.
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339

s/ Brett A. Ross
Of Counsel

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

SIMPSON VENTURES, INC., )
                                )

        Plaintiff,       )

                                )     Civil Act File No. 3:06-cv-901 WKW

v.                           )

                                )     **Demand for Jury Trial**

MID-WEST METAL        )
PRODUCTS                )
COMPANY, INC.        )

        Defendant.     )

_____)

                                )
MID-WEST METAL        )
PRODUCTS                 )
COMPANY, INC.,       )
        Counterclaimant,  )

                                )
v.                           )

                                )
SIMPSON VENTURES, INC., )

                                )
        Counterdefendant. )

_____)

## PLAINTIFF SIMPSON VENTURE'S ANSWERS TO FIRST SET OF INTERROGATORIES FROM DEFENDANT MID-WEST METAL

COMES NOW, Plaintiff Simpson, and for its answers to Defendant's First Set of Interrogatories, states as follows:

### GENERAL STATEMENT AND OBJECTIONS

Plaintiff Simpson has not concluded its investigation into the facts relating to this case, its formal discovery, or its preparation for trial. These answers represent said Plaintiff's reasonable effort to provide the information requested based upon information in its possession, custody or control, and based upon its current knowledge. Plaintiff reserves the right to produce information regarding subsequently discovered facts, to alter or amend these responses as set forth herein, and otherwise to assert factual and legal contentions as additional facts are ascertained, analyses are made and legal research completed.

Plaintiff objects to each and every Interrogatory insofar as it may be construed as limiting or restricting its right to rely upon any document or information for any purpose whatsoever, including but not limited to the use of responsive documents or information as evidence at any subsequent hearing, trial or proceeding.

Plaintiff objects to Defendant's First Set of Interrogatories in its entirety to the extent it seeks information or documents protected by any applicable privilege, including but not limited to the attorney/client privilege, the work product doctrine, the investigative and party communication privileges, and any other applicable privilege or exemption from discovery as outlined in the Federal Rules of Civil Procedure and applicable law, and Plaintiff hereby asserts such privileges and/or exemptions. Specifically, and without limiting the foregoing, letters, memoranda and other writings transmitted by or between Plaintiff and its counsel, or writing prepared and maintained internally by Plaintiff's counsel that have not been disclosed to third parties, are not included in these Answers.

Plaintiff will make reasonable efforts to respond to each Interrogatory, to the extent that no objection is made, as Plaintiff understands or interprets the Interrogatory. If Defendant or other parties hereto subsequently asserts any other interpretation or otherwise clarifies any of these Interrogatories at variance to Plaintiff's interpretation thereof, Plaintiff reserves the right to supplement or modify these Objections and Answers.

Plaintiff further objects to Defendant's instructions and definitions to the extent that the same seeks to impose a duty on this Plaintiff that would exceed the permissible scope of discovery under Rule 26 of the Federal Rules of Civil Procedure.

Many of the documents and responses requested concern matters protectable under the attorney-client privilege and/or the work product doctrine. Rather than to object and refer to these privileged matters question by question, a list of withheld documents will be produced with appropriate identification in accordance with the requirements of the Federal Rules of Civil Procedure after production of the discoverable documents is complete.

Subject to, and without waiving, the foregoing objections, Plaintiff answers as follows:

1.    Identify all witnesses, including expert witnesses, who will be called to testify in support of Simpson Venture's claims in this action. For each, state the nature and substance of the testimony which is expected to be given by each such witness, and state the relationship, if any, to the Plaintiff.

**RESPONSE:**

Objection.  Plaintiff objects to this interrogatory as premature and calling for protected work product.  Moreover, discovery is ongoing and the Plaintiff's investigation into this matter continues and as such Plaintiff does not now know what witnesses it will or may use at trial. Pursuant to the Court's order, prior to the trial, the parties are to exchange witness lists as part of the pre-trial order.  Thus, this requested information is premature and duplicative of the information to be produced as part of the pre-trial order.

Subject to the above objection, Plaintiff responds as follows:

**Mr. Robert Anders**
A Design Consultancy of Warwick, N.Y.
78 Continental Road
P.O. Box 609
Warwick, N.Y.  10990-0609

Mr. Anders is expected to testify as to the design patent and infringement thereof.

Mr. Anders is not related to Plaintiff Simpson Ventures.

**Mr. Mark Gallagher**
Duff & Phelps
10 Tenth Street, Suite 1030
Atlanta, GA  30309

4

Mr. Gallagher is expected to testify as to the damages and financial matters.

Mr. Gallagher is not related to Plaintiff Simpson Ventures.


**Mr. Jeff Simpson**
President
Simpson Ventures, Inc.
480 N. Dean Rd., Suite E
Auburn, AL  36830

Mr. Simpson is expected to testify about the conception of the invention, the '156 Patent, the construction and appearance of the Defendant's products; the impact of Defendant's entry into the market on Plaintiff Simpson, and other matters, inter alia.

Mr. Simpson is the patent holder and President of Simpson Ventures, Inc.


**Ms. Kathy Simpson**
Vice President/Treasurer
Simpson Ventures, Inc.
480 N. Dean Rd., Suite E
Auburn, AL  36830

Kathy Simpson may testify about the conception and reduction to practice of the invention, the impact of Defendant's infringement in the market and the history and performance of Simpson Ventures, Inc.

Kathy Simpson is the spouse of patent holder Jeff Simpson and is Vice President/Treasurer of Simpson Ventures, Inc.


**Mr. Bernie Kelley**
Vice President
Vigor International HK Ltd.
3141 Montclair Ave.

Lewis Centre, OH 43035

Mr. Kelley may testify about the prototype development and production thereof of products as shown in the '156 Patent.

Mr. Kelly is the Sourcing Agent for Simpson Ventures, Inc.


**Ms. Donna Belenchia**
Customer Service Mgr.
Simpson Ventures, Inc.
814 Lakeshore Ave.
Opelika, AL 36801

Ms. Belenchia may testify about customer service issues regarding the product shown in the '156 Patent, and about confusion in the market place between Simpson Ventures' products and those of Defendant Mid-West Metal Products.

Ms. Belenchia is the Customer Service Manager for Simpson Ventures, Inc.

   2.    List specifically and describe in detail each and every exhibit
you will or may utilize at the trial in this matter.  This interrogatory is
directed both to exhibits you intend to use at trial, and exhibits you may use.

**RESPONSE:**

   Objection.  Plaintiff objects to this interrogatory as premature and
calling for protected work product.  Moreover, discovery is ongoing and the
Plaintiff's investigation into this matter continues and as such Plaintiff does
not now know what exhibits it will or may use at trial.  Prior to the trial, the
parties are to exchange exhibit lists as part of the pre-trial order.  Thus, this
requested information is premature and duplicative of the information to be
produced as part of the pre-trial order (and therefore it is unduly burdensome
to try to produce such now).  Moreover, even if such a list were to be
compiled at this time (with considerable effort), such a list likely would
differ substantially from the list of exhibits compiled for the pre-trial.

3.    Please identify every person who participated, assisted, or was involved in any way in the creation and/or development of the design that is the subject of the `156 Patent, and describe in detail each person's role in the development and/or creation of that design.

**RESPONSE:**

Jeff Simpson.

Jeff Simpson conceived of and developed the design that is the subject of the '156 patent. The involvement of others was limited to the fabrication of one or more prototypes at Mr. Simpson's direction.

4.    Please describe in detail when and how the claimed invention was conceived, and then reduced to practice. Include in your answer the date when the inventor(s) first conceived of the claimed invention, and state the earliest date it was reduced to practice. Also, include in your answer the dates of the first drawing and written description of the claimed invention.

**RESPONSE:**

Plaintiff objects to this interrogatory as vague and indefinite in that there is no definition of what type of "written description" is referred to in the interrogatory. This could be interpreted to mean any kind of writing that in any way refers to the invention or could be interpreted to mean a detailed, technical description of the various features shown in the '156 Patent. Subject to this objection, Plaintiff answers as follows:

While employed as Director of Marketing at Doskocil Manufacturing Co., Inc. in Arlington TX from 1997 to 1999, the inventor, Jeff Simpson, had a notion that many consumers might not be satisfied with the aesthetic quality of a plastic carrier or wire kennel as an indoor pet containment device. He initiated a project with the Doskocil product development group while at Doskocil to develop indoor containment that replicated indoor occasional furniture. Two prototypes were developed, one of which was in

9

the form of an end table and the other a corner table. The prototypes were fabricated from particle board construction with imitation wood grain melamine surfaces. The project was dropped due primarily to the fact that the articles looked like cheap pieces of knock-down furniture which would most likely not match a consumer's indoor décor.

