## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## <u>EASTERN DIVISION</u>

SIMPSON VENTURES, INC., )
    Plaintiff,  )
v.         )
         )
MID-WEST METAL  )
PRODUCTS     )
COMPANY, INC.   )
    Defendant.  )
_____)   Case No. 06-cv-00901-WKW-VPM
         )
MID-WEST METAL  )
PRODUCTS     )
COMPANY, INC.,   )
    Counterclaimant, )
v.         )
         )
SIMPSON VENTURES, INC., )
    Counterdefendant. )
_____)

## <u>PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT</u>
## <u>OF MOTION TO COMPEL AND FOR OTHER RELIEF</u>

COMES NOW the Plaintiff, SIMPSON VENTURES, INC. ("Simpson") by

counsel, and does hereby respectfully submit this memorandum of facts and law in

support of its MOTION TO COMPEL AND FOR OTHER RELIEF:

## I. INTRODUCTION

Plaintiff Simpson Ventures (hereinafter "Simpson") alleges that certain

products manufactured and sold by Defendant Mid-West Metal Products Company, Inc. (hereinafter "Mid-West") as part of Mid-West's Bay Isle product line (namely wicker pet crates) infringe the Plaintiff's Design Patent No. D483,156 (hereinafter "the '156 Patent"). The current test for design patent infringement is two-fold. First, the Court must evaluate the accused product under the "ordinary observer" test, which states that "if in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." Gorham Manufacturing Co. v. White, 81 U.S. 511, 528 (1872). Second, the Court must determine if the accused design appropriates the novelty which distinguishes the patented design from the prior art. Litton Sys., Inc. v. Whirlpool Corp., 728 F.2d 1423, 1444 (Fed. Cir. 1984).

The "ordinary observer" test for design patent infringement inquires as to whether a purchaser would find that the two designs are substantially the same, such that the purchaser would be confused between the two, or different enough that no such confusion between the patented design and accused product would occur. Even if many differences may exist between the patented design and the accused product, the Supreme Court has held that infringement exists if an

ordinary observer—viewing the accused product through casual observation rather than a critical eye—finds the accused product to be substantially the same as the patented design.  The Supreme Court in Gorham v. White explicitly rejected the notion of using a side-by-side comparison in discerning any differences between a patented design and an accused product. The Supreme Court also rejected making the comparison between the patented design and the accused product from the perspective of an expert.  Instead, the proper focus is whether an ordinary observer would be confused.  Therefore, an important inquiry in the present case is the determination of the differences recognized by an ordinary observer that may exist between the design shown in Simpson's '156 Patent and the Bay Isle product line that is manufactured and sold by Defendant Mid-West.  Under the "ordinary observer" test, it is important to learn what differences an ordinary observer recognizes *on their own*—without the input of an expert or legal counsel.

In a recent deposition of Ms. Brenda Bartlett, a Mid-West employee, counsel for Mid-West repeatedly objected to questions about what differences (if any) that Ms. Bartlett was able to discern between the patented design and Mid-West's infringing products.  It was then discovered through Ms. Bartlett's testimony that counsel for Mid-West had coached Ms. Bartlett about a number of alleged differences between the '156 Patent and Mid-West's Bay Isle line of

wicker pet crates—differences that Ms. Bartlett admitted she *had not* discerned on her own, prior to being coached by counsel.  When counsel for Simpson tried to discover exactly what differences Ms. Bartlett had recognized before her discussions with counsel for Mid-West, counsel for Mid-West repeatedly instructed Ms. Bartlett to not answer such questions—after which the witness refused to answer.  It quickly became apparent that counsel for Mid-West did not merely prepare Ms. Bartlett for her deposition, but rather crossed the line and actually coached the witness to testify to particular differences between the '156 Patent and Mid-West's Bay Isle that Ms. Bartlett *did not* discern on her own.

While Brenda Bartlett may not be an ordinary observer as defined by Gorham v. White, as an employee of Defendant Mid-West and having experience with the Bay Isle brand of wicker products manufactured and sold by Mid-West, her ability to discern differences between the '156 Patent and the Bay Isle products is a relevant inquiry in the present case.  Certainly, if an employee *intimately* familiar with Mid-West's Bay Isle brand is not able to discern certain differences between the '156 Patent and the Bay Isle brand, or finds any such differences to be minimal, Mid-West's argument that an ordinary observer under Gorham (who would certainly be *less* informed than Ms. Bartlett) would find that the two designs are substantially different—is untenable.  Therefore, Plaintiff Simpson is entitled

-4-

to know what differences between the '156 Patent and Mid-West's Bay Isle wicker crate Ms. Bartlett recognized on her own, and what differences counsel for Mid-West coached her to recognize in preparation for her deposition (among other topics as discussed below).

Additionally, during her deposition, Ms. Bartlett admitted to having discussions with Mr. James Wingate (past-President of Mid-West and currently heading up the Mid-West litigation effort) prior to her deposition.  These conversations were <u>not</u> in the presence of counsel for Mid-West, were <u>not</u> identified as confidential or privileged by Mr. Wingate, and Ms. Bartlett was <u>not</u> informed that the information communicated to her by Mr. Wingate represented legal advice.  Nevertheless, counsel for Mid-West instructed the witness not to answer questions about her discussions with Mr. Wingate, asserting that the discussions were attorney-client communications.  Plaintiff Simpson is entitled to discovery on the details of the conversation(s) between Mid-West employees Mr. Wingate and Ms. Bartlett.

Counsel for Simpson previously conferred with counsel for Mid-West about the present motion.

## II. STATEMENT OF FACTS

During the week of April 14, 2008, Plaintiff's counsel traveled to Indianapolis, Indiana for the deposition upon oral examination of the following persons: Thomas Swan, James W. Wingate, Jr., David Clemmons, William Stewart Kerr. Through the course of the oral examinations, Plaintiff's counsel noticed that the witnesses gave statements regarding certain aspects of the case that were so highly similar that a coincidence was unlikely. This was particularly a concern when each witness was asked about the differences they perceived between the design depicted in Plaintiff's '156 Patent and Defendant's Bay Isle wicker pet crates. Counsel for Plaintiff became highly suspicious when each witness made almost identical assertions of the differences between the two designs (using very similar language)—down to minute details. When asked about the preparations for the deposition, each deponent admitted on the record that they met with counsel for Mid-West and also gathered together as a group (without counsel present) and discussed the facts of the case.

Jim Wingate, past-President of Defendant Mid-West, testified that they "had a group meeting in Muncie of all the people that were going to be deposed… Tom Swan, Stew Kerr, and Dave Clemmons, and [Wingate]." Deposition of Jim Wingate ("JW") 67:23-24; 68:1. According to Mr. Swan, the meeting prior to the depositions between the four deponents concerned the details of what any

particular person knew.    Deposition of Tom Swan ("TS") 43:10-16.     Mr.

Clemmons testified that the four deponents met and that Mr. Wingate "was

checking for facts that he would have to answer to in his own deposition."

Deposition of Dave Clemmons ("DC") 67:2-7.   Mr. Kerr admitted that during that

group meeting there were discussions on the facts and circumstances surrounding

Simpson Ventures wicker products and Mid-West wicker products.  Deposition of

Stew Kerr ("SK") 126:19-24; 127:1-4.

Plaintiff's counsel traveled back to Indianapolis, Indiana on May 27, 2008

for the deposition upon oral examination of Brenda Bartlett, Bob Dale and Yassir

Karam.  The deposition of Ms. Bartlett was taken on May 28, 2008.  Ms. Bartlett is

the Inside Sales Manager of the Defendant Mid-West.   Deposition of Brenda

Bartlett ("BB"), 10:6.   Throughout her testimony, counsel for the Defendant

repeatedly asserted various objections, most of which were guised as attorney-

client privilege objections.   In many situations, the attorney-client privilege

objections by counsel for Defendant were to *purely factual questions*.    For

example, when Ms. Bartlett was asked what documents she had reviewed in

preparation for her deposition, counsel for Defendant objected and asserted

privilege.  BB 29:3-9.

Further, Ms. Bartlett admitted that she had spoken to Mr. Wingate, without

counsel present, about additional topics other than simply document production issues. BB 23:23-25:14. But when asked about the content of those conversations with Mr. Wingate, counsel for Mid-West objected and asserted privilege. BB24:1-14. After that, Ms. Bartlett testified that she believed the content of those conversations to be privileged. BB 26:12- 28:23. However, Ms. Bartlett was unable to point to any particular reason why such conversations with Mr. Wingate were privileged, and in fact, Ms. Bartlett herself stated that Mr. Wingate never told her that the information was privileged, nor had Mr. Wingate asserted that the information communicated to Ms. Bartlett came from counsel for Mid-West. BB 27:3-12, 28:17-23.

Ms. Bartlett also admits that she discussed key elements of her testimony with counsel for Defendant. <u>In particular, Ms. Bartlett testified under oath that counsel for Defendant pointed out to her a number of differences between the Plaintiff's product and the Defendant's product that she herself had not noticed on her own</u>. BB 46: 23- 47:3. This is plainly seen in the following excerpt:

> Page 46
> 14 Q During the course of your involvement in this
> 15 litigation, has anyone discussed those differences
> 16 with you?
> 17 A Yes.
> 18 Q Who was that?

19 A Mr. Hinshaw.

20 Q Other than Mr. Hinshaw, has anybody else discussed

21 those differences with you?

22 A No.

23 Q Did you notice all the differences on your own, or

24 did you rely on Mr. Hinshaw to point those out to

25 you?

Page 47

1 A The majority of them I realized on my own.

2 Q Which ones did you not realize on your own?

3 A I didn't pick up the gap across the top.

4 MR. HINSHAW: I'm going to object --

5 THE WITNESS: Oh, I'm sorry.

6 MR. HINSHAW: -- to the extent that we are now

7 getting into attorney-client communications and

8 discussions.

9 And I'm going to instruct the witness to not

10 answer, as it calls for attorney-client privilege,

11 anticipation of litigation, and work product

12 privilege.

13 MR. STALEY: I think what features you didn't

14 recognize on your own is not privileged in any way.

15 BY MR. STALEY:

16 Q So I'd ask you to please answer that question.

17 MR. HINSHAW: And I'm instructing you not to

18 answer it.

19 A I won't answer the question.

20 MR. STALEY: James, what is your basis for

> 21 making that objection?
>
> 22 MR. HINSHAW: Because the contra of that, the
>
> 23 flip side of that is what I did discuss with her.
>
> 24 MR. STALEY: What points she didn't recognize
>
> 25 on her own has nothing to do with any privileged
>
> Page 48
>
> 1 information whatsoever. It's merely features that
>
> 2 she was told by somebody whether or not they were
>
> 3 there.
>
> 4 MR. HINSHAW: And the "told by somebody" is
>
> 5 counsel. So that's an attorney-client privilege.
>
> 6 So I'm going to instruct her not to answer.

And the record goes on, to again reflect the plain fact that Ms. Bartlett's "personal knowledge" as to the products at the heart of this suit had in fact been spoon-fed to her by counsel for Defendant:

> Page 55
>
> 11 Q Now, when you first looked at the Simpson Ventures
>
> 12 patent of Exhibit 77, and looked at the Mid-West --
>
> 13 Exhibit 2 here, the Mid-West crate, what differences
>
> 14 did you notice on your own?
>
> 15 MR. HINSHAW: Well ...
>
> 16 MR. STALEY: James, I'm asking about a
>
> 17 completely different exhibit here than before.
>
> 18 MR. HINSHAW: Yeah, I realize that.
>
> 19 Do you believe you can answer that question

20 without disclosing communications that you had

21 with me?

22 THE WITNESS: No.

23 MR. HINSHAW: Then I'm going to object on the

24 basis of attorney-client privilege, anticipation of

25 litigation, work product privilege, and instruct the

Page 56

1 witness not to answer.

2 MR. STALEY: James, I didn't ask you if you

3 had any involvement in her discerning differences

4 between the patent of Exhibit 77. I asked if she

5 was able to discern all those differences that she's

6 espoused on her own.

7 THE WITNESS: May I talk to you in the hallway?

8 MR. HINSHAW: Yeah.

9 MR. GARDNER: Let's take five, I guess.

10 (A recess is taken, after which, the

11 proceedings resume as follows:)

12 MR. HINSHAW: Is there a question pending?

13 THE REPORTER: Yes, there is. Do you want me

14 to read that back?

15 MR. HINSHAW: Yes, please.

16 (The reporter reads back as requested.)

17 MR. HINSHAW: I stand on that objection and

18 those privileges. Just to make it clear,

19 anticipation of litigation, work product, mental

20 processes, and attorney-client communications. And

21 I'm going to instruct the witness not to answer.

22 BY MR. STALEY:

23 Q Are you going to answer that question or are you

24 going to listen to your counsel's instructions?

25 A I'm going to take my counsel's instructions.

Page 57

1 Q Without telling me who told you, are there any

2 differences between the embodiment shown in

3 Exhibit 77, which is the Simpson Ventures pattern,

4 and the Mid-West crate shown in Exhibit 2? Are

5 there any differences between those embodiments that

6 you did not notice on your own?

7 MR. HINSHAW: Same objections, same privileges,

8 and same instruction.

9 BY MR. STALEY:

10 Q Are you going to answer the question?

11 A No, I'm not.

12 Q Generally, not looking at these exhibits anymore,

13 was there anything that you were told to say today

14 in this deposition, without revealing who that

15 person may have been, that you didn't already have

16 in your personal knowledge before you -- before you

17 discussed the deposition with anybody else?

18 MR. HINSHAW: I'm going to object to that

19 question because I don't understand what it means.

20 So objection, form, foundation.

21 MR. STALEY: Let me rephrase it.

22 BY MR. STALEY:

23 Q Were you told to say specific things at this

24 deposition that you didn't already have previous

25 knowledge of, without revealing who that person may

Page 58

1 have been?

