**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
<u>EASTERN DIVISION</u>**

| | | |
|---|---|---|
| SIMPSON VENTURES, INC., | ) | |
|           Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MID-WEST METAL | ) | |
| PRODUCTS | ) | |
| COMPANY, INC. | ) | |
|           Defendant. | ) | |
| _____ | ) | Case No. 06-cv-00901 WKW-VPM |
| | ) | |
| MID-WEST METAL | ) | |
| PRODUCTS | ) | |
| COMPANY, INC., | ) | |
|           Counterclaimant, | ) | |
| v. | ) | |
| | ) | |
| SIMPSON VENTURES, INC., | ) | |
|           Counterdefendant. | ) | |
| _____ | ) | |

**MID-WEST METAL'S OPPOSITION TO SIMPSON VENTURES'
<u>MOTION TO COMPEL AND FOR OTHER RELIEF</u>**

Defendant and Counterclaimant Mid-West Metal Products Company, Inc. ("Mid-West Metal"), by counsel, respectfully submits this Memorandum in opposition to Simpson Ventures, Inc.'s ("Simpson Ventures") Motion To Compel And For Other Relief.   Mid-West Metal properly objected to deposition questions to protect from disclosure Mid-West Metal's confidential attorney-client communications and its attorneys' work product.  At no time did Mid-West Metal's employee Brenda Bartlett refuse to testify concerning any facts known by her, and she was never instructed by anyone about what to say or not say for the deposition.  Simpson Ventures' motion to compel should be denied.

## Introduction

Despite having repeated and explicit sworn testimony from Mid-West Metal's employee Brenda Bartlett that she was <u>never</u> instructed what to say or not to say at her deposition, Simpson Ventures has twisted an everyday, necessary litigation occurrence – pre-deposition witness preparation – into a tale of "witness coaching."  Simpson Ventures bases its distorted contention on two facts:  (1) Vice President of Product Development James Wingate organized a meeting of certain key employees to discuss facts of the case, and (2) Mid-West Metal employees "admitted" to meeting with counsel before depositions.  Simpson Ventures attempts to use these facts as a wedge to try to improperly pry into Mid-West Metal's privileges and its attorneys' work product protections, and seeks to compel Ms. Bartlett to answer questions that would clearly invade those privileges and protections.  Although Mid-West Metal's objections were appropriate, its witness preparations were appropriate, and Simpson Ventures has identified no prejudice to it, Simpson Ventures now seeks sanctions and an extraordinary jury instruction. Simpson Ventures' requests should be denied.

## Factual Background

### 1.    Mid-West Metal's Meetings

Simpson Ventures first takes issue with meetings that occurred between certain Mid-West Metal employees and Mr. Wingate about the facts concerning this litigation – suggesting that improper coaching and collaboration occurred therein.  What Simpson Ventures deliberately fails to inform the Court, though, is that it was Simpson Ventures' own actions that necessitated those meetings.

Specifically, in March of 2008, Simpson Ventures served Mid-West Metal with two identical Rule 30(b)(6) deposition notices (one for this case and one for the related '321 Patent

2

case).  Attached as Exhibit A is a copy of the 30(b)(6) deposition notice.  Simpson Ventures

demanded Mid-West Metal present an informed corporate representative to testify about the

following broad topics:

1. Each defense or assertion raised by Defendant in its Answer to the complaint, at the time the Answer was filed and now.

2. Each defense or counterclaim to be presented by Defendant at the trial of this action.

3. The preparation and substance of Defendant's answers and responses to each of the interrogatories in Plaintiff's First or Second Set Of Interrogatories to Defendant.

4. The preparation and substance of Defendant's Initial Disclosures.

5. The existence of documents called for in either Plaintiff's First or Second Set of Requests for Documents and Things and Defendant's actions to produce documents in response to those requests.

6. Any and all instances of confusion or mistake between products sold by the Defendant and products sold by Plaintiff, including without limitation mistaken warranty claims, mistaken service or parts inquiries, mistaken returns, and mistaken sales or purchase inquiries.

7. Knowledge of Plaintiff's products and/or patents prior to the filing of this suit, the circumstances surrounding the purchase of any of Plaintiff's products by Defendant or any of Defendant's employees, any use by the Defendant of the Plaintiff's products, and the current location of any examples of Plaintiff's product purchased by Defendant or any of Defendant's employees.

8. Defendant's experiences and practices in obtaining, enforcing, and/or licensing patents.

On April 8, 2008, Mid-West Metal provided written objections based on the overbreadth

and lack of particularity of these deposition notices, but agreed to produce James Wingate as its

corporate representative on certain detailed topics.  Mr. Wingate was then scheduled to be

deposed by Simpson Ventures' counsel on April 16, 2008 (eight days later).  *See* Ex. B, April 8,

2008 letter from J. Hinshaw to counsel for Simpson Ventures.

As a designated Rule 30(b)(6) deposition witness, Mr. Wingate was *obligated* to gather information and become fully informed on Mid-West Metal's collective corporate knowledge regarding the topics for which he was designated to provide the testimony. *See e.g., Media Svcs.Group, Inc. v. Lesso, Inc.*, 45 F. Supp.2d 1237, 1253 (D. Kan. 1999) (Rule 30(b)(6) imposes a duty upon the named business entity to prepare its selected deponent to adequately testify not only on matters known by the deponent, but also on subjects that the entity should reasonably know); *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996) (same). This obligation includes interviewing other company employees about *their* factual knowledge. Indeed, Mr. Wingate was instructed by the undersigned about this obligation and was instructed to conduct the referenced interviews and meetings. *That* is why he met with the other employees prior to his scheduled Rule 30(b)(6) deposition – to discuss Mid-West Metal's corporate knowledge of the facts that he would be required to testify about as the corporate representative.

Simpson Ventures' counsel is well aware that its Rule 30(b)(6) deposition notice was pending when Mr. Wingate met to gather Mid-West Metal's corporate knowledge on the broad topics contained in the deposition notice – *i.e.*, the facts that Simpson Ventures now implies were improperly discussed. Indeed, at least oneof the witnesses *told* Simpson Ventures' counsel in his deposition that the purpose of the meetings with Mr. Wingate was to address the 30(b)(6) deposition. (*See e.g.*, Ex. C., David Clemmons Deposition at p. 67 – "As I recall this meeting, this meeting was a meeting called by Jim [Wingate] to discuss a 30(b)(6) or something, deposition that he had to deal with. Didn't quite understand what that meant, but he was checking for facts that he would have to answer to in his own deposition.")

As the designated corporate representative, Mr. Wingate took the steps that Simpson Ventures obligated him and Mid-West Metal to take through the 30(b)(6) deposition procedure – a deposition that Simpson Ventures' counsel then abandoned and did not even complete at the

time.[1]  Simpson Ventures now attempts to distort the facts and manipulate them into a charge of

wrongdoing.  There is and was nothing improper about the meetings – they were necessary to

comply with the 30(b)(6) deposition notice served by Simpson Ventures.  Consistent with that

required and normal procedure, Mid-West Metal's employees have testified freely concerning

the facts that were discussed, withholding only testimony regarding privileged communications

with counsel for Mid-West Metal.  When it complains that "Mr. Clemmons testified that the four

deponents met and that Mr. Wingate 'was checking for facts that he would have to answer in his

own deposition,'" (*Pltf's. Brief* at 7), Simpson Ventures never mentions that it had first served

the Rule 30(b)(6) deposition notice and was aware that Mr. Wingate was designated to be the

witness.  Of course Mr. Wingate was checking with others for facts - he was obligated to do so

pursuant to Fed. R. Civ. Proc. 30(b)(6).

**2.  Brenda Bartlett's Deposition**

        Building on the faulty premise that Mid-West Metal had somehow "rehearsed" the

testimony of deponents in this case[2] (*Pltf's. Brief* at 16), Simpson Ventures next stretches to

---

[1]  Simpson Ventures' counsel surprisingly cancelled the 30(b)(6) deposition during the afternoon
of Mr. Wingate's fact deposition under 30(a)(1) – the day before the 30(b)(6) deposition was to
take place.  By agreement of counsel, that 30(b)(6) deposition was to be rescheduled.  It was
rescheduled for June 3, 2008, but Simpson Ventures' counsel cancelled it again on that day.
Thus, the 30(b)(6) deposition has not yet even been conducted, although the parties have
discussed rescheduling it for sometime in July 2008.  Mid-West Metal has repeatedly questioned
whether the 30(b)(6) deposition is and/or has ever even been necessary as Simpson Ventures'
counsel has already exhaustively deposed practically every fact witness who would have had
responsive factual information about the topics identified in the 30(b)(6) notices.

[2]  Simpson Ventures' suggestion -  that similar testimony regarding visual differences between
the parties' respective products suggests "rehearsed testimony" – is strange considering that
many of Simpson Venture's *own witnesses* identified and agreed with many of those same
noticeable differences, using much the same terminology in doing so as that used by the Mid-
West Metal witnesses.

make unfounded accusations of "witness coaching" of Brenda Bartlett.[3]  No evidence

whatsoever supports that false accusation.

As an initial matter, Ms. Bartlett testified explicitly and repeatedly that she had *not* been

instructed to do or say anything in her deposition – either by Mid-West Metal's attorneys or by

its employees:

> Q:      Did *anyone* instruct you to do or say anything in regards to this lawsuit?
> A:      No."

Ex. D, B. Bartlett Dep, at p. 25:19-21 (emphasis added).

> Q:      I understood you've been told to look for documents.  I guess I'm asking for anything other than looking for documents.  Has *anybody* instructed you to do or say anything with regards to this lawsuit?
> A:      No.
>
> Q:      Has anyone instructed you – other than again, relating to those documents, has anyone instructed you not to do or say anything in regards to this lawsuit?
> A:      No.  I mean…

*Id.*, at p. 26:2-11 (emphasis added).  Thus, when asked directly and plainly, Ms. Bartlett

unequivocally and repeatedly rejected the proposition that anyone had ever told her what to say

in her deposition.

Simpson Ventures now attempts to fabricate an argument that Mid-West Metal is

somehow "hiding" facts because it took the steps necessary and appropriate to protect its

---

[3]  Ms. Bartlett is the Inside Sales Manager for Mid-West Metals.  In that capacity, her responsibilities include managing the entire customer services department – and thus monitoring, receiving, and handling instances where customers or consumers erroneously present other companies' products to Mid-West Metal for repair, return, or other problems.  In this capacity, she testified that no one in the department recalls there ever having been an instance where any customer or consumer had erroneously confused a Simpson Ventures wicker product with a Mid-West Bay Isle wicker product – for example, by "returning" a Simpson Ventures' wicker product to Mid-West Metals or otherwise seeking repairs or warranty service for a Simpson Ventures crate.  *See* Ex. D., B. Bartlett Deposition at pp. 88-89.

privileged communications and attorney work product.  Ms. Bartlett in fact answered all

questions as to the facts regarding what she believed to be the "differences" and "similarities"

between the designs at issue in this litigation.  It was <u>only</u> when she was asked to answer

questions that would disclose specific communications from an interview session with counsel

that she declined to answer on the basis of privilege and work product protection.  Specifically,

after having her compare and testify to visual differences between diagrams of Simpson

Venture's product and Mid-West Metal's product, counsel for Simpson Ventures then insisted

that Ms. Bartlett identify which specific differences she had "*discussed*" with her attorney.[4]  She

was thus unequivocally asked to disclose which issues were deemed significant to Mid-West

Metal's attorney such that those issues were discussed with the client during her preparation to

testify in deposition.

        Contrary to Simpson Ventures' suggestion, a refusal to disclose a privileged

communication is no basis to infer that the communication was inappropriate.  A common and

perfectly appropriate deposition preparation session includes interviewing and questioning the

witness on topics that are likely to be relevant in the litigation and covered by the other party in

the deposition - in much the same manner, for example, that Midwest Metal's counsel questioned

Ms. Bartlett during her deposition (i.e., present two diagrams and ask the witness if she sees

---

[4]   That a "discussion" occurred between the witness and counsel by no means suggests or
supports the inflammatory accusations of "coaching," "spoonfeeding," and/or "instructions" by
counsel to Ms. Bartlett on what to say or not say.  These reckless and false accusations thus have
no factual basis whatsoever, and do not support to the leap in logic that counsel for Simpson
Ventures now asserts.  For a true example of an attorney instructing a witness what to say, the
Court needs only to look at Simpson Ventures' expert reports.  Mr. Gardner literally wrote the
heart of Simpson Ventures' liability expert witness report in this matter – sending him an e-mail
of the language he was to use at approximately 5pm on Friday, September 21, 2007, which Mr.
Anders then simply cut and pasted verbatim into "his" official report on the Points of Novelty on
Saturday September 22, 2007 (Compare Ex. E, (Deposition Exhibit 228) to Ex. F (Deposition
Exhibit 218.)

differences between various aspects of the two designs).  *See, e.g.* Ex. D, Bartlett Dep. at pp. 94
– 97.

