**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
<u>EASTERN DIVISION</u>**

| | | |
|---|---|---|
| SIMPSON VENTURES, INC., | ) | |
| | ) | |
| Plaintiff/Counterdefendant, | ) | |
| | ) | Case No. 3:06-cv-901-WKW-VPM |
| v. | ) | |
| | ) | |
| MID-WEST METAL PRODUCTS | ) | |
| COMPANY, INC. | ) | |
| | ) | |
| Defendant/Counterclaimant. | ) | |

**MID-WEST METAL'S EVIDENTIARY
SUBMISSION IN SUPPORT OF COMBINED MOTIONS
<u>FOR CLAIM CONSTRUCTION AND SUMMARY JUDGMENT</u>**

Defendant/Counterclaimant Mid-West Metal Products Company, Inc. ("Mid-West

Metal"), does hereby designate and submit the following evidentiary materials in support of its

Combined Motions for Claim Construction and Summary Judgment:

| **<u>EXHIBIT</u>** | **<u>DESCRIPTION & LIST OF SUB-EXHIBITS</u>** |
|---|---|
| A | Simpson Ventures' Complaint |
| B | The 156 Patent |
| C | <u>First</u> Affidavit of Bret Smith (Prior Art References Viewed by US PTO)<br>Exhibit 1 – Sawyer Patent<br>Exhibit 2 – Diefendorf Patent<br>Exhibit 3 – Sou Patent<br>Exhibit 4 – Burks Patent<br>Exhibit 5 – Rutman Patent<br>Exhibit 6 – Hui Patent<br>Exhibit 7 – Powers Patent<br>Exhibit 8 – Roddy Patent<br>Exhibit 9 – 2001 In the Company of Dogs Publication |
| D | The 138 Patent |

| **EXHIBIT** | **DESCRIPTION & LIST OF SUB-EXHIBITS** |
|---|---|

E    138 Patent – Certified Copy of Prosecution History

F    Simpson Ventures' Responses to Interrogatories [July 23, 2007]
        Number 4
        Number 11

G    Simpson Ventures' Responses to Interrogatories [September 26, 2007]
        Number 11
        Number 12

H    Robert Anders Report [September 29, 2006]

I    Second Affidavit of Bret Smith (Smith's Expert Disclosures/Reports)
        Exhibit 1 – Smith's Curriculum Vitae
        Exhibit 2 – Smith's August 17, 2007 Report
        Exhibit 3 – Smith's November 5, 2007 Supplemental Report
        Exhibit 4 – Smith's April 22, 2008 2nd Supplemental Report

J    Third Affidavit of Bret Smith (Other Prior Art References)
        Exhibit 1 – 1985 Russian Cage
        Exhibit 2 – 1973 Cage in Modern Basketry
        Exhibit 3 – 1974 Carrier in American Basketry & Woodenware
        Exhibit 4 – 1999 Cage in American Baskets
        Exhibit 5 – 1912 Perry Patent (26,728)
        Exhibit 6 – 2001 Cage 1 in Art of the Basket
        Exhibit 7 – 1920s Cage
        Exhibit 8 – 1994 Carrier in Baskets
        Exhibit 9 – 2001 Cage 2 in Art of the Basket
        Exhibit 10 – 1998 Schwartz Patent
        Exhibit 11 – 1997 Askins Patent
        Exhibit 12 – 2001 Kolozsvari Patent
        Exhibit 13 – 1998 Ondrasik Patent
        Exhibit 14 – 1885 Milbourne Patent
        Exhibit 15 – 1896 Parthier Patent
        Exhibit 16 – 1994 Mo Patent
        Exhibit 17 – 2001 Liu Patent
        Exhibit 18 – 1999 Weng Patent
        Exhibit 19 – 1995 Ho Patent
        Exhibit 20 – 1935 Giannasca Patent
        Exhibit 21 – 2001 Basket in Art of the Basket
        Exhibit 22 – 2003 Ziglar Patent
        Exhibit 23 – Weave techniques (*American Baskets*)
        Exhibit 24 – Weave techniques (*basketweaving.com*)

| **EXHIBIT** | **DESCRIPTION & LIST OF SUB-EXHIBITS** |
|---|---|
| K | Mid-West Metal's Responses to Interrogatories [July 13, 2007] Number 17 |
| L | Affidavit of Jim Wingate<br>Exhibit 1 – 1999 Nantong Catalog<br>Exhibit 2 – Crate Cover<br>Exhibit 3 – Mid-West Metal's wire cage<br>Exhibit 4 – 5 Views of Model 1836 |
| M | Affidavit of Tom Swan<br>Exhibit 1 – Doggy's Dream House |
| N | Deposition of Jim Wingate/Day 1 |
| O | Deposition of Tom Swan/Day 1 |
| P | Deposition of Dave Clemmons |
| Q | Deposition of Stew Kerr |
| R | Deposition of Bob Dale |
| S | Deposition of Robert Anders |
| T | Deposition of Jeff Simpson/Day 1<br>Exhibit 1 – Deposition Exhibit 95 (To be filed under seal)<br>Exhibit 2 – Deposition Exhibit 112 (To be filed under seal)<br>Exhibit 3 – Deposition Exhibit 113 (To be filed under seal)<br>Exhibit 4 – Deposition Exhibit 114 (To be filed under seal) |
| U | Deposition of Jeff Simpson/Day 2<br>Exhibit 1 – Deposition Exhibit 195 (To be filed under seal) |

In addition, Mid-West Metal incorporates by reference herein all materials more specifically designated and cited in its Brief in Support of Combined Motions for Claim Construction and Summary Judgment.

Respectfully submitted,


s/ *James M. Hinshaw*
James M. Hinshaw-pro hac vice
  Indiana Attorney No. 16744-49
Neal Bowling- pro hac vice,
  Indiana Attorney No. 19278-41
BINGHAM MCHALE, LLP
2700 Market Tower
10 W. Market Street
Indianapolis, Indiana 46204-4900
Telephone: (317) 635-8900
Email: JHinshaw@binghammchale.com
   NBowling@binghammchale.com


Brett A. Ross
CARR ALLISON
100 Vestavia Parkway
Birmingham, Alabama  35216
Telephone:  (205) 949-2938
Email: bross@carrallison.com


Counsel for the Defendants


## CERTIFICATE OF SERVICE

   I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following on this the 29th day of July, 2008:

   Robert T. Meadows, III
   Capell & Howard, P.C.
   3120 Frederick Road
   P. O. Drawer 2268
   Opelika, Alabama  36803

   Arthur A. Gardner
   Joseph Staley
   Gardner, Groff, Santos & Greenwald, P.C.
   2018 Powers Ferry Road, Suite 800
   Atlanta, Georgia  30339


      s/ *James M. Hinshaw*

1316793

4

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA RECEIVED
EASTERN DIVISION

SIMPSON VENTURES, INC.,                )          2006 OCT -5  ⊢  4: 1 9
                                       )
            Plaintiff,                 )          Civil Action File No.: 3:06-CV-901-WKW
                                       )
v.                                     )
                                       )          **JURY DEMAND**
MIDWEST METAL PRODUCTS                 )
COMPANY, INC.                          )
                                       )
            Defendant.                 )
_____   )_____

## COMPLAINT

COMES NOW Simpson Ventures, Inc. (hereinafter "SIMPSON"), the Plaintiff

herein, and by and through its undersigned attorneys, files this Complaint against

the Defendant Mid-West Metal Products Company, Inc., (hereinafter referred to as

"MID-WEST"), and in support thereof respectfully shows as follows:

### NATURE OF THE CASE

1.      Plaintiff Simpson seeks legal and equitable remedies for infringement of

United States Design Patent No. 483,156 for a PET HOME (hereinafter the '156

patent) resulting from the actions and conduct of Defendant as set forth herein.


2.      This action arises under the patent laws of the United States, 35 U.S.C. § 1

et seq., and this Court has subject matter jurisdiction over all causes of action set

forth herein under 28 U.S.C. §§ 1331, 1332, and 1338.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 and § 1400.

## PARTIES

4.    Plaintiff is an Alabama corporation (Subchapter S) having a regular and established place of business in Auburn, Alabama.

5.    Upon information and belief, Defendant MID-WEST is an Indiana corporation with offices located at 4211 E. Jackson St., Muncie, IN 47303. Upon information and belief, Defendant MID-WEST is doing business as Mid-West Homes For Pets.

## FACTS

6.    Upon information and belief, Defendant is doing business in the United States including in the State of Alabama and within the judicial district of the United States District Court for the Middle District of Alabama.

7.    Upon information and belief, Defendant is offering to sell, making, selling, and/or importing pet homes into the United States, including selling through retail pet stores located in the United States, including a retail store known as the "For Paws Boutique" pet store located at 1747 Ogletree Road, Auburn, Alabama 36830.

8.    On December 2, 2003, United States Patent No. Des. 483,156, entitled "PET HOME" was duly and legally issued (hereinafter referred to as the '156 Patent), naming Jeffrey M. Simpson of Auburn, Alabama as inventor. A true and accurate copy of the '156 Patent is attached hereto as **Exhibit A**.

9.    Plaintiff Simpson Ventures, Inc. is the exclusive licensee under the '156 Patent and has the right to sue on the '156 Patent and collect damages. Plaintiff Simpson Ventures, Inc. has been (and is) selling a pet home under the exclusive license and under the "Mr. Herzher's" brand name.

2

10.   Upon information and belief, Defendant has been and is currently making, using, offering for sale, selling and/or importing pet homes that infringe the '156 Patent.

11.   Upon information and belief, Defendant has been for a time and still is infringing and contributing to/inducing infringement of the '156 Patent by selling infringing pet homes, including the "Bay Isle" model pet homes, embodying the invention patented under the '156 Patent to customers in the United States, including customers in the Middle District of Alabama.  This selling of the Bay Isle model pet homes is conducted at least in part through established distribution channels, and Defendant will continue to do so unless enjoined by this Court.

12.   The infringing pet homes manufactured, used, offered for sale, sold and/or imported by Defendant include, but are not necessarily limited to, the Bay Isle pet home.  One example of a Bay Isle Pet Home sold by Defendants is shown in **Exhibit B** hereto (printed from Defendant's website).

13.   Upon information and belief, Defendant has been and currently is making, using, offering for sale, and/or selling the Bay Isle pet homes bearing the designation, model name or trademark Model numbers 1824, 1830, 1836, and 1842.

14.   Neither Plaintiff nor the patentee Mr. Jeffrey Simpson has granted a license or any other rights to Defendant to make, use, offer for sale, or sell the invention covered by the '156 Patent.  Therefore, the conduct of Defendant MID-WEST is unlicensed.

3

15.    Defendant's infringement has been with knowledge of the '156 patent.

16.    On November 4, 2003, a representative for Mr. Simpson notified Mr. James Wingate (President of Defendant MID-WEST) via letter that the application for the '156 patent had received a Notice Of Allowance and would soon issue. The letter alerted Defendant that the Bay Isle Collection was the subject of the then-pending patent application that eventually became the '156 patent. A copy of the Notice Of Allowance from the United States Patent and Trademark Office was enclosed with the November 4, 2003 letter. A true and accurate copy of the letter is attached hereto as **Exhibit C**.

17.    On November 19, 2003, a representative of Mr. Simpson notified Mr. Wingate via letter that the '156 patent would issue to Mr. Simpson on December 2, 2003 and enclosed a copy of the Issue Notification from the United States Patent and Trademark Office. The letter further requested that Defendant cease and desist from any manufacturing, using, selling, or offering to sell any of the products in its Bay Isle Collection or other products covered by the '156 patent. A true and accurate copy of the November 19, 2003 letter is attached hereto as **Exhibit D**.

18.    Although Defendant was put on notice of the '156 patent, Defendant has not ceased or desisted from manufacturing, using, selling, and/or offering to sell products in its Bay Isle Collection that are protected by the '156 patent.

19.    Defendant's infringement is willful.

20.    The Plaintiff markets and sells pet homes covered by the '156 patent though a variety of channels. One such channel is Frontgate ® catalog, which sells high-

4

end home consumer goods. An example screenshot from the Frontgate® website depicting the Plaintiff's product for sale is attached hereto as **Exhibit E**.

21.    On or around September 30, 2002, Mr. Wingate personally purchased one of the Plaintiff's pet homes that is protected by the '156 patent, through the Frontgate ® catalog, and had the pet home delivered to what is believed to be Mr. Wingate's personal address. A true and accurate copy of the packing slip showing Mr. Wingate's address is attached hereto as **Exhibit F,** and the shipping and tracking information, including delivery confirmation, is attached hereto as **Exhibit G**.

22.    Prior to October 1, 2003, Creative Focus Sales, LLC (believed to be a sales representative for MID-WEST) introduced MID-WEST's Bay Isle Collection to dealers and announced that the collection would be available for warehouse shipping beginning October 1, 2003. The announcement mentioned that the Collection would be a "great consumer catalog item" and suggested that dealers "check out high-end catalogs like 'Frontgate'" for verification. A true and accurate copy of the announcement has been attached hereto as **Exhibit H**.

23.    The Frontgate ® catalog markets and sells pet homes produced exclusively by the Plaintiff and does not market or sell any of Defendant's products.

24.    Defendant MID-WEST knew about the Plaintiff's product in the marketplace, bought at least one for the apparent purpose of copying the product, was informed that the product was patented, and has persisted in infringing the '156 patent anyway. The infringement of Defendant MID-WEST is willful.

25.    Plaintiff has been damaged by the foregoing infringing acts of the Defendant

5

in an amount to be determined at trial or upon an accounting.

26.    By reason of said acts by Defendant, Plaintiff has been, and will continue to be, seriously damaged and irreparably injured unless Defendant is enjoined by this Court from the actions complained of herein, and thus, Plaintiff is without an adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for an Order of this Court, entering judgment:

A.    Holding that Defendant has infringed the '156 Patent;

B.    Preliminarily and permanently enjoining Defendant, its officers, agents, employees, representatives, and all others acting in concert therewith, from further infringing, contributing to, or inducing infringement of the '156 Patent;

C.    Awarding damages to Plaintiff pursuant to 35 U.S.C. § 284 in an amount adequate to compensate Plaintiff for the patent infringement, and finding that, in light of the nature of the infringement, such award be increased three times the amount of the damages found or assessed, and for an award to Plaintiff of all its costs and reasonable attorney's fees in respect thereto in accordance with 35 U.S.C. §§ 284-285;

D.    Finding this to be an exceptional case and awarding Plaintiff its reasonable attorney's fees under 35 U.S.C. § 285;

E.    Awarding to Plaintiff, pursuant to 35 U.S.C. § 289, Defendant's gross profits derived from the infringement of the '156 Patent; and

F.    Awarding such further and other relief as this Court may deem just and

6

proper.

_Robert T. Meadows_
Robert T. Meadows, III
Alabama Bar No. MEA012
One of the Attorneys for Plaintiff
SIMPSON VENTURES, INC

JURY DEMAND

Plaintiff requests a trial by jury of any and all issues triable of right by a jury.

Date:  _Dcb. 5 2006_ .

_Robert T. Meadows_
Robert T. Meadows, III
Alabama Bar No. MEA012
One of the Attorneys for Plaintiff
SIMPSON VENTURES, INC.

OF COUNSEL:

CAPELL & HOWARD, P.C.
3120 B. Frederick Road (36801)
P.O. Drawer 2268
Opelika, Alabama 36803
334.501.1540 (ph)
334.501.4512 (fax)

OF COUNSEL

Arthur A. Gardner
agardner@gardnergroff.com
GARDNER GROFF SANTOS & GREENWALD, PC
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339
770.984.2300 (ph)
770.984.0098 (fax)

7

3:06-cv-00901-**WKW-VPM**

# Exhibit A



US00D483156S

(12) **United States Design Patent**    (10) Patent No.:    **US D483,156 S**
Simpson    (45) Date of Patent:    **∗∗    Dec. 2, 2003**

(54) **PET HOME**

(76) Inventor:    **Jeffrey M. Simpson**, 381 Oak Ridge
Dr., Auburn, AL (US) 36380

(∗∗) Term:    **14 Years**

(21) Appl. No.: **29/160,054**

(22) Filed:    **May 2, 2002**

(51) LOC (7) Cl. .................................................. **30-02**
(52) U.S. Cl. ...................................................... **D30/108**
(58) Field of Search ................................ D30/108–119,
D30/161; 119/28.5, 165–170, 428–429,
432, 453, 461, 463, 468–470, 474, 482,
497–499, 531, 537, 725; D6/391

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,211,762 A | ∗ | 1/1917 | Sawyer ......................... D6/391 |
| 2,789,531 A | ∗ | 4/1957 | Diefendorf .................. 119/461 |
| 4,256,056 A | ∗ | 3/1981 | Sou ............................. 119/497 |
| D382,374 S | ∗ | 8/1997 | Burks ......................... D30/116 |
| 5,960,744 A | ∗ | 10/1999 | Rutman ...................... 119/498 |
| 5,967,090 A | ∗ | 10/1999 | Hui ............................. 119/497 |
| D427,730 S | ∗ | 7/2000 | Powers et al. ............. D30/114 |
| 6,354,245 B1 | ∗ | 3/2002 | Roddy et al. ............... 119/453 |

OTHER PUBLICATIONS

In the Company of Dogs catalog; Spring Preview 2001; p. 8; Delux Sport Utility Bicycle with bamboo and rattan wrapped steel baskets for pets.∗

∗ cited by examiner

*Primary Examiner*—Cathy Anne MacCormac
(74) *Attorney, Agent, or Firm*—Bradley Arant Rose & White LLP

(57)    **CLAIM**

The ornamental design for a pet home, substantially as shown and described.

**DESCRIPTION**

FIG. 1 is a perspective view taken from the front and right side, showing my new design;
FIG. 2 is a front view thereof;
FIG. 3 is a rear view thereof;
FIG. 4 is a top view thereof; and,
FIG. 5 is a side view thereof, the opposite side being a mirror image.
The bottom and interior are not shown and not claimed.

**1 Claim, 4 Drawing Sheets**







*Fig. 1*









*Fig. 4*



Fig. 5

3:06-cv-00901-WKW-VPM

# Exhibit B

MIDWEST - Bay Isle Collection                                        Page 1 of 5

  **America's Largest Home Builder For Pets**

**Where to Buy** | Why Crate Train? | How To Crate Train | What's New | Assembly Instructions | Find the Right Sized Crate!! | Home

**Toll Free Helpline: (800) 428-8560 - Monday-Friday, 9am-4pm (EST)**

Dogs & Puppies

Cats & Kittens

Rabbits & Bunnies

Small Animals

Birds

Exercise Pens

Chain-Link Kennels

Pet Beds

Vehicle Barriers

Grooming Tables

Waste Removal Tools

Miscellaneous

Product Quick Links



- No Tools Required, Easy to Set Up
- Attractive Rattan Weave Blends Well with Any Décor
- Durable, Non-Absorbant Resin Remains Odor Free
- Secure, Double Latch Door Swings Out and In, Out of the Way of People and Pets
- Window Openings On The Sides and Back Panel Provide Pet Proper Ventilation and Visibility
- Strong Interior Wire Structure
- Rubber Feet Keep Pet Home in Place and Protect Floor Surfaces

Not Intended for Puppies in Chewing Stage or Chronic Chewers

*Bay Isle Collection's exclusive window openings on the sides as well as the back panel provide pet proper ventilation and visibility. Attractive rattan finish with square pattern accent weave blends well with any décor. Rubber feet keep pet home in place and protect floor surfaces.*



**3:06-cv-00901-WKW-VPM**

# Exhibit C



**Bradley Arant**
BRADLEY ARANT ROSE & WHITE LLP

ONE FEDERAL PLACE
1819 FIFTH AVENUE NORTH
BIRMINGHAM, AL 35203-2104
205.521.8000   FAX 205.521.8800
WWW.BRADLEYARANT.COM

John W. Smith T

Direct Dial: 205-521-8521
Direct Fax: 205-488-6521
jst@bradleyarant.com

November 4, 2003

**VIA CERTIFIED MAIL**
James Wingate, Jr.
President
Midwest Homes for Pets
4211 East Jackson Street
Muncie, IN 47303

Re:   *Pet Containment Device*

Dear Mr. Wingate:

We represent Jeff Simpson, the inventor of a pet containment device that is the subject of several pending patent applications, one of which has been approved by the United States Patent and Trademark Office and will soon issue. I am enclosing a copy of Application No. 29/160,054 and the USPTO's Notice of Allowance entered with respect to this application.

It has come to our attention that you are making and selling products, including the Bay Isle Collection, that are the subject of Mr. Simpson's patent applications. This letter is intended to put Midwest on notice that your continued manufacture, use or sale of such products after the above-referenced patent issues may subject you to liability for patent infringement. We will notify you as soon as the patent issues, but please be advised that Mr. Simpson will take all necessary steps to enforce his intellectual property rights. In the meantime, we ask that you put on notice anyone to whom you have sold your product about the potential infringement that may occur by continued sales or uses of your products.

If you have any questions, please do not hesitate to contact me.

Sincerely,

John W. Smith T

JST/lrs
Enclosures

Cc:   Nathan W. Johnson

BIRMINGHAM    HUNTSVILLE    JACKSON    MONTGOMERY    WASHINGTON, DC

3:06-cv-00901-WKW-VPM

# Exhibit D



**Bradley Arant**

BRADLEY ARANT ROSE & WHITE LLP

ONE FEDERAL PLACE
1819 FIFTH AVENUE NORTH
BIRMINGHAM, AL 35203-2104
205.521.8000   FAX 205.521.8800
WWW.BRADLEYARANT.COM

John W. Smith T

Direct Dial: 205-521-8521
Direct Fax: 205-488-6521
jst@bradleyarant.com

November 19, 2003

**VIA CERTIFIED MAIL**
James Wingate, Jr.
President
Midwest Homes for Pets
4211 East Jackson Street
Muncie, IN 47303

      Re:   *Pet Containment Device*

Dear Mr. Wingate:

     As we indicated we would in our letter to you dated November 4, this is to notify you that United States Patent D 483,156 will issue to Mr. Jeff Simpson on December 2, 2003. I am enclosing a copy of the issue notice we received recently from the U.S. Patent and Trademark Office. We request that you cease and desist from any manufacturing, using, selling or offering to sell any of the products in the Bay Isle Collection or any other products covered by this patent ("the covered products") after December 2, 2003. We also request that you submit within 15 business days a list of all vendors, individuals and anyone else to whom you have sold or provided the covered products so that we may put them on notice of Mr. Simpson's rights arising from the subject patent. Your failure to comply with these instructions may subject you to liability for direct or indirect infringement.

                       Sincerely,

                       John W. Smith T

JST/lrs
Enclosures

Cc:   Nathan W. Johnson

3:06-cv-00901-WKW-VPM

# Exhibit E

Frontgate - Rattan Pet Residences                                                Page 1 of 1



# FRONTGATE
### OUTFITTING AMERICA'S FINEST HOMES

My Account | Customer Servi

Keyword or Item #

| Outdoor Living | Bed & Bath Essentials | Furnishings & Decor | Kitchen & Entertaining | Home Care & Storage | Electronics Innovations | Holiday & Gifts | Frontgate Outlet | |

Home > Home Care & Storage > Pet Products > Rattan Pet Residences

Previo



View Larger/Additional Images

## Rattan Pet Residences
**Not a wire cage or a molded-plastic eyesore**

Our **Rattan Pet Residences** offer a private, secluded place for pets that you won't have to hide out of view in the utility room or basement. By combining luxury with functionality, you can see why this product illustrates The Frontgate Difference.

- Attractive rattan exterior matches most decor
- Woven of a durable resin that won't absorb odors or fluids and is easily cleaned with soap and water
- Sturdy internal frame and door are made of steel wire
- Door opens in and out, and can be secured open inside, out of the way of people and pets
- Plastic floor pan removes for easy cleaning

Not intended for puppies in the chewing stage.

To size, measure pet height to shoulders.

Additional Information | Ask a Question | Tell a Friend

**Rattan Pet Residence**
$159.00  $299.00
Item # 10486

Small: Fits pets up to 10" tall.
Medium: Fits pets up to 15" tall.
Large: Fits pets up to 23" tall.
X-Large: Fits pets up to 28" tall.

- Limited Stock!

**Color:** (view options)

First, Select Color

**Size:**

Then, Select Size

**Quantity:** 1

**No Payments for 6 Months**
on orders over $400!  view disclosures

ADD TO WISH LIST    ADD TO CART

**Catalog Customers:** Catalog Quick Shop | Free Catalog Request | Online Catalogs
**Company Information:** About Us | Contact Us | Privacy & Security | Store Locations
**Shopping Services:** Bill Me Later℠ | One-Year Guarantee | Order Tracking | Shipping
Site Map | Wish Lists
**Call us at:** 1-888-263-9850

*Preferred*
EMAIL REGISTRY

Enter you
exclusive
or to chan

Enter email address

© 2006 Frontgate

# FRONTGATE·

**8879 Union Center Blvd.**
**West Chester, OH 45069**
**1-800-436-2100**

**PACKING SLIP**

REPRINT

**Cust # 0041782202**      **Order # 078783160001**

**Sold To**
JAMES W WINGATE JR
3401 WEST GATE WOOD LANE
MUNCIE, IN 473043704

**Ship To**
JAMES W WINGATE JR
3401 WEST GATE WOOD LANE
MUNCIE, IN 473043704

**Delivery Phone # 765-289-3355x23**

| Qty | Item No | Description | Unit Price | Total |
|-----|---------|-------------|-----------|-------|
| 1 | 10390 | Small Pet Residence | 155.00 | 155.00 |

Thank you for your first order with FRONTGATE!

| | |
|---|---|
| SubTotal | 155.00 |
| Tax | 0.00 |
| (UPSGRND) PH | 20.95 |
| **Total** | **175.95** |

09/30/2002

Page 1 of 1

## Exchange/Return Information
### TO RETURN ANY ITEM, SIMPLY FOLLOW THESE 3 STEPS

**1** Please explain the reason you're returning the item. This information helps us process returns quickly and enables us to improve our products and service. Be as specific as possible. _____

Many concerns can be resolved by phone. If you need assistance with a replacement part, assembly, operation of an item, or have a question about our Price Protection guarantee, give us a call at 1-800-436-2100

**2** List The Item(s) You Are Returning

| ITEM # | DESCRIPTION | SIZE/COLOR | QTY. | PRICE |
|--------|-------------|-----------|------|-------|
| | | | | |
| | | | | |

Do you prefer?  ☐Exchange  ☐Gift Certificate  ☐Refund          Was the Item A Gift?  ☐Yes  ☐No

**3** List The Item(s) You Would Like To Order In Exchange

| ITEM # | DESCRIPTION | SIZE/COLOR | QTY. | PRICE |
|--------|-------------|-----------|------|-------|
| | | | | |
| | | | | |

Method of Payment  ☐Visa  ☐MasterCard  ☐Novus/Discover  ☐American Express  ☐Check or Money Order
Credit Card Payment _____   Expiration Date _____
Signature _____   Daytime Phone _____

**EXHIBIT "F"**

Simpson & Co
## SHIPMENT SEARCH REPORT
10/11/03 10:25 AM

UPS Account No.: R36A31
Sorted By:Order of Shipment

| Name/Address | Shipment Detail | | Options | Reference Rate Charges | |
|---|---|---|---|---|---|
| **Ship To:**<br>Casey L Ritchie<br>5012 N. Timothy Way<br>MUNCIE IN 47304-6177<br>(Residential)<br><br>**Ship From:**<br>Frontgate<br>480 N. Dean Rd.<br>AUBURN AL 36830 | Service Type:<br>Total Packages:<br>Hundredweight:<br>Billable Wt.:<br>Billing Option:<br>Package Ref No.1: | UPS GROUND<br>2<br>No<br>97.0<br>Prepaid<br>077912980001 | Shipment Service Charge: | $ | 26.36 |
| | Tracking No.:<br>Package Type:<br>Weight:<br>Package Ref No.1: | 1ZR36A310340830499<br>Package<br>27.0<br>077912980001 | Package Service Charge: | $ | 9.29 |
| | Tracking No.:<br>Package Type:<br>Weight:<br>Oversized:<br>Package Ref No.1: | 1ZR36A310340592103<br>Package<br>51.0<br>Oversize 2<br>077912980001 | Package Service Charge:<br><br>3rd Party Amt: (X107W4)<br>UPS Total Charge: | $<br><br>$<br>$ | 17.07<br><br>26.36<br>26.36 |
| **Ship To:**<br>James W Wingate Jr.<br>3401 West Gate Wood Lane<br>MUNCIE IN 47304-3704<br>(Residential)<br><br>**Ship From:**<br>Frontgate<br>480 N. Dean Rd.<br>AUBURN AL 36830 | Service Type:<br>Total Packages:<br>Hundredweight:<br>Billable Wt.:<br>Billing Option:<br>Package Ref No.1: | UPS GROUND<br>1<br>No<br>27.0<br>Prepaid<br>078783160001 | Shipment Service Charge: | $ | 9.29 |
| | Tracking No.:<br>Package Type:<br>Weight:<br>Package Ref No.1: | 1ZR36A310340245363<br>Package<br>27.0<br>078783160001 | Package Service Charge:<br><br>3rd Party Amt: (X107W4)<br>UPS Total Charge: | $<br><br>$<br>$ | 9.29<br><br>9.29<br>9.29 |
| **Ship To:**<br>Thomas W Swan<br>2100 W Mt Pleasant Blvd<br>MUNCIE IN 47302<br>(Residential)<br><br>**Ship From:**<br>Frontgate<br>480 N. Dean Rd.<br>AUBURN AL 36830 | Service Type:<br>Total Packages:<br>Hundredweight:<br>Billable Wt.:<br>Billing Option:<br>Package Ref No.1: | UPS GROUND<br>1<br>No<br>27.0<br>Prepaid<br>080023400001 | Shipment Service Charge: | $ | 9.29 |
| | Tracking No.:<br>Package Type:<br>Weight:<br>Package Ref No.1: | 1ZR36A310340858255<br>Package<br>27.0<br>080023400001 | Package Service Charge:<br><br>3rd Party Amt: (X107W4)<br>UPS Total Charge: | $<br><br>$<br>$ | 9.29<br><br>9.29<br>9.29 |
| **Ship To:**<br>Melissa Cambell<br>1325 North Elm St.<br>MUNCIE IN 47303<br>(Residential)<br><br>**Ship From:**<br>Simpson & Co<br>480 N. Dean Rd.<br>AUBURN AL 36830-5149 | Service Type:<br>Total Packages:<br>Hundredweight:<br>Billable Wt.:<br>Billing Option:<br>Package Ref No.1:<br>Package Ref No.2: | UPS GROUND<br>1<br>No<br>31.0<br>Prepaid<br>1336267<br>Dark | Shipment Service Charge: | $ | 10.63 |

Page 1

**EXHIBIT "G"**

UPS Package Tracking                                                    Page 1 of 1

    

Home | About UPS | Contact UPS

**Tracking**                    🔒 **WorldShip Customer**          My UPS | Address

➔ **Track by Tracking Number**
➔ Track by Reference Number
➔ Import Tracking Numbers 🔒
➔ Track by E-mail
➔ Get Quantum View Files 🔒
➔ Request Quantum View Notify 🔒
➔ Void a Shipment 🔒
➔ Help



Full-Service Customs Brokerage

UPS Supply Chain Solutions ➔

## ▌▌▌ Track by Tracking Number

**View Details**

To view Proof of Delivery, please select the link.

**Status:**        Delivered  _Proof of Delivery_ 🔒
**Delivered on:**   Oct 2, 2002 7:12 P.M.
**Location:**       FRT PORCH
**Delivered to:**   MUNCIE, IN, US

**Tracking Number:**  1Z R36 A31 03 4024 536 3
**Service Type:**     GROUND

🔒 Information and services provided to My UPS users.

Have problems or questions about your package?
If you have questions about one of your packages, you can find more information with this special UPS serv
➔ Request More Information 🔒

**Package Progress:**

| Date | Time | Location | Activity |
|------|------|----------|----------|
| Oct 2, 2002 | 7:12 P.M. | MUNCIE, IN, US | DELIVERY |

Tracking results provided by UPS: Oct 11, 2003 11:23 A.M. Eastern Time (USA)

**NOTICE:** UPS authorizes you to use UPS tracking systems solely to track shipments tendered by or for you to delivery and for no other purpose. Any other use of UPS tracking systems and information is strictly prohibited

← Back to Tracking Summary

↑ Back to Top

Copyright © 1994-2003 United Parcel Service of America, Inc. All rights reserved.

https://wwwapps.ups.com/etracking/tracking.cgi?Requester=UOW&TypeOfInquiryNum...    10/11/2003

UPS Package Tracking                                                    Page 1 of 1

 **United Parcel Service**

**DELIVERY NOTIFICATION**

Dear Customer,

This is in response to your request for delivery information concerning the
shipment listed below.

**Tracking Number:**  1Z R36 A31 03 4024 536 3
**Service Type:**     GROUND
**Delivered on:**     Oct 2, 2002 7:12 P.M.
**Delivered to:**     MUNCIE, IN, US
**Location:**         FRT PORCH

Thank you for giving us this opportunity to serve you.

Sincerely,
United Parcel Service

Tracking results provided by UPS:  Oct 11, 2003 11:23 A.M.   Eastern Time
(USA)

3:06-cv-00901-WKW-VPM

# Exhibit H

# CREATIVE FOCUS SALES, LLC

## COMING SOON FROM MIDWEST

**Introducing the Bay Isle Collection (3 sizes – 1824, 1830, & 1836)
Available October 1, 2003**



(1824)



(carton image)

Attractive Rattan Weave blends well with any décor. Durable, non-absorbent Resin remains odor free. Secure, double latch door swings out and in....out of the way of people and pets. Window openings on the sides and back panel provide pet proper ventilation and visibility. Strong interior wire structure with black e-coat finish, and rubber feet keep pet home in place and protects floor surfaces.

- A great consumer catalog item (check out high-end catalogs like "Frontgate")
- A perfect entry for holiday and Christmas catalogs
- 3 sizes available (24", 30", 36") for October 1, 2003 warehouse shipping
- Hi-resolution web images available at www.midwesthomes4pets.com
- Tan woven polyethylene Rattan in a drop pin pet home w/ABS plastic pan

| Model | Size | Warehouse Price | Suggested Dealer Price |
|-------|------|-----------------|------------------------|
| 1824 | 24"L x 20"W x 21"H | $45.45 | $68.18 |
| 1830 | 30"L x 23"W x 24"H | $57.30 | $85.95 |
| 1836 | 36"L x 23"W x 24"H | $77.85 | $116.78 |

# Exhibit B

US00D483156S

(12) **United States Design Patent**   (10) **Patent No.:**      **US D483,156 S**
Simpson                                 (45) **Date of Patent:**   **  Dec. 2, 2003**

(54) **PET HOME**

(76) Inventor:  **Jeffrey M. Simpson,** 381 Oak Ridge
                Dr., Auburn, AL (US) 36380

(**) Term:   **14 Years**

(21) Appl. No.: **29/160,054**

(22) Filed:     **May 2, 2002**

(51) LOC (7) Cl. ..................................................... **30-02**
(52) U.S. Cl. ............................................................ **D30/108**
(58) Field of Search ................................ D30/108–119,
                    D30/161; 119/28.5, 165–170, 428–429,
                    432, 453, 461, 463, 468–470, 474, 482,
                    497–499, 531, 537, 725; D6/391

(56)             **References Cited**

          **U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 1,211,762 | A | * 1/1917 | Sawyer ......................... D6/391 |
| 2,789,531 | A | * 4/1957 | Diefendorf ................... 119/461 |
| 4,256,056 | A | * 3/1981 | Sou ............................ 119/497 |
| D382,374 | S | * 8/1997 | Burks ........................ D30/116 |
| 5,960,744 | A | * 10/1999 | Rutman ..................... 119/498 |
| 5,967,090 | A | * 10/1999 | Hui ........................... 119/497 |
| D427,730 | S | * 7/2000 | Powers et al. ............. D30/114 |
| 6,354,245 | B1 | * 3/2002 | Roddy et al. .............. 119/453 |

                 OTHER PUBLICATIONS

In the Company of Dogs catalog; Spring Preview 2001; p.
8; Delux Sport Utility Bicycle with bamboo and rattan
wrapped steel baskets for pets.*

* cited by examiner

*Primary Examiner—*Cathy Anne MacCormac
(74) *Attorney, Agent, or Firm—*Bradley Arant Rose &
White LLP

(57)            **CLAIM**

The ornamental design for a pet home, substantially as
shown and described.

                **DESCRIPTION**

FIG. 1 is a perspective view taken from the front and right
side, showing my new design;
FIG. 2 is a front view thereof;
FIG. 3 is a rear view thereof;
FIG. 4 is a top view thereof; and,
FIG. 5 is a side view thereof, the opposite side being a mirror
image.
The bottom and interior are not shown and not claimed.

            **1 Claim, 4 Drawing Sheets**





**U.S. Patent**          Dec. 2, 2003          Sheet 1 of 4          US D483,156 S



*Fig. 1*

**U.S. Patent**      Dec. 2, 2003      Sheet 2 of 4      US D483,156 S



Fig. 2



Fig. 3

**U.S. Patent**        Dec. 2, 2003        Sheet 3 of 4        US D483,156 S



*Fig. 4*

**U.S. Patent**          Dec. 2, 2003          Sheet 4 of 4          US D483,156 S



*Fig. 5*

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## <u>EASTERN DIVISION</u>

SIMPSON VENTURES, INC.,                    )
                                           )
            Plaintiff/Counterdefendant,    )
                                           )      Civil Action File No. 306CV-901-WKW
      v.                                   )
                                           )
MID-WEST METAL PRODUCTS                    )
COMPANY, INC.                              )
                                           )
            Defendant/Counterclaimant.    )

### *FIRST* AFFIDAVIT OF BRET SMITH

Bret Smith, being first sworn upon his oath, states the following:

1.)    I am over 18 years old, a resident of Auburn, Alabama, and otherwise competent to testify to the matters set forth herein. The observations made herein, and the opinions derived from such, are based upon my personal knowledge and are based on my professional experience as industrial designer.

2.)    I was retained by Mid-West Metal Company, Inc. ("Mid-West Metal") in this case to help investigate and evaluate the scope of design references that would have been relevant to the endeavor of developing an aesthetically pleasing or decorative pet cage in the period of time prior to September of 2001 – which is my understanding of when Mr. Jeff Simpson claims he conceived the idea of a rectangular shaped wicker covered pet cage with windows and a door.

3.)    In the process of my investigation, I reviewed the nine prior art references that were presented to the United States Patent and Trademark Office as part of Mr. Simpson's prosecution of the 156 Patent at issue in this case. True and accurate copies of those prior art references are attached hereto as the following exhibits:

Exhibit 1 – Sawyer Patent
Exhibit 2 – Diefendorf Patent
Exhibit 3 – Sou Patent
Exhibit 4 – Burks Patent
Exhibit 5 – Rutman Patent
Exhibit 6 – Hui Patent
Exhibit 7 – Powers Patent
Exhibit 8 – Roddy Patent
Exhibit 9 – 2001 In the Company of Dogs Publication

4.)     The substance of my Second Affidavit and my Third Affidavit of today's date, and all exhibits attached thereto, are incorporated herein by reference.

I AFFIRM, UNDER THE PENALTIES FOR PERJURY, THAT THE FOREGOING REPRESENTATIONS ARE TRUE TO THE BEST OF MY KNOWLEDGE.

Dated: **7/28/08**

Bret Smith

1317100

# Exhibit 1



F. M. SAWYER.
BABY BED.
APPLICATION FILED DEC. 8, 1914.

1,211,762.

Patented Jan. 9, 1917.

WITNESSES:
Frank R. Glove
H. C. Rodgers

INVENTOR
F.M.Sawyer
BY
George Thorpe
ATTORNEY

EXHIBIT
227
6-11-08

ANDERS 00617

# UNITED STATES PATENT OFFICE.

FRANKLIN M. SAWYER, OF KANSAS CITY, MISSOURI.

BABY-BED.

1,211,762.        Specification of Letters Patent.        Patented Jan. 9, 1917.

Application filed December 19, 1914.  Serial No. 877,966.

*To all whom it may concern:*

Be it known that I, FRANKLIN M. SAWYER, a citizen of the United States, residing at Kansas City, in the county of Jackson and
5 State of Missouri, have invented certain new and useful Improvements in Baby-Beds, of which the following is a specification.

This invention relates to screened baby beds and has for its object to produce a bed
10 of the character mentioned, possessing a number of advantageous features of construction and organization of parts hereinafter more particularly set forth.

To this end the invention consists in cer-
15 tain novel and peculiar features of construction and combination of parts, as hereinafter described and claimed, and in order that it may be fully understood reference is to be had to the accompanying drawings, in
20 which:—

Figure 1, is a perspective view of a screened baby bed embodying my invention, the mattress being broken away to disclose features otherwise not clearly shown. Fig.
25 2, is a vertical transverse section of the bed. Fig. 3, is an enlarged horizontal section through one of the corner posts or legs and the adjacent portions of the side and end frames of the bed. Fig. 4, is a vertical sec-
30 tion on the dotted line IV of Fig. 2, with the mattress omitted. Fig. 5, is a fragmentary view of a removable floor adapted to be supported just above the mattress.

Referring to the figures of the drawing in
35 detail, 1 indicates four corner posts or legs and rigidly secured to and between each pair of transversely opposite legs is a rectangular frame 2 provided with vertical rods 3 which extend from the bottom to the top of the
40 frame and to exclude flies and mosquitos from entering the bed at the ends said frames are covered at the outer sides of the rods by screens 4, the screens being preferably permanently secured to the frames.
45 In substantially the horizontal planes of the upper and lower ends of end frames 2, the corner posts or legs are provided at their inner sides with sockets 5. One of the end pair of legs is equipped with small wheels
50 6, for convenience in moving the bed about, it being understood that to move it the opposite end will be lifted slightly so as to bring the wheels into service.

Fitting between the longitudinally oppo-
55 site posts of the end frames and of substantially the same height as the latter are

frames 7, provided with dowels or pins 8 for engagement in the sockets 5 of the posts, and to secure the side frames reliably to the posts they are provided with pivoted catches 60 9 for engagement with headed pins or screws 10 secured to the posts as shown clearly.

One of the side frames is provided for its full length with spaced rods 11 and said side is covered preferably by a single screen 65 12. The opposite side of the frame 7 is provided with a horizontal partition 13 extending from one end of said frame to the other, the partition being located a few inches above the bottom of said frame, and from 70 the latter to the partition said side frame is provided with vertical spaced rods 14, and a screen 15 is secured to the frame at the outer side of said rods. The opening in said side frame constituted by the space above the 75 partition 13, is adapted to be closed by a skeleton door 16 provided with rods 17 to extend from the upper to the lower side of the door, and said door is provided exteriorly with a screen 18. The door is 80 hinged at its lower end at 19 to the partition bar 13 and is provided with a pair of catches 20 for engagement with keepers 21 secured to the top rail of said side frame.

The bed is provided with a slatted bottom 85 22 of the type shown or of any equivalent construction, and secured to and underlying the bottom are substantially U-shaped springs 23 having their lower or free ends bowed upwardly at 24 and adapted to fit 90 snugly on the cross rods or hangers 25, the hangers being provided with vertical crank arms 26, which engage the lower rails of the side frames and thereby afford the proper support for the bottom 22.        95

For closing the top of the bed to exclude flies and mosquitos, I provide a folding hinged top, the top being of the folding type to permit the bed to be placed fairly close to a wall without necessitating shift- 100 ing its position each time it is necessary or desirable to swing the top to closed or open position.

The top consists of two sections 27 hinged together at 28 and equipped with screens 29. 105 One of the sections is provided with a handle or knob 30 and is also provided with hinge members 31 for connection with hinge members 32 secured to the top of the adjacent side frame. The top is adapted to 110 rest upon the side and end frames and to open it, the handle or knob 30 will be pulled

ANDERS 00618

**2**                                           1,211,762

upward, this action raising and moving rearward the hinged edges of the sections 27 and of course sliding the front edge of the front section along the tops of the end frames. When the hinged section is vertical, the front section will fit flatly against it so that both sections may be swung together to a pendant position, at the side which constitutes the back of the bed.

For placing the child in or removing it from the bed, it being understood of course that the bed is provided with a mattress 33, the door 16 will be opened, as one may handle the child with less exertion through said door opening than by reaching down over the top of the bed. Another advantage of the side door opening is that the bed can be drawn close to the mother's bed at night so that she can reach from her bed into the baby's bed without rising to her feet.

The posts are provided at their inner sides in a level slightly lower preferably than the side door opening, with small supporting brackets 34 for the accommodation of a floor 35 upon which a child can conveniently amuse himself without necessitating attention from the mother. The corners of the floor are cut away to accommodate the corner posts so that no openings shall be left at the margins of the floor through which small toys or other objects might fall to the mattress below, from which position such objects could be recovered without removing the child and raising the floor.

From the above description it will be apparent that I have produced a screened baby bed possessing features of advantage,

such as the protection of the child; the conversion of the bed into a convenient and protected play yard or room, and convenience for the mother in reaching from her bed to the child's at night through the side door opening of the baby's bed.

It will also be seen that the bed is of knock-down construction for convenience of storage and transportation.

It is to be understood that I reserve the right to make all changes falling within the spirit and scope of the appended claim.

I claim:—

A baby bed, comprising ends, sides arranged between said ends, means connecting the ends and sides to prevent independent movement in every direction except longitudinally of the sides, fastening devices connecting the ends and sides against movement longitudinally of the sides; one of the sides having an opening and an outwardly opening door controlling said opening; and a suitably supported bottom for the bed arranged between the sides and occupying a horizontal plane below the lower margin of said door opening, in combination with a movable top, and screens covering the ends, the top and the sides, the screen for the side provided with the door opening consisting of two sections, one covering the door and the other the side below the door.

In testimony whereof, I affix my signature, in the presence of two witnesses.

FRANKLIN M. SAWYER.

Witnesses:
  H. C. Rodgers,
  G. Y. Thorpe.

ANDERS 00619

# Exhibit 2

April 23, 1957          A. E. DIEFENDORF          2,789,531

COLLAPSIBLE CAGE FOR BIRDS

Filed April 11, 1955



Fig. 1.

Fig. 2.

Fig. 4.

Fig. 5.

Fig. 3.

INVENTOR.
Aurel E. Diefendorf
BY
ATTORNEY.

ANDERS 00620

# United States Patent Office

**2,789,531**
Patented Apr. 23, 1957

1

**2,789,531**

**COLLAPSIBLE CAGE FOR BIRDS**

Aurel E. Diefendorf, Topeka, Kans.

Application April 11, 1955, Serial No. 500,404

7 Claims. (Cl. 119—17)

This invention relates to cages for birds and small animals and, more particularly, to a knock-down type enclosure which may be assembled and disassembled easily and quickly to permit transfer or storage thereof with a minimum of effort.

The most important object of the present invention is to provide, in a knock-down type enclosure, a collapsible body portion which includes opposed, hingedly interconnected side and end walls and a flanged top which may be placed on the walls at the upper ends thereof to hold the walls expanded.

Another important object of the present invention is the provision of base structure adapted for receiving and supporting the lower edges of the body portion, which structure may be in the nature of a table or the like.

A further object of the present invention is to provide channel means on the base structure for receiving the lower edges of the body portion and thus cooperating with the top member to hold the body portion in an expanded position, the channel means being open at one side of the structure to permit sliding movement of a tray toward and away from a position beneath the top member.

Other, more minor objectives of the present invention include details of construction of the collapsible body portion, the top, the channel means and the base structure, as will become apparent in the specification which follows.

In the drawing:

Figure 1 is a perspective view of an enclosure made in accordance with the teachings of the present invention, with the legs of the supporting structure shown fragmentarily.

Fig. 2 is an enlarged, fragmentary, vertical cross section taken on line II—II of Fig. 1.

Fig. 3 is an enlarged, fragmentary, vertical cross section taken on line III—III of Fig. 1.

Fig. 4 is an enlarged, fragmentary, horizontal cross section taken on line IV—IV of Fig. 1; and

Fig. 5 is a top, plan view, on a reduced scale, of the central body portion of the cage of Fig. 1, illustrating the manner in which this central body portion may be collapsed when not in use.

Referring now to the drawing, wherein like numerals indicate similar parts, the enclosure of the present invention is designated broadly by the numeral 10 and includes, as elements thereof, a top member or lid 12, a collapsible body portion 14, a tray 16 and a base or supporting structure 18.

In the embodiment chosen for illustration, top 12 and body portion 14 are fabricated from wire screen or any suitable foraminous, sheet material. Top 12 is provided with a lateral, peripheral flange 20, the latter being reinforced throughout its length by a binding 22. As best illustrated in Fig. 2, the binding 22 takes the form of an initially flat, elongated strip of any suitable, light-weight sheet material which has been bent along a longitudinal

line and clamped to the flange 20 in press fit engagement therewith.

Body portion 14 is rectangular in configuration and includes a pair of end walls 24, and a pair of side walls 26 presenting four vertical corners lying in parallel planes. Hinge means 28 interconnects proximal walls along the adjoining edges thereof at each of the corners. Each of the walls 24 and 26 is provided, along the upper and lower edges thereof, with a binding 25 which is coextensive in length with the respective walls and similar, in all respects, to the binding 22 on flange 20 of top member 12. By virtue of the hinges 28, body portion 14 may be expanded to the position shown in Fig. 1 and held in that position by engagement of the upper bindings 25 with the binding 22 on flange 20 of top member 12. Similarly, after removal of top member 12, body portion 14 may be collapsed to the position shown in Fig. 5 to facilitate transfer or storage thereof.

The base structure 18 chosen for illustration includes a table having a top panel 30 and conventional supporting legs 32 which may be braced as at 34. On its uppermost surface, panel 30 is specially provided with three pairs of spaced rails 36 and 38 between which is presented a U-shaped channel having a bight and an inner and outer leg spaced from each other, said channel receiving the lower bindings 25 of the walls 24 and 26. The outer rails 36 and the inner rails 38 may be interconnected with the adjoining pair of rails (as shown) or spaced therefrom, as desired. It is thus apparent that, when the body portion 14 is expanded and placed on the panel 30 in the manner described, with the lower bindings 25 between the rails 36—38, the body portion 14 will be maintained in the expanded position not only by the rails 36—38 but, also by the engagement thereof with the flange 20 of top member 12. Viewing Fig. 3, it is seen that the binding 25 on the lower edge of one of the walls 26 terminates above the lower edge of the remaining walls 24 and 26, to present a clearance slot therebeneath for the tray 16 which is slidable on the upper surface of panel 30 between the opposed pair of inner rails 38.

The tray 16 is generally pan shaped and includes an upstanding, peripheral lip 40. At the front of tray 16, lip 40 extends upwardly above the lowermost edge of the corresponding side wall 26 and is there provided with a handle 42. Additionally, each of the inner rails 38 is provided with a slot 44 which receives the lip 40 as tray 16 is moved into position beneath the top member 12.

One of the walls 24 is provided with an access opening (not shown) and with a door 46 slidable in a pair of spaced tracks 48. The tracks 48 are U-shaped in transverse cross section and provided at each end thereof with a projection 50 which is attached to one of the transverse wires of the wall 24. The door 46 is fabricated from a sheet of wire screen of the same mesh as that used for the walls 24—26 and the top 12 and is reinforced throughout its periphery with a binding 47 which is identical to the binding 22 on the top member 12, except as to dimensions.

In assembly, the body portion 14 is expanded and the lower, reinforced, marginal portions of the walls 24 and 26 are placed in the channels presented between the inner and outer rails 36 and 38. Tray 16 may then be moved into the slots 44 and the necessary play items (not shown) located within the body portion 14. Subsequently, top member 12 is placed on body portion 14 with the flange 20 circumscribing the upper marginal portions of the walls 24 and 26, and the enclosure 10 of the present invention is then ready for use. A semi-permanent enclosure 10 has thus been provided which is not only sturdy and attractive but also highly practicable. The tray 16 may be removed for periodic cleaning and access may be had to the interior of the enclosure 10

ANDERS 00621

2,789,531

3

through door 46. As necessary, the enclosure 10 may be disassembled and the body portion 14 collapsed for storage with the top member 12 beneath the panel 30.

It is obvious that the embodiment herein disclosed is a preferred form only and that many changes or modifications may be made therein without departing from the broad principles of the present invention. Such changes or modifications are contemplated hereby and it is, therefore, desired to be limited only by the scope of the appended claims.

Having thus described the invention what is claimed as new and desired to be secured by Letters Patent is:

1. In a collapsible bird cage, a rectangular body portion of foraminous sheet material and including a pair of normally upright, spaced, opposed end walls, and a pair of normally upright, spaced, opposed side walls presenting four vertical corners lying in parallel planes; hinge means interconnecting the walls at said corners whereby the body may be collapsed by movement of diagonally opposed hinged corners toward each other; a polygonal top member having a lateral, peripheral flange circumscribing said walls and in engagement with the uppermost marginal portions thereof for holding the body portion expanded at the uppermost end thereof; and base structure provided with an upwardly facing, U-shaped, polygonal channel therein for receiving said walls at the lowermost ends thereof, when the body portion is expanded.

2. In a bird cage as set forth in claim 1 wherein is provided an access opening in one of said walls and a door mounted on said one wall for sliding movement to and from a position in closing relationship to said opening.

3. In a collapsible bird cage, a rectangular body portion of foraminous sheet material, hingedly interconnected side and end walls; a top member having a lateral, peripheral flange circumscribing said walls and in engagement with the uppermost marginal portions thereof for holding the body portion expanded at the uppermost end thereof; base structure having an upper surface for supporting said body portion, said structure being provided with three pairs of spaced rails thereon, presenting upwardly facing U-shaped channels for receiving three of said walls at the lowermost ends thereof, when the body portion is expanded; and a tray slidable on said structure between the opposed, inner rails, toward and away from the third inner rail the lowermost marginal edge of one of the walls terminating above said

4

upper surface to provide a clearance space for said tr[a]

4. In a bird cage as set forth in claim 3 wherein sa[id] tray is provided with an upstanding, peripheral lip a[nd] wherein said inner rails each have slots formed in t[he] inner surface thereof for receiving said lip.

5. In a bird cage as set forth in claim 4 wherein provided a binding for each of said walls at the upp[er] and lower edges thereof and for said flange, said bindi[ng] comprising an elongated strip of rigid, sheet materi[al] joined to the respective walls and to the flange along ma[r]ginal portions thereof.

6. In a bird cage as set forth in claim 5 wherein eac[h] binding is U-shaped and has a marginal portion of wall or the flange between the legs thereof.

7. In a collapsible bird cage, a rectangular body po[r]tion of wire screen and having a pair of normally up[right], spaced, opposed end walls, and a pair of normall[y] upright, spaced, opposed side walls presenting four ver[ti]cal corners lying in parallel planes; hinge means inter[-]connecting the walls at said corners whereby the bod[y] may be collapsed by movement of diagonally oppose[d] hinged corners toward each other, one of said walls bein[g] provided with an access opening; a top member of wir[e] screen, said top member having a lateral, peripher[al] flange circumscribing the upper marginal portion of sai[d] body portion when in place thereon; base structure hav[-]ing a substantially flat, upper surface provided with a pa[ir] of spaced, U-shaped rails, each having a bight and an inner and outer leg spaced from each other, said rails presenting an upwardly facing U-shaped channel for receiving the lower, marginal portions of three of said walls; and a tray slidable on said upper surface between the legs of the inner rail toward and away from the bight of said inner rail the lowermost marginal edge of one of the walls terminating above said upper surface to provide a clearance space for said tray.

**References Cited in the file of this patent**

UNITED STATES PATENTS

| | | |
|---|---|---|
| 1,581,082 | Clarke | Apr. 13, 1926 |
| 1,635,942 | Knudsen | July 12, 1927 |
| 2,529,893 | Albert | Nov. 14, 1950 |
| 2,678,628 | Williams | May 18, 1954 |
| 2,708,900 | Yellin | May 24, 1955 |

ANDERS 00622

# Exhibit 3

# United States Patent [19]

**Sou**

[11] **4,256,056**

[45] **Mar. 17, 1981**

[54] **PORTABLE CASE FOR CARRYING SMALL ANIMAL**

[76] Inventor: Teho Sou, 7-18 Higashiimazato 2-chome, Higashinari-ku, Osaka, Japan

[21] Appl. No.: **39,848**

[22] Filed: **May 17, 1979**

[30] **Foreign Application Priority Data**

Mar. 17, 1979 [JP]   Japan ............................. 54-34555

[51] Int. Cl.³ .............................. A01K 1/02; A01K 1/03

[52] U.S. Cl. .................................................... 119/19

[58] Field of Search ................ 220/6, 7, 23, 4 F, 94 R, 220/94 A; 119/19, 17

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,079,458 | 5/1937 | Leichtfuss | 220/7 |
| 2,766,796 | 10/1956 | Tupper | 220/23 X |
| 3,234,908 | 2/1966 | Doskocil | 119/19 |
| 3,490,417 | 1/1970 | Swinney | 119/19 |
| 3,973,692 | 8/1976 | Cloyd | 220/7 |

### FOREIGN PATENT DOCUMENTS

1166867 11/1958  France ................................. 119/19

*Primary Examiner*—Hugh R. Chamblee
*Attorney, Agent, or Firm*—Trexler, Wolters, Bushnell & Fosse

[57] **ABSTRACT**

A portable case, into which the pet fancier puts his small animal and carries it about, is disclosed, wherein the main body of the case is constructed by putting together a pair of side wall boards, a top board connected at its left and right sides to the respective upper end faces of the left and right side wall boards through the aid of hinged joints, and a bottom board connected at its left and right sides to the respective lower end faces of the left and right side wall boards likewise as above through the aid of hinged joints, which main body of the case is furnished at its front and rear sides with the respective on-off door leaves, and the case thus constructed can be simply folded up by opening both the door leaves.

**12 Claims, 8 Drawing Figures**



ANDERS 00623

**U.S. Patent**    Mar. 17, 1981    Sheet 1 of 3    **4,256,056**

## F I G. 1



ANDERS 00624

FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



ANDERS 00625

U.S. Patent    Mar. 17, 1981    Sheet 3 of 3    4,256,056



FIG. 7

FIG. 8

ANDERS 00626

4,256,056

1.

### PORTABLE CASE FOR CARRYING SMALL ANIMAL

The present invention relates to a portable case into which the pet fancier puts his small animal, for example, such as pup or puss and carriers it about.

It is well-known that there is something what is called a portable case into which the pet fancier put his house pet he keeps so as to be able to carry it about when going out.

However, such kind of portable case heretofore in use has a weak point of occupying a great deal of space at the time of putting it in order because it is always tenacious of a cubical form even when being not used.

Thereupon, the present invention has for its object to provide a portable case for carrying a small animal, which case is so designed as to be able to be folded up when not letting the animal in, and as not to take up much room at the time of being put back.

Another object of this invention is to provide a portable case for carrying a small animal which is foldable and erectable through a simple manipulation.

A further object of the present invention is to provide a portable case for carrying a small animal whose door leaves do not open of itself during accommodating the animal within, in consequence of which there is no fear of the animal's running away accidentally.

These and other objects of the present invention will be more clearly understood from a reading of the following description taken in connection with the accompanying drawings in which:

FIG. 1 is an exploded view in perspective of a portable case for carrying a small animal, illustrating a preferred embodiment of the present invention;

FIG. 2 is an assembly drawing of the same portable case as in FIG. 1;

FIG. 3 is a front view of one of the door leaves;

FIG. 4 is a longitudinal sectional view of a part of a door leaf, showing the state of its being fitted-in;

FIG. 5 is a longitudinal sectional view in part, showing the state where an engaging piece of a side wall board is being inserted in an engaging hole of a door leaf;

FIG. 6 is a cross sectional view of the top board; and

FIGS. 7 and 8 are perspective views, showing the folding method and the already folded state, respectively, of the portable case according to the present invention.

As shown in FIGS. 1 and 2, the portable case according to the present invention comprises a case body and two door leaves 6a, 6b, wherein the case body 5 is made up of two side wall boards 1a, 1b, one top board 3, and one bottom board 4, while the two door leaves 6a, 6b each shut up the respective openings at either side of the case body 5.

The top board 3, as shown also in FIG. 6, is formed at its upper surface with three concave parts 7, 8, 9, but of which the middle concave part 7 is provided vis-a-vis with two pivote bearings 11, 11. Into these pivote bearings 11, 11 are inserted both the end points of a grip 12 while being pivotably held thereat so as to be able to be raised or laid with freedom. The left and right concaves 8, 9, which are situated on the both sides of the middle concave 7, are converted with the respective lids 13 long and narrow. These lids each are fitted rotatively at their own sides. By the way, these two concaves are used as a container in which small articles such as teth-

2

ers and others are stored. Thus designed, these concave serve the purpose of neatly receiving the grip and the other small articles, so that the grip does not happen to protrude, following that the whole case comes to be foldable in compactness. Further, pivot bearing bodies 16 having pivot bearing holes 15 are formed projecting integrally along the under side of the left and right brims of the top board 3 at the middle and both end parts.

On the other hand, the bottom board 4 is in the form of a flat board, and is likewise formed projecting integrally at its left and right edges with pivote bearing bodies 18 having pivote bearing holes 17, correspondingly to the pivote bearing bodies 16 of the top board 3.

Now, two side wall boards 1a, 1b opposing face to face are provided at their own upper half with a plurality of windows 19 bored each in the form of an oblong. on the both sides of a row of these windows 19 each are formed L-shaped protrusions 20, three to every side at suitable intervals in the up-and-down direction. The vacant spaces produced between the L-shaped protrusions 20 and the external surfaces of the side wall boards 1a, 1b serve as guide grooves 21 upward and downward, into which both ends of window cover plates 22 are inserted slidably in the up-and-down direction. The windows 19 are able to be opened and closed by making these window cover plates 22 move up and down.

On each of the upper and lower edges of each of the side wall boards 1a, 1b, two stripes of supporting rods 23a, 23b arranged straightly along each edge are formed integrally along each of the upper and lower edges of the left and right side wall boards 1a, 1b, separately. The both end parts of these supporting rods 23a, 23b is shaped into the form of protrusions on account of the side wall boards having been partially cut away in these spots. As described before, in the present invention, the side wall boards 1a, 1b, the top board 3, and the bottom board 4 are connected hinged-jointedly to construct a single case body 5, namely, to obtain a collapsible cubical body which is made open at the both sides, by inserting each of both ends of the supporting rods 23a, 23b, which are formed at both the upper and lower edges of each of the side wall boards 1a, 1b, into the respective pivote bearing holes 15, 17 of the correspondent pivote bearing bodies 16, 18.

The side wall boards 1a, 1b, as shown also in FIG. 4, are provided at their one side end faces with a pair of supporting bodies 26 having longish supporting holes 25 in the direction of the thickness of the side wall boards 1a, 1b, which supporting bodies are formed integrally with the side wall boards while opposing face to face between themselves at vertically suitable intervals.

Further similarly, the side wall boards 1a, 1b are provided midway at their another side end faces integrally with slat-shaped guide tongue pieces 27. With the guide tongue pieces 27 as a center are formed integrally above and below a pair of engaging pieces 28, 28 at equal intervals. The inner sides of the engaging pieces, as shown in FIG. 5, are formed inclined surfaces 29 gradually thickening from the front part toward the root, and engaging step parts 30 projecting continually from the rear ends of the inclined surfaces. The two side wall boards boards 1a, 1b have the same form in common with each other.

On the other hand, the door leaves 6a, 6b, which are to cover the openings of both the front and rear sides of the aforesaid case body 5, each are formed on their respective one sides with projecting brims 31, severally.

ANDERS 00627

4,256,056

**3**

Along the verge of the projecting brim 31 is formed integrally a supporting rod 32 in the up-and-down direction. They 6a, 6b are also provided at their respective central parts with perforated guide holes 33 severally, whereinto the before-mentioned guide tongue pieces are to be fitted. In an equal distance with this guide hole 33 between are formed a pair of projecting brims 34, 34, in whichare bored the respective engaging holes 35, 35. Into these holes 35, 35 are fitted the aforesaid engaging pieces 28, 28 of the side wall board. The two door leaves 6a, 6b thus formed have the same form in common with each other. The length of the supporting rods 32 formed on the door leaves 6a, 6b are made longer than the distance between the upper and lower supporting bodies 26, 26 disposed facing each other.

In order to make the supporting rod 32 of the door leaf 6a fit into the two pivot bearing bodies 26, 26 of each side wall board 1a, 1b, it will be conducted as follows:

First curve the supporting rod 32 slightly to reduce the length between its both ends so as to correspond to the pivot bearing holes 25, 25 of the pivot bearing bodies 26, 26, and then while releasing its curvature make the both ends of the supporting rod 32 swingably pivot into the respective pivot bearing holes 25, 25 owing to the return of the elasticity of the supporting rod 32. As shown in FIG. 4, the pivot bearing bodies 26, 26 are projecting outward from the side wall board 1a, 1b, and consequently the door leaves 6a, 6b, can be folded back freely on the external surfaces of the side wall boards 1a, 1b.

Reference numerals 36, 36 indicate a plurality of windows provided side by side on the upper half of the door leaves 6a, 6b likewise as the case of the above-mentioned side wall board 1a, 1b. On both sides of such a row of windows are formed L-shaped protrusions 37 like the case of the side wall board 1a, 1b. The spaces created between these L-shaped protrusions 37 and the external surfaces of the door leaves 6a, 6b constitute the guide grooves 38, 38, into which the both sides of the window cover plate 39 are inserted in a state slidable in the up-and-down direction, being made to serve to open and close the windows 36. That is, when the window cover plate 39 is raised, it is the time of the windows having been closed, as shown in FIG. 3, and when it is let to fall, the time of the windows having been opened, as seen in FIGS. 1 and 2.

In this connection, it is desirable to provide the side wall boards 1a, 1b and the door leaves 6a, 6b or further their respective window cover plates 22, 39 with some engaging means such as, for example, some kind of protrusions for the purpose of retaining the window cover plates 22, 39 at the point of time of their having been raised. Down below the window cover plates 22, 39 are provided protruding strips 40 with the view of preventing them from falling-off.

In order to carry the portable case according to the present invention in the state of a small animal being put therein, as a start rotate the door leaves 6a, 6b, and engage the guide hole 33 with the guide tongue piece 27 of the side wall board 1a, 1b and the engaging holes 35 with the engaging pieces 28 of the same board 1a, 1b, when the engaging holes 35 pass over the inclined surfaces 29 formed at the inner sides of the engaging pieces 28 while making the engaging pieces 28 slightly curve outward. And at the point of time of the engaging holes 35 having reached the engaging step parts 30, the engaging pieces 28 return to their original position

**4**

through their own elasticity, thus the complete state of engagement being achieved. That is, as shown in FIG. 5, the guide tongue piece 27 is provided for holding the door leaves 6a, 6b so as to be always engaged at the engaging step parts 30 by preventing the door leaves 6a, 6b from their transverse shifting. Consequently, there is not at all a possibility of these door leaves 6a, 6b coming off at the time of carrying this case or anytime, and as a result there is also no fear of the small animal running away out of it.

Referring now to how to open the door leaves 6a, 6b, it is easily completed by doing as follows:

For a start, press sofly outward the engaging pieces 28,28 showing the before-described state of engagement to make them a little curved, and, after releasing the engagement of the engaging step parts 30, 30 of the engaging pieces 28, 28 with the engaging holes 35, 35 of the door leaves 6a, 6b, rotate the door leaves 6a, 6b with the supporting rod 32 as a center in the direction opening the door leaves.

In order to fold up the portable case for carrying a small animal according to the present invention at the time of not using it, it will do well only to execute in compliance with the same knack as before. That is, if the door leaves 6a, 6b on both sides are opened, the cubical form of the case body 5 deforms naturally of itself because the side wall boards 1a, 1b, the top board 3, and the bottom board 4 are connected to each other only through the aid of hinged joints, as shown in FIG. 7, when the back of the top board 3 comes into contact with the inside of either of the side wall boards 1a, 1b, and the surface of the bottom board 4 touches with the remaining inside of the side wall boards 1a, 1b, thus a flat thing being obtained in the folded state. Then, as shown in FIG. 8, if the door leaves 6a, 6b are folded back with the supporting rod 32 as a fulcrum on the outside of the side wall boards 1a, 1b, the state of being completely folded can be achieved. In such a manner, the process of folding the case is extremely easy and simple.

Since the pivot bearing bodies 26, 26 supporting the door leaves 6a, 6b is made projecting outward from the side wall board 1a, 1b, it is possible to execute without the smallest strain the above-mentioned assembling and folding method, by which the surface of the door leaves 6a, 6b is to be brought into close contact with the outer surfaces of the side wall boards 1a, 1b, therewith obtaining a good state of being folded.

The present invention is not limited only to the above-described embodiment and is able to make various changes and modifications without departing from the scope of the appended claims.

What is claimed is:

1. A portable case for carrying a small animal, which comprises a case body and two door leaves; said case body being composed of two side wall boards opposing each other, one top board being mounted hinge-jointedly on the upper end faces of said side wall boards, and one bottom board being attached likewise hinge-jointedly to the lower end faces of said wall boards; said side wall boards being formed at their upper and lower end faces with elongate rods integrally, end portions of said upper and lower faces of each side wall board being cut away so that end portions of said rods protrude to define pivot pins; said top board and said bottom board being provided integrally with cooperating pivot bearings whereby said side wall boards, said top board and said bottom board are all connected hinge-jointedly by

ANDERS 00628

4,256,056

5

inserting said pivot pins into said pivot bearings; said case body thus having openings at its front and rear side and becoming foldable; said door leaves covering said openings and pivoting severally their own one sides on end faces of ones of said boards thereby to be foldable back onto the outer surface of said ones of said boards; the other side of said door leaves being free to be engaged and disengaged with and from the other end faces of said boards.

2. A portable case for carrying a small animal as set forth in claim 1, which is characterized in that said wall boards are formed at the one side end faces with guide tongue pieces and engaging pieces having engaging step parts, and said door leaves are formed at the one side end parts with guide holes and engaging holes, both engaging with said guide tongue pieces and said engaging pieces, respectively, so as to enable said door leaves to freely engage and disengage with and from the end parts of said side wall boards.

3. A portable case for carrying a small animal, which comprises a case body and two door leaves; said case body being composed of two side wall boards opposing each other, one top board being mounted hinge-jointedly on the upper end faces of said side wall boards, and one bottom board being attached likewise hinge-jointedly to the lower end faces of said wall boards; said case body thus having openings at its front and rear side and becoming foldable; said door leaves covering said openings and pivoting severally at their own one sides about an end face of one of said boards of said case body, the other sides of said door leaves being formed with guide slots and engaging slots respectively; and cooperating, interfitting guide tongues and engaging pieces formed projecting outwardly from a facing end face of said case body, said guide slots and guide tongues cooperating upon interengagement thereof to substantially prevent relative movement between said doors and said case body in a manner which would disengage said engaging slots from said engaging pieces.

4. A portable case for carrying a small animal as set forth in claim 1 or 2, which is characterized in that said side wall boards are formed in the middle part of the one side end parts with said guide tongue pieces, and on

6

both sides of said guide tongue pieces, above and below, with said engaging pieces at suitable intervals.

5. A portable case for carrying a small animal as set forth in claim 3 or claim 4, wherein said engaging pieces are formed with inclined surfaces gradually thickening from the front parts toward the roots and further with engaging step parts projecting continually from the rear ends of said inclined surfaces.

6. A portable case for carrying a small animal as set forth in claim 3 or claim 1, which is characterized in that said side wall boards are formed on the another side end parts with pivot bearing bodies having pivot bearing holes opposing each other, above and below, and door leaves are formed integrally on the another side end parts with supporting rods, whereby said door leaves are made to be rotatable through engaging both ends of said supporting rods with said pivot bearing holes.

7. A portable case for carrying a small animal as set forth in claim 3 or claim 1, wherein said side wall boards and/or said door leaves are furnished with windows.

8. A portable case for carrying a small animal as set forth in claim 7, wherein guide grooves are provided on both sides of a row of said windows in the up-and-down direction, and both left and right ends of window cover plate are inserted into said guide grooves slidably in the up-and-down direction, whereby said windows is made to be opened and closed at will.

9. A portable case for carrying a small animal as set forth in claim 1 or claim 3, wherein said top board is formed on its upper face with a concave in which a grip is fixed in such a manner as to be freely raised and laid.

10. A portable case for carrying a small animal as set forth in claim 1 or claim 3, wherein a concave formed on the upper face of said top board is covered by the use of a lid provided for opening and closing said concave, which serves as a container for putting small articles thereinto.

11. A portable case for carrying a small animal as set forth in claim 10, wherein two concaves for receiving small articles are formed on the both sides of said concave to which said grip is attached.

12. A portable case for carrying a small animal as set forth in claim 1 or claim 3, wherein each member is all made of synthetic resinous material.

* * * * *

# Exhibit 4



US00D382374S

# United States Patent [19]

## Burks

| [11] | Patent Number: | **Des. 382,374** |
|---|---|---|
| [45] | Date of Patent: | **∗∗Aug. 12, 1997** |

[54] **PET CAGE FOR USE WITH AUTO RESTRAINT BELTS**

[76] Inventor: **J. R. Burks**, 1670 Pine Valley Rd., Milledgeville, Ga. 31061

[∗∗] Term: **14 Years**

[21] Appl. No.: **46,691**

[22] Filed: **Oct. 23, 1995**

[51] LOC (6) Cl. ................................. **30-02**
[52] U.S. Cl. ........................... **D30/116; D30/114**
[58] Field of Search ...................... D30/108, 110, D30/114–116; D22/121; 119/452–453, 461, 474

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| D. 85,404 | 10/1931 | Towaley ................... D30/114 X |
| D. 300,377 | 3/1989 | Willingham ................ D30/116 |
| D. 356,877 | 3/1995 | Burks ..................... D30/108 |
| 4,439,911 | 4/1984 | Mandell ................ 119/452 X |
| 4,763,606 | 8/1988 | Ondrasik, II ............. 119/474 |
| 4,781,147 | 11/1988 | Delino, Jr. ............... 119/453 |
| 4,909,188 | 3/1990 | Tominaga ................ 119/474 |
| 4,917,047 | 4/1990 | Wazeter, III .......... 119/452 X |
| 4,984,535 | 1/1991 | White ................... 119/474 |
| 5,010,848 | 4/1991 | Raskin .................. 119/461 |
| 5,097,796 | 3/1992 | Reimers ................. 119/453 |

*Primary Examiner*—B.J. Bullock
*Assistant Examiner*—Stacia Sinulk
*Attorney, Agent, or Firm*—Terry M. Gernstein

[57] **CLAIM**

The ornamental design for a pet cage for use with auto restraint belts, as shown and described.

## DESCRIPTION

FIG. 1 is a front, top and side perspective view of the pet cage for use with auto restraint belts showing my new design;

FIG. 2 is a front elevational view thereof;

FIG. 3 is a rear elevational view thereof;

FIG. 4 is a side elevational view thereof;

FIG. 5 is a side elevational view thereof;

FIG. 6 is a top plan view thereof; and,

FIG. 7 is a bottom plan view thereof.

**1 Claim, 4 Drawing Sheets**



ANDERS 00630

**U.S. Patent**        Aug. 12, 1997        Sheet 1 of 4        **Des. 382,374**



FIG.1.

ANDERS 00631

**U.S. Patent**     Aug. 12, 1997     Sheet 2 of 4     **Des. 382,374**



FIG. 2.



FIG. 5.

ANDERS 00632



FIG. 3.



FIG. 4.

ANDERS 00633

**U.S. Patent**     Aug. 12, 1997     Sheet 4 of 4     **Des. 382,374**



FIG.6.



FIG.7.

ANDERS 00634

# Exhibit 5



US005960744A

# United States Patent [19]

## Rutman

[11] Patent Number: 5,960,744

[45] Date of Patent: *Oct. 5, 1999

[54] **EXPANDABLE PET CAGE AND METHOD**

[76] Inventor: Mark A. Rutman, 26240 Hendon, Beachwood, Ohio 44122

[*] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: 08/898,193

[22] Filed: Jul. 22, 1997

### Related U.S. Application Data

[63] Continuation of application No. 08/505,775, Jul. 21, 1995, Pat. No. 5,671,697.

[51] Int. Cl.⁶ .............................. A01K 1/03; B65D 6/12
[52] U.S. Cl. ............................ 119/473; 119/498; 119/752; 190/22; 190/105; 220/8
[58] Field of Search ............................ 119/473, 472, 119/482, 496, 452, 453, 498, 500, 491, 752, 606, 676; 190/22, 104, 105; 312/296; 220/8

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 108,187 | 10/1870 | Rice | 190/22 |
| 1,303,736 | 5/1919 | Speicher | 119/487 |
| 1,345,968 | 7/1920 | Speicher | 119/487 |
| 1,449,428 | 3/1923 | McGaffee | 119/494 |
| 3,683,512 | 8/1972 | Beam, Jr. | 119/606 X |
| 4,140,080 | 2/1979 | Snader | 119/473 |
| 4,228,765 | 10/1980 | Berlin | 119/752 |
| 4,770,127 | 9/1988 | Volk | 119/473 |
| 4,991,543 | 2/1991 | Silberman | 119/473 |
| 5,010,848 | 4/1991 | Rankin | 119/461 |
| 5,016,772 | 5/1991 | Wilk | 220/8 |
| 5,054,426 | 10/1991 | Panarelli et al. | 119/473 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 2569084 | 2/1986 | France . |
| 3439279 | 10/1984 | Germany . |
| 195734 | 4/1923 | United Kingdom . |

*Primary Examiner*—Jack W. Lavinder
*Assistant Examiner*—Yvonne R. Abbott
*Attorney, Agent, or Firm*—Renner, Otto, Boisselle & Sklar, P.L.L.

[57] **ABSTRACT**

An expandable pet cage for animals, and a method for house-training pets of various sizes comprises two complimentary compartments that are in telescopic relation to each other, thereby providing an adjustable composite volume to house a pet. The adjustable composite volume facilitates using the natural instincts of the pet to resist excreting in the volume of the confinement, thus resulting in house-training the pet. The adjustable composite volume also can be relied on to hold an animal securely and safely during transporting, and provides an efficient enclosure for drying a pet after grooming. Also, the adjustable composite volume provides the pet owner with the convenience of only having to purchase one cage even if dogs of various sizes are to utilize the cage at different times and for different purposes.

**20 Claims, 2 Drawing Sheets**



ANDERS 00635



FIG. 1

FIG. 2

FIG. 3

FIG. 4

ANDERS 00636



FIG. 5

FIG. 6

FIG. 7

ANDERS 00837

5,960,744

1

### EXPANDABLE PET CAGE AND METHOD

This is a continuation of copending application Ser. No. 08/505,775, filed Jul. 21, 1995 which is now U.S. Pat. No. 5,671,697.

### TECHNICAL FIELD

The present invention relates generally, as indicated, to an expandable pet cage, a method for house training a puppy or other pet animal, a method that facilitates grooming an animal, and a method for safely transporting an animal in an aircraft, boat or automobile, and, more particularly, to animal cages that may be expanded or collapsed to accommodate pets of various sizes and years of development and methods of using such cages.

### BACKGROUND

Various types of devices have been developed to facilitate convenient transporting and housing of pets. These devices include many types of cages, shell-type carriers and other similar forms of enclosure. Such devices tend to fall into either of two categories: (1) small, movable or portable cages or housings outfitted with handles and hinged access members, and (2) larger stand-alone cages. The first type of construction facilitates transporting pets. However, many domestic pets such as dogs may substantially increase in size during their development. Consequently, it is likely that at least one larger replacement cage eventually will be required to house the pet.

There are several disadvantages associated with initially acquiring only a cage that is of such a size properly to accommodate the pet at maturity and not first obtaining a relatively small size cage that is a better size to "fit" the pet when immature. Cages that are disproportionately large, as compared to the size of the animal, can result in injury to a small or relatively immature pet due to sliding around and jostling during transporting. Additionally, a large size cage is less amenable to storing in a home. Moreover, cages are often employed to house-train a puppy-cages that are large as compared to the size of the pet inhibit the instinctual self-training that a pet undergoes when confined to a relatively small area.

Cage training is the most widely accepted means of house training dogs in the world. This method is successful because certain pets such as puppies will not soil their sleeping quarters, and if the cage is small enough (just enough room for the puppy to turn around in it) the pet will remain dry until released from its cage by its owner. If the cage is too large, however, the puppy will use one end of the cage for "bathroom habits" and the other end for sleeping. This presents a dilemma for pet owners wishing to purchase a cage for their newly-acquired puppy. If the owner were to purchase a small puppy-sized cage, eventually a larger cage would have to be purchased to match the growth of the puppy into adulthood. This becomes expensive. If an adult-sized cage were purchased for use with a small puppy, the pet owner must reduce the cage size by cutting sheets of plywood or some other suitable material and placing them in the cage to serve as barriers to part of the cage, thus reducing the size of the space inside the cage. Reducing space available to a puppy inside a cage facilitates house-training. Sometimes various other items, such as pillows, cardboard or plastic boxes, may be inserted into the cage to reduce space. These various articles are difficult to conform to the shape of the cage, and the puppy may dislodge these articles and, then having access to the previously blocked off part of the cage, create a mess in the cage.

2

Also, expandable pet cages lack sufficient waterproofing to confine the excrement, e.g., to prevent leakage.

An example of an expandable cage is disclosed in U.S. Pat. No. 5,054,426. The cage of that patent can be adjusted by sliding the parts thereof to accommodate different sized animals. However, the sliding mechanism of that cage consists of guide bars fitted into guide tracks along the bottom edge corners of the cage, and dirt, corrosion or breakage there may impede sliding. The lack of water-tightness and the use of an open-air inner cage portion allows dirt, corrosion and/or breakage further to limit the ease of sliding of the compartments relative to each other. Some of the pet excrement in the cage inevitably will deposit on and along the guide tracks resulting in increased resistance and corrosion of the guide bars and guide tracks.

### SUMMARY

According to one aspect of the invention, an expandable pet cage includes first and second compartments; each of the compartments having an open end and a closed or closeable end; the compartments being positioned in telescoping relation providing a composite volume including both of the open ends; and a substantially liquid-tight seal between the compartments at the bottom thereof.

Another aspect relates to an expandable pet cage, including first and second compartments; each of the compartments having an open end and a closed or closeable end; the compartments being positioned in telescoping relation providing a composite volume including both of the open ends; and a slide interconnect between the compartments, and along which one of the compartments can slide relative to the other of the compartments to modify the size of the composite volume, the slide interconnect being located between the top and bottom of the compartment, and including portions integral with the sides of the compartments.

Another aspect relates to a method of house-training a pet, including the steps of placing the pet in an size-adjustable cage; and adjusting the size of the cage to confine the pet to a volume that does not permit bodily excretion at a separate area, thereby using the natural instinct of the pet to resist excreting in the volume of the confinement.

Another aspect relates to a method of confining a pet for travel safety in an aircraft, boat or automobile, including the steps of placing a pet in a size-adjustable cage; and adjusting the size of the cage to limit undesirable movement of the pet therein, whereby the cage provides support to avoid accidental injury and jostling of the pet in the cage during transporting of the cage and pet.

Another aspect relates to a method of grooming a pet, including the steps of placing a pet in a size-adjustable cage; and adjusting the size of the cage to accommodate the pet for the drying part of the grooming procedure, wherein the adjusting further includes substantially minimizing the size of the cage to optimize drying efficiency.

A further aspect of the invention relates to an expandable pet cage which has a sliding mechanism located above the bottom of the cage to avoid the accumulation of waste products on the sliding mechanism.

Another aspect is to avoid excrement of a pet from impeding the sliding mechanism of an adjustable size pet cage.

Another aspect of the invention relates to an animal enclosure that is easy to store, occupies a minimum amount of space, is easy to transport (including in vehicles), and confines waste products of a pet to avoid leakage.

ANDERS 00698

5,960,744

3

Another aspect of the present invention relates to facilitating house-training a pet.

Another aspect of the invention allows owners of multiple pets to purchase only one cage which accommodates to the appropriate size and shape for each individual pet without having to purchase multiple cage units.

An additional aspect relates to facilitating the grooming of a pet.

To the accomplishment of the foregoing and related ends, the invention, then, comprises the features hereinafter fully described in the specification and particularly pointed out in the claims, the following description and the annexed drawings setting forth in detail a certain illustrative embodiment of the invention, this being indicative, however, of but one of the various ways in which the principles of the invention may be suitably employed.

Although the invention is shown and described with respect to one or more preferred embodiments, it is obvious that equivalents and modifications will occur to others skilled in the art upon the reading and understanding of the specification. The present invention includes all such equivalents and modifications, and is limited only by the scope of the claims.

BRIEF DESCRIPTION OF THE DRAWINGS

In the annexed drawings:

FIG. 1 is an isometric illustration of a pet cage in accordance with the invention;

FIG. 2 is an enlarged, fragmentary section view of the slide interconnect assembly of the cage of FIG. 1;

FIG. 3. is an enlarged, fragmentary section view of an alternate slide interconnect assembly that employs teeth;

FIG. 4 is a fragmentary section view of a seal at the bottom of the cage, such illustration being exemplary, and the seal being similar along parts of the sides of the cage;

FIG. 5 is a top view of the cage;

FIG. 6 is a side view of the cage; and

FIG. 7 is a front view of the cage.

DESCRIPTION OF THE INVENTION

Referring to the drawings, wherein like reference numerals designate like parts in the several figures, and initially to FIG. 1, a size-adjustable pet cage in accordance with the present invention is generally indicated at 10. The cage 10 is described herein with respect to use with a pet dog animal. However, it will be appreciated that the features of the invention may be used with other animals to provide a cage therefor along with the various functions described herein.

The cage 10 includes a pair of compartments or housing portions 11, 12 which can be mounted in the manner illustrated in FIG. 1 in telescoping relation to each other to provide an interior composite volume 13 that can be adjusted in size depending on the telescoped position relationship of the two housing portions 11, 12. A door 14 can be opened to provide access to the interior volume 13 to place a dog therein, and the door can be swung closed on hinges 15 and secured closed by a conventional latch or lock mechanism 16 to prevent the dog from exiting the cage 10. Windows 17 in one or more of the walls of the cage 10 provide ventilation to the interior volume, and the door 14 may be of spaced wire or mesh design to provide ventilation, too. The door 14 and windows 17 also permit light to enter the interior volume 13 and also permit viewing of the pet inside the cage.

4

A slide interconnect assembly 20 guides the two compartment or housing parts 11, 12 as they are moved in telescoping relation to each other to enlarge or to reduce the size of the interior composite volume or compartment 13 of the cage 10.

In using the cage 10, the compartment portions 11, 12 are adjusted in telescoping relation to a desired size of the interior volume 13 for a particular dog. The door 14 is opened and the dog is placed inside the cage. The door 14 is closed and the latch 16 is secured. The dog can be released from the cage 10 by unlocking the latch 16 and opening the door 14. In adjusting the size of the volume 13, a user would take into consideration the size of the dog and the uses of the cage 10. For example, if the dog were mature, of relatively large size, and house-trained, and the cage were not intended to be transported, the cage could be adjusted to relatively large size to accommodate the dog and to permit space for the dog to move about in the cage. However, if the cage and dog were to be transported, then the size may be adjusted to one suitable to accommodate the dog but to minimize movement; therefore, during transporting, there would not be space for the dog to slide,or to be josiled in the cage and the possibility of injury can be reduced. If the dog were immature and not house-trained, such as a relatively young puppy, the cage may be adjusted to relatively small size. The small size limits the space available for the puppy to move in the cage and minimizes the likelihood that the puppy would excrete waste in the cage, for instinct causes the puppy to avoid excreting waste in space usually occupied by the puppy.

With the above in mind, then, the invention relates to a method of confining a pet for travel safety including the steps of placing a pet in the size-adjustable cage 10 and adjusting the size of the cage to limit undesirable movement of the pet therein so that the cage provides support to avoid accidental injury caused by jostling, movement, sliding, etc. of the pet in the cage during travel motion as the cage is transported from one location to another. The transporting can be by hand, in a vehicle, such as an aircraft, boat or automobile, or the cage and animal may be moved in any way from one place to another. The order in which the steps are carried out, for example, whether the pet first is placed in the cage and then the cage is adjusted in size or the size adjustment first is made and the pet then is placed inside, ordinarily would not be critical. The cage 10 will conform to airline standards in terms of size and durability. The cage provides added safety for pets who travel in the baggage compartment of commercial aircraft because jostling of the pet is nearly eliminated.

For house training a pet, the cage 10 of the invention may be used by adjusting the size of the cage to confine the pet to a volume that does not permit bodily excretion at a separate area other than that actually or primarily occupied by the pet. The pet is placed in the size-adjustable cage. The natural instinct of the pet resists excreting in the volume of confinement in the cage. Therefore, the various walls of the cage themselves provide the desired containment for the pet, and it is unnecessary to use other means, such as pillows, cardboard, wood, etc., in the cage to block the pet from gaining access to other space in the cage. Preferably sufficient sealing of the cage is provided to prevent leakage of excrement from the cage, as is described further below, and this seal function or waterproofing tends to prevent leakage of waste, contains the waste in the cage, and provides another incentive for the pet to avoid excreting waste in the cage itself. If desired, as the pet becomes house-trained, a reward can be provided by enlarging the cage providing additional free space for the pet therein.

ANDERS 00005

5,960,744

The size-adjustable cage 10 of the invention also may be used in carrying out a method of grooming a pet. During the grooming process the fur of the pet usually is wetted, e.g., shampooed, and eventually has to be dried. An appliance is used to blow air on the pet to speed the drying process. However, frequently the pet tries to move away from the air blowing appliance, which increases the difficulty of grooming the pet and also delays the drying process. An aspect of the invention relates to a method of grooming a pet wherein the pet is placed in a size-adjustable cage and the size of the cage is adjusted to accommodate the pet to limit movement in the cage. An airflow may be directed into the cage to dry the pet. The airflow may enter from one or more windows 17, from the door 14, and/or from other access openings (not shown). The cage preferably is adjusted to a size to prevent the animal from turning in the cage, and, therefore, airflow can be directed to the animal from respective locations to achieve the desired drying effect in an efficient manner. Various connections also made be provided to the cage to facilitate directing airflow to the animal in the cage.

In the grooming method of the invention, the order of carrying out the steps of placing the pet in the cage and adjusting the size of the cage can be varied, as may be desired. An advantage to adjusting the size of the cage before placing the animal in the cage is that the desired positioning of the animal in the cage, e.g., the direction the animal is facing, usually can be carried out more easily than if the animal first were placed in the cage and the size later were adjusted. Furthermore, by minimizing the size of the cage to accommodate the animal in reasonable comfort but to avoid the animal moving about in the cage, the animal will tend not to excrete waste in the cage during the drying process, as was described above.

The two compartment housing portions 11, 12 may be fabricated from a highly durable, low weight, waterproof material, such as a plastic, a copolymer, etc. The housing portions 11, 12 may be fabricated by plastic molding technique, such as injection molding, blow molding, etc.; or they may be made by some other technique. Also, if desired the housing portions 11, 12 may be made of a material other than plastic or copolymer. Such material may be metal, wood, etc. Each compartment housing portions 11, 12 may be a separate integrally formed structure. For example, the compartment housing portion 11 may be molded as a single piece, and the compartment housing portion 12 may be molded as a single piece. The windows 17 may be integrally molded as part of the respective housing portion 11, 12, for example, being a grid work of plastic ribs 17a. Alternatively, the windows may be openings in one or more walls of the respective housing portion, and, if desired, one or more of those openings may be covered by a grid work, screen mesh, or the like to provide light and ventilation to the interior volume 13 of the cage 10 while preventing an animal from escaping or extending part of its body out of the window.

One or both of the component housing portions 11, 12 may be formed as multiple parts. Such multiple part construction is shown in the detail of FIG. 2 and also is seen in FIGS. 1 and 5–7. Specifically, as is seen in FIG. 2 together with FIG. 1, the component housing portion 11 has top and bottom housing parts 11t and 11b; and the component housing portion 12 is formed of respective top and bottom housing parts 12t, 12b. The top and bottom housing parts 11t, 11b of the component housing portion 11 may be secured together to form a structure like that shown in FIG. 1, for example. The method of fastening these parts together includes the use of an angle bracket slide member 21, which is fastened to flanges 22t, 22b (composite flange 22) of the

top and bottom housing parts 11t, 11b by screw fasteners or some other fastener means 23. The angle member 21 may extend along the entire length of the flanges 22t, 22b on both sides left and right 10L, 10R (FIGS. 4 and 6) of the component housing portion 11. Additionally, the flanges 22t, 22b may extend around the back 24b of the component housing portion 11 and be secured together by an angle member 21 in the manner just described. If desired, the angle member 21 may extend less than the entire distance of a pair of confronting flanges, such as those designated 22t, 22b in which case a small gap may be provided between otherwise adjacent angle members providing additional space for ventilation, light, etc. to enter the interior composite volume 13 of the cage 10. As a further alternative, the top and bottom housing parts 11t, 11b may be fastened at respective flanges 22t, 22b by means other than the angle member 21 or the two housing parts may be molded as a single integral unit, and in either case an angle member 21 may be located only at the forward end 24f thereof inserted to provide a reinforcement and slide surface against which the flange 25 of the composite housing 12 may rub or slide in a fairly accurately controlled positioning manner while also avoiding damage to confronting plastic surfaces of flanges.

As was mentioned above, the component housing portion 12 may be made of a single integral part or it may be formed of plural parts, such as those designated 12t, 12b, which are joined at a connection of flanges 25t, 25b(composite flange 25) seen more clearly in FIG. 2. The flanges 25t, 25b may be secured by adhesive, rivets, screw fasteners, or by some other means along the two side walls of the cage 10, as is seen in FIG. 1. If desired, a portion of the flange 25 also may be extended across the front wall 26 of the housing portion 12, being arranged so as not to interfere with the ability of the door 14 to be opened and closed.

The slide interconnect assembly 20 includes the interfitting flanges 22, 25; the respective flanges 25 can fit within and slide within the space 30 provided by the flange 22 and, if used, angle member 21. Preferably the vertical height of the flange 25, as it is seen in FIG. 2, for example, and the vertical height of the space 30 are nearly identical to provide a relatively close fit allowing a smooth sliding between the respective component housing portions 11, 12 to effect telescoping thereof to enlarge or to reduce the interior composite volume 13 of the cage 10.

A size locking mechanism 31 can be used to fix the housing portions 11, 12 in desired telescoped position with respect to each other to provide a particular size volume 13 of the cage 10. The size locking mechanism 31 can be used to prevent further telescoping in one direction or the other of the housing parts 11, 12. An exemplary size locking mechanism 31 includes a plurality of openings 32 located at spaced apart positions in the flange 25 and a locking pin 33, which may be inserted through an opening 34 in the flange 22 to extend into one of the openings 32. When the pin 33 is in place in opening 34 and one of the openings 32, the pin prevents further sliding action along the slide interconnect assembly 20 and telescoping of the cage 10. There may be a slide locking mechanism 31 only on one of the flanges on one side of the cage 10. There may be a size locking mechanism 31 at the slide interconnect assembly on both sides of the cage 10. Also, although only a single pin 33 and opening 34 in the flange 22 is shown in FIG. 1 near the leading or front end of the flange 22, additional openings 34 may be provided in the flange 22 at respective locations along the length thereof to insert pins 33 for engaging respective openings 32. Thus, the size locking mechanism 31 may include a single pin 33 in a single flange 22, a

ANDERS 00640

5,960,744

**7**

separate pin 33 in each of the flanges 22 on opposite sides of the cage 10, or a plurality of pins 33 associated with one or with each of the respective flanges 22 and openings 32. To change cage size, the pin(s) 33 can be removed and the housing portions telescoped in one direction or the other.

Briefly referring to FIG. 3, primed reference numerals designate parts corresponding to those described above and designated by the same unprimed reference numerals, an alternate size locking mechanism 31' is shown in partial view. The size locking mechanism 31' includes a plurality of saw teeth like grooves 40 in the flange 25' and corresponding saw teeth like grooves 41 in the bottom flange 22b'. The teeth 40, 41 can mesh together and prevent the withdrawing out of the component housing portion 12 in opening telescoping fashion. However, by lifting the housing portion 12 up relative to the housing portion 11 a slight amount so as to disengage the teeth 40, 41, the housing portion 12 can be withdrawn from the housing portion 11. The teeth 40 may be located along substantially the entire length or a fairly extended length of the flange 25' of the housing portion 12. However, the teeth 41 may be located only near the forward end relative to the illustration of FIG. 1 of the housing portion 12 to provide a suitable locking function, while facilitating intentional disengaging of the teeth 40, 41 allowing for the housing portion 12 to be pulled out from the housing portion 11.

It will be appreciated that other types of size locking mechanisms may be used to secure the housing portions 11, 12 relative to each other so that after the size of the cage 10 has been adjusted, the size will be maintained until intentionally readjusted.

As is seen in FIG. 4, for example, the seal 43 is located between the bottom walls of the telescoping housing portions 11, 12 of the cage 10. The seal 43 includes a seal member 47, which cooperates with walls of the housing portions to tend to prevent liquid, excrement, dirt, or the like from exiting the cage 10. An exemplary seal member 47 is an elastomeric material; another exemplary seal member is a plastic or a Teflon-like material which can provide a sealing function while permitting the telescoping action of the two housing portions 11, 12. Other seal members or seal materials also may be used.

The seal member 47 is attached to the outside of the wall of the housing portion 12. Such attachment may be by adhesive material or by a fastener, such as a screw, rivet, etc. The seal member 47 is recessed from the leading edge 48 so it would not be damaged by the animal in the cage 10. The seal member 47 includes a wiper portion 48, which wipes against the inside of the wall of the housing portion 11. Preferably the attachment to the wall of the housing portion or compartment 12 and the wiping engagement against the wall of the housing portion or compartment 11 are sufficient to block fluid flow, such as urine or water, excrement, dirt, etc. from exiting or leaking from the cage at the area of the seal 43. If desired, the seal 47 may be attached to the wall of the housing portion 11 and wipe against the wall of the housing portion 12.

The weight of the housing portion 12 against the seal member 47, which has a suitable elasticity, causes a compression of the seal member between the housing portions 11, 12. The seal 43 is U-shape; it commences just below the slide interconnect assembly 20 on one side of the cage, traverses across the bottom of the cage, and ends in a just below the slide interconnect assembly 20 on the other side of the cage. Thus, the entire lower half of the cage including the sides below the sliding mechanism and the entire floor of the cage would be sealed, and fluids would thus be prevented from leaking out of the telescoping housing portion 11, 12 of the cage.

Preferably the slide interconnect assembly 20 for the cage 10 is located up above the bottom or floor area of the cage

**8**

10. Therefore, it is unlikely that waste product, gravel, dirt, etc. would enter the slide interconnect assembly and impede the telescoping of the respective component housing portions 11, 12 to adjust the size of the cage 10.

Also, if desired, the slide interconnect assembly 20 may be configured so that the flange 22r of the component housing portion 11 or the top of the angle member 21, as is seen in FIG. 2, for example, ordinarily is resiliently engaged with the top 42 of the flange 25 to urge the outside bottom wall of the housing portion 12 against the inside bottom wall of the housing portion 11 to maintain a relatively fluid-tight seal 43 either along the entire extent of confrontation between the bottom walls of the housing portions 11, 12 or at least at the leading edge 48 of the bottom wall of the housing portion 11 and the directly confronting bottom wall portion of the housing portion 12. Such fluid-tight seal tends to prevent excrement from leaking out of the cage 10.

Preferably the slide interconnect assembly 20 is located on both sides of the cage 10 to facilitate smooth sliding of one housing portion relative to the other when the cage is adjusted in size. Also, the slide interconnect assembly on both sides of the cage 10 helps to maintain its strength of the cage as compared to having a slide interconnect assembly only on one side. The U-shape channel member 21 also may be of a material which provides strength and/or reinforcement of the slide interconnect assembly 20 along the entire length of the slide interconnect assembly or at the end thereof adjacent the edge 43.

The housing portions 11, 12 may be molded or otherwise formed of relatively lightweight plastic material having suitable strength to avoid breakage when used and being able easily to be cleaned thoroughly. Additionally, by molding the windows 17 and possibly also the ribs 17a thereof as integral parts of the housing portions 11, 12, manufacturing is facilitated and weight is minimized. If a separate grid work is required at the windows, that grid work can be separately fastened over the openings forming the windows or, alternatively, such grid work may be molded into the body of the respective housing portion, for example, by insert molding techniques or other techniques.

The back 24b of the housing portion 11 is closed by a solid back wall; the front 26 of the housing portion 12 is closed by a wall and the door 14. If desired, other types of doors may be substituted for the door 14. Also, if desired, a door or some means other than a solid wall may be used to close the back 24b of the housing portion 11. Furthermore, although the cage 10 is shown with two housing portions 11, 12, it will be appreciated that the cage may include on or more additional housing portions or sections located between the two housing portions 11, 12 further increasing the size to the cage may be telescoped.

The various edges and junctions of the parts forming the cage 10, such as the illustrated component housing portions 11, 12 preferably are sufficiently beveled so as to avoid presenting sharp edges which could injure an animal or a person; and such smooth or beveled edges tend to reduce breakage. Furthermore, the junction between the housing portions 11, 12 may be beveled, for example, at the leading edge 48 in order to facilitate assembling the housing portions 11, 12 and the positioning of the seal member 47 with respect to the housing wall against which it slides.

Since the housing portions 11, 12 of the cage 10 are relatively strong and since there are no exposed bars or parts on which an animal inadvertently catch its teeth, nose or paws, injury to an animal contained in the cage is minimized. Also, since the cage can be reduced to a relatively minimum size, storage when not in use is facilitated.

Turning briefly to FIGS. 5–7, top, side and front views of the cage 10 are shown. In FIGS. 5 and 6 the housing portion

5,960,744

9

12 has been withdrawn to a maximum extension out from the housing portion 11 providing the largest size volume for the cage. As is seen in FIG. 5, for example, five of the openings 32 in the flanges 25 are visible, and a sixth opening 32 (not seen) is in alignment with the opening 34 and pin 33. A handle 50 is on the top wall 51 of the housing portion 11 to facilitate carrying the cage 10. If desired, a plurality of handles may be used to provide additional balance when carrying the cage 10; such handles may be spaced along the top wall 51 and an additional handle may be located in the front wall 26, above the door 14. Wheels 52 may be mounted in a conventional way to the bottom walls 53, 54 or sides of the respective housing portions 11, 12, as is seen in FIGS. 6 and 7. The wheels facilitate rolling the cage 10 along a surface. The latch 16 may be a conventional double bar latch that can be manipulated to lock or to unlock the door 14 when in close position.

The present invention provides an enclosure for animals of all sizes; the enclosure easily can be made larger or smaller. An exemplary cage in accordance with the invention can expand from as small as 24 inches in length to a length as long as 40 inches.

From the foregoing, then, it will be appreciated that the cage of the present invention may be used to hold animals of various sizes and can be adjusted in size to accommodate the growth of a single animal, to facilitate house training an animal, such as a puppy, and to facilitate drying an animal as part of a bathing and grooming procedure. The cage also facilitates transporting an animal while minimizing injury to the animal.

What is claimed is:

1. A pet cage for house training a pet, comprising:

a first compartment having an open end and a closeable end;

a second compartment having an open end and a closeable end, the second compartment adapted to telescopically engage with the first compartment;

an elastic seal member located between the first and second compartment, the elastic seal member forming a substantially liquid tight seal at the bottom area between the first and second compartment so as to prevent leakage of fluids and/or debris from the pet cage;

wherein the first compartment and second compartment are positionable relative to one another to effect a substantially water tight, expandable pet cage.

2. The pet cage of claim 1, wherein the open ends of the first and second compartments face each other.

3. The pet cage of claim 1, wherein the elastic seal member is substantially U-shaped.

4. The pet cage of claim 1, wherein the elastic seal member is situated at the bottom half of the pet cage.

5. The pet cage of claim 1, wherein the elastic seal member is compressed between overlapping portions of the first and second compartments to form a substantially liquid tight seal.

6. The pet cage of claim 1 further comprising a slide interconnect assembly to permit telescopic movement of the first and second compartments relative to one another.

7. The pet cage of claim 1, wherein a volume of the pet cage is increased by telescopically moving the first and second compartments away from each other.

8. The pet cage of claim 1, wherein a volume of the pet cage is decreased by telescopically moving the first and second compartments toward each other.

9. The pet cage of claim 1, wherein the first and second compartments are formed of lightweight plastic material.

10. The pet cage of claim 1, wherein at least one of the first and second compartment includes a window.

11. The pet cage of claim 1, wherein at least one of the first and second compartment includes a door.

10

12. A method of house training a pet, comprising the steps of:

placing the pet in a cage which includes:

a first compartment having an open end and a closeable end; a second compartment having an open end and a closeable end, the second compartment adapted to telescopically engage with the first compartment; an elastic seal member located at the bottom area between the first and second compartment, the elastic seal member forming a substantially liquid tight seal at the bottom area between the first and second compartments so as to prevent leakage of fluids and/or debris from the pet cage; wherein the first compartment and second compartment are positionable relative to one another to effect a substantially water tight, expandable pet cage; and

adjusting the size of the pet cage to a volume that does not permit bodily excretion at a separate area, thereby using the natural instinct of the pet to resist excreting in the pet cage.

13. The method of claim 12, further including the step of enlarging the volume of the pet cage as the pet grows.

14. A pet cage for house training a pet, comprising:

a first compartment having an open end and a closeable end;

a second compartment having two open ends, the second compartment adapted to telescopically engage with the first compartment;

a third compartment having an open end and a closeable end, the third compartment adapted to telescopically engage with the second compartment;

a first elastic seal member located at the bottom area between the first and second compartment, the elastic seal member forming a substantially liquid tight seal at the bottom area between the first and second compartment so as to prevent leakage of fluids and/or debris from the pet cage;

a second seal member located at the bottom area between the second and third compartment, the elastic seal member forming a substantially liquid tight seal at the bottom area between the first and second compartment so as to prevent leakage of fluids and/or debris from the pet cage

wherein the first compartment, second compartment and third compartment are positionable relative to one another to effect a substantially water tight, expandable pet cage.

15. The pet cage of claim 14, wherein the open ends of the first and third compartments face each other.

16. The pet cage of claim 14, wherein the first and second elastic seal members are substantially U-shaped.

17. The pet cage of claim 14, wherein the elastic seal members are situated at the bottom half of the pet cage.

18. The pet cage of claim 14, wherein the elastic seal members are compressed between overlapping portions of the first and second compartments and second and third compartments, respectively, to form substantially liquid tight seals.

19. The pet cage of claim 14 further comprising a slide interconnect assembly to permit telescopic movement of the first and second compartments and second and third compartments relative to one another, respectively.

20. The pet cage of claim 14, wherein a volume of the pet cage is increased by telescopically moving either or both of the first and third compartments away from the second compartment.

* * * * *

ANDERS 00642

# Exhibit 6



US005967090A

# United States Patent [19]

## Hui

[11] **Patent Number:** **5,967,090**

[45] **Date of Patent:** **Oct. 19, 1999**

[54] **PET CAGE**

[76] Inventor: **Cheng Chen Hui**, P.O. Box 453, Taichung, Taiwan

[21] Appl. No.: **08/995,351**

[22] Filed: **Dec. 22, 1997**

[51] Int. Cl.⁶ .......................... A01K 1/00; A01K 31/07

[52] U.S. Cl. ................................ 119/497; 119/453

[58] Field of Search ........................ 119/453, 496, 119/497

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

3,195,506  7/1965  Beard .......................... 119/496

| | | |
|---|---|---|
| 5,357,900 | 10/1994 | Ho .......................... 119/497 X |
| 5,669,331 | 9/1997 | Richmond .......................... 119/497 |

*Primary Examiner*—Robert P. Swiatek

[57] **ABSTRACT**

A pet cage consists of a cover, a base, two side plates, and end plate, and a door plate. The side plates are fastened between the base and the cover. The end plate is fastened with one end of the two side plates, whereas the door plate is fastened with another end of the two side plates. The pet cage can be disassembled to facilitate the shipping of the pet cage and made thinner for easy storage.

**1 Claim, 5 Drawing Sheets**





FIG.1



FIG.2

ANDERS 00645



FIG.3

ANDERS 00646



FIG.4



FIG.5

5,967,090

1

# PET CAGE

## FIELD OF THE INVENTION

The present invention relates generally to an animal cage, and more particularly to a pet cage.

## BACKGROUND OF THE INVENTION

The conventional pet cages are generally rather cumbersome such that they take up a relatively large storage space, and that they can not be shipped easily and economically. In addition, the conventional pet cages are generally devoid of a built-in device to facilitate the disposal of the pet waste.

## SUMMARY OF THE INVENTION

The primary objective of the present invention is to provide an improved pet cage free from the drawbacks of the conventional pet cages.

In keeping with the principle of the present invention, the foregoing objective of the present invention is attained by the improved pet cage consisting of a cover, a base, two longitudinal side plates, an end plate, and a door plate. The two longitudinal side plates are fastened between the base and the cover. The end plate is fastened with one end of the two longitudinal side plates, whereas the door plate is fastened with another end of the two longitudinal side plates. The longitudinal side plates are perforated to facilitate the circulating of air between the inside of the pet cage and the outside of the cage. The component parts of the pet cage are detachably assembled such that they can be separated for easy storage and shipment.

The foregoing objective, features, functions and advantages of the present invention will be more readily understood upon a thoughtful deliberation of the following detailed description of a preferred embodiment of the present invention with reference to the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a perspective view of the present invention.

FIG. 2 shows an exploded view of the present invention.

FIG. 3 shows a schematic view of the assembly of the present invention.

FIG. 4 shows a schematic view of the present invention.

FIG. 5 shows another schematic view of the present invention.

## DETAILED DESCRIPTION OF THE EMBODIMENT

As shown in all drawings provided herewith, a pet cage embodied in the present invention is composed of a cover 10, a base 20, two longitudinal side plates 30, a door plate 40, and an end plate 50.

The cover 10 is provided at the center of the upper side thereof with a recess 11 for mounting a handle 12, and at both ends thereof with a plurality of slender holes 13. The cover 10 has two arcuate ends 14. The cover 10 is further provided along the longitudinal margin of the upper side thereof with a plurality of dimples 15. The arcuate ends 14 are provided respectively in the inner wall thereof with a plurality of arresting columns 16, retaining hooks 18. The cover 10 is further provided with two retaining pieces 19 located at both ends of the cover 10.

The base 20 is provided with longitudinal sides 21, a plurality of arresting columns 22 and retaining hooks 23.

2

The longitudinal sides 21 are provided with a locating piece 24 and a plurality of protruded portions 25 engageable with the dimples 15 of the cover 10. Located between the locating piece 24 and the longitudinal sides 21 is a thin piece 26. The longitudinal sides 21 are provided with the dimples 27, a high arresting piece 28, a low arresting piece 29,and a plurality of cross tubes 281 and 291.

The perforated side plates 30 are composed of two long plates 33 connected with each other by means of a thin piece 32. The side plates 30 are provided with two frame sides 33 each having a retaining piece 34. Each side plate 30 is provided respectively at the top edge thereof and the bottom edge thereof with a long retaining piece 35 connected with the side plate 30 by a thin piece 36. The long retaining piece 35 is provided with a longitudinal hole 37 corresponding in location to the arresting columns 16 and 22, a cross hole 38 corresponding in location to the retaining hooks 18 and 23, and a long hook piece 39. The cross hole 38 is engaged with the retaining hooks 18 and 23.

The door plate 40 is formed of a door frame 41 and a door piece 40. The door frame 41 has two side frames 411 provided with a retaining piece 42 corresponding in location to the retaining piece 34. The door frame 41 has a top frame 412 provided with a locating hook 43 corresponding in location to the slender hole 13 of the cover 10 and having two slits 431. The door frame 41 further has a bottom frame 413 provided with a cross tubular body 44 corresponding in location to the cross tube 291 of the base 20. A pin 45 is engaged with the cross tubular body 44 and the cross tube 291. One of the two side frames 411 of the door frame 41 is provided with a longitudinal tubular body 46. The door frame 41 has a slotted side 47.

The end plate 50 is provided with two longitudinal holes 51 corresponding in location to the retaining piece 34 of the side plate 30, a locating hook 52 corresponding in location to the slender hole 13 of the cover 10, a slit 53, a cross tubular body 54 corresponding in location to the cross tube 281 of the base 20. The cross tubular body 54 and the cross tube 281 are engaged with a pin 55.

The cover 10, the base 20, two side plates 30, the door plate 40 and the end plate 50 are detachably assembled such that the long retaining piece 35 is located between the arresting column 22 and the longitudinal side 21 is engaged with the cross hole 38 of the long retaining piece 35, and further that the door frame 41 and the door plate 40 are fastened pivotally with both ends of the base 20, and still further that the end plate 50 is fastened with another end of the base 20, and still further that the retaining pieces 34 of the frame sides 33 are engaged respectively with the longitudinal holes 42 and 51. The cover 10 is joined with the top edges of the two side plates 30, the door plate 40 and the end plate 50 such that the long retaining pieces 35 of the side plates 30 are located respectively between the arresting columns 16 and the arcuate ends 14 of the cover 10, and that the retaining hook 18 is engaged with the cross hole 38 of the long hook piece 39, and further that the locating hooks 43 and 52 are engaged with the slender hole 13 of the cover 10.

The pet cage of the present invention can be washed with water or the cleaning solution. The cover 10 must be first disengaged with the side plates 30 so as to facilitate the washing of the interior of the pet cage. By using a hand tool, the locating hooks 43 and 52 are pressed such that they become disengaged with the cover 10, which can be then lifted slightly to move away from the top edges of the side plates 30.

5,967,090

3

As illustrated in FIGS. 4 and 5, the pet cage of the present invention can be made compact to facilitate the storing and the shipping of the pet cage. The door frame 41 and the end plate 50 are first disengaged with the cover 10 by pressing the locating hooks 43 and 52. The door frame 41 and the door plate 40 are pushed toward the base 20 before the end plate 50 is pushed toward the base 20. The side plates 30 are then pushed toward each other, as illustrated in FIG. 4, before the cover 10 is joined with the base 20. The locating pieces 24 are lifted such that the protruded portions 25 are located in the dimples 15 of the cover 10. As a result, the pet cage of the present invention is made thinner, as shown in FIG. 5.

What is claimed is:

1. A pet cage comprising:

a cover provided at a center of an upper side thereof with a handle fastened therewith, a plurality of slender holes, two arcuate ends, a plurality of dimples, and two retaining pieces located at both ends thereof, said arcuate ends provided in an inner wall thereof with a plurality of arresting columns and retaining hooks;

a base provided with two longitudinal sides, a plurality of arresting columns and retaining hooks, said longitudinal sides provided with two frame sides each having a retaining piece, and two long retaining pieces each having a longitudinal hole corresponding in location to said arresting columns of said cover and said base, a cross hole corresponding in location to said retaining hooks of said cover and said base, and a long hook piece;

two perforated side plates each having two long plates connected with each other by a thin piece, said side plates provided with two frame sides each having a retaining piece, and two long retaining pieces each having a longitudinal hole corresponding in location to said arresting columns of said cover and said base, a cross hole corresponding in location to said retaining hooks of said cover and said base, and a long hook piece;

4

a door plate formed of a door frame and a door piece, said door frame having two side frames provided with a longitudinal hole corresponding in location to said retaining piece of said frame sides of said side plates, said door frame further having a top frame provided with a locating hook corresponding in location to said slender hold of said cover and having two slits, said door frame still further having a bottom frame provided with a cross tubular body corresponding in location to said cross tube of said base, one of said two side frames of said door frame provided with a longitudinal tubular body; and

an end plate provided with two longitudinal holes corresponding in location to said retaining piece of said side plate, a locating hook corresponding in location to said cross tube of side base;

said cover, said base, said side plates, said door plate and said end plate being detachably assembled such that said side plates are mounted on said base, and that said cover is joined with top edges of said side plates, and further that said door plate is fastened pivotally at one end of each of said side plates, and still further that said end plate is fastened with another end of each of said side plates, and still further that said long retaining pieces of said side plates are located between said arresting columns of said base and said longitudinal side of said base, and still further that a retaining hook is engaged with said cross hole of a long retaining piece of said side plates, and still further that said door frame and said door plate are fastened pivotally with both ends of said base, and still further that said retaining pieces of said frame sides are engaged respectively with said longitudinal holes of said door plate and said end plate.

* * * * *

# Exhibit 7



US00D427730S

# United States Patent [19]

Powers et al.

[11] Patent Number: **Des. 427,730**

[45] Date of Patent: ** **Jul. 4, 2000**

[54] **ANIMAL CRATE**

[76] Inventors: **E. Michael Powers**, 59 Racine St., Suite 102, Menasha, Wis. 54952; **Trygve M. Pederson; Chester Beavers**, both of 3580 Holly La. North, Suite 10, Plymouth, Minn. 55446; **W. Robert Worrell**, 148 Interlachen Rd., Hopkins, Minn. 55343; **William Johnson**, 8147 Copland Way, East Inver Grove Heights, Minn. 55076; **Thomas A. Tedham**, 17051 Hanover La., Eden Prairie, Minn. 55347

[**] Term: **14 Years**

[21] Appl. No.: **29/083,672**

[22] Filed: **Feb. 19, 1998**

[51] LOC (7) Cl. ............................................ **30-02**

[52] U.S. Cl. ............................................ **D30/114**

[58] Field of Search .................... D30/108–109, D30/114, 116; 119/452–453, 461, 474, 455, 482, 491, 497–498, 502, 504, 513–514

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D. 376,874 | 12/1996 | Reyes, III | D30/114 |
| D. 382,374 | 8/1997 | Burks | D30/116 |
| 1,005,886 | 10/1911 | Ruff | 119/491 |
| 1,170,794 | 2/1916 | Barnes | 119/513 |
| 2,121,658 | 6/1938 | Genret | 119/474 |
| 3,087,459 | 4/1963 | Dirck | 119/455 |
| 4,256,056 | 3/1981 | Sou . | |
| 4,763,606 | 8/1988 | Ondrasik, II | 119/474 |
| 4,901,672 | 2/1990 | Rosenberger . | |
| 4,917,047 | 4/1990 | Wazeter, III . | |
| 5,036,795 | 8/1991 | Houghton . | |
| 5,452,681 | 9/1995 | Ho | 119/498 |
| 5,462,015 | 10/1995 | Murphy . | |
| 5,467,734 | 11/1995 | Ho . | |
| 5,653,194 | 8/1997 | Guy | 119/453 |

Primary Examiner—Cathy Anne MacCormac

Attorney, Agent, or Firm—Fredrikson & Byron, P.A.

[57] **CLAIM**

We claim the ornamental design for a animal crate, as shown.

**DESCRIPTION**

FIG. 1 is a perspective view of the animal crate of the invention;

FIG. 2 is a right side elevational view thereof, the left side being a mirror image;

FIG. 3 is a front view thereof;

FIG. 4 is a rear view thereof;

FIG. 5 is a top, plan view thereof; and,

FIG. 6 is a bottom plan view thereof.

1 Claim, 6 Drawing Sheets



**U.S. Patent**    Jul. 4, 2000    Sheet 1 of 6    **Des. 427,730**



**FIG.1**



**FIG.2**

**U.S. Patent**      Jul. 4, 2000      Sheet 3 of 6      **Des. 427,730**



# FIG.3



# FIG.4



**FIG.5**

Case 3:06-cv-00901-WKW-WC    Document 60-11    Filed 07/29/2008    Page 8 of 8



**FIG.6**

# Exhibit 8



US006354245B1

(12) **United States Patent**
Roddy et al.

(10) Patent No.:     **US 6,354,245 B1**
(45) Date of Patent:     **Mar. 12, 2002**

(54) **INFLATABLE PET CAGE**

(76) Inventors: **Kathleen K. Roddy; John F. Roddy**, both of 421 Gibbons St., Alexandria, VA (US) 22314

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/558,290**

(22) Filed: **Apr. 25, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/132,209, filed on May 3, 1999.

(51) Int. Cl.[7] .......................... A01K 31/07; A01K 1/02; E04B 1/34

(52) U.S. Cl. .......................... 119/453; 119/482; 52/2.22

(58) Field of Search .................................. 119/453, 474, 119/482, 496, 497, 498, 499; 52/2.11, 2.22; 5/706, 710; 446/220, 225

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,538,778 A    1/1951    Halpin

| | | | | |
|---|---|---|---|---|
| 2,830,606 A | * | 4/1958 | Daughtery | 119/498 |
| 3,982,500 A | * | 9/1976 | Marlatt | 119/482 |
| 4,893,586 A | * | 1/1990 | Carson | 119/482 |
| 5,007,212 A | | 4/1991 | Fritts et al. | |
| 5,078,096 A | | 1/1992 | Bishop et al. | |
| 5,487,400 A | | 1/1996 | Dawkins | |
| 5,636,478 A | | 6/1997 | Chea | |
| 5,660,197 A | | 8/1997 | Boe et al. | |
| 5,671,698 A | | 9/1997 | Farrugia | |
| 5,761,852 A | | 6/1998 | Liu | |
| 5,813,172 A | * | 10/1998 | McNally | 52/2.22 |
| 5,967,090 A | * | 10/1999 | Hui | 119/453 |
| 5,970,661 A | * | 10/1999 | Bishop et al. | 52/2.22 |

* cited by examiner

Primary Examiner—Charles T. Jordan
Assistant Examiner—Elizabeth Shaw
(74) Attorney, Agent, or Firm—Randall J. Knuth

(57)    **ABSTRACT**

An inflatable pet cage, including a top member, a bottom member, and a plurality of inflatable wall members. The wall members have interior sides and exterior sides, with one of the inflatable wall members forming an entrance member.

**8 Claims, 4 Drawing Sheets**





Fig. 1



Fig. 2

**U.S. Patent**    Mar. 12, 2002    Sheet 3 of 4    US 6,354,245 B1



Fig. 3



Fig. 4



*Fig. 5*

US 6,354,245 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## INFLATABLE PET CAGE

This Application claims benefit to Provisional Application No. 60/132,209 filed May 3, 1999.

### BACKGROUND OF THE INVENTION

#### 1. Field of the Invention

The present invention relates to pet cages and more particularly to an inflatable pet cage which includes side walls which conform to the shape of their surroundings.

#### 2. Description of the Related Art

Pet cages and carriers of various size and shape exist. A common example is the pet transport cages which are used by common carriers such as airlines. These pet transport containers are generally rectangular in shape and are usually formed from rigid plastic. These pet carriers/cages are generally formed of two parts, a top and a bottom, which may be separated about the middle circumference. The two parts of these carriers are fastened together by fastening devices at intervals about their periphery. The door of the carriers is normally made of rigid wire crossed bars and the sides and/or rear walls may have openings with crossed bars for ventilation. These carriers are designed to provide protection for the pet and to prevent any damage to the carrier and consequently the pet contained therein. These carriers may include a carrying handle. Owing to their rigid construction, these containers cannot conform to different surroundings and occupy a large space.

Other currently existing carriers include designs which appear as large utility or tote bags. These pet carriers are formed from light weight material attached to a rigid frame structure. The rigid frame structure of these containers prevents these containers from conforming to their surroundings. Additionally, the light weight material used in forming these carriers does not provide much comfort or protection to the animal contained within.

Additional pet carriers/cages known in the art include many collapsible type pet carriers/cages which have rigid walls which are collapsible. Pet cages of this type are bulky and heavy to carry. Owing to their rigid construction, these containers cannot conform to different surroundings and occupy a large space.

What is needed in the art is a collapsible pet cage/carrier which is light weight and easy to transport, which can conform to different surroundings and which provides adequate protection and comfort to a pet.

### SUMMARY OF THE INVENTION

The present invention is directed to improve upon the aforementioned pet cage/carriers wherein it is desired to provide a pet cage which is collapsible, is light weight and easy to carry, which can conform to different surroundings and which provides comfort and protection to a pet.

The present invention comprises a pet cage which is formed from inflatable walls.

The inflatable pet cage includes a housing having rigid top and bottom panels attached to inflatable side panels. The top and bottom panels allow the housing to be stable when the cage is inflated and in use and provide for protection and encapsulation of the side panels when the cage is deflated to form a "suitcase" configuration. Handles are provided on one side of the top and bottom panel for carrying purposes.

The side panels are inflatable, readily allowing the suitcase to be passed through a smaller opening such as a car door or in between seats prior to inflating the cage to its full

dimensions. The sides of the cage are comprised of baffled inflatable compartments protected by an overlay of protective fabric to prevent puncture. The flexible sides also allow the cage to conform to cramped spaces in which a rigid shape would not fit. When compressed into its suitcase configuration the cage can be easily stored and transported.

Light and ventilation are provided by wire mesh panels encapsulated in the upper portions of the cage sides. Access is provided through a zipping flap on one end. The cage can be secured inside a car by passing the seat belts through the restraining loops in the cage's side and bottom and anchoring them. The cage is inflated through an air valve on either end. The cage is deflated by opening the air valves, allowing some air to escape, interlocking the hinges on the side opposite the handles, and compressing the cage. This forces the air out as a bellows would and allows the top to be secured by latches passing through the restraining loops. The cage then resembles a suitcase and can be stored or carried as such.

The invention, in one form thereof, comprises an inflatable pet cage which includes a top member, a bottom member and a plurality of inflatable wall members. The inflatable wall members have interior sides and exterior sides, and a plurality of sections of protected fabric may be provided to cover the interior sides of these wall members. The protective fabric utilized is a material which is light weight and which is not susceptible to puncture.

The invention, in another form thereof, comprises an inflatable pet cage. In this form, the inflatable pet cage includes a top member which is rigid in construction and which has a first side and a second side. The inflatable pet cage further includes a bottom member which is rigid in construction and which has a first side and a second side. In one form of the invention, the inflatable pet cage includes an interlocking hinge member which includes a first interlocking member and a complementary interlocking hinge member. The first interlocking hinge member and the complementary interlocking hinge member are selectively rotatably engagable. The first interlocking hinge member is affixed to the first side of the top member and the complementary interlocking hinge member is affixed to the first side of the bottom member.

In one form of the current invention, the inflatable pet cage includes a pair of carrying handles. One of the pair of carrying handles is affixed to the second side of the top member while the other of the pair of carrying handles is affixed to the second side of the bottom member. The inflatable pet cage of the current invention further includes an end member which is selectively inflatable and selectively collapsible. The end member includes baffles which assist in the inflation of the end member. The end member is fixedly attached to the top member and to the bottom member. The inflatable pet cage further includes a pair of side members which are selectively inflatable and selectively collapsible. The side members also include baffles which assist in the inflation of the side members. The side members are fixedly attached to the top member and to the bottom member.

In one form of the current invention, a first air valve is connected to the end member. The first air valve is in fluid communication with the end member baffles and the side member baffles. The first air valve is selectively actuatable between an open and a closed position.

The inflatable pet cage of the current invention further includes an entrance member which is selectively inflatable and selectively collapsible. The entrance member includes

US 6,354,245 B1

3

baffles which assist in the inflation of the entrance member and which are in fluid communication with the first air valve. The entrance member is fixedly attached to the top member and to the bottom member. The entrance member has a hole which defines an entrance passage.

In one form of the current invention, a second air valve is provided which is connected to the entrance member. The entrance member baffles, end member baffles and side member baffles are all in fluid communication with the second air valve. The second air valve is selectively actuatable between an open and a closed position.

The inflatable pet cage of the current invention further includes an entry flap formed from a protective fabric, which entry flap has a base. The entry flap base is fixedly attached to the entrance passage. The protective fabric which forms the entry flap is a fabric material which resists puncture. A zipper is attached to the entry flap and to the entrance member, whereby closing the zipper closes the hole which forms the entrance passage.

In one form of the current invention, a wire mesh window is provided. The wire mesh window may be disposed within either of the pair of side members which form the inflatable pet cage.

An advantage of the present invention is the ability to provide a pet cage which is small, light weight and portable, and which can conform to cramped spaces in which the cage may be placed.

Another advantage of the present invention is the ability to provide a small, light weight and collapsible pet cage which provides protection and comfort to the pet by utilizing inflatable walls which are not susceptible to puncture.

BRIEF DESCRIPTION OF THE DRAWINGS

The above-mentioned and other features and advantages of this invention, and the manner of attaining them, will become more apparent and the invention will be better understood by reference to the following description of an embodiment of the invention taken in conjunction with the accompanying drawings, wherein:

FIG. 1 is a perspective view of the inflatable pet cage of the current invention;

FIG. 2 is a perspective view of the inflatable pet cage of the current invention in a partially collapsed position in which the interlocking hinges are not engaged;

FIG. 3 is an end elevational view of the inflatable pet cage of the current invention;

FIG. 4 is a perspective view of the inflatable pet cage of the current invention in its collapsed form; and

FIG. 5 is an end elevational view of the inflatable pet cage of the current invention shown installed in the back seat of a car.

Corresponding reference characters indicate corresponding parts throughout the several views. The exemplification set out herein illustrates one preferred embodiment of the invention, in one form, and such exemplification is not to be construed as limiting the scope of the invention in any manner.

DETAILED DESCRIPTION OF THE INVENTION

Referring now to the drawings and particularly to FIG. 1, there is shown an inflatable pet cage 10. Inflatable pet cage 10 includes rigid top and bottom members 12, 14 and side members 16. Side members 16 are selectively inflatable.

4

FIG. 2 illustrates inflatable pet cage 10 in a partially collapsed position. As illustrated, the walls of inflatable pet cage 10 have fold lines to ease the transition from the inflated position of the pet cage to the deflated position.

As illustrated in FIG. 3, a first interlocking hinge member is affixed to an end of top member 12. A complementary interlocking hinge member is affixed to bottom member 14. The first interlocking hinge member and the complementary interlocking hinge member are selectively rotatably engagable to form interlocking hinge member 18. In this way, interlocking hinge member 18 can be rotatably engaged and the opposing ends of top member 12 and bottom member 14 may be brought together in an effort to expel the air from the inflatable walls of inflatable pet cage 10. FIG. 4 illustrates inflatable pet cage 10 in its fully closed position.

Referring now to FIG. 1, air valve 22 is connected to entrance member 24 and is in fluid communication with interior baffles which form a part of entrance member 24, side members 16, and the end member (not shown). As illustrated, entrance member 24 includes a hole which forms entrance passage 26. Entry flap 28 has a base which is fixedly attached to entrance member 24. Wire mesh window 32 is disposed within side member 16. Carrying handles 20 are affixed to both top member 12 and bottom member 14 and allow for ease in carrying the inflatable pet cage in its collapsed configuration. Closure latches 36 may be actuated to engage seat belt retaining loops 34 and retain inflatable pet cage 10 in its closed position upon deflation of the inflatable walls. Seat belt retaining loops 34 additionally may be utilized to anchor inflatable pet cage 10 in the seat of an automobile.

As illustrated in FIG. 5, inflatable pet cage 10 may be placed in an automobile back seat and inflated. Since inflatable side members 16 are not rigid, they will conform to the configuration of the seat in which inflatable pet cage 10 is placed. Zipper 30 may then be actuated to allow entry flap 28 to be moved and access to entrance passage 26 obtained. The inflatable pet cage may be easily loaded into a vehicle prior to inflation, anchored to the seat utilizing seat belt retaining loops 34, and be subsequently inflated. In this way, inflatable pet cage 10 can provide a safe and comfortable environment for a pet during travel while eliminating pet mess in the automobile.

While this invention has been described as having a preferred design, the present invention can be further modified within the spirit and scope of this disclosure. This application is therefore intended to cover any variations, uses, or adaptations of the invention using its general principles. Further, this application is intended to cover such departures from the present disclosure as come within known or customary practice in the art to which this invention pertains and which fall within the limits of the appended claims.

What is claimed is:

1. An inflatable pet cage, comprising:
    a rigid top member;
    a rigid bottom member; and
    a plurality of inflatable wall members, said wall members having interior sides and exterior sides, said wall member permanently attached to said top and bottom members one of said plurality of inflatable wall members forming an entrance member, said wall members storable between said top and bottom members.

2. The inflatable pet cage as recited in claim 1, further comprising:
    a plurality of sections of protective fabric, said sections of protective fabric covering said interior sides of said

ANDERS 00664

US 6,354,245 B1

5

wall members, wherein said protective fabric is not susceptible to puncture.

3. The pet cage of claim 1 further including a belt retaining loops for connection to automobile seatbelts.

4. An inflatable pet cage, comprising:

a top member, said top member being rigid in construction, said top member having a first side and a second side;

a bottom member, said bottom member being rigid in construction, said bottom member having a first side and a second side;

an interlocking hinge member, said interlocking hinge member comprising a first interlocking hinge member and a complementary interlocking hinge member, said first interlocking hinge member and said complementary interlocking hinge member being selectively rotatably engagable, said first interlocking hinge member affixed to said first side of said top member, said complementary interlocking hinge member affixed to said first side of said bottom member;

a pair of carrying handles, one of said pair of carrying handles affixed to said second side of said top member, the other of said pair of carrying handles affixed to said second side of said bottom member;

an end member, said end member being selectively inflatable, said end member being selectively collapsible, said end member including baffles which assist inflation of said end member, said end member fixedly attached to said top member, said end member fixedly attached to said bottom member;

a pair of side members, said side members being selectively inflatable, said side members being selectively collapsible, said side members including baffles which assist inflation of said side members, said side members fixedly attached to said top member, said side members fixedly attached to said bottom member;

a first air valve, said first air valve connected to said end member, said end member baffles and said side member baffles in fluid communication with said first air valve, said first air valve being selectively actuatable between an open and a closed position;

an entrance member, said entrance member being selectively inflatable, said entrance member being selectively collapsible, said entrance member including baffles which assist inflation of said entrance member, said entrance member baffles in fluid communication with said first air valve, said entrance member fixedly attached to said top member, said entrance member fixedly attached to said bottom member, said entrance member having an entrance passage;

6

a second air valve, said second air valve connected to said entrance member, said entrance member baffles, said end member baffles and said side member baffles in fluid communication with said second air valve, said second air valve being selectively actuatable between an open and a closed position;

an entry flap, said entry flap having a base, said entry flap base fixedly attached to said entrance passage, said entry flap formed from protective fabric, whereby said protective fabric resists puncture;

a zipper, said zipper attached to said entry flap and to said entrance member, whereby closing said zipper closes said entrance passage; and

a wire mesh window, said wire mesh window disposed within one of said pair of side members.

5. An inflatable pet cage comprising:

a rigid top member;

a rigid bottom member;

a plurality of inflatable wall members, said wall members having interior sides and exterior sides, one of said plurality of inflatable wall members forming an entrance member said wall member storable between said top and bottom members; and

an interlocking hinge member, said hinge member comprising a first interlocking hinge member and complementary interlocking hinge member, said first interlocking hinge member and said complementary interlocking hinge member being selectively rotatably engagable, said first interlocking hinge member affixed to said top member, said complementary interlocking hinge member affixed to said bottom member.

6. The pet cage of claim 5 further including a belt retaining loops for connection to automobile seatbelts.

7. An inflatable pet cage comprising:

a rigid top member;

a rigid bottom member;

a plurality of inflatable wall members, said wall members having interior sides and exterior sides, one of said plurality of inflatable wall members forming an entrance member said wall member storable between said top and bottom members; and

said plurality of inflatable wall members together creating a sealable escape-proof enclosure.

8. The pet cage of claim 7 further including a belt retaining loops for connection to automobile seatbelts.

* * * * *

# Exhibit 9





**DELUXE S.U.B. (SPORTS UTILITY BICYCLE)**
This custom tricycle is a grand
transportation alternative for marketing,
outings, carrying loads of stuff without fear
of toppling, and taking along a spare
passenger or two. Perfect for busy
summertime resorts (Parking? Traffic? No
problem!) Features front and rear bamboo
and rattan wrapped steel baskets; rear
basket is a roomy 23"Lx17"Wx10"D.
Adjustable seat and handlebars. Single
speed. (Shipped directly from manufacturer,
please allow 2-4 weeks for delivery.)
B2054  $610
Also available in single speed women's
bicycle (front basket only).
B2151  $450

8

**OUTDOOR PET BED**
Made especially for outdoor
use, this bed withstands
exposure to weather, resists
stains, sunlight and moisture.
Bead fill makes it virtually
impossible for parasites, fungus
and mildew to exist; will not
absorb and retain odors.
Covered in an open-weave,
synthetic fabric. Choose Green
Ivy or Black Leaf.
34"  A876A  $80
43"  A882A  $100
52"  A883A  $125
New Super Jumbo 52" x 71"
D1003  $175

**FLOWER POOCHES**
Large "Mom" and small
"Puppy" plant stands are made
of rustic metal with a natural
rusted patina. Includes terra
cotta pot.
Small, 12 1/2"H.  B2030  $39,
2 or more for $34 Each
Large, 25"H.  B2029  $89,
2 or more for  $79 Each



TOLL FREE
1•800•924•5050
www.inthecompanyofdogs.com

*Spring Preview 2001*



**PAW PRINT FURNITURE**
Constructed of solid cypress wood with doghouse and
paw print accents. Specify White or Celadon.
(Shipped directly from manufacturer, allow 4-6 weeks
for delivery.) Additional freight charges apply.
Chair, 33"L x 34"W x 44"H  B2056  $399
Accent Table, 22"L x 19"W x 21"H  B2058  $239
Loveseat, 59"Lx34"Wx44"H  B2057  $599

**SUSAN SARGENT 'GOOD DOG' PILLOW**
His/her just rewards — appliquéd "Good Dog"
artwork by creative artist Susan Sargent. 20" square.
100% cotton with fiberfill insert. USA  B2059  $79



# Exhibit D



US006997138B1

(12) **United States Patent**       (10) **Patent No.:**       **US 6,997,138 B1**
Simpson                              (45) **Date of Patent:**              **Feb. 14, 2006**

(54) **PET ENCLOSURE**

(76) Inventor: **Jeffrey M. Simpson**, 381 Oak Ridge Dr., Auburn, AL (US) 36830

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/612,589**

(22) Filed: **Jul. 2, 2003**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 29/160,054, filed on May 2, 2002, now Pat. No. Des. 483,156.

(60) Provisional application No. 60/394,181, filed on Jul. 3, 2002, provisional application No. 60/465,119, filed on Apr. 24, 2003.

(51) **Int. Cl.**
   *A01K 1/03*       (2006.01)

(52) **U.S. Cl.** ..................... **119/499**; 119/474; 119/496; 217/122; 232/1 B

(58) **Field of Classification Search** ............... 119/499, 119/498, 482, 501, 496, 462, 165, 452, 459, 119/461, 474, 481; 135/143, 149, 151; 217/122, 217/124, 42, 51, 68; D30/108; 220/493, 220/494; 52/343, 791.1; 232/1 B
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 318,812 A * | 5/1885 | Smith et al. | ................... 217/47 |
| 539,394 A * | 5/1895 | Poulson et al. | ............... 52/243 |
| 1,211,762 A | 1/1917 | Sawyer | |
| 2,247,598 A * | 7/1941 | Bohlen | ........................... 5/102 |
| 2,560,661 A | 7/1951 | Poovey | |
| 2,789,531 A | 4/1957 | Diefendorf | |
| 2,892,562 A | 6/1959 | Smithson | |
| 3,738,322 A | 6/1973 | Smith | |

| | | | |
|---|---|---|---|
| 3,774,929 A | 11/1973 | Stanley | |
| 3,978,616 A | 9/1976 | Pennock | |
| 4,170,312 A * | 10/1979 | Lloyd et al. | ............... 220/4.21 |
| 4,224,899 A | 9/1980 | Cruchelow et al. | |
| 4,256,056 A | 3/1981 | Sou | |
| D287,650 S | 1/1987 | Braeuner | |
| 4,696,259 A | 9/1987 | Fewox | |
| 4,762,085 A | 8/1988 | Ondrasik | |
| 4,989,546 A | 2/1991 | Cannaday | |
| 5,167,202 A | 12/1992 | Bradford et al. | |
| 5,203,281 A | 4/1993 | Harwich | |
| 5,282,542 A * | 2/1994 | Mo | ................................ 220/7 |
| 5,464,113 A * | 11/1995 | Ho et al. | ................... 220/9.2 |
| 5,469,807 A | 11/1995 | Kosmaczeska | |
| 5,626,098 A | 5/1997 | Askins et al. | |
| 5,649,500 A | 7/1997 | Klavemann et al. | |
| D382,374 S | 8/1997 | Burks | |
| 5,845,970 A | 12/1998 | Schwartz | |
| 5,890,455 A | 4/1999 | Donchey | |
| 5,931,326 A * | 8/1999 | Weng | ........................ 220/4.33 |
| 5,938,057 A * | 8/1999 | Cramer et al. | ............. 217/123 |
| 5,960,744 A | 10/1999 | Rutman | |

(Continued)

OTHER PUBLICATIONS

In the Company of Dogs, Spring Preview 2001—Catalog, Portland, Tennessee.

*Primary Examiner*—Robert P. Swiatek
(74) *Attorney, Agent, or Firm*—Gardner Groff, P.C.

(57)              **ABSTRACT**

A pet enclosure having a moisture and odor-resistant, plastic, rattan-like material woven onto a frame. The enclosure is foldably collapsible for compact storage and shipping, and is quickly and easily assembled with minimal or no tools. An elevated floor panel is securely but removably engaged to the framing of the enclosure. An access door pivots inwardly and outwardly, and can be latched in a closed position or an open position.

**17 Claims, 12 Drawing Sheets**



## US 6,997,138 B1
Page 2

**U.S. PATENT DOCUMENTS**

| | | |
|---|---|---|
| 5,967,090 A | 10/1999 | Hui |
| D427,730 S | 7/2000 | Powers et al. |
| D442,748 S | 5/2001 | Farrugia |

| | | | |
|---|---|---|---|
| 6,354,245 B1 | 3/2002 | Roddy et al. | |
| 6,601,723 B1 * | 8/2003 | Ziglar | 220/4.34 |
| 6,694,918 B1 * | 2/2004 | Draft | 119/453 |

* cited by examiner



*Fig. 1*





Fig. 4b

Fig. 4a

*Fig. 5a*



*Fig. 5b*



*Fig. 5c*

*Fig. 5d*





*Fig. 5e*

*Fig. 5f*



*Fig. 5g*



*Fig. 5h*



*Fig. 6*



Case 3:06-cv-00901-WKW-WC     Document 60-14     Filed 07/29/2008     Page 15 of 19



*Fig. 8a*

*Fig. 8b*

US 6,997,138 B1

1

# PET ENCLOSURE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of application Ser. No. 29/160,054, filed May 2, 2002, now U.S. Design Pat. No. D483156; and claims priority to U.S. Provisional Patent Application Ser. No. 60/394,181, filed Jul. 3, 2002, and to U.S. Provisional Patent Application Ser. No. 60/465, 119, filed Apr. 24, 2003. U.S. Design Pat. No. D483156, U.S. Provisional Patent Application Ser. No. 60/394,181, and U.S. Provisional Patent Application Ser. No. 60/465,119 are hereby incorporated herein by reference in their entireties for all purposes.

## TECHNICAL FIELD

The present invention relates generally to the field of pet products, and more particularly to enclosures for domestic pets. The invention also relates to pet enclosures that can be shipped and/or stored in a folded or disassembled state and which can be easily set up or assembled for use, and subsequently re-folded or disassembled for storage and/or transport.

## BACKGROUND OF THE INVENTION

Millions of households in the United States and throughout the world keep domesticated pets indoors. Allowing the animal to remain indoors reduces exposure to infectious diseases, territorial disputes with other neighborhood animals, and exposure to the harsher elements of weather, such as rain, snow, the cold of winter and the heat of summer. And, since an animal will not always be supervised as it undergoes various developmental stages such as teething and potty training, there often exists a need to enclose the animal when the owners are not present. Additionally, many veterinarians recommend having an enclosure for an animal that acts as a "safe place" that the animal may go even when the owners are home.

One common problem that has been found to exist with current pet enclosures is that they generally are not aesthetically pleasing or complimentary to the typical home decor. As a result, pet owners commonly hide the enclosure in areas not frequented by the family or guests. Often, however, it would be desirable to locate the enclosure in a more visible location, for example, for promoting the animal's usage of the enclosure while increasing human interaction with the pet.

Attempts have been made to provide pet enclosures that are more aesthetically appealing. Such past attempts have included the placement of veneering on the exterior of the enclosure to compliment the décor; however, this generally results in either poor ventilation for the animal, or the enclosure being too heavy and cumbersome to move conveniently. Another shortcoming of current pet enclosures is that they absorb and emit pet odors that can foul the smell of the entire house or apartment surroundings. For example, the inclusion of many materials such as wood and/or other natural materials, and/or natural or synthetic fabric into an enclosure can trap urine and other sources of unpleasant odors associated with animals. Attempts to reduce the absorption of odors have focused on fabricating the structure entirely of metal or other non-porous materials. This construction, however, typically results in an unattractive enclosure not complimenting to typical home décor, as discussed above.

2

Another shortcoming of many known enclosures is their lack of transportability. The construction of many enclosures often renders them too cumbersome to utilize on trips away from home. This may be caused by the amount of time and/or tools needed to set up and disassemble the enclosure, and/or the overall weight of the enclosure. Because of this inconvenience, many consumers are forced to purchase one enclosure for the house, and another less appealing, or less useful, but more easily portable enclosure for traveling.

Thus it can be seen that needs exist for improvements to pet enclosures to provide a more attractive appearance that matches a typical home decor, that does not absorb pet odors, and that is easily compacted for transport and/or storage outside the home.

## SUMMARY OF THE INVENTION

The present invention is an enclosure for pets. In example embodiments, the enclosure of the present invention is attractive and complementary to a variety of home decors. In further embodiments, the enclosure of the present invention is fabricated from materials that do not absorb moisture or odors, that resist damage and deterioration from moisture, mold, mildew and the like, and which is easily cleaned. In further embodiments, the enclosure of the present invention is assembled from panels that are collapsible or foldable for compact storage and shipping, and is easily assembled by one person without tools or with only minimal tools.

In one aspect, the present invention a pet enclosure comprising a substantially rigid frame and a moisture-resistant plastic stranded material woven onto said frame to present the appearance of a rattan or wicker material. Weaving the material into the frame allows the enclosure to be disassembled and compacted to a flat shape.

In another aspect, the invention is a frame comprising a resilient material and at least one recess for receiving and engaging cooperating elements of at least two panels for attaching the panels together.

In still another aspect, the invention is a pet enclosure including a frame formed of a substantially rigid, non-porous material; and a flexible, non-porous material woven onto the frame.

In another aspect, the invention is a pet enclosure including a plurality of panels, each panel having a substantially rigid frame and a plastic material having the appearance of natural rattan or wicker woven onto the frame.

In yet another aspect, the invention is a pet enclosure including an opening in which a door is pivotally mounted to swing both inwardly and outwardly, and further including a latch for securing the door in a closed position and in an open position.

In another aspect, the invention is a pet enclosure including a floor panel and a plurality of legs for supporting the floor panel a distance above an underlying support surface.

In still another embodiment, the invention is a pet enclosure including a frame and a removable floor panel, the floor panel having at least one channel for receiving a cooperating portion of the frame.

In another aspect, the invention is a pet enclosure including a base portion; a first side panel hingedly connected to the base portion; a second side panel hingedly connected to the base portion; a first end panel hingedly connected to the base portion; a second end panel hingedly connected to the base portion; and a top panel hingedly connected to at least one of the first and second side panels and/or at least one of the first and second end panels.

US 6,997,138 B1

**3**

These and other aspects, features and advantages of the invention will be understood with reference to the drawing figures and detailed description herein, and will be realized by means of the various elements and combinations particularly pointed out in the appended claims. It is to be understood that both the foregoing general description and the following brief description of the drawings and detailed description of the invention are exemplary and explanatory of preferred embodiments of the invention, and are not restrictive of the invention, as claimed.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a perspective view of an assembled pet enclosure according to one example embodiment of the present invention.

FIG. 2 shows a front view of the enclosure of FIG. 1.

FIG. 3 shows a rear view of the enclosure of FIG. 1.

FIGS. 4a and 4b show perspective views of an embodiment of a pet enclosure of the present invention, substantially similar to the embodiment of FIG. 1, in a folded or collapsed configuration.

FIGS. 5a–5h show representative views in the set-up and assembly of the pet enclosure of FIG. 4.

FIG. 6 shows differently-sized embodiments of pet enclosures according to the present invention.

FIGS. 7a–7c show schematic views of the two-way hinge arrangement of a door of a pet enclosure according an embodiment of the present invention.

FIGS. 8a and 8b show a raised floor arrangement of a pet enclosure according an embodiment of the present invention.

DETAILED DESCRIPTION OF EXAMPLE EMBODIMENTS

The present invention may be understood more readily by reference to the following detailed description of the invention taken in connection with the accompanying drawing figures, which form a part of this disclosure. It is to be understood that this invention is not limited to the specific devices, methods, conditions or parameters described and/or shown herein, and that the terminology used herein is for the purpose of describing particular embodiments by way of example only and is not intended to be limiting of the claimed invention. Also, as used in the specification including the appended claims, the singular forms "a," "an," and "the" include the plural, and reference to a particular numerical value includes at least that particular value, unless the context clearly dictates otherwise. Ranges may be expressed herein as from "about" or "approximately" one particular value and/or to "about" or "approximately" another particular value. When such a range is expressed, another embodiment includes from the one particular value and/or to the other particular value. Similarly, when values are expressed as approximations, by use of the antecedent "about," it will be understood that the particular value forms another embodiment.

With reference now to the drawing figures, an enclosure 10 is shown by way of example embodiments of the present invention. The enclosure preferably comprises a plurality of generally rectangular panels, preferably including a top panel 12; first and second side panels 14, 16; a front panel 18; a back panel 20; and a bottom panel 22, as shown in FIGS. 1–3. When the enclosure is in this assembled or set-up configuration, the side panels 14, 16 and the end panels 18, 20 are upright and generally perpendicular to the generally

**4**

horizontal bottom panel 22; the side panels 14, 16 are generally parallel to one another and generally perpendicular to the end panels 18, 20; and the top panel 12 is generally perpendicular to the side panels 14, 16 and the end panels 18, 20; thereby forming a generally rectangular box-like structure.

The back panel 20 preferably defines an aperture 28 for use when assembling and disassembling the enclosure, and for moving the enclosure. A handle 30 is preferably provided for use when transporting the enclosure once disassembled. The side panels 14, 16 preferably define a longitudinal opening 17 for ventilation of the enclosure. The front panel 18 preferably defines an opening 24 therein for access by a housecat, domestic dog or other pets of typical size. Different sizes of enclosures may be provided for pets of different sizes. The front panel 18 also preferably comprises a door 26 preferably hinged on a vertical axis to allow the door 26 to swing both inwardly into the enclosure and outwardly from the enclosure, and to latch in a closed position and in an inwardly open position. The door preferably comprises a latch 32 that is operable with one hand. Latching the door in the closed position prevents entry and/or exit; whereas latching the door in the inwardly open position allows free entry and exit without unintentional closing, and without the open door extending into human living space where it might create a tripping hazard or obstruct a walkway.

The panels of the enclosure 10 preferably comprise frames formed of substantially rigid, non-porous material(s) onto which strands or sheets of flexible, non-porous material are woven or otherwise affixed. Each frame preferably comprises a rectangular peripheral structure of four corner-posts with one or more intermediate framing members extending therebetween for structural support and/or for interweaving or attachment of the strands or sheets of flexible, non-porous material thereon. In example embodiments, one or more strands of flexible material(s) such as thermoplastic extruded resin having the appearance of natural rattan or wicker, are woven onto frames constructed of rods or wires of steel or other metal(s), rigid plastic, or like material(s). In a particular embodiment, the strands are extrusions of high-density polyethylene having a yellow, tan or brown color; and optionally having one or more lines or patterns, preferably of a visibly darker or lighter shade of yellow tan or brown, coextruded therewith or otherwise applied thereon along the axis of the strand. The strands are preferably about $\frac{3}{32}$" in diameter or width, and optionally have one or more serrations or surface irregularities extruded generally along the axis thereof to reduce glare and provide a more natural appearance. So constructed, the enclosure complements many home decor schemes. The wire framing is optionally painted or coated with plastic for improved appearance and resistance to corrosion and discoloration, and/or for ease of cleaning. One or more of the panels may be woven with a decorative pattern or design for even further improved aesthetics.

The enclosure 10 is preferably foldable or collapsible for easy and compact storage and transport, and easily and quickly assembled for use. Assembly of the enclosure 10 is preferably enabled without the necessity of tools, or with only minimal, commonly available household tools. The depicted embodiments of the enclosure 10 comprise panels that are hingedly connected to a base structure 19 and/or to one another for ease of set-up and take-down. For example, the bottom panel 22 preferably forms part of a base portion of the enclosure, which is supported a small distance above the underlying surface by four feet 23, which are preferably formed of or coated with a rubber, plastic or other soft

US 6,997,138 B1

**5**

material to prevent marring of the floor or other underlying support surface. The front panel 18 and the back panel 20 are preferably hingedly connected to the base portion 19 of the enclosure by pin connections 25 between the panels 18, 20 and upright corner-posts of the base portion, which form axles about which the end panels can pivot relative to the base portion. The first and second side panels 14, 16 are preferably hingedly connected to the base portion of the enclosure by connector links 27 between the upright corner-posts of the base portion and end-posts of the side panels, to permit pivotal folding of the side panels relative to the base portion. The top panel 12 is preferably hingedly connected to the first side panel 14 (or alternatively to the second side panel 16, or to one of the end panels 18, 20) along adjacent edges thereof by connector links 27 between end-posts thereof.

The positions of the hinge or pivot joints connecting one or more of the panels 14, 16, 18, 20 to the base 19 are preferably offset from one another at different elevations above the floor or other underlying support surface (in the assembled configuration of the enclosure, with the feet 23 resting on a flat support surface), so that when the enclosure 10 is fully collapsed or folded (as shown in FIG. 4), the complete enclosure is substantially flat and compact with all of the panels able to closely overlie one another. Alternatively, short connector links are interposed between one or more of the panels 14, 16, 18, 20 and the base 19 to permit the panels to fold flat against the base. Although the panels of the depicted embodiments are hingedly connected to the base or to one or more adjacent panel(s) by one or more hinges, pin connections, connector links or the like for ease of assembly and disassembly, in alternate embodiments the panels are separately detachable from one another for disassembly and storage, and/or are releasably or permanently connected to one another by one or more screws, bolts, pins, snap couplings, ties, weldments, adhesive joints, or other detachable or permanent connector(s) to assemble the enclosure 10 for use. In still other alternative embodiments, the panels are rigidly and permanently affixed to one another.

FIGS. 4a–4b show an embodiment of the enclosure 10 in a fully collapsed or folded configuration, as for storage or transport. FIGS. 5a–5h show representative steps in an example assembly sequence for setting up or assembling the enclosure 10 from its folded configuration shown in FIG. 4 into its assembled configuration shown in FIG. 6. As shown in FIGS. 5a and 5b, the top panel 12 is preferably first pivoted about and away from the side panel 14, and the side panel 14 is pivoted about and away from the base portion 19 of the enclosure. The second side panel 16 is then pivoted about and away from the base portion of the enclosure, to form an open-ended, generally box-like configuration. As shown in FIGS. 5c–5e, the back panel 20 is then pivoted about and away from the base portion of the enclosure, into position between the side panels 14, 16. Corner-posts of the back panel 20 and the side panels 14, 16 are aligned and pins, screws, bolts, clips or other connectors 29 are then installed at the upper ends of the corner-posts of the back panel 20 and the side panels 14, 16, as shown in FIGS. 5d and 5e, to secure the back panel and side panels in their upright or assembled positions. The top panel 12 is then closed onto the top of the second side panel 16 and a connector link 31 is secured therebetween, as shown in FIG. 5f, to affix the top panel in its assembled position. The assembly is turned over, end-for-end, and the front panel 18 is then pivoted about and away from the base portion of the enclosure as shown in FIG. 5g. Corner-posts of the front panel 18 and the side panels 14, 16 are aligned and connec-

**6**

tors 29 are then installed at the upper ends of the corner-posts of the front panel 18 and the side panels 14, 16 to secure the front panel and side panels in their upright or assembled positions. Another connector link 31 is then secured between the top panel 12 and the second side panel 16. The connectors are then tightened by hand or using a tool such as an Allen wrench, as shown in FIG. 5h, to complete the assembly. The enclosure 10 is then turned over to rest on its feet 23 in the assembled configuration shown in FIG. 6. As shown in FIG. 6, enclosures 10, 10′ of different sizes can be provided for different sizes of pets. The enclosure is folded for storage and/or transport by substantially reversing the above operation.

With reference now to FIGS. 2 and 7a–7c, the front panel 18 preferably defines an opening 24 within which a door 26 is hingedly mounted. The door 26 preferably pivots both inwardly into the enclosure and outwardly of the enclosure, as indicated by the directional arc in FIG. 7a. A latch 32, such as a spring-biased element, one or more magnetic coupling(s), and/or other releasable connector(s) is preferably mounted to the door 26 for securing the door in its closed position, as shown in FIGS. 1 and 7b to prevent exit or entrance into the enclosure 10. The latch 32 preferably also allows the door 26 to be secured in an inwardly open position, as shown in FIG. 7c, and/or in an outwardly open position, so that the pet may freely enter and exit the enclosure 10, whereby the enclosure serves more as a "den" or refuge for the pet than a cage or enclosure. Latching the door 26 in an inwardly open position also prevents inadvertent opening of the door and keeps the door out of the way of human foot traffic passing by the enclosure 10, where it otherwise might create a tripping hazard or an obstacle. The latch 32 is preferably operable with one hand to open and close the door 26, so that the user has another hand free, for example to grab the pet's collar to attach a leash. In alternate embodiments, the latch is mounted internally of the enclosure for improved aesthetics.

FIGS. 8a and 8b show floor framing 40 of an example embodiment of the enclosure of the present invention, to which a removable floor pan 42 is preferably mounted. One or more channels or grooves 44 in the floor pan 42 preferably receive cooperating portions of the floor framing 40 with a closely engaging fit, to releasably secure the floor pan to the floor framing. In further preferred form, a plurality of channels or grooves 44 are configured to receive a plurality of cooperating frame portions therein, and one or more of the channels or grooves are angularly offset from one or more other channels or grooves so that the floor pan 42 resists movement in all directions. This provides a more stable platform for the pet and reduces noise that would otherwise result from relative movement between the floor pan and the framing. The floor pan 42 may be removed, as for cleaning, by removing the connectors 29 securing the front panel 18 to the side panels 14, 16 (FIG. 2), and pivoting the front panel down and away from the remainder of the enclosure. The pan 42 is then lifted away from the framing 40 and pulled out of the enclosure through the opening formed by lowering the front panel 18. A further advantage of example embodiments of the enclosure of the present invention is that the floor surface upon which the pet rests is elevated a distance above the underlying floor or other support surface. The feet 23 and the floor framing 40 hold the floor pan 42 or other floor surface of the enclosure above the underlying support surface, to provide ventilation between the floor the pet rests on and the surface supporting the enclosure. This increases comfort for the pet, allows

US 6,997,138 B1

7

8

dissipation of moisture and thereby reduces odor, and prevents damage to the floor beneath the enclosure.

While the invention has been described with reference to preferred and example embodiments, it will be understood by those skilled in the art that a variety of modifications, additions and deletions are within the scope of the invention, as defined by the following claims.

What is claimed is:

1. A pet enclosure comprising:

a frame formed of a substantially rigid, non-porous material;

a flexible, non-porous material woven onto said frame, wherein the frame comprises a plurality of panels and wherein one of the panels defines an opening in which a door is pivotally mounted; and

a floor panel supported a distance above an underlying support surface, wherein the floor panel comprises at least one channel for receiving a cooperating portion of said frame.

2. The enclosure of claim 1, wherein the plurality of panels are generally flat, rectangular panels.

3. The enclosure of claim 2, wherein the panels are pivotally connected to one another to allow folding of the enclosure into a compact configuration and assembly of the enclosure into an assembled configuration without separation of the panels from one another.

4. The enclosure of claim 3, wherein the enclosure is substantially flat in the compact configuration.

5. The enclosure of claim 2, wherein the door is pivotally mounted to swing both inwardly and outwardly.

6. The enclosure of claim 5, further comprising a latch for securing said door in a closed position and in an open position.

7. The enclosure of claim 6, wherein the latch secures said door in an inwardly open position within the enclosure.

8. The enclosure of claim 1, wherein the substantially rigid, non-porous material of the frame is a metal wire.

9. The enclosure of claim 1, wherein the flexible, non-porous material woven onto said frame is a plastic having the appearance of natural rattan or wicker.

10. The enclosure of claim 1, wherein the floor panel comprises a plurality of channels or grooves configured to receive a plurality of cooperating frame portions therein, and wherein one or more of the plurality of channels or grooves is/are angularly offset from one or more other channels or grooves, so that the floor panel resists movement in all directions.

11. A pet enclosure comprising:

a plurality of panels, each panel comprising a substantially rigid frame and a plastic material woven onto said frame and having the appearance of natural rattan or wicker and wherein at least one panel defines an opening therein in which a door is pivotally mounted; and

a floor panel supported a distance above an underlying support surface, wherein the floor panel comprises at least one channel for receiving a cooperating portion of said frame.

12. The enclosure of claim 11, wherein the plurality of panels are pivotally connected to one another to allow folding of the enclosure into a compact configuration and assembly of the enclosure into an assembled configuration without separation of the panels from one another.

13. The enclosure of claim 11, wherein one of the plurality of panels defines an opening in which a door is pivotally mounted to swing both inwardly and outwardly.

14. The enclosure of claim 13, further comprising a latch for securing said door in a closed position and in an open position.

15. The enclosure of claim 14, wherein the latch secures said door in an inwardly open position within the enclosure.

16. A pet enclosure comprising:

a base portion;

a first side panel hingedly connected to the base portion;

a second side panel hingedly connected to the base portion;

a first end panel hingedly connected to the base portion;

a second end panel hingedly connected to the base portion; and

a top panel hingedly connected to at least one panel selected from said side and said end panels, and wherein at least one of said panels comprise a substantially rigid frame and a plastic material woven on said frame and having the appearance of natural rattan or wicker, and wherein a hinge connection between a first of said panels and the base portion is offset from a hinge connection between a second of said panels and the base portion to permit the panels to fold into a compact configuration.

17. A pet enclosure comprising:

a base portion;

a first side panel hingedly connected to the base portion;

a second side panel hingedly connected to the base portion;

a first end panel hingedly connected to the base portion;

a second end panel hingedly connected to the base portion; and

a top panel hingedly connected to at least one panel selected from said side and said end panels, and wherein at least one of said panels comprise a substantially rigid frame and a plastic material woven on said frame and having the appearance of natural rattan or wicker, wherein short connector links are interposed between one or more of said panels and the base portion to permit the panels to fold into a compact configuration.

* * * * *

# Exhibit E



## THE UNITED STATES OF AMERICA

### TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

**United States Patent and Trademark Office**

**June 27, 2008**

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:

**APPLICATION NUMBER:** *10/612,589*
**FILING DATE:** *July 02, 2003*
**PATENT NUMBER:** *6,997,138*
**ISSUE DATE:** *February 14, 2006*

By Authority of the

**Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office**

**P. SWAIN**

**Certifying Officer**

PTO/SB/05 (03-01)
Approved for use through 10/31/2002. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| UTILITY PATENT APPLICATION TRANSMITTAL | Attorney Docket No. | 2S14.1-011 |
|---|---|---|
| | First Inventor | SIMPSON, Jeffrey M. |
| | Title | "PET ENCLOSURE" |
| (Only for new nonprovisional applications under 37 CFR 1.53(b)) | Express Mail Label No. | EV349859416US |

| APPLICATION ELEMENTS | | ADDRESS TO: | Assistant Commissioner for Patents Box Patent Application Washington, DC 20231 |
|---|---|---|---|

*See MPEP chapter 600 concerning utility patent application contents.*

1. [✔] Fee Transmittal Form (e.g., PTO/SB/17)
   *(Submit an original and a duplicate for fee processing)*
2. [✔] Applicant claims small entity status.
   See 37 CFR 1.27.
3. [✔] Specification [Total Pages] 18
   *(preferred arrangement set forth below)*
   - Descriptive title of the invention
   - Cross Reference to Related Applications
   - Statement Regarding Fed sponsored R & D
   - Reference to sequence listing, a table, or a computer program listing appendix
   - Background of the Invention
   - Brief Summary of the Invention
   - Brief Description of the Drawings (if filed)
   - Detailed Description
   - Claim(s)
   - Abstract of the Disclosure
4. [✔] Drawing(s) (35 U.S.C. 113) [Total Sheets] 12
5. Oath or Declaration [Total Pages] 2
   a. [✔] Newly executed (original or copy)
   b. [ ] Copy from a prior application (37 CFR 1.63 (d))
      *(for continuation/divisional with Box 18 completed)*
      i. [ ] DELETION OF INVENTOR(S)
         Signed statement attached deleting inventor(s) named in the prior application, see 37 CFR 1.63(d)(2) and 1.33(b).
6. [✔] Application Data Sheet. See 37 CFR 1.76

7. [ ] CD-ROM or CD-R in duplicate, large table or Computer Program (Appendix)
8. Nucleotide and/or Amino Acid Sequence Submission *(if applicable, all necessary)*
   a. [ ] Computer Readable Form (CRF)
   b. Specification Sequence Listing on:
      i. [ ] CD-ROM or CD-R (2 copies); or
      ii. [ ] paper
   c. [ ] Statements verifying identity of above copies

ACCOMPANYING APPLICATION PARTS

9. [ ] Assignment Papers (cover sheet & document(s))
10. [ ] 37 CFR 3.73(b) Statement *(when there is an assignee)* [ ] Power of Attorney
11. [ ] English Translation Document *(if applicable)*
12. [ ] Information Disclosure Statement (IDS)/PTO-1449 [ ] Copies of IDS Citations
13. [ ] Preliminary Amendment
14. [ ] Return Receipt Postcard (MPEP 503) *(Should be specifically itemized)*
15. [ ] Certified Copy of Priority Document(s) *(if foreign priority is claimed)*
16. [✔] Nonpublication Request under 35 U.S.C. 122 (b)(2)(B)(i). Applicant must attach form PTO/SB/35 or its equivalent.
17. [ ] Other: Credit Card Payment Form

18. If a CONTINUING APPLICATION, check appropriate box, and supply the requisite information below and in a preliminary amendment, or in an Application Data Sheet under 37 CFR 1.76:

[ ] Continuation   [ ] Divisional   [✔] Continuation-in-part (CIP)   of prior application No.: 29 / 160,054

Prior application information:   Examiner: N/A   Group Art Unit: N/A

For CONTINUATION OR DIVISIONAL APPS only: The entire disclosure of the prior application, from which an oath or declaration is supplied under Box 5b, is considered a part of the disclosure of the accompanying continuation or divisional application and is hereby incorporated by reference. The incorporation can only be relied upon when a portion has been inadvertently omitted from the submitted application parts.

19. CORRESPONDENCE ADDRESS

[✔] Customer Number or Bar Code Label    23508    or    [ ] Correspondence address below

| Name | Bradley K. Groff GARDNER GROFF, P.C. |
|---|---|
| Address | Paper Mill Village, Building 23 600 Village Trace, Suite 300 |
| City | Marietta | State | GA | Zip Code | 30067 |
| Country | US | Telephone | 770.984.2300 | Fax | 770.984.0098 |

| Name (Print/Type) | Bradley K. Groff | Registration No. (Attorney/Agent) | 39,695 |
|---|---|---|---|
| Signature | | Date | 07/02/2003 |

Burden Hour Statement: This form is estimated to take 0.2 hours to complete. Time will vary depending upon the needs of the individual case. Any comments on the amount of time you are required to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, Washington, DC 20231. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Assistant Commissioner for Patents, Box Patent Application, Washington, DC 20231.

PTO/SB/17 (05-03)
Approved for use through 04/30/2003. OMB 0651-0032
U.S. Patent and Trademark Office: U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

07/02/2003    17698 U.S. PTO

# FEE TRANSMITTAL
## for FY 2003

*Effective 01/01/2003. Patent fees are subject to annual revision.*

☒ Applicant claims small entity status. See 37 CFR 1.27

| TOTAL AMOUNT OF PAYMENT | ($) | 564 |
|---|---|---|

### Complete if Known

| | |
|---|---|
| Application Number | Filed Herewith |
| Filing Date | 07/02/2003 |
| First Named Inventor | SIMPSON, Jeffrey M. |
| Examiner Name | N/A |
| Art Unit | N/A |
| Attorney Docket No. | 2S14.1-011 |

---

## METHOD OF PAYMENT (check all that apply)

☐ Check  ☒ Credit card  ☐ Money Order  ☐ Other  ☐ None

☐ Deposit Account:

| | |
|---|---|
| Deposit Account Number | 501513 |
| Deposit Account Name | GARDNER GROFF, P.C. |

The Director is authorized to: *(check all that apply)*
☐ Charge fee(s) indicated below  ☒ Credit any overpayments
☒ Charge any additional fee(s) during the pendency of this application
☒ Charge fee(s) indicated below, except for the filing fee
to the above-identified deposit account.

## FEE CALCULATION

### 1. BASIC FILING FEE

| Large Entity Fee Code | Fee ($) | Small Entity Fee Code | Fee ($) | Fee Description | Fee Paid |
|---|---|---|---|---|---|
| 1001 | 750 | 2001 | 375 | Utility filing fee | 375 |
| 1002 | 330 | 2002 | 165 | Design filing fee | |
| 1003 | 520 | 2003 | 260 | Plant filing fee | |
| 1004 | 750 | 2004 | 375 | Reissue filing fee | |
| 1005 | 160 | 2005 | 80 | Provisional filing fee | |

SUBTOTAL (1)  ($) 375

### 2. EXTRA CLAIM FEES

| | Extra Claims | | Fee from below | | Fee Paid |
|---|---|---|---|---|---|
| Total Claims | 27 | -20 ** | 7 | X | 9 | = | 63 |
| Independent Claims | 6 | -3 ** | 3 | X | 42 | = | 126 |
| Multiple Dependent | | | | X | | = | 0 |

| Large Entity Fee Code | Fee ($) | Small Entity Fee Code | Fee ($) | Fee Description |
|---|---|---|---|---|
| 1202 | 18 | 2202 | 9 | Claims in excess of 20 |
| 1201 | 84 | 2201 | 42 | Independent claims in excess of 3 |
| 1203 | 280 | 2203 | 140 | Multiple dependent claim, if not paid |
| 1204 | 84 | 2204 | 42 | ** Reissue independent claims over original patent |
| 1205 | 18 | 2205 | 9 | ** Reissue claims in excess of 20 and over original patent |

SUBTOTAL (2)  ($) 189

**or number previously paid, if greater; For Reissues, see above

## FEE CALCULATION (continued)

### 3. ADDITIONAL FEES

| Large Entity Fee Code | Fee ($) | Small Entity Fee Code | Fee ($) | Fee Description | Fee Paid |
|---|---|---|---|---|---|
| 1051 | 130 | 2051 | 65 | Surcharge - late filing fee or oath | |
| 1052 | 50 | 2052 | 25 | Surcharge - late provisional filing fee or cover sheet | |
| 1053 | 130 | 1053 | 130 | Non-English specification | |
| 1812 | 2,520 | 1812 | 2,520 | For filing a request for reexamination | |
| 1804 | 920* | 1804 | 920* | Requesting publication of SIR prior to Examiner action | |
| 1805 | 1,840* | 1805 | 1,840* | Requesting publication of SIR after Examiner action | |
| 1251 | 110 | 2251 | 55 | Extension for reply within first month | |
| 1252 | 410 | 2252 | 205 | Extension for reply within second month | |
| 1253 | 930 | 2253 | 465 | Extension for reply within third month | |
| 1254 | 1,450 | 2254 | 725 | Extension for reply within fourth month | |
| 1255 | 1,970 | 2255 | 985 | Extension for reply within fifth month | |
| 1401 | 320 | 2401 | 160 | Notice of Appeal | |
| 1402 | 320 | 2402 | 160 | Filing a brief in support of an appeal | |
| 1403 | 280 | 2403 | 140 | Request for oral hearing | |
| 1451 | 1,510 | 1451 | 1,510 | Petition to institute a public use proceeding | |
| 1452 | 110 | 2452 | 55 | Petition to revive - unavoidable | |
| 1453 | 1,300 | 2453 | 650 | Petition to revive - unintentional | |
| 1501 | 1,300 | 2501 | 650 | Utility issue fee (or reissue) | |
| 1502 | 470 | 2502 | 235 | Design issue fee | |
| 1503 | 630 | 2503 | 315 | Plant issue fee | |
| 1460 | 130 | 1460 | 130 | Petitions to the Commissioner | |
| 1807 | 50 | 1807 | 50 | Processing fee under 37 CFR 1.17 (q) | |
| 1806 | 180 | 1806 | 180 | Submission of Information Disclosure Stmt | |
| 8021 | 40 | 8021 | 40 | Recording each patent assignment per property (times number of properties) | |
| 1809 | 750 | 2809 | 375 | Filing a submission after final rejection (37 CFR § 1.129(a)) | |
| 1810 | 750 | 2810 | 375 | For each additional invention to be examined (37 CFR § 1.129(b)) | |
| 1801 | 750 | 2801 | 375 | Request for Continued Examination (RCE) | |
| 1802 | 900 | 1802 | 900 | Request for expedited examination of a design application | |

Other fee (specify) _____

*Reduced by Basic Filing Fee Paid    SUBTOTAL (3)  ($) 0

---

## SUBMITTED BY

| | | Complete (if applicable) | | |
|---|---|---|---|---|
| Name (Print/Type) | Bradley K. Groff | Registration No. Attorney/Agent | 39,695 | Telephone | 770.984.2300 |
| Signature | | | | Date | 07/02/2003 |

WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.

This collection of information is required by 37 CFR 1.17 and 1.27. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comment on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing this form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

PTO/SB/35 (05-03)
Approved for use through 04/30/2003. OMB 0651-0031
U.S. Patent and Trademark Office; U. S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| **NONPUBLICATION REQUEST UNDER 35 U.S.C. 122(b)(2)(B)(i)** | First Named Inventor | SIMPSON, Jeffrey M. |
| | Title | "PET ENCLOSURE" |
| | Atty Docket Number | 2S14.1-011 |

I hereby certify that the invention disclosed in the attached application **has not and will not be** the subject of an application filed in another country, or under a multilateral agreement, that requires publication at eighteen months after filing. I hereby request that the attached application not be published under 35 U.S.C. 122(b).

| 07/02/2003 | _[signature]_ |
| Date | Signature |

| 770.984.2300 | Bradley K. Groff Reg. No. 39,695 |
| Telephone number | Typed or printed name |

This request must be signed in compliance with 37 CFR 1.33(b) and submitted with the application **upon filing**.

Applicant may rescind this nonpublication request at any time. If applicant rescinds a request that an application not be published under 35 U.S.C. 122(b), the application will be scheduled for publication at eighteen months from the earliest claimed filing date for which a benefit is claimed.

If applicant subsequently files an application directed to the invention disclosed in the attached application in another country, or under a multilateral international agreement, that requires publication of applications eighteen months after filing, the applicant **must** notify the United States Patent and Trademark Office of such filing within forty-five (45) days after the date of the filing of such foreign or international application. **Failure to do so will result in abandonment of this application (35 U.S.C. 122(b)(2)(B)(iii)).**

This collection of information is required by 37 CFR 1.213(e). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 6 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

Patent
Attorney Docket No. 2S14.1-011

I hereby certify that this correspondence is being deposited with the United States Postal Service as "Express Mail Post Office To Addressee" in an envelope addressed to: Mail Stop Patent Application, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450 on the date indicated below.

Express Mail No.: EV349859416US

Date: July 2, 2003

Signature: Vanessa Lako

# APPLICATION FOR LETTERS PATENT

## UNITED STATES OF AMERICA

Be it known that **Jeffrey M. SIMPSON** of 381 Oak Ridge Drive, Auburn, AL 36830 has invented certain new and useful improvements in a

# PET ENCLOSURE

for which the following is a specification.

GARDNER GROFF, P.C.
Paper Mill Village, Building 23
600 Village Trace, Suite 300
Marietta, GA 30067
770.984.2300

W:\Client Files\BKG Clients\2S14-Simpson, Jeff\2S14.1-011\0001.pat (Non-Provisional Patent App).doc

1                                    Pat nt
                                     Docket No. 2S14.1-011

# PET ENCLOSURE

## Cross-Reference to Related Applications

[00001]    This application is a continuation-in-part of U.S. Design Patent Application Serial No. 29/160,054, filed May 2, 2002; and claims priority to U.S. Provisional Patent Application Serial No. 60/394,181, filed July 3, 2002, and to U.S. Provisional Patent Application Serial No. 60/465,119, filed April 24, 2003.  U.S. Design Patent Application Serial No. 29/160,054, U.S. Provisional Patent Application Serial No. 60/394,181, and U.S. Provisional Patent Application Serial No. 60/465,119 are hereby incorporated herein by reference in their entireties for all purposes.

## Technical Field

[00002]    The present invention relates generally to the field of pet products, and more particularly to enclosures for domestic pets. The invention also relates to pet enclosures that can be shipped and/or stored in a folded or disassembled state and which can be easily set up or assembled for use, and subsequently re-folded or disassembled for storage and/or transport.

## Background of the Invention

[00003]    Millions of households in the United States and throughout the world keep domesticated pets indoors. Allowing the animal to remain indoors reduces exposure to infectious diseases, territorial disputes with other neighborhood animals, and exposure to the harsher elements of weather, such as rain, snow, the cold of winter and the heat of summer.  And, since an animal will not always be supervised as it undergoes various developmental stages such as teething and potty training, there often exists a need to enclose the animal when the owners are not present.  Additionally, many veterinarians recommend having an enclosure for an animal that acts as a "safe place" that the animal may go even when the owners are home.

Patent
Docket No. 2S14.1-011

[00004]    One common problem that has been found to exist with current pet enclosures is that they generally are not aesthetically pleasing or complimentary to the typical home décor. As a result, pet owners commonly hide the enclosure in areas not frequented by the family or guests. Often, however, it would be desirable to locate the

5    enclosure in a more visible location, for example, for promoting the animal's usage of the enclosure while increasing human interaction with the pet.

[00005]    Attempts have been made to provide pet enclosures that are more aesthetically appealing. Such past attempts have included the placement of veneering on the exterior of the enclosure to compliment the décor; however, this generally results

10    in either poor ventilation for the animal, or the enclosure being too heavy and cumbersome to move conveniently.  Another shortcoming of current pet enclosures is that they absorb and emit pet odors that can foul the smell of the entire house or apartment surroundings. For example, the inclusion of many materials such as wood and/or other natural materials, and/or natural or synthetic fabric into an enclosure can

15    trap urine and other sources of unpleasant odors associated with animals. Attempts to reduce the absorption of odors have generally focused on fabricating the structure entirely of metal or other non-porous materials. This construction, however, typically results in an unattractive enclosure not complimenting to typical home décor, as discussed above.

20    [00006]    Another shortcoming of many known enclosures is their lack of transportability. The construction of many enclosures often renders them too cumbersome to utilize on trips away from home. This may be caused by the amount of time and/or tools needed to set up and disassemble the enclosure, and/or the overall weight of the enclosure. Because of this inconvenience, many consumers are forced to

25    purchase one enclosure for the house, and another less appealing, or less useful, but more easily portable enclosure for traveling.

Patent
Docket No. 2S14.1-011

[00007]    Thus it can be seen that needs exist for improvements to pet enclosures to provide a more attractive appearance that matches a typical home décor, that does not absorb pet odors, and that is easily compacted for transport and/or storage outside the home.

5    **Summary of the Invention**

[00008]    The present invention is an enclosure for pets. In example embodiments, the enclosure of the present invention is attractive and complementary to a variety of home décors. In further embodiments, the enclosure of the present invention is fabricated from materials that do not absorb moisture or odors, that resist damage and
10    deterioration from moisture, mold, mildew and the like, and which is easily cleaned. In further embodiments, the enclosure of the present invention is assembled from panels that are collapsible or foldable for compact storage and shipping, and is easily assembled by one person without tools or with only minimal tools.

[00009]    In one aspect, the present invention a pet enclosure comprising a
15    substantially rigid frame and a moisture-resistant plastic stranded material woven onto said frame to present the appearance of a rattan or wicker material. Weaving the material into the frame allows the enclosure to be disassembled and compacted to a flat shape.

[00010]    In another aspect, the invention is a frame comprising a resilient material
20    and at least one recess for receiving and engaging cooperating elements of at least two panels for attaching the panels together.

[00011]    In still another aspect, the invention is a pet enclosure including a frame formed of a substantially rigid, non-porous material; and a flexible, non-porous material woven onto the frame.

[00012]      In another aspect, the invention is a pet enclosure including a plurality of panels, each panel having a substantially rigid frame and a plastic material having the appearance of natural rattan or wicker woven onto the frame.

[00013]      In yet another aspect, the invention is a pet enclosure including an
5    opening in which a door is pivotally mounted to swing both inwardly and outwardly, and further including a latch for securing the door in a closed position and in an open position.

[00014]      In another aspect, the invention is a pet enclosure including a floor panel and a plurality of legs for supporting the floor panel a distance above an underlying
10   support surface.

[00015]      In still another embodiment, the invention is a pet enclosure including a frame and a removable floor panel, the floor panel having at least one channel for receiving a cooperating portion of the frame.

[00016]      In another aspect, the invention is a pet enclosure including a base
15   portion; a first side panel hingedly connected to the base portion; a second side panel hingedly connected to the base portion; a first end panel hingedly connected to the base portion; a second end panel hingedly connected to the base portion; and a top panel hingedly connected to at least one of the first and second side panels and/or at least one of the first and second end panels.

20   [00017]      These and other aspects, features and advantages of the invention will be understood with reference to the drawing figures and detailed description herein, and will be realized by means of the various elements and combinations particularly pointed out in the appended claims. It is to be understood that both the foregoing general description and the following brief description of the drawings and detailed description

of the invention are exemplary and explanatory of preferred embodiments of the invention, and are not restrictive of the invention, as claimed.

**Brief Description of the Drawings**

[00018]    FIGURE 1 shows a perspective view of an assembled pet enclosure according to one example embodiment of the present invention.

[00019]    FIGURE 2 shows a front view of the enclosure of Fig. 1.

[00020]    FIGURE 3 shows a rear view of the enclosure of Fig. 1.

[00021]    FIGURES 4a and 4b show perspective views of an embodiment of a pet enclosure of the present invention, substantially similar to the embodiment of Fig. 1, in a folded or collapsed configuration.

[00022]    FIGURES 5a-5h show representative steps in the set-up and assembly of the pet enclosure of Fig. 4.

[00023]    FIGURE 6 shows differently-sized embodiments of pet enclosures according to the present invention.

[00024]    FIGURES 7a-7c show schematic views of the two-way hinge arrangement of a door of a pet enclosure according an embodiment of the present invention.

[00025]    FIGURES 8a and 8b show a raised floor arrangement of a pet enclosure according an embodiment of the present invention.

**Detailed Description of Example Embodiments**

[00026]    The present invention may be understood more readily by reference to the following detailed description of the invention taken in connection with the accompanying drawing figures, which form a part of this disclosure. It is to be understood that this invention is not limited to the specific devices, methods, conditions

or parameters described and/or shown herein, and that the terminology used herein is
for the purpose of describing particular embodiments by way of example only and is not
intended to be limiting of the claimed invention.  Also, as used in the specification
including the appended claims, the singular forms "a," "an," and "the" include the plural,
5    and reference to a particular numerical value includes at least that particular value,
unless the context clearly dictates otherwise.  Ranges may be expressed herein as
from "about" or "approximately" one particular value and/or to "about" or "approximately"
another particular value.  When such a range is expressed, another embodiment
includes from the one particular value and/or to the other particular value.  Similarly,
10   when values are expressed as approximations, by use of the antecedent "about," it will
be understood that the particular value forms another embodiment.

[00027]     With reference now to the drawing figures, an enclosure 10 is shown by
way of example embodiments of the present invention.  The enclosure preferably
comprises a plurality of generally rectangular panels, preferably including a top panel
15   12; first and second side panels 14, 16; a front panel 18; a back panel 20, and a bottom
panel 22, as shown in Figs. 1-3.  When the enclosure is in this assembled or set-up
configuration, the side panels 14, 16 and the end panels 18, 20 are upright and
generally perpendicular to the generally horizontal bottom panel 22; the side panels 14,
16 are generally parallel to one another and generally perpendicular to the end panels
20   18, 20; and the top panel 12 is generally perpendicular to the side panels 14, 16 and
the end panels 18, 20; thereby forming a generally rectangular box-like structure.

[00028]     The back panel 20 preferably defines an aperture 28 for use when
assembling and disassembling the enclosure, and for moving the enclosure.  A handle
30 is preferably provided for use when transporting the enclosure once disassembled.
25   The side panels 14, 16 preferably define a longitudinal opening 17 for ventilation of the
enclosure.  The front panel 18 preferably defines an opening 24 therein for access by a

housecat, domestic dog or other pets of typical size. Different sizes of enclosures may
be provided for pets of different sizes. The front panel 18 also preferably comprises a
door 26 preferably hinged on a vertical axis to allow the door 26 to swing both inwardly
into the enclosure and outwardly from the enclosure, and to latch in a closed position

5    and in an inwardly open position. The door preferably comprises a latch 28 that is
operable with one hand. Latching the door in the closed position prevents entry and/or
exit; whereas latching the door in the inwardly open position allows free entry and exit
without unintentional closing, and without the open door extending into human living
space where it might create a tripping hazard or obstruct a walkway.

10   **[00029]**        The panels of the enclosure 10 preferably comprise frames formed of
substantially rigid, non-porous material(s) onto which strands or sheets of flexible, non-
porous material are woven or otherwise affixed. Each frame preferably comprises a
rectangular peripheral structure of four corner-posts with one or more intermediate
framing members extending therebetween for structural support and/or for interweaving

15   or attachment of the strands or sheets of flexible, non-porous material thereon. In
example embodiments, one or more strands of flexible material(s) such as
thermoplastic extruded resin having the appearance of natural rattan or wicker, are
woven onto frames constructed of rods or wires of steel or other metal(s), rigid plastic,
or like material(s). In a particular embodiment, the strands are extrusions of high-

20   density polyethylene having a yellow, tan or brown color; and optionally having one or
more lines or patterns, preferably of a visibly darker or lighter shade of yellow tan or
brown, coextruded therewith or otherwise applied thereon along the axis of the strand.
The strands are preferably about 3/32" in diameter or width, and optionally have one or
more serrations or surface irregularities extruded generally along the axis thereof to

25   reduce glare and provide a more natural appearance. So constructed, the enclosure
complements many home décor schemes. The wire framing is optionally painted or
coated with plastic for improved appearance and resistance to corrosion and

discoloration, and/or for ease of cleaning. One or more of the panels may be woven with a decorative pattern or design for even further improved aesthetics.

[00030]    The enclosure 10 is preferably foldable or collapsible for easy and compact storage and transport, and easily and quickly assembled for use. Assembly of

5    the enclosure 10 is preferably enabled without the necessity of tools, or with only minimal, commonly available household tools.  The depicted embodiments of the enclosure 10 comprise panels that are hingedly connected to a base structure 19 and/or to one another for ease of set-up and take-down. For example, the bottom panel 22 preferably forms part of a base portion of the enclosure, which is supported a small

10    distance above the underlying surface by four feet 23, which are preferably formed of or coated with a rubber, plastic or other soft material to prevent marring of the floor or other underlying support surface.  The front panel 18 and the back panel 20 are preferably hingedly connected to the base portion 19 of the enclosure by pin connections 25 between the panels 18, 20 and upright corner-posts of the base portion,

15    which form axles about which the end panels can pivot relative to the base portion. The first and second side panels 14, 16 are preferably hingedly connected to the base portion of the enclosure by connector links 27 between the upright corner-posts of the base portion and end-posts of the side panels, to permit pivotal folding of the side panels relative to the base portion.  The top panel 12 is preferably hingedly connected

20    to the first side panel 14 (or alternatively to the second side panel 16, or to one of the end panels 18, 20) along adjacent edges thereof by connector links 27 between end-posts thereof.

[00031]    The positions of the hinge or pivot joints connecting one or more of the panels 14, 16, 18, 20 to the base 19 are preferably offset from one another at different

25    elevations above the floor or other underlying support surface (in the assembled configuration of the enclosure, with the feet 23 resting on a flat support surface), so that

when the enclosure 10 is fully collapsed or folded (as shown in Fig. 4), the complete
enclosure is substantially flat and compact with all of the panels able to closely overlie
one another. Alternatively, short connector links are interposed between one or more
of the panels 14, 16, 18, 20 and the base 19 to permit the panels to fold flat against the
5      base. Although the panels of the depicted embodiments are hingedly connected to the
base or to one or more adjacent panel(s) by one or more hinges, pin connections,
connector links or the like for ease of assembly and disassembly, in alternate
embodiments the panels are separably detachable from one another for disassembly
and storage, and/or are releasably or permanently connected to one another by one or
10     more screws, bolts, pins, snap couplings, ties, weldments, adhesive joints, or other
detachable or permanent connector(s) to assemble the enclosure 10 for use. In still
other alternative embodiments, the panels are rigidly and permanently affixed to one
another.

       [00032]    Figures 4a-4b show an embodiment of the enclosure 10 in a fully
15     collapsed or folded configuration, as for storage or transport. Figures 5a-5h show
representative steps in an example assembly sequence for setting up or assembling
the enclosure 10 from its folded configuration shown in Fig. 4 into its assembled
configuration shown in Fig. 6. As shown in Figs. 5a and 5b, the top panel 12 is
preferably first pivoted about and away from the side panel 14, and the side panel 14 is
20     pivoted about and away from the base portion 19 of the enclosure. The second side
panel 16 is then pivoted about and away from the base portion of the enclosure, for
form an open-ended, generally box-like configuration. As shown in Figs. 5c-5e, the
back panel 20 is then pivoted about and away from the base portion of the enclosure,
into position between the side panels 14, 16. Corner-posts of the back panel 20 and
25     the side panels 14, 16 are aligned and pins, screws, bolts, clips or other connectors 29
are then installed at the upper ends of the corner-posts of the back panel 20 and the
side panels 14, 16, as shown in Figs. 5d and 5e, to secure the back panel and side

10                                                                    **Patent**
                                                          **Docket No. 2S14.1-011**

panels in their upright or assembled positions. The top panel 12 is then closed onto the
top of the second side panel 16 and a connector link 31 is secured therebetween, as
shown in Fig. 5f, to affix the top panel in its assembled position. The assembly is
turned over, end-for-end, and the front panel 18 is then pivoted about and away from

5      the base portion of the enclosure as shown in Fig. 5g. Corner-posts of the front panel
18 and the side panels 14, 16 are aligned and connectors 29 are then installed at the
upper ends of the corner-posts of the front panel 18 and the side panels 14, 16 to
secure the front panel and side panels in their upright or assembled positions. Another
connector link 31 is then secured between the top panel 12 and the second side panel

10     16. The connectors are then tightened by hand or using a tool such as an Allen
wrench, as shown in Fig. 5h, to complete the assembly. The enclosure 10 is then
turned over to rest on its feet 23 in the assembled configuration shown in Fig. 6. As
shown in Fig. 6, enclosures 10, 10' of different sizes can be provided for different sizes
of pets. The enclosure is folded for storage and/or transport by substantially reversing

15     the above operation.

[00033]     With reference now to Figs. 2 and 7a-7c, the front panel 18 preferably
defines an opening 24 within which a door 26 is hingedly mounted. The door 26
preferably pivots both inwardly into the enclosure and outwardly of the enclosure, as
indicated by the directional arc in Fig. 7a. A latch 28, such as a spring-biased element,

20     one or more magnetic coupling(s), and/or other releasable connector(s) is preferably
mounted to the door 26 for securing the door in its closed position, as shown in Figs. 1
and 7b to prevent exit or entrance into the enclosure 10. The latch 28 preferably also
allows the door 26 to be secured in an inwardly open position, as shown in Fig. 7c,
and/or in an outwardly open position, so that the pet may freely enter and exit the

25     enclosure 10, whereby the enclosure serves more as a "den" or refuge for the pet than
a cage or enclosure. Latching the door 26 in an inwardly open position also prevents
inadvertent opening of the door and keeps the door out of the way of human foot traffic

**Patent**
                                                                  **Docket No. 2S14.1-011**

passing by the enclosure 10, where it otherwise might create a tripping hazard or an
obstacle.  The latch 28 is preferably operable with one hand to open and close the door
26, so that the user has another hand free, for example to grab the pet's collar to attach
a leash.  In alternate embodiments, the latch is mounted internally of the enclosure for
5      improved aesthetics.

[00034]      Figures 8a and 8b show floor framing 40 of an example embodiment of
the enclosure of the present invention, to which a removable floor pan 42 is preferably
mounted.  One or more channels or grooves 44 in the floor pan 42 preferably receive
cooperating portions of the floor framing 40 with a closely engaging fit, to releasably
10     secure the floor pan to the floor framing.   In further preferred form, a plurality of
channels or grooves 44 are configured to receive a plurality of cooperating frame
portions therein, and one or more of the channels or grooves are angularly offset from
one or more other channels or grooves so that the floor pan 42 resists movement in all
directions.  This provides a more stable platform for the pet and reduces noise that
15     would otherwise result from relative movement between the floor pan and the framing.
The floor pan 42 may be removed, as for cleaning, by removing the connectors 29
securing the front panel 18 to the side panels 14, 16 (Fig. 2), and pivoting the front
panel down and away from the remainder of the enclosure.  The pan 42 is then lifted
away from the framing 40 and pulled out of the enclosure through the opening formed
20     by lowering the front panel 18.  A further advantage of example embodiments of the
enclosure of the present invention is that the floor surface upon which the pet rests is
elevated a distance above the underlying floor or other support surface. The feet 23
and the floor framing 40 hold the floor pan 42 or other floor surface of the enclosure
above the underlying support surface, to provide ventilation between the floor the pet
25     rests on and the surface supporting the enclosure.  This increases comfort for the pet,
allows dissipation of moisture and thereby reduces odor, and prevents damage to the
floor beneath the enclosure.

12

Patent
Docket No. 2S14.1-011

[00035]    While the invention has been described with reference to preferred and example embodiments, it will be understood by those skilled in the art that a variety of modifications, additions and deletions are within the scope of the invention, as defined by the following claims.

5

13

Patent
Docket No. 2S14.1-011

**What is Claimed is:**

1.    A pet enclosure comprising a frame formed of a substantially rigid, non-porous material; and a flexible, non-porous material woven onto said frame.

2.    The enclosure of Claim 1, wherein the frame comprises a plurality of generally flat, rectangular panels.

3.    The enclosure of Claim 2, wherein the panels are pivotally connected to one another to allow folding of the enclosure into a compact configuration and assembly of the enclosure into an assembled configuration without separation of the panels from one another.

4.    The enclosure of Claim 3, wherein the enclosure is substantially flat in the compact configuration.

5.    The enclosure of Claim 2, wherein one of the panels defines an opening in which a door is pivotally mounted to swing both inwardly and outwardly.

6.    The enclosure of Claim 5, further comprising a latch for securing said door in a closed position and in an open position.

7.    The enclosure of Claim 6, wherein the latch secures said door in an inwardly open position within the enclosure.

8.    The enclosure of Claim 1, wherein the substantially rigid, non-porous material of the frame is a metal wire.

9.    The enclosure of Claim 1, wherein the flexible, non-porous material woven onto said frame is a plastic having the appearance of natural rattan or wicker.

10.    The enclosure of Claim 1, comprising a floor panel supported a distance above an underlying support surface.

14

Patent
Dock t No. 2S14.1-011

11.    The enclosure of Claim 10, wherein the floor panel comprises at least one channel for receiving a cooperating portion of said frame.

12.    The enclosure of Claim 11, wherein the floor panel comprises a plurality of channels or grooves configured to receive a plurality of cooperating frame portions therein, and wherein one or more of the plurality of channels or grooves is/are angularly offset from one or more other channels or grooves, so that the floor panel resists movement in all directions.

13.    A pet enclosure comprising a plurality of panels, each panel comprising a substantially rigid frame and a plastic material having the appearance of natural rattan or wicker woven onto said frame.

14.    The enclosure of Claim 13, wherein the plurality of panels are pivotally connected to one another to allow folding of the enclosure into a compact configuration and assembly of the enclosure into an assembled configuration without separation of the panels from one another.

15.    The enclosure of Claim 13, wherein one of the plurality of panels defines an opening in which a door is pivotally mounted to swing both inwardly and outwardly.

16.    The enclosure of Claim 15, further comprising a latch for securing said door in a closed position and in an open position.

17.    The enclosure of Claim 16, wherein the latch secures said door in an inwardly open position within the enclosure.

18.    The enclosure of Claim 13, comprising a floor panel supported a distance above an underlying support surface.

19.    The enclosure of Claim 18, wherein the floor panel comprises at least one channel for receiving a cooperating portion of said frame.

Case 3:06-cv-00901-WKW-WC    Document 60-15    Filed 07/29/2008    Page 21 of 109

15

Pat nt
Docket No. 2S14.1-011

20.   A pet enclosure comprising an opening in which a door is pivotally mounted to swing both inwardly and outwardly, and further comprising a latch for securing said door in a closed position and in an open position.

21.   The enclosure of Claim 20, wherein the latch secures said door in an inwardly open position within the enclosure.

22.   A pet enclosure comprising a floor panel and a plurality of legs for supporting said floor panel a distance above an underlying support surface.

23.   A pet enclosure comprising a frame and a removable floor panel, the floor panel comprising at least one channel for receiving a cooperating portion of said frame.

24.   The enclosure of Claim 23, wherein the floor panel comprises a plurality of channels or grooves configured to receive a plurality of cooperating frame portions therein, and wherein one or more of the plurality of channels or grooves is/are angularly offset from one or more other channels or grooves, so that the floor panel resists movement in all directions.

25.   A pet enclosure comprising:

        a base portion;

        a first side panel hingedly connected to the base portion;

        a second side panel hingedly connected to the base portion;

        a first end panel hingedly connected to the base portion;

        a second end panel hingedly connected to the base portion; and

        a top panel hingedly connected to at least one of the first and second side panels and/or at least one of the first and second end panels.

16                                          **Patent**
                                    **Docket No. 2S14.1-011**

26. The enclosure of Claim 25, wherein a hinge connection between a first of said panels and the base portion is offset from a hinge connection between a second of said panels and the base portion to permit the panels to fold into a compact configuration.

27. The enclosure of Claim 25, wherein short connector links are interposed between one or more of said panels and the base portion to permit the panels to fold into a compact configuration.

17
Pat nt
Docket No. 2S14.1-011

## ABSTRACT

A pet enclosure having a moisture and odor-resistant, plastic, rattan-like material woven onto a frame.  The enclosure is foldably collapsible for compact storage and shipping, and is quickly and easily assembled with minimal or no tools.  An elevated floor panel is securely but removably engaged to the framing of the enclosure.  An access door pivots inwardly and outwardly, and can be latched in a closed position or an open position.

INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: BRADLEY K. GROFF
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011
SHEET 1 OF 12

¹/12



Fig. 1

INVENTOR: SIMPSON, Jeffrey M.
TITLE: "PET ENCLOSURE"
ATTY: BRADLEY K. GROFF
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011
SHEET 2 OF 12

2/12



Fig. 2

Fig. 3

INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: BRADLEY K. GROFF
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011
SHEET 3 OF 12

3/12



Fig. 4b



Fig. 4a

INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: BRADLEY K. GROFF
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011
SHEET 4 OF 12

4/12



FIG. 5a

INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: BRADLEY K. GROFF
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011
SHEET 5 OF 12

5/12

10



16

20

12

14

FIG. 5b

INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: BRADLEY K. GROFF
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011
SHEET 6 OF 12

6/12



FIG. 5c



FIG. 5d

INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: BRADLEY K. GROFF
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011
SHEET 7 OF 12

7/12



FIG. 5e



FIG. 5f

INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: BRADLEY K. GROFF
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011
SHEET 8 OF 12

8/12



FIG. 5₉

INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: BRADLEY K. GROFF
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011
SHEET 9 OF 12

9/12



FIG. 5h

INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: BRADLEY K. GROFF
ATTY TEL: 770.984,2300
ATTY DOCKET NO.: 2S14.1-011
SHEET 10 OF 12

10/12



FIG. 6

INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: BRADLEY K. GROFF
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011
SHEET 11 OF 12

11/12



Fig. 7c



Fig. 7b



Fig. 7a

INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: BRADLEY K. GROFF
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2514.1-011
SHEET 12 OF 12

12/12



40

FIG. 8a



42

FIG. 8b

44

| DECLARATION FOR UTILITY OR DESIGN PATENT APPLICATION (37 CFR 1.63) | Attorney Docket Number: 2S14.1-011 |
|---|---|
| | First Named Inv ntor: SIMPSON, Jeffrey M. |
| | *COMPLETE IF KNOWN* |
| [X] Declaration Submitted with Initial Filing **OR** [] Declaration Submitted after Initial Filing (surcharge (37 CFR 1.16 (e)) required) | Application Number: Filed Herewith Filing Date: N/A Group Art Unit: N/A Examiner Name: N/A |

As a b low named inventor, I hereby declare that:

My residence, post office address, and citizenship are as stated below next to my name.

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

| "PET ENCLOSURE" |
|---|

*the specification of which*
[X] is attached hereto
   OR
[] was filed on (MM/DD/YYYY) _____ as United States Application Number or PCT

   International Application Number _____ and was amended on (MM/DD/YYYY) _____

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment specifically referred to above.

I acknowledge the duty to disclose information which is material to patentability as defined in 37 CFR 1.56.

I hereby claim foreign priority benefits under 35 U.S.C. 119(a)-(d) or 365(b) of any foreign application(s) for patent or inventor's certificate, or 365(a) of any PCT international application which designated at least one country other than the United States of America, listed below and have also identified below, by checking the box, any foreign application for patent or inventor's certificate, or of any PCT international application having a filing date before that of the application on which priority is claimed.

| Prior Foreign Application Number(s) | Country | Foreign Filing Date (MM/DD/YYYY) | Priority Not Claimed | Certified Copy Attached? Yes | No |
|---|---|---|---|---|---|
| | | | [] | [] | [] |
| | | | [] | [] | [] |
| | | | [] | [] | [] |
| | | | [] | [] | [] |

[] Additional foreign application numbers are listed on a supplemental priority data sheet attached hereto:

I hereby claim benefit under 35 U.S.C. 119(e) of any United States provisional application(s) listed below.

| Application Number(s) | Filing Date (MM/DD/YYYY) | [] Additional provisional application numbers are |
|---|---|---|
| 60/394,181 | 07-03-2002 | listed on a supplemental priority data sheet |
| 60/465,119 | 04-24-2003 | attached hereto. |

## DECLARATION-Utility or Design Patent Application

I hereby claim the benefit under 35 U.S.C. 120 of any United States application(s), or 365(c) of any PCT international designating the United States of America, listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States or PCT international application in the manner provided by the first paragraph of 35 U.S.C. 112, I acknowledge the duty to disclose information which is material to patentability as defined in 37 CFR 1.56 which became available between the filing date of the prior application and the national or PCT international filing date of this application.

| U.S. Parent Application or PCT Parent Number | Parent Filing Date (MM/DD/YYYY) | Parent Patent Number (if applicable) |
|---|---|---|
| 29/160,054 | 05-02-2002 | |

[ ] Additional U.S. or PCT international application numbers are listed on a supplemental priority data sheet attached hereto.

As a named inventor, I hereby appoint the following registered practitioner(s) as my attorneys/agents to prosecute this application and to transact all business in the Patent and Trademark Office connected therewith:

[X] Customer Number    23506

OR

    Place Customer Number
    Bar Code Label Here

[X] Registered practitioner(s) name/registration number listed below

| Name | Registration Number | Name | Registration Number |
|---|---|---|---|
| Arthur A. Gardner | 33,887 | Bradley K. Groff | 39,695 |
| Daniel J. Santos | 40,158 | John W. Greenwald | 41,803 |

[ ] Additional registered practitioner(s) named on supplemental Registered Practitioner Information sheet attached hereto.

Direct all correspondence to: [X] Customer Number or Bar Code Label    23506    [X] Correspondence address below

| Name | Bradley K. Groff |
|---|---|
| Address | GARDNER GROFF, P.C. |
| Address | Paper Mill Village, Building 23, 600 Village Trace, Suite 300 |
| City | Marietta          State: Georgia                    ZIP: 30067 |
| Country | U.S.          Telephone: 770/984-2300          Fax: 770/984-0098 |

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001 and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

| Name of Sole or First Inventor: SIMPSON, Jeffrey M. | [ ] A petition has been filed for this unsigned inventor |
|---|---|

| Given Name (first and middle if any) | Family Name or Surname |
|---|---|
| Jeffrey M. | SIMPSON |
| Inventor's Signature | Date: 7/1/03 |
| Residence | City: Auburn          State: AL          Country: US          Citizenship: US |
| Post Office Address | 381 Oak Ridge Drive |
| Post Office Address | |
| City | Auburn          State: AL          ZIP: 36830          Country: US |

[ ] Additional inventors are being named on the [ ] supplemental Additional Inventor(s) sheet(s) attached hereto.

W:\Client Files\BKG Clients\2S14-Simpson, Jeff\2S14.1-011 Improved Pet Enclosure (NonProv)\0002.pat (Dec).doc

Practioner's Docket No. <u>2S14.1-011</u>     PATENT

## <u>IN THE UNITED STATES PATENT AND TRADEMARK OFFICE</u>

In re prior application of:  **SIMPSON, Jeffrey M.**

Application No.: **Filed Herewith**          Group No.: **N/A**

Filed:  **July 2, 2003**                    Examiner: **N/A**

For:  **"PET ENCLOSURE"**

Mail Stop <u>Patent Application</u>
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## <u>APPLICATION DATA SHEET</u>
## <u>37 C.F.R. §1.76</u>

### BIBLIOGRAPHIC DATA

---

### CERTIFICATION UNDER 37 C.F.R. §§ 1.8(a) and 1.10

(When using Express mail, the Express Mail label number is mandatory;
Express Mail certification is optional.)

I hereby certify that, on the date shown below, this correspondence is being deposited with the United States Postal Service in an envelope addressed to:  Mail Stop Patent Application, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450 as "Express Mail Post Office To Addressee"

Mailing Label No. **EV349859416US**

*Vanessa Lake*                              Date:  <u>July 2, 2003</u>
Vanessa Lake

1

1.    **Applicant information:**

First Applicant:
**Jeffrey M. Simpson**

Citizenship:
**US**

Residence:
**381 Oak Ridge Drive, Auburn, AL 36830**

2.    **Correspondence information:**

Correspondence for this application should be addressed as follows:

Name:
**Bradley K. Groff**

Address:
**GARDNER GROFF, P.C.**
**Paper Mill Village, Building 23**
**600 Village Trace, Suite 300**
**Marietta, GA 30067**

Customer No.: **23506**

3.    **Application Information:**

Title of Invention:
**"PET ENCLOSURE"**

Docket number assigned to this application:
**2S14.1-011**

Suggested Classification:    Class:

                              Subclass:

                              Technology Center to which
                              subject matter is assigned:

Total number of drawing sheets:
<u>12</u>

Type of application:
<u>Utility</u>
<u>APPLICATION IS NOT TO BE PUBLISHED</u>

Suggested drawing figure for publication:
<u>1</u>

## 4.    Representative information:

The following have a power of attorney or authorization of agent in this application:

Name of attorney (agent):

| | |
|---|---|
| <u>Bradley K. Groff</u> | <u>Reg. No. 39,695</u> |
| <u>Arthur A. Gardner</u> | <u>Reg. No. 33,887</u> |
| <u>John W. Greenwald</u> | <u>Reg. No. 41,803</u> |
| <u>Daniel J. Santos</u> | <u>Reg. No. 40,158</u> |

Address:
<u>GARDNER GROFF, P.C.</u>
<u>Paper Mill Village, Building 23</u>
<u>600 Village Trace, Suite 300</u>
<u>Marietta, GA 30067</u>

Customer No.:
<u>23506</u>

## 5.    Domestic Priority Information:

| Application: | Continuity Type: | Parent Application: | Parent Filing Date: |
|---|---|---|---|
| <u>This Application</u> | <u>C-I-P</u> | <u>29/160,054</u> | <u>05/02/2002</u> |
| <u>This Application</u> | <u>Claims Priority to</u> | <u>60/394,181</u> | <u>07/03/2002</u> |
| <u>This Application</u> | <u>Claims Priority to</u> | <u>60/465,119</u> | <u>04/24/2003</u> |

3

Reg. No. **39,695**

Bradley K. Groff

Tel. No. **770.984.2300**

Customer No. **23506**

GARDNER GROFF, P.C.
Paper Mill Village, Building 23
600 Village Trace, Suite 300
Marietta, GA 30067
Tel: 770.984.2300
Fax: 770.984.0098

W:\Client Files\BKG Clients\2S14-Simpson, Jeff\2S14.1-011  Improved Pet Enclosure (NonProv)\0008.pat (Application Data Sheet).doc

4

PATENT APPLICATION SERIAL NO. _____

### U.S. DEPARTMENT OF COMMERCE
### PATENT AND TRADEMARK OFFICE
### FEE RECORD SHEET

07/08/2003 SDIRETA1 00000027 10612589

01 FC:2001          375.00 OP
02 FC:2202           63.00 OP
03 FC:2201          126.00 OP

PTO-1556
  (5/87)

**PATENT APPLICATION FEE DETERMINATION RECORD**
Effective January 1, 2003

Application or Docket Number

10,612589

## CLAIMS AS FILED - PART I

| | (Column 1) | (Column 2) |
|---|---|---|
| TOTAL CLAIMS | 27 | |
| FOR | NUMBER FILED | NUMBER EXTRA |
| TOTAL CHARGEABLE CLAIMS | 27 minus 20= | * 7 |
| INDEPENDENT CLAIMS | 6 minus 3 = | * 3 |
| MULTIPLE DEPENDENT CLAIM PRESENT | | |

| SMALL ENTITY TYPE ☐ | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|
| RATE | FEE | | RATE | FEE |
| BASIC FEE | 375.00 | OR | BASIC FEE | 750.00 |
| X$ 9= | 63 | OR | X$18= | |
| X42= | 126 | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL | 564 | OR | TOTAL | |

\* If the difference in column 1 is less than zero, enter "0" in column 2

## CLAIMS AS AMENDED - PART II

**AMENDMENT A**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | * | Minus | ** | = |
| Independent | * | Minus | *** | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | |

| SMALL ENTITY | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|
| RATE | ADDITIONAL FEE | | RATE | ADDITIONAL FEE |
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

13 20 22 23 25

**AMENDMENT B**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | * | Minus | ** | = |
| Independent | * | Minus | *** | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | |

| RATE | ADDITIONAL FEE | | RATE | ADDITIONAL FEE |
|---|---|---|---|---|
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

**AMENDMENT C**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | * | Minus | ** | = |
| Independent | * | Minus | *** | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | |

| RATE | ADDITIONAL FEE | | RATE | ADDITIONAL FEE |
|---|---|---|---|---|
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

\* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20."
\*\*\*If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3."
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE



# Electronic Filing System (EFS) Data
## Electronic Patent Application Submission
### USPTO Use Only

| | |
|---|---|
| EFS ID: | 49527 |
| Application ID: | 10612589 |
| Title of Invention: | PET ENCLOSURE |
| First Named Inventor: | Jeffrey SIMPSON |
| Domestic/Foreign Application: | Domestic Application |
| Filing Date: | 2003-07-02 |
| Effective Receipt Date: | 2003-10-21 |
| Submission Type: | Information Disclosure Statement |
| Filing Type: | |
| Confirmation number: | 6134 |
| Attorney Docket Number: | 2S14.1-011 |

Total Fees Authorized:

Digital Certificate Holder: cn=Bradley Groff,ou=Registered Attorneys,ou=Patent and Trademark Office,ou=Department of Commerce,o=U.S. Government,c=US
Certificate Message Digest: 1905624b96fa454be5d13bc1b031ce2332528a62

OIPE

OCT 2 1 2003

PATENT & TRADEMARK

| | TRANSMITTAL |
|---|---|

Electronic Version v1.1
Stylesheet Version v1.1.0

| Title of Invention | PET ENCLOSURE |
|---|---|

| Application Number: | 10/612589 | |||||||||||||||| |
|---|---|---|
| Date: | 2003-07-02 | |
| First Named Applicant: | Jeffrey M. SIMPSON | |

Confirmation Number:   6134
Attorney Docket Number: 2S14.1-011

I hereby certify that the use of this system is for OFFICIAL correspondence between patent applicants or their representatives and the USPTO. Fraudulent or other use besides the filing of official correspondence by authorized parties is strictly prohibited, and subject to a fine and/or imprisonment under applicable law.

I, the undersigned, certify that I have viewed a display of document(s) being electronically submitted to the United States Patent and Trademark Office, using either the USPTO provided style sheet or software, and that this is the document(s) I intend for initiation or further prosecution of a patent application noted in the submission. This document(s) will become part of the official electronic record at the USPTO.

| Submitted by: | Elec. Sign. | Sign. Capacity |
|---|---|---|
| Bradley K. GROFF<br>Registered Number: 39,695 | /bkg/ | Agent |

| Documents being submitted | Files |
|---|---|
| us-ids | 2S141011-usidst.xml<br>us-ids.dtd<br>us-ids.xsl |

| Comments |
|---|



# ELECTRONIC INFORMATION DISCLOSURE STATEMENT

Electronic Version v18
Stylesheet Version v18.0

| Title of Invention | PET ENCLOSURE |
|---|---|

Application Number: 10/612589
Confirmation Number: 6134
First Named Applicant: Jeffrey SIMPSON
Attorney Docket Number: 2S14.1-011
Art Unit: 3643
Search string: ( D287650 or D442748 or 2560661 or 2892562 or 3738322 or 3774929 or 3978616 or 4224899 or 4696259 or 4762085 or 4989546 or 5167202 or 5203281 or 5469807 or 5626098 or 5649500 or 5845970 or 5890455 ).pn.

## US Patent Documents

Note: Applicant is not required to submit a paper copy of cited US Patent Documents

| Init | Cite.No. | Patent No. | Date | Patentee | Kind | Class | Subclass |
|---|---|---|---|---|---|---|---|
|  | 1 | D287650 | 1987-01-06 | BRAEUNER |  |  |  |
|  | 2 | D442748 | 2001-05-22 | FARRUGIA | S |  |  |
|  | 3 | 2560661 | 1951-07-17 | POOVEY |  |  |  |
|  | 4 | 2892562 | 1959-06-30 | SMITHSON |  |  |  |
|  | 5 | 3738322 | 1973-06-12 | SMITH |  |  |  |
|  | 6 | 3774929 | 1973-11-27 | STANLEY |  |  |  |
|  | 7 | 3978616 | 1976-09-07 | PENNOCK |  |  |  |
|  | 8 | 4224899 | 1980-09-30 | CRUCHELOW et al. |  |  |  |
|  | 9 | 4696259 | 1987-09-29 | FEWOX |  |  |  |
|  | 10 | 4762085 | 1988-08-09 | ONDRASIK |  |  |  |
|  | 11 | 4989546 | 1991-02-05 | CANNADAY |  |  |  |
|  | 12 | 5167202 | 1992-12-01 | BRADFORD et al. |  |  |  |
|  | 13 | 5203281 | 1993-04-20 | HARWICH |  |  |  |
|  | 14 | 5469807 | 1995-11-28 | KOSMACZESKA |  |  |  |
|  | 15 | 5626098 | 1997-05-06 | ASKINS et al. |  |  |  |
|  | 16 | 5649500 | 1997-07-22 | KLAVEMANN et al. |  |  |  |

| | 17 | 5845970 | 1998-12-08 | SCHWARTZ |
| | 18 | 5890455 | 1999-04-06 | DONCHEY |

## Signature

| Examiner Name | Date |
|---|---|
| | |



Application Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of: SIMPSON, Jeffrey M.          )
                                                   )   Group Art Unit: 3643
Serial No.: 10/612,589                             )
                                                   )   Examiner: Unknown
Filed: July 2, 2003                                )
                                                   )
For: **"PET ENCLOSURE"**                           )
_____)

## INFORMATION DISCLOSURE STATEMENT

Mail Stop IDS                          GARDNER GROFF, P.C.
Commissioner for Patents               Paper Mill Village, Building 23
P.O. Box 1450                          600 Village Trace, Suite 300
Alexandria, VA 22313-1450              Marietta, GA 30067

                                       February 17, 2004

Sir:

Submitted herewith on form PTO/SB/08a is a listing of documents known to applicant and/or his attorneys in compliance with the requirements of 37 C.F.R. § 1.56. Applicant also advises the Office of co-pending related Application Serial No. 29/191,801, filed October 14, 2003. Consideration of the cited documents and making the same of record in the prosecution of the above-noted application are respectfully requested. Copies of these documents are not enclosed. 37 C.F.R. § 1.98(d).

The filing of this Information Disclosure Statement shall not be construed as a representation that a search has been made (37 C.F.R. § 1.97(g)), an admission that the information cited is, or is considered to be, material to patentability (37 C.F.R. § 1.97(h)) or statutory prior art, or that no other material information exists. The filing of this Information Disclosure Statement shall not be construed as an admission against interest in any manner. Notice of January 9, 1992, 1135 O.G. 13-25, at 25.

Application Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

No fee is believed to be due, as this Information Disclosure Statement is submitted within three months of the filing date or before receipt of a first office action on the merits. 37 C.F.R. § 1.97(b). However, if any extension of time is necessary to render this filing timely, please consider this a request therefor. The Commissioner is authorized to charge any additional fees due or credit any overpayment to Deposit Account 50-1513.

Respectfully submitted,

*Michelle E Kandcer*

Michelle E. Kandcer
Registration No. 54,207

GARDNER GROFF, P.C.
Paper Mill Village, Bldg 23
600 Village Trace, Ste. 300
Marietta, GA 30067
Tel:    770/984-2300
Fax:    770/984-0098

---

**Certificate of Mailing (37 C.F.R. §1.8)**
I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Mail Stop **IDS**, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450, on the date indicated below.

*Michelle E Kandcer*                        Feb. 17, 2004
Michelle E. Kandcer                         Date

---

W:\Client Files\BKG Clients\2S14-Simpson & Co\2S14.1-011  Pet Enclosure (NonProv)\0014.pat (IDS Transmittal - copies of ref's NOT enclosed).wpd

PTO/SB/08a (05-03)
Approved for use through 04/30/2003. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

Substitute for form 1449A/PTO

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT

*(use as many sheets as necessary)*

| Complete if Known | |
|---|---|
| Application Number | 10/612,589 |
| Filing Date | July 2, 2003 |
| First Named Inventor | SIMPSON, Jeffrey M. |
| Art Unit | 3643 |
| Examiner Name | Unknown |
| Attorney Docket Number | 2S14.1-011 |

| Sheet | 1 | of | 1 |
|---|---|---|---|

## U.S. PATENT DOCUMENTS

| Examiner Initials * | Cite No.[1] | Document Number Number - Kind Code[2] *(if known)* | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| | A | US- 1,211,762 | 01/09/1917 | SAWYER | |
| | B | US- 2,789,531 | 04/23/1957 | DIEFENDORF | |
| | C | US- 4,256,056 | 03/17/1981 | SOU | |
| | D | US- D382,374 | 08/12/1997 | BURKS | |
| | E | US- 5,960,744 | 10/05/1999 | RUTMAN | |
| | F | US- 5,967,090 | 10/19/1999 | HUI | |
| | G | US- D427,730 | 07/04/2000 | POWERS et al. | |
| | H | US- 6,354,245 | 03/12/2002 | RODDY et al. | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document Country Code[3] - Number[4] - Kind Code[5] *(if known)* | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST. 16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached.
This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*



## United States Patent and Trademark Office

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/612,589 | 07/02/2003 | Jeffrey M. Simpson | 2S14.1-011 | 6134 |

23506    7590    02/25/2004

GARDNER GROFF, P.C.
PAPER MILL VILLAGE, BUILDING 23
600 VILLAGE TRACE
SUITE 300
MARIETTA, GA 30067

| EXAMINER |
|---|
| OLSZEWSKI, JOAN M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3643 | |

DATE MAILED: 02/25/2004

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 10/612,589 | SIMPSON, JEFFREY M. |
| | Examiner | Art Unit |
| | Joan M. Olszewski | 3643 |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM
THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed
  after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any
  earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☐ Responsive to communication(s) filed on _____.

2a) ☐ This action is **FINAL.**    2b) ☒ This action is non-final.

3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is
    closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4) ☒ Claim(s) *1-27* is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5) ☐ Claim(s) _____ is/are allowed.

6) ☒ Claim(s) *1-27* is/are rejected.

7) ☐ Claim(s) _____ is/are objected to.

8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9) ☒ The specification is objected to by the Examiner.

10) ☒ The drawing(s) filed on <u>02 July 2003</u> is/are: a) ☐ accepted or b) ☒ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All    b) ☐ Some * c) ☐ None of:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____.

      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage
    application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3) ☒ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08)
    Paper No(s)/Mail Date _____.

4) ☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date _____.

5) ☐ Notice of Informal Patent Application (PTO-152)

6) ☐ Other: _____.

Application/Control Number: 10/612,589                                    Page 2
Art Unit: 3643

## DETAILED ACTION

### *Drawings*

The drawings are objected to as failing to comply with 37 CFR 1.84(p)(5)

because they include the following reference sign(s) not mentioned in the description:

"30" in Figure 4a. A proposed drawing correction, corrected drawings, or amendment to

the specification to add the reference sign(s) in the description, are required in reply to

the Office action to avoid abandonment of the application. The objection to the drawings

will not be held in abeyance.

The drawings are objected to as failing to comply with 37 CFR 1.84(p)(4)

because reference character "28" has been used to designate both "aperture 28" and

"latch 28". A proposed drawing correction or corrected drawings are required in reply to

the Office action to avoid abandonment of the application. The objection to the

drawings will not be held in abeyance.

Further, Applicant is required to carefully review the entire specification for errors

of the type mentioned above and correct all locations in the specification so that the

reference character and the term to describe that reference character is consistent

throughout.

Further, Figure 4b has a lead line with no reference character.

### *Specification*

The disclosure is objected to because of the following informalities:

Page 1, [00001], lines 1 and 2,  "Application Serial No. 29/160,054, filed May 2,

2002" should be deleted and   -- D483156 --  should be inserted.

Application/Control Number: 10/612,589                                          Page 3
Art Unit: 3643

Page 1, [00001], lines 4 and 5, "Application Serial No. 29/160,054" should be
deleted and  — D483156 -- should be inserted.

Appropriate correction is required.

### Claim Rejections - 35 USC § 112

The following is a quotation of the second paragraph of 35 U.S.C. 112:

The specification shall conclude with one or more claims particularly pointing out and distinctly
claiming the subject matter which the applicant regards as his invention.

Claims 25-27 are rejected under 35 U.S.C. 112, second paragraph, as being
indefinite for failing to particularly point out and distinctly claim the subject matter which
applicant regards as the invention.  Specifically, the use of "and/or" in claim 25, line 8 is
confusing and makes the scope of the claim unclear.  Further, since claims 26-27
depend from claim 25 these are also rejected.

### Claim Rejections - 35 USC § 102

(b) the invention was patented or described in a printed publication in this or a foreign country or in public
use or on sale in this country, more than one year prior to the date of application for patent in the United
States.

Claims 1 and 2 are rejected under 35 U.S.C. 102(b) as being anticipated by Liu
(US Patent 6,230,915).

Regarding Claims 1 and 2, Liu discloses a device (Figure 1) capable of being a
pet enclosure comprising a frame formed of a substantially rigid, non-porous material
and a flexible, non-porous material woven onto the frame (Figure 1); and wherein the
frame comprises a plurality of generally flat rectangular panels (Figure 1).


Claim 22 is rejected under 35 U.S.C. 102(b) as being anticipated  by Richmond
et al. (US Patent 6,318,294).

Application/Control Number: 10/612,589                                    Page 4
Art Unit: 3643

Regarding Claim 22, Richmond et al. disclose a pet enclosure (Figure 1) comprising a floor panel and a plurality of legs for supporting the floor panel a distance above an underlying support surface (Figure 1).


Claims 25 and 26 are rejected under 35 U.S.C. 102(b) as being anticipated by Kolozsvari (US Patent 6,192,834) and as best understood in light of the 35 USC 112 second paragraph rejection above.

Regarding Claim 25, Kolozsvari discloses pet enclosure (20) comprising: a base portion (50); a first side panel hingedly connected to the base portion; a second side panel hingedly connected to the base portion; a first end panel hingedly connected to the base portion; a second end panel hingedly connected to the base portion; and a top panel hingedly connected to at least one of the first and second side panels and at least one of the first and second end panels (Figures 1 and 2).

Regarding Claim 26, Kolozsvari discloses all the claimed features as discussed in the rejection above including wherein a hinge connection between a first of the panels and the base portion is offset from a hinge connection between a second of the panels and the base portion to permit the panels to fold into a compact configuration (Figure 6).


### Claim Rejections - 35 USC § 103

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the

Application/Control Number: 10/612,589                                      Page 5
Art Unit: 3643

> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

Claims 9 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Liu.

Regarding Claims 9 and 13, Liu discloses all the claimed features as discussed

in the rejection above except for a plastic having the appearance of natural rattan or

wicker. However, the use of plastics to simulate natural rattan in order to provide

durability has been notoriously well known in the art .

Therefore, it would have been obvious to one of ordinary skill in the art to have

utilized a simulated plastic in Liu for the well known benefits.

Claims 3-8,10 and 14-18 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Liu in view of Kolozsvari (US Patent 6,192,834).

Regarding Claims 3,4 and 14, Liu discloses all the claimed features as discussed

in the rejection above including wherein the panels are pivotally connected to one

another to allow folding of the enclosure into a compact configuration (Figure

4)(columns 2 and 3, lines 66-3). Liu does not show the assembly of the enclosure into

an assembled configuration without separation of the panels from one another.

However, Kolozsvari discloses a collapsible enclosure (20) (Figures 2 and 3).

Therefore, it would have been obvious to one of ordinary skill in the art at the

time the invention was made to have modified the device of Liu to include an assembly

of the enclosure into an assembled configuration without separation of the panels from

one another as taught by Kolozsvari in order to provide ease and a less time consuming

process of assembly.

Regarding Claims 5 and15, Liu discloses all the claimed features as discussed in the rejection above except for a door pivotally mounted to swing both inwardly and outwardly in one of the panels. However, Kolozsvari teaches the use of an inwardly and outwardly swinging door (120) mounted in panel (110) in opening (114).

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have modified the device of Liu to include a door as detailed above and taught by Kolozsvari in order to provide access to the interior of the enclosure.

Regarding Claims 6 and 16, Liu as modified by Kolozsvari discloses all the claimed features as discussed in the rejections above except for a latch for securing the door in a closed or open position. However, Kolozsvari teaches the use of a latch (130) for securing the door in a closed position. Further, it is well known to utilize latches on doors to lock them in both open and closed positions in order to keep the door out of the way while open.

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have modified the device of Liu as modified by Kolozsvari to include a latch on the door for securing the door in the closed position as taught by Kolozsvari so as to lock the door and prevent opening. Further, as discussed above it would be obvious to also lock the door in an open position.

Regarding Claims 7 and 17, the combination of Liu and Kolozsvari discloses all the claimed features as discussed in the rejections above except for the latch securing the door in an inwardly open position within the enclosure. However, it is the

Examiner's position that it is well known to secure a door in both an inwardly and outwardly open position in order to keep the doorway clear.

Regarding Claim 8, Liu discloses all the claimed features as discussed above except for the substantially rigid, non-porous material of the frame being formed of metal wire. However, Kolozsvari teaches the forming of a frame structure of metal wire to be well known.

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have modified the Liu device by forming the frame elements of a metal wire as taught by Kolozsvari in order to provide an inexpensive easy to produce structure.

Regarding Claims 10 and 18, Liu discloses all the claimed features as discussed above except for a floor panel supported a distance above an underlying support surface. However, Kolozsvari teaches a floor panel (28) supported a distance above an underlying surface formed of wires. In Kolozsvari the bottom surface of the wires are considered the support surface and as such the floor panel (28) would be a distance above the underlying surface.

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have modified the Liu device by utilizing a tray element mounted on top of the bottom frame as taught by Kolozsvari in order to provide a removable cleanable surface.

Claims 11,12 and 19 are rejected under 35 U.S.C. 103(a) as being unpatentable over Liu as modified by Kolozsvari and further in view of Wheeler (US Patent 4,027,625).

Regarding Claims 11 and 19, Liu as modified by Kolozsvari discloses all the claimed features as discussed in the rejections above except for wherein the floor panel comprises at least one channel for receiving a cooperating portion of the frame. However, Wheeler teaches the concept of a floor panel (16) placement in channeled area (column 3, lines 24-25). To rearrange the channels to be a part of the removeable floor and form the cage wall with an extending frame member to engage the channels would be an obvious rearrangement of parts with no change in function.

Therefore, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have modified the device of Liu as modified by Kolozsvari to include a channel member for receiving a cooperating portion of the frame as taught by Wheeler in order to provide a more stable securement of the element.

Regarding Claim 12, Liu as modified by Kolozsvari and Wheeler, also discloses the plurality of angular offset channels and cooperating frame elements as Wheeler teaches the channels and engaging elements being located on three sides.

Claims 20 and 21 are rejected under 35 U.S.C. 103(a) as being unpatentable over Kolozsvari (US Patent 6,192,834).

Regarding Claim 20, Kolozsvari discloses a pet enclosure (Figure 3A) comprising an opening in which a door is pivotally mounted to swing both inwardly and outwardly, a

Application/Control Number: 10/612,589                                    Page 9
Art Unit: 3643

latch for securing the door in a closed position (Figure 3A). Kolozsvari does not

specifically state that the latch secures the door in an open position it is the Examiner's

position that it would be obvious to latch a door in both an open or closed position.

Regarding Claim 21, Kolozsvari discloses all the claimed features as discussed

in the rejection above except for wherein the latch secures the door in an inwardly open

position within the enclosure. However, it is the Examiner's position it is well known to

secure a door in both an inwardly and outwardly open position in order to keep the

doorway clear.


Claims 23 and 24 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Kolozsvari in view of Wheeler.

Regarding Claim 23, Kolozsvari discloses a pet enclosure (20) comprising a

frame and a removable floor panel (28). Kolozsvari does not show the floor panel

comprising at least one channel for receiving a cooperating portion of the frame.

However, Wheeler teaches the concept of a floor panel (16) placement in channeled

area (column 3, lines 24-25). To rearrange the channels to be a part of the removeable

floor and form the cage wall with an extending frame member to engage the channels

would be an obvious rearrangement of parts with no change in function.

Therefore, it would have been obvious to one of ordinary skill in the art at the

time the invention was made to have modified the device of Kolozsvari to include a

channel member for receiving a cooperating portion of the frame as taught by Wheeler

in order to provide a more stable securement of the element.

Application/Control Number: 10/612,589                                    Page 10
Art Unit: 3643

Regarding Claim 24, Kolozsvari as modified by Wheeler also discloses the
plurality of angular offset channels and cooperating frame elements as Wheeler teaches
the channels and engaging elements being located on three sides.


Claim 27 is rejected under 35 U.S.C. 103(a) as being unpatentable over
Kolozsvari in view of Leichtfuss (US Patent 2,079,458).

Regarding Claim 27, Kolozsvari discloses all the claimed features as discussed
in the rejection above except for wherein short connector links are interposed between
one or more of the panels and the base portion to permit the panels to fold into a
compact configuration.  However, Leichtfuss teaches short connector links interposed
between one or more panels and the base portion to permit the panels to fold into a
compact configuration (Figure 1 and 3).

Therefore, it would have been obvious to one of ordinary skill in the art at the
time the invention was made to have modified the device of Kolozsvari to include short
connector links interposed between one or more panels and the base portion to permit
the panels to fold into a compact configuration as taught by Leichtfuss in order to
facilitate easier collapsing of the enclosure.


### *Conclusion*

The prior art made of record and not relied upon is considered pertinent to
applicant's disclosure.

Application/Control Number: 10/612,589                                    Page 11
Art Unit: 3643

Newcomb (989,029), Ortt (2,170,379), Sou (4,256,056), Sugiura (4,527,512),

Rockaitis, III (5,249,549), Mo (5,282,542), Richmond (5,669,331), Weng (5,931,326),

Askins et al. (5,943,982), Axelrod (6,131,534) and Huang (GB 2 238 296 A).

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Joan M. Olszewski whose telephone number is 703-

305-2693. The examiner can normally be reached on Monday-Friday (5:30-3:00) First

Friday Off.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Peter Poon can be reached on 703-308-2574. The fax phone number for

the organization where this application or proceeding is assigned is 703-872-9306.

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system. Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free).

                                        Joan M. Olszewski
                                        Patent Examiner
                                        Art Unit 3643

JMO

                                        PETER M. POON
                                        SUPERVISORY PATENT EXAMINER
                                        TECHNOLOGY CENTER 3600

                                        2/20/04



| Search Notes | | | |
|---|---|---|---|

| Application No. | Applicant(s) |
|---|---|
| 10/612,589 | SIMPSON, JEFFREY M. |
| Examiner | Art Unit |
| Joan M. Olszewski | 3843 |

| SEARCHED | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| 119 | 499 | 2/11/04 | fo |
| 119 | 498 | 2/12/04 | fo. |
| 119 | 482 | " | " |
| 119 | 501 | " | " |
| 119 | 496 | " | " |
| " | 462 | " | " |
| " | 565 | " | " |
| 135 | 143 | " | " |
| 135 | 149 | " | " |
| 135 | 151 | " | " |
| 217 | 122 | " | " |
| " | 124 | " | " |
| D30 | 108 | 2/18/04 | " |
| | | | |

| INTERFERENCE SEARCHED | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| | | | |
| | | | |
| | | | |
| | | | |

| SEARCH NOTES (INCLUDING SEARCH STRATEGY) | DATE | EXMR |
|---|---|---|
| Consulted Examiner Robert Swiatek for search | 2/11/04 | fo |
| tech search | 2/11/04 | fo |
| bk./pd. search on relevant prior art | 2/11/04 2/12/04 | fo |
| | | |
| | | |
| | | |
| | | |
| | | |

## Index of Claims

| Application No. | Applicant(s) |
|---|---|
| 10/612,589 | SIMPSON, JEFFREY M. |
| Examiner | Art Unit |
| Joan M. Olszewski | 3643 |

| | | | |
|---|---|---|---|
| √ | Rejected | — | (Through numeral) Cancelled |
| = | Allowed | + | Restricted |
| N | Non-Elected | A | Appeal |
| I | Interference | O | Objected |

| Final | Original | 2/19/04 | Date | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | √ | | | | | | |
| | 2 | √ | | | | | | |
| | 3 | √ | | | | | | |
| | 4 | √ | | | | | | |
| | 5 | √ | | | | | | |
| | 6 | √ | | | | | | |
| | 7 | √ | | | | | | |
| | 8 | √ | | | | | | |
| | 9 | √ | | | | | | |
| | 10 | √ | | | | | | |
| | 11 | √ | | | | | | |
| | 12 | √ | | | | | | |
| | 13 | √ | | | | | | |
| | 14 | √ | | | | | | |
| | 15 | √ | | | | | | |
| | 16 | √ | | | | | | |
| | 17 | √ | | | | | | |
| | 18 | √ | | | | | | |
| | 19 | √ | | | | | | |
| | 20 | √ | | | | | | |
| | 21 | √ | | | | | | |
| | 22 | √ | | | | | | |
| | 23 | √ | | | | | | |
| | 24 | √ | | | | | | |
| | 25 | √ | | | | | | |
| | 26 | √ | | | | | | |
| | 27 | √ | | | | | | |
| | 28 | | | | | | | |
| | 29 | | | | | | | |
| | 30 | | | | | | | |
| | 31 | | | | | | | |
| | 32 | | | | | | | |
| | 33 | | | | | | | |
| | 34 | | | | | | | |
| | 35 | | | | | | | |
| | 36 | | | | | | | |
| | 37 | | | | | | | |
| | 38 | | | | | | | |
| | 39 | | | | | | | |
| | 40 | | | | | | | |
| | 41 | | | | | | | |
| | 42 | | | | | | | |
| | 43 | | | | | | | |
| | 44 | | | | | | | |
| | 45 | | | | | | | |
| | 46 | | | | | | | |
| | 47 | | | | | | | |
| | 48 | | | | | | | |
| | 49 | | | | | | | |
| | 50 | | | | | | | |

| Final | Original | Date | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 51 | | | | | | | |
| | 52 | | | | | | | |
| | 53 | | | | | | | |
| | 54 | | | | | | | |
| | 55 | | | | | | | |
| | 56 | | | | | | | |
| | 57 | | | | | | | |
| | 58 | | | | | | | |
| | 59 | | | | | | | |
| | 60 | | | | | | | |
| | 61 | | | | | | | |
| | 62 | | | | | | | |
| | 63 | | | | | | | |
| | 64 | | | | | | | |
| | 65 | | | | | | | |
| | 66 | | | | | | | |
| | 67 | | | | | | | |
| | 68 | | | | | | | |
| | 69 | | | | | | | |
| | 70 | | | | | | | |
| | 71 | | | | | | | |
| | 72 | | | | | | | |
| | 73 | | | | | | | |
| | 74 | | | | | | | |
| | 75 | | | | | | | |
| | 76 | | | | | | | |
| | 77 | | | | | | | |
| | 78 | | | | | | | |
| | 79 | | | | | | | |
| | 80 | | | | | | | |
| | 81 | | | | | | | |
| | 82 | | | | | | | |
| | 83 | | | | | | | |
| | 84 | | | | | | | |
| | 85 | | | | | | | |
| | 86 | | | | | | | |
| | 87 | | | | | | | |
| | 88 | | | | | | | |
| | 89 | | | | | | | |
| | 90 | | | | | | | |
| | 91 | | | | | | | |
| | 92 | | | | | | | |
| | 93 | | | | | | | |
| | 94 | | | | | | | |
| | 95 | | | | | | | |
| | 96 | | | | | | | |
| | 97 | | | | | | | |
| | 98 | | | | | | | |
| | 99 | | | | | | | |
| | 100 | | | | | | | |

| Final | Original | Date | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 101 | | | | | | | |
| | 102 | | | | | | | |
| | 103 | | | | | | | |
| | 104 | | | | | | | |
| | 105 | | | | | | | |
| | 106 | | | | | | | |
| | 107 | | | | | | | |
| | 108 | | | | | | | |
| | 109 | | | | | | | |
| | 110 | | | | | | | |
| | 111 | | | | | | | |
| | 112 | | | | | | | |
| | 113 | | | | | | | |
| | 114 | | | | | | | |
| | 115 | | | | | | | |
| | 116 | | | | | | | |
| | 117 | | | | | | | |
| | 118 | | | | | | | |
| | 119 | | | | | | | |
| | 120 | | | | | | | |
| | 121 | | | | | | | |
| | 122 | | | | | | | |
| | 123 | | | | | | | |
| | 124 | | | | | | | |
| | 125 | | | | | | | |
| | 126 | | | | | | | |
| | 127 | | | | | | | |
| | 128 | | | | | | | |
| | 129 | | | | | | | |
| | 130 | | | | | | | |
| | 131 | | | | | | | |
| | 132 | | | | | | | |
| | 133 | | | | | | | |
| | 134 | | | | | | | |
| | 135 | | | | | | | |
| | 136 | | | | | | | |
| | 137 | | | | | | | |
| | 138 | | | | | | | |
| | 139 | | | | | | | |
| | 140 | | | | | | | |
| | 141 | | | | | | | |
| | 142 | | | | | | | |
| | 143 | | | | | | | |
| | 144 | | | | | | | |
| | 145 | | | | | | | |
| | 146 | | | | | | | |
| | 147 | | | | | | | |
| | 148 | | | | | | | |
| | 149 | | | | | | | |
| | 150 | | | | | | | |




## ELECTRONIC INFORMATION DISCLOSURE STATEMENT

Electronic Version v18
Stylesheet Version v18.0

| Title of Invention | PET ENCLOSURE |
|---|---|

Application Number:     10/612589
Confirmation Number:    6134
First Named Applicant:  Jeffrey SIMPSON
Attorney Docket Number: 2S14.1-011
Art Unit:               3643
Search string:          ( D287650 or D442748 or 2560661 or 2892562
                        or 3738322 or 3774929 or 3978616 or 4224899
                        or 4696259 or 4762085 or 4989546 or 5167202
                        or 5203281 or 5469807 or 5626098 or 5649500
                        or 5845970 or 5890455 ).pn.

## US Patent Documents

Note: Applicant is not required to submit a paper copy of cited US Patent Documents

| Init | Cite.No. | Patent No. | Date | Patentee | Kind | Class | Subclass |
|---|---|---|---|---|---|---|---|
| | 1 | D287650 | 1987-01-06 | BRAEUNER | | | |
| | 2 | D442748 | 2001-05-22 | FARRUGIA | S | | |
| | 3 | 2560661 | 1951-07-17 | POOVEY | | | |
| | 4 | 2892562 | 1959-06-30 | SMITHSON | | | |
| | 5 | 3738322 | 1973-06-12 | SMITH | | | |
| | 6 | 3774929 | 1973-11-27 | STANLEY | | | |
| | 7 | 3978616 | 1976-09-07 | PENNOCK | | | |
| | 8 | 4224899 | 1980-09-30 | CRUCHELOW et al. | | | |
| | 9 | 4696259 | 1987-09-29 | FEWOX | | | |
| | 10 | 4762085 | 1988-08-09 | ONDRASIK | | | |
| | 11 | 4989546 | 1991-02-05 | CANNADAY | | | |
| | 12 | 5167202 | 1992-12-01 | BRADFORD et al. | | | |
| | 13 | 5203281 | 1993-04-20 | HARWICH | | | |
| | 14 | 5469807 | 1995-11-28 | KOSMACZESKA | | | |
| | 15 | 5626098 | 1997-05-06 | ASKINS et al. | | | |
| | 16 | 5649500 | 1997-07-22 | KLAVEMANN et al. | | | |

APP_ID=10612589                                                    Page 1 of 2

| | 17 | 5845970 | 1998-12-08 | SCHWARTZ |
|---|---|---|---|---|
| | 18 | 5890455 | 1999-04-06 | DONCHEY |

**Signature**

| Examiner Name | Date |
|---|---|
| *John Olazobi* | 2/18/04 |



Application Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
**PATENT**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of: SIMPSON, Jeffrey M. )
 ) Group Art Unit: 3643
Serial No.: 10/612,589 )
 ) Examiner: OLSZEWSKI, Joan M.
Filed: July 2, 2004 )
 )
For: **"PET ENCLOSURE"** )
———————————————————)

## INFORMATION DISCLOSURE STATEMENT

Mail Stop IDS      GARDNER GROFF, P.C.
Commissioner for Patents   Paper Mill Village, Building 23
P.O. Box 1450       600 Village Trace, Suite 300
Alexandria, VA 22313-1450  Marietta, GA 30067

             March 22, 2004

Sir:

  Submitted herewith on form PTO/SB/08a&b is a listing of documents known to applicants and/or their attorneys in compliance with the requirements of 37 C.F.R. § 1.56. Consideration of the cited documents and making the same of record in the prosecution of the above-noted application are respectfully requested. Copies of non-patent documents are enclosed.

  The filing of this Information Disclosure Statement shall not be construed as a representation that a search has been made (37 C.F.R. § 1.97(g)), an admission that the information cited is, or is considered to be, material to patentability (37 C.F.R. § 1.97(h)) or statutory prior art, or that no other material information exists. The filing of this Information Disclosure Statement shall not be construed as an admission against interest in any manner. Notice of January 9, 1992, 1135 O.G. 13-25, at 25.

03/25/2004 SMIMASS1 00000005 10612589
01 FC:1806     180.00 OP

1

Application Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

The requisite fee under 37 C.F.R. § 1.97(c) is enclosed.  If any extension of time is necessary to render this filing timely, please consider this a request therefor.  The Commissioner is authorized to charge any additional fees due or credit any overpayment to Deposit Account 50-1513.

Respectfully submitted,

Bradley K. Groff
Registration No. 39,695

GARDNER GROFF, P.C.
Paper Mill Village, Bldg 23
600 Village Trace, Ste. 300
Marietta, GA 30067
Tel:    770/984-2300
Fax:    770/984-0098

**Certificate of Mailing (37 C.F.R. §1.8)**
I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Mail Stop IDS, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450, on the date indicated below.

Bradley K. Groff                                                                3/22/04
                                                                                    Date

W:\Client Files\BKG Clients\2S14-Simpson & Co\2S14.1-011  Pat Enclosure (NonProv)\0018.pat (IDS Transmittal).wpd

2

PTO/SB/08b(06-03)
Approved for use through 07/31/2006. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

Substitute for form 1449B/PTO

## INFORMATION DISCLOSURE STATEMENT BY APPLICANT

*(Use as many sheets as necessary)*

| | | **Complete if Known** |
|---|---|---|
| *Application Number* | 10/612,589 |
| *Filing Date* | 07/02/2003 |
| *First Named Inventor* | SIMPSON, Jeffery M. |
| *Art Unit* | 3643 |
| *Examiner Name* | OLSZEWSKI, Joan M. |
| Sheet | 1 | of | 1 | *Attorney Docket Number* | 2S14.1-011 |

| | | NON PATENT LITERATURE DOCUMENTS | |
|---|---|---|---|
| Examiner Initials * | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T [2] |
| | A | IN THE COMPANY OF DOGS, Spring Preview 2001 - Catalog, Portland, Tennessee. | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.
[1] Applicant's unique citation designation number (optional). [2] Applicant is to place a check mark here if English language Translation is attached.
This collection of information is required by 37 CFR 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 120 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: **Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

This Page Is Inserted by IFW Operations
and is not a part of the Official Record

# BEST AVAILABLE IMAGES

Defective images within this document are accurate representations of
the original documents submitted by the applicant.

Defects in the images may include (but are not limited to):

- BLACK BORDERS

- TEXT CUT OFF AT TOP, BOTTOM OR SIDES

- FADED TEXT

- ILLEGIBLE TEXT

- SKEWED/SLANTED IMAGES

- COLORED PHOTOS

- BLACK OR VERY BLACK AND WHITE DARK PHOTOS

- GRAY SCALE DOCUMENTS

# IMAGES ARE BEST AVAILABLE COPY.

## As rescanning documents *will not* correct images, please do not report the images to the Image Problem Mailbox.

Spring Preview 2001

## IN THE COMPANY OF
# DOGS

# SALE

UP TO 60% OFF
Beginning on page 13

GIFTS AND GEAR FOR DOGS & THE PEOPLE WHO SHARE THEIR LIVES

*"If the dogs you know are anything like the dogs we know, they're not just pets ... they're family. And, as with any family member, you want them to look their best, feel their best and share your way of life."*
*Our Philosophy*



Noses are twitching. Tails are wagging. It's a sure sign that spring is here! So sit back, relax and enjoy the latest "In the Company of Dog's" collection. This season our collection includes the best of the best. Wonderful gear for travel, whether it's a vacation or short can trip. Terrific ideas for the active, outdoor lifestyle that spring brings. Clever ways to keep your dog cool and hydrated. Not to mention wonderful home accessories and apparel that celebrate the love between you and your best friend.

Enjoy!

**BREED WIND CHIMES**
Dogs love to feel the wind and these are no exception. Cast of durable metal with the warmth of pewter, they'll emit a delightful sound with every breeze. Dog head on top approx. 6"H, suspends a trio of standing dogs, approx. 4". Specify Basset, Bichon, Boston Terrier, Cocker, Dachshund, Doberman, German Shepherd, Golden, Greyhound, Lab, Pug, Rottweiler, Schnauzer, Westie or Yorkie.
**A863A   $39**

## "Dogs Love to Feel the Wind





**K-9-11 ... FIDO FLOAT TO THE RESCUE!**
Don't take chances, take Fido for a swim or boat ride and play it safe. The Fido Float is designed as a life vest and swim aid and features a unique handle so it's easy to hoist or pull her to safety. Superior full body fit and special collar keeps heads and tails above water. Special nylon mesh at chest keeps Fido cool, comfortable and less bulky. USA. Specify topline measurement 7"-32" and give your dog's weight.  **B2099  $36**

**PET CHAISE**
Portable cabana bed allows air to circulate, filters sunlight and reduces temperature up to 15°. Tear and mildew-resistant, UV fabric on a sturdy, no-rust aluminum base that's raised to discourage fleas, ticks and ants. Easy assembly, spot clean. USA. Specify Blue/White or Hunter/White. 22" x 20" x 20H.  **A3297  $44**

**TOLL FREE**
**1•800•924•5050**
www.inthecompanyofdogs.com

2



28
a wind
ception.
al with
ur, they'll
nd with
ead on
pends a

ion
shund,

Wind'

**CANINE COOL PAD**

Keep your pet cool and comfortable for hours. Just soak in cold water until plump, and it maintains a 62° temperature for up to 3 days. Since it cools through natural evaporation, your dog's hair stays dry. Reversible, portable and non-toxic; it's easy to clean and store. USA. Specify Blue or Green. The small size coordinates as a "cool" lounge mat to fit on our pet chaise (see photo below).
Small 20" x 22"  B2089 $40   Large 30" x 40"  B2090 $60
Also available in Taupe, especially designed to fit into your shoulder, dog carriers. Small 14" x 6-1/2"  B2087 $22
Large 16" x 7".  B2088 $26



**RAISED WATER STATIONS**

Attractive wrought iron stands feature an antiqued rusted finish that's sealed to resist weather and looks great both indoors and out. The raised design lets your dog drink in a naturally comfortable position and a stabilizing disk on each leg helps prevent tipping. Includes a stainless steel bowl. Small, 7-1/2"W x 9-1/2"H, with 1-1/2-qt. bowl  B1012  $65
Large, 10-3/4"W x 13-1/2"H, with 4-qt. bowl  B1013  $120

**CANINE COOLER FOR IMMEDIATE, LONG-LASTING RELIEF**

Cooling sensation helps prevent hyperventilating and overheating during exercise, car travel or extended heat exposure. Unique design will maintain coolness for over a day when soaked in water, yet stays dry next to dog's hair. Improved Velcro® closings for a custom fit. Non-toxic and veterinarian approved, it's durable, reusable and hand washable. Use and care instructions included. USA. Specify topline measurement 6"-32" and give your dog's weight.
XX-Small-Small  B2092  $39
Medium-XLarge  B2093  $49



3



**QUILTED CARSEAT COVERS**
Our back seat covers are so luxurious, it's hard to believe they're practical too. Totally carefree 10% nylon microfiber protects your car upholstery and pet hair moisture beads up for easy cleaning. Back Seat cover has opening for seat belt and elastic loops to secure in place. USA, specify Khaki or Grey. Back Seat (bench cover), 59"L x 22"W B6220 $125
Cargo (fits most SUV's), 60"L x 42"W B6221 $98
New! Bucket Seat Cover, 22"L x 45"W C1156 $78



**PETS WELCOME ... THROUGHOUT THE COUNTRY**
The definitive guide to hotels, inns and resorts that welcome pets. Caters to all budgets and offers an array of options The National edition offers a comprehensive overview of pet-friendly accommodations across the country. Regional Editions focus on your specific destination. Illustrated.
National Edition. A947A $19.95
For Regional Edition, please specify California, Pacific Northwest, Mid-Atlantic/Chesapeake, New England/New York, Southwest or America's South.
Regional Edition. B1040 $15.95

**"MUTTLUKS" BOOTIES**
Protect tender tootsies all year 'round. Choose toasty Yukon fleece booties in Black or all-weather booties of breathable, waterproof Yellow fabric with leather toe protection (size S & up). Both feature treated leather bottoms that resist water and salt; rib-knit cuffs and easy Velcro®-fastening. 3M reflective straps for night walking. Machine wash. Imported. Specify size XXS-XXL (ask operator for assistance). Cold-weather booties (Black) B6012  All-weather booties (Yellow) A943A $39 (set of 4)

**EXPANDABLE "POCKETBOOK" DOG CARRIER**
Perfect for traveling, this unique and fashionable carrier is ideal for both pet and owner. For you, it's a chic pocketbook that expands into a dog carrier. For pup, it's a safe and secure place to ride along or stay when traveling. One size, 20-1/2"L x 12-1/4"H x 5-3/4"W. C1158 $98





| MUTTLUKS PAW SIZE CHART | | | |
|---|---|---|---|
| XX-Large 4-3/4" - 5-1/2" | | Small 2-3/4" - 3-1/2" | |
| X-Large 4-1/4" - 4-3/4" | | X-Small 2-1/4" - 2-3/4" | |
| Large 3-3/4" - 4-1/4" | | XX-Small 1-3/4" - 2-1/4" | |
| Medium 3-1/4" - 3-3/4" | | Itty Bitty 1" - 1-3/4" | |

4



## CAR SEAT LOOKOUTS AND COORDINATE THROW

Give small dogs a boost so they can enjoy the view from your car windows. Booster seat features a seat belt slot for security (use your own harness and strap for complete safety). Quilted nylon over comfy foam with cozy sherpa interior removes to machine wash. Specify beige or black. 19" x 16"x 14". USA.
Classic Lookout   **A700A $68**
Deluxe version with personalized flap lifts to reveal a plastic storage container. Specify dog's name (up to 10 letters) for personalizing.
**B6002 $88**
Coordinate quilted nylon car seat throw. Black only   **A880A $35**

**TOLL FREE**
**1•800•924•5050**
www.inthecompanyofdogs.com

## PAC-A-PET CARRIER™

Transport your "baby" in safety and comfort. Removable polar fleece liner keeps him snug. Safety leash attaches to collar. Durable nylon with adjustable straps.
Small (up to 8 lbs.)
**A6850 $64**
Large (up to 14 lbs.)
**A6851 $69**

## DELUXE PET FIRST-AID KIT

Medi+pet® to the rescue! Travel and outdoor summer fun can expose your dog to numerous injuries, insect bites and heat stroke. Specifically designed for the special needs of animals, this deluxe kit contains over 40 veterinarian-suggested items packed in water-repellent canvas case along with an informative treatment guide.
Compact 9"L x 6"W x 3"H.   **B6254  $44**

## BLACK LAB CAR MATS

Taking a front seat! Black Lab mats protect original car or SUV carpeting. U.S.-made of wear-durable poly; Latex® acrylic waffle back. 17-1/4"L x 27"H, fully bound. Hose clean
**D2000  set of 2  $39.95**

## SHERPA TRAVELERS

Only the best for dogs on the move! Deluxe Pique Sherpa Roll-Up features 2-way entry with U-shaped top zip, ventilating mesh panels with roll-up flaps on three sides, plus a large zip pocket. Features washable fleece liner and adjustable shoulder strap that doubles as a leash. Approved by most airlines for carry-on, folds flat to store. Black. Deluxe Sherpa Roll-Up:
Small (up to 9 lbs.) 16" x 10" x 9-1/2"   **A582A  $90**
Medium (up to 16 lbs.) 17-1/2" x 10" x 10-1/2"
**A583A $100**
Large (up to 22 lbs.) 19" x 11" x 11-1/2"
**A584A  $110**
Sherpa-On-Wheels:
Medium (up to 16 lbs.) 18" x 11" x 10-1/2"H
**A660A $130**
Large (up to 22 lbs.) 20" x 11-3/4" x 11-1/2"H
**A806A $150**

5



...UGHOUT
...OUNTRY

...o hotels
...welco
...gets and
...ions The
...offers a
...v of pet-
...odations
...Regional
...specific
...strated.
**$19.95**
...alifornia,
...ke, New
...'s South.
**$15.95**

...ties in

...e that
...ctive

## CAR SEAT LOOKOUTS AND COORDINATE THROW

Give small dogs a boost so they can enjoy the view from your car windows. Booster seat features a seat belt slot for security (use your own harness and strap for complete safety). Quilted nylon over comfy foam with cozy sherpa interior removes to machine wash. Specify beige or black. 19" x 16"x 14". USA.
Classic Lookout    A700A  $68
Deluxe version with personalized flap lifts to reveal a plastic storage container. Specify dog's name (up to 10 letters) for personalizing.
B6002  $88
Coordinate quilted nylon car seat throw. Black only    A880A  $35



## BLACK LAB CAR MATS

Taking a front seat! Black Lab mats protect original car or SUV carpeting. U.S.-made of wear-durable poly; Latex® acrylic waffle back. 17-1/4"L x 27"H, fully bound. Hose clean
D2000  set of 2  $39.95

## SHERPA TRAVELERS

Only the best for dogs on the move! Deluxe Pique Sherpa Roll-Up features 2-way entry with U-shaped top zip, ventilating mesh panels with roll-up flaps on three sides, plus a large zip pocket. Features washable fleece liner and adjustable shoulder strap that doubles as a leash. Approved by most airlines for carry-on, folds flat to store. Black. Deluxe Sherpa Roll-Up:
Small (up to 9 lbs.) 16" x 10" x 9-1/2"  A582A  $90
Medium (up to 16 lbs.) 17-1/2" x 10" x 10-1/2" A583A $100
Large (up to 22 lbs.) 19" x 11" x 11-1/2"
A584A  $110
Sherpa-On-Wheels:
Medium (up to 16 lbs.) 18" x 11" x 10-1/2"H
A660A  $130
Large (up to 22 lbs.) 20" x 11-3/4" x 11-1/2"H
A806A  $150

**TOLL FREE**
**1•800•924•5050**
www.inthecompanyofdogs.com

## PAC-A-PET CARRIER™

Transport your "baby" in safety and comfort. Removable polar fleece liner keeps him snug. Safety leash attaches to collar. Durable nylon with adjustable straps.
Small (up to 8 lbs.)
A6850  $64
Large (up to 14 lbs.)
A6851  $69

## DELUXE PET FIRST-AID KIT

Medi+pet® to the rescue! Travel and outdoor summer fun can expose your dog to numerous injuries, insect bites and heat stroke. Specifically designed for the special needs of animals, this deluxe kit contains over 40 veterinarian-suggested items in a water-repellent canvas case along with an informative treatment guide.
Compact 9"L x 6"W x 3"H.  B6254  $44





**BREED BOTTLE STOPPERS**
These realistically sculpted, hand-painted resin dog heads are complete with cork and ring chain. Each approx. 2"-3"H. Offered in over 100 AKC breeds. Ask operator for availability. **C1344  $24   3 or more $19 each**

**WASHED BREED SWEATSHIRT**
Pigment dyed sweatshirt with a lightly washed look are richly embroidered with an image and breed name. Green available with Chocolate Lab or (not shown) Jack Russell, Golden Retriever, or Boxer. Purple available with Spring Spaniel or (not shown) Greyhound or Yorkshire Terrier. Blue available with Dachshund or (not shown) Sheltie or German Shepherd. USA. Specify breed and Unisex size M, L, XL.  **B6139  $59**

**OUR-RAISED HARVEST TABLES**
Available in 3 sizes, 2 styles and 5 handsome finishes, our raised harvest tables allow dogs of every size to eat in a healthful, naturally relaxed position that aids digestion and relieves stress on joints. Choose our standard 12"H for mid size to larger dogs, 6"H for short dogs and 18"H for extra-tall dogs.

**BONE-SHAPED BRAIDED RUGS**
The perfect shape under our harvest tableSturdy, spot-clean polypropylene. USA. Specify Green/Multi, Blue/Multi or Black/Multi. 36"L x 15"W.  **A913A  $34** 2 or more $29 Each

**CLASSIC HARVEST TABLES**
Sturdy wood construction, two stainless steel bowls included. Specify straight or turned legs.
Short, 15"x7"x6" Natural only.  **A618A  $74**
Short, 15"x7"x6" Natural/White, Natural/Indigo, Natural/Hunter, Walnut
**A654A  $74**
Standard, 21"x11"x12" Natural only
**A226A  $99**
Standard, 21"x11"x12" Natural/White, Natural/Indigo, Natural/Hunter, Walnut
**A211A  $99**
Tall, 21"x11"x18" Natural only.  **A619A  $119**
Tall, 21"x11"x18" Natural/White, Natural/Indigo, Natural Hunter, Walnut
**A655A  $119**

6

**PAPER TOWEL HOLDER**
This dog's on a roll! Expressive hand-painted resin pooch holds a roll of paper towels. Just push on the head to tear off a sheet! Specify Chocolate Lab, Boston Terrier, Dalmatian or (not shown) Buff Cocker, Bulldog, Doberman, Golden Retriever, Irish Setter, Jack Russell, Lab (Black or Yellow), Pug, Red Dachshund, Rottweiler, Schnauzer or Westie. Resin, approx 18-1/2"H on 8-1/2" base.
**A6221  $45**

TOLL FREE
1•800•924•5050
www.inthecompanyofdogs.com

**"COUNTRY FRENCH" FEEDING TABLES**
Pooch in Provence exclusively handpainted. Specify Blue Grape or Khaki Pears. Includes two stainless steel bowls.
Small, 15-1/2" L x 7-1/2"W 6"H.  C1169  $95
Medium, 21"L x 11"W x 12"H.  C1170  $125
Large, 21"L x 11"W x 18"H.  C1171  $145
See B1217 and B1218 for Ceramic Bowls.

**"AMERICAN HERITAGE" FEEDING TABLES**
This American classic with distinctive scalloped apron. Distressed wood finish. Specify Sage, White or Cornflower Blue. Includes two stainless steel bowls.
Small, 15-1/2"L x 7-1/2"W x 6"H.  C1172  $95
Medium, 21"L x 11"W x 12"H.  C1173  $125
Large, 21"L x 11"W x 18"H.  C1174  $145

D RUGS
. harvest
e. USA.
Multi or
3A  $34
29 Each

**"RUNNING DOG" CERAMIC BOWLS**
We custom cast these bowls especially to fit our raised harvest tables. Handcrafted and glazed with a matte finish, they feature our own happy running dog at the bottom. Dishwasher-safe earthenware. Available in White and Green. (Colors Blue, Yellow and Khaki not available.) Small 3-1/2-cup bowl. 6" diam.; fits our Short table. Set of 2  B1217  $48
Large 8-cup bowl. 8-1/2" diam., fits our Standard and Tall tables.
Set of 2  B1218  $58
$10 discount on Set of 2 Ceramic Bowls when ordered with table

gs.com



**OUTDOOR PET BED**
Made especially for outdoor use, this bed withstands exposure to weather, resists stains, sunlight and moisture. Bead fill makes it virtually impossible for parasites, fungus and mildew to exist; will not absorb and retain odors. Covered in an open-weave, synthetic fabric. Choose Green Ivy or Black Leaf.
34"  A876A  $80
43"  A882A  $100
52"  A883A  $125
New Super Jumbo 52" x 71"
D1003  $175

**FLOWER POOCHES**
Large "Mom" and small "Puppy" plant stands are made of rustic metal with a natural rusted patina. Includes terra cotta pot.
Small, 12 1/2"H.  B2030  $39, 2 or more for $34 Each
Large, 25"H.  B2029  $89, 2 or more for  $79 Each



TOLL ✦ FREE
1✦800✦924✦5050
www.inthecompanyofdogs.com



**PAW PRINT FURNITURE**
Constructed of solid cypress wood with doghouse and paw print accents. Specify White or Celedon. (Shipped directly from manufacturer, allow 4-6 w for delivery.) Additional freight charges apply.
Chair, 33"L x  34"W x 44"H  B2056  $399
Accent Table, 22"L x  19"W x 21"H  B2058  $239
Loveseat, 59"Lx34"Wx44"H  B2057  $599

**SUSAN SARGENT 'GOOD DOG' PILLOW**
His/her just rewards — appliquéd "Good Dog" artwork by creative artist Susan Sargent. 20" square. 100% cotton with fiberfill insert. USA  B2059  $79



**DELUXE S.U.B. (SPORTS UTILITY BICYCLE)**
This custom tricycle is a grand transportation alternative for marketing outings, carrying loads of stuff without fear of toppling, and taking along a spare passenger or two. Perfect for busy summertime resorts (Parking? Traffic? No problem!) Features front and rear bamboo and rattan wrapped steel baskets; rear basket is a roomy 23"Lx17"Wx10"D. Adjustable seat and handlebars. Single speed. (Shipped directly from manufacturer, please allow 2-4 weeks for delivery.)
B2054  $610
Also available in single speed women's bicycle (front basket only).
B2151  $450

8





se and

$79



**CONTOURED DOGGIE RAIN SLICKER**
Breathable waterproof and windproof nylon will
keep your pooch comfy and dry. Contoured shape
allows complete freedom of movement; has
adjustable belt with quick-release buckle for easy
on/off. Snug drawstring hood folds down into a
collar. Packs into a lightweight pouch that's small
enough to fit into a pocket. USA. Yellow. Specify
topline size 8"-24".   Sizes 8-14  B6230  $65
Sizes 16-24   B6231   $79

**DOG ZEN FOUNTAIN**
This happy, hospitable pooch will lend the tranquil,
soothing sounds of running water to your patio or
garden pool. Just add meditation (water not
included). Resin pond recycles water from the
base, comes complete with pump, ready to install.
USA. 12"H. Allow 4-6 weeks for delivery.
Dog with hose.  B2060  $129
Resin pond with pump. Simply place in soil and fill.
Recycles water. 33"Diam. x 9"H.
B2061  $329

**"WIPE PAWS" MAT**
Spread out a bright
and witty welcome
for family and
friends ...
4-footed or not!
Durable
doormat
features
colorful hand
stencils on natural cir.
Suitable for indor/outdoor
use.30"L x 18"W x 1-1/2"D.
A448A  $30, 2 for $24 Each





**TOLL FREE**
**1•800•924•5050**
www.inthecompanyofdogs.com

**"BERBER" FLEECE WHIPSTITCH DOG BED**
Richly textured, flecked "Berber" pile cover of poly acrylic; inside, resilient polyfill. Both are machine washable. USA. Specify color: Oatmeal, Cornflower Blue or Graphite. Personalize it for just $12 (up to 12 characters).
Medium, 36" x 27"  B6022  $105  Large, 45" x 35"  B6023  $125
X-Large, 58" x 41"  B6024  $145
Additional Duvet Cover:  Medium  B6026  $79  Large  B6027  $89
X-Large  B6028  $99

**EMBROIDERED VELVETEEN PILLOWS**
Dog lover's delight ... on a chair, sofa or bed, these luscious velveteen pillows say it all. Richly embroidered 100% cotton covers zip-off to dry clean, polyfill inside.  "Want The Best Seat In The House,"
10 1/2" sq.  B1239  $54
"My Dog Is My Baby," 12" x 8",
B1238  $54
Personalized (specify dog's name) "Sleeps Here," 12" x 18"
B1240  $54

**OUTDOOR TOPIARY PET BED & BOLSTERS PILLOWS FOR "CULTIVATED" CANINES**
Available with a matching set of three bolsters for added comfort. This deluxe bed is covered with a coated acrylic fabric treated to withstand outdoor exposure from moisture, sunlight and stains. Resilient poly-silk filling is quick drying and resistant to mold and mildew. Wipe clean. Yellow/green topiary print. USA. Medium, 36"L x 27"W
B6232  $98  Large, 45"L x 36"W  B6233  $148
X-Large, 58"L x 41"W
B6234  $178
Coordinating bolster pillows:
Medium  B2182  $49
Large  B2183  $59
X-Large  B23184  $69

**ANIMAL KINGDOM FAUX FUR BEDS**
He'll dream of great adventures as he snuggles down on this soft, warm bed with a zip-off cover of plush faux fur. Inside, our resilient polyfill bed cradles and supports him in comfort; it is non-allergenic, durable and odorless. Completely machine washable. USA. Specify Grey Lynx, Giraffe or Leopard.
Medium, 36" x 27"  B6040  $95
Large, 45" x 35"  B6041  $125
X-Large, 58" x 41"  B6042  $155
Additional Duvet sold separately:
Medium  B6044  $69
Large  B6045  $89
X-Large  B6046  $109

IN THE COMPANY OF DOGS 1•800•924•5050

**FINE ARF PAW PRINT COLLAR, LEASH & PERSONALIZED ID TAG**
English bridle leather collars are embellished with antique gold brass paw prints. Add a matching paw print ID tag that we'll personalize for you (up to 10 letters each). Specify Black/Red, Red/Black or Brown/Green and neck measurement 10"-24".
Collar  A688A  $49  Paw ID Tag  A687A  $16
Matching 4' leash  A689A  $44
Set of 3: Collar, Tag and Leash  A690A  $99

**BRAID-TRIMMED JACQUARD BED**
So richly elegant it will make its own distinctive statement in your living room, den or office. The woven jacquard cover trimmed with lavish braided cord has a unique quilted button design. Inside, resilient polyfill with downy, high loft, extremely comfortable, durable and nonallergenic. Both are machine washable. USA. Specify Olive or Champagne.
Medium, 36" x 27"  B6036  $125  Large, 45" x 35"  B6037  $155
X-Large, 58" x 41"  B6038  $195
Additional duvets available: Medium  B6036  $99
Large  B6037  $119  X-Large  B6038  $149

**WROUGHT IRON DAYBED BASE**
Made especially for our wrought iron base is sealed with. Specify Antique Gold, Rust, Red, Antique White Allow 6 weeks for delivery.
Medium, 37"L x 27-1/2"W x 22"H  B6200  $398
Large, 46"L x 35-1/2"W x 22"H  B6201  $498
X-Large, 59"L x 41-1/2"W x 22"H  B6202  $648
Delivery surcharge. Please see order form for additional information.

**VINTAGE FLORAL DOG BED**
We've discovered marvelous inner designer look.
plump filled feather beds are made of 95% goose feathers and 5% down, to provide a firm, yet gentle body of support. The cotton linen floral cover removes for machine washing. Medium, 36"L x 27"W  D1000  $135
Large, 45"L x 35"W  D1001  $165
X-Large, 58"L x 41"W  D1002  $195
Set 3/Bolster Pillows: Medium  B6270  $45
Large  B6271  $55  X-Large  B6272  $62
Additional Duvets Available:
Medium  B6182  $88  Large  B6183  $108  X-Large  B6184  $128



**NEW! RESCUED DOG SWEATSHIRT**
This shirt tells the world that you're the "Proud Owner of a Rescued Dog." Relaxed fleece sweatshirt features an embroidered motif. Cotton/polyester is machine washable. USA. Specify Spruce, Natural or Blue.
Size M, L, XL.  B6260  $45

**DRESSY COLLARS & LEASHES**
Choose Silver with clear crystals, Antique Gold with black crystals, Black with multicolored crystals, Brown or Denim. Specify color and neck measurement: X-Small (10-12"), Small (12-15"), Medium (15-18"), Large (18-21")
Collar  A6670  $29
Matching 4' Leash  A6671  $29
Collar & Leash Set  A6672  $55

When you see this symbol, you'll know this product is exclusively offered through our catalog.

**THIS LUCKY DOG'S LIFE IS A CABARET!**
Our Kismit Tapestry "Pup Tents" are unique pet beds made of top-quality materials. They feature a therapeutic sleeping cushion raised off the floor.
Recommended for dogs up to 20 lbs.  23"L x 30"H.
Kismit Tapestry  C3214  $259
Cabaret Stripe  C1145  $159

**THIS DOG'S LIFE IS MADE IN THE CHAISE**
Our sumptuous fainting chaise sofas are made for caviar hounds. Specify Zebra or Leopard print. Nylon/poly/cotton slipcover removes for easy cleaning. High density foam base.
37"L x 24"W x 15"H. USA.
C3167  $199

**TOLL FREE**
**1•800•924•5050**
www.inthecompanyofdogs.com

Save up to 60% ◆ **S P R I N G   S A L E** ◆ Quantities Limited

**BIRKENSTOCK® CLOGS**
Deemed as their "Dog Walking Shoes" by Birkenstock®, these lightweight, flexible clogs are waterproof and bacteria-resistant. Famous for their arch support, they feature a unique contoured footbed that encourages a natural flex and grip motion that lets you walk in healthful comfort. Durable, easy-clean polyurethane. Imported. Specify Red, Black, Blue or Hunter and the following sizes:
B6065 $49 SALE $39



# SALE



**PLANTER PUP**
Happy dog farmer holds a detachable 4" terra-cotta pot in his red-gloved paws. Available in 10 breeds. Specify Buff Cocker (as shown), Bulldog, Dachshund (Red), Dalmatian, Doberman, Golden Retriever, Irish Setter, Jack Russell, Lab (Black, Chocolate or Yellow), Rottweiler, or Westie. Handpainted Resin. 8-1/2"x17"H. A6870 $71 SALE $49

**JUMBO BREED DOG MATS**

This faithful friend will lie down on a porch or in an entry to provide a wipe for muddy paws and shoes. Outline-stitched silhouettes of durable, high-quality woven seagrass. Wipe clean. Imported. Approx. 36"x20". Please specify Bulldog or Labrador.
A520A $22 SALE $14.99

## UP TO 60% OFF
Limited quantites of sale items

**ANGEL DOG WHIRLY-GIG**
Guardian angel dog is a true work of art. Inspired by American Folk Art, it's individually hand crafted of wood and metal on a wooden stand. Each numbered original is carved and painted by hand, and treated for weather-resistance. 21-1/4" x 18" x 19.
B1204 $245 SALE $179

**WOODEN BISTRO CHAIRS & BENCH**
Elegant yet practical seating for our exclusive bistro tables. Wooden slat seat and back on sturdy metal frames are reminiscent of European cafe chairs. Folds for easy storage.
Chair B2026 $59 each SALE $49
Bench B2027 $129 SALE $99



Save up to 60% ◆ S P R I N G   S A L E ◆ Quantities Limited



Visit our website
for more details on selected
items in this catalog





## "WINTER'S TAIL" RUNNING DOG BED

Our exclusive cover is a cuddly soft,
acrylic berber fleece with decorative felt
applique gussets. Choose Red or Royal.
Inner pillow is an extra-plump and
resilient poly-fill. Machine wash cold, or
dry clean. Medium Bed, 36"L x 27"W.
C3219 $120 SALE $69  Large Bed,
45"L x 35"W  C3220 $140 SALE $79
X-Large Bed, 58L x 41"W  C3221 $160
SALE $89
Additional Duvets also available:
Medium  C3052 $95 SALE $49
Large  C3217 $105 SALE $59
X-Large  C3218 $115 SALE $69
Set of 3 Roll-Pillows of blown poly-fill:
Medium  C3053 $65 SALE $39
Large  C3222 $70 SALE $42
X-Large  C3223 $75 SALE $45



### EXCLUSIVE SYMBOL

When you see this symbol, you'll
know this product is offered only
through our catalog



### "SANTA" & "FROSTY" SWEATERS FOR MOTHER & DAUGHTER

Hand-loomed ramie/cotton
sweaters with chenille trim
are perfect for daughters who
want to be prepared for
holidays full of festivities.
Hand-wash. Imported. Girls'
Sweater in Cobalt. Specify
size.  Girl's 2T, 4T; 4-5, 6-6x.
C3076 $79 SALE $49
Specify size... Girl's 7-8, 10,
12-14.  C3256 $89
SALE $49
Women's Sweater in Red,
specify size S(4-6), M(8-10),
L(12), XL(14-16).  C3075
$139  SALE $89

## DENIM BREED-PATCH SHIRT

Sporty denim with easy, relaxed fit
flaunts an embroidered patch featuring
the breed of your choice realistically
rendered in true-to-life color on the
button pocket. Offered in over 20 AKC
breeds. Machine wash 100% cotton.
Imported. Blue Denim. Specify size
S/M (6-10), M/L (12-14), XL(16-20)··
B6077 $49 SALE $34



### CHILL CHASERS

Decorative pillows and throw. Plush acrylic berber throw with a
decorative felt border featuring hand-cut appliques. 60"W x 40"L.
Matching pillows feature hand cut appliques. Dry clean only.
Imported. Throw. C3051 $85 SALE $59
Western Dog Pillow, 14"square.
C3050 $69 SALE $39
Snowflake Pillow, 16"L x 12"W
C3049 $69 SALE $39
2 or more pillows $34 Each

Save up to 60%   ◆   S P R I N G   S A L E   ◆   Quantities Limited

### SILK SEPARATES GO CANINE CHIC

Express your heart's desire with our sophisticated dog print silk separates. This perfect ensemble features a wrap skirt and oblong scarf in 100% silk. Dry clean only. One size fits 4-16.
Wrap Skirt  B2008 $149 SALE $98  Scarf  B2009 $59 SALE $39

Coordinating twin set features a sleeveless shell and cardigan in silk. Handwash. Imported. In black. Specify S(6-8), M(10-12). L(14-16), XL(18). Cardigan B2007 $69 SALE $49 Shell B2006 $39 SALE $34



### GIANT BREED ST. NICK

A full 27" high, dressed in a rich Mocha velveteen gown with braided trim. He wears an Emerald brocade robe with faux sable fur trim and matching hat. There is a burgundy sack stuffed with woodland items. A wooden rocking horse and burlap sack are slung over his shoulder. Specify, Schnauzer, Bernese Mountain, Boston Terrier, Bulldog, Cairn Terrier, Cocker Spaniel, Dachshund, Dalmatian, Doberman, English Setter, Golden Retriever, Gordon Setter, Irish Setter, Jack Russell, Labrador, Pug, Pointer, Rottweiler, Scottie, Vizsla, Weimaraner or Westie. B1074 $125 SALE $59



R &

tton
trim
rs who
r
ss.
Girls'
icify
6-6x.
9
, 10,

ed,
B-10),
175

IASERS
with a
x 40"L.
an only.
LE $59
square.
9
x 12"W
LE $39
4 Each

### ALL ABOUT EYES — CRYSTAL & VELVET TWIN SET

Twin set embellished with delicate Swarovski crystal bones. Long-sleeve cardigan has crystal buttons down the front; short-sleeve pullover features a jewel neckline. Black. Polyester/nylon blend velvet; hand wash. USA. Specify sizes S(6), 0), L(12-14), XL(16).
Cardigan  C3114 $69 SALE $49
Pullover  C3113 $69 SALE $39



### RUNNING DOG CARRY POUCH

Fleece and hand-cut felt Hungarian applique carry pouch. Features zippered pockets, padded shoulders straps and webbed nylon waist strap. Safety leash attaches to dog's collar. Green. Dry clean only.  Small, up to 8 lbs.  C3072 $62 SALE $44  Large, up to 14 lbs. C3230 $85 SALE $49

### CHAMOIS SHEARLING BEDS

First class comfort! So pamperingly soft, warm and cozy, you'll wish you could sleep in one too! Natural shearling cushion offers ergonomic support; is lightweight and hypoallergenic. The brushed cotton is soft-to-the-touch and polyurethane-treated on the inside for durability. Cover zips off for cleaning. USA. Specify Bay Green, Khaki or Pale Blue.

Small, 18"x14"  B6122  $110  SALE $69
Medium, 24"x18"  B6123  $135  SALE $79
Large, 30"x24"  B6124  $188  SALE $109
X-Large, 40"x34"  B6125  $278  SALE $159

### MOODY COLLARS & LEADS

Sensational doggie carriers and matching "Mood" collars and leads are too groovy for ordinary hound dogs. Just like the "mood rings" of the 70's, these collars and leads are adorned with mood stones that change color. Specify style and neck size 12"-25". Specify Zebra Fur or Red Crocodile. Coordinating carriers are designed with a safety hook to attach to collar. Available in: Black Faux-Fur with Zebra Print Faux-Fur Trim or Grey Flannel with Red Crocodile-Embossed Patent Leather Trim.

Collar  C1260  $46  SALE $39
Lead  C1261  $55  SALE $49
Collar & Lead Set  C1334  $98  SALE $79

### COORDINATE CARRIER

Carrier is designed with a safety hook to attach to collar. Holds 9-15 lb dog. 16"L x 8"W, 10"H.

C1262  $175  SALE $99





### CONTEMPORARY SOLID DOGGIE DUVETS

Duvet covers of soft brushed cotton embellished with contrast piping. Machine washable. USA. Specify round or rectangle and color: Bay Green, Lilac, Khaki or Pale Blue. Round Cover:

Medium 36"  B6193  $68  SALE $39
Large  42"  B6194  $78  SALE $49
X-Large  50"  B6195  $88  SALE $59

Rectangular Cover:

Medium 36"x27"  B6190  $68  SALE $39
Large  45"x35"  B6191  $78  SALE $49
X-Large  58"x41"  B6192  $88  SALE $59

Personalization is available (up to 12 letters) for $12

Save up to 60%   ◆   S P R I N G   S A L E   ◆   Quantities Limited





**POCKET TWILL SNUGGLE BALLS**
Cotton twill covers zip-off to machine wash. Filled with plump polyfill. Specify Red, Indigo, Orange or Khaki. USA. Medium, 26" C1136 ~~$79~~ SALE $59 Large, 32" C1137 ~~$95~~ SALE $69 X-Large, 44" C1138 ~~$149~~ SALE $109

**TEXTURED "BERBER" BED**
Dogs dream of reclining on this cozy bed covered in richly textured, flecked "Berber" pile with double welt piping. Washable poly/acrylic cover plumped with polyfill. USA. Oatmeal, Blue. Small, 24" A366A ~~$59~~ SALE $49 Medium, 36" A367A ~~$89~~ SALE $69 Large, 42" A368A ~~$119~~ SALE $89
Additional Slip Covers available: Medium B6206 ~~$55~~ SALE $39 Large B6207 ~~$75~~ SALE $49 X-Large B6208 ~~$99~~ SALE $59



**FIFI & ROMEO CANINE CARRIERS**
Individually handcrafted of Italian leather and vintage wool with washable inside cushion. USA. Specify Camel, Pink or Black. One size holds dogs up to 15 lbs.
C1155 ~~$559~~ SALE $259



**"SNUGGLE BALL" BED**
It's a retro-look bean bag chair for your dog! Entire bed is machine washable. USA. Plump polyfill is covered in our leopard faux fur, Berber pile, Olive Jacquard swirl or solid faux furs (please specify). Medium, 26" A900A ~~$69~~ SALE $49
Large, 32" A901A ~~$99~~ SALE $69
X-Large, 44" B6295 ~~$129~~ SALE $99

**TEXTURED COZY-UP BED**
The bed that will grace any room is covered in textured cotton and designed with foam sides and removable polyfill pillow for cuddly comfort. Completely washable. Pucker grid: Specify Salmon or Sage. Small A5280 ~~$55~~ SALE $39 Medium A5282 ~~$70~~ SALE $59 Large A6867 ~~$90~~ SALE $74 Extra Large A7885 ~~$115~~ SALE $99 Chenille grid: Specify Fawn, Mushroom, Wine, Gold, Blue or Olive. Small, 20" x 15" A785H ~~$55~~ SALE $39 Medium, 23" x17" A786P ~~$70~~ SALE $59 Large, 27" x 20" A787A ~~$90~~ SALE $74 Extra Large, 36" x 30" A788A ~~$115~~ SALE $99





Save up to 60% ◆ S P R I N G   S A L E ◆ Quantities Limited

### "PUPPY LOVE" LOUNGEWARE
Zany pups frolic all over these cozy thermal sets. Short set has a V-neck pullover and drawstring-waist shorts. Long set has button-front top that pairs with drawstring waist pants. Machine wash cotton/poly. USA. Lilac/White/Black combo.
Specify size S/M(4-8), M/L(10-12), L/XL(14-16).
Long lounge set A896A $69 SALE $49
Short lounge set A972A $59 SALE $49

### ALL AMERICAN DOG LOVER TOP
So proudly we hail the Paws & Stripes! Knock around this summer season sporting our dog lover-inspired American flag logo (features paw prints as stars). Summer weight cotton interlock fleece crewneck in red. Sizes S, M, L, XL. Machine washable. Imported. B6308 $62 SALE $49

### "ALL AMERICAN DOG LOVER" HAT
Be true to your best friend and country sporting our All American Dog Lover hat. In denim with embroidered design. Adjustable, one size fits all. B2134 $24 SALE $19

### FLEECE ROBE
Snuggle up in our luxuriously soft and toasty warm fleece robe. It's richly contrasted with a shawl collar, cuffs and tie belt. Machine washable acrylic/poly. USA. Specify size S(4-6), M(8-10), L(12-14). B6083 $118 SALE $69

### "FIDO" HAND-HOOKED WOOL RUG
Exclusive design is a perfect match for our Fido bedding. 100% wool pile, cotton backing. 36" round. C1014 $95 SALE $69

### COMFORT-LOVING LINEN CLOGS
In step with fashion! Stylish clogs have a thermal rubber sole and feature a cork foot bed that molds comfortably to your foot to cushion every step you take. Great on those long walks Fido loves so well! Breathable linen upper helps keep you cool. Imported. Specify Denim or Khaki and Women's whole size 6-11. B6257 $79 SALE $59





### HANDMADE ORNAMENTS AND GARDAND

Original breed ornaments are handmade and finished in a rich patina with gold accents. Imported. Specify Dachshund, Retriever, Cocker Spaniel, Poodle, Scotty, Wire Hair, Beagle, Norwich, Collie, Fox Terrier or Frame w/Dog. Set of 3 (same breed). B1065 ~~$22 set~~ SALE $14
Garland B1066 ~~$18~~ SALE $9.99

### IMPERIAL LOUNGE BED

At last! Here's elegant style and pampering luxury for the larger dog in our kidney-shape design with rolled arms and 3 contrast plaid throw pillows. A textured grid pattern cover in 100% cotton removes for washing. Foam form comfortably holds dogs up to 95 lbs. USA. Mushroom. 39" x 30 "x 32". A911A ~~$310~~ SALE $259
Additional slipcover with pillows available. B6030 ~~$145~~ SALE $99



### DOG LOVER BOXY SWEATSHIRT

Be up-front with your personal style! Cotton fleece sweatshirt displays our logo in tonal embroidery. The generous, boxy cut and wider neck make it grat for layering. Machine wash. Imported. Specify Palomino or Plum (shown) and size S(6-8), M(10-12), L(14-16), XL(18-20). A526A ~~$49~~ SALE $39

### TOWER OF TINS

Cater to his canine appetite with treats fit for a king or queen. Trio of reusable tins are filled with a tempting selection of treats. Large tin contains a baker's dozen of Banana Biscotti; Medium tin contains 8 Carob Drizzled Chips; Small tin has a dozen Shortbread cookies with a dollop of Carob. Freshly baked with all-natural ingredients, a yummy source of Vitamin C. B1133 ~~$36~~ SALE $24

### BELGIAN NEEDLEPOINT FOOTSTOOL & PILLOW

The footstool measures 20"L x 20"W x 10"H with the apron and welt trim in Beige 100% cotton velvet. Matching pillow is 12" square with Beige cotton velvet backing with polyfill stuffing. Zipper closure for easy removal and dry cleaning. Choose from Bulldog (shown), Yorkie, Standing Lab or Westie. Footstool
C1004 ~~$298~~ SALE $279
Pillow   C1003 ~~$65~~ SALE $54
Footstool & Pillow Set.   C1065 ~~$359~~ SALE $299





**FLEECE PULLOVER**
Roll-neck pullover in a textured rib has soft, warm fleece inside that shows on the neck, cuffs and bottom. Machine wash polyester. Imported/USA. Natural. Specify Unisex size S, M, L, XL.
B6101  $75  SALE $49

**CELEBRATION SWEATER**
Festive cardigan with a bright patchwork design on front. The colorful buttons are shaped just like holiday light bulbs. 100% cotton. M(8-10) and L(12-14).
B6097  $165  SALE $99.99



**ACTIVE SPORTS SEPARATES**
Designed exclusively for us by American Groove and featuring our signature running dog appliques. Made of 100% cotton fleece knit, in grey. Machine washable. USA. Fleece Zipper Sweatshirt (one size)  B2016  $69  SALE $49
Pant and Tee, sizes S/M (4-6), M/L (8-12)
Fleece Sweat Pants.  B2018  $59  SALE $39
Coordinating Tee in Hot Pink  B2017  $49  SALE $39



**CASUAL CHIC LEADS THE PACK**
Relax in our newest length Capri pants and gingham blouse with our Happy Dog embroidery for light-hearted appeal. 100% cotton. Machine washable. Imported.
Blouse (Blue). Specify S/M, M/L, XL.  B2019  $69  SALE $49
Capri Pants (White). Specify S, M, L, XL.  B2020  $49  SALE $45



**CASUAL CHIC**
"Sweet Puppy" pullover in Natural. Machine washable acrylic/polyester fleece. USA. Specify size S(4-6), M(8-10), L(12-14), XL(16-18).
"Sweet Puppy"  C1060  $59  SALE $39



**EXCLUSIVE SYMBOL**
When you see this symbol, you'll know this product is offered only through our catalog



**POSITIVELY TOASTY PULLOVER**
Walk the dog and keep cozy in this pullover with zipper funnel neck you can wear up or open. 100% polyester fleece, machine washable. Specify Cranberry, Lemon or Navy. Imported. Size S(6-8), M(10-12), L(14-16), XL(18).
C3124 $79 SALE $69

**PONCHO**
Echo's fabulous poncho will keep you clear of the worst elements from head to toe. Durable polyester/nylon with self-snap front and tie hood. Available in black and pink.
B2001 $39 SALE $29
Folding Umbrella. Compact size, only 7" folded.
B2013 $29 SALE $19

**FLEECE PULL-ON PANTS**
Keep you warm, even on cold, wet nights when your dog wants to walk forever. Relaxed fit allows for layering and provides comfort. Elastic waist, on-seam pockets. Machine washable acrylic/poly. Imported. Black. S(4-6), M(8-10), L(12-14), XL(16).   B6074 $45 SALE $29

**FLEECE VEST**
Front zip vest with 2 handy zippered pockets keep keys, cash, treats safe. Relaxed bottom band allows for easy layering. Machine wash acrylic/poly. USA. Specify Oatmeal or Graphite and unisex sizes M, L, XL.   B6073 $39 SALE $29

**"BOW WOW" CARDIGANS**
Collectible cardigans will delight canine fanciers of all ages. Designed by Christine Foley, they're hand loomed and hand embroidered. Fine mercerized cotton; dry clean. Imported. Available in ladies' sizes 1 (4-6), 2 (8-10), and 3 (12-14), and children's sizes 2/4, 7/8, 10/12 (please specify).
Women's cardigan  B6235 $355 SALE $229
Children's cardigan  B6256 $118 SALE $99

**LINENS FOR ISLAND DOG LOVERS**
These luxe linen separates are designed exclusively for us by Liz & Jane Clothes. The natural linen tank is embroidered front and center with our running dog frolicking in a field of flowers. Linen jacket in tangerine and coordinating black and white check pants complete the look. All easy-fit styling in 100% linen. Hand wash or dry clean. USA. Sizes S, M, L, XL.
Jacket  B2128 $89 SALE $69
Pants  B2130 $79 SALE $69

-· in
·able
·t. USA.
(8-10),

$59

·· you'll
·red only
·g



## LIMITED-EDITION LITHOGRAPHS

Two titles by artist Cynthia Kagen. Hand-signed, and numbered on archival paper. Beautifully matted and framed, in a hardwood frame. Westie From The East, 24" x 30"
C1071 $179 SALE $129
The Rescued Hero, 26" x 31"  C1070 $179 SALE $129

## WATERFORD CRYSTAL

Lovable puppies presented in all the meticulous detail that's a Waterford tradition. Each hand-blown, full lead crystal sculpture is accompanied by a handcrafted solid pewter accessory that's colorfully hand-painted. Approx. 1-3/4"-2"H. Let's Play Labrador with Ball, Suppertime Scottish Terrier with Bowl A580A $75 each SALE $59

## RESERVATIONS REQUIRED

Start the party off right with these fun, easy to clean wood placemats and when the party's over hang on the wall as a reminder of his special day. 18-1/2"L x 12"W.
B2164  Set of 2  $26  SALE $19



## PINE STORAGE BENCH AND SHELF

An American classic with the appeal of an antique in solid Maine pine. Bench to store your pet's gear, while shelf adds more function for hanging leashes, hats and coats.
Bench, 35"W x 30"H x 15"D  B2035  $358  SALE $299
Wall shelf  B2036  $69 SALE $59

## "ALL AMERICAN" DOG PILLOW

Dogs are among America's most deserving patriots and unsung heroes. Our comfy pillow affords a resting place for loyal heads and paws. Linen blend front is embroidered with our unique paw print flag, back is denim. Dry clean. USA.
B2034  $49  SALE $39

## "RAPTURE'S REPOSE" LITHOGRAPH

Limited edition print by award-winning artist Lorena Pugh is a sequel to her first print, "Persistence" (retired), the couch is patterned with tennis balls. Matted inside a goldleaf frame.
Unframed, 33-1/2" x 14"  A6884  $75  SALE $59
Framed, 35-1/2" x 16-1/2"  A6883  $175  SALE $129



Save up to 60%  ◆  S P R I N G   S A L E  ◆  Quantities Limited



### "IN A HEARTBEAT" LITHOGRAPH

Award-winning artist, Lorena Pugh, has done it again! Introducing a neighbor's spirited Black Labrador, Baxter, portrayed in a striking new dimension. Matted inside a hardwood frame. Specify Teak stain or Natural.
Unframed, 29-1/4" X 9-3/4"   A849A  ~~$75~~ SALE $59
Framed, 36-3/4" x 18-1/8"   A850A  ~~$165~~ SALE $129

### "HOT DOGS!"

Adorable pooch captured in 3 delightful moods. Presented in a hardwood frame. Unframed, 11-3/4" x 36"
C1072  ~~$29~~  SALE $24
Framed, 12-3/4" x 37" C1073  ~~$69~~  SALE $59

### "MY DOG" SPECIAL EDITION SCULPTURE

Created by artists Ellen Donovan and Long Thor, each incredibly realistic, hand-finished pooch wears a gold-finished chain collar.
Golden Retriever with newspaper, 5-1/2"Sq. x 8"H   B1028  ~~$60~~  SALE $49
Bichon by mailbox, 9"L x 6-1/2"W x 7"H
B1029  ~~$69~~  SALE $49
Great Dane with rake and leaves, 11"L x 8"W x 5"H   B1030  ~~$79~~ SALE $59
Sheltie with birdbath,10"L x 6-3/4" W x 7"H
B1031  ~~$79~~  SALE $59
Maltese by fireplace, 9 1/2"L x 7-1/2"W x 9"H
B1032  ~~$75~~  SALE $59

### THEY'RE HOOKY & THEY'RE SPOOKY

Dressed-up for Halloween and presented in a hardwood frame. Unframed  C1102  $29  SALE $9.99
Framed  C1103  ~~$69~~ SALE $29.99

### RUNNING DOG WOODEN TOY CHEST

Designed just for us, this solid hardwood chest is hand-painted. It displays a wooden plaque that we'll personalize with your dog's name– up to 10-letters (please specify). Includes a brass clasp and decorative wooden ball feet. Forest Green/Ivory as shown. 21" x 15" x 11".
B1023  ~~$139~~  SALE $99



### BULLETIN BOARD WITH HOOKS

"46 Dogs," an adorable print by English artist Sarah Battle, tops a generously sized bulletin board. The handsome wood frame in weathered Sage Green has 3 solid brass hooks for keys, leashes, hats, more.
15-1/2"W x 27"H.
B1062  ~~$89~~  SALE $79



Save up to 60%  ◆  S P R I N G   S A L E  ◆  Quantities Limited

**BERBER SHIRT**
Button-front shirt, to wear on its own or layered as a jacket, sports our newest logo patch in the corner. Pamperingly soft and toasty warm acrylic/poly fleece in a neutral Oatmeal color is machine washable. Imported. Specify unisex size M, L, XL.
B6072  $69  SALE $39

**"BERBER" MOCK TURTLENECK TOP**
Mock neck pullover with relaxed, generous fit is richly textured "Berber" fleece embroidered with our "All American Dog Lover" logo and tipped in contrast color. Washable acrylic/poly. Imported. Specify Navy with Oatmeal or Oatmeal with Navy and unisex size M, L, XL.
A551A  $52  SALE $29



**YES, VIRGINIA, THERE IS A "SANTA DOG"**
The tradition continues . . . from our collectible Santa tabletop series. Handpainted sculptured resin head. Offered in over 50 AKC breeds. 4-1/2"W x 10-1/2"H.  C1335  $59 SALE $39



Visit our website
for more details on selected items in this catalog

**COUTURE CARRIERS, COLLARS & LEADS**
Travel 1st class. Manufactured in accordance with IATA, ATA and major airline regulations for carry-ons, these carriers feature roll-up sides for maximum ventilation and comfy padded interiors with washable liners. Choose: Python-print leather, Crocodile-embossed leather in Brown or Black or Leopard faux-fur. Small Leather Carrier (Crocodile only), 131/2"x81/4"x91/2. B6216  $369  SALE $269
Large Couture Carrier, 18"x111/2"x11"
C1226  $369  SALE $299  Matching Collars & Leads. Choose Phthon-print with Brown or Leopard faux-fur with Black. Specify neck sizes 8"-16".
Collar  C3002  $49  SALE $39



**"BERBER" FLEECE BACKPACKS & FLEECE PET CARRIERS**
Soft backpack with outside zip pocket has fleece covered shoulder straps with reinforced webbings, 2 inside compartments and zip pocket; is secured by a toggled drawstring. Front flap fastens with a heavy duty buckle. Small pack has 3 zip compartments to hold treats, cash and keys. Poly/nylon plush textured fleece is machine washable and water-resistant. Our very own pet carry pouch features the softest "Berber" fleece inside and out, an elastic drawstring closure and double-zipped front pouch pocket. Adjustable shoulder straps are reinforced with strong nylon denier. A nylon strap wraps around the waist for added support. Safety leash attaches to collar. USA. Specify Oatmeal or Black.
Backpack, 12" x 6" x 14"H.
B6061  $65  SALE $49
Small pack, 4"x1"x6"H.
B6062  $55  SALE $29
Pet Carrier, Small (up to 8 lbs.)  B6000  $67 SALE $44  Large (up to 14 lbs.)  B6001  $69 SALE $49



214    1·800·924·5050  ◆  S P R I N G   S A L E  ◆  1·800·924·5050

Save up to 60% ◆ S P R I N G   S A L E ◆ Quantities Limited

## ANTIQUE GOLDTONE JEWELRY

Our antique-look jewelry is charmed with a delightful canine motif. "Love Me, Love My Dog" bracelet displays the sentiment dear to every dog lover's heart interspersed with other charms. "Dog Mom" banner pin suspends a trio of charms. Necklace has "Dog Mom" and happy Running Dog heart charms. Charm Bracelet  B6078  $65 SALE $49
Pendant, 16" long  B6079  $39 SALE  $29
Pin  B6080  $24 SALE  $19



## ANTIQUE DOG BROOCHES

Antique dog images are beautifully reproduced in exquisite detail and encased in an elaborate pendant outlined in gilt or pearls. Please specify breed.  Jack Russell  B6138  $54  SALE $39  Golden Retriever or Black Labrador, King Charles Spaniel or Pug  B6136  $39  SALE $29  Dalmatian or Greyhound  B6137  $49  SALE $29

## HANDPAINTED ORNAMENTS

Choose from our two collections of handpainted resin ornaments. Each collection includes 4 ornaments in the same breed plus our charming "Holiday Dog House." The Holiday Collection consists of an assortment which may include: sitting Santa with tree, gift-wrapped dog, Santa dog and dog in a stocking. The Angel Collection includes 4 angel dogs (same breed). Available in more than 100 AKC breeds. All 2-1/2"-3H.
Holiday Collection  C1273  $54  SALE $39
Angel Collection  C1274  $54  SALE $39



## DRESSY HOLIDAY COLLRS

Puttin' on the glitz! Just the thing for those festive holiday soirées and gala parties in Red glitter with Green stones or Gold glitter with red-and-green stones, both with shot bead trim. Please specify color and neck measurement 9 1/2"-2 1/2".
A275A  $25 SALE $19



## MIDAS TOUCH SILK/CASHMERE SWEATER SET

Dress to the "K-nines" in soft, luxurious cashmere and silk blend sweater set with a touch of shimmering Lurex®. The cardigan and short-sleeve pullover top are a winning combination for fashion-conscious dog lovers. Dry clean only. Imported. Specify Gold or Silver and size S(2-4), M(6-8), L(10-12), XL(14-16).
Cardigan  B6111  $89
SALE $49
Pullover  B6094  $69
SALE $39



From
Address

PLACE



### WINDOW DRAWER WALL CABINET

This unique, handcrafted wall cabinet has classic "country living" charm plus the functional storage space for dog-friendly needs. The glass-front drawers are designed for decorative displays. The row of hooks is perfect for hanging dog gear. Crafted of Indonesian plantation mahogany with a handpainted distressed finish. White. 26"L x 19"H x 9-1/2"W. C1001  $169  SALE $129

### TEXTURED UPHOLSTERY SNUGGLE BALL

Dog's will love to settle into this cushy snuggle. Durable, woven upholstery weight cover removes for easy care. Specify Plum, Olive or Cognac. USA.
Medium, 26"  C1139  $69  SALE $49
Large, 32"  C1140  $79  SALE $59
Extra Large, 44"  C1141  $115  SALE $89



### BREED ST. NICK DOGS

Enchanting Old World Santas are regally dressed in faux fur-trimmed red plush with sacks laden with toys and goodies to deliver to good dogs everywhere. Christmas Eve Santa carefully checks his long list with a magnifying glass. North Pole Santa resplendent with white "fur" and gold braid has removable snowshoes and holds a lantern and walking stick. Available in over 75 AKC breeds. Durable resin, 6" x 12"H.
Christmas List St. Nick
A151A  $89  SALE $29
North Pole St. Nick
A152A  $59  SALE $29

### FOOD STORAGE TINS

The perfect solution for storing large bags of dog chow, and protecting it from dampness and pests! Feature heavy-duty side handles and stay-tight knobbed lid. "Daze" has a litter of adorable puppies with Black Watch plaid trim. "Iris" is a pretty pink floral on white. 10-gallon tins holds a 20-lb. bag. 20-gal. tin holds a 40-lb. bag.
"Iris" 10-gal., 15-1/2"D x 15"  A5366  $59  SALE $49
"Iris" 20-gal., 17-3/4"D x 23"H  B1050  $69  SALE $59
"School Daze" 10-gal., 15-1/2"D x 16-1/2"H  A664  $59  SALE $49   "School Daze" 20-gal., 17-3/4"D x 23"H  A671A  $69  SALE $59



### EXCLUSIVE SYMBOL

When you see this symbol, you'll know this product is offered only through our catalog



### "DOG HAUS" STORAGE BINS

Store food, toys and all your dog accessories in these cute and crafty miniature wooden dog houses. Hinged roof flips open for easy access. Large size holds up to 20 lb. bag of food. Smaller size holds all of your best friend's toys and gear. Handcrafted in the USA. Small Haus, 11"L x 14"W x 14"H  C1007  $99  SALE $69
Large Haus, 13"L x 17"W x 18"H  C1008  $189  SALE $129

LL
snuggle
r removes
ognac. USA.

$89

### COOKIE CUTTERS & BISCUIT MIX

"Bakers and Barkers" will cherish these fabulous cookie cutters for their good-looking, quality craftsmanship and of course, the adorable cookies they produce! Sets include one of each dog shape.
Set of 2 Small  C1232  $25  SALE $19
Set of 2 Large  C1324  $35  SALE $29
Biscuit Mix Set includes one of each all-natural treat mix in Garlic Parsley and Cinnamon Molasses.
Dog Biscuit Mix, Set of 2
C1323  $24  SALE $19



gs of dog
and pastel
ay-tight
ble puppies
retty p
-lb. bag

### PERFORMANCE BED

Performance Bed in hypo-allergenic crushed, cubed foam. Baffled construction ensures long-term support and comfort. Bi-color polar-fleece cover coordinates with bowls and feed pads and zips off for easy care.  Specify Khaki/Orange or Lime/Grey and size.
Fleece Dog Bed, Small  .C1146  $59  SALE $39  Medium   C1147  $79  SALE $59
Large  C1148  $99  SALE $79

### PERFORMANCE BOWL

Performance Bowl in chip-resistant, high density plastic with a coordinating "feed pad" made of stain and moisture resistant cordura. Bowl's ergodynamic interior makes eating easier while a weighted base prevents movement. Feed pad is backed in non-skid PVC and cleans up with a damp sponge. Specify Khaki/Orange (orange bowl/khaki pad) or Green/Blue (green bowl/blue pad).  C1263  $39  SALE $19





9 SALE $49
99 SALE $59
"H
gal.,

### "BALL BUDDIES" STOCKING STUFFERS

These happy looking, floppy chew toys can be tossed around and chewed for endless fun.
Set of 4  C3138  $28
SALE $22

### LEAD AND BALL

Polypropylene slip-on lead and triple-injected, two-tone rubber ball. Lead is pressure and resistance engineered; ball is non-toxic, vanilla scented sanoprene. Specify Orange/Khaki (orange/khaki/ blue lead & orange/blue ball) or Grey/Black (grey/yellow/black lead & yellow/black ball).Small Lead & Ball C1159  $35  SALE $19 Large Lead & Ball  C1160  $40
SALE $24



### TOAST TO DOG LOVER'S SPIRIT

"Bone Wine Rack" is handcrafted of steel with a rustic bronze finish holds up to six bottles of wine and 4 wine glasses. Imported. 32-1/4"H x 14-1/2"W x 7".
C3023  $295  SALE $149 

### HANDKNIT STOCKING WITH TREATS

Handknit stocking of pure Maine wool with canine motif is brimming with over 1 lb. of bakery-fresh bone biscuits USA. 17"L x 7"w.
B1141  $29  SALE $19 



Save up to 60% ◆ S P R I N G   S A L E ◆ Quantities Limited



**VELVET POOCH POUCH**
Pawsitively deluxe Pooch Pouch carrier in luxurious quilted velvet with contrasting satin lining. Adjustable shoulder straps and nylon waist strap for added support. Safety leash attaches to collar. USA. Specify Burgundy with Gold lining or Olive with Burgundy lining. Small, up to 8 lbs.
C3172 $72 SALE $49
Large, up to 14 lbs.
C3065 $79 SALE $54

**"HER MASTER SUITE"**
Quilted bedspread and dog duvet are all 100% cotton, machine wash/dry. Imported. Quilted Bedspread:
Crib size, 36" x 54" C1027 $109 SALE $99
Queen, 85" x 95" C1023 $249 SALE $189
King, 95" x 105" C1024 $298 SALE $249

**DOG BED**
Dog Bed comes complete with removable 100% cotton quilted cover with plump polyfill bed inside. Machine washable. Medium, 36" x 27". C1198 $149 SALE $99  Large, 45" x 35" C1199 $179 SALE $129 X-Large, 50" x 41" C1200 $199 SALE $149

**"REBEL WITH PAWS"**
Urban chic pleather motorcycle jacket for Fifi, Fido and the Fonz! Available in topline sizes 8"-18". C3026 $79 SALE $49

**PUPPIE BLANKIE & HOODED DOGGIE TEE**
Puppie Blankie in plush fleece features a faux-sherpa bone appliqué and gingham trim. Rolls up. Hooded jersey knit tee shirt. Specify topline size 10"-30". Specify Pink or Baby Blue. Personalization available for an additional $12.
Blankie  C1186 $35 SALE $25
Tee  C1097 $24 SALE $15

**SHAGGY RUGS**
Made exclusively for us, our signature "Running Dog" and "Bone" shaped rugs feature a shaggy coat of deep pile that looks and feels great underfoot. USA. Specify Green, Blue or Natural. Measures 3'L x 2'W. Running Dog Rug C1267 $129 SALE $89  Bone Rug  C1268 $129 SALE $89



**OUR FIDO TESTED BERBR BED**
Rich textured Berber Pile cover with contrast whipstitching; zips off. Washable polyester/acrylic cover plumped to the max with polyfill. Personalization available for an additional $12. Specify Navy, Hunter or Oatmeal.
Medium, 36" C1339 $95 SALE $59
Large, 42" C1340 $118 SALE $69
X-Large, 50" C1341 $138 SALE $89

1·800·924·5050 ◆ S P R I N G   S A L E ◆ 1·800·924·5050



**CAR SEAT HARNESS**

Your dog's natural exuberance can make riding in cars dangerous for both the driver and himself. Durable nylon harness has a special adaptor that connects to car's safety belt. The best we've seen, it adjusts for both neck and girth, and features removable protective padding for the breast and back. It also doubles as an everyday harness. Imported from Germany. Black. Please specify size M(20-50 lbs.), L(50-80 lbs) or XL(80-120 lbs).  A802A  ~~$55~~  SALE $39

**TINSEL SWEATERS**

Stretch acrylic fabric is soft and offers an easy fit, easy machine care. USA. Specify Burgundy or Cognac and topline size 9"-22".
B6229  ~~$69~~  SALE $39

**DOG IN TUXEDO**

Shimmer-yarn chenille tuxedo sweater is perfect for parties or out "panting" the town. Wool/rayon. USA. Specify topline size 8"-16"
C1127  ~~$85~~  SALE $49

**GGIE TEE**
eatures a
gingham
y knit tee
". S...y
nai...n
onal $12.
ALE $25
ALE $15



**GIANT DOG TOYS**

Finally, a toy big enough to satisfy even the wildest puppy dream. 15" toy shown.
Giant Teddy Bear, 27"
C1193  ~~$49~~  SALE $39
Large Teddy Bear, 15"
C1192  ~~$25~~  SALE $19
Giant Dog House, 19" x 21".
C1190  ~~$25~~  SALE $19
(not shown)



machine





"Outdoor Garden"

# OUR BOLSTER BEDS

Dogs really settle into these cozy beds because they provide a true feeling of security. The half bolster back provides comfort plus helps your dog feel safer and reassured because all dogs feel more secure when they can't be approached from behind. Plumped with soft, resilient polyfill that gently cradles them for comforting support. Available in your choice of attractive covers that zip off for machine washing. USA.

**OUTDOOR GARDEN BOLSTER BED**
Made especially for outdoor use, this comfy bed withstands exposure to weather, sunlight and moisture. Quick-drying resilient poly-silk fill resists mold and mildew. Floral print poly/olefin cover resists stains and odors; wipes clean easily. USA. Specify Taupe or Green. 35" B6168 $115   42" B6169 $145
50" B6170 $185

**"ROLY POLY" BOLSTER BED**
Classic Acanthus Leaf brocade cover has a distinctive braided edging. Polyester/cotton/acrylic. Specify Tan or Green. 35" B6171 $135   42" B6172 $175
50" B6173 $215   57" C1306 $260

"Roly Poly"



**GARDEN LEAF BOLSTER BED**
Elegant leaf-patterned cotton/poly cover zips off to machine wash. USA. Taupe. 35" B6014 $115
42" B6015 $145   50" B6016 $185

**TAPESTRY BOLSTER BED**
Covered in a rich tonal tapestry in Navy or Moss (please specify). Washable poly/cotton zip-off cover over plump polyfill. USA. 35" A648A $105
42" A652A $145   50" A653A $185

"Garden Leaf"          "Tapestry"





30



"Leopard Print"



"Botanica" Print



"Victoria" Floral



"Knowledge"

**LEOPARD-PRINT BOLSTER BED**
Covered in plush faux fur of leopard polyester/
acrylic with gold rope edging.
35" A279A $115  42" A310A $145
50" A311A $175  57" C1308 $220

**"BOTANICA" PRINT BOLSTER BED**
Earthly delights make a fine bed for sleeping dogs. Cotton/rayon.
35"  C1133  $99  42"  C1134  $139  50"  C1135  $169
57"  C1302  $199  Additional Slipcovers available:
35"  C1236  Special Price $49  42"  C1237  Special Price $69
50"  C1238  Special Price $89  57"  C1301  Special Price $99

**VICTORIA FLORAL BOLSTER BED**
Vintage floral cover offers your dog a bed of roses. Brushed, preshrunk cotton.
Specify Blue or Khaki.
35"  C1130  $99  42"  C1131  $139  50"  C1132  $169  57"  C1298  $199
Additional Slipcovers available:
35"  C1248  Special Price $49  42"  C1249  Special Price $69
50"  C1250  Special Price $89  57"  C1297  Special Price $99

**"KNOWLEDGE" BOLSTER BED**
Contemporary cover for design-conscious dogs. Linen/cotton.
35"  C1227  $99  42"  C1228  $139  50"  C1229  $169
57"  C1300  $199  Additional Slipcovers available:
35"  C1239  Special Price $49
42"  C1240  Special Price $69
50"  C1241  Special Price $89
57"  C1290  Special Price $99

**BERBER PLUSH BOLSTER BED**
Plush, cozy Berber pile gives this bed a soft
touch. Specify Cornflower Blue, Olive or Khaki.
Polyester/acrylic. Available personalized for an
additional $12.
35"  A649A  $115  35"  42"  A650A  $145
50"  A651A  $175  57"  C1304  $220

Ariel

Berber Plush



**HOODED SWEATSHIRT**
Hoods up to soft, warm textured fleece dashed with a sporty color-block stripe. Nylon drawstring has toggles to adjust fit at hood and banded bottom. Washable acrylic microfiber. USA. Specify Oatmeal or Navy in Berber fleece or Dill Green or Indigo Blue in heathered Polar fleece, topline measurement 5"-18" and dogs weight.
**B6008** *$42* SALE **$29**

**STRETCH BOUCLÉ SWEATERS**
Your little fashion hound will love the soft, lush texture, warmth and fabulous style of this stretch bouclé sweater that's specially fashioned to offer the best possible fit. Ribbed Lycra® at neck and cuffs. Acrylic/Lycra® is machine wash. Imported. Specify Red or Black and topline size 8"-16".
**B6127** *$32* SALE **$19.99**



**CONTOURED POLAR FLEECE COAT**
Assure great fit and comfort with the more elegant, contoured shape of this luxurious polar fleece coat that's brushed to a soft nap on both sides.  Lightweight, water-repellent and machine washable, it boasts a contrast Black rib-knit turtleneck that unfolds into a hood and a chest protector to keep him snug from tip to tail. Adjustable belt with brass hardware. Poly/acrylic.By Panache&reg; USA. Red. Specify topline size 8"-24".
Sizes 8"-18"  **B6151** *$65* SALE **$39**   Sizes 19"-24"
**B6152** *$75* SALE **$49**



**FASHION COLLECTION OF LEASHES & COLLARS**
A new line of quality leather leashes and collars featuring unique fashion accents from beadwork to feather to flowers. All created exclusively for us. Choose from three styles. Specify style and neck size 12" to 25".
Feather Trim: Collar  C1161 *$32* SALE **$24**
Leash  C1162 *$45* SALE **$29**  Pouch
w/Keychain  C1163 *$25* SALE **$14**
Collection  C1201 *$69* SALE **$67**
Beaded Trim: Collar  C1184 *$32* SALE **$24**
Leash  C1165 *$45* SALE **$29**  Pouch
w/Keychain C1202 *$25* SALE **$14**  Collection
C1203 *$69* SALE **$67**  Flower Trim: Collar
C1166 *$32* SALE **$24**  Leash  C1167 *$45*
SALE **$29**  Pouch w/Kechain  C1168 *$25*
SALE **$14**  Collection C1204 *$69* SALE **$87**



Save up to 60% ◆ SPRING SALE ◆ Quantities Limited

**SNOWFLAKE SKI SWEATER**
Keep him toasty warm and looking great in his own personal version of a classic favorite. 100% wool is knit in a traditional snowflake design and specially contoured to fit his unique shape. Hand wash. Imported. Specify Red or Royal and topline size 8"-16". B6126 $52 SALE $19

**BERBER COLLAR & LEASH**
Take comfort for a walk! Because he's so special, treat him to the cozy comfort of soft fleece reinforced with strong denier nylon and contrast zig-zag stitching. Specify Oatmeal or Black. Neck measurements 14"-22". Specify dog's name (up to 10 letters) for personalizing. B1009 $55 SALE $19
Matching 1" x 63" leash B1010 $26 SALE $14

**FOOTBALL COLLAR, LEASH & TAG**
Extra-durable, textured leather for your star athlete. Collar has 2 layers of leather, contrast stitching and reinforced rivets. Leash has a long handle for comfort and control. Add a matching football ID tag that we'll personalize for you (up to 10 letters). Specify color and neck measurement 14"-22". "Green" Collar is Green with Red Star cutouts, while "Red" Collar is Red with Yellow Star Cutouts. "Red" Leash is Red with Green Handle, while "Yellow" Leash is Yellow with Red Handle. "Red" Set is Red Collar with Yellow Leash, "Green" Set is Green Collar with Red leash. Football Collar C1207 $45 SALE $34 Football Tag C1208 $20 SALE $14 Football Leash C1209 $40 SALE $29 Set C1210 $99 SALE $69

**HAND-PAINTED GARDEN FRIENDS**
Your favorite breed is captured in these hand-sculpted originals. Delightful pot pets on a 3-1/2" stake add a decorative touch to potted plants. Each available in 20 AKC breeds (ask operator for availability). Happy gardener, 12"h B1210 $55 SALE $39
Pot Pets B1209 $24 SALE $16

Save up to 60%   ◆   S P R I N G   S A L E   ◆   Quantities Limited



### HARVEST DOG TREATS

Packed cornucopia of leaf, squirrel and acorn shaped treats includes a stuffed squirrel chew toy.
C1279 $34 SALE $24

### RAINBOW CARDIGAN

This cardigan is a colorful reminder of who holds your heart's affection. Rainbow running dog appliques romp across the front and colorful yarns accent the collar. Dry clean only. Imported.
Specify size S(6), M(8-10), L(14-16), XL(18). C3079 $129 SALE $79

### HOLIDAY NECKWEAR

Formal bow-tie collar for him is the next best thing to a tuxedo. Of washable poly/cotton with Velcro® closure; fits necks 12"-22". Ruff in red velvet and plaid taffeta; fit necks 8"-22". USA. Please specify neck size.
Black Bow Tie Collar  A3290 $25 SALE $19
Velvet Ruff  A2350 $19 SALE $14
Taffetta Ruff  A6395 $19 SALE $14
Tiara  C1092 $29 SALE $14



### PULLOVER DOGGIE SWEATER

Our warm pullover doggie sweater features a rainbow-colored striped scarf and accents on the legs and hem. Imported.  Specify topline sizes 6-3/4"-10-1/2".  C3080 $78 SALE $49
Santa sweater and snowman sweater also available.
Santa  C3078 $78 SALE $49
Snowman  C3087 $78  SALE $49

### ANGELIC NECKWEAR

Your angel will be the star of your holiday photo-op! Exclusive angel wing collar is red plaid taffeta with gold lamé; angel wings in back; fits necks 8"-26". USA. Please specify neck size.
A605A $19 SALE 2 for $10 Each



### DOGGIE BAGEL TIN

Treat your favorite dog to tasty and nourishing pretzel-, bone- and donut-shaped treats in beef, plain and cheese flavors. Specially formulated by a NY bagel maker, they won't stain floors or carpets. 2-gallon stay-fresh tin holds 6 dozen.
A104A $36 SALE $25
Also available in Blue Tin
C3037 $36 SALE $25





## PERSONALIZED FOOD & WATER BOWLS

Handpainted designs make each bowl a work of art you can have personalized with your pet's name. Heavyweight ceramic won't slide across the floor; sized to fit in our custom wrought iron stands. Signed by the artist. Dishwasher safe. Choose Leopard; Watercolor Paw Print in Pastel Blue/Yellow, Dog Figure, Traditional Paw Print in Blue or Hunter Green or Zebra. Please specify pattern, color and dog's name. Allow 4 weeks for delivery.

Small 6" bowl, holds 3 cups.   B1213  $39
Medium 9" bowl, holds 5 cups.   A629A  $49
Large 11" bowl, holds 11 cups.   A630A  $59

## SUSAN SARGENT "GOOD DOG" HANDMADE RUG

special and unique 100% wool hand-hooked rug by Vermont artist Susan Sargent. Imported. 36" round.   C1062  $129

## WROUGHT IRON STANDS

Raised design lets them eat and drink in a relaxed, upright posture that aids digestion and eases strain on joints. Crafted of hand-welded steel rods for maximum strength and stability; coated to protect from rust and scratches.

Double feeders: Small, 18"L x 5"W x 5"H  B1214  $60
Medium, 20"L x 9"W x 9"H  A631A  $70
Large, 24"L x 11"W x 12"H  A632A  $80
Single feeders: Small, 9"D x 5"H  B1222  $35
Medium, 13"D x 9"H  B1215  $40
Large, 17"D x 11"H  B1216  $50

## COORDINATE PLACEMATS

Wipe-clean canvas place mats.
Hand washable, USA.
Medium  B2146  $35
Large  B2147  $45

**TOLL FREE**
**1•800•924•5050**
www.inthecompanyofdogs.com

When you see this symbol, you'll know this product is exclusively offered through our catalog

CWEAR
is the
dg. Of
elcro®
f in red
ks 8"-
k size.
.0  $24
.E  $19
.E  $14
5 $19
.E  $14
.E  $14

35





**"FANCY FACE" ACCESSORY RACK HOLDS THE RUFF STUFF"**
Totally cute faces to grace the wall of your bath, kitchen or
entry. Made of sturdy wrought iron with three hooks to hang
towels, hats, leashes, coats, whatever 36"L x 5"W x 10"H.
Imported. B2039 $39

**THEIR OWN MONOGRAMMED TOWELS**
Each towel has a delightful bone motif and we'll add your
pet's name in coordinating embroidery (up to 12 letters).
Thick and absorbent 100% cotton terry towels. USA. Specify
Sage, Denim, Bone or Black. (Additional $12 for personalization.)
Bath size B2040 $39 · Hand size B2104 $19

**IT'S TIME ... FOR DOG LOVERS!**
"Dog Mom" pewter watch is a reminder of who loves mom
most. Heart-shaped case, Japanese quartz movement. Woven
black leather band with tiny pewter heart charm. 1-year
limited manufacturer's warranty. USA/Imported.
A944A $79

**THE "TIMES" OF THEIR LIVES CAPTURED IN FOUR
DELIGHTFUL PRINTS**
The times of their lives captured in four delightful prints.
These graphic fine art prints follow the best times in a dog's
life. Each print measures 16" x 20" unframed. USA.
Unframed: Naptime C1055 Hugtime C1053
Bathtime C1051 Playtime C1057 $19 Each
Set of 4 unframed C1059 $59
Framed: Naptime C1056 Hugtime C1054
Bathtime C1052 Playtime C1058 $69 Each



**PUPPY "LONG
STOCKINGS"**
Put your best foot forward with colorful
novelty socks featuring playful pups of
various breeds. Choose from three styles.
Cotton/nylon in packages of 3. Imported.
One size fits 9-11. K-9 Club in Denim,
White and Heather Grey. B6237
Puppy Love in Natural, Taupe and Black.
B6238  Dogs in Grass, Blue and Pink.
B2000 $24

Visit our website
for more details on selected
items in this catalog

36

IN THE COMPANY OF DOGS 1·800·924·5050



**DOG "FAMILY" GEAR**
Show the world you're
a proud parent or grandparent!
Our classic cotton caps and T-shirts are
embroidered with "Dog Mother" or "Dog
Grandma" in hot pink and "Dog Father" or "Dog
Grandpa" in electric blue. Available on Black or on White. Machine wash. USA. Specify size and color.
Caps: S/M or M/L. T-shirt: Unisex size M, L, XL, XXL.
"Dog Mother" Cap  A6020  $19, Tee  A6025  $22
"Dog Father" Cap  A6030  $19, Tee  A6035  $22
"Dog Grandma" Cap  A941A  $19, Tee  A977A
$22 "Dog Grandpa" Cap  A951A  $19,
Tee  A978A  $22

**DOG "FAMILY" SWEATSHIRTS**
Relaxed fleece sweatshirt embroidered with "Dog
Mother," "Dog Grandma" or "Dog Sister" in Pink or
"Dog Father" or "Dog Brother" in Blue Machine wash
cotton/poly. USA. Please specify adult size M, L, XL or
XXL and black or white "Dog Mother"  A6386  "Dog
Grandma"  A732A  "Dog Father"  A6387  $45 each
"Dog Sister" and "Dog Brother" in children's size
S(6-8), M(10-12), L(14-16), XL(18-20) White only.
"Dog Sister"  A735A  "Dog Brother"  A734A
$45 each

**BATHROBE FOR
BOWSER —
MONOGRAMMED**
More than a fashion
statement, it's an after-bath
and rainy day essential to keep
Bowser wrapped and cozy 'til his fur dries
(and keep the wet fur from making
contact with your furniture or lap).
Quilted, 100% cotton, machine washable.
Can be personalized for an additional $12.
White. Imported.
Topline size: S (8"-10"), M (12"-14"),
L(16"-18")  C1129  $39

**HAPPY DOG TERRY ROBE**
You'll love curling up with these happy
pooches! Lusciously thick, plush terrycloth
robe is colorfully appliquéd with a bevy of
pups doing what they do best ... sitting,
running, giving a paw. Machine washable
100% cotton. Imported. White. One size
fits all.  B6082  $69



**WATCH DOG**
You'll be charmed by this adorable fashion accessory designed by Ann and Jane Harvey. Bracelet watch with sweep second hand, in sterling silver. 7"L. USA/Imported.   B2138  $79

**NEW! "A DOG'S LIFE" POSTER**
This witty and wacky statement of the canine personality shows a languid pup sprawled blissfully across his master's bed enjoying the cooling breeze of a fan. Presented in a charcoal or natural hardwood frame (please specify). Unframed, 15-3/8"w x 21-1/4"h. A845A  $19  Framed, 21"w x 28-5/8"h, A846A  $79



**TOLL** ✦ **FREE**
**1✦800✦924✦5050**
www.inthecompanyofdogs.com

**"WIZZER"**
A fountain that celebrates the light side of what every puppy owner - and puppy - knows all about. At least this one is already housebroken. Recycles water from the base, comes complete with pump, is fully assembled and ready to plug-in. Indoor/outdoor use. 7-1/2"D x 8"H.
A974A $110





When you see this symbol, you'll know this product is exclusively offered through our catalog

**BONE-A-FIED! SWEATSHIRT**
It's obvious to all ... dogs rule your heart! Pigment-dyed sweatshirt with generous relaxed fit sports our exclusive embroidery in contrast colors. Hefty cotton/poly blend is machine washable. USA. Specify Periwinkle , Watermelon, or Goldenrod and Unisex sizes M, L, XL, XXL. A928A $45

**CONTEMPORARY CUBE**
Foam bed frame holds a plump inner cushion of resilient hi-loft polyfill. Cotton/polyester covers remove to machine wash. USA. Specify Black, Natural or Sage Green, all with contrast piping.
Small, 26"L x 22"W x 10"H  B6248  $99
Medium, 30"L x 26"W x 10"H  B6249  $115
Large, 37"L x 31"W x 10"H  B6250  $139



**BEDSIDE PRAYERS**
Our fine-art canvas-transfer print masterly captures a precious young girl saying her evening prayers; a faithful, adoring dog sits at her side. Reproduced from the original, signed painting by American artist Ron Bayens. In a 23-1/4"-square hardwood frame. Will endear your heart!  D2001  $175



**JITTERBUG CUBE**
Comfort with style. Retro hip upholstery fabric covers our high-density foam rectangular cuddler. Inner pillow of resilient hi-loft polyfill has coordinating pattern. Cotton/poly covers remove machine wash. USA. Specify taupe or grey.
Small, 26"L x 22"W x 10"H  B6248  $99
Medium, 30"L x  26"W x 10"H  B6249  $115
Large, 37"L x  31"W x 10"H  B6250  $139





### NAMEPLATE COLLARS & LEASHES

Crafted of English bride leather with solid brass fittings, they have an engraveable brass nameplate that takes 2 lines — up to 15 letters each. Please specify Black with fancy stitching or Brown in classic styling, personalization and neck size 11"-25". Allow 4 weeks delivery.

Black collar  A467A  $49   Black 5' Leash  A468A  $59
Black Set  A658A  $99   Brown Collar  A3128  $49
Brown 5' Leash  A3130  $59   Brown Set  A657A  $99
Coupler lets you walk 2 dogs on one leash. Classic. 11-1/2"l in Black or Brown.
B1005  $39

### DOG'S LIFE TEES & SWEATSHIRTS

Take a witty look at life! Machine washable, 100% cotton. USA. Black or White unless noted. Specify Unisex size M, L,XL. Tees:
"Because They Can"  C1327  "Networking"  B6114  "Menage a Trois"
B6107  "Greetings"  B6262  $24 Each
Sweatshirts:  "Greetings"  B2171  "Life is a Ball"  B2172  "Networking"
(Black only)  B2174  $44 Each

### TOY BOX SOFA

Fun for Fido! A great place to sleep and store all of their toys and accessories. Solid wood frame is generously padded for seating and sleeping comfort. Covered in soft cotton striped upholstery. Please specify Blue/Multi or Green/Multi. 37"L x 18"W x 2"H.  D1004  $299 (Please allow 3 weeks for delivery. Delivery surcharge. Please see order form for details.)

TOLL FREE
1•800•924•5050
www.inthecompanyofdogs.com



**STEPHEN HUNECK LITHOGRAPHS**
Each endearing print is artist-signed and matted inside a handsome wood frame. 13"L x 11 1/2"H.
"Greetings"  B1208
"Life Is a Ball"  B1205
"Menage a Trois"  B1206
"Love Is Give and Take"  B1207
"Networking"  B1225
$98 each

**SHAGGY DOG MAT**
Stretch out and provide a soft, cuddly place for your munchkin to snuggle up. Washable acrylic with nonskid bottom. USA. 46" long.  C1316  Special Price $59

**"RUNNING DOG" BRAIDED RUG**
Pure wool handhooked center is surrounded by wool blend braid border. Charming accent in an entry, kitchen or family room. 36" diameter. USA/Imported; professionally dry clean only. Specify black or burgundy. D2002 $149

**PAWSITIVELY UNIQUE CARDIGAN**
Express your dog lover's personality in our "Paw Prints" cardigan sweater. Handknit by skilled artisans, each sweater has a unique texture and appearance. Dry clean only. Imported. Specify size S(4-6), M(8-10), L(12-14), XL(16-18).  C1089  $89

IN THE COMPANY OF DOGS 1·800·924·5050    41



**WOOL RUGS & PILLOWS**

Quality hand-hooked accent rugs and hand-stitched pillows are a handsome addition to any room. Rug, 36"L x 24"W  C1033  $79
Puppy pillow, 8" sq.  C1043  $19
Full size pillow (size varies by breed).
C1042  $49

TOLL FREE
1•800•924•5050
www.inthecompanyofdogs.com

**ANDREW WYETH PRINTS**

"Master Bedroom" (above) depicts a tranquil scene of a sleeping dog in his master's bedroom, bathed in light as captured by the American master of realism, Andrew Wyeth. Framed version is handsomely matted and presented in a hardwood frame. "Master Bedroom." Walnut or Natural finish.
Unframed Print, 25"W x 18"H  A5626  $34
Framed Print, 32"W x 25"H  A5628  $129
"Ides of March" (left), a newly released Andrew Wyeth print, is handsome on its own or as a companion to "Master Bedroom". Comes to you unframed or matted with beautiful cherry veneer frame. Allow 4 weeks for delivery. Unframed Print, 29"W x 19"H D2004 $34  Framed Print, 36"W x 28"H D2003 $149



**"MY BEST FRIEND" SNOWGLOBE — OVER 30 BREEDS!**
Irresistible mementos! Each snowglobe features a reproduction of an original handcarved dog sculpture. Choose from more than 30 breeds.
4 1/2" x 6 1/2", Wood base.
**C1206  $59**



**MULTI-DOG CARDIGAN**
The creme de la creme of canine chic! A patchwork of breeds wearing actual beaded collars highlights the front, sleeves and upper back of this shawl-collared cardigan. Each panel is edged with ribbons, accented with silvertone buckles. Hand washable. 100's cotton with covered buttons. Imported. Black. Tan. Specify size S(4-6) and M(8-10), L(12-14), XL(16).
**B6076  $149**

**CUSTOM PHOTO BLANKET**
A unique gift for that special person. Cotton photo blanket is knit of pure cotton from your favorite photo of Fido or friends. Machine wash. USA. 30"L x 40"W.  **C3032  $98**
Shipped directly from the manufacturer, please allow 2-4 weeks for delivery.



**HAND PAINTED DOG SLATES**
Ready to greet house guests with words of whimey and welcome.
"Wipe Your Paws Slate",
8"l x 6-3/4"w.
**B1046  $24**
"No Outfit Is Complete without Dog Hairs", 8"l x 6"w
**C1085  $24**   "Welcome" Personalized Breed Slate, 12"l x 8"h
**C3024  $49** Personalized breed slate is shipped directly from the manufacturer; specify name and breed up to 12 letters; please allow 2 weeks for delivery.

**"DOG LOVER" SWEATSHIRTS**
Top everything off in soft cotton fleece with a generous cut and our happy "Dog Lover" logo embroidered in contrasting colors. Machine washable. Imported/USA. Specify Driftwood, Natural, Black or Sage. Unisex sizes M, L, XL, XXL.  **A134A  $45**



43





**STERLING SILVER CHARM COLLECTION**

Create your own customized charm jewelry from this distinguished collection. Smooth link bracelet with toggle closure includes a single charm of your choice. Charms include over 40 AKC breeds, rawhide bone, feeding bowl, ribbon, bone biscuit, doghouse, hydrant, paw print, Zodiac with birthstone, or dog tag. Additional charms also sold separately. Engraving for dog tag or Zodiac with birthstone charm is $8 additional.

Bracelet with Charm, 7-1/2"  B6265  $170
Necklace w/Charm, 16"  B6266  $78
Key Fob w/Charm  A626A  $68
Paw-print Earrings  B6267  $38
Additional Charm  A2532  $38 each
Engraving for dog tag or Zodiac w/birthstone charm is $12 additional

**NEW! VINTAGE STRIPE CLUB CHAIR & LOVESEAT!**
Deep-seated comfort with lots of canine appeal but the casual unconstructed look that's at home in today's more informal settings. Club chair and loveseat with modern camelback, roll-arm styling feature a vintage design stripe cover over comfy polyfoam. 100% cotton slipcover zips off to machine wash. USA. Please specify Blk/Natural or Green/Natural.
Club Chair 30"L x 25"W x 24"H  B6109  $225
Loveseat 49"L x 25"W x 24"H  B6107  $245



**SHADES OF SUMMER JACKET DRESS**
Keep company with canine status symbols in the perfect ensemble for autumn days. The sleeveless dress with matching jacket by Trisha's in soft, 100% cotton French terry in Dusty Iris. Machine washable. USA. Specify S(6-8), M(10-12), L(14-16), XL(18).  B2005  $119

**LUMPY BUMPY BALLS**
Our dog models gave these
rave! Deeply textured,
bouncy squeak balls provide
hours of fun and exercise for
dogs. They just love the feel
of the roughly textured fleece
pile! Acrylic is washable and
durable for lots of rugged
play. Imported. Set of 3
includes: 9" Football, 6"
Baseball and 6" Basketball.
Set of 3   A752A   $24

clude
, bone
one, or
ng for

**ROSEBUD COLLAR, LEASH &
HAIR CLIPS**
She'll adore being a girl in these
blooming satin rosebuds. Collar and
leash of durable nylon webbing with
adjustable nickel hardware. USA.
Specify Lilac, Powder Blue or Pink
and neck size 8" to 13-1/2".
Collar   B1231   $28
4' Leash   B1232   $22
Collar & Leash Set   B1233   $46
Hair Clips   B1234   $22 set of 3



**EMBROIDERED BREED CAPS**
Hats on to the dogs in our lives! Soft washed cotton canvas cap in khaki features the breed of your choice colorfully embroidered on the front. Black leather strap has adjustable brass buckle. Available in 28 AKC breeds. Imported. One size.
B6063  $24

**DOG PERSON SHERPA TOP**
Soft pullover flaunts our "Dog Person" embroidery in "handwritten" script. Features ribbed crewneck and cuffs, vented sides for relaxed fit. Machine washable cotton/polyester. Imported. Specify Navy, Oatmeal, Sage or Grey Heather and Unisex size M, L, XL, XXL.
A637A  $59  Special Value $49

**TOLL FREE**
**1•800•924•5050**
www.inthecompanyofdogs.com

**PET STEP RAMP**
Now it's easy for any pet to walk unassisted in or out of your SUV, pick-up, RV, wagon or boat. Perfect for aging pets or exhausted show dogs, it has a universal grip to fit all vehicles. Optional legs turn it into a handy grooming or tailgating table. Rugged polypropylene and glass fiber holds up to 500 lbs., is lightweight and portable. 70"L x 18"W; it folds to a compact 35" and weighs just 20 lb.
Pet Step Ramp  B6213  $175
Optional table legs  B6214  $38

**BLUE RIBBON DOG CO'S ABSTRACT RUBBER BONES**
Great design has gone to the dogs! The unique cubist shape of these molded rubber bones not only looks great, but will survive lots of heavy chomping and chewing.
Set of 2  C1194  $24

**POLAR FLEECE SPLOGS®**
Layering is the secret of this shoe's warmth! It offers the ultimate in comfort and performance with maximum traction and wear. Flexible thick lug sole has waterproof mud guard. Layers of Polartec fleece with Thinsulate™ insulation keep in heat and allow moisture to escape. Shearling hing-pile likner. USA. Specify grey, Black or Red and Unisex sizes 37-45 (Women's 6-12, Men's 7-11).
B6060  $79



**"SHOW & TAILS" SHIRTS & TEES FEATURE YOUR FAVORITE BREEDS**
All-season classics for dog lovers and professional breeders, portrait collage shirts depict each breed in three poses on the front chest pocket. Available in full-cut shirt or crewneck T-shirt. Offered in more than 75 AKC breeds. Made of 100% cotton. USA/Imported. Machine washable.
Shirt: S/M (8-10), M/L (12-14), XL (16-20).   A6185  $29.99
Pocket Tee: Unisex size M, L, XL, XXL   B6069  $22

**SQUIRREL SQUEAKY TOY**
Satisfy your dog's urge for the hunt with this squeaky faux fur squirrel that's ruggedly constructed to withstand even the most arduous tug-o'war game. Machine washable.  Standard, 22" long.
A2380  $18,
2 for $15 Each
Giant, 35" long.
C1187  $39,
2 for $29 Each

**AUTHENTIC TAILGATE JERSEYS**
Football fanatic? Let your dog root for the home team in these officially licensed NFL and collegiate jerseys available in official team colors and logos. We'll even personalize it with your dog's name. Washable nylon mesh. USA. Specify team, topline measurement 8"-32" and dog's weight.  Personalized Jersey (specify dog's name up to 8 letters).
Personalized NFL Jersey  B6006  $28 Each  2 for $25 Each
Personalized Collegiate Jersey  C1211  $28 Each   47



## WROUGHT IRON RAISED FEEDERS

Classic European design for your dog's dining pleasure. The healthy raised design is handmade of hand-forged wrought iron coated with a maintenance-free, epoxy-like sealer. Includes two stainless steel bowls. Imported. Specify natural Rust finish or Antique Gold finish. Small, 13"L x 9"W x 7"H, with two 6-cup bowls **A815A $95** Large, 23"L x 13"W x 14"H, with two 9-cup bowls **A816A $155**

**TOLL FREE**
**1•800•924•5050**
www.inthecompanyofdogs.com

## RAISED WATER STATIONS

Always keep plenty of fresh water easily accessible to keep him healthfully hydrated no matter what the temperature. Attractive wrought iron stands feature an antiqued rusted finish that's sealed to resist weather and looks great both indoors and out. The raised design lets your dog drink in a naturally comfortable position and a stabilizing disk on each leg helps prevent tipping. Includes a stainless steel bowl. Small, 7-1/2"W x 9-1/2"H, with 1-1/2-qt. bowl **B1012 $65** Large, 10-3/4"W x 13-1/2"H, with 4-qt. bowl **B1013 $120**



## DOG "FAMILY" SWEATSHIRTS

Relaxed fleece sweatshirt embroidered w/ "Dog Mother," "Dog Grandma" or "Dog Sister" in Pink or "Dog Father" or "Dog Brother" in Blue Machine wash cotton/poly. USA. Please specify adult size M, L, XL or XXL and black or white "Dog Mother" **A6386** "Dog Grandma" **A732A** "Dog Father" **A6387 $45 each** "Dog Sister" and "Dog Brother" in children's size S(6-8), M(10-12), L(14-16), XL(18-20) White only. "Dog Sister" **A735A** "Dog Brother" **A734A $45 each**

**Shop Online Anytime**
www.inthecompanyofdogs.com

©2001 ICOD

**DOGS**
IN THE COMPANY OF
Department D100-1
104 Challenger Drive
Portland, TN 37148-1717



PRSRT STD
U.S. POSTAGE
PAID
In The Company
Of Dogs

*IFW*

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In Re Application of: SIMPSON, Jeffrey M. | ) |
| | ) |
| Serial No.: 10/612,589 | ) |
| | ) Group Art Unit: 3643 |
| Filed: July 2, 2003 | ) |
| | ) Examiner: OLSZEWSKI, Joan M. |
| For:  **"PET ENCLOSURE"** | ) |
| | ) |

Mail Stop Amendment                              July 23, 2004
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### RESPONSE AND AMENDMENT

Sir:

In response to the Office Action mailed February 25, 2004, please amend the above-referenced patent application as follows and consider the remarks below. This Response is submitted with a petition for a two-month extension of time and the requisite extension fee. If any additional extension is required, please consider this a request therefor. The Commissioner is authorized to charge any additional fees due or credit any overpayment to Deposit Account 50-1513.

---

**CERTIFICATE OF MAILING**

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Mail Stop Amendment, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450, on the date indicated below.

Signature _____          Date   July 23, 2004
_____

---

1

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

## IN THE SPECIFICATION

Please replace paragraph 1 with the following:

[00001]      This application is a continuation-in-part of U.S. Design Patent <u>D483156</u> ~~Application Serial No. 29/160,054, filed May 2, 2002~~; and claims priority to U.S. Provisional Patent Application Serial No. 60/394,181, filed July 3, 2002, and to U.S. Provisional Patent Application Serial No. 60/465,119, filed April 24, 2003. U.S. Design Patent ~~Application Serial No. 29/160,054~~ <u>D483156</u>, U.S. Provisional Patent Application Serial No. 60/394,181, and U.S. Provisional Patent Application Serial No. 60/465,119 are hereby incorporated herein by reference in their entireties for all purposes.

Please replace paragraph 28 with the following:

[00028]      The back panel 20 preferably defines an aperture 28 for use when assembling and disassembling the enclosure, and for moving the enclosure. A handle 30 is preferably provided for use when transporting the enclosure once disassembled. The side panels 14, 16 preferably define a longitudinal opening 17 for ventilation of the enclosure. The front panel 18 preferably defines an opening 24 therein for access by a housecat, domestic dog or other pets of typical size. Different sizes of enclosures may be provided for pets of different sizes. The front panel 18 also preferably comprises a door 26 preferably hinged on a vertical axis to allow the door 26 to swing both inwardly into the enclosure and outwardly from the enclosure, and to latch in a closed position and in an inwardly open position. The door preferably comprises a latch ~~28~~ 32 that is operable with one hand. Latching the door in the closed position prevents entry and/or exit; whereas latching the door in the inwardly open position allows free entry and exit without unintentional closing, and without the open door extending into human living space where it might create a tripping hazard or obstruct a walkway.

2

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

Please replace paragraph 33 with the following:

[00033]     With reference now to Figs. 2 and 7a-7c, the front panel 18 preferably defines an opening 24 within which a door 26 is hingedly mounted.  The door 26 preferably pivots both inwardly into the enclosure and outwardly of the enclosure, as indicated by the directional arc in Fig. 7a.  A latch 28 32, such as a spring-biased element, one or more magnetic coupling(s), and/or other releasable connector(s) is preferably mounted to the door 26 for securing the door in its closed position, as shown in Figs. 1 and 7b to prevent exit or entrance into the enclosure 10.  The latch 28 32 preferably also allows the door 26 to be secured in an inwardly open position, as shown in Fig. 7c, and/or in an outwardly open position, so that the pet may freely enter and exit the enclosure 10, whereby the enclosure serves more as a "den" or refuge for the pet than a cage or enclosure.  Latching the door 26 in an inwardly open position also prevents inadvertent opening of the door and keeps the door out of the way of human foot traffic passing by the enclosure 10, where it otherwise might create a tripping hazard or an obstacle.  The latch 28 32 is preferably operable with one hand to open and close the door 26, so that the user has another hand free, for example to grab the pet's collar to attach a leash.  In alternate embodiments, the latch is mounted internally of the enclosure for improved aesthetics.

3

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

## CLAIM AMENDMENTS

Please amend the claims (~~strikethrough~~ indicating deletion and <u>underline</u> indicating insertion) as follows:

1. (Original)   A pet enclosure comprising a frame formed of a substantially rigid, non-porous material; and a flexible, non-porous material woven onto said frame.

2. (Original)   The enclosure of Claim 1, wherein the frame comprises a plurality of generally flat, rectangular panels.

3. (Original)   The enclosure of Claim 2, wherein the panels are pivotally connected to one another to allow folding of the enclosure into a compact configuration and assembly of the enclosure into an assembled configuration without separation of the panels from one another.

4. (Original)   The enclosure of Claim 3, wherein the enclosure is substantially flat in the compact configuration.

5. (Original)   The enclosure of Claim 2, wherein one of the panels defines an opening in which a door is pivotally mounted to swing both inwardly and outwardly.

6. (Original)   The enclosure of Claim 5, further comprising a latch for securing said door in a closed position and in an open position.

7. (Original)   The enclosure of Claim 6, wherein the latch secures said door in an inwardly open position within the enclosure.

8. (Original)   The enclosure of Claim 1, wherein the substantially rigid, non-porous material of the frame is a metal wire.

9. (Original)   The enclosure of Claim 1, wherein the flexible, non-porous material woven onto said frame is a plastic having the appearance of natural rattan or wicker.

10. (Original) The enclosure of Claim 1, comprising a floor panel supported a distance above an underlying support surface.

4

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

11. (Original) The enclosure of Claim 10, wherein the floor panel comprises at least one channel for receiving a cooperating portion of said frame.

12. (Original) The enclosure of Claim 11, wherein the floor panel comprises a plurality of channels or grooves configured to receive a plurality of cooperating frame portions therein, and wherein one or more of the plurality of channels or grooves is/are angularly offset from one or more other channels or grooves, so that the floor panel resists movement in all directions.

13. (Currently Amended)   A pet enclosure comprising a plurality of panels, each panel comprising a substantially rigid frame and a plastic material having the appearance of natural rattan or wicker woven onto said frame and wherein at least one panel defines an opening therein in which a door is pivotally mounted.

14. (Original) The enclosure of Claim 13, wherein the plurality of panels are pivotally connected to one another to allow folding of the enclosure into a compact configuration and assembly of the enclosure into an assembled configuration without separation of the panels from one another.

15. (Original) The enclosure of Claim 13, wherein one of the plurality of panels defines an opening in which a door is pivotally mounted to swing both inwardly and outwardly.

16. (Original) The enclosure of Claim 15, further comprising a latch for securing said door in a closed position and in an open position.

17. (Original) The enclosure of Claim 16, wherein the latch secures said door in an inwardly open position within the enclosure.

18. (Original) The enclosure of Claim 13, comprising a floor panel supported a distance above an underlying support surface.

19. (Original) The enclosure of Claim 18, wherein the floor panel comprises at least one channel for receiving a cooperating portion of said frame.

5

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

20. (Original) A pet enclosure comprising an opening in which a door is pivotally mounted to swing both inwardly and outwardly, and further comprising a latch for securing said door in a closed position and in an open position.

21. (Original) The enclosure of Claim 20, wherein the latch secures said door in an inwardly open position within the enclosure.

22. (Currently Amended)    A pet enclosure comprising a floor panel and a plurality of legs for supporting said floor panel pet enclosure a distance above an underlying support surface[[.]]; and

a removable floor panel, wherein the floor panel comprises a channel for receiving a cooperating portion of said pet enclosure.

23. (Original) A pet enclosure comprising a frame and a removable floor panel, the floor panel comprising at least one channel for receiving a cooperating portion of said frame.

24. (Original) The enclosure of Claim 23, wherein the floor panel comprises a plurality of channels or grooves configured to receive a plurality of cooperating frame portions therein, and wherein one or more of the plurality of channels or grooves is/are angularly offset from one or more other channels or grooves, so that the floor panel resists movement in all directions.

25. (Currently Amended)    A pet enclosure comprising:

a base portion;

a first side panel hingedly connected to the base portion;

a second side panel hingedly connected to the base portion;

a first end panel hingedly connected to the base portion;

a second end panel hingedly connected to the base portion; and

6

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

a top panel hingedly connected to at least one <u>panel selected from said side and said end panels, and wherein at least one of said panels comprise a substantially rigid frame and a plastic material having the appearance of natural rattan or wicker woven on said frame.</u> ~~of the first and second side panels and/or at least one of the first and second end panels.~~

26. (Original) The enclosure of Claim 25, wherein a hinge connection between a first of said panels and the base portion is offset from a hinge connection between a second of said panels and the base portion to permit the panels to fold into a compact configuration.

27. (Original) The enclosure of Claim 25, wherein short connector links are interposed between one or more of said panels and the base portion to permit the panels to fold into a compact configuration.

7

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

## REMARKS

The Office Action mailed February 25, 2004, has been received and reviewed. By the present Response and Amendment, Claims 1-27 are pending, and Claims 13, 22, and 25 are amended. No new matter is introduced.

### Drawings

The Examiner objected to the drawings as failing to comply with 37 C.F.R. 1.84(p)(5) because they include the reference sign "30", which the Examiner stated was not mentioned in the description. Applicant respectfully traverses this rejection. Element 30 is clearly defined on page 6, paragraph 28 as referencing a handle. Accordingly, the objection has been addressed, and Applicant requests the Examiner to withdraw this objection.

The Examiner also objected to the drawings as failing to comply with 37 C.F.R. 1.84(p)(4) because reference character "28" was used to designate both "aperture 28" and "latch 28." Applicant has amended the drawings, specifically Figures 2, 7a, 7b, and 7c, to use reference character "32" to designate the latch. Applicant attaches hereto the replacement sheets and annotated sheets showing the changes made relative to the previous version. Accordingly, the objection has been addressed, and Applicant requests the Examiner to withdraw this objection.

As for the Examiner's objection to the lead lines that do not designate a reference character, Applicant will remove the lead lines at the time of filing formal drawings.

### Specification

Applicant has amended paragraph 1 to conform to the suggestions of the Examiner. Applicant has also amended paragraphs 28 and 33 to conform with the amendments to the drawings. Applicant submits that no new matter has been added.

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

### Claim Rejections under 35 U.S.C. § 112

Claims 25-27 are rejected under 35 U.S.C. § 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention. In particular, the Examiner stated that the term "and/or" in Claim 25 is confusing and makes the scope of the claim unclear. Applicant has amended the claim to replace the term "and/or" with language omitting the term but having the same meaning. Accordingly, Applicant submits that the rejection is overcome and respectfully requests the Examiner to withdraw this rejection.

Applicant does note, however, that this rejection is inconsistent with the actual practice of the Office, as a search of the online U.S. Patent and Trademark Office Full-Text Patent Database indicates that at least 106,622 patents were issued by the Office between 1976 and the present, having the term "and/or" in their claims (search results attached). It is further noted that the term "and/or" is in common usage in current lexicon (see dictionary.com entry attached), and is sufficiently well-understood, such that its use would not be confusing to those of ordinary skill in the art.

### Claim Rejections under 35 U.S.C. § 102(b)

Claims 1 and 2 are rejected under 35 U.S.C. § 102(b) as being anticipated by U.S. Patent No. 6,230,915 to Liu. Applicant respectfully traverses this rejection.

Claims 1 and 2 are patentably distinguishable from Liu. Claims 1 and 2 recite, "A pet enclosure comprising a frame formed of a substantially rigid, non-porous material; and a flexible, non-porous material woven onto said frame." Liu does not disclose a flexible, *non-porous* material woven onto a frame formed of a substantially rigid, non-porous material, but rather Liu discloses that natural rattan, a porous material, is woven onto a frame. As described in the Applicant's specification, a non-porous material is preferable to a porous material, like natural rattan, because the non-porous material does not absorb

9

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

moisture and pet odors. As such, Applicant submits that the Claims are patentably distinct from that disclosed in Liu and requests the Examiner to withdraw this rejection.

Claim 22 is rejected under 35 U.S.C. § 102(b) as being anticipated by U.S. Patent No. 6,318,294 to Richmond et al. Applicant respectfully traverses this rejection. To be a proper 102(b) reference, the invention must have been patented or described in a printed publication "more than one year prior to the date of application for patent in the United States." U.S. Patent No. 6,318,294 issued on November 20, 2001, which is not more than one year prior to the earliest effective filing date of May 2, 2002 of the U.S. Design Patent Application, nor is it more than one year prior to the filing date of U.S. Provisional Patent Application Serial No. 60/394,181, filed July 3, 2002. Both U.S. Design Patent D483156 and U.S. Provisional Patent Application Serial No. 60/394,181 fully support the contents of Claim 22, which recites a pet enclosure comprising a floor panel and a plurality of legs for supporting said floor panel a distance above an underlying support surface. Accordingly, Applicant requests the Examiner to withdraw this rejection.

Nevertheless, to advance prosecution, Applicant has amended Claim 22 to recite, "A pet enclosure comprising a plurality of legs for supporting said pet enclosure a distance above an underlying support surface; and a removable floor panel, wherein the floor panel comprises a channel for receiving a cooperating portion of said pet enclosure." Richmond et al. does not disclose a removable floor panel having a channel for receiving a cooperating portion of the pet enclosure. Accordingly, Applicant submits that amended Claim 22 is patentably distinct from that disclosed in Richmond et al. and requests the Examiner to withdraw this rejection.

Claims 25 and 26 are rejected under 35 U.S.C. § 102(b) as being anticipated by U.S. Patent No. 6,192,834 to Kolozsvari. As currently amended, Claim 25 recites, in part, that "at least one of said panels comprise a substantially rigid frame and a plastic material

10

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

having the appearance of natural rattan or wicker woven on said frame." As Kolozsvari does not disclose that at least one of the panels comprise a substantially rigid frame and a plastic material having the appearance of natural rattan or wicker woven on the frame, Kolozsvari does not anticipate Claim 25. Accordingly, Applicant submits that the rejection is overcome and respectfully requests the Examiner to withdraw this rejection.

Because dependent Claim 26 incorporates the limitations of the claim on which it depends, this dependent claim is allowable for at least the reasons set forth above for the corresponding independent Claim. Thus, as Claim 25 is allowable, Claim 26 is also allowable.

### Claim Rejections under 35 U.S.C. § 103

Claims 9 and 13 are rejected under 35 U.S.C. § 103(a) as being unpatentable over U.S. Patent No. 6,230,915 to Liu. Applicant respectfully traverses this rejection.

Because dependent Claim 9 incorporates the limitations of the claim on which it depends, this dependent claim is allowable for at least the reasons set forth above for the corresponding independent Claim. Thus, as Claim 1 is allowable, Claim 9 is also allowable.

To further prosecution, Applicant has amended Claim 13 to recite, "A pet enclosure comprising a plurality of panels, each panel comprising a substantially rigid frame and a plastic material having the appearance of natural rattan or wicker woven onto said frame and wherein at least one panel defines an opening therein in which a door is pivotally mounted." Applicant submits that the claim, as currently amended, is not obvious in light of Liu because Liu does not disclose, teach or suggest a door pivotally mounted within one of the panels. Accordingly, Applicant respectfully requests the Examiner to withdraw this rejection.

11

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

Claims 3-8, 10 and 14-18 are rejected under 35 U.S.C. § 103(a) as being unpatentable over U.S. Patent No. 6,230,915 to Liu in view of U.S. Patent No. 6,192,834 to Kolozsvari. Applicant respectfully traverses this rejection.

Because dependent Claims 3-8, 10, and 14-18 incorporate the limitations of the claims on which they depend, these dependent claims are allowable for at least the reasons set forth above for the corresponding independent Claims. Thus, as Claims 1 and 13 are allowable, Claims 3-8, 10, and 14-18 are also allowable.

Claims 11, 12 and 19 are rejected under 35 U.S.C. § 103(a) as being unpatentable over U.S. Patent No. 6,230,915 to Liu as modified by U.S. Patent No. 6,192,834 to Kolozsvari and further in view of U.S. Patent No. 4,027,625 to Wheeler. Applicant respectfully traverses this rejection.

Because dependent Claims 11, 12, and 19 incorporate the limitations of the claims on which they depend, these dependent claims are allowable for at least the reasons set forth above for the corresponding independent Claims. Thus, as Claim 13 is allowable, Claims 11, 12, and 19 are also allowable.

Claims 20 and 21 are rejected under 35 U.S.C. § 103(a) as being unpatentable over U.S. Patent No. 6,192,834 to Kolozsvari. Applicant respectfully traverses this rejection.

Claim 20 recites, "A pet enclosure comprising an opening in which a door is pivotally mounted to swing both inwardly and outwardly, and further comprising a latch for securing said door in a closed position and in an open position." Contrary to the Examiner's assertions, Kolozsvari does not disclose a door that can swing both inwardly and outwardly. Rather, the door in Kolozsvari is limited to swing outwardly only because a doorframe engages the door when the door is in a closed position. Thus, the doorframe acts as a barrier to prevent the door from swinging inwardly. Moreover, the latch of Kolozsvari can be used to secure the door in a closed position only. The latch cannot be used to secure the door in an open position. To construct a latch that can secure the door

12

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

in both an open and a closed position would require the device of Kolozsvari to be modified in a significant, non-obvious manner. Accordingly, Applicant submits that Claim 20 is not obvious in view of Kolozsvari and requests the Examiner to withdraw this rejection.

Because dependent Claim 21 incorporates the limitations of the claim on which it depends, this dependent claim is allowable for at least the reasons set forth above for the corresponding independent Claim. Thus, as Claim 20 is allowable, Claim 21 is also allowable.

Claims 23 and 24 are rejected under 35 U.S.C. § 103(a) as being unpatentable over U.S. Patent No. 6,192,834 to Kolozsvari in view of U.S. Patent No. 4,027,625 to Wheeler. Applicant respectfully traverses this rejection.

Claim 23 recites, "A pet enclosure comprising a frame and a removable floor panel, the floor panel comprising at least one channel for receiving a cooperating portion of said frame." Neither Kolozsvari nor Wheeler, individually or in combination, teaches a floor panel comprising a channel for receiving a cooperating portion of the frame. Kolozsvari teaches a wire frame having tray projections extending from the frame to prevent the accidental removal of the tray. Thus, there is no motivation to combine the teachings of Kolozsvari with the teachings of Wheeler to modify Kolozsvari to include a tray with a channel for receiving a cooperating portion of the frame because Kolozsvari alone teaches a different mechanism for securing the tray. Accordingly, Applicant submits that Claim 23 is not obvious in view of the combination of Kolozsvari and Wheeler and requests the Examiner to withdraw this rejection.

Because dependent Claim 24 incorporates the limitations of the claim on which it depends, this dependent claim is allowable for at least the reasons set forth above for the corresponding independent Claim. Thus, as Claim 23 is allowable, Claim 24 is also allowable.

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

Claim 27 is rejected under 35 U.S.C. § 103(a) as being unpatentable over U.S. Patent No. 6,192,834 to Kolozsvari in view of U.S. Patent No. 2,079,458 to Leichtfuss. Applicant respectfully traverses this rejection.

Because dependent Claim 27 incorporates the limitations of the claim on which it depends, this dependent claim is allowable for at least the reasons set forth above for the corresponding independent Claim. Thus, as Claim 25 is allowable, Claim 27 is also allowable.

## CONCLUSION

In view of the amendments submitted herein and the above comments, it is believed that all grounds of rejection are overcome and that the application has now been placed in full condition for allowance. Accordingly, Applicant earnestly solicits early and favorable action. Should there be any further questions or reservations, the Examiner is urged to telephone Applicant's undersigned attorney at (770) 984-2300.

Respectfully submitted,

Bradley K. Groff
Reg. No. 39,695

GARDNER GROFF, P.C.
Paper Mill Village, Building 23
600 Village Trace, Suite 300
Marietta, GA 30067
Tel:   770/984-2300
Fax:   770/984-0098

W:\Client Files\BKG Clients\2S14-Simpson & Co\2S14.1-011  Pat Enclosure (NonProv)\2008.pat (Response and Amendment).doc

14

## USPTO PATENT FULL-TEXT AND IMAGE DATABASE

| Home | Quick | Advanced | Pat Num | Help |

| Next List | Bottom | View Cart |

*Searching 1976 to present...*

**Results of Search in 1976 to present db for:**
**ACLM/"and/or": 106622 patents.**
*Hits 1 through 50 out of 106622*

Next 50 Hits

Jump To [          ]

Refine Search [ aclm/"and/or"                          ]

| | PAT. NO. | Title |
|---|---|---|
| 1 | 6,754,886 | Method and system for storing java objects in devices having a reduced support of high-level programming concepts |
| 2 | 6,754,880 | Method for automatically laying out semiconductor integrated circuit |
| 3 | 6,754,840 | Over-clocking detection system utilizing a reference signal and thereafter preventing over-clocking by reducing clock rate |
| 4 | 6,754,812 | Hardware predication for conditional instruction path branching |
| 5 | 6,754,740 | Interface apparatus for connecting devices operating at different clock rates, and a method of operating the interface |
| 6 | 6,754,725 | USB peripheral containing its own device driver |
| 7 | 6,754,699 | Content delivery and global traffic management network system |
| 8 | 6,754,691 | Distributed system, access control process and apparatus and program product having access controlling program thereon |
| 9 | 6,754,672 | System and method for efficient integration of government administrative and program systems |
| 10 | 6,754,661 | Hierarchical storage systems for holding evidentiary objects and methods of creating and operating upon hierarchical storage systems |
| 11 | 6,754,641 | Dynamic identification interchange method for exchanging one form of identification for another |
| 12 | 6,754,638 | Web site offering specialty chemicals such as adhesives sealants coatings lubricants cleaners and related equipment in conjunction with access to product support and product usage information |
| 13 | 6,754,632 | Methods and devices for delivering exogenously generated speech signals to enhance |

US 6,754,589 B2

33

being pumped dry. In another example, if it is determined that two existing oil wells are drilled into the same oil reservoir, then one well could be used as the offset well, eliminating the time and cost of drilling a new offset well. Determining whether one or more wells are drilled into the same reservoir can be achieved in a number of ways. For example, neural networks can be used, as described above. In another example, historical production levels can be used to make the determination (e.g., if production of one well decreases production of another well, the wells may be drilled into the same reservoir). In another example, a pressure gauge can be used on one well, while another well is pressurized (e.g., if pressurizing one well increases the pressure of another, the wells may be drilled into the same reservoir). In another example, the bottom hole pressures of adjacent wells could be compared (it is known in the art that wells having the same bottom hole pressure may be drilled into the same reservoir).

The present invention may also be used to determine the likelihood of success using enhanced oil recovery techniques on an oil and/or gas well. Note that whether a technique is feasible depends on many external factors (e.g., the price and demand of oil, etc.). FIG. 20 is a flowchart illustrating such a process. First, at step 2010, seismic data is collected in the area in question. Next, at step 2020, a neural network is developed using training data relating to areas corresponding to successful and unsuccessful oil recovery attempts (either actually successful or assumed). Note that the order of these steps is not essential. At step 2030, the neural network is applied to the collected seismic data. Finally, at step 2040, the process determines whether one or more wells is likely to benefit from an enhanced oil recovery technique. Therefore, the present invention greatly increases the success rate of enhanced hydrocarbon recovery efforts by: (1) determining which wells are likely to be producers in an enhanced recovery effort; and (2) determining optimal locations for offset wells.

Alternatives and Closing

While the present invention has been described in the context of using seismic data to delineate hydrocarbon accumulations from seismic data, the present invention is not limited to this particular application. The present invention may be utilized in any number of fields including but not limited to: weather forecasting from radiometers, analysis of aeromagnetic profiles, delineation of astronomical clusters from radio-telescope data, delineation of objects from radar, sonar, and infrared returns, etc.

While the present invention has been described in detail herein in accord with certain preferred embodiments thereof, modifications and changes therein may be effected by those skilled in the art. Accordingly, it is intended by the appended claims to cover all such modifications and changes as fall within the true spirit and scope of the invention.

What is claimed is:

1. A method of determining locations for offset wells for use in an enhanced oil recovery process in an oil and/or gas field comprising the steps of:

developing an algorithm that iteratively presents a set of seismic data relating to one or more hydrocarbon producing areas and seismic data relating to one or more hydrocarbon non-producing areas to a portion of the algorithm that has a goal of minimizing the error over all of the data by propagating the error value back after each iteration and performing appropriate adjustments to a function that takes on characteristics or patterns in the data;

34

terminating the algorithm after a sufficient number of iterations for the function to have taken on sufficient characteristics or patterns in the data;

applying the function containing the characteristics or patterns to at least a portion of seismic data collected in the oil and/or gas field to determine areas where hydrocarbons have been produced; and

determining one or more locations for offset wells based on the determined areas where hydrocarbons have been produced.

2. The method of claim 1, wherein the enhanced oil recovery process includes the introduction of bacteria into an offset well.

3. The method of claim 1, wherein the enhanced oil recovery process includes the step of applying pressure to an offset well.

4. A method of enhancing the hydrocarbon recovery in an oil and/or gas field having a plurality of wells comprising the steps of:

choosing two or more of the wells in the oil and/or gas field for use with an enhanced hydrocarbon recovery technique;

using at least one of the chosen wells as an injection well for the enhanced hydrocarbon recovery technique; and

using one or more remaining chosen wells as a producing well.

5. The method of claim 4, wherein the enhanced hydrocarbon recovery technique involves injecting bacteria into one of the wells.

6. The method of claim 5, wherein the wells are chosen using a neural network.

7. The method of claim 4, further comprising the step of using a neural network to help choose the wells for use with the enhanced hydrocarbon recovery technique.

8. The method of claim 7, wherein the neural network is developed to recognize where hydrocarbons have been produced from existing hydrocarbon wells.

9. The method of claim 7, wherein the neural network is developed to recognize hydrocarbon producing areas and hydrocarbon non-producing areas.

10. The method of claim 7, wherein the neural network is developed to determine whether two or more wells are drilled into the same reservoir.

11. The method of claim 7, wherein the enhanced hydrocarbon recovery technique involves injecting bacteria into one of the wells.

12. The method of claim 4, wherein the two or more wells are chosen using historical well production data.

13. A method of enhancing the hydrocarbon recovery in an oil and/or gas field having a plurality of existing wells comprising the steps of:

using one of the existing wells to create an offset well;

using the offset well for an enhanced hydrocarbon recovery technique; and

using another existing well to produce hydrocarbons.

14. The method of claim 13, wherein the well used to produce hydrocarbons is one of the existing wells.

15. The method of claim 13, wherein the well used to produce hydrocarbons is a new well.

16. The method of claim 13, wherein the enhanced hydrocarbon recovery technique involves injecting bacteria into the offset well.

17. The method of claim 16, wherein the step of using one of the existing wells to create an offset well further comprises the step of using a neural network to determine optimal locations for an offset well.

US 6,754,886 B1

7

knowledge if the application engineer is provided with the respective JAVA BeanItem objects loadFromCard ( ) and saveToCard ( ), respectively.

In conjunction with the co-pending application concerning visual programming of SmartCard applications by using card independent objects the storing and recovering of objects of Java applications can be realized even card-independently using a visual engineering environment: There, a Java interface is provided defining methods for storing and recovering of objects. The application can use such methods as a placeholder, i.e. a dummy in order to define its own SmartCard access procedures, which in turn can be advantageously performed by visual programming techniques, as well. Using the principle presented in that co-pending application the actual implementation of the interface is performed at application runtime and specific for each of the applied SmartCards. Thus, the proper implementation is instantiated depending of the actual used SmartCard in order to serialize the concerned object and to store it onto the SmartCard or to recover it therefrom.

In the foregoing specification the invention has been described with reference to a specific exemplary embodiment thereof. It will, however, be evident that various modifications and changes may be made thereto without departing from the broader spirit and scope of the invention as set forth in the appended claims. The specification and drawings are accordingly to be regarded as illustrative rather than in a restrictive sense.

| 6 | host application |
|---|---|
| 7, 8 | SmartCards |
| 9 | interface |
| 10, 12 | objects |
| 110–156 | steps comprised of the inventional method |

What is claimed is:

1. A method for storing objects in devices having a reduced resources of high-level programming support, in which said objects are associated with both an application implemented on such device and a host application running on a host computer, the method comprising a step of:

providing an interface between the host application and the device application, said interface being associated with said objects and comprising methods being able to be performed on the attributes associated with said objects,

the method being characterized by the step of:

serializing, contiguously, attributes and methods of said objects into a format applicable to said devices.

2. The method according to claim 1, in which said reduced resources computer devices are SmartCards.

3. The method according to claim 1, wherein serializing is performed with Java Class technology by providing a serializing BeanItem.

4. The method according to claim 1, in which said objects are packed in tag, length, value formatted form and/or compressed prior to storing said objects.

5. A method for recovering objects from devices having reduced resources for high-level programming support in which said objects are associated with both an application

8

implemented on such device and a host application running on a host computer, the method comprising a step of:

providing an interface between said host application and said device application, said interface being associated with said objects and comprising methods being able to be performed on the attributes associated with said objects

the method being characterized by the step of

de-serializing contiguous attributes.and methods of said objects from a format applicable on said devices.

6. The method according to claim 5, in which said devices are SmartCards.

7. The method according to claim 5, wherein de-serializing is performed with Java Class technology by providing a de-serializing BeanItem.

8. The method according to claim 5, further comprising the step of reading said objects onto or from said device, wherein said objects are uncompressed and/or unpacked from tag, length, value formatted form after reading said objects.

9. A program storage device readable by machine, tangibly embodying a program of instructions executable by the machine to perform method steps for storing objects in devices having a reduced resources of high-level programming support, in which said objects are associated with both an application implemented on such device and a host application running on a host computer, the method steps comprising:

providing an interface between the host application and the device application, said interface being associated with said objects and comprising methods being able to be performed on the attributes associated with said objects,

the method being characterized by the steps of

serializing, contiguously, attributes and methods of said objects into a format applicable to said devices; and de-serializing contiguous attributes and methods of said objects from a format applicable on said devices.

10. The method according to claim 9, in which said reduced resources computer devices are SmartCards.

11. The method according to claim 9, wherein serializing is performed with Java Class technology by providing a serializing BeanItem.

12. The method according to claim 9, in which said objects are packed in tag, length, value formatted form and/or compressed prior to storing said objects.

13. The method according to claim 9, wherein de-serializing is performed with Java Class technology by providing a de-serializing BeanItem.

14. The method according to claim 9, further comprising the step of reading said objects onto or from said device, wherein said objects are uncompressed and/or unpacked from tag, length, value formatted form after reading said objects.

* * * * *

**≡◯ Dictionary.com**    | and/or | | Search |

◉ Dictionary  ○ Thesaurus  ○ Web

Home                                    Premium: Sign up | Login

---

**Find Your Graduating Class**
  
 classmates·com

199[
1986
197.
196.
195.

ADVERTISEMENT

Dictionary - Thesaurus - Web

Get the Most Popular Sites for "and/or"

# 2 entries found for *and/or*.

ADVERTISEMENT

**and/or** ◁ 回 **Pronunciation Key** (ăn'dôr')
*conj.*

> Used to indicate that either or both of the items connected by it are involved.
>
> *Usage Note: And/or* is widely used in legal and business writing. Its use in general writing to mean "one or the other or both" is acceptable but can appear stilted. See Usage Note at or[1].

[Download or Buy Now]
Source: *The American Heritage® Dictionary of the English Language, Fourth Edition*
*Copyright © 2000 by Houghton Mifflin Company.*
*Published by Houghton Mifflin Company. All rights reserved.*

**and/or**

Both or either of two options. For example, *His use of copyrighted material shows that the writer is careless and/or dishonest.* This idiom originated in legal terminology of the mid-1800s.

Source: *The American Heritage® Dictionary of Idioms by*

ANNOTATED SHEET SHOWING CHANGES

2/12

Fig. 2

Fig. 3

11/12    ANNOTATED SHEET SHOWING CHANGES



Fig. 7c

Fig. 7b

Fig. 7a

OIPE
JUL 2 8 2004
PATENT & TRADEMARK

PTO/SB/22 (08-03)
Approved for use through 7/31/2006. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PETITION FOR EXTENSION OF TIME UNDER 37 CFR 1.136(a) | Docket Number (Optional) 2S14.1-011 |
|---|---|

| In re Application of SIMPSON, Jeffrey M. | |
|---|---|
| Application Number 10/612,589 | Filed   July 2, 2003 |
| For   "PET ENCLOSURE" | |
| Art Unit  3643 | Examiner   OLSZEWSKI, Joan M. |

This is a request under the provisions of 37 CFR 1.136(a) to extend the period for filing a reply in the above identified application.

The requested extension and appropriate non-small-entity fee are as follows (check time period desired):

| | | |
|---|---|---|
| ☐ | One month (37 CFR 1.17(a)(1)) | $_____ |
| ☒ | Two months (37 CFR 1.17(a)(2)) | $420 |
| ☐ | Three months (37 CFR 1.17(a)(3)) | $_____ |
| ☐ | Four months (37 CFR 1.17(a)(4)) | $_____ |
| ☐ | Five months (37 CFR 1.17(a)(5)) | $_____ |

☒ Applicant claims small entity status. See 37 CFR 1.27. Therefore, the fee amount shown above is reduced by one-half, and the resulting fee is: $ 210 .

☐ A check in the amount of the fee is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☐ The Director has already been authorized to charge fees in this application to a Deposit Account.

☒ The Director is hereby authorized to charge any fees which may be required, or credit any overpayment, to Deposit Account Number 50-1513 .
I have enclosed a duplicate copy of this sheet.

I am the     ☐ applicant/inventor.

☐ assignee of record of the entire interest.  See 37 CFR 3.71
   Statement under 37 CFR 3.73(b) is enclosed.  (Form PTO/SB/96).

☒ attorney or agent of record.  Registration Number 39,695

☐ attorney or agent under 37 CFR 1.34(a).
   Registration number if acting under 37 CFR 1.34(a). _____ .

**WARNING: Information on this form may become public.  Credit card information should not be included on this form.  Provide credit card information and authorization on PTO-2038.**

| July 23, 2004 | _/signature/_ |
|---|---|
| Date | Signature |
| 770.984.2300 | Bradley K. Groff |
| Telephone Number | Typed or printed name |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below.

☐ Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.136(a). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 6 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

07/27/2004 DCHAU1    00000820 10612589    210.00 OP
01 FC:2252

REPLACEMENT SHEET

2/12



Fig. 2



Fig. 3



Fig. 7c

Fig. 7b

Fig. 7a

**PATENT APPLICATION FEE DETERMINATION RECORD**
Effective January 1, 2003

Application or Docket Number
10/612 589
10,6 12 5 89

## CLAIMS AS FILED - PART I

| | (Column 1) | (Column 2) | | SMALL ENTITY TYPE ☐ | OR | OTHER THAN SMALL ENTITY |
|---|---|---|---|---|---|---|

| | | | | RATE | FEE | | RATE | FEE |
|---|---|---|---|---|---|---|---|---|
| TOTAL CLAIMS | 27 | | | BASIC FEE | 375.00 | OR | BASIC FEE | 750.00 |
| FOR | NUMBER FILED | NUMBER EXTRA | | | | | | |
| TOTAL CHARGEABLE CLAIMS | 27 minus 20= | 7 | | X$ 9= | 63 | OR | X18= | |
| INDEPENDENT CLAIMS | 6 minus 3 = | 3 | | X42= | 126 | OR | X84= | |
| MULTIPLE DEPENDENT CLAIM PRESENT | | ☐ | | +140= | | OR | +280= | |
| | | | | TOTAL | 564 | OR | TOTAL | |

\* If the difference in column 1 is less than zero, enter "0" in column 2

## CLAIMS AS AMENDED - PART II

| AMENDMENT A | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | SMALL ENTITY | OR | OTHER THAN SMALL ENTITY |
|---|---|---|---|---|---|---|---|

| | | | | | RATE | ADDITIONAL FEE | | RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|---|
| Total | 27 | Minus | 27 | — | X$ 9= | | OR | X18= | |
| Independent | 3 | Minus | 3 | ✓ | X42= | | OR | X84= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM ☐ | | | | | +140= | | OR | +280= | |
| | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

13 20 22 23 25

| AMENDMENT B | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | RATE | ADDITIONAL FEE | | RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|---|
| Total | | Minus | | | X$ 9= | | OR | X18= | |
| Independent | | Minus | | | X42= | | OR | X84= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM ☐ | | | | | +140= | | OR | +280= | |
| | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

| AMENDMENT C | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA | RATE | ADDITIONAL FEE | | RATE | ADDITIONAL FEE |
|---|---|---|---|---|---|---|---|---|---|
| Total | | Minus | | | X$ 9= | | OR | X18= | |
| Independent | | Minus | | | X42= | | OR | X84= | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM ☐ | | | | | +140= | | OR | +280= | |
| | | | | | TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

\* if the entry in column 1 is less than the entry in column 2, write "0" in column 3.
\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20."
\*\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3."
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE

| L Number | Hits | Search Text | DB | Time stamp |
|---|---|---|---|---|
| 1 | 9 | plastic adj2 rattan | USPAT; US-PGPUB; EPO; JPO; DERWENT; IBM_TDB | 2004/10/18 10:44 |
| 2 | 17 | plastic adj2 wicker | USPAT; US-PGPUB; EPO; JPO; DERWENT; IBM_TDB | 2004/10/18 10:44 |

Best Available Copy

PTO/SB/08a (05-03)
Approved for use through 04/30/2003. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

Substitute for form 1449A/PTO

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT

*(use as many sheets as necessary)*

| Complete if Known | |
|---|---|
| Application Number | 10/612,589 |
| Filing Date | July 2, 2003 |
| First Named Inventor | SIMPSON, Jeffrey M. |
| Art Unit | 3643 |
| Examiner Name | Unknown |
| Attorney Docket Number | 2S14.1-011 |

| Sheet | 1 | of | 1 |
|---|---|---|---|

## U.S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.¹ | Document Number — Number - Kind Code² (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| RPS | A | US-1,211,762 | 01/09/1917 | SAWYER | C.1/Sub |
| RPS | B | US-2,789,531 | 04/23/1957 | DIEFENDORF | — — |
| RRS | C | US-4,256,056 | 03/17/1981 | SOU | — — |
| RPS | D | US-D382,374 | 08/12/1997 | BURKS | — — |
| RPS | E | US-5,960,744 | 10/05/1999 | RUTMAN | — — |
| RPS | F | US-5,967,090 | 10/19/1999 | HUI | — — |
| RPS | G | US-D427,730 | 07/04/2000 | POWERS et al. | — — |
| RPS | H | US-6,354,245 | 03/12/2002 | RODDY et al. | — — |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |

## FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.¹ | Foreign Patent Document — Country Code³ - Number⁴ - Kind Code⁵ (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear | T⁶ |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Examiner Signature | Robert P. Swiatek | Date Considered | 10-19-04 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant. 1 Applicant's unique citation designation number (optional). 2 See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. 3 Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). 4 For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. 5 Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST. 16 if possible. 6 Applicant is to place a check mark here if English language Translation is attached.
This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*


Best Available Cop...

PTO/SB/08b(08-03)
Approved for use through 07/31/2006. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number

Substitute for form 1449B/PTO

## INFORMATION DISCLOSURE STATEMENT BY APPLICANT

*(Use as many sheets as necessary)*

| Complete If Known | |
|---|---|
| Application Number | 10/612,589 |
| Filing Date | 07/02/2003 |
| First Named Inventor | SIMPSON, Jeffery M. |
| Art Unit | 3643 |
| Examiner Name | OLSZEWSKI, Joan M. |
| Attorney Docket Number | 2S14.1-011 |

| Sheet | 1 | of | 1 |
|---|---|---|---|

| NON PATENT LITERATURE DOCUMENTS | | | | |
|---|---|---|---|---|
| Examiner Initials * | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | | T[2] |
| RPS | A | IN THE COMPANY OF DOGS, Spring Preview 2001 - Catalog, Portland, Tennessee. | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| Examiner Signature | Robert P. Swiatek | Date Considered | 10-19-04 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.
[1] Applicant's unique citation designation number (optional). [2] Applicant is to place a check mark here if English language Translation is attached.
This collection of information is required by 37 CFR 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 120 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: **Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

| | | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| ***Notice of References Cited*** | | 10/612,589 | SIMPSON, JEFFREY M. |
| | | Examiner | Art Unit | |
| | | Robert P. Swiatek | 3643 | Page 1 of 1 |

### U.S. PATENT DOCUMENTS

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-539,394 | 05-1895 | Poulson et al. | 52/243 |
| | B | US-6,601,723 B1 | 08-2003 | Ziglar, Paul S. | 220/4.34 |
| | C | US-318,812 | 05-1885 | Smith el al. | 217/47 |
| | D | US-2,247,598 | 07-1941 | BOHLEN OVID L | 5/102 |
| | E | US-4,170,312 | 10-1979 | Lloyd et al. | 220/4.21 |
| | F | US-6,694,918 B2 | 02-2004 | Draft, Roger | 119/453 |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

### FOREIGN PATENT DOCUMENTS

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

### NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                     **Notice of References Cited**                     Part of Paper No. 20041018



### UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/612,589 | 07/02/2003 | Jeffrey M. Simpson | 2S14.1-011 | 6134 |

| 23506 | 7590 | 11/03/2004 |
|---|---|---|

GARDNER GROFF, P.C.
PAPER MILL VILLAGE, BUILDING 23
600 VILLAGE TRACE
SUITE 300
MARIETTA, GA  30067

| EXAMINER |
|---|
| SWIATEK, ROBERT P |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3643 | |

DATE MAILED: 11/03/2004

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| ***Office Action Summary*** | Application No. | Applicant(s) |
| | 10/612,589 | SIMPSON, JEFFREY M. |
| | Examiner | Art Unit | |
| | Robert P. Swiatek | 3643 | |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE _3_ MONTH(S) FROM
THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed
  after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any
  earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on _26 July 2004_.

2a) ☐ This action is **FINAL**.    2b) ☒ This action is non-final.

3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is
closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4) ☒ Claim(s) _1-27_ is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5) ☐ Claim(s) _____ is/are allowed.

6) ☒ Claim(s) _1-10 and 13-27_ is/are rejected.

7) ☒ Claim(s) _11 and 12_ is/are objected to.

8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9) ☐ The specification is objected to by the Examiner.

10) ☒ The drawing(s) filed on _02 July 2003_ is/are: a) ☐ accepted or b) ☒ objected to by the Examiner.
Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All  b) ☐ Some * c) ☐ None of:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____.

      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage
application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3) ☒ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08)
Paper No(s)/Mail Date _2-23-04_.

4) ☐ Interview Summary (PTO-413)
Paper No(s)/Mail Date. _____ .

5) ☐ Notice of Informal Patent Application (PTO-152)

6) ☐ Other: _____.

Application/Control Number: 10/612,589                                    Page 2
Art Unit: 3643

## DETAILED ACTION

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this
or a foreign country, before the invention thereof by the applicant for a patent.

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on
sale in this country, more than one year prior to the date of application for patent in the United States.

Claims 1, 2, 8 are rejected under 35 U.S.C. 102(b) as being anticipated by Poulson et al.

(US 539,394). The patent to Poulson et al. discloses a wall structure including a metallic frame

A, B with interwoven, metallic lathing C. The structure of which the Poulson et al. partition is a

part could be employed to enclose an animal.

Claims 1-4, 9, 10, 25-27 are rejected under 35 U.S.C. 102(a) as being anticipated by

Ziglar (US 6,601,723 B1). The Ziglar patent discloses frames 112, 114, 116, 218 comprised of

metal and hingedly connected together. Flexible, non-porous material is woven onto the frames

(see Figures 3, 4 of Ziglar) to form panels. Column 2, lines 35-40, of Ziglar indicates the non-

porous, woven material 104, 106 can be, *inter alia*, plastic; the finished product is considered to

resemble rattan or wicker. As to claim 1, an animal could be placed within the Ziglar hamper.

With regard to claim 25, if the Ziglar hamper is reoriented such that panel 206 is on the bottom,

it becomes a base panel with side and end panels hingedly connected to it; in such a scenario,

panel 104 becomes a top panel. Hinge knuckles 182, 183 of panel 206 are considered to be

Application/Control Number: 10/612,589                                    Page 3
Art Unit: 3643

offset with one another along a longitudinal axis. With respect to claim 27, Figure 5 of Ziglar

depicts (unnumbered) connector links between panel "bottom" panel 206 and grate 202.

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
> section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the
> manner in which the invention was made.

Claims 5-7, 13, 15-17, 20, 21 are rejected under 35 U.S.C. 103(a) as being unpatentable

over Poulson et al. in view of Smith et al. (US 318,812). The Poulson et al. patent does not

disclose an opening and associated door in their wall structure. However, it would have been

obvious to one skilled in the art to provide the wall structure of Poulson et al. with the swinging

door h of the Smith et al. patent, in order to permit easy passage of items with a minimum of

obstruction through the partition. As to claims 6, 16, 20, provision of a latch to secure the door

in an open position would have been obvious to one skilled in the art seeking to prevent

inadvertent movement or closure of the door while in use. With respect to claim 13, use of

plastic in the construction of the Poulson et al. wall structure, while not disclosed, nonetheless

would have been obvious to one skilled in the art seeking to reduce costs.

Claims 22-24 are rejected under 35 U.S.C. 102(b) as being anticipated by Bohlen (US

2,247,598). The Bohlen enclosed bed includes a floor panel 4, support legs 17, and a plurality of

channels 4' that receive cooperating portions 6 of the enclosed bed. The preamble of claim 22

has not been given weight inasmuch as a pet could be placed in the Bohlen bed. As to claim 24,

the panel is considered to resist movement in any one direction by virtue of the tension exerted

by the springs 6.

Claims 13-19, 25-27 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention. In claim 13, lines 2, 3, and claim 25, lines 9, 10, it is unclear if the plastic material itself is woven onto the frame or whether it has only the appearance of being woven onto the frame.

In claim 24, line 3, "is/are" should be changed to –are–.

The drawings are objected to under 37 CFR 1.83(a). The drawings must show every feature of the invention specified in the claims. Therefore, the plurality of channels or grooves of claim 24 must be shown or the feature(s) canceled from the claim(s). No new matter should be entered.

Corrected drawing sheets in compliance with 37 CFR 1.121(d) are required in reply to the Office action to avoid abandonment of the application. Any amended replacement drawing sheet should include all of the figures appearing on the immediate prior version of the sheet, even if only one figure is being amended. The figure or figure number of an amended drawing should not be labeled as "amended." If a drawing figure is to be canceled, the appropriate figure must be removed from the replacement sheet, and where necessary, the remaining figures must be renumbered and appropriate changes made to the brief description of the several views of the drawings for consistency. Additional replacement sheets may be necessary to show the renumbering of the remaining figures. The replacement sheet(s) should be labeled "Replacement Sheet" in the page header (as per 37 CFR 1.84(c)) so as not to obstruct any portion of the drawing figures. If the changes are not accepted by the examiner, the applicant will be notified

Application/Control Number: 10/612,589                                        Page 5
Art Unit: 3643

and informed of any required corrective action in the next Office action. The objection to the

drawings will not be held in abeyance.

      Claims 14, 18, 19 would be allowable if rewritten to overcome the rejection(s) under 35

U.S.C. 112, 2nd paragraph, set forth in this Office action and to include all of the limitations of

the base claim and any intervening claims.

      Claims 11, 12 are objected to as being dependent upon a rejected base claim, but would

be allowable if rewritten in independent form including all of the limitations of the base claim

and any intervening claims.

      Applicant's arguments with respect to claims 1-27 have been considered but are moot in

view of the new ground(s) of rejection.

      The patents to Lloyd et al. (US 4,170,312) and Draft (US 6,694,918 B2) have been cited

to provide additional examples of enclosures.

RPS: ☏703/308-2700
19 October 2004

Robert P. Swiatek
**ROBERT P. SWIATEK**
**PRIMARY EXAMINER**
**ART UNIT 253 3643**

| | Index of Claims | | Application No. | | Applicant(s) | |
|---|---|---|---|---|---|---|
| | | | 10/612,589 | | SIMPSON, JEFFREY M. | |
| | | | Examiner | | Art Unit | |
| | | | Robert P. Swiatek | | 3643 | |

| √ | Rejected | − | (Through numeral) Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | + | Restricted | I | Interference | O | Objected |

| Claim | | Date | Claim | | Date | Claim | | Date |
|---|---|---|---|---|---|---|---|---|
| Final | Original | 10/19/04 | Final | Original | | Final | Original | |
| | 1 | √ | | 51 | | | 101 | |
| | 2 | √ | | 52 | | | 102 | |
| | 3 | √ | | 53 | | | 103 | |
| | 4 | √ | | 54 | | | 104 | |
| | 5 | √ | | 55 | | | 105 | |
| | 6 | √ | | 56 | | | 106 | |
| | 7 | √ | | 57 | | | 107 | |
| | 8 | √ | | 58 | | | 108 | |
| | 9 | √ | | 59 | | | 109 | |
| | 10 | √ | | 60 | | | 110 | |
| | 11 | O | | 61 | | | 111 | |
| | 12 | O | | 62 | | | 112 | |
| | 13 | √ | | 63 | | | 113 | |
| | 14 | √ | | 64 | | | 114 | |
| | 15 | √ | | 65 | | | 115 | |
| | 16 | √ | | 66 | | | 116 | |
| | 17 | √ | | 67 | | | 117 | |
| | 18 | √ | | 68 | | | 118 | |
| | 19 | √ | | 69 | | | 119 | |
| | 20 | √ | | 70 | | | 120 | |
| | 21 | √ | | 71 | | | 121 | |
| | 22 | √ | | 72 | | | 122 | |
| | 23 | √ | | 73 | | | 123 | |
| | 24 | √ | | 74 | | | 124 | |
| | 25 | √ | | 75 | | | 125 | |
| | 26 | √ | | 76 | | | 126 | |
| | 27 | √ | | 77 | | | 127 | |
| | 28 | | | 78 | | | 128 | |
| | 29 | | | 79 | | | 129 | |
| | 30 | | | 80 | | | 130 | |
| | 31 | | | 81 | | | 131 | |
| | 32 | | | 82 | | | 132 | |
| | 33 | | | 83 | | | 133 | |
| | 34 | | | 84 | | | 134 | |
| | 35 | | | 85 | | | 135 | |
| | 36 | | | 86 | | | 136 | |
| | 37 | | | 87 | | | 137 | |
| | 38 | | | 88 | | | 138 | |
| | 39 | | | 89 | | | 139 | |
| | 40 | | | 90 | | | 140 | |
| | 41 | | | 91 | | | 141 | |
| | 42 | | | 92 | | | 142 | |
| | 43 | | | 93 | | | 143 | |
| | 44 | | | 94 | | | 144 | |
| | 45 | | | 95 | | | 145 | |
| | 46 | | | 96 | | | 146 | |
| | 47 | | | 97 | | | 147 | |
| | 48 | | | 98 | | | 148 | |
| | 49 | | | 99 | | | 149 | |
| | 50 | | | 100 | | | 150 | |

| Search Notes | | Application No. | Applicant(s) |
|---|---|---|---|
| | | 10/612,589 | SIMPSON, JEFFREY M. |
| | | Examiner | Art Unit |
| | | Robert P. Swiatek | 3643 |

| SEARCHED | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| Search | Updated | 10/20/2004 | RPS |
| 220 | 493 | 10/19/2004 | RPS |
| 119 | 452 | | |
| 119 | 459 | | |
| 119 | 461 | | |
| 119 | 474 | | |
| 119 | 481 | | |
| 52 | 343 | | |
| 52 | 791.1 | | |
| 232 | 1B | | |
| | | | |
| | - | | |
| | | | |
| | | | |

| INTERFERENCE SEARCHED | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| | | | |
| | | | |
| | | | |
| | | | |

| SEARCH NOTES (INCLUDING SEARCH STRATEGY) | | |
|---|---|---|
| | DATE | EXMR |
| EAST Search--see accompanying strategy | 10/18/2004 | RPS |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

U.S. Patent and Trademark Office

Part of Paper No. 20041018

Serial No.: **10/612,589**
Attorney Docket No.: **2S14.1-011**
**PATENT**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of: SIMPSON, Jeffrey M.          )
                                                  )
Serial No.: 10/612,589                            )  Group Art Unit: 3643
                                                  )
Filed: July 2, 2003                               )  Examiner: SWIATEK, Robert P.
                                                  )
For:   **"PET ENCLOSURE"**                         )
                                                  )

Mail Stop Amendment                              March 3, 2005
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## <u>RESPONSE AND AMENDMENT</u>

Sir:

In response to the Office Action mailed November 3, 2004, please amend the above-referenced patent application as follows and consider the remarks below. This Response is filed with a one-month extension of time. If any additional extension is required, please consider this a request therefor. The Commissioner is authorized to charge any additional fees due or credit any overpayment to Deposit Account 50-1513.

---

**CERTIFICATE OF MAILING**

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Mail Stop Amendment, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450, on the date indicated below.

Signature                                 Date — March 3, 2005

1

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

## CLAIM AMENDMENTS

Please amend the claims (~~strikethrough~~ and [[ ]] indicating deletion and <u>underline</u> indicating insertion) as follows:

1. (Currently Amended)    A pet enclosure comprising a frame formed of a substantially rigid, non-porous material; and a flexible, non-porous material woven onto said frame[[.]], <u>wherein the frame comprises a plurality of panels and wherein one of the panels defines an opening in which a door is pivotally mounted.</u>

2. (Currently Amended)    The enclosure of Claim 1, wherein the ~~frame comprises a~~ plurality of <u>panels are</u> generally flat, rectangular panels.

3. (Original)   The enclosure of Claim 2, wherein the panels are pivotally connected to one another to allow folding of the enclosure into a compact configuration and assembly of the enclosure into an assembled configuration without separation of the panels from one another.

4. (Original)   The enclosure of Claim 3, wherein the enclosure is substantially flat in the compact configuration.

5. (Currently Amended)    The enclosure of Claim 2, wherein ~~one of the panels defines an opening in which a~~ <u>the</u> door is pivotally mounted to swing both inwardly and outwardly.

6. (Original)   The enclosure of Claim 5, further comprising a latch for securing said door in a closed position and in an open position.

7. (Original)   The enclosure of Claim 6, wherein the latch secures said door in an inwardly open position within the enclosure.

8. (Original)   The enclosure of Claim 1, wherein the substantially rigid, non-porous material of the frame is a metal wire.

9. (Original)   The enclosure of Claim 1, wherein the flexible, non-porous material woven onto said frame is a plastic having the appearance of natural rattan or wicker.

3

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

10. (Original) The enclosure of Claim 1, comprising a floor panel supported a distance above an underlying support surface.

11. (Original) The enclosure of Claim 10, wherein the floor panel comprises at least one channel for receiving a cooperating portion of said frame.

12. (Original) The enclosure of Claim 11, wherein the floor panel comprises a plurality of channels or grooves configured to receive a plurality of cooperating frame portions therein, and wherein one or more of the plurality of channels or grooves is/are angularly offset from one or more other channels or grooves, so that the floor panel resists movement in all directions.

13. (Currently Amended)    A pet enclosure comprising a plurality of panels, each panel comprising a substantially rigid frame and a plastic material ~~having the appearance of natural rattan or wicker~~ woven onto said frame and having the appearance of natural rattan or wicker and wherein at least one panel defines an opening therein in which a door is pivotally mounted.

14. (Original) The enclosure of Claim 13, wherein the plurality of panels are pivotally connected to one another to allow folding of the enclosure into a compact configuration and assembly of the enclosure into an assembled configuration without separation of the panels from one another.

15. (Original) The enclosure of Claim 13, wherein one of the plurality of panels defines an opening in which a door is pivotally mounted to swing both inwardly and outwardly.

16. (Original) The enclosure of Claim 15, further comprising a latch for securing said door in a closed position and in an open position.

17. (Original) The enclosure of Claim 16, wherein the latch secures said door in an inwardly open position within the enclosure.

4

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

18. (Original) The enclosure of Claim 13, comprising a floor panel supported a distance above an underlying support surface.

19. (Original) The enclosure of Claim 18, wherein the floor panel comprises at least one channel for receiving a cooperating portion of said frame.

20. (Original) A pet enclosure comprising an opening in which a door is pivotally mounted to swing both inwardly and outwardly, and further comprising a latch for securing said door in a closed position and in an open position.

21. (Original) The enclosure of Claim 20, wherein the latch secures said door in an inwardly open position within the enclosure.

22. (Previously Presented) A pet enclosure comprising a plurality of legs for supporting said pet enclosure a distance above an underlying support surface; and

a removable floor panel, wherein the floor panel comprises a channel for receiving a cooperating portion of said pet enclosure.

23. (Original) A pet enclosure comprising a frame and a removable floor panel, the floor panel comprising at least one channel for receiving a cooperating portion of said frame.

24. (Currently Amended)   The enclosure of Claim 23, wherein the floor panel comprises a plurality of channels or grooves configured to receive a plurality of cooperating frame portions therein, and wherein one or more of the plurality of channels or grooves [[is/]]are angularly offset from one or more other channels or grooves, so that the floor panel resists movement in all directions.

25. (Currently Amended)   A pet enclosure comprising:

a base portion;

a first side panel hingedly connected to the base portion;

a second side panel hingedly connected to the base portion;

5

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

a first end panel hingedly connected to the base portion;

a second end panel hingedly connected to the base portion; and

a top panel hingedly connected to at least one panel selected from said side and said end panels, and wherein at least one of said panels comprise a substantially rigid frame and a plastic material ~~having the appearance of natural rattan or wicker~~ woven on said frame <u>and having the appearance of natural rattan or wicker</u>.

26. (Original) The enclosure of Claim 25, wherein a hinge connection between a first of said panels and the base portion is offset from a hinge connection between a second of said panels and the base portion to permit the panels to fold into a compact configuration.

27. (Original) The enclosure of Claim 25, wherein short connector links are interposed between one or more of said panels and the base portion to permit the panels to fold into a compact configuration.

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

## REMARKS

The Office Action mailed November 3, 2004, has been received and reviewed. By the present Response and Amendment, Claims 1-27 are pending, and Claims 1, 2, 5, 13, 24, and 25 are amended. No new matter is introduced.

### Drawings

The Examiner objected to the drawings as failing to comply with 37 C.F.R. 1.83(a) because they did not show every feature of the invention as specified in the claims. Specifically, the Examiner stated that the plurality of channels or grooves of Claim 24 must be shown or the feature must be canceled from the claims. Applicant respectfully traverses this rejection. The channels or grooves are clearly shown in Fig. 8b. Accordingly, the objection has been addressed, and Applicant requests the Examiner to withdraw this objection.

In addition, Applicant submits herewith 12 replacement sheets of formal drawings.

### Claim Rejections under 35 U.S.C. § 102(b)

Claims 1, 2, and 8 are rejected under 35 U.S.C. § 102(b) as being anticipated by U.S. Patent No. 539,394 to Poulson et al. Applicant respectfully traverses this rejection. Nevertheless, Applicant has amended Claim 1 to clarify that the frame has a plurality of panels, one of which defines an opening in which a door is pivotally mounted, which is not disclosed, taught, or suggested by Poulson et al. Accordingly, allowance of Claim 1 is respectfully requested.

Because dependent Claims 2 and 8 incorporate the limitations of Claim 1, these dependent claims are allowable for at least the reasons set forth above for the corresponding independent claim. Thus, as Claim 1 is allowable, Claims 2 and 8 are also allowable. Accordingly, allowance of Claims 2 and 8 is respectfully requested.

7

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

Claims 22-24 are rejected under 35 U.S.C. § 102(b) as being anticipated by U.S. Patent No. 2,247,598 to Bohlen. Applicant respectfully traverses this rejection.

Claim 22 recites a pet enclosure, "wherein the floor panel comprises a channel for receiving a cooperating portion of said pet enclosure." Bohlen discloses a baby bed, not an enclosed bed, as asserted by the Examiner. Thus, Claim 22 is patentably distinguishable from Bohlen, and accordingly, allowance of Claim 22 is respectfully requested.

Claim 23 recites, in part, "the floor panel comprising at least one channel for receiving a cooperating portion of said frame." Bohlen does not disclose, teach, or suggest a floor panel comprising at least one channel for receiving a portion of the *frame*. Rather, Bohlen discloses a floor having an aperture through which a spring connects the floor to the frame of the bed. Accordingly, allowance of Claim 23 is respectfully requested.

Because dependent Claim 24 incorporates the limitations of Claim 23, this dependent claim is allowable for at least the reasons set forth above for the corresponding independent claim. Thus, as Claim 23 is allowable, Claim 24 is also allowable. Claim 24 is also allowable because Bohlen does not disclose, teach, or suggest that the grooves or channels are angularly offset from one or more other channels. Accordingly, allowance of Claim 24 is respectfully requested.

### Claim Rejections under 35 U.S.C. § 102(a)

Claims 1-4, 9, 10, and 25-27 are rejected under 35 U.S.C. § 102(a) as being anticipated by U.S. Patent No. 6,601,723 to Ziglar. Applicant respectfully traverses this rejection. U.S. Patent No. 6,601,723 to Ziglar issued on August 5, 2003, and the present application was filed on July 2, 2003. Thus, the Ziglar patent issued *after* the filing date of the present application. Accordingly, Ziglar is not a valid 102(a) rejection, and Applicant requests the Examiner to withdraw this rejection.

8

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

Applicant, as the inventor of the present application, conceived and reduced the invention to practice in the United States prior to the effective date of the Ziglar reference. Submitted herewith is a Declaration of Prior Invention, under 37 C.F.R. § 131, setting forth facts sufficient to show that the present invention was invented in the United States prior to the effective date of the cited reference.

As described in the declaration attached hereto as Exhibit A, Applicant had invented the pet enclosure of the present application prior to April 30, 2002. The supporting materials provided with the 37 C.F.R. § 131 Declaration were prepared prior to April 30, 2002, and clearly show Applicant was then in possession of the presently claimed invention. Accordingly, Applicant respectfully requests removal of the cited Ziglar reference.

### Claim Rejections under 35 U.S.C. § 103

Claims 5-7, 13, 15-17, 20, and 21 are rejected under 35 U.S.C. § 103(a) as being unpatentable over U.S. Patent No. 539,394 to Poulson et al. in view of U.S. Patent No. 318,812 to Smith et al. Applicant respectfully traverses this rejection.

Because dependent Claims 5-7 incorporate the limitations of Claim 1, these dependent claims are allowable for at least the reasons set forth above for the corresponding independent claim. Thus, as Claim 1 is allowable, Claims 5-7 are also allowable. Accordingly, allowance of Claims 5-7 is respectfully requested.

Independent Claims 13 and 20 recite in part a pet enclosure comprising a plurality of panels, wherein at least one panel defines "an opening therein in which a door is pivotally mounted." Hence, the door is pivotally mounted *within* the panel. Neither Poulson et al. nor Smith et al., individually or in combination, disclose, teach, or suggest a structure having a plurality of panels, wherein one of the panels defines an opening therein in which a door is pivotally mounted. Rather, Smith et al. discloses a panel, which itself in its entirety can be considered a door. Thus, combining the frame with the interwoven lathing

9

Serial No.:  10/612,589
Attorney Docket No.:  2S14.1-011
PATENT

of Poulson et al. with the shipping cage of Smith et al. does not yield a device having a door mounted *within* a panel of the frame.  Accordingly, allowance of Claims 13 and 20 is respectfully requested.

Because dependent Claims 15-17 and 21 incorporate the limitations of the claims on which they depend, these dependent claims are allowable for at least the reasons set forth above for the corresponding independent claims.  Thus, as Claims 13 and 20 are allowable, Claims 15-17 and 21 are also allowable.  Accordingly, allowance of Claims 15-17 and 21 is respectfully requested.

**Claim Rejections under 35 U.S.C. § 112**

Claims 13-19 and 25-27 are rejected under 35 U.S.C. § 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.  Accordingly, Applicant has clarified Claims 13 and 25 to reflect "a plastic material woven on said frame and having the appearance of natural rattan or wicker."  Applicant has also amended Claim 24 to include the verb "are."  Applicant submits that the rejection is overcome and respectfully requests the Examiner to withdraw this rejection.

**Allowable Subject Matter**

Applicant wishes to thank the Examiner for recognizing the allowable subject matter of dependent Claims 11, 12, 14, 18, and 19.  As discussed herein, Applicant believes all independent claims are in condition for allowance, and accordingly, dependent Claims 11, 12, 14, 18, and 19 are in condition for allowance.

10

## CONCLUSION

In view of the amendments submitted herein and the above comments, it is believed that all grounds of rejection are overcome and that the application has now been placed in full condition for allowance. Accordingly, Applicant earnestly solicits early and favorable action. Should there be any further questions or reservations, the Examiner is urged to telephone Applicant's undersigned attorney at (770) 984-2300.

Respectfully submitted,

*Michelle E Kandce*

Michelle E. Kandcer
Reg. No. 54,207

GARDNER GROFF, P.C.
100 Parkwood Point
2018 Powers Ferry Road
Suite 800
Atlanta, GA  30339

Tel:   770/984-2300
Fax:   770/984-0098

11

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

## DRAWING AMENDMENTS

Please substitute the enclosed replacement drawing sheets into the application.

2



REPLACEMENT DRAWING
INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: MICHELLE E. KANDZER
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011

1/12



*Fig. 1*

REPLACEMENT DRAWING
INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: MICHELLE E. KANDER
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011

2/12



*Fig. 2*

*Fig. 3*



REPLACEMENT DRAWING
INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: MICHELLE E. KANDCER
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011

3/12



Fig. 4b



Fig. 4a

REPLACEMENT DRAWING
INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: MICHELLE E. KANDCER
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011

4/12



Fig. 5a

REPLACEMENT DRAWING
INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: MICHELLE E. KANDCER
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011

5/12



*Fig. 5b*

REPLACEMENT DRAWING
INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: MICHELLE E. KANDCER
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011

6/12



Fig. 5c

Fig. 5d

**REPLACEMENT DRAWING**
INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: MICHELLE E. KANDCER
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011

7/12



*Fig. 5e*

*Fig. 5f*

REPLACEMENT DRAWING
INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: MICHELLE E. KANDCER
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011

8/12



*Fig. 5g*

REPLACEMENT DRAWING
INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: MICHELLE E. KANDCER
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011

9/12



*Fig. 5h*

**REPLACEMENT DRAWING**
INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: MICHELLE E. KANDCER
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011

10/12



**Fig. 6**

**REPLACEMENT DRAWING**
INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: MICHELLE E. KANDCER
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011

**11/12**



*Fig. 1c*



*Fig. 1b*



*Fig. 1a*

**REPLACEMENT DRAWING**
INVENTOR: SIMPSON, JEFFREY M.
TITLE: "PET ENCLOSURE"
ATTY: MICHELLE E. KANDCER
ATTY TEL: 770.984.2300
ATTY DOCKET NO.: 2S14.1-011

**12/12**



*Fig. 8a*

*Fig. 8b*



BEST AVAILABLE COPY

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re: Application of            )
                                 )
SIMPSON, Jeffrey M.              )
                                 )    Examiner: SWIATEK, Robert P.
Serial No.: 10/612,589           )
                                 )    Group Art Unit: 3643
Filed: July 2, 2003              )
                                 )
For:  PET ENCLOSURE              )

### DECLARATION OF PRIOR INVENTION

Sir:

I, Jeffrey M. Simpson, declare as follows:

1.      This declaration is to establish invention of the subject matter of the above-identified application, U.S. Patent Application Serial No. 10/612,589, in the United States, prior to April 30, 2002.

2.      I am the inventor of the above-identified application, am of the age of majority, and am otherwise competent to give this Declaration.

3.      Attached hereto as Attachment 1, and forming a part of this Declaration, is a redacted copy of a presentation including a photograph of a sample device embodying the invention of Application Serial No. 10/612,589. The conception and construction of this sample device was completed under my direction, and the sample device was in my possession within the United States, prior to April 30, 2002. The presentation and the photograph of the sample device included therein were, themselves, also prepared and in my possession within the United States prior to April 30, 2002, and are records maintained in the ordinary course of my business.

4.      From this Declaration, including the attached records, it can be seen that the invention of Application Serial No. 10/612,589 was conceived and reduced to practice prior to April 30, 2002.

## BEST AVAILABLE COPY

5.     I acted diligently to effect the preparation and filing of the provisional patent application to which this application claims priority, from prior to April 30, 2002 through the filing date of the provisional patent application.

6.     I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

By: _____          Date: 2/22/2005

Jeffrey M. Simpson

BEST AVAILABLE COPY

# Simpson & Co., LLC

### Patents Pending
### Proprietary



**"House Pets Home"**

- Aesthetically pleasing containment for pets.
- Replacement for plastic boxes and wire crates.
- Weatherproof imitation wicker won't absorb pet odors or fluids.
- Easy to clean – just hose it off.
- Easy assembly – goes together in minutes.
- Take it with you – great for vans and SUVs.
- Extra durable, easily removable pan included.
- Great for patio, porch or garage too.
- Comes in 4 sizes – 24" through 42"
- Available for delivery in May 2002.

P.O. Box 630, Auburn AL 36831-0630             Proprietary             (334) 821-4354 Office, (334) 703-4294 Mobile

PTO/SB/22 (12-04)
Approved for use through 7/31/2006. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PETITION FOR EXTENSION OF TIME UNDER 37 CFR 1.136(a) FY 2005 *(Fees pursuant to the Consolidated Appropriations Act, 2005 (H.R. 4818).)* | Docket Number (Optional) 2S14.1-011 |
|---|---|

| Application Number   10/612,589 | Filed    July 2, 2003 |
|---|---|

| For    "PET ENCLOSURE" | |
|---|---|

| Art Unit   3643 | Examiner   SWIATEK, Robert P. |
|---|---|

This is a request under the provisions of 37 CFR 1.136(a) to extend the period for filing a reply in the above identified application.
The requested extension and fee are as follows (check time period desired and enter the appropriate fee below):

| | **Fee** | **Small Entity Fee** | |
|---|---|---|---|
| ☒ One month (37 CFR 1.17(a)(1)) | $120 | $60 | $60 |
| ☐ Two months (37 CFR 1.17(a)(2)) | $450 | $225 | $_____ |
| ☐ Three months (37 CFR 1.17(a)(3)) | $1020 | $510 | $_____ |
| ☐ Four months (37 CFR 1.17(a)(4)) | $1590 | $795 | $_____ |
| ☐ Five months (37 CFR 1.17(a)(5)) | $2160 | $1080 | $_____ |

☒ Applicant claims small entity status. See 37 CFR 1.27.

☒ A check in the amount of the fee is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☐ The Director has already been authorized to charge fees in this application to a Deposit Account.

☒ The Director is hereby authorized to charge any fees which may be required, or credit any overpayment, to

Deposit Account Number 50-1513 . I have enclosed a duplicate copy of this sheet.
**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the
   ☐ applicant/inventor.
   ☐ assignee of record of the entire interest. See 37 CFR 3.71
       Statement under 37 CFR 3.73(b) is enclosed. (Form PTO/SB/96).
   ☒ attorney or agent of record. Registration Number 54,207
   ☐ attorney or agent under 37 CFR 1.34.
       Registration number if acting under 37 CFR 1.34. _____ .

| *Michelle E Kandcer* | March 3, 2005 |
|---|---|
| Signature | Date |
| Michelle E. Kandcer | (770) 984-2300 |
| Typed or printed name | Telephone Number |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below.

☐ Total of _____ forms are submitted.

This collection of information is required by 37 CFR 1.136(a). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 6 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

*JFW/*



Serial No.: **10/612,589**
Attorney Docket No.: **2S14.1-011**
**PATENT**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of: SIMPSON, Jeffrey M.　　　)
　　　　　　　　　　　　　　　　　　　　　　　)
Serial No.: 10/612,589　　　　　　　　　　　　) Group Art Unit: 3643
　　　　　　　　　　　　　　　　　　　　　　　)
Filed: July 2, 2003　　　　　　　　　　　　　　) Examiner: SWIATEK, Robert P.
　　　　　　　　　　　　　　　　　　　　　　　)
For:　**"PET ENCLOSURE"**　　　　　　　　　　)
_____)

Mail Stop Amendment　　　　　　　　　　　　　　March 3, 2005
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### RESPONSE AND AMENDMENT

Sir:

　　In response to the Office Action mailed November 3, 2004, please amend the above-referenced patent application as follows and consider the remarks below.  This Response is filed with a one-month extension of time.  If any additional extension is required, please consider this a request therefor.  The Commissioner is authorized to charge any additional fees due or credit any overpayment to Deposit Account 50-1513.

---

| **CERTIFICATE OF MAILING** |
|---|
| I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Mail Stop Amendment, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450, on the date indicated below. |

*RLFall*　　　　　　　　　　　　*March 3, 2005*
Signature　　　　　　　　　　　　　Date

1

# PATENT APPLICATION FEE DETERMINATION RECORD
### Effective January 1, 2003

**Application or Docket Number**

10,612589

## CLAIMS AS FILED - PART I

| | (Column 1) | (Column 2) |
|---|---|---|
| TOTAL CLAIMS | 27 | |
| FOR | NUMBER FILED | NUMBER EXTRA |
| TOTAL CHARGEABLE CLAIMS | 27 minus 20= | 7 |
| INDEPENDENT CLAIMS | 6 minus 3 = | 3 |
| MULTIPLE DEPENDENT CLAIM PRESENT | | ☐ |

\* If the difference in column 1 is less than zero, enter "0" in column 2.

| SMALL ENTITY TYPE ☐ | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|
| RATE | FEE | | RATE | FEE |
| BASIC FEE | 375.00 | OR | BASIC FEE | 750.00 |
| X 9= | 63 | | X$18= | |
| X42= | 126 | | X84= | |
| +140= | | | +280= | |
| TOTAL | 564 | OR | TOTAL | |

## CLAIMS AS AMENDED - PART II

anot
3-8-05

### AMENDMENT A

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|
| Total | 27 | Minus ** 27 | = |
| Independent | 6 | Minus *** 6 | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM ☐ | | | |

| SMALL ENTITY | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|
| RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

13  20  22  73  25

### AMENDMENT B

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|
| Total | | Minus ** | = |
| Independent | | Minus *** | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM ☐ | | | |

| RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
|---|---|---|---|---|
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

### AMENDMENT C

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|
| Total | | Minus ** | = |
| Independent | | Minus *** | = |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM ☐ | | | |

| RATE | ADDI-TIONAL FEE | | RATE | ADDI-TIONAL FEE |
|---|---|---|---|---|
| X$ 9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

\* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20."
\*\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3."
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

EA



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/612,589 | 07/02/2003 | Jeffrey M. Simpson | 2S14.1-011 | 6134 |

23506    7590    06/02/2005
GARDNER GROFF, P.C.
2018 POWERS FERRY ROAD
SUITE 800
ATLANTA, GA  30339

| EXAMINER |
|---|
| SWIATEK, ROBERT P |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3643 | |

DATE MAILED: 06/02/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 10/612,589 | SIMPSON, JEFFREY M. |
| | Examiner | Art Unit | |
| | Robert P. Swialek | 3643 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>08 March 2005</u>.

2a)☒ This action is FINAL.        2b)☐ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-27</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>1-10,13-18 and 20-25</u> is/are rejected.

7)☒ Claim(s) <u>11,12,19,26 and 27</u> is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☒ The drawing(s) filed on <u>08 March 2005</u> is/are: a)☒ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some * c)☐ None of:

        1.☐ Certified copies of the priority documents have been received.

        2.☐ Certified copies of the priority documents have been received in Application No. _____.

        3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08) Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.

5)☐ Notice of Informal Patent Application (PTO-152)

6)☐ Other: _____.

Application/Control Number: 10/612,589                                                Page 2
Art Unit: 3643

# DETAILED ACTION

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

· A person shall be entitled to a patent unless –

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on
sale in this country, more than one year prior to the date of application for patent in the United States.

Claims 1-6, 9, 10, 13-18 are rejected under 35 U.S.C. 102(b) as being anticipated by Mo

(US 5,282,542). The carrier 20 of Mo includes rectangular panels 21, 22 made from strips of a

bendable plastic material (see column 1, lines 17-20, of Mo) that resembles wicker or rattan, a

frame (unnumbered *per se*, but essentially the sides of the bottom member 21) about which lower

portions 221 of the side walls 22 are woven or wrapped, and a latch 23', 23", 40 for fastening a

longer side wall 22 to a shorter side wall 22. In this respect, longer side wall 22 is deemed to

constitute a door and the edges of shorter side walls 22 elements of a door opening. The Mo

carrier is capable of containing a pet.

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
such that the subject matter as a whole would have been obvious at the time the invention was made to a person
having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the
manner in which the invention was made.

Claims 7, 8 are rejected under 35 U.S.C. 103(a) as being unpatentable over Mo. Use of a

latch to secure a door/side panel 22 of Mo in an inwardly open position as well as the use of

metal in the construction of the frame would have been obvious to one skilled in the art wishing

to enhance carrier ventilation and increase its strength, respectively.

Claims 20, 21 are rejected under 35 U.S.C. 103(a) as being unpatentable over Poulson et

al. (US 539,394) in view of Smith et al. (US 318,812). The patent to Poulson et al. discloses a

wall structure including a metallic frame A, B with interwoven, metallic lathing C. The structure

of which the Poulson et al. partition is a part could be employed to enclose an animal. The

Poulson et al. structure, however, does not disclose an opening and associated door. It would

have been obvious to one skilled in the art to provide the wall structure of Poulson et al. with the

swinging door h of the Smith et al. patent, in order to permit easy passage of items through the

partition with a minimum of obstruction. Provision of a latch to secure the door of Poulson et al.

in an inwardly open position would have been obvious to one skilled in the art seeking to prevent

inadvertent movement or closure of the door while in use—the latch essentially serving as a

doorstop.

Claims 22-24 are rejected under 35 U.S.C. 102(b) as being anticipated by Bohlen (US

2,247,598). The Bohlen bed includes a floor panel 4, sides 13, 24, support legs 17, and a

plurality of tubular channels 4' that receive cooperating portions 6 of the bed. The sides 13, 24

serve to enclose the mattress that would be used with the bed. The preamble of claim 22 has not

been given weight inasmuch as a pet could be placed in the Bohlen bed; as to claim 24, the floor

panel 24 is considered to resist movement in any one direction because of tension exerted by the

springs 6.

Claim 25 is rejected under 35 U.S.C. 103(a) as being unpatentable over Mo in view of Ho

et al. (US 5,464,113). The Mo carrier lacks a hinged top panel. The patent to Ho et al. depicts a

Application/Control Number: 10/612,589                                    Page 4
Art Unit: 3643

woven hamper having sidewalls 1, a bottom, and a hinged lid 5. It would have been obvious to

one skilled in the art to employ the hinged lid of Ho et al. with the Mo carrier, in order to permit

the contents of the carrier to be shielded and protected from the environment.

Claims 11, 12, 19, 26, 27 are objected to as being dependent upon a rejected base claim,

but would be allowable if rewritten in independent form including all of the limitations of the

base claim and any intervening claims.

Applicant's arguments filed 8 March 2005 have been fully considered but they are not

persuasive. Claims 1-10, 13-18, 20-25 are not believed allowable for the reasons set forth above.

Applicant's amendment necessitated the new ground(s) of rejection presented in this

Office action. Accordingly, **THIS ACTION IS MADE FINAL**. See MPEP § 706.07(a).

Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action. In the event a first reply is filed within TWO

MONTHS of the mailing date of this final action and the advisory action is not mailed until after

the end of the THREE-MONTH shortened statutory period, then the shortened statutory period

will expire on the date the advisory action is mailed, and any extension fee pursuant to 37

CFR 1.136(a) will be calculated from the mailing date of the advisory action. In no event,

however, will the statutory period for reply expire later than SIX MONTHS from the date of this

final action.

Applicant's declaration filed 8 March 2005 and the amendment to claim 13 necessitated

the new grounds of rejection.

Application/Control Number: 10/612,589                                        Page 5
Art Unit: 3643

The patents to Weng (US 5,931,326) and Cramer et al. (US 5,938,057) have been cited to

provide additional examples of container assemblies.

Summary:  Claims 1-10, 13-18, 20-25 have been rejected; claims 11, 12, 19, 26, 27 have

been rejected.


RPS:  ☎571/272-6894
27 May 2005

ROBERT P. SWIATEK
PRIMARY EXAMINER
ART UNIT 333 3643

| | | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|---|
| ***Notice of References Cited*** | | 10/612,589 | SIMPSON, JEFFREY M. |
| | | Examiner | Art Unit | |
| | | Robert P. Swialek | 3643 | Page 1 of 1 |

### U.S. PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US-5,282,542 A | 02-1994 | Mo, Yau-Kee | 220/7 |
| | B | US-5,464,113 A | 11-1995 | Ho et al. | 220/9.2 |
| | C | US-5,931,326 A | 08-1999 | Weng, Stanley | 220/4.33 |
| | D | US-5,938,057 A | 08-1999 | Cramer et al. | 217/123 |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

### FOREIGN PATENT DOCUMENTS

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

### NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    **Notice of References Cited**                    Part of Paper No. 20050527

### Index of Claims

| Application No. | Applicant(s) |
|---|---|
| 10/612,589 | SIMPSON, JEFFREY M. |
| **Examiner** | **Art Unit** |
| Robert P. Swiatek | 3643 |

| √ | Rejected | – | (Through numeral) Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | + | Restricted | I | Interference | O | Objected |

| Final | Original | 5/27/05 | | | | | | | Final | Original | | | | | | | | Final | Original | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | √ | | | | | | | | 51 | | | | | | | | | 101 | | | | | | |
| | 2 | √ | | | | | | | | 52 | | | | | | | | | 102 | | | | | | |
| | 3 | √ | | | | | | | | 53 | | | | | | | | | 103 | | | | | | |
| | 4 | √ | | | | | | | | 54 | | | | | | | | | 104 | | | | | | |
| | 5 | √ | | | | | | | | 55 | | | | | | | | | 105 | | | | | | |
| | 6 | √ | | | | | | | | 56 | | | | | | | | | 106 | | | | | | |
| | 7 | √ | | | | | | | | 57 | | | | | | | | | 107 | | | | | | |
| | 8 | √ | | | | | | | | 58 | | | | | | | | | 108 | | | | | | |
| | 9 | √ | | | | | | | | 59 | | | | | | | | | 109 | | | | | | |
| | 10 | √ | | | | | | | | 60 | | | | | | | | | 110 | | | | | | |
| | 11 | O | | | | | | | | 61 | | | | | | | | | 111 | | | | | | |
| | 12 | O | | | | | | | | 62 | | | | | | | | | 112 | | | | | | |
| | 13 | √ | | | | | | | | 63 | | | | | | | | | 113 | | | | | | |
| | 14 | √ | | | | | | | | 64 | | | | | | | | | 114 | | | | | | |
| | 15 | √ | | | | | | | | 65 | | | | | | | | | 115 | | | | | | |
| | 16 | √ | | | | | | | | 66 | | | | | | | | | 116 | | | | | | |
| | 17 | √ | | | | | | | | 67 | | | | | | | | | 117 | | | | | | |
| | 18 | √ | | | | | | | | 68 | | | | | | | | | 118 | | | | | | |
| | 19 | O | | | | | | | | 69 | | | | | | | | | 119 | | | | | | |
| | 20 | √ | | | | | | | | 70 | | | | | | | | | 120 | | | | | | |
| | 21 | √ | | | | | | | | 71 | | | | | | | | | 121 | | | | | | |
| | 22 | √ | | | | | | | | 72 | | | | | | | | | 122 | | | | | | |
| | 23 | √ | | | | | | | | 73 | | | | | | | | | 123 | | | | | | |
| | 24 | √ | | | | | | | | 74 | | | | | | | | | 124 | | | | | | |
| | 25 | √ | | | | | | | | 75 | | | | | | | | | 125 | | | | | | |
| | 26 | O | | | | | | | | 76 | | | | | | | | | 126 | | | | | | |
| | 27 | O | | | | | | | | 77 | | | | | | | | | 127 | | | | | | |
| | 28 | | | | | | | | | 78 | | | | | | | | | 128 | | | | | | |
| | 29 | | | | | | | | | 79 | | | | | | | | | 129 | | | | | | |
| | 30 | | | | | | | | | 80 | | | | | | | | | 130 | | | | | | |
| | 31 | | | | | | | | | 81 | | | | | | | | | 131 | | | | | | |
| | 32 | | | | | | | | | 82 | | | | | | | | | 132 | | | | | | |
| | 33 | | | | | | | | | 83 | | | | | | | | | 133 | | | | | | |
| | 34 | | | | | | | | | 84 | | | | | | | | | 134 | | | | | | |
| | 35 | | | | | | | | | 85 | | | | | | | | | 135 | | | | | | |
| | 36 | | | | | | | | | 86 | | | | | | | | | 136 | | | | | | |
| | 37 | | | | | | | | | 87 | | | | | | | | | 137 | | | | | | |
| | 38 | | | | | | | | | 88 | | | | | | | | | 138 | | | | | | |
| | 39 | | | | | | | | | 89 | | | | | | | | | 139 | | | | | | |
| | 40 | | | | | | | | | 90 | | | | | | | | | 140 | | | | | | |
| | 41 | | | | | | | | | 91 | | | | | | | | | 141 | | | | | | |
| | 42 | | | | | | | | | 92 | | | | | | | | | 142 | | | | | | |
| | 43 | | | | | | | | | 93 | | | | | | | | | 143 | | | | | | |
| | 44 | | | | | | | | | 94 | | | | | | | | | 144 | | | | | | |
| | 45 | | | | | | | | | 95 | | | | | | | | | 145 | | | | | | |
| | 46 | | | | | | | | | 96 | | | | | | | | | 146 | | | | | | |
| | 47 | | | | | | | | | 97 | | | | | | | | | 147 | | | | | | |
| | 48 | | | | | | | | | 98 | | | | | | | | | 148 | | | | | | |
| | 49 | | | | | | | | | 99 | | | | | | | | | 149 | | | | | | |
| | 50 | | | | | | | | | 100 | | | | | | | | | 150 | | | | | | |

### Search Notes

| Application No. | Applicant(s) |
|---|---|
| 10/612,589 | SIMPSON, JEFFREY M. |
| **Examiner** | **Art Unit** | |
| Robert P. Swiatek | 3643 | |

| SEARCHED | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| Search | Updated | 5/27/2005 | RPS |
| 220 | 493 | 5/27/2005 | RPS |
| 220 | 494 | | |
| 217 | 42 | | |
| 217 | 51 | | |
| 217 | 68 | | |
| 217 | 122 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| SEARCH NOTES (INCLUDING SEARCH STRATEGY) | DATE | EXMR |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| INTERFERENCE SEARCHED | | | |
|---|---|---|---|
| Class | Subclass | Date | Examiner |
| | | | |
| | | | |
| | | | |
| | | | |

Part of Paper No. 20050527

08/02/2005  16:39   7709840098                    GARDNER GROFF                          PAGE   01

RECEIVED
CENTRAL FAX CENTER

AUG 0 2 2005

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of: SIMPSON, Jeffrey M.              )
                                                       )
Serial No.: 10/612,589                                 ) Group Art Unit: 3643
                                                       )
Filed: July 2, 2003                                    ) Examiner: SWIATEK, Robert P.
                                                       )
For:   "PET ENCLOSURE"                                 )
_____)

Mail Stop Amendment                                    August 2, 2005
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## RESPONSE AFTER FINAL

Sir:

    In response to the Final Office Action mailed June 2, 2005, please amend the above-referenced patent application as follows and consider the remarks below. This Response is believed to be timely. If any extension is required, please consider this a request therefor. No additional claim fees are believed to be due because even though Applicant has added independent Claims 11, 19, 26, and 27, Applicant has concurrently cancelled independent Claims 1, 13, 22, 23, and 25. However, the Commissioner is authorized to charge any additional fees due or credit any overpayment to Deposit Account 50-1513.

---

**CERTIFICATE OF FACSIMILE TRANSMISSION**

I hereby certify that this correspondence is being transmitted via facsimile to 571.273.8300 on the date indicated below.

Signature: *Michelle E Kander*          Date: *August 2, 2005*

---

1

08/02/2005 16:39    7709840098    GARDNER GROFF    PAGE 02

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

## CLAIM AMENDMENTS

Please amend the claims (~~strikethrough~~ and [[ ]] indicating deletion and <u>underline</u> indicating insertion) as follows:

1. (Cancelled)

2. (Currently Amended)    The enclosure of Claim [[1]] <u>11</u>, wherein the plurality of panels are generally flat, rectangular panels.

3. (Original)   The enclosure of Claim 2, wherein the panels are pivotally connected to one another to allow folding of the enclosure into a compact configuration and assembly of the enclosure into an assembled configuration without separation of the panels from one another.

4. (Original)   The enclosure of Claim 3, wherein the enclosure is substantially flat in the compact configuration.

5. (Previously Presented)   The enclosure of Claim 2, wherein the door is pivotally mounted to swing both inwardly and outwardly.

6. (Original)   The enclosure of Claim 5, further comprising a latch for securing said door in a closed position and in an open position.

7. (Original)   The enclosure of Claim 6, wherein the latch secures said door in an inwardly open position within the enclosure.

8. (Currently Amended) The enclosure of Claim [[1]] <u>11</u>, wherein the substantially rigid, non-porous material of the frame is a metal wire.

9. (Currently Amended) The enclosure of Claim [[1]] <u>11</u>, wherein the flexible, non-porous material woven onto said frame is a plastic having the appearance of natural rattan or wicker.

10. (Cancelled)

2

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

11. (Currently Amended)    A pet enclosure comprising:

a frame formed of a substantially rigid, non-porous material;

a flexible, non-porous material woven onto said frame, wherein the frame comprises a plurality of panels and wherein one of the panels defines an opening in which a door is pivotally mounted; and

a floor panel supported a distance above an underlying support surface, The enclosure of Claim 10, wherein the floor panel comprises at least one channel for receiving a cooperating portion of said frame.

12. (Original) The enclosure of Claim 11, wherein the floor panel comprises a plurality of channels or grooves configured to receive a plurality of cooperating frame portions therein, and wherein one or more of the plurality of channels or grooves is/are angularly offset from one or more other channels or grooves, so that the floor panel resists movement in all directions.

13. (Cancelled)

14. (Currently Amended)    The enclosure of Claim [[13]] 19, wherein the plurality of panels are pivotally connected to one another to allow folding of the enclosure into a compact configuration and assembly of the enclosure into an assembled configuration without separation of the panels from one another.

15. (Currently Amended)    The enclosure of Claim [[13]] 19, wherein one of the plurality of panels defines an opening in which a door is pivotally mounted to swing both inwardly and outwardly.

16. (Original) The enclosure of Claim 15, further comprising a latch for securing said door in a closed position and in an open position.

17. (Original) The enclosure of Claim 16, wherein the latch secures said door in an inwardly open position within the enclosure.

3

Serial No.: 10/612,589
Attorney Docket No.: 2314.1-011
PATENT

18. (Cancelled)

19. (Currently Amended)    <u>A pet enclosure comprising:</u>

<u>a plurality of panels, each panel comprising a substantially rigid frame and a plastic material woven onto said frame and having the appearance of natural rattan or wicker and wherein at least one panel defines an opening therein in which a door is pivotally mounted; and</u>

<u>a floor panel supported a distance above an underlying support surface,</u> The enclosure of Claim 18, wherein the floor panel comprises at least one channel for receiving a cooperating portion of said frame.

20 - 25. (Cancelled)

26. (Currently Amended)    <u>A pet enclosure comprising:</u>

<u>a base portion:</u>

<u>a first side panel hingedly connected to the base portion;</u>

<u>a second side panel hingedly connected to the base portion;</u>

<u>a first end panel hingedly connected to the base portion;</u>

<u>a second end panel hingedly connected to the base portion; and</u>

<u>a top panel hingedly connected to at least one panel selected from said side and said end panels, and wherein at least one of said panels comprise a substantially rigid frame and a plastic material woven on said frame and having the appearance of natural rattan or wicker, and</u> The enclosure of Claim 25, wherein a hinge connection between a first of said panels and the base portion is offset from a hinge connection between a second of said panels and the base portion to permit the panels to fold into a compact configuration.

4

Serial No.: 10/812,589
Attorney Docket No.: 2814.1-011
PATENT

27. (Currently Amended)     ~~A pet enclosure comprising:~~

~~a base portion;~~

~~a first side panel hingedly connected to the base portion;~~

~~a second side panel hingedly connected to the base portion;~~

~~a first end panel hingedly connected to the base portion;~~

~~a second end panel hingedly connected to the base portion; and~~

~~a top panel hingedly connected to at least one panel selected from said side and said end panels, and wherein at least one of said panels comprise a substantially rigid frame and a plastic material woven on said frame and having the appearance of natural rattan or wicker.~~ ~~The enclosure of Claim 25,~~ wherein short connector links are interposed between one or more of said panels and the base portion to permit the panels to fold into a compact configuration.

5

Serial No.: 10/612,589
Attorney Docket No.: 2314.1-011
PATENT

## REMARKS

The Final Office Action mailed June 2, 2005 has been received and reviewed. By the present Response and Amendment, Claims 2-9, 11, 12, 14-17, 19, 26, and 27 are pending. Claims 1, 10, 13, 18, and 20-25 are cancelled, and Claims 2, 8, 9, 11, 14, 15, 19, 26, and 27 are amended. No new matter is introduced.

### Claim Objections

Claims 11, 12, 19, 26, and 27 have been indicated to be allowable if rewritten in independent form to include all of the limitations of the base claims and any intervening claims. Claims 11, 19, 26, and 27 have been rewritten in independent form, as suggested. Claim 12 depends from Claim 11, which is now allowable.

Claims 2-9 now depend from allowable Claim 11, and Claims 14-17 now depend from allowable Claim 19. Thus, all claims are now believed to be in condition for allowance.

6

08/02/2005  16:39    7709840098                GARDNER GROFF                      PAGE  07

Serial No.: 10/812,589
Attorney Docket No.: 2914.1-011
PATENT

## CONCLUSION

In view of the amendments submitted herein and the above comments, it is believed that all grounds of rejection are overcome and that the application has now been placed in full condition for allowance. Accordingly, Applicant earnestly solicits early and favorable action. Should there be any further questions or reservations, the Examiner is urged to telephone Applicant's undersigned attorney at (770) 984-2300.

Respectfully submitted,

Michelle E. Kandcer
Reg. No. 54,207

GARDNER GROFF, P.C.
100 Parkwood Point
2018 Powers Ferry Road
Suite 800
Atlanta, GA  30339

Tel:   770/984-2300
Fax:   770/984-0098

7

08/02/2005  16:39   7709840098                GARDNER GROFF                        PAGE  01

RECEIVED
CENTRAL FAX CENTER

AUG 0 2 2005

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In Re Application of: SIMPSON, Jeffrey M. | ) |
| | ) |
| Serial No.: 10/612,589 | ) Group Art Unit: 3643 |
| | ) |
| Filed: July 2, 2003 | ) Examiner: SWIATEK, Robert P. |
| | ) |
| For:   "PET ENCLOSURE" | ) |

Mail Stop Amendment                         August 2, 2005
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## RESPONSE AFTER FINAL

Sir:

        In response to the Final Office Action mailed June 2, 2005, please amend the
above-referenced patent application as follows and consider the remarks below.  This
Response is believed to be timely.  If any extension is required, please consider this a
request therefor.  No additional claim fees are believed to be due because even though
Applicant has added independent Claims 11, 19, 26, and 27, Applicant has concurrently
cancelled independent Claims 1, 13, 22, 23, and 25.  However, the Commissioner is
authorized to charge any additional fees due or credit any overpayment to Deposit Account
50-1513.

---

**CERTIFICATE OF FACSIMILE TRANSMISSION**

I hereby certify that this correspondence is being transmitted via facsimile to 571.273.8300 on the
date indicated below.

*Michelle E Kandee*                         *August 2, 2005*
Signature                                   Date

---

1

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

## CLAIM AMENDMENTS

Please amend the claims (strikethrough and [[ ]] indicating deletion and <u>underline</u> indicating insertion) as follows:

1. (Cancelled)

2. (Currently Amended)   The enclosure of Claim [[1]] <u>11</u>, wherein the plurality of panels are generally flat, rectangular panels.

3. (Original)   The enclosure of Claim 2, wherein the panels are pivotally connected to one another to allow folding of the enclosure into a compact configuration and assembly of the enclosure into an assembled configuration without separation of the panels from one another.

4. (Original)   The enclosure of Claim 3, wherein the enclosure is substantially flat in the compact configuration.

5. (Previously Presented)   The enclosure of Claim 2, wherein the door is pivotally mounted to swing both inwardly and outwardly.

6. (Original)   The enclosure of Claim 5, further comprising a latch for securing said door in a closed position and in an open position.

7. (Original)   The enclosure of Claim 6, wherein the latch secures said door in an inwardly open position within the enclosure.

8. (Currently Amended) The enclosure of Claim [[1]] <u>11</u>, wherein the substantially rigid, non-porous material of the frame is a metal wire.

9. (Currently Amended) The enclosure of Claim [[1]] <u>11</u>, wherein the flexible, non-porous material woven onto said frame is a plastic having the appearance of natural rattan or wicker.

10. (Cancelled)

2

08/02/2005  16:39    7709840098              GARDNER GROFF                    PAGE  03

Serial No.: 10/612,589
Attorney Docket No.: 2S14.1-011
PATENT

11. (Currently Amended)    A pet enclosure comprising:

a frame formed of a substantially rigid, non-porous material;

a flexible, non-porous material woven onto said frame, wherein the frame comprises a plurality of panels and wherein one of the panels defines an opening in which a door is pivotally mounted; and

a floor panel supported a distance above an underlying support surface. The enclosure of Claim 10, wherein the floor panel comprises at least one channel for receiving a cooperating portion of said frame.

12. (Original) The enclosure of Claim 11, wherein the floor panel comprises a plurality of channels or grooves configured to receive a plurality of cooperating frame portions therein, and wherein one or more of the plurality of channels or grooves is/are angularly offset from one or more other channels or grooves, so that the floor panel resists movement in all directions.

13. (Cancelled)

14. (Currently Amended)    The enclosure of Claim [[13]] 19, wherein the plurality of panels are pivotally connected to one another to allow folding of the enclosure into a compact configuration and assembly of the enclosure into an assembled configuration without separation of the panels from one another.

15. (Currently Amended)    The enclosure of Claim [[13]] 19, wherein one of the plurality of panels defines an opening in which a door is pivotally mounted to swing both inwardly and outwardly.

16. (Original) The enclosure of Claim 15, further comprising a latch for securing said door in a closed position and in an open position.

17. (Original) The enclosure of Claim 16, wherein the latch secures said door in an inwardly open position within the enclosure.

3

08/02/2005  16:39    7709840098              GARDNER GROFF                PAGE  04

Serial No.: 10/612,589
Attorney Docket No.: 2314.1-011
PATENT

18. (Cancelled)

19. (Currently Amended)    A pet enclosure comprising:

a plurality of panels, each panel comprising a substantially rigid frame and a plastic material woven onto said frame and having the appearance of natural rattan or wicker and wherein at least one panel defines an opening therein in which a door is pivotally mounted; and

a floor panel supported a distance above an underlying support surface, The enclosure of Claim 18, wherein the floor panel comprises at least one channel for receiving a cooperating portion of said frame.

20 – 25. (Cancelled)

26. (Currently Amended)    A pet enclosure comprising:

a base portion;

a first side panel hingedly connected to the base portion;

a second side panel hingedly connected to the base portion;

a first end panel hingedly connected to the base portion;

a second end panel hingedly connected to the base portion; and

a top panel hingedly connected to at least one panel selected from said side and said end panels, and wherein at least one of said panels comprise a substantially rigid frame and a plastic material woven on said frame and having the appearance of natural rattan or wicker, and The enclosure of Claim 25, wherein a hinge connection between a first of said panels and the base portion is offset from a hinge connection between a second of said panels and the base portion to permit the panels to fold into a compact configuration.

4

Serial No.: 10/812,589
Attorney Docket No.: 2S14.1-011
PATENT

27. (Currently Amended)    A pet enclosure comprising:

a base portion:

a first side panel hingedly connected to the base portion:

a second side panel hingedly connected to the base portion:

a first end panel hingedly connected to the base portion:

a second end panel hingedly connected to the base portion; and

a top panel hingedly connected to at least one panel selected from said side and said end panels, and wherein at least one of said panels comprise a substantially rigid frame and a plastic material woven on said frame and having the appearance of natural rattan or wicker. The enclosure of Claim 25, wherein short connector links are interposed between one or more of said panels and the base portion to permit the panels to fold into a compact configuration.

5

08/02/2005  16:39    7709840098                    GARDNER GROFF                    PAGE  06

Serial No.: 10/612,589
Attorney Docket No.: 2314.1-011
PATENT

## REMARKS

The Final Office Action mailed June 2, 2005 has been received and reviewed. By the present Response and Amendment, Claims 2-9, 11, 12, 14-17, 19, 26, and 27 are pending. Claims 1, 10, 13, 18, and 20-25 are cancelled, and Claims 2, 8, 9, 11, 14, 15, 19, 26, and 27 are amended. No new matter is introduced.

### Claim Objections

Claims 11, 12, 19, 26, and 27 have been indicated to be allowable if rewritten in independent form to include all of the limitations of the base claims and any intervening claims. Claims 11, 19, 26, and 27 have been rewritten in independent form, as suggested. Claim 12 depends from Claim 11, which is now allowable.

Claims 2-9 now depend from allowable Claim 11, and Claims 14-17 now depend from allowable Claim 19. Thus, all claims are now believed to be in condition for allowance.

6

Serial No.: 10/812,589
Attorney Docket No.: 2814.1-011
PATENT

## CONCLUSION

In view of the amendments submitted herein and the above comments, it is believed that all grounds of rejection are overcome and that the application has now been placed in full condition for allowance. Accordingly, Applicant earnestly solicits early and favorable action. Should there be any further questions or reservations, the Examiner is urged to telephone Applicant's undersigned attorney at (770) 984-2300.

Respectfully submitted,

Michelle E. Kandcer
Reg. No. 54,207

GARDNER GROFF, P.C.
100 Parkwood Point
2018 Powers Ferry Road
Suite 800
Atlanta, GA  30339

Tel:   770/984-2300
Fax:   770/984-0098

7

10/6/12,589

**PATENT APPLICATION FEE DETERMINATION RECORD**
Effective January 1, 2003

Application or Docket Number
10,612,589

BEST AVAILABLE COPY

### CLAIMS AS FILED - PART I

| | (Column 1) | (Column 2) |
|---|---|---|
| TOTAL CLAIMS | 27 | |
| FOR | NUMBER FILED | NUMBER EXTRA |
| TOTAL CHARGEABLE CLAIMS | 27 minus 20= | 7 |
| INDEPENDENT CLAIMS | 6 minus 3 = | 3 |
| MULTIPLE DEPENDENT CLAIM PRESENT | | ☐ |

* If the difference in column 1 is less than zero, enter "0" in column 2

| SMALL ENTITY TYPE ☐ | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|
| RATE | FEE | OR | RATE | FEE |
| BASIC FEE | 375.00 | OR | BASIC FEE | 750.00 |
| X$9= | 63 | OR | X$18= | |
| X42= | 126 | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL | 564 | OR | TOTAL | |

andt
3-8-05

### CLAIMS AS AMENDED - PART II

**AMENDMENT A**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | 27 | Minus | 27 | — |
| Independent | 6 | Minus | 6 | — |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | |

| SMALL ENTITY | | OR | OTHER THAN SMALL ENTITY | |
|---|---|---|---|---|
| RATE | ADDITIONAL FEE | OR | RATE | ADDITIONAL FEE |
| X$9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

8 2/0 13 20 22 23 25

**AMENDMENT B**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | 17 | Minus | 27 | / |
| Independent | 4 | Minus | 6 | / |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | |

| RATE | ADDITIONAL FEE | OR | RATE | ADDITIONAL FEE |
|---|---|---|---|---|
| X$9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

**AMENDMENT C**

| | (Column 1) CLAIMS REMAINING AFTER AMENDMENT | | (Column 2) HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3) PRESENT EXTRA |
|---|---|---|---|---|
| Total | | Minus | | |
| Independent | | Minus | | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM | | | | |

| RATE | ADDITIONAL FEE | OR | RATE | ADDITIONAL FEE |
|---|---|---|---|---|
| X$9= | | OR | X$18= | |
| X42= | | OR | X84= | |
| +140= | | OR | +280= | |
| TOTAL ADDIT. FEE | | OR | TOTAL ADDIT. FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE



### Index of Claims

| Application No. | Applicant(s) |
|---|---|
| 10/612,589 | SIMPSON, JEFFREY M. |
| Examiner | Art Unit |
| Robert P. Swiatek | 3643 |

| √ | Rejected | – | (Through numeral) Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | + | Restricted | I | Interference | O | Objected |

| Claim | | Date | | | | | Claim | | Date | | | | | Claim | | Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 5/27/05 | | | | | Final | Original | | | | | | Final | Original | |
| | 1 | √ | | | | | | 51 | | | | | | | 101 | |
| | 2 | √ | | | | | | 52 | | | | | | | 102 | |
| | 3 | √ | | | | | | 53 | | | | | | | 103 | |
| | 4 | √ | | | | | | 54 | | | | | | | 104 | |
| | 5 | √ | | | | | | 55 | | | | | | | 105 | |
| | 6 | √ | | | | | | 56 | | | | | | | 106 | |
| | 7 | √ | | | | | | 57 | | | | | | | 107 | |
| | 8 | √ | | | | | | 58 | | | | | | | 108 | |
| | 9 | √ | | | | | | 59 | | | | | | | 109 | |
| | 10 | √ | | | | | | 60 | | | | | | | 110 | |
| | 11 | O | | | | | | 61 | | | | | | | 111 | |
| | 12 | O | | | | | | 62 | | | | | | | 112 | |
| | 13 | √ | | | | | | 63 | | | | | | | 113 | |
| | 14 | √ | | | | | | 64 | | | | | | | 114 | |
| | 15 | √ | | | | | | 65 | | | | | | | 115 | |
| | 16 | √ | | | | | | 66 | | | | | | | 116 | |
| | 17 | √ | | | | | | 67 | | | | | | | 117 | |
| | 18 | √ | | | | | | 68 | | | | | | | 118 | |
| | 19 | O | | | | | | 69 | | | | | | | 119 | |
| | 20 | √ | | | | | | 70 | | | | | | | 120 | |
| | 21 | √ | | | | | | 71 | | | | | | | 121 | |
| | 22 | √ | | | | | | 72 | | | | | | | 122 | |
| | 23 | √ | | | | | | 73 | | | | | | | 123 | |
| | 24 | √ | | | | | | 74 | | | | | | | 124 | |
| | 25 | √ | | | | | | 75 | | | | | | | 125 | |
| | 26 | O | | | | | | 76 | | | | | | | 126 | |
| | 27 | = | | | | | | 77 | | | | | | | 127 | |
| | 28 | | | | | | | 78 | | | | | | | 128 | |
| | 29 | | | | | | | 79 | | | | | | | 129 | |
| | 30 | | | | | | | 80 | | | | | | | 130 | |
| | 31 | | | | | | | 81 | | | | | | | 131 | |
| | 32 | | | | | | | 82 | | | | | | | 132 | |
| | 33 | | | | | | | 83 | | | | | | | 133 | |
| | 34 | | | | | | | 84 | | | | | | | 134 | |
| | 35 | | | | | | | 85 | | | | | | | 135 | |
| | 36 | | | | | | | 86 | | | | | | | 136 | |
| | 37 | | | | | | | 87 | | | | | | | 137 | |
| | 38 | | | | | | | 88 | | | | | | | 138 | |
| | 39 | | | | | | | 89 | | | | | | | 139 | |
| | 40 | | | | | | | 90 | | | | | | | 140 | |
| | 41 | | | | | | | 91 | | | | | | | 141 | |
| | 42 | | | | | | | 92 | | | | | | | 142 | |
| | 43 | | | | | | | 93 | | | | | | | 143 | |
| | 44 | | | | | | | 94 | | | | | | | 144 | |
| | 45 | | | | | | | 95 | | | | | | | 145 | |
| | 46 | | | | | | | 96 | | | | | | | 146 | |
| | 47 | | | | | | | 97 | | | | | | | 147 | |
| | 48 | | | | | | | 98 | | | | | | | 148 | |
| | 49 | | | | | | | 99 | | | | | | | 149 | |
| | 50 | | | | | | | 100 | | | | | | | 150 | |

 

U̲NITED S̲TATES P̲ATENT AND T̲RADEMARK O̲FFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| 23506 | 7590 | 08/25/2005 |
|---|---|---|

GARDNER GROFF, P.C.
2018 POWERS FERRY ROAD
SUITE 800
ATLANTA, GA 30339

| EXAMINER |
|---|
| SWIATEK, ROBERT P |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3643 | |

DATE MAILED: 08/25/2005

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/612,589 | 07/02/2003 | Jeffrey M. Simpson | 2S14.1-011 | 6134 |

TITLE OF INVENTION: PET ENCLOSURE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | YES | $700 | $0 | $700 | 11/25/2005 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATEN** **PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHT THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPO PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM TH** MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. TH STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOV REFLECTS A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE APPLIED IN THIS APPLICATION. THE PTOL-85B (O AN EQUIVALENT) MUST BE RETURNED WITHIN THIS PERIOD EVEN IF NO FEE IS DUE OR THE APPLICATION WIL BE REGARDED AS ABANDONED.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown above.

B. If the status above is to be removed, check box 5b on Part B - Fee(s) Transmittal and pay the PUBLICATION FEE (if required) and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is n claiming SMALL ENTITY status, check box 5a on Part B - Fee Transmittal and pay the PUBLICATION FEE (if required) and 1 the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL should be completed and returned to the United States Patent and Trademark Office (USPTO) w your ISSUE FEE and PUBLICATION FEE (if required). Even if the fee(s) have already been paid, Part B - Fee(s) Transmittal should completed and returned. If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should completed and an extra copy of the form should be submitted.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment** maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.

Page 1 of 3

PTOL 85 (Rev 07/05) Approved for use through 04/30/2007

## PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** **Mail**       Mail Stop ISSUE FEE
                                                                                  Commissioner for Patents
                                                                                  P.O. Box 1450
                                                                                  Alexandria, Virginia 22313-1450
                                                                       or **Fax**  (571) 273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed wh appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

|  |  |  |
|---|---|---|
| 23506 | 7590 | 08/25/2005 |

GARDNER GROFF, P.C.
2018 POWERS FERRY ROAD
SUITE 800
ATLANTA, GA 30339

Note: A certificate of mailing can only be used for domestic mailings of Fee(s) Transmittal. This certificate cannot be used for any other accompany papers. Each additional paper, such as an assignment or formal drawing, m have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the Un States Postal Service with sufficient postage for first class mail in an envel addressed to the Mail Stop ISSUE FEE address above, or being facsim transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's na
_____ (Signat
_____ (D

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/612,589 | 07/02/2003 | Jeffrey M. Simpson | 2S14.1-011 | 6134 |

TITLE OF INVENTION: PET ENCLOSURE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | YES | $700 | $0 | $700 | 11/25/2005 |

| EXAMINER | | ART UNIT | CLASS-SUBCLASS |
|---|---|---|---|
| SWIATEK, ROBERT P | | 3643 | 119-499000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. Use of a Customer Number is required.

2. For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,      1 _____

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.      2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE          (B) RESIDENCE: (CITY and State OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual ☐ Corporation or other private group entity ☐ Governm

4a. The following fee(s) are enclosed:

☐ Issue Fee

☐ Publication Fee (No small entity discount permitted)

☐ Advance Order - # of Copies _____

4b. Payment of Fee(s):

☐ A check in the amount of the fee(s) is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☐ The Director is hereby authorized to charge the required fee(s), or credit any overpayment Deposit Account Number _____ (enclose an extra copy of this form).

5. Change in Entity Status (from status indicated above)

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.       ☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

The Director of the USPTO is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above. NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other part interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____          Date _____

Typed or printed name _____          Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to proc an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to comp this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 14 Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL 85 (Rev 07/05) Approved for use through 04/30/2007          OMB 0651 0033     U S Patent and Trademark Office; U S DEPARTMENT OF COMMER



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/612,589 | 07/02/2003 | Jeffrey M. Simpson | 2S14.1-011 | 6134 |

23506      7590      08/25/2005
GARDNER GROFF, P.C.
2018 POWERS FERRY ROAD
SUITE 800
ATLANTA, GA 30339

| EXAMINER |
|---|
| SWIATEK, ROBERT P |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3643 | |

DATE MAILED: 08/25/2005

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 0 day(s). If the issue fee is paid on the date that is three months after t mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a ha months) after the mailing date of this notice, the Patent Term Adjustment will be 0 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date th determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retriev (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office Patent Legal Administration at (571) 272-7702. Questions relating to issue and publication fee payments should directed to the Customer Service Center of the Office of Patent Publication at (703) 305-8283.

PTOL 85 (Rev 07/05) Approved for use through 04/30/2007

| *Notice of Allowability* | Application No. | Applicant(s) |
|---|---|---|
| | 10/612,589 | SIMPSON, JEFFREY M. |
| | Examiner | Art Unit | |
| | Robert P. Swiatek | 3643 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to _amendment filed 2 August 2005_.

2. ☒ The allowed claim(s) is/are _2-9,11,12,14-17,19,26 and 27_.

3. ☒ The drawings filed on _8 March 2005_ are accepted by the Examiner.

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some*   c)☐ None   of the:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

6. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

      1)☐ hereto or 2)☐ to Paper No./Mail Date _____ .

    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

**Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

7. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3. ☐ Information Disclosure Statements (PTO-1449 or PTO/SB/08), Paper No./Mail Date _____
4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application (PTO-152)
6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .
7. ☐ Examiner's Amendment/Comment
8. ☐ Examiner's Statement of Reasons for Allowance
9. ☐ Other _____ .

Robert P. Swiatek
Primary Examiner
Art Unit: 3643

| *Issue Classification*  | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 10/612,589 | SIMPSON, JEFFREY M. |
| | Examiner | Art Unit |
| | Robert P. Swiatek | 3643 |

## ISSUE CLASSIFICATION

| ORIGINAL | | CROSS REFERENCE(S) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| CLASS | SUBCLASS | CLASS | SUBCLASS (ONE SUBCLASS PER BLOCK) | | | | | | |
| 119 | 499 | 119 | 474 | 496 | | | | | |
| INTERNATIONAL CLASSIFICATION | | 217 | 122 | | | | | | |

| A | 0 | 1 | K | 1/03 | 232 | 1B | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | / | | | | | | | | | |
| | | | | / | | | | | | | | | |
| | | | | / | | | | | | | | | |
| | | | | / | | | | | | | | | |

| (Assistant Examiner)        (Date) | *Robert P. Swiatek*<br>Robert P. Swiatek<br>12 August 2005 | Total Claims Allowed: 17 | |
|---|---|---|---|
| *Coker*    8-23-05<br>(Legal Instruments Examiner)    (Date) | (Primary Examiner)        (Date) | O.G.<br>Print Claim(s)<br>1 | O.G.<br>Print Fig.<br>1 |

| ☐ Claims renumbered in the same order as presented by applicant | | | | | | | | | | | | ☐ CPA | | ☐ T.D. | | ☐ R.1.47 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original |
| | 1 | | 31 | | 61 | | 91 | | 121 | | 151 | | 181 |
| 2 | 2 | | 32 | | 62 | | 92 | | 122 | | 152 | | 182 |
| 3 | 3 | | 33 | | 63 | | 93 | | 123 | | 153 | | 183 |
| 4 | 4 | | 34 | | 64 | | 94 | | 124 | | 154 | | 184 |
| 5 | 5 | | 35 | | 65 | | 95 | | 125 | | 155 | | 185 |
| 6 | 6 | | 36 | | 66 | | 96 | | 126 | | 156 | | 186 |
| 7 | 7 | | 37 | | 67 | | 97 | | 127 | | 157 | | 187 |
| 8 | 8 | | 38 | | 68 | | 98 | | 128 | | 158 | | 188 |
| 9 | 9 | | 39 | | 69 | | 99 | | 129 | | 159 | | 189 |
| | 10 | | 40 | | 70 | | 100 | | 130 | | 160 | | 190 |
| 1 | 11 | | 41 | | 71 | | 101 | | 131 | | 161 | | 191 |
| 10 | 12 | | 42 | | 72 | | 102 | | 132 | | 162 | | 192 |
| | 13 | | 43 | | 73 | | 103 | | 133 | | 163 | | 193 |
| 12 | 14 | | 44 | | 74 | | 104 | | 134 | | 164 | | 194 |
| 13 | 15 | | 45 | | 75 | | 105 | | 135 | | 165 | | 195 |
| 14 | 16 | | 46 | | 76 | | 106 | | 136 | | 166 | | 196 |
| 15 | 17 | | 47 | | 77 | | 107 | | 137 | | 167 | | 197 |
| | 18 | | 48 | | 78 | | 108 | | 138 | | 168 | | 198 |
| 11 | 19 | | 49 | | 79 | | 109 | | 139 | | 169 | | 199 |
| | 20 | | 50 | | 80 | | 110 | | 140 | | 170 | | 200 |
| | 21 | | 51 | | 81 | | 111 | | 141 | | 171 | | 201 |
| | 22 | | 52 | | 82 | | 112 | | 142 | | 172 | | 202 |
| | 23 | | 53 | | 83 | | 113 | | 143 | | 173 | | 203 |
| | 24 | | 54 | | 84 | | 114 | | 144 | | 174 | | 204 |
| | 25 | | 55 | | 85 | | 115 | | 145 | | 175 | | 205 |
| 16 | 26 | | 56 | | 86 | | 116 | | 146 | | 176 | | 206 |
| 17 | 27 | | 57 | | 87 | | 117 | | 147 | | 177 | | 207 |
| | 28 | | 58 | | 88 | | 118 | | 148 | | 178 | | 208 |
| | 29 | | 59 | | 89 | | 119 | | 149 | | 179 | | 209 |
| | 30 | | 60 | | 90 | | 120 | | 150 | | 180 | | 210 |

## Index of Claims

| | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 10/612,589 | SIMPSON, JEFFREY M. |
| | Examiner | Art Unit |
| | Robert P. Swiatek | 3643 |

| | | | | |
|---|---|---|---|---|
| √ | Rejected | − | (Through numeral) Cancelled | N Non-Elected | A Appeal |
| ▪ | Allowed | + | Restricted | I Interference | O Objected |

| Final | Original | 8/12/05 |
|---|---|---|
| | 1 | |
| 2 | 2 | ▪ |
| 3 | 3 | ▪ |
| 4 | 4 | ▪ |
| 5 | 5 | ▪ |
| 6 | 6 | ▪ |
| 7 | 7 | ▪ |
| 8 | 8 | ▪ |
| 9 | 9 | ▪ |
| | 10 | |
| 1 | 11 | ▪ |
| 10 | 12 | ▪ |
| | 13 | |
| 12 | 14 | ▪ |
| 13 | 15 | ▪ |
| 14 | 16 | ▪ |
| 15 | 17 | ▪ |
| | 18 | |
| 11 | 19 | ▪ |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |
| 16 | 26 | ▪ |
| 17 | 27 | ▪ |
| | 28 | |
| | 29 | |
| | 30 | |
| | 31 | |
| | 32 | |
| | 33 | |
| | 34 | |
| | 35 | |
| | 36 | |
| | 37 | |
| | 38 | |
| | 39 | |
| | 40 | |
| | 41 | |
| | 42 | |
| | 43 | |
| | 44 | |
| | 45 | |
| | 46 | |
| | 47 | |
| | 48 | |
| | 49 | |
| | 50 | |

Claims 51–100 and 101–150 are blank.

| *Search Notes*  | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 10/612,589 | SIMPSON, JEFFREY M. |
| | Examiner | Art Unit |
| | Robert P. Swiatek | 3643 |

### SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| Search | Updated | 8/12/2005 | RPS |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

### SEARCH NOTES (INCLUDING SEARCH STRATEGY)

| | DATE | EXMR |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

### INTERFERENCE SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| 119 | 474 | 8/12/2005 | RPS |
| 119 | 496 | | |
| 119 | 499 | | |
| 119/482; 217/122; 232/1 B | | | |

U.S. Patent and Trademark Office

Part of Paper No. 20050812



**UNITED STATES PATENT AND TRADEMARK OFFICE**

COMMISSIONER FOR PATENTS
UNITED STATES PATENT AND TRADEMARK OFFICE
WASHINGTON, D.C. 20231
www.uspto.gov

## *BIBDATASHEET*
Bib Data Sheet

**CONFIRMATION NO. 6134**

| SERIAL NUMBER 10/612,589 | FILING DATE 07/02/2003 RULE | CLASS 119/499 | GROUP ART UNIT 3643 | ATTORNEY DOCKET NO. 2S14.1-011 |
|---|---|---|---|---|

**APPLICANTS**

Jeffrey M. Simpson, Auburn, AL;

** CONTINUING DATA *********************
This application is a CIP of 29/160,054 05/02/2002 PAT D,483,156
and claims benefit of 60/394,181 07/03/2002
and claims benefit of 60/465,119 04/24/2003

** FOREIGN APPLICATIONS ********************

IF REQUIRED, FOREIGN FILING LICENSE GRANTED ** SMALL ENTITY **
** 09/29/2003

| Foreign Priority claimed | ☐ yes ☑ no | STATE OR | SHEETS | TOTAL | INDEPENDENT |
|---|---|---|---|---|---|
| 35 USC 119 (a-d) conditions met | ☐ yes ☐ no ☐ Met after Allowance | | | | |
| Verified and Acknowledged | Examiner's Signature   Initials | COUNTRY AL | DRAWING 12 | CLAIMS 27 | CLAIMS 6 |

**ADDRESS**
23506
GARDNER GROFF, P.C.
PAPER MILL VILLAGE, BUILDING 23
600 VILLAGE TRACE
SUITE 300
MARIETTA , GA
30067

**TITLE**
Pet enclosure

| FILING FEE | FEES: Authority has been given in Paper No. _____ to charge/credit DEPOSIT ACCOUNT | ☐ All Fees |
|---|---|---|
| | | ☐ 1.16 Fees ( Filing ) |
| | | ☐ 1.17 Fees ( Processing Ext. of time ) |

http://neo:8000/preexam/JavaProxy/jsp/bibdata/transform.jsp                    2/11/04

08/02/2005  16:39   7709840098                    GARDNER GROFF                          PAGE  01

RECEIVED
CENTRAL FAX CENTER

AUG 0 2 2005

Serial No.: 10/612,589
Attorney Docket No.:  2814.1-011
PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Re Application of: SIMPSON, Jeffrey M.      )
                                              )
Serial No.: 10/612,589                        )  Group Art Unit: 3643
                                              )
Filed: July 2, 2003                           )  Examiner: SWIATEK, Robert P.
                                              )
For:   "PET ENCLOSURE"                        )
                                              )

Mail Stop Amendment                           August 2, 2005
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### RESPONSE AFTER FINAL

Sir:

In response to the Final Office Action mailed June 2, 2005, please amend the
above-referenced patent application as follows and consider the remarks below.  This
Response is believed to be timely.  If any extension is required, please consider this a
request therefor.  No additional claim fees are believed to be due because even though
Applicant has added independent Claims 11, 19, 26, and 27, Applicant has concurrently
cancelled independent Claims 1, 13, 22, 23, and 25.  However, the Commissioner is
authorized to charge any additional fees due or credit any overpayment to Deposit Account
50-1513.

> ### CERTIFICATE OF FACSIMILE TRANSMISSION
> I hereby certify that this correspondence is being transmitted via facsimile to 571.273.8300 on the date indicated below.
>
> _Michelle E Kander_                    _August 2, 2005_
> Signature                             Date

*Amendment approved for entry. -RPS*

1

# PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>

**Mail Stop ISSUE FEE**
**Commissioner for Patents**
**P.O. Box 1450**
**Alexandria, Virginia 22313-1450**
**(571) 273-2885**

or <u>Fax</u>

*[Postmark stamp: NOV 18 2005]*

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed wh appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" maintenance fee notification.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

23506    7590    08/25/2005

GARDNER GROFF, P.C.
2018 POWERS FERRY ROAD
SUITE 800
ATLANTA, GA 30339

11/21/2005 KBERHE1 00000023 10612589

01 FC:2501    700.00 DP
02 FC:8001    9.00 DP

Note: A certificate of mailing can only be used for domestic mailings of Fee(s) Transmittal. This certificate cannot be used for any other accompany papers. Each additional paper, such as an assignment or formal drawing, m have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the Un States Postal Service with sufficient postage for first class mail in an envel addressed to the Mail Stop ISSUE FEE address above, or being facsim transmitted to the USPTO (571) 273-2885, on the date indicated below.

Bradley K. Groff    (Depositor's na

*[signature]*    (Signat

November 15, 2005    (D

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/612,589 | 07/02/2003 | Jeffrey M. Simpson | 2S14.1-011 | 6134 |

TITLE OF INVENTION: PET ENCLOSURE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | YES | $700 | $0 | $700 | 11/25/2005 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| SWIATEK, ROBERT P | 3643 | 119-499000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. Use of a Customer Number is required.

**2. For printing on the patent front page, list**

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 GARDNER GROFF, P.C.

2 _____

3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)**

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

(B) RESIDENCE: (CITY and STATE or COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent): ☐ Individual ☐ Corporation or other private group entity ☐ Governm

**4a. The following fee(s) are enclosed:**

☒ Issue Fee

☐ Publication Fee (No small entity discount permitted)

☒ Advance Order - # of Copies ___3___

**4b. Payment of Fee(s):**

☐ A check in the amount of the fee(s) is enclosed.

☒ Payment by credit card. Form PTO-2038 is attached.

☒ The Director is hereby authorized by charge the required fee(s), or credit any overpayment Deposit Account Number 50-1513 (enclose an extra copy of this form).

**5. Change in Entity Status (from status indicated above)**

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.

☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

The Director of the USPTO is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above. NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other part interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature *[signature]*    Date November 15, 2005

Typed or printed name Bradley K. Groff    Registration No. 39,695

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to proc an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to comp this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 14 Alexandria, Virginia 22313-1450.
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL 85 (Rev 07/05) Approved for use through 04/30/2007    OMB 0651 0033    U S Patent and Trademark Office; U S DEPARTMENT OF COMMER

# Exhibit F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## <u>EASTERN DIVISION</u>

SIMPSON VENTURES, INC., )
                       )
       Plaintiff,      )      Civil Act File No. 3:06-cv-901 WKW
                       )
v.                )      **Demand for Jury Trial**
                       )
MID-WEST METAL  )
PRODUCTS          )
COMPANY, INC.    )
                       )
      Defendant.    )
_____)
                       )
MID-WEST METAL  )
PRODUCTS          )
COMPANY, INC.,   )
       Counterclaimant,  )
                       )
v.                )
                       )
SIMPSON VENTURES, INC., )
                       )
      Counterdefendant. )
_____)

## PLAINTIFF SIMPSON VENTURE'S ANSWERS TO FIRST SET OF
## <u>INTERROGATORIES FROM DEFENDANT MID-WEST METAL</u>

       COMES NOW, Plaintiff Simpson, and for its answers to Defendant's

First Set of Interrogatories, states as follows:

## <u>GENERAL STATEMENT AND OBJECTIONS</u>

Plaintiff Simpson has not concluded its investigation into the facts relating to this case, its formal discovery, or its preparation for trial. These answers represent said Plaintiff's reasonable effort to provide the information requested based upon information in its possession, custody or control, and based upon its current knowledge. Plaintiff reserves the right to produce information regarding subsequently discovered facts, to alter or amend these responses as set forth herein, and otherwise to assert factual and legal contentions as additional facts are ascertained, analyses are made and legal research completed.

Plaintiff objects to each and every Interrogatory insofar as it may be construed as limiting or restricting its right to rely upon any document or information for any purpose whatsoever, including but not limited to the use of responsive documents or information as evidence at any subsequent hearing, trial or proceeding.

Plaintiff objects to Defendant's First Set of Interrogatories in its entirety to the extent it seeks information or documents protected by any applicable privilege, including but not limited to the attorney/client privilege, the work product doctrine, the investigative and party communication privileges, and any other applicable privilege or exemption from discovery as outlined in the Federal Rules of Civil Procedure and applicable law, and Plaintiff hereby asserts such privileges and/or exemptions. Specifically, and without limiting the foregoing, letters, memoranda and other writings transmitted by or between Plaintiff and its counsel, or writing prepared and maintained internally by Plaintiff's counsel that have not been disclosed to third parties, are not included in these Answers.

2

Plaintiff will make reasonable efforts to respond to each Interrogatory, to the extent that no objection is made, as Plaintiff understands or interprets the Interrogatory. If Defendant or other parties hereto subsequently asserts any other interpretation or otherwise clarifies any of these Interrogatories at variance to Plaintiff's interpretation thereof, Plaintiff reserves the right to supplement or modify these Objections and Answers.

Plaintiff further objects to Defendant's instructions and definitions to the extent that the same seeks to impose a duty on this Plaintiff that would exceed the permissible scope of discovery under Rule 26 of the Federal Rules of Civil Procedure.

Many of the documents and responses requested concern matters protectable under the attorney-client privilege and/or the work product doctrine. Rather than to object and refer to these privileged matters question by question, a list of withheld documents will be produced with appropriate identification in accordance with the requirements of the Federal Rules of Civil Procedure after production of the discoverable documents is complete.

Subject to, and without waiving, the foregoing objections, Plaintiff answers as follows:

3

**1.**    Identify all witnesses, including expert witnesses, who will be called to testify in support of Simpson Venture's claims in this action.  For each, state the nature and substance of the testimony which is expected to be given by each such witness, and state the relationship, if any, to the Plaintiff.

**RESPONSE:**

> Objection.  Plaintiff objects to this interrogatory as premature and calling for protected work product.  Moreover, discovery is ongoing and the Plaintiff's investigation into this matter continues and as such Plaintiff does not now know what witnesses it will or may use at trial.  Pursuant to the Court's order, prior to the trial, the parties are to exchange witness lists as part of the pre-trial order.  Thus, this requested information is premature and duplicative of the information to be produced as part of the pre-trial order.
> Subject to the above objection, Plaintiff responds as follows:

**Mr. Robert Anders**
A Design Consultancy of Warwick, N.Y.
78 Continental Road
P.O. Box 609
Warwick, N.Y.  10990-0609

Mr. Anders is expected to testify as to the design patent and infringement thereof.

Mr. Anders is not related to Plaintiff Simpson Ventures.

**Mr. Mark Gallagher**
Duff & Phelps
10 Tenth Street, Suite 1030
Atlanta, GA  30309

4

Mr. Gallagher is expected to testify as to the damages and financial matters.

Mr. Gallagher is not related to Plaintiff Simpson Ventures.


**Mr. Jeff Simpson**
President
Simpson Ventures, Inc.
480 N. Dean Rd., Suite E
Auburn, AL 36830

Mr. Simpson is expected to testify about the conception of the invention, the '156 Patent, the construction and appearance of the Defendant's products; the impact of Defendant's entry into the market on Plaintiff Simpson, and other matters, inter alia.

Mr. Simpson is the patent holder and President of Simpson Ventures, Inc.


**Ms. Kathy Simpson**
Vice President/Treasurer
Simpson Ventures, Inc.
480 N. Dean Rd., Suite E
Auburn, AL 36830

Kathy Simpson may testify about the conception and reduction to practice of the invention, the impact of Defendant's infringement in the market and the history and performance of Simpson Ventures, Inc.

Kathy Simpson is the spouse of patent holder Jeff Simpson and is Vice President/Treasurer of Simpson Ventures, Inc.


**Mr. Bernie Kelley**
Vice President
Vigor International HK Ltd.
3141 Montclair Ave.

Lewis Centre, OH 43035

Mr. Kelley may testify about the prototype development and production thereof of products as shown in the '156 Patent.

Mr. Kelly is the Sourcing Agent for Simpson Ventures, Inc.

**Ms. Donna Belenchia**
Customer Service Mgr.
Simpson Ventures, Inc.
814 Lakeshore Ave.
Opelika, AL 36801

Ms. Belenchia may testify about customer service issues regarding the product shown in the '156 Patent, and about confusion in the market place between Simpson Ventures' products and those of Defendant Mid-West Metal Products.

Ms. Belenchia is the Customer Service Manager for Simpson Ventures, Inc.

**2.**    List specifically and describe in detail each and every exhibit you will or may utilize at the trial in this matter.  This interrogatory is directed both to exhibits you intend to use at trial, and exhibits you may use.

**<u>RESPONSE</u>:**

Objection.  Plaintiff objects to this interrogatory as premature and calling for protected work product.  Moreover, discovery is ongoing and the Plaintiff's investigation into this matter continues and as such Plaintiff does not now know what exhibits it will or may use at trial.  Prior to the trial, the parties are to exchange exhibit lists as part of the pre-trial order.  Thus, this requested information is premature and duplicative of the information to be produced as part of the pre-trial order (and therefore it is unduly burdensome to try to produce such now).  Moreover, even if such a list were to be compiled at this time (with considerable effort), such a list likely would differ substantially from the list of exhibits compiled for the pre-trial.

     **3.**     Please identify every person who participated, assisted, or was involved in any way in the creation and/or development of the design that is the subject of the `156 Patent, and describe in detail each person's role in the development and/or creation of that design.

**<u>RESPONSE</u>:**

     Jeff Simpson.

     Jeff Simpson conceived of and developed the design that is the subject of the '156 patent. The involvement of others was limited to the fabrication of one or more prototypes at Mr. Simpson's direction.

4.    Please describe in detail when and how the claimed invention was conceived, and then reduced to practice. Include in your answer the date when the inventor(s) first conceived of the claimed invention, and state the earliest date it was reduced to practice. Also, include in your answer the dates of the first drawing and written description of the claimed invention.

**RESPONSE**:

Plaintiff objects to this interrogatory as vague and indefinite in that there is no definition of what type of "written description" is referred to in the interrogatory. This could be interpreted to mean any kind of writing that in any way refers to the invention or could be interpreted to mean a detailed, technical description of the various features shown in the '156 Patent. Subject to this objection, Plaintiff answers as follows:

While employed as Director of Marketing at Doskocil Manufacturing Co., Inc. in Arlington TX from 1997 to 1999, the inventor, Jeff Simpson, had a notion that many consumers might not be satisfied with the aesthetic quality of a plastic carrier or wire kennel as an indoor pet containment device. He initiated a project with the Doskocil product development group while at Doskocil to develop indoor containment that replicated indoor occasional furniture. Two prototypes were developed, one of which was in

9

the form of an end table and the other a corner table. The prototypes were fabricated from particle board construction with imitation wood grain melamine surfaces. The project was dropped due primarily to the fact that the articles looked like cheap pieces of knock-down furniture which would most likely not match a consumer's indoor décor.

In late May 2001 Jeff Simpson and Jared Simpson (inventor's son) purchased an outdoor porch swing for Kathy Simpson as a Mother's Day present. The outdoor porch swing was manufactured with a metallic tubular frame and had a woven resin wicker material covering. While employed as a sales and marketing manager for GDA, LLC, in early September 2001 while sitting on the porch swing at his home, Jeff Simpson came up with the concept of a decorative indoor pet home utilizing resin wicker on a steel frame. He felt that an aesthetically pleasing product could be manufactured according to this design.

With the help of GDA, LLC, Mr. Simpson developed a first prototype design for a decorative pet home covered with a woven, wicker-look material. Thereafter, Mr. Simpson left the employ of GDA, LLC and continued to develop his ideas further.

In early 2002 Mr. Simpson continued to develop his decorative pet home design and began marketing the product to potential customers. His

business plan was to offer the product to pet catalogs companies, pet distributors and high-end general merchandise catalogs companies, and once the product concept gained acceptance, offer the product line in more mass retail-type settings. The design shown in the '156 Patent is believed to have been finalized in April or May, 2002 and the first production order was placed in May 2002. The '156 design patent was filed on May 2, 2002. A subsequent Provisional Utility Patent was filed on July 3, 2002 and Non-provisional Utility Patent filed on July 2, 2003.

The date of the first drawing (or image) of the design shown in the '156 Patent is believed to be sometime in April, 2002.

The date of the first written description of the design shown in the '156 Patent is believed to coincide with the filing of the design patent application in May 2002.

11

**5.**     Identify all documents and things, including but not limited to patents and printed publications, made known to and/or considered by each person identified in response to Interrogatory #3 in creating, conceiving, and/or developing the design that is the subject of the `156 Patent.

**RESPONSE:**

Plaintiff objects on the basis that the interrogatory is vague, indefinite and overbroad. For example, at the time that Mr. Simpson conceived of and/or developed the invention shown in the '156 Patent, by that stage in his life he had been made aware of countless documents and things and there is no way of recounting all the documents and things that a person has known of over his lifetime. On its face the interrogatory is not limited to only those documents and things that Mr. Simpson had in mind at the time of the invention, and so the interrogatory would encompass a lifetime's accumulation of knowledge (even things he had forgotten). Subject to this objection, Plaintiff responds by identifying documents and things that the inventor was specifically aware of at the time of conceiving and/or developing the invention shown in the '156 Patent as follows.

Plaintiff's investigation into this interrogatory is not complete and Plaintiff declines to provide an incomplete (and perhaps incorrect) answer at

12

this moment. Plaintiff intends to supplement this response once the investigation is completed and it is anticipated that the supplemented answer should be forthcoming soon.

**6.**    Please describe in detail the circumstances of the first time that the design that is the subject of the `156 Patent was disclosed to a person who was not an employee or representative of Simpson Ventures. Include in your answer the date, the identity of all persons with knowledge of such, and identify all documents related to such.

**RESPONSE:**

It is believed that the design that is the subject of the '156 Patent was first disclosed to Taresa Perry of Jeffers Pet in Dothan, Alabama.

The date of such initial disclosure is believed to be around March 2002.

The identity of persons believed to have knowledge of such is as follows: Jeff Simpson; Ruth Jeffers; and Taresa Perry.

At this time, Plaintiff Simpson is unaware of any existing documents related to such.

14

7.    Please identify the date on which you first offered for sale any product that embodied the design that is the subject of the `156 Patent. For that event, please identify all terms and conditions of the offer, describe in detail how it was made or communicated, to whom it was made or communicated, and identify all documents that relate to such.

**RESPONSE:**

To the best of Jeff Simpson's recollection, the first offer for sale of any product that embodied the design of the '156 Patent was an offer to Jeffers Pet on or around March 2002.

The terms of the offer for sale are not recollected at this time.

The offer for sale was made in person by Jeff Simpson and Jeff Simpson no longer has any documents relating to the offer.

The offer for sale was communicated to Ruth Jeffers and/or Taresa Perry of Jeffers Pet.

Jeff Simpson no longer has any records relating to the offer for sale due partly to a computer hard drive crash in July 2004.

15

**8.**     For all sales, or offers of sale, of any products that embody the design that is the subject of the `156 Patent, where such sales occurred prior to May 2, 2001, please describe in detail the item sold, identify the seller/offeror and purchaser/offeree, state the date, identify all terms and conditions related to such, identify all documents related to such, and identify all persons with knowledge concerning such.

**RESPONSE:**

There are no such sales or offers for sale.  Thus, Simpson cannot describe in detail the item sold, cannot identify the seller/offeror and purchaser/offeree, cannot state the date of such, cannot identify all terms and conditions related to such, cannot identify all documents related to such, and cannot identify all persons with knowledge concerning such.

**9.**     For all uses of any items or products that embody the design that is the subject of the `156 Patent, where such uses occurred prior to May 2, 2001, please describe in detail the item or product used, describe in detail the nature of the use(s), state the date, identify all documents related to such, and identify all persons with knowledge concerning such.

**RESPONSE**:

There are no such uses.

As there are no such uses, Plaintiff Simpson cannot identify the item or product used, cannot state a date for such, cannot identify documents related to such, and cannot identify persons with knowledge of such.

**10.** If you contend that sales, offers for sale, disclosures, and/or uses of any embodiments of the design that is the subject of the `156 Patent prior to May 2, 2001, do not constitute sales, offers, disclosures, or public uses that would invalidate the `156 Patent, then please identify in detail all factual and legal bases for that contention, identify all witnesses with knowledge of those facts, and identify each and every document that contains factual information relating to that contention.

**RESPONSE:**

There are no such sales, offers for sale, disclosures, and/or uses prior to May 2, 2001.

As there are no such sales, offers for sale, disclosures, and/or uses, Plaintiff cannot identify factual and legal bases for such a contention, cannot identify knowledgeable witnesses, and cannot identify documents related thereto.

**11.**    Please identify with specificity all "points of novelty" of the design that is the subject of the `156 Patent. In your response, please itemize and describe with particularly the prior art from which these points of novelty are contended by you to be distinct.

**RESPONSE:**

Objection.    Plaintiff Simpson objects to this interrogatory as premature in that Plaintiff's investigation into this matter is continuing. Furthermore, the interrogatory calls for the identity of <u>all</u> prior art from which the patented design is contended to be distinct, which would encompass all patents and things then in existence.    Subject to these objections, Plaintiff answers as follows.

The points of novelty include a pet home having a woven outer texture with the appearance of wicker, rattan or the like, the woven texture appearing on the top, non-window portions of the sides and rear, and on a non-door portion of the front.

The prior art from which this point of novelty is distinct includes the prior art cited during the prosecution of the `156 Patent.

**12.**    Please identify with specificity all aspects of the design that is the subject of the `156 Patent that are ornamental.

**RESPONSE:**

Objection.    Plaintiff Simpson objects to this interrogatory as premature in that Plaintiff's investigation into this matter is continuing. Subject to this objection, Plaintiff answers as follows.

a.  Overall Ornamental Silhouette.  A box shaped pet home that is longer than it is wide or tall, which includes a woven texture outer surface having the appearance of wicker or rattan.

b.  Overall Ornamental Appearance.  The overall ornamental appearance is of a pet home with a woven texture surface with the appearance of wicker or rattan on some portion or entirety of each of the 5 panels or faces claimed in the '156 Patent.  The front panel has a non-door portion that is covered in a woven wicker-look material and a rectangular door portion, which is not so covered.  The sides are each covered with a woven wicker-look material, except for a window opening that is not so covered.  The rear face is covered with a woven wicker-look material, except for a window opening that is not so covered.

20

13.    Please identify with specificity all aspects of the design that is the subject of the `156 Patent that are functional.

**RESPONSE:**

Objection.    Plaintiff Simpson objects to this interrogatory as premature in that Plaintiff's investigation into this matter is continuing. Subject to this objection, Plaintiff answers as follows.

The functional features include the pet residence or pet home having the following features:

a. feet for supporting the pet home upon the floor;

b. a non-covered pivoting door on the front thereof to enable the pet to go into and out of the pet home;

c. a latch for securing the door in place for securing the pet in the pet home;

d. non-covered windows formed in the sides and the back;

e. mechanical features along the edges and at the corners thereof for holding the structure together, including fasteners and links;

f. a tray or bottom pan;

g. a tray latch; and

h. a framework to which the woven wicker-look material is applied.

**14.**    Please describe in detail, and not merely in summary form, each and every difference between the design that is the subject of the `156 Patent, and the Accused Products.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

**15.**    Please identify and describe with particularity all studies, surveys and/or polls, and the results therefrom, relating to what an ordinary observer believes, thinks, feels, observes, concludes, etc. when observing the Accused Products in relation to and/or in comparison with the design that is the subject of the `156 Patent.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

23

**16.**    Please identify and describe with particularity all products or items that embody or otherwise reduce to practice the design that is the subject of the `156 Patent.    Please separately identify these, where appropriate, as (i) products or items that are manufactured by or on behalf of Simpson Ventures; (ii) products or items that are manufactured by third parties but with the permission of Simpson Ventures (including under any license agreement); and (iii) products or items that are manufactured by third parties without the permission of Simpson Ventures (excluding Plaintiff's allegations regarding the Accused Products at issue in this lawsuit).

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts.   As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

24

17.    Please identify and describe with particularity all instances of actual or apparent confusion between any product(s) or item(s) embodying the `156 Patented design and the Defendant's Accused Products. Include in your answer the identity of all persons with knowledge of the facts relating to such confusion. This interrogatory includes all instances where customers (or potential customers) have mistaken Mid-West Metal's Accused Products for a product/item embodying the `156 Patented design, or where customers (or potential customers) were deceived into purchasing a Mid-West Metal's Accused Product, believing it to be a product/item that embodies the `156 Patented design.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

25

18.    For each and all of Simpson Venture's products or items that

embody the design that is the subject of the `156 Patent, please state the

following information:

> (a)    how many of each product Simpson
> Ventures has produced for each year in
> which Simpson Ventures has produced such
> products;
>
> (b)    how many of each product Simpson
> Ventures has sold for each year in which
> Simpson Ventures has sold such products;
>
> (c)    how much gross revenue Simpson Ventures
> obtained from such sales of each such
> product for each year in which sales were
> made; and
>
> (d)    how must it cost Simpson Ventures to
> produce, sell, deliver, and service each such
> product for each year in which sales were
> made. In this aspect of your answer, please
> separately itemize by category and amount
> the costs and expenses associated with the
> following    -    manufacturing/production,
> marketing/advertising,
> transportation/delivery/distribution,
> administration and overhead costs, licensing
> fees, warranty/customer complaint costs,
> and any other costs.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits,

including subparts, stipulated in the parties' Report of the Parties' Planning

Meeting filed with the Court on or about January 26, 2007 in which the

26

parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

**19.**    Please identify and describe in detail Simpson Venture's manufacturing capabilities – including, but not limited to, any facilities that it owns or operates (and their locations), any OEM arrangements that it has with other manufacturers, and its daily/monthly/quarterly/annual production capacities.  Please describe in detail any changes to such capabilities that have occurred since January 1, 2000, and identify such changes by date.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts.  As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

**20.**    Please describe in detail, and specifically quantify, all of Simpson Venture's claims for damages arising out of its allegation that Mid-West Metal has infringed the `156 Patent. This includes claims, if any, for price erosion.

**<u>RESPONSE</u>:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts.  As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

21.) If Simpson Ventures contends that there are any secondary indicia of non-obviousness relevant to the design that is the subject of the `156 Patent, then please state all facts and information pertaining to such, describe the asserted relationship between such, identify each person having knowledge of facts and/or an opinion of such, and identify each document pertaining to such.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

22.)   Identify and describe in detail all instances in which Simpson Ventures contends that it has provided notice of its alleged patent rights under the `156 Patent under 35 U.S.C. § 287, including but not limited to, the marking of products covered by the `156 Patent. For each such instance, provide the date, identify each person with knowledge of such facts, and identify each document relating to such.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

**23.** Please identify each instance where Simpson Ventures has obtained any information regarding any knowledge or confusion whatsoever on the part of any person as between the source, affiliation, or sponsorship of its wicker (or wicker-like) pet cages/home products (or any form of advertisement therefore) and the source, affiliation, or sponsorship of any Mid-West Metal's pet cages/home products (or any form of advertisement therefore) including the date and location of each such occurrence, the identity of the person who was confused, and the identity of all persons who witnessed or have knowledge of each such instance of confusion.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

**24.**    Please state in detail the terms of engagement between Simpson Ventures and its lawyers in this litigation, including but not limited to, the terms relating to attorney's fees and litigation costs.  In addition, please state the number of hours your attorneys have spent in pursuing this litigation.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts.  As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

25.)    State in detail all facts that are the basis for Simpson Venture's claim that Mid-West Metal's alleged infringement of the `156 Patent was and/or is willful, identify each witness that has personal knowledge of those facts, and identify each document that contains information relating to those facts.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

**26.**    Identify    all    instances    in    which    Simpson    Ventures    has communicated a cease and desist request/demand (or words to that effect) to any third party.  For each such instance, provide the date, the targeted third party, a description of the rights being asserted, a description of the targeted third party's response, the identities of all persons with knowledge of such, and the identity of each document relating to such.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts.  As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

27.    Identify all license agreements relating to pet products to which Simpson Ventures is or has ever been a party.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts.  As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or the remaining interrogatories and hereby declines to answer.

28.    Identify all other lawsuits or claims of infringement by or against Simpson Ventures that relate to any product or item having any portion or components comprising or having the appearance of wicker, rattan, woven resin strand, or other woven material.

**RESPONSE:**

Plaintiff objects to this interrogatory as exceeding the number limits, including subparts, stipulated in the parties' Report of the Parties' Planning Meeting filed with the Court on or about January 26, 2007 in which the parties agreed to be limited to 30 interrogatories, including subparts, and in violation of Rule 33 of FRCP as exceeding the limit of 25 interrogatories, including subparts. As Defendants' interrogatories above already number up to 30, including subparts, Plaintiff is under no obligation to answer this or any remaining interrogatories and hereby declines to answer.

I AFFIRM UNDER PENALTIES OF PERJURY THAT THE INFORMATION SET FORTH HEREIN IS TRUE AND ACCURATE TO THE BEST OF MY KNOWLEDGE

7/23/2007

Jeffrey M. Simpson

37

As to Objection:

Respectfully submitted,


Arthur A. Gardner
Gardner, Groff, Greenwald &
Villanueva, P.C.
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339
*Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was duly forwarded to all counsel of record and interested parties on this 23rd day of July, 2007, via United States mail, postage prepaid, as follows:

James M. Hinshaw
Bingham McHale LLP
2700 Market Tower
10 W. Market Street
Indianapolis, IN 46204-4900
(317) 635-8900
*Pro Hac Vice*

Brett A. Ross
Carr Allison
100 Vestavia Parkway
Birmingham, Alabama 35216
(205) 822-2006

(And via Email to James M. Hinshaw at jhinshaw@bringhammchale.com)

*Attorneys for Defendant Mid-West Metal Products Company, Inc.*


Arthur A. Gardner
Gardner, Groff, Greenwald &
Villanueva, P.C.
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339

# Exhibit G

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
<u>**EASTERN DIVISION**</u>

# COPY

| | |
|---|---|
| SIMPSON VENTURES, INC., )<br>)<br>    Plaintiff, )<br>)<br>)<br>v. )<br>)<br>MID-WEST METAL )<br>PRODUCTS )<br>COMPANY, INC. )<br>)<br>    Defendant. )<br>————————————————)<br>)<br>MID-WEST METAL )<br>PRODUCTS )<br>COMPANY, INC., )<br>    Counterclaimant, )<br>)<br>v. )<br>)<br>SIMPSON VENTURES, INC., )<br>)<br>    Counterdefendant. )<br>————————————————) | Civil Act File No. 3:06-cv-901 WKW<br><br>**Demand for Jury Trial** |

**PLAINTIFF SIMPSON VENTURE'S SECOND SUPPLEMENTAL**
**ANSWERS TO FIRST SET OF INTERROGATORIES FROM**
**DEFENDANT MID-WEST METAL**

COMES NOW, Plaintiff Simpson, and supplements its answers to Defendant's First Set of Interrogatories, stating as follows:

## GENERAL STATEMENT AND OBJECTIONS

Plaintiff Simpson has not concluded its investigation into the facts relating to this case, its formal discovery, or its preparation for trial. These answers represent said Plaintiff's reasonable effort to provide the information requested based upon information in its possession, custody or control, and based upon its current knowledge. Plaintiff reserves the right to produce information regarding subsequently discovered facts, to alter or amend these responses as set forth herein, and otherwise to assert factual and legal contentions as additional facts are ascertained, analyses are made and legal research completed.

Plaintiff objects to each and every Interrogatory insofar as it may be construed as limiting or restricting its right to rely upon any document or information for any purpose whatsoever, including but not limited to the use of responsive documents or information as evidence at any subsequent hearing, trial or proceeding.

Plaintiff objects to Defendant's First Set of Interrogatories in its entirety to the extent it seeks information or documents protected by any applicable privilege, including but not limited to the attorney/client privilege, the work product doctrine, the investigative and party communication privileges, and any other applicable privilege or exemption from discovery as outlined in the Federal Rules of Civil Procedure and applicable law, and Plaintiff hereby asserts such privileges and/or exemptions. Specifically, and without limiting the foregoing, letters, memoranda and other writings transmitted by or between Plaintiff and its counsel, or writing prepared and maintained internally by Plaintiff's counsel that have not been disclosed to third parties, are not included in these Answers.

2

Plaintiff will make reasonable efforts to respond to each Interrogatory, to the extent that no objection is made, as Plaintiff understands or interprets the Interrogatory. If Defendant or other parties hereto subsequently asserts any other interpretation or otherwise clarifies any of these Interrogatories at variance to Plaintiff's interpretation thereof, Plaintiff reserves the right to supplement or modify these Objections and Answers.

Plaintiff further objects to Defendant's instructions and definitions to the extent that the same seeks to impose a duty on this Plaintiff that would exceed the permissible scope of discovery under Rule 26 of the Federal Rules of Civil Procedure.

Subject to, and without waiving, the foregoing objections, Plaintiff answers as follows:

11.    Please identify with specificity all "points of novelty" of the design that is the subject of the `156 Patent. In your response, please itemize and describe with particularly the prior art from which these points of novelty are contended by you to be distinct.

**RESPONSE:**

Objection.    Plaintiff Simpson objects to this interrogatory as premature in that Plaintiff's investigation into this matter is continuing. Furthermore, the interrogatory calls for the identity of <u>all</u> prior art from which the patented design is contended to be distinct, which would encompass all patents and things then in existence.    Subject to these objections, Plaintiff answers as follows.

Plaintiff states that the point of novelty of the '156 patent, in comparison with the prior art now known, includes the following numbered individual features.  For conciseness, it should be understood that in using the term "wicker", the Plaintiff refers to an outer texture with the appearance of woven wicker (as the '156 patent is a design patent, the patent covers what can be seen in the drawings, and the drawings depict an outer texture with the appearance of woven wicker).  For the convenience of the parties and the Court in considering and discussing the points of novelty, descriptive headings are provided below regarding each novel feature.

4

1.    Extent of Wicker

A pet home with a rectangular volume and having a top, sides, a rear, and a front, the top has an outer surface substantially having wicker, the sides each including a window and the non-window portion of each side has an outer surface substantially having wicker, the rear including a window and the non-window portion of the rear has an outer surface substantially having wicker, and the front includes a door and the non-door portion of the front has an outer surface substantially having wicker, wherein the sides and rear mostly have wicker, the majority of the front does not have wicker, and substantially the entire top has wicker.

2.    Door/Front Panel Configuration

A pet home with a rectangular volume and having a rectangular front, the front including a rectangular see-through door that is framed substantially by wicker.

3.    Distinct Panels

A pet home with a rectangular volume, the pet home having the appearance of being formed from distinct, individual panels having wicker outer surfaces.

4.    Window Geometry & Placement

A pet home with a rectangular volume and having a front, sides, a rear and a top, the pet home further having a rectangular window positioned in the

upper half of each side and in the upper half of the rear, the non-window portions of the sides and rear having outer surfaces with wicker such that the rectangular windows are surrounded by wicker on all sides.

5. Panels Without Overhang

A pet home with a rectangular volume and having wicker outer surfaces over a majority of the pet home, the pet home having the appearance of being formed from individual panels, the panels being configured such that each panel extends substantially to the edge of the adjacent panels, but no panel extends beyond the adjacent panels.

6. Combination of Items 1-5

A pet home with a combination of the features as described in Items 1-5 above.

The prior art from which these points of novelty are distinct include the prior art cited during the prosecution of the '156 Patent and the prior art cited in Bret H. Smith's expert report dated August 17, 2007.

6

**12.**     Please identify with specificity all aspects of the design that is the subject of the `156 Patent that are ornamental.

**RESPONSE:**

Objection.     Plaintiff Simpson objects to this interrogatory as premature in that Plaintiff's investigation into this matter is continuing. Subject to this objection, Plaintiff answers as follows.

I. Overall Ornamental Silhouette.  A pet home having a rectangular volume, wherein the visible surfaces of the pet home substantially have an outer texture with the appearance of woven wicker or the like.

II.   Individual Ornamental Features.   The individual ornamental features include the following (note that in using the term "wicker" the Plaintiff is referring to an outer texture having the appearance of woven wicker or the like):

    i.     A pet home having a rectangular volume, with a top, sides, a rear, and a front.

        a. The top has an outer surface substantially having wicker.

        b. The sides each have a rectangular window, and the non-window portion of each side has an outer surface substantially having wicker.

7

c. The rear includes a rectangular window, and the non-window portion of the rear has an outer surface substantially having wicker.

d. The front includes a rectangular door, and the non-door portion of the front has an outer surface substantially having wicker.

e. The sides mostly have wicker.

f. The rear mostly has wicker.

g. The majority of the front does not have wicker.

ii.   The front of the pet home is rectangular and has a rectangular see-through door and the door is framed substantially by wicker.

iii.   The pet home has the appearance of being formed from distinct, individual panels that have wicker outer surfaces.

iv.   The individual panels of the pet home are configured such that each panel extends substantially to the edge of the adjacent panels, but no panel extends beyond the adjacent panels.

v.   The pet home has a rectangular window positioned in the upper half of each side and in the upper half of the rear, wherein the non-window portions of the sides and rear have outer surfaces

8

with wicker such that the rectangular windows are surrounded by wicker on all sides.

**26.**    Identify all instances in which Simpson Ventures has communicated a cease and desist request/demand (or words to that effect) to any third party. For each such instance, provide the date, the targeted third party, a description of the rights being asserted, a description of the targeted third party's response, the identities of all persons with knowledge of such, and the identity of each document relating to such.

**RESPONSE:**

The following cease and desist requests (either written or verbal) have been communicated:

- Mid-West Metal in November 2003 ('156 Patent)

- International Development Corp in November 2003 ('156 Patent)

- Abel Morgan in June 2006 ('156 Patent)

- Mike Ham in February 2006 ('156 Patent)

- Jewett-Cameron in February 2005 ('156 Patent)

- Various Ebay sellers ('156 Patent)

- Mid-West Metal in January 2007 ('321 Patent)

- Radio Fence Distributors/Essential Pet Products in May 2007 ('156 Patent).

I AFFIRM UNDER PENALTIES OF PERJURY THAT THE
INFORMATION SET FORTH HEREIN IS TRUE AND ACCURATE TO
THE BEST OF MY KNOWLEDGE.

Jeffrey M. Simpson

11

As to Objection:

Respectfully submitted,

Arthur A. Gardner
Gardner, Groff, Greenwald &
Villanueva, P.C.
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339
*Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was duly forwarded to all counsel of record and interested parties on this 26th day of September, 2007, via United States mail, postage prepaid, as follows:

James M. Hinshaw
Bingham McHale LLP
2700 Market Tower
10 W. Market Street
Indianapolis, IN  46204-4900
(317) 635-8900
*Pro Hac Vice*

Brett A. Ross
Carr Allison
100 Vestavia Parkway
Birmingham, Alabama  35216
(205) 822-2006

(And via Email to James M. Hinshaw at jhinshaw@bringhammchale.com)

*Attorneys for Defendant Mid-West Metal Products Company, Inc.*

Arthur A. Gardner
Gardner, Groff, Greenwald &
Villanueva, P.C.
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339

# Exhibit H

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| SIMPSON VENTURES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| MIDWEST METAL PRODUCTS | ) | |
| COMPANY, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## EXPERT REPORT OF ROBERT JOHN ANDERS

### I.    INTRODUCTION

1.    My name is Robert John Anders. I am the owner of Robert Anders, A Design Consultancy of Warwick, N.Y. My business address is 78 Continental Road, PO Box 609, Warwick, N.Y. 10990-0609. I have been involved in the industrial design field for 48 years. I am over 18 years of age and I would otherwise be competent to testify as to the matter set forth herein if I am called upon to do so at trial, hearing or deposition.

2.    I have been retained by Gardner, Groff, Santos & Greenwald, PC, counsel for SIMPSON VENTURES. INC., of 480 North Dean Road, Suite E, PO Box 430, Auburn AL 36831-0430, (hereinafter "Simpson") as an industrial design expert witness and asked to opine on whether Design Patent D483,156 S, issued on December 2, 2003 to Jeffrey M. Simpson was infringed by a pet home product labeled Bay Isle Collection (hereinafter "the accused product") and marketed by MIDWEST METAL PRODUCTS COMPANY, INC., P.O. Box 1031, Muncie,

Indiana 47308 (hereinafter "Midwest"). My time in this matter is billed at the rate of $325.00 per hour.

      3.     For purposes of this Report, I have been asked by counsel to provide an expert industrial design analysis as to the proper interpretation of the claim of U.S. Patent No. D483,156 (hereinafter the " '156 patent") that Simpson contends is infringed by Midwest. I have also been asked by counsel to provide an expert industrial design analysis of whether the asserted claim of the '156 patent, as properly interpreted, is infringed by the accused product.

      4.     As set forth herein, it is my opinion that the pet home accused product, labeled as the Bay Island Collection, literally infringes the patented design claimed in the '156 patent.

      5.     My qualifications are set forth in Section II below and in my *Curriculum Vitae* attached as Exhibit A to the Report. Section III sets forth the materials I reviewed in performing my analysis that is the subject of this Report. Section IV sets forth my understandings of the legal framework which applies to my analysis. Section V sets forth my opinion as to the "ordinary observer" and "designer of ordinary skill in the art" which apply to my analysis. Section VI sets forth my opinions as to the proper construction of certain claim terms from the perspective of a designer of ordinary skill in the art at the time of the inventions of the '156 patent. Section VII sets forth my opinions that the claim of the '156 patent is literally infringed by the accused product. Section VIII sets for my opinion that the claim of the '156 patent is valid over the prior art.

      6.     This Report is based on my study to date and includes:

- My opinion concerning the ordinary observer;

- My opinion concerning a designer of ordinary skill in the field of the '156 patent;

2

- My opinions regarding how such a person of ordinary skill in the art would interpret the claimed design at the relevant time; and

- My opinion that the Midwest pet home literally infringes the '156 patent.

7.      I currently hold the opinions set forth in this Report.  As my study of the case continues, I may acquire additional information and/or attain supplemental insights that result in added observations.  I reserve the right to supplement this Report and to rely on additional documents and testimony that come to my attention between now and the time of the trial, hearing or deposition in which I am asked to give testimony.  I also reserve the right to rely on all other declarations and expert reports submitted in this litigation.  I further reserve the right to supplement my report upon issuance of the Court's *Markman* Order to the extent needed to take the Court's claim constructions into account in my infringement analysis.

## II.     BACKGROUND, EDUCATION, EXPERIENCE

8.      In August of 2000, I retired as a tenured Professor of Industrial Design from my alma mater, Pratt Institute, one of the largest and most prestigious schools of Art, Design and Architecture in the United States.  I had been a member of the faculty at Pratt since 1988.  I received my B.I.D. (Bachelor of Industrial Design) degree in 1958.  I also was matriculated in the M.I.D. (Master of Industrial Design) program at Pratt during the 1990's.

9.      During my time on the faculty at Pratt, I taught both in Pratt's Department of Industrial Design at the undergraduate and graduate levels and in two graduate programs I created, entitled Design Management and Arts & Cultural Management, and I was elected by my peers to a three-year term as president of the Academic Senate.  While on the faculty at Pratt, I was acting Associate Dean for the School of Art and Design between 1992 and 1994.

3

10.    Throughout my teaching career, I developed a wide variety of course materials related to industrial design and design management. I authored nineteen papers that were published and/or presented to professional societies and organizations. Among the courses I taught were those concerned with consumer product design and ergonomics. A listing of my publications for the past ten years is contained in Exhibit B. Exhibit C lists the cases in which I have testified in the last four years.

11.    Prior to joining the faculty at Pratt, I spent thirty years in the industrial design profession in a variety of senior design management positions, in various positions with the federal government, and as head of my own consultancies. In addition, I served as a senior design executive at two major corporations: Bristol-Myers Company, for whom I created their corporate identity program and Revlon, Inc., where I designed point of purchase displays and fixtures.

12.    I am a member of the Industrial Designers Society of America (IDSA) (#19785) and the Human Factors and Ergonomics Society (HFES) (#12595).

### III.    MATERIALS REVIEWED

13.    In performing the analysis that is the subject of this Report, I have reviewed the '156 patent attached as Exhibit D, and the prosecution history attached as Exhibit E.

14.    In addition, in performing this analysis, I unpacked and assembled the accused product. Documents included in the package are attached as Exhibit F. I then inspected and photographed the accused product. Attached as Exhibit G is my photographic documentation of the six panels of the package which contained the accused product as well as the unassembled accused product. My photographs in Exhibit H were taken from the same views (perspective, top, side, front and rear) as the views contained in the '156 patent. However, I am aware that a

4

photograph of a three dimensional product built from technical two dimensional orthogonal

drawings (such as those used both in manufacturing and in United States patent drawings) will

not translate into an exact replication of a drawing produced by this drawing technique. I also

note that whereas the '156 patent does not include any information concerning the interior of the

product, my photographs include such information. Nevertheless, the photographs are a good

indicator of the ornamental design that infringes the ornamental design taught by the '156 patent.

**IV.    UNDERSTANDING OF LAW TO BE APPLIED TO INTERPRET THE CLAIMS
        AND DETERMINE INFRINGEMENT AND VALIDITY**

15.    In formulating my opinions and conclusions in this case, I have developed an

understanding of the prevailing principles of U.S. design patent law that govern the issue of

patent claim interpretation, infringement and validity after being previously retained in twenty

design patent cases during the past sixteen years.

16.    As a result, I am informed and understand that it is a basic principle of patent law

that the determination of whether a patent claim is infringed requires a two-step analysis.

Whether a design patent is infringed is determined by first construing the claim to the design,

when appropriate, and then comparing it to the design of the accused device. A design patent

only protects the novel, ornamental features of the patented design. Where a design contains

both functional and non-functional elements, the scope of the claim must be construed in order to

identify the non-functional aspects of the design as shown in the patent.

17.    I am informed and understand that comparison to the accused product includes

two distinct tests, both of which must be satisfied in order to find infringement: (a) the "ordinary

observer" test, and (b) the "point of novelty" test. The two tests are separate.

18.    As for the "ordinary observer" test, I am informed and understand that the

Supreme of the United States in 1871 in *Gorham Co. v. White* articulated a test for design patent

infringement that is still used today: "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." In other words, the patentee must establish that an ordinary person would be deceived by reason of the common features in the claimed and accused designs which are ornamental. Furthermore, *Gorham Co. v. White* also has visually defined the meaning of "substantially the same" of an ornamental design. I attach as Exhibit I, the ornamental designs of White which the Supreme Court found infringed the earlier patent to Gorham Co. I note these designs are substantially similar and do not have to be identical to infringe.

19.     As for the "point of novelty" test, I am informed and understand that it requires proof that the accused device infringes the novel aspects of the patented design as distinct from the prior art.

20.     The comparison step of the infringement analysis requires a determination of whether the patented design as a whole is substantially similar in appearance to the accused design. The patented and accused designs do not have to be identical in order for design patent infringement to be found. Instead, it is the appearance of a design as a whole which is controlling in determining infringement. In fact, there can be no infringement based on the similarity of specific features if the overall appearance of the designs is dissimilar.

21.     In determining whether a design patent is invalid based on a description in a printed publication, the factual inquiry is the same as that which determines anticipation by prior publication of the subject matter of a utility patent, *i.e.*, the publication must show the same subject matter as that of the patent, and must be identical in all material respects.

6

22.    The determination of the ultimate question of obviousness is made from the viewpoint of a person of ordinary skill in the field of the patented design.  The scope of the prior art is not the universe of abstract design and artistic creativity, but designs of the same article of manufacture or of articles sufficiently similar that a person of ordinary skill would look to such articles in their designs.  Obviousness is determined by ascertaining whether the applicable prior art contains any suggestion or motivation for making the modifications in the design of the prior art article in order to produce the claimed design.

## V.    THE ORDINARY OBSERVER AND DESIGNER OF ORDINARY SKILL IN THE ART

23.    I am informed and understand that an "ordinary observer," for purposes of my infringement analysis herein, is the ordinary purchaser or one who may purchase the patented pet home.

24.    For purposes of my analysis herein, in my opinion, a designer of ordinary skill in the relevant art would have a degree in industrial design and a minimum of 3 years professional experience designing consumer products with a basic understanding of the ergonomic aspects of pet home design, i.e., the clearances and dimensional allowances for users such as the height of the opening, the overall size of the product, etc.  Alternatively, a designer of ordinary skill could have developed technical skills and knowledge gained while working in a variety of manufacturing industries, coupled with an interest and knowledge gained about animals used as pets.

## VI.    CONSTRUCTION OF THE '156 PATENT CLAIM

25.    I am informed and understand that the claim of the '156 patent must be analyzed to determine which aspects are non-functional because the patentee must establish that an ordinary person would be deceived by reason of the common features in the claimed and accused

7

designs which are ornamental. The '156 patent's pet home design embodies an overall ornamental silhouette, an overall ornamental appearance along with several ornamental components. Each are listed and interpreted in turn below.

26.    Overall Ornamental Silhouette. Countless authorities acknowledge that individuals recognize objects by their overall appearance in a silhouette. Silhouettes of objects convey in a split second the overall shape of the underlying object and the initial—and oftentimes the lasting—impression an object leaves with the ordinary observer. In the case of the '156 patented design, the overall ornamental impression of the silhouette is of a rectangular volume in which horizontal length is greater than the horizontal width or the vertical height.

27.    Overall Ornamental Appearance. The overall ornamental appearance is of a pet home with a woven texture surface on all five surfaces claimed in the patent. The front face has a rectangular non-woven door portion which is functional and not ornamental. The woven side and top ornamental portions of the front face have less area than the functional area. The sides have a non-woven window open portion that is functional and not ornamental. The area of the ornamental woven area is greater than the area of the functional window. The ornamental design of the rear face of the invention has a window opening that is functional. The area of the ornamental woven area is greater than the area of the functional window. The top face of the design has no functional portions but has an overall woven ornamental textured appearance. Each of these individual ornamental components are discussed and interpreted below.

28.    The front face has a rectangular non-woven door portion which is functional and not ornamental. The woven side and top ornamental portions of the front face have less area than the functional area, as shown in Figures 1 and 2 of the '156 patent.

8

29.    The sides have a non-woven window open portion that is functional and not ornamental, as depicted in Figures 1 and 5 of the '156 patent. The area of the ornamental woven area is greater than the area of the functional window.

30.    The ornamental design of the rear face of the invention has a window opening that is functional as shown in Figure 3 of the '156 patent. The area of the ornamental woven area is greater than the area of the functional window.

31.    The top face of the design has no functional portions but has an overall woven ornamental textured design as depicted in Figures 1 and 4 of the '156 patent.

32.    Each of the foregoing aspects of the patented design, *i.e.*, the front face, the side faces, and the rear face, have both ornamental and functional elements, which I have defined. Only the top face has only ornamental features and no functional features. Indeed, the '156 patent only claims the ornamental features and not the functional ones. Together, in the combination presented, the ornamental design of the different faces provides a unique, ornamental appearance to an ordinary observer.

## VII.    INFRINGEMENT OF THE '156 PATENT BY THE ACCUSED PRODUCT

33.    In the table below, I determined that my interpretation of the claims of the '156 patent read upon the accused product.

| Claims of the '156 patent | The Accused Product |
|---|---|
| The overall ornamental impression of the silhouette is of a rectangular volume in which horizontal length is greater than the horizontal width or the vertical height. | The overall ornamental impression of the silhouette is of a rectangular volume in which horizontal length is greater than the horizontal width or the vertical height. |
| The overall ornamental appearance is of a pet home with a woven texture surface on all five surfaces claimed in the patent. | The overall ornamental appearance is of a pet home with a woven texture surface on the same five surfaces. |
| The front face has a rectangular non-woven | The front face has a rectangular non-woven |

9

| | |
|---|---|
| door portion which is functional and not ornamental. The woven side and top ornamental portions of the front face have less area than the functional area, as shown in Figures 1 and 2 of the '156 patent. | door portion which is functional and not ornamental. The woven side and top ornamental portions of the front face have less area than the functional area. |
| The sides have a non-woven window open portion that is functional and not ornamental, as depicted in Figures 1 and 5 of the '156 patent. The area of the ornamental woven area is greater than the area of the functional window. | The sides have a non-woven window open portion that is functional and not ornamental. The area of the ornamental woven area is greater than the area of the functional window. |
| The ornamental design of the rear face of the invention has a window opening that is functional as shown in Figure 3 of the '156 patent. The area of the ornamental woven area is greater than the area of the functional window. | The ornamental design of the rear face of the invention has a window opening that is functional. The area of the ornamental woven area is greater than the area of the functional window. |
| The top face of the design has no functional portions but has an overall woven ornamental textured design as depicted in Figures 1 and 4 of the '156 patent. | The top face of the design has no functional portions but has an overall woven ornamental textured design. |

### The Ordinary Observer (Gorham) Test

34.    Comparison of the views of the '156 patent with the same views of the accused product are attached as Exhibit J. In my opinion, and as set forth in this exhibit, in the eye of the ordinary observer, the Midwest accused product as a whole is substantially similar to that of the '156 patented design, such that a purchaser would be induced to purchase one supposing it to be the other.

35.    From the foregoing side-by-side comparison of the ornamental features of the patented pet home and the Midwest pet home. it is evident that the designs as a whole are substantially similar to one another. In my opinion, an ordinary observer giving such attention as

10

a purchaser usually gives, would find that the two designs so substantially similar as to deceive such an observer inducing him to purchase one supposing it to be the other.

### Point of Novelty

36.    In addition to the *Gorham* test of overall similarity, I am informed and understand that the accused design must appropriate the point of novelty of the patented design, *i.e.*, the accused design must incorporate the novel ornamental features that distinguish the patented design from the prior art. I observe that the design claimed in the '156 patent distinguishes from the prior art in one respect: i.e., the point of novelty is a woven texture on all disclosed surfaces.

37.    The accused product has therefore also appropriated the point of novelty found in the '156 patent.

## VIII.  VALIDITY OF THE '156 PATENT

38.    I am informed and understand that in determining whether a design patent is invalid based on a description in a printed publication, the factual inquiry is the same as that which determines anticipation by prior publication of the subject matter of a utility patent, *i.e.*, the publication must show the same subject matter as that of the patent, and must be identical in all material respects. And I am informed and understand that just as in the infringement inquiry; the ordinary observer standard is applied to determine the validity of a patented design.

39.    In addition, I am informed and understand that a design patent must meet the requirement of non-obviousness, and invalidity based on obviousness of a patented design is determined by assessing the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art.

40.    I am furthermore informed and understand that the determination of the ultimate question of obviousness is made from the viewpoint of a person of ordinary skill in the field of

11

the patented design, and that the scope of the prior art is not the universe of abstract design and artistic creativity, but designs of the same article of manufacture or of articles sufficiently similar that a person of ordinary skill would look to such articles in their designs. Obviousness is determined by ascertaining whether the applicable prior art contains any suggestion or motivation for making the modifications in the design of the prior art article in order to produce the claimed design. Exemplary prior art from the prosecution history of the '156 patent is attached in Exhibit E:

The '156 Patent is not Anticipated by the Prior Art

41.    In my opinion, none of the patents in Exhibit E disclose designs identical in all material respects as that in the '156 patent. While each of the designs in the prior art depict either housings or baskets for pets, each provide a different overall ornamental impression of the various components to an ordinary observer.

42.    To defeat a finding of invalidity based on anticipation under 35 U.S.C. §102, I am informed that only one distinction between the prior art and the claimed invention is necessary. In the case at hand, the distinctions are legion, and as such, in my opinion, the '156 patent is valid over the prior art.

The '156 Patent is not Obvious over the Prior Art

43.    In my opinion, the '156 patent is not obvious to a designer of ordinary skill in the art. Referring to the prior art in Exhibit E, the differences between the claimed design and prior art are substantial.

44.    I am informed that a single "primary reference" having basically the same design characteristics must be found before prior art references may be combined. The scope and content of the prior art is so far afield of the claimed design that none could serve as a "primary

reference." In the case at hand, none of the prior art in Exhibit E having the "basic design characteristics" as the claimed design. In the absence of a primary reference having a design that is basically the same as the claimed design, one of ordinary skill in the design of pet housings would not find the necessary teachings in the prior art to combine the prior art in Exhibit E to arrive at the claimed invention.

## X.    CONCLUSION

45.    I currently hold the opinions expressed in this Expert Report.

46.    The pet home marketed by Midwest Homes for Pets infringes the '156 patent in that all of the claim construction reads on the accused product.

47.    The pet home marketed by Midwest Homes for Pets infringes the '156 patent in that "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other".

48.    The pet home marketed by Midwest Homes for Pets infringes the '156 patent in that it has appropriated the point of novelty of the '156 patent.

49.    As my study of the case continues, I may acquire additional information and/or attain supplemental insights that result in added observations. I reserve the right to supplement this Report and to rely on additional documents and testimony that come to my attention.

Respectfully submitted,

Dated: September 2 7, 2006

Robert John Anders

13

# Exhibit I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

SIMPSON VENTURES, INC.,         )
                                      )

     Plaintiff/Counterdefendant,   )

                              )    Civil Action File No. 306CV-901-WKW
         v.                  )

                              )

MID-WEST METAL PRODUCTS     )
COMPANY, INC.                 )

                              )

    Defendant/Counterclaimant.  )

### *SECOND* AFFIDAVIT OF BRET SMITH

Bret Smith, being first sworn upon his oath, states the following:

1.)    I am over 18 years old, a resident of Auburn, Alabama, and otherwise competent to testify to the matters set forth herein. The observations made herein, and the opinions derived from such, are based upon my personal knowledge and are based on my professional experience as an industrial designer.

2.)    I was retained by Mid-West Metal Company, Inc. ("Mid-West Metal") in this case to help investigate and evaluate the scope of design references that would have been relevant to the endeavor of developing an aesthetically pleasing or decorative pet cage in the period of time prior to September of 2001 – which is my understanding of when Mr. Jeff Simpson claims he first had the idea of a rectangular shaped wicker covered pet cage with windows and a door.

3.)    I am a professor of Industrial Design at Auburn University, where I have taught a variety of courses on the subject for over 21 years. I graduated *summa cum laude* from Purdue University with a B.S. degree in Industry Technology, and obtained an M.A. degree in Industrial Design from Purdue University. A true and accurate copy of my curriculum vitae is attached hereto as Exhibit 1, which is a document that I regularly prepare and keep in the ordinary course of my professional activities as a professor of Industrial Design.

4.)    The profession and discipline of Industrial Design can be described in many ways. In my view, industrial designers design products and environments that are people friendly (safe, appealing, well constructed, and easy to use), and production friendly (capable of being produced within the client's production abilities, vendor framework, and distribution channels and sold for a profit). Industrial designers work with both the aesthetic (finish, texture, surface shape, points of interaction) and the

practical requirements (mechanical and electrical function, shipping, assembly, production costs) of products and environments. They also look at user abilities (human factors), behavior and interaction, competition, consumer behavior, marketing and market trends, branding, packaging, and product placement. For a design to be successful, it must work within the framework of available materials and cost effective methods of production (including subcontracting). Industrial Designers work closely with marketing, sales, engineering, production, purchasing, outside vendors, and corporate management.

Industrial Designers are creative problem solvers in service of the client and the user. They are what one well-know designer, Paul Specht, founder of Yamasaki, Goldsmith and Specht (the premier Chicago design consultancy firm from its founding in 1972 until its sale in 1995), describes as creative with a small "c." According to Specht,

"Designers are creative with a small 'c.' If we were creative with a capital 'C,' we couldn't work for anybody; we'd be too busy pursuing our own vision. We're really like blackbirds that see something shiny in one back yard and something shiny in another back yard, and we pick them up and see how they might go together."

After working as a designer for over twenty-five years, Henry Dreyfuss, one of the founders of industrial design, described this process in the following way:

"We assemble photographs of competitive products and paste them on boards so that a display of the entire field is before us. . . . . Furthermore, it is our job to be familiar with over-all trends that are above and beyond the particular industry which we are dealing. For example, with the air full of jet planes, the public may be so conditioned to these sleek forms that it will accept or even seek out such forms translated into household appliances. We must make an evaluation of the extent of this conditioning process."

*Designing for People*, 1955. Page 45

In other words, Industrial Designers are trained to look across a wide variety of product fields, materials, methods and processes, both contemporary and historical, and find how things from one field might be adapted and applied to another.

5.)    I authored several reports in this matter that reflect the results of my investigation and evaluation of the prior art references in relation to the design that is the subject of the 156 Patent. True and accurate copies of those reports are attached hereto as the following exhibits:

Exhibit 2 – Bret Smith's August 17, 2007 Report
Exhibit 3 – Bret Smith's November 5, 2007 Supplemental Report
Exhibit 4 – Bret Smith's April 22, 2008 2nd Supplemental Report

6.)    The substance of my First Affidavit and my Third Affidavit of today's date, and all exhibits attached thereto, are incorporated herein by reference.

I AFFIRM, UNDER THE PENALTIES FOR PERJURY, THAT THE FOREGOING REPRESENTATIONS ARE TRUE TO THE BEST OF MY KNOWLEDGE.

Dated: **7/28/08**

_____
Bret Smith

1317096

# Exhibit 1

# Bret H. Smith, IDSA

**Department of Industrial Design**
**207 Wallace Center**
**Auburn University, AL 36830**

**email: smithbh@auburn.edu**
**Phone: 334-844-2372**

## Education

Purdue University.  M.A.,  Industrial Design.*   May 1984.

Purdue University.  M.A., English.   May 1984.

Purdue University.  B.S. IED,  Industrial Education and Industrial Technology. May 1981, *Magna cum laude.*

Teacher's License, State of Indiana.  Grades 7-12.  Issued, 1985.

## Experience

| | | |
|---|---|---|
| Auburn University | Professor | 1997- present |
| | Associate Professor | 1990 -1997 |
| | Acting Department Head | 1989 - 1990 |
| | Assistant Professor | 1985 - 1989 |
| DrDesign, Inc. | Product Designer | 1984 - 1985 |
| Tom David Design | Design Assistant | Jan. - May 1984 |
| Independent Contractor | Residential Remodeling | 1978 - 1981 |

*M.A. is considered the terminal degree in Industrial Design

1

## Honors and Awards

**Recipient,** Life member, The Honor Society of Phi Kappa Phi. 2005.

**Recipient, Design Leadership Award from NASA Marshall Space Flight Center.** The award was for outstanding leadership in the development, prototyping and testing of payload equipment restraint system (PERS) currently deployed on the international space station. 2001.

**Recipient,** College of Architecture, Design and Construction Award for Outstanding Service to the College. Fall, 1999.

**Recipient,** Special Recognition Award for Contributions to the Field of Exhibit Design from the Exhibit Designers and Producers Association. EDPA National Conference. May 1999.

**Recipient, Design Leadership Award from NASA Marshall Space Flight Center.** The award was for outstanding leadership in the development of concepts for the materials science rack payload equipment restraint system. December, 1998.

**Recipient,** College of Architecture, Design and Construction Award for Excellence in Leadership. Fall 1998.

**Special Recognition** by the Exhibit Designers and Producers Association for quality of teaching in an exhibit design studio. May, 1997.

**Recipient,** College of Architecture, Design and Construction Award for Outstanding Teaching. Fall 1997.

**Recipient,** College of Architecture, Design and Construction Award for Outstanding Contributions to Extension. The award was given in recognition of service to the Industrial Designers Society of America as a member of the Membership Development Committee and for the development of Design Voices: A Contemporary History of Industrial Design. Fall 1996.

**Chair, IDSA (Industrial Designers Society of America) Membership Development Committee Task Force on Education.** As chair of this task force I successfully led efforts to lower the membership dues for recent graduates, to establish a national jobs fair for graduating seniors, and to establish an annual orientation and training program for student chapter officers of IDSA. January 1996 to January 1998.

**Member,** Advisory Board for Exhibit Designer World Symposium. 1995 - June 1998.

**IDSA Southern District Vice President.** IDSA is the professional society for industrial designers within the United States. The Southern District encompasses a ten-state area. Elected Office. January 1993 - January 1995.

**Member of the Executive Council and Board of Directors for IDSA.** Executive Council members are responsible for directing the overall operation of the professional society, monitoring the month to

2

month status of programs and finances, and for authoring bylaws and policy changes. Elected Office. January 1993 - January 1995.

**Special Recognition** by the Exhibit Designers and Producers Association for quality of teaching in an exhibit design studio. TS/2 national trade show. Atlanta, Georgia. TS/2 is the national trade show for exhibit designers and producers and trade show service industries and is attended by professionals throughout the United States. July 1991.

**International ICSID/Philips Citation of Merit Design Award** for design of Remote Injury Evacuation System. The ICSID/Philips Design Competition was the premier, worldwide competition for industrial designers at that time. It was sponsored by the International Council of Societies of Industrial Design (ICSID) and N.V. Philips of the Netherlands. N.V. Philips, a $5.6 billion dollar company, is the parent company of Philips Electronics, PolyGram Records, Norelco and Magnavox, among others. Entries were submitted by professional design firms all over the world. Three Citations of Merit were awarded in addition to a first and second place. Team leader for this project. 1983.

**Member,** The Honor Society Phi Kappa Phi (Inducted as a junior).

## Invited Speaker

The Eighth International Congress on Behaviorism and Behavioral Sciences, September 2006, Santiago de Compostela, Spain.

The Sixth International Congress on Behaviorism and Behavioral Sciences, Auburn, Alabama. September 2002.

The Fifth International Congress on Behaviorism and Behavioral Sciences, Special Session. Taiwan. December 2000.

The Fifth International Congress on Behaviorism and Behavioral Sciences. Mexico. October 2000.

The Fourth International Congress on Behaviorism and Behavioral Sciences. Seville, Spain. November 1998.

Third International Congress of Behaviorism and Behavioral Sciences. Japan. October 1996. The congress is a biannual event and features presentations by leading professionals from around the world in the area of behavior and behavioral sciences.

**Invited Panel Member,** (one of two educators selected nationally) "Plastics and Design Education, What's Missing." Materials & Processes Section Meeting held in conjunction with the SPE at the SPE/SPD National Conference in Atlanta. April 1996.

## Competitive Grants from within the College

College of Architecture, Design and Construction Grant to develop Digital Video Disc technology. This is a college-wide competitive RFP process. Summer 2001.

College of Architecture, Design and Construction Grant. The grant provided funds for travel to Seville, Spain to present at the Fourth International Congress on Behaviorism and Behavioral Sciences. November 1998.

College of Architecture, Design and Construction Grant. The grant provided funds for travel in order to present at the national Design Education Conference of the Industrial Designers Society of America. Fall, 1998.

College of Architecture, Design and Construction Grant. The grant provided funds for travel in order to present at the Annual conference of the Industrial Designers of America. Fall, 1999.

College of Architecture, Design and Construction Grant. The grant provided funds for travel in order to present the results of research on the effective design of interactive multimedia at the 1996 World Design Conference in Orlando. Summer of 1996.

College of Architecture, Design and Construction Grant to develop an advanced undergraduate course in animation and computer modeling. This is a college-wide competitive RFP process. Summer 1995.

Discretionary Research Grant-in-Aid for travel to present research at the Second International Congress of Behaviorism and Behavioral Sciences, September 1994. Award amount: $500.

**Team member,** "Design of Computer controlled Work Station for the Teaching of Basic Drawing Skills." Part of a joint research project between members of the departments of Psychology and Industrial Design. Other members included Tin-man Lau, Peter Harzem and David Lupin. 1988 to August of 1989. Jointly funded ($4200) by the School of Architecture and the Department of Psychology.

Competitive Research Grant-in-Aid, Auburn University. "Definition and Articulation of Human Factors Problem Areas in Residential Living Environments for the Elderly" 1986.

## University Committees

**Member,** University Committee for Wrongful Termination. Served in one Wrongful termination case brought before the committee. 2005 – 2007.

**Member,** University Finance Committee, 2002-2004.

**Member,** University Senate (one term)

**Industrial Design representative,** Committee on Design Instruction. The Committee on Instruction is comprised of faculty members from the School of Business, the College of Engineering and the Department of Industrial Design. The committee was formed to explore ways in which students in the three disciplines could be more effectively trained to work with teams. Much of the 1991-1992 timeframe was spent laying the ground work for an NSF proposal through the Thomas Walter Center

4

**Outside Reader** and Graduate School Representative for selected Ph.D. dissertations, Auburn University, 1989, 1990, 1991, 1994.

**Member,** ACHE Internal Review Committee for the Department of Architecture, Auburn University, winter, 1989.

**Member,** Program Development Council for the Center on Aging, Auburn University 1988-1991.

**Taught** "Introduction to CADKEY for Auburn University Personnel," Fall Quarter 1988. This was offered free of charge to interested university personnel in order to train and certify them in the latest CADKEY software. Organized and team-taught with Professor Tin-man Lau.

## School/Department Activities

**Acting Department Head,** Department of Industrial Design, Auburn University, May-June 2008.

**Member,** Faculty Search Committee, Spring 2007.

**Reviewer,** CADC seed grant proposals, 2005 and 2006.

**Member,** CADC IT Director Search committee, 2005.

**Search Committee Chair** (3 times), Department of Industrial Design search for new faculty position.

**Department Representative,** Dean Search committee (twice).

**Department Representative** for Golden eagles 2004-2005

**Member,** Dean's counsel, 2004.

**Author,** Department of Industrial Design five-year comprehensive plan. Final draft was reviewed and augmented by the full faculty of the Department of Industrial Design, Spring 2000.

**Author,** Department Assessment Procedures for regional accreditation. Final draft was reviewed and augmented by the full faculty of the Department of Industrial Design Fall 2001

**Author,** Departmental Safety Program. This program was developed with working in concert with the University Safety Office. As a result, the Department of Industrial Design became the first department on campus to have clearly articulated safety policy and required safety procedures. Final draft was reviewed and augmented by the full faculty of the Department of Industrial Design Fall 2000.

**Member,** Portfolio Review Committee, 1994 - 1998.

**Member,** Industrial Design Graduate Curriculum Committee, 1990 - present.

**Member,** Committee for NASAD accreditation, September 1992 - April 1993. NASAD is the accrediting body for Industrial Design.

**Department Representative**, CADC tenure and promotion policy committee.

**Member**, Industrial Design Curriculum Development Committee.

**Member**, Dean's Task Force on Tenure and Promotion, Fall 1994 - 1995.

**Member**, School of Architecture Dean Search Committee, Summer 1993- Spring of 1994.

**Member**, Dean's Research Council, School of Architecture, 1988 - 1992.

**Member**, School of Architecture Computer Committee, 1989 - 1991.

**Acting Department Head**, Department of Industrial Design. Responsibilities included managing departmental budget and staff, scheduling teaching assignments, preparing a five year strategic plan for Industrial Design, working with the Design Advisory Council, developing undergraduate enrollment standards and reopening the graduate program. September 1989 - June 1990.

**Faculty Advisor**, Student Chapter of the Industrial Designers Society of America. January - October 1989.

## Additional Department Contributions

CADKEY Training Center Director and liaison with CADKEY Inc. 1989 - 1993.

Negotiated and received $25,000 in software (20 stations) and software support from CADKEY, Inc. CADKEY is a world leader in three-dimensional CAD software for DOS-based computers. August, 1992.

Negotiated and received $1,000 in word processing software (10 stations)--site license for WordPerfect for Windows. Private contribution. January 1992.

Negotiated and received $2,000 worth of Design for Assembly Software (unlimited site license). Private contribution. May 1989.

Negotiated and received $35,000 worth of software (20 stations) from Micro Control systems, Inc. April 1988.

Negotiated and received $3,200 worth of training in Design for Assembly from Xerox Corporation. May 1988.

## Professional Development

### Tours and Course work
**Toured** Great Southern Wood Preserving Manufacturing Facilities, Abbeville, AL. August 2007.

**Toured** Broan-Nutone advance manufacturing center, Hartford WI, April, 2006

6

**Toured** the advanced computing and robotics facility, University of Minnesota, July 2005.

**Toured** the Tupperware design facility, Orlando Florida, April, 2005.

**Toured** the World War II memorial and the Smithsonian Museum, August 2005.

**Rhino Professional Training,** Auburn University, September, 2005. Rhino is a three-dimensional surface and solids modeling program that has wide spread use in our profession. It is capable of photo realistic rendering and exporting for computer controlled model making including fuse deposition, stereo lithography, and computer controlled milling.

**Director 4.0 Multimedia Authoring System.** Georgia Institute of Technology, Mulimedia Center. November 1995. Director is one of the two major multimedia authoring systems (ToolBook is the other). This course was taken in preparation for introducing multimedia design as an option within the Graduate program. Based upon this course and on experience gained at the Center for Creative Imaging students are now being trained to make effective contributions as industrial designers in the development of interface design for interactive environments. I was supported, in part, through the award of a Discretionary Teaching Grant-in-Aid from Auburn University.

**Interactive Multimedia: Concept, Design and Production.** Center for Creative Imaging. The Center for Creative Imaging (CCI) was established by Kodak as a state-of-the-art center for computer imaging and multimedia. Courses are taught by leading industry professionals. *Interactive Multimedia Concept, Design an Production* is the most advanced course offered at CCI. Camden, Maine. May 1994.

**Design for Assembly**. Xerox Automation Institute. Xerox Corporation's in-house training course for designing and evaluating products (quantitatively and qualitatively) for ease and economy of assembly and manufacturing. Considered one of the top two programs in the United States. Much of this training was incorporated into a graduate level course in advanced manufacturing. The principles of quality assurance learned in this course have also been used in coauthoring academic evaluation policies within the department. Webster, New York. May 1988.

**Basic CADKEY Training.** CADKEY Incorporated. CADKEY is a world leader in DOS and Unix-based three-dimensional CAD software. Completing the basic and advanced courses resulted in my becoming a certified CADKEY trainer and allowed the department to qualify and be listed nationally as a CADKEY Training Center. June 1988.

**Advanced CADKEY Training**. CADKEY Incorporated. This training covered the construction of automated drawing sequences and dynamic calculation routines and the use of the advanced solids modeling program "Solids Synthesis." It allowed me to qualify as an Advanced Level CADKEY Trainer and for the department to strengthen its standing and versatility as a CADKEY training site. More importantly, it allowed our students to graduate with advanced level CADKEY certification. August 1988.

**American Society on Aging and Technology Conference.** Washington, D.C. March, 1987. 11 hours continuing education.

## Professional Conferences and Meetings Attended

**ICSID /IDSA International Conference**, San Francisco, October 2007.

**National Home Builders Show**, Orlando Florida, February 2007.

Workshop leader, **IDSA National Conference,** Austin Texas, September 2006.

**Consumer Electronics Show**, Las Vegas NV.  January 2006.

**IDSA National Education Conference** in Alexandria, VA.  August, 2005

**Sixth International Congress on Behaviorism and Behavioral Sciences**.  Auburn, Alabama. September, 2002.

**POP Chicago**, Chicago, IL.  June 2002.

**IDSA Southern District Conference**, Brass Towne Valley Resort.  Spring 2002

**IDSA Materials Section**, Recent Developments in Plastics Molding Techniques.  April 2001.

**IDSA National Conference**.  Chicago, IL.  July 1999.

**IDSA National Educator's Conference**.  Chicago, IL.  July 1999.

**Fourth International Congress on Behaviorism and Behavioral Sciences**.  Seville, Spain.  November 1998.

**IDSA National Conference**.  San Diego, CA.  September 1998.

**IDSA National Educator's Conference**.  Long beach, CA.  September 1998.

**Exhibit Designers World Symposium**.  Chicago, IL.  August 1998.

**Exhibit Designers World Symposium**.  Washington D. C.  June 1997.

**IDSA National Educator's Conference**.  Washington D.C.  June 1997.

**World Design 1996**.  Orlando, Florida.  I made four presentations at this conference and my Design Voices work was featured during the General Session on Saturday morning.  September 1996.

**Education Town Meeting**.  Orlando, Florida.  September 1996 (Presenter).

**IDSA Board of Directors Meeting**.  Orlando, Florida.  September 1996.  Presented plans for increasing involvement of professors, students and recent graduates in IDSA.

**IDSA Membership Development Committee Meeting**.  Orlando, Florida.  September 1996.

8

**IDSA Membership Development Committee Meeting**. Auburn, Alabama. Hosted and participated in a meeting of the IDSA Membership Development Committee. August 1996.

**Exhibit Designer World Symposium**. Atlanta, GA. June 1996. Invited Presenter.

Representative of the Membership Development Committee to the Southern District Conference. Atlanta, Georgia. May 1996.

**Structural Plastics'96**, Annual Conference of the Society of the Plastics Industry. Atlanta, Georgia. April 1996. Invited Speaker.

**IDSA Membership Development Committee Meeting**. Seattle, Washington. February 1996.

**Teague Design Office Tour**. Seattle, Washington. February 1996.

**IDSA National Conference**. Santa Fe, New Mexico. September 1995. Attended and Presented.

**IDSA Board of Directors Meeting**. Santa Fe, New Mexico. September 1995.

**IDSA Membership Development Committee Meeting**. Santa Fe, New Mexico. September 1995.

**IDSA Membership Development Committee Meeting**. Pittsburgh, Pennsylvania. June 1995.

**The Second International Congress of Behaviorism and Behavioral Sciences**. Invited to conduct a symposium at this conference (see section 4.B.3). Palermo, Italy. October 6-9, 1994.

**IDSA** (Industrial Designers Society of America) **Board of Directors Meeting**. Dearborn, Michigan. August 1994.

**IDSA Education Conference**. Henry Ford Museum, Dearborn, Michigan. August 1994.

**IDSA National Conference**. Dearborn, Michigan. August 1994.

**IDSA Executive Council Meeting**. Annapolis, Maryland. June 1994.

**IDSA Southern District Conference**: *Design Visions*. Charleston, South Carolina. May 1994.

**IDSA National Conference**. Atlanta, Georgia. August 1993.

**IDSA Board of Directors Meeting**. Atlanta, Georgia. August 1993.

**TS/2 Exhibit Builders Trade Show**. Atlanta, Georgia. July 1993.

**IDSA Executive Council Meeting**. Reston, Virginia. June 1993.

**Comdex**. Comdex is one of the major trade shows for computer software and hardware in the United States. It features products from U.S., Canada, and European countries. Atlanta, Georgia. May 1993.

9

**IDSA Executive Council Transition Meeting**. Cayman Islands. December 1992.

**EDPA** (Exhibit Designs and Producers Association) **Student Design Competition Briefing**. Atlanta, Georgia. January 1993.

*Aging: The Wave of the Future*, 1992 **AGS** (Alabama Gerontological Society) **Conference**. Perdido Beach, Alabama. March 1992.

**AECT** (Association for Educational Communications & Technology) **National Convention**. The AECT Conference is the largest single conference (over 5000 in attendance) for education, media, curriculum specialists and trainers (See also section 4.A.6 "Refereed Presentations"). Washington D.C. February 1992.

**INFOCOMM Exposition**. INFOCOMM is dedicated to hardware and software for computer-based and multimedia instruction. Washington, D.C. February 1992.

**Home Health Care Show**. The Home Health Care Show is the annual national trade show of the home health care industry. It is the key trade show for keeping current on the latest products for general home health care as well as for older adults and people with specific disabilities. Atlanta, Georgia. February 1992.

**Interface 91**, *Seventh Symposium on Human Factors and Industrial Design in Consumer Products*. Dayton, Ohio. May 1991.

**IDSA Southern District Conference**, Space: Design for the Last Frontier. Cocoa Beach, Florida. March 1990.

**IDSA National Conference**. Santa Barbara, California. August 1990.

**The Design Education Conference**. Pasadena, California. August 1990.

**Color in Computer Applications** (workshop), Indianapolis, Indiana. June 1990.

**The Conference on Design Education: Educating in the 90's**, Minneapolis College of Art and Design, Minneapolis Minnesota, August 1989.

**IDSA National Conference**, Minneapolis, August 1989.

**IDSA Design Education Conference**, Northwestern University, 1986.

**IDSA National Conference**, Chicago, 1986.

## Contributions to teaching

**2004-2007**
Restructure the design history course, INDD to take lessons from history, beginning with the invention of the printing press and perspective drawing, through the Industrial Revolution, and the

esthetic movements of the last century, and apply them to contemporary design situations. The new course makes extensive use of interview footage collected from contemporary designers who have made significant contributions to the profession.

**2005-2007**
Developed the technical drawing text and course material for freshman summer studio 2005-2007. Co-author, Chris Arnold.   Based upon a concept developed by Tin-man Lau and William Bullock.

**Fall 2006**
Developed an undergraduate seminar course in the use of Rhino Software. Rhino is a three dimensional surface and solids modeling program with wide industry adoption. The seminar covers basic and advanced training with special attention on troubleshooting files for manufacturing.

**Fall 2004-2005**
Developed required Graduate course in Rhino Software.   Final results are the subject of an annual month long show in Dudley Gallery. January 2005- Present.
Developed required Graduate course in advanced computing, INDD 7020. Fall 2000. The course covers the basic and advanced Rhino training manuals, Photo realistic rendering using Flamingo, studio lighting effects, and animation.

**2000**
Authored course description and curricula for INDD 3110 for semester transition.

**1994-1997**
Developed the EDPA National Exhibit Design Curriculum with Gary Stewart, principle and founder of Design South.

**1995-1996**
IND 621 Industrial Design -- Developed a department-wide graduate course to teach students how to identify a researchable question, conduct a literature review, develop a thesis and design an effective course of research.

IND 614 Design Systems -- Developed the first departmental course in the construction of multimedia information systems. This course required that students learn an authoring system (Director 4.0), identify a design problem and develop an effective multimedia solution. The course made use of information acquired through attending a course in Director taught at the Georgia Institute of Technology.

IND 602 Design Principles -- Developed a course in the application of design for assembly methods to the industrial design process. Working with industrial designers from Panasonic, students disassembled and evaluated cellular phones designed and manufactured by Panasonic. Students redesigned the phones, applying DFA principles as part of the design process. The final designs were then scored for assemble ability using two different DFA systems. Panasonic provided support for this project through a donation of $5000-$6000 worth of prototype parts and nonfunctional prototypes.

IND 601 Design Principles -- Developed a course in the application of design principles for interactive multimedia and internet design.   Students were required to conduct extensive field

work, review relevant literature, develop design principles and test these principles through the design and implementation of a multimedia program or a web site.

**1994-1995**
IND 110 Drawing Systems -- I developed and taught a special version of this course for "Summer Op." Summer Op provides students with the opportunity to take three quarters of freshman design studios in a single quarter. In order to accomplish this teaching and the assignments must be very carefully crafted to ensure that Summer Op students receive the same high level of instruction that students receive during the normal school year. This pilot course later became the basis for the first third of our current Summer Op program.

IND 385 Seminar – Developed and taught a special advanced section of IND 385 designed to teach students how to effectively create and animate 3-D models using trueSpace software. This course was developed in response to a growing need within the industry to use animation and 3-D modeling to analyze and detect operational and logistical product problems prior to soft tooling.

IND 585 Special Problems -- Developed and taught a combined post-baccalaureate and graduate student studio. Students worked in teams to develop a ruggedized 486, multimedia-capable computer for Miltope Incorporated in Montgomery, Alabama. Miltope is a leading supplier of ruggedized communication and computer equipment for military use. Their communication equipment is used in aircraft carriers and nuclear submarines as well as in military operations such as Desert Storm. While the company has built an extremely successful business based upon the performance and dependability of its equipment, the equipment is often extremely expensive. The final design made use of new process and assembly alternatives that reduced the overall case manufacturing costs by 90% over a two-year period while at the same time making the equipment more durable and easier to assemble, service and maintain.

**1993-1994**
IND 620 Industrial Design – Developed specialized course on the use of computer-integrated design in the design process. In addition to learning high-end three-dimensional software, students were taught about advanced computer-related design topics, including effective use of internet, mass storage systems, multimedia, digital imagery and cross-platform development.

IND 385 Design Seminars. Developed new seminar course to teach students MicroStation 5.0 (advanced 3-D software). Also developed new course material to teach PageMaker 5.0 (industry leader in desktop publishing software) and CorelDRAW (industry leader at the time in desktop and illustration software for DOS platforms).

IND 310 Industrial Design/Concept Development. During the 1993-94 school year, I developed a special section of the course to teach students how to prepare work for competitions. Students were required to prepare a submission for the 1993 National Housewares Student Design Competition (NHMA Competition). One of my students, Chris Schwab, won second place in a field of 183 entries from 22 colleges and universities throughout the United States.

IND 605 Design Management. Developed and implemented entirely new structure and material for existing course. Students were required to complete a number of instructional modules on various aspects of design management and then to complete an in-depth investigation of one management area.

**1992-1993**

IND 606 Human Factors in Design. Developed and implemented current course. Current course contains sections on basic physiology, human factors of special populations and human factors of aging. Each student completes and documents the results of a design project which requires special attention to human factors.

**1991-1992**

IND 621 Industrial Design – Advanced Manufacturing and Materials. Developed a graduate level industrial design course with special emphasis on design for assembly, and design for environment. The course covered the Boothroyd and Dewhurst and the Poli methods of design for assembly evaluation. Graduate students worked with me to develop methods for evaluating products for ease of disassembly and environmental friendliness. The materials developed in this course for Design for Disassembly and Design for Environment are currently being evaluated by the Committee for Environmental Concerns of the Industrial Designers Society of America for nationwide distribution as a vehicle for promoting greater understanding of and attention to environmental and disassembly issues.

IND 420 Professional Practice. I completely restructured the course, developing detailed lectures and self-paced projects on contracts, proposal writing, cost structures of business, business plans, marketing, client contact and intellectual property. I also brought in outside professionals to give lectures on specific topics related to the running of design businesses.

IND 311 Packaging. Developed a special, industry-sponsored section of this course which addressed packaging and corporate identity through the design of trade show exhibits.

IND 307 Anthropometry. Completely restructured the course and developed the following new sections: Anthropometry of Vision, Anthropometry of Hearing, Anthropometry of Aging, Physiology of the Hand and Control Considerations, Links, Joints and Posture.

**1990-1991**

IND 308 Model Making. Developed course material and projects for ridged foam, foam-core, wood and plastic models as well as material and assignments for mixed media model making with paper and foam core, painting with spray guns effectively, creating models with complex geometry, vacuum form modeling and cut-piece composite modeling.

## Grants Received related to teaching

**1995-1996**

Exhibit Designers and Producers Association (EDPA) Student Design Competition, 1996. This competition is a quarter-long studio project in which the students work in teams to design, develop, model and document a 30' x 30' trade show exhibit for EDPA. The work of ten of the Auburn students involved in the project was featured at the Exhibit Designer World Symposium in Atlanta in June of 1996. One student from the winning team was chosen to receive a $1200 scholarship to attend the Exhibit Designer World Symposium. Results of this competition were also featured in *Action News*, Vol. 10. No.4. *Action News* is the bimonthly newsletter the Exhibit Designers & Producers Association and is distributed to exhibit design professionals throughout the

13

United States. This project was sponsored by The Exhibit Designers and Producers Association. Amount: $1500 in direct support plus $4000 gifts-in-kind in the form of personnel, materials and travel in support of the project.

**1994-1995**
Awarded Discretionary Teaching Grant-in-Aid to take a course, Multimedia Authoring with Director, at Georgia Institute of Technology. November 1995. This course provided basic and intermediate level knowledge for authoring with Director. Knowledge gained from this course was incorporated into a graduate multimedia design course. Level of award: $500.

Awarded College of Architecture, Design and Construction Grant to develop an advanced undergraduate course in animation and computer modeling. This class was offered as a special section of IND 385 during the summer of 1995. Results of this course were featured in a student presentation at the IDSA Southern District Conference in May of 1996. Grant amount: $2400.

Miltope, Inc. Sponsored Studio Project to develop a housing design for a ruggedized 486 DX66 multimedia computer designed to operate under battle field conditions. Students explored alternatives and worked in teams to develop final solutions which were presented in appearance model form to the client. Students also developed recommendations for the use of new process and assembly techniques which resulted in a 90% reduction in the cost of the computer housing without compromising the strenuous field performance requirements. Grant amount: $10,000 cash and $3000 gifts-in-kind in the form of personnel, materials and travel in support of the project.

Exhibit Designers and Producers Association (EDPA) Student Design Competition, 1995. This competition is a quarter-long studio project in which the students work in teams to design, develop, model and document a 30' x 30' trade show exhibit for EDPA. Results of this competition were featured in *Action News*, Vol. 9. No.3. *Action News* is the bimonthly newsletter of the Exhibit Designers & Producers Association and is distributed to exhibit design professionals throughout the United States. Sponsored by The Exhibit Designers and Producers Association. Amount: $1500 in direct support plus $4000 gifts-in-kind in the form of personnel, materials and travel in support of the project.

**1993-1994**
Exhibit Designers and Producers Association (EDPA) Student Design Competition, 1994. This competition is a quarter-long studio project in which the students work in teams to design, develop, model and document a 20' x 20' trade show exhibit for EDPA. Results of this competition were featured in Action News, Vol. 8. No.3. Action News is the bimonthly newsletter of the Exhibit Designers & Producers Association and is distributed to exhibit design professionals throughout the United States. Sponsored by the Exhibit Designers and Producers Association. Amount: $1500 in direct support plus $4000 gifts-in-kind in the form of personnel, materials and travel in support of the project.

**1992-1993**
Exhibit Designers and Producers Association EDPA Student Design Competition, 1993. Student designs produced as part of this studio were shown to over 150 exhibit design professionals at the TS/2 trade show for exhibit designers and producers. Students were honored at a special reception at TS/2 in Atlanta, Georgia. July 1993. Results of this competition were featured in Action News, Vol. 6. No.4. Action News is the bimonthly newsletter of the Exhibit Designers & Producers

14

Association and is distributed to exhibit design professionals throughout the United States. Sponsored by the Exhibit Designers and Producers Association. Amount: $1500 in direct support plus $4000 gifts-in-kind in the form of personnel, materials and travel in support of the project.

**1991-1992**

"Design of a Lunar Campsite." I designed and directed the project. Students worked in teams to develop solutions to mechanical, environmental and logistical problems in the proposed Lunar Campsite. The final results were favorably received by NASA. According to the NASA lead engineer for the Lunar Campsite project, many of the ideas generated by the students have been incorporated into the baseline configuration requirements of the Campsite. The project was part of a larger grant authored by Clark Lundell and made to the Industrial Design Department. NASA contributed $2500 in direct support for supplies and travel plus $3000 gifts-in-kind in the form of personnel, materials and travel in support of the project. Sponsored by NASA, George C. Marshall Space Flight Center, Huntsville, Alabama.

"Exhibit and Trade Show Design." Sponsored by Design South, Inc., Atlanta, Georgia. Design South contributed $1500 in direct support plus $4000 gifts-in-kind in the form of personnel, materials and travel in support of the project. Design South is one of the top five design/build exhibit firms in the United States.

**1987-1988**

"Structural Foam Applications." Students were given the task of developing applications for structural foam plastic. The same charge was given to industrial design students at other schools across the country. At the end of the quarter, BorgWarner selected the most promising designs to be featured in *Structural Foam Applications Unlimited*, a booklet on state-of-the-art structural foam applications published by BorgWarner Chemicals and distributed worldwide. Of the three schools featured in that publication, Auburn had over twice as many student designs as the other schools combined. Moreover, Auburn was the only school in which students competed individually instead of in teams. Four of the six Auburn students featured developed their applications as a five-week assignment in the senior studio class which I was teaching. Sponsored by BorgWarner Chemicals, Inc., a multi-billion-dollar-a-year company with offices in the United States, Canada, Hong Kong, Australia, Europe and Japan. BorgWarner contributed direct support of $5,000 and $2000 gifts-in-kind in the form of material, personnel and travel in support of the project.

1985-1986

"Personal Fitness Equipment: Design Explorations." Sponsored by Diversified Products. Diversified Products contributed direct support of $3,000 plus $1000 gifts-in-kind in the form of personnel, materials and prototyping in support of the project.

# Research/Creative Work

## Sabbatical

**Sabbatical**, Fall 1995. While on sabbatical I visited design firms throughout the Midwest, collecting oral history, views on the business of design, the future of the profession and the requirements for an excellent design education.

Milwaukee Institute of Art and Design. October 4, 1995. Toured the MIAD collection on Brooks Stevens and spent the afternoon in the Brooks Stevens archives.

Brooks Stevens Design Associates. October 5, 1995. Met with CEO Kipp Stevens.

Bruce Renquist and Associates. October 6, 1995. Met with founder and CEO Bruce Renquist.

Edward Peterson Design. October 6, 1995. Met with owner Ed Peterson.

Tom David. Brooks Stevens Endowed Chair. October 7, 1995. Met with Tom David and toured the MIAD facility.

Motorola Incorporated, Schaumburg, IL. October 9, 1995. Met with Rudy Kroelop, director of design worldwide for Motorola. Also toured their 1.6 million square foot manufacturing facility.

Source Design Inc., Chicago, IL. October 10, 1995. Met with James Hansen, founder and CEO of Source Design.

Yamasaki Goldsmith and Specht Inc., Chicago, IL. October 11, 1995. Met with Paul Specht, founder and surviving principal of the firm.

Herbst, Lazar, Bell Inc., Chicago, IL. October 11, 1995. Met with Ralph Lazar, cofounder of the firm.

Dana Mox and Associates, Chicago, IL. October 12, 1995. Met with Dana Mox, founder.

Perkins Design Ltd. October 12, 1995. Met with Nancy Perkins, founder and CEO.

KDA Design. Chicago, IL. October 13, 1995. Met with John Howard, CEO.

Gantz Design. Pittsburgh, PA. October 19, 1995. Met with Carroll Gantz, founder.

Bally Design. Pittsburgh, PA. October 20, 1995. Met with Alex Bally, founder and CEO.

Daedalus Design. Pittsburgh, PA. October 20, 1995. Met with Tim Cunningham, founder and CEO.

Fitch, Inc. Columbus, OH. October 23, 1995. Met with founders Deane Richardson (October 23) and Dave Smith (October 24).

Design Central. Columbus, OH. October 24, 1995. Met with Gregg Davis, founder.

ATT Global Systems. October 25, 1995. Met with Ken Schory, Director of Corporate Design for ATT Global Systems.

## Refereed Articles

"Micro-mass production." Presented at the 2005 IDSA Education conference. Co-authored along with Chris Arnold. Authorship equal. Published Proceedings, *IDSA National Design Education*

*Conference Proceedings, 2005*.  Juried publication (additional jury process selects from juried presentations—see presentations).

"Grades that Work."  IDSA *National Design Education Conference Proceedings*.  Juried. September, 2000.

"Creating Safe Student Environments." *Design Gumbo*.  Industrial Designers Society of America International Design Education Conference, New Orleans, 2000.  Juried Published Proceedings.

"Pedagogy for Teaching New media Design Start to Finish in One Class." *Design Gumbo*.  Industrial Designers Society of America International Design Education Conference, New Orleans, 2000. Juried Published Proceedings.

"Developing Industry Collaboratives: Their critical roll in Education."  Published in *National Design Education Conference* Proceedings. University of California, Long beach.  September 1998.  Juried Presentation and Published Proceedings.

"New Media: Blurred Boundaries; Sharpened Skills."  Published in *IDSA National Design Education Conference Proceedings*.  Juried.  June 1997.

"A Design for Disassembly," *Innovation*.  Spring 1996.  Juried.  *Innovation* is the only refereed journal for industrial design in North America.  This article presented quantitative methods for evaluating products for ease of disassembly, allowing designers to be better stewards of our natural resources while still designing products that are durable, easy to use and cost effective to produce. Acceptance rate for articles by non-first time authors is 15%. This article received the highest rating of all articles submitted for the spring issue of Innovation. The article included work and illustrations by Richard Britnell and Eric Tse.

"Quantifying Environment-Related Design Decisions," *Structural Plastics '96 Proceedings*. Washington D.C.: The Society of the Plastics Industry, Inc., 1996.  Pages 181 - 188.

"The Effective Use of Color in Communication," *Interface 91*, Seventh Symposium on Human Factors and Industrial Design in Consumer Products, Dayton, Ohio, May 1991. Presented Paper & Published Proceedings.  Bret Smith and Peter Harzem.  Papers and presentations are selected through a peer review process.

*Just in time Teaching*, Published in the *National Design Education Conference Proceedings*, Pasadena California, August 1990. Bret Smith (senior author) and Eric Smith.  Presented paper & published proceedings.  Selected through a peer review process.

"Application of Instructional Systems Design to Design Education." *The Conference on Design Education: Educating in the 90's*, Minneapolis College of Art and Design, Minneapolis Minnesota, August 1989.  Presented paper & published proceedings.  Selected through a peer review process.

"The future of Design Education," *Innovation*, Vol. 7 No. 4, 1988.  William Bullock and Bret Smith. Authorship equal.  Published quarterly, Innovation is the only national refereed journal in Industrial Design in the United States.  The acceptance rate for first time authors is 25%.  It is about 15% for second time authors.

17

"Expanding User Populations: Designing for the Elderly." *Interface 87*, Fifth Symposium on Human Factors and Industrial Design in Consumer Products, Rochester, New York, May 1987. Presented Paper & Published Proceedings. Selected for presentation and publication through a peer review process.

"Life in Space—the Ultimate Design Challenge?" *Innovation*, Vol. , No. 4, 1987. William Bullock (senior author), Bret Smith and Tin-man Lau. Published quarterly, Innovation is the only national refereed journal in Industrial Design in the United States. The acceptance rate for first time authors is 25%. It is about 15% for second time authors.

## Refereed Presentations

"Micro-mass production." Presented at the 2005 IDSA Education conference. Alexandria VA. Co-authored along with Chris Arnold. Authorship equal. Juried presentation.

"Developing Industry Collaboratives: Their Critical Role in Education." Presented Paper and Published Proceedings." National Design Education Conference of the Industrial Designers Society of America. University of California at Long beach, Long beach California. September 1998.

"Alternative Realities: The Potential and Promise of Multimedia," WorldDesign 96. Refereed presentation. This presentation was made as part of the break-out sessions at WorldDesign 96. Other presenters included Liz Sanderson, director of human factors for Fitch, one of the two largest design consultancies in the United States, and Bill Stumpf, whose firm, Bill Stumpf+Associates, designs furniture manufactured by Hermann Miller.

## Solicited Publications and Presentations

"Tom David: Lessons Learned," The Icsid/IDSA World Design Congress, San Francisco, 2007. Produced at the request of the IDSA as part of the National Educator award ceremony during the opening session of the conference.

"Care and Feeding of Your Laptop Computer," Ezine article for The Honor Cord, the Honor Society of Phi Kappa Phi Ezine. Phicappaphi.org. June, 2008.

"Can I Get There from Here? Selecting a GPS Device," Ezine article for The Honor Cord, the Honor Society of Phi Kappa Phi Ezine. Phicappaphi.org. October 2007.

"What to look for in a cellular phone service." Ezine article for The Honor Cord, the Phi Kappa Phi Ezine. phikappaphi.org. June 2007

"Audio Migration in a Windows world." Ezine article for The Honor Cord, the Honor Society of Phi Kappa Phi Ezine. phikappaphi.org. October 2006.

"Point and Shoot?" Ezine article for The Honor Cord, the Honor Society of Phi Kappa Phi Ezine. phikappaphi.org. June 2006.

"The Digital Dance." Ezine article for The Honor Cord, the Honor Society of Phi Kappa Phi Ezine. phikappaphi.org. January 2006.

"Arthur Pulos: Circles of Influence." (ICSID 10 minute cut) Documentary. Presented at the International Council of Societies of Industrial Design bi-annual meeting. Toronto Canada. October, 1997. Designer, Editor and Producer: Bret H. Smith.

"Arthur Pulos: Circles of Influence." Documentary, 18 minutes. Designer, Editor and Producer: Bret H. Smith. Presented at the IDSA National Conference, Washington D.C, June 1997; IDSA National Educators Conference, Alexandria, Virginia, June 1997; and the biannual meeting of the International Councils of Societies of Industrial Design, Toronto , Canada, August, 1997.

"Housing Modifications for Older Adults," Alabama Gerontological Society Annual Conference. Perdido Beach, Alabama. March 1992. Bret Smith and Tarik Orgen. Featured Speakers.

"Creating a Practical Product Environment for Seniors," Eighth Annual Conference of the Alabama Gerontological Society, March, 1989. Bret Smith and Tin-man Lau. Juried presentation.

"Discussion After Modernism," Review of Design After Modernism, John Thackera, ed. New York: Thames and Hudson, 1988. DESIGNperspectives, January 1989. Solicited review. DESIGNperspectives is the national monthly newsletter for the Industrial Designers Society of America.

"Designing Products for the Elderly," Seventh Annual Conference of the Alabama Gerontological Society, March 1988. William Bullock and Bret Smith. Juried presentation.

"Design Education: Where do we go from here?" Biennial IDSA Educators Conference, Monterey, California. August 1987. William Bullock and Bret Smith. Juried presentation.

"Expanding User Populations." Industrial Designers Society of America National Conference, Chicago, Illinois. August 1986. William Bullock and Bret Smith. Juried presentation.

## External Reviewer

External reviewer of a prospectus for a book on Exhibit Design. Reviewed for Laurence King Publishing Ltd, London, UK. August 2007.

External reviewer, Introduction to Exhibit Design. Reviewed for Laurence King Publishing Ltd, London, UK. July 2008.

## Interviews

Interview APT. Interview about products the department has designed for NASA and the role that Kaplana Chawla (crew member on the Columbia) played in their development. February 2003.

Interview, Channel 9. Interviewed about Kaplana Chawla and her role in the development of equipment for the international space station. February 2003.

Interview, *P-O-P* (Point-of-Purchase) *Magazine*. Interviewed about the Eastman/Spartech project. December 2001. P-O-P magazine is the leading trade publication for the point-of-purchase industry in the United States.

Interview, Channel 9. January 2001. Interviewed about PERS and the department of Industrial Design's collaboration with NASA for the Channel 9 Morning Show.

## Books:

*The Research Paper: A Commonsense Approach*. Prentice Hall, 1988. Thomas Gaston and Bret Smith. Authorship equal. Within the first year of publication, this text was adopted by 22 universities including Ohio Wesleyan University, Michigan State University, Carnegie-Mellon University and Purdue University.

*Teacher's Guide for The Research Paper: A Commonsense Approach*. Prentice Hall, 1988. Thomas Gaston and Bret Smith. Authorship equal.

## Software Publication

*Jump Starting with PageMaker 5.0*. Longmont, Colorado: Evan Design Group, November 1994. *Jump Starting with PageMaker 5.0* is a 200-screen, windows-based, self-installing interactive computer program. The program runs concurrently with PageMaker 5.0 (an industry leader in desktop publishing). It is designed to allow first time users to produce desktop published documents in less than an hour. The program includes the following topic areas: single and multiple column layout, single and multiple page layout, effective use of style sheets, graphics importing, sizing and cropping, text editing, spell checking and printing. Authors: Bret Smith and Eric Smith. Authorship equal.

## Published Abstracts

"The Design of Products in the Post Machine Age." Fifth International Congress on Behaviorism and Behavioral Sciences, Special Session, Taiwan. Published Abstract. 2000.

"Behavior and the Design of Products." Third International Congress on Behaviorism and Behavioral Sciences, Mexico. Published Abstract. 1996.

## Papers at Professional Meetings

"To Err is Human, to Anticipate, Divine." The Sixth International Congress of Behaviorism and Behavioral Sciences." Invited presentation and published abstract. Auburn, Alabama, 2002.

"Neat Plausible and Wrong: The Consequences of Explaining Rather than Understanding Human Behavior." The Fourth International Congress of Behaviorism and Behavioral Sciences. Invited presentation and published abstract. Seville, Spain. November 1998.

"Environment-Related Design Decisions," Structural Plastics '96. April 1996. Juried Presentation. I was one of four industrial designers selected nationally to participate in the conference. Also a published proceeding

## Exhibitions

"Betty Baugh: Design Pioneer," The Icsid/IDSA World Design Congress, San Francisco, 2007. Produced for the IDSA sage special interest section presentation at the 2007 World Design Congress. The congress was attended by 1800 designers from all over the world.

"Budd Steinhilber: Interning at the Raymond Loewy office," Produced for the IDSA sage special interest section presentation at the 2007 World Design Congress. The congress was attended by 1800 designers from all over the world.

"Excerpts from Design Voices." WorldDesign 96. Orlando Florida. September 18 - 21, 1996. Exhibit by invitation only. The exhibit displayed work from my Design Voices project and viewed by over design professionals, journalists and industry representatives.

## Other Scholarly Contributions to the Profession

### Interactive Multimedia History

*Design Voices: A Contemporary History of Industrial Design in the Words of Those Who Have Helped to Shape It.* Design Voices is an interactive multimedia oral history of Industrial Design. Thus far I have interviewed twenty-eight industrial designers and collected over sixty hours of videotape. From these interviews I digitized and edited over 90 minutes of video material containing stories about famous Industrial Designers, early design work, famous projects and products and personal influences. Excerpts from *Design Voices* were exhibited in the International Design Gallery during the four-day WorldDesign 96 Conference in Orlando, Florida. Parts of this project were also featured in presentations during the General Session of the conference and during break-out sessions. Additional interviews were edited for the recent Icsid/IDSA World Congress attended by over 1800 design professionals from around the world. Volume 1 of the history was completed in August 1996. The project is ongoing. Since that time I have continued interviewing Industrial designers who have made significant contributions to the profession, amassing over 100 hours of interview footage from which I have edited additional videos, totaling over 6 hours in length, for use in the our design history class. Interview excerpts are also currently in preparation for posting as podcasts on the IDSA history section website. Current videos include: The creation of the cell phone, design in the 1950s, 60s and 70s; the design of the Tucker automobile; the design work of Russell Wright; apprenticing for NCR; designing for the Robert Budlong office; designing for the Raymond Loewy office (Chicago); designing for the Raymond Loewy office (New York); designing for International Harvester and for MacDonald Douglas; Designing for Henry Dreyfuss; the first

American design director of Sony (also the first woman V.P. of any Sony division); four keys to successful design; and, problem definition.

## Consulting

**Product Design** for Tupperware Corporation, Orlando Florida. Provided product design, consultation and instructional support for proprietary new product. As part of this project I participated in consumer product testing in Detroit. March 2005-present (project is ongoing).

**Expert witness**. *Simpson Ventures, Inc. v. Mid-West Metal Products, Inc.* Produced 43 page intellectual property and patent analysis document. July 2007 – Present. Case pending.

**Human factors consultation and expert witness**, for Partridge Smith, P.C. in *Lancaster et al. v. Roschell Flowers*. July 2007 – October 2007. Case settled based, in part, on my evaluation.

**Logo and brand development** for KICK, a Colorado based training group. Developed logo, standards and brand applications. January – April 2007.

**Human factors consultation and expert witness**, for Partridge Smith, P.C.in *Kathy A. Ferguson V. Southern Medical Health Systems, Inc.* Case No. CV-04-4701. Case settled prior to trial based upon my analysis. January, 2007.

**Human factors consultation and expert witness** in *Oden v. Springhill*. July 2006 – November 2006. Case settled prior to trial.

**Presentation Design** for Tupperware Corporation's Chairman's Retreat in Hong Kong. In addition to the design of the presentation, I designed and produced a thirty second opening video. March, 2006.

**Human Factors consultation and product evaluation** for Page, Scrantom, Sprouse, Tucker and Ford, PC., attorneys at law. Responsible for computer models, evaluation and documentation of the human factors related design issues for an Ameristep tread design that had resulted in the amputation of a man's finger. Ameristep settled the case prior to trial. June 2005-January 2006.

**Consulting**: Corporate and publication branding for *Phi Kappa Phi Forum*. Spring 2005.

**Designer**, User interface design for the state of Wyoming Department of Mental Health. Contracted by Impel Corp. to develop the user interface for an interactive teaching site for the State of Wyoming department of mental health workers. Responsibilities included design of all screens, development of system that was easily updatable, graphics specification and the development of all interface graphics. April-June 2003.

**Expert Witness** for Williams and Gullage. Used my expertise in human factors and aging to assist analyzing an automatic door accident. Case was tried in November of 2001. Juried decided in favor of the plaintiff.

**Primary design consultant,** PEP Tub Assist, Phase II. Constructed a working mechanical model that resolved mechanical, human factors and safety problems inherent in the original design. Summer and Fall, 1997.

**Designed and authored a curriculum guide** for the EDPA Student Design Competition. Exhibit Designers and Producers Association (EDPA). August - September 1996. This curriculum was distributed to all forty-four industrial design programs in the United States and served as the guide for each program's participation in the EDPA Student Design Competition.

**Expert Witness** for Civil Action Number CV-93-563 in the Circuit Court of Lee County, Alabama. Served as an expert witness on product design, safety and ergonomics in a multinational product liability suit. July 1994- October 1995. Case settled prior to trial.

**Developer,** Adobe Corporation. Developer of instructional material for PageMaker 4.0, 5.0 and 6.0 software. Adobe is a Seattle, Washington based software firm with offices in the United States and in Europe. Adobe software is sold throughout the United States, Canada, Europe and the Pacific Rim. Adobe is considered an industry leader in desktop publishing, graphics, photo editing and charting software. 1991-1996.

**Instructor,** Industry Specific CADKEY training for MCE. Designed and taught a custom training course in the use of CADKEY for the layout and design of interior spaces in commercial buildings. May 1992.

**Graphic Design,** Parallel Resources, Inc., Auburn, Alabama. Cover photography, art work and package consulting for software product. August 1989 - September 1990.

**Manufacturing consultant,** Prime Industrial, Auburn, Alabama. Consultant on materials and processes for solar tracker faceplate. August, 1989.

**Product evaluation,** Advanced Living Systems Division of the Institute for Technology Development (ITD), Oxford, Mississippi. Testing, evaluation and recommendations for human factors CAD software. November 1988.

**Design,** Human Dynamics, Inc., Oxford, Mississippi. Trade show and product design consultant. June 1988.

**Design,** Advanced Living Systems Division of ITD, Oxford, Mississippi. Responsibilities included product design; development of a new system to reach the older market; development of new data collection and analysis systems for dynamic human factors measurements of older populations (part of a $300,000 grant from the National Institute of Disabled Research and Rehabilitation); development of slide and lecture materials on designing for the elderly for a series of AIA (American Institute of Architects) sponsored workshops; specification of materials, processes and assembly techniques for a portable interactive video workstation. June - September 1987.

23

## Grants and Contracts

### Industry Sponsored Research

**Director,** Development of branding for Great Southern Wood Preserving. Directed students in the development of brand name, branding, packaging, point-of-sale displays and tradeshow design for Great Southern Wood Preserving (GSWP). GSWP is the manufacturer of Yellowood brand treated lumber. Fall 2007

**Director,** Range hood design and branding for Broan-Nutone, LLC. Hartford, WI. Broan-Nutone is an $800 million a year company which manufactures range hoods, central vacuums, home theater sound systems, medicine cabinets, bath fans and door chimes. Directed 18 undergraduate and graduate students in the design and definition of three separate product families: Best by Broan, Broan Elite and Zephyr. January - May 2007.

**Director,** Development of "break the paradigm in-wall storage" for Broan-Nutone, LLC. Hartford, WI. Broan-Nutone is an $800 million a year company which manufactures range hoods, central vacuums, home theater sound systems, medicine cabinets, bath fans and door chimes. Directed students in the development of original in-wall storage product designs for the medicine cabinet divisions of Broan-Nutone (Jensen and Aubry). Students presented over 130 concepts and developed 18 prototypes. Worked directly with the President of Jensen and the General Manager of Aubry as well as the V.P. of Marketing for Broan-Nutone. Presented the final results to the President, CFO, Marketing Managers, Director of Branding and other corporate managers at the Broan-Nutone world headquarters. Designs developed during this project are already in production.

**Director,** Redesign and extension of the Nutone Central Vacuum product line, Broan-Nutone, LLC. Hartford, WI. Directed students in the analysis of current central vacuum systems and the development of 140 different concepts for the Nutone Central Vac. System. The client selected 52 concepts for further development. Students developed each concept to the point of working and appearance models at which point the client selected 18 for development as pre-prototypes. Worked directly with the General Manager, Director of Marketing and Engineering Manager for Nutone Central Vacuums in Cincinnati, OH as well as the V.P. of Marketing for Broan-Nutone. Final Presentation to President of Broan-Nutone, V.P of Broan-Nutone Engineering, V.P. of Marketing Broan-Nutone, and Director of product placement Broan-Nutone.

**Director,** Corporate identity, brand assessment and P-O-P design, packaging design and trade show exhibit design, Broan-Nutone, LLC. Hartford, WI. Directed seventeen students in the design and development of corporate identity, packaging, point-of-purchase displays and tradeshow exhibits for both the Broan and the Nutone brands. Final results of the research for Broan-Nutone were so successful that the client sponsored another studio for Spring 05. The final Broan identity was based upon a student mark, the final Nutone identity incorporated a font that was proposed by one of the students. Much of Broan-Nutone's new packaging and branding strategy is based upon the work completed as part of this project. Broan-Nutone is continuing to evaluate P-O-P solutions designed by students for further development and implementation. Presented to the Director of Corporate Graphics, Broan-Nutone; Director of Marketing, Broan-Nutone; Director of Canadian Sales, Broan-Nutone; and Director of Product Placement, Broan-Nutone.

24

**Director,** Door entry notification systems design. Broan-Nutone, LLC. Hartford, WI. Broan-Nutone is an $800 million a year company which manufactures range hoods, central vacuums, home theater sound systems, medicine cabinets, bath fans and door chimes. Directed students in the development of new concepts for door entry notification systems. Presented 13 final concepts as well as a packaging strategy to increase brand awareness. Worked directly with the V.P. of Marketing, Director of product promotions and V.P of Engineering. Spring, 2004.

**Director,** Corporate Identity, Brand Assessment and P-O-P (Point-of-Purchase) design and construction, Bridges Inc. Cusseta, Alabama. Directed students in the development of a branding strategy, corporate identity and point of purchase displays for Bridges, Inc. This project also included a complete graphics and space assessment. Authored the graphics standards manual, finalized the logo design, and prepared master artwork for design implementation. Corporate identity and P-O-P designs adopted by the client. Fall, 2002.

**Director,** "Point of Purchase and Exhibit Design for Spectar Sheet" Eastman Plastics and Spartech, Inc. Final results from this project, P-O-P prototypes and exhibit designs for the pop Chicago trade show were presented to Eastman and Spartech at the Spartech headquarters in St. Louis. Designed and supervised the production and assembly of a 275 page document detailing our work on the project. Final results of this project were featured in P-O-P Magazine. Success in this project has lead to a follow-on studio and an ongoing relationship with Eastman Plastics. Fall, 2001.

**Director,** "Design of Application Tools for Vinyl Sheet"   Directed undergraduate and graduate students in the evaluation and design of application tools for 3M Controltac vinyl sheet. The final presentation included final prototypes for four separate tool designs. Each concept included computer generated control drawings, parts list, vendor list assembly instructions, sequence of use documentation and preliminary price quotes from vendors. Final tool designs decreased the amount of time required to finish the rivets on a truck by 40-60 percent. As part of this project I directed the design and development of a 300 page document detailing the work completed for the client. This document was successfully constructed in Quark Express thereby providing a format that allows the document to be easily reproduced. Additional responsibilities included providing client direction and clarification and editing the copy for the final documentation. May, 2002.

**Director,** "Redesigning Pipe Locating Equipment." Directed graduate and undergraduate students in the development of an updated design for pipe locating equipment for Pipehorn, a Birmingham-based manufacturer. The new design need to incorporated new technology and provide a common platform and identity for their expanded product line."

**Director,** "Flight testing and Final Prototype Construction of PERS." NASA Marshall Space Flight Center. Directed graduate and under graduate students in the refinement, flight testing and final Prototype design and construction of the Payload Equipment Restraint System (PERS) for NASA. KC 135 zero-G Flight testing focused on safety, ease of use, and ease of deployment of the PERS. Deployed on ISS April of 2001 still in active service. Astronaut Jim Voss called it the "best designed equipment that I have ever worked with." Winter 2000.

**Director,** "Onboard Interactive Computer Based Training for PERS." NASA Marshall Space Flight Center. Trained the design team and directed the development of interactive crew training software for the International Space Station. The software was the first project to be completed

under the NASA OCBT (on board computer based training) guidelines for the International Space Station. One of the key requirements was that the interface be intuitive and the information clearly structured to ensure safe use of the equipment. Deployed on ISS April of 2001. Retired, same year because NASA determined that the equipment was so effectively designed that it did not require crew training. Winter 2000.

**Director**, "Ground Based Interactive Multimedia Training for PERS." NASA Marshall Space Flight Center. Trained the design team and directed the development of interactive crew training software for the International Space Station. This is the companion piece to the software described above. In addition to meeting the client requirements for ease of use, clarity, safety and comprehensive training, we introduce new interface paradigms that are currently being evaluated by NASA for incorporation into the next generation of OCBT baseline standards. Winter 2000.

**Director,** "NASA/ Auburn Industrial Design Promotional CD." NASA Marshall Space Flight Center. Under contract to NASA. I trained the design team and directed the development of an interactive multimedia CD to promote the collaborations between NASA and the Department of Industrial Design at Auburn University. Winter 2000.

**Director**, "Ergonomic Tools for Vinyl Film Installation." Phases I & II. 3M Corporation. Directed the human factors analysis and the subsequent design of tools for the application of 3M vinyl film. The team produced working mechanical models and final appearance models of the tools. January-June 1999.

**Director**, "Development of Temporary Stowage Devices for the Use with the Materials Science Resource Rack (MSRR)." NASA Marshall Space Flight Center. Directed undergraduate students in the discovery and development of temporary restraint devices for the MSRR that is to be deployed on the International Space Station. Concepts focused on safety and ease of use. Three of these devices were further developed for actual deployment in the International Space Station. Fall, 1998.

**Director and Principal Investigator.** "The Effective Use of Color in Business Communication, Phase 3." Contract research and design project for Seiko Mead Company and Mead Imaging, Inc., Miamisburg, Ohio. Seiko Mead was established as a joint-venture between Seiko Epson Corporation of Japan, a 5.5 billion-dollar-a-year Japanese-based company and Mead Corporation, a 3.5 billion-dollar-a-year U.S.-based company. Results of each phase of research were presented to officers of both companies at board of directors' meetings in Japan and in the U.S. Phase three focused on the use of color in video display terminals, transparencies and written communication. Coauthored the proposal with Peter Harzem. Responsibilities included design, establishing budgets, hiring personnel, scheduling work, evaluating performance, coauthoring proposals and final reports, working with Auburn University Contracts and Grants office on letters of agreement, developing seminars and presentations. Partial results of this research and of the research in phases one and two have been reported in *Modern Office* and *Presentation Products* as well as more than one hundred other periodicals and newspapers nationwide. Partial results of this work were published in *Interface 91 Proceedings*, by the consumer products group of the Human Factors Society. June 1991- January 1992. Contract amount: $61,735.

26

**Director and Principal Investigator.** "The Effective Use of Color in Business Communication: Phase 2." Contract research and design project for Seiko Mead Company and Mead Imaging, Inc., Miamisburg, Ohio (See Phase 3 above). Coauthored the proposal with Peter Harzem. Phase 2 focused on how the use of color affects longer term recall of information. Responsibilities were the same as in phase 3. Co-principal investigator: Peter Harzem. February - May 1991. Award amount: $14,799.

**Director and Principal Investigator.** "The Effective Use of Color in Business Communication." Contract research and design project for Seiko Mead Company and Mead Imaging, Inc., Miamisburg, Ohio (See Phase 3 above). This research focused on how color affects the recall of information and on developing a series of general guidelines for effective color use in business. Co-authored the proposal with Peter Harzem and Robert Spain. In addition to the responsibilities noted in the previous phases, I was also responsible for coauthoring and providing final editing of the "Guide to Color Communication." Coauthored, with Peter Harzem, the research report for phase 1. Co-principal investigators: Peter Harzem, Tin-Man Lau and Walter Schaer. September 1989 - January 1990. Award amount: $54,964 plus $16,000 in equipment.

**Director and Principal Investigator,** "Computer Enhanced Design: A Study of Computer Interaction in the Design Process." Contract research for International Business Machines (IBM), Boca Raton, Florida. Responsibilities included establishing budgets, developing hardware and software specifications, conducting research, and authoring presentations and final reports. As part of this research a national survey of computer use by industrial designers was conducted. Results of this research served as the basis for long-term software and hardware design recommendations to the client. Co-principal investigator: Tin-Man Lau. January 1989 - December 1991. Award amount: $40,000 in cash plus $40,000 in equipment.

**Director of Industrial Design and team member**. "Design Proposal for NASA Space Station Habitation Module Interior Environment." Contract research for Martin Marietta Denver Aerospace (MMDA). The industrial design team was responsible for developing preliminary product concepts which addressed the human factors, manufacturing, and aesthetic considerations of the module as well as the design of interior components and development of evaluation criteria for the interior environment alternatives. Results of this work were presented by Bret Smith, Bill Bullock, Wayne Drummond and Steffen Doersling to over 40 engineers, scientists, and project managers at MMDA headquarters in Denver, CO. Partial results of this work were published in *Innovation*, Vol.6. No. 4, 1987. Team members: Bret Smith, Bill Bullock, Steffen Doersling, Wayne Drummond, Norbert Lechner, Peter Weiss, Tin-Man Lau, Sheri Schumacher, Alan La Fon, and Alfred Lindsay. January to May 1987. Award Amount: $50,000.

**Director and Principal Investigator.** "Definition and Articulation of Human Factors Problem Areas in Residential Living Environments for the Elderly." Competitive Research Grant-in-Aid, Auburn University. Responsibilities included coauthoring proposal, conducting research and authoring of the final report. Results from this research were presented at the Eighth Annual Conference of the Alabama Gerontological Society. Results of this research were requested by the National Gerontological Resource Center in Washington, D.C. and have become part of their permanent resource collection. A summary of this research also appeared in *Design for Aging: An Annotated Bibliography 1980-1992*. Published by the Aging Design Research Program (ADRP) AIA/ACSA Council on Architectural Research, 1993. Co-principal Investigators: John R. Zellner (1986) and Tin-

27

Man Lau (December 1986 - completion). Award amount: $3,000 from Auburn plus $7,000 gifts-in-kind from industry. January 1986 - December 1988.

**Design Director and Team Member.** "Development of a Bedside Medication Dispensing Unit." Contract research for PMR, Incorporated, a privately-held medical products development company in Costa Mesa, California. Joint research between the School of Pharmacy and the Department of Industrial Design. Responsibilities included product design, design supervision, management of design budget ($20,000), electronics specification, design and development of working appearance model, materials and assembly recommendations, and identification and qualification of vendors. Additional responsibilities included designing and specifying the logistics sequence and operational protocol for the software. Results of this research were featured in *Design Alabama*. January - June 1986. Industrial design team members: Bret Smith, Bill Bullock, Brian Coleman, John Zellner. Pharmacy team members: Ken Barker and Tyrone Gibson. Grant Author: Ken Barker. Total award amount: $40,000.

## Outreach

### Workshops

"Changing Paradigms in Design and Production." IDSA workshop. 2006 IDSA National Conference. Bret Smith and Chris Arnold.

"Housing Modifications to Improve the Quality of Living for Older People," Auburn University. April 1993. Two-day intensive course developed by Tarik Orgen and Bret Smith (authorship equal). The course was attended by contractors, physicians and developers from throughout the state.

"Basic and Advanced Cadkey: A Short Course." Auburn University Continuing Education Extension course. Five day intensive course developed and team taught with Tin-Man Lau. September 1992.

"Design for Ambulance Rescue," Interface 87, Fifth Symposium on Human Factors and Industrial Design in Consumer Products. (juried workshop). The workshop was three hours in length and dealt with issues of safety, patient comfort, manufacturability, standards, product communication and ease of use. The workshop was attended by product designers and engineers from the United States and Canada. Rochester, New York. May 1987. Workshop Leader.

### Invited Design History Presentations.

"Streamlined Life." A presentation to the docents on the growth and impact of streamlined design. December 3, 2007. Montgomery Museum of Fine Art.

"Streamline This." A presentation on the development of streamlining and collectables for the patrons of the Montgomery Museum of Fine Art. December 3, 2007.

"Streamline and Familiar Objects." A lecture on the nature of streamlining and its impact through graphics, architecture and product design on everyday life in the 1930s and beyond. One of three featured speakers at the opening of the Streamline exhibit at the Montgomery Museum of Fine Art. February, 2008.

## Professional Organizations

**Chair,** IDSA History Special Interest Section, October 2007- present.

**Member,** IDSA Nominations Committee, 2005.

**Chair,** IDSA Membership Development Committee Task Force on Education. June 1996- August 1998. As chair of this task force, I successfully led efforts to develop regional orientation program for student chapter officers within each of the five regions. The education task force and membership development committee were also successful in getting the entry level membership dues reduced for recent graduates and in instituting a national job fair for graduating seniors and recent graduates, as well as members in transition.

**Member,** IDSA Membership Development Committee. June 1996- August 1998. The IDSA Membership Development Committee is comprised of five Industrial Design professionals. The committee was created by the president of IDSA to study the problem of low-membership retention and to develop specific proposals to enhance and increase membership within IDSA. Based upon our recommendations, IDSA membership grew from 2,200 members to over 3,000 members during a six year period.

**IDSA Southern District Vice President.** The IDSA (Industrial Designers Society of America) is the professional society for industrial designers within the United States. The Southern District encompasses a nine-state area. Elected Office. January 1993 - January 1995.

**Member of the Executive Council and Board of Directors for IDSA.** Executive Council members are responsible for directing the overall operation of the professional society, monitoring the month to month status of programs and finances, and for authoring bylaws and policy changes. Elected Office. January 1993 - January 1995.

**Member,** Publication Committee for *Innovation*, January 1988-December1990. Innovation is the only refereed publication of Industrial Design in the United States. Publication Committee members were responsible for the review, scoring and selection of articles for the publication.

**Editor,** *FocusSouth* Newsletter for the Atlanta Chapter of the Industrial Designers Society of America, 1986-1988. During the first year-and-a-half of this period, when neighboring chapters were without a news letter, *FocusSouth* served as the newsletter for the entire 9 state southeast region.

## Community Service

Brochure design for International Students Office, Auburn University, 2008

Design of 50th Anniversary logo, brochure and musical program for Holy Trinity Episcopal Church, 2006-2007.

Awards Poster, *Phi Kappa Phi Forum*, 2006. Designed and produced a poster to celebrate five national awards won by *Phi Kappa Phi Forum* magazine.

29

Logo and brand Analysis for The Honor Society Phi Kappa Phi.  Analyzed publications, brand standards and applications and made recommendations for brand realignment and publication design.  2005

Webelos and cubs scout leader 1998 – 2004.

Volunteer, Wrights Mill Road Elementary School, 1997-2004

Guest lecturer/workshop leader, development of multimedia material, Wrights Mill Road Elementary School, 2001.

Reader at Wrights Mill Road Elementary School, 1997 – 2004.

Guest Speaker, Auburn Early Education Center, 1997 and 1999.

Fabricated classroom equipment, Auburn Early Education Center, 1999.

# Exhibit 2

In the United States District Court
For the Middle District of Alabama
Eastern Division

| | |
|---|---|
| Simpson Ventures, Inc., *Plaintiff*, V. Mid-West Metal Products Company, Inc., *Defendant* | Civil Action File No. 406-cv-901-WKW-VPM |

## Expert Report of Professor Bret H. Smith, IDSA

### Introduction

My Name is Bret H. Smith. I am a full professor in the industrial design department at Auburn University where I have taught industrial design for over twenty-one years.

I have been retained in the above referenced lawsuit as an industrial design expert witness. I am being compensated for my work here at a rate of $180 an hour. I have no financial interest in the outcome of this case.

### Background and experience

I graduated Summa Cum Laude from Purdue University with B.S. degree in Industrial Technology. I have an M.A. in English, and an M. A. in Industrial Design, both from Purdue University (the Masters Degree is the terminal degree in industrial design).

As an industrial designer, I have worked on brand identity, commercial food equipment, medical equipment, consumer products, computer applications research, the habitation module of the international space station, hand tools, instrumentation, software interface design, and human factors. I have supervised industry projects for NASA, Martin Marietta Denver Aerospace, 3-M Company, IBM, Mead Imaging, Broan-Nutone and others. In addition to this, I have directed over $300,000 in research projects while at Auburn University.

I have served on the executive board and the board of directors of our professional society, the Industrial Designers Society of America (IDSA), and served as the Southern District Vice President of IDSA. I have also served as a referee for *Innovation*, the only refereed journal of industrial design in the United States. I have lectured internationally on industrial design, human factors, and human behavior.

I have received special commendation from NASA for my contributions to design for the International Space Station, hold a Citation of Merit from NV Phillips, and am a life member of Phi Kappa Phi. A list of my publications during the last ten years, courses taught, and research conducted may be found in my *Vitae* located in the appendix. My most recent publications are listed on pages 7-9 of my *Vitae*.

### Patent Review

In reviewing U.S. Patent D 483,156 I have reviewed the patent document, the patents listed as prior art within the '156 patent, additional patent documents, on line resources, books on weaving, basketry and furniture, relevant sections of *Chisum on Patents*, assembled and photographed a Bay Isle cage, and spoken with those knowledgeable about animal behavior. A complete collection of these references is provided in the appendix.

I have received and reviewed Simpson Ventures' supplemental interrogatories. I understand that Simpson Ventures has responded but has objected to, interrogatories and requests for production of documents submitted by Mid-West Metal. I understand that Simpson Ventures' responses may not be complete. I thus reserve the right to review Simpson Ventures' complete responses upon submission and to revise or supplement my analysis accordingly.

# Design Analysis
## of
# United States Design Patent Number US D483,156 S

## Subject

This document provides an analysis of patent D 483,156, hereafter referred to as "'156," licensed to Simpson Ventures, Inc., hereafter referred to as "Simpson Ventures;" a comparison of that patent to prior art; and a comparison of the '156 patent to the Bay Isle design by Mid-West Metal Products Company Inc. The '156 patent is for a pet home. The top and the four sides are depicted in the patent drawings (Figures 1-5). The bottom of the cage is expressly disclaimed in patent '156. My evaluation will include a review of the functional and ornamental aspects of the design as well as relevant pieces of prior art. Throughout this report the words "wicker" and "rattan" will be used interchangeably to describe surfaces that are woven in texture.

## Verbal description of the '156 patent design

The pet house is rectangular in shape with rattan on all visible sides. It has four sides, and a top.

It is depicted as a rectangular structure with rattan

on the five visible surfaces. The top of the structure is completely covered by rattan (Figure 2).

The front side has a square door with a grid of bars. It latches on the right and opens to the left. The door is not covered by rattan (Figure 3). Rattan is present above and on both sides of the door.



Figure 2. Top view of patent '156



Figure 3. Front view of patent '156.

Figure 1. 3/4 view of the '156 patent.

2



Figure 4. Side view of pet house '156

The right and left sides are each composed of two parts (Figure 4). The top side piece, comprising approximately 7/8ths of the vertical height, has a rectangular opening, or window, above the horizontal center line. The window is created by the absence of the rattan material that leaves the bars of the frame exposed. A separate narrow piece is located at the bottom of both the right and left sides. This bottom side piece runs the entire length of each side and comprises a little over 1/8th of the vertical height of the side. It is covered with rattan.

The back of the structure is covered by rattan except for a small rectangular opening at the top of the back panel that serves as a handle (Figure 5). The opening is centered and unobstructed. The back has a latch at the bottom, presumably to secure the bottom tray.

The structure rests on the floor by means of four legs (Figure 5).



Figure 5. Back view of pet house '156

3

## Ornamental features:

Several ornamental elements are noteworthy. These elements are provided by specific choices in weave and method of construction (Figure 8), much in the same way that some patterns in rugs or fabric are dictated by choices in weaving method at specific points. In addition to this, the corner details provided by the method of fastening form part of the over all visual impression by providing a repetitive element that is consistent in size at each connection point.

### Front

The weave pattern on the front has a visual element in the center above the door (Figure 7) that is created by a change in the weave. This change in weave will be subsequently referred to as a "loose weave." The front also has tight continuous coils that appear around the perimeter.



Figure 6. 3/4 view of Patent '156



Figure 7. Front view of Patent '156



Figure 8. Examples of various border weaves
Based on figures found in *Baskets and Basketry*, 1959 & 1972
See attached for more examples.

4

## Sides

In the ¾ view drawing (Figure 9), the right side also has decorative vertical accents above the window and in the narrower horizontal piece at the bottom of each side -- a loose weave pattern. In the case of the sides, the choice to stop the cane wrapping at the end of each side of the windows is also a decorative choice. Both the top and bottom pieces have tight continuous coils around the perimeter.

The proportion of the narrow bottom piece on the right and left sides and the visual separation that it creates (Figure 10) is a decorative element because of the proportions and spacing. As in the case of the front, the corner connections also provide a visual detail by providing a repetitive element that is consistent in size at each connection point.



Figure 9. 3/4 view of weave in patent '156.



Figure 10. Side view of patent '156.

## Functional features

The following are functional features: the rectangular shape, the door and latch, the windows, the handle slot, the legs, and the rattan surface.

**Rectangular shape:**
The rectangular shape is a function of two requirements: manufacturing and collapsibility. The rectangular sides, top, and bottom are more easily suited to the production requirements of contemporary manufacturing processes than are other shapes. Rectangular shapes are more easily measured, cut, joined, and transported than other shapes. From the drawings it also may be inferred that the cage is designed to be collapsible based upon the corner joining detail. If the object is designed to be collapsible, the rectangular shape better accommodates the collapsibility of a ridged cage.

**Door**
The door provides egress and ingress for the pet. It is also a source of fresh air. The latch provides a way of keeping the pet in the cage if necessary.

**Windows**
The windows provide a way for the animal to look out and observe its environment, something that is important for the psychological comfort of the animal. They are also a source of fresh air.

**Handle and catch**
The handle on the back provides a hand hold at the back of the cage so that it can be more easily lifted (Figure 12). The catch at the bottom most likely serves to hold the bottom pan in place.

**Legs**
The legs provide points of contact with the floor. Because floors frequently have uneven surfaces, it is easier for four distinct points to rest flat on the floor than the entire bottom surface of the cage. Also, the elevation allows for air circulation.

**Material choice**
As a material choice, the rattan has several functional purposes. The rattan serves to provide cover—an area in which the pet can rest unobserved. According to Charles Hendrix, DVM, Professor of Veterinary Medicine at Auburn University and Vice President of the AVMA, dogs are den animals. The wicker reinforces the den quality of the space. The wicker is also an important functional feature for cats. According to Sandra McCune, Sub-Department of Animal Behaviour, University of Cambridge, and Madingley, Cambridge CB3 8AA, UK, in *Environmental Enrichment Information Resources for Laboratory Animals: 1965 - 1995: Birds, Cats, Dogs, Farm Animals, Ferrets, Rabbits, and Rodents*, cats prefer resting places that are warm, dry, and protected on one, or even better, two sides.

If the weave of the rattan is loose, it will also allow the animal to see out through the weave without being observed. Because rattan is a woven material it has superior air circulation when compared with solid materials like sheet metal, wood, wood composites, or plastic. This is important to the needs of the animal for fresh air. If the rattan was made from a synthetic material, it would also retard the growth of mold. The rattan also provides a friendlier material finish; one that is more compatible with interior décor than wire pet cages or plastic pet carriers. In other words, the rattan allows it to perform the function of blending into the environment better than other materials.



Figure 11. 3/4 of view patent '156



Figure 12. Back view of pet house '156

6

## A person of ordinary skill

A person of ordinary skill in the relevant arts in the case of this design would be a person with a bachelor's degree in industrial design[1] and three or more years of experience. The designer would also have or be able to acquire knowledge in the design of products that require frame construction or wicker fabrication. The designer also would possess, or be able to acquire, a knowledge of the animal equivalent of human factors or ergonomics. (Ergonomics, according to the *Columbia Encyclopedia*, is "the engineering science concerned with the physical and psychological relationship between machines and the people who use them.") For the purposes of this analysis I will refer to this knowledge as "animal factors."

Alternatively, a person of ordinary skill might also be a someone with more than six years of practical experience designing objects for metal fabricators, furniture design, or store fixture design, or would have or be able to acquire substantial knowledge of metal fabrication, kinematics, and assembly. The person also would possess or be able to acquire skill in researching and understanding manufacturing processes, including wicker weaving, and a knowledge of animal factors, or be able to acquire such knowledge.

---

[1] According to the Industrial Designers Society of America, Industrial design (ID) is the professional service of creating and developing concepts and specifications that optimize the function, value and appearance of products and systems for the mutual benefit of both user and manufacturer.

Industrial designers develop these concepts and specifications through collection, analysis and synthesis of data guided by the special requirements of the client or manufacturer. They are trained to prepare clear and concise recommendations through drawings, models and verbal descriptions.

The industrial designer's unique contribution places emphasis on those aspects of the product or system that relate most directly to human characteristics, needs and interests. This contribution requires specialized understanding of visual, tactile, safety and convenience criteria, with concern for the user. Education and experience in anticipating psychological, physiological and sociological factors that influence and are perceived by the user are essential industrial design resources.

Industrial designers also maintain a practical concern for technical processes and requirements for manufacture; marketing opportunities and economic constraints; and distribution sales and servicing processes. They work to ensure that design recommendations use materials and technology effectively, and comply with all legal and regulatory requirements.

In addition to supplying concepts for products and systems, industrial designers are often retained for consultation on a variety of problems that have to do

with a client's image. Such assignments include product and organization identity systems, development of communication systems, interior space planning and exhibit design, advertising devices and packaging and other related services. Their expertise is sought in a wide variety of administrative arenas to assist in developing industrial standards, regulatory guidelines and quality control procedures to improve manufacturing operations and products.

Industrial designers, as professionals, are guided by their awareness of obligations to fulfill contractual responsibilities to clients, to protect the public safety and well-being, to respect the environment and to observe ethical business practice.

www.idsa.org

## Prior art

At least three areas of prior art are relevant to this design. The first is the method of construction of the rattan pieces of the pet house. The second is the construction of pet cages in general. The third is the combination of metal and rattan-type materials.

## Method of construction of woven materials

While rattan was originally a term that was applied to objects constructed of specific materials (palm trees belonging to the genus *Calamus*, native to the tropical regions of Africa and India), it has come to be used as a term that describes objects made of woven, wood-like material. This type of weaving goes back at least 10,000 years with the oldest examples having been unearthed in Faiyum in upper Egypt. One of the oldest complete baskets can be found in the British Museum and has been dated at 3000 BC (Figure 13). More specifically, there are a number of examples of woven, or rattan, cages for pets.



Figure 13  Egyptian Basket, circa 3000 BC from collection of the British Museum.



Figure 14  Basket from Egypt
Probably 18th Dynasty, 1550-1300 BC
from collection of the British Museum

Weaving decorative and utilitarian objects is as old as recorded history (Figure 14). The transition to mass produced woven objects did not come about until the 19th century, when the Thonet Company and others, began mass producing furniture with wicker components. Figure 15 shows the first widely mass produced wicker chair. It was designed by Thonet, and is designated chair number 14 . It began distribution in the late 1850s. Figure 16 shows a wood and rattan partition which appeared in the 1904 Thonet furniture catalog. In addition to being strong and light weight, wicker is also an aesthetically pleasing material as Christopher Will points out in *International Basketry* published in 1978, "Even the simplest weave is an ornament, readily recognizable to the eye (pg.9).



Figure 15  Thonet Chair number 14. First produced in 1859. Still in production today, it has the distinction of being the longest running mass produced chair in history. This picture is take from the 1904 Thonet Catalog.



Figure 16  Thonet wood and rattan partition from the 1904 Thonet catalog

The use of wicker or rattan for the construction of pet cages can be reliably traced back to the beginning of the last century. In the *Department of the Interior Ethnological Survey 1904*, a photograph of a "cage in which fowls are shut at night" depicts a woven cage with a securable front opening from Manila (www.bohol.ph/books/bi/). See Figure 17.

British patent number 26728, issued in 1913, depicts a basket used for housing pigeons or poultry (Figure 18) that has woven wicker on all visible sides, and is rectangular in shape. The sides and top have open areas or windows. The horizontal length is greater than the horizontal width or the vertical height. The windows

are created by an absence of wicker, leaving the underlying frame as bars in the window. Another striking example of the use of wicker for a pet cage is shown in a posting on eBay on June 29, 2007. The cage is wicker on all sides with a door in front that swings open and is secured in place by a stick. The eBay description notes that the cage dates from the 1920s or 1930s (Figure 19). According to the seller, the wicker caged was purchased by his wife in the year 2000. She purchased the cage from an antique dealer. I have not been able to confirm the date of manufacture at this point; however, my grandmother owned a cage identical to the one shown in Figure 19 in the mid 1960s making this design at least forty years old.



Figure 17  Manilan bird cage  From the Department of Interior Ethological Survey, 1904



Figure 18  Pigeon cage , British patent number 26728, issued in 1913




Figure 19  Pet cage for sale on eBay  The seller dates it to the 1920s or 1930s  My grandmother owned a cage like this in the mid 1960s

In 1935 U.S. patent number 2,016,005 was issued for a dog bed made of wicker (Figure 20). More recently, plate 28 in *Modern Basketry from the Start*, 1973, (Figure 21) shows the design for a wicker animal cage. The cage has a rectangular silhouette, is wicker on all visible sides and the horizontal length is greater than the horizontal width or the vertical height. The windows and bars are created by an absence of woven material.

Page 126 of *belorusskie rhudazhestvennye pronnyslys*, a Russian book on basketry published in 1985 (Figure 22), shows a wicker or rattan pet cage with windows and a door. It has a rectangular silhouette, is wicker on all visible sides and the horizontal length is greater than the horizontal width or the vertical height. The windows and bars are created by an absence of woven material.



Figure 20. Dog Bed. Patent 2,016,005, issued 1935.



Figure 22. Rattan or wicker animal cage with windowed sides and door taken from page 126 of *belorusskie rhudazhestvennye pronnyslys*, 1985



Figure 21. Wicker cage design, plate 28 in *Modern Basketry from the Start*, 1973.

Additional examples of wicker animal houses are located in the attachments at the end of this report. They include those found on page 13 of *Indian Basketry, fourth edition*, 1909; pages 140, 141 and 155 of *Art of the Basket: Traditional Basketry from Around the World*, September 2001; pages 60, 88, and 125 of *Baskets, A Schiffer Book for Collectors*, 1994; and excerpts from *The Complete Book of Baskets and Basketry* by Dorothy Wright, 1992. All of these examples are made of wicker and provide windows for the pet to look out of.

## General pet cage construction

There are numerous patents covering general pet cage construction. All of the cages discussed on this page have a rectangular silhouette, and the horizontal length is greater than the horizontal width or the vertical height.

A patent issued in 1885 (318,812) describes a folding stock shipping cage with framed construction and woven panels. See Figure 23. Patent number 2,892,562, issued in 1959 is for a foldable metal cage with metal wire door (Figure 24). It is constructed of bent wire and stands on four legs. Patent number 4,762,085, issued in 1988, is also for a folding metal cage with metal wire door though its method of folding is different from the previous one (Figure 25 top). In patent number 5,626,098, issued in 1997, the cage is also made of metal wire and is also collapsible. The door opens toward the top (Figure 25 bottom). Patent 6,192,834, issued in February 2001, is also for a metal collapsible cage. It has an inset door on the front that swings from right to left (Figure 26). In each case, these cages are rectangular in shape. This is a function of the material (metal) the desired performance, (durability and collapsibility). In order for the pivot points and hinges to work, the edges have to be parallel, and the overall shapes rectangular.



Figure 23. Patent number 318,812. 1885.



Figure 24. Patent number 2,892,562. 1959.



Figure 25. Patents number 4,762,085 (top) and 5,626,098 (shown on bottom)



Figure 26. Patent number 6,192,834, issued February 27, 2001.

More recent patents include plastic cages, typically designed for smaller pets or for specialty applications. Patent number 5,960,744, issued in 1999 is for a plastic expandable cage. It features a solid shell with window cut outs, and a door inset from the front edges, and hinged on the right (Figure 27). Though it is expandable, it is not collapsible beyond a certain point because of the material and design. It is not an efficient volume for packaging or shipping. Patent number 5,967,090, issued in 1999, depicts a folding plastic structure without distinct windows, but with molded plastic grill on the sides, on top and on the door (Figure 28). The grill allows the animal to look out and provides a means for air circulation. The door is inset from the front edges and hinged on the right.



Figure 27. Patent number 5,960,744, issued 1999



Figure 28. Patent number, 5,967,090, issued 1999

12

## Combined materials

Combining wicker and metal or wood has a long history. In the 1850s the Thonet brothers combined wood and wicker in a number of different ways. As early as 1904, wicker or rattan was being used to create flat panels secured to wood frames. See Figure 29. A more recent example of this technique is shown in *International Basketry for Weavers and Collectors*, originally published in 1973 in German; translated and published by Schiffer in 1985 (Figure 30). Examples of contemporary wicker and frame construction also are shown in patent 5,931,326 for container assembly, patented 1999 (Figure 31), and patent 6,230,915 for a rattan basket, patented May 15, 2001 (Figure 32).



Figure 29. Thonet wood and rattan partition from the 1904 Thonet catalog.



Figure 31. Container assembly. Patent 5,931,326, 1999.



Figure 30. Wood framed partition with rattan weave. Image from *International Basketry for Weavers and Collectors*, published in by Schiffer. Translated in 1985 originally published in German in 1973.

13



Figure 32. Rattan basket. Patent 6,230,915. Issue May 15, 2001

The weave detail on both '326 and '915 is similar to the weave depicted in the '156 patent. In addition to some general similarities in the weave, all three designs ('156, '326, and '915) are rectilinear in shape to aid in production, shipping, and assembly.

Other examples of combined wicker and wood are shown in the figures on this page (Figures 33-35). It is important to note that the objects which are irregular in shape are not designed for contemporary methods of mass production. Additional examples may be found in the appendix.



Figure 33. Appalachian sleigh, 1986. Image take from *Appalachian White Oak Basketmaking: handing down the basket.*



Figure 34. Bermuda Carriage, circa 1920.



Figure 35. Wicker and metal or wood construction. Images from *International Basketry for Weavers and Collectors,* published in by Schiffer, Translated in 1985 originally published in German in 1973.

## Conclusions

### 1. Anticipation

Three pieces of art anticipate patent '156. See Figures 18, 36 and 37. My evaluation of designs that anticipate '156 is based upon *Chisum*, section 23.03 [5] which notes that "design anticipation requires a showing that a single prior art reference is 'identical in all material aspects' to the claimed invention."

Mr. Anders has argued that the only material features that distinguish the '156 patent from the prior art are that the '156 cage is wicker on all visible sides and, it is rectangular in shape with a rectilinear silhouette, whose horizontal length is greater than its horizontal width or vertical height. This is simply not the case. All of the pet cages depicted in Figures 18, 36 and 37 are wicker on all visible sides, rectangular in shape with a rectilinear silhouette, whose horizontal length is greater than its horizontal width or vertical height. All are made from wicker woven over a frame. All have windows that are created by an absence of wicker and make use of vertically spaced bars to maintain the structure and to keep the pet from getting out. All three cages have hinged, lockable doors. I do note that figure 18 has its door on the top, however, that is not a feature that Anders or Simpson Ventures has asserted as being material.

Accordingly the prior art clearly demonstrates the features Simpson Ventures now claims as novel. Moreover, under the Gorham test, an ordinary observer would view the over all designs as substantially the same.

### 2. Obviousness

In his patent evaluation for Simpson Ventures, Robert Anders asserts that the only point of novelty is the weave on all visible sides, " I observe that the design claimed in the '156 patent distinguishes from prior art in one respect: i.e., the point of novelty is a woven texture on all disclosed surfaces." As demonstrated in Figures 18, 36 and 37, those features are not novel or unique and therefore do not distinguish patent '156 from prior art.

Beyond that, as discussed earlier in this document, there are a number of pieces of prior art that, when combined, contribute to the design that is shown in patent '156. Rattan or wicker cages date back at least as far as the early 1900s (Figures 17-19 and 21-22). Moreover, patents for rectangular metal cages, both collapsible and fixed, have been issued for a number of designs over the past forty years (Figures 23-26).

A number of products combine wicker or rattan with rectangular frame pieces that are assembled to form containers. Two examples of this are patent '915 and patent '326 (Figures 31 and 32) discussed earlier in this report as well as the general technique of using woven material over a frame (Figures 29 and 30). The use of woven material has obvious design benefits because it allows air circulation, and it blends in with the environment more favorably than metal wire or plastic containers. It also provides cover for the pet which is important to its comfort. Moreover, a number of examples of wicker animal cages that predate the '156 patent have been cited in this report and in the attachments. Based upon this, I conclude that it would be obvious to a designer with ordinary skill in the art who had full knowledge of the prior art to combine wicker or rattan weave patterns to all surfaces of a rectangular cage structure for the purposes of providing the aesthetically pleasing pet containment structure and design that is the subject of the '156 patent. (Chisum 23.03 [6]).



Figure 36  Wicker cage design. , plate 28 in Modern Basketry from the start. 1973.



Figure 37  Rattan or wicker animal cage with windowed sides and door from page 126 of belorusskie rhuda-zhestvennye pronnyslys. 1985

## Additional issues of obviousness based on *KSR*

The recent Supreme Court ruling in the case of *KSR International Co. v. Teleflex Inc. et al.* (No. 04-1350) elaborates on several points that further address the issue of obviousness as it relates to the '156 patent.

## Uniting old elements

In writing the unanimous opinion for the Court, Justice Kennedy notes, "For over a half century, the Court has held that a 'patent for a combination which only unites old elements with no change in their respective functions ... obviously withdraws what is already known into the field of its monopoly and diminishes the resources available to skillful men.' This is the principle for declining to allow patents for what is obvious." Based on the points raised earlier in this section it is clear that the elements present in the '156 patent, woven texture on all visible sides, a lockable door on the front, windows that are created by an absence of woven texture, a rigid cage structure and a cage which is rectangular in shape and whose horizontal length is greater than its horizontal width or vertical height have all been present in earlier designs and are therefore obvious.

## Substitution of one element for another

Justice Kennedy went on to say, "The Court recognized that when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." Justice Kennedy further notes that in citing *Sakraida v. Ag Pro. Inc.*, the Court concluded that "when a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement the combination is obvious." In this case, the collapsing frame and wicker weave are a combination of old elements with each performing the function that it has previously performed; the wicker providing cover, air circulation, and an improved aesthetic, and the structural framework of the cage providing a structure that is rigid in operation but may be collapsed for shipping, storage or transportation. Thus the '156 patent is obvious.

## Predictable variation

The court also noted that in determining obviousness, it was important not to look too narrowly. "If a person of ordinary skill can implement a predictable variation, 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless the actual application is beyond his or her skill." Patents '326 and '915 (Figures 31 and 32) clearly show the application of a woven texture to a ridged frame in order to provide an aesthetically appealing surface with good circulation. This same technique would be obvious to a person skilled in the art (as described earlier in this report) to try as a method of providing cover, aesthetic finish, and air circulation for an animal cage. Beyond this, part of the design process involves product comparisons. Typically these include not only like products, but also an investigation of materials and processes from other fields that may have utility for the present design. This information is then used to create a variety of solutions based upon available technology, techniques, and methods. Patent '156 clearly demonstrates materials and techniques found in patents '326 and '915, both of which were patented prior to '156 and both of which would be recognized as having methods that would improve the pet cage.

## Fitting together of multiple patents

The Court further stated "Common sense teaches, however, that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle. Even if we disregard all of the previously noted ways in which the '156 patent is obvious and confine our examination to the teachings of prior patents, such as '562 (Figure 24), '834 (Figure 26), '085 and '098 (Figure 25), '744 (Figure 27), '090 (Figure 28), '326 (Figure 31), and '915 (Figure 32) we see that the '156 patent is, in fact, a combination of these features. It has a rigid collapsible frame (Figures 23 – 26), windows for the animal to view out (Figures 27 and 28) and a woven finish (Figures 31 and 32). Each of the above points serve to further emphasize that the '156 design is obvious to an ordinary person skilled in the art.

## 3. Analysis of infringement allegations

Based upon my review of *Chisum*, I understand there are two standards Simpson Ventures must meet in order to prove infringement. The first is satisfaction of the Gorham standard. The second is that it must demonstrate that the alleged points of novelty of the '156 design are present in Mid-West Metal's Bay Isle Collection.

### A. Points of novelty

With regard to "points of novelty," as explained in parts one and two of "conclusions," there are no points of novelty. Specifically, the only feature of the '156 patent design that Simpson Ventures has claimed as a "point of novelty" is "a woven texture on all disclosed surfaces." As already explained, this feature is in fact already present in the prior art. It thus cannot be a "point of novelty." In other words, this is not a feature that distinguishes the '156 patent design from the prior art because this feature has long been present in the prior art. Accordingly, there are no points of novelty presented by the '156 patent design.

The following analysis assumes that Simpson Ventures might now attempt to argue that *other* as-yet-unspec-

ified features of the '156 patent design are somehow points of novelty. I do not know which, if any, Simpson Ventures might actually present. I do have several observations though on the following features that Simpson Ventures might possibly attempt to assert. However, it is important to note that I have not yet undertaken to evaluate whether any of these features are in fact novel. In other words, I express no opinion yet on whether any of these features in fact distinguish the '156 patent design from the prior art, or are already present in the prior art. I reserve any opinion on that point contingent on whether Simpson Ventures even attempts to assert such a position.

Having noted this, the only possible points of novelty of '156 design might be in the individual weave patterns chosen for the rattan. While these patterns are not new (see Figure 8 and appendix material), they may be used or combined in unique ways.

Nonetheless, a number of visual differences exist between patent '156 and the Bay Isle Collection. [2]

---

[2] There are some differences within the Bay Island Collection. These are generally differences of size and proportion with the exception of model 1805 which has some additional noteworthy differences that will be discussed later. The following observations hold true for all of the Bay Isle Collection models (1824, 1830, 1836, 1842 and 1805) when compared with the possible points of novelty in patent '156.

### 1. Material separation

There is a material separation that patent '156 shows at the bottom of the right and left sides of the cage (Figures 38 and 39). This separation forms a visual break that is distinct to the design in '156 when compared with the Bay Isle Collection (Figures 40 and 41). This feature makes the right and left sides of '156 a composition of two visually distinct pieces.



Figure 38. 3/4 view of patent '156



Figure 39. Side view of patent '156



Right and left sides are continuous

Figure 40. Right side view of Bay Isle Collection by Mid-West



Right and left sides are continuous

Figure 41  3/4 view of Bay Isle Collection by Mid-West

## 2. Edge wrapping

In the '156 design the edges are tightly wrapped (Figures 42 and 43). There is no functional purpose that requires this particular weave. It is thus a decorative choice. In the Bay Isle Collection the frame is clearly visible at the corner edges (Figures 44 and 45).



The corner edges tightly wrapped and without gaps.

The corner edges tightly wrapped and without gaps.

The corner edges tightly wrapped and without gaps.

Figure 42. 3/4 view of '156 patent.



The corner edges tightly wrapped and without gaps.

Figure 43. Right side view of '156 design.



The corner edges display an exposed frame.

Figure 44  3/4 view of Bay Isle Collection by Mid-West



The corner edges display an exposed frame.

The corner edges display an exposed frame.

Figure 45  Right side view of Bay Isle Collection by Mid-West

22

### 3. Edge continuity

In the '156 design the decorative edges are tightly woven, continuous and uninterrupted (Figure 46). There is no functional purpose that requires this particular weave. It is thus a decorative choice. The Mid-West cage has prominent notches that are clearly visible along the top and bottom of both the right and left sides (Figure 47).



Continuous edges

Figure 46  Side view of pet house '156



Notches on the right and left sides create a distinctive difference between Bay Isle and '156

Figure 47  Right side view of Bay Isle Collection by Mid-West

23

### 4. Weave pattern

In the '156 patent the weave pattern on the top and back is plain, but the sides and front have an ornamental detail consisting of a vertical loose weave as defined earlier in this analysis (Figure 48).

#### a. Absence of the '156 pattern

The Bay Isle Collection does not have this distinctive loose weave pattern anywhere -- whether on the front, above the side windows or on the bottom side pieces (Figure 49) .

#### b. Bay Isle's decorative pattern

The Bay Isle design has a decorative square weave pattern woven on the top, sides and back wicker panels of the cage (Figure 49). The '156 patent does not have such a square weave decorative pattern (Figure 48).



Top of the '156 patent.

Decorative weave

Decorative weave

Decorative weave

Wrapping

Decorative weave

Side of the '156 patent.

Figure 48. Patent '156 weave detail

24



Figure 49  Bay Isle Collection Decorative Weave

25

### 5. Edge gap

The '156 design has no gap where the corner edges meet (Figure 50). The Bay Isle Collection has a distinct gap where the corner edges meet (Figure 51).



Enlarged view

Corner Detail

Side view of pet house '156

Back view of pet house '156

Figure 50. Patent '156 corner detail

26



Corner detail

Enlarged view

Gap

Side of the Bay Isle design

Back of the bay isle design

Figure 51  Bay Isle Collection Decorative Weave

27

### 6. Top edge
The top view of the '156 design shows no gap where
the top edges meet the sides (Figure 52 at top). The
Bay Isle design has a gap where the top edges come
in contact with the sides (Figure 52 at bottom).



Top View of pet house 156

Gap

Top view of the Bay Isle design

Figure 52  Comparison of top views of the 156 patent and the Bay Isle design

28

### 7. Window detail.

The '156 patent has tightly woven coils around the windows on the sides and around the handle on the back (Figure 53, top). The choice of tightly woven continuous coils is not dictated by function -- it is an aesthetic choice. The Bay Isle design has round coils woven above and below the side and back windows. The rounded coils do not stop at the edge of the windows, but continue clear across the side. The Bay Isle design does not have a handle on the back (Figure 53, bottom) The '156 patent does not have a window in the back (Figure 53 top).



Tightly woven, squared off coils around the perimeter of the side windows and the back handle

Side view of patent 156

Back view of patent 156

Rounded coils extend across the sides and back above and below the windows

Side of the Bay Isle design

Back of the bay isle design

Figure 53  Window detail of patent 156 and the Bay Isle design

29

## 8. Legs

While the concept of legs is functional, the style is possibly ornamental. The '156 design uses four clearly visible post-type legs (Figure 54, top). The Bay Isle design makes use of rubber feet that are not visible (Figure 54, bottom).



Side view of patent 156

Back view of patent 156

Legs

Side of the Bay Isle design

Back of the bay isle design

No legs

Figure 54  Leg detail of patent 156 and the Bay Isle design

### 9. Additional differences -- Bay Isle 1805

As mentioned earlier, the Bay Isle cage model 1805 has some additional differences when compared to the '156 patent.

#### a. Front opening

The '156 patent has a square front opening with a hinged door. The Bay Isle 1805 cage has an arched front opening and no door (Figure 55).

#### b. Two piece Front

The '156 patent has a single front panel with a hinged door. The Bay Isle 1805 has a two piece front panel (Figure 56).



Square front opening with door

Arched front opening No door

Figure 55 Bay Isle Collection Cage 1805



156 patent 3/4 view    One piece front

Bay Isle 1805    Two piece front

Figure 58 Bay Isle Collection Cage 1805 Front pieces

31

### c. Windows

The '156 patent has windows on the sides. The Bay Isle 1805 does not have windows on the sides (Figure 57).



Figure 57. Window comparison

## B. The Gorham Standard

*Gorham Mfg. Co. V. White* (1872) instructs us that identity is tested through the eyes of an ordinary observer rather than an expert: "[I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other..." (quoted from *Chisum* 23.05[3]).

This speaks to the overall look of the '156 patent when compared with the Bay Isle Collection. Based upon my experience as a designer and my analysis of the '156 patent and the Bay Isle Collection, I believe that there are three prominent attributes that distinguish the two cage designs for the ordinary observer: the edges, the presence or absence of separate side pieces, and the weave detail.

The first two attributes (edges and the presence or absence of separate side pieces) are part of the overall shape recognition. These are visual cues that we use to distinguish one shape from another. In the case of the '156 patent, the edges are crisp, continuous, and straight. The sides are made up, visually, of two different pieces. This is reinforced visually by the square edge bindings (Figure 58, left). In the eyes of an ordinary observer, the Bay Isle design is strikingly different in comparison. It has separated edges with noticeable gaps, single piece sides, and prominent notches along the top and bottom of the sides (Figure

58, right).

The third attribute (the weave detail) is a key part of the overall impression of the two cages. The '156 patent makes use of a loose weave decorative element on the front and sides. This element is vertical in orientation. There is no weave pattern on the top. The Bay Isle collection uses a decorative square weave pattern on the top, back, and sides of the cage. The square decorative weave is clearly different than the decorative details of the '156 patent, and would present a clear and noticeable difference to an ordinary observer (Figure 58). Based on this analysis it is my opinion that an ordinary observer would not view the two designs as substantially the same.

There are some additional specific points of overall difference that apply to the 1805 Bay Isle design. Applying the Gorham standard there are the following additional substantial overall differences between the Bay Isle design and the '156 patent: the arched opening and absence of a door on the 1805 compared to the square opening and door on the '156 patent, the two-piece front of the 1805 compared to the one-piece front of the '156 patent, and the lack of windows on the sides of 1805 compared to the prominent side windows on the '156 patent. These points, taken together, present additional overall differences that would be clearly noticeable to the ordinary observer when comparing the 1805 Bay Isle design to the '156 patent (Figures 55-57).



Two separate pieces

156 patent

Crisp, continuous, edges

Figure 58. Edge detail

Notches

Bay Isle Design

Visual separate edges

Bret H. Smith, IDSA
Professor of Industrial Design
Auburn University

8·17·07
Date

33

# Exhibit 3

In the United States District Court
For the Middle District of Alabama
Eastern Division

Simpson Ventures, Inc.,
*Plaintiff,*
V.
Mid-West Metal Products
Company, Inc.,
*Defendant*

Civil Action File No.
406-cv-901-WKW-VPM

## Supplemental Expert Report by Professor Bret H. Smith, IDSA

### Introduction

My Name is Bret H. Smith. I am a full professor in the Industrial Design department at Auburn University where I have taught industrial design for over twenty-one years.

I have been retained in the above referenced lawsuit as an industrial design expert witness. I am being compensated for my work here at a rate of $180 an hour. I have no financial interest in the outcome of this case.

I submitted a Review of U.S. Patent D 483,156 on August 17, 2007. This supplemental review is based upon the receipt of additional material from Simpson Ventures that lists six additional points of novelty. It is my understanding that these points have been devel-oped in response to my analysis. I have received and reviewed Simpson Ventures' Supplemental expert reports dated September 11 and September 22 of 2007. I have also received and reviewed the Interrogatories dated September 27, 2007. I understand that Simpson Ventures' responses may not be complete. I thus reserve the right to review Simpson Ventures' complete responses upon submission and to revise or supplement my analysis accordingly.

Additionally, I am in the process of acquiring a cage that Simpson Ventures says embodies the claims of the '156 patent. Thus, my investigation is ongoing, and I reserve the right to supplement this report based upon that analysis and additional information that may become available.

I

## Claims in Robert Anders' September 11 Supplemental Report

In the September 11, 2007 additional report Robert Anders makes the following additional claim:

> The points of novelty includes a pet home in the shape of a rectangular volume, the pet home having a woven outer texture with the appearance of wicker or the like, the woven texture appearing on the top, on the non-window portions of the sides and rear, and on a non-door portion of the front, the woven portion of the front substantially framing a non-woven door. (Paragraph 4)

In my original report, Figures 18, 21 and 22 are all in the shape of a rectangular volume, having a woven outer texture with the appearance of wicker or the like, the woven texture appearing on the non-window portions of the sides and rear (see Figures 1-3).



Figure 1. Pigeon cage . British patent number 26728. issued in 1913.



Figure 2. Rattan or wicker animal cage with windowed sides and door taken from page 126 of *belorusskie rhudazhestvennye pronnyslys*. 1985.



Figure 3. Wicker cage design. plate 28 in *Modern Basketry from the Start*. 1973.

The one claimed difference appears to be that the area around the door is open and that the door has the woven texture. Both the 156 design and the three cited here have visibility on the door side. This is important for the psychological comfort of the pet. Without this open space, the pet cannot see who is approaching the cage to let it out. This causes the pet to be ill at ease. That there is an open non-woven aspect to the cage on the door side is functional.

The 156 has simply reversed the placement of the wicker so that the door remains uncovered. This is a solution that would be obvious to a person of ordinary skill in the relevant arts as described on page 7 of my initial report. Additionally, cages shown in Figures 1-3 are structurally made from wicker or a similar material, and the weave is required to hold the door together. Because of the underlying metal structure in the '156 cage, the weave is not necessary to maintain the structural integrity of the door. Thus, if a wicker pet cage made use of a wire door, it would remain free of wicker. Figure 4 from *American Basketry and Wood-enware. A Collector's Guide* (New York Macmillan Publishing Co.: 1974) shows a rectangular wicker cage with woven outer texture with the appearance of wicker or the like, the woven texture appearing on the



Figure 4 from *American Basketry and Woodenware. A Collector's Guide*. New York Macmillan Publishing Co.: 1974.

2

top, on the sides and rear, and on a non-door portion of the front. The woven portion of the front substantially frames a non-woven door.

In addition to this, the prior art noted in my first report (see page 9) also shows us a clear example of a mostly open-area or windowed door being used on a wicker cage (Figure 5). The cage depicted in Figure 5 has a rounded top largely as a result of the materials requirements and the production technique for wicker. The Figure 5 cage has a handle on the top. If the top of the cage was flat, the force of lifting would be concentrated at the top corners of the cage, creating stress on the corner joints. By arching the top, the force is distributed across the entire top and sides. Figure 6 shows a wicker cage design featured in *Baskets* by Nancy N. Schiffer (a Schiffer book for collectors, 1994). The caption reads "wicker pet carrier, 17" high, (the Pennsylvania Farm Museum) $25-$75." Like the '156 cage, this pet carrier has wicker on the front edges substantially framing the door, while the door is largely open in construction. Finally, the poultry cage in Figure 7 is rectangular in shape with wicker on all visible sides and the front has an area that is largely non-wicker. **So all of the features claimed as novel in Mr. Anders' September 11, 2007 Supplemental Expert report all exist in the prior art.**



Wicker pet carrier, 17" high. *(Pennsylvania Farm Museum)* $25-75

Figure 6. *Baskets* by Nancy N. Schiffer (a Schiffer book for collectors), 1994



Figure 5. Pet cage for sale on eBay. The seller dates it to the 1920s or 1930s. My grandmother owned a cage like this in the mid 1960s.



Figure 7. Poultry Cage, circa 1910. Old Town, Maine, from *American Baskets: a Cultural History of a Traditional Domestic Art*. By Robert Shaw. 1999.

## Claims in Robert Anders' September 22 Supplemental Report

In his Supplemental Report of September 22 of 2007, Mr. Anders asserts six new claims of novelty. Those claims are separately repeated and evaluated below. However, it is important to note that the '156 cage is based upon a wire cage that is designed to collapse to be transported. This design requires that the sides be rectangular. Furthermore, the functionality design requires that there is no overhang of any of the edges, since this would prevent the sides from collapsing. So the shape of the sides results from the functionality of the underlying structure rather than from a decorative choice. Thus, the flat sides and non intersecting corners cannot serve as the basis for a claim of novelty.

### Point 1: The Extent of the wicker

*A pet home with a rectangular volume and having a top, sides, a rear, and a front, the top has an outer surface substantially having wicker, the sides each including a window and the non-window portion of each side has an outer surface substantially having wicker, the rear including a window and the non-window portion of the rear has an outer surface substantially having wicker, and the front includes a door and the non-door portion of the front has an outer surface substantially having wicker, wherein the sides and rear mostly have wicker, the majority of the front does not have wicker, and substantially the entire top has wicker.* (paragraph 3)

As shown in the Figures 1-4, 7, 8a, 8b, 8c, and 8d, a number of pieces of prior art are rectangular in volume having an outer surface of wicker with window and non-window portions on the sides. Figure 8 also shows three different pieces of prior art in which "substantially the entire top has wicker."

In addition to the Figures cited above that deal with rectangular cages, Figures 5 and 6 depict near-rectangular cages; cages which are rectangular in proportion but have an arched top. See Figure 9. Moreover, the rectangular shape for this design is largely dictated by the choices made for the function of the underlying collapsible cages. An arched top would not collapse flat.



Asserted novelty: Rectangular

'156 patent 3/4 view

Prior art, substantially wicker with a rectangular volume

These three also have window and non window portions on the sides

Figure 8a. Comparison of the claims of novelty in paragraph 3 of Anders' supplemental expert report dated September 22. 2007 with prior art

4

Asserted novelty: Majority of the front does not have wicker

Prior art where the majority of the front does not have wicker







'156 patent 3/4 view

Figure 8b. Comparison of the claims of novelty in paragraph 3 of Anders' supplemental expert report dated September 22, 2007 with prior art

Asserted novelty: Substantially the entire top has wicker

Prior art where substantially the entire top has wicker







'156 patent 3/4 view

Figure 8c. Comparison of the claims of novelty in paragraph 3 of Anders' supplemental expert report dated September 22, 2007 with prior art



Figure 8d. Comparison of the claims of novelty in paragraph 3 of Anders' supplemental expert report dated September 22. 2007 with prior art



Figure 9. Comparison of claim 1 of novelty in Supplemental Expert Report dated 9/22/07.

6

Mr. Anders also notes that there is a "window" and non-window portion on the rear of the cage. This is inconsistent with the patent drawings which show a slot at the top the back panel. While the slot on the back panel might serve as a handle, it could not properly be termed a window because the animal would not be able to see out of it because it is too close to the top of the cage and because it is too small. See Figure 10. This feature differs from the Mid-West Bay Isle design which has a window across the back of the cage. See Figure 11.

In addition to this, the Bay Isle 1805 design does not have a window or a handle in back. See Figure 12. So with respect to point of novelty 1 claimed by Mr. Anders, even if there were no prior art, which clearly there is, the 1805 cage does not match the first point of novelty asserted in Mr. Anders' Supplemental Expert Report of September 22, 2007.



This slot is too high to be a window. There is not enough distance between it and the top of the cage to allow the animal to see out.

Figure 10. Back view of pet house '156



Window

Back

Figure 11. Back of the Bay Isle design by Mid-West



The back of the 1805 Bay Isle design does not have a handle or a window

Back

Figure 12. Back of the Bay Isle 1805 design by Mid-West

7

## Point 2: The Door/Front Panel Configuration

> *A pet home with a rectangular volume and having a rectangular front, the front including a rectangular see-through door that is framed substantially by wicker. (paragraph 4)*

In Point two, Mr. Anders claims that the 156 design is unique because it is a pet home with rectangular front, the front including a see through door. However, the rectangular volume including a front rectangular see-through door design is documented in the prior art as shown in Figures 4, 13 and 14 of this report. Figure 14 Shows a sampling of the wide variety of cages with see-through doors. While the material surrounding the cages in Figure 14 are not wicker, the principle of the see-through door substantially framed by wicker is clearly established in prior art.

In addition, Figure 15 shows a poultry cage from 1910 that has a rectangular front including a see-through area of much the same proportions as that of the '156 design, that is substantially framed by wicker.

It is important to note that the see-though door serves the functional requirement of providing the pet with a clear view of people or animals as they approach. The wicker on the sides and back of the cage also prevent the animal from being approached from behind. According to Sandra McCune, Sub-Department of Animal Behaviour, University of Cambridge, and Madingley, Cambridge CB3 8AA, UK, in *Environmental Enrichment Information Resources for Laboratory Animals: 1965 - 1995: Birds, Cats, Dogs, Farm Animals, Ferrets, Rabbits, and Rodents*, forward visibility is an important aspect of habitat. It is important to the psychological comfort of the pet because it allows the pet to observe people or other animals as they approach the front of the cage. The see-through door also serves an important function for the owner because it allows the owner to observe the animal while it is in the cage.

As demonstrated earlier, this claimed point of novelty is clearly evident in prior art. Even if it were not present in prior art, the see through door serves a functional purpose and integrating such a door into a pet cage design would be obvious to a person of ordinary skill in the relevant arts.

Finally, it is important to note that the Bay Isle 1805 cage does not have a rectangular door. See Figure 16. In fact, this entry way has no door at all. So with respect to point of novelty 2 claimed by Mr. Anders, even if there were no prior art, which clearly there is, the 1805 cage does not match the second point of novelty asserted in Mr. Anders' Supplemental Expert Report of September 22, 2007.



Rectangular front with a front rectangular see-through door

Figure 13 from *American Basketry and Woodenware. A Collector's Guide*. New York Macmillan Publishing Co.: 1974.



Patents number and 5.626.098

Patent number 2.892.562. 1959.

Patent number 318.812. 1885.

Rectangular see-through door

Patent number. 5,967,090, issued 1999.

Patent number 5.960.744, issued

Figure 14: Examples of prior art rectangular see-through doors



'156 patent

Rectangular see-though area

Figure 15. Comparison of the front of the '156 patent with a poultry Cage, circa 1910. Old Town, Maine, from *American Baskets: a Cultural History of a Traditional Domestic Art*. By Robert Shaw. 1999.



Non-rectangular opening

Figure 16. The arched front opening of the Bay Isle 1805 cage

9

## Point 3: Distinct Panels

*A pet home with a rectangular volume, the pet home having the appearance of being formed from distinct, individual panels having wicker outer surfaces. (Paragraph 5)*

The prior art shows us that objects prior to the '156 design have been made of distinct rectangular wicker panels. Figure 17 Shows two patents that preceded the '156 patent, patent 5,931,326 from 1999 and patent 6,230,915 from 2001. Both of these patents depict a rectangular structure of distinct panels, made out of wicker.

Figure 18 shows a cage originally patented in 1885. Though the cage is not covered with wicker, it is composed of clearly separate rectangular pieces with a woven covering attached to the frame.

Likewise, the appearance of distinct panels is not new to wicker. Figure 19 shows a sewing stand that appeared in *Furniture Weaving Projects* by Lloyd F. Hyatt, published in 1922. The top and sides of the sewing stand give the appearance of distinct panels.

The technique of using independent panels is also clearly demonstrated in the lid of the poultry cage from 1910. See Figure 20.

Even if these examples of prior art did not match precisely the features being claimed as unique to the '156 cage the features would, nonetheless, be an obvious combination of attributes to a person of ordinary skill in the arts.

Moreover, as stated earlier, in the case of the '156 design, the appearance of individual panels is the result of a combination of the underlying wire cage structure and the physical requirements of collapsibility. See Figures 21 - 23.



Container assembly. Patent 5.931.326. 1999

Rectangular volume having the appearance of being formed from distinct panels

Rattan basket. Patent 6.230.915. Issue May 15. 2001

Figure 17: Prior art depicting a rectangular volume having the appearance of being formed form distinct panels



Rectangular volume having the appearance of being formed from distinct panels

Figure 18. Patent number 318.812. 1885.

10

Rectangular shape and the appearance of flat panels



Figure 19. Sewing stand from *Furniture Weaving Projects* by Lloyd F. Hyatt, published in 1922.

Rectangular shape and flat panels are necessary in order for the cage to be collapsible



Figure 21. Collapsible wire cage. Patent number 6,192,834, issued February 27, 2001.

Rectangular shape and flat panel



Figure 20. Poultry Cage, circa 1910. Old Town, Maine, from *American Baskets: a Cultural History of a Traditional Domestic Art.* By Robert Shaw, 1999.

Rectangular shape and flat panels are necessary in order for the cage to be collapsible



Figure 22. Collapsible wire cage. Patent number 4,762,085 issued 1988.

11

All of the features claimed in this point of novelty are clearly demonstrated in prior art and serve a functional purpose as described previously. If, for the sake of argument, we allow that wicker is a new feature (which the prior art clearly demonstrates is not the case) it would be, at best, a trivial advancement to anyone of ordinary skill in the art since there is wide spread evidence of using wicker to overlay existing conventional frame products. Figure 24, from page 689 of the 1925 *Sears and Roebuck Catalog* shows wicker being used as an alternative to cloth covering on strollers. Figure 25 shows wicker being used as a covering for a metal framed carriage. The author notes, "Very early in the nineteenth century, English coach makers introduced basketry bodies for gigs, considering them the best means to achieve strength without weight" (page 2). Clearly the idea of covering a frame with wicker is not new.



Figure 24. Wicker as a covering for strollers. Sears and Roebuck Catalog. 1925.



Rectangular shape and flat panels are necessary in order for the cage to be collapsible

Figure 23. Collapsible wire cage. Patent number 2.892.562 issued 1959.



Figure 25. Basket Phaeton. Circa 1900. *Baskets of Rural America* by Gloria Roth Teleki. 1975.

## Point 4: The Window Geometry & Placement

*A pet home with a rectangular volume and having a front, sides, a rear and a top, the pet home further having a rectangular window positioned in the upper half of each side and in the upper half of the rear, the non-window portions of the sides and rear having outer surfaces with wicker such that the rectangular windows are surrounded by wicker on all sides. (Paragraph 6)*

The claim here is that the pet cage geometry and the window placement is unique over the prior art. Figure 26 shows a wicker pigeon cage, patented in 1913, with a rectangular window positioned in the upper half of each side. The second part of Anders' claim (that there is a window in the upper half of the rear of the pet cage) is not consistent with the patent drawings, however, as explained previously. See Figure 27.

Though the claim also mentions wicker, the material is not relevant to the geometric features being claimed. Again, the geometry and placement of the windows exists in the prior art. Figure 28 shows patent 4,256,065 (1981), which is a pet cage that collapses for transport. The pet cage has windows on the sides and the rear that are located above the half way point. This is the same geometrical configuration asserted as being unique by Anders.

Figure 29 shows patent number 5,960,744 issued in 1999 for a rectangular pet cage that has windows on the upper half of the sides. This is the same geometry claimed by Anders as being unique. Thus, it can be clearly seen that the window placement is well documented in the prior art and therefore cannot be claimed as a new feature.

Finally, it is important to note that the Bay Isle 1805 cage does not have any windows on the sides or on the back of the cage. See Figure 30. So with respect to point of novelty 4 claimed by Mr. Anders, even if there were no prior art, which clearly there is, the 1805 cage does not match the fourth point of novelty asserted in Mr. Anders' Supplemental Expert Report of September 22, 2007.



This slot is too high to be a window. There is not enough distance between it and the top of the cage to allow the animal to see out.

Figure 27. Back view of pet house '156

Windows located above the half way point on the sides

Figure 28. Patent 4,256,065. 1981.



Windows located above the half way point on the sides

Figure 29. Patent number 5,960,744, issued 1999.



Figure 26. Pigeon cage. British patent number 26728, issued in 1913.

13



No windows on the side
or back of the 1805 Bay
Isle design

Figure 30: Lack of windows on the sides and back of Bay Isle cage 1805

## Point 5: Panels Without Overhang

*A pet home with a rectangular volume and having wicker outer surfaces over a majority of the pet home, the pet home having the appearance of being formed from individual panels, the panels being configured such that each panel extends substantially to the edge of the adjacent panels, but no panel extends beyond the adjacent panels.*
(Paragraph 7)

Once again, this type of panel placement is clearly demonstrated in the prior art. The panel technique that Mr. Anders describes can be clearly seen in patent number 5,931,326 issued in 1999 and in patent 6,230,915, issued in May of 2001. See Figure 31. In both the '326 patent and the '915 patent, there is the appearance of being formed from individual panels with each panel extending substantially to the edge of the adjacent panels without extending beyond the adjacent panels.

Even if these patents did not exist, the panel technique is clearly demonstrated in the construction of the lid for the poultry cage show in Figure 32. As such, the application of this technique would have been

obvious to a person of ordinary skill in the relevant arts to use the panel technique as a method of integrating a woven appearance and a collapsible pet cage.

The functional requirement that the cage be collapsible while the panels remain partially connected dictates that panels not extend beyond the edge of adjacent panels. This is a result of the functional requirements of the underlying wire cage structure. See Figures 21-23. If the wicker extended beyond the edges, it would not be possible to collapse the cage for shipping and transport. This makes this detail functional rather than aesthetic.

The feature that is being claimed as novel, is clearly demonstrated in the prior art and is being driven by the functional requirements of the underlying cage structure.

Finally, the Mid-west Metals cage is distinctly different. Its sides do not extend to the edge of the adjacent panel. There are significant gaps. See Figures 33 and 34. Thus, even if this were a novel feature that was not obvious to someone skilled in art, and even if it were not a result of the underlying structure, it would not be a feature that the Mid-west cages (including the 1805 cage) and patent '156 had in common.



Container assembly. Patent 5,931,326, 1999.

The appearance of being formed from individual panels with each panel extending substantially to the edge of the adjacent panels without extending beyond the adjacent panel.

Rattan basket. Patent 6,230,915. Issue May 15, 2001.

Figure 31: Prior art depicting panels which extend to the adjacent edges without going beyond them.

15



The appearance of being formed from an individual panel extending substantially to the edge of the adjacent panels without extending beyond the adjacent panel.

Figure 32. Poultry Cage. circa 1910. Old Town. Maine. from *American Baskets: a Cultural History of a Traditional Domestic Art*. By Robert Shaw. 1999.



Top view of the Bay Isle design.

Gap

The top, front, side and back panels do not extend substantially to the edge of the adjacent panels. There are substantial gaps.

Back of the bay isle design

Figure 33. Mid-west cage edge details



Top view of the Bay Isle 1805 design.

Gap

The top, front, side and back panels do not extend substantially to the edge of the adjacent panels. There are substantial gaps.

Back of the bay isle design

Figure 34. Mid-west Bay Isle 1805 cage edge details

### Point 6: A combination of the first five points

> A pet home, the pet home with a combination of the points of novelty as described in paragraphs 3 through 7 above. (Paragraph 8)

As seen already seen in this analysis, all of the features claimed in Mr. Roberts' supplemental expert reports (September 11, 2007 and September 22, 2007) are clearly shown in prior art.

Beyond this, the recent ruling by United States Court of Appeals for the Federal Circuit in *Egyptian Goddess, Inc. and ADI Torkiya v. Swissa, Inc. and Dror Swissa (Swissa)*, the Court of Appeals ruled that

> For a combination of individually known design elements to constitute a point of novelty, the combination must be a non-trivial advance over the prior art.

As noted earlier in this report, all of the features claimed in Anders' supplemental reports are clearly present in prior art. Figure 35 and those previous, show that every point that has been claimed is present in prior art, and any claimed advancement would be only trivial at best.

Moreover, the court noted that

> The question is not whether the infringement and validity analyses are similar or conflated, they already are. The question is: When the patentee claims a combination of old prior art elements as its asserted point of novelty should the test be one of anticipation or obviousness? We conclude that non-triviality ought to apply -- if the standard is akin to anticipation then a combination with even the most trivial difference would meet the standard.

Finally, in addition to the large body of prior art both in my original analysis and in this supplemental analysis, many of the features being claimed as unique such as windows and doors are not only not unique, they are driven by functional requirements. (See Expert report of Professor Bret H. Smith, dated August 17, 2007). Even it these claimed points of novelty were new, which they are not, they would represent, at best, a trivial advancement and one which would be obvious to a person of ordinary skill in the relevant arts. Their combination does not present any advancement over the prior art, let alone a non-trivial advancement.



Distinct panels without overhang

Window Geometry and placement

Rectangular Volume

Rectangular windows above the halfway point on the sides

Rectangular Volume

The front including a rectangular see-through door that is substantially framed by wicker

Rectangular volume having a top, sides, a rear and a front, the top having an outer surface substantially of wicker and the sides substantially of wicker with a window portion, etc.

Figure 35. Prior art for patent '156.

Bret H. Smith, IDSA
Professor of Industrial Design
Auburn University

11·5·07

Date

17

# Exhibit 4

In the United States District Court
For the Middle District of Alabama
Eastern Division

Simpson Ventures, Inc.,                 Civil Action File No.
*Plaintiff*,                            406-cv-901-WKW-VPM
V.
Mid-West Metal Products
Company, Inc.,
*Defendant*

## Second Supplemental Expert Report by Professor Bret H. Smith, IDSA

### Introduction

My Name is Bret H. Smith. I am a full professor in the Industrial Design department at Auburn University where I have taught industrial design for over twenty-one years.

I have been retained in the above referenced lawsuit as an industrial design expert witness. I am being compensated for my work here at a rate of $180 an hour. I have no financial interest in the outcome of this case.

I submitted a Review of U.S. Patent D 483,156 on August 17, 2007. Subsequently, I received and reviewed Simpson Ventures' Supplemental expert reports dated September 11 and September 22 of 2007, together with the Interrogatories dated September 27, 2007

after which I issued a Supplemental Report examining the additional claims as well as additional prior art.

Since the Supplemental Report, I have found two additional pieces of prior art. This prior art, patent 332,407 and patent 571,452, is the subject of this Second Supplemental Report.

Finally, I reserve the right to supplement the conclusions in this and previous reports to reflect any additional material that may come to light.

## Additional patents

In the course of my research I found two additional patents, patent 332,407 and patent 771,452, that are part of the prior art relating to the '156 patent. Patent 332,407 for a basket and skip was awarded in 1885. It describes a method of making baskets, skips and other similar articles stronger and more durable by using a wire metal frame in conjunction with a wicker or strand covering. See Figure 1. Patent 571,452 was awarded in 1896. It describes a method of reinforcing the top of a basket structure which can then be covered with a web of "any suitable material" (lines 84 & 85). See Figure 2



Figure 1 Method of making baskets stronger  Patent 332,407, awarded in 1885

Figure 2 Patent 571,452, awarded in 1896.

Enlargement added for clarity

As discussed in my initial and supplemental expert reports on the '156 patent, the '156 patent has several primary references. See Figure 3.

The '407 and '452 patents demonstrate the concept of weaving wicker onto a rectangular metal frame in or-der to strengthen the wicker. These patents date from 1885 and 1896, respectively. Both of these patents clearly set forth the idea of using a wire or wooden rectangular frame which is then covered in wicker or another suitable material. These patents further dem-onstrate the obviousness of the '156 design.

Wicker enclo-sure design, plat 28 in *Mod-ern Basketry from the Start.* 1973.





British Patent 20.728



Wicker enclosure from *American Basketry and Woodenware. A Col-lectors Guide.* 1974.

Wicker animal enclosure from page 126 of belorusskie rhudazhestvennye pronnyslys, 1985.



Figure 3. Primary references

_____

Bret H. Smith, IDSA
Professor of Industrial Design
Auburn University

April 22, 2008

Date

3

# Exhibit J

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
<u>EASTERN DIVISION</u>

| | | |
|---|---|---|
| SIMPSON VENTURES, INC., | ) | |
| | ) | |
| Plaintiff/Counterdefendant, | ) | |
| | ) | Civil Action File No. 306CV-901-WKW |
| v. | ) | |
| | ) | |
| MID-WEST METAL PRODUCTS | ) | |
| COMPANY, INC. | ) | |
| | ) | |
| Defendant/Counterclaimant. | ) | |

### *THIRD* AFFIDAVIT OF BRET SMITH

Bret Smith, being first sworn upon his oath, states the following:

1.)     I am over 18 years old, a resident of Auburn, Alabama, and otherwise competent to testify to the matters set forth herein.  The observations made herein, and the opinions derived from such, are based upon my personal knowledge and are based on my professional experience as an industrial designer.

2.)     I was retained by Mid-West Metal Company, Inc. ("Mid-West Metal") in this case to help investigate and evaluate the scope of design references that would have been relevant to the endeavor of developing an aesthetically pleasing or decorative pet cage in the period of time prior to September of 2001 – which is my understanding of when Mr. Jeff Simpson claims he first had the idea of a rectangular shaped wicker covered pet cage with windows and a door.

3.)     In the process of my investigation, I found numerous prior art references that were *not* presented to the United States Patent and Trademark Office as part of Mr. Simpson's prosecution of the 156 Patent at issue in this case, but which are nonetheless highly relevant to the endeavor of developing an aesthetically pleasing or decorative pet cage.  True and accurate copies of those prior art references are attached hereto as the following exhibits:

Exhibit 1 – 1985 Russian Cage
Exhibit 2 – 1973 Cage in Modern Basketry
Exhibit 3 – 1974 Carrier in American Basketry & Woodenware
Exhibit 4 – 1999 Cage in American Baskets
Exhibit 5 – 1912 Perry Patent (26,728)
Exhibit 6 – 2001 Cage 1 in Art of the Basket
Exhibit 7 - 1920s Cage

Exhibit 8 – 1994 Carrier in Baskets
Exhibit 9 – 2001 Cage 2 in Art of the Basket
Exhibit 10 – 1998 Schwartz Patent
Exhibit 11 – 1997 Askins Patent
Exhibit 12 – 2001 Kolozsvari Patent
Exhibit 13 – 1998 Ondrasik Patent
Exhibit 14 – 1885 Milbourne Patent
Exhibit 15 – 1896 Parthier Patent
Exhibit 16 – 1994 Mo Patent
Exhibit 17 – 2001 Liu Patent
Exhibit 18 – 1999 Weng Patent
Exhibit 19 – 1995 Ho Patent
Exhibit 20 – 1935 Giannasca Patent
Exhibit 21 – 2001 Basket in Art of the Basket
Exhibit 22 – 2003 Ziglar Patent

4.)    Each of these prior art references that are patents (Exhibits 5, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, and 22) are of course readily available to the public through various official repositories and websites, including at Auburn University – which is such a repository. I obtained or viewed copies of the same from Auburn University and/or various public websites (e.g., google.com and freepatents.com).

5.)    Exhibit 1 appears at page 126 of *Belorusskie Rhudazahevetveenye Pornnyslys*. It was authored by N.M. Shkut. Although the book is written in Russian, I am able to obtain this book from the Auburn University Ralph Brown Draughon Library and/or its interlibrary loan system (at call number NK 8713.S55), which is open to the public. The book was published in 1985.

6.)    Exhibit 2 appears at Plate 28 in *Modern Basketry From the Start*, by Barbara Maynard. It was published in 1973. I am able to obtain this book from the Auburn University Ralph Brown Draughon Library and/or its interlibrary loan system, which is open to the public.

7.)    Exhibit 3 appears at pages 36 and 37 of *American Basketry and Woodenware – A Collectors Guide*. It was authored by William C. Ketchum. I am able to obtain this book from the Auburn University Ralph Brown Draughon Library and/or its interlibrary loan system, which is open to the public. The book was published in 1974.

8.)    Exhibit 4 appears at page 93 of *American Baskets: A Cultural History of Traditional Domestic Art*, authored by Robert Shaw. I am able to obtain this book from the Auburn University Ralph Brown Draughon Library and/or its interlibrary loan system, which is open to the public. The book was published in 1999.

9.)    Exhibit 6, Exhibit 9, and Exhibit 21 each appear in the book *Art of the Basket: Traditional Basketry From Around the World*, authored by Bryan Sentance – at

pages 140 and 155. It was published in 2001. I am able to obtain this book from the Auburn University Ralph Brown Draughon Library and/or its interlibrary loan system, which is open to the public.

10.)    The product shown in Exhibit 7 is a wicker pet cage that is substantially identical to a wicker pet cage that I personally viewed sometime in the 1960s. It had been purchased by my grandmother, and was used by her in public settings. In addition, the cage is described as dating back to the 1920s by the eBay seller who was offering it for sale in August of 2007.

11.)    Exhibit 8 appears at page 125 of *Baskets (3rd ed.)*, authored by Nancy Schiffer. It was published in 1994. I am able to obtain this book from the Auburn University Ralph Brown Draughon Library and/or its interlibrary loan system, which is open to the public.

12.)    I understand that Mr. Simpson has testified that he did not prepare any drawings that visually or graphically show wicker as applied or woven to the structure of his pet cage – that he instead simply told the person at a manufacturing facility in China to weave the wicker to make it look similar to "outdoor furniture," and may have used lines to point to certain areas of the wire structure he wanted or did not want wicker to appear.

These concepts communicated by Mr. Simpson left a very wide variety of options for the weaver to choose from and use to create what ultimately became the design that is the subject of the 156 Patent. There is no such thing as a "standard" weave when it comes to wicker or rattan.

As I indicated in my reports, the choice of weave is an artistic one. It is a choice that involves a series of decisions including the width of the material, the pattern and technique of the weave, edge treatment, and the use of color. These decisions all have a significant impact on the visual character of the finished piece, as the attached pages (Exhibit 23) from *American Baskets: A Cultural History of a Traditional Domestic Art* clearly demonstrate (some page numbers added for reference).

For example, compare the basket on page 91 with that on page 109. Even though both are rectangular, and both are longer than they are wide or high, they look strikingly different. Likewise, the rectangular baskets shown on page 83, 84, 107 and 124 are almost identical in height, but the choice of weave pattern and color, makes them distinct from one another. The rectangular baskets shown on pages 135 and 163 are similar in height, width and length, yet they are distinctly different in appearance. This is true for the baskets on page 81, 97 and 91 as well. The baskets on page 106, 141, 184 and 174 are also strikingly different in appearance because of the difference in the weave pattern that was selected for each one.

One of the clearest examples of how the weave pattern affects the final appearance of a product can be seen on the website basketweaving.com

(http://www.basketweaving.com/camp_kit_variations.htm). See attached Exhibit 24.
This website shows nine baskets, each created from the same basket kit, each one
distinctly different from the others.

Using a material like wicker or rattan to cover an object involves a number of
design decisions. These decisions combine together to create a unique look in the final
product.

13.) The substance of my First Affidavit and my Second Affidavit of ~~today's~~ yesterday's
date, and all exhibits attached thereto, are incorporated herein by reference.


I AFFIRM, UNDER THE PENALTIES FOR PERJURY, THAT THE FOREGOING
REPRESENTATIONS ARE TRUE TO THE BEST OF MY KNOWLEDGE.

Dated: 7/29/08

Bret Smith

1317103

# Exhibit 1

Н.Н. Шкут

# Белорусские художественные промыслы

## (изделия из соломки и лозы)

МИНСК
«НАУКА И ТЕХНИКА»
1985

Case 3:06-cv-00901-WKW-WC   Document 60-26   Filed 07/29/2008   Page 3 of 6

ББК 85.12
УДК 745/5 (476)

Под редакцией
кандидата исторических наук
М. Ф. Пилипенко

Рецензенты:
доктор искусствоведения Л. Н. Дробов,
кандидаты искусствоведения М. Ф. Романюк, В. В. Шамшур

Фото Н. Н. Шкуты

Ш 4904000000—133    22—85
   М316—85

© Издательство
«Наука и техника», 1985.

# ПРЕДИСЛОВИЕ

Современное развитие народов нашей страны характеризуется всесторонним прогрессом, подъемом национальных, социалистических культур. На новый, более высокий уровень поднимается не только профессиональная, но и народная (традиционная) культура белорусского этноса и ее неотъемлемая часть — народное искусство. Идет процесс сближения традиционной и профессиональной культур, усиливаются взаимосвязи между ними, их взаимодействие. Обогащается социалистическое содержание народного искусства, повышается его идеологическое значение, неуклонно возрастает художественное мастерство.

Этим обусловлен возрастающий интерес ученых и трудящихся к белорусскому народному искусству. В последние десятилетия появились ценные монографические исследования по белорусской народной одежде, резьбе по дереву, керамике, изделиям из стекла и т. д. Однако некоторые весьма характерные для белорусского народа и своеобразные разделы народного искусства, в частности изготовление художественных изделий из соломки и лозы, оставались до настоящего времени почти не исследованными. Книга Н. Н. Шкуты восполняет этот пробел.

Автор знакомит читателя с историей этого раздела белорусского народного искусства, его развитием в дореволюционный и в современный период, глубоко исследует процесс изменения этого традиционного вида прикладного искусства в современную эпоху, раскрывает многосторонний, прогрессивный характер его, показывает региональные особенности изделий из соломки и лозы, плодотворное сотрудничество профессиональных художников и народных мастеров.

Белорусские художественные изделия из соломки представляют собой своеобразное явление не только в отечественной, но и в мировой культуре. Автор раскрывает их художественные особенности, показывает своеобразное значение

1 Раманюк М. Беларускае народнае адзенне.— Мн., 1981; Сахута Я. Напоткая разьба па дрэве.— Мн., 1978; Елатомцева И. Художественная керамика Советской Белоруссии.— Мн., 1966; Якимовіч Ю. Беларускае мастацкае шкло.— Мн., 1977.

3



Н. Д. Литюк. Корзина. Лоза. Гродно. 1971 г.

...лий. Возникшие под их влиянием новые виды техники плетения (веревочкой в четыре) в своей основе сохраняли традиционные приемы исполнения. Отгачивалось мастерство плетения, повышалось качество изделий. Корзинки, хлебницы становились подлинными художественными произведениями, сочетающими утилитарность с декоративностью.

Изменение форм плетеных изделий быта разнообразило технику плетения, создавало новые стилевые особенности исполнения. Возникновение новых приемов плетения и отмирание старых на гродненском промысле происходило на основе преемственности и сохранения исполнителями таких народных черт, как простота композиций, симметричность и строгость цветовых решений. Отсутствие ивы красноцветной (краснотала) и ивы миндальной (белолаза) компенсировалось обработкой прутьев белцем, необходимая окраска материала (светло-темно-коричневый цвет) достигалась применением той или иной компентрации раствора красителя. Сочетание теплых оттенков с преобладанием натурального цвета прутьев ивы миндальной повышало художественную содержательность бытового изделия. Декоративный рельеф, полученный в результате применения традиционных видов техники исполнения — постой-

ной, рядами, веревочкой в четыре пары прутьев, обогащает форму изделия, придает ей выявленные красотой природного материала лаконизм, пластичность.

Модификация в лозоплетении на гродненском промысле оказала положительное влияние не только на художественно-изобразительные средства, но и на техническое усовершенствование многих процессов. Очистка прутьев от коры теперь происходит на специальном приспособлении. Вставленные под углом один к другому и разделенные деревянные бруски ножа легко снимают распаренную кору ивы

127

ношенной плоскости плетения, делают изделия гродненских мастеров привлекательными.

Следует отметить, что гродненские мастера умело соединяют народную традицию с живым восприятием действительности. Благодаря этому их плетеным изделиям свойственно разнообразие творческого подхода, который заключается в более ярком колорите, эмоциональности и свободном композиционном строе. Национальное своеобразие изделий выражается не только в колорите, композиционных приемах, но и технике исполнения. Своим самобытным творчеством плетения гродненские мастера в какой-то мере оказывают воздействие на тиражируемую продукцию художественной промышленности, на изменение форм и декора изделий из лозы. В большинстве случаев корзинки, кухонная утварь приобретают формы, навеянные творческим воображением мастера. Их влияние ощущается и в строгой уравновешенности и в композиционной завершенности.

Модификация бытовых изделий из лозы, ощутимо проявившаяся на гродненском художественном промысле в конце 60-х годов, повлияла не только на традиционную форму изделий, но и на технику исполнения. Это было прямым следствием привлечения профессиональных художников для создания тиражируемых изде-

126



Н. Д. Литюк. Корзина. Лоза. Гродно. 1971 г.



Н. Д. Литюк. Лоток для голубей. Лоза. Гродно. 1969 г.



нения, это нововведение становится только функциональным. Нужно разумно использовать искусственный материал, создавать формы изделий на основе локальных традиций.

Отметим, что традиционность заключается не во внешнем заимствовании, а в крепкой органической связи содержания, художественной формы, техники исполнения, материала/с соответствующими им опытом и жизненными потребностями.

Подлинное новаторство возможно только на основе глубокого и критического усвоения традиций в их комплексе, в бережном отношении к художественному наследию. Копирование или, наоборот, «прямой отход» от традиций не имеют ничего общего с запросами современности. Только на основе творческого освоения опыта народных мастеров можно определить тенденции развития народных традиций. Умение мастеров-художников степень традиции и развивать ее — одна из актуальных задач художественных промыслов.

Традиционностью материала и техникой исполнения отмечаются бытовые изделия из лозы и речной травы (ситника) мастера В. Корниенко. Ему принадлежит заслуга возрождения лозоплетения в конце 60-х годов промысле в мозырском Корзинки больших и маленьких размеров выполнены мастером без претензий на ми-



делия получают здесь пространственное развитие. Сплетение локальных цветов ивовых прутьев (белого, желтого и коричневого) становится составной частью художественной формы. Однако в начале 70-х годов художественный промысел стал снабжаться только миндальными ивовыми прутьями, а для усиления декоративности и увеличения производительности — разноцветным эпролоновым пластмассовым шнуром. Замена природного материала искусственным оказалась неравноценной. Чрезмерное увеличение экспериментами подобного рода превращает традиционное лозоплетение в «ремесло».

Коллекции народных изделий из природных материалов — соломки и лозы, хранящиеся в фондах музеев нашей страны, открывают перед нами путь в большой и уникальный мир.

Плетеные изделия из природных материалов были составными элементами домашнего быта. В них материализованы эстетические представления, переходящие из поколения в поколение. На современном этапе в век унификации, стандартизации многие изделия из лозы и на мозырском промысле утрачивают художественное выражение из-за чрезмерного применения искусственных материалов. Не смотря на соблюдение традиционных видов техники испол-

В. Я. Ращепа. Корзина. Лоза. Гродно. 1975 г.



мую известность. Следуя местным видам техники плетения — постойной и веревочной (в четыре прута) мастер творчески сочетает их с лентами-косичками из ситника. Как по цветовой гамме, так и стилям техники плетения из природных материалов-модельные изделия отличаются благородством и чистотой форм, своеобразием декора. В них не только твердое следование народным традициям, но и смелые поиски новых форм и техники плетения, которые повышают художественные достоинства изделий. Например, оборачивание ручки корзинки накладываниями двух прутьев, оплетенных ивовой лентой, ведет за собой

В. А. Драгуновская. Корзина. Лоза. ситник, «кожезаменитель, металлическое соединение. Гродно. 1974 г.

131

Б. К. Гончарук. Корзина. Лоза, ситник. Гродно. 1971 г.

130



В. И. Гаврилюк. «Мой родны кут». Соломка. Брест. 1967 г.

И. А. Третьяков. Соломиная шкатулка. Могилевская обл. 50-е годы XX в.

Чрезмерное перенасыщение элементов как по композиции, так и по декору снижает художественную ценность вазы, формы изделий часто бывает конструктивно незаконченной, и тогда предмет неустойчив на плоскости. Это наблюдается в творчестве многих начинающих мастеров, которые повторяют традиционные изделия, предназначенные для утилитарных целей. Необходим творческий подход к художественному наследию прошлого.

В цветенных вазах из ситника В. Гаврилюк уточняет пропорции, оживляет силуэт. И когда здесь нет декора на изделиях, несомненно, ощущаются художественные приемы народного искусства, которые глубоко и самостоятельно переосмыслены мастером.

Часто для создания декора ваз, шкатулок и кухонной утвари В. Гаврилюк применяет бересту, украшенную узорами из соломки. Это явление в ее творчестве вызвано влиянием подольского народного искусства «вышиванки»[2].

Корзинки, выполненные могилевским мастером Е. Арте-

менно в начале 80-х годов, созданы также на основе народных традиций соломоплетения. В них ощущается умение автора соединить технику плетения с формой, созданной под влиянием современных фабричных вещей из металла, пластмассы и стекла. Сочетание традиционных видов техники плетения с современными формами предметов подчеркивает бытовое назначение изделия и является результатом модификации традиционных форм.

В плетенных из соломки изделиях часто наблюдается стремление к перенасыщенной декоративностью. Форма корзинок с цветами, выполненных из соломки и разноцветных ленных ниток, соответствует традиционной, однако перегружена излишними деталями, чрезмерное многообразие техники плетения приводит к лесническому народному творчеству претенциозности. Задача мастера не только сохранить технику исполнения в изделии...

2 Ганцкая О. А. Народное искусство Польши.— М., 1970, с. 95.

34

35

# Exhibit 2



*Plate 28   Circus cage in buff willow*

# Exhibit 3

EXHIBIT
208
6-9-08
PENGAD 800-631-6989

Basketry    36

Similarly decorated were bonnet or cap baskets in which women going on visits carried their beribboned headgear. A prosaic hood or dust bonnet was worn in transit, and at the end of the journey it was exchanged for the one carried in the basket.

### Clothes baskets and hampers

Nearly half of the willow basketry listed in Mace's 1883 catalog related to the laundry. There were nested oval clothes baskets in small, medium, and large from $6.50 to 9.00 per dozen; square and oval laundry baskets including a set of five "ex. heavy" at $6.50 the dozen; and three sizes of square hampers. All were in a natural finish and were substantially similar to their modern counterparts.

### Flax baskets

Alice Earle, in her *Home Life in Colonial Days*, illustrated a conical openwork flax basket of unsplit willow. This repository for cleaned flax fiber had a circular opening through which the flax was inserted and a shallow loop carrying handle. It was some fourteen inches high by seven in diameter and was left unfinished.

### Utility baskets and boxes

Various utility baskets in willow or willow with splint are the most common items found in this medium. The handled basket shown in figure 24 was probably for storage, while the small open splint and willow containers illustrated in figure 25 are fruit or whatnot baskets.

The large wicker box pictured in figure 26 is the forerunner of today's cat or dog carrier. It dates from the early days of the twentieth century.



Figure 24.

Figure 25. Above, *whatnot basket*; right, *fruit basket*.

Figure 26.

# Exhibit 4



designs,

which    they

stamped or painted

in place after weaving the

basket. Natural vegetable dyes

such as indigo (*Indigofera* sp.), walnut hulls, or the red berries of Solomon's
seal (*Polygonatum* sp.), or commercial dry pigments mixed with water and
animal-hide glue were often used to color the splint. A mixture of red and
white lead, which produced what is now called Mohegan pink, was partic-
ularly popular, partly because the materials were inexpensive. Indians typi-
cally applied the dye only to the outside face of the splint, so that the
interior and bottom of the basket remained plain. They often wove dyed
and undyed splint together to create horizontal bands or patterns of color:

above: POULTRY CAGE

*John T. Ranco c. 1910. Old Town, Maine. Black
ash, sweetgrass, wire. H: 16", W: 13½". Shelburne
Museum, Shelburne, Vermont. Photograph by Ken
Burris.*

This unusual basket cage may have been
used to transport chickens or ducks to
market. The basket's lid is secured with a
wooden peg at the front.

# Exhibit 5



# N° 26,728    A.D. 1912

### Date of Application, 21st Nov., 1912
### Complete Specification Left, 21st May, 1913—Accepted, 13th Nov., 1913

## PROVISIONAL SPECIFICATION.

### Improvements in or relating to Baskets for Pigeons, Poultry and the like.

I, WILLIAM PARRY, Blacksmith, 48, Lower Monk Street, Abergavenny, Monmouthshire, do hereby declare the nature of this invention to be as follows:—

This invention relates to an improved basket for exhibition or transit purposes of pigeons poultry and the like and provides for an hygienic effectual and easy
5 method of feeding and watering the birds during exhibition or transit through the following arrangement.

I provide a wickerwork partition inside of basket, setting off sufficient space to contain feed and water troughs which is so constructed as to allow the birds to take feed or water at any time.

10 For the purposes of replenishing the troughs I leave open spaces on the outside of basket next same.

Over the troughs I provide an hinged lid for the placing in or removal of the troughs secured by eyes or staples through which an iron pin is passed and so made that the lid may be securely fastened or locked.

15 Dated this 18th day of November, 1912.

WILLIAM PARRY,
Blacksmith,
48, Lower Monk Street, Abergavenny.

## COMPLETE SPECIFICATION.

### 20 Improvements in or relating to Baskets for Pigeons, Poultry and the like.

I, WILLIAM PARRY, 48, Lower Monk Street, Abergavenny, Monmouthshire, Shoeing and Agricultural Smith, do hereby declare the nature of this invention and in what manner the same is to be performed, to be particularly described
25 and ascertained in and by the following statement:

This invention relates to an improved basket for exhibition or transit purposes of pigeons or poultry and provides for an hygienic, effectual and easy method of feeding and watering the birds during exhibition or transit through the following arrangement.

30 In an ordinary transit basket I provide a wickerwork partition inside of basket between which and the end of same sufficient space is left to contain food and water troughs.

I provide and fix portable troughs made preferably with zinc therein, the same being held in proper position by the wickerwork partition and sides of basket.

35 The partition being so constructed as to allow the birds to take food or water at any time.

*[Price 8d.]*



2                    Nᵒ 26,728.—A.D. 1912.

*Parry's Improvements in or relating to Baskets for Pigeons, Poultry and the like.*

For the purposes of replenishing the troughs I leave open spaces on the outside of the basket next same and over the troughs I provide an hinged lid for placing in or the removal of the troughs secured by eyes or staples, through which an iron pin is passed and so made that the lid may be securely fastened or locked.

The accompanying drawing will explain the invention in detail.                5

The "figure" shews basket complete.

The letter *a* shews hinged lid.

The letter *b* points to, and is intended to shew the wickerwork partition, and the position occupied by the troughs is shown by the letter *c*.

The special feature of this basket is to enable the birds to always obtain clean     10 food and water in transit or otherwise.

Having now particularly described and ascertained the nature of my invention and in what manner the same is to be performed, I declare that I am aware that it is not novel in a bird cage to prevent pollution of the food and water by means of an openwork partition separating the food and water from the body of the     15 cage but what I claim is :—

In an ordinary transit basket the provision of a fixed wickerwork partition so placed as to hold in a proper position between it and the sides of the basket the food and water troughs, thereby preventing to a great extent the food and water becoming contaminated.                                                            20

Dated this 18th day of October, 1913.

WILLIAM PARRY.

Redhill: Printed for His Majesty's Stationery Office, by Love & Malcomson, Ltd.—1913

A.D. 1912. Nov. 21. N⁰ 26,728.
PARRY'S COMPLETE SPECIFICATION.

( 1 SHEET )

[This Drawing is a full-size reproduction of the Original.]



Malby & Sons, Photo-Litho.

BIRMINGHAM
REFERENCE LIBRARY
PUBLIC LIBRARIES

# Exhibit 6



# BIRDS

**B**IRDS have been a source of food and entertainment since time immemorial. The transition from hunting to domesticating birds necessitated the development of cages and containers that would keep a bird captive, but also allow the passage of light and air.

### Food

**S**OME fowl intended for the table are kept permanently cooped up, but most are allowed to wander about scavenging for food. They may be held in a compound, restrained on a leash or have their primary feathers clipped, but at night they may be caged and hung out of the reach of prowling predators.

Carrying fowl to market to sell them also requires a basket, often made to contain a number of birds. In the West these are generally wicker, but in the East they most often have a hexagonal plaited structure of bamboo or rattan.

### Nests

**T**O encourage the breeding of captive and wild birds artificial nests were once common in Western Europe. They







FOUR

# Exhibit 7





# Exhibit 8



*Baskets*

*Nancy N. Schiffer*

*With Price Guide*

A Schiffer Book for Collectors

Splint Baskets



Woven splint bonnet; English; early nineteenth century. *(Herbert Schiffer Antiques)* $600-750



Woven splint bonnet; made in Pennsylvania by Quakers. *(Schwenkfelder Museum)* $450-600

Oak splint cat's bed with nailed rims; mid-Atlantic area; 19-1/2" wide, 15" high. $200-350





Two rib-type baskets specialized to transport pigeons.
Left, willow and reed; Right, oak splint, $150-200 ea.



Splint gathering basket
made by Mari D'Onofrio of
Branford, Connecticut in
1983. *(Natural Basketry,
Photograph by Gerard Roy)*
$75-125





Wicker clothes hamper;
Pennsylvania; 22-1/2" square, 30"
high. *(Pennsylvania Farm Museum)*
$40-150



Left, large painted wicker hamper 18" diameter, 17-1/2" high; right,
wicker bird cage, 19" high. *(Pennsylvania Farm Museum)* L. $25-30,
R. $30-50



Wicker pet carrier, 17" high. *(Pennsylvania Farm
Museum)* $25-75

125



A stairwell became the fishing closet. *(Pauline White Collection)*

Two wicker fishing creels; left, with leather strap and reinforcements, 14" wide, 8" high; right, with woven hemp strap, 12" wide, 7" high. *(Pauline White Collection)* L. $110-250. R. $75-150.

# Exhibit 9



# Exhibit 10

US005845970A

# United States Patent [19]

## Schwartz

[11] **Patent Number:** 5,845,970

[45] **Date of Patent:** Dec. 8, 1998

[54] **YARN HAVING WICKER APPEARANCE AND ARTICLE MADE THEREFROM**

[75] Inventor: **Larry Schwartz**, Franklin Lakes, N.J.

[73] Assignee: **Sun Isle Casual Furniture, LLC**, Franklin Lakes, N.J.

[21] Appl. No.: **944,922**

[22] Filed: **Oct. 6, 1997**

### Related U.S. Application Data

[60] Division of Ser. No. 846,368, Apr. 30, 1997, Pat. No. 5,803,540, which is a continuation-in-part of Ser. No. 697, 464, Aug. 26, 1996, Pat. No. 5,704,690.

[51] Int. Cl.⁶ ............................... **A47C 5/02; A47C 5/12**

[52] U.S. Cl. ................................. **297/451.9**; 297/452.64; 428/17

[58] Field of Search ........................... 297/451.9, 452.63, 297/452.64; 428/15, 17

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 15,252 | 8/1856 | Williams . |
| D. 32,542 | 4/1900 | Tyler . |
| D. 91,125 | 11/1933 | Thomas . |
| D. 217,601 | 5/1970 | Borichevsky . |
| D. 220,906 | 6/1971 | Borichevsky . |
| D. 272,020 | 1/1984 | Baty . |
| D. 316,338 | 4/1991 | Frinier . |
| D. 328,981 | 9/1992 | Wisner . |
| D. 337,094 | 7/1993 | Bernstein . |
| D. 345,262 | 3/1994 | Caldwell . |
| 3,436,870 | 4/1969 | Sellman . |
| 3,691,749 | 9/1972 | McKay . |
| 3,700,544 | 10/1972 | Matsui . |
| 3,839,526 | 10/1974 | Riley et al. . |
| 4,460,649 | 7/1984 | Park et al. . |

### OTHER PUBLICATIONS

Advertising copy from Brown Jordan "Eastlake" design.

*Primary Examiner*—Peter R. Brown
*Attorney, Agent, or Firm*—Lerner, David, Littenberg, Krumholz & Mentlik

[57] **ABSTRACT**

A stackable arm chair is constructed from the combination of a frame which supports woven material to form the chair's seat, back and side arm portions. Openings provided in the side arm portions enable passage of the rear legs of an adjacent arm chair to provide a nested forward stack occupying a minimum of volume. The openings are configured and dimensioned so as to cooperate with a conventional cushion to block the openings from view thereby eliminating the conventional stackable chair appearance.

**11 Claims, 21 Drawing Sheets**







FIG. 1

FIG. 2

FIG. 3



FIG. 4

FIG. 5

FIG. 6



FIG. 7

FIG. 8

FIG. 9



FIG. 10

FIG. 11

FIG. 12



FIG. 13

FIG. 14

FIG. 15



*FIG. 16*



*FIG. 17*



*FIG. 18*



*FIG. 19*



FIG. 20



*FIG. 21*



FIG. 22



*FIG. 23*



*FIG. 24*



*FIG. 25*



*FIG. 26*





FIG. 27



120

188

*FIG. 28*





FIG. 29



**FIG. 30**



*FIG. 31*



*FIG. 32*



*FIG. 33*

5,845,970

**1**

## YARN HAVING WICKER APPEARANCE AND ARTICLE MADE THEREFROM

This is a division of application Ser. No. 08/846,368, filed Apr. 30, 1997, now U.S. Pat. No. 5,803,540, which is a CIP of application Ser. No. 08/697,464, filed Aug. 26, 1996, now U.S. Pat. No. 5,704,690.

### BACKGROUND OF THE INVENTION

The present invention relates in general to stackable furniture, and more specifically, to stackable arm chairs having removable seat cushions, the chairs constructed from synthetic yarns of polymer material having a natural wicker appearance which are suitable for use in a variety of environments such as outdoors. The yarns and weaves of the present invention are also disclosed in Applicant's pending Design Application Ser. No. 056,425, filed on Jun. 28, 1996.

Natural wicker has been used in the manufacture of furniture, baskets and other articles for many centuries. Natural wicker articles are manufactured from the twigs or branches of various plants that are first soaked in water in order to make them pliable, then woven to form into the article and finally allowed to dry. Furniture manufactured from wicker offers greater comfort than furniture manufactured from other materials because of wicker's inherent compliancy. Further, wicker is light weight and reasonably strong, making it an important material in the manufacture of furniture.

In recent years, the popularity of wicker furniture has increased significantly. The casual, informal appearance of wicker has made it especially popular for use in enclosed porches and other informal settings in homes, hotels and other establishments. Natural wicker, however, has had limited use in the outdoor furniture market, including patio furniture, pool furniture and the like. This is because natural wicker softens and weakens when wet, and is more susceptible to rotting and mildew than many other natural and man-made furniture materials. Further, natural wicker furniture is expensive because of the cost of the raw natural wicker which must be harvested and treated. The cost of natural wicker furniture is also increased by the added step of moistening the wicker before weaving it into furniture.

Woven wicker typically comprises a warp yarn, i.e., a yarn running straight through the woven material and providing support, and a weft yarn, i.e., a yarn used as filler that is woven around the warp yarn. Numerous styles of weave are used in the manufacture of wicker furniture. The various styles of weave result in a different look, feel, strength and weight of the finished woven product. In a simple weave pattern, the warp yarns are spaced apart and arranged parallel to each other. The weft yarns are woven over and under alternating warp yarns. Adjacent weft yarns pass on opposite sides of a given warp yarn. Variations of this pattern, such as passing the weft yarn over two adjacent warp yarns, are known in the art.

Wicker is additionally used in the manufacture of furniture by covering structural members such as legs and arms by wrapping. Further, decorative open patterns may be incorporated into an article of furniture between the panels of woven material and the structural members.

A primary reason for the popularity of wicker is its unique, natural look. Inherent imperfections in the natural plant material used in manufacturing wicker furniture create random changes in coloration and texture across the surface of a given woven panel. The imperfections may reflect light differently from the surrounding areas of wicker, or may

**2**

appear as local changes in color or hue within a woven wicker panel. The small nicks and knots present in a natural wicker yarn further create a unique, mildly rough "feel" to wicker.

Other materials have been used in the manufacture of wicker-like furniture. For example, metallic wire has been wrapped in natural rush or paper and woven to simulate natural wicker furniture. Like natural wicker furniture, furniture made in this manner may not be used in outdoor environments. In addition, the wrapping tends to tear and wear away from the wire, causing unsightly defects.

Polymer yarns have also been used to manufacture wicker-like furniture. In one example of a polymer yarn, a polyester filament cord is coated with a polyvinyl chloride (PVC) coating. Wicker-like furniture manufactured from such polymer yarns has been found to be strong, wear-resistant and relatively inexpensive. In addition, polymer wicker chairs may be used outdoors because the yarn is resistant to the effects of water and the environment. Wicker-like furniture manufactured from a smooth, monochrome polymer yarn, however, has an artificial look and feel. A woven panel of such furniture has a uniform, uninterrupted color and reflects light without variation across its surface. It is immediately evident that furniture manufactured from such yarn has been made from man-made materials, and the furniture has, in general, a "plastic" look. In addition, such panels have a smooth, silky feel, unlike the slightly roughened feel of natural wicker.

In order to overcome these deficiencies in synthetic yarns, a longitudinal color stripe has been added to the outside surface of a polymer yarn in order to give furniture manufactured from that yarn a more natural look. The stripe imparts a variation of color on the surface of a material woven from that yarn. The material, however, remains smooth and silky to the touch, unlike natural wicker and hence, still retained much of its "plastic" look.

In another example in order to impart a more natural feel to a panel woven from a polymer yarn, raised points have been formed on the outside surface of the polymer yarn, giving it a star-shaped cross section. Such raised points interrupt the light reflection by the yarn, decreasing the artificial look of a smooth yarn surface. The raised points, however, form a very rough surface on the woven material, making it uncomfortable and likely to catch delicate clothing. The surface color of the polymer yarn may have a motley look in different hues. In sum, no adequate yarn material has been suggested for the manufacture of a wicker-like article of furniture that has the look and texture or feel of natural wicker, but is durable and may be used in a variety of environments such as an outdoor setting.

Furniture such as chairs are often shipped from the manufacturer or distributor to the retail store and/or to the ultimate consumer in protective cardboard boxes. In the absence of the ability to stack these chairs, each chair would necessitate its storage in its own container. As a result, substantially increased storage space at warehouses, as well as truck space during shipping is required for these chairs. It would therefore be highly desirable to be able to stack a plurality of chairs into a single nested stack which would occupy approximately the same floor space as a container having a single chair therein. To this end, there is known a number of chairs which are stackable. For example, stackable chairs are disclosed in Rowland, U.S. Pat. No. 3,338, 591; Wilson, U.S. Pat. No. 2,997,339; Barile, U.S. Pat. No. 5,524,963; Stafford, U.S. Pat. No. 3,053,493; Perry, U.S. Pat. No. 5,383,722; and Timmons, U.S. Pat. No. Des.

5,845,970

**3**

374,129. Each of the aforementioned patents disclose stackable chairs which are specifically constructed without arm rests.

Chairs which have arm rests are desirable for many applications since the sidearms reduce fatigue of the person sitting in the chair and therefore increase the ability of the sitter to concentrate. In addition, certain chair designs lend themselves more suitable for those having arm rests, such as chairs having a wicker look. Accordingly, chairs having arm rests are desirable for many uses, for example, indoor and outdoor furniture where a particular look or style is desired, as well as to provide additional sitting comfort. However, in general, chairs having arm rests do not typically provide stackability because the arm rests interfere with the stacking arrangement and/or increase the stack height of the chairs to render stacking undesirable. There is known from Guichon, U.S. Pat. No. 5,044,691 and Sebel, U.S. Pat. No. 4,441,419 stackable chairs having armrests. In Sebel, the legs are formed with outwardly directed channels, the forward edge portion of each rear leg and the rearward edge portion of each front leg being extended upwardly beyond the seat to form rearward and forward portions of the corresponding arm rests. This construction allows the legs from adjacent chairs to be received within the outwardly directed channels to enable stacking of the chairs. However, this construction severely limits the ability to create stackable arm chairs of various designs. In Guichon, the front and rear legs are similarly constructed, with the rear legs passing through notched sections of the seat which communicate with the rear leg channels.

It has been found desirable to provide arm chairs with side panels which are substantially closed to create a pleasing appearance. To this end, there are known stackable arm chairs of the aforementioned type in which a relatively large opening is provided in the side panels to allow passage of the rear legs of another chair to accommodate stacking. However, because of the large size of these openings, such openings often detract from the aesthetic appearance of the chair. Although these stackable chairs may include a removable seat cushion, the thickness of the standard cushion is relatively small in comparison to the size of the opening. Thus, with or without a seat cushion, the enlarged openings in the side panels detract from the aesthetic appearance of the chair. In sum, there is unknown a stackable arm chair which is aesthetically pleasing, while at the same time allowing a greater degree of design flexibility than provided by the prior art stackable arm chairs and which provides greater consumer acceptance.

SUMMARY OF THE INVENTION

It is therefore broadly an object of the present invention to provide an arm chair which is suitable for stacking while providing an aesthetically pleasing appearance.

Another object of the present invention is to provide a stackable arm chair which retains versatility of design.

A yarn of indeterminate length is disclosed having a wicker look suitable to be woven into wicker-like articles such as the aforementioned stackable arm chairs and the like. In accordance with one embodiment, the yarn has an inner core and an outer coating having an outer surface. At least one groove is formed in the outer surface extending substantially in an axial direction on the yarn. The groove may vary in position around the circumference of the yarn, and may be interrupted in an axial direction along the yarn. The groove may furthermore have a generally rectangular, curved or other cross sectional shape.

**4**

The yarn additionally has a visual representation of a stripe of a color or visual appearance other than the color or appearance of the outer surface of the yarn, extending substantially in an axial direction along the yarn. The stripe may vary in position around the circumference of the yarn. Further, the stripe may be located within the groove, or may intersect the groove. The relative circumferential position of the groove and the stripe may vary at different axial positions along the yarn. The stripe may be continuous or interrupted in an axial direction along the yarn.

In accordance with one embodiment of the present invention there is described a stackable arm chair comprising a frame forming a seat, a back, a pair of front legs, a pair of back legs and a pair of side arms; a side wall extending between the seat and each of the side arms, each of the side walls having an opening adjacent the seat and a corresponding one of the back legs, the size of the opening cooperating with the height of a seat cushion positionable on the seat between the side arms such that the opening is substantially covered by the cushion, the opening being of sufficient size and location to permit passage therethrough of a corresponding back leg of another stackable arm chair of substantially the same construction for arranging the chairs in a nested stack thereof.

In accordance with another embodiment of the present invention there is disclosed a cushioned stackable arm chair comprising a frame forming a seat, a back, a pair of front legs, a pair of back legs and a pair of side arms; a side wall extending between the seat and each of the side arms, the side wall having an opening adjacent the seat and a corresponding one of the back legs; and a seat cushion supported on the seat between the side arms, the height of the cushion and the size of the opening cooperating with each other such that the opening is substantially covered by the cushion, the opening being of sufficient size and location to permit passage therethrough of a corresponding back leg of another stackable arm chair of substantially the same construction for arranging the chairs in a nested stack thereof.

In accordance with another embodiment of the present invention there is described a nested stack of at least two stackable arm chairs, each of the stackable arm chairs comprising a frame forming a seat, a back, a pair of front legs, a pair of back legs and a pair of side arms; a side wall extending between the seat and each of the side arms, each of the side walls having an opening adjacent the seat and a corresponding one of the back legs, the size of the opening cooperating with the length of a seat cushion positionable on the seat between the side arms such that the opening is substantially covered by the cushion, the opening being of sufficient size and location to permit passage therethrough of a corresponding back leg of the other of the at least two stackable arm chairs of substantially the same construction for arranging the chairs in the nested stack thereof.

BRIEF DESCRIPTION OF THE DRAWINGS

The above description, as well as further objects, features and advantages of the present invention will be more fully understood with reference to the following detailed description of a stackable arm chair having a removable seat cushion, the chair constructed from a yarn having wicker appearance, when taken in conjunction with the accompanying drawings, wherein:

FIG. 1 is a perspective view of a yarn according to one embodiment of the invention having one stripe and one groove;

FIG. 2 is a sectional view of the yarn of FIG. 1;

5,845,970

**5**

FIG. 3 is an elevation view of the yarn of FIG. 1;

FIG. 4 is a perspective view of a yarn according to another embodiment of the invention having two grooves and one stripe;

FIG. 5 is a sectional view of the yarn of FIG. 4;

FIG. 6 is an elevation view of the yarn of FIG. 4;

FIG. 7 is a perspective view of a yarn according to another embodiment of the invention having two grooves and two stripes;

FIG. 8 is a sectional view of the yarn of FIG. 7;

FIG. 9 is an elevation view of the yarn of FIG. 7;

FIG. 10 is a perspective view of the yarn according to another embodiment of the invention having three grooves and two stripes;

FIG. 11 is a sectional view of the yarn of FIG. 10;

FIG. 12 is an elevation view of the yarn of FIG. 10;

FIG. 13 is a perspective view of a yarn according to another embodiment of the invention having a stripe intersecting a groove;

FIG. 14 is a sectional view of the yarn of FIG. 13;

FIG. 15 is an elevation view of the yarn of FIG. 13;

FIG. 16 is a perspective view of the yarn according to the present invention showing the effect of the yarn being formed from foamed PVC material;

FIG. 17 is a plan view of a material according to the invention woven from polymer yarns having grooves and stripes;

FIG. 18 is a sectional view of the woven yarn taken along line 18—18;

FIG. 19 is a sectional view of the woven yarn taken along line 19—19;

FIG. 20 is a perspective view of a cushioned arm chair constructed of yarn according to the invention;

FIG. 21 is a perspective view of a frame forming a stackable arm chair;

FIG. 22 is a perspective view of a stackable arm chair covered in woven material, constructed in accordance with one embodiment of the present invention;

FIG. 23 is front elevational view of the stackable arm chair;

FIG. 24 is a top plan view of the stackable arm chair;

FIG. 25 is a rear elevational view of the stackable arm chair;

FIG. 26 is a bottom plan view of the stackable arm chair;

FIG. 27 is a top plan view of the stackable arm chair showing a seat cushion thereon;

FIG. 28 is a perspective view of the stackable arm chair showing the seat cushion thereon;

FIG. 29 is a front elevational view of the stackable arm chair showing the seat cushion thereon;

FIG. 30 is a side elevational view showing three stackable arm chairs arranged in a nested forward stack;

FIG. 31 is a front elevational view showing three stackable arm chairs arranged in a nested forward stack;

FIG. 32 is a rear elevational view showing three stackable arm chairs arranged in a nested forward stack; and

FIG. 33 is a perspective view of a yarn formed in accordance with another embodiment of the present invention.

### DETAILED DESCRIPTION

Referring now to the drawings, there is shown in FIG. 1 a yarn designated generally as reference number 1 con-

**6**

structed in accordance with one embodiment of the present invention. The yarn 1 shown is constructed as an elongated body, such as of indeterminate length, having a core 3 surrounded by a PVC outer coating 2, for example, foamed PVC material which gives greater volume with less material. However, it is to be understood that the outer coating 2 may be formed of other synthetic materials if desired such as polyamides, polyesters and the like. The yarn may be made in a single step using a coextrusion process, as is known in the art. The inner core may include a single filament of polyester, or may include a plurality of polyester filaments bundled to form a single core 3. In addition, the core 3 may be formed of other materials than polyester, monofilament or stranded, such as polyamides and the like. The core 3 is designated to give the yarn 1 greater mechanical strength over yarns formed only of PVC material or the like. However, it is to be understood that the core 3 forms no part of the present invention and may be eliminated if desired. Although the yarn has been shown as cylindrical in shape, other shapes such as square, oval, triangular and the like can be used.

At least one groove 5 is formed on the outer surface 4 of the yarn. The width of the groove at the outer surface may vary from relatively narrow to much wider, for example, about 45°. The groove may have a shallow depth or deeper from the outer surface 4, and may have a cross section comprising a flat floor with radii 6 or may have a generally rounded cross section (not shown). The groove may be formed by a die during the coextrusion process, or may be formed later using a finishing die.

The groove 5 as shown in FIGS. 1 and 2 gives a natural feel to a material woven from the yarn of the invention. The corners 15 formed between the groove 5 and the outer surface 4 of the yarn closely simulates in feel the nicks found in natural wicker materials. Further, the groove itself forms an interruption in the smooth outer surface 4 of the yarn, reflecting light unevenly wherever it is exposed on the surface of material woven from the grooved yarn. The uneven light reflection creates a look closely paralleling the appearance of natural wicker.

Because the groove 5 is a concave feature or inward depression in the outer surface 4 of the yarn, the corners 15 are not so rough as to be uncomfortable to a person seated in a chair made from the yarn, and do not catch clothing. This is a significant advance over designs including convex features such as the star-shaped yarn of the prior art, which may abrade the user and catch clothing.

The groove 5 may have a wobble 18, as opposed to being straight as shown in FIG. 21, relative to the axis of the yarn, as shown is FIG. 6, in order to more closely duplicate the conditions on a natural wicker fiber. The wobble causes the groove to vary in position around the circumference of the yarn at various points along the axis of the yarn. The wobble of the groove 5 prevents regular patterns from being formed in a material woven from the grooved yarn, instead presenting a random appearance and disappearance of the groove on the surface of the woven material.

In order to further increase the random appearance and disappearance of the groove 5 on the woven material, interruptions 10, shown in FIGS. 4 and 6, may be placed at spaced apart locations along the groove. The interruptions 10 may be of any length and occurrence as desired. In addition to further randomize the light reflected by the woven material, the interruptions 10 form additional corners 16 that present tactile features in an axial direction along the yarn, as compared to the corners 15 that present tactile

5,845,970

| 7 | 8 |

features in a tangential direction. The corners 16 are detected by a user when running the hand in an axial direction along the yarn, and thus closely simulate the random nicks found on natural wicker materials.

In an alternative form of groove interruption (not shown), a smooth transition is made between the groove 5 and the outer surface 4. This embodiment provides a less prominent tactile feature in the axial direction of the groove 5, however, it can be appreciated that the groove 5 can be constructed in a variety of forms which may be randomly oriented and arranged on the outer surface 4.

In addition to the grooves 5, at least one stripe 7 is placed on the outer surface 4 of the yarn 1 in order to further enhance the natural look of material woven from the yarn 1, as shown in FIGS. 1–3. The stripe 7 is of a different color or different hue than that of the outer surface 4. In this regard, the stripe 7 provides a visual representation or visual appearance of an area being distinguished from the remaining surface of the yarn 4. For example, on a natural or tan-colored wicker yarn, a black or brown stripe may be used. In another example, a yellow stripe may be used on a green yarn or a gray stripe on a white, yarn. As the yarn is woven into a material, the stripe appears at random locations on the surface of the material, interrupting the otherwise uniform color of the surface. These random interruptions simulate the color variations and imperfections of natural wicker fiber, making the woven material closely resemble wicker.

The stripe 7 may have a wobble 17, as opposed to being straight, with respect to the axis of the yarn, as shown in FIG. 3. The wobble further randomizes the appearance of the stripe on the surface of the woven material. In one example of the yarn, the magnitude of wobble of the stripe 7 is approximately equal to that of the grooves.

The stripe 7 may be molded into the yarn during the coextrusion process with the core 3 when present, and may extend deep into the yarn as a color portion 13 of the outer coating 2, shown in FIG. 5. Such a configuration is advantageous over painting or inking the stripe 7 on the yarn which may also be used, in that the color portion 13 may not be removed by wear on the outer surface 4. The stripe 7 may incorporate interruptions 11, as shown in FIGS. 4 and 6. The interruptions may be of any length and occurrence as desired. The interruptions 11 simulate the interrupted nicks and scratches appearing on natural wicker fibers.

Additional stripes and/or grooves may be incorporated in the yarn in order to further enhance the natural appearance of a fabric woven from the yarn. In the example shown in FIGS. 4–6, two grooves 5 and 12, located by way of one example approximately 180 degrees apart, are formed on the yarn 19 in conjunction with stripe 7. The use of two grooves increases the frequency that the groove appears on a given surface of the woven material, making the woven material feel and appear rougher.

Additional stripes may be placed on the yarn, as shown in FIGS. 7–9. Stripes 7 and 20 are placed on the wicker yarn 25 by way of one example approximately 180 degrees apart. The use of two stripes increases the frequency that a stripe appears on a given surface of the woven material, giving the woven material the appearance of having a larger number of darker or differently colored areas. Additional stripes and/or grooves may be added in order to achieve the desired effect on the finished material. For example, in FIGS. 10–12, three grooves 5, 12, 21, and two stripes 7, 20, are placed around the circumference of the wicker yarn. The stripes 7, 20 wobble with respect to the axis of the wicker yarn as

previously described. The grooves 5, 12, 21 as shown do not wobble. The configuration shown in FIGS. 10–12, when woven into a wicker-like material, provides surfaces that are very rough in both look and feel, with a medium amount of random interruption in the color of the material. Other combinations of stripes and grooves on a wicker-like yarn may be utilized in order to achieve varying amounts of roughness and color interruption. The invention is therefore not limited to the examples provided herein, which are only exemplary of the present invention.

A stripe and a groove provided on a single wicker yarn may remain separated as shown in FIGS. 1–2, or may intersect as shown in FIGS. 13–15. Stripe 31, shown in FIGS. 13–15, is superimposed on the groove 32 at various locations along the axis of the yarn 30. The appearance of a material woven from the yarn 30 is further altered by the changing surface upon which the stripe 31 appears. As the stripe 31 makes a transition from the outer surface 4 of the yarn 30 to the groove 32, the appearance of the stripe changes, giving a different look to the woven material. The use of a stripe intersecting a groove may be combined with the use of multiple grooves, such as grooves 32, 33, shown in FIGS. 13–15, and may also be used in combination with various numbers of grooves and stripes, in order to produce a desired effect on a woven material.

As previously described, the yarn 1 is preferably constructed from foamed PVC material which is generally softer than unfoamed PVC material. Foamed PVC material provides about 15% more bulk volume thereby resulting in cost savings. As a result of the lack of uniformity in the foaming of the PVC material during the extrusion process, the resulting yarn lacks a uniform cylindrical appearance. Specifically, as shown in FIG. 16, the outer surface of the yarn is deformed by the absence of a uniform cylindrical surface, such as by having undulations and/or mounds. Not wishing to be bound by any particular theory, it is believed that due to the small volume of PVC material, the PVC material density during the foaming process varies along the length and/or thickness of the yarn so as to cause the deformed shape; This deformed shape results in the yarn having a more natural look to that of real wicker. Yarn constructed from foamed PVC material having at least one random stripe and at least one random groove pursuant to the present invention provides the yarn with a more natural and pleasing appearance which overcomes the objections from the prior yarns used in the construction of casual furniture.

A woven material 50 of the invention comprises warp yarns, such as yarns 40, 41 and weft yarns, such as yarns 42, 43, as shown in the example of FIGS. 17–19. The weave pattern shown in these figures is by way of example, and those skilled in the art will recognize that other weave patterns may be utilized to meet various requirements of strength, look, feel, texture, design, and weight. Warp yarns 40, 41 are placed at even, spaced apart intervals and traverse the material in a substantially straight path. Weft yarns, or "filler" yarns 42, 43 are woven on alternating sides of the warp yarns 40, 41. For example, weft yarns 42 pass on top of the warp yarn 40, while weft yarns 43 pass beneath the warp yarn 40, as shown in FIG. 17. Weft yarns 42 then proceed beneath the warp yarn 41, while weft yarns 43 proceed on top of the warp yarn 41. This weaving pattern is continued throughout a given panel of material. As can be seen in the plan view of FIG. 17, grooves 45 and stripes 46 on the weft yarns 42, 43 impart a random "natural" wicker look to the woven material. In the example shown in FIGS. 17–19, each weft yarn has a single groove and a single stripe, both of which wobble with respect to the yarn axis.

5,845,970

| 9 | 10 |

Additional grooves and/or stripes may be added in order to increase the effects each of those elements has on the overall look of the material 50.

It is to be understood that it is not required that the warp yarns 40, 41 include stripes and grooves of the present invention. In this regard, the warp yarns 40, 41 can be convention yarns as they are generally concealed by the weft yarns 42, 43. Similarly, it is not required that all of the weft yarns 42,43 be constructed in accordance with the present invention. Other conventional yarns can be combined with the weft yarns 42, 43 to give the weave 50 a particular look which still retains a wicker look and feel without departing from the present invention.

The wicker-like yarns to be woven into material, such as material 50, may if desired be heated before the weaving process, or may be woven immediately after the coextrusion process before the yarns cool. By weaving the yarns in a heated state, adjacent weft yarns 42, 43 adhere to each other and adhere to the warp yarns 40, 41. In this way, a more stable woven material 50 is produced. Alternatively, an adhesive may be used between the yarns in order to produce similar results if desired.

A furniture item of the invention, such as the wicker-like chair 100 shown in FIG. 20, may be produced from a rigid skeletal frame 110 covered by weaving yarns of the invention into woven material panels such as panel 101 forming the back of the chair 100, and panel 104 forming the seat of the chair which are attached to the frame. The chair has a look and feel of natural wicker because of the use of stripes and grooves on the yarn used in making the panels. Yarns with stripes and/or grooves may also be used in wrapping the structural members of the frame such as legs 102 and arms 103, giving those members a natural wicker look as well. Such yarns may also be used in forming lattice work such as the lower chair back 103, which is often formed using the warp yarns of adjacent woven panels. Other furniture items such as couches, tables, benches, stools, trunks, and the like can also be produced using the yarn disclosed in accordance with the present invention so as to have a wicker look.

Chair 100 may be fabricated from wicker yarns of the invention having colors other than the color of natural wicker. Such chairs have the advantages of color coordination offered by a painted wicker chair, while maintaining the random coloration and the slightly rough feel of natural wicker.

Referring now to FIGS. 21–26, there is illustrated pursuant to another aspect of the present invention an arm chair constructed to be stackable and which is suitable for manufacture using any of the yarns as thus far described. The stackable arm chair 120, as shown in FIG. 21, is constructed from a rigid hollow tubular frame 122 which, as to be described hereinafter, provides the stackable arm chair 120 with a seat, a back, a pair of front legs, a pair of back legs and a pair of side arms. The seat 124 is delineated by a connecting front member 126, a parallel spaced apart back member 128 and a pair of parallel spaced apart side members 130, 132. As shown, the front member 126 is somewhat longer than the back member 128, the side members 130,132 being connected to the front and back members slightly inwardly of their terminal ends. As a result, the side members 130, 132 taper inwardly from the front member 126 to the back member 128 such that the forward portion of the seat 124 is wider than the rear portion of the seat.

The front legs 134, 136 are constructed as parallel spaced apart vertical members joined to the free ends of the front member 126 and have outwardly turned extensions 137

providing the front legs with an L-shape. The front legs 134, 136 are arranged generally vertical to the floor as viewed from the front and side of the stackable arm chair 120.

The back legs 138, 140 are constructed from an angular member attached to the free ends of the back member 128. The back legs 138, 140 have generally parallel spaced apart upper members 142 extending vertically from the back member 128 as viewed from the front and side and generally parallel spaced apart lower members 144. The lower members 144 are arranged at a rearwardly extending angle as viewed from the side and extend generally vertical from the back member 128 as shown from the rear of the stackable arm chair 120. As the front member 126 is longer than the back member 128, the distance between the front legs 134, 136 is greater than the distance between the back legs 140, 144. This offset between the front legs 134, 136 and the back legs 138, 140 in conjunction with the rearward tapering of the side members 130, 132 facilitates the stackability of the arm chair 120 as to be described hereinafter.

A generally U-shaped member 146 includes a center section 148 connected across the free ends of the upper members 142 of the back legs 138, 140 and a pair of curved spaced apart side arm members 150, 152 forming the side arms 154, 156 of the arm chair 120. The free ends of the side arm members 150, 152 are attached to the free ends of the extensions 137 of the respective front legs 134, 136. The side arm members 150, 152 are spaced apart wider at their mouth where they connect to the extensions 137 then where they form the center section 148. This arranges the side arms 154, 156 outwardly of the side members 130, 132. The upper members 142 of the back legs 138, 140, the back member 128 and center section 148 of U-shaped 146 delineate the back 157 of the arm chair 120.

A secondary frame provides attachment support for woven material utilized in covering the tubular frame 122. Specifically, a generally U-shaped elongated rod 158 having a shape conforming substantially to the shape of the U-shaped member 146 is connected thereto in underlying relationship by means of a plurality of spaced apart ribs 160. Another secondary support frame is positioned between the front and back legs 134, 136, 138, 140 underlying the seat 124. This secondary frame is constructed from a front rod 162 connected between the front legs 134, 136, a back rod 164 connected between the back legs 138,140 and a pair of side rods 166, 168 arranged in parallel spaced apart relationship connected between the front rod 162 and back rod 164 inwardly of their terminal ends. An additional front rod 170 may be positioned between the front legs 134, 136 underlying front rod 162.

Referring now to FIGS. 22–26, the tubular frame 122 of the stackable arm chair 120 is covered by weaving yarns as previously described and illustrated into woven material panels which are attached to the frame. More specifically, one woven material panel forms the seat 124 by being attached to the back and side members 128, 130, 132 and extending over the front member 126 to where it is ultimately attached to front rod 170. In addition to forming the seat 124, there is also thus formed a front panel 172 or skirt between the front legs 134, 136. A pair of side skirts 174, 176 are formed from secondary woven material panels attached between the side members 130, 132 and corresponding side rods 166, 168. The back 157 of the stackable arm chair 140 is formed from a woven material panel which is wrapped about the U-shaped member 146 and attached along its upper edge to rod 158. The bottom edge of the woven material panel is attached to back rod 164 thereby completing the back 157 of the arm chair 120. The woven

5,845,970

**11**

material panel also forms a pair of side panels 178, 180 which is provided as an integral extension of the back 157 and forms a front portion of the side skirts 174, 176. An opening 182, 184 is provided in each of the side panels 178, 180. The openings 182, 184 are defined on two sides by the pair of side members 130, 132 and the upper members 142 of the rear legs 138, 140. The other two sides of the openings 182, 184 are bound by a terminal edge of the side panels 178, 180 which may be secured by a suitable rod (not shown) attached, for example, between the rear legs 138, 140 and side rods 166, 168.

As best shown in FIGS. 24 and 26, the side panels 178, 180 taper outwardly from the seat 124 as a result of the side arm members 150, 152 of the U-shaped member 146 being positioned outwardly of the side members 130, 132 which form the sides of the seat. This arrangement allows the openings 182, 184 to extend in both a horizontal and vertical plane. The extent of the openings 182, 184 in the horizontal plane are best shown in FIG. 24, while the extent of the openings in the vertical plane is best shown in FIG. 22. As the openings 182, 184 are defined within both horizontal and vertical planes, there is provided a three dimensional space between the side panels 178, 180 and the side members 130,132 forming the seat 124 as generally indicated by the dotted circular lines 186 in FIG. 24. This three dimensional space, as to be described hereinafter, allows for the stackability of the arm chairs 120.

Referring to FIGS. 27–29, the stackable arm chair 120 is adapted to be used in association with a conventional seat cushion 188. The seat cushion 188 is of standard thickness, e.g., about ½–4½ inches as conventionally used in cushioned outdoor patio furniture. As shown, the size of the openings 182, 184 cooperate with the height and size of the seat cushion 188 such that the openings are substantially blocked from view thereby eliminating the objectionable appearance of the opening. As shown in FIG. 27, the size of the seat cushion 188 is sufficient to substantially cover the openings 182, 184 in the horizontal plane. Similarly as shown in FIGS. 28 and 29, the size of the seat cushion 188 is such to cover the openings 182, 184 in the vertical plane. In other words, the volume of the three dimensional space created by the openings 182, 184 in both horizontal and vertical planes are substantially occupied by a portion of the seat cushion 188. This construction maintains the ornamental and aesthetic characteristics of the stackable arm chair 120 without affecting the ease and simplicity of the stackable feature of the arm chairs.

Referring now to FIGS. 30–32, the stacking of the arm chairs 120 in a nested stack will now be described. One objective of stackable chairs in general is to allow the nesting of the chairs in a single stack which occupies a minimum of volume thereby minimizing the size of the storage container and, hence, the space occupied on common carriers during shipping resulting in lower transportation costs. The arm chairs 120 are nested into a single stack by inserting the lower members 144 of the back legs 138, 140 through the three dimensional openings 182, 184 at the location defined by the dotted circular lines 186. In this arrangement, seats 124 and backs 157 of the nested arm chairs 120 will be arranged adjacent one another in overlying relationship. As shown in FIGS. 31 and 32, the front legs 134, 136 and back legs 138, 140 of the nested arm chairs 120 are arranged substantially in alignment with each other within a respective common plane 190, 192, one behind the other. Similarly, the U-shaped members 146 of adjacent nested arm chairs 120 are arranged in substantial alignment with each other, one above the other. As a result of the

**12**

foregoing construction, the arm chairs 120 are nested as tightly as possible with one another so as to minimize the overall space required by a set of, for example, four nested chairs, which are typically sold as a set. The close nesting of the arm chairs 120 is further facilitated by the absence of any cross bracing between the front and back legs 134, 136, 138, 140 as is conventional with known chair construction.

As the arm chairs 120 are nested with one another, they form what is commonly referred to as a forward stack. As shown in FIG. 30, the nested arm chairs 120 progressively move forward in the stack, as well as upwardly in height. However, because of the close nesting of the arm chairs, the forward and upward displacement of the arm chairs 120 is minimal, thereby minimizing the overall volume occupied by the nested arm chairs.

Although the stackable arm chairs 120 have been described with respect to a particular ornamental appearance and woven material panels, it is to be understood that other designs and shapes, including using other woven material panels from other materials than those described herein encompassing other weaves and yarns may be included in the stackable arm chairs pursuant to the present invention. That is, the present invention is not intended to be limited by any particular woven material panels, yarns or the overall shape of the stackable arm chair 120 illustrated. For example, although the yarn has been shown as generally cylindrical in shape, other shapes such as square, oval, triangular and the like can be used.

Referring now to FIG. 33, there is shown a perspective view of a yarn 200 in accordance with another embodiment of the present invention. The yarn 200 can be constructed generally pursuant to any one of the previously described embodiments. In this regard, the yarn 200 can be constructed from a variety of synthetic materials such as polyamides, polyesters and the like. Preferably, the yarn 200 is constructed from foamed PVC material about a center core 3 such as a single filament of polyester or a plurality of polyester filaments bundled to form the core. The yarn 200 may also be provided with one or more grooves 5 and/or stripes 7 in the manner as previously described.

In forming the woven material 50 as shown in FIG. 17, the weft yarns 42, 43 are provided as having a different color from the warp yarns 40, 41. By way of example only, the outer surface of the weft yarns 42, 43 may be green, while the outer surface of the warp yarns 40, 41 may be bone.

During the weaving process, the warp yarns 40, 41 are pulled through the weft yarns 42, 43 within the woven material 50. As the warp yarns 40, 41 are pulled through the woven material 50, there is created friction with the weft yarns 42, 43. This friction results in the random and non-uniform transfer of small portions of the material forming the weft yarns 42, 43 onto the outer surface of the warp yarns 40, 41 as generally designated at locations 202. This random and non-uniform transfer of the different colored material from the weft yarns 42, 43 to the warp yarns 40, 41 creates a more natural and unique attractive appearance to the warp yarns and the overall woven material 50. As a result, there is provided an overall enhanced pleasing appearance to the woven material 50. This effect is greater depending upon the extent of the contrast color between the weft and warp yarns. It is contemplated that a greater amount of transfer of material from the weft yarns 42, 43 to the warp yarns 40, 41 will be achieved by constructing the yarns from foamed material, such as PVC material, which is generally softer than non-foamed materials. Accordingly, by constructing the woven material 50 from foamed PVC material having an

5,845,970

**13**

irregular surface, including one or more stripes 7 and/or one or more grooves 5 along with contrasting colors, the woven material can be provided with a unique look heretofore unknown.

Although the invention herein has been described with reference to particular embodiments, it is to be understood that the embodiments are merely illustrative of the principles and application of the present invention. It is therefore to be understood that numerous modifications may be made to the embodiments and that other arrangements may be devised without departing from the spirit and scope of the present invention as defined by the claims.

I claim:

1. An article of furniture having a wicker look, said article comprising a frame having a shape of an article of furniture and at least one woven panel from a yarn of polymer material, said yarn comprising an elongated body of foamed polymer material having a non-uniform deformed outer surface of varying cross section along substantially the length of said body, and at least one groove depressed in said outer surface extending in substantially an axial direction along said body, said deformed outer surface and said groove being visible on said panel.

2. An article of furniture having a wicker look, said article comprising a frame having a shape of an article of furniture and at least one woven panel from a yarn of polymer material, said yarn comprising an elongated body of foamed polymer material having a non-uniform deformed outer surface of varying cross section along substantially the length of said body, and at least one visual representation of a stripe on said outer surface extending in substantially an axial direction along said body, said deformed outer surface and said stripe being visible on said panel.

3. An article of furniture having a wicker look, said article comprising a frame having a shape of an article of furniture and at least one woven panel from a yarn of polymer material, said yarn comprising an elongated body of foamed polymer material including a non-uniform deformed outer surface of varying cross section along substantially the length of said body, at least one groove depressed in said outer surface extending in substantially an axial direction along said body, and at least one visual representation of a

**14**

stripe on said outer surface extending in substantially an axial direction along said body, said deformed outer surface, said groove and said stripe being visible on said panel.

4. The article of furniture of claims 1, 2 or 3, wherein said yarn includes a polymer filament core surrounded by said polymer material.

5. The article of furniture of claims 1, 2, or 3, wherein said panel forms a seat and back of a chair.

6. The article of furniture of claims 2 or 3, wherein said yarn is of a first color and said stripe is of a second color different from said first color.

7. An article of furniture having a wicker look, said article comprising a frame having a shape of an article of furniture and at least one woven panel from a yarn of polymer material, said yarn comprising an elongated body of polymer material having a non-uniform deformed outer surface of varying cross section along substantially the length of said body, and at least one groove depressed in said outer surface extending in substantially an axial direction along said body, said outer surface and said groove being visible on said panel.

8. An article of furniture having a wicker look, said article comprising a frame having a shape of an article of furniture and at least one woven panel from a yarn of polymer material, said yarn comprising an elongated body of polymer material including a non-uniform deformed outer surface of varying cross section along substantially the length of said body, at least one groove depressed in said outer surface extending in substantially an axial direction along said body, and at least one visual representation of a stripe on said outer surface extending in substantially an axial direction along said body, said outer surface, said groove and said stripe being visible on said panel.

9. The article of furniture of claim 8, wherein said yarn is of a first color and said stripe is of a second color different from said first color.

10. The article of furniture of claims 7 or 8, wherein said yarn includes a polymer filament core surrounded by said polymer material.

11. The article of furniture of claims 7 or 8, wherein said panel forms a seat and back of a chair.

* * * * *

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  : 5,845,970
DATED       : December 8, 1998
INVENTOR(S) : Schwartz

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 7, line 22, "white, yarn." should read --white yarn--.

Column8, line 40, "shape; This" should read --shape. This--.

Column 11, line 31, "½-4 ½: should read --3 ½-4 ½--.

Signed and Sealed this

Twenty-second Day of May, 2001

Attest:

Nicholas P. Godici

NICHOLAS P. GODICI

*Attesting Officer*        *Acting Director of the United States Patent and Trademark Office*

# Exhibit 11

US005626098A

# United States Patent [19]

## Askins et al.

[11] **Patent Number:** 5,626,098

[45] **Date of Patent:** May 6, 1997

[54] **COLLAPSIBLE CAGE**

[75] Inventors: **William E. Askins; Michael W. Stewart; Gary H. Roulston.** all of Lititz; **Joseph F. Flore, Jr.,** Lebanon, all of Pa.

[73] Assignee: **Woodstream Corporation,** Lititz, Pa.

[21] Appl. No.: **681,403**

[22] Filed: **Jul. 23, 1996**

### Related U.S. Application Data

[63] Continuation of Ser. No. 459,497, Jun. 2, 1995, Pat. No. 5,549,073.

[51] Int. Cl.$^6$ .............................. A01K 1/03; A01K 31/08
[52] U.S. Cl. ................................ 119/474; 119/461
[58] Field of Search ...................... 119/461, 474, 119/491, 492, 504, 513, 514, 459, 480, 481, 463, 453

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 1,965,259 | 8/1934 | Johnson . |
| 2,456,419 | 12/1948 | Jackson et al. . |
| 2,693,786 | 11/1954 | Babros et al. . |
| 2,822,780 | 2/1958 | Buell . |
| 2,898,884 | 8/1959 | Messersmith . |
| 3,195,505 | 7/1965 | Hauth et al. ..................... 119/474 |
| 3,389,686 | 6/1968 | Taylor et al. . |
| 3,913,258 | 10/1975 | Souza et al. ...................... 43/60 |
| 4,484,540 | 11/1984 | Yamamoto ..................... 119/19 |
| 4,527,512 | 7/1985 | Sugiura ........................... 119/19 |
| 4,577,589 | 3/1986 | Voss et al. ................... 119/461 X |

| | | | |
|---|---|---|---|
| 4,696,257 | 9/1987 | Neary et al. ..................... 119/166 |
| 4,696,259 | 9/1987 | Fewox ............................ 119/482 |
| 4,762,085 | 8/1988 | Ondrasik ........................ 119/17 |
| 4,819,582 | 4/1989 | Lichvar ......................... 119/474 |
| 5,010,848 | 4/1991 | Rankin .......................... 119/26 |
| 5,544,619 | 8/1996 | Braun ........................... 119/474 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1188699A | 9/1959 | France ........................... 119/474 |
| 26649 | of 1914 | United Kingdom ................... 119/19 |

#### OTHER PUBLICATIONS

Star Large Collapsible Plastic Crate (The General Corporation)—advertisement appearing in Jun. 1995 issue of the Pet Dealer Magazine.

Midwest Homes For Pets Catalogue—Publication date unknown.

*Primary Examiner*—Robert P. Swiatek
*Assistant Examiner*—Yvonne R. Abbott
*Attorney, Agent, or Firm*—Jacobson, Price, Holman & Stern PLLC

[57] **ABSTRACT**

A collapsible cage for dogs or rabbits has a rectangular base, fold-down end walls folding side walls and a roof. The walls and roof are made of metal grids. The end walls fold down onto the base one over the other. The side walls fold in the middle concertina-wise and are hinged at the top to opposite edges of the roof allowing the side walls and roof to collapse onto the base over the end walls. The base has a pull-out tray or pan and an access door is provided in one of the end walls. Releasable clips are provided to hold the walls and roof together in an elevated position of the structure.

**12 Claims, 8 Drawing Sheets**



**U.S. Patent**          May 6, 1997          Sheet 1 of 8          5,626,098



FIG. 1



FIG. 2



FIG. 3



FIG.4



FIG.5

Case 3:06-cv-00901-WKW-WC     Document 60-36     Filed 07/29/2008     Page 6 of 13



FIG. 7



FIG. 6



FIG. 8

FIG. 10



FIG. 9



**FIG. 10b**



**FIG. 10a**



70

FIG. 11

71

FIG. 12

72

FIG. 13

74

FIG. 14

5,626,098

## 1

# COLLAPSIBLE CAGE

### CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation of application Ser. No. 08/459.497 filed Jun. 2, 1995.now U.S. Pat. No. 5.549.073.

### BACKGROUND OF THE INVENTION

This invention relates to cage structures particularly for pet animals such as dogs or rabbits.

Dog crates, for example, are recommended by many owners, trainers, veterinarians and breeders as a means for training puppies and to provide a safe, secure environment for housebreaking, travel and general control. In time, the crate becomes the dog's den, which he regards as his home, rather than a cage which confines him.

Cage structures according to the invention may also be used as rabbit hutches, for example, are further useful for transportation of pet animals, and can also be used in certain kinds of animal traps.

### SUMMARY OF THE INVENTION

It is an object of the invention to provide a collapsible cage structure which can be transported in a collapsed state and which can be rapidly and easily erected by a user into a sturdy animal-retaining cage without the use of specialized tools or other equipment.

Another object of the invention is to provide a collapsible cage structure having a rectangular base, peripheral walls and a roof, wherein the walls and roof can be compactly folded against the base, so that the structure, when folded, is contained wholly within the footprint of the base.

Still another object of the invention is to provide a collapsible cage structure as above, which includes a sliding removable pan in the base for animal droppings and the like.

Yet another object of the invention is to provide a collapsible cage structure as above, in which at least the peripheral walls and roof are formed from metal grids.

In fulfillment of the above and other objects, the invention provides a collapsible cage structure comprising a rectangular base, end walls, side walls and a roof wherein the end walls, side walls and roof are formed from rectangular metal grids, the end walls being hinged along their bottom edges to opposite ends of the base for folding down of the end walls onto the base one over the other and for unfolding from the base into an elevated position, the side walls each comprising upper and lower grids interconnected by a hinge joint, the lower grids being hinged along their bottom edges to opposite side edges of the base, the upper grids being hinged along their top edges to side edges of the roof, the side walls thus being foldable inwardly concertina-wise about the hinge joints to collapse the side walls and roof onto the base over the end walls and being unfoldable outwardly about the hinge joints to elevate the side walls and roof prior to elevating the end walls, clips for releasably securing the end walls, side walls and roof in the elevated position and an animal access opening at least in one of the end or side walls. Preferably, the hinge joints of the side walls may include a stop mechanism for preventing the side walls from unfolding outwardly beyond the vertical. The stop mechanism may conveniently comprise a section of one of the upper or lower grids extending beyond the hinge joint.

The base of the cage many also be formed of metal grid-work with a slide-in, slide-out tray or pan in metal or plastic.

## 2

In one embodiment of the invention the collapsible cage is designed particularly as a dog home and in a second embodiment of the invention the collapsible cage is made in lighter gauge gridwork and is designed particularly as a rabbit hutch. In the hutch structure, the base is provided with an upper fixed grid over the removable tray.

The invention provides a collapsible cage structure which is compact to pack and transport in its collapsed state, which is simply and readily opened out and fixed in upright position, for use in which a sturdy cage structure is provided and which is equally easily collapsed and stored.

Additional features and advantages of the invention will become apparent from the ensuing description and claims read in conjunction with the attached drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective in-use view of a collapsible dog home according to the invention;

FIG. 2 is a perspective view of the dog home in a collapsed condition for storage, packing and transportation;

FIG. 3 is a perspective view of the dog home showing a first step in erecting the home from the collapsed position;

FIG. 4 is a perspective view of the dog home showing a second step in erecting the home;

FIG. 5 is a perspective view of the dog home when erected showing an animal access door in closed position;

FIG. 6 is an enlarged view showing the details of one corner of the dog home as seen in FIG. 5;

FIG. 7 is a view similar to FIG. 5 showing the door in an open position;

FIG. 8 is a perspective view of a collapsible rabbit hutch according to the invention shown in a collapsed condition;

FIG. 9 is a perspective view of the rabbit hutch in a partly erected condition;

FIG. 10 is a perspective view of the rabbit hutch in an erected condition;

FIGS. 10a and 10b are enlarged perspective views of parts of the rabbit hutch showing fold-over clips for latching the walls and roof of the hutch together in the effected condition; and

FIGS. 11–14 are elevational views of alternative clips which can be used for holding the walls an roof of the hutch together.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIGS. 1–7 show a collapsible and portable dog home 10 in the form of a cage structure formed of plural metal grid-like sections interconnected in a manner to be described in more detail below. FIG. 2 shows the dog home in a collapsed position for storage or transportation, FIG. 3 shows the dog home in a partially elevated position and the remaining figures show the dog home in a fully elevated in-use position.

In more detail, the dog home comprises a base 12, end walls 14, 16 hinged along their bottom edges to respective end edges of the base, so that the end walls can be folded down onto the base, one over the other, as best seen in FIG. 3, folding side walls 18, 20 each comprising a lower grid 18a, 20a and an upper grid 18b, 20b connected to the respective lower grid by a hinge joint 18c, 20c and a roof 22 hinged at its side edges to upper edges of the respective upper grids 18b, 20b. The lower edges of the respective lower grids 18a, 20a are hinged to respective side edges of

5,626,098

**3**

the base 12. The arrangement is such that the side walls 18, 20 can fold inwardly concertina-wise about the hinge joints 18c, 20c in order to collapse the side walls and roof onto the base on top of the downwardly folded end walls and form the compact package shown in FIG. 2.

In more detail still, the base 12 comprises a generally rectangularly shaped metal grid having transverse metal rods 12a and longitudinal metal rods 12b. The ends oil rods 12a are bent upwardly as are the ends of rods 12b at one end only (the back) of the dog home. The base 12 is thus formed into a dish-like structure with an open front where there are no upwardly turned ends to the rods 12b. A metal or like tray or pan 24 is provided to slide into and out of base 10 from the open front and a hinged wire locking hook 26 attached to the base is provided for holding the tray in place. Release and swinging away of the hook allows the tray to be removed.

The upper ends of rods 12a are welded to longitudinal rods 12c at the side edges of the base and grids 18a, 20a have vertical rods 18d, 20d with their lower ends curled around rods 12c to form hinges between the lower grids and the base. Similar connections are made between grids 18a, 18b and 20a, 20b to form the hinge joints 18c, 20c and again between the upper edges of grids 18b, 20b and the side edges of the roof form hinges between the side walls and the roof. In the case of the connections between grids 18a, 18b and 20a, 20b, the end most rod of one grid is hinged to a rod adjacent to the end most rod of the adjacent grid to provide a grid section such as section 20f seen in FIG. 3 which extends beyond hinge joint 20c. This has the effect of providing a stop allowing the side walls to hinge inwardly only and the walls cannot kink outwardly beyond the vertical position, i.e., a planar configuration of the respective side wall.

End wall 14 at the front of the cage is hinged to the base at its lower end above the level of pan 24. For example, the base may have a fixed rod extending across the cage at the front above the pan and vertical rods of end wall 14 may have their ends curled around that rod to form a hinge. A similar hinge connection is formed between the base and end wall 16 at the back end of the cage. The hinge connections between the end walls and the base may be somewhat displaced vertically so that one end wall can fold down onto the base over the other end wall. The hinge connections between side walls 18, 20 and the base are at a still higher level so that the side walls and the roof can fold down onto the base over the end walls.

In order to elevate the structure from the position shown in FIG. 2, the roof is lifted until the side walls 18, 20 are fully extended. Then, holding the roof in the elevated position, the end walls 14, 16 are swung to upright positions as shown in FIGS. 4 and 5. Hooks 18e, 20e (FIG. 4) are provided at the ends of selected longitudinal rods of the side walls and the vertical end rods of the end walls fit into the hooks in the elevated position. Similar hooks 22e are formed at opposite ends of the roof and the top most rods of the end walls fit into these hooks. To latch the cage in the elevated position the roof may have a central lengthwise rod terminating in upwardly facing hooks 22a at the front and back ends which can be pushed down when the walls are opened out to snap under the top-most rods 14a, 16a of the end walls. To collapse the structure, these steps are simply reversed.

The front wall 14 incorporates an upwardly sliding and outwardly pivoting door 28 which can be latched closed flat against wall 14 by means of a push-in spring lever latch 30 mounted on wall 14. To open the door, latch 30 is pressed

**4**

inwardly allowing door 28 to slide upwardly somewhat and then pivot out and up to lie flat on the roof 22. To this end, the door is mounted on a double hinge arrangement comprising a U-shaped rod 32 hinged to the top-most rod of wall 14 and vertical rods of the door which are hinged to rod 32, see FIGS. 5 and 7. For latching the door closed, a horizontal rod of the door fits into hooks 34 provided on wall 14 and latch 30 snaps over rod 28b.

FIGS. 8–14 show a second embodiment collapsible cage structure 40 according to the invention particularly suitable for use as a rabbit hutch and which is made from lighter gauge metal grids than the dog home previously described.

Cage structure 40 again comprises a rectangular base 42, end walls 44, 46 hinged to the base for folding down onto the base one over the other, concertina-type side walls 48, 50 and a roof 52 hingedly attached at its side edges to the upper edges of side walls 48, 50. The structure thus collapses and extends in like manner to the previous embodiment. In FIG. 9 the end walls 44, 46 have been omitted for clarity.

In the second embodiment, base 42 comprises a lower grid 54 with upwardly turned sides 56 and an upper grid 58 attached to the lower grid by metal connector sleeves 60 gripping the endmost rods of the respective grids. A plastic slide-out droppings tray or pan 62 is provided between the grids. The end walls 44, 46 are similarly connected to the upper grid 58 by additional sleeves 60, the respective sleeves being dimensioned for providing sufficient play to allow one of the end walls to fold down on top of the other.

Side walls 48, 50 again comprise upper and lower grids 48a, 50a, and 48, 50b hingedly interconnected by further sleeves 60 to allow for the concertina effect. Again, one grid on each side wall (in this case the lower grids 48a, 50a) have sections (48e, 50e) extending beyond the central hinge joint between the grids, to form stops which prevent the side walls from unfolding outwardly beyond the vertical. The lower panels are connected to grid 58 by still further sleeves 60 that provide sufficient elevational clearance for the side walls to fold down onto the folded-in end walls 44, 46. The cage structure opens out and folds in like manner to the previously described dog house.

In order to releasably latch the cage structure in the upright elevated position pivotal bend-over light gauge metal clips 64 are provided at the junctions of the end walls and roof. As best seen in FIGS. 10a and 10b each clip 64 comprises a lightweight metal plate curled at one end around a rod such as rod 52a adjacent end rod 52b of the roof to allow for pivoting of the clip. The clip extends over the end rod 52b and the adjacent top rod 44d or 46d of a respective end wall and can be manually squeezed around to grip rods 52b and 44d or 46d together. Additional clips 64 are similarly mounted to grip the edges of the side walls and end walls together. When the cage structure is to be collapsed the clips can be opened out by hand. The clips 64 can also be used to hold the walls, roof and base together in the collapsed condition of the structure.

End wall 44 at the front the cage structure incorporates a pivoting door 66 attached by further sleeves 60 and having a spring wire retention latch 68.

FIGS. 11 and 12 show alternative forms of metal clips 70, 71 which can be used in place of the clips 64 and FIGS. 13 and 14 show alternative snap on and snap over pivotal plastic clips 72, 74 which can be used in place of clips 64. The left hand ends of clips 72, 74 for example snap over a rod such as rod 52a in FIGS. 10a and 10b and the right hand ends of clips 72, 74 snap over rods 52b and 44d or 46d to releasably secure the roof and side walls in the upright position.

5,626,098

## 5

While only preferred embodiments of the invention have been described in detail, the invention is not limited thereby and modifications can be made within the scope of the attached claims.

We claim:

1. In a collapsible cage structure comprising a base, a pair of end walls, a pair of side walls and a roof, the walls and roof each formed of grids with parallel rods, wherein selected ends of said walls, said base and said roof are hinged together and other ends of said walls, said base and said roof have releasable latching means therebetween whereby the cage structure can be secured in a erected condition by engaging the latching means and can be folded into a collapsed condition by disengaging the latching means, the improvement wherein said walls, said base and said roof to be releasably secured to each other include juxtaposed end rods in the erected condition of the cage structure, said latching means comprising a plurality of releasable clips, each clip including spaced end portions and an intermediate portion, one end portion of each clip being pivotally mounted on a selected rod of one of said grids for swinging over an end rod of an adjacent grid to releasably grip said end rods together in the erected condition of the cage structure, at least one end portion of said clip engaging a rod parallel to, and spaced from, said end rod of one of said grids.

2. A cage structure as claimed in claim 1 wherein each clip comprises a sheet metal clip adapted to be manually distorted by squeezing into a position releasably gripping said end rods together.

3. A cage structure as claimed in claim 1 wherein each clip comprises a plastic clip having a formation for snapping into engagement with said end rods for releasably gripping the end rods together.

4. A cage structure as claimed in claim 1 wherein at least one wall of the structure comprises adjacent panels and a hinge joint therebetween for folding said wall about the hinge joint to collapse the cage structure.

## 6

5. A cage structure as claimed in claim 4 including a stop for the hinge joint for preventing the panels unfolding beyond a planar configuration in the erected condition of the structure.

6. A cage structure as claimed in claim 5 wherein said stop comprises a section of one of said panels extending beyond the hinge joint.

7. A cage structure as claimed in claim 4 wherein the side walls of the structure each comprises adjacent upper and lower panels with a hinge joint therebetween, the lower panels being hinged to the base and the upper panels being hinged to the roof for collapsing the roof concertina-wise towards the base by folding the hinge joints.

8. A cage structure as claimed in claim 1 wherein said walls, said base and said roof are rectangular.

9. A cage structure as claimed in claim 1 wherein said walls, said base and said roof are defined by metal grids formed of parallel metal rods.

10. A cage structure as claimed in claim 1 wherein said one end portion of each clip is pivotally secured to a selected rod of one grid, parallel to, and spaced from the end rod of that grid, the other end portion of said clip swinging over said end rod of said one grid and the juxtaposed end rod of an adjacent grid to releasably grip said end rods together in the erected condition of the cage structure.

11. A cage structure as claimed in claim 10 wherein each clip comprises a sheet metal clip, said other end portion of which is adapted to be manually distorted by squeezing into a position releasably gripping said end rods together.

12. A cage structure as claimed in claim 11 wherein said intermediate portion of each clip is of reduced cross-section adjacent said other end portion at the point where it is to be squeezed into a position releasably gripping said end rods together to facilitate manually distorting said clip.

*  *  *  *  *

# Exhibit 12

US006192834B1

(12) **United States Patent**

Kolozsvari

(10) Patent No.: **US 6,192,834 B1**

(45) Date of Patent: **Feb. 27, 2001**

(54) **COLLAPSIBLE CAGE**

(75) Inventor: **Kevin Kolozsvari**, Arlington, TX (US)

(73) Assignee: **Doskocil Manufacturing Company, Inc.**, Arlington, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/248,161**

(22) Filed: **Feb. 10, 1999**

(51) Int. Cl.$^7$ ................................................. **A01K 1/03**
(52) U.S. Cl. ............................. **119/498**; 119/499; 119/474
(58) Field of Search ..................................... 119/498, 499, 119/474, 461, 491, 497

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 969,285 | * | 9/1910 | Keipper . |
| 1,187,875 | * | 6/1916 | Welty . |
| 1,198,524 | * | 9/1916 | Cunliffe . |
| 2,892,562 | * | 6/1959 | Smithson . |
| 3,556,058 | * | 1/1971 | Smiler . |
| 3,896,766 | * | 7/1975 | Martin ............................... 119/474 |
| 4,016,833 | * | 4/1977 | Ray ..................................... 119/498 |
| 4,762,085 | * | 8/1988 | Ondrasik ........................... 119/474 |
| 4,763,606 | * | 8/1988 | Ondrasik, II ..................... 119/474 |
| 5,549,073 | * | 8/1996 | Askins et al. ..................... 119/474 |
| 5,626,098 | * | 5/1997 | Askins et al. ..................... 119/474 |
| 5,669,331 | * | 9/1997 | Richmond ........................... 119/497 |

| | | | |
|---|---|---|---|
| 5,727,502 | * | 3/1998 | Askins et al. ..................... 119/499 |
| 5,943,982 | * | 8/1999 | Askins et al. ..................... 119/499 |

* cited by examiner

*Primary Examiner*—Peter M. Poon
*Assistant Examiner*—Yvonne R. Abbott
(74) *Attorney, Agent, or Firm*—Locke Liddell & Sapp LLP

(57) **ABSTRACT**

A collapsible cage for housing an animal having an expanded and a collapsed configuration. The collapsible cage comprises a top platform and a bottom platform defining the ceiling and floor of said collapsible cage, a first accordion wall, a second accordion wall, a first end wall, and a second end wall, which collectively define a cage interior when the collapsible cage is in an expanded configuration. The first end wall rotatably engages the bottom platform and the second end wall rotatably engages the top platform. The first accordion wall and second accordion wall each have a first upper portion and a first lower portion. The first upper portions have first upper ends rotatably attached to the top platform, and the first lower portions have first lower ends rotatably attached to the bottom platform. The first upper portions rotatably engage the first lower portions along a hinge intermediate of the first upper ends and the first lower ends. During the transition of the collapsible cage from the expanded configuration to the collapsed configuration, the first and second end walls and the first and second accordion walls pivot into the cage interior and the top platform approaches the bottom platform.

**18 Claims, 7 Drawing Sheets**





FIG. 1



Fig. 2



Fig. 3



Fig. 3A



Fig. 4



Fig. 6

US 6,192,834 B1

**1**

# COLLAPSIBLE CAGE

## FIELD OF THE INVENTION

This invention relates to animal cages. More particularly, this inventions relates to collapsible cages for pets.

## BACKGROUND OF THE INVENTION

Though most pets, such as cats and dogs, enjoy permanent housing facilities in the homes or yards of their owners, other temporary housing facilities are also occasionally required. Temporary housing facilities may be needed to isolate a pet during specific occasions, such as during yard work or the entry of visitors into a home. Temporary housing facilities may also be needed to accommodate a pet separated from its normal environs, or to serve as a carrier in which the pet may be transported from place to place. The size of temporary housing facilities appropriate for such purposes, and the corresponding difficulty in storing such temporary housing facilities, may discourage the retention of temporary housing facilities beyond the specific occasion for which they were purchased. In response to the high cost and waste associated with the replacement of temporary housing facilities so disposed of, a number of cages capable of being collapsed to a smaller size for easy storage were developed. These include U.S. Pat. No. 5,669,331 to Richmond, and U.S. Pat. No. 4,484,540 to Yamamoto, among others.

However, despite the storage advantages such previous collapsible cages have presented over their larger and bulkier non-collapsible brethren, significant deficiencies still remained. Specifically, the transition of previous cages from a collapsed to an expanded state, or the reverse transition, has proved difficult to achieve, especially when attempted by a single individual (who may be simultaneously attempting to control a distressed and highly uncooperative pet). In addition, the manner in which previous cages transitioned from an expanded to a collapsed state has limited the reduction in cage size achievable through the transition. A need exists for an improved collapsible cage that addresses these deficiencies.

## SUMMARY OF THE INVENTION

The present invention provides a collapsible cage for housing an animal. The collapsible cage has an expanded and a collapsed configuration. The collapsible cage comprises a top platform and a bottom platform defining the ceiling and floor of said collapsible cage, a first accordion wall, a second accordion wall, a first end wall, and a second end wall, which collectively define a cage interior when the collapsible cage is in an expanded configuration. The first end wall rotatably engages the bottom platform and the second end wall rotatably engages the top platform.

The first accordion wall has a first upper portion and a first lower portion. The first upper portion has a first upper end rotatably engaged to the top platform, and the first lower portion has a first lower end rotatably engaged to the bottom platform. The first upper portion rotatably engages the first lower portion along a hinge intermediate of the first upper end and the first lower end.

The second accordion wall has a second upper portion and a second lower portion. The second upper portion has a second upper end rotatably engaged to the top platform, and the second lower portion has a second lower end rotatably engaged to the bottom platform. The second upper portion rotatably engages the second lower portion along a hinge intermediate of the second upper end and the second lower end.

**2**

During the transition of the collapsible cage from the expanded configuration to the collapsed configuration, the first and second end walls and the first and second accordion walls pivot into the cage interior and the top platform approaches the bottom platform.

The rotatable engagement of the first end wall to an individual one of the top or bottom platforms, combined with the rotatable engagement of the second end wall to the other of the top or bottom platforms, advantageously reduces the need to manually position both end walls during the transformation of the collapsible cage into either an expanded or collapsed configuration, and may also reduce the size of the collapsible cage within the collapsed configuration. This reduction in the size of the collapsed cage within the collapsed configuration is aided by the need for each of the top and bottom platforms to accommodate only an individual one of the end walls between itself and the collapsed accordion walls. Collapsible cages having both end walls attached to an individual one of the top or bottom platforms, by contrast, must necessarily accommodate both end walls between that individual one of the top and bottom platforms and the accordion walls within the collapsed configuration.

## BRIEF DESCRIPTION OF THE DRAWINGS

The objects and advantages of the present invention described above will be more clearly understood when considered in conjunction with the accompanying drawings, in which:

FIG. 1 is a forward perspective view of a collapsible cage of the present invention.

FIG. 2 is a forward perspective view of the top platform, bottom platform, and first accordion wall of the collapsible cage of FIG. 1.

FIG. 3 is a forward perspective view of the top platform, bottom platform, first accordion wall, and forward end wall of the collapsible cage of FIG. 1.

FIG. 3A is a forward perspective view of an alternate embodiment of the collapsible cage of FIG. 1 wherein two latches are utilized to maintain the cage door in a closed position.

FIG. 4 is a rear perspective view of the top platform, bottom platform, first accordion wall, and rear end wall of the collapsible cage of FIG. 1.

FIG. 5 is a forward perspective view of a simplified cage **20** illustrating the collapsible cage of FIG. 1 during transformation between expanded and collapsed configurations.

FIG. 6 is a forward perspective view of the collapsible cage of FIG. 1 in a collapsed configuration.

FIG. 7 is a simplified forward cross-sectional view of the collapsible cage of FIG. 1 taken along line 7—7 of FIG. 6.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 1 provides a forward perspective view of a collapsible cage **20** of the present invention in an expanded configuration. Cage **20** is capable of transforming from the expanded configuration illustrated in FIG. 6 for convenient transportation or storage of cage **20**. Cage **20** comprises a top platform **30**, a bottom platform **50**, a first accordion wall **70**, a second accordion wall **100**, a first end wall **110**, and a rear end wall **160**. Platforms **30** and **50** and walls **70**, **100**, **110**, and **160** are each of a wire-frame construction and are substantially rectangular in shape, and together define a cage

US 6,192,834 B1

3                                                                                      4

interior 24. Though cage 20 is illustrated as having wire-frame construction, it should be understood that cage 20 could also be constructed from other materials, such as molded plastic or aluminum sheeting. In the expanded configuration illustrated, top platform 30 and bottom platform 50, first accordion wall 70 and second accordion wall 100, and forward end wall 110 and rear end wall 160, each form opposite parallel walls of a rectangular cube, wherein each wall or platform comprising a side of the rectangular cube defines a plane perpendicular to those planes defined by adjacent walls and platforms. This expanded configuration permits housing of an animal within cage 20. Subsequent reference to cage 20, top platform 30, bottom platform 50, first accordion wall 70, second accordion wall 100, forward end wall 110, or rear end wall 160, as "expanded" or in an "expanded configuration" shall indicate a position and orientation consistent with that illustrated in FIG. 1. A floor tray 28 within cage interior 24 substantially overlays bottom platform 50.

First accordion wall 70 and second accordion wall 100 each rotatably engage both top platform 30 and bottom platform 50. A rotatable engagement is engagement which permits at least some degree of rotating or pivoting of one or both of the engaged members about an axis defined or controlled by the points of engagement. Forward end wall 110 rotatably engages bottom platform 50, while rear end wall 160 rotatably engages top platform 30. Forward end wall 110 comprises a door frame 112 defining an entryway 114, and a door 120 rotatably engaging door frame 112. A latch 130 and a locking hook 136 secure door 120 to door frame 112 in a closed position.

FIG. 2 provides a forward perspective view of cage 20 of FIG. 1 in an expanded configuration, wherein second accordion wall 100, forward end wall 110, and rear end wall 160 have been removed for clarity of illustration. Top platform 30 and bottom platform 50 respectively define the ceiling and floor of cage 20. Top platform 30 comprises a substantially planar main top section 32, a first upper lip 34 and a second upper lip 36. First upper lip 34 and second upper lip 36 extend from opposite ends of main top section 32 toward bottom platform 50, in a direction substantially perpendicular to the plane defined by main top section 32, and terminate in wires 42 and 44 respectively.

Similarly, bottom platform 50 comprises a substantially planar main bottom section 52, a first lower lip 54 and a second lower lip 56. First lower lip 54 and second lower lip 56 extend from opposite ends of main bottom section 52 toward top platform 30, in a direction substantially perpendicular to the plane defined by main bottom section 52, and terminate in wires 61 and 62 respectively.

First accordion wall 70 comprises a lower portion 72 and an upper portion 82, both of which are substantially planar and rectangular in configuration. In the expanded configuration of cage 20 upper portion 82 and lower portion 72 define a single plane substantially perpendicular to the planes defined by main bottom section 52 and main top section 32. Lower portion 72 has a lower end 74 terminating in a plurality of wire loops 76 and an opposite inner wire end 78 terminating in an wire 79. Wire loops 76 substantially encircle wire 61 and thereby rotatably engage lower portion 72 to first lower lip 54 of bottom platform 50.

Wire loops similar to wire loops 76 are utilized throughout the construction of cage 20. However, it should be understood that means other than wire loops may also be utilized to rotatably engage components of cage 20 to one another. Other acceptable methods of rotatably engaging

components include, but are not limited to, separate collars or more traditional separate hinge arrangements.

Upper portion 82 has an upper end 84 terminating in a plurality of wire loops 86 and an opposite inner loop end 88 terminating in a plurality of wire loops 89. Wire loops 86 substantially encircle wire 42 and thereby rotatably engage upper portion 82 to first upper lip 34 of top platform 30. Wire loops 89 substantially encircle wire 79 and thereby form a hinge 80 and rotatably engage lower portion 72 to upper portion 82. Hinge 80 is therefore located intermediate of upper end 84 and lower end 74 of first accordion wall 70. "Intermediate" in this sense should be understood to mean at any point between upper end 84 and lower end 74, though hinge 80 is preferably located substantially midway between wire loops 76 and wire loops 86.

A plurality of accordion wall stops 90 extend from lower portion 72 toward top platform 30, and between cage interior 24 and upper portion 82. In the expanded configuration of cage 20, accordion wall stops 90 prevent upper portion 82 from pivoting about hinge 80 substantially toward cage interior 24.

Second accordion wall 100 (not illustrated in FIG. 2) substantially mirrors the construction of first accordion wall 70, and engages top platform 30 and bottom platform 50 in a manner substantially similar to that in which first accordion wall 70 engages platforms 30 and 50.

FIG. 3 provides a forward perspective view of cage 20 of FIG. 1 in an expanded configuration, wherein second accordion wall 70 and rear end wall 160 have been removed for clarity of illustration. Bottom platform 50 has a tray wire 63 extending from first lower lip 54 to second lower lip 56 adjacent to forward end wall 110. Tray wire 63 includes two tray projections 66 extending substantially toward main bottom section 52. Tray projections 66 prevent the accidental removal of floor tray 28 from the cage interior 24. Preferably, tray wire 63 is sufficiently flexible to allow movement of tray wire 63 away from main bottom section 52 under ordinary hand pressure, thereby permitting intentional removal of floor tray 28 from cage interior 24 between tray wire 63 and main bottom section 52.

Door frame 112 of forward end wall 110 has an edge wire 148 adjacent to first accordion wall 70 and an edge wire 150 opposite second accordion wall 70. Edge wires 148 and 150 terminate in wire loops 142. Wire loops 142 substantially encircle tray wire 63 and thereby rotatably engage door frame 112 of forward end wall 110 to bottom platform 50.

Several mechanisms help ensure that, from the expanded configuration of cage 20, forward end wall 110 may only pivot about tray wire 63 inwardly toward cage interior 24. End stop 92 comprises perpendicular extension 94 and parallel extension 96. Perpendicular extension 94 extends from lower portion 72 adjacent forward end wall 110 toward cage interior 24, in a direction substantially perpendicular to the plane defined by lower portion 72. The length of perpendicular extension 94 should be sufficient to permit perpendicular extension 94 to extend immediately beyond edge wire 148 when cage 20 is in an expanded configuration. Parallel extension 96 extends, from the end of perpendicular extension 94 opposite lower portion 72, in a direction substantially parallel to the plane defined by lower portion 72, and toward cage interior 24.

Perpendicular extension 94 ensures that forward end wall 110 may only pivot inwardly toward cage interior 24 from an expanded configuration. In an alternate embodiment parallel extension 96 also frictionally engages edge wire 148 and thereby assists in the maintenance of forward end wall

US 6,192,834 B1

5

110 in an expanded configuration. In an alternate embodiment not illustrated in FIG. 3, parallel extension 96 extends both toward cage interior 24 and toward lower portion 72 to enhance the strength of the engagement between parallel extension 96 and edge wire 148. End stop 98 extends from upper portion 82 in a manner similar to that in which end stop 92 extends from lower portion 72, and performs similar functions to those performed by end stop 92. Two end stops extend from second accordion wall 100 (not illustrated in FIG. 3) in a manner similar to that in which end stops 92 and 98 extend from first accordion wall 70, and also perform similar functions to those performed by end stop 92.

Top stops 152 and 154 extend from the end of door frame 112 opposite door wire loops 142, in a direction away from wire loops 142 and substantially parallel to the plane defined by door frame 112. As illustrated in FIG. 3, top stops 152 and 154 are formed by edge wires 148 and 150 respectively. In the expanded configuration of cage 20, top stops 152 and 154 contact a end wire 46 of top platform 30 and thereby prevent the pivoting of forward end wall 110 away from cage interior 24 from the expanded configuration. The presence of gaps 38 in the wire-frame construction of top platform 30, through which top stops 152 and 154 may pivot, ensures that top stops 152 and 154 do not prevent the pivoting of forward end wall 110 into cage interior 24 from the expanded configuration.

A locking tongue 144 also extends from the end of door frame 112 opposite wire loops 142, in a direction substantially parallel to the plane defined by door frame 112 and away from wire loops 142. In the expanded configuration of cage 20, locking tongue 144 contacts a side of end wire 46 substantially opposite the side of end wire 46 contacted by top stops 152 and 154. End wire 46 is thereby locked in position between locking tongue 144 and top stops 152 and 154, and substantially any pivoting of forward end wall 110 either toward or away from cage interior 24 is prevented. To facilitate this locking while preventing unwanted bending of either door frame 112 or end wire 46, locking tongue 144 incorporates an outward extension 146. Outward extension 146 creates a gap between locking tongue 144 and the plane defined by top stops 152 and 154, measured perpendicular to the plane defined forward end wall 110, that is capable of receiving end wire 46.

Door frame 112 defines substantially rectangular entryway 114. A hinge wire 140 of door frame 112 is oriented substantially parallel to edge wires 148 and 150. Substantially rectangular door 120 has a hinge end 122 and a latch end 126. Hinge end 122 terminates in a plurality of wire loops 124. Wire loops 124 substantially encircle hinge wire 140 and thereby rotatably engage door 120 to door frame 112.

Latch end 126 includes latch 130. Latch 130 operates by removably inserting a latch pin 132 into a receiving loop 158 extending from door frame 112. Removable insertion of latch pin 132 is achieved by pivoting latch handle 134 toward top stops 152 and 154, moving latch handle 134 toward receiving loop 158, and then lowering latch handle 134 to lock latch pin 132 in place. Six door stops 156 extend from door frame 112 into entryway 114 in a direction parallel to the plane defined by door frame 112. Door stops 156 prevent door 120 from pivoting about hinge wire 140 into cage interior 24.

A locking hook 136 extends from door 120 adjacent to latch end 126. In an expanded configuration, locking hook 136 extends upward in the plane defined by door 120 toward and partly around a hook wire 138 of door frame 112. Door

6

120 rotatably engages door frame 112 in a manner permitting sufficient movement of door 120 parallel to hinge wire 140 to allow locking hook 136 to be lifted over and then engage hook wire 138 during closing of door 120.

FIG. 3A illustrates an alternate embodiment of cage 20 wherein door 220 incorporates a lower latch 228 and an upper latch 230, but does not incorporate a locking hook. The use of multiple latches 228 and 230 advantageously allows for a more secure closure of door 220, and prevents accidental opening of door 220 upon failure of any one latch 228 or 230. It should be understood that cage 20 may incorporate alternate types of door fasteners other than the illustrated latches 130, 228, or 230. Acceptable alternative door fasteners include, but are not limited to, spring loaded wire hooks, cantilevered clips, or even old fashioned gate latches.

FIG. 4 provides a rear perspective view of cage 20 of FIG. 1 in an expanded configuration, wherein first accordion wall 70 and forward end wall 110 have been removed for clarity of illustration. Top platform 30 has an end wire 48 extending across main top section 32 from first upper lip 34 to second upper lip 36 adjacent rear end wall 160. Rear end wall 160 has an edge wire 162 adjacent to second accordion wall 100, and an edge wire 164 opposite second accordion wall 100. Edge wires 162 and 164 terminate in wire loops 168. Wire loops 168 substantially encircle end wire 48 and thereby rotatably engage rear end wall 160 to top platform 30.

End stops 102 and 108 extend from second accordion wall 100 in a manner similar to that in which end stops 92 and 98 extend from first accordion wall 70 (as illustrated in FIG. 3). End stops 102 and 108 also serve functions similar to those served by end stops 92 and 98. Specifically, end stops 102 and 108 ensure that rear end wall 160 may only pivot inwardly toward cage interior 24 from the expanded configuration. In an alternate embodiment end stops 102 and 108 may also frictionally engage edge wire 162 to assist in the maintenance of rear end wall 160 and cage 20 in the expanded configuration. Two stops extend from first accordion wall 70 (not illustrated in FIG. 4) in a manner similar to that in which end stops 102 and 108 extend from second accordion wall 100, and perform similar functions to those performed by end stops 102 and 108.

Bottom stops 170 and 172 extend from rear end wall 160 opposite wire loops 168, in a direction substantially parallel to the plane defined by rear end wall 160, and away from wire loops 168. As illustrated in FIG. 4, bottom stops 170 and 172 are formed by edge wires 162 and 164 respectively. In the expanded configuration of cage 20, bottom stops 170 and 172 contact a tray wire 64 of bottom platform 50 and thereby prevent the pivoting of rear end wall 160 away from cage interior 24 from an expanded configuration. A locking tongue 174 also extends from the rear end wall 160 opposite wire loops 168, in a direction substantially parallel to the plane defined by rear end wall 160, and way from wire loops 168. In the expanded configuration of cage 20, locking tongue 174 contacts a side of tray wire 64 substantially opposite the side of tray wire 64 contacted by bottom stops 170 and 172. Tray wire 64 is thereby locked in position between locking tongue 174 and bottom stops 170 and 172, and substantially any pivoting of rear end wall 160 either toward or away from cage interior 24 is prevented. To facilitate this locking while preventing unwanted bending of either rear end wall 160 or tray wire 64, locking tongue 174 may incorporate an outward extension similar to outward extension 146 of locking tongue 144, to create a gap capable of receiving tray wire 64 between locking tongue 174 and the plane defined by bottom stops 170 and 172.

US 6,192,834 B1

7                                                                    8

Tray wire 64 extends from first lower lip 54 and second lower lip 56 adjacent to rear end wall 160. Tray wire 64 is configured to include two tray projections 68 extending substantially toward main bottom section 52 to prevent the accidental removal of floor tray 28 from the cage interior 24. Tray wire 64 is similarly configured to include a locking projection 69 extending away from main bottom section 52, and along which locking tongue 174 contacts tray wire 64. The locking of tray wire 64 between locking tongue 174 and bottom stops 170 and 172, as well as the locking of end wire 46 between locking tongue 144 and top stops 152 and 154, assist in the maintenance of cage 20 in an expanded configuration.

Referring now to FIGS. 1, 2, 3, and 4, the transition of cage 20 from an expanded configuration to a collapsed configuration is begun by extricating end wire 46 from between locking tongue 144 and top stops 152 and 154, and tray wire 64 from between locking tongue 174 and bottom stops 170 and 172. The extrication of end wire 46 may be accomplished by pulling door frame 112 and main top section 32 adjacent forward end wall 110 away from one another, and then pivoting forward end wall 110 about tray wire 63 toward cage interior 24. The extrication of tray wire 64 may be accomplished by pulling rear end wall 160 and main bottom section 52 away from one another, and then pivoting rear end wall 160 about end wire 48 toward cage interior 24. The extrication of tray wire 64 and end wire 46 is facilitated by the flexibility of the wire frame construction utilized in main top section 32 and main bottom section 52.

In an alternate embodiment, the initiation of pivoting of forward end wall 110 and rear end wall 160 will require the application of forces sufficient to overcome a frictional engagement between forward and rear end walls 110 and 160 and the ends stops (including end stops 92, 98, 102, and 108) extending from first and second accordion walls 70 and 100. Top platform 30 and bottom platform 50 may be moved toward one another upon the removal of forward end wall 110 and rear end wall 160 as barriers separating top platform 30 from bottom platform 50. Top platform 30 will preferably naturally collapse upon bottom platform 50 under the influence of gravity if cage 20 is oriented with bottom platform 50 toward the ground. Any significant movement of top platform 30 toward bottom platform 50 will result in the folding of first accordion wall 70 along hinge 80, whereby upper end 84 and lower end 74 move toward one another, and hinge 80 moves toward cage interior 24. Second accordion wall 100 folds in a manner similar to and substantially simultaneous with the folding of first accordion wall 70. Before significant movement of top platform 30 toward bottom platform 50 is initiated, the pivoting of rear end wall 160 into cage interior 24 should be sufficient so that bottom stops 170 and 172 have cleared a plane parallel to main top section 32 and passing through hinge 80, so as to prevent interference between the inward pivoting of rear end wall 160 and the folding of accordion walls 70 and 100.

FIG. 5 provides a simplified forward perspective view of cage 20 during the transition from an expanded configuration to a collapsed configuration. Top platform 30 has moved toward bottom platform 50, causing first and second accordion walls 70 and 100 to fold and begin to move into cage interior 24. Forward end wall 110 has pivoted into cage interior 24 and is disposed between bottom platform 50 and partially folded first and second accordion walls 70 and 100. Similarly, rear end wall 160 has pivoted into cage interior 24 and is disposed between platform 30 (part of which is cut away to permit viewing of rear end wall 160) and partially folded first and second accordion walls 70 and 100.

FIG. 6 provides a forward perspective view of cage 20 in a collapsed configuration. In the collapsed configuration of cage 20, first upper lip 34 abuts first lower lip 54, and second upper lip 36 abuts second lower lip 56. Cage 20 may be maintained in a collapsed state through the use of clips 180 rotatably engaged to first upper lip 34 and second upper lip 36. In the collapsed configuration, clips 180 may pivot downward and removably engage first and second lower lips 54 and 56. As illustrated, clips 180 rotatably engage upper lips 34 and 36 through clip loops 182, and removably engage lower lips 54 and 56 through slots 184 configured to accept clip wires 186 of clips 180. Clips 180 have tabs 188 to provide leverage for disengaging slots 184 from clip wires 186. A handle 190 rotatably attached to first lower lip 54 facilitates hand transport of cage 20 in the collapsed configuration.

FIG. 7 provides a forward cross-sectional view taken along line 7—7 of FIG. 6, approximately to main top section 32 and approximately half-way between the engagement forward end wall 110 and bottom platform 30, and the engagement of rear end wall 160 and top platform 30. The planes defined by upper portion 82 and lower portion 72 of first accordion wall 70 (and the corresponding components of second accordion wall 100) are immediately adjacent to one another and substantially parallel to the planes defined by main to portion 32 and main bottom portion 52. Forward end wall 110 is disposed between first lower lip 54 and second lower lip 56, and between lower portion 72 (and the corresponding lower portion of second accordion wall 100) and main bottom section 52. Rear end wall 160 is disposed between first upper lip 34 and second upper lip 36, and between upper portion 82 (and the corresponding upper portion of second accordion wall 100) and main top section 32.

The appearance of both forward end wall 110 and rear wall 160 within the cross-sectional view of FIG. 7 indicates that in the collapsed configuration of cage 20, rear end wall 160 overlaps forward end wall 110. Similar overlapping will occur in any collapsible cage having end walls of a height 200 greater than half the length 202 of cage 20 (height 200 and length 202 are illustrated in FIG. 1).

Prior art collapsible cage designs, like the collapsible cage of the instant invention, have utilized two non-accordion end walls hinged to top or bottom platforms. However, the prior art has only disclosed and taught the rotatable attachment of non-accordion end walls to a single one of the top or bottom platforms of a collapsible cage.

For example, U.S. Pat. No. 5,626,098, issued May 6, 1997 to Askins, et al., discloses a collapsible cage having an two end walls, each of which is hinged to the collapsible cage's bottom platform. Similarly, U.S. Pat. No. 5,727,502, issued Mar. 17, 1998, to Askins, et al., discloses a collapsible cage having two end walls, each of which is hinged to the collapsible cage's bottom platform. Such a design facilitates transformation of the cage into a collapsed configuration, as both end walls may naturally pivot into the cage's interior under the influence of gravity without a need for substantial manual positioning. However, transformation of cages utilizing such a design into an expanded configuration requires manual positioning of both end walls while raising the cage's top platform.

U.S. Pat. No. 5,669,331, issued Sep. 23, 1997 to Richmond, discloses an animal carrier having two side walls (non-accordion end walls), each of which is pivotably coupled to the bottom of the top platform. Such a design facilitates transformation of the cage into an expanded

**9**

configuration, as both end walls may naturally pivot out of the cage's interior and into a substantially vertical alignment without a need for substantial manual positioning. However, significant difficulty may be encountered in transforming cages utilizing such a design into a collapsed configuration, as both end walls must be pivoted upward and into the cage interior prior to lowering the top platform toward the bottom platform.

Cage 20 advantageously reduces the need to manually position both end walls 110 and 160 during the transformation of cage 20 into either an expanded or collapsed configuration. During transformation to a collapsed configuration, for example, forward end wall 110 should require little impetus to pivot into cage interior 24 once disengaged from end wire 46. The presence of door 120 in forward end wall 110 provides additional mass to forward end wall 110 and promotes the pivoting of forward end wall 1.00 into cage interior 24. Similarly, during transformation to an expanded configuration, rear end wall 160 should require little impetus to pivot out of cage interior 24 once top platform 30 is raised away from bottom platform 50. While forward end wall 10 may require substantial manual positioning during transformation of cage 20 into an expanded configuration, and rear end wall 160 may require substantial manual positioning during transformation of cage 20 into a collapsed configuration, the collapsible cage design of the instant invention advantageously avoids the need for substantial manual positioning of both end walls 110 and 160 during either transformation.

The collapsible cage design of the instant invention may also reduce the size of cage 20 within the collapsed configuration. This reduction in the size of cage 20 within the collapsed configuration is aided by the need for each of top and bottom platforms 30 and 50 to accommodate only an individual one of end walls 110 and 160 between itself and collapsed accordion walls 110 and 160. Collapsible cages having both end walls attached to an individual one of the top or bottom platforms, by contrast, must necessarily accommodate both end walls between that individual one of the top and bottom platforms and the accordion walls within the collapsed configuration.

U.S. Pat. No. 5,626,098, issued May 6, 1997, is hereby incorporated by reference in its entirety. It should be understood that the invention is not limited to the exact details of construction shown and described herein for obvious modifications will occur to persons skilled in the art.

We claim:

1. A collapsible cage for housing an animal, said collapsible cage having an expanded and a collapsed configuration, said collapsible cage comprising:

a top platform and a bottom platform defining a ceiling and a floor of said collapsible cage;

a first accordion wall having a first upper portion and a first lower portion, said first upper portion having a first upper end rotatably engaged to said top platform, said first lower portion having a first lower end rotatably engaged to said bottom platform, and said first upper portion rotatably engaging said first lower portion along a hinge intermediate of said first upper end and said first lower end;

a second accordion wall having a second upper portion and a second lower portion, said second upper portion having a second upper end rotatably attached to said top platform, said second lower portion having a second lower end rotatably attached to said bottom platform, and said second upper portion rotatably

**10**

engaging said second lower portion along a hinge intermediate of said second upper end and said second lower end;

a first end wall rotatably engaging said bottom platform;

a second end wall rotatably engaging said top platform;

wherein said top and bottom platforms, first and second end walls, and first and second accordion walls define a cage interior when said collapsible cage has said expanded configuration, and

wherein during the transition from said expanded configuration to said collapsed configuration said first and second end walls and said first and second accordion walls pivot into said cage interior and said top platform approaches said bottom platform.

2. The collapsible cage of claim 1 wherein a door wall chosen from a group consisting of said first end wall, second end wall, first accordion wall, and second accordion wall, said door wall comprising a door frame defining an entryway through said door wall, and a door rotatably engaging said door frame along a door hinge.

3. The collapsible cage of claim 2 wherein said door wall is said first end wall.

4. The collapsible cage of claim 3 wherein said door rotatably engages said door frame along a door hinge adjacent to said entryway.

5. The collapsible cage of claim 3 wherein said door wall further comprises a latch removably securing said door to said door frame to prevent rotation of said door around said door hinge.

6. The collapsible cage of claim 3 wherein said door wall further comprises a plurality of latches removably securing said door to said door frame to prevent rotation of said door around said door hinge.

7. The collapsible cage of claim 1 wherein said end walls and said accordion walls are of a wire-frame construction.

8. The collapsible cage of claim 7 wherein said top platform and said bottom platform are of a wire-frame construction.

9. A collapsible cage for housing an animal, said collapsible cage having an expanded and a collapsed configuration, said collapsible cage comprising:

a top platform and a bottom platform defining a ceiling and a floor of said collapsible case;

a first accordion wall having a first upper portion and a first lower portion, said first upper portion having a first upper end rotatable engaged to said top platform, said first lower portion having a first lower end rotatably engaged to said bottom platform, and said first upper portion rotatable engaging said first lower portion along a hinge intermediate of said first upper end and said first lower end;

a second accordion wall having a second upper portion and a second lower portion, said second upper portion having a second upper end rotatable attached to said top platform, said second lower portion having a second lower end rotatable attached to said bottom platform, and said second upper portion rotatable engaging said second lower portion along a hinge intermediate of said second upper end and said second lower end;

a first end wall rotatable engaging said bottom platform;

a second end wall rotatably engaging said top platform;

wherein said top and bottom platforms, first and second end walls, and first and second accordion walls define a cage interior when said collapsible cage has said expanded configuration;

US 6,192,834 B1

11

wherein during the transition from said expanded configuration to said collapsed configuration said first and second end walls and said first and second accordion walls pivot into said cage interior and said top platform approaches said bottom platform;

wherein a door wall chosen from a group consisting of said first end wall, second end wall, first accordion wall, and second accordion wall, said door wall comprising a door frame defining an entryway through said door wall, and a door rotatable engaging said door frame along a door hinge;

wherein said door wall is said first end wall;

wherein said door rotatable engages said door frame along said door hinge adjacent to said entryway

wherein said door has a securing extension, said door frame has a receiving element, and said rotatable engagement between said door and said door frame permits movement of said door parallel to said door hinge whereby said securing extension may be raised over said receiving element to prevent the accidental opening of said door.

10. A collapsible cage for housing an animal, said collapsible cage having an expanded and a collapsed configuration and defining a cage interior, said collapsible cage comprising:

top and bottom platforms defining the top and bottom of said collapsible cage;

first and second accordion walls each having opposite ends rotatably engaging said top and bottom platforms and hinged at an intermediate position between said opposite ends, to provide for a rotational collapse of said first and second accordion walls against said top and bottom platforms for portable transport of said collapsible cage in said collapsed configuration, and to provide for an expansion of said first and second accordion walls into said expanded configuration for use in housing an animal;

a first end wall rotatably engaging an individual one of the top and bottom platforms to facilitate the collapse of said first and second accordion walls when said first end wall is pivoted into said cage interior;

a second end wall rotatably engaging the individual one of the top and bottom platforms not engaged to said first end wall, to facilitate the collapse of said first and second accordion walls when said second end wall is pivoted into said cage interior.

11. The collapsible cage of claim 10 wherein a door wall chosen from a group consisting of said first end wall, second end wall, first accordion wall, and second accordion wall, said door wall comprising a door frame defining an entryway through said door wall, and a door rotatable engaging said door frame alone a door hinge.

12. The collapsible cage of claim 11 wherein said door wall is said first end wall.

13. The collapsible cage of claim 12 wherein said door rotatably engages said door frame along a door hinge adjacent to said entryway.

14. The collapsible cage of claim 12 wherein said door wall further comprises a latch removably securing said door to said door frame to prevent rotation of said door around said door hinge.

12

15. The collapsible cage of claim 12 wherein said door wall further comprises a plurality of latches removably securing said door to said door frame to prevent rotation of said door around said door hinge.

16. The collapsible cage of claim 10 wherein said end walls and said accordion walls are of a wire-frame construction.

17. The collapsible cage of claim 16 wherein said top platform and said bottom platform are of a wire-frame construction.

18. A collapsible cage for housing an animal, said collapsible cage having an expanded and a collapsed configuration and defining a cage interior, said collapsible cage comprising:

top and bottom platforms defining the top and bottom of said collapsible cage;

first and second accordion walls each having opposite ends rotatably engaging said top and bottom platforms and hinged at an intermediate position between said opposite ends, to provide for a rotational collapse of said first and second accordion walls against said top and bottom platforms for portable transport of said collapsible cage in said collapsed configuration, and to provide for an expansion of said first and second accordion walls into said expanded configuration for use in housing an animal;

a first end wall rotatable engaging an individual one of the top or bottom platforms to facilitate the collapse of said first and second accordion walls when said first end wall is pivoted in to said cage interior;

a second end wall rotatable engaging the individual one of the top or bottom platforms not engaged to said first end wall, to facilitate the collapse of said first and second accordion walls when said second end wall is pivoted into said cage interior;

wherein the rotatable engagement of said first end wall to an individual one of said top or bottom platforms, combined with the rotatable engagement of said second end wall to the other of said top or bottom platforms, facilitates transformation of the cage into either an expanded or collapsed configuration;

wherein a door wall chosen from a group consisting of said first end wall, second end wall, first accordion wall, and second accordion wall, said door wall comprising a door frame defining an entryway through said door wall, and a door rotatably engaging said door frame along a door hinge;

wherein said door wall is said first end wall;

wherein said door rotatable engages said door frame along said door hinge adjacent to said entryway;

wherein said door has a securing extension, said door frame has a receiving element, and said rotatable engagement between said door and said door frame permits movement of said door parallel to said door hinge whereby said securing extension may be raised over said receiving element to prevent the accidental opening of said door.

* * * * *

# Exhibit 13

# United States Patent [19]

## Ondrasik

[11] Patent Number: 4,762,085

[45] Date of Patent: Aug. 9, 1988

[54] **COLLAPSIBLE WIRE CAGE**

[76] Inventor: **Vladimir J. Ondrasik,** 11215 S. Wilmington, Los Angeles, Calif. 90059

[21] Appl. No.: **934,465**

[22] Filed: **Nov. 24, 1986**

[51] Int. Cl.⁴ .............................................. A01K 31/00
[52] U.S. Cl. .................................................. 119/17
[58] Field of Search ................................ 119/17, 19, 22; 220/331, 332, 329, 19, 1.5, 4 F, 6, 7; 49/382, 193; 43/105

[56]                  **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,129,011 | 2/1915 | Pyle | 220/6 X |
| 1,669,300 | 5/1928 | Hunter | 220/6 |
| 2,892,562 | 6/1959 | Smithson | 119/17 X |
| 3,058,445 | 10/1962 | Johnson | 119/17 |
| 3,556,058 | 1/1971 | Smiler | 220/19 X |
| 4,577,772 | 3/1986 | Bigliardi | 220/4 F X |

### OTHER PUBLICATIONS

Central Metal Products, Inc., Catalog, undated–see "Uni–Fold Cages".
Midwest Metal Products, Catalog, undated (1985)–see "Folding Cages", Models 60–62.
Kennel–Aire Spring 1985 Catalog–see "Commander".

Primary Examiner—Robert P. Swiatek
Assistant Examiner—R. Thomas Price
Attorney, Agent, or Firm—Brown, Martin, Haller & Meador

[57]                  **ABSTRACT**

A collapsible wire cage has opposite side walls, upper and lower walls, and end walls of wire grille construction defining an enclosure. Each end wall is pivoted at one side edge to a respective one of the side walls and has a releasable locking mechanism at its other side edge for releasably securing it to the other side wall. The upper and lower walls are each formed in two panel sections, one of which is pivoted to one of the side walls and the other of which is pivoted to the other side wall. The panel sections are pivotally connected together to allow them to pivot between an expanded position in which they are coplanar and a folded position in which they are pivoted inwardly and flattened against one another to collapse the cage. A releasable locking mechanism is provided on each of the collapsible walls to retain them in their expanded, coplanar position. In an alternative, the side walls may be collapsible with the end walls pivotally secured to the upper and lower walls.

**12 Claims, 3 Drawing Sheets**





FIG. 1





FIG. 5

4,762,085

1

## COLLAPSIBLE WIRE CAGE

### BACKGROUND OF THE INVENTION

The present invention relates to a collapsible wire cage of the type generally used for animal enclosures.

Wire animal cages are often used for confining animals, either in a particular location such as a kennel, animal show or the like, or during transportation of animals from one location to another. It is desirable that such cages be collapsible for easy storage and handling when not in use, and a number of prior art animal cages have been of collapsible construction.

In U.S. Pat. No. 3,556,058 of Smiler, for example, a collapsible cage is formed from six wire grille panels having detachable hinges which allow the cage to be separated into two pieces of three hinged sections each, which can be folded flat for storage. This has the disadvantage that two separate sections must be stored, with consequent difficulty in reassembling and risk of loosing one section. It is more difficult to carry two separate parts from a place of storage to a place where they are to be used, and the parts are separated by completely removing two hinge rods which also must be stored and may easily be lost.

In U.S. Pat. No. 1,129,011 of Pyle a folding shipping crate is described which has top and bottom walls hinged to the respective side walls so that the top and one side wall can be folded flat against the bottom and other side wall. A similar collapsing arrangement is shown in U.S. Pat. No. 2,892,562 of Smithson. This has the disadvantage that a large rectangular area is required for storage, since the collapsed cage will have a length equal to the sum of the height of the side walls and the width of the top or bottom walls.

### SUMMARY OF THE INVENTION

It is an object of the present invention to provide an animal cage which is readily collapsible for storage and can be easily carried and reassembled for use when needed.

According to the present invention a collapsible wire animal cage is provided which comprises two pairs of opposed walls defining an open-ended enclosure, the walls of one pair being collapsible and each being pivotally connected at their opposite side edges to adjacent side edges of the two walls of the other pair. The collapsible walls each comprise two sections pivoted together along a pivot axis extending between the opposite ends of the enclosure to allow them to pivot between an open position in which they are substantially flat and co-planar and a collapsed position in which they are folded inwardly relative to the enclosure into a face to face engagement with one another, drawing the other pair of walls inwardly towards one another into a collapsed, storage position. Each collapsible wall has a releasable securing or locking mechanism for releasably securing it in its open position while the cage is in use.

A pair of opposite end walls are provided for closing the opposite ends of the enclosure. Each end wall is pivotally secured at one edge to one of the non-collapsible walls at the respective end of the enclosure, and releasably secured at the opposite edge to the other non-collapsible wall. Thus for storage the end wall is released at one edge and pivoted about the other edge into face to face engagement with the wall to which it is pivotally secured. In the preferred embodiment one of the end walls is pivoted to one of the non-collapsible

2

walls and the other end wall is pivoted to the other non-collapsible wall, so that the end walls are pivoted outwardly in opposite directions for storage.

Preferably, the two pivot sections overlap at their inner edges and are pivoted together by means of a pivot rod which extends through a first set of aligned openings in the inner edge of a first one of the sections and the overlapped portion of the other section. The securing mechanism is arranged to releasably secure the inner edge of the other section to the overlapped edge of the first section in the open position.

In the preferred embodiment the two pivot sections of each collapsible wall each comprise a wire panel having a series of spaced rods extending between opposite ends of the enclosure and a series of cross bars extending transverse to the rods. The pivot rod is generally centrally located and extends through a first set of aligned openings in the overlapping portions of the cross bars. Preferably, the securing mechanism for holding the two sections in their open, flat position comprises a pair of spring loaded clip rods, one at each end of the wall, which extend through a second set of aligned openings in the overlapping portions of the cross bars which are offset from the pivot rod.

One of the non-collapsible walls, which are the side walls of the cage in the preferred embodiment but which could be the top and bottom walls in alternative arrangements, has its opposite edges to which the opposite collapsible walls are pivoted bent inwardly so that the pivotal connection to the collapsible walls is offset from the plane of the non-collapsible walls. This means that when the cage is folded or collapsed, a gap will be left between that non-collapsible wall and the folded collapsible walls. This gap can be used for storage of an animal tray or pan of the type often used in the bottom of such cages for holding sawdust and the like and for catching debris.

In the preferred arrangement, carrying handles are provided on edges of the non-collapsible walls which will be adjacent one another when the cage is collapsed, to facilitate carrying the cage to and from a storage location or from one place of use to another.

### BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will be better understood from the following detailed description of a preferred embodiment, taken in conjunction with the accompanying drawings in which like reference numerals refer to like parts, and in which:

FIG. 1 is a perspective view showing an animal cage according to a preferred embodiment of the present invention in its fully expanded, ready-for-use condition;

FIG. 2 is a partial view showing details of the door release mechanism;

FIG. 3 is a partial view showing details of one of the collapsible wall release pins;

FIG. 4 is an end view of the cage showing a modification to one of the side walls and showing the end door opened and clipped back and the upper and lower walls partially collapsed; and

FIG. 5 is a perspective view of the modified cage in its collapsed, storage condition.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 1 of the drawings shows a collapsible, wire grille cage 10 according to a preferred embodiment of

4,762,085

3

the present invention in its fully assembled and ready-to-use condition. The cage basically comprises two pairs of opposed walls 12, 14 and 16, 18 connected together to form upper, lower and opposite side walls of an open-ended enclosure. The opposite ends of the enclosure are closed by releasable end doors or walls 22, 24. In FIG. 1, the side wall 18 and end wall 24 have been omitted for reasons of clarity. In the preferred embodiment a tray or pan 25 is placed in the bottom of the cage when assembled, to catch food or debris and to contain bedding materials, for example. Trays or pans of this type are commonly used in animal cages.

Each wall of one of the opposed pairs is collapsible to allow the cage to be flattened for storage as shown in FIG. 5 and described in more detail below. In the preferred embodiment of the invention shown in the drawings the upper and lower walls 12 and 14 are each collapsible and pivotally secured at their opposite side edges to the upper and lower edges, 30, 32 and 34, 36, respectively, of the opposite side walls 16 and 18. However, in an alternative embodiment the opposite side walls could be of collapsible construction and be pivotally secured to the opposite side edges of the upper and lower walls. In a modification best shown in FIGS. 4 and 5, one of the side walls is bent inwardly out of the plane of the side wall at its upper and lower edges 30 and 32, so that the upper and lower walls pivot around lines 35, 39 which are offset inwardly from the plane of side wall 16.

As shown in the drawings each of the walls of the cage is preferably of wire grille, wire rod or mesh panel construction, each of the non-collapsible side walls consisting of a bent rod or wire 38 defining the outer perimeter of the panel which is substantially rectangular shape, and a series of spaced transverse wires 40 extending between the upper and lower edges of the panel. A series of cross wires or rods 42 extend between opposite ends of the panel for strengthening.

Each of the end walls is of similar construction, and in the preferred embodiment one of the end walls 22 is pivotally secured at one side edge to one of the side walls 16 while the other end wall is pivotally secured at its opposite side edge to the other side wall 18. The pivotal or hinge connection between the end walls and the opposite side walls is provided by extensions of the end wall cross bars 44 which are bent to form eyelets or hinges 46 around the adjacent vertical end portion 48 of the bent rod 38 of the respective side wall 16, 18, as best shown in FIG. 1. Although in the preferred arrangement the end walls are pivotally secured to the opposite side walls, in an alternative they may each be pivoted to the same side wall at opposite ends of the enclosure. In another alternative arrangement where the side walls are collapsible, as discussed above, the end walls will be pivotally secured to the respective upper and lower walls in an equivalent manner.

The end walls are releasably connected at their free side edges 50, 52, respectively to the opposite ends of the side walls 18, 16, respectively, by means of a releasable fastener mechanism 54 which is described in more detail below in connection with FIG. 2. This allows either of the end doors or walls to be opened to allow animals to enter or exit the cage, and allows both doors to be opened when the cage is to be collapsed for storage as described in more detail below.

The collapsible upper and lower wall will now be described in more detail with reference to FIGS. 1, 3 and 4. Each of the walls is formed in two panel sections

4

56, 58, which overlap one another as can be seen in FIGS. 1 and 4. Each panel section consists of a plurality of spaced longitudinal wires or rods 60 extending the length of the cage, and a series of spaced transverse or cross bars 62,64, respectively, extending across and secured to the longitudinal wires. The cross bars 62 of one of the panel sections 56 extend beyond the innermost longitudinal rod 60 of that section to overlap the other panel section 58, and the cross bars 62 and 64 have a first set of aligned openings 66,68 through which a pivot rod 70 extends to allow the sections 56 and 58 to pivot around rod 70 and the opposite edge hinge connections to the side walls to collapse or flatten the cage. Thus panel section 56 is pivotally connected at its inner edge to an intermediate point on panel section 58, which is offset from the inner end 59 of that section.

The hinge connections to the adjacent side wall longitudinal edges are similar to those of the end walls and consist of projections of the respective panel sections from the outermost longitudinal rods which are bent round to form eyelets or hinges 72 around the respective longitudinal edge portion 74 of the side wall perimeter rod 38. The pivotal connections between each of the panel sections and between the respective panel section and adjacent side wall allow the panel sections to pivot between an open position in which they are substantially flat and co-planar, as shown in FIG. 1, and a collapsed position in which they are folded inwardly relative to the enclosure, as indicated in FIG. 4, into face to face engagement with one another in the fully collapsed position shown in FIG. 5. Each of the pivot rods 70 is in a substantially central position on the respective upper and lower walls, and the dimensions are such that the opposite upper and lower walls can collapse inwardly without interfering with one another. Preferably, the lower wall has its panel sections arranged the opposite way round to those of the upper wall, with section 58 pivoted to side wall 16 and section 56 pivoted to side wall 18.

Each of the collapsible walls has a releasable locking mechanism 76, as best shown in FIGS. 1 and 3, for releasably locking or retaining the respective wall in its open, fully extended position as shown in FIG. 1. The locking mechanism releasably secures the inner free edge of panel section 58 to overlying portions of panel section 56. The locking mechanism comprises a pair of locking spring clips 78, 80, one each provided at each end of the wall. The spring clips extend through a second series of aligned openings in overlapping portions of the cross bars 62, 64 which are offset from the pivot rod 70. Spring clip 78 extends through aligned openings 82 in the outer two cross bars of each panel section at one end of the cage, and spring clip 80 extends through aligned openings in the outer two cross bars of each panel section at the opposite end of the cage.

As best seen in FIG. 3, each spring clip comprises a rod like member having a first, elongate section 84 which extends through aligned openings of the innermost of the two cross bars 85, 86 of each section, and a bent end portion 87 which is offset from the first section, bent to form a handle portion 86, and bent inwardly at its free end 88 to extend through the outermost cross bar 90, 92 of each of the panel sections. Thus urging the spring clip at each end of the wall outwardly via handle portion 86 as indicated in FIG. 3 will release it from the respective cross bars 90, 94 of the one panel section to allow the two panel sections to pivot. The

4,762,085

5

clip is urged into its locked position by means of return spring 96 which acts between a stop 98 on the elongate portion 82 and a foreshortened cross member 100 of panel section 56 which is hinged at one end to the adjacent side wall and bent around the clip or rod member to form eyelet 110 at the opposite end. Thus the spring will act to urge clip inwardly relative to the respective collapsible wall and retain the wall in its locked, open position unless positively released by outward force applied to handle portion 86. Each clip is permanently retained on panel section 56 so that it will not be lost or mislaid when the sections are released from one another.

The end wall securing mechanism 54 is similar to that of the upper and lower walls and is shown in more detail in FIG. 2. The securing mechanism consists of two opposed spring loaded latch pins 112, 114 which each extend through aligned openings provided in the respective side edge 50 of the end wall 22, 24 and the adjacent end portion of the side wall 18, 16, respectively. The openings comprise eyelets or openings 116 formed in bent projecting end portions of the end wall cross members or bars 44, and similar eyelets 118 formed in projecting end portions of the side wall cross bars or members 42. The respective eyelets 116 and 118 are arranged to be in alignment along line 120 when the door or wall is fully closed.

The cross bars of each end wall consist of two relatively closely spaced pairs of cross bars positioned in a middle portion of the wall, and upper and lower cross bars positioned adjacent the upper and lower edges, respectively, of the end wall. Each of the latch pins consists of a first straight end portion 128 which extends through the openings in the upper or lower cross bar of the end wall and the adjacent aligned uppermost or lowermost opening in the side wall, respectively, a second portion 130 which is offset inwardly relative to the first portion to avoid the other eyelets or openings, a handle or finger grip portion 132 bent outwardly from portion 130 which is located inwardly of the innermost end wall eyelet and a third portion 134 which extends back along line 120 towards the first portion and through the aligned eyelets 116 of one of the inner pairs of end wall cross bars and an inner eyelet 116 of the side wall. The handle portions 132 of the two latch pins are orientated to be parallel to one another and are located within an average hand grips distance from one another when in the secured position shown in FIG. 1 and FIG. 2.

A return spring 136 on third portion 134 of each latch pin acts between a stop 138 on the portion 134 and the innermost one of the inner pair of cross bar eyelets to urge the respective pins outwardly from the center of the door and into latching engagement with the respective side wall eyelets, i.e. in the opposite direction to the arrows in FIG. 2. This arrangement allows the end walls to be released and opened one-handed, simply by gripping the handle portions of each latch pin between the thumb and first finger of one hand and then urging them towards one another until each latch pin is released from the two side wall eyelets 116 which it normally engages. At this point, the door can be swung open about the opposite side edge hinges. A reverse operation allows the door to be reclosed, and an additional padlock may be used if desired for additional security. The return springs ensure that the door remains secured in its closed position unless positively released.

6

The latch pins are permanently retained on the respective end walls by the spring action, so that they cannot be lost or mislaid. In an alternative arrangement, the latch pins may be mounted on the end edges of the respective side walls in an equivalent fashion, and be retractable from eyelets in the end walls to open the cage.

A rotatable clip member 140 is provided at the upper edge of each end wall. The member is of generally U-shaped configuration with its two ends bent around the upper member of each end wall so that it is rotatably secured to that member, and is bent over at its curved end to form a latch or hook 144 which can be looped over the endmost cross bar of the upper wall as indicated in FIG. 1 to retain the end wall in position prior to latching, for example. When the end wall is released and opened prior to storage of the cage, the same clip member can be used to clip it to the respective side wall, as discussed below. The opposite side walls are preferably also provided with bent wire handle members 146 rotatably mounted at their upper edges at positions directly opposite one another, as can be seen in FIGS. 1 and 5.

The collapsible wire cage described above can be made entirely of wire rod construction using wire rod of a suitable strength guage according to the type of animal cage to be made. The cross bars of each of the wall panels are preferably of thicker construction than the transverse or longitudinal members making up the majority of the panel. The spacing between the wire rods will be chosen according to the size of the animal or animals to be kept in the cage.

The collapsing of the cage from its fully opened position shown in FIG. 1 into its fully collapsed position shown in FIG. 5 will now be described in more detail. The two end wall hooks or clip members 140 are first released from the upper wall end cross bars 44. The latch pins 112 and 114 are then released from the end portion eyelets 118 of side walls 16 and 18, respectively, by gripping the opposed handle portions and urging the latch pins towards one another. The two end walls can then be swung outwardly in opposite directions about the end portions of side walls 16 and 18, respectively, until they lie in face to face relationship against the respective side wall. At this point the clip members or hooks 140 can be hooked over the upper edge of the respective side wall to retain the end walls in place.

The tray or pan 25 is then removed from the bottom of the cage. The opposite end spring clips 78, 80 of the upper and lower walls are then released from the cross bars of the panel section 56 of each of those walls, by urging them outwardly via handle portions 86. The upper and lower walls can then be collapsed inwardly about pivot rods 70, in the direction of the arrows in FIG. 4, pivoting around the side wall hinge connections and allowing the side walls to be moved inwardly towards one another until the fully collapsed or flattened position shown in FIG. 5 is reached. At this point there will be a gap or space 150 between one side wall 16 and the collapsed upper and lower walls 12 and 14, because of the inwardly offset hinge connection at 35 and 39 between the side wall and the upper and lower wall, respectively. This gap allows tray 25 to be stored on its side as indicated in FIG. 5 for transportation and storage. When collapsed the cage and tray can easily be carried to and from a place of storage or a transport vehicle using the handle members 146.

4,762,085

7

It will be understood that the collapsed cage can be reassembled relatively quickly and easily by removing the tray 25, pulling the side walls apart until the upper and lower walls are flattened, and urging the spring clips outwardly and then releasing them to reengage in the openings in the cross bars of panel section 86. At this point the tray can be replaced in the bottom of the cage, and the end walls can be released from the side walls, swung round into their closed position, retained in the closed position by hooks 144 engaged over the upper wall end cross bars, and secured to the side walls via latch pins 112 and 114 as described above.

This collapsible animal cage has no separable parts which can easily be lost or misplaced, and can be collapsed and reassembled relatively quickly and easily. It can be carried in one hand, and allows a tray or pan to be carried within the confines of the collapsed cage as well. The end doors can be opened one handed, which is particularly useful when they are opened to put an animal in the cage, leaving the handler with one hand free to hold onto the animal while the door is being opened.

Although a preferred embodiment of the invention has been described above by way of example, it will be understood by those skilled in the field that modifications may be made to the disclosed embodiment without departing from the scope of the invention, which is defined by the appended claims.

What is claimed is:

1. A collapsible wire cage comprising:

two pairs of opposed walls defining an open-ended enclosure, each wall of one pair being collapsible and being pivotally connected at its opposite side edges to adjacent side edges of the other pair of walls;

a pair of end walls for closing the opposite ends of the enclosure, one of the end walls being pivoted at one edge to one of the walls of said other pair and the other end wall being pivoted at the opposite edge to the other wall of said other pair, each end wall having releasable fastener means for releasably securing it to the wall of said other pair opposite the wall to which the end wall is secured;

the collapsible walls each comprising at least two panel sections and pivot means for pivotally connecting said panel sections about a pivot axis extending between said opposite ends of said enclosure, said pivot means comprising means for allowing pivotal movement of said sections between an open position in which they are substantially flat and co-planar and a collapsed position in which they are folded inwardly relative to said enclosure into a face to face engagement to one another to allow said other pair of walls to be moved towards one another to collapse said cage; and

each of said collapsible walls further including releaseable securing means for releaseably securing the respective collapsible wall in said open position.

2. A collapsible wire cage comprising:

two pairs of opposed walls defining an open-ended enclosure, each wall of one pair being collapsible and being pivotally connected at its opposite side edges to adjacent side edges of the other pair of walls;

a pair of end walls for closing the opposite ends of the enclosure, each end wall being pivotally secured to one of the walls of said pair at the respective end of

8

the enclosure and having releaseable fastener means for releaseably securing it to the opposite wall of said other pair;

the collapsible walls each comprising at least two panel sections and pivot means for pivotally connecting said panel sections about a pivot axis extending between said opposite ends of said enclosure, said pivot means comprising means for allowing pivotal movement of said sections between an open position in which they are substantially flat and co-planar and a collapsed position in which they are folded inwardly relative to said enclosure into a face to face engagement to one another to allow said other pair of walls to be moved towards one another to collapse said cage; the two panel sections of the collapsible walls overlapping one another in the open position, the inner edge of a first one of the sections being pivotally secured to an overlapping portion of the second section and the inner edge of said second section being releaseably secured to an overlapping portion of the first section; and

each of said collapsible walls further including releaseable securing means for releaseably securing the respective collapsible wall in said open position.

3. A collapsible wire cage, comprising:

two pairs of opposed walls defining an open-ended enclosure, each wall of one pair being collapsible and being pivotally connected at its opposite side edges to adjacent side edges of the other pair of walls;

a pair of end walls for closing the opposite ends of the enclosure, each end wall being pivotally secured to one of the walls of said other pair at the respective end of the enclosure and having releasable fastener means for releasably securing it to the opposite wall of said other pair;

the collapsible walls each comprising at least two panel sections and pivot means for pivotally connecting said panel sections about a pivot axis extending between said opposite ends of said enclosure, said pivot means comprising means for allowing pivotal movement of said sections between an open position in which they are substantially flat and co-planar and a collapsed position in which they are folded inwardly relative to said enclosure into fact to face engagement to one another to allow said other pair of walls to be moved towards one another to collapse said cage, each of said panel sections having a plurality of spaced cross members extending across it from side to side, the cross members of one panel section over lapping the other panel section, the cross member of each panel section having a first set of aligned openings, and the pivot means comprising a pivot rod extending throughout said aligned openings between opposite ends of the respective collapsible walls; and each of said collapsible walls further including releaseable securing means for releaseably securing the respective collapsible wall in said open position.

4. The wire cage as claimed in claim 3, wherein said cross members of said panel sections have a second set of aligned openings offset from the first set, and said releasable locking means comprises at least one clip rod for extending through said second set of aligned openings to secure said panel sections against rotation.

4,762,085

9

5. The wire cage as claimed in claim 4, wherein said releasable securing means comprises a releasable clip rod at each end of each of the collapsible walls, each of the clip rods having a first end portion for projecting through a first pair of aligned openings in a cross member of one of said panel sections and a cross member of the other panel section, and a second end portion for projecting in the same direction as said first end portion through a second pair of aligned openings in cross members of said two panel sections, and handle means for urging said clip rod outwardly to release the two end portions from the openings in the cross bars of one of said panel sections.

6. The cage as claimed in claim 5, wherein spring means are provided on each of said clip rods for urging them into the retaining position in which their end portions extend through the respective aligned pairs of openings in cross members of both panel sections.

7. The cage as claimed in claim 6, wherein each clip rod has a stop in said first portion and a transverse retaining bar on said other panel section is secured to said clip rod at a point spaced from said stop, and said return spring acts between said stop and said retaining bar.

8. A collapsible wire cage, comprising:

two pairs of opposed walls defining an open-ended enclosure, each wall of one pair being collapsible and being pivotally connected at its opposite side edges to adjacent side edges of the other pair of walls;

a pair of end walls for closing the opposite ends of the enclosure, each end wall being pivotally secured to one of the walls of said other pair at the respective end of the enclosure and having releasable fastener means for releasably securing it to the opposite wall of said other pair, said releaseable fastener means of each end wall comprising a pair of oppositely directed latch pins, the adjacent respective side edge of the end wall and end edge of the respective one of the other pair of walls to which the end wall is releasably securable having first and second sets of aligned openings, one of said latch pins comprising means for engaging in a first direction through said first set of openings and the other latch pin comprising means for engaging in a second, opposite direction through said second set of openings, each of said latch pins having gripping means at their innermost ends spaced within a hand grip's distance of one another, said gripping means comprising means for gripping by an operator to urge the latch pins towards one another to release them from the openings in one of said wall edges to release the door;

the collapsible walls each comprising at least two panel sections and pivot means for pivotally connecting said panel sections about a pivot axis extending between said opposite ends of said enclosure, said pivot means comprising means for allowing pivotal movement of said sections between an open position in which they are substantially flat and co-planar and a collapsed position in which they are folded inwardly relative to said enclosure into fact to face engagement to one another to allow said other pair of walls to be moved towards one another to collapse said cage; and

each of said collapsible walls further including releasable securing means for releasably securing the respective collapsible wall in said open position.

10

9. The cage as claimed in claim 8, wherein each of said latch pins includes return spring means for urging said latch pin outwardly into its latching position engaging through the aligned openings in the adjacent edges of said side and end walls.

10. The cage as claimed in claim 8, wherein each latch pin comprises a first straight end portion and an opposite end portion bent through 180 degrees to extend in the same direction as said first end portion, said first set of openings including a first pair of aligned openings in said end wall and side wall edge, respectively and a second pair of openings in said end and side wall spaced inwardly from said first pair of openings, said first end portion comprising means for extending through said first pair of openings and said opposite end portion comprising means for extending in the same direction as said first end portion through said second pair of openings, said gripping means comprising a bent handle portion between said first and opposite end portions for gripping by an operator to urge said latch pin in the opposite direction to release said first and opposite end portions from one opening of said first and second pair, respectively.

11. A collapsible wire cage comprising:

an open-ended enclosure defined by opposed upper and lower walls, and opposed side walls, each of the upper and lower walls being collapsible and being pivotally connected at its opposite side edges to adjacent side edges of the side walls;

a pair of end walls for closing the opposite ends of the enclosure, each end wall being pivotally secured to one of the side walls at the respective end of the enclosure and having releaseable fastener means for releasably securing it to the opposite side wall;

the collapsible walls each comprising at least two panel sections and pivot means for pivotally connecting said panel sections about a pivot axis extending between said opposite ends of said enclosure, said pivot means comprising means for allowing pivotal movement of said sections between an open position in which they are substantially flat and co-planar and a collapsed position in which they are folded inwardly relative to said enclosure into a face to face engagement to one another to allow said other pair of walls to be moved towards one another to collapse said cage;

each of said collapsible walls further including releasable securing means for releasably securing the respective collapsible wall in said open position; and

each of said walls having a handle member at its upper edge for carrying the cage when collapsed.

12. A collapsible wire cage comprising:

two pairs of opposed walls defining an open-ended enclosure, each wall of one pair being collapsible and being pivotally connected at its opposite side edges to adjacent side edges of the other pair of walls;

a pair of end walls for closing the opposite ends of the enclosure, each end wall being pivotally secured to one of the walls of said pair at the respective end of the enclosure and having releaseable fastener means for releasably securing it to the opposite wall of said other pair;

the collapsible walls each comprising at least two panel sections and pivot means for pivotally connecting said panel sections about a pivot axis extending between said opposite ends of said enclo-

4,762,085

11

sure, said pivot means comprising means for allow-
ing pivotal movement of said sections between an
open position in which they are substantially flat
and co-planar and a collapsed position in which
they are folded inwardly relative to said enclosure    5
into a face to face engagement to one another to
allow said other pair of walls to be moved towards
one another to collapse said cage; and

each of said collapsible wall further including releas-

12

able securing means for releasably securing the
respective collapsible wall in said open position,
the releaseable securing means being offset and
parallel to the pivot axis of said pivot means said
securing means, comprising means for releasably
securing said panel sections together.

* * * * *

# Exhibit 14

(No Model.)                                    2 Sheets—Sheet 2.

## J. P. MILBOURNE & T. HUMPHREYS.

### BASKET AND SKIP.

No. 332,407.                        Patented Dec. 15, 1885.



Witnesses:
Willard R. Haight
J. W. Reynolds

Inventors:
John Parker Milbourne
Thomas Humphreys
by W. H. Babcock
Attorney

H. PETERS, Photo-Lithographer, Washington, D. C.

(No Model.)          2 Sheets—Sheet 1.

## J. P. MILBOURNE & T. HUMPHREYS.

### BASKET AND SKIP.

No. 332,407.        Patented Dec. 15, 1885.

## FIG. 1.

## FIG. 2.





## FIG. 3.



## FIG. 4.



## FIG. 5.

Witnesses
Willard S. Haight
J. Reynolds

Inventors:
John Parker Milbourne
Thomas Humphreys
by W. H. Babcock
attorney

N. PETERS, Photo-Lithographer, Washington, D. C.

# UNITED STATES PATENT OFFICE.

JOHN PARKER MILBOURNE AND THOMAS HUMPHREYS, OF MANCHESTER, COUNTY OF LANCASTER, ENGLAND; SAID THOMAS HUMPHREYS ASSIGNOR TO SAID JOHN PARKER MILBOURNE.

## BASKET AND SKIP.

SPECIFICATION forming part of Letters Patent No. 332,407, dated December 15, 1885.

Application filed May 25, 1885. Serial No. 166,585. (No model.) Patented in England September 5, 1884, No. 12,031.

*To all whom it may concern:*

Be it known that we, JOHN PARKER MIL-BOURNE and THOMAS HUMPHREYS, both subjects of the Queen of Great Britain, residing at Manchester, in the county of Lancaster, England, have invented a new and useful Improvement in Baskets, Skips, and other Similar Receptacles, (for which we have obtained a patent in Great Britain, No. 12,031, bearing date September 5, 1884,) of which the following is a specification.

Our invention relates to improvements in the manufacture of baskets, skips, and other similar articles; and the objects of our improvements are, first, to make the basket or skip stronger and more durable than those of the ordinary construction; and, secondly, to increase the rigidity of the lid and sides, thus dispensing with the necessity for cording and sealing the ends, in order to prevent the contents being abstracted during transit. We attain these objects by constructing the basket or skip with a solid wood or metal rail immediately under the top border, and extending round all or any of the sides, the sticks or runners which form the frame or skeleton passing through holes in this rail. More than one such rail placed at a suitable distance below that described may be employed, if desired.

In place of securing the "clogs" or "shoes" to the bottom of the skip with nails or other fastenings in the ordinary manner, we bore holes in the clogs, through which are passed the "sticks" forming the frame or skeleton of the bottom. When "runners"—*i. e.*, sticks which extend across the bottom and up the sides—are employed, we pass them through the clogs, and in like manner, if desired, we may also pass through the clogs the ends of the sticks which form the frame or skeleton for the sides. We make each end of the lid of a wood or metal rail, and bore holes partly through these rails, into which the ends of the sticks forming the frame or skeleton of the lid project; or, if preferred, some or all of the holes may be bored entirely through these end rails and the sticks secured in them. The rails are or may be further held together by passing one or

more metal rods or bars through the wicker-work of the lid and securing the rod or rods to the rails at each end. When extra strength for the lid is required, one or more rails may be placed between and at a suitable distance from the two end rails.

In order that our invention may be fully understood and readily carried into effect, we will describe the accompanying two sheets of drawings, in which—

Figure 1 is a front elevation of a basket or skip made according to our invention. Fig. 2 is a vertical section on the line A B, Fig. 1. Fig. 3 is a sectional plan on the line C D, Fig. 1, looking downward. Fig. 4 is a plan, and Fig. 5 a vertical section, of the lid, with part of the wicker-work removed, in order to show the construction more clearly. Fig. 6 is a front elevation, and Fig. 7 an end view, of a basket or skip of a slightly-modified construction. Fig. 8 is a sectional plan on the line E F, Fig. 6, looking downward. Fig. 9 is a vertical section on the line G H, Fig. 6, the lid having been removed. Fig. 10 is a plan, and Fig. 11 a vertical section of the lid with part of the wicker-work removed, in order to show the construction more clearly.

Similar letters refer to similar parts throughout the several views.

In Figs. 1 to 5, *a* represents the wicker-work of the skip, and *b* the wood or metal rail, placed immediately under the top border and extending round all four sides. The rods known as "sticks" *c* and "runners" *d*, on which the wicker-work of the sides is built, pass through holes formed in the rail *b*. The ends of the sticks *c*, as well as the sticks *c* and runners *d*, on which the wicker-work of the bottom is built, pass through the clogs *f*. The clogs thus form part of the bottom of the skip, and are secured by every bottom stick *c*, as well as by the runners *d* and side sticks, *c*. Nails, bolts, or other fastenings are thus dispensed with, and the clogs are held more securely and cannot possibly work loose or become detached. The lid *g* has a wood or metal rail, *h*, at each end, connected by the sticks *i*, upon which the wicker-work of the lid is built. The ends of the

332,407

sticks *i* are fixed in holes in the end rails, *h*, which are shown further connected together and to the lid by the metal rods *k*, which pass through and are secured to the rails, as shown in Figs. 4 and 5 of the drawings, or in any other suitable manner.

In the slightly-modified construction of basket or skip illustrated by Figs. 6 to 11 the clogs *f* are placed at or near the edges of the bottom of the skip, and a rail, *l*, through which all or some of the side sticks, *c*, and runners *d* pass, is employed, instead of the ordinary willow or cane "upset," and a second rail, *b*, is employed, extending round all four sides of the skip. To give additional strength to the lid, two cross-rails, *h'*, through which the sticks *i* and metal rods *k* pass, are placed at suitable distances apart and parallel to the end rails, *h*.

Having now particularly described and ascertained the nature of our said invention and in what manner the same is to be performed, we declare that what we claim as our invention, and desire to secure by Letters Patent of the United States, is—

1. The combination of the upright rods *c* and the wicker-work, which is built thereon, with the clogs *f* at the bottom of the basket and the rail *b* at the top thereof, said rail being perforated to receive the upper ends of said rods, and said clogs being recessed to receive the lower ends thereof, substantially as set forth.

2. A basket-lid consisting of the rods or sticks *i*, the wicker-work built thereon, and the rails *h*, which are recessed to receive the ends of said rods, substantially as set forth.

3. The combination of the metal rods *k* and sticks *i* with the rails *h*, which are recessed to receive the ends of said sticks and rods, and the wicker-work built on said sticks, the whole forming the cover of a basket or similar article, substantially as set forth.

The foregoing specification of our improvement in the manufacture of baskets, skips, and other similar receptacles signed by us this 29th day of April, 1885.

JOHN PARKER MILBOURNE.
THOMAS HUMPHREYS.

Witnesses:
H. B. BARLOW,
S. W. GILLETT,
*Both of 4 Mansfield Chambers, 17 St. Ann's Square, Manchester.*

# Exhibit 15

(No Model.)

**F. PARTHIER.**
BASKET.

No. 571,452.                    Patented Nov. 17, 1896.



*Fig. 1*



*Fig. 2.*



*Fig. 3.*    *Fig. 4.*

Witnesses
Wm. F. Heming
Geo. W. Rhein

Inventor
F. Parthier
by Elliott & Hopkins
Attys.

THE NORRIS PETERS CO. PHOTO-LITHO, WASHINGTON, D.C.

# UNITED STATES PATENT OFFICE.

## FRIEDRICH PARTHIER, OF CHICAGO, ILLINOIS.

## BASKET.

**SPECIFICATION** forming part of Letters Patent No. 571,452, dated November 17, 1896.

Application filed July 31, 1896. Serial No. 557,669. (No model.)

*To all whom it may concern:*

Be it known that I, FRIEDRICH PARTHIER, a citizen of the United States, residing at Chicago, in the county of Cook and State of Illinois, have invented certain new and useful Improvements in Baskets, of which the following is a full, clear, and exact specification.

My invention relates more particularly to improvements in the manner of securing the sticks or upright portions of the basket.

My invention has for its primary object to securely fasten the upper ends of the sticks or upright portions of the basket and shield such ends from injury and wear.

With these ends in view my invention consists in certain features of novelty by which the said object and certain other objects hereinafter appearing are attained, all as fully described with reference to the accompanying drawings, and more particularly pointed out in the claim.

In the said drawings, Figure 1 is a perspective view of the skeleton portion of a basket embodying my improvements, certain portions being shown in dotted lines. Fig. 2 is an enlarged detail plan view of one of the horizontal sticks on the edge of the basket. Fig. 3 is a vertical longitudinal sectional view thereof with the finishing-strip secured in place, and Fig. 4 is a transverse sectional view taken on the line 4 4, Fig. 3.

In carrying out my invention I pass the upper ends of the sticks or upright portions 1 of the basket through suitable perforations extending vertically through a number of horizontal sticks or bars 2, which constitute the upper edge or rim of the basket and which are provided in their upper edges with a groove or channel 3 of sufficient width to receive the extremities 4 of the sticks 1, which, after being projected a short distance through the sticks 2, are bent down into the groove or channel 3 in the manner more clearly shown in Fig. 3. The channel 3 is preferably of sufficient depth to receive the entire thickness of the ends 4, so that the latter when turned down in the manner shown in the drawings, will be below the surface of the stick or bar 2, and hence, when secured in this position, completely shielded from wear or any injury that might be entailed by stacking the baskets or otherwise.

As a convenient means of holding the ends 4 depressed in the groove or channel 3, and thus securely binding the sticks 1 and 2 together, I have shown a number of ordinary staples 5, which are driven into the sticks 2 over the ends 4 in the manner shown in Fig. 4.

My invention thus described would be complete and operative without other covering or attachment for the ends 4 of the upright sticks; but for the sake of greater finish to the upper edge of the basket and further guarding against the dislodgment of the ends 4 from the groove 3 I provide the upper edge of the stick or bar 2 with a finishing bead or strip 6, which covers the groove 3 and ends 4 therein and may be secured in place on the stick or bar 2 by any suitable attaching devices, such as the screws 7, which are passed through the strip 6 and screwed into the bar 2, and also through the ends 4 should the latter fall in the line of the screw, as shown in Fig. 3; or, if desired, the screws may be arranged to one side of the ends 4, as will readily be understood. It is also evident that the strip 6 in one sense constitutes a substitute for the staples 5 or other attaching devices, inasmuch as the strips 6 would, in the absence of such staples, serve to hold the ends 4 in their angular relation with reference to the sticks 1, and consequently prevent their withdrawal from the bar 2.

The web or body portion of the basket may be constructed of any suitable material and secured to the skeleton or frame thus provided in any desired manner. In Fig. 1 I have shown a portion of the body or web constructed of wicker woven around the sticks in the ordinary manner. The upper edges of the basket, if desired, may also be reinforced by metallic straps or other suitable stays 8, and the joints of the bars 2 and strips 6 reinforced by corner-pieces 9.

Having thus described my invention, what I claim as new therein, and desire to secure by Letters Patent, is—

In a basket the combination with the upright sticks, of longitudinal bars arranged along the upper edges of the basket at the

2                                    571,452

upper ends of said sticks and having perfo-
rations for the passage of said sticks and be-
ing grooved in their upper edges from end to
end, the ends of said sticks being of less ver-
5 tical thickness than said groove and being
bent over and seated thereinto; staples driven
into said longitudinal bars over the bent ends
of said sticks, and a strip secured to said lon-
gitudinal bars over said staples and said bent
ends of the sticks, for holding said staples 10
and the bent ends of the sticks in place, sub-
stantially as set forth.

FRIEDRICH PARTHIER.

Witnesses:
    F. A. HOPKINS,
    EDNA B. JOHNSON.

# Exhibit 16

US005282542A

# United States Patent [19]

## Mo

[11] **Patent Number:** **5,282,542**

[45] **Date of Patent:** **Feb. 1, 1994**

[54] **LOAD CARRIER**

[76] Inventor: **Yau-Kee Mo,** Flat 02 10th Floor Block A, Lotto Villa, 18 Broadwood Rd., Happy Valley, Hong Kong

[21] Appl. No.: **982,805**

[22] Filed: **Nov. 30, 1992**

[51] Int. Cl.⁵ ............................................... **B65D 8/14**
[52] U.S. Cl. ................................... **220/7; 220/485**
[58] Field of Search ...................... 220/7, 6, 4.28, 485

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,889,837 | 6/1985 | Wilson | 220/7 |
| 4,887,874 | 12/1989 | Joffe | 220/7 |
| 4,978,020 | 12/1990 | Aono | 220/7 |
| 5,114,034 | 5/1992 | Miller et al. | 220/7 |

*Primary Examiner*—Joseph Man-Fu Moy

*Attorney, Agent, or Firm*—Panitch Schwarze Jacobs & Nadel

[57] **ABSTRACT**

A load carrier which is made from a tough and bendable material, includes a bottom member that has a predetermined number of sides and a plurality of side walls that are mounted on the bottom member and cooperatively define a surrounding wall. Each of the side walls has a lower portion wrapped around the respective side of the bottom member in such a manner that the side wall is pivotable relative to the latter. Each of the side walls has a first fastening piece mounted on one side thereof and which abuts a second fastening piece mounted on one side of an adjacent side wall when the side walls are pivoted to a perpendicular position relative to the bottom member. A locking member fastens detachably the adjacent side walls.

2 Claims, 3 Drawing Sheets





F I G. 1



F I G. 2



# FIG. 3



# F I G. 4



# F I G. 5

5,282,542

| 1 | 2 |

# LOAD CARRIER

## BACKGROUND OF THE INVENTION

### 1. FIELD OF INVENTION

This invention relates to a load carrier, more particularly to a load carrier which includes a bottom member and a surrounding wall that has a lower portion wrapped around the periphery of the bottom member in such a manner that the surrounding wall is pivotable relative to the bottom member. The surrounding wall is held vertically relative to the bottom member by means of locking members.

### 2. DESCRIPTION OF THE RELATED ART

A conventional load carrier includes a bottom member and a surrounding wall connected to the periphery of the bottom member so as to confine a load receiving space therein. The load carrier is generally made from metal, rattan stem, bamboo strap or bendable plastic material. In the conventional load carrier, the surrounding wall is integrally formed with the bottom member. Therefore, the load carrier has a predetermined shape and height. Thus, a large space or a large vehicle is needed when storing or when shipping the conventional load carriers to a desired destination. Renting a large storage room or vehicle results in higher costs.

## SUMMARY OF THE INVENTION

A main object of the present invention is to provide a load carrier which includes a bottom member and a surrounding wall that has a lower portion wrapped around the periphery of the bottom member in such a manner that the surrounding wall is pivotable relative to the bottom member. The surrounding wall is vertically held relative to the bottom member by means of locking members If desired, the locking members can be unfastened, and the surrounding wall can be made to lie in level with the bottom member to reduce the height of the load carrier and thereby facilitate transport and storage.

According to the present invention, the load carrier is made from a tough and bendable material, such as rattan stem, bamboo strap or plastic, and includes a bottom member with a predetermined number of sides and a surrounding wall which has a plurality of side walls that correspond to the sides of the bottom member. Each of the side walls has a lower portion wrapped around the respective side of the bottom member in such a manner that the side wall is pivotable relative to the respective side of the bottom member. Each of the side walls further has a first fastening piece provided on one side thereof and which abuts a second fastening piece provided on one side of an adjacent side wall when the side walls are pivoted to a perpendicular position with respect to the bottom member. A set of locking members fastens detachably the first and second fastening pieces thereby retaining the side walls at the perpendicular position. In the event that the load carriers are to be stored or transported to a desired destination, the locking members are unfastened so as to permit unfolding of the side walls, thereby achieving a reduction in the space occupied by the load carrier.

## BRIEF DESCRIPTION OF THE DRAWINGS

Other features and advantages of the present invention will become more apparent in the following detailed description, including drawings, all of which show a non-limiting form of the present invention, and in which:

FIG. 1 shows a perspective, schematic view of a load carrier of the present invention;

FIG. 2 shows a partially exploded view of the load carrier of FIG. 1;

FIG. 3 shows the load carrier of FIG. 1 in an unfolded position;

FIG. 4 shows a plurality of the load carriers of the present invention when piled one on top of the other for transport or storage purposes; and

FIG. 5 shows a locking member employed in the load carrier of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to FIGS. 1, 2 and 3, a load carrier (20) of the present invention is made from rattan, bamboo or bendable plastic material and includes a bottom member (21) with a predetermined number of sides and a surrounding wall which has a plurality of side walls (22) that correspond to the sides of the bottom member (21).

In the preferred embodiment, the bottom member (21) is rectangular in shape and has four sides. Four side walls (22) cooperatively form the surrounding wall in this embodiment. Each of the side walls (22) has a lower portion (221) wrapped around the respective side of the bottom member (21) in such a manner that the side wall (22) is pivotable relative to the respective side of the bottom member (21). Each of the shorter side walls (22) has a first fastening piece (23') mounted fixedly thereon on one side thereof. Each of the longer side walls has a retaining ear (224, 225) formed integrally and pivotally thereon on one side thereof. The retaining ear (224, 225) extends perpendicularly from the long side wall (22) and encloses securely the periphery of a second fastening piece (23''). A set of hook-and-loop fasteners is used as the first and second fastening pieces (23', 23'') in the preferred embodiment. When the side walls (22) are pivoted to a perpendicular position with respect to the bottom member (21), the first and second fastening pieces (23', 23'') are disposed to overlap with one another. Each of the fastening pieces (23', 23'') has two through-holes (231) extending therethrough. A locking member (40) includes a locking bolt (41) which is inserted through the through-hole (231) and which engages a nut (42) so as to hold together the adjacent shorter and longer side walls (22). The pivotal connection between the retaining ears (224, 225) and the longer side walls (22) permits abutment of the second fastening pieces (23'') with the first fastening pieces (23').

Alternatively, the retaining ears (224, 225) can be mounted pivotally on the shorter side walls (22) on one side thereof so as to hold the first fastening pieces (23') perpendicularly relative to the shorter side walls (22), while the second fastening pieces (23'') can be mounted fixedly on the longer side walls (22) one side thereof.

Referring to FIG. 5, a locking member (50) can be employed in the load carrier of the present invention instead of the locking member (40). The locking member (50) includes a locking bolt (51) with a plurality of barbed projections (511) formed on a shank thereof, and a nut (52) with a plurality of grooves (522) that are adapted to engage the barbed projections (511) when the locking bolt (51) is press-fitted into the nut (52). The locking bolt (51) is pulled outwardly with respect to the nut (52) so as to disengage the two elements.

5,282,542

| 3 | 4 |

In the event that a plurality of load carriers (20) of the present invention are to be stored or shipped to a desired destination, the locking members (40, 50) which join together adjacent side walls (22) are unfastened so as to lie in level with the bottom member (21), as shown in FIG. 3. The side walls (23) can be pivoted inwardly of the bottom member (21) so as to lie on top of the bottom member (21). The load carriers (20) are piled one on top of the other, as shown in FIG. 4. Thus, a large storage space or a large vehicle is not required when transporting and/or storing a plurality of load carriers of the present invention. The object and feature of the present invention are therefore achieved.

While a preferred embodiment has been illustrated and described, it will be apparent that many changes and modifications may be made in the general construction and arrangement of the present invention without departing from the spirit and scope thereof. Therefore, it is desired that the present invention be not limited to the exact disclosure but only to the extent of the appended claims.

I claim:

1. A load carrier including:

a bottom member formed of a tough and bendable material and having a predetermined number of sides;

a surrounding wall formed of a tough and bendable material and having a predetermined number of side walls that corresponds to the number of sides of the bottom member, each of the side walls having an edge pivotally attached to a corresponding side of the bottom member and first and second ends, each of the side walls being pivotable relative to the bottom member from a first position in which the side wall and the bottom member are generally co-planar to a second position in which the side wall is generally perpendicular to the bottom member, the ends of each side wall abutting adjacent ends of adjacent side walls when the side walls are pivoted to the second position;

a predetermined number of fastening pairs corresponding to the number of side walls, each fastening pair comprising a first fastening piece fixedly mounted to a side wall proximate to one end thereof, and a second fastening piece mounted on a retaining ear formed integrally and pivotably on an adjacent side wall proximate to the one end, such that when the side wall having the first fastening piece and the adjacent side wall having the second fastening piece are pivoted to the second position and the retaining ear is pivoted, the first fastening piece and the second fastening piece are in engagement with each other, the first and second fastening pieces comprising sets of hook-and-loop fasteners; and

a predetermined number of sets of locking members corresponding to the number of fastening pairs, each set of locking members cooperating with a fastening pair for detachably fastening together the engaged first and second fastening pieces for retaining the side wall and the adjacent side wall perpendicularly with respect to the bottom member and abuttingly with respect to each other.

2. A load carrier including:

a bottom member formed of a tough and bendable material and having a predetermined number of sides;

a surrounding wall formed of a tough and bendable material and having a predetermined number of side walls that corresponds to the number of sides of the bottom member, each of the side walls having an edge pivotally attached to a corresponding side of the bottom member and first and second ends, each of the side walls being pivotable relative to the bottom member from a first position in which the side wall and the bottom member are generally co-planar to a second position in which the side wall is generally perpendicular to the bottom member, the ends of each side wall abutting adjacent ends of adjacent side walls when the side walls are pivoted to the second position;

a predetermined number of fastening pairs corresponding to the number of side walls, each fastening pair comprising a first fastening piece fixedly mounted to a side wall proximate to one end thereof, and a second fastening piece mounted on a retaining ear forming integrally and pivotably on an adjacent side wall proximate to the one end, such that when the side wall having the first fastening piece and the adjacent side wall having the second fastening piece are pivoted to the second position and the retaining ear is pivoted, the first fastening piece and the second fastening piece are in engagement with each other, the first and second fastening pieces each having at least one hole, the holes being in registry when the fastening pieces are engaged with each other; and

a predetermined number of sets of locking members corresponding to the number of fastening pairs, each set of locking members cooperating with a fastening pair for detachably fastening together the engaged first and second fastening pieces for retaining the side wall and the adjacent side all perpendicularly with respect to the bottom member and abuttingly with respect to each other, the locking members comprising locking nuts and bolts, the locking nuts and bolts for being connected through the registered holes in the first and second fastening pieces.

* * * * *

# Exhibit 17

US006230915B1

(12) **United States Patent** (10) **Patent No.:** **US 6,230,915 B1**
Liu (45) **Date of Patent:** **May 15, 2001**

(54) **RATTAN BASKET**

(75) Inventor: **Hsin Ying Liu**, Taipei (TW)

(73) Assignee: **Pro-Winnex Worldwide Corp.**, Taipei (TW)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/428,475**

(22) Filed: **Oct. 28, 1999**

(51) Int. Cl.[7] ....................................... **B65D 6/18**
(52) U.S. Cl. ............................ **220/6**; 220/4.29; 220/4.33; 217/122
(58) Field of Search ................................ 220/4.28, 4.29, 220/4.33, 6, 7, 668; 217/122

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,958,713 | * 5/1976 | Selz | 220/6 |
| 4,053,079 | * 10/1977 | Karpisek | 217/43 A |
| 4,662,532 | * 5/1987 | Anderson et al. | 220/7 |
| 5,072,828 | * 12/1991 | Irvine | 220/4.33 |
| 5,282,542 | * 2/1994 | Mo | 220/7 |
| 5,595,305 | * 1/1997 | Hart | 206/600 |
| 5,918,743 | * 7/1999 | Uitz | 206/509 |
| 5,931,326 | * 8/1999 | Weng | 220/4.33 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2262503A | * 6/1993 | (GB) | 220/4.29 |

* cited by examiner

*Primary Examiner*—Stephen Castellano
(74) *Attorney, Agent, or Firm*—Dougherty & Troxell

(57) **ABSTRACT**

A rattan basket is disclosed. The rattan basket has a first, a second, a third and a fourth plans incorporated into a rectangle frame. The rattan basket further has a bottom plan and a cover. With the insertion of a first connector, a second connector and a third connector, the rectangle frame and the bottom plan are securely connected together. With the insertion of the first connector, the second connector and a fourth connector, the cover is able to be pivotally connected to encase the basket.

**2 Claims, 7 Drawing Sheets**





# FIG. 1



FIG. 2



## FIG. 3

Case 3:06-cv-00901-WKW-WC    Document 60-42    Filed 07/29/2008    Page 6 of 12



# FIG. 4



# FIG. 5



# FIG. 6



**FIG. 7**

US 6,230,915 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## RATTAN BASKET

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a basket, and more particularly, to a rattan basket which is able to be assembled after delivery. The basket is woven piece by piece and then connected with one another by connectors, such that the space will be greatly reduced when stored and delivered.

2. Description of the Related Art

The reason for the popularity of rattan furniture is because the way it is woven such that the objects stored therein is not easy to have fungus. Normally, a piece of rattan furniture uses twigs or rods to form the main body and then strips of rattan are woven between the twigs to form a plan. Therefore, plans of rattan are connected with one another to gradually form the contour of a furniture. Although, this kind of weaving method do meet the requirements of various customers, most of the weaving process involves manual labor, which is troublesome and too time consuming. Furthermore, once the rattan furniture is finished, it requires a large space for storage and shipment. Accordingly, the cost is intentionally increased.

To solve such a problem, a new process of assembling rattan furniture is introduced to the market. This kind of rattan furniture uses iron rods as the main body of the furniture. Once the plan formed by strips of rattan is finished, retainers such as bolts or rivets are used to secure one plan with another. According to this kind of new formation, rattan furniture can be assembled after delivery and the cost for storage and shipment is greatly reduced because the furniture is able to be disassembled before being delivered to the customers. Again, this kind of assembly also requires a lot of labor to connect all the plans together. Other kinds of damage may also happen if the retainers used to connect the plans together are loose.

In order to obviate and mitigate the aforementioned problems, the present invention provides an improved rattan basket which is able to be disassembled when stored and shipped and the assembly of which is easy and simple, such that the rattan basket is economic labor efficient.

### SUMMARY OF THE INVENTION

The main objective of the invention is to provide a rattan basket which is able to be disassembled for storage and shipment.

Another objective of the invention is that the each plan of the basket contains a main frame and a secondary frame. With such an arrangement, the plans of the basket are able to be easily connected together by retainers inserted in the secondary frames. When disassembly of the rattan basket is necessary, the user can just detach the retainers from the secondary frames of two adjacent plans, so that the basket is once again become isolated plans.

Still, another objective of the invention is to provide an improved rattan basket containing a cover. The cover is pivotally connected with the basket so as to achieve the purpose of covering the basket. The rattan basket uses a second retainer to pivotally connect the cover to one side of the rattan basket, such that the cover is able to pivot relative to the basket.

Other objective of the invention will be clear after the detailed description of the package with the reference of the accompanying drawings.

### BRIEF DESCRIPTION OF THE INVENTION

The present invention will be better understood with the description to the following drawings, wherein:

FIG. 1 is a perspective view showing the rattan basket constructed in accordance with the present invention;

FIG. 2 is an exploded perspective view showing the components of the rattan basket shown in FIG. 1;

FIG. 3 is an exploded perspective view showing the bottom plan of the rattan basket of the invention;

FIG. 4 is a perspective view of the folded rattan basket without the bottom plan;

FIG. 5 is a partially enlarged perspective view showing a connector used to connect the bottom plan to the rattan basket of the invention;

FIG. 6 is a perspective view of an embodiment with a cover pivotally connected with the rattan basket; and

FIG. 7 is an exploded perspective view showing the parts of the rattan basket shown in FIG. 6.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

With reference to FIG. 1, the rattan basket of the invention has a first plan (1), a second plan (2) opposite to the first plan (1), a third plan (5) engaged with edges of the first and the second plans (1,2), a fourth plan (6) engaged with edges of the first and the second plans (1,2) and opposite to the third plan (5) and a bottom plan (7) engaged with edges of the first, the second, the third and the fourth plans (1,2,5,6). Furthermore, a first connector (3) is provided to secure bottom edges of the first, the second, the third and the fourth plans (1,2,5,6).

Referring to FIG. 2, it is to be noted that the first plan (1) has a rectangle main frame (10) and two side frames (11) each securely mounted on opposite sides of the main frame (10). The second plan (2) has a rectangle main frame (20) and two side frames (21) each securely mounted on opposite sides of the main frame (20). The third and the fourth plans (5,6) respectively have a first and a second spaced horizontal rails (51,51',61,61') and a pair of spaced vertical rails (52,62). For easier understanding and description, the rattan strips on the third and the fourth plans (5,6) are removed.

The side frames (11,21) of the first plan (1) and the second plan (2) are hollow and the first and the horizontal rails (51,51',61,61') are also hollow, such that a first connector (3) and a second connector (3') are able to connect the first, the second, the third and the fourth plans (1,2,5,6) together. As shown in FIG. 2, it is to be noted that the first connector (3) has a first extension (31) to be inserted into one ends of the horizontal rail (51',61'), a second extension (32) to be inserted into one ends of the side frames (11,21) of the first and the second plans (1,2) and a third extension (33) to be inserted into one ends of the vertical rails (52,62). After the extensions (31,32,33) of the first connector (3) are respectively inserted into the ends of the horizontal rails (51'61'), the side frames (11,21) and the vertical rails (52,62), one side of the rattan basket is assembled. Still referring to FIG. 2, it is to be noted that the second connector (3') has a first extension (31') to be inserted into the other end of the horizontal rails (51,61), a second extension (32') to be inserted into the other ends of the side frames (52,62) and a third extension (33') to be inserted into the other ends of the vertical rails (52,62). When the extensions (31',32'33') are inserted respectively into the horizontal rails (51,61), the side frames (52,62) and the vertical rails (52,62), the other side of the rattan basket of the invention is assembled as shown in FIG. 3.

Referring to FIG. 4, when the first, the second, the third and the fourth plans (1,2,5,6) are connected by the first

US 6,230,915 B1

**3**

connector (3), the connected plans (1,2,5,6) are able to be folded for storage or shipment so as to reduce the space occupied.

Referring to FIG. 5 and taking FIG. 3 for reference, the first connector (3) further has a through hole (34) defined therethrough and two horizontal blind holes (35) defined therein. A third connector (4) has a base (41), a extension (42) formed to correspond to the through hole (34) and two horizontal rods (43) formed to correspond to the blind holes (35). Therefore, when a bottom plan (7) having two hollow side frames (71) respectively and oppositely mounted on a rectangle main frame (70) is to be engaged with edges of the first, the second, the third and the fourth plans (1,2,5,6), the two rods (43) are inserted into the blind holes (35) and the extension (42) is inserted through the through hole (34) and into one end of the hollow side frame (71), so that the bottom plan (7) is assembled with the edges of the first, the second, the third and the fourth plans (1,2,5,6), as shown in FIG. 1.

With reference to FIGS. 6 and 7, if a cover (9) having a hollow side frame (91) is about to encase the rattan basket a fourth connector (8) is used to connect the ends of the first, the second and the fourth plans (1,2,6) instead of the second connector (3'). The fourth connector (8) has a first extension (81) integrally extending outward therefrom and corresponding to one distal end of the horizontal frame (51) of the first plan (1) or the horizontal frame (61) of the fourth plan (6) depending on if the edge of the first plan (1) or the fourth plan (6) the cover (9) is to be pivotally connected, two legs (82,83) formed to respectively correspond to one distal end of the vertical rail (61) and the side frame (21) of the second plan (2) and second extension (84) formed upright with respect to the legs (82,83). The second extension (84) has a through hole (841) defined to allow a pin (85) to be inserted therethrough.

Accordingly, when the cover (9) is to be pivotally mounted on top of the rattan basket, the legs (82,83) are respectively inserted into the distal ends of the vertical rail (61) and the side frame (21) and the first extension (81) is inserted into one distal end of the horizontal rail (61) of the fourth plan (6). The pin (85) is then inserted through the through hole (841) of the second extension (84) and into one distal end of the side frame (91) of the cover. Thus, the cover (9) is assembled on the rattan basket to cover the basket.

It is known that from the description above, the present invention has the following advantages:

1. easy to assemble.

2. easy for storage and shipment;

3. reducing cost in both storage and shipment; and

4. adding varieties to the rattan basket.

It is to be understood, however, that even though numerous characteristics and advantages of the present invention have been set forth in the foregoing description, together with details of the structure and function of the invention, the disclosure is illustrative only, and changes may be made in detail, especially in matters of shape, size, and arrangement of parts within the principles of the invention to the full extent indicated by the broad general meaning of the terms in which the appended claims are expressed.

What is claimed is:

1. A rattan basket comprising:

a first plan (1), a second plan (2) opposite to the first plan (1), a third plan (5) engaged with edges of the first and the second plans (1,2), a fourth plan (6) engaged with edges of the first and the second plans (1,2) and opposite to the third plan (5) and a bottom plan (7) engaged with edges of the first, the second, the third and the fourth plans (1,2,5,6);

**4**

wherein the first plan (1) has a rectangle main frame (10) and two side frames (11) each securely mounted on opposite sides of the main frame (10);

wherein the second plan (2) has a rectangle main frame (20) and two side frames (21) each securely mounted on opposite sides of the main frame (20);

wherein the third and the fourth plans (5,6) respectively have a first and a second spaced horizontal rails (51, 51',61,61') and a pair of spaced vertical rails (52,62);

wherein the side frames (11,21) of the first plan (1) and the second plan (2) are hollow and the first and the horizontal rails (51,51'61,61') are also hollow;

a first connector (3) has a first extension (31) to be inserted into one ends of the horizontal rail (51',61'), a second extension (32) to be inserted into one ends of the side frames (11,21) of the first and the second plans (1,2) and a third extension (33) to be inserted into one ends of the vertical rails (52,62);

a second connector (3') has a first extension (31') to be inserted into the other end of the horizontal rails (51,61), a second extension (32') to be inserted into the other ends of the side frames (52,62) and a third extension (33') to be inserted into the other ends of the vertical rails (52,62); whereby the first connector (3) and the second connector (3') are able to connect the first, the second, the third and the fourth plans (1,2,5,6) together;

wherein the first connector (3) further has a through hole (34) defined therethrough and two horizontal blind holes (35) defined therein;

a bottom plan (7) having two hollow side frames (71) respectively and oppositely mounted on a rectangle main frame (70); and

a third connector (4) has a base (41), a extension (42) formed to correspond to the through hole (34) and two horizontal rods (43) formed to correspond to the blind holes (35);

whereby with the insertion of the extension (42) through the through hole (34) and into one distal end of the side frame (71) and the insertion of the horizontal rods (43) into the blind holes (35), the bottom plan (7) is thus secured with respect to the first, the second, the third and the fourth plans (1,2,5,6).

2. A rattan basket comprising:

a first plan (1), a second plan (2) opposite to the first plan (1), a third plan (5) engaged with edges of the first and the second plans (1,2), a fourth plan (6) engaged with edges of the first and the second plans (1,2) and opposite to the third plan (5) and a bottom plan (7) engaged with edges of the first, the second, the third and the fourth plans (1,2,5,6);

wherein the first plan (1) has a rectangle main frame (10) and two side frames (11) each securely mounted on opposite sides of the main frame (10);

wherein the second plan (2) has a rectangle main frame (20) and two side frames (21) each securely mounted on opposite sides of the main frame (20);

wherein the third and the fourth plans (5,6) respectively have a first and a second spaced horizontal rails (51, 51',61,61') and a pair of spaced vertical rails (52,62);

wherein the side frames (11,21) of the first plan (1) and the second plan (2) are hollow and the first and the horizontal rails (51,51'61,61') are also hollow;

a first connector (3) has a first extension (31) to be inserted into one ends of the horizontal rail (51',61'), a

US 6,230,915 B1

5

second extension (32) to be inserted into one ends of the side frames (11,21) of the first and the second plans (1,2) and a third extension (33) to be inserted into one ends of the vertical rails (52,62);

wherein the first connector (3) further has a through hole (34) defined therethrough and two horizontal blind holes (35) defined therein;

a bottom plan (7) having two hollow side frames (71) respectively and oppositely mounted on a rectangle main frame (70); and

a third connector (4) has a base (41), a extension (42) formed to correspond to the through hole (34) and two horizontal rods (43) formed to correspond to the blind holes (35);

whereby with the insertion of the extension (42) through the through hole (34) and into one distal end of the side frame (71) and the insertion of the horizontal rods (43) into the blind holes (35), the bottom plan (7) is thus

6

secured with respect to the first, the second, the third and the fourth plans (1,2,5,6);

a fourth connector (8) has a first extension (81) integrally extending outward therefrom and corresponding to one distal end of the horizontal frame (61) of the fourth plan (6), two legs (82,83) formed to respectively correspond to one distal end of the vertical rail (61) and the side frame (21) of the second plan (2) and a second extension (84) formed upright with respect to the legs (82,83);

wherein the second extension (84) has a through hole (841) defined to allow a pin (85) to be inserted therethrough; whereby a cover (9) having two opposite hollow side frames are able to be pivotally connected to an edge of the fourth plan (6).

* * * * *

# Exhibit 18



US005931326A

# United States Patent [19]

## Weng

| [11] | Patent Number: | **5,931,326** |
| [45] | Date of Patent: | **Aug. 3, 1999** |

[54] **CONTAINER ASSEMBLY**

[76] Inventor: **Stanley Weng**, No. 291-16, Peitun Rd., Taichung, Taiwan

[21] Appl. No.: **09/035,733**

[22] Filed: **Mar. 5, 1998**

[51] Int. Cl.⁶ ........................................ **B65D 6/22**

[52] U.S. Cl. .......................................... **220/4.33**; 220/4.28

[58] Field of Search ................................ 220/4.28, 4.32, 220/4.29, 4.33, 4.34

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| 3,138,398 | 6/1964 | Silverman | 220/4.28 |
| 4,194,642 | 3/1980 | Glavan | 220/4.28 |
| 4,561,554 | 12/1985 | Swincicki | 220/4.28 |
| 4,649,667 | 3/1987 | Kitograd | 220/4.28 |
| 4,782,972 | 11/1988 | Wenkman et al. | 220/4.28 |
| 5,413,236 | 5/1995 | Kenevan | 220/4.28 |

*Primary Examiner*—Joseph M. Moy
*Attorney, Agent, or Firm*—Patterson & Keough, P.A.

[57] **ABSTRACT**

A container assembly includes a bottom member, two end members and two side members so as to form the container which defines an open top. There are holes defined in and stubs extending from said members so as to connect said members together. At least one connecting member connects the two end members together so that said container is easily assembled and has a rigid construction.

**6 Claims, 9 Drawing Sheets**





# FIG.1



FIG. 2



# F I G . 3

Case 3:06-cv-00901-WKW-WC     Document 60-43     Filed 07/29/2008     Page 6 of 14





# FIG.4



FIG. 5



FIG.6



F I G . 7



FIG.8



# F I G . 9

5,931,326

**1**

## CONTAINER ASSEMBLY

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a container and, more particularly, to a container which includes more than two members, each one of which has holes defined therein and some of the members have stubs extending therefrom so as to be inserted into the holes to form the container.

2. Brief Description of the Prior Art

Most containers are made of wooden boards which are fixedly connected with each other by nailing or glue. These types of containers occupy a certain space and are not suitable to be dismantled frequently so that the owners have to prepare a large warehouse to store the containers. A high transportation cost is incurred when the containers are sent to the sellers or the like. Furthermore, the containers are troublesome for the owners if one or two walls thereof need to be replaced.

The present invention intends to provide an improved container assembly which is formed by members, some of which have holes defined therein and some of which have stubs extending therefrom so as to be inserted into the holes whereby the container can be constructed.

Therefore, the container in accordance with the present invention can be assembled or dismantled easily without any damage occurring to an outer surface of the members of the container.

### SUMMARY OF THE INVENTION

The present invention provides a container assembly which includes a bottom member having two first holes defined in one of two ends thereof and two second holes defined in the other end thereof. A first end member has two third holes defined in a lower end thereof and two fourth holes defined in an upper end thereof. A second end member has two fifth holes defined in a lower end thereof and two sixth holes defined in an upper end thereof. Two first stubs extend laterally from said lower end of said first end member so as to be inserted into said first holes of said bottom member. Two second stubs extend laterally from said upper end of said first end member. Two third stubs extend laterally from said lower end of said second end member so as to be inserted into said second holes of said bottom member. Two fourth stubs extend laterally from said upper end of said second member.

A first side member has two fifth stubs extending upwardly from a lower end thereof so as to be respectively inserted into one of said two third holes of said first end member and one of said two fifth holes of said second end member. Two seventh holes are respectively and longitudinally defined in an upper end of said first side member so as to respectively receive one of said two second stubs of said first end member and one of said two fourth stubs of said second end member. A second side member has two sixth stubs extending upwardly from a lower end thereof so as to be respectively inserted into the other one of said third holes of said first end member and the other one of said two fifth holes of said second end member. Two eighth holes are respectively and longitudinally defined in an upper end of said second side member so as to respectively receive the other one of said two second stubs of said first end member and the other one of said two fourth stubs of said second end member.

Two connecting members each have two connecting stubs extending transversely therefrom so that said two connecting

**2**

stubs are inserted into said sixth holes of said second end member. The two connecting stubs are inserted into said fourth holes of said first end member.

It is an object of the present invention to provide a container including five members and which is easily to be manufactured and assembled.

It is another object of the present invention to provide a container which can be dismantled so as to reduce space occupied when being transported from a manufacturer.

Other objects, advantages, and novel features of the invention will become more apparent from the following detailed description when taken in conjunction with the accompanying drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of a container assembly in accordance with the present invention;

FIG. 2 is an exploded view of the container assembly in accordance with the present invention;

FIG. 3 is an exploded view of two members of the container assembly and shows stubs and holes which receive the stubs;

FIG. 4 is an illustrative view to show a stub is received in a hole of a member;

FIG. 5 is an exploded view of a second end member and the container assembly in accordance with the present invention except for the second end member;

FIG. 6 is an illustrative view to show the members of the container assembly when disengaged from each other and can be overlapped;

FIG. 7 is a perspective view of another embodiment of the container assembly in accordance with the present invention;

FIG. 8 is an exploded view of the container assembly shown in FIG. 7, and

FIG. 9 is an exploded view of two members of the container assembly and shows stubs and holes which receive the stubs.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring to the drawings and initially to FIGS. 1 through 5, a container assembly in accordance with the present invention generally includes a bottom member 14 which has two first holes 36 defined in one of two ends thereof and two second holes 37 defined in the other end thereof.

A first end member 10 has two third holes 30 defined in a lower end thereof and two fourth holes 31 defined in an upper end thereof. A second end member 13 has two fifth holes 32 defined in a lower end thereof and two sixth holes 33 defined in an upper end thereof. Two first stubs 20 extend laterally from said lower end of said first end member 10 so as to be inserted into said first holes 36 of said bottom member 14. Two second stubs 21 extend laterally from said upper end of said first end member 10. Two third stubs 22 extend laterally from said lower end of said second end member 13 so as to be inserted into said second holes 37 of said bottom member 14. Two fourth stubs 23 extend laterally from said upper end of said second end member 10.

A first side member 11 has two fifth stubs 24 extending upwardly from a lower end thereof so as to be respectively inserted into one of said two third holes 30 of said first end member 10 and one of said two fifth holes 32 of said second end member 13. Two seventh holes 34 are respectively and

5,931,326

3

longitudinally defined in an upper end of said first side member 11 so as to respectively receive one of said two second stubs 21 of said first end member 10 and one of said two fourth stubs 23 of said second end member 13. A second side member 12 has two sixth stubs 25 extending upwardly from a lower end thereof so as to be respectively inserted into the other one of said two third holes 30 of said first end member 10 and the other one of said two fifth holes 32 of said second end member 13. Two eighth holes 35 are respectively and longitudinally defined in an upper end of said second side member 12 so as to respectively receive the other one of said two second stubs 21 of said first end member 10 and the other one of said two fourth stubs 23 of said second end member 13.

Two connecting members 40, 41 each have two connecting stubs 42, 43 extending transversely therefrom so that said two connecting stubs 42 are inserted into said sixth holes 33 of said second end member 13 and said two connecting stubs 43 are inserted into said fourth holes 31 of said first end member 10.

Referring to FIG. 4, it is to be noted that each of said first stubs 20, said second stubs 21, said third stubs 22, said fourth stubs 23, said fifth stubs 24, said sixth stubs 25, and said connecting stubs 42, 43 has a curved portion 200, formed thereto. A width of each of said curved portions 200, with respect to a respective longitudinal axis of said stubs 20, 21, 22, 23, 24, 25, 42, 43 is slightly larger than an inner diameter of each of said holes 36, 37, 30, 31, 32, 33, 34, 35 of said bottom member 14, said first and said second end member 10, 13, said first and said second side member 11, 12. Therefore, any one of the stubs 20, 21, 22, 23, 24, 25, 42, 43 is interference fitted into the corresponding hole 36/37/30/31/32/33/34/35 so as to provide the assembled container a suitable rigidity.

Referring to FIG. 6, all the members 14, 10, 13, 11, 12 and two connecting members 40, 41 can be separated from each other and overlapped together so as to reduce the space they occupy when being transported from a manufacturer.

FIGS. 7–9 show another embodiment of the container assembly of the present invention which includes a bottom member 14 which has two first holes 36 defined in one of two ends thereof and two second holes 37 defined in the other end thereof.

A first end member 100 is a curved and has two third holes 30 defined in a lower end thereof and two fourth holes 31 defined in an upper end thereof. A second end member 130 has two fifth holes 62 defined in an upper end thereof. Two first stubs 20 extend laterally from said lower end of said first end member 100 so as to be inserted into said first holes 36 of said bottom member 14. Two second stubs 21 extend laterally from said upper end of said first end member 100. Two third stubs 52 extend laterally from said lower end of said second end member 130 so as to be inserted into said second holes 37 of said bottom member 14. Two fourth stubs 51 extend upwardly from said lower end of said second member 130.

A first side member 110 has a fifth stub 24 extending upwardly from a lower end thereof away from said second end member 130 so as to be inserted into one of said two 60 third holes 30 of said first end member 100. Two sixth holes 60 are respectively defined in an upper end and said lower end thereof away from said first end member 100. The sixth hole 60 in said lower end of said first side member 110 receives one of said fourth stubs 51 of said second end 65 member 130 and a sixth stub 50 extend laterally from said upper end of said first side member 110 so as to be received

4

in one of said fifth holes 62 of said second end member 130. The first side member 110 has a seventh hole 34 defined longitudinally in said upper end thereof away from said second end member 130 so as to receive one of said second stubs 21 of said first end member 100. The second side member 120 has a seventh stub 25 extending upwardly from a lower end thereof away from said second end member 130 so as to be inserted into the other one of said two third holes 30 of said first end member 100. Two eighth holes 61 are respectively defined in an upper end and said lower end thereof away from said first end member 100. The eighth hole 61 in said lower end of said second side member 120 receives the other one of said fourth stubs 51 of said second end member 130. An eighth stub 53 extends laterally from said upper end of said second side member 120 so as to be received in the other one of said fifth holes 62 of said second end member 130. The second side member 120 has a ninth hole 35 defined longitudinally in said upper end thereof away from said second end member 130 so as to receive the other one of said second stubs 21 of said first end member 100.

A U-shaped connecting member includes a bottom portion 46 and two leg portions 45 respectively extending from two ends of said bottom portion 46. Each of two connecting portions where said bottom portion 46 and said two leg portions 45 are connected has a first connecting stub 48 extending downwardly therefrom so as to be respectively inserted into said sixth hole 60 and said eighth hole 61 of said first side member 110 and said second side member 120. Each of said leg portions 45 has a second connecting stub 47 extending downwardly from a free end thereof so as to be respectively inserted into said two fourth holes 31 of said first end member 100.

The first stubs 20, said second stubs 21, said third stubs 52, said fourth stubs 51, said fifth stub 24, said sixth stub 50, said seventh stub 25, said eighth stub 53, said first connecting stubs 48 and said second connecting stubs 47 each have a curved portion 200 formed thereto. A width of each of said curved portions 200, with respect to a respective longitudinal axis of each of said stubs 20, 21, 52, 51, 24, 50, 25, 53, is slightly larger than an inner diameter of each of said holes 36, 37, 30, 31, 62, 60, 34, 61, 35 of said bottom member 14, said first and said second end members 100, 130, and said first and said second side members 110, 120.

Although the invention has been explained in relation to its preferred embodiment, it is to be understood that many other possible modifications and variations can be made without departing from the spirit and scope of the invention as hereinafter claimed.

What is claimed is:

1. A container assembly comprising:

a bottom member which has two first holes defined in one of two ends thereof and two second holes defined in the other end thereof;

a first end member and a second end member, said first end member having two third holes defined in a lower end thereof and two fourth holes defined in an upper end thereof, said second end member having two fifth holes defined in a lower end thereof and two sixth holes defined in an upper end thereof, two first stubs extending laterally from said lower end of said first end member so as to be inserted into said first holes of said bottom member, two second stubs extending laterally from said upper end of said first end member, two third stubs extending laterally from said lower end of said second end member so as to be inserted into said

5,931,326

<table>
<tr><td>5</td><td>6</td></tr>
</table>

second holes of said bottom member, two fourth stubs extending laterally from said upper end of said second member;

a first side member and a second side member, said first side member having two fifth stubs extending upwardly from a lower end thereof so as to be respectively inserted into one of said two third holes of said first end member and one of said two fifth holes of said second end member, two seventh holes respectively and longitudinally defined in an upper end of said first side member so as to respectively receive one of said two second stubs of said first end member and one of said two fourth stubs of said second end member, said second side member having two sixth stubs extending upwardly from a lower end thereof so as to be respectively inserted into the other one of said two third holes of said first end member and the other one of said two fifth holes of said second end member, two eighth holes respectively and longitudinally defined in an upper end of said second side member so as to respectively receive the other one of said two second stubs of said first end member and the other one of said two fourth stubs of said second end member, and

two connecting members each having two connecting stubs extending transversely therefrom so that said two connecting stubs are inserted into said sixth holes of said second end member and said two connecting stubs are inserted into said fourth holes of said first end member.

2. The container assembly as claimed in claim 1 wherein each of said first stubs, said second stubs, said third stubs, said fourth stubs, said fifth stubs, said sixth stubs, and said connecting stubs has a curved portion formed thereto.

3. The container assembly as claimed in claim 2 wherein a width of each of said curved portions, with respect to a respective longitudinal axis of said stubs, is slightly larger than an inner diameter of each of said holes of said bottom member, said first and said second end member, and said first and said second side member.

4. A container assembly comprising:

a bottom member which has two first holes defined in one of two ends thereof and two second holes defined in the other end thereof;

a first end member and a second end member, said first end member having two third holes defined in a lower end thereof and two fourth holes defined in an upper end thereof, said second end member having two fifth holes defined in an upper end thereof, two first stubs extending laterally from said lower end of said first end member so as to be inserted into said first holes of said bottom member, two second stubs extending laterally from said upper end of said first end member, two third stubs extending laterally from said lower end of said second end member so as to be inserted into said second holes of said bottom member, two fourth stubs extending upwardly from said lower end of said second end member;

a first side member and a second side member, said first side member having a fifth stub extending upwardly from a lower end thereof away from said second end member so as to be inserted into one of said two third holes of said first end member, two sixth holes respectively defined in an upper end and said lower end thereof, away from said first end member, said sixth hole in said lower end of said first side member receiving one of said fourth stubs of said second end member, a sixth stub extending laterally from said upper end of said first side member so as to be received in one of said fifth holes of said second end member, said first side member having a seventh hole defined longitudinally in said upper end thereof away from said second end member so as to receive one of said second stubs of said first end member, said second side member having a seventh stub extending upwardly from a lower end thereof away from said second end member so as to be inserted into the other one of said two third holes of said first end member, two eighth holes respectively defined in an upper end and said lower end thereof, away from said first end member, said eighth hole in said lower end of said second side member receiving the other one of said fourth stubs of said second end member, an eighth stub extending laterally from said upper end of said second side member so as to be received in the other one of said fifth holes of said second end member, said second side member having a ninth hole defined longitudinally in said upper end thereof away from said second end member so as to receive the other one of said second stubs of said first end member, and

a U-shaped connecting member including a bottom portion and two leg portions extending from two ends of said bottom portion, each of two connecting portions where said bottom portion and said two leg portions are connected having a first connecting stub extending downwardly therefrom so as to be respectively inserted into said sixth hole and said eighth hole of said first side member and said second side member, each of said leg portions having a second connecting stub extending downwardly from a free end thereof so as to be respectively inserted into said two fourth holes of said first end member.

5. The container assembly as claimed in claim 4 wherein said first stubs, said second stubs, said third stubs, said fourth stubs, said fifth stub, said sixth stub, said seventh stub, said eighth stub, said first connecting stubs and said second connecting stubs each have a curved portion formed thereto.

6. The container assembly as claimed in claim 5 wherein a width of each of said curved portions, with respect to a respective longitudinal axis of each of said stubs, is slightly larger than an inner diameter of each of said holes of said bottom member, said first and said second end members, and said first and said second side members.

* * * * *

# Exhibit 19

US005464113A

# United States Patent [19]

## Ho et al.

[11] Patent Number: 5,464,113

[45] Date of Patent: * Nov. 7, 1995

[54] **COLLAPSIBLE HAMPER FOR STORAGE OF LAUNDRY AND OTHER ITEMS**

[75] Inventors: **Stanley Ho,** Warren, N.J.; **Mark Ho,** Taipei, Taiwan

[73] Assignee: **Allure Home Creation Co., Inc.,** Boonton, N.J.

[ * ] Notice: The portion of the term of this patent subsequent to Oct. 18, 2011, has been disclaimed.

[21] Appl. No.: **234,069**

[22] Filed: **Apr. 28, 1994**

### Related U.S. Application Data

[63] Continuation of Ser. No. 921,236, Jul. 29, 1992, Pat. No. 5,356,024.

[30] **Foreign Application Priority Data**

Mar. 26, 1992 [CN] China ...................... 92205228

[51] **Int. Cl.⁶** ...................................... B65D 6/26
[52] **U.S. Cl.** ................................ 220/9.2; 220/651
[58] **Field of Search** ................... 220/9.1, 9.2, 9.3, 220/4.28, 6, 902, 908, 909, 651, 666, 401; 383/117

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 1,144,643 | 6/1915 | Elkins | 220/9.2 |
| 1,181,829 | 5/1916 | Bower | 220/9.3 |
| 1,263,294 | 4/1918 | Taylor | 220/9.3 |
| 2,009,035 | 7/1935 | Towers | 383/117 |
| 2,361,743 | 10/1944 | Butler | 220/9.3 |
| 2,625,973 | 1/1953 | Weldon et al. | 220/909 |
| 3,160,307 | 12/1964 | Morrison | 220/902 |
| 3,265,284 | 8/1966 | Tompkins | 220/401 |
| 3,310,089 | 3/1967 | Silverman | 220/9.1 |
| 3,410,328 | 11/1968 | Sasai | 220/9.2 |
| 3,439,865 | 4/1969 | Port et al. | 383/117 |
| 4,180,113 | 12/1979 | Liebling . | |
| 4,246,945 | 1/1981 | Sterling . | |
| 4,248,442 | 2/1981 | Barrett . | |
| 4,585,283 | 4/1986 | Redmon et al. . | |
| 4,683,927 | 8/1898 | Pyzer | 220/902 |
| 4,730,748 | 3/1988 | Bane | 220/902 |
| 4,779,794 | 10/1988 | Moore . | |
| 4,781,300 | 11/1988 | Long . | |
| 4,948,077 | 8/1990 | Gonzalez . | |
| 5,143,283 | 9/1992 | Lancaster | 220/651 |
| 5,195,649 | 3/1993 | Wolters | 220/908 |
| 5,253,775 | 10/1993 | Gould | 220/909 |
| 5,356,024 | 10/1994 | Ho et al. . | |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5939 | of 1915 | United Kingdom | 220/9.2 |
| 2126535 | 3/1984 | United Kingdom . | |
| 2212114 | 7/1989 | United Kingdom . | |

*Primary Examiner*—Stephen J. Castellano
*Attorney, Agent, or Firm*—Curtis, Morris & Safford

[57] **ABSTRACT**

The present invention relates to a collapsible hamper, used for the storage of laundry or other items comprising a rigid upper frame, a rigid lower frame, a lid movably hinged to the upper frame, a flexible side wall woven out of polypropylene strips, fabric or other weavable material, and a plurality of supporting rods removably secured between the upper and lower rigid frames, which define a three dimensional internal storage space and decorative external structure that is attractive to the eye when the hamper is assembled for use and which can be easily disassembled and collapsed for convenient storage or transport when not in use.

**15 Claims, 5 Drawing Sheets**





*FIG. 1*



*FIG.2*



# FIG.3



*F I G. 4*



*FIG.5*



*FIG.6*

5,464,113

| 1 | 2 |

## COLLAPSIBLE HAMPER FOR STORAGE OF LAUNDRY AND OTHER ITEMS

This application is a continuation of application Ser. No. 07/921,236, filed Jul. 29, 1992, now U.S. Pat. No. 5,356, 024.

### BACKGROUND OF THE INVENTION

This invention relates to hampers for the storage of items, particularly for the storage of laundry, which can easily be assembled, disassembled and folded to provide the advantages of convenient storage, use and ease of display and also provide a decorative hamper that is attractive to the eye when assembled for use.

### DESCRIPTION OF THE PRIOR ART

To date, a variety of laundry basket and container designs for use in the storage and carrying of laundry have been made to promote various aspects relating to the convenience of use and storage of such containers. For example, U.S. Pat. No. 4,781,300 discloses a laundry basket with hinged rigid side walls and U.S. Pat. No. 4,948,077 discloses a foldable basket assembly on a laundry buggy. However, none of the prior art designs possesses the combination of features disclosed and claimed herein, namely a decorative hamper with a woven flexible side wall structure that can be easily disassembled and collapsed for convenience of storage, transport and display.

### SUMMARY OF THE INVENTION

The side wall of the hamper constituting the invention is fabricated from a sheet of weavable material and is secured about the circumference of an upper and a lower rigid frame to define a decorative storage structure. The side wall is preferably fabricated from thin polypropylene strips or fabric strips, to provide a flexible woven wall structure which is collapsible when the hamper is disassembled for transport or storage, yet appears as a uniform woven surface when the hamper is assembled for use. The upper and lower rigid frames are preferably made from a moldable plastic such as commercial grade polypropylene or polyethylene, but can also be fabricated from other structural materials such as wood or lightweight aluminum, to provide a rigid thin walled frame structure upon which the flexible side wall can be circumferentially secured by staples, screws or other common fastening methods. The upper and lower frames define the particular circumferential shape of the assembled hamper. The lid or cover of the hamper is also movably attached, preferably with hinges, to the upper rigid frame which can be opened and closed as laundry or other items are stored or removed from the internal space of the assembled hamper. The lid is also preferably fabricated of a planar rigid plastic or particleboard material with padding secured thereupon, both of which are covered by a sheet of woven material that matches the woven material of the flexible side wall to achieve a uniform woven surface for the hamper lid. The rectangular upper and lower rigid frames are also constructed to provide raised flanges or cavities in the frame structure to accommodate a number of supporting rods, which are removably installed between the lower and upper surfaces of the upper and lower frame, respectively, to define a three dimensional internal storage space and uniform external structure of the flexible side wall of the assembled hamper. Each supporting rod extending between the upper and lower frames is of sufficient length so that,

when each said rod is installed within the flanges or cavities provided in said upper and lower rigid frames, the flexible woven side wall is stretched and extended to achieve the appearance of a solid uniform wall. Each supporting rod may be fabricated from any lightweight structural material, such as wood, aluminum or a moldable plastic and is preferably fabricated of a semi-circular cross-section. The rounded surface of each supporting rod, as installed, is preferably in contact with the flexible woven side wall to form rounded corners in the flexible side wall extending between the upper and lower frames when the hamper is assembled. Several evenly or randomly spaced slots or perforations are also provided in the lower rigid frame to promote the ventilation of air into and out of the internal hamper storage space to prevent an excessive accumulation of undesirable odors due to the storage of soiled laundry or other such items. Leg members are also provided for in the lower frame extending downwardly from the bottom surface thereof to provide a satisfactory space between the floor and the perforations of said lower rigid frame to accommodate the ventilation of air through the internal storage space of said hamper.

It is a principal object of the present invention to provide a collapsible hamper or container, the side wall of which has the appearance of a uniform wicker or woven fabric, is easy to assemble or disassemble, can consequently be conveniently stored, displayed and transported, and yet is pleasing to the eye when assembled for use so that it is particularly suitable for decorative interior applications.

It is an additional object of the invention to provide a collapsible hamper or container wherein the flexible side wall is fabricated from a plurality of strips of flexible material, such as thin strips of polypropylene or natural or synthetic fabric material, giving the appearance of a wicker or woven side wall, which is easy to clean and provides a smooth surface which prevents damage to delicate clothing or other items that are stored within and removed from the internal storage space of the hamper. Such a flexible woven side wall also allows the ventilation of air into and out of the inside storage space to reduce the undesirable odor of soiled clothes or other items that may be stored within the container space.

It is a further object of the invention to provide a lightweight collapsible hamper that is very economical to manufacture and assemble.

### DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of the assembled hamper;

FIG. 2 illustrates a perspective view of the disassembled hamper as collapsed for storage;

FIG. 3 illustrates a sectional view of a front elevation of the as assembled hamper;

FIG. 4 illustrates the bottom view of the hamper which depicts the slotted perforations and leg members of the lower rigid frame;

FIG. 5 illustrates a close-up sectional view of one of the supporting rods as installed into one of the cavities provided in the lower rigid frame when the hamper is assembled for use;

FIG. 6 illustrates a close-up sectional view of one of the supporting rods as installed into one of the cavities provided in the upper rigid frame when the hamper is assembled for use.

5,464,113

3

## DESCRIPTION OF THE PREFERRED EMBODIMENT

With reference to the drawings, FIG. 1 shows an overall perspective view of the assembled hamper or container with the movable lid 5 in an opened position. The assembled hamper comprises a flexible side wall 1, a rectangular rigid upper frame 2, a rectangular rigid lower frame 3, four supporting rods 4 removably secured and extending between said upper and lower rigid frames and a lid 5 hingably secured to the rigid upper frame 2. The flexible side wall 1 constitutes a sheet of flexible material preferably fabricated from a plurality of polypropylene strips made through the extrusion process, but can also be made of natural or synthetic fabric strips or other flexible material. The physical properties of the flexible side wall enable the user to fold the hamper for storage upon disassembly thereof into a conveniently storable size when not in use or when transporting said hamper. This feature additionally promotes economy of packaging, shipping and display in retail outlets, as the disassembled hampers can be packaged in a compact carton for shipping and display. Each supporting rod 4 is removably secured between each corner of said rectangular upper and lower rigid frames so that an ample internal storage space and an external appearance of a solid uniform woven side wall structure, such as wicker, is achieved.

FIG. 2 illustrates the hamper when disassembled and collapsed for storage. The supporting rods 4 are removed from the cavities provided in the upper and lower rigid frames enabling the flexible side wall 1 to collapse, allowing the upper rigid frame 2 to drop down upon the lower rigid frame 3.

FIG. 3 illustrates a cross-sectional elevation of the assembled hamper. The supporting rods 4 are removably installed between the lower rigid frame 3 and the upper rigid frame 2 so that each supporting rod 4 remains in a substantially vertical position when the hamper is assembled. This cross-section also illustrates the preferred construction of the upper rigid frame 2 as a thin-walled molded plastic part 7 and the lower rigid frame 3 as a thin-walled molded plastic part having structural ribs 6 for additional strength and rigidity.

FIG. 4 illustrates a bottom view of said hamper which depicts the bottom surface of the lower rigid frame 3. Uniform slots or perforations 8 are provided in the lower rigid frame to promote air flow into and out of the internal hamper space. Downwardly extending legs 10 and 11 are further provided at each corner of said frame to provide for a satisfactory space between the slots or perforations 8 and the floor.

FIG. 5 illustrates a close-up cross-sectional view of the supporting rod 4 as installed in its removably fixed position between upwardly extending flanges or tabs 12 & 13 molded into the lower rigid frame 3. The cross-section also depicts one of the downwardly extending tabs 10 which serves as a leg for the hamper.

FIG. 6 illustrates a close-up cross-sectional view of one of the supporting rods 4 removably installed within one of the cavities 14 provided for in the molded upper rigid frame 2.

The above description has been set forth with reference to the preferred embodiment. However, modifications, alterations and other applications of the invention may occur to those skilled in the art upon reading and understanding the specification.

Having thus described my invention, I claim:

1. A collapsible container comprising:

a side wall substantially fabricated of a sheet of flexible

4

material,

an upper rigid frame having a first circumferential surface,

a lower rigid frame having a second circumferential surface,

a plurality of supporting rods removably secured and extending between said upper rigid frame and said lower rigid frame to define a three dimensional internal storage space,

the side wall having top and bottom edges which are secured about the first and second circumferential surfaces of said upper rigid frame and said lower rigid frame, respectively, and enclose the plurality of supporting rods when the supporting rods extend between the upper rigid frame and the lower rigid frame.

2. The collapsible container as claimed in claim 1, in which the flexible material is dimensioned to stretch between the upper rigid frame and the lower rigid frame and around the plurality of supporting rods to achieve the appearance of a solid side wall when the plurality of supporting rods are secured and extending between said upper rigid frame and said lower rigid frame.

3. The collapsible container, as claimed in claim 1, in which said lower rigid frame comprises a horizontal surface having a plurality of perforations in said horizontal surface, and includes downwardly extending legs sufficient to provide space below said horizontal surface to allow air to flow into and out of said collapsible container through the plurality of perforations in said horizontal surface.

4. The collapsible container, as claimed in claim 2, wherein the circumferential shape of the container is defined by the first and second circumferential surfaces.

5. The collapsible container, as claimed in claim 4, wherein the flexible material is formed from a plurality of woven strips.

6. The collapsible container, as claimed in claim 5, wherein the flexible material has the appearance of wicker.

7. A collapsible container comprising:

a side wall substantially fabricated of a sheet of flexible material,

an upper rigid frame,

a lower rigid frame,

said side wall being secured about the outside circumferential surface of said upper rigid frame and said lower rigid frame, respectively,

a plurality of supporting rods removably secured and extending between the downward surface of said upper rigid frame and the upward surface of said lower rigid frame to define a three dimensional internal storage space, and

said upper rigid frame further including,

an outside wall, and

an inside wall,

said outside wall having a circumference greater than said inside wall,

a substantially horizontal wall extending between said inside wall and said outside wall,

a plurality of support ribs, downwardly extending from the bottom surface of said horizontal wall, between said inside and outside walls, and

a plurality of cavities adjacent the lower edges of said downwardly extending ribs for removably securing each said supporting rod in position when said container is assembled for use,

said upper rigid frame further defining an opening within

5,464,113

5

the inside surface of said inside wall to accommodate storage and removal of items in the container.

8. A collapsible container comprising:

a side wall having top and bottom edges substantially fabricated of a sheet of flexible material,

an upper rigid frame having a lower surface and a first outside circumferential surface,

a lower rigid frame having an upper horizontal surface and a second outside circumferential surface,

the top and bottom edges of said side wall being secured about the first and second outside circumferential surfaces of said upper rigid frame and said lower rigid frame, respectively,

a plurality of supporting rods removably secured and extending between the lower surface of said upper rigid frame and the upper surface of said lower rigid frame thereby defining a three dimensional internal storage space, and

said lower rigid frame further including,

a plurality of perforations throughout said upper horizontal surface,

a plurality of upwardly extending flanges for removably securing each of said supporting rods therebetween and maintaining each said supporting rod in position when said hamper is assembled for use, and

downwardly extending legs of a length sufficient to provide space between said upper horizontal surface of said lower rigid frame and a floor on which said container may be located whereby air may flow into and out of said internal storage space through said perforations.

9. The container as claimed in claim 8, wherein said lower rigid frame and said upper rigid frame are molded polypropylene and rectangular in shape.

10. The container as claimed in claim 9, wherein said flexible material is formed from a plurality of woven strips of polypropylene or natural fabric.

11. The container as claimed in claim 8, wherein said

6

flexible material has the appearance of wicker.

12. The container as claimed in claim 8, wherein the circumferential shape of the container is defined by the first and second outside circumferential surfaces.

13. The container as claimed in claim 12, wherein the circumferential shape of the container is substantially rectangular.

14. A kit for assembly into a collapsed container comprising:

an upper rigid frame having an outer surface, an inner surface, an upper surface, a lower surface, and a plurality of first cavities formed below the upper surface and between the outer and the inner surfaces,

a lower rigid frame having an outer surface, an inner surface, an upper surface, a lower surface, and a plurality of second cavities formed above the lower surface and between the outer and the inner surfaces,

a side wall fabricated of a collapsible flexible material, said side wall being attached to the upper and lower rigid frames, when the container is in use,

a plurality of supporting rods having a length sufficient to maintain the side wall in tension between the upper and lower rigid frames, each rod having a first end for matingly and removably fitting into one of said first cavities and a second end for matingly and removably fitting into one of said second cavities, wherein

each of said first and second cavities are paired and in substantial alignment to receive said rods with tension on the side wall when the container is assembled, and

the side wall and the upper and the lower rigid frames collapse as one unit when the plurality of supporting rods are not assembled into the plurality of the first and second cavities and the container is not assembled.

15. The kit for assembly into a collapsed container as claimed in claim 14, wherein said collapsible flexible material has a decorative appearance.

* * * * *

# Exhibit 20

Oct. 1, 1935.                 E. GIANNASCA                 2,016,005

DOG BASKET

Filed Jan. 24, 1935



Inventor

Ettore Giannasca

Geo. F. Kimmel
Attorney

Patented Oct. 1, 1935                                  2,016,005

# UNITED STATES PATENT OFFICE

### 2,016,005

### DOG BASKET

### Ettore Giannasca, New York, N. Y.

### Application January 24, 1935, Serial No. 3,367

### 2 Claims.  (Cl. 119—15)

My invention relates to a dog basket.

The objects of my invention are to provide, in a manner as hereinafter set forth, a basket of the class referred to which is so constructed as to enable the dog to conveniently enter and depart therefrom; distinctive and attractive in appearance; set up with a split upstanding wicker body part to provide a combined entrance and exit at the front thereof; readily portable; formed with a reinforced top edge and a supported non-warping bottom; strong, durable, thoroughly efficient for the purpose intended thereby; and comparatively inexpensive to manufacture.

With the foregoing and other objects which may hereinafter appear, the invention consists of such parts and such combination of parts which fall within the scope of the invention as claimed.

In the drawing:

Figure 1 is a front elevation of the basket.

Figure 2 is a top plan view thereof.

Figure 3 is a section on line 3—3, Figure 1.

Figure 4 is a section on line 4—4, Figure 1.

Figure 5 is a section on line 5—5, Figure 2, and

Figure 6 is a top plan view of a modified form.

The contour of the basket may be as desired. As shown in Figure 1, the basket generally indicated at 7 is of oval form, and as shown in Figure 6, the basket is generally indicated at 8 and is rectangular.

Preferably the basket will be of oval contour and with reference to Figure 1, the basket 7 includes an oval-shaped rigid imperforated bottom 9 consisting of a series of superimposed like laminations 10 anchored together and of the desired thickness. Preferably the laminations will be of wood. The edge 11 of bottom 9 is squared. There is formed in the bottom 9, in proximity to the edge 11, a vertically disposed opening 12 intersected centrally by the transverse median of the bottom 9. The opening 12 is positioned in the rear lengthwise marginal portion of bottom 9. There is also formed in the bottom 9, in proximity to edge 11, a pair of spaced parallel vertically disposed openings 13, 14 located adjacent each side of the transverse median of bottom 9. The openings 13, 14 are positioned in the front lengthwise marginal portion of bottom 9.

The basket 7 includes a pair of front and a pair of back supporting legs 15, 16 respectively. The legs of each pair are arranged in parallel spaced relation. The legs are of the same height. The legs are relatively short and each is arranged at an end of and has its upper end anchored to the bottom 9. Preferably the legs will be of rounded stock.

The basket 7 includes a vertically disposed body part 16 arranged throughout the back and ends and part of the front of the basket 7. The body part 16 comprises a pair of spaced vertically disposed parallel front posts 17, 18 mounted at their lower ends into the openings 13, 14 respectively and a vertically disposed rear post 19 mounted at its lower end into the opening 12. The posts 17, 18, and 19 are formed with reduced upper ends, as indicated at 20 with respect to posts 17, 18 and at 21 with respect to post 19. Positioned against the edge 11 are the lower ends of a set of vertically disposed spaced bars 22. The outer bars of the row are spaced from the posts 17, 18. The bars 22 gradually decrease slightly in height from the central bar of the set to each end bar of the latter. The body part 16 further includes an upstanding wicker-like wall portion formed from a fibrous strip 23 of bendable wooden material of the desired length which is bent in a manner to provide intermediate its ends with two sets 24, 25 of superposed loops and also sets of superposed stretches 26 extending from the set of loops 24 to the set of loops 25. The loops and stretches coact with the posts 17, 18 and bars 22 to provide an upstanding wicker-like wall extending from the post 17 around one end, throughout the back or rear and around the other end of bottom 9 to post 18. The wicker-like wall slightly decreases in height from its vertical median towards each end thereof whereby the front portions of the wall are of less height than the ends and back thereof.

The loops of the sets 24, 25 encompass respectively the posts 17, 18. Each stretch 26 is alternately disposed with respect to the inner and outer faces of the bars 22. One end of the wicker-like wall is provided by the post 17 and loops 24 and the other end by the post 18 and loops 25. The space between the ends of the wicker wall provides the front of the basket 7 with a combined entrance and exit 27.

The body part 16 further includes a combined reinforcing and anchoring element 28 formed of a length of bendable wooden fibrous material of cylindrical cross section. The element 28 seats upon the upper stretch 26 of strip 23. The element 28 acts to reinforce the top of the wicker wall and also to anchor the upper ends of the posts 17, 18, 19 and bars 22. The element 28 is of greater diameter than that of the posts 17, 18, 19 and bars 22. The element 28, in proximity to each end, is formed with a socket 29, only one shown, for receiving the reduced upper ends of the posts 17, 18. The element 28 between the sockets 29 is formed with a series of spaced sockets 30, only

**2**                                                    **2,016,005**

one shown, for receiving the upper ends of the
bars 22.  The element 28, at its transverse center,
is provided with a socket 31 for receiving the re-
duced upper end of the post 19.  A holdfast
means 32 is employed for securing the reduced
upper end of post 19 to element 28.  The latter is
arranged inwardly of the stretches 20 of strip 23.

The lower ends of the bars 22 are anchored
against the edge 11 of bottom 9 by a binder 33
and a series of holdfast means 34.  The binder is
of semi-circular cross section and co-extensive
with the edge 11.  Certain of the holdfast means
34 extend through binder 33, bars 22 and into bot-
tom 9 and others through the lower ends of posts
17, 18, and 19.

There is associated with the element 28 a pair
of holding down straps 35, 36.  Each strap over-
laps element 28 in proximity to one end.  The
straps 35, 36 depend from element 28 and are
positioned at opposite sides of the posts 17, 18
respectively.  The straps 35, 36 are anchored in
position by upper loops 24, 25 respectively.

The basket 8, shown in Figure 6, is of the same
construction as the basket 7 but with the excep-
tion that it is of rectangular contour instead of
oval.

The manner of setting up the body part 16 pro-
vides for the top thereof sloping downwardly from
the center of its back towards each of its ends.
The post 19 acts as a brace for the rear or back
of body part 16.

Although the preferred embodiments of the
invention are as illustrated and described, yet it is
to be understood that changes, variations and
modifications may be had therein without depart-
ing from the spirit of the invention.

What I claim is:

1. A dog basket including a bottom, a body part
including an upstanding wicker-like wall portion
arranged throughout the back and ends and
spaced parts of the front of said bottom, a pair
of end posts extending through the ends of said
wall portion and located adjacent each side of the
transverse median of said bottom at the front of
the latter to provide a combined entrance and
exit, and a set of spaced parallel vertically dis-
posed posts arranged between said pair of posts
secured against and extending above the edge of
said bottom and threaded through said wall por-
tion, and said body part being formed throughout
its top with a reinforcing element provided with
sockets for receiving the upper ends of said posts.

2. In a dog basket, a rigid laminated flat bottom
formed with a pair of spaced parallel openings in
proximity to its front edge portion and adjacent
each side of its transverse median and with an
opening in proximity to its rear edge portion on
its transverse median, a pair of end posts an-
chored in the openings of said pair, a bracing post
anchored in the other of said openings, an up-
standing wicker-like wall portion having its ends
encompassing said end posts and arranged out-
wardly with respect to the bracing post, a series
of spaced upstanding elements secured at their
lower ends against the edge of said bottom and
threaded through said wall portion, a reinforc-
ing member disposed throughout the top of said
wall portion and having means for receiving the
upper ends of the said posts and elements, and
supporting legs attached to said bottom, and said
wall portion gradually decreasing in height from
its vertical median to the said end posts.

                    ETTORE GIANNASCA.

# Exhibit 21



# Exhibit 22

US006601723B1

(12) **United States Patent**
Ziglar

(10) Patent No.: **US 6,601,723 B1**
(45) Date of Patent: **Aug. 5, 2003**

(54) **METHOD AND SYSTEM FOR PROVIDING AN EASILY ASSEMBLED RIGID-WALLED WICKER HAMPER**

(75) Inventor: **Paul S. Ziglar**, Burlington, IA (US)

(73) Assignee: **Lamont Limited**, Burlington, IA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/063,500**

(22) Filed: **Apr. 30, 2002**

(51) Int. Cl.[7] ................................................ **B65D 8/14**
(52) U.S. Cl. ................................ **220/4.34**; 220/6; 220/7; 220/4.28; 312/258
(58) Field of Search ........................... 220/9.1, 9.2, 9.3, 220/4.34, 6, 7, 4.29, 4.33, 4.28; 312/258, 265.1, 262, 265.2, 265.3, 259; 5/99.1; 160/136, 135; 217/16, 48

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 579,030 A | * | 3/1897 | Yerby ...................... 248/188.4 |
| 1,595,929 A | * | 8/1926 | Rhodes ...................... 160/135 |
| 1,692,765 A | | 11/1928 | Salt |
| 2,348,012 A | * | 5/1944 | Levi ............................ 256/25 |
| 2,476,366 A | * | 7/1949 | Grim ...................... 220/4.33 |
| 2,841,306 A | * | 7/1958 | Vitoux ........................ 220/7 |
| 2,919,045 A | | 12/1959 | Waugh et al. |
| 3,246,828 A | * | 4/1966 | Branscum et al. ......... 220/4.34 |
| 3,404,818 A | * | 10/1968 | Miscoe .................. 224/42.34 |
| 3,405,835 A | | 10/1968 | Eby |
| 3,451,578 A | | 6/1969 | Edmundson |
| 3,565,377 A | * | 2/1971 | Schreyer ................. 248/188.4 |
| 3,727,786 A | * | 4/1973 | Fausel .......................... 217/16 |
| 3,759,412 A | * | 9/1973 | Bush ............................ 220/7 |
| 4,020,604 A | | 5/1977 | Legler et al. |

| | | | |
|---|---|---|---|
| 4,169,639 A | | 10/1979 | Zola |
| 4,463,864 A | | 8/1984 | Roach |
| 4,789,075 A | | 12/1988 | Sun |
| 5,054,635 A | | 10/1991 | Kolom |
| 5,107,652 A | * | 4/1992 | Sosa ............................ 52/578 |
| 5,163,417 A | | 11/1992 | Dalton |
| 5,359,809 A | | 11/1994 | Johnson |
| 5,464,113 A | * | 11/1995 | Ho et al. .................... 220/9.2 |
| 5,490,604 A | | 2/1996 | Alexander |
| 5,931,326 A | * | 8/1999 | Weng ........................ 206/512 |
| 5,964,533 A | | 10/1999 | Ziglar |
| 5,971,187 A | | 10/1999 | Clee et al. |
| 6,006,918 A | | 12/1999 | Hart |
| 6,019,226 A | | 2/2000 | Zajdlik et al. |
| 6,089,394 A | | 7/2000 | Ziglar |
| 6,216,872 B1 | | 4/2001 | Haasbroek |
| 6,216,899 B1 | | 4/2001 | Vicari |
| 6,230,915 B1 | * | 5/2001 | Liu ............................... 220/6 |
| 6,299,011 B1 | | 10/2001 | Rosenfeldt |

OTHER PUBLICATIONS

Copies of Webpages from Target.com showing photos of hampers—2 pages.
Copy of Webpage of Pier 1 Imports showing Ventura Hamper.
Copy of photo of hamper made by BBI Corporation, Angeles City, Philippines.

* cited by examiner

*Primary Examiner*—Lee Young
*Assistant Examiner*—Joseph C. Merek
(74) *Attorney, Agent, or Firm*—Simmons, Perrine, Albright & Ellwood, P.L.C.

(57) **ABSTRACT**

A system and method for providing a multi-paneled hamper where adjacent panels are coupled to one another via an exposed hinge-like pivoting coupling.

**14 Claims, 4 Drawing Sheets**





FIG. 1



FIG. 2





FIG.5

US 6,601,723 B1

**1**

# METHOD AND SYSTEM FOR PROVIDING AN EASILY ASSEMBLED RIGID-WALLED WICKER HAMPER

## BACKGROUND OF THE INVENTION

In recent years, more and more home furnishing items are being manufactured in Asia or other places that have labor costs relatively lower than those in the United States. For many small items, the foreign manufacture of products raises few logistical problems. However, with furniture and home furnishings, the size of the item can make a tremendous difference in the ability to sell the product. For example, cost of shipping a fully assembled rigid sided hamper can be prohibitive. The term "hamper" is defined to include a container sized and configured for retaining laundry. The term "hamper" is defined to include a container having a volumetric range from 2.0 cubic feet to 6.0 cubic feet. The term "hamper" is intended to refer only to containers which have a lid which can be raised to insert clothing therein. In the alternative, the term "hamper" is intended to include a tilting apparatus where a lid portion is stationary, and a front, back or side portion is arranged to be tilted away from the lid section so as to expose an area where laundry can be inserted. "Hamper" is also intended to specifically exclude baskets or other containers which are designed with pivoting or flexible handles which are configured to be disposed above a concave section for carrying items.

Additionally, shipping fully assembled hampers reduces the number of items that a retailer can maintain in stock for a given shelf space. This can affect the ability for a seller to supply hampers, especially during times when the demands fluctuate.

Other hampers exist which have spring wire therein which provides for an easily deployable hamper. One example of this approach is described in U.S. Pat. No. 5,964,533. Another example of a folding or collapsible hamper is described in U.S. Pat. No. 6,089,394, both of which were issued to Paul S. Ziglar. These patents are hereby incorporated herein in their entirety by these references.

While these hampers have been used extensively in the past, they do have some drawbacks. First of all, some consumers prefer a more rigid hamper than that which is provided by the spring wire hampers. The '394 patent describes a hamper which is more complex to build than would be necessary with the present invention.

Consequently, there exists a need for improved methods and systems for providing an easily assembled exterior framed hamper.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide a system and method for providing an easily assembled rigid-walled hamper.

It is a feature of the present invention to utilize a set of hinge-like connectors between adjoining panels.

It is another feature of the present invention to have a pivoting bottom section coupled to at least one panel.

It is another feature of the present invention to include screw-on feet.

It is another advantage of the present invention to achieve improved efficiency in assembling a hamper.

The present invention is an apparatus and method for providing an easily assembled hamper designed to satisfy

**2**

the aforementioned needs, provide the previously stated objects, include the above-listed features, and achieve the already articulated advantages. The present invention is carried out in a "wasted time-less" manner, in a sense that the time required by a consumer to assemble a hamper, has been greatly reduced.

Accordingly, the present invention is a system and method including an external framed hamper having hinge-like panel couplings.

## BRIEF DESCRIPTION OF DRAWINGS

The invention may be more fully understood by reading the following description of the preferred embodiments of the invention, in conjunction with the appended drawings wherein:

FIG. 1 is a perspective view of a hamper of the present invention.

FIG. 2 is a perspective view of a partially assembled hamper of the present invention.

FIG. 3 is a perspective view of a lower section of the connection between the front panel and the side panel.

FIG. 4 is a perspective view of the upper section of the connection between the front panel and the side panel shown in FIG. 3.

FIG. 5 is a perspective view of the underside of the hamper of the present invention as it is being assembled.

## DETAILED DESCRIPTION

Now referring to the drawings wherein like numerals refer to the like matter throughout, and more specifically referring to FIG. 1, there is shown a system of the present invention generally designated 100, including a pivotable hinged hamper top 102. Also shown are front hamper panel 104 and right hamper panel 106. The panel material is preferably wicker, which is intended to be made of the following twig materials: rattan, bamboo, abacca, willow (both full and split), seagrass, rattan core and pell, palm leaf, twisted rope, fern, water hyacinth, and folded and/or twisted paper or plastic, The term "wicker" as used herein is intended to specifically exclude the following materials: cotton, wool, textiles and rubber. However, it should be understood that the panel material could in alternate embodiments be made of fabric, textiles or any suitable material, which may be rigid, semi-rigid, and/or non-rigid. Also shown are right front exposed hamper hinge pin leg 112, right rear exposed hamper hinge pin leg 114 and left front exposed hamper hinge pin leg 116. These legs may be metal, wood, plastic or any suitable material. They may be painted, unpainted or otherwise.

Also shown are front side hinged bottom panel supports 122, which help support the folding bottom metal grate 202 (FIG. 2). Right front exposed hamper hinge pin leg 112, right rear exposed hamper hinge pin leg 114 and left front exposed hamper hinge pin leg 116, as well as left rear exposed hamper hinge pin leg 218 (FIG. 2) are coupled to front hamper panel 104, right hamper panel 106, left hamper panel 204 (FIG. 2) and back hamper panel 206 (FIG. 2) with a hinge-like arrangement. Each pair of adjacent panels is coupled by a single hinge pin and a top and bottom pair of knuckles.

More specifically, there is shown front-right top knuckle 142, and front-right top bottom knuckle 143, which like front-right bottom top knuckle 172 and front-right bottom bottom knuckle 173, are joined by right front exposed hamper hinge pin leg 112. Similarly, back-right top top

US 6,601,723 B1

3

knuckle 162 and back-right top bottom knuckle 162, as well as back-right bottom top knuckle 182 and back-right bottom bottom knuckle 182 are joined by right rear exposed hamper hinge pin leg 114. Front-left top top knuckle 152 and front-left top bottom knuckle 152, together with front-left bottom top knuckle 192 and front-left bottom bottom knuckle 193, are linked by left front exposed hamper hinge pin leg 116.

A more detailed understanding of the present invention can be achieved by now referring to FIG. 2, which shows the hamper 100 at an intermediate step during the assembly process. All of the panels have been connected to one another except that left hamper panel 204 is yet unconnected to front hamper panel 104, due to the omission of left front exposed hamper hinge pin leg 116. This partially assembled view provides a view of folding bottom metal grate 202, back hamper panel 206 and several of the hamper panel mid-section supports 208.

An even more detailed understanding of the present invention may be achieved by now referring to FIG. 3, which shows a close up view of front-right bottom top knuckle 172 and front-right bottom bottom knuckle 173. Screw-on feet 132 are shown partially threaded onto the threaded leg end 302 of right front exposed hamper hinge pin leg 112.

Now referring to FIG. 4, there is shown a close-up view of front-right top top knuckle 142 and front-right top bottom knuckle 143. It can be seen that front-right top bottom knuckle 143 is part of front hamper panel 104, while front-right top top knuckle 142 is part of right hamper panel 106.

Now referring to FIG. 5, there is shown a bottom-up view of the hamper 100 during the process of assembly where left hamper panel 204 is being attached to front hamper panel 104 via alignment of the appropriate knuckles and the insertion of left front exposed hamper hinge pin leg 116. Pivotable hinged hamper top 102 is shown in an open position.

In operation, the apparatus and method of the present invention as described in FIGS. 1–5, could be assembled as follows:

Pivotable hinged hamper top 102, folding bottom metal grate 202 and back hamper panel 206 are pre-assembled before shipment to the retail outlet or the consumer. Right hamper panel 106 and left hamper panel 204 are coupled to back hamper panel 206 by insertion of left rear exposed hamper hinge pin leg 218 and right rear exposed hamper hinge pin leg 114 respectively. Front hamper panel 104 is them coupled to right hamper panel 106 by insertion of right front exposed hamper hinge pin leg 112. Finally, left hamper panel 204 and front hamper panel 104 are coupled by insertion of left front exposed hamper hinge pin leg 116. Screw-on feet 132 may be added immediately after insertion of each leg or done after all legs have been inserted.

Screw-on feet 132, when screwed on tightly, can crate pressure on the knuckles by pressing the knuckles against a flat head section of the hinge pins.

Throughout this description, reference is made to a hamper, because it is believed that the beneficial aspects of the present invention would be most readily apparent with hampers; however, it should be understood that the present invention is not intended to be limited to hampers, and other household containers could be made as well. Also, throughout this description, reference has been frequently made to wicker hampers, wicker panels and wicker in general. It should be understood that the present invention could be of

4

a non-wicker construction. In fact, the panels of the present invention could be textiles, sheets of plastic, wood or any other suitable material. Additionally, it should be understood that the pins used to connect the knuckles may, in some alternate embodiments, be unexposed. It should also be understood that while a trapezoidal shape may be preferred in some situations, the present invention is not intended to be limited to trapezoidal shapes. The present invention is intended to also be applicable to non-wicker, rectangular containers which have unexposed pins and folding handles.

It is thought that the method and apparatus of the present invention will be understood from the foregoing description and that it will be apparent that various changes may be made in the form, construct steps, and arrangement of the parts and steps thereof, without departing from the spirit and scope of the invention or sacrificing all of their material advantages. The form herein described is merely a preferred exemplary embodiment thereof.

What is claimed is:

1. A method of assembling a hamper comprising the steps of:

providing a hamper back with a bottom pivotally coupled thereto;

providing a first panel, a second panel and a wicker front panel;

providing each side of each of said hamper back, said first panel, said second panel and said wicker front panel with a top hinge knuckle and a bottom hinge knuckle;

coupling each one of said hamper back said first panel, said second panel and said wicker front panel to another of said hamper back, said first panel, said second panel, and said wicker front panel, by pushing one of four separate rods through a top pair of hinge knuckles and a bottom pair of hinge knuckles;

wherein each of said top pair of hinge knuckles and said bottom pair of hinge knuckles is formed by a knuckle on one of said panels and a knuckle on another adjoining panel;

wherein a substantial portion of each of said four separate rods is exposed between said top pair of hinge knuckles and said bottom pair of hinge knuckles; and

wherein each of said first panel, said second panel, said hamper back and said wicker front panel have disposed thereon an equal number of hinge knuckles.

2. A method of claim 1 further comprising the step of:

screwing a detachable foot onto a threaded portion of each of said four separate rods.

3. A method of claim 2 further comprising the step of:

folding said front panel, said second panel and said wicker front panel from a flat orientation to an obelisk configuration when taken together with said hamper back.

4. A method of claim 1 further comprising the step of folding said first panel, said second panel and said wicker front panel from a flat orientation to a three-dimensional closed configuration when taken together with said hamper back.

5. A method of claim 3 wherein said first panel, said second panel and said front panel are trapezoidal in shape.

6. A wicker hamper comprising:

a wicker back hamper panel, having a top side, a bottom side, a right side and a left side;

said wicker back hamper panel having a back hamper panel right side top hinge knuckle, a back hamper panel left side top hinge knuckle, a back hamper panel right side bottom hinge knuckle and a back hamper panel left side bottom hinge knuckle;

US 6,601,723 B1

| 5 | 6 |

a wicker right panel, having a right panel right side top hinge knuckle, a right panel left side top hinge knuckle, a right panel right side bottom hinge knuckle and a right panel left side bottom hinge knuckle;

a wicker front panel, having a front panel right side top hinge knuckle, a front panel left side top hinge knuckle, a front panel right side bottom hinge knuckle and a front panel left side bottom hinge knuckle;

a wicker left panel, having a left panel right side top hinge knuckle, a left panel left side top hinge knuckle, a left panel right side bottom hinge knuckle and a left panel left side bottom hinge knuckle; and a bottom pivotally coupled to said wicker hamper back panel; and

four pins, each of which is configured to pass through a pair of top hinge knuckles and a pair of bottom hinge knuckles where each of said pairs is formed by a knuckle on one of said panels and a knuckle on another adjoining panel;

wherein each of said four pins has a substantial exposed portion and wherein each of said wicker right pane, said wicker left panel, said wicker hamper back panel, and said wicker front panel have disposed thereon an equal number of hinge knuckles.

7. A hamper of claim 6 wherein each of said four pins has a detachable foot coupled thereto.

8. A hamper of claim 7 where said detachable foot is screwed onto a lower threaded portion of a pin.

9. A hamper of claim 8 wherein said each of said four pins is a partially exposed pin which has a middle section which is exposed and is longer than a total of all non-exposed sections thereof.

10. A hamper of claim 9 wherein a distance between said back hamper panel right side top hinge knuckle and said back hamper panel right side bottom hinge knuckle is greater than half of a distance between said top side and said bottom side.

11. A hamper of claim 10 wherein said bottom section comprises a folding bottom metal grate pivotally coupled to at least one of said back hamper panel, said right panel, said left panel and said front panel.

12. A hamper of claim 11 further comprising a top pivotally coupled to said back hamper panel.

13. A hamper of claim 12 wherein said back hamper panel is a trapezoidal shape.

14. A hamper of claim 13 wherein said right panel, said left panel and said front panel are each trapezoidal in shape, thereby creating a hamper having a truncated obelisk shape.

* * * * *

# Exhibit 23

# Collecting

NORTHEASTERN Indian baskets can be divided into two broad categories: utilitarian baskets made for use by Indians or sale to their white neighbors, and the later decorative fancy baskets made strictly for sale to tourists. Relatively few early baskets have survived; any made before 1850 are rare and highly coveted by collectors. Because they were made in greater quantities and suffered far less from daily wear and tear, fancy baskets are far more common than earlier utilitarian examples, thus the quality of their workmanship rather than their rarity governs the prices. Good examples in both categories cost several hundred dollars, while the rarest and choicest early examples, such as large, lidded storage baskets with extensive, well-preserved decoration can easily bring more than ten times as much.

Painted decoration is the hallmark of early northeastern baskets. Rich hues cover some, while others are decorated with dyed weavers, stamps, or stencils. Vibrant reds, pinks, yellows, greens, and blues are common, and contrast beautifully with areas or patterns of uncolored ash splint. Many different northeastern tribes created baskets with distinctive decorative techniques and motifs, which can



be the subject of much study and enjoyment. Some connoisseurs focus on the products of a particular tribal group such as the Schagticoke or Penobscot; others collect by region, searching for examples from a specific state, or from a production center such as Old Town, Maine, or Brothertown, New York. Collectors also cherish work by certain craftspeople, such as the well-known late nineteenth-century Schagticoke artisan Henry "Hen Pen" Harris.

Northeastern Indian baskets reflect the interaction of Native Americans and European settlers better than those of any other region. As commerce increased between the two groups in the nineteenth century, Indians adapted their baskets to suit the tastes of

their customers, so as a rule, the older the basket, the purer its Indian sensibility. The best fancy baskets strike a balance between traditional Indian techniques and color combinations and the wonderful decorative excess of Victorian design.

above: BASKET
*Mohegan. Early nineteenth century. Brothertown, New York. Natural and dyed black ash. H: 4", L: 7½", W: 4½". Haffenreffer Museum of Anthropology, Brown University, Bristol, Rhode Island.*
Brothertown was a settlement on Indian-owned lands near Oneida in upstate New York. Certain New England Mohegans voluntarily emigrated to Brothertown in the late eighteenth and early nineteenth centuries, where they absorbed decorative techniques of other tribes living there. This early basket is typical of Mohegan work in its exclusive use of wide splint and its brightly colored medallion designs.

Page 91

in the trap to serve as bait and point the narrow entrance downstream. Eels, smelling the bait, would squeeze through the tight opening of the trap and would not be able to escape back through the funnel.

Since baskets were used as measuring devices for foods, herbs, wool, and other materials, New England basketmakers made them in sizes ranging from a bushel down to a pint. Most measuring baskets are square or rectangular and employ splint construction, in which thin horizontal weavers are laced through a framework of wider vertical stakes. Northeastern makers occasionally created round or oval splint baskets, which demanded more technical skill and are therefore less common. Most splint baskets were constructed with a plain weave—over-one, under-one, set in alternating rows. The craftsmen reinforced the bases of square and rectangular baskets with interwoven stakes and strengthened the foundations of round and oval splint baskets with interwoven weavers and stakes. In both cases, they turned up the splints to form the side framework after finishing the bottom. Once the sides were woven, they lashed a thick bentwood rim in place. A handle or handles, which an artisan could add last or incorporate into the framework as stakes, finished the basket. The most common types included curved overhead handles, followed by "eared" handles—grips set into opposite sides of the basket. The least common and most difficult to execute were swing handles, which were attached to side pivots so that they could be moved up and down.

New England settlers were strongly influenced by the Indian traditions that surrounded them; they learned directly from their Indian neighbors or borrowed their techniques and forms. Because interaction, cooperation, and intermarriage between the two groups were common in the region from the earliest days of contact, northeastern Indian and Anglo-American baskets are sometimes difficult to tell apart. To further complicate identification, during the nineteenth and early twentieth centuries, Indians also made undecorated, functional baskets for sale or barter to farmers

opposite: NEW ENGLAND FARM BASKETS
*Artists unknown. c. 1860–1880. New England. black ash, hardwood handles. Shelburne Museum, Shelburne, Vermont. Photograph by Ken Burris.*
A selection of typical nineteenth-century New England farm baskets on exhibit in the kitchen of the historic Dutton House at the Shelburne Museum, Shelburne, Vermont.

below: UTILITY BASKET
*Artist unknown. c. 1840. New England. Painted black ash splint with carved hardwood handles. H: 7", W: 5", L: 9¼". Private collection. Photograph courtesy David A. Schorsch American Antiques.*
This beautifully proportioned little basket was probably used to hold sewing materials and other household sundries.



Another important basketmaking tradition arose among the Cherokee, who originally lived throughout southern Appalachia but were displaced by whites early in the nineteenth century. State governments systematically stripped Indians of their rights and opened their lands to settlement. The Cherokee, however, believed they had a legal right to their ancestral land; they sued to win back land that had been taken from them, and in the late 1820s their hard-fought case finally reached the Supreme Court. Although Chief Justice John Marshall presided over a decision that rendered the challenged state laws unconstitutional, President Andrew Jackson refused to enforce it and instead signed a law in 1830 to remove the Indians. During the following decade, thousands of Cherokee were forcibly and shamefully relocated by the U.S. government to reservations in Oklahoma, which was then known as the Indian Territory. Armed escorts marched them to their new "home" along the infamous Trail of Tears. At least 2,000 of the estimated 16,000 Cherokees who were forced westward on the trail are believed to have died en route.

A small number of the Cherokee, who had previously left the tribe and obtained U.S. citizenship, remained in northwestern North Carolina, exempted from removal by their citizenship. Others became fugitives, hiding in inaccessible parts of the Southern Highlands. Eventually the government purchased reservation land at Cherokee, North Carolina, near Asheville, and allowed both groups of eastern Cherokee to settle on the reservation, where they remain to this day.

Cherokee basketmakers originally worked with river cane, from which they crafted twilled, double-woven baskets for their own ceremonial and utilitarian purposes. During the nineteenth

left: RIBBED BASKET WITH HINGED LID

*Probably Cherokee. c. 1920. Found in Franklin County, Tennessee. White oak, natural pigments. Collection of Roddy and Sally Moore. Photograph by Ken Burris.*

Although this basket's origin is undocumented, similar examples with a centrally hinged lid and colored splint are known to be made by Cherokee.

below: SWING-HANDLED BASKET WITH LACED BAIL

*Elenora and John Wilnoty (Cherokee). c. 1983. Cherokee, North Carolina. Plain and dyed white oak splint, hickory handle. 9½" x 5" x 7". Collection of Cynthia Taylor. Photograph by Ken Burris.*

Like a number of contemporary Cherokee artisans, the Wilnotys collaborate on their baskets. John is a woodcarver who fashions the basket handles, while Elenora weaves the baskets. This basket's unusual handle is laced back on itself for added strength.



NATIVE AMERICAN TRADITIONS



above: MARKET BASKET
*Melinda Taylor, c. 1950. Qualla Indian Reservation, Cherokee, North Carolina. Natural and dyed white oak. Maximum height: 9½". Appalachian Museum, Berea College, Berea, Kentucky.*
This Cherokee basket was originally purchased through Allanstand Cottage Industries in Asheville, North Carolina. It was made to be used as a carrier for foods and other goods purchased at local markets.

opposite: DOUBLE WALL BASKET
*Cherokee, c. 1930. Western North Carolina. Natural and dyed white oak. H: 19½". Collection of Roddy and Sally Moore. Photograph by Ken Burris.*
Like their Northeastern contemporaries, the Cherokee sometimes made tiered wall baskets for sale to tourists. This example includes dyed splint and a diagonal overlay of curlicues, both common in Cherokee trade baskets.

century, however, when they began selling baskets to their white neighbors in Appalachia, the Cherokee switched their primary basket material to oak splint, long the favored material of non-Indian basketmakers in the region.

From it they fashioned a variety of forms, including the ribbed baskets crafted by white basketmakers in the Southern Highlands. This sharing of forms, materials, and techniques, brought about by the long regional history of close interaction between the races—including a considerable amount of intermarriage—can at times make it hard to distinguish between white and Cherokee work. Some approaches were unique to the Cherokee, however. Whether working with oak or cane, Cherokee basketmakers often used dyed splints, which are rarely found in early utilitarian baskets made by whites. Many Cherokee baskets in both materials are twill plaited. While twilled baskets of whites or other tribes are often decorated with diamond patterns, the Cherokee commonly used simple alternating rows of colored (usually dark brown or red) and uncolored weavers on their baskets. Some contemporary makers have remastered the art of double-weave twill, creating baskets within baskets similar to those made by the Chitimacha. Unlike those of the Chitimacha, however, most Cherokee baskets have handles rather than lids.

As inexpensive manufactured containers reached the highlands, the Cherokee's white neighbors needed far fewer utilitarian baskets. Resourceful Cherokee women began making purely decorative baskets for sale to the many tourists who came to the region. Tourists liked the colorful, decorative effects possible with honeysuckle and maple, and innovative Cherokee craftswomen developed new forms and techniques that exploited the possibilities of these new materials.

Today, basketmaking is the most important craft practiced by the eastern Cherokee. The Indian-managed Qualla Arts and Crafts Mutual, Inc., cooperative in Cherokee, North Carolina, represents over one hundred Cherokee artisans. The Qualla cooperative is affiliated with the Southern Highland Handicraft Guild in Asheville, which was founded in 1930 as an umbrella organization that unites a large number of Appalachian craft schools and centers and increases recognition of highland crafts. During the 1930s the guild organized seminal craft exhibitions that traveled to



inside easily with one hand. Baskets also held wool before and after the farm wife carded and spun it. Inside the house, baskets were used to hold thread, scraps of cloth, other sewing supplies, and small personal items, and to carry laundry between the washtub and the clothesline.

New Englanders also used baskets to carry fish, clams, oysters, mussels, and crabs home or to market. Lidded creels shaded fish from the drying sun at the same time they allowed air to flow freely; they kept trout, salmon, and panfish cool and fresh until the fisherman reached his destination. And freshwater eels, a popular staple in early days, were trapped in long, cylindrical baskets with a narrow, funnel-shaped opening at one end and a wooden plug at the other. The fishermen would put some dead fish

*above:* DOUBLE SWING-HANDLED
MARKET BASKET
*Jonathan Kline. 1995. Trumansburg, New York. Black ash splint, shagbark hickory handles and runners. H: 9½", W: 13", L: 19". Private collection.* Hardwood runners secured along the length of the bottom protect its plaited rectangular weave. The sides are woven straight, while the top keeps the rectangular form.



above: COVERED KNIFE BASKET
*Unknown Shaker artist. c. 1880. Probably New Lebanon, New York. Black ash with hardwood handle. Overall H: 9⅞", L: 11½", W: 4⅝". Hancock Shaker Village, Pittsfield, Massachusetts. Photograph by Paul Rocheleau.*
This type of fancy basket was intended to store kitchen knives and other tableware, but undoubtedly found many uses around the home. The hinged lids (called covers by the Shakers) of this skillfully crafted example are woven with a decorative twilled pattern. Like all Shaker fancy work, this basket was woven over a wooden mold.

inferior. Like most other basketmakers in the region, northeastern Shakers made their baskets from black ash splint. Building on traditional models and methods, they refined the forms and techniques of earlier Indian and northeastern farm baskets by creating perfectly symmetrical shapes and attending to the fine details of construction. For example, early Shaker basketmakers took extra time to finish their rims and handles with files, which allowed finer shaping and a smoother surface. They lined their chip baskets with leather or cloth to hold dirt and small pieces, thereby keeping their indoor spaces clean, and they attached wooden "skates" to the bases so they could drag or slide heavy loads over frozen ground or ice. The lining and the skates also helped to keep the kindling dry. The bottoms of the

124

a thousand Believers remained, and by the outset of World War II, all but four villages had closed. Today only the community at Sabbathday Lake, Maine, is still inhabited.

Although fewer than a dozen Brothers and Sisters remain at Sabbathday Lake to continue the Shaker way of life, the art of Shaker basketmaking has paradoxically enjoyed a tremendous revival in recent years. As interest in American history, traditional crafts, and artifacts grew in the 1960s and especially after the Bicentennial in 1976, so did interest in the Shakers. The long overlooked Shaker handcrafts, including their furniture, oval boxes, and baskets, came to represent a signal chapter of American design, and their value skyrocketed. Beginning in the early 1970s, several young museum curators, craftspeople, and scholars began to reexamine the historical record of Shaker life and craftsmanship. Throughout the past two decades, these individuals have identified and elucidated many techniques of Shaker basketmaking and other crafts, and their efforts have, in turn, helped bring the excellence of Shaker work to broad public and critical attention. In 1986, June Sprigg, who was then the curator of Hancock Shaker Village, organized an exhibition of Shaker design at the Whitney Museum of American Art in New York City. This exhibition marked the first time a museum had presented Shaker handcrafts as works of art, thus firmly establishing the artistic importance of Shaker artifacts. Along with outstanding Shaker museums like the ones at Hancock, Massachusetts; Canterbury, New Hampshire; Old Chatham, New York; and Pleasant Hill, Kentucky, dozens of other major public institutions now give Shaker rooms or artifacts a prominent place among their exhibits of American decorative arts. They include the Metropolitan Museum of Art in New York, the Museum of Fine Arts in Boston, the Philadelphia Museum of Fine Art, the M. H. de Young Museum in San Francisco, and the Henry Francis Du Pont Winterthur Museum in Delaware.

opposite: GROUP OF SHAKER WORK BASKETS
*Artists unknown. c. 1880. New Lebanon, New York; Canterbury, New Hampshire; and Sabbathday Lake, Maine. Black ash, hardwood handles. Collection of Richard Klank. Photograph by Paul Rocheleau.*
Note the openwork cheese basket in the foreground. Like other farmers in the Northeast, Shakers made many such hexagonal weave baskets.

below: WORK BASKETS
*Unknown Shaker Brothers. c. 1860. South Union, Kentucky. White oak. Shaker Museum at South Union, South Union, Kentucky. Photograph by Shutterbug, Bowling Green, Kentucky.*
Marked "O.F." and "N.F." for "Office Family" and "North Family," these two work baskets are typical of the white oak work baskets made in this southern Shaker community. They represent a distinctive mingling of Shaker and Appalachian basketmaking traditions.



# The Taconic Area



above and left:
MARKET BASKET (DETAIL)
*Artist unknown. c. 1880. West Taghkanic, New York, area. White oak splint, hickory rim and handle, black ash lashings. Overall height: 13", W: 10½", L: 15½". Private collection.*
A typically sturdy and well-made Taconic utility basket, ideal for carrying goods to and from the store or market.

opposite: ASSEMBLED NEST OF ROUND BASKETS
*Artists unknown. c. 1850–1880. West Taghkanic, New York, area. White oak splint, black ash lashings, hickory rims and handles. Height of largest basket: 11". Collection of Nellie Ptasvek. Photograph by Ken Burris.*
Taconic basketmakers crafted round utilitarian baskets in a variety of sizes. Their largest baskets were made with paired eared handles, which distributed the weight of heavy loads evenly and allowed a full basket to be carried by two people if necessary.

The quality of surviving Shaker basketry is so consistently high and its appeal to collectors is so strong that many people label every well-made northeastern splint basket as "Shaker" or "possibly Shaker." This

Page 135



# Appalachia



above: "DOLLY" BASKET

*Dan and Martha Jones. c. 1985. Warren County, Tennessee. Plain and dyed white oak. Overall height: 13", W: 8", L: 12½". Collection of Larry Hackley. Photograph by Rachel Nash Law and Cynthia Taylor, reproduced courtesy the University of Tennessee Press.*

This unique modern variation on a traditional rectangular ribbed form was named after the curvaceous country music legend Dolly Parton. The basket's ribs were pulled out to create a pair of breastlike bulges on its side, and the exaggerated rib form was then cleverly woven with dyed splint to suggest the upper torso of a woman wearing a bikini.

left: APPALACHIAN BASKETMAKERS.

opposite: EGG BASKET

*Mrs. Hord. c. 1950. Asheville, North Carolina. White oak. Overall height: 12". Appalachian Museum, Berea College, Berea, Kentucky.*

This high-sided ribbed basket was originally purchased through Allanstand Cottage Industries in Asheville.

Appalachia seems almost like a separate country, culturally unified and geographically distinct from the rest of the eastern United States, a place where time has stood still and tradition has reigned. While its boundaries are still debated, Appalachia's

Case 3:06-cv-00901-WKW-WC    Document 60-46    Filed 07/29/2008    Page 11 of 29



Page 81





A M E R I C A N   B A S K E T S



NATIVE AMERICAN TRADITIONS

below: GATHERING BASKET
*Aleut. c. early 1900s, Aleutian Islands. Rye grass stems (foundation and weft), wool embroidery yarn and seal intestine (design). D: 30.5 cm, H: 19.7 cm. California Academy of Sciences, San Francisco; catalog #145-15. Photograph by Dong Lin.*
This relatively wide utilitarian basket is decorated with a combination of imported colored yarn and strands of dark brown seal intestine.

Circle and stretching 1,000 miles off Alaska's southwest coast toward Russia—the Aleuts lived a far more stable life than the nomadic Eskimos, who made very few baskets of aesthetic note. They lived year-round in coastal villages governed by wealthy and powerful chiefs in a highly structured and class-conscious society that included slaves as its bottom tier. Aleuts dwelled in substantial communal homes, built partially underground for insulation from the cold and damp and roofed with driftwood or whalebone covered with sod. Like the Eskimos, the Aleuts were hunters of Alaska's sea mammals, which served as their main source of food and clothing.

Eager to collect the rich fur of the plentiful seals and sea otters, Russian hunters began to traverse the Aleutians in the 1740s, bringing devastating change and oppression to the region and its people. Setting up hunting camps throughout the islands, greedy Russian fur traders decimated the Aleuts, enslaving, raping, and killing thousands of natives and dooming many thousands more with the spread of their diseases. By the time the United States acquired the Aleutian Islands as part of its Alaska purchase of 1867, the Aleut population had dropped from an estimated precontact high of around 20,000 to less than 1,000. Despite gains in this century, the Aleuts still have not recovered more than a third of that population loss.

Basketmaking was practiced by Aleutian women from the earliest times, and many ancient baskets and fragments have been uncovered in archaeological digs. Like everything else made by the natives of this harsh land, baskets were essential to survival. Aleuts used baskets to collect the eggs of seabirds and to store dried meats and berries, which sustained life through the long dark winter months of greatest scarcity. Hats and capes were also woven from grass, as were baglike wallets made to carry personal accessories, and mats used for a variety of household applications.



The traditional material for Aleutian baskets was a type of ryegrass (*Elymus mollis*) that grew wild throughout the islands and was carefully gathered and prepared over the course of several months. Harsh elements at the coast kept the grass from reaching its full maturity, so in the early summer the women traveled inland to find the longest and tough-

N A T I V E   A M E R I C A N   T R A D I T I O N S

right: CHEMEHUEVIS BASKET-MAKER posing with some of her work. Southern California or Nevada, c. 1900. Chemehuevis basketry shows influence of both Great Basin and Southwest coiling styles.
*Courtesy Museum of New Mexico; photo #82624.*

opposite: BOTTLENECK BASKET
*Panamint. c. 1900. Death Valley region, California. Willow, devil's claw, yucca root, white quills. H: 5"; diameter at shoulder: 7⅝". Lauren Rogers Museum of Art, Laurel, Mississippi. Gift of Catherine Marshall Gardiner.*
This form, called a seed jar, bottleneck or treasure basket, was made by southern California tribes, including the Panamint and Yokuts. This example alternates two decorative panels, one depicting a lizard, men, and a deer, the other a triangular pattern that probably represents a diamondback rattlesnake.

below: COOKING BASKET
*Mary Benson. c. 1900–1950. Central California. Twined sedge, redbud and willow. H: 24 cm. National Museum of the American Indian, Smithsonian.*
Although this example was made for sale to a collector, the Pomo traditionally used watertight baskets of this form to cook acorn mush.

twentieth-century revival of Native American basketry, which centered on the highest quality California and Great Basin baskets. Abram Cohn, for example, was a Carson City, Nevada, entrepreneur and trading post owner who encouraged and promoted the work of a remarkable Washo basketmaker he dubbed Datsolalee and whose given name was Louisa Keyser. (Cohn's nickname translates as "fat-in-the-hips." Although his protégée was a substantial woman, Cohn's disparaging nickname is more suggestive of the bigotry and sexism of whites at the time.) Keyser's baskets grew out of the highly sophisticated and technically accomplished Washo tradition, but were self-conscious works of art, made specifically for sale to collectors and museums rather than for her own use. Some experts consider Keyser, who died in 1925, the greatest basketmaker of all time. The globular forms of her coiled willow, rosebud, and fern-root bowls, which she called degikups, reflected the Pomo's treasure baskets and employ as many as thirty stitches to the inch. One of her works—a 16½-inch-diameter basket that took over a year to complete—contains an estimated 100,000 stitches, and several others contain well over half of that number.

Through Cohn's efforts, Keyser received nationwide acclaim, and her baskets brought phenomenal prices for the time. The influential collector George Wharton James declared Keyser's work "exquisite" and reported that "her baskets have brought . . . prices ranging from $150 to $250. Three of her recent baskets are valued even higher. [Her] work is wonderful in its shape, symbolization, and weave. [Her] delicacy of touch, artistic skill, and poetical conception excite admiration."[6]

Keyser was the central figure in the commercial and aesthetic revival of Great Basin basketry, and the degikup form she

*The   Southwest*



above: COILED BOWLS
*Anasazi. c. 1100–1300. Southern Utah. Natural and dyed sumac. Largest diameter: 11½". The Southwest Museum, Los Angeles.*
The Anasazi, also known as the Basketmakers for the many woven and coiled bowls and trays they left behind, are believed to be the ancestors of the Hopi and other modern Pueblo Indians. These ancient coiled baskets demonstrate how sophisticated their art was.

northeastern Arizona and northwestern New Mexico, and the oldest continuously occupied settlement in North America is the pueblo at old Oraibi in Arizona, where the Hopi have lived for nearly a thousand years. While the homogenizing forces of the modern world threaten the survival of their culture, many Hopi still live in much the same way their ancestors did a millennium ago.

Although the native peoples of the Southwest are best known for their extraordinary pottery and weaving traditions, basketmaking has always been an important craft in the region. Some of the earliest documented American baskets were made in the Southwest. Preserved in large numbers by the desert climate, these ancient baskets were made by the early, pre–pueblo building Anasazi, who prospered from the beginning of the Christian era to about A.D. 700. The well-made coiled and stitched baskets produced by the Basketmakers, as they are called by anthropologists, are the most significant artifacts remaining from their culture. The Basketmakers created pieces to serve a wide range of domestic and agri-

I M M I G R A N T   T R A D I T I O N S



above: CHEESE BASKET
*Artist unknown. c. 1900. Vermont. Ash. H: 8",*
*D: 20½". Shelburne Museum, Shelburne,*
*Vermont. Photograph by Ken Burris.*
Basketmakers created the hexagonal
openwork weave of cheese baskets by
weaving opposing diagonals over and
under horizontal strips of the same size
splint.

bound Down East coast. As its name indicates, immigrants from England,
dominated by Puritan Protestants from East Anglia, settled the area. The
hardworking, intensely religious, and morally upright Puritans formed
tight communities that valued forbearance and interdependence. They
found the rocky soil and long, hard winters of the region both challenging
and rewarding, and their tough, resourceful character become inseparably
intertwined with the land on which they grew and flourished. Once the

*The  Shakers*



left: FIELD BASKET WITH EARED HANDLES

*Unknown Shaker Brother. c. 1820–1850. Probably Alfred or Sabbathday Lake, Maine. Black ash with hardwood handles. H: 14½", D: 22". United Society of Shakers, Sabbathday Lake, Maine. Photograph by Paul Rocheleau.*

Big sturdy baskets like this were used to harvest crops such as potatoes and apples. The basket's bottom is reinforced with a thick piece of splint for extra carrying strength.

following pages: VICTORIAN LAUNDRY BASKET

*Joyce Schaum. 1993. Keymar, Maryland. Rattan with oak handles. 16" x 24" x 24". Private collection. Photograph by David Egan.*

This large utilitarian basket combines twill and plain weave techniques, adding sophisticated visual appeal to a functional piece. Schaum is best known for her twill weaving, which is influenced by the fancy work of Shaker Sisters. While this basket does not have a direct Shaker antecedent, its combination of beauty and utility is very much in keeping with the Shaker aesthetic.

Shakers' workbaskets were often reinforced, outside and sometimes inside as well, with hardwood strips, which relieved stress on the most vulnerable part of the basket. Craftsmen often used wooden molds to enable them to replicate a perfected basket or handle, and because they equated moral development with technological progress, the Shakers adopted and even devised new methods and tools that saved time and improved the quality of their work. A Shaker sister is credited, for example, with the invention of the circular saw, in 1810. Later Shaker basketmakers modified black-smiths' trip-hammers for use in pounding the splint from ash logs. They also used mechanical tools to shape uniform handles and rims.

Shakers freely shared information, ideas, and craft products with other

Like skeps, rye straw bread-raising baskets came to America with the first German immigrants. These baskets were typically low and open round forms that were sometimes fitted with a cover. After kneading pastry dough, the baker would place it in the basket, cover the bread, then wait for it to rise. Before each use, the baker lined the baskets with cloth, so that the sticky dough would slip out easily. Like bee skeps, bread-raising baskets acted as natural insulators, protecting the fragile yeast from cooling drafts while it acted. The baskets also kept dough clean and dry in the midst of other kitchen activity. While bread-raising baskets rarely had handles, they often had a single coil loop or a series of loops on their sides so they could be hung on the kitchen wall when not in use. German immigrants also used these simple baskets for a host of other household purposes, such as storing nuts, eggs, fruit, herbs, or vegetables and holding balls of yarn, scraps of fabric, and other sewing materials. Larger covered baskets served as storage bins for grains, vegetables, fresh and dried fruits, sheared wool, and feathers gathered for bedding. Heavy, durable baskets stood in cold cellars, sheds, barns, or back rooms, where they served as receptacles for harvested crops.

Rye straw is unfamiliar to most people today. Basket-quality straw is difficult to find, and few contemporary artisans feel the need to make baskets out of this material. An exception is Marie Elena Stotler of Malvern, Pennsylvania, a specialist in skeps who also crafts several different types of bread baskets. An avid herb and flower gardener, she learned the rudiments of straw basketry from a Lancaster Amish couple and then used the techniques to construct a skep for her garden. Stotler was asked by visitors who saw her skep to make one for them, and by sheer chance, she discovered that a neighbor grew rye as bedding for his cows and horses— another traditional use for the crop. Before he cuts and bails his rye, she harvests a year's supply of basketmaking material from his fields, using only a hedge clipper.[17]

below: BREAD-RAISING BASKET
*Artist unknown. c. 1880. Broadway, Shenandoah County, Virginia. Rye straw, oak splint. 4" x 10½" x 9¼". Collection of Roddy and Sally Moore. Photograph by Ken Burris.*
Many German immigrants settled the Shenandoah Valley, moving through southwest Virginia into east Tennessee. Although rye straw baskets have been found in most areas of Virginia that were settled by Germans, openwork baskets like this are rare.

IMMIGRANT TRADITIONS

right: WIRE-HANDLED BASKET
*Cemore Landon Morehouse. c. 1880. Westford, Vermont. Ash with wire and hardwood handle. D: 6¼". Shelburne Museum, Shelburne, Vermont. Photograph by Ken Burris.*
Morehouse (1822–1909) was Vermont's most accomplished and versatile nineteenth-century basketmaker. This unusual little basket combines the wire bail handle of a tin pail with a traditional basket form.

preceding pages: EEL TRAP
*Artist unknown. c. 1880. Ash, hardwood, rope. L: 25". New England. Shelburne Museum, Shelburne, Vermont. Photograph by Ken Burris.*
This simply made but effective trap was probably crafted by a Native American. Similar traps were used by both Indians and whites in the Northeast.



Baskets were also essential in animal husbandry. Most landowners and small farmers in the region kept a dairy cow for their own use and made cheese by fermenting the milk. When the milk formed curds of cheese, the farmers strained them from the remaining liquid whey by pouring the mixture into a porous open-weave basket lined with cheesecloth. Farmers used small, round baskets with raised bases to cradle freshly laid eggs, and they had other types of baskets for transporting chickens, geese, turkeys, and pigeons safely to market. Farmers often placed a vase-shaped basket over a goose's head while they plucked its insulating down feathers, a task that invariably provoked the fowl's temper and put the plucker at some risk. Covered feather baskets served to keep plucked down and feathers from blowing away. Feather baskets often had lids that slid up and down on the upright handle, enabling the gatherer to raise the lid and tuck feathers

made many rectangular forms, and some round Shaker baskets made at Mount Lebanon have square bottoms. By contrast, Taconic basketmakers concentrated mainly on round baskets, most of which have round bases. The few Taconic baskets that combine a square base with a round top lack the graceful flow of the Mount Lebanon Shakers' blending of these shapes.

The daintiest of Taconic baskets, and the only Taconic works that rival the airy delicacy of the Shakers' late nineteenth-century fancy baskets are their so-called friendship baskets. Used to carry cookies on a visit to a neighbor, or to hold sewing materials, friendship baskets usually have a round base with a raised center, low sides, and split handles. A few square-bottomed friendship baskets were made, but the round form is far more common as well as more elegant.

Like other professional basketmakers around the Northeast, Taconic artisans found that demand for their work declined drastically during World War I, and by the end of World War II, only a handful continued the craft. The last descendant of the basketmaking families of West Taghkanic, Elizabeth Proper, single-handedly kept the tradition alive until she lost her sight in the 1980s. Her death marked the end of the long line of Taconic basketmakers, although a number of young northeastern revivalist basketmakers, including Jonathan Kline, John McGuire, Martha Wetherbee, and Stephen Zeh, have been strongly influenced by the Taconic tradition and can produce superb reproductions.

below: ROUND SWING-HANDLED BASKET
*John McGuire. 1998. Geneva, New York. Black ash splint, white oak. OH: 13", D: 9". Private collection.*
John McGuire established a basketmaking program for Old Sturbridge Village and has served as a consultant to the Farmers Museum in Cooperstown, New York. This New England/New York style basket was inspired by a nineteenth-century form in McGuire's collection. Like traditional Taconic baskets, it features a mixture of woods and a double-lashed rim. McGuire says he feels that basketmaking is a contradictory art, that "assures continuity and defies predicability . . . adds a serenity and ignites our passion." He defines a traditional basket as "a vessel that serves the ultimate vessel or 'self' rooted in a purity of design and sacredness of function."

IMMIGRANT TRADITIONS









*Appalachia*



opposite: ROD BASKET
*Artist unknown. c. 1880. Virginia. White oak. Collection of Roddy and Sally Moore. Photograph by Ken Burris.*
A basket within the skeleton of a basket. The rim and base of this unusual form are connected by an outside framework of single rods.

left and below: ROUND BASKET WITH BYE-STAKED BASE
*Ralph Chesney. 1983. Union County, Tennessee. White oak. Overall height: 10", W: 10½", L: 11¼", Diameter of base: 9¼". Collection of Cynthia Taylor. Photograph by Ken Burris.*
Chesney is a fastidious craftsman who adds many fine details to his baskets. He carefully carves all the stakes used in the bottom of his round baskets, narrowing the main stakes at the center and then adding many additional sharply pointed bye-stakes alongside to create a unique spoked matrix for his weaving. Also note the added rim at the base and the purely decorative braiding on the handle and both rims. The basket's base is round, while the top is slightly ovoid.

Beginning around the turn of the twentieth century, just as the old ways were starting to fade, a crafts revival began in Appalachia, fostered by missionary educators who imagined it would build local pride, help to preserve important regional traditions, and, perhaps most important, provide much needed work for the area's otherwise unskilled residents. Dozens of craft schools were established throughout the region, including such important and influential centers as Berea College and Arrowmont in Kentucky and Penland in North Carolina. These schools offered training in traditional arts such as quilting, weaving, woodcarving, pottery, and basket-making and, for the first time, marketed Appalachian wares to customers outside the region. Through the efforts of these schools and regional craft centers, a number of which are still active today, the community has maintained a strong, unbroken continuity of traditional craftsmanship.







# Exhibit 24



 **Click here to enter ONLINE STORE to buy Basket Weaving items**   

*Enter*
*Basketweaving.com*
*for Q&A and more.*

*Need Seat Weaving*
*Supplies?* *Visit*
*www.seatweaving.org*

Click here
for Gift Suggestions for
Basket Weavers.

*Camps & Schools*
Click Here







Return to Art Teachers page            Return to Kids Page

**If you have 30 different students weaving a basket, you're going to have 30 different baskets.**

Here are some easy suggestions for variations in weaving patterns and color patterns.  A picture is worth a 1000 words.
We've also included some brief descriptions.
(Our Camp / Kids / Classroom kits come with natural reed. Use basketry dye to color some of your batch.)

### Variations on Camp / Kids / Classroom Baskets







twill



2 tone plain weave

3 strand plain weave

Twill - Weave over 2, under 1 and repeat for the entire basket.

2 tone plain weave - Weave in plain weave with two strands at the same time.

3 strand plain weave - Weave in plain weave with 3 strands at the same time.



dark weft w/light warp



horizontal stripes



vertical stripes

Dark weft with light warp - Weave with 2 strands of a contrasting weaver on a light warp.

Horizontal stripes - Weave with different colors in plain weave one after the other.

Vertical stripes - Weave with 2 colors in plain weave at the SAME time.

  

**arches openwork**  **crayon scribble©**  **confetti**

Arches - Add pieces of reed to make open patterns. This one has 4" pieces tucked in to make arches.

Crayon scribble© - After weaving a basket, lace a strand of small diameter reed in and out of the basket, weaving it into itself at random. This is #1 crayon scribble©. (Don't cross the width of the basket or you'll block the basket opening. )

Confetti - As you weave, place beads in random places onto the spokes, and weave around them.

     

# Exhibit K

2/13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| SIMPSON VENTURES, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MID-WEST METAL PRODUCTS )<br>COMPANY, INC. )<br>)<br>Defendant. )<br>_____)<br>)<br>MID-WEST METAL PRODUCTS )<br>COMPANY, INC., )<br>)<br>Counterclaimant, )<br>)<br>v. )<br>)<br>SIMPSON VENTURES, INC., )<br>)<br>Counterdefendant. ) | Civil Action File No. 306CV-901-WKW<br><br>**Demand for Jury Trial** |

## MID-WEST METAL'S RESPONSES TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant Mid-West Metal Products Company, Inc., ("Mid-West Metal"), by counsel,

does hereby submit its responses to the First Set of Interrogatories served by Plaintiffs.

### General Objections

Mid-West Metal objects to the definitions and instructions to the extent Plaintiff is attempting to impose discovery response obligations that exceed those obligations established by the Federal Rules of Civil Procedure and/or this Court's local rules and requirements. Mid-West Metal will comply with its discovery response obligations as established by the Federal Rules of Civil Procedure and this Court's local rules and requirements.

Mid-West Metal objects to the definitions proposed by the Plaintiff. Mid-West Metal will respond according to the reasonable and plain meaning of the words used by the Plaintiff.

Plaintiff has propounded several requests that are so broadly worded as to call for the production of information that clearly includes confidential attorney-client communications, information that was prepared in anticipation of litigation, and information that includes attorney work product. To prepare a privilege log for all privileged documents created after this litigation was commenced would be unduly burdensome. Accordingly, subject to and without waiving its objections and privileges, Mid-West Metal will limit its privilege log to those documents created before this litigation was commenced on or before October 6, 2006.

### Interrogatory Responses

1.    Identify all pet containment products (whether referred to as pet cages, crates, homes, carriers, beds, or by other product designation) that the defendant designs, manufactures, distributes, assembles, uses, sells, offers for sale, or imports into the United States, which include any portion or components comprising or having the appearance of wicker, rattan, woven resin strand, or other woven material.

**RESPONSE:**

Mid-West Metal states that the only such products that it sells are its Bay Isle line of products – Models 1805, 1824, 1830, 1836, and 1842.

2.    For each product identified in response to Interrogatory No. 1, identify all sales of said products, including without limitation the sales volume in terms of units sold and sales revenue (in US currency), the date of said sales, the customer to whom the products were sold, and the number of units returned for which a refund was made.

**RESPONSE:**



2







3.    For each product identified in response to Interrogatory No. 1, identify

Defendant's average costs of goods sold and profit margins, providing a description of any

financial assumptions made in calculating such average costs of goods sold and profit margins.

**RESPONSE:**





4.      For each product identified in response to Interrogatory No. 1, identify the persons involved in or knowledgeable of the facts surrounding the design of such products, the decision of whether or how to make or sell such products, including without limitation the identification of each person who contributed to the product conception, product design, selection of manufacturer, pricing structure, and marketing strategies; and when, how and by

whom the decision was made to include the portion or components comprising or having the

appearance of wicker, rattan, woven resin strand, or other woven material.

**RESPONSE**:

Objection. This request is vague and ambiguous, and overly broad. Subject to and
without waiving these objections, the persons with such knowledge on one or more of the
identified topics are Jim Wingate, Tom Swan, Stew Kerr, Bob Dale, Dave Clemmons,
Terry Jones, Larry Gross, Yang Yuan, and Steve Smith.

5.      Identify all license agreements relating to pet products to which Defendant is or

has been a party.

**RESPONSE**:

Mid-West Metal has been a party to two license agreements relating to pet products. One
related to "waste rakes," commenced on April 20, 1999, and was with Handy Hound
Product, LLC (3753 South Lake Shore Drive, House Springs, MO 63051). The second
related to a bird feeder, commenced June 5, 2000, and was with Limberlost Products,
Inc., (4545 W. State Road 218, Berne, IN 46711).

6.      Explain fully the circumstances surrounding Defendant's decision to continue

selling products that include any portion or components comprising or having the appearance of

wicker, rattan, woven resin strand, or other woven material, after Defendant received the letters

of November 4, 2003 and November 19, 2003 referred to in paragraphs 16 and 17 of Defendant's

Answer, including without limitation an identification of the person or persons participating in or

approving that decision and all information considered in making that decision.

**RESPONSE**:

Objection. This request is overly broad and calls for the production of information that is
protected by the attorney-client, work product, and anticipation of litigation privileges.
Assuming that Simpson Ventures were to limit this request to the period of time after
receipt of the referenced letters but before it filed this lawsuit, the request still seeks the
production of information that is protected by the attorney-client privilege. Mid-West

7

Metal in fact conferred with legal counsel Dan Boots and John Brannon (both with Bingham McHale at the time) during that period of time and received a spoken opinion from both on or about December 12, 2003. A written opinion was then provided by John Brannon on November 8, 2006, after Plaintiff filed this lawsuit. The Mid-West Metal employees who were involved in the decision in December of 2003 are Jim Wingate, Tom Swan, and Larry Gross, and the decision was approved by Steve Smith. The Mid-West Metal employees who were involved in the decision in November of 2006 are Jim Wingate and Steve Smith. As to the content of these communications with legal counsel, or about legal counsel's advice, such are privileged. Mid-West Metal has not yet determined whether to waive that privilege, but reserves the right to do so in due course.

7.    Identify all opinions of counsel that Defendant has received or requested, which relate to the '156 patent, to Plaintiff, or to any Product identified in response to Interrogatory No. 1, including without limitation identification of all persons giving, receiving and/or relying upon said opinions, and the substance of said opinions.

**RESPONSE:**

Mid-West Metal incorporates by reference its objections, privileges, and response to Interrogatory 6.

8.    Explain fully the basis for Defendant's claim that Defendant's products do not infringe the '156 patent, including without limitation a specific identification of each point or points of novelty of the patented design that defendant contends are not incorporated in Defendant's products, all dissimilarities between Defendants' product and the patented design that would be relevant to an ordinary observer, and identify all evidence known to Defendant that may support or refute its claim of non-infringement.

**RESPONSE:**

Objection. This request seeks the premature production of information that is the subject of ongoing investigation and discovery, including the potential reliance on expert opinion testimony. Mid-West Metal reserves the right to supplement or modify this response, accordingly.

8

Subject to and without waiving these objections, there is no infringement because the design that is the subject of the '156 Patent is not substantially the same as the design used with Mid-West Metal's Bay Isle product line. There are numerous important differences. For example, the '156 Patent design depicts a first relatively tight weave pattern that completely covers the top panel, the sides of the front panel, and the larger top sections of the side panels (except for the door and window portions), a second relatively loose weave pattern positioned above the door and window portions and the smaller bottom sections, and elongated straight members defining the top panel edges, the larger and smaller section edges, and the front and back panel edges, wherein the elongated straight members are wrapped in tight coils of wicker. None of these design features are present in the design used with the Bay Isle product line. Indeed, the Bay Isle product line includes top, back, and side portions characterized by a first weave pattern with rectangular portions characterized by a second weave pattern embedded therein. Further, the vertical supports defining the edge intersections of the side panels with the front and rear panels are unwrapped, or bare.

9.     Identify those features shown in the '156 patent that you contend are the point or

points of novelty of the invention claimed in the '156 patent.

**RESPONSE:**

Objection. This request seeks the premature production of information that is the subject of ongoing investigation and discovery, including the potential reliance on expert opinion testimony. Mid-West Metal reserves the right to supplement or modify this response, accordingly. Subject to and without waiving these objections, Mid-West Metal does not concede, let alone contend, that any features depicted in the '156 Patent are in fact Points of Novelty – or "the novelty which distinguishes the patented design from the prior art." Indeed, the sole Point of Novelty that Plaintiff has identified through its expert witness report is the following – "I observe that the design claimed in the '156 Patent distinguishes from the prior art in one respect: i.e., the point of novelty is a woven texture on all disclosed surfaces." (Anders at ¶36.) Mid-West Metal's discovery and investigation is ongoing, but upon information and belief, preliminarily contends that the prior art will clearly demonstrate that any such claimed Point of Novelty was in fact obvious, if not anticipated.

10.     Identify those features that you contend collectively constitute the overall

patented design as claimed in the '156 patent, excluding what you contend are functional

features, such that the overall patented design could be compared with the accused device(s) in

order to evaluate whether the accused device is so substantially similar as to be likely to deceive

or confuse an ordinary observer.

### RESPONSE:

Objection. This request seeks the premature production of information that is the subject of ongoing investigation and discovery, including the potential reliance on expert opinion testimony. Mid-West Metal reserves the right to supplement or modify this response, accordingly. Subject to and without waiving these objections, Mid-West Metal contends that practically all, if not all, of the features depicted in the `156 Patent are in fact functional, and not ornamental. The only non-functional features that are possibly ornamental are the particular patterns depicted within the weave materials. Specifically, the presence and dimensions of the openings for the door on the front panel, the presence and dimensions of the opening or handle on the back panel, the presence and dimensions of the windows or openings on the side panels, the use of any material to cover the cage to create a den-like structure, and the rectangular shape or silhouette of the pet cage are all functional features. In addition, the use of a non-porous woven material for covering the pet cage is a utilitarian or functional feature as well – indeed, Mr. Simpson expressly represented such to the US PTO in July 2004, in prosecuting his application for the `138 Utility Patent and in distinguishing its utilitarian features from the prior art.

11.    For each product identified in response to Interrogatory No. 1, if you contend that

any features of such products are functional, identify such features and state whether such

features are purely functional or are partly functional, partly ornamental.

### RESPONSE:

Objection. This request seeks the premature production of information that is the subject of ongoing investigation and discovery, including the potential reliance on expert opinion testimony. Mid-West Metal reserves the right to supplement or modify this response, accordingly. Subject to and without waiving these objections, Mid-West Metal contends that practically all, if not all, of the features depicted in the `156 Patent are in fact functional, and not ornamental. See Mid-West Metal's response to Interrogatory 10 herein, for an identification of those functional features.

12.    Explain the basis of each of Defendant's affirmative defenses presented in the Answer, and identify all evidence known to Defendant that may support or refute its affirmative defenses.

**RESPONSE:**

Objection. This request seeks the premature production of information that is the subject of ongoing investigation and discovery, including the potential reliance on expert opinion testimony. Mid-West Metal reserves the right to supplement or modify this response, accordingly. Subject to and without waiving these objections, Mid-West Metal states that the prior art is expected to demonstrate that any claimed novelty in the design depicted in the `156 Patent was anticipated and/or made obvious by the prior art (especially in light of the United States Supreme Court's recent decision in <u>KSR International Co. v. Teleflex, Inc.</u>, 127 S.Ct. 1727 (2007)). Further, the evidence may show that the design depicted in the `156 Patent was on sale and/or in public use on or before May 2, 2001.

13.    Explain fully the relevance of all prior art known to Defendant that you contend would render the '156 Patent invalid or unenforceable.

**RESPONSE:**

Objection. This request seeks the premature production of information that is the subject of ongoing investigation and discovery, including the potential reliance on expert opinion testimony. Mid-West Metal reserves the right to supplement or modify this response, accordingly.

14.    Identify all surveys or studies conducted by or on behalf of Defendant regarding the '156 patent, regarding any product identified in response to Interrogatory No. 1, or regarding any pet product having a portion or components comprising or having the appearance of wicker, rattan, woven resin strand, or other woven material.

**RESPONSE:**

Mid-West Metal does not have any such surveys or studies.

15.    Identify all patents or patent applications filed by or on behalf of Defendant that cover or relate to any product identified in response to Interrogatory No. 1, or to any pet product having any portion or components comprising or having the appearance of wicker, rattan, woven resin strand, or other woven material.

**RESPONSE:**

Mid-West Metal does not hold and has not applied for any such patents.

16.    Identify all other lawsuits or claims of infringement by or against Defendant that relate to any product identified in response to Interrogatory No. 1, or to any pet product having any portion or components comprising or having the appearance of wicker, rattan woven resin strand, or other woven material.

**RESPONSE:**

There are no such other lawsuits or claims.

17.    Explain fully the circumstances surrounding all purchases or analyses of Plaintiff's products by any employee or representative of Defendant or any third party acting on Defendant's behalf, including without limitation the date of said purchase or analysis, the persons involved in making the purchase or analysis, the persons to whom the purchase or analysis was reported, the product purchase or analyzed, and identify all reports, outcomes or actions taken as a result of said purchase or analysis.

**RESPONSE:**

Objection. This request is overly broad and unduly burdensome, and calls for the production of information that is more efficiently gathered and produced through deposition. In addition, it is so broadly worded that it calls for the production of information and analysis that occurred after the commencement of this litigation – and is thus protected against disclosure by the attorney-client, anticipation of litigation, and work product privileges.

Subject to and without waiving these objections and privileges, sometime in the fall of 2002, Mid-West Metal Vice President Jim Wingate saw a wicker-covered pet cage in the Frontgate catalog. For some time long before 2002, Jim Wingate had had the idea and desire to use wicker appearing material with its pet cages, but could not previously justify the manufacturing costs for such. However, because of a new manufacturing relationship established in 2002 with the Dailan Huamei Stocade company in China, Mid-West Metal was able to explore more seriously production of such a product line.

Jim Wingate thus purchased a small pet home with a wicker weave covering from Frontgate. That product was delivered to them in early October 2002. The pet home was a wire cage covered in certain areas by a rattan material. The rattan material had specific weave patterns within the rattan and on the frame in certain areas. At the time, Mid-West Metal was not aware of any patent or patent-pending applicable (or allegedly applicable) to the design – and did not see any such notice markings on the packaging materials when the product arrived, despite their efforts to look for such.

After discussing the concepts and the Frontgate pet cage at a regularly scheduled New Products Meeting (attended by Jim Wingate, Tom Swan, Yang Yuan, and Stew Kerr), and after discussing wicker-covered pet cage concepts that Jim Wingate had previously presented to the group, the decision was made to explore production possibilities and costs with the Dailan Humai company in China. Mr. Yuan thereafter presented the concept to representatives of Dailan Humain in China, who confirmed that a wicker-weave pattern could be woven onto Mid-West Metal's drop-pin models of collapsible pet cages.

Dave Clemmons and Stew Kerr then prepared the initial design drawings for a wicker-covered pet cage. They were careful to prepare a design characterized by a fundamentally different weave pattern (as described elsewhere in these Interrogatory responses). Dailan Humai then made a sample product based on those designs. After manufacturing pricing was agreed upon between Mid-West Metal and Dailan Humai, the first orders were made by Mid-West Metal in April of 2003, and the product was first received in June of 2003. Bob Dale prepared the product packaging and marketing literature, and the Bay Isle brand was adopted.

18.    Identify all persons who participated in preparation of the answers to these

interrogatories, and provide a brief explanation of the information or assistance they provided.

**RESPONSE:**

Jim Wingate was the Mid-West Metal employee who was primarily involved in providing the factual information responsive to these Interrogatories. He was assisted by Steven Smith on certain factual information relating to the decision to proceed with

13

manufacturing the Bay Isle line of products, and by Tom Swan on certain information relating to the development of the Bay Isle line of products' design. He was further assisted by legal counsel James Hinshaw in preparing objections and legal contentions.

19.    Identify the manufacturer of each product identified in response to Interrogatory

No. 1.

**RESPONSE:**

Dailan Huamei Stocade Co, Ltd. d/b/a Dailan H&M Metal Products is the entity that manfuctures the Bay Isle line of products for Mid-West Metal. It's address is Kuangdong Street, Taiping Office, Pulandian, Dalian 116200 in the People's Republic of China.

WHILE I DO NOT HAVE PERSONAL KNOWLEDGE OF ALL INFORMATION GATHERED IN RESPONDING TO THESE INTERROGATORIES, I AFFIRM UNDER PENALTIES OF PERJURY THAT THE INFORMATION SET FORTH HEREIN IS TRUE AND ACCURATE TO THE BEST OF MY KNOWLEDGE.

**James W. Wingate**, As Vice President of Mid-West Metal Products Company, Inc.

14

As to Objections:

James M. Hinshaw
BINGHAM MCHALE LLP
2700 Market Tower
10 W. Market Street
Indianapolis, IN 46204-4900
(317) 635-8900
(317) 236-9907 (facsimile)
jhinshaw@binghammchale.com

Brett A. Ross
CARR ALLISON
100 Vestavia Parkway
Birmingham, Alabama 35216
(205) 949-2938
(205) 822-2057 (facsimile)
BAR@carrallison.com

*Attorneys for Defendant/Counterclaimant, Mid-West Metal Products Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was duly forwarded to all counsel of record and interested parties on this 13th day of July, 2007, via United States mail, postage prepaid, as follows:

Robert T. Meadows
CAPELL & HOWARD, P.C.
3120 B. Frederick Road (36801)
P.O. Drawer 2268
Opelika, Alabama 36803

Arthur A. Gardner
GARDNER GROFF SANTOS & GREENWALD, PC
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339

1167532

15

# Exhibit L

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

SIMPSON VENTURES, INC.,                )
                                       )
    Plaintiff/Counterdefendant,    )
                                       )   Civil Action File No. 306CV-901-WKW
    v.                                 )
                                       )
MID-WEST METAL PRODUCTS                )
COMPANY, INC.                          )
                                       )
    Defendant/Counterclaimant.     )

**AFFIDAVIT OF JIM WINGATE**

Jim Wingate, being first sworn upon his oath, states the following:

1.)     I am over 18 years old, a resident of Indiana, and otherwise competent to testify to these matters set forth herein. The statements made herein are based upon my personal knowledge of the facts and observations.

2.)     I am currently the Vice President of Product Development for MidWest Homes for Pets, which is a division of Mid-West Metal Products Company, Inc. ("Mid-West Metal"). At all relevant times prior, though, I was the President of that pet products division for Mid-West Metal.

3.)     In the early 1990s, I formed a team of company employees to help identify and develop new ideas and improvements for the company's pet products. This team has been referred to as the New Products Development Team. The team did not always meet, and the different members of the team were not always present when the team meetings did occur. However, I was a member of the team, as was Tom Swan, Stew Kerr, and David Clemmons. From time to time, our outside graphics contractor Bob Dale might attend a meeting, or a portion of a meeting. Bob Dale became an employee of Mid-West Metal in about March of 2008.

4.)     As I testified to in my deposition, I recall several meetings where the team talked about the idea of weaving wicker onto one of the company's bare-wire pet cages for the purpose of creating a decorative aesthetically pleasing pet cage. I recall that the first of those meetings took place sometime back in about 1995, after I had just seen an old movie with a wicker covered bird cage.

5.)     After a number of discussions in that mid-1990s time frame, we decided to table the idea for practical reasons. We were concerned about the use of natural wicker

1

because it would hold moisture and eventually smell and rot. In addition, animals could chew through it. Also, there were significant cost concerns. At the time, the company made all of its wire cages here in the United States. The only way to put wicker onto a pet cage would be to weave it on manually. We have since learned from our present manufacturing process, for example, that it takes about one full day for workers to hand weave the wicker onto one of our Bay Isle wicker pet cages. The labor costs for that process made the idea cost-prohibitive at the time.

6.)    Starting in the late 90s, Mid-West Metal principals (myself and Steve Smith) undertook to establish production relationships with manufacturing companies located in China. Those efforts were driven primarily by escalating metal-wire costs domestically, and by the then warming and opening of Asian markets to companies and business from companies such as ours. Our efforts were successful, and Mid-West Metal eventually transitioned practically all of its pet products production to a set of selected companies located in China. This process was mostly completed in approximately 2001 or 2002. We realized at that time that we then had new access to a very inexpensive labor market, as well.

7.)    In approximately 1999, I received a catalog from the Nantong Orient Pet Co., Ltd. It was and is a common event for similar such pet products companies to send me such catalogs, and I received them and kept some of them in the ordinary course of the company's business activities and practices. The same is true for this Nantong Orient's catalog – I received it and kept it in the ordinary course of the company's business activities and practices, in approximately 1999. True and accurate copies of selected pages from the Nantong Orient's catalog are attached hereto as Exhibit 1.

8.)    In approximately 2000, I received a catalog from J-B Wholesale Pet Supplies, Inc. Again, it was and is a common event for similar such pet products companies to send me such catalogs, and I received them and kept some of them in the ordinary course of the company's business activities and practices. Although I did not retain a copy of the entire catalog at the time, true and accurate copies of selected pages from the J-B Wholesale Pet Supplies catalog sent to me in 2000 are attached hereto as Exhibit 2.

9.)    A true and accurate copy of a picture of one of Mid-West Metal's bare-wire pet cages is attached hereto as Exhibit 3. This picture was included as a flyer in one of Mid-West Metal's catalogs, published and issued to customers in December of 1997. This is a business record regularly made and kept in the ordinary course of the company's business activities and practices, and was made at or near the time of the issuance of the company's December 1997 catalog flyer.

10.)    The following pictures are true and accurate photographs representative of the four models of Bay Isle products that I understand to be at issue in this case – the Model 1824 (24" in size), the Model 1830 (30" in size), the Model 1836 (36" in size), and the Model 1842 (42" in size):

**Model 1824**



**Model 1830**



**Model 1836**



**Model 1842**



11.) Attached hereto as Exhibit 4 are five pictures, showing different perspectives of one of Mid-West Metal's Model 1830 product. The photographs are true and accurate representations of that product.

12.) In the process of developing the appearance and decorative features of our Bay Isle line of products in 2002 and early 2003, I specifically told the team members and Bob Dale that we wanted to make our design look unique and original, and that we did not want it to look like the Simpson Ventures "Mr. Herzsher" sample that I had purchased sometime in October of 2002.

I AFFIRM, UNDER THE PENALTIES FOR PERJURY, THAT THE FOREGOING REPRESENTATIONS ARE TRUE TO THE BEST OF MY KNOWLEDGE.

Dated: 7-28-08          Jim Wingate

3

# Exhibit 1

**Nantong  Orient  Pet  Co.,Ltd.**

*J. F. Jiang*

Export Manager

Add:77-301  Hong  Qiao  Xin  Cun,Nantong  226006  China
Fax: 0086-513-5500060          Tel: 0086-513-3510313

CONFIDENTIAL
MWM 001374

# Pet Products



NANTONG



COMB

MASSAGE GLOVES



CAT TOYS



DOG TEETH CLEANERS



RAWHIDE TOYS

| CODE NOS | ITEMS | SPECS |
|---|---|---|
| NT06083 | KNOTTED BONE | 2"-12" |
| NT06084 | KNOTTED BONE | 2"-12" |
| NT06085 | PRESSED BONE | 3"-10" |
| NT06086 | BASEBALL | 2"-3" |
| NT06087 | TWISTED STICK | 1.5"o4-11 |
| NT06088 | CHEW SHOES | 2"-8" |
| NT06089 | CHEW SHOES | 2"-8" |
| NT06090 | RUGBY FOOTBALL | O4.5" |



**CMEC NANTONG CO.** 中设南通机械设备进出口公司
ADD:8/F.,15TH QING NIAN ROAD (M) NANTONG 226006 CHINA
FAX:0086-513-5511827, 5527879-TEL:0086-513-5519040

FAX 0086-513-5500060    13    (MR. J. F. JIANG)

CONFIDENTIAL
MWM 001375

# Wicker Pet Beddings, Carriers





NT06652A/C  DIA. A43 × 12 × 52/C29 × 12 × 38



NT06653A/B
AO50 × H40 × H14/BO40 × H33 × H11



NT06654A/E
A61 × 48 × 23/E42 × 31 × 19



NT06655A/E
A68 × 54 × 27/E45 × 34 × 21



NT06656A/C
AO46 × 39/CO32 × 32



NT06657A/C
A54 × 37 × 29/C44 × 27 × 27



NT06658A/C
A50 × 35 × 64/C37 × 25 × 51


ADD: 8/F., 15TH QING NIAN ROAD(M), NANTONG 226006 CHINA
FAX: 0086-513-5511827  5527879  TEL: 0086-513-5519040
E-mail: cmec.nt@public.nt.js.cn

FAX 0086 - 513 - 5500060  Mr. J. F. JIANG

CONFIDENTIAL
MWM 001377

# Wicker Pet Beddings, Baskets





NANTONG



NT06644A/C  A57 × 44 × 15/C48 × 34 × 12



NT06645A/D  A57 × 43 × 10/D46 × 33 × 8



NT06646A/E  A58 × 46 × 13/E43 × 30 × 14



NT06647A/G  A72 × 56 × 16/G44 × 32 × 12



NT06648A/D  A57 × 43 × 10(12)/D46 × 33 × 8(10)



NT06649A/D  A57 × 46 × 15/D46 × 34 × 14



NT06650A/C  A72 × 48 × 19/C54 × 35 × 16



NT06651A/E  A81 × 68 × 20/E65 × 51 × 17

CONFIDENTIAL
MWM 001378

# Wicker Pet Beddings



CMEC
NANTONG



NT06636A/G  A74 × 57 × 17/G46 × 34 × 12



NT06637A/D  A59 × 49 × 17/D45 × 36 × 10



NT06638A/G  A65 × 50 × 11/G41 × 29 × 7



NT06639A/G  A70 × 56 × 15/G43 × 31 × 12



NT06640A/G  A74 × 59 × 22/G49 × 35 × 16



NT06641A/G  A85 × 73 × 24/G45 × 35 × 15



NT06642A/F  A100 × 79 × 23/F60 × 47 × 17



NT06643A/F  A67 × 54 × 20/F42 × 30 × 14

46

CONFIDENTIAL
MWM 001379

# Wicker Pet Carriers, Beddings



NANTONG



NT06626A/B
A37 × 40 × 34/B26 × 28 × 22



NT06627A/B
A55 × 34 × 32/B39 × 23 × 20



0NT06628A/B
A53 × 42 × 40/B38 × 34 × 33



NT06629A/G
A79 × 58 × 24/G50 × 32 × 14



NT06630A/E
A77 × 57 × 12/E58 × 41 × 9



NT06631A/F
A100 × 77 × 22/F61 × 44 × 14



NT06632A/F
A100 × 79 × 23/F60 × 47 × 17



NT06633A/E
A65 × 52 × 11/E46 × 35 × 8



NT06634A/M
A100 × 80 × 26/M41 × 28 × 14



NT06635A/M
A100 × 78 × 23/M40 × 29 × 13

45

CONFIDENTIAL
MWM 001380

# Pet Beddings, Carriers



NANTONG



NT06614A/C
A45 × 45 × 48/C35 × 35 × 35



NT06615A/C
A49 × 37 × 38/C40 × 27 × 27



NT06616A/C
A45 × 37 × 30/C35 × 26 × 20



NT06617A/C
A42 × 42 × 42/C31 × 31 × 31



NT06618A/C
A37 × 43 × 36/C27 × 28 × 26



NT06619A/C
AØ50 × 53/CØ40 × 41



NT06620
39 × 27 × 34



NT06621A/C
A46 × 46 × 55/C33 × 33 × 39



NT06622A/C
A44 × 44 × 38/C34 × 30 × 27



NT06623A/C
A50 × 45 × 38(40)/C32 × 27 × 23(24)



NT06624A/D
A64 × 52 × 33/D47 × 36 × 36



NT06625A/C
A54 × 44 × 45/C40 × 29 × 33



NANTONG

ADD: 8/F., 15TH QING NIAN ROAD(M), NANTONG 226006 CHINA
FAX: 0086-513-5511827 5527879  TEL: 0086-513-5519040
E-mail: cmec.nt@public.nt.js.cn

44

CONFIDENTIAL
MWM 001382

# Wicker Pet Beddings





NT06571A/C
A50 × 43 × 39/C41 × 36 × 32



NT06572A/D
A60 × 48 × 30/D45 × 36 × 23



NT06573A/E
A60 × 54 × 8/E40 × 31 × 6



NT06574A/C
A58 × 51 × 39/C44 × 34 × 29



NT06575A/C
A56 × 42 × 8/C48 × 36 × 5



NT06576A/C
A57 × 48 × 20/C45 × 34 × 13



NT06577A/E
A62 × 58 × 10/E42 × 38 × 9



NT06578A/C
A56 × 41 × 44/C38 × 28 × 29



NT06579A/C
A57 × 45 × 39/C31 × 25 × 23



ADD: 8/F., 15TH QING NIAN ROAD(M), NANTONG 226006 CHINA
FAX: 0086-513-5511827 5527879   TEL: 0086-513-5519040
E-mail: cmec.nt@public.nt.js.cn

CONFIDENTIAL
MWM 001386

# Pet Cages, Bags Beds And Nests



NANTONG



**AMERICAN TYPE PET CAGES**
NT06131 (201) 19.50" × 11.50" × 14.25"
NT06132 (202) 25.00" × 17.25" × 20.00"
NT06133 (203) 30.00" × 22.00" × 24.25"



**JAPAN TYPE PET CAGES**
NT06134 (N101) 490 × 300 × 370
NT06135 (N102) 600 × 430 × 510
NT06136 (N103) 750 × 540 × 620



**PET CAGES** NT06137 400 × 260 × 300



**PET BAGS** NT06138 550 × 320 × 480



**PET BEDS** NT06139 3PCS/SET
540 × 420 × 230    490 × 380 × 210    430 × 340 × 180



**PET NESTS**
NT06140
3PCS/SET
450 × 380 × 450
400 × 340 × 400
340 × 310 × 340



CMEC NANTONG CO. 中设南通机械设备进出口公司
ADD:8/F., 15TH QING NIAN ROAD (M) NANTONG 226006 CHINA
FAX:0086-513-5511827, 5527879 TEL:0086-513-5519040

CONFIDENTIAL
MWM 001395

# Bamboo Cages



**NANTONG**



NT06026(S93-10 S/3)



NT06027(S93-13 S/2)



NT06028(S93-22 S/3)



NT06029(S93-23PC)



NT06030(S93-17PC)



NT06031(S93-20 S/3)



NT06032(S93-26 S/3)



NT06033(S93-27PC)



NT06034(S93-32 S/4)



NT06035(S93-33PC)



**NANTONG**

CMEC NANTONG CO. 中设南通机械设备进出口公司
ADD:8/F., 15TH QING NIAN ROAD (M) NANTONG 226006 CHINA
FAX:0086-513-5511827, 5527879  TEL:0086-513-5519040

CONFIDENTIAL
MWM 001405

# Bamboo Cages



**NANTONG**



NT06036(S93-35 S/4)



NT06037(S93-36 S/4)



NT06038(S93-37 S/4)



NT06039(S93-38 S/4)



NT06040(S93-39 S/4)



NT06041(S93-40 S/3)



NT06042(S93-41 S/4)



NT06043(S93-42PC)



NT06044(S93-43 S/3)



**NANTONG**

CMEC NANTONG CO. 中设南通机械设备进出口公司
ADD:8/F., 15TH QING NIAN ROAD (M) NANTONG 226006 CHINA
FAX:0086-513-5511827, 5527879  TEL:0086-513-5519040

FAX 0086 -513- 5500060      12      /1/16  J. E. JIANG

CONFIDENTIAL
MWM 001406

# Exhibit 2



$2.50

# J·B Wholesale Pet Supplies Inc.

**TOLL FREE from U.S. or Canada**

# (800) 526-0388

## Visit J-B on the Web!
## www.jbpet.com

You can e-mail us at jbpet@intac.com

# Special Purchases and Super Specials!
### see page 3

**Our New Shipping Policy!**
We're now charging for ACTUAL SHIPPING ONLY!

TOLL FREE FAX **(800) 788-5005**
Local calls (201) 405-1111   Local Fax (201) 405-1706
**Order hours: Weekdays 8:30 am to 10 pm, Saturdays 9:30-4:30, Sundays 11-4**
copyright © 2000 J-B Wholesale Pet Supplies, Inc.     **Catalog # 1804    Prices effective through September 15, 2000**

Crate Accessories, Sherpa



## Polar Pups Fan

A fan that hooks on crates and carriers for powerful air circulation. • Ultra quiet operation. • Two speeds. • Ideal for shows or on the road. • Uses two "D" batteries (not included) for up to 100 hours running time. • We've tested a number of fans for crates, and this is by far the best we've seen.
• 6" high, 5½" wide. 502-1000 .....**$24.95**



## General Cage Crate Dolly

A very sturdy roller base – indispensible for shows for many years.
• It is made of heavy, plated wire. • 15 lbs.
• 24" wide x 42" long, with 4" wire spacing.
• 600 lb. capacity. • The front wheels swivel.
• A rigid metal T handle keeps the dolly from rolling into you. Built to last. 164-1000 ....**$64.95**



### Card Holder

Sturdy metal card holder holds a 3"x 5" file card to note the animal's name, medication, etc.
• Mount on any crate or wire mesh kennel
door. 164-0117-3 ....................**$2.85**



## Precision Kennel Kart

A premium quality crate dolly, the strongest cart on the market, built for years of hard use.
• Tubular steel, chrome plated with a baked-on plastic coating.
• Wheel bearings make it easy-rolling.
• 42" x 24".
• Rope handle included; a rigid chrome plated handle is also available.
245-1001......................................**$79.95**
**Metal handle.** 245-1002 ................**$8.95**

## Original Sherpa Bag Deluxe

An excellent quality, well-made soft carrier for small dogs and cats that is *permitted by many airlines for carry-on use.* The designer has worked for airlines, and was frustrated when her dog couldn't travel with her in the cabin. She designed the Sherpa Bag and has gotten most of the major airlines to permit pets in the Sherpa bag – a list is included, along with well-researched travel tips.
• Made with durable quilted nylon fabric with mesh panels on 3 sides. • Comfortable handles. • Zippered pocket. • ID tags. • Removable absorbent liner. • Shoulder strap removes and works as a leash. • Front or top entry with U-shaped top zipper. • Fits under airplane seat. • Folds flat. • Black, green or navy. Specify color!
**Medium.** 10"x 17½"x 10½" high. For pets up to 16 lbs. 498-0100.............................**$59.95**
**Large.** 11" x 19¾" x 11½" high. For pets up to 22 lbs. 498-0100...............................**$64.95**
**Accessory Pouch.** Fits onto the handles, holds food, etc. 9½" x 7" x 2". 498-0100.....**$18.95**



## E-Z Fill Bottle

The first top-fill bottle with a standard ball-point drinking tube. A new plastic water bottle with an extra-wide cap that can be lifted to fill while staying on the cage. Easy to clean. Sturdy plastic brackets easily fasten to any wire fence, crate or crate door.
**17 oz.** 523-0179...................................**$8.95**

## Lixit

Premium quality super sanitary waterers that keep water clean, available, and off the floor.
• Mount on wire crate doors and fencing.
• They deliver more water, less dripping.
  • *Airline approved.* • 3 year warranty.
  **32 oz.** 418-0100-32 ...................**$6.95**
  **64 oz.** 418-0100-64 ................**$10.95**



## Sherpa On Wheels

For easy travel with small pets.
• The quality and features you expect from Sherpa, with recessed, removeable wheels for super convenience.

• Top and front zipper openings. • Roll-up flaps.
• Large zippered pocket. • Shoulder strap will double as a leash. • Black color, quilted fabric with brass hardware.
**Medium Sherpa on Wheels.** 18"x 11"x 10½" high. 498-0103-1 ....**$99.95**
**Large Sherpa on Wheels.** 20"x 11¾"x 11½" high. 498-0103-2....**$119.95**

## THE Sherpa Roll-Up

• Roll-up panels on the side windows give privacy and draft protection. • Reinforced handles and bottom. • Brass hardware. • Roomy zippered pocket. • Mesh panels on 3 sides.
• Adjustable shoulder strap (doubles as a leash).
• *Permitted by airlines for carry-on.*
• Available in black with black trim or classic black diamond pique with black trim. Specify color!
**Small.** 15"x 8"x 9" high. 498-0101.............**$69.95**
**Medium.** 10"x 17½"x 10½" h. 498-0101 ..............**$79.95**
**Large.** 11"x 19¾"x 11½". 498-0101...............................**$84.95**
**Accessory Pouch.** Fits onto the handles, holds food, etc. 9½" x 7" x 2". 498-0101........**$18.95**



## Crate Covers

Particularly well-designed covers for wire crates.
• Durable water and weather resistant coated 600 denier fabric with rubber bead coating.
• Windows on sides and back.
• Windows are screened.
• Front door and windows roll up or fasten down.

| Size | Item | Price |
|---|---|---|
| 24" x 18" x 21" | 649-0100-1 | **$36.95** |
| 30" x 21" x 24" | 649-0100-2 | **$41.95** |
| 36" x 24" x 28" | 649-0100-3 | **$49.95** |
| 42" x 28" x 32" | 649-0100-4 | **$54.95** |
| 48" x 30" x 35" | 649-0100-5 | **$63.95** |

# Exhibit 3

 by MIDWEST Homes for Pets

## Home Training Series

### Corner Drop-Pin Construction



Models 1024, 1036, 1042, 1048

## Home Training & Travel Series

### Folds Down & Sets Up in Seconds




Folds "Suitcase Style" for Easy Portability & Storage

Models 1224, 1236, 1242, 1248

- Designed to Attract Price Conscious Pet Owners
- Best Quality for the Price Available in the Marketplace
- Easy to Set Up, NO Tools Required
- Tough, Long-lasting, Easy to Clean, ABS Plastic Pan
- Safe & Secure Slide Bolt Latch(es)
- Durable Electro-Coat Finish

 Made in USA

See Reverse Side for Specifications



# Home Training Series

Corner Drop-Pin Construction
Black Electro-Coat Finish & Tough ABS Plastic Pan

   

### Model 1024

Size – 24 L x 20 W x 21 H"
61 L x 51 W x 53 H cm
Mesh – 1 1/2 " x 5 "
Material – 7 & 12 gauge wire
Weight – 16 lbs.
Packed – 1 per carton w/pan
Accessories – 37FN
Can Be Shipped UPS

### Model 1036

Size – 36 L x 23 W x 24 H"
91 L x 58 W x 61 H cm
Mesh – 1 1/2 " x 5 "
Material – 7 & 12 gauge wire
Weight – 24 lbs.
Packed – 1 per carton w/pan
Accessories – 36FN, 36DPN
Can Be Shipped UPS

### Model 1042

Size – 42 L x 26 W x 28 H"
107 L x 66 W x 71 H cm
Mesh – 1 1/2 " x 73/4 "
Material – 7 & 9 gauge wire
Weight – 34 lbs.
Packed – 1 per carton w/pan
Accessories – 86FN, 86DPN
Can Be Shipped UPS

### Model 1048

Size – 48 L x 30 W x 36 H"
122 L x 76 W x 91 H cm
Mesh – 1 1/2 " x 8 "
Material – 7 & 9 gauge wire
Weight – 47 lbs.
Packed – 1 per carton w/pan
Accessories – 89FN, 89DPN
Can Be Shipped UPS

# Home Training & Travel Series

Folds Down & Sets Up in Seconds
Black Electro-Coat Finish & Tough ABS Plastic Pan

**Black Plastic Carrying Handles Also Available
for Purchase Call 800 428-8560**

   

### Model 1224

Size – 24 L x 18 W x 21 H"
61 L x 46 W x 53 H cm
Mesh – 1 1/2 " x 6 "
Material – 7 & 11 gauge wire
Weight – 15 lbs.
Packed – 1 per carton w/pan
Accessories – 02 F
Can Be Shipped UPS

### Model 1236

Size – 36 L x 24 W x 28 H"
91 L x 61 W x 71 H cm
Mesh – 1 1/2 " x 8 "
Material – 7 & 11 gauge wire
Weight – 28 lbs.
Packed – 1 per carton w/pan
Accessories – 06 F, 06DP
Can Be Shipped UPS

### Model 1242

Size – 42 L x 28 W x 32 H"
107 L x 71 W x 81 H cm
Mesh – 1 1/2 " x 7 "
Material – 7 & 9 gauge wire
Weight – 41 lbs.
Packed – 1 per carton w/pan
Accessories – 08 F, 08DP
Can Be Shipped UPS

### Model 1248

Size – 48 L x 30 W x 35 H"
122 L x 76 W x 89 H cm
Mesh – 1 1/2 " x 71/2 "
Material – 7 & 9 gauge wire
Weight – 49 lbs.
Packed – 1 per carton w/pan
Accessories – 10F, 10DP
Can Be Shipped UPS

Made in USA
by MIDWEST Homes for Pets
P.O. Box 1031, Muncie, IN 47308

800 428 8560

www.midwesthomes4pets.com

PART # 5052   712

# Exhibit 4



**ISOMETRIC VIEW**

**(FRONT, SIDE, AND TOP PLANES)**



**FRONT PLANE**

|  | **REAR PLANE** |
|  | **TOP PLANE** |



**SIDE PLANE**

# Exhibit M

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

SIMPSON VENTURES, INC.,       )
                                  )
        Plaintiff/Counterdefendant,  )
                                  )   Civil Action File No. 306CV-901-WKW
       v.                           )
                                  )
MID-WEST METAL PRODUCTS     )
COMPANY, INC.                  )
                                  )
        Defendant/Counterclaimant.  )

**AFFIDAVIT OF TOM SWAN**

     Tom Swan, being first sworn upon his oath, states the following:

     1.)     I am over 18 years old, a resident of Indiana, and otherwise competent to testify to these matters set forth herein. The statements made herein are based upon my personal knowledge of the facts and observations.

     2.)     I am currently the Marketing Manager for MidWest Homes for Pets, which is a division of Mid-West Metal Products Company, Inc. ("Mid-West Metal"). At all relevant times prior, though, I was also responsible for new product development for that pet products division.

     3.)     I was a member of the Mid-West Metal New Product Development Team, starting sometime in the 1990s. The team would regularly discuss new product ideas and ways to improve the company's existing product line. I recall that sometime in the mid-1990s, Jim Wingate presented the team with the idea of weaving wicker onto the company's bare-wire pet cages, in order to improve the look of the cage. He said that he got the idea from a wicker woven bird cage that he had seen in an old movie he had just watched. The team liked the idea, and we talked about other common pet products that we had all seen or were aware of that used wicker – for example, wicker pet bed products similar to those shown in these two pictures:



1

3.) The idea of weaving wicker onto one of our wire cages was tabled at thte time for practical reasons. There were questions about using natural material, and there were significant cost concerns – specifically, the labor cost to manually weave the wicker onto a cage was cost prohibitive at the time. This cost concern, though, was eliminated later once we transitioned practically all of our pet cage production over to China in 2001 or 2002, and then had access to a very inexpensive labor market.

4.) The team continued its work, and developed a decorative pet cage later called the "Doggy's Dream House." A true and accurate copy of that product is attached hereto as Exhibit 1 – which is a flyer from one of Mid-West Metal's catalogs, published and issued to customers in October of 1999, when the product was first introduced to the marketplace. This flyer is a business record regularly made and kept in the ordinary course of the company's business activities and practices, and was made at or near the time of the issuance of the company's October 1999 catalog flyer.

5.) One of Mid-West Metal's competitors in the pet products industry is Doskocil. It is a common business practice for me and others at Mid-West Metal to research the competition and learn more about the pet products that they are offering. Doskocil has offered a line of products that include the following, as displayed on the website of the PetMobile website (www.petmobile.com):

 

I AFFIRM, UNDER THE PENALTIES FOR PERJURY, THAT THE FOREGOING REPRESENTATIONS ARE TRUE TO THE BEST OF MY KNOWLEDGE.

Dated: 7/28/08

Tom Swan

2

# Exhibit 1

# MIDWEST

## HOMES FOR PETS

*AMERICA'S LARGEST HOME BUILDER FOR PETS*



*Crate Training with Style*

A Playful, Practical Place for Doggy & Your Doggy's Stuff !

Patent Pending

### Model DDH24



- **Attractive, Durable, Interlocking ABS Plastic Components Coordinate with Any Decor**

- **Easy to Assemble Sets Up in Minutes** No Tools Required

- **Wire Mesh Provides Pet Proper Ventilation and Visibility**

- **Includes Nameplate and Lettering to Personalize Doggy's Dream House**

**Model DDH24**
36L x 29W x 29H "

**Crate Dimensions :**
24L x 20W x 21H "



**Hinged Roof Panels Provide Perfect Storage Spot and Easy Accessibility**

Made in USA

See Reverse Side for Product Specifications

 

## Crate Training with Style
### A Playful, Practical Place for Doggy & Your Doggy's Stuff !

## Model DDH24



### Model DDH24
*Weight : 37 lbs.*
*Crate : 11 lbs.*
*Plastic Components : 26 lbs.*
*Wire : 7 & 12 gauge black electo-coat*
*Mesh : 1.5 x 5 "*
*Plastic : ABS*
*Packed : 1 per carton in single carton*
**Can Be Shipped UPS**

**Overall Dimensions :**
*36L x 29W x 29H "*
**Crate Dimensions :**
*24L x 20W x 21H "*

**Made in USA**

PART # 5063 (99)



P.O. BOX 1031 MUNCIE, IN 47308

**800 428 8560 /www.midwesthomes4pets.com**

# Exhibit N

James W. Wingate, Jr.
April 16, 2008

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF ALABAMA
 2                        EASTERN DIVISION
 3
     SIMPSON VENTURES, INC.,              )
 4          Plaintiff,                    )
                                          )
 5              -vs-                       )
                                          )
 6   MID-WEST METAL PRODUCTS               )
     COMPANY, INC.,                        ) Civil Action File No.
 7          Defendant.                     ) 3:06-cv-00901-WKW-VPM
     ─────────────────────────────────────)
 8                                         )
     MID-WEST METAL PRODUCTS               ) Case No. 3:07-cv-
 9   COMPANY, INC.,                        ) 00048 WHA-CSC
            Counterclaimant,               )
10                                         )
                -vs-                        )
11                                         )
     SIMPSON VENTURES, INC.,               )
12          Counterdefendant.              )
13
14          DEPOSITION OF JAMES W. WINGATE, JR.
15      The deposition upon oral examination of
     JAMES W. WINGATE, JR., a witness produced and sworn
16   before me, Jenny L. Reeve, RPR, CSR No. 00-R-3006,
     a Notary Public in and for the County of Hamilton,
17   State of Indiana, taken on behalf of the Plaintiff
     and Counterdefendant, at the offices of Bingham
18   McHale, 2700 Market Tower, 10 West Market Street,
     Indianapolis, Marion County, Indiana, on the
19   16th day of April, 2008, at 10:10 a.m., pursuant to
     the Federal Rules of Civil Procedure, all
20   applicable rules, and all stipulations, if any,
     stated on the record, and pursuant to written
21   notice and/or agreement and/or subpoena as to time
     and place thereof.
22
23
     Connor + Associates, Inc.
24   1650 One American Square
     Indianapolis, IN 46282
25   (317) 236-6022
```

CONFIDENTIAL

James W. Wingate, Jr.
April 16, 2008

```
 1                    JAMES W. WINGATE, JR.,

 2   having been duly sworn to tell the truth, the whole

 3   truth, and nothing but the truth relating to said

 4   matter, was examined and testified as follows:

 5

 6   DIRECT EXAMINATION,

 7      QUESTIONS BY MR. ARTHUR A. GARDNER:

 8   Q   If you would, state your name for the record.

 9   A   James W. Wingate, Jr.

10   Q   And your address, please?

11   A   3401 West Gatewood Lane, Muncie, Indiana 47304.

12   Q   And what's your position with Mid-West Metals?

13   A   I'm vice president of new product development.

14   Q   Now, are you vice president of new product

15       department for Mid-West Homes for Pets -- or is it

16       pet homes?

17   A   Mid-West Homes for Pets.

18   Q   Do you have a position with Mid-West Metal Products,

19       per se?

20   A   No.

21   Q   How long have you been with Mid-West Homes for Pets?

22   A   Well, I'm not exactly sure when we created the

23       division, if you're asking me how long I've been

24       with Mid-West.

25   Q   Let's start with that.  When did you first join
```

Page 14

```
 1              (At this time, by agreement of counsel,
 2         the portion of the transcript designated as
 3         "confidential" is concluded.)
 4              MR. HINSHAW:  No confidentiality.
 5              MR. GARDNER:  I thought there was an
 6         interrogatory response at one point that indicated
 7         that this witness was not with the company any
 8         longer.  Maybe I'm not remembering it right.
 9              MR. HINSHAW:  Mr. Wingate?
10              MR. GARDNER:  Yes.  There was a time, I
11         thought, when earlier interrogatory responses
12         indicated that he was no longer with the company.
13              MR. HINSHAW:  That would surprise me.  I don't
14         recall ever having that belief.
15              MR. GARDNER:  Maybe I'm confused because I
16         didn't get any dinner last night.
17              MR. HINSHAW:  And the phones.  Your wake-up
18         call was messed up.
19              MR. GARDNER:  Right.  Well, we'll look at that.
20    BY MR. GARDNER:
21    Q    Regardless of that, you've been with the company and
22         have not retired or left the employment of the
23         company in the last few years, correct?
24    A    That's correct.
25    Q    Now, yesterday while you were present here, there
```

James W. Wingate, Jr.
April 16, 2008

Page 15

```
 1        was some testimony from Mr. Swan about your
 2        conception of a wicker product some years ago.
 3        Would you tell us how that came about.
 4   A    I had remembered seeing a movie, an old movie.  And
 5        in the movie was a wicker cage, a woven wicker bird
 6        cage.  And that stayed with me.
 7             And I brought it to a new products meeting,
 8        and brought it up and talked to the team about the
 9        possibility of doing a woven wicker product around
10        our cages.
11   Q    When was that?
12   A    That was approximately 1995.
13   Q    And who was present in the meeting?
14   A    I can't say for certain who each person was at that
15        time.
16   Q    Who was on the new products team at that time?
17   A    Tom Swan, Stew Kerr.  I can't remember for certain
18        if Dave Clemmons was or not.
19   Q    Did you make any notes from the meeting?
20   A    No.
21   Q    Did you create any document that would reflect your
22        conception of the wicker product?
23   A    No.  It was more of a brainstorming session, which
24        we did as part of our meetings, really.
25   Q    Did you do any patent searching at that time for
```

James W. Wingate, Jr.
April 16, 2008

Page 16

| 1  |   | that concept? |
|----|---|---------------|

1    that concept?

2   A  No.

3   Q  Did you describe or disclose the concept to anybody

4    outside the company at that time?

5   A  No.

6   Q  Did you create any sort of a prototype at that time?

7   A  No.

8   Q  You seemed to hesitate for that last answer.  Is

9    there some reason that you hesitated?

10  A  No.

11  Q  What was -- was there a reason that the company

12    didn't go forward with a product like that?

13  A  Well, it was just a concept.  And when we talked

14    about it, it was -- it was fairly evident that

15    everybody -- that we couldn't put actual wicker on

16    our cages because dogs would chew it and we'd get a

17    lot of returns, or they might urinate on the wicker

18    and it would be difficult to keep clean, and that

19    sort of thing.

20    So it was a concept that was something that we

21    all felt would look good, but that's about as far as

22    it went.

23  Q  Now, at the time did you have in mind that the

24    wicker would be natural wicker or would it be a

25    plastic wicker looking product?

CONFIDENTIAL

James W. Wingate, Jr.
April 16, 2008

Page 24

```
 1         we supplied most all of their crates; not all, but
 2         most.  And they were wire crates.  They're simple.
 3         We sold them a drop pin style and a folding cage
 4         style.  And they were looking for an upscale, sort
 5         of like the best of a good-better-best.  And they
 6         were interested in the wicker crates.
 7    Q    Did they approach you about you supplying them with
 8         wicker crates, or did you approach them?
 9    A    We approached them.
10    Q    Now, tell me the first time that you noticed the
11         Simpson Ventures product in the marketplace, even if
12         it may have been under a different brand.
13    A    In the fall of '02, approximately.
14    Q    Well, how did it come to be that you noticed their
15         product in the marketplace?  What happened?
16    A    I saw it in the Frontgate catalog.
17    Q    Is that a catalog you get at your home or were you
18         flying on an airplane, or just what?
19    A    Could have been either.  I don't remember exactly.
20    Q    What was your reaction when you saw the product in
21         the Frontgate catalog?
22    A    Well, I thought -- I thought it looked good, and it
23         reminded me of our previous efforts to try to use
24         wicker and make a more upscale product.
25    Q    How much longer -- well, did there come a time after
```

James W. Wingate, Jr.
April 16, 2008

Page 25

```
 1        seeing it in the catalog when you, yourself, placed
 2        an order for a Simpson Ventures wicker crate?
 3    A   I'm sorry?
 4    Q   I'll say it again.
 5            Did there come a time after seeing the Simpson
 6        Ventures wicker crate in the Frontgate catalog that
 7        you, yourself, placed an order for a Simpson
 8        Ventures wicker crate?
 9    A   Yes.
10    Q   How much time elapsed from the time you saw it in
11        the catalog until you placed the order?
12    A   I don't know.
13    Q   Was it a matter of days or weeks?
14    A   I'd say within a couple of weeks.
15    Q   What was your purpose in ordering the Simpson
16        Ventures wicker crate?
17    A   Well, it's something that we do, and I think it's
18        common in the industry.  We wanted to analyze it.
19        We wanted to see how it worked.  We wanted to see
20        how the parts fit together.  It was a folding crate,
21        and we have folding crates, and we wanted to see how
22        they did theirs.
23    Q   Had you had a meeting with your product development
24        team about the possibility of putting wicker on any
25        of your crates anytime immediately prior to
```

CONFIDENTIAL

James W. Wingate, Jr.
April 16, 2008

Page 30

```
 1        discussion, and in the sense that if I felt that
 2        it -- we got off track, or something like that, I'd
 3        redirect the conversation, that sort of thing.
 4    Q   Well, what was discussed at that meeting concerning
 5        the Simpson Ventures wicker crate?
 6    A   The mechanical aspects of it.  And ...
 7    Q   Was there any discussion of any of the design
 8        elements of that product?
 9    A   I'm not sure at -- at that time.  That was a meeting
10        where Yang, Y-A-N-G -- pronounced "young" -- let it
11        be known to us that he thought that one of our
12        manufacturers might be able to do the weaving on our
13        crates.
14    Q   So if I understand your testimony, Mr. Yang Yuan
15        made that comment either at that meeting or at a
16        subsequent meeting; is that right?
17    A   I believe so.
18    Q   Was there any discussion in that initial meeting
19        concerning the Simpson Ventures wicker crate of the
20        possibility of adopting wicker to your wire crates?
21    A   Yes.
22    Q   And who brought that idea up?
23    A   I can't remember.
24    Q   How was that idea received among the group?
25    A   From Yang's response?
```

James W. Wingate, Jr.
April 16, 2008

1   Q   Well, what was your response?  We'll start with

2       that.  What was your response to the idea of perhaps

3       putting wicker on the Mid-West wire crates?

4   A   Well, first of all, I -- I questioned whether it was

5       really possible.  But I asked him to check it out

6       and see if he could get more information.

7   Q   Why did you question whether it was really possible?

8   A   Because we were wire manufacturers, and this

9       involved more than just wire manufacturing.

10  Q   So if I understand your testimony, you had questions

11      about whether your company had the technical ability

12      to apply the wicker; is that correct?

13  A   That's correct.

14  Q   And further, that you instructed Mr. Yuan to

15      determine whether the Chinese company could do that

16      for you?

17  A   Yes.

18  Q   Were there any mechanical features of the Simpson

19      Ventures wicker crate that you observed that you

20      later adopted in any of your products?

21  A   I don't think we adopted any.

22  Q   Well, were there any mechanical features of the

23      Simpson Ventures wicker crate which inspired

24      Mid-West to make mechanical changes in its own

25      product line?

James W. Wingate, Jr.
April 16, 2008

Page 33

```
 1              MR. HINSHAW:  Asked and answered.

 2              I didn't mean -- I'm sorry, Mr. Wingate.  My

 3         objection is to the form of the question.  You can

 4         go ahead and answer his question.

 5              THE WITNESS:  I'm sorry.

 6    A    I thought I answered it before.

 7              Now I forget what the question was.  I'm sorry.

 8         I was waiting for you.

 9    BY MR. GARDNER:

10    Q    I understood your testimony this morning -- and

11         maybe I'm misunderstanding it.  But I thought that

12         you had told me that you had ordered the Simpson

13         Ventures wicker crate because you wanted to see

14         how it folded, or something to that effect.  Maybe I

15         don't have that quite right.

16    A    No.

17    Q    But then, when I asked you that question just a

18         moment ago to kind of confirm, you said that no,

19         that wasn't it.  So I followed up with, why did you

20         order it?

21    A    We wanted to see how it worked mechanically.

22    Q    And what aspect of how it worked mechanically were

23         you hoping to learn?

24    A    Well, how it goes together, how it folds, how the

25         doors work, the gauge of wire, things like that.
```

CONFIDENTIAL

James W. Wingate, Jr.
April 16, 2008

Page 34

```
 1   Q   Now, at the time you ordered it, did you know that
 2       it was a folding crate?
 3   A   Yes.
 4   Q   And how did you know that?
 5   A   I think the copy in the catalog specified that.
 6   Q   Well, after you had this meeting or at the
 7       conclusion of this initial meeting concerning the
 8       Simpson Ventures wicker crate, what was the -- what
 9       was decided to do with the -- with that concept or
10       with that wicker crate?
11   A   Well, that was the meeting where Yang had -- was
12       there and thought that one of our manufacturers
13       could do weaving on our crates.  So I asked him to
14       check it out.
15   Q   And did he check it out?
16   A   Yes.
17   Q   And what did he report back to you?
18   A   He said they could do it.
19   Q   And when did he tell you that?
20   A   I don't know.
21   Q   What was -- what action or decision did you take in
22       response to that information?
23   A   At that point, I believe I asked Yang to see if they
24       could make a sample.
25   Q   What information was provided to the Chinese
```

CONFIDENTIAL

James W. Wingate, Jr.
April 16, 2008

Page 35

```
 1        manufacturer for them to make such a sample?
 2   A    Oh, let me correct that.  Let me correct that.  That
 3        came after, because -- I'm sorry.  We had to -- they
 4        said they could do it.  This is the way it happened,
 5        I believe.  We had to do the design work first.  And
 6        that's where we went through the whole long process
 7        of figuring out what our weave pattern was going to
 8        be, and how it could actually work on our drop pin
 9        crate as opposed to what we'd seen with the Simpson
10        cage.
11   Q    So if I understand correctly, the first thing the
12        company did was check to see if the Chinese
13        manufacturer could make such a product at all.  And
14        then the Chinese manufacturer indicated that they
15        could, but before they would give you a quote or
16        make a sample, they wanted you to give them more of
17        a specific design that they wanted to have made; is
18        that correct?
19   A    No.  We wanted to do the design work.
20   Q    Well, maybe I wasn't clear.  Sometimes I get myself
21        turned around.
22            But the first thing that happened was, you
23        checked with the Chinese manufacturer to see if they
24        could do that kind of a project at all, right?
25   A    Right.
```

CONFIDENTIAL

James W. Wingate, Jr.
April 16, 2008

Page 36

```
 1   Q   And then they reported that they could, correct?

 2   A   Correct.

 3   Q   But before they would agree to make you a sample,

 4       they required a design from your company to which

 5       they were going to make a sample; is that right?

 6   A   No.  Technically, no.

 7   Q   How did that go?

 8   A   They didn't require us to do it.  It was, okay, they

 9       can do it.  Now, let's us go to work and make the

10       design.

11   Q   All right.  When did you get that information, that

12       the Chinese company could make the product for you,

13       in general?

14   A   Within approximately two weeks of that meeting.

15   Q   Now, I'm handing you what's been marked as

16       Exhibit 6, I believe.  And I'll represent to you

17       that this is -- appears to be some sort of UPS

18       tracking information.

19           If you would, looking at page 3 of Exhibit 6,

20       you'll see in the middle of the page, it looks like

21       there's shipping information for a package to go

22       from Frontgate to a James Wingate, Jr., at West

23       Gatewood Lane.  Is that your home address?

24   A   They've got it spelled incorrectly -- Gatewood --

25       but that's it.
```

CONFIDENTIAL

James W. Wingate, Jr.
April 16, 2008

Page 37

```
 1   Q   So there's a tracking number there that ends in 5363
 2       associated with that shipment.  And then on the
 3       first page of this exhibit, that -- it looks like
 4       that 5363 tracking number corresponds to it being
 5       delivered on October 2nd, 2002.
 6           Is that about the time period that you received
 7       this product from Frontgate?
 8   A   Yes.
 9   Q   So you think that the -- the meetings were sometime
10       in early October of 2002, perhaps?
11   A   Perhaps.
12   Q   Any reason to think it's a different time period?
13   A   No.
14   Q   Now, what happened to the Simpson Ventures wicker
15       crate that you ordered and received and then brought
16       into the office?
17   A   I don't know.
18   Q   Who had possession of it last?
19   A   That I don't know.
20   Q   Do you know whether it was perhaps sent to China for
21       Dalian to take a look at?
22   A   No.
23   Q   Is it possible that that's what happened to it?
24   A   It's possible.
25   Q   Now, are you aware that Mr. Swan ordered a second
```

Page 38

```
 1      one from Frontgate?

 2   A  Yes.

 3   Q  Why was that?

 4   A  I don't know.

 5   Q  Did you ever see two of them together?  I mean both

 6      of the Simpson Ventures wicker crates at Mid-West

 7      Metals at the same time.

 8   A  No.

 9   Q  Well, you indicated a little bit ago that after the

10      initial meeting, at some point Mid-West Homes for

11      Pets took it upon itself to design a wicker crate;

12      is that right?

13   A  Yes.

14   Q  Who -- who created that design?

15   A  That's a collaborative effort with most all the team

16      members.

17   Q  Well, who did what?

18   A  Well, we all did a little bit of everything.  Bob

19      Dale did -- gave examples for the weave pattern.

20      Stew and Dave Clemmons worked on the mechanicals

21      with -- it's a situation like, "We could do this,"

22      and someone else says, "We could do that," or, "Why

23      don't we do this to accommodate that."  So there

24      wasn't any assigned positions.

25   Q  Was one person responsible for preparing drawings of
```

Page 39

```
 1        the design?

 2    A   Yes.

 3    Q   And who was that?

 4    A   Dave Clemmons did it.

 5    Q   Well, what was Stew Kerr's involvement in this?

 6    A   Well, he's very good at the mechanics, making sure

 7        everything fits together correctly.  And if we would

 8        think we could do one thing, Stew might say, "You

 9        won't be able to do that."  You know, "The wires

10        will be too close together," or something like that.

11            (Deposition Exhibit Number 38-Wingate is

12        marked for identification.)

13    Q   Mr. Wingate, I've passed you what's been marked as

14        Exhibit 38.  Have you seen this before?

15    A   This exhibit?

16    Q   Yes.

17    A   No.

18    Q   Have you seen this email before that's shown on

19        page 1 of the exhibit?

20    A   I don't believe so.

21    Q   Well, does it appear that it's an email from

22        Mr. Stew Kerr to Mr. Yuan from November 20th, 2002?

23    A   Yes.

24    Q   And it appears that Mr. Kerr was sending Mr. Yuan a

25        picture of the Simpson Ventures wicker crate.
```

James W. Wingate, Jr.
April 16, 2008

Page 48

```
 1   Q   Well, do you see there where it says, "We will offer

 2       the crates to everyone in October"?

 3   A   Yes.

 4   Q   Did you tell Ms. Bartlett that on the telephone?

 5   A   I don't remember.

 6   Q   Did you, in fact, ultimately deliver an initial

 7       quantity of wicker crates to PetsMart sometime in

 8       the summer of that year?

 9   A   I believe it was the summer.

10   Q   And did you later introduce the wicker crates to the

11       market generally at a trade show in the fall of that

12       year?

13   A   I don't know if it was at a trade show.

14   Q   Was it -- was there another way you introduced the

15       Mid-West wicker crates to the market generally,

16       other than a trade show?

17   A   Yes.

18   Q   And how was that?

19   A   We basically send out information to our sales reps,

20       and they call on customers.

21   Q   What types of information do you send out to sales

22       reps?

23   A   Well, it would be product information.  It could be

24       photographs, the flyers.

25   Q   Do you send letters or memos to them as well?
```

James W. Wingate, Jr.
April 16, 2008

Page 55

```
 1   Q   Any other mechanical features?

 2   A   There may have been, but I can't remember.

 3   Q   What about on the aesthetic design side?  Any of the

 4       design features from the Simpson Ventures product

 5       provide inspiration for Mid-West in developing its

 6       design for its wicker pet litter cover?

 7   A   Not really, because we had the -- the pet crates,

 8       where we'd -- as far as the weave and the pattern

 9       and so forth, underway, that we thought we'd do

10       basically a very similar type weave pattern to get

11       that aesthetic look that we liked.  And, of course,

12       we wanted to be different.

13   Q   What did you -- what might you -- in what way did

14       you want to be different?

15   A   Well, always.  We wanted to be -- well, no. 1, make

16       ours look better.  And we liked the look of our pet

17       crates, so we tried to do similar things.

18           The -- if you'll remember on the pet crates

19       where we designed the windows where there was a

20       straight line going around, I believe on our

21       product, we have horizontal features of weaving, and

22       on the -- on the front.  And that's different than

23       theirs.  Things like that.

24   Q   Now, the windows that you just referred to, did

25       they carry over from the Mid-West wicker crate to
```

CONFIDENTIAL

Connor + Associates                                    (317)236-6022

James W. Wingate, Jr.
April 16, 2008

Page 56

```
 1        the Mid-West wicker pet litter cover?

 2   A    No.  I was just using that as an example.

 3   Q    So what happened after Mid-West got the Simpson

 4        Ventures sample pet litter cover?  What did you do

 5        next in the development of the Mid-West wicker pet

 6        litter cover?

 7   A    Well, as best I can recall, we had a collaborative

 8        meeting and talked about the ways that we could

 9        design it.

10   Q    How long did it take to go from no design to having

11        a finished design?

12   A    I really don't know.  But we had a head start on

13        this one.  It wasn't as difficult as the first one.

14   Q    In what way did you have a head start?

15   A    Well, as I mentioned before, the weave pattern.

16   Q    Did there come a time when Mid-West was attempting

17        to test or evaluate whether the wicker pet litter

18        cover product would sell well or not?

19   A    I don't believe so.

20   Q    First of all, look at Exhibit 22, if you would.  I'm

21        showing you what's been previously marked as

22        Exhibit 22.  It's an email from Mr. Swan and appears

23        to bear a notation that, "Jim estimated that about

24        6,000 units a year would be the initial sales volume

25        of the litter box cover."  Did you estimate that you
```

Page 60

```
 1        marking, correct?

 2    A   No, I don't know.

 3    Q   Is there anybody at Mid-West that would know the

 4        answer to either of those questions?

 5    A   I don't know.

 6    Q   Well, Mr. Wingate, I'll represent to you that the

 7        company, Mid-West, has taken the position in the

 8        lawsuit that those products were, in fact, not

 9        marked.  Can you direct me to anybody that would be

10        able to explain the factual basis for that position

11        by the company?

12    A   No.

13    Q   I want to talk now for a few minutes about some

14        letters that you may have received from Simpson

15        Ventures' former counsel about patents that Simpson

16        Ventures was pursuing.  And as we go forward, again,

17        I'm going to try to frame my questions so that it

18        does not actually call for you to reveal to me the

19        substance of anything that you told your lawyers or

20        what your lawyers told you.  And I would ask you to

21        try to refrain from answering in such a way as to

22        reveal information that you told your lawyers or

23        that your lawyers told you.

24            First of all, do you recall receiving a first

25        letter from Simpson Ventures' legal counsel back in
```

James W. Wingate, Jr.
April 16, 2008

| 1 | | 2003 asserting that Simpson Ventures had a patent |
| 2 | | application on file relating to their wicker crates? |
| 3 | A | Yes. |
| 4 | Q | And what did you do in response to the letter? |
| 5 | A | I asked Tom Swan to call Dan Boots, or to talk to |
| 6 | | Dan Boots. |
| 7 | Q | Do you know if Mr. Swan did talk to Mr. Boots? |
| 8 | A | Yes. |
| 9 | Q | Did the company do anything else in response to that |
| 10 | | letter? |
| 11 | A | At that time?  After?  What time period are you ... |
| 12 | Q | In late 2003. |
| 13 | A | Well, after the patent was issued, we once again met |
| 14 | | to discuss and compare our design with theirs.  And |
| 15 | | we all agreed that ours was substantially different. |
| 16 | | So the end result was, we continued to make the |
| 17 | | product. |
| 18 | Q | I'd like to focus on the period of time between when |
| 19 | | you got the first letter and prior to the first |
| 20 | | patent issuing. |
| 21 | | And my question is, did the company change its |
| 22 | | product during that time period in response to the |
| 23 | | letter? |
| 24 | A | No. |
| 25 | Q | Did the company send any sort of response by letter |

James W. Wingate, Jr.
April 16, 2008

Page 63

```
 1   Q   Now, earlier you testified that at some point, you
 2       got a copy of the patent, the one -- well, the
 3       patent for Simpson Ventures.
 4            Am I correct that in response to this second
 5       letter of November 19th, which is Exhibit 40, you
 6       took care to obtain a copy of the patent sometime
 7       after this letter?
 8   A   Yes.
 9   Q   And I say that -- I'm not trying to make this a
10       trick question.  But the letter, which is dated
11       November the 19th, is a little bit before the patent
12       issued, but informs you of the upcoming issue date
13       and patent number.  So it would appear that you knew
14       when the patent was going to issue and what the
15       number was going to be, and then obtained the patent
16       sometime after the issue date; is that right?
17   A   I believe so.
18   Q   Did you ever -- did anyone at Mid-West ever respond
19       to either one of these letters?
20   A   No.  As I stated before, we had discussions about
21       it, and we had checked again to make sure that our
22       product was substantially different.  Then we
23       decided to continue.
24   Q   Well, why didn't you tell Simpson Ventures that you
25       had looked at it and considered your product to be
```

James W. Wingate, Jr.
April 16, 2008

Page 92

 1        was ordered, when you may have met with the rest of

 2        your team concerning looking at the Simpson Ventures

 3        pet litter cover.

 4             MR. HINSHAW:  Objection to the form of the

 5        question.

 6   BY MR. GARDNER:

 7   Q    So with that kind of background, does this document

 8        help you to remember when you met with your product

 9        development team concerning the Simpson Ventures

10        wicker pet litter cover?

11   A    Well, no.  It may pin it down some, but I'm still

12        not exactly sure.

13   Q    Would it be accurate to say that it was probably

14        sometime in late October or sometime in November of

15        2003?

16   A    Yes.  Yes, it's possible in that time period.

17   Q    Mr. Wingate, how would you describe the Bay Isle

18        line of wicker products to a potential customer?

19   A    I would say -- well, first my preference would be to

20        have the product right there and show it to them.

21        And then I'd go through the features.

22   Q    Well, what -- if you were describing those features

23        to the potential customer, what features would you

24        point out?

25   A    Well, first I'd talk to them about the aesthetics of

CONFIDENTIAL

James W. Wingate, Jr.
April 16, 2008

```
 1          it with the weave pattern, and note how attractive
 2          that looks.  I would note that we designed notches
 3          in the side panels, top, and bottom to give it a
 4          look that's -- that we think is really nice.
 5              Talk to them about the rubber feet that are
 6          obscure, kind of go out of sight, but still are
 7          effective and not marring floors, and keeps it from
 8          skidding so it's kind of stable.  Not "kind of
 9          stable."  Stable.
10              I'd talk to them about the windows, as I
11          mentioned before, how we designed the windows to be
12          in line as you go from one side panel around the
13          back and the front.
14              Then there's details -- I mean I don't recall
15          exactly -- that we put around the windows, a
16          different sort of weave pattern that's unobtrusive,
17          but we think aesthetically pleasing.  And we left
18          the wire in the corners bare.  And I think with the
19          black E-coat that we chose, it's a nice contrast.
20          It's -- we think that's -- leaving those bare is a
21          nice contrast.  We could have made it different
22          finishes, different colors, like a gold zinc.  We
23          could have finished them in epoxy.  We could have
24          done a number of things.  But it's a nice contrast
25          to the color of the wicker.
```

CONFIDENTIAL

James W. Wingate, Jr.
April 16, 2008

```
 1              A drop pin cage for us is one of the most
 2       stable units we make, so I'd talk to the stability
 3       of the crate itself.  I'd talk to them about the
 4       type of material of the -- the wicker being some
 5       form of resin, so that if a dog would urinate on it,
 6       it could be disinfected and kept fresh.
 7              Talk about with wicker, the wicker, you can --
 8       the dog can still see out through the wicker.
 9       There's some ventilation and visibility in it, so
10       it's not solid.
11              And there's probably other features that I
12       can't quite remember now.
13   Q   Am I correct that many of the features that you just
14       described in some detail are not mentioned in your
15       advertising?
16              MR. HINSHAW:   Objection to form and foundation.
17              THE WITNESS:   Could you restate the question
18       for me?
19              (The reporter reads back as requested.)
20   A   Well, to get that many features in an advertisement,
21       it would probably be too much for the reader to
22       comprehend all at one time.
23   BY MR. GARDNER:
24   Q   So the answer is yes, I'm correct, not all of those
25       features are described in your advertising, right?
```



**CONNOR+ASSOCIATES**

1650 One American Square         Indianapolis, IN 46282
317+236+6022   800+554+3376   317+236+6015 (F)

RE: Indiana Rules of Procedure, Trial Rule 30 (E) and/or Federal Rules of Civil Procedure.

*PAGE _6_ LINE # _6_

CHANGE _I have a BS in Business Management, AND AN MA IN_
_Business Management_

TO _I have a BS in General Business Administration, AND AN MA in_
_Business Management_

REASON FOR CHANGE _____ _I mis-spoke_ _____


*PAGE _6_ LINE # _10_

CHANGE _I was in the Army for Two years, and then I joined Mid-West_

TO _I was in the Army for two years, then I went to Graduate School and_
_then I joined Midwest_

REASON FOR CHANGE ___ _I mis-spoke_ _____


*PAGE _51_ LINE # _20_

CHANGE _No_ _____

TO _I am not certain, but I don't think so._ _____

REASON FOR CHANGE _I mis-spoke_ _____


*PAGE_____ LINE #_____

CHANGE_____

TO_____

REASON FOR CHANGE _____


*PAGE_____ LINE #_____

CHANGE_____

TO_____

REASON FOR CHANGE _____


*PAGE_____ LINE #_____

CHANGE_____

TO_____

REASON FOR CHANGE _____


*PAGE_____ LINE #_____

CHANGE_____

TO_____

REASON FOR CHANGE _____


*PAGE_____ LINE #_____

CHANGE_____

TO_____

REASON FOR CHANGE _____


I am, therefore, signing my deposition conditioned on the fact that the above noted shall be entered upon the deposition by the notary public

_Anreu. Wingate Jr._
(Signature of Deponent)

# Exhibit O

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF ALABAMA
 2                       EASTERN DIVISION
 3
     SIMPSON VENTURES, INC.,            )
 4            Plaintiff,                )
                                        )
 5              -vs-                     )
                                        )
 6   MID-WEST METAL PRODUCTS            )
     COMPANY, INC.,                     ) Civil Action File No.
 7            Defendant.                ) 3:06-cv-00901-WKW-VPM
     _____     )
 8                                      )
     MID-WEST METAL PRODUCTS            ) Case No. 3:07-cv-
 9   COMPANY, INC.,                     ) 00048 WHA-CSC
              Counterclaimant,          )
10                                      )
                -vs-                     )
11                                      )
     SIMPSON VENTURES, INC.,            )
12            Counterdefendant.         )
13
                   DEPOSITION OF THOMAS SWAN
14
             The deposition upon oral examination of
15   THOMAS SWAN, a witness produced and sworn before
     me, Jenny L. Reeve, RPR, CSR No. 00-R-3006, a
16   Notary Public in and for the County of Hamilton,
     State of Indiana, taken on behalf of the Plaintiff
17   and Counterdefendant, at the offices of Bingham
     McHale, 2700 Market Tower, 10 West Market Street,
18   Indianapolis, Marion County, Indiana, on the
     15th day of April, 2008, at 9:09 a.m., pursuant to
19   the Federal Rules of Civil Procedure, all
     applicable rules, and all stipulations, if any,
20   stated on the record, and pursuant to written
     notice and/or agreement and/or subpoena as to time
21   and place thereof.
22
23
     Connor + Associates, Inc.
24   1650 One American Square
     Indianapolis, IN 46282
25   (317) 236-6022
```

CONFIDENTIAL

```
 1                        THOMAS SWAN,

 2    having been duly sworn to tell the truth, the whole

 3    truth, and nothing but the truth relating to said

 4    matter, was examined and testified as follows:

 5

 6    DIRECT EXAMINATION,

 7       QUESTIONS BY MR. ARTHUR A. GARDNER:

 8    Q   Would you state your name and address, please.

 9    A   It's Tom Swan, 1701 North County Road 600 West,

10        Yorktown, Indiana.

11    Q   Mr. Swan, my name is Art Gardner, and I represent

12        Simpson Ventures in this case.  And this is a

13        deposition that's going to be used actually in both

14        cases.

15            And it's important during the deposition that

16        we make a clear record.  So as we go forward -- I'm

17        hoping your attorney already explained this to you.

18        But as we go forward, if you'll wait until you --

19        let me finish my question and make sure that you

20        understand the question, pause for a second, give

21        time for your attorney to potentially object to my

22        question before you answer, I'll try not to ask

23        questions or interrupt you while you're giving an

24        answer.  And if you can try not to interrupt me when

25        I'm asking the questions, that would be helpful, and
```

Thomas Swan
April 15, 2008

Page 18

```
 1              What was your involvement in the development of

 2         the decorative pet residence that was ultimately

 3         brought to market by Mid-West Metal products?

 4              MR. HINSHAW:  Could I have the question read

 5         back, please.

 6              (The reporter reads back as requested.)

 7              MR. HINSHAW:  Just so we're clear, decorative

 8         pet residence might refer to a lot of things.

 9         You're referring to the --

10              MR. GARDNER:  Yeah.

11              MR. HINSHAW:  Okay.

12    BY MR. GARDNER:

13    Q    So that we have common nomenclature, are you

14         familiar with the Bay Isle line of decorative

15         pet residences that are -- that are marketed by

16         Mid-West?

17    A    Yes.

18    Q    Were you involved in the development of that

19         product?

20    A    Yes.

21    Q    Tell us about the beginning of your involvement in

22         that.

23    A    That project was able to move forward because of

24         relations, new relations in China.  And at that

25         point, I was responsible for coordinating the
```

Thomas Swan
April 15, 2008

Page 19

1     packaging, design of the product, have any promotion

2     and so on.

3  Q  When was your first involvement in the development

4     of the Bay Isle line of pet residences?

5  A  Before it became Bay Isle, the idea had been of --

6     of a wicker crate, a -- using facades on crates was

7     well before that.  But due to resources, price

8     constraints, it was an idea that couldn't move

9     forward at that time.

10  Q  Well, I'd ask you to pay careful attention to what

11     I'm asking.  I'm trying to find out when you became

12     involved, and not what the precursors were or what

13     the conditions were that led to the development

14     product, but simply when did you get involved.  Do

15     you know when that was?

16  A  I don't recall the date.

17  Q  Do you know where the product was in the development

18     cycle when you became involved?

19  A  From the very beginning.

20  Q  Well, I believe you testified a moment ago that you

21     were -- your involvement was primarily in the area

22     of packaging design and promotion; is that right?

23  A  I think I also said in design, meaning product

24     design.  I'm sorry.

25  Q  Oh, I missed that.  Well, when you got involved with

Thomas Swan
April 15, 2008

```
 1        selling that wasn't a drop pin style?
 2    A   What we would call a folding crate, which would fold
 3        in on itself, and a collapsable cage, which has all
 4        four panels connected and would fold flat, longways.
 5    Q   Like a box?  Like a cardboard box could collapse?
 6    A   If we're thinking of the same type of box, yes.
 7    Q   Yeah.  Tell me, how did it come to be that at one
 8        moment the company didn't have a wicker covered dog
 9        kennel, and then eventually did.  Tell me about how
10        that came about.
11    A   The circumstances presented themselves with the new
12        partnership in China.
13    Q   When was that?
14    A   I'm not exactly sure.  I was not involved in that.
15    Q   Well, to be clear, is it your testimony that you
16        weren't involved in establishing the relationship
17        with the Chinese manufacturer?
18    A   Yes.
19    Q   But you were involved in the product development,
20        correct?
21    A   Yes.
22    Q   Okay.  How did you -- how did you end up with this
23        particular design that's in the Bay Isle line?  Tell
24        me some more detail of how that happened.
25    A   We evaluated our crates to see which we felt would
```

CONFIDENTIAL

Page 22

```
 1        be a -- the best to use in a woven crate.
 2    Q   And what did you determine?
 3    A   To use the drop pin style.
 4    Q   Now, when you evaluated the existing crates being
 5        sold by Mid-West Metal, did you or anybody else on
 6        the team also consider other designs that were out
 7        in the marketplace?
 8    A   No.  As far as a style of crate, no.
 9    Q   Well, did there come a time when anybody on the team
10        evaluated the product offerings of Simpson Ventures?
11    A   Yes.
12    Q   Tell me about that.
13    A   We looked to see how it was -- what the assembly
14        was.
15    Q   When you say "we," who did that?
16    A   I'm not for certain.
17    Q   Did you yourself look at one of the Simpson Ventures
18        crates?
19    A   Yes.
20    Q   How did that company about?
21    A   In one of our new product meetings.
22    Q   What was said at that meeting?
23    A   I don't know.
24    Q   What I'm getting at is, did somebody order or
25        otherwise obtain one of the Simpson Ventures
```

Page 23

```
 1        products?
 2    A   Yes.
 3    Q   Who did that?
 4    A   Jim Wingate.
 5    Q   Anybody else?
 6    A   Not that I can remember.
 7    Q   What was your understanding of the reason behind
 8        ordering or otherwise obtaining the Simpson Ventures
 9        product?
10    A   To see the design of the folding aspect.
11    Q   When was that?
12    A   I don't know.
13    Q   Did you yourself actually see the product?
14    A   Yes.
15    Q   Who else saw it?
16    A   I can't be certain.
17    Q   Was it discussed at one of the development meetings?
18    A   Yes.
19    Q   Was the product physically present at one of the
20        development meetings?
21    A   I can't be certain.
22    Q   Did you remember seeing it in the building?
23    A   Yes.
24    Q   Where was it physically?
25    A   I'm not positive.
```

Thomas Swan
April 15, 2008

Page 29

```
 1    Q    Who all was involved in the development of the Bay
 2         Isle pet litter cover?
 3    A    The entire team.
 4    Q    What was the purpose of obtaining the Simpson
 5         Ventures pet litter cover?
 6    A    To see how it worked, to see the mechanics.
 7    Q    Is it your testimony that the only purpose for
 8         obtaining that was to see the mechanical aspects
 9         of it?
10    A    Yes.
11    Q    And no -- no design element of it?
12    A    No.  No, not -- yes, that's my testimony.  I'm
13         sorry.
14    Q    And is the same also true for the Bay Isle pet
15         residence, that the purpose for Mid-West obtaining
16         the Simpson Ventures product was purely to see the
17         mechanical aspects of the Simpson Ventures product?
18    A    Yes.
19    Q    Is the Bay Isle product mechanically similar to the
20         Simpson Ventures product, or is it more mechanically
21         similar to the preexisting Mid-West Metal Products
22         cages?
23              MR. HINSHAW:  Art, I hate to interrupt, but Bay
24         Isle product, your -- your comparison's ...
25              MR. GARDNER:  Let me rephrase that question.
```

CONFIDENTIAL

Thomas Swan
April 15, 2008

Page 30

```
 1       That's a good point, James, because it is -- we do
 2       want the record to be clear.
 3   BY MR. GARDNER:
 4   Q   Regarding the Bay Isle pet residence, is the Bay
 5       Isle pet residence product mechanically more similar
 6       to the preexisting Mid-West Metal Products pet
 7       residence, or is it more similar to the Simpson
 8       Ventures product that you saw?
 9   A   Similar to the Mid-West, or it is the Mid-West
10       crate.
11   Q   So mechanically, are there any differences between
12       the preexisting Mid-West Metal Products crate pet
13       residence and the Bay Isle pet residence or crate?
14   A   Yes.
15   Q   What are those differences?
16   A   Wires were moved in to accommodate for the wicker so
17       we could keep the gaps at the ends of the panels the
18       same.
19   Q   Anything else?
20   A   Not that I can recall.
21   Q   Were any of the mechanical features of the Simpson
22       Ventures pet residence adopted and used in the
23       Mid-West Metal Products Bay Isle pet residence?
24   A   None I'm aware of.
25   Q   Well, at the time you were developing the Mid-West
```

CONFIDENTIAL

Page 44

```
 1      to market?

 2   A  Yes.

 3   Q  Has there been any changes in that product since

 4      that time, or is it still pretty much the same?

 5   A  No, there hasn't been any changes in the product.

 6          (Deposition Exhibit Number 2-Swan is marked

 7      for identification.)

 8   Q  Pass you what's been marked for identification

 9      purposes as Exhibit 2.

10          What are we looking at here, Mr. Swan?

11   A  I can't be certain.  The name plate has been blacked

12      out.

13   Q  Well, with the exception of the name plate, does

14      it look like a Mid-West Metal Products Bay Isle pet

15      residence?

16   A  Yes.

17   Q  I believe you testified earlier that mechanically,

18      the only difference between these two, discounting

19      for a moment the wicker covering, is along the edges

20      or the seams or the positioning of the wire to allow

21      for the wicker; is that correct?

22   A  To the best I can remember, yes.

23   Q  Well, in looking at these, is there anything else

24      that you can now recall that's mechanically

25      different from one to the other?
```

Thomas Swan
April 15, 2008

| | | |
|---|---|---|
| 1 | A | The -- we did round the corners on the door, and |
| 2 | | used a different -- I believe a different style of |
| 3 | | pan stop. |
| 4 | Q | What is a pan stop? |
| 5 | A | Stops the pan from coming out of the cage. |
| 6 | Q | If you would, looking at the first page of |
| 7 | | Exhibit 2, would you agree with me that on the side |
| 8 | | panel, there's a -- there's two different or |
| 9 | | slightly different appearing weaves of the wicker? |
| 10 | A | There's a distinct weave pattern where it's a |
| 11 | | thicker weave in two square boxes. |
| 12 | Q | How did Mid-West Homes for Pets arrive at that |
| 13 | | particular pattern to be affixed on this product? |
| 14 | A | Better part of one of our new products meetings was |
| 15 | | devoted to the size, the width of the band, the |
| 16 | | location, the length, height.  We had Bob Dale come |
| 17 | | up with any other designs that he thought would look |
| 18 | | appealing, and he came back with a square design. |
| 19 | Q | When you say "square design," you're talking about |
| 20 | | the square patch of -- |
| 21 | A | Correct. |
| 22 | Q | -- of wicker weave which is different than the rest |
| 23 | | of the wicker weaver? |
| 24 | A | Yes. |
| 25 | Q | Is that what you mean? |

Page 46

```
 1    A    Yes.

 2    Q    And Mr. Dale came up with that concept?

 3    A    Yes.

 4    Q    Anybody else contribute to that?

 5    A    I can't be for certain.

 6    Q    And when was that idea originated?

 7    A    During the design phase of the Bay Isle collection.

 8    Q    And when was that?

 9    A    I'm not sure of the dates.

10    Q    Now, still looking at the first page of Exhibit 2,

11         who came up with the idea of leaving an opening or

12         window in the side panel?

13    A    In the front, or ...

14    Q    No.  I'm still referring to the side panel now.

15    A    I'm sorry.

16    Q    Which is mostly covered in wicker and has two square

17         patches of a different wicker pattern.  And then it

18         appears to have what I'll refer to as an opening or

19         window where there's no wicker.  Whose idea was it

20         to leave an opening or window like that?

21    A    I don't know specifically whose idea.

22    Q    Is that something that you contributed?

23    A    Possibly.  But I don't recall.

24    Q    Now, still looking at the side panel of Exhibit 2,

25         particularly on page 1 and thereof, am I correct
```

Thomas Swan
April 15, 2008

```
 1        that the outer peripheral wire or frame is largely
 2        wrapped in wicker?
 3             MR. HINSHAW:  Objection.  Form.  Foundation.
 4    BY MR. GARDNER:
 5    Q   But you can answer the question.
 6    A   The sides of the panel, the side wires, I would say
 7        are not wrapped.
 8    Q   Well, how would you characterize it?
 9    A   It's part of the weaving process.  It goes around
10        and weaves.
11    Q   Well, the side wires, as you referred to them --
12        is that the nomenclature you'd like to refer to the
13        peripheral wires, the side wires?
14    A   That would be fine.
15    Q   The side wires, as the wicker approaches that, is
16        the wicker kind of double-wrapped around, or just
17        wrapped around once?
18    A   I can't be certain.
19    Q   If the wicker were wrapped around once, would it
20        leave a little gap between the adjacent wicker
21        wrappings and leave a little --
22    A   I don't know.
23    Q   Still looking at the first page of Exhibit 1, and
24        now I'm going to direct your attention to what I'll
25        call the front panel, which shows -- which includes
```

CONFIDENTIAL

Page 48

```
 1        the door, who came up with the design for the front
 2        panel with the door on it?
 3   A    It was an existing design.
 4   Q    Well, mechanically, do you mean that mechanically
 5        the door was the same as an existing design?
 6   A    Correct.
 7   Q    What I was trying to get at is, who came up with the
 8        idea of putting a wicker covering on that portion
 9        of the front panel that surrounds the door, but not
10        putting wicker on the door itself?
11   A    As with the -- to take a step back, with the side
12        panels, it was -- we all contributed into where it
13        could go, where it should go.  I know that from
14        earlier discussions, back -- and I want to -- my
15        time frames, I think, are messed up, as far as like
16        1999, I mentioned -- I may -- if  I mentioned 1999
17        being the starting point of something.
18            The idea or notion of having a covering on a
19        crate started back in the mid '90s.  I don't know
20        exactly when we talked, like I mentioned, about
21        facades, wicker, anything that we thought could make
22        the crate more appealing to someone to put into
23        their home, incorporating a wood top to make it an
24        end table, legs.  And I know Jim had mentioned
25        wicker, noting a movie that he had seen.  We all
```

Thomas Swan
April 15, 2008

```
 1        thought about Toto being in a little box on the
 2        Wizard of Oz and contained in a wicker box there.
 3            But again, we couldn't do anything at that time
 4        because of that process being labor intensive.  We
 5        were able to make a product that we called the Doggy
 6        Dreamhouse where we did incorporate some soddy
 7        molding, some plastic molding, a top with a lift-up
 8        roof which was, I believe, available in 1999.  So
 9        that -- I wanted to get back to that just because
10        1999 was that date.
11            So these ideas kind of are a reincarnation or
12        a remembrance of, "Hey, we can do that now.  Where
13        would be the logical places to put it?"  The size
14        and location of the windows was very important to
15        us, and as far as the wicker on the front, it has to
16        be functional so that the door and latches operate.
17    Q   Now, you mentioned that Mr. Wingate commented to you
18        at some time about the use of wicker.
19    A   Yes.
20    Q   Let me take you back to 1999, when you transitioned
21        into this product development role.  At that time in
22        1999, were you aware that Mr. Wingate may have been
23        considering using wicker?
24    A   Again, the dates, I don't -- the date was probably
25        earlier.  That's what I'm saying.  The 1999 date was
```

CONFIDENTIAL

Page 50

```
 1        for the Doggy Dreamhouse.  So this was earlier in

 2        the '90s, mid '90s.  I don't know exactly.

 3   Q    I'm not trying to figure out when Mr. Wingate may

 4        have had the idea.  What I'm trying to figure out is

 5        when that idea may have been communicated to you.

 6   A    Okay.

 7   Q    So, you know, I don't know when he had it.

 8   A    Okay.  He communicated that idea to us in -- early

 9        in the -- or in the life of the new product team.

10        So we were able to throw ideas out and -- and, you

11        know, look at different things as a collective

12        group.

13   Q    Are you aware of any document that would corroborate

14        that?

15   A    I'm not aware.

16            MR. HINSHAW:  If we can go off the record.

17            (Discussion off the record.)

18            MR. HINSHAW:  Back on the record.

19   BY MR. GARDNER:

20   Q    Mr. Swan, this morning I believe you testified that

21        you believed that sometime around 1999, you started

22        working in new product development for the company;

23        and, if I understand your most recent answers here

24        this morning, that you may have the date not quite

25        correct, and it might have been earlier than 1999
```

Thomas Swan
April 15, 2008

Page 53

```
 1    A    Yes.
 2    Q    If you will, flip over, now, to the fourth page of
 3         Exhibit 2, which I believe is a rear view of the --
 4         or view of the rear panel of the Bay Isle pet
 5         residence; is that right?
 6    A    Appears to be, yes.
 7    Q    Who came up with the design for this opening?
 8    A    I don't know.
 9    Q    Why is the opening sized and shaped and positioned
10         in this manner?
11    A    The -- we wanted to keep the side windows to
12         continue that line around, if you want to see from
13         the -- the front window goes all the way around.  We
14         knew that we wanted to have a window for a function
15         for the dog, being that this is for the dog's
16         safety.  But we put -- positioned it there so that
17         it would be symmetrical, so the appearance held
18         through all the way around.
19    Q    Do I understand your testimony to be that the
20         position of the rear window is -- was affixed so
21         that it aligned vertically with the position of the
22         side windows?  They were all --
23    A    Yes.
24    Q    -- on the same height?
25    A    Yes.
```

CONFIDENTIAL

Thomas Swan
April 15, 2008

Page 54

```
 1              MR. HINSHAW:  Let him finish the question
 2         before you answer.
 3              THE WITNESS:  I'm sorry.
 4    BY MR. GARDNER:
 5    Q    In your view as one of the people who came up with
 6         this design, is the provision of a window necessary
 7         for the dog?
 8    A    We felt it was.  And it helped with the design of
 9         the look.
10    Q    How did it help with the look?
11    A    Those -- or the horizontal lines of the side windows
12         carried through there.
13    Q    Now, looking at the first page of Exhibit 2, why is
14         the entire moveable door not covered in wicker?
15    A    I'm not sure of the reasoning at that time.
16    Q    Do you have an understanding of why it is today?
17    A    Not from what we -- no, not of -- no recollection of
18         what it would have been then.
19    Q    Is there any reason why you couldn't have covered
20         part of the door?
21    A    The latches would prevent part of that from being
22         covered, the name plate that we had started using
23         and felt it necessary to put on the cage.
24    Q    Well, aside from the latch portions or from the name
25         plate, am I correct that you -- one could cover
```

CONFIDENTIAL

Thomas Swan
April 15, 2008

Page 58

1   Q   Yes.

2   A   Except for the dog being able to see out, no.

3   Q   Now, if you would, look at the last page of

4       Exhibit 2, which I believe is page 5, although the

5       pages are not numbered.  And would you agree with me

6       that that's kind of a top view?

7           MR. HINSHAW:  I'm sorry.  We're looking at

8       Exhibit 2, last page?

9           MR. GARDNER:  Yes.  Please.

10  A   Yes.

11  BY MR. GARDNER:

12  Q   And that's sort of a top view in perspective of the

13      Mid-West Bay Isle product?

14  A   Yes.

15  Q   And it appears that there's a pattern of one style

16      of wicker on a major portion of that field on the

17      top, and then there's four patches of a different

18      pattern; is that correct?

19  A   The four squares?

20  Q   Yes.  Who came up with that look?

21  A   Same as on the side panel.  It was a collaborative

22      effort.  Bob Dale made his expert suggestions as a

23      graphic designer, and we went from there to see if

24      the width should be wider or the -- maybe rectangle,

25      square, and so on.

Page 59

1    Q   Now, these design choices, if you will, when were

2        these decisions made?

3    A   During the -- the design process of the product.

4    Q   Were any of these individual design choices made to

5        make the product appear different or similar to the

6        Simpson pet residence?

7    A   It -- we want ours to be distinctive, yes.

8    Q   Do I understand your testimony to be that you had

9        the Simpson product, the Simpson pet residence

10       product in mind, and with that in mind, came up with

11       some of these design elements that are shown in your

12       Bay Isle pet residence as shown in Exhibit 2, in

13       response to the Simpson Ventures product?

14   A   We were aware of their product and wanted to make

15       ours look as good as we could.

16           (Deposition Exhibit Number 3-Swan is marked

17       for identification.)

18           MR. GARDNER:  Mr. Hinshaw, I'll point out to

19       you that the last couple of pages of this exhibit

20       are on small size paper, copied front and back.  It

21       appears it was done that way to mimic the appearance

22       of some portion of the original literature.

23           MR. HINSHAW:  The literature or the packaging?

24       I'm not clear.

25           THE WITNESS:  That's this (indicating).

CONFIDENTIAL

Thomas Swan
April 15, 2008

Page 72

1    Mid-West was looking at the Simpson Ventures wicker

2    pet residence?

3  A  I'm not sure of the time frame, the timeline.

4        (Deposition Exhibit Number 6-Swan is marked

5    for identification.)

6  Q  I passed you what's been marked for identification

7    purposes as Exhibit 6, if you would look at the

8    third page thereof.

9        Would you agree with me that it looks like

10   Mr. Wingate ordered his copy of the Simpson Ventures

11   wicker pet residence at about the same time that you

12   did?

13  A  I don't see any dates to indicate that.

14        (Deposition Exhibit Number 7-Swan is marked

15   for identification.)

16  Q  We've passed you what's been marked as Exhibit 7,

17   which appears to be an order from Mr. Wingate to

18   obtain the Simpson Ventures wicker pet residence.

19   And it appears to bear a date of September 30th,

20   2002.

21        Does this refresh your recollection about when

22   Mid-West was looking at the Simpson Ventures wicker

23   pet residence?

24  A  Yes.

25  Q  So isn't it true that in the fall of 2002 or early

CONFIDENTIAL

Thomas Swan
April 15, 2008

Page 73

```
 1        winter of 2002, 2003, that Mid-West was evaluating
 2        the Simpson Ventures wicker pet residence?
 3             MR. HINSHAW:  Objection to the form.
 4    A    We had obtained it to look at the structure, yes.
 5
 6             (At this time, by agreement of counsel, the
 7        following portion of the transcript has been
 8        designated as "confidential.")
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Thomas Swan
April 15, 2008

Page 80

 1       name?

 2   A   No.

 3   Q   What's going on there in that passage?

 4   A   Best I can remember, we had different names that we

 5       were throwing around for the series.  One of them

 6       being Bayport Isle, another one being Bay Isle.

 7       Laurie indicated that she would -- preferred Bayport

 8       Isle.

 9   Q   Looking at the top of this page, do you see where it

10       says, "PetsMart's DC on or before June 25th."  What

11       does that mean?

12   A   I believe that's a continuation from the first page.

13   Q   What does the term "DC" mean to you?

14   A   Distribution center.

15   Q   So as of March 14th, 2003, was it correct that you

16       were -- the company was required to have a certain

17       quantity of these wicker products available to

18       PetsMart's distribution center by June 25th?

19   A   It appears so.

20           (Deposition Exhibit Number 11-Swan is marked

21       for identification.)

22   Q   We've passed you what's been marked as Exhibit 11.

23       Do you recognize this, Mr. Swan?

24   A   Yes.

25   Q   What is this?

Thomas Swan
April 15, 2008

Page 87

 1   Q   Had you seen it before that?

 2   A   I can't be certain.

 3   Q   Now, do you see the next paragraph where it says,

 4       "The wicker will be a plastic that is the same as

 5       the competitors material."  Which competitor is that

 6       referring to?

 7   A   I -- I would imagine Mr. Herzher's product.

 8   Q   So that would be the Simpson Ventures product,

 9       correct?

10   A   Yes.

11   Q   If you would, still referring to Exhibit 18, there's

12       a sentence there that says that, "The wire gages in

13       spacing are the same as the 1000 series."  Do you

14       see that?

15   A   Yes.

16   Q   In the final product, the Bay Isle 1800 series

17       wicker crate, did the wire spacing end up being the

18       same as the 1000 series product?

19   A   I can't be certain.  I do know that wires were --

20       end wires were moved in to accommodate the wicker to

21       leave the predetermined gap.

22   Q   Let me see if I've got this straight.  So if you

23       looked at a side panel, for example, on the wire

24       crate of Exhibit 1 -- in particular, let's look at

25       maybe the third page of Exhibit 1 -- there's a

Page 88

```
 1        number of vertical wires.
 2             If I understand your testimony correctly, when
 3        you turned this into a wicker crate, the 1800 series
 4        Bay Isle, most of these vertical wires stayed in
 5        their same position relative to one another.  The
 6        spacing was the same.  And the only ones that
 7        changed were the outside ones, correct?
 8   A    Right.  We talked about moving wires in.  So in
 9        Exhibit 2, the gaps here (indicating) are dictated
10        by those wires.  We had talked about bringing those
11        wires in.
12             We talked about making that hook shorter and
13        possibly changing it to a collapsable cage so we
14        could almost get rid of that gap.  But it was a
15        design, intentional design to keep it that way
16        because we liked how it looked.  Same with the ones
17        up top.
18             (Deposition Exhibit Number 19-Swan is marked
19        for identification.)
20   Q    We've passed to you what's been marked as
21        Exhibit 19.  Do you recognize this, Mr. Swan?
22   A    Yes.
23   Q    And what is this?
24   A    An email exchange that was forwarded to me about
25        carton production.
```

Thomas Swan
April 15, 2008

Page 89

```
 1   Q   Who is Luoping --
 2   A   Luoping.
 3   Q   -- from Liansheng?
 4   A   Best I know is that she was a graphic designer on --
 5       at the carton maker, those producing cartons.
 6           (Deposition Exhibit Number 20-Swan is marked
 7       for identification.)
 8   Q   We've passed you what's been marked as Exhibit 20.
 9       Do you recognize this?
10   A   Yes.
11   Q   Does this help you to recall when the products were
12       first shipped?
13   A   It appears that they were shipped from our
14       manufacturer on June 8th.
15   Q   What is -- do you see where it says, "The first mix
16       container of 1800 wicker crates shipped Dalian on
17       June 8th."  What is Dalian?
18   A   That's where our manufacturers are located.
19   Q   That's a city in China?
20   A   Dalian, yes.
21   Q   That's not actually the name of the manufacturer?
22   A   No.
23   Q   What is the name of the manufacturer?
24   A   I don't know.
25
```

Thomas Swan
April 15, 2008

```
 1   Q   What were the circumstances under which you for the
 2       first time saw the Simpson Ventures wicker crate?
 3   A   Jim Wingate brought it into a new products meeting.
 4   Q   And where was that meeting?
 5   A   Down at our Warehouse 2 facility.
 6   Q   Your warehouse?
 7   A   Warehouse 2.
 8   Q   Warehouse 2 facility?
 9   A   That's the name we call it.
10   Q   And where is that?
11   A   On Seymour Street.
12   Q   That's not the facility at Mount Pleasant Boulevard?
13   A   No.  I'm sorry.  I can't remember the address, but
14       no, that's not the Mount Pleasant.
15   Q   And --
16   A   Go ahead.  I'm sorry.
17   Q   So if I understand your testimony, Mr. Wingate
18       brought that Simpson Ventures wicker crate to your
19       Warehouse 2 facility for a product development
20       meeting, correct?
21   A   Correct.
22   Q   Do you recall who all was in the meeting?
23   A   No, not specifically.
24   Q   Was it one of your regular weekly meetings?
25   A   I can't be certain.
```

CONFIDENTIAL

Thomas Swan
April 15, 2008

Page 108

 1   Q   I believe you testified in the morning that you did
 2       have regular, typically weekly meetings; is that
 3       right?
 4   A   If schedules allowed.  There were times where Jim
 5       would be unavailable, you know, going to China
 6       with -- searching for the manufacturers.  That took
 7       a lot of his time.  If we had trade shows, whatever,
 8       we'd have to adjust.
 9   Q   Where were those meetings typically held?
10   A   At that location.
11   Q   At the Warehouse 2 facility?
12   A   (Witness nods head.)
13   Q   Is there like a meeting room where you would do
14       those?
15   A   Yes.
16   Q   Is it possible that the sales events product is
17       still somewhere in the Warehouse 2 facility?
18   A   No, it's not.
19   Q   Why do you say it's not possible?
20   A   Because we've searched high and low to make sure.
21       And that facility is not used as a warehouse any
22       longer, so -- and none of us work at that facility
23       anymore.
24   Q   Now, when you say you "searched high and low," is it
25       your testimony that the company has searched high

Thomas Swan
April 15, 2008

Page 111

1    developments.  And they'll write down what they did

2    today, and tomorrow they did something else, and

3    they make a little notation what they did that day.

4         And it's kind of a running diary that they use

5    to document their research efforts so that they

6    don't duplicate efforts that are wasted, and so that

7    if later they have something that's successful, they

8    can refer to that.  They might even have somebody

9    witness it.

10        It's kind of common among scientists and

11   engineers.  Other people use similar types of

12   diaries to keep track of their efforts over time.

13        So with that explanation, was there any kind

14   of a diary or running progress log of the product

15   development team --

16   A   No.

17   Q   -- that was generated?

18   A   No.

19   Q   So besides the emails and an occasional hand note,

20       what other documents might exist that would allow us

21       to track the progress of the product development

22       team over time?

23   A   I can't think of any.  Phone calls, or -- with,

24       again, Jim traveling and different schedules, phone

25       calls were used to keep each other up to date, or,

Page 112

```
 1        you know, request information, whatever it might be.
 2   Q    Well, for example, let's take the proposition that
 3        Mr. Wingate may have had an idea to use wicker on a
 4        wire crate.  What types of documents might exist
 5        that would corroborate that proposition?
 6   A    I don't know that there would be any.  They would
 7        just be other people remembering the conversation.
 8   Q    Well, let me be clear.  I'm not trying to figure out
 9        at this particular moment whether there, in fact,
10        are documents to support that proposition, but only
11        what types of documents might exist to support a
12        proposition like that; not necessarily that one, but
13        if there was a product development effort on or a
14        product development result that had been obtained by
15        the team, I'm trying to find out what kind of
16        documents might exist within the company that would
17        tend to show or reflect those developments or
18        efforts.
19   A    I don't think there would be any.  Ideas thrown
20        around wouldn't necessarily be noted.
21   Q    Help me to understand a little bit better your role
22        within the product development team, because if I
23        understood your testimony from this morning, you
24        were sort of a team leader within the group, but
25        also under the direction of Mr. Wingate.  Do I have
```

Thomas Swan
April 15, 2008

Page 113

1      that correct?

2   A   That's basically how it worked.

3   Q   So did the other people on the product development

4       team report to you on product development matters or

5       did they report to Mr. Wingate, or somebody else?

6   A   That would depend on the situation.  Most likely, to

7       the group at a meeting.

8   Q   Well, let's be specific about a couple of particular

9       projects.  On the Bay Isle wicker crate that was

10      being developed by Mid-West Pet Homes, who was in

11      charge of that product development effort?

12  A   I have a hard time saying that anyone was, you know,

13      in charge, more than Jim Wingate.  That was a

14      transitional time where we had production in China,

15      where before that, you know, it was all domestic.

16      We could handle things there, where now we have to

17      have someone relay something to China.

18          So it was a lot -- it was a different

19      procedure.  Around that time was when the -- you

20      know, it kind of changed a bit.

21  Q   Well, who had been in charge of those kinds of

22      projects before that?

23  A   I would probably be in -- again, not in charge.  But

24      I would direct focus on -- you know, with the plant

25      managers, the production.  And, you know, design and

Page 131

```
 1        and ask you if you recognize this.

 2   A    Yes.

 3   Q    What is Exhibit 36?

 4   A    It's our promotional flyer for our canine camper.

 5   Q    Is that what you referred to as a tent crate?

 6   A    Yes.

 7   Q    Returning your attention back to Exhibit 33 for the

 8        moment, towards the bottom of the page there's a

 9        notation that's circled.  And it says, "Dave" -- I

10        think it says, "Dave, 36, 42, 48."  What is that

11        notation about?

12   A    Looking at it today, I'm assuming that that would

13        be a note to me that Dave -- well, I don't know.  I

14        don't know exactly what that means.

15   Q    Does it say "Dave"?

16   A    Yes, it does say "Dave."

17   Q    Who's Dave?

18   A    I'm fairly certain it would be Dave Graham, not Dave

19        Clemmons.

20   Q    Why are you certain it's Graham and not Clemmons?

21   A    Because those are the type of notes that I would

22        write to ask his opinion on things.

23   Q    What does the rest of the note say after the number

24        48?

25   A    "36, 42, 48 sized samples of pet dreams, some casual
```

Page 132

```
 1           designs."
 2    Q    What are pet dreams?
 3    A    I believe those were tent crates.  Again, getting
 4          samples like we would normally do to look to see how
 5          those were done to improve.
 6              Also, to see how they've accommodated one cover
 7          for every manufacturer.
 8    Q    Well, if you would look to the second page of
 9          Exhibit 36, it appears that you, in fact, ended up
10          selling a 36, 42, and a nominal 48-inch tent crate.
11          So is that what you were referring to here?
12    A    No.  Totally different.
13    Q    Explain for me what you were meaning.
14    A    This it a tent crate.  This is about crate covers, a
15          wire crate cover.  Wire crates, a cover to a wire
16          crate.
17    Q    So it's a fabric cover to go back on a regular wire
18          crate like the type shown in Exhibit 1?
19    A    Yes.
20    Q    Okay.  All right.  Now, let's turn our attention to
21          Exhibit 34, and I'll ask you to identify what that
22          is, please.
23    A    Again, more notes from our meeting, meetings.
24    Q    In looking at the notation there about the tent
25          crate, it says, "Get Doskocil sample;" is that
```

Thomas Swan
April 15, 2008

Page 133

```
 1        correct?

 2   A    Correct.

 3   Q    So at that moment you didn't have a Doskocil sample,

 4        correct?

 5   A    Correct.

 6   Q    Were you going to be the one to go get the sample,

 7        or somebody else?

 8   A    Most likely would have been me.

 9   Q    Were you the one typically going out to get sample

10        products?

11   A    Typically, yes.  Again, looking to see how, you

12        know, they function; in this case, having a customer

13        tell us about a rounded top of a Doskocil tent

14        crate, and to see, you know, what they meant.  We

15        didn't know, so we wanted to see.

16            Obviously, we went to a reinforced flat top.

17        We wanted to make sure.  When people tell us about

18        something, we want to see what they're talking

19        about.

20   Q    Did you, in fact, go out and get a Doskocil sample?

21   A    Yes.

22   Q    Did you go get a Foster & Smith sample?

23   A    Yes.

24   Q    Did you get any other samples relating to tent

25        crates?
```

Thomas Swan
April 15, 2008

1   A   Yes.

2   Q   What were the other ones?

3   A   From General Cage.  And I don't recall any others.

4   Q   What's going on with the next notation, kind of the

5       largest notation here on this exhibit?  What's this

6       about?

7   A   I'm not exactly sure what that -- what I was noting

8       there.

9   Q   Can you discern anything from that notation, from

10      the words "4 crate covers" all the way down to

11      "4 feet deep" that in any way relates to wicker

12      crates?

13  A   No.  This would be -- I'm assuming "crate covers,

14      pegboard," looking at that, may be a way to display

15      them.  The stuff to the far right maybe being a

16      possible layout, but I'm not totally sure.

17  Q   What's the last notation on the bottom that says

18      "18-inch" and then some words?

19  A   "Gold ex-pen."

20  Q   Is that an exercise pen?

21  A   Yes.

22  Q   Let's look at Exhibit No. 35, please, Mr. Swan.

23      First of all, do you believe that these are your

24      notes?

25  A   I know they are.

Page 156

```
 1         I can remember.
 2    Q    What materials did you look at, documents in
 3         particular, before coming here for your deposition
 4         today?
 5    A    These, you know, notes that I've hand wrote, just to
 6         make sure I was familiar with them.  Some emails.  I
 7         believe that's all.
 8    Q    Now, are you aware that the company, Mid-West, has
 9         produced a fair amount of documents as document
10         production to us in this case?
11    A    (Witness nods head.)
12    Q    Did you look at all of those papers before you --
13    A    I saw them.  I didn't read them all.
14              MR. GARDNER:  I have no further questions of
15         the witness at this time.
16              MR. HINSHAW:  Give us just one second to see if
17         we have any redirect -- or cross, but I doubt it.
18              (A recess is taken, after which, the
19         proceedings resume as follows:)
20
21    CROSS-EXAMINATION,
22         QUESTIONS BY MR. JAMES M. HINSHAW:
23    Q    Mr. Swan, do you have a memory of when the company
24         introduced a product into the marketplace that was
25         known as the Doggy Dreamhouse?
```

Thomas Swan
April 15, 2008

```
 1   A   Yes.
 2   Q   And what was the date of that introduction of the
 3       project into the marketplace?
 4   A   I believe it was in October of '99.
 5   Q   Prior to the introduction of that product into the
 6       marketplace, do you recall the new product
 7       development team having discussions about the use of
 8       wicker with a dog crate?
 9   A   Yes.
10   Q   And what is your memory of what those discussions
11       were?
12   A   During meetings, we would throw out ideas.  You
13       know, like I mentioned a table top for a crate, and
14       trying to make it more homey, more fit into a home.
15           Jim threw out the idea of a wicker -- using
16       wicker.  He had remembered a movie where he'd
17       seen -- I believe he said he'd seen a wicker bird
18       cage.  We -- everybody, you know, chimed in, "Oh,"
19       you know.  The wicker dog beds came up.  The
20       Dorothy -- or Toto's containment in the Wizard of
21       Oz, and ideas of that nature would be brought up in
22       different meetings of, you know, "Hey, could we do
23       that?  You mentioned it.  What could we do?"
24   Q   Did those -- I think you said this, but did those
25       discussions occur in only one meeting, or was it
```

CONFIDENTIAL

Thomas Swan
April 15, 2008

Page 158

```
 1        across more than one meeting?

 2    A   It was more than one meeting.

 3    Q   Can you estimate the number of meetings that that --

 4        those discussions occurred.

 5    A   I -- four or five meetings.  I'm not positive.

 6    Q   And those four or five meetings, did they occur

 7        prior to the company's development of the Doggy

 8        Dreamhouse?

 9    A   Yes.

10    Q   The company -- as you said, the company introduced

11        Doggy Dreamhouse in October of 1999, correct?

12    A   Yes.

13    Q   After that, but before the product development team

14        meeting where Jim Wingate showed you guys the

15        Simpson Ventures product that he had ordered, okay,

16        were there any discussions in that time period about

17        using wicker or creating a wicker appearance on dog

18        crates?

19    A   Yes.  We had the Doggy Dreamhouse, which I think I

20        explained was a -- had molded corners, molded

21        bottom, and a frame top that opened up made of

22        plastic.  And it looked good, functioned well, but

23        the price was too expensive for the market.

24            And we thought about ways, again, "How can we

25        make a crate more appealing?" which at that time was
```

Page 159

```
 1        kind of our battle, with people not thinking it was
 2        a cage for their dog, that it be a crate, something
 3        that they wanted to bring into their home.
 4              And we knew that -- that using wicker or having
 5        something woven around the wire would be too
 6        expensive to have made in the United States.  We
 7        were throwing out ideas, again, of what we could do.
 8              And we thought about having a plastic facade,
 9        if you will, that would snap onto a crate to make it
10        look -- give the appearance of what the Doggy
11        Dreamhouse was giving.
12              And then that grew into, "Hey, we could have
13        one for different regions of the country.  We could
14        do a Georgian style, you know, New England Cape Cod
15        style.  We could do something for the different
16        areas of the country.  We could do a tropical feel
17        with a look of a bamboo, and a woven wicker material
18        that would just be that look.  It would not be
19        actually -- it would just be something that would
20        somehow work into the cage.
21              MR. HINSHAW:  Thank you.  No further questions.
22              MR. GARDNER:  I have some follow-ups to that.
23
24
25
```

Page 160

```
 1   REDIRECT EXAMINATION,

 2        QUESTIONS BY MR. ARTHUR A. GARDNER:

 3   Q   First, let's talk about the several meetings in

 4       which, you know, apparently there was a discussion

 5       of using wicker on a dog crate prior to 1999.

 6            I believe you testified that that occurred over

 7       several meetings?

 8   A   Yes.

 9   Q   Do you have any documents that would corroborate

10       that story?

11   A   No, I don't.

12   Q   Does the company have any documents that would

13       corroborate that story?

14   A   Not that I'm aware of.  We weren't taking -- again,

15       we did not take minute-type notes.  And ideas thrown

16       out were not always noted.

17   Q   Now, regarding the post-1999 snap-on plastic facade

18       concept, do you have any documents that relate to

19       that concept?

20   A   Again, being that it was ideas being thrown out, I

21       don't know that that would have been something

22       noted.  And I -- again, preparing for this, turning

23       over any notes, I did not find anything that

24       would -- that addressed that at all.

25   Q   Does the company have any documents?
```

CONFIDENTIAL

# CONNOR+ASSOCIATES

1650 One American Square         Indianapolis, IN 46282
317+236+8022   800+554+3376   317+236+8015 (F)

RE: Indiana Rules of Procedure, Trial Rule 30 (E) and/or Federal Rules of Civil Procedure.

•PAGE __9__ LINE # __13__
CHANGE __"1997"__
TO __"1994"__
REASON FOR CHANGE __MISSPOKE__

•PAGE __11__ LINE # __1__
CHANGE __"1999"__
TO __"1997"__
REASON FOR CHANGE __MISSPOKE__

•PAGE __49__ LINE # __6__
CHANGE __"SODDY"__
TO __"SIDE"__
REASON FOR CHANGE __MISTRANSCRIPTION__

•PAGE __132__ LINE # __3__
CHANGE __"TENT CRATES"__
TO __"CRATE COVERS"__
REASON FOR CHANGE __I WAS CONFUSED & MISSPOKE__

•PAGE __150__ LINE # __18__
CHANGE __"NO."__
TO __"NO, NOT AT THAT TIME. BOB DALE WAS NOT EMPLOYED AT MID-WEST MY THEN."__
REASON FOR CHANGE __CLARIFICATION__

•PAGE __151__ LINE # __3__
CHANGE __"NO."__
TO __"NO, NOT AT THAT TIME. BOB DALE WAS NOT EMPLOYED AT MID-WEST THEN."__
REASON FOR CHANGE __CLARIFICATION__

•PAGE __52__ LINE # __15__
CHANGE __"CORRECT."__
TO __"CORRECT, THAT IS ONE REASON."__
REASON FOR CHANGE __CLARIFICATION__

•PAGE __52__ LINE # __22__
CHANGE __"YES."__
TO __"YES, THAT IS ONE REASON."__
REASON FOR CHANGE __CLARIFICATION__

I am, therefore, signing my deposition conditioned on the fact that the above noted shall be entered upon the deposition by the notary public

_(Signature of Deponent)_

# Exhibit P

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF ALABAMA
 2                    EASTERN DIVISION
 3
    SIMPSON VENTURES, INC.,         )
 4          Plaintiff,              )
                                    )
 5              -vs-                )
                                    )
 6   MID-WEST METAL PRODUCTS        )
    COMPANY, INC.,                  ) Civil Action File No.
 7          Defendant.              ) 3:06-cv-00901-WKW-VPM
    _____     )
 8                                  )
    MID-WEST METAL PRODUCTS         ) Case No. 3:07-cv-
 9   COMPANY, INC.,                 ) 00048 WHA-CSC
           Counterclaimant,         )
10                                  )
                -vs-                )
11                                  )
    SIMPSON VENTURES, INC.,         )
12          Counterdefendant.       )
13
                DEPOSITION OF DAVID CLEMMONS
14
        The deposition upon oral examination of
15   DAVID CLEMMONS, a witness produced and sworn before
    me, Jenny L. Reeve, RPR, CSR No. 00-R-3006, a
16   Notary Public in and for the County of Hamilton,
    State of Indiana, taken on behalf of the Plaintiff
17   and Counterdefendant, at the offices of Bingham
    McHale, 2700 Market Tower, 10 West Market Street,
18   Indianapolis, Marion County, Indiana, on the
    17th day of April, 2008, at 9:59 a.m., pursuant to
19   the Federal Rules of Civil Procedure, all
    applicable rules, and all stipulations, if any,
20   stated on the record, and pursuant to written
    notice and/or agreement and/or subpoena as to time
21   and place thereof.
22
23
    Connor + Associates, Inc.
24   1650 One American Square
    Indianapolis, IN 46282
25   (317) 236-6022
```

Page 5

```
 1                    DAVID CLEMMONS,

 2   having been duly sworn to tell the truth, the whole

 3   truth, and nothing but the truth relating to said

 4   matter, was examined and testified as follows:

 5

 6   DIRECT EXAMINATION,

 7      QUESTIONS BY MR. ARTHUR A. GARDNER:

 8   Q   Would you state your name and address for the

 9       record, please.

10   A   David Clemmons, 4916 South Arlington, Dunkirk,

11       Indiana.

12   Q   Where are you employed, Mr. Clemmons?

13   A   Mid-West Metal.

14   Q   When did you go to work for Mid-West Metal Products?

15   A   December 11th, 1995.

16   Q   What did you do before that?

17   A   I worked at Lift-A-Loft.

18   Q   How long were you with Lift-A-Loft?

19   A   Three years.

20   Q   What did you do at Lift-A-Loft?

21   A   Designed a scissor list and work platforms.

22   Q   So you were a designer for Lift-A-Loft?

23   A   Primarily, yes.

24   Q   How about before that?

25   A   Compugraph Engineering.
```

David Clemmons
April 17, 2008

Page 6

```
 1   Q   What years were you with Compugraph Engineering?
 2   A   Go a year before that, so -- right out of school, so
 3       it would have been '91.  I was only there a year and
 4       went to Lift-A-Loft.
 5   Q   What kind of educational background do you have?
 6   A   Two years associate's degree in drafting, CAD
 7       technology.
 8   Q   I'm going to just go over some ground rules about
 9       how depositions work.  I take it you haven't been
10       deposed before?
11   A   No.
12   Q   I'll be asking you questions, and you've got lawyers
13       here representing you.  I speak somewhat slowly.  If
14       you'll wait until I finish the question before you
15       begin your answer, that will allow the court
16       reporter to make a clear record.  At the same time
17       I'll try to make sure I wait until you finish your
18       answer before I move on to another question.
19           Also, before you give your answer, you may want
20       to pause for a second to allow your attorneys an
21       opportunity to interject an objection, which they
22       may do from time to time.
23           It's important that you understand the question
24       before you answer.  Sometimes people think they know
25       what I'm going to ask and will start to answer that,
```

David Clemmons
April 17, 2008

Page 7

```
 1        but it is important for you and for us both that you

 2        understand the question before you answer it.

 3             Also, when you give your answers, the court

 4        reporter has a hard time making a clean record if

 5        you say "uh-huh" or "huh-uh."  You have to give

 6        verbal responses, because nods and other nonverbal

 7        responses are difficult for the court reporter to

 8        make a record from.

 9             So you got a two-year associate's degree in

10        1991; is that right?

11   A    Yes.

12   Q    Now, when you joined Mid-West Metal Products in

13        1995, what was your job title?

14   A    I don't recall a job title being given.

15   Q    Well, what kind of work were you doing initially?

16   A    Design, layout work.

17   Q    What kinds of things were you designing?

18   A    Anything on the pet side and anything on the

19        industrial side that needed done.

20   Q    So you were doing product design; is that right?

21   A    Yes.

22   Q    What do you mean by when you say "layout"?  What

23        does that refer to?

24   A    Layout work to make sure things don't interfere when

25        certain things are being applied to other things, so
```

David Clemmons
April 17, 2008

Page 8

```
 1        there's not an interference fit.
 2   Q    When you began -- joined the firm in 1995, who was
 3        your immediate supervisor at that time?
 4   A    Keith Smith.
 5   Q    Smith?
 6   A    Keith Smith.
 7   Q    Is he still with the company?
 8   A    No.
 9   Q    Who was your next supervisor or boss?
10   A    After Keith?
11   Q    Yes, please.
12   A    I think Ron Smithson took over at that point.
13        There's a little bit of time in between before Ron
14        took over, but ...
15   Q    And after Mr. Smithson, who was your next boss or
16        supervisor?
17   A    When that happened, it went from Ron to -- I was
18        over the CAD room and documentation area.  And my
19        immediate supervisor -- I'm going to say it would
20        have been, I guess, Jim Wingate at the time.
21            Well, I take that back.  It wouldn't have been
22        Jim at that time.  It would have been Larry Gross.
23        They were going through restructuring at that point.
24   Q    What time frame was that?
25   A    I don't recall.
```

David Clemmons
April 17, 2008

Page 9

1    Q    What kind of restructuring?

2    A    They were going through -- different people were

3         going to be over different areas at that point.  So

4         Larry was the head of things at that time.  And

5         sometime in there, the pet and industrial sites got

6         more separated with the fact that the industrial

7         side had people dedicated to work on their stuff,

8         and the pet side had people dedicated to work on

9         their stuff.  And at that point my direct supervisor

10        would have been Jim.

11   Q    Now, as part of your product design work, are you

12        responsible for making drawings or design plans of

13        the products that Mid-West Homes for Pets makes?

14   A    Yes.

15   Q    Tell me about the procedure for developing those

16        plans or drawings.  How do they come about?

17   A    It all depended if it's a new product or an

18        existing.  Existing products, we'll go back and make

19        revisions or make a totally new set of prints for

20        any line or anything we have along those lines.

21            New product, we'll develop, go through our

22        trials and errors, go through approval processes,

23        yeas or nays on whether it's liked or disliked.

24   Q    If you're developing a totally new product, would it

25        be typical to make a prototype first and then make

David Clemmons
April 17, 2008

```
 1         drawings perhaps from the prototype, or would you
 2         make drawings and then make the prototype?  What's
 3         been your experience?
 4    A    With my experience at Mid-West, it's worked both
 5         ways.  We've either used a physical prototype that
 6         we've developed and made prints off of it, went back
 7         and revised, or we made what we call "stick figure"
 8         prints on CAD, which could be similar to using paper
 9         and pen, paper and pencil to sketch them out, make
10         them off there, prove out what we're thinking, and
11         then print up final documentation.
12    Q    What do you mean when you say "stick figure" in CAD?
13    A    Conceptual.  Whether it be on paper, whether it's on
14         a CAD, or computer-aided drafting system.
15    Q    And you make a distinction between that and a
16         regular full-blown CAD drawing in what way?
17    A    There's no title blocks.  There's -- it's all
18         concept.  It's all prototype.  It wouldn't be a full
19         set of documented prints that -- you know, "This is
20         our final result."
21    Q    Now, since you've been with the company, have you
22         always done your work, your drawing work on the
23         computer, or was there a time when you did it with
24         pen and ink?
25    A    It's all -- the final documentation has always been
```

David Clemmons
April 17, 2008

```
 1        computer-generated.

 2   Q    Do you do some drawings with pen and ink or --

 3   A    Sketches.

 4   Q    -- pencil and paper?

 5            Do you still do that?

 6   A    From time to time.

 7   Q    Do you know whether, in connection with the wicker

 8        crates that Mid-West developed, whether you did any

 9        drawings or sketches on -- with paper and pencil?

10   A    No.

11   Q    You don't know, or you didn't do any?

12   A    No, we didn't do any.

13   Q    Did you make any hand sketches like that with paper

14        and pencil or pen and ink in connection with the

15        wicker pet litter cover?

16   A    No.

17   Q    Have you been involved in some sort of a product

18        development team since you've been employed with

19        Mid-West?

20   A    Not from the start of being employed with Mid-West.

21        But yes, I am involved in a new products committee.

22   Q    Is it referred to as a "new products committee"?

23   A    Yes.

24   Q    How often does the committee meet?

25   A    Usually once a week, sometimes more, sometimes less,
```

David Clemmons
April 17, 2008

Page 18

```
 1         existing or new products.
 2    Q    Let's talk a little bit about the development of the
 3         wicker crate product, the series 1800 Bay Isle
 4         collection.  What was your first involvement with
 5         that?
 6    A    The very first earliest involvement was pre-China
 7         production, when we had talked about new type cages
 8         that would look like furniture.
 9    Q    When you say "pre-China development," do you mean
10         you had some internal discussions before you began
11         production in China?
12    A    Yes.
13    Q    What was the first such discussion?
14    A    To come up with new inventive designs for pet type
15         homes, crates, to be more furniture like, more
16         appealing to a consumer.
17    Q    So do you recall specifically a first meeting about
18         that?
19    A    Yes.
20    Q    And who was at that meeting?
21    A    Jim, Jim Wingate, Tom Swan, Stew Kerr.  I don't
22         remember if Bob Dale, or not, was there.  Myself,
23         Terry Jones.
24    Q    What was discussed at the meeting?
25    A    Exactly what I just described to you, furniture type
```

David Clemmons
April 17, 2008

Page 19

```
 1        crates, this type of thing, for a better-looking,
 2        more appealing-that-would-fit-inside-of-a-home type
 3        crate.
 4   Q    When was the meeting?
 5   A    Specific dates?
 6   Q    If you can give it.
 7   A    I don't know.  I would say around '97.
 8   Q    What was the result of that meeting?
 9   A    The results of the meeting, we came up with several
10        ideas, whether they varied from plastic to clip-on
11        panels, wicker look type, this type of thing.
12             And the results of coming up with those ideas,
13        we had an actual product called a Doggy Dreamhouse
14        that was developed not by myself, but by another in
15        the company.  And when that went to market, or at
16        the time, a wicker type development would have been
17        cost prohibitive due to labor.  So it was put on the
18        back shelf.
19   Q    When was the next meeting at which you discussed a
20        wicker crate?
21   A    It would have been after China production for us had
22        started.
23   Q    Did you ever see a sample of some competitor's
24        wicker product?
25   A    Have I ever?
```

David Clemmons
April 17, 2008

Page 20

1    Q    Yes.

2    A    Yes.

3    Q    And when was the first time you saw that?

4    A    During the prototype stage of ours, 1824.

5    Q    By that you're referring to the Bay Isle wicker

6         crate that Mid-West developed?

7    A    Mid-West developed the 1824 through 42 wicker type

8         crates that we named Bay Isle, yes.

9    Q    I'm not trying to trip you up, but sounds like you

10        saw the sample of a competitor's product while you

11        were doing the prototyping of the Bay Isle wicker

12        line, and that would have been before you actually

13        went into production in China; is that right?

14   A    What had happened was, we were in our prototype

15        stage, and we had received a wicker crate that came

16        in.  But the timeline, I don't -- I don't recall.

17   Q    Let's back up a little bit and clarify a little bit

18        of your testimony.  When you refer to China

19        production, were you referring to production in

20        China of the wicker crates or are you referring to a

21        time when the company start producing products in

22        China in general?

23   A    The time when Mid-West Metal started producing pet

24        homes, this type of crate over in China, existing

25        product line.

David Clemmons
April 17, 2008

Page 21

```
 1   Q    All right.  So with that, if I understand your

 2        testimony, then, there was a time when the company

 3        started producing pet homes in China.  And then,

 4        after that Chinese production began is when the

 5        prototyping effort was made to create the 1824 to

 6        1842 wicker crates; is that right?

 7   A    Mid-West Metal went into China, this type of thing.

 8        And we already had the idea to have a different

 9        looking cage, to have wicker, or what have you.

10            And China -- now that China was offering a

11        cheaper labor, it was more feasible to produce this

12        item overseas due to cost.

13   Q    Do you recall a meeting at which a competitor's

14        product was evaluated by members of the new product

15        development committee?

16   A    Yes.

17   Q    What happened at that meeting?

18   A    The wicker sample that was brought in was poked and

19        prodded at and looked at at least by myself, and put

20        together also by myself and with Terry Jones to

21        evaluate mechanical elements of the crate.

22   Q    Who brought the product in to the facility?

23   A    I do not know.

24   Q    Is it your testimony that you're the one that

25        assembled it?
```

David Clemmons
April 17, 2008

```
 1   A   Yes.  I was one of the ones that helped assemble it,

 2       yes.

 3   Q   When it came in, was it in a box?

 4   A   I remember pieces on a table when I came in at that

 5       point.  I don't know who took it, or would have took

 6       it out of a box or package.

 7   Q   Did you see the box or package?

 8   A   No.

 9   Q   Do you know whose product it was?

10   A   No.

11   Q   Did you see any packaging or instructions with the

12       product?

13   A   No.  I remember seeing nuts, bolts, side panels, top

14       panels, this type of thing, laid out on the table,

15       similar to this (indicating).

16   Q   Where is that product today?

17   A   I don't know.

18   Q   What happened to it after the conclusion of the

19       meeting?

20   A   What happened to it in conclusion of the meeting?

21       It was left around for a little while.  I mean it

22       just became of no relevance to us after that point,

23       after mechanically looking at it.

24   Q   Now, prior to evaluating that competitor's product,

25       had the company already decided to make a wicker
```

David Clemmons
April 17, 2008

1    crate?

2  A   As previously stated, we had the idea to do so.  And

3      that idea was to take an existing, what is a 1024,

4      which is a 24-inch drop pin cage, and make a wicker

5      looking type cage out of that either by using molded

6      plastic, clip-on type panels, or something to that

7      order, whether it was wicker or whether it was

8      plastic.

9  Q   Is it your testimony that as of the time that you

10     and others evaluated the wicker crate from a

11     competitor, the company had a specific intention at

12     that moment already to bring to market a wicker

13     crate?

14  A   If I understand your question correctly, did we have

15     the intention of bringing a wicker crate to market

16     before we seen the sample?

17  Q   Yes, sir.

18  A   Yes.

19  Q   Who told you that?

20  A   Who told me that?  It was just knowledge from coming

21     out of a new products committee meeting.

22  Q   And when was this new products committee meeting?

23  A   I don't know specific dates.  I mean they happen

24     weekly, so ...

25  Q   Did you ever see anything in writing, any internal

David Clemmons
April 17, 2008

Page 24

```
 1        document from the company, prior to observing the
 2        competitor's wicker crate that would reflect any
 3        intention on the part of the company to bring to
 4        market a wicker crate?
 5    A   I don't know understand what you're asking.
 6    Q   Well, maybe I can explain what I'm trying to get at.
 7            I understand from your testimony and the
 8        testimony of others that there was a meeting some
 9        years ago, perhaps in the mid to late '90s, at which
10        the idea of producing a wicker covered crate was
11        discussed.  Is that correct?
12    A   There was an idea there to produce a different
13        looking crate, whether it was to use wicker whether
14        to use plastic, yes.
15    Q   And that was sometime in the mid to late '90s?
16    A   Yes.
17    Q   And isn't it correct that at that time, the idea of
18        using wicker was dismissed as being not feasible
19        because it was too expensive?
20    A   The idea wasn't dismissed.  The practicality was
21        dismissed because of the cost of the wicker, and, at
22        the time, development of the Doggy Dreamhouse.
23    Q   Isn't it true that the company didn't revive that
24        idea again until it observed the Simpson Ventures
25        wicker crate?
```

David Clemmons
April 17, 2008

Page 25

```
 1   A   I can't speak for the company on that part, but I
 2       can speak from my knowledge.
 3   Q   What's your knowledge?
 4   A   My knowledge is that we had already instituted China
 5       production, and China cost would enable us to do a
 6       wicker type woven cage at a cost benefit for
 7       Mid-West.
 8   Q   Well, let's be more particular.  Had you done any
 9       design work relative to creating a wicker crate
10       prior to seeing the Simpson Ventures wicker crate?
11   A   Yes.  I was -- I was already in the development
12       of a prototype structure based off our 1024 drop pin
13       design.
14   Q   Do you have any drawings that are dated prior to the
15       time of seeing the Simpson Ventures wicker crate
16       that reflect your design efforts to create a wicker
17       crate?
18   A   We have all kinds of documentation on 1024s, prior
19       to -- I believe those even date back to '92, before
20       I even was with the company, on 1024 drop pins.
21       That's what we based our design off of.
22   Q   Now, at this initial meeting where the Simpson
23       Ventures wicker crate was first evaluated, did
24       anybody indicate that there was some concern about
25       whether it could be economically produced?
```

David Clemmons
April 17, 2008

1  A  Whether the Simpson Ventures cage could be

2      economically produced?  I don't know.

3  Q  Let me state that again.  At this initial meeting,

4      where the Simpson Ventures wicker crate product was

5      evaluated, there was a discussion about potentially

6      creating a Mid-West wicker crate product, correct?

7  A  The Mid-West wicker crate, like I said, the idea

8      came before China production.  And then afterwards,

9      once we were in China production, it was thought

10     that it would be economically ...

11  Q  Isn't it true that before that meeting, there was no

12     such thing as a Mid-West wicker crate?

13  A  We were in the prototype stage of that.

14  Q  Had you produced the prototype prior to that

15     meeting?

16  A  Prior to the meeting of what?

17  Q  That initial meeting when you evaluated the Simpson

18     Ventures product.

19  A  Yes.  We were in the development of a 24-inch drop

20     pin type prototype.

21  Q  Is it your testimony that the company had already

22     produced a wicker prototype prior to the meeting in

23     which the Simpson Ventures product was evaluated?

24  A  If I'm understanding the question right, did we

25     already have a wicker prototype in by the time we

David Clemmons
April 17, 2008

```
 1       seen the Simpson Ventures one?
 2   Q   Yes, sir.
 3   A   We did not have it fully developed, no.
 4   Q   Had someone specifically instructed you prior to
 5       that initial meeting to develop a wicker prototype?
 6   A   Yes.  I was in the process of developing one of a --
 7       based off a 1024 drop pin design.
 8   Q   And who told you to do that?
 9   A   The visionary.  Jim's always been our visionary, and
10       he hands the details off to us to develop.
11   Q   Well, I'm not asking who's the visionary.  Who told
12       you to do that?
13   A   To develop?
14   Q   Who told you to develop a prototype of a wicker pet
15       home?
16   A   That would have came out of the new products
17       committee.
18   Q   Which person told you to develop a prototype of a
19       wicker pet home?
20   A   The agenda would have came out of the new products
21       committee, which Jim Wingate is head of.
22   Q   Is it your testimony that Mr. Wingate instructed you
23       to develop a wicker prototype?
24   A   It's my instruction that it came out of a meeting
25       that we've had to develop one.
```

David Clemmons
April 17, 2008

1   Q   So is it your testimony that you don't know which
2       person instructed you to do so?
3   A   I know the normal sequence of events that it takes
4       to make that happen, yes.
5   Q   Then who told you?  You told me that you were told
6       to produce a wicker prototype.
7   A   That's correct.
8   Q   I'm asking you who told you to do that.
9   A   And I'm telling you it was put on our agenda to get
10      one made, and that agenda comes out of the new
11      products committee meeting.  That's where the agenda
12      would have came from.
13  Q   How long before the initial meeting concerning the
14      Simpson Ventures product were you so instructed to
15      produce a wicker prototype?
16  A   I'd say at least two months prior.
17  Q   What happened during those two months?
18  A   I was looking at a 1024 design on how we could
19      modify, remove wire, take wire gauge down, this type
20      of thing, on what we could make it work for a wicker
21      type cage crate.
22  Q   Do you keep -- how do you do your timekeeping, or do
23      you keep time?
24  A   Keep time for what?
25  Q   Do you have to record your time to projects that

David Clemmons
April 17, 2008

Page 34

1   A   That represents the date that this drawing was

2       released.  It is a final result of a prototype.

3   Q   And then, if you make subsequent changes to the

4       drawing, where would those dates show up on the

5       drawing?

6   A   Subsequent changes after release would appear

7       usually in the lower left-hand corner as stated in

8       Exhibit 53, revisions A, B, and C.

9   Q   Have you ever changed the release date on a drawing?

10  A   Not once we've released it, we normally do not, no.

11      They're usually in the revision blocks.

12  Q   I'm going to pass you what's previously been marked

13      as Exhibit 4, and ask you if this looks like the

14      Simpson Ventures wicker product that you evaluated

15      in that new product development committee meeting.

16  A   It looks familiar.

17  Q   Does this look like the product that you evaluated

18      in that meeting?

19  A   It looks very familiar from that meeting that --

20      this would be it.

21  Q   Now, do you know -- I mean do you know what year

22      that meeting was?

23  A   I don't recall.

24  Q   First of all, do you recall seeing a product like

25      this, Simpson Ventures, on more than one occasion at

David Clemmons
April 17, 2008

```
 1      Mid-West?

 2   A  I remember seeing it initially, even putting it

 3      together.  I remember it sitting around for a period

 4      of time afterwards.

 5   Q  Do you know who ordered the first one?

 6   A  No.

 7   Q  Do you know if a second one was ordered?

 8   A  A second ...

 9   Q  Simpson Ventures wicker crate.

10   A  Similar to this one?

11   Q  Yes, sir.

12   A  No, I do not.

13   Q  Did you ever have any discussions with Mr. Swan

14      about a Simpson Ventures wicker crate?

15   A  You keep referring to it as a Simpson Ventures,

16      which I've come to know this product as.  But at

17      that time I wouldn't have known it as a Simpson

18      Ventures.  I would have known it as a competitor's

19      crate.

20          But during the prototyping stage of ours, yes,

21      I talked with Tom.

22   Q  Is it possible that the initial meeting that you had

23      on the new product development committee concerning

24      the competitor's wicker crate was in October of

25      2002?  Does that sound right?
```

David Clemmons
April 17, 2008

1    A    That's the problem.  The date, exact dates I don't

2         know.  But that could be a possibility, yes.

3    Q    Well, what happened after the initial meeting?  I

4         mean who was doing what in regards to developing

5         this kind of product for Mid-West?

6    A    Me, I was developing the drop pin design on the 1024

7         base, stripping wire out, taking wire gauge down to

8         feel what we still had was a good structure to

9         support wicker type development or a plastic type

10        development.

11   Q    What kind of changes did you have to make to the

12        existing wire crate to make it work with the new Bay

13        Isle design?

14   A    Types of changes would have been, I think, a border

15        door, a drop and wire gauge, actually losing wires

16        on the top panel, and maybe some on the side and end

17        panels, along with the drop and wire gauge.

18   Q    When did it become apparent that you needed to make

19        those changes?

20   A    Now, those are the first things we did.

21   Q    And those developments came after that initial

22        meeting?

23   A    After which initial meeting?

24   Q    The initial meeting at which you evaluated the

25        Simpson Ventures.

David Clemmons
April 17, 2008

| | | |
|---|---|---|
| 1 | A | No.   This would have been before, beforehand when I |
| 2 | | was working on the prototype. |
| 3 | Q | Was anybody else working on making those kind of |
| 4 | | changes? |
| 5 | A | At that point I was the only one really doing pet |
| 6 | | type changes.  So I would draw up the prints, or |
| 7 | | stick figure prints, or markups of a 1024 and give |
| 8 | | them to Terry to make product like you see of our |
| 9 | | 1024.  He would be the hands-on guy that would make |
| 10 | | it, use the press welder, this type of thing. |
| 11 | Q | So if I understand your testimony, you were working |
| 12 | | on those kinds of changes in the wire configuration |
| 13 | | of the Mid-West wire cages to make them -- to make |
| 14 | | the design workable with wicker prior to the first |
| 15 | | time you saw the competitor's wicker crate; is that |
| 16 | | correct? |
| 17 | A | Yeah.  What I stated is, we took a 1024 and was |
| 18 | | making changes to that for a prototype furniture |
| 19 | | looking cage, whether to take wicker or plastic. |
| 20 | | So I was stripping wire, I was taking wire out |
| 21 | | of the cage, I was taking diameters of wire down, |
| 22 | | which would be the gauge of wire, before I even seen |
| 23 | | this one. |
| 24 | Q | And you keep referring to "we."  Who else was |
| 25 | | involved in that besides you prior to seeing the |

David Clemmons
April 17, 2008

Page 38

```
 1        competitor's wicker crate?
 2   A    Like I say, me and Terry.  I would draw up prints,
 3        stick figures, even take a 1024, modify it by pen
 4        or pencil, hand it over to Terry and say, "Hey, do
 5        you think we could do this and still keep structural
 6        integrity?"
 7   Q    Anybody besides -- what's Terry's last name?
 8   A    Terry Jones.
 9   Q    Anybody besides yourself and Mr. Jones who were
10        working on any changes or prototypes to potentially
11        bring wicker to market prior to seeing the
12        competitor's product?
13   A    I can't speak for them.  I know what I worked on.
14   Q    Well, were other members of the product development
15        committee also doing things to develop a wicker
16        crate prior to seeing the competitor's wicker crate
17        design?
18   A    I can't speak on what they seen before they seen the
19        competitor's crate.  I would have no authority to
20        know what they were working on.
21   Q    Well, tell me, now, what involvement you had in the
22        Chinese manufacturing company making a sample or
23        prototype for review and approval.
24   A    As far as what the Chinese did, I had no control
25        over what they did, no involvement.
```

David Clemmons
April 17, 2008

Page 42

```
 1              And we've been going about an hour, and this
 2         would be a good time to take a short break.
 3              (A recess is taken, after which, the
 4         proceedings resume as follows:)
 5    BY MR. GARDNER:
 6    Q    Mr. Clemmons, I want to revisit the 2002 time period
 7         again, when we were discussing this morning about
 8         the product development team meetings, the
 9         investigation of the competitor's wicker crate, and
10         the company's development effort that was occurring
11         at about that time.
12              Do you know, or have you been informed by
13         anyone at Mid-West, that prior to you seeing the
14         competitor's wicker crate, the company had also seen
15         another copy of the competitor's wicker crate?
16    A    No.
17    Q    Do you know whether, when you saw it at that product
18         development meeting, that was, in fact, the first or
19         the second time that such a product had been
20         received and evaluated by Mid-West?
21    A    It was the first time I seen it to evaluate it.
22    Q    The reason that I'm asking that is because in my
23         line of questioning before the break, I was -- I
24         kept referring to your evaluation of it as that
25         initial product development meeting.  And it may be
```

David Clemmons
April 17, 2008

Page 43

```
 1        that there was an earlier meeting at which
 2        someone -- other people at Mid-West evaluated the
 3        competitor's wicker crate, and then made a decision
 4        to go forward, so that -- and you weren't in that
 5        earlier meeting.  So that may be part of the
 6        confusion or the misunderstanding between us
 7        earlier.
 8            At the meeting when you first saw the -- what
 9        you now know as the Simpson Ventures wicker crate,
10        was it your impression from that meeting that the
11        company had already made a decision to go forward
12        with a wicker crate product?
13   A    Before that meeting?
14   Q    Well, let me state that again.  The first time you
15        saw what you now know is the Simpson Ventures wicker
16        crate product was at a product development meeting,
17        correct?
18   A    The first time I seen it was the -- at a -- yeah.
19   Q    At that product development meeting when you for the
20        first time saw the Simpson Ventures wicker crate,
21        were you under the impression at that time that
22        Mr. Wingate, for example, was already interested in
23        developing a wicker crate product for Mid-West?
24   A    We were already -- I was already working on a
25        prototype either for a wicker or for a plastic type
```

David Clemmons
April 17, 2008

Page 44

1      wicker looking cage.

2    Q   And you had been doing that for about two months,

3        correct?

4    A   Prior to me seeing the initial sample, yes.

5    Q   And is it possible that the time when you saw that

6        initial sample was perhaps December of 2002?

7    A   I can't recall.

8    Q   Well, when -- let's see.  During your -- the two

9        months or so prior to your initial evaluation of

10       this Simpson Ventures wicker crate, were you aware

11       that Mr. Yang Yuan was coordinating with China to

12       see where the Chinese manufacturer could make such a

13       product for you?

14   A   I was not aware directly that he was looking

15       into it.

16   Q   When you say you weren't "aware directly," did you

17       know that was going on, but you didn't actually see

18       him doing that?

19   A   I was aware that Yang was our China liaison, as I

20       like to call him, and he would look into things for

21       us that we could get done over there.  I don't know

22       directly what exactly his agendas were because I was

23       not directly involved with Yang.

24   Q   Now, I believe you testified earlier that when you

25       evaluated the Simpson Ventures product, what you now

Page 45

1      know is the Simpson Ventures product, you were

2      primarily looking at the mechanical features of that

3      product?

4   A  Yes, from a design and layout standpoint, yes.

5   Q  Did any of those mechanical features end up

6      inspiring you to develop any of the features of the

7      Mid-West product?

8   A  The mechanical features were of no use to me.

9   Q  And why is that?

10  A  Because of the drop pin design that we came up with,

11     or that we've already had in existence that we

12     modified to work for what is now known as the Bay

13     Isle.

14  Q  Is it because the Mid-West product that's now known

15     as the Bay Isle is a drop pin style that was

16     developed from an existing or preexisting Mid-West

17     drop pin style product, and the Simpson Ventures

18     product was not a drop pin style product?  Correct?

19  A  I'm having a hard time following you on that one.

20     I'm sorry.

21  Q  Is the reason that the Simpson Ventures product was

22     of little or no help mechanically to you was that

23     the Mid-West product that you were developing was a

24     drop pin style cage, and the Simpson Ventures

25     product was not a drop pin style cage?

David Clemmons
April 17, 2008

Page 46

```
 1   A   The reason it was of no use or of little use was for
 2       one, they use tubing.  They use a two-piece design
 3       on their side panels, even a tube that goes across
 4       the bottom.  I don't even remember how these things
 5       were sitting now, but ours does not sit like that.
 6       And if I'm not mistaken, it was collapsable somehow.
 7           But when I gave it the attention that I gave
 8       into it, they use screws, they use nuts, bolts type
 9       things which was of no use to me.
10   Q   So the Simpson Ventures product was not a drop pin
11       style, correct?
12   A   No.  It was not a drop pin style that I would --
13       that I would be accustomed to, no.
14   Q   Were any features from the Simpson Ventures product
15       of any use at all?
16   A   The tubular design, the collapsable design, the
17       fasteners, this type of thing was of no use to me.
18   Q   What about the door that swings both in and out?
19   A   What about the door?
20   Q   Did -- does the Mid-West product, the Bay Isle
21       wicker crate, include a door that swings both in and
22       out?
23   A   Yes.
24   Q   Had Mid-West used such a door before?
25   A   Not to my knowledge, unless it was on earlier
```

David Clemmons
April 17, 2008

Page 48

```
 1        not yet in production.  And at some point, the
 2        Chinese manufacturing company began production.
 3             In between the time that you began the design
 4        effort and production began, was there some
 5        communication back and forth with China to show the
 6        Chinese company what the company wanted to produce?
 7   A    I would say once Terry and I had a prototype
 8        structure made -- now, we might have made two or
 9        three prototype structures, depending on how
10        production was going to go.  That would be shipped
11        over to China, and they would finish out the
12        prototyping, either plastic or weave, and send it
13        back to us for approval.
14   Q    Well, when was the first of those prototype or
15        mockups prepared and sent over to China?
16   A    I don't recall specific dates.  But it seems to me
17        it would be in the fall of '02.
18   Q    How many prototypes or mockups did you prepare and
19        send over to China?
20   A    I don't recall.
21   Q    Do you recall what kind of problems you were having?
22        Because typically, there are problems that crop up,
23        isn't that right, before you go into production?
24   A    Yes, there can be.  That's why the prototype stage.
25   Q    What kind of problems became apparent during the
```

David Clemmons
April 17, 2008

```
 1        prototype stage of this product development?
 2   A    Typically, we wanted same-size-gaps symmetry.  We
 3        wanted a specific look.  We had to adjust structure
 4        to accommodate the gaps we have on the side panels
 5        to the front panel to the end panel and to the top
 6        panel, to create symmetry of a similar gap all the
 7        way around the structure.  We would have that.
 8             The pattern design we came up with, we were
 9        very specific on that to get symmetry to go from the
10        top panel to the side panels back over to the end
11        panel to create the look that we wanted.
12   Q    Let's talk about the gaps.  What gaps are you
13        referring to on the product?
14   A    The gaps are spaces that I'm referring to.  If I had
15        a picture it would help better.  But the spaces on
16        the top panel to the side panel, the end panels to
17        the side panel to the top panel, even on the
18        windows, we kept those symmetrical.
19   Q    Let me pass you what's previously been marked as
20        Exhibit 2.  Does this look like a Bay Isle product
21        to you from Mid-West?
22   A    Yeah.  It looks very similar except for the name
23        plate thing is blotted out.
24   Q    So when you're referring to "the gaps," you're
25        talking about the gaps along the edges of adjacent
```

David Clemmons
April 17, 2008

Page 50

1          panels?

2    A    Yeah.  These gaps, features, and the looks that we

3          wanted to create throughout this line.  Even the

4          horizontal -- or, yeah, horizontal lines going

5          across the windows all the way around the structure,

6          we wanted to create that symmetry.

7                Even the -- these notches up here (indicating).

8          We made them as big as they were to create a look

9          that we wanted, along with the ones down here.

10               The name plate we added to the door to give

11         name recognition out in the field as being a

12         Mid-West Metal product.  Our standard buckle latch.

13         And we always go with two for security reasons, to

14         keep the cage secure.  And the drop pins.

15               And the color, keeping it black to brown,

16         keep it looking like a wrought iron type to a wicker

17         look.

18   Q    Now, all those design elements that you just rattled

19         off, do you have any documents that reflect the

20         company's choices in those designs?  I mean did you

21         receive any written instructions that that's how the

22         company wanted to do it?

23   A    Through the prototype coming back from us, and

24         everything that was taken care of as far as where

25         these were put, or these placements, this wicker

David Clemmons
April 17, 2008

Page 51

```
 1          we've replaced.  We made adjustments to those.  We
 2          made adjustments to the structure to create the
 3          gaps.
 4     Q    I guess what I'm getting at is, do you have any
 5          emails or memos or notes or letters or other written
 6          documents that mention or describe any of those
 7          features from back in the prototyping time period?
 8     A    The documentation I would have are the final result
 9          in prints.
10     Q    So other than the drawings that are shown in
11          Exhibits 53 and 54, you're not aware of any
12          documents that would describe or show those
13          features, correct?
14     A    Not from myself, no.
15     Q    Well, are you aware of any other documents that
16          might exist within the company that would -- that
17          would describe or mention those features from that
18          time period?
19     A    I have no recollection of those at all.
20     Q    Who made those design choices within the company?
21     A    Which design choices?  The features I talked about?
22     Q    Yes, sir.
23     A    They were brought up in front of the committee to
24          create a visual look that was symmetry throughout
25          the crate.  And they were brought up in the meeting
```

David Clemmons
April 17, 2008

1    and decided upon in there.

2  Q  Is it your testimony that no one person made those

3     design choices, but instead, those design choices

4     were made by a committee?

5  A  The committee that we were in, headed up by Jim,

6     Jim being the visionary and us doing the detail

7     work, we had came up with this design that was in

8     front of us.

9        And it was ultimately decided on by Jim to go

10     ahead with what we had, or disapproved what we had.

11  Q  Now, I understand from your last answer that

12     Mr. Wingate was the person who gave final approval

13     to the final design; is that correct?

14  A  Jim is the one that would usually give final

15     approval.

16  Q  Did he give final approval in this instance?

17  A  Knowing how things normally work and how they work

18     currently, I don't recall him specifically saying

19     that, but that's how it would normally work.

20  Q  So the answer is you don't know exactly in this

21     case, but it probably was; is that right?

22  A  No.  Just like I said.  It normally happens in that

23     manner.  Now, whether it happened specifically to

24     the wicker, I don't recall.

25  Q  For each of those features that you mentioned, do

David Clemmons
April 17, 2008

Page 53

```
 1        you know who contributed the idea of each of those
 2        features?  For example, the idea that the windows
 3        are all aligned with one another to provide
 4        symmetry, who came up with that?
 5   A    That's something we do currently with all design on
 6        cages.  We try to keep symmetry throughout.
 7             And that goes along with the horizontal and
 8        vertical wires, trying to line them up going around
 9        the cage this way (indicating), horizontally or
10        vertically.
11   Q    Did you have any cages previously that had windows?
12   A    Windows as in how?
13   Q    Well, this product that's shown in Exhibit 2 which
14        Mid-West is selling as the Bay Isle series wicker
15        crate has windows, doesn't it?
16   A    Yeah.  It has what you could deem as windows, yes.
17   Q    Did -- before bringing this product to market, did
18        any of the Mid-West crates have windows?
19   A    The only one I could even think of that would have
20        it is possibly the Doggy Dreamhouse.  And I'm not
21        remembering exactly how it went, but you could have
22        that from a Doggy Dreamhouse standpoint.
23   Q    How many windows did it have?
24   A    We would have had the front door opening and then
25        the two side panels and end panel, because the top
```

David Clemmons
April 17, 2008

Page 54

| | | |
|---|---|---|
| 1 | | would have been covered.  So possibly three. |
| 2 | Q | Did it have three windows, or are you speculating? |
| 3 | A | Possibly. |
| 4 | Q | Do you know if it had windows or not? |
| 5 | A | Not for sure, no. |
| 6 | Q | So you don't know if those windows were aligned with |
| 7 | | one another, do you? |
| 8 | A | I know the product that we used, everything was in |
| 9 | | symmetry on it, because that's something we do |
| 10 | | throughout our product line. |
| 11 | Q | Did anyone tell you to align the windows with one |
| 12 | | another? |
| 13 | A | As a designer, it's understood that you keep |
| 14 | | symmetry throughout. |
| 15 | Q | So the alignment of the windows was a standard |
| 16 | | feature for you? |
| 17 | A | Keeping alignment and symmetry through our cage line |
| 18 | | is, yes. |
| 19 | Q | What other features of the Mid-West wicker crate |
| 20 | | exemplify this symmetry? |
| 21 | A | The symmetry of the gaps that run vertically here |
| 22 | | (indicating).  The gap that -- you really can't see |
| 23 | | it there.  This gap here (indicating). |
| 24 | Q | Are you talking about a gap between the top of the |
| 25 | | back panel and the bottom of the top panel? |

David Clemmons
April 17, 2008

1   A   The end panel and the top panel.  Yeah, you can see

2       them a lot better here.  Symmetry starts from the

3       bottom panel through the doorframe panel across the

4       top panel and down the end panel.

5   Q   Are you describing the gap between the tops of the

6       side panels and the bottom of the top panel are to

7       remain consistent all the way around the crate?

8   A   That's what we tried to create, along with the

9       pattern of the square pattern we had being aligned

10      to the -- the end panel, side panel, and top panel.

11          And the symmetry of the distance from here to

12      here (indicating) on the windows, and the placement

13      of the windows all around were to keep symmetry all

14      the way around also.

15  Q   How is the placement of the window on the side panel

16      symmetrical?

17  A   The window is symmetrical with its opposite

18      counterpart on the other side panel.  And actually,

19      I believe it's the same panel just turned around.

20      And the end panel window with the side panels are

21      all kept in symmetry from side to side to end.

22          And then the wires that proceed through the

23      doorframe panel through the door and around all stay

24      within symmetry, all stay in line with one another.

25  Q   And if I understand your testimony, it was a

David Clemmons
April 17, 2008

Page 56

```
 1         standard practice of the designer at Mid-West to
 2         maintain such symmetry in all of the products that
 3         Mid-West sells; is that right?
 4    A    We were to try to create symmetry, yes.
 5    Q    In addition to symmetry, are there other design
 6         principles that you used in designing the Mid-West
 7         wicker crate?
 8    A    Yeah.  We created -- we created these notches at the
 9         bottom and kept it the same on the other side along
10         with the top and on the side of the top to create
11         these -- I've referred to them as finger hole looks,
12         but to create that look.  And the name plate, that's
13         been -- for whatever reason, been blotted out.  We
14         always put a name plate on there to distinguish
15         also, to create a visual distinction.
16    Q    Well, you testified that you were trying to maintain
17         symmetry throughout the product?
18    A    Uh-huh.
19    Q    And that that's a -- that Mid-West tries to maintain
20         symmetry in all of its product designs.  So in
21         addition to this symmetry design principle that you
22         espoused, is there another design principle that you
23         employed in designing this product?
24    A    What are you referring to?  What principle?
25    Q    Well, for example, perhaps you were trying to draw a
```

David Clemmons
April 17, 2008

```
 1        contrast in color between the wicker and the black
 2        of the wire cage, so you were trying to use
 3        contrast.  So you identified symmetry as one
 4        principle that you use as a designer.
 5             And I'm asking you, are there other principles
 6        that you employed?  And if you tell me that symmetry
 7        is the only one that you can think of now, I'll
 8        accept that as your answer.  But what other design
 9        principles did you use in designing this product in
10        addition to symmetry?
11   A    The design principles I usually am involved with are
12        the structure of the product.  When it comes down to
13        colors, that's normally not my call.  But I am to
14        create the symmetry look and the gaps to keep those
15        almost identical.
16             In visual features, the black of the structure
17        compared with the warm wood look of the -- woven
18        wicker look created a furniture type look that Jim
19        was looking for.
20   Q    Now, did Mr. Wingate specifically tell you that he
21        was looking for a furniture look in the finished
22        product?
23   A    Yeah.  It had even been discussed previously, and
24        what -- in the mid to late '90s when we first
25        discussed this type of thing, to have a furniture
```

David Clemmons
April 17, 2008

1    look to be more appealing.

2  Q  Did Mr. Wingate give you any other design guidance

3     besides his desire that this have a furniture look?

4  A  Jim's usually the visionary and turns the details

5     loose on us to create the finished product.

6  Q  So can you recall any other design principles

7     besides finished -- besides furniture look that

8     Mr. Wingate communicated to you before you got

9     started on your design effort?

10 A  Before the prototype stage, we had either two or

11    three different options.  Either plastic, actual

12    wicker, or some type of plastic type covering.  That

13    was the initial prototype starting point.

14 Q  If you would, describe what you mean by those three

15    different types.

16 A  Develop the structure, take the wire gauge down,

17    take wire out to either go with a plastic type

18    panel -- actual wicker was dismissed because of

19    sealing issues, dog urine, absorbing that into the

20    wicker.

21 Q  Are you talking now about the discussions that you

22    had back in the '90s?

23 A  No.  You asked me to talk about design direction,

24    and I gave you three different instances and

25    elaborated on those.

David Clemmons
April 17, 2008

```
 1   Q    What I was trying to figure out -- and maybe I
 2        wasn't clear.  But I was trying to figure out what
 3        instructions, what guidance you were given when you
 4        were asked to create what ultimately became the
 5        Mid-West Bay Isle series.
 6             I believe you testified that prior to seeing
 7        the Simpson Ventures product, you were asked to do
 8        some work on a prototype to come up with a design,
 9        and you did so.  And you testified that Mr. Wingate
10        told you that he wanted it to have a furniture look.
11             I'm trying to figure out, in connection with
12        your instructions to develop what ultimately became
13        the Mid-West Bay Isle wicker crate, what other
14        guidance or instruction were you given at that time?
15        Not years earlier, but at that time.
16   A    I can't think of any.
17             MR. GARDNER:  It's about noon.  Is it all right
18        if we break for lunch?  Are you hungry?  I'm hungry.
19             MR. HINSHAW:  Yeah.
20             (A lunch recess is taken, after which, the
21        proceedings resume as follows:)
22   BY MR. GARDNER:
23   Q    Mr. Clemmons, before the lunch break we were talking
24        about your design work, engineering work on the
25        Mid-West wicker crate.  And I think you testified to
```

Page 60

```
 1        the effect that there were three possibilities or

 2        three choices you were working towards.  One was

 3        putting wicker on the product, on an existing type

 4        crate, another was solid plastic, and another was

 5        putting plastic that looked like wicker on it, like

 6        a plastic sheet that looked like wicker, correct?

 7   A    The plastic sheet or actual wicker or plastic wicker

 8        which we wound up going with was the three different

 9        types of material.

10   Q    Now, in 2002, when you were tasked with developing a

11        furniture looking crate, were you tasked at that

12        time to consider those three options, or when you

13        were referring to those three choices or options,

14        you were talking about something that had happened

15        years before?

16   A    The idea came from years before.  The prototype was

17        developed to possibly accept the three different

18        options.

19   Q    So in 2002, at about the time that you saw the

20        competitor's product, you were considering those --

21        those different options, and ended up choosing the

22        wicker look; is that correct?

23   A    The three different options were in play when we

24        first started it.  But the plastic part of it we

25        didn't like because we had to get into injection
```

David Clemmons
April 17, 2008

Page 61

```
 1      type molding type plastic.  So we stayed away from

 2      that and actually looked into the two different

 3      types of wicker at that time.

 4   Q  What are those two different types of wicker?

 5   A  Either the wood wicker or a plastic wicker, which,

 6      we ultimately went with the plastic, or the -- I

 7      don't know what's it called.  Resin.

 8   Q  Now, did there come a time when you were asked to

 9      look into making a wicker litter pan cover product?

10   A  Yes.

11   Q  And who did that, asked you to look into that kind

12      of product?

13   A  Again, that would have came out of the committee.

14      As far as one person, I can't think of one person

15      that said, "Hey, do this."  That's the direction we

16      got after a new products committee meeting.

17   Q  Were there -- how many meetings were there of the

18      new products committee that touched on the -- the

19      development of a wicker litter pan cover?

20   A  There was the first initial meeting, and not that it

21      was brought up every meeting after that, except for

22      maybe to check progress.

23   Q  When was that first meeting?

24   A  Fall '03.

25   Q  At that meeting in the fall of '03, or any of the
```

David Clemmons
April 17, 2008

Page 69

1     the development of the wicker pet covers?

2  A  No.

3  Q  Did anyone ask you to describe your involvement or

4     what you remember regarding the evaluation of any of

5     the Simpson Ventures products?

6  A  Yes.

7  Q  And who asked you that?

8  A  I don't recall who asked the question.  But I do

9     remember being asked.

10  Q  Was anybody else asked a similar question?

11  A  I think we were asked as a group if we remember

12     where packaging was, this type of thing.

13  Q  Were any notes taken at that meeting?

14  A  I took no notes.  I don't know if anybody else did.

15  Q  Was there any sort of a handout?

16  A  No.

17  Q  I'm referring you again to Exhibit 2, which I

18     believe you identified was a fair depiction of the

19     Mid-West wicker crate.  And I wanted to ask you some

20     more questions about what you referred to as the

21     finger holes.

22        Looking at the side panel that's shown on the

23     first page of Exhibit 2, how many finger holes, or

24     holes or openings, does it have along the bottom?

25  A  Three.

David Clemmons
April 17, 2008

```
 1   Q   What's the reason that those holes are included at
 2       all?
 3   A   We wanted a different look.  We wanted an ornamental
 4       type of look, an aesthetic, to set it apart.
 5   Q   Do the holes along the bottom provide access or
 6       clearance for the hooks to engage another portion of
 7       the structure?
 8   A   That is part of the function of the cage, but not
 9       the only reason.
10   Q   But is that part of the function of the holes, to
11       provide access for the hooks?
12   A   It's part of the function of those.  But ultimately,
13       it was the ornamental design.  We could have made
14       those smaller.  We could have made those larger.  We
15       could have made the spacing tighter to make it more
16       wrapped.  But we chose to do it this way.
17   Q   Now, the product is a drop pin style cage that
18       evolved from a preexisting Mid-West product,
19       correct?
20   A   Yes.
21   Q   And do hooks like that appear in the preexisting
22       product?
23   A   Yes.
24   Q   Could you -- instead of providing the holes, could
25       you not have simply covered that area with wicker?
```

David Clemmons
April 17, 2008

Page 71

```
 1       Would that have worked?
 2   A   I'm not clearly understanding the question that
 3       you're asking.
 4   Q   Well, isn't it correct that the holes along the
 5       bottom of the side panel as shown in Exhibit 2 are
 6       really necessary in order for it to work; without
 7       the holes, you won't have clearance to make the
 8       connection with the drop pins and the hooks,
 9       correct?
10   A   Well, again, the size and the relativity of how we
11       done them, how we spaced it, that was all dependent
12       on design.  We could have made it tighter, looser,
13       bigger, not done it at all.  It was how we wanted it
14       to look.
15   Q   I understand that you could have made the holes
16       bigger or perhaps smaller.
17           But as you sit here today, could you have made
18       this style of drop pin crate and not provided any
19       holes along the bottom of the side panels?
20   A   Those holes do provide a functionality for the
21       assembly of the cage, but it's not their primary
22       function.
23   Q   But it is true that the holes are required to allow
24       the user to assemble the cage, correct?
25   A   It is true that they're there for assembly of the
```

David Clemmons
April 17, 2008

Page 72

```
 1        cage, but it is not their only function.
 2    Q   But without the holes, you wouldn't be able to put
 3        the cage together, right?
 4    A   Honestly, I could redesign the cage where they
 5        didn't have to be there.  So I could eliminate the
 6        notches if I wanted, or I could leave them there if
 7        I wanted.  We can make them smaller or larger.
 8    Q   But you wouldn't be able to attach those hooks in
 9        that location without the holes, correct?
10    A   The notches that are in there, that is part of their
11        function, is the assembly of the cage.
12    Q   Is the same also true for the openings at the top
13        of the side panel that are shown on page 1 of
14        Exhibit 2?
15    A   Is what true?
16    Q   That the openings are provided in the top of the
17        side panel in the Mid-West wicker crate to allow the
18        product to be assembled.  Is that correct?
19    A   What is true is that those are part of a look that
20        we wanted to create.  So we put those holes in those
21        places to allow for function and for aesthetics, to
22        create the look we were looking for.
23    Q   What's the function that those holes allow for?
24    A   The function is for, again, the assembly of the cage
25        with primary benefit of an ornamental design.
```

David Clemmons
April 17, 2008

Page 73

1   Q   And in what way do those holes at the top of the

2       side panel allow for assembly?  Please explain that.

3   A   The holes at the top of the cage, when this is all

4       assembled, they have hooks on the side of the top

5       panel that hook into the side panel.

6   Q   In this design of -- or this style of crate, how

7       would the user be able to assemble it if he didn't

8       have the holes along the top of the side panel?

9   A   I can't speak for that.  We designed it the way we

10      wanted it to look, and that was part of the function

11      of that look.

12  Q   Now, still looking at the first page of Exhibit 2,

13      you'll see that there's a seam that extends from top

14      to bottom between the side panel and the front

15      panel.  Do you see that?

16  A   Yes, the spacing.

17  Q   Am I correct that the way this product works is that

18      in that seam, or, as you called it, spacing, a long

19      pin is dropped through eyelets or loops in each of

20      those panels to bind the panels together?

21  A   For assembly reasons, we created what we call a drop

22      pin that assembles through the loops that are in the

23      doorframe and in the side panel.

24  Q   So would it be possible to make a drop pin style

25      crate like this and have the wicker extend from the

David Clemmons
April 17, 2008

```
 1          side panel on to the drop pin itself?

 2    A     The design that we have here, we could have moved

 3          the current wire out farther towards the hook.  And

 4          not knowing exactly how they do wicker, I can't

 5          speak for the wicker part.

 6              But we could have made it -- a lot less space

 7          in there.  If not so, eliminated it.

 8    Q     So it's your testimony that the size of the gap

 9          there at the seam could have been tightened up?

10    A     Or eliminated all together, yes.

11    Q     Would the -- would you have been able to -- what I

12          was trying to get at is, would you have been able to

13          extend the weaving from either the side panel or the

14          front panel onto the drop pin itself, or would the

15          drop pin inherently not be connected to that weaving

16          on either the side or the front?

17    A     The drop pin -- you're saying could the wicker have

18          been attached to the drop pin itself?  That would

19          have to be asked to somebody that does wicker.  I

20          don't do wicker.  But ...

21    Q     Isn't it true that if you -- that you can't extend

22          the weaving from either the front panel or the side

23          panel onto the drop pin and still be able to drop

24          the pin through the joint, correct?

25    A     I would not agree with that.  I would say that you
```

David Clemmons
April 17, 2008

```
 1       could attach wicker somehow to a drop pin, make the
 2       loops bigger so you can drop the drop pin with
 3       wicker on it through the loops if you wanted.
 4    Q  Would you agree with me that not having wicker on
 5       the drop pin itself allows the drop pin to slide
 6       through the joint more easily than having wicker on
 7       the drop pin?
 8    A  "More easy" is a broad term.  If you had it on
 9       there, you make the loops bigger and drop them
10       through the loops.
11    Q  Would you agree with me that it's preferable that
12       the drop pin be smooth rather than ridged because
13       it's going to be inserted through a series of
14       joints?
15    A  I would not agree.
16    Q  And why not?
17    A  For the same reason I just stated, that it can be
18       done either way, in my opinion.
19    Q  Has Mid-West ever made a drop pin that was not
20       smooth?
21    A  Since I've been there in '95, I have not seen a drop
22       pin that wasn't smooth.
23    Q  Now, looking at Exhibit 2, where are the rubber feet
24       on this product?
25
```

David Clemmons
April 17, 2008

Page 76

```
 1   A   Picture is kind of vague, but they look to be under

 2       the front of the pan that's in the cage.  And if we

 3       put them there, we would have put them in the back

 4       of the cage also.  But without seeing that -- I can

 5       only see the front.  So on the front they're under

 6       the very front of the cage.

 7           In fact on page 1, 2, page 3 of Exhibit 2, it

 8       does show the feet under the pan.  And still no

 9       picture of the back, so I can't say if they're there

10       on this particular one or not.

11   Q   Why were the feet added?

12   A   I would say to cushion the floor.  It sits up off

13       the floor here.  And for movement.

14   Q   What do you mean by "for movement"?

15   A   Just -- so it couldn't be kicked or not moved

16       easily.

17   Q   Were the rubber feet put there for a decorative

18       purpose?

19   A   Being that they're not real visual, I would say no.

20   Q   Now, let's -- still looking at page 3 of Exhibit 2,

21       I believe we're looking at the front of the Mid-West

22       wicker crate.  And you'll see that there's a --

23       looks like a wire door that appears to be surrounded

24       by a frame on three sides of wicker; is that

25       correct?
```

David Clemmons
April 17, 2008

```
 1   A   And the door is surrounded by a frame, and that
 2       frame -- it's surrounded by a frame on all four
 3       sides, and three of the four sides do have wicker.
 4   Q   Now, looking at the portion of the frame on the
 5       right-hand side of page 3, you'll see that the
 6       wicker covering is left absent in two small places,
 7       adjacent where the latch mechanism engages the
 8       frame.  Do you see that?
 9   A   Yes.
10   Q   What's the purpose of not including wicker there?
11   A   A look, and a function of the buckle latch.
12   Q   So at least in part, the reason that the wicker is
13       not woven there is to provide clearance for the
14       buckle or latch; is that correct?
15   A   No.  The wicker's not included there to create a
16       look, and to allow the buckle latch to function.
17   Q   If the wicker were woven in that location, would it
18       interfere with the operation of this latch?
19   A   In my opinion if you were to take wicker across
20       there, there might be some clearance issue --
21       issues.  But we wouldn't have done that because we
22       wanted the look that was there.
23   Q   Well, the latch includes a slide bar, correct, that
24       extends through a loop, right?
25   A   Yeah.  The buckle latch works that way, yes.
```

David Clemmons
April 17, 2008

Page 79

```
 1              MR. HINSHAW:  Here, I'll ...
 2              THE WITNESS:  Thank you.
 3    BY MR. GARDNER:
 4    Q   Now, still looking at page 3 of Exhibit 2, at the
 5        bottom of the front panel, I think you identified
 6        that there's a bit of frame that surrounds the
 7        bottom of the door but is not covered by wicker.  Do
 8        you see that?
 9    A   Yes, part of the doorframe there that's not covered
10        by wicker at the bottom.
11    Q   And why is that not covered by wicker?
12    A   That's the look we wanted.
13    Q   Could you have extended the wicker all the way to
14        the bottom of the structure?  Right now you've
15        got -- let me rephrase that.
16             You'll see the wicker extends down both sides
17        of the door to a certain point.  Do you see that?
18    A   Uh-huh.
19    Q   And at a certain point it stops, correct?
20    A   Yes.
21    Q   But the structure of the crate extends some distance
22        below that, correct?
23    A   Yes.
24    Q   Could you have extended that wicker all the way to
25        the bottom of the structure of your crate at those
```

David Clemmons
April 17, 2008

Page 80

```
 1      two points?

 2  A   On this existing design, we did not extend it down

 3      that far, no.

 4  Q   And why not?

 5  A   We allowed pan access for easy removal in and out of

 6      the cage.

 7  Q   So am I correct, then, that the reason it stops at

 8      the place that it stops is to allow you to take the

 9      pan in and out, correct?

10  A   Yes.

11  Q   Now, still looking at this page, what's the reason

12      that the door, the moveable door is not covered in

13      wicker, and the frame is covered in wicker?

14  A   That's for easy visibility of the pet to see out and

15      for you to see the pet, if the pet is in there.

16  Q   If you would, flip over to the next page of this

17      exhibit.  I believe this is the rear panel or back

18      panel; is that correct?

19  A   Yeah.  We'd call it the end panel.

20  Q   You call it the end panel?  Is that your

21      nomenclature?

22  A   Yes.

23  Q   Now looking at this end panel or rear panel, it

24      appears that is has a window; is that right?

25  A   Yes.
```

David Clemmons
April 17, 2008

1  Q  And other than the window, the entire end panel is

2     covered in wicker, correct?

3  A  All but the right and left -- right, left, and top,

4     there's a gap.  That is consistent with the side and

5     front panels and top panels.

6  Q  Well, when I was referring to the panel, this rear

7     panel or end panel, what I was -- what I meant by

8     that was the physical rear panel that you could take

9     off or put on.  So it has an edge that appears to be

10    wrapped in wicker.  Do you agree with that?  It has

11    a peripheral edge all the way around that appears to

12    be wrapped in wicker?

13  A  Yes.

14  Q  So when we look at this -- the rear panel portion of

15    the crate, the only portion that's not wrapped in

16    wicker appears to be the grating in the window, and

17    the loops that extend out the sides of the panel,

18    correct?

19  A  Looking at page 4 of exhibit -- what is this?  Two?

20  Q  Yes.

21  A  I will agree with that.

22  Q  Still looking at page 4, why did you decide to

23    include a window?

24  A  Again, for the pet to be seen or see out, and for

25    ventilation.  And it creates a constant look of the

David Clemmons
April 17, 2008

Page 82

```
 1        horizontal lines that wrap around from the sides to
 2        the end panel to the other side.
 3    Q   So looking at page 2 of this exhibit, it appears to
 4        also show a window, correct?
 5    A   Yeah.  That would be the side panel window.
 6    Q   And the side panel windows were provided for the
 7        same reasons as the rear window?
 8    A   Yeah.  To create that horizontal looking symmetry
 9        throughout the cage and provide ventilation, and to
10        see and be seen.
11    Q   Now, this idea of horizontal symmetry, when was that
12        first considered?
13    A   I would say sometime when we got the sample back,
14        but I don't recall exactly.
15    Q   Now, if you would explain what you mean by getting
16        a sample back, and explain to us what that sample
17        looked like.
18    A   At this point in time, I don't recall what it looked
19        like.  I recall a finished product like what we see
20        here in the pictures.
21            MR. GARDNER:  Let's take five minutes.
22            (A recess is taken, after which, the
23        proceedings resume as follows:)
24    BY MR. GARDNER:
25    Q   If you would, Mr. Clemmons, look at page 3 of
```

David Clemmons
April 17, 2008

```
 1        the two to each other; is that right?
 2   A    The drop pin becomes part of the assembly, once it's
 3        dropped through the loops on the front panel and
 4        side panels.
 5   Q    So the answer is yes?
 6   A    The answer is yes, it becomes part of the assembly
 7        once it's dropped through the loops.
 8   Q    So we've established that the drop pins during
 9        assembly are moved relative to the front panel or
10        the side panel.  So with that as a backdrop, isn't
11        it correct that it would be difficult or impossible
12        to extend the weaving from the front panel onto the
13        drop pins and still have the drop pins function the
14        way they do?
15   A    The drop pins themselves could have a wicker put on
16        them.
17   Q    I understand that.  I'm not asking whether you could
18        wrap the drop pin itself so that the drop pin is
19        still a separate pin and has wicker from top to
20        bottom.
21             What I'm trying to get at is, could you extend
22        the weaving from the front panel onto the pin so
23        that it's all one woven product, and still be able
24        to use the drop pin in the way that it's designed to
25        be used in this drop pin style crate?
```

Connor+ Associates
(317) 236-6022

David Clemmons
April 17, 2008

Page 85

1  A    The drop pin is a separate piece of the assembly and

2       is used in the assembly to hold the cage in place.

3  Q    Correct.  So isn't it true that you could not extend

4       the weaving from either the front panel or the side

5       panel onto the drop pin?  Right?

6  A    The function of the cage, you could eliminate all

7       gaps and still use a drop pin.

8  Q    I'm not asking if you can eliminate all the gaps,

9       sir.  Do you understand where I'm going with this

10      question?  I'm trying to figure out, could you take

11      the weaving that's on the front panel and extend it

12      so that it reaches onto and wraps around the drop

13      pin?  Do you understand that?

14 A    If I understand you correctly, you're asking if the

15      side panel or the front panel weaving can extend and

16      attach to the drop pin?

17 Q    Yes.

18 A    The drop pin has to remain separate from the

19      assembly to assemble the cage.  So the assembly of

20      the wicker to the drop pin would not allow that

21      piece to be removeable.

22 Q    So then that means that the weaving that's on either

23      the front panel or the side panel could not be

24      extended onto the drop pin, correct?

25 A    The drop pin is its own entity.  It allows for the

David Clemmons
April 17, 2008

Page 87

1    A    You could move wires closer, or even have a wire on

2         the loop itself, where you could extend the weaving

3         around that loop, around that wire, and the drop pin

4         still drop in there, and where the wrapping would

5         actually still touch the drop pin.

6    Q    Is it your testimony that you could extend the

7         weaving from the front panel onto the drop pin, and

8         the drop pin could still be a removeable part?

9    A    My testimony is, you could extend the weaving out to

10        the loops and put the drop pin in there still.

11   Q    But would you be able to extend the weaving around

12        the drop pin and still have the drop pin be a

13        removeable part?

14   A    If you change this design, you could add a wire to

15        those loops.  And it looks like you could possibly

16        extend the plastic rattan around that wire and the

17        drop pin still function to hold the cage together.

18             MR. GARDNER:  Do we have some blank paper that

19        the witness could draw what he means?  Not lined

20        paper, because he's going to be drawing lines.

21             (Following a pause, the proceedings resume as

22        follows:)

23   BY MR. GARDNER:

24   Q    I'm trying to figure out whether it would be

25        possible to extend the weaving from either the side

David Clemmons
April 17, 2008

Page 88

```
 1        panel or the front panel, or both, around the drop
 2        pin and still make the drop pin be removeable.  And
 3        I believe you testified just a minute ago that you
 4        have in mind a way to do that.  And I'd like you to
 5        take a minute and draw what that would look like.
 6    A   Okay.
 7            (The witness complies, following which,
 8        Deposition Exhibit Number 56-Clemmons is marked
 9        for identification.)
10    Q   Now, in the drawing that you drew, which we've had
11        labeled as Exhibit 56, explain to us what's going on
12        in this drawing.
13    A   We have a labeled drop pin.  We have possible wicker
14        plastic being added to a possible added wire design
15        on our current Bay Isle collection.  Shows current
16        wires, existing wires.  I'll add to that
17        (indicating) the loops.  Currently the wicker
18        currently goes to that order.
19            The proposed wicker, which, I don't know if
20        they could do this or not because I don't wicker,
21        put the wicker on.  Seems like it could be woven in
22        somehow to encompass all the way down.
23    Q   All the way to what?
24    A   All the way over and around, all the way down to
25        where we stopped it on the current design.
```

David Clemmons
April 17, 2008

```
 1   Q   At the end, what's it going to be wrapped around in
 2       your drawing?
 3   A   I don't know what they would attach it to.  But I
 4       know if we put wires there, they could get that
 5       wicker to that point and stop it, just like they
 6       have everything else, because they have two wires
 7       here and come down here and stopped it somehow.  Why
 8       couldn't we have two wires out here, then wrap it
 9       around and stop it down there?  That's my thought.
10   Q   Is it your thought that you're going to basically
11       extend the width of the panels so that they come
12       closer to the drop pin, but that the wicker would
13       still only wrap around the outside of the end piece
14       of wire in the panel?  Is that what you've drawn
15       here?
16   A   The wicker would wrap around the two wires, which,
17       the drop pin would then be inserted just as it is
18       now, through the loops, and that wicker would
19       actually be part of the cage.  And the drop pin
20       going down would be touching that wicker, and the
21       wicker would be wrapped around the drop pin with the
22       drop pin still removeable.
23   Q   How is that going to interface with the adjacent
24       side panel?
25   A   Not given time to lay it out and everything, we
```

David Clemmons
April 17, 2008

1    would have to look and put more design into it.  But

2    that's a thought on how it could be done.

3  Q  In the design that you've shown here in Exhibit 56,

4    the pin is not actually what the wicker is wrapped

5    around, though, is it?  It's wrapped around

6    something else, and then the pin is inserted through

7    what amounts to a tube; is that correct?

8  A  Not a tube, but loops that are in the current panel

9    already.  We add two wires to add wicker to the

10   front panel so the drop pin can be encompassed by

11   wicker as it's inserted.

12 Q  Let's look at Exhibit 3.  In looking at Exhibit 3,

13   particularly page 1, does the Mid-West Bay Isle 1805

14   litter pan cover include a moveable door?

15 A  It's kind of a door/doorframe all in one.  But yes,

16   it's moveable.

17 Q  Isn't it correct that it really contains a doorway

18   or opening rather than a door that you swing out of

19   the way to let the dog or cat in or out?

20 A  I follow what you're looking at now, yes, the

21   archway.

22 Q  So it doesn't have a moving door; it has a doorway

23   through which the pet can go in and out?

24 A  That is correct, it has a doorway, archway.

25 Q  And the opening or doorway, that feature was found

David Clemmons
April 17, 2008

Page 116

1    documentation showing the features and everything
2    that was decided on.
3  Q  Well, for example, who came up with the checkerboard
4    wicker weave pattern?
5  A  The major design influence behind the square
6    patterns on the 1824 assembly sketch would have been
7    Bob Dale.
8  Q  Do you know whose contribution it was to decide to
9    have the windows, as you stated before, I believe,
10   horizontally aligned around the -- around the crate?
11 A  Also, as I stated before, it's something we try to
12   do throughout our cage line, is to create symmetry.
13      So throughout the Bay Isle line, we would
14   have created symmetry by having the rectangular
15   windows on three sides, and have horizontal lines
16   as such.
17 Q  Did any particular person suggest that you include
18   those features in the 1824 Bay Isle model?
19 A  Any certain person I do not recall.
20 Q  Did any particular person identify the notches in
21   the top and bottom of the side panel, for instance,
22   as a design feature?
23 A  Any one person?  We done it -- the design features
24   of the notches were decided upon as a committee.
25 Q  Did any particular person decide to have the wire of

David Clemmons
April 17, 2008

Page 117

```
 1        the kennel coated in a black color?

 2    A   No.

 3    Q   Well, now that we've kind of gone through what some

 4        of the features are in the design, I'll reask the

 5        question to you.  And that is, did you individually

 6        contribute any particular design aspect of this --

 7        of the 1824 model?

 8    A   I personally contributed what you see in front of

 9        you, the documentation that shows the 1824 assembly

10        sketch.

11    Q   Other than creating the document showing the design

12        features, did you independently contribute any of

13        the particular features; not drawing them, but did

14        you conceptualize any of the features shown in those

15        figures?

16    A   The design of it coming throughout, I did work on

17        the structure part of it, which would become the

18        feature itself.

19    Q   So if I understand you correctly, you did design

20        work on the mechanical features of the wire subframe

21        itself, correct?

22    A   Yes.

23    Q   And did you personally have any influence over the

24        positioning of the wicker?

25    A   Yes, in the meetings we had.
```

David Clemmons
April 17, 2008

Page 118

 1   Q   What was your personal contribution to the
 2       positioning of the wicker?
 3   A   Personal contributions, I remember color.
 4   Q   It was your idea to have the wicker the color that
 5       is shown in Exhibit 2?
 6   A   It was part of my contribution.
 7   Q   Who else contributed to that decision?
 8   A   We -- anyone in the committee would have thrown out
 9       ideas for color, color of the cage, color of the
10       weave, the size of the weaves, positioning of the
11       weaves.  So as a conglomerate in the meeting, we
12       came up with this design.
13   Q   So it's your testimony that you were part of that
14       conglomerate that shows that color wicker?
15   A   I was part of the conglomerate or the meeting, new
16       products committee group that came up with the
17       wicker design, the wicker color, the color of the
18       cage, so on and so forth.
19   Q   Did you first suggest that color?
20   A   I suggested a warm wood look color.
21   Q   Did anything in particular give you the idea to
22       suggest a warm wicker color?
23   A   Furniture.  We wanted a good looking furniture look.
24   Q   Have you recently seen any furniture that had a warm
25       wicker color that would have potentially influenced

David Clemmons
April 17, 2008

Page 119

```
 1        your suggestion?
 2   A    I've seen furniture made out of wicker that has been
 3        too dark, too light.  And I've seen it where, to me,
 4        it is appealing as a personal choice.  And that
 5        wicker reflects that.
 6   Q    Do you specifically remember telling the product
 7        development group about your suggestion for the
 8        color of the wicker?
 9   A    I remember telling them of the color of the wicker,
10        and -- yeah.
11   Q    But you specifically remember having that
12        conversation with the product development group?
13   A    I remember having it in one of our meetings.
14   Q    Now, as you sit here today and you think about that
15        conversation, had you seen the Simpson Ventures
16        wicker kennel prior to making that suggestion?
17   A    I don't recall.
18   Q    Is it possible that you had seen the Simpson
19        Ventures wicker kennel before you made that
20        suggestion?
21   A    Not being able to recall, I can't answer the
22        question.
23   Q    Do you remember at what point in the design stage
24        you made that suggestion?
25   A    It would have been when we were trying to decide on
```

# Exhibit Q

William Stewart Kerr
April 18, 2008

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF ALABAMA
 2                      EASTERN DIVISION
 3
     SIMPSON VENTURES, INC.,          )
 4            Plaintiff,              )
                                      )
 5               -vs-                 )
                                      )
 6   MID-WEST METAL PRODUCTS          )
     COMPANY, INC.,                   ) Civil Action File No.
 7            Defendant.              ) 3:06-cv-00901-WKW-VPM
     _____)
 8                                    )
     MID-WEST METAL PRODUCTS          ) Case No. 3:07-cv-
 9   COMPANY, INC.,                   ) 00048 WHA-CSC
              Counterclaimant,        )
10                                    )
                 -vs-                 )
11                                    )
     SIMPSON VENTURES, INC.,          )
12            Counterdefendant.       )
13
             DEPOSITION OF WILLIAM STEWART KERR
14
          The deposition upon oral examination of
15   WILLIAM STEWART KERR, a witness produced and sworn
     before me, Jenny L. Reeve, RPR, CSR No. 00-R-3006,
16   a Notary Public in and for the County of Hamilton,
     State of Indiana, taken on behalf of the Plaintiff
17   and Counterdefendant, at the offices of Bingham
     McHale, 2700 Market Tower, 10 West Market Street,
18   Indianapolis, Marion County, Indiana, on the
     18th day of April, 2008, at 9:09 a.m., pursuant to
19   the Federal Rules of Civil Procedure, all
     applicable rules, and all stipulations, if any,
20   stated on the record, and pursuant to written
     notice and/or agreement and/or subpoena as to time
21   and place thereof.
22
23
     Connor + Associates, Inc.
24   1650 One American Square
     Indianapolis, IN 46282
25   (317) 236-6022
```

William Stewart Kerr
April 18, 2008

```
 1                    WILLIAM STEWART KERR,

 2   having been duly sworn to tell the truth, the whole

 3   truth, and nothing but the truth relating to said

 4   matter, was examined and testified as follows:

 5

 6   DIRECT EXAMINATION,

 7      QUESTIONS BY MR. ARTHUR A. GARDNER:

 8   Q   Mr. Kerr, could you state your name and address for

 9       the record.

10   A   William Stewart Kerr, IV, 1515 West Eighth Street,

11       Muncie, Indiana 47302.

12   Q   Mr. Kerr, my name is Art Gardner.  I'm an attorney

13       for the plaintiff in these two lawsuits.  With me

14       today I've got Joe Staley, another lawyer in our

15       office.  And this is Mr. Simpson, the owner of

16       Simpson Ventures.

17           Have you ever been deposed before?

18   A   No.

19   Q   Well, your attorneys may have told you somewhat how

20       it works.  But as you can see, I'll be asking you

21       questions, and the court reporter takes down

22       everything that's said.  And so it's important when

23       you give answers that you give verbal answers and

24       not nods or shaking your head one way or the other.

25           Also, please make sure that you wait until I
```

William Stewart Kerr
April 18, 2008

Page 8

```
 1    A    Yes.

 2    Q    Could you read that out loud.

 3    A    "Jim Wingate thus purchased a small pet home with a

 4         wicker weave covering from Frontgate.  That product

 5         was delivered to them in early October 2002.

 6              "The pet home was a wire cage covered in

 7         certain areas by a rattan material.  The rattan

 8         material had a specific weave pattern -- patterns

 9         within the rattan and on the frame at certain areas.

10              "At the time, Mid-West Metal was not aware of

11         any patent or patent pending applicable or allegedly

12         applicable to the design.  It did not see any such

13         notice markings on the packaging materials when the

14         product arrived despite their efforts to look for

15         such."

16    Q    Now, do you remember when that happened?

17    A    Yes.

18    Q    Tell me the first time you saw the Simpson Ventures

19         wicker pet home.

20    A    I saw that at a meeting we had to look at the

21         functionality of it.

22    Q    Who was at the meeting?

23    A    Jim, Tom, Bob Dale, myself, Dave Clemmons.

24    Q    When was the meeting?

25    A    I don't recall.
```

William Stewart Kerr
April 18, 2008

```
 1   Q   Do you know if it was shortly after Mr. Wingate

 2       obtained the sample?

 3   A   Yes.

 4   Q   What was discussed at the meeting?

 5   A   We discussed doing a wicker type crate.

 6   Q   Was that the first time that doing a wicker type

 7       crate had been discussed for -- in the preceding

 8       months?

 9   A   No.

10   Q   When was it discussed before that?

11   A   It had been brought up a -- a handful of times

12       concerning possibly doing a wicker crate, along with

13       we had other ideas with other types of items also.

14   Q   Well, there's been some testimony this week from

15       various witnesses that there was a discussion of

16       potentially using wicker on a pet crate sometime in

17       the '90s.  And then that idea apparently lay dormant

18       for a while.  And then this instance happened when

19       the -- Mr. Wingate obtained a copy -- or not copy --

20       a sample of the Simpson Ventures product.

21           At about the time that the sample was obtained,

22       were there ongoing discussions about producing a

23       wicker pet home?

24   A   Yes.

25   Q   Were those discussions prior to obtaining that
```

William Stewart Kerr
April 18, 2008

| | | |
|---|---|---|
| 1 | | sample? |
| 2 | A | There had been discussions, yes. |
| 3 | Q | When were those? |
| 4 | A | It was sometime I think around the late '90s, and |
| 5 | | then also probably in the early 2000s. |
| 6 | Q | During the year 2002, which is when the Simpson |
| 7 | | Ventures sample product was obtained by Mid-West, |
| 8 | | were there any discussions prior to obtaining that |
| 9 | | sample? |
| 10 | A | Yes. |
| 11 | Q | There were discussions in 2002? |
| 12 | A | I don't recall exactly the time, but I know it was |
| 13 | | sometime between 2000 and 2002. |
| 14 | Q | Now, when the sample was obtained in the fall of |
| 15 | | 2002, who put it together? |
| 16 | A | I don't recall. |
| 17 | Q | Well, when you first saw it, was it still in the |
| 18 | | box, or was it already assembled? |
| 19 | A | I recall seeing it assembled. |
| 20 | Q | It was already assembled? |
| 21 | A | Yeah. |
| 22 | Q | Did you see the box? |
| 23 | A | The box was there. |
| 24 | Q | And where was this meeting held? |
| 25 | A | In a conference room office. |

William Stewart Kerr
April 18, 2008

Page 11

| | | |
|---|---|---|
| 1 | Q | Which building? |
| 2 | A | At -- we call it Warehouse 2. |
| 3 | Q | Now, are you aware that the company may have |
| 4 | | obtained a second sample of the Simpson Ventures |
| 5 | | product? |
| 6 | A | I don't recall that. |
| 7 | Q | Well, the interrogatory response indicates that the |
| 8 | | persons who attended that initial meeting were |
| 9 | | Mr. Wingate, Tom Swan, Mr. Yang Yuan, and yourself. |
| 10 | | It does not indicate that Dave Clemmons was there. |
| 11 | | And I believe -- do you specifically remember Dave |
| 12 | | Clemmons being there? |
| 13 | A | Not specifically. |
| 14 | Q | What was the consensus about what to do with the |
| 15 | | Simpson Ventures product? |
| 16 | A | Well, we looked at the Simpson Ventures product to |
| 17 | | see how it functioned, to see how -- the features of |
| 18 | | how it folded up, and then we looked at the type of |
| 19 | | material that they used. |
| 20 | Q | Now, were any decisions made at that meeting about |
| 21 | | what to do? |
| 22 | A | I don't recall. |
| 23 | Q | Well, what did come out of that meeting? |
| 24 | A | That we had maybe the possibility of -- we had had a |
| 25 | | hard time finding the material and being able to do |

William Stewart Kerr
April 18, 2008

1    something like that before when we had discussed the

2    product.  This gave us maybe the opportunity, we

3    thought, to be able to pursue some type of unit like

4    that.

5    Q   Did anyone express any questions about whether the

6        company could technically produce such a product?

7    A   At that time we thought maybe we could produce the

8        product.

9    Q   Am I correct that at that time, the company was

10       considering having the product produced in China?

11   A   That's what -- that's why we thought we possibly

12       could now.

13   Q   And how did the company go about figuring out if it

14       could produce the product in China?

15   A   I know I had to give Yang pictures, and he was going

16       to check and see if someone could possibly, in

17       China, make it.

18   Q   Now, Mr. Yuan was there at the meeting, correct?

19   A   I don't recall.  He traveled so much, I don't

20       exactly recall.

21   Q   At that time did you travel some to China?

22   A   Yes.

23   Q   Were you traveling in the fall of 2002 to China?

24   A   Most likely.

25   Q   How often were you going to China?

William Stewart Kerr
April 18, 2008

Page 13

```
 1    A    I go about five to seven times a year.

 2    Q    During any of your trips to China, did you discuss

 3         with the Chinese manufacturer the possibility of

 4         making such a product for Mid-West Metal?

 5    A    Yes.

 6    Q    Did you take any materials with you as part of that

 7         trip?

 8    A    I don't recall doing that.

 9    Q    Did the -- did you send the sample product, the

10         sample Mid-West -- strike that.

11              Did you or anybody else send the Simpson

12         Ventures sample to the Chinese manufacturer?

13    A    I don't recall.

14    Q    Do you know whether it was sent?

15    A    Not for sure.

16    Q    Do you have a belief as to whether or not it was

17         sent?

18    A    Not for sure.

19    Q    What do you think happened?

20    A    I think maybe we sent some of the rattan for sure.

21    Q    Do you think that somebody took the Simpson Ventures

22         product apart and sent parts of it overseas?

23    A    I don't recall.

24    Q    Well, then, why do you say you think some of the

25         rattan may have been sent?
```

William Stewart Kerr
April 18, 2008

Page 14

```
 1   A   That was the thing.  When we discussed it before, we
 2       never could get by the point of a regular wicker
 3       wouldn't have worked, and making a design of that
 4       type.  Well, when we seen theirs in the rattan, we
 5       thought that might function with the possibility of
 6       making that type of unit.  We'd -- that would -- had
 7       been an obstacle in our discussions prior to that.
 8   Q   Did you take some of the rattan with you to China at
 9       one point?
10   A   I don't recall doing that.
11   Q   Well, do you recall any discussions with the Chinese
12       officials about whether they could replicate that
13       resin wicker?
14   A   We had samples sent back that showed us that they
15       possibly could.
16   Q   Well, what I was trying to ask you is whether you
17       had any specific discussions with the Chinese
18       manufacturer about whether they could replicate the
19       material that you think you sent over to them.
20   A   I didn't.
21   Q   Did anybody else have discussions with the Chinese
22       manufacturer about that?
23   A   Yuan did.
24   Q   And what was the response?
25   A   They -- they sent samples of different types of
```

William Stewart Kerr
April 18, 2008

Page 15

```
 1        rattan over that showed that they could possibly

 2        replicate it.

 3   Q    When you use the word "rattan" and the word

 4        "wicker," what's your understanding of those?

 5   A    The rattan I'm looking at like a synthetic or a

 6        plastic, where the wicker is more like a wicker or a

 7        wicker basket type deal that the dog could chew

 8        right through or that wouldn't work as well on a

 9        crate.  It would be very tough to weave, where the

10        synthetic rattan enabled it to hold its form.  The

11        dog couldn't chew it as easy, and it could be

12        cleaned up, where the wicker would not be able to.

13   Q    As a matter of semantics, would you agree with me

14        that natural rattan and natural wicker are one type

15        of product, and that synthetic or plastic rattan and

16        plastic wicker are something else?  They might look

17        similar, but they're different materials?

18   A    Yes.

19   Q    And the Simpson Ventures product had a plastic or

20        synthetic or resin wicker material, right?

21   A    Yes.

22   Q    And before, when you were considering making a

23        product that generally looked like wicker or rattan,

24        the company had been considering natural rattan or

25        natural wicker, right?
```

William Stewart Kerr
April 18, 2008

Page 16

```
 1    A    That was our thought.

 2    Q    So what happened to that first sample of the Simpson

 3         Ventures product?

 4    A    I do not recall.

 5    Q    Now, I believe you indicated a moment ago that you

 6         sent some pictures to Mr. Yuan of the Simpson

 7         Ventures product.  Where was Mr. Yuan when you sent

 8         those pictures?

 9    A    China.

10    Q    And why did you need to send pictures to him?

11    A    To let him see what we was dealing with, as far

12         as he -- most likely, he had to see what he was

13         looking at.

14    Q    Wasn't he at the initial meeting?

15    A    That's what I don't recall.

16    Q    I'm going to pass you what's been marked previously

17         as Exhibit 38, and ask you if you recognize this.

18    A    Yes.

19    Q    What is this, Mr. Kerr?

20    A    This looks like the sample that we had received.

21    Q    First of all, is the first page of Exhibit 38 an

22         email that you sent to Mr. Yuan forwarding a picture

23         or pictures of the Simpson Ventures product?

24    A    Yes.

25    Q    At this time Mr. Yuan was in China?
```

William Stewart Kerr
April 18, 2008

| 1 | A | They felt like they could. |
| 2 | Q | When did they indicate that? |
| 3 | A | I don't recall the exact time. |
| 4 | Q | Do you recall a time when the -- when you or anyone |
| 5 |   | else at the company asked Mr. Clemmons to start |
| 6 |   | working on -- on revising any of your existing |
| 7 |   | products to accommodate the use of wicker? |
| 8 | A | Yes. |
| 9 | Q | When was that? |
| 10 | A | That would have been around the time we seen that we |
| 11 |   | had a capability to possibly produce it in China |
| 12 |   | once we could make the synthetic plastic. |
| 13 | Q | Do you think it was before or after you sent this |
| 14 |   | picture to Mr. Yuan? |
| 15 | A | I wouldn't know for sure. |
| 16 | Q | So is it possible it was about this time? |
| 17 | A | Yeah, possible around this time. |
| 18 | Q | Were there any other new product development |
| 19 |   | committee meetings concerning developing a wicker |
| 20 |   | product within Mid-West Metal Products? |
| 21 | A | We had discussed it prior. |
| 22 | Q | Well, I'm going to pass you what's been marked as |
| 23 |   | Exhibit 4 and ask you if that's -- that looks like |
| 24 |   | the Simpson Ventures product that you evaluated. |
| 25 | A | Yes. |

William Stewart Kerr
April 18, 2008

Page 20

```
 1        China now.
 2   Q    So the idea of converting one of your existing wire
 3        crates into a wicker crate, that came up at a weekly
 4        meeting after the meeting in which you saw the
 5        Simpson Ventures product, right?
 6   A    We had discussed it before, but we was always stuck
 7        on the part of the synthetic wicker versus natural
 8        wicker.
 9   Q    But am I correct that the meeting that you're
10        referring to now, where the company made the
11        specific decision to take one of its existing wire
12        crates and convert it to wicker, that occurred after
13        this meeting in which you first evaluated the
14        Simpson Ventures product, right?
15   A    Yes.
16   Q    And is that when Mr. Clemmons would have been asked
17        to do some design changes to the existing product?
18   A    Yes.
19   Q    Now, in this time frame, in the fall of 2002, were
20        there written agendas that were sometimes prepared
21        for the new product development committee meetings?
22   A    I don't recall.
23   Q    Was it common for people to take notes?
24   A    Yes.
25   Q    Was there -- what was the nature of any
```

William Stewart Kerr
April 18, 2008

Page 27

```
 1        sample of the wicker material that they were

 2        planning to weave on the product?

 3   A    I believe so.

 4   Q    When did they send that?

 5   A    I would have thought it would have been sometime

 6        probably in the early part of that year, most likely

 7        January or February, because I do remember getting

 8        different types of rattan or plastic, synthetic

 9        plastic with different colors.

10   Q    Were the different samples merely different in

11        color, or were they different in material?

12   A    I was thinking the size was different on some.

13   Q    You're talking about the size of the reeds?

14   A    The size of the synthetic material itself.

15   Q    Now, when did you start working on the actual wicker

16        pattern that was ultimately applied to the Mid-West

17        wicker residence?

18   A    I believe we worked on the pattern probably sometime

19        around December and then into that early year,

20        because it came up at many meetings, trying to get

21        exactly the pattern that we wanted.

22   Q    Well, now, let's go back to October, when you first

23        saw the Simpson Ventures wicker crate.  Did you see

24        that wicker crate again after that initial meeting?

25   A    I believe so.
```

William Stewart Kerr
April 18, 2008

Page 31

| 1  |   | there's something on there. |
|----|---|---|
| 2  | Q | Did you see anybody do that in this instance? |
| 3  | A | I know he glanced through the items. |
| 4  | Q | Do you know where the packaging is today? |
| 5  | A | No. |
| 6  | Q | Do you know what happened to the packaging? |
| 7  | A | No. |
| 8  | Q | Do you remember the packaging or any of the material |
| 9  |   | that came inside? |
| 10 | A | I can't remember. |
| 11 | Q | Now, when you got the different resin wicker samples |
| 12 |   | from China, how did you determine which size of |
| 13 |   | wicker to use? |
| 14 | A | I don't recall. |
| 15 | Q | When you -- when you got the Simpson -- strike that. |
| 16 |   | When you evaluated the Simpson Ventures wicker |
| 17 |   | crate, did you make any notes or drawings about the |
| 18 |   | appearance of the Simpson Ventures wicker crate? |
| 19 | A | No. |
| 20 | Q | Did you in any other way record the appearance of |
| 21 |   | the Simpson Ventures wicker crate? |
| 22 | A | No. |
| 23 | Q | Now, describe for me how you ended up choosing the |
| 24 |   | particular appearance of the Mid-West wicker crate. |
| 25 | A | Well, we -- once we decided we was going to take one |

William Stewart Kerr
April 18, 2008

```
 1          of our type of wire products and then attach the
 2          wicker to it, the synthetic wicker, we spent a lot
 3          of time looking at how we wanted the patterns to
 4          look on it, how we wanted the features to be on it,
 5          and to determine like the spacing of where the
 6          wicker was at, the design of the wicker itself, the
 7          design of the pattern itself, and determined what we
 8          wanted.  Then we sent the wire mesh and the sketch
 9          of how we wanted the wicker attached to China.
10    Q     Who came up with those design thoughts?
11    A     Bill Dale was very instrumental in it, but the whole
12          team looked at it.
13    Q     What did Mr. Dale contribute?
14    A     He would show different patterns of how we do our
15          wicker.
16    Q     And when did he show these patterns to the team?
17    A     It would have had to have been sometime between the
18          end of that December and that April, before -- or
19          probably before March, to determine how we wanted to
20          do the pattern before we sent the wire over.
21    Q     Now, was Mr. Dale looking at a Simpson Ventures
22          product when he was doing his design work?
23    A     No.  He had just many different sketches that he
24          come up with.
25    Q     Where did Mr. Dale do his work?
```

William Stewart Kerr
April 18, 2008

| | | |
|---|---|---|
| 1 | A | He does it from his office. |
| 2 | Q | Where is his office in relationship to your office? |
| 3 | A | It's in another small town that's outside our city, |
| 4 | | probably 15 minutes. |
| 5 | Q | His office is 15 minutes from yours? |
| 6 | A | Yeah. |
| 7 | Q | Did you have occasion to visit him in his office |
| 8 | | during the time that he was doing the design work? |
| 9 | A | No. |
| 10 | Q | So do you know whether he had a Simpson Ventures |
| 11 | | product in his office when he was doing his design |
| 12 | | work or not? |
| 13 | A | No. |
| 14 | Q | So you don't know? |
| 15 | A | I don't recall that he did, but I couldn't say.  But |
| 16 | | I don't believe he did. |
| 17 | Q | Well, if you didn't visit his office, how would you |
| 18 | | know whether he had a sample of the Simpson Ventures |
| 19 | | product in his office at that time or not? |
| 20 | A | I wouldn't know. |
| 21 | Q | And when was the first time that Mr. Dale presented |
| 22 | | a proposed wicker design to the committee for its |
| 23 | | consideration? |
| 24 | A | It would have been sometime in that December, |
| 25 | | January, February time frame.  The first time |

William Stewart Kerr
April 18, 2008

Page 34

```
 1        probably would have been in December or January,
 2        before we finalized it.  Most likely in February.
 3   Q    And how was it presented?
 4   A    Just on a piece of paper sketching how we might
 5        want a pattern, how we might want to orientate the
 6        wicker.
 7   Q    Do you know what's happened to any such piece of
 8        paper?
 9   A    I wouldn't know.
10   Q    Did there come a time in this lawsuit that you were
11        asked to collect documents?
12   A    Yes.
13   Q    And what did you do in response to that request?
14   A    Looked for all documents that dealt with either
15        Simpson or Mid-West Metals' 1800 series.
16   Q    What did you find?
17   A    I just found emails and things that I had that I
18        forwarded to Mr. Wingate.
19   Q    Did you find anything besides emails?
20   A    Mainly emails.  I don't recall anything else.
21   Q    If you would, look at -- I think it's Exhibit 38
22        that's in front you, which is the email of
23        November 20th, 2002, that forwarded the picture to
24        Mr. Swan.  Is this one of the emails that you found?
25   A    This one here (indicating)?
```

William Stewart Kerr
April 18, 2008

1   A   Yes.

2   Q   And did he prepare the marketing literature?

3   A   Yes.

4   Q   I believe you also indicated he prepared the wicker

5       design that was applied to the crate, correct?

6   A   Yes.

7   Q   Now, what you read out, it stated that they were

8       careful to prepare a design characterized by a

9       fundamentally different weave pattern.  And that

10      seems to indicate that you and Mr. Clemmons prepared

11      a design that was -- had a fundamentally different

12      weave pattern than the Simpson Ventures product.  Is

13      that what happened?

14  A   Well, it was a team effort.  As we chose how we was

15      going to do the wicker, it was our job, mainly

16      Dave's, to put that on a drawing to show how we

17      wanted the pattern, which was in that assembly

18      sheet, of showing the pattern of how the wicker was.

19  Q   And that happened sometime in December, January,

20      March time frame?

21  A   As far as determining the pattern.

22  Q   Now, at that time did you have the Simpson Ventures

23      product available to look at?  Were you looking at

24      the Simpson Ventures product at that time?

25  A   I don't remember looking at the product, but it was

William Stewart Kerr
April 18, 2008

```
 1        in the office, I believe in the conference room

 2        meeting area.

 3   Q    Well, did you look at the Simpson Ventures product

 4        at that time or not in preparing your weave pattern?

 5   A    No.

 6   Q    You didn't look at it?

 7   A    No.

 8   Q    Do you know if Mr. Clemmons was looking at it?

 9   A    I can't speak for him.  I ...

10   Q    Well, how is it, sir, that it can be that you were

11        careful to prepare a design that was different than

12        the Simpson Ventures product if you weren't looking

13        at the Simpson Ventures product?

14   A    Well, I remember when we initially looked at it,

15        they had the diamond shape design pattern.  And

16        theirs was a fold-and-carry type crate with tubes,

17        and we didn't want to go down that path.  We was

18        very -- it was made very clear we didn't want to go

19        down that path when we initially evaluated it.

20   Q    Which path?  The folding crate, or --

21   A    Both.

22   Q    -- or the diamond weave pattern?

23   A    The folding crate and also the diamond weave

24        pattern.  That is not what we wanted.

25   Q    When did the concept of avoiding the folding crate
```

William Stewart Kerr
April 18, 2008

```
 1       come up?
 2   A   Well, we had discussed it before, and we thought it
 3       was -- if we ever had the opportunity, we thought a
 4       drop pin style cage that we'd had would be a good
 5       unit to put the wicker on.
 6   Q   Why did you think it would be good to put the wicker
 7       on a drop pin style cage?
 8   A   Mainly because the way they have to weave it.  Each
 9       panel is separate.  And then, once it's complete,
10       it's easy to pack.  And each panel's still separate.
11       They're not intertwining with other panels that are
12       there that are connected to each other.
13   Q   So is it your testimony that because the panels are
14       separate and distinct from one another, it makes it
15       easier to weave them together, to weave the
16       individual panels and still make a product that can
17       be packaged easily?
18   A   That helps.
19   Q   And so when was it decided to use a drop pin style?
20   A   It was decided pretty much initially to use a drop
21       pin style.
22   Q   When was it decided to avoid using a diamond weave
23       pattern?
24   A   Initially.
25   Q   Did someone say, "Hey, let's not use a diamond weave
```

William Stewart Kerr
April 18, 2008

Page 40

```
 1         pattern," or something like that?

 2    A    Yes.

 3    Q    Who said that?

 4    A    I don't recall.

 5              MR. GARDNER:  Mr. Kerr, one of the things I

 6         often forget to tell deponents is that if you need

 7         to take a break at any time, you can take a break.

 8         It's not a marathon session.  We take breaks from

 9         time to time.

10              And we've been questioning you for a little

11         over an hour, so this is a good time for a break.

12              THE WITNESS:  Okay.

13              (A recess is taken, after which, the

14         proceedings resume as follows:)

15    BY MR. GARDNER:

16    Q    At the time that the Simpson Ventures product was

17         obtained in early October of 2002, did the company

18         already have in mind that it would prefer to use

19         the drop pin style to put wicker on rather than the

20         folding style?

21    A    Not that I recall.

22    Q    Now, going back to page 13 of Exhibit 60,

23         particularly that sentence that says, "Dave Clemmons

24         and Stew Kerr then prepared the initial design

25         drawings for a wicker-covered pet cage," when you
```

William Stewart Kerr
April 18, 2008

Page 41

```
 1        made those drawings, did you already have a wicker
 2        design, a weave design from Mr. Dale?
 3            I guess my question is which came first, the
 4        chicken or the egg?  Did you make the drawings and
 5        then the pattern came from the drawings, or did
 6        Mr. Dale make the pattern and then the drawings were
 7        made from the pattern?
 8            MR. BOWLING:  Object to the complex and
 9        compound nature of the question.
10            But to the extent you understand, go ahead and
11        answer.
12    A   I believe we was working on both at the same time.
13    BY MR. GARDNER:
14    Q   Well, would I be accurate in saying that Mr. Dale
15        created the weave pattern?
16    A   He came up with the ideas.  Then, as a group, we
17        would look them over and tweak them and fine-tune it
18        to exactly what we want.  But he would come up with
19        the ideas.
20    Q   Did you come up with any of the weave pattern ideas?
21    A   Placement, things like that, I was involved in.
22    Q   Placement of what?
23    A   Like the patterns.  We're big in symmetrics and
24        locations of how we wanted it, and where we wanted
25        the pattern at.
```

William Stewart Kerr
April 18, 2008

1    Q    Exactly what did you contribute to the design of the

2         weave pattern?

3    A    I would have been along the lines of, we'll try to

4         get it to look -- the locations to look the same on

5         all the panels as you roll around the cage, that we

6         get the look so we have a symmetrical look.

7    Q    Anything else?

8    A    That would have been the major area.

9    Q    Did you contribute to the square weave pattern that

10        appears in some of the corners?

11   A    As far as an opinion on whether I liked it or not.

12   Q    I'm going to pass you what's previously been marked

13        as Exhibit 2, and ask you if that's an accurate

14        depiction of the Mid-West wicker crate that's now

15        sold as the Bay Isle series.

16   A    Yes.

17   Q    As someone who was involved in the creation of that

18        product, can you tell me which features of that

19        product you considered to be ornamental.

20   A    I consider the rectangle or square pattern, the

21        amount of the wicker that goes into the -- like the

22        amount of thread that's woven in the rectangle or

23        square, to be ornamental when we use 5 threads or 10

24        threads, and how many we use going up, because it's

25        actually a pattern within a pattern.

William Stewart Kerr
April 18, 2008

Page 43

1          How we orientate our wires to get a symmetrical
2     look that goes all the way around the cage and try
3     to get a symmetrical look going up and down.
4          How we orientate the squares to get that same
5     symmetrical look as you roll around the cage and
6     roll from side to top to side.
7          Using the drop pin style with the drop pins as
8     an ornamental type look.  Especially with the drop
9     pins being the size that they are, it gives you a
10    sense of security.  And how we notched our notches
11    for -- on the panels.
12         I believe that the two buckles, they do -- as
13    far as a look at a cage, and ornamentally,
14    especially on this size right here, the two buckles
15    make it look very secure.  The hairpins provide the
16    same function.  The name plate is definitely one of
17    our features that we include on most units that we
18    make.  How we locate the windows and where we locate
19    the windows.
20         How we even do our gaps.  That's very -- like
21    to where the drop pins are at.  We was very
22    particular on making sure our spacing looked the
23    same in the corners all the way around the cage.
24         How we wove it, especially like on the side
25    panel.  We put the weave on the one wire that kind

William Stewart Kerr
April 18, 2008

Page 44

```
 1        of frames the window.  How we weave our doorframe,
 2        concerning whether we have weave at the bottom or
 3        not.
 4             That would be it, some of the major areas.
 5   Q    Now, when you made the decision to put wicker on the
 6        product back in 2002, 2003, at that time did you
 7        consider the use of wicker to be decorative or
 8        ornamental?
 9   A    Yes.
10   Q    Do you still consider it so?
11   A    Yes.
12   Q    Is the provision of a window -- regardless of its
13        size or shape -- but is the provision of a window a
14        functional or ornamental feature?
15   A    As far as the -- it would be functional in terms of
16        the dog being able to look out and you being able to
17        look in.
18             But as far as ornamental, we're very particular
19        on designing things, and wrap our wires all the way
20        around.  And if you look at the end panel, it will
21        wrap along the back, back to the side, to get a look
22        that the -- the windows all line up with each other
23        on the sides and on the end panel.  So I call that
24        ornamental as far as the look goes.
25   Q    Now, you talked about the notches.  Let's talk about
```

Page 45

```
 1        the notches that are at the bottom of the side panel
 2        first.  Why are there notches there at all?
 3    A   We liked the look of the notches, as far as, they
 4        give it -- it's back to symmetrical, the way it
 5        spaces itself out.  Then we have notches also on the
 6        top, and we like the way it give it a look.
 7    Q   Isn't it true that the primary reason for having
 8        notches at all is to provide clearance for the hooks
 9        so that you can put the thing together?
10    A   Well, we could have designed it different ways to --
11        them hooks could actually have been brought down.
12        We got a cage like that called a collapsable style,
13        and then we could have brought our wicker down.  Or
14        we could have even pinned in the hook wires a little
15        tighter.
16            We left that spacing out, and we could have
17        brought our spacing really tight so that the wicker
18        almost touches.  We could have eliminated, pretty
19        much, that.
20    Q   But with this style construction, this drop pin
21        style construction and this style of frame, isn't it
22        true that the -- some notches are required in order
23        to allow the product to be assembled?
24    A   Yes, the notches are required.  But the size of the
25        notches could be different from what we had.
```

Page 46

```
 1   Q   Now, looking at the notches that are at the top, is
 2       it also true that the notches at the top of the side
 3       panel are required to allow this style of crate to
 4       be assembled?
 5   A   Yes, the notches are required.  But at the same
 6       time, the spacing could have been a lot tighter to
 7       eliminate the look of seeing the notch.
 8   Q   Looking at the front door, the one that's shown here
 9       has an -- in Exhibit 2 has a double latch; is that
10       correct?
11   A   Yes.
12   Q   So it has two latch mechanisms that secure the door.
13       Does that feature appear on all of the Mid-West
14       wicker pet homes?
15   A   No.  Some homes have one.
16   Q   What dictates whether the home has one or two?
17   A   Normally, on a smaller unit we'll go one latch,
18       unless it's going to be like a nicer unit.  And this
19       was considered a nicer unit.  So we like the look.
20           One -- from all our testing, we've done many
21       tests on doors, and dropped weights on them and
22       pushed through that latch.  One would be sufficient,
23       but we do two on something like this or one of our
24       deluxe brands because it has the look of being
25       secure.  It gives it a nice look of, "Boy, that's
```

William Stewart Kerr
April 18, 2008

```
 1        really a secure cage," in the thoughts of the owner

 2        when they're looking at it.

 3   Q    Does it make it more secure?

 4   A    In actuality, on the size of this cage from our

 5        testing, it really doesn't have to be there.

 6   Q    When have you done such testing?

 7   A    We've tested a number of times.  Our QC department

 8        will drop a weight.  I can't remember if it's a 10-

 9        or 20-pound weight.  We lay the door across and drop

10        it on to see how our latch will hold, to see if the

11        door will go through and hit.

12   Q    When was the first time you did testing like that?

13   A    It was probably in the '90s sometime.

14   Q    Do you use -- on your regular wire crates, do you

15        sometimes use one latch for small crates and two

16        latches for larger crates?

17   A    Yes.

18   Q    Do you know whether any of your advertising touts

19        the second latch as providing a better look?

20   A    I don't know for sure.

21   Q    Have you ever seen any advertising that touted the

22        second latch as providing an improved look?

23   A    I know we've talked about it, but I haven't actually

24        seen it.

25   Q    If I understand your testimony concerning the latch,
```

William Stewart Kerr
April 18, 2008

```
 1        in the mind of the consumer, the second latch makes
 2        it look more secure, correct?
 3   A    It gives it a cosmetic look that it's very secure.
 4        It does.
 5   Q    So the answer would be yes?
 6   A    Yes.
 7   Q    Now, let's talk about the door for a second.  The
 8        door is a moveable door, correct?
 9   A    What was that again?
10   Q    The door in the Mid-West wicker crate product that's
11        shown in Exhibit 2 is a moveable door, correct?
12   A    Yes.
13   Q    And does it swing both in and out?
14   A    Yes.
15   Q    When was the first time you ever saw a product that
16        had a door that swung both in and out in the pet
17        crate arena?
18   A    I don't recall.
19   Q    Isn't it true that the first one you saw was the
20        Simpson Ventures product?
21   A    I couldn't guarantee that was the first time that I
22        saw it.
23   Q    Can you think of any product you may have seen prior
24        to that that had that kind of a door?
25   A    I don't recall.
```

William Stewart Kerr
April 18, 2008

Page 49

```
 1   Q   Do you recall that the Simpson Ventures product had
 2       a door that swung in and out?
 3   A   Yes.
 4   Q   Did Mid-West have a door that swung in and out on
 5       any of their products prior to that time?
 6   A   No.
 7   Q   Now, your door that swings in and out on the
 8       Mid-West wicker crate, the door itself is not
 9       covered in wicker, is it?
10   A   No.
11   Q   Why is that?
12   A   It's back to, we like the look of that with the
13       animal being able to see in and out, and that the
14       owner can see in.
15   Q   So the primary reason that the door is not covered
16       is to allow the owner to look in and for the dog to
17       look out; is that correct?
18   A   That would be -- yes.
19   Q   Could you explain the reasoning behind the wicker
20       that surrounds at least part of the door.
21   A   Around the doorframe?
22   Q   Yes.
23   A   It gives it the look that we was trying to achieve
24       as far as wicker on all the panels making a wicker
25       crate.
```

William Stewart Kerr
April 18, 2008

Page 50

| | | |
|---|---|---|
| 1 | Q | If you would refer to the exhibit that shows the |
| 2 | | Simpson Ventures product. |
| 3 | A | Okay. |
| 4 | Q | Which exhibit is that?  Is that Exhibit 4? |
| 5 | A | Yeah. |
| 6 | Q | Four.  Does the Simpson Ventures product also have a |
| 7 | | door that's not covered in wicker? |
| 8 | A | Yes. |
| 9 | Q | And is the door of the Simpson Ventures product |
| 10 | | surrounded on three sides by wicker? |
| 11 | A | It look -- looks like four sides. |
| 12 | Q | When you say it's surrounded on four sides, you're |
| 13 | | referring to a bar across the bottom that has wicker |
| 14 | | wrapped around it on the Simpson Ventures product? |
| 15 | A | Yes. |
| 16 | Q | Other than the bar across the bottom that has wicker |
| 17 | | wrapped around it on the Simpson Ventures design, |
| 18 | | are there any other differences in the wicker design |
| 19 | | for the front panels between the Simpson Ventures |
| 20 | | design and the Mid-West design? |
| 21 | A | Yeah.  We pulled our -- we actually use hooks to |
| 22 | | give us a look in the corners of a space gap, which |
| 23 | | is probably around 20 millimeters, or something like |
| 24 | | that, from edge to edge.  And we did the same thing |
| 25 | | on the other side to give it a space gap, because |

William Stewart Kerr
April 18, 2008

```
 1        we -- we wanted that to look like that all the way
 2        around the cage, and all four corners have that gap
 3        to make it look -- allow the drop pin to fall
 4        through, so that it looks a lot more secure with the
 5        bigger cage drop pin.
 6   Q    Is the drop pin that you're using in the wicker
 7        product a bigger gauge than the drop pin that you're
 8        using in your regular wire frame?
 9   A    No.
10   Q    It's the same?
11   A    Yeah.
12   Q    How does the gap that you described between the
13        front panel and the side panels of the Mid-West
14        wicker product compare to the gap between the front
15        panel and the side panel in the Mid-West wire frame
16        product?
17   A    Yeah, when we -- when we designed this, it was real
18        particular on what -- on that exact spacing.  And at
19        the time, our drop pin cages had a little bit bigger
20        gap, probably somewhere around three-eighths of an
21        inch on the side panel.  It was about three-eighths
22        of an inch wider.
23            So I remember on this we had to pull that in to
24        get that same -- because we felt like this was a
25        higher end cage for us, we wanted that same
```

William Stewart Kerr
April 18, 2008

Page 52

```
 1          symmetrical look to look identical.  So we pulled
 2          them hooks in so it was the same spacing as it is on
 3          the doorframe and on the end panel.
 4               And we intentionally did that, because I
 5          remember we had to change the pan stop and the size
 6          of the pan because it created a lot of headaches for
 7          what we had to deal with, because we wanted that
 8          look exactly right.
 9     Q    Well, if I understand the answer you just gave, the
10          Mid-West existing wire crate had a certain gap at
11          the seam between the front panel and the side
12          panels.  And when you took that design and created
13          the Mid-West wicker crate, you made the gap somewhat
14          narrower or tighter; is that correct?
15     A    Well, no.  The doorframe end panel already had the
16          existing gap, so we didn't change the doorframe or
17          end panel gap.  But we wanted the side panels to
18          look exactly the same, so we changed only the side
19          panel gap.
20     Q    When you say the side panel gap, the gap between
21          which two edges?
22     A    I'm talking about like from the edge of the wicker
23          to like the edge of the drop pin.
24     Q    Well, let's compare the gap -- let's talk for a
25          moment about the preexisting Mid-West wire frame
```

William Stewart Kerr
April 18, 2008

Page 53

| | | |
|---|---|---|
| 1 | | products; not the wicker product for a moment, but |
| 2 | | the wire frame products. |
| 3 | | And in particular, let's consider the gap |
| 4 | | between the edge of the side panel and the edge of a |
| 5 | | front panel.  Do you agree that there's a gap |
| 6 | | between those two panels? |
| 7 | A | Yes. |
| 8 | Q | How does that gap compare to the gap between the |
| 9 | | side panel in the Mid-West wicker product and the |
| 10 | | front panel? |
| 11 | A | Can you ask that one more time? |
| 12 | Q | Yeah.  We've established that you agree that there's |
| 13 | | a gap in the Mid-West conventional wire frame |
| 14 | | product between the side panel and the front panel. |
| 15 | A | It's kind of easier to orientate off the drop pin, |
| 16 | | though, because it forms a corner, as far as ... |
| 17 | Q | Well, we'll talk about it in your parlance, then. |
| 18 | | That's fine, if that will help you. |
| 19 | A | Yeah.  That will help me picture it. |
| 20 | Q | Okay.  In connection with the -- in regard to the |
| 21 | | Mid-West conventional wire frame product, there's a |
| 22 | | gap between the drop pin and the edge of the side |
| 23 | | panel, correct? |
| 24 | A | Yes. |
| 25 | Q | How does that gap between the drop pin and the side |

William Stewart Kerr
April 18, 2008

Page 54

```
 1        panel in the wire frame product compare to the same

 2        gap in the Mid-West wicker product?

 3   A    It's smaller.

 4   Q    So the gap in the wicker product is smaller,

 5        correct?

 6   A    Concerning the side panel only.

 7   Q    So when you went from the wire frame product to the

 8        wicker product, you tightened up the gap between the

 9        side panel and the drop pin, correct?

10   A    Yes.

11   Q    Now, let's talk about the same concept with regard

12        to the front panel.

13   A    Okay.

14   Q    Did the gap in the -- from the front panel edge to

15        the drop pin get narrower or bigger when you went

16        from the wire frame product to the wicker product?

17   A    It stayed the same.

18   Q    So that gap stayed the same?

19   A    Yes.

20   Q    But you did narrow the gap on the side?

21   A    Yes.

22   Q    Now, when you look at the side panel of Exhibit 2,

23        particularly the first page thereof, that side panel

24        has wicker -- again -- well, let me back up.

25            Exhibit 2 shows the Mid-West product, correct?
```

William Stewart Kerr
April 18, 2008

Page 55

```
 1   A   Yes.

 2   Q   The wicker product.  And when you look at the wicker

 3       covering on the side panel of the Mid-West wicker

 4       crate of Exhibit 2, do you agree with me that the

 5       wicker covering on the side panel stops at the end

 6       of the panel?  Correct?

 7   A   At the end of the last wire?

 8   Q   Yes.

 9   A   Yes.

10   Q   Would you agree with me that it would not be

11       practical to extend that wicker weaving around the

12       drop pin and still have the thing to be usable or

13       capable of being assembled?

14   A   We could have brought that wire closer to the drop

15       pin.

16   Q   But you could not really have taken the wicker from

17       the field of the side panel and wrapped it around

18       the drop pin itself; isn't that correct?

19   A   Well, we could have wrapped it around a drop pin and

20       made our eyelets bigger.

21   Q   But if you wrap the drop pin with wicker that is

22       also attached to the side panel and the front panel,

23       how are you going to take the pin in and out to

24       assemble and disassemble?

25   A   Well, if we made our hook eyelets bigger, we could
```

William Stewart Kerr
April 18, 2008

Page 70

```
 1   A   Pretty similar, most likely about the same.

 2   Q   Are there some differences?

 3   A   Just in terms of the hooking and stuff, but I

 4       couldn't recall exactly.

 5   Q   What do you mean when you say, "We also added an

 6       extra line wire on the top of the side panel"?

 7       What's that about?

 8   A   We put a line wire up here, because otherwise we

 9       didn't have a wire to catch the wicker up at the top

10       where we put our notches.

11   Q   What do you mean by "line wire"?

12   A   The wires that run this way (indicating), your

13       bigger spaced wires.

14   Q   Are line wires only extending horizontally?

15   A   It's dependent.  They're the ones usually with the

16       least amount of wires.  It's a technical term for

17       how our Schlatter machines work, our manufacturing

18       machines.

19   Q   Did you say slotter, S-L-O-T-T-E-R?

20   A   S-C-H-L-A-T-T-E-R.  I know on the top of the side

21       panel, we dropped this in.  Otherwise we would have

22       had a gap all the way down, and we didn't want that

23       look.

24   Q   Am I correct that in your 1000 series wire cages, on

25       the side panels there's no top wire that runs across
```

William Stewart Kerr
April 18, 2008

Page 71

```
 1        the very top of the side panel; is that right?
 2    A   Do you mean the very top wire, or the one -- which
 3        wire exactly?
 4    Q   Well, what do you mean by "line wire"?  I'm
 5        confused.
 6    A   Okay.  This wire right here is the one below the top
 7        wire (indicating).
 8    Q   Why is it called a line wire?
 9    A   Well, that's our technical term to call it.  Because
10        of the way our Schlatters push wires through the
11        machine, then it drops wires, we call the wires that
12        get pushed, which are usually the longer wire and
13        the least spaced wires, the line wires.  We call the
14        wires that get dropped by the machines, the tighter
15        spacing, we call them the cross wires.
16    Q   Are they called line wires because they extend
17        longitudinally in the direction of movement out of
18        the machine?
19    A   Yes.
20    Q   So then the cross wires are dropped onto the line
21        wires during manufacture crosswise to the length of
22        the line wires?
23    A   Yes.
24    Q   All right.  Now, we've had some difficulty with --
25        we've come to understand what a line wire is.
```

William Stewart Kerr
April 18, 2008

```
 1        What -- why was the extra line wire added, exactly?

 2   A    Well, we wanted to produce the look that we had here

 3        with the notches.  We could have put that wire

 4        wherever we wanted or we could have left it out, but

 5        that would have made our notch come all the way down

 6        to the window.  So we put it in there to where we

 7        wanted the look of our notch.

 8   Q    Am I correct that the line wire that you added near

 9        the top of the side panel forms the bottom of the

10        upper notches?

11   A    Yes.

12   Q    And you added an extra line wire near the bottom of

13        the side panel, and that extra line wire near the

14        bottom of the side panel forms the top of the lower

15        notches?

16   A    Possibly.

17   Q    Doesn't your email state, "We added one wire needed

18        on the bottom of the side panel" --

19   A    Yeah.

20   Q    -- "one and a quarter inch from the second line wire

21        for the bottom panel hooks"?

22   A    Yeah.  And I would have to remember -- I'm trying to

23        recall in my mind the thousand series.  I'm thinking

24        that sometimes it was there, but maybe all the way

25        through the series it wasn't there, so we had to add
```

# CONNOR+ASSOCIATES

1850 One American Square        Indianapolis, IN 46282
317+236+8022   800+554+3376   317+236+6015 (F)

RE: Indiana Rules of Procedure, Trial Rule 30 (E) and/or Federal Rules of Civil Procedure.

*PAGE _8_ LINE # _23_
CHANGE _THE SENTENCE SHOULD START WITH_
TO _"I THINK IT WAS ..."_
REASON FOR CHANGE _I HAD INTENDED TO SAY IT THIS WAY_

*PAGE _32_ LINE # _11_
CHANGE _"BILL DALE"_
TO _"BOB DALE"_
REASON FOR CHANGE _MISTRANSCRIPTION_

*PAGE _123_ LINE # _5_
CHANGE _INSERT AT THE BEGINNING OF THE LINE_
TO _"THE CURRENT LINES WERE STARTED ..."_
REASON FOR CHANGE _CLARIFICATION_

*PAGE _124_ LINE # _1_
CHANGE _STRIKE THE CURRENT ANSWER AND REPLACE THE FOLLOWING_
TO _AS FOR THE FIRST LINE DEVELOPED IN THE 90'S, WE DID NOT. AS FOR THE_
REASON FOR CHANGE _I WAS CONFUSED BY THE QUESTION._

*PAGE _____ LINE # _____
TO
CHANGE _SECOND LINE DEVELOPED IN THE EARLY 2000'S, I DO NOT THINK WE DID._
TO _AS FOR THE THIRD LINE DEVELOPED IN THE MID-2000'S, I THINK WE LOOKED AT PRECISION'S_
TO
REASON FOR CHANGE _DOUBLE DOOR WIRE CRATE._

*PAGE _____ LINE # _____
CHANGE _____
TO _____
REASON FOR CHANGE _____

*PAGE _____ LINE # _____
CHANGE _____
TO _____
REASON FOR CHANGE _____

*PAGE _____ LINE # _____
CHANGE _____
TO _____
REASON FOR CHANGE _____

I am, therefore, signing my deposition conditioned on the fact that the above noted shall be entered upon the deposition by the notary public

_William Stuart Kerr_
(Signature of Deponent)

# Exhibit R

Robert Dale
May 28, 2008

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF ALABAMA
 2                      EASTERN DIVISION
 3   SIMPSON VENTURES, INC.,              )
              Plaintiff,                  )
 4                                        )
                    -vs-                  )
 5                                        )
     MID-WEST METAL PRODUCTS              )
 6   COMPANY, INC.,                       ) Civil Action File No.
              Defendant.                  ) 3:06-cv-00901-WKW-VPM
 7   _____)
                                          )
 8   MID-WEST METAL PRODUCTS              ) Case No. 3:07-cv-
     COMPANY, INC.,                       ) 00048 WHA-CSC
 9           Counterclaimant,             )
                                          )
10                  -vs-                  )
                                          )
11   SIMPSON VENTURES, INC.,              )
              Counterdefendant.           )
12
13
                 DEPOSITION OF ROBERT DALE
14
          The deposition upon oral examination of
15   ROBERT DALE, a witness produced and sworn before
     me, Jenny L. Reeve, RPR, CSR No. 00-R-3006, a
16   Notary Public in and for the County of Hamilton,
     State of Indiana, taken on behalf of the Plaintiff,
17   at the offices of Bingham McHale, 2700 Market
     Tower, 10 West Market, Indianapolis, Marion County,
18   Indiana, on the 28th day of May, 2008, at 9:09
     a.m., pursuant to the Federal Rules of Civil
19   Procedure, all applicable rules, and all
     stipulations, if any, stated on the record, and
20   pursuant to written notice and/or agreement and/or
     subpoena as to time and place thereof.
21
22
23
     Connor + Associates, Inc.
24   1650 One American Square
     Indianapolis, IN 46282
25   (317) 236-6022
```

Robert Dale
May 28, 2008

Page 4

```
 1                          ROBERT DALE,
 2    having been duly sworn to tell the truth, the whole
 3    truth, and nothing but the truth relating to said
 4    matter, was examined and testified as follows:
 5
 6    DIRECT EXAMINATION,
 7       QUESTIONS BY MR. JOSEPH W. STALEY:
 8    Q   I know we just met a moment ago, but could you
 9        please state your name and address for the record.
10    A   John Robert Dale, 13020 West Council Road, Yorktown,
11        Indiana.
12    Q   Now, up front, I just want to set a couple of ground
13        rules.  Just to let you know, at any time during
14        this deposition if you need a break, please let me
15        know and I'll try to get to a stopping point as soon
16        as possible and accommodate your request.
17            While I'm asking you questions, please let me
18        finish the entire question before you answer.  And
19        perhaps, after I finish the question, maybe you can
20        take a moment before you answer to allow any
21        objections by your counsel.
22            Can you tell me a little bit about your
23        educational background.
24    A   Graduated from Ball State University with a major in
25        visual communications, bachelor of arts.
```

Robert Dale
May 28, 2008

Page 5

```
 1   Q   What is visual communications?

 2   A   It entailed not only design sequence, but

 3       filmmaking, print technology, journalism,

 4       communications, written communications.

 5   Q   So you got a graduate degree as well as a bachelor's

 6       degree, you mentioned?

 7   A   No.  Bachelor's degree only.

 8   Q   Okay.  And how long have you been employed with

 9       Mid-West?

10   A   It's coming up on 60 days.  My first day was

11       March 31st of '08.

12   Q   What is your current job title?

13   A   Director of marketing and design.

14   Q   What responsibilities does that job entail?

15   A   Oversee all marketing design, and that would include

16       package design, product design.  I'm also over the

17       design manager as well as the marketing manager,

18       those two positions.

19   Q   What exactly is the design manager responsible for?

20   A   Everything that entails any kind of retail exposure,

21       market exposure.

22   Q   Who is the design manager?

23   A   Tiffany Morgan -- Tiffany Meyer.  I'm sorry.

24       M-E-Y-E-R.

25   Q   Now, before you were the director of marketing and
```

Robert Dale
May 28, 2008

```
 1        design on March 31st, did you have any other
 2        positions with Mid-West?
 3   A    No.
 4   Q    Did you have any interactions with Mid-West --
 5   A    Yeah.
 6   Q    -- prior to that?
 7   A    (Witness nods head.)
 8   Q    Can you describe how you interacted with Mid-West
 9        before you were a full-time employee.
10   A    I have done work for them on a project basis for --
11        dating back to 1983.
12   Q    What kind of projects would you normally take on for
13        Mid-West?
14   A    Typically, marketing design projects, which
15        encompassed package design, marketing, promotional
16        flyers, advertising.
17   Q    Did you ever take on any projects in which you
18        developed products or helped them develop products
19        for Mid-West?
20   A    No, not early on.  I think as time went on, as we
21        got into the '90s, then I got more exposure in that
22        sense.  But for the most part, no, I didn't have.
23   Q    So into the '90s, you said you had some exposure to
24        design products or helping in the design aspects.
25            What was the first project you ever worked on
```

Connor+Associates

Page 7

| | | |
|---|---|---|
| 1 | | on which you worked on the design of a product? |
| 2 | A | Actually, probably -- I would say at any depth and |
| 3 | | length, it would have been with this project. |
| 4 | Q | And "with this project," can you -- |
| 5 | A | Bay Isle. |
| 6 | Q | So you're saying that the first time you had a |
| 7 | | product development role, any role in the product |
| 8 | | development, was with the Bay Isle line? |
| 9 | A | To this extent, yes. |
| 10 | Q | Well, to any extent.  Can you remember working on |
| 11 | | any other project on which you had product design |
| 12 | | experience? |
| 13 | A | No. |
| 14 | Q | So I believe you were an independent contractor, |
| 15 | | then, working with Mid-West between 1983 all the way |
| 16 | | through May (sic) 31st of this year? |
| 17 | A | (Witness nods head.) |
| 18 | Q | Did you work for other companies during that stretch |
| 19 | | of time? |
| 20 | A | Yes, yeah. |
| 21 | Q | How much of your business would you say came from |
| 22 | | Mid-West, what percentage of your work during that |
| 23 | | period of time? |
| 24 | A | Overall? |
| 25 | Q | Uh-huh. |

Robert Dale
May 28, 2008

Page 8

| | | |
|---|---|---|
| 1 | A | Initially, it probably accounted for as little as |
| 2 | | 15 percent.  And then it grew to -- in recent years, |
| 3 | | the last two years, it stood for 65 to 70 percent of |
| 4 | | the overall |
| 5 | Q | When you say last few years -- |
| 6 | A | Last two. |
| 7 | Q | The last two? |
| 8 | A | Yes. |
| 9 | Q | Are you still doing contract work for other |
| 10 | | companies at this time? |
| 11 | A | No. |
| 12 | Q | So you're exclusively with Mid-West at this point? |
| 13 | A | Yes. |
| 14 | Q | As a contract employee, who did you report to? |
| 15 | A | In the early years, Jim Wingate.  And then it became |
| 16 | | more so -- yeah, interacting with Tom Swan, Jim |
| 17 | | Wingate.  And as things evolved, the entire |
| 18 | | committee, which is most recent. |
| 19 | Q | When you say "the entire committee," what committee |
| 20 | | are you referring to? |
| 21 | A | New product committee. |
| 22 | Q | Who else is on that new products committee? |
| 23 | A | Stew Kerr, Dave Clemmons, presently Bryan Jennings. |
| 24 | | Jim Wingate, Tom Swan.  Now -- well, Tiffany Meyer |
| 25 | | as well. |

Robert Dale
May 28, 2008

Page 15

```
 1      anything that we had pertaining ...
 2  Q   Approximately, do you recall when that was?
 3  A   This goes back as early as 2006.
 4  Q   Before Mr. Wingate identified this product as
 5      Simpson Ventures product, did you previously have
 6      any awareness of this product under a different
 7      name?
 8  A   No, not under a different name.
 9  Q   So before 2006, you had no awareness whatsoever of
10      who the manufacturer of this product was?
11  A   No.
12  Q   Now, I'm going to hand you what has been previously
13      marked as Exhibit 2.  And if you'd take a look
14      through that exhibit and tell me if you can identify
15      what's shown in Exhibit 2 there.
16  A   Yes.  It's the Bay Isle dog crate.
17  Q   So this picture is representative of the Bay Isle
18      line of wicker crates?
19  A   Yes.
20  Q   I'm now going to hand you what has been previously
21      marked as Exhibit 3.  Could you identify what's
22      shown in Exhibit 3 for me, please.
23  A   This is the Bay Isle what they refer to as the 1805,
24      and the carton.
25  Q   Going back to -- let's look through Exhibit 2.  So
```

Robert Dale
May 28, 2008

Page 16

```
 1       going back to Exhibit 2 now, could you -- would you
 2       describe or could you tell me how you would describe
 3       the Bay Isle product lines with a potential
 4       customer, or to a potential customer?
 5   A   It's a dog crate with a wicker weave incorporated
 6       throughout.  Employs design elements such as these
 7       squares, a pattern, symmetry throughout each panel.
 8           I see that it's contiguous from panel to panel
 9       with the symmetry of specific dimensions that play
10       off of each other and flow from panel to panel.
11           A specific number or count of notches at top
12       as well as bottom, that coordinate with that same
13       interval of symmetry.
14           The front panel, I'm seeing a door with two
15       latches, a name pin -- name plate identifying the
16       product, in this case drop pins that pull the panels
17       together, from this photograph.
18           Do you want me to go to others?
19   Q   Yeah, please.  You can look at any picture you want
20       in Exhibit 2 there.  I'm just looking for how you
21       would describe this to a potential customer.
22   A   There is a side view of a side panel throughout.
23       Again, we see coil bars going above and below the
24       window.  The square patterns of the weave, the
25       pattern weave within a weave, the notches across the
```

Robert Dale
May 28, 2008

Page 17

1    bottom, notches across the top, the specific

2    symmetry that goes with -- coordinates with

3    everything else in a contiguous manner.

4         You've got a gap at the corners where the

5    junctions -- of each panel, where the drop pins go,

6    you have a gap of space that's uniform from panel to

7    panel.  You've got the coil wicker around the bottom

8    wire, the very -- the bottom, the side panel, as

9    well as the upper panel below the notches.

10        Front panel, two latches again, you've got

11   notches allocated to where the latches secure.

12   Again, just carrying through the same contiguous

13   design onto the front panel.

14        The back panel with window, and you have the

15   bars above and below the window wrapped in wicker.

16   Specific size or grid allocation above the window as

17   well as adjacent to the window.  A margin left and

18   right of the window that equals that of the side

19   panel.

20        Two squares revealing a pattern within a

21   pattern.  Again, I see the -- how the -- around the

22   outside of the frame, how you have a gap revealed

23   between panels as they come to a junction.

24        The top panel in this instance, I think, as all

25   of their line, employed four squares, with patterns

Robert Dale
May 28, 2008

Page 18

```
 1        within a pattern.  Also it reveals, again, the gap
 2        around the outside where the junction between panels
 3        come together.  A black wire finish throughout.
 4   Q    Anything else?
 5   A    That's all.
 6   Q    Now, being that you're the head of marketing and
 7        design, is that how you actually would describe the
 8        product to a potential customer?
 9   A    Yes.
10   Q    Have you ever described the product in that fashion
11        to a potential customer?
12   A    No.  I've never described the product to someone.
13   Q    Have you worked on any of the marketing or
14        advertising materials for this product?
15   A    Yes.
16   Q    And in your work in those marketing or advertising
17        pieces, have you ever described the product in that
18        fashion?
19   A    No.
20   Q    How have you described the product to a potential
21        customer?
22   A    Just a wicker-covered crate.
23   Q    Now, in all those features that you just gave me,
24        and how you first said you would describe this to a
25        customer, did anybody at Mid-West go over those
```

Page 19

```
 1         features with you, or is that your own impression of
 2         what features are present in the Bay Isle model?
 3    A    This is the specifics that once we began the design
 4         process, we arrived at those -- all those specifics
 5         that made it unique.
 6    Q    When you said "we arrived at the design process,"
 7         can you be more specific?
 8    A    That's my communication back and forth through the
 9         product committee.
10    Q    So in your communication back and forth with the new
11         product committee, those are features that were
12         routinely discussed as important features of the Bay
13         Isle model?
14    A    Yes, that I designated and they followed through
15         with --
16    Q    So you --
17    A    -- at their input, collaboration,
18    Q    Are you aware of any documents that would validate
19         your claim that these features were described
20         previous to this lawsuit?
21    A    No.
22    Q    Do you recall any documents that would validate your
23         statement?
24    A    No.
25    Q    Do you think at any point in time such documents
```

Page 20

```
 1        could have existed?

 2    A   I don't believe so.  Most of this is a verbal

 3        communication and was typically acted upon by the

 4        other members of the committee.

 5    Q   So when you say the communications were verbal, were

 6        they via telephone, or were you present at a new

 7        product --

 8    A   At the meetings.

 9    Q   Can you tell me what your specific involvement was

10        in the design of the Bay Isle line wicker crates.

11    A   Essentially, everything I just went through;

12        actually, everything -- all the -- all the

13        specifics, specific elements that I pointed out and

14        described, the Bay Isle model.

15    Q   So all of those numerous features that you espoused

16        a minute ago, you're saying that you were the one

17        that came up with all those features particularly?

18        It was your design?

19    A   That was part my input, and acted upon by the

20        collaboration of the committee.

21    Q   When you say it was a collaboration, did you

22        merely -- did you suggest all these features and

23        they adopted them, or did other people come up with

24        features and you came up with some features?

25    A   I suggested, for the most part, most of them, the
```

Page 21

```
 1        majority.
 2    Q   Are there any features that you particularly recall
 3        that you did not come up with?
 4    A   No.
 5    Q   For example, I believe earlier you stated that the
 6        black finish was a design choice that you suggested.
 7            Isn't it true that all the Bay Isle -- isn't it
 8        true that all of the Mid-West drop pin crates before
 9        the wicker crate came out were black?
10    A   Yes.
11    Q   So did you suggest -- are you the originator of the
12        black finish, or did you merely just use what was
13        already available?
14    A   They have other finishes that could always be
15        considered.  I mean wire can be finished in any
16        color.
17    Q   At the time was any other color wire being used?
18    A   Yes.
19    Q   What colors were those?
20    A   Oh, everything from silver to galvanized.  They had
21        a color series, actually, they'd done as well, a
22        color collection.
23    Q   Are you aware if the black powder-coated feature is
24        cheaper than the galvanized finish?
25    A   No, I'm not
```

Page 25

```
 1   A   Other than the fact that it was there at a
 2       subsequent meeting.  I did see the -- see it at the
 3       meeting.
 4   Q   And you assumed somebody from Mid-West ordered it,
 5       or do you have any specific recollection?
 6   A   No, no specific recollection.
 7   Q   Were you regularly at new product development
 8       meetings?
 9   A   That was the -- close to that time it became --
10       became a regular committee meeting weekly that I
11       attended.
12   Q   And when you said close to that time, are you
13       referring to 2002/2003 time frame --
14   A   Yes.
15   Q   -- when this was discussed?
16   A   Yes.
17   Q   And on these weekly meetings, where did they take
18       place?
19   A   At that time, what they refer to as engineering or
20       fabrication department.
21   Q   How were you notified of the upcoming meetings?
22   A   They would -- I guess initially, it was verbal from
23       week to week.
24   Q   At any point in time, were the meetings scheduled
25       via email?
```

Robert Dale
May 28, 2008

Page 27

 1   Q   Let's briefly go back, I'm sorry, to the initial
 2       meeting we talked about in 2002 in which the catalog
 3       picture of this -- of the wicker crate in Exhibit 4
 4       was discussed.  Do you recall what else was
 5       discussed at that initial meeting?
 6   A   Not specifically.
 7   Q   Generally, do you have any recollection at all of
 8       what was discussed?
 9   A   If anything was discussed about the product, about
10       this product, it was their interest in the weave and
11       how that might have been accomplished.
12   Q   And when you say "interest in the weave and how that
13       might be accomplished," can you be more specific.
14   A   It's how, just generally, one might weave that into
15       wire.
16   Q   Prior to that meeting in 2002, had there been any
17       discussions that you're aware of in which employees
18       of Mid-West discussed how to weave wicker onto wire?
19   A   There have been many things considered over a number
20       of years prior to that, you know, different types of
21       product and media, and how it might interrelate
22       into, or how you might incorporate it into a wire
23       frame fabrication and/or just through metal, just
24       all -- you know, just an array of different types of
25       materials we could possibly use.

Page 28

```
 1   Q   Specifically wicker was discussed?

 2   A   Yes.

 3   Q   Do you have any knowledge of why wicker was not used

 4       previously in conjunction with Mid-West crates?

 5   A   No, I don't.

 6   Q   Well, at this meeting in 2002, what was the new

 7       product development group's reaction to the catalog

 8       picture of the wicker crate shown in Exhibit 4?

 9   A   I guess it was more so -- as I said or mentioned

10       before, it was more so about the method by which one

11       might weave into a wire frame.

12   Q   Were the members of the team surprised that it could

13       be done?

14   A   No, not really.  I mean they knew it was -- you

15       know, they knew it was accomplishable, but they just

16       didn't know -- they hadn't seen this specific one, a

17       specific example.

18   Q   So prior to -- prior to that meeting, then, it's

19       your understanding that employees at Mid-West had

20       never seen a wicker woven kennel before?

21   A   I'm sorry.  Restate.

22   Q   Let me ask that a different way.

23           You said earlier that the new product

24       development team was interested in this crate,

25       particularly because they wanted to see how the
```

Robert Dale
May 28, 2008

Page 32

```
 1        the Bay Isle line -- or to create the Bay Isle line?
 2             MR. HINSHAW:  Objection.  Form and foundation.
 3        It mischaracterizes any testimony that anybody
 4        incorporated features from the Simpson Ventures
 5        product into the Bay Isle product.
 6   BY MR. STALEY:
 7   Q    I believe earlier you said that the new product
 8        development team talked about incorporating the
 9        wicker that was shown in the catalog photograph into
10        a Mid-West wire frame kennel, correct?
11             MR. HINSHAW:  I believe that mischaracterizes
12        his testimony.  I believe what he testified to was
13        the interest in the weaving technique of the Simpson
14        Ventures product.  I object on that basis as
15        mischaracterizing his testimony.
16             MR. STALEY:  Can we read back the testimony
17        earlier when Mr. Dale discussed the -- incorporating
18        the wicker from the Simpson Ventures product into
19        the Mid-West wire frame kennel.
20             (The reporter reads back as requested.)
21             MR. STALEY:  Thank you.
22   BY MR. STALEY:
23   Q    And so this technique that the new product
24        development team was going to incorporate into their
25        Bay Isle line, where did this technique come from?
```

Connor+Associates

Page 33

```
 1       Where did they get the idea for that technique?
 2    A  We viewed the sample.  But it's not unlike many
 3       other things you might use as a resource for a
 4       technique of weave.
 5    Q  Did the idea come from the sample?
 6    A  No.
 7    Q  Did the particular technique come from the sample?
 8    A  No.
 9    Q  Did -- did you incorporate any features from the
10       Simpson Ventures product into the Bay Isle line
11       product?
12    A  No.
13    Q  Does the Simpson Ventures product have wicker?
14    A  Synthetic wicker.  I guess we refer to it as rattan,
15       yes.
16    Q  Could be synthetic.  Could be real wicker.  Let's
17       just call it a wicker.
18           And did any product you've ever seen before
19       have wicker incorporated on it, any crate?
20    A  No.
21    Q  Did any Mid-West kennel ever have wicker
22       incorporated on it --
23    A  No.
24    Q  -- prior to the Bay Isle line?
25           So isn't it true that you incorporated the
```

Page 36

```
 1    Q    At the time that the Simpson Ventures sample was

 2         actually physically at a new product development

 3         meeting, were there any other crates of any kind at

 4         that meeting?

 5    A    No.

 6    Q    There wasn't a Mid-West crate at that meeting?

 7    A    No.

 8              MR. STALEY:  We've been going for about an hour

 9         and 10 minutes.  Would now be a good time to take a

10         quick break?

11              MR. HINSHAW:  Sure.

12              (A recess is taken, after which, the

13         proceedings resume as follows:)

14    BY MR. STALEY:

15    Q    How did it come about exactly that you were told

16         to design the design aspects of the Bay Isle line

17         wicker pet crate?

18    A    They were interested in bringing a wicker pet crate

19         to market.  They had me look over the possibilities

20         of how it could be incorporated into their existing

21         product line, show them designs as such that would

22         be appealing, and at the same time demonstrate the

23         infrastructure or underlying structure of their

24         crate, and the -- how substantial their crates are.

25    Q    First off, when you say "they," I just want to be
```

Robert Dale
May 28, 2008

Page 37

```
 1        clear again that we're talking about the new product
 2        development team.
 3   A    Yes.
 4   Q    Did anyone in particular give you instruction --
 5        give you those instructions?
 6   A    Jim Wingate and Tom Swan.
 7   Q    Do you recall specifically the conversation in which
 8        you were instructed to come up with designs for the
 9        Bay Isle line?
10   A    Yes.
11   Q    When did those discussions take place?
12   A    It was either in the first or second meeting that
13        they had where this was a topic of conversation.
14   Q    Was the actual physical sample in the Simpson
15        Ventures crate present when you were given those
16        instructions?
17   A    Yes.
18   Q    Did anyone instruct you to incorporate specific
19        features from the Simpson Ventures product into the
20        Bay Isle line?
21   A    No.
22   Q    Were you ever instructed or spoken to about trying
23        to mimic the Simpson Ventures product?
24   A    No.
25   Q    Did you yourself attempt to mimic any features of
```

Robert Dale
May 28, 2008

Page 38

```
 1       the Simpson Ventures product?

 2   A   No.

 3   Q   Were you ever instructed or spoken to concerning how

 4       you could possibly change the Simpson Ventures

 5       product to create the Bay Isle line product?

 6   A   No.

 7   Q   Did you in any way try to take the Simpson Ventures

 8       product and modify it to create the Bay Isle line?

 9   A   No.

10   Q   Were you ever asked or instructed to design around

11       or to change the look from the Simpson Ventures

12       product?

13   A   Yes.

14   Q   Who gave you those instructions?

15   A   Jim Wingate and Tom Swan.

16   Q   Specifically, could you elaborate on what those

17       instructions were.

18   A   To come up with an original design for a wicker

19       crate, one that wouldn't mimic by any means.

20   Q   Do you recall the exact words that they used in

21       giving you those instructions?

22   A   I think it was "propose" -- or, "Give us a proposal

23       on an original design."

24   Q   What did you understand "original" to mean?

25   A   Something that was unique to itself, novel, unlike
```

Page 39

```
 1        anything else.
 2    Q   When you say "unlike anything else," I'm assuming
 3        you -- that's -- you still were going to incorporate
 4        wicker into the design, correct?
 5    A   Yes.
 6    Q   So when you used the word "original," are you
 7        referring to the -- could you tell me exactly what
 8        you're referring to, and to -- what you were going
 9        for in terms of originality for the Bay Isle line as
10        compared to the Simpson Ventures product.
11    A   To be an original -- aesthetic original principles
12        of design being applied.
13    Q   And what features did you incorporate in the Bay
14        Isle line that you feel are original, as compared to
15        the wicker -- or the Simpson Ventures product, or
16        any other product on the market for that matter?
17            MR. HINSHAW:  Could I have the question read
18        back, please.
19            (The reporter reads back as requested.)
20            MR. HINSHAW:  Objection.  Form.  Foundation.
21    A   Can you restate?
22   BY MR. STALEY:
23    Q   Sure.  What features on the Mid-West Bay Isle line
24        wicker crate are original?
25    A   Probably throughout the whole principle --
```

Robert Dale
May 28, 2008

Page 40

```
 1          principles of design that were employed.  And that
 2          has to do with symmetry.  Has to do with application
 3          of the square pattern, the patterns within the
 4          square, the windows, the placement of the windows,
 5          the size of the windows;
 6              The contiguous symmetry that goes from panel to
 7          panel, including the top, the notches above and
 8          below, and the interval with which they appear in
 9          coordination with the panels; the gaps as the panels
10          come together, the junctions of -- the junction of
11          each panel, top, side, bottom, the rear panels;
12              The name plate on the door, the door latches,
13          two door latches, the style of door latch, the gaps
14          on the front panel where the door latch is secure
15          back into the metal frame;
16              The choice of the black electro-coat finish.
17          That was to allude to or emulate a wrought iron
18          effect.  I think that's everything.
19     Q    Could you elaborate more on what you mean by
20          "symmetry."  You've twice mentioned symmetry.
21     A    As we go through, the side panel's an example.
22          These sizes on a grid (indicating) are the same.
23          And you see the symmetry from the left to right on
24          the margins, the window to each -- on the -- how --
25          where the margin is between the windows and the ends
```

Page 41

```
 1        of the panels.

 2             You also see symmetry here in the way the

 3        spacing of the notches appear, top and bottom.

 4        There's a certain interval that takes place.  It's

 5        symmetrical.

 6             The weave throughout from top to bottom on each

 7        panel is also consistent, other than the pattern

 8        weave of the square, the decorative pattern weave of

 9        the square.

10             And the coil wrap.  Of course, again, that

11        accentuates that symmetry once again and let's you

12        see that is contiguous from panel to panel as it

13        encircles the whole crate.

14    Q   The coil is contiguous from panel to panel, or --

15    A   The spacing of the coil, it's at either side of the

16        window, how that goes from panel to panel.  You see

17        this come around to the side.  It's consistent.

18        Comes all the way around.

19    Q   You don't mean contiguous with each other?  You just

20        mean that each panel has coil; is that correct?

21    A   The design of it is a contiguous design that flows

22        from panel to panel.

23    Q   Anything else on symmetry?

24    A   No.

25
```

Page 42

```
 1   Q   Now, looking at Exhibit 4 for me, is the Simpson
 2       Ventures product shown there in -- does it lack
 3       symmetry?
 4   A   Yes.
 5   Q   Could you elaborate.
 6   A   In that the windows on the side there aren't
 7       necessarily in any kind of -- they aren't in any
 8       symmetrical fashion or balance with each panel.
 9       There's not a set specific distance at the top to
10       the size of the window to the rest of the frame.
11       The location of the diamond weave pattern is such
12       that it could be located or centered, but not
13       necessarily set up in a pattern that's necessarily
14       centered here, or left or right (indicating), or top
15       to bottom.
16   Q   I'm sorry.  Are you saying that the diamond weave
17       pattern is not centered, sir?
18   A   Not perfectly centered.  The weave itself doesn't
19       look as consistent as what ...
20   Q   It "doesn't look as consistent as," could you
21       complete that, sir?
22   A   Doesn't look as consistent, or just doesn't look
23       consistent.
24   Q   So to you, the weave does not look consistent?
25   A   Yes.
```

Page 43

| | | |
|---|---|---|
| 1 | Q | Could you show me specifically in figure 4 where it |
| 2 | | does not look consistent to you. |
| 3 | A | Across here.  It's variegated in a variation from |
| 4 | | (indicating). |
| 5 | Q | And you're pointing above the door, sir? |
| 6 | A | Yes. |
| 7 | Q | Where does it look inconsistent from that? |
| 8 | A | I think it -- throughout you see inconsistency, |
| 9 | | (indicating) from here to there. |
| 10 | Q | What's inconsistent about it, sir? |
| 11 | A | It's not a consistent weave.  You see a variation, a |
| 12 | | variegation for that matter. |
| 13 | Q | Let's look at page 2 of Exhibit 4.  Could you point |
| 14 | | out to me what variation exists between the weave |
| 15 | | and the side panel. |
| 16 | A | See right through here (indicating), how |
| 17 | | inconsistent that is? |
| 18 | Q | You're pointing out on the edges where the frame |
| 19 | | of the panel is visible that the wicker is |
| 20 | | inconsistent, in your eyes? |
| 21 | A | Yes. |
| 22 | Q | From the remaining parts of the panel? |
| 23 | A | Yes. |
| 24 | Q | Other than at the edges of the panel, does the |
| 25 | | majority of the field of panel, does it have a |

Robert Dale
May 28, 2008

Page 44

```
 1        consistent weave pattern?
 2    A   It does below the window.  Above the window I see
 3        inconsistency and certainly one that doesn't match
 4        this lower panel.
 5    Q   You believe there's inconsistency in the weave below
 6        the window and above the window?
 7    A   Yes.
 8    Q   Let's go -- well, still looking at page 2 of
 9        Exhibit 4, and then flipping over to -- looking at
10        page 2 of Exhibit 4, are you aware if the other side
11        panel looks any different from that side panel, sir?
12    A   The opposite side panel?
13    Q   Correct.
14    A   I'm not aware of the open side panel to be
15        different.
16    Q   Assuming that both side panels are the same, would
17        that be symmetrical in your eyes?  Let me rephrase
18        the question.
19            Assuming that both side panels are the same,
20        would that be an incidence of symmetry?
21    A   Likeness, not necessarily symmetry.
22    Q   What is your definition of symmetry?
23    A   Working within a grid, taking, as an example, one
24        side panel and laying it out in symmetrical fashion
25        so it actually operates and has been laid out over
```

Robert Dale
May 28, 2008

Page 47

```
 1        the top of the panel and fold it in half, would it
 2        not be true that that side panel is symmetrical,
 3        using the definition we just discussed?
 4    A   I don't know.
 5    Q   What gives you pause?
 6    A   Looks like there's a lack of consistency in the
 7        weaving that would make it perfectly symmetrical.
 8    Q   Specifically, what weaving could possibly make it
 9        asymmetrical?
10    A   The placement of the diamond.
11    Q   Are you contending that you believe it might be
12        possible that the diamond is not perfectly centered
13        on the panel?
14    A   Yes.
15    Q   Assuming that the diamond was perfectly centered on
16        that panel, would you then agree with me that that
17        panel is symmetrical?
18    A   Yes.
19    Q   Let's talk about the notches for a moment in
20        Exhibit 2, which is the Mid-West wicker crate.
21            Are those notches required to perform any
22        function of the crate?
23    A   I don't believe so.  But it was -- rather than hide
24        any portion of the underlying frame, we brought
25        forth a design principle that more so acknowledged
```

Robert Dale
May 28, 2008

```
 1        or demonstrated the infrastructure rather than try
 2        to hide the infrastructure.
 3   Q    Is it possible that that style crate could be
 4        assembled without having the notches in the side
 5        panels, for instance?
 6   A    Yes.
 7   Q    How so, sir?
 8   A    The weaving wouldn't be necessary to have weaving
 9        that far away from these connecting points
10        (indicating), at any point through here, that would
11        apply to any of the notches.
12   Q    But you can see there would -- would you concede
13        that there needs to be some opening to allow those
14        panel connectors to extend beyond the surface of the
15        wicker?
16   A    Very little.  Only as big as the wire itself.
17   Q    But at least some notch would be required, correct?
18   A    I wouldn't say -- I don't know if it would be called
19        a notch.  It would be a -- it would be where this
20        wire would connect.
21   Q    You agree with me there would need to be some
22        opening in the wicker panel itself to allow those
23        connectors to extend, correct?
24   A    Only large enough for the wire to protrude through.
25   Q    In that there would be an opening, correct?
```

Robert Dale
May 28, 2008

Page 49

```
 1   A   For the size of the wire.

 2   Q   Now, let's talk about the gaps along the panel

 3       edges.  Specifically, let's -- let's take a look at

 4       figure -- or page 1 of Exhibit 2.

 5           Isn't it true that at least some gap between

 6       the panels is required to allow the drop pin to

 7       connect the panels?

 8   A   I don't know that it's -- that's true.

 9   Q   Well, in this configuration, it appears we have

10       two -- appears that the crate can be disassembled

11       for shipping, and each panel has what appears to be

12       hooks or rings that extend from the end of the panel

13       in which the drop pin is pushed through to secure

14       them together, correct?

15   A   Yes.

16   Q   So isn't it true that there would have to be at

17       least some gap between the panels to allow the drop

18       pin to connect the panels using this style of crate?

19   A   I don't know.

20   Q   Why don't you know?

21   A   I'm not that close to how that might be configured

22       on that style crate that it could be drawn even

23       closer together or farther apart.

24           But the gap was intentional and followed

25       through with the rest of the aesthetic, in that we
```

Robert Dale
May 28, 2008

Page 50

```
 1        wanted to allude to, particularly with this black
 2        finish, more of a wrought iron type infrastructure
 3        in appearance.
 4   Q    Let me first ask you if you're aware of a way that
 5        the -- that no gap could be employed on this design.
 6   A    I could envision one.  I'm not aware of one where
 7        the drop pin might go down on the interior --
 8   Q    Using --
 9   A    -- of the panel.
10   Q    I'm sorry.  I apologize for interrupting you.
11            Using this configuration of panel where the
12        hooks extend beyond the panel itself, are you aware,
13        using this configuration, of any configuration in
14        which there would not be at least a minimal amount
15        of gap to allow for the drop pin to secure the
16        panels together?
17   A    No.
18   Q    Did anyone at Mid-West or in any of the new product
19        meetings discuss the gap in any way when you were
20        designing the wicker crate?
21   A    That it would be an element we would work into the
22        entire aesthetic.
23   Q    When you say "we would work into the entire
24        aesthetic" --
25   A    Or would be worked into the entire aesthetic.
```

Page 51

```
 1    Q    Who is "we"?

 2    A    The -- back to the committee.

 3    Q    Specifically, why did you choose that amount of gap?

 4    A    It was appropriate for the framing and the balance

 5         from panel to panel, if you see the way it works

 6         across the top as well as the sides.

 7    Q    What do you mean by "appropriate"?  For instance,

 8         when I look at figure 2 of Exhibit 2, between

 9         the side and top panel -- page 2, in looking at

10         page 2 of Exhibit 2, and looking at the interaction

11         between the side panel and the top panel, I don't

12         see a gap.

13    A    Oh, here (indicating).  Here's your gap.  That's a

14         view from the top.

15    Q    What page are you referring to, sir?

16    A    The last page of Exhibit 2.  That's very consistent.

17    Q    Could you specifically point to how that gap along

18         the top edge between the front panel and the top

19         panel is consistent with the gap in the -- between

20         the front panel and the side panel?

21    A    Right here (indicating).

22    Q    You're pointing to the drop pin, sir?

23    A    No.  This gap is consistent -- the distance between

24         panels is consistent on the top and side panels as

25         well as the front and side panels, as well as the
```

Page 52

```
 1        back and side panels.
 2   Q    Is it your testimony today that the distance between
 3        the gaps on the front panel and the side panel is
 4        the same as the distance between the top panel and
 5        the front panel?
 6   A    Not the top panel or front panel.
 7   Q    So the gap between the side panels and the front
 8        panel and the gap between the top panel and the
 9        front panel are inconsistent, correct, sir?
10   A    The distance between the front panel and the back
11        panel, front panel and top panel, the back panel or
12        the top panel is consistent.  The gap exists on
13        either side (indicating) of the crate, from front to
14        back.
15   Q    Notwithstanding that, I asked you if the gap between
16        the top panel and the front panel, is that gap
17        consistent with the distance between the front panel
18        and the side panel?
19   A    No.
20   Q    So those gaps are inconsistent, then?
21   A    But it's symmetrical in the sense that the top panel
22        is the same distance to the front panel of the gap
23        as it is to the back panel.
24           So we're looking at -- in the length of the
25        crate, that gap that exists between the panels that
```

Robert Dale
May 28, 2008

Page 53

```
 1        exist on either side to the top panel and the front
 2        and back panels is consistent.  These are consistent
 3        and these are consistent (indicating).
 4   Q    But the gaps between the front and sides and front
 5        and top are inconsistent, correct?
 6   A    Yes.
 7   Q    Okay.  And the gaps between the front panel and side
 8        panel have a drop pin between them, correct?
 9   A    Yes.
10   Q    Is there any such connector between the front panel
11        and the top panel?
12   A    No.
13   Q    Let's briefly go back to that issue of symmetry for
14        a moment.
15            If you look at page 1 of Exhibit 2, is it your
16        contention that when looking at the front panel,
17        when looking at the front panel of page 1 of
18        Exhibit 2, is it your contention that if you were
19        to take a -- draw a line from the top of the front
20        panel to the bottom and the middle of the front
21        panel, that the crate itself is symmetrical, meaning
22        that it's the same on the left as it is on the right
23        side?
24   A    No, not from the front panel.
25   Q    What specifically would make it asymmetrical?
```

Page 57

```
 1        the panel.  Is the -- using that line as a line of
 2        symmetry, is the Simpson Ventures crate symmetrical,
 3        other than the latch and the notch on the front
 4        panel?
 5   A    Appears to be.  But I wouldn't say perfectly
 6        symmetrical.
 7   Q    Substantially symmetrical, though, correct?
 8   A    Virtually.  Well, symmetrical might be a -- I don't
 9        know if I understand "substantially."
10   Q    The word "virtually" is fine.  So virtually
11        symmetrical, correct?
12   A    Yes.
13   Q    Or instead of using the word "virtually," is it
14        essentially symmetrical?
15   A    It's approximately symmetrical.
16   Q    Going back to when we were earlier discussing your
17        instructions to make an original or unique design in
18        the Mid-West Bay Isle line, were there any
19        particular features of the Simpson Ventures crate
20        that you were instructed to avoid?  And when I say
21        "avoid," I mean avoid copying or mimicking.
22            MR. HINSHAW:  Could I have the question read
23        back, please.
24            (The reporter reads back as requested.)
25   A    I was instructed to devise an original design, one
```

Page 58

```
 1         that certainly would not incorporate a diamond.
 2    BY MR. STALEY:
 3    Q   Were you told specifically to avoid using a diamond?
 4    A   No.
 5    Q   Were there any other instructions given to you
 6        that would have shed light on what you meant by
 7        "original"?
 8    A   No.
 9    Q   So you were just simply told to make an original
10        unique look, correct?
11    A   Yes.
12    Q   At any point in time while you were designing the
13        Bay Isle line, were you ever shown any patents?
14    A   No.
15    Q   Were you ever shown any -- any other wicker crates,
16        other than the Simpson Ventures crate?
17    A   No.
18    Q   Were you ever advised by a lawyer in any capacity
19        in coming up with the design of the Bay Isle wicker
20        crate?
21    A   No.
22    Q   How many designs did you come up with?
23    A   From final approval, roughly, we had three, and I'll
24        say just rough designs that I sketched out, with the
25        idea in mind that they were to follow through with
```

Robert Dale
May 28, 2008

Page 59

```
 1        everything I've elaborated on about the perfect
 2        symmetry:  How the notches would appear, top and
 3        bottom, the area of the window, the placement of the
 4        window, the margins of the window to the ends of the
 5        panels, as well as the patterns, square patterns,
 6        and the patterns within the pattern of the square
 7        pattern.
 8   Q    So you sketched out three different designs that
 9        incorporate in some level those features you just
10        mentioned?
11   A    Yes.
12   Q    Do you know what happened to those sketches?
13   A    I discarded them after our meetings.
14   Q    Were the sketches done on computer, or are they done
15        on paper?
16   A    No.  Just paper, rough drawings.
17   Q    Did you present all three sketches or designs to the
18        new product development team?
19   A    Yes.
20   Q    Can you -- well, first of all, was one of those
21        designs what is now shown as the Bay Isle line
22        wicker crate?
23   A    This is what it evolved into, yes.
24   Q    And what was the difference in the other two
25        designs?
```

Robert Dale
May 28, 2008

```
 1   A   Size and placement of window, size and placement of

 2       squares in relationship to the window.  Size and

 3       placement of squares, window and notches, top and

 4       bottom, of the panels.

 5   Q   Did all of your designs have a square pattern in the

 6       weave?

 7   A   Yes.

 8   Q   Did all of your designs roughly locate the square

 9       patterns as shown in figure -- Exhibit 2, sir?

10   A   Yes.

11   Q   Specifically, how was the size and placement of the

12       windows different in your other two designs?

13   A   We considered placing them -- I believe there was

14       two different sizes they considered, just smaller

15       and larger than what was arrived at.

16   Q   So this was somewhere in the middle between a

17       smaller and larger window size?

18   A   Devised again by going back to the principle of good

19       symmetry.

20   Q   And how did the placement of the window change in

21       the other two designs?

22   A   I believe the window was larger and lower in an

23       initial pass.  It was larger and lower on the side

24       panel configurations, than back.

25   Q   In any of your designs, was the window in the
```

Page 61

```
 1        rear panel ever smaller than what is shown in

 2        Exhibit 2?

 3   A    No.  That was -- we worked initially only the side

 4        panels and took those same principles over the back

 5        panel with a window of that size.

 6   Q    Why was a window included on the back panel?

 7   A    For visibility and ventilation.

 8   Q    Was that feature of the window being on the back

 9        panel ever discussed at a new product development

10        meeting?

11   A    I believe it was, yes.

12   Q    Do you recall what was specifically discussed

13        pertaining to the back window?

14   A    I recall that having a back window would align with

15        their consciousness, as they've come across all our

16        pet products, that the dog crate would have -- would

17        entail or have the elements of good visibility and

18        ventilation for the pet.

19   Q    How did the notches differ in your other designs?

20   A    I believe there was more -- as we proceed up in the

21        size of the models, you'll find more in number.

22   Q    So you find more notches as the size increases?

23   A    Without a visual reference, I don't recall.

24   Q    Are you aware whether the larger sizes have

25        additional connectors at the bottom, for instance,
```

Robert Dale
May 28, 2008

Page 65

```
 1        change in any of your designs?

 2   A    I don't recall.

 3   Q    Being that you were an independent contractor at the

 4        time you developed these designs, did you make any

 5        copies of those sketches and put them in a file, for

 6        example?

 7   A    No, I didn't.

 8   Q    Are you aware whether anyone at Mid-West ever made

 9        copies of your sketches?

10   A    No.

11   Q    Did you turn over your sketches to Mid-West?

12   A    I left them at the meeting.  Didn't turn them over

13        to anybody specifically.

14   Q    Did you ever see those sketches again, sir?

15   A    No.

16   Q    When you developed your three designs that we've

17        been speaking about for the Mid-West Bay Isle line,

18        what was your inspiration for this particular

19        design, or the other two designs?

20   A    Actually, the square pattern inspiration was taken

21        from an art history background of a designer and

22        architect in the late -- of the late 19th Century by

23        the name of Mackintosh, with a K, that was actually

24        an inspiration -- Mackintosh was an inspiration for

25        Frank Lloyd Wright.
```

Robert Dale
May 28, 2008

Page 66

```
 1              But his -- he built a whole motif around
 2         the power and the decorative element of simply
 3         the square, and incorporated it into many of his
 4         designs.
 5    Q    Is there any particular piece that you looked at
 6         when you developed this design?
 7    A    No.  Just an overview of his theory and principle
 8         about the simplicity of efficient design.
 9    Q    Now, when you were developing these three designs,
10         ultimately, why was this particular design chosen
11         over the other two?
12    A    I think it was primarily about the -- relates back
13         to the symmetry.  But the window size and placement,
14         Mid-West was comfortable with the window size and
15         placement for the pet's advantage and the consumer's
16         advantage, and the rest of the symmetry and elements
17         that came together.
18    Q    Did the other two designs lack symmetry?
19    A    Yes, somewhat.
20    Q    In what way?
21    A    In the size of the window and the placement of the
22         window.
23    Q    Who ultimately made the decision to use this
24         particular design?
25    A    I believe it was a consensus of the committee.
```

Robert Dale
May 28, 2008

Page 67

```
 1   Q   Who has the final say in the new products committee
 2       to adopt or shoot down suggestions?
 3   A   Jim Wingate.
 4   Q   Is he the only one with that authority?
 5   A   Yes.
 6   Q   Today, is he the one with that authority?
 7   A   Today that authority lies with Glen Godley, who is
 8       the president of the company.  Jim oversees the new
 9       product committee as vice president of new product
10       development.
11   Q   When you came up with these three designs we've
12       been discussing, did you reference the Simpson
13       Ventures product in any way in developing this
14       design?
15   A   No.
16   Q   So other than the meeting in which you looked at
17       the catalog photograph and the meeting in which you
18       looked at a physical sample, you never again looked
19       at the Simpson Ventures product?
20   A   No.
21   Q   Did you ever look up on the Internet at the Simpson
22       Ventures product wicker crate, or any other crates
23       for that matter, when you were designing the Bay
24       Isle line?
25   A   No.
```

Page 68

| | | |
|---|---|---|
| 1 | Q | Is there any other influence you had in coming up |
| 2 | | with this design, other than I believe you said |
| 3 | | Mr. Mackintosh? |
| 4 | A | No.  I mean other than just other exposures to |
| 5 | | wicker products in general. |
| 6 | Q | Anything in particular that you can recall? |
| 7 | A | They've had to do with pet bed products, baskets. |
| 8 | Q | Was a pet bed wicker product ever examined or |
| 9 | | analyzed at Mid-West? |
| 10 | A | I don't recall. |
| 11 | Q | Did you personally ever analyze a wicker pet bed |
| 12 | | before coming up with the design of the Bay Isle |
| 13 | | line? |
| 14 | A | Actually, I think we may have looked at different |
| 15 | | types of weave, different weave patterns from pet |
| 16 | | beds and other wicker products, be it baskets or, |
| 17 | | you know, home use for that matter. |
| 18 | Q | Did you look at those wicker pet beds at Mid-West? |
| 19 | A | I don't recall. |
| 20 | Q | But you do recall looking at some wicker products at |
| 21 | | Mid-West? |
| 22 | A | Yes. |
| 23 | Q | Did you look at those wicker products before |
| 24 | | developing the design of the Bay Isle line product? |
| 25 | A | Yes. |

Robert Dale
May 28, 2008

Page 70

 1  Q  So you have no idea what happened to it after you
 2     saw it at the meeting?
 3  A  I don't.
 4  Q  Have you personally ever purchased a Simpson
 5     Ventures product?
 6  A  No.
 7  Q  Do you remember, after you came up with the design
 8     of the Bay Isle line, whether anyone at a new
 9     product meeting discussed getting a patent for the
10     Mid-West Bay Isle line product?
11  A  No, I don't.
12  Q  Did the possibility -- did anyone at Mid-West ever
13     discuss the possibility of a patent with you --
14  A  No.
15  Q  -- concerning your designs?
16  A  (Witness shakes head.)
17  Q  Please let me finish the question before you answer.
18         Do you remember if there was ever a discussion
19     of any intellectual property rights, being patent,
20     trademark, or copyright, at any new product
21     development meeting, regarding this product or any
22     product?
23  A  No.
24  Q  And I believe earlier you said that you attend a
25     good bit of these new product development meetings

Robert Dale
May 28, 2008

Page 71

```
 1        since new products started in 2002?

 2   A    Prior to that time, they were sporadic.  It was

 3        around that time they became regular.

 4   Q    Sometime in 2002 until today, you've attended a --

 5        would you say a majority of the new product

 6        development meetings?

 7   A    Majority, yes.

 8             MR. STALEY:  Let's take a five-minute break.

 9             MR. HINSHAW:  Sure.

10             (A recess is taken, after which, the

11        proceedings resume as follows:)

12   BY MR. STALEY:

13   Q    Mr. Dale, do you consider yourself, as the director

14        of design at Mid-West Metal, to be some sort of a --

15        somewhat of an expert in industrial design, or -- or

16        design?

17   A    I'm certainly qualified, or have vast experience in

18        graphic design, surface design.  I can't honestly

19        say industrial design.

20   Q    But certainly you'd -- would you consider yourself

21        to be an expert in design principles?

22   A    Yes.

23   Q    Do you have any history, background, or education on

24        design patents?

25   A    No.
```

Robert Dale
May 28, 2008

Page 72

```
 1   Q   Have you ever worked with a design patent in any
 2       capacity before?
 3   A   No.
 4   Q   As you've worked with design and design principles
 5       in the last 25 years or more, do you think you've
 6       developed a good sense of consumer reactions to
 7       product designs?
 8   A   Yes.
 9   Q   I'm now handing you what's been previously marked as
10       Exhibit 77.  I'll represent to you that is a design
11       patent for Simpson Ventures relating to the wicker
12       crate shown in Exhibit 4.
13           If you can, could you take a look through it
14       and get familiar with the pictures therein.
15   A   (Witness complies.)
16   Q   Have you had occasion to study this patent at any
17       length before today's deposition, sir?
18   A   No.
19   Q   Have you ever seen this patent before today's
20       deposition, sir?
21   A   Yes.
22   Q   When was that?
23   A   Earlier today.
24   Q   Before today, had you ever seen this patent, sir?
25   A   No.
```

Robert Dale
May 28, 2008

Page 76

```
 1        openings on their side panels.

 2   Q    Are the openings on the side panels the same shape?

 3   A    Similar shape.

 4   Q    Is the rectangular box-like crate similar in both

 5        Exhibit 2 and Exhibit 77?

 6   A    Similar.

 7   Q    Are the doors on the front panel uncovered, meaning

 8        have no wicker covering in both Exhibit 77 and

 9        Exhibit 2?

10   A    Yes.

11   Q    Are both doors framed on three sides by wicker in

12        Exhibit 77 and Exhibit 2?

13   A    No.

14   Q    Why do you say that?

15   A    This is framed by wicker on all sides.  This is not

16        framed (indicating).

17           MR. HINSHAW:  Would you make a record of what

18        he's pointing to.

19   BY MR. STALEY:

20   Q    When you're pointing to --

21   A    That's wicker as well as down here (indicating).

22   Q    You're pointing to a bar at the lower portion of the

23        front panel on figure 1 of Exhibit 77, correct?

24   A    Yes.

25   Q    Other than that bar being wrapped in wicker, and the
```

Robert Dale
May 28, 2008

Page 77

```
 1        bottom of the front panel of figure 1 of Exhibit 77,
 2        are the front panels substantially similar in the
 3        two views, meaning Exhibit 2 and Exhibit 77?
 4   A    They're similar.
 5   Q    So generally, overall, are the two designs, meaning
 6        Exhibit 2 and Exhibit 77, similar?
 7   A    Only in a broad description.
 8   Q    You keep using the qualifier "only in a broad
 9        description."  Why are the two just not generally
10        similar?
11   A    There's -- there's actually -- what I see here is
12        more things that make them different from each other
13        than make them similar to each other.
14   Q    Do you think they're more similar or dissimilar from
15        each other?
16   A    More dissimilar.
17   Q    Your testimony today is that Exhibit 2 and
18        Exhibit 77 are more dissimilar than they are
19        similar, sir?
20   A    Yes.
21   Q    And at this point can you point out to me what the
22        differences are between Exhibit 2 and Exhibit 77
23        using any of the figures or photographs in each
24        respective exhibit?  What makes them dissimilar?
25   A    Beginning with Exhibit 2, page 1, or referring to,
```

Page 78

1     it would be the gate on the front panel.  That's

2     composed of two latches, a name plate, the lack of

3     a heavy or large border around that panel, around

4     the front panel that has been incorporated into

5     figure 1.

6          The notches on the front panel of the Bay Isle

7     to accommodate the security of the latches, two

8     latches versus one.  The lack of a coil wicker, or

9     wicker being coiled around the bottom of the frame

10    of the front panel.  The size of the opening on the

11    side panel.  The notches that appear, top and

12    bottom, on the Bay Isle versus the large coil wicker

13    that's been applied to -- large frame, rather --

14    around the side panel of the figure 1.

15         The area below the side panel discrete from an

16    entire panel as we see it on the Bay Isle model,

17    that again has been -- the frame has been wrapped in

18    a coil of wicker.  The employment of a pattern on

19    Bay Isle and the lack -- in this reference, a lack

20    of any pattern either on the side panel or the top

21    panel as it's shown in this schematic.

22         The lack of a gap between panels at their

23    juncture as they appear on the Bay Isle.  The lack

24    of an exposure of the infrastructure and a black

25    finish as it appears on the Bay Isle.  The lack of

Robert Dale
May 28, 2008

Page 79

```
 1       symmetry in the relationship between the opening on
 2       the side panel of figure 1.  The --
 3   Q   I'm sorry to interrupt.  Again, on the -- on the
 4       symmetry of the side panel on figure 1, again, could
 5       you point out the lack of symmetry?
 6           MR. HINSHAW:  Hang on.  I don't think he was
 7       done answering your question, which asked for him
 8       to go through figure by figure, page by page.
 9           MR. STALEY:  Fair enough.
10   BY MR. STALEY:
11   Q   You can continue.
12           MR. HINSHAW:  So I would ask you to allow him
13       to finish his answer and go through each figure and
14       each page of the Bay Isle.
15   BY MR. STALEY:
16   Q   Like I said, you can continue.
17   A   What I see is a lack of symmetry in the weave
18       itself.  As you see in this schematic above, the
19       side opening does not match the weave that appears
20       below the side opening.  And the weave that appears
21       on the bottom section here appears to be different
22       from what appears below the opening on the side
23       panel.  It's a lack of consistency in symmetry.
24           You asked that I just compare these two.  That
25       was your question.
```

Page 80

```
 1    Q    I said you could use any figures.  If you want to

 2         use more figures, you may, sir.  I wasn't limiting

 3         you to any particular figure.

 4             I just wanted to hear what you felt the

 5         differences were between the designs shown in

 6         Exhibit 77 and the design shown in Exhibit 2.

 7    A    Again, figure 5, an inconsistency in the weave above

 8         the side opening and below, and then a different

 9         weave in the lower portion.  That which I haven't

10         covered before, what I see  here in comparison

11         between figure 3 and the back of the Bay Isle --

12    Q    And you're referring to figure 3 of the --

13    A    Of the U.S. patent, and the back of the Bay Isle.

14             I see certainly differences in the opening on

15         the back.  The Bay Isle was a tinted rear window,

16         same approximate size in accordance with the panel

17         as they were on the side panels of the Bay Isle.

18             The consistency of the weave from the top to

19         the bottom of the panel.  The incorporation of the

20         square patterns and the pattern within the patterns.

21         The gap at the left and right of that panel as they

22         adjoin with the side panels.  The rear panel adjoins

23         with the side panels.

24             The lack of what appears to be some sort of

25         secure or additional wire configuration at the
```

Page 81

```
 1        bottom of the rear panel.
 2    Q   And you're, again, referencing figure 3 of the
 3        patent in Exhibit 77, sir?
 4    A   Yes, yes.  The lack on the Bay Isle of having the
 5        heavy bar frame wrapped in coil on the back of
 6        figure 3, and on the -- or in figure 3 as it
 7        compares to the back of the Bay Isle.  That's all.
 8            MR. HINSHAW:  I'm sorry.  Did you cover
 9        figure 4, the top of the crate, the picture, the
10        figures?
11            THE WITNESS:  I believe I mentioned it earlier.
12    A   On the top, one readily evident likeness that isn't
13        there is that figure 4 lacks any sort of pattern.
14        The Bay Isle has employed a pattern of four squares,
15        the patterns within patterns, and symmetry across
16        the top of the entire panel.
17            From this configuration or from this viewpoint,
18        figure 4 differs, too, in that the large bar around
19        the outside of the top fits flush with the top
20        panel, as opposed to a panel with a gap surround of
21        the Bay Isle.  That's all.
22    BY MR. STALEY:
23    Q   Now, those differences that you just went through,
24        did anyone at Mid-West Metal ever discuss those
25        differences with you prior to this deposition?
```

Robert Dale
May 28, 2008

Page 82

```
 1   A   No.

 2   Q   Did anyone at Mid-West Metal discuss the differences

 3       between the Simpson Ventures product of Exhibit 4

 4       and the Mid-West Bay Isle product of Exhibit 2 --

 5   A   No.

 6   Q   -- prior to this deposition?

 7   A   I'm sorry.  No.

 8   Q   Did you meet with any Mid-West Metal employees prior

 9       to this deposition to discuss your testimony today?

10   A   No.

11   Q   Did you attend any meeting amongst Midwest Metal

12       employees to discuss, generally, the litigation,

13       the present litigation we're discussing today?

14   A   No.

15   Q   Going back to these differences that you, again,

16       just went through, do you believe that a customer --

17       let's -- an end consumer.  Do you think an end

18       consumer would notice these differences?

19   A   Yes, I think they're readily evident.

20           MR. HINSHAW:  Could you read back the question

21       and answer.

22           (The reporter reads back as requested.)

23   BY MR. STALEY:

24   Q   As the director of marketing and design, are you

25       aware of how the Mid-West Bay Isle brand wicker
```

# Exhibit S

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

SIMPSON VENTURES, INC.,
          Plaintiff,

vs.                                CIVIL ACTION FILE
                                      NO. 3:06cv-901-WKW

MID-WEST METAL PRODUCTS
COMPANY, INC.
          Defendant.
_____

MID-WEST METAL PRODUCTS
COMPANY, INC.,
          Counterclaimant,

vs.

SIMPSON VENTURES, INC.,
          Counterdefendant.


DEPOSITION OF
ROBERT J. ANDERS
June 11, 2008
8:06 a.m.

GARDNER GROFF GREENWALD & VILLANUEVA, P.C.
100 Parkwood Point
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia  30339

LaRita J. Cormier, CCR-B-2578

Robert J. Anders
June 11, 2008

Page 4

```
 1                    ROBERT J. ANDERS,
 2    having been first duly sworn, was examined and
 3    testified as follows:
 4                         EXAMINATION
 5    BY-MR.HINSHAW:
 6         Q.   Good morning, Mr. Anders.  We've met off the
 7    record, but for the record, my name is James Hinshaw.
 8    I'm one of the attorneys for Midwest Metal in this
 9    matter.  Would you please state your full name for
10    the record and state your date of birth.
11         A.   Robert John Anders, August 23rd, 1932.
12         Q.   And what is the address where you reside?
13         A.   P. O. Box 609, Warwick, New York 10990.
14         Q.   Do you have any medical condition that would
15    interfere with your ability to recall or otherwise
16    testify accurately today?
17         A.   No.
18         Q.   And are you taking any medications that
19    would interfere with your ability to recall or
20    otherwise testify accurately today?
21         A.   No.
22         Q.   You've been through depositions before;
23    correct?
24         A.   Yes.
25         Q.   You understand that the court reporter is
```

Page 16

```
 1    don't want to rock the boat.  And so I was

 2    terminated.

 3        Q.   Have you ever resigned from any employment

 4    relationship under investigation or suspension

 5    pending some investigation into accusations of

 6    wrongdoing on your part?

 7        A.   No.

 8        Q.   How would you describe to a layperson what

 9    the field of industrial design is?

10        A.   Industrial design is a field that includes

11    the design of consumer products, furniture, retail

12    displays, displays in museums.  And ergonomics and

13    human factors are related to that in that we're

14    concerned with the interface between the user and the

15    product itself.  Industrial design is, I've always

16    thought of it as having one step in engineering and

17    production and one step in art.  Industrial design

18    gives the form to the product.

19        Q.   Have you ever been involved in any

20    industrial design project that involves pet products?

21        A.   No.

22        Q.   Have you ever been involved as an industrial

23    designer on any projects that involved the use of

24    wicker, materials that look like wicker?

25        A.   No.
```

Robert J. Anders
June 11, 2008

Page 89

1    excluding any features from your proposed claim

2    construction other than the existence of a window,

3    the existence of windows and the existence of a door?

4        A.    No.    Those were the only elements that I

5    considered to be functional.

6        Q.    So all the other elements you considered to

7    be ornamental?

8        A.    Part of the overall ornamental design, yes.

9        Q.    Mr. Simpson in his 156 design patent didn't

10   employ the technique of or practice of using dashed

11   lines to show features that are to be excluded from

12   the claimed design; correct?

13       A.    Correct.

14       Q.    He could have; he didn't?

15       A.    Correct.

16       Q.    So does that indicate to you that he

17   intended to claim all of the features shown there as

18   part of his design patent?

19       A.    Correct.

20       Q.    In paragraph 36 of your report dated

21   September 29, 2006 -- are you there?

22       A.    Yes.

23       Q.    In the last sentence you write, "I observe

24   that the design claimed in the 156 patent

25   distinguishes from the prior art in one respect:

Page 90

1    i.e., the point of novelty is a woven texture on all

2    disclosed surfaces."  Did I read that correctly?

3        A.    Correct.

4        Q.    What did you mean by that at that time?

5        A.    At that point in time that's what appeared

6    to be from the limited prior art that was part of the

7    file wrapper that distinguished the invention from

8    the prior art.

9        Q.    That it had a woven texture on all disclosed

10   surfaces?

11       A.    Yes.

12       Q.    And that was based upon your review of a set

13   of prior art that was cited in the 156 design patent;

14   correct?

15       A.    Correct.

16       Q.    Now, you had not undertaken at that time to

17   investigate whether there were other relevant prior

18   art references, had you?

19       A.    No.

20       Q.    Why not?

21       A.    I didn't think I had to at that point in

22   time.

23       Q.    You simply accepted that the only relevant

24   prior art was that referenced in the patent itself?

25       A.    That's what the patent office examined and

Page 121

```
 1    industrial design professional, using that same

 2    scale, how would you rate the degree of similarity

 3    between these two designs under Gorham?

 4         A.    I read it the same.

 5         Q.    So you think an industrial design

 6    professional wouldn't see any more differences than

 7    what an ordinary observer would see?

 8         A.    Well, an industrial design professional

 9    would see some more.

10         Q.    So what would the rating be?

11         A.    Maybe a 7, 6 and a half.  Don't know.

12         Q.    What's your reasoning behind that?

13         A.    Gut feeling, you know.  There's no --

14         Q.    Say for what an ordinary observer would see?

15         A.    Based upon my lifetime experience of being a

16    designer and looking at designs, teaching design.

17         Q.    I'm sorry, I wasn't clear in my question.

18    You answered that from the eyes of an ordinary

19    observer you would rate this as an 8 and a half or a

20    9?

21         A.    Right.

22         Q.    And what's your reason behind that?

23         A.    Because of the similarity, the substantial

24    similarity of the overall appearance between the two.

25         Q.    As a general proposition, would you agree
```

Robert J. Anders
June 11, 2008

Page 122

1    with me that it's a question of degree to determine

2    how similar or dissimilar designs are for purposes of

3    evaluating whether they're substantially the same

4    under the Gorham analysis?

5        A.   Yes.

6        Q.   It's a value judgment?

7        A.   Yes.

8        Q.   And it's a question where the answer might

9    vary depending on the level of detail that an

10   ordinary observer might in fact consider in comparing

11   the two designs; correct?

12       A.   I'm sorry, restate the question.

13       Q.   It's a question where the answer of how

14   similar or dissimilar two designs are might vary

15   depending on how much detail an ordinary observer

16   would look at in comparing the two designs.

17       A.   Yes, it could.

18       Q.   And you don't know what level of detail an

19   ordinary observer would use here in looking at these

20   two products in their designs; correct?

21       A.   Only based upon all of my years of

22   experience of designing and teaching design.

23       Q.   And that's it?

24       A.   Yes.  I've done no detailed specific survey.

25       Q.   Setting aside your opinion that you don't

Page 123

```
 1    think that the differences in the two designs, the

 2    Bay Isle product and the 156 patent, are sufficient

 3    under the Gorham analysis to make these not

 4    substantially the same; correct?

 5         A.    Correct.

 6         Q.    Setting aside that opinion, do you think

 7    that the differences that we went through earlier

 8    demonstrate an effort made by the designers of the

 9    Bay Isle product to try to make their product look

10    different?

11         A.    I don't know because it's obvious to me that

12    this was a design around, and the question is always

13    did they design around far enough away so it doesn't

14    infringe.  And in this case I'd have to say no.

15         Q.    I understand it's your opinion that they

16    didn't do it good enough.

17         A.    They didn't depart enough.

18         Q.    But you think they tried, as demonstrated by

19    what you see?

20         A.    Well, they've created a different structure

21    in terms of the methodology for assembly, it seems.

22    But the result is, you know, this is not a utility

23    patent, this is a design patent.  So it's the

24    appearance that counts.  And the fact that they have,

25    you know, come up with a different structure that
```

Page 124

1   functions differently, they were still unable to get

2   the ornamental design far enough away.

3        Q.   In your opinion?

4        A.   In my opinion.

5        Q.   But you agree that what you see there

6   demonstrates that they tried?

7        A.   Well, they tried to do something

8   differently, yes, there's no question about that.

9        Q.   You talked earlier about one of the

10  differences you saw between the two designs was, I

11  think you called it a subtle variation of surface

12  texture or weave.

13       A.   Yes.

14       Q.   What were you referring to there?

15       A.   The portions which have -- on Exhibit 2,

16  there are portions in which the weave departs from

17  the general overall weave.

18       Q.   Can't you just call those squares?

19       A.   Well, I don't know if they're squares.

20       Q.   Do they look like squares?

21       A.   They're more rectangular to me, but --

22       Q.   You wouldn't agree that those are squares,

23  Mr. Anders?

24       A.   Well, let me put my glasses on.

25       Q.   What are you looking for?

Page 125

```
 1      A.   Piece of paper.  Thanks.  Yeah, they're
 2   square.  They're close to being square.
 3      Q.   So on each --
 4      A.   Excuse me.  They look visually as though
 5   they were slightly longer horizontally than in
 6   height.  It's a visual effect as a result of the
 7   weave.
 8      Q.   Do you agree with me that there are square
 9   patterns woven into all of the panels of the Bay Isle
10   product with the exception of the front panel?
11      A.   Yes.
12      Q.   And that is a difference between that design
13   and what is set forth in the 156 patent's design;
14   correct?
15      A.   Yes.
16      Q.   Is it your testimony that, is it your
17   testimony that an industrial design professional
18   would notice those differences?
19      A.   Oh, an industrial designer would notice.
20      Q.   But it's your testimony that in your opinion
21   an ordinary observer would not notice those
22   differences?
23      A.   Probably not.
24      Q.   Probably not?
25      A.   Yeah.
```

Robert J. Anders
June 11, 2008

Page 145

1    the front includes a rectangular see-through door

2    that is framed substantially by wicker.

3        Q.    And again, what are you talking about framed

4    substantially by wicker?

5        A.    The surround of the front.

6        Q.    Including the wicker coiled bar underneath

7    the door?

8        A.    No.  Actually, I hadn't included that.

9        Q.    What does framed mean to you?

10       A.    Frame is to encircle.

11       Q.    So isn't that what you're talking about here

12   is that there's wicker on all sides of the front

13   door?

14       A.    Yeah.  That's true.

15       Q.    In paragraph 5 what is it that you're trying

16   to describe there?

17       A.    Well, the design shows that the faces all

18   seem to be composed of separate panels, unlike, for

19   example, in Exhibit 78, page 9, the Figure 19 at the

20   bottom, which is of a pet cage for sale on eBay in

21   which it is not made up of separate panels.

22       Q.    Would you agree with me that the figure on

23   page 13 is formed from distinct individual panels

24   having wicker outer surfaces?

25       A.    That portion is, yes, but it has no front

Robert J. Anders
June 11, 2008

Page 146

1    door, so we're not, we can't confuse that by saying

2    that it has a see-through door.

3        Q.    I'm sorry.    I thought we were talking about

4    paragraph 5.

5        A.    Well -- I'm sorry.    You're right.    Distinct

6    panels.    Well, we don't know that this is a pet home.

7        Q.    Other than that?

8        A.    It's just a container.

9        Q.    But other than that distinction?

10        A.    Well, that's a pretty significant

11    distinction.

12        Q.    But other than that distinction, you would

13    agree that the item on page 13 in Figure 31 has the

14    appearance of being formed from distinct individual

15    panels having wicker outer surfaces?

16        A.    Yes.

17        Q.    In looking at paragraph 7 of Exhibit 218,

18    which I think is what you've identified as the fifth

19    point of novelty; right?

20        A.    Yes.

21        Q.    And you end that with "the panels being

22    configured such that each panel extends substantially

23    to the edge of the adjacent panel, but no panel

24    extends beyond the adjacent panels."

25        A.    Yes.    That was how I interpreted the

Robert J. Anders
June 11, 2008

Page 147

1    drawings.

2        Q.    And what is it specifically that you're

3    talking about there?  Can you elaborate on that?

4        A.    No.  I think it's pretty clear.  The panels

5    all seem to not overlap but go to the edge of the

6    other panels.

7        Q.    And touch the edge of the other panels?

8        A.    Partially, almost.

9        Q.    They appear to?

10       A.    They appear to closely.

11       Q.    How is that feature present in the Bay Isle

12   product in Exhibit 2, if at all?

13       A.    Well, they don't overlap.

14       Q.    But do they appear to touch?

15             MR. GARDNER:  Objection.  That language

16   doesn't say that they appear to touch.

17   Mischaracterizes point of novelty per his report.

18   BY MR. HINSHAW:

19       Q.    Do they, Mr. Anders?

20       A.    Well, again, it doesn't say of the point of

21   novelty that they touch.

22       Q.    True.  It says extends substantially to the

23   edge, though, doesn't it?

24       A.    Right.

25       Q.    Which you told me means that they appear to

Robert J. Anders
June 11, 2008

Page 149

1    the edge doesn't mean it touches it.  It means

2    substantially to the edge of the adjacent panel.

3        Q.    And you think that that's present in Exhibit

4    2?

5        A.    Yeah.

6        Q.    Despite the gaps?

7        A.    Yeah.

8        Q.    That are readily apparent?

9        A.    Yep.

10       Q.    How many different elements are described in

11   your first point of novelty in Exhibit 218?

12       A.    They extend to the wicker, a pet home.

13       Q.    So is that one?

14       A.    I guess.  Rectangular volume.

15       Q.    Is that two?

16       A.    Having a top.

17       Q.    Three.

18       A.    Sides.

19       Q.    Four.

20       A.    A rear.

21       Q.    Five.

22       A.    A front.

23       Q.    Six.

24       A.    The top has an outer surface substantially

25   having wicker.

Robert J. Anders
June 11, 2008

Page 150

```
 1        Q.    Seven.

 2        A.    The sides each including a window.

 3        Q.    Eight.

 4        A.    And the non-window portion of each side has

 5   an outer surface substantially having wicker.

 6        Q.    Nine.

 7        A.    The rear, including a window.

 8        Q.    Ten.

 9        A.    A non-window portion of the rear has an

10   outer surface substantially having wicker.

11        Q.    Eleven.

12        A.    The front includes a door.

13        Q.    Twelve.

14        A.    And non-door portion of front --

15        Q.    Thirteen.

16        A.    -- has an outer surface substantially having

17   wicker.

18        Q.    Thirteen.

19        A.    Wherein the sides and rear mostly have

20   wicker.

21        Q.    Fourteen.

22        A.    A majority of the front does not have

23   wicker.

24        Q.    Fifteen.

25        A.    And substantially the entire top has wicker.
```

1      Q.    Sixteen.

2      A.    Yeah.

3      Q.    So 16 different elements combined in that

4    single point of novelty?

5      A.    Yes.

6      Q.    And it's that combination of those 16

7    different elements that in your mind makes this a

8    point of novelty that distinguishes the 156 design

9    patent from the prior art?

10     A.    Yes.

11     Q.    How many different elements appear in your

12   sixth point of novelty, in paragraph 8?

13     A.    All of the above.

14     Q.    It would be those 16 plus the same kind of

15   approach of all of the different elements that appear

16   in the other four points of novelty; correct?  It

17   would be all of the 16 from the first point of

18   novelty?

19     A.    Right.

20     Q.    It would be all of the elements from the

21   second?

22     A.    Right.

23     Q.    Which, let's do the math.  So read through

24   the second point of novelty.

25     A.    The door front panel configuration -- no,

Page 153

1     A.    Yeah.

2     Q.    How about the next one, third point of

3   novelty, paragraph 5?

4     A.    A pet home with a rectangular volume.

5     Q.    So that's two.

6     A.    The pet home having the appearance of being

7   formed from distinct individual panels.

8     Q.    So is that three or four?

9     A.    However you want to count them.

10    Q.    Three.  Having wicker outer surfaces, four.

11    A.    Having wicker outer surfaces.

12    Q.    The point is, is in your sixth point of

13   novelty, the combination of the above, you're talking

14   about a combination of what, 20, 30, 40 different

15   elements?

16    A.    Could be.

17    Q.    Is that correct?

18    A.    Correct.

19    Q.    So in paragraph 2 of your report of Exhibit

20   218 where you say "I hereby modify my previous points

21   of novelty found in the 156 patent to include the

22   following numbered individual features," certainly

23   those numbered features are not individuals, they're

24   conglomeration of multiple, multiple elements;

25   correct?

Page 160

1    substantially framing a non-woven door."

2        Q.    Okay.  And again, "substantially framing"

3    referring to the wicker that appears above, below,

4    and to the sides of --

5        A.    Around, yeah.

6        Q.    -- "the bare wire door"; correct?

7        A.    Correct.

8        Q.    Why don't you take a moment and read through

9    what you wrote under Obviousness.

10       A.    Yes.

11       Q.    So first of all, am I correct that at the

12   time you wrote this, you were referring to this

13   Exhibit 78, the August 2007 Bret Smith report?

14       A.    Yes.

15       Q.    At the time you had not seen any of the

16   other prior art that he has since discovered or

17   reported on; correct?

18       A.    Correct.

19       Q.    And you've not been asked to give an opinion

20   in response or a rebuttal to his obviousness analysis

21   in the Exhibit 78 report; correct?

22       A.    Correct.

23       Q.    Or in response to any of his supplemental

24   reports?

25       A.    Correct.

Page 161

1       Q.    Does what you have written here in Exhibit

2   229 accurately reflect, though, your critique of his

3   analysis of the obviousness issue?

4       A.    Yes, but it's very limited.  Obviously I

5   just got started on this, and then I basically

6   stopped.  So it wasn't, it doesn't purport to be a

7   thorough analysis or evaluation of his report.  I did

8   a quick summary and then went on with other things.

9       Q.    In your September 29, 2006 report, Exhibit

10  216, page 12, paragraphs 43 and 44, that was written

11  September 29, 2006; correct?

12      A.    September 29th, 2006, yes.

13      Q.    And you express your opinion at that time

14  that the patent was valid over the prior art that you

15  were aware of at that time; correct?

16      A.    Correct.

17      Q.    Which was limited to that set of prior art

18  that had been submitted to the U.S., United States

19  Patent and Trademark Office; correct?

20      A.    Correct.

21      Q.    It didn't include any of the prior art that

22  Bret Smith identified in any of his initial report or

23  supplement reports; correct?

24      A.    Correct.

25      Q.    And so do you have an opinion on the

Page 175

 1    access door on top, not in the front.  There is --

 2    and Exhibit 76 is of a wicker that is made out of

 3    looks like a combination of woven as well as

 4    structural members of the rattan, which are diamond

 5    shaped and which are at an angle.  It has a small

 6    door with a semi-circular top.  It's surrounded on

 7    all four sides with material, whereas the patented

 8    design is really surrounded only on three sides by

 9    the woven rattan.

10        Q.   Earlier you testified that it's surrounded

11    on four sides because it's got the wicker coiled bar

12    underneath.  That's --

13        A.   Well, it's got the wicker coiled bar, but

14    it's not the woven wicker, isn't it?  This is a door.

15    It's like a door going into a room.  It's surrounded

16    on two sides and the top.  It's empty on the bottom.

17    And that's what this is.  This has --

18        Q.   But that's got wicker underneath the door,

19    doesn't it?

20        A.   It has not woven wicker.  It has wrapped

21    wicker.  That's different than woven, isn't it?

22        Q.   That's a difference that is meaningful?

23        A.   That is a difference, yeah.

24        Q.   I see.  You're familiar with the KSR

25    decision?

Page 176

```
 1        A.    Yes, I am.

 2        Q.    You make no reference to that decision in

 3   any of your written reports, do you?

 4        A.    No, I don't believe I did.

 5        Q.    You've read it?

 6        A.    I've read it a while back.

 7        Q.    When did you read it?

 8        A.    Weeks and weeks ago.

 9        Q.    Weeks ago?

10        A.    Yeah.

11        Q.    You didn't read it at the time you had

12   written your first report, had you?

13        A.    I don't know.  I don't remember.

14        Q.    In your opinion, does the KSR decision have

15   any impact on your analysis of the obviousness issue

16   here?

17        A.    No.

18        Q.    Why not?

19        A.    Because I don't think it does.

20        Q.    Why not?

21        A.    Because the KSR decision said that there are

22   a number of instances where that for the most part

23   all designs make use of something that went on

24   before, they're stepping stones, I believe is the

25   language that was used in KSR.  And therefore, there
```

Page 177

```
 1   was no direction or teaching in the patent that would

 2   invalidate it as being obvious.

 3        Q.   That's your understanding of the KSR

 4   decision?

 5        A.   KSR said that -- first of all, it's a

 6   utility patent case; it is not a design patent case.

 7        Q.   Is there anything in that case that said the

 8   analysis in KSR doesn't apply to design patents?

 9        A.   No, it doesn't.

10        Q.   So it does apply to design patents, doesn't

11   it?

12        A.   Yes, until someone comes along and says

13   otherwise, yes, it does.

14        Q.   I realize you're not a lawyer, but --

15        A.   I'm not a lawyer.  I'm a design expert.

16        Q.   -- to your understanding.

17        A.   I'm a design expert.

18        Q.   I understand.

19        A.   I'm not a legal expert.

20        Q.   But your understanding of KSR there's

21   nothing that said that that analysis does not apply

22   to design patents; correct?

23        A.   Correct.

24        Q.   And is that the extent of -- what you've

25   told me, is that the extent of your understanding of
```

Page 178

1   what the KSR analysis is?

2       A.    Well, KSR says that you can't combine things

3   that are obvious and come up with a unique invention.

4   They specifically criticize the court of appeals'

5   utilization of teaching, suggesting, motivation, TSM,

6   by limiting it to only the areas related to the

7   design at hand.  And the KSR decision said, well, you

8   can't limit it to just the field of endeavor.  You

9   can go and include things from other unrelated fields

10  that may be then incorporated into the invention.

11      Q.    You've made no effort to incorporate or

12  analyze or disclose to us your analysis of KSR and

13  how it applies to the obviousness issues in this

14  case; is that correct?

15      A.    Not yet, no.

16      Q.    I'd like you to take a look at the images of

17  the objects that appear in 199, 200, and 201.

18      A.    Yes.

19            (Exhibit-199, Exhibit-200, Exhibit-201

20  previously introduced.)

21            MR. GARDNER:  He was referring you to

22  multiple exhibits, and you've looked at 199.

23  BY MR. HINSHAW:

24      Q.    I would like you to look at 200 and 201 as

25  well.

Page 229

1    motivation to do that.  Additionally, the proportions

2    are totally different from what is depicted in the

3    321 patent.

4        Q.    Anything else?

5        A.    That's basically it.

6        Q.    So if you were an industrial designer, which

7    of course you are, in April of 2002, sitting in your

8    workshop with these five references that I've just

9    put in front of you, exhibits 206, 207, 232, 233, and

10   231, you don't think it would have been obvious to

11   combine those features to come up with a design that

12   is that set forth in Exhibit 321 [sic]?

13       A.    No.

14       Q.    Why not?

15       A.    I just don't think it would be, based upon

16   my years of experience.

17       Q.    You don't think that would have just been

18   plain common sense to do that?

19       A.    First of all, in design there's no such

20   thing as plain common sense.

21       Q.    That's foreign to industrial designers?

22       A.    There's no such thing as plain common sense.

23       Q.    Why is that?

24       A.    Because I don't believe it is.

25       Q.    Do you think it would have been a logical

# Exhibit T

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

SIMPSON VENTURES,

      Plaintiff,

                      CASE NO:
      vs.                3:07cv00048 WHA-CSC

MID-WEST METAL PRODUCTS     Demand for Jury
COMPANY, INC.,             Trial

      Defendant.


MID-WEST METAL PRODUCTS
COMPANY, INC.,

      Counterclaimant,

      vs.

SIMPSON VENTURES, INC.,

      Counterdefendant.


DEPOSITION OF
JEFFREY MARK SIMPSON
May 2, 2008
8:35 a.m.
Suite 800, 100 Parkwood Point
2018 Powers Ferry Road
Atlanta, Georgia


Amanda Upton, CCR-B-1523

Jeffrey Simpson
May 2, 2008

Page 5

1                    JEFFREY MARK SIMPSON,

2    having been first duly sworn, was examined and

3    testified as follows:

4                         EXAMINATION

5    BY-MR. HINSHAW:

6        Q.    Good morning, Mr. Simpson.  We've met many

7    times off the record.  But on the record, my name is

8    James Hinshaw.

9              I'm one of the attorneys for Mid-West

10   Metals in this case.  I've brought here today with me

11   my associate Neal Bowling.

12             Would you please state your full name for

13   the record?

14       A.    Jeffrey Mark Simpson.

15       Q.    And where do you reside?

16       A.    381 Oak Ridge Drive, Auburn, Alabama.

17       Q.    What's your date of birth?

18       A.    November 4th, 1959.

19       Q.    Mr. Simpson, have you ever been deposed

20   before?

21       A.    Yes.

22       Q.    Have you ever given court testimony

23   before?

24       A.    No.

25       Q.    In the matters where you've been deposed

Jeffrey Simpson
May 2, 2008

Page 39

1    talk to Mr. Kleijan about with regard to your wicker

2    kennel?

3        A.    I don't recall specifically.

4        Q.    What about generally?

5        A.    I would guess generally why I felt it was

6    a good idea.

7        Q.    And what did you tell him?

8        A.    I don't remember specifically.

9        Q.    Did he think it was not a good idea?

10       A.    No.

11       Q.    Did he think it was a good idea?

12       A.    I would guess yes.

13       Q.    Why would you guess yes?

14       A.    Well, if he didn't think it was a bad

15   idea, then it would be something north of that.

16       Q.    What was your -- was Mr. Kleijan your boss

17   at GDA?

18       A.    Yes.

19       Q.    What was his title?

20       A.    I believe that his title was president.

21       Q.    And did you have to go to Mr. Kleijan to

22   get approval to spend time working on your wicker

23   kennel?

24            MR. GARDNER:   Objection; foundation.

25   There's no foundation the witness was working on a

Jeffrey Simpson
May 2, 2008

```
 1   wicker kennel at GDA.

 2        A.    Could you restate the question, please?

 3   BY MR. HINSHAW:

 4        Q.    Did you have to go to Mr. Kleijan to get

 5   approval to spend time to work on your wicker kennel?

 6        A.    No.

 7        Q.    Why were you discussing your wicker kennel

 8   with Mr. Kleijan?

 9        A.    To show him the idea.

10        Q.    What did you show him?

11        A.    To present the idea.

12        Q.    Did you show him any drawings?

13        A.    I would guess he saw my drawings, yes.

14        Q.    And what drawings did you show him?

15        A.    Drawings that I had prepared.

16        Q.    Would you describe the drawings that you

17   prepared?

18        A.    I would guess that I would have had

19   detailed panel drawings as well as an overall

20   assembled drawing.

21        Q.    Did any of those drawings depict the

22   visual appearance or ornamental features of your

23   wicker kennel?

24        A.    Could you be more specific?

25        Q.    Well, did they show the wicker as it was
```

Jeffrey Simpson
May 2, 2008

1    applied or woven onto your kennel?

2        A.    No.

3        Q.    Did you show Mr. Kleijan any drawings that

4    showed the wicker or the weave patterns that you

5    wanted to use for your wicker kennel?

6        A.    Could you restate the question, please?

7              MR. HINSHAW:  Can I have it read back,

8        please?

9              (The record was read by the reporter.)

10       A.    The drawings would have shown the location

11   of the wicker.

12   BY MR. HINSHAW:

13       Q.    What do you mean by that?

14       A.    What I mean by that is that I wasn't

15   capable of drawing every strand of wicker on my

16   drawings.  So the drawings would have shown those

17   locations of each panel that were to be covered by

18   wicker.

19       Q.    Why did you show those drawings to Mr.

20   Kleijan?

21       A.    Because I was excited about the idea.

22       Q.    Did you prepare any of those drawings

23   while you were working -- while you were working at

24   GDA?

25       A.    Do you mean between the time frame of when

Jeffrey Simpson
May 2, 2008

1    I started GDA until I left in December of 2001?

2         Q.    Yes.

3         A.    Yes.

4         Q.    And did you prepare any of those drawings

5    while you were at the facility of GDA or the offices

6    of GDA?

7         A.    No.

8         Q.    Did you use any resources at GDA to help

9    you in developing the design of your wicker kennel?

10        A.    Not that I recall.

11        Q.    You talked about your wicker kennel with

12   Dick Allen; is that correct?

13        A.    That's correct.

14        Q.    What did you discuss with Mr. Allen?

15        A.    I would have discussed the drawings.

16        Q.    What was Dick Allen's job title at GDA?

17        A.    Specifically I don't recall.

18        Q.    What were his responsibilities to the best

19   of your knowledge?

20        A.    Product development.

21        Q.    And did you report to him, did he report

22   to you?  What was the nature of your relationship

23   with him?

24        A.    No, I did not report to him, nor did he

25   report to me.  He was responsible for developing or

Jeffrey Simpson
May 2, 2008

Page 43

```
 1    finding product for me to sell.
 2         Q.    You discussed your wicker kennel drawings
 3    with him?
 4         A.    Yes.
 5         Q.    Did any of those drawings show or attempt
 6    to show the wicker as it was applied to the wicker --
 7    or, I'm sorry, as it was applied to the metal cage?
 8         A.    Again, it would have -- those drawings
 9    would have shown the locations of the wicker to be
10    applied.
11         Q.    Did any of those drawings show a weave
12    pattern?
13         A.    Show a weave pattern?
14         Q.    Yeah.
15         A.    No.  Describe a weave pattern?  Yes.
16         Q.    How did it describe a weave pattern?
17         A.    I believe I would have had a note that
18    said a weave pattern similar to outdoor wicker
19    furniture.
20         Q.    What did Mr. Allen say about your idea?
21         A.    I don't recall specifically.
22         Q.    Do you recall generally?
23         A.    No.
24         Q.    Did he make any suggestions about how you
25    might change certain features of your drawings?
```

Jeffrey Simpson
May 2, 2008

1    accurate statement?

2         A.    Could you please read that again, please?

3         Q.    Sure.  With the help of GDA, LLC Mr.

4    Simpson developed a first prototype design for a

5    decorative pet home covered with a woven wicker look

6    material.  Is that an accurate statement?

7         A.    Yes.

8         Q.    What is it that GDA helped you with?

9         A.    They helped in having the prototype

10   fabricated to my drawings.

11        Q.    How did they help do that?

12        A.    They would have sent my drawings to, I'm

13   assuming, Alex Lau.  And Alex Lau would have had a

14   factory produce the first sample to my drawings.

15        Q.    Who is Alex Lau?

16        A.    He's the "A" in GDA.

17        Q.    How do you spell his last name?

18        A.    I'm guessing it's, L-a-u.

19        Q.    Does he reside over in China?

20        A.    If you're in --

21        Q.    Well, strike that.  You said that GDA

22   would have sent my drawings to Alex Lau.  Where?

23        A.    I believe his offices were in Hong Kong.

24        Q.    Do you have still the drawings that you

25   sent to -- or that GDA sent to Mr. Lau in Hong Kong?

Jeffrey Simpson
May 2, 2008

1        A.      No.

2        Q.      Do you know what happened to those?

3        A.      No.

4        Q.      Did you keep copies of those?

5        A.      No, I did not.

6        Q.      It is from those drawings, though, that

7   the appearance of the wicker would have been derived?

8        A.      Could you restate that, please?

9        Q.      Those drawings that were sent to Mr. Lau

10   in Hong Kong, would those have shown how the wicker

11   was to be applied to the metal structure of the pet

12   crate?

13       A.      It would have shown where the wicker was

14   to be applied with, again, a reference as to outdoor

15   furniture.

16       Q.      And so, for example, those drawings would

17   not have shown a diamond weave pattern?

18       A.      No.

19       Q.      They would not have shown using wicker

20   coiled around the tubes around the perimeters of the

21   side panels, for example?

22       A.      Could you state that again, please?

23       Q.      Would those drawings have shown wicker

24   continuously coiled around the tubes or bars that

25   formed the perimeters of the side panels, for

Jeffrey Simpson
May 2, 2008

1    example?

2        A.    Would it have shown it?

3        Q.    Yes.

4        A.    No.

5        Q.    Would it have described it?

6        A.    Yes.

7        Q.    Would those drawings have shown where

8    the -- or described where the wicker was supposed to

9    go on the front panel?

10       A.    Yes.

11       Q.    And what's your memory of what that

12   description was?

13       A.    The wicker would have been applied in all

14   locations where the door wasn't.

15       Q.    How about on the top panel, did you create

16   a drawing to show how the wicker would be applied to

17   the top panel or just a description?

18       A.    A description.

19       Q.    And how did you describe it?

20       A.    Again, showing where the wicker was to be

21   applied.

22       Q.    And how did you describe your showing of

23   where the wicker would be applied on the top panel?

24       A.    I'm assuming that it would have shown an

25   area where the wicker was to be applied.

Jeffrey Simpson
May 2, 2008

Page 49

```
 1        Q.    You're assuming, but you don't recall?
 2        A.    I recall providing details as to where the
 3   wicker was to be applied.
 4        Q.    Do you recall if you described, showed or
 5   instructed Mr. Lau to have a diamond weave pattern
 6   put on the top of the wicker kennel crate?
 7        A.    Could you repeat that for me, please?
 8              (The record was read by the reporter.)
 9        A.    No, I did not.
10   BY MR. HINSHAW:
11        Q.    The sample that was constructed -- or let
12   me back up.  So these drawings were sent by GDA over
13   to Mr. Lau, right?
14        A.    I believe so, yes.
15        Q.    Who from GDA specifically sent those over
16   to Mr. Lau to your knowledge?
17        A.    I believe it would be Dick Allen.
18        Q.    Do you know if Mr. Allen gave any
19   instructions to Mr. Lau about how to apply the wicker
20   or where to apply the wicker, what kind of ornamental
21   features to use?
22        A.    Not that I'm aware of.
23        Q.    Were there any instructions about what the
24   underlying metal structure was to be to form as the
25   base for the wicker application?
```

Jeffrey Simpson
May 2, 2008

Page 50

```
 1        A.    Could you repeat that for me, please?
 2        Q.    That was a poorly worded question.  The
 3   crate had to have a metal -- or it had to have a
 4   structure, correct?
 5        A.    Don't know that it had to.
 6        Q.    In this case it did?
 7        A.    Yes.
 8        Q.    And describe that structure.
 9        A.    Tubular metal and wire fronting.
10        Q.    And that was designed by you?
11        A.    Yes.
12        Q.    And were those drawings sent over to Mr.
13   Lau at the same time as the drawings or the
14   description or instructions about the application of
15   the wicker?
16        A.    Yes.
17        Q.    How long did it take -- and the request
18   was for them to create a sample or a prototype; is
19   that correct?
20        A.    The request was for them to fabricate a
21   sample, yes.
22        Q.    And did they?
23        A.    Yes.
24        Q.    How long did that take?
25        A.    I don't recall specifically.
```

Jeffrey Simpson
May 2, 2008

Page 51

```
 1        Q.    Was it six months?

 2        A.    No.

 3        Q.    Less?

 4        A.    Yes.

 5        Q.    More than one month?

 6        A.    I would think it would have been a couple

 7   of weeks only because that's a typical turnaround

 8   time for factory samples.

 9        Q.    Do you know who Mr. Lau took these

10   drawings and descriptions to over in Hong Kong or

11   China to have the sample constructed?

12        A.    No.

13        Q.    In addition to your drawings and your

14   descriptions and instructions, did you send over to

15   Mr. Lau any photographs, clips from magazines or

16   books that had anything to do with the application of

17   wicker to a metal crate?

18        A.    I didn't send anything over to Mr. Lau.

19        Q.    Do you know if Mr. Allen sent anything

20   over to Mr. Lau that would have shown wicker

21   application or weave patterns?

22        A.    I don't know.

23        Q.    Do you know if GDA is still in business

24   today?

25        A.    Yes.
```

Jeffrey Simpson
May 2, 2008

Page 65

1      A.    Yes, I have.

2      Q.    What is that?

3      A.    It's my design patent for my wicker kennel

4   design.

5      Q.    You're identified as the inventor,

6   correct?

7      A.    Yes, I am.

8      Q.    No one from GDA is identified as an

9   inventor, correct?

10      A.    That is correct.

11      Q.    The date is May 2nd of 2002 for when you

12   filed it, correct?

13      A.    That is correct.

14      Q.    The design that's shown here, would you

15   please tell me how you first came up with the idea

16   for this design?

17      A.    I first came up with the concept of the

18   overall design while sitting on a wicker porch swing,

19   specifically a resin rattan porch swing.

20      Q.    And what is it about that experience that

21   gave you this idea?

22      A.    Could you rephrase your question, please?

23      Q.    Let's try it this way.

24            MR. HINSHAW:  Let's go ahead and mark

25   this.  And I only have one color copy.  Let's make

Jeffrey Simpson
May 2, 2008

Page 66

1    that the deposition exhibit.

2              (Defendant's Exhibit-93 was marked for

3    identification.)

4    BY MR. HINSHAW:

5        Q.    The court reporter has handed to you

6    what's been marked as deposition Exhibit Number 93.

7    Do you recognize that?

8        A.    Yes, I do.

9        Q.    What is that?

10       A.    That's the porch swing that my son and I

11   bought for my wife for Mother's Day in May of 2001.

12       Q.    And is this the porch swing you were just

13   talking about that where you first had this idea?

14       A.    Yes, it is.

15       Q.    Well, first of all, what was the idea that

16   you had?

17       A.    A wicker kennel.

18       Q.    Anything more specific than that?

19       A.    Initially, no.

20       Q.    It was just the idea of making a kennel

21   out of wicker?

22       A.    Making a kennel with a covering of

23   specifically resin wicker or resin rattan.

24       Q.    What was it about the porch swing here in

25   Exhibit Number 93 that inspired that idea?

Jeffrey Simpson
May 2, 2008

Page 67

```
 1        A.     The decorative nature of the material.

 2        Q.     Could you elaborate on what you mean by

 3   that?

 4        A.     Well, when I was at Doskocil, we had

 5   worked -- we, the development team at Doskocil, had

 6   worked on a concept for decorative indoor containment

 7   based on my suggestion.

 8              And that product concept was knockdown

 9   furniture, for lack of a better term, an end table

10   that was designed to contain a pet.

11              A couple of prototypes were developed.

12   And they were fabricated of particle board or MDF

13   with a imitation wood covering or laminate.

14              Those products were never brought to

15   market because I felt that they -- that they wouldn't

16   work with people's decor.

17        Q.     Okay.  But what I'm trying to figure out

18   here and you're sitting on your porch swing in

19   Exhibit 93, and the question was:  How did this

20   inspire your idea?

21        A.     Because it gave me the idea that rattan,

22   from a decorative aspect, could fit in with many

23   different types of decor, and, secondly, that resin

24   rattan would be a good material to use because of the

25   environment.
```

Jeffrey Simpson
May 2, 2008

Page 68

```
 1       Q.    What do you mean by that?
 2       A.    Well, dogs sometimes make messes.
 3       Q.    So by environment you don't mean global
 4  warming environment, you meant the context of what
 5  pets do in their pet homes?
 6       A.    You're right.
 7       Q.    This swing in Exhibit 93, is that made out
 8  of a resin wicker material?
 9       A.    Yes, it is.
10       Q.    Tell me, do you make a distinction between
11  wicker and rattan?
12       A.    I don't really.  In fact, I use them both.
13       Q.    Interchangeably?
14       A.    Yes.
15       Q.    And is it correct that - and I think I
16  just said this - but Exhibit 93 was made out of a
17  resin wicker material?
18       A.    That is correct.
19       Q.    In your eye, does it have any visual
20  difference than, say, natural wicker look?
21       A.    Does this specific one you meant have
22  difference?
23       Q.    Well, let's start there.
24       A.    Could you restate the question for me,
25  please?
```

Jeffrey Simpson
May 2, 2008

Page 69

```
 1        Q.    Does the resin wicker that was used in
 2   your porch swing look substantially the same as
 3   natural wicker?
 4        A.    I believe it does.
 5        Q.    So you're sitting on this porch swing.
 6   And were you sitting there by yourself?
 7        A.    I believe I was.
 8        Q.    What were you doing?
 9        A.    Relaxing.
10        Q.    Were there any pet product objects around
11   you?
12        A.    No, I don't believe so.
13        Q.    Did you have a wire crate at your home at
14   the time?
15        A.    No.
16        Q.    Where were you working at the time you had
17   this idea?
18        A.    At GDA, LLC.
19        Q.    Was this on the weekend, in the evening?
20        A.    I'm assuming it would have been, yes, on
21   the weekend or during an evening.
22        Q.    And so you're sitting on the porch swing
23   and this idea just pops in your head or was there
24   something that made you think about this?
25        A.    Popped into my head.
```

Jeffrey Simpson
May 2, 2008

Page 70

```
 1        Q.    What did you do next?
 2        A.    I believe I told my wife about it.
 3        Q.    At the time did you guys -- did your
 4   family have a dog?
 5        A.    No.
 6        Q.    You had a cat?
 7        A.    That's correct.
 8        Q.    Mr. Herzher?
 9        A.    You are correct.
10        Q.    Did you have any kind of wire crates for
11   the cat?
12        A.    No.
13        Q.    Your wife testified the other day about
14   you having a workshop or a work area in your house?
15        A.    That's correct.
16        Q.    Describe that for me.
17        A.    It's a area in the basement that's heated
18   and cooled.  It's probably eight feet by twenty-five
19   feet with a eight foot workbench along one wall.
20        Q.    And is that generally how it was back when
21   you had this idea?
22        A.    Yes.
23        Q.    And did you have any pet crates down in
24   your work area?
25        A.    May have had a plastic carrier stored in
```

Jeffrey Simpson
May 2, 2008

1    that area.

2         Q.    Describe that.

3         A.    A small plastic injection molded pet

4    carrier.  It was probably a Pet Taxi manufactured by

5    Doskocil in which we would use to transport our cat

6    to and from the vet.

7         Q.    At the time you had this idea, do you

8    recall the date generally when you had this idea?

9         A.    Again, it would have been after I started

10   employment with GDA.  I don't know specifically a

11   date.

12        Q.    I believe in your interrogatory answers

13   you had said at that time it was in September of

14   2001.  Does that sound accurate?

15        A.    To the best of my knowledge.  It could

16   have been a little bit before that.  I don't recall a

17   specific date.

18        Q.    Did you have any other wicker objects in

19   your house at the time you had this idea?

20        A.    I believe we would have, yes.

21        Q.    And what do you recall?

22        A.    We would have had at least one wicker

23   basket.

24        Q.    Anything else?

25        A.    Not that I recall.

Page 72

```
 1              (Defendant's Exhibit-94 was marked for
 2      identification.)
 3      BY MR. HINSHAW:
 4          Q.    The court reporter has handed you what's
 5      been marked as Exhibit Number 94.  Do you recognize
 6      that?
 7          A.    Yes, I do.
 8          Q.    What is that?
 9          A.    It's a wicker or rattan basket.
10          Q.    And is that the basket that you had in
11      your house around the time that you had this idea?
12          A.    I believe it is, yes.
13          Q.    Did that basket play any role in inspiring
14      your idea?
15          A.    No.
16          Q.    You don't recall any other wicker objects
17      being in your house around this time?
18          A.    As I said, there may have been additional
19      wicker baskets, but I don't recall specifically.
20          Q.    Now, you started to tell me earlier
21      about -- well, strike that.  At the time you had this
22      idea, was there a problem that you had identified and
23      you were trying to address when you came up with this
24      idea of putting wicker with the wire crate?
25          A.    Absolutely.
```

Jeffrey Simpson
May 2, 2008

```
 1        Q.    And what was that problem?
 2        A.    The problem was the aesthetic quality of a
 3    wire crate or plastic carrier when being used as
 4    containment in a home.
 5        Q.    Exactly what was that problem?
 6        A.    Well, they don't look very good.
 7        Q.    Well, when did you first identify that
 8    problem?
 9        A.    Again, when I was employed by Doskocil.
10        Q.    And when you were at Doskocil, there were
11    discussions about this problem?
12        A.    Yes.
13        Q.    Did those discussions incorporate or were
14    they based upon any studies or articles or market
15    surveys that had been done?
16        A.    No.
17        Q.    Just kind of common sense go looking at a
18    wire pet crate and thinking that's not very
19    aesthetically pleasing?
20        A.    I'm sorry.  Could you repeat that, please?
21        Q.    Was it just a commonsensical
22    acknowledgement that you look at a wire pet crate and
23    it's not very aesthetically pleasing?
24        A.    That was my commonsensical conclusion,
25    yes.
```

Jeffrey Simpson
May 2, 2008

Page 74

```
 1        Q.    And others in your product development
 2   team at Doskocil agreed?
 3        A.    Well, I wasn't part of a product -- I
 4   wasn't in product development at Doskocil.  Others
 5   within Doskocil agreed, yes.
 6        Q.    Who were the others within Doskocil that
 7   agreed?
 8        A.    I don't know specifically.
 9        Q.    Do you know if other pet companies were
10   acknowledging the same problem with wire pet crates
11   at that time?
12        A.    Not to my knowledge.
13        Q.    Do you know of any efforts by any other
14   pet companies that would appear that they were
15   undertaking efforts to address that problem?
16             MR. GARDNER:  Is your question now or at
17   the time?  It's unclear.
18   BY MR. HINSHAW:
19        Q.    At the time, were you aware of any other
20   pet companies who were making efforts to develop pet
21   crates in a way that made it appear that they were
22   trying to address this problem?
23        A.    No.
24        Q.    Looking back at that period of time, are
25   you aware of such efforts now?
```

Jeffrey Simpson
May 2, 2008

1      A.    To develop pet crates?

2      Q.    Well, let's start there.  Yes.

3      A.    No.

4      Q.    Are you aware of efforts to make

5    aesthetically pleasing pet products during that

6    period of time?

7      A.    Yes.

8      Q.    Pet products that were intended to contain

9    pets or provide housing for pets?

10     A.    The only products that I was aware of at

11   that time were what I call crate covers.

12     Q.    Describe those.

13     A.    They were typically a fabric product that

14   was sewn inside each tube, typical wire crate sizes.

15     Q.    What was their purpose?

16     A.    I would think their purpose was to hide

17   the -- to hide the ugly wire crate.

18     Q.    So to make an aesthetically pleasing

19   crate?

20     A.    Well, that's in the eye of the beholder.

21     Q.    Well, at least it was an effort to do

22   that?

23     A.    A weak effort in my opinion.

24     Q.    But an effort?

25     A.    I would say so.

Page 76

1      Q.    Do you recall ever seeing any crate covers

2   that had a pattern that resembled wicker?

3      A.    No.   They were typically paw prints.

4      Q.    And are you speaking of just Doskocil's

5   products or other companies?

6      A.    Doskocil did not have that product line.

7   And I don't believe I said that.

8      Q.    I didn't mean to suggest that you did.   So

9   the only pet crate covers that you can recall, at

10  least the designs of them, were paw prints?

11     A.    That's my recollection, yes.

12     Q.    When do you recall first seeing those?

13     A.    I think it would have -- I think it would

14  have had to have been during the time of my

15  employment at Doskocil.

16     Q.    I think you said that that was back in,

17  what, '97 to '99?  Did I get that right?

18     A.    Yes, I believe you're correct.

19     Q.    Well, coming forward to this moment in

20  time looking at Exhibit 93 when you had this idea,

21  were you actively working on trying to come up with

22  some solution to the problem of pet crates that are

23  not aesthetically pleasing?

24     A.    I'm sorry.  Say that one more time.

25     Q.    Do you want me to --

Page 77

1      A.     Yeah, please, if you don't mind.

2      Q.     Well, I don't want to call them -- there

3   was this problem perceived as far back as 1997 that

4   pet crates were not aesthetically pleasing, right?

5      A.     Well, I don't think -- it may not have

6   been in '97.  It was during my tenure at Doskocil

7   that I got the notion that, hey, you know, this just

8   can't be working in many households.

9      Q.     And you had seen pet crates made by

10  other companies -- or, I'm sorry, pet crate covers

11  made by other companies in an effort to address that

12  problem, correct?

13     A.     Again, I think in a weak effort, yes.

14     Q.     But an effort?

15     A.     An effort.

16     Q.     And so prior to you coming up with your

17  idea that you had while sitting on this swing in

18  Exhibit 93, were you actively working on coming up

19  with a solution for that problem?

20     A.     No.

21     Q.     No?

22     A.     No.

23     Q.     Just occurred to you?

24     A.     Yes.

25     Q.     Out of the blue?

Jeffrey Simpson
May 2, 2008

Page 78

1          A.    Absolutely.

2          Q.    You hadn't done any kind of research or

3    looking through magazines, looking on the Internet,

4    looking at old books in the library, anything like

5    that?

6          A.    No.  Again, the only efforts were back at

7    Doskocil where there was two products that were

8    developed in an attempt to create and produce

9    decorative indoor containment.

10         Q.    Have you ever heard of the indoor

11   doghouse?

12         A.    The indoor doghouse?

13         Q.    Yes, sir.

14         A.    Is that a trademark?

15         Q.    I don't know.  Did you ever work on a

16   project while at Doskocil that was known internally

17   at Doskocil as the indoor doghouse?

18         A.    That may have been the name of the project

19   that I spoke of earlier.

20         Q.    And which project?

21         A.    The only project that I spoke of

22   specifically relative to Doskocil in that we were

23   trying to create decorative indoor containment.

24              And the product was -- the sample was

25   manufactured from particle board or MDF and it had a

Jeffrey Simpson
May 2, 2008

Page 80

```
 1      A.    I can't say with a hundred percent of
 2   assuredness.
 3      Q.    The name doesn't ring a bell with you
 4   today?
 5      A.    The name does not ring a bell, but the
 6   connotation does.
 7      Q.    And what's the connotation?
 8      A.    Of a rotating litter box.
 9      Q.    So taking waste material --
10      A.    You did say rotobox, right?
11      Q.    That's -- yes.
12      A.    Okay.
13      Q.    And did that -- do you recall working on
14   such a project?
15      A.    Well, I remember such a project being
16   developed, yes.
17      Q.    Did that project involve wicker or rattan
18   or similar appearing materials at all?
19      A.    No.
20      Q.    Do you recall working on a project or a
21   series of projects at Doskocil that related to making
22   furniture specifically for cats so that that
23   furniture could be used in indoor living rooms and
24   family rooms?
25      A.    Yes.
```

Jeffrey Simpson
May 2, 2008

Page 81

```
 1        Q.    And what were those projects?

 2        A.    Yes, I recall those products.

 3        Q.    And what were those?

 4        A.    They were a line of I'll say whimsical cat

 5   furniture.

 6        Q.    Could you elaborate on that, please?

 7        A.    The only elaboration that comes to mind

 8   they looked like Looney Tunes kind of images or that

 9   you would see in a cartoon in terms of their overall

10   forms and appearance.

11              I believe there was a chair.  There was a

12   cat tower.  And I believe there was a -- a bed with a

13   headboard and footboard.

14        Q.    Were any of those rectangular or crate

15   like structures?

16        A.    No.

17        Q.    Did any of them have doorways on them or

18   door portals?

19        A.    I believe the cat tower did, yes.

20        Q.    And would you describe that?

21        A.    Well, I believe there was a cylindrically

22   shaped -- oblong cylindrically shaped nook, if you

23   will, in the cat tower that had, I believe, both ends

24   open.

25        Q.    Was there a door portal that was
```

Jeffrey Simpson
May 2, 2008

Page 84

```
 1        A.    New products.
 2        Q.    While you were employed at Doskocil, did
 3   you ever order a competitor's pet crate or a pet
 4   product for purposes of evaluating it?
 5        A.    No, I don't believe I would have.
 6        Q.    Do you recall whether others at Doskocil
 7   did such?
 8        A.    Yes, I believe they would have, yes.
 9        Q.    How frequently?
10        A.    I wouldn't know.
11        Q.    Did it seem pretty frequent?
12        A.    I just don't have a recollection of the
13   frequency.
14        Q.    Who were the people, as you perceived it,
15   who were ordering competitor's pet products?
16        A.    I think it would have been the folks in
17   the product development group.
18        Q.    And what was your understanding of their
19   purpose in ordering competitor's pet products?
20        A.    To analyze the competition.
21        Q.    Did you think that there was anything
22   inappropriate about that?
23        A.    Could you rephrase that?
24        Q.    Did you think there was anything
25   inappropriate about your fellow employees at Doskocil
```

Page 85

```
 1    ordering competitor's pet products to evaluate the
 2    competition?
 3         A.    I really wouldn't know what my feelings
 4    were back then.
 5         Q.    You have no recollection of whether you
 6    thought that was an appropriate thing or
 7    inappropriate thing or it was just done?
 8         A.    It was just done.
 9         Q.    Your company Simpson Ventures now is in
10    the pet product business?
11         A.    That's correct.
12         Q.    Have you ever ordered your competitor's
13    pet products?
14         A.    Yes.
15         Q.    For what purpose?
16         A.    How do you define competitors?
17         Q.    Well, you have a product line at Simpson
18    Ventures, correct?
19         A.    That's correct.
20         Q.    And I assume that you are also looking at
21    developing new products from time to time that you
22    don't currently offer?
23         A.    That's correct.
24         Q.    And so from time to time do you go out and
25    evaluate what's available in the marketplace from
```

Jeffrey Simpson
May 2, 2008

Page 86

```
 1    your competition?

 2         A.    Yes.

 3         Q.    Other pet product companies?

 4         A.    Sure.

 5         Q.    And do you sometimes order their products?

 6         A.    Yes.

 7         Q.    For what purpose?

 8         A.    That depends on which purchase.

 9         Q.    Well, why have you ordered your

10    competitor's pet products in the past at Simpson

11    Ventures?

12         A.    Well, one instance is to provide samples

13    to -- samples of the Mid-West product.

14         Q.    To whom?

15         A.    To my attorneys.

16         Q.    Any other instances?

17         A.    Of the Mid-West product?

18         Q.    No; of ordering your competitor's pet

19    products.

20         A.    Yes.

21         Q.    How frequently have you done that?

22         A.    I -- I don't know a frequency.

23         Q.    How many times have you done that?

24         A.    Maybe a half a dozen, I'm guessing.

25         Q.    Other than the ordering of the Mid-West
```

Page 87

1    wicker pet crate, tell me about these other half

2    dozen instances.

3        A.    Okay.   There would have been several

4    purchases of litter pans, both standard pans

5    available from Vanness, Stylette.

6        Q.    Could you please spell those?

7        A.    Vanness is V-a-n-and I think it's

8    another-n-e-s-s, Vanness Plastics.   They're one of

9    the big litter pan suppliers or manufacturers.

10   Stylette, S-t-y-l-e-t-t-e, I believe, and Petmate or

11   Doskocil.   That's, I think, Doskocil's brand.

12            I would have purchased those when sizing

13   or determining what the internal dimensions of our

14   decorative litter pan cover should be.

15            I have also purchased a Litter Maid,

16   L-i-t-t-e-r, M-a-i-d, automatic litter pan.   And I

17   believe one other.   And that was probably the

18   Doskocil automatic litter pan system.

19            And I would have purchased those two to

20   determine if I could make a universal, I'll call it,

21   litter pan cover for automatic litter pans.

22       Q.    So that evaluation was of a product that

23   you didn't presently offer, and you had ordered --

24       A.    Didn't present -- I'm sorry.

25       Q.    And you had ordered these litter pans from

Jeffrey Simpson
May 2, 2008

1    Doskocil and Litter Maid to help you evaluate whether
2    to create a new product?
3        A.    Whether to create a different product,
4    yes.  I think I stated that I ordered them - and
5    subsequently I think I returned a couple of them, the
6    automatic ones, because of their expense - again, to
7    size -- to size a decorative litter pan cover to
8    ensure that it housed or fit or accommodated the
9    popular basic litter pans on the market because I had
10   no interest in coming out with a litter pan.
11       Q.    Do you think it's pretty common practice
12   in the pet product industry to order competitor's
13   products for purposes of evaluating them?
14       A.    Yes.
15       Q.    Who did you work with at Doskocil?
16       A.    I worked for Mike Farmer.  Other folks
17   that I worked with were Gary Kleijan, Dick Allen,
18   Kevin Kolozvari.
19       Q.    Could you spell that last name, please, as
20   best as you can?
21       A.    I'll butcher it.  K-o-l-o-z-v-a-r-i.  Ann
22   McCullough, Julie Brandsford, Kevin Mitchell, Ken
23   Jordan, Pat Hoffman.  How far do you want me to go?
24       Q.    Several of those names sound like the
25   folks who are involved at GDA?

Jeffrey Simpson
May 2, 2008

Page 91

```
 1    think you said in your interrogatories and your

 2    testimony today was around September of 2001.  Okay?

 3    Does that sound accurate?

 4         A.    Yes.

 5         Q.    And I think you said earlier that you

 6    weren't actively working on some solution for this

 7    problem of coming up with an aesthetically pleasing

 8    dog crate -- or pet crate, correct?

 9         A.    That's correct.

10         Q.    So am I correct that you hadn't been

11    thinking of what other materials you might put on a

12    pet crate to make it aesthetically pleasing?

13         A.    No, not actively, no.

14         Q.    And you hadn't experimented with anything?

15         A.    No.

16         Q.    And I think you were telling me that after

17    you had this idea I asked you what did you do next

18    and you said you talked to your wife?

19         A.    Uh-huh (affirmative).

20         Q.    What do you recall telling your wife?

21         A.    Well, I mean, specifically I can't recall

22    verbatim.

23         Q.    What do you recall generally?

24         A.    I think generally I would have asked her

25    about the idea and got her impression of the overall
```

Jeffrey Simpson
May 2, 2008

Page 92

```
 1    concept.

 2         Q.    And what did she say?

 3         A.    I recall her liking the idea.

 4         Q.    Did she say anything else?

 5         A.    Not that I recall.

 6         Q.    How did you describe the idea to her at

 7    that time?

 8         A.    As a general -- you know, in essence a

 9    form or a shape of a wire kennel covered with -- with

10    resin rattan.

11         Q.    And at that time -- and I think you said

12    you didn't have any wire kennels in your house.  But

13    at that time were you envisioning a rectangular wire

14    kennel?

15         A.    Yes.

16         Q.    Pretty common in the marketplace at that

17    time?

18         A.    Yes.  And Doskocil had a line of wire

19    kennels as well.

20         Q.    And were those collapsable?

21         A.    Yes.

22         Q.    And that feature too was a common feature

23    of wire metal pet crates at that time?

24         A.    Collapsibility?

25         Q.    Yes, sir.
```

Jeffrey Simpson
May 2, 2008

Page 93

```
 1        A.     Yes.

 2        Q.     What did you do next?

 3        A.     You mean immediately next or --

 4        Q.     Well, in terms of working on your idea to

 5   take a wire pet crate and make it aesthetically

 6   pleasing.

 7        A.     I would have started preparing drawings.

 8        Q.     Would you have done those yourself?

 9        A.     Yes.

10        Q.     Did anybody assist you with those?

11        A.     No.

12        Q.     And would you have started with basically

13   drawing out the structure or shape of the crate?

14        A.     I would have started by defining what the

15   overall dimensions were and then drawing or sketching

16   the details of the concept.

17               MR. GARDNER:  Off the record.

18               (Off-the-record discussion.)

19               MR. HINSHAW:  Go ahead and mark that as

20   Exhibit 95.

21               (Defendant's Exhibit-95 was marked for

22   identification.)

23   BY MR. HINSHAW:

24        Q.     The court reporter has handed you what's

25   been marked as deposition Exhibit Number 95.  It's
```

Jeffrey Simpson
May 2, 2008

Page 94

1    several pages in length.  If you want to thumb

2    through those.  Oh, I will tell you, just the heads

3    up, if you -- do you see the bates labels there --

4         A.    Yes, sir.

5         Q.    -- on this ending in 54?  Do you recognize

6    those?

7         A.    Yes.

8         Q.    When you come to between P000057 and

9    P000058, you see in the bottom right-hand corner of

10   those drawings there appear to be page numbers like

11   one of seven, three of seven, four of seven?

12        A.    That's what appears to me as well.

13        Q.    One of my questions is, do you see page

14   five of seven anywhere in here?  But go ahead and

15   take a look at the materials.

16        A.    (Witness complies.)

17        Q.    Mr. Simpson, what are these?

18        A.    These are my drawings or sketches of a --

19   framework components of a resin rattan pet home.

20        Q.    And you prepared these back sometime in

21   2001 or do you recall?

22        A.    2001?

23        Q.    Yes, sir.

24        A.    No.  These would have been prepared in

25   2002.

Jeffrey Simpson
May 2, 2008

Page 95

1      Q.    Why do you say that?

2      A.    Because this is a different mechanical

3   configuration than my first drawings.

4      Q.    How so?

5      A.    Primarily this mechanical configuration

6   collapsed or kd'd differently than the first.

7      Q.    How did the first one collapse?

8      A.    The first one collapsed in a -- I think

9   the general term used is a Z-fold.

10      Q.    And how does this one collapse?

11      A.    Do you have my assembly instructions that

12   would show or I could try to explain?

13      Q.    Just try to explain generally.

14      A.    I'm using Exhibit 84 as an example.  So

15   these drawings are reflective of this mechanical

16   configuration shown in Figure 1 -- shown in all

17   figures of Exhibit 84 wherein the front and the back

18   panels would hinge about their lower edges and fold

19   down.

20          The links at the upper corners would be

21   disengaged at one upper edge.  That side panel

22   adjacent to those disengaged links would then be

23   folded down on top of the front and back panels that

24   have previously been folded.

25          And then the remaining side and top -- the

Page 96

1    side would come down next and the top would fold over

2    upside-down.

3        Q.    So this Exhibit 95 were your hand drawn

4    drawings that essentially correlate with the object

5    that's depicted in Exhibit 84?

6        A.    Essentially, yes.

7        Q.    And you said there was a previous set of

8    drawings where the collapsing feature was a different

9    feature, a Z-fold; is that correct?

10       A.    That is correct.

11       Q.    Do you know where those drawings are?

12       A.    No, I do not.

13       Q.    Have you seen them as you've been

14   reviewing the materials that you've gathered and

15   produced to your attorneys in this case?

16       A.    I've only seen one sketch.  And it was

17   a -- it was just a very minimal sketch that I think

18   may -- I may have used it to determine what the

19   links -- lengths of the different panels would be or

20   the heights of the different panels would be in the

21   Z-fold.

22       Q.    You've looked for those drawings in the

23   context of this lawsuit pursuant to our document

24   request; is that correct?

25       A.    Yes, I have.

Jeffrey Simpson
May 2, 2008

Page 98

1        A.     The decorative features?

2        Q.     The decorative features that appear in

3    your design patent 156.

4        A.     Well, that depends on what you determine

5    or define as decorative.

6        Q.     Exhibit 95, do you see any wicker drawings

7    or sketches here?

8        A.     No.

9        Q.     Do you see any weave patterns on any of

10   the features depicted in Exhibit 95?  Correct?

11       A.     Let me double check because -- okay.

12   Could you restate your question, please?

13              MR. HINSHAW:  Read it back.

14              (The record was read by the reporter.)

15       A.     No.

16   BY MR. HINSHAW:

17       Q.     Did you personally ever prepare drawings

18   that show the weave patterns of the wicker over your

19   pet crate?

20       A.     Could you repeat that last question,

21   please?

22              (The record was read by the reporter.)

23       A.     If your question is, did I ever try to

24   replicate what this looks like via pen and ink

25   drawing -- is that your question?

Jeffrey Simpson
May 2, 2008

1     Q.    My question is pretty plain.  Did you ever

2    personally draw any wicker or weave patterns as they

3    would appear on your pet crate?

4     A.    Then I think the answer is, no, I didn't

5    prepare any drawings of the wicker or weave patterns.

6    I only indicated the location that that wicker or

7    rattan should be located.

8                    (Lunch recess 11:45-12:40 p.m.)

9                    (Defendant's Exhibit-96 was marked for

10    identification.)

11    BY MR. HINSHAW:

12     Q.    Mr. Simpson, the court reporter has handed

13    you what's been marked as Exhibit Number 96.  Do you

14    recognize that?

15     A.    To answer your question, yes, I do, I do

16    recognize it.

17     Q.    What is that?

18     A.    This would -- this would be a

19    communication to my agent in Hong Kong relative to

20    changes in the process of developing the wicker

21    kennel.

22     Q.    Your agent is Berne?  Bernie or Berne?

23     A.    Bernie.

24     Q.    And who is Bernie?

25     A.    Bernie Kelly is -- I believe his title is

Jeffrey Simpson
May 2, 2008

```
 1    here in the United States?

 2         A.    That is correct.

 3         Q.    So there are no employees in Alabama or

 4    Georgia who are involved in making any of your

 5    Simpson Venture product line?

 6         A.    That is correct.

 7         Q.    Including your wicker pet crates?

 8         A.    That is correct.

 9         Q.    That's all done over in China?

10         A.    Specifically on the wicker crates, yes.

11         Q.    Why did you set up that business model?

12         A.    Because I believe, number one, I didn't

13    think I could find anybody in the U.S. that wove

14    wicker.

15         Q.    Why is that?

16         A.    I don't know.

17         Q.    Do you think that that is a labor

18    intensive process?

19         A.    I know it's a labor intensive process.

20         Q.    Do you think that that would be very cost

21    effective or cost affordable to do that here in the

22    United States?

23         A.    I'm sorry, Mr. Hinshaw.  Could you repeat

24    that, please?

25                MR. HINSHAW:  If you would, please.
```

Jeffrey Simpson
May 2, 2008

Page 102

1              (The record was read by the reporter.)

2         A.    No, I do not.

3    BY MR. HINSHAW:

4         Q.    Going back to Exhibit 96, is that your

5    handwriting that appears on the first page of that

6    document?

7         A.    I believe it is, yes.

8         Q.    And your handwritten note says, sent to

9    Bernie on January 27, 2002?

10        A.    Yes.

11        Q.    And then below that someone has typed,

12   required product changes to the sample provided to me

13   on January 21, 2002.  Did I read that correctly?

14        A.    Yes, you did.

15        Q.    Did you type this document?

16        A.    Yes.

17        Q.    Okay.  So was a sample -- is it correct to

18   use the words sample and prototype interchangeably

19   here at this point in time?

20        A.    At this point in time I believe it is,

21   yes.

22        Q.    So this sample or prototype that was

23   provided to you on January 21 of 2002, was that the

24   first prototype?

25        A.    No.

Page 103

```
 1        Q.    How many prototypes preceded this one that
 2   was sent on January 21 of 2002?
 3        A.    One.
 4        Q.    And was that the first time that you had
 5   seen a metal wire pet crate with wicker woven on it
 6   when you saw that first prototype?
 7        A.    Yes.
 8        Q.    Describe for me what you recall seeing at
 9   that time.
10        A.    I recall seeing a sample or prototype of a
11   wicker covered kennel that was built to my drawings,
12   my original drawings.
13        Q.    And by built to your original drawings
14   you're talking about the structural drawings much
15   like the predecessor to Exhibit Number 95?
16        A.    Structural drawings and the location of
17   the wicker.
18        Q.    Which you used words to describe where you
19   wanted the wicker to go?
20        A.    Words and/or I may have used lines - I
21   don't know - defining the area, not lines defining
22   each individual strand of rattan or wicker.
23        Q.    Well, you may have.  Tell me specifically
24   what you recall drawing in terms of the -- how the
25   wicker was supposed to look on your crate.  If you
```

Jeffrey Simpson
May 2, 2008

1    have --

2        A.      Could you repeat that for me, please?

3                (The record was read by the reporter.)

4    BY MR. HINSHAW:

5        Q.      If you have such a recollection.

6        A.      I don't have a specific recollection as to

7    how I defined that feature.

8        Q.      So this first prototype that you saw prior

9    to January 21 of 2002 --

10       A.      Yes.

11       Q.      -- how much earlier than January 21 of

12   2002 did you receive that first prototype?

13       A.      I would guess it would have been in the

14   late September to October time frame.

15       Q.      Of 2001?

16       A.      Yes, sir.

17       Q.      So you're sitting on your wicker porch

18   swing in September of 2001, you have this idea, and

19   by the end of September or early October you have the

20   prototype of it?

21       A.      Yes.

22       Q.      Do you recall the name of the company who

23   prepared that first prototype?

24       A.      No, I do not.  I would have not known

25   that.

Jeffrey Simpson
May 2, 2008

```
 1        Q.    Because it was provided through Mr. Lau to
 2   GDA to you?
 3        A.    That is correct.
 4        Q.    The visual appearance of that first
 5   prototype, how did it compare to what ultimately
 6   became your design patent in Exhibit 84?
 7        A.    Very close.
 8        Q.    What do you recall being different about
 9   it?
10        A.    As I stated earlier, it was a -- again, I
11   used the colloquial term, I guess, a Z-fold.  So
12   there would have been hinge points -- another two
13   sets of hinge points in the side wall of the product.
14   There's a picture of the Z-fold prototype in the
15   documents.
16        Q.    What do you recall seeing about a picture
17   of a Z-fold in the documents?
18        A.    I recall seeing a picture of the Z-fold in
19   the documents that I reviewed, that I provided as
20   part of the doc request.
21        Q.    I've seen a lot of documents and a lot of
22   pictures.  So can you be a little more specific
23   than --
24        A.    I can't give you a bates number.  I'm
25   sorry about that.
```

Jeffrey Simpson
May 2, 2008

Page 108

1    do you think that that refers to the January --

2         A.    I think that refers to the very first

3    prototype.  And I apologize for interrupting you.

4         Q.    No.  You're fine.  The factory sample you

5    think refers to this January 21, 2002 sample?

6         A.    That is correct.

7         Q.    So if we can figure out which of those

8    objects these boxes point to, that would help us

9    understand that.

10             Do you know what happened to that first

11   prototype?  Do you know where it's located today?

12        A.    No, I do not.

13        Q.    Do you recall doing anything with it,

14   disposing of it, giving it away, putting it in a

15   storage?

16        A.    I don't remember specifically what I would

17   have done with it.

18        Q.    Do you recall whether that first prototype

19   had a diamond weave pattern on it?

20        A.    I don't believe it did, no.

21        Q.    Did this sample, the January 21, 2002

22   sample, have a diamond weave pattern on it?

23        A.    I don't believe it did.

24        Q.    In Paragraph 5 of this document, bates

25   label POO3628 -- do you see that?

Jeffrey Simpson
May 2, 2008

Page 121

1        A.     Yes, after we've been in production with

2    that factory, yes.

3        Q.     How many different Chinese manufacturers,

4    as best you can recollect, have you used for

5    manufacturing the wicker pet crates?

6        A.     At least four.

7        Q.     How is it that you communicate to them

8    what it is they're supposed to produce?

9        A.     Communicate to the factory?

10       Q.     Manufacturing factory, yes.

11       A.     I communicate through Vigor International.

12       Q.     So does Vigor have some set of standard

13   drawings that they submit to the manufacturing

14   factory over in China?

15       A.     They would have had my drawings.

16       Q.     The drawings in Exhibit 95?

17       A.     I don't see any dates on these, so I can't

18   say specifically that it's these -- this set of

19   drawings.  But I'm assuming it would be during that

20   time frame.

21       Q.     How would the manufacturing company know

22   -- four different manufacturing companies in China

23   know what kind of wicker weave patterns, where to put

24   the wicker, how to weave it, what kind of patterns

25   you wanted, how would they know that?

Jeffrey Simpson
May 2, 2008

Page 122

```
 1        A.    Well, they would simply look at a sample
 2   that was provided them and duplicate it.
 3        Q.    So going off of a sample, a prototype, if
 4   you will?
 5        A.    Yes.
 6        Q.    No drawings though?
 7        A.    For subsequent factories, yes.
 8        Q.    Well, I have yet to hear you identify a
 9   set of drawings for me that show the wicker and how
10   you wanted the weave patterns on the wicker on a
11   crate.
12              Are you telling me that there was a set of
13   drawings that specifically showed that?
14        A.    What do you mean by specifically showed?
15        Q.    I mean exactly what I say.
16        A.    Well, again - and I think as I've stated
17   before - the initial drawings would have shown only
18   the areas in which to cover with wicker or resin
19   rattan.
20        Q.    So was it then left up to the factory to
21   decide whether to do a loose weave or a tight weave
22   or a diamond pattern or a square pattern or a plain
23   pattern or what?
24        A.    Well, I don't believe I ever told -- I
25   don't believe I ever indicated in my initial drawing
```

Jeffrey Simpson
May 2, 2008

Page 123

 1    set that a diamond pattern or a square pattern or any
 2    other weave -- alternate weave pattern should be
 3    included.
 4             I would have told them to weave it like
 5    all weather wicker outdoor furniture, similar to
 6    what's in Exhibit 93.  I don't --
 7        Q.    Did you give any instruction for the
 8    factory over in China to weave the tubes around the
 9    perimeters of the different panels with a continuous
10    coil of wicker?
11        A.    I don't know how else they would have done
12    it.  They have to be able to weave around the frame.
13        Q.    You told them to weave those tubes,
14    though?
15        A.    I gave them the area in which it was to be
16    woven.  I don't know how you'd go around a tube other
17    than to go around it.
18        Q.    But is it your testimony that you
19    instructed them to weave around the tube?
20        A.    That specifically?
21        Q.    Yes.
22        A.    No.  How else would you go around the tube
23    but to weave around it?
24        Q.    Or they could have chosen to not weave
25    around the tube at all.

Jeffrey Simpson
May 2, 2008

Page 124

1      A.    Then -- then it wouldn't have gone to the
2   area that I defined.
3      Q.    What was the area that you defined?
4      A.    That the entire panel be -- I'm assuming
5   that the entire panel be covered with resin rattan
6   except for in areas that I notated.
7      Q.    You're assuming, but you don't
8   specifically recall that?
9      A.    I don't specifically recall that.  But the
10   first sample came back per my instructions, so I have
11   to assume that they got it.
12      Q.    Do you recall the names of any of the four
13   manufacturing companies over in China who have made
14   your crate -- wicker pet crate?
15      A.    My only recollection, Mr. Hinshaw, is that
16   the first factory his name was Mr. Hong.
17      Q.    O-n-g?
18      A.    H-o-n-g.
19      Q.    H-o-n-g.  And were there circumstances
20   that came about that caused you to switch from one to
21   the second to the third to the fourth?
22      A.    Yes.
23      Q.    And what were those circumstances?
24      A.    I believe the second factory would have
25   been located and suggested by Fred Lynn.

Jeffrey Simpson
May 2, 2008

Page 139

1   novelty that we've --

2       Q.    Not at this point.

3       A.    So this has no relationship to the points

4   of novelty that we've answered in our interrogatory

5   responses?

6       Q.    This is purely focused on the features of

7   your design that you think make it ornamental or

8   decorative.

9       A.    And in terms of or searching for -- as

10  simple as you put it?

11      Q.    Yes, sir.

12      A.    I think the fact that it's a wicker

13  kennel.  And the reason you can tell it's a kennel is

14  because you can see windows and doors.

15      Q.    Anything else?

16      A.    I think that's the overall decorativeness

17  of it.  It's a wicker kennel.

18      Q.    You don't believe that there are any other

19  features of the design that are ornamental or

20  decorative?

21      A.    Again, as it relates to the interrogatory

22  responses or --

23      Q.    Independent of the interrogatory

24  responses.  As I'm sitting here right now you and me

25  talking about this case, do you believe that there

Jeffrey Simpson
May 2, 2008

1    are no other features that are ornamental or

2    decorative?

3        A.    Well, you have to understand I'm a little

4    concerned about being tripped up here, Mr. Hinshaw.

5        Q.    I'm not trying to trip you up.

6        A.    I believe when a person sees my product

7    that they say, that's a wicker kennel.  And that

8    overall impression is what's decorative.

9        Q.    And so you don't identify and won't

10   identify any other features that you believe are

11   decorative or ornamental for me?

12       A.    For this specific question?  No, I don't

13   think it's necessary.

14       Q.    Well, whether it's necessary or not --

15       A.    I wouldn't know what to say, Mr. Hinshaw.

16       Q.    So you can't identify any other features

17   that you think are ornamental or decorative other

18   than its overall impression of being a wicker kennel

19   and I think you said with windows and doors?

20       A.    Right.

21       Q.    If you look at each of these figures in

22   Exhibit 84 figure by figure, are there features in

23   here that you believe exist because they are truly

24   functional?

25       A.    And does this relate to the interrogatory

Jeffrey Simpson
May 2, 2008

1   responses that we provided?

2       Q.   It relates to the question I just asked

3   you here in this deposition.

4       A.   Are you gonna compare it to the answers

5   that I provided in the interrogatory --

6       Q.   I don't know what I'm going to do with it

7   until I hear your answers, Mr. Simpson.

8       A.   Please.  I apologize.  I'm not trying to

9   be difficult.  I just -- I want to understand.

10      Q.   What I'm trying to understand is you're

11  the inventor of --

12      A.   That is correct.

13      Q.   -- the design that is shown here in

14  Exhibit 84?

15      A.   You're absolutely right.

16      Q.   And I am trying to figure out as the named

17  inventor on this patent what features you believe

18  exist because they are there purely for a functional

19  or mechanical purpose.

20      A.   Okay.  Well, certainly doors and windows

21  are there as a functional feature just as they're

22  present in other products.

23           The feet.  I see links.  I see screws.  I

24  see a latch on the front door.  I see a tray keeper

25  on the back.

Jeffrey Simpson
May 2, 2008

Page 142

```
 1      Q.    Anything else?
 2      A.    No.  May I use the rest room?
 3            MR. HINSHAW:  Yes, sir.  Let's take a
 4   break.
 5            (Recess 2:00-2:20 p.m.)
 6      A.    May I ask a question first, please?
 7   BY MR. HINSHAW:
 8      Q.    Sure.
 9      A.    Are you satisfied that I fully understood
10   your question with respect to what is the design
11   features or ornamental features of what's depicted in
12   Exhibit 84 design patent?
13      Q.    Well, judging by your question to me,
14   gosh, maybe I will want to rethink that.  But let's
15   come back to that.
16      A.    May I say something first, please?
17      Q.    Sure.
18      A.    Prior to this lawsuit or these lawsuits, I
19   probably would have interchanged those two words,
20   design or ornamental, and may not have.  I can't say
21   with a hundred percent assurances.
22            But if you're asking me what the specific
23   ornamental features are of what's depicted in Exhibit
24   84, then I would like to elaborate because I believe
25   I answered your question of what's the design
```

Jeffrey Simpson
May 2, 2008

1    Q.    What did you mean by that?

2    A.    I don't know.

3    Q.    Do you think you were referring to the

4    handle on the crate?

5    A.    I would think it would apply to the crate,

6    yes.

7    Q.    You understand what I mean by the handle

8    on the crate.  When you look at Exhibit 84, Figure 3,

9    the rear panel, that's a handle, correct?

10   A.    Well, it's a handle and a window, yes.

11   Its primary purpose is a handle.  Its secondary

12   purpose is a window.

13   Q.    A window for what?

14   A.    For ventilation, viewing, whatever.

15   Q.    It appears at the top of the crate, would

16   it not?

17   A.    Yes.

18   Q.    So the animal would have to have its head

19   stuck at the top of the crate to use that opening as

20   a window, wouldn't it?

21   A.    I don't believe so, no.

22   Q.    No?

23   A.    I mean, he could view out the window and

24   look at the upper part of the wall.

25

Jeffrey Simpson
May 2, 2008

Page 154

1      A.    You would get that same look with wire.

2      Q.    If the wire were a large gauge?

3      A.    Even on small gauge wire the wicker is

4    still coiled around the outer wire.

5      Q.    Is it correct that the size of the tubing,

6    the diameter of the tubing, could be increased to

7    have a more -- a more significant visual impact of

8    the wicker coiled around it as opposed to a smaller

9    diameter tubing with wicker coiled around it?

10      A.    If you're saying that the -- that the

11    wicker wrapped around a larger diameter is more

12    visible than that when it's wrapped around the small

13    diameter, I would agree with you.

14      Q.    And that's true for wire or for tubing?

15      A.    I would believe so, yes.

16      Q.    Looking again at Exhibit 84, is it your

17    testimony that nobody else contributed to the

18    ornamental features of this design?

19      A.    Yes, that's correct.

20      Q.    Was there an overall look that you were

21    trying for when you developed this design?

22      A.    The overall look would have been a

23    decorative wicker kennel.

24      Q.    Were there any design principles that you

25    followed in developing this design?

Jeffrey Simpson
May 2, 2008

1        A.    I wanted them to be sized such that they

2    were similar to existing containment devices by size.

3        Q.    And by existing containment devices you're

4    talking about existing pet crates?

5        A.    Wire crates, plastic crates, plastic

6    kennels, carriers and the like, yes.

7        Q.    Any other design principles that you

8    followed in developing your design?

9        A.    I wanted it to look as good as it could.

10       Q.    Earlier I asked you if you had done any

11   research after you came up with your idea when

12   sitting on the porch swing.

13            Before you finalized your design, did you

14   do any research, look at any magazines, books,

15   Internet, for different kinds of weave pattern or

16   wicker designs?

17       A.    No.

18       Q.    Before you --

19       A.    Other than, you know, a color reference,

20   which is shown as Exhibit 94.

21       Q.    Which I think was referenced in one of

22   your --

23       A.    And, you know -- and the resin or all

24   weather wicker, you know, weaving of Exhibit 93.

25       Q.    Was there anything about that weave

Jeffrey Simpson
May 2, 2008

Page 156

1    pattern in Exhibit 93 in particular that you were
2    trying to capture?
3         A.    No.  I don't think -- I don't think the
4    weave pattern changes the overall decorative
5    appearance of the product.
6         Q.    Not at all?
7         A.    Not substantially, no.
8         Q.    Well, what do you mean substantial?
9         A.    I don't -- I don't think a consumer is
10   going to care that it has a diamond pattern or not.
11   And I would believe that they wouldn't even pick up
12   on that.
13        Q.    So if you looked at Exhibit 93 and there
14   were three large diamond patterns woven into it, you
15   don't think that that would be a significant
16   ornamental difference?
17        A.    No.  There's two in this one today.
18        Q.    And where are those?
19        A.    They're in the back rest from the
20   right-hand side of the product that is shown in
21   Exhibit 93.
22              It's in the upper half of the back about
23   one-third of the way over from the right side and the
24   other is about two-thirds away over from the right
25   side.

Jeffrey Simpson
May 2, 2008

Page 157

1        Q.      And those are directly underneath the

2   white squares that sit at the top of the photo?

3        A.      Pretty much.

4        Q.      May I see that color photo?

5        A.      Uh-huh (affirmative).

6        Q.      Is that where you got the idea to put a

7   diamond wicker weave in your wicker pet crates?

8        A.      I believe it was, yes.

9        Q.      So you copied that feature from this porch

10  swing into your pet crates?

11       A.      Not exactly, no.

12       Q.      Well, how was it not exactly?

13       A.      You'll notice in the color picture of

14  Exhibit 93 that that's somewhat of a solid diamond.

15  And -- well, I can't tell from this.  But I believe

16  that what has been used in our product is just an

17  outline of a diamond.

18       Q.      And you think that's a significant

19  difference?

20       A.      Between a solid and just the outline?

21       Q.      Yes, sir.

22       A.      No, not to -- I don't think any of them is

23  significant over just the other portion of the

24  weaving -- or woven product.  I mean, you -- it's

25  barely discernable.

Jeffrey Simpson
May 2, 2008

Page 158

1      Q.    In this particular photograph I would

2    agree.

3      A.    In that particular photograph and I think

4    in general.

5      Q.    Doesn't the discernability (SIC) of it

6    depend on how you do the weave pattern to highlight

7    it or --

8      A.    It's all the same colored material.  If it

9    was a different colored material in just that diamond

10   than the color of the material surrounding it, then

11   maybe it would be a discernable difference.  But I

12   don't believe it is.  It's just a very subtle little

13   accent.

14     Q.    Kind of like how men see colors in window

15   sixteen and women see colors in I think fifty-six

16   palate or so?

17     A.    I have never heard that.

18     Q.    You've never heard that?

19     A.    No, I had not.

20     Q.    Kind of in the eye of the beholder, isn't

21   it?  Before you finalized your design in Exhibit 84,

22   did you purchase any other -- strike that.  Before

23   you finalized your design in Exhibit 84, did you

24   purchase any wicker products?

25     A.    No, I don't believe I would have.  Well,

Jeffrey Simpson
May 2, 2008

Page 159

1    let me back up, please.  Certainly purchased the --

2    you took my exhibit.  But certainly purchased the --

3         Q.    You had already purchased that?

4         A.    Yeah, certainly purchased the --

5         Q.    And you had already purchased the wicker

6    basket?

7         A.    Well, yeah, we had.  You're absolutely

8    correct.  We had ownership of it for -- how long I

9    don't know.

10        Q.    Other than those two objects --

11        A.    We may have other baskets in the house.

12              MR. GARDNER:  Mr. Hinshaw, if you can

13   clarify your question as to the time frame when you

14   asked him whether he had wicker in his --

15   BY MR. HINSHAW:

16        Q.    After you came up with your idea on the

17   porch swing and before you finalized your design, did

18   you purchase any other wicker objects?

19        A.    No.

20        Q.    After you had your idea on the porch swing

21   and before you finalized your design, did you go buy

22   any wire pet crates?

23        A.    Please - I'm sorry - if you'd state that

24   again, please.

25        Q.    Sure.  After you had your idea on the

Jeffrey Simpson
May 2, 2008

1    porch swing in September 2001 and before you

2    finalized your design that's reflected in Exhibit 84,

3    did you go out and purchase any wire pet crates?

4        A.    Well, I don't know what you mean by go out

5    and purchase.  But, yes, I did purchase at least one

6    wire crate from Doctors Fosters & Smith of which you

7    can see a representation of that package of that

8    product in --

9        Q.    That was the Gorilla Tough?

10       A.    Yes.  You can see a representation of that

11   product packaging on -- or in Exhibit 96, bates

12   number P003628.

13       Q.    Other than purchasing that wicker -- or,

14   I'm sorry, that metal crate, did you buy any other

15   metal crates before you finalized your design?

16       A.    I don't know why I would have.  So I don't

17   believe I did, no.

18       Q.    The metal crate that you did buy from Dr.

19   Fosters?

20       A.    Doctors Foster & Smith.

21       Q.    Did you attempt to weave any wicker or

22   resin wicker on it?

23       A.    No.

24       Q.    Why not?

25       A.    Have you ever seen people weaving resin

Jeffrey Simpson
May 2, 2008

```
 1   wicker?

 2        Q.    No, I haven't.

 3        A.    It's -- well, I would liken it to

 4   crocheting or knitting.  You've got to know how to do

 5   it.  And I didn't know how nor did I want to learn.

 6        Q.    Have you learned since?

 7        A.    No.  But I've seen it done many times

 8   since.

 9        Q.    After you had your idea while sitting on

10   the porch swing in September of 2001 and finalizing

11   your design as depicted in Exhibit 84, did you

12   personally do any patent searches relating to the

13   ornamental features of your design?

14        A.    I don't believe I did.  You said relating

15   to the ornamental features of my design.  That's

16   fairly specific.

17              I believe I had or asked Mr. Smith T to do

18   a - I don't know how I would have phrased it to him -

19   to do a patent search.

20        Q.    I'm going to hand you what's been marked

21   as deposition Exhibit Number 4.

22        A.    Okay.  Thank you.

23        Q.    Have you seen that before?

24        A.    Yes, I have.

25        Q.    What is that?
```

Jeffrey Simpson
May 2, 2008

Page 162

1          A.      These are photographs of a medium pet

2     residence wicker kennel of a Mr. Herzher's brand.

3     This is part number 13301.

4          Q.      This design has a diamond weave pattern on

5     it?

6          A.      It does.

7          Q.      On the sides and in the rear?

8          A.      And I stand corrected on my previous

9     comment.  I thought it was just an outline diamond.

10    But it is, in fact, a solid filled in diamond very

11    similar if not close -- it just looks to be larger.

12         Q.      Do all of the sizes of your wicker pet

13    crates have a diamond on them like this?

14         A.      Yes.

15         Q.      Has that been the case since you first

16    started selling these wicker covered pet crates back

17    in May of 2002?

18         A.      I believe the diamond has been present in

19    all production articles of which I started selling

20    and invoicing for thereof in August of 2002.

21         Q.      Can you think of any wicker covered pet

22    crates that you have sold to a consumer or a customer

23    that did not have a diamond weave pattern on it?

24         A.      No.

25         Q.      The design pattern in Exhibit Number 84

Jeffrey Simpson
May 2, 2008

Page 169

```
 1        A.    Do you mind repeating that back, please?
 2              (The record was read by the reporter.)
 3   BY MR. HINSHAW:
 4        Q.    Wasn't the reason -- well, let's -- let's
 5   try something else.
 6              (Defendant's Exhibit-112 was marked for
 7   identification.)
 8   BY MR. HINSHAW:
 9        Q.    This is an email to John Smith T from
10   yourself dated February 14, 2002, correct?
11        A.    This is an email -- at the bottom it's an
12   email from me to John Smith T.  And I see now there
13   is a space after the H and before the T.
14        Q.    So the answer to my question is yes?
15        A.    I'm sorry.  Mr. Hinshaw, please, do you
16   mind repeating that question?
17        Q.    This is an email from yourself to Mr. John
18   Smith T dated February 14th, 2002, correct?
19        A.    Yes, that's correct.
20        Q.    And it says:  I will forward via mail a CD
21   containing several views of the product by Monday.
22   Correct?
23        A.    It does say that, yes.
24        Q.    Do you happen to still have those views or
25   that CD?
```

Jeffrey Simpson
May 2, 2008

1      A.    Not that I'm aware of.

2      Q.    And is it your understanding that the

3  slide jpg file that was attached is, in fact, P003001

4  the same -- essentially the same photo we saw earlier

5  attached to your declaration?

6      A.    Yes.   I believe that to be what is

7  attached to the email to the best of my knowledge.

8              (Defendant's Exhibit-113 was marked for

9  identification.)

10 BY MR. HINSHAW:

11     Q.    The court reporter's handing you what's

12 been marked as deposition Exhibit 113.   Who is Thomas

13 Dean?

14     A.    Let me quickly read this, please.   And,

15 again - I'm sorry - your --

16     Q.    Who is Thomas Dean?

17     A.    I believe he is a -- a graphic artist that

18 prepares -- that prepares drawings appropriate for

19 inclusion in patents.

20     Q.    And did he do the drawings that were

21 submitted on the 156 patent?

22     A.    To my belief he is, yes.

23     Q.    And you had a chance to review that work

24 product and approve it?

25     A.    I'm sure I did to the best of my

# Exhibit U

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

SIMPSON VENTURES, INC.,
      Plaintiff,

vs.                              CIVIL ACTION FILE
                                 NO. 3:06cv-901-WKW

MID-WEST METAL PRODUCTS
COMPANY, INC.
         Defendant.

_____

MID-WEST METAL PRODUCTS
COMPANY, INC.,
        Counterclaimant,

vs.

SIMPSON VENTURES, INC.,
        Counterdefendant.


DEPOSITION OF
JEFFREY M. SIMPSON
Volume 2
June 9, 2008
9:04 a.m.
GARDNER GROFF GREENWALD & VILLANUEVA, P.C.
100 Parkwood Point
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia  30339


LaRita J. Cormier, CCR-B-2578

Jeffrey M. Simpson
June 9, 2008

Page 4

```
 1                    JEFFREY M. SIMPSON,

 2   having been first duly sworn, was examined and

 3   testified as follows:

 4                         EXAMINATION

 5   BY-MR.HINSHAW:

 6        Q.    Good morning, Mr. Simpson.  We've met many

 7   times off the record, but again for the record, my

 8   name is James Hinshaw.  I'm one of the attorneys for

 9   Mid-West Metal Products in these litigation matters.

10   Before we begin, are you on any medications today

11   that would interfere with your ability to recall or

12   otherwise testify accurately?

13        A.    No.

14        Q.    Have you had any medical conditions since

15   the last time we had your deposition that would

16   interfere with your memory or ability to testify

17   accurately?

18        A.    No.

19        Q.    What did you do to prepare for today's

20   deposition?

21        A.    I read the transcript from my prior

22   deposition, and I reviewed our interrogatory

23   responses.

24        Q.    Did you meet with your attorneys?

25        A.    Not for the purpose of preparing.
```

Page 12

1    two-dimensional drawing.

2       A.    Well, the thickness of the tube is actually

3    shown where the rattan or wicker is not woven upon

4    it.

5       Q.    And that would be at the peg feet here?

6       A.    Yeah, that would be an indication of the

7    diameter of that tubing, yes.

8       Q.    All right.  Back to my question, though,

9    these tubes that appear above and below the gap --

10      A.    Okay.

11      Q.    -- why are they there?

12      A.    They are there because in this configuration

13   the folding sequence was such that for the KD, the

14   knock-down sequence was such that the links in one of

15   the upper corners of the product would be removed,

16   and a side panel would then fold down into the bottom

17   after you lower both the back and the front panels

18   down, then the side panel would come down.  Then the

19   other side would come over and the top would flip up

20   basically upside down on top of that.  So --

21      Q.    Sorry to interrupt.  Mr. Simpson, could you

22   have eliminated the use of these tubes and still have

23   that folding function?

24      A.    Is your question still have the folding

25   function as I've explained it?

Jeffrey M. Simpson
June 9, 2008

Page 18

```
 1              MR. GARDNER:  I'm going to object.  It's
 2   about the third or fourth time the witness has been
 3   answering and you've interrupted before he's finished
 4   his answer.  The witness is not being combative.
 5   Please allow the witness to finish his answers.
 6   BY MR. HINSHAW:
 7        Q.   My apologies.  Go ahead.
 8        A.   I'm not sure where I was at.
 9        Q.   Yeah.  I thought you were done.
10        A.   Well, I don't know that I was done.
11        Q.   Were you aware of any -- I'm sorry.
12        A.   I think I got some feedback from one of my
13   customers saying you might consider putting a second
14   latch on the large size, but I can't say that with a
15   hundred percent of assuredness.
16        Q.   Who is that customer?
17        A.   I don't know who it would have been.
18        Q.   Do you recall that actually happening or --
19        A.   I don't know if I got feedback from a
20   customer or I just decided to do it on my own for a
21   pet safety reason.
22        Q.   You never sold a wicker pet crate that does
23   not have one of those diamond weave patterns on it;
24   is that correct?
25        A.   I believe that is correct.
```

Jeffrey M. Simpson
June 9, 2008

Page 19

1      Q.    You stopped selling the wicker pet crates
2    with the two-part side panels as of July,
3    approximately July 2005; correct?
4      A.    That's correct.
5      Q.    And you stopped selling wicker pet crates
6    with the rear handle opening on the rear panel as of
7    approximately July of 2005; is that correct?
8      A.    Yes.
9      Q.    Would you please describe who you believe is
10   the typical consumer that purchases these wicker pet
11   crate products from Simpson Ventures.
12     A.    Well, we don't sell to consumers.
13     Q.    I understand, but who is the typical
14   consumer who purchases your wicker pet crate
15   products?
16     A.    The typical consumer that would purchase our
17   products through our customers would be somebody
18   that, that cares about the aesthetic quality, if you
19   will, of an indoor containment device for their pet.
20     Q.    Would you agree with me that that person
21   would have more discriminating taste than, say,
22   someone who was just interested in buying a plain,
23   bare wire pet crate?
24     A.    Yes.
25     Q.    They would pay more attention to the details

Jeffrey M. Simpson
June 9, 2008

Page 21

1    as well as ZIP code 90210.

2    BY MR. HINSHAW:

3        Q.   Is your product designed for a consumer with

4    a higher level of income?

5        A.   No, I wouldn't say that, no.

6        Q.   Is it priced for consumers with a higher

7    level of income?

8        A.   It was priced based on what my cost was.

9        Q.   You have Exhibit 84 in front of you, sir?

10       A.   Yes.

11       Q.   In looking at Figure 1 of Exhibit 84,

12   please, and looking at the vertical corner, if you

13   will, between the edge of the front panel and the

14   edge of the side panel, would you agree with me that

15   those two panels touch, they're contiguous?

16       A.   No, I would not agree with you.

17       Q.   Would you agree with me that they appear to

18   touch or are contiguous in this figure?

19       A.   Well, this is an oblique view.  You can't

20   make a hundred percent determination as to whether

21   they touch --

22       Q.   My question is --

23       A.   -- in this view.

24       Q.   I'm sorry to interrupt.  Go ahead.

25       A.   I think I'm done.

Jeffrey M. Simpson
June 9, 2008

Page 22

1     Q.    My question is do they appear to touch.

2     A.    They appear to touch.

3     Q.    Were you trying to accomplish such a look?

4     A.    Not necessarily, no.

5     Q.    But you didn't make any effort to correct

6     that from the patent drawings in the patent

7     application process, did you?

8     A.    No.

9     Q.    Was there any inspiration or reason for this

10    look where the two panels appear to touch?

11    A.    Don't believe so.

12    Q.    In looking at Figure 3 of Exhibit 84, which

13    is the rear panel; correct?

14    A.    That's correct.

15    Q.    And we've talked a little bit about this

16    opening at the top of that.  What is that opening?

17    A.    It's a handle window.

18    Q.    Why did you design this opening in that way?

19    A.    The primary use was as a handhold, secondary

20    use as an additional window or ventilation.

21    Q.    Was there any inspiration or reason for

22    having that opening there?

23    A.    No.

24    Q.    You've eliminated it in your reconfigured

25    design as of July of 2005, or approximately July

Jeffrey M. Simpson
June 9, 2008

Page 24

1      A.    They are different.

2      Q.    They're not, it's not a minor difference, is

3    it?

4      A.    No.

5      Q.    If you had intended this opening on Figure 3

6    to be a window, why didn't you just make it look like

7    the window in Figure 5?

8      A.    Again, its primary purpose was as a handle.

9      Q.    In looking at Figure 2 on Exhibit 84, which

10   I think you've got it open to; correct?

11     A.    Yes.

12     Q.    There is a tube that appears at the bottom

13   below the door, correct, that has wicker coiled over

14   it; correct?

15     A.    That is correct.

16     Q.    And that then causes, with that wicker coil

17   below, that causes the door to be essentially framed

18   by wicker; correct?

19     A.    Based on the interrogatory response, yes.

20     Q.    What's the reason for having the wicker

21   coiled along the tube that is below the door?

22     A.    What's the reason?

23     Q.    Yes, sir.

24     A.    The reason would have been to cover up

25   metal.

Page 25

```
 1       Q.   So that was an aesthetic reason?

 2       A.   Yes.

 3       Q.   Was there any inspiration for that?

 4       A.   No.

 5       Q.   Did you make a decision to remove coil on

 6   the tube that rests immediately below the front door?

 7       A.   I'm sorry.  Say that again, please.

 8       Q.   Here, maybe I can show you better.  On

 9   Figure 2 you see this area right here immediately

10   below the door?

11       A.   Yes.

12       Q.   And that is not covered with wicker; is that

13   correct?

14       A.   That's correct.

15       Q.   Why was that not covered with wicker?

16       A.   Because of potential damage due to ingress

17   and egress of the pet.

18       Q.   Had you actually experienced that, or was

19   that just a concern that you had?

20       A.   That was a concern.

21       Q.   In looking at Exhibit 105, are you there?

22       A.   Yes, I am.

23       Q.   And does this reconfigured product have

24   wicker coil along the tube underneath the door?

25       A.   No.
```

Jeffrey M. Simpson
June 9, 2008

Page 26

```
 1      Q.   And do any of your wicker pet crate products
 2   since approximately July of 2005 have wicker coil
 3   along the tube below the door?
 4      A.   No.
 5      Q.   In looking at Figure 2, again of Exhibit 84,
 6   Mr. Simpson, and particularly directing your
 7   attention to the latch.
 8      A.   Yes.
 9      Q.   And where it attaches to the wicker framing
10   around the door on the right-hand side.  You see
11   that?
12      A.   Where it attaches to the wicker framing?
13      Q.   Well, I don't know how -- to the framework
14   of the door, which I understand there's a metal wire
15   that you can discern right there.
16      A.   You're going to have to be more specific,
17   Mr. Hinshaw.
18      Q.   How does the latch of the door attach to the
19   frame of the front panel?
20      A.   The latch attaches through welds and screws
21   and nuts.
22      Q.   There's a portion of the door that's metal,
23   bare wire; correct?
24      A.   All of the door is bare wire.
25      Q.   Okay.  And then in looking at Figure 2,
```

Jeffrey M. Simpson
June 9, 2008

Page 29

```
 1        Q.    But you could have extended that absence of
 2   weaving all the way over to the farthest right-hand
 3   side of the front panel; correct?
 4        A.    Possibly.
 5        Q.    I guess what I'm getting at is that you
 6   chose to weave over as much of that area immediately
 7   to the right of the latch for aesthetic reasons to
 8   continue your wicker weaving appearance; correct?
 9        A.    Yes.
10        Q.    Why is there no wicker woven over the front
11   door on the front panel of Figure 2?
12        A.    Over the front door?  You mean on the front
13   door or --
14        Q.    All of the above.
15        A.    I don't understand your question.
16        Q.    What don't you understand about my question?
17        A.    I'm not sure what you're asking.
18        Q.    The front door doesn't have any wicker woven
19   on it; correct?
20        A.    The metal framework door does not, you are
21   correct.
22        Q.    Okay.  Why not?
23        A.    So the dog has visibility.  And the consumer
24   has visibility in to see the dog.
25        Q.    This door on your production crates, as I
```

Jeffrey M. Simpson
June 9, 2008

Page 35

```
 1       A.    Yes.

 2       Q.    And is that what you attempted to do, then,

 3   around the perimeter of the panels in the various

 4   figures of Exhibit No. 84?

 5       A.    Yes.

 6       Q.    In looking at page 1 of Exhibit No. 2, and

 7   the vertical corner there between the side of the

 8   front panel and the side of the side panel.  Are you

 9   with me?

10       A.    Yes.

11       Q.    Do you agree that those two panels don't

12   touch?

13       A.    The rattan portion of those panels appear

14   not to touch.

15       Q.    There's a gap that exists between the wicker

16   weave of those two panels; correct?

17       A.    That is correct.

18       Q.    And that's not present in the design that is

19   shown in your 156 patent; is that correct?

20       A.    That is correct.

21       Q.    That's a difference between the two designs,

22   isn't it?

23       A.    It is a minor difference.

24       Q.    But it's a difference nonetheless; correct?

25       A.    It is a difference --
```

Page 36

```
 1      Q.    It's --

 2      A.    -- nonetheless.

 3      Q.    I'm sorry, I didn't mean to interrupt.

 4      A.    That's okay.

 5      Q.    It's a readily apparent difference?

 6      A.    It's apparent to me in viewing these photos,

 7   and I'm intimately familiar with the product.

 8      Q.    It's easy to see, it's not hidden or

 9   obscured?

10      A.    It's easy for me to see.

11      Q.    The top panel in Exhibit 156, Figure No. 4,

12   in looking at that and comparing it to page 5 of

13   Exhibit No. 2 -- are you there?

14      A.    Yes.

15      Q.    If you turn Exhibit 2, it might align it a

16   little bit better.  Thank you.  Would you agree with

17   me that in looking at the top of the Bay Isle product

18   in Exhibit No. 2 on page 5 there is a gap that exists

19   between the edge of the top panel and the top of the

20   side panel.

21      A.    In the woven portion, yes.

22      Q.    And that gap doesn't exist on Figure No. 4,

23   does it, of your 156 patent?

24      A.    No, it does not.

25      Q.    And that's because when you look down the
```

Page 47

```
 1        Q.    The court reporter is going to hand you what
 2    has been marked as Exhibit 194.  Do you recognize
 3    this document?
 4        A.    I recognize that it's my handwriting, yes.
 5        Q.    And are these your first drawings of what
 6    became the wicker pet crate?
 7        A.    No, I don't think they would have been the
 8    first drawings.
 9        Q.    They do refer to a z-fold; correct?
10        A.    Refers to a z-fold and a suitcase on the
11    second page.
12        Q.    I see.  So when in the process do you think
13    you made these?
14        A.    I can't say with a, I don't know.
15        Q.    Would it have been before you saw the first
16    prototype?
17        A.    I don't know.
18              (Deposition Exhibit-195 was marked for
19    identification.)
20    BY MR. HINSHAW:
21        Q.    The court reporter has handed you what has
22    been marked as Exhibit No. 195.  What is that?
23        A.    That would have been an early sales sheet.
24        Q.    The product that is shown in that early
25    sales sheet is of a z-fold pet crate; is that
```

Jeffrey M. Simpson
June 9, 2008

Page 48

```
 1    correct?
 2        A.    Yeah, that's the z-fold, the initial z-fold
 3    configuration.
 4        Q.    So is that the first prototype?
 5        A.    Yes.
 6        Q.    Do you know when you created this document?
 7        A.    Not specifically, no.
 8        Q.    Do you know when in the process you would
 9    have created this document?
10        A.    Well, after I received the first prototype.
11        Q.    What did you do with this document?
12        A.    I don't know.
13        Q.    Was this used as part of an effort with GDA
14    to try to sell the product?
15        A.    I would guess this would have been after I
16    left GDA.
17        Q.    Why?  Why do you think that that's the time
18    frame?
19        A.    Well, it's got my home address on it.  I
20    don't know.
21        Q.    You see on the front panel of the product
22    shown in Exhibit 195 that there are two notches above
23    the door?
24        A.    Yes.
25        Q.    What are those for?
```

Jeffrey M. Simpson
June 9, 2008

Page 50

```
 1      A.    Would you read that back?

 2      Q.    Let me try it again.

 3      A.    Okay.

 4      Q.    You testified that these notches in the

 5   object that's the subject of Exhibit 195 were there

 6   to allow for an attachment mechanism; correct?

 7      A.    It was to allow attachment for security of

 8   that front panel in the upright position.

 9      Q.    What did it attach to?

10      A.    Again, there were wire clips very similar to

11   what's found on wire suitcase fold and z-fold wire

12   kennels.

13      Q.    And are those devices present in the object

14   that became the subject of your 156 patent?

15      A.    No.

16      Q.    They were eliminated?

17      A.    They were.

18      Q.    And thus, you eliminated the use of notches

19   there?

20      A.    That is correct.

21      Q.    You received this prototype that's shown in

22   Exhibit No. 195 from someone in China?

23      A.    Some factory in China fabricated the sample.

24      Q.    And sent it to you?

25      A.    I believe it was sent first to GDA in Texas.
```

Page 51

```
 1      Q.    To whom with GDA in Texas?

 2      A.    I can't say specifically who it was sent to.

 3      Q.    You don't know the name of the factory over

 4   in China who made this?

 5      A.    No.

 6      Q.    And you don't know the name of any

 7   individual who made this?

 8      A.    No.

 9      Q.    Does this prototype have a diamond weave

10   pattern on it?

11      A.    I don't believe it does.

12      Q.    Is that consistent with your memory of the

13   prototype?

14      A.    Yes.

15      Q.    Earlier we were talking about Exhibit 84 and

16   the product shown in Exhibit 2.  I don't know that

17   you need to look at it, but my question is do you

18   have an opinion about whether an ordinary observer

19   looking at those two objects would be confused into

20   thinking that one product shown in the patent is

21   substantially the same as the product shown in

22   Exhibit No. 2?

23      A.    Well, from an ordinary observer, yeah, I

24   think they would be viewed as substantially the same

25   when comparing what's shown in Exhibit 2 versus the
```

Page 76

| | | |
|---|---|---|
| 1 | A. | I think the overall impression is the same. |
| 2 | Q. | Anything else? |
| 3 | A. | Well, they certainly ordered a few of my |
| 4 | products. | |
| 5 | Q. | But you've ordered samples of competitors' |
| 6 | products too, haven't you? | |
| 7 | A. | Yes. |
| 8 | Q. | That's pretty common in the pet industry, |
| 9 | isn't it? | |
| 10 | A. | I haven't copied any competitors' designs. |
| 11 | Q. | But you've ordered competitors' sample |
| 12 | products, haven't you? | |
| 13 | A. | Yes. |
| 14 | Q. | And that's a common practice in the pet |
| 15 | industry, isn't it? | |
| 16 | A. | I think it is. |
| 17 | Q. | So other than the appearance of the product |
| 18 | and the fact that they ordered a few of your | |
| 19 | products, is there any other reason that you think | |
| 20 | that they copied your design? | |
| 21 | A. | Yeah.  I believe it was intentional because |
| 22 | they did it again with the litter pan cover. | |
| 23 | Q. | Anything else? |
| 24 | A. | They seem to have a track record of doing |
| 25 | that.  I haven't seen any Mid-West products or heard | |

Page 89

1    marketing of your product?

2        A.    That's it.

3        Q.    I understand that you think that the

4    appearances of the Bay Isle product in your opinion

5    look substantially the same as the design that's set

6    forth in the 156 patent; correct?

7        A.    That's correct.

8        Q.    You heard the testimony -- you attended all

9    the depositions of all of the Mid-West Metal folks;

10   correct?

11       A.    Mid-West Metal employees?

12       Q.    Yes.

13       A.    Yes, I believe I have.

14       Q.    And you attended the depositions of the

15   various people who were specifically involved in the

16   design or the new product development team; correct?

17       A.    I believe so.

18       Q.    You heard their testimony about how they

19   made efforts, at least in their minds, to make their

20   product look different than the Mr. Herzher product;

21   correct?

22       A.    Yes, I believe I heard that.

23       Q.    And I understand you think their judgment

24   was wrong, they didn't make it different enough;

25   correct?

Page 90

```
 1      A.    Yes.

 2      Q.    But do you have any reason to believe that

 3   they didn't think that it was different enough?

 4      A.    I don't know what they thought.

 5      Q.    But you said earlier the differences are in

 6   the eye of the beholder; correct?

 7      A.    I'm not sure the specific question that I

 8   answered that way to.

 9      Q.    Would you agree with me that the differences

10   or similarities between the two product designs are

11   in the eye of the beholder?

12      A.    Yes.

13      Q.    That's a judgment call; correct?

14      A.    I believe so.

15      Q.    And you don't have any reason to believe

16   that this new product development team truly didn't

17   believe that their efforts to make their product look

18   different were sufficient, do you?

19            THE WITNESS:  Could you repeat that back for

20   me, please?

21            (The reporter read the requested material.)

22      A.    Could you rephrase that question?

23   BY MR. HINSHAW:

24      Q.    You don't have any reason to believe that

25   these people weren't in fact trying to make their
```

Connor+Associates

Jeffrey M. Simpson
June 9, 2008

Page 98

1    you about that as an option?

2        A.    That's correct.

3              MR. GARDNER:  May the witness use the rest

4    room?

5              MR. HINSHAW:  Yes.  Let's take a break.

6              (Recess 11:49-12:37 p.m.)

7    BY MR. HINSHAW:

8        Q.    Mr. Simpson, I think I put back in front of

9    you Exhibit No. 84.

10       A.    Yes, you have.

11       Q.    And I really just kind of want to set aside

12   all the legalese and worrying about points of novelty

13   and interrogatory answers and things like that.  I

14   guess I'd just like to hear from you what it is that

15   you thought when you filed that application, what you

16   thought about that look made it unique and different.

17       A.    Well, there wasn't anything on the market

18   like it.

19       Q.    How so?

20       A.    There wasn't a rectangular form indoor

21   containment device with wire door and wire vent

22   windows, as I think I stated earlier.  The only thing

23   that I was aware of that one could say might be

24   decorative was the crate covers.

25       Q.    So the rectangular pet crate with wicker

Jeffrey M. Simpson
June 9, 2008

Page 99

1    woven over it with wire door and wire windows, that's

2    what you felt was unique over whatever you had seen

3    out there or had not seen out there in the

4    marketplace, at least at the time you filed for your

5    application?

6         A.    Yeah, I mean, what's shown.

7         Q.    Yeah, but I mean, I understand what's shown,

8    but I'm trying to get what you felt was unique or

9    different at the time you filed for your patent

10   application.  Have you told me what you thought was

11   unique or different about the appearance of your

12   design at the time you filed that application?

13        A.    Yeah, I believe so.

14              (Deposition Exhibit-199, Exhibit-200, and

15   Exhibit-201 were marked for identification.)

16   BY MR. HINSHAW:

17        Q.    The court reporter has handed to you three

18   patents which we've marked as Exhibit 199, 200, and

19   201.  And I'm not asking you to read the patents.

20   I'll tell you that they're all utility patents, so

21   there's a lot of detailed language in there.  Really

22   just interested in the drawings and figures and what

23   you see there.  So if you want to take a moment and

24   look at those.

25              Mr. Simpson, would you agree with me that

Page 101

```
 1            MR. GARDNER:  Can you refer to them by
 2     exhibit number?
 3            THE WITNESS:  Yes.
 4       A.   I don't know that that is shown on Exhibit
 5     201 made it to market.  I don't know if that which is
 6     shown in Exhibit 200 made it to market.  And I'm not
 7     entirely sure with what is shown in Exhibit 199,
 8     Kolozsvari, made it to market, but I believe it did.
 9     BY MR. HINSHAW:
10       Q.   Would you agree with me that prior to May of
11     2002 bare wire rectangular metal pet crates that were
12     collapsible in some form were pretty common in the
13     industry?
14       A.   Yes, I would agree with you.
15       Q.   And first of all, have you ever seen any of
16     these three patents before, to your knowledge?
17       A.   I may have.  I don't know.
18       Q.   You just don't have a memory of it?
19       A.   I don't have a memory of it.
20       Q.   And the products that are depicted in here,
21     I think you said you just don't know whether you've
22     seen the products before?
23       A.   Right, whether the products as depicted in
24     the, or as taught in the patents made it to market.
25     I do not know.
```

Jeffrey M. Simpson
June 9, 2008

Page 128

1    Has an arch or a radius, slight --

2        Q.    I understand what you're saying.

3        A.    -- radius to the top.  That's the way I'm

4    interpreting the picture.

5        Q.    So your testimony is that that does not

6    appear to be a rectangular shaped wicker pet crate?

7        A.    Generally it looks to be a rectangular form.

8        Q.    Made out of wicker?

9        A.    It's made, it looks to be made out of

10   wicker.

11       Q.    And its intended purpose is for crating or

12   containing animals; correct?

13       A.    That's what the copy says.

14       Q.    What is that device that appears above the

15   door on the top panel?

16       A.    I can't make that out.

17       Q.    Does it appear to be made out of metal?

18       A.    You know, I don't know.  Do you know what it

19   is?

20       Q.    I'm asking you.

21       A.    I don't.  I don't know.

22       Q.    How would you describe the door that you see

23   there?

24       A.    As, it's either made out of, it looks to be

25   made out of wire or cane or rattan; and it appears

Jeffrey M. Simpson
June 9, 2008

```
 1    that the handle is to the left, which allows you to

 2    somehow either slide or hinge open that window/door.

 3         Q.    Rectangular shape door?

 4         A.    Pretty close to a square, but I would say

 5    it's a little taller than it is wide.

 6         Q.    Which would be a rectangular shaped door;

 7    correct?

 8         A.    Yes, it would.

 9         Q.    Has bars on it with no wicker on it?

10         A.    It appears, yes.

11         Q.    Substantially surrounded or framed by

12    wicker?

13         A.    Yes.

14              (Deposition Exhibit-209 was marked for

15    identification.)

16    BY MR. HINSHAW:

17         Q.    The court reporter has handed you what has

18    been marked as Exhibit 209.  Have you seen this

19    photograph or this product before seeing it in a Bret

20    Smith report?

21         A.    No.

22         Q.    There's an opening on the front side of this

23    object with a, with bars that are made out of metal

24    wire; is that correct?

25         A.    It appears that the bars were made out of
```

Jeffrey M. Simpson
June 9, 2008

Page 144

1    feet are utilized in connecting or keeping the panels

2    together.

3         Q.    Anything else?

4         A.    It might have been his idea for arched

5    entry.  I don't recall specifically.

6         Q.    Anything else?

7         A.    Not that I recall.

8         Q.    When you say he contributed to the

9    mechanical configuration and how the panels are

10   connected together --

11        A.    Right.

12        Q.    -- can you elaborate on what you mean by

13   that?

14        A.    Well, again, the concept was to have a

15   knock-down design such that it is easily assembled by

16   the consumer.  I knew I wanted a rectangular form so

17   it's how do you attach those individual panels

18   together in an easy fashion for a consumer to where

19   you've got a, when it's assembled, a unitized piece.

20        Q.    Why did you want a rectangular form?

21        A.    Because that's the form of litter pans, in

22   essence.

23        Q.    Well, you could have, for example, a pyramid

24   shaped litter pan cover or a dome shaped litter pan

25   yet at its base be rectangular, couldn't you?

Page 145

```
 1      A.    Okay.

 2      Q.    So why rectangular?

 3      A.    Specifically, I don't know.  It was the form

 4   that I wanted.

 5      Q.    It didn't have anything to do with the

 6   ability to collapse and put the device in a carton so

 7   that it could be loaded on containers more

 8   efficiently?

 9      A.    Sure.

10      Q.    Was that it's primary reason?

11      A.    That's certainly one of the reasons.

12      Q.    Was it a primary reason, though?

13      A.    Yeah.  When you have a domed structure, then

14   it requires more given volume in a package, so I

15   would say that that was one of the primary reasons.

16      Q.    Any other primary reasons?

17      A.    Well, I wanted it in a form that could be

18   utilized in and around the house, in other words,

19   didn't want it too big for its intended function

20   because in many cases consumers have litter pans in

21   their bathrooms, in their kitchens, in their

22   pantries, and you don't want to take up more space

23   than is needed.  Plus, having a flat top, other

24   things could be set on top of it.

25      Q.    We were talking about what Mark Haley had
```