**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SIMPSON VENTURES, INC., | ) | |
| | ) | |
| Plaintiff/Counterdefendant, | ) | |
| | ) | Case No. 3:06-cv-901-WKW-VPM |
| v. | ) | |
| | ) | |
| MID-WEST METAL PRODUCTS | ) | |
| COMPANY, INC. | ) | |
| | ) | |
| Defendant/Counterclaimant. | ) | |

**MID-WEST METAL'S MOTION TO CORRECT**
**BRIEF IN SUPPORT OF COMBINED MOTIONS FOR**
**CLAIM CONSTRUCTION AND SUMMARY JUDGMENT**

Mid-West Metal Products Company, Inc. ("Mid-West Metal"), by counsel, does hereby respectfully request that the Court allow substitution of three certain pages to the Brief in Support of Combined Motions for Claim Construction and Summary Judgment filed on July 29, 2008 (Document No. 59). In support hereof, Mid-West Metal states the following:

1.     Mid-West Metal filed its 86 page Brief in Support of Combined Motions for Claim Construction and Summary Judgment on July 29, 2008 (Document No. 59).

2.     Mid-West Metal's Brief was created using Microsoft Word. When the Brief was converted to a PDF file for electronic filing, the conversion caused the digital omission of certain material/text that was part of Mid-West Metal's original brief – specifically, omitting certain material/text on pages 9, 10, and 81 (only).

3.     The undersigned did not learn about the computer's omission of the material/text caused by the Word-to-PDF conversion until late on the evening of July 30, 2008.

4.     A full, corrected version of the Brief is attached hereto.

WHEREFORE, Mid-West Metal respectfully requests that the Court enter an Order substituting the Corrected Brief for the Brief in Support of Combined Motions for Claim Construction and Summary Judgment filed on July 29, 2008 (Document No. 59), and for all other relief just and proper in the premises.

Respectfully submitted,

s/ *James M. Hinshaw*
James M. Hinshaw-pro hac vice
     Indiana Attorney No. 16744-49
Neal Bowling- pro hac vice,
     Indiana Attorney No. 19278-41
BINGHAM MCHALE, LLP
2700 Market Tower
10 W. Market Street
Indianapolis, Indiana 46204-4900
Telephone: (317) 635-8900
Email: JHinshaw@binghammchale.com
     NBowling@binghammchale.com

Brett A. Ross
CARR ALLISON
100 Vestavia Parkway
Birmingham, Alabama 35216
Telephone: (205) 949-2938
Email: bross@carrallison.com

*Counsel for the Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following on this the 31st day of July, 2008:

Robert T. Meadows, III
Capell & Howard, P.C.
3120 Frederick Road
P. O. Drawer 2268
Opelika, Alabama 36803

Arthur A. Gardner
Joseph Staley
Gardner, Groff, Santos & Greenwald, P.C.
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia  30339

s/ *James M. Hinshaw*

1318375

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## <u>EASTERN DIVISION</u>

| | | |
|---|---|---|
| SIMPSON VENTURES, INC., | ) | |
| | ) | |
| Plaintiff/Counterdefendant, | ) | |
| | ) | Case No. 3:06-cv-901-WKW-VPM |
| v. | ) | |
| | ) | |
| MID-WEST METAL PRODUCTS | ) | |
| COMPANY, INC. | ) | |
| | ) | |
| Defendant/Counterclaimant. | ) | |

## MID-WEST METAL'S BRIEF IN SUPPORT OF COMBINED
## <u>MOTIONS FOR CLAIM CONSTRUCTION AND SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

I.)    INTRODUCTION ..................................................................................... 1

II.)   STATEMENT OF UNDISPUTED MATERIAL FACTS ......................... 1

       A.)   The 156 Patent's Design. .............................................................. 1

       B.)   The Scope and Content of the Prior Art. ..................................... 3

             1.)   The Nine Prior Art References Viewed by the
                   US PTO. ............................................................................ 3

             2.)   The *Actual* Field of Prior Art. ........................................ 7

                   a.) Combinations of Wicker and Animal Cages. .............. 8

                   b.) Rectangular Wire Animal Cages. .............................. 13

                   c.) Combinations of Wicker and Metal-Wire
                       Structures/Components. ............................................. 14

       C.)   The "Bay Isle" Wicker Pet Cages Developed by
             Mid-West Metal. ......................................................................... 17

       D.)   Mr. Simpson's "Invention" of the Design Claimed in the
             156 Patent. ................................................................................. 25

             1.)   Mr. Simpson's Idea. ........................................................ 25

             2.)   The "Commonsensical" Problem. ................................... 26

             3.)   The 138 Patent. ............................................................... 27

III.)  THE MATERIAL FACTS ARE UNDISPUTED, AND MID-WEST
       METAL IS ENTITLED TO SUMMARY JUDGMENT AS A
       MATTER OF LAW ............................................................................... 32

       A.)   Claim Construction of the 156 Patent. ....................................... 33

             1.)   The Law Regarding Claim Construction of a Design Patent. ......... 33

             2.)   Claim Construction of the 156 Patent. ........................... 36

B.)    There is No Infringement as a Matter of Law Because There Has Been No Misappropriation of Any Legitimate Point of Novelty. ............................................................................................. 40

    1.)    The Law Regarding the Point of Novelty Test. ........................... 41

    2.)    Mid-West Metal Has Not Misappropriated Any Legitimate Point of Novelty. ............................................... 42

        a.) "Door/Front Panel Configuration" ........................... 43

        b.) "Panels Without Overhang" .................................... 46

        c.) "Distinct Panels" ................................................... 50

        d.) "Window Geometry & Placement" .......................... 52

        e.) "Extent of Wicker" ............................................... 56

        f.) "Combination of Items 1-5" ................................... 60

        g.) Conclusion ........................................................... 61

C.)    The 156 Patent Is Invalid Because the Design is Clearly Obvious. ........................................................................................ 62

    1.)    The Law Regarding Obviousness. ........................................... 62

    2.)    The 156 Patent's design is clearly obvious and the 156 Patent is thus invalid. ................................................ 67

D.)    The 156 Patent Is Invalid Because Mr. Simpson Did Not Invent the Depicted Design. ................................................................. 76

    1.)    The Law Regarding Inventorship. ........................................... 77

    2.)    Mr. Simpson's Development Activity. ...................................... 78

    3.)    The 156 Patent is Invalid Because the True Inventor Is Not Named. ................................................................... 82

IV.)    CONCLUSION .................................................................................. 86

## I.)    **INTRODUCTION**

Simpson Ventures, Inc. ("Simpson Ventures") alleges that Mid-West Metal Products

Company, Inc. ("Mid-West Metal") is liable for infringing a patent that it owns – specifically,

the D483,156 S design patent (the "156 Patent").  However, the undisputed facts show that Mid-

West Metal is clearly entitled to summary judgment against Simpson Ventures for three main

reasons:

- The Mid-West Metal products do not infringe the 156 Patent because they do not misappropriate any of the 156 Patent's alleged "points of novelty."

- The 156 Patent is invalid because the design is obvious in light of the prior art.

- The 156 Patent is invalid because Mr. Simpson did not invent the depicted design.

## II.)    **STATEMENT OF UNDISPUTED MATERIAL FACTS**

On May 2, 2002, Mr. Jeffrey Simpson filed his application for a patent on the ornamental

design for a pet home.  (Tab B – 156 Patent, at page 1).  That application ultimately resulted in

the issuance of the 156 Patent on December 2, 2003, which he then licensed to his company

Simpson Ventures.  (Tab A – Complaint at ¶9).  Mid-West Metal introduced a line of wicker

covered pet crate products to the marketplace in the summer of 2003 under the "Bay Isle" brand

name.   Those Bay Isle products have a visual design that is different from the design set forth in

the 156 Patent.  Material facts demonstrating Mid-West Metal is entitled to summary judgment

are set forth below.

### A.)    **The 156 Patent's Design.**

The 156 Patent claims "[t]he ornamental design for a pet home, substantially as shown

and described."  (Tab B – 156 Patent, at page 1).  The patent then sets forth the following five

figures:



*Fig. 1*

*Fig. 2*

*Fig. 3*

*Fig. 4*

*Fig. 5*

**B.)**     <u>The Scope and Content of the Prior Art.</u>

When he applied for the 156 Patent on May 2, 2002, Mr. Simpson cited only nine references of prior art to the United States Patent and Trademark Office (the "US PTO").[1] It was against this limited field of only nine prior art references, then, that Mr. Simpson declared his design was novel and worthy of patent protection. However, after this lawsuit was filed in October of 2006, Mid-West Metal undertook to investigate the true scope of the field of prior art references. As shown below, that investigation confirmed that the field was in fact vast and crowded with numerous examples of instances where people had created structures that are not only intended to hold an animal, but that are also designed to be aesthetically pleasing – including through the use of wicker that is woven over a rectangular structure or cage, and that have barred doors and windows. The 156 Patent was thus issued by the US PTO based on a very myopic set of prior art references.

      **1.)**     <u>The Nine Prior Art References Viewed by the US PTO.</u>[2]



**US Patent 1,211,762**
**Inventor - Franklin Sawyer**
**January 9, 1917**
This is a utility patent for a human baby-bed. The drawings depict a rectangular structure that is covered on all 5 sides by a "screen." As stated in the patent's specification, that structure is intended to contain a baby, the screen is intended to keep out insects, and the side-door is intended to provide easy access to the baby.

---

[1] (156 Patent, at page 1, "References Cited").
[2] (Tab C – <u>First</u> Smith Affidavit, at ¶ 3, and Exhibits 1 to 9 thereto).



**US Patent 2,789,531**
**Inventor - Aurel Diefendorf**
**April 23, 1957**
This is a utility patent for a collapsible cage for birds and small animals. The design figures show a rectangular enclosure covered with "wire screen." The design figures also show a rectangular door on the front side.



**US Patent 4,256,056**
**Inventor - Teho Sou**
**March 17, 1981**
This is a patent for a rectangular portable case for a small animal "such as a pup or puss." The stated object of the invention is that it can be folded up when it is unoccupied. The design figures show a row of window slots positioned in "the upper half" of the side panels and rear panel – and are so described in the patent's specification. The dimensions of the window slots and spacing in between, combined with the number of window slots, create the appearance of one long rectangular window with bars, positioned on the upper half of the side panels and the rear panel.



**US Patent 382,374**
**Inventor - J.R. Burks**
**October 23, 1995**
This is a design patent for the ornamental design of an animal cage for use with automobile restraint belts. The figures show a rectangular shaped cage where the bare bars along all sides run vertical with no horizontal bars, the bare bars on the top side run laterally with no cross bars, there are no bars on the bottom side, there is a latch of a certain configuration on the front, and there are connection devices (presumably for connecting to the seatbelts) of a certain configuration on one of the sides.

4



FIG. 1

FIG. 6

**US Patent 5,960,744**
**Inventor - Mark Rutman**
**October 5, 1999**
The primary purpose of the invention in this patent is to provide a pet cage that can be enlarged and/or reduced in size. The drawings depict an elevated rectangular structure, with long rectangular shaped windows on at least one of the sides of the structure that are positioned in the upper half of the side plane. The structure has a rectangular wire door on the front side. The specification describes the material of the structure as being plastic because it is durable and waterproof. The specification states that the window openings may be covered by grid work, screen mesh, or the like to provide light and ventilation, and to prevent the animal from escaping.



**US Patent 5,967,090**
**Inventor - Cheng Chen Hui**
**December 22, 1997**

This utility patent is for an animal cage. The primary purpose of the invention is to provide for a cage that can be disassembled, for easy and economical shipment and storage of the cage. The drawings depict a rectangular animal cage that has a group of rectangularly-grouped perforations on the front plane and side planes to allow for air circulation. The top plane and bottom plane of the otherwise rectangular structure are arched.

| | |
|---|---|
|  **FIG.1** | **US Patent Des. 427,730**<br>**Inventor - E. Michael Powers, et al.**<br>**July 4, 2000**<br>This is a design patent for an animal crate. The drawings depict a rectangular animal cage that has a grid of vertical and horizontal bars, and a wide, curved, and plain-surfaced structure at the edges of the various planes of the enclosure. The bars are not covered. |
|  *Fig. 1* | **US Patent 6,354,245 B1**<br>**Inventors - Kathleen and John Roddy**<br>**March 12, 2002**<br>This is a utility patent for an animal cage. The drawings depict a rectangular enclosure with a rectangular shaped door on the front plane, and a long rectangular shaped window with a grid of wire mesh in it, located in the upper half of one of the side planes. The objective of the patent is to disclose a cage with inflatable side panels that may be shaped to conform the enclosure to the surroundings. The patent specification notes that many carriers already exist where "the door of the carriers is normally made of rigid wire crossed bars and the sides and/or rear walls may have openings with crossed bars for ventilation." |
|  | **Publication – In the Company of Dogs,**<br>**Spring Preview 2001, at Page 8**<br>This 2001 catalog discloses a bike with woven rattan and bamboo baskets attached to both the front and rear portions of the bike. The rear basket is rectangular in shape, but its rear portion is elevated. The basket appears to have rattan woven on all sides except for the top of the basket. |

At the time he filed his application for the 156 Patent, Mr. Simpson felt that what made his claimed design unique over this limited set of prior art references was that the design presented a "rectangular pet crate with wicker woven over it, with wire door and wire windows."

(Simpson/Day 2 at p98:8 to p99:13). Indeed, at the beginning of this lawsuit, Simpson Ventures'

interrogatory response stated simply that what made the 156 Patent's design unique over the

prior art (i.e., the "points of novelty") was that it was a "pet home having a woven outer texture

with the appearance of wicker, rattan, or the like, the woven texture appearing on the top, non-

window portions of the sides and rear, and on the non-door portion of the front." (Tab F –

Simpson Ventures' Responses to Interrogatories [July 23, 2007], at No. 11). Further, Simpson

Ventures' purported expert, Robert Anders, similarly declared then that what made the 156

Patent design unique over this limited field of prior art references was even more simplistic – "I

observe that the design claimed in the 156 Patent distinguishes from the prior art in one respect:

i.e., the point of novelty is a woven texture on all disclosed surfaces." (Tab H – Anders' Report

of September 29, 2006, at ¶ 36).

### 2.) The *Actual* Field of Prior Art.

In reality, the field of prior art relating to the design of animal cages was substantially

more vast and crowded than the mere nine references presented by Mr. Simpson in the

prosecution proceedings before the US PTO. Mid-West Metal engaged Professor Bret Smith to

assist its investigation into the field of prior art relevant to the task of designing an animal cage

that is aesthetically pleasing. Professor Smith is a professor of Industrial Design at Auburn

University, where he has taught that discipline for over 21 years.[3] (Tab I – Second Smith

Affidavit, at ¶ 3, at Exhibit 1 thereto); (Tab I – Second Smith Affidavit, at ¶ 5, at Exhibit 2

thereto at page 1). Professor Smith's investigation revealed that there were in fact a large

number and wide variety of examples of animal cages that were highly relevant to that task. The

---

[3] According to Simpson Ventures, a "person of ordinary skill in the art" includes a person who has "a degree in industrial design and a minimum of 3 years professional experience designing consumer products with a basic understanding of the ergonomic aspects of pet home design, i.e., the clearances and dimensional allowances for users such as the height of the opening, the overall size of the product, etc." (Tab H – Anders Report of September 29, 2006, at ¶24.) Mid-West Metal does not disagree with this proposed definition.

following sections set forth a number of such references that were published and/or in use prior to September of 2001, which is the date Jeffrey Simpson claims to have first had the idea for what became the 156 Patent's design. (Simpson/Day 1 at p71:12 to p71:17; p104:17 to p104:21); (Tab F – Simpson Ventures' Responses to Interrogatories [July 23, 2007], at No. 4).

### a.) **Combinations of Wicker and Animal Cages.**

The field of prior art presents numerous examples of products where wicker (or wicker-like material) has been woven over a structure to present a wicker-covered animal cage – in a multitude of shapes and sizes, including rectangular structures, and structures with barred doors or windows. (Tab J – Third Smith Affidavit, at ¶¶ 3-11, and Exhibits 1 to 9 thereto).



**Published in 1985 (Page 126 of *Belorusskie Rhudazahestveenye Pronnyslys*, a Russian book on basketry)**.

This publication shows a rectangular animal cage with wicker woven on all visible sides. The rectangular shaped windows with bars are created by the absence of wicker.



**Published in 1973 (*Maynard, Modern Basketry From the Start,* at Plate 28).**

This photograph shows a rectangular shaped animal cage with wicker woven on all visible sides. The rectangular windows' bars are created by the absence of woven material.



