# EXHIBIT A

# Design Analysis
## of
# United States Design Patent Number US D483,156 S

Expert Report of Professor Bret H. Smith, IDSA
AUGUST 17, 2007

# Report

In the United States District Court
For the Middle District of Alabama
Eastern Division

| | |
|---|---|
| Simpson Ventures, Inc., *Plaintiff,* V. Mid-West Metal Products Company, Inc., *Defendant* | Civil Action File No. 406-cv-901-WKW-VPM |

## Expert Report of Professor Bret H. Smith, IDSA

### Introduction

My Name is Bret H. Smith. I am a full professor in the industrial design department at Auburn University where I have taught industrial design for over twenty-one years.

I have been retained in the above referenced lawsuit as an industrial design expert witness. I am being compensated for my work here at a rate of $180 an hour. I have no financial interest in the outcome of this case.

### Background and experience

I graduated Summa Cum Laude from Purdue University with B.S. degree in Industrial Technology. I have an M.A. in English, and an M. A. in Industrial Design, both from Purdue University (the Masters Degree is the terminal degree in industrial design).

As an industrial designer, I have worked on brand identity, commercial food equipment, medical equipment, consumer products, computer applications research, the habitation module of the international space station, hand tools, instrumentation, software interface design, and human factors. I have supervised industry projects for NASA, Martin Marietta Denver Aerospace, 3-M Company, IBM, Mead Imaging, Broan-Nutone and others. In addition to this, I have directed over $300,000 in research projects while at Auburn University.

I have served on the executive board and the board of directors of our professional society, the Industrial Designers Society of America (IDSA), and served as

the Southern District Vice President of IDSA. I have also served as a referee for *Innovation,* the only refereed journal of industrial design in the United States. I have lectured internationally on industrial design, human factors, and human behavior.

I have received special commendation from NASA for my contributions to design for the International Space Station, hold a Citation of Merit from NV Phillips, and am a life member of Phi Kappa Phi. A list of my publications during the last ten years, courses taught, and research conducted may be found in my *Vitae* located in the appendix. My most recent publications are listed on pages 7-9 of my *Vitae.*

### Patent Review

In reviewing U.S. Patent D 483,156 I have reviewed the patent document, the patents listed as prior art within the '156 patent, additional patent documents, on line resources, books on weaving, basketry and furniture, relevant sections of *Chisum on Patents,* assembled and photographed a Bay Isle cage, and spoken with those knowledgeable about animal behavior. A complete collection of these references is provided in the appendix.

I have received and reviewed Simpson Ventures' supplemental interrogatories. I understand that Simpson Ventures has responded but has objected to, interrogatories and requests for production of documents submitted by Mid-West Metal. I understand that Simpson Ventures' responses may not be complete. I thus reserve the right to review Simpson Ventures' complete responses upon submission and to revise or supplement my analysis accordingly.

# Design Analysis
## of
# United States Design Patent Number US D483,156 S

## Subject

This document provides an analysis of patent D 483,156, hereafter referred to as "'156," licensed to Simpson Ventures, Inc., hereafter referred to as "Simpson Ventures;" a comparison of that patent to prior art; and a comparison of the '156 patent to the Bay Isle design by Mid-West Metal Products Company Inc. The '156 patent is for a pet home. The top and the four sides are depicted in the patent drawings (Figures 1–5). The bottom of the cage is expressly disclaimed in patent '156. My evaluation will include a review of the functional and ornamental aspects of the design as well as relevant pieces of prior art. Throughout this report the words "wicker" and "rattan" will be used interchangeably to describe surfaces that are woven in texture.

## Verbal description of the '156 patent design

The pet house is rectangular in shape with rattan on all visible sides. It has four sides, and a top.

It is depicted as a rectangular structure with rattan

on the five visible surfaces. The top of the structure is completely covered by rattan (Figure 2).

The front side has a square door with a grid of bars. It latches on the right and opens to the left. The door is not covered by rattan (Figure 3). Rattan is present above and on both sides of the door.


Figure 2. Top view of patent '156


Figure 1. 3/4 view of the '156 patent.


Figure 3. Front view of patent '156.

2



Figure 4. Side view of pet house '156

The right and left sides are each composed of two parts (Figure 4). The top side piece, comprising approximately 7/8ths of the vertical height, has a rectangular opening, or window, above the horizontal center line. The window is created by the absence of the rattan material that leaves the bars of the frame exposed. A separate narrow piece is located at the bottom of both the right and left sides. This bottom side piece runs the entire length of each side and comprises a little over 1/8th of the vertical height of the side. It is covered with rattan.

The back of the structure is covered by rattan except for a small rectangular opening at the top of the back panel that serves as a handle (Figure 5). The opening is centered and unobstructed. The back has a latch at the bottom, presumably to secure the bottom tray.

The structure rests on the floor by means of four legs (Figure 5).



Figure 5. Back view of pet house '156

3

## Ornamental features:

Several ornamental elements are noteworthy. These elements are provided by specific choices in weave and method of construction (Figure 8), much in the same way that some patterns in rugs or fabric are dictated by choices in weaving method at specific points. In addition to this, the corner details provided by the method of fastening form part of the over all visual impression by providing a repetitive element that is consistent in size at each connection point.

### Front

The weave pattern on the front has a visual element in the center above the door (Figure 7) that is created by a change in the weave. This change in weave will be subsequently referred to as a "loose weave."
The front also has tight continuous coils that appear around the perimeter.



Visual element

Figure 6. 3/4 view of Patent '156



Continuous coils

Visual element

Fastener detail

Figure 7. Front view of Patent '156



Figure 8. Examples of various border weaves
Based on figures found in *Baskets and Basketry*, 1959 & 1972
See attached for more examples.

4

## Sides

In the ¾ view drawing (Figure 9), the right side also has decorative vertical accents above the window and in the narrower horizontal piece at the bottom of each side -- a loose weave pattern. In the case of the sides, the choice to stop the cane wrapping at the end of each side of the windows is also a decorative choice. Both the top and bottom pieces have tight continuous coils around the perimeter.

The proportion of the narrow bottom piece on the right and left sides and the visual separation that it creates (Figure 10) is a decorative element because of the proportions and spacing. As in the case of the front, the corner connections also provide a visual detail by providing a repetitive element that is consistent in size at each connection point.



Figure 9. 3/4 view of weave in patent '156.



Figure 10. Side view of patent '156.

## Functional features

The following are functional features: the rectangular shape, the door and latch, the windows, the handle slot, the legs, and the rattan surface.

### Rectangular shape:

The rectangular shape is a function of two requirements: manufacturing and collapsibility. The rectangular sides, top, and bottom are more easily suited to the production processes of contemporary manufacturing than are other shapes. Rectangular shapes are more easily measured, cut, joined, and transported than other shapes. From the drawings it also may be inferred that the cage is designed to be collapsible based upon the corner joining detail. If the object is designed to be collapsible, the rectangular shape better accommodates the collapsibility of a ridged cage.

### Door

The door provides egress and ingress for the pet. It is also a source of fresh air. The latch provides a way of keeping the pet in the cage if necessary.

### Windows

The windows provide a way for the animal to look out and observe its environment, something that is important for the psychological comfort of the animal. They are also a source of fresh air.

### Handle and catch

The handle on the back provides a hand hold at the back of the cage so that it can be more easily lifted (Figure 12). The catch at the bottom most likely serves to hold the bottom pan in place.

### Legs

The legs provide points of contact with the floor. Because floors frequently have uneven surfaces, it is easier for four distinct points to rest flat on the floor than the entire bottom surface of the cage. Also, the elevation allows for air circulation.

### Material choice

As a material choice, the rattan has several functional purposes. The rattan serves to provide cover—an area in which the pet can rest unobserved. According to Charles Hendrix, DVM, Professor of Veterinary Medicine at Auburn University and Vice President of the AVMA, dogs are den animals. The wicker reinforces the den quality of the space. The wicker is also an important functional feature for cats. According to Sandra McCune, Sub-Department of Animal Behaviour, University of Cambridge, and Madingley, Cambridge CB3 8AA, UK, in *Environmental Enrichment Information Resources for Laboratory Animals: 1965 - 1995: Birds, Cats, Dogs, Farm Animals, Ferrets, Rabbits, and Rodents*, cats prefer resting places that are warm, dry, and protected on one, or even better, two sides.

If the weave of the rattan is loose, it will also allow the animal to see out through the weave without being observed. Because rattan is a woven material it has superior air circulation when compared with solid materials like sheet metal, wood, wood composites, or plastic. This is important to the needs of the animal for fresh air. If the rattan was made from a synthetic material, it would also retard the growth of mold. The rattan also provides a friendlier material finish; one that is more compatible with interior décor than are wire pet cages or plastic pet carriers. In other words, the rattan allows it to perform the function of blending into the environment better than other materials.



Figure 11. 3/4 of view patent '156



Figure 12. Back view of pet house '156

## A person of ordinary skill

A person of ordinary skill in the relevant arts in the case of this design would be a person with a bachelor's degree in industrial design[1] and three or more years of experience. The designer would also have or be able to acquire knowledge in the design of products that require frame construction or wicker fabrication. The designer also would possess, or be able to acquire, a knowledge of the animal equivalent of human factors or ergonomics. (Ergonomics, according to the Columbia Encyclopedia, is "the engineering science concerned with the physical and psychological relationship between machines and the people who use them.") For the purposes of this analysis I will refer to this knowledge as "animal factors."

Alternatively, a person of ordinary skill might also be a someone with more than six years of practical experience designing objects for metal fabricators, furniture design, or store fixture design, or would have or be able to acquire substantial knowledge of metal fabrication, kinematics, and assembly. The person also would possess or be able to acquire skill in researching and understanding manufacturing processes, including wicker weaving, and a knowledge of animal factors, or be able to acquire such knowledge.

---

[1] According to the Industrial Designers Society of America, Industrial design (ID) is the professional service of creating and developing concepts and specifications that optimize the function, value and appearance of products and systems for the mutual benefit of both user and manufacturer.

Industrial designers develop these concepts and specifications through collection, analysis and synthesis of data guided by the special requirements of the client or manufacturer. They are trained to prepare clear and concise recommendations through drawings, models and verbal descriptions.

The industrial designer's unique contribution places emphasis on those aspects of the product or system that relate most directly to human characteristics, needs and interests. This contribution requires specialized understanding of visual, tactile, safety and convenience criteria, with concern for the user. Education and experience in anticipating psychological, physiological and sociological factors that influence and are perceived by the user are essential industrial design resources.

Industrial designers also maintain a practical concern for technical processes and requirements for manufacture; marketing opportunities and economic constraints; and distribution sales and servicing processes. They work to ensure that design recommendations use materials and technology effectively, and comply with all legal and regulatory requirements.

In addition to supplying concepts for products and systems, industrial designers are often retained for consultation on a variety of problems that have to do with a client's image. Such assignments include product and organization identity systems, development of communication systems, interior space planning and exhibit design, advertising devices and packaging and other related services. Their expertise is sought in a wide variety of administrative arenas to assist in developing industrial standards, regulatory guidelines and quality control procedures to improve manufacturing operations and products.

Industrial designers, as professionals, are guided by their awareness of obligations to fulfill contractual responsibilities to clients, to protect the public safety and well-being, to respect the environment and to observe ethical business practice.

www.idsa.org

## Prior art

At least three areas of prior art are relevant to this design. The first is the method of construction of the rattan pieces of the pet house. The second is the construction of pet cages in general. The third is the combination of metal and rattan-type materials.

## Method of construction of woven materials

While rattan was originally a term that was applied to objects constructed of specific materials (palm trees belonging to the genus *Calamus*, native to the tropical regions of Africa and India), it has come to be used as a term that describes objects made of woven, wood-like material. This type of weaving goes back at least 10,000 years with the oldest examples having been unearthed in Faiyum in upper Egypt. One of the oldest complete baskets can be found in the British Museum and has been dated at 3000 BC (Figure 13). More specifically, there are a number of examples of woven, or rattan, cages for pets.

Weaving decorative and utilitarian objects is as old as recorded history (Figure 14). The transition to mass produced woven objects did not come about until the 19th century, when the Thonet Company and others, began mass producing furniture with wicker components. Figure 15 shows the first widely mass produced wicker chair. It was designed by Thonet, and is designated chair number 14. It began distribution in the late 1850s. Figure 16 shows a wood and rattan partition which appeared in the 1904 Thonet furniture catalog. In addition to being strong and light weight, wicker is also an aesthetically pleasing material as Christopher Will points out in *International Basketry* published in 1978, "Even the simplest weave is an ornament, readily recognizable to the eye (pg.9)."



Figure 13. Egyptian Basket, circa 3000 BC from collection of the British Museum.



Figure 15. Thonet Chair number 14. First produced in 1859. Still in production today, it has the distinction of being the longest running mass produced chair in history. This picture is take from the 1904 Thonet Catalog.



Figure 14. Basket from Egypt Probably 18th Dynasty, 1550-1300 BC from collection of the British Museum.



Figure 16. Thonet wood and rattan partition from the 1904 Thonet catalog.

The use of wicker or rattan for the construction of pet cages can be reliably traced back to the beginning of the last century. In the *Department of the Interior Ethnological Survey 1904*, a photograph of a "cage in which fowls are shut at night" depicts a woven cage with a securable front opening from Manila (www.bohol.ph/books/bi/). See Figure 17.

British patent number 26728, issued in 1913, depicts a basket used for housing pigeons or poultry (Figure 18) that has woven wicker on all visible sides, and is rectangular in shape. The sides and top have open areas or windows. The horizontal length is greater than the horizontal width or the vertical height. The windows are created by an absence of wicker, leaving the underlying frame as bars in the window. Another striking example of the use of wicker for a pet cage is shown in a posting on eBay on June 29, 2007. The cage is wicker on all sides with a door in front that swings open and is secured in place by a stick. The eBay description notes that the cage dates from the 1920s or 1930s (Figure 19). According to the seller, the wicker caged was purchased by his wife in the year 2000. She purchased the cage from an antique dealer. I have not been able to confirm the date of manufacture at this point; however, my grandmother owned a cage identical to the one shown in Figure 19 in the mid 1960s making this design at least forty years old.



Figure 17. Manilan bird cage. From the Department of Interior Ethological Survey, 1904.



Figure 18. Pigeon cage , British patent number 26728, issued in 1913.




Figure 19. Pet cage for sale on eBay. The seller dates it to the 1920s or 1930s. My grandmother owned a cage like this in the mid 1960s.

In 1935 U.S. patent number 2,016,005 was issued for a dog bed made of wicker (Figure 20). More recently, plate 28 in *Modern Basketry from the Start*, 1973, (Figure 21) shows the design for a wicker animal cage. The cage has a rectangular silhouette, is wicker on all visible sides and the horizontal length is greater than the horizontal width or the vertical height. The windows and bars are created by an absence of woven material.

Page 126 of *belorusskie rhudazhestvennye pronnyslys*, a Russian book on basketry published in 1985 (Figure 22), shows a wicker or rattan pet cage with windows and a door. It has a rectangular silhouette, is wicker on all visible sides and the horizontal length is greater than the horizontal width or the vertical height. The windows and bars are created by an absence of woven material.



Figure 20. Dog Bed. Patent 2,016,005, issued 1935.



Figure 22.  Rattan or wicker animal cage with windowed sides and door taken from page 126 of *belorusskie rhudazhestvennye pronnyslys*, 1985.



Figure 21. Wicker cage design, plate 28 in *Modern Basketry from the Start*, 1973.

10

Additional examples of wicker animal houses are located in the attachments at the end of this report. They include those found on page 13 of *Indian Basketry, fourth edition*, 1909; pages 140, 141 and 155 of *Art of the Basket: Traditional Basketry from Around the World*, September 2001; pages 60, 88, and 125 of *Baskets, A Schiffer Book for Collectors*, 1994; and excerpts from *The Complete Book of Baskets and Basketry* by Dorothy Wright, 1992. All of these examples are made of wicker and provide windows for the pet to look out of.

## General pet cage construction

There are numerous patents covering general pet cage construction. All of the cages discussed on this page have a rectangular silhouette, and the horizontal length is greater than the horizontal width or the vertical height.

A patent issued in 1885 (318,812) describes a folding stock shipping cage with framed construction and woven panels. See Figure 23. Patent number 2,892,562, issued in 1959 is for a foldable metal cage with metal wire door (Figure 24). It is constructed of bent wire and stands on four legs. Patent number 4,762,085, issued in 1988, is also for a folding metal cage with metal wire door though its method of folding is different from the previous one (Figure 25 top). In patent number 5,626,098, issued in 1997, the cage is also made of metal wire and is also collapsible. The door opens toward the top (Figure 25 bottom). Patent 6,192,834, issued in February 2001, is also for a metal collapsible cage. It has an inset door on the front that swings from right to left (Figure 26). In each case, these cages are rectangular in shape. This is a function of the material (metal) the desired performance, (durability and collapsibility). In order for the pivot points and hinges to work, the edges have to be parallel, and the overall shapes rectangular.



Figure 23. Patent number 318,812, 1885.

Figure 24. Patent number 2,892,562, 1959.



Figure 25. Patents number 4,762,085 (top) and 5,626,098 (shown on bottom)



Figure 26. Patent number 6,192,834, issued February 27, 2001.

More recent patents include plastic cages, typically designed for smaller pets or for specialty applications. Patent number 5,960,744, issued in 1999 is for a plastic expandable cage. It features a solid shell with window cut outs, and a door inset from the front edges, and hinged on the right (Figure 27). Though it is expandable, it is not collapsible beyond a certain point because of the material and design. It is not an efficient volume for packaging or shipping. Patent number 5,967,090, issued in 1999, depicts a folding plastic structure without distinct windows, but with molded plastic grill on the sides, on top and on the door (Figure 28). The grill allows the animal to look out and provides a means for air circulation. The door is inset from the front edges and hinged on the right.



Figure 27. Patent number 5,960,744, issued 1999.



Figure 28. Patent number, 5,967,090, issued 1999.

## Combined materials

Combining wicker and metal or wood has a long history. In the 1850s the Thonet brothers combined wood and wicker in a number of different ways. As early as 1904, wicker or rattan was being used to create flat panels secured to wood frames. See Figure 29. A more recent example of this technique is shown in *International Basketry for Weavers and Collectors*, originally published in 1973 in German; translated and published by Schiffer in 1985 (Figure 30). Examples of contemporary wicker and frame construction also are shown in patent 5,931,326 for container assembly, patented 1999 (Figure 31), and patent 6,230,915 for a rattan basket, patented May 15, 2001 (Figure 32).



Figure 29. Thonet wood and rattan partition from the 1904 Thonet catalog.



Figure 31. Container assembly. Patent 5,931,326, 1999



Figure 30. Wood framed partition with rattan weave. Image from *International Basketry for Weavers and Collectors*, published in by Schiffer, Translated in 1985 originally published in German in 1973.

13



Figure 32. Rattan basket. Patent 6,230,915. Issue May 15, 2001

The weave detail on both '326 and '915 is similar to
the weave depicted in the '156 patent. In addition to
some general similarities in the weave, all three de-
signs ('156, '326, and '915) are rectilinear in shape to
aid in production, shipping, and assembly.

Other examples of combined wicker and wood are shown in the figures on this page (Figures 33-35). It is important to note that the objects which are irregular in shape are not designed for contemporary methods of mass production. Additional examples may be found in the appendix.



Figure 33. Appalachian sleigh, 1986. Image take from *Appalachian White Oak Basketmaking: handing down the basket.*



Figure 35. Wicker and metal or wood construction. Images from *International Basketry for Weavers and Collectors*, published in by Schiffer. Translated in 1985 originally published in German in 1973.



Figure 34. Bermuda Carriage, circa 1920.

## Conclusions

### 1. Anticipation

Three pieces of art anticipate patent '156. See Figures 18, 36 and 37. My evaluation of designs that anticipate '156 is based upon *Chisum*, section 23.03 [5] which notes that "design anticipation requires a showing that a single prior art reference is 'identical in all material aspects' to the claimed invention."

Mr. Anders has argued that the only material features that distinguish the '156 patent from the prior art are that the '156 cage is wicker on all visible sides and, it is rectangular in shape with a rectilinear silhouette, whose horizontal length is greater than its horizontal width or vertical height. This is simply not the case. All of the pet cages depicted in Figures 18, 36 and 37 are wicker on all visible sides, rectangular in shape with a rectilinear silhouette, whose horizontal length is greater than its horizontal width or vertical height. All are made from wicker woven over a frame. All have windows that are created by an absence of wicker and make use of vertically spaced bars to maintain the structure and to keep the pet from getting out. All three cages have hinged, lockable doors. I do note that figure 18 has its door on the top, however, that is not a feature that Anders or Simpson Ventures has asserted as being material.

Accordingly the prior art clearly demonstrates the features Simpson Ventures now claims as novel. Moreover, under the Gorham test, an ordinary observer would view the over all designs as substantially the same.

### 2. Obviousness

In his patent evaluation for Simpson Ventures, Robert Anders asserts that the only point of novelty is the weave on all visible sides, " I observe that the design claimed in the '156 patent distinguishes from prior art in one respect: i.e., the point of novelty is a woven texture on all disclosed surfaces." As demonstrated in Figures 18, 36 and 37, those features are not novel or unique and therefore do not distinguish patent '156 from prior art.

Beyond that, as discussed earlier in this document, there are a number of pieces of prior art that, when combined, contribute to the design that is shown in patent '156. Rattan or wicker cages date back at least as far as the early 1900s (Figures 17-19 and 21-22). Moreover, patents for rectangular metal cages, both collapsible and fixed, have been issued for a number of designs over the past forty years (Figures 23-26).

A number of products combine wicker or rattan with rectangular frame pieces that are assembled to form containers. Two examples of this are patent '915 and patent '326 (Figures 31 and 32) discussed earlier in this report as well as the general technique of using woven material over a frame (Figures 29 and 30). The use of woven material has obvious design benefits because it allows air circulation, and it blends in with the environment more favorably than metal wire or plastic containers. It also provides cover for the pet which is important to its comfort. Moreover, a number of examples of wicker animal cages that predate the '156 patent have been cited in this report and in the attachments. Based upon this, I conclude that it would be obvious to a designer with ordinary skill in the art who had full knowledge of the prior art to combine wicker or rattan weave patterns to all surfaces of a rectangular cage structure for the purposes of providing the aesthetically pleasing pet containment structure and design that is the subject of the '156 patent.   (Chisum 23.03 [6]).



Figure 36. Wicker cage design. , plate 28 in Modern Basketry from the start, 1973.



Figure 37.  Rattan or wicker animal cage with windowed sides and door from page 126 of belorusskie rhuda-zhestvennye pronnysiys, 1985.

16

## Additional Issues of obviousness based on *KSR*

The recent Supreme Court ruling in the case of *KSR International Co. v. Teleflex Inc. et al.* (No. 04-1350) elaborates on several points that further address the issue of obviousness as it relates to the '156 patent.

## Uniting old elements

In writing the unanimous opinion for the Court, Justice Kennedy notes, "For over a half century, the Court has held that a 'patent for a combination which only unites old elements with no change in their respective functions ... obviously withdraws what is already known into the field of its monopoly and diminishes the resources available to skillful men.' This is the principle for declining to allow patents for what is obvious." Based on the points raised earlier in this section it is clear that the elements present in the '156 patent, woven texture on all visible sides, a lockable door on the front, windows that are created by an absence of woven texture, a rigid cage structure and a cage which is rectangular in shape and whose horizontal length is greater than its horizontal width or vertical height have all been present in earlier designs and are therefore obvious.

## Substitution of one element for another

Justice Kennedy went on to say, "The Court recognized that when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." Justice Kennedy further notes that in citing *Sakraida v. Ag Pro. Inc.*, the Court concluded that "when a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement the combination is obvious." In this case, the collapsing frame and wicker weave are a combination of old elements with each performing the function that it has previously performed; the wicker providing cover, air circulation, and an improved aesthetic, and the structural framework of the cage providing a structure that is rigid in operation but may be collapsed for shipping, storage or transportation. Thus the '156 patent is obvious.

## Predictable variation

The court also noted that in determining obviousness, it was important not to look too narrowly. "If a person of ordinary skill can implement a predictable variation, 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless the actual application is beyond his or her skill." Patents '326 and '915 (Figures 31 and 32) clearly show the application of a woven texture to a ridged frame in order to provide an aesthetically appealing surface with good circulation. This same technique would be obvious to a person skilled in the art (as described earlier in this report) to try as a method of providing cover, aesthetic finish, and air circulation for an animal cage. Beyond this, part of the design process involves product comparisons. Typically these include not only like products, but also an investigation of materials and processes from other fields that may have utility for the present design. This information is then used to create a variety of solutions based upon available technology, techniques, and methods. Patent '156 clearly demonstrates materials and techniques found in patents '326 and '915, both of which were patented prior to '156 and both of which would be recognized as having methods that would improve the pet cage.

## Fitting together of multiple patents

The Court further stated "Common sense teaches, however, that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle. Even if we disregard all of the previously noted ways in which the '156 patent is obvious and confine our examination to the teachings of prior patents, such as '562 (Figure 24), '834 (Figure 26), '085 and '098 (Figure 25), '744 (Figure 27), '090 (Figure 28), '326 (Figure 31), and '915 (Figure 32) we see that the '156 patent is, in fact, a combination of these features. It has a rigid collapsible frame (Figures 23 – 26), windows for the animal to view out (Figures 27 and 28) and a woven finish (Figures 31 and 32). Each of the above points serve to further emphasize that the '156 design is obvious to an ordinary person skilled in the art.

## 3. Analysis of infringement allegations

Based upon my review of *Chisum*, I understand there are two standards Simpson Ventures must meet in order to prove infringement. The first is satisfaction of the Gorham standard. The second is that it must demonstrate that the alleged points of novelty of the '156 design are present in Mid-West Metal's Bay Isle Collection.

### A. Points of novelty

With regard to "points of novelty," as explained in parts one and two of "conclusions," there are no points of novelty. Specifically, the only feature of the '156 patent design that is claimed as a "point of novelty" is "a woven texture on all disclosed surfaces." As already explained, this feature is in fact already present in the prior art. It thus cannot be a "point of novelty." In other words, this is not a feature that distinguishes the '156 patent design from the prior art because this feature has long been present in the prior art. Accordingly, there are no points of novelty presented by the '156 patent design.

The following analysis assumes that Simpson Ventures might now attempt to argue that *other* as-yet-unspec-ified features of the '156 patent design are somehow points of novelty. I do not know which, if any, Simpson Ventures might actually present. I do have several observations though on the following features that Simpson Ventures might possibly attempt to assert. However, it is important to note that I have not yet undertaken to evaluate whether any of these features are in fact novel. In other words, I express no opinion yet on whether any of these features in fact distinguish the '156 patent design from the prior art, or are already present in the prior art. I reserve any opinion on that point contingent on whether Simpson Ventures even attempts to assert such a position.

Having noted this, the only possible points of novelty of '156 design might be in the individual weave patterns chosen for the rattan. While these patterns are not new (see Figure 8 and appendix material), they may be used or combined in unique ways.

Nonetheless, a number of visual differences exist between patent '156 and the Bay Isle Collection.[2]

---

[2] There are some differences within the Bay Island Collection. These are generally differences of size and proportion with the exception of model 1805 which has some additional noteworthy differences that will be discussed later. The following observations hold true for all of the Bay Isle Collection models (1824, 1830, 1836, 1842 and 1805) when compared with the possible points of novelty in patent '156.

### 1. Material separation

There is a material separation that patent '156 shows at the bottom of the right and left sides of the cage (Figures 38 and 39). This separation forms a visual break that is distinct to the design in '156 when compared with the Bay Isle Collection (Figures 40 and 41). This feature makes the right and left sides of '156 a composition of two visually distinct pieces.



Figure 38. 3/4 view of patent '156



Figure 39. Side view of patent '156



Right and left sides are continuous

Figure 40. Right side view of Bay Isle Collection by Mid-West.



Right and left sides are continuous

Figure 41. 3/4 view of Bay Isle Collection by Mid-West.

## 2. Edge wrapping

In the '156 design the edges are tightly wrapped (Figures 42 and 43). There is no functional purpose that requires this particular weave. It is thus a decorative choice. In the Bay Isle Collection the frame is clearly visible at the corner edges (Figures 44 and 45).



The corner edges tightly wrapped and without gaps.

The corner edges tightly wrapped and without gaps.

The corner edges tightly wrapped and without gaps.

Figure 42. 3/4 view of '156 patent.



The corner edges tightly wrapped and without gaps.

Figure 43. Right side view of '156 design.

21



The corner edges display an exposed frame.

Figure 44. 3/4 view of Bay Isle Collection by Mid-West.



The corner edges display an exposed frame.

The corner edges display an exposed frame.

Figure 45. Right side view of Bay Isle Collection by Mid-West.

### 3. Edge continuity

In the '156 design the decorative edges are tightly woven, continuous and uninterrupted (Figure 46). There is no functional purpose that requires this particular weave. It is thus a decorative choice. The Mid-West cage has prominent notches that are clearly visible along the top and bottom of both the right and left sides (Figure 47).



Continuous edges

Figure 46. Side view of pet house '156



Notches on the right and left sides create a distinctive difference between Bay Isle and '156

Figure 47. Right side view of Bay Isle Collection by Mid-West.

23

### 4. Weave pattern

In the '156 patent the weave pattern on the top and back is plain, but the sides and front have an ornamental detail consisting of a vertical loose weave as defined earlier in this analysis (Figure 48).

#### a. Absence of the '156 pattern

The Bay Isle Collection does not have this distinctive loose weave pattern anywhere -- whether on the front, above the side windows or on the bottom side pieces (Figure 49) .

#### b. Bay Isle's decorative pattern

The Bay Isle design has a decorative square weave pattern woven on the top, sides and back wicker panels of the cage (Figure 49). The '156 patent does not have such a square weave decorative pattern (Figure 48).



Top of the '156 patent.

Decorative weave

Decorative weave

Decorative weave

Decorative weave

Wrapping

Decorative weave

Side of the '156 patent.

Figure 48 Patent '156 weave detail

24



Figure 49  Bay Isle Collection Decorative Weave

### 5. Edge gap

The '156 design has no gap where the corner edges meet (Figure 50). The Bay Isle Collection has a distinct gap where the corner edges meet (Figure 51).



Enlarged view

Corner Detail

Side view of pet house '156

Back view of pet house '156

Figure 50. Patent '156 corner detail

26



Corner detail

Enlarged view

Gap

Side of the Bay Isle design

Back of the bay isle design

Figure 51. Bay Isle Collection Decorative Weave

27

### 6. Top edge

The top view of the '156 design shows no gap where the top edges meet the sides (Figure 52 at top). The Bay Isle design has a gap where the top edges come in contact with the sides (Figure 52 at bottom).



Top View of pet house '156

Top view of the Bay Isle design.

Figure 52. Comparison of top views of the '156 patent and the Bay Isle design.

28

### 7. Window detail.

The '156 patent has tightly woven coils around the windows on the sides and around the handle on the back (Figure 53, top). The choice of tightly woven continuous coils is not dictated by function -- it is an aesthetic choice, The Bay Isle design has round coils woven above and below the side and back windows. The rounded coils do not stop at the edge of the windows, but continue clear across the side. The Bay Isle design does not have a handle on the back (Figure 53, bottom) The '156 patent does not have a window in the back (Figure 53 top).



Figure 53. Window detail of patent '156 and the Bay Isle design

### 8. Legs

While the concept of legs is functional, the style is possibly ornamental. The '156 design uses four clearly visible post-type legs (Figure 54, top). The Bay Isle design makes use of rubber feet that are not visible (Figure 54, bottom).



Side view of patent '156

Back view of patent '156

Legs

Side of the Bay Isle design

Back of the bay isle design

No legs

Figure 54. Leg detail of patent '156 and the Bay Isle design

30

### 9. Additional differences -- Bay Isle 1805

As mentioned earlier, the Bay Isle cage model 1805 has some additional differences when compared to the '156 patent.

#### a. Front opening

The '156 patent has a square front opening with a hinged door. The Bay Isle 1805 cage has an arched front opening and no door (Figure 55).

#### b. Two piece Front

The '156 patent has a single front panel with a hinged door. The Bay Isle 1805 has a two piece front panel (Figure 56).



Square front opening with door

Arched front opening No door

Figure 55. Bay Isle Collection Cage 1805.



'156 patent 3/4 view — One piece front

Bay Isle 1805 — Two piece front

Figure 58. Bay Isle Collection Cage 1805 Front pieces.

31

### c. Windows

The '156 patent has windows on the sides. The Bay Isle
1805 does not have windows on the sides (Figure 57).



'156 patent 3/4 view

Window

Bay Isle 1805

No window

Figure 57. Window comparison

## B. The Gorham Standard

*Gorham Mfg. Co. V. White* (1872) instructs us that identity is tested through the eyes of an ordinary observer rather than an expert: "[I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other..." (quoted from *Chisum* 23.05[3]).

This speaks to the overall look of the '156 patent when compared with the Bay Isle Collection. Based upon my experience as a designer and my analysis of the '156 patent and the Bay Isle Collection, I believe that there are three prominent attributes that distinguish the two cage designs for the ordinary observer: the edges, the presence or absence of separate side pieces, and the weave detail.

The first two attributes (edges and the presence or absence of separate side pieces) are part of the overall shape recognition. These are visual cues that we use to distinguish one shape from another. In the case of the '156 patent, the edges are crisp, continuous, and straight. The sides are made up, visually, of two different pieces. This is reinforced visually by the square edge bindings (Figure 58, left). In the eyes of an ordinary observer, the Bay Isle design is strikingly different in comparison. It has separated edges with noticeable gaps, single piece sides, and prominent notches along the top and bottom of the sides (Figure 58, right).

The third attribute (the weave detail) is a key part of the overall impression of the two cages. The '156 patent makes use of a loose weave decorative element on the front and sides. This element is vertical in orientation. There is no weave pattern on the top. The Bay Isle collection uses a decorative square weave pattern on the top, back, and sides of the cage. The square decorative weave is clearly different than the decorative details of the '156 patent, and would present a clear and noticeable difference to an ordinary observer (Figure 58). Based on this analysis it is my opinion that an ordinary observer would not view the two designs as substantially the same.

There are some additional specific points of overall difference that apply to the 1805 Bay Isle design. Applying the Gorham standard there are the following additional substantial overall differences between the Bay Isle design and the '156 patent: the arched opening and absence of a door on the 1805 compared to the square opening and door on the '156 patent, the two-piece front of the 1805 compared to the one-piece front of the '156 patent, and the lack of windows on the sides of 1805 compared to the prominent side windows on the '156 patent. These points, taken together, present additional overall differences that would be clearly noticeable to the ordinary observer when comparing the 1805 Bay Isle design to the '156 patent (Figures 55-57).




Two separate pieces

'156 patent

Crisp, continuous, edges

Figure 58. Edge detail.

Notches

Bay Isle Design

Visual separate edges

8·17·07
Date

Bret H. Smith, IDSA
Professor of Industrial Design
Auburn University

33

# EXHIBIT B

# Bingham ● McHale LLP

### a t t o r n e y s    a t    l a w

James M. Hinshaw
Attorney
Direct: (317) 968-5385
jhinshaw@binghammchale.com

August 22, 2007

**VIA OVERNIGHT MAIL**

Arthur A. Gardner, Esq.
Gardner Groff Santos & Greenwald, PC
100 Parkwood Point
2018 Powers Ferry Road, Suite 800
Atlanta, GA  30339

Re: Simpson Ventures, Inc. v. Mid-West Metal Products Company, Inc.
U.S. District Court, Middle District of Alabama (Eastern Division)
Cause No. 06-cv-00901-WKW-VPM
Our File No. 11128-64696

Dear Art:

I am enclosing under this cover the report of Bret H. Smith, who will provide expert opinion testimony regarding invalidity and non-infringement.

Sincerely,

James M. Hinshaw

JMH:lac/1182700
Enclosure
cc:    Brett A. Ross, Esq.
       J. Neal Bowling, Esq.

# EXHIBIT C



# Bret H. Smith, IDSA

Department of Industrial Design
207 Wallace Center
Auburn University, AL 36830

email: brethsmith@mindspring.com
Phone: 334-332-9920

## Degrees

Purdue University.  M.A.,  Industrial Design.*  May 1984.

Purdue University. M.A.,  English.  May 1984.

Purdue University.  B.S. IED,  Industrial Education and Industrial Technology.
May 1981


## Experience

| | | |
|---|---|---|
| Auburn University | Professor | 1997– present |
| | Associate Professor | 1990 -1997 |
| | Acting Department Head | 1989 - 1990 |
| | Assistant Professor | 1985 - 1989 |
| DrDesign, Inc. | Product Designer | 1984 - 1985 |
| Tom David Design | Design Assistant | Jan. - May 1984 |
| Independent Contractor | Residential Remodeling | 1978 - 1981 |


*M.A. is considered the terminal degree in industrial design

1



## Honors and Awards

**Recipient**, Life member, Phi Kappa Phi Honorary. 2005.

**Recipient**, College of Architecture, Design and Construction Award for Outstanding Service to the College. Fall, 1999.

**Recipient**, Special Recognition Award for Contributions to the Field of Exhibit Design from the Exhibit Designers and Producers Association. EDPA National Conference. May 1999.

**Recipient, Design Leadership Award from NASA Marshall Space Flight Center.** The award was for outstanding leadership in the development of concepts for the materials science rack payload equipment restraint system. December, 1998.

**Recipient**, College of Architecture, Design and Construction Award for Excellence in Leadership. Fall 1998.

**Special Recognition** by the Exhibit Designers and Producers Association for quality of teaching in an exhibit design studio. May, 1997.

**Recipient**, College of Architecture, Design and Construction Award for Outstanding Teaching. Fall 1997.

**Recipient**, College of Architecture, Design and Construction Award for Outstanding Contributions to Extension. The award was given in recognition of service to the Industrial Designers Society of America as a member of the Membership Development Committee and for the development of Design Voices: A Contemporary History of Industrial Design. Fall 1996.

**Chair, IDSA Membership Development Committee Task Force on Education.** As chair of this task force I successfully led efforts to lower the membership dues for recent graduates, establish a national jobs fair for graduating seniors and to establish an annual orientation and training program for student chapter officers of IDSA. January 1995 to January 1996.

**Member**, Advisory Board for Exhibit Designer World Symposium. 1995 - June 1998.

**IDSA Southern District Vice President.** The IDSA (Industrial Designers Society of America) is the professional society for industrial designers within the United States. The Southern District encompasses a ten-state area. Elected Office. January 1993 - January 1995.

**Member of the Executive Council and Board of Directors for IDSA.** Executive Council members are responsible for directing the overall operation of the professional society, monitoring the month to month status of programs and finances, and for authoring bylaws and policy changes . Elected Office. January 1993 - January 1995.

**Phi Kappa Phi** (Inducted as a junior). Phi Kappa Phi is a scholastic honorary.

2



## Invited Speaker

**Invited Speaker,** The Eighth International Congress on Behaviorism and Behavioral Sciences, September, 2006, Santiago de Compostela, Spain.

**Invited Speaker,** The Sixth International Congress on Behaviorism and Behavioral Sciences, Auburn, Alabama. September, 2002.

**Invited Speaker,** The Fifth International Congress on Behaviorism and Behavioral Sciences, Special Session. Taiwan. December, 2000.

**Invited Speaker,** The Fifth International Congress on Behaviorism and Behavioral Sciences.   Mexico. October, 2000.

**Invited Speaker,** The Fourth International Congress on Behaviorism and Behavioral Sciences. Seville, Spain. November 1998.

**Invited speaker,** Third International Congress of Behaviorism and Behavioral Sciences. Japan. October 1996. The congress is a biannual event and features presentations by leading professionals from around the world in the area of behavior and behavioral sciences.

**Invited Panel Member,** (one of two educators selected nationally) "Plastics and Design Education, What's Missing." Materials & Processes Section Meeting held in conjunction with the SPE at the SPE/SPD National Conference in Atlanta. April 1996.



## Competitive Grants from within the College

**Recipient,** College of Architecture, Design and Construction Grant to develop Digital Video Disc technology.   This is a college-wide competitive RFP process. Summer 2001.

**Recipient,** College of Architecture, Design and Construction Grant. The grant provided funds for travel to Seville, Spain to present at the Fourth International Congress on Behaviorism and Behavioral Sciences. November 1998.

**Recipient,** College of Architecture, Design and Construction Grant. The grant provided funds for travel in order to present at the national Design Education Conference of the Industrial Designers Society of America. Fall, 1998.

**Recipient,** College of Architecture, Design and Construction Grant. The grant provided funds for travel in order to present at the Annual conference of the Industrial Designers of America. Fall, 1999.

**Recipient,** College of Architecture, Design and Construction Grant. The grant provided funds for travel in order  to present the results of research on the effective design of interactive multimedia at the 1996 World Design Conference in Orlando. Summer of 1996.

3



## University Committees

Member, University Committee for Wrongful Termination. Served in one Wrongful termination case brought before the committee.2005 – present.

Member, University Finance Committee, 2002-2004.

Member, University Senate (one term)

## School/Department Activities

CADC seed grant proposal reviewer, 2005 and 2006.

Member, CADC IT Director Search committee, 2005.

Search Committee Chair (3 times), department of industrial design search for new faculty position.

Department Representative, Dean search committee (2 times).

Department Representative for Golden eagles 2004-2005

Member, Dean's counsel, 2004.

Authored Department of Industrial Design five-year comprehensive plan. Spring 2000.

Authored Department Assessment Procedures for regional accreditation. Fall 2001

Development of Departmental Safety Program. This program was developed with working in concert with the University Safety Office. As a result, the department of Industrial Design became the first department on campus to have clearly articulated safety policy and required safety procedures. Fall 2000.

Department Representative, CADC tenure and promotion policy committee.

Member, Industrial Design Curriculum Development Committee.



## Professional Development

Toured Broan-Nutone advance manufacturing center, Hartford WI, April, 2006

Toured the advanced computing and robotics facility, University of Minnesota, July 2005.

Toured the Tupperware design facility, Orlando Florida, April, 2005.

Toured the World War II memorial and the Smithsonian Museum, August 2005.

Rhino Professional Training, Auburn University, September, 2005.

## Sabbatical

**Sabbatical**, fall 1995. While on sabbatical I visited design firms throughout the Midwest, collecting oral history, views on the business of design, the future of the profession and the requirements for an excellent design education. List available upon request.

## Professional Conferences and Meetings Attended Since 1996

Workshop leader, IDSA National Conference, Austin Texas, September 2006.

Attended, Consumer Electronics Show, Las Vegas NV.  January 2006.

Attended IDSA National Education Conference in Alexandria, VA.  August, 2005

Sixth International Congress on Behaviorism and Behavioral Sciences.  Auburn, Alabama. September, 2002.

POP Chicago, Chicago, IL.  June, 2002.

IDSA Southern District Conference, Brass Towne Valley Resort.  Spring, 2002

IDSA Materials Section,  Recent Developments in Plastics Molding Techniques.  April, 2001.

IDSA National Conference.  Chicago, IL.  July 1999.

IDSA National Educator's Conference.  Chicago, IL.  July 1999.

Fourth International Congress on Behaviorism and Behavioral Sciences.  Seville, Spain.  November 1998.

IDSA National Conference.  San Diego, CA.  September 1998.

IDSA National Educator's Conference.  Long beach, CA.  September 1998.

5



Exhibit Designers World Symposium. Chicago, IL. August 1998.

Exhibit Designers World Symposium. Washington D. C. June 1997.

IDSA National Educator's Conference. Washington D.C. June 1997.

World Design 1996. Orlando, Florida. I made four presentations at this conference and my Design Voices work was featured during the General Session on Saturday morning. September 1996.

Education Town Meeting. Orlando, Florida. September 1996 (Presenter).

IDSA Board of Directors Meeting. Orlando, Florida. September 1996. Presented plans for increasing involvement of professors, students and recent graduates in IDSA.

IDSA Membership Development Committee Meeting. Orlando, Florida. September 1996.

IDSA Membership Development Committee Meeting. Auburn, Alabama. Hosted and participated in a meeting of the IDSA Membership Development Committee. August 1996.

Exhibit Designer World Symposium. Atlanta, GA. June 1996. Invited Presenter.

Representative of the Membership Development Committee to the Southern District Conference. Atlanta, Georgia. May 1996.

Structural Plastics'96, Annual Conference of the Society of the Plastics Industry. Atlanta, Georgia. April 1996. Invited Speaker.

IDSA Membership Development Committee Meeting. Seattle, Washington. February 1996.

Teague Design Office Tour. Seattle, Washington. February 1996.

## Other contributions to teaching

Developed the technical drawing text and course material for freshman summer studio 2005-2007. Co-author, Chris Arnold.

Developed required Graduate course in Rhino Software. Fall 2004-2005. Final results were exhibited in a month long show in Dudley Gallery. January 2006.

Developed required Graduate course in advanced computing, INDD 7020. Fall 2000.

Authored course description and curricula for INDD 3110 for semester transition.

Developed the EDPA National Exhibit Design Curriculum with Gary Stewart, principle and founder of Design South. 1994-1997.

6



## Research/Creative Work

### Refereed Articles

"Micro-mass production." Presented at the 2005 IDSA Education conference. Co-authored along with Chris Arnold. Authorship equal. Published Proceedings. Juried publication (additional jury process selects from juried presentations—see presentations).

"Grades that Work." IDSA National Design Education Conference Proceedings. Juried. September, 2000.

"Creating Safe Student Environments." Design Gumbo. Industrial Designers Society of America International Design Education Conference, New Orleans, 2000. Juried Published Proceedings.

Pedagogy for Teaching New media Design Start to Finish in One Class." Design Gumbo. Industrial Designers Society of America International Design Education Conference, New Orleans, 2000. Juried Published Proceedings.

"Developing Industry Collaboratives: Their critical roll in Education." National Design Education Conference at the University of California, Long beach. September 1998. Juried Presentation and Published Proceedings.

"New Media: Blurred Boundaries; Sharpened Skills." IDSA National Design Education Conference Proceedings. Juried. June 1997.

"A Design for Disassembly," Innovation. Spring 1996. Juried. Innovation is the only refereed journal for industrial design in North America. This article presented quantitative methods for evaluating products for ease of disassembly, allowing designers to be better stewards of our natural resources while still designing products which are durable, easy to use and cost effective to produce. Acceptance rate for articles by non-first time authors is 15%. This article received the highest rating of all articles submitted for the spring issue of Innovation.

"Quantifying Environment-Related Design Decisions," Structural Plastics '96 Proceedings. Washington D.C.: The Society of the Plastics Industry, Inc., 1996. Pages 181 - 188.

### Refereed Presentations

"Micro-mass production." Presented at the 2005 IDSA Education conference. Alexandria VA. Co-authored along with Chris Arnold. Authorship equal. Juried presentation.

"Developing Industry Collaboratives: Their Critical Role in Education. Presented Paper and Published Proceedings." National Design Education Conference of the Industrial Designers Society of America. University of California at Long beach, Long beach California. September 1998.

"Alternative Realities: The Potential and Promise of Multimedia," WorldDesign 96. Refereed presentation. This presentation was made as part of the break-out sessions at WorldDesign 96. Other presenters included Liz Sanderson, director of human factors for Fitch, one of the two largest design consultancies in the United States, and Bill Stumpf, whose firm, Bill Stumpf+Associates, designs most of the office furniture manufactured by Hermann Miller.

7



## Solicited Publications and Presentations

"What to look for in a cellular phone service." Ezine article for The Honor Cord, the Phi Kappa Phi Society Ezine. phikappaphi.org. June 2007

"Audio Migration in a Windows world." Ezine article for The Honor Cord, the Phi Kappa Phi Society Ezine. phikappaphi.org. October 2006.

"Point and Shoot?" Ezine article for The Honor Cord, the Phi Kappa Phi Society Ezine. phikappaphi.org. June 2006.

"The digital dance." Ezine article for The Honor Cord, the Phi Kappa Phi Society Ezine. phikappaphi.org. January, 2006.

"Arthur Pulos: Circles of Influence." (ICSID 10 minute cut) Documentary. Presented at the International Council of Societies of Industrial Design bi-annual meeting. Toronto Canada. October, 1997. Designer, Editor and Producer: Bret H. Smith.

"Arthur Pulos: Circles of Influence.." Documentary, 18 minutes. Designer, Editor and Producer: Bret H. Smith. Presented at the IDSA National Conference, Washington D.C, June 1997; IDSA National Educators Conference, Alexandria, Virginia, June 1997; and the biannual meeting of the International Councils of Societies of Industrial Design, Toronto , Canada, August, 1997.

## Invited Articles and Interviews

Interview APT. Interview about products the department has designed for NASA and the role that Kaplana Chawla (crew member on the Columbia) played in their development. February 2003.

Interview, Channel 9. Interviewed about Kaplana Chawla and her role in the development of equipment for the international space station. February 2003.

Interview, P-O-P magazine. Interviewed about the Eastman/Spartech project. December 2001.

Interview, Channel 9. January 2001. Interviewed about PERS and the department of Industrial Design's collaboration with NASA for the Channel 9 Morning Show.

## Published Abstracts

"The Design of Products in the Post Machine Age." Fifth International Congress on Behaviorism and Behavioral Sciences, Special Session, Taiwan. Published Abstract.

"Behavior and the Design of Products." Fifth International Congress on Behaviorism and Behavioral Sciences, Mexico. Published Abstract.



## Papers at Professional Meetings

"To Err is Human, to Anticipate, Divine." The Sixth International Congress of Behaviorism and Behavioral Sciences." Invited presentation and published abstract. Auburn, Alabama, 2002.

"Neat Plausible and Wrong: The Consequences of Explaining Rather than Understanding Human Behavior." The Fourth International Congress of Behaviorism and Behavioral Sciences. Invited presentation and published abstract. Seville, Spain. November 1998.

"Environment-Related Design Decisions," Structural Plastics '96. April 1996. Juried Presentation. I was one of four industrial designers selected nationally to participate in the conference. Also a published proceeding  The congress is a biannual event, featuring presentations by leading professionals from around the world in the area of behavioral .

## Exhibitions

"Excerpts  from Design Voices." WorldDesign 96. Orlando Florida.  September 18 - 21, 1996.  Exhibit by invitation only.  The exhibit displayed work from my Design Voices project and viewed by over design professionals, journalists and industry representatives.

## Workshops

"Changing Paradigms in Design and Production."  IDSA workshop.  2006 IDSA National Conference.  Bret Smith and Chris Arnold.



## Other Scholarly Contributions to the Profession

### Interactive Multimedia History

Design Voices: A Contemporary History of Industrial Design in the Words of Those Who Have Helped to Shape It.  Design Voices is an interactive multimedia oral history of industrial design. Thus far I have interviewed twenty-eight industrial designers and collected over sixty hours of videotape. From these interviews I digitized and edited over 90 minutes of video material containing stories about famous industrial designers, early design work, famous projects and products and personal influences.  Excerpts from Design Voices were exhibited in the  International Design Gallery during the four-day WorldDesign 96 Conference  in Orlando, Florida.  Parts of this project were also featured in presentations during the General Session of the conference and during break-out sessions.  Volume 1 of the history was completed in August 1996. The project is ongoing.

## Consulting

Product Design for Tupperware Corporation, Orlando Florida.  Provided product design, consultation and instructional support for proprietary new product.  As part of this project I participated in consumer product testing in Detroit.  March 2005-present (project is on going).

Logo and brand development for KICK, a Colorado based training group.  Developed logo, standards and brand applications. January – April 2007.

9

Human factors consultation and expert witness, for Partridge Smith, P.C.in Kathy A. Ferguson V. Southern Medical Health Systems, Inc. Case No. CV-04-4701. Case settled prior to trial based upon my analysis. January, 2007.

Human factors consultation and expert witness in Oden v. Springhill. July 2006 – November 2006. Case settled prior to trial.

Presentation Design for Tupperware Corporation's Chairman's Retreat in Hong Kong. In addition to the design of the presentation, I designed and produced a thirty second opening video. March, 2006.

Human Factors consulting for Page, Scrantom, Sprouse, Tucker and Ford, PC., attorneys at law. Responsible for computer models, evaluation and documentation of the human factors related design issues for an Ameristep tread design that had resulted in the amputation of a Columbus man's finger. Ameristep settled the case prior to trial. June 2005-January 2006.

Consulting: Corporate and publication branding for Phi Kappa Phi. Spring 2005.

Designer, User interface design for the state of Wyoming department of mental heath. Contracted by Impel Corp. to develop the user interface for an interactive teaching site for the state of Wyoming department of mental health workers. Responsibilities included design of all screens, development of system that was easily updatable, graphics specification and the development of all interface graphics. April-June 2003.

Expert Witness for Williams and Gullage. Used my expertise in human factors and aging to assist analyzing an automatic door accident. Case was tried in November of 2001. Juried decided in favor of the plaintiff.

Primary design consultant, PEP Tub Assist, Phase II. Constructed a working mechanical model which resolved mechanical, human factors and safety problems inherent in the original design. Summer and Fall, 1997.

Designed and authored a curriculum guide for the EDPA Student Design Competition. Exhibit Designers and Producers Association (EDPA). August - September 1996. This curriculum will be distributed to all forty-four industrial design programs in the United States and will serve as the guide for each program's participation in the EDPA Student Design Competition.

Expert Witness for Civil Action Number CV-93-563 in the Circuit Court of Lee County, Alabama. Served as an expert witness on product design, safety and ergonomics in a multinational product liability suit. July 1994- October 1995. Case settled prior to trial.

Developer, Adobe Corporation. Developer of instructional material for PageMaker software. Adobe is a Seattle, Washington based software firm with offices in the United States and in Europe. Adobe software is sold throughout the United States, Canada, Europe and the Pacific Rim. Adobe is considered an industry leader in desktop publishing, graphics, photo editing and charting software. 1991-1996.

Industry Specific CADKEY training for MCE. Designed and taught a custom training course in the use of CADKEY for the layout and design of interior spaces in commercial buildings. May 1992.

10



Parallel Resources, Inc., Auburn, Alabama. Cover photography, art work and package consulting for software product. August 1989 - September 1990.

Prime Industrial, Auburn, Alabama. Consultant on materials and processes for solar tracker faceplate. August, 1989.

Advanced Living Systems Division of the Institute for Technology Development (ITD), Oxford, Mississippi. Testing, evaluation and recommendations for human factors CAD software. November 1988.

Human Dynamics, Inc., Oxford, Mississippi. Trade show and product design consultant. June 1988.

Advanced Living Systems Division of ITD, Oxford, Mississippi. Responsibilities included product design: development of a new system to reach the older market: development of new data collection and analysis systems for dynamic human factors measurements of older populations (part of a $300,000 grant from the National Institute of Disabled Research and Rehabilitation); development of slide and lecture materials on designing for the elderly for a series of AIA (American Institute of Architects) sponsored workshops; specification of materials, processes and assembly techniques for a portable interactive video workstation. June - September 1987.

## Grants and Contracts since 1994

### Industry  Sponsored Research

**Director,** Range hood design and branding for Broan-Nutone, LLC. Hartford, WI. . Broan-Nutone is an $800 million a year company which manufactures range hoods, central vacuums, home theater sound systems, medicine cabinets, bath fans and door chimes.  Directed 18 undergraduate and graduate students in the design and definition of three separate product families: Best by Broan, Broan Elite and Zephyr. January - May 2007.

**Director,** Development of "break the paradigm in-wall storage" for Broan-Nutone, LLC. Hartford, WI. Broan-Nutone is an $800 million a year company which manufactures range hoods, central vacuums, home theater sound systems, medicine cabinets, bath fans and door chimes.  Directed students in the development of original in-wall storage product designs for the medicine cabinet divisions of Broan-Nutone (Jensen and Aubry).  Students presented over 130 concepts and developed 18 prototypes. Worked directly with the President of Jensen and the General Manager of Aubry as well as the V.P. of Marketing for Broan-Nutone.  Presented the final results to the President, CFO, Marketing Managers, Director of Branding and other corporate managers at the Broan-Nutone world headquarters.

**Director,** Redesign and extension of the Nutone Central Vacuum product line. , Broan-Nutone, LLC. Hartford, WI. Directed students in the analysis of current central vacuum systems and the development of 140 different concepts for the Nutone Central Vac. System. The client selected 52 concepts for further development.  Students developed each concept to the point of working and appearance models at which point the client selected 18 for development as pre-prototypes. Worked directly with the General Manager, Director of Marketing and Engineering Manager for Nutone Central Vacuums in Cincinnati, OH as well as the V.P. of Marketing for Broan-Nutone.  Final Presentation to President of Broan-Nutone, V.P of Broan-Nutone Engineering, V.P. of Marketing Broan-Nutone, and Director of product placement Broan-Nutone.

Director, Corporate identity, brand assessment and P-O-P design, packaging design and trade show exhibit design, Broan-Nutone, LLC. Hartford, WI. Directed seventeen students in the design and development of corporate identity, packaging, point-of-purchase displays and tradeshow exhibits for both the Broan and the Nutone brands. Final results of the research for Broan-Nutone were so successful that the client sponsored another studio for Spring 05. The final Broan identity was based upon a student mark, the final Nutone identity incorporated a font that was proposed by one of the students. Much Broan-Nutone's new packaging and branding strategy is based upon the work completed as part of this project. Broan-Nutone is continuing to evaluate P-O-P solutions designed by students for further development and implementation. Presented to the Director of Corporate Graphics, Broan-Nutone; Director of Marketing, Broan-Nutone; Director of Canadian Sales, Broan-Nutone; and Director of Product Placement, Broan-Nutone.

**Director,** Door entry notification systems design. Broan-Nutone, LLC. Hartford, WI. Broan-Nutone is an $800 million a year company which manufactures range hoods, central vacuums, home theater sound systems, medicine cabinets, bath fans and door chimes. Directed students in the development of new concepts for door entry notification systems. Presented 13 final concepts as well as a packaging strategy to increase brand awareness. Worked directly with the V.P. of Marketing, Director of product promotions and V.P of Engineering. Spring, 2004.

**Director,** Corporate Identity, Brand Assessment and P-O-P design and construction, Bridges Inc. Cusseta, Alabama. Directed students in the development of a branding strategy, corporate identity and point of purchase displays for Bridges, Inc. This project also included a complete graphics and space assessment. Authored the graphics standards manual, finalized the logo design, and prepared master artwork for design implementation. Corporate identity and P-O-P designs adopted by the client. Fall, 2002.

**Director,** "Point of Purchase and Exhibit Design for Spectar Sheet" Eastman Plastics and Spartech, Inc. Final results from this project, P-O-P prototypes and exhibit designs for the pop Chicago trade show were presented to Eastman and Spartech at the Spartech headquarters in St. Louis. Designed and supervised the production and assembly of a 275 page document detailing our work on the project. Final results of this project were featured in P-O-P Magazine. Success in this project has lead to a follow-on studio and an ongoing relationship with Eastman Plastics. Fall, 2001.

**Director,** "Design of Application Tools for Vinyl Sheet" Directed undergraduate and graduate students in the evaluation and design of application tools for 3M Controltac vinyl sheet. The final presentation included final prototypes for four separate tool designs. Each concept included computer generated control drawings, parts list, vendor list assembly instructions, sequence of use documentation and preliminary price quotes from vendors. Final tool designs decreased the amount of time required to finish the rivets on a truck by 40-60 percent. As part of this project I directed the design and development of a 300 page document detailing the work completed for the client. This document was successfully constructed in Quark Express thereby providing a format which allows the document to be easily reproduced. Additional responsibilities included providing client direction and clarification and editing the copy for the final documentation. May, 2002.

**Director,** "Redesigning Pipe Locating Equipment." Directed graduate and undergraduate students in the development of an updated design for pipe locating equipment for Pipehorn, a Birmingham-based manufacturer. The new design need to incorporated new technology and provide a common platform and identity for their expanded product line."

12



**Director,** "Flight testing and Final Prototype Construction of PERS." NASA Marshall Space Flight Center. Directed graduate and under graduate students in the refinement, flight testing and final Prototype design and construction of the Payload Equipment Restraint System (PERS) for NASA. KC 135 zero-G Flight testing focused on safety, ease of use, and ease of deployment of the PERS. Deployed on ISS April of 2001 still in active service. Jim Voss called it the "best designed equipment that he had ever worked with." Winter 2000.

**Director,** "Onboard Interactive Computer Based Training for PERS." NASA Marshall Space Flight Center. Trained the design team and directed the development of interactive crew training software for the International Space Station. The software is the first project to be completed under the NASA OCBT (on board computer based training) guidelines for the International Space Station. One of the key requirements was that the interface be intuitive and the information clearly structured to ensure safe use of the equipment. Deployed on ISS April of 2001. Retired, same year because NASA determined that the equipment was so effectively designed that it did not require crew training. Winter 2000.

**Director,** "Ground Based Interactive Multimedia Training for PERS." NASA Marshall Space Flight Center. Trained the design team and directed the development of interactive crew training software for the International Space Station. This is the companion piece to the software described above. In addition to meeting the client requirements for ease of use , clarity, safety and comprehensive training, we introduce new interface paradigms which are currently being evaluated by NASA for incorporation into the next generation of OCBT baseline standards. Winter 2000.

**Director,** "NASA/ Auburn Industrial Design Promotional CD." NASA Marshall Space Flight Center. Under contract to NASA. I trained the design team and directed the development of an interactive multimedia CD to promote the collaborations between NASA and the Department of Industrial Design at Auburn University. January 2000 -- present.

**Director,** "Ergonomic Tools for Vinyl Film Installation." Phases I & II. 3M Corporation. Directed the human factors analysis and the subsequent design of tools for the application of 3M vinyl film. The team produced working mechanical models and final appearance models of the tools. January-June 1999.

**Director,** "Development of Temporary Stowage Devices for the Use with the Materials Science Resource Rack (MSRR)." NASA Marshall Space Flight Center. Directed undergraduate students in the discovery and development of temporary restraint devices for the MSRR that is to be deployed on the International Space Station. Concepts focused on safety and ease of use. Three of these devices were further developed for actual deployment in the International Space Station. Fall, 1998.

## Professional Organizations

**Chair,** IDSA Membership Development Committee Task force on Education. As chair of this task force, I successfully led efforts to develop regional orientation program for student chapter officers within each of the five regions. These orientations provide opportunities for the student chapter officers to begin to network with the chapter officers and other full-time practitioners within their region. The education task force was also successful in getting the entry level membership dues reduced for recent graduates and in instituting a national job fair for graduating seniors and recent graduates, as well as members in transition.

13



**Member**, IDSA Membership Development Committee. The IDSA Membership Development Committee is comprised of five Industrial design professionals. The committee was created by the president of IDSA to study the problem of low-membership retention and to develop specific proposals to enhance and increase membership within IDSA.

14

# Bret H. Smith, IDSA

Department of Industrial Design
207 Wallace Center
Auburn University, AL 36830

email: smithbh@auburn.edu
Phone: 334-844-2372

## Education

Purdue University.  M.A.,  Industrial Design.*  May 1984.

Purdue University.  M.A.,  English.  May 1984.

Purdue University.  B.S. IED,  Industrial Education and Industrial Technology.
May 1981, *Magna cum laude.*

Teacher's License, State of Indiana.  Grades 7-12.  Issued, 1985.

## Experience

| | | |
|---|---|---|
| Auburn University | Professor | 1997- present |
| | Associate Professor | 1990 -1997 |
| | Acting Department Head | 1989 - 1990 |
| | Assistant Professor | 1985 - 1989 |
| DrDesign, Inc. | Product Designer | 1984 - 1985 |
| Tom David Design | Design Assistant | Jan. - May 1984 |
| Independent Contractor | Residential Remodeling | 1978 - 1981 |

*M.A. is considered the terminal degree in Industrial Design

I

## Honors and Awards

**Recipient,** Life member, The Honor Society of Phi Kappa Phi. 2005.

**Recipient, Design Leadership Award from NASA Marshall Space Flight Center.** The award was for outstanding leadership in the development, prototyping and testing of payload equipment restraint system (PERS) currently deployed on the international space station. 2001.

**Recipient,** College of Architecture, Design and Construction Award for Outstanding Service to the College. Fall, 1999.

**Recipient,** Special Recognition Award for Contributions to the Field of Exhibit Design from the Exhibit Designers and Producers Association. EDPA National Conference. May 1999.

**Recipient, Design Leadership Award from NASA Marshall Space Flight Center.** The award was for outstanding leadership in the development of concepts for the materials science rack payload equipment restraint system. December, 1998.

**Recipient,** College of Architecture, Design and Construction Award for Excellence in Leadership. Fall 1998.

**Special Recognition** by the Exhibit Designers and Producers Association for quality of teaching in an exhibit design studio. May, 1997.

**Recipient,** College of Architecture, Design and Construction Award for Outstanding Teaching. Fall 1997.

**Recipient,** College of Architecture, Design and Construction Award for Outstanding Contributions to Extension. The award was given in recognition of service to the Industrial Designers Society of America as a member of the Membership Development Committee and for the development of Design Voices: A Contemporary History of Industrial Design. Fall 1996.

**Chair, IDSA (Industrial Designers Society of America) Membership Development Committee Task Force on Education.** As chair of this task force I successfully led efforts to lower the membership dues for recent graduates, to establish a national jobs fair for graduating seniors, and to establish an annual orientation and training program for student chapter officers of IDSA. January 1996 to January 1998.

**Member,** Advisory Board for Exhibit Designer World Symposium. 1995 - June 1998.

**IDSA Southern District Vice President.** IDSA is the professional society for industrial designers within the United States. The Southern District encompasses a ten-state area. Elected Office. January 1993 - January 1995.

**Member of the Executive Council and Board of Directors for IDSA.** Executive Council members are responsible for directing the overall operation of the professional society, monitoring the month to

2

month status of programs and finances, and for authoring bylaws and policy changes. Elected Office. January 1993 - January 1995.

**Special Recognition** by the Exhibit Designers and Producers Association for quality of teaching in an exhibit design studio. TS/2 national trade show. Atlanta, Georgia. TS/2 is the national trade show for exhibit designers and producers and trade show service industries and is attended by professionals throughout the United States. July 1991.

**International ICSID/Philips Citation of Merit Design Award** for design of Remote Injury Evacuation System. The ICSID/Philips Design Competition was the premier, worldwide competition for industrial designers at that time. It was sponsored by the International Council of Societies of Industrial Design (ICSID) and N.V. Philips of the Netherlands. N.V. Philips, a $5.6 billion dollar company, is the parent company of Philips Electronics, PolyGram Records, Norelco and Magnavox, among others. Entries were submitted by professional design firms all over the world. Three Citations of Merit were awarded in addition to a first and second place. Team leader for this project. 1983.

**Member,** The Honor Society Phi Kappa Phi (Inducted as a junior).

## Invited Speaker

The Eighth International Congress on Behaviorism and Behavioral Sciences, September 2006, Santiago de Compostela, Spain.

The Sixth International Congress on Behaviorism and Behavioral Sciences, Auburn, Alabama. September 2002.

The Fifth International Congress on Behaviorism and Behavioral Sciences, Special Session. Taiwan. December 2000.

The Fifth International Congress on Behaviorism and Behavioral Sciences. Mexico. October 2000.

The Fourth International Congress on Behaviorism and Behavioral Sciences. Seville, Spain. November 1998.

Third International Congress of Behaviorism and Behavioral Sciences. Japan. October 1996. The congress is a biannual event and features presentations by leading professionals from around the world in the area of behavior and behavioral sciences.

**Invited Panel Member,** (one of two educators selected nationally) "Plastics and Design Education, What's Missing." Materials & Processes Section Meeting held in conjunction with the SPE at the SPE/SPD National Conference in Atlanta. April 1996.

## Competitive Grants from within the College

College of Architecture, Design and Construction Grant to develop Digital Video Disc technology. This is a college-wide competitive RFP process. Summer 2001.

3

College of Architecture, Design and Construction Grant. The grant provided funds for travel to Seville, Spain to present at the Fourth International Congress on Behaviorism and Behavioral Sciences. November 1998.

College of Architecture, Design and Construction Grant. The grant provided funds for travel in order to present at the national Design Education Conference of the Industrial Designers Society of America. Fall, 1998.

College of Architecture, Design and Construction Grant. The grant provided funds for travel in order to present at the Annual conference of the Industrial Designers of America. Fall, 1999.

College of Architecture, Design and Construction Grant. The grant provided funds for travel in order to present the results of research on the effective design of interactive multimedia at the 1996 World Design Conference in Orlando. Summer of 1996.

College of Architecture, Design and Construction Grant to develop an advanced undergraduate course in animation and computer modeling. This is a college-wide competitive RFP process. Summer 1995.

Discretionary Research Grant-in-Aid for travel to present research at the Second International Congress of Behaviorism and Behavioral Sciences, September 1994. Award amount: $500.

**Team member,** "Design of Computer controlled Work Station for the Teaching of Basic Drawing Skills." Part of a joint research project between members of the departments of Psychology and Industrial Design. Other members included Tin-man Lau, Peter Harzem and David Lupin. 1988 to August of 1989. Jointly funded ($4200) by the School of Architecture and the Department of Psychology.

Competitive Research Grant-in-Aid, Auburn University. "Definition and Articulation of Human Factors Problem Areas in Residential Living Environments for the Elderly" 1986.

## University Committees

**Member,** University Committee for Wrongful Termination. Served in one Wrongful termination case brought before the committee. 2005 – 2007.

**Member,** University Finance Committee, 2002-2004.

**Member,** University Senate (one term)

**Industrial Design representative,** Committee on Design Instruction. The Committee on Instruction is comprised of faculty members from the School of Business, the College of Engineering and the Department of Industrial Design. The committee was formed to explore ways in which students in the three disciplines could be more effectively trained to work with teams. Much of the 1991-1992 timeframe was spent laying the ground work for an NSF proposal through the Thomas Walter Center

4

**Outside Reader** and Graduate School Representative for selected Ph.D. dissertations, Auburn University, 1989, 1990, 1991, 1994.

**Member**, ACHE Internal Review Committee for the Department of Architecture, Auburn University, winter, 1989.

**Member**, Program Development Council for the Center on Aging, Auburn University 1988-1991.

**Taught** "Introduction to CADKEY for Auburn University Personnel," Fall Quarter 1988. This was offered free of charge to interested university personnel in order to train and certify them in the latest CADKEY software. Organized and team-taught with Professor Tin-man Lau.

## School/Department Activities

**Member**, Faculty Search Committee, Spring 2007.

**Reviewer**, CADC seed grant proposals, 2005 and 2006.

**Member**, CADC IT Director Search committee, 2005.

**Search Committee Chair** (3 times), Department of Industrial Design search for new faculty position.

**Department Representative**, Dean Search committee (twice).

**Department Representative** for Golden eagles 2004-2005

**Member**, Dean's counsel, 2004.

**Author**, Department of Industrial Design five-year comprehensive plan. Final draft was reviewed and augmented by the full faculty of the Department of Industrial Design, Spring 2000.

**Author**, Department Assessment Procedures for regional accreditation. Final draft was reviewed and augmented by the full faculty of the Department of Industrial Design Fall 2001

**Author**, Departmental Safety Program. This program was developed with working in concert with the University Safety Office. As a result, the Department of Industrial Design became the first department on campus to have clearly articulated safety policy and required safety procedures. Final draft was reviewed and augmented by the full faculty of the Department of Industrial Design Fall 2000.

**Member**, Portfolio Review Committee, 1994 - 1998.

**Member**, Industrial Design Graduate Curriculum Committee, 1990 - present.

**Member**, Committee for NASAD accreditation, September 1992 - April 1993. NASAD is the accrediting body for Industrial Design.

**Department Representative**, CADC tenure and promotion policy committee.

Member, Industrial Design Curriculum Development Committee.

Member, Dean's Task Force on Tenure and Promotion, Fall 1994 - 1995.

Member, School of Architecture Dean Search Committee, Summer 1993- Spring of 1994.

Member, Dean's Research Council, School of Architecture, 1988 - 1992.

Member, School of Architecture Computer Committee, 1989 - 1991.

Acting Department Head, Department of Industrial Design.  Responsibilities included managing departmental budget and staff, scheduling teaching assignments, preparing a five year strategic plan for Industrial Design, working with the Design Advisory Council, developing undergraduate enrollment standards and reopening the graduate program.  September 1989 - June 1990.

Faculty Advisor, Student Chapter of the Industrial Designers Society of America.  January - October 1989.

## Additional Department Contributions

CADKEY Training Center Director and liaison with CADKEY Inc.  1989 - 1993.

Negotiated and received $25,000 in software (20 stations) and software support from CADKEY, Inc. CADKEY is a world leader in three-dimensional CAD software for DOS-based computers.  August, 1992.

Negotiated and received $1,000 in word processing software (10 stations)--site license for WordPerfect for Windows.  Private contribution. January 1992.

Negotiated and received $2,000 worth of Design for Assembly Software (unlimited site license). Private contribution. May 1989.

Negotiated and received $35,000 worth of software (20 stations) from Micro Control systems, Inc. April 1988.

Negotiated and received $3,200 worth of training in Design for Assembly from Xerox Corporation. May 1988.

## Professional Development

### Tours and Course work
Toured Great Southern Wood Preserving Manufacturing Facilities, Abbeville, AL.  August 2007.

Toured Broan-Nutone advance manufacturing center, Hartford WI, April, 2006

Toured the advanced computing and robotics facility, University of Minnesota, July 2005.

6

**Toured** the Tupperware design facility, Orlando Florida, April, 2005.

**Toured** the World War II memorial and the Smithsonian Museum, August 2005.

**Rhino Professional Training,** Auburn University, September, 2005. Rhino is a three-dimensional surface and solids modeling program that has wide spread use in our profession. It is capable of photo realistic rendering and exporting for computer controlled model making including fuse deposition, stereo lithography, and computer controlled milling.

**Director 4.0 Multimedia Authoring System.** Georgia Institute of Technology, Mulimedia Center. November 1995. Director is one of the two major multimedia authoring systems (ToolBook is the other). This course was taken in preparation for introducing multimedia design as an option within the Graduate program. Based upon this course and on experience gained at the Center for Creative Imaging students are now being trained to make effective contributions as industrial designers in the development of interface design for interactive environments. I was supported, in part, through the award of a Discretionary Teaching Grant-in-Aid from Auburn University.

**Interactive Multimedia: Concept, Design and Production**. Center for Creative Imaging. The Center for Creative Imaging (CCI) was established by Kodak as a state-of-the-art center for computer imaging and multimedia. Courses are taught by leading industry professionals. *Interactive Multimedia Concept, Design an Production* is the most advanced course offered at CCI. Camden, Maine. May 1994.

**Design for Assembly**. Xerox Automation Institute. Xerox Corporation's in-house training course for designing and evaluating products (quantitatively and qualitatively) for ease and economy of assembly and manufacturing. Considered one of the top two programs in the United States. Much of this training was incorporated into a graduate level course in advanced manufacturing. The principles of quality assurance learned in this course have also been used in coauthoring academic evaluation policies within the department. Webster, New York. May 1988.

**Basic CADKEY Training.** CADKEY Incorporated. CADKEY is a world leader in DOS and Unix-based three-dimensional CAD software. Completing the basic and advanced courses resulted in my becoming a certified CADKEY trainer and allowed the department to qualify and be listed nationally as a CADKEY Training Center. June 1988.

**Advanced CADKEY Training.** CADKEY Incorporated. This training covered the construction of automated drawing sequences and dynamic calculation routines and the use of the advanced solids modeling program "Solids Synthesis." It allowed me to qualify as an Advanced Level CADKEY Trainer and for the department to strengthen its standing and versatility as a CADKEY training site. More importantly, it allowed our students to graduate with advanced level CADKEY certification. August 1988.

**American Society on Aging and Technology Conference.** Washington, D.C. March, 1987. 11 hours continuing education.

## Professional Conferences and Meetings Attended

**ICSID /IDSA International Conference,** San Francisco, October 2007.

**National Home Builders Show,** Orlando Florida, February 2007.

Workshop leader, **IDSA National Conference,** Austin Texas, September 2006.

**Consumer Electronics Show,** Las Vegas NV.  January 2006.

**IDSA National Education Conference** in Alexandria, VA.  August, 2005

**Sixth International Congress on Behaviorism and Behavioral Sciences.**  Auburn, Alabama.  September, 2002.

**POP Chicago,** Chicago, IL.  June 2002.

**IDSA Southern District Conference,** Brass Towne Valley Resort.  Spring 2002

**IDSA Materials Section,** Recent Developments in Plastics Molding Techniques.  April 2001.

**IDSA National Conference.**  Chicago, IL.  July 1999.

**IDSA National Educator's Conference.**  Chicago, IL.  July 1999.

**Fourth International Congress on Behaviorism and Behavioral Sciences.**  Seville, Spain.  November 1998.

**IDSA National Conference.**  San Diego, CA.  September 1998.

**IDSA National Educator's Conference.**  Long beach, CA.  September 1998.

**Exhibit Designers World Symposium.**  Chicago, IL.  August 1998.

**Exhibit Designers World Symposium.**  Washington D. C.  June 1997.

**IDSA National Educator's Conference.**  Washington D.C.  June 1997.

**World Design 1996.**  Orlando, Florida.  I made four presentations at this conference and my Design Voices work was featured during the General Session on Saturday morning.  September 1996.

**Education Town Meeting.**  Orlando, Florida.  September 1996 (Presenter).

**IDSA Board of Directors Meeting.**  Orlando, Florida.  September 1996.  Presented plans for increasing involvement of professors, students and recent graduates in IDSA.

*IDSA Membership Development Committee Meeting.*  Orlando, Florida.  September 1996.

**IDSA Membership Development Committee** Meeting. Auburn, Alabama. Hosted and participated in a meeting of the IDSA Membership Development Committee. August 1996.

**Exhibit Designer World Symposium**. Atlanta, GA. June 1996. Invited Presenter.

Representative of the Membership Development Committee to the Southern District Conference. Atlanta, Georgia. May 1996.

**Structural Plastics'96**, Annual Conference of the Society of the Plastics Industry. Atlanta, Georgia. April 1996. Invited Speaker.

**IDSA Membership Development Committee Meeting**. Seattle, Washington. February 1996.

**Teague Design Office Tour**. Seattle, Washington. February 1996.

**IDSA National Conference**. Santa Fe, New Mexico. September 1995. Attended and Presented.

**IDSA Board of Directors Meeting**. Santa Fe, New Mexico. September 1995.

**IDSA Membership Development Committee Meeting**. Santa Fe, New Mexico. September 1995.

**IDSA Membership Development Committee Meeting**. Pittsburgh, Pennsylvania. June 1995.

**The Second International Congress of Behaviorism and Behavioral Sciences**. Invited to conduct a symposium at this conference (see section 4.B.3). Palermo, Italy. October 6-9, 1994.

**IDSA** (Industrial Designers Society of America) **Board of Directors Meeting**. Dearborn, Michigan. August 1994.

**IDSA Education Conference**. Henry Ford Museum, Dearborn, Michigan. August 1994.

**IDSA National Conference**. Dearborn, Michigan. August 1994.

**IDSA Executive Council Meeting**. Annapolis, Maryland. June 1994.

**IDSA Southern District Conference**: *Design Visions*. Charleston, South Carolina. May 1994.

**IDSA National Conference**. Atlanta, Georgia. August 1993.

**IDSA Board of Directors Meeting**. Atlanta, Georgia. August 1993.

**TS/2 Exhibit Builders Trade Show**. Atlanta, Georgia. July 1993.

**IDSA Executive Council Meeting**. Reston, Virginia. June 1993.

**Comdex**. Comdex is one of the major trade shows for computer software and hardware in the United States. It features products from U.S., Canada, and European countries. Atlanta, Georgia. May 1993.

IDSA Executive Council Transition Meeting. Cayman Islands. December 1992.

EDPA (Exhibit Designs and Producers Association) **Student Design Competition Briefing**. Atlanta, Georgia. January 1993.

*Aging: The Wave of the Future*, 1992 **AGS** (Alabama Gerontological Society) **Conference**. Perdido Beach, Alabama. March 1992.

**AECT** (Association for Educational Communications & Technology) **National Convention**. The AECT Conference is the largest single conference (over 5000 in attendance) for education, media, curriculum specialists and trainers (See also section 4.A.6 "Refereed Presentations"). Washington D.C. February 1992.

**INFOCOMM Exposition**. INFOCOMM is dedicated to hardware and software for computer-based and multimedia instruction. Washington, D.C. February 1992.

**Home Health Care Show**. The Home Health Care Show is the annual national trade show of the home health care industry. It is the key trade show for keeping current on the latest products for general home health care as well as for older adults and people with specific disabilities. Atlanta, Georgia. February 1992.

**Interface 91**, *Seventh Symposium on Human Factors and Industrial Design in Consumer Products*. Dayton, Ohio. May 1991.

**IDSA Southern District Conference**, Space: Design for the Last Frontier. Cocoa Beach, Florida. March 1990.

**IDSA National Conference**. Santa Barbara, California. August 1990.

**The Design Education Conference**. Pasadena, California. August 1990.

**Color in Computer Applications** (workshop), Indianapolis, Indiana. June 1990.

**The Conference on Design Education: Educating in the 90's**, Minneapolis College of Art and Design, Minneapolis Minnesota, August 1989.

**IDSA National Conference**, Minneapolis, August 1989.

**IDSA Design Education Conference**, Northwestern University, 1986.

**IDSA National Conference**, Chicago, 1986.

## Contributions to teaching

**2004-2007**
Restructure the design history course, INDD to take lessons from history, beginning with the invention of the printing press and perspective drawing, through the Industrial Revolution, and the esthetic movements of the last century, and apply them to contemporary design situations. The

10

new course makes extensive use of interview footage collected from contemporary designers who have made significant contributions to the profession.

**2005-2007**
Developed the technical drawing text and course material for freshman summer studio 2005-2007. Co-author, Chris Arnold.   Based upon a concept developed by Tin-man Lau and William Bullock.

**Fall 2006**
Developed an undergraduate seminar course in the use of Rhino Software.  Rhino is a three dimensional surface and solids modeling program with wide industry adoption.  The seminar covers basic and advanced training with special attention on troubleshooting files for manufacturing.

**Fall 2004-2005**
Developed required Graduate course in Rhino Software.   Final results are the subject of an annual month long show in Dudley Gallery.  January 2005- Present.
Developed required Graduate course in advanced computing, INDD 7020.  Fall 2000. The course covers the basic and advanced Rhino training manuals, Photo realistic rendering using Flamingo, studio lighting effects, and animation.

**2000**
Authored course description and curricula for INDD 3110 for semester transition.

**1994-1997**
Developed the EDPA National Exhibit Design Curriculum with Gary Stewart, principle and founder of Design South.

**1995-1996**
IND 621 Industrial Design -- Developed a department-wide graduate course to teach students how to identify a researchable question, conduct a literature review, develop a thesis and design an effective course of research.

IND 614 Design Systems -- Developed the first departmental course in the construction of multimedia information systems.  This course required that students learn an authoring system (Director 4.0), identify a design problem and develop an effective multimedia solution.  The course made use of information acquired through attending a course in Director taught at the Georgia Institute of Technology.

IND 602 Design Principles -- Developed a course in the application of design for assembly methods to the industrial design process.  Working with industrial designers from Panasonic, students disassembled and evaluated cellular phones designed and manufactured by Panasonic. Students redesigned the phones, applying DFA principles as part of the design process.  The final designs were then scored for assemble ability using two different DFA systems. Panasonic provided support for this project through a donation of $5000-$6000 worth of prototype parts and nonfunctional prototypes.

IND 601 Design Principles -- Developed a course in the application of design principles for interactive multimedia and internet design.  Students were required to conduct extensive field

11



work, review relevant literature, develop design principles and test these principles through the design and implementation of a multimedia program or a web site.

**1994-1995**
IND 110 Drawing Systems -- I developed and taught a special version of this course for "Summer Op." Summer Op provides students with the opportunity to take three quarters of freshman design studios in a single quarter. In order to accomplish this teaching and the assignments must be very carefully crafted to ensure that Summer Op students receive the same high level of instruction that students receive during the normal school year. This pilot course later became the basis for the first third of our current Summer Op program.

IND 385 Seminar -- Developed and taught a special advanced section of IND 385 designed to teach students how to effectively create and animate 3-D models using trueSpace software. This course was developed in response to a growing need within the industry to use animation and 3-D modeling to analyze and detect operational and logistical product problems prior to soft tooling.

IND 585 Special Problems -- Developed and taught a combined post-baccalaureate and graduate student studio. Students worked in teams to develop a ruggedized 486, multimedia-capable computer for Miltope Incorporated in Montgomery, Alabama. Miltope is a leading supplier of ruggedized communication and computer equipment for military use. Their communication equipment is used in aircraft carriers and nuclear submarines as well as in military operations such as Desert Storm. While the company has built an extremely successful business based upon the performance and dependability of its equipment, the equipment is often extremely expensive. The final design made use of new process and assembly alternatives that reduced the overall case manufacturing costs by 90% over a two-year period while at the same time making the equipment more durable and easier to assemble, service and maintain.

**1993-1994**
IND 620 Industrial Design -- Developed specialized course on the use of computer-integrated design in the design process. In addition to learning high-end three-dimensional software, students were taught about advanced computer-related design topics, including effective use of internet, mass storage systems, multimedia, digital imagery and cross-platform development.

IND 385 Design Seminars. Developed new seminar course to teach students MicroStation 5.0 (advanced 3-D software). Also developed new course material to teach PageMaker 5.0 (industry leader in desktop publishing software) and CorelDRAW (industry leader at the time in desktop and illustration software for DOS platforms).

IND 310 Industrial Design/Concept Development. During the 1993-94 school year, I developed a special section of the course to teach students how to prepare work for competitions. Students were required to prepare a submission for the 1993 National Housewares Student Design Competition (NHMA Competition). One of my students, Chris Schwab, won second place in a field of 183 entries from 22 colleges and universities throughout the United States.

IND 605 Design Management. Developed and implemented entirely new structure and material for existing course. Students were required to complete a number of instructional modules on various aspects of design management and then to complete an in-depth investigation of one management area.

12

**1992-1993**

IND 606 Human Factors in Design. Developed and implemented current course. Current course contains sections on basic physiology, human factors of special populations and human factors of aging. Each student completes and documents the results of a design project which requires special attention to human factors.

**1991-1992**

IND 621 Industrial Design -- Advanced Manufacturing and Materials. Developed a graduate level industrial design course with special emphasis on design for assembly, and design for environment. The course covered the Boothroyd and Dewhurst and the Poli methods of design for assembly evaluation. Graduate students worked with me to develop methods for evaluating products for ease of disassembly and environmental friendliness. The materials developed in this course for Design for Disassembly and Design for Environment are currently being evaluated by the Committee for Environmental Concerns of the Industrial Designers Society of America for nationwide distribution as a vehicle for promoting greater understanding of and attention to environmental and disassembly issues.

IND 420 Professional Practice. I completely restructured the course, developing detailed lectures and self-paced projects on contracts, proposal writing, cost structures of business, business plans, marketing, client contact and intellectual property. I also brought in outside professionals to give lectures on specific topics related to the running of design businesses.

IND 311 Packaging. Developed a special, industry-sponsored section of this course which addressed packaging and corporate identity through the design of trade show exhibits.

IND 307 Anthropometry. Completely restructured the course and developed the following new sections: Anthropometry of Vision, Anthropometry of Hearing, Anthropometry of Aging, Physiology of the Hand and Control Considerations, Links, Joints and Posture.

**1990-1991**

IND 308 Model Making. Developed course material and projects for ridged foam, foam-core, wood and plastic models as well as material and assignments for mixed media model making with paper and foam core, painting with spray guns effectively, creating models with complex geometry, vacuum form modeling and cut-piece composite modeling.

## Grants Received related to teaching

**1995-1996**

Exhibit Designers and Producers Association (EDPA) Student Design Competition, 1996. This competition is a quarter-long studio project in which the students work in teams to design, develop, model and document a 30' x 30' trade show exhibit for EDPA. The work of ten of the Auburn students involved in the project was featured at the Exhibit Designer World Symposium in Atlanta in June of 1996. One student from the winning team was chosen to receive a $1200 scholarship to attend the Exhibit Designer World Symposium. Results of this competition were also featured in *Action News*, Vol. 10. No.4. *Action News* is the bimonthly newsletter the Exhibit Designers & Producers Association and is distributed to exhibit design professionals throughout the

13

United States. This project was sponsored by The Exhibit Designers and Producers Association. Amount: $1500 in direct support plus $4000 gifts-in-kind in the form of personnel, materials and travel in support of the project.

**1994-1995**
Awarded Discretionary Teaching Grant-in-Aid to take a course, Multimedia Authoring with Director, at Georgia Institute of Technology. November 1995. This course provided basic and intermediate level knowledge for authoring with Director. Knowledge gained from this course was incorporated into a graduate multimedia design course. Level of award: $500.

Awarded College of Architecture, Design and Construction Grant to develop an advanced undergraduate course in animation and computer modeling. This class was offered as a special section of IND 385 during the summer of 1995. Results of this course were featured in a student presentation at the IDSA Southern District Conference in May of 1996. Grant amount: $2400.

Miltope, Inc. Sponsored Studio Project to develop a housing design for a ruggedized 486 DX66 multimedia computer designed to operate under battle field conditions. Students explored alternatives and worked in teams to develop final solutions which were presented in appearance model form to the client. Students also developed recommendations for the use of new process and assembly techniques which resulted in a 90% reduction in the cost of the computer housing without compromising the strenuous field performance requirements. Grant amount: $10,000 cash and $3000 gifts-in-kind in the form of personnel, materials and travel in support of the project.

Exhibit Designers and Producers Association (EDPA) Student Design Competition, 1995. This competition is a quarter-long studio project in which the students work in teams to design, develop, model and document a 30' x 30' trade show exhibit for EDPA. Results of this competition were featured in *Action News*, Vol. 9. No.3. *Action News* is the bimonthly newsletter of the Exhibit Designers & Producers Association and is distributed to exhibit design professionals throughout the United States. Sponsored by The Exhibit Designers and Producers Association. Amount: $1500 in direct support plus $4000 gifts-in-kind in the form of personnel, materials and travel in support of the project.

**1993-1994**
Exhibit Designers and Producers Association (EDPA) Student Design Competition, 1994. This competition is a quarter-long studio project in which the students work in teams to design, develop, model and document a 20' x 20' trade show exhibit for EDPA. Results of this competition were featured in Action News, Vol. 8. No.3. Action News is the bimonthly newsletter of the Exhibit Designers & Producers Association and is distributed to exhibit design professionals throughout the United States. Sponsored by the Exhibit Designers and Producers Association. Amount: $1500 in direct support plus $4000 gifts-in-kind in the form of personnel, materials and travel in support of the project.

**1992-1993**
Exhibit Designers and Producers Association EDPA Student Design Competition, 1993. Student designs produced as part of this studio were shown to over 150 exhibit design professionals at the TS/2 trade show for exhibit designers and producers. Students were honored at a special reception at TS/2 in Atlanta, Georgia. July 1993. Results of this competition were featured in Action News, Vol. 6. No.4. Action News is the bimonthly newsletter of the Exhibit Designers & Producers

14

Association and is distributed to exhibit design professionals throughout the United States. Sponsored by the Exhibit Designers and Producers Association. Amount: $1500 in direct support plus $4000 gifts-in-kind in the form of personnel, materials and travel in support of the project.

1991-1992
"Design of a Lunar Campsite." I designed and directed the project. Students worked in teams to develop solutions to mechanical, environmental and logistical problems in the proposed Lunar Campsite. The final results were favorably received by NASA. According to the NASA lead engineer for the Lunar Campsite project, many of the ideas generated by the students have been incorporated into the baseline configuration requirements of the Campsite. The project was part of a larger grant authored by Clark Lundell and made to the Industrial Design Department. NASA contributed $2500 in direct support for supplies and travel plus $3000 gifts-in-kind in the form of personnel, materials and travel in support of the project. Sponsored by NASA, George C. Marshall Space Flight Center, Huntsville, Alabama.

"Exhibit and Trade Show Design." Sponsored by Design South, Inc., Atlanta, Georgia. Design South contributed $1500 in direct support plus $4000 gifts-in-kind in the form of personnel, materials and travel in support of the project. Design South is one of the top five design/build exhibit firms in the United States.

1987-1988
"Structural Foam Applications." Students were given the task of developing applications for structural foam plastic. The same charge was given to industrial design students at other schools across the country. At the end of the quarter, BorgWarner selected the most promising designs to be featured in *Structural Foam Applications Unlimited*, a booklet on state-of-the-art structural foam applications published by BorgWarner Chemicals and distributed worldwide. Of the three schools featured in that publication, Auburn had over twice as many student designs as the other schools combined. Moreover, Auburn was the only school in which students competed individually instead of in teams. Four of the six Auburn students featured developed their applications as a five-week assignment in the senior studio class which I was teaching. Sponsored by BorgWarner Chemicals, Inc., a multi-billion-dollar-a-year company with offices in the United States, Canada, Hong Kong, Australia, Europe and Japan. BorgWarner contributed direct support of $5,000 and $2000 gifts-in-kind in the form of material, personnel and travel in support of the project.

1985-1986
"Personal Fitness Equipment: Design Explorations." Sponsored by Diversified Products. Diversified Products contributed direct support of $3,000 plus $1000 gifts-in-kind in the form of personnel, materials and prototyping in support of the project.

# Research/Creative Work

## Sabbatical

**Sabbatical**, Fall 1995. While on sabbatical I visited design firms throughout the Midwest, collecting oral history, views on the business of design, the future of the profession and the requirements for an excellent design education.

Milwaukee Institute of Art and Design. October 4, 1995. Toured the MIAD collection on Brooks Stevens and spent the afternoon in the Brooks Stevens archives.

Brooks Stevens Design Associates. October 5, 1995. Met with CEO Kipp Stevens.

Bruce Renquist and Associates. October 6, 1995. Met with founder and CEO Bruce Renquist.

Edward Peterson Design. October 6, 1995. Met with owner Ed Peterson.

Tom David. Brooks Stevens Endowed Chair. October 7, 1995. Met with Tom David and toured the MIAD facility.

Motorola Incorporated, Schaumburg, IL. October 9, 1995. Met with Rudy Kroelop, director of design worldwide for Motorola. Also toured their 1.6 million square foot manufacturing facility.

Source Design Inc., Chicago, IL. October 10, 1995. Met with James Hansen, founder and CEO of Source Design.

Yamasaki Goldsmith and Specht Inc., Chicago, IL. October 11, 1995. Met with Paul Specht, founder and surviving principal of the firm.

Herbst, Lazar, Bell Inc., Chicago, IL. October 11, 1995. Met with Ralph Lazar, cofounder of the firm.

Dana Mox and Associates, Chicago, IL. October 12, 1995. Met with Dana Mox, founder.

Perkins Design Ltd. October 12, 1995. Met with Nancy Perkins, founder and CEO.

KDA Design. Chicago, IL. October 13, 1995. Met with John Howard, CEO.

Gantz Design. Pittsburgh, PA. October 19, 1995. Met with Carroll Gantz, founder.

Bally Design. Pittsburgh, PA. October 20, 1995. Met with Alex Bally, founder and CEO.

Daedalus Design. Pittsburgh, PA. October 20, 1995. Met with Tim Cunningham, founder and CEO.

Fitch, Inc. Columbus, OH. October 23, 1995. Met with founders Deane Richardson (October 23) and Dave Smith (October 24).

Design Central. Columbus, OH. October 24, 1995. Met with Gregg Davis, founder.

ATT Global Systems. October 25, 1995. Met with Ken Schory, Director of Corporate Design for ATT Global Systems.

## Refereed Articles

"Micro-mass production." Presented at the 2005 IDSA Education conference. Co-authored along with Chris Arnold. Authorship equal. Published Proceedings, *IDSA National Design Education*

16

*Conference Proceedings, 2005.* Juried publication (additional jury process selects from juried presentations—see presentations).

"Grades that Work." IDSA *National Design Education Conference Proceedings.* Juried. September, 2000.

"Creating Safe Student Environments." *Design Gumbo.* Industrial Designers Society of America International Design Education Conference, New Orleans, 2000. Juried Published Proceedings.

"Pedagogy for Teaching New media Design Start to Finish in One Class." *Design Gumbo.* Industrial Designers Society of America International Design Education Conference, New Orleans, 2000. Juried Published Proceedings.

"Developing Industry Collaboratives: Their critical roll in Education." Published in *National Design Education Conference* Proceedings. University of California, Long beach. September 1998. Juried Presentation and Published Proceedings.

"New Media: Blurred Boundaries; Sharpened Skills." Published in *IDSA National Design Education Conference Proceedings.* Juried. June 1997.

"A Design for Disassembly," *Innovation.* Spring 1996. Juried. *Innovation* is the only refereed journal for industrial design in North America. This article presented quantitative methods for evaluating products for ease of disassembly, allowing designers to be better stewards of our natural resources while still designing products that are durable, easy to use and cost effective to produce. Acceptance rate for articles by non-first time authors is 15%. This article received the highest rating of all articles submitted for the spring issue of Innovation. The article included work and illustrations by Richard Britnell and Eric Tse.

"Quantifying Environment-Related Design Decisions," *Structural Plastics '96 Proceedings.* Washington D.C.: The Society of the Plastics Industry, Inc., 1996. Pages 181 - 188.

"The Effective Use of Color in Communication," *Interface 91,* Seventh Symposium on Human Factors and Industrial Design in Consumer Products, Dayton, Ohio, May 1991. Presented Paper & Published Proceedings. Bret Smith and Peter Harzem. Papers and presentations are selected through a peer review process.

*Just in time Teaching,* Published in the *National Design Education Conference Proceedings,* Pasadena California, August 1990. Bret Smith (senior author) and Eric Smith. Presented paper & published proceedings. Selected through a peer review process.

"Application of Instructional Systems Design to Design Education." *The Conference on Design Education: Educating in the 90's,* Minneapolis College of Art and Design, Minneapolis Minnesota, August 1989. Presented paper & published proceedings. Selected through a peer review process.

"The future of Design Education," *Innovation,* Vol. 7 No. 4, 1988. William Bullock and Bret Smith. Authorship equal. Published quarterly, Innovation is the only national refereed journal in Industrial Design in the United States. The acceptance rate for first time authors is 25%. It is about 15% for second time authors.

17

"Expanding User Populations: Designing for the Elderly." *Interface 87*, Fifth Symposium on Human Factors and Industrial Design in Consumer Products, Rochester, New York, May 1987. Presented Paper & Published Proceedings. Selected for presentation and publication through a peer review process.

"Life in Space—the Ultimate Design Challenge?" *Innovation*, Vol. , No. 4, 1987. William Bullock (senior author), Bret Smith and Tin-man Lau. Published quarterly, Innovation is the only national refereed journal in Industrial Design in the United States. The acceptance rate for first time authors is 25%. It is about 15% for second time authors.

## Refereed Presentations

"Micro-mass production." Presented at the 2005 IDSA Education conference. Alexandria VA. Co-authored along with Chris Arnold. Authorship equal. Juried presentation.

"Developing Industry Collaboratives: Their Critical Role in Education." Presented Paper and Published Proceedings." National Design Education Conference of the Industrial Designers Society of America. University of California at Long beach, Long beach California. September 1998.

"Alternative Realities: The Potential and Promise of Multimedia," WorldDesign 96. Refereed presentation. This presentation was made as part of the break-out sessions at WorldDesign 96. Other presenters included Liz Sanderson, director of human factors for Fitch, one of the two largest design consultancies in the United States, and Bill Stumpf, whose firm, Bill Stumpf+Associates, designs furniture manufactured by Hermann Miller.

## Solicited Publications and Presentations

"Tom David: Lessons Learned," The Icsid/IDSA World Design Congress, San Francisco, 2007. Produced at the request of the IDSA as part of the National Educator award ceremony during the opening session of the conference.

"Can I Get There from Here? Selecting a GPS Device," Ezine article for The Honor Cord, the Honor Society of Phi Kappa Phi Ezine. Phicappaphi.org. October 2007.

"What to look for in a cellular phone service." Ezine article for The Honor Cord, the Phi Kappa Phi Ezine. phikappaphi.org. June 2007

"Audio Migration in a Windows world." Ezine article for The Honor Cord, the Honor Society of Phi Kappa Phi Ezine. phikappaphi.org. October 2006.

"Point and Shoot?" Ezine article for The Honor Cord, the Honor Society of Phi Kappa Phi Ezine. phikappaphi.org. June 2006.

"The Digital Dance." Ezine article for The Honor Cord, the Honor Society of Phi Kappa Phi Ezine. phikappaphi.org. January 2006.

"Arthur Pulos: Circles of Influence." (ICSID 10 minute cut) Documentary. Presented at the International Council of Societies of Industrial Design bi-annual meeting. Toronto Canada. October, 1997. Designer, Editor and Producer: Bret H. Smith.

"Arthur Pulos: Circles of Influence." Documentary, 18 minutes. Designer, Editor and Producer: Bret H. Smith. Presented at the IDSA National Conference, Washington D.C, June 1997; IDSA National Educators Conference, Alexandria, Virginia, June 1997; and the biannual meeting of the International Councils of Societies of Industrial Design, Toronto , Canada, August, 1997.

"Housing Modifications for Older Adults," Alabama Gerontological Society Annual Conference. Perdido Beach, Alabama. March 1992. Bret Smith and Tarik Orgen. Featured Speakers.

"Creating a Practical Product Environment for Seniors," Eighth Annual Conference of the Alabama Gerontological Society, March, 1989. Bret Smith and Tin-man Lau. Juried presentation.

"Discussion After Modernism," Review of Design After Modernism, John Thackera, ed. New York: Thames and Hudson, 1988. DESIGNperspectives, January 1989. Solicited review. DESIGNperspectives is the national monthly newsletter for the Industrial Designers Society of America.

"Designing Products for the Elderly," Seventh Annual Conference of the Alabama Gerontological Society, March 1988. William Bullock and Bret Smith. Juried presentation.

"Design Education: Where do we go from here?" Biennial IDSA Educators Conference, Monterey, California. August 1987. William Bullock and Bret Smith. Juried presentation.

"Expanding User Populations." Industrial Designers Society of America National Conference, Chicago, Illinois. August 1986. William Bullock and Bret Smith. Juried presentation.

## Interviews

Interview APT. Interview about products the department has designed for NASA and the role that Kaplana Chawla (crew member on the *Columbia*) played in their development. February 2003.

Interview, Channel 9. Interviewed about Kaplana Chawla and her role in the development of equipment for the international space station. February 2003.

Interview, *P-O-P* (Point-of-Purchase) *Magazine*. Interviewed about the Eastman/Spartech project. December 2001. P-O-P magazine is the leading trade publication for the point-of-purchase industry in the United States.

Interview, Channel 9. January 2001. Interviewed about PERS and the department of Industrial Design's collaboration with NASA for the Channel 9 Morning Show.

Books:

*The Research Paper: A Commonsense Approach.* Prentice Hall, 1988. Thomas Gaston and Bret Smith. Authorship equal. Within the first year of publication, this text was adopted by 22 universities including Ohio Wesleyan University, Michigan State University, Carnegie-Mellon University and Purdue University.

*Teacher's Guide for The Research Paper: A Commonsense Approach.* Prentice Hall, 1988. Thomas Gaston and Bret Smith. Authorship equal.

## Software Publication

*Jump Starting with PageMaker 5.0.* Longmont, Colorado: Evan Design Group, November 1994. *Jump Starting with PageMaker 5.0* is a 200-screen, windows-based, self-installing interactive computer program. The program runs concurrently with PageMaker 5.0 (an industry leader in desktop publishing). It is designed to allow first time users to produce desktop published documents in less than an hour. The program includes the following topic areas: single and multiple column layout, single and multiple page layout, effective use of style sheets, graphics importing, sizing and cropping, text editing, spell checking and printing. Authors: Bret Smith and Eric Smith. Authorship equal.

## Published Abstracts

"The Design of Products in the Post Machine Age." Fifth International Congress on Behaviorism and Behavioral Sciences, Special Session, Taiwan. Published Abstract. 2000.

"Behavior and the Design of Products." Third International Congress on Behaviorism and Behavioral Sciences, Mexico. Published Abstract. 1996.

## Papers at Professional Meetings

"To Err is Human, to Anticipate, Divine." The Sixth International Congress of Behaviorism and Behavioral Sciences." Invited presentation and published abstract. Auburn, Alabama, 2002.

"Neat Plausible and Wrong: The Consequences of Explaining Rather than Understanding Human Behavior." The Fourth International Congress of Behaviorism and Behavioral Sciences. Invited presentation and published abstract. Seville, Spain. November 1998.

"Environment-Related Design Decisions," Structural Plastics '96. April 1996. Juried Presentation. I was one of four industrial designers selected nationally to participate in the conference. Also a published proceeding

## Exhibitions

"Betty Baugh: Design Pioneer," The Icsid/IDSA World Design Congress, San Francisco, 2007.

20

Produced for the IDSA sage special interest section presentation at the 2007 World Design Congress. The congress was attended by 1800 designers from all over the world.

"Budd Steinhilber: Interning at the Raymond Loewy office." Produced for the IDSA sage special interest section presentation at the 2007 World Design Congress. The congress was attended by 1800 designers from all over the world.

"Excerpts from Design Voices." WorldDesign 96. Orlando Florida. September 18 - 21, 1996. Exhibit by invitation only. The exhibit displayed work from my Design Voices project and viewed by over design professionals, journalists and industry representatives.

## Other Scholarly Contributions to the Profession

### Interactive Multimedia History

*Design Voices: A Contemporary History of Industrial Design in the Words of Those Who Have Helped to Shape It.* Design Voices is an interactive multimedia oral history of Industrial Design. Thus far I have interviewed twenty-eight industrial designers and collected over sixty hours of videotape. From these interviews I digitized and edited over 90 minutes of video material containing stories about famous Industrial Designers, early design work, famous projects and products and personal influences. Excerpts from *Design Voices* were exhibited in the International Design Gallery during the four-day WorldDesign 96 Conference in Orlando, Florida. Parts of this project were also featured in presentations during the General Session of the conference and during break-out sessions. Additional interviews were edited for the recent Icsid/IDSA World Congress attended by over 1800 design professionals from around the world. Volume 1 of the history was completed in August 1996. The project is ongoing. Since that time I have continued interviewing Industrial designers who have made significant contributions to the profession, amassing over 100 hours of interview footage from which I have edited additional videos, totaling over 6 hours in length, for use in the our design history class. Interview excerpts are also currently in preparation for posting as podcasts on the IDSA history section website. Current videos include: The creation of the cell phone, design in the 1950s, 60s and 70s; the design of the Tucker automobile; the design work of Russell Wright; apprenticing for NCR; designing for the Robert Budlong office; designing for the Raymond Loewy office (Chicago); designing for the Raymond Loewy office (New York); designing for International Harvester and for MacDonald Douglas; Designing for Henry Dreyfuss; the first American design director of Sony (also the first woman V.P. of any Sony division); four keys to successful design; and, problem definition.

## Consulting

**Product Design** for Tupperware Corporation, Orlando Florida. Provided product design, consultation and instructional support for proprietary new product. As part of this project I participated in consumer product testing in Detroit. March 2005-present (project is ongoing).

**Expert witness.** *Simpson Ventures, Inc. v. Mid-West Metal Products, Inc.* Produced 43 page intellectual property and patent analysis document. July 2007 – Present. Case pending.

21

**Human factors consultation and expert witness**, for Partridge Smith, P.C. in *Lancaster et al. v. Roschell Flowers.* July 2007 – October 2007. Case settled based, in part, on my evaluation.

**Logo and brand development** for KICK, a Colorado based training group. Developed logo, standards and brand applications. January – April 2007.

**Human factors consultation and expert witness**, for Partridge Smith, P.C.in *Kathy A. Ferguson V. Southern Medical Health Systems, Inc.* Case No. CV-04-4701. Case settled prior to trial based upon my analysis. January, 2007.

**Human factors consultation and expert witness** in *Oden v. Springhill.* July 2006 – November 2006. Case settled prior to trial.

**Presentation Design** for Tupperware Corporation's Chairman's Retreat in Hong Kong. In addition to the design of the presentation, I designed and produced a thirty second opening video. March, 2006.

**Human Factors consultation and product evaluation** for Page, Scrantom, Sprouse, Tucker and Ford, PC., attorneys at law. Responsible for computer models, evaluation and documentation of the human factors related design issues for an Ameristep tread design that had resulted in the amputation of a man's finger. Ameristep settled the case prior to trial. June 2005-January 2006.

**Consulting**: Corporate and publication branding for *Phi Kappa Phi Forum.* Spring 2005.

**Designer,** User interface design for the state of Wyoming Department of Mental Health. Contracted by Impel Corp. to develop the user interface for an interactive teaching site for the State of Wyoming department of mental health workers. Responsibilities included design of all screens, development of system that was easily updatable, graphics specification and the development of all interface graphics. April-June 2003.

**Expert Witness** for Williams and Gullage. Used my expertise in human factors and aging to assist analyzing an automatic door accident. Case was tried in November of 2001. Juried decided in favor of the plaintiff.

**Primary design consultant**, PEP Tub Assist, Phase II. Constructed a working mechanical model that resolved mechanical, human factors and safety problems inherent in the original design. Summer and Fall, 1997.

**Designed and authored a curriculum guide** for the EDPA Student Design Competition. Exhibit Designers and Producers Association (EDPA). August - September 1996. This curriculum was distributed to all forty-four industrial design programs in the United States and served as the guide for each program's participation in the EDPA Student Design Competition.

**Expert Witness** for Civil Action Number CV-93-563 in the Circuit Court of Lee County, Alabama. Served as an expert witness on product design, safety and ergonomics in a multinational product liability suit. July 1994- October 1995. Case settled prior to trial.

22

**Developer,** Adobe Corporation. Developer of instructional material for PageMaker 4.0, 5.0 and 6.0 software. Adobe is a Seattle, Washington based software firm with offices in the United States and in Europe. Adobe software is sold throughout the United States, Canada, Europe and the Pacific Rim. Adobe is considered an industry leader in desktop publishing, graphics, photo editing and charting software. 1991-1996.

**Instructor,** Industry Specific CADKEY training for MCE. Designed and taught a custom training course in the use of CADKEY for the layout and design of interior spaces in commercial buildings. May 1992.

**Graphic Design,** Parallel Resources, Inc., Auburn, Alabama. Cover photography, art work and package consulting for software product. August 1989 - September 1990.

**Manufacturing consultant,** Prime Industrial, Auburn, Alabama. Consultant on materials and processes for solar tracker faceplate. August, 1989.

**Product evaluation,** Advanced Living Systems Division of the Institute for Technology Development (ITD), Oxford, Mississippi. Testing, evaluation and recommendations for human factors CAD software. November 1988.

**Design,** Human Dynamics, Inc., Oxford, Mississippi. Trade show and product design consultant. June 1988.

**Design,** Advanced Living Systems Division of ITD, Oxford, Mississippi. Responsibilities included product design; development of a new system to reach the older market; development of new data collection and analysis systems for dynamic human factors measurements of older populations (part of a $300,000 grant from the National Institute of Disabled Research and Rehabilitation); development of slide and lecture materials on designing for the elderly for a series of AIA (American Institute of Architects) sponsored workshops; specification of materials, processes and assembly techniques for a portable interactive video workstation. June - September 1987.

# Grants and Contracts

## Industry Sponsored Research

**Director,** Development of branding for Great Southern Wood Preserving. Directed students in the development of brand name, branding, packaging, point-of-sale displays and tradeshow design for Great Southern Wood Preserving (GSWP). GSWP is the manufacturer of Yellowood brand treated lumber. Fall 2007

**Director,** Range hood design and branding for Broan-Nutone, LLC. Hartford, WI. Broan-Nutone is an $800 million a year company which manufactures range hoods, central vacuums, home theater sound systems, medicine cabinets, bath fans and door chimes. Directed 18 undergraduate and graduate students in the design and definition of three separate product families: Best by Broan, Broan Elite and Zephyr. January - May 2007.

**Director,** Development of "break the paradigm in-wall storage" for Broan-Nutone, LLC. Hartford, WI. Broan-Nutone is an $800 million a year company which manufactures range hoods, central

vacuums, home theater sound systems, medicine cabinets, bath fans and door chimes. Directed students in the development of original in-wall storage product designs for the medicine cabinet divisions of Broan-Nutone (Jensen and Aubry). Students presented over 130 concepts and developed 18 prototypes. Worked directly with the President of Jensen and the General Manager of Aubry as well as the V.P. of Marketing for Broan-Nutone. Presented the final results to the President, CFO, Marketing Managers, Director of Branding and other corporate managers at the Broan-Nutone world headquarters. Designs developed during this project are already in production.

**Director,** Redesign and extension of the Nutone Central Vacuum product line, Broan-Nutone, LLC. Hartford, WI. Directed students in the analysis of current central vacuum systems and the development of 140 different concepts for the Nutone Central Vac. System. The client selected 52 concepts for further development. Students developed each concept to the point of working and appearance models at which point the client selected 18 for development as pre-prototypes. Worked directly with the General Manager, Director of Marketing and Engineering Manager for Nutone Central Vacuums in Cincinnati, OH as well as the V.P. of Marketing for Broan-Nutone. Final Presentation to President of Broan-Nutone, V.P of Broan-Nutone Engineering, V.P. of Marketing Broan-Nutone, and Director of product placement Broan-Nutone.

**Director,** Corporate identity, brand assessment and P-O-P design, packaging design and trade show exhibit design, Broan-Nutone, LLC. Hartford, WI. Directed seventeen students in the design and development of corporate identity, packaging, point-of-purchase displays and tradeshow exhibits for both the Broan and the Nutone brands. Final results of the research for Broan-Nutone were so successful that the client sponsored another studio for Spring 05. The final Broan identity was based upon a student mark, the final Nutone identity incorporated a font that was proposed by one of the students. Much of Broan-Nutone's new packaging and branding strategy is based upon the work completed as part of this project. Broan-Nutone is continuing to evaluate P-O-P solutions designed by students for further development and implementation. Presented to the Director of Corporate Graphics, Broan-Nutone; Director of Marketing, Broan-Nutone; Director of Canadian Sales, Broan-Nutone; and Director of Product Placement, Broan-Nutone.

**Director,** Door entry notification systems design. Broan-Nutone, LLC. Hartford, WI. Broan-Nutone is an $800 million a year company which manufactures range hoods, central vacuums, home theater sound systems, medicine cabinets, bath fans and door chimes. Directed students in the development of new concepts for door entry notification systems. Presented 13 final concepts as well as a packaging strategy to increase brand awareness. Worked directly with the V.P. of Marketing, Director of product promotions and V.P of Engineering. Spring, 2004.

**Director,** Corporate Identity, Brand Assessment and P-O-P (Point-of-Purchase) design and construction, Bridges Inc. Cusseta, Alabama. Directed students in the development of a branding strategy, corporate identity and point of purchase displays for Bridges, Inc. This project also included a complete graphics and space assessment. Authored the graphics standards manual, finalized the logo design, and prepared master artwork for design implementation. Corporate identity and P-O-P designs adopted by the client. Fall, 2002.

**Director,** "Point of Purchase and Exhibit Design for Spectar Sheet" Eastman Plastics and Spartech, Inc. Final results from this project, P-O-P prototypes and exhibit designs for the pop Chicago trade show were presented to Eastman and Spartech at the Spartech headquarters in St. Louis.

24

Designed and supervised the production and assembly of a 275 page document detailing our work on the project. Final results of this project were featured in P-O-P Magazine. Success in this project has lead to a follow-on studio and an ongoing relationship with Eastman Plastics. Fall, 2001.

**Director,** "Design of Application Tools for Vinyl Sheet"  Directed undergraduate and graduate students in the evaluation and design of application tools for 3M Controltac vinyl sheet. The final presentation included final prototypes for four separate tool designs. Each concept included computer generated control drawings, parts list, vendor list assembly instructions, sequence of use documentation and preliminary price quotes from vendors. Final tool designs decreased the amount of time required to finish the rivets on a truck by 40-60 percent. As part of this project I directed the design and development of a 300 page document detailing the work completed for the client. This document was successfully constructed in Quark Express thereby providing a format that allows the document to be easily reproduced. Additional responsibilities included providing client direction and clarification and editing the copy for the final documentation. May, 2002.

**Director,** "Redesigning Pipe Locating Equipment." Directed graduate and undergraduate students in the development of an updated design for pipe locating equipment for Pipehorn, a Birmingham-based manufacturer. The new design need to incorporated new technology and provide a common platform and identity for their expanded product line."

**Director,** "Flight testing and Final Prototype Construction of PERS." NASA Marshall Space Flight Center.  Directed graduate and under graduate students in the refinement, flight testing and final Prototype design and construction of the Payload Equipment Restraint System (PERS) for NASA. KC 135 zero-G Flight testing focused on safety, ease of use, and ease of deployment of the PERS. Deployed on ISS April of 2001 still in active service. Astronaut Jim Voss called it the "best designed equipment that I have ever worked with." Winter 2000.

**Director,** "Onboard Interactive Computer Based Training for PERS." NASA Marshall Space Flight Center. Trained the design team and directed the development of  interactive crew training software for the International Space Station.  The software was the first project to be completed under the NASA OCBT (on board computer based training) guidelines for the International Space Station.  One of the key requirements was that the interface be intuitive and the information clearly structured to ensure safe use of the equipment. Deployed on ISS April of 2001.  Retired, same year because NASA determined that the equipment was so effectively designed that it did not require crew training. Winter 2000.

**Director,** "Ground Based Interactive Multimedia Training for PERS." NASA Marshall Space Flight Center.  Trained the design team and directed the development of  interactive crew training software for the International Space Station.  This is the companion piece to the software described above.  In addition to meeting the client requirements for ease of use, clarity, safety and comprehensive training, we introduce new interface paradigms that are currently being evaluated by NASA for incorporation into the next generation of OCBT baseline standards.  Winter 2000.

**Director,** "NASA/ Auburn Industrial Design Promotional CD." NASA Marshall Space Flight Center. Under contract to NASA.  I trained the design team and directed the development of an interactive multimedia CD to promote the collaborations between NASA and the Department of Industrial Design at Auburn University. Winter 2000.

25

**Director,** "Ergonomic Tools for Vinyl Film Installation." Phases I & II. 3M Corporation. Directed the human factors analysis and the subsequent design of tools for the application of 3M vinyl film. The team produced working mechanical models and final appearance models of the tools. January-June 1999.

**Director,** "Development of Temporary Stowage Devices for the Use with the Materials Science Resource Rack (MSRR)." NASA Marshall Space Flight Center. Directed undergraduate students in the discovery and development of temporary restraint devices for the MSRR that is to be deployed on the International Space Station. Concepts focused on safety and ease of use. Three of these devices were further developed for actual deployment in the International Space Station. Fall, 1998.

**Director and Principal Investigator.** "The Effective Use of Color in Business Communication, Phase 3." Contract research and design project for Seiko Mead Company and Mead Imaging, Inc., Miamisburg, Ohio. Seiko Mead was established as a joint-venture between Seiko Epson Corporation of Japan, a 5.5 billion-dollar-a-year Japanese-based company and Mead Corporation, a 3.5 billion-dollar-a-year U.S.-based company. Results of each phase of research were presented to officers of both companies at board of directors' meetings in Japan and in the U.S. Phase three focused on the use of color in video display terminals, transparencies and written communication. Coauthored the proposal with Peter Harzem. Responsibilities included design, establishing budgets, hiring personnel, scheduling work, evaluating performance, coauthoring proposals and final reports, working with Auburn University Contracts and Grants office on letters of agreement, developing seminars and presentations. Partial results of this research and of the research in phases one and two have been reported in *Modern Office* and *Presentation Products* as well as more than one hundred other periodicals and newspapers nationwide. Partial results of this work were published in *Interface 91 Proceedings*, by the consumer products group of the Human Factors Society. June 1991- January 1992. Contract amount: $61,735.

**Director and Principal Investigator.** "The Effective Use of Color in Business Communication: Phase 2." Contract research and design project for Seiko Mead Company and Mead Imaging, Inc., Miamisburg, Ohio (See Phase 3 above). Coauthored the proposal with Peter Harzem. Phase 2 focused on how the use of color affects longer term recall of information. Responsibilities were the same as in phase 3. Co-principal investigator: Peter Harzem. February - May 1991. Award amount: $14,799.

**Director and Principal Investigator.** "The Effective Use of Color in Business Communication." Contract research and design project for Seiko Mead Company and Mead Imaging, Inc., Miamisburg, Ohio (See Phase 3 above). This research focused on how color affects the recall of information and on developing a series of general guidelines for effective color use in business. Co-authored the proposal with Peter Harzem and Robert Spain. In addition to the responsibilities noted in the previous phases, I was also responsible for coauthoring and providing final editing of the "Guide to Color Communication." Coauthored, with Peter Harzem, the research report for phase 1. Co-principal investigators: Peter Harzem, Tin-Man Lau and Walter Schaer. September 1989 - January 1990. Award amount: $54,964 plus $16,000 in equipment.

**Director and Principal Investigator,** "Computer Enhanced Design: A Study of Computer Interaction in the Design Process." Contract research for International Business Machines (IBM), Boca Raton, Florida. Responsibilities included establishing budgets, developing hardware and software

26

specifications, conducting research, and authoring presentations and final reports. As part of this research a national survey of computer use by industrial designers was conducted. Results of this research served as the basis for long-term software and hardware design recommendations to the client. Co-principal investigator: Tin-Man Lau. January 1989 - December 1991. Award amount: $40,000 in cash plus $40,000 in equipment.

**Director of Industrial Design and team member.** "Design Proposal for NASA Space Station Habitation Module Interior Environment." Contract research for Martin Marietta Denver Aerospace (MMDA). The industrial design team was responsible for developing preliminary product concepts which addressed the human factors, manufacturing, and aesthetic considerations of the module as well as the design of interior components and development of evaluation criteria for the interior environment alternatives. Results of this work were presented by Bret Smith, Bill Bullock, Wayne Drummond and Steffen Doersling to over 40 engineers, scientists, and project managers at MMDA headquarters in Denver, CO. Partial results of this work were published in *Innovation*, Vol.6. No. 4, 1987. Team members: Bret Smith, Bill Bullock, Steffen Doersling, Wayne Drummond, Norbert Lechner, Peter Weiss, Tin-Man Lau, Sheri Schumacher, Alan La Fon, and Alfred Lindsay. January to May 1987. Award Amount: $50,000.

**Director and Principal Investigator.** "Definition and Articulation of Human Factors Problem Areas in Residential Living Environments for the Elderly." Competitive Research Grant-in-Aid, Auburn University. Responsibilities included coauthoring proposal, conducting research and authoring of the final report. Results from this research were presented at the Eighth Annual Conference of the Alabama Gerontological Society. Results of this research were requested by the National Gerontological Resource Center in Washington, D.C. and have become part of their permanent resource collection. A summary of this research also appeared in *Design for Aging: An Annotated Bibliography 1980-1992.* Published by the Aging Design Research Program (ADRP) AIA/ACSA Council on Architectural Research, 1993. Co-principal Investigators: John R. Zellner (1986) and Tin-Man Lau (December 1986 - completion). Award amount: $3,000 from Auburn plus $7,000 gifts-in-kind from industry. January 1986 - December 1988.

**Design Director and Team Member.** "Development of a Bedside Medication Dispensing Unit." Contract research for PMR, Incorporated, a privately-held medical products development company in Costa Mesa, California. Joint research between the School of Pharmacy and the Department of Industrial Design. Responsibilities included product design, design supervision, management of design budget ($20,000), electronics specification, design and development of working appearance model, materials and assembly recommendations, and identification and qualification of vendors. Additional responsibilities included designing and specifying the logistics sequence and operational protocol for the software. Results of this research were featured in *Design Alabama.* January - June 1986. Industrial design team members: Bret Smith, Bill Bullock, Brian Coleman, John Zellner. Pharmacy team members: Ken Barker and Tyrone Gibson. Grant Author: Ken Barker. Total award amount: $40,000.

## Outreach

## Workshops

"Changing Paradigms in Design and Production." IDSA workshop. 2006 IDSA National Conference. Bret Smith and Chris Arnold.

27

"Housing Modifications to Improve the Quality of Living for Older People," Auburn University. April 1993. Two-day intensive course developed by Tarik Orgen and Bret Smith (authorship equal). The course was attended by contractors, physicians and developers from throughout the state.

"Basic and Advanced Cadkey: A Short Course." Auburn University Continuing Education Extension course. Five day intensive course developed and team taught with Tin-Man Lau. September 1992.

"Design for Ambulance Rescue," Interface 87, Fifth Symposium on Human Factors and Industrial Design in Consumer Products. (juried workshop). The workshop was three hours in length and dealt with issues of safety, patient comfort, manufacturability, standards, product communication and ease of use. The workshop was attended by product designers and engineers from the United States and Canada. Rochester, New York. May 1987. Workshop Leader.

## Upcoming Presentations.

"Streamlined Life." A presentation to the docents on the growth and impact of streamlined design. December 3, 2007. Montgomery Museum of Fine Art.

"Streamline This." A presentation on the development of streamlining and collectables for the patrons of the Montgomery Museum of Fine Art. December 3, 2007.

"Streamline and Familiar Objects." A lecture on the nature of streamlining and its impact through graphics, architecture and product design on everyday life in the 1930s and beyond. One of three featured speakers at the opening of the Streamline exhibit at the Montgomery Museum of Fine Art. February, 2008.

## Professional Organizations

**Chair,** IDSA History Special Interest Section, October 2007- present.

**Member,** IDSA Nominations Committee, 2005.

**Chair,** IDSA Membership Development Committee Task Force on Education. June 1996- August 1998. As chair of this task force, I successfully led efforts to develop regional orientation program for student chapter officers within each of the five regions. The education task force and membership development committee were also successful in getting the entry level membership dues reduced for recent graduates and in instituting a national job fair for graduating seniors and recent graduates, as well as members in transition.

**Member,** IDSA Membership Development Committee. June 1996- August 1998. The IDSA Membership Development Committee is comprised of five Industrial Design professionals. The committee was created by the president of IDSA to study the problem of low-membership retention and to develop specific proposals to enhance and increase membership within IDSA. Based upon our recommendations, IDSA membership grew from 2,200 members to over 3,000 members during a six year period.

**IDSA Southern District Vice President.** The IDSA (Industrial Designers Society of America) is the professional society for industrial designers within the United States. The Southern District encompasses a nine-state area. Elected Office. January 1993 - January 1995.

Member of the Executive Council and Board of Directors for IDSA. Executive Council members are responsible for directing the overall operation of the professional society, monitoring the month to month status of programs and finances, and for authoring bylaws and policy changes. Elected Office. January 1993 - January 1995.

**Member**, Publication Committee for *Innovation*, January 1988-December 1990. Innovation is the only refereed publication of Industrial Design in the United States. Publication Committee members were responsible for the review, scoring and selection of articles for the publication.

**Editor**, *FocusSouth* Newsletter for the Atlanta Chapter of the Industrial Designers Society of America, 1986-1988. During the first year-and-a-half of this period, when neighboring chapters were without a news letter, *FocusSouth* served as the newsletter for the entire 9 state southeast region.

## Community Service

Design of 50th Anniversary logo, brochure and musical program for Holy Trinity Episcopal Church, 2006-2007.

Awards Poster, *Phi Kappa Phi Forum*, 2006. Designed and produced a poster to celebrate five national awards won by *Phi Kappa Phi Forum* magazine.

Logo and brand Analysis for The Honor Society Phi Kappa Phi. Analyzed publications, brand standards and applications and made recommendations for brand realignment and publication design. 2005

Webelos and cubs scout leader 1998 – 2004.

Volunteer, Wrights Mill Road Elementary School, 1997-2004

Guest lecturer/workshop leader, development of multimedia material, Wrights Mill Road Elementary School, 2001.

Reader at Wrights Mill Road Elementary School, 1997 – 2004.

Guest Speaker, Auburn Early Education Center, 1997 and 1999.

Fabricated classroom equipment, Auburn Early Education Center, 1999.

# EXHIBIT D

In the United States District Court
For the Middle District of Alabama
Eastern Division

Simpson Ventures, Inc.,
*Plaintiff,*
V.
Mid-West Metal Products
Company, Inc.,
*Defendant*

Civil Action File No.
406-cv-901-WKW-VPM

## Supplemental Expert Report by Professor Bret H. Smith, IDSA

### Introduction

My Name is Bret H. Smith. I am a full professor in the Industrial Design department at Auburn University where I have taught industrial design for over twenty-one years.

I have been retained in the above referenced lawsuit as an industrial design expert witness. I am being compensated for my work here at a rate of $180 an hour. I have no financial interest in the outcome of this case.

I submitted a Review of U.S. Patent D 483,156 on August 17, 2007. This supplemental review is based upon the receipt of additional material from Simpson Ventures that lists six additional points of novelty. It is my understanding that these points have been devel-

oped in response to my analysis. I have received and reviewed Simpson Ventures' Supplemental expert reports dated September 11 and September 22 of 2007. I have also received and reviewed the Interrogatories dated September 27, 2007. I understand that Simpson Ventures' responses may not be complete. I thus reserve the right to review Simpson Ventures' complete responses upon submission and to revise or supplement my analysis accordingly.

Additionally, I am in the process of acquiring a cage that Simpson Ventures says embodies the claims of the '156 patent. Thus, my investigation is ongoing, and I reserve the right to supplement this report based upon that analysis and additional information that may become available.

## Claims in Robert Anders' September 11 Supplemental Report

In the September 11, 2007 additional report Robert Anders makes the following additional claim:

> The points of novelty includes a pet home in the shape of a rectangular volume, the pet home having a woven outer texture with the appearance of wicker or the like, the woven texture appearing on the top, on the non-window portions of the sides and rear, and on a non-door portion of the front, the woven portion of the front substantially framing a non-woven door. (Paragraph 4)

In my original report, Figures 18, 21 and 22 are all in the shape of a rectangular volume, having a woven outer texture with the appearance of wicker or the like, the woven texture appearing on the non-window portions of the sides and rear (see Figures 1-3).



Figure 3. Wicker cage design. plate 28 in *Modern Basketry from the Start*. 1973.



Figure 1. Pigeon cage , British patent number 26728. issued in 1913.



Figure 2. Rattan or wicker animal cage with windowed sides and door taken from page 126 of *belorusskie rhudazhestvennye pronnyslys*. 1985.

The one claimed difference appears to be that the area around the door is open and that the door has the woven texture. Both the 156 design and the three cited here have visibility on the door side. This is important for the psychological comfort of the pet. Without this open space, the pet cannot see who is approaching the cage to let it out. This causes the pet to be ill at ease. That there is an open non-woven aspect to the cage on the door side is functional.

The 156 has simply reversed the placement of the wicker so that the door remains uncovered. This is a solution that would be obvious to a person of ordinary skill in the relevant arts as described on page 7 of my initial report. Additionally, cages shown in Figures 1-3 are structurally made from wicker or a similar material, and the weave is required to hold the door together. Because of the underlying metal structure in the '156 cage, the weave is not necessary to maintain the structural integrity of the door. Thus, if a wicker pet cage made use of a wire door, it would remain free of wicker. Figure 4 from *American Basketry and Woodenware. A Collector's Guide* (New York Macmillan Publishing Co.: 1974) shows a rectangular wicker cage with woven outer texture with the appearance of wicker or the like, the woven texture appearing on the



Figure 4 from *American Basketry and Woodenware. A Collector's Guide*. New York Macmillan Publishing Co.: 1974.

2

top, on the sides and rear, and on a non-door portion of the front. The woven portion of the front substantially frames a non-woven door.

In addition to this, the prior art noted in my first report (see page 9) also shows us a clear example of a mostly open-area or windowed door being used on a wicker cage (Figure 5). The cage depicted in Figure 5 has a rounded top largely as a result of the materials requirements and the production technique for wicker. The Figure 5 cage has a handle on the top. If the top of the cage was flat, the force of lifting would be concentrated at the top corners of the cage, creating stress on the corner joints. By arching the top, the force is distributed across the entire top and sides. Figure 6 shows a wicker cage design featured in *Baskets* by Nancy N. Schiffer (a Schiffer book for collectors,1994). The caption reads "wicker pet carrier, 17" high, (the Pennsylvania Farm Museum) $25-$75." Like the '156 cage, this pet carrier has wicker on the front edges substantially framing the door, while the door is largely open in construction. Finally, the poultry cage in Figure 7 is rectangular in shape with wicker on all visible sides and the front has an area that is largely non-wicker. **So all of the features claimed as novel in Mr. Anders' September 11, 2007 Supplemental Expert report all exist in the prior art.**



Wicker pet carrier, 17" high. *(Pennsylvania Farm Museum)* $25-75

Figure 6. *Baskets* by Nancy N. Schiffer (a Schiffer book for collectors),1994



Figure 5. Pet cage for sale on eBay. The seller dates it to the 1920s or 1930s. My grandmother owned a cage like this in the mid 1960s.



Figure 7. Poultry Cage, circa 1910. Old Town, Maine, from *American Baskets: a Cultural History of a Traditional Domestic Art.* By Robert Shaw. 1999.

## Claims in Robert Anders' September 22 Supplemental Report

In his Supplemental Report of September 22 of 2007, Mr. Anders asserts six new claims of novelty. Those claims are separately repeated and evaluated below. However, it is important to note that the '156 cage is based upon a wire cage that is designed to collapse to be transported. This design requires that the sides be rectangular. Furthermore, the functionality design requires that there is no overhang of any of the edges, since this would prevent the sides from collapsing. So the shape of the sides results from the functionality of the underlying structure rather than from a decorative choice. Thus, the flat sides and non intersecting corners cannot serve as the basis for a claim of novelty.

### Point 1: The Extent of the wicker

*A pet home with a rectangular volume and having a top, sides, a rear, and a front, the top has an outer surface substantially having wicker, the sides each including a window and the non-window portion of each side has an outer surface substantially having wicker, the rear including a window and the non-window portion of the rear has an outer surface substantially having wicker, and the front includes a door and the non-door portion of the front has an outer surface substantially having wicker, wherein the sides and rear mostly have wicker, the majority of the front does not have wicker, and substantially the entire top has wicker. (paragraph 3)*

As shown in the Figures 1-4, 7, 8a, 8b, 8c, and 8d, a number of pieces of prior art are rectangular in volume having an outer surface of wicker with window and non-window portions on the sides. Figure 8 also shows three different pieces of prior art in which "substantially the entire top has wicker."

In addition to the Figures cited above that deal with rectangular cages, Figures 5 and 6 depict near-rectangular cages; cages which are rectangular in proportion but have an arched top. See Figure 9. Moreover, the rectangular shape for this design is largely dictated by the choices made for the function of the underlying collapsible cages. An arched top would not collapse flat.



Asserted novelty: Rectangular

'156 patent 3/4 view

Prior art, substantially wicker with a rectangular volume

These three also have window and non window portions on the sides

Figure 8a. Comparison of the claims of novelty in paragraph 3 of Anders' supplemental expert report dated September 22, 2007 with prior art

4

Asserted novelty: Majority
of the front does not have
wicker

Prior art where the majority of the
front does not have wicker









'156 patent 3/4 view

Figure 8b. Comparison of the claims of novelty in paragraph 3 of Anders' supplemental expert report dated September 22, 2007 with prior art

Asserted novelty: Substantially
the entire top has wicker

Prior art where substantially the
entire top has wicker









'156 patent 3/4 view

Figure 8c. Comparison of the claims of novelty in paragraph 3 of Anders' supplemental expert report dated September 22, 2007 with prior art

Asserted novelty: Wicker on top, front and sides

Prior art with wicker on the top, front and sides



'156 patent 3/4 view



Figure 8d. Comparison of the claims of novelty in paragraph 3 of Anders' supplemental expert report dated September 22, 2007 with prior art



Wicker on top, front and sides

Majority of the front does not have wicker and contains a door.

Figure 9. Comparison of claim 1 of novelty in Supplemental Expert Report dated 9/22/07.

Mr. Anders also notes that there is a "window" and non-window portion on the rear of the cage. This is inconsistent with the patent drawings which show a slot at the top the back panel. While the slot on the back panel might serve as a handle, it could not properly be termed a window because the animal would not be able to see out of it because it is too close to the top of the cage and because it is too small. See Figure 10. This feature differs from the Mid-West Bay Isle design which has a window across the back of the cage. See Figure 11.

In addition to this, the Bay Isle 1805 design does not have a window or a handle in back. See Figure 12. So with respect to point of novelty 1 claimed by Mr. Anders, even if there were no prior art, which clearly there is, the 1805 cage does not match the first point of novelty asserted in Mr. Anders' Supplemental Expert Report of September 22, 2007.



This slot is too high to be a window. There is not enough distance between it and the top of the cage to allow the animal to see out.

Figure 10. Back view of pet house '156



Window

Back

Figure 11. Back of the Bay Isle design by Mid-West



The back of the 1805 Bay Isle design does not have a handle or a window

Back

Figure 12. Back of the Bay Isle 1805 design by Mid-West

7

## Point 2: The Door/Front Panel Configuration

*A pet home with a rectangular volume and having a rectangular front, the front including a rectangular see-through door that is framed substantially by wicker. (paragraph 4)*

In Point two, Mr. Anders claims that the 156 design is unique because it is a pet home with rectangular front, the front including a see through door. However, the rectangular volume including a front rectangular see-through door design is well documented in the prior art as shown in Figures 4, 13 and 14 of this report. Figure 14 Shows a sampling of the wide variety of cages with see-through doors. While the material surrounding the cages in Figure 14 are not wicker, the principle of the see-through door substantially framed by wicker is clearly established in prior art.

In addition, Figure 15 shows a poultry cage from 1910 that has a rectangular front including a see-through area of much the same proportions as that of the '156 design, that is substantially framed by wicker.

It is important to note that the see-though door serves the functional requirement of providing the pet with a clear view of people or animals as they approach. The wicker on the sides and back of the cage also prevent the animal from being approached from behind. According to Sandra McCune, Sub-Department of Animal Behaviour, University of Cambridge, and Madingley, Cambridge CB3 8AA, UK, in *Environmental Enrichment Information Resources for Laboratory Animals: 1965 - 1995: Birds, Cats, Dogs, Farm Animals, Ferrets, Rabbits, and Rodents,* forward visibility is an important aspect of habitat. It is important to the psychological comfort of the pet because it allows the pet to observe people or other animals as they ap-

proach the front of the cage. The see-through door also serves an important function for the owner because it allows the owner to observe the animal while it is in the cage.

As demonstrated earlier, this claimed point of novelty is clearly evident in prior art. Even if it were not present in prior art, the see through door serves a functional purpose and integrating such a door into a pet cage design would be obvious to a person of ordinary skill in the relevant arts.

Finally, it is important to note that the Bay Isle 1805 cage does not have a rectangular door. See Figure 16. In fact, this entry way has no door at all. So with respect to point of novelty 2 claimed by Mr. Anders, even if there were no prior art, which clearly there is, the 1805 cage does not match the second point of novelty asserted in Mr. Anders' Supplemental Expert Report of September 22, 2007.



Rectangular front with a front rectangular see-through door

Figure 13 from *American Basketry and Woodenware. A Collector's Guide.* New York Macmillan Publishing Co.: 1974.



Patents number and 5,626,098

Patent number 2,892,562, 1959.

Patent number 318,812, 1885.

Rectangular see-through door

Patent number, 5,967,090, issued 1999.

Patent number 5,960,744, issued

Figure 14: Examples of prior art rectangular see-through doors



'156 patent

Rectangular see-though area

Figure 15.  Comparison of the front of the '156 patent with a poultry Cage, circa 1910.  Old Town, Maine, from *American Baskets: a Cultural History of a Traditional Domestic Art*.  By Robert Shaw. 1999.



Non-rectangular opening

Figure 16. The arched front opening of the Bay Isle 1805 cage

## Point 3: Distinct Panels

*A pet home with a rectangular volume, the pet home having the appearance of being formed from distinct, individual panels having wicker outer surfaces.* (Paragraph 5)

The prior art shows us that objects prior to the '156 design have been made of distinct rectangular wicker panels. Figure 17 Shows two patents that preceded the '156 patent, patent 5,931,326 from 1999 and patent 6,230,915 from 2001. Both of these patents depict a rectangular structure of distinct panels, made out of wicker.

Figure 18 shows a cage originally patented in 1885. Though the cage is not covered with wicker, it is composed of clearly separate rectangular pieces with a woven covering attached to the frame.

Likewise, the appearance of distinct panels is not new to wicker. Figure 19 shows a sewing stand that appeared in *Furniture Weaving Projects* by Lloyd F. Hyatt, published in 1922. The top and sides of the sewing stand give the appearance of distinct panels.

The technique of using independent panels is also clearly demonstrated in the lid of the poultry cage from 1910. See Figure 20.

Even if these examples of prior art did not match precisely the features being claimed as unique to the '156 cage the features would, nonetheless, be an obvious combination of attributes to a person of ordinary skill in the arts.

Moreover, as stated earlier, in the case of the '156 design, the appearance of individual panels is the result of a combination of the underlying wire cage structure and the physical requirements of collapsibility. See Figures 21 - 23.



Rectangular volume having the appearance of being formed from distinct panels

Container assembly. Patent 5,931,326, 1999

Rattan basket. Patent 6,230,915, Issue May 15, 2001

Figure 17: Prior art depicting a rectangular volume having the appearance of being form from distinct panels



Rectangular volume having the appearance of being formed from distinct panels

Figure 18. Patent number 318,812, 1885.



Rectangular shape and the appearance of flat panels

Figure 19.  Sewing stand from *Furniture Weaving Projects* by Lloyd F. Hyatt, published in 1922.



Rectangular shape and flat panels are necessary in order for the cage to be collapsible

Figure 21.  Collapsible wire cage. Patent number 6,192,834, issued February 27, 2001.



Rectangular shape and flat panel

Figure 20. Poultry Cage, circa 1910. Old Town, Maine, from *American Baskets: a Cultural History of a Traditional Domestic Art*. By Robert Shaw. 1999.



Rectangular shape and flat panels are necessary in order for the cage to be collapsible

Figure 22.  Collapsible wire cage. Patent number 4,762,085 issued 1988.

All of the features claimed in this point of novelty are clearly demonstrated in prior art and serve a functional purpose as described previously. If, for the sake of argument, we allow that wicker is a new feature (which the prior art clearly demonstrates is not the case) it would be, at best, a trivial advancement to anyone of ordinary skill in the art since there is wide spread evidence of using wicker to overlay existing conventional frame products. Figure 24, from page 689 of the 1925 *Sears and Roebuck Catalog* shows wicker being used as an alternative to cloth covering on strollers. Figure 25 shows wicker being used as a covering for a metal framed carriage. The author notes, "Very early in the nineteenth century, English coach makers introduced basketry bodies for gigs, considering them the best means to achieve strength without weight" (page 2). Clearly the idea of covering a frame with wicker is not new.



Figure 24. Wicker as a covering for strollers. Sears and Roebuck Catalog, 1925.



Rectangular shape and flat panels are necessary in order for the cage to be collapsible

Figure 23. Collapsible wire cage. Patent number 2,892,562 issued 1959.



Figure 25. Basket Phaeton, Circa 1900. *Baskets of Rural America* by Gloria Roth Teleki, 1975.

12

**Point 4: The Window Geometry & Placement**

*A pet home with a rectangular volume and having a front, sides, a rear and a top, the pet home further having a rectangular window positioned in the upper half of each side and in the upper half of the rear, the non-window portions of the sides and rear having outer surfaces with wicker such that the rectangular windows are surrounded by wicker on all sides.* (Paragraph 6)

The claim here is that the pet cage geometry and the window placement is unique over the prior art. Figure 26 shows a wicker pigeon cage, patented in 1913, with a rectangular window positioned in the upper half of each side. The second part of Anders' claim (that there is a window in the upper half of the rear of the pet cage) is not consistent with the patent drawings, however, as explained previously. See Figure 27.

Though the claim also mentions wicker, the material is not relevant to the geometric features being claimed. Again, the geometry and placement of the windows exists in the prior art. Figure 28 shows patent 4,256,065 (1981), which is a pet cage that collapses for transport. The pet cage has windows on the sides and the rear that are located above the half way point. This is the same geometrical configuration asserted as being unique by Anders.

Figure 29 shows patent number 5,960,744 issued in 1999 for a rectangular pet cage that has windows on the upper half of the sides. This is the same geometry claimed by Anders as being unique. Thus, it can be clearly seen that the window placement is well documented in the prior art and therefore cannot be claimed as a new feature.

Finally, it is important to note that the Bay Isle 1805 cage does not have any windows on the sides or on the back of the cage. See Figure 30. So with respect to point of novelty 4 claimed by Mr. Anders, even if there were no prior art, which clearly there is, the 1805 cage does not match the fourth point of novelty asserted in Mr. Anders' Supplemental Expert Report of September 22, 2007.



This slot is too high to be a window. There is not enough distance between it and the top of the cage to allow the animal to see out.

Figure 27. Back view of pet house '156



Windows located above the half way point on the sides

Figure 28. Patent 4,256,065, 1981.



Windows located above the half way point on the sides

Figure 29. Patent number 5,960,744, issued 1999.



Figure 26. Pigeon cage , British patent number 26728, issued in 1913.



No windows on the side
or back of the 1805 Bay
Isle design

Figure 30: Lack of windows on the sides and back of Bay Isle cage 1805

## Point 5: Panels Without Overhang

*A pet home with a rectangular volume and having wicker outer surfaces over a majority of the pet home, the pet home having the appearance of being formed from individual panels, the panels being configured such that each panel extends substantially to the edge of the adjacent panels, but no panel extends beyond the adjacent panels.* (Paragraph 7)

Once again, this type of panel placement is clearly demonstrated in the prior art. The panel technique that Mr. Anders describes can be clearly seen in patent number 5,931,326 issued in 1999 and in patent 6,230,915, issued in May of 2001. See Figure 31. In both the '326 patent and the '915 patent, there is the appearance of being formed from individual panels with each panel extending substantially to the edge of the adjacent panels without extending beyond the adjacent panels.

Even if these patents did not exist, the panel technique is clearly demonstrated in the construction of the lid for the poultry cage show in Figure 32. As such, the application of this technique would have been obvious to a person of ordinary skill in the relevant arts to use the panel technique as a method of integrating a woven appearance and a collapsible pet cage.

The functional requirement that the cage be collapsible while the panels remain partially connected dictates that panels not extend beyond the edge of adjacent panels. This is a result of the functional requirements of the underlying wire cage structure. See Figures 21-23. If the wicker extended beyond the edges, it would not be possible to collapse the cage for shipping and transport. This makes this detail functional rather than aesthetic.

The feature that is being claimed as novel, is clearly demonstrated in the prior art and is being driven by the functional requirements of the underlying cage structure.

Finally, the Mid-west Metals cage is distinctly different. Its sides do not extend to the edge of the adjacent panel. There are significant gaps. See Figures 33 and 34. Thus, even if this were a novel feature that was not obvious to someone skilled in art, and even if it were not a result of the underlying structure, it would not be a feature that the Mid-west cages (including the 1805 cage) and patent '156 had in common.



Container assembly. Patent 5,931,326. 1999.

The appearance of being formed from individual panels with each panel extending substantially to the edge of the adjacent panels without extending beyond the adjacent panel.

Rattan basket. Patent 6,230,915. Issue May 15, 2001.

Figure 31: Prior art depicting panels which extend to the adjacent edges without going beyond them.

15



The appearance of being formed from an individual panel extending substantially to the edge of the adjacent panels without extending beyond the adjacent panel.

Figure 32. Poultry Cage, circa 1910. Old Town, Maine, from *American Baskets: a Cultural History of a Traditional Domestic Art.* By Robert Shaw. 1999.



Top view of the Bay Isle design.

Gap

The top, front, side and back panels do not extend substantially to the edge of the adjacent panels. There are substantial gaps.

Back of the bay isle design

Figure 33. Mid-west cage edge details



Top view of the Bay Isle 1805 design.

Gap

The top, front, side and back panels do not extend substantially to the edge of the adjacent panels. There are substantial gaps.

Back of the bay isle design

Figure 34. Mid-west  Bay Isle 1805 cage edge details

## Point 6: A combination of the first five points

*A pet home, the pet home with a combination of the points of novelty as described in paragraphs 3 through 7 above. (Paragraph 8)*

As seen already seen in this analysis, all of the features claimed in Mr. Roberts' supplemental expert reports (September 11, 2007 and September 22, 2007) are clearly shown in prior art.

Beyond this, the recent ruling by United States Court of Appeals for the Federal Circuit in *Egyptian Goddess, Inc. and ADI Torkiya v. Swissa, Inc. and Dror Swissa* (Swissa), the Court of Appeals ruled that

*For a combination of individually known design elements to constitute a point of novelty, the combination must be a non-trivial advance over the prior art.*

As noted earlier in this report, all of the features claimed in Anders' supplemental reports are clearly present in prior art. Figure 35 and those previous, show that every point that has been claimed is present in prior art, and any claimed advancement would be only trivial at best.

Moreover, the court noted that

*The question is not whether the infringement and validity analyses are similar or conflated, they already are. The question is: When the patentee claims a combination of old prior art elements as its asserted point of novelty should the test be one of anticipation or obviousness? We conclude that non-triviality ought to apply -- if the standard is akin to anticipation then a combination with even the most trivial difference would meet the standard.*

Finally, in addition to the large body of prior art both in my original analysis and in this supplemental analysis, many of the features being claimed as unique such as windows and doors are not only not unique, they are driven by functional requirements. (See Expert report of Professor Bret H. Smith, dated August 17, 2007). Even if these claimed points of novelty were new, which they are not, they would represent, at best, a trivial advancement and one which would be obvious to a person of ordinary skill in the relevant arts. Their combination does not present any advancement over the prior art, let alone a non-trivial advancement.



Distinct panels without overhang

Window Geometry and placement

Rectangular Volume

Rectangular windows above the halfway point on the sides

Rectangular Volume

The front including a rectangular see-through door that is substantially framed by wicker

Rectangular volume having a top, sides, a rear and a front, the top having an outer surface substantially of wicker and the sides substantially of wicker with a window portion, etc.

Figure 35. Prior art for patent '156.

Bret H. Smith, IDSA
Professor of Industrial Design
Auburn University

11·5·07
Date

17

# EXHIBIT E

In the United States District Court
For the Middle District of Alabama
Eastern Division

Simpson Ventures, Inc.,
*Plaintiff*,
V.
Mid-West Metal Products
Company, Inc.,
*Defendant*

Civil Action File No.
3:07cv48_WHA

---

## Expert Report by Professor Bret H. Smith, IDSA

### Introduction
My Name is Bret H. Smith. I am a full professor in the industrial design department at Auburn University, where I have taught industrial design for over twenty-one years.

I have been retained in the above referenced lawsuit as an industrial design expert witness. I am being compensated for my work here at a rate of $180 an hour. I have no financial interest in the outcome of this case.

### Background and experience
I graduated *Summa Cum Laude* from Purdue University with B.S. degree in Industrial Technology. I have an M.A. in English, and an M. A. in Industrial Design, both from Purdue University (the Masters Degree is the terminal degree in industrial design).

As an industrial designer, I have worked on brand identity, commercial food equipment, medical equipment, consumer products, computer applications research, the habitation module of the international space station, hand tools, instrumentation, software interface design, and human factors. I have supervised industry projects for NASA, Martin Marietta Denver Aerospace, 3-M Company, IBM, Mead Imaging, Broan-Nutone, Dell Inc., Great Southern Wood Preserving, Inc., and others. In addition to this, I have directed over $300,000 in research projects while at Auburn University.

I have served on the executive board and the board of directors of our professional society, the Industrial Designers Society of America (IDSA), and served as the Southern District Vice President of IDSA. I am currently serving as chair of the Design History Special Interest Section of IDSA. I also have served as a referee for *Innovation*, the only refereed journal of industrial design in the United States. I have lectured internationally on industrial design, human factors, and human behavior.

I have received special commendation from NASA for my contributions to design for the International Space Station, hold a Citation of Merit from NV Phillips, and am a life member of The Honor Society of Phi Kappa Phi. A list of my publications, courses taught, and research conducted may be found in my *Vitae*, located in the appendix.

I have previously been retained to review U.S. Patent D 483,156.

### Patent Review
In reviewing U.S. Patent US D 534,321, I have examined the patent document and other publications listed as prior art within the '321 patent, additional patent documents, on line resources, relevant sections of *Chisum on Patents*, and assembled and photographed a Bay Isle 1805 cage, as well as the Mr. Herzher's Large Decorative Litter Pan Cover. A complete collection of these references is provided in the appendix.

I have received and reviewed Simpson Ventures' supplemental interrogatories and the expert opinion of Mr. Robert Anders. I understand that Simpson Ventures' responses may not be complete. Likewise, my investigation is ongoing. I thus reserve the right to revise or supplement my analysis accordingly.

# Design Analysis
## of
# United States Design Patent Number US D 534,321

## Subject

This document provides an analysis of United States Design Patent 534,321, hereafter referred to as '321, licensed to Simpson Ventures, Inc., hereafter referred to as "Simpson Ventures;" a comparison of that patent to prior art; and a comparison of the '321 patent to Bay Isle model 1805, here after referred to as Model 1805, designed and produced by Mid-West Metal Products Company, Inc., hereafter referred to as "Mid-West."

The '321 patent is for an ornamental design for a pet litter pan housing. For the purposes of this report the following terms will be used interchangeably: "woven covering," "rattan," and "wicker."

The claim is described as "the ornamental design for a pet litter pan housing as shown and described."

It is shown in 12 drawings, with drawings 7-12 constituting "another embodiment of the present design." Figures 1-12.

## Verbal description of the '321 patent design

The pet litter pan housing is rectangular in shape with a woven covering on all visible sides. It has a top, front, back and two sides.

The front is one piece and has an arched entrance with wicker surrounding it and a small wire cross-piece just above the bottom woven edge of the doorway. Figure 2. At the bottom are cube-shaped feet.

The right and left sides are each composed of a single, uninterrupted flat panel entirely covered in wicker. At the bottom are cube-shaped feet.

The back is composed of a single panel entirely covered in wicker. At the top is a change in weave. At the bottom are cube-shaped feet.

The pet litter pan housing rests on four cube-shaped feet (Figures 1 and 7).

The top is composed of a single, uninterrupted, flat panel entirely covered in wicker



Cube-shaped feet

Figure 1: Patent '321, figure 1



Wire cross piece without wicker wrapping

Tightly wrapped vertical element

Cube-shaped feet

Figure 2: Patent '321, figure 2, front view.



Cube-shaped feet O→

O Decorative overlapping
diamond weave

Figure 3: Patent '321, figure 3, side view.



O Decorative overlapping
diamond weave

Figure 5: Patent '321, figure 5, top view.



Cube-shaped feet O→

O Decorative diamond weave

Figure 4: Patent '321, figure 4, back view.



O Decorative overlapping
diamond weave

Figure 6: Patent '321, figure 6, view looking through
to the bottom of the top panel



Cube-shaped feet

Figure 7: Patent '321, figure 7,
perspective view of another embodiment of the design



Tightly
wrapped
coils on
vertical
element

Figure 8: Patent '321, figure 8,
front view of another embodiment of the design



Figure 9: Patent '321, figure 9,
right side view of another embodiment of the design



Figure 10: Patent '321, figure 10,
back view of another embodiment of the design



Figure 11: Patent '321, figure 11,
top view of another embodiment of the design



Figure 12: Patent '321, figure 12. View looking through to
the bottom of the top panel of "another embodiment" of the
'321 design

Figures 1-6 in the patent drawings show the pet litter pan housing as having a decorative diamond weave. See Figures 1-6 and Figure 13. Figures 7-12 of the '321 drawings depict a design in which the diamond decorative weave is absent. The patent drawings that are part of Mr. Anderson's report are unclear, as are the patent drawings on line at Google Patent and FreePatentsOnline.com. I looked up the patent at the Auburn University Ralph Brown Draughon Library, which is a Federal Patent and Trademark Depository. The official copy of the patent on file at the Auburn

library is also unclear so I consulted the public pair site (portal.uspto.gov/external/portal/pair) and reviewed the replacement sheets submitted on May 11, 2006. These drawings are clearer. In these, Figures 1-6 show a diamond weave on a plain weave background while Figures 7- 12 show a regular or plain weave and an absence of the diamond decorative weave. The designs are depicted as identical in all other respects. See Figures 7-12 and Figure 14 herein. The rest of my remarks about figures 7-12 will be based on my analysis of the replacement sheets referenced above-



Figure 13: Sample weave patterns

5

which do not appear to have any variegated pattern. Because the drawings associated with the final patent are unclear, I reserve the right to change or amend this portion of my analysis.

## Ornamental features

Several ornamental features are noteworthy. These elements are provided by specific choices in weave and method of construction (Figure 13). Each of these choices contributes to the final appearance of the woven product. In addition to the choices in weave, the edges and the shape of the feet (Figures 1 and 7) form part of the overall visual impression by providing repetitive elements that are consistent throughout.

The tightly wrapped coils around all of the edges and the doorway create a distinctive visual element as does the cross bar just above the bottom of the doorway. The tightly wrapped edges of the front create a decorative element. The drawings also depict a tightly wrapped vertical element at the left and the right sides of the doorway. This wrapping goes from the bottom edge to the top edge of the front panel and creates a strongly vertical decorative element. The choice of cube-shaped feet also creates a strong decorative element at the base of the front (Figure 14).

## Front



Figure 14: Patent '321, figures 2 and 8

## Sides

The sides of the litter pan housing have a tightly wrapped weave around all of the edges of the right and left side panels. See Figure 15. This weave creates a decorative element. Figure 15 also shows a decorative weave composed of two intersecting diamond shapes. Finally, Figure 15 shows a visual separation between the top and the sides.

Figure 16, which shows ('321 patent drawing Figure 9) "another embodiment of the present design," depicts a regular or a plain weave without the diamond pattern. It has a tightly wrapped coil weave around all of the edges and a visual separation between the top and the sides.

6



visual
separation
between the
top panel
and the
sides

L-shaped
bend in the
top of the
pet litter
covering.

Side view from figure 3 of '321 patent

Overlapping diamond pattern. White line added to indi-
cate location.

Figure 15: Diamond and variegated weave patterns

7



visual
sepa-
ration
between
the top
and side
panel

Figure 16: Replacement drawing 9 -- side view of "another em-
bodiment"

## Top

The top has a tightly wrapped decorative weave around all of the edges. Figure 17 also depicts a decorative intersecting diamond weave surrounded by a plain weave similar to that of the sides, while Figure 18, part of "another embodiment," depicts a plain weave without a decorative diamond weave.



Tightly coiled decorative weave

Figure 5 from '321 patent: top view

White outlines added for emphasis

Figure 5 from '321 patent: top view, emphasis added

Figure 17: top view from figure 5 of the '321 patent



Tightly coiled decorative weave

Figure 18: Top view from figure 11 of the '321 patent

**Back**

The back has a tightly wrapped decorative weave around all of the edges. It also has a decorative diamond weave in the center of the panel, surrounded by a variegated weave. See Figure 19. The "other embodiment of the design" in Figure 10 of the '321 patent shows a plain weave on the panel surface as well as the tightly wrapped decorative weave all around the edges. See Figure 20. The weave changes direction at the top of this panel creating a decorative element (Figure 20).



Decorative diamond-shaped weave

Tightly coiled decorative weave

White outlines added for emphasis

Figure 19: '321 Patent drawing 4, back view



Change in direction and pattern of weave creates a decorative element

Tightly coiled decorative weave

Tightly coiled decorative weave

Figure 20: '321 Patent drawing 10, back view of "another embodiment of the present design"

# Functional features

The following are functional features: the rectangular shape, the doorway, the feet, the open bottom, and the material choice.

## Rectangular shape

The rectangular shape is primarily a function of manufacturing and assembly, and collapsibility for shipping. The rectangular sides are more suited to the production requirements of contemporary manufacturing than are other shapes. Rectangular shapes are more easily measured, cut, joined and transported than other shapes. The rectangular shape is also more easily assembled from individual pieces because the edges can be squared to each other, providing ease of fastening and strength. The rectangular shape allows the pet litter pan housing to be assembled from individual panels. These panels can be separated and stacked for efficient packaging and shipping.

In addition to this, litter pans are rectangular, thus a rectangular shape is the most sensible and functional choice for the overall geometry of the litter pan cover.

## Doorway

The doorway provides egress and ingress for the pet.

## Feet

The feet provide points of contact with the floor. Because floors frequently have uneven surfaces, it is easier for four distinct points to rest flat on the floor than the entire bottom surface of the litter box cover. Also, the elevation allows for air circulation. The choice of shape for the feet is a decorative one as noted earlier in this analysis (page 6).

## Open bottom

The open bottom provides an easy method for the owner to access the litter box to empty the litter, clean the litter box thoroughly, replace the litter and easily replace the litter pan housing. It also allows the owner to easily clean stray litter that has escaped from the litter box in the course of normal use.

## Material choice

As a material choice, the wicker has several functional



Figure 21: Functional features of the '321 patent

purposes. It serves to provide cover for the pet while it is using the litter box. This enhances the psychological comfort of the animal (Andrew Edney, Complete Cat Care Manual, 1999). If the weave of the rattan is loose, it will also allow the animal to see out through the weave without being observed, and it will allow light in so that the animal does not feel as if it is crawling into a hole. Because wicker is a woven material, it also has superior air circulation when compared with solid materials like sheet metal, wood, corrugated cardboard or solid plastic. The air circulation helps to keep the litter box dry and cuts down on the speed with which bacteria will grow. If the wicker is made from a synthetic material, it also will retard the growth of mold and be more easily disinfected than natural wicker. The wicker also provides a friendlier material finish; one that is more compatible with interior decor than solid plastic, sheet metal or corrugated cardboard.

# A person of ordinary skill

A person of ordinary skill in the relevant arts in the case of this design would be a person with a bachelor's degree in industrial design[1] and three or more years of experience. The designer also would have or be able to acquire knowledge in the design of products that require frame construction or wicker fabrication. The designer also would possess, or be able to acquire, a knowledge of the animal equivalent of human factors or ergonomics. (Ergonomics, according to the *Columbia Encyclopedia*, is "the engineering science concerned with the physical and psychological relationship between machines and the people who use them.") For the purposes of this analysis I will refer to this knowledge as "animal factors."

Alternatively, a person of ordinary skill also might be someone with more than six years of practical experience designing objects for metal fabricators, furniture design, or store fixture design, or would have or be able to acquire substantial knowledge of metal fabrication, kinematics, and assembly. The person also would possess or be able to acquire skill in researching and understanding manufacturing processes, including wicker weaving and a knowledge of animal factors, or be able to acquire such knowledge.

---

[1] According to the Industrial Designers Society of America, Industrial design (ID) is the professional service of creating and developing concepts and specifications that optimize the function, value and appearance of products and systems for the mutual benefit of both user and manufacturer.

Industrial designers develop these concepts and specifications through collection, analysis and synthesis of data guided by the special requirements of the client or manufacturer. They are trained to prepare clear and concise recommendations through drawings, models and verbal descriptions.

The industrial designer's unique contribution places emphasis on those aspects of the product or system that relate most directly to human characteristics, needs and interests. This contribution requires specialized understanding of visual, tactile, safety and convenience criteria, with concern for the user. Education and experience in anticipating psychological, physiological and sociological factors that influence and are perceived by the user are essential industrial design resources.

Industrial designers also maintain a practical concern for technical processes and requirements for manufacture; marketing opportunities and economic constraints; and distribution sales and servicing processes. They work to ensure that design recommendations use materials and technology effectively, and comply with all legal and regulatory requirements.

In addition to supplying concepts for products and systems, industrial designers are often retained for consultation on a variety of problems that have to do with a client's image. Such assignments include product and organization identity systems, development of communication systems, interior space planning and exhibit design, advertising devices and packaging and other related services. Their expertise is sought in a wide variety of administrative arenas to assist in developing industrial standards, regulatory guidelines and quality control procedures to improve manufacturing operations and products.

Industrial designers, as professionals, are guided by their awareness of obligations to fulfill contractual responsibilities to clients, to protect the public safety and well-being, to respect the environment and to observe ethical business practice.

www.idsa.org

## Prior art

### The use of wicker

The use of an object that is wicker on all sides and open on the bottom as a place for animals to be concealed is widely documented in recent history. For example, in 1904 Helen Beatrix Potter published the children's story *Benjamin Bunny* that includes an illustration of an overturned basket under which Peter Rabbit and Benjamin Bunny are hiding (Figure 22).

The use of woven materials, goes back at least 10,000 years, with the oldest examples having been unearthed in Faiyum in Upper Egypt. One of the oldest compete baskets can be found in the British Museum and has been dated at 3,000 B.C. (Figure 23). More

specifically, there are a number of examples from the 19th and 20th century of woven wicker or rattan structures being used for pets. These will be discussed in greater detail shortly.

The use of woven materials to construct decorative and utilitarian objects is as old as recorded history (Figures 23 and 24). The transition to mass-produced woven objects did not come about until the 19th century, when the Thonet Company and others, began mass producing furniture with wicker components. Figure 25 shows the first widely mass-produced wicker chair. It was designed by Thonet, and is designated "chair number 14." It began distribution in the late



Figure 22: Helen Beatrix Potter illustration from *The Tale of Benjamin Bunny*. 1904.



Figure 24: Basket from Egypt: probably 18th dynasty (1550-1300 BC ).From the collection of the British Museum.



Figure 23: Egyptian Basket circa 3000 BC from the collection of the British Museum.



Figure 25. Thonet Chair number 14. First produced in 1859, it is still in production today. It has the distinction of being the longest running mass-produced chair in history. This picture is taken from the 1904 Thonet Catalog.

13

1850s. Figure 27 shows a wood and rattan partition that appeared in the 1904 Thonet furniture catalog. In addition to being strong and lightweight, wicker is also an aesthetically pleasing material as Christopher Will points out in *International Basketry* published in 1978, "Even the simplest weave is an ornament, readily recognizable to the eye (pg.9)."

The use of wicker or rattan for the construction of structures for pets can be reliably traced back to the beginning of the last century. In the *Department of the Interior Ethnological Survey 1904*, a photograph of a "cage in which fowls are shut at night" depicts a woven cage with a securable front opening from Manila (www.bohol.ph/books/bi/). See Figure 28.

British patent number 26728, issued in 1913, depicts a wicker structure used for housing pigeons or poultry (Figure 29) that has woven wicker on all visible sides, and is rectangular in shape. Another striking example of the use of wicker for a pet enclosure is shown in a posting on eBay on June 29, 2007. The cage is wicker on all sides with an arched opening in front. The eBay description notes that the cage dates from the 1920s or 1930s (Figure 30). According to the seller, the wicker cage was purchased by his wife in the year 2000. She purchased the cage from an antiques dealer. i have not been able to confirm the date of manufacture at this point; however, my grandmother owned a cage identical to the one shown in Figure 30 in the mid 1960s, making this design at least forty years old.



Figure 27: Thonet Wood and rattan partition from the 1904 Thonet catalog



Figure 28: Manilan bird cage. From the Department of Interior Ethological Survey 1904.



Figure 29: Pigeon cage. British patent number 26728. Issued in 1913.



Figure 30 Pet cage for sale on eBay. The seller dates it to the 1920s or 1930s. My grandmother owned a cage like this in the mid 1960s.

In 1935, U.S. patent number 2,016,005 was issued for a dog bed made of wicker (Figure 31). More recently, plate 28 in *Modern Basketry from the Start*, 1973, (Figure 32) shows the design for a wicker animal enclosure. The enclosure has a rectangular silhouette, is wicker on all visible sides and the horizontal length is greater than the horizontal width or the vertical height.

Page 126 of *belorusskie rhudazhestvennye pronnyslys*, a Russian book on basketry published in 1985 (Figure 33), shows a wicker or rattan pet structure with win-

dows and a door. It has a rectangular silhouette, is wicker on all visible sides, and the horizontal length is greater than the horizontal width or the vertical height. Figure 34 shows a poultry cage from the early 1900s that is rectangular in shape with flat top and sides and a non-wicker area in front. Figure 35 shows a wicker animal enclosure from the collection of the Pennsylvania Farm Museum with an arched front opening, while Figure 36 shows a wicker enclosure with a front opening from *American Basketry and Woodenware*, published in 1974.

## Covering structures



Figure 31: Dog bed. Patent 2,016,005, issued 1935.



Figure 32: Wicker enclosure design, plat 28 in Modern Basketry from the Start, 1973.



Figure 33: Wicker animal enclosure from page 126 of belorusskie rhudazhestvennye pronnyslys, 1985.



Figure 34: Poultry cage circa 1910. Old Town, Maine, from *American Baskets: a Cultural History of Traditional Domestic Art*. By Robert Shaw. 1999.



Figure 35: Wicker pet enclosure from *Baskets* by Nancy N. Schiffer (a Schiffer book for collectors). 1994



Figure 36: Wicker enclosure from *American Basketry and Woodenware, A Collectors Guide*. 1974.

15

The design of rectangular animal structures with a closed top, an opening in the front and an open bottom is not new. Figure 37 shows patent number 5,791,292 awarded on August 11, 1998 for an enclosure for capturing and transporting small animals. While the purpose is different, it is, nonetheless, rectangular in shape, with the length being longer than the width or height, and it can be used with an open front and bottom. The patent even shows it in use with a cat.

Likewise, litter box covers are not new. Patent number 4,696,257 awarded on September 29, 1987 shows a covered litter box with a rounded rectangular opening. See Figure 38. Figure 39 shows patent number 4,161,157, awarded in 1979, for an enclosed litter container for animals with a rounded opening for the animal to gain access to the litter.

Figure 40 from *Comfortable Quarters for Laboratory*



Figure 37: Patent 5,791,292. Awarded in 1998.



Figure 38: Covered litter box, patent 4,696,257 awarded on September 29, 1987.



Figure 39: Enclosed litter container, patent number 4,161,157, awarded in 1979.

*Animals*, published in 2002, shows a covered habitat with flat sides and an arched doorway. The habitat is longer than it is wide or tall. Figure 41, from *The Complete Illustrated Guide to Cat Care and Behavior*, published in 1999 shows a litter box that is covered on the top, back and sides with an opening in the front. Figure 42 taken from *The Complete Cat Owner's*

*Manual*, 1997, shows a largely rectangular cat carrier, closed on the sides and back, with an arched doorway. Figure 43 shows an illustration from *Kittens and Cats*, acquired by Auburn University Libraries in 1964, that depicts a cat carrier with an arched door. Figure 44 shows patent '989, awarded in 1974. Patent '989 is for a litter box cover with an arched opening in front. It has predominantly rectangular sides and a closed back and, it fits over a litter pan.



Figure 40: Covered habitat with flat sides, and an arched doorway. From *Comfortable Quarters for Laboratory Animals*. 2002



Figure 41: Litter box cover with an opening in the front. Taken from *The Complete Illustrated Guide to Cat Care and Behavior*. 1999



Figure 42: A largely rectangular pet carrier with an arched door way. From The Complete Cat Owner's Manual. 1997.



Figure 43 shows another cat carrier from *Kittens and Cats: their care an feeding, training and breeding*. 1964.



Figure 44: Litter box cover with an arched opening in the front. Patent 3,793,989, awarded in 1974.

17

## Combined materials

The Thonet brothers (see page 13) were not the only ones experimenting with wicker in combination with other materials. Patent 332,407 awarded on December 15, 1885 shows a method of making baskets or skips and other similar articles so that they are stronger and more durable than those of ordinary construction. The method makes use of a solid wood or metal rail immediately under the top border and extending around all or any of the sides. See Figures 45 and 46.



Figure 45: Method of making baskets stronger. Patent 332,407, awarded in 1885



Figure 46: Method of making baskets stronger. Patent 332,407, awarded in 1885.

U.S. patent number 571,452, awarded on November 17, 1896, shows a method of constructing rectangular baskets reinforced with a metal substructure. If flipped over, this basket would be longer than it is wide or high, with wicker on all visible sides and an open bottom. See Figure 47. As early as 1904, wicker or rattan was being used to create flat panels secured to wood frames. See Figure 48.

A more recent example of this technique is shown in *International Basketry for Weavers and Collectors* (Figure 49), originally published in 1973 in German; translated and published by Schiffer in 1985. Examples of contemporary wicker and frame construction are also shown in patent 5,931,326 for container assembly, patented in 1999 (Figure 50), and patent 6,230,915 for a rattan basket, patented May 15, 2001 (Figure 51).



Figure 48: Thonet wood and rattan partition from the 1904 Thonet catalog.



Figure 47: Patent 571,452, awarded in 1886.

Figure 49: Contemporary wicker and frame construction, 1973.

## Panel Structures

The literature contains numerous examples of prior art showing paneled structures, many of which are made from a combination of metal or wood structures covered with wicker or similar woven materials. Figure 50 shows an illustration from patent 5,931,326, awarded in 1999, depicting a paneled, metal-framed structure with wicker material completely covering all sides. Patent number 318,812, awarded in 1885 shows a structure made from distinct panels. See Figure 52. Though the cage is not covered in wicker, it is composed of clearly separated rectangular pieces with a woven covering attached to the frame. Patent number 6,230,915 awarded in 2001, also shows a rectilinear structure made from metal-framed wicker-covered panels (Figure 51).



Figure 51: Wicker over metal frame container assembly. Patent 6,230,915, awarded 2001.



Figure 50: Wicker over metal frame container assembly. Patent 5,931,326, awarded 1999.



Figure 52: Patent number 318,812, 1885.

20

The appearance of distinct panels is not new to wicker construction. Figure 53 shows a sewing stand published in *Furniture Weaving Projects* in 1922. The sewing stand has a rectangular shape and the appearance of distinct, flat panels. Likewise, Figure 54

Rectangular shape and flat panels

Figure 53: Sewing stand from *Furniture Weaving Projects* by Lloyd F. Hyatt, published in 1922

Rectangular shape and flat panel

Figure 54: Poultry cage, circa 1910. Old Town, Maine. Taken from *American Baskets: a Cultural History of Traditional Domestic Art*, by Robert Shaw, 1999.

shows a poultry cage, circa 1910 that has rectangular shaped flat panels and an opening in the front.

**Weave Patterns**

The use of weave patterns to achieve a decorative effect is as old as weaving techniques themselves. Figure 55 shows how weave patterns may be established through varying of the over and under lapping of the wicker (top) and by varying the way that the wicker is used to wrap the staves (bottom). The variations in the top illustration show how a diamond-shaped decorative pattern might be established and the lower illustration shows how the vertical elements of a basket might be accentuated by the way in which the wicker is wrapped around them (See also Figure 15).



Illustration from *Hand made Baskets*, 1991.



Illustration from *The Nature of Basketry*, 1973.

Figure 55: weaving techniques and the creation of pattern

# Conclusions:

## 1. Obviousness

A number of pieces of art contribute to the design that is shown in patent '321. Wicker structures for animals date back at least as far as the early 1900s (Figures 56-58) and have been in and out of popular use up to the present time (Figures 58-63). The characteristics of the '321 patent are all visible in these examples. The poultry cage (Figure 57), the Russian cage (Figure 60), the pigeon cage (Figure 56), the wicker enclosure (Figure 58), and the wicker wagon (Figure 59) all have rectangular wicker sides. The poultry cage (Figure 57) has rectangular sides that are entirely covered by wicker and a front that has a large opening. More recently, US patent number D 483,156 also makes use of distinct panels with woven surface over a sub-frame. The '156 patent is also rectangular in shape with its length being longer than its width or height. It also has an opening in the front and tightly wrapped coils



Figure 56: Pigeon cage. British patent number 26728. Issued in 1913.



Figure 59: Wicker enclosure design, plat 28 in *Modern Basketry from the Start*. 1973.



Figure 57: Poultry cage circa 1910. Old Town, Maine, from *American Baskets: a Cultural History of Traditional Domestic Art*. By Robert Shaw. 1999.



Figure 60: Wicker animal enclosure from page 126 of belorusskie rhudazhestvennye pronnyslys. 1985.



Figure 58: Wicker enclosure from *American Basketry and Woodenware. A Collectors Guide*. 1974.



Figure 61: Patent D 483,156. awarded 2003.

22

around the edges of each panel (Figure 60). The eBay cage (Figure 62) and the arched wicker cage (Figure 63) both have arched openings.

The use of a rectangular structure to cover a litter box also clearly can be demonstrated in the prior art. Patent '292 shows a rectangular structure that can be configured so that it is without a bottom and so that the front is open (Figure 64). There are also several examples of litter boxes that are covered on the top and all sides and have openings in the front for the pet to enter (Figures 65 - 67). Two of these (Figures



Wicker pet carrier, 17" high. (Pennsylvania Farm Museum) $25-75

Figure 63: Wicker pet enclosure from Baskets by Nancy N. Schiffer (a Schiffer book for collectors). 1994.



Figure 64: Patent 5,791,292. Awarded in 1998.



Figure 62: Pet cage for sale on eBay. The seller dates it to the 1920s or 1930s. My grandmother owned a cage like this in the mid 1960s.

65 and 66) have a square entrance; the other has a round entrance.

Figure 69 shows a pet cage similar in construction and shape to those shown in Figures 65-68. It has an arched front. It is rectilinear in shape with an open

bottom that has been placed on top of a base that resembles a litter box. Although the publication date is 2002, the habitat would have had to have been available in 2001 since it takes at least a year, on average, to produce a book. Figure 70 shows a design for a litter box cover that slides over the litter box and has an arched opening in the front.



Figure 65: Covered litter box, patent 4,696,257 awarded on September 29, 1987.



Figure 68: Enclosed litter container, patent number 4,161,157, awarded in 1979.



Figure 66: Litter box cover with an opening in the front. Taken from *The Complete Illustrated Guide to Cat Care and Behavior*, 1999.



Figure 69: Covered habitat with flat sides, and an arched door-way. From *Comfortable Quarters for Laboratory Animals*, 2002.



Figure 67: Litter box cover with an opening in the front. Patent 3,246,630, awarded in 1966.



Figure 70: Litter box cover with an arched opening in the front. Patent 3,793,989, awarded in 1974.

24

The practice of using wire or wood as a substructure for a wicker covering is demonstrated in general terms by the Thonet folding partition (Figure 71) and chair (Figure 72) and by the plant stand (Figure 73). Patent 332,407 (Figures 45-46 on page 18, and Figure 74), awarded in 1885, specifically shows a metal or wood substructure with woven covering, and patent '452, awarded in 1896 shows the use of a metal or wood substructure to create a wicker-covered rectangular basket (Figure 75). More recently, Patent '156 has used a woven covering over the wire sub-structure of a pet cage (Figure 61 on page 22).



Figure 73: Sewing stand from *Furniture Weaving Projects* by Lloyd F. Hyatt, published in 1922.



Figure 71: Thonet Wood and rattan partition from the 1904 Thonet catalog.



FIG. 3.

Figure 74: Portions of patent 332,407, awarded in 1885 for a method of making baskets stronger.



Figure 72. Thonet Chair number 14. First produced in 1859, it is still in production today. It has the distinction of being the longest running mass produced chair in history. This picture is taken from the 1904 Thonet Catalog.



Figure 75: Patent 571,452, awarded in 1886.

25

A number of products combine wicker or rattan with rectangular frame pieces that are assembled to form containers. Two examples of this are patent '326 and patent '915 (Figures 76 and 77) discussed earlier in this report as well as patent '542 (Figure 78) that shows a material which appears to be of a wicker type, being used to create tightly wrapped edges and sides on a load carrier. There is also a long history of prior art that uses woven material in combination with a frame (Figures 79 and 80). Figure 80, from page 689 of the 1925 *Sears and Roebuck Catalog*, shows wicker used as an alternative to cloth-covered strollers. In the case of pet cages and covers, the use of woven material has obvious design benefits because it allows air circulation, and it blends in with the environment more favorably than metal wire or plastic containers. It also provides cover for the pet, which is important to its comfort. Moreover, a number of examples of wicker animal structures that predate the '321 patent have been cited in this report and in the attachments. Based upon this, I conclude that it would be obvious to a designer with ordinary skill in the art who had full knowledge of the prior art to apply wicker or rattan weave patterns to all surfaces of a rectangular cage structure for the purposes of providing the aesthetically pleasing pet containment structure and design that is the subject of the '321 patent. (*Chisum* 23.03 [6]).



Figure 76: Wicker over metal frame container assembly. Patent 5,931,326, awarded 1999.



Figure 77: Wicker over metal frame container assembly. Patent 6,230,915, awarded 2001



Figure 78: Patent 5,282,542 awarded February 1, 1994 for a load carrier that makes use of woven material



Figure 79: Contemporary wicker and frame construction, 1973



Figure 80: Wicker as a covering for strollers. *Sears and Roebuck Catalog*, 1925

## Additional Issues of obviousness based on *KSR*

The recent Supreme Court ruling in the case of *KSR International Co. v. Teleflex Inc. et al.* (No. 04-1350) elaborates on several points that further address the issue of obviousness as it relates to the '321 patent.

## Uniting old elements

In writing the unanimous opinion for the Court, Justice Kennedy notes, "For over a half century, the Court has held that a 'patent for a combination which only unites old elements with no change in their respective functions ... obviously withdraws what is already known into the field of its monopoly and diminishes the resources available to skillful men.' This is the principle for declining to allow patents for what is obvious." Based on the points raised earlier in this section, it is clear that the elements present in the '321 patent, woven texture on all visible sides, an arched doorway, a rigid cage structure and a cage which is rectangular in shape and whose horizontal length is greater than its horizontal width or vertical height have all been present in earlier designs and are therefore obvious.

## Substitution of one element for another

Justice Kennedy went on to say, "The Court recognized that when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." Justice Kennedy further notes that in citing *Sakraida v. Ag Pro. Inc.*, the Court concluded that "when a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement the combination is obvious." In this case, the frame and wicker weave are a combination of old elements with each performing the function that it has previously performed; the wicker providing cover, air circulation, and an improved appearance, and the framework providing a structure that is rigid in operation but collapsible for shipping, storage or transportation. Thus the '321 patent is obvious.

## Predictable variation

The court also noted that in determining obviousness, it was important not to look too narrowly. "If a person of ordinary skill can implement a predictable variation, 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless the actual application is beyond his or her skill." Patents '257 (Figure 61) and '157 (Figure 63), along with the plastic litter box shown in Figure 62 and the plastic cover with the arched doorway shown in Figure 64, clearly establish the idea of covering a litter box with a cover that is largely rectilinear in shape with an opening in the front. Patents '326 (Figure 47), '915 (Figure 48), '407 (Figures 42 and 43), '452 (Figure 44) and '156 (Figure 57) show the application of a woven texture to a rigid frame in order to provide an aesthetically appealing surface over a metal sub-frame. Additionally, the wicker covering provides superior air circulation (See page 11). This same technique would be obvious to a person skilled in the art (as described earlier in this report) to try as a method of providing cover, aesthetic finish, and air circulation for a litter box cover. Beyond this, part of the design process involves product comparisons. Typically these include not only like products, but also an investigation of materials and processes from other fields that may have utility for the present design. This information is then used to create a variety of solutions based upon available technology, techniques, and methods. Patent '321 clearly demonstrates materials and techniques found in patents '326 (Figure 50), '915 (Figure 51), '407 (Figures 45 and 46), '452 (Figure 47) and '156 (Figure 61) all of which were patented prior to '321 and all of which would be recognized as having methods that would improve the pet litter box cover.

## Fitting together of multiple patents

The Court further stated, "Common sense teaches, however, that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." Even if we disregard all of the previously noted ways in which the '321 patent is obvious and confine our examination to the teachings of prior patents, such as '452 (Figure 47) '407 (Figures 45 and 46), '915 (Figure 77), '326 (Figure 76), '812 (Figure 52) '156 (Figure 61), '257 (Figure 65), '157 (Figure 68), '630 (Figure 67) and '989 (Figure 70), we see that the '321 patent is, in fact, a combination of these features. It has a rigid collapsible frame (Figures 52, 61, 76 and 77), it fits over the litter box (Figures 65-68, and 70), it has an arched front opening (Figure 70) and a woven finish (Figures 61, 76, and 78). Each of the above points serve to further emphasize that the '321 design is obvious to an ordinary person skilled in the art.

## 2. Analysis of infringement allegations

Based upon my review of *Chisum* and recent court decisions, I understand there are two standards Simpson Ventures must meet in order to prove infringement. The first is satisfaction of the Gorham standard. The second is that it must demonstrate that the al-leged points of novelty are present in Mid-West Metal's Bay Isle 1805 design.

### A. Points of novelty

With regard to the points of novelty, the general configuration, construction techniques and materials, and entrance geometry are all present in the prior art. See Figures 81 and 82. Mr. Anders has identified several features of the '321 patent that he claims are novel-



Prior art pet carriers and litter box covers with arched openings

Prior art panel construction pre-dominantly wicker covering with metal sub-frame

Figure 81: Examples of features found in prior art.

28



Rectilinear woven animal con-
tainers with open areas in front

Prior art patents
concerning the use of
woven material over
metal or wood sub-
frame

Inverted for emphasis

FIG. 3.

Rectangular volume in which hori-
zontal length is greater than the
vertical height or width and with
a woven texture surface on all five
outer surfaces. Each outer surface
appears to be formed by separate
pieces.

Litter box covers, largely rec-
tilinear in shape, closed on the
top, open on the bottom and
having openings in front.

Figure 82: Examples of features found in prior art.

features that supposedly distinguish that design from the prior art. However, his description of the scope of reference to prior art is extremely narrow and clearly incomplete. He identifies it in section III of his report. Notably he does not identify any of the pieces of prior art that I have presented here in this report or in the reports that I prepared in evaluating the '156 patent (see *Design Analysis of United States Design Patent Number US D483,156*, dated August, 2007; and the *Supplemental Expert Report by Professor Bret H. Smith, IDSA, December, 2007*). As already discussed herein each of the distinguishing features of the '321 design alleged by Mr. Anders (based upon his narrow and limited examination of prior art) are, in fact, not novel. They were already present in the prior art. Those features are thus not even "points of novelty."

In his report, Mr. Anders identifies four points of novelty for the '321 design. These are identified in paragraphs 41-44 of his report of November 29, 2007 entitled *Expert Report of Robert John Anders*. I will examine each of these points in turn.

### 1. The first point of Novelty is: The Extend of Wicker

*A pet litter pan housing with five faces comprising a top, sides, front and rear, the five faces visually defining a rectangular volume and having wicker substantially on all surfac-*

*es while the front face includes an arched open portion and the non-open portion of the front face has an outer surface substantially having wicker, while the bottom of the rectangular volume has no bottom surface (Anders, paragraph 41).*

This statement is simply not true. As demonstrated elsewhere in this report, there are numerous examples of prior art. Patent '156 has five faces comprising a top, sides, front and rear, the five faces visually defining a rectangular volume and having wicker substantially on all surfaces (Figure 83). This description also fits other patents, such as patent '915 (awarded in 2001) and '452 (awarded in 1886).

Moreover, "Five faces visually defining a rectangular volume" is also a shared characteristic of patents '326 (awarded in 1999), and patent '542 (awarded in 1994). Anders goes on to point out that the '321 design does not have a bottom surface. The bottom surface was specifically excluded from the claims in the '156 patent, so this is not new. And, if you invert '326, and ' 542, they too would fit the description of "the bottom of the rectangular volume having no bottom surface."



Note: Patents '542 and '326 inverted for emphasis

'915 patent

'542 patent

156 patent

'452 patent

'326 patent

Figure 83: Prior art of rectangluar wicker construction

Likewise, there are numerous examples of animal housings with five faces; top, front, sides and rear, without a bottom surface (figure 84). Many of these are specifically litter pan covers, and the prior art contains several examples of litter pan covers, or similarly shaped habitats that have arched open portions in the opening on the front surface, so this idea cannot be claimed as a point of novelty (Figure 85).



Figure 84: Animal housings with five surfaces and no bottom surface



Figure 85: Animal housings with five surfaces and no bottom surface and arched front openings

## 2. The second point of novelty is: The Front Panel Configuration

*A pet litter pan housing with a rectangular volume and having a rectangular front panel, the front panel including an opening with and arched top portion and a rectangular bottom portion that is framed substantially by wicker (Anders, Paragraph 42).*

This assertion is not supported by an examination of the relevant prior art. Figure 86, discussed earlier, shows one example of an animal housing having a rectangular front panel including an arched top portion and a rectangular bottom portion that is substantially framed by wicker. Moreover, the use of an arched opening as a method for animals to enter and exit a manufactured habitat is not new. Figure 87 shows a number of pet habitats, previously discussed, that have arched front openings with rectangular bottoms. All of these examples are cat-related habitats or litter pan covers pre-dating the '321 design and are therefore prior art. This feature cannot, therefore, be claimed as "novel."



Figure 86: Wicker animal enclosure from page 126 of *belorusskie rhudazhestvennye pronnyslys*, 1985.



1920s

1997

1974

1994

1964

published in 2002

Figure 87: Prior art showing pet habitats that have arched front openings with rectangular bottoms

32

### 3. The third point of novelty is: Distinct Panels

*A pet litter pan housing having the appearance of being formed from four distinct, individual panels substantially having wicker outer surfaces without any openings and a fifth panel that has a centrally positioned opening substantially surrounded by wicker (Anders, paragraph 43).*

This claimed point of novelty is not supported by an examination of the prior art. Figure 88 shows a plant stand from 1922 that is made up of visually distinct panels as is the poultry cage from 1910 (Figure 88). The poultry cage is also formed from distinct panels substantially having wicker outer surfaces without any openings and a fifth panel that has a centrally positioned opening substantially surrounded by wicker. Likewise, the wicker enclosure from *American Basketry and Woodenware: A Collectors Guide* (1974) depicts an animal enclosure that is formed from wicker on four sides with a fifth side that has an opening that is centrally located and surrounded by wicker. See Figure 58.






Figure 88: Poultry cage circa 1910. Old Town, Maine, (from *American Baskets: a Cultural History of Traditional Domestic Art.* By Robert Shaw, 1999) and plant stand (from *Furniture Weaving Projects* by Lloyd F. Hyatt, published in 1922.)

The prior art also contains several examples of animal habitats or enclosures that are rectangular in geometry and have centrally positioned openings in the front (Figure 89). The design in patent '156 clearly shows an animal housing having the appearance of being formed from four distinct individual panels substantially having wicker surfaces with the fifth panel having a centrally positioned opening substantially surrounded by wicker. Moreover, though it is not made of wicker,

the habitat shown in Figure 90 has four distinct, flat rectangular sides with the fifth panel having an opening that is centrally positioned and surrounded by the same material as the side panels. Figure 91 shows the '989 patent (awarded in 1974) which, though it has a differently shaped roof, is still composed of rectangular panes with a flat front that has an opening centered in front.



Patent '630, awarded in 1966

Published in 2002 book

Patent '257, awarded in 1987

Patent '157, awarded in 1979

'156 patent

Published 1997

Figure 89: Animal habitats or enclosures that are rectangular in geometry and have centrally positioned openings in the front.



Figure 90: Litter box cover with an arched opening in the front. Patent 3,793,989, awarded in 1974.

34

**4. The fourth point of novelty is: A combination of the above.**

> A pet litter pan housing with the combination of the points of novelty as described in paragraphs 42 through 43 (Anders, paragraph 44).

However, the Courts clearly reject this type of analysis.

> What the patent owner's contention comes down to is that the patent contains a ninth `point of novelty,' namely, the combination in a single design of the eight non-novel `points of novelty' it embodies. This argument is inconsistent with, and would seriously undermine, the rational of the `points of novelty' test. . . . Litton did not hold that the combination of several points of novelty was itself a point of novelty, but rather held that there were several points of novelty in the patented design, none of which was found in the accused design. The patent owner's argument would stand the `points of novelty' test on its head, and defeat its purpose.
> Lawman Armor, 437 F.3d. 1383, 1386 (Fed. Cir. 2006), supplemented by 449 F.3d 1190,1192 (Fed.Cir. 2006)

As already seen in this analysis, all of the features claimed by Mr. Anders in his expert report are already clearly shown in the prior art. Therefore, their combination cannot serve as a point of novelty.

Beyond this, the recent ruling by United States Court of Appeals for the Federal Circuit in *Egyptian Goddess, Inc. and ADI Torkiya v. Swissa, Inc. and Dror Swissa (Swissa)*, the Court of Appeals ruled that

> For a combination of individually known design elements to constitute a point of nov-

> elty, the combination must be a non-trivial advance over the prior art.

As noted earlier in this report, all of the features claimed in Anders' reports are clearly present in the prior art (Figures 81 - 88).

Moreover, the court noted that

> The question is not whether the infringement and validity analyses are similar or conflated, they already are. The question is: When the patentee claims a combination of old prior art elements as its asserted point of novelty should the test be one of anticipation or obviousness? We conclude that non-triviality ought to apply -- if the standard is akin to anticipation then a combination with even the most trivial difference would meet the standard.

In addition to the large body of prior art detailed in this analysis, many of the features being claimed as unique such as the rectangular shape of the housing and the open doorway in the front are not only not unique, but also are driven by functional requirements. Even if these claimed points of novelty were new, which they are not, they would represent, at best, a trivial advancement and one which would be obvious to a person of ordinary skill in the relevant arts. Their combination does not present any advancement over the prior art, let alone a non-trivial advancement.

Moreover, even if I were disregarding the broader and more accurate field of prior art that I have presented here and joined in Mr. Anders limited review of only the prior art that was submitted with the '321 patent application, Mr. Anders still erroneously failed to identify several potential points of novelty.

35

## B. Potential points of novelty which Mr. Anders ignored

When I refer to these potential points as "distinctive," I mean to say that I have not seen the identified visual elements in pieces that I have reviewed to date and identified herein as relating to pet litter box covers or related prior art. These other features that Mr. Anders completely ignored are as follows:

### 1. Distinctive surface decoration

The '321 patent has a distinctive surface decoration, in the form of a diamond weave pattern, shown in the first embodiment. The other embodiment shows a regular weave. The diamond pattern consists of two overlapping diamonds on the top and side panels and a single diamond on the rear panel. See Figures 2-6 and 7-12 and Figures 91 and 92.

Both embodiments of the '321 patent also have an additional decorative element at the top of the back panel (Figures 91 and 92). This decorative element is provided by a change in the direction and style of weaving and results in a distinctive horizontal band at the top of the back panel.



Figure 91: Comparison of decorative elements between Bay Isle 1805 and the first embodiment of the '321 patent.



Side of '321

Top of '321

Plain weave pattern

Top of Bay Isle 1805

Back of Bay Isle 1805

Back of '321

Square weave

Notches

Distinctive change in weave

Figure 92: Comparison of decorative elements between Bay Isle 1805 and the second embodiment of the '321 patent.

Notches

37

## 2. Front decoration

Tightly wrapped vertical pieces are present on the front panels of both embodiments of the '321 design (Figure 93). In addition to this, both embodiments have a metal cross piece, which spans the opening just above the bottom edge (Figure 93), and both fronts have a one-piece panel construction.



Figure 93: A comparison of the front panels of the '321 patent and the Model 1805 design.

### 3. The cube-shaped feet

The '321 patent clearly shows cube-shaped feet upon which the pet litter pan housing rests. While the feet serve a functional purpose as described earlier (page 11), there is a decorative choice in the shape of the feet. The cube-shaped feet (Figure 94) and are thus a potential point of novelty.



Plastic piece on bottom wire of pet litter box cover acts as feet

Distinctive cube-like feet keep the liter pan cover off of the floor, giving it a distinct and elevated appearance

Figure 94: A comparison of the presence and absence of feet.

## B. Comparison of the points of novelty in the '321 patent with the Model 1805 design

### 1. Distinctive surface decoration

As mentioned earlier, the '321 has made use of the woven material in such a way as to create a distinctive surface decoration: diamond shape(s) surrounded by a plain weave in the case of one embodiment, and a simple plain weave in the case of the other embodiment. In both embodiments, there is a distinctive change in the weave at the top of the back panel (Figures 91 and 92).

A comparison of these features with the Model 1805 design shows that the Model 1805 design does not make use of these elements. The Model 1805 design uses an entirely different and distinctive square weave pattern in the corners of the panels on the top sides and back. Also, the Model 1805 does not have the pronounced and distinctive weave change at the top of the back panel (Figure 91 and 92).

### 2. Front decoration

Both of the embodiments of the '321 patent have identical decorative features. The front is formed by a single piece. At either side of the arched doorway there is a tightly coiled vertical element. Both fronts also have a wire cross-bar just above the bottom of the front opening. The wire is not wrapped in wicker.

The front of the Bay Isle 1805 design is significantly different. It does not have tightly coiled vertical element at either side of the doorway. Instead, it has three *horizontal* elements across the front (Figure 93). Moreover, the 1805 design has a front that is composed of two distinct pieces, rather than the one-piece front of the '321 design. Finally, there is no wire cross-bar just above the bottom of the front opening (Figure 93).

### 3. The cube-shaped feet

The '321 patent clearly shows cube-shaped feet upon which the pet litter pan housing rests. While the feet serve a functional purpose as described earlier, (page 11), there is a decorative choice in the shape of the feet. The cube-shaped feet (Figure 94) are a decorative choice that sets the '321 design apart from prior art.

The Bay Isle design does not have traditional feet of any kind. It makes use of a cylindrical plastic piece around the bottom wires of the left and right sides (Figure 94). This presents a distinctly different appearance than '321 which has four cube-like feet that elevate the pet litter pan covering off of the floor (Figure 94).

## C. The Gorham Standard

*Gorham Mfg. Co. V. White* (1872) instructs us that iden-tity is tested through the eyes of an ordinary observer rather than an expert: "[I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other..." (quoted from *Chisum* 23.05[3]).

This speaks to the overall look of the '321 patent when compared with Model 1805 design. Based upon my experience as a designer and my analysis of the '321 patent and the Bay Isle 1805, I believe that there are four prominent attributes that distinguish the two designs for the ordinary observer: the edges, the pres-ence or absence of a two-piece front, the weave detail (including the horizontal and vertical detail differences of the front panels), and the presence or absence of distinct feet

The edges and the presence or absence of distinct feet are part of the overall shape recognition. These are visual cues that people use to distinguish one shape from another. In the case of the '321 patent, the edges are crisp, continuous, and straight. The front panel is a single piece with an arched opening and tightly wrapped continuous coils around the perimeter (Figures 1-12). The edges of the front, side and back panels butt up against each other without a gap, giv-ing the appearance of a continuous, uninterrupted edge. This is reinforced visually by the square edge bindings (Figures 95 and 96). In the eyes of an ordinary

observer, the Model 1805 design does not have con-tinuous edges. There is a distinct gap or visual separa-tion between the top, front, side and back panels of the 1805 design. The black wire that Mid-West chose to use in in the design of the Model 1805 further em-phasizes the gapes between the panels of the Model 1805. In addition to this, the side pieces have a series of notches along the top and bottom. The '321 sides have continuous uninterrupted edges (Figure 95). The prominent feet of the '321 design are also part of the overall shape recognition. By using cube-shaped, dis-tinctive feet, the pet litter pan cover has the appear-ance of floating above the floor or of being on short stilts. The Model 1805 design, by contrast, appears to rest directly on the floor (Figure 95).

The third and fourth attributes (the weave detail, and the one-piece front panel) are key parts of the overall impression of the two cages. The '321 patent makes use of a diamond weave pattern in the first embodi-ment and a the absence of a distinctive weave in the second embodiment as discussed previously. The decorative choices on the front are also part of the distinct appearance, namely the vertical elements on either side of the entrance and the tight edge weav-ing of the panels.

Unlike the '321 design, the decorative weave on the Model 1805 design is a square weave pattern, distinct-ly different than that of the '321 patent. The front of the litter box cover shows even more differences. The visual separation between the two pieces of the front



Figure 95: Comparison of visual elements between the '321 patent and the Bay Isle 1805.

in the Model 1805 design, and the emphasis of horizontal elements created by the three wrapped horizontal bars (Figure 95) are distinctly different than the '321 design, which emphasizes vertical elements with the tightly wrapped vertical elements on either side of the door way (Figure 95). As with the corner elements, the use of black wire to connect the two pieces of the Model 1805 front panel, further emphasizes the two-



Patent '321

Model 1805

Panels butt up against each other

Gaps between panels further emphasized by the use of black wire

Black wire connector

Notches along the top and bottom edges of the sides

Figure 96: Comparison of the panel edge detail between the '321 patent and the Bay Isle 1805

42

piece construction, further reenforcing the differences between the front panel of the Model 1805 and that of the '321 design.

In addition to this, the proportions of Model 1805 are clearly different than those of the '321 design. Model 1805 is noticeably taller than the '321 design while maintaining a similar width, thus providing another point of differentiation for the ordinary observer.

Finally, Model 1805 uses a decorative square weave pattern on the top, back, and sides of the cage. The square decorative weave is clearly different than the decorative details of the '321 patent, and would present a clear and noticeable difference to an ordinary observer (Figure 96). Based on this analysis, it is my opinion that an ordinary observer would not view the two designs as substantially the same, but would, instead, view them as substantially different.

March 3, 2008

Date

Bret H. Smith, IDSA
Professor of Industrial Design
Auburn University

# EXHIBIT F

In the United States District Court
For the Middle District of Alabama
Eastern Division

Simpson Ventures, Inc.,
*Plaintiff,*
V.
Mid-West Metal Products
Company, Inc.,
*Defendant*

Civil Action File No.
406-cv-901-WKW-VPM

## Second Supplemental Expert Report by Professor Bret H. Smith, IDSA

### Introduction

My Name is Bret H. Smith. I am a full professor in the Industrial Design department at Auburn University where I have taught industrial design for over twenty-one years.

I have been retained in the above referenced lawsuit as an industrial design expert witness. I am being compensated for my work here at a rate of $180 an hour. I have no financial interest in the outcome of this case.

I submitted a Review of U.S. Patent D 483,156 on August 17, 2007. Subsequently, I received and reviewed Simpson Ventures' Supplemental expert reports dated September 11 and September 22 of 2007, together with the Interrogatories dated September 27, 2007

after which I issued a Supplemental Report examining the additional claims as well as additional prior art.

Since the Supplemental Report, I have found two additional pieces of prior art. This prior art, patent 332,407 and patent 571,452, is the subject of this Second Supplemental Report.

Finally, I reserve the right to supplement the conclusions in this and previous reports to reflect any additional material that may come to light.

## Additional patents

In the course of my research I found two additional patents, patent 332,407 and patent 771,452, that are part of the prior art relating to the '156 patent. Patent 332,407 for a basket and skip was awarded in 1885. It describes a method of making baskets, skips and other similar articles stronger and more durable by using a wire metal frame in conjunction with a wicker or strand covering. See Figure 1. Patent 571,452 was awarded in 1896. It describes a method of reinforcing the top of a basket structure which can then be covered with a web of "any suitable material" (lines 84 & 85). See Figure 2.



Figure 1: Method of making baskets stronger. Patent 332,407, awarded in 1885.



Figure 2: Patent 571,452, awarded in 1896.

Enlargement added for clarity

As discussed in my initial and supplemental expert reports on the '156 patent, the '156 patent has several primary references. See Figure 3.

The '407 and '452 patents demonstrate the concept of weaving wicker onto a rectangular metal frame in or-der to strengthen the wicker. These patents date from 1885 and 1896, respectively. Both of these patents clearly set forth the idea of using a wire or wooden rectangular frame which is then covered in wicker or another suitable material. These patents further dem-onstrate the obviousness of the '156 design.



Wicker enclo-sure design, plat 28 in *Modern Basketry from the Start*, 1973.



British Patent 20,728



Wicker enclosure from *American Basketry and Woodenware. A Collectors Guide*, 1974.

Wicker animal enclosure from page 126 of belorusskie rhudazhestvennye pronnyslys, 1985.



Figure 3: Primary references

April 22, 2008

Date

Bret H. Smith, IDSA
Professor of Industrial Design
Auburn University

3

# EXHIBIT G

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION


SIMPSON VENTURES, INC.,

    Plaintiff/Counterclaimant,

vs.                  CASE NO.  3:06cv901-WKW
                      CASE NO.  3:07cv00048-WHA-CSC

MID-WEST METAL PRODUCTS,
COMPANY, INC.

    Defendant/Counterdefendant.



\* \* \* \* \* \* \* \* \* \*



    DEPOSITION OF BRET HUNTER SMITH, taken

pursuant to stipulation and notice before Mallory

M. Johnson, Certified Court Reporter and

Commissioner for the State of Alabama at Large,

at Auburn University, Department of Industrial

Design, 208 Wallace Center, 519 West Tach Avenue,

Auburn, Alabama, on Monday, April 28, 2008,

commencing at approximately 10:11 a.m.



\* \* \* \* \* \* \* \* \* \*

Page 2

```
 1                    APPEARANCES
 2    FOR THE PLAINTIFF/COUNTERCLAIMANT:
 3    Mr. Arthur Gardner
      Mr. Joe Staley
 4    GARDNER GROFF SANTOS & GREENWALD
      Attorneys at Law
 5    2018 Power Ferry Road, Suite 800
      Atlanta, Georgia  30339
 6
      FOR THE DEFENDANT/COUNTERDEFENDANT:
 7
 8    Mr. James H. Hinshaw
      BINGHAM McHALE
      Attorneys at Law
 9    2700 Market Tower
      10 West Market Street
10    Indianapolis, Indiana  46204
11    Mr. C. Steven Ball
      CARR ALLISON
12    Attorneys at Law
      100 Vestavia Parkway
13    Birmingham, Alabama  35216
14    ALSO PRESENT:
15    Mr. Jeff Simpson
16            * * * * * * * * * *
17              EXAMINATION INDEX
18    BRET HUNTER SMITH
         BY MR. GARDNER                    4
19
20                EXHIBIT INDEX
21    EXHIBIT NOS:
22    74   Drawing entitled Parry's    55-63,105-106
           Complete Specification      144-148
23
      75   Photograph entitled Circus  55-63,143-148
24         Cage in buff willow
25
```

Page 3

1    EXHIBITS continued:

2    76   Photograph of basket                55-63,105-107
                                              144-148
3
     77   U.S. Design Patent                  58-73,82-86
4         US D483,156 S                       95

5    78   Design Analysis of U.S.             64-71,83-93
          Design patent US D483,156 S         123-136,143
6                                             156

7    79   Supplemental Expert Report          64,94-971,105
          By Professor Bret Smith             106-116,121
8
     80   Second Supplement Expert            74,94
9         Report by Professor Smith

10   81   Appendix Part 2 from                130
          Design Analysis by Prof. Smith
11
     82   Drawing of forks                    139-142
12

13                * * * * * * * * * *

14                     STIPULATIONS

15         It is hereby stipulated and agreed by

16   and between counsel representing the parties that

17   the deposition of BRET SMITH is taken pursuant to

18   the Federal Rules of Civil Procedure and that

19   said deposition may be taken before Mallory M.

20   Johnson, Court Reporter and Commissioner for the

21   State of Alabama at Large, without the formality

22   of a commission; that objections to questions

23   other than objections as to the form of the

24   questions need not be made at this time but may

25   be reserved for a ruling at such time as the

Page 4

1   deposition may be offered in evidence or used for

2   any other purpose as provided for by the Federal

3   Rules of Civil Procedure.

4        It is further stipulated and agreed by

5   and between counsel representing the parties in

6   this case that said deposition may be introduced

7   at the trial of this case or used in any manner

8   by either party hereto provided for by the

9   Federal Rules of Civil Procedure.

10            * * * * * * * * * *

11        MR. GARDNER:  The witness is to

12        be able to read and sign.

13            BRET HUNTER SMITH

14        The witness, having first been sworn to

15   speak the truth, the whole truth, and nothing but

16   the truth, testified as follows:

17                EXAMINATION

18   BY MR. GARDNER:

19   Q.   Mr. Smith, if you would, please state your

20        full name and address for the record.

21   A.   Bret Hunter Smith.   I live at 1812 Hillbrook

22        Circle in Auburn.

23   Q.   And I believe you've been deposed before,

24        correct?

25   A.   Yes.

BRET HUNTER SMITH
APRIL 28, 2008

Page 5

1   Q.   How many times?

2   A.   Once.

3   Q.   Once.   Just to kind of go over a few kind of

4        basic ideas, my name is Art Gardner.   I'm an

5        attorney for Simpson Ventures.   I'm going to

6        be asking the questions in this deposition.

7        And if you would, wait until I finish my

8        question before you begin to answer.   I speak

9        somewhat slowly at times, and sometimes

10       people have a tendency to start to answer

11       before I finish my question.   And if you will

12       wait until I finish the question, make sure

13       you understand it before you begin, we'll end

14       up with a clean record.

15            Also, if you will wait for a fraction of

16       a second or so for Mr. Hinshaw to perhaps

17       interject an objection, that will allow for a

18       clean record.   It's very important that we

19       don't speak at the same time.   The court

20       reporter has a hard time following that.   At

21       the same time, the court reporter needs for

22       your answers to be verbal, not nodding of

23       your head or shaking of your head or anything

24       like that.   So we need verbal answers for a

25       clean record.

BRET HUNTER SMITH
APRIL 28, 2008

Page 6

1           Do you understand all that?

2    A.   Yes, I do.

3    Q.   Is there anything in your medical history

4         that would keep you from giving accurate

5         testimony here today?

6    A.   No.

7    Q.   And there's nothing that would affect your

8         memory?

9    A.   No.

10   Q.   All right.  If you would, describe for me

11        your understanding of how someone should go

12        about evaluating a product to see if it

13        infringes a design patent.

14   A.   Well, the first thing that you would do is --

15        is look at the functional elements of the

16        product and determine what those are.  You

17        also need to look at the ordinary observer

18        and whether or not they would confuse the

19        design elements, the ornamental elements of

20        the patent.  Then you also need to look at

21        prior art to determine whether the features

22        that are being claimed were -- can be found

23        in prior art.

24   Q.   Well, specifically what -- I mean, what is

25        the -- once you've got the product in front

Page 7

1    of you, is it your testimony that the first

2    thing you do is figure out what features are

3    functional, or do you first try to figure out

4    if the invention -- if the product looks

5    substantially similar or substantially the

6    same to what is shown in the patent?

7  A. I -- I think that you're going to have to

8    look at all three of the things that we

9    talked about.  And regardless of the order,

10    you have to address each one individually.

11  Q. And so, in your view, the order doesn't

12    matter?

13  A. No, as long as you look at the entire scope

14    of it.

15  Q. And what role does evaluating the

16    functionality play?

17  A. It's my understanding that features which are

18    purely functional are not part of a design

19    patent.  In other words, they could not be

20    distinguishing features.

21  Q. Well, is it true that design patents

22    sometimes show, in the drawings, functional

23    features?

24  A. Yes.  Yes.

25  Q. So do those functional features form part of

BRET HUNTER SMITH
APRIL 28, 2008

Page 8

1          the invention or not?

2     A.   It is my understanding that the design patent

3          cannot cover functional features; that is,

4          that it does not address purely functional

5          features.

6     Q.   Well, if a feature has both a function and an

7          ornamental aspect, can the ornamental aspect

8          nonetheless be part of the patented design?

9     A.   I want to make sure I understand.  You're

10         saying that if something is both ornamental

11         and functional, is the ornamentality part of

12         the overall consideration of the design

13         patent or can it be, can you have sort of

14         dual roles being played by a part.  And my

15         understanding is yes.

16    Q.   How do you -- how do you draw the line in

17         determining whether a feature is worthy of

18         design patent protection if it has both some

19         functional aspect and some ornamental aspect

20         to the feature?

21    A.   I think you have to look at the ornamental

22         choices that are made, things like, you know,

23         the -- an example would be a hinge, for

24         example, on a laptop computer can be made to

25         be a significant visual feature, or it can be

Page 9

```
1         made to essentially disappear.  So even
2         though it's forming a -- it's performing a
3         mechanical function, being able to open the
4         laptop, it, nonetheless, could be made a
5         visual feature of a laptop, which would make
6         it a design -- I mean a feature for a design
7         patent, the look of it, of how it's detailed.
8    Q.   And regarding the look of it, exactly what
9         are design patents supposed to protect?
10   A.   They are supposed to protect -- it's my
11        understanding they're supposed to protect the
12        ornamental features of a design that are --
13   Q.   Would --
14   A.   Go ahead.
15   Q.   Well, you were going to say something else.
16   A.   Those -- just to clarify, those ornamental
17        features that are distinct to that design, I
18        guess would be a better way to phrase it.  If
19        I'm using ornamental features of something,
20        say identical ornamental features to
21        something that came before, then that would
22        be prior art.
23   Q.   Well, would I be accurate in stating that a
24        design patent primarily protects how nice an
25        object looks?
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 10

1    A.    It protects the unique look of an object.

2          I'm not trying to quibble, but nice is a

3          subjective term.  And I always -- when I talk

4          with my students, I talk about effective and

5          ineffective; but nice is, you know, do you

6          like the wallpaper in your kitchen, it's

7          nice.  So it -- I like to think more in terms

8          of, you know, features and uniqueness.

9    Q.    Well, how does a design patent differ from a

10         utility patent?

11   A.    It's my understanding that a utility patent

12         covers functional elements.

13   Q.    Well, is there any difference in how you

14         would go about evaluating a product for

15         infringement of a design patent versus a

16         utility patent?

17   A.    I haven't evaluated objects relative to

18         utility patents.

19   Q.    Is the answer you don't know?

20   A.    I don't -- I don't know.

21   Q.    I believe you testified in evaluating a

22         product for potential design patent

23         infringement, that you would look at the

24         functionality of any of the features of a

25         design, you look at the overall similarity,

Page 11

```
 1        and then you look at the points of novelty,

 2        or something along those lines.  Those -- do

 3        you know what the doctrine of equivalents is?

 4   A.   No.

 5   Q.   Do you know whether the doctrine of

 6        equivalents applies to the evaluation of

 7        infringement of a design patent?

 8   A.   No.

 9   Q.   Let's talk about what I'll refer to in

10        shorthand as the substantial similarity

11        portion of the test.  What's your

12        understanding of exactly how that test is

13        applied?

14   A.   When you're talking about substantial

15        similarity, are you talking about the Gorham

16        Standard?

17   Q.   If you want to refer to the Gorham Standard,

18        let's talk about your understanding of how

19        the Gorham Standard is applied.

20   A.   My understanding is that it deals with the

21        ordinary observer and whether or not the

22        ordinary observer, paying attention to such

23        detail as the ordinary observer would pay

24        attention to in purchasing a product, would

25        confuse one for the other.
```

Page 12

1    Q.    Is that ordinary observer different from

2          somebody skilled in the art?

3    A.    Yes.

4    Q.    How so?

5    A.    Somebody skilled in the art would deal with

6          somebody who had sufficient training or

7          knowledge to design the product.

8    Q.    So if you're applying the -- if you're

9          looking at the product from the perspective

10         of the ordinary observer, it's my under -- is

11         it your testimony that the ordinary observer,

12         you're supposed to -- scratch that.

13               In applying the Gorham Test --

14   A.    Okay.

15   Q.    -- using -- from the perspective of the

16         ordinary observer, I believe you testified

17         that the ordinary observer is supposed to

18         have used the amount of care in observing the

19         product that they usually would use in

20         purchasing such a product, correct?

21   A.    Yes.

22   Q.    In this case, how much care is that?

23   A.    I'm not sure I understand what you're asking

24         me.  In comparison to what?

25   Q.    Well, in the context of purchasing a wicker

Page 13

```
 1          pet residence, such as the Bay Isle product

 2          made by Mid-West Metal Products, how much

 3          care would this theoretical ordinary observer

 4          use in evaluating that product?

 5    A.    There are -- I would say that it would be a

 6          little bit more care than the person who

 7          would be going to a big box retailer just to

 8          buy a pet cage.  In other words, this

 9          particular product is designed to blend in

10          with the decor.  So this is going to be

11          somebody who, in general, is going to look a

12          little more closely at fit and finish and

13          details than the sort of person who might pop

14          over to Target or Wal-Mart and just pick up a

15          dog cage.

16    Q.    What's the basis for that statement?  I mean,

17          where did you get that idea?

18    A.    Well, the wicker covering is designed -- it

19          has some functional purposes, and it has some

20          aesthetic purposes.  One of the aesthetic

21          purposes is that it -- it blends more nicely

22          with the decor.  In general, people who are

23          concerned at that level of detail are usually

24          paying more attention to things like fabric

25          covering, quality of furniture, that sort of
```

Page 14

1    thing.  They tend to be more conscious of

2    those kinds of decisions if we're talking

3    about sort of a price point.  This is a

4    higher price point than a typical cage; and

5    therefore, it has to have some added value

6    from a design and marketing point of view.

7         Having said that, I think that the

8    differences are such that the general cage

9    purchaser would also notice them, what I

10   would call the general cage purchaser, which

11   would be the price point below that.  That

12   might be the person that might pop over to

13   Petco or Wal-Mart or wherever.  I think

14   this -- the market is aimed at a little bit

15   more discriminating buyer based on the fit

16   and finish of the cages.

17 Q.  So is it your testimony that for the Bay Isle

18      products, the typical purchaser would exhibit

19      a little more care in the purchasing decision

20      than for a conventional wire kennel?

21 A.  Yes.

22 Q.  Is there anything like that stated in any of

23      your reports?

24 A.  No.  There is the general comment about the

25      purchaser and what they would see when they

Page 15

```
 1        look at, you know, the two different designs,
 2        the 156 design and the Bay Isle design.  And
 3        I think that holds true.
 4   Q.   But I'm correct that none of your reports --
 5        either for the 156 patent or the 321 patent,
 6        either the original reports or the
 7        supplemental reports -- none of them mention
 8        this idea that the purchaser of a Bay Isle
 9        product might exhibit a little more care than
10        the conventional kennel purchaser, correct?
11   A.   That's correct.
12   Q.   Well, that brings up an interesting point.
13        Do you have any additional conclusions or
14        opinions that are presently not stated in
15        your reports that you would like to tell us
16        about?
17   A.   The only thing, I believe you have the second
18        supplemental on the 156, which is I think the
19        three-page.  And it adds two patents that I
20        found when I was looking at the 321 design.
21        There is one more patent that I simply --
22        that is in the 321 report and that I had
23        intended to put in the supplemental and just
24        didn't.  It's -- it concerns a basket, a
25        fold-down basket, I think.
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 16

1           Let's see.  I think I pulled a copy of

2       that.

3               MR. HINSHAW:  Is this the Mo

4       patent?

5               THE WITNESS:  The Mo patient.

6               MR. HINSHAW:  Or -- this is the

7       patent that I sent you in the mail

8       over the weekend?  It's called the Mo

9       patent, M-O.  It's in the 321 report.

10              THE WITNESS:  Yeah, it is in the

11      321 that it's referred to.  It's

12      referred to in the 321 report.

13              MR. HINSHAW:  I don't think I

14      have it in here.  I think I left it

15      out in the car.

16  A.  There it is, that one.

17  Q.  So you're referring to U.S. patent number

18      5,282,542 issued to Mr. Mo, correct?

19  A.  Yes.

20  Q.  And does what I'll refer to as the 542 Mo

21      patent -- does the 542 Mo patent cause you to

22      change any of the opinions or conclusions

23      that you reach in your reports regarding the

24      156 patent?

25  A.  No.  It reinforces the edge treatment in

BRET HUNTER SMITH
APRIL 28, 2008

Page 17

```
 1        particular.  And if you look at this and

 2        invert it -- and I believe I talked about

 3        that in the 321 patent discussion.  But

 4        basically, you have the panel construction

 5        with pronounced edges, almost tubular-looking

 6        edges.  And that's an example of prior art

 7        that has that edge look that is in the 156

 8        patent.  So it's supporting.  It doesn't

 9        change the conclusion.

10   Q.   So it doesn't change any of the conclusions

11        or any of the opinions you've reached.  It

12        just only lends more support to your

13        position.  Is that your testimony?

14   A.   It lends more support.  It does show that the

15        edge treatment has been used in prior art,

16        that pronounced visual edges has been used in

17        prior art.

18   Q.   Well, does this 542 Mo patent cause you to

19        want to amend your written reports regarding

20        the 156 patent in any way?

21   A.   It -- it means that the edge treatment which

22        I talk about as a design feature of the 156,

23        that the edge, the square edge -- it means

24        for the -- visually, that pronounced edge

25        treatment, it means that that's been used
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 18

1           before and it's, therefore, not unique to

2           that -- to the 156 patent.  It's in the prior

3           art.  But it -- so that's -- that's what it

4           means.

5      Q.   I'll ask the question another way because I

6           don't think you quite answered, which is

7           does -- do you need to amend any of your

8           findings or conclusions or opinions that are

9           stated in the written reports regarding the

10          156 patent in light of the 542 Mo patent?

11     A.   Yes.  It means that the edge treatment in the

12          156 isn't unique.  It has appeared in the

13          prior art.

14     Q.   So if I understand correctly, your testimony

15          is that you need to amend the written reports

16          that you've given regarding the 156 patent to

17          incorporate a mention of this 542 Mo patent

18          so as to describe that the edge treatments

19          were shown in the prior art; is that

20          correct?

21     A.   Yes.

22     Q.   And other than that, does the 542 Mo patent

23          cause you to want to make any other changes

24          in your opinions that are stated in the

25          written reports regarding the 156 patent?

Page 19

1   A.   No.

2   Q.   Other than the effect that the 542 Mo patent

3        may have on your written opinions regarding

4        the 156 reports, are there any other changes

5        that you would like to make in your written

6        reports at this time?

7   A.   No.

8   Q.   So, as far as you know, the reports are

9        completely accurate, correct?

10  A.   Correct.

11  Q.   Going back to the -- the description of how

12       one should go about evaluating a product

13       design for potential design patent

14       infringement, please describe for me how the

15       so-called point of novelty or points of

16       novelty test is to be applied.  What is the

17       test and how is it applied?

18  A.   The points of novelty, it's my understanding

19       that in order to claim infringement, in order

20       to prove infringement, you have to show that

21       the points of novelty, those things which

22       make the device unique, have been

23       appropriated by another product, the product

24       that is said to be infringing.

25            And the points of novelty are points

BRET HUNTER SMITH
APRIL 28, 2008

Page 20

```
 1        which are novel in the light of prior art.

 2        In other words, if -- if I had another piece

 3        of prior art that had the exact same point,

 4        visual point on it, I guess I'll call it,

 5        then the -- that point would not be

 6        considered a point of novelty because it's

 7        found in the prior art.  So that is what you

 8        look at in the -- it's my understanding

 9        that's what you look at when you look at

10        points of novelty.

11   Q.   Is it legally permissible for there to be

12        more than one point of novelty in a claim

13        design?

14             MR. HINSHAW:   Objection.   Calls

15          for legal conclusion.

16   A.   I'm not -- and, you know, I'm not a patent

17        attorney, so I don't know that I can speak to

18        the legality issue.

19   Q.   What's your understanding?

20   A.   There -- my understanding is that a design

21        may have several points of novelty.

22   Q.   Well, let's talk about the word "novelty" for

23        a moment.  What does "novelty" mean to you in

24        regard to the point of novelty test?

25   A.   It should be something that represents a
```

Page 21

1       nontrivial advancement over the prior art.

2       That's my understanding.

3   Q.  Well, where did you get the idea that it has

4       to be a nontrivial advancement over the prior

5       art?

6   A.  From a combination of reading material in

7       Chisum and the KSR decision and the decision

8       in the Swissa case.

9   Q.  Does KSR talk about the point of novelty test

10       in any way?

11   A.  KSR talks about the combining of old elements

12       and the -- whether or not that is sufficient

13       to claim that something is a unique feature.

14   Q.  I'll make this easier.  Isn't it true that

15       the KSR decision that you're referring to

16       relates to a utility patent case, not a

17       design case?

18   A.  The -- I believe it was a utility patent that

19       was being discussed.

20   Q.  And isn't it true that in a utility patent

21       case, the question of whether something has

22       certain points of novelty is not part of the

23       test?

24   A.  Well, as I said before, I have not evaluated

25       utility patents as an expert witness; so I

Page 22

```
 1          really can't speak to that.
 2   Q.   But you have read the KSR decision, correct?
 3   A.   I have read the KSR decision.
 4   Q.   Isn't it true that the KSR decision doesn't
 5          mention the point of novelty test in any
 6          respect?
 7   A.   I don't recall.  I don't recall.
 8   Q.   How many times have you read the KSR?
 9   A.   Several times.
10   Q.   When was the last time?
11   A.   The last time would have been when I was
12          preparing the 321 evaluation, which would
13          have been several months ago, a couple of
14          months ago.
15   Q.   Now, you just prepared a supplemental report
16          on the 321 patent, correct?
17   A.   Unh-unh.
18   Q.   Did you reread the KSR decision just prior to
19          that?
20   A.   I did not prepare a supplemental report on
21          the 321.
22   Q.   Excuse me.  I misspoke.  You just this month
23          prepared a second supplemental report on the
24          156 patent; is that correct?
25   A.   That is correct.
```

Page 23

1    Q.    And in connection with that second

2          supplemental report, did you have occasion to

3          reread the KSR decision?

4    A.    No.

5    Q.    Now, am I correct that in your 156 reports

6          and the 321 reports, when you apply the point

7          of novelty test, you compare the individual

8          points of novelty against multiple patents;

9          is that correct?

10   A.    Are you asking did I look at multiple patents

11         relative to each of the individual points?

12   Q.    Let me -- let me -- I'll break it down in

13         smaller bits.   Simpson Ventures defined that

14         the patent invention had multiple points of

15         novelty, correct?

16   A.    Not initially.

17   Q.    But eventually.

18   A.    Subsequently, yes.

19   Q.    So for those points of novelty that were

20         subsequently identified by Simpson

21         Ventures --

22   A.    Yes.

23   Q.    -- do you understand that there were more

24         than one feature in at least some of those

25         points of novelty?

Page 24

```
 1    A.    More than -- let me make sure I understand
 2          what you're saying.  More than one feature in
 3          each of the points that they were claiming?
 4    Q.    Yes.
 5    A.    Yes.
 6    Q.    So if you're evaluating a so-called point of
 7          novelty --
 8    A.    Yes.
 9    Q.    -- that may have, in itself, a combination of
10          features --
11    A.    Yes.
12    Q.    -- is it legally permissible to refer to
13          multiple prior art references to meet the
14          so-called point of novelty?
15                  MR. HINSHAW:  Objection.  Calls
16             for legal conclusion.
17    A.    I'm not an attorney; I'm a product designer.
18    Q.    Isn't that, in fact, what you did in your
19          reports?  Isn't it correct that when you
20          analyzed the so-called points of novelty that
21          were asserted by Simpson Ventures, that in
22          analyzing each so-called point of novelty,
23          you relied on multiple references, multiple
24          prior art references, to meet these so-called
25          points of novelty, correct?
```

Page 25

1   A.   We would have to take these a point at a time

2        because each point was -- I looked at each of

3        the claims as I went through, and I looked at

4        the prior art as I went through, so I

5        don't -- I don't think that a blanket answer

6        is going to be an accurate one.

7   Q.   Well, is it accurate to say in at least some

8        instances in your reports, you combined

9        multiple references to meet the claimed point

10       of novelty then being asserted?

11  A.   I looked at multiple references in looking to

12       whether -- in some cases in looking to

13       whether or not features were present in prior

14       art.

15  Q.   Okay.  And we'll get to the specifics of it

16       when we dig into your report later, but I

17       want to make sure I understand the rationale

18       that you were using before we do that.  So in

19       your reports, at least in some instances, you

20       relied on multiple reference in some

21       combination to compare that combination with

22       the asserted point of novelty, correct?

23  A.   I looked at multiple references in some cases

24       to determine whether or not a feature was

25       present in prior art.

Page 26

1    Q.    Well, I'm not just interested in whether you

2          looked at the feature, but whether you

3          actually relied on a combination of prior art

4          references to meet the so-called point of

5          novelty being asserted.  Because you may have

6          considered lots of references.  You may have

7          looked at hundreds of patents; but in the

8          end, in trying to determine whether this

9          particular -- a particular point of novelty

10         is found in the prior art, you relied on

11         certain of those references, correct?

12   A.    Yes.

13   Q.    And in some instances, you relied on a

14         combination of certain references to meet a

15         single point of novelty, correct?

16   A.    Yes.

17   Q.    And where did you get the idea that it would

18         be permissible or appropriate to rely on

19         multiple references to compare with a single

20         point of novelty?

21   A.    Well, as a designer, when you are looking at

22         what's available in the field as you're

23         developing a design, you look at a wide

24         variety of things.  And so it can be a

25         combination of characteristics, but it's

Page 27

1      pre-existing.

2   Q.  But in this instance, we're talking about

3       your application of a legal test.

4   A.  Right.

5   Q.  So at some point, you came to the

6       understanding that it was permissible or

7       appropriate to combine multiple references in

8       applying that legal test, correct?

9   A.  Yes.

10  Q.  And where did you get the idea that applying

11      that particular legal test, the point of

12      novelty test, that it would be appropriate or

13      proper to combine references?

14  A.  I'm not sure.  I'm not sure.  I mean, I

15      understand the words you're using, but I'm

16      not sure what you're asking.

17  Q.  Well, did you get the idea that it would be

18      appropriate to combine references in applying

19      the point of novelty test from something that

20      Mr. Hinshaw told you?

21  A.  No.

22  Q.  Did you get the idea that it would be proper

23      or appropriate to combine references in

24      applying the point of novelty test from

25      something you read?

BRET HUNTER SMITH
APRIL 28, 2008

Page 28

1   A.   No.

2   Q.   Did you get the idea that it would be

3        appropriate or proper to combine references

4        in applying the point of novelty test from

5        something outside of your experience in

6        connection with this lawsuit?

7   A.   No.

8   Q.   Well, what is the source of your

9        understanding that it would be appropriate or

10       permissible to combine references in applying

11       the point of novelty test?

12  A.   I don't know that I can identify a source.

13  Q.   Are you aware of any court case that has

14       stated that that would be appropriate?

15  A.   No.

16  Q.   Are you aware of whether the Chisum

17       reference, the treatise that you referred to

18       in your expert reports, indicates in any

19       place that it would be appropriate to combine

20       references in applying the point of novelty

21       test?

22  A.   I don't recall.

23  Q.   Would I be correct in stating that you

24       don't -- you don't know anything about the

25       origins of the point of novelty test or,

BRET HUNTER SMITH
APRIL 28, 2008

Page 29

1      historically, the basis for it?

2  A.  I've read in the Chisum material; but if

3      you're asking can I repeat word for word at

4      this point, no, I cannot.

5  Q.  Well, do you understand what the Chisum

6      treatise is?

7  A.  It's my understanding that it's a collection

8      of cases and decisions that relate to

9      intellectual property.  And in particular,

10     the part that I read was related to design

11     patents.

12  Q.  What's your understanding of which would be

13     controlling, the statements in Chisum or the

14     statements in court cases?

15  A.  I don't understand your question.

16  Q.  I'll move on to something else.

17        Let's see.  Do you -- do you understand

18     that the word "novelty" in the point of

19     novelty test has any special meaning or

20     definition?

21  A.  I guess my understanding is that it would be

22     a point of distinction.

23  Q.  What did you do to go about figuring out what

24     the novelty portion of the point of novelty

25     test meant?

BRET HUNTER SMITH
APRIL 28, 2008

Page 30

1   A.   I'm not sure -- I'm not sure I understand

2        what you're asking.

3   Q.   Well, before you got involved in this

4        lawsuit, you had -- you had some

5        understanding of the word "novelty," correct?

6   A.   Yes.

7   Q.   And you had some understanding of what that

8        word meant, correct?

9   A.   Yes.

10  Q.   One -- one possible item is -- one possible

11       definition of a novelty is an unusual

12       amusement, like a little toy.

13  A.   Right.

14  Q.   That's not the kind of novelty we're talking

15       about here, is it?

16  A.   No.

17  Q.   So what kind of novelty is involved in the

18       point of novelty test?

19  A.   It -- it should be something that -- that --

20       it would -- I guess I would call it a point

21       of newness.  It's something that is -- that

22       differs from the prior art, a point of

23       uniqueness.

24  Q.   How does -- how does that relate to the

25       concept of anticipation?

Page 31

1    A.    Anticipation -- it's my understanding that

2          anticipation is that -- that that would be

3          finding something that came prior to the

4          patent that would be considered identical to

5          the patent.  So, for example, in the initial

6          evaluation of the patent and in the initial

7          claim that was being made about what was the

8          unique feature -- that it was wicker on all

9          sides and that it was longer than it was wide

10         or high -- there were several pieces of prior

11         art that fit that description.  And so within

12         the confines of that claim, it could be

13         said -- it's my understanding it could be

14         said to anticipate that.

15              In the subsequent claims that were made,

16         there were -- in the additional claims, there

17         were things that were being claimed that

18         meant that the three pieces that were cited

19         under anticipation didn't fit exactly with

20         the new claims; and, therefore, you would say

21         that they did not anticipate.

22    Q.   Is it your testimony that anticipating is a

23         way of evaluating points of novelty?

24    A.   My understanding of anticipation is that it's

25         more exact than that, that anticipation

Page 32

1        really is looking for an object that really

2        is -- I don't know that I -- that, really, is

3        essentially identical.

4    Q.  Identical in what respect?

5    A.  Identical in all unique respects, I guess I

6        would say.  In other words, it's not --

7        identical feature.  It's -- it's identical.

8        I don't know how to say it any differently.

9    Q.  So in order for a patent to be anticipated by

10       a prior art reference, you would have to have

11       a prior art reference that showed all of the

12       features that are shown in the patent,

13       correct?

14   A.  It's my --

15   Q.  Let me stop you to rephrase that.  I'm going

16       to rephrase that to clarify.

17   A.  Okay.

18   Q.  Isn't it true that in order for a patent to

19       be anticipated by prior art reference, the

20       claim invention of the patent has to be shown

21       in all material respects in that single prior

22       art reference?

23   A.  That's my understanding.

24   Q.  And that applies to both design patents and

25       utility patents, correct?

Page 33

1    A.    I can't speak to utility patents.

2    Q.    But it's your understanding that that

3          certainly is the way it works for design

4          patents, correct?

5    A.    That's my understanding.

6    Q.    We've just been talking about anticipation,

7          which I believe you testified requires a

8          single prior art reference.

9    A.    Yes.

10   Q.    Just to show -- a single prior art reference

11         that shows all the features of the claimed

12         invention.  Let's talk about obviousness.

13         What's your understanding of obviousness?

14   A.    My understanding of obviousness is that it

15         deals with a person skilled in the art and

16         whether or not a particular innovation or

17         feature would have been obvious to a person

18         of ordinary skill in the art of whatever the

19         object and design, whatever the design in

20         question is.

21   Q.    Would you agree with me that if no single

22         prior art reference shows all the features of

23         the claimed invention, that, nonetheless, the

24         invention might yet be invalid -- the claimed

25         invention might yet be invalid as obvious in

Page 34

1    light of a combination of prior art

2    references?

3    A.   Yes.  It -- you're saying that it would be an

4         object -- even though there isn't something

5         that directly anticipates it, that it could

6         be invalid as a -- in terms of patent because

7         of -- because a collection of features that

8         pre-exist in prior art made it obvious to a

9         person normally skilled in the arts or a

10        normal person skilled in the arts?  Is

11        that --

12   Q.   I'll break it down a little bit.

13   A.   I just want to make sure I heard you

14        correctly.

15   Q.   Let's assume that you got a design patent

16        that shows certain features, correct?

17   A.   Yes.  Yes.

18   Q.   And there's a prior art reference that's

19        similar, but it doesn't show all of the

20        features of the design patent.  So you would

21        agree with me that that prior art reference

22        does not anticipate, correct?

23   A.   Yes.

24   Q.   However, it's possible that that reference

25        could be combined with another reference and

Page 35

1       the combination could show all of the

2       features of the claimed invention and design

3       patent and that combination might then be

4       obvious, correct?

5    A.    Yes.

6    Q.    Now, in performing an obviousness analysis,

7       do you have to use a primary reference?

8       First of all, do you know what a primary

9       reference is in context of obviousness?

10   A.    Well, my understanding of a primary

11      reference -- I'm trying to think how to

12      phrase it.

13          I don't know.  A primary reference might

14      be, you know, a cage.  Let's say there's a

15      cage, and it is modified -- it could be

16      modified or treated in such a way as to make

17      it different.  In doing that, you might use

18      techniques that you would find in a second --

19      secondary reference, so that you can have

20      primary and secondary references to a -- to a

21      particular patent.

22   Q.    Anything else you know about primary

23      references?

24   A.    Not that comes to mind.

25   Q.    Now, we'll still talking about a design

Page 36

1    patent infringement.

2  A.  Okay.

3  Q.  In comparing a product with a patented

4      design, is it necessary to consider each

5      figure of the design patent?

6  A.  Could you repeat the question?

7  Q.  I'll state it another way that might be

8      helpful.  In comparing product design with an

9      existing design patent, is it required or

10     necessary as part of that infringement review

11     to compare every figure of the patented

12     design with the accused product?

13  A.  I would certainly look at every figure.  I'm

14     not sure how to interpret the word

15     "necessary."  I think certainly you should

16     have -- you should thoroughly examine the

17     figures of the patent and how those relate to

18     the other product.

19  Q.  Well, what do you do if the -- if the

20     patented design has more than one embodiment?

21     First of all, do you understand what I mean

22     when I say more than one embodiment?

23  A.  Yes.  Yes.

24  Q.  What does that mean to you?

25  A.  Well, the example that I -- from what we've

BRET HUNTER SMITH
APRIL 28, 2008

Page 37

1       been talking about would be the 321 patent,
2       which showed -- it showed a design that had
3       diamonds on it and then it showed an
4       alternate embodiment that did not have a
5       diamond weave on it.  So your question was?
6   Q.  My question, then, is how does one go about
7       evaluating a patent that has more than one
8       embodiment for possible infringement by an
9       accused product?
10  A.  I think you have to look at the embodiments,
11      and you have to look at the accused product.
12  Q.  But what -- if you have one product and two
13      embodiments in the design patent, which
14      embodiment should be considered for design
15      infringement purposes?
16  A.  Well, my understanding is that both of them.
17  Q.  And how do you go about doing that?
18  A.  By comparing them to the product.
19  Q.  Do you compare them one at a time or do you
20      in some manner merge the two designs before
21      comparing it with the accused product?
22  A.  You mean do you look at them and said, okay,
23      here's embodiment one, here's the accused
24      product, here's embodiment two, here's the
25      accused product?

BRET HUNTER SMITH
APRIL 28, 2008

Page 38

1   Q.   I'll ask it another way.  If you have a

2        patent -- a design patent that has multiple

3        embodiments, like the 321 patent --

4   A.   Yes.

5   Q.   -- and you're trying to figure out whether a

6        product like the Bay Isle product infringes

7        that patent --

8   A.   Yes.  Yes.

9   Q.   -- do you have to, in effect, check it

10       twice?  You have to compare it -- compare the

11       accused product with one embodiment,

12       determine whether there's infringement or

13       not, and then compare that same product with

14       the other embodiment to determine whether

15       there's infringement or not?  Is that your

16       understanding?

17  A.   That's what I did.  I -- I compared each of

18       the embodiments against the accused product.

19  Q.   Now, prior to getting involved in this

20       lawsuit, had you --

21  A.   Yes.

22  Q.   -- had you had any contact or experience with

23       design patents or design patent law?

24  A.   No.  No, nothing in particular.  No.  I think

25       every industrial designer is aware of the

Page 39

```
 1         concept of intellectual property and that

 2         there are design patents and there are

 3         utility patents.  And so beyond general

 4         understanding, no.

 5    Q.   What was your general understanding prior to

 6         getting involved in this lawsuit?

 7    A.   Design patents protect the -- I guess you can

 8         call it individual features of the look.

 9         Utility patents are directed at the

10         mechanical or the chemical or the formulaic

11         issues in a product.

12    Q.   Did you ever take any classes on design

13         patents or utility patents or patent law?

14    A.   No.

15    Q.   Ever attend any symposia relating to design

16         patents or patent law?

17    A.   No.

18    Q.   Did you ever -- did you ever talk to or work

19         with an examiner at the patent office

20         regarding any design patents?

21    A.   No.

22    Q.   Did you ever file any design patents

23         yourself?

24    A.   No.

25    Q.   Were you ever involved in any design patent
```

Page 40

1       filings?

2   A.   No.

3   Q.   Did you ever work with any lawyers in

4       connection with any design patent or utility

5       patent disputes prior to this case?

6   A.   No.

7   Q.   Did you ever study or note the differences

8       between design patents and utility patents

9       prior to this lawsuit?

10   A.   No, not beyond the terms that I just

11       mentioned.

12   Q.   Is it your understanding that if all of the

13       features of a claimed design, according to a

14       design patent, can be individually found in

15       the prior art, such as by combining the

16       number of prior art references, that that

17       inherently means the invention being claimed

18       is obvious and the patent is invalid?

19              MR. HINSHAW:  Can I have that

20           question read back, please?

21               (The court reporter read from

22               the record.)

23              MR. HINSHAW:  Objection to form.

24   A.   Are you talking about within the same sort of

25       category of things, or are you talking about

BRET HUNTER SMITH
APRIL 28, 2008

Page 41

1       in general?

2    Q.  I'll ask it another way.  You're still

3       talking about obviousness.

4    A.  Okay.

5    Q.  And so if you have a design patent that shows

6       certain features and you have a number of

7       individual prior art references that show

8       those features, such as one patent shows one

9       of the features and a second patent shows

10      another feature and a third patent shows yet

11      a third feature and so on, does the mere fact

12      that each of the features in the design

13      patent can be found in a prior art reference

14      and combined that way -- does that

15      necessarily mean that the claimed invention

16      is obvious?

17           MR. HINSHAW:  Objection to form.

18   A.  My understanding is that prior art speaks to

19      the issue of obviousness and that it also --

20      it speaks to the issue of whether or not

21      someone who is an ordinary person skilled in

22      the art would have looked to those references

23      and -- and seen an obvious choice or an

24      obvious response in a particular design.  In

25      other words, would I have looked at wicker

Page 42

1  being used on pet cages in past design and

2  said that would be a good idea to try because

3  it's been done before; and in that sense, it

4  would be obvious.

5 Q. Well, what I'm trying to figure out is are

6  there circumstances, in your mind -- in your

7  view, are there circumstances that would

8  cause a patent to not be invalid even though

9  each of the individual features of a claimed

10  design can be found in some prior art

11  references?

12 A. I don't know.

13 Q. Well, let's say that you had a design patent

14  and it showed four ornamental features.

15 A. Okay.

16 Q. Feature one, two, three, and four.

17 A. Okay.

18 Q. And you had -- you had four prior art

19  references, references A, B, C, and D.  And

20  reference A showed feature one and reference

21  B showed feature two and reference C showed

22  feature three and reference D showed feature

23  four.  So would you agree with me that all of

24  the features of the claimed invention

25  individually are shown in prior art?

Page 43

1  A.  In your example, yes.

2  Q.  Now, in my example, would it necessarily

3      follow that the invention that's being

4      claimed in that design patent is invalid as

5      obvious?

6  A.  I don't know that I can answer your question

7      because it is absent a context.

8  Q.  Well, isn't it true that in some instances

9      with exactly that factual scenario, where

10     there's four features in the claimed design

11     and four individual references that each

12     shows one of those features, that sometimes

13     such a patent would be valid and sometimes

14     such a patent would not be valid, correct?

15 A.  I don't know.  I can't speak to it because I

16     don't have the breadth of experience and

17     knowledge in the field, obviously, that you

18     have.  I'm not an attorney.

19 Q.  So if I understand your testimony, even

20     though the prior art might show all of the

21     features of the claimed invention, you don't

22     know how to determine whether that claimed

23     invention is obvious or not, correct?

24 A.  No, that's not correct.  What I said is in

25     the absence of a context, I can't answer your

BRET HUNTER SMITH
APRIL 28, 2008

Page 44

1       question.  In other words, what I'm saying is

2       I would need to look at the object

3       specifically.  I would need to look at -- I

4       can't answer that in the abstract is what I'm

5       saying.

6  Q.  Well, isn't it true that in some instances,

7       such a patent would be valid?

8  A.  I don't know.

9  Q.  Tell me about the KSR decision that you refer

10     to at multiple points in your written

11     reports.  Explain to me your understanding of

12     what the KSR decision is all about.

13  A.  Well, it looks at the issue of combining old

14     elements and -- or elements in existing

15     patents and whether -- or it also -- well, it

16     looks at whether or not that is, in and of

17     itself, sufficient grounds for a patent.  It

18     looks at whether or not -- well, that's one

19     of the major issues, whether or not you can

20     knit together pieces found in prior patents

21     and then claim that as, essentially, new.

22  Q.  Now, you testified that you read the KSR

23     decision several times, correct?

24  A.  Yes.

25  Q.  Are you aware that the KSR decision

Page 45

1      specifically states that a patented invention

2      can be a combination of old elements?

3   A.   Yes.

4   Q.   So isn't it true that a patented invention

5      can be a combination of old elements?

6              MR. HINSHAW:   Objection.   I'm

7           sorry.   I didn't say that very loud.

8           Objection.   Calls for a legal

9           conclusion.

10  A.   Would you repeat the question?

11             MR. GARDNER:   Read it back,

12          please.

13             (Court reporter read from the

14             record.)

15  Q.   Then I'll ask another question.   So based on

16     your understanding of KSR, isn't it correct

17     that a patented invention can be a

18     combination of old elements?

19  A.   That's my understanding.

20  Q.   Mr. Smith, one thing I failed to mention --

21     and I seem to do this every time -- is that

22     this is not a marathon session.   We've been

23     going for about an hour and half.   If at any

24     time during the deposition, you need to take

25     a break to use the restroom or catch your

Page 46

1           breath or stretch your legs, just ask and

2           we'll try to accommodate you.

3                And on top of that, we're -- I guess

4           it's 11:30 local time.  What time do you like

5           to eat lunch?

6     A.    If we're going to beat the crowds, now's the

7           time to go or at 1:30 after everybody's been

8           through.

9                MR. HINSHAW:  I forget we're on

10               a college campus.

11               MR. GARDNER:  If it's all right

12               with you, why don't we take a break

13               for lunch.  And we'll come back in an

14               hour.

15                    (Lunch recess)

16    Q.    We're ready to go back on the record.

17          Mr. Smith, we were talking a little bit about

18          your views on the ordinary observer and the

19          care that that person might utilize in making

20          a purchase decision of the Mid-West product.

21    A.    Yes.

22    Q.    Do you have an understanding of where and how

23          the Mid-West products are sold?

24    A.    The distribution chain as such, no.  No, I

25          don't.

Page 47

1   Q.   Are the Mid-West products sold over the

2        internet?

3   A.   I believe I've seen them on the internet, but

4        I can't recall for sure.

5   Q.   Are they -- are they sold through catalogs?

6   A.   Again, I believe I've seen some pages in the

7        material I went through.  I'm not sure if

8        they were from the internet or catalog.  I'm

9        not sure if they were from online or from the

10       catalog.

11  Q.   Are the Bay Isle products from Mid-West sold

12       through small independent pet shops?

13  A.   I recall reading that that's -- something to

14       effect that that's where Mr. Simpson

15       originally saw -- or he saw it at Four Paws,

16       a local pet place.  He saw Bay Isle, I

17       believe.

18  Q.   So the answer is yes?

19  A.   So yes.

20  Q.   And, of course, the Mid-West Bay Isle

21       products are sold through big box pet stores,

22       correct?

23  A.   That's my understanding.

24  Q.   Are there differences in how much care

25       consumers would use in ordering off the

BRET HUNTER SMITH
APRIL 28, 2008

Page 48

```
 1        internet versus ordering through a catalog

 2        versus ordering -- or purchasing at an

 3        independent pet store versus purchasing at a

 4        big box pet store?

 5    A.  I think it would depend on the products that

 6        are being purchased.  Are you speaking

 7        specifically about -- well, in general, the

 8        trend in internet purchases is they do a lot

 9        of comparison; that is, that they'll go to

10        one site and look at stuff, go to another

11        site and look at stuff.  So there's generally

12        a lot of comparing that goes on.  They don't

13        always -- they haven't always seen the

14        product in person.

15    Q.  Well, the question I have is are there

16        differences in how much care people would use

17        in purchasing the Mid-West Bay Isle product

18        depending upon whether they're purchasing

19        from a big box pet store, independent pet

20        store, through a catalog, or the internet?

21    A.  I think in all cases, they will spend some

22        time comparing because -- if for no other

23        reason than the price point is different than

24        what I would call an entry level pet cage.

25        So they will spend time comparing.  But
```

Page 49

1        beyond that, I can't speculate.

2    Q.  So you don't know if there would be any

3        differences in the amount of care used in

4        those different purchase environments,

5        correct?

6    A.  I think.  Yes.

7    Q.  So the answer is yes, that's correct, right?

8    A.  Yes.  But let me -- it's -- there may be

9        differences.  They may look.  But I would say

10       that there will be care exercised regardless

11       of the place of purchase because it is above

12       an entry-level product.  And, typically,

13       people pay more attention as you move above

14       an entry-level product.  I would call a

15       standard cage, for example, an entry-level

16       product.

17   Q.  Do you have a background in marketing?

18   A.  I have no degree in marketing.  I have no

19       classes specifically in marketing.  I have

20       worked with a number of marketing people, and

21       we do a number of industry projects where

22       there's a very heavy marketing focus.  And as

23       a product designer, one of the people you're

24       accountable for and need to understand -- or

25       accountable to and need to understand is the

Page 50

1    marketing group within a company.  And,

2    typically, I work with vice presidents or

3    marketing managers.

4  Q.  You've worked with marketing people; but

5      you've never worked in marketing yourself,

6      correct?

7  A.  That's correct.

8  Q.  Is it possible that despite this, as you say,

9      extra care that's being used in the purchase

10     decisions of a Mid-West Bay Isle product,

11     that consumers might actually get confused

12     between the Mid-West product and the Simpson

13     Ventures product in the marketplace?

14 A.  I don't think so because of the visual

15     differences.

16 Q.  Well, would you be surprised to learn that

17     there have been such incidents of confusion?

18 A.  I guess I would say I'd need to know more

19     about the confusion and the number of people

20     who were confused before I could respond to

21     that.

22 Q.  Well, what types of visual clues or cues are

23     present in the Mid-West product that would --

24     that would tend to avoid this kind of

25     confusion?

Page 51

1    A.    Well, the Mid-West product has a very

2          pronounced -- it has notches along the edges.

3          The -- the cage framework is exposed at the

4          edges in a very pronounced way.  There's a

5          substantial visual gap between the edges.

6          And I think that those are very strong visual

7          cues.  And -- oh, let's see.  There are

8          differences in the -- in the surface weave

9          pattern.

10              Really, there's almost, visually, kind

11         of an opposite approach in that from a design

12         point of view, we would say maybe that they

13         had emphasized the skeletal structure of the

14         cage because it's so visually obvious and

15         then, as I said before, the notches, as

16         opposed to the very continuous tight edge on

17         the 156 patent.

18   Q.    Well, when this mythical or hypothetical

19         casual observer first would observe the

20         Mid-West product and using the amount of care

21         that they would typically use in making a

22         purchasing decision, in your view, are these

23         visual cues that you just mentioned going to

24         jump out at the consumer before the overall

25         shape and the -- the extent of the wicker

Page 52

 1       covering the product?

 2   A.  Yes, I would say so.  You notice we -- we

 3       notice things in part by edges.  And the

 4       notches in the edge are really noticeable.

 5       The -- depending on what level they see the

 6       cage at, the gaps in the roof of the pet cage

 7       are also really noticeable on the Mid-West

 8       design.

 9   Q.  So if I understand your testimony, the edge

10       treatments and the gaps and the visible

11       skeletal structure and the notches are the

12       features that are going to jump out at the

13       consumer first, correct?

14   A.  Yes.  Depending on the consumer, they also --

15       and again it depends on -- to some extent on

16       the consumer; but also the -- things like the

17       name plate on the front door of the cage

18       might be noticed, probably secondarily,

19       though, to the structure.

20   Q.  When we talked this morning about your

21       understanding of the test for design patent

22       infringement and you mentioned the Gorham

23       substantially the same or similarity test and

24       the point of novelty test, is there a

25       relationship between the point of novelty

Page 53

```
 1        test and the Gorham Test?
 2   A.   I'm not -- I don't know how to respond to
 3        that.  Can you state it a different way?
 4   Q.   Are you aware of any relationship of any sort
 5        between the Gorham substantial similarity
 6        test and the point of novelty test?
 7   A.   It's my understanding that the Gorham Test
 8        would -- at some level, you could say, it
 9        would deal with overall impressions that the
10        average consumer might have who is taking
11        interest and reasonable care in purchase of a
12        product.
13   Q.   Now, are you aware of any other relationship
14        between the two tests?
15   A.   None that I could think of.
16   Q.   When you're evaluating a design patent to see
17        if it is infringed by some new product, how
18        do you figure out what the invention that's
19        being claimed is?
20   A.   The first thing I do is look at the document,
21        the patent document.
22   Q.   And what does that tell you?
23   A.   Well, in the case of a design patent, it has
24        the visuals; but also there can -- there can
25        be verbal claims associated with it.  I need
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 54

1            to look -- but my recollection of the 156

2            patent was that it said "as shown," you know,

3            that the design as shown was what was being

4            claimed.

5     Q.    Is it possible in a design patent for the

6            claimed invention to encompass anything other

7            than what is shown in the drawings?

8     A.    It's my understanding that the drawings work

9            together with the claims.  And in the case of

10           the 156 patent, the claim was as shown.  And

11           so as a result, the drawings are what you

12           would refer to.  I don't know if -- as I said

13           at the beginning, I'm not an attorney; so in

14           terms of knowing, you know, all of the things

15           that have been granted design patents, I

16           can't speak to that.  I just can say that in

17           the case of the 156, the reference was to

18           what was shown.

19    Q.    Isn't it true that you don't know whether a

20           design patent is limited to what is shown in

21           the drawings or not?  Correct?

22    A.    My experience is that it's limited to the

23           drawings.  My understanding is it's limited

24           to the drawings in the claims.

25    Q.    So it's your testimony that the design patent

BRET HUNTER SMITH
APRIL 28, 2008

Page 55

1        scope can encompass both what's shown in the

2        drawings and a written description of sorts

3        according to what's claimed, correct?

4    A.   That's my understanding.

5    Q.   And so with that understanding, the claimed

6        invention can be more than what's shown in

7        the drawings, correct?

8    A.   That would seem to be correct.

9                    (Exhibits 74, 75, and 76 were

10                       marked for identification.)

11   Q.   Mr. Smith, we're passing you what's been

12        marked for identification purposes as

13        Exhibits 74, 75, and 76.

14   A.   Yes.

15   Q.   And ask if you can identify what these are.

16   A.   Yes.   These are examples of prior art, and

17        they are all examples that I cited in my

18        reports.

19   Q.   And 74 is a depiction of some sort of a

20        bird cage; is that correct?

21   A.   Yes.

22   Q.   What is 75, Exhibit 75?

23   A.   Exhibit 75 is a wicker cage with wheels

24        that's being pulled by an elephant.

25   Q.   Is that a real elephant or --

BRET HUNTER SMITH
APRIL 28, 2008

Page 56

1   A.   No.  It does not look to be.  It looks to be

2        a toy.

3   Q.   So the cage of Exhibit 75 is a toy or a

4        decoration; is that correct?

5   A.   It would -- yes.

6   Q.   It's not -- it's not intended or actually

7        used as an animal cage, is it?

8   A.   No, it is not.  It's -- it's a scaled, you

9        know, representation of an animal cage.

10  Q.   And what does Exhibit 76 depict?

11  A.   That's a bird cage.

12  Q.   These -- do these three products or cages on

13       Exhibits 74, 75, and 76 look the same to you;

14       or do they look different from one another?

15  A.   I don't -- I don't mean to be nitpicking

16       here, but that would depend upon what you

17       meant by the same.

18  Q.   Well, would you agree with me that they're

19       not identical with one another?

20  A.   Yes, I would agree that they're not

21       identical.

22  Q.   And that they have obvious or apparent visual

23       differences that readily stand out when you

24       look at the three of them?

25  A.   Yes.  They have visual differences and visual

Page 57

1       similarities.

2   Q.  But if a person were looking at these three,

3       they would quickly be able to discern that

4       they are three different things, correct?

5   A.  Yes.   Three different objects, yes.

6   Q.  I'm going to refer -- I'm going to pass you

7       what's previously been marked as Exhibit 2.

8   A.  Yes.

9   Q.  And ask if you recognize that.

10   A.  Yes.

11   Q.  And what is that, please?

12   A.  This looks to me to be the Bay Isle Mid-West

13       design, cage.

14   Q.  Does this product look to be the same or

15       identical -- let me rephrase that.  The Bay

16       Isle product by Mid-West of Exhibit 2 appear

17       identical to any of the three items we've

18       just looked at in Exhibits 74, 75, or 76?

19   A.  No, it does not appear identical to me.

20   Q.  Would you agree that they're -- that the bay

21       Isle product is visually readily different

22       from those three exhibits?

23   A.  I would agree that there's visual differences

24       and that there are also similarities.

25   Q.  What are the similarities?

Page 58

1    A.    Similarities would have to do with windows.

2          Similarities would have to do with they all

3          three have doors.  They all three make use of

4          wicker or a material that would appear to be

5          wicker, give that appearance, a woven

6          material.  And they all -- they all create

7          their windows by leaving an opening or a

8          space in the wicker.

9                MR. GARDNER:  All right.  Let's

10             put this in as 77.

11                (Exhibit 77 was marked for

12                   identification.)

13   Q.   Let me pass you what's been marked as Exhibit

14        77 and ask if you recognize that.

15   A.   Yes.

16   Q.   What is that, sir?

17   A.   This is the 156 design or patent drawing.

18   Q.   Now, let's set the patent aside for a moment,

19        just off to one side.  And I would like for

20        you to take Exhibits 74, 75, 76, and Exhibit

21        2, and arrange them in a sequence of most

22        similar to what's shown in the 156 patent on

23        Exhibit 77 to least similar.

24   A.   Based upon?

25   Q.   Based upon your understanding of what's shown

BRET HUNTER SMITH
APRIL 28, 2008

Page 59

1      in the patent, Mr. Smith.

2  A.  Based upon my -- I want to make sure I

3      understand what you're asking.  Are you --

4  Q.  Well, first of all, you've studied --

5  A.  Yes.

6  Q.  -- the 156 patent, correct?

7  A.  I have, yes.

8  Q.  And you're familiar with what's shown in the

9      drawings.

10  A.  Yes.

11  Q.  So with your knowledge of what's shown in the

12      drawings in the 156 patent --

13  A.  Okay.

14  Q.  -- I would like you to take these four

15      references, which are Exhibit 74, 75, 76, and

16      Exhibit 2, and put them in some sort of an

17      order of most like what's shown in the patent

18      to least like what's shown in the patent.

19      Then we'll talk about that.

20  A.  Okay.

21  Q.  And it's not a speed test.  You can take a

22      while if you need to.  I trust that you're

23      familiar with all these documents and it

24      shouldn't take an hour or two.

25  A.  Well, I can address common qualities.  There

Page 60

1    are -- if you're comparing this drawing to

2    these, if we're comparing the drawings, then

3    it's not a straightforward process.  For

4    example, this proportionally and in point of

5    view is the closest to this (indicating.)

6  Q.  You're referring to --

7  A.  76.

8  Q.  The bird -- the cage of 76 or the Russian --

9  A.  In terms of the proportion and view angle of

10    it is closest to 77, if that's what you're

11    talking about.  If you're taking about, for

12    example -- if we're looking for the -- yeah.

13    If we're talking about the window placement,

14    for example, then these two would be the

15    closest in terms of looking at the

16    proportions for where the window is located.

17         MR. STALEY:  For the record to

18      be clear --

19         THE WITNESS:  I'm sorry.  74 and

20      number 2 -- I'm sorry -- compared to

21      the 156 patent, which is Exhibit 77.

22  A.  I think it would be fair to say that this

23    one, in both of those comparisons, that

24    number 75 is the least like in the sense of a

25    visual comparison.

BRET HUNTER SMITH
APRIL 28, 2008

Page 61

1    Q.   All right.  So having done a little bit of

2         thinking about it and talking through it, is

3         it your testimony that the cage of Exhibit 75

4         is the least like what's shown in the 156

5         patent --

6    A.   As the --

7    Q.   -- in comparison to Exhibit 74, 76, and

8         Exhibit 2?

9    A.   Yes.

10   Q.   All right.  So Exhibit 75 is the least like

11        what's shown in the patent.  What's next?

12   A.   It -- what's next depends on what specific

13        features you're comparing.  And part of

14        the -- part of it is the fact that if we're

15        looking -- I mean, if you're looking at

16        proportion, if you're looking at point of

17        view, for example, of the isometric drawing,

18        that's the closest match with the bird cage.

19        If you're -- or with 76.  Excuse me.  Number

20        76.

21   Q.   Well, you're familiar with all the drawings

22        in the patent, the 156 patent --

23   A.   Uh-huh.

24   Q.   -- Exhibit 77.  So taking into account what's

25        shown in all the drawings, which of these

Page 62

```
 1        three references do you think is the least

 2        like what's shown in the patent and

 3        considering Exhibit 74, 76 --

 4   A.   So you're saying looking at it from all

 5        sides, from all points of view, which is the

 6        least like?

 7   Q.   Yeah.

 8   A.   Is that your question?

 9   Q.   Yes.

10   A.   It's not a clear call from this point of

11        view.  Figure 74 and 76 both have different

12        visual characteristics that are also

13        reflected in Exhibit 77.  For example, the

14        window placement on 74 is higher up and you

15        have more weave below.  The window on the 76,

16        on Exhibit 76, is basically centered or the

17        open area is basically centered.  76 is more

18        close in proportion to the Exhibit 77.  Okay?

19   Q.   Closer to the patent.

20   A.   Yes.  Yes, in proportion.

21   Q.   Talking about the overall shape?

22   A.   The overall shape and proportion, yeah.

23   Q.   So Exhibit 76, the Russian bird cage of

24        Exhibit 76 has an overall shape that is more

25        similar to what's shown in the patent than
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 63

1          the bird cage of Exhibit 74.  Is that what

2          you mean?

3   A.    That's correct.

4   Q.    Do you view that Exhibit 74 and 76 are

5          roughly equally similar but in different ways

6          to what's shown in the 156 patent on Exhibit

7          77?

8   A.    Yes.  I think that would be fair to say.

9   Q.    And do you -- is it also your testimony that

10         Exhibits 74 and 76 are not as similar to the

11         patent as is the Bay Isle product of

12         Exhibit 2?

13  A.    If we are looking at all sides of it and all

14         of the characteristics, yes, that would be

15         correct.

16  Q.    Okay.  So then I think we have a sequence,

17         that as between Exhibits 74, 75, 76, and the

18         Bay Isle product of Exhibit 2, the one that

19         is most like what is shown in the patent is

20         the Bay Isle product of Exhibit 2, correct?

21  A.    Yes.

22  Q.    And the one that's the least like what is

23         shown in the patent is the cage of Exhibit

24         75, correct?

25  A.    Yes.

Page 64

```
 1   Q.   And that the -- the cages of Exhibit 74 and

 2        76 are somewhere in between?

 3   A.   Yes.

 4   Q.   They're not --

 5   A.   I'm sorry.  I didn't mean to cut you off.

 6        I'm sorry.  They are somewhere in between.

 7             MR. GARDNER:  Let's take about a

 8        five-minute break.

 9                  (Brief recess)

10                  (Exhibits 78, 79, and 80 were

11                     marked for identification.)

12   Q.   Mr. Smith, we've passed you what's been

13        marked for identification purposes as

14        Exhibits 78, 79 and 80.  Can you identify

15        those, please?

16   A.   And 80?

17   Q.   Yes.

18   A.   These are the three reports that I've written

19        relative to the 156 patent.  The first was

20        the manual report and then two supplemental

21        reports.

22   Q.   And I believe that we've earlier -- this

23        morning we established that you don't have

24        any other opinions that are not -- regarding

25        the 156 patent that are not encompassed in
```

Page 65

1    these three documents except to the extent

2    that you would prefer to refer to the Mo

3    patent, correct?

4   A.   Right.  And that I may not have been clear,

5        but -- the edges, but also the fact that --

6        and I show this in the 321.  If you invert

7        the 542 Mo patent and enlarge it, you have

8        the basic -- basic structure of a wire frame

9        covering that is the 156.

10            MR. STALEY:  They appear to

11            be --

12   A.   It's just a little clearer.

13   Q.   Now, if you would, look at -- let's look at

14        pages 6 and 7.

15   A.   6 and 7?

16   Q.   Of the first report.

17   A.   Of the first report?

18   Q.   Which is Exhibit 78.

19   A.   Yes.  Okay.

20   Q.   And you see at the bottom of page 6 in

21        discussion of the material choice --

22   A.   Yes.

23   Q.   -- where you -- you make a statement that

24        according to Charles Hendricks, DVM,

25        professor of veterinary medicine at Auburn

Page 66

1        University.

2    A.   Yes.

3    Q.   You make some statements that apparently you

4         attribute to Mr. Hendricks.  Did you have

5         occasion to speak to Mr. Hendricks about this

6         matter?

7    A.   I had a very brief conversation where I asked

8         him about -- about dogs and cages and his,

9         you know, covering a cage or providing some

10        cover with the cage of a good thing.  And his

11        response was that dogs are den animals and

12        den animals like to have some cover.  So

13        there's a functional -- this is my -- this

14        last part is my wording.  So that, therefore,

15        there is a functional aspect to the covering

16        that's on the cage.

17   Q.   Okay.  But the statements here that the

18        wicker would reinforce the den quality --

19   A.   Den quality of the space.  He said that a

20        covering would reinforce the den quality of

21        the space.  I don't --

22   Q.   So that's --

23   A.   I don't believe that he specific -- I don't

24        recall if he specifically said wicker, but I

25        said a covering.  And I believe that -- that

Page 67

1        that's -- I don't -- I don't recall if I --

2        if I specifically went beyond that or not and

3        said a wicker.  I was trying to get an

4        opinion about -- one way or another about

5        whether or not having some cover or covering

6        surrounding the cage was -- was a good thing

7        or a -- or a bad thing with respect to the

8        function of the animal feeling safe and that

9        sort of thing.

10   Q.  So it was Dr. Hendricks' opinion that

11        covering the cage would improve the den

12        quality for a dog?

13   A.  Yes.

14   Q.  And did he indicate to you also that that

15        would be an important feature for cats?

16   A.  The -- the -- the statement about cats is

17        based on the source that's mentioned directly

18        after that, which talks specifically about

19        cats.  It's talking about in the context of

20        laboratory animals; but it also talks about

21        cat behavior and the fact that on at least

22        two sides, it's good if they have cover,

23        obviously, one side open so that they can

24        view, you know, what's going on; but

25        that's -- that is -- I've given you the full

Page 68

1       reference there for the publication.

2   Q.  Is that some research that you did?

3   A.  To find the publication?

4   Q.  Well, where did the -- I mean, how did you

5       come up with the idea that wicker would be an

6       important functional feature for cats?  And I

7       see that it's supported by the reference to a

8       specific publication, but --

9   A.  Well, yeah.  I was looking at -- I believe I

10      did just a general search on animal

11      behavior.  I was trying to see whether or not

12      I guess the human equivalent of privacy, you

13      know, was an issue.  And I came across this

14      reference relative to cats -- well, in a

15      larger -- you know, cats, dogs, farm animals,

16      ferrets, rabbits, and rodents.  But there was

17      a section that specifically addressed cats

18      and their environment.

19  Q.  Well, in this section here where you're

20      discussing what cats and dogs might prefer or

21      what would be beneficial for cats and dogs,

22      is this your opinion or the opinion of

23      Dr. Hendricks?

24  A.  The opinion of Dr. Hendricks relative to

25      dogs, the opinion of -- what's her name --

BRET HUNTER SMITH
APRIL 28, 2008

Page 69

1        Sandra McCune relative to cats.

2    Q.   Do you have any special training or education

3         in animal psychology or animal behavior or

4         animal factors?

5    A.   Other than what I've researched relative to

6         this project and working for a summer job

7         at -- doing construction work at a place

8         called Wolf Park in Battleground, Indiana,

9         no.  The director of Wolf Park is -- at that

10        time was a world famous zoologist.  So other

11        than casual conversation with him, no.

12   Q.   So you're not an expert in animal psychology?

13   A.   No, which is why I went looking to see what

14        they said.

15   Q.   And you're not an expert in animal factors or

16        animal ergonomics as such?

17   A.   Yeah.  Ergonomics, the ergo refers to man,

18        so -- which is why I kind of said animal

19        factors.  Other than, you know, looking at

20        basic dimensions and measures, which are -- I

21        ran across a number of things, none of

22        which -- but -- like this that talk about

23        what do animals -- you know, what should they

24        have, what do they like, that kind of thing,

25        no.  No.  I'm not -- that's not my field of

BRET HUNTER SMITH
APRIL 28, 2008

Page 70

1   expertise, which is why I wanted to check

2   outside.

3 Q. So, for example, when we go further up the

4   page under the heading "Windows" and you make

5   the statement that the windows provide a way

6   for the animal to look out and observe its

7   environment, something that is important for

8   the psychological comfort of the animal, you

9   don't really know whether that's important

10   for the psychological comfort of the animal,

11   do you?

12 A. That's -- that's something that came up, I

13   believe, in the laboratory animals book and

14   specifically when she was talking about

15   cats.  Cats prefer resting places that are

16   warm, dry, and protected on one or, even

17   better, two sides.  As I recall, she went on

18   to talk about the fact that they do need a

19   way to see out and what's going on.  And I --

20   again, that -- that's the basis for that

21   discussion and I guess some general

22   discussion that I recall from talking with

23   Dr. Klinghammer years ago when I was working

24   on his house and garage and other things.

25 Q. But isn't it true that you don't know

BRET HUNTER SMITH
APRIL 28, 2008

Page 71

1    yourself whether --

2  A.  I am not an animal expert.

3  Q.  Let me finish my question, please.

4  A.  I'm sorry.  I'm sorry.

5  Q.  You yourself don't know any more than anybody

6       else whether it's important for the

7       psychological comfort of animals that -- that

8       windows be provided, correct?

9  A.  I know according to Sandra McCune, it's

10      important; and she is an expert.  I'm not an

11      expert.  That's why I would go and check and

12      confer.

13 Q.  But isn't it possible that some other expert

14      in the field of animal psychology might have

15      a different view?

16 A.  I'm not an expert in animal psychology, so --

17 Q.  So you don't know that?

18 A.  -- I can't answer that one way or the other.

19 Q.  But you do have to admit that it's possible

20      that an expert in that field might have a

21      different view from Sandra McCune, correct?

22 A.  To the degree that anything is possible, yes.

23 Q.  Now, your -- your opinion of -- not opinion.

24      Your report of Exhibit 78 has numerous

25      mentions -- instances where you mention

Page 72

```
 1        features that are important to animals or

 2        that are functional for animals.  You don't

 3        have any other basis for those statements

 4        except what you've read in that one book or

 5        from what you gathered from speaking with

 6        Mr. Hendricks, correct?

 7   A.   No.  I -- that's not correct.  I read a

 8        number of books about -- or skimmed a number

 9        of books, read some portions of books about

10        cats and dogs.  I -- I -- you know, if you

11        can point to specific statements, I can

12        answer more specifically; but I did do

13        background, kind of general reading on the

14        subject.

15   Q.   Well, let's look in particular at the

16        statement you make at the top of page 6.  You

17        argue that the rattan -- because rattan is a

18        woven material, it has superior air

19        circulation when compared with solid

20        materials like sheet metal, wood, composites

21        or plastics.  This is important to the needs

22        of the animal for fresh air.

23            Do you see that statement that you made?

24   A.   Yes.

25   Q.   If the product has windows and doors that are
```

Page 73

```
 1        open, how does the -- how does the open weave
 2        or loose weave of the wicker make any
 3        difference at all to the fresh air needs of
 4        the animal?
 5    A.  Well, it gives greater air circulation in the
 6        same way that if I put you in the -- out in
 7        the 80-degree sun and I made a tent out of
 8        wood and gave it a window and a door, you
 9        would be a whole lot warmer than if I used a
10        nylon that had an open mesh that let some
11        wind through and some air circulate.  So it
12        is a design issue.  It's not -- so it is a
13        design issue.
14    Q.  Are these -- are these residences typically
15        used in a home or outside?
16    A.  I would think that would depend on the owner.
17        I've seen -- I've seen owners put, you know,
18        their kennels out on the porch, you know.  So
19        I don't know.
20    Q.  Well, we're talking about the wicker-covered
21        residences.
22    A.  Uh-huh.
23    Q.  Either what's shown in the patent, the 156
24        patent, or the Bay Isle product of Exhibit 2.
25        Is it your understanding that most of the Bay
```

Page 74

1      Isle products are used indoors?

2    A.   I haven't read one way or the other or been

3         informed one way or the other.  I would

4         think, from a design point of view, that one

5         of the reasons to purchase these would be for

6         interior decor.  So I would think that it

7         would tend to be used inside as opposed to

8         outside the majority of the time.

9    Q.   So it is your understanding that most of the

10        time, they're likely indoors?

11   A.   That would be -- yes.

12   Q.   Does that lessen or more -- strengthen your

13        argument that the loose-weave pattern

14        contributes to the fresh air needs of the

15        animal?

16   A.   I think the loose weave contributes to air

17        circulation, I guess I would say.  To air

18        circulating within the cage might be a better

19        way to say it.

20   Q.   Isn't it true for indoor use, it doesn't make

21        any difference on the Bay Isle product?

22   A.   On the Bay Isle product or the 156 product?

23   Q.   Either one.

24   A.   I would think it would make a difference the

25        same way that a clogged furnace filter gives

Page 75

```
 1        poorer air circulation than one that isn't.
 2   Q.   In the circumstance of a clogged air --
 3        furnace filter, does the air normally have a
 4        path other than through the filter?
 5   A.   No.
 6   Q.   And the situation of the -- in the context of
 7        the 156 patent, aren't there substantial
 8        windows and a large open door?
 9   A.   There are open windows.  There are open
10        windows and an open door.  And -- but if we
11        want to look at this architecturally, in the
12        case of the 156, those are at 90 degrees to
13        each other.  The windows go across so you can
14        get some cross-ventilation that way.  It will
15        improve the ventilation.
16             Is it possible for the animal to get air
17        without it?  Yes.  It's not a hermetically
18        sealed container.  Of course, the animal
19        could get air through the windows and the
20        doors.  It's just an added benefit to have
21        the loose weave of the rattan as opposed to a
22        flat surface material.
23   Q.   Have you made any calculation of how much
24        extra air would pass out through the side
25        panels?
```

Page 76

1    A.   No, I have not.  No, I did not.

2    Q.   Would you agree that it's -- the extra air

3         that might be received by the animal would be

4         a negligible amount?

5    A.   No, I would not.  And the reason I would not

6         is if you would compare this to, say, a

7         plastic animal cage with a wire front door

8         and with side windows, the -- the air quality

9         inside would be less than with an open weave.

10   Q.   How does it -- how does the open -- given

11        that the -- strike that.

12             Let's talk about wicker for a second.

13   A.   Okay.

14   Q.   Is there a difference between wicker and

15        rattan?

16   A.   Rattan -- the terms are, generally,

17        frequently used interchangeably.  Rattan

18        actually comes from a very specific plant,

19        and so there is -- and I think I referred to

20        it in the first report.  Yes, it comes from

21        palm trees belonging to the Calamus genus

22        that are native to tropical regions in

23        Africa.  That's the -- but like so many

24        terms, it broadly is used frequently to

25        describe furniture or articles, similar

Page 77

```
 1        articles, that have a woven texture to them.
 2             In other words, if you look at rattan
 3        furniture, it's not always made with rattan
 4        in the strictest sense.  The word has become
 5        more generalized kind of like Kleenix.  You
 6        know, it's being applied just to mean --
 7        typically or frequently, it's applied to mean
 8        a woven cover.
 9   Q.   Well, how do you mean -- when you use -- in
10        your report, you use wicker --
11   A.   And rattan interchangeably.
12   Q.   -- and rattan somewhat interchangeably.
13   A.   Yes.  And I said I would be using them
14        interchangeably.
15   Q.   Now, you've seen -- in the marketplace,
16        you've seen furniture products where the
17        woven material is a very fine, reed-like
18        material that's perhaps a quarter to an
19        eighth of an inch diameter.
20   A.   Yes.
21   Q.   And then there are other products in the
22        marketplace where it's a split reed maybe a
23        half of an inch wide.
24   A.   Right.
25   Q.   Do you mean one or the other of those
```

Page 78

```
 1        products or both when you're referring to

 2        wicker and rattan?

 3   A.   Well, the problem is -- and the reason that I

 4        didn't make distinction is the problem is --

 5        for example, let's take your first example,

 6        the thin material.  You can get the same

 7        material -- let's say it's willow, a willow

 8        reed, which is used in basketry a lot.  You

 9        can get that same material, willow, in a very

10        thick reed.  So, you know, the distinctions

11        aren't necessarily related to size.  And in

12        this day and age with synthetic rattan,

13        they're not related to the material either.

14        It's become more of a term to describe

15        furniture or the like articles.

16   Q.   Does it -- does one or the other refer to a

17        whole reed product versus a split reed or a

18        split cane product?

19   A.   You mean rattan versus?

20   Q.   Well, you're using rattan and wicker

21        interchangeably.

22   A.   Right.  Right.

23   Q.   And does rattan sometimes, in the

24        marketplace, refer to a woven product where

25        the weave is of a fiber that's been split or
```

Page 79

1        wide -- wide cane that's been split.

2    A.   That's been split?  Yes, sometimes in the

3        marketplace, it is used that way.  Sometimes

4        it isn't used that way.  It depends.

5    Q.   Now, in your reports --

6    A.   Yes.

7    Q.   -- when you say wicker or rattan, are you

8        referring to a whole reed product or a split

9        reed product?

10   A.   I'm referring more to the appearance of the

11       woven material; that is, that it's a woven

12       material.  And, you know, I'm -- in my

13       report, I'm essentially using the terms

14       interchangeably.  And I say that in the

15       report.

16   Q.   But when you use the terms, either wicker or

17       rattan, in your --

18   A.   Yes.

19   Q.   -- in your reports, do you mean to encompass

20       a wide split reed that might be a half of an

21       inch wide; or are you just referring to the

22       whole reed, small diameter?

23   A.   Well, rattan itself is split, so I'm not sure

24       I understand the distinction you're making.

25       Rattan itself can be a split.  Furniture

BRET HUNTER SMITH
APRIL 28, 2008

Page 80

1        referred to as rattan can be made from a

2        split material.  So I'm not sure I understand

3        your distinction.

4    Q.  Well, Mr. Smith, I'm not trying to make a

5        distinction.  I'm trying to figure out what

6        you meant by the terms in your report.

7    A.  Yeah.

8    Q.  I'm not trying to impose any particular

9        definition on you.

10   A.  It's -- well, what I meant was just the use

11       of a woven material, the -- if we're talking

12       about -- let's go back to willow.  If we're

13       talking about willow, well, what that split

14       down from depends a whole lot on how the

15       willow is processed.  So if you take another

16       example, which would be oak baskets, which

17       are traditionally where things are split down

18       by hand, the distinction -- I don't -- I

19       don't see -- I mean, it's -- they're used

20       interchangeably.  They're used

21       interchangeably in catalogs.  They're used

22       interchangeably in this report.  The terms

23       are.

24   Q.  Well, when you use wicker or rattan, do you

25       mean to include woven fabrics like cotton?

BRET HUNTER SMITH
APRIL 28, 2008

Page 81

1    A.    No.

2    Q.    Do you mean to include woven split-oak

3          caning?

4    A.    That can -- yeah.  That would fall within

5          this.  That is a woven material used to

6          create a wicker or a, you know, rattan sort

7          of look.  It would also apply to synthetic

8          material.  That's a distinction that's also

9          in the marketplace, synthetic rattan, which

10         is kind of an oxymoron; but that's the way

11         the language has shifted in the marketplace.

12         So I did not make a distinction.

13   Q.    If you would, let's look at page 16 of your

14         report.

15   A.    16, yes.

16   Q.    And if you would read the last sentence out

17         loud.

18   A.    The last sentence?

19   Q.    The last sentence on page 16.

20   A.    On page 16.  Let me go back and find the

21         beginning.

22             Based upon this, I conclude that it

23         would be obvious to a designer with ordinary

24         skill in the art, by full knowledge of the

25         prior art, to combine wicker or rattan weave

BRET HUNTER SMITH
APRIL 28, 2008

Page 82

1      patterns to all surfaces of a rectangular

2      cage structure for the purposes of providing

3      the aesthetically pleasing pet containment

4      structure and design that is the subject of

5      the 156 patent.

6   Q.  Would you agree with me, then, that wicker is

7      aesthetically pleasing when applied to a pet

8      containment structure?

9   A.  If it's done well, yes.

10  Q.  Would you agree with me that it's

11     aesthetically pleasing as shown in the 156

12     patent, which is Exhibit 77?

13  A.  Yes.

14  Q.  If you would look at page 17.

15  A.  Yes.

16  Q.  And on the second column, under the

17     "Predictable Variation" heading --

18  A.  Yes.

19  Q.  -- read the sentence that starts, Patents 326

20     and 915.

21  A.  Patents 326 and 915, Figures 31 and 32,

22     clearly show the application of a woven

23     texture to a rigid frame in order to provide

24     an aesthetically appealing surface with good

25     circulation.

BRET HUNTER SMITH
APRIL 28, 2008

Page 83

1    Q.    First of all, when you wrote rigid there, you

2          meant R-I-G-I-D, correct?

3    A.    Yes.  Yes.  It's just a typo.

4    Q.    You didn't really mean that it's ridged, it

5          has ridges like Ruffles?

6    A.    No, sir, I did not.  That's a typo.

7    Q.    And if we see that word "rigid" -- "ridged"

8          like that somewhere else in the document, it

9          probably means rigid?

10   A.    Yes.  Yes, sir.

11   Q.    And here you're stating again that the woven

12         texture provides an aesthetically appealing

13         surface.

14   A.    Yes.

15   Q.    And that was a wicker surface?

16   A.    It's a -- it's a -- it's a woven surface.

17         I -- the -- let's see.  It's a woven texture.

18         I don't recall that that -- whether or not --

19   Q.    If you look at pages 13 and 14 of Exhibit 78,

20         it shows you Figure 31 and Figure 32, which

21         are referred to in that sentence.

22   A.    Yes.

23   Q.    Figure 31 is either wicker or rattan; is that

24         correct?

25   A.    Yes.  It's woven, yes.

Page 84

1   Q.  Well, it's not woven out of cotton cloth.

2   A.  No, not cotton cloth.  Could it be cotton

3       cord?  I don't know.

4   Q.  Would you agree that what's shown in Figure

5       31 is either wicker or rattan?

6   A.  It has that appearance.

7   Q.  And the same for Figure 32?

8   A.  Yes.  It has that appearance.

9   Q.  So when you're making the statement what is

10      shown in Figures 31 and 32 provide an

11      aesthetically appealing surface, you're

12      referring to the wicker look, correct?

13  A.  Yes.

14  Q.  Now, if you would, at the tail end of that

15      paragraph --

16  A.  Wait.  We're back on?

17  Q.  17, please.

18  A.  17.  Okay.  Let me flip back.

19          Okay.  Back on 17.

20  Q.  We're still on page 17 of Exhibit 78.

21  A.  Yes.

22  Q.  And if you would, read the last sentence out

23      loud under that paragraph, Predictable

24      Variation.

25  A.  Oh, okay.  Patent 156 clearly demonstrates

Page 85

```
 1        materials and techniques found in patents 326

 2        and 915, both of which were patented prior to

 3        the 156 and both of which would be recognized

 4        as having methods that would improve the pet

 5        cage.

 6   Q.   What did you mean by they have methods that

 7        would improve the pet cage?

 8   A.   The idea of a framed structure with a

 9        covering that's a woven that would give the

10        appearance of wicker or rattan.

11   Q.   So what you meant by this language is that

12        putting wicker on the pet cage would improve

13        the pet cage; is that correct?

14   A.   Yes.

15   Q.   And am I correct that the way -- at least one

16        of the ways that it would improve the pet

17        cage is in its appearance?

18   A.   Yes.  The issue is -- well, that's also

19        something that has been shown in prior art;

20        that is, the idea of a wicker or woven cage.

21        So this wouldn't be the first time.  But if

22        you look at 326 and 915, those have an

23        underlying metal structure and there's a

24        wicker or a woven texture that's been applied

25        to them.  So the idea of using wicker in a
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 86

1       pet cage isn't -- isn't new.  Does that make

2       sense?

3    Q.  Well, independent of your opinion of whether

4       wicker is new or not as applied to pet

5       cages --

6    A.  Yes.

7    Q.  -- would you agree with me that applying

8       wicker to a wire pet cage improves its

9       appearance?

10   A.  Yes.

11   Q.  Now, looking at Exhibit 77 --

12   A.  Yes.

13   Q.  -- and the wicker-looking covering --

14   A.  Yes.

15   Q.  -- that's shown on the 156 patent --

16   A.  Yes.

17   Q.  -- would you agree with me that the

18      wicker-looking covering provides an

19      aesthetically pleasing appearance?

20   A.  Yes.

21   Q.  Would you agree with me that the

22      wicker-looking covering of the 156 patent is

23      at least partly ornamental?

24   A.  Yes.

25   Q.  Now, in your report, you make a distinction

Page 87

1       between the plain weave and various weave

2       patterns.  Would you agree with me that even

3       a plain weave wicker pattern applied to the

4       structure of the 156 patent is ornamental?

5    A.  Is ornamental?  It's -- it has an ornamental

6        component.

7    Q.  Well, independent of whether it might also

8        have a function, I'm trying to figure out

9        whether a plain weave as applied to a wire

10       pet cage can be ornamental.

11   A.  Yes.

12   Q.  Now, when -- when -- a moment ago when I

13       asked you whether a plain weave as applied to

14       the structure of the 156 patent is

15       ornamental, you seemed to qualify your

16       answer.  Is there a reason for that?

17   A.  Well, because the -- the material -- the

18       material itself has a functional purpose.  So

19       regardless of the weave, there's a functional

20       purpose, whether it's a plain weave or a

21       patterned weave.

22   Q.  What is the functional purpose of the --

23   A.  It's a --

24   Q.  Excuse me.

25   A.  I'm sorry.  I'm sorry.

Page 88

| | | |
|---|---|---|
| 1 | Q. | What is the functional purpose of the pattern |
| 2 | | that's shown on the surface of the 156 pet |
| 3 | | residence? |
| 4 | A. | Okay.  I would explain it in this way.  When |
| 5 | | you're creating -- when you're using wicker |
| 6 | | or rattan or a woven product as a covering or |
| 7 | | even as a structural piece of another |
| 8 | | product, you have -- there are design choices |
| 9 | | that you can make:  the thickness of the |
| 10 | | material, how the edges are finished.  Those |
| 11 | | sorts of things become decorative choices. |
| 12 | | So I would say that the choices, that it's -- |
| 13 | | it's -- there's the woven material and there |
| 14 | | are the choices that are made in the weaving |
| 15 | | of the material that are decorative or that |
| 16 | | can be decorative. |
| 17 | Q. | I'll ask it another way. |
| 18 | A. | Okay. |
| 19 | Q. | Are there any aspects of the wicker covering |
| 20 | | of the 156 patent that are functional? |
| 21 | A. | Okay.  The fact that it is wicker has a |
| 22 | | functional component to it.  The functional |
| 23 | | component has to do with air circulation |
| 24 | | and -- and, also, the synthetic wickers are |
| 25 | | good at retarding bacterial growth.  So there |

**BRET HUNTER SMITH**
**APRIL 28, 2008**

Page 89

1      are some functional qualities that go with

2      wicker.  So is there a functional purpose?

3      Yes.  Is there a decorative component?  Yes.

4  Q.  Well, I would like for you to look carefully

5      now at the 156 patent.

6  A.  Yes.

7  Q.  Can you tell me what portion of the patent

8      informs you that the covering is synthetic

9      wicker?

10 A.  There is nothing that informs me that it's

11     synthetic wicker.  In some of the reading

12     that I did in various patents, they

13     mention -- actually mention both synthetic

14     and regular.  They did not make a distinction

15     between synthetic and regular wicker.  One of

16     the features or benefits that was mentioned

17     had to do with it was less likely to grow

18     mold, bacteria, that kind of thing.

19 Q.  Well, now, I'm going to -- for definitional

20     purposes, I'm going to talk about

21     synthetic resin -- synthetic wicker or resin

22     wicker and what I'll call natural wicker.

23 A.  Okay.

24 Q.  Do those terms make sense to you?

25 A.  Yes, they do.

BRET HUNTER SMITH
APRIL 28, 2008

Page 90

1   Q.  You understand kind of the difference?

2   A.  Yes, they do.

3   Q.  So the natural resin might be made from a

4       natural product, a plant product?

5   A.  A natural material would be, yes.  Yes.

6   Q.  In looking at the 156 patent, would you agree

7       with me that what's shown there can be a

8       natural wicker product?

9   A.  Yes.

10  Q.  It also can be a synthetic wicker product,

11      correct?

12  A.  Yes.

13  Q.  Could it also be a piece of molded plastic

14      panel that has a wicker pattern molded into

15      it to have that appearance?

16  A.  I think it would be almost impossible.

17  Q.  Well, do you agree with me that the 156

18      design patent covers how the thing looks and

19      not how it's made?  Correct?

20  A.  Yes.

21  Q.  So it's not limited to either synthetic

22      wicker or resin wicker or natural wicker,

23      correct?

24  A.  Yes.

25  Q.  So given that the patent covers both natural

Page 91

1          wicker and what you refer to as synthetic

2          wicker, how can you conclude that the wicker

3          that is shown in the patent has -- has some

4          functional attributes?

5     A.   It allows air circulation.  Poor air

6          circulation combined with animals, due to

7          dampness, produces mold and bacteria.

8     Q.   Any other functional aspect to the wicker

9          that you can think of?

10    A.   No, beyond the things stated earlier in the

11         report we talked about, the weave making it

12         possible to see -- to see out.  It would

13         be -- for example, if I made this -- this

14         shape out of plywood, it would be a lot less

15         light on the interior.  So the gaps, you

16         know, affect the interior quality.  But other

17         than that, no.

18    Q.   Are there other materials that could be

19         employed to provide air circulation and still

20         have some covering effect?

21    A.   Yes.

22    Q.   And what are those?

23    A.   Well, you could, for example, use screen.

24         You could -- it's possible that you could use

25         some fabrics depending on their weave.  There

Page 92

```
 1        are some -- the results would be somewhat
 2        different, but it would allow -- I mean, it
 3        could fulfill, you know, having some air
 4        circulation and some visibility in allowing
 5        light through and that kind of thing.
 6    Q.  Do you know whether those other -- other
 7        choices of material would be more expensive
 8        or less expensive?
 9    A.  I would -- I would want to do some pricing.
10        I can tell you some reasons from a design
11        point of view why I might not choose to use
12        them.
13    Q.  What are those?
14    A.  Well, the wire -- the screen, rather, would
15        have some attachment difficulties.  Anytime
16        you go from a small diameter to a much larger
17        diameter wire and you're trying to weld or
18        assemble those, it gets kind of tricky.  The
19        screen also would be more easily damaged, I
20        would think, generally, again depending on
21        how you did it.  So, you know, there are
22        reasons why that probably wouldn't -- and
23        aesthetically, also.  Again, for an indoor
24        cage that you want to get to match furniture
25        or furnishings or -- or seem more at home in
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 93

1          that environment, wire and fabric are both

2          probably not as effective as choices.

3     Q.   When you say they're not as effective

4          aesthetically, do you mean they don't look as

5          good typically as the -- as the wicker?

6     A.   I think, again, it's a hypothetical, and so

7          it's hard to answer that in broad terms.  One

8          of the problems with fabric would be that

9          once you make that transition to fabric, that

10         it -- people perceive that material

11         differently.  They're going to -- you know,

12         they may be more inclined to look at matching

13         the fabric pattern of their sofa or their

14         drapes or whatever.  Now production costs go

15         up because you have to have different fabrics

16         on inventory.  Everything is more custom.  I

17         mean there are a lot of kind of pitfall

18         reasons to steer away from that.

19    Q.   Now, in looking at Exhibit 78 --

20    A.   Okay.

21    Q.   -- which was your first report regarding the

22         156 patent --

23    A.   Yes.

24    Q.   -- am I correct that according to this

25         report, there are no points of novelty in the

BRET HUNTER SMITH
APRIL 28, 2008

Page 94

1       156 patent?  Is that right?

2   A.  Yes.

3   Q.  And let's look at Exhibit 79, which is your

4       first supplemental report regarding the 156

5       patent.

6   A.  Yes.

7   Q.  Is it also correct that according to this

8       first supplemental report, Exhibit 79,

9       regarding the 156 patent -- that according to

10      this report, there are no points of novelty

11      regarding the -- in the 156 patent?  Isn't

12      that correct?

13  A.  Yes.

14  Q.  And looking at Exhibit 80, which is your

15      second supplemental report --

16  A.  Yes.

17  Q.  -- regarding the 156 patent --

18  A.  Yes.

19  Q.  -- is it also correct that in this report,

20      there's no identification of any points of

21      novelty of the 156 patent, correct?

22  A.  Yes.

23  Q.  So these three reports that you've issued

24      concerning the 156 patent individually and

25      collectively failed to identify even one

BRET HUNTER SMITH
APRIL 28, 2008

Page 95

1      point of novelty in the 156 patent; is that

2      correct?

3  A.  Outside of, you know, a weave pattern or

4      something like that, that is correct.

5  Q.  Is it your opinion as you sit here today that

6      there are, in fact, no points of novelty in

7      the 156 patent?

8  A.  Yes.

9  Q.  What's, in your understanding, the

10      significance of that?  If a court would agree

11      with you that the 156 patent has no point of

12      novelty at all, do you understand what that

13      would mean?

14  A.  My understanding is that -- my understanding

15      is that the conclusion would be that the

16      patent should not have been issued or that

17      it's not a valid patent.

18  Q.  Would you agree with me that if the patent

19      has no point of novelty or points of novelty,

20      that the patent has no enforceable scope?

21  A.  Yes.

22  Q.  Now, looking at Exhibit 77 --

23  A.  Yes.

24  Q.  -- let's take that to the logical extreme.

25      If we brought a product into this room that

BRET HUNTER SMITH
APRIL 28, 2008

Page 96

1    was made exactly like what's shown in the 156

2    patent and it had every feature down to

3    the tiniest detail, in fact was the model or

4    could have been the model that was used to

5    make the patent, is it your testimony that

6    such a product would not infringe the 156

7    patent?

8  A.  Could you repeat that?  I'm not quite sure

9    I'm following what you're saying.

10           MR. GARDNER:   Could you read

11       that one back?

12              (The court reporter read from

13                 the record.)

14  A.  It is my testimony that there aren't points

15    of novelty; that is, that everything that is

16    found in 156 is present in prior art.

17  Q.  So based on that, no product, no matter what

18    it looked like, in your view, could infringe

19    the 156 patent, correct?

20  A.  Based upon that, the 156 patent isn't --

21    doesn't represent -- based upon this, the 156

22    design isn't a valid patent in -- as the

23    prior art all shows all of the features that

24    are present in the 156.  I'm not the judge,

25    and I don't rule on it, but that's my --

Page 97

```
 1        those are my findings.
 2   Q.   Now, you understand, of course, that the
 3        point of novelty test is an infringement
 4        test, not an invalidity test, correct?
 5   A.   Yes.  Wait.  Say that again.  Point of
 6        novelty test.
 7   Q.   You understand, correct, that the point of
 8        novelty test is an infringement test, not an
 9        invalidity test, correct?
10   A.   Yes.
11   Q.   And you learned that from reading Chisum,
12        right?
13   A.   Yes.
14   Q.   So given that the point of novelty test is an
15        infringement test, isn't it true that if the
16        patent has no point of novelty at all --
17   A.   Yes.
18   Q.   -- no device can infringe the patent,
19        correct?
20   A.   That would be my understanding; but as I
21        stated earlier, I'm not a patent attorney.
22   Q.   Now, as I understand your reports, in the
23        first supplemental report of Exhibit 79, you
24        analyzed and addressed the points of novelty
25        that Mr. Anders raises in his report,
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 98

1       correct?

2    A.    In the supplemental report, yes.

3    Q.    Let's go through those one at a time now.

4          For example, I think on page 2, you address

5          the first point of novelty.

6    A.    Yes.

7    Q.    And the point of novelty that you recited

8          there is the points of novelty include a pet

9          home in the shape of a rectangular volume;

10         the pet home having a woven outer texture

11         with the appearance of wicker or the like;

12         the woven texture appearing on the top, on

13         the nonwindow portions of the side and rear

14         and on a nondoor portion of the front seat;

15         the woven portion of the front substantially

16         framing a nonwoven door.  Do you see that

17         language?

18   A.    Yes. I do.

19   Q.    Now, do you agree with me that there's not a

20         single reference in prior art that shows

21         those features in combination?

22   A.    That shows them in combination together?

23         There is none that I have found so far, yes.

24   Q.    And so in your report, instead of relying on

25         a single reference that shows those features,

BRET HUNTER SMITH
APRIL 28, 2008

Page 99

1        instead, you point to several features that

2        you combined to address the claimed point of

3        novelty, correct?

4    A.  Yes.  The claimed point of novelty actually

5        includes several features.  So, yes, I looked

6        at several features.

7    Q.  And in connection with this particular point

8        of novelty, which references do you find are

9        necessary to combine to meet this claimed

10       point of novelty?

11   A.  Well, the big distinction that's made between

12       the earlier claim has to do with the nonwoven

13       door.  And Figure 4 and Figure 6 show

14       nonwoven doors or doors with large nonwoven

15       areas.  And then Figures 5 and 7 both have,

16       you know, fronts that are absent weaving.

17   Q.  Well, over pages 2 and 3, it looks like you

18       identify, it looks like, about seven

19       different references.

20   A.  Yes.

21   Q.  Which of those would you combine to meet the

22       definition of the point of novelty there at

23       the top of page 2?

24   A.  Well, my point in showing seven of them was

25       to show that it wasn't an isolated, a single

BRET HUNTER SMITH
APRIL 28, 2008

Page 100

1      piece of prior art.  The rectangular

2      structures can be seen certainly in the first

3      four figures.  The rectangular structure can

4      also be seen in Figure 7.  The open door can

5      be seen in Figure 4 and in Figure 6.

6      Having a window or largely open area can be

7      seen in Figure 5.  And the framing of a front

8      open area can be seen in Figure 7.

9   Q.  What's the minimal combination that you would

10      need to refute Mr. Anders' statement of the

11      point of novelty there at the top of page 2?

12  A.  Well, I'm not sure why I would choose a

13      minimum combination if all of these things

14      are in the prior art.  I don't understand

15      your question.

16  Q.  Well, do you agree with me that the statement

17      of the points of novelty there has multiple

18      features?

19  A.  Yes.

20  Q.  How many different references do you need at

21      a minimum to -- to meet that claimed point of

22      novelty?

23  A.  Well, part of the issue is that these

24      features occur not individually, but that

25      there are multiple instances of these

Page 101

```
 1       features in the prior art.
 2    Q.  So?
 3    A.  So as somebody doing the background research
 4        on the prior art, this is what I found that
 5        applies to this.  So --
 6    Q.  Let me explain what I'm getting at here,
 7        because we're -- I'm not sure you're
 8        following me.
 9    A.  I'm not following you.  That's true.
10    Q.  If the point of novelty that's defined by
11        Mr. Anders has three features, A, B, and C --
12    A.  Yes.
13    Q.  -- all I'm asking you to do is to identify at
14        least one reference that shows A, at least
15        one reference that shows B, and at least one
16        reference that shows C.  They can all be the
17        same reference if you like.  But I'm not
18        asking you to identify two, three, or four
19        references that show feature A.  I want to
20        know the minimum number of references that
21        you would need to find all of the features in
22        the point of novelty.
23    A.  Well, Figures 1, 2, and 3 show rectangular
24        volume having a woven outer texture with the
25        appearance of wicker or the like, woven
```

Page 102

1    texture appearing on the top and nonwindow

2    portions -- nonwindow portions of the sides

3    and rear and on the nondoor portion of the

4    front.

5         Figure 4 is rectangular.  Figure 4 does

6    not appear to have windows, though we only

7    have a three-quarter view of it.  And there

8    is a framing around the door.  The door has

9    a -- is not woven.  So Figure 4 does that.

10        And -- and the Figure 6 also has a

11   nondoor portion on the front, that the woven

12   portion of the front is substantially framing

13   a nonwoven door.

14        So that's how those relate back to

15   Mr. Anders' claim.

16   Q.  So --

17   A.  And then looking at the prior art.

18   Q.  So in your view, you would use Figures 1, 2,

19       3, 4, and 6 in combination to the meet the

20       invention -- or the point of novelty --

21       excuse me -- mentioned at the top of page 2?

22   A.  In my view, I would use all of the figures I

23       used because they all relate to what was

24       claimed.  That's -- that's why they're all

25       here.

Page 103

1   Q.  Not to put too fine a point on it, we're

2       trying to figure out what's the minimum

3       number, the minimum set, of prior art

4       references that you would use to meet any --

5       any of these points of novelty.  And we're --

6       we're going to go through each one of them in

7       detail, and you can take as long as you like

8       to figure that out.

9   A.  I think that the claims that are mentioned in

10      this -- in this first claim, I would say 1,

11      2, and 4.  All of those show the points being

12      addressed by that first claim.

13   Q.  All right.  Let's go on to page 4, in which

14      you address Mr. Anders' September 22

15      supplemental report.

16   A.  Yes.

17   Q.  And you see there, there's a heading, "Point

18      1, the Extent of the Wicker;" and then what

19      follows is a paragraph description of an

20      asserted point of novelty.

21   A.  Uh-huh.

22   Q.  Which -- which prior art references, as a

23      minimum set, would you use to find that all

24      the features of this point of novelty are in

25      the prior art?

BRET HUNTER SMITH
APRIL 28, 2008

Page 104

1    A.   Well, as I said before, I wouldn't use a

2         minimum set.

3    Q.   But I'm asking --

4    A.   I would use as many as it takes.

5    Q.   I'm asking --

6              MR. HINSHAW:   Let him finish his

7         answer, please.

8    A.   Personally, as someone going back and looking

9         at this, what I would want to do is show

10        where it's occurred.   And I wouldn't do that.

11        If there were more than one example, I would

12        use more than one example.

13   Q.   I'm not interested in using more than one

14        example.

15   A.   But you asked me what I would do.   That's

16        what I would do.

17   Q.   No.   I asked you to identify a minimum set,

18        minimum number of references that would meet

19        the asserted point of novelty.

20   A.   I misheard you.   I thought you said what

21        would I do.   And I wouldn't pick a minimum

22        set.

23   Q.   Okay.

24   A.   But if you're asking is there a minimum

25        set --

Page 105

1    Q.   Yes.

2    A.   I'm not trying to quibble.  I just want to

3         make sure I'm answering the question that you

4         asked.

5    Q.   What is the minimum set or the minimum number

6         of prior art references that you could apply

7         to meet the asserted point of novelty of

8         point one shown on page 4 of Exhibit 79?

9    A.   Again, I would say -- do you want me to refer

10        to the earlier exhibits?  Because I think we

11        looked at a number of these that are

12        incorporated into the -- I would say that the

13        pigeon cage design, which was Exhibit 40 --

14        74 -- excuse me -- and Exhibit 76, the

15        Russian cage design.  I don't think we have

16        an exhibit that's the -- the cage with the

17        wire door on the front of it, but the wicker

18        cage with the wire door.

19   Q.   Is the cage with the wire door, what appears

20        to be a wire door, is that -- is that the

21        thing that you show in Figure 4 on page 2?

22   A.   Yes, that's what that is.  And the -- the

23        issue -- and I show it in the figures, but

24        the issue of the top being substantially

25        wicker.  Again, Exhibit 76 appears to show

BRET HUNTER SMITH
APRIL 28, 2008

Page 106

1      that, but also the -- what would be Figure 7

2      shows that, that the top is substantially

3      wicker as well.  Figure 7 in the supplemental

4      report, Exhibit 79.

5  Q.  Do you need Figure 7, as well, or is that --

6  A.  It's covered by Figure 4 from Exhibit 79,

7      what looks to be a cage with a wire frame.

8  Q.  So right now I think you've identified that

9      as a minimum set of prior art references to

10     meet or address the asserted point of novelty

11     of point one, you would combine Exhibit 74

12     with Exhibit 76 and Figure 4, which is on

13     page 2 of Exhibit 79; is that right?

14 A.  Yes.

15 Q.  And how would -- what features would you

16     delete from any of these references?  How

17     would you do the combination?

18 A.  Well, the front opening substantially framed

19     by wicker is Figure 4, along with the top

20     being wicker.  It's Figure 4 of Exhibit 79.

21     And both Exhibit 74 and Exhibit 76 have

22     windows that are the absence -- provided by

23     the absence of wicker.

24 Q.  Does one of these three references have a

25     front whose majority does not have wicker?

BRET HUNTER SMITH
APRIL 28, 2008

Page 107

1    A.    A front whose majority does not have wicker?

2    Q.    Yeah.

3    A.    76 has a front whose majority does not have

4          wicker.

5    Q.    And your testimony is that most of the front

6          of Exhibit 76 is not wicker?

7    A.    Yes.  It's a -- yes.  And, again, one of the

8          reasons that I provide lots of examples of

9          the prior art is, you know, that's probably

10         more clearly demonstrated.  And I'm looking

11         to see if I referred to it earlier in what's

12         Figure 7.  It's a front that's absent wicker,

13         largely absent wicker.

14   Q.    Would you rather use a different reference

15         than Exhibit 76?

16   A.    I think Exhibit 7 would also work there, yes,

17         sir.

18               MR. HINSHAW:  Do you mean

19            Figure 7 or Exhibit 7?

20               THE WITNESS:  Figure 7.  Excuse

21            me.

22   A.    Figure 7 from Exhibit 79.

23   Q.    So you're going to strike Exhibit 76 and in

24         its place use Figure 7?

25   A.    That would probably be a clearer distinction.

BRET HUNTER SMITH
APRIL 28, 2008

Page 108

1   Q.   Figure 7 is found on page 3 of Exhibit 79,

2        correct?

3   A.   Yes.

4   Q.   All right.  So now the new lineup is Exhibit

5        74, Figure 7, and Figure 4 from the

6        supplemental report, right?

7   A.   Yes.

8   Q.   Are you going to use -- well, are you going

9        to use one of these three figures as the

10       starting point and then take features from

11       the other two and modify that starting point

12       to come up with a point -- the asserted point

13       of novelty?  And if so, which one?

14  A.   No.  I mean that's why I've broken it down in

15       the illustrations.

16  Q.   Is it your testimony that it would not be

17       appropriate to do it that way?

18  A.   It's my testimony that that's not the way I

19       would do it.

20  Q.   Well, how would you do it?

21  A.   The way that I did it in the report.

22  Q.   Well, now we're talking about -- we've

23       narrowed it down to we're going to use these

24       three references.

25  A.   Right.  I would show the features and the

Page 109

1    relationship between them for each of the

2    references that we've talked about.

3  Q.  Well, explain to me how these three

4    references, Exhibit 74, Figure 7, and Figure

5    4, show the asserted features of the point of

6    novelty.

7  A.  Well, as I explained, the -- what I'll call

8    the bird cage, which is Figure 4 on page 2 of

9    Exhibit 79, shows the substantially wicker

10    top, the wicker front, sides, back, the front

11    framed by having an open front door with a

12    nondoor portion substantially having wicker;

13    the -- the poultry cage, which is Figure 7 on

14    page 3, I believe, yes, of Exhibit 79 again

15    reflects an open area in front that's

16    substantially framed by wicker and has the

17    wicker top and sides and back that are

18    wicker.  And Exhibit 74 has wicker that's

19    rectangular volume, having top sides, rear

20    and front.  It has window and nonwindow

21    portions.

22        And that's how I would make the

23    connections.

24  Q.  Well, how -- which of those three references,

25    if any, show a front that has a door and a

BRET HUNTER SMITH
APRIL 28, 2008

Page 110

1       nondoor portion of the front which has its

2       outer surface substantially having wicker?

3    A.    A door and nondoor portion -- let's see.

4       Door and nondoor portion of the front has an

5       outer surface substantially having wicker.

6       That would be the Figure 4 on page 2 of

7       Exhibit 79.

8    Q.    All right.  So to kind of sum up, in your

9       testimony, it would require three references

10       to -- to address or meet or find all of the

11       features of the asserted point one of the

12       points of novelty, correct?

13            MR. HINSHAW:   Objection to form,

14          foundation.

15    A.    Would you repeat the question, please?

16    Q.    So according to your testimony, it would take

17       at least three references in combination in

18       some fashion to meet or address the asserted

19       point of novelty in point one, correct?

20    A.    Yes.

21            MR. HINSHAW:   Art, it's 2:50.

22          We've been going for quite some time.

23          Are you at a break point?

24            MR. GARDNER:   Sure.   That's

25          fine.

Page 111

```
 1                    (Brief recess)
 2    Q.   Now, we've -- Mr. Smith, we've just gone
 3         through an examination of point one of the
 4         asserted points of novelty that Mr. Anders
 5         submitted in his September 22 supplemental
 6         report.  And I'm going to move on to point
 7         two, which I believe you addressed later in
 8         your supplemental report, at page 8 of
 9         Exhibit 79.
10    A.   Yes.
11    Q.   And you see there at the top of page 8,
12         there's the asserted second point of novelty,
13         being a pet home with a rectangular volume,
14         having a rectangular front, the front
15         including a see-through door that is
16         substantially framed by wicker.
17    A.   Yes.
18    Q.   How many references do you need at a minimum
19         to find this -- this asserted point of
20         novelty in the prior art?
21    A.   Figure 13, which is the same as -- Figure 13
22         on page 8, which is the same as Figure 4 on
23         page 2, has the rectangular volume or
24         rectangular front, the front including a
25         rectangular see-through door.  As I said
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 112

1       before, in doing the research, you know, all

2       of the examples in Figure 14 also have

3       rectangular see-through doors.

4   Q.  Is Figure 13, which is shown there on page 8,

5       which you also referred to as on a different

6       figure number in connection with your earlier

7       examination --

8   A.  Right.

9   Q.  -- does Figure 13 show a product with an

10      arched or curved top?

11  A.  It looks like there's a slight curve to it.

12      It's a little hard to tell from the angle of

13      the photograph.

14  Q.  But do you believe it has an arched top?

15  A.  I think it's difficult to tell from the

16      photograph.

17  Q.  Well, do you need -- do you need another

18      prior art reference to combine with this

19      reference in order to find the -- the

20      rectangular volume as asserted in point two

21      of the asserted point of novelty?

22  A.  Well, as I said before, one of the reasons

23      that -- for example, Figure 14 shows a number

24      of rectangular volumes with doors, a

25      rectangular front and a see-through door;

BRET HUNTER SMITH
APRIL 28, 2008

Page 113

1       but -- so, again, I mean, part of my approach

2       to this was to show what I found as prior

3       art, not to show a minimum set of prior art.

4    Q.  Well, here this afternoon we're trying to

5       find out what's the minimum set, minimum

6       number, minimum collection of prior art

7       references that would be necessary to meet

8       the asserted points of novelty.  So with

9       regard to point two, is it your testimony

10      that you can meet that point of novelty with

11      one, or do you need two prior art references

12      to do so?

13   A.  The -- I would include something from Figure

14      14 just in case there's a question about

15      his -- is that an arched top or not from

16      Figure 13.

17   Q.  So if I understand your testimony, in order

18      to meet the asserted point two of the points

19      of novelty raised by Mr. Anders in his

20      September 22 report, you would combine

21      Figure 13 shown on page 8 with one of the

22      rectangular volumes shown in Figure 14 on

23      page 9 of your supplemental report of

24      Exhibit 79, correct?

25   A.  Yes.

BRET HUNTER SMITH
APRIL 28, 2008

Page 114

1    Q.    All right.  Let's go to page 10 of Exhibit 79

2          and let's -- the same inquiry with regard to

3          the asserted third point of novelty, point

4          three at the top of page 10, which is labeled

5          Distinct Panels.  And there I believe you

6          recited Mr. Anders' point of novelty being a

7          pet home with a rectangular volume, the pet

8          home having the appearance of being formed

9          from distinct individual panels having wicker

10         outer surfaces.  And I'll ask you in

11         connection with this point of novelty how

12         many reference would you need at a minimum to

13         meet this point of novelty

14              MR. HINSHAW:  I do have a

15              clarification question.  You directed

16              him to this report.  Are you asking

17              him to exclude the Mo patent that he

18              has?

19              MR. GARDNER:  No.  He can use

20              the Mo patent if that would be

21              helpful to him.  Thank you.

22   Q.   So I'll ask the question again.  In

23        connection with the third point of novelty

24        asserted by Mr. Anders in his September 22

25        report as recited at the top of page 10 of

Page 115

1       Exhibit 79, what's the minimum collection of

2       prior art references that you would need to

3       meet that point of novelty?

4                   (Brief pause)

5   A.  Well, I would say that Figure 18 is a pet

6       home of a rectangular volume, and the Mo

7       patent or 326 or 915 shows the wicker panels

8       having wicker outer surfaces.  But actually,

9       if you turn -- if you turn patent 326 or 915

10      upside down, essentially, you have, you know,

11      a wicker covered frame.  Again, you know, my

12      approach would be to show all the prior art

13      that I found that relates.

14  Q.  But how many references -- which references

15      are you going to use, Mr. Smith?

16              MR. HINSHAW:  I'm going to

17          object to the form of the question.

18  A.  As I said before, I would use all the

19      references.  That's why I put them in there,

20      because they all relate to the claim that's

21      being made.  They're all prior art pieces

22      that relate to the claim that's being made,

23      as I explain in the text.

24  Q.  Well, if you would, humor me and tell me

25      which references you would use as a minimum

Page 116

1          to meet the asserted third point of novelty

2          at the top of page 10.

3     A.   Well, again, I wouldn't use a minimum; but

4          Figure 18, which is the 812 patent, and

5          Figure -- the 326 patent from Figure 17.

6     Q.   So you would combine the 326 patent from

7          Figure 17 with the draw -- with Figure 18?

8          Is that -- is that what you would do?

9     A.   Well, the actual wording here -- well, yes.

10    Q.   Is the 326 patent a pet home?

11    A.   No, it is not.

12    Q.   Does Figure 18 depict a pet home?

13    A.   Yes.

14    Q.   So in connection with this third asserted

15         point of novelty, it is your testimony that

16         you would require at least two references,

17         correct?

18    A.   Yes.  I would use all the references I have,

19         yes.

20    Q.   Let's look at page 13 of your supplemental

21         report of Exhibit 79.

22    A.   Yes.

23    Q.   And you'll see at the top of the page,

24         there's a recitation of the fourth asserted

25         point of novelty that was asserted by

Page 117

1   Mr. Anders in his September 22 report,

2   correct?

3 A. Yes.

4 Q. And that fourth asserted point of novelty

5   being a pet home with a rectangular volume

6   and having a front, sides, a rear and a top;

7   the pet home further having a rectangular

8   window positioned in the upper half of each

9   side and in the upper half of the rear, the

10   nonwindow portions of the side and rear

11   having outer surfaces with wicker such that

12   the rectangular windows are surrounded by

13   wicker on all sides.  Do you see that?

14 A. Yes.

15 Q. At a minimum, which references would you

16   combine to meet that asserted point of

17   novelty?

18 A. Well, the Figure 26, the pigeon cage.

19 Q. Is it your testimony that Figure 26 shows all

20   of the features?

21 A. Yes.  But, again, I would put all the figures

22   because part of the issue is prior art.

23 Q. Are the windows of the Figure 26, which is

24   the Bridge patent number 26,728, are those

25   windows surrounded on all sides by wicker?

Page 118

1    A.   Yes.

2    Q.   How -- how so?

3    A.   At each edge, there's wicker.

4    Q.   Oh, you mean that the corner -- at the

5         corner?

6    A.   Yes.

7    Q.   Okay.  Does that patent show the other two

8         faces, the rear and -- rear side and the

9         other side?

10   A.   No.

11   Q.   Do you know whether the windows are formed in

12        or on the other two faces?

13   A.   Not from this illustration, no.

14   Q.   Does that fact make you want to combine this

15        reference with another reference to meet the

16        asserted point of novelty?

17   A.   Well, before doing that, I would want to go

18        back and read the claims on -- on the pigeon

19        patent.

20   Q.   Do you mean look at the rest of the drawings?

21   A.   No.  Well, the drawings in the claims; but I

22        mean, clearly, Figure 28 also does show

23        windows all around.  They're above the half

24        point.

25   Q.   So, in your view, does the Bridge patent

Page 119

1          number 26,728, which is shown in Figure 26,

2          by itself show all of the features of the

3          asserted?

4     A.   This drawing does not, no.  This drawing,

5          together with patent 065, which is in Figure

6          28, does.

7     Q.   Let's look at page 15.

8     A.   Okay.

9     Q.   Which is the fifth point of novelty asserted

10         by Mr. Anders in his September 22 report,

11         being a pet home with a rectangular volume,

12         having wicker outer surfaces over a majority

13         of the pet home, the pet home having the

14         appearance of being formed from individual

15         panels, the panels being configured such that

16         each panel extends substantially to the edge

17         of the adjacent panels, but no panel extends

18         beyond the adjacent panels.

19              How many prior art references would you

20         need at a minimum to meet this asserted point

21         of novelty?

22              MR. HINSHAW:  Again, for

23              clarification, are you including the

24              Mo patent in the question?

25              MR. GARDNER:  Sure.

BRET HUNTER SMITH
APRIL 28, 2008

Page 120

1   A.   Well, I mean patent 326 or the Mo patent,

2        both, if you turn them upside down, meet the

3        description of the edges and the wicker.

4   Q.   Would the 326 patent, if turned upside down,

5        would that be a pet home, in your view?

6   A.   I think it demonstrates prior art for that

7        kind of configuration for a pet home, yes.

8   Q.   But it -- are you aware of anybody selling

9        boxes like this as pet homes that have

10       neither windows nor doors?

11  A.   No.

12  Q.   So isn't it accurate to say that the 326

13       patent, whether the structure of it as shown

14       in the patent or shown upside down, is not a

15       pet home?  Correct?

16  A.   It's not a pet home, that is correct.

17  Q.   So is there another prior art reference that

18       you would combine with the teachings of the

19       326 patent to achieve the asserted point of

20       novelty of point five?

21  A.   Well, Figure 32.

22  Q.   So you would agree with me that in connection

23       with this fifth asserted point of novelty, it

24       requires two references to meet the asserted

25       point of novelty, correct?

BRET HUNTER SMITH
APRIL 28, 2008

Page 121

1    A.    Yes.

2    Q.    Let's look at page 17 of your supplemental

3          report, Exhibit 79.  And at this page,

4          there's a discussion of the sixth point of

5          novelty, being a combination of the first

6          five points.

7    A.    Yes.

8    Q.    How many points of novelty -- scratch that.

9                How many prior art references are you

10         relying on in your report here to meet the

11         asserted sixth point of novelty, being a

12         combination of the first five points?

13   A.    Well, all of the points that -- the majority

14         of the points that have been asserted are

15         combinations of points.  And if you're asking

16         me -- I -- you know, Figure 35 shows prior

17         art, all of which deal with the points being

18         asserted in paragraphs three through seven.

19   Q.    Well, it looks like you're using seven or

20         eight prior art references.  Could -- could

21         you meet the same point of novelty, being

22         this combination point of novelty, with fewer

23         than the seven or eight references?

24   A.    Again, I see no reason why I would do that.

25         These are all prior art; and they all speak

Page 122

```
 1        to the points that are being grouped together

 2        in claim number six, which is basically a

 3        combination of the points in paragraphs three

 4        through seven.

 5   Q.   Well, could you eliminate one or two of these

 6        and -- these prior art references from the

 7        discussion and still meet the claimed point

 8        of novelty of point six, being the

 9        combination of the prior five points of

10        novelty?

11   A.   I -- I would use all of the points.

12   Q.   Is it your testimony that all of the prior

13        art references are required to meet that

14        point of novelty?

15   A.   It's my testimony that all of the points that

16        are shown in Figure 35 demonstrate prior art

17        for the 156 patent and for the points that

18        are raised by Mr. Roberts.

19   Q.   Mr. Anders?

20   A.   Mr. Anderson.  Excuse me.

21   Q.   It's Mr. Anders.

22   A.   Anders.  That's a typo, I guess.

23   Q.   I'm sorry to belabor the point; but for the

24        moment, I'm not particularly interested in

25        whether you think that your approach was the
```

Page 123

1   correct approach or not.  What I want to find

2   out again is at this moment, what do you

3   think is the minimum collection of prior art

4   that would be required to meet the asserted

5   sixth point of novelty.

6                 (Brief pause)

7   A.   I would say either the Russian bird cage or

8        the -- what I guess I will call the elephant

9        cart.  Either one of those could go, but I

10       would keep the rest.

11  Q.   So how many would that leave you with?

12  A.   Six.

13  Q.   So it would take at least six prior art

14       references to meet the asserted --

15  A.   The combination of claims asserted in point

16       six?

17  Q.   Yes.

18  A.   Yes.

19  Q.   Now looking at the report, your first

20       report --

21  A.   Yes.

22  Q.   -- of Exhibit 78.

23  A.   Yes.

24  Q.   Some 33 pages or so, correct?

25  A.   Yes.

BRET HUNTER SMITH
APRIL 28, 2008

Page 124

1   Q.  Did anyone other than you write any of the

2       words or prepare any of the figures --

3   A.  No.

4   Q.  -- that are mentioned in this report?

5   A.  I'm sorry.  No.

6   Q.  So this is 100 percent your work product,

7       correct?

8   A.  Yes.

9   Q.  Did you receive -- or prior to issuing this

10      report, what kind of contacts did you have

11      with Mr. Hinshaw or anyone else concerning

12      the drafting of the report?

13   A.  I believe there was a phone call at the

14      beginning and maybe one or two phone calls to

15      touch base before the draft, and I read the

16      material that he sent.  And that was it.

17   Q.  Did you do anything to investigate whether

18      additional materials were required?

19   A.  You mean did I search for additional

20      materials?

21   Q.  Yes.

22   A.  Yes.

23   Q.  Okay.  What kind of additional materials did

24      you search for?

25   A.  Well, I looked at -- I looked at cages.  I

Page 125

1      looked at wicker construction and rattan

2      construction.  Woven construction, I guess we

3      could call it.  As I mentioned before, I

4      spent some time over at the -- the vet school

5      library.  I did -- did some research online.

6      The majority of it was book stuff.

7  Q.  Now, the report was drafted August 17th -- or

8      it's dated August 17th --

9  A.  August 17th.

10 Q.  -- 2007.  Is that when the report was

11     completed?

12 A.  That's when this report was completed, I

13     believe, yes.

14 Q.  And if you'll -- if you will, go to page 1,

15     under the section that's titled --

16 A.  Which one?

17 Q.  Page 1.

18 A.  Yes.

19 Q.  It's --

20 A.  Yes.

21 Q.  -- numbered page 1.

22 A.  Numbered page 1, yes.

23 Q.  Of Exhibit 78.  And if you would, read the

24     paragraph out loud that says "Patent Review"?

25 A.  Patent Review.  I'm reviewing U.S. patent

BRET HUNTER SMITH
APRIL 28, 2008

Page 126

1       D8 -- 483, 156.  I've reviewed the patent

2       document, patents listed as prior art within

3       the 156 document, additional patent

4       documents, online resources -- I'm sorry --

5       books on weaving, basketry, and furniture,

6       relevant sections of Chisum On Patents,

7       assembled and photographed the Bay Isle cage,

8       and spoke with those knowledgeable about

9       animal behavior.  A complete collection of

10      these references is provided in the appendix.

11  Q.  Were there other materials that you looked at

12      as part of your review besides what's listed

13      there in that paragraph?

14  A.  Not that I recall.

15  Q.  Now, when you -- it says there that you

16      reviewed relevant sections of Chisum On

17      Patents, correct?

18  A.  Yes.

19  Q.  Did you -- someone gave you a copy of

20      relevant sections of Chisum On Patents?

21  A.  Yes.  Yes.

22  Q.  But you didn't have -- scratch that.

23      Did you do anything to study patent law

24      besides reading those relevant sections of

25      Chisum On Patents?

BRET HUNTER SMITH
APRIL 28, 2008

Page 127

 1   A.   No.

 2   Q.   Did you have any discussions with anyone

 3        about how design patent law worked prior to

 4        putting together this written report?

 5   A.   Mr. Hinshaw and I -- I had some general

 6        discussions about it during the preliminary

 7        phone calls, and that's -- that's it.

 8   Q.   How extensive were those discussions

 9        regarding design patent law?

10   A.   I'd say -- I don't recall the length.  Less

11        than -- less than 30 minutes, I would think.

12   Q.   Less than 30 minutes each or less than 30

13        minutes total?

14   A.   I'm trying to think.  Total?  Maybe total

15        time throughout this, probably about an hour.

16   Q.   Now, prior to issuing this report on August

17        the 17th, 2007 --

18   A.   Yes.

19   Q.   -- did you have occasion to speak with anyone

20        in person about design patent law?

21   A.   No.

22   Q.   So outside of your review of Chisum On

23        Patents and the one hour or so discussions

24        that you had with Mr. Hinshaw regarding

25        design patent law, did you have any other

BRET HUNTER SMITH
APRIL 28, 2008

Page 128

1      information that you received regarding
2      design patent law prior to putting together
3      this report?
4  A.  Not that I recall.  A copy of the KSR, I
5      think, maybe.  No.  That would have been in
6      the second report, so no.  Oh, it's in this
7      one.  So yes, KSR.
8  Q.  You're referring to the report of Exhibit 78?
9  A.  Yes.
10 Q.  And what page are you looking at now,
11     Mr. Smith?
12 A.  I'm looking at page 17.
13 Q.  And so there at the top of page 17, there's a
14     beginning of a discussion about a court case
15     from the Supreme Court styled as KSR
16     International Company versus Teleflex, Inc.
17 A.  Yes.
18 Q.  Had you read the KSR opinion as of the time
19     of the drafting of this report?
20 A.  I read the material relative to it that I
21     received from Mr. Hinshaw, and I would have
22     to look at the appendices material to tell
23     you exactly what that was, but it's all
24     material that was included in the appendices
25     that were furnished with this report.

BRET HUNTER SMITH
APRIL 28, 2008

Page 129

1           MR. GARDNER:  Off the record.

2                (Off-the-record discussion)

3           MR. GARDNER:  Let's go back on

4      the record.

5    Q.  Mr. Smith, I'm going to pass you what's been

6        produced to us as a copy of your appendix, or

7        appendices.

8    A.  Yes.

9    Q.  And I believe what's shown on the first page

10       of this four-inch or five-inch stack of paper

11       is kind of an overall table of contents of

12       your appendix, or appendices.

13   A.  It's what is on -- it's actually Appendix

14       Part 1, then the context -- contents of

15       Appendix Part 1; Appendix Part 2, then has

16       the contents of that volume -- what was

17       originally that volume; and then there should

18       be --

19           MR. HINSHAW:  Are you looking

20       for a third appendix?

21   Q.  I think it's the green.  That's the break

22       point.

23   A.  And then there's Appendix Part 3, which has

24       Mr. Anders' patent analysis.

25           MR. GARDNER:  Off the record.

Page 130

```
 1                    (Off-the-record discussion)

 2                    (Exhibit 81 was marked for

 3                       identification.)

 4   Q.   All right.  As much as I hate to do it, we're

 5        going to make Appendix Part 2 an exhibit.

 6        With some effort, we are passing you what's

 7        now been marked as Exhibit --

 8   A.   81.

 9   Q.   -- 81.

10   A.   Okay.

11   Q.   And ask if you recognize this.

12   A.   Yes.

13   Q.   Is this one of the appendices to your initial

14        report of August 17th, 2007?

15   A.   Yes, it is.

16   Q.   Now, if you would, after the first page,

17        which is like a title or a table of contents

18        page, there appears to be a printout of a

19        court case from Westlaw.

20   A.   Yes.

21   Q.   Do you see that there?

22   A.   Yes.

23   Q.   Entitled KSR.  Is that the -- is this the

24        form --

25   A.   Yes.
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 131

1    Q.   -- of this court case that you saw?

2    A.   Yes.

3    Q.   And after the court case, there appear to be

4         photocopied excerpts from treatises; in

5         particular, the Chisum On Patents treatise.

6         Do you see that?

7    A.   Yes.

8    Q.   Is this in the form that you got it, or did

9         you make notes on it?

10   A.   This is -- this is it.  This is it.

11   Q.   If you would, look at page 23-65 in the

12        Chisum section.

13             MR. HINSHAW:  I'm sorry.  What

14        was the reference?

15             MR. GARDNER:  23-65,

16        Mr. Hinshaw.

17   Q.   Do you see at page 23-65 where someone has

18        written by hand the words "sub parts."  Is

19        that your handwriting?

20   A.   Yes, that looks to be my handwriting.

21   Q.   And that wasn't on there when you got it,

22        correct?

23   A.   I do -- do not recall it being on there when

24        I got it.

25   Q.   What did you mean by "sub parts" when you

BRET HUNTER SMITH
APRIL 28, 2008

Page 132

1       wrote that?

2    A.  Well, it's divided into -- my understanding

3        of the structure of it was that it's -- the

4        six, which is not obvious, has been divided

5        into subparts that are alphabetically

6        labeled.  So there's a subpart A and a

7        subpart B, C, D.

8    Q.  If you would, flip back in the other

9        direction to page 23-47.

10   A.  23-47?  Oh.  I was almost there with the

11       first flip.

12   Q.  Do you see the little arrow that's been

13       added?

14   A.  Yes.

15   Q.  Did you add that arrow?

16   A.  I believe I did.

17   Q.  Why did you add the arrow?

18   A.  Just to make sure that I went back and looked

19       carefully at this portion.

20   Q.  Were you asked to look at whether the

21       invention claimed in the 156 patent is

22       invalid -- strike that.

23           Were you asked to look at whether the

24       156 patent is invalid?

25   A.  No.  We had discussions about -- you know,

BRET HUNTER SMITH
APRIL 28, 2008

Page 133

1      in -- in the discussion, you know, there was

2      a discussion about novelty and the ordinary

3      observer; but the arrow was for me, to remind

4      me to go back and look through that very

5      carefully.

6   Q.  Am I correct that the arrow is there because

7      it involved the word "novelty"?

8   A.  Because it was at the start of a section and

9      I wanted to make sure that I read through

10     very carefully.  In other words, it was a

11     kind of a note to self, make sure you read

12     through this very carefully.  This is a lot

13     of material; and, as I mentioned at the

14     beginning when you asked me, this is the

15     first design patent case.  So I wanted to

16     make sure I was as thorough as I could be.

17  Q.  Let me see if I understand correctly.  When

18     you were first engaged to do this report,

19     were you asked only to look at the

20     infringement question and not the invalidity

21     question?

22  A.  No.  I was -- there is, in fact, a letter

23     that's also part of one of the appendices --

24     it's in the correspondence -- that lays out a

25     specific list of things that -- questions I

BRET HUNTER SMITH
APRIL 28, 2008

Page 134

1          need to make sure that I have looked at and

2          addressed.  And so I went through that list.

3     Q.   All right.  If you would, flip now to page

4          23-101.

5     A.   Yes.

6     Q.   You see there someone has written in the word

7          "obvious" and then underlined it?

8     A.   Yes.

9     Q.   Is that your writing?

10    A.   I honestly can't tell you.  That does not

11         look like my V, but the S looks similar.  I

12         don't remember.

13    Q.   Does this portion of Chisum look familiar?

14         Do you remember studying this portion?

15    A.   I read through all of -- I read through all

16         of Chisum, but it's -- it's a lot of material

17         to go through.  So I know I read it.  And

18         that's all I can say with certainty.

19    Q.   Well, do you --

20    A.   I would expect that I read it several times.

21    Q.   Well, are you aware that this portion of

22         Chisum on this page and the preceding page

23         has to do with the need for applying a

24         primary reference and then perhaps applying

25         secondary references to modify the primary

BRET HUNTER SMITH
APRIL 28, 2008

Page 135

1        reference?

2   A.   Yes.

3   Q.   And did you, in fact, read the passages in

4        Chisum that talk about primary references and

5        secondary references?

6   A.   I'm sure I did.

7   Q.   But your testimony earlier was correct; you

8        don't know what a primary reference is,

9        right?

10  A.   I'm not an attorney.  So when I had a

11       question about something, I would return to

12       this and under -- make sure that I felt I

13       understood it.  Occasionally, I would ask a

14       question of Mr. Hinshaw to check my

15       understanding.  And that's how I proceeded.

16  Q.   How much time do you think you spent studying

17       Chisum?

18  A.   I don't recall.

19  Q.   Well, do you think it was a handful of hours,

20       a half a week, a week?

21  A.   Certainly not a week; but I know I read it

22       several times, at least twice clear through

23       and then returned to individual passages on

24       other occasions.

25  Q.   Well, it looks like it's a couple hundred

BRET HUNTER SMITH
APRIL 28, 2008

Page 136

1       pages of material.  How long would that take
2       you to read?
3    A.  At least four or five hours, I would think.
4    Q.  So you think you may have spent more than ten
5       hours or so studying Chisum?
6    A.  Yeah.  I would say probably more than ten
7       hours, less than 40 hours.
8    Q.  Are you familiar with a case Gorham v. White?
9    A.  I remember reading about it.
10   Q.  When was the first time you read about it?
11   A.  When I read the Chisum material.  I believe
12      it was around that time.
13   Q.  Did you -- prior to issuing your report of
14      August 17th, 2007, which is Exhibit 78 --
15   A.  Yes.
16   Q.  -- did you actually read the Gorham v. White
17      case itself?
18   A.  I believe so.  I don't recall specifically,
19      but I believe so, yes.
20   Q.  Why do you believe so?
21   A.  Well, I read through all of this material
22      prior to the first report.
23   Q.  Well, you would agree with me that the Chisum
24      materials that you were sent refer to
25      hundreds and hundreds of cases, correct?

Page 137

1    A.    Yes.

2    Q.    You didn't read all those individual cases,

3          did you?

4    A.    I read through -- I read through --

5    Q.    You read Chisum.  You didn't read the cases.

6    A.    No, no, no.  No.  No.  I did not go get, you

7          know, books out of the law library and read

8          the cases individually, no.

9    Q.    So --

10   A.    I read Chisum.

11   Q.    Correct.  So did you -- prior to issuing your

12         report of August 17, 2007, did you actually

13         read the Gorham v. White case itself separate

14         from what might be said about it in Chisum?

15   A.    I don't believe so.  If I did, that would be

16         in one of the appendices.  I don't believe it

17         is, but I -- that's as accurate an answer as

18         I can give you.  I don't recall.

19   Q.    Well, you believe that if you had read it

20         prior to issuing the report, that it would

21         have been included in the appendices or

22         mentioned in the report as one of the

23         materials that you reviewed, correct?

24   A.    Yes.  Yes.

25   Q.    So if it's not mentioned in the report or --

Page 138

1   A.   I did not put it in the appendices.

2   Q.   -- the appendices, you probably didn't review

3        it?

4   A.   No.  As you can see, I tried to include

5        everything in the appendices so that it was

6        all there.

7   Q.   Let's talk about the Gorham case for a minute

8        because -- first of all, do you understand

9        that Gorham v. White is still good law and

10        still controlling in the area of design

11        patent infringement?

12             MR. HINSHAW:  Object to form,

13        foundation.

14   A.   I'm not a patent attorney, so I can't -- I

15        can't answer, to be honest.  I've read it.

16   Q.   Is it your understanding that Gorham v. White

17        sets out a test for infringement that's

18        important to follow in determining whether

19        there's infringement of a design patent?

20   A.   It's my understanding it sets forth a test

21        for infringement, yes.

22   Q.   Do you recall the -- in the Gorham case, the

23        nature of the question that was presented to

24        the Supreme Court in terms of what was

25        accused of infringement?

Page 139

1   A.   I don't recall the specifics of it.

2                    (Exhibit 82 was marked for

3                        identification.)

4   Q.   I pass you what's been marked as Exhibit 82

5        and ask you if you've ever seen those figures

6        before.

7   A.   Yes.

8   Q.   What are they?

9   A.   They are the ends of utensils, silverware.

10  Q.   Do they have any relation to the Gorham v.

11       White case?

12  A.   I believe so.  I believe this was mentioned

13       in Anders.  I mean, this figure appeared in

14       Anders' discussion of the 321 patent.

15  Q.   What -- would you agree with the statement

16       that the Gorham v. White case stands for the

17       proposition that it's the overall appearance

18       of the object that's important, particularly

19       in the eyes of an ordinary observer, and that

20       fine details that can be observed and

21       discerned by experts in the field are less

22       important?

23  A.   I would agree that Gorham deals with the eyes

24       of an ordinary observer and, in this

25       particular case that -- I would agree that

BRET HUNTER SMITH
APRIL 28, 2008

Page 140

1         it's the eyes of an ordinary observer.

2    Q.   Well, are you aware that in the Gorham case,

3         there the defendant presented testimony from

4         experts in the field who identified numerous

5         fine details, differences between the accused

6         product and the patented product?

7    A.   As I said, I don't think I have read the full

8         Gorham case.  I don't believe that I have.

9         Or if I have, I don't recall having read the

10        entire case.

11   Q.   Well, when is the first time that you saw

12        the illustration that is before you in

13        Exhibit 82 of the various flatware patterns?

14   A.   I don't recall.  I do recall seeing it

15        as part of the Anders material; but I don't

16        recall, beyond that, if I had seen it prior

17        to that or not.

18   Q.   If I understand your testimony, you're not

19        sure that you've ever read the whole Gorham

20        opinion; is that correct?

21   A.   I don't recall, yes.

22   Q.   And you're not sure if you've seen the

23        flatware images in the Gorham opinion,

24        correct?

25   A.   I don't recall the first time that I saw

BRET HUNTER SMITH
APRIL 28, 2008

Page 141

```
 1        this.
 2   Q.   Well, do you have a specific recollection
 3        today of having seen the Gorham images in the
 4        Gorham decision?
 5   A.   I -- I believe that they are part of the --
 6        of Mr. Anders' discussion of the 321 patent.
 7             MR. GARDNER:  Let's take a real
 8             quick break so I can get reorganized
 9             before we go on to a new topic.
10             (Off-the-record discussion)
11             (Brief recess)
12   Q.   What kinds of things did you do to get ready
13        for today's deposition, Mr. Smith?
14   A.   I read through my reports for the 156 and the
15        321, and I met with Mr. Hinshaw just for a
16        couple of hours on Saturday and maybe an
17        hour -- I don't know if it was two hours or
18        not on Sunday.
19   Q.   How much time would you say that you spent in
20        the last week or so getting ready for this
21        deposition?
22   A.   Probably about -- somewhere between 12 and 15
23        hours.  It's been a busy week.
24   Q.   Referring you again to Exhibit 82, during the
25        break, did you discuss this exhibit or the
```

Page 142

1          Gorham v. White case with Mr. Hinshaw?

2     A.   No.

3     Q.   Now, if the design on the far left of Exhibit

4          82 were a design patent, would the design

5          shown in the middle constitute infringement?

6               MR. HINSHAW:  Objection, form

7               and foundation.

8     A.   I would want to read back through the

9          arguments and have a context for making a

10         statement about it.

11    Q.   Well, in your view as an industrial designer,

12         does this -- the middle design look

13         substantially like the design on the far

14         left?

15    A.   The middle design most closely resembles the

16         design on the right.

17    Q.   Do you think somebody buying flatware would

18         be likely to confuse the middle design with

19         the one on the left?

20              MR. HINSHAW:  Objection, form

21              and foundation.

22    A.   As I said, I want to do the reading and the

23         background before making a statement one way

24         or the other.  And that would include looking

25         at other patterns available at the time and

BRET HUNTER SMITH
APRIL 28, 2008

Page 143

1          things of that nature.

2     Q.   So is your answer you don't know?

3     A.   I don't know.

4     Q.   Let's look at page 16 of your report --

5     A.   Okay.

6     Q.   -- identified as Exhibit 78.

7     A.   Okay.   Page 16?

8     Q.   Yes, please.   If you would read the first

9          paragraph out loud, please.

10    A.   Three pieces of art anticipate patent 156.

11         See Figures 18, 36, and 37.   My evaluation of

12         designs that anticipate 156 is based upon

13         Chisum section 23-03, Bracket 5, which notes

14         that design anticipation requires a showing

15         that a single prior art reference is

16         identical in all material aspects to the

17         claimed invention.

18    Q.   Isn't it true that this passage here

19         comprises a statement that the design in

20         Exhibit 75 is identical in all material

21         respects to the invention claimed in the 156

22         patent?

23    A.   Could you -- could you state that again?

24    Q.   Isn't it true that that paragraph you just

25         read --

BRET HUNTER SMITH
APRIL 28, 2008

Page 144

1   A.   Yes.

2   Q.   -- indicates that the design shown in

3        Exhibit 75 is identical in all material

4        respects and, therefore, anticipates the

5        design of the 156 patent?

6   A.   Based upon the material feature that

7        Mr. Anders claimed, yes.

8   Q.   And didn't you state also that the design

9        that's now shown in Exhibit 76 anticipates

10       the 156 patent?

11  A.   Again, based on the distinguishing feature

12       that Mr. Anders identified, yes.

13  Q.   And you also indicated that the design that's

14       shown in Exhibit 74 anticipates the 156

15       patent, correct?

16  A.   Yes.  And again based on Mr. Anders' feature,

17       yes.

18  Q.   Is it true that for a design patent to be

19       anticipated, there must be a showing that a

20       single prior art reference is identical in

21       all material respects to the claimed

22       invention?

23  A.   That's my understanding.

24  Q.   If you would, read the third paragraph on

25       that page out loud, the one that starts,

Page 145

1          Accordingly.

2     A.   Accordingly, the prior art clearly

3          demonstrates the features Simpson Ventures

4          now claims as novel.  Moreover, under the

5          Gorham Test, an ordinary observer would view

6          the overall designs as substantially the

7          same.

8     Q.   Which -- which designs were you referring to

9          there?  Were you referring to the designs on

10         74, 75, and 76?

11    A.   Yes.  Based on the material feature that

12         Mr. Anders identified, yes.

13    Q.   Is it true that those designs are

14         substantially the same under the Gorham Test

15         as what is shown in the 156 patent?

16    A.   Again, in light of the material feature

17         that's claimed to distinguish, yes.

18    Q.   Does the Gorham Test apply to a point of

19         novelty or the entire design shown in the

20         drawings of a patent?

21    A.   I'm sorry.  Could you -- could you state that

22         again?

23    Q.   Does the Gorham Test apply to a point of

24         novelty, or does it apply to the entire

25         design shown in the drawings of a design

Page 146

1           patent?

2    A.    My understanding is that the Gorham Test is

3           the ordinary observer test and that it

4           applies to the totality.

5    Q.    So if by this language in the third

6           paragraph, do you mean that under the

7           Gorham -- that you were -- if you mean by

8           this -- scratch that.

9                When you referred to the Gorham Test in

10          the third paragraph here --

11   A.    Yes.

12   Q.    -- were you referring to the entire design of

13          the Simpson Ventures 156 patent or just a

14          portion of it?

15   A.    I was referring to the -- say -- could you

16          repeat it, please?

17   Q.    In the third paragraph here, the one that

18          begins with the phrase, "Accordingly, the

19          prior art," in that paragraph, you refer to

20          the Gorham Test.

21   A.    Yes.

22   Q.    Were you applying the Gorham Test to the

23          entire design shown in the 156 patent

24          drawings or to merely a point of novelty?

25                (Brief pause)

Page 147

1  A.  I'm sorry.  Say it one more time.

2  Q.  In the third paragraph, you -- you refer to

3      the Gorham Test.  And the question is, were

4      you applying the Gorham Test to the entire

5      design shown in the drawings of the 156

6      patent or only to a point of novelty asserted

7      by Mr. Anders?

8  A.  The -- I was applying it to -- well, the

9      description is there in the second paragraph,

10     that all of the pet cages depicted in Figures

11     18, 36, and 37 are wicker on all visible

12     sides, rectangular in shape, with a

13     rectilinear silhouette whose horizontal

14     length is greater than its horizontal width

15     or vertical height.  All are made from wicker

16     woven over a frame.  All have windows that

17     are created by an absence of wicker and make

18     use of vertically spaced bars to maintain the

19     structure and keep the pet from getting out.

20     All three cages have hinged, lockable doors.

21         I do note that Figure 18 has its door on

22     the top; however, that is not a feature that

23     Mr. Anders or Simpson Ventures has asserted

24     as being material.  So it's -- it's looking

25     at all of those things.

BRET HUNTER SMITH
APRIL 28, 2008

Page 148

1  Q.  So having said that, were you applying that

2        Gorham Test to an asserted point of novelty

3        or to the overall design shown in the patent

4        drawings?

5  A.  I would say that it's -- the application is

6        to the overall -- not concept but the overall

7        cage.  The -- it does identify specific

8        features in the discussion, however.

9  Q.  Well, so is it your testimony that that third

10       paragraph identifies that under the Gorham

11       Test, the design shown in the Simpson

12       Ventures 156 patent is substantially the same

13       as what is shown in Exhibit 74 and Exhibit 75

14       and Exhibit 76?

15  A.  No.  The anticipation -- or the conclusion

16       here was based upon the examination and the

17       claim made by Mr. Anders relative to the 156

18       patent.  As the claims and the discussion

19       expanded, then the subsequent discussion

20       within the paper deals with issues other than

21       anticipation.  So I would say that at this

22       point in time, I would -- I would not say

23       that the Figures 36, 37 and -- what was the

24       earlier figure -- 18 anticipate.

25  Q.  So that's the first paragraph.  So you're

Page 149

```
 1          saying that the first paragraph in which you

 2          argue that the three pieces of prior art

 3          anticipate the 156 patent --

 4     A.   That's only so far as the --

 5     Q.   -- that's incorrect?

 6     A.   Well, so far as Mr. Anders' claim that was

 7          made there, they do anticipate.  In light of

 8          additional claims, then I would say that they

 9          do not individually anticipate.  In other

10          words, in the first material that I read and

11          in his claim, that the only material feature

12          that distinguishes the 156 patent from the

13          prior art are that the 156 cages were drawn,

14          on all visible sides, rectangular in shape

15          and with a rectilinear silhouette whose

16          horizontal length is greater than its

17          horizontal width or vertical height.

18               Then as far as that statement goes, then

19          I would say that Figures 18, 36, and 37 do

20          anticipate the 156 patent.  Mr. Anders goes

21          on to make additional claims.  And those

22          I addressed in subsequent sections of the

23          report and in the supplemental section.

24     Q.   Well, I'll try to make this easier on you.

25          I'll represent to you, Mr. Smith, that it
```

Page 150

```
 1        appears that you have confused applying tests

 2        to the entire patented design with evaluating

 3        points of novelty.  You don't have to take my

 4        representation as true, but that's -- I'll

 5        represent that that's what it appears.  And

 6        we're trying to figure out whether you still

 7        view this language to be correct.  And it

 8        appears in doing this, you have applied, for

 9        example, an anticipation standard against a

10        point of novelty that Mr. Anders was

11        asserting and that you have applied the

12        Gorham Test for infringement to a point of

13        novelty that Mr. Anders was asserting.

14             And I'm asking you whether these three

15        paragraphs are in any way correct today or

16        whether this needs -- this section needs to

17        be rewritten because this is no longer your

18        opinion.

19   A.   I would revisit this section in light of

20        subsequent discussion.  So yes, I would go

21        back and revise this.

22   Q.   Am I correct that the first paragraph

23        incorrectly states that three pieces of prior

24        art anticipate the 156 patent?

25   A.   That -- that statement was made in light of
```

Page 151

1    Mr. Anders' claim as the material features

2    that distinguished the 156 patent from prior

3    art.   I would revisit -- in looking at all of

4    this as a totality, I would examine point one

5    thoroughly.

6  Q.  Isn't it true that those prior art references

7    do not anticipate the 156 patent?

8  A.  I do not believe that they do in light of the

9    expanded claim that Mr. Anders is making.   As

10    I said, those are addressed later -- or in

11    subsequent reports, but I would go back and

12    revisit this.

13  Q.  Isn't it true that the test for anticipation

14    is whether the features shown in the

15    drawings -- not what some expert says, but

16    the features shown in the drawings are

17    already shown in a single prior art

18    reference?   Isn't that true?

19        MR. HINSHAW:   Objection to form

20        and foundation.

21  A.  Could you repeat that one more time?

22  Q.  Isn't it true that the test for anticipation

23    of a design patent is whether the features

24    shown in the drawings of the design patent

25    are shown in a single prior art reference?

BRET HUNTER SMITH
APRIL 28, 2008

Page 152

1       Correct?

2               MR. HINSHAW:   Objection to form

3           and foundation.

4   A.   My understanding of anticipation is that

5        features are shown in the prior art, yes.

6   Q.   And that's measured -- anticipation is

7        measured against what's shown in the patent,

8        correct?

9   A.   That's my understanding.

10  Q.   So for anticipation, it doesn't matter how

11       Mr. Anders or anybody else might interpret or

12       assert points of novelty, correct?

13              MR. HINSHAW:   Objection to form

14          and foundation.

15  A.   Please say that one more time.

16  Q.   So the test for anticipation of a design

17       patent does not depend on the interpretation

18       of the patent by an expert or any assertion

19       of points of novelty, correct?

20              MR. HINSHAW:   Objection to form

21          and foundation.

22  Q.   Let me ask it another way.  Isn't it true

23       that to evaluate whether the 156 patent is

24       anticipated by a prior art reference, you

25       simply have to look at the 156 patent and the

Page 153

1           prior art reference, not Mr. Anders'

2           assertion of any points -- of any points of

3           novelty, correct?

4      A.   I -- I -- that is my understanding.

5      Q.   So if all we have to do to evaluate whether a

6           patent is anticipated is compare the patent

7           drawings with the prior art, isn't it true

8           that your first statement on page 16 is

9           incorrect?

10     A.   I do not believe that the designs in Figures

11          18, 36, and 37 could be said to fully

12          anticipate the 156 design.

13     Q.   So that first sentence is wrong, correct?

14     A.   Yes.

15     Q.   Now, we have the same sort of issue with

16          regard to your application of the Gorham Test

17          in the third paragraph of page 16.  And do

18          you agree with me that under the Gorham Test,

19          one should compare the patented design, which

20          is defined by the drawings in the design

21          patent, with another product to see whether

22          that product is substantially the same to an

23          ordinary observer?

24     A.   Say that again, please.

25                    (The court reporter read from

Page 154

1                    the record.)

2    Q.  Let me see if we can break this into smaller

3        pieces.

4    A.  Okay.

5    Q.  First of all, do you agree that the Gorham

6        Test is a test for infringement?

7    A.  The Gorham Test is the test of seeing whether

8        an ordinary observer would confuse the two

9        items.   That's my understanding.

10   Q.  So yes, you agree that it's an infringement

11       test?

12   A.  Yes.

13   Q.  Do you agree that it does not involve looking

14       at points of novelty?

15   A.  Doing an individual point-by-point

16       comparison, is that -- I'm trying to

17       understand.

18   Q.  Do you agree --

19   A.  Is that --

20   Q.  Do you agree that it does not involve any

21       assessment of the points of novelty?   I'll

22       represent to you that the Gorham case dates

23       to 1872 or thereabouts.   And the point of

24       novelty test was developed many, many years

25       after the Gorham case.

Page 155

1    A.    What -- what I was going to say is that my

2          understanding is that the Gorham Test --

3          really, when you're talking about the

4          ordinary observer, it goes to the overall

5          appearance or it doesn't mean that -- it

6          doesn't mean that the ordinary observer might

7          not notice a feature, but it would be the

8          overall impression for the ordinary observer.

9    Q.    And that's -- that was a test for

10         infringement that was developed a long time

11         ago, correct?  And under that test, the

12         Gorham Test, one would compare the drawings

13         of a design patent with another device to see

14         if that device infringes, correct?

15   A.    Would compare it with the drawings of another

16         product or with the other product?

17   Q.    The product.

18   A.    Okay.  My understanding is that the patent

19         drawings are the thing that you would compare

20         to.  That is, in my analysis, for example,

21         looking at the Bay Isle design, I looked only

22         at the 156 patent drawings because any

23         physical manifestation -- it's the drawings

24         themselves that are at issue.

25   Q.    All right.  So you understand that in the

BRET HUNTER SMITH
APRIL 28, 2008

Page 156

```
 1        Gorham Test, you would look at the 156 patent

 2        drawings, correct?

 3   A.   Yes.

 4   Q.   And to see whether -- under the Gorham Test,

 5        the prior art that you pointed out in these

 6        three paragraphs -- whether that prior art is

 7        substantially the same, you would compare the

 8        prior art with the drawings of the 156

 9        patent, correct?

10   A.   That's my understanding.

11   Q.   So is any of these three prior art

12        references, which you identified as Figures

13        18, 36, and 37, in your report of Exhibit

14        78 -- are any of those references

15        substantially the same under the Gorham Test

16        as what's shown in the 156 patent drawings?

17   A.   I do not believe that they are.

18   Q.   So this last sentence in the -- in this third

19        paragraph in which you say, Moreover, under

20        the Gorham Test, an ordinary observer would

21        view the overall designs as substantially the

22        same, is incorrect, right?

23   A.   That's correct.

24             MR. GARDNER:  We can suspend the

25        deposition for today.  We will resume
```

Page 157

1           another time to be determined when

2           it's appropriate and convenient for

3           the witness and the parties.

4                   (The deposition recessed at

5                    5:05 p.m.)

6           *  *  *  *  *  *  *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 158

1                    REPORTER'S CERTIFICATE

2    STATE OF ALABAMA

3    MONTGOMERY COUNTY

4        I, Mallory M. Johnson, Certified Court

5    Reporter and Commissioner for the State of

6    Alabama at Large, hereby certify that on Monday,

7    April 28, 2008, I reported the deposition of BRET

8    SMITH, who was first duly sworn or affirmed to

9    speak the truth in the matter of the foregoing

10   cause, and that pages 4 through 157 contain a

11   true and accurate transcription of the

12   examination of said witness by counsel for the

13   parties set out herein.

14       I further certify that I am neither of kin

15   nor of counsel to any of the parties to said

16   cause, nor in any manner interested in the

17   results thereof.

18       This 12th day of May, 2008.

19

20       _____
         MALLORY M. JOHNSON, CCR
21       Commissioner for the
         State of Alabama at Large
22       Alabama License 443, Expires 9/30/08
         MY COMMISSION EXPIRES:  2/24/09
23

24

25

BRET HUNTER SMITH
APRIL 28, 2008

Page 159

1              SIGNATURE OF WITNESS

2          I, BRET SMITH, hereby certify that I

3     have read the transcript of my deposition

4     consisting of pages 4 through 157, and except for

5     the corrections listed below, certify that it is

6     a true and correct transcription.

7

8     _____

      BRET SMITH
9

10    SWORN TO AND SUBSCRIBED before me
      this _____ day of _____, 2008.
11

12    _____

      NOTARY PUBLIC
13

14              * * * * * * * * * *

15    Page    Line    Correction and reason therefor

16

17

18

19

20

21

22

23

24

25

BRET SMITH
APRIL 28, 2008

Page 1

## A

able 4:12 9:3 57:3
absence 43:25 106:22,23 147:17
absent 43:7 99:16 107:12 107:13
abstract 44:4
accommodate 46:2
account 61:24
accountable 49:24,25
accurate 6:4 9:23 19:9 25:6,7 120:12 137:17 158:11
accused 36:12 37:9,11,21 37:23,25 38:11,18 138:25 140:5
achieve 120:19
actual 116:9
add 132:15,17
added 14:5 75:20 132:13
additional 15:13 31:16 124:18,19,23 126:3 149:8,21
address 4:20 7:10 8:4 59:25 98:4 99:2 103:14 106:10 110:10,18
addressed 68:17 97:24 103:12 111:7 134:2 149:22 151:10
adds 15:19
adjacent 119:17,18
admit 71:19
advancement 21:1,4
aesthetic 13:20,20
aesthetically 82:3,7,11 82:24 83:12 84:11 86:19 92:23 93:4
affect 6:7 91:16
affirmed 158:8
Africa 76:23
afternoon 113:4
age 78:12
ago 22:13,14 70:23 87:12 155:11
agree 33:21 34:21 42:23 56:18,20 57:20,23 76:2 82:6,10 84:4 86:7,17,21 87:2 90:6,17 95:10,18 98:19 100:16 120:22 136:23 139:15,23,25 153:18 154:5,10,13,18 154:20
agreed 3:15 4:4

ahead 9:14
aimed 14:14
air 72:18,22 73:3,5,11 74:14,16,17 75:1,2,3,16 75:19,24 76:2,8 88:23 91:5,5,19 92:3
Alabama 1:2,18,21 2:13 3:21 158:2,6,21,22
ALLISON 2:11
allow 5:17 92:2
allowing 92:4
allows 91:5
alphabetically 132:5
alternate 37:4
amend 17:19 18:7,15
amount 12:18 49:3 51:20 76:4
amusement 30:12
analysis 3:5,10 35:6 129:24 155:20
analyzed 24:20 97:24
analyzing 24:22
Anders 97:25 100:10 101:11 102:15 103:14 111:4 113:19 114:6,24 117:1 119:10 122:19,21 122:22 129:24 139:13 139:14 140:15 141:6 144:7,12,16 145:12 147:7,23 148:17 149:6 149:20 150:10,13 151:1 151:9 152:11 153:1
Anderson 122:20
angle 60:9 112:12
animal 56:7,9 67:8 68:10 69:3,3,4,12,15,16,18 70:6,8,10 71:2,14,16 72:22 73:4 74:15 75:16 75:18 76:3,7 126:9
animals 66:11,12 67:20 68:15 69:23 70:13 71:7 72:1,2 91:6
answer 5:8,10 10:19 25:5 43:6,25 44:4 47:18 49:7 71:18 72:12 87:16 93:7 104:7 137:17 138:15 143:2
answered 18:6
answering 105:3
answers 5:22,24
anticipate 31:14,21 34:22 143:10,12 148:24 149:3 149:7,9,20 150:24 151:7 153:12

anticipated 32:9,19 144:19 152:24 153:6
anticipates 34:5 144:4,9 144:14
anticipating 31:22
anticipation 30:25 31:1,2 31:19,24,25 33:6 143:14 148:15,21 150:9 151:13,22 152:4,6,10 152:16
anybody 71:5 120:8 152:11
Anytime 92:15
apparent 56:22
apparently 66:3
appealing 82:24 83:12 84:11
appear 57:16,19 58:4 65:10 102:6 131:3
appearance 58:5 79:10 84:6,8 85:10,17 86:9,19 90:15 98:11 101:25 114:8 119:14 139:17 155:5
APPEARANCES 2:1
appeared 18:12 139:13
appearing 98:12 102:1
appears 105:19,25 130:18 150:1,5,8
appendices 128:22,24 129:7,12 130:13 133:23 137:16,21 138:1,2,5
appendix 3:10 126:10 129:6,12,13,15,15,20 129:23 130:5
application 27:3 82:22 148:5 153:16
applied 11:13,19 19:16 19:17 77:6,7 82:7 85:24 86:4 87:3,9,13 150:8,11
applies 11:6 32:24 101:5 146:4
apply 23:6 81:7 105:6 145:18,23,24
applying 12:8,13 27:8,10 27:18,24 28:4,10,20 86:7 134:23,24 146:22 147:4,8 148:1 150:1
approach 51:11 113:1 115:12 122:25 123:1
appropriate 26:18 27:7 27:12,18,23 28:3,9,14 28:19 108:17 157:2

appropriated 19:23
approximately 1:22
April 1:21 158:7
arched 112:10,14 113:15
architecturally 75:11
area 62:17 100:6,8 109:15 138:10
areas 99:15
argue 72:17 149:2
argument 74:13
arguments 142:9
arrange 58:21
arrow 132:12,15,17 133:3,6
art 5:4 6:21,23 9:22 12:2 12:5 17:6,15,17 18:3,13 18:19 20:1,3,7 21:1,5 24:13,24 25:4,14,25 26:3,10 30:22 31:11 32:10,11,19,22 33:8,10 33:15,18,22 34:1,8,18 34:21 40:15,16 41:7,13 41:18,22 42:10,18,25 43:20 55:16 81:24,25 85:19 96:16,23 98:20 100:1,14 101:1,4 102:17 103:3,22,25 105:6 106:9 107:9 110:21 111:20 112:18 113:3,3,6,11 115:2,12 115:21 117:22 119:19 120:6,17 121:9,17,20 121:25 122:6,13,16 123:3,13 126:2 143:10 143:15 144:20 145:2 146:19 149:2,13 150:24 151:3,6,17,25 152:5,24 153:1,7 156:5,6,8,11
Arthur 2:3
articles 76:25 77:1 78:15
arts 34:9,10
aside 58:18
asked 66:7 87:13 104:15 104:17 105:4 132:20,23 133:14,19
asking 5:6 12:23 23:10 27:16 29:3 30:2 59:3 101:13,18 104:3,5,24 114:16 121:15 150:14
aspect 8:7,7,19,19 66:15 91:8
aspects 88:19 143:16
assemble 92:18
assembled 126:7

Page 2

assert 152:12
asserted 24:21 25:10,22
    26:5 103:20 104:19
    105:7 106:10 108:12
    109:5 110:11,18 111:4
    111:12,19 112:20,21
    113:8,18 114:3,24
    116:1,14,24,25 117:4
    117:16 118:16 119:3,9
    119:20 120:19,23,24
    121:11,14,18 123:4,14
    123:15 147:6,23 148:2
asserting 150:11,13
assertion 152:18 153:2
assessment 154:21
associated 53:25
assume 34:15
Atlanta 2:5
attachment 92:15
attend 39:15
attention 11:22,24 13:24
    49:13
attorney 5:5 20:17 24:17
    43:18 54:13 97:21
    135:10 138:14
Attorneys 2:4,8,12
attribute 66:4
attributes 91:4
Auburn 1:19,21 4:22
    65:25
August 125:7,8,9 127:16
    130:14 136:14 137:12
available 26:22 142:25
Avenue 1:20
average 53:10
avoid 50:24
aware 28:13,16 38:25
    44:25 53:4,13 120:8
    134:21 140:2
a.m 1:22

**B**

B 42:19,21 101:11,15
    132:7
back 19:11 40:20 45:11
    46:13,16 80:12 81:20
    84:16,18,19 96:11
    102:14 104:8 109:10,17
    118:18 129:3 132:8,18
    133:4 142:8 150:21
    151:11
background 49:17 72:13
    101:3 142:23
bacteria 89:18 91:7

bacterial 88:25
bad 67:7
Ball 2:11
bars 147:18
base 124:15
based 14:15 45:15 58:24
    58:25 59:2 67:17 81:22
    96:17,20,21 143:12
    144:6,11,16 145:11
    148:16
basic 5:4 65:8,8 69:20
basically 17:4 62:16,17
    122:2
basis 13:16 29:1 70:20
    72:3
basket 3:2 15:24,25
basketry 78:8 126:5
baskets 80:16
Battleground 69:8
bay 13:1 14:17 15:2,8
    38:6 47:11,16,20 48:17
    50:10 57:12,15,20
    63:11,18,20 73:24,25
    74:21,22 126:7 155:21
beat 46:6
beginning 54:13 81:21
    124:14 128:14 133:14
begins 146:18
behavior 67:21 68:11
    69:3 126:9
belabor 122:23
believe 4:23 10:21 12:16
    15:17 17:2 21:18 33:7
    47:3,6,17 64:22 66:23
    66:25 68:9 70:13
    109:14 111:7 112:14
    114:5 124:13 125:13
    129:9 132:16 136:11,18
    136:19,20 137:15,16,19
    139:12,12 140:8 141:5
    151:8 153:10 156:17
belonging 76:21
beneficial 68:21
benefit 57:20
benefits 89:16
better 9:18 70:17 74:18
beyond 39:3 40:10 49:1
    67:2 91:10 119:18
    140:16
big 13:7 47:21 48:4,19
    99:11
BINGHAM 2:8
bird 55:20 56:11 60:8
    61:18 62:23 63:1 109:8

123:7
Birmingham 2:13
bit 13:6 14:14 34:12
    46:17 61:1
bits 23:13
blanket 25:5
blend 13:9
blends 13:21
book 70:13 72:4 125:6
books 72:8,9,9 126:5
    137:7
bottom 65:20
box 13:7 47:21 48:4,19
boxes 120:9
Bracket 143:13
breadth 43:16
break 23:12 34:12 45:25
    46:12 64:8 110:23
    129:21 141:8,25 154:2
breath 46:1
Bret 1:15 2:18 3:7,17
    4:13,21 158:7 159:2,8
Bridge 117:24 118:25
brief 64:9 66:7 111:1
    115:4 123:6 141:11
    146:25
brings 15:12
broad 93:7
broadly 76:24
broken 108:14
brought 95:25
buff 2:24
busy 141:23
buy 13:8
buyer 14:15
buying 142:17

**C**

C 2:11 42:19,21 101:11
    101:16 132:7
cage 2:24 13:8,15 14:4,8
    14:10 35:14,15 48:24
    49:15 51:3,14 52:6,6,17
    55:20,23 56:3,7,9,11
    57:13 60:8 61:3,18
    62:23 63:1,23 66:9,10
    66:16 67:6,11 74:18
    76:7 82:2 85:5,7,12,13
    85:17,20 86:1,8 87:10
    92:24 105:13,15,16,18
    105:19 106:7 109:8,13
    117:18 123:7 126:7
    148:7
cages 14:16 42:1 56:12

64:1 66:8 86:5 124:25
    147:10,20 149:13
Calamus 76:21
calculation 75:23
call 14:10 20:4 30:20
    39:8 48:24 49:14 62:10
    89:22 109:7 123:8
    124:13 125:3
called 16:8 69:8
calls 20:14 24:15 45:8
    124:14 127:7
campus 46:10
cane 78:18 79:1
caning 81:3
car 16:15
care 12:18,22 13:3,6
    14:19 15:9 46:19 47:24
    48:16 49:3,10 50:9
    51:20 53:11
carefully 89:4 132:19
    133:5,10,12
CARR 2:11
cart 123:9
case 1:7,7 4:6,7 12:22
    21:8,16,17,21 28:13
    40:5 53:23 54:9,17
    75:12 113:14 128:14
    130:19 131:1,3 133:15
    136:8,17 137:13 138:7
    138:22 139:11,16,25
    140:2,8,10 142:1
    154:22,25
cases 25:12,23 29:8,14
    48:21 136:25 137:2,5,8
casual 51:19 69:11
cat 67:21
catalog 47:8,10 48:1,20
catalogs 47:5 80:21
catch 45:25
category 40:25
cats 67:15,16,19 68:6,14
    68:15,17,20,21 69:1
    70:15,15 72:10
cause 16:21 17:18 18:23
    42:8 158:10,16
CCR 158:20
Center 1:20
centered 62:16,17
certain 21:22 26:11,14
    34:16 41:6
certainly 33:3 36:13,15
    100:2 135:21
certainty 134:18
CERTIFICATE 158:1

Certi
    certif
    chain
    chan
    chan
    chara
        62:
    Char
    check
        135
    chem
    Chis
        29:
        126
        131
        135
        137
    choic
    choic
        88:
    choos
    Circl
    circu
    circu
    circu
        74:
        91:
    circu
    circu
    Circl
    cited
    Civil
    claim
        31:
        54:
        103
        122
        151
    claim
        33:
        40:
        43:
        54:
        100
        132
        144
    claim
    claim
        53:
        118
        148
    clarif
        119
    clarif

Certified 1:17 158:4
certify 158:6,14 159:2,5
chain 46:24
change 16:22 17:9,10
changes 18:23 19:4
characteristics 26:25
  62:12 63:14
Charles 65:24
check 38:9 70:1 71:11
  135:14
chemical 39:10
Chisum 21:7 28:16 29:2
  29:5,13 97:11 126:6,16
  126:20,25 127:22 131:5
  131:12 134:13,16,22
  135:4,17 136:5,11,23
  137:5,10,14 143:13
choice 41:23 65:21
choices 8:22 88:8,11,12
  88:14 92:7 93:2
choose 92:11 100:12
Circle 4:22
circulate 73:11
circulating 74:18
circulation 72:19 73:5
  74:17 75:1 82:25 88:23
  91:5,6,19 92:4
circumstance 75:2
circumstances 42:6,7
Circus 2:23
cited 31:18 55:17
Civil 3:18 4:3,9
claim 19:19 20:12 21:13
  31:7,12 32:20 44:21
  54:10 99:12 102:15
  103:10,12 115:20,22
  122:2 148:17 149:6,11
  151:1,9
claimed 6:22 25:9 31:17
  33:11,23,24 35:2 40:13
  40:17 41:15 42:9,24
  43:4,10,21,22 53:19
  54:4,6 55:3,5 99:2,4,9
  100:21 102:24 122:7
  132:21 143:17,21 144:7
  144:21 145:17
claiming 24:3
claims 25:3 31:15,16,20
  53:25 54:9,24 103:9
  118:18,21 123:15 145:4
  148:18 149:8,21
clarification 114:15
  119:23
clarify 9:16 32:16

classes 39:12 49:19
clean 5:14,18,25
clear 60:18 62:10 65:4
  135:22
clearer 65:12 107:25
clearly 82:22 84:25
  107:10 118:22 145:2
clogged 74:25 75:2
close 62:18
closely 13:12 142:15
Closer 62:19
closest 60:5,10,15 61:18
cloth 84:1,2
clues 50:22
collection 29:7 34:7
  113:6 115:1 123:3
  126:9
collectively 94:25
college 46:10
column 82:16
combination 21:6 24:9
  25:21,21 26:3,14,25
  34:1 35:1,3 45:2,5,18
  98:21,22 100:9,13
  102:19 106:17 110:17
  121:5,12,22 122:3,9
  123:15
combinations 121:15
combine 27:7,13,18,23
  28:3,10,19 81:25 99:9
  99:21 106:11 112:18
  113:20 116:6 117:16
  118:14 120:18
combined 25:8 34:25
  41:14 91:6 99:2
combining 21:11 40:15
  44:13
come 46:13 68:5 108:12
comes 35:24 76:18,20
comfort 70:8,10 71:7
commencing 1:22
comment 14:24
commission 3:22 158:22
Commissioner 1:18 3:20
  158:5,21
common 59:25
company 1:9 50:1 128:16
compare 23:7 25:21
  26:19 36:11 37:19
  38:10,10,13 76:6 153:6
  153:19 155:12,15,19
  156:7
compared 38:17 60:20
  72:19

comparing 36:3,8 37:18
  37:21 48:12,22,25 60:1
  60:2 61:13
comparison 12:24 48:9
  60:25 61:7 154:16
comparisons 60:23
complete 2:22 126:9
completed 125:11,12
completely 19:9
component 87:6 88:22,23
  89:3
composites 72:20
comprises 143:19
computer 8:24
concept 30:25 39:1 148:6
concerned 13:23
concerning 94:24 124:11
concerns 15:24
conclude 81:22 91:2
conclusion 17:9 20:15
  24:16 45:9 95:15
  148:15
conclusions 15:13 16:22
  17:10 18:8
confer 71:12
configuration 120:7
configured 119:15
confines 31:12
confuse 6:18 11:25
  142:18 154:8
confused 50:11,20 150:1
confusion 50:17,19,25
connection 23:1 28:6
  40:4 99:7 112:6 114:11
  114:23 116:14 120:22
connections 109:23
conscious 14:1
consider 36:4
consideration 8:12
considered 20:6 26:6
  31:4 37:14
considering 62:3
consisting 159:4
constitute 142:5
construction 17:4 69:7
  125:1,2,2
consumer 51:24 52:13,14
  52:16 53:10
consumers 47:25 50:11
contact 38:22
contacts 124:10
contain 158:10
container 75:18
containment 82:3,8

contents 129:11,14,16
  130:17
context 12:25 35:9 43:7
  43:25 67:19 75:6
  129:14 142:9
continued 3:1
continuous 51:16
contributes 74:14,16
controlling 29:13 138:10
convenient 157:2
conventional 14:20 15:10
conversation 66:7 69:11
copy 16:1 126:19 128:4
  129:6
cord 84:3
corner 118:4,5
correct 4:24 12:20 15:4
  15:10,11 16:18 18:20
  19:9,10 22:2,16,24,25
  23:5,9,15 24:19,25
  25:22 26:11,15 27:8
  28:23 30:5,8 32:13,25
  33:4 34:16,22 35:4
  43:14,23,24 44:23
  45:16 47:22 49:5,7
  50:6,7 52:13 54:21
  55:3,7,8,20 56:4 57:4
  59:6 63:3,15,20,24 65:3
  71:8,21 72:6,7 83:2,24
  84:12 85:13,15 90:11
  90:19,23 93:24 94:7,12
  94:19,21 95:2,4 96:19
  97:4,7,9,19 98:1 99:3
  108:2 110:12,19 113:24
  116:17 117:2 120:15,16
  120:25 123:1,24 124:7
  126:17 131:22 133:6
  135:7 136:25 137:11,23
  140:20,24 144:15 150:7
  150:15,22 152:1,8,12
  152:19 153:3,13 155:11
  155:14 156:2,9,23
  159:6
Correction 159:15
corrections 159:5
correctly 18:14 34:14
  133:17
correspondence 133:24
costs 93:14
cotton 80:25 84:1,2,2
counsel 3:16 4:5 158:12
  158:15
COUNTY 158:3
couple 22:13 135:25

141:16
course 47:20 75:18 97:2
court 1:1,17 3:20 5:19,21
  28:13 29:14 40:21
  45:13 95:10 96:12
  128:14,15 130:19 131:1
  131:3 138:24 153:25
  158:4
cover 8:3 66:10,12 67:5
  67:22 77:8
covered 106:6 115:11
covering 13:18,25 52:1
  65:9 66:9,15,20,25 67:5
  67:11 85:9 86:13,18,22
  88:6,19 89:8 91:20
covers 10:12 90:18,25
create 58:6 81:6
created 147:17
creating 88:5
cross-ventilation 75:14
crowds 46:6
cues 50:22 51:7,23
curve 112:11
curved 112:10
custom 93:16
cut 64:5

                    D
D 42:19,22 132:7
damaged 92:19
dampness 91:7
dated 125:8
dates 154:22
day 78:12 158:18 159:10
deal 12:5 53:9 121:17
deals 11:20 33:15 139:23
  148:20
decision 14:19 21:7,7,15
  22:2,3,4,18 23:3 44:9
  44:12,23,25 46:20
  51:22 141:4
decisions 14:2 29:8 50:10
decor 13:10,22 74:6
decoration 56:4
decorative 88:11,15,16
  89:3
defendant 140:3
Defendant/Counterdef...
  1:10 2:6
defined 23:13 101:10
  153:20
definition 29:20 30:11
  80:9 99:22
definitional 89:19

degree 49:18 71:22
degrees 75:12
delete 106:16
demonstrate 122:16
demonstrated 107:10
demonstrates 84:25
  120:6 145:3
den 66:11,12,18,19,20
  67:11
Department 1:19
depend 48:5 56:16 73:16
  152:17
depending 48:18 52:5,14
  91:25 92:20
depends 52:15 61:12
  79:4 80:14
depict 56:10 116:12
depicted 147:10
depiction 55:19
deposed 4:23
deposition 1:15 3:17,19
  4:1,6 5:6 45:24 141:13
  141:21 156:25 157:4
  158:7 159:3
describe 6:10 18:18
  19:14 76:25 78:14
description 19:11 31:11
  55:2 103:19 120:3
  147:9
design 1:20 3:3,5,5,10
  6:13,19 7:18,21 8:2,8
  8:12,18 9:6,6,9,12,17
  9:24 10:9,15,22,25 11:7
  12:7 14:6 15:2,2,20
  17:22 19:13,20 20:13
  20:20 21:17 26:23
  29:10 32:24 33:3,19,19
  34:15,20 35:2,25 36:4,5
  36:8,9,12,20 37:2,13,14
  38:2,23,23 39:2,7,12,15
  39:20,22,25 40:4,8,13
  40:14 41:5,12,24 42:1
  42:10,13 43:4,10 51:11
  52:8,21 53:16,23 54:3,5
  54:15,20,25 57:13
  58:17 73:12,13 74:4
  82:4 88:8 90:18 92:10
  96:22 105:13,15 127:3
  127:9,20,25 128:2
  133:15 138:10,19 142:3
  142:4,4,12,13,15,16,18
  143:14,19 144:2,5,8,13
  144:18 145:19,25,25
  146:12,23 147:5 148:3

148:11 150:2 151:23,24
  152:16 153:12,19,20
  155:13,21
designed 13:9,18
designer 24:17 26:21
  38:25 49:23 81:23
  142:11
designs 15:1 37:20
  143:12 145:6,8,9,13
  153:10 156:21
despite 50:8
detail 11:23 13:23 96:3
  103:7
detailed 9:7
details 13:13 139:20
  140:5
determine 6:16,21 25:24
  26:8 38:12,14 43:22
determined 157:1
determining 8:17 138:18
developed 154:24 155:10
developing 26:23
device 19:22 97:18
  155:13,14
diameter 77:19 79:22
  92:16,17
diamond 37:5
diamonds 37:3
differ 10:9
difference 10:13 73:3
  74:21,24 76:14 90:1
differences 14:8 40:7
  47:24 48:16 49:3,9
  50:15 51:8 56:23,25
  57:23 140:5
different 12:1 15:1 35:17
  48:23 49:4 53:3 56:14
  57:4,5,21 62:11 63:5
  71:15,21 92:3 93:15
  99:19 100:20 107:14
  112:5
differently 32:8 93:11
differs 30:22
difficult 112:15
difficulties 92:15
dig 25:16
dimensions 69:20
directed 39:9 114:15
direction 132:9
directly 34:5 67:17
director 69:9
disappear 9:1
discern 57:3
discerned 139:21

discriminating 14:15
discuss 141:25
discussed 21:19
discussing 68:20
discussion 17:3 65:21
  70:21,22 121:4 122:7
  128:14 129:2 130:1
  133:1,2 139:14 141:6
  141:10 148:8,18,19
  150:20
discussions 127:2,6,8,23
  132:25
disputes 40:5
distinct 9:17 114:5,9
distinction 29:22 78:4
  79:24 80:3,5,18 81:8,12
  86:25 89:14 99:11
  107:25
distinctions 78:10
distinguish 145:17
distinguished 151:2
distinguishes 149:12
distinguishing 7:20
  144:11
distribution 46:24
DISTRICT 1:1,2
divided 132:2,4
DIVISION 1:3
doctrine 11:3,5
document 53:20,21 83:8
  126:2,3
documents 59:23 65:1
  126:4
dog 13:15 67:12
dogs 66:8,11 68:15,20,21
  68:25 72:10
doing 35:17 37:17 69:7
  101:3 112:1 118:17
  150:8 154:15
door 52:17 73:8 75:8,10
  76:7 98:16 99:13 100:4
  102:8,8,13 105:17,18
  105:19,20 109:11,25
  110:3,4 111:15,25
  112:25 147:21
doors 58:3 72:25 75:20
  99:14,14 112:3,24
  120:10 147:20
Dr 67:10 68:23,24 70:23
draft 124:15
drafted 125:7
drafting 124:12 128:19
drapes 93:14
draw 8:16 116:7

drawing 2:22 3:11 58:17
60:1 61:17 119:4,4
drawings 7:22 54:7,8,11
54:21,23,24 55:2,7 59:9
59:12 60:2 61:21,25
118:20,21 145:20,25
146:24 147:5 148:4
151:15,16,24 153:7,20
155:12,15,19,22,23
156:2,8,16
drawn 149:13
dry 70:16
dual 8:14
due 91:6
duly 158:8
DVM 65:24
D483,156 3:4,5
D8 126:1

**E**

earlier 64:22 91:10 97:21
99:12 105:10 107:11
112:6 135:7 148:24
easier 21:14 149:24
easily 92:19
EASTERN 1:3
eat 46:5
edge 16:25 17:7,15,21,23
17:23,24 18:11,18
51:16 52:4,9 118:3
119:16
edges 17:5,6,16 51:2,4,5
52:3 65:5 88:10 120:3
education 69:2
effect 19:2 38:9 47:14
91:20
effective 10:4 93:2,3
effort 130:6
eight 121:20,23
eighth 77:19
either 4:8 15:5,6 73:23
74:23 78:13 79:16
83:23 84:5 90:21 123:7
123:9
elements 6:15,19,19
10:12 21:11 44:14,14
45:2,5,18
elephant 55:24,25 123:8
eliminate 122:5
embodiment 36:20,22
37:4,8,14,23,24 38:11
38:14
embodiments 37:10,13
38:3,18

emphasized 51:13
employed 91:19
encompass 54:6 55:1
79:19
encompassed 64:25
ends 139:9
enforceable 95:20
engaged 133:18
enlarge 65:7
entire 7:13 140:10
145:19,24 146:12,23
147:4 150:2
entitled 2:22,23 130:23
entry 48:24
entry-level 49:12,14,15
environment 68:18 70:7
93:1
environments 49:4
equally 63:5
equivalent 68:12
equivalents 11:3,6
ergo 69:17
ergonomics 69:16,17
essentially 9:1 32:3 44:21
79:13 115:10
established 64:23
evaluate 152:23 153:5
evaluated 10:17 21:24
evaluating 6:12 7:15
10:14,21 13:4 19:12
24:6 31:23 37:7 53:16
150:2
evaluation 11:6 22:12
31:6 143:11
eventually 23:17
everybody's 46:7
evidence 4:1
exact 20:3 31:25
exactly 9:8 11:12 31:19
43:9 96:1 128:23
examination 2:17 4:17
111:3 112:7 148:16
158:12
examine 36:16 151:4
examiner 39:19
example 8:23,24 17:6
31:5 36:25 43:1,2
49:15 60:4,12,14 61:17
62:13 70:3 78:5,5
80:16 91:13,23 98:4
104:11,12,14 112:23
150:9 155:20
examples 55:16,17 107:8
112:2

excerpts 131:4
exclude 114:17
excuse 22:22 61:19 87:24
102:21 105:14 107:20
122:20
exercised 49:10
exhibit 2:20,21 14:18
15:9 55:22,23 56:3,10
57:7,16 58:11,13,20,23
59:15,16 60:21 61:3,7,8
61:10,24 62:3,13,16,18
62:23,24 63:1,4,6,12,18
63:20,23 64:1 65:18
71:24 73:24 82:12
83:19 84:20 86:11
93:19 94:3,8,14 95:22
97:23 105:8,13,14,16
105:25 106:4,6,11,12
106:13,20,21,21 107:6
107:15,16,19,22,23
108:1,4 109:4,9,14,18
110:7 111:9 113:24
114:1 115:1 116:21
121:3 123:22 125:23
128:8 130:2,5,7 136:14
139:2,4 140:13 141:24
141:25 142:3 143:6,20
144:3,9,14 148:13,13
148:14 156:13
exhibits 3:1 55:9,13
56:13 57:18,22 58:20
63:10,17 64:10,14
105:10
existing 36:9 44:14
expanded 148:19 151:9
expect 134:20
expensive 92:7,8
experience 28:5 38:22
43:16 54:22
expert 3:7,8 21:25 28:18
69:12,15 71:2,10,11,13
71:16,20 151:15 152:18
expertise 70:1
experts 139:21 140:4
Expires 158:22,22
explain 44:11 88:4 101:6
109:3 115:23
explained 109:7
exposed 51:3
extends 119:16,17
extensive 127:8
extent 51:25 52:15 65:1
103:18
extra 50:9 75:24 76:2

extreme 95:24
eyes 139:19,23 140:1

**F**

fabric 13:24 93:1,8,9,13
fabrics 80:25 91:25 93:15
faces 118:8,12
fact 24:18 41:11 61:14
65:5 67:21 70:18 88:21
95:6 96:3 118:14
133:22 135:3
factors 69:4,15,19
factual 43:9
failed 45:20 94:25
fair 60:22 63:8
fall 81:4
familiar 59:8,23 61:21
134:13 136:8
famous 69:10
far 19:8 98:23 142:3,13
149:4,6,18
farm 68:15
fashion 110:18
feature 8:6,17,20,25 9:5
9:6 17:22 21:13 23:24
24:2 25:24 26:2 31:8
32:7 33:17 41:10,11
42:16,20,21,22,22
67:15 68:6 96:2 101:19
144:6,11,16 145:11,16
147:22 149:11 155:7
features 6:21 7:2,17,20
7:23,25 8:3,5 9:12,17
9:19,20 10:8,24 24:10
25:13 32:12 33:11,22
34:7,16,20 35:2 39:8
40:13 41:6,8,9,12 42:9
42:14,24 43:10,12,21
52:12 61:13 72:1 89:16
96:23 98:21,25 99:1,5,6
100:18,24 101:1,11,21
103:24 106:15 108:10
108:25 109:5 110:11
117:20 119:2 145:3
148:8 151:1,14,16,23
152:5
Federal 3:18 4:2,9
feeling 67:8
felt 135:12
ferrets 68:16
Ferry 2:5
fewer 121:22
fiber 78:25
field 26:22 43:17 69:25

Page 6

71:14,20 139:21 140:4
**fifth** 119:9 120:23
**figure** 7:2,3 36:5,11,13
38:5 42:5 53:18 62:11
80:5 83:20,20,23 84:4,7
87:8 99:13,13 100:4,5,5
100:7,8 102:5,5,9,10
103:2,8 105:21 106:1,3
106:5,6,12,19,20
107:12,19,20,22,24
108:1,5,5 109:4,4,8,13
110:6 111:21,21,22
112:2,4,6,9,23 113:13
113:16,21,22 115:5
116:4,5,5,7,7,12 117:18
117:19,23 118:22 119:1
119:5 120:21 121:16
122:16 139:13 147:21
148:24 150:6
**figures** 36:17 82:21 84:10
99:15 100:3 101:23
102:18,22 105:23 108:9
117:21 124:2 139:5
143:11 147:10 148:23
149:19 153:10 156:12
**figuring** 29:23
**file** 39:22
**filings** 40:1
**filter** 74:25 75:3,4
**find** 35:18 68:3 81:20
99:8 101:21 103:23
110:10 111:19 112:19
113:5 123:1
**finding** 31:3
**findings** 18:8 97:1
**fine** 77:17 103:1 110:25
139:20 140:5
**finish** 5:7,11,12 13:12
14:16 71:3 104:6
**finished** 88:10
**first** 4:14 6:14 7:1,3 35:8
36:21 51:19 52:13
53:20 59:4 64:19 65:16
65:17 76:20 78:5 83:1
85:21 93:21 94:4,8
97:23 98:5 100:2
103:10,12 121:5,12
123:19 129:9 130:16
132:11 133:15,18
136:10,22 138:8 140:11
140:25 143:8 148:25
149:1,10 150:22 153:8
153:13 154:5 158:8
**fit** 13:12 14:15 31:11,19

**five** 120:20 121:6,12
122:9 136:3
**five-inch** 129:10
**five-minute** 64:8
**flat** 75:22
**flatware** 140:13,23
142:17
**flip** 84:18 132:8,11 134:3
**focus** 49:22
**fold-down** 15:25
**follow** 43:3 138:18
**following** 5:20 96:9 101:8
101:9
**follows** 4:16 103:19
**foregoing** 158:9
**forget** 46:9
**forks** 3:11
**form** 3:23 7:25 40:23
41:17 110:13 115:17
130:24 131:8 138:12
142:6,20 151:19 152:2
152:13,20
**formality** 3:21
**formed** 114:8 118:11
119:14
**forming** 9:2
**formulaic** 39:10
**forth** 138:20
**found** 6:22 15:20 20:7
26:10 40:14 41:13
42:10 44:20 85:1 96:16
98:23 101:4 108:1
113:2 115:13
**foundation** 110:14
138:13 142:7,21 151:20
152:3,14,21
**four** 42:14,16,18,23
43:10,11 47:15 59:14
100:3 101:18 136:3
**fourth** 116:24 117:4
**four-inch** 129:10
**fraction** 5:15
**frame** 65:8 82:23 106:7
115:11 147:16
**framed** 85:8 106:18
109:11,16 111:16
**framework** 51:3
**framing** 98:16 100:7
102:8,12
**frequently** 76:17,24 77:7
**fresh** 72:22 73:3 74:14
**front** 6:25 52:17 76:7
98:14,15 100:7 102:4
102:11,12 105:17

106:18,25 107:1,3,5,12
109:10,10,11,15,20,25
110:1,4 111:14,14,24
111:24 112:25 117:6
**fronts** 99:16
**fulfill** 92:3
**full** 4:20 67:25 81:24
140:7
**fully** 153:11
**function** 8:6 9:3 67:8
87:8
**functional** 6:15 7:3,18,22
7:25 8:3,4,11,19 10:12
13:19 66:13,15 68:6
72:2 87:18,19,22 88:1
88:20,22,22 89:1,2 91:4
91:8
**functionality** 7:16 10:24
**furnace** 74:25 75:3
**furnished** 128:25
**furnishings** 92:25
**furniture** 13:25 76:25
77:3,16 78:15 79:25
92:24 126:5
**further** 4:4 70:3 117:7
158:14

---

**G**

**gap** 51:5
**gaps** 52:6,10 91:15
**garage** 70:24
**Gardner** 2:3,4,18 4:11,18
5:4 45:11 46:11 58:9
64:7 96:10 110:24
114:19 119:25 129:1,3
129:25 131:15 141:7
156:24
**gathered** 72:5
**general** 13:11,22 14:8,10
14:24 39:3,5 41:1 48:7
68:10 70:21 72:13
127:5
**generalized** 77:5
**generally** 48:11 76:16
92:20
**genus** 76:21
**Georgia** 2:5
**getting** 38:19 39:6 101:6
141:20 147:19
**give** 58:5 85:9 137:18
**given** 18:16 67:25 76:10
90:25 97:14
**gives** 73:5 74:25
**giving** 6:4

**go** 5:3 6:11 9:14 10:14
19:12 29:23 37:6,17
46:7,16 48:9,10 70:3
71:11 75:13 80:12
81:20 89:1 92:16 93:14
98:3 103:6,13 114:1
118:17 123:9 125:14
129:3 133:4 134:17
137:6 141:9 150:20
151:11
**goes** 48:12 149:18,20
155:4
**going** 5:5 7:7 9:15 13:7
13:10,11 19:11 25:6
32:15 45:23 46:6 51:23
52:12 57:6,6 67:24
70:19 89:19,20 93:11
103:6 104:8 107:23
108:8,8,23 110:22
111:6 115:15,16 129:5
130:5 155:1
**good** 42:2 66:10 67:6,22
82:24 88:25 93:5 138:9
**Gorham** 11:15,17,19
12:13 52:22 53:1,5,7
136:8,16 137:13 138:7
138:9,16,22 139:10,16
139:23 140:2,8,19,23
141:3,4 142:1 145:5,14
145:18,23 146:2,7,9,20
146:22 147:3,4 148:2
148:10 150:12 153:16
153:18 154:5,7,22,25
155:2,12 156:1,4,15,20
**granted** 54:15
**greater** 73:5 147:14
149:16
**green** 129:21
**GREENWALD** 2:4
**GROFF** 2:4
**grounds** 44:17
**group** 50:1
**grouped** 122:1
**grow** 89:17
**growth** 88:25
**guess** 9:18 20:4 29:21
30:20 32:5 39:7 46:3
50:18 68:12 70:21
74:17 122:22 123:8
125:2

---

**H**

**H** 2:7
**half** 45:23 77:23 79:20

117:8,9 118:23 135:20
**hand** 80:18 131:18
**handful** 135:19
**handwriting** 131:19,20
**hard** 5:20 93:7 112:12
**hate** 130:4
**head** 5:23,23
**heading** 70:4 82:17
  103:17
**heard** 34:13
**heavy** 49:22
**height** 147:15 149:17
**helpful** 36:8 114:21
**Hendricks** 65:24 66:4,5
  67:10 68:23,24 72:6
**hereto** 4:8
**hermetically** 75:17
**high** 31:10
**higher** 14:4 62:14
**Hillbrook** 4:21
**hinge** 8:23
**hinged** 147:20
**Hinshaw** 2:7 5:16 16:3,6
  16:13 20:14 24:15
  27:20 40:19,23 41:17
  45:6 46:9 104:6 107:18
  110:13,21 114:14
  115:16 119:22 124:11
  127:5,24 128:21 129:19
  131:13,16 135:14
  138:12 141:15 142:1,6
  142:20 151:19 152:2,13
  152:20
**historically** 29:1
**history** 6:3
**holds** 15:3
**home** 73:15 92:25 98:9
  98:10 111:13 114:7,8
  115:6 116:10,12 117:5
  117:7 119:11,13,13
  120:5,7,15,16
**homes** 120:9
**honest** 138:15
**honestly** 134:10
**horizontal** 147:13,14
  149:16,17
**hour** 45:23 46:14 59:24
  127:15,23 141:17
**hours** 135:19 136:3,5,7,7
  141:16,17,23
**house** 70:24
**human** 68:12
**humor** 115:24
**hundred** 135:25

**hundreds** 26:7 136:25,25
**Hunter** 1:15 2:18 4:13,21
**hypothetical** 51:18 93:6

**I**

**idea** 13:17 15:8 21:3
  26:17 27:10,17,22 28:2
  42:2 68:5 85:8,20,25
**ideas** 5:4
**identical** 9:20 31:4 32:3,4
  32:5,7,7 56:19,21 57:15
  57:17,19 143:16,20
  144:3,20
**identification** 55:10,12
  58:12 64:11,13 94:20
  130:3 139:3
**identified** 23:20 106:8
  140:4 143:6 144:12
  145:12 156:12
**identifies** 148:10
**identify** 28:12 55:15
  64:14 94:25 99:18
  101:13,18 104:17 148:7
**illustration** 118:13
  140:12
**illustrations** 108:15
**images** 140:23 141:3
**important** 5:18 67:15
  68:6 70:7,9 71:6,10
  72:1,21 138:18 139:18
  139:22
**impose** 80:8
**impossible** 90:16
**impression** 155:8
**impressions** 53:9
**improve** 67:11 75:15
  85:4,7,12,16
**improves** 86:8
**inch** 77:19,23 79:21
**incidents** 50:17
**inclined** 93:12
**include** 80:25 81:2 98:8
  113:13 138:4 142:24
**included** 128:24 137:21
**includes** 99:5
**including** 111:15,24
  119:23
**incorporate** 18:17
**incorporated** 105:12
**incorrect** 149:5 153:9
  156:22
**incorrectly** 150:23
**independent** 47:12 48:3
  48:19 86:3 87:7

**INDEX** 2:17,20
**Indiana** 2:10 69:8
**Indianapolis** 2:10
**indicate** 67:14
**indicated** 144:13
**indicates** 28:18 144:2
**indicating** 60:5
**individual** 23:7,11 39:8
  41:7 42:9 43:11 114:9
  119:14 135:23 137:2
  154:15
**individually** 7:10 40:14
  42:25 94:24 100:24
  137:8 149:9
**indoor** 74:20 92:23
**indoors** 74:1,10
**industrial** 1:19 38:25
  142:11
**industry** 49:21
**ineffective** 10:5
**information** 128:1
**informed** 74:3
**informs** 89:8,10
**infringe** 96:6,18 97:18
**infringed** 53:17
**infringement** 10:15,23
  11:7 19:14,19,20 36:1
  36:10 37:8,15 38:12,15
  52:22 97:3,8,15 133:20
  138:11,17,19,21,25
  142:5 150:12 154:6,10
  155:10
**infringes** 6:13 38:6
  155:14
**infringing** 19:24
**inherently** 40:17
**initial** 31:5,6 130:13
**initially** 40:17
**innovation** 33:16
**inquiry** 114:2
**inside** 74:7 76:9
**instance** 27:2
**instances** 25:8,19 26:13
  43:8 44:6 71:25 100:25
**intellectual** 29:9 39:1
**intended** 15:23 56:6
**interchangeably** 76:17
  77:11,12,14 78:21
  79:14 80:20,21,22
**interest** 53:11
**interested** 26:1 104:13
  122:24 158:16
**interesting** 15:12
**interior** 74:6 91:15,16

**interject** 5:17
**International** 128:16
**internet** 47:2,3,8 48:1,8
  48:20
**interpret** 36:14 152:11
**interpretation** 152:17
**introduced** 4:6
**invalid** 33:24,25 34:6
  40:18 42:8 43:4 132:22
  132:24
**invalidity** 97:4,9 133:20
**invention** 7:4 8:1 23:14
  32:20 33:12,23,24,25
  35:2 40:17 41:15 42:24
  43:3,21,23 45:1,4,17
  53:18 54:6 55:6 102:20
  132:21 143:17,21
  144:22
**inventory** 93:16
**invert** 17:2 65:6
**investigate** 124:17
**involve** 154:13,20
**involved** 30:3,17 38:19
  39:6,25 133:7
**Isle** 13:1 14:17 15:2,8
  38:6 47:11,16,20 48:17
  50:10 57:12,16,21
  63:11,18,20 73:24 74:1
  74:21,22 126:7 155:21
**isolated** 99:25
**isometric** 61:17
**issue** 20:18 41:19,20
  44:13 68:13 73:12,13
  85:18 100:23 105:23,24
  117:22 153:15 155:24
**issued** 16:18 94:23 95:16
**issues** 39:11 44:19 148:20
**issuing** 124:9 127:16
  136:13 137:11,20
**item** 30:10
**items** 57:17 154:9

**J**

**James** 2:7
**Jeff** 2:15
**job** 69:6
**Joe** 2:3
**Johnson** 1:17 3:20 158:4
  158:20
**judge** 96:24
**jump** 51:24 52:12

**K**

**keep** 6:4 123:10 147:19

Page 8

kennel 14:20 15:10
kennels 73:18
kin 158:14
kind 5:3,3 30:14,17 50:24
    51:10 69:18,24 72:13
    77:5 81:10 89:18 90:1
    92:5,18 93:17 110:8
    120:7 124:10,23 129:11
    133:11
kinds 14:2 141:12
kitchen 10:6
Kleenix 77:5
Klinghammer 70:23
knit 44:20
know 8:22 10:5,8,19,20
    11:3,5 15:1 19:8 20:16
    20:17 28:12,24 32:2,8
    35:8,13,14,22 42:12
    43:6,15,22 44:8 49:2
    50:18 53:2 54:2,12,14
    54:19 56:9 66:9 67:24
    68:13,15 69:19,23 70:9
    70:25 71:5,9,17 72:10
    73:17,18,19 77:6 78:10
    79:12 81:6 84:3 91:16
    92:3,6,21 93:11 95:3
    99:16 101:20 107:9
    112:1 115:10,11 118:11
    121:16 132:25 133:1
    134:17 135:8,21 137:7
    141:17 143:2,3
knowing 54:14
knowledge 12:7 43:17
    59:11 81:24
knowledgeable 126:8
KSR 21:7,9,11,15 22:2,3
    22:4,8,18 23:3 44:9,12
    44:22,25 45:16 128:4,7
    128:15,18 130:23

L

labeled 114:4 132:6
laboratory 67:20 70:13
language 81:11 85:11
    98:17 146:5 150:7
laptop 8:24 9:4,5
    99:14 158:6,21
largely 100:6 107:13
larger 68:15 92:16
law 2:4,8,12 38:23 39:13
    39:16 126:23 127:3,9
    127:20,25 128:2 137:7
    138:9

lawsuit 28:6 30:4 38:20
    39:6 40:9
lawyers 40:3
lays 133:24
learn 50:16
learned 97:11
leave 123:11
leaving 58:7
left 16:14 142:3,14,19
legal 20:15 24:16 27:3,8
    27:11 45:8
legality 20:18
legally 20:11 24:12
legs 46:1
lends 17:12,14
length 127:10 147:14
    149:16
lessen 74:12
letter 133:22
let's 11:9,18 16:1 20:22
    29:17 33:12 34:15
    35:14 42:13 51:7 58:9
    58:18 64:7 65:13 72:15
    76:12 78:5,7 80:12
    81:13 83:17 94:3 95:24
    98:3 103:13 110:3
    114:1,2 116:20 119:7
    121:2 129:3 138:7
    141:7 143:4
level 13:23 48:24 52:5
    53:8
library 125:5 137:7
License 158:22
light 18:10 20:1 34:1
    91:15 92:5 145:16
    149:7 150:19,25 151:8
limited 54:20,22,23 90:21
line 8:16 159:15
lines 11:2
lineup 108:4
list 133:25 134:2
listed 126:2,12 159:5
little 13:6,12 14:14,19
    15:9 30:12 34:12 46:17
    61:1 65:12 112:12
    132:12
live 4:21
local 46:4 47:16
located 60:16
lockable 147:20
logical 95:24
long 7:13 103:7 136:1
    155:10
longer 31:9 150:17

look 6:15,17,20 7:8,13
    8:21 9:7,8 10:1,23,25
    11:1 13:11 15:1 17:1,7
    20:8,9,9 23:10 26:23
    36:13 37:10,11,22 39:8
    44:2,3 48:10,11 49:9
    53:20 54:1 56:1,13,14
    56:24 57:14 65:13,13
    70:6 72:15 75:11 77:2
    81:7,13 82:14 83:19
    84:12 85:22 89:4 93:4
    93:12 94:3 116:20
    118:20 119:7 121:2
    128:22 131:11 132:20
    132:23 133:4,19 134:11
    134:13 142:12 143:4
    152:25 156:1
looked 25:2,3,11,23 26:2
    26:7 41:22,25 57:14
    96:18 99:5 105:11
    124:25,25 125:1 126:11
    132:18 134:1 155:21
looking 12:9 15:20 25:11
    25:12 26:21 32:1 57:2
    60:12,15 61:15,15,16
    62:4 63:13 68:9 69:13
    69:19 86:11 90:6 93:19
    94:14 95:22 102:17
    104:8 107:10 123:19
    128:10,12 129:19
    142:24 147:24 151:3
    154:13 155:21
looks 7:4 9:25 44:13,16
    44:18 56:1 57:12 90:18
    99:17,18 106:7 112:11
    121:19 131:20 134:11
    135:25
loose 73:2 74:16 75:21
loose-weave 74:13
lot 48:8,12 73:9 78:8
    80:14 91:14 93:17
    133:12 134:16
lots 26:6 107:8
loud 45:7 81:17 84:23
    125:24 143:9 144:25
lunch 46:5,13,15

M

M 1:17 3:19 158:4,20
mail 16:7
maintain 147:18
major 44:19
majority 74:8 106:25
    107:1,3 119:12 121:13

125:6
making 46:19 51:21
    79:24 84:9 91:11 142:9
    142:23 151:9
Mallory 1:16 3:19 158:4
    158:20
man 69:17
managers 50:3
manifestation 155:23
manner 4:7 37:20 158:16
manual 64:20
marathon 45:22
marked 55:10,12 57:7
    58:11,13 64:11,13
    130:2,7 139:2,4
market 2:9,9 14:14
marketing 14:6 49:17,18
    49:19,20,22 50:1,3,4,5
    125:22
marketplace 50:13 77:15
    77:22 78:24 79:3 81:9
    81:11
match 61:18 92:24
matching 93:12
material 21:6 29:2 32:21
    47:7 58:4,6 65:21
    72:18 75:22 77:17,18
    78:6,7,9,13 79:11,12
    80:2,11 81:5,8 87:17,18
    88:10,13,15 90:5 92:7
    93:10 124:16 128:20,22
    128:24 133:13 134:16
    136:1,11,21 140:15
    143:16,20 144:3,6,21
    145:11,16 147:24
    149:10,11 151:1
materials 72:20 85:1
    91:18 124:18,20,23
    126:11 136:24 137:23
matter 7:12 66:6 96:17
    152:10 158:9
McCune 69:1 71:9,21
McHALE 2:8
mean 6:24 9:6 13:16
    20:23 27:14 36:21,24
    37:22 41:15 56:15
    61:15 63:2 64:5 68:4
    77:6,7,9,25 78:19 79:19
    80:19,25 81:2 83:4
    85:6 92:2 93:4,17
    95:13 107:18 108:14
    113:1 118:4,20,22
    120:1 124:19 131:25
    139:13 146:6,7 155:5,6
meaning 29:19

means 17:21,23,25 18:4
    18:11 40:17 83:9
meant 29:25 30:8 31:18
    56:17 80:6,10 83:2
    85:11
measured 152:6,7
measures 69:20
mechanical 9:3 39:10
medical 6:3
medicine 65:25
meet 24:13,24 25:9 26:4
    26:14 99:9,21 100:21
    102:19 103:4 104:18
    105:7 106:10 110:10,18
    113:7,10,18 114:13
    115:3 116:1 117:16
    118:15 119:20 120:2,24
    121:10,21 122:7,13
    123:4,14
memory 6:8
mention 15:7 18:17 22:5
    45:20 71:25 89:13,13
mentioned 40:11 51:23
    52:22 67:17 89:16
    102:21 103:9 124:4
    125:3 133:13 137:22,25
    139:12
mentions 71:25
mere 41:11
merely 146:24
merge 37:20
mesh 73:10
met 141:15
metal 1:8 13:2 72:20
    85:23
methods 85:4,6
middle 1:2 142:5,12,15
    142:18
Mid-West 1:8 13:2 46:20
    46:23 47:1,11,20 48:17
    50:10,12,23 51:1,20
    52:7 57:12,16
mind 35:24 42:6
minimal 100:9
minimum 100:13,21
    101:20 103:2,3,23
    104:2,17,18,21,24
    105:5,5 106:9 111:18
    113:3,5,5,6 114:12
    115:1,25 116:3 117:15
    119:20 123:3
minute 138:7
minutes 127:11,12,13
misheard 104:20

misspoke 22:22
Mo 16:3,5,8,18,20,21
    17:18 18:10,17,22 19:2
    65:2,7 114:17,20 115:6
    119:24 120:1
model 96:3,4
modified 35:15,16
modify 108:11 134:25
mold 89:18 91:7
molded 90:13,14
moment 20:23 58:18
    87:12 122:24 123:2
Monday 1:21 158:6
MONTGOMERY 158:3
month 22:22
months 22:13,14
morning 52:20 64:23
move 29:16 49:13 111:6
multiple 23:8,10,14
    24:13,23,23 25:9,11,20
    25:23 26:19 27:7 38:2
    44:10 100:17,25
mythical 51:18
M-O 16:9

_____ N _____

name 4:20 5:4 52:17
    68:25
narrowed 108:23
native 76:22
natural 89:22 90:3,4,5,8
    90:22,25
nature 138:23 143:1
necessarily 41:15 43:2
    78:11
necessary 36:4,10,15
    99:9 113:7
need 3:24 5:24 6:17,20
    18:7,15 44:2,3 45:24
    49:24,25 50:18 53:25
    59:22 70:18 100:10,20
    101:21 106:5 111:18
    112:17,17 113:11
    114:12 115:2 119:20
    134:1,23
needs 5:21 72:21 73:3
    74:14 150:16,16
negligible 76:4
neither 120:10 158:14
never 50:5
new 31:20 44:21 53:17
    86:1,4 108:4 141:9
newness 30:21
nice 9:24 10:2,5,7

nicely 13:21
nitpicking 56:15
nodding 5:22
nondoor 98:14 102:3,11
    109:12 110:1,3,4
nontrivial 21:1,4
nonwindow 98:13 102:1
    102:2 109:20 117:10
nonwoven 98:16 99:12
    99:14,14 102:13
normal 34:10
normally 34:9 75:3
NOS 2:21
NOTARY 159:12
notches 51:2,15 52:4,11
note 40:7 133:11 147:21
notes 131:9 143:13
notice 1:16 14:9 52:2,3
    155:7
noticeable 52:4,7
noticed 52:18
novel 20:1 145:4
novelty 11:1 19:15,16,18
    19:21,25 20:6,10,12,21
    20:22,23,24 21:9,22
    22:5 23:7,8,15,19,25
    24:7,14,20,22,25 25:10
    25:22 26:5,9,15,20
    27:12,19,24 28:4,11,20
    28:25 29:18,19,24,24
    30:5,11,14,17,18 31:23
    52:24,25 53:6 93:25
    94:10,21 95:1,6,12,19
    95:19 96:15 97:3,6,8,14
    97:16,24 98:5,7,8 99:3
    99:4,8,10,22 100:11,17
    100:22 101:10,22
    102:20 103:5,20,24
    104:19 105:7 106:10
    108:13 109:6 110:12,19
    111:4,12,20 112:21
    113:8,10,19 114:3,6,11
    114:13,23 115:3 116:1
    116:15,25 117:4,17
    118:16 119:9,21 120:20
    120:23,25 121:5,8,11
    121:21,22 122:8,10,14
    123:5 133:2,7 145:19
    145:24 146:24 147:6
    148:2 150:3,10,13
    152:12,19 153:3 154:14
    154:21,24
now's 46:6
number 16:17 40:16 41:6

49:20,21 50:19 60:20
    60:24 61:19 69:21 72:8
    72:8 101:20 103:3
    104:18 105:5,11 112:6
    112:23 113:6 117:24
    119:1 122:2
numbered 125:21,22
numerous 71:24 140:4
nylon 73:10

_____ O _____

oak 80:16
object 9:25 10:1 32:1
    33:19 34:4 44:2 115:17
    138:12 139:18
objection 5:17 20:14
    24:15 40:23 41:17 45:6
    45:8 110:13 142:6,20
    151:19 152:2,13,20
objections 3:22,23
objects 10:17 57:5
observe 51:19 70:6
observed 139:20
observer 6:17 11:21,22
    11:23 12:1,10,11,16,17
    13:3 46:18 51:19 133:3
    139:19,24 140:1 145:5
    146:3 153:23 154:8
    155:4,6,8 156:20
observing 12:18
obvious 33:17,25 34:8
    35:4 40:18 41:16,23,24
    42:4 43:5,23 51:14
    56:22 81:23 132:4
    134:7
obviously 43:17 67:23
obviousness 33:12,13,14
    35:6,9 41:3,19
occasion 23:2 66:5
    127:19
Occasionally 135:13
occasions 135:24
occur 100:24
occurred 104:10
offered 4:1
office 39:19
Off-the-record 129:2
    130:1 141:10
oh 51:7 84:25 118:4
    128:6 132:10
okay 12:14 25:15 32:17
    36:2 37:22 41:4 42:15
    42:17 59:13,20 62:18
    63:16 65:19 66:17

76:13 84:18,19,25 88:4
88:18,21 89:23 93:20
104:23 118:7 119:8
124:23 130:10 143:5,7
154:4 155:18
old 21:11 44:13 45:2,5,18
once 5:2,3 6:25 93:9
online 47:9 125:5 126:4
open 9:3 62:17 67:23
73:1,1,10 75:8,9,9,10
76:9,10 100:4,6,8
109:11,15
opening 58:7 106:18
opinion 67:4,10 68:22,22
68:24,25 71:23,23 86:3
95:5 128:18 140:20,23
150:18
opinions 15:14 16:22
17:11 18:8,24 19:3
64:24
opposed 51:16 74:7
75:21
opposite 51:11
order 7:9,11 19:19,19
32:9,18 59:17 82:23
112:19 113:17
ordering 47:25 48:1,2
ordinary 6:17 11:21,22
11:23 12:1,10,11,16,17
13:3 33:18 41:21 46:18
81:23 133:2 139:19,24
140:1 145:5 146:3
153:23 154:8 155:4,6,8
156:20
original 15:6
originally 47:15 129:17
origins 28:25
ornamental 6:19 8:7,7,10
8:19,21 9:12,16,19,20
42:14 86:23 87:4,5,5,10
87:15
ornamentality 8:11
outer 98:10 101:24 110:2
110:5 114:10 115:8
117:11 119:12
outside 28:5 70:2 73:15
74:8 95:3 127:22
overall 8:12 10:25 51:24
53:9 62:21,22,24
129:11 139:17 145:6
148:3,6,6 155:4,8
156:21
owner 73:16
owners 73:17

oxymoron 81:10

___

**P**

page 65:20 70:4 72:16
81:13,19,20 82:14
84:20 98:4 99:23
100:11 102:21 103:13
105:8,21 106:13 108:1
109:8,14 110:6 111:8
111:11,22,23 112:4
113:21,23 114:1,4,25
116:2,20,23 119:7
121:2,3 125:14,17,21
125:22 128:10,12,13
129:9 130:16,18 131:11
131:17 132:9 134:3,22
134:22 143:4,7 144:25
153:8,17 159:15
pages 47:6 65:14 83:19
99:17 123:24 136:1
158:10 159:4
palm 76:21
panel 17:4 90:14 119:16
119:17
panels 75:25 114:5,9
115:7 119:15,15,17,18
paper 129:10 148:20
paragraph 84:15,23
103:19 125:24 126:13
143:9,24 144:24 146:6
146:10,17,19 147:2,9
148:10,25 149:1 150:22
153:17 156:19
paragraphs 121:18 122:3
150:15 156:6
Park 69:8,9
Parkway 2:12
Parry's 2:22
part 3:10 7:18,25 8:8,11
8:14 21:22 29:10 36:10
52:3 61:13,14 66:14
100:23 113:1 117:22
126:12 129:14,15,15,23
130:5 133:23 140:15
141:5
particular 13:9 17:1 26:9
26:9 27:11 29:9 33:16
35:21 38:24 41:24
72:15 80:8 99:7 131:5
139:25
particularly 122:24
139:18
parties 3:16 4:5 157:3
158:13,15

partly 86:23
parts 131:18,25
party 4:8
pass 57:6 58:13 75:24
129:5 139:4
passage 143:18
passages 135:3,23
passed 64:12
passing 55:11 130:6
patent 3:3,5 6:13,20 7:6
7:19 8:2,13,18 9:7,24
10:9,10,11,15,16,22
11:7 15:5,5,21 16:4,7,9
16:17,21,21,24 17:3,8
17:18,20 18:2,10,10,16
18:17,22,25 19:2,13
20:16 21:16,18,20
22:16,24 23:14 31:4,5,6
32:9,12,18,20 34:6,15
34:20 35:3,21 36:1,5,9
36:17 37:1,7,13 38:2,2
38:3,7,23 39:13,16,19
39:25 40:4,5,14,18 41:5
41:8,9,10,13 42:8,13
43:4,13,14 44:7,17
51:17 52:21 53:16,21
53:23 54:2,5,10,20,25
58:17,18,22 59:1,6,12
59:17,18 60:21 61:5,11
61:22,22 62:2,19,25
63:6,11,19,23 64:19,25
65:3,7 73:23,24 75:7
82:5,12 84:25 86:15,22
87:4,14 88:20 89:5,7
90:6,18,25 91:3 93:22
94:1,5,9,11,17,21,24
95:1,7,11,16,17,18,20
96:2,5,7,19,20,22 97:16
97:18,21 114:17,20
115:7,9 116:4,5,6,10
117:24 118:7,19,25
119:5,24 120:1,1,4,13
120:14,19 122:17
125:24,25,25 126:1,3
126:23 127:3,9,20,25
128:2 129:24 132:21,24
133:15 138:11,14,19
139:14 141:6 142:4
143:10,22 144:5,10,15
144:18 145:15,20 146:1
146:13,23 147:6 148:3
148:12,18 149:3,12,20
150:24 151:2,7,23,24
152:7,17,18,23,25

153:6,6,21 155:13,18
155:22 156:1,9,16
patented 8:8 36:3,11,20
45:1,4,17 85:2 140:6
150:2 153:19
patents 7:21 9:9 10:18
15:19 21:25 23:8,10
26:7 29:11 32:24,25
33:1,4 38:23 39:2,3,7,9
39:13,13,16,20,22 40:8
40:8 44:15,20 54:15
82:19,21 85:1 89:12
126:2,6,17,20,25
127:23 131:5
path 75:4
patient 16:5
pattern 51:9 74:13 87:3
88:1 90:14 93:13 95:3
patterned 87:21
patterns 82:1 87:2
140:13 142:25
Paws 47:15
pay 11:23 49:13
paying 11:22 13:24
people 5:10 13:22 48:16
49:13,20,23 50:4,19
93:10
perceive 93:10
percent 124:6
performing 9:2 35:6
permissible 20:11 24:12
26:18 27:6 28:10
person 13:6,13 14:12
33:15,17 34:9,10 41:21
46:19 48:14 57:2
127:20
Personally 104:8
perspective 12:9,15
pet 13:1,8 42:1 47:12,16
47:21 48:3,4,19,19,24
52:6 82:3,7 85:4,7,12
85:13,16 86:1,4,8 87:10
88:2 98:8,10 111:13
114:7,7 115:5 116:10
116:12 117:5,7 119:11
119:13,13 120:5,7,9,15
120:16 147:10,19
Petco 14:13
phone 124:13,14 127:7
photocopied 131:4
photograph 2:23 3:2
112:13,16
photographed 126:7

BRET SMITH
APRIL 28, 2008

phrase 9:18 35:12 146:18
physical 155:23
pick 13:14 104:21
piece 20:2 88:7 90:13
    100:1
pieces 31:10,18 44:20
    115:21 143:10 149:2
    150:23 154:3
pigeon 105:13 117:18
    118:18
pitfall 93:17
place 28:19 47:16 49:11
    69:7 107:24
placement 60:13 62:14
places 70:15
plain 87:1,3,9,13,20
Plaintiff/Counterclaim...
    1:6 2:2
plant 76:18 90:4
plastic 76:7 90:13
plastics 72:21
plate 52:17
play 7:16
played 8:14
please 4:19 19:14 40:20
    45:12 57:11 64:15 71:3
    84:17 104:7 110:15
    143:8,9 146:16 152:15
    153:24
pleasing 82:3,7,11 86:19
plywood 91:14
point 14:3,4,6,11 15:12
    19:15 20:3,4,5,6,12,24
    21:9 22:5 23:6 24:6,14
    24:22 25:1,2,9,22 26:4
    26:9,15,20 27:5,11,19
    27:24 28:4,11,20,25
    29:4,18,22,24 30:18,20
    30:22 48:23 51:12
    52:24,25 53:6 60:4
    61:16 62:10 72:11 74:4
    92:11 95:1,11,19 97:3,5
    97:7,14,16 98:5,7 99:1
    99:2,4,7,10,22,24
    100:11,21 101:10,22
    102:20 103:1,17,20,24
    104:19 105:7,8 106:10
    106:11 108:10,11,12,12
    109:5 110:11,19,19,23
    111:3,6,12,19 112:20
    112:21 113:9,10,18
    114:3,3,6,11,13,23
    115:3 116:1,15,25
    117:4,16 118:16,24

119:9,20 120:19,20,23
    120:25 121:4,11,21,22
    122:7,8,14,23 123:5,15
    129:22 145:18,23
    146:24 147:6 148:2,22
    150:10,12 151:4 154:23
pointed 156:5
points 11:1 19:15,18,21
    19:25,25 20:10,21
    21:22 23:8,11,14,19,25
    24:3,20,25 31:23 44:10
    62:5 93:25 94:10,20
    95:6,19 96:14 97:24
    98:8 100:17 103:5,11
    110:12 111:4 113:8,18
    121:6,8,12,13,14,15,17
    122:1,3,9,11,15,17
    150:3 152:12,19 153:2
    153:2 154:14,21
point-by-point 154:15
Poor 91:5
poorer 75:1
pop 13:13 14:12
porch 73:18
portion 11:11 29:24 89:7
    98:14,15 102:3,11,12
    109:12 110:1,3,4
    132:19 134:13,14,21
    146:14
portions 72:9 98:13
    102:2,2 109:21 117:10
position 17:13
positioned 117:8
possible 30:10,10 34:24
    37:8 50:8 54:5 71:13
    71:19,22 75:16 91:12
    91:24
potential 10:22 19:13
poultry 109:13
Power 2:5
preceding 134:22
Predictable 82:17 84:23
prefer 65:2 68:20 70:15
preliminary 127:6
prepare 22:20 124:2
prepared 22:15,23
preparing 22:12
present 2:14 25:13,25
    50:23 96:16,24
presented 138:23 140:3
presently 15:14
presidents 50:2
previously 57:7
pre-exist 34:8

pre-existing 27:1
price 14:3,4,11 48:23
pricing 92:9
primarily 9:24
primary 35:7,8,10,13,20
    35:22 134:24,25 135:4
    135:8
printout 130:18
prior 6:21,23 9:22 17:6
    17:15,17 18:2,13,19
    20:1,3,7 21:1,4 22:18
    24:13,24 25:4,13,25
    26:3,10 30:22 31:3,10
    32:10,11,19,21 33:8,10
    33:22 34:1,8,18,21
    38:19 39:5 40:5,9,15,16
    41:7,13,18 42:10,18,25
    43:20 44:20 55:16
    81:25 85:2,19 96:16,23
    98:20 100:1,14 101:1,4
    102:17 103:3,22,25
    105:6 106:9 107:9
    111:20 112:18 113:2,3
    113:6,11 115:2,12,21
    117:22 119:19 120:6,17
    121:9,16,20,25 122:6,9
    122:12,16 123:3,13
    124:9 126:2 127:3,16
    128:2 136:13,22 137:11
    137:20 140:16 143:15
    144:20 145:2 146:19
    149:2,13 150:23 151:2
    151:6,17,25 152:5,24
    153:1,7 156:5,6,8,11
privacy 68:12
probably 52:18 83:9
    92:22 93:2 107:9,25
    127:15 136:6 138:2
    141:22
problem 78:3,4
problems 93:8
Procedure 3:18 4:3,9
proceeded 135:15
process 60:3
processed 80:15
produced 129:6
produces 91:7
product 6:12,16,25 7:4
    10:14,22 11:24 12:7,9
    12:19,20 13:1,4,9 15:9
    19:12,23,23 24:17 36:3
    36:8,12,18 37:9,11,12
    37:18,21,24,25 38:6,6
    38:11,13,18 39:11

46:20 48:14,17 49:12
    49:14,16,23 50:10,12
    50:13,23 51:1,20 52:1
    53:12,17 57:14,16,21
    63:11,18,20 72:25
    73:24 74:21,22,22
    78:17,18,24 79:8,9 88:6
    88:8 90:4,4,8,10 95:25
    96:6,17 112:9 124:6
    140:6,6 153:21,22
    155:16,16,17
production 93:14
products 1:8 13:2 14:18
    46:23 47:1,11,21 48:5
    56:12 74:1 77:16,21
    78:1
Prof 3:10
professor 3:7,9 65:25
project 69:6
projects 49:21
pronounced 17:5,16,24
    51:2,4
proper 27:13,22 28:3
property 29:9 39:1
proportion 60:9 61:16
    62:18,20,22
proportionally 60:4
proportions 60:16
proposition 139:17
protect 9:9,10,11 39:7
protected 70:16
protection 8:18
protects 9:24 10:1
prove 19:20
provide 70:5 82:23 84:10
    91:19 107:8
provided 4:2,8 71:8
    106:22 126:10
provides 83:12 86:18
providing 66:9 82:2
psychological 70:8,10
    71:7
psychology 69:3,12 71:14
    71:16
PUBLIC 159:12
publication 68:1,3,8
pulled 16:1 55:24
purchase 46:20 49:4,11
    50:9 53:11 74:5
purchased 48:6
purchaser 14:9,10,18,25
    15:8,10
purchases 48:8
purchasing 11:24 12:20

12:25 14:19 48:2,3,17
48:18 51:22
**purely** 7:18 8:4
**purpose** 4:2 87:18,20,22
88:1 89:2
**purposes** 13:19,20,21
37:15 55:12 64:13 82:2
89:20
**pursuant** 1:16 3:17
**put** 15:23 58:10 59:16
73:6,17 103:1 115:19
117:21 138:1
**putting** 85:12 127:4
128:2
**p.m** 157:5

**Q**

**qualify** 87:15
**qualities** 59:25 89:1
**quality** 13:25 66:18,19
66:20 67:12 76:8 91:16
**quarter** 77:18
**question** 5:8,11,12 18:5
21:21 29:15 33:20 36:6
37:5,6 40:20 43:6 44:1
45:10,15 48:15 62:8
71:3 100:15 105:3
110:15 113:14 114:15
114:22 115:17 119:24
133:20,21 135:11,14
138:23 147:3
**questions** 3:22,24 5:6
133:25
**quibble** 10:2 105:2
**quick** 141:8
**quickly** 57:3
**quite** 18:6 96:8 110:22

**R**

**rabbits** 68:16
**raised** 113:19 122:18
**raises** 97:25
**ran** 69:21
**rationale** 25:17
**rattan** 72:17,17 75:21
76:15,16,17 77:2,3,11
77:12 78:2,12,19,20,23
79:7,17,23,25 80:1,24
81:6,9,25 83:23 84:5
85:10 88:6 125:1
**reach** 16:23
**reached** 17:11
**read** 4:12 22:2,3,8 27:25
29:2,10 40:20,21 44:22

45:11,13 72:4,7,9 74:2
81:16 82:19 84:22
96:10,12 118:18 124:15
125:23 128:18,20 133:9
133:11 134:15,15,17,20
135:3,21 136:2,10,11
136:16,21 137:2,4,4,5,5
137:7,10,13,19 138:15
140:7,9,19 141:14
142:8 143:8,25 144:24
149:10 153:25 159:3
**readily** 56:23 57:21
**reading** 21:6 47:13 72:13
89:11 97:11 126:24
136:9 142:22
**ready** 46:16 141:12,20
**real** 55:25 141:7
**really** 22:1 32:1,1,2 51:10
52:4,7 70:9 83:4 155:3
**rear** 98:13 102:3 109:19
117:6,9,10 118:8,8
**reason** 48:23 76:5 78:3
87:16 121:24 159:15
**reasonable** 53:11
**reasons** 74:5 92:10,22
93:18 107:8 112:22
**recall** 22:7,7 28:22 47:4
47:13 66:24 67:1 70:17
70:22 83:18 126:14
127:10 128:4 131:23
135:18 136:18 137:18
138:22 139:1 140:9,14
140:14,16,21,25
**receive** 124:9
**received** 76:3 128:1,21
**recess** 46:15 64:9 111:1
141:11
**recessed** 157:4
**recitation** 116:24
**recited** 98:7 114:6,25
**recognize** 57:9 58:14
130:11
**recognized** 85:3
**recollection** 54:1 141:2
**record** 4:20 5:14,18,25
40:22 45:14 46:16
60:17 96:13 129:1,4,25
154:1
**rectangular** 82:1 98:9
100:1,3 101:23 102:5
109:19 111:13,14,23,24
111:25 112:3,20,24,25
113:22 114:7 115:6
117:5,7,12 119:11

147:12 149:14
**rectilinear** 147:13 149:15
**reed** 77:22 78:8,10,17,17
79:8,9,20,22
**reed-like** 77:17
**refer** 11:9,17 16:20 24:12
44:9 54:12 57:6 65:2
78:16,24 91:1 105:9
136:24 146:19 147:2
**reference** 25:20 28:17
32:10,11,19,22 33:8,10
33:22 34:18,21,24,25
35:7,9,11,13,19 41:13
42:20,20,21,22 54:17
68:1,7,14 98:20,25
101:14,15,16,17 107:14
112:18,19 114:12
118:15,15 120:17
131:14 134:24 135:1,8
143:15 144:20 151:18
151:25 152:24 153:1
**references** 24:13,23,24
25:9,11,23 26:4,6,11,14
26:19 27:7,13,18,23
28:3,10,20 34:2 35:20
35:23 40:16 41:7,22
42:11,19,19 43:11
59:15 62:1 99:8,19
100:20 101:19,20 103:4
103:22 104:18 105:6
106:9,16,24 108:24
109:2,4,24 110:9,17
111:18 113:7,11 115:2
115:14,14,19,25 116:16
116:18 117:15 119:19
120:24 121:9,20,23
122:6,13 123:14 126:10
134:25 135:4,5 151:6
156:12,14
**referred** 16:11,12 28:17
76:19 80:1 83:21
107:11 112:5 146:9
**referring** 16:17 21:15
60:6 78:1 79:8,10,21
84:12 128:8 141:24
145:8,9 146:12,15
**refers** 69:17
**reflected** 62:13
**reflects** 109:15
**refute** 100:10
**regard** 20:24 113:9 114:2
153:16
**regarding** 9:8 16:23
17:19 18:9,16,25 19:3

39:20 64:24 93:21 94:4
94:9,11,17 127:9,24
128:1
**regardless** 7:9 49:10
87:19
**regions** 76:22
**regular** 89:14,15
**reinforce** 66:18,20
**reinforces** 16:25
**relate** 29:8 30:24 36:17
102:14,23 115:20,22
**related** 29:10 78:11,13
**relates** 21:16 115:13
**relating** 39:15
**relation** 139:10
**relationship** 52:25 53:4
53:13 109:1
**relative** 10:17 23:11
64:19 68:14,24 69:1,5
128:20 148:17
**relevant** 126:6,16,20,24
**relied** 24:23 25:20 26:3
26:10,13
**rely** 26:18
**relying** 98:24 121:10
**remember** 134:12,14
136:9
**remind** 133:3
**reorganized** 141:8
**repeat** 29:3 36:6 45:10
96:8 110:15 146:16
151:21
**rephrase** 32:15,16 57:15
**report** 3:7,9 15:22 16:9
16:12 22:15,20,23 23:2
25:16 64:20 65:16,17
71:24 76:20 77:10
79:13,15 80:6,22 81:14
86:25 91:11 93:21,25
94:4,8,10,15,19 97:23
97:25 98:2,24 103:15
106:4 108:6,21 111:6,8
113:20,23 114:16,25
116:21 117:1 119:10
121:3,10 123:19,20
124:4,10,12 125:7,10
125:12 127:4,16 128:3
128:6,8,19,25 130:14
133:18 136:13,22
137:12,20,22,25 143:4
149:23 156:13
**reported** 158:7
**reporter** 1:17 3:20 5:20
5:21 40:21 45:13 96:12

153:25 158:5
**REPORTER'S** 158:1
**reports** 14:23 15:4,6,7,15
  16:23 17:19 18:9,15,25
  19:4,6,8 23:5,6 24:19
  25:8,19 28:18 44:11
  55:18 64:18,21 79:5,19
  94:23 97:22 141:14
  151:11
**represent** 96:21 149:25
  150:5 154:22
**representation** 56:9
  150:4
**representing** 3:16 4:5
**represents** 20:25
**require** 110:9 116:16
**required** 36:9 122:13
  123:4 124:18
**requires** 33:7 120:24
  143:14
**reread** 22:18 23:3
**research** 68:2 101:3
  112:1 125:5
**researched** 69:5
**resembles** 142:15
**reserved** 3:25
**residence** 13:1 88:3
**residences** 73:14,21
**resin** 89:21,21 90:3,22
**resources** 126:4
**respect** 22:6 32:4 67:7
**respects** 32:5,21 143:21
  144:4,21
**respond** 50:20 53:2
**response** 41:24 66:11
**rest** 118:20 123:10
**resting** 70:15
**restroom** 45:25
**result** 54:11
**results** 92:1 158:17
**resume** 156:25
**retailer** 13:7
**retarding** 88:25
**return** 135:11
**returned** 135:23
**review** 36:10 125:24,25
  126:12 127:22 138:2
**reviewed** 126:1,16
  137:23
**reviewing** 125:25
**revise** 150:21
**revisit** 150:19 151:3,12
**rewritten** 150:17
**ridged** 83:4,7

**ridges** 83:5
**right** 6:10 27:4 30:13
  46:11 49:7 58:9 61:1
  61:10 65:4 77:24 78:22
  78:22 94:1 97:12
  103:13 106:8,13 108:4
  108:6,25 110:8 112:8
  114:1 130:4 134:3
  135:9 142:16 155:25
  156:22
**rigid** 82:23 83:1,7,9
**Road** 2:5
**Roberts** 122:18
**rodents** 68:16
**role** 7:15
**roles** 8:14
**roof** 52:6
**room** 95:25
**roughly** 63:5
**Ruffles** 83:5
**rule** 96:25
**Rules** 3:18 4:3,9
**ruling** 3:25
**Russian** 60:8 62:23
  105:15 123:7
**R-I-G-I-D** 83:2

_____

**S**

S 3:4,5 134:11
**safe** 67:8
**Sandra** 69:1 71:9,21
**SANTOS** 2:4
**Saturday** 141:16
**saw** 47:15,15,16 131:1
  140:11,25
**saying** 8:10 24:2 34:3
  44:1,5 62:4 96:9 149:1
**says** 125:24 126:15
  151:15
**scaled** 56:8
**scenario** 43:9
**school** 125:4
**scope** 7:13 55:1 95:20
**scratch** 12:12 121:8
  126:22 146:8
**screen** 91:23 92:14,19
**sealed** 75:18
**search** 68:10 124:19,24
**seat** 98:14
**second** 3:8 5:16 15:17
  22:23 23:1 35:18 41:9
  76:12 82:16 94:15
  111:12 128:6 147:9
**secondarily** 52:18

**secondary** 35:19,20
  134:25 135:5
**section** 68:17,19 125:15
  131:12 133:8 143:13
  149:23 150:16,19
**sections** 126:6,16,20,24
  149:22
**see** 6:12 14:25 16:1 29:17
  51:7 52:5 53:16 65:20
  68:7,11 69:13 70:19
  72:23 80:19 83:7,17
  91:12,12 98:16 103:17
  107:11 110:3 111:11
  116:23 117:13 121:24
  130:21 131:6,17 132:12
  133:17 134:6 138:4
  143:11 153:21 154:2
  155:13 156:4
**seeing** 140:14 154:7
**seen** 41:23 47:3,6 48:13
  73:17,17 77:15,16
  100:2,4,5,7,8 139:5
  140:16,22 141:3
**see-through** 111:15,25
  112:3,25
**self** 133:11
**selling** 120:8
**sense** 42:3 60:24 77:4
  86:2 89:24
**sent** 16:7 124:16 136:24
**sentence** 81:16,18,19
  82:19 83:21 84:22
  153:13 156:18
**separate** 137:13
**September** 103:14 111:5
  113:20 114:24 117:1
  119:10
**sequence** 58:21 63:16
**session** 45:22
**set** 58:18 103:3,23 104:2
  104:17,22,25 105:5
  106:9 113:3,5 158:13
**sets** 138:17,20
**seven** 99:18,24 121:18,19
  121:23 122:4
**shaking** 5:23
**shape** 51:25 62:21,22,24
  91:14 98:9 147:12
  149:14
**sheet** 72:20
**shifted** 81:11
**shops** 47:12
**shorthand** 11:10
**show** 7:22 17:14 19:20

33:10 34:19 35:1 41:7
  43:20 65:6 82:22 99:13
  99:25 101:19,23 103:11
  104:9 105:21,23,25
  108:25 109:5,25 112:9
  113:2,3 115:12 118:7
  118:22 119:2
**showed** 32:11 37:2,2,3
  42:14,20,21,21,22
**showing** 99:24 143:14
  144:19
**shown** 7:6 18:19 32:12
  32:20 42:25 54:2,3,7,10
  54:18,20 55:1,6 58:22
  58:25 59:8,11,17,18
  61:4,11,25 62:2,25 63:6
  63:19,23 73:23 82:11
  84:4,10 85:19 86:15
  88:2 90:7 91:3 96:1
  105:8 112:4 113:21,22
  119:1 120:13,14 122:16
  129:9 142:5 144:2,9,14
  145:15,19,25 146:23
  147:5 148:3,11,13
  151:14,16,17,24,25
  152:5,7 156:16
**shows** 33:11,22 34:16
  41:5,8,9,10 43:12 83:20
  96:23 98:20,22,25
  101:14,15,16 106:2
  109:9 112:23 115:7
  117:19 121:16
**side** 58:19 67:23 75:24
  76:8 98:13 117:9,10
  118:8,9
**sides** 31:9 62:5 63:13
  67:22 70:17 102:2
  109:10,17,19 117:6,13
  117:25 147:12 149:14
**sign** 4:12
**SIGNATURE** 159:1
**significance** 95:10
**significant** 8:25
**silhouette** 147:13 149:15
**silverware** 139:9
**similar** 7:5 34:19 58:22
  58:23 62:25 63:5,10
  76:25 134:11
**similarities** 57:1,24,25
  58:1,2
**similarity** 10:25 11:10,15
  52:23 53:5
**simply** 15:21 152:25
**Simpson** 1:5 2:15 5:5

23:13,20 24:21 47:14
50:12 145:3 146:13
147:23 148:11
single 26:15,19 32:21
33:8,10,21 98:20,25
99:25 143:15 144:20
151:17,25
sir 58:16 83:6,10 107:17
sit 95:5
site 48:10,11
situation 75:6
six 122:2,8 123:12,13,16
132:4
sixth 121:4,11 123:5
size 78:11
skeletal 51:13 52:11
skill 33:18 81:24
skilled 12:2,5 33:15 34:9
34:10 41:21
skimmed 72:8
slight 112:11
slowly 5:9
small 47:12 79:22 92:16
smaller 23:13 154:2
Smith 1:15 2:18 3:7,9,10
3:17 4:13,19,21 45:20
46:17 55:11 59:1 64:12
80:4 111:2 115:15
128:11 129:5 141:13
149:25 158:8 159:2,8
sofa 93:13
sold 46:23 47:1,5,11,21
solid 72:19
somebody 12:2,5,6 13:11
101:3 142:17
somewhat 5:9 77:12 92:1
sorry 45:7 60:19,20 64:5
64:6 71:4,4 87:25,25
122:23 124:5 126:4
131:13 145:21 147:1
sort 8:13 13:13,25 14:3
40:24 53:4 55:19 59:16
67:9 81:6 153:15
sorts 55:2 88:11
source 28:8,12 67:17
so-called 19:15 24:6,14
24:20,22,24 26:4
space 58:8 66:19,21
spaced 147:18
speak 4:15 5:8,19 20:17
22:1 33:1 43:15 54:16
66:5 121:25 127:19
158:9
speaking 48:6 72:5

speaks 41:18,20
special 29:19 69:2
specific 61:12 66:23 68:8
72:11 76:18 133:25
141:2 148:7
specifically 6:24 44:3
45:1 48:7 49:19 66:24
67:2,18 68:17 70:14
72:12 136:18
Specification 2:22
specifics 25:15 139:1
speculate 49:1
speed 59:21
spend 48:21,25
spent 125:4 135:16 136:4
141:19
split 77:22 78:17,18,25
79:1,2,8,20,23,25 80:2
80:13,17
split-oak 81:2
spoke 126:8
square 17:23
stack 129:10
Staley 2:3 60:17 65:10
stand 56:23
standard 11:16,17,19
49:15 150:9
stands 139:16
start 5:10 133:8
starting 108:10,11
starts 82:19 144:25
state 1:18 3:21 4:19 36:7
53:3 143:23 144:8
145:21 158:2,5,21
stated 14:22 15:14 18:9
18:24 28:14 91:10
97:21
statement 13:16 65:23
67:16 70:5 72:16,23
84:9 100:10,16 139:15
142:10,23 143:19
149:18 150:25 153:8
statements 29:13,14 66:3
66:17 72:3,11
states 1:1 45:1 150:23
stating 9:23 28:23 83:11
steer 93:18
Steven 2:11
stipulated 3:15 4:4
stipulation 1:16
STIPULATIONS 3:14
stop 32:15
store 48:3,4,19,20
stores 47:21

straightforward 60:3
Street 2:9
strengthen 74:12
stretch 46:1
strictest 77:4
strike 76:11 107:23
132:22
strong 51:6
structural 88:7
structure 51:13 52:11,19
65:8 82:2,4,8 85:8,23
87:4,14 100:3 120:13
132:3 147:19
structures 100:2
students 10:4
studied 59:4
study 40:7 126:23
studying 134:14 135:16
136:5
stuff 48:10,11 125:6
styled 128:15
sub 131:18,25
subject 72:14 82:4
subjective 10:3
submitted 111:5
subpart 132:6,7
subparts 132:5
SUBSCRIBED 159:10
subsequent 31:15 148:19
149:22 150:20 151:11
subsequently 23:18,20
substantial 11:10,14 51:5
53:5 75:7
substantially 7:5,5 52:23
98:15 102:12 105:24
106:2,18 109:9,12,16
110:2,5 111:16 119:16
142:13 145:6,14 148:12
153:22 156:7,15,21
sufficient 12:6 21:12
44:17
Suite 2:5
sum 110:8
summer 69:6
sun 73:7
Sunday 141:18
superior 72:18
Supplement 3:8
supplemental 3:7 15:7,18
15:23 22:15,20,23 23:2
64:20 94:4,8,15 97:23
98:2 103:15 106:3
108:6 111:5,8 113:23
116:20 121:2 149:23

support 17:12,14
supported 68:7
supporting 17:8
supposed 9:9,10,11 12:12
12:17
Supreme 128:15 138:24
sure 5:12 8:9 12:23 24:1
25:17 27:14,14,16 30:1
30:1 34:13 36:14 47:4
47:7,9 59:2 79:23 80:2
96:8 100:12 101:7
105:3 110:24 119:25
132:18 133:9,11,16
134:1 135:6,12 140:19
140:22
surface 51:8 75:22 82:24
83:13,15,16 84:11 88:2
110:2,5
surfaces 82:1 114:10
115:8 117:11 119:12
surprised 50:16
surrounded 117:12,25
surrounding 67:6
suspend 156:24
Swissa 21:8
sworn 4:14 158:8 159:10
symposia 39:15
synthetic 78:12 81:7,9
88:24 89:8,11,13,15,21
89:21 90:10,21 91:1

**T**

table 129:11 130:17
Tach 1:20
tail 84:14
take 25:1 39:12 45:24
46:12 58:20 59:14,21
59:24 64:7 78:5 80:15
95:24 103:7 108:10
110:16 123:13 136:1
141:7 150:3
taken 1:15 3:17,19
takes 104:4
talk 10:3,4 11:9,18 17:22
20:22 21:9 33:12 39:18
59:19 69:22 70:18
76:12 89:20 135:4
138:7
talked 7:9 17:2 52:20
91:11 109:2
talking 11:14,15 14:2
27:2 30:14 33:6 35:25
37:1 40:24,25 41:3
46:17 60:11,13 61:2

62:21 67:19 70:14,22
73:20 80:11,13 108:22
155:3
talks 21:11 67:18,20
Target 13:14
teachings 120:18
techniques 35:18 85:1
Teleflex 128:16
tell 15:15 44:9 53:22 89:7
92:10 112:12,15 115:24
128:22 134:10
ten 136:4,6
tend 14:1 50:24 74:7
tendency 5:10
tent 73:7
term 10:3 78:14
terms 10:7 34:6 40:10
54:14 60:9,15 76:16,24
79:13,16 80:6,22 89:24
93:7 138:24
test 11:11,12 12:13 19:16
19:17 20:24 21:9,23
22:5 23:7 27:3,8,11,12
27:19,24 28:4,11,21,25
29:19,25 30:18 52:21
52:23,24 53:1,1,6,6,7
59:21 97:3,4,4,6,8,8,9
97:14,15 138:17,20
145:5,14,18,23 146:2,3
146:9,20,22 147:3,4
148:2,11 150:12 151:13
151:22 152:16 153:16
153:18 154:6,6,7,7,11
154:24 155:2,9,11,12
156:1,4,15,20
testified 4:16 10:21 12:16
33:7 44:22
testimony 6:5 7:1 12:11
14:17 17:13 18:14
31:22 43:19 52:9 54:25
61:3 63:9 96:5,14
107:5 108:16,18 110:9
110:16 113:9,17 116:15
117:19 122:12,15 135:7
140:3,18 148:9
tests 53:14 150:1
text 115:23
texture 77:1 82:23 83:12
83:17 85:24 98:10,12
101:24 102:1
Thank 114:21
theoretical 13:3
thereabouts 154:23
therefor 159:15

thereof 158:17
thick 78:10
thickness 88:9
thin 78:6
thing 6:14 7:2 14:1 15:17
45:20 53:20 66:10 67:6
67:7,9 69:24 89:18
90:18 92:5 105:21
155:19
things 7:8 8:22 13:24
19:21 26:24 31:17
40:25 52:3,16 54:14
57:4 69:21 70:24 80:17
88:11 91:10 100:13
133:25 141:12 143:1
147:25
think 7:7 8:21 10:7 14:7
14:13 15:3,18,25 16:1
16:13,14 18:6 25:5
35:11 36:15 37:10
38:24 48:5,21 49:6
50:14 51:6 53:15 60:22
62:1 63:8,16 73:16
74:4,6,16,24 76:19
90:16 91:9 92:20 93:6
98:4 103:9 105:10,15
106:8 107:16 112:15
120:6 122:25 123:3
127:11,14 128:5 129:21
135:16,19 136:3,4
140:7 142:17
thinking 61:2
third 41:10,11 114:3,23
116:1,14 129:20 144:24
146:5,10,17 147:2
148:9 153:17 156:18
thorough 133:16
thoroughly 36:16 151:5
thought 104:20
three 7:8 31:18 42:16,22
56:12,24 57:2,4,5,17,22
58:3,3 62:1 64:18 65:1
94:23 101:11,18 106:24
108:9,24 109:3,24
110:9,17 114:4 121:18
122:3 143:10 147:20
149:2 150:14,23 156:6
156:11
three-page 15:19
three-quarter 102:7
tight 51:16
time 3:24,25 5:19,20,21
19:6 22:10,11 25:1
37:19 45:21,24 46:4,4,7

48:22,25 69:10 74:8,10
85:21 98:3 110:22
125:4 127:15 128:18
135:16 136:10,12
140:11,25 141:19
142:25 147:1 148:22
151:21 152:15 155:10
157:1
times 5:1,9 22:8,9 44:23
134:20 135:22
tiniest 96:3
title 130:17
titled 125:15
today 6:5 95:5 141:3
150:15 156:25
today's 141:13
told 27:20
top 46:3 72:16 98:12
99:23 100:11 102:1,21
105:24 106:2,19 109:10
109:17,19 111:11
112:10,14 113:15 114:4
114:25 116:2,23 117:6
128:13 147:22
topic 141:9
total 127:13,14,14
totality 146:4 151:4
touch 124:15
Tower 2:9
toy 30:12 56:2,3
traditionally 80:17
training 12:6 69:2
transcript 159:3
transcription 158:11
159:6
transition 93:9
treated 35:16
treatise 28:17 29:6 131:5
treatises 131:4
treatment 16:25 17:15,21
17:25 18:11
treatments 18:18 52:10
trees 76:21
trend 48:8
trial 4:7
tricky 92:18
tried 138:4
tropical 76:22
true 7:21 15:3 21:14,20
22:4 32:18 43:8 44:6
45:4 54:19 70:25 74:20
97:15 101:9 143:18,24
144:18 145:13 150:4
151:6,13,18,22 152:22

153:7 158:11 159:6
trust 59:22
truth 4:15,15,16 158:9
try 7:3 42:2 46:2 149:24
trying 10:2 26:8 35:11
38:5 42:5 67:3 68:11
80:4,5,8 87:8 92:17
103:2 105:2 113:4
127:14 150:6 154:16
tubular-looking 17:5
turn 115:9,9 120:2
turned 120:4
twice 38:10 135:22
two 15:1,19 37:12,20,24
42:16,21 53:14 59:24
60:14 64:20 67:22
70:17 101:18 108:11
111:7 112:20 113:9,11
113:18 116:16 118:7,12
120:24 122:5 124:14
141:17 154:8
types 50:22
typical 14:4,18
typically 49:12 50:2
51:21 73:14 77:7 93:5
typo 83:3,6 122:22

— U —

Uh-huh 61:23 73:22
103:21
underlined 134:7
underlying 85:23
understand 5:13 6:1 8:9
12:23 18:14 23:23 24:1
25:17 27:15 29:5,15,17
30:1 36:21 43:19 49:24
49:25 52:9 59:3 79:24
80:2 90:1 95:12 97:2,7
97:22 100:14 113:17
133:17 138:8 140:18
154:17 155:25
understanding 6:11 7:17
8:2,15 9:11 10:11
11:12,18,20 19:18 20:8
20:19,20 21:2 27:6
28:9 29:7,12,21 30:5,7
31:1,13,24 32:23 33:2,5
33:13,14 35:10 37:16
38:16 39:4,5 40:12
41:18 44:11 45:16,19
46:22 47:23 52:21 53:7
54:8,23 55:4,5 58:25
73:25 74:9 95:9,14,14
97:20 132:2 135:15

BRET SMITH
APRIL 28, 2008

Page 16

138:16,20 144:23 146:2
152:4,9 153:4 154:9
155:2,18 156:10
**understood** 135:13
**Unh-unh** 22:17
**unique** 10:1 18:1,12
19:22 21:13 31:8 32:5
**uniqueness** 10:8 30:23
**UNITED** 1:1
**University** 1:19 66:1
**unusual** 30:11
**upper** 117:8,9
**upside** 115:10 120:2,4,14
**use** 12:19 13:4 35:7,17
45:25 47:25 48:16
51:21 58:3 74:20 77:9
77:10 79:16 80:10,24
91:23,24 92:11 102:18
102:22 103:4,23 104:1
104:4,12 107:14,24
108:8,9,23 114:19
115:15,18,25 116:3,18
122:11 147:18
**usually** 12:19 13:23
**utensils** 139:9
**utility** 10:10,11,16,18
21:16,18,20,25 32:25
33:1 39:3,9,13 40:4,8
**utilize** 46:19
**U.S** 3:3,5 16:17 125:25

_____

**V**

**v** 134:11 136:8,16 137:13
138:9,16 139:10,16
142:1
**valid** 43:13,14 44:7 95:17
96:22
**value** 14:5
**Variation** 82:17 84:24
**variety** 26:24
**various** 87:1 89:12
140:13
**ventilation** 75:15
**Ventures** 1:5 5:5 23:13
23:21 24:21 50:13
145:3 146:13 147:23
148:12
**verbal** 5:22,24 53:25
**versus** 10:15 48:1,2,3
78:17,19 128:16
**vertical** 147:15 149:17
**vertically** 147:18
**Vestavia** 2:12
**vet** 125:4

**veterinary** 65:25
**vice** 50:2
**view** 7:11 14:6 42:7
51:12,22 60:5,9 61:17
62:5,11 63:4 67:24
71:15,21 74:4 92:11
96:18 102:7,18,22
118:25 120:5 142:11
145:5 150:7 156:21
**views** 46:18
**visibility** 92:4
**visible** 52:10 147:11
149:14
**visual** 8:25 9:5 17:16
20:4 50:14,22 51:5,6,23
56:22,25,25 57:23
60:25 62:12
**visually** 17:24 51:10,14
57:21
**visuals** 53:24
**volume** 98:9 101:24
109:19 111:13,23
112:20 114:7 115:6
117:5 119:11 129:16,17
**volumes** 112:24 113:22
**vs** 1:7

_____

**W**

**wait** 5:7,12,15 84:16 97:5
**Wallace** 1:20
**wallpaper** 10:6
**Wal-Mart** 13:14 14:13
**want** 8:9 11:17 17:19
18:23 25:17 34:13 59:2
75:11 92:9,24 101:19
104:9 105:2,9 118:18
118:17 123:1 142:8,22
**wanted** 70:1 133:9,15
**warm** 70:16
**warmer** 73:9
**wasn't** 99:25 131:21
**way** 9:18 17:20 18:5
21:10 31:23 33:3 35:16
36:7 38:1 41:2,14 51:4
53:3 67:4 70:5,19
71:18 73:6 74:2,3,19,25
75:14 79:3,4 81:10
85:15 88:4,17 108:17
108:18,21 142:23
150:15 152:22
**ways** 63:5 85:16
**weave** 37:5 51:8 62:15
73:1,2 74:16 75:21
76:9 78:25 81:25 87:1

87:1,3,9,13,19,20,21
91:11,25 95:3
**weaving** 88:14 99:16
126:5
**week** 135:20,20,21
141:20,23
**weekend** 16:8
**weld** 92:17
**went** 25:3,4 47:7 67:2
69:13 70:17 132:18
134:2
**West** 1:20 2:9
**Westlaw** 130:19
**we'll** 5:13 25:15 35:25
46:2,13 59:19
**we're** 14:2 27:2 30:14
46:3,6,9,16 55:11 60:2
60:12,13 61:14 73:20
80:11,12 84:16,20
101:7 103:1,5,6 108:22
108:23 113:4 130:4
150:6
**we've** 33:6 36:25 45:22
57:17 64:12,22 108:22
109:2 110:22 111:2,2
**wheels** 55:23
**White** 136:8,16 137:13
138:9,16 139:11,16
142:1
**wicker** 12:25 13:18 31:8
41:25 51:25 55:23 58:4
58:5,8 66:18,24 67:3
68:5 73:2 76:12,14
77:10 78:2,20 79:7,16
80:24 81:6,25 82:6
83:15,23 84:5,12 85:10
85:12,20,24,25 86:4,8
87:3 88:5,19,21 89:2,9
89:11,15,21,22,22 90:8
90:10,14,22,22,22 91:1
91:2,2,8 93:5 98:11
101:25 103:18 105:17
105:25 106:3,19,20,23
106:25 107:1,4,6,12,13
109:9,10,12,16,17,18
109:18 110:2,5 111:16
114:9 115:7,8,11
117:11,13,25 118:3
119:12 120:3 125:1
147:11,15,17
**wickers** 88:24
**wicker-covered** 73:20
**wicker-looking** 86:13,18
86:22

**wide** 26:23 31:9 77:23
79:1,1,20,21
**width** 147:14 149:17
**willow** 2:24 78:7,7,9
80:12,13,15
**wind** 73:11
**window** 60:13,16 62:14
62:15 73:8 100:6
109:20 117:8
**windows** 58:1,7 70:4,5
71:8 72:25 75:8,9,10,13
75:19 76:8 102:6
106:22 117:12,23,25
118:11,23 120:10
147:16
**wire** 14:20 65:8 76:7 86:8
87:9 92:14,17 93:1
105:17,18,19,20 106:7
**witness** 4:11,14 16:5,10
21:25 60:19 107:20
157:3 158:12 159:1
**Wolf** 69:8,9
**wood** 72:20 73:8
**word** 20:22 29:3,3,18
30:5,8 36:14 77:4 83:7
133:7 134:6
**wording** 66:14 116:9
**words** 7:19 13:8 20:2
27:15 32:6 41:25 44:1
77:2 124:2 131:18
133:10 149:10
**work** 39:18 40:3 50:2
54:8 69:7 107:16 124:6
**worked** 49:20 50:4,5
127:3
**working** 69:6 70:23
**works** 33:3
**world** 69:10
**worthy** 8:17
**wouldn't** 85:21 92:22
104:1,10,21 116:3
**woven** 58:5 72:18 77:1,8
77:17 78:24 79:11,11
80:11,25 81:2,5 82:22
83:11,16,17,25 84:1
85:9,20,24 88:6,13
98:10,12,15 101:24,25
102:9,11 125:2 147:16
**write** 124:1
**writing** 134:9
**written** 17:19 18:9,15,25
19:3,5 44:10 55:2
64:18 127:4 131:18
134:6

wrong 153:13
wrote 83:1 132:1

___

**Y**

yeah 16:10 60:12 62:7,22
68:9 69:17 80:7 81:4
107:2 136:6
years 70:23 154:24

___

**Z**

zoologist 69:10

___

**0**

065 119:5

___

**1**

1 101:23 102:18 103:10
103:18 125:14,17,21,22
129:14,15
1:30 46:7
10 2:9 114:1,4,25 116:2
10:11 1:22
100 2:12 124:6
106-116,121 3:7
11:30 46:4
12 141:22
12th 158:18
123-136,143 3:5
13 83:19 111:21,21 112:4
112:9 113:16,21 116:20
130 3:10
139-142 3:11
14 83:19 112:2,23 113:14
113:22
144-148 2:22 3:2
15 119:7 141:22
156 3:6 15:2,5,18 16:24
17:7,20,22 18:2,10,12
18:16,25 19:4 22:24
23:5 51:17 54:1,10,17
58:17,22 59:6,12 60:21
61:4,22 63:6 64:19,25
65:9 73:23 74:22 75:7
75:12 82:5,11 84:25
85:3 86:15,22 87:4,14
88:2,20 89:5 90:6,17
93:22 94:1,4,9,11,17,21
94:24 95:1,7,11 96:1,6
96:16,19,20,21,24
122:17 126:1,3 132:21
132:24 141:14 143:10
143:12,21 144:5,10,14
145:15 146:13,23 147:5
148:12,17 149:3,12,13

149:20 150:24 151:2,7
152:23,25 153:12
155:22 156:1,8,16
157 158:10 159:4
16 81:13,15,19,20 143:4
143:7 153:8,17
17 82:14 84:17,18,19,20
116:5,7 121:2 128:12
128:13 137:12
17th 125:7,8,9 127:17
130:14 136:14
18 115:5 116:4,7,12
143:11 147:11,21
148:24 149:19 153:11
156:13
1812 4:21
1872 154:23

___

**2**

2 3:10 57:7,16 58:21
59:16 60:20 61:8 63:12
63:18,20 73:24 98:4
99:17,23 100:11 101:23
102:18,21 103:11
105:21 106:13 109:8
110:6 111:23 129:15
130:5
2/24/09 158:22
2:50 110:21
2007 125:10 127:17
130:14 136:14 137:12
2008 1:21 158:7,18
159:10
2018 2:5
208 1:20
22 103:14 111:5 113:20
114:24 117:1 119:10
23-03 143:13
23-101 134:4
23-47 132:9,10
23-65 131:11,15,17
26 117:18,19,23 119:1
26,728 117:24 119:1
2700 2:9
28 1:21 118:22 119:6
158:7

___

**3**

3 99:17 101:23 102:19
108:1 109:14 129:23
3:06cv901-WKW 1:7
3:07cv00048-WHA-CSC
1:7
30 127:11,12,12

30339 2:5
31 82:21 83:20,23 84:5
84:10
32 82:21 83:20 84:7,10
120:21
321 15:5,20,22 16:9,11
16:12 17:3 22:12,16,21
23:6 37:1 38:3 65:6
139:14 141:6,15
326 82:19,21 85:1,22
115:7,9 116:5,6,10
120:1,4,12,19
33 123:24
35 121:16 122:16
35216 2:13
36 143:11 147:11 148:23
149:19 153:11 156:13
37 143:11 147:11 148:23
149:19 153:11 156:13

___

**4**

4 2:18 99:13 100:5 102:5
102:5,9,19 103:11,13
105:8,21 106:6,12,19
106:20 108:5 109:5,8
110:6 111:22 158:10
159:4
40 105:13 136:7
443 158:22
46204 2:10
483 126:1

___

**5**

5 99:15 100:7 143:13
5,282,542 16:18
5:05 157:5
519 1:20
542 16:20,21 17:18 18:10
18:17,22 19:2 65:7
55-63,105-106 2:22
55-63,105-107 3:2
55-63,143-148 2:23
58-73,82-86 3:3

___

**6**

6 65:14,15,20 72:16
99:13 100:5 102:10,19
64,94-97l,105 3:7
64-71,83-93 3:5

___

**7**

7 65:14,15 99:15 100:4,8
106:1,3,5 107:12,16,19
107:19,20,22,24 108:1

108:5 109:4,13
74 2:22 55:9,13,19 56:13
57:18 58:20 59:15
60:19 61:7 62:3,11,14
63:1,4,10,17 64:1
105:14 106:11,21 108:5
109:4,18 144:14 145:10
148:13
74,94 3:8
75 2:23 55:9,13,22,22,23
56:3,13 57:18 58:20
59:15 60:24 61:3,10
63:17,24 143:20 144:3
145:10 148:13
76 3:2 55:9,13 56:10,13
57:18 58:20 59:15 60:7
60:8 61:7,19,20 62:3,11
62:15,16,17,23,24 63:4
63:10,17 64:2 105:14
105:25 106:12,21 107:3
107:6,15,23 144:9
145:10 148:14
77 3:3 58:10,11,14,23
60:10,21 61:24 62:13
62:18 63:7 82:12 86:11
95:22
78 3:5 64:10,14 65:18
71:24 83:19 84:20
93:19 123:22 125:23
128:8 136:14 143:6
156:14
79 3:7 64:10,14 94:3,8
97:23 105:8 106:4,6,13
106:20 107:22 108:1
109:9,14 110:7 111:9
113:24 114:1 115:1
116:21 121:3

___

**8**

8 111:8,11,22 112:4
113:21
80 3:8 64:10,14,16 94:14
80-degree 73:7
800 2:5
81 3:10 130:2,8,9
812 116:4
82 3:11 139:2,4 140:13
141:24 142:4

___

**9**

9 113:23
9/30/08 158:22
90 75:12
915 82:20,21 85:2,22

BRET SMITH
APRIL 28, 2008

Page 18

115:7,9
95 3:4

# EXHIBIT H

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    EASTERN DIVISION

4

5    SIMPSON VENTURES, INC.,
              Plaintiff,

6
     vs.                    CASE NO. 3:06-cv-901-WKW

7
     MID-WEST METAL PRODUCTS,

8    COMPANY, INC.
              Defendant.

9    _____/

10   MID-WEST METAL PRODUCTS
     COMPANY, INC.,

11            Counterclaimant,

12   vs.

13   SIMPSON VENTURES, INC.,
              Counterdefendant.

14

15

16              * * * * * * * * * * *

17          DEPOSITION OF BRET SMITH, taken pursuant

18   to notice before Mallory M. Johnson, Certified

19   Court Reporter and Commissioner for the State of

20   Alabama at Large, at the Industrial Designs

21   Building, Auburn University, 519 West Thach

22   Avenue, Auburn, Alabama, on Friday, June 13,

23   2008, commencing at approximately 8:44 a.m.

24              * * * * * * * * * * *

25

2

```
 1                    APPEARANCES

 2   FOR THE PLAINTIFF:

 3   Mr. Arthur Gardner
     Mr. Joe Staley
 4   GARDNER GROFF SANTOS & GREENWALD
     Attorneys at Law
 5   2018 Power Ferry Road, Suite 800
     Atlanta, Georgia  30339
 6
     FOR THE DEFENDANT:
 7
     Mr. James H. Hinshaw
 8   BINGHAM MCHALE
     Attorneys at Law
 9   2700 Market Tower
     10 West Market Street
10   Indianapolis, Indiana 46204

11   ALSO PRESENT:

12   Mr. Jeff Simpson
     Ms. Jou Taing
13

14          *  *  *  *  *  *  *  *  *  *  *

15              EXAMINATION INDEX

16   BRET SMITH
         BY MR. GARDNER                4
17       BY MR. HINSHAW                187
         BY MR. GARDNER                189
18

19                 EXHIBIT INDEX

20   EXHIBIT NUMBER:

21   1   Wire crate                    94-96

22   2   Bay Isle Wicker crate         46,123-129
                                       131-135,137
23                                     141,147,188

24   3   Bay Isle model 1805           47,49,57,59
         wicker litter pan cover       69,85,169
25
```

1    EXHIBIT INDEX continued:

2    75    Closest visually to the          123-132,134
            design patent                    135-137,141
3                                            147

4    78    Report on the 156 patent         120,121

5    79    November '07 report              121

6    80    Second supplemental report       121,122

7    83    321 patent                       13-17,22,25
                                            50,54,57-59
8                                            124,167

9    84    156 patent                       119-120
                                            123-129,131
10                                           132-135,137
                                            141
11
     197-198   Reports of instances         114,115
12      of confusion between Simpson
        Ventures and Mid-West parts
13
     218     Second supplemental expert     187
14      report of Robert John Anders

15   235 Report on the 321 patent           7-11,14,15
                                            19-120,168
16                                           174-178,182
                                            183
17
     236 Prosecution file history           36,40
18      of the 321 patent

19   237-241  Websites depicting the        70-78
        Mid-West wicker products
20
     242 Deposition excerpts                99,104
21
     243     Smith's curriculum vitae       162
22

23              *  *  *  *  *  *  *  *  *  *  *

24

25

4

1           MR. HINSHAW:  She just asked about

2                 usual stipulations, and I don't

3                 really know what that means.

4           MR. GARDNER:  Yeah, we don't really

5                 have any standing --

6           MR. HINSHAW:  We don't really have the

7                 usual stipulations to agree to,

8                 so.

9           MR. GARDNER:  We don't have any

10                standing stipulations in this case

11                other than, as is normal, the

12                witness can read and sign the

13                transcript within 30 days.

14                      BRET SMITH

15        The witness, having first been sworn to

16   speak the truth, the whole truth and nothing but

17   the truth, testified as follows:

18                     EXAMINATION

19   BY MR. GARDNER:

20   Q.   Mr. Smith, what types of things did you do to

21        prepare for today's deposition?

22   A.   I read over the reports that I'd written,

23        because it's been a little while, and met

24        with Mr. Hinshaw yesterday.  And we read some

25        of the -- the Chisum material and went back

5

1      through things.

2   Q.  Did you read any deposition transcripts?

3   A.  Deposition -- other than I glanced through

4       what I had been sent from my deposition.

5   Q.  Have you read your -- your own deposition

6       transcript front to back?

7   A.  Yes.  Once.

8   Q.  Is there anything in that transcript that you

9       currently think looks inaccurate?

10  A.  There's one thing Dr. Klinghammer said as a

11      zoologist.  He is or was an ethologist, which

12      is an animal behaviorist.  That was in one

13      portion of the testimony.

14          There were a couple of things I thought

15      when I read back through I wasn't real clear

16      about or I wasn't sure that -- that I

17      answered clearly.  One had to do with -- I

18      think you asked about an invalidity, did I do

19      an invalidity analysis.  And I did -- and it

20      was kind of -- the opposite way of the way I

21      was thinking about it.  But I did an

22      obviousness analysis which is part of the --

23      you know, which is -- relates to the test of

24      validity of the patent.  So I did do that.

25          Let me see what else.  Oh, primary

6

1    reference.  And, again, I thought, you know,

2    when I read over my answer, it didn't seem

3    quite as crisp; but primary reference is a

4    reference that's basically the same, and it's

5    a starting point when you look at a product

6    design and when you're looking at issues of

7    obviousness.

8    Q.   Is that the understanding that you had at the

9         time of your last deposition?

10   A.   It is.  I just did not express it very well.

11   Q.   Anything else about your prior deposition

12        transcript that is inaccurate?

13   A.   Nothing -- I don't -- there's nothing that I

14        recall.  I read through it once.  And I -- I

15        would say that it was just a question of when

16        I read it, I didn't think my answers were

17        quite as clear as they needed to be.

18   Q.   And other than looking at your own deposition

19        transcript, have you looked at any deposition

20        transcripts from any other witnesses in this

21        case?

22   A.   No, I have not.

23   Q.   Has anyone discussed with you the testimony

24        given by any other witnesses in this case?

25   A.   No.

7

1   Q.  So you're not familiar with any -- any

2       testimony from any of the other witnesses in

3       this case?

4   A.  No.  No.  We -- we talked about the case in

5       general, but I don't -- no, I don't recall

6       any specifics of testimony.

7          MR. GARDNER:  Let's mark this, I think,

8               as #235.  And James, I believe

9               #235 will be the same as Exhibit

10              #234, except it will be better

11              quality, more easily read.

12  Q.  Mr. Smith, we've passed you what's been

13      marked as Exhibit #235.

14  A.  Okay.

15  Q.  And ask if you recognize this.

16  A.  Yes, I do.

17  Q.  Is this your report regarding the 321 patent?

18  A.  Yes.

19  Q.  Do you have any other reports regarding the

20      321 patent?

21  A.  No.

22  Q.  Does this report of Exhibit #235 contain all

23      of your opinions regarding the 321 patent?

24  A.  Yes.

25  Q.  Is there anything in the report that's

8

| | | |
|---|---|---|
| 1 | | inaccurate or incorrect or that you would |
| 2 | | want to change at this time? |
| 3 | A. | As I recall, there's one page that has some |
| 4 | | of the figure numbers that are off.  I'm |
| 5 | | trying to find it.  The -- I mean the |
| 6 | | references in terms of the patent are |
| 7 | | correct, but I think the figure numbers on |
| 8 | | one of the pages for part of it were off.  I |
| 9 | | think it may have been page 27.  Yeah, I |
| 10 | | think at the bottom, the section that talks |
| 11 | | about predictable variation.  No, it's not. |
| 12 | | 527 is -- yeah.  527 is figure 65.  157 is |
| 13 | | figure 68.  And where it says figure 62, it's |
| 14 | | figure 69.  And figure 64 is -- I'm sorry. |
| 15 | | Figure -- where it says figure 62, that's |
| 16 | | figure 66.  Where it says figure 62, that |
| 17 | | should be figure 66.  And where it says |
| 18 | | figure 64, that should be figure 69. |
| 19 | Q. | This is all on page 27 of Exhibit #235? |
| 20 | A. | Yeah, this is all on page 27.  I moved some |
| 21 | | of the figures around so that it would read |
| 22 | | better, and I just missed updating the figure |
| 23 | | numbers. |
| 24 | Q. | Mr. Smith, I'll politely remind you that in a |
| 25 | | deposition, it's important that we do not |

9

| | | |
|---|---|---|
| 1 | | speak at the same time so that the court |
| 2 | | reporter can take down what we're each saying |
| 3 | | and make a clean record.  So if you'll |
| 4 | | remember to wait until I finish my question |
| 5 | | before you respond with your answer, that |
| 6 | | will be most helpful to the reporter. |
| 7 | A. | Okay.  I will do my best. |
| 8 | Q. | Thank you.  Other than the figure number |
| 9 | | corrections on page 27, are there any other |
| 10 | | corrections that need to be made in this |
| 11 | | report? |
| 12 | A. | None that I can think of, no. |
| 13 | Q. | Has Mid-West Metals or any of its attorneys |
| 14 | | informed you that the company may want to |
| 15 | | rely on a newly discovered prior art |
| 16 | | reference in the form of a French movie |
| 17 | | called Amelie? |
| 18 | A. | Yes, just briefly. |
| 19 | Q. | Have you seen the wicker -- or woven products |
| 20 | | that are depicted in the movie? |
| 21 | A. | Yes. |
| 22 | Q. | Do those woven products or wicker products |
| 23 | | cause you to want to amend or change this |
| 24 | | opinion in any respect? |
| 25 | A. | No.  They reinforce the opinion, but they |

10

1    don't -- they don't alter the opinion.

2  Q.  Do they -- do they want -- cause you to want

3      to change your opinions with regard to the

4      156 patent?

5  A.  No.  Again, they reinforce the 156, the three

6      reports for the 156 patent.  But they

7      don't -- they don't change.

8  Q.  Do the images in the movie Amelie show

9      designs that were not previously discovered

10     in any of the prior art that you've looked

11     at?

12 A.  No.  It's -- the -- the cage that's depicted

13     in it is -- is largely -- I would say in

14     resemblance, it's close to the cage in

15     figure 35.  It's squarer.  It has a slightly

16     smaller door.  But it's -- it doesn't have

17     really the cone shape that you have in

18     figure 35.  But it's -- it's that sort of

19     a -- a cage.

20 Q.  You're referring to figure 35 of page 15 of

21     Exhibit #235?

22 A.  Yes, I am.  Yes, I am.  Oh, I'm sorry.  You

23     asked about the deposition; and there was one

24     other thing that I noticed, and that was that

25     at some points in the deposition -- and I'm

11

1        not sure which of us started, but I -- I used

2        the term bird cage for figure 33, which I

3        forget what exhibit it was in that

4        discussion.  But in Exhibit #235, it's

5        figure 33, and it could be a bird cage.  It's

6        just, I would say, more properly termed an

7        animal cage of some kind.  We don't know

8        really the scale from the -- from the photo,

9        so.  That's -- that's the only other thing

10       that I can remember from the earlier

11       deposition.  But the Amelie cage, as I said,

12       is similar to the cage in figure 35.

13   Q.  So it's more the same?

14   A.  Largely.  It's a little squarer.  It's a

15       little squarer.  But it's in frame for

16       about -- I don't know, probably less than a

17       minute.

18   Q.  Now, looking still at figure 33 on page 15 of

19       your report of Exhibit #235.

20   A.  Yes.

21   Q.  Would you agree that the opening in -- in

22       that animal enclosure is fairly small, such

23       that it would be appropriate for a bird or a

24       very small animal?

25   A.  You're talking about figure 33?

12

1    Q.    Yes, sir.

2    A.    No.  Because, I mean -- I don't know the --

3          the scale.  When I was in high school, I

4          bought a spy glass from a catalog; and the

5          spy glass looked this big, but when I got it,

6          it was this big.  So I don't know.  I would

7          really have to see it in person to make some

8          kind of a judgment one way or another.  It is

9          a smaller opening relative to the overall

10         size of the cage.

11   Q.    Well, how is the opening sized in relation to

12         the thickness of the woven product, the

13         wicker-looking product?

14               MR. HINSHAW:  Objection to form.

15   Q.    Does that help you get an appreciation for

16         the scale of the opening?

17   A.    No.  Any -- anything that I might infer

18         from that would be an assumption since I

19         didn't take -- you know, I haven't seen

20         this in person.  I don't know if those are

21         half-inch thick, you know, reeds or if

22         they're eighth-inch thick.  You can't

23         really -- there isn't anything that I can

24         discern in the photograph that would tell you

25         scale.

13

1          MR. STALEY:  Can we go off the record

2              real quick?

3                  (Off-the-record discussion)

4   A.   Just to be clear, those -- I mean, I would --

5        if -- those are things that, you know, would

6        make good illustrations for this, but your

7        question, as I understood it, was does it

8        substantially change your -- or does it alter

9        your opinion as discussed in this report.  Is

10       that correct understanding?

11  Q.   I asked you if it -- if it required you to

12       change your report or --

13  A.   Right.

14  Q.   -- or amend your report?

15  A.   No.  I mean, other than add it as another

16       example.  No.

17  Q.   I'd like you to refer now to Exhibit #83.

18  A.   Okay.

19  Q.   Which is the 321 patent.

20  A.   Let me move my coffee cup.  Okay.

21  Q.   And flip through that, if you would, to

22       refamiliarize yourself with the patent.

23  A.   Okay.

24  Q.   Now, you -- do you agree with me that the 321

25       patent of Exhibit #83 shows two different

14

1       embodiments?

2   A.   Yes, that's in the -- the description of the

3        figures.

4   Q.   What's your understanding of the difference

5        between the two embodiments?

6   A.   Well, one embodiment has on the sides and the

7        top a double diamond -- what I call a double

8        diamond pattern in the -- in my report.  And

9        the other one, frankly -- and I think I

10       mentioned this in the report -- the other

11       embodiment, it's a little hard to tell from

12       these drawings whether it's meant to be a

13       plain woven surface or whether it's meant to

14       be what I think I called a variegated kind of

15       surface.  When I went back and looked, I

16       mean, I looked at the drawings here at -- on

17       campus and they were the same, so.  But when

18       I went -- and I think I referred to this in

19       this supplemental report -- or not in the

20       supplemental, in the -- in Exhibit #235 that

21       I went to the Public PAIR site and looked at

22       the drawings and there, there wasn't any

23       variegated pattern.  There were just -- it

24       was just a plain woven, you know, top, front,

25       side, back.  So, the analysis, I think, to

15

1        the degree that it was possible to determine

2        from the drawings, I treated as a -- as a

3        plain woven.

4    Q.   Do you believe that the variegation, as you

5        describe it, in the printed images of

6        Exhibit #83 is a printing effect?

7             MR. HINSHAW:   Objection.   Foundation.

8    A.   I don't -- I don't know.   It could be any

9        number of things.   Having worked with

10       electronic files, the translation isn't

11       always clean, you know.   I don't know why it

12       has that look.   That's why I went to the --

13       the, you know, to see if I could find better

14       images.   My -- and I made a note of it, I

15       think, in the -- in the report.   I assume, or

16       I proceeded with the analysis as if those

17       were just plain woven panels.   You know, that

18       there wasn't a design, for example, like a

19       diamond, the double diamond design.

20   Q.   Are you aware of any indication that the

21       patent owner may have attempted to

22       intentionally have the patent issued with the

23       variegated effect that you see in

24       Exhibit #83?

25   A.   I'm not.

16

1    Q.   If you would, turn to page 41 of your report

2         of Exhibit #235.

3    A.   Yes.

4    Q.   And you see there on the last photograph that

5         begins there, "Unlike."  Would you read that

6         first sentence out loud?

7    A.   Last paragraph on the -- okay.  On the

8         right-hand side.  Unlike the 321 design, the

9         decorative weave on model 1805, design is a

10        square weave pattern distinctly different

11        than that of the 321 patent.

12   Q.   Is that statement correct?

13   A.   Yes.

14   Q.   Is the weave pattern of the 1805 distinctly

15        different from what's patented in the 321

16        patent?

17   A.   The weave design is distinctively different

18        than the weave design shown on the drawings

19        in the 321 patent.  Yes.

20   Q.   Is the weave pattern of the 1805 Mid-West

21        product distinctly different from the first

22        embodiment of the 321 patent?

23   A.   The double -- what I call the double diamond

24        embodiment?

25   Q.   Yes, sir.

17

1  A.  Yes.

2  Q.  Does it look substantially the same as that

3      first embodiment with the double diamond?

4  A.  No, it does not.

5  Q.  Is the weave pattern of the 1805 product

6      distinctly different from the second

7      embodiment, the one without the diamond

8      pattern?

9  A.  Yes.

10 Q.  Does the weave pattern of the 1805 look

11     substantially the same as the second

12     embodiment in the patent, the one without the

13     diamond?

14 A.  Does it look distinctively different, you

15     said?

16 Q.  No, I asked if it looked substantially the

17     same.

18 A.  No, it does not look substantially the same.

19 Q.  Now, looking at the -- well, in your view,

20     does the weave pattern make a big difference

21     in the infringement analysis?

22 A.  Yes, the weave pattern makes a difference.

23     It's part of the design.  This is a design

24     patent that deals with the appearance.  So

25     yes, it makes a difference.

18

1    Q.    Well, looking at the weave patterns of
2          Exhibit #83 --
3    A.    #83.
4    Q.    -- which is the 321 design patent, and does
5          the weave pattern of the double diamond in
6          the first embodiment look substantially
7          different from the plain weave of the second
8          embodiment?
9    A.    Yes, it looks different.  It's a different --
10         it's a different pattern.
11   Q.    Do you think that they look distinctively
12         different from one another?
13   A.    They look different from one another.  It
14         would be a noticeable difference.
15   Q.    Would you agree with me that the 321 patent
16         covers products both with and without a
17         pattern in the weave?
18   A.    No, I wouldn't, because the pattern is
19         specific.  The double diamond pattern is a
20         specific pattern.  So I would not agree that
21         it covers with or without a pattern.  That
22         would -- no.  I wouldn't say that at all.
23   Q.    Does the -- does the patent cover a product
24         that has no pattern in the weave?
25   A.    It covers -- yeah, I mean, the -- the

19

1       variation that is the -- the variation does

2       not have a pattern in the weave, although

3       there are additional weaving details that

4       give it a specific look.  And those are

5       things I talk about elsewhere in the -- in

6       Exhibit #235 in the expert report, how it

7       deals with the edges, how it deals with

8       vertical -- verticality, how it deals with --

9       those kinds of details also form part of its

10       appearance.

11   Q.  Right now I'm focusing on the existence of

12       the double diamond or the lack of a double

13       diamond.  Would you agree with me that the

14       321 patent would cover a product that has the

15       double diamond pattern as shown in the

16       patent?

17   A.  If it also had the other weaving details,

18       yes.  But -- but the double diamond isn't the

19       only weaving detail.  It's not the only

20       design choice, the only appearance choice

21       that's in that drawing.

22   Q.  Would you also agree with me that the patent

23       covers a product that does not include the

24       double diamond?

25   A.  Again, I would not make a blanket statement

20

1      like that because it depends upon the other

2      details; that is, the pattern over the main

3      part of the panel is one of the visual

4      details.

5  Q.  Well, let's assume that the other details are

6      there, either identically or very close.  And

7      the only -- the only feature we're focusing

8      on as a potential difference is the lack of

9      any diamond pattern on the side or the top.

10     Would that -- would that product be covered

11     by the patent?

12         MR. HINSHAW:  Objection.  Asked and

13            answered.

14  A.  The only way that I can answer that any

15      differently is I would say if it had the

16      exact same weaving details --

17  Q.  Well, let me stop you there.  Let's say that

18      the product was exactly as shown in the

19      patent in all respects except it did not --

20      it did not have the double diamond.

21  A.  So you're saying, for example, that if there

22      was a product that looked exactly like --

23      exactly like figure 7 down to the last

24      detail, would that product be covered by the

25      321 patent?

21

1   Q.  Yes.

2   A.  Yes, if it looked exactly like figure 7 in

3       every detail.

4   Q.  Now, let's flip that question around.  If the

5       product looked exactly like the first

6       embodiment, down to every detail including

7       the double diamond pattern on some of the

8       panels, would you agree that that product is

9       covered by or infringes the 321 patent?

10  A.  In both cases, assuming that the 321 patent

11      is in fact ultimately deemed valid, yes.

12  Q.  So wouldn't you agree with me, then, that the

13      patent can cover products that either do have

14      the diamond pattern or do not, correct?

15  A.  Not as a blanket statement.  The other

16      details have to be there.  You can't just say

17      the absence of a single detail.

18  Q.  I understand the other details may make a

19      difference.  But just focusing for a

20      moment on the diamond or lack of a diamond,

21      the patent potentially can cover products

22      that have it and don't have it, correct?

23  A.  Again, as I keep saying, the other details

24      have to be there.

25  Q.  I understand.  I'm not quibbling about the

22

1           other details.

2      A.   Okay.

3      Q.   We're granting that you're asserting that the

4           other details have to be there.

5      A.   Okay.

6      Q.   And assuming that those other details are

7           there, or enough of them that a court would

8           find similarity.

9      A.   Assuming the other details are there, then,

10          if the product had the double diamond

11          patent -- or the double diamond pattern or

12          the plain weave, then yes, the 321 -- I mean

13          that's what the 321 visually represents.

14     Q.   So given that, it does cover both products

15          that have the double D pattern and no

16          pattern, correct?

17     A.   That have -- that are -- yes.  If -- you

18          know, if they are complete in the other

19          details.

20     Q.   Do you believe that the -- the two

21          embodiments shown in the patent, in the 321

22          patent of Exhibit #83 constitute one

23          invention or two?

24          MR. STALEY:  Objection.  Foundation.

25     A.   I think one invention.

23

1   Q.  Do you believe that they constitute a single

2        inventive concept?

3   A.  Well, the -- that's the -- the -- my

4        understanding is that is the language of the

5        patent, that one is another embodiment of

6        the -- you know, that figure 7 -- I think 7

7        through 12 is another embodiment of what was

8        shown in figures 1 through 6.

9   Q.  So do I understand your answer to be that you

10      believe that the two embodiments shown in the

11      patent represent a single inventive concept?

12          MR. HINSHAW:  Objection.  Foundation.

13   A.  One is another embodiment of the present

14      design.  That's what it says.

15   Q.  Is it two --

16   A.  I don't know how else to answer that.

17   Q.  Does the patent show two inventive concepts

18      or one?

19          MR. HINSHAW:  Objection to foundation.

20   A.  The patent description says that figures 7

21      through 12 are another embodiment of the

22      design shown in figures 1 through 6.  So

23      that's how I would look at it.

24   Q.  Does that mean that you believe that it's one

25      inventive concept or two?

24

1          MR. HINSHAW:  Objection to foundation.

2                Asked and answered.

3  A.  I don't know how else to answer other than

4      the way I've answered.

5  Q.  I understand you may not understand or may

6      not be able to make a decision between

7      whether it's one concept or two.  But is it

8      one or two?

9          MR. HINSHAW:  Objection, foundation,

10            legal conclusion, and asked and

11            answered.

12          MR. GARDNER:  Witness hasn't answered

13            yet.  He's evaded pretty well.

14          MR. HINSHAW:  No, he's answered.  You

15            just don't like the answer.

16  A.  It says it's an alternate.  It's another

17      embodiment.  I don't know how else to answer

18      you.  That's what it says.  That's the

19      language in the patent.

20  Q.  Do you know whether it's one or two inventive

21      concepts disclosed in the patent?

22  A.  It's another embodiment of the concept

23      disclosed in figures 1 through 6.

24  Q.  Listen to my question very carefully.  Do you

25      know whether the patent discloses one

25

1    inventive concept or two?

2  A.  That's what I've already answered.  It says

3      it's another embodiment of the design shown

4      in figures 1 through 6.

5  Q.  Do you know whether it's one inventive

6      concept or two, or do you not know?

7  A.  I know it's another embodiment.  I know it's

8      another embodiment of figure 1 through 6.

9      That's what it says in the patent.

10 Q.  So you don't know whether it's one inventive

11     concept or two, correct?

12         MR. HINSHAW:  Objection, asked and

13             answered.

14 A.  I've already answered that question.

15 Q.  Is there a particular reason that you won't

16     answer?

17 A.  No.  I'm telling you my answer.  Figure 7

18     through 12 says it in the patent.  They are

19     another embodiment of figure -- figures 1

20     through 6 in Exhibit #83.

21 Q.  So would I be correct in stating that you

22     believe that it's two inventive concepts

23     shown in the patent?

24         MR. HINSHAW:  Objection.  Asked and

25             foundation.

26

1 A. No. I believe that 7 through 12 is another

2   embodiment.

3 Q. Do you believe that it's one inventive

4   concept shown in the patent?

5    MR. HINSHAW:  Same objections.

6 A. I don't understand how else to answer your

7   question.  There's a description, figures 1

8   through 6.  Figures 7 through 12 are in

9   another embodiment.  It says another

10   embodiment of the present design, so.

11 Q. Do you understand the difference between one

12   and two?

13 A. Yes, I do.

14 Q. Do you understand that I'm asking you to

15   identify whether there is one embodiment --

16   one inventive concept shown in this patent or

17   two?  Do you understand that's what I'm

18   asking?

19 A. I understand that's what you're asking.  I

20   don't understand --

21 Q. Do you understand that I'm asking you to make

22   a choice between one inventive concept or

23   two?

24    MR. HINSHAW:  I'm going to object.  Let

25     the witness answer your question.

27

1    MR. GARDNER: He hasn't been answering.

2    He's been evading pretty well. I

3    want to know whether there's one

4    inventive concept or two. And he

5    won't answer.

6    MR. HINSHAW: You're not letting him

7    finish his testimony in

8    responding, or trying to respond

9    to your question repeatedly now.

10   A.  It says it's another embodiment of the

11   present design. That's what it says.

12   Q.  I'm not asking you to read the words of the

13   patent out to me. I'm asking you to tell me

14   in your opinion, is there one inventive

15   concept shown in this patent or two?

16   MR. HINSHAW: Same objections.

17   A.  Under the description it says another

18   embodiment of the present design. So that

19   would be singular.

20   Q.  So your testimony is that there's a single

21   inventive concept disclosed in the patent,

22   correct?

23   MR. HINSHAW: Same objections.

24   A.  My testimony is that's what the description

25   says.

28

1    Q.   Mr. Smith, we can all read the patent.   I'm

2         trying to find out whether you understand

3         that patent to disclose a single inventive

4         concept.   Not what the words of the patent

5         say.   You keep reading me the words out of

6         the patent.   I want you to tell me whether

7         you believe that the words and the drawings

8         of this patent convey to you a single

9         inventive concept or two inventive concepts?

10              MR. HINSHAW:   Same objections.

11   A.   I don't know how else to answer you than the

12        way I've answered you.

13   Q.   I'm not moving off this point.   I'm entitled

14        to know whether you believe this is one or

15        two.   It's a simple question.

16   A.   It says another embodiment of --

17   Q.   I'm not asking you what it says.

18              COURT REPORTER:   One at a time.

19              MR. STALEY:   Hang on a second.   Let's

20                   make a record.   There is

21                   absolutely no reason for you to

22                   be yelling at this man.   So please

23                   lower your voice.

24              MR. GARDNER:   The witness won't answer

25                   a simple question.

29

1       MR. STALEY:  He has answered the best
2              he can.
3       MR. GARDNER:  He's given answers, but
4              he has not answered a simple
5              question of how many inventive
6              concepts are in the patent.  It's
7              either one or two.  I'm asking him
8              one or two.  He won't tell me
9              whether it's one or two.  He won't
10             even --
11      MR. STALEY:  Why are you yelling at me,
12             Art?
13      MR. GARDNER:  If you want to go outside
14             and talk to him and counsel him
15             about whether he ought to say one
16             or two, fine.
17      MR. STALEY:  I absolutely am not going
18             to do that.
19      MR. GARDNER:  But I'm not leaving this
20             topic until we get an answer that
21             says he believes it's either one
22             or he believes it's two or he
23             believes it's some other number.
24             But I want to know the number
25      THE WITNESS:  Mr. Gardner --

30

1          MR. HINSHAW:  Mr. Smith -- Mr. Smith.

2                Hang on.  Hang on.  You can ask

3                your question a thousand different

4                ways and repeat it, and you can

5                spend your whole time doing that,

6                if that's what you want to do.

7                But at some point, I'm going to

8                instruct the witness not to answer

9                because you're harassing him; and

10               it's unduly burdensome and

11               oppressive.

12         MR. GARDNER:  I'm entitled to an

13               answer.

14         MR. STALEY:  You've asked the question

15               and he's given you the best answer

16               that he can under the

17               circumstances, and despite my

18               objections over foundation, legal

19               conclusion, and that you've

20               already asked and answered it

21               repeatedly.  I don't agree that

22               you should be shouting at this man

23               or shouting at me.

24         MR. GARDNER:  I'm not shouting.

25         MR. STALEY:  You are.

31

1          MR. GARDNER:  I can shout.  I'm not

2               shouting.  I'm not happy, but I'm

3               not shouting.

4          MR. STALEY:  I would suggest you move

5               on.

6          MR. GARDNER:  If you want to shout,

7               I'll shout.  I won't move on.  I

8               want the answer.

9          MR. STALEY:  All right.  Then ask your

10              question, and we'll see how this

11              goes.

12    Q.   How many inventive concepts are shown in this

13         patent?

14         MR. STALEY:  Same objections.

15    A.   It says what it says.  It says -- it says

16         figure 7 is a perspective view of a litter

17         pan housing according to another embodiment

18         of the present design.  That's the language.

19    Q.   What number between 0 and 10 of inventive

20         concepts are shown in this patent?

21         MR. STALEY:  Same objection.

22    A.   It says the same of the present design.

23    Q.   Is it one, sir?

24         MR. HINSHAW:  Same objections.

25    A.   The language says of the present design.

32

1   Q.   I'm not interested in what the language says.

2        I'm not asking you to read it.

3   A.   Well, isn't this about --

4   Q.   Please.  Please.  I understand you want to

5        keep reading from the patent as your answer.

6        That's what you've been doing.  And I'm

7        guessing from that that you don't know

8        whether the patent discloses a single

9        inventive concept or more than one.  I'm

10       asking you to either tell us how many

11       inventive concepts it has or to say that you

12       don't know.

13  A.   It says of the present design.  There's no --

14       that's what it says.

15  Q.   Do you know what an inventive concept is?

16  A.   No.

17  Q.   So if you don't know what an inventive

18       concept is, would I be correct in stating

19       that you don't know how many inventive

20       concepts are shown in the patent?

21  A.   It says of the present design.  It doesn't

22       say designs.  It says of the present design.

23       That's what it says.  I can't make it say

24       something it doesn't say.  That's what's in

25       the patent.

33

1  Q.  Again, sir, I'm not asking you to read from

2      the patent.

3  A.  You're asking me what does the patent say.

4      That's what the patent says.

5  Q.  I did not ask you what the patent says.  Now,

6      we've established that you don't know what an

7      inventive concept is, correct?

8  A.  No.

9  Q.  Do you know what an inventive concept is?

10 A.  In that specific phrase, no.  I'm a designer.

11     I'm not a lawyer.

12 Q.  So if you don't know what an inventive

13     concept is, you don't know how many of them

14     are in the patent, correct?

15 A.  Well, if it -- there's no plural in the

16     statement in figure 7, so -- it says the

17     embodiment -- it's another embodiment of the

18     present design.  I'm not sure what you're

19     asking beyond that.

20 Q.  Are you presuming that there's one inventive

21     concept in the patent?

22 A.  There's no plural in that sentence.

23 Q.  So I'd be correct in stating that although

24     you're not completely sure what an inventive

25     concept is, you're presuming from the

34

```
 1        language of the patent itself that there must
 2        be only one, correct?
 3   A.   It says the present -- it's another
 4        embodiment of the present design.
 5   Q.   Isn't that correct that you're presuming that
 6        there's only one?
 7   A.   That there's no plural there.
 8   Q.   So only one, right?
 9            MR. STALEY:  Objection.  Asked and
10                 answered.  Same objections.
11                 Foundation and legal conclusion.
12   A.   Based on the language that's there, yes.
13   Q.   Did you read the file histories of the 156
14        and the 321 patents?
15   A.   I read -- I read through them.  It wasn't the
16        main emphasis of my analysis.  But I read
17        through them.
18   Q.   How much time do you think you spent reading
19        each one of them?
20   A.   I can't recall.
21   Q.   Do you think it was a lot of time?
22   A.   Reading the patent -- could you repeat the
23        question?
24   Q.   Do you think you spent a lot of time reading
25        the file history of either the 156 patent or
```

35

1      the 321 patent?

2   A.   No, I don't think I spent an extensive amount

3        of time.

4             MR. STALEY:   Object to the question,

5                  ask for a clarification.   When

6                  you're talking about file history,

7                  are you talking about prior art

8                  that was sited in the file history

9                  or are you just talking about the

10                 prosecution filings with the

11                 USPTO?

12  Q.   Mr. Smith, do you know what I mean when I say

13       file history?

14  A.   My understanding is that that would be the

15       history of the prosecution of the patent.

16       But if you're asking did I read and reread

17       the correspondence, no, I did not reread or

18       spend an extensive amount of time on the

19       correspondence.   I did look at the prior art

20       that was sited in the prosecution and that

21       sort of thing.

22  Q.   What do you believe is the role of the

23       prosecution file history in analyzing a

24       patent for infringement?

25  A.   I -- I don't know of a specific role.

36

1    Q.    Do you know whether the prosecution file

2          history of a patent can have any impact on

3          the scope of the coverage of the patent?

4    A.    My understanding is that in the -- the

5          process of -- of submitting and resubmitting

6          for a patent, sometimes the patent office

7          will give advice or will say -- for example,

8          I think I recall in the 156 patent it said

9          that you shouldn't show the bottom of the --

10         of the pet cage because it wasn't being

11         covered by the patent.  So I know that things

12         like that can be part of that.

13   Q.    And how does that affect the scope of the

14         patent?

15   A.    How does it affect the scope?

16   Q.    Yes, sir.

17   A.    Well, with a design patent, since it's -- has

18         shown something like that would -- would

19         affect the -- what would be considered in the

20         design.

21   Q.    Let's mark this.  I'm passing you what's been

22         marked as Exhibit #236.

23   A.    Okay.

24   Q.    And ask you if you recall seeing this.

25   A.    Yes.

37

1   Q.  Do you recognize this to be the prosecution

2       file history of the 321 patent that was

3       attached to Mr. Anders' report?

4   A.  Yes.

5   Q.  Now, I'll represent to you, Mr. Smith, that

6       our firm has added page numbers in the lower

7       right for easier reference, page dash 1

8       through 112.

9          MR. STALEY:  I'm not clear,

10             Mr. Gardner.  Is your question is

11             this an accurate copy or is this

12             what purports to be the 321

13             prosecution history that was

14             attached to be Mr. Anders' report?

15             I mean, if you're asking him --

16       MR. GARDNER:  Asking him.

17       MR. STALEY:  -- to verify 112 pages and

18             whether or not that jibes with --

19             that's really not a fair question.

20       MR. GARDNER:  I'm not asking him to

21             verify that all 112 pages are

22             there or that these are the same

23             112 pages that he saw; only that

24             it looks like the file history

25             that he saw attached to

38

1                  Mr. Anders' report.

2    Q.   And you've indicated that it does look like

3         it?

4    A.   It -- it appears to be, yes.

5    Q.   If you would, look at the document that

6         begins on page 38 as part of this file

7         history.

8    A.   Hang on.

9    Q.   It continues on for several pages.  First of

10        all, do you recognize this as an office

11        action or office letter received from the

12        United States Patent and Trademark office?

13   A.   That's -- yes, that's what it appears to be.

14   Q.   Do you recall seeing this in your review of

15        the file history?

16   A.   Not specifically.  But I mean, in -- in exact

17        detail.  But yes, I recall seeing it.

18   Q.   Let's look at the third page of this --

19   A.   Okay.  So that would be 40.

20   Q.   -- office action which is page 40.

21   A.   40.  Okay.

22   Q.   Do you see where the examiner has written at

23        the top there beginning with "This

24        application"?

25   A.   Contains the following embodiments?

39

1    Q.   Yeah.   Would you read that out, and then the

2         next paragraph that begins "Multiple

3         embodiments."

4    A.   Multiple embodiments of a single inventive

5         concept may include -- may be included in the

6         same design application only if they're

7         patentably indistinct.  See In Re Rubinfield

8         270 F.2d.  Embodiments that are -- do you

9         want me to read all the --

10   Q.   Read the rest of the paragraph, please.

11   A.   Okay.  All right.  Let me see.  In Re

12        Rubinfield, 270 F.2d, 391, 123 USP -- looks

13        like a Q -- 210(CCPA 1959).  Embodiments that

14        are patentably distinct from one another do

15        not constitute a single inventive concept and

16        thus may not be included in the same design

17        application.  See In Re Platner,

18        P-L-A-T-N-E-R.

19   Q.   That's enough from there.  Would you agree

20        with me that the examiner apparently

21        considered that there were two embodiments in

22        this design patent application?

23   A.   That appears to be from this, yes.

24   Q.   Isn't that what the examiner indicated in

25        this office action letter?

40

1    A.  Yes.  Yes.

2          COURT REPORTER:  I'm sorry.  Repeat your

3    question.  Is that what the examiner --

4    Q.  -- indicated in this office action letter?

5          MR. HINSHAW:  I would object.  Document

6              speaks for itself.

7    Q.  Isn't it also true that the examiner

8    indicated that these multiple embodiments

9    constituted a single inventive concept?

10          MR. HINSHAW:  Objection.  Document

11             speaks for itself.

12   A.  What it -- it's a discussion of the

13   difference between multiple embodiments and

14   embodiments that are patentably distinct from

15   one another.

16   Q.  What does it mean for embodiments to be

17   patentably distinct from one another?

18          MR. HINSHAW:  Objection.  Form and

19             foundation.

20   A.  My understanding from this is that it would

21   require a separate -- if they were patentably

22   distinct from one another would require a

23   separate patent, or they could not be

24   included in the same application.

25   Q.  If you would, still referring to page 40 of

41

```
 1        Exhibit #236, does the next paragraph begin
 2        with the following language:  The above
 3        identified embodiments are considered by the
 4        examiner to present overall appearances that
 5        are basically the same.  Furthermore, the
 6        differences between the appearances of the
 7        embodiments are considered minor and
 8        patentably indistinct or are shown to be
 9        obvious in view of analogous prior art sited.
10        Did I read that, correctly?
11   A.   Yes, you did.
12   Q.   Do you agree with the examiner that the two
13        embodiments have basically the same overall
14        appearance?
15             MR. HINSHAW:  Objection to form and
16                  foundation.
17   A.   I think that -- you're asking me if I agree
18        with their conclusion?
19   Q.   Well, first of all, we'll break it up.  Do
20        you agree that the examiner concluded that
21        the two embodiments had basically the same
22        overall appearances?
23   A.   Yes.
24   Q.   Do you believe that the two embodiments shown
25        in the 321 patent have basically the same
```

42

1      overall appearances?

2  A.  The same overall appearance?

3  Q.  Yes.

4  A.  I think that the diamond -- I think that the

5      double diamond pattern is a noticeable

6      difference between the two.

7  Q.  Can you agree with the statement that the --

8      the two embodiments have basically the same

9      overall appearance?

10  A.  Yes.

11  Q.  Do you see the next language where the

12      examiner indicates that the differences

13      between the appearances of the two

14      embodiments are considered minor?

15  A.  I'm sorry.  Where are you?

16  Q.  In that same paragraph.

17  A.  The very last sentence?

18  Q.  No.

19  A.  Okay.

20  Q.  No.  After the --

21  A.  Oh, okay.  It starts with "Furthermore"?

22  Q.  The examiner indicates furthermore the

23      differences between the appearances of the

24      embodiments are considered minor.  Do you see

25      that language?

43

1  A.  Yes, I see that language.

2  Q.  Do you believe that the differences between

3      the two embodiments are minor?

4          MR. HINSHAW:  Objection to form.

5  A.  I -- I believe that the differences would be

6      noticeable.  That is, I believe that if -- if

7      you look at the -- if you look at the litter

8      pan cover and it was without the double

9      diamond -- that is, with a plain weave, and

10     there was one beside it that had the double

11     diamond, I believe that people would notice

12     the double diamond.  People would notice that

13     one had it and one didn't.  But beyond that,

14     no.

15 Q.  So if I said that the differences between the

16     two embodiments shown in the 321 patent are

17     minor, you would not agree with that

18     statement, correct?

19         MR. HINSHAW:  Objection, asked and

20                 answered.

21 A.  I would say that you would notice one being

22     plain and one having a double diamond.

23     That's what I would say.

24 Q.  But would you agree that they're minor or

25     not?

44

1           MR. HINSHAW:  Objection to form.

2    A.   Minor in comparison, one to another?  Is that

3         what you're asking?

4    Q.   Yes.  I understand that you've testified that

5         the differences between the two embodiments

6         shown in the 321 patent could be noticed.

7         What I'm asking you is whether you can agree

8         with the characterization that those

9         differences between the two embodiments are

10        minor.

11           MR. HINSHAW:  My objection, to make it

12                clear, is I'm not clear from your

13                question whether you're asking him

14                about that comparison in the eyes

15                of an ordinary observer or if

16                you're asking him about that

17                comparison in the eyes of a person

18                of ordinary skill in art as an

19                industrial designer.

20   Q.   Well, we'll take it in turn.  We'll start

21        with your personal view as an industrial

22        designer; not some typical industrial

23        designer, but you personally, Mr. Smith.  Can

24        you personally agree that in your view the

25        differences between the two embodiments shown

45

1       in the 321 patent are minor or not?

2   A.  As an industrial designer, I would notice the

3       difference in pattern.  I would notice that,

4       because it would be a clear decorative

5       choice.  I would notice that.

6   Q.  I understand that you might notice it.  What

7       I'm asking you is whether you consider --

8       that difference that you consider noticeable,

9       do you also consider that difference to be

10      minor?

11  A.  Assuming all other things are the same

12      between the two?

13  Q.  Yes.

14  A.  I would not consider it to be a major

15      difference between the two, assuming all

16      other things are equal.

17  Q.  So --

18  A.  Assuming all the other details are there,

19      visual details are there.

20  Q.  So could you agree, then, that it's a minor

21      difference?

22  A.  That's a -- as a designer, that's kind of a

23      charged sort of word.  So I don't know that I

24      would apply that characterization to it as a

25      designer.  I don't know that I would -- I

46

```
 1        would personally say it was a minor
 2        difference.  I certainly wouldn't say it was
 3        a major difference.
 4   Q.   Would you agree that some designers might
 5        consider it a minor difference?
 6             MR. HINSHAW:  Objection.  Foundation.
 7   A.   It's possible.
 8   Q.   Now, let's talk about the ordinary consumer.
 9        Would an ordinary consumer consider the
10        difference between those two embodiments to
11        be a minor difference?
12   A.   I think -- I think they would perceive it as
13        a clear difference.  But I think that they
14        might consider it a minor difference.
15   Q.   And again, we're talking about --
16   A.   Just the pattern or not the pattern.
17   Q.   We're talking about the two embodiments shown
18        in the 321 patent, just to be clear.
19   A.   Yes.  Yes.
20   Q.   So in your view, an ordinary consumer might
21        agree with the examiner that the difference
22        between those two embodiments is a minor
23        difference?
24   A.   Yes.
25             MR. GARDNER:  I'm going to take a short
```

47

1          break for restroom and stretch

2          your legs and whatnot.

3               (Brief recess)

4    Q.   Mr. Smith, referring now to Exhibit #2, which

5         we've placed in front of you, do you recall

6         that's the -- excuse me.  That's the wrong

7         one.

8    A.   Oh, yeah.

9    Q.   #3, please.  Exhibit #3.

10   A.   Exhibit #3.

11   Q.   Which is the next one?

12   A.   Oh, I'm sorry.

13   Q.   Do you recall that Exhibit #3 shows the

14        Bay Isle model 1805 wicker litter pan cover,

15        correct?

16   A.   Yes.

17   Q.   Now, first of all, looking at the second page

18        of this exhibit --

19   A.   Pull it out.

20   Q.   Yeah.  Looking at the second page of this

21        exhibit, do you see what some people have

22        referred to as a hang tag hanging in the

23        opening?

24   A.   Yes.

25   Q.   Do you consider that the hang tag forms part

48

1     of the product or is that part of the

2     packaging or is it something else?

3  A.  I would consider it part of the branding.  It

4     would be something that you'd want every

5     consumer to notice when they looked at the

6     product in this particular case.

7  Q.  But the hang tag itself is not part of the

8     litter pan cover, is it?  It's attached to it

9     but doesn't form part of the cover, correct?

10  A.  Correct.

11  Q.  So should the hang tag form part of the

12     analysis of whether this product, the 1805

13     litter pan cover infringes a patent or not?

14  A.  I did not include it in my analysis.  I'm

15     not -- it -- it would be part of the

16     branding.  It would be something you would

17     want the consumer to notice as a way of

18     establishing your brand.  That's how I would

19     approach it as a designer.

20  Q.  But for purposes of evaluating whether the

21     model 1805 infringes the 321 patent, the hang

22     tag should not be considered, correct?

23  A.  I -- as I said, I did not consider it to be

24     part of the -- the analysis.

25  Q.  And not -- I'm sorry.

49

1    A.    For looking at -- in the comparison between

2          the two products.

3    Q.    And not considering it was the correct thing

4          to do, correct?

5    A.    In my approach, yes.

6    Q.    Well, do you believe anybody else should

7          consider the hang tag in evaluating whether

8          there's an infringement or not?

9    A.    I -- I don't know if somebody else would or

10         not.  All I can say is that I did not

11         consider it.

12   Q.    Well, do you -- do you yourself know whether

13         it would be appropriate in the infringement

14         analysis to consider that hang tag in

15         evaluating whether the product infringes a

16         patent?

17   A.    I don't -- I don't know for certain from a --

18         I'm not a patent attorney, but I would not

19         consider it.

20   Q.    Let's look at the third page of Exhibit #3.

21         And the third page shows what I think is the

22         side panel.  Do you agree with that?

23   A.    Yes.

24   Q.    And on the side panel there in the woven

25         wicker there appears to be some squares or

50

1      rectangles of a different weaving pattern.
2      Is that correct?
3  A.  Yes.
4  Q.  How would you describe those?
5  A.  I think in my analysis I describe them as a
6      square weave.  You're talking about the
7      four -- the four distinct -- you know, one in
8      each corner, those weaves, is that what
9      you're talking about?
10 Q.  Well, the -- in the picture, do you agree
11     with me that there are four patches or
12     squares of woven area that appear different
13     than the other --
14 A.  Yes.
15 Q.  -- the rest of the panel?
16 A.  Yes.
17 Q.  And you refer to those individual squares as
18     a square weave?
19 A.  I believe I did, yes.
20 Q.  Now, looking at the design patent, the 321
21     design patent of Exhibit #83.
22 A.  Yes.  Was that in here?  Yes.
23 Q.  Do you believe that the square pattern shown
24     on the Bay Isle model 1805 litter pan cover
25     is a difference than from what's shown in the

51

1       321 design patent of Exhibit #83?

2 A.   Yes.  I believe it's a difference.

3 Q.   Do you believe that it's a minor difference,

4       a major difference, or something in between?

5 A.   I think it's a noticeable difference.  And we

6       were talking about -- I think we were talking

7       about the 321 before the -- the break and

8       about plain versus the diamonds.  And, you

9       know, I think the consumer would notice it

10       the same way you would notice a fabric

11       pattern on a sofa that you were purchasing.

12       That it would -- they would notice it.  They

13       would pay attention to it.  It might not be

14       the ultimate deciding factor, but they would

15       notice it.

16 Q.   Well, would you agree with the statement that

17       it's not a major difference between what's

18       shown in the patent?

19 A.   I think -- I think it's a noticeable

20       difference.  I think it's a difference the

21       consumer will notice.

22 Q.   Well, I understand that you think that it's

23       noticeable.  And independent of whether you

24       think it's noticeable, do you yourself think

25       that it's a major difference between what's

52

1 shown in the 321 patent and what's shown in

2 the Bay Isle 1805 litter pan cover?

3   MR. HINSHAW:  Again, for clarification,

4     you're asking him as an industrial

5     designer?

6   MR. GARDNER:  I'm asking him

7     personally.

8   MR. HINSHAW:  As an industrial designer

9     or as a consumer?

10   MR. GARDNER:  In his own personal

11     view.  What does he think.

12 A. I think it's a significant difference.

13 Q. Would you agree that it's not a major

14  difference?

15 A. No, I wouldn't agree with that from this -- I

16  wouldn't agree with that, no.

17 Q. So you think it's a major difference between

18  what's shown in the patent and what's shown

19  in the Bay Isle product?

20 A. I think it's a -- it's a noticeable

21  difference between the two.

22 Q. Let's -- let's assume for a moment that there

23  was an extremely minor difference.  Not this

24  difference but an extremely minor

25  difference.

53

1   A.   Yes.

2   Q.   I think we can both agree that a person like

3        yourself, an industrial designer, could

4        notice even an extremely minor difference,

5        right?

6   A.   Depending on the context, but yes.

7   Q.   So what I want to keep distinct is the

8        question of whether the feature can be

9        noticed versus whether you as a designer

10       would consider it major, minor, significant

11       or however you might characterize it.  So

12       isn't it true that you as an industrial

13       designer could notice major differences,

14       minor differences, very minor differences and

15       a whole range of differences, correct?

16  A.   Depending on the context.  Depending on the

17       context.

18  Q.   But I -- but it is true in general that you

19       as a designer could notice both major

20       differences and minor differences, right?

21  A.   Yes.

22  Q.   So I'm not asking you whether the difference

23       in the weave pattern is noticeable or not.

24       I -- I'll grant you that you as a designer

25       may notice it, even if it's minor or very

54

1    minor.   What I'm asking you is whether you

2    would agree with the statement that the

3    difference between the square weave pattern

4    in the 1805 Bay Isle product is a major

5    difference from what's shown in the 321

6    patent of Exhibit #83.

7  A.  It's -- again, I think it's question,

8    perhaps, of wording.  But I would not

9    consider it a minor difference.  I would

10    consider it to be noticeable, and I would

11    consider it to have an influence on the

12    overall appearance.  It's not -- it's not a

13    single controlling factor.  But it is

14    noticeable, and it's significant.

15  Q.  Well, I'm trying to narrow the focus here.

16    I'm trying to ask you whether you could agree

17    or whether you disagree with the statement

18    that the difference between the square weave

19    pattern of the model 1805 and what's shown in

20    the patent is a major difference.

21        MR. HINSHAW:   Asked and answered.

22  A.  Your scale is one or ten.   And -- and I'm not

23    comfortable saying that it is -- I would -- I

24    would as an industrial designer, I would call

25    this a noticeable difference between the

55

1      Bay Isle and the 321.

2  Q.  If I made you choose between it being a major

3      difference or not being a major difference,

4      which would you choose?

5         MR. HINSHAW:  Objection to form.

6  A.  I would say that -- that's a -- that's not

7      how I would categorize it as a designer,

8      because -- I would not categorize it or

9      characterize it in that way.  I would say

10      it's a noticeable clear difference.  And

11      that's how I would categorize it as a

12      designer.

13  Q.  Do you agree with the statement that it is a

14      major difference?

15  A.  I would not -- I would not characterize it in

16      that way.  I would say it's noticeable.  It's

17      a clearly visible difference.

18  Q.  So in your view, it's a noticeable, clearly

19      visible difference but not a major

20      difference, correct?

21  A.  I -- I would not -- I wouldn't use -- I would

22      not use that dichotomy as major, not major.

23      I would say it's a noticeable difference.

24  Q.  Well, given that you believe it's visible and

25      noticeable, the question is do you also

56

```
 1         believe that it's a major difference?
 2              MR. HINSHAW:  Asked and answered.
 3    A.   As I've said, that's -- as a designer, I
 4         would describe this as clearly noticeable or
 5         visible difference between the two.  That's
 6         how I would describe it as a designer.
 7    Q.   Well, would you agree with the statement that
 8         it's a noticeable visible difference but a
 9         minor difference?
10    A.   No, because the word minor would tend to
11         generally be taken to trivialize it.  And I
12         think it's a noticeable difference.
13    Q.   But you don't personally think that it's a
14         major difference, do you?
15              MR. HINSHAW:  Objection.  Asked and
16                   answered.
17    A.   You've already asked me that.  I would not --
18         I told you how I would characterize it as an
19         industrial designer.
20    Q.   And that terminology, the answer that you
21         gave did not characterize it as a major
22         difference, correct?
23    A.   I would not use those words, major or minor,
24         in the case of this.
25    Q.   So in your view, it's neither a major nor a
```

57

1      minor difference?

2   A.  I would describe it as a noticeable, clearly

3       visible difference.  That's how I would

4       describe it.

5   Q.  Do you think other industrial designers would

6       view the difference between the square weave

7       pattern of the model 1805 and that which is

8       shown in the 321 patent, Exhibit #83, are a

9       major difference?

10  A.  I can't speak to what other industrial

11      designers would say.  I can tell you what my

12      opinion is as an industrial designer.

13  Q.  What about a person of ordinary skill in the

14      art.  Would that person think that the

15      difference between the square weave pattern

16      of the model 1805 Bay Isle product shown in

17      Exhibit #3 is a major difference as compared

18      to that which is shown in the design patent

19      of Exhibit #83?

20  A.  I think they would notice it as a difference.

21      In other words, I think they would notice

22      that one was diamond or plain, the other

23      was -- had a square weave on it.  I think

24      they would notice that.

25  Q.  Do you believe that they would agree with the

58

1          statement that it's a major difference?

2    A.    I think they would see it as a difference,

3          not -- they would see it as a difference.

4          And the analogy would be kind of as I

5          discussed earlier, you know, sofa, finished

6          fabric, you know; you notice those things

7          when you make a purchase.

8    Q.    Isn't it true that at least some industrial

9          designers, in viewing the square weave

10         pattern of the 1805 and comparing that to

11         what's shown in the 321 patent, would

12         consider that pattern difference to be a

13         minor difference?

14   A.    I can't speak to what some industrial

15         designers would say.  I can tell you what I

16         would say.

17   Q.    Isn't it true that at least some consumers

18         would view the difference between the square

19         weave pattern of the Bay Isle product and

20         that which is shown in Exhibit #83, the 321

21         patent, as a minor difference?

22   A.    I would say I don't know about the

23         characterization of minor, but some consumers

24         might -- how can I say this.  It's a

25         difference that might have more impact on

59

1       some consumers than another in making a

2       selection.

3  Q.  Well, let's assume for a moment that all --

4       we had a pool of 100 consumers or potential

5       consumers, and they all either noticed the

6       difference or someone pointed it out to them

7       so that all 100 of these consumers are now

8       aware of the difference between the square

9       weave pattern shown in the Bay Isle product

10      of Exhibit #3 and that which is shown in the

11      321 patent of Exhibit #83.  Are you with me

12      so far?

13  A.  Okay.

14  Q.  So we've got a pool of 100 consumers or

15      potential consumers.

16  A.  Right.

17  Q.  And they either were aware of the difference

18      or we have made them aware, so that all 100

19      are actually aware of this difference.

20  A.  Okay.

21  Q.  Do you understand that?

22  A.  Yes.

23  Q.  Isn't it true that at least some of those 100

24      consumers would consider the difference to be

25      a minor difference?

60

1   A.   I think it's possible that some would

2        consider in that light.

3   Q.   Now, if you change the group of persons from

4        retail consumers to be industrial designers,

5        now you had a room full of 100 industrial

6        designers; and they're all aware of this

7        difference, either by having noticed it

8        themselves or someone's pointed it out to

9        them.   Isn't it true that at least some of

10       those industrial designers would consider the

11       difference between the square weave pattern

12       of the 1805 and that which is shown in the

13       design patent to be a minor difference?

14  A.   If you're talking about the -- if you're

15       talking about the industrial designers -- and

16       again, I can only speak for myself and from

17       my experience with other designers, most

18       designers are pretty pattern-conscious, so

19       they would certainly notice it.   And I would

20       think that they would consider it in general

21       to be a noticeable detail for the most part.

22       I can't -- since this is a hypothetical

23       group, I can't testify as to, you know,

24       whether some of these hypothetical industrial

25       designers might have another opinion.   But as

61

1       I said, industrial designers as a whole are

2       pretty pattern-conscious.

3 Q.   Well, understanding that industrial designers

4       may be pattern-conscious, isn't it still true

5       that at least some of them would consider the

6       difference to be minor?

7 A.   Again, it's a hypothetical.  There's a --

8       surface detail is one of the details that --

9       that makes a difference in how an object

10      appears.  And so, industrial designers in

11      general would consider this to be a

12      difference.

13 Q.   Is it your testimony that none of the 100

14      would consider it minor?

15 A.   They're all hypothetical.  So I can't answer

16      that.

17 Q.   Well, you've been proffered as an expert, so

18      we're asking for your --

19 A.   I have told you --

20 Q.   We're asking for your opinion in that

21      situation whether any of those -- any of

22      those designers would consider the difference

23      to be minor.

24 A.   I don't think any design practitioner would

25      say that the choice of weave made no

62

1    difference, if that's what you mean by minor.

2    Industrial designers are trained to pay

3    attention to surface detail that impacts how

4    a product is perceived in it's sort of

5    totality, if you will.  If I have a number 3

6    mold texture versus a number 0 mold texture,

7    that makes a significant difference in how a

8    part appears when it's done.  And so

9    industrial designers would see that as

10   conscious choice and not an unimportant one,

11   because it affects how the object appears.

12 Q.  My question is not whether it made no

13   difference.  My question was simply whether

14   any of those designers would find it to be a

15   minor difference.

16 A.  As I've said before, the word minor tends to

17   trivialize this.  And I don't think any

18   designer would see it as a trivial choice.

19 Q.  Do you equate minor, the word minor with the

20   word trivial?

21 A.  I think it frequently is used that way, an

22   unimportant difference.  And I don't think

23   that designers would -- that industrial

24   designers in general would see the choice of

25   a pattern which affects the appearance to be

63

1     an unimportant difference.  We're all about

2     making careful choices about things like

3     that.

4  Q.  Well, what does the word "minor" mean to you?

5  A.  Minor, in the sense that you're using it, I

6     would take to mean a choice that is not

7     important to the overall appearance.

8  Q.  Have I defined it that way to you today?

9  A.  No.  In the context of the questions, that's

10    how I understood you to mean.

11 Q.  Anything else you would like to add about

12    your understanding of the word minor today?

13 A.  No.

14 Q.  What do you understand the word major to mean

15    as it's been used today?

16 A.  A -- in the context of the discussion, I

17    would say that -- I mean, I understood it to

18    be in the sense of a difference that would

19    completely separate one idea from another.

20    To return to the 321 patent, if the patent

21    examiner had considered it a major difference

22    then, to -- then both of the embodiments,

23    that couldn't have been covered by the same

24    patent.

25 Q.  Let's move to a different topic now.  Let's

64

1          talk about the casual observer or ordinary

2          observer.

3     A.   Okay.

4     Q.   What's your understanding of who is the

5          appropriate or ordinary observer under

6          Gorham?

7     A.   It's someone, an ordinary observer exercising

8          such care as one might exercise in the

9          purchase of whatever the product is, if they

10         would be deceived into purchasing one

11         supposing it to be the other.

12    Q.   Now, in the context of a consumer product

13         like these wicker crates or wicker litter pan

14         covers, who is the purchaser that we should

15         be concerned with?

16    A.   I think I mentioned this in the -- in the

17         last -- during the first part of the

18         deposition, that I think the average

19         purchaser of, you know, pet cages and the

20         like certainly would observe differences.  I

21         think this particular group is probably the

22         next tier up because the products are of

23         higher price point, in that this group is

24         going to pay more attention to things like

25         their interior decor and matching things.  So

65

1    they are probably going to be a little more

2    detail-conscious than the ordinary observer.

3    But I think the ordinary observer would

4    notice a difference -- I think that the

5    ordinary purchaser, rather, of pet products

6    would notice differences as well.

7  Q.  Well, let's try to narrow that down a little

8    bit.  Do you believe that the appropriate

9    ordinary observer in this context is a retail

10    consumer?

11  A.  Yes.

12        MR. HINSHAW:  I'm sorry.  Are we

13            talking about the litter pan

14            covers?

15        MR. GARDNER:  Well, in either instance.

16  Q.  Either the litter pan cover or the wicker

17    crates.  Do you believe that the appropriate

18    ordinary observer is a retail consumer or

19    retail purchaser?

20  A.  Yes.

21  Q.  Do you believe that the buyer had a

22    distributor who orders the product from, say,

23    Mid-West to inventory it and then sell it to

24    pet stores is an inappropriate person to

25    select as an ordinary observer?

66

1    A.    I think that the ultimate purchaser will

2          exercise more control over it.  So I would

3          still pick the ordinary -- you know, I would

4          pick the -- the end purchaser over the

5          distributor.

6    Q.    So the buyer -- the professional buyer at the

7          distributor is not the right person to use as

8          the --

9    A.    I would not think so in this instance.

10   Q.    What about a professional buyer at a pet

11         store or a chain of pet stores that buys from

12         a manufacturer or from a distributor to

13         inventory it at their pet stores so that

14         retail consumers could come buy it?

15   A.    I would still think that the retail consumer

16         is the -- the ordinary observer.

17   Q.    Am I correct that neither one of your reports

18         either regarding the 321 patent or the 156

19         patent actually defines who would be the

20         appropriate ordinary observer?

21   A.    It defines it only by inference but, no, I

22         don't call out that it's the end purchaser in

23         those specific words.

24   Q.    Now, in our previous examination of you --

25   A.    Yes.

67

1   Q.  -- Mr. Smith, I believe we discussed that

2       that retail consumer can buy the Mid-West

3       wicker products, both the litter pan cover

4       and the wicker crates through a number of

5       sources.  And those sources would include

6       small pet stores, big box pet store chains,

7       catalogs and online retailers.  Do you agree

8       that a retail consumer can and does buy

9       Mid-West wicker products from those four

10      sources?

11  A.  That's my understanding.

12  Q.  Are you aware of any other sources that the

13      retail consumer might buy the Mid-West wicker

14      products from?

15  A.  None that I can think of.

16  Q.  Would you agree with me that as between those

17      four different channels of distribution, the

18      retail consumer does or might get different

19      amounts or levels of detail regarding the

20      Bay Isle wicker products in those different

21      scenarios?

22      MR. HINSHAW:  Could I have that

23            question repeated, please.

24             (The court reporter read the

25               pending question.)

68

1         MR. GARDNER:  Let me rephrase that

2              because the way she read it back,

3              if I said it that way, then there

4              was an error in it.

5    Q.  Would you agree that in those four different

6         channels of distribution, the amount of

7         detail conveyed to the consumer regarding the

8         appearance of the Bay Isle product is not

9         always the same?

10        MR. HINSHAW:  Objection.  Foundation.

11   A.  I would say that the amount of detail that

12        you can get for any product within those

13        individual environments can vary.

14   Q.  So I'm correct, then, in my statement that

15        there is or can be a variance.

16   A.  There can be.

17   Q.  Now, let's examine a couple of examples.

18   A.  Okay.

19   Q.  Am I correct that in some stores, the

20        Bay Isle product, whether it be the litter

21        pan cover or the wicker crate, is sometimes

22        set up as a display item to help promote the

23        sale of the product?

24   A.  I can't testify to that one way or the other

25        because I haven't made a -- a survey of store

69

1       displays.  That was not part of the

2       examination that I undertook.

3  Q.  Has anyone explained to you that that has or

4       sometimes does occur?

5  A.  No.  No one has explained that to me.

6  Q.  Well, you would agree that in retailing, it

7       sometimes does occur that manufacturers

8       display their items in a retail store by

9       erecting the product or taking it out of the

10      box and putting it on or near a shelf so that

11      a consumer can see it?

12  A.  In general in retail environments that --

13      that is a practice.

14  Q.  So it wouldn't surprise you to learn that

15      that may have happened in connection with the

16      sale of Mid-West products in this suit?

17  A.  No.

18  Q.  Now, do you have an understanding that when

19      the Mid-West product is sold, it comes in a

20      box?

21  A.  That's my understanding.

22  Q.  And that the box has some information on the

23      outside of it depicting the product?

24  A.  Yes.

25  Q.  For example, if you would, look at Exhibit #3

70

1       which is what you've got in your hand.

2   A.  Is that -- okay.

3   Q.  And if you refer to the first page of

4       Exhibit #3, you'll see a depiction of both

5       the product and part of the box for the

6       product.  Do you see that?

7   A.  Yes, I do.

8   Q.  So if the consumer were walking down the

9       aisle in a store, they might see the box with

10      as much detail as can be gleaned from the

11      image on the box, correct?

12  A.  Yes.

13  Q.  And if the product were also erected or set

14      up in the store, it might gather additional

15      detail information from -- from the product

16      itself, correct?

17  A.  They might.

18  Q.  Now, if the product were sold also through an

19      online retailer, do you expect that the

20      amount of detail that the consumer could

21      glean from a website would be the same, more

22      or less, from what a consumer might glean at

23      a store?

24          MR. HINSHAW:  Objection.  Foundation.

25  A.  It could be any of those.  Some websites are

71

1           highly detailed in the information they

2           provide.  Others are less so.  It's -- it's

3           a -- there aren't any standards, per se.

4       Q.  Mr. Smith, we're passing you what's been

5           marked as Exhibits #237, #238, #239, #240,

6           and #241, which I'll represent to you are

7           some websites that we randomly pulled and

8           printed out that depict the Mid-West wicker

9           products.

10      A.  Okay.

11              MR. HINSHAW:  And just so I'm clear,

12                  these are printouts of websites,

13                  correct?

14              MR. GARDNER:  Printouts from website

15                  pages, yeah.  So you go to the

16                  bottom of the page, you should be

17                  able to reproduce the same image

18                  by going to that site.

19              MR. HINSHAW:  Well, we've all seen the

20                  experience where you go into a

21                  website, you see something on the

22                  website and you say print it and

23                  it says okay, let's make you a

24                  printable version, which it prints

25                  off.

72

1            MR. GARDNER:  This is not a printable
2                version.  This is our printer's
3                attempt to print exactly what was
4                on the screen.  And to that
5                extent, there's a little cutoff of
6                information on the right-hand side
7                of some of these exhibits where
8                the print spooler imperfectly
9                captures everything that is on the
10               screen.
11           MR. HINSHAW:  I appreciate your
12               representation of what it is.  But
13               we would defer to the actual
14               website and what's shown there.
15               But I understand these are all
16               paper printouts as best you could
17               make them.  Is there a question
18               pending?
19           MR. GARDNER:  I was letting the witness
20               review the documents, in which he
21               seems engrossed.
22   Q.   First of all, have you yourself ever gone
23        online and looked at any source of either the
24        Mid-West product or the Simpson Ventures
25        product?

73

1  A.  I purchased two Simpson Ventures products.

2      One was the -- the dog crate or pet -- pet

3      crate, and the other was the litter box

4      cover.  And I did those online.  And I -- I

5      believe at the very beginning, or when I

6      first received a call from Mr. Hinshaw, that

7      I went online for a few minutes and just

8      looked at, you know, the Bay Isle.

9  Q.  When you looked at the Bay Isle line of

10     products online after being initially

11     contacted by Mr. Hinshaw, did you see images

12     and websites that looked somewhat similar to

13     what we put before you as Exhibits #237

14     through #241?

15 A.  As I recall.

16         MR. HINSHAW:  Could I have that

17            question read back, please?

18               (The court reporter read

19                  previous question.)

20 A.  I -- I think that --

21         MR. HINSHAW:  You already answered.

22 Q.  When you looked at the images online some

23     time ago yourself, did you see images that

24     were similar in size and appearance to those

25     which are in front of you now, in Exhibits

74

```
 1        #237 through #241?

 2   A.   I think the site that I went to had clickable

 3        enlargements, as I recall.

 4   Q.   So you would agree that some sites have

 5        clickable enlargements and some might not,

 6        correct?

 7   A.   In general.  I don't know about these in

 8        particular or about relative to these dog

 9        crates.

10   Q.   Well, if the images shown in Exhibits #237

11        through #241 are representative of what -- of

12        what consumers might see if they went online,

13        how much detail can be gleaned from these

14        images?

15   A.   In all of the images you can see the etched

16        detail clearly.  You can see the door detail

17        clearly.  Windows, you can -- in all of these

18        images you can see the back window, the

19        Bay Isle.  You can see the frame, and you can

20        see the weave.

21   Q.   Can you see the square weave clearly in every

22        image?

23   A.   Yes.

24   Q.   Would you agree that it's hard to see in some

25        locations on some of the panels on these
```

75

1      online sources?

2   A.  In these printouts, it's -- I can see them in

3       every location.

4   Q.  Would you agree with me that given the size

5       of the images overall and the relatively

6       small size of the square weave pattern as a

7       portion of those images that at least some

8       consumers might not notice the square weave

9       pattern that you're referring to?

10  A.  I think -- I think they would all notice that

11      there's a -- that there are blocks where the

12      color is different and I think -- it's a

13      little hard to tell from these printouts what

14      the screen image itself would look like.  But

15      all of them show a difference in -- I mean,

16      all of them show the squares, I guess I would

17      say.

18  Q.  Well --

19  A.  Is it -- go ahead.

20  Q.  I'm sorry.

21  A.  No.  Go ahead.

22  Q.  Do you have anything else?

23  A.  No.

24          MR. GARDNER:  Off the record.

25                  (Off-the-record discussion)

76

1  Q.  Well, maybe I've been going about this the

2      hard way.  I'm trying to figure out whether

3      you would agree that the size of the image

4      that the consumer is subjected to when making

5      the purchasing decision might have some

6      impact on the amount of detail that they can

7      glean about the product.

8  A.  In this case specifically or in general?

9  Q.  I'm talking about in this lawsuit

10     specifically, but --

11 A.  I think that the features that have

12     identified and when I was just looking at

13     these and saying what you could see are

14     visible in all of the image sizes.

15 Q.  I understand that you believe that you can

16     pick them out.  But what I'm trying to figure

17     out is whether a consumer, when looking at

18     small images like these of Exhibits #237 to

19     #241 is going to have a harder time noticing

20     some of the fine details of the Mid-West

21     product as compared to seeing the product

22     full scale in a pet store.

23 A.  I think that they would clearly notice the

24     edges.  I think they would clearly notice

25     the -- that is the notches in the edges.  I

77

1  think they would clearly notice the corners,

2  the corner detail.  I think they would

3  clearly notice the door and the windows.  I

4  think those would be clear across the board.

5  They would see something in the -- in the

6  side panels these are all I think

7  three-quarter views where there's a

8  difference in coloration or texture.  And

9  again, how much of that they would see would

10  depend on whether or not there was an

11  enlargement feature on multiple views.  That

12  is how much of the -- whether they would see

13  specifically, you know, the number of strands

14  in the square weave.  They'll notice the

15  square, the squares in these but -- in the

16  three- quarter views, even in the small views

17  you can see that there are squares that are

18  different color.  But you can't -- you can't

19  in every case see that there's a -- what I've

20  called the square weave.  That is, you might

21  not see the -- that in -- in some of the

22  smaller images.  The site that I went to

23  had -- and many sites have multiple views as

24  well as enlargements, so.

25  Q.  Well, maybe you misunderstood.  I'm not

78

```
 1        trying to get you to agree that because the

 2        images are small the consumer would be

 3        prevented from seeing the features that you

 4        have just discussed.  You understand that?

 5   A.   Okay.

 6   Q.   I'm only trying to figure out whether you

 7        could agree in principle that it's easier for

 8        the consumer to -- to notice those features,

 9        to see those features when the product is in

10        front of them full scale, versus looking at

11        small images on a computer screen.

12   A.   It's a -- it's kind of an apples and oranges

13        thing, in that people online shop a little

14        differently usually.  Typically for example,

15        if they go to one site and they don't have a

16        good visual, they'll use Google or some other

17        search engine to see if they can get better

18        visuals.  Is it a little bit different

19        experience, if that's what you're asking,

20        yes, it is.

21   Q.   I'm not asking if it's a different

22        experience.

23   A.   Okay.

24   Q.   I'm trying to figure out if a person goes to

25        a website like that on Exhibit #237 and those
```

79

1       are the images that they see, wouldn't you

2       agree that -- that they would have an easier

3       time picking out the details of the product

4       from seeing it in person than from seeing

5       such a small image on the screen?

6  A.  I think the details that I mentioned would be

7       clearly visible either way.  In person or

8       on -- on the computer screen.

9  Q.  I'm not trying to get you to admit that the

10      details are not visible on the computer

11      screen.  That's not -- that's not my

12      question.

13  A.  Okay.

14  Q.  It's a simple issue of isn't it true that if

15      a consumer had the product in front of them

16      in a store, versus looking at a small image

17      on a computer screen that they would have an

18      easier time picking out all of the small

19      details of the product by looking at the

20      product in full size right in front of them,

21      versus looking at an image on a computer

22      screen?

23  A.  In general I would say that would be true.

24  Q.  And is the same also true for catalog sales

25      as compared to viewing the product in the

80

1     store?

2  A.  Depending on the catalog layout and the

3     detail.  But in general it would probably

4     also be true.

5  Q.  Well, am I correct that typically catalog

6     entries for a product such as this would be

7     fairly small and have a fairly small picture

8     of the product?

9        MR. HINSHAW:  Objection.  Foundation.

10 A.  I haven't done a survey of, you know, all of

11     the pet supply catalogs.  They certainly

12     would not be full size.

13 Q.  Well, you get catalogs at your house?

14 A.  Yes.

15 Q.  And in the typical home products catalog that

16     you might get, isn't it true that the images

17     of the products are typically fairly small?

18 A.  There are multiple images on a page.  I think

19     we may be talking about semantics at this

20     point.  But I think most catalogs that are

21     well done give you -- I mean, the whole

22     purpose is to give you sufficient detail to

23     make an intelligent purchase to attract you

24     to purchasing a particular product.  So they

25     have a vested interest in trying to convey

81

1      detail.

2   Q.  You indicated that typical catalog normally

3       has multiple items on a page, right?

4   A.  Typically.

5   Q.  So --

6   A.  Most of the ones I get.

7   Q.  So it follows from that that the image would

8       be a fraction of a page typically, not a

9       whole page, right?

10  A.  Would be a percentage of a page, yes.

11  Q.  And that fraction of a page is typically

12      going to be substantially smaller than the

13      product would appear in person in a store,

14      correct?

15  A.  It will typically be smaller than -- yes, it

16      will be smaller than the product appears

17      in -- in the store.

18  Q.  So given that in the catalog, the typical

19      image of a product like the Mid-West Bay Isle

20      wicker cover or the Bay Isle wicker dog crate

21      would be much smaller in the catalog than the

22      actual product might be set up in a store,

23      can you agree with me that the average

24      consumer might have an easier time picking

25      out all of the details of the product in the

82

1      store compared to catalogs?

2   A.  Catalog, a good catalog, the products are

3       photographed very carefully to show detail.

4       In general -- I mean -- what I'm saying is

5       that there usually is, if it's a well done

6       catalog there usually is a fair amount of

7       detail.  But yes, going and seeing the thing

8       full size, you might notice other things.

9   Q.  So you would agree with me that it's easier

10      to observe all of the details of the Mid-West

11      Bay Isle products, both the litter pan cover

12      and the wicker pet crate, by viewing the

13      product in person as compared to seeing a

14      small image of it in a catalog, right?

15  A.  In general.

16              MR. GARDNER:  Can I take a couple of

17                  minutes?  I need to confer with

18                  Mr. Simpson.

19          MR. HINSHAW:  Five.

20                  (Brief recess)

21  Q.  Do you believe it less likely that retail

22      consumers could be confused as between the

23      designs of the Simpson Ventures 321 patent

24      and the Mid-West model 1805 litter pan cover

25      in the context of a pet store versus a

83

1      catalog?

2           MR. HINSHAW:  Objection to the form.

3              I'm confused by your question.

4  Q.  All right.  Let's look -- we established

5      earlier that there are at least four channels

6      of outlet for this product, for the Bay Isle

7      products.  And right now we're talking about

8      the Bay Isle litter pan cover, the 1805.

9      There's small independent pet shops.  There's

10     the big box pet store chains.  There's

11     catalog sales.  And there's online retailers.

12     So there's at least four -- four channels.

13     There may be something else but we've

14     identified four.  What I'm trying to figure

15     out is whether you would agree that it's less

16     likely that a consumer would be confused

17     between the patent design and the Bay Isle

18     1805 in the context of, say, a big box pet

19     store as compared to the other avenues.

20  A.  No.  I would not agree with that as a blanket

21     statement.

22  Q.  Do you agree that -- or do you believe that

23     all four channels have an equal chance or

24     likelihood of exhibiting some consumer

25     confusion as between those two designs?

84

1          MR. HINSHAW:   I'm going to object to

2                  the question because I think it's

3                  misleading in that it assumes he

4                  thinks there's a likelihood of the

5                  consumer having any confusion.

6                  And I don't believe that's his

7                  opinion or has been his testimony.

8          MR. GARDNER:   Well, I'm not trying to

9                  trick him into agreeing that there

10                 is a likelihood that people would

11                 get confused.  But --

12     Q.   Because I believe your testimony is that

13          people would not be confused, right?

14     A.   Yes.

15     Q.   But do you believe that that likelihood that

16          people would not be confused is equal across

17          all four channels of distribution?

18     A.   The likelihood of not being confused, is that

19          what you said?

20     Q.   Yes.

21     A.   In general, yes.  But that's a -- that's a

22          generalized answer, realizing that how things

23          are displayed in any one of those

24          environments may be different on an

25          individual case-by-case basis.

85

1  Q.  Well, let's talk about the four channels as a

2      lump again.  Do you believe that there is

3      zero chance that consumers would be confused

4      as between the patent design in the 321

5      patent and the Bay Isle model 1805 as shown

6      in Exhibit #3?

7  A.  I believe the differences are clear in all of

8      the distribution channels that you've

9      mentioned.

10 Q.  Well, do you believe that there is a zero

11     percent chance or nearly zero percent chance

12     that people would be confused in any of those

13     venues?

14 A.  In general, I believe that the differences

15     are clear in all of those environments.

16 Q.  Well, I understand that you believe that the

17     differences are clear and that they're clear

18     in all of the environments.  What I'm trying

19     to figure out is, trying to get you to put

20     some estimation on -- on how many people are

21     going to be confused.  I understand that

22     you -- you certainly believe that a hundred

23     percent of the people are not going to be

24     confused as between the patent design and the

25     model 1805, correct?

86

1  A.  Yes.

2  Q.  Do you believe that nobody would ever be

3      confused between the patent design of the 321

4      patent and the model 1805?

5  A.  Under the ordinary observer test you're

6      talking about?

7  Q.  Yeah.

8  A.  I think the differences are very clear.

9  Q.  So if we had 100 consumers in a room and you

10     surveyed them regarding the patent design and

11     the -- the Bay Isle model 1805, do you

12     believe that 100 percent of them would not

13     have been confused as between those two

14     designs?

15 A.  If we're talking about ordinary observers

16     exercising the care that one would exercise,

17     I think the differences would be clear to

18     them.

19 Q.  So none of them would ever be confused using

20     the ordinary care that they usually use in

21     buying such products?

22 A.  I think the differences are clear.  Absolutes

23     are something that I'm always -- you know, it

24     may be possible to find someone somewhere

25     that would be -- that wouldn't be attentive.

87

1        But in general I think the differences are

2        very clear.

3   Q.   Do you agree that some people, maybe not many

4        but some people would be confused?

5   A.   Not at -- I think if they're exercising a

6        level of care that you would generally

7        associate in a purchase of such a product

8        that they would see the differences from --

9        from -- between the Bay Isle and the Simpson

10       Venture Product.

11  Q.   Well, I understand your testimony to be that

12       at least most of those ordinary observers

13       would -- would not be confused.  But do you

14       believe that a small percentage would be

15       confused?

16            MR. HINSHAW:  Object.  I think it

17                 mischaracterizes his testimony to

18                 say only most would not.  I think

19                 he's pretty clear on his

20                 testimony.

21            MR. GARDNER:  Well, what I'm trying to

22                 figure out is whether he believes

23                 that most would be confused --

24                 would not confused, or that all

25                 would not be confused.  And he

88

1           said that -- that some people
2           might not use all the care they
3           should and would end up confused.
4      MR. HINSHAW:  Are you arguing with me
5           about my objection or do you have
6           a question for him?  I guess is
7           what I'm trying.
8      MR. GARDNER:  I guess you engaged me in
9           an argument on your objection,
10          James.  So, which is bad for me.
11          We shouldn't do that.
12  Q.  As you sit here today, do you have a belief
13      that under the ordinary observer test, 100
14      percent of the ordinary observers would not
15      be confused as between the patent design and
16      the model 1805?
17  A.  Under the ordinary observer test, which it's
18      my understanding says that they are
19      exercising the degree of care that one would
20      normally exercise in the purchase of such a
21      product, I am not saying that there might not
22      be a careless person, somebody who might be
23      inattentive.  But I am saying that under the
24      analysis of the ordinary observer exercising
25      care, I think the differences would be very

89

1    clear.

2  Q.  So if I understand your testimony, 100

3      percent of the ordinary observers who are

4      using appropriate care would not be confused.

5      And if they're not using an appropriate level

6      of care, they -- then some people might be

7      confused.  Is that right?

8  A.  I guess the best way I can explain it is kind

9      of an analogy.  When electric lawnmowers were

10     introduced and, in fact, up until the safety

11     measures were added, the kill bar and things

12     like that, there were a number of incidents

13     reported to the Consumer Product Safety

14     Commission of people picking up their

15     lawnmowers and using them to try and trim the

16     hedges.  I would not characterize that person

17     as necessarily exercising, you know, normal

18     careful judgment.  So I'm saying that there

19     are people out there who might be

20     inattentive.  But my understanding of Gorham

21     is that we're talking about the person who

22     exercises the degree of care that a person

23     would normally exercise in the purchase of

24     that particular item.  And I'm saying

25     that that group would see clear differences

90

1     between the Bay Isle and the 321 designs.

2  Q.  So -- so if a person is using the appropriate

3     amount of care in making their purchase

4     decision, in your view, they won't be

5     confused under the -- under the --

6  A.  I'm saying the -- I'm sorry.  I'm sorry.

7  Q.  Right.  If the person is using the correct

8     amount of care, the appropriate amount of

9     care in making their purchase decision, they

10    would not be confused between the Bay Isle

11    1805 and the patent design shown in the 321

12    patent, correct?

13  A.  I'm saying that the ordinary observer would

14    not be confused.

15  Q.  But you've tied that to them using the

16    correct amount of care, right?

17  A.  Well, that's the ordinary observer test.

18    That's my understanding.  I'm just wanting to

19    make sure we're talking about the same group

20    of people.

21  Q.  And so if a person -- or if a group of people

22    did not use that level of care, some of that

23    second group might be confused, correct?

24  A.  I would say that possibility exists but

25    that's -- that's -- as much as -- I mean,

91

1      I -- that possibility exists.

2  Q.  So the answer is yes?

3  A.  It's possible.

4  Q.  So if people are sloppy or careless in their

5      purchasing, they might make a mistake and be

6      confused, correct?

7  A.  I think it's unlikely but it's possible.

8          MR. GARDNER:  I've reached my pumpkin

9              hour.  It's time for a lunch

10             break.

11          (Lunch recess)

12  Q.  Mr. Smith, when the average retail consumer

13      is purchasing the product, the 1805 wicker

14      litter pan cover, are they always looking for

15      a wicker product when they end up making that

16      purchase decision?

17  A.  I don't know that I could answer that.  I

18      haven't -- I don't know that I could answer

19      that.

20  Q.  And your report indicates that they're a

21      little more careful or a little more

22      discriminating and your testimony in the

23      deposition has been to that effect; is that

24      correct?

25  A.  The -- yes, that in general people who are

92

1       paying the higher price point for an item, I

2       mean, there needs to be a reason for that and

3       generally they tend to be more attentive to

4       the quality issues and to details.

5  Q.  Am I correct that sometimes people have

6       purchased the Bay Isle wicker pet litter

7       cover, the model 1805 after initially

8       shopping for some other product?

9  A.  I don't know.

10  Q.  Do you think it's likely that sometimes

11       people go into a store and they're intending

12       to perhaps buy an inexpensive litter pan

13       cover, maybe a plastic litter pan cover and

14       then see the wicker product and say gee, I

15       think I'll get that and take it home?

16  A.  The -- it's a -- it's a noticeable difference

17       in price.  I would be surprised if that was a

18       regular occurrence.

19  Q.  Well, do you think that all of the sales or

20       most of the sales of a wicker litter pan

21       cover like the model 1805 occur as a result

22       of people going to a store or to a website

23       specifically to find that kind of a product?

24  A.  Again, I -- I don't have data on that one way

25       or the other.

93

| | | |
|---|---|---|
| 1 | Q. | So you don't know? |
| 2 | A. | No. |
| 3 | Q. | Is it possible that some of the purchases are |
| 4 | | impulse purchases because people just happen |
| 5 | | to see the product while they're shopping for |
| 6 | | something else and like the way it looks and |
| 7 | | decide to buy it? |
| 8 | A. | It's possible. |
| 9 | Q. | Now, is the same also true with respect to |
| 10 | | the wicker pet crate, the Bay Isle wicker pet |
| 11 | | crates, that some people who end up buying it |
| 12 | | did not set out to buy a wicker pet crate but |
| 13 | | they saw the wicker pet crate and liked it |
| 14 | | and bought that instead? |
| 15 | A. | To the degree that anything is possible, |
| 16 | | sure. |
| 17 | Q. | But you don't know whether that happens or |
| 18 | | not? |
| 19 | A. | No, I don't. |
| 20 | Q. | And you wouldn't know whether that happens a |
| 21 | | lot of time or just a little of the time? |
| 22 | A. | No, I -- no. |
| 23 | Q. | And you wouldn't know whether most of the |
| 24 | | sales of the Bay Isle wicker pet crate occur |
| 25 | | as a result of people specifically seeking |

94

1      out a wicker pet crate, correct?

2  A.  I don't -- I don't have any information on

3      that, no.

4  Q.  So you don't know that, correct?

5  A.  Correct.  I'm sorry.

6  Q.  If you would look at Exhibit #1.  Are you

7      familiar with Exhibit #1, what's shown in

8      Exhibit #1?

9  A.  Specifically?  I haven't, you know, examined

10     this specific kennel.

11 Q.  Are you aware that Mid-West Metal Products

12     makes wire crates like -- like that shown in

13     Exhibit #1?

14 A.  I am aware that Mid-West Metal makes wire

15     crates, yes.

16 Q.  Are you aware that wire crates similar to

17     that shown in Exhibit #1 are fairly common in

18     the marketplace?

19 A.  I found a number of patents for wire crates.

20     So I'm aware there are a number of wire

21     crates.

22 Q.  Do you believe that a person who buys a

23     wicker pet crate like the Bay Isle product is

24     more discriminating or more careful in their

25     purchase than a person who buys a wire crate

95

| | | |
|---|---|---|
| 1 | | like that shown in Exhibit #1? |
| 2 | A. | Well, I would think that they would tend to |
| 3 | | be more careful. I think that the |
| 4 | | differences that I've outlined are -- would |
| 5 | | be clear to the person who would purchase |
| 6 | | this kind of crate. But I -- I do think that |
| 7 | | because of the added expense, generally |
| 8 | | people look for a reason why they should pay |
| 9 | | more. So they tend to pay more attention to |
| 10 | | the -- going from this price point to the |
| 11 | | next price point. I would want to know what |
| 12 | | I'm getting. So I would exam it more |
| 13 | | carefully in general. |
| 14 | Q. | Do you believe that the people who buy the |
| 15 | | simple wire crates of Exhibit #1 are a |
| 16 | | different group of consumers than the people |
| 17 | | who buy the wicker crates like the Bay Isle |
| 18 | | product? |
| 19 | A. | I -- I think the questions for me is a little |
| 20 | | too general. A different group of consumers. |
| 21 | | There -- they would be willing or prepared or |
| 22 | | able to spend more money because it's more |
| 23 | | expensive. So, some people who purchased |
| 24 | | this would probably not be in that group. |
| 25 | Q. | Would you agree that some people might |

96

```
 1        purchase both?
 2   A.   That's possible.
 3   Q.   Do you know whether that has happened or not?
 4   A.   I do not.
 5   Q.   Do you know whether the wire crate like that
 6        shown in -- strike that.  Let me start over.
 7        Do you know whether wire crates similar to
 8        that shown in Exhibit #1 are sold side by
 9        side with wicker crates like the Bay Isle
10        wicker crates?
11   A.   Are you talking about like in a big box pet
12        store?
13   Q.   Yes, sir.
14   A.   No.  As I said, I didn't do a survey of pet
15        stores as part of my analysis.
16   Q.   Well, did you do any kind of surveys or
17        studies or polls or other analysis of -- that
18        would support your opinion that people
19        wouldn't be confused between the Bay Isle
20        products of Mid-West and the patents owned by
21        Simpson Ventures?
22   A.   The -- if you will recall, when I was talking
23        about the features that I felt would be
24        noticeable, I talked about the fact that
25        among other things people pay attention to
```

97

```
 1        the edges of products because that's one of
 2        the ways that we define things.  I've done a
 3        lot of -- I have done research on that from
 4        the standpoint of how the -- how perception
 5        changes for people as they get older.  And
 6        one of the key issues has to do with
 7        environmental discrimination.  And one of the
 8        issues has to do with visual acuity and the
 9        reason that's important is because we pay
10        attention to the edges of things.  It's part
11        of how we perceive shapes.  So, it's -- those
12        are areas that would be paid attention to.
13   Q.   But isn't it true that you did not conduct
14        any survey, poll, or study specific to this
15        case to determine whether consumers would or
16        would not be confused as between the Bay Isle
17        products and the Simpson Ventures patents?
18   A.   That is true.
19   Q.   Do you believe that you would be more
20        qualified or less qualified than someone who
21        is in the business of buying and selling
22        wicker pet crates to gauge whether consumers
23        are likely to be confused?
24   A.   I would say that I would in general have more
25        consumer experience in all likelihood.
```

98

1  Q.  Well, let's imagine a person who has been in

2      the field of merchandising products like this

3      for a number of years and is responsible for

4      buying the products from suppliers and then

5      putting them in their stores to try to get

6      consumers to buy them?

7  A.  Okay.

8  Q.  And has been doing that kind of work for,

9      say, ten years?

10  A.  Okay.

11  Q.  Would you think that you are as qualified as

12      that person to gauge whether consumers are

13      likely to be confused as between a particular

14      product and a patent?

15  A.  Yes.

16  Q.  You think you would be better qualified to

17      gauge confusion?

18  A.  Yes.

19  Q.  And why so?

20  A.  Because as a product designer my focus is on

21      the product.  That's not necessarily the

22      focus of the buyer.

23  Q.  What is the focus of the buyer if it's not on

24      the product?

25  A.  It depends upon the merchandising structure

99

1     and that varies within -- both within market

2     segments but also within particular retail

3     environments.  So there isn't a way to give

4     you a blanket answer to that question.

5  Q.  Are you aware of whether there's been any

6     testimony in this litigation by any buyers

7     like that?

8  A.  No.

9  Q.  Has anybody mentioned to you whether there

10     might have been such testimony?

11  A.  No.

12  Q.  I'll pass you what's been marked as

13     Exhibit #242, and ask you to take a few

14     minutes and read these deposition excerpts.

15          MR. HINSHAW:  You want him to read the

16               entire exhibit?

17          MR. GARDNER:  Yes, I do.  Off the

18               record.

19                    (Off-the-record discussion)

20                    (Brief pause)

21  A.  Okay.

22  Q.  Mr. Smith, you've taken a few minutes and

23     you've read the deposition transcript

24     excerpts contained in Exhibit #242, correct?

25  A.  Yes.

100

1    Q.   I'll represent to you that Mr. Mantle

2         testified that -- in his deposition he is a

3         buyer for Pet Smart in Phoenix, Arizona.   And

4         specifically he's the buyer who is

5         responsible or was responsible for purchasing

6         the model 1805 litter pan cover from

7         Mid-West.

8    A.   Okay.

9    Q.   Does the fact that a buyer from Pet Smart

10        such as Mr. Mantle considers that the average

11        consumer might be confused as between the

12        design of the 321 patent and the model 1805

13        give you any pause or concern about your

14        opinions?

15   A.   No.

16   Q.   Does -- is this the sort of information that

17        you as an expert should take into account in

18        formulating your opinions?

19   A.   I think that an expert should look at and

20        make judgments about all of the evidence.

21        That's part of the process of being an

22        expert.

23   Q.   Well, let's assume for a minute that there

24        were 100 buyers in this industry.   And that

25        if you -- if there was a survey conducted,

101

1    all 100 buyers would say that retail

2    consumers are going to be confused between

3    the patent design and the accused product.

4    Would that sort of information be something

5    that an expert should consider in formulating

6    his or her opinion regarding the likelihood

7    of infringement?

8              MR. HINSHAW:   Improper hypothetical.

9                   Lack of foundation.

10  A.  You're saying if you surveyed 100 buyers and

11      if all 100 said that there could be some

12      confusion.

13  Q.  Would be some confusion, actually.

14  A.  The first thing I would want to know is what

15      their basis was and what their experience was

16      with actual consumers.

17  Q.  Well, the buyers are not reporting instances

18      of actual confusion.  Only that they -- they

19      would believe that if the product goes to

20      market there's a probability that consumers

21      would be confused as between the patent

22      design and the proposed design?

23  A.  Right.  And I would ask are the buyers

24      trained in evaluating consumers and users of

25      products and do they have a background in

102

1    that.   That's what I would ask.   Because

2    you're saying they haven't actually surveyed

3    or talked to any consumers.   They don't know

4    it, they just suspect it.   So I would want to

5    know the basis for their opinion.

6  Q.  Do you believe that buyers at companies like

7    Pet Smart would have some understanding of

8    consumer preferences based on their

9    experience in selling products in their

10   stores?

11 A.  My understanding from your -- from the

12   initial conversation was that their

13   experience was in buying products from the

14   stores.

15 Q.  Do you understand that a buyer for a product

16   like these wicker crates typically is

17   responsible for -- for buying the item for

18   the purpose of carrying it in the store?

19 A.  Yes.

20 Q.  And they make decisions about whether to

21   carry a product based on their expectation

22   about how consumers are going to react to it?

23 A.  I don't know what the structure is in -- for

24   example, I don't know -- in -- in Petco or

25   other stores what the buyer structure is and

103

1    what their priorities are.  I do know that in

2    many industries the priorities of the buyer

3    are not necessarily what the consumer will

4    purchase.  They may have to do with buy so

5    many of these from us and we'll discount so

6    many of those.  So there are a lot of issues

7    that can enter into a buyer's decision to

8    acquire particular merchandise lines for the

9    retailer.

10  Q.   So is it your testimony that the opinion of

11       someone like Mr. Mantle as a buyer can be

12       discounted because you don't know what his

13       other job responsibilities are?

14  A.   It's my opinion that part of assessing it

15       would be to get answers to those questions

16       and to experience and to the structure of the

17       particular store chain that he's a buyer for.

18  Q.   Do you --

19  A.   That would all be a part of it.

20  Q.   Do you intend now to ask Mid-West Metal

21       Products or their attorneys for more

22       information about Mr. Mantle to determine

23       whether you should consider his opinions in

24       reassessing your own?

25  A.   Could you repeat the question?

104

1   Q.   Do you intend to request additional

2       information from Mid-West Metal Products or

3       their attorneys to allow you to assess

4       whether you should pay any credence to

5       Mr. Mantle's opinions in reassessing your own

6       opinions?

7   A.   I would have some follow-up questions

8       probably.

9   Q.   If it turns out that Mr. Mantle has

10      substantial experience in marketing and

11      merchandising consumer products to consumers,

12      would -- would you give more credence to his

13      opinions that are contained in Exhibit #242?

14   A.   Again, that depends.  It depends on the kind

15      of experience and how closely it was

16      connected with actual consumer preferences

17      and an understanding of what's involved in

18      assessing that.

19   Q.   So potentially yes?

20   A.   Again, as I've said before, I guess you could

21      say anything's possible.  I would want more

22      information.  I really can't answer that in

23      the abstract.

24   Q.   Now, if there was another buyer at Petco who

25      gave similar testimony with respect to the

105

1          Bay Isle wicker crates, would that have any

2          bearing on your opinions?

3    A.   Again, I'd want more information.

4    Q.   Has anyone told you that a Ms. Laurie Taylor

5          from Petco gave similar testimony that buyers

6          of the -- retail buyers of the Bay Isle

7          wicker crates might very well confuse that

8          product with the patented product in the 156

9          patent?

10              MR.  HINSHAW:   I'm going to object to

11                   the question to the extent it

12                   improperly characterizes

13                   Ms.  Taylor's testimony.   It's

14                   otherwise an improper hypothetical

15                   and lacks foundation.

16   A.   I'm not aware of having heard of or I can't

17        recall hearing of or reading testimony from

18        her.

19   Q.   As you sit here today, do you intend to

20        obtain more information about Mr. Mantle's

21        testimony or Ms. Taylor's testimony to

22        re-evaluate your opinions?

23   A.   I would certainly ask some follow-up

24        questions.  I don't know at this point that

25        that would -- I don't know whether or not it

106

```
 1        would effect -- I mean, I -- I don't know

 2        that that would make any changes in the

 3        reports but I would certainly ask some

 4        follow-up questions.

 5   Q.   As you sit here today, do you believe that

 6        Mr. Mantle's opinions, that there would

 7        likely be some confusion as between the

 8        Bay Isle 1805 and the 321 patented design are

 9        incorrect?

10            MR. HINSHAW:   Objection.   Form and

11                   foundation.

12   A.   Could you repeat the question?

13   Q.   Well, you read the excerpt from Mr. Mantle's

14        deposition, correct?

15   A.   Yes.

16   Q.   And you agree there are some opinions

17        expressed in there by Mr. Mantle regarding

18        some possible confusion by retail consumers,

19        right?

20   A.   Yes.

21   Q.   Do you disagree with the opinions or

22        conclusions that he stated in his deposition?

23   A.   In -- I -- I didn't see -- I would want to

24        know more.   I did not see a reason or a

25        rationale for his opinions that would be tied
```

107

1        to direct experience with consumers.  So I

2        don't know the -- I mean, I would need to

3        know more.

4   Q.   Any other reason why you disagree with his

5        opinions or conclusions?

6   A.   What I said was I would simply need to know

7        more.

8   Q.   Well, can you think of any reasons besides

9        the lack of a statement of experience with --

10       with consumers that would inform us of why

11       you disagree with the opinions or conclusions

12       of Mr. Mantle?

13  A.   Nothing that comes to mind at present.

14  Q.   So would be I be correct that if Mr. Mantle

15       has the appropriate experience, both in terms

16       of depth and nature with consumers, it's

17       possible that his conclusions and opinions

18       would be correct, right?

19  A.   I don't know.  He did not express that his

20       opinions were based on any actual experience.

21       In other words, it was all a hypothetical.

22  Q.   I understand that it was -- he was not

23       expressing opinions about actual confusion

24       that he measured in the marketplace, only the

25       likelihood of confusion.  We agree on that?

108

1  A.  That was my impression.

2  Q.  So with that understanding, assuming that

3      Mr. Mantle has the appropriate experience in

4      dealing with consumers and consumer

5      marketing, his opinions and conclusions might

6      be correct, right?

7  A.  They would certainly be -- if all of those

8      things were true, they would certainly be a

9      part of considering that question.

10 Q.  So his opinions might be correct, right?

11 A.  They would be -- they would be opinions to be

12     considered in part of answering that

13     question.  That's part of answering that

14     question.

15 Q.  Well, separate from whether you would agree

16     with them or whether you should consider his

17     opinions, isn't it true that if Mr. Mantle

18     has the appropriate experience in dealing

19     with consumers and marketing to consumers,

20     his opinions might be valid, correct?

21 A.  Again, I would say as a designer, I would

22     look at that.  And if his experience was

23     there and if it was demonstrated, than that

24     would be one of the factors that I would

25     consider in arriving at my opinion.

109

1  Q.  Well --

2  A.  It would not be an exclusive necessarily.

3  Q.  I understand that you as a proffered expert

4      have your opinion, but what I'm trying to

5      glean from you is whether you think that

6      there would be anything inherently wrong or

7      fundamentally flawed with Mr. Mantle's

8      opinions presuming that he has, or assuming

9      that he has the right kind of experience in

10     marketing to consumers?

11 A.  And I -- as a -- as a designer I would have

12     to look at that specifically to answer your

13     question.  I -- I can't answer that as a

14     hypothetical.

15 Q.  Well, so you don't know?

16 A.  As a hypothetical, I -- I don't -- it -- it

17     has to be answered in terms of looking at

18     specifics.  It would be irresponsible to

19     answer it as a hypothetical.

20 Q.  Well, he stated some opinions and

21     conclusions.  That's not hypothetical.

22 A.  No.

23 Q.  The only issue is whether in your mind he has

24     the right kind of experience and background

25     for those opinions to be valid; is that

110

1     right?

2              MR.  HINSHAW:   That mischaracterizes his

3                     testimony.   It's just not his

4                     experience but the actual

5                     experiences of the consumers.

6                     He's testified to that repeatedly.

7  Q.   Is it your testimony that Mr. Mantle's

8       opinions and conclusions are valid or can be

9       valid in light of his own experience or does

10      it require that there have been actual

11      confusion by consumers?

12 A.   I need to know the basis for his conclusions.

13      That would include his background.   That

14      would include consumer experiences.   It's --

15      I don't know any other way to answer your

16      question.

17 Q.   So again I'll come back.   If he has the right

18      background, and the right experience dealing

19      with consumers and consumer issues, his

20      opinions could be valid and correct, right?

21 A.   That's a complete hypothetical.

22 Q.   Isn't that correct?

23 A.   I need -- I need to -- I -- I cannot as a

24      blanket sort of thing just sign off on a

25      hypothetical of someone else who may or may

111

1    not have experience, et cetera, et cetera.  I

2    need to know more.  That's part of doing a

3    thorough job in assessing things.

4  Q.  Well, I understand that you have your

5    opinion.  Mr. Mantle's expressed different

6    opinions that obviously differ from yours.

7    Can we agree about that?

8  A.  He's expressed -- my understanding was he

9    expressed an opinion that there might be

10    confusion.

11  Q.  Do you agree that there might be confusion?

12        MR. HINSHAW:  Objection.  Asked and

13            answered.

14  A.  From --

15  Q.  Do you agree -- do you agree with the

16    opinions and conclusions that Mr. Mantle

17    stated in this deposition excerpt?

18  A.  Are we back to the ordinary observer?  Are

19    you asking about the ordinary observer?

20  Q.  Sure.

21  A.  I think that the ordinary observer will see

22    clear differences between the 321 and the

23    Mid-West design.

24  Q.  So in your view there would be no confusion,

25    and when Mr. Mantle testified that some

112

1       consumers would be confused, he's incorrect,

2       right?

3   A.  With the evidence that I have at this point,

4       yes.

5   Q.  And so if Ms. Taylor testified similarly that

6       some consumers of the Bay Isle wicker pet

7       crate might confuse that with the patent

8       design in the 156 patent, she would be

9       incorrect also?

10          MR. HINSHAW:   Objection to

11             characterization of Ms. Taylor's

12             testimony.   Lack of foundation.

13             Improper hypothetical.

14  A.  Again, I've already -- I've already said in

15      both cases, I would want to know more about

16      their backgrounds and their experience.   I

17      have no way to evaluate what they're saying

18      based on what you've described or what I've

19      just read.

20  Q.  As a proffered expert, what use should you

21      make of any evidence that there might be of

22      actual consumer confusion in this design

23      patent infringement pattern?

24  A.  You -- as -- as an expert I would investigate

25      it, find out more about it.

1   Q.  Are you aware of whether there has been any

2        evidence of that?

3   A.  I am not aware at this point in time.  I

4        can't recall.

5   Q.  Has anyone at Mid-West Metal Products or any

6        of their attorneys told you that Simpson

7        Ventures claims to have experienced some

8        actual confusion by consumers?

9   A.  I believe that something to that effect might

10       have been in one of the documents that were

11       exchanged.

12   Q.  Do you mean that it may have been in an

13       interrogatory response?

14   A.  Yes.

15          MR. GARDNER:  Off the record.

16               (Off-the-record discussion)

17   Q.  Has anyone at Mid-West Metal Products or any

18       of their attorneys shared with you any

19       testimony regarding any actual confusion that

20       Simpson Ventures claims has occurred?

21   A.  Not that I can recall.

22   Q.  Is that the sort of information that you as a

23       proffered expert would consider important in

24       rendering your decisions, your opinions?

25   A.  It would certainly -- I mean, it would -- I

114

1      would certainly look at it.

2   Q.  Has anyone shared with you any documents that

3      would reflect any instances of consumer

4      confusion?

5   A.  Not that I can recall.

6          MR. GARDNER:  Let's go off the record.

7                  (Brief recess)

8   Q.  If I understand your testimony from a moment

9      ago, you have not been provided with any

10      deposition testimony transcript relating to

11      Simpson Ventures' allegations of actual

12      confusion by consumers, correct?

13   A.  Correct.

14   Q.  And you have not been provided with documents

15      relating to such, correct?

16   A.  Correct.

17   Q.  If you would, turn to Exhibits #197 and #198

18      in the book.

19   A.  I'm sorry.  #197 and #198?

20   Q.  Yes, sir.  You've read now Exhibits #197 and

21      #198.  Do you agree that they purport to

22      relate to allegations of actual confusion by

23      consumers?

24   A.  I don't know how they relate to allegations.

25      I know that -- that they seem to be reporting

115

1    consumer -- two instances where a consumer

2    was confused.

3  Q.  Do they seem to be reporting instances where

4    consumers were trying to get replacement

5    parts for a Mid-West product and contacted

6    Simpson Ventures?

7  A.  Yes.

8  Q.  Is that the sort of information that you as a

9    proffered expert should look at in

10    determining whether there's infringement in

11    these design infringement matters?

12  A.  It's -- it's something that should --

13    examining considering it's part of looking at

14    ordinary observer, yes.

15  Q.  Do you have any reason to believe that the

16    information contained in those two documents

17    of Exhibit #197 and #198 is incorrect?

18  A.  That the people writing didn't, in fact, make

19    that confusion, is that what you're saying?

20    Do I have any reason to believe that these

21    aren't genuine?

22  Q.  Correct.

23  A.  No.  Not -- not to my knowledge.

24  Q.  If these are instances of genuine confusion

25    by consumers, what impact should that have or

116

1        would have on your opinions?

2    A.  I would need more information.  I would need

3        to know how many have been sold, how many

4        times has this issue occurred.  There's a lot

5        more information to ask about it or to -- I

6        mean, there are questions that need to be

7        answered before I can properly assess the

8        weight of two pieces of correspondence.

9    Q.  But do you agree that the evidence actual

10       confusion should be considered by you as a

11       proffered expert?

12   A.  Considered, yes.  As I said earlier, you have

13       to -- you have to look at a whole picture

14       because there are people who try and trim

15       their hedges with lawnmowers, you know.  So,

16       yeah, there's more information I would need

17       in order to -- to assign the proper value to

18       it.

19   Q.  What additional information do you need?

20   A.  I would need to know -- as I said before, I'd

21       need to know total units sold, how many

22       people have -- have written or -- or

23       contacted the company with similar issues.

24       In the case of these two people in

25       particular, I"d want to know maybe a little

117

1    bit more about -- I mean, these are

2    individual cases.  So I don't know if -- if -

3    - I don't know whether these people are less

4    than average care in purchasing kinds of

5    people or whether they would fall under the

6    Gorham ordinary observer.  So I would need

7    more information.

8   Q.   If it turns out that these two instances of

9        consumer confusion are the sort that you

10       should consider after further investigation,

11       but you only have two instances, what impact

12       would that have on your opinion regarding the

13       156 patent?

14  A.   Regarding the 156 patent?  Again, I would

15       think that, you know, how many have been sold

16       is -- is a very relevant part of that

17       question.

18  Q.   Do you have an understanding of how many

19       units have been sold?

20  A.   I don't.

21  Q.   No one's told you how many units have been

22       sold?

23  A.   Not that I can recall.

24  Q.   It's not been contained in any of the

25       interrogatory responses that you've looked

118

1    at?

2  A.  I don't recall specifically.  One of the

3      reasons that you need more information I can

4      give you a very specific example.  We just

5      finished a project for Dell, laptop

6      computers.  And one of the things that they

7      struggle with is when someone calls in with a

8      computer problem, are they discerning whether

9      or not.  You know -- are they calling us with

10     an actual computer problem, are these people

11     who are, you know -- is there a difference,

12     I'll put it that way, between college, what a

13     college student would consider a computer

14     problem and what would a businessman consider

15     a computer problem.  There's -- there's more

16     information to be found out when you get

17     feedback like this.  And so, as I -- as I

18     designer, I would find out more information.

19  Q.  So let's assume that you've completed your

20     investigation into these two instances, and

21     you've determined that these are actual bona

22     fide instances where people who were being

23     careful were confused nonetheless.  And that

24     there's only these two instances of confusion

25     out of, say, 50,000 units sold.  What

119

1          information -- what use should you as a
2          proffered expert make of that information?
3      A.  Well, that's -- based on my experience,
4          that's remarkably -- that would be remarkably
5          low.
6      Q.  So in your view, you would -- you would be
7          free to discount it or ignore it?
8      A.  Well, by looking into it to begin with I
9          wouldn't be ignoring it.
10     Q.  Well, you -- under those circumstances, would
11         you feel secure in not changing your opinion
12         regarding confusion?
13     A.  Under circumstances, as I've said before,
14         it's a hypothetical and I -- I don't think
15         that -- you know.  And I -- you know, I'm a
16         product designer instead of a astrophysicist
17         because I like putting my hands on the real
18         data and the real stuff.  But yeah, under
19         those circumstances I would think that the
20         conclusions that I've drawn about the
21         ordinary observer would stand.
22     Q.  Let's change gears for a minute and look at
23         the 156 patent which is Exhibit #84.  It's
24         not in that book.
25     A.  Okay.

120

1   Q.   This book.

2   A.   Okay.

3   Q.   Do you recall this patent?

4   A.   Yes.

5   Q.   What -- what prior art reference do you think

6        is the closest visually to what's shown in

7        the 156 patent?

8   A.   Are you asking me for primary reference?

9   Q.   I'm asking you to tell me which reference you

10       think among all of the references that you've

11       seen in this litigation, which reference

12       looks the most like what's shown in

13       Exhibit #84?

14  A.   Um --

15  Q.   And you can refer, study through any of your

16       reports that you need to.

17            MR. HINSHAW:  Do you want to pull

18                 those?  Yeah.

19  Q.   It's -- and his -- the 321 report in

20       Exhibit #235.

21  A.   I've got #235.

22  Q.   His 156 report--

23  A.   I can --

24  Q.   -- is #78.  #78.

25            MR. HINSHAW:  Go back this way.

121

1   Q.   Which is in this book.   #78 is in this book?

2          MR. HINSHAW:   Grab each of his reports

3               so --

4          MR. GARDNER:   There's #78.   #235 which

5               he's got in front of him is his

6               321 report.

7          MR. HINSHAW:   Are you wanting --

8               these -- this #78 is your

9               August 7th report.   #79 is your

10              November '07.

11  A.   And it will probably be faster if I can find

12       it in the actual reports relating to the 156.

13       If -- well, primary references, there are --

14  Q.   No.   Let me stop.   I'm sorry.   I'm not asking

15       you what you believe is a primary reference

16       that you might combine with some other

17       references to make an obvious determination.

18       I'm asking you what you think is the closest

19       reference visually to what's shown in the 156

20       patent.

21          MR. HINSHAW:   In his eyes?

22          MR. GARDNER:   In his eyes.

23          MR. HINSHAW:   As a professional

24               industrial designer, correct?

25          MR. GARDNER:   Yeah.

122

1   A.   I think -- let's see.  We look at the second

2        supplemental report on page 3.

3             MR. HINSHAW:   Which exhibit?

4             MR. GARDNER:   #86.

5   A.   Exhibit #80.

6   Q.   #80?

7   A.   Yeah, I think.  Yeah.  Exhibit #80.  I would

8        say that it would be a draw between the

9        wicker enclosure from the modern basketry

10       from the start, the one that has the elephant

11       pulling it and the wicker animal enclosure

12       from page 126, that's on a -- that second one

13       to the lower right of -- in figure 3.

14  Q.   So you think it's either the cart being

15       pulled by the elephant or the Bellaruski

16       wicker animal enclosure on the lower right

17       hand corner of page 3 of your second

18       supplemental report of Exhibit #80?

19  A.   Yes.  If I -- I mean, in answer to your

20       question, and I've stated before that's not

21       how I would think about it.  But yes, in

22       answer to your question.

23  Q.   Which one of those two in the final analysis

24       would you think is the closest to what's

25       shown in the patent, visually?

123

1    A.   I think they are both close.   I wouldn't pick

2         a single one.

3    Q.   I'm asking you to pick one.

4    A.   They're very close in slightly different

5         ways.

6    Q.   But on balance which do you think is closest?

7    A.   On balance probably the -- probably the

8         wicker enclosure design, plate 28 in modern

9         basketry from the start.

10   Q.   The one that's being pulled by the elephant?

11   A.   Yes.

12   Q.   If you would, flip to Exhibit #75.   Let's

13        pull that out.   Take it out of the -- and

14        let's take out Exhibit #2, if it's not

15        already out.   I don't think --

16   A.   Wait, wait, wait.

17             MR. HINSHAW:   I think that's what you

18                 intended to pull.

19             MR. GARDNER:   He pulled out 74 instead

20                 of #75.   It looks like it.

21   A.   Oh, I was reading the numbers from the other

22        side.   Let's put it this way.

23   Q.   All right.   So we've got #75 out.   And pull

24        out Exhibit #2.

25   A.   Exhibit #2.

124

1    Q.   And we need one more thing, Exhibit #84 which

2         is right here all right.  So since #84 is

3         loose and it's missing its staple, we've got

4         it in the book?

5              MR. HINSHAW:  You got it on

6                   Exhibit #83.

7              MR. GARDNER:  Thank you, counselor.

8    Q.   All right.  So now I'd like for you to

9         consider three items:  The design patent 156

10        of Exhibit #84, the Bay Isle wicker crate of

11        Exhibit #2 and what you indicated was the

12        closest visually to the design patent, that

13        being the design shown in Exhibit #75.  So do

14        you have those three?

15   A.   Yes.

16   Q.   Now, in looking at the Mid-West Bay Isle

17        wicker crate of Exhibit #2, does that product

18        look more like the patent or more like the

19        prior art reference number #75?

20             MR. HINSHAW:  Before you answer that,

21                  while you're thinking about this,

22                  I do want to make an objection on

23                  the record to the extent you're

24                  asking him to compare designs of

25                  objects pursuant to a standard

125

```
1              that has not yet been announced or
2              that he's ever considered.  I do
3              object to that because there's no
4              proper foundation for that.  But
5              you can go ahead and try and
6              answer his question.
7   Q.  So mentally we'll put the design patent of
8       Exhibit #84 on one end of the spectrum and
9       we'll put the prior art reference of
10      Exhibit #75 at the other end of the spectrum.
11      Where in that spectrum does the Mid-West
12      product of Exhibit #2 fall?
13          MR. HINSHAW:  I'm going to make a
14              continuing objection.  All right.
15  A.  You're saying Exhibit #75 is on one end of
16      the spectrum and #84 is on the other end of
17      the spectrum?
18  Q.  Yes, sir.
19  A.  I -- I mean, it falls somewhere in between.
20  Q.  Would you agree with me that the Mid-West
21      Bay Isle product of Exhibit #2 visually looks
22      more like what's shown in the patent of
23      Exhibit #84 than what's shown in the prior
24      art reference of Exhibit #75?
25  A.  As a designer, the way I would think about
```

126

1     this is if we were looking at a family tree.

2     You know, this would be toward the root, and

3     each of these would be branches on the family

4     tree.   Just -- that's how I would structure

5     it.

6            MR. HINSHAW:   Would you make a record

7                 of what exhibit numbers he's

8                 referring to?

9  A.  That #75 would be sort of the root of the

10     tree, or the trunk, rather; and that

11     Exhibit #2 and Exhibit #84 would be branches

12     in that tree.

13  Q.  Isn't it true that the Bay Isle product of

14     Exhibit #2 visually looks closer to the

15     patent of Exhibit #84 than it does to the

16     prior art reference of Exhibit #75?

17  A.  Well, prior art reference Exhibit #75 has

18     largely exposed vertical elements at the

19     corner, as does Exhibit #2.   The 156 patent

20     does not have exposed corner elements.

21     The -- Exhibit #84, excuse me.   Exhibit #75

22     tends to emphasize the -- the -- the base

23     visually with the weave.   Exhibit #84 also

24     does that on the side view.   And so as I

25     said, I would see them as branches on the

127

1      tree.

2   Q.   I understand you don't want to make the

3        comparison the way I'm asking you to make

4        it.

5   A.   No.

6   Q.   But I want you to -- I want you to tell me

7        whether the product shown in Exhibit #2 looks

8        more like the patent on Exhibit #84 or does

9        it look more like the prior art reference of

10       Exhibit #75.

11  A.   Okay.  I'm saying that's now how I would view

12       it as a designer.

13  Q.   I understand that's not how you would

14       normally do it as a designer.  But I'm asking

15       a question here and I'm entitled to an

16       answer.  So if you would, please assess for

17       us whether the product of Exhibit #2, the

18       Bay Isle wicker crate looks more like what's

19       shown in the 156 patent of Exhibit #84 or

20       does it look more like what's shown in the

21       prior art reference of Exhibit #75.

22  A.   Well, I would start by saying that Exhibit #2

23       doesn't look like -- I mean, your question

24       implies that -- that there is a -- is a

25       strong visual proximity of the two.  And I

128

1       disagree with that.

2  Q.  I'm not asking you to agree that there's a

3       strong visual proximity.  But if you had --

4       if you had the prior art reference on one

5       goal line of a football field visually and

6       you had the patent of Exhibit #84 on the

7       opposite goal line and you had to make an

8       assessment of visually where the product of

9       Exhibit #2 being the Bay Isle falls, isn't it

10      true that it would be on -- it would be

11      closer to the goal line of the patented

12      design than to the prior art reference?

13  A.  It would probably be somewhere around the 60

14      yard line.

15  Q.  So it would be closer -- it's -- you agree

16      with me, then -- you agree with me, then --

17          MR. HINSHAW:  I don't understand what a

18             60 yard line is on a 100.

19  Q.  You agree with me that the Bay Isle product

20      of Exhibit #2 is at least slightly closer

21      visually to the patent design of Exhibit #84

22      than it is to the prior art reference of

23      Exhibit #75, correct?

24  A.  Ask your question again.

25          MR. GARDNER:  Could you read it back,

129

1             please?

2                  (The court reporter read the

3                  pending question.)

4   A.  No, I don't think it's closer visually.

5   Q.  Do you believe that it's closer to the prior

6       art reference than it is to the patent

7       design?

8   A.  No.  As I said before, I don't think it's

9       closer visually to one relative to the other.

10  Q.  It's got --

11  A.  Visually different.  No, it does not have to

12      be.  As an industrial designer I can tell you

13      it does not have to be.  Everything is not

14      equidistant.  Everything is not closer to

15      something than another.  That's not the

16      product world.

17  Q.  You can't -- so is it your testimony that you

18      can't tell me --

19  A.  I'm saying I would not -- I'm sorry.

20  Q.  Hold on.  Left me ask my question.  You can't

21      tell me whether the Bay Isle product of

22      Exhibit #2 is closer visually to either the

23      design of patent 156 as shown in Exhibit #84

24      or instead it's closer to what's shown in

25      Exhibit #75?

130

1   A.  No, I'm not saying I can't tell you.  I am

2       saying I would not say that it is closer to

3       one than the other.  That's what I'm saying.

4   Q.  Then if you can tell me if it's closer to one

5       or the other, then tell me which one it's

6       closer to.

7   A.  I would not say it was closer to either of

8       them.

9   Q.  Would you say that it's equidistant, that

10      it's equally right in the middle.  That it's

11      just as much like the prior art Exhibit #75

12      as it like the patent?

13   A.  You're asking are they equidistant, is that

14      your question?

15   Q.  Is that your -- is that how you would

16      characterize it?

17   A.  No, I wouldn't characterize it on a

18      continual.

19   Q.  Well, if we have -- if we have the patent

20      design on the one hand, you understand that?

21   A.  I understand your question.

22   Q.  And if we have the prior art reference on the

23      other hand, do you understand that?

24   A.  Yes.

25   Q.  Would you agree with me that if we were

131

1    trying to evaluate some third object in

2    comparison to those two, that that object

3    would either be more like one of them or the

4    other or there's a third possibility that

5    it's equally like them both.  There is no

6    fourth possibility, correct?

7  A.  That's -- no.  I would say that there's a

8    fourth possibility which is that they -- you

9    know, that both of these are related to this

10   in their own way.

11 Q.  That's a different analysis than what we're

12   asking you to do though, isn't it?

13 A.  You're asking me what the relationship is

14   between this, this and this.  Between, #75,

15   Exhibit #2 and #84, right?

16 Q.  Let me ask it another way.  Let me ask it

17   another way.  When we go to trial and the

18   jury looks at these three references, the

19   patent, the prior art reference of

20   Exhibit #75 and the Bay Isle product of

21   Exhibit #2, don't you think the jury is

22   likely to think that the Bay Isle product of

23   Exhibit #2 looks like a lot more like what's

24   shown in the patent than what's shown in

25   Exhibit #75?

132

1          MR. HINSHAW:  Objection, form and

2               foundation.  Improper question.

3  A.   It's possible.

4  Q.   Don't you think most people would, in looking

5      at those three designs would think the

6      Bay Isle product of Exhibit #2 looks a lot

7      closer to what's shown in the patent of

8      Exhibit #84 than it does to the design of

9      Exhibit #75?

10         MR. HINSHAW:  Objection, form and

11            foundation.  It's entirely an

12            improper question.

13  A.   That's possible.

14  Q.   Is there any reason that you think that most

15      people might think that but you don't?

16         MR. HINSHAW:  Same objections.

17  A.   I didn't say that most people thought that.

18      I said it was possible.

19  Q.   And my question was, since most people might

20      think that, why is it that you don't?

21         MR. HINSHAW:  Objection.  Form and

22            foundation.

23  A.   That's a double hypothetical.  I can't answer

24      that.

25  Q.   Will you tell me which of the patent and the

133

1    prior art reference the Mid-West product is

2    more visually similar to or will you not?

3         MR. HINSHAW:  Objection.  Asked and

4              answered.

5  A.  I've already told you how I would look at it

6    as a designer.

7  Q.  I'm not leaving this table until you tell me

8    which one it's closer to.  It's either closer

9    to one, it's closer to the other, or it's in

10   the middle?

11        MR. HINSHAW:  Objection, asked and

12             answered.

13 Q.  I want to know.

14 A.  It's not necessarily closer.  That's a false

15   dichotomy.

16 Q.  Do you refuse to answer?

17 A.  I'm saying that the question presumes that

18   one is closer than the other.  And I'm saying

19   that that's not necessarily true.

20 Q.  Well, if they were numbers, one was -- the

21   patent were a 10 and the prior art reference

22   were a zero and we didn't know what the

23   number was of Exhibit #2, you could say that

24   it's closer or the other by figuring out what

25   the number is, right?

134

1    A.   It doesn't matter if you make them numbers or

2         pictures or goal lines or yard lines, that

3         is, as a designer, not -- your -- that's not

4         how I would answer.  I mean, that's not how I

5         would frame -- that's not how I would view

6         these.

7    Q.   I understand you don't want to view them that

8         way.

9    A.   No.  That's not how I would view them.

10   Q.   And I understand that's not how you would

11        normally view them.  But I'm asking you to

12        give us your best judgment of where on the

13        continuum that product of Exhibit #2 falls as

14        between Exhibit #84 the patent and the prior

15        art reference Exhibit #75.  Surely you can

16        place it somewhere along that scale.

17             MR. HINSHAW:  Same objections.

18   A.   It's an inaccurate question.

19   Q.   Well, let's have your answer and we'll deal

20        with whether the question is inaccurate.

21        Give us the answer.  Tell us whether it's

22        closer to one or the other.

23             MR. HINSHAW:  Same objections.

24                  Continuing objections to this line

25                  of questioning.

135

1   A.   I've already told you.  There are attributes

2        of this that can be seen in this.  There are

3        attributes of this that can be seen in this

4        that aren't in this.  It's not cut and dry

5        the way you're presenting it.

6   Q.   Whether it's cut and dried or not, where does

7        Exhibit #2 fall as between Exhibit #75 and

8        Exhibit #84?  Is it closer to one or is it

9        closer to the other?

10              MR. HINSHAW:  Mr. Smith, are you going

11                   to change your answer?

12          THE WITNESS:  No.

13              MR. HINSHAW:  Then this is a pointless

14                   line of questioning.  You've asked

15                   it for the last 20 minutes.

16              MR. GARDNER:  And I'm not moving off of

17                   it.

18              MR. HINSHAW:  Well, then, keep asking

19                   it but he's going to keep giving

20                   the same answer.  If you want to

21                   waste everybody's time with that,

22                   then that's your choice.

23              MR. GARDNER:  And we'll go to the court

24                   and we'll come back.

25              MR. HINSHAW:  That is your option.

136

1    MR. GARDNER:  I'm not getting off of

2         it.

3    MR. HINSHAW:  But this is a pointless

4         line of questioning.  You're

5         wasting everybody's time.  He's

6         not going to change his answer.

7    MR. GARDNER:  I'm not wasting anybody's

8         time.  The witness refuses --

9         refuses to cooperate and give an

10        answer other than to say I

11        wouldn't do it that way, I can't

12        answer.

13   MR. HINSHAW:  Then your recourse is to

14        take it up to the judge.  But to

15        continue to badger the witness and

16        waste our time with this line of

17        questioning is pointless.

18  Q.  Do you refuse to give an answer?  Do you

19      refuse to identify where as between these two

20      references Bay Isle product falls?

21        MR. HINSHAW:  And I'm going to object

22             to that because he hasn't refused

23             to answer.  He's answered.  He

24             just hasn't given the answer that

25             you want, and he hasn't changed

137

1        the answer from what the answer is

2        that you want.

3    Q.   It's a simple matter.  There's the patent on

4         one end, and there's the prior art reference

5         on the other.  Everybody in the room except

6         you can see that it would fall closer to the

7         patent.  Is there any reason that you won't

8         agree that visually the Bay Isle product

9         looks closer to what's shown in the patent

10        than it does to that prior art reference?

11   A.   I've already given you my answer.

12   Q.   You don't -- do you believe honestly that the

13        Bay Isle product of Exhibit #2 does not look

14        closer visually to what's shown in the patent

15        than what's shown in the prior art reference

16        of Exhibit #75?

17   A.   I've already given you my answer.

18   Q.   Do you really believe that this reference --

19        this product, the Bay Isle product, doesn't

20        look a lot more like the patent than what's

21        shown in the prior art reference of

22        Exhibit #2?

23   A.   I've already given you my answer.

24   Q.   Will you answer the question, sir?

25   A.   I have answered the question.

138

1   Q.   And what is the answer?

2   A.   I've told you.  They each have different

3        attributes of Exhibit #75.  That is,

4        Exhibit #2 and Exhibit #84 each have

5        different attributes to Exhibit #75 that I

6        would not rate them on a line.

7   Q.   I understand you wouldn't normally rate them

8        on a line.

9   A.   That's my answer.

10  Q.   But we're asking you to do just that, and you

11       refuse to rate them on a line because you

12       wouldn't normally do that.  We're asking you

13       to do that.

14  A.   I'm saying --

15  Q.   That's what we do.  We ask witnesses to do

16       things they wouldn't normally do.  We're

17       asking you to rate it on a line from one end

18       to the other.

19  A.   I'm saying it's a faulty comparison.

20  Q.   I understand you believe it's a faulty

21       comparison.  We're asking you to make it

22       anyway.  You can object later and say you

23       don't think it's a correct comparison.  Your

24       lawyer may say it's a bad comparison.  But we

25       want the comparison.  We want to know is it

139

1      closer to one or is it closer to the other

2      visually?

3          MR. HINSHAW:  Same objections.

4  A.   I've already given you my answer.

5          MR. GARDNER:  Let's take a break.  I

6                 want to call my local counsel and

7                 see if we can get a court on the

8                 line.

9           (Brief recess)

10         MR. GARDNER:  Mr. Hinshaw and I spoke

11                with Judge Watkins and explained

12                the situation to Judge Watkins.

13                And after hearing both sides,

14                Judge Watkins has ruled that for

15                now he considers that the witness

16                has answered as best he can or in

17                some manner.  And that witness can

18                live with that answer.  The judge

19                has also ruled that this line of

20                questioning is not improper.  The

21                judge has indicated in response to

22                our protest that we would --

23                plaintiff, Simpson Ventures, would

24                be free to complain later if the

25                witness should attempt to give a

140

1       different answer at a trial or

2       otherwise than the witness is

3       giving now.  Do you have something

4       else to add to that, Mr. Hinshaw?

5     MR. HINSHAW:  I guess I would just -- I

6       don't know that it deviates a

7       whole lot but I'd say in my own

8       words the judge agreed with us

9       that this -- the witness has

10      answered the line of questions as

11      best he can.  And that it's time

12      to move on the line of questions.

13      The judge has said that he's not

14      restricting the line of questions

15      in that it somehow legal error to

16      ask these questions because it's a

17      standard or legal standard that

18      has not yet been adopted or

19      announced in the Egyptian Goddess

20      case.  The judge did say that if

21      the Egyptian Goddess case comes

22      out with a -- such a standard or

23      any other standard, that we'd have

24      to revisit the issue or the facts

25      and the schedule at that time.

141

1        MR. GARDNER:  And the -- and look at

2        the question the judge further

3        indicated that if that is so, we

4        might have to look at the question

5        of whether the witness's answers

6        have been evasive.  But that's an

7        issue for another day.

8        (Off-the-record discussion)

9  Q.  We've been off the record for some time while

10    the lawyers conferred with the court.  During

11    that time, Mr. Smith, has anything occurred

12    that would cause you to want to change your

13    answer regarding whether you can tell us if

14    the Bay Isle product of Exhibit #2 is closer

15    to the design patent of Exhibit #84 or in

16    fact is closer to the prior art reference of

17    Exhibit #75?

18 A.  My answer hasn't changed.

19 Q.  So as of now you can't tell us one way or the

20    other?

21 A.  That is my answer.

22       MR. HINSHAW:  His answer hasn't

23       changed.

24 Q.  Now, regarding the 156 patent -- excuse me,

25    the 321 patent, if we went through a similar

142

1       exercise, would you be able to tell me

2       whether the accused product is closer to the

3       321 patent or is closer to a prior art

4       reference?

5  A.   Do you want me to look through the -- what --

6       what are you asking?

7  Q.   Well, look through your report and find

8       whatever reference you think is most visually

9       similar to the 321 patent.

10 A.   Well, it -- you're talking about of all of

11      the prior art in 321?

12 Q.   Of all of the prior art that you're aware of,

13      what looks most visually like the 321 patent?

14 A.   Well, again, I -- there are a number of

15      things that have attributes and I know you're

16      asking for the most.  The -- if you're

17      talking about the edge lines, if I were

18      talking about the edge lines, for example,

19      then obviously, the 156 is the closest in

20      similarity to the way the edge treatment

21      and -- and wrappings and things like that are

22      done than on the 321.  If you're looking at

23      doorways and you are ignoring edges and weave

24      patterns and a number of other things, then,

25      you know, there's some resemblance between

143

1     the Bay Isle and the 321.  There's also, you

2     know, in terms of the opening, the one shown

3     in figure 69 has an arched opening.

4  Q.  Which prior art reference do you think is

5     overall the closest?

6  A.  I think -- I think the -- as I said, I think

7     the -- the 156 and the 321 have a lot of

8     similarities.  I think the model 1805 has an

9     arched opening and model 321 has an arched

10    opening.  So there's some similarity there.

11    And that would be what I would say.

12  Q.  Well, the model 1805 is not prior art to the

13    321 patent, is it?

14  A.  Right.  No.

15  Q.  The 156 patent is prior art to the 321

16    patent, correct?

17  A.  Yes.

18  Q.  Do you think that the 156 patent is the

19    closest reference, the reference that is most

20    visually like what's shown in the 321 patent?

21  A.  Yes.

22  Q.  All right.  So I think we've established that

23    in your view, the 156 patent is the prior art

24    reference that looks the most visually like

25    the 321 patent.  If you put the 321 patent on

144

1    one end and you put the 156 patent on the

2    other end, where in that continuum would the

3    Bay Isle 1805 fall?  Would be it be closer to

4    the prior art 156 patent or would it be

5    closer to the 321 patent?

6         MR. HINSHAW:  Same objections.

7  A.  I think there are differences that make it

8    distinct from either of them.  In other

9    words, I don't think that it has -- it has an

10    arched opening.  The 321 has an arched

11    opening but the edges are completely

12    different.  So --

13  Q.  On balance can you say it's closer to one or

14    the other?

15  A.  I would not.

16  Q.  Are you able to say or --

17  A.  I would -- I would not characterize it as

18    being closer to one than the other.

19  Q.  Are you able to characterize it as closer to

20    one than the other?

21  A.  I don't think it would be accurate to

22    characterize it to be closer to one than the

23    other.

24  Q.  If you had to try to, could you characterize

25    it as closer to one than the other?

145

1          MR. HINSHAW:  Show a continuing

2                 objection to this line of

3                 questioning, please.

4  A.  Your question to me boils down to, would I or

5      could I make a false characterization.

6      You're asking me to characterize something

7      that I said I would not characterize in that

8      way.  So I don't know how else to answer your

9      question.

10  Q.  Well, I'm asking you if you are physically

11      able to make -- to characterize model 1805 as

12      being visually closer to the 321 patent or

13      the 156 patent.  Is that something that you

14      can actually do?

15  A.  I'm saying it's different from both of them

16      and it's different in different ways from

17      both of them.

18  Q.  I understand it may be different from both of

19      them.  But can you say that it's more like

20      one than the other or are you not able to say

21      that it's more like one than the other?

22  A.  I don't think it would be accurate to say

23      that it was more like one than the other.

24  Q.  Well, let's assume that it's not -- let's put

25      aside whether it's accurate or not.  Are you

146

1    able to -- to say that it is closer to one or

2    the other or not?

3  A.  No, it differs from both of them and it

4    differs from both of them in important ways.

5  Q.  So if I understand your testimony, you're not

6    able to say whether it's closer to one or the

7    other; is that correct?

8  A.  I don't think it would be an accurate

9    statement to say that it's closer to one than

10    the other.

11  Q.  And because of that, you're not able to say,

12    right?

13  A.  It would not be accurate to say that it was

14    closer to one than another.  That's -- that's

15    my answer.

16  Q.  So you won't say, correct?

17        MR. HINSHAW:  Objection.  Asked and

18            answered.  Mischaracterizes his

19            testimony.

20  A.  It wouldn't be accurate to say.

21  Q.  Am I correct that you won't say whether it's

22    closer to one or the other because in your

23    view it wouldn't be accurate to say that it's

24    closer to one than that other; is that right?

25  A.  Yes.  It's an inaccurate comparison.  Yes.

147

1   Q.   So I'm correct?

2   A.   That it's an inaccurate comparison, yes.

3   Q.   And is that the same reason after all the

4      machinations we went through before, that you

5      were unable to say before whether the

6      Bay Isle product of Exhibit #2 was closer to

7      the 156 patent?

8          MR. HINSHAW: Objection. Asked and

9             answered. Repeatedly.

10  A.   I've already answered that.

11  Q.   Am I correct that the reason that you

12      couldn't answer before was that you believe

13      in regard to the 156 patent that it would be

14      inaccurate to say that it -- the Bay Isle

15      product was closer to the 156 patent or

16      Exhibit #75?

17          MR. HINSHAW: Objection. Asked and

18             answered.

19  A.   I did answer before. You can have any answer

20      reread. My answer is my answer.

21  Q.   If that kind of a test becomes the legal

22      standard, do you expect in the future to be

23      able to determine whether Bay Isle product

24      off Exhibit #2 would be closer to the prior

25      art or closer to the patent?

148

1   A.   If what kind of a test?

2   Q.   This kind of test where you have the patent

3        on one side and a prior art reference on the

4        other side and the accused product is in the

5        middle.

6           MR. HINSHAW:  Objection.  Sorry.

7   Q.   If that becomes the test or a test, a legal

8        test for infringement, do you expect in the

9        future to be able to perform that analysis

10       and determine whether the product is closer

11       to the prior art or closer to the patent?

12          MR. HINSHAW:  Objection to form and

13             foundation.

14   A.   I would look at the new requirements.  And I

15       would evaluate the -- the -- I mean, I would

16       add that evaluation to my reports.

17   Q.   So you expect to be able to do that in the

18       future, correct?

19   A.   Since I don't know exactly what the context

20       is, I can only answer it the way I've

21       answered it.

22   Q.   Do you recall a time before you were engaged

23       in this lawsuit?

24   A.   Yes.

25   Q.   And before you were engaged in this lawsuit,

149

1      did you consider yourself an expert in patent

2      law?

3  A.  No.

4  Q.  Did you consider yourself an expert in design

5      patent matters at that time?

6  A.  No.  I'm not an attorney.  I'm not a patent

7      attorney.

8  Q.  Did you consider yourself an expert at that

9      time before you were engaged in this lawsuit

10     in evaluating a design patent to see if

11     there's infringement?

12  A.  This is the first design patent that I have

13     evaluated.

14  Q.  Before you were engaged in this litigation,

15     did you consider yourself an expert in

16     evaluating whether a design patent is valid

17     or not?

18  A.  This is the first design patent I've

19     evaluated.

20  Q.  So the answer would be no, at that time you

21     did not consider yourself an expert in this

22     area?

23  A.  It's not -- this is my first -- yeah.  This

24     is my first evaluation of a design patent.

25  Q.  I understand this is your first evaluation of

150

1    design patent.  But what I'm trying to figure
2    out is whether at the time you were engaged
3    you already considered yourself an expert in
4    design patent infringement matters?
5  A.  No.
6  Q.  Did you consider yourself an expert at that
7    time in evaluating the validity of design
8    patents?
9  A.  No.
10 Q.  And I believe from our previous deposition
11    you indicated that you don't have any
12    experience in doing infringement or validity
13    analysis in utility patents; is that correct?
14 A.  That's correct.
15 Q.  So at the time that you were engaged in this
16    case, you did not consider yourself an expert
17    in either design patent or utility patent
18    matters, correct?
19 A.  Correct.
20 Q.  Are you an expert today in analyzing products
21    to determine if they infringed design
22    patents?
23 A.  I am still not an attorney.  I'm an
24    industrial designer and I have done what I
25    consider to be a thorough investigation of

151

1    the 156 and the 321 patents.  And that's as

2    far as, you know, I can claim at this point.

3  Q.  Do you yourself consider yourself to be an

4    expert today in design patent and

5    infringement matters?

6  A.  In all matters relating to design patent

7    infringement, is that what you're asking?

8  Q.  In any matter relating to design pattern

9    infringement?

10  A.  My expertise is in design and I'm applying

11    that to this -- these two particular patents.

12    And that's what I would claim.  I -- I'm not

13    going to start a website and, you know,

14    proclaim myself an expert as a patent person.

15  Q.  So if I understand your testimony, you

16    consider yourself to be a design expert,

17    right?

18  A.  Yeah.  I'm an industrial designer of product

19    expertise, yes.

20  Q.  So you consider yourself to be an industrial

21    design expert, correct?

22  A.  Yes.

23  Q.  But you did not consider yourself at this

24    moment to be an expert in design patent

25    infringement questions, correct?

152

```
 1  A.   I don't consider my expertise in design
 2       patents to extend beyond what I've examined
 3       in the preparation of my reports.
 4  Q.   Well, let me ask you.  Are you an
 5       infringement expert or not?
 6            MR. HINSHAW:  Objection.  Asked and
 7                 answered.
 8  A.   Beyond these cases?  I mean, these are the
 9       cases that I dealt with.  So, that's all I
10       can claim expertise in.  Or experience in at
11       this point.
12  Q.   I understand that you've got experience now a
13       little bit from this case.  But do you
14       believe that the experience you've gained in
15       this case renders you an expert in design
16       patent infringement matters?
17            MR. HINSHAW:  Objection.  To form and
18                 foundation.  Asked and answered.
19  A.   Speaking in the abstract I wouldn't make that
20       claim.
21  Q.   Why do you say speaking in the abstract?
22  A.   Because the specifics I think I'm, you know,
23       versed in the 1 -- in the specifics
24       surrounding the 156 and the 321 patents.
25  Q.   Do you mean by that that in general you're
```

153

1        not an expert in design patent matters?

2   A.   I would not make a blanket statement like

3        that, yes.

4   Q.   So I'm correcting that statement?

5   A.   I would not make the statement that said I'm

6        an expert in all matters of design patents.

7   Q.   Well, what areas of design patent

8        infringement are you an expert?

9   A.   As I said, my expertise is -- is specific to

10       the investigation of the 156 and the 321

11       patents.

12  Q.   Would I be correct that the only thing you

13       know about design patent infringement

14       standards is what you learned from either

15       Mr. Hinshaw or from the materials that

16       Mr. Hinshaw sent you?

17  A.   I -- I think that would be an accurate

18       statement.

19  Q.   Do you consider yourself today to be an

20       expert on the invalidity of design patents?

21  A.   My answer is the same.  I -- my area of

22       expertise would be confined to, you know, the

23       156 and the 321 examinations that I've

24       conducted.  And that would -- that's all I

25       would claim.

154

1   Q.  So would I be correct in stating that in

2       general you are not a design patent

3       invalidity expert, correct?

4   A.  I -- I would not claim to be an expert beyond

5       what I have written in my reports.

6   Q.  So my general statement is correct, right?

7   A.  My statement is correct, yes.  That that's

8       all I would -- I wouldn't -- I wouldn't claim

9       anything beyond what I have written and done

10      and learned relative to the 156 and the 321

11      patent and the reports that I prepared.

12  Q.  Well, aside from your involvement in this

13      case, in these two cases, do you otherwise

14      consider yourself an expert in the validity

15      or invalidity of design patents?

16  A.  Beyond these cases, no.

17  Q.  And would I be correct in stating that

18      everything you know about the validity or

19      invalidity of design patents you gleaned from

20      things that Mr. Hinshaw communicated to you

21      or information that he forwarded to you?

22  A.  In general.  I mean, I -- I -- I think I read

23      a few cases that were referred to in Chisum I

24      read online.  You know, the full text of the

25      cases.  But that's the extent of my

155

1      background, yes.

2  Q.  So in general I'm correct?

3  A.  In general.

4  Q.  So in general, you're not an expert for

5      design patent infringement or for design

6      patent invalidity but you have rendered an

7      expert report on both of these issues in this

8      case, correct?

9  A.  Beyond this -- beyond the scope of this case,

10      and the issues that I've addressed, I would

11      not claim any expertise beyond that, beyond

12      what I've examined and read.

13          MR. HINSHAW:  And just so we're clear,

14              you guys are talking about this

15              case.

16  Q.  These cases?

17  A.  These cases.

18          MR. GARDNER:  Thank you, Mr. Hinshaw.

19  Q.  How much time would you say you spent

20      studying to learn invalidity principles as it

21      applies to design patents for this case?

22  A.  I don't -- that would be difficult to

23      estimate.  I read -- I referred back.  That

24      would be -- I don't know that I could give

25      you a figure.

156

1   Q.   Would you say that it's less than 20 hours?

2   A.   No.

3   Q.   Would you say that it's less than 40 hours?

4   A.   That what's less than 40 hours?

5   Q.   How much time you spent studying design

6       patent invalidity principles.  Do you

7       understand what I'm getting at?  Let me give

8       you a little preface.

9   A.   Okay.

10   Q.   Do you understand that in order to do the

11       work that you've done in your reports, you

12       first had to gain some knowledge of some --

13       some principles that you then applied to

14       make -- to do your analysis?

15   A.   Yes.

16   Q.   And those principles are design patent

17       infringement and design patent invalidity

18       primarily?

19   A.   Yes.

20   Q.   What I'm trying to figure out is how much

21       time you spent developing the knowledge that

22       you had regarding design patent infringement

23       and design patent invalidity so that you --

24       not how much time you spent on the case

25       overall.

157

1   A.   Right.

2   Q.   But how much time you spent getting basic

3        knowledge?

4   A.   Right.

5   Q.   Okay.  Does that clarify for you?

6   A.   Yes.  I -- the -- the two are kind of

7        intertwined.  But yes, I understand what

8        you're asking.

9   Q.   If you think those two issues are

10       intertwined, let me combine them.  How much

11       time do you think you spent gaining basic

12       knowledge about design patent infringement

13       principles and design patent invalidity

14       principles for this case?

15  A.   I would say more than 40 hours.  Certainly

16       probably less than -- less than 100 hours,

17       but it was more than 40.

18  Q.   Of these somewhere between 40 and 100 hours,

19       how much of that time was spent in reading

20       materials and how much of that time was spent

21       talking with or communicating with the

22       lawyers in the case?

23  A.   The majority of the time was spent on reading

24       materials.  Conversations were limited to a

25       question here or there to verify my

158

1      understanding.

2   Q.  How many pages of materials do you think you

3      read?

4   A.  It's all in the -- it's all in what y'all

5      have been carting around.  I don't know.

6   Q.  Would it -- would I be correct in stating

7      that, say, for a few court cases, that

8      everything that you read is in the

9      appendices?

10  A.  Yes, that would be correct.

11  Q.  I'm going to pass you what's previously been

12      marked as Exhibit #81.  And it's -- I think

13      it's entitled appendix part two.

14  A.  Yes.

15  Q.  If you would, flip through that and estimate

16      for me how many pages of that you think

17      relate to your study of the principles of

18      design patent infringement and design patent

19      invalidity.  I'm not looking for an exact

20      number.  But is it 100 pages?  200 pages?

21  A.  I don't --

22          MR. HINSHAW:  It's marked 256 pages.

23              Are you --

24          MR. GARDNER:  Off the record.

25                  (Off-the-record discussion)

159

1          MR. HINSHAW:   You coming on a breaking

2             point?

3          MR. GARDNER:   Yes, that's fine.

4           (Brief recess)

5  Q.  Before we broke we were starting an

6      examination regarding Exhibit #81 and how

7      many pages of information were there and the

8      lawyers got into a little levity and whatnot.

9      Am I correct that there's 250 or so pages of

10     legal information that you studied contained

11     in that appendix?

12  A.  Yes.

13  Q.  Was -- was there any additional information

14     beyond that that you studied or was that

15     primarily it?

16  A.  That's primarily it other than, as I said, to

17     read a few cases online.

18  Q.  Is it your testimony that you studied that

19     information and those 256 pages for somewhere

20     between 40 and 100 hours?

21  A.  Total, yes.

22  Q.  Do you think that that is sufficient to

23     render you an expert in this case?

24  A.  In this case, yes.  Or these cases.

25  Q.  In these cases.  Now, outside of these cases,

160

1        you consider yourself an expert in industrial

2        design, right?

3 A.   Yes.

4 Q.   Are you also an expert in merchandising or

5        marketing?

6 A.   I've had experience through various projects

7        with those issues.  So I would say I'm

8        certainly experienced.

9 Q.   But do you consider yourself an expert in

10       merchandising and marketing?

11 A.   I don't think I would characterize myself as

12       an expert.  But as I've said, I've had lots

13       of experience in that area through cases.

14       Through client.

15 Q.   Now, you're a -- are you a full professor at

16       Auburn?

17 A.   Yes.

18 Q.   Tenured I assume?

19 A.   Yes.

20 Q.   Congratulations.

21 A.   Thank you.

22 Q.   As a tenured professor, are you required to

23       bring in any outside research or contract

24       money?

25 A.   No, I am not.  It certainly is a part of

161

1       looking at annual performance, but it's not a

2       requirement.

3  Q.  Do you have a -- do you have an outside fee

4       goal?

5  A.  An outside fee goal?

6  Q.  Do you as a tenured professor have a goal

7       that the school imposes on you of how much

8       money they would like for you to bring in?

9  A.  No.

10  Q.  Are you required by the University to share

11       any of your fees that you generated from

12       these cases with the University?

13  A.  No.

14  Q.  How much in fees have you earned, perhaps not

15       been paid yet, through today?

16  A.  I would have to check last year's taxes.  I'd

17       say somewhere around 30,000 I think would be

18       accurate, perhaps a little.  30 -- somewhere

19       between 30 and 40,000.

20  Q.  Do you think that the total of the fees that

21       you either charged so far or will charge

22       through today is somewhere between 30 and

23       40,000?

24  A.  That sounds right.  I need to go back and

25       look through.  But yeah, that sounds right.

162

1    Q.   Could it be as much as 50,000?

2    A.   It's possible.

3    Q.   Is it possible that it might be as much as

4         60,000?

5    A.   I don't think that likely.  But I -- I don't

6         know how much additional time.

7    Q.   And let me take that back.  I'm sorry.  Let

8         me pass to you what's been marked as

9         Exhibit #243 and ask you if you recognize

10        that as your CV or curriculum vitae?

11   A.   Yes.

12   Q.   And this curriculum vitae of Exhibit #243 is

13        accurate as of the time that you submitted in

14        connection of one or more of your reports in

15        these litigation matters?

16   A.   Yes.  It may be missing a couple of lectures

17        or presentations.  But otherwise, yes.

18   Q.   Well, there's a -- the CV is 29 pages long,

19        right?

20   A.   Yes.

21   Q.   It mentions lots of activities and accolades

22        and accomplishments.  Am I correct that none

23        of those accomplishments or activities relate

24        to patents?

25   A.   Other than the listing of my current

163

1       involvement in this case, that would be

2       correct.

3   Q.  Mr. Smith, under the Gorham test, what role

4       if any do purely functional features play?

5   A.  The Gorham test deals with the ordinary

6       observer.  So, the Gorham test is about how

7       the ordinary observer, whether or not

8       exercising such care as they would normally

9       exercise.  That's my understanding of the

10      Gorham statement.

11  Q.  Well, in performing the Gorham analysis, if

12      the patent that you're evaluating has a

13      purely functional feature, does that feature

14      get included in the comparison between the

15      patent design and the accused product?

16  A.  My understanding is that purely functional

17      features are not covered by design patents.

18  Q.  So would I be correct in stating, then, that

19      you believe that the purely functional

20      features would be excluded from the Gorham

21      analysis?

22  A.  My understanding is that the purely

23      functional features are not covered by a

24      design patent, and therefore would not be

25      patentable.  And that's -- that's my

164

1      understanding.

2   Q.   So what do you do if there's a purely

3        functional feature shown in the patent

4        drawings, do you include that as part of the

5        comparison?

6   A.   That's part of the --

7   Q.   Under Gorham?

8   A.   That's part of the comparison under Gorham?

9        My understanding is that Gorham deals with

10       the ordinary observer and whether or not they

11       would be confused in viewing the -- the

12       patented product or -- that's my

13       understanding.

14  Q.   So do you know what should be done in a

15       situation -- under Gorham in a situation

16       where the patent shows a purely functional

17       feature in the drawings?

18  A.   Under Gorham?  As I said, my understanding is

19       that Gorham deals with how the ordinary

20       observer observes the design.  So my

21       understanding is that functionality is not

22       part of the patent.  In other words, it would

23       be excluded from a design patent.

24  Q.   Does that mean that under the Gorham test it

25       would be excluded from comparison?

165

1   A.   I don't know how you could tell someone, an

2        ordinary observer to exclude something.  I'm

3        not -- I'm not sure how that would work.

4   Q.   So would it be correct, then, that you should

5        include as part of the design under

6        consideration a purely functional feature

7        shown in the patent and compare that with an

8        accused product under the Gorham test to see

9        if there's infringement?

10  A.   My understanding is that infringement is --

11       the issue of infringement is -- there are two

12       parts to it.  The first part is the ordinary

13       observer, the Gorham test.  And the second

14       part is the points of novelty test, in that

15       points of novelty cannot be purely

16       functional.  And the question is whether or

17       not -- under that whether or not they're --

18       the points of novelty have been appropriated

19       by the accused product.

20  Q.   I'm not -- at the moment I'm not asking you

21       about the point of novelty test.  I'm trying

22       to figure out what's your understanding of

23       how to treat -- if at all, a purely

24       functional feature that appears in the design

25       patent under the first test, the Gorham test?

166

1  A.  I don't recall functionality being addressed

2      under the Gorham test.

3  Q.  So would I be correct that it's your

4      understanding that one should ignore for the

5      moment the fact that there is a purely

6      functional feature shown in the patent

7      drawings and compare the patent drawings with

8      the accused product under the Gorham test?

9  A.  My understanding of the Gorham test is it's

10     the eyes of the ordinary observer and it

11     doesn't make distinction beyond that.

12 Q.  Well, let me ask you a different series of

13     questions.  In a design patent, is it proper

14     for purely functional items to appear in the

15     patent?

16 A.  I would say the -- if it is a functional item

17     it is not considered to be covered by the

18     patent.  If it is a purely functional item.

19 Q.  Now, let's back up for a second.  Let's

20     consider that we have a product.

21 A.  Okay.

22 Q.  The product has a number of features.  Would

23     you agree with me that the product which may

24     itself be functional can still be a subject

25     of a design patent for the ornamental aspects

167

1      that it contains?

2   A.   That's my understanding.

3   Q.   Okay.  Even though the product could be

4        highly utilitarian?

5   A.   Yes.  That's my understanding.

6   Q.   All right.  Now, so we've got a product which

7        may or may not be utilitarian, but it's the

8        subject of a design patent for its ornamental

9        look.  And within the drawings of that

10       patent, one can see a feature which is purely

11       functional.

12  A.   Okay.

13  Q.   Is it proper for that purely functional

14       feature to appear in the patent?

15            MR. HINSHAW:  Objection to form.  Calls

16                 for a legal conclusion.  Do you

17                 want to ask him his understanding,

18                 that's the way your question is

19                 intended, then that's fine.

20  A.   Are you asking my understanding?

21  Q.   Yes, sir.

22  A.   As I understand it, there might be some

23       elements that are functional.

24  Q.   Now, looking at the 321 patent of

25       Exhibit #83.

168

1   A.   Okay.  Right here.

2   Q.   Do you consider the arched doorway or opening

3        to be a purely functional feature, a purely

4        ornamental feature or a feature that is

5        partly functional and partly ornamental?

6   A.   I would say that it could be considered both.

7   Q.   So it's -- in your view the arched doorway is

8        partly functional, partly ornamental?

9   A.   The -- yes.  Yes.

10   Q.   In looking at that patent, did you -- do you

11        see the threshold rod at the bottom of that

12        opening?

13   A.   Yes.

14   Q.   And do you observe that it does not appear to

15        have wicker wrapped around it?

16   A.   Yes.

17   Q.   Did you conclude in your report of

18        Exhibit #235 that that feature is an

19        ornamental feature?

20   A.   Under ornamental features that's labeled in

21        the figure 14 of Exhibit #235.

22   Q.   So in your report you considered that bare

23        wire threshold of the opening or doorway to

24        be a ornamental feature, correct?

25   A.   Yes.  I considered it a visual feature.

169

1   Q.   Where did you or how did you come to the

2         conclusion that that feature is an ornamental

3         feature?

4   A.   It's a -- it's a visual feature.  I'm not

5         sure how else to answer that.

6   Q.   If I told you that there were testimony in

7         these litigations that the reason that that

8         threshold wire is not wrapped in wicker is

9         for the safety of the cat, so that the cat's

10        claws would not get caught on the wicker as

11        it goes in and out of the enclosure, would

12        you tend to agree with that?

13  A.   I would say that could be a possible reason.

14        I don't think cats usually walk with their

15        claws out.  But I would say that could be a

16        possible reason.

17  Q.   Now, looking at your 321 report, when you

18        compared the model 1805 Bay Isle litter pan

19        cover of Exhibit #3 with the patented product

20        shown in the 321 patent, did you compare the

21        Bay Isle product with each one of the two

22        embodiments and conclude separately that it

23        was different from the first embodiment and

24        then different from the second embodiment, or

25        did you lump the two embodiments together and

170

1   then compare the Bay Isle 1805 with the

2   combined embodiments?

3 A.  I looked at the embodiments individually.  I

4   wrote it addressing both.

5 Q.  Could you point out in the report what

6   portion or what language in the report would

7   inform a reader of which approach you used?

8 A.  Well, each of the -- the figures addresses

9   them in turn.  And, then, the text on page 5

10   talks about figures 1 through 6 and then it

11   talks about figures 7 through 12.

12 Q.  Well, if you could point us to any

13   conclusions that you draw where you -- you

14   deal with the embodiments together or

15   separately, that would -- that would be

16   helpful.  Can you identify such?

17 A.  Conclusions?

18 Q.  Perhaps if you look at page 41, it contains

19   your analysis under the Gorham standard.  It

20   might be helpful.  If I may?

21 A.  Yes.

22 Q.  At the end of the portions of the text on

23   page 41, the last two paragraphs seem to be

24   where you analyze what you see as differences

25   between the Bay Isle 1805 and the -- the

171

1    weave patterns as shown in the 321 patent.

2    But I have to say I'm struggling to figure

3    out from this language whether you lumped the

4    two embodiments together or treated them

5    separately.  And I'm hoping you can tell us

6    from the language what you intended.

7  A.  Well, I talk about them each in turn.  The

8    321 patent makes use of a diamond weave

9    pattern in the first embodiment and the

10   absence of a distinctive weave in the second

11   embodiment as discussed previously.  The

12   decorative choices on the front are also part

13   of the distinct appearance, namely the

14   vertical elements on either side of the

15   entrance and the type edge weaving of the

16   panels.  That would apply to both

17   embodiments.  And unlike the 321 design, the

18   decorative weave on the model 1805 design is

19   a square weave pattern, distinctively

20   different than that of the 321 pattern --

21   patent as described above.  I guess I could

22   have put that there.  The front of the litter

23   box cover shows even more differences.

24  Q.  From that language, do you -- do you consider

25   that you treated them in seriatim or in

172

1    tandem?

2            MR. HINSHAW:   Objection to form.  Get a

3                dictionary.

4   Q.   S-E-R-I-A-T-U-M.   Means in sequence

5        basically.   One after another.

6   A.   I -- I discussed -- I discussed each of them

7        in turn early on, and then in the conclusions

8        sort of drew together those things.   And I

9        guess I could have added a few words to make

10       sure that that was clear, but that was the

11       process.   In other words, you know, they're

12       diagramed separately, they're discussed

13       separately, and then the conclusions apply to

14       both of them.   And I guess I could have

15       written it twice.

16   Q.   Is that what -- is that what you meant to say

17       is that you separately analyzed the Bay Isle

18       1805 product with the first embodiment and

19       then separately analyzed it in comparison to

20       the second embodiment?

21   A.   I looked at both of them.   I looked at both

22       of them.   Because both were claimed in the,

23       you know -- it was -- it was this and this

24       configuration.   So I looked at both

25       configurations.

173

1    Q.   Can you tell me whether you -- whether this

2         comparison that you made was separately or

3         was against the combined embodiments?

4    A.   It addressed both embodiments.

5    Q.   So combined?

6              MR. HINSHAW:  Objection to form and

7                   foundation.  I think you're

8                   mischaracterizing his testimony.

9                   Are you asking him is his

10                  conclusion -- did he mail these

11                  together and analyze them as a

12                  combined embodiment, the two

13                  different embodiments?  Because I

14                  think he's made it clear he

15                  didn't.  I'm confused by your

16                  question.

17             MR. GARDNER:  I can't tell what he did

18                  from his report.  I'm trying to

19                  find out what --

20             MR. HINSHAW:  But I think he said he

21                  analyzed them separately.  He

22                  viewed them separately.  He

23                  recognized there are two

24                  embodiments, and his conclusion is

25                  two different -- he analyzed them

174

1                          separately.
2          MR. GARDNER:  What he said is he
3                  described them separately.
4          THE WITNESS:  I looked at each one of
5                  them in turn.
6          MR. GARDNER:  He looked at each
7                  embodiment separately.  But when
8                  it came to actually doing the
9                  comparison, which the comparison
10                 is what's stated here on page 41,
11                 it's not clear whether the
12                 comparison was done as against the
13                 combined embodiments or against
14                 the embodiments separately.
15                 That's what I'm trying to figure
16                 out.  That's simple -- that simple
17                 thing.
18  A.   Separately.  Separately.
19  Q.   Separately.  Very good.  That's all I needed
20       to know.
21  A.   Sorry.  I didn't understand.
22  Q.   Am I correct that in your 321 report of
23       Exhibit #235, you do not identify any point
24       of novelty that may exist for the 321 patent,
25       correct?

175

1   A.   That's correct.

2   Q.   And as you sit here today, are you aware of

3        any point of novelty that the 321 patent may

4        have?

5   A.   No.  I mean, I did talk about the fact

6        that -- you know, considering the weaving and

7        how that emphasized or de-emphasized things.

8        But, no.  That's --

9   Q.   Is there -- is there any aspect of the 321

10       patent that you consider novel over the prior

11       art?

12   A.   No.

13   Q.   Now, last time we -- we went through some

14       lengthy -- last time.  Previous deposition

15       date we examined you regarding your point of

16       novelty analysis with regard to the 156

17       report.  Do you recall that?

18   A.   Yes.  Yes, I do.

19   Q.   And at some length we were able to ascertain

20       that with regard to each point of novelty

21       that was asserted by Simpson Ventures, you

22       combined two or more prior art references to

23       meet that alleged point of novelty.  You

24       recall that testimony?

25   A.   I recall that discussion, yes.

176

Q.   Am I correct that with respect to each of the
     asserted points of novelty that Simpson
     Ventures has raised concerning the 321
     patent, your analysis and your report of
     Exhibit #235 relies on multiple prior art
     references for each asserted point of
     novelty; is that correct?

          MR. HINSHAW:  Mr. Gardner, just clarify
               when you use the word multiple,
               that means one or more as in at
               least two.

          MR. GARDNER:  No, multiple would be two
               or more.  One is not a multiple.

          MR. HINSHAW:  Right.  I said at least
               two.

          MR. GARDNER:  You said -- you said --
               yeah, but, then, first you said
               one or more and then at least two.
               And those are two different
               things.

          MR. HINSHAW:  All right.  But at least
               is what you mean by multiple.

          MR. GARDNER:  At least two, correct.

A.   Well, the point 3 and the 156 patent, I mean
     point 3 matches the 156 patent.  The first

177

1       points had multiple -- had more than one.

2  Q.  So, if I understand your testimony, out of

3       the four points of novelty that are asserted

4       by Simpson Ventures regarding the 321 patent,

5       three of them you believe have two or more

6       prior art references that are used in

7       combination to meet those points of novelty

8       and one of them you think you can meet with a

9       single reference; is that correct?

10  A.  Yes.

11  Q.  And would you agree with me also that there's

12       no single reference that shows all of the

13       points of novelty in combination?

14  A.  Yes.

15  Q.  Does the 321 patent contain a verbal

16       construction of the patent claim?

17  A.  An ornamental design for a pet litter pan

18       housing is shown as described.

19  Q.  Hold on.  Let me stop you for a second.  I

20       may have misstated my question.  Let me start

21       that one over.  Does your report -- your 321

22       report of Exhibit #235 contain a verbal

23       construction of the patent claim?

24  A.  It contains a verbal description of the 321

25       patent.

178

1  Q.  Do you know what I mean when I say a verbal

2      construction of a patent claim?

3  A.  My understanding is that ultimately the

4      verbal construction is something that the --

5      the court does.

6  Q.  Is that something that is appropriate or

7      inappropriate for an expert to do in

8      analyzing a design patent?

9  A.  Well, it's something that Mr. Anders did.

10 Q.  Am I correct that it is something that you

11     did not do?

12 A.  I addressed potential things that might be

13     potential points of novelty I think in this

14     report.

15 Q.  Separate from whether you've addressed the

16     potential points of novelty, is there a

17     section or portion of this report of

18     Exhibit #235 that constitutes a verbal

19     construction of the patent claim?

20         MR. HINSHAW:  I'm getting confused.

21             Are you -- I mean, are you asking

22             him about page 2, the verbal

23             description of the 321 patent

24             design on page 2 that goes on

25             for -- at least to page 10?

179

1           MR. GARDNER:  Well, I was trying to
2                  figure out if the witness
3                  considers any portion of his
4                  report to be a verbal
5                  construction.  Now that you've
6                  suggested to him that page 2 might
7                  be such, he may in fact adopt that
8                  as his verbal construction.  I
9                  don't know.
10          MR. HINSHAW:  That was not my intent.
11                 I was kind of in -- this 256 pages
12                 or not.
13  A.  Then I go through and describe what I
14      consider to be the ornamental features,
15      functional features.  That really is
16      essentially the first -- the first quarter of
17      the report.
18  Q.  Mr. Smith, do you consider that introduction
19      portion of your report from page 2, et cetera
20      to be your verbal construction of the claim
21      of the 321 patent?
22  A.  I consider that to be my verbal description
23      of the 321 patent, yes.
24  Q.  In looking at the 321 patent, is -- do you
25      believe that the arched doorway is a more

180

1     significant or less significant ornamental

2     feature as compared to the -- the rectangular

3     feet?

4  A.  I would describe them both as significant

5     features.  I think -- I would say they're

6     both pronounced features.

7  Q.  Are you -- are you able to say whether one is

8     more significant than the other from a design

9     standpoint?

10  A.  It's possible that you would notice the

11     arched doorway before the feet.

12  Q.  Is the rectangular shape of the feet

13     ornamental or functional?

14  A.  The choice of -- of the shape of the feet is

15     an ornamental choice.

16  Q.  Is the -- is the rectangular shape of the

17     unit overall an ornamental choice?

18  A.  The rectangular shape overall has some --

19     some very functional aspects of mainly that

20     it -- it folds down and shifts well in a

21     small volume.

22  Q.  And I believe you testified earlier that

23     you -- you ordered some of Mr. Simpson's or

24     Simpson Ventures products, specifically a

25     wicker crate and a wicker litter pan cover.

181

```
 1        Is that correct?
 2   A.   Yes.
 3   Q.   Why did you do that?
 4   A.   I wanted to just take a look at the products
 5        and familiarize myself with them.
 6   Q.   What role does that or should that play in
 7        evaluating the two patents for possible
 8        infringement?
 9   A.   My understanding is none whatsoever.  That
10        the -- it is the -- the patent and the
11        drawings, the drawings in the patent are the
12        issue.
13   Q.   Then why order it?
14   A.   To familiarize myself with it.  Just as a
15        point of awareness.
16   Q.   Do you believe that the arched opening in the
17        321 patent is the most distinctive visual
18        element on the front panel?
19            MR. HINSHAW:  Can we go off record?
20                     (Off-the-record discussion)
21            MR. HINSHAW:  My apologies.
22            MR. GARDNER:  Could you read the
23                question back, please?  I believe
24                he answered, but you may not have
25                heard it because of the phone.
```

182

1          (The court reporter read the

2              pending question.)

3     A.   I think it's part of the distinctiveness of

4          the front panel.   It's pronounced because of

5          the way it's wrapped as are the vertical

6          elements that are right beside it, which are

7          also a pronounced feature of the front.

8     Q.   Now, looking at your report of Exhibit #235,

9          I see in numerous pages that you highlighted

10         the diamond patterns with white lines.   Am I

11         correct in that?

12    A.   Yes, that's correct.

13    Q.   And you did that to make them more visible or

14         more noticeable?

15    A.   To make sure that everyone understood what

16         exactly I was referring to when I said the

17         double diamond pattern.

18    Q.   Did you feel it was necessary to do that

19         because the patterns are somewhat hard to see

20         in the drawings?

21    A.   The drawings are a little hard to see, yes.

22    Q.   In your report regarding the 321 patent of

23         Exhibit #235, do you conclude that wicker is

24         ornamental or functional?

25    A.   It's -- it has aspects of both.

183

1   Q.   So would you agree with me that wicker, as

2        applied to the structure shown in the 321

3        patent is at least partly ornamental?

4   A.   The way in which it is applied involves

5        ornamental choices.

6   Q.   Now, earlier, you identified the 156 patent

7        as the closest visually to the 321 patent.

8        Is it not correct that the patent office

9        considered the 156 patent in examining the

10       321 patent application?

11  A.   I believe that they did.

12  Q.   So isn't it correct that the patent office

13       considered it to be patentable over the 156

14       patent?

15  A.   That would be my understanding.

16  Q.   Do you believe the patent office was correct

17       in that?

18  A.   Well, as I've said elsewhere in the report, I

19       think all of the points that are involved in

20       the design existed in one form or another in

21       the prior art, and that, therefore, I would

22       not have called -- I -- that -- they all

23       existed in prior art.  And so they aren't

24       points of novelty.

25  Q.   If you would look at page 25 of your 321

184

1          report of Exhibit #235.

2     A.   Yes.

3     Q.   You see there in figure 72 you make reference

4          to a Thonet chair number 14.

5     A.   Yes.

6     Q.   Isn't it true that the Thonet chair number 14

7          is really a cane bottomed chair, not a wicker

8          chair?

9     A.   It uses the same kind of material as what

10         we've been describing as wicker.  It has an

11         open pattern, and generally that's described

12         as caned.

13    Q.   Do you understand the -- are you familiar

14         with cane bottomed chairs?

15    A.   Yes.

16    Q.   And do you understand that a caned bottom

17         chair typically is made from a flat material,

18         woven?

19    A.   Yes.

20    Q.   And that flat material would have, once

21         woven, a generally flat surface as opposed to

22         the undulating surface of wicker?

23    A.   Yes.

24    Q.   So do you think many people would consider a

25         cane bottom chair to be a wicker chair?

185

1    A.   I think they would consider it to be an

2         example of a combination of woven material

3         and wooden structure.

4    Q.   But it's not wicker, is it?

5    A.   It's -- it's generally referred to as cane.

6    Q.   Not wicker, right?

7    A.   The same material that's used in caning is

8         also frequently used in baskets and other

9         sorts of items that would be described

10        frequently as wicker by people.  So it's the

11        same basic -- it is a material that people

12        might describe in that way.

13   Q.   Have you ever seen a Thonet chair number 14

14        described as a wicker chair?

15   A.   I may have.  I can't recall.

16   Q.   Are you aware that sometimes a wire crate of

17        a certain size might cost more in a store

18        than a similarly sized Bay Isle wicker crate?

19             MR. HINSHAW:   Could I have that read

20                  back?

21                  (The court reporter read the

22                  pending question.)

23             MR. HINSHAW:   Objection to form.

24   A.   I'm not aware one way or the other.

25   Q.   Would you agree with me that it's possible

186

1        that some wire crates of a given size might

2        sell for more than a Bay Isle wicker crate of

3        the same size?

4    A.  To the degree that, you know, many things are

5        possible, yes.

6    Q.  Isn't it also true that some of your analysis

7        regarding the discriminating taste of

8        consumers is based on the idea that wicker

9        crates cost more than wire crates?

10   A.  Well, it would depend upon the specific

11       features of the crate.  It's conceivable that

12       you could have features in a wire crate that

13       would make the wire crate more expensive.

14       Those are --

15   Q.  Have you read the Amicus brief filed by the

16       Industrial Designer Society in connection

17       with the Egyptian Goddess case?

18   A.  No, I have not.

19   Q.  Are you familiar with the position taken by

20       the Industrial Designer Society in that

21       brief?

22   A.  No.

23   Q.  In your two reports -- well, your multiple

24       reports, this series of reports in the 156

25       case and the single report in the 321 patent

187

1      dispute, you cite to a large number of prior

2      art references.  Did you yourself search for

3      and find those prior art references?

4   A.  Many of them.

5   Q.  How many of them were provided to you?

6   A.  You can look in the appendix material that

7      was part of my report and see which ones were

8      from -- were provided by Bingham McHale or as

9      part of the material that Mr. Anders went

10     through.

11         MR. GARDNER:  I have no further

12             questions at this time.  Thank

13             you.

14         MR. HINSHAW:  Give me just one minute,

15             please.

16                 EXAMINATION

17  BY MR. HINSHAW:

18  Q.  I do have just one line of questions.  If you

19     would look at Exhibit #218.

20  A.  Okay.

21  Q.  Do you recognize that as the second

22     supplemental expert report of Robert John

23     Anders?

24  A.  Yes, I do.

25  Q.  And if you would, take a look at the second

188

1          point of novelty that Mr. Anders has

2          proposed.  I believe it's paragraph 4.

3     A.   Do you want me to read it?

4     Q.   Do you see it?

5     A.   Yes, I do.

6     Q.   Would you read that out loud?

7     A.   The second point of novelty is the door slash

8          front panel configuration.  A pet home with a

9          rectangular volume and having a rectangular

10         front, the front including a rectangular

11         see-through door that is framed substantially

12         by wicker.

13    Q.   What does the phrase, door that is framed

14         substantially by wicker mean to you?

15    A.   Like a picture frame.  It's surrounded.  It

16         has wicker on all sides.

17    Q.   On all four sides?

18    A.   Yes.

19    Q.   Is that feature present in the Bay Isle

20         product that is shown in Exhibit #2?

21    A.   No, it is not.

22              MR. HINSHAW:  I have no further

23                   questions.

24

25

189

1                              EXAMINATION

2      BY MR. GARDNER:

3      Q.   Mr. Smith, what does the word substantially

4           mean to you?

5      A.   It would depend upon the context.

6      Q.   Well, let's look at this door over here to

7           this room.  See that the door has a border

8           around it?

9      A.   Yes.

10     Q.   And that border is actually a door frame,

11          correct?

12     A.   Yes.

13     Q.   And that door frame extends along one side,

14          over the top and down the other side, right?

15     A.   Yes.

16     Q.   Would you agree with me that that door frame

17          substantially frames the door?

18     A.   We're talking about -- a door frame, if

19          you -- if you look at a regular door frame in

20          a wood frame house, they have a lintel.  In

21          other words, it is surrounded.  It does

22          completely frame the door.  If you look at it

23          in the lumbar yards, it -- it is completely a

24          door frame.  It has a top, a bottom and it

25          has -- it has top, sides and they connect

190

1      around the bottom.  In other words -- but

2      when you use the term framed, it's typically

3      like a picture frame.  That is, it is

4      surrounded by.

5  Q.  Do you understand that the phrase

6      substantially framed or substantially framing

7      means something short of completely framing?

8  A.  I would understand his phrase to mean, in

9      essence, surrounded by wicker.  And that is,

10     in fact, what the patent drawing reflects.

11  Q.  So you believe that the phrase substantially

12     framing or substantially framed by requires

13     that the door be completely framed on all

14     four sides by wicker.  Is that your

15     testimony?

16  A.  Yes.  That is the description for the patent

17     drawings.  The patent drawings show wicker on

18     all four sides, substantially framed.

19        MR. GARDNER:  Nothing further.

20        MR. HINSHAW:  Thank you.  No further

21           questions.

22             (The deposition concluded

23                at 4:40 p.m.)

24         * * * * * * * * * * *

25        FURTHER DEPONENT SAITH NOT

191

```
 1              REPORTER'S CERTIFICATE
 2    STATE OF ALABAMA
 3    MONTGOMERY COUNTY
 4        I, Mallory M. Johnson, Certified Court
 5    Reporter and Commissioner for the State of
 6    Alabama at Large, hereby certify that on Friday,
 7    June 13, 2008, I reported the deposition of BRET
 8    SMITH, who was first duly sworn or affirmed to
 9    speak the truth in the matter of the foregoing
10    cause, and that pages 4 through 190 contain a
11    true and accurate transcription of the
12    examination of said witness by counsel for the
13    parties set out herein.
14        I further certify that I am neither of kin
15    nor of counsel to any of the parties to said
16    cause, nor in any manner interested in the
17    results thereof.
18        This 25th day of June, 2008.
19
20
21        _____
              MALLORY M. JOHNSON, COURT REPORTER
22            And Commissioner for the
              State of Alabama at Large
23            Alabama License Number: 443
              Expires 09/30/08
24
              MY COMMISSION EXPIRES:  2/24/09
25
```

192

1                    SIGNATURE OF WITNESS

2            I, BRET SMITH, hereby certify that I

3    have read the transcript of my deposition

4    consisting of pages 4 through 190, and except for

5    the corrections listed below, it is a true and

6    correct transcription.

7

8    _____
     BRET SMITH
9

10
     SWORN TO AND SUBSCRIBED before me
11   this _____ day of _____, 2008.

12

13   _____
     NOTARY PUBLIC

14            *  *  *  *  *  *  *  *  *  *  *

15   Page   Line   Correction and reason therefor

16

17

18

19

20

21

22

23

24

25

Mid-West vs.
Simpson Ventures, Inc.

Bret Smith
June 13, 2008

**#**

#1 94: 6, 7, 8,13,17;95: 1, 15;96: 8
#197 114:17,19,20; 115:17
#198 114:17,19,21; 115:17
#2 47: 4;123:14,24,25; 124:11,17;125:12,21; 126:11,14,19;127: 7,17, 22;128: 9,20;129:22; 131:15,21,23;132: 6; 133:23;134:13;135: 7; 137:13,22;138: 4;141:14; 147: 6,24;188:20
#218 187:19
#234 7:10
#235 7: 8, 9,13,22;8:19; 10:21;11: 4;19;14:20; 16: 2;19: 6;120:20,21; 121: 4;168:18,21;174:23; 176: 5;177:22;178:18; 182: 8,23;184: 1
#236 36:22;41: 1
#237 71: 5;73:13;74: 1, 10;76:18;78:25
#238 71: 5
#239 71: 5
#240 71: 5
#241 71: 6;73:14;74: 1, 11;76:19
#242 99:13,24;104:13
#243 162: 9,12
#3 47: 9, 9,10,13;49:20; 57:17;59:10;69:25;70: 4; 85: 6;169:19
#75 123:12,20,23;124:13, 19;125:10,15,24;126: 9, 16,17,21;127:10,21; 128:23;129:25;130:11; 134:15;135: 7;137:16; 138: 3, 5;141:17;147:16
#78 120:24,24;121: 1, 4, 8
#79 121: 9
#80 122: 5, 6, 7,18
#81 158:12;159: 6
#83 13:17,25;15: 6,24; 18: 2, 3;22:22;25:20; 50:21;51: 1;54: 6;57: 8,19; 58:20;59:11;124: 6;167:25
#84 119:23;120:13; 124: 1, 2,10;125: 8,16,23; 126:11,15,21,23;127: 8, 19;128: 6,21;129:23; 131:15;132: 8;134:14; 135: 8;138: 4;141:15
#86 122: 4

**0**

0 31:19;62: 6
07 121:10

**1**

1 23: 8,22;24:23;25: 4, 8, 19;26: 7;37: 7;152:23; 170:10
10 31:19;133:21;178:25
100 59: 4, 7,14,18,23; 60: 5;61:13;86: 9,12; 88:13;89: 2;100:24;101: 1, 10,11;128:18;157:16,18; 158:20;159:20
112 37: 8,17,21,23
12 23: 7,21;25:18;26: 1, 8; 170:11
123 39:12
126 122:12
14 168:21;184: 4, 6; 185:13
15 10:20;11:18
156 10: 4, 5, 6;34:13,25; 36: 8;66:18;105: 8;112: 8; 117:13,14;119:23;120: 7, 22;121:12,19;124: 9; 126:19;127:19;129:23; 141:24;142:19;143: 7,15, 18,23;144: 1, 4;145:13; 147: 7,13,15;151: 1; 152:24;153:10,23;154:10; 175:16;176:24,25;183: 6, 9,13;186:24
157 8:12
1805 16: 9,14,20;17: 5, 10;47:14;48:12,21;50:24; 52: 2;54: 4,19;57: 7,16; 58:10;60:12;82:24;83: 8, 18;85: 5,25;86: 4,11; 88:16;90:11;91:13;92: 7, 21;100: 6,12;106: 8; 143: 8,12;144: 3;145:11; 169:18;170: 1,25;171:18; 172:18
1959 39:13

**2**

2 178:22,24;179: 6,19
20 135:15;156: 1
200 158:20
210CCPA 39:13
25 183:25
250 159: 9
256 158:22;159:19; 179:11
27 8: 9,19,20;9: 9
270 39: 8,12
28 123: 8
29 162:18

**3**

3 62: 5;122: 2,13,17; 176:24,25
30 4:13;161:18,19,22
30,000 161:17
321 7:17,20,23;13:19,24; 16: 8,11,15,19,22;18: 4, 15;19:14;20:25;21: 9,10; 22:12,13,21;34:14;35: 1; 37: 2,12;41:25;43:16; 44: 6;45: 1;46:18;48:21; 50:20;51: 1, 7;52: 1;54: 5; 55: 1;57: 8;58:11,20; 59:11;63:20;66:18;82:23; 85: 4;86: 3;90: 1,11; 100:12;106: 8;111:22; 120:19;121: 6;141:25; 142: 3, 9,11,13,22;143: 1, 7, 9,13,15,20,25,25; 144: 5,10;145:12;151: 1; 152:24;153:10,23;154:10; 167:24;169:17,20;171: 1, 8,17,20;174:22,24;175: 3, 9;176: 3;177: 4,15,21,24; 178:23;179:21,23,24; 181:17;182:22;183: 2, 7, 10,25;186:25
33 11: 2, 5,18,25
35 10:15,18,20;11:12
38 38: 6
391 39:12

**4**

4 188: 2
4:40 190:23
40 38:19,20,21;40:25; 156: 3, 4;157:15,17,18; 159:20
40,000 161:19,23
41 16: 1;170:18,23;174:10

**5**

5 170: 9
50,000 118:25;162: 1
527 8:12,12

**6**

6 23: 8,22;24:23;25: 4, 8, 20;26: 8;170:10
60 128:13,18
60,000 162: 4
62 8:13,15,16
64 8:14,18
65 8:12
66 8:16,17
68 8:13
69 8:14,18;143: 3

**7**

7 20:23;21: 2;23: 6, 6,20; 25:17;26: 1, 8;31:16; 33:16;170:11
72 184: 3
74 123:19
7th 121: 9

**A**

able 24: 6;71:17;95:22; 142: 1;144:16,19;145:11, 20;146: 1, 6,11;147:23; 148: 9,17;175:19;180: 7
above 41: 2;171:21
absence 21:17;171:10
absolutely 28:21;29:17
Absolutes 86:22
abstract 104:23;152:19, 21
accolades 162:21
accomplishments 162:22,23
according 31:17
account 100:17
accurate 37:11;144:21; 145:22,25;146: 8,13,20, 23;153:17;161:18;162:13
accused 101: 3;142: 2; 148: 4;163:15;165: 8,19; 166: 8
acquire 103: 8
across 77: 4;84:16
action 38:11,20;39:25; 40: 4
activities 162:21,23
actual 72:13;81:22; 101:16,18;104:16;107:20, 23;110: 4,10;112:22; 113: 8,19;114:11,22; 116: 9;118:10,21;121:12
actually 59:19;66:19; 101:13;102: 2;145:14; 174: 8;189:10
acuity 97: 8
add 13:15;63:11;140: 4; 148:16
added 37: 6;89:11;95: 7; 172: 9
additional 19: 3;70:14; 104: 1;116:19;159:13; 162: 6
addressed 155:10; 166: 1;173: 4;178:12,15
addresses 170: 8
addressing 170: 4
admit 79: 9
adopt 179: 7
adopted 140:18
advice 36: 7
affect 36:13,15,19
affects 62:11,25
again 6: 1;46:15;54: 7; 60:16;77: 9;85: 2;110:17; 128:24;142:14;10: 5; 19:25;21:23;33: 1;52: 3; 61: 7;92:24;104:14,20; 105: 3;108:21;112:14; 117:14
against 173: 3;174:12,13
ago 73:23;114: 9
agree 4: 7;11:21;13:24; 18:15,20;19:13,22;21: 8, 12;30:21;39:19;41:12,17, 20;42: 7;43:17,24;44: 7, 24;45:20;46: 4;49:22; 50:10;51:16;52:13,15,16; 53: 2;54: 2,16;55:13;56: 7; 57:25;67: 7,16;68: 5;69: 6; 74: 4,24;75: 4;76: 3;78: 1, 7;79: 2;81:23;82: 9;83:15, 20,22;87: 3;95:25;106:16; 107:25;108:15;111: 7,11, 15,15;114:21;116: 9; 125:20;128: 2,15,16,19; 130:25;137: 8;166:23; 169:12;177:11;183: 1; 185:25;189:16
agreed 140: 8
agreeing 84: 9
ahead 75:19,21;125: 5
aisle 70: 9
allegations 114:11,22,24
alleged 175:23
allow 104: 3
along 134:16;189:13
alter 10: 1;13: 8
alternate 24:16
although 19: 2;33:23
always 15:11;68: 9;86:23; 91:14
Amelie 9:17;10: 8;11:11
amend 9:23;13:14
Amicus 186:15
among 96:25;120:10
amount 35: 2,18;68: 6,11; 70:20;76: 6;82: 6;90: 3, 8, 8,16
amounts 67:19
analogous 41: 9
analogy 58: 4;89: 9
analysis 5:19,22;14:25; 15:16;17:21;34:16;48:12, 14,24;49:14;50: 5;88:24; 96:15,17;122:23;131:11; 148: 9;150:13;156:14; 163:11,21;170:19;175:16; 176: 4;186: 6
analyze 170:24;173:11
analyzed 172:17,19; 173:21,25
analyzing 35:23;150:20; 178: 8
Anders 178: 9;187: 9,23;

Mid-West vs.
Simpson Ventures, Inc.

Bret Smith
June 13, 2008

188: 1
**Anders'** 37: 3,14;38: 1
**animal** 5:12;11: 7,22,24;
122:11,16
**announced** 125: 1;
140:19
**annual** 161: 1
**answered** 5:17;20:13;
24: 2, 4,11,12,14;25: 2,13,
14;28:12;29: 1, 4;30:20;
34:10;43:20;54:21;56: 2,
16;73:21;109:17;111:13;
116: 7;133: 4,12;136:23;
137:25;139:16;140:10;
146:18;147: 9,10,18;
148:21;152: 7,18;181:24
**anything's** 104:21
**apologies** 181:21
**apparently** 39:20
**appear** 50:12;81:13;
166:14;167:14;168:14
**appearance** 17:24;
19:10,20;41:14;42: 2, 9;
54:12;62:25;63: 7;68: 8;
73:24;171:13
**appearances** 41: 4, 6,
22;42: 1,13,23
**appears** 38: 4,13;39:23;
49:25;61:10;62: 8,11;
81:16;165:24
**appendices** 158: 9
**appendix** 158:13;159:11;
187: 6
**apples** 78:12
**application** 38:24;39: 6,
17,22;40:24;183:10
**applied** 156:13;183: 2, 4
**applies** 155:21
**apply** 45:24;171:16;
172:13
**applying** 151:10
**appreciate** 72:11
**appreciation** 12:15
**approach** 48:19;49: 5;
170: 7
**appropriate** 11:23;49:13;
64: 5;65: 8,17;66:20;89: 4,
5;90: 2, 8;107:15;108: 3,
18;178: 6
**appropriated** 165:18
**arched** 143: 3, 9, 9;
144:10,10;168: 2, 7;
179:25;180:11;181:16
**area** 50:12;149:22;
153:21;160:13
**areas** 97:12;153: 7
**arguing** 88: 4
**argument** 88: 9
**Arizona** 100: 3
**around** 8:21;21: 4;
128:13;158: 5;161:17;
168:15;189: 8;190: 1
**arriving** 108:25

**art** 9:15;10:10;35: 7,19;
41: 9;44:18;57:14;120: 5;
124:19;125: 9,24;126:16,
17;127: 9,21;128: 4,12,22;
129: 6;130:11,22;131:19;
133: 1,21;134:15;137: 4,
10,15,21;141:16;142: 3,
11,12;143: 4,12,15,23;
144: 4;147:25;148: 3,11;
175:11,22;176: 5;177: 6;
183:21,23;187: 2, 3;29:12
**ascertain** 175:19
**aside** 145:25;154:12
**aspect** 175: 9
**aspects** 166:25;180:19;
182:25
**asserted** 175:21;176: 2,
6;177: 3
**asserting** 22: 3
**assess** 104: 3;116: 7;
127:16
**assessing** 103:14;
104:18;111: 3
**assessment** 128: 8
**assign** 116:17
**associate** 87: 7
**assume** 15:15;20: 5;
52:22;59: 3;100:23;
118:19;145:24;160:18
**assumes** 84: 3
**assuming** 21:10;22: 6;
45:15;108: 2;109: 8;22: 9;
45:11,18
**assumption** 12:18
**astrophysicist** 119:16
**attached** 37: 3,14,25;
48: 8
**attempt** 72: 3;139:25
**attempted** 15:21
**attention** 51:13;62: 3;
64:24;95: 9;96:25;97:10,
12
**attentive** 86:25;92: 3
**attorney** 49:18;149: 6, 7;
150:23
**attorneys** 9:13;103:21;
104: 3;113: 6,18
**attract** 80:23
**attributes** 135: 1, 3;
138: 3, 5;142:15
**Auburn** 160:16
**August** 121: 9
**avenues** 83:19
**average** 64:18;81:23;
91:12;100:10;117: 4
**aware** 15:20;59: 8,17,18,
19;60: 6;67:12;94:11,14,
16,20;99: 5;105:16;113: 1,
3;142:12;175: 2;185:16,
24
**awareness** 181:15

**B**

**back** 4:25;5: 6,15;14:15,
25;68: 2;73:17;74:18;
110:17;111:18;120:25;
128:25;135:24;155:23;
161:24;162: 7;166:19;
181:23;185:20
**background** 101:25;
109:24;110:13,18;155: 1
**backgrounds** 112:16
**bad** 88:10;138:24
**badger** 136:15
**balance** 123: 6, 7;144:13
**bar** 89:11
**bare** 168:22
**base** 126:22
**basic** 157: 2,11;185:11
**basically** 4;4:41: 5,13,
21,25;42: 8;172: 5
**basis** 84:25;101:15;
102: 5;110:12
**basketry** 122: 9;123: 9
**baskets** 185: 8
**Bay** 47:14;50:24;52: 2,19;
54: 4;55: 1;57:16;58:19;
59: 9;67:20;68: 8,20;73: 8,
9;74:19;81:19,20;82:1,11;
83: 6, 8,17;85: 5;86:11;
87: 9;90: 1,10;92: 6;93:10,
24;94:23;95:17;96: 9,19;
97:16;105: 1, 6;106: 8;
112: 6;124:10,16;125:21;
126:13;127:18;128: 9,19;
129:21;131:20,22;132: 6;
136:20;137: 8,13,19;
141:14;143: 1;144: 3;
147: 6,14,23;169:18,21;
170: 1,25;172:17;185:18;
186: 2;188:19
**bearing** 105: 2
**becomes** 147:21;148: 7
**begin** 41: 1;119: 8
**beginning** 38:23;73: 5
**begins** 16: 5;38: 6;39: 2
**behaviorist** 5:12
**belief** 88:12
**believes** 29:21,22,23;
87:22
**Bellaruski** 122:15
**beside** 43:10;182: 6
**besides** 107: 8
**best** 9: 7,29: 1;30:15;
72:16;89: 8;134:12;
139:16;140:11
**better** 7:10;8:22;15:13;
78:17;98:16
**beyond** 33:19;43:13;
152: 2;154: 4, 9;155: 9,11,

11;159:14;166:11;152: 8;
154:16;155: 9
**big** 12: 5, 6;17:20;67: 6;
83:10,18;96:11
**Bingham** 187: 8
**bird** 11: 2, 5,23
**bit** 65: 8;78:18;117: 1;
152:13
**blanket** 19:25;21:15;
83:20;99: 4;110:24;153: 2
**blocks** 75:11
**board** 77: 4
**boils** 145: 4
**bona** 118:21
**book** 114:18;119:24;
120: 1;121: 1, 1;124: 4
**border** 189: 7,10
**both** 18:16;21:10;22:14;
53: 2,19;63:22;67: 3;70: 4;
82:11;96: 1;99: 1;107:15;
112:15;123: 1;131: 5, 9;
139:13;145:15,17,18;
146: 3, 4;155: 7;168: 6;
170: 4;171:16;172:14,21,
21,22,24;173: 4;180: 4, 6;
182:25
**bottom** 8:10;36: 9;71:16;
168:11;184:16,25;189:24;
190: 1
**bottomed** 184: 7,14
**bought** 12: 4;93:14
**box** 67: 6;69:10,20,22;
70: 5, 9,11;73: 3;83:10,18;
96:11;171:23
**branches** 126: 3,11,25
**brand** 48:18
**branding** 48: 3,16
**break** 41:19;47: 1;51: 7;
91:10;139: 5
**breaking** 159: 1
**BRET** 4: 1
**brief** 186:15,21;47: 3;
82:20;99:20;114: 7;139: 9;
159: 4
**briefly** 9:18
**bring** 160:23;161: 8
**broke** 159: 5
**burdensome** 30:10
**business** 97:21
**businessman** 118:14
**buy** 66:14;67: 2, 8,13;
92:12;93: 7,12;95:14,17;
98: 6;103: 4
**buyer** 65:21;66: 6, 6,10;
98:22,23;100: 3, 4, 9;
102:15,25;103: 2,11,17;
104:24
**buyers** 99: 6;100:24;
101: 1,10,17,23;102: 6;
105: 5, 6
**buyer's** 103: 7
**buying** 86:21;93:11;
97:21;98: 4;102:13,17

**buys** 66:11;94:22,25

**C**

**cage** 10:12,14,19;11: 2,
5, 7,11,12;12:10;36:10
**cages** 64:19
**call** 14: 7;16:23;54:24;
66:22;73: 6;139: 6
**called** 9:17;14:14;77:20;
183:22
**calling** 118: 9
**calls** 118: 7;167:15
**came** 174: 8
**campus** 14:17
**can** 4:12;9: 2,12;11:10;
12:23;20:14;21:13,21;
28: 1;29: 2;30: 2, 4,16;
31: 1,36: 2,12;44: 7;49:10;
53: 2, 8;57:11;58:15,24;
60:16;67: 2, 8,15;68:12,
13,15,16;69:11;70:10;
74:13,15,16,17,18,19,19;
75: 2;76: 6,15;77:17;
78:17;81:23;89: 8;103: 7,
11;107: 8;110: 8;113:21;
114: 5;116: 7;117:23;
118: 3;120:15,23;121:11;
125: 5;129:12;130: 4;
134:15;135: 2, 3;137: 6;
138:22;139: 7,16,17;
140:11;141:13;144:13;
145:14,19;147:19;148:20;
151: 2;152:10;166:24;
167:10;171: 5;177: 8;
187: 6;13: 1;42: 7;44:23;
74:21;82:16;111: 7;
170:16;173: 1;181:19
**cane** 184: 7,14,25;185: 5
**caned** 184:12,16
**caning** 185: 7
**captures** 72: 9
**care** 64: 8;86:16,20;87: 6;
88: 2,19,25;89: 4, 6,22;
90: 3, 8, 9,16,22;117: 4;
163: 8
**careful** 63: 2;89:18;91:21;
94:24;95: 3;118:23
**carefully** 24:24;82: 3;
95:13
**careless** 88:22;91: 4
**carry** 102:21
**carrying** 102:18
**cart** 122:14
**carting** 158: 5
**case** 4:10;6:21,24;7: 3, 4;
48: 6;56:24;76: 8;77:19;
97:15;116:24;140:20,21;
150:16;152:13,15;154:13;
155: 8, 9,15,21;156:24;
157:14,22;159:23,24;
163: 1;186:17,25
**case-by-case** 84:25

Mid-West vs.
Simpson Ventures, Inc.

Bret Smith
June 13, 2008

cases 21:10;112:15;
117: 2;152: 8, 9;154:13,
16,23,25;155:16,17;
158: 7;159:17,24,25,25;
160:13;161:12
casual 64: 1
cat 169: 9
catalog 12: 4;79:24;80: 2,
5,15;81: 2,18,21;82: 2, 6,
14;83: 1,11;82: 2
catalogs 67: 7;80:11,13,
20;82: 1
categorize 55: 7, 8,11
cats 169:14
cat's 169: 9
caught 169:10
cause 9:23;10: 2;141:12
certain 49:17;185:17
certainly 46: 2;60:19;
64:20;80:11;85:22;105:23;
106: 3;108: 7, 8;113:25;
114: 1;160: 8,25;157:15
cetera 111: 1, 1;179:19
chain 66:11;103:17
chains 67: 6;83:10
chair 184: 4, 6, 7, 8,17,
25,25;185:13,14
chairs 184:14
chance 83:23;85: 3,11,11
change 8: 2;9:23;10: 3, 7;
13: 8,12;60: 3;119:22;
135:11;136: 6;141:12
changed 136:25;141:18,
23
changes 97: 5;106: 2
changing 119:11
channels 67:17;68: 6;
83: 5,12,23;84:17;85: 1, 8
characterization 44: 8;
45:24;58:23;112:11;145: 5
characterize 53:11;55: 9,
15;56:18,21;89:16;130:16,
17;144:17,19,22,24;
145: 6, 7,11;160:11
characterizes 105:12
charge 161:21
charged 45:23;161:21
check 161:16
Chisum 4:25;154:23
choice 19:20,20;26:22;
45: 5;61:25;62:10,18,24;
63: 6;135:22;180:14,15,17
choices 63: 2;171:12;
183: 5
choose 55: 2, 4
circumstances 30:17;
119:10,13,19
cite 187: 1
claim 151: 2,12;152:10,
20;153:25;154: 4, 8;
155:11;177:16,23;178: 2,
2, 19;179:20
claimed 172:22

claims 113: 7,20
clarification 35: 5;52: 3
clarify 157: 5;176: 8
claws 169:10,15
clean 9: 3;15:11
clear 5:15;6:17;13: 4;
37: 9;44:12,12;45: 4;
46:13,18;55:10;71:11;
77: 4;85: 7,15,17,17;86: 8,
17,22;87: 2,19;89: 1;25;
95: 5;111:22;155:13;
172:10;173:14;174:11
clearly 5:17;55:17,18;
56: 4;57: 2;74:16,17,21;
76:23,24;77: 1, 3;79: 7
clickable 74: 2, 5
client 160:14
close 10:14;20: 6;123: 1,
4
closely 104:15
closer 126:14;128:11,15,
20;129: 4, 5, 9,14,22,24;
130: 2, 4, 6, 7;132: 7;
133: 8, 8, 9,14,18,24;
134:22;135: 8, 9;137: 6, 9,
14;139: 1, 1;141:14,16;
142: 2, 3;144: 3, 5,13,18,
19,22,25;145:12;146: 1, 6,
9,14,22,24;147: 6,15,24,
25;148:10,11
closest 120: 6;121:18;
122:24;123: 6;124:12;
142:19;143: 5,19;183: 7
coffee 13:20
college 118:12,13
color 75:12;77:18
coloration 77: 8
combination 177: 7,13;
185: 2
combine 121:16;157:10
combined 170: 2;173: 3,
5,12;174:13;175:22
comfortable 54:23
coming 159: 1
Commission 89:14
common 94:17
communicated 154:20
communicating 157:21
companies 102: 6
company 9:14;116:23
compare 124:24;165: 7;
166: 7;169:20;170: 1
compared 57:17;76:21;
79:25;82: 1,13;83:19;
169:18;180: 2
comparing 58:10
comparison 44: 2,14,17;
49: 1;127: 3;131: 2;
138:19,21,23,24,25;
146:25;147: 2;163:14;
164: 5, 8,25;172:19;
173: 2;174: 9, 9,12
complain 139:24

complete 22:18;110:21
completed 118:19
completely 33:24;63:19;
144:11;189:22,23;190: 7,
13
computer 78:11;79: 8,10,
17,21;118: 8,10,13,15
computers 118: 6
conceivable 186:11
concept 23: 2,11,25;
24: 7,22;25: 1, 6,11;26: 4,
16,22;27: 4,15,21;28: 4, 9;
32: 9,15,18;33: 7, 9,13,21,
25;39: 5,15;40: 9
concepts 23:17;24:21;
25:22;28: 9;29: 6;31:12,
20;32:11,20
concern 100:13
concerned 64:15
concerning 176: 3
conclude 168:17;169:22;
182:23
concluded 41:20;190:22
conclusion 24:10;30:19;
34:11;41:18;167:16;
169: 2;173:10,24
conclusions 106:22;
107: 5,11,17;108: 5;
109:21;110: 8,12;111:16;
119:20;170:13;172: 7,13;
170:17
conduct 97:13
conducted 100:25;
153:24
cone 10:17
confer 82:17
conferred 141:10
configuration 172:24;
188: 8
configurations 172:25
confined 153:22
confuse 105: 7;112: 7
confused 82:22;83: 3,16;
84:11,13,16,18;85: 3,12,
21,24;86: 3,13,19;87: 4,
13,15,23,24,25;88: 3,15;
89: 4, 7;90: 5,10,14,23;
91: 6;96:19;97:16,23;
98:13;100:11;101: 2,21;
112: 1;115: 2;118:23;
164:11;173:15;178:20
confusion 83:25;84: 5;
98:17;101:12,13,18;
106: 7,18;107:23,25;
110:11;111:10,11,24;
112:22;113: 8,19;114: 4,
12,22;115:19,24;116:10;
117: 9;118:24;119:12
Congratulations 160:20
connect 189:25
connected 104:16
connection 69:15;
162:14;186:16

conscious 62:10
consider 45: 7, 8, 9,14;
46: 5, 9,14;47:25;48: 3,23;
49: 7,11,14,19;53:10;
54: 9,10,11;58:12;59:24;
60: 2,10,20;61: 5,11,14,
22;101: 5;103:23;108:16,
25;113:23;117:10;118:13,
14;124: 9;149: 1, 4, 8,15,
21;150: 6,16,25;151: 3,16,
20,23;152: 1;153:19;
154:14;160: 1, 9;166:20;
168: 2;171:24;175:10;
179:14,18,22;184:24;
185: 1
consideration 165: 6
considered 36:19;39:21;
41: 3, 7;42:14,24;48:22;
63:21;108:12;116:10;
125: 2;150: 3;166:17;
168: 6,22,25;183: 9,13;
116:12
considering 49: 3;108: 9;
115:13;175: 6
considers 100:10;139:15;
179: 3
constitute 22:22;23: 1;
39:15
constituted 40: 9
constitutes 178:18
construction 177:16,23;
178: 2, 4,19;179: 5, 8,20
consumer 46: 8, 9,20;
48: 5,17;51: 9,21;52: 9;
64:12;65:10,18;66:15;
67: 2, 8,13,18;68: 7;69:11;
70: 8,20,22;76: 4,17;78: 2,
8;79:15;81:24;83:16,24;
84: 5;91:12;97:25;100:11;
102: 8;103: 3;104:11,16;
108: 4;110:14,19;112:22;
114: 3;115: 1, 1;117: 9;
89:13
consumers 58:17,23;
59: 1, 4, 5, 7,14,15,24;
60: 4;66:14;74:12;75: 8;
82:22;85: 3;86: 9;95:16,
20;97:15,22;98: 6,12;
101: 2,16,20,24;102: 3,22;
104:11;106:18;107: 1,10,
16;108: 4,19,19;109:10;
110: 5,11,19;112: 1, 6;
113: 8;114:12,23;115: 4,
25;186: 8
contacted 73:11;115: 5;
116:23
contain 7:22;177:15,22
contained 99:24;104:13;
115:16;117:24;159:10
contains 1: 1;170:18;
177:24;38:25
context 53: 6,16,17;63: 9,
16;64:12;65: 9;82:25;

83:18;148:19;189: 5
continual 130:18
continue 136:15
continues 38: 9
continuing 125:14;
145: 1;134:24
continuum 134:13;144: 2
contract 160:23
control 66: 2
controlling 54:13
conversation 102:12
Conversations 157:24
convey 28: 8;80:25
conveyed 68: 7
cooperate 136: 9
copy 37:11
corner 50: 8;77: 2;122:17;
126:19,20
corners 77: 1
correcting 153: 4
corrections 9: 9,10
correctly 41:10
correspondence 35:17,
19;116: 8
cost 185:17;186: 9
counsel 29:14;139: 6
counselor 124: 7
couple 5:14;68:17;82:16;
162:16
court 9: 1;22: 7;67:24;
73:18;129: 2;135:23;
139: 7;141:10;158: 7;
178: 5;182: 1;185:21;
28:18;40: 2
cover 18:23;19:14;21:13,
21;22:14;43: 8;47:14;
48: 8, 9,13;50:24;52: 2;
65:16;67: 3;68:21;73: 4;
81:20;82:11,24;83: 8;
91:14;92: 7,13,13,21;
100: 6;169:19;171:23;
180:25
coverage 36: 3
covered 20:10,24;21: 9;
36:11;63:23;163:17,23;
166:17
covers 18:16,21,25;
19:23;64:14;65:14
crate 68:21;73: 2, 3;
81:20;82:12;93:10,12,13,
24;94: 1,23,25;95: 6;96: 5;
112: 7;124:10,17;127:18;
180:25;185:16,18;186: 2,
11,12,13
crates 64:3;65:17;67: 4;
74: 9;93:11;94:12,15,16,
19,21;95:15,17;96: 7, 9,
10;97:22;102:16;105: 1, 7;
186: 1, 9, 9
credence 104: 4,12
crisp 6: 3
cup 13:20
current 162:25

Mid-West vs.
Simpson Ventures, Inc.

Bret Smith
June 13, 2008

currently 5: 9
curriculum 162:10,12
cut 135: 4, 6
cutoff 72: 5
CV 162:10,18

**D**

dash 37: 7
data 92:24;119:18
date 175:15
day 141: 7
days 4:13
deal 134:19;170:14
dealing 108: 4,18;110:18
deals 17:24;19: 7, 7, 8;
163: 5;164: 9,19
dealt 152: 9
deceived 64:10
decide 93: 7
deciding 51:14
decision 24: 6;76: 5;
90: 4, 9;91:16;103: 7
decisions 102:20;113:24
decor 64:25
decorative 16: 9;45: 4;
171:12,18
deemed 21:11
de-emphasized 175: 7
defer 72:13
define 97: 2
defined 63: 8
defines 66:19,21
degree 15: 1;88:19;
89:22;93:15;186: 4
Dell 118: 5
demonstrated 108:23
depend 77:10;186:10;
189: 5
Depending 53: 6,16,16;
80: 2
depends 20: 1;98:25;
104:14,14
depict 71: 8
depicted 9:20;10:12
depicting 69:23
depiction 70: 4
DEPONENT 190:25
deposition 4:21;5: 2, 4,
5;6: 9,11,18,19;8:25;
10:23,25;11:11;64:18;
91:23;99:14,23;100: 2;
106:14,22;111:17;114:10;
150:10;175:14;190:22;5: 3
depth 107:16
describe 15: 5;50: 4, 5;
56: 4, 6;57: 2, 4;179:13;
180: 4;185:12
described 112:18;
171:21;174: 3;177:18;
184:11;185: 9,14
describing 184:10
description 14: 2;23:20;

26: 7;27:17,24;177:24;
178:23;179:22;190:16
design 6; 6;15:18,19;
16: 8, 9,17,18;17:23,23;
18: 4;19:20;23:14,22;
25: 3;26:10;27:11,18;
31:18,22,25;32:13,21,22;
33:18;34: 4;36:17,20;
39: 6,16,22;50:20,21;
51: 1;57:18;60:13;61:24;
83:17;85: 4,24;86: 3,10;
88:15;90:11;100:12;
101: 3,22,22;106: 8;
111:23;112: 8,22;115:11;
123: 8;124: 9,12,13;
125: 7;128:12,21;129: 7,
23;130:20;132: 8;141:15;
149: 4,10,12,16,18,24;
150: 1, 4, 7,17,21;151: 4,
6, 8,10,16,21,24;152: 1,
15;153: 1, 6, 7,13,20;
154: 2,15,19;155: 5, 5,21;
156: 5,16,17,22,23;
157:12,13;158:18,18;
160: 2;163:15,17,24;
164:20,23;165: 5,24;
166:13,25;167: 8;171:17,
18;177:17;178: 8,24;
180: 8;183:20
designer 33:10;44:19,22,
23;45: 2,22,25;48:19;
52: 5, 8;53: 3, 9,13,19,24;
54:24;55: 7,12;56: 3, 6,19;
57:12;62:18;98:20;108:21;
109:11;118:18;119:16;
121:24;125:25;127:12,14;
129:12;133: 6;134: 3;
150:24;151:18;186:16,20
designers 46: 4;57: 5,11;
58: 9,15;60: 4, 6,10,15,17,
18,25;61: 1, 3,10,22;62: 2,
9,14,23,24
designs 10: 9;32:22;
82:23;83:25;86:14;90: 1;
124:24;132: 5
despite 30:17
detail 19:19;20:24;21: 3,
6,17;38:17;60:21;61: 8;
62: 3;67:19;68: 7,11;
70:10,15,20;74:13,16,16;
76: 6;77: 2;80: 3,22;81: 1;
82: 3, 7
detail-conscious 65: 2
detailed 71: 1
details 19: 3, 9;17:20; 2,
4, 5,16;21:16,18,23;22: 1,
4, 6, 9,19;45:18,19;61: 8;
76:20;79: 3, 6,10,19;
81:25;82:10;92: 4
determination 121:17
determine 15: 1;97:15;
103:22;147:23;148:10;
150:21

determined 118:21
determining 115:10
developing 156:21
deviates 140: 6
diagramed 172:12
diamond 14: 7, 8;15:19,
19;16:23;17: 3, 7,13;18: 5,
19;19:12,13,15,18,24;
20: 9,20;21: 7,14,20,20;
22:10,11;42: 4, 5;43: 9,11,
12,22;57:22;171: 8;
182:10,17
diamonds 51: 8
dichotomy 55:22;133:15
dictionary 172: 3
differ 111: 6
difference 14: 4;17:20,
22,25;18:14;20: 8;21:19;
26:11;40:13;42: 6;45: 3, 8,
9,15,21;46: 2, 3, 5,10,11,
13,14,21,23;50:25;51: 2,
3, 4, 5,17,20,20,25;52:12,
14,17,21,23,24,25;53: 4,
22;54: 3, 5, 9,18,20,25;
55: 3, 3,10,14,17,19,20,
23;56: 1, 5, 8, 9,12,14,22;
57: 1, 3, 6, 9,15,17,20;
58: 1, 2, 3,12,13,18,21,25;
59: 6, 8,17,19,24,25;60: 7,
11,13;61: 6, 9,12,22;62: 1,
7,13,15,22,23;63: 1,18,21;
65: 4;75:15;77: 8;92:16;
118:11
differences 41: 6;42:12,
23;43: 2, 5,15;44: 5, 9,25;
53:13,14,14,15,20,20;
64:20;65: 6;85: 7,14,17;
86: 8,17,22;87: 1, 8;88:25;
89:25;95: 4;111:22;144: 7;
170:24;171:23
different 13:25;16:10,15,
17,21;17: 6,14;18: 7, 9, 9,
10,12,13;30: 3;50: 1,12;
63:25;67:17,18,20;68: 5;
75:12;77:18;78:18,21;
84:24;95:16,20;111: 5;
123: 4;129:11;131:11;
138: 2, 5;140: 1;144:12;
145:15,16,16,18;166:12;
169:23,24;171:20;173:13,
25;176:19
differently 20:15;78:14
differs 146: 3, 4
difficult 155:22
direct 107: 1
disagree 54:17;106:21;
107: 4,11;128: 1
discern 12:24
discerning 118: 8
disclose 28: 3
disclosed 24:21,23;27:21
discloses 24:25;32: 8
discount 103: 5;119: 7

discounted 103:12
discovered 9:15;10: 9
discriminating 91:22;
94:24;186: 7
discrimination 97: 7
discussed 6:23;13: 9;
58: 5;67: 1;78: 4;171:11;
172: 6, 6,12
discussion 11: 4;13: 3;
40:12;63:16;75:25;99:19;
113:16;141: 8;158:25;
175:25;181:20
display 68:22;69: 8
displayed 84:23
displays 69: 1
dispute 187: 1
distinct 39:14;40:14,17,
22;50: 7;53: 7;144: 8;
171:13
distinction 166:11
distinctive 171:10;181:17
distinctively 16:17;17:14;
18:11;171:19
distinctiveness 182: 3
distinctly 16:10,14,21;
17: 6
distribution 67:17;68: 6;
84:17;85: 8
distributor 65:22;66: 5, 7,
12
document 38: 5;40: 5,10
documents 72:20;
113:10;114: 2,14;115:16
dog 73: 2;74: 8;81:20
done 62: 8;80:10,21;
82: 5;97: 2, 3;142:22;
150:24;154: 9;156:11;
164:14;174:12
door 10:16;74:16;77: 3;
188: 7,11,13;189: 6, 7,10,
13,16,17,18,19,22,24;
190:13
doorway 168: 2, 7,23;
179:25;180:11
doorways 142:23
double 14: 7, 7;15:19;
16:23,23;17: 3;18: 5,19;
19:12,12,15,18,24;20:20;
21: 7;22:10,11,15;42: 5;
43: 8,10,12,22;132:23;
182:17
down 9: 2;20:23;21: 6;
65: 7;70: 8;145: 4;180:20;
189:14
Dr 5:10
draw 122: 8;170:13
drawing 19:21;190:10
drawings 14:12,16,22;
15: 2;16:18,28: 7;164: 4,
17;166: 7, 7;167: 9;
181:11,11;182:20,21;
190:17,17
drawn 119:20

drew 172: 8
dried 135: 6
dry 135: 4
during 64:17;141:10

**E**

earlier 11:10;58: 5;83: 5;
116:12;180:22;183: 6
early 172: 7
earned 161:14
easier 37: 7;78: 7;79: 2,
18;81:24;82: 9
easily 7:11
edge 142:17,18,20;
171:15
edges 19: 7;76:24,25;
97: 1,10;142:23;144:11
effect 15: 6,23;91:23;
106: 1;113: 9
Egyptian 140:19,21;
186:17
eighth-inch 12:22
either 20: 6;21:13;29: 7,
21;32:10;34:25;59: 5,17;
60: 7;65:15;66:18;72:23;
79: 7;122:14;129:22;
130: 7;131: 3;133: 8;
144: 8;150:17;153:14;
161:21;171:14;65:16
electric 89: 9
electronic 15:10
element 181:18
elements 126:18,20;
167:23;171:14;182: 6
elephant 122:10,15;
123:10
else 5:25;6:11;23:16;
24: 3,17;26: 6;28:1;48: 2;
49: 6, 9;63:11;75:22;
83:13;93: 6;110:25;140: 4;
145: 8;169: 5
elsewhere 19: 5;183:18
embodiment 14: 6,11;
16:22,24;17: 3, 7,12;18: 6,
8;21: 6;23: 5, 7,13,21;
24:17,22;25: 3, 7, 8,19;
26: 2, 9,10,15;27:10,18;
28:16;31:17;33:17,17;
34: 4;169:23,24;171: 9,11;
172:18,20;173:12;174: 7
embodiments 14: 1, 5;
22:21;23:10;38:25;39: 3,
4,21;40: 8,13,14,16;41: 3,
7,13,21,24;42: 8,14,24;
43: 3,16;44: 5, 9,25;46:10,
17,22;63:22;169:22,25;
170: 2, 3,14;171: 4,17;
173: 3, 4,13,24;174:13,14;
39: 8,13
emphasis 34:16
emphasize 126:22
emphasized 175: 7

enclosure 11:22;122: 9, 11,16;123: 8;169:11
end 66: 4,22;88: 3;91:15; 93:11;125: 8,10,15,16; 137: 4;138:17;144: 1, 2; 170:22
engaged 88: 8;148:22, 25;149: 9,14;150: 2,15
engine 78:17
engrossed 72:21
enlargement 77:11
enlargements 74: 3, 5; 77:24
enough 22: 7;39:19
enter 103: 7
entire 99:16
entirely 132:11
entitled 28:13;30:12; 127:15;158:13
entrance 171:15
entries 80: 6
environmental 97: 7
environments 68:13; 69:12;84:24;85:15,18; 99: 3
equal 45:16;83:23;84:16
equally 130:10;131: 5
equate 62:19
equidistant 129:14; 130: 9,13
erected 70:13
erecting 69: 9
error 68: 4;140:15
essence 190: 9
essentially 179:16
established 33: 6;83: 4; 143:22
establishing 48:18
estimate 155:23;158:15
estimation 85:20
et 111: 1, 1;179:19
etched 74:15
ethologist 5:11
evaded 24:13
evading 27: 2
evaluate 112:17;131: 1; 148:15
evaluated 149:13,19
evaluating 48:20;49: 7, 15;101:24;149:10,16; 150: 7;163:12;181: 7
evaluation 148:16; 149:24,25
evasive 141: 6
even 29:10;53: 4,25; 77:16;171:23;167: 3
Everybody 137: 5
everybody's 135:21; 136: 5
everyone 182:15
evidence 100:20;112: 3, 21;113: 2;116: 9
exact 20:16;38:16;158:19

exactly 20:18,22,23;21: 2, 5;72: 3;148:19;182:16
exam 95:12
examination 66:24;69: 2; 159: 6;4:18;187:16;189: 1
examinations 153:23
examine 68:17
examined 94: 9;152: 2; 155:12;175:15
examiner 38:22;39:20, 24;40: 3, 7;41: 4,12,20; 42:12,22;46:21;63:21
examining 115:13;183: 9
example 13:16;15:18; 20:21;36: 7;69:25;78:14; 102:24;118: 4;142:18; 185: 2
examples 68:17
except 7:10;20:19;137: 5
excerpt 106:13;111:17
excerpts 99:14,24
exchanged 113:11
exclude 165: 2
excluded 163:20;164:23, 25
exclusive 109: 2
excuse 47: 6;126:21; 141:24
exercise 64: 8;66: 2; 86:16;88:20;89:23;142: 1; 163: 9
exercises 89:22
exercising 64: 7;86:16; 87: 5;88:19,24;89:17; 163: 8
exhibit 11: 3;47:18,21; 99:16;122: 3;126: 7;7: 9, 13,22;8:19;10:21;14:19; 13:17,25;14:20;15: 6,24; 16: 2;18: 2;19: 6;22:22; 25:20;36:22;41: 1;47: 4, 9, 10,13;49:20;50:21;51: 1; 54: 6;57: 8,17,19;58:20; 59:10,11;69:25;70: 4; 78:25;85: 6;94: 6, 7, 8,13, 17;95: 1,15;96: 8;99:13, 24;104:13;115:17;119:23; 120:13,20;122: 5, 7,18; 123:12,14,24,25;124: 1, 6, 10,11,13,17;125: 8,10,12, 15,21,23,24;126:11,11,14, 15,16,17,19,21,21,23; 127: 7, 8,10,17,19,21,22; 128: 6, 9,20,21,23;129:22, 23,25;130:11;131:15,20, 21,23,25;132: 6, 8, 9; 133:23;134:13,14,15; 135: 7, 7, 8;137:13,16,22; 138: 3, 4, 4, 5;141:14,15, 17;147: 6,16,24;158:12; 159: 6;162: 9,12;167:25; 168:18,21;169:19;174:23; 176: 5;177:22;178:18;

182: 8,23;184: 1;187:19; 188:20
exhibiting 83:24
exhibits 72: 7;71: 5; 73:13,25;74:10;76:18; 114:17,20
exist 174:24
existed 183:20,23
existence 19:11
exists 90:24;91: 1
expect 70:19;147:22; 148: 8,17
expectation 102:21
expense 95: 7
expensive 95:23;186:13
experience 60:17;71:20; 78:19,22;97:25;101:15; 102: 9,13;103:16;104:10, 15;107: 1, 9,15,20;108: 3, 18,22;109: 9,24;110: 4, 9, 18;111: 1;112:16;119: 3; 150:12;152:10,12,14; 160: 6,13
experienced 113: 7; 160: 8
experiences 110: 5,14
expert 19: 6;61:17; 100:17,19,22;101: 5; 109: 3;112:20,24;113:23; 115: 9;116:11;119: 2; 149: 1, 4, 8,15,21;150: 3, 6,16,20;151: 4,14,16,21, 24;152: 5,15;153: 1, 6, 8, 20;154: 3, 4,14;155: 4, 7; 159:23;160: 1, 4, 9,12; 178: 7;187:22
expertise 151:10,19; 152: 1,10;153: 9,22; 155:11
explain 89: 8
explained 69: 3, 5; 139:11
exposed 126:18,20
express 6:10;107:19
expressed 106:17; 111: 5, 8, 9
expressing 107:23
extend 152: 2
extends 189:13
extensive 35: 2,18
extent 72: 5;105:11; 124:23;154:25
extremely 52:23,24;53: 4
eyes 44:14,17;121:21,22; 166:10

F

F2d 39: 8,12
fabric 51:10;58: 6
fact 21:11;89:10;96:24; 100: 9;115:18;141:16; 166: 5;175: 5;179: 7;

190:10
factor 51:14;54:13
factors 108:24
facts 140:24
fair 37:19;82: 6
fairly 11:22;80: 7, 7,17; 94:17
fall 117: 5;125:12;135: 7; 137: 6;144: 3
falls 125:19;128: 9; 134:13;136:20
false 133:14;145: 5
familiar 7: 1;94: 7;184:13; 186:19
familiarize 181: 5,14
family 126: 1, 3
far 59:12;151: 2;161:21
faster 121:11
faulty 138:19,20
feature 70: 7;53: 8;77:11; 163:13,13;164: 3,17; 165: 6,24;166: 6;167:10, 14;168: 3, 4, 4,18,19,24, 25;169: 2, 3, 4;180: 2; 182: 7;188:19
features 76:11;78: 3, 8, 9; 96:23;163: 4,17,20,23; 166:22;168:20;179:14,15; 180: 5, 6;186:11,12
fee 161: 3, 5
feedback 118:17
feel 119:11;182:18
fees 161:11,14,20
feet 180: 3,11,12,14
felt 96:23
few 73: 7;99:13,22; 154:23;158: 7;159:17; 172: 9
fide 118:22
field 98: 2;128: 5
figure 8: 4, 7,12,13,13,14, 14,15,16,16,17,18,18,22; 9: 8;10:15,18,20;11: 2, 5, 12,18,25;20:23;21: 2; 23: 6;25: 8,19;31:16; 33:16;76: 2,16;78: 6,24; 83:14;85:19;87:22;122:13; 143: 3;150: 1;155:25; 156:20;165:22;168:21; 171: 2;174:15;179: 2; 184: 3;8:15;25:17
figures 8:21;14: 3;23: 8, 20,22;24:23;25: 4,19; 26: 7;170: 8,10,11;26: 8
figuring 133:24
file 34:13,25;35: 6, 8,13, 23;36: 1;37: 2,24;38: 6,15
filed 186:15
files 15:10
filings 35:10
final 122:23
find 8: 5;15:13,22: 8;28: 2; 62:14;86:24;92:23;112:25;

118:18;121:11;142: 7; 173:19;187: 3
fine 29:16;76:20;159: 3; 167:19
finish 9: 4;27: 7
finished 58: 5;118: 5
firm 37: 6
first 4:15;16: 6,21;17: 3; 18: 6;21: 5,41:19;47:17; 64:17;70: 3;73: 6;101:14; 149:12,18,23,24,25; 156:12;165:12,25;169:23; 171: 9;172:18;176:17,25; 179:16,16,38: 9;72:22
Five 82:19
flat 184:17,20,21
flawed 109: 7
flip 13:21;21: 4;123:12; 158:15
focus 54:15;98:20,22,23
focusing 19:11;20: 7; 21:19
folds 180:20
following 38:25;41: 2
follows 4:17;81: 7
follow-up 104: 7;105:23; 106: 4
football 128: 5
forget 11: 3
form 9:16;12:14;19: 9; 41:15;43: 4;44: 1;48: 9,11; 55: 5;83: 2;132: 1,10; 148:12;152:17;167:15; 172: 2;173: 6;183:20; 185:23;40:18;106:10; 132:21
forms 47:25
formulating 100:18; 101: 5
forwarded 154:21
found 94:19;118:16
foundation 23:19;24: 1, 9;25:25;30:18;40:19; 41:16;101: 9;105:15; 106:11;112:12;125: 4; 132: 2,11,22;148:13; 152:18;173: 7;15: 7;22:24; 23:12;34:11;46: 6;68:10; 70:24;80: 9
four 50: 7, 7,11;67: 9,17; 68: 5;83: 5,12,12,14,23; 84:17;85: 1;177: 3;188:17; 190:14,18
fourth 131: 6, 8
fraction 81: 8,11
frame 11:15;74:19;134: 5; 188:15;189:10,13,16,18, 19,20,22,24;190: 3
framed 188:11,13;190: 2, 6,12,13,18
frames 189:17
framing 190: 6, 7,12
frankly 14: 9

free 119: 7;139:24
French 9:16
frequently 62:21;185: 8, 10
front 5: 6;14:24;47: 5; 73:25;78:10;79:15,20; 121: 5;171:12,22;181:18; 182: 4, 7;188: 8,10,10
full 60: 5;76:22;78:10; 79:20;80:12;82: 8;154:24; 160:15
functional 163: 4,13,16, 19,23;164: 3,16;165: 6,16, 24;166: 6,14,16,18,24; 167:11,13,23;168: 3, 5, 8; 179:15;180:13,19;182:24
functionality 164:21; 166: 1
fundamentally 109: 7
further 117:10;141: 2; 187:11;188:22;190:19,20, 25
furthermore 42:22;41: 5; 42:21
future 147:22;148: 9,18

**G**

gain 156:12
gained 152:14
gaining 157:11
Gardner 29:25;37:10; 176: 8;4: 4, 9,19;7: 7; 24:12;27: 1;28:24;29: 3, 13,19;30:12,24;31: 1, 6; 37:16,20;46:25;52: 6,10; 65:15;68: 1;71:14;72: 1, 19;75:24;82:16;84: 8; 87:21;88: 8;91: 8;99:17; 113:15;114: 6;121: 4,22, 25;122: 4;123:19;124: 7; 128:25;135:16,23;136: 1, 7;139: 5,10;141: 1; 155:18;158:24;159: 3; 173:17;174: 2, 6;176:12, 16,23;179: 1;181:22; 187:11;189: 2;190:19
gather 70:14
gauge 97:22;98:12,17
gave 56:21;104:25;105: 5
gears 119:22
gee 92:14
general 7: 5;53:18;60:20; 61:11;62:24;69:12;74: 7; 76: 8;79:23;80: 3;82: 4,15; 84:21;85:14;87: 1;91:25; 95:13,20;97:24;152:25; 154: 2, 6,22;155: 2, 3, 4
generalized 84:22
generally 56:11;87: 6; 92: 3;95: 7;184:11,21; 185: 5
generated 161:11

genuine 115:21,24
given 6:24;22:14;29: 3; 30:15;55:24;75: 4;81:18; 136:24;137:11,17,23; 139: 4;186: 1
giving 135:19;140: 3
glanced 5: 3
glass 12: 4, 5
glean 70:21,22;76: 7; 109: 5
gleaned 70:10;74:13; 154:19
goal 128: 5, 7,11;134: 2; 161: 4, 5, 6
Goddess 140:19,21; 186:17
goes 31:11;78:24;101:19; 169:11;178:24
good 13: 6;78:16;82: 2; 174:19
Google 78:16
Gorham 64: 6;89:20; 117: 6;163: 3, 5, 6,10,11, 20;164: 7, 8, 9,15,18,19, 24;165: 8,13,25;166: 2, 8, 9;170:19
Grab 121: 2
grant 53:24
granting 22: 3
group 60: 3,23;64:21,23; 89:25;90:19,21,23;95:16, 20,24
guess 75:16;88: 6, 8; 89: 8;104:20;140: 5; 171:21;172: 9,14
guessing 32: 7
guys 155:14

**H**

half-inch 12:21
hand 70: 1;122:17; 130:20,23
hands 119:17
hang 47:22,25;48: 7,11, 21;49: 7,14;28:19;30: 2, 2; 38: 8
hanging 47:22
happen 93: 4
happened 69:15;96: 3
happens 93:17,20
happy 31: 2
harassing 30: 9
hard 14:11;74:24;75:13; 76: 2;182:19,21
harder 76:19
heard 105:16;181:25
hearing 105:17;139:13
hedges 89:16;116:15
help 12:15;68:22
helpful 9: 6;170:16,20
high 12: 3
higher 64:23;92: 1

highlighted 182: 9
highly 71: 1;167: 4
Hinshaw 4:24;73: 6,11; 139:10;140: 4;153:15,16; 154:20;155:18;4: 1, 6; 12:14;15: 7;20:12;23:12, 19;24: 1, 9,14;25:12,24; 26: 5,24;27: 6,16,23; 28:10;30: 1;31:24;40: 5, 10,18;41:15;43: 4,19; 44: 1,11;46: 6;52: 3, 8; 54:21;55: 5;56: 2,15; 65:12;67:22;68:10;70:24; 71:11,19;72:11;73:16,21; 80: 9;82:19;83: 2;84: 1; 87:16;88: 4;99:15;101: 8; 105:10;106:10;110: 2; 111:12;112:10;120:17,25; 121: 2, 7,21,23;122: 3; 123:17;124: 5,20;125:13; 126: 6;128:17;132: 1,10, 16,21;133: 3,11;134:17, 23;135:10,13,18,25; 136: 3,13,21;139: 3; 140: 5;141:22;144: 6; 145: 1;146:17;147: 8,17; 148: 6,12;152: 6,17; 155:13;158:22;159: 1; 167:15;172: 2;173: 6,20; 176: 8,14,21;178:20; 179:10;181:19,21;185:19, 23;187:14,17;188:22; 190:20
histories 34:13
history 34:25;35: 6, 8,13, 15,23;36: 2;37: 2,13,24; 38: 7,15
Hold 129:20;177:19
home 80:15;92:15;188: 8
honestly 137:12
hoping 171: 5
hour 91: 9
hours 156: 1, 3, 4;157:15, 16,18;159:20
house 80:13;189:20
housing 31:17;177:18
hundred 85:22
hypothetical 60:22,24; 61: 7,15;101: 8;105:14; 107:21;109:14,16,19,21; 110:21,25;112:13;119:14; 132:23

**I**

Id 116:25
idea 63:19;186: 8
identically 20: 6
identified 41: 3;76:12; 83:14;183: 6
identify 26:15;136:19; 170:16;174:23
ignore 119: 7;166: 4

ignoring 119: 9;142:23
illustrations 13: 6
image 70:11;71:17;74:22; 75:14;76: 3,14;79: 5,16, 21;81: 7,19;82:14
images 10: 8;15: 5,14; 73:11,22,23;74:10,14,15, 18;75: 5, 7;76:18;77:22; 78: 2,11;79: 1;80:16,18
imagine 98: 1
impact 36: 2;58:25;76: 6; 115:25;117:11
impacts 62: 3
imperfectly 72: 8
implies 127:24
important 8:25;63: 7; 97: 9;113:23;146: 4
imposes 161: 7
impression 108: 1
improper 105:14;132:12; 139:20;101: 8;112:13; 132: 2
improperly 105:12
impulse 93: 4
inaccurate 5: 9;6:12;8: 1; 134:18,20;146:25;147: 2, 14
inappropriate 65:24; 178: 7
inattentive 88:23;89:20
incidents 89:12
include 19:23;39: 5; 48:14;67: 5;110:13,14; 164: 4;165: 5
included 39: 5,16;40:24; 163:14
including 21: 6;188:10
incorrect 8: 1,106: 9; 112: 1, 9;115:17
independent 51:23;83: 9
indicated 38: 2;39:24; 40: 4, 8;81: 2;124:11; 139:21;141: 3;150:11
indicates 42:12,22;91:20
indication 15:20
indistinct 39: 7;41: 8
individual 50:17;68:13; 84:25;117: 2
individually 170: 3
industrial 44:19,21,22; 45: 2;52: 4, 8;53: 3,12; 54:24;56:19;57: 5,10,12; 58: 8,14;60: 4, 5,10,15,24; 61: 1, 3,10;62: 9,23; 121:24;129:12;150:24; 151:18,20;160: 1;62: 2; 186:16,20
industries 103: 2
industry 100:24
inexpensive 92:12
infer 12:17
inference 66:21
influence 54:11

inform 107:10;170: 7
information 69:22;70:15; 71: 1;72: 6;94: 2;100:16; 101: 4;103:22;104: 2,22; 105: 3,20;113:22;115: 8, 16;116: 2, 5,16,19;117: 7; 118: 3,16,18;119: 1, 2; 154:21;159: 7,10,13,19
informed 9:14
infringed 150:21
infringement 17:21; 35:24;49: 8,13;101: 7; 112:23;115:10,11;148: 8; 149:11;150: 4,12;151: 5, 7, 9,25;152: 5,16;153: 8, 13;155: 5;156:17,22; 157:12;158:18;165: 9,10, 11;181: 8
infringes 21: 9;48:13,21; 49:15
inherently 109: 6
initial 102:12
initially 73:10;92: 7
instance 65:15;66: 9
instances 101:17;114: 3; 115: 1, 3,24;117: 8,11; 118:20,22,24
instead 93:14;119:16; 123:19;129:24
instruct 30: 8
intelligent 80:23
intend 103:20;104: 1; 105:19
intended 123:18;167:19; 171: 6
intending 92:11
intent 179:10
intentionally 15:22
interest 80:25
interested 32: 1
interior 64:25
interrogatory 113:13; 117:25
intertwined 157: 7,10
into 64:10;71:20;84: 9; 92:11;100:17;103: 7; 118:20;119: 8;159: 8
introduced 89:10
introduction 179:18
invalidity 5:18,19;153:20; 154: 3,15,19;155: 6,20; 156: 6,17,23;157:13; 158:19
invention 22:23,25
inventive 23: 2,11,17,25; 24:20;25: 1, 5,10,22;26: 3, 16,22;27: 4,14,21;28: 3, 9, 9;29: 5;31:12,19;32: 9,11, 15,17,19;33: 7, 9,12,20, 24;39: 4,15;40: 9
inventory 65:23;66:13
investigate 112:24
investigation 117:10;

118:20;150:25;153:10
**involved** 104:17;183:19
**involvement** 154:12;
163:1
**involves** 183:4
**irresponsible** 109:18
**Isle** 47:14;50:24;52:2,19;
54:4;55:1;57:16;58:19;
59:9;67:20;68:8,20;73:8,
9;74:19;81:19,20;82:11;
83:6,8,17;85:5;86:11;
87:9;90:1,10;92:6;93:10,
24;94:23;95:17;96:9,19;
97:16;105:1,6;106:8;
112:6;124:10,16;125:17;
126:13;127:18;128:9,19;
129:21;131:20,22;132:6;
136:20;137:8,13,19;
141:14;143:1;144:3;
147:6,14,23;169:18,21;
170:1,25;172:17;185:18;
186:2;188:19
**issue** 79:14;109:23;
116:4;140:24;141:7;
165:11;181:12
**issued** 15:22
**issues** 6:6;92:4;97:6,8;
103:6;110:19;116:23;
155:7,10;157:9;160:7
**item** 68:22;89:24;92:1;
102:17;166:16,18
**items** 69:8;81:3;124:9;
166:14;185:9

**J**

**James** 7:8;88:10
**jibes** 37:18
**job** 103:13;111:3
**John** 187:22
**judge** 136:14;139:18,21;
140:8,13,20;141:2;
139:11,12,14
**judgment** 12:8;89:18;
134:12
**judgments** 100:20
**jury** 131:18,21

**K**

**keep** 21:23;28:5;32:5;
53:7;135:18,19
**kennel** 94:10
**key** 97:6
**kill** 89:11
**kind** 5:20;11:7;12:8;
14:14;45:22;58:4;78:12;
89:8;92:23;95:6;96:16;
98:8;104:14;109:9,24;
147:21;148:1,2;157:6;
179:11;184:9
**kinds** 19:9;117:4
**Klinghammer** 5:10

**knowledge** 115:23;
156:12,21;157:3,12

**L**

**labeled** 168:20
**lack** 19:12;20:8;21:20;
107:9;101:9;112:12
**lacks** 105:15
**language** 23:4;24:19;
31:18,25;32:1;34:1,12;
41:2;42:11,25;43:1;
170:6;171:3,6,24
**laptop** 118:5
**large** 187:1
**largely** 10:13;126:18;
11:14
**last** 6:9;16:4;20:23;
42:17;64:17;135:15;
161:16;170:23;175:13,14;
16:7
**later** 138:22;139:24
**Laurie** 105:4
**law** 149:2
**lawnmowers** 89:9,15;
116:15
**lawsuit** 76:9;148:23,25;
149:9
**lawyer** 33:11;138:24
**lawyers** 141:10;157:22;
159:8
**layout** 80:2
**learn** 69:14;155:20
**learned** 153:14;154:10
**least** 58:8,17;59:23;60:9;
61:5;75:7;83:5;128:12;
128:20;176:11,14,18,21,
23;178:25;183:3
**leaving** 29:19;133:7
**lectures** 162:16
**Left** 129:20
**legal** 24:10;30:18;34:11;
140:15,17;147:21;148:7;
159:10;167:16
**legs** 47:2
**length** 175:19
**lengthy** 175:14
**less** 11:16;70:22;71:2;
82:21;83:15;97:20;117:3;
156:1,3,4;157:16,16;
180:1
**letter** 38:11;39:25;40:4
**letting** 27:6;72:19
**level** 87:6;89:5;90:22
**levels** 67:19
**levity** 159:8
**light** 60:2;110:9
**liked** 93:13
**likelihood** 83:24;84:4,10,
15,18;97:25;101:6;107:25
**likely** 82:21;83:16;92:10;
97:23;98:13;106:7;
131:22;162:5

**limited** 157:24
**line** 73:9;128:5,7,11,14,
18;134:24;135:14;136:4,
16;138:6,8,11,17;139:8,
19;140:10,12,14;145:2;
187:18
**lines** 103:8;134:2,2;
142:17,18;182:10
**lintel** 189:20
**Listen** 24:24
**listing** 162:25
**litigation** 99:6;120:11;
149:14;162:15
**litigations** 169:7
**litter** 31:16;43:7;47:14;
48:8,13;50:24;52:2;
64:13;65:13,16;67:3;
68:20;73:3;82:11,24;
83:8;91:14;92:6,12,13,
20;100:6;169:18;171:22;
177:17;180:25
**little** 4:23;11:14,15;14:11;
65:1,7;72:5;75:13;78:13,
18;91:21,21;93:21;95:19;
116:25;152:13;156:8;
159:8;161:18;182:21
**live** 139:18
**local** 139:6
**location** 75:3
**locations** 74:25
**long** 162:18
**look** 6:5;15:12;17:2,10,
14,18;18:6,11,13;19:4;
23:23;35:19;38:2,5,18;
43:7,7;49:20;69:25;
75:14;83:4;94:6;95:8;
100:19;108:22;109:12;
114:1;115:9;116:13;
119:22;122:1;124:18;
127:9,20,23;133:5;
137:13;20;141:1,4;
142:5,7;148:14;161:25;
167:9;170:18;181:4;
183:25;187:6,19,25;
189:6,19,22
**looked** 6:19;10:10;12:5;
14:15,16,21;17:16;20:22;
21:2,5;48:5;72:23;73:8,
9,12,22;117:25;170:3;
172:21,21,24;174:4,6
**looking** 6:18;11:18;
17:19,18;1,47:17;49:1;
50:20;76:12,17;78:10;
79:16,19,21;91:14;109:17;
115:13;119:8;124:16;
126:1;132:4;142:22;
158:19;161:1;167:24;
168:10;169:17;179:24;
182:8;47:20
**looks** 9:18;9:37:24;
39:12;93:6;120:12;
123:20;125:21;126:14;
127:7,18;131:18,23;

132:6;137:9;142:13;
143:24
**loose** 124:3
**lot** 34:21,24;93:21;97:3;
103:6;116:4;131:23;
132:6;137:20;140:7;
143:7
**lots** 160:12;162:21
**loud** 16:6;188:6
**low** 119:5
**lower** 28:23;37:6;122:13,
16
**lumbar** 189:23
**lump** 85:2;169:25
**lumped** 171:3
**lunch** 91:9,11

**M**

**machinations** 147:4
**mail** 173:10
**main** 20:2;34:16
**mainly** 180:19
**major** 43:14;46:3;51:4,
17,25;52:13,17;53:10,13,
19;54:4;20;55:2,3,14,19,
22,22;56:1,14,21,23,25;
57:9,17;58:1;63:14,21
**majority** 157:23
**makes** 17:22,25;61:9;
62:7;94:12,14;171:8
**making** 59:1;63:2;76:4;
90:3,9;91:15
**man** 28:22;30:22
**manner** 139:17
**Mantle** 100:1,10;103:11,
22;104:9;106:17;107:12,
14;108:3,17;111:16,25
**Mantle's** 104:5;105:20;
106:6,13;109:7;110:7;
111:5
**manufacturer** 66:12
**manufacturers** 69:7
**many** 29:5;31:12;32:10,
19;33:13;77:23;85:20;
87:3;103:2,5,6;116:3,
3,21;117:15,18,21;158:2,
5;159:7;184:24;186:4;
187:5,4
**mark** 7:7;36:21
**marked** 7:13;36:22;71:5;
99:12;158:12,22;162:8
**market** 9:1;101:20
**marketing** 104:10;108:5,
19;109:10;160:5,10
**marketplace** 94:18;
107:24
**matches** 176:25
**matching** 64:25
**material** 4:25;184:9,17,
20;185:2,7,11;187:6,9
**materials** 153:15;157:20,
24;158:2

**matter** 134:1;137:3;
151:8
**matters** 115:11;149:5;
150:4,18;151:5,6;
152:16;153:1,6;162:15
**may** 8:9;9:14;15:21;
21:18;24:5,5;39:5,5,16;
53:25;61:4;69:15;80:19;
83:13;84:24;86:24;103:4;
110:25,25;113:12;138:24;
145:18;162:16;166:23;
167:7,7;170:20;174:24;
175:3;177:20;179:7;
181:24;185:15
**maybe** 6:1;77:25;87:3;
92:13;116:25
**McHale** 187:8
**mean** 8:5;12:2;13:4,15;
14:16;18:25;22:12;23:24;
35:12;37:15;38:16;40:16;
62:1;63:4,6,10,14,17;
75:15;80:21;82:4;90:25;
92:2;106:1;107:2;
113:12,25;116:6;117:1;
122:19;125:19;127:23;
134:4;148:15;152:8,25;
154:22;164:24;175:5;
176:22,24;178:1,21;
188:14;189:4;190:8
**means** 4:3;176:10;
190:7;172:4
**meant** 14:12,13;172:16
**measured** 107:24
**measures** 89:11
**meet** 175:23;177:7,8
**mentally** 125:7
**mentioned** 14:10;64:16;
79:6;85:9;99:9
**mentions** 162:21
**merchandise** 103:8
**merchandising** 98:2,25;
104:11;160:4,10
**met** 4:23
**Metal** 94:11,14;103:20;
104:2;113:5,17
**Metals** 9:13
**middle** 103:10;133:10;
148:5
**Mid-West** 9:13;16:20;
65:23;67:2,9,13;69:16,
19;71:8;72:24;76:20;
81:19;82:10,24;94:11,14;
96:20;100:7;103:20;
104:2;111:23;113:5,17;
115:5;124:16;125:11,20;
133:1
**might** 12:17;45:6;46:4,
14,20;51:13;53:11;58:24,
25;60:25;64:8;67:13,18;
70:9,14,17,22;74:5,12;
75:8;76:5;77:20;80:16;
81:22,24;82:8;88:2,21,
22;89:6,19;90:23;91:5;

Mid-West vs.
Simpson Ventures, Inc.

Bret Smith
June 13, 2008

95:25;99:10;100:11; 105: 7;108: 5,10,20; 111: 9,11;112: 7,21; 113: 9;121:16;132:15,19; 141: 4;162: 3;167:22; 170:20;178:12;179: 6; 185:12,17;186: 1
**mind** 107:13;109:23
**minor** 41: 7;42:14,24; 43: 3,17,24;44:10;45: 1, 10,20;46: 1, 5,11,14,22; 51: 3;52:23,24;53: 4,10, 14,14,20,25;54: 1, 9;56: 9, 10,23;57: 1;58:13,21,23; 59:25;60:13;61: 6,14,23; 62: 1,15,16,19,19;63: 4, 12;44: 2;63: 5
**minute** 11:17;100:23; 119:22;187:14
**minutes** 73: 7;82:17; 99:14,22;135:15
**mischaracterizes** 87:17; 110: 2;146:18
**mischaracterizing** 173: 8
**misleading** 84: 3
**missed** 8:22
**missing** 124: 3;162:16
**misstated** 177:20
**mistake** 91: 5
**misunderstood** 77:25
**model** 16: 9;47:14;48:21; 50:24;54:19;57: 7,16; 82:24;85: 5,25;86: 4,11; 88:16;92: 7,21;100: 6,12; 143: 8, 9,12;145:11; 169:18;171:18
**modern** 122: 9;123: 8
**mold** 62: 6, 6
**moment** 21:20;52:22; 59: 3;114: 8;151:24; 165:20;166: 5
**money** 95:22;160:24; 161: 8
**more** 7:11;11: 6;13;32: 9; 58:25;64:24;65: 1;66: 2; 70:21;91:21,21;92: 3; 94:24,24;95: 3, 9, 9,12,22, 22;97:19,24;103:21; 104:12,21;105: 3,20; 106:24;107: 3, 7;111: 2; 112:15,25;116: 2, 5,16; 117: 1, 7;118: 3,15,18; 124: 1,18,18;125:22; 127: 8, 9,18,20;131: 3,23; 133: 2;137:20;145:19,21, 23;157:15,17;162:14; 171:23;175:22;176:10,13, 18;177: 1, 5;179:25; 180: 8;182:13,14;185:17; 186: 2, 9,13
**most** 9: 6;60:17,21;80:20; 87:12,18,23;92:20;93:23;

120:12;132: 4,14,17,19; 142: 8,13,16;143:19,24; 181:17;81: 6
**move** 13:20;31: 4, 7; 63:25;140:12
**moved** 8:20
**movie** 9:16,20;10: 8
**moving** 28:13;135:16
**much** 34:18;70:10;74:13; 77: 9,12;81:21;90:25; 130:11;155:19;156: 5,20, 24;157: 2,10,19,20;161: 7, 14;162: 1, 3, 6
**multiple** 40: 8,13;77:11, 23;80:18;81: 3;176: 5, 9, 12,13,22;177: 1;186:23; 39: 2, 4
**must** 34: 1
**myself** 60:16;151:14; 160:11;181: 5,14

## N

**namely** 171:13
**narrow** 54:15;65: 7
**nature** 107:16
**near** 69:10
**nearly** 85:11
**necessarily** 89:17;98:21; 103: 3;109: 2;133:14,19
**necessary** 182:18
**need** 9:10;82:17;107: 2, 6;110:12,23,23;111: 2; 116: 2, 2, 6,16,19,20,21; 117: 6;118: 3;120:16; 124: 1;161:24
**needed** 6:17;174:19
**needs** 92: 2
**neither** 56:25;66:17
**new** 148:14
**newly** 9:15
**next** 39: 2;41: 1;42:11; 47:11;64:22;95:11
**nobody** 86: 2
**none** 61:13;86:19;162:22; 181: 9;9:12;67:15
**nonetheless** 118:23
**nor** 56:25
**normal** 4:11;89:17
**normally** 81: 2;88:20; 89:23;127:14;134:11; 138: 7,12,16;163: 8
**notches** 76:25
**note** 15:14
**notice** 43:11,12,21;45: 2, 3, 5, 6;48: 5,17;51: 9,10, 12,15,21;53: 4,13,19,25; 57:20,21,24;58: 6;60:19; 65: 4, 6;75: 8,10;76:23,24; 77: 1, 3,14;78: 8;82: 8; 180:10
**noticeable** 18:14;42: 5; 43: 6;45: 8;51: 5,19,23,24;

52:20;53:23;54:10,14,25; 55:10,16,18,23,25;56: 4, 8,12;57: 2;60:21;92:16; 96:24;182:14
**noticed** 10:24;44: 6;53: 9; 59: 5;60: 7
**noticing** 76:19
**novel** 175:10
**novelty** 165:14,15,18,21; 174:24;175: 3,16,20,23; 176: 2, 7;177: 3, 7,13; 178:13,16;183:24;188: 1, 7
**November** 121:10
**number** 9: 8;15: 9;29:23, 24;31:19;62: 5, 6;67: 4; 77:13;89:12;94:19,20; 98: 3;124:19;133:23,25; 142:14,24;158:20;166:22; 184: 4, 6;185:13;187: 1
**numbers** 8: 4, 7,23;37: 6; 123:21;126: 7;133:20; 134: 1
**numerous** 182: 9

## O

**object** 26:24;40: 5;61: 9; 62:11;84: 1;105:10;125: 3; 131: 1, 2;136:21;138:22; 35: 4;87:16
**objection** 31:21;44:11; 88: 5, 9;124:22;125:14; 145: 2;12:14;15: 7;20:12; 22:24;23:12,19;24: 1, 9; 25:12,24,34: 9;40:10,18; 41:15;43: 4,19;44: 1;46: 6; 55: 5;56:15;68:10;70:24; 80: 9;83: 2;106:10;111:12; 112:10;132: 1,10,21; 133: 3,11;146:17;147: 8, 17;148: 6,12;152: 6,17; 167:15;172: 2;173: 6; 185:23
**objections** 26: 5;27:16, 23;28:10;30:18;31:14,24; 34:10;132:16;134:17,23, 24;139: 3;144: 6
**objects** 124:25
**observe** 64:20;82:10; 168:14
**observer** 44:15;64: 1, 2, 5, 7;65: 3, 9,18,25; 66:16,20;86: 5;88:13,17, 24;90:13,17;111:18,19,21; 115:14;117: 6;119:21; 163: 6, 7;164:10,20; 165: 2,13;166:10
**observers** 86:15;87:12; 88:14;89: 3
**observes** 164:20
**obtain** 105:20
**obvious** 41: 9;121:17

**obviously** 111: 6;142:19
**obviousness** 5:22;6: 7
**occur** 69: 4, 7;92:21; 93:24
**occurred** 113:20;116: 4; 141:11
**occurrence** 92:18
**off** 8: 4, 8;13: 1;28:13; 71:25;110:24;114: 6; 135:16;136: 1;141: 9; 147:24;181:19;75:24; 99:17;113:15;158:24
**office** 36: 6;38:10,11,12, 20;39:25;40: 4;183: 8,12, 16
**Off-the-record** 13: 3; 75:25;99:19;113:16; 141: 8;158:25;181:20
**older** 97: 5
**once** 6:14;184:20;5: 7
**one** 5:10,12;8: 3, 8;10:23; 12: 8;14: 6, 9;17: 7,12; 18:12,13,20: 3;22:22,25; 23: 5,18,24;24: 7, 8,20,25; 25: 5,10;26: 3,11,15,16, 22;27: 3,14;28:14;29: 7, 8, 9,15,21;31:23;32: 9; 33:20;34: 2, 6, 8,19;39:14; 40:15,17,22;43:10,13,13, 21,22;44: 2;47: 7,11;50: 7; 54:22;57:22;61: 8;62:10; 63:19;64: 8,10;66:17; 68:24;69: 5;78:15;84:23; 86:16;88:19;92:24;97: 1, 6, 7;108:24;113:10; 118: 6;122:10,12,23; 123: 2, 3,10;124: 1;125: 8, 15;128: 4;129: 9;130: 3, 4, 5,20;131: 3;133: 8, 9,18, 20;134:22;135: 8;137: 4; 138:17;139: 1;141:19; 143: 2;144: 1,13,18,20,22, 25;145:20,21,23;146: 1, 6, 9,14,22,24;148: 3;162:14; 166: 4;167:10;169:21; 174: 4;176:10,18;177: 1, 8,21;180: 7;183:20; 185:24;187:14,18;189:13; 5:17;23:13;28:18;73: 2; 118: 2;172: 5;176:13
**ones** 81: 6;187: 7
**one's** 117:21
**online** 67: 7;70:19;72:23; 73: 4, 7,10,22;74:12;75: 1; 78:13;83:11;154:24; 159:17
**only** 11: 9;19:19,19,20; 20: 7, 7,14;34: 2, 6, 8; 37:23;39: 6;60:16;66:21; 78: 6;87:18;107:24; 109:23;117:11;118:24; 148:20;153:12;101:18
**open** 184:11

**opening** 11:21;12: 9,11, 16;47:23;143: 2, 3, 9,10; 144:10,11;168: 2,12,23; 181:16
**opinion** 9:24,25;10: 1; 13: 9;27:14;57:12;60:25; 61:20;84: 7;96:18;101: 6; 102: 5;103:10,14;108:25; 109: 4;111: 5, 9;117:12; 119:11
**opinions** 7:23;10: 3; 100:14,18;103:23;104: 5, 6,13;105: 2,22;106: 6,16, 21,25;107: 5,11,17,20,23; 108: 5,10,11,17,20;109: 8, 20,25;110: 8,20;111: 6,16; 113:24;116: 1
**opposed** 184:21
**opposite** 5:20;128: 7
**oppressive** 30:11
**option** 135:25
**oranges** 78:12
**order** 116:17;156:10; 181:13
**ordered** 180:23
**orders** 65:22
**ordinary** 44:15,18;46: 8, 9,20;57:13;64: 1, 5, 7; 65: 2, 3, 5, 9,18,25;66: 3, 16,20;86: 5,15,20;87:12; 88:13,14,17,24;89: 3; 90:13,17;111:18,19,21; 115:14;117: 6;119:21; 163: 5, 7;164:10,19; 165: 2,12;166:10
**ornamental** 166:25; 167: 8;168: 4, 5, 8,19,20, 24;169: 2;177:17;179:14; 180: 1,13,15,17;182:24; 183: 3, 5
**Others** 71: 2
**otherwise** 105:14;140: 2; 154:13;162:17
**ought** 29:15
**out** 16: 6;27:13;28: 2, 5; 39: 1;47:19;59: 6;60: 8; 66:22;69: 9;71: 8;76: 2,16, 17;78: 6,24;79: 3,18; 81:25;83:15;85:19;87:22; 89:19;93:12;94: 1;104: 9; 112:25;117: 8;118:16,18, 25;123:13,13,14,15,19,23, 24;133:24;140:22;150: 2; 156:20;165:22;169:11,15; 170: 5;171: 3;173:19; 174:16;177: 2;179: 2; 188: 6
**outlet** 83: 6
**outlined** 95: 4
**outside** 29:13;69:23; 159:25;160:23;161: 3, 5
**over** 4:22;6: 2;20: 2; 30:18;66: 2, 4;96: 6;

---

Connor+Associates, Inc.                Min-U-Script®                (8) mind - over

Mid-West vs.
Simpson Ventures, Inc.

Bret Smith
June 13, 2008

175:10;177:21;183:13;
189: 6,14
**overall** 12: 9;41: 4,13,22;
42: 1, 2, 9;54:12;63: 7;
75: 5;143: 5;156:25;
180:17,18
**own** 5: 5;6:18;52:10;
103:24;104: 5;110: 9;
131:10;140: 7
**owned** 96:20
**owner** 15:21

**P**

**packaging** 48: 2
**page** 8: 3, 9,19,20;9: 9;
10:20;11:18;16: 1;37: 6, 7;
38: 6,18,20;40:25;47:17,
20;49:20,21;70: 3;71:16;
80:18;81: 3, 8, 9,10,11;
122: 2,12,17;170: 9,18,23;
174:10;178:22,24,25;
179: 6,19;183:25
**pages** 8: 8;37:17,21,23;
38: 9;71:15;158: 2,16,20,
20,22;159: 7, 9,19;162:18;
179:11;182: 9
**paid** 97:12;161:15
**PAIR** 14:21
**pan** 31:17;43: 8;47:14;
48: 8,13;50:24;52: 2;
64:13;65:13,16;67: 3;
68:21;82:11,24;83: 8;
91:14;92:12,13,20;100: 6;
169:18;177:17;180:25
**panel** 20: 3;49:22,24;
50:15;181:18;182: 4;
188: 8
**panels** 15:17;21: 8;74:25;
77: 6;171:16
**paper** 72:16
**paragraph** 16: 7;39: 2,
10;41: 1;42:16;188: 2
**paragraphs** 170:23
**part** 5:22;8: 8;17:23;19: 9;
20: 3;36:12;38: 6;47:25;
48: 1, 3, 7, 9,11,15,24;
60:21;62: 8;64:17;69: 1;
70: 5;96:15;97:10;100:21;
103:14;19;108: 9,12,13;
111: 2;115:13;117:16;
158:13;160:25;164: 4, 6,
8,22;165: 5,12,14;171:12;
182: 3;187: 7, 9
**particular** 25:15;48: 6;
64:21;74: 8;80:24;89:24;
98:13;99: 2;103: 8,17;
116:25;151:11
**partly** 168: 5, 5, 8, 8;
183: 3
**parts** 115: 5;165:12
**pass** 99:12;158:11;162: 8
**passed** 7:12

**passing** 36:21;71: 4
**patches** 50:11
**patent** 5:24;7:17,20,23;
8: 6;10: 4, 6;13:19,22,25;
15:21,22;16:11,16,19,22;
17:12,24;18: 4,15,23;
19:14,16,22;20:11,19,25;
21: 9,10,13,21;22:11,21,
22;23: 5,11,17,20;24:19,
21,25;25: 9,18,23;26: 4,
16;27:13,15,21;28: 1, 3, 4,
6, 8;29: 6;31:13,20;32: 5,
8,20,25;33: 2, 3, 4, 5,14,
21;34: 2, 3, 6, 6, 8,11,14,
17;37: 2;39:22;40:23;
41:25;43:16,44: 6;45: 1;
46:18;48:13,21;49:16,18;
50:20,21;51: 1,18;52: 1,
18;54: 6,20;57: 8,18;
58:11,21;59:11;60:13;
63:20,20,24;66:18,19;
82:23;83:17;85: 4, 5,24;
86: 3, 4,10;88:15;90:11,
12;98:14;100:12;101: 3,
21;105: 9;112: 7, 8,23;
117:13,14;119:23;120: 3,
7;121:20;122:25;124: 9,
12,18;125: 7;126:15,
19;127: 8,19;128: 6,21;
129: 6,23;130:12,19;
131:19,24;132: 7,25;
133:21;134:14;137: 3, 7,
9,14,20;141:15,24,25;
142: 3, 9,13;143:13,15,16,
18,20,23,25,25;144: 1, 4,
5;145:12,13;147: 7,13,15,
25;148: 2,11;149: 1, 5, 6,
10,12,16,18,24;150: 1, 4,
17,17;151: 4, 6,14,24;
152:16;153: 1, 7,13;
154: 2,11;155: 5, 6;156: 6,
16,17,22,23;157:12,13;
158:18,18;163:12,15,24;
164: 3,16,22,23;165: 7,25;
166: 6, 7,13,15,18,25;
167: 8,10,14,24;168:10;
169:20;171: 1, 8,21;
174:24;175: 3,10;176: 4,
24,25;177: 4,15,16,23,25;
178: 2, 8,19,23;179:21,23,
24;181:10,11,17;182:22;
183: 3, 6, 7, 8, 9,10,12,14,
16;186:25;190:10,16,17;
38:12
**patentable** 163:25;
183:13
**patentably** 39: 7,14;
40:14,17,21;41: 8
**patented** 16:15;105: 8;
106: 8;128:11;164:12;
169:19
**patents** 34:14;94:19;

96:20;97:17;150: 8,13,22;
151: 1,11;152: 2,24;
153: 6,11,20;154:15,19;
155:21;162:24;163:17;
181: 7
**pattern** 14: 8,23;16:10,14,
20;17: 5, 8,10,20,22;18: 5,
10,17,18,19,20,21,24;
19: 2,15;20: 2, 9;21: 7,14;
22:11,15,16;42: 5;45: 3;
46:16,16;50: 1,23;51:11;
53:23;54: 3,19;57: 7,15;
58:10,12,19;59: 9;60:11;
62:25;75: 6, 9;112:23;
151: 8;171: 9,19,20;
182:17;184:11
**pattern-conscious**
60:18;61: 2, 4
**patterns** 18: 1;142:24;
171: 1;182:10,19
**pause** 99:20;100:13
**pay** 51:13;62: 2;64:24;
95: 8, 9;96:25;97: 9;104: 4
**paying** 92: 1
**pending** 67:25;72:18;
129: 3;182: 2;185:22
**people** 43:11;47:21;
78:13;84:10,13,16;85:12,
20,23;87: 3, 4;88: 1;89: 6,
14,19;90:20,21;91: 4,25;
92: 5,11,22;93: 4,11,25;
95: 8,14,16,23,25;96:18,
25;97: 5;115:18;116:14,
22,24;117: 3, 5;118:10,22;
132: 4,15,17,19;184:24;
185:10,11;43:12
**per** 71: 3
**perceive** 46:12;97:11
**perceived** 62: 4
**percent** 85:11,11,23;
86:12;88:14;89: 3
**percentage** 81:10;87:14
**perception** 97: 4
**perform** 148: 9
**performance** 161: 1
**performing** 163:11
**perhaps** 54: 8;92:12;
161:14,18;170:18
**person** 12: 7,20;44:17;
53: 2;57:13,14;65:24;
66: 7;78:24;79: 4, 7;81:13;
82:13;88:22;89:16,21,22;
90: 2, 7,21;94:22,25;95: 5;
98: 1,12;151:14
**personal** 44:21;52:10
**personally** 44:23,24;
46: 1;52: 7;56:13
**persons** 60: 3
**perspective** 31:16
**pet** 36:10;64:19;65: 5,24;
66:10,11,13;67: 6, 6;73: 2,
2;76:22;80:11;82:12,25;
83: 9,10,18;92: 6;93:10,

10,12,13,24;94: 1,23;
96:11,14;97:22;112: 6;
177:17;188: 8;100: 3, 9;
102: 7
**Petco** 102:24;104:24;
105: 5
**Phoenix** 100: 3
**phone** 181:25
**photo** 11: 8
**photograph** 12:24;16: 4
**photographed** 82: 3
**phrase** 33:10;188:13;
190: 5, 8,11
**physically** 145:10
**pick** 66: 3, 4;76:16;123: 1,
3
**picking** 79: 3,18;81:24;
89:14
**picture** 50:10;80: 7;
116:13;188:15;190: 3
**pictures** 134: 2
**pieces** 116: 8
**place** 134:16
**placed** 47: 5
**plain** 14:13,24;15: 3,17;
18: 7;22:12;43: 9,22;51: 8;
57:22
**plaintiff** 139:23
**plastic** 92:13
**plate** 123: 8
**Platner** 39:17
**P-L-A-T-N-E-R** 39:18
**play** 163: 4;181: 6
**please** 28:22;39:10;47: 9;
67:23;73:17;127:16;
129: 1;145: 3;181:23;
187:15;32: 4, 4
**plural** 33:15,22;34: 7
**pm** 190:23
**point** 6: 5;28:13;30: 7;
64:23;80:20;92: 1;95:10,
11;105:24;112: 3;113: 3;
151: 2;152:11;159: 2;
165:21;170: 5,12;174:23;
175: 3,15,20,23;176: 6,24,
25;181:15;188: 1, 7
**pointed** 59: 6;60: 8
**pointless** 135:13;136: 3,
17
**points** 10:25;165:14,15,
18;176: 2;177: 1, 3, 7,13;
178:13,16;183:19,24
**politely** 8:24
**poll** 97:14
**polls** 96:17
**pool** 59: 4,14
**portion** 5:13;75: 7;170: 6;
178:17;179: 3,19
**portions** 170:22
**position** 186:19
**possibility** 90:24;91: 1;
131: 4, 6, 8
**possible** 15: 1;46: 7;

60: 1;86:24;91: 3, 7;93: 3,
8,15;96: 2;104:21;106:18;
107:17;132: 3,13,18;
162: 2, 3;169:13,16;
180:10;181: 7;185:25;
186: 5
**potential** 20: 8;59: 4,15;
178:12,13,16
**potentially** 21:21;104:19
**practice** 69:13
**practitioner** 61:24
**predictable** 8:11
**preface** 156: 8
**preferences** 102: 8;
104:16
**preparation** 152: 3
**prepare** 4:21
**prepared** 95:21;154:11
**present** 23:13;26:10;
27:11,18;31:18,22,25;
32:13,21,22;33:18;34: 3,
4;41: 4;107:13;188:19
**presentations** 162:17
**presenting** 135: 5
**presumes** 133:17
**presuming** 33:20,25;
34: 5;109: 8
**pretty** 24:13;27: 2;60:18;
61: 2;87:19
**prevented** 78: 3
**previous** 66:24;73:19;
150:10;175:14
**previously** 10: 9;158:11;
171:11
**price** 64:23;92: 1,17;
95:10,11
**primarily** 156:18;159:15,
16
**primary** 5:25;6: 3;120: 8;
121:13,15
**principle** 78: 7
**principles** 155:20;156: 6,
13,16;157:13,14;158:17
**print** 71:22;72: 3, 8
**printable** 71:24;72: 1
**printed** 15: 5;71: 8
**printer's** 72: 2
**printing** 15: 6
**printouts** 71:12;72:16;
75: 2,13;71:14
**prints** 71:24
**prior** 6:11;9:15;10:10;
35: 7;19;41: 9;120: 5;
124:19;125: 9,23;126:16,
17;127: 9,21;128: 4,12,22;
129: 5;130:11,22;131:19;
133: 1,21;134:14;137: 4,
10,15,21;141:16,22;143:
3, 11,12;143: 4,12,15,23;
144: 4;147:24;148: 3,11;
175:10,22;176: 5;177: 6;
183:21,23;187: 1, 3
**priorities** 103: 1, 2

probability 101:20
probably 11:16;64:21;
65: 1;80: 3;95:24;104: 8;
121:11;123: 7, 7;128:13;
157:16
problem 118: 8,10,14,15
proceeded 15:16
process 36: 5;100:21;
172:11
proclaim 151:14
product 6: 5;12:12,13;
16:21;17: 5;18:23;19:14,
23;20:10,18,22,24;21: 5,
8;22:10;48: 1, 6,12;49:15;
52:19;54: 4;57:16;58:19;
59: 9;62: 4;64: 9,12;65:22;
68: 8,12,20,23;69: 9,19,
23;70: 5, 6,13,15,18;
72:24,25;76: 7,21,21;
78: 9;79: 3,15,19,20,25;
80: 6, 8,24;81:13,16,19,
22,25;82:13;83: 6;87: 7;
88:21;91:13,15;92: 8,14,
23;93: 5;94:23;95:18;
98:14,20,21,24;101: 3,19;
102:15,21;105: 8, 8;
115: 5;119:16;124:17;
125:12,21;126:13;127: 7,
17;128: 8,19;129:16,21;
131:20,22;132: 6;133: 1;
134:13;136:20;137: 8,13,
19,19;141:14;142: 2;
147: 6,15,23;148: 4,10;
151:18;163:15;164:12;
165: 8,19;166: 8,20,22,23;
167: 3, 6;169:19,21;
172:18;188:20;87:10;
89:13
products 9:19,22,22;
18:16;21:13,21;22:14;
49: 2;64:22;65: 5;67: 3, 9,
14,20;69:16;71: 9;73: 1,
10;80:15,17;82: 2,11;
83: 7;86:21;96:20;97: 1,
17;98: 2, 4;101:25;102: 9,
13;104:11;150:20;180:24;
181: 4;94:11;103:21;
104: 2;113: 5,17
professional 66: 6,10;
121:23
professor 160:15,22;
161: 6
proffered 61:17;109: 3;
112:20;113:23;115: 9;
116:11;119: 2
project 118: 5
projects 160: 6
promote 68:22
pronounced 180: 6;
182: 4, 7
proper 116:17;125: 4;
166:13;167:13
properly 11: 6;116: 7

proposed 101:22;188: 2
prosecution 35:10,15,20,
23;36: 1;37: 1,13
protest 139:22
provide 71: 2
provided 114: 9,14;
187: 5, 8
proximity 127:25;128: 3
Public 14:21
pull 120:17;123:13,18,23;
47:19
pulled 71: 7;122:15;
123:10,19
pulling 122:11
pumpkin 91: 8
purchase 58: 7;64: 9;
80:23;87: 7;88:20;89:23;
90: 3, 9;91:16;94:25;95: 5;
96: 1;103: 4
purchased 73: 1;92: 6;
95:23
purchaser 64:14,19;
65: 5,19;66: 1, 4,22
purchases 93: 3, 4
purchasing 51:11;64:10;
76: 5;80:24;91: 5,13;
100: 5;117: 4
purely 163: 4,13,16,19,
22;164: 2,16;165: 6,15,23;
166: 5,14,18;167:10,13;
168: 3, 3
purport 114:21
purports 37:12
purpose 80:22;102:18
purposes 48:20
pursuant 124:25
put 73:13;85:19;118:12;
123:22;125: 7, 9;143:25;
144: 1;145:24;171:22
putting 69:10;98: 5;
119:17

Q

qualified 97:20,20;98:11,
16
quality 7:11;92: 4
quarter 77:16;179:16
quibbling 21:25
quick 13: 2
quite 6: 3,17

R

raised 176: 3
randomly 71: 7
range 53:15
rate 138: 6, 7,11,17
rather 65: 5;126:10
rationale 106:25
Re 39: 7,11,17
reached 91: 8
react 102:22

read 4:12,22,24;5: 2, 5,
15;6: 2,14,16;7:11;8:21;
16: 5;27:12;28: 1;32: 2;
33: 1;34:13,15,15,16;
35:16;39: 1, 9;41:10;
67:24;68: 2;73:17,18;
99:14,15,23;106:13;
112:19;114:20;128:25;
129: 2;154:22,24;155:12,
23;158: 3, 8;159:17;
181:22;182: 1;185:19,21;
186:15;188: 3, 6;39:10
reader 170: 7
reading 28: 5;32: 5;
34:18,24;105:17;123:21;
157:19,23;34:22
real 5:15;13: 2;119:17,18
realizing 84:22
really 4: 3, 4, 6;10:17;
11: 8;12: 7,23;37:19;
104:22;137:18;179:15;
184: 7
reason 25:15;28:21;92: 2;
95: 8;97: 9;106:24;107: 4;
115:15,20;132:14;137: 7;
147: 3,11;169: 7,13,16
reasons 107: 8;118: 3
reassessing 103:24;
104: 5
recall 6:14;7: 5;8: 3;
34:20;36: 8,24;38:14,17;
47: 5,13;73:15;74: 3;
96:22;105:17;113: 4,21;
114: 5;117:23;118: 2;
120: 3;148:22;166: 1;
175:17,24,25;185:15
received 38:11;73: 6
recess 47: 3;82:20;91:11;
114: 7;139: 9;159: 4
recognize 7:15;37: 1;
38:10;162: 9;187:21
recognized 173:23
record 9: 3;13: 1;28:20;
75:24;99:18;113:15;
114: 6;124:23;126: 6;
141: 9;158:24;181:19
recourse 136:13
rectangles 50: 1
rectangular 180: 2,12,16,
18;188: 9, 9,10
reeds 12:21
re-evaluate 105:22
refamiliarize 13:22
refer 13:17;50:17;70: 3;
120:15
reference 6: 1, 3, 4;9:16;
37: 7;120: 5, 8, 9,11;
121:15,19;124:19;125: 9,
24;126:16,17;127: 9,21;
128: 4,12,22;129: 6;
130:22;131:19;133: 1,21;
134:15;137: 4,10,15,18,
21;141:16;142: 4, 8;

143: 4,19,19,24;148: 3;
177: 9,12;184: 3
references 8: 6;120:10;
121:13,17;131:18;136:20;
175:22;176: 6;177: 6;
187: 2, 3
referred 14:18;47:22;
154:23;155:23;185: 5
referring 10:20;40:25;
47: 4;75: 9;126: 8;182:16
reflect 114: 3
reflects 190:10
refuse 133:16;136:18,19;
138:11
refused 136:22
refuses 136: 8, 9
regard 10: 3;147:13;
175:16,20
regarding 7:17,19,23;
66:18;67:19;68: 7;86:10;
101: 6;106:17;113:19;
117:12;119:12;141:13,24;
156:22;159: 6;175:15;
177: 4;182:22;186: 7;
117:14
regular 92:18;189:19
reinforce 9:25;10: 5
relate 114:22,24;158:17;
162:23
related 131: 9
relates 5:23
relating 114:10,15;
121:12;151: 6, 8
relation 12:11
relationship 131:13
relative 12: 9;74: 8;
129: 9;154:10
relatively 75: 5
relevant 117:16
relies 176: 5
rely 9:15
remarkably 119: 4, 4
remember 9: 4;11:10
remind 8:24
render 159:23
rendered 155: 6
rendering 113:24
renders 152:15
repeat 30: 4;34:22;
103:25;106:12;40: 2
repeated 67:23
repeatedly 27: 9;30:21;
110: 6;147: 9
rephrase 68: 1
replacement 115: 4
report 7:17,22,25;9:11;
11:19;13: 9,12,14;14: 8,
10,19;15:15;16: 1;19: 6;
37: 3,14;38: 1;91:20;
120:19;121: 6, 9;122: 2,
18;142: 7;155: 7;168:17,
22;169:17;170: 5, 6;
173:18;174:22;175:17;

176: 4;177:21,22;178:14,
17;179: 4,17,19;182: 8,22;
183:18;184: 1;186:25;
187: 7,22
report- 120:22
reported 89:13
reporter 9: 2, 6;67:24;
73:18;129: 2;182: 1;
185:21;28:18;40: 2
reporting 101:17;114:25;
115: 3
reports 4:22;7:19;10: 6;
66:17;106: 3;120:16;
121: 2,12;148:16;152: 3;
154: 5,11;156:11;162:14;
186:23,24,24
represent 23:11;37: 5;
71: 6;100: 1
representation 72:12
representative 74:11
represents 22:13
reproduce 71:17
request 104: 1
require 40:21,22;110:10
required 13:11;160:22;
161:10
requirement 161: 2
requirements 148:14
requires 190:12
reread 35:16,17;147:20
research 97: 3;160:23
resemblance 10:14;
142:25
respect 9:24;93: 9;
104:25;176: 1
respects 20:19
respond 9: 5;27: 8
responding 27: 8
response 113:13;139:21
responses 117:25
responsibilities 103:13
responsible 98: 3;100: 5,
5;102:17
rest 39:10;50:15
restricting 140:14
restroom 47: 1
resubmitting 36: 5
result 92:21;93:25
retail 60: 4;65: 9,18,19;
66:14,15;67: 2, 8,13,18;
69: 8,12;82:21;91:12;
99: 2;101: 1;105: 6;106:18
retailer 70:19;103: 9
retailers 67: 7;83:11
retailing 69: 6
return 63:20
review 38:14;72:20
revisit 140:24
right 31: 9;34: 8;37: 7;
39:11;53: 5,20;66: 7;
79:20;81: 3, 9;82:14;83: 4,
7;84:13;89: 7;90:16;
106:19;107:18;108: 6,10;

109: 9,24;110: 1,17,18,20;
112: 2;122:13,16;123:23;
124: 2, 2, 8;125:14;
130:10;131:15;133:25;
143:22;146:12,24;151:17;
154: 6;160: 2;161:24,25;
162:19;167: 6;176:21;
182: 6;185: 6;189:14;
13:13;19:11;59:16;90: 7;
101:23;143:14;157: 1, 4;
168: 1;176:14
**right-hand** 16: 8;72: 6
**Robert** 187:22
**rod** 168:11
**role** 35:22,25;163: 3;
181: 6
**room** 60: 5;86: 9;137: 5;
189: 7
**root** 126: 2, 9
**Rubinfield** 39: 7,12
**ruled** 139:14,19

## S

**safety** 89:10;169: 9;89:13
**SAITH** 190:25
**sale** 68:23;69:16
**sales** 79:24;83:11;92:19,
20;93:24
**same** 6: 4;7: 9;9: 1;11:13;
14:17;17: 2,11,17,18;
20:16;31:22;37:22;39: 6,
16;40:24;41: 5,13,21,25;
42: 2, 8,16;45:11;51:10;
63:23;68: 9;70:21;71:17;
79:24;90:19;93: 9;135:20;
147: 3;153:21;184: 9;
185: 7,11;186: 3;26: 5;
27:16,23;28:10;31:14,21,
24;34:10;132:16;134:17,
23;139: 3;144: 6
**saw** 37:23,25;93:13
**saying** 9: 2;20:21;21:23;
54:23;76:13;82: 4;88:21,
23;89:18,24;90: 6,13;
101:10;102: 2;112:17;
115:19;125:15;127:11,22;
129:19;130: 1, 2, 3;
133:17,18;138:14,19;
145:15
**scale** 11: 8;12: 3,16,25;
54:22;76:22;78:10;134:16
**scenarios** 67:21
**schedule** 140:25
**school** 12: 3;161: 7
**scope** 36: 3,13,15;155: 9
**screen** 72: 4,10;75:14;
78:11;79: 5, 8,11,17,22
**se** 71: 3
**search** 78:17;187: 2
**second** 17: 6,11;18: 7;
28:19;47:17,20;90:23;
122: 1,12,17;165:13;

166:19;169:24;171:10;
172:20;177:19;187:21,25;
188: 7
**section** 8:10;178:17
**secure** 119:11
**seeing** 36:24;38:14,17;
76:21;78: 3;79: 4, 4;82: 7,
13
**seeking** 93:25
**seem** 6: 2;114:25;115: 3;
170:23
**seems** 72:21
**see-through** 188:11
**segments** 99: 2
**select** 65:25
**selection** 59: 2
**sell** 65:23;186: 7
**selling** 97:21;102: 9
**semantics** 80:19
**sense** 63: 5,18
**sent** 5: 4;153:16
**sentence** 16: 6;33:22;
42:17
**separate** 40:21,23;63:19;
108:15;178:15
**separately** 169:22;
170:15;171: 5;172:12,13,
17,19;173: 2,21,22;174: 1,
3, 7,14,18,18,19
**sequence** 172: 4
**seriatim** 171:25
**S-E-R-I-A-T-U-M** 172: 4
**series** 166:12;186:24
**set** 68:22;70:13;81:22;
93:12
**several** 38: 9
**shape** 10:17;180:12,14,
16,18
**shapes** 97:11
**share** 161:10
**shared** 113:18;114: 2
**shelf** 69:10
**shifts** 180:20
**shop** 78:13
**shopping** 92: 8;93: 5
**shops** 83: 9
**short** 46:25;190: 7
**shout** 31: 1, 6, 7
**shouting** 30:22,23,24;
31: 2, 3
**show** 10: 8;23:17;36: 9;
75:15,16;82: 3;190:17;
145: 1
**shown** 16:18;19:15;
20:18;22:21;23: 8,10,22;
25: 3,23;26: 4,16;27:15;
31:12,20;32:20;36:18;
41: 8,24;43:16;44: 6,25;
46:17;50:23,25;51:18;
52: 1, 1,18,18;54: 5,19;
57: 8,16,18;58:11,20;
59: 9,10;60:12;72:14;
74:10;85: 5;90:11;94: 7,

12,17;95: 1;96: 6, 8;
120: 6,12;121:19;122:25;
124:13;125:22,23;127: 7,
19,20;129:23,24;131:24,
24;132: 7;137: 9,14,15,21;
143: 2,20;164: 3;165: 7;
166: 6;169:20;171: 1;
177:18;183: 2;188:20
**shows** 13:25;47:13;49:21;
164:16;171:23;177:12
**side** 14:25;16: 8;20: 9;
49:22,24;72: 6;77: 9;
9;123:22;126:24;148: 3,
4;171:14;189:13,14
**sides** 14: 6;139:13;
188:16,17;189:25;190:14,
18
**sign** 4:12;110:24
**significant** 52:12;53:10;
54:14;62: 7;180: 1, 1, 4, 8
**similar** 11:12;73:12,24;
94:16;96: 7;104:25;105: 5;
116:23;133: 2;141:25;
142: 9
**similarities** 143: 8
**similarity** 22: 8;142:20;
143:10
**similarly** 112: 5;185:18
**simple** 28:15,25;29: 4;
79:14;95:15;137: 3;
174:16,16
**simply** 62:13;107: 6
**Simpson** 72:24;73: 1;
82:18,23;87: 9;96:21;
97:17;113: 6,20;114:11;
115: 6;139:23;175:21;
176: 2;177: 4;180:24
**Simpson's** 180:23
**single** 21:17;23: 1,11;
27:20;28: 3, 8;32: 8;39: 4,
15;40: 9;54:13;123: 2;
177: 9,12;186:25
**singular** 27:19
**sit** 88:12;105:19;106: 5;
175: 2
**site** 14:21;71:18;74: 2;
77:22;78:15
**sited** 35: 8,20;41: 9
**sites** 74: 4;77:23
**situation** 61:21;139:12;
164:15,15
**size** 12:10;73:24;75: 4, 6;
76: 3;79:20;80:12;82: 8;
185:17;186: 1, 3
**sized** 12:11;185:18
**sizes** 76:14
**skill** 44:18;57:13
**slash** 188: 7
**slightly** 10:15;123: 4;
128:20
**sloppy** 91: 4
**small** 11:22,24;67: 6;
75: 6;76:18;77:16;78: 2,

11;79: 5,16,18;80: 7, 7,17;
82:14;83: 9;87:14;180:21
**smaller** 10:16;12: 9;
77:22;81:12,15,16,21
**Smart** 100: 3, 9;102: 7
**Smith** 4:20;7:12;8:24;
28: 1;30: 1, 1;35:12;37: 5;
44:23;47: 4;67: 1;71: 4;
91:12;99:22;135:10;
141:11;163: 3;179:18;
189: 3;4:14
**Society** 186:16,20
**sofa** 51:11;58: 5
**sold** 69:19;70:18;96: 8;
116: 3,21;117:15,19,22;
118:25
**somebody** 49: 9;88:22
**somehow** 140:15
**someone** 59: 6;64: 7;
86:24;97:20;103:11;
110:25;118: 7;165: 1
**someone's** 60: 8
**sometimes** 36: 6;68:21;
69: 4, 7;92: 5,10;185:16
**somewhat** 73:12;182:19
**somewhere** 86:24;
125:19;128:13;134:16;
157:18;159:19;161:17,18,
22
**sorry** 8:14;10:22;40: 2;
42:15;47:12;48:25;65:12;
75:20;90: 6, 6;94: 5;
114:19;121:14;129:19;
162: 7;148: 6;174:21
**sort** 10:18;35:21;45:23;
62: 4;100:16;101: 4;
110:24;113:22;115: 8;
117: 9;126: 9;172: 8
**sorts** 185: 9
**sounds** 161:24,25
**source** 72:23
**sources** 67: 5, 5,10,12;
75: 1
**speak** 4:16;9: 1;57:10;
58:14;60:16
**speaking** 152:21,19
**speaks** 40: 6,11
**specific** 18:19,20;19: 4;
33:10;35:25;66:23;94:10;
97:14;118: 4;153: 9;
186:10
**specifically** 38:16;76: 8,
10;77:13;92:23;93:25;
100: 4;109:12;118: 2;
180:24;94: 9
**specifics** 7: 6;109:18;
152:22,23
**spectrum** 125: 8,10,11,
16,17
**spend** 50: 5;35:18;95:22
**spent** 34:18,24;35: 2;
155:19;156: 5,21,24;
157: 2,11,19,20,23

11;79: 5,16,18;80: 7, 7,17;
82:14;83: 9;87:14;180:17
**spoke** 139:10
**spooler** 72: 8
**spy** 12: 4
**square** 16:10;50: 6,18,23;
54: 3,18;57: 6,15,23;58: 9,
18;59: 8;60:11;74:21;
75: 6, 8;77:14,15,20;
171:19
**squarer** 10:15;11:14,15
**squares** 49:25;50:12,17;
75:16;77:15,17
**STALEY** 13: 1,22:24;
28:19;29: 1,11,17;30:14,
25;31: 4, 9,14,21;34: 9;
35: 4;37: 9,17
**stand** 119:21
**standard** 124:25;140:17,
17,22,23;147:22;170:19
**standards** 71: 3;153:14
**standing** 4: 5,10
**standpoint** 97: 4;180: 9
**staple** 124: 3
**start** 44:20;96: 6;122:10;
123: 9;127:22;151:13;
177:20
**started** 11: 1
**starting** 6: 5;159: 5
**starts** 42:21
**stated** 106:22;109:20;
111:17;122:20;174:10
**statement** 16:12;19:25;
21:15;33:16;42: 7;43:18;
51:16;54: 2,17;55:13;
56: 7;58: 1;68:14;83:21;
107: 9;146: 9;153: 2, 4, 5,
18;154: 6, 7;163:10
**States** 38:12
**stating** 25:21;32:18;
33:23;154: 1,17;158: 6;
163:18
**still** 11:18;40:25;61: 4;
66: 3,15;150:23;166:24
**stipulations** 4: 2, 7,10
**stop** 20:17;121:14;177:19
**store** 66:11;67: 6;68:25;
69: 8;70: 9,14,23;76:22;
79:16;80: 1;81:13,17,22;
82: 1,25;83:10,19;92:11,
22;96:12;102:18;103:17;
185:17
**stores** 65:24;66:11,13;
67: 6;68:19;96:15;98: 5;
102:10,14,25
**strands** 77:13
**stretch** 47: 1
**strike** 96: 6
**strong** 127:25;128: 3
**structure** 98:25;102:23,
25;103:16;126: 4;183: 2;
185: 3
**struggle** 118: 7
**struggling** 171: 2
**student** 118:13

Mid-West vs.
Simpson Ventures, Inc.

**studied** 159:10,14,18
**studies** 96:17
**study** 97:14;120:15;
158:17
**studying** 155:20;156: 5
**stuff** 119:18
**subject** 166:24;167: 8
**subjected** 76: 4
**submitted** 162:13
**submitting** 36: 5
**substantial** 104:10
**substantially** 13: 8;17: 2,
11,16,18;18: 6;81:12;
188:11,14;189: 3,17;
190: 6, 6,11,12,18
**sufficient** 80:22;159:22
**suggest** 31: 4
**suggested** 179: 6
**suit** 69:16
**supplemental** 14:19,20;
122: 2,18;187:22
**suppliers** 98: 4
**supply** 80:11
**support** 96:18
**supposing** 64:11
**sure** 5:16;11: 1;33:18,24;
90:19;93:16;165: 3;169: 5;
172:10;182:15;111:20
**Surely** 134:15
**surface** 14:13,15;61: 8;
62: 3;184:21,22
**surprise** 69:14
**surprised** 92:17
**surrounded** 188:15;
189:21;190: 4, 9
**surrounding** 152:24
**survey** 68:25;80:10;
96:14;97:14;100:25
**surveyed** 86:10;101:10;
102: 2
**surveys** 96:16
**suspect** 102: 4
**sworn** 4:15

**T**

**table** 133: 7
**tag** 47:22,25;48: 7,11,22;
49: 7,14
**talk** 19: 5;29:14;46: 8;
64: 1;85: 1;171: 7;175: 5
**talked** 7: 4;96:24;102: 3
**talking** 11:25;35: 6, 7, 9;
46:15,17;50: 6, 9;51: 6, 6;
60:14,15;65:13;76: 9;
80:19;83: 7;86: 6,15;
89:21;90:19;96:11,22;
142:10,17,18;155:14;
157:21;189:18
**talks** 8:10;170:10,11
**tandem** 172: 1
**taste** 186: 7
**taxes** 161:16

**Taylor** 105: 4;112: 5
**Taylor's** 105:13,21;
112:11
**telling** 25:17
**ten** 54:22;98: 9
**tend** 56:10;92: 3;95: 2, 9;
169:12
**tends** 62:16;126:22
**tenured** 160:22;161: 6;
160:18
**term** 11: 2;190: 2
**termed** 11: 6
**terminology** 56:20
**terms** 8: 6;107:15;109:17;
143: 2
**test** 5:23;86: 5;88:13,17;
90:17;147:21;148: 1, 2, 7,
7, 8;163: 3, 5, 6;164:24;
165: 8,13,14,21,25,25;
166: 2, 8, 9
**testified** 4:17;44: 4;
100: 2;110: 6;111:25;
112: 5;180:22
**testify** 60:23;68:24
**testimony** 5:13;6:23;7: 2,
6;27: 7,20,24;61:13;84: 7,
12;87:11,17,20;89: 2;
91:22;99: 6,10;103:10;
104:25;105: 5,13,17,21,
21;110: 3, 7;112:12;
113:19;114: 8,10;129:17;
146: 5,19;151:5;159:18;
169: 6;173: 8;175:24;
177: 2;190:15
**texture** 62: 6, 6;77: 8
**therefore** 163:24;183:21
**thick** 12:21,22
**thickness** 12:12
**thinking** 5:21;124:21
**third** 38:18;49:20,21;
131: 1, 4
**Thonet** 184: 4, 6;185:13
**thorough** 111: 3;150:25
**though** 131:12;167: 3
**thought** 5:14;6: 1;132:17
**thousand** 30: 3
**three** 10: 5;124: 9,14;
131:18;132: 5;177: 5
**three-** 77:16
**three-quarter** 77: 7
**threshold** 168:11,23;
169: 8
**thus** 39:16
**tied** 90:15;106:25
**tier** 64:22
**times** 116: 4
**today** 63: 8,12,15;88:12;
105:19;106: 5;150:20;
151: 4;153:19;161:15,22;
175: 2
**today's** 4:21
**together** 169:25;170:14;
171: 4;172: 8;173:11

**told** 56:18;61:19;105: 4;
113: 6;117:21;133: 5;
135: 1;138: 2;169: 6
**top** 14: 7,24;20: 9;38:23;
189:14,24,25
**topic** 29:20;63:25
**total** 116:21;161:20;
159:21
**totality** 62: 5
**toward** 126: 2
**Trademark** 38:12
**trained** 62: 2;101:24
**transcript** 4:13;5: 6, 8;
6:12,19;99:23;114:10
**transcripts** 5: 2;6:20
**translation** 15:10
**treat** 165:23
**treated** 15: 2;171: 4,25
**treatment** 142:20
**tree** 126: 1, 4,10,12;
127: 1
**trial** 131:17;140: 1
**trick** 84: 9
**trim** 89:15;116:14
**trivial** 62:18,20
**trivialize** 56:11;62:17
**true** 40: 7;53:12,18;58: 8,
17;59:23;60: 9;61: 4;
79:14,23,24;80: 4,16;
93: 9;97:13,18;108: 8,17;
126:13;128:10;133:19;
184: 6;186: 6
**trunk** 126:10
**truth** 4:16,16,17
**try** 65: 7;89:15;98: 5;
116:14;125: 5;144:24
**trying** 8: 5;27: 8;28: 2;
54:15,16;76: 2,16;78: 1, 6,
24;79: 9;80:25;83:14;
84: 8;85:18,19;87:21;
88: 7;109: 4;115: 4;131: 1;
150: 1;156:20;165:21;
173:18;174:15;179: 1
**turn** 16: 1;44:20;114:17;
170: 9;171: 7;172: 7;
174: 5
**turns** 104: 9;117: 8
**twice** 172:15
**two** 13:25;14: 5;22:20,23;
23:10,15,17,25;24: 7, 8,
20;25: 1, 6,11,22;26:12,
17,23;27: 4,15;28: 9,15;
29: 7, 8, 9,16,22;39:21;
41:12,21,24;42: 6, 8,13;
43: 3,16;44: 5, 9,25;45:12,
15;46:10,17,22;49: 2;
52:21;56: 5;73: 1;83:25;
86:13;115: 1,16;116: 8,24;
117: 8,11;118:20,24;
122:23;127:25;131: 2;
136:19;151:11;154:13;
157: 6, 9;158:13;165:11;
169:21,25;170:23;171: 4;

173:12,23,25;175:22;
176:11,12,15,18,19,23;
177: 5;181: 7;186:23
**type** 171:15
**types** 4:20
**typical** 44:22;80:15;81: 2,
18
**typically** 80: 5,17;81: 8,
11,15;102:16;184:17;
190: 2;78:14;81: 4

**U**

**ultimate** 51:14;66: 1
**ultimately** 21:11;178: 3
**Um** 120:14
**unable** 147: 5
**under** 30:16;64: 5;88:13,
23;90: 5, 5;117: 5;119:10,
18;163: 3;164: 8,15,24;
165: 5, 8,17,25;166: 2, 8;
170:19;27:17;86: 5;87:17;
119:13;164: 7,18;168:20
**understood** 13: 7;63:10,
17;182:15
**undertook** 69: 2
**undulating** 184:22
**unduly** 30:10
**unimportant** 62:10,22;
63: 1
**unit** 180:17
**United** 38:12
**units** 116:21;117:19,21;
118:25
**University** 161:10,12
**unlike** 171:17;16: 5, 8
**unlikely** 91: 7
**up** 41:19;64:22;68:22;
70:14;81:22;88: 3;89:10,
14;91:15;93:11;136:14;
166:19
**updating** 8:22
**upon** 20: 1;98:25;186:10;
189: 5
**use** 55:21,22;56:23;66: 7;
78:16;86:20;88: 2;90:22;
112:20;119: 1;171: 8;
176: 9;190: 2
**used** 11: 1;62:21;63:15;
170: 7;177: 6;185: 7, 8
**users** 101:24
**uses** 184: 9
**using** 63: 5;86:19;89: 4,
5,15;90: 2, 7,15
**USP** 39:12
**USPTO** 35:11
**usual** 4: 2, 7
**usually** 78:14;82: 5, 6;
86:20;169:14
**utilitarian** 167: 4, 7
**utility** 150:13,17

**V**

**valid** 21:11;108:20;
109:25;110: 8, 9,20;
149:16
**validity** 5:24;150: 7,12;
154:14,18
**value** 116:17
**variance** 68:15
**variation** 8:11;19: 1, 1
**variegated** 14:14,23;
15:23
**variegation** 15: 4
**varies** 99: 1
**various** 160: 6
**vary** 68:13
**Venture** 87:10
**Ventures** 72:24;73: 1;
82:23;96:21;97:17;113: 7,
20;115: 6;139:23;175:21;
176: 3;177: 4;180:24
**Ventures'** 114:11
**venues** 85:13
**verbal** 177:15,22,24;
178: 1, 4,18,22;179: 4, 8,
20,22
**verify** 37:17,21;157:25
**versed** 152:23
**version** 71:24;72: 2
**versus** 51: 8;53: 9;62: 6;
78:10;79:16,21;82:25
**vertical** 19: 8;126:18;
171:14;182: 5
**verticality** 19: 8
**vested** 80:25
**view** 17:19;31:16;41: 9;
44:21,24;46:20;52:11;
55:18;56:25;57: 6;58:18;
90: 4;111:24;119: 6;
126:24;127:11;134: 5, 7,
9,11;143:23;146:23;
168: 7
**viewed** 173:22
**viewing** 58: 9;79:25;
82:12;164:11
**views** 77: 7,11,16,16,23
**visible** 55:17,19,24;56: 5,
8;57: 3;76:14;79: 7,10;
182:13
**visual** 20: 3;45:19;78:16;
97: 8;127:25;128: 3;
168:25;169: 4;181:17
**visually** 22:13;120: 6;
121:19;122:25;124:12;
125:21;126:14,23;128: 5,
8,21;129: 4, 9,22;133: 2;
137: 8,14;139: 2;142: 8,
13;143:20,24;145:12;
183: 7;129:11
**visuals** 78:18
**vitae** 162:10,12
**voice** 28:23

Mid-West vs.
Simpson Ventures, Inc.

**volume** 180:21;188: 9

## W

**wait** 9: 4;123:16,16,16
**walk** 169:14
**walking** 70: 8
**waste** 135:21;136:16
**wasting** 136: 5, 7
**Watkins** 139:11,12,14
**way** 5:20,20;12: 8;20:14;
   24: 4;28:12;48:17;51:10;
   55: 9,16;62:21;63: 8;68: 2,
   3,24;76: 2;79: 7;89: 8;
   92:24;93: 6;99: 3;110:15;
   112:17;118:12;120:25;
   123:22;125:25;127: 3;
   131:10,16,17;134: 8;
   135: 5;136:11;141:19;
   142:20;145: 8;148:20;
   167:18;182: 5;183: 4;
   185:12,24
**ways** 30: 4;97: 2;123: 5;
   145:16;146: 4
**weave** 16: 9,10,14,17,18,
   20;17: 5,10,20,22;18: 1, 5,
   7,17,24;19: 2;22:12;43: 9;
   50: 6,18;53:23;54: 3,18;
   57: 6,15,23;58: 9,19;59: 9;
   60:11;61:25;74:20,21;
   75: 6, 8;77:14,20;126:23;
   142:23;171: 1, 8,10,18,19
**weaves** 50: 8
**weaving** 19: 3,17,19;
   20:16;50: 1;171:15;175: 6
**website** 70:21;71:14,21,
   22;72:14;78:25;92:22;
   151:13
**websites** 70:25;71: 7,12;
   73:12
**weight** 116: 8
**whatnot** 47: 2;159: 8
**what's** 7:12;16:15;32:24;
   36:21;50:25;51:17,25;
   52: 1,18,18;54: 5,19;
   58:11;71: 4;72:14;94: 7;
   99:12;104:17;120: 6,12;
   121:19;122:24;125:22,23;
   127:18,20;129:24;131:23,
   24;132: 7;137: 9,14,15,20;
   143:20;156: 4;158:11;
   162: 8;165:22;174:10;
   14: 4;64: 4
**whatsoever** 181: 9
**white** 182:10
**whole** 4:16;30: 5;53:15;
   61: 1;80:21;81: 9;116:13;
   140: 7
**wicker** 9:19,22;47:14;
   49:25;64:13,13;65:16;
   67: 3, 4, 9,13,20;68:21;
   71: 8;81:20,20;82:12;
   91:13,15;92: 6,14,20;

93:10,10,12,13,24;94: 1,
   23;95:17;96: 9,10;97:22;
   102:16;105: 1, 7;112: 6;
   122: 9,11,16;123: 8;
   124:10,17;127:18;168:15;
   169: 8,10;180:25,25;
   182:23;183: 1;184: 7,10,
   22,25;185: 4, 6,10,14,18;
   186: 2, 8;188:12,14,16;
   190: 9,14,17
**wicker-looking** 12:13
**willing** 95:21
**window** 74:18
**windows** 77: 3;74:17
**wire** 94:12,14,16,19,20,
   25;95:15;96: 5, 7;168:23;
   169: 8;185:16;186: 1, 9,
   12,13
**within** 4:13;68:12;99: 1, 1,
   2;167: 9
**without** 17: 7,12;18:16,
   21;43: 8
**witness** 4:12,15;26:25;
   28:24;30: 8;72:19;136: 8,
   15;139:15,17,25;140: 2, 9;
   179: 2;24:12;29:25;
   135:12;174: 4
**witnesses** 6:20,24;7: 2;
   138:15
**witness's** 141: 5
**wood** 189:20
**wooden** 185: 3
**word** 45:23;56:10;62:16,
   19,20;63: 4,12,14;176: 9;
   189: 3
**wording** 54: 8
**words** 27:12;28: 4, 5, 7;
   56:23;57:21;66:23;107:21;
   140: 8;144: 9;164:22;
   172: 9,11;189:21;190: 1
**work** 98: 8;156:11;165: 3
**worked** 15: 9
**world** 129:16
**woven** 9:19,22;12:12;
   14:13,24;15: 3,17;49:24;
   50:12;184:18,21;185: 2
**wrapped** 168:15;169: 8;
   182: 5
**wrappings** 142:21
**writing** 115:18
**written** 4:22;38:22;
   116:22;154: 5, 9;172:15
**wrong** 47: 6;109: 6
**wrote** 170: 4

## Y

**y'all** 158: 4
**yard** 128:14,18;134: 2
**yards** 189:23
**years** 98: 3, 9
**year's** 161:16
**yelling** 28:22;29:11

**yesterday** 4:24

## Z

**zero** 85: 3,10,11;133:22
**zoologist** 5:11