In late May 2001 Jeff Simpson and Jared Simpson (inventor's son) purchased an outdoor porch swing for Kathy Simpson as a Mother's Day present. The outdoor porch swing was manufactured with a metallic tubular frame and had a woven resin wicker material covering. While employed as a sales and marketing manager for GDA, LLC, in early September 2001 while sitting on the porch swing at his home, Jeff Simpson came up with the concept of a decorative indoor pet home utilizing resin wicker on a steel frame. He felt that an aesthetically pleasing product could be manufactured according to this design.

With the help of GDA, LLC, Mr. Simpson developed a first prototype design for a decorative pet home covered with a woven, wicker-look material. Thereafter, Mr. Simpson left the employ of GDA, LLC and continued to develop his ideas further.

In early 2002 Mr. Simpson continued to develop his decorative pet home design and began marketing the product to potential customers. His

business plan was to offer the product to pet catalogs companies, pet distributors and high-end general merchandise catalogs companies, and once the product concept gained acceptance, offer the product line in more mass retail-type settings. The design shown in the '156 Patent is believed to have been finalized in April or May, 2002 and the first production order was placed in May 2002. The '156 design patent was filed on May 2, 2002. A subsequent Provisional Utility Patent was filed on July 3, 2002 and Non-provisional Utility Patent filed on July 2, 2003.

The date of the first drawing (or image) of the design shown in the '156 Patent is believed to be sometime in April, 2002.

The date of the first written description of the design shown in the '156 Patent is believed to coincide with the filing of the design patent application in May 2002.

5.     Identify all documents and things, including but not limited to patents and printed publications, made known to and/or considered by each person identified in response to Interrogatory #3 in creating, conceiving, and/or developing the design that is the subject of the `156 Patent.

**RESPONSE:**

Plaintiff objects on the basis that the interrogatory is vague, indefinite and overbroad. For example, at the time that Mr. Simpson conceived of and/or developed the invention shown in the '156 Patent, by that stage in his life he had been made aware of countless documents and things and there is no way of recounting all the documents and things that a person has known of over his lifetime. On its face the interrogatory is not limited to only those documents and things that Mr. Simpson had in mind at the time of the invention, and so the interrogatory would encompass a lifetime's accumulation of knowledge (even things he had forgotten). Subject to this objection, Plaintiff responds by identifying documents and things that the inventor was specifically aware of at the time of conceiving and/or developing the invention shown in the '156 Patent as follows.

Plaintiff's investigation into this interrogatory is not complete and Plaintiff declines to provide an incomplete (and perhaps incorrect) answer at

12

this moment. Plaintiff intends to supplement this response once the

investigation is completed and it is anticipated that the supplemented answer

should be forthcoming soon.

6.    Please describe in detail the circumstances of the first time that the design that is the subject of the '156 Patent was disclosed to a person who was not an employee or representative of Simpson Ventures. Include in your answer the date, the identity of all persons with knowledge of such, and identify all documents related to such.

**RESPONSE:**

It is believed that the design that is the subject of the '156 Patent was first disclosed to Taresa Perry of Jeffers Pet in Dothan, Alabama.

The date of such initial disclosure is believed to be around March 2002.

The identity of persons believed to have knowledge of such is as follows: Jeff Simpson; Ruth Jeffers; and Taresa Perry.

At this time, Plaintiff Simpson is unaware of any existing documents related to such.

14

7.    Please identify the date on which you first offered for sale any product that embodied the design that is the subject of the `156 Patent. For that event, please identify all terms and conditions of the offer, describe in detail how it was made or communicated, to whom it was made or communicated, and identify all documents that relate to such.

**RESPONSE:**

To the best of Jeff Simpson's recollection, the first offer for sale of any product that embodied the design of the '156 Patent was an offer to Jeffers Pet on or around March 2002.

The terms of the offer for sale are not recollected at this time.

The offer for sale was made in person by Jeff Simpson and Jeff Simpson no longer has any documents relating to the offer.

The offer for sale was communicated to Ruth Jeffers and/or Taresa Perry of Jeffers Pet.

Jeff Simpson no longer has any records relating to the offer for sale due partly to a computer hard drive crash in July 2004.

8.     For all sales, or offers of sale, of any products that embody the design that is the subject of the `156 Patent, where such sales occurred prior to May 2, 2001, please describe in detail the item sold, identify the seller/offeror and purchaser/offeree, state the date, identify all terms and conditions related to such, identify all documents related to such, and identify all persons with knowledge concerning such.

**RESPONSE:**

There are no such sales or offers for sale.  Thus, Simpson cannot describe in detail the item sold, cannot identify the seller/offeror and purchaser/offeree, cannot state the date of such, cannot identify all terms and conditions related to such, cannot identify all documents related to such, and cannot identify all persons with knowledge concerning such.

9.    For all uses of any items or products that embody the design that is the subject of the `156 Patent, where such uses occurred prior to May 2, 2001, please describe in detail the item or product used, describe in detail the nature of the use(s), state the date, identify all documents related to such, and identify all persons with knowledge concerning such.

**RESPONSE:**

There are no such uses.

As there are no such uses, Plaintiff Simpson cannot identify the item or product used, cannot state a date for such, cannot identify documents related to such, and cannot identify persons with knowledge of such.

10.   If you contend that sales, offers for sale, disclosures, and/or uses of any embodiments of the design that is the subject of the `156 Patent prior to May 2, 2001, do not constitute sales, offers, disclosures, or public uses that would invalidate the `156 Patent, then please identify in detail all factual and legal bases for that contention, identify all witnesses with knowledge of those facts, and identify each and every document that contains factual information relating to that contention.

**RESPONSE:**

There are no such sales, offers for sale, disclosures, and/or uses prior to May 2, 2001.

As there are no such sales, offers for sale, disclosures, and/or uses, Plaintiff cannot identify factual and legal bases for such a contention, cannot identify knowledgeable witnesses, and cannot identify documents related thereto.

11.    Please identify with specificity all "points of novelty" of the design that is the subject of the '156 Patent. In your response, please itemize and describe with particularly the prior art from which these points of novelty are contended by you to be distinct.

**RESPONSE:**

Objection.    Plaintiff Simpson objects to this interrogatory as premature in that Plaintiff's investigation into this matter is continuing. Furthermore, the interrogatory calls for the identity of <u>all</u> prior art from which the patented design is contended to be distinct, which would encompass all patents and things then in existence. Subject to these objections, Plaintiff answers as follows.

The points of novelty include a pet home having a woven outer texture with the appearance of wicker, rattan or the like, the woven texture appearing on the top, non-window portions of the sides and rear, and on a non-door portion of the front.

The prior art from which this point of novelty is distinct includes the prior art cited during the prosecution of the '156 Patent.

12.    Please identify with specificity all aspects of the design that is the subject of the `156 Patent that are ornamental.

**RESPONSE:**

Objection.    Plaintiff Simpson objects to this interrogatory as premature in that Plaintiff's investigation into this matter is continuing. Subject to this objection, Plaintiff answers as follows.

a.  Overall Ornamental Silhouette.  A box shaped pet home that is longer than it is wide or tall, which includes a woven texture outer surface having the appearance of wicker or rattan.

b.  Overall Ornamental Appearance.  The overall ornamental appearance is of a pet home with a woven texture surface with the appearance of wicker or rattan on some portion or entirety of each of the 5 panels or faces claimed in the '156 Patent. The front panel has a non-door portion that is covered in a woven wicker-look material and a rectangular door portion, which is not so covered.  The sides are each covered with a woven wicker-look material, except for a window opening that is not so covered.  The rear face is covered with a woven wicker-look material, except for a window opening that is not so covered.

13.    Please identify with specificity all aspects of the design that is the subject of the `156 Patent that are functional.

**RESPONSE:**

Objection.    Plaintiff Simpson objects to this interrogatory as premature in that Plaintiff's investigation into this matter is continuing. Subject to this objection, Plaintiff answers as follows.

The functional features include the pet residence or pet home having the following features:

a. feet for supporting the pet home upon the floor;

b. a non-covered pivoting door on the front thereof to enable the pet to go into and out of the pet home;

c. a latch for securing the door in place for securing the pet in the pet home;

d. non-covered windows formed in the sides and the back;

e. mechanical features along the edges and at the corners thereof for holding the structure together, including fasteners and links;

f. a tray or bottom pan;

g. a tray latch; and

h. a framework to which the woven wicker-look material is applied.