2 MR. HINSHAW: Objection to form and foundation.

3 I have no idea what you're referring to, but to the

4 extent you're talking about discussions that I had

5 with the witness in preparation for this deposition,

6 then I'm objecting. It calls for attorney-client

7 communications, anticipation of litigation, work

8 product and mental processes, and I would instruct

9 the witness to not answer to that.

10 MR. STALEY: Let me ask the question one more

11 time. I'll rephrase it again.

12 BY MR. STALEY:

13 Q Were you told to say anything at this deposition

14 that you do not have personal knowledge of without

15 revealing who that person may have been?

16 MR. HINSHAW: Same objections, same

17 instructions, same privileges.

18 BY MR. STALEY:

19 Q Can you answer the question?

20 A No, I cannot.

21 Q Did Mr. Hinshaw instruct you to answer or to give

22 any specific testimony that you did not already have

23 knowledge of before meeting with Mr. Hinshaw?

24 MR. HINSHAW: Same objections and same

25 privileges and same instructions.

Page 59

1 MR. STALEY: And you realize I'm not asking her

2 for what the testimony was. I'm asking was there

3 any instance of specific testimony that she was

4 instructed to say today.

5 MR. HINSHAW: But in your question, you're

6 essentially putting content of the communication

7 into the form of your question and asking her to

8 endorse that or not, and that's essentially calling

9 for content of communication.

10 I would stand on my objections and stand on

11 my instructions to the witness and an assertion of

12 privilege.

13 MR. STALEY: James, can I see you outside for a

14 second?

15 MR. HINSHAW: Sure. Why don't we go off the

16 record.

17 (A recess is taken, after which, the

18 proceedings resume as follows:)

19 BY MR. STALEY:

20 Q Earlier, we were discussing the differences that you

21 saw between the patent of Exhibit 77 and Exhibit 2,

22 which is the Mid-West Bay Isle line.

23 Did anyone at Mid-West point out any of the

24 differences between the patent and the wicker kennel

25 of Exhibit 2?

Page 60

1 A No one at Mid-West pointed out the differences

2 between the two crates.

3 Q Did you, on your own, identify all of those

4 differences between the patent of Exhibit 77 and the

5 Mid-West Bay Isle crate of Exhibit 2?

6 MR. HINSHAW: Same objections, same privileges,

7 same instructions.

8 MR. STALEY: When you say "same objections,

9 same privileges, same instructions," could you

10 expound upon that for me?

11 MR. HINSHAW: Yes. Again, attorney-client

12 communication, anticipation of litigation, work

13 product and mental processes are the privileges that

14 we are asserting, and I'm instructing the witness to

15 not answer that question.

16 BY MR. STALEY:

17 Q And are you going to take your counsel's advice?

18 A Yes, I am.

Despite the best efforts of counsel for Plaintiff to elicit only the *witness' personal knowledge* of these key issues in the case, counsel for Defendant repeatedly asserted attorney-client privilege (in addition to work product in anticipation of litigation and mental processes) and instructed the witness not to testify. Defendant's counsel's apparent coaching of the deponent before the deposition, vociferous and numerous objections related thereto, including instructing the witness not to answer questions relating to the witness' *factual knowledge*, suggest

that counsel for Defendant may have overstepped the boundaries of appropriate witness preparation. Counsel's behavior, in light of the aforementioned indications of rehearsed testimony from other deponents in this case, clearly warrant not only the retaking of Ms. Bartlett's testimony, but also an award of costs, expenses and attorney's fees related to the retaking of Ms. Bartlett's deposition and the filing of the instant motion.

## III.   LEGAL ARGUMENT

### A.  The Law of Depositions and the Attorney-Client Privilege

According to Fed. R. Civ. P. 30(c)(2), to preserve the existence of a privilege, an attorney may instruct the deponent not to answer a question. This rule permits "an objection at the time of the examination — whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition — must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection." However, the Court may impose an appropriate sanction — including the reasonable expenses and attorney's fees incurred by any party — on a person who impedes, delays, or frustrates the fair examination of the deponent. Fed. R. Civ. P. 30(d)(2). This policy, as reflected in the 1993 Amendment, was designed to address a common problem in deposition strategies, such as described by the

Committee: "[d]irections to a deponent not to answer a question can be even more disruptive than objections."  Fed. R. Civ. P. 30, *Notes of Advisory Committee on 1993 amendments*.  Even when a direction to the witness not to testify is within the scope of Fed. R. Civ. P. 30(c)(2), an abuse of the rule – such as the broad assertion of an attorney-client privilege where none exists, and instructing the client not to testify – may certainly be sanctioned by the Court.

The recognition of the attorney-client privilege should be determined on a case-by-case basis.  Upjohn Co. v. United States, 449 U.S. 383, 396 (U.S. 1981)(citing Fed. R. Evid. 501, *Notes of Committee on the Judiciary*, Senate Report No. 93-1277).  This is particularly true when the privilege is asserted in a corporate context.  *Id.* at 396; *See also* FDIC v. Gonzalez-Gorrondona, 1992 U.S. Dist. LEXIS 15541 (S.D. Fla. 1992).  Generally, attorney-client privilege applies if:

> 1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or [the attorney's] subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by [the attorney's] client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceedings and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

In re Federal Grand Jury Proceedings, 89-10, 938 F.2d 1578, 1581 (11th Cir. 1991). Federal district courts of Alabama follow these general rules regarding the attorney-client privilege. In general, the communication must be between an **_attorney and the client_**, the privilege is one for the client to assert, and the communication must be made under circumstances indicating that the client intended the communications to be confidential. Of course, the known presence of third parties may destroy this privilege. Peacock v. Merrill, 2008 U.S. Dist. LEXIS 24104, 21-23 (S.D. Ala. Mar. 18, 2008)(emphasis added; citing McClary v. Walsh, 202 F.R.D. 286, 290 (N.D. Ala. 2000)); *See also* Ex Parte Gonzales, 686 So.2d 204 (Ala. 1996).

### B. The Factual Knowledge of Brenda Bartlett is Not Protected by the Attorney-Client Privilege.

The attorney-client privilege extends to communications from the attorney to the client, as well as reverse. Pitney Bowes, Inc. v. Mestre, 86 F.R.D. 444, 446 (S.D. Fla. 1980). The Supreme Court has held that the protection of the attorney-client privilege "extends only to communications and not to facts." Upjohn Co. v. United States, 449 U.S. 383, 396 (1981)(internal quotations omitted; quoting Philadelphia v. Westinghouse Electric Corp., 205 F.Supp. 830, 831 (ED Pa. 1962)). The Court reasoned: "A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the

question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." *Id.*; *See also* <u>Jeffers v. Russell County Bd. of Educ.</u>, 2007 U.S. Dist. LEXIS 74480, 8-9 (M.D. Ala. Oct. 4, 2007)(quoting <u>Upjohn</u> at 395-96.)    The attorney-client privilege does not protect the disclosure of the underlying facts known by those who communicated with the attorney.   <u>Freiermuth v. PPG Indus.</u>, 218 F.R.D. 694, 699, 2003 U.S. Dist. LEXIS 23248, (N.D. Ala. 2003).[1]   Courts have noted that a party cannot conceal a fact merely by revealing it to his lawyer.  *Id.*  Conversely, a party cannot conceal a fact merely because the lawyer communicated the fact to him.   <u>Pitney Bowes</u>, 86 F.R.D. at 446.

There are several problems with Defendant Mid-West's counsel's multiple assertions of the attorney-client privilege during the deposition of Brenda Bartlett on May 28, 2008.   When counsel for Plaintiff Simpson is clearly asking the witness for her interpretation or opinion about factual matters, separate from what Mid-West's counsel told her about those factual matters – and she cannot do so,

---

[1] The Alabama Supreme Court agrees: "attorney-client privilege protects only against the disclosure of the contents of the communication itself between an attorney and the attorney's client; *it does not protect against the disclosure of the underlying facts by the person who has personal knowledge of those facts*, even though that person may have consulted with an attorney."   <u>Ex parte Alfa Mut. Ins. Co.,</u> 631 So. 2d 858, 860 (Ala. 1993)(emphasis added).

without divulging what counsel told her – it can only be because the "privileged" information communicated from counsel to witness so influenced the witness that it corrupted her testimony. Since counsel for Simpson was only asking about the facts relevant to the case, specifically what product differences she was able to recognize on her own before meeting with counsel for Mid-West, counsel for Mid-West should have let the witness answer. Instead, by asserting attorney-client privilege and instructing the witness *not* to answer, counsel for Defendant has every appearance of guilt in trying to cover up his coaching of the witness.

Moreover, the communication of purported factual differences between the designs of the '156 Patent and the Mid-West Bay Isle wicker crates from counsel for Mid-West to Ms. Bartlett is not legal advice in any context. Instead, the conveyance of such factual information from counsel for Mid-West to Ms. Bartlett appears to be unsolicited planting of facts in the mind of the witness and obviously corrupted her testimony. It appears that prior to discussions with Mid-West's counsel, Ms. Bartlett had discerned only a limited number of differences between the '156 Patent and the Mid-West Bay Isle wicker crates. After her discussions with Mid-West's counsel, Ms. Bartlett identified a greater number of differences between the two designs. In fact, Ms. Bartlett is on record as attributing her knowledge of the additional differences to Mid-West's counsel's identification of

those to her.  Certainly, Plaintiff Simpson is fully entitled to discover what differences Ms. Bartlett recognized on her own, and what differences Mid-West's lawyers pointed out to her.

### C. The Factual Knowledge of Brenda Bartlett is Not Protected by the Work Product Doctrine or Mental Processes Doctrine.

Under Federal Rule of Civil Procedure Rule 26 (b)(3)(A), ordinarily, a party may not discover *documents and tangible things* that are prepared in anticipation of litigation or for trial by or for another party or its representative.  Fed. Rule. 26 (b)(3)(A) (emphasis added).  If the court orders discovery of those *materials*, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation. Fed. Rule Civ. Pro. Rule 26(b)(3)(B).  In the present instance, Plaintiff Simpson is not requesting the discovery of documents or other tangible things, but is merely requesting the opportunity to discover the extent of Ms. Bartlett's personal knowledge pertaining to this case.  Clearly, Fed. Rule Civ. Pro. Rule 26 does not protect such testimony from being elicited by Ms. Bartlett.  Counsel for Mid-West's objections pertaining to work product and mental processes are inappropriate.

### D. Conversations Between Brenda Bartlett and James Wingate are Not Privileged.

The attorney-client privilege applies only to communications between an **attorney** and the client. United States v. Rockwell Int'l, 897 F.2d 1255, 1265 (3d Cir. 1990)(emphasis added; citing Arthur Young, 465 U.S. at 817-20). This rule has been sparingly expanded to only include agents of the attorney, such as accountants hired specifically for litigation. *See also* Schwimmer at 244 (asserting joint defense protection over communications to the attorney and to his agent, an accountant hired for the litigation). Whether or not conversations, outside the presence of counsel, between employees of a company that involve the legal opinions and mental impressions of counsel for the company are privileged or not—it appears to be an open question in the 11th Circuit—certainly no privilege extends to protect any portion of the conversation that pertains to the individuals' opinions or impressions. Reginald Martin Agency, Inc. v Conseco Med. Ins. Co., (2006, SD Ind) 460 F. Supp. 2d. 915.

Counsel for Defendant has asserted attorney-client privilege as a blanket protection over meetings and conversations to which counsel was not even a party. Plaintiff has been denied full access to the truth in the discovery process in this case, particularly in the deposition testimony given by Ms. Bartlett concerning her discussions with Mr. Wingate prior to her deposition. The record reflects that Ms. Bartlett spoke to Mr. Wingate about the present case prior to giving her sworn

testimony.  BB 23:23-25:14.  Ms. Bartlett stated that Mr. Wingate never told her that the information was privileged, nor that the information related to advice given by counsel for Mid-West.  BB 27:3-12, 28:17-23.  It has not been established, or even suggested, that there was a communication of legal advice of *any sort* between Mr. Wingate and Ms. Bartlett.  Moreover, even if any legal advice was passed to Ms. Bartlett via Mr. Wingate, there does not seem to be any reason for it.  Ms. Bartlett is an Inside Sales Manager.  She has no policymaking authority and her job duties could not possibly have been affected by legal advice from counsel.  Therefore, Simpson is entitled to discover the content of the communications between Mr. Wingate and Ms. Bartlett, and particularly, any content relating to Mr. Wingate's opinions or impressions.

## IV.  APPROPRIATE RELIEF

Relief is appropriate under both Fed. R. Civ. P. Rule 37 and 28 U.S.C. §1927, and this Court has broad latitude to fashion relief appropriate to the defendant's failure to make discovery.  Federal courts have the inherent power to control the conduct of the parties who appear before them, including the power to punish conduct which abuses the judicial process.  Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991).  This includes a number of sanctions, including an assessment of fines, costs or attorney's fees, or even the more severe sanction of dismissal.  *Id.*

Sanctions for discovery abuses are intended to prevent unfair prejudice to litigants and to insure the integrity of the discovery process. Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 (11th Cir. 2005).

Under the present circumstances, Plaintiff Simpson Ventures respectfully suggests that this situation can only be corrected by an order providing three separate forms of relief; one, to compel the fact testimony of Brenda Bartlett regarding the topics inappropriately objected to by Defendant's counsel, two, to order the Defendant to pay the costs, expenses and attorney's fees associated with having to retake the deposition of Ms. Bartlett, and three, to allow a jury instruction showing Defendant's misconduct. Plaintiff should also be awarded its fees and costs associated with bringing the present Motion.

## A. This Court Should Compel the Retaking of the Deposition of Brenda Bartlett.

Plaintiff Simpson Ventures should be permitted to conduct further deposition of Ms. Bartlett. Plaintiff Simpson Ventures deserves said retaking without the meddling of Mid-West's counsel and with Ms. Bartlett fully aware of her obligations to answer questions put to her, under oath. What's more, the Court should caution Defendant's counsel for his abuse of the attorney-client privilege, specifically, as a means to the end of disrupting the deposition process through unwarranted objections, and to the end of being able to, under the guise of

attorney-client privilege, instruct the witness not to testify.