## Argument

1.    **Mid-West Metal Properly Invoked Its Right To Protect Its Attorney-Client Privileged Communications.**

"A person may instruct a deponent not to answer only when necessary to preserve a

privilege . . . ." Fed.R.Civ.Proc. 30(d)(1).  Consistent with the provisions of Rule 30(d)(1), the

only questions that Ms. Bartlett did not answer were those questions which sought to invade

Mid-West Metal's privileges.

The elements for establishing a privileged communication are:

> (1) the asserted holder of the privilege is or sought to become a
> client;
> (2) the person to whom the communication was made
>     (a) is [the] member of a bar of a court, or his subordinate
>        and
>     (b) in connection with this communication is acting as a
>        lawyer;
> (3) the communication relates to a fact of which the attorney was
> informed
>     (a) by his client
>     (b) without the presence of strangers
>     (c) for the purpose of securing primarily either
>        (i) an opinion on law or
>        (ii) legal services or
>        (iii) assistance in some legal proceeding, and
>            not
>     (d) for the purpose of committing a crime or tort; and
> (4) the privilege has been
>     (a) claimed and
>     (b) not waived by the client.

*Freiermuth v. PPG Indus.*, 218 F.R.D. 694 (N.D. Ala. 2003) (*citing Bogle v. Clure*, 332 F.3d

1347, 1358 (11th Cir. 2003)).

**A.    Mid-West Metal's Objections Were Limited To Privileged Communications.**

Ms. Bartlett declined to answer *only* those questions that were posed in a way that would have required her to disclose the content of her communications with counsel for Mid-West Metal.  The issue raised by the objectionable questions posed to Ms. Bartlett was that each of those questions was an indirect attempt to elicit testimony that would disclose what was or was not discussed by counsel with Ms. Bartlett regarding issues involved in this litigation.  Those *discussions* are protected:  "A fact is one thing and a communication concerning that fact is an entirely different thing.  *The client cannot be compelled to answer the question, 'What did you say or write to the attorney*?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communications to his attorney."  *Uphohn Co. v. United States*, 449 U.S. 383, 395-96 (1981) (emphasis added)(*quoting Philadelphia v. Westinghouse Elec. Corp.*, 205 F. Supp 830, 831 (E.D. Pa. 1962)).  "What did you say to the attorney?" (or "What did he say to you?") is <u>precisely</u> what Simpson Ventures seeks to compel Ms. Bartlett to answer.

Before the objectionable questions arose, Ms. Bartlett had already answered questions about what she believed to be differences between diagrams of the two pet crates.  Simpson Ventures had its "facts" from her.  It was then established that:

(1) she did have discussions with Mid-West Metal's attorney James Hinshaw about the differences;

(2) she did not have discussions with anyone else concerning those differences; and

(3) she had not been through the exercise of identifying specific differences before meeting with Mr. Hinshaw – she had never even seen the '156 Patent until the day before her deposition.

With those foundations established, any inquiry into whether a specific difference was discussed by her, or whether a specific difference was "pointed out" to her necessarily reveals the specific communications between Ms. Bartlett and counsel - detailed for each item that was

9

or was not discussed. Whether a specific discussion was had (for example, regarding one of the fifteen differences noted below) would be disclosed by process of elimination.

The discussion between Ms. Bartlett and Mr. Hinshaw during their interview and preparation session is privileged. *See Banks v. Office of the Senate Sergeant-At-Arms*, 233 F.R.D. 1, 4-6 (D.D.C. 2005) (declining to compel testimony concerning communications exchanged during a deposition preparation session between the defendant's employee and attorney). In *Banks*, the court ruled that the attorney client privilege protected from disclosure "communications made by employees of the client when the client's attorney is interviewing those employees for the purposes of rendering legal services to the client." *Id.* at 4. The *Banks* court then noted that "any question which [opposing counsel] asks the employee what she told counsel during an interview or a deposition preparation session seeks privileged information." In a situation similar to this - asking a yes or no question about whether a topic was discussed - the court found the question invaded the attorney-client privilege. The question, "if answered in the affirmative, would disclose that attorney and client discussed this topic and [the] client would expect such a communication to be privileged." *Id.* at 5.

   **B.     Ms. Bartlett Testified As To Her Understanding Of All "Facts."**

   **Communications with Counsel.** Mid-West Metal does not dispute that "facts" are not privileged. However, communications with counsel about the facts clearly are. To the extent Ms. Bartlett's opinions or observations about the differences she sees when comparing two pictures can be deemed to be facts, she has fully testified to those "facts."

   Ms. Bartlett was asked a series of questions about the differences she observed between the Bay Isle wicker pet crates (Dep. Exhibit #2) and an old version of the Simpson Ventures' production model of its wicker pet crates (Dep. Exhibit #4). *See* Ex. D, Bartlett Dep. at pp. 44-46. First, this line of questions is legally irrelevant to the infringement analysis. Under the

*Gorham* "ordinary observer" standard, the fact finder is to evaluate the accused product (the Bay

Isle crate) against the design *set forth in the patent* – not the patent holder's production model

sold in the marketplace.[5]  Second, Ms. Bartlett testified to the following differences

(paraphrased):

1.)     The latches are different.
2.)     The Bay Isle product has a name plate on the front.
3.)     The Bay Isle product has gaps around the black rods at each side.
4.)     The Bay Isle product has square latches at the bottom.
5.)     The Bay Isle product is a different color.
6.)     The Bay Isle product has square woven patterns, whereas the Simpson Ventures product has a diamond pattern.
7.)     The Bay Isle product has square openings, or notches, along the top of the side panel.
8.)     The Simpson Ventures side panel is made out of 2 pieces.
9.)     The Bay Isle product has a gap along the top, and along the sides so you can see how sturdy the crate is.
10.)    The Bay Isle product has a woven line that goes around the cage on the top of the windows.

*Id.*

When asked which of those differences she discussed with legal counsel in her deposition

preparation session, Ms. Bartlett properly did not answer the questions because those

communications are protected against disclosure under the attorney-client and work product

privileges.

Recognizing the legal irrelevance of this line of questions, counsel for Simpson Ventures

then asked Ms. Bartlett to compare the accused product (the Bay Isle crate shown in Dep. Exhibit

---

[5]   This is not a distinction without a difference.  The Simpson Ventures production model (Dep. Exhibit #4) does not actually embody the design in the '156 Patent (Dep. Exhibit #77) – a major difference being that the '156 Patent does not have a large singular diamond woven into any of the crate's panels, while the Simpson Ventures production model (Dep. Exhibit #4) shows that a large singular diamond shape is woven into the all of the crate's panels (except for the front panel).  Moreover, Mr. Simpson has since testified that the production model shown in Dep. Exhibit 4 is no longer even sold in the marketplace.

11

#2) to the design set forth in the '156 Patent (Dep. Exhibit #77), and identify the differences

between those designs.  Ms. Bartlett testified to the following differences (paraphrased):

1.) The latches are different in both configuration and number.
2.) The Bay Isle product has the emblem or label on the front door.
3.) The Bay Isle product does not have wicker going across the bottom of the front door, compared to Figure 1 of the '156 Patent.
4.) The Bay Isle product has the rods or drop pins that run down the sides.
5.) The Bay Isle panels have gaps that show those rods, whereas the '156 Patent's panels are flush at the sides and top.
6.) The windows on the back panels are different – in placement, centering, and size of opening.
7.) There is a square weave pattern that appears on the panels of the Bay Isle product, whereas there is no weave pattern on the '156 Patent design.
8.) There is a difference in the woven cord around the windows, as seen looking at the Rear Panel (Figure 3) and the Side Panel (Figure 5).
9.) The Bay Isle pan-stop device is in the front, the '156 Patent's pan-stop device is in the back.
10.) In looking at the rear panel (Figure 3) and the side panel (Figure 5), the '156 Patent's design has the crate sitting elevated off the floor on peg legs, whereas the Bay Isle product is not and appears to be flush.
11.) The top panel again has the square weave patterns, and the gap along the side of the top panel where the crate fits together – neither of which are present in the '156 Patent.
12.) The windows in the side panels are different – the Bay Isle windows are larger in size than width – meaning their vertical height.
13.) The side edges of the side panels are different – the Bay Isle product shows a gap, whereas the '156 Patent's side edges are flush.
14.) The '156 Patent's side panel appears to be made out of 2 pieces, whereas the Bay Isle product is just 1 piece.
15.) There are notch cut-outs along the bottom of the side panel and along the top of the side panel in the Bay Isle product, whereas the '156 Patent does not have any, and appears to be flush.

*Id*. at pp. 48-52

A simple comparison of the two designs demonstrates that these differences are obvious

to the naked eye, not obscured, and are readily apparent.  See Exhibit G (Dep. Ex. 2) and Exhibit

H (Dep. Ex. 77)  The line of questions asked by Simpson Ventures is a line of questions that

every single witness deposed in this case has been asked, by both counsel.  The subject matter of

the questions is not complex – it calls for a simple visual comparison of the two designs.  The

fact that such a line of questions may have been "discussed" between Mr. Hinshaw and Ms.

Bartlett is hardly even remarkable, and certainly does not rise to the level of crossing any line into "coaching" or "spoon-feeding" testimony to the witness.

To the extent counsel for Simpson Ventures tries to draw an inference that coaching must have occurred because there is similarity among the witnesses in their responses, such an argument falls flat. First, the similar testimony arises because there are obvious differences that exist between the two designs – all of which are easily observed and straightforward. Of course the testimony is similar. The visible differences are what they are. Second, Simpson Ventures' own witnesses (including Mr. Simpson, its liability expert Mr. Anders, its treasurer Mrs. Simpson, and its customer service representative Ms. Bellenchia) each testified to the presence of these differences, using terminology that was substantially similar to that used by Ms. Bartlett. By Simpson Ventures' reasoning, if Mr. Hinshaw "coached" Ms. Bartlett, then Mr. Hinshaw obviously must have also "coached" Simpson Ventures' own witnesses. The similarity of testimony among the witnesses exists because the designs are in fact different. Those differences are easily observed, and easily articulated using similar terminology. There is nothing more that can be inferred here.[6]

Nevertheless, Simpson Ventures claims that there was coaching, premised on its faulty assumption that Ms. Bartlett's "knowledge" somehow changed: "It appears that prior to discussions with Mid-West's counsel, Ms. Bartlett had discerned only a limited number of differences between the '156 Patent and the Mid-West Bay Isle wicker crates. After her

---

[6]   Mid-West Metal invites the Court to engage in a similar exercise and compare the 5 figures set forth in the '156 Patent (Exhibit H hereto) to the pages of photographs of the accused Bay Isle product (Exhibit G hereto), and consider what those differences are and what words it would use to describe the numerous differences between the two designs.

discussions with Mid-West's counsel, Ms. Bartlett identified a greater number of differences between the two designs." *Pltf's Brief* at 20.

As Ms. Bartlett's testimony unequivocally shows, however, there was no "before and after" comparison done by her and thus no "change" in her factual position. Ms. Bartlett had never seen Exhibit 77 before meeting with Mr. Hinshaw to prepare for her deposition. *See* Ex. D, Bartlett Dep. at p. 48. She had never discussed differences between Simpson Ventures' pet crate and Mid-West Metal's pet crate with anyone at Mid-West Metal. *Id.* at p. 46. Given that she had never before compared the diagrams or pictures to consider whether there were differences between the crates, there could have been no change in her understanding of the facts as a result of her preparation for a deposition.

**Communications with Mr. Wingate.** Simpson Ventures also seeks to discover what Mr. Wingate said to Ms. Bartlett *specifically about this litigation.* Ex. D, Bartlett Dep. at p. 25:10-18; p. 27:24-28:16. Privileged communications between an attorney and his client are broader than the "legal advice" category which Simpson Ventures paints so narrowly. Rather, a privileged communication "relates to a fact of which the attorney was informed . . . for the purpose of securing primarily either (i) an opinion on law *or* (ii) legal services *or* (iii) *assistance in some legal proceeding*." *Freiermuth*, 218 F.R.D. at 698 (emphasis added). Ms. Bartlett did not answer as to what was discussed to the extent that the answer would disclose privileged communications. Legal assessments and communications intended to assist a client with litigation are privileged communications. Whether, as asked during her deposition, Ms. Bartlett believed "advice" was relayed does not answer the issue of whether confidential and privileged communications took place.