**Published in 1974 (*American Basketry and Woodenware – A Collectors Guide* at pages 36-37)**

This photograph shows a rectangular shaped animal enclosure that has wicker woven on all visible sides. It has a rectangular shaped door on the front plane with bars that have no wicker on them and that is otherwise substantially framed by wicker.

The authors of this publication state that this "*large wicker box … is the forerunner of today's <u>cat or dog carrier</u>. It dates from the early days of the twentieth century.*" (Emphasis added).



**Published in 1999 (Page 93, *American Baskets: A Cultural History of a Traditional Domestic Art*).**

This publication shows a rectangular cage with wicker woven on all visible sides, with a rectangular shaped front opening that has a grid of wires, that is largely not wicker, but that is framed by wicker. It has a rectangular top panel that is separate and distinct. The publication authors note that the cage dates back to 1910.

9

| | |
|---|---|
|  | **Published in 1912 (British Patent 26,728) (Inventor William Perry).**<br><br>This utility patent discloses a wickerwork basket used to transport birds. The design drawings show a rectangular cage that is covered with wicker on all visible sides, with long rectangular windows on the side planes, where the bars of those windows are formed by the absence of wicker, but the windows are otherwise surrounded by wicker. |
|  | **Published in 2001 (Sentance, *Art of the Basket – Traditional Basketry from Around the World*, at p. 140) (wicker or rattan bird cage).**<br><br>This rectangular shaped animal cage is covered with wicker or rattan, and has a long rectangular shaped window on its side plane, where the vertical bars are formed from the absence of wicker. It has a rectangular top panel that appears separate and distinct from the side planes. |
|  | **Public Use/Sale Prior Art (from 1920s to 1960s).**<br><br>These photographs are of a wicker animal cage. Professor Bret Smith personally observed the same cage design on a product that had been purchased by his grandmother, in the mid-1960s. (The eBay seller here represents that the cage dates back to the 1920s or 1930s.) The photographs depict a wicker animal cage that is mostly rectangular in shape, but that has an arched top. Wicker covers all visible sides. The front plane shows an opening in the door that is largely rectangular, but that has an arched top. The front opening or door is formed by the absence of wicker, but otherwise has |

 

a grid of wire. The front opening of the door is substantially framed by wicker. There are two openings located on the back plane of the cage.



**Published in ~1999 (Nantong Orient Pet Co., Ltd., catalog).**

This photograph from a catalog received by Mid-West Metal's division president Jim Wingate shows a wicker animal cage that has a rectangular base with an arched top. (Tab L – Wingate Affidavit, at ¶ 7 and Exhibit 1 thereto). Wicker covers all visible sides. The front plane shows an opening in the door that is largely rectangular, but that has an arched top. The front opening is formed by the absence of wicker, but otherwise has a grid of bars. The front opening of the door is substantially framed by wicker.



**Published in ~1999 (Nantong Orient Pet Co., Ltd., catalog).**

This photograph from a catalog received by Mid-West Metal's division president Jim Wingate shows an animal cage where wicker covers all visible sides. (Tab L – Wingate Affidavit, at ¶ 7 and Exhibit 1 thereto). The front plane shows an opening in the door that is rectangular. The front opening is formed by the absence of wicker, but otherwise has vertical bars. The front opening of the door is substantially framed by wicker.

| | |
|---|---|
|  | **Published 1994 (Schiffer, _Baskets_, at p. 125) ("wicker pet carrier").**<br><br>This photograph depicts the design of a wicker animal cage that is mostly rectangular in shape, but that has an arched top. Wicker covers all visible sides. The front plane shows an opening in the door that is largely rectangular, but that has an arched top. The front opening or door is formed by the absence of wicker, but otherwise has a grid of bars. The front opening of the door is substantially framed by wicker. |
|  | **Published in 2001 (Sentance, _Art of the Basket – Traditional Basketry from Around the World_, at p. 155) (portable cage for pampered pets).**<br><br>This photograph depicts a wicker animal cage that that has an arched top. Wicker covers all visible sides. The front plane shows an opening in the door that has an arched top. The front opening or door is formed by the absence of wicker, but otherwise has a grid of bars. The front opening of the door is substantially framed by wicker. |

The use of *plastic* or *resin* strands as a substitute for *natural* wicker strands has long been known, as well. For example, the Schwartz Patent (US 5,845,970) was issued December 8, 1998. (Tab J – Third Smith Affidavit, at ¶ 3, and Exhibit 10 thereto). The Schwartz Patent discloses the invention of using newly refined "synthetic yarns of polymer material having a natural wicker appearance" to weave onto "a rigid skeletal frame" (such as a stackable chair) to be used as outdoor furniture. In its specification, the Schwartz Patent disclosed the following, in relevant part:

> "Natural wicker has been used in the manufacture of furniture, baskets, and other articles for many centuries. . . . In recent years, the popularity of wicker furniture

has increased significantly. . . . [However,] natural wicker softens and weakens when wet, and is more susceptible to rotting and mildew than many other natural and man-made furniture materials. Further, natural wicker furniture is expensive because of the cost of the raw natural wicker which must be harvested and treated. . . . [and] the added step of moistening the wicker before weaving it into furniture."

The Schwartz Patent goes on to explain that "[p]olymer yarns have also been used to manufacture wicker-like furniture. . . . Wicker-like furniture manufactured from a smooth monochrome polymer yarn, however, has an artificial look and feel." Thus, the concept of using synthetic plastic or resin strands that have improved design features (i.e., notched grooves and color lines) to mimic more closely the look of natural wicker-like material has also long known in the field of art – and specifically for the purpose of creating aesthetically pleasing furniture (including "couches, tables, benches, stools, <u>trunks, and the like</u>") that would resist the negative effects of moisture such as rotting and mildew.



FIG. 4



FIG. 17

### b.) <u>Rectangular Wire Animal Cages.</u>

It is also undisputed that rectangular shaped bare-wire animal cages have long been common in the pet products industry.[4] Examples of such products (including Mid-West Metal's own bare-wire crate) are as follows (Tab J – <u>Third</u> Smith Affidavit, at ¶ 3, and Exhibits 11, 12,

---

[4]  Q:    Would you agree with me that prior to May of 2002, bare wire rectangular metal pet crates that were collapsible in some form were pretty common in the industry?

   A:    Yes, I would agree with you.

(Simpson/Day 1 at p92:11 to p93:1); (Simpson/Day 2 at p101:10 to p101:14).

and 13 thereto):

| Published May 6, 1997 (US Patent 5,626,098) (Inventor William E. Askins, et al.). | Published February 27, 2001 (US Patent 6,192,834 B1) (Inventor Kevin Kolozsvari). |
|---|---|
|  FIG. 7 |  |
| **Published August 9, 1998 (US Patent 4,762,085) (Inventor Vladimir J. Ondrasik).** | **Published December 1997 (Mid-West Metal's *"Better Buy Dog Crates"* catalog sheet, as published in December 1997).** |
|  |  (This design was the structure used by Mid-West Metal as the basis for its wicker Bay Isle products.) (Tab L – Wingate Affidavit, at ¶ 9 and Exhibit 3 thereto). |

It should be noted that each of these collapsible cages is rectangular in shape – a shape that is dictated by the functional nature of their collapsibility feature, as explained below.

### c.) Combinations of Wicker and Metal-Wire Structures/Components.

It also cannot be disputed that the concept of combining wicker woven materials with a metal-wire structure or frame designed to hold, carry, and/or enclose an object (*any* object) has long been known, as well. Examples of such techniques, concepts, and designs that were

14

disclosed to the world long before September of 2001 are as follows (Tab J – <u>Third</u> Smith

Affidavit, at ¶ 3, and Exhibits 14, 15, 16, 17, 18, and 19 thereto):

| | |
|---|---|
|  | **Published December 15, 1885 (US Patent 332,407) (Inventor John Milbourne and Thomas Humphreys).**<br><br>This utility patent discloses an invention to improve the strength, durability, and rigidity of baskets, skips, and "*other similar receptacles*." This is achieved by using metal or solid wood rails under and around the top border (and/or at intervals below that), which are then attached to the vertically-aligned sticks. As described by the inventors, the enclosure may be further strengthened by using metal rods or bars in the lid structure (bottom right corner). The entire enclosure is then woven with wicker-work. The design drawings show a rectangular wicker-woven enclosure that has been strengthened by weaving the wicker over a structure with various metallic rods, bars, and rails. |
|  | **Published November 17, 1896 (US Patent 571,452) (Inventor Friedrich Parthier).**<br><br>This utility patent discloses an invention to secure and protect the upper ends of the vertical sticks or bars of a basket structure. The specification shows and describes these "bars" and they appear to contemplate the bars being made of metal in one embodiment. The design drawings and specification also show that the body of the rectangular shaped basket is made of wicker woven over the vertical sticks or bars. |

15



**Published February 1, 1994 (US Patent 5,282,542) (Inventor Yau-Kee Mo).**

This utility patent discloses a rectangular shaped carrier that is made of metal and "tough and bendable material such as rattan stem, bamboo strap, or plastic," where the structure is collapsible to facilitate transportation and storage. The design drawings depict a rectangular carrier that has wicker-like material woven on all of its visible sides, including the edges of the various planes of the structure, which appear to be made in part of tubes or rails that are of comparatively larger diameter.



**Published May 15, 2001 (US Patent 6,230,915 B1) (Inventor Hsin Ying Liu).**

This utility patent discloses a rectangular basket with rattan woven onto all of its sides. The planes are all woven separately over metal rails (some of which are hollow), and then assembled – resulting in the appearance of distinct and separate panels for the enclosure.

16

|  | **Published August 3, 1999 (US Patent 5,931,326) (Inventor Stanley Weng)**<br><br>This utility patent discloses a container where the different sides are made of distinct panels than can be connected without nails or glue. The design drawings show that the distinct panels are made of wicker woven material. The edges of most of the panels have both vertical and horizontal bars that are large in diameter, and that have protrusions (or stubs) that allow the panels to be connected, but that have wicker otherwise continuously woven around them. |
| --- | --- |
|  | **Published November 7, 1995 (US Patent 5,464,113) (Inventor Stanly Ho and Mark Ho)**<br><br>This utility patent's figures disclose a collapsible rectangular shaped enclosure (a laundry hamper) that has wicker woven onto all visible sides of a rigid frame that is made from materials described as including metal aluminum. The specification also describes the use of plastic or synthetic material to give the appearance of wicker. |

**C.)     The "Bay Isle" Wicker Pet Cages Developed by Mid-West Metal.**

Mid-West Metal developed a line of wicker covered pet cages that it marketed and sold under the "Bay Isle" brand name. The Bay Isle product was first offered for sale to the public in the summer of 2003. (Wingate/Day 1 at p48:1 to p48:20); (Swan/Day 1 at p80:15 to p80:19;

p89:8 to p89:14); (Tab K – Mid-West Metal's Responses to Interrogatories [July 13, 2007], at
No. 17). The Bay Isle cages at issue in this case come in four different sizes and models – the
1824 Model (24"), the 1830 Model (30"), the 1836 Model (36") and the 1842 Model (42"). The
following pictures present an isometric view of those four models (Tab L – Wingate Affidavit, at
¶ 10):





Although the dimensions and sizes of certain features vary in significant ways[5] between the four

different Bay Isle models at issue, the following photographs provide a more detailed view of the

design features of the 1830 Model (organized to correspond to the five figures of the 156 Patent),

and are generally representative of the other models for the present purposes (only) (Tab L –

Wingate Affidavit, at ¶ 11 and Exhibit 4 thereto):

| | |
|---|---|
|  | **ISOMETRIC VIEW**<br><br>**(FRONT, SIDE, AND TOP PLANES)** |
|  | **FRONT PLANE** |

---

[5] For example, the dimensions and vertical placement of the windows vary, as do the number of notches that appear along the top and bottom edges of the side panels.



| | REAR PLANE |
| | TOP PLANE |



SIDE PLANE

Mid-West Metal employees first discussed the idea of using wicker to make an aesthetically pleasing pet crate in the mid-1990s. The company had formed a New Product Development team under the leadership of the company's pet division president Jim Wingate. (Tab L – Wingate Affidavit at ¶¶ 3 and 4). In about 1995, Mr. Wingate had seen a wicker covered bird cage in an old movie he had just watched. (Id.) He then brought the idea of weaving natural wicker onto one of the company's rectangular bare-wire pet cages to the team as part of a brainstorming session – where the team also discussed other well-known pet products made out of wicker woven materials, similar to dog beds such as those shown here:





6

---

[6] The left figure was published January 24, 1935 (US Patent 2,016,005) (Inventor Ettore Giannasca). While the drawings focus on an oval shaped basket described as being made out of wicker-like material, they also show (in

(Wingate/Day 1 at p14:25 to p15:24); (Swan/Day 1 at p48:7 to p50:12; p111:19 to p112:20;
p156:23 to p158:9; p160:3 to p160:16); (Tab M – Swan Affidavit, at ¶3); (Clemmons at p18:2 to
p19:22; p20:17 to p21:12; p22:24 to p23:21; p24:6 to p24: 16); (Kerr at p8:3 to p10:13); (Dale at
p27:16 to p28:17).

After a series of meetings and discussions about the concept, the team decided to not go
forward with the idea at that time – there were practical issues of cost constraints,[7] as well as
questions about whether natural wicker would be a suitable material to weave onto a pet crate
(i.e., dogs chew it, and it absorbs moisture and odors).[8]  (Wingate/Day 1 at p16:11 to p16:22);
(Swan/Day 1 at p18:13 to p19:9; p21:7 to p21: 21; p113:3 to p113: 20; p159:4 to p159:7; p48:24
to p49:4); (Clemmons at p19:12 to p19:22; p20:17 to p21:12; p24:15 to p25:7); (Kerr at p13:21
to p14:15; p15:3 to p15:12; p15:22 to p16:1; p18:4 to p18:21; p20:2 to p20:8); (Tab L – Wingate
Affidavit, at ¶ 5); (Tab M – Swan Affidavit, at ¶ 3).

Mid-West Metal's development team came back to the idea of using wicker with its bare-
wire pet cages again sometime in 2002, after it had established manufacturing relationships with
companies in China.[9]  As Jim Wingate recalls it, he had seen a photograph in a catalog of what

---

Figure 8) a rectangular shaped dog basket – and the specification describes the same.  The right figure was published
in 2001 (Sentance, *Art of the Basket – Traditional Basketry from Around the World*, at p. 155) (dog basket woven
out of rattan).  (Tab J – Third Smith Affidavit, at ¶ 3, and Exhibits 20 and 21 thereto).

[7] At the time, Mid-West Metal manufactured all of its pet cages domestically.  (Tab L – Wingate Affidavit at ¶ 5).
There is no known way to weave wicker onto a frame such as a dog cage in an automated way – it has to be done
manually.  It takes approximately an entire workday to create just one wicker-woven Bay Isle cage.  (Tab L –
Wingate Affidavit at ¶ 5).  The labor costs associated with the manual weaving process were thus cost-prohibitive
domestically, at that time.  (Tab L – Wingate Affidavit at ¶ 5).

[8] After the introduction of their Doggy's Dream House product in 1999 (see below), the Mid-West Metal team also
talked about the idea of creating panels out of mold-injected plastic that would be shaped to mimic different house
styles (e.g., a Cape Cod look, or a Tudor style) as part of the team's "battle" of figuring out "how we can make a
crate more appealing."  The plastic panels would then be snapped onto the sides of the metal cage.  One of the
house styles they discussed in the 1999 or 2000 timeframe was to create a set of plastic molded panels that had the
appearance of wicker – to create the impression of a beach house or hut.  (Swan/Day 1 at p158:10 to p159:20).

[9] It was not until Mid-West Metal moved practically all of its manufacturing operations to China (in the 2000
timeframe) that Mid-West Metal had access to the inexpensive labor markets afforded by that relationship.  (Tab L –

he later learned was a Simpson Ventures wicker woven cage. It reminded him then of the team's previous discussions about the same idea, and he ordered a sample of that product in about October of 2002.[10] (Wingate/Day 1 at p24:10 to p25:22). It is undisputed that it is a common practice in the pet products industry for companies to order samples of competitors' products for evaluation purposes, and in order to help create a different product – even Mr. Simpson agrees, and does so himself. (Simpson/Day 1 at p84:2 to p86:24; p87:22 to p88:14); (Simpson/Day 2 at p76:5 to p76:16); (Wingate/Day 1 at p24:10 to p25:22; p37:1 to p37:13); (Swan/Day 1 at p131:23 to p132:7; p133:9 to p134:3). The team viewed the sample product for purposes of evaluating its mechanical features, and to see how the wicker was actually woven onto the wire cage. They had no other purpose or use for it. (Wingate/Day 1 at p30:4 to p30:23; p31:1 to p31:21; p33:17 to p33:25; p34:6 to p36:14); (Swan/Day 1 at p22:9 to p23:25; p29:14 to p29:18; p72:16 to p73:4; p107:17 to p108:12); (Clemmons at p 19:23 to p20:16; p21:13 to p22:23; p25:8 to p28:21; p34:24 to p38:20; p42:6 to p44:7; p44:24 to p46:17); (Kerr at p11:14 to p12:17); (Dale at p27:1 to p27:15).