14.    Please describe in detail, and not merely in summary form, each and every difference between the design that is the subject of the `156 Patent, and the Accused Products.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

15.    Please identify and describe with particularity all studies, surveys and/or polls, and the results therefrom, relating to what an ordinary observer believes, thinks, feels, observes, concludes, etc. when observing the Accused Products in relation to and/or in comparison with the design that is the subject of the `156 Patent.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

**16.**    Please identify and describe with particularity all products or items that embody or otherwise reduce to practice the design that is the subject of the `156 Patent.    Please separately identify these, where appropriate, as (i) products or items that are manufactured by or on behalf of Simpson Ventures; (ii) products or items that are manufactured by third parties but with the permission of Simpson Ventures (including under any license agreement); and (iii) products or items that are manufactured by third parties without the permission of Simpson Ventures (excluding Plaintiff's allegations regarding the Accused Products at issue in this lawsuit).

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts.    As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

17.    Please identify and describe with particularity all instances of actual or apparent confusion between any product(s) or item(s) embodying the '156 Patented design and the Defendant's Accused Products. Include in your answer the identity of all persons with knowledge of the facts relating to such confusion. This interrogatory includes all instances where customers (or potential customers) have mistaken Mid-West Metal's Accused Products for a product/item embodying the '156 Patented design, or where customers (or potential customers) were deceived into purchasing a Mid-West Metal's Accused Product, believing it to be a product/item that embodies the '156 Patented design.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

18.    For each and all of Simpson Venture's products or items that embody the design that is the subject of the '156 Patent, please state the following information:

    (a)   how many of each product Simpson Ventures has produced for each year in which Simpson Ventures has produced such products;

    (b)   how many of each product Simpson Ventures has sold for each year in which Simpson Ventures has sold such products;

    (c)   how much gross revenue Simpson Ventures obtained from such sales of each such product for each year in which sales were made; and

    (d)   how must it cost Simpson Ventures to produce, sell, deliver, and service each such product for each year in which sales were made. In this aspect of your answer, please separately itemize by category and amount the costs and expenses associated with the following - manufacturing/production, marketing/advertising, transportation/delivery/distribution, administration and overhead costs, licensing fees, warranty/customer complaint costs, and any other costs.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the

parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts.  As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

19. Please identify and describe in detail Simpson Venture's manufacturing capabilities – including, but not limited to, any facilities that it owns or operates (and their locations), any OEM arrangements that it has with other manufacturers, and its daily/monthly/quarterly/annual production capacities. Please describe in detail any changes to such capabilities that have occurred since January 1, 2000, and identify such changes by date.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

20.    Please describe in detail, and specifically quantify, all of Simpson Venture's claims for damages arising out of its allegation that Mid-West Metal has infringed the `156 Patent. This includes claims, if any, for price erosion.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

21.)  If Simpson Ventures contends that there are any secondary indicia of non-obviousness relevant to the design that is the subject of the '156 Patent, then please state all facts and information pertaining to such, describe the asserted relationship between such, identify each person having knowledge of facts and/or an opinion of such, and identify each document pertaining to such.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts.  As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

22.) Identify and describe in detail all instances in which Simpson Ventures contends that it has provided notice of its alleged patent rights under the `156 Patent under 35 U.S.C. § 287, including but not limited to, the marking of products covered by the `156 Patent. For each such instance, provide the date, identify each person with knowledge of such facts, and identify each document relating to such.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

23.    Please identify each instance where Simpson Ventures has obtained any information regarding any knowledge or confusion whatsoever on the part of any person as between the source, affiliation, or sponsorship of its wicker (or wicker-like) pet cages/home products (or any form of advertisement therefore) and the source, affiliation, or sponsorship of any Mid-West Metal's pet cages/home products (or any form of advertisement therefore) including the date and location of each such occurrence, the identity of the person who was confused, and the identity of all persons who witnessed or have knowledge of each such instance of confusion.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts.  As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

32

24.    Please state in detail the terms of engagement between Simpson Ventures and its lawyers in this litigation, including but not limited to, the terms relating to attorney's fees and litigation costs. In addition, please state the number of hours your attorneys have spent in pursuing this litigation.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

25.)    State in detail all facts that are the basis for Simpson Venture's claim that Mid-West Metal's alleged infringement of the `156 Patent was and/or is willful, identify each witness that has personal knowledge of those facts, and identify each document that contains information relating to those facts.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

26.    Identify all instances in which Simpson Ventures has communicated a cease and desist request/demand (or words to that effect) to any third party. For each such instance, provide the date, the targeted third party, a description of the rights being asserted, a description of the targeted third party's response, the identities of all persons with knowledge of such, and the identity of each document relating to such.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

27.    Identify all license agreements relating to pet products to which

Simpson Ventures is or has ever been a party.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits,

including subparts, stipulated in the parties' Report of the Parties' Planning

Meeting filed with the Court on or about January 26, 2007 in which the

parties agreed to be limited to 30 interrogatories, including subparts, and in

violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories,

including subparts. As Defendants' interrogatories above already number up

to 30, including subparts, Plaintiff is under no obligation to answer this or

the remaining interrogatories and hereby declines to answer.

28.    Identify all other lawsuits or claims of infringement by or against Simpson Ventures that relate to any product or item having any portion or components comprising or having the appearance of wicker, rattan, woven resin strand, or other woven material.

RESPONSE:

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or any remaining interrogatories and hereby declines to answer.

I AFFIRM UNDER PENALTIES OF PERJURY THAT THE INFORMATION SET FORTH HEREIN IS TRUE AND ACCURATE TO THE BEST OF MY KNOWLEDGE

7/23/2007

Jeffrey M. Simpson

37

As to Objection:

Respectfully submitted,

Arthur A. Gardner
Gardner, Groff, Greenwald &
Villanueva, P.C.
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339
*Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was duly forwarded to all counsel of record and interested parties on this 23rd day of July, 2007, via United States mail, postage prepaid, as follows:

James M. Hinshaw
Bingham McHale LLP
2700 Market Tower
10 W. Market Street
Indianapolis, IN  46204-4900
(317) 635-8900
*Pro Hac Vice*

Brett A. Ross
Carr Allison
100 Vestavia Parkway
Birmingham, Alabama  35216
(205) 822-2006

(And via Email to James M. Hinshaw at jhinshaw@bringhammchale.com)

*Attorneys for Defendant Mid-West Metal Products Company, Inc.*

Arthur A. Gardner
Gardner, Groff, Greenwald &
Villanueva, P.C.
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339

EXHIBIT 2

# Bingham ● McHale LLP

## attorneys at law

James M. Hinshaw
Attorney
Direct: (317) 968-5385
jhinshaw@binghammchale.com

July 25, 2007

Arthur A. Gardner, Esq.
Gardner Groff Santos & Greenwald, PC
100 Parkwood Point
2018 Powers Ferry Road, Suite 800
Atlanta, GA 30339

      Re:    Simpson Ventures, Inc. v. Mid-West Metal Products Company, Inc.
              U.S. District Court, Middle District of Alabama (Eastern Division)
              Cause No. 06-cv-00901-WKW-VPM
              Our File No. 11128-64696

Dear Art:

    I am writing with regard to Simpson Ventures' responses to Mid-West Metal's First Set of Interrogatories – which you served at 8:08 p.m. on Monday night (July 23), and that I first viewed yesterday morning (July 24).

    Specifically, I am writing to request that your client promptly supplement its responses to Interrogatories 14 through 28. You have asserted for each an objection to the number of interrogatories served, and on the basis of that position, Simpson Ventures has refused to produce any responsive information.

    First, it is clear that our number of Interrogatories does not exceed the 30 Interrogatories limitation that the parties stipulated to in the Parties' Report of the Planning Meeting, submitted to the Court on January 26, 2007. We submitted only 28 Interrogatories.

    Second, your objection is thus necessarily based on the premise that our Interrogatories contain too many subparts. Your interpretation of what constitutes a subpart is not correct. As the Advisory Committee Notes to the 1993 Amendments to FRCP 33(a) make clear, the purpose of the rule is to prevent adding to an Interrogatory areas of inquiry that are discrete[1] from the subject of the interrogatory, and to thus do an end-run around the numerosity limitation. Id. ("a question asking about communications of a particular type should be treated as a single

---

[1] The New Oxford American Dictionary defines discrete as "individually separate and distinct."

Arthur A. Gardner, Esq.
July 25, 2007
Page 2

interrogatory even though it requests that the times, place, persons present, and contents be stated separately for each such communication."). See also WRIGHT & MILLER, 8A FEDERAL PRACTICE AND PROCEDURE §2168.1 (1994 Ed.) ("an interrogatory containing subparts directed at eliciting details concerning a common theme should be considered a single question"). It is clear that for each of our Interrogatories, the details that are called out for and requested therein for each are related to the common subject or theme of the interrogatory. They are logically and factually subsumed within and necessarily related to the primary question presented in each. They do not constitute separate topics, subjects, or themes, are not "discrete" subparts, and thus constitute a singular interrogatory. Again, the numerosity limitation that we agreed to has not been exceeded.