**B.  This Court Should Award the Plaintiff Costs, Expenses and Attorneys Fees for the Instant Motion and the Retaking of the Deposition of Ms. Bartlett.**

Defendant Mid-West should bear the cost, expense and attorneys fees of the retaking of Ms. Bartlett's deposition.  The "inherent power" of a court can be invoked even if procedural rules exist which sanction the same conduct." Chambers, 501 U.S. at 46.  One aspect of a court's inherent power is the ability to assess attorneys' fees and costs against the client or his attorney, or both, when either has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 45-46.

Because Mid-West's counsel's deliberate behavior has caused the need to retake the deposition of Ms. Bartlett, the Court should require Mid-West to bear both the costs, expenses and attorney's fees of bringing this Motion to Compel and of the costs, expenses and attorney's fees for retaking the deposition pursuant to Rules 30(d)(2) and 37(a)(3)(B)(i).  If the Court does not impose sanctions in this case, the Defendant Mid-West loses nothing, and gains the ability to continue the suppression of the truth.  Clearly, if the Court wishes to deter such conduct, it must order costs, expenses and attorney's fees--a reasonable and just dessert.

**C.  This Court Should Allow the Plaintiff a Jury Instruction Indicating that Some of Mid-West's Witnesses Have Been Tainted by Counsel.**

Moreover, as at least one of the witnesses for Mid-West have been persuaded to testify to facts or assertions in support of Mid-West's legal position, instead of merely what they know or knew, and in light of Mid-West's extensive efforts to thwart Plaintiff's discovery in this matter, it is appropriate that Plaintiff be allowed a jury instruction indicating that at least some of the testimony of Mid-West's witnesses is tainted by things the attorneys told them or by what other Mid-West employees told them.

Respectfully submitted this 15th day of June, 2008.

_____/s/ Arthur A Gardner_____
Arthur A. Gardner
GA Bar No. 283,995
Joseph W. Staley
GA Bar No. 142,571
Email: agardner@gardnergroff.com
GARDNER GROFF, GREENWALD
& VILLANUEVA, P.C.
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339
Tel: (770) 984-2300
Fax: (770) 984-0098
*Attorneys for Plaintiff*

Brenda Bartlett Deposition Excerpts

1

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF ALABAMA
2                     EASTERN DIVISION

3    SIMPSON VENTURES, INC.,          )
            Plaintiff,                )
4                                     )
                  -vs-                )
5                                     )
     MID-WEST METAL PRODUCTS          )
6    COMPANY, INC.,                   ) Civil Action File No.
            Defendant.                ) 3:06-cv-00901-WKW-VPM
7    _____)
                                      )
8    MID-WEST METAL PRODUCTS          ) Case No. 3:07-cv-
     COMPANY, INC.,                   ) 00048 WHA-CSC
9           Counterclaimant,          )
                                      )
10                -vs-                )
                                      )
11   SIMPSON VENTURES, INC.,          )
            Counterdefendant.         )
12

13            DEPOSITION OF BRENDA BARTLETT

14        The deposition upon oral examination of
     BRENDA BARTLETT, a witness produced and sworn
15   before me, Jenny L. Reeve, RPR, CSR No. 00-R-3006,
     a Notary Public in and for the County of Hamilton,
16   State of Indiana, taken on behalf of the Plaintiff,
     at the offices of Bingham McHale, 2700 Market
17   Tower, 10 West Market , Indianapolis, Marion
     County, Indiana, on the 28th day of May, 2008, at
18   1:59 p.m., pursuant to the Federal Rules of Civil
     Procedure, all applicable rules, and all
19   stipulations, if any, stated on the record, and
     pursuant to written notice and/or agreement and/or
20   subpoena as to time and place thereof.

21

22

23
     Connor + Associates, Inc.
24   1650 One American Square
     Indianapolis, IN 46282
25   (317) 236-6022

2

1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFF AND COUNTERDEFENDANT:
     Simpson Ventures, Inc.
4
              Arthur A. Gardner, Esq.
5             Joseph W. Staley, Esq.
              GARDNER GROFF GREENWALD & VILLANUEVA, PC
6             2018 Powers Ferry Road, Suite 800
              Atlanta, GA  30339
7             agardner@gardnergroff.com
              jstaley@gardnergroff.com
8

9    FOR THE DEFENDANT AND COUNTERCLAIMANT:
     Mid-West Metal Products Company, Inc.
10
              James M. Hinshaw, Esq.
11            BINGHAM McHALE LLP
              2700 Market Tower
12            10 West Market Street
              Indianapolis, IN  46204-4900
13            nbowling@binghammchale.com

14
     ALSO PRESENT:
15
              Mr. Jeff Simpson
16

17

18         I N D E X   O F   E X A M I N A T I O N

19                                          Page

20   DIRECT EXAMINATION  . . . . . . . . . . . .    4
          Questions by Mr. Joseph W. Staley
21
     CROSS-EXAMINATION . . . . . . . . . . . . .   94
22        Questions by Mr. James M. Hinshaw

23   CONFIDENTIAL TESTIMONY  . . . . . . . . . .   12

24

25

3

1              I N D E X   O F   E X H I B I T S

2                                                    Page

3     Deposition Exhibit No.:

4     2     Previously marked  .......................    30

5     2     Previously marked  .......................    43

6     2     Previously marked  .......................    48

7     3     Previously marked  .......................    31

8     4     Previously marked  .......................    30

9     4     Previously marked  .......................    42

10    37    Previously marked  .......................    73

11    77    Previously marked  .......................    48

12    120   Copy of document entitled Bay Isle ......    85
            Replacements, Bates Confidential MWM
13          001479 thru 1485

14

15

16

17

18

19

20

21

22

23

24

25

10

```
 1   A    I have -- I had a group of employees at that time, I
 2        believe four, customer service, that handled all of
 3        the pet sales, orders, inventory, co-op, different
 4        functions of the department.
 5   Q    And what position do you hold today?
 6   A    The job has grown into inside sales manager, is my
 7        title currently at the time.
 8            I'm -- are you going to ask me another -- I
 9        mean ...
10   Q    I'm sorry.  I thought you were still continuing.
11   A    No.
12   Q    What was the difference between your previous
13        position as sales manager and your current position
14        as inside sales manager?
15   A    I worked more with the independent and the in-house
16        sales rep'g groups.
17   Q    When you say "independent," do you mean outside
18        sales reps?
19   A    Yes.
20   Q    And presently, how many people do you manage as the
21        inside sales manager?
22   A    Right now I have five inside salespeople, and we
23        have -- we have probably 24 sales reps.
24   Q    Are those sales reps employed by Mid-West, or are
25        those the independent --
```

23

| | | |
|---|---|---|
| 1 | A | It's mid year.  June and December -- or July and |
| 2 | | December. |
| 3 | Q | Before you started working at Mid-West, did you |
| 4 | | have any experience with pet products previous to |
| 5 | | this job? |
| 6 | A | I did not. |
| 7 | Q | Have you ever been sued by any chance -- |
| 8 | A | No. |
| 9 | Q | -- personally? |
| 10 | A | No. |
| 11 | Q | Have you ever been involved in any kind of patent |
| 12 | | litigation? |
| 13 | A | No. |
| 14 | Q | Have you ever been involved in any way in any type |
| 15 | | of non-patent litigation, or any other type of |
| 16 | | litigation? |
| 17 | A | No. |
| 18 | Q | Have you talked to or written anything to anyone |
| 19 | | about this lawsuit? |
| 20 | A | I'm sorry.  Repeat that. |
| 21 | Q | Have you talked to or written anything or written to |
| 22 | | anyone about this lawsuit? |
| 23 | A | I've talked to Mr. Hinshaw and Mr. Wingate, but I've |
| 24 | | not written. |
| 25 | Q | What did you talk with Mr. Wingate about? |

24

1        MR. HINSHAW:  I'm going to object.  To the

2    extent any communications you had with Jim Wingate

3    about this lawsuit related to his seeking advice

4    from me or anybody from my office, or our provision

5    of advice, the things that we talked about with Jim

6    Wingate, then that's privileged and I would instruct

7    you not to answer.

8        If you can answer his question in terms of

9    talking about this lawsuit without disclosing

10    litigation strategies, what the attorneys had to

11    say, mental processes or strategies, or things like

12    that, if you can answer that, then you can answer.

13    If you can't, then I'm instructing you not to

14    answer.

15  A   Mr. Wingate just asked me to look for documents that

16    had anything to do with wicker.

17  BY MR. STALEY:

18  Q   Did you look at any documents?

19  A   Yes.

20  Q   And did you give those documents to Mr. Wingate?

21  A   Yes.

22  Q   Did you and Mr. Wingate talk about anything else?

23    Not necessarily -- I'm not asking you to tell me

24    what you talked about.

25        I'm asking did you and Mr. Wingate talk about

25

1      anything else other than you looking for documents

2      relating to wicker?

3  A   And why?

4  Q   No, no.  I just want to know a yes-or-no answer.

5          MR. HINSHAW:  And yet, relating to this

6      litigation.

7          MR. STALEY:  Yes.  Not in --

8          MR. HINSHAW:  His --

9          MR. STALEY:  -- the context of --

10         MR. HINSHAW:  His question is simply calling

11     for a yes-or-no answer.  Did you talk to Mr. Wingate

12     about this litigation other than looking for

13     documents?  Yes or no.

14  A   Yes.

15  BY MR. STALEY:

16  Q   And you believe those conversations are privileged

17     in lieu of Mr. Hinshaw's advice today?

18  A   Yes.

19  Q   Did anyone instruct you to do or say anything in

20     regards to this lawsuit?

21  A   No.

22         MR. HINSHAW:  Do you mean other than looking

23     for documents?

24         MR. STALEY:  Yeah.  I'm sorry.

25

26

BY MR. STALEY:

1  
2   Q    I understood you've been told to look for documents.

3        I guess I'm asking for anything other than

4        looking for documents.  Has anybody instructed you

5        to do or say anything with regards to this lawsuit?

6   A    No.

7   Q    Has anyone instructed you -- other than, again,

8        relating to those documents, has anyone instructed

9        you not to do or say anything in regards to this

10       lawsuit?

11  A    No.  I mean ...

12  Q    Going back to those conversations with Mr. Wingate,

13       other than the conversations about the documents,

14       is there any particular reason why you believe those

15       conversations are privileged?

16       Let me ask this.  Why do you think those

17       conversations that you've refrained from speaking

18       about are privileged?

19       MR. HINSHAW:  Again, I'll object to the

20       question and instruct the witness that in answering

21       that question, if you can't answer Mr. Staley's

22       question without speaking to the content of those

23       communications which you believe are privileged,

24       then I'm instructing you not to answer his question

25       because it is privileged.

27

1   A    Yeah, I believe that.

2   BY MR. STALEY:

3   Q    Did Mr. Wingate discuss advice he'd received from

4        his counsel?  Did he tell you that the conversations

5        were advice he received from his counsel?

6   A    No.

7   Q    Do you have any reason to believe those

8        conversations revolved around advice that he had

9        received from his legal counsel?

10  A    No.

11  Q    Then I'll ask again why you think those

12       conversations are privileged.

13           MR. HINSHAW:  Do you need to confer with me

14       about whether or not --

15           THE WITNESS:  Yeah, I do.

16           MR. STALEY:  Why don't you guys step outside

17       and talk about this and figure out whether the

18       communication is privileged or not.

19           Let's go off the record.

20           (A recess is taken, after which, the

21       proceedings resume as follows:)

22           MR. STALEY:  Back on the record.

23  BY MR. STALEY:

24  Q    Going back to the line of questions that we had

25       before the short break here, can you tell me about

28

1      your conversations with Mr. Wingate about this

2      lawsuit outside of material that you believe is

3      privileged.

4  A   Yes.  Mr. Wingate, when he asked me to look for the

5      documents, he told me that we had been sued for

6      patent infringement.  He discussed it again with me

7      when he found out that I probably would be deposed,

8      and asked me to get with Mr. Hinshaw to set up the

9      time and date.

10  Q   So all -- he just asked you to get together with

11      Mr. Hinshaw to set up your deposition time and date;

12      is that correct?

13  A   Yes.

14  Q   And there is more that he said that you believe is

15      privileged; is that correct?

16  A   That's correct.

17  Q   But again, he never told you that any of that

18      information was privileged, correct?

19  A   At one time or another -- I would say no.

20  Q   Just to confirm, he never -- and he never told you

21      that these communications were what the lawyer had

22      told him?

23  A   That's correct.  He did not.

24  Q   Did you review any documents in preparation of your

25      deposition today?

29

1    A    Yes.

2    Q    What documents were those?

3         MR. HINSHAW:  I'm going to object.  Calls for

4         the disclosure of attorney-client privilege,

5         anticipation of litigation, and work product mental

6         processes, and I'm going to instruct the witness not

7         to answer.

8    BY MR. STALEY:

9    Q    Who did you discuss the deposition with?

10   A    Mr. Hinshaw.

11   Q    And nobody else except for Mr. Wingate; is that

12        correct?