Simpson Ventures also argues, incorrectly, that privileged communications made to corporate representatives lose their privileged status if relayed by a non-attorney to others within

14

the corporation. Such intra-corporate communications are necessary and do not waive the

privilege. *See, e.g., McCook Metals L.L.C. v. Alcoa, Inc.*, 192 F.R.D. 242, 254 (N.D. Ill. 2000)

("Management should be able to discuss amongst themselves the legal advice given to them as

agents of the corporation with an expectation of privilege."); *see also Bank Brussels Lambert v.*

*Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 442 (S.D.N.Y. 1995) ("This follows from the

recognition that since the decision-making power of the corporate client may be diffused among

several employees, the dissemination of confidential communications to such persons does not

defeat the privilege.")

Ms. Bartlett was and is the Inside Sales Manager for Mid-West Metal and works closely

with Jim Wingate on a daily basis. The privileged status of information originally conveyed to

Mr. Wingate was not waived because it remained confidential as Ms. Bartlett did not disclose the

information to anyone. *See* Ex. D, Bartlett Dep. at p. 23 (no discussions concerning this

litigation except with Mr. Wingate and counsel for Mid-West Metal). Thus, privileged

communications relayed to her by Mr. Wingate were properly preserved by her by refusal to

disclose those communications during her deposition.

2.      **Mid-West Metal Properly Invoked Its Right to Protect The Opinion Work Product Of Its Attorneys.**

In *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir.

Ala. 1994), the Eleventh Circuit explained that there is near absolute protection of attorney

opinion work product:

> Material that reflects an attorney's mental impressions, conclusions, opinions, or legal theories, is referred to as "opinion work product. Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney. In *Upjohn*, the Supreme Court made clear that an attorney's notes and memoranda of a witness's oral statements is considered to be opinion work product. As Rule 26(b)(3) makes apparent, "opinion work product can not

be discovered upon a showing of substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship.

(Internal citations omitted)  Thus, "opinion work product enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances." *Cox,* 17 F.3d at 1422 (*citing Murphy*, 560 F.2d at 336).

Although work product is normally thought of as the recorded thoughts of an attorney, an attorneys' confidential oral communications with his client can also contain the attorneys' opinion work product when those communications reveal his thoughts and strategies. *See Lake Shore Radiator, Inc. v. Radiator Express Warehouse,* 2007 U.S. Dist. LEXIS 19028, at pp. 14-16 (M.D. Fla. Mar. 19, 2007) ("Contrary to Defendant's contentions, courts have held that 'work product consists of the tangible and intangible material which reflects an attorney's efforts at investigating and preparing a case, including one's pattern of investigation, assembling of information, [and] determination of the relevant facts . . . .'") (*quoting In re Grand Jury Subpoena Dated November 8, 1979*, 622 F.2d 933, 935 (6th Cir. 1980) (emphasis added); *see also Phoenix Nat'l Corp. v. Bowater United Kingdom Paper, Ltd.*, 98 F.R.D. 669, 671 (N.D. Ga. 1983) ("Insofar as defendant's question attempted to elicit from the witness specific questions that plaintiff's counsel posed to him, or even the area of the case to which he directed the majority of his questions, it exceeds the permissible bounds of discovery and begins to infringe on plaintiff's counsel's evaluation of the case").

A.    **Mid-West Metal's Objections Appropriately Sought To Prevent Disclosure Of Counsel's Litigation Assessments.**

In addition to invading the attorney client privilege, Simpson Ventures' questions to Ms. Bartlett sought disclosure of the litigation assessments of Mid-West Metal's trial counsel. Simpson Ventures attempted to determine, item by item, the specific topics that counsel deemed important to cover with Mid-West Metal's employee in preparation for her deposition. *See*

*Bowater*, 98 F.R.D at 671 (attempting to question witness "even [about] the area of the case to which [counsel] directed the majority of his question []exceeds the permissible bounds of discovery and begins to infringe on plaintiff's counsel's evaluation of the case."). That information is protected opinion work product.

"The questions and comments by a lawyer and his client's employees as they discuss legal and factual questions that have arisen in litigation *or prepare for a deposition* are at the heart of a lawyer's preparation and surely the attorney must be permitted to do that in peace, free from the intrusion of opposing counsel." *Banks*, 233 F.R.D. at 5. In *Banks*, like the situation encountered here, questions were posed that would have invaded the attorneys work product by disclosing not just the words that were discussed, but what *topics* were discussed. On various questions posed in a deposition, the court in *Banks* ruled questions "unquestionably objectionable" concerning witness preparation: "Work product; would disclose how the attorney prepared the witness for deposition." "Work product; would disclose what topics attorneys discussed with witness during preparation." "Work product because it indicates a topic that the attorneys considered important and relevant during the preparation of the witness." Invasions of work product - how Ms. Bartlett was prepared, what topics were discussed, and what topics were considered important and relevant - are precisely the problems with the questions posed to Ms. Bartlett.

**B.     Simpson Ventures Has Not Met Its High Burden To Establish Substantial Need For The Information It Seeks.**

When it sought to elicit testimony of what counsel deemed to be important areas of the case, Simpson Ventures was seeking opinion work product. Simpson Ventures made no showing of "very rare" or extraordinary circumstances sufficient to invade counsel's opinion work product. There was no need for otherwise unavailable evidence because, as explained above, Ms. Bartlett testified about her own conclusions on all subjects of inquiry. Simpson

17

Ventures has the "facts," and has demonstrated no need to determine opposing counsel's assessment of those facts.

**3.      The Relief Requested By Simpson Ventures Is Wholly Unwarranted.**

First, there is no basis or need to "retake" the deposition of Ms. Bartlett. She testified fully concerning all differences and similarities between the designs presented to her. There is nothing to be gained from further testimony, and Simpson Ventures' request should be denied.

Second, a court need not impose attorney's fees and expenses when compelling discovery if "the party was substantially justified in resisting discovery." *Maddow v. Procter & Gamble Co., Inc.*, 107 F.3d 846, 853 (11th Cir. 1997). "A party's objection is substantially justified if reasonable people could differ as to the appropriateness of the contested action." *Id.* Here there is no basis for an award of attorney's fees because the information withheld is and was privileged from disclosure. As the case law shows regarding privilege and work product protections, Mid-West Metal was substantially justified in its actions – especially so where the line of questions here in particular is of marginal relevance.

Finally, Simpson Ventures' request for the vague jury instruction it has identified ("that at least some of the testimony of Mid-West's witnesses is tainted by things attorneys told them or by what other Mid-West employees told them") is wholly unsupported – by fact or by citation to any authority that issuing such an instruction would be proper.

**Conclusion**

WHEREFORE, Plaintiff Simpson Ventures, Inc.'s June 16, 2008 Motion to Compel and for Other Relief should be denied, and pursuant to Fed.R.Civ.Proc. 37(a)(4)(B), Simpson

Ventures should be ordered to pay Mid-West Metal's costs and attorneys' fees incurred in opposing the motion.

Respectfully submitted,

 /s/ James M. Hinshaw
James M. Hinshaw-pro hac vice
        Indiana Attorney No. 16744-49
Neal Bowling- pro hac vice,
        Indiana Attorney No. 19278-41
Bingham McHale, LLP
2700 Market Tower
10 W. Market Street
Indianapolis, Indiana 46204-4900
Telephone: (317) 635-8900
Email:  JHinshaw@binghammchale.com
            NBowling@binghammchale.com


Brett A. Ross
Carr Allison
100 Vestavia Parkway
Birmingham, Alabama  35216
Telephone:  (205) 949-2938
Email:  bross@carrallison.com

Counsel for the Defendants

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following on this the 23rd day of June, 2008:

       Robert T. Meadows, III
       Capell & Howard, P.C.
       3120 Frederick Road
       P. O. Drawer 2268
       Opelika, Alabama  36803

       Arthur A. Gardner
       Joseph Staley
       Gardner, Groff, Santos & Greenwald, P.C.
       2018 Powers Ferry Road, Suite 800
       Atlanta, Georgia  30339

                                                    /s/ James M. Hinshaw
                                                An Attorney for the Defendants

w1307163-v4 / 11128.64696

20

# EXHIBIT  A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| SIMPSON VENTURES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | )Civil Action File No. 3:06-cv-901-WKW | |
| | ) | |
| MID-WEST METAL PRODUCTS | ) | **Demand For Jury Trial** |
| COMPANY, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| MID-WEST METAL PRODUCTS | ) | |
| COMPANY, INC., | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SIMPSON VENTURES, INC., | ) | |
| | ) | |
| Counterdefendant. | ) | |
| | ) | |

**NOTICE OF DEPOSITION OF DEFENDANT
MID-WEST METAL PRODUCTS COMPANY, INC.
UNDER FRCP RULE 30(b)(6)**

TO:  MID-WEST METAL PRODUCTS COMPANY, INC.

PLEASE TAKE NOTICE that on MARCH 26, 2008, beginning at 9:00

a.m., counsel for Plaintiff, Simpson Ventures, Inc., in the above-styled civil action

will take the deposition of a representative or representatives designated by Defendant Mid-West Metal Products Company, Inc., upon oral examination, for purposes of cross-examination, discovery and all proper purposes under the Federal Rules of Civil Procedure and the Federal Rules of Evidence, before a Notary Public or some other officer duly authorized by law to administer oaths. The deposition will cover the topics listed on Exhibit 1 attached hereto.

Said deposition will take place at Defendant's corporate offices or at the offices of Defendant's counsel, as may be agreed to between the parties. The deposition may be recorded by video and by other stenographic means.   The deposition will continue from hour to hour and day to day until complete.

This 12th day of March, 2008.

Arthur A. Gardner
Georgia Bar No. 283,995

GARDNER GROFF, GREENWALD
& VILLANUEVA, P.C.
Attorneys for Plaintiff
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339
Tel:  (770) 984-2300  Fax:  (770) 984-0098

## EXHIBIT I

To Notice of Deposition of Defendant Mid-West Metal Products Company, Inc.

## Definitions and Instructions

1.    The words "you," "your," "Defendant" and "Mid-West Metal Products Company, Inc.", means any directors, officers, employees, agents, representatives or other persons acting, or purporting to act, on behalf of Defendant Mid-West Metal Products Company, Inc..

2.    The word "Plaintiff" means Simpson Ventures, Inc., and any directors, officers, employees, agents, representatives or other persons acting, or purporting to act, on behalf of Plaintiff Simpson Ventures, Inc.

3.    " '156 Patent", "the Patent", and "patent-in-suit" mean United States Patent No. D483,156.

4.    "Products" means the goods and services identified in the certificates of registration of Plaintiff's Marks as well as any other goods or services provided in conjunction or association with Plaintiff's Marks.

5.    Any words not otherwise defined herein shall have their ordinary meaning and any other meaning attributable to such words under the Federal Rules of Civil Procedure and case law interpreting those rules.

3

# DEPOSITION TOPICS

Defendant Mid-West Metal Products Company, Inc. should be prepared to testify, and shall designate one or more witnesses to do so, regarding the following topics, however, as permitted in FRCP Rule 30(b)(6), the deposition topics addressed by the Plaintiff are not necessarily limited to the following:

1. Each defense or assertion raised by Defendant in its Answer to the Complaint, at the time the Answer was filed and now.

2. Each defense or counterclaim to be presented by Defendant at the trial of this action.

3. The preparation and substance of Defendant's answers and responses to each of the interrogatories in Plaintiff's First or Second Set of Interrogatories to Defendant.

4. The preparation and substance of Defendant's Initial Disclosures.

5. The existence of documents called for in either Plaintiff's First or Second Set of Requests for Documents and Things and Defendant's actions to produce documents in response to those requests.

6. Any and all instances of confusion or mistake between products sold by the Defendant and products sold by Plaintiff, including without limitation mistaken

warranty claims, mistaken service or parts inquiries, mistaken returns, and mistaken sales or purchase inquiries.

7. Knowledge of Plaintiff's products and/or patents prior to the filing of this suit, the circumstances surrounding the purchase of any of Plaintiff's products by Defendant or any of Defendant's employees, any use by the Defendant of the Plaintiff's products, and the current location of any examples of Plaintiff's product purchased by Defendant or any of Defendant's employees.

8. Defendant's experiences and practices in obtaining, enforcing, and/or licensing patents.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the attached NOTICE OF DEPOSITION OF DEFENDANT MID-WEST METAL PRODUCTS COMPANY, INC. UNDER FRCP RULE 30(b)(6) has been served on Defendant's counsel via First Class U.S. Mail to the following address: James M. Hinshaw, BINGHAM McHALE, LLP, 2700 Market Tower, 10 West Market Street, Indianapolis, IN 46204-4900 and via email to jhinshaw@binghammchale.com, this 12th day of March, 2008.