Once the team had determined that its manufacturing partner in China was capable of fabricating a wicker-covered cage using Mid-West Metal's drop-pin bare-wire collapsible cage as the base structure (as earlier shown, under section II(B)(2)(b)), the development process proceeded. (Wingate/Day 1 at p31:1 to p31:17; p34:6 to p35:10; p35:22 to p36:10). The team then undertook to develop its own look and design for what became the Bay Isle products. (Tab

---

Wingate Affidavit ¶ 6); (Tab M – Swan Affidavit at ¶ 3). Indeed, Mr. Simpson manufactures all of his wicker cages in China for the very same cost reasons. (Simpson/Day 1 at p101:3 to p102:2; p160:18 to p161:8). See also the Ziglar Patent (US 6,601,723 B1) (disclosing a collapsible hamper that is covered with woven wicker). When he applied for the Ziglar Patent in April of 2002, the inventor described the wicker furniture industry at the time as follows – "[i]n recent years, more and more home furnishings are being manufactured in Asia or other places that have labor costs relatively lower than those in the United States." (Tab J – Third Smith Affidavit, at ¶ 3 and Exhibit 22 thereto at Col. 1 ln. 7).

[10] The 156 Patent had not been issued at the time – it was not actually issued or even viewable by the public until December 2, 2003, over a year later.

L – Wingate Affidavit, at ¶ 12); (Swan/Day 1 at p59:1 to p59:15). They specifically asked Bob

Dale – their contractor[11] for graphic design and an expert in surface design, design principles,

and consumer reactions to such[12] - to develop an original and unique look for their product. He

was specifically told to not mimic by any means the Simpson Ventures' product. (Dale at

p38:10 to p39:12; p57:16 to p58:11). The Mid-West Metal team members thus specifically and

deliberately undertook to make their design look different from the Simpson Ventures' design.

The differences between the designs are numerous and significant. Several of the more

significant aesthetic differences that Mid-West Metal deliberately implemented with its Bay Isle

design are as follows (paraphrased):

- There are multiple square weave patterns incorporated into each panel (except the front) of the cage – the number varies depending on the cage size, but there are at least two squares appearing on each panel of each model, located in a symmetrical way.
- There are multiple large notches located along the top edge of each side plane. The notches are further emphasized through the use of black wire that shows through.
- There are multiple large notches located along the bottom edge of each side plane. The notches are further emphasized through the use of black wire that shows through.
- There is a large gap between the vertical edges of each plane – including the intersection of the front and side planes, and the intersection of the side and rear planes. The gap is further emphasized through the use of black wire that shows through.
- There is a large gap between the side-edges of the top plane and the top-edges of each of the side planes.
- There is a true window, not just a handle, on the rear plane – its dimensions and vertical placement are substantially similar in appearance to the windows of the side planes.
- There are wicker-coiled rods above and below the windows that appear to extend completely around the cage (except for the front) in a symmetrical way.

---

[11] In 2002, Mr. Dale was an independent contractor working with Mid-West Metals and the New Products Development team on a project basis – which he had been doing since 1983. He started to regularly attend the team's meetings sometime in 2002, although he still did not attend all of those meetings. (Dale at p5:25 to p7:17; p8:14 to p8:25; p25:7 to p25:14; p70:24 to p71:7). Mr. Dale became an employee in March of 2008, and is now the Director of Marketing and Design for the company. (Dale at p4:22 to p5:21).

[12] (Dale at p4:22 to p6:16; p71:13 to p71:22; p72:4 to p72:8).

24

- There is no wicker at all beneath the front door.
- There is a name plate prominently placed on the front door.
- There are two latches on the front door, in a configuration regularly used by Mid-West Metal for its wire cage products.
- The cage appears to sit flush to the ground.
- The side planes have a 1-piece side panel, not a 2-piece side-panel.
- Aside from the square weave patterns, the weave pattern is the same on each plane of the cage.[13]

Even Simpson Ventures' expert Robert Anders agrees that the Mid-West Metal team had deliberately and "obviously" undertaken to try to make their design look different from the Simpson Ventures' design – that "there's no question about it."  (Anders at p121:25 to p125:19). And, both Mr. Simpson and Mr. Anders agree that the sufficiency of the degree of differences made is a "judgment call" that depends on the "eye of the beholder." (Simpson/Day 2 at p89:8 to p90:14).

**D.)**   **Mr. Simpson's "Invention" of the Design Claimed in the 156 Patent.**

**1.)**   **Mr. Simpson's Idea.**

Mr. Simpson testified that in September of 2001, he was at home sitting on an outdoor porch swing made out of resin rattan material, relaxing.  It was at that moment that "out of the blue" the idea simply "popped into [his] head" to make a wicker dog kennel, using resin wicker or rattan.  (Simpson/Day 1 at p69:1 to p69:9; p77:16 to p78:1).  He testified that his idea was inspired by seeing the decorative nature of his porch swing's material – that rattan could fit in with many different types of décor, and that resin would be a good material because dogs

---

[13] (Wingate/Day 1 at p38:9 to p39:10; p92:17 to p94:12; p55:3 to p56:2; p60:24 to p61:17; p63:18 to p63:23); (Swan/Day 1 at p21:22 to p22:3; p30:11 to p30:18; p44:13 to p46:9; p47:23 to p49:16; p53:3 to p54:12; p58:3 to p59:15; p87:22 to p88:17); (Clemmons at p6:5 to p6:7; p7:9 to p8:4; p9:11 to p11:6; p48:25 to p61:7; p69:17 to p73:5; p73:12 to p75:18; p76:20 to p77:3; p79:4 to p79:12; p80:11 to p80:15; p80:23 to p81:5; p81:22 to p82:10; p84:21 to p85:7; p87:24 to p90:11 and Deposition Exhibit 56; p116:3 to p117:2; p117:11 to p119:13); (Kerr at p27:15 to p27:21; p31:23 to p34:9; p37:7 to p40:4; p41:14 to p48:6; p49:7 to p49:18; p49:19 to p49:25; p50:9 to p50:15; p50:16 to p51:5; p51:12 to p52:23; p53:20 to p54:21; p55:10 to p55:15; p70:5 to p70:23; p71:24 to p72:11); (Dale at p15:25 to p18:9; p18:23 to p19:17; p20:9 to p21:24; p32:7 to p33:12; p36:15 to p44:7; p47:19 to p49:1; p49:2 to p53:6; p57:16 to p58:11; p58:22 to p61:23; p65:16 to p67:5; p67:11 to p68:25; p70:24 to p71:7; p71:13 to p71:22; p76:11 to p76:24; p77:8 to p81:21; p82:15 to p82:19).

sometimes make messes. (Simpson/Day 1 at p65:14 to p68:2; p69:5 to p69:9; p69:22 to p69:25; p77:16 to p78:1). He was not actively working on any project to design such a product. He was not experimenting with any such products, and had not done any research on the idea. He did not even have a wire crate at his home at the time, had no pet products around him at the time, and made no effort to try to weave wicker onto a pet cage at any time. The only other wicker product he recalls having in his house at the time was a small wicker basket. (Simpson/Day 1 at p69:5 to p70:12; p71:7 to p72:19; p77:16 to p78:9; p91:5 to p91:15; p158:20 to p161:8; p155:10 to p155:24).

### 2.) The "Commonsensical" Problem.

The concept of taking a bare-wire animal cage and making it aesthetically pleasing has been around for a very long time – as is clearly demonstrated in part by the prior art samples set forth earlier in this brief. Indeed, Mr. Simpson admits that this concept was, in his view, "commonsensical" – that wire crates do not look very good, and are not aesthetically pleasing for use in the home. (Simpson/Day 1 at p72:20 to p74:5).

In fact, various companies in the pet products industry have introduced numerous products to the marketplace in more recent years to address this problem – including by way of fabric "crate covers," wooden structures with laminated materials and designs on them, pet homes designed to mimic cartoon-like furniture, and pet homes that use plastic structures that fit over/onto the wire-structure.[14] Some examples of these modern efforts to create such an aesthetically pleasing pet cage are as follows:

---

[14] In the specifications for a different patent for wicker-covered pet cage, Mr. Simpson admits this – "One common problem that has been found to exist with current pet enclosures is that they generally are not aesthetically pleasing or complimentary to the typical home décor. . . . Attempts have been made to provide pet enclosures that are more aesthetically appealing. Such past attempts have included the placement of veneering on the exterior of the enclosure to compliment the décor . . . . [T]he inclusion of many materials such as wood and/or other natural materials, and/or natural or synthetic fabric into an enclosure, [presents problems too]." (Tab D – The 138 Patent, at Col. 1 ln. 50-62).

| | |
|---|---|
| **Model DDH24**<br> | **Publication in October 1999.**<br><br>Mid-West Metal's New Product Development team designed and developed this "Doggy's Dream House" product in order to present an aesthetically pleasing wire pet cage. It was first introduced to the marketplace in October of 1999, and was advertised for its attractiveness. (Swan/Day 1 at p156:23 to p159:20); (Tab M – Swan Affidavit, at ¶ 4 and Exhibit 1 thereto). |
|  | **Crate Cover**<br><br>(Tab L – Wingate Affidavit, at ¶ 8 and Exhibit 2 thereto).<br><br>(See also Simpson/Day 1 at p75:4 to p76:18: p77:9 to p77:15). |
|  | **Publication between 1997-1999.**<br><br>Doskocil (a pet products company) introduced these products to the marketplace some time between 1997 and 1999, when Mr. Simpson was working there. Doskocil introduced these "whimsical" pieces of cat furniture, that looked like "Looney Tunes" cartoon images, and intended them to be used in indoor living rooms and family rooms.<br><br>(Simpson/Day 1 at p80:20 to p81:13); (Tab M – Swan Affidavit, at ¶ 5). |

**3.)    The 138 Patent.**

Finally, it is undisputed that Mr. Simpson also applied for and obtained a utility patent

relating to the way his wicker-covered pet cage product functions. Specifically, on February 14,

2006, he was issued US Patent 6,997,138 B1 (the "138 Patent"), which was a continuation-in-part from the Design Patent application he filed on May 2, 2002, for the 156 Patent. (Tab D – The 138 Patent, at page 1). Mr. Simpson described a number of functional purposes of the product and its features in the 138 Patent, including the following:

> [T]he enclosure of the present invention is fabricated from materials that do not absorb moisture or odors, that resist damage and deterioration from moisture, mold, mildew and the like, and which is easily cleaned. (Col. 2, ln. 21).
>
> * * *
>
> In further embodiments, the enclosure of the present invention is assembled from panels that are collapsible or foldable for compact storage and shipping, and is easily assembled by one person without tools or with only minimal tools. (Col. 2 ln. 25).
>
> * * *
>
> In one aspect, the present invention [sic] a pet enclosure comprising a substantially rigid frame and a moisture-resistant plastic stranded material woven onto said frame to present the appearance of a rattan or wicker material. Weaving the material into the frame allows the enclosure to be disassembled and compacted to a flat shape. (Col. 2 ln. 29).
>
> * * *
>
> In another aspect, the invention is a pet enclosure including a plurality of panels, each panel having a substantially rigid frame formed of substantially rigid frame and a plastic material having the appearance of natural rattan or wicker woven onto the frame. (Col. 2 ln. 43).
>
> * * *
>
> The enclosure preferably comprises a plurality of generally rectangular panels . . . . [with each panel shown in the drawings] thereby forming a general rectangular box-like structure. (Col 3 ln. 62 to Col. 4 ln. 6).
>
> * * *
>
> The back panel preferably defines an aperture for use when assembling and disassembling the enclosure, and for moving the enclosure. A handle is preferably provided for use when transporting the enclosure once disassembled. (Col. 4 ln. 7).
>
> The side panels preferably define a longitudinal opening for ventilation of the enclosure. (Col. 4 ln. 11).
>
> The front panel preferably defines an opening therein for access by a housecat, domestic dog, or other pets of typical size. The front panel also preferably comprises a door preferably hinged on a vertical axis to allow the door to swing

28

both inwardly into the enclosure and outwardly from the enclosure, and to latch in a closed position and in an inwardly open position. (Col. 4 ln. 12).

* * *

The panels of the enclosure preferably comprise frames formed of substantially rigid, non-porous materials onto which strands or sheets of flexible, non-porous material are woven or otherwise affixed. . . . In example embodiments, one or more strands of flexible material(s) such as thermoplastic extruded resin having the appearance of natural rattan or wicker, are woven onto frames constructed of rods or wires of steel or other metal(s), rigid plastic, or like material(s). (Col. 4 ln. 27).

* * *

The positions of the hinge or pivot joints connecting one or more of the panels to the base are preferably [located in such a way] . . . so that when the enclosure is fully collapsed or folded (as shown in Fig 4), the complete enclosure is substantially flat and compact with the panels able to closely overlie one another. (Col. 5 ln. 16).



*Fig. 1*

*Fig. 5b*

Mr. Simpson's prosecution of this 138 Patent did not technically start until July 2, 2003.[15]

The US PTO did not issue its first Office Action on the 138 Patent application until February 25, 2004 – ironically, only months *after* the 156 Patent for the design had already issued (December 2, 2003). In the 138 Patent's prosecution history, though, the US PTO[16] repeatedly rejected Mr.

---

[15] The application for the 138 Patent was a "continuation in part" of the application that Mr. Simpson had filed on May 2, 2002 for the design patent.

[16] The US PTO patent examiner for the 138 Patent was Robert Swiatek, not Cathy Anne MacCormac who was the US PTO patent examiner for the 156 Patent. (See 156 Patent, page 1 and 138 Patent, page 1).

Simpson's several efforts to independently claim as novel or non-obvious the feature of having a

flexible non-porous wicker-like material woven onto the wire frame of his paneled and

rectangular structure.[17]   For example, the US PTO determined the following in the 138 Patent

prosecution:

> Claims 1 and 2 are rejected under 35 U.S.C. 102(b) as being anticipated by Liu
> (US Patent 6,230,915). . . . Liu discloses a device (Figure 1) capable of being a
> pet enclosure comprising a frame formed of a substantially rigid, non-porous
> material and a flexible, non-porous material woven onto the frame (Figure 1); and
> wherein the frame comprises a plurality of generally flat rectangular panels
> (Figure 1).
>
> Claims 9 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable over
> Liu. . . . Liu discloses all the claimed features as discussed in the rejection above
> except for a plastic having the appearance of natural rattan or wicker.  However,
> the use of plastics to simulate natural rattan in order to provide durability has been
> notoriously well known in the art.  Therefore, it would have been obvious to one
> of ordinary skill in the art to have utilized a simulated plastic in Liu for the well
> known benefits.
>
> Therefore, it would have been obvious to one of ordinary skill in the art at the
> time the invention was made to have modified the device of Liu to include an
> assembly of the enclosure into an assembled configuration without separation of
> the panels from one another as taught by Kolozsvari in order to provide ease and a
> less time consuming process of assembly.
>
> Regarding Claim 8, Liu discloses all the claimed features as discussed above
> except for the substantially rigid, non-porous material of the frame being formed
> of metal wire.  However, Kolozsvari teaches the forming of a frame structure of
> metal wire to be well known.  Therefore, it would have been obvious to one of
> ordinary skill in the art at the time the invention was made to have modified the
> Liu device by forming the frame elements of a metal wire as taught by Kolozsvari
> in order to provide an inexpensive easy to produce structure.

(Tab E – The 138 Patent Prosecution History – February 25, 2004 US PTO Office Action, at

pages 3, 5, and 7) (emphasis added).

---

[17] As originally presented (but later rejected and cancelled), Mr. Simpson tried to claim a "pet enclosure comprising a frame formed of a substantially rigid, non-porous material; and a flexible, non-porous material woven onto said frame" (Claim 1) and where "the frame comprises a plurality of generally flat, rectangular panels" (Claim 2), and where the frame of that enclosure is "a metal wire" (Claim 8), and where the weave material "is a plastic having the appearance of natural rattan or wicker" (Claim 9).  (See Tab E – 138 Patent Prosecution History, passim).