Third, it is clear that by proceeding to select the Interrogatories that Simpson Ventures would choose to respond to and those to which it would object on this erroneous numerosity position, Simpson Ventures has waived its right to object at all on this basis. Allahverdi v. Regents of the University of New Mexico, 228 FRD 696, (D.N.M. 2005) ("When a party believes that another party has asked too many interrogatories, th[at] party . . . should object to all interrogatories or file a motion for protective order. The responding party should not answer some interrogatories and object to the ones to which it does not want to respond. By answering some and not answering others, the Defendants waive this objection.").

Fourth, while I am not accusing you of improper motives here, I cannot help but comment that the motives behind your objection seem very curious. This is a patent infringement case. The issues presented in any patent infringement case are complex and numerous. The information we have requested is not onerous or overly broad – particularly where the parties have not yet asked the Court for a separate set of procedures for claim construction, infringement contentions, and/or invalidity contentions. Indeed, I note that you do not even assert such grounds of undue burden or irrelevancy as the basis for your refusal to respond to Interrogatories 14 through 28 (and have thus waived any such objections). The sole basis for Simpson Ventures' numerosity objection is this overly rigid (and erroneous) interpretation of subparts. Further, the information we have requested – which is only obtainable through Simpson Ventures - is very important to our experts' analysis and reports, and they cannot complete their work without having considered Simpson Ventures' responses to these Interrogatories – your objections (communicated for the first time) thus come at a critical time when you have refused to agree to our requested extensions of time, despite our repeated agreements to accommodate your several requested extensions of time (with no strings attached). The delay that you are causing with this objection will thus further delay the completion of that work. Absent your consent to a reasonable extension of time for them to review your client's supplemental responses upon receipt thereof, we will be compelled to move the Court for an extension of the August 1 and August 15 deadlines presently in place. Finally, the curious nature of your motives here is further demonstrated by the fact that you have submitted Interrogatories that would have clearly far exceeded the numerosity limitation that you are now seeking to use to

Arthur A. Gardner, Esq.
July 25, 2007
Page 3

prevent our clearly legitimate discovery efforts - were we to have adopted your erroneous and overly rigid interpretation of subparts (which we did not). Unfortunately, it is becoming more and more clear to me that your statement to me early in this case that "what is good for the goose is good for the gander" was nothing more than hollow words.

In summary, your interpretation of the limitation on the number of interrogatories is wrong – specifically, your interpretation of what a subpart is, is wrong. Further, even if your rigid position is correct, the information that we have asked for is crucial to our analysis of the case and our preparations for trial – including the work of our experts. We have no desire to involve the Court and waste its resources to resolve this matter. However, if Simpson Ventures will not agree to promptly supplement and to extend the expert report deadlines, then you will have forced us to file a motion with the Court asking that Simpson Ventures be compelled to produce the information we have requested and are entitled to, and to move the expert deadlines.

Please consider these points, and please let me know your position on this. If I do not hear from you by the close of business on July 26, I will assume that you have no intention of supplementing Simpson Ventures' responses to Interrogatories 14 through 28, and no intention of agreeing to reasonably extend the August 1 and August 15 deadlines for our expert reports (to new deadlines that would be based on the date we receive Simpson Ventures' supplemental responses). Thank you.

Sincerely,

James M. Hinshaw

JMH:lac/1174834
cc:    Brett A. Ross, Esq.

EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## <u>EASTERN DIVISION</u>

| | |
|---|---|
| SIMPSON VENTURES, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>MID-WEST METAL PRODUCTS )<br>COMPANY, INC. )<br><br>Defendant. )<br>─────────────────────────)<br><br>MID-WEST METAL PRODUCTS )<br>COMPANY, INC., )<br><br>Counterclaimant, )<br><br>v. )<br><br>SIMPSON VENTURES, INC., )<br><br>Counterdefendant. ) | Civil Action File No. 306CV-901-WKW<br><br>**Demand for Jury Trial** |

### MID-WEST METAL'S RESPONSES TO
### <u>PLAINTIFF'S FIRST SET OF INTERROGATORIES</u>

Defendant Mid-West Metal Products Company, Inc., ("Mid-West Metal"), by counsel,

does hereby submit its responses to the First Set of Interrogatories served by Plaintiffs.

### <u>General Objections</u>

Mid-West Metal objects to the definitions and instructions to the extent Plaintiff is attempting to impose discovery response obligations that exceed those obligations established by the Federal Rules of Civil Procedure and/or this Court's local rules and requirements. Mid-West Metal will comply with its discovery response obligations as established by the Federal Rules of Civil Procedure and this Court's local rules and requirements.

Mid-West Metal objects to the definitions proposed by the Plaintiff. Mid-West Metal will respond according to the reasonable and plain meaning of the words used by the Plaintiff.

Plaintiff has propounded several requests that are so broadly worded as to call for the production of information that clearly includes confidential attorney-client communications, information that was prepared in anticipation of litigation, and information that includes attorney work product. To prepare a privilege log for all privileged documents created after this litigation was commenced would be unduly burdensome. Accordingly, subject to and without waiving its objections and privileges, Mid-West Metal will limit its privilege log to those documents created before this litigation was commenced on or before October 6, 2006.

### Interrogatory Responses

1.     Identify all pet containment products (whether referred to as pet cages, crates, homes, carriers, beds, or by other product designation) that the defendant designs, manufactures, distributes, assembles, uses, sells, offers for sale, or imports into the United States, which include any portion or components comprising or having the appearance of wicker, rattan, woven resin strand, or other woven material.

**RESPONSE:**

Mid-West Metal states that the only such products that it sells are its Bay Isle line of products – Models 1805, 1824, 1830, 1836, and 1842.

2.     For each product identified in response to Interrogatory No. 1, identify all sales of said products, including without limitation the sales volume in terms of units sold and sales revenue (in US currency), the date of said sales, the customer to whom the products were sold, and the number of units returned for which a refund was made.

**RESPONSE:**

Objection. This request is vague and ambiguous, overly broad, and unduly burdensome. Subject to and without waiving these objections, Mid-West Metal states that the following table reflects its annual sales and units sold (through May, for 2007), by model.

| Year | 1805 | |
|---|---|---|
| | Qty | $ |
| 2003 | - | - |
| 2004 | 4,285 | 113,645.59 |
| 2005 | 1,875 | 65,240.57 |
| 2006 | 2,842 | 97,760.07 |
| 2007 Jan through May | 1,261 | 41,258.40 |
| Total | 10,263 | $317,904.63 |

| Year | 1824 | |
|---|---|---|
| | Qty | $ |
| 2003 | 2,419 | 94,828.97 |
| 2004 | 7,954 | 317,546.26 |
| 2005 | 3,815 | 149,335.92 |
| 2006 | 3,464 | 143,637.71 |
| 2007 Jan through May | 1,681 | 64,154.83 |
| Total | 19,333 | $769,503.69 |

| Year | 1830 | |
|---|---|---|
| | Qty | $ |
| 2003 | 2,084 | 104,058.29 |
| 2004 | 4,072 | 198,935.32 |
| 2005 | 2,213 | 110,999.34 |
| 2006 | 2,611 | 133,298.17 |
| 2007 Jan through May | 1,017 | 50,416.84 |
| Total | 11,997 | $597,707.96 |

| Year | 1836 | |
|---|---|---|
| | Qty | $ |
| 2003 | 1,789 | 121,557.40 |
| 2004 | 2,907 | 183,093.39 |
| 2005 | 1,586 | 107,153.92 |
| 2006 | 1,273 | 90,337.26 |
| 2007 Jan through May | 636 | 41,516.75 |
| Total | 8,191 | $543,658.72 |

| Year | 1842 | |
|---|---|---|
| | Qty | $ |
| 2003 | - | 0 |
| 2004 | 419 | 38,313.04 |
| 2005 | 1,064 | 87,565.95 |
| 2006 | 1,136 | 92,413.15 |
| 2007 Jan through May | 472 | 36,618.68 |
| **Total** | **3,091** | **$254,910.82** |

Further, Mid-West Metal states that it has sold such products to the following entities:

AAFES
AMAZON.COM
ANDERSONS THE
ANIMAL HEALTH PRODUCTS
ANIMAL SUPPLY COMPANY
ANIMAL SUPPLY LOG LLC
ATWOOD DISTRIBUTING, INC.
BOSTON'S PET SUPPLY, INC.
BRADLEY CALDWELL
BRADY COMPANY, JOSEPH M
CARE-A-LOT
CARIBBEAN PET SUPPLY
CENTRAL PET/KENLIN DIV.
CENTRAL PET--TAMPA
DOG SHOW SPECS - SAC
DRESSLER PET SUPPLY
FOR HAPPY DOGS.COM
FREEDOM PET SUPPLIES
GENERAL PET SUPPLY INC
GENERAL PET, INC.
H & H DISTRIBUTING
HOUSE OF PET SUPPLIES
HUB INTERNATIONAL
IMPERIAL PET PRODUCTS
ITASCA PET PRODUCTS
JACK'S AQUARIUM & PET
J-B WHOLESALE
JEFFERS VET SY - DOTHAN
JEMAR PET SUPPLY
K V VET SUPPLY COMPANY
KENNEL VET CORPORATION
KING WHOLESALE PET SYS