13   A    That's correct.

14   Q    Did you bring any documents with you today?

15   A    I did not.

16   Q    Have you ever been deposed before?

17   A    No.

18   Q    Have you ever been an inventor on a patent before?

19   A    No.

20   Q    Have you ever been convicted of any crimes?

21   A    No.

22   Q    Have you ever been accused of fraud or perjury?

23   A    No.

24   Q    Do you have any medication or health problems

25        that would affect your memory or ability to give

46

```
 1        the sides so you can see how the crate is -- how
 2        sturdy the crate is.
 3    Q   Now -- I'm sorry.  But we're referring to the --
 4        we're referring to the rear view --
 5    A   Yes.
 6    Q   -- of the Mid-West Bay Isle line crate?
 7    A   Yes.  Has the opening at the top, between the top
 8        and side panels, and also down the sides.
 9            We have -- we have the woven lines going
10        across the top, the side panel on the windows.
11        It's kind of a different weave than the rest of it,
12        and that carries through across the top and all
13        around the cage.
14    Q   During the course of your involvement in this
15        litigation, has anyone discussed those differences
16        with you?
17    A   Yes.
18    Q   Who was that?
19    A   Mr. Hinshaw.
20    Q   Other than Mr. Hinshaw, has anybody else discussed
21        those differences with you?
22    A   No.
23    Q   Did you notice all the differences on your own, or
24        did you rely on Mr. Hinshaw to point those out to
25        you?
```

47

1    A    The majority of them I realized on my own.

2    Q    Which ones did you not realize on your own?

3    A    I didn't pick up the gap across the top.

4         MR. HINSHAW:  I'm going to object --

5         THE WITNESS:  Oh, I'm sorry.

6         MR. HINSHAW:  -- to the extent that we are now

7    getting into attorney-client communications and

8    discussions.

9         And I'm going to instruct the witness to not

10   answer, as it calls for attorney-client privilege,

11   anticipation of litigation, and work product

12   privilege.

13        MR. STALEY:  I think what features you didn't

14   recognize on your own is not privileged in any way.

15   BY MR. STALEY:

16   Q    So I'd ask you to please answer that question.

17        MR. HINSHAW:  And I'm instructing you not to

18   answer it.

19   A    I won't answer the question.

20        MR. STALEY:  James, what is your basis for

21   making that objection?

22        MR. HINSHAW:  Because the contra of that, the

23   flip side of that is what I did discuss with her.

24        MR. STALEY:  What points she didn't recognize

25   on her own has nothing to do with any privileged

BRENDA BARTLETT
MAY 28, 2008

## Page 45

1    Mid-West has the square openings at the top of
2    the crate.
3  Q  I'm sorry. Could you point again to it. You said
4    Mid-West had a square opening at the top?
5  A  At the top, the square notches.
6  Q  So we're talking about the side panel and --
7  A  The top panel, yes.
8  Q  In the first picture of Exhibit 2. And you're
9    pointing to the top of the side panel?
10 A  Yes.
11 Q  And referencing those openings there; is that
12   correct?
13 A  Yes. I believe they're -- there's a big difference
14   in the way they're assembled. Ours has rods in each
15   corner that hold it together. The side panel of the
16   Simpson crate appears to be two pieces. I don't
17   know for a fact that that's the case. Again, it has
18   the diamond, Simpson. Ours has the square woven
19   panels at the bottom.
20 Q  Now we're referring to the --
21 A  Side panels.
22 Q  -- side panel views of the Mid-West crate and the
23   Simpson Ventures crate, correct?
24 A  Yes. Again, we have the -- the Mid-West crate has
25   the gap along the top, the opening, and then along

## Page 46

1    the sides so you can see how the crate is -- how
2    sturdy the crate is.
3  Q  Now -- I'm sorry. But we're referring to the --
4    we're referring to the rear view --
5  A  Yes.
6  Q  -- of the Mid-West Bay Isle line crate?
7  A  Yes. Has the opening at the top, between the top
8    and side panels, and also down the sides.
9    We have -- we have the woven lines going
10   across the top, the side panel on the windows.
11   It's kind of a different weave than the rest of it,
12   and that carries through across the top and all
13   around the cage.
14 Q  During the course of your involvement in this
15   litigation, has anyone discussed those differences
16   with you?
17 A  Yes.
18 Q  Who was that?
19 A  Mr. Hinshaw.
20 Q  Other than Mr. Hinshaw, has anybody else discussed
21   those differences with you?
22 A  No.
23 Q  Did you notice all the differences on your own, or
24   did you rely on Mr. Hinshaw to point those out to
25   you?

## Page 47

1  A  The majority of them I realized on my own.
2  Q  Which ones did you not realize on your own?
3  A  I didn't pick up the gap across the top.
4    MR. HINSHAW: I'm going to object --
5    THE WITNESS: Oh, I'm sorry.
6    MR. HINSHAW: -- to the extent that we are now
7    getting into attorney-client communications and
8    discussions.
9    And I'm going to instruct the witness to not
10   answer, as it calls for attorney-client privilege,
11   anticipation of litigation, and work product
12   privilege.
13   MR. STALEY: I think what features you didn't
14   recognize on your own is not privileged in any way.
15 BY MR. STALEY:
16 Q  So I'd ask you to please answer that question.
17   MR. HINSHAW: And I'm instructing you not to
18   answer it.
19 A  I won't answer the question.
20   MR. HINSHAW: James, what is your basis for
21   making that objection?
22   MR. HINSHAW: Because the contra of that, the
23   flip side of that is what I did discuss with her.
24   MR. STALEY: What points she didn't recognize
25   on her own has nothing to do with any privileged

## Page 48

1    information whatsoever. It's merely features that
2    she was told by somebody whether or not they were
3    there.
4    MR. HINSHAW: And the "told by somebody" is
5    counsel. So that's an attorney-client privilege.
6    So I'm going to instruct her not to answer.
7  BY MR. STALEY:
8  Q  All right. I'm now going to hand you what has been
9    previously marked as Exhibit 77. And I'd ask you if
10   you've ever seen that exhibit before, or have you
11   ever seen that patent before?
12 A  Yes.
13 Q  When have you seen Exhibit 77 before, ma'am?
14 A  With Mr. Hinshaw.
15 Q  Had you seen this patent before meeting with
16   Mr. Hinshaw?
17 A  No.
18 Q  Do you know who the owner of the patent shown in
19   Exhibit 77 is?
20 A  Mr. Simpson.
21 Q  I want you to look at the figures that are in the
22   patent of Exhibit 77, and I want you to again look
23   at the Mid-West Bay Isle pet crate of Exhibit 2.
24   And I'd like you to tell me if there are additional
25   differences -- just tell me what the differences are

**BRENDA BARTLETT**
**MAY 28, 2008**

| | Page 53 | | Page 55 |
|---|---|---|---|
| 1 | you can tell from figure 1? | 1 | MR. HINSHAW: Could I have that question read |
| 2 | **A No.** | 2 | back, please. |
| 3 | Q Let's look at figure 2, which I think corresponds to | 3 | (The reporter reads back as requested.) |
| 4 | page 3 of Exhibit 2. | 4 | MR. HINSHAW: Objection to form. |
| 5 | **A All right. Again, we have the door, and they're** | 5 | BY MR. STALEY: |
| 6 | **both made of -- appear to be made of wicker or** | 6 | Q Let me ask that a different way. |
| 7 | **rattan.** | 7 | Is the crate depicted in the Simpson Ventures |
| 8 | Q So the same thing we just discussed. The door -- | 8 | patent of Exhibit 77, is it similar to the Mid-West |
| 9 | you agreed the doors have the same shape? | 9 | crate of Exhibit 2? |
| 10 | **A Yes.** | 10 | **A Yes.** |
| 11 | Q The doors are both uncovered, and the door -- I mean | 11 | Q Now, when you first looked at the Simpson Ventures |
| 12 | the rest of it's made of wicker? | 12 | patent of Exhibit 77, and looked at the Mid-West -- |
| 13 | **A Yes.** | 13 | Exhibit 2 here, the Mid-West crate, what differences |
| 14 | Q Let's move on to figure 3, if you will. | 14 | did you notice on your own? |
| 15 | **A Oh, 3, at the bottom? Oh, it's in the back.** | 15 | MR. HINSHAW: Well ... |
| 16 | **They're both wicker, or appear to be. And they** | 16 | MR. STALEY: James, I'm asking about a |
| 17 | **both have a window.** | 17 | completely different exhibit here than before. |
| 18 | Q Are the windows both rectangles? | 18 | MR. HINSHAW: Yeah, I realize that. |
| 19 | **A That's correct, yes.** | 19 | Do you believe you can answer that question |
| 20 | Q Let's look at figure 4, then. Any features similar | 20 | without disclosing communications that you had |
| 21 | between figure 4 of Exhibit 77, which is the patent, | 21 | with me? |
| 22 | or the top view of the Mid-West Bay Isle crate? | 22 | THE WITNESS: No. |
| 23 | **A They both are made of wicker, and they're both** | 23 | MR. HINSHAW: Then I'm going to object on the |
| 24 | **rectangular.** | 24 | basis of attorney-client privilege, anticipation of |
| 25 | Q Is the weave -- other than the rectangles -- excuse | 25 | litigation, work product privilege, and instruct the |

| | Page 54 | | Page 56 |
|---|---|---|---|
| 1 | me -- other than the squares showing in the top of | 1 | witness not to answer. |
| 2 | Exhibit 2, does the weave, the wicker weave look | 2 | MR. STALEY: James, I didn't ask you if you |
| 3 | similar to you? | 3 | had any involvement in her discerning differences |
| 4 | **A Yes.** | 4 | between the patent of Exhibit 77. I asked if she |
| 5 | Q All right. If we could, let's move on to figure 5. | 5 | was able to discern all those differences that she's |
| 6 | **A Again, they both have a window, and they both appear** | 6 | espoused on her own. |
| 7 | **to be made out of wicker or rattan.** | 7 | THE WITNESS: May I talk to you in the hallway? |
| 8 | Q Again, the windows are the same rectangular shape? | 8 | MR. HINSHAW: Yeah. |
| 9 | **A I believe that they're the same length, but not** | 9 | MR. GARDNER: Let's take five, I guess. |
| 10 | **height.** | 10 | (A recess is taken, after which, the |
| 11 | Q But they're both rectangles? | 11 | proceedings resume as follows:) |
| 12 | **A That's correct.** | 12 | MR. HINSHAW: Is there a question pending? |
| 13 | Q All right. Let's go back and look at figure 1 | 13 | THE REPORTER: Yes, there is. Do you want me |
| 14 | briefly. | 14 | to read that back? |
| 15 | **A Okay.** | 15 | MR. HINSHAW: Yes, please. |
| 16 | Q And I believe that would be page 1 of Exhibit 2. | 16 | (The reporter reads back as requested.) |
| 17 | Are the -- are both crates generally a | 17 | MR. HINSHAW: I stand on that objection and |
| 18 | rectangular box? | 18 | those privileges. Just to make it clear, |
| 19 | **A Yes.** | 19 | anticipation of litigation, work product, mental |
| 20 | Q Are they similar in that way? | 20 | processes, and attorney-client communications. And |
| 21 | **A Yes.** | 21 | I'm going to instruct the witness not to answer. |
| 22 | Q So like with the Simpson Ventures product that we | 22 | BY MR. STALEY: |
| 23 | discussed earlier, and now looking at the patent, | 23 | Q Are you going to answer that question or are you |
| 24 | would you also say that the patent is somewhat | 24 | going to listen to your counsel's instructions? |
| 25 | similar to the Mid-West crate of Exhibit 2? | 25 | **A I'm going to take my counsel's instructions.** |

**CONFIDENTIAL**

BRENDA BARTLETT
MAY 28, 2008

| Page 57 | Page 59 |
|---|---|

**Page 57**

1　Q　Without telling me who told you, are there any
2　　differences between the embodiment shown in
3　　Exhibit 77, which is the Simpson Ventures pattern,
4　　and the Mid-West crate shown in Exhibit 2?  Are
5　　there any differences between those embodiments that
6　　you did not notice on your own?
7　　　　MR. HINSHAW:  Same objections, same privileges,
8　　and same instruction.
9　BY MR. STALEY:
10　Q　Are you going to answer the question?
11　A　No, I'm not.
12　Q　Generally, not looking at these exhibits anymore,
13　　was there anything that you were told to say today
14　　in this deposition, without revealing who that
15　　person may have been, that you didn't already have
16　　in your personal knowledge before you -- before you
17　　discussed the deposition with anybody else?
18　　　　MR. HINSHAW:  I'm going to object to that
19　　question because I don't understand what it means.
20　　So objection, form, foundation.
21　　　　MR. STALEY:  Let me rephrase it.
22　BY MR. STALEY:
23　Q　Were you told to say specific things at this
24　　deposition that you didn't already have previous
25　　knowledge of, without revealing who that person may

**Page 59**

1　　　　MR. STALEY:  And you realize I'm not asking her
2　　for what the testimony was.  I'm asking was there
3　　any instance of specific testimony that she was
4　　instructed to say today.
5　　　　MR. HINSHAW:  But in your question, you're
6　　essentially putting content of the communication
7　　into the form of your question and asking her to
8　　endorse that or not, and that's essentially calling
9　　for content of communication.
10　　　　I would stand on my objections and stand on
11　　my instructions to the witness and an assertion of
12　　privilege.
13　　　　MR. STALEY:  James, can I see you outside for a
14　　second?
15　　　　MR. HINSHAW:  Sure.  Why don't we go off the
16　　record.
17　　　　(A recess is taken, after which, the
18　　proceedings resume as follows:)
19　BY MR. STALEY:
20　Q　Earlier, we were discussing the differences that you
21　　saw between the patent of Exhibit 77 and Exhibit 2,
22　　which is the Mid-West Bay Isle line.
23　　　　Did anyone at Mid-West point out any of the
24　　differences between the patent and the wicker kennel
25　　of Exhibit 2?

| Page 58 | Page 60 |
|---|---|

**Page 58**

1　　have been?
2　　　　MR. HINSHAW:  Objection to form and foundation.
3　　I have no idea what you're referring to, but to the
4　　extent you're talking about discussions that I had
5　　with the witness in preparation for this deposition,
6　　then I'm objecting.  It calls for attorney-client
7　　communications, anticipation of litigation, work
8　　product and mental processes, and I would instruct
9　　the witness to not answer to that.
10　　　　MR. STALEY:  Let me ask the question one more
11　　time.  I'll rephrase it again.
12　BY MR. STALEY:
13　Q　Were you told to say anything at this deposition
14　　that you do not have personal knowledge of without
15　　revealing who that person may have been?
16　　　　MR. HINSHAW:  Same objections, same
17　　instructions, same privileges.
18　BY MR. STALEY:
19　Q　Can you answer the question?
20　A　No, I cannot.
21　Q　Did Mr. Hinshaw instruct you to answer or to give
22　　any specific testimony that you did not already have
23　　knowledge of before meeting with Mr. Hinshaw?
24　　　　MR. HINSHAW:  Same objections and same
25　　privileges and same instructions.