Arthur A. Gardner
Georgia Bar No. 283,995

GARDNER GROFF GREENWALD
& VILLANUEVA, PC
Attorneys for Plaintiff
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339
Tel: (770) 984-2300  Fax: (770) 984-0098

**EXHIBIT  B**

# Bingham ● McHale LLP

a t t o r n e y s     a t     l a w

James M. Hinshaw
Attorney
Direct: (317) 968-5385
jhinshaw@binghammchale.com

April 8, 2008

Arthur A. Gardner
Joseph W. Staley
Gardner Groff Santos & Greenwald, PC
100 Parkwood Point
2018 Powers Ferry Road, Suite 800
Atlanta, GA 30339

> Re:  Simpson Ventures, Inc. v. Mid-West Metal Products Company, Inc. ('156 Patent)
> Cause No. 06-cv-00901-WKW-VPM
> Our File No. 11128-64696
>
> Simpson Ventures, Inc. v. Mid-West Metal Products Company, Inc. ('321 Patent)
> Cause No. 3:07-cv-00048 WHA-CSC
> Our File No. 11128-66351

Dear Art and Joe:

I am writing with regard to the 30(b)(6) Notices of Deposition that you served in both the '156 Patent and '321 Patent cases.

With regard to Topics 6, 7, and 8, Jim Wingate will be the corporate representative. He will be prepared to testify on those topics on April 16th.

With regard to Topics 3, 4, and 5, Jim Wingate will be the corporate representative relating to the topics of searching for, production of, existence of, and preparation of the documents and information for the company's written discovery responses and initial disclosures. He will be prepared to testify on those topics on April 16th. As for the "substance" of the answers and responses in those discovery documents, the answers and responses in those discovery documents are what they are. Mr. Wingate can certainly repeat those answers and responses, but if you are seeking testimony beyond that, then your notice is not sufficiently particular to allow us to identify the topic and/or to identify an appropriate deponent who is prepared to speak further on behalf of the company. The requested deposition is also unduly burdensome in light of the pure multitude and breadth of your written discovery requests in these two lawsuits.

Arthur A. Gardner
Joseph W. Staley
April 8, 2008
Page 2

In so designating Mr. Wingate as the 30(b)(6) deponent on these topics, Mid-West Metal is not waiving its right to assert privilege, as appropriate.

With regard to Topics 1 and 2, Mid-West Metal objects to these proposed topics as they each fail to state with reasonable particularity that which is requested, and the request is unduly burdensome. Mid-West Metal cannot reasonably be expected to discern the topic and/or to identify an appropriate deponent who is prepared to speak on behalf of the company. Moreover, the request calls for the disclosure of privileged communications and materials – including anticipation of litigation, work product, and attorney-client privileged information. See, e.g., In re: Independent Service Organizations Antitrust Litigation, 168 F.R.D. 651, 654 (D.Kan. 1996) ("Even under the present-day liberal discovery rules, Xerox is not required to have counsel marshal all of its factual proof and prepare a witness to be able to testify on a given defense or counterclaim."). I would also note that Topic 2 asks for a witness to speak about litigation decisions that have not yet been determined ("to be presented by Defendant at trial"). Those decisions will not be made until after all discovery is completed, dispositive motions are ruled upon, and other pre-trial motions are resolved.

Finally, your Notices each start with the phrase "not necessarily limited to the following." I do not see how Mid-West Metal can possibly be expected to identify and prepare a 30(b)(6) deponent on topics that are not identified at all – as thus object on this basis, as well.

As a practical matter, you have already identified and noticed for 30(a)(1) deposition the important fact and expert witnesses on each of our defenses and contentions, with the exception of perhaps Chip Rolfsen. We are producing a 30(b)(6) witness on the topics that you have sufficiently described. Since depositions in Indiana will continue into May, I suggest we revisit your need for a 30(b)(6) deposition on these other topics (if and as refined) after you have completed the 30(a)(1) and the agreed-upon 30(b)(6) depositions next week. Please consider, and advise if you view this differently.

Sincerely,

James M. Hinshaw

JMH:lac/1285285
Enclosure
cc:     Brett A. Ross, Esq.
        J. Neal Bowling, Esq.

# EXHIBIT C

# In The Matter Of:

*Mid-West Metals vs.*
*Simpson Ventures*

---

*David Clemmons*
*April 17, 2008*

---



1650 ONE AMERICAN SQUARE
INDIANAPOLIS, IN  46282

317+236+6022
317+236+6015(F)

*Original File ClemmonsDave(041708).txt*
**Min-U-Script® with Word Index**

Page 1

[1]            IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF ALABAMA
[2]                     EASTERN DIVISION

[3]
SIMPSON VENTURES, INC.,          )
[4]            Plaintiff,         )
                                 )
[5]        -vs-                   )
                                 )
[6] MID-WEST METAL PRODUCTS       )
COMPANY, INC.,                    ) Civil Action File No.
[7]        Defendant.             ) 3:06-cv-00901-WKW-VPM
                                 )
[8] ────────────────────────     )
MID-WEST METAL PRODUCTS           ) Case No. 3:07-cv-
[9] COMPANY, INC.,                ) 00048 WHA-CSC
        Counterclaimant,          )
[10]                              )
                                 )
[11]        -vs-                  )
                                 )
SIMPSON VENTURES, INC.,           )
[12]        Counterdefendant.     )

[13]            DEPOSITION OF DAVID CLEMMONS

[14]       The deposition upon oral examination of
[15] DAVID CLEMMONS, a witness produced and sworn before
me, Jenny L. Reeve, RPR, CSR No. 00-R-3006, a
[16] Notary Public in and for the County of Hamilton,
State of Indiana, taken on behalf of the Plaintiff
[17] and Counterdefendant, at the offices of Bingham
McHale, 2700 Market Tower, 10 West Market Street,
[18] Indianapolis, Marion County, Indiana, on the
17th day of April, 2008, at 9:59 a.m., pursuant to
[19] the Federal Rules of Civil Procedure, all
applicable rules, and all stipulations, if any,
[20] stated on the record, and pursuant to written
notice and/or agreement and/or subpoena as to time
[21] and place thereof.

[22]

[23]
Connor + Associates, Inc.
[24] 1650 One American Square
Indianapolis, IN 46282
[25] (317) 236-6022

Page 2

[1]            A P P E A R A N C E S

[2]

[3] FOR THE PLAINTIFF AND COUNTERDEFENDANT:
Simpson Ventures, Inc.
[4]
            Arthur A. Gardner, Esq.
[5]         Joseph W. Staley, Esq.
            GARDNER GROFF GREENWALD & VILLANUEVA, PC
[6]         2018 Powers Ferry Road, Suite 800
            Atlanta, GA  30339
[7]         agardner@gardnergroff.com
            jstaley@gardnergroff.com
[8]

[9] FOR THE DEFENDANT AND COUNTERCLAIMANT:
Mid-West Metal Products Company, Inc.
[10]
            Neal Bowling, Esq.
[11]        James M. Hinshaw, Esq.
            BINGHAM McHALE LLP
[12]        2700 Market Tower
            10 West Market Street
[13]        Indianapolis, IN  46204-4900
            nbowling@binghammchale.com
[14]        jhinshaw@binghammchale.com

[15]

ALSO PRESENT:
[16]
            Mr. Jeff Simpson
[17]        Mr. James Wingate

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 3

[1]        I N D E X   O F   E X A M I N A T I O N

[2]                                              Page

[3] DIRECT EXAMINATION  . . . . . . . . . . . .    5
        Questions by Mr. Arthur A. Gardner
[4]
    RESUMED DIRECT EXAMINATION  . . . . . . . .   99
[5]     Questions by Mr. Joseph W. Staley

[6] CROSS-EXAMINATION  . . . . . . . . . . . .   143
        Questions by Mr. Neal Bowling
[7]
    REDIRECT EXAMINATION  . . . . . . . . . . .  146
[8]     Questions by Mr. Joseph W. Staley

[9] RECROSS-EXAMINATION  . . . . . . . . . . .   148
        Questions by Mr. Neal Bowling
[10]

[11]        I N D E X   O F   E X H I B I T S

[12]                                              Page

[13] Deposition Exhibit No.:

[14] 2-Swan    Previously marked . . . . . . . . .   49
     2-Swan    Previously marked . . . . . . . . .   53
[15] 2-Swan    Previously marked . . . . . . . . .   69
     2-Swan    Previously marked . . . . . . . . .   76
[16] 2-Swan    Previously marked . . . . . . . . .   83
     2-Swan    Previously marked . . . . . . . . .  104
[17] 2-Swan    Previously marked . . . . . . . . .  118
     3-Swan    Previously marked . . . . . . . . .   63
[18] 3-Swan    Previously marked . . . . . . . . .   90
     3-Swan    Previously marked . . . . . . . . .   93
[19] 3-Swan    Previously marked . . . . . . . . .   97
     3-Swan    Previously marked . . . . . . . . .  120
[20] 3-Swan    Previously marked . . . . . . . . .  123
     3-Swan    Previously marked . . . . . . . . .  127
[21] 4-Swan    Previously marked . . . . . . . . .   34
     9-Swan    Previously marked . . . . . . . . .  108
[22] 26-Swan   Previously marked . . . . . . . . .  125
     29-Swan   Previously marked . . . . . . . . .  127
[23] 31-Swan   Previously marked . . . . . . . . .  132
     32-Swan   Previously marked . . . . . . . . .  134
[24] 32-Swan   Previously marked . . . . . . . . .  140
     33-Swan   Previously marked . . . . . . . . .  141
[25]

Page 4

[1]      I N D E X   O F   E X H I B I T S  (cont'd)

[2]
                                              Page
[3]
    Deposition Exhibit No.:
[4]
    53-Clemmons  Copies of various drawings, ....  30
[5]      Bates MWM 00077 thru 916

[6] 54-Clemmons  Copies of various drawings  ....  30

[7] 55-Clemmons  Copy of U.S. Design Patent .....  63
        No. US D534,321 S, inventor Jeffrey M.
[8]     Simpson, for a pet litter pan housing,
        dated December 26, 2006
[9]
    56-Clemmons  Copy of sketch drawn by ........  88
[10]    deponent

[11] 57-Clemmons  Copy of Mid-West in-house ......  109
        email dated March 19, 2003, regarding
[12]    wicker cages, Bates MWM 00862

[13] 58-Clemmons  Copies of Mid-West in-house ....  124
        emails dated in March 2003, regarding
[14]    wicker part numbers, Bates MWM 00866

[15] 59-Clemmons   Copies of Mid-West in-house ...  126
        emails dated January 14, 2004, regarding
[16]    1805 wicker cat litter, Bates MWM 00916

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Simpson Ventures

---

Page 65

[1] in these search efforts.

[2]     **MR. GARDNER:** Well, the witness did testify

[3] that he got his instructions to do some of the work

[4] from the agendas or schedules. So it's not correct

[5] that the witness didn't identify that they existed

[6] in connection with the wicker crates, because when

[7] we asked him who instructed him, he deferred to the

[8] schedules as where he got his instructions.

[9]     **MR. HINSHAW:** I'm not going to quibble with you

[10] over the testimony. The transcript will speak to

[11] that. I have a different memory of the testimony.

[12]     Regardless, we have gone back and asked for a

[13] double effort to search for that, and they've

[14] confirmed that there is no such schedule, either

[15] digital or paper.

[16]     **BY MR. GARDNER:**

[17] Q  Mr. Clemmons, what types of things did you do to

[18] prepare for coming to today's deposition?

[19] A  **Met with the lawyers.**

[20] Q  Did you do anything else?

[21] A  **To prepare for the deposition, I met with Neal and**

[22] **James.**

[23] Q  Did you have any sort of meeting within the company,

[24] outside of the presence of the lawyers, to get ready

[25] for this deposition?

---

Page 66

[1] A  **Not to get ready for the deposition, my deposition,**

[2] **no.**

[3] Q  Well, did you have -- did you participate in a

[4] meeting in the last week or two with other people

[5] within the company and discuss the facts of this

[6] case?

[7]     **MR. BOWLING:** I'm going to have to object to

[8] the question to the extent that it would call for

[9] any information that is privileged, either the

[10] attorney-client privilege or the attorney work

[11] product privilege.

[12]     Mr. Clemmons, if you can answer Mr. Gardner's

[13] question without divulging any communications from

[14] your attorneys, or any discussions about

[15] communications from your attorneys, you may answer

[16] the question.

[17] A  **Well, we did have a meeting. When was it?**

[18] **Wednesday, I believe, of last week. And Jim**

[19] **Wingate, myself, Stew Kerr, Tom Swan were there.**

[20]     **BY MR. GARDNER:**

[21] Q  Anybody else?