The US PTO never withdrew these objections, but subsequently built further upon them –

citing to numerous examples where various metal framed structures have had wicker woven on

them and that had been/could be obviously modified to create a pet enclosure – including by

adding a door. Such examples included the Liu Patent (6,230,915), the Mo Patent (5,282,542),

the Weng Patent (5,931,326), the Ho Patent (5,464,113), and the Klozsvari Patent (6,192,834)

(all of which were previously shown in this brief under Section II(B)(2)). (See Tab E – 138

Patent Prosecution History – November 3, 2004 US PTO Office Action, at page 2; Simpson's

March 3, 2005 Response and Amendment, at page 7; June 2, 2005 US PTO Final Office Action,

at pages 2-4; and Simpson's August 2, 2005 Response After Final, at pages 2 and 3). None of

these references cited in the 138 Patent prosecution were ever viewed by the US PTO examiner

in the prosecution of the 156 Patent.[18]

Finally, Mr. Simpson's 138 Patent discloses that "[o]ne or more of the panels may be

woven with a decorative pattern or design for even further improved aesthetics." (Tab E – 138

Patent, at Col. 4 ln. 53). On this point, the only discernable difference between the design used

in the 138 Patent and the design claimed in the 156 Patent is that the utility patent drawings show

a large singular diamond pattern woven into every panel (except the front).

---

[18] The US PTO ultimately issued the 138 Patent, and allowed for the patentability of certain mechanical features of Mr. Simpson's cage structure (i.e., "a floor panel supported a distance above an underlying support surface, wherein the floor panel comprises at least one channel for receiving a cooperating portion of said frame," and the use of hinged connections in a specified way to permit the panels to fold into a compact configuration). Mr. Simpson then expressly cancelled his efforts to independently claim flexible non-porous material woven onto a rigid non-porous frame for a pet enclosure with distinct flat rectangular panels. (Tab E – 138 Patent Prosecution History – Simpson's August 2, 2005, Response After Final, at pages 2 and 3.) It was only when he then added those features to be dependent upon and combined with the allowed mechanical features that were the subject of his claimed invention that the US PTO allowed the 138 Patent to issue.



Fig. 1



Fig. 5f

Indeed, every wicker woven pet crate that Simpson Ventures has *ever* sold has had a large single diamond pattern woven into all sides (except the front) of the pet cage. He took the diamond weave pattern from the pattern of his wicker porch swing. (Simpson/Day 1 at p156:18 to p157:8; p162:1 to p162:24). In July of 2005, Mr. Simpson also eliminated the handle on the rear panel (there is now no opening in the back panel at all), eliminated the 2-piece side panel (it is now a single piece side panel), and eliminated the wicker coiled tube underneath the front door (there is now no wicker appearing under the front door) for all subsequent production models of the cage. (Simpson/Day 2 at p18:22 to p19:8; p25:21 to p26:4). The design of Simpson Venture's actual production models is thus different than the design set forth in the 156 Patent.

Additional facts that are material and undisputed are set forth below.

## III.)  THE MATERIAL FACTS ARE UNDISPUTED, AND MID-WEST METAL IS ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW

Summary Judgment under Fed.R.Civ.Pro. 56 is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. A dispute is "genuine" if the issue could be resolved in favor of either party. A fact is "material" if it might reasonably affect the outcome of the case. A movant who does not have the burden of proof at trial must point to the absence of a genuine fact issue. The burden then shifts to the nonmovant to show that summary judgment is not proper. All the evidence must be viewed in the light most

favorable to the party opposing the motion.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 106 S.Ct. 2548, 2552

(1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 106 S.Ct. 1348, 1356 (1986);

<u>Anderson v. Liberty Lobby, Inc.</u>, 106 S.Ct. 2505, 2510 (1986); <u>Minka Lighting, Inc. v.</u>

<u>Craftmade International, Inc.</u>, 2002 WL 1331883 (N.D.Tex. 2002).  To avoid an adverse ruling

on a motion for summary judgment, the non-moving party "may not rest upon the mere

allegations or denials of [their] pleadings.  Fed.R.Civ.P. 56(e).  Nor may the non-moving party

defeat summary judgment by simply providing a mere "scintilla" of evidence.  <u>Burger King</u>

<u>Corp. v. Weaver</u>, 169 F.3d 1310, 1321 (11th Cir. 1999); <u>Burton v. City of Belle Glade</u>, 178 F.2d

1175, 1187 (11th Cir. 1999).

**A.)**     **Claim Construction of the 156 Patent.**

"Similar to the infringement analysis of a utility patent, infringement of a design patent is

evaluated in a two-step process.  First, the court must construe the claims of the design patent to

determine their meaning and scope. . . . Second, after construction of the patent's claims, the

court is to compare the construed claims to the accused design."  <u>Arminak and Associates, Inc.,</u>

<u>et al v. Saint-Gobain Calmar, Inc.</u>, 501 F.3d 1314, 1319-20 (Fed.Cir. 2007).

   **1.)** **The Law Regarding Claim Construction of a Design Patent.**

With regard to the first step of construing the design patent claims, it should first be noted

that claim construction is a question of law for the court to determine.  <u>See</u> <u>Markman v.</u>

<u>Westview Instruments, Inc.</u>, 52 F.3d 967, 976 (Fed.Cir. 1995).  Further, it has long been

established that "[d]esign patents have almost no scope.  The claim at bar, as in all design cases,

is <u>limited to what is *shown*</u> in the application drawings."  <u>In re Mann</u>, 861 F.2d 1581, 1582

(Fed.Cir. 1988) (emphasis added).  "Design patents typically are claimed as shown in drawings.

Claim construction by a court is adapted accordingly. . . . The scope of the claim of a patented

design 'encompasses its visual appearance as a whole, and in particular the visual impression it creates.'" Arminak, 501 F.3d at 1319. "Design patents do not claim concepts. They claim specific designs set forth in their claims, which invariably refer to the appearance of what is illustrated in the patent's drawings." Hoop v. Hoop, 279 F.3d 1004, 1010 (Fed.Cir. 2002) (J. Lourie dissenting) (emphasis added); 37 CFR §1.153(a) (2001). A "design patent protects the nonfunctional aspects of an ornamental design as shown in the patent." Arminak, 501 F.3d at 1319, *citing* Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., 162 F.3d 1113, 1116-17 (Fed.Cir. 1998) and *citing* Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1377 (Fed.Cir. 2002).

The court must thus verbalize the visual impression made by the drawings presented in a design patent. Elmer et al. v. ICC Fabricating, Inc., 67 F.3d 1571, 1577 (Fed.Cir. 1995) ("Determining whether a design patent claim has been infringed requires, first, as with utility patents, that the claim be properly construed to determine its meaning and scope.") "Our case law does not prohibit detailed claim construction of design patent drawings. It merely disapproves claim construction that goes beyond the novel, nonfunctional ornamental features visually represented by the claimed drawings, or that fails to encompass the claimed ornamental features of the design as a whole." Arminak, 501 F.3d at 1319 and 1321 ("First, the court must construe the claims of the design patent to determine their meaning and scope.")

Further, the Federal Circuit's "precedent makes clear that all of the ornamental features illustrated in the figures must be considered in evaluating design patent infringement. This is because a patented design is defined by the drawings in the patent, not just by one feature of the claimed design. . . . [and the] 'ordinary observer' analysis is not limited to the ornamental features of a subset of the drawings, but instead must encompass the claimed ornamental features

34

of all figures of the design patent." <u>Contessa Food Products, Inc. v. Conagra, Inc.</u>, 282 F.3d 1370, 1378-79 (Fed.Cir. 2002) (while the district court properly considered all of the patent figures in its claim construction initially, it committed reversible error by failing to then compare the accused product against <u>all</u> of those figures and perspectives).

In addition, it is reversible error for a court to identify only those features that it believes are seen at the point of sale, instead of features that "were visible at <u>some time</u> during the <u>normal use</u> of the product." <u>Contessa</u>, 282 F.3d at 1379-80 (citations omitted) ("[i]t has been held repeatedly that articles which are concealed or obscure [sic] in normal use are not proper subjects for design patents, since their appearance cannot be a matter of concern. . . . We have construed 'normal use' in the design patent context to extend over 'a period in the article's life, beginning after completion of manufacture or assembly and ending with the ultimate destruction, loss, or disappearance of the article.'"); <u>see also</u> <u>Door-Master Corp. v. Yorktown, Inc.</u>, 256 F.3d 1308, 1313 (Fed.Cir. 2001) (rejecting the patent holder's argument that the features on the rear side of a cabinet door should be disregarded because they are usually hidden from view when the cabinet door is closed – those features were included in the patent figures and are sometimes visible during normal use of the product).

"The chief limitation on the patentability of designs is that they must be primarily ornamental in character. If the design is dictated by performance of the article, then it is judged to be functional and ineligible for design patent protection." <u>Arminak</u>, 501 F.3d at 1319; <u>Best Lock Corp. v. Ilco Unican Corp.</u>, 94 F.3d 1563, 1566 (Fed.Cir. 1996).

It should also be noted that Mr. Simpson did <u>not</u> ultimately use any broken lines[19] in the

_____

[19] According to the U.S. Patent & Trademark Office, Manual of Patent Examining Procedure §1503.02 (3d ed. 1976), the patent specification must "make it clear that <u>the structure shown in broken lines is not part of the design</u> sought to be patented." (Emphasis added.) As amended in 2005, that Manual further explains "[b]roken lines may not be used to show hidden planes and surfaces which cannot be seen through opaque materials. <u>The use of broken</u>

156 Patent that would otherwise indicate his intent to <u>disclaim</u> or <u>exclude</u> any features from his claimed design. "If features appearing in the figures are not intended to be claimed, the patent holder is permitted to show those features in broken lines to exclude those features from the claimed design, and the failure to do so signals inclusion of the features in the claimed design." <u>Door-Master Corp. v. Yorktown, Inc.</u>, 256 F.3d 1308, 1313 (Fed.Cir. 2001); <u>Contessa Food Products, Inc. v. Conagra, Inc.</u>, 282 F.3d 1370, 1378 (Fed.Cir. 2002). Similarly, "[i]f, as [the patent holder] now contends, the [certain design features] were functional, not ornamental, features, [the patent holder] could have omitted these features from its patent application drawings. [The patent holder] did not do so, however, and thus effectively limited the scope of its patent claim by including those features in it." <u>Elmer v. ICC Fabricating, Inc.</u>, 67 F.3d 1571, 1577 (Fed.Cir. 1995). <u>See also</u> <u>Hosley Int'l Trading Corp. v. K Mart Corp.</u>, 237 F.Supp.2d 907, 910 (N.D.Ill. 2002) (by failing to use broken lines with certain features of its design, the patent holder admitted that those features were part of its claimed ornamental features).

### 2.) <u>Claim Construction of the 156 Patent.</u>

With these legal principles in mind, Mid-West Metal submits the following for the Court's consideration as the appropriate claim construction to adopt for the 156 Patent:

The 156 Patent expressly claims the "ornamental design for a pet home, substantially as shown and described." The bottom and interior are expressly disclaimed, and are thus not part of the patent.

The drawings collectively depict an enclosure that has 5 planes – a front, two mirror-image sides, a top, and a rear.

The shape of the door on the front plane is rectangular (Figure 2) and is surrounded on all four sides by wicker-like material. The door is a grid of evenly-spaced horizontal and vertical bars, and those bars do not have wicker-like material on them. The door has a single latch mechanism that appears as a small

---

lines indicates that the environmental structure or the portion of the article depicted in broken lines forms no part of the design, and is not to indicate the relative importance of parts of the design." U.S. Patent & Trademark Office, Manual of Patent Examining Procedure §1503.02 (8[th] ed. rev. October 2005) (emphasis added).

solid rectangular shape, with a long notch in which a small latch slides laterally.

The shape of the windows on the side planes is a long rectangular shape, and the windows are located near (approximately 20% away from) the top of the side-plane (Figure 5). The windows have vertical bars in them. The side plane is divided into two pieces – there is a lower piece that appears near the bottom edge of the side plane, making up approximately 20% of the side plane's vertical height. The two-piece side panel is visually emphasized with coiled bars located above and below the gap. These two bars are of a comparatively large diameter, and extend laterally across the entirety of the side panels. This feature is also visually emphasized by the size of the gap. The wicker weave pattern above the window and in the lower piece of the side planes is different than the wicker weave pattern that appears below the windows of the side planes, as shown in Figure 5. That different weave pattern also appears above the door on the front plane, as shown in Figure 2.

The rear plane (Figure 3) has a small rectangular shaped opening located substantially at the top of the rear plane that is a handle. There are no bars in the handle's opening. The handle opening is of much smaller dimensions than the windows that appear on the side planes (Figure 5) of the enclosure. The handle opening's location on the rear plane is substantially different than and higher than the vertical placement of the windows that appear on the side plans (Figure 5) of the enclosure.

The top plane (Figure 4) shows a wicker woven surface surrounded on all sides by wicker-coiled bars. The top plane does not show the top edges of any of the side, front, or rear planes – those top edges thus are located completely underneath the perimeter edges of the top plane.

In viewing Figure 1 and Figure 3, it can be seen that the vertical edges of the front plane and side planes, and the vertical edges of the rear plane and side planes, touch and there are no gaps there.

The enclosure is otherwise covered with wicker-like material, and each plane is framed on all sides with larger diameter bars that are continuously coiled with wicker-like material.

The enclosure uses peg-shaped legs for elevating the structure off of the ground.

There are no figures or shapes woven into or part of the wicker-like material.

Certain features of the 156 Patent's design are excluded from this proposed claim

construction because their appearance is dictated by their functional purposes. Specifically, the

overall rectangular shape, the appearance of distinct rectangular panels, the existence of

windows, the existence of a handle, and the existence of a door are all excluded from the

proposed construction for this reason.

The overall shape of the 156 Patent's pet enclosure design is rectangular, as are the

individual panels. However, it is undisputable that these rectangular shapes are dictated

primarily by the collapsibility functioning of this specific pet enclosure. As explained by Mr.

Simpson, and shown in the drawings for his 138 Patent:

> The enclosure preferably comprises a plurality of generally <u>rectangular</u> panels . . .
> . [with each panel shown in the drawings] thereby forming a general <u>rectangular
> box-like</u> structure. (Col. 3 ln. 62 to Col. 4 ln. 6).

> In further embodiments, the enclosure of the present invention is assembled from
> <u>panels</u> that are <u>collapsible</u> or <u>foldable</u> for compact storage and shipping, and is
> easily assembled by one person without tools or with only minimal tools. (Col. 2
> ln. 25).

> The positions of the hinge or pivot joints connecting one or more of the <u>panels</u> to
> the base are preferably [located in such a way] . . . so that when the enclosure is
> fully <u>collapsed</u> or <u>folded</u> (as shown in Fig 4), the complete enclosure is
> <u>substantially flat and compact with the panels able to closely overlie one another</u>.
> (Col.5 ln. 16).



*Fig. 1*

*Fig. 5b*

(Tab E – The 138 Patent); (<u>See also</u> Simpson/Day 1 at p95:10 to p96:6); (Simpson/Day 2 at

p12:8 to p12:20). As Professor Bret Smith further explains, the rectangular shape is required for

manufacturing and collapsibility – specifically noting that the rectangular shape accommodates the collapsibility of a rigid cage, and further explaining that for metal collapsible cages, the form must be rectangular with parallel edges in order for the hinges and pivot points to work.  (Tab I – Second Smith Affidavit , at ¶ 5 and Exhibit 2 thereto – Smith's August 17, 2007 Report, at pages 6 and 11). (See also Simpson/Day 2 at p144:20 to p145:24, explaining that a primary purpose for the rectangular form of a wicker covered litter-box cover he had developed was to allow for its collapsibility, and for ease of storage and shipment – and further noting that a domed top would require more space for packaging).  Accordingly, and setting aside for the moment the undisputed fact that rectangular-shaped collapsible pet crates were already well-known in the pet products industry, the overall rectangular shape and the rectangular distinct panels cannot be considered "ornamental" features of the 156 Patent's design as those shapes are dictated primarily here by their functional purposes related to the collapsibility of Simpson Venture's cage.  The Ziglar Patent, the Mo Patent, the Weng Patent, and the Liu Patent each further explain and show how the collapsibility functioning of such wicker-woven structures dictates the need for there to be separate panels for the structure that are rectangular in shape – thus resulting in an overall rectangular shape, as well.  (Tab J – Third Smith Affidavit, at ¶ 3 and Exhibits 22, 16, 17, and 18 thereto – the Ziglar Patent, at Figure 2, Figure 5, and Col. 1 ln.6-ln.51; the Mo Patent at Figure 3, Figure 4, and Col. 1 ln.5-ln.63; the Liu Patent, at Figure 2, Figure 4, and Col. 1 ln.4-ln.41; and the Weng Patent at Figure 6 and Col. 1 ln.4-ln.29).