PET EXPO
PET FOOD EXPERTS
PET PROFESSIONAL CHOICE
PET WORLD WAREHOUSE
PETAROO
PETCO
PETCO.COM
PETCRATESDIRECT.COM
PETEDGE
PETFOODDIRECT.COM
PETLANE
PETS UNITED LLC
PETsMART, INC.
PETSR4U.COM
PHILLIPS FEED & PET SY
PJ'S PET CENTRES
REN'S FEED & SUPPLIES LTD
REVIVAL ANIMAL HEALTH
ROCKBOTTOMPETSUPPLY.COM
RYAN'S PET SUPPLIES
S & S SUPPLIES
SHOP CAROLINA, INC.
SOLUTIONS
SOUTHEAST PET
SPEEDY PET TAGS
STACKS & STACKS HOMEWARES
SUMMIT PET PRODUCTS DIST
SUPER-DOG PET FOOD CO.
THE PAMPERED PET MART
TREASURE COAST PET PROD
U P C O - ST JOSEPH
UNITED PACIFIC PET

4

LADS PET SUPPLIES
LION COUNTRY SUPPLY, INC.
LONE STAR PET SUPPLY
LOVELAND PET PRODUCTS
MARTHA'S PLACE
MIDDLE WEST DISTRIBUTOR
MIGHTYPETS.COM
NEEPS INC.
NETSHOPS, INC.
NEXT DAY PETS, L.L.C.

UTM DISTRIBUTING, INC.
VERMONT PET FOOD & SY

Mid-West Metal has attempted to identify and quantify any refunds or returns. While such have occurred, the company does not formally track such and cannot respond further at this time.

3.    For each product identified in response to Interrogatory No. 1, identify

Defendant's average costs of goods sold and profit margins, providing a description of any

financial assumptions made in calculating such average costs of goods sold and profit margins.

RESPONSE:

Mid-West Metal responds as follows:

| Year | 1805 | | | | | |
|------|-------|----------|--------------|--------|------------|-------|
|      | Sales | Cost (a) | Gross Profit | SG&A | Net Profit | % |
| 2003 | -     | -        | -            | -      | -          | 0.0% |
| 2004 | 113,646 | 74,967 | 38,678 | 28,411 | 10,267 | 9.0% |
| 2005 | 65,405 | 32,995 | 32,410 | 16,351 | 16,059 | 24.6% |
| 2006 | 97,760 | 49,982 | 47,778 | 24,440 | 23,338 | 23.9% |
| 2007 | 44,776 | 24,718 | 20,058 | 11,194 | 8,864 | 19.8% |
| Total | 321,587 | 182,663 | 138,924 | 80,397 | 58,527 | 18.2% |

| | 1824 | | | | | |
|------|-------|----------|--------------|--------|------------|-------|
|      | Sales | Cost (a) | Gross Profit | SG&A | Net Profit | % |
| 2003 | 94,829 | 51,789 | 43,040 | 23,707 | 19,333 | 20.4% |
| 2004 | 317,556 | 158,534 | 159,023 | 79,389 | 79,633 | 25.1% |
| 2005 | 149,508 | 80,383 | 69,125 | 37,377 | 31,748 | 21.2% |
| 2006 | 143,638 | 73,417 | 70,220 | 35,909 | 34,311 | 23.9% |
| 2007 | 68,116 | 38,771 | 29,345 | 17,029 | 12,316 | 18.1% |
| Total | 678,818 | 351,105 | 327,713 | 169,704 | 158,008 | 23.3% |

|       | 1830 | | | | | |
|-------|---------|---------|--------------|--------|------------|--------|
|       | Sales   | Cost (a) | Gross Profit | SG&A   | Net Profit | %      |
| 2003  | 104,058 | 58,467  | 45,591       | 26,015 | 19,577     | 18.8%  |
| 2004  | 200,469 | 106,875 | 93,594       | 50,117 | 43,476     | 21.7%  |
| 2005  | 111,201 | 60,924  | 50,277       | 27,800 | 22,477     | 20.2%  |
| 2006  | 133,298 | 72,681  | 60,617       | 33,325 | 27,293     | 20.5%  |
| 2007  | 53,790  | 30,965  | 22,825       | 13,447 | 9,377      | 17.4%  |
| Total |         | 498,758 | 227,313      | 124,689 | 102,623   | 20.6%  |

|       | 1836 | | | | | |
|-------|---------|---------|--------------|--------|------------|--------|
|       | Sales   | Cost (a) | Gross Profit | SG&A   | Net Profit | %      |
| 2003  | 121,557 | 65,748  | 55,810       | 30,389 | 25,421     | 20.9%  |
| 2004  | 185,226 | 90,720  | 94,507       | 46,307 | 48,200     | 26.0%  |
| 2005  | 107,976 | 53,367  | 54,609       | 26,994 | 27,615     | 25.6%  |
| 2006  | 90,411  | 78,083  | 12,328       | 22,603 | (10,275)   | -11.4% |
| 2007  | 48,050  | 25,639  | 22,411       | 12,013 | 10,399     | 21.6%  |
| Total | 431,664 | 247,808 | 183,856      | 107,916 | 75,940    | 17.6%  |

|       | 1842 | | | | | |
|-------|---------|---------|--------------|--------|------------|--------|
|       | Sales   | Cost (a) | Gross Profit | SG&A   | Net Profit | %      |
| 2003  | -       | -       | -            | -      | -          | 0.0%   |
| 2004  | 38,313  | 19,645  | 18,668       | 9,578  | 9,090      | 23.7%  |
| 2005  | 87,912  | 46,824  | 41,087       | 21,978 | 19,109     | 21.7%  |
| 2006  | 92,413  | 49,801  | 42,613       | 23,103 | 19,509     | 21.1%  |
| 2007  | 41,117  | 23,806  | 17,311       | 10,279 | 7,032      | 17.1%  |
| Total | 259,755 | 140,077 | 119,679      | 64,939 | 54,740     | 21.1%  |

4.      For each product identified in response to Interrogatory No. 1, identify the

persons involved in or knowledgeable of the facts surrounding the design of such products, the

decision of whether or how to make or sell such products, including without limitation the

identification of each person who contributed to the product conception, product design,

selection of manufacturer, pricing structure, and marketing strategies; and when, how and by

whom the decision was made to include the portion or components comprising or having the

appearance of wicker, rattan, woven resin strand, or other woven material.

**RESPONSE:**

Objection. This request is vague and ambiguous, and overly broad. Subject to and
without waiving these objections, the persons with such knowledge on one or more of the
identified topics are Jim Wingate, Tom Swan, Stew Kerr, Bob Dale, Dave Clemmons,
Terry Jones, Larry Gross, Yang Yuan, and Steve Smith.


5.    Identify all license agreements relating to pet products to which Defendant is or

has been a party.

**RESPONSE:**

Mid-West Metal has been a party to two license agreements relating to pet products. One
related to "waste rakes," commenced on April 20, 1999, and was with Handy Hound
Product, LLC (3753 South Lake Shore Drive, House Springs, MO 63051). The second
related to a bird feeder, commenced June 5, 2000, and was with Limberlost Products,
Inc., (4545 W. State Road 218, Berne, IN 46711).


6.    Explain fully the circumstances surrounding Defendant's decision to continue

selling products that include any portion or components comprising or having the appearance of

wicker, rattan, woven resin strand, or other woven material, after Defendant received the letters

of November 4, 2003 and November 19, 2003 referred to in paragraphs 16 and 17 of Defendant's

Answer, including without limitation an identification of the person or persons participating in or

approving that decision and all information considered in making that decision.

**RESPONSE:**

Objection. This request is overly broad and calls for the production of information that is
protected by the attorney-client, work product, and anticipation of litigation privileges.
Assuming that Simpson Ventures were to limit this request to the period of time after
receipt of the referenced letters but before it filed this lawsuit, the request still seeks the
production of information that is protected by the attorney-client privilege. Mid-West

Metal in fact conferred with legal counsel Dan Boots and John Brannon (both with Bingham McHale at the time) during that period of time and received a spoken opinion from both on or about December 12, 2003. A written opinion was then provided by John Brannon on November 8, 2006, after Plaintiff filed this lawsuit. The Mid-West Metal employees who were involved in the decision in December of 2003 are Jim Wingate, Tom Swan, and Larry Gross, and the decision was approved by Steve Smith. The Mid-West Metal employees who were involved in the decision in November of 2006 are Jim Wingate and Steve Smith. As to the content of these communications with legal counsel, or about legal counsel's advice, such are privileged. Mid-West Metal has not yet determined whether to waive that privilege, but reserves the right to do so in due course.