**Page 60**

1　A　No one at Mid-West pointed out the differences
2　　between the two crates.
3　Q　Did you, on your own, identify all of those
4　　differences between the patent of Exhibit 77 and the
5　　Mid-West Bay Isle crate of Exhibit 2?
6　　　　MR. HINSHAW:  Same objections, same privileges,
7　　same instructions.
8　　　　MR. STALEY:  When you say "same objections,
9　　same privileges, same instructions," could you
10　　expound upon that for me?
11　　　　MR. HINSHAW:  Yes.  Again, attorney-client
12　　communication, anticipation of litigation, work
13　　product and mental processes are the privileges that
14　　we are asserting, and I'm instructing the witness to
15　　not answer that question.
16　BY MR. STALEY:
17　Q　And are you going to take your counsel's advice?
18　A　Yes, I am.
19　Q　I believe you identified as a difference, and that
20　　the side panel of the Simpson Ventures patent
21　　appears to be two panels, correct?
22　A　Correct.
23　Q　And the Mid-West product appears to be one panel; is
24　　that correct?
25　A　That's correct.

CONFIDENTIAL

James Wingate Deposition Excerpts

---

**Page 1**

[1]             IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF ALABAMA
[2]                         EASTERN DIVISION

[3]
     SIMPSON VENTURES, INC.,        )
[4]          Plaintiff,             )
                                    )
[5]          -vs-                   )
                                    )
[6]  MID-WEST METAL PRODUCTS        )
     COMPANY, INC.,                 ) Civil Action File No.
[7]          Defendant.             ) 3:06-cv-00901-WKW-VPM
     _____)
[8]                                 )
     MID-WEST METAL PRODUCTS        ) Case No. 3:07-cv-
[9]  COMPANY, INC.,                 ) 00048 WHA-CSC
             Counterclaimant,       )
[10]                                )
             -vs-                   )
[11]                                )
     SIMPSON VENTURES, INC.,        )
[12]         Counterdefendant.      )

[13]

[14]         DEPOSITION OF JAMES W. WINGATE, JR.

[15]      The deposition upon oral examination of
     JAMES W. WINGATE, JR., a witness produced and sworn
[16] before me, Jenny L. Reeve, RPR, CSR No. 00-R-3006,
     a Notary Public in and for the County of Hamilton,
[17] State of Indiana, taken on behalf of the Plaintiff
     and Counterdefendant, at the offices of Bingham
[18] McHale, 2700 Market Tower, 10 West Market Street,
     Indianapolis, Marion County, Indiana, on the
[19] 16th day of April, 2008, at 10:10 a.m., pursuant to
     the Federal Rules of Civil Procedure, all
[20] applicable rules, and all stipulations, if any,
     stated on the record, and pursuant to written
[21] notice and/or agreement and/or subpoena as to time
     and place thereof.

[22]

[23]
     Connor + Associates, Inc.
[24] 1650 One American Square
     Indianapolis, IN 46282
[25] (317) 236-6022

---

**Page 2**

[1]              A P P E A R A N C E S

[2]

[3]  FOR THE PLAINTIFF AND COUNTERDEFENDANT:
     Simpson Ventures, Inc.
[4]
          Arthur A. Gardner, Esq.
[5]       Joseph W. Staley, Esq.
          GARDNER GROFF GREENWALD & VILLANUEVA, PC
[6]       2018 Powers Ferry Road, Suite 800
          Atlanta, GA  30339
[7]       agardner@gardnergroff.com
          jstaley@gardnergroff.com
[8]

[9]  FOR THE DEFENDANT AND COUNTERCLAIMANT:
     Mid-West Metal Products Company, Inc.
[10]
          James M. Hinshaw, Esq.
[11]      Neal Bowling, Esq.
          BINGHAM McHALE LLP
[12]      2700 Market Tower
          10 West Market Street
[13]      Indianapolis, IN  46204-4900
          jhinshaw@binghammchale.com
[14]      nbowling@binghammchale.com

[15]

[16] ALSO PRESENT:

[17]      Mr. Jeff Simpson

[18]      I N D E X   O F   E X A M I N A T I O N

[19]                                          Page

[20] DIRECT EXAMINATION . . . . . . . . . . . .   5
        Questions by Mr. Arthur A. Gardner
[21]
     CONFIDENTIAL TESTIMONY  . . . . . . . . .   12
[22]
     CONFIDENTIAL TESTIMONY  . . . . . . . . .   74
[23]

[24]

[25]

---

**Page 3**

[1]            I N D E X   O F   E X H I B I T S

[2]                                                Page

[3] Deposition Exhibit No.:

[4]  6-Swan     Previously marked . . . . . . . . . .  36

[5] 10-Swan     Previously marked . . . . . . . . . .  22

[6] 10-Swan     Previously marked . . . . . . . . . .  46

[7] 22-Swan     Previously marked . . . . . . . . . .  56

[8] 25-Swan     Previously marked . . . . . . . . . .  57

[9] 35-Swan     Previously marked . . . . . . . . . .  17

[10] 37-Swan    Previously marked . . . . . . . . . .  66

[11] 38-Wingate  Copy of Mid-West in-house . . . . . .  39
        email dated November 20, 2002, with
[12]    attachment, Bates MWM 00853

[13] 39-Wingate  Copy of certified letter from . . .  62
        Bradley Arant/John Smith letter dated
[14]    November 4, 2003 to James Wingate/Midwest
        Homes for Pets, regarding pet containment
[15]    device

[16] 40-Wingate  Copy of certified letter . . . . . . . .  62
        dated November 19, 2003, from Bradley
[17]    Arant/John Smith to James Wingate/Midwest
        Homes for Pets, regarding pet containment
[18]    device

[19] 41-Wingate  Copy of executed purchase . . . . . .  77
        agreement dated April 20, 1999, by and
[20]    between Handy Hound Products and Mid-West
        Metal Products, with regard to animal
[21]    waste collection, Bates MWM 00803 thru
        00807
[22]
     42-Wingate  Copy of executed license . . . . . . . .  77
[23]    agreement by and between Mid-West Metal
        Products and Limberlost Products, Inc.,
[24]    with regard to bird feeders, Bates MWM
        00813 thru 830
[25]

---

**Page 4**

[1]       I N D E X   O F   E X H I B I T S  (cont'd)
[2]
                                                    Page
[3] Deposition Exhibit No.:
[4] 43-Wingate  Copy of Mid-West Homes for . . . . . .  82
        Pets advertisement, MWM 00001
[5]
     44-Wingate  Copies of various Mid-West . . . . . .  84
[6]     Homes for Pets documents, Bates MWM 00002
        thru 00005
[7]
     45-Wingate  Copy of Mid-West Homes for . . . . . .  85
[8]     Pets press release with regard to the Bay
        Isle Collection, Bates MWM 00006
[9]
     46-Wingate  Copies of documents regarding . . .  87
[10]    the Bay Isle 1824, 1830, 1836, and 1842
        series of Mid-West Homes for Pets
[11]    products, Bates MWM 00007 thru 00010
     47-Wingate  Copy of Mid-West Homes for . . . . . .  89
[12]    Pets documents with regards to 1824,
        1830, 1836, and 1846 products, Bates MWM
[13]    00011 thru 00014
[14]
     48-Wingate  Copies of Mid-West Homes for . . . .  89
[15]    Pets documents with regard to various
        products, Bates MWM 00015 thru 00016b
[16]
     49-Wingate  Copy of packing slip dated . . . . . .  91
[17]    October 21, 2003, with regard to jumbo
        litter pan cover sold to Tom Swan
[18]
     50-Wingate  Copy of Mid-West in-house . . . . . . . 106
[19]    email dated March 25, 2003, regarding
        forecast 1800 series, Bates MWM 00865
[20]
     51-Wingate  Copies of Mid-West in-house . . . . . 107
[21]    emails dated in October 2003, regarding
        1800 series wicker crates price
[22]    reduction, Bates MWM 00900 thru 901
[23] 52-Wingate  Copies of Mid-West in-house . . . . . 109
[24]    emails dated January 6, 2004, with regard
        to wicker litter box cover carton weight
[25]    est., Bates MWM 00909

---

Mid-West Metals
Simpson Ventures

Confidential

James W. Wingate, Jr.
April 16, 2008

---

**Page 65**

[1] So with respect to these two letters, has
[2] Mid-West ever changed its wicker products?
[3] A No. We didn't feel a need to do that.
[4] Q And with regard to the allegations in the two
[5] lawsuits, has Mid-West changed any of the designs in
[6] its wicker products?
[7] A No.
[8] MR. GARDNER: Before the break, I represented
[9] to you that your company may have taken a position
[10] in the lawsuit that there's been no patent marking.
[11] And during the break, your counsel and I have had a
[12] discussion about that. And there's some -- that may
[13] or may not be correct. So I didn't want to leave
[14] you with a false impression, so I just wanted to
[15] clarify that.
[16] THE WITNESS: What is that exactly?
[17] MR. GARDNER: It's my understanding that some
[18] of your discovery responses assert that at least
[19] some of the people who saw the Simpson Ventures
[20] sample products within your company did not notice
[21] any patent marking on those. And when I was asking
[22] you some questions about that earlier, I believe I
[23] prefaced my question by stating that your company is
[24] asserting such as a defense, that there has been no
[25] marking. And my characterization of that may have

---

**Page 66**

[1] exceeded the position that your company is actually
[2] taking. I may have misspoken slightly.
[3] So there's not a question pending. I just
[4] wanted to clarify that. I don't think that changes
[5] your responses to any of the questions from before.
[6] But if it does, feel free to amend that now.
[7] BY MR. GARDNER:
[8] Q Now, I -- I'm going to pass you what's previously
[9] been marked as Exhibit 37. Do you recognize this?
[10] A Saw it yesterday.
[11] Q Is that the first time you've ever seen it?
[12] A I believe it is.
[13] Q Earlier today you testified that there are some
[14] communications that are sent from Mid-West to its
[15] sales reps to help the sales reps promote Mid-West
[16] products.
[17] As far as we can determine, this is the only
[18] document that might even fall into that category
[19] that's been produced.
[20] Are you aware of communications that were sent
[21] from your company to sales reps to inform them of
[22] the new wicker line of products?
[23] A We do that. I can't say that this is what we sent
[24] out. I don't know about that. But we send out
[25] information to the sales reps.

---

**Page 67**

[1] Q Well, what was sent out to the sales reps to help
[2] launch the wicker crates?
[3] A I don't know exactly.
[4] Q What was sent out to the sales reps to help launch
[5] the wicker pet litter cover?
[6] A I don't know exactly.
[7] MR. GARDNER: Mr. Hinshaw, I would suggest to
[8] you that there's a complete dearth of such documents
[9] in the document production.
[10] MR. HINSHAW: Yeah. I was listening to your
[11] question. I can't sit here and tell you that you're
[12] wrong. I think you're wrong, but I can't cite you
[13] Bates numbers as I sit here. I don't have the
[14] documents in front of me. We will double-check.
[15] MR. GARDNER: All right.
[16] BY MR. GARDNER:
[17] Q Earlier I asked you about the door that swings both
[18] in and out. What product was that feature first
[19] introduced on by Mid-West?
[20] A That was the Bay Isle crates.
[21] Q What types of things did you do to get ready for
[22] today's deposition?
[23] A Well, we had a group meeting in Muncie of all the
[24] people that were going to be deposed.
[25] Q Who was at that group meeting?

---

**Page 68**

[1] A Tom Swan, Stew Kerr, and Dave Clemmons, and me.
[2] Q What kind of things were discussed at this group
[3] meeting?
[4] A Well, we pieced together a --
[5] MR. HINSHAW: Let me --
[6] MR. GARDNER: Go ahead.
[7] MR. HINSHAW: -- interject here, because even
[8] though I may not have been present or Neal may not
[9] have been present, their discussions about
[10] communications from counsel would still nonetheless
[11] be privileged.
[12] And so, Mr. Wingate, I would instruct you to
[13] not talk about the content of any communications
[14] that you and I or the other members of the group may
[15] have had, even though I may not have been present.
[16] Do you understand that?
[17] THE WITNESS: Yes.
[18] MR. HINSHAW: Okay.
[19] BY MR. GARDNER:
[20] Q Aside from anything that may have been communicated
[21] to or from counsel, what kinds of things were
[22] discussed at this group meeting?
[23] A The schedule, information about how depositions
[24] are conducted, from my opinion, that I'd heard it
[25] happen, things like that.

---

Page 69

[1] Q   Was there any discussion of the issues in the case?

[2] A   Such as?

[3] Q   Well, was there any discussion of what the key
[4] issues are in this case?

[5]        MR. HINSHAW: Again, I'm going to have to
[6] interject.  To the extent that that question calls
[7] for you to talk about discussions with counsel about
[8] what the key issues are in the case, then I believe
[9] that calls for attorney-client privilege in
[10] anticipation of litigation, and work product
[11] privilege, and I'll instruct you not to answer as to
[12] those communications.  Do you understand?

[13]        THE WITNESS: Yes.

[14]        BY MR. GARDNER:

[15] Q   Can you answer independent of that?

[16] A   No.

[17] Q   Was there any discussion about any of the factual
[18] underpinnings of the dispute?

[19] A   Could you explain what you mean by ...

[20] Q   Well, in this group meeting, for example, was there
[21] any discussion of what happened regarding the
[22] ordering of a sample of the Simpson Ventures wicker
[23] crate?