[22] A  **No. Excuse me. I have something in my eye. No.**

[23] Q  At that meeting, did -- was it -- at that meeting

[24] was there a discussion of the facts and

[25] circumstances surrounding the development of the

---

Page 67

[1] Mid-West wicker crate?

[2] A  **As I recall this meeting, this meeting was a meeting**

[3] **called by Jim to discuss a 30(b)(6), or something,**

[4] **deposition that he had to deal with. Didn't quite**

[5] **understand what that meant, but he was checking for**

[6] **facts that he would have to answer to in his own**

[7] **deposition.**

[8] Q  Was your involvement discussed as part of this

[9] meeting?

[10] A  **My involvement was limited to schedules: When I**

[11] **was to be down here, what times. And then just this**

[12] **week that schedule got redone to where I'd be here**

[13] **all day today. But that's as far as it went with**

[14] **what I had.**

[15] Q  Well, during this meeting of last week within the

[16] company, was there a time when you stated what you

[17] remembered about the facts surrounding this case?

[18] A  **As it pertained to what Jim needed to know, and**

[19] **not -- I guess I don't understand the question.**

[20] Q  Well, how long did the meeting last?

[21] A  **Half hour or 40 minutes, as I recall.**

[22] Q  Did anybody ask you any questions during the

[23] meeting?

[24] A  **Questions were asked, yes.**

[25] Q  Did people ask you questions?

---

Page 68

[1] A  **Yes.**

[2] Q  And what was asked?

[3]     **MR. BOWLING:** I'm going to object, again, to

[4] the extent that the question calls for information

[5] protected by the attorney-client privilege and the

[6] attorney work product privilege in anticipation of

[7] litigation.

[8]     Mr. Clemmons, to the extent, again, that you

[9] can answer Mr. Gardner's question without discussing

[10] what your attorneys have told you, or discussing or

[11] revealing discussions about the advice of your

[12] attorneys, you may answer Mr. Gardner's question.

[13] A  **Repeat --**

[14]     **THE WITNESS:** What was the question, again?

[15]     (The reporter reads back as requested.)

[16] A  **What was asked is if we had any documentation, any**

[17] **information that retained -- that remained, any**

[18] **packaging, this type of thing.**

[19]     **And again, as I stated before, that I didn't**

[20] **have any more information.**

[21]     **BY MR. GARDNER:**

[22] Q  Did anyone ask you to describe your involvement in

[23] the development of the wicker crates?

[24] A  **No.**

[25] Q  Did anyone ask you to describe your involvement in

---

Page 149

[1] Q   Let me clarify that.  Is there anything that you

[2]      said this morning that you would now like to say,

[3]      "No, I think I misspoke," or, "That is not

[4]      accurate," to your knowledge?

[5] A   To my knowledge, the written communication that

[6]      we're talking about here --

[7] Q   I'm sorry, Mr. Clemmons.  I want you to answer just

[8]      the question I'm asking, okay?

[9]          Did you -- are you changing any of your

[10]     testimony?  Is it your intent to change any of your

[11]     testimony from what it was this morning?

[12] A   No.

[13]         MR. BOWLING:  Thank you.  I have no further

[14]     questions.

[15]         MR. GARDNER:  See you tomorrow at 9:00?

[16]         MR. BOWLING:  Sounds good.

[17]         THE REPORTER:  Signature?

[18]         MR. BOWLING:  Please.

[19]             (Deposition concluded at 6:09 p.m.)

[20]             AND FURTHER THE DEPONENT SAITH NOT

[21]

[22]

[23]         _____
                    DAVID CLEMMONS

[24]

[25]

Page 150

[1] STATE OF INDIANA      )
                          )  SS:
[2] COUNTY OF HAMILTON    )

[3]

[4]      I, Jenny L. Reeve, RPR, CSR No. 00-R-3006,a

[5] Notary Public in and for the County of Hamilton,

[6] State of Indiana, at large, do hereby certify that

[7] DAVID CLEMMONS, the deponent herein, was by me

[8] first duly sworn to tell the truth, the whole

[9] truth, and nothing but the truth in the

[10] aforementioned matter;

[11]     That the foregoing deposition was taken on

[12] behalf of the Plaintiff and Counterdefendant at the

[13] offices of Bingham McHale, 2700 Market Tower, 10

[14] West Market Street, Indianapolis, Marion County,

[15] Indiana, on the 17th day of April, 2008, at 9:59

[16] a.m., pursuant to the Federal Rules of Civil

[17] Procedure;

[18]     That said deposition was taken down in

[19] stenograph notes and afterwards reduced to

[20] typewriting under my direction, and that the

[21] typewritten transcript is a true record, to the

[22] best of my ability, of the testimony given by the

[23] said deponent; and that the signature by said

[24] deponent to his deposition was not waived.

[25]     That the parties were represented by their

Page 151

[1] counsel as aforementioned.

[2]      I do further certify that I am a disinterested

[3] person in this cause of action, that I am not a

[4] relative or attorney of either party or otherwise

[5] interested in the event of this action, and that I

[6] am not in the employ of the attorneys for any

[7] party.

[8]      IN WITNESS WHEREOF, I have hereunto set my

[9] hand and affixed my notarial seal on this _____

[10] day of April, 2008.

[11]

[12]

[13]                    N O T A R Y   P U B L I C

[14]
My Commission Expires:
[15] June 19, 2008

[16] County of Residence:
     Hamilton County
[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

# EXHIBIT  D

# DEPOSITION OF:
# BRENDA BARTLETT

## CONFIDENTIAL TRANSCRIPT

## CASE: MID-WEST METALS V. SIMPSON VENTURES

## DATE TAKEN: MAY 28, 2008

CONNOR+ASSOCIATES, INC.
1650 ONE AMERICAN SQUARE
BOX 82020
INDIANAPOLIS, IN 46282
(800) 554-3376
(317) 236-6022
CONNORREPORTING.COM

**BRENDA BARTLETT**
**MAY 28, 2008**

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

SIMPSON VENTURES, INC.,          )
          Plaintiff,             )
                                 )
     -vs-                        )
                                 )
MID-WEST METAL PRODUCTS          )
COMPANY, INC.,                   ) Civil Action File No.
          Defendant.             ) 3:06-cv-00901-WKW-VPM
_____)
                                 )
MID-WEST METAL PRODUCTS          ) Case No. 3:07-cv-
COMPANY, INC.,                   ) 00048 WHA-CSC
          Counterclaimant,       )
                                 )
     -vs-                        )
                                 )
SIMPSON VENTURES, INC.,          )
          Counterdefendant.      )

DEPOSITION OF BRENDA BARTLETT
     The deposition upon oral examination of
BRENDA BARTLETT, a witness produced and sworn
before me, Jenny L. Reeve, RPR, CSR No. 00-R-3006,
a Notary Public in and for the County of Hamilton,
State of Indiana, taken on behalf of the Plaintiff,
at the offices of Bingham McHale, 2700 Market
Tower, 10 West Market , Indianapolis, Marion
County, Indiana, on the 28th day of May, 2008, at
1:59 p.m., pursuant to the Federal Rules of Civil
Procedure, all applicable rules, and all
stipulations, if any, stated on the record, and
pursuant to written notice and/or agreement and/or
subpoena as to time and place thereof.

Connor + Associates, Inc.
1650 One American Square
Indianapolis, IN 46282
(317) 236-6022

---

**Page 3**

1      INDEX OF EXHIBITS
2                              Page
3  Deposition Exhibit No.:
4   2  Previously marked ..................  30
5   2  Previously marked ..................  43
6   2  Previously marked ..................  48
7   3  Previously marked ..................  31
8   4  Previously marked ..................  30
9   4  Previously marked ..................  42
10  37 Previously marked ..................  73
11  77 Previously marked ..................  48
12  120 Copy of document entitled Bay Isle ...... 85
        Replacements, Bates Confidential MWM
13      001479 thru 1485
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 2**

1        APPEARANCES
2
3  FOR THE PLAINTIFF AND COUNTERDEFENDANT:
   Simpson Ventures, Inc.
4
      Arthur A. Gardner, Esq.
5     Joseph W. Staley, Esq.
      GARDNER GROFF GREENWALD & VILLANUEVA, PC
6     2018 Powers Ferry Road, Suite 800
      Atlanta, GA 30339
7     agardner@gardnergroff.com
      jstaley@gardnergroff.com
8
9  FOR THE DEFENDANT AND COUNTERCLAIMANT:
   Mid-West Metal Products Company, Inc.
10
      James M. Hinshaw, Esq.
11    BINGHAM McHALE LLP
      2700 Market Tower
12    10 West Market Street
      Indianapolis, IN 46204-4900
13    nbowling@binghammchale.com
14
   ALSO PRESENT:
15
      Mr. Jeff Simpson
16
17
18      INDEX OF EXAMINATION
19                           Page
20 DIRECT EXAMINATION .............  4
      Questions by Mr. Joseph W. Staley
21
   CROSS-EXAMINATION .............  94
22    Questions by Mr. James M. Hinshaw
23 CONFIDENTIAL TESTIMONY ...........  12
24
25

---

**Page 4**

1         BRENDA BARTLETT,
2  having been duly sworn to tell the truth, the whole
3  truth, and nothing but the truth relating to said
4  matter, was examined and testified as follows:
5
6  DIRECT EXAMINATION,
7    QUESTIONS BY MR. JOSEPH W. STALEY:
8  Q  Could you state your full name and address for the
9     record.
10 A  Brenda Bartlett. I live at 1204 North Ridge Road in
11    Muncie, Indiana.
12 Q  I know we met just a moment ago, but again, for the
13    record, my name is Joe Staley, and I'm an attorney
14    representing Simpson Ventures in this matter.
15    I just want to go over a couple of ground rules
16    before we really get started. If at any point
17    during this deposition you need a break for any
18    reason, let me know.
19 A  Okay.
20 Q  And as soon as we possibly can, we'll accommodate
21    you and let you take that break.
22    As I'm asking a question, I'd ask that you
23    please let me complete the question and let me
24    completely finish the thought before you jump in
25    there and answer. And likewise I'll do my best to

---

BRENDA BARTLETT
MAY 28, 2008

## Page 21

1   that has a Mid-West -- Mid-West -- if they advertise
2   a Mid-West product, we'll help them pay for that
3   advertisement.
4   Q   So if the vendor or the sales rep places an ad on
5   your behalf, you'll rebate them or help them pay for
6   that ad?
7   A   In this case it would be the distributor.
8   Q   The distributor.
9   A   Or the retail store.
10  Q   All right.  For the most part, in the 12 years that
11  you've worked at Mid-West, have the majority of
12  these job descriptions been what you've done for the
13  last 12 years, or have you had more duties or less
14  duties at any point in time?
15  A   Basically, it's been about the same, except that
16  when we decided to take everything to China, you
17  know, the duties changed and increased at that
18  point.  So China would be the only exception.
19  Q   And your duties increased then, when you started
20  shipping things to China or having things made in
21  China?
22  A   Yes.
23  Q   How so?
24  A   Well, we've learned a lot about containers and
25  shipping things, paperwork, terminology, dealing

## Page 22

1   with customs.
2   Q   Are you by any chance related to anyone else who
3   works at Mid-West Metal?
4   A   No, I am not.
5   Q   Do you have any financial stake in Mid-West Metal
6   such as owning stock or any ownership interest?
7   A   No.
8   Q   Do you receive any kind of bonus, year-end bonus or
9   anything at Mid-West Metal?
10  A   No.
11  Q   So no bonus tied to performance or profitability of
12  the company, or anything like that?
13  A   No.
14  Q   So you're on straight salary?
15  A   They do offer a profit-sharing program, but that's
16  available to all employees.
17  Q   Are you choosing not to take that program, or are
18  you --
19  A   I am part of that program, but it's not stock.
20  Q   So you are -- you do have the opportunity to receive
21  some kind of bonus tied to the profitability of the
22  company, though?
23  A   Twice a year.
24  Q   And is that mid year and end of year, or when do you
25  get that?

## Page 23

1   A   It's mid year.  June and December -- or July and
2   December.
3   Q   Before you started working at Mid-West, did you
4   have any experience with pet products previous to
5   this job?
6   A   I did not.
7   Q   Have you ever been sued by any chance --
8   A   No.
9   Q   -- personally?
10  A   No.
11  Q   Have you ever been involved in any kind of patent
12  litigation?
13  A   No.
14  Q   Have you ever been involved in any way in any type
15  of non-patent litigation, or any other type of
16  litigation?
17  A   No.
18  Q   Have you talked to or written anything to anyone
19  about this lawsuit?
20  A   I'm sorry.  Repeat that.
21  Q   Have you talked to or written anything or written to
22  anyone about this lawsuit?
23  A   I've talked to Mr. Hinshaw and Mr. Wingate, but I've
24  not written.
25  Q   What did you talk with Mr. Wingate about?