Similarly, the existence of a see-through door and the existence of windows in the 156 Patent's design of a pet cage are undeniably dictated by their functional purposes.  (Simpson/Day 1 at p141:16 to p142:2).  The door opening itself is obviously necessary to allow the animal to access and exit the cage, and a door with a latch is necessary so the animal can be locked into the

cage.  (Tab I – <u>Second</u> Smith Affidavit, at ¶ 5 and Exhibit 2 thereto – Smith's <u>August 17, 2007</u>

Report, page 6); (Tab E – The 138 Patent, at Col. 4 ln. 12).  The see-through opening of the door

is present for the functional purpose of allowing the animal to see in/out, and to allow people to

see into the cage.  (Simpson/Day 2 at p29:18 to p29:24).  The existence of the side windows is

similarly to allow for visibility and ventilation.  (Tab I – <u>Second</u> Smith Affidavit, at ¶ 5 and

Exhibit 2 thereto – Smith's <u>August 17, 2007</u> Report, page 6); (Tab E – The 138 Patent, at Col. 4

ln. 11).  With regard to the opening in the rear plane, its primary purpose is undeniably that of a

handle:

> Q.      If you had intended this opening on Figure 3 to be a window, why didn't
>         you just make it look like the window in Figure 5?
> A.      Again, its primary purpose was as a handle.

(Simpson/Day 2 at p24:5 to 24:8); (Simpson/Day 1 at p149:7 to p149:24); (Tab E – The 138

Patent, at Col. 4 ln. 7).  Accordingly, the existence alone of these features cannot serve as

"ornamental" features in the Court's construction of the 156 Patent's claimed design.

## B.)    There is No Infringement as a Matter of Law Because There Has Been No Misappropriation of Any Legitimate Point of Novelty.

After properly construing the claim of the design patent, the court next moves into the

infringement analysis by comparing the patented design against the accused design.  With regard

to this comparison step of the design patent infringement analysis, "a court must apply 'two

distinct tests, both of which must be satisfied in order to find infringement:  (a) the 'ordinary

observer' test, and (b) the 'point of novelty' test.'"  <u>Lawman Armor v. Winner Intern., LLC</u>, 437

F.3d 1383, 1384 (Fed.Cir. 2006), *as clarified by* 449 F.3d 1190 (Fed.Cir. 2006); *citing* <u>Contessa</u>

<u>Food Prods., Inc. v. Conagra, Inc.</u>, 282 F.3d 1370, 1377 (Fed.Cir. 2002).[20]  Design patent

---

[20] Under the "ordinary observer" prong or sub-test, the patent holder bears the burden of proving that "in the eye of an ordinary observer, giving such attention as a purchaser usually gives, [the] two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the

infringement is typically a question of fact, which must be proven by a preponderance of the

evidence.  Hosley Int'l Trading Corp. v. K Mart Corp., 237 F.Supp.2d 907, 910 (N.D.Ill. 2002)

(summary judgment entered in favor of defendant because there was no infringement as a matter

of law under the point of novelty test).  Here, Mid-West Metal is entitled to summary judgment

because Simpson Ventures cannot possibly satisfy the "point of novelty" prong of the analysis,

as a matter of law.

### 1.)    The Law Regarding the Point of Novelty Test.

Under the point of novelty test, the patent holder must show that "no matter how similar

two items look, the accused device must appropriate the novelty in the patented device which

distinguishes it from the prior art."  Litton Sys., Inc. v. Whirlpool Corp., 728 F.2d 1423, 1444

(Fed.Cir. 1984); Lawman Armor, 437 F.3d at 1384-85.  Smith v. Whitman Saddle Co., 13 S.Ct.

768, 682 (1893) ("unless there was infringement of [the 'new and material' design feature of the

saddle not used in the prior art] there was none at all").  "The 'point of novelty' test does not ask

how noticeable the points of novelty are; rather, the inquiry focuses on those features of a design

that distinguish it from prior art, and thus make it patentable."  Hosley, 237 F.Supp.2d at 913.

The Federal Circuit has repeatedly emphasized that the "overall appearance" of a design cannot

itself be a point of novelty.  Sun Hill, 48 F.3d at 1197 (one "cannot evade the point of novelty

test by relying on the claimed overall design as the point of novelty"); Litton, 728 F.2d at 1444

("to consider the overall appearance of a design without regard to prior art would eviscerate the

---

other."  Gorham Co. v. White, 81 U.S. (14 Wall.) 511, 528, 20 L.Ed. 731 (1871).  Arminak, 501 F.3d at 1323
(precedent establishes "that the ordinary observer is a person who is either a purchaser of, or sufficiently interested
in, the item that displays the patented designs and who has the capability of making a reasonably discerning decision
when observing the accused item's design whether the accused item is substantially the same as the item claimed in
the design patent.")  Specifically, "the question to be addressed in applying the ordinary observer test is whether the
ordinary observer would be deceived by the accused design because it is substantially similar to the patented design.
. . . [The test requires] the comparing of the accused and patented designs from all views included in the design
patent, not simply those views a retail consumer seeking to buy would likely see when viewing the product at the
point of sale."  Arminak, 501 F.3d at 1325.

purpose of the 'point of novelty' approach, which is to focus on those aspects of a design which render the design different from prior art designs").

### 2.)   Mid-West Metal Has Not Misappropriated Any Legitimate Point of Novelty.

As Mid-West Metals has demonstrated, the field of relevant prior art was in fact vast and crowded. Simpson Ventures ultimately conceded that its initially asserted point of novelty was myopic and fatally flawed. It issued a new declaration of the claimed points of novelty on September 26, 2007, in the middle of this litigation – for the (a) "Door/Front Panel Configuration," (b) "Panels Without Overhang," (c) "Distinct Panels," (d) "Window Geometry and Placement," (e) "Extent of Wicker," and (f) "Combination of Items 1-5."[21] (Tab G – Simpson Ventures' Responses to Interrogatories [September 26, 2007], at No. 11).[22] However, none of these claimed points of novelty were misappropriated by mid-West Metal, as alleged. An analysis of each point, recited and discussed individually below, demonstrates this inescapable conclusion. Mid-West Metal is thus entitled to summary judgment in its favor and against Simpson Ventures, as a matter of law.

---

[21] Simpson Ventures initially asserted that what made the 156 Patent's design unique over the prior art was that it was a "*pet home having a woven outer texture with the appearance of wicker, rattan, or the like, the woven texture appearing on the top, non-window portions of the sides and rear, and on the non-door portion of the front.*" (Tab F – Simpson Ventures' Responses to Interrogatories [July 23, 2007], at No. 11). Indeed, Simpson Ventures' purported expert Robert Anders declared that what made the 156 Patent design of this limited field of prior art was even more simple – "*I observe that the design claimed in the '156 Patent distinguishes from the prior art in one respect: i.e., the point of novelty is a woven texture on all disclosed surfaces.*" (Tab H – Anders Report [September 29, 2006], at ¶ 36); (Anders at p89:20 to p90:19). Again, Simpson Ventures has admitted that this coyly myopic assertion was premised on a review of only the nine prior art references presented to and cited by the US PTO. (Tab F – Simpson Ventures' Responses to Interrogatories [July 23, 2007], at No. 11).

[22] "The prior art from which these points of novelty are distinct include the prior art cited during the prosecution of the '156 Patent and the prior art cited in Bret H. Smith's expert report dated August 17, 2007." (Id.)

### a.) "Door/Front Panel Configuration"

> *"A pet home with a rectangular volume and
> having a rectangular front, the front including a
> rectangular see-through door that is framed
> substantially by wicker."*

Simpson Venture's assertion of liability based on this claimed point of novelty is

erroneous for two main reasons. First, the claimed features are already present in the prior art.

Second, the claimed features are not present in the Bay Isle products.

As the prior art set forth previously clearly demonstrates, the assertion that these features

somehow distinguish the 156 Patent's design from the prior art is simply false. There are

numerous examples of animal cages with the identified features:





Each of these designs depict animal cages that are rectangular,[23] with rectangular fronts and

rectangular see-through doors. The top two designs further show that the front rectangular

opening is framed substantially by wicker – having wicker above, below, and on both sides of

such. (Tab I – Second Smith Affidavit, at ¶ 5 and Exhibit 3 thereto – Smith's November 5, 2007

Report, at pages 8-9).[24]

Second, Simpson Ventures unlawfully attempts to broaden the scope of its patent through

---

[23] As previously demonstrated, the overall rectangular shape of the design cannot even be a claimed "ornamental" feature because it is dictated by the functional nature of the collapsible cage. Regardless, there is still no misappropriation of such, as explained in this section.

[24] Even Mr. Simpson admits this:

    Q: How would you describe the door that you see there [in the object Exhibit Number 208 {which is the object in the top left corner cell of the above table in this brief}]?
    A: As, it's either made out of, it looks to be made out of wire or cane or rattan; and it appears that the handle is to the left, which allows you to somehow either slide or hinge open that window/door.
    Q: Rectangular shape door?
    A: Pretty close to square, but I would say it's little taller than it is wide.
    Q: Which would be a rectangular shaped door; correct?
    A: Yes, it would.
    Q: Has bars on it with no wicker on it?
    A: It appears, yes.
    Q: Substantially surrounded or framed by wicker?
    A: Yes.

(Simpson/Day 2 at p128:22 to p129:13). See also the deposition testimony of the various Mid-West Metal employees (Clemmons at p76:20 to p77:3; p79:4 to p79:12); (Kerr at p49:19 to p49:25); (Dale at p76:11 to p76:24).

the use of <u>words</u> to falsely describe that which is in fact <u>not</u> <u>shown</u> in the 156 Patent figures.

However, it is the drawings that matter for determining the scope of the patent, not the verbal

description provided in litigation by the patent holder. <u>Arminak,</u> 501 F.3d at 1328. In <u>Arminak,</u>

the patent holder (erroneously) argued that the court "should have limited its discussion of the

points of novelty comparison to only the exact words [the patent holder] used to describe its two

points of novelty." The court rejected that, however, and held that "[t]he relevant inquiry is <u>not</u>

to analyze <u>the words</u> used by the patent owner to describe the particular design features after the

issuance of the patent, but whether the design feature, <u>as it appears</u> in the Figures of the patent as

issued, is found in the accused design." As both Mr. Simpson and Robert Anders testified, the

156 Patent <u>shows</u> wicker material on <u>all</u> four sides of the 156 Patent's design – above, on each

side, *and below* the door on the front plane. (Tab B – The 156 Patent, at Figure 2).



(Simpson/Day 2 at p24:9 to p25:4); (Anders at p145:9 to p145:14). Indeed, Mr. Anders testified

that that is what is meant by the word "framed"– that the wicker surrounds or "encircles" the

door, meaning that there is wicker on <u>all</u> sides. Again, that is in fact what is <u>shown</u> in the 156

Patent's drawings – the wicker appears on all four sides of the door. Simpson Ventures thus

cannot now use words to change the scope of the patent – and argue that the 156 Patent does <u>not</u>

include the wicker coiled bar underneath the front door.

Last, this falsely claimed point of novelty is not in fact present in the Bay Isle products. Specifically, the door for the Bay Isle products is not "framed substantially by wicker." It is undisputed that none of the Bay Isle products have <u>any</u> wicker below the front door. (Clemmons at p76:20 to p77:3; p79:4 to p79:12) (Kerr at p49:19 to p49:25) (Dale at p76:11 to p76:24).



The Bay Isle products' front doors are thus not "framed substantially by wicker."

Accordingly, Mid-West Metal cannot be held liable based on the fatally flawed claim that the Bay Isle products have somehow misappropriated this illegitimately asserted point of novelty. See <u>Arminak</u>, 501 F.3d at 1328 (the "relevant inquiry is not to analyze the words used by the patent owner…but whether the design feature as it appears in the Figures of the patent").

### b.) "Panels Without Overhang"

> *"A pet home with a rectangular volume and having wicker outer surfaces over a majority of the pet home, the pet home having the appearance of being formed from individual panels, the panels being configured such that each panel extends substantially to the edge of the adjacent panels, but no panel extends beyond the adjacent panels."*

The assertion of liability based on this claimed point of novelty is flawed for several reasons, as well. Again, the claimed features are already present in the prior art, and the claimed features are not present in the Bay Isle products.

The prior art clearly demonstrates that this claimed point of novelty in fact presents nothing new, novel, or otherwise unique. There are numerous examples of rectangular enclosures with wicker-covered panels that extend "substantially to the edge" of the adjacent panel, but then do not extend beyond that adjacent panel. (Tab I – Second Smith Affidavit, at ¶ 5 and Exhibit 3 thereto – Smith's November 5, 2007 Report, at pages 15-16). Indeed, both Mr. Simpson and Mr. Anders admit that the 156 Patent's design figures show that the panel edges are so close that they "appear to touch." (Simpson/Day 2 at p21:11 to p22:11); (Anders at p146:17 to p147:10). They in fact do not just "appear" to touch, they in fact do touch.



Fig. 1                Fig. 2                Fig. 1

Thus, the asserted language used by Simpson Ventures of "substantially to the edge" is not legitimate to the extent Simpson Ventures tries to argue (as it has) that the 156 Patent's scope includes enclosures where there is a visible gap between those panels. Arminak 501 F.3d at 1328 (again, "[t]he relevant inquiry is not to analyze the words used by the patent owner to describe the particular design features after the issuance of the patent, but whether the design feature, as it appears in the Figures of the patent as issued, is found in the accused design"). Regardless, examples of such prior art are as follows – the latter two examples further showing a top panel that has no "overhang" in relation to the side planes of the woven rectangular structure below it (Tab I – Second Smith Affidavit, at ¶ 5 and Exhibit 3 thereto – Smith's November 5,

2007 Report, at pages 15-16):



Moreover, even if this claimed feature was not already present in the prior art, this illegitimately claimed feature is not even present in the accused Bay Isle products. (Tab I – Second Smith Affidavit, at ¶ 5 and Exhibit 3 thereto – Smith's November 5, 2007 Report, at

pages 15-16). Specifically, there are substantial gaps clearly visible at the vertical edges of each

cornerpost of the Bay Isle products (i.e., at the side-edges of the side plane and the side-edges of

the front plane and the rear plane), as well as between the side-edges of the top plane and the top-

edges of the side planes. In viewing the Bay Isle products, it is thus clear that the edges of these

planes do not evenly remotely "appear to touch" (as the 156 Patent figures actually show), or

even appear to be "substantially to the edge of the adjacent panels" (as Simpson Ventures'

wordsmithing erroneously attempts to claim). There are instead substantial gaps – and even Mr.

Simpson agrees. He testified that it is easily apparent to him that the woven edges of the Bay

Isle panels appear not to touch and that there is a gap, which is a difference between the two

designs. (Simpson/Day 2 at p35:6 to p37:9).





### c.) "Distinct Panels"

*"A pet home with a rectangular volume, the pet home having the appearance of being formed from distinct, individual panels having wicker outer surfaces."*

In addition to being a feature dictated by the collapsible and stackable functionality of Mr. Simpson's cage, the prior art clearly demonstrates that this claimed feature of distinct individual panels made out of wicker was already present in the prior art - including the top panel of various animal cages. Even Mr. Anders admits that the object set forth in the top left cell of the table below "has the appearance of being formed from distinct individual panels having wicker outer surfaces." (Anders at p146:12 to p146:16).





Accordingly, there is nothing unique or novel about this claimed feature in the 156 Patent's design – and it cannot serve as a legitimate claimed point of novelty. (Tab I – <u>Second</u> Smith Affidavit, at ¶ 5 and Exhibit 3 thereto – Smith's <u>November 5, 2007</u> Report, at pages 10-12).

Moreover, as previously explained, the 138 Patent obtained by Mr. Simpson makes it clear that the reason for the appearance of these distinct and rectangular panels is dictated by the functional purposes of this particular collapsible cage – the cage has to be collapsible so that the plurality panels can be folded over one another into a compact rectangular shape, for ease of packaging, shipment, and storage. (Tab E – The 138 Patent, at Col. 2 ln. 25; Col. 3 ln. 62 to Col. 4 ln. 6; Col. 5 ln. 16); (Tab J – <u>Third</u> Smith Affidavit, at ¶ 3 and Exhibit 22 thereto – the Ziglar Patent, at Figure 2 and Figure 5). These functional features thus cannot serve as a legitimately claimed point of novelty.

Mid-West Metal cannot be held liable, then, for the Bay Isle models allegedly having a look of being formed from distinct individual panels.