7.    Identify all opinions of counsel that Defendant has received or requested, which relate to the '156 patent, to Plaintiff, or to any Product identified in response to Interrogatory No. 1, including without limitation identification of all persons giving, receiving and/or relying upon said opinions, and the substance of said opinions.

**RESPONSE:**

Mid-West Metal incorporates by reference its objections, privileges, and response to Interrogatory 6.

8.    Explain fully the basis for Defendant's claim that Defendant's products do not infringe the '156 patent, including without limitation a specific identification of each point or points of novelty of the patented design that defendant contends are not incorporated in Defendant's products, all dissimilarities between Defendants' product and the patented design that would be relevant to an ordinary observer, and identify all evidence known to Defendant that may support or refute its claim of non-infringement.

**RESPONSE:**

Objection. This request seeks the premature production of information that is the subject of ongoing investigation and discovery, including the potential reliance on expert opinion testimony. Mid-West Metal reserves the right to supplement or modify this response, accordingly.

8

Subject to and without waiving these objections, there is no infringement because the design that is the subject of the '156 Patent is not substantially the same as the design used with Mid-West Metal's Bay Isle product line. There are numerous important differences. For example, the '156 Patent design depicts a first relatively tight weave pattern that completely covers the top panel, the sides of the front panel, and the larger top sections of the side panels (except for the door and window portions), a second relatively loose weave pattern positioned above the door and window portions and the smaller bottom sections, and elongated straight members defining the top panel edges, the larger and smaller section edges, and the front and back panel edges, wherein the elongated straight members are wrapped in tight coils of wicker. None of these design features are present in the design used with the Bay Isle product line. Indeed, the Bay Isle product line includes top, back, and side portions characterized by a first weave pattern with rectangular portions characterized by a second weave pattern embedded therein. Further, the vertical supports defining the edge intersections of the side panels with the front and rear panels are unwrapped, or bare.

9.    Identify those features shown in the '156 patent that you contend are the point or points of novelty of the invention claimed in the '156 patent.

**RESPONSE:**

Objection. This request seeks the premature production of information that is the subject of ongoing investigation and discovery, including the potential reliance on expert opinion testimony. Mid-West Metal reserves the right to supplement or modify this response, accordingly. Subject to and without waiving these objections, Mid-West Metal does not concede, let alone contend, that any features depicted in the '156 Patent are in fact Points of Novelty – or "the novelty which distinguishes the patented design from the prior art." Indeed, the sole Point of Novelty that Plaintiff has identified through its expert witness report is the following – "I observe that the design claimed in the '156 Patent distinguishes from the prior art in one respect: i.e., the point of novelty is a woven texture on all disclosed surfaces." (Anders at ¶36.) Mid-West Metal's discovery and investigation is ongoing, but upon information and belief, preliminarily contends that the prior art will clearly demonstrate that any such claimed Point of Novelty was in fact obvious, if not anticipated.

10.    Identify those features that you contend collectively constitute the overall patented design as claimed in the '156 patent, excluding what you contend are functional features, such that the overall patented design could be compared with the accused device(s) in

order to evaluate whether the accused device is so substantially similar as to be likely to deceive

or confuse an ordinary observer.

**RESPONSE:**

Objection. This request seeks the premature production of information that is the subject
of ongoing investigation and discovery, including the potential reliance on expert opinion
testimony. Mid-West Metal reserves the right to supplement or modify this response,
accordingly. Subject to and without waiving these objections, Mid-West Metal contends
that practically all, if not all, of the features depicted in the '156 Patent are in fact
functional, and not ornamental. The only non-functional features that are possibly
ornamental are the particular patterns depicted within the weave materials. Specifically,
the presence and dimensions of the openings for the door on the front panel, the presence
and dimensions of the opening or handle on the back panel, the presence and dimensions
of the windows or openings on the side panels, the use of any material to cover the cage
to create a den-like structure, and the rectangular shape or silhouette of the pet cage are
all functional features. In addition, the use of a non-porous woven material for covering
the pet cage is a utilitarian or functional feature as well – indeed, Mr. Simpson expressly
represented such to the US PTO in July 2004, in prosecuting his application for the '138
Utility Patent and in distinguishing its utilitarian features from the prior art.


11.    For each product identified in response to Interrogatory No. 1, if you contend that

any features of such products are functional, identify such features and state whether such

features are purely functional or are partly functional, partly ornamental.

**RESPONSE:**

Objection. This request seeks the premature production of information that is the subject
of ongoing investigation and discovery, including the potential reliance on expert opinion
testimony. Mid-West Metal reserves the right to supplement or modify this response,
accordingly. Subject to and without waiving these objections, Mid-West Metal contends
that practically all, if not all, of the features depicted in the '156 Patent are in fact
functional, and not ornamental. See Mid-West Metal's response to Interrogatory 10
herein, for an identification of those functional features.

10

12.    Explain the basis of each of Defendant's affirmative defenses presented in the

Answer, and identify all evidence known to Defendant that may support or refute its affirmative

defenses.

**RESPONSE:**

Objection. This request seeks the premature production of information that is the subject
of ongoing investigation and discovery, including the potential reliance on expert opinion
testimony. Mid-West Metal reserves the right to supplement or modify this response,
accordingly.  Subject to and without waiving these objections, Mid-West Metal states that
the prior art is expected to demonstrate that any claimed novelty in the design depicted in
the '156 Patent was anticipated and/or made obvious by the prior art (especially in light
of the United States Supreme Court's recent decision in KSR International Co. v.
Teleflex, Inc., 127 S.Ct. 1727 (2007)). Further, the evidence may show that the design
depicted in the '156 Patent was on sale and/or in public use on or before May 2, 2001.

13.    Explain fully the relevance of all prior art known to Defendant that you contend

would render the '156 Patent invalid or unenforceable.

**RESPONSE:**

Objection. This request seeks the premature production of information that is the subject
of ongoing investigation and discovery, including the potential reliance on expert opinion
testimony. Mid-West Metal reserves the right to supplement or modify this response,
accordingly.

14.    Identify all surveys or studies conducted by or on behalf of Defendant regarding

the '156 patent, regarding any product identified in response to Interrogatory No. 1, or regarding

any pet product having a portion or components comprising or having the appearance of wicker,

rattan, woven resin strand, or other woven material.

**RESPONSE:**

Mid-West Metal does not have any such surveys or studies.

11

15.    Identify all patents or patent applications filed by or on behalf of Defendant that cover or relate to any product identified in response to Interrogatory No. 1, or to any pet product having any portion or components comprising or having the appearance of wicker, rattan, woven resin strand, or other woven material.

**RESPONSE:**

Mid-West Metal does not hold and has not applied for any such patents.

16.    Identify all other lawsuits or claims of infringement by or against Defendant that relate to any product identified in response to Interrogatory No. 1, or to any pet product having any portion or components comprising or having the appearance of wicker, rattan woven resin strand, or other woven material.

**RESPONSE:**

There are no such other lawsuits or claims.

17.    Explain fully the circumstances surrounding all purchases or analyses of Plaintiff's products by any employee or representative of Defendant or any third party acting on Defendant's behalf, including without limitation the date of said purchase or analysis, the persons involved in making the purchase or analysis, the persons to whom the purchase or analysis was reported, the product purchase or analyzed, and identify all reports, outcomes or actions taken as a result of said purchase or analysis.

**RESPONSE:**

Objection. This request is overly broad and unduly burdensome, and calls for the production of information that is more efficiently gathered and produced through deposition. In addition, it is so broadly worded that it calls for the production of information and analysis that occurred after the commencement of this litigation – and is thus protected against disclosure by the attorney-client, anticipation of litigation, and work product privileges.

12

Subject to and without waiving these objections and privileges, sometime in the fall of 2002, Mid-West Metal Vice President Jim Wingate saw a wicker-covered pet cage in the Frontgate catalog. For some time long before 2002, Jim Wingate had had the idea and desire to use wicker appearing material with its pet cages, but could not previously justify the manufacturing costs for such. However, because of a new manufacturing relationship established in 2002 with the Dailan Huamei Stocade company in China, Mid-West Metal was able to explore more seriously production of such a product line.