[24] A   What happened about the ordering of it?

[25] Q   Let me ask it another way.  Was there any discussion

Page 70

[1] of what each person or any person in the group knew
[2] about the facts of the lawsuit?

[3] A   I guess I'm having trouble with the wording of "the
[4] facts of the lawsuit."  I'm not quite sure what you
[5] mean by that.

[6] Q   Well, I'll break it down a little more, even.  Was
[7] there any discussion during this group meeting of
[8] any participant's memory of the facts and
[9] circumstances that gave rise to the lawsuit?

[10] A   Yes.

[11] Q   Whose memory was discussed?

[12] A   It wasn't whose memory.

[13] Q   Well, how did it go?

[14] A   It was basically from the conception of the product,
[15] trying to become familiar with what transpired until
[16] the lawsuit.

[17] Q   So at this group meeting, did -- was there a
[18] discussion of your prior conception of a wicker
[19] product?

[20] A   Prior conception?

[21] Q   I believe you testified earlier that you had -- you
[22] had conceived of the wicker product sometime in the
[23] '90s; is that right?

[24] A   Yes.

[25] Q   Was there any discussion during this group meeting

Page 71

[1] of that fact?

[2] A   I can't remember.

[3] Q   Was there a discussion during this group meeting of
[4] any of the product development team meetings?

[5] A   Yes.

[6] Q   Was there discussion during this group meeting of
[7] having received one or more of the Simpson Ventures
[8] wicker products?

[9] A   Yes.

[10] Q   Was there a discussion during this group meeting of
[11] the development of the Mid-West wicker products?

[12] A   Can you be more specific?

[13] Q   Was there a discussion during this group meeting of
[14] the development of the Bay Isle wicker products?

[15] A   Yes.

[16] Q   Was there a discussion during this group meeting of
[17] the circumstances surrounding the manufacture of the
[18] Bay Isle wicker products by the Chinese company?

[19] A   I don't remember that.

[20] Q   Was there a discussion during this group meeting of
[21] any patent searching that may have been done by
[22] Mr. Tom Swan?

[23] A   I don't recall.

[24] Q   Well, in addition to the things that you have just
[25] described that were discussed, what else was

Page 72

[1] discussed during this group meeting, separate and
[2] aside from what your lawyers may have told you or
[3] you told the lawyers.

[4] A   That's about it.

[5] Q   Have you ever been in a lawsuit before, Mr. Wingate?

[6] A   No.

[7] Q   Have you ever been deposed before?

[8] A   No.

[9] Q   Have you ever testified in court?

[10] A   No.

[11] Q   Have you ever been convicted of a crime?

[12] A   No.

[13] Q   Have you ever been named an inventor on a patent
[14] application?

[15] A   Yes.

[16] Q   When was that?

[17] A   Just recently, within months.

[18] Q   Anything before that?

[19] A   No.

[20] Q   Did you take any medication that would affect your
[21] memory in any way?

[22] A   I don't think so.

[23]        MR. GARDNER: Off the record.

[24]        (Discussion off the record.)

[25]

Tom Swan Deposition Excerpts

Case 3:06-cv-00901-WKW-WC    Document 51-2    Filed 06/15/2008    Page 23 of 31

Mid-West Metals
Simpson Ventures
Confidential
Thomas Swan
April 15, 2008

**Page 1**

[1]          IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF ALABAMA
[2]                     EASTERN DIVISION

[3]
      SIMPSON VENTURES, INC.,            )
[4]          Plaintiff,                  )
                                         )
[5]          -vs-                        )
                                         )
[6]  MID-WEST METAL PRODUCTS             )
      COMPANY, INC.,                     ) Civil Action File No.
[7]          Defendant.                  ) 3:06-cv-00901-WKW-VPM
      _____)
[8]  MID-WEST METAL PRODUCTS             ) Case No. 3:07-cv-
[9]   COMPANY, INC.,                     ) 00048 WHA-CSC
         Counterclaimant,                )
[10]                                     )
             -vs-                        )
[11]                                     )
      SIMPSON VENTURES, INC.,            )
[12]     Counterdefendant.               )
                                         )
[13]

[14]             DEPOSITION OF THOMAS SWAN

[15]     The deposition upon oral examination of
      THOMAS SWAN, a witness produced and sworn before
[15]  me, Jenny L. Reeve, RPR, CSR No. 00-R-3006, a
      Notary Public in and for the County of Hamilton,
[16]  State of Indiana, taken on behalf of the Plaintiff
      and Counterdefendant, at the offices of Bingham
[17]  McHale, 2700 Market Tower, 10 West Market Street,
      Indianapolis, Marion County, Indiana, on the
[18]  15th day of April, 2008, at 9:09 a.m., pursuant to
      the Federal Rules of Civil Procedure, all
[19]  applicable rules, and all stipulations, if any,
      stated on the record, and pursuant to written
[20]  notice and/or agreement and/or subpoena as to time
      and place thereof.
[21]

[22]

[23]

      Connor + Associates, Inc.
[24]  1650 One American Square
      Indianapolis, IN 46282
[25]  (317) 236-6022

---

**Page 2**

[1]           A P P E A R A N C E S

[2]

[3]  FOR THE PLAINTIFF AND COUNTERDEFENDANT:
      Simpson Ventures, Inc.
[4]
            Arthur A. Gardner, Esq.
[5]         Joseph W. Staley, Esq.
            GARDNER GROFF GREENWALD & VILLANUEVA, PC
[6]         2018 Powers Ferry Road, Suite 800
            Atlanta, GA  30339
[7]         agardner@gardnergroff.com
            jstaley@gardnergroff.com
[8]

[9]  FOR THE DEFENDANT AND COUNTERCLAIMANT:
      Mid-West Metal Products Company, Inc.
[10]
            James M. Hinshaw, Esq.
[11]        BINGHAM McHALE LLP
            2700 Market Tower
[12]        10 West Market Street
            Indianapolis, IN  46204-4900
[13]        jhinshaw@binghammchale.com

[14]
      ALSO PRESENT:
[15]
            Mr. Jeff Simpson
[16]        Mr. James Wingate

[17]

[18]

[19]      I N D E X   O F   E X A M I N A T I O N

[20]                                            Page

      DIRECT EXAMINATION . . . . . . . . . . . .   7
[21]      Questions by Mr. Arthur A. Gardner
      CROSS-EXAMINATION . . . . . . . . . . . . 156
[22]      Questions by Mr. James M. Hinshaw
      REDIRECT EXAMINATION . . . . . . . . . . . 160
[23]      Questions by Mr. Arthur A. Gardner

[24]  CONFIDENTIAL TESTIMONY  . . . . . . . . . . 74-104
      CONFIDENTIAL TESTIMONY  . . . . . . . . . . 118-161
[25]

---

**Page 3**

[1]      I N D E X   O F   E X H I B I T S

[2]                                            Page

[3]  Deposition Exhibit No.:

[4]  1-Swan   Photographs . . . . . . . . . . . . . . .   43

[5]  2-Swan   Photographs . . . . . . . . . . . . . . .   44

[6]  3-Swan   Photographs . . . . . . . . . . . . . . .   59

[7]  4-Swan   Photographs . . . . . . . . . . . . . . .   69

[8]  5-Swan   Copy of Frontgate packing slip . . . . .   71
[9]           dated December 3, 2002, for small pet
              residence sold to Tom Swan

[10] 6-Swan   Copy of UPS tracking document . . . . . .   72
              dated October 2, 2002

[11]
[12] 7-Swan   Copy of Frontgate packing slip . . . . .   72
              dated September 30, 2002, for small pet
[13]          residence sold to Jim Wingate

[14] 8-Swan   Copies of various Mid-West . . . . . . . .   74
      in-house emails dated in February 2003,
[15]          regarding Dalian pricing, Bates MWM 00855
              and 856

[16] 9-Swan   Copy of Mid-West in-house email . . . .   75
              dated February 24, 2003, regarding wicker
[17]          part numbers, Bates MWM 00857

[18] 10-Swan  Copies of various Mid-West . . . . . . . .   77
              in-house emails dated in March 2003, with
[19]          regard to PetsMart visit - wicker crates
              2, Bates MWM 00858 thru 859

[20]
[21] 11-Swan  Copy of Mid-West in-house email . . . .   80
              dated April 1, 2003, with regard to 1824,
[22]          1830 & 1836 carton size estimates
              (overall), Bates MWM 00867

[23] 12-Swan  Copy of Mid-West in-house email . . . .   81
              dated April 1, 2003, with regard to
[24]          1800s, Bates MWM 00868

[25]

---

**Page 4**

[1]      I N D E X   O F   E X H I B I T S   (cont'd)
[2]
                                              Page
[3]
      Deposition Exhibit No.:
[4]
      13-Swan  Copy of Mid-West in-house email . . . .   81
[5]            dated April 1, 2003, regarding 1800
               series container quantity estimates,
[6]            Bates MWM 00871

[7]   14-Swan  Copy of Mid-West in-house email . . . .   82
               dated April 1, 2003, regarding 1800
[8]            series launch schedule, with attachment,
               Bates MWM 00873 thru 874
[9]
      15-Swan  Copy of Mid-West in-house email . . . .   82
[10]           dated April 9, 2003, regarding 1800s
               divider, Bates MWM 00876
[11]
      16-Swan  Copy of Mid-West in-house email . . . .   84
[12]           dated April 16, 2003, regarding Bay Isle
               1830 UPC change, Bates MWM 00878
[13]
      17-Swan  Copy of Mid-West in-house emails . . .   85
[14]           dated in April 2003, with regard to feet
               for the 1800s, Bates MWM 00879
[15]
      18-Swan  Copy of Mid-West in-house email . . . .   86
[16]           dated in May 2003 regarding
               specifications, Bates MWM 00882
[17]
      19-Swan  Copies of Mid-West in-house . . . . . . .   88
[18]           emails dated in May 2003, regarding name
               plate label files, Bates MWM 00884
[19]
      20-Swan  Copy of email dated June 9, . . . . . .   89
[20]           2003, regarding first container of 1800,
               Bates MWM 00885
[21]
      21-Swan  Copies of various Mid-West . . . . . . . .   90
[22]           in-house emails dated in July 2003,
               regarding plastic pans, China 2, Bates
[23]           MWM 00890 thru 891
[24]  22-Swan  Copy of Mid-West in-house email . . . .   90
               dated November 10, 2003, regarding wicker
[25]           litter box cover, Bates MWM 00902

---

Page 5

[1]      I N D E X   O F   E X H I B I T S  (cont'd)
[2]
[3]                                                              Page

Deposition Exhibit No.:
[4]
     23-Swan  Copy of Mid-West in-house email ....    92
[5]      dated November 17, 2003, regarding China
         information, Bates MWM 00903 thru 904
[6]
     24-Swan  Copy of Mid-West in-house email ....    93
[7]      dated November 18, 2003, regarding wicker
         cat litter crate quote, Bates MWM 00905
[8]
     25-Swan  Copy of Mid-West in-house email ....    94
[9]      dated November 24, 2003, regarding pads,
         beds, covers, Bates MWM 00906
[10]
     26-Swan  Copy of Mid-West in-house email ....    98
[11]     dated January 6, 2004, regarding litter
         box cover PN & UPC, Bates MWM 00910
[12]
     27-Swan  Copy of Mid-West in-house email ...    99
[13]     dated in January 2004, regarding
         preliminary launch meeting, Bates MWM
[14]     00915
[15] 28-Swan  Copy of Mid-West in-house emails ...    99
[16]     dated in February 2004, with regard to
         merchandising the litterbox cover, Bates
[17]     MWM 00919
     29-Swan  Copy of Mid-West in-house emails ...    100
[18]     dated in February 2004, regarding
         merchandising the litterbox cover, Bates
[19]     MWM 00922 thru 923
[20] 30-Swan  Copies of Mid-West in-house ........    101
[21]     emails dated in February and March 2004,
         regarding 1805 instructions, Bates MWM
[22]     00927
[23] 31-Swan  Copies of Mid-West in-house ........    103
     emails, dated in June 2004, regarding cat
[24]     box cover, with attachment, Bates MWM
[25]     00947 thru 948

Page 6

[1]      I N D E X   O F   E X H I B I T S  (cont'd)
[2]
[3]                                                              Page

Deposition Exhibit No.:
[4]
     32-Swan  Copy of handwritten notes, Bates ...    118
[5]      MWM 00849
[6] 33-Swan  Copy of handwritten notes, Bates ...    122
         MWM 00850
[7]
     34-Swan  Copy of handwritten notes, Bates ...    122
[8]      MWM 00851
[9] 35-Swan  Copy of handwritten notes ..........    122
[10] 36-Swan  Copy of document entitled .........    130
         Mid-West Homes for Pets, Bates MWM 00032
[11]     thru 33
[12] 37-Swan  Copy of document entitled .........    148
         Creative Focus Sales, LLC
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 7

[1]         THOMAS SWAN,
[2] having been duly sworn to tell the truth, the whole
[3] truth, and nothing but the truth relating to said
[4] matter, was examined and testified as follows:
[5]
[6] DIRECT EXAMINATION,
[7]      QUESTIONS BY MR. ARTHUR A. GARDNER:
[8] Q   Would you state your name and address, please.
[9] A   It's Tom Swan, 1701 North County Road 600 West,
[10] Yorktown, Indiana.
[11] Q   Mr. Swan, my name is Art Gardner, and I represent
[12] Simpson Ventures in this case.  And this is a
[13] deposition that's going to be used actually in both
[14] cases.
[15]      And it's important during the deposition that
[16] we make a clear record.  So as we go forward -- I'm
[17] hoping your attorney already explained this to you.
[18] But as we go forward, if you'll wait until you --
[19] let me finish my question and make sure that you
[20] understand the question, pause for a second, give
[21] time for your attorney to potentially object to my
[22] question before you answer, I'll try not to ask
[23] questions or interrupt you while you're giving an
[24] answer.  And if you can try not to interrupt me when
[25] I'm asking the questions, that would be helpful, and

Page 8

[1] it will help the court reporter to make a clean
[2] record.
[3]      It's also important that you give a verbal
[4] response and not just nod or shake your head no, or
[5] something like that, because the court reporter
[6] can't take that down.  We need a verbal record that
[7] the court reporter can transcribe.
[8]      Have you ever been deposed before?
[9] A   No.
[10] Q   Are you taking any medication or anything else that
[11] would cause your testimony here to be impacted in a
[12] negative way?
[13] A   No.
[14] Q   What's your educational background, Mr. Swan?
[15] A   Bachelor of arts from Hanover College.
[16] Q   And when did you get that?
[17] A   1988.
[18] Q   What did you do after you got your degree from
[19] Hanover College?
[20] A   Worked as a customer service representative for a
[21] company in Indianapolis called Resort Condominiums
[22] International.
[23] Q   What is the time period for that employment?
[24] A   From '88 until 1992.
[25] Q   And after you left them, where did you go to work?