## Page 24

1       MR. HINSHAW:  I'm going to object.  To the
2   extent any communications you had with Jim Wingate
3   about this lawsuit related to his seeking advice
4   from me or anybody from my office, or our provision
5   of advice, the things that we talked about with Jim
6   Wingate, then that's privileged and I would instruct
7   you not to answer.
8       If you can answer his question in terms of
9   talking about this lawsuit without disclosing
10  litigation strategies, what the attorneys had to
11  say, mental processes or strategies, or things like
12  that, if you can answer that, then you can answer.
13  If you can't, then I'm instructing you not to
14  answer.
15  A   Mr. Wingate just asked me to look for documents that
16  had anything to do with wicker.
17  BY MR. STALEY:
18  Q   Did you look at any documents?
19  A   Yes.
20  Q   And did you give those documents to Mr. Wingate?
21  A   Yes.
22  Q   Did you and Mr. Wingate talk about anything else?
23  Not necessarily -- I'm not asking you to tell me
24  what you talked about.
25  I'm asking did you and Mr. Wingate talk about

**BRENDA BARTLETT**
**MAY 28, 2008**

---

Page 25

1    anything else other than you looking for documents
2    relating to wicker?
3    A    And why?
4    Q    No, no. I just want to know a yes-or-no answer.
5        MR. HINSHAW:    And yet, relating to this
6    litigation.
7        MR. STALEY:    Yes. Not in --
8        MR. HINSHAW:    His --
9        MR. STALEY:    -- the context of --
10        MR. HINSHAW:    His question is simply calling
11    for a yes-or-no answer. Did you talk to Mr. Wingate
12    about this litigation other than looking for
13    documents? Yes or no.
14    A    Yes.
15    BY MR. STALEY:
16    Q    And you believe those conversations are privileged
17    in lieu of Mr. Hinshaw's advice today?
18    A    Yes.
19    Q    Did anyone instruct you to do or say anything in
20    regards to this lawsuit?
21    A    No.
22        MR. HINSHAW:    Do you mean other than looking
23    for documents?
24        MR. STALEY:    Yeah. I'm sorry.
25

---

Page 26

1    BY MR. STALEY:
2    Q    I understood you've been told to look for documents.
3        I guess I'm asking for anything other than
4    looking for documents. Has anybody instructed you
5    to do or say anything with regards to this lawsuit?
6    A    No.
7    Q    Has anyone instructed you -- other than, again,
8    relating to those documents, has anyone instructed
9    you not to do or say anything in regards to this
10    lawsuit?
11    A    No. I mean ...
12    Q    Going back to those conversations with Mr. Wingate,
13    other than the conversations about the documents,
14    is there any particular reason why you believe those
15    conversations are privileged?
16        Let me ask this. Why do you think those
17    conversations that you've refrained from speaking
18    about are privileged?
19        MR. HINSHAW:    Again, I'll object to the
20    question and instruct the witness that in answering
21    that question, if you can't answer Mr. Staley's
22    question without speaking to the content of those
23    communications which you believe are privileged,
24    then I'm instructing you not to answer his question
25    because it is privileged.

---

Page 27

1    A    Yeah, I believe that.
2    BY MR. STALEY:
3    Q    Did Mr. Wingate discuss advice he'd received from
4    his counsel? Did he tell you that the conversations
5    were advice he received from his counsel?
6    A    No.
7    Q    Do you have any reason to believe those
8    conversations revolved around advice that he had
9    received from his legal counsel?
10    A    No.
11    Q    Then I'll ask again why you think those
12    conversations are privileged.
13        MR. HINSHAW:    Do you need to confer with me
14    about whether or not --
15        THE WITNESS:    Yeah, I do.
16        MR. STALEY:    Why don't you guys step outside
17    and talk about this and figure out whether the
18    communication is privileged or not.
19        Let's go off the record.
20        (A recess is taken, after which, the
21    proceedings resume as follows:)
22        MR. STALEY:    Back on the record.
23    BY MR. STALEY:
24    Q    Going back to the line of questions that we had
25    before the short break here, can you tell me about

---

Page 28

1    your conversations with Mr. Wingate about this
2    lawsuit outside of material that you believe is
3    privileged.
4    A    Yes. Mr. Wingate, when he asked me to look for the
5    **documents, he told me that we had been sued for**
6    **patent infringement. He discussed it again with me**
7    **when he found out that I probably would be deposed,**
8    **and asked me to get with Mr. Hinshaw to set up the**
9    **time and date.**
10    Q    So all -- he just asked you to get together with
11    Mr. Hinshaw to set up your deposition time and date;
12    is that correct?
13    A    Yes.
14    Q    And there is more that he said that you believe is
15    privileged; is that correct?
16    A    That's correct.
17    Q    But again, he never told you that any of that
18    information was privileged, correct?
19    A    At one time or another -- I would say no.
20    Q    Just to confirm, he never -- and he never told you
21    that these communications were what the lawyer had
22    told him?
23    A    That's correct. He did not.
24    Q    Did you review any documents in preparation of your
25    deposition today?

---

BRENDA BARTLETT
MAY 28, 2008

Page 41

1   Q   All right. For the sake of this deposition, when I
2       use the word "distributor," I want you to think of
3       an entity in which you sell to them, and they resell
4       to another company but not to an end user.
5   A   Okay.
6   Q   And then, when we talk about customers or retail
7       stores, those are the entities that are going to
8       sell to the end user who's going to buy it and put
9       it in their home. Does that make sense to you?
10  A   Yes.
11  Q   Is that a fair definition?
12  A   Yes.
13  Q   So using that new context -- and I'm sorry I
14      confused you earlier. But using this new definition
15      of "distributor," are there any other entities other
16      than PetsMart, and now we say Norm Thompson, that
17      you sell to directly and thus bypass a distributor?
18  A   Yes.
19  Q   Could you list those for me.
20  A   Care-A-Lot, catalog and Internet. There's quite a
21      few catalog and Internet companies, especially
22      Internet, that carry our product line. I can't tell
23      you they specifically carry this item, but I do know
24      Care-A-Lot does. And then maybe an Internet company
25      called Pet Crates Direct.

Page 42

1   Q   What about J.B. Wholesale? Do you sell directly to
2       J.B. Wholesale?
3   A   We do.
4   Q   Do you sell the Bay Isle line?
5   A   I don't recall.
6   Q   Petco?
7   A   Yes, Petco.com.
8   Q   Does Petco have retail, actual physical retail
9       stores?
10  A   They do.
11  Q   And do you directly sell to the stores, the retail
12      stores?
13  A   No.
14  Q   Just Petco.com?
15  A   That's correct.
16  Q   So does Petco carry your crates in their store?
17  A   No. Let me rephrase that. They do not carry the
18      Bay Isle.
19  Q   I'm sorry. Thank you for that clarification, yes.
20      The question was, do they sell the Bay Isle
21      line in their stores? And the answer is no?
22  A   No.
23  Q   Let's, again, look at Exhibit 4, which is the
24      Simpson wicker pet crate.
25      I believe earlier we said, or you told me that

Page 43

1       you first saw it on a plane, while flying, in
2       Frontgate catalog.
3       Did you ever talk to anybody at Mid-West
4       about seeing the Simpson Ventures crate in the
5       Frontgate catalog?
6   A   I don't recall talking to anyone.
7   Q   Do you think you talked to anybody, or ...
8   A   I -- I don't recall.
9   Q   Did you order one by any chance?
10  A   No, not to my knowledge.
11  Q   Do you remember showing the catalog to anyone at
12      Mid-West?
13  A   No.
14  Q   Did you take the catalog from the plane?
15  A   I don't recall.
16  Q   Now, in looking at Exhibit 4, and then looking at
17      Exhibit 2, I would ask that you tell me what you
18      think is similar between the two, the two pet
19      crates.
20  A   The obvious. They both have doors and windows, and
21      they're both made of wicker or rattan, and they both
22      have a black plastic pan.
23  Q   Is there anything else that you would say is similar
24      between the two?
25  A   They're both rectangular. That's it.

Page 44

1   Q   That's it?
2   A   (Witness nods head.)
3   Q   Is the shape of the door similar?
4   A   Yes.
5   Q   Are the windows and the sides both rectangles?
6   A   Yes.
7   Q   Would you say that overall, they look similar?
8   A   Yes.
9   Q   Given that they look similar, can you tell me what
10      the differences are between the Simpson Ventures
11      crate shown in Exhibit 4 and the wicker crate from
12      the Bay Isle line in Exhibit 2.
13  A   One main thing would be our latches are different,
14      locking devices. Ours has a label or the plate on
15      the outside identifying it as a Mid-West item.
16      The Mid-West crate has black rods running
17      through the sides to hold it together, and for the
18      appearance, with the gap on each side of the crate.
19      Or each side of the rod, I should say. It has the
20      square latches at the bottom.
21      Did I mention color? The major difference is
22      the color of the wicker. The -- the Mid-West has a
23      square woven pattern on both the sides, the top,
24      and the back, whereas the Simpson Ventures has the
25      diamond.

BRENDA BARTLETT
MAY 28, 2008

Page 45

1    Mid-West has the square openings at the top of
2    the crate.
3    Q  I'm sorry.  Could you point again to it.  You said
4    Mid-West had a square opening at the top?
5    A  At the top, the square notches.
6    Q  So we're talking about the side panel and --
7    A  The top panel, yes.
8    Q  In the first picture of Exhibit 2.  And you're
9    pointing to the top of the side panel?
10   A  Yes.
11   Q  And referencing those openings there; is that
12   correct?
13   A  Yes.  I believe they're -- there's a big difference
14   in the way they're assembled.  Ours has rods in each
15   corner that hold it together.  The side panel of the
16   Simpson crate appears to be two pieces.  I don't
17   know for a fact that that's the case.  Again, it has
18   the diamond, Simpson.  Ours has the square woven
19   panels at the bottom.
20   Q  Now we're referring to the --
21   A  Side panels.
22   Q  -- side panel views of the Mid-West crate and the
23   Simpson Ventures crate, correct?
24   A  Yes.  Again, we have the -- the Mid-West crate has
25   the gap along the top, the opening, and then along

Page 46

1    the sides so you can see how the crate is -- how
2    sturdy the crate is.
3    Q  Now -- I'm sorry.  But we're referring to the --
4    we're referring to the rear view --
5    A  Yes.
6    Q  -- of the Mid-West Bay Isle line crate?
7    A  Yes.  Has the opening at the top, between the top
8    and side panels, and also down the sides.
9       We have -- we have the woven lines going
10   across the top, the side panel on the windows.
11   It's kind of a different weave than the rest of it,
12   and that carries through across the top and all
13   around the cage.
14   Q  During the course of your involvement in this
15   litigation, has anyone discussed those differences
16   with you?
17   A  Yes.
18   Q  Who was that?
19   A  Mr. Hinshaw.
20   Q  Other than Mr. Hinshaw, has anybody else discussed
21   those differences with you?
22   A  No.
23   Q  Did you notice all the differences on your own, or
24   did you rely on Mr. Hinshaw to point those out to
25   you?