### d.) "Window Geometry & Placement"

> "A pet home with a rectangular volume and having a front, sides, a rear and a top, the pet home further having a rectangular window

> *positioned in the upper half of each side and in the upper half of the*
> *rear, the non-window portions of the sides and rear having outer*
> *surfaces with wicker such that the rectangular windows are*
> *surrounded by wicker on all sides."*

Once again, Simpson Ventures falsely claims as unique certain features that are in fact

not unique.  Specifically, the prior art clearly demonstrates that the claimed combination of

features was already known – the best (but not the only) example of such is the following

rectangular animal cage:



This publication clearly shows a rectangular animal cage made out of wicker with rectangular

windows located in the upper half of the planes, where the window openings are surrounded by

wicker on all sides.  Other examples from the prior art of animal cages with essentially the same

window geometry and placement as that described are as follows:



(Tab I – <u>Second</u> Smith Affidavit, at ¶ 5 and Exhibit 3 thereto – Smith's <u>November 5, 2007</u> Report, at page 13). Further, although the window is admittedly located more in the middle of the side plane (a trivial distinction), the following publication too shows a rectangular animal cage made out of wicker with a rectangular window on the side plane that is surrounded by wicker on all sides:



Moreover, Simpson Ventures attempts (again) to claim too much with its wording of this feature. The 156 Patent's figures <u>show</u> that the rear panel (Figure 3) does <u>not</u> actually have a rear "window," let alone one that is merely located in the "upper half" of the rear plane. That figure <u>shows</u> that there is only a very small opening located essentially at the top of that plane that looks like and serves the purpose of being a handle – indeed, Mr. Simpson described it as a

"handle" in his 138 Patent.[25]  It is not a "window," it looks like and is a handle, and perhaps most importantly, it does not have any dimensions or vertical placement that could be remotely described as being similar to the windows located on the side panels (Figure 5), as now suggested by the wording of Simpson Ventures' claimed point of novelty.  It is instead substantially different.



Moreover, regardless of how Simpson Ventures tries to verbally describe this claimed point of novelty now, it is indisputable that the Rear Plane opening for the Mid-West Metal's Bay Isle products does not look *anything like* the opening that exists on the Rear Plane *actually shown* in Figure 3 of the 156 Patent.  (Tab I – Second Smith Affidavit, at ¶ 5 and Exhibit 3 thereto – Smith's November 5, 2007 Report, at page 13).

---

[25] "The back panel preferably defines an aperture for use when assembling and disassembling the enclosures, and for moving the enclosure.  A handle is preferably provided for use when transporting the enclosure once disassembled." (Tab E – The 138 Patent, at Col. 4 ln.7) (emphasis added).



Accordingly, Simpson Ventures' claim that the combination of features described in this point of novelty somehow distinguishes the 156 Patent's design from the prior art is simply false. Moreover, Simpson Venture's verbal description of this claimed Point of Novelty grossly misstates what is actually shown in the 156 Patent's drawings. Further, it is clear that the rear window of the Bay Isle products does not look anything like the rear handle actually shown in the 156 Patent's design. Mid-West Metal thus cannot be held liable for somehow appropriating (if at all) this illegitimately claimed point of novelty in its Bay Isle products.

### e.) "Extent of Wicker"

*"A pet home with a rectangular volume and having a top, sides, a rear, and a front, the top has an outer surface substantially having wicker, the sides each including a window and the non-window portion of each side has an outer surface having wicker, the rear including a window and the non-window portion of the rear has an outer surface substantially having wicker, and the front includes a door and the non-door portion of the front has an outer surface substantially having wicker, wherein the sides and rear mostly have wicker, the majority of the front does not have wicker, and substantially the entire top has wicker."*

56

Here, Simpson Ventures attempts to conglomerate over *16 different elements*[26] into one claimed point of novelty. In addition to the fact that the features described here – both individually and collectively – are already present in the prior art, Simpson Ventures has in fact simply attempted to claim the <u>overall</u> <u>appearance</u> of the 156 Patent's design as a point of novelty. However, the law is clear – this is not a legitimate point of novelty.

First, the following examples of prior art clearly depict the numerous features of the point of novelty that Simpson Ventures has attempted to claim here:

  

  

---

[26] (Anders at p149:10 to p151:19;  p153:12 to p153:18.)



(See also Tab I – <u>Second</u> Smith Affidavit, at ¶ 5 and Exhibit 3 thereto – Smith's <u>November 5,</u>

<u>2007</u> Report, at pages 4 to 7).  There is nothing new, novel, or unique presented through this

claimed point of novelty that would in fact distinguish the 156 Patent's design from the prior art.

As the Federal Circuit reasoned in <u>Lawman Armor</u>:

> "New" designs frequently involve only relatively small changes in the shape, size,
> placement, and color of elements of old designs.  It is those changes in and
> departures from the old designs that constitute the "points of novelty" in the
> patented design.  If the combination of old elements shown in the prior art is itself
> sufficient to constitute a "point of novelty" of a new design, it would be the rare
> design that would not have a point of novelty.  The practical effect of [the patent
> holder's] theory [of combining eight non-novel elements or features into an
> asserted point of novelty] would be virtually to eliminate the significance of the
> "points of novelty" test in determining infringement of design patents, and to
> provide patent protection for designs that in fact involve no significant changes
> from the prior art. . . . [The patent holder's] argument would stand the "points of
> novelty" test on its head, and defeat its purpose.

<u>Id.</u>, 437 F.3d. at 1386. [27]

---

[27] On August 29, 2007, a three-judge panel of the Federal Circuit issued a design patent decision in the <u>Egyptian</u>
<u>Goddess</u> case.  <u>Egyptian Goddess</u>, 498 F.3d 1354 (Fed.Cir. 2007).  With regard to combinations of elements that are
individually already known in the prior art, that panel of the Federal Circuit held as follows:

> The patentee is <u>not</u> free to set forth any combination of elements as the point of novelty, rather, the
> point of novelty must include features of the claimed design that distinguish it from the prior art.
>                                          * * *
> For a combination of individually known design elements to constitute a point of novelty, the
> combination must be a <u>non-trivial advance</u> over the prior art.
>
>                                          * * *
>
> Design patent law has already intertwined the infringement and validity tests.  The infringement
> test at issue in this case is the 'point of novelty' test.  The question is not whether the infringement

The claimed point of novelty here is not legitimate. The law is clear that it is legal error to use the overall design depicted in the patent as the point of novelty. As the Federal Circuit held in <u>Sun Hill</u>, for example, one "cannot evade the point of novelty test by relying on the claimed overall design as the point of novelty." <u>Id.</u>, 48 F.3d at 1197. <u>See also</u>, <u>Litton</u>, 728 F.2d at 1444 ("to consider the overall appearance of a design without regard to prior art would eviscerate the purpose of the `point of novelty' approach, which is to focus on those aspects of a design which render the design different from prior art designs"). Here, it is clear that Simpson Venture's proposed point of novelty is essentially claiming the overall appearance of the design. Specifically, Simpson Ventures and its purported expert Mr. Anders have respectively described that "overall ornamental appearance" as follows:

> 27. <u>Overall Ornamental Appearance</u>. The overall ornamental appearance is of a pet home with a woven texture surface on all five surfaces claimed in the patent. The front face has a rectangular non-woven door portion which is functional and not ornamental. The woven side and top ornamental portions of the front face have less area than the functional area. The sides have a non-woven window open portion that is functional and not ornamental. The area of the ornamental woven area is greater than the area of the functional window. The ornamental design of the rear face of the invention has a window opening that is functional. The area of the ornamental woven area is greater than the area of the functional window. The top face of the design has no functional portions but has an overall woven ornamental textured appearance.

(Tab H – Anders Report [September 29, 2006], at ¶ 27).

> I. <u>Overall Ornamental Silhouette</u>. A pet home having a rectangular volume, wherein the visible surfaces of the pet home substantially have an outer texture with the appearance of

---

and validity analyses are similar or conflated, they already are. The question is: when the patentee claims a combination of old prior art elements as its asserted point of novelty, should the test be one of anticipation [(which is stricter, and requires identical features)] or obviousness? We conclude that non-triviality ought to apply. If the standard is akin to anticipation [(or identical features)], then a combination with even the most trivial difference would meet the standard.

<u>Id.</u>, 498 at 1357-58 n3. As previously reported to this Court, that decision has been vacated while the Federal Circuit reviews several issues presented in the case *en banc*. 256 Fed.App. 357, 2007 WL 4179111 (Fed.Cir. 2007). Oral argument in the <u>Egyptian Goddess</u> case occurred on June 2, 2008. A decision has not yet been announced by the Federal Circuit.

woven wicker or the like.

(Tab G – Simpson Ventures' Second Supplemental Answers to Mid-West Metal's First Set of

Interrogatories [September 26, 2007], at No. 12).  Although the wording and grammatical

structure of Simpson Ventures' proposed point of novelty here differs, it is exactly this same

overall ornamental appearance that Simpson Ventures is attempting (unlawfully) to claim.

Accordingly, as a matter of law, Mid-West Metal cannot be held liable for somehow

misappropriating this point of novelty.  The asserted point of novelty is illegitimate – not only

because every claimed feature is already present in the prior art, both individually and in

combination, but also because Simpson Ventures is unlawfully attempting to claim the overall

appearance of the depicted design as a point of novelty, and thereby evade the very purpose of

the point of novelty analysis.  Again, as the Federal Circuit held in Lawman Armor,

> What [the patent holder's] contention comes down to is that the [] patent contains
> a ninth point of novelty, namely, the combination in a single design of the eight
> non-novel points of novelty it embodies.  This argument is inconsistent with, and
> would seriously undermine, the rationale of the points of novelty test. . . .
> Lawman's argument would stand the points of novelty test on its head, and defeat
> its purpose.

Id., 437 F.3d at 1385-86.

### f.) "Combination of Items 1-5"

> "A pet home with a combination of the features as
> described in Items 1-5 above."

This claimed point of novelty is fatally flawed, as well.  As already demonstrated, each of

the features described in the other claimed points of novelty are all individually and/or

collectively set forth in the prior art. (See also Tab I – Second Smith Affidavit, at ¶ 5 and

Exhibit 3 thereto – Smith's November 5, 2007 Report, at page 17).  They do not distinguish the

156 Patent's design over the prior art, or otherwise make the design unique.  Second, practically

all of the asserted points of novelty are in fact not even present in the accused Bay Isle products. Third, each of the prior points of novelty asserted by Simpson Ventures are not legitimate – not only do the words used by Simpson not match to the design actually shown in the patent's figures, but the descriptions attempt to improperly merge the overall image analysis with the point of novelty analysis. If the 5 asserted points of novelty are flawed, then so too is any combination of those asserted points. Thus, Simpson Ventures' 6th asserted point of novelty fails here as well. Accordingly, as a matter of law, Mid-West Metal cannot be held liable for somehow misappropriating this 6th point of novelty.

### g.) **Conclusion**

It is clear that every single element that Simpson Ventures alleges as being unique over the prior art is in fact not unique – whether viewed as a single element or in combination with the other asserted conglomeration of elements and/or other asserted points of novelty. Moreover, in almost all instances, the point of novelty asserted by Simpson Ventures is not legitimate – either the words do not match to the actual figures shown in the patent, the asserted point is an unlawful combination of old and known elements, the asserted point unlawfully attempts to claim the overall impression of the 156 Patent, or the features are dictated by their function. Finally, in almost all instances, the asserted point of novelty is not, as a matter of undisputable fact, even present in the accused Bay Isle products. See, Goodyear Tire & Rubber Co. v Hercules Tire & Rubber Co., Inc., 162 F.3d 1113, 1121 (Fed.Cir. 1998) (judgment in favor of the defendant for noninfringement of a design patent was appropriate where the defendant had shown that several - but not all - of the asserted points of novelty were not present in the accused products). Accordingly, Mid-West Metal has not misappropriated any of the points of novelty asserted by Simpson Ventures. For all of these reasons, Mid-West Metal is entitled to summary

judgment, and respectfully requests that judgment be entered in its favor and against Simpson
Ventures.

**C.)    The 156 Patent Is Invalid Because the Design is Clearly Obvious.**

Mid-West Metal is entitled to summary judgment for the additional reason that the 156
Patent is invalid as a matter of law because it is clearly obvious in light of the prior art.

### 1.)    The Law Regarding Obviousness.

The law is clear that "design patents are subject to the same conditions on patentability as
utility patents, including the *nonobviousness* requirement of 35 U.S.C. §103." In re: Borden, 90
F.3d 1570, 1574 (Fed.Cir. 1996) (emphasis added); Avia Group Int'l., Inc. v. L.A. Gear Calif.,
Inc., 853 F.2d 1557, 1563 (Fed.Cir. 1988) ("design patents must meet a nonobviousness
requirement identical to that applicable to utility patents"). Specifically, 35 U.S.C. §103
expressly prohibits patent protection where "the differences between the subject matter sought to
be patented and the prior art are such that the subject matter as a whole would have been *obvious*
at the time the invention was made to a person of ordinary skill in the art to which such subject
matter pertains." (Emphasis added).

The obviousness analysis in a design patent case "focuses on the visual impression of the
claimed design as a whole and not on selected individual features." In re: Borden, 90 F.3d at
1574; In re: Nalbandian, 661 F.2d 1214, 1216 (CCPA 1981). The "central inquiry in analyzing
an ornamental design for obviousness is whether the design would have been obvious to a
'designer of ordinary skill who designs articles of the type involved.'" Id. More specifically
stated, then, the inquiry is whether a designer "of ordinary skill would have combined teachings
of the prior art to create the same overall visual appearance as the claimed design." Durling v.
Spectrum Furniture Co., 101 F.3d 100, 103 (Fed.Cir. 1996). As the Federal Circuit has stated –

"[p]ut another way, the question is whether persons of ordinary skill in the art, who had set out to solve the same problem presented by the patent, and who had in their 'workshop' all of the prior art, would reasonably have been expected to use the solution claimed in the patent." Para-Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc., 73 F.3d 1085, 1088 (Fed.Cir. 1995). The obviousness analysis then is not based on what the "ordinary observer" sees or does not see, but rather on the perspectives of a hypothetical ordinary designer who (here) is skilled in the art of designing pet cages – and who is "presumed to know all the pertinent prior art, whether or not the [patent] applicant is actually aware of its existence," and even where that prior art appears in a foreign patent or foreign publication. In re: Carlson, 983 F.2d 1032, 1039 (Fed.Cir. 1992) (affirming the finding of obviousness, and invalidating the patent).

In April of 2007, the United States Supreme Court issued the KSR decision. KSR Int'l Co. v. Teleflex, Inc., 127 S.Ct. 1727 (2007). The Court reiterated the factors for evaluating whether a patent is invalid because the claimed invention's combination of features disclosed in the prior art would be obvious to one who is skilled in the art. Quoting Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17-18 (1966), the Court reiterated that a court considers the scope and content of the prior art, the differences between the prior art and the patent claims, and the level of ordinary skill in the pertinent art to objectively evaluate an obviousness challenge to a patent's validity. In addition, objective evidence of secondary factors of nonobviousness, such as commercial success and long felt need, may be considered by the court. KSR, 127 S.Ct. at 1734.

Specifically at issue in the KSR case was whether the obviousness analysis requires a court to rigidly apply the "TSM Test" adopted by the Federal Circuit (also known as the "Teaching, Suggestion, or Motivation test"). That doctrine established that "a patent claim is

only proved obvious if some motivation or suggestion to combine the prior art teachings can be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art." The Court held that a rigid application of that test is <u>not</u> required or appropriate – "[t]hroughout this Court's engagement with the question of obviousness, our cases have set forth an <u>expansive</u> and <u>flexible</u> approach inconsistent with the way the [Federal Circuit] applies its TSM test here." <u>KSR</u> S.Ct. at 1739 (emphasis added).

> Helpful insights [in identifying a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does], however, need not become rigid and mandatory formulas; and when it is so applied, the TSM Test is incompatible with our precedents. The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents. The diversity of inventive pursuits and or modern technology counsels against limiting the analysis in this way.

<u>Id</u>., at 1741. The Court thus emphasized that "[r]igid preventive rules that deny factfinders recourse to <u>common sense</u>, however, are neither necessary under our case law nor consistent with it." <u>KSR</u>, S.Ct. at 1742-43 (emphasis added). The Court thus reversed the Federal Circuit, and affirmed the District Court's summary judgment invalidating the patent for obviousness as a matter of law.

In its holding, the <u>KSR</u> Court stated the following important principles applicable to any obviousness analysis – each of which are worthy of direct quotation and consideration here:

- "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." (<u>Id</u>. at 1739).

- "When a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such arrangement, the combination is obvious." (<u>Id</u>. at 1740).

- "When a work is available in one field of endeavor, design incentives and other market incentives can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, Section

103 likely bars its patentability." (Id. at 1740).

- "For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill. . . . [A] court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions." (Id. at 1740) (emphasis added).

Moreover, the KSR Court made it clear that common sense, logic, and creativity are traits

that a person of ordinary skill in the art already possesses – regardless of whether changes to

and/or combinations of existing designs expressly teach, suggest, or provide motivation for such.

- "As our precedents make clear, however, the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." (Id. at 1741).

- "In many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature, will drive design trends." (Id. at 1741).