Jim Wingate thus purchased a small pet home with a wicker weave covering from Frontgate. That product was delivered to them in early October 2002. The pet home was a wire cage covered in certain areas by a rattan material. The rattan material had specific weave patterns within the rattan and on the frame in certain areas. At the time, Mid-West Metal was not aware of any patent or patent-pending applicable (or allegedly applicable) to the design – and did not see any such notice markings on the packaging materials when the product arrived, despite their efforts to look for such.

After discussing the concepts and the Frontgate pet cage at a regularly scheduled New Products Meeting (attended by Jim Wingate, Tom Swan, Yang Yuan, and Stew Kerr), and after discussing wicker-covered pet cage concepts that Jim Wingate had previously presented to the group, the decision was made to explore production possibilities and costs with the Dailan Humai company in China. Mr. Yuan thereafter presented the concept to representatives of Dailan Humain in China, who confirmed that a wicker-weave pattern could be woven onto Mid-West Metal's drop-pin models of collapsible pet cages.

Dave Clemmons and Stew Kerr then prepared the initial design drawings for a wicker-covered pet cage. They were careful to prepare a design characterized by a fundamentally different weave pattern (as described elsewhere in these Interrogatory responses). Dailan Humai then made a sample product based on those designs. After manufacturing pricing was agreed upon between Mid-West Metal and Dailan Humai, the first orders were made by Mid-West Metal in April of 2003, and the product was first received in June of 2003. Bob Dale prepared the product packaging and marketing literature, and the Bay Isle brand was adopted.

18.    Identify all persons who participated in preparation of the answers to these

interrogatories, and provide a brief explanation of the information or assistance they provided.

**RESPONSE:**

Jim Wingate was the Mid-West Metal employee who was primarily involved in providing the factual information responsive to these Interrogatories. He was assisted by Steven Smith on certain factual information relating to the decision to proceed with

manufacturing the Buy Isle line of products, and by Tom Swan on certain information relating to the development of the Bay Isle line of products' design. He was further assisted by legal counsel James Hinshaw in preparing objections and legal contentions.

19.   Identify the manufacturer of each product identified in response to Interrogatory

No. 1.

**RESPONSE:**

Dailan Huamei Stocade Co, Ltd. d/b/a Dailan H&M Metal Products is the entity that manfuctures the Bay Isle line of products for Mid-West Metal. It's address is Kuangdong Street, Taiping Office, Pulandian, Dalian 116200 in the People's Republic of China.

WHILE I DO NOT HAVE PERSONAL KNOWLEDGE OF ALL INFORMATION GATHERED IN RESPONDING TO THESE INTERROGATORIES, I AFFIRM UNDER PENALTIES OF PERJURY THAT THE INFORMATION SET FORTH HEREIN IS TRUE AND ACCURATE TO THE BEST OF MY KNOWLEDGE.

James W. Wingate, As Vice President of Mid-West Metal Products Company, Inc.

As to Objections:

_____

James M. Hinshaw
BINGHAM MCHALE LLP
2700 Market Tower
10 W. Market Street
Indianapolis, IN 46204-4900
(317) 635-8900
(317) 236-9907 (facsimile)
jhinshaw@binghammchale.com

Brett A. Ross
CARR ALLISON
100 Vestavia Parkway
Birmingham, Alabama 35216
(205) 949-2938
(205) 822-2057 (facsimile)
BAR@carrallison.com

*Attorneys for Defendant/Counterclaimant, Mid-West Metal Products Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was duly forwarded to all counsel of record and interested parties on this 13th day of July, 2007, via United States mail, postage prepaid, as follows:

Robert T. Meadows
CAPELL & HOWARD, P.C.
3120 B. Frederick Road (36801)
P.O. Drawer 2268
Opelika, Alabama 36803

Arthur A. Gardner
GARDNER GROFF SANTOS & GREENWALD, PC
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339

_____

1167532

15

EXHIBIT 4

## James M Hinshaw

**From:**  Gardner, Art [agardner@gardnergroff.com]
**Sent:**  Wednesday, May 23, 2007 1:57 PM
**To:**    James M Hinshaw
**Subject:** RE: Expert report

James,


Thanks for your understanding and cooperation on this issue.  However, we just got in a scheduling order from the Court that moots our efforts to work this out between us.  If you didn't get it yet, let me know and I will send you a copy.


The Court has set June 25 as the deadline for the Plaintiff's expert reports and July 25 for the Defendant's expert reports.  Given the new order from the Court, I can't see any way for us to utilize the 10-day extension we had worked out between us.  We will have to just conform to the Court's order.  If you have a different view of this, let me know.


With best regards, I remain,
very truly yours,

# Art Gardner


**From:** James M Hinshaw [mailto:JHinshaw@binghammchale.com]
**Sent:** Tuesday, May 22, 2007 8:27 AM
**To:** Gardner, Art
**Subject:** RE: Expert report

Art - Yes.  10 day extension on expert deadlines (reciprocal) is fine.  Thanks.
- James -

-----Original Message-----
**From:** Gardner, Art [mailto:agardner@gardnergroff.com]
**Sent:** Monday, May 21, 2007 12:59 PM
**To:** James M Hinshaw
**Subject:** RE: Expert report

James,
Yes, I was intending the extension to be reciprocal.  What is good for the goose is good for the gander.
Let me know once you have a definitive answer.  If the answer is yes, I will put together a new set of dates based on our agreement and send it over to you so we will all be on the same page.

7/20/2007

With best regards, I remain,
very truly yours,

# Art Gardner

---

**From:** James M Hinshaw [mailto:JHinshaw@binghammchale.com]
**Sent:** Monday, May 21, 2007 12:55 PM
**To:** Gardner, Art
**Subject:** RE: Expert report

Art...i am in court all day today...dont think this will be a problem if it is reciprocal...but need to see if client has any problem with...will get bqck to you by tomorriw....james

-----Original Message-----
From:   Gardner, Art [mailto:agardner@gardnergroff.com]
Sent:   Monday, May 21, 2007 11:21 AM Eastern Standard Time
To:     James M Hinshaw
Cc:     RTM
Subject:     Expert report

James,

Our expert report(s) is (are) due this week.  However, due to the amount
of time we spent working on a possible settlement and a death in my
family, we are a little behind where we would like to be at this point.
Can you agree to a 10-day extension until June 4 for Plaintiff to serve
expert reports?  If so, we would propose to push all of the expert dates
back by 10 days.

Please let me know if you can agree to this.  I would prefer to have
your answer today or tomorrow since the deadline presently is this
Friday.  Thanks in advance for your cooperation.

With best regards, I remain,
very truly yours,

Art Gardner

GARDNER GROFF SANTOS & GREENWALD, PC
2018 Powers Ferry Road
Suite 800
Atlanta, GA  30339

770.984.2300

CONFIDENTIALITY NOTICE:  The information transmitted herewith, including
any attachments, is intended only for the person or entity to which it
is addressed and may contain confidential and/or attorney-client
privileged material.  Any review, retransmission, dissemination, or
other use of, or taking of any action in reliance upon, this information
by persons or entities other than the intended recipient is prohibited.

If you received this in error, please contact the sender and delete the
material from all computers. Thank you.

CONFIDENTIALITY NOTICE:
This e-mail contains information that is privileged, confidential
and subject to legal restrictions and penalties regarding
its unauthorized disclosure or other use. You are prohibited from
copying, distributing or otherwise using this information if you are
not the intended recipient. If you have received this e-mail in error,
please notify us immediately by return e-mail and delete this email
and all attachments from your system. Thank you.

DISCLOSURE REQUIRED BY CIRCULAR 230.
This Disclosure may be required by Circular 230 issued by the
Department of Treasury and the Internal Revenue Service. If this
e-mail, including any attachments, contains any federal tax advice,
such advice is not intended or written by the practitioner to be used,
and it may not be used by any taxpayer, for the purpose of avoiding
penalties that may be imposed on the taxpayer. Furthermore, any
federal tax advice herein (including any attachment hereto) may not
be used or referred to in promoting, marketing or recommending a
transaction or arrangement to another party.  Further information
concerning this disclosure, and the reasons for such disclosure,
may be obtained upon request from the author of this e-mail. Thank you.

EXHIBIT 5

## James M Hinshaw

| | |
|---|---|
| **From:** | James M Hinshaw |
| **Sent:** | Friday, July 20, 2007 1:08 PM |
| **To:** | 'Gardner, Art' |
| **Cc:** | RTM; Brett A. Ross Esq. (E-mail) |
| **Subject:** | RE: Simpson Ventures v. MWMP |

Art - I am not going to respond further now to your rhetoric, other than to say I disagree.  My position has been consistent throughout - as the e-mails below make clear.  I will continue to work with my liabilty expert to try to meet the August 1 deadline you have agreed to for id/report, and with my damages expert to try to meet the August 15 deadline you have agreed to for id/report.