Confidential

**Page 41**

[1] with counsel.

[2] **A   All right.**

[3] Q   I'd simply like to know which people you've spoken

[4] with about this lawsuit.

[5] **A   Jim Wingate, Stew Kerr, Dave Clemmons, Bob Dale, the**

[6] **attorneys.   Steve Smith.**

[7] Q   With regard to each one of those people, other than

[8] the attorneys, when did you speak to them about the

[9] lawsuit?

[10] **A   Over, you know, a period of time.   From the time the**

[11] **lawsuit started until now.**

[12] Q   With regard to those persons other than your

[13] counsel, have you had any meetings to discuss what

[14] you know about the development of the Bay Isle Pet

[15] Homes?

[16] **A   Yes.   I didn't know if you were done or not.**

[17] Q    Sorry.   I can be exceedingly slow.

[18]          When was the first of those meetings to discuss

[19] your involvement in the development of the Bay Isle

[20] Pet Homes?

[21]          **MR. HINSHAW:** Let me interject here and

[22] instruct the witness in this way.

[23]          There's a distinction between meetings of the

[24] folks at Mid-West Metal about what happened, the

[25] factual information.   Some of those meetings may

**Page 42**

[1] have been -- taken place when counsel were present.

[2] Some of those meetings may have occurred when just

[3] the members of Mid-West Metal are talking about what

[4] the attorneys had said or advised.

[5]          And I don't want you to talk about any advice

[6] or communications that occurred with the counsel,

[7] the attorneys.   I don't want you to talk about any

[8] discussions amongst yourselves about advice from the

[9] counsel or the attorneys.   But certainly, you can

[10] talk about the factual information about the

[11] development of the product line that Mr. Gardner has

[12] asked.   Do you understand?

[13]          **THE WITNESS:** Yes.

[14]          **BY MR. GARDNER:**

[15] Q   So when was the first of these meetings of Mid-West

[16] people to discuss what you knew or what you know

[17] about the development of the Mid-West Bay Isle pet

[18] residence?

[19] **A   Just Mid-West people?**

[20] Q   Yes.

[21] **A   Okay.   I'm not certain of the time.**

[22] Q   When was the most recent of such discussions or

[23] meetings?

[24] **A   A week ago.**

[25] Q   Who all was in that meeting?

**Page 43**

[1] **A   Jim Wingate, Stew Kerr, Dave Clemmons, and myself.**

[2] Q   And at this meeting, did the -- was there a review

[3] of what each person knew or remembered?

[4] **A   No.**

[5] Q   What happened at the meeting?

[6] **A   It was more of a -- it was the day before we came**

[7] **here to be educated about the deposition process,**

[8] **and it was more along those lines rather than about**

[9] **the case, details.**

[10] Q   During that meeting -- was there any discussion

[11] during that meeting about the details of what any

[12] particular person remembered?

[13] **A   I'm trying to think of how to say it, but yes.**

[14] Q   And what was said?

[15] **A   Well, just more of an understanding of what -- an**

[16] **understanding of what we -- what we all knew.**

[17]          (Deposition Exhibit Number 1-Swan is marked

[18] for identification.)

[19] Q   Mr. Swan, you've been passed for identification

[20] purposes what's been marked as Deposition Exhibit 1.

[21] Can you identify what we're looking at here.

[22] **A   Pictures of our 24-inch starter series crate and**

[23] **instructions, assembly instructions.**

[24] Q   Is this the design that Mid-West Homes for Pets was

[25] selling prior to bringing the Bay Isle pet residence

**Page 44**

[1] to market?

[2] **A   Yes.**

[3] Q   Has there been any changes in that product since

[4] that time, or is it still pretty much the same?

[5] **A   No, there hasn't been any changes in the product.**

[6]          (Deposition Exhibit Number 2-Swan is marked

[7] for identification.)

[8] Q   Pass you what's been marked for identification

[9] purposes as Exhibit 2.

[10]          What are we looking at here, Mr. Swan?

[11] **A   I can't be certain.   The name plate has been blacked**

[12] **out.**

[13] Q   Well, with the exception of the name plate, does

[14] it look like a Mid-West Metal Products Bay Isle pet

[15] residence?

[16] **A   Yes.**

[17] Q   I believe you testified earlier that mechanically,

[18] the only difference between these two, discounting

[19] for a moment the wicker covering, is along the edges

[20] or the seams or the positioning of the wire to allow

[21] for the wicker; is that correct?

[22] **A   To the best I can remember, yes.**

[23] Q   Well, in looking at these, is there anything else

[24] that you can now recall that's mechanically

[25] different from one to the other?

Dave Clemmons Deposition Excerpts

## Page 1

[1] IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
[2] EASTERN DIVISION

[3]
SIMPSON VENTURES, INC.,           )
[4]     Plaintiff,                 )
                                  )
[5]        -vs-                    )
                                  )
[6] MID-WEST METAL PRODUCTS        )
COMPANY, INC.,                    ) Civil Action File No.
[7]     Defendant.                 ) 3:06-cv-00901-WKW-VPM
                                  )
[8] ─────────────────────────     )
MID-WEST METAL PRODUCTS           ) Case No. 3:07-cv-
[9] COMPANY, INC.,                 ) 00048 WHA-CSC
     Counterclaimant,             )
[10]                               )
        -vs-                       )
[11]                               )
SIMPSON VENTURES, INC.,           )
[12]     Counterdefendant.         )

[13]        DEPOSITION OF DAVID CLEMMONS

[14]      The deposition upon oral examination of
DAVID CLEMMONS, a witness produced and sworn before
[15] me, Jenny L. Reeve, RPR, CSR No. 00-R-3006, a
Notary Public in and for the County of Hamilton,
[16] State of Indiana, taken on behalf of the Plaintiff
and Counterdefendant, at the offices of Bingham
[17] McHale, 2700 Market Tower, 10 West Market Street,
Indianapolis, Marion County, Indiana, on the
[18] 17th day of April, 2008, at 9:59 a.m., pursuant to
the Federal Rules of Civil Procedure, all
[19] applicable rules, and all stipulations, if any,
stated on the record, and pursuant to written
[20] notice and/or agreement and/or subpoena as to time
and place thereof.

[21]

[22]

[23]

Connor + Associates, Inc.
[24] 1650 One American Square
Indianapolis, IN 46282
[25] (317) 236-6022

## Page 2

[1]        A P P E A R A N C E S

[2]

[3] FOR THE PLAINTIFF AND COUNTERDEFENDANT:
Simpson Ventures, Inc.
[4]
        Arthur A. Gardner, Esq.
[5]     Joseph W. Staley, Esq.
        GARDNER GROFF GREENWALD & VILLANUEVA, PC
[6]     2018 Powers Ferry Road, Suite 800
        Atlanta, GA   30339
[7]     agardner@gardnergroff.com
        jstaley@gardnergroff.com
[8]
[9] FOR THE DEFENDANT AND COUNTERCLAIMANT:
Mid-West Metal Products Company, Inc.
[10]
        Neal Bowling, Esq.
[11]    James M. Hinshaw, Esq.
        BINGHAM McHALE LLP
[12]    2700 Market Tower
        10 West Market Street
[13]    Indianapolis, IN  46204-4900
        nbowling@binghammchale.com
[14]    jhinshaw@binghammchale.com

[15]

[16] ALSO PRESENT:

[17]    Mr. Jeff Simpson
        Mr. James Wingate
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

## Page 3

[1]   I N D E X   O F   E X A M I N A T I O N

[2]                                            Page

[3] DIRECT EXAMINATION . . . . . . . . . . . .   5
        Questions by Mr. Arthur A. Gardner
[4]
RESUMED DIRECT EXAMINATION . . . . . . . .  99
[5]     Questions by Mr. Joseph W. Staley

[6] CROSS-EXAMINATION . . . . . . . . . . . . 143
        Questions by Mr. Neal Bowling
[7]
REDIRECT EXAMINATION . . . . . . . . . . . 146
[8]     Questions by Mr. Joseph W. Staley

[9] RECROSS-EXAMINATION . . . . . . . . . . . 148
        Questions by Mr. Neal Bowling
[10]

[11]       I N D E X   O F   E X H I B I T S

[12]                                           Page

[13] Deposition Exhibit No.:

[14] 2-Swan     Previously marked . . . . . . . . .  49
     2-Swan     Previously marked . . . . . . . . .  53
[15] 2-Swan     Previously marked . . . . . . . . .  69
     2-Swan     Previously marked . . . . . . . . .  76
[16] 2-Swan     Previously marked . . . . . . . . .  83
     2-Swan     Previously marked . . . . . . . . . 104
[17] 2-Swan     Previously marked . . . . . . . . . 118
     3-Swan     Previously marked . . . . . . . . .  63
[18] 3-Swan     Previously marked . . . . . . . . .  90
     3-Swan     Previously marked . . . . . . . . .  93
[19] 3-Swan     Previously marked . . . . . . . . .  97
     3-Swan     Previously marked . . . . . . . . . 120
[20] 3-Swan     Previously marked . . . . . . . . . 123
     3-Swan     Previously marked . . . . . . . . . 127
[21] 4-Swan     Previously marked . . . . . . . . .  34
     9-Swan     Previously marked . . . . . . . . . 106
[22] 26-Swan    Previously marked . . . . . . . . . 125
     29-Swan    Previously marked . . . . . . . . . 127
[23] 31-Swan    Previously marked . . . . . . . . . 132
     32-Swan    Previously marked . . . . . . . . . 134
[24] 32-Swan    Previously marked . . . . . . . . . 140
     33-Swan    Previously marked . . . . . . . . . 141
[25]

## Page 4

[1]   I N D E X   O F   E X H I B I T S   (cont'd)

[2]
                                            Page
[3]
Deposition Exhibit No.:
[4]
     53-Clemmons  Copies of various drawings, . . . .  30
[5]   Bates MWM 00077 thru 916

[6]  54-Clemmons  Copies of various drawings . . . .  30

[7]  55-Clemmons  Copy of U.S. Design Patent . . . . .  63
     No. US D534,321 S, inventor Jeffrey M.
[8]   Simpson, for a pet litter pan housing,
      dated December 26, 2006
[9]
     56-Clemmons  Copy of sketch drawn by . . . . . . .  88
[10]  deponent
[11] 57-Clemmons  Copy of Mid-West in-house . . . . . . 109
      email dated March 19, 2003, regarding
[12]  wicker cages, Bates MWM 00862
[13] 58-Clemmons  Copies of Mid-West in-house . . . . 124
      emails dated in March 2003, regarding
[14]  wicker part numbers, Bates MWM 00866
[15] 59-Clemmons   Copies of Mid-West in-house . . . 126
      emails dated January 14, 2004, regarding
[16]  1805 wicker cat litter, Bates MWM 00916
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 65

[1] in these search efforts.

[2]     MR. GARDNER: Well, the witness did testify
[3] that he got his instructions to do some of the work
[4] from the agendas or schedules. So it's not correct
[5] that the witness didn't identify that they existed
[6] in connection with the wicker crates, because when
[7] we asked him who instructed him, he deferred to the
[8] schedules as where he got his instructions.

[9]     MR. HINSHAW: I'm not going to quibble with you
[10] over the testimony. The transcript will speak to
[11] that. I have a different memory of the testimony.

[12]     Regardless, we have gone back and asked for a
[13] double effort to search for that, and they've
[14] confirmed that there is no such schedule, either
[15] digital or paper.

[16]     BY MR. GARDNER:

[17] Q   Mr. Clemmons, what types of things did you do to
[18] prepare for coming to today's deposition?

[19] A   Met with the lawyers.

[20] Q   Did you do anything else?

[21] A   To prepare for the deposition, I met with Neal and
[22] James.

[23] Q   Did you have any sort of meeting within the company,
[24] outside of the presence of the lawyers, to get ready
[25] for this deposition?

Page 66

[1] A   Not to get ready for the deposition, my deposition,
[2] no.

[3] Q   Well, did you have -- did you participate in a
[4] meeting in the last week or two with other people
[5] within the company and discuss the facts of this
[6] case?

[7]     MR. BOWLING: I'm going to have to object to
[8] the question to the extent that it would call for
[9] any information that is privileged, either the
[10] attorney-client privilege or the attorney work
[11] product privilege.

[12]     Mr. Clemmons, if you can answer Mr. Gardner's
[13] question without divulging any communications from
[14] your attorneys, or any discussions about
[15] communications from your attorneys, you may answer
[16] the question.

[17] A   Well, we did have a meeting. When was it?
[18] Wednesday, I believe, of last week. And Jim
[19] Wingate, myself, Stew Kerr, Tom Swan were there.

[20]     BY MR. GARDNER:

[21] Q   Anybody else?

[22] A   No. Excuse me. I have something in my eye. No.

[23] Q   At that meeting, did -- was it -- at that meeting
[24] was there a discussion of the facts and
[25] circumstances surrounding the development of the

Page 67

[1] Mid-West wicker crate?