Page 47

1    A  The majority of them I realized on my own.
2    Q  Which ones did you not realize on your own?
3    A  I didn't pick up the gap across the top.
4       MR. HINSHAW:  I'm going to object --
5       THE WITNESS:  Oh, I'm sorry.
6       MR. HINSHAW:  -- to the extent that we are now
7    getting into attorney-client communications and
8    discussions.
9       And I'm going to instruct the witness to not
10   answer, as it calls for attorney-client privilege,
11   anticipation of litigation, and work product
12   privilege.
13      MR. STALEY:  I think what features you didn't
14   recognize on your own is not privileged in any way.
15   BY MR. STALEY:
16   Q  So I'd ask you to please answer that question.
17      MR. HINSHAW:  And I'm instructing you not to
18   answer it.
19   A  I won't answer the question.
20      MR. STALEY:  James, what is your basis for
21   making that objection?
22      MR. HINSHAW:  Because the contra of that, the
23   flip side of that is what I did discuss with her.
24      MR. STALEY:  What points she didn't recognize
25   on her own has nothing to do with any privileged

Page 48

1    information whatsoever.  It's merely features that
2    she was told by somebody whether or not they were
3    there.
4       MR. HINSHAW:  And the "told by somebody" is
5    counsel.  So that's an attorney-client privilege.
6       So I'm going to instruct her not to answer.
7    BY MR. STALEY:
8    Q  All right.  I'm now going to hand you what has been
9    previously marked as Exhibit 77.  And I'd ask you if
10   you've ever seen that exhibit before, or have you
11   ever seen that patent before?
12   A  Yes.
13   Q  When have you seen Exhibit 77 before, ma'am?
14   A  With Mr. Hinshaw.
15   Q  Had you seen this patent before meeting with
16   Mr. Hinshaw?
17   A  No.
18   Q  Do you know who the owner of the patent shown in
19   Exhibit 77 is?
20   A  Mr. Simpson.
21   Q  I want you to look at the figures that are in the
22   patent of Exhibit 77, and I want you to again look
23   at the Mid-West Bay Isle pet crate of Exhibit 2.
24   And I'd like you to tell me if there are additional
25   differences -- just tell me what the differences are

**BRENDA BARTLETT**
**MAY 28, 2008**

Page 49

1  between the two.
2      MR. HINSHAW: Do you understand what he means
3  by "figures"? You see that each one of these has a
4  figure next to it. And I believe Exhibit 2 has a
5  corresponding with respect to each of those figures.
6  A  Okay. If we start with the first page, figure 1,
7  the differences between Mid-West and Mr. Simpson's
8  crate would be, of course, the lock latches, not
9  only the fact that we have two and he has one, but
10  they're different in configuration.
11      Mid-West has, of course, their emblem or their
12  label on the front of our crate. Mid-West does not
13  have the wicker going across the bottom. It is --
14  Mid-West has the rods or drop pins that run down the
15  sides, and Mr. Simpson's does not. We, again, have
16  the gap where the rods are shown, and Mr. Simpson's
17  is flush, not only at the sides but at the top.
18  That's about all I see. Okay.
19      Figure 2, should be -- okay. We pretty much
20  covered figure 2.
21      So if we go to figure 3, which appears to be
22  Mr. Simpson's back panel, the placement of the
23  windows, Mr. Simpson's is at the top. Ours is more
24  centered. Our opening is larger. We have the woven
25  squares on the left and the right-hand side of the

Page 50

1  back panel. He does not. We have the cord or the
2  difference in the way the -- it's woven around the
3  windows, and again at the top.
4      We also -- we -- Mid-West crate does not have
5  the pan stop in the back. It's, of course, in the
6  front. Mr. Simpson's appears on a stand, or appears
7  to be on pegs sitting off the floor, and ours does
8  not. Again, you can see the openings in the back
9  around the rod, where Mr. Simpson's is flush.
10      Figure 4, I'm assuming this is the top panel
11  for Mr. Simpson.
12  BY MR. STALEY:
13  Q  Yes, ma'am. I represent it's the top panel, and I
14  believe the last figure in here is going to be --
15  A  That's right. Okay. That looks better.
16      Again, Mid-West has the four square woven, a
17  little bit different design in the top panel, two in
18  the front and two in the back. We, again, have the
19  gap in the -- along the side of the crate at the
20  top, where the -- where the crate fits together on
21  the top. Mr. Simpson's does not. That's all I can
22  say about the top.
23      The side panels --
24  Q  You're referring to figure 5 of the --
25  A  Yes.

Page 51

1  Q  -- patent at this point in time, ma'am?
2  A  Figure 5. Mid-West window appears to be larger in
3  size and width. We have the --
4  Q  I'm sorry. When you say "larger in size than
5  width," do you mean vertical height, windows higher,
6  or do you mean that it's longer?
7  A  Vertical height.
8  Q  Sorry. I just wanted to clarify that.
9  A  We have the -- again, the rods with the gap opening,
10  where Mr. Simpson's is flush. Again, his side panel
11  appears to be two panels, where ours is just one.
12      We have the notch -- three notch cutouts in
13  the -- at the bottom, and you can actually see the
14  black wire in Mid-West's. We have the same thing at
15  the top. We have the four cutouts in the top panel,
16  where Mr. Simpson's is flush.
17      Again, it appears to be -- Mr. Simpson's
18  appears to be sitting on a peg or a -- it's elevated
19  off the floor, and ours appears to be flush.
20      And I don't think -- but -- we have the two
21  square patterns on the bottom, on the left and the
22  right, which is a little bit different with the
23  weaving.
24  Q  You're saying that the Mid-West Bay Isle has two
25  square patterns?

Page 52

1  A  Yeah. That's a little bit different on the left and
2  the right side. I'm sure that's decorative.
3      We have the -- on the top and bottom of each
4  window running all the way across the crate, we have
5  a little different weave. Ours runs all the way
6  across and is also at the top and the bottom.
7  Q  All right. Similar to what we did the last time
8  when we looked at the Simpson Ventures product, now
9  looking at the patent, Exhibit 77, what are the
10  similarities you see between the patented pictures
11  and the Mid-West Bay Isle model?
12  A  I don't understand.
13  Q  I'm asking you now to look at the same figures we
14  just went through when we discussed the differences.
15      I'm asking you now to go back through and tell
16  me what the similarities are between them.
17  A  Looking at figure 1, Mr. Simpson's, I would say they
18  both have a door, and they're both made of wicker.
19  Q  Looking at this figure, before we move on, again,
20  are the doors similarly shaped?
21  A  Yes.
22  Q  And in both instances are the doors -- do they lack
23  a wicker cover?
24  A  Yes.
25  Q  Is there any other -- any other similarities that

BRENDA BARTLETT
MAY 28, 2008

Page 89

1  A  No.
2  Q  Are you familiar with the Mr. Herzher's brand of
3     wicker kennels?
4  A  Yes.
5  Q  Has anyone ever returned a Simpson Ventures crate to
6     Mid-West?
7  A  No.
8  Q  Are you aware if anybody's ever returned a
9     Simpson Ventures crate to one of your retailers
10    or distributors?
11 A  No.
12 Q  Are you aware of anyone ever requesting replacement
13    parts from one of your retailers or distributors?
14 A  No.
15 Q  Do you offer a warranty with your Bay Isle line
16    crate?
17 A  We offer a one-year warranty for any manufacturing
18    defect.
19 Q  Have you had any instances of someone who owns a
20    Simpson Ventures crate trying to take advantage of
21    your warranty?
22 A  No.
23 Q  Are you aware of any instances in which somebody
24    returned a Mid-West Metal product to Simpson
25    Ventures?

Page 90

1  A  No.
2  Q  Are you aware of anybody ever confusing a Mid-West
3     Bay Isle product for any other wicker kennel?
4  A  No.
5  Q  Are you aware of any wicker kennels on the market
6     besides the Simpson Ventures and the Bay Isle line
7     wicker kennel?
8  A  No.
9     MR. STALEY: Can you give me just one more
10    minute to confer with counsel before I finish up?
11    MR. HINSHAW: Sure.
12    (A recess is taken, after which, the
13    proceedings resume as follows:)
14    MR. STALEY: We can go on the record.
15    MR. GARDNER: I think we're about done with the
16    questioning.
17    From this afternoon's testimony, there's
18    substantial disagreement between the parties about
19    whether Simpson Ventures is entitled to inquire
20    further of this witness regarding what the witness
21    knows versus what the witness was told because of
22    certain privileges. And Simpson Ventures has
23    been -- will file a motion to compel to bring this
24    to the Court's attention so that we can get a
25    ruling, and so that we can potentially continue this

Page 91

1     deposition and continue that line of inquiry.
2        We believe that we're entitled to know what the
3     dividing line is between the witness's knowledge and
4     what the witness was told. Even if that means that
5     we don't find out what the witness was told, we're
6     entitled to know what the witness herself knows.
7        With that having been said, and given that
8     Mid-West has indicated that it would be willing to
9     make a couple of other witnesses available next
10    Tuesday, we would request that Mid-West perhaps look
11    into making those witnesses available on Friday so
12    that the Court might have a couple of days to look
13    at our motion to compel and maybe rule one way or
14    the other. And then we would only have to come back
15    once instead of twice. So that's ...
16       MR. HINSHAW: I will look into that. I can
17    tell you I'm not very optimistic about moving those
18    dates.
19       MR. GARDNER: All right. I'll come back
20    Tuesday, Mr. Hinshaw. But I'd rather not come back
21    two more times.
22       MR. HINSHAW: I understand. I guess what I
23    would suggest is that we plan on coming back
24    Tuesday. I will look into moving the date to
25    Friday, but I'm not very optimistic.

Page 92

1        MR. GARDNER: I understand. One final
2     clarification is that the depositions for Tuesday
3     are going to be kind of a continuation of
4     Mr. Wingate and Mr. Swan. And I gathered from your
5     email that it will also be the 30(b)(6) as
6     previously noticed; is that correct?
7        MR. HINSHAW: Well, to be clear, when you say
8     "continuation of Mr. Swan and Mr. Wingate," I
9     understood that what you wanted was to open up the
10    deposition for them as it relates to additional
11    documents that have been produced since the time of
12    their last deposition; is that correct?
13       MR. GARDNER: That's right.
14       MR. HINSHAW: And as to the 30(b)(6) notice, I
15    guess I want to clarify. I've objected to that.
16       As I understand what you're saying -- you want
17    to go forward on the 30(b)(6) -- it is to those
18    portions of that 30(b)(6) notice that I have not
19    objected to, correct?
20       MR. GARDNER: Well, we may ask some questions.
21    You may say, "Well, the witness is not prepared to
22    talk about that," and tell the witness not to
23    answer. That's fine.
24       But we do expect that you will have a witness
25    prepared to talk concerning the topics that you've

BRENDA BARTLETT
MAY 28, 2008

## Page 93

1 already identified the witnesses will be prepared to
2 talk about.
3     MR. HINSHAW: Okay. I understand.
4     MR. GARDNER: And we may have a disagreement at
5 the end of it. When we have the deposition on
6 Tuesday and we're doing 30(b)(6), I may be asking
7 questions, and you may say, "That's outside the
8 scope," or you may say, "The witness is not prepared
9 to talk about that because we objected." And that
10 will be fine.
11     MR. HINSHAW: I just want to make it clear that
12 you're not expecting that I'm making this witness
13 available on all eight of those topics that you've
14 served previously that I've objected to. We may get
15 into the nits-and-nats of what your questions are,
16 but you understand I've objected to that.
17     MR. GARDNER: I understand that we haven't, by
18 our recent correspondence, overcome your objections.
19 Your objections stand.
20     MR. HINSHAW: Got it. Okay.
21     (Discussion off the record.)
22     MR. GARDNER: That's all I have.
23     MR. STALEY: I have no further questions of
24 this particular witness.
25     MR. HINSHAW: I have a few follow-ups.

## Page 94

1 CROSS-EXAMINATION,
2 QUESTIONS BY MR. JAMES M. HINSHAW:
3 Q Earlier, Ms. Bartlett, when you gave testimony, you
4    were asked to compare -- I think first you were
5    asked to compare Exhibit 2 to Exhibit 4. Do you
6    recall that, in general terms?
7 A Yes, I do.
8 Q During your testimony, I believe you said that you
9    thought that overall, the design of the Bay Isle
10    product in Exhibit 2 was similar to the design of
11    the product in Exhibit 4. Do you recall that?
12 A Yes.
13 Q What did you mean when you said you thought that
14    they were similar?
15 A I meant that they were both rectangular and they
16    both have wicker on them.
17 Q Do you believe that the designs of the product in
18    Exhibit 2, the Bay Isle, and the product in
19    Exhibit 4 are the same?
20 A No.
21 Q Do you believe that they are substantially the same?
22 A No.
23 Q Do you believe that they are different?
24 A Yes.
25 Q Do you believe that they are substantially

## Page 95

1 different?
2 A I do, yes.
3 Q Earlier, you also were asked a series of questions
4    relating to comparing the design that is the subject
5    of Patent 156 in Exhibit 77, and compared that to
6    the Bay Isle product design shown in Exhibit No. 2.
7    Do you recall that?
8 A Yes.
9 Q And I believe you testified that you thought that
10    the designs, overall, were similar. Do you recall
11    that?
12 A Yes.
13 Q And what did you mean when you said that you thought
14    they were similar?
15 A In that they're both rectangular and they both have
16    wicker.
17 Q Do you believe that those designs are the same?
18 A No.
19 Q Do you believe that they are substantially similar
20    designs, the Patent 156 and the Bay Isle?
21 A No.
22 Q Do you believe that they are different?
23 A I do, yes.
24 Q And do you believe that they are substantially
25    different?

## Page 96

1 A I do, yes.
2 Q There was a line of questions asking you to compare
3    what you saw in the figures of Exhibit 77, which
4    is the 156 patent, and compare those to the
5    photographs that you see of the Bay Isle product
6    in Exhibit No. 2. Do you recall that?
7 A I do, yes.
8 Q If you would, I'll direct your attention to figure 5
9    of the 156 patent, Exhibit 77. Do you see that
10    figure 5 of Exhibit 77?
11 A Yes.
12 Q That is the side panel?
13 A Yes.
14 Q And -- well, in looking at figure 5 of Exhibit 77,
15    I'll direct your attention to the area above the
16    window. Do you see that area?
17 A Yes.
18 Q Would you describe what you see there.
19 A Above the window, the weave appears to be elevated,
20    or it stands out more so than the rest of the crate.
21 Q And how would you compare that to the weave that
22    appears below the window on Exhibit 5 of -- figure 5
23    of Exhibit 77?
24 A It's a more flat weave at the bottom of the side
25    panel.