- "In determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim [in the patent.] . . . One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims." (Id. at 1741-1742).

- "The question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art. Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." (Id. at 1742).

- "Common sense teaches, however, that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." (Id. at 1742).

- "A person of ordinary skill is also a person of ordinary creativity, not an automaton." (Id. at 1742).

- "When there is a design need or market pressure to solve a problem and there are a

> finite number of identified, predictable solutions, a person of ordinary skill has
> good reason to pursue the known options within his or her technical grasp. If this
> leads to the anticipated success, it is likely the product not of innovation but of
> ordinary skill and common sense. In that instance the fact that a combination was
> obvious to try might show that it was obvious under Section 103." (Id. at 1742)
> (emphasis added).

Thus, "the results of ordinary innovation are not the subject of exclusive rights under the

patent laws. Were it otherwise patents might stifle, rather than promote, the progress of useful

arts." KSR, at 1746. Indeed, these very same principles were applied long ago by the Supreme

Court in evaluating one aspect claimed in a design patent case, in Smith v. Whitman Saddle, 13

S.Ct. 768 (1893) ("Nothing more was done in this instance (except as hereafter noted) than to put

the two halves of these saddles together in the exercise of the ordinary skill of workmen of the

trade, and in the way and manner ordinarily done. The presence or absence of [the feature] was

not material, and we do not think the addition of a known [feature] to a known saddle, in view of

the fact such use of [the feature] was common, in itself involved genius or invention, or produced

a patentable design.").

Finally, whether a patent is invalidated for obviousness "is a legal determination" made

by the Court based on the underlying facts, upon a showing of clear and convincing evidence.

Graham, 86 S.Ct. at 685; Petersen Mfg. Co., Inc. v. Central Purchasing, Inc., (Fed.Cir. 1984) (in

affirming the entry of summary judgment on the obviousness of a design patent, the court

confirmed that the "obviousness of a design is an issue of law" and that expert witness evidence

is not needed, disregarding the patent holder's conclusory expert affidavits asserting non-

obviousness). And, while a patent is entitled to a legal presumption that it is valid upon issuance

by the US PTO (per 35 U.S.C. §282), the KSR Court expressly noted that that presumption is

"much diminished" where the US PTO has not viewed the prior art references that are the basis

for the obviousness attack on the patent's validity – that there is little reason for the court to defer

to the US PTO's presumed expertise in such instances.

**2.)   The 156 Patent's design is clearly obvious and the 156 Patent is thus invalid.**

Here, Simpson Ventures contends that the overall visual appearance of the 156 Patent's design is simply that it presents a wicker covered kennel, having windows and a door. (Simpson/Day 1 at p139:6 to p140:20; p154:20 to p154:23). Indeed, in Mr. Simpson's view, what made the 156 Patent's design unique in September of 2001 (when he claims to have first had the idea) was a "rectangular pet crate with wicker woven over it, with wire door and wire windows." (Simpson/Day 2 at p98:8 to p99:6). Again, Simpson Ventures' expert, Mr. Anders, proposes a substantially similar description of the overall visual appearance:

> Overall Ornamental Appearance. The overall ornamental appearance is of a pet home with a woven texture surface on all five surfaces claimed in the patent. The front face has a rectangular non-woven door portion which is functional and not ornamental. The woven side and top ornamental portions of the front face have less area than the functional area. The sides have a non-woven window open portion that is functional and not ornamental. The area of the ornamental woven area is greater than the area of the functional window. The ornamental design of the rear face of the invention has a window opening that is functional. The area of the ornamental woven area is greater than the area of the functional window. The top face of the design has no functional portions but has an overall woven ornamental textured appearance.

(Tab H – Anders Report [September 29, 2006], at ¶ 27).

The question presented, then, is whether this overall visual impression would have been obvious in September of 2001 to a designer of ordinary skill in the field of pet cage design. As an initial matter, the parties are in essential agreement that the "person of ordinary skill" in whose eyes the obviousness of a combination must be evaluated includes a designer who has a "degree in industrial design and a minimum of 3 years professional experience designing consumer products with a basic understanding of the ergonomic aspects of pet home design." (Tab H – Anders Report [September 29, 2006], at ¶ 24); (Tab I – Second Smith Affidavit , at ¶ 5 and Exhibit 2 thereto – Smith's August 17, 2007 Report, at p. 7). An important characteristic of

such Industrial Designers is that "they are <u>trained</u> to look across a wide variety of product fields, materials, methods and processes, both contemporary and historical, and find how things from one field might be adapted and applied to another." (Tab I – <u>Second</u> Smith Affidavit, at ¶ 4). As one authority describes it, they are "really like black birds that see something shiny in one back yard and something shiny in another back yard, and [they] pick them up and see how they might go together." (<u>Id.</u>) Indeed, as Simpson Ventures' own expert puts it – "[i]ndustrial design is, I've always thought of it as having one step in engineering and production, and one step in art," and further, "in design, there's no such thing as <u>plain</u> common sense." (Anders at p16:8 to p16:18; p229:17 to p229:24) (emphasis added). <u>See also</u> <u>In re: Nalbandian</u>, 661 F.2d at 1216 (the "ordinary designer means one who brings certain background and training to the problems of developing designs in a particular field."). Industrial Designers thus, by definition and training, possess a higher level of creativity than the average type of product designer (who, as the Court acknowledged in <u>KSR</u> is deemed to already possess a normal level of creativity, common sense, innovation, and logic), and are trained to search for and consider a wide variety of fields of development that might otherwise seem to be unrelated in designing the look for a product. Not only are Industrial Designer's <u>not</u> "automaton's," they are the polar opposite of such and are trained to be creative artists who, "like black birds," borrow attractive concepts from a wide variety of fields.

As discussed earlier, the scope and content of the prior art clearly demonstrates numerous examples of rectangular animal cages made out of wicker with barred doors and/or barred windows – thus presenting basically the same visual impression as that described by Simpson Ventures and Mr. Anders of a rectangular wicker covered animal cage with windows and a door. These references include the following:

68



(Tab I – Second Smith Affidavit, at ¶ 5 and Exhibit 4 thereto – Smith's April 22, 2008 Report, at page 3). See In re: Borden, 90 F.3d at 1574 ("In order for a design to be unpatentable because of obviousness, there must first be a basic design reference in the prior art, a 'something in existence, the design characteristics of which are basically the same as the claimed design.'") None of these prior art references were viewed by the US PTO before issuing the 156 Patent.

Moreover, to the extent any of these prior art references do not possess *all* of the features that Simpson Ventures *says* contribute to the overall visual impression and/or that are *actually shown* in the 156 Patent's figures, such individual features are clearly present in other prior art references. Examples of important prior art references that include such features (as explained in more detail under the Points of Novelty analysis, earlier) are as follows – only three of which were ever viewed by the US PTO before it issued the 156 Patent (as indicated by an **):



Fig. 1

**

FIG. 7



FIG. I

FIG. 2



While these prior art references may not individually include in one place all of the features

claimed by the 156 Patent, "[c]ommon sense teaches, however, that familiar items may have

obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be

able to fit the teachings of multiple patents together like pieces of a puzzle."[28]  KSR at page

1742; Whitman Saddle, at 770-71 (1893) ("we do not think the addition of a known [feature] to a

known saddle, in view of the fact such use of [the feature] was common, in itself involved genius

or invention, or produced a patentable design."); Thomas America Corp. v. Fitzgerald, 869

F.Supp. 221, 225 (S.D.N.Y. 1994) ("Even the claim that [the inventor] has combined design

elements that were not all previously seen together would be of no avail because any such

'combination of old elements must represent an exercise of inventive skill and creative talent

---

[28] In light of the Supreme Court's holdings in KSR on this point, prior Federal Circuit case law that suggests that a "primary reference" with "design characteristics . . . basically the same as the claimed design" must be found and identified first is no longer valid law.  The stated rationale behind that doctrine is that "a finding of obviousness cannot be based on selecting features from the prior art and assembling them to form an article similar in appearance to the claimed design."  In re: Borden, 90 F.3d at 1574.  This is clearly and irreconcilably at odds with the KSR Court's reasoning that "[c]ommon sense teaches, however, that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle."  However, because there are several clear "primary references" presented by the prior art in this case, this tension in the law may not need to be resolved by this Court at this time.  However, to the extent Simpson Ventures argues (erroneously) that there are no "primary references" in the prior art, this Court should note that the mandate of that legal doctrine is no longer viable in light of the KSR Court's "expansive and flexible approach" to the obviousness analysis, and express rejection of "rigid and mandatory rules" that confine the analysis to a "formalistic conception of [] words" and that "deny factfinders recourse to common sense."

beyond that of the ordinary designer chargeable with knowledge of the prior art.'")

After thoroughly analyzing this substantially same set of prior art references[29] and the

guiding legal principles declared by the Supreme Court in KSR, Bret Smith - a professor of

Industrial Design at Auburn University for over 20 years – concluded that "it would be obvious

to a designer with ordinary skill in the art who had full knowledge of the prior art to combine

wicker or rattan weave patterns to all surfaces of a rectangular cage structure for the purposes of

providing the aesthetically pleasing pet containment structure and design that is the subject of the

156 Patent." (Tab I – Second Smith Affidavit at ¶ 5 and Exhibits 2 and 4 thereto – Smith's

August 17, 2007 Report, at pages 16-17, and Smith's April 22, 2008 Report, at page 3).[30]

Indeed, the US PTO reached essentially the same conclusion, even before the KSR

decision – albeit after the 156 Patent had already issued.  Specifically, in his subsequent

prosecution of the 138 Patent (a utility patent), Mr. Simpson attempted to *independently* claim

patent protection for the features of a flexible non-porous material woven onto the frame of a pet

enclosure and having the appearance of natural rattan or wicker.   The US PTO examiner there

repeatedly rejected that claim.  For example, the US PTO determined the following:

> Claims 1 and 2 are rejected under 35 U.S.C. 102(b) as being anticipated by [the]
> Liu [Patent]. . . . Liu discloses a device (Figure 1) capable of being a pet enclosure
> comprising a frame formed of a substantially rigid, non-porous material and a
> flexible, non-porous material woven onto the frame (Figure 1); and wherein the
> frame comprises a plurality of generally flat rectangular panels (Figure 1).
>
> Claims 9 and 13 are rejected under 35 U.S.C. 103(a) as being unpatentable over
> Liu. . . . Liu discloses all the claimed features as discussed in the rejection above

---

[29] Professor Smith did not expressly reference the Ho Patent (wicker clothes hamper) or the Mid-West Metal bare-wire pet crate.

[30] Like an ostrich putting its head in the sand, Simpson Ventures' expert Robert Anders never disclosed any obviousness opinion or analysis of the prior art other than stating a very conclusory opinion expressly based on looking solely at the limited nine prior art references considered by the US PTO.  (Anders at p160:8 to p161:8).  Even then, he never considered the KSR decision or disclosed any analysis based on such – he instead simply left his September 2006 (conclusory) opinion of nonobviousness as is, despite the U.S. Supreme Court's watershed decision on obviousness just a few months later in April of 2007.  (Anders at p175:24 to p178:15).

except for a plastic having the appearance of natural rattan or wicker. However, the use of plastics to simulate natural rattan in order to provide durability has been notoriously well known in the art. Therefore, it <u>would have been obvious</u> to one of ordinary skill in the art to have utilized a simulated plastic in Liu for the well known benefits.

Therefore, it <u>would have been obvious</u> to one of ordinary skill in the art at the time the invention was made to have modified the device of Liu to include an assembly of the enclosure into an assembled configuration without separation of the panels from one another as taught by [the] Kolozsvari [Patent] in order to provide ease and a less time consuming process of assembly.

Regarding Claim 8, Liu discloses all the claimed features as discussed above except for the substantially rigid, non-porous material of the frame being formed of metal wire. However, Kolozsvari teaches the forming of a frame structure of metal wire to be well known. Therefore, <u>it would have been obvious</u> to one of ordinary skill in the art at the time the invention was made to have modified the Liu device by forming the frame elements of a metal wire as taught by Kolozsvari in order to provide an inexpensive easy to produce structure.

(Tab E – The 138 Patent Prosecution History, February 25, 2004 US PTO Office Action, at

pages 3, 5, and 7) (emphasis added). The US PTO never withdrew these objections, and later

found additional invalidating references – ultimately citing to numerous examples where various

metal-framed structures have had wicker appearing non-porous material woven over, them and

that had been/could be obviously modified to create a pet enclosure with a hinged door (see

below).



| Liu Patent | Mo Patent | Weng Patent |



Ho Patent

Kolozsvari Patent                                    FIG. 7

Again, *none* of these prior art references were ever viewed by the US PTO during the

prosecution of the 156 Patent.  Clearly, had the US PTO viewed these references in the 156

Patent prosecution proceeding, it would have concluded that the 156 Patent's design was obvious

– as the examiner so concluded in the 138 Patent prosecution (even *before* <u>KSR</u>).

      Finally, to the extent <u>KSR</u> instructs that an expressed "teaching, suggestion, or

motivation" to combine these various references is still helpful to the obviousness analysis, such

expressions in the prior art references are plentiful here.  First, in Mr. Simpson's own words, the

problem presented was "commonsensical" – bare wire pet cages do not look very good and are

not aesthetically pleasing for use in the home.  Companies in the pet products industry clearly

knew this problem long before September of 2001, and had undertaken to solve it in a multitude

of ways – not only through the age-old wicker covered cages previously set forth in this brief,

but also through more modern expressions such as the Doggy's Dream House, pet "crate

covers," and the "Looney Tunes" products (see Section II(D)(2) of this brief).  Indeed, the Mid-

West Metal New Products Development team had discussed the very same concept back in the

mid-1990s – and it simply "popped into [Mr. Simpson's] head" and "out of the blue" with no

effort at all on his part, and even though he was not working on any project to create or invent

such a device or design.  Further, numerous prior patent disclosures expressly speak to the use of

wicker or plastic wicker-like strands to make structures like trunks, crates, baskets, outdoor

furniture and other similar structures more aesthetically pleasing and yet capable of resisting the

problems of moisture such as weakening, rot, and smell.  (See e.g., the Schantz Patent, the

Milbourne Patent, and the Ho Patent).  Accordingly, the "teaching, suggestion, and/or

motivation" to combine the various features set forth in the prior art references identified by

Mid-West Metal herein were clearly and expressly present in the prior art, as was the problem of

coming up with a pet cage that was aesthetically pleasing.

    In conclusion, the design that is the subject of the 156 Patent is clearly obvious.

Common sense, logic, and ordinary creativity would make that design obvious certainly to a

designer of ordinary skill undertaking the endeavor to design an aesthetically pleasing pet cage,

and certainly to an Industrial Designer who by their very training considers, looks to, and draws

upon features derived from a very wide variety of fields of products, designs, and materials to

create aesthetically pleasing products in an artistic way.  Indeed, the 156 Patent's design would

have been obvious to anyone – even a lay person who happened to be viewing a wicker covered

porch swing while relaxing at home one evening.[31]

**D.)**    **The 156 Patent Is Invalid Because Mr. Simpson Did Not Invent the Depicted Design.**

    Mid-West Metal is entitled to summary judgment for the additional reason that Mr.

Simpson did not invent the design claimed in the 156 Patent, and the patent is thus invalid

pursuant to 35 U.S.C. §102(f) ("A person shall be entitled to a patent unless . . . he did not

himself invent the subject matter sought to be patented.").

---

[31] See Monaplastics, Inc. v. Caldor, Inc., 378 F.2d 20, 21 (2nd Cir. 1967) (summary judgment of obviousness was appropriate and the claimed invention would have been obvious not only to persons having ordinary skill in the field, but also to ordinary layman of modest intelligence).

### 1.) <u>The Law Regarding Inventorship.</u>

Section 102(f) "mandates that a patent accurately list the correct inventors of a claimed invention. . . . Accordingly, if nonjoinder of an actual inventor is proved by clear and convincing evidence, . . . a patent is rendered invalid." <u>Pannu v. Iolab Corp.</u>, 155 F.3d 1344, 1349 (Fed.Cir. 1998). "We apply the same standard of inventorship to design patents that we require for utility patents." <u>Hoop v. Hoop</u>, 279 F.3d 1004, 1007 (Fed.Cir. 2002) (emphasis added) ; <u>Line Tamer, Inc. v. Terrell and Associates, Inc.</u>, 2005 WL 1072709 (M.D.Ala. 2005) (granting summary judgment to defendants because co-inventorship was established as a matter of law).