- James -

-----Original Message-----
**From:** Gardner, Art [mailto:agardner@gardnergroff.com]
**Sent:** Friday, July 20, 2007 11:40 AM
**To:** James M Hinshaw
**Cc:** RTM
**Subject:** RE: Simpson Ventures v. MWMP

James,
I am sorry, but I still cannot accommodate your request.  We will stick to the offer of additional time sent to you last night -- 3 additional weeks for a damages expert and 1 additional week for any others.
I note that you give different justifications today for the requested extensions than you gave previously, so I don't know which to believe.  Also, I pleaded with you to consider whether you could work with less than a full extra month for these expert id's and reports and you told me yesterday that you couldn't, that you had to have the full month.  Now you tell me that you can work with less than the full month.  Again, if you could work with less than a full month extension, you shouldn't have told me the opposite yesterday in our phone conference.

With best regards, I remain,
very truly yours,

# Art Gardner

**From:** James M Hinshaw [mailto:JHinshaw@binghammchale.com]
**Sent:** Friday, July 20, 2007 8:30 AM
**To:** Gardner, Art
**Cc:** RTM; Brett A. Ross Esq. \(E-mail\)
**Subject:** RE: Simpson Ventures v. MWMP

Art - Well, you sure have a funny definition of what is accomodating.

As for the additional 3 day extension that I have agreed to for you to respond to our Interrogatories and Document Requests (July 23), you are welcome.

As for the 3 week extension on the damages expert report, we will work to meet that - so, to and including August 15.

As for the 1 week extension on the liability expert report, I am asking you to reconsider. I think that my expert can have his work wrapped up in time for me and my client to review it and present any follow up questions by August 10. I asked for the additional 2 weeks beyond that to accomodate my schedule, my client's schedule, and my experts schedule - particularly as the summer ends, and school schedules start. Apparently those are not of any concern for you or your client. Even with an August 10 date, there is little to no room for us to identify and/or analyze any unexpected issues with the report and/or resolve any unexpected delays. You state that you are concerned about the September 30 discovery cutoff date. You state no reason for your reluctance to be accomodating with that date (as we would be). Regardless, with an August 10 date, that still leaves you plenty of time to initiate whatever discovery you think you need to meet the September 30 discovery cutoff - let alone to get ready for a trial that is not scheduled to start until March of 2008. Simply put, there is no prejudice caused by our requested extension.

I do not appreciate your suggestion that we have not been diligent in working on this case. It simply is not true. Settlement discussions commenced after the Scheduling Report was agreed upon and submitted, and proceeded well into May of 2007 - I believe the date of your last position was May 11, 2007, and my client had to consider its options for a time after that. There was no justification for ramping up on experts analysis and fees until that avenue was exhausted - as your own actions have demonstrated. Indeed, by your own admission, the pursuit of these settlement discussions caused you to seek an extension of your expert deadlines - which we had in fact agreed to, and to which you had agreed would be reciprocal ("what is good for the goose is good for the gander"), but which was made moot by the Court giving you a 30 day extension of your deadline (sua sponte), but not giving us a similar 30 day extension. After settlement discussions died, both parties duly launched into serving written discovery requests. We worked hard to meet the deadlines for responding to your Interrogatories (July 13), and continue working hard on responding to your Document Requests (July 30). You have yet to respond to the Interrogatories and Documents Requests that we served back on June 4 and June 6 - the deadlines for which I agreed to extend, at your request, without question or demand for justification. Further, your written discovery responses are now not due until next Monday (again, yet another extension that I have agreed to, without question, simply because you asked for it). We expect to be provided information therein that we may want to have our experts consider in their analysis - yet another justification for our requested extension.

So, please reconsider your position on our request for extension of the liability expert id/report deadline. I can try to work with August 10, but even that will be a major press. I am nonetheless willing to make that effort if it will avoid having to involve the Court's time and resources to resolve this.

I need to know your position this morning, as I will be out of the office this afternoon and early next week. Thank you.

- James -

- James M. Hinshaw -
BINGHAM McHALE, LLP
2700 Market Tower
10 West Market Street

7/24/2007

Indianapolis, IN 46204-4900
(317) 968-5385
jhinshaw@binghammchale.com
www.binghammchale.com

-----Original Message-----
**From:** Gardner, Art [mailto:agardner@gardnergroff.com]
**Sent:** Thursday, July 19, 2007 5:58 PM
**To:** James M Hinshaw
**Cc:** RTM
**Subject:** RE: Simpson Ventures v. MWMP

James,

Thank you for the 1 business day extension for Simpson Ventures to serve its discovery responses (now due Monday).

Regarding your request for a 30-day extension for Defendant Mid-West to identify experts and produce expert reports, I cannot agree. I would like to agree to the request, but cannot. In an effort to be as accommodating as possible, we can agree to a three-week extension for Mid-West to serve any financial expert report and a one-week extension for any other expert report.

We note that the requested blanket one-month extension for Mid-West to produce expert reports is problematic. Discovery closes on September 30, so the last day to serve written discovery requests (and get an answer thereto) will be in late August. If your client serves its expert report(s) on August 25, there would be precious little time to study the report(s) and do any follow-up discovery. That could lead to a need for extending the discovery period, which we do not wish at this time. Also, if your client has a strong defense to the infringement allegations, we want to see such sooner, rather than later, in order to allow the parties to evaluate the case and potentially minimize litigation costs.

As for the supposed justification for the extension, I am confused because I believe your experts would be engaged largely in response to our experts and our damages expert report was provided to you last month (and the technical/design expert report was provided last year). The time the parties spent trying to settle the action several months ago does not seem to be related to your present desire for more time. I asked you this afternoon whether you could work with a shorter extension, but you insisted that you had to have the full month extension. If Mid-West had been diligent on this, it would not now need another full month to complete this effort.

Both parties have been aware of these expert deadlines for quite some time now and Simpson Ventures managed to comply with its deadline. Moreover, you have had the expert report from our technical/design expert (Mr. Anders) since the suit was filed more than 9 months ago. We believe your client has had more than ample time to locate and work with an expert in rebuttal to Mr. Anders' report.

Given the length of time that your client has been in possession of the Mr. Anders' report, our first inclination was to grant no extension for Mid-West to serve an expert report in opposition thereto. In the interest of mutual cooperation and professional courtesy, we will agree to the one-week extension for any expert report other than from a damages expert (until August 1). Since the damages expert report from Simpson Ventures has been in your possession a shorter period of time, we are somewhat more sympathetic and are willing to allow Mid-West until August 15 to serve a damages expert report.

As always, I want to accommodate an opposing counsel's request for extension whenever I can. But the extension you have requested would create other problems in the suit. Under the circumstances, the above is the most I can agree to for you.

With best regards, I remain,
very truly yours,

# Art Gardner

---

**From:** James M Hinshaw [mailto:JHinshaw@binghammchale.com]
**Sent:** Wednesday, July 18, 2007 7:19 PM
**To:** Gardner, Art
**Subject:** Simpson Ventures v. MWMP

Hi Art. I am writing to request your position on my need for an extension of time. Specifically, MWMP currently has a deadline of July 25 to produce its expert reports. In light of the due delay caused by our clients' efforts to explore settlement and the consequent due delay on commencing written discovery, I will need a 30 day extension - or to August 25. The time is also needed for my experts to view and digest your client's responses to our written discovery (which I show as due tomorrow pursuant to our agreement to extend your deadline for responding). Please let me know if you have any objection to that. Thank you. - James -

- James M. Hinshaw -
BINGHAM McHALE, LLP
2700 Market Tower
10 West Market Street
Indianapolis, IN 46204-4900
(317) 968-5385
*jhinshaw@binghammchale.com*
www.binghammchale.com

CONFIDENTIALITY NOTICE:
This e-mail contains information that is privileged, confidential
and subject to legal restrictions and penalties regarding
its unauthorized disclosure or other use. You are prohibited from
copying, distributing or otherwise using this information if you are
not the intended recipient. If you have received this e-mail in error,
please notify us immediately by return e-mail and delete this email
and all attachments from your system. Thank you.

DISCLOSURE REQUIRED BY CIRCULAR 230.
This Disclosure may be required by Circular 230 issued by the
Department of Treasury and the Internal Revenue Service. If this
e-mail, including any attachments, contains any federal tax advice,
such advice is not intended or written by the practitioner to be used,
and it may not be used by any taxpayer, for the purpose of avoiding
penalties that may be imposed on the taxpayer. Furthermore, any
federal tax advice herein (including any attachment hereto) may not
be used or referred to in promoting, marketing or recommending a
transaction or arrangement to another party. Further information
concerning this disclosure, and the reasons for such disclosure,
may be obtained upon request from the author of this e-mail. Thank you.