[2] A   As I recall this meeting, this meeting was a meeting
[3] called by Jim to discuss a 30(b)(6), or something,
[4] deposition that he had to deal with. Didn't quite
[5] understand what that meant, but he was checking for
[6] facts that he would have to answer to in his own
[7] deposition.

[8] Q   Was your involvement discussed as part of this
[9] meeting?

[10] A   My involvement was limited to schedules: When I
[11] was to be down here, what times. And then just this
[12] week that schedule got redone to where I'd be here
[13] all day today. But that's as far as it went with
[14] what I had.

[15] Q   Well, during this meeting of last week within the
[16] company, was there a time when you stated what you
[17] remembered about the facts surrounding this case?

[18] A   As it pertained to what Jim needed to know, and
[19] not -- I guess I don't understand the question.

[20] Q   Well, how long did the meeting last?

[21] A   Half hour or 40 minutes, as I recall.

[22] Q   Did anybody ask you any questions during the
[23] meeting?

[24] A   Questions were asked, yes.

[25] Q   Did people ask you questions?

Page 68

[1] A   Yes.

[2] Q   And what was asked?

[3]     MR. BOWLING: I'm going to object, again, to
[4] the extent that the question calls for information
[5] protected by the attorney-client privilege and the
[6] attorney work product privilege in anticipation of
[7] litigation.

[8]     Mr. Clemmons, to the extent, again, that you
[9] can answer Mr. Gardner's question without discussing
[10] what your attorneys have told you, or discussing or
[11] revealing discussions about the advice of your
[12] attorneys, you may answer Mr. Gardner's question.

[13] A   Repeat --

[14]     THE WITNESS: What was the question, again?

[15]     (The reporter reads back as requested.)

[16] A   What was asked is if we had any documentation, any
[17] information that retained -- that remained, any
[18] packaging, this type of thing.

[19]     And again, as I stated before, that I didn't
[20] have any more information.

[21]     BY MR. GARDNER:

[22] Q   Did anyone ask you to describe your involvement in
[23] the development of the wicker crates?

[24] A   No.

[25] Q   Did anyone ask you to describe your involvement in

Stew Kerr Deposition Excerpts

---

**Page 1**

[1]                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF ALABAMA
[2]                         EASTERN DIVISION

[3]
       SIMPSON VENTURES, INC.,          )
[4]            Plaintiff,                )
                                        )
[5]            -vs-                      )
                                        )
[6]    MID-WEST METAL PRODUCTS          )
       COMPANY, INC.,                   ) Civil Action File No.
[7]            Defendant.               ) 3:06-cv-00901-WKW-VPM
                                        )
[8]    ─────────────────────────        )
       MID-WEST METAL PRODUCTS          )
[9]    COMPANY, INC.,                   ) Case No. 3:07-cv-
           Counterclaimant,            ) 00048 WHA-CSC
[10]                                    )
               -vs-                     )
[11]                                    )
       SIMPSON VENTURES, INC.,          )
[12]       Counterdefendant.           )

[13]
                 DEPOSITION OF WILLIAM STEWART KERR
[14]
            The deposition upon oral examination of
[15]   WILLIAM STEWART KERR, a witness produced and sworn
       before me, Jenny A. Reeve, RPR, CSR No. 00-R-3006,
[16]   a Notary Public in and for the County of Hamilton,
       State of Indiana, taken on behalf of the Plaintiff
[17]   and Counterdefendant, at the offices of Bingham
       McHale, 2700 Market Tower, 10 West Market Street,
[18]   Indianapolis, Marion County, Indiana, on the
       18th day of April, 2008, at 9:09 a.m., pursuant to
[19]   the Federal Rules of Civil Procedure, all
       applicable rules, and all stipulations, if any,
[20]   stated on the record, and pursuant to written
       notice and/or agreement and/or subpoena as to time
[21]   and place thereof.

[22]

[23]
       Connor + Associates, Inc.
[24]   1650 One American Square
       Indianapolis, IN 46282
[25]   (317) 236-6022

---

**Page 2**

[1]              A P P E A R A N C E S
[2]

[3]   FOR THE PLAINTIFF AND COUNTERDEFENDANT:
      Simpson Ventures, Inc.
[4]
[5]        Arthur A. Gardner, Esq.
           Joseph W. Staley, Esq.
[6]        GARDNER GROFF GREENWALD & VILLANUEVA, PC
           2018 Powers Ferry Road, Suite 800
[7]        Atlanta, GA  30339
           agardner@gardnergroff.com
[8]        jstaley@gardnergroff.com

[9]   FOR THE DEFENDANT AND COUNTERCLAIMANT:
      Mid-West Metal Products Company, Inc.
[10]
[11]       Neal Bowling, Esq.
           James M. Hinshaw, Esq.
[12]       BINGHAM McHALE LLP
           2700 Market Tower
[13]       10 West Market Street
           Indianapolis, IN  46204-4900
[14]       nbowling@binghammchale.com
           jhinshaw@binghammchale.com
[15]

[16]  ALSO PRESENT:

[17]       Mr. Jeff Simpson
           Mr. James Wingate
[18]

[19]

[20]           I N D E X   O F   E X A M I N A T I O N

[21]                                                  Page

[22]  DIRECT EXAMINATION  . . . . . . . . . . . . .  5
           Questions by Mr. Arthur A. Gardner
[23]
      CONFIDENTIAL TESTIMONY  . . . . . . . . . . . 105
[24]

[25]

---

**Page 3**

[1]        I N D E X   O F   E X H I B I T S
[2]
      Deposition Exhibit No.:                        Page
[3]

[4]   2-Swan      Previously marked  . . . . . . . . . .  42
      2-Swan      Previously marked  . . . . . . . . . .  54
[5]   2-Swan      Previously marked  . . . . . . . . . .  60
      3-Swan      Previously marked  . . . . . . . . . .  84
[6]   4-Swan      Previously marked  . . . . . . . . . .  18
      4-Swan      Previously marked  . . . . . . . . . .  50
[7]   5-Swan      Previously marked  . . . . . . . . . .  30
      7-Swan      Previously marked  . . . . . . . . . .  19
      12-Swan     Previously marked  . . . . . . . . . .  63
[8]   14-Swan     Previously marked  . . . . . . . . . .  64
      15-Swan     Previously marked  . . . . . . . . . .  66
[9]   16-Swan     Previously marked  . . . . . . . . . .  66
      17-Swan     Previously marked  . . . . . . . . . .  67
[10]  18-Swan     Previously marked  . . . . . . . . . .  69
      21-Swan     Previously marked  . . . . . . . . . .  75
[11]  22-Swan     Previously marked  . . . . . . . . . .  94
      23-Swan     Previously marked  . . . . . . . . . .  94
[12]  25-Swan     Previously marked  . . . . . . . . . .  95
      27-Swan     Previously marked  . . . . . . . . . . 108
[13]  28-Swan     Previously marked  . . . . . . . . . . 110
      30-Swan     Previously marked  . . . . . . . . . . 114
[14]  31-Swan     Previously marked  . . . . . . . . . . 117

[15]  38-Wingate  Previously marked  . . . . . . . . . .  16
      38-Wingate  Previously marked  . . . . . . . . . .  34
[16]
[17]  53-Clemmons Previously marked  . . . . . . . . . .  23
      54-Clemmons Previously marked  . . . . . . . . . .  23
[18]  55-Clemmons Previously marked  . . . . . . . . . .  84
      57-Clemmons Previously marked  . . . . . . . . . .  58
[19]  59-Clemmons Previously marked  . . . . . . . . . . 109

[20]  60-Kerr     Copy of Mid-West Metal's  . . . . . . .  7
                  responses to plaintiff's first set of
[21]              interrogatories

[22]  61-Kerr     Copies of Mid-West in-house  . . . . . . 62
                  emails dated in March of 2003, regarding
[23]              PetsMart visit - wicker crates 3, Bates
                  MWM 00863 thru 864

[24]  62-Kerr     Copy of Mid-West in-house emails . . .  65
                  dated April 4, 2003, regarding 1800
[25]              carton sizes, Bates MWM 00875

---

**Page 4**

[1]       I N D E X   O F   E X H I B I T S  (cont'd)
[2]   Deposition Exhibit No.:

[3]   63-Kerr     Copy of Mid-West in-house email  . . .  73
                  dated June 10, 2003, regarding "confirm,"
[4]               with attachments, Bates MWM 00886-888

[5]   64-Kerr     Copy of Mid-West in-house emails  . . .  74
                  dated July 21, 2003, regarding plastic
[6]               pans - China, Bates MWM 00889

[7]   65-Kerr     Copies of Mid-West in-house  . . . . . .  75
                  emails dated in July 2003, regarding
[8]               plastic pans-China 1, Bates MWM 00892-895

[9]   66-Kerr     Copies of Mid-West in-house  . . . . . .  76
                  emails dated in October 2003, regarding
[10]              1800 series wicker crates price
                  reduction, Bates MWM 00898 thru 899
[11]
      67-Kerr     Copy of Mid-West in-house email . . . . 104
[12]              dated December 2, 2003, regarding wicker
                  cat litter cover, Bates MWM 00907
[13]
      68-Kerr     Copies of Mid-West in-house  . . . . . . 106
[14]              emails dated in January 2004, regarding
                  wicker litter box cover, Bates MWM 00912
[15]              thru 913

[16]  69-Kerr     Copies of Mid-West in-house  . . . . . . 108
                  emails dated January 13, 2004, regarding
[17]              1805 final quote 1-13-04, Bates MWM 00914

[18]  70-Kerr     Copy of Mid-West in-house email . . . . 112
                  dated February 4, 2004, regarding 1805
[19]              wicker sample, Bates MWM 00921

[20]  71-Kerr     Copies of Mid-West in-house  . . . . . . 115
                  emails dated March 24, 2004, regarding
[21]              wicker crate cover, Bates MWM 00930

[22]  72-Kerr     Copies of Mid-West in-house  . . . . . . 117
                  emails dated in March 2004, regarding
[23]              1842 wicker quote needed, Bates MWM 00933

[24]  73-Kerr     Copy of Mid-West in-house email . . . . 119
                  dated July 12, 2004, regarding mini
[25]              wicker samples quote, Bates MWM 00949

---

Page 125

[1] Q   Prior to this lawsuit, have you ever seen any
[2] Simpson Ventures patent or patent application
[3] yourself?
[4] A   No.
[5] Q   Have you ever seen any of the -- well, you've seen
[6] it here today.  Scratch that.
[7]      What kind of things did you do to get ready for
[8] today's deposition?
[9]      MR. BOWLING: I'm going to object to the
[10] question to the extent that it would call for any
[11] disclosure of any privileged information,
[12] attorney-client communications, or work product
[13] information, or anticipation-of-litigation
[14] information.
[15]      Mr. Kerr, to the extent that you can answer
[16] Mr. Gardner's question without revealing any
[17] privileged information, you may do so.
[18]      MR. GARDNER: Would you read back the question.
[19] It's been a while.
[20]      (The reporter reads back as requested.)
[21] A   We met with the attorneys.  I met with the
[22] attorneys.
[23]      BY MR. GARDNER:
[24] Q   Other than meeting with the attorneys, did you also
[25] meet with individuals who work at Mid-West to get

Page 126

[1] ready for today's deposition?
[2] A   Once.
[3] Q   Was that meeting in the last two weeks?
[4] A   Two to three weeks.
[5] Q   Isn't it true that at that meeting, there was a
[6] discussion surrounding the facts and circumstances
[7] surrounding the evaluation of the Simpson Ventures
[8] products?
[9] A   What was that again, now?
[10]      MR. GARDNER: You can read it back, please.
[11]      (The reporter reads back as requested.)
[12] A   What do you mean by like "evaluation"?  Like ...
[13]      BY MR. GARDNER:
[14] Q   Well, you testified that at at least two meetings
[15] of the new product development committee, Simpson
[16] Ventures wicker products were observed and
[17] evaluated, correct?
[18] A   Yes.
[19] Q   So isn't it true that during this preparation
[20] meeting that you had in the last two to three weeks
[21] with other employees of Mid-West, the facts and
[22] circumstances surrounding that evaluation of the
[23] Simpson Ventures wicker products was discussed?
[24] A   Yes.
[25] Q   And isn't it true that at the preparation meeting in

Page 127

[1] the last two to three weeks, there was discussion of
[2] the facts and circumstances of the development of
[3] the Mid-West wicker products, correct?
[4] A   Yes.
[5] Q   And isn't it true that during this deposition
[6] preparation meeting in the last two to three weeks,
[7] there was a discussion of which features of the
[8] Mid-West products are ornamental and which features
[9] are functional, correct?
[10] A   At that meeting two or three weeks ago?
[11] Q   Yes, sir.
[12] A   I don't recall that.  I was in and out of that
[13] meeting a lot.
[14] Q   Well, did you hear some discussion about ornamental
[15] features during that preparation meeting?
[16] A   I don't recall going into that detail.
[17] Q   Isn't it true that during that deposition
[18] preparation meeting in the last two to three
[19] weeks, there was a discussion about whether the
[20] company had done any patent searching prior to this
[21] lawsuit?
[22] A   Yes.
[23]      MR. GARDNER: I have nothing further at this
[24] time.
[25]      MR. BOWLING: Could we take just about a

Page 128

[1]      five-minute break?
[2]      MR. GARDNER:  Sure.
[3]      (A recess is taken, after which, the
[4] proceedings resume as follows:)
[5]      MR. BOWLING:  We have no questions of this
[6] witness.
[7]      MR. GARDNER:  So I guess we're done for the
[8] week, and we'll see you all in Atlanta.
[9]      THE REPORTER:  Signature?
[10]      MR. HINSHAW:  We do want signature.
[11]
[12]      (Deposition concluded at 3:30 p.m.)
[13]      AND FURTHER THE DEPONENT SAITH NOT
[14]
[15]      _____
[16]           WILLIAM STEWART KERR
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]