**BRENDA BARTLETT**
**MAY 28, 2008**

Page 97

1    Q   And how would you describe the weave of the area
2        below the window in figure 5 to the weave that
3        appears in the bottom piece of figure 5?
4    A   **Again, the bottom piece appears to be more elevated**
5        **or it sticks out more than the -- below the window**
6        **on the side panel.**
7    Q   And the weave pattern that appears in that bottom
8        piece of figure 5 and the weave pattern that appears
9        above the window in figure 5, do either of those
10       weave patterns appear in the side panel photograph
11       of Exhibit 2, which is the Bay Isle product?
12   A   No.
13   Q   So is that a difference between the two designs?
14   A   Yes.
15           MR. HINSHAW: I have no further questions.
16           MR. STALEY: I think we're done.
17           MR. HINSHAW: We would like signature, please.
18

19               (Deposition concluded at 5:32 p.m.)

19           AND FURTHER THE DEPONENT SAITH NOT
20
21
22
23           _____
                    BRENDA BARTLETT
24
25

Page 98

1    STATE OF INDIANA      )
                           ) SS:
2    COUNTY OF HAMILTON    )
3
4        I, Jenny L. Reeve, RPR, CSR No. 00-R-3006, a
5    Notary Public in and for the County of Hamilton,
6    State of Indiana, at large, do hereby certify that
7    BRENDA BARTLETT, the deponent herein, was by me
8    first duly sworn to tell the truth, the whole
9    truth, and nothing but the truth in the
10   aforementioned matter;
11       That the foregoing deposition was taken on
12   behalf of the Plaintiff at the offices of Bingham
13   McHale, 2700 Market Tower, 10 West Market,
14   Indianapolis, Marion County, Indiana, on the 28th
15   day of May, 2008, at 1:59 p.m., pursuant to the
16   Federal Rules of Civil Procedure;
17       That said deposition was taken down in
18   stenograph notes and afterwards reduced to
19   typewriting under my direction, and that the
20   typewritten transcript is a true record, to the
21   best of my ability, of the testimony given by the
22   said deponent; and that the signature by said
23   deponent to her deposition was not waived.
24       That the parties were represented by their
25   counsel as aforementioned.

Page 99

1        I do further certify that I am a disinterested
2    person in this cause of action, that I am not a
3    relative or attorney of either party or otherwise
4    interested in the event of this action, and that I
5    am not in the employ of the attorneys for any
6    party.
7        IN WITNESS WHEREOF, I have hereunto set my
8    hand and affixed my notarial seal on this 29·th
9    day of May, 2008.
10
11
12                        N O T A R Y   P U B L I C
13
     My Commission Expires:
14   June 19, 2008
15   County of Residence:   *Jenny L. Reeve*
     Hamilton County
16
17
18
19
20
21
22
23
24
25

# EXHIBIT  E

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
(EASTERN DISTRICT)

| | | |
|---|---|---|
| SIMPSON VENTURES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Cause No. 06-cv-00901. (WKW-VPM) |
| | ) | |
| v. | ) | |
| | ) | |
| MID-WEST METAL PRODUCTS | ) | |
| COMPANY, INC. | ) | |
| | ) | |
| Defendant. | ) | |

SECOND SUPPLEMENTAL EXPERT REPORT OF ROBERT JOHN ANDERS, IDSA

I.    INTRODUCTION

1.    I am the same Robert John Anders that submitted an Expert Report in this matter on September 29, 2006 and a Supplemental Expert Report on September 11, 2007. I am the owner of Robert Anders, A Design Consultancy of Warwick, N.Y. My business address is 78 Continental Road, PO Box 609, Warwick, N.Y. 10990-0609. I have been involved in the industrial design field for 48 years. I am over 18 years of age and I would otherwise be competent to testify as to the matter set forth herein if I am called upon to do so at trial, hearing or deposition.

II.    POINTS OF NOVELTY IN U.S. PATENT D483,156 (THE '156 PATENT)

2.    After an additional review of the entire prior art in this case, I hereby modify my previous points of novelty found in the '156 patent to include the following numbered individual features. For conciseness, it should be understood that in using the term "wicker", I refer to an outer texture with the appearance of woven wicker (as the '156 patent is a design patent, the

patent covers what can be seen in the drawings, and the drawings depict an outer texture with the appearance of woven wicker). For the convenience of the parties and the Court in considering and discussing the points of novelty, descriptive headings are provided below regarding each novel feature.

      3.      The first point of novelty is:  The Extent of Wicker

A pet home with a rectangular volume and having a top, sides, a rear, and a front, the top has an outer surface substantially having wicker, the sides each including a window and the non-window portion of each side has an outer surface substantially having wicker, the rear including a window and the non-window portion of the rear has an outer surface substantially having wicker, and the front includes a door and the non-door portion of the front has an outer surface substantially having wicker, wherein the sides and rear mostly have wicker, the majority of the front does not have wicker, and substantially the entire top has wicker.

      4.      The second point of novelty is:  The Door/Front Panel Configuration

A pet home with a rectangular volume and having a rectangular front, the front including a rectangular see-through door that is framed substantially by wicker.

      5.      The third point of novelty is:  Distinct Panels

A pet home with a rectangular volume, the pet home having the appearance of being formed from distinct, individual panels having wicker outer surfaces.

      6.      The fourth point of novelty is:  The Window Geometry & Placement

A pet home with a rectangular volume and having a front, sides, a rear and a top, the pet home further having a rectangular window positioned in the upper half of each side and in the upper half of the rear, the non-window portions of the sides and rear having outer surfaces with wicker such that the rectangular windows are surrounded by wicker on all sides.

2

7.    The fifth point of novelty is:  Panels Without Overhang

A pet home with a rectangular volume and having wicker outer surfaces over a majority of the pet home, the pet home having the appearance of being formed from individual panels, the panels being configured such that each panel extends substantially to the edge of the adjacent panels, but no panel extends beyond the adjacent panels.

8.    The sixth point of novelty is:  A combination of the above.

A pet home with a combination of the points of novelty as described in paragraphs 3 through 7 above.

5.    As my study of the case continues, I may acquire additional information and/or attain supplemental insights that result in added observations.  I reserve the right to supplement this Report and to rely on additional documents and testimony that come to my attention.

Respectfully submitted,

Dated:  September 22, 2007

Robert John Anders

3

**EXHIBIT  F**

 Windows Live™

---

**Revised interrogatory answer re point of novelty**
From: **Gardner, Art** (agardner@gardnergroff.com)
Sent: Fri 9/21/07 4:52 PM
To: rjanders (rjanders@msn.com)
Cc: Groff, Brad (bgroff@gardnergroff.com); Staley, Joe (jstaley@gardnergroff.com)

---

Robert,

As we discussed with you, Simpson Ventures is planning to serve a revised
(supplemental) interrogatory answer regarding the point of novelty. We appreciate your
thoughts on the matter. Below is our proposed answer, incorporating your suggestions.
Please look it over and let us know if you agree with this or if you suggest any changes
thereto. Also, if you agree with this, could you provide a supplement to your report
about this?

Plaintiff states that the point of novelty of the '156 patent, in comparison with the prior art now known,
includes the following numbered individual features. For conciseness, it should be understood that in using the
term "wicker", the Plaintiff refers to an outer texture with the appearance of woven wicker (as the '156 patent is
a design patent, the patent covers what can be seen in the drawings, and the drawings depict an outer texture
with the appearance of woven wicker). For the convenience of the parties and the Court in considering and
discussing the points of novelty, descriptive headings are provided below regarding each novel feature.

1. Extent of Wicker
A pet home with a rectangular volume and having a top, sides, a rear, and a front, the top has an outer surface
substantially having wicker, the sides each including a window and the non-window portion of each side has an
outer surface substantially having wicker, the rear including a window and the non-window portion of the rear
has an outer surface substantially having wicker, and the front includes a door and the non-door portion of the
front has an outer surface substantially having wicker, wherein the sides and rear mostly have wicker, the
majority of the front does not have wicker, and substantially the entire top has wicker.

2. Door/Front Panel Configuration
A pet home with a rectangular volume and having a rectangular front, the front including a rectangular see-
through door that is framed substantially by wicker.

3. Distinct Panels
A pet home with a rectangular volume, the pet home having the appearance of being formed from distinct,
individual panels having wicker outer surfaces.

4. Window Geometry & Placement
A pet home with a rectangular volume and having a front, sides, a rear and a top, the pet home further having a
rectangular window positioned in the upper half of each side and in the upper half of the rear, the non-window
portions of the sides and rear having outer surfaces with wicker such that the rectangular windows are
surrounded by wicker on all sides.

5. Panels Without Overhang
A pet home with a rectangular volume and having wicker outer surfaces over a majority of the pet home, the
pet home having the appearance of being formed from individual panels, the panels being configured such that
each panel extends substantially to the edge of the adjacent panels, but no panel extends beyond the adjacent
panels.

6. Combination of Items 1-5

ANDERS 00396

A pet home with a combination of the features as described in Items 1-5 above.

With best regards, I remain,
very truly yours,

*Art Gardner*

GARDNER GROFF GREENWALD & VILLANUEVA, PC
2018 Powers Ferry Road
Suite 800
Atlanta, GA 30339

770.984.2300

**WARNING:** From time to time, our spam blocker and/or firewall blocks legitimate email from known email senders, including from clients and other lawyers. When that happens, we might not become aware of the email you sent. Therefore, if your email contains vital instructions, please ensure that we acknowledge receipt of those instructions by return email.

**CONFIDENTIALITY NOTICE**: The information transmitted herewith, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or attorney-client privileged material. Any review, retransmission, dissemination, or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from all computers. Thank you.

ANDERS 00397

# EXHIBIT  G



PENGAD 800-631-6989

DEPOSITION
EXHIBIT
R-swan
4/5/06 (MC)









# EXHIBIT  H

US00D483156S

(12) **United States Design Patent**     (10) Patent No.:     **US D483,156 S**
Simpson                                   (45) Date of Patent:   ** **Dec. 2, 2003**

(54) **PET HOME**

(76) Inventor:  **Jeffrey M. Simpson**, 381 Oak Ridge
                Dr., Auburn, AL (US) 36380

(**) Term:      **14 Years**

(21) Appl. No.: **29/160,054**

(22) Filed:     **May 2, 2002**

(51) LOC (7) Cl. ................................................. **30-02**
(52) U.S. Cl. ...................................................... **D30/108**
(58) Field of Search ............................... D30/108–119,
                D30/161; 119/28.5, 165–170, 428–429,
                432, 453, 461, 463, 468–470, 474, 482,
                497–499, 531, 537, 725; D6/391

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 1,211,762 A | * | 1/1917 | Sawyer | ........................ | D6/391 |
| 2,789,531 A | * | 4/1957 | Diefendorf | ................. | 119/461 |
| 4,256,056 A | * | 3/1981 | Sou | ............................ | 119/497 |
| D382,374 S | * | 8/1997 | Burks | ........................ | D30/116 |
| 5,960,744 A | * | 10/1999 | Rutman | ...................... | 119/498 |
| 5,967,090 A | * | 10/1999 | Hui | ........................... | 119/497 |
| D427,730 S | * | 7/2000 | Powers et al. | ............. | D30/114 |
| 6,354,245 B1 | * | 3/2002 | Roddy et al. | ............... | 119/453 |

OTHER PUBLICATIONS

In the Company of Dogs catalog; Spring Preview 2001; p. 8; Delux Sport Utility Bicycle with bamboo and rattan wrapped steel baskets for pets.*

* cited by examiner

*Primary Examiner*—Cathy Anne MacCormac
(74) *Attorney, Agent, or Firm*—Bradley Arant Rose & White LLP

(57)            **CLAIM**

The ornamental design for a pet home, substantially as shown and described.

**DESCRIPTION**

FIG. 1 is a perspective view taken from the front and right side, showing my new design;
FIG. 2 is a front view thereof;
FIG. 3 is a rear view thereof;
FIG. 4 is a top view thereof; and,
FIG. 5 is a side view thereof, the opposite side being a mirror image.
The bottom and interior are not shown and not claimed.

**1 Claim, 4 Drawing Sheets**







PLAINTIFF'S
EXHIBIT
77



*Fig. 1*



*Fig. 2*



*Fig. 3*



*Fig. 4*



*Fig. 5*