"An inventorship analysis, like an infringement or invalidity analysis, begins as a first step with a construction of each asserted claim to determine the subject matter encompassed thereby. The second step is then to compare the alleged contributions of each asserted co-inventor with the subject matter of the properly construed claim to then determine whether the correct inventors were named." <u>Trovan, Ltd. v. Sokymat SA, Irori</u>, 299 F.3d 1292, 1302 (Fed.Cir. 2002); <u>Ely Lilly and Co. v. Aradigm Corp.</u>, 375 F.3d 1352, 1360 (Fed.Cir. 2004). "A determination of inventorship, as a general matter, is a question of law." <u>Sunbeam Products, Inc. v. Wing Shing Products (BV) Ltd.</u>, 311 B.R. 378, 389 (S.D.N.Y. 2004) <i>aff'd</i> 153 Fed.Appx. 703 (Fed.Cir. 2005). "Whether the improved design, as a whole, is substantially similar to the original, as a whole, is a question of fact." <u>Id</u>.

"Conception is 'the touchstone of inventorship' and each joint inventor must generally contribute to the conception of the invention. . . . 'Conception' is the 'formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.' . . . 'An idea is sufficiently `definite and permanent` when `only ordinary skill would be necessary to reduce the invention to practice, without extensive

77

research or experimentation.'" Board of Educ. Ex rel. Bd. Of Trustees of Florida State Univ. v. American Bioscience, Inc., 333 F.3d 1330, 1337-38 (Fed.Cir. 2003) (citations omitted).

It is well known that one does not qualify as a joint inventor by merely assisting the actual inventor. American Bioscience, 333 F.3d at 1338; Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1460 ("One who simply provides the inventor with well-known principles or explains the state of the art without ever having 'a firm and definite' idea of the claimed combination as a whole does not qualify as a joint inventor.") That assistance, though, must occur "*after* conception of the claimed invention." Hoop, 279 F.3d at 1004 (emphasis added).

Finally, a patent holder *may* attempt to obtain relief from a determination of invalidity for nonjoinder of a co-inventor, pursuant to 35 U.S.C. §256. Specifically, if and when the Court determines that the patent does not correctly name the inventor, then the Court must give the patent holder the *opportunity* to correct inventorship pursuant to 35 U.S.C. §256.[32] However, the Federal Circuit has made it clear – "a patent with improper inventorship does not avoid invalidation simply because it *might* be corrected under section 256. Rather, the patentee must claim entitlement to relief under the statute and the court must give the patentee an opportunity to correct the inventorship. . . . On the other hand, if the patentee does not claim relief under the statute and a party asserting invalidity proves incorrect inventorship, the court should hold the patent invalid for failure to comply with section 102(f)." Pannu v. Iolab Corp., 155 F.3d 1344, 1350-51 (Fed.Cir. 1998) (emphasis in original).

### 2.) **Mr. Simpson's Development Activity.**

After the idea to make a dog kennel out of resin wicker had popped into Mr. Simpson's

---

[32] "Nonjoinder may be corrected 'on notice and hearing of all parties concerned' and upon a showing that the error occurred without any deceptive intent on the part of the unnamed inventor." Pannu v. Iolab Corp., 155 F.3d 1344, 1350 (Fed.Cir. 1998) (emphasis in original).

head in September 2001, he prepared a set of drawings of a crate structure and its overall

dimensions. He showed these structural drawings to some colleagues at work, who then made

arrangements to have the structural drawings delivered to some unknown person or company in

China to create a prototype of the product. (Simpson/Day 1 at p39:16 to p41:21; p42:11 to

p42:20; p43:2 to p43:19; p46:3 to p46:23; p47:9 to p48:4; p49:11 to p49:22; p51:9 to p51:12;

p93:2 to p93:16; p104:8 to p105:3); (Simpson/Day 2 at p50:21 to p51:8). Mr. Simpson testified

that it was only weeks from the time this idea first came to him out of the blue and the time he

received the first prototype – that "by the end of September [2001] or early October [2001] [he]

ha[d] the prototype of [the product]." (Simpson/Day 1 at p50:2 to p51:8; p104:8 to p104:21). A

picture of that first prototype created by the Chinese fabricator is as follows:



(Simpson/Day 2 at p47:21 to p48:5, and Deposition Exhibit 195). Mr. Simpson did not keep the

first prototype, and does not know what happened to it. (Simpson/Day 1 at p108:10 to p108:17).

Mr. Simpson has admitted that he never prepared _any_ drawings that graphically showed

any wicker or wicker weave patterns as such would appear on the crate's structure.

Q:    Did any of those drawings depict the visual appearance or ornamental
      features of your wicker kennel?
A:    Could you be more specific?
Q:    Well, did they show the wicker as it was applied or woven onto your
      kennel?
A:    No.

(Simpson/Day 1 at p40:12 to p41:18; p43:2 to p43:19; p47:9 to p49:9; p122:8 to p124:11).

Instead, he prepared only the structural drawings. He then simply provided verbal instructions to

the unknown Chinese fabricator to make the wicker look similar to "outdoor furniture," and

otherwise indicated where to put or not put the wicker – he says he "may" have used lines to

point to such areas, like over the front door.[33]

| | |
|---|---|
| A: | If your question is, did I ever try to replicate what this looks like via pen and ink drawing – is that your question? |
| Q: | My question is pretty plain. Did you ever personally draw any wicker or weave patterns as they would appear on your pet crate? |
| A: | Then I think the answer is, no, I didn't prepare any drawings of the wicker or weave patterns. I only indicated the location that that wicker or rattan should be located. |

* * *

| | |
|---|---|
| Q: | And was that the first time that you had seen a metal wire pet crate with wicker woven on it – when you first saw that first prototype? |
| A: | Yes. |
| Q: | Describe for me what you recall seeing at that time. |
| A: | I recall seeing a sample or prototype of a wicker covered kennel that was built to my drawings, my original drawings. |
| Q: | And by built to your original drawings you're talking about the structural drawings much like the predecessor to Exhibit Number 95? |
| A: | Structural drawings and the location of the wicker. |
| Q: | Which you used words to describe where you wanted the wicker to go? |
| A: | Words and/or I may have used lines – I don't know – defining the area, not lines defining each individual strand or rattan or wicker. |
| Q: | Well, you may have . . . tell me specifically what you recall drawing in terms of the – how the wicker was supposed to look on your crate. If you have…such a recollection. |
| A: | I don't have a specific recollection as to how I defined that feature. |

(Simpson/Day 1 at p98:23 to p99:7; p103:4 to p104:7).

Mr. Simpson says he did not keep his first set of drawings (or a copy), and does not know

what happened to them. (Simpson/Day 1 at p46:21 to p47:5). However, Deposition Exhibit 95

presents a set of drawings that he prepared shortly thereafter (in early 2002) for a subsequent

---

[33] For example, he did not want wicker woven onto the front door so that "the dog has visibility. And the consumer has visibility in to see the dog." (Simpson/Day 2 at p29:18 to p29:24).

80

prototype of the cage. (Simpson/Day 1 at p94:17 to p96:12; Deposition Exhibit 95). This

second set is like the first set in what it shows or does not show:



     Mr. Simpson did not specify or otherwise show anything else to the unknown Chinese

fabricator about the weave or weave patterns that he wanted to be used for his product – he

simply left it to the fabricator to decide what outdoor wicker furniture might look like.

(Simpson/Day 1 at p121:21 to p124:11).[34] Mr. Simpson further admits that he did not send to

---

[34]   Q: So was it then left up to the factory to decide whether to do a loose weave or a tight weave or a

the unknown Chinese fabricator any photographs, clips from magazines, or books that had

anything to do with the application of wicker to a metal crate – and does not know whether his

colleague from GDA ever did, either.  (Simpson/Day 1 at p51:13 to p51:22).[35]  The only other

design principles he says he tried to follow in developing the claimed design was that he "wanted

it to look as good as it could" and that he wanted the crate to be "sized such that they were

similar to existing containment devices by size."  (Simpson/Day 1 at p154:20 to p155:9).

Mr. Simpson subsequently sent photographs of the finalized prototype[36] made by the

unknown Chinese fabricator to Mr. Thomas Dean on or about February 26, 2002.  (Simpson/Day

1 at p169:17 to p170:7; Deposition Exhibit 112; Deposition Exhibit 113).  Mr. Dean – not Mr.

Simpson - is the professional artist who then created the drawings ultimately included in Mr.

Simpson's patent application for the 156 Patent.  (Simpson/Day 1 at p170:16 to p170:22;

Deposition Exhibit 114).  And Mr. Dean, in turn, based those drawings on photographs of a pet

cage whose surface design was created by an unknown person in China, not Mr. Simpson.

### 3.) The 156 Patent is Invalid Because the True Inventor Is Not Named.

Mr. Simpson came up with an idea – to use plastic wicker on a pet cage to make an

aesthetically pleasing pet cage.  While this idea may have come to Mr. Simpson out of the blue,

as already explained, the idea and the design were in fact obvious to anyone familiar with the

---

diamond pattern or a square pattern or a plain pattern, or what?

A:  Well, I don't believe I ever told – I don't believe I ever indicated in my initial drawing set that a diamond
pattern or a square pattern or any other weave – alternate weave pattern should be included.  I would have
told them to weave it like all weather wicker outdoor furniture, similar to what's in Exhibit 93 [, a
photograph of his outdoor porch swing].  I don't – [sic].

(Id. at p122:20 to p123:6).

[35] Moreover, he never personally attempted to weave wicker onto a metal crate, and had no interest in learning such.
(Simpson/Day 1 at p160:18 to p161:8).

[36] Mr. Simpson modified the mechanical design of the cage after the first prototype – it no longer folded in a z-form
along a middle-line of the side panels, but instead folded up along a lower-line located near the bottom of the side
panels.  (Simpson/Day 1 at p94:20 to p96:9).

field of prior art. Oblivious to such, Mr. Simpson set out to develop his idea, and he prepared a set of drawings for the wire <u>structure</u> of the cage – primarily relating to the way it would collapse for purposes of efficient storage and shipment, which in turn dictated the overall rectangular shape of the structure.



When it came to the surface wicker design, though, Mr. Simpson had practically no input on the design features – other than the obvious directions to not put wicker over the door, the windows, or the rear handle. He did not know how to weave wicker, and has never made an effort to learn about the different weave techniques. Other than perhaps telling the unknown Chinese fabricator to make the wicker "like outdoor furniture," that was the end of his input on the point. He then left it to the fabricator to decide what type or style of wicker strand to use, the size of the wicker strand, and perhaps most importantly, the style of weave and/or weave patterns to use or to not use. The resulting end product was thus substantially different and improved over the basic wire structure drawings that Mr. Simpson had provided.

This is a significant point. There were a wide variety of options available to the Chinese weaver. As Professor Bret Smith explains,

> There is no such thing as a 'standard' weave when it comes to wicker or rattan. . . . [T]he choice of weave is an artistic one. It is a choice that involves a series of decisions including the width of the material, the pattern and technique of the weave, edge treatment, and the use of color.

These decisions all have a significant impact on the visual character of the finished piece.

(Tab J – <u>Third</u> Smith Affidavit at ¶12 and Exhibits 23 and 24 thereto); (Tab I – <u>Second</u> Smith

Affidavit at ¶5 and Exhibit 2 thereto – Smith's <u>August 17, 2007</u> Report, at pages 4, and 8-13).

This point is driven home by a simple comparison of the different looks created by basket

weaving students, using the same weaving kit, and using the same basic form or structure:



And, as noted in the Schwartz Patent, it was well known even in 1998 that

> [n]umerous styles of weave are used in the manufacture of wicker furniture. <u>The
> various styles of weave result in a different look, feel, strength and weight of the</u>

> finished product. In a simple weave pattern, the warp yarns are spaced apart and arranged parallel to each other. The weft yarns are woven over and under alternating warp yarns. Adjacent weft yarns pass on opposite sides of a given warp yarn. Variations of this pattern, such as passing the weft yarn over two adjacent warp yarns, are known in the art.

(Tab J – Third Smith Affidavit at ¶3 and Exhibit 10 thereto – the Schwartz Patent, at Col.1 ln.47) (emphasis added). Indeed, the Schwartz Patent itself discloses at least 6 different designs for the plastic strand alone, with each design intended to result in a different wicker look and feel for the end product.

As Judge Lourie explained in her dissent in Hoop, "[d]esign patents do not claim concepts. They claim specific designs set forth in their claims, which invariably refer to the appearance of what is illustrated in the patent's drawings." Hoop, 279 F.3d at 1010 (emphasis added) (unlike here, the patent holder in Hoop had at least created several drawings graphically showing the visual features of the design, which were then subsequently modified by a graphic artist before being finalized for the patent application). Accordingly, while Mr. Simpson may have had the initial idea (which itself was not novel), and created the underlying wire structure, he did not in fact invent the surface design for the animal cage that is the subject of the 156 Patent. The fabricator in China did. See 35 U.S.C. §116 (inventors may be joint inventors "even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent."); Pannu, 155 F.3d at 1351 ("All that is required of a joint inventor is that he or she (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or

85

the current state of the art.").

Further, as Mr. Simpson has admitted, he does not know who the Chinese fabricator was – neither the company nor the person. He thus <u>cannot</u> correct this fatal omission in the 156 Patent, even if the Court were to give him the opportunity now to try (and even if Mr. Simpson could make a showing that he had no deceptive intent when he failed to include that person as an inventor in the patent application).

The facts that compel the conclusion that Mr. Simpson did not invent the design shown in the 156 Patent are undisputed. Accordingly, even if the design that the Chinese fabricator came up with is not obvious under 35 U.S.C. §203 (which it is), 35 U.S.C. §102(f) nonetheless mandates that the 156 Patent be declared invalid for failing to identify the correct inventor. Further, 35 U.S.C. §256 affords Mr. Simpson no relief here – he cannot correct the omission. Mid-West Metal thus respectfully requests that summary judgment be entered in its favor and against Simpson Ventures for this reason, as well.

## IV.)    <u>CONCLUSION</u>

For all of the reasons set forth herein, Mid-West Metal respectfully submits that it is entitled to summary judgment in its favor, and against Simpson Ventures, as a matter of law.

Respectfully submitted,

<u>s/ *James M. Hinshaw*</u>
James M. Hinshaw-pro hac vice
     Indiana Attorney No. 16744-49
Neal Bowling- pro hac vice,
     Indiana Attorney No. 19278-41
BINGHAM MCHALE, LLP
2700 Market Tower
10 W. Market Street
Indianapolis, Indiana 46204-4900
Telephone: (317) 635-8900
Email: JHinshaw@binghammchale.com
     NBowling@binghammchale.com

86

Brett A. Ross
CARR ALLISON
100 Vestavia Parkway
Birmingham, Alabama 35216
Telephone: (205) 949-2938
Email: bross@carrallison.com

Counsel for the Defendants

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following on this the 29th day of July, 2008:

Robert T. Meadows, III
Capell & Howard, P.C.
3120 Frederick Road
P. O. Drawer 2268
Opelika, Alabama 36803

Arthur A. Gardner
Joseph Staley
Gardner, Groff, Santos & Greenwald, P.C.
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339

s/ *James M. Hinshaw*

1316839

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
<u>EASTERN DIVISION</u>**

| | | |
|---|---|---|
| SIMPSON VENTURES, INC., | ) | |
| | ) | |
| Plaintiff/Counterdefendant, | ) | |
| | ) | Case No. 3:06-cv-901-WKW-VPM |
| v. | ) | |
| | ) | |
| MID-WEST METAL PRODUCTS | ) | |
| COMPANY, INC. | ) | |
| | ) | |
| Defendant/Counterclaimant. | ) | |

**<u>ORDER GRANTING MID-WEST METAL'S MOTION TO CORRECT</u>**

Defendant Mid-West Metal Products Company, Inc. ("Mid-West Metal"), having filed its Motion to Correct Brief in Support of Combined Motions for Claim Construction and Summary Judgment ("Motion to Correct"), and the Court being duly advised in the premises and having considered said Motion, now finds this Motion meritorious and hereby orders said Motion GRANTED.

IT IS, THEREFORE, ORDERED that Mid-West Metal Products Company, Inc., by counsel, be allowed to substitute the Corrected Brief, which was attached to its Motion to Correct (filed July 31, 2008), for the original Brief in Support of Combined Motions for Claim Construction and Summary Judgment (filed with the Court on July 29, 2008).

Dated: _____

_____
JUDGE, United States District Court
For the Middle District of Indiana
Eastern Division

Distribution to:

James M. Hinshaw - pro hac vice
Neal Bowling - pro hac vice,
BINGHAM MCHALE, LLP
JHinshaw@binghammchale.com
NBowling@binghammchale.com

Brett A. Ross
CARR ALLISON
bross@carrallison.com

Robert T. Meadows, III
CAPELL & HOWARD, P.C.
rtm@chlaw.com

Arthur A. Gardner
Joseph Staley
GARDNER, GROFF, SANTOS & GREENWALD, P.C.
agardner@gardnergroff.com
jstaley@gardnergroff.com

1318513