# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

SIMPSON VENTURES, INC., )
          *Plaintiff*, )
v. )
    )
MID-WEST METAL )
PRODUCTS )
COMPANY, INC. )
       *Defendant*. )
_____)    Case No. 06-cv-00901-WKW-VPM
    )
MID-WEST METAL )
PRODUCTS )
COMPANY, INC., )
     *Counterclaimant*, )
v. )
    )
SIMPSON VENTURES, INC., )
     *Counterdefendant*. )
_____)

## PLAINTIFF SIMPSON VENTURES, INC.'S MOTION TO CORRECT MEMORANDUM AND STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Simpson Ventures, Inc., by its undersigned counsel, does hereby respectfully request that the Court allow correction of its Memorandum in Support of Motion for Partial Summary Judgment (Document No. 69), and its Statement of Material Facts (Document No. 68), both filed on August 11, 2008. In support hereof, Simpson Ventures, Inc. states the following:

1.      Simpson Ventures, Inc. filed its Memorandum in Support of Motion for Partial Summary Judgment and its Statement of Material Facts on August 11, 2008.

2.      Simpson Ventures, Inc.'s Memorandum was created using Microsoft Word.  When the Memorandum was converted to a PDF file for electronic filing, the conversion caused some of the formatting for the visual aids in the Memorandum to be lost – specifically on pages 30, 72 and 73.

3.      The Certificate of Service encompassed within Simpson Ventures' Statement of Material Facts erroneously stated that service was accomplished on August 1, 2008 instead of August 11, 2008.  The corrected version filed herewith has been updated to include this change.  Additionally, certain portions of Simpson Venture's Statement of Material Facts inadvertently contained citations to the record that were in error or were incomplete.  It is believed that the corrected version includes the appropriate citations to the litigation record.  There are no changes to the facts as stated, merely to the citations themselves.

4.      The undersigned did not learn about the computer's formatting errors caused by the Word-to-PDF conversion and the citation errors until after filing, on August 12, 2008.

5.      A full, corrected version of the corrected Memorandum is attached hereto as **Exhibit A**.

6.      A full, corrected version of the corrected Statement of Material Facts is attached hereto as **Exhibit B**.

WHEREFORE, Simpson Ventures, Inc. respectfully requests that the Court enter an Order substituting the Corrected Memorandum for the Memorandum at Document No. 69, and the Corrected Statement of Material Facts for the Statement at Document No. 68, both filed on August 11, 2008, and for all other relief just and proper under the circumstances.

Accordingly, a Proposed Order is attached hereto as **Exhibit C**.

Respectfully submitted this 12th day of August, 2008.

 _/s/_ Arthur A Gardner_____
Arthur A. Gardner
GA Bar No. 283,995
Email:  agardner@gardnergroff.com
GARDNER GROFF, GREENWALD & VILLANUEVA, P.C.
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339
Tel:  (770) 984-2300
Fax:  (770) 984-0098
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2008, I electronically filed the foregoing PLAINTIFF SIMPSON VENTURES, INC.'S MOTION TO CORRECT MEMORANDUM AND STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorney of record:

> James M. Hinshaw
> Bingham McHale LLP
> 2700 Market Tower
> 10 W. Market Street
> Indianapolis, IN  46204-4900
> (317) 635-8900
> Pro Hac Vice
>
> Brett A. Ross
> Carr Allison
> 100 Vestavia Parkway
> Birmingham, Alabama  35216
> (205) 822-2006

**Attorneys for Defendant**

__/s/ Arthur A Gardner_____

Arthur A. Gardner
GA Bar No. 283,995
Email:  agardner@gardnergroff.com
GARDNER GROFF, GREENWALD
& VILLANUEVA, P.C.
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339
Tel:  (770) 984-2300
Fax:  (770) 984-0098
**Attorneys for Plaintiff**

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| SIMPSON VENTURES, INC., )<br>            Plaintiff, )<br>v. )<br> )<br>MID-WEST METAL )<br>PRODUCTS )<br>COMPANY, INC. )<br>            Defendant. )<br>_____ )<br> )<br>MID-WEST METAL )<br>PRODUCTS )<br>COMPANY, INC., )<br>            Counterclaimant, )<br>v. )<br> )<br>SIMPSON VENTURES, INC., )<br>            Counterdefendant. )<br>_____ ) | Case No. 06-cv-00901-WKW-VPM |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF SIMPSON VENTURES, INC.'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

COMES NOW the Plaintiff, Simpson Ventures, Inc. (hereinafter "Simpson")

and files this Memorandum of Facts and Law in Support of its Motion for Partial

Summary Judgment under FRCP 56(a) and supporting authorities.

## <u>TABLE OF CONTENTS</u>

I.   <u>INTRODUCTION</u>                                                    1

   A.   **The Relief Sought**                                          4

   B.   **The Context of the Present Motion**                          5

   C.   **Current State of the Law and the <u>Egyptian Goddess</u> Appeal**    6

   D.   **Patent Parlance**                                            8

   E.   **The Difference Between Utility Patents and Design Patents**   9

      1.   *Utility Patents*                                          10

      2.   *Design Patents*                                           11

      3.   *The Key Differences Between Utility and Design Patents*    13

II.   <u>PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT AS A</u>

<u>MATTER OF LAW</u>                                                       15

   A.   **The Standard for Summary Judgment**                         15

   B.   **Claim Construction in a Design Patent Case**                 16

      1.   *The Court Should Adopt Plaintiff's Proposed Claim Construction*   19

      2.   *The  Defendant's (Expected) Competing Claim Construction Should be Ignored*   21

   C.   **Plaintiff is Entitled to Summary Judgment of Design Patent Infringement as a Matter of Law**   24

      1.   *The Standard for Design Patent Infringement*              24

**2.** *Summary Judgment that Mid-West's Bay Isle Products Satisfy the* <u>*Gorham*</u> *Test for Infringement is Appropriate.*    27

    **i.**    <u>Substantial Similarity under *Gorham* is Self-Evident</u>    29

    **ii.**    <u>Third Party Testimony Supporting: a Finding of Substantial Similarity</u>    35

    **iii.**    <u>Simpson's Evidence of Actual Confusion</u>    39

    **iv.**    <u>Mid-West has Effectively Admitted that the Mid-West Products Look Substantially the Same as the Patented Design</u>    40

    **v.**    <u>Mid-West Has No Evidence to Support Non-infringement under *Gorham*</u>    42

    **vi.**    <u>B. Smith DQ (testimony not relevant)</u>    43

**3.** *Summary Judgment Under the Points of Novelty Test is Appropriate.*    43

    **i.**    <u>Mid-West has not Offered any Points of Novelty for Consideration</u>    44

    **ii.**    <u>The Court Should Adopt Simpson Ventures' Points of Novelty</u>    45

    **iii.**    <u>The Mid-West "Bay Isle" Line of Wicker Crates Incorporate All of the Points of Novelty</u>    47

    **iv.**    <u>Mid-West has No Competing Evidence to Support Non-infringement</u>    53

**D.**    **Plaintiff is Entitled to Summary Judgment of Validity as a Matter of Law**    54

    **1.**    *The '156 Patent is Presumed Valid Under 35 U.S.C. § 282*    54

    **2.**    *The Standard for Design Patent Anticipation*    55

      **i.**    **No Single Anticipatory Reference Has Been Identified by Mid-West**
58

      **ii.**   **Defendant Has Not Presented Any Evidence to Support a Finding of Anticipation**    59

   **3.**   *The Standard for Design Patent Obviousness*    62

     **i.**    **Mid-West Has Failed to Identify a Primary Reference**    67

     **ii.**   **The Prior Art Fails to Reveal a Primary Reference**    68

     **iii.**  **No Motivation to Combine Elements in the Prior Art Exists**    76

     **iv.**  **Secondary Considerations of Nonobviousness**    79

     **v.**   **Mid-West's Purported Expert Testimony Should Be Rejected**    83

**E.**  **Some of The Defendant's Affirmative Defenses Are Unsupported By Evidence.**    84

  **1.**   *Public Use/On-Sale Bar*    85

  **2.**   *Inequitable Conduct*    86

  **3.**   *Laches*    86

  **4.**   *Estoppel*    87

  **5.**   *35 U.S.C. § 101 and § 112*    87

**III. CONCLUSION**    88

# TABLE OF AUTHORITIES

**CASES**

Adenta GmbH v. OrthoArm, Inc., 501 F.3d 1364 (Fed. Cir. 2007) ................. 55, 85

Aero Products Int'l. Inc., v. Intex Recreation Corp., 466 F.3d 1000 (Fed. Cir. 2006)

............................................................................................................66

Allen Archery, Inc. v. Browning Mfg. Co., 819 F.2d 1087 (Fed. Cir. 1987) .........80

Amhil Enters. v. Wawa, Inc., 81 F.3d 1554 (Fed. Cir. 1996)........................... 16, 49

Arminak & Assocs. v. Saint-Gobain Calmar, Inc., 501 F.3d 1314 (Fed. Cir. 2007)

.................................................................................. 11, 12, 24, 25, 57

Aronson v. Quick Point Pencil Co., 440 U.S. 257 (1979)........................................9

Ashley Furniture Industries, Inc. v. Lifestyle Enterprise, Inc., 2008 U.S. Dist.

LEXIS 16039 (W.D. Wis. 2008)..........................................................................66

Avia Group International, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557 (Fed.

Cir. 1988) ...........................................................................................................11

Bernhardt, L.L.C. v. Collezione Europa USA, Inc., 386 F.3d 1371 (Fed. Cir. 2004)

.................................................................................................. 26, 57, 58

Black & Decker (U.S.) v. Pro-Tech Power, 1998 U.S. Dist. LEXIS 9162, at *6-7

(E.D. Va. 1998) ..................................................................................................18

iv

Brown & Williamson Tobacco Corp. v. Philip Morris, Inc., 229 F.3d 1120 (Fed. Cir. 2000) ...........................................................................................79

Catalina Lighting, Inc. v. Lamps Plus Inc., 295 F.3d 1277 (Fed. Cir. 2002) ... 26, 58

Celeritas Techs. v. Rockwell Int'l Corp., 150 F.3d 1354 (Fed. Cir. 1998)..............56

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ................................................ 15, 16

Connell v. Sears Roebuck & Co., 722 F.2d 1542 (Fed. Cir. 1983)........ 9, 55, 56, 59

Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370 (Fed. Cir. 2002) 18, 25, 26, 58

Diversitech Corp. v. Century Steps, Inc., 850 F.2d 675 (Fed. Cir. 1988) ..............80

Durling v. Spectrum Furniture Co., 101 F.3d 100 (Fed. Cir. 1996)........... 19, 63, 67

Ecolab, Inc. v. Envirochem, Inc., 264 F.3d 1358 (Fed. Cir. 2001) ........................50

Egyptian Goddess, Inc. v. Swisa, Inc., 256 Fed. Appx. 357 (Fed. Cir. 2007) . 6, 7, 8

Elmer v. ICC Fabricating, Inc., 67 F.3d 1571 (Fed. Cir. 1995) ................. 24, 25, 57

Environmental Designs, Ltd. v. Union Oil Co. of Cal., 713 F.2d 693 (Fed. Cir. 1983)..............................................................................................................79

Fickling v. United States, 507 F.3d 1302 (11th Cir. 2007). ............................ 15, 16

Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323 (Fed. Cir. 2008).................56

Finnigan Corp. v. Int'l Trade Comm'n, 180 F.3d 1354 (Fed. Cir. 1999)................85

Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368 (Fed. Cir. 2005)............85

Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770 (Fed. Cir. 1995) .87

Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., 162 F.3d 1113 (Fed.

   Cir. 1998) ...............................................................................................25

Gorham Manufacturing Co. v. White, 81 U.S. 511 (1872) 4, 6, 7, 12, 26, 27, 29, 35,

   36, 37, 39, 42, 43, 58, 64

Graham v. John Deere Co., 383 U.S. 1 (1966) ................................................. 62, 79

Hakim v. Cannon Avent Group, PLC, 479 F.3d 1313 (Fed. Cir. 2007).................56

Hupp v. Siroflex of Am., Inc., 122 F.3d 1456 (Fed. Cir. 1997) ....................... 41, 56

Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F. 2d 1367 (Fed. Cir. 1986) ..55

In re Borden, 90 F.3d 1570 (Fed. Cir. 1996) ................................................... 63, 77

In re Daniels, 144 F.3d 1452 (Fed. Cir. 1998)................................................. 13, 14

In re Finch, 535 F.2d 70 (CCPA 1976)...................................................................87

In re Harvey, 12 F.3d 1061 (Fed. Cir. 1993) .........................................................63

In re Kahn, 441 F.3d 977 (CA Fed. 2006)..............................................................67

In re Kotzab, 217 F.3d 1365 (Fed. Cir. 2000) .......................................................62

In re Nalbandian, 661 F.2d 1214 (C.C.P.A. 1981) ................................................62

In re Rosen, 673 F.2d 388 (C.C.P.A. 1982).....................................................41, 63

Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374 (Fed. Cir. 2005)..............55

J. P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc., 747 F.2d 1553 (Fed. Cir. 1984)....86

Jamesbury Corp. v. Litton Ind. Prods., Inc., 756 F.2d 1556 (Fed Cir. 1985)............8

Jazz Photo Corp. v. ITC, 264 F.3d 1094 (Fed. Cir. 2001)........................................85

Keystone Retaining Wall Sys., Inc. v. Westrock, Inc., 997 F.2d 1444 (Fed. Cir.

    1993)...............................................................................................................57

Kingsdown Med. Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867 (Fed. Cir. 1988)

    ........................................................................................................................86

KSR v. Teleflex, 127 S. Ct. 1727 (2007)...................... 41, 54, 64, 65, 66, 67, 76, 77

Lee v. Dayton-Hudson Corp., 838 F.2d 1186 (Fed. Cir. 1988)................. 12, 23, 24

Litton Sys., Inc. v. Whirlpool Corp., 728 F.2d 1423 (Fed. Cir. 1984). ....................7

LNP Engineering Plastics, Inc. v. Miller Waste Mills, Inc., 275 F.3d 1347 (Fed Cir.

    2001).................................................................................................................50

Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995)................11

Motionless Keyboard Co. v. Microsoft Corp., 486 F.3d 1376 (Fed. Cir. 2007) .....85

Netscape Communications Corp. v. Konrad, 295 F.3d 1315 (Fed. Cir. 2002) .......55

Nike Inc. v. Wolverine World Wide, 43 F.3d 644 (Fed. Cir. 1994).......................16

Nike, Inc. v. Meitac Int'l Ent. Co., No. 2:06-CV-0934, 2006 U.S. Dist. LEXIS

    94662, at *4, 2006 WL 3883278 (D. Nev. Oct. 11, 2006) ...................................18

OddzOn v. Just Toys, 122 F.3d 1396 (Fed. Cir. 1997)...................................... 25, 57

Peters v. Active Mfg. Co., 129 U.S. 530 (1889)......................................................57

Phonometrics, Inc. v. N. Telecom, 133 F.3d 1459 (Fed. Cir. 1998) ......................16

RCA Corp. v. Applied Digital Data Sys., Inc., 730 F.2d 1440 (Fed. Cir. 1984) 8, 27

Reese v. Herbert, 527 F.3d 1253 (11th Cir. 2008) ...................................................15

Riverwood Int'l Corp. v. The Mead Corp., 212 F.3d 1365 (Fed. Cir. 2000)...........62

Soundscriber Corp. v. United States, 360 F.2d 954 (Ct. Cl. 1966) ........................56

SRI Int'l, Inc. v. Internet Sec. Sys., 511 F.3d 1186 (Fed. Cir. 2008)......................56

Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530 (Fed. Cir. 1983) ......................80

Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313 (Fed. Cir. 2002) ................17

Titan Tire Corporation and The Goodyear Tire and Rubber Company v. Case New

   Holland, Inc.; CNH America LLC; and GPX International Tire Corporation,

   2007 U.S. Dist. LEXIS 74173 (S.D. Iowa October 2007)...................................66

Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd., 491 F. Supp. 2d 871 (D. Minn.

   2007)...................................................................................................................18

Wanlass v. GE, 148 F.3d 1334 (Fed. Cir. 1998)......................................................87

Welding Servs. v. Forman, 509 F.3d 1351 (11th Cir. 2007) ...................................15

York Products, Inc. v. Central Tractor Farm and Family Center, 99 F.3d 1568 (Fed.

   Cir. 1996) ...........................................................................................................49

Zodiac Pool Care, Inc., v. Hoffinger Industries, Inc., 206 F.3d 1408 (Fed. Cir.

   2000)...................................................................................................................50

## STATUTES

35 U.S.C. § 101 .............................................................................. 9, 10, 13, 14, 87, 88

35 U.S.C. § 102 ............................................................................................ 8, 55, 56, 64

35 U.S.C. § 102(a) ................................................................................................. 10, 13, 55

35 U.S.C. § 102(b) ........................................................................................................56

35 U.S.C. § 102(e) ................................................................................................. 10, 13

35 U.S.C. § 102(f) ........................................................................................................10

35 U.S.C. § 102(g) ................................................................................................. 10, 13

35 U.S.C. § 103 .............................................................................. 9, 10, 13, 55, 64, 66

35 U.S.C. § 103(a) ........................................................................................................62

35 U.S.C. § 154 ..............................................................................................................9

35 U.S.C. § 154(a)(2) ............................................................................................. 10, 14

35 U.S.C. § 161 ..............................................................................................................9

35 U.S.C. § 163 ..............................................................................................................9

35 U.S.C. § 171 ....................................................................................................... 9, 11

35 U.S.C. § 173 ..................................................................................................... 11, 14

35 U.S.C. § 271(a). ........................................................................................................11

35 U.S.C. § 282 ............................................................................................................54

35 U.S.C. § 289 ............................................................................................................24

## OTHER AUTHORITIES

Manual of Patent Examining Procedure § 1502 ......................................... 12, 13, 14

Manual of Patent Examining Procedure § 1502.01 ......................................... 10, 11

Manual of Patent Examining Procedure § 1503.02 ......................................... 12, 13

Manual of Patent Examining Procedure § 1504 ............................................. 12, 13

Manual of Patent Examining Procedure § 1504.03 ................................................66

Manual of Patent Examining Procedure § 1504.05 ................................................12

## RULES

37 C.F.R. § 1.153 ........................................................................................ 12, 14

37 C.F.R. § 1.153(a)................................................................................................12

37 C.F.R. § 1.20 ....................................................................................................14

Fed. R. Civ. P. 56 ..................................................................................................15

Fed. R. Civ. P. 56(c).........................................................................................15, 16

## TREATISES

*Chisum on Patents*, § 23.03 ............................................................................. 13, 14

*Chisum on Patents*, § 23.04 ..................................................................................14

# I. **INTRODUCTION**

Plaintiff Simpson Ventures, Inc. (hereinafter "Simpson or "Simpson Ventures") is an Alabama corporation based in Auburn Alabama. Simpson Ventures is in the business of designing and selling pet related products. In or about September of 2001, Mr. Jeff Simpson conceived of the idea of a decorative pet home design covered in a woven plastic material having the appearance of wicker. Mr. Simpson proceeded to develop a prototype, further develop and refine the product's design, and market the product to potential customers.

The Simpson Ventures product enjoyed considerable acclaim and success in the marketplace. Simpson received numerous laudatory comments from retail sellers and consumers alike, largely because Simpson's design was the first pet kennel that had a real "furniture look" suitable for placement inside the home. At the time, no pet kennel or pet home had been sold with wicker look wrapped panels. It was evident from the start that the product was going to be a very successful venture for the Plaintiff, and in the first 12 months alone the Plaintiff sold over 9,000 units.

An application for a design patent was filed on June 3, 2002 to protect the ornamental design of Mr. Simpson's pet home. This patent application ripened into the design patent that is the subject of this suit, U.S. Design Patent No.

483,156 (hereinafter "the '156 patent").  The '156 patent issued on December 2, 2003, and is directed to a "Pet Home" having the appearance of being substantially covered in wicker or rattan.   A copy of the '156 patent is attached hereto as **Exhibit A**.

In September of 2002, Mr. Jim Wingate, then the President of Defendant Mid-West Metal Products Co., Inc. (hereinafter "Mid-West"), purchased one of Simpson's pet homes from Frontgate® Catalog, and had it shipped to his residence. Mid-West subsequently forwarded photos and/or parts of Simpson's pet home design to Mid-West's Chinese manufacturer, Dalian Co., to produce a competing product.  By early to mid-2003, Mid-West had introduced its Bay Isle line of wicker look covered pet homes onto the US market.  The Bay Isle Pet Homes are shown in **Exhibit B**.

The infringing sales of Mid-West's Bay Isle pet homes caused Simpson to lose a considerable number of sales, and significantly eroded the profit margins Simpson had been able to establish.  Mid-West even went so far as to release a "Sales Bulletin" copying Simpson's marketing points and referred to the products customers were familiar with from the Frontgate® Catalog (Simpson's products). At least one dealer affiliated with Simpson Ventures saw Mid-West's

announcement and contacted Mr. Simpson to ask if he had decided to market his Pet Home through Mid-West.

On November 4, 2003 counsel for Simpson Ventures sent a letter notifying Mid-West that Simpson's design patent application had received a notice of allowance from the United States Patent and Trademark Office (USPTO) and would soon issue as a patent. Mid-West did not respond to the November 4, 2003 letter. Thereafter, on November 19, 2003, counsel for Simpson Ventures sent a second letter to Mid-West, this time notifying them that Mr. Simpson had received an issue notification from the U.S. Patent and Trademark Office, identifying the patent number, and that the patent would officially issue on December 2, 2003. Mid-West did not respond to the November 19, 2003 letter either. The '156 patent issued on December 2, 2003, at which time Mid-West's liability for patent infringement began to accrue.

Plaintiff Simpson did not lightly enter into the present litigation, and carefully evaluated the instigation of litigation to resolve this matter. Simpson was hesitant to do so chiefly because Simpson Ventures is a small family-owned operation, whereas Mid-West is a large conglomerate corporation. Simpson retained a design patent expert to assess the question of infringement, and received

a very strong opinion from the expert that the Mid-West Bay Isle product line infringed the '156 patent.

## A.  The Relief Sought

Plaintiff Simpson moves for partial summary judgment on the following issues:

1)   On the issue of infringement of Simpson's U.S. Design Patent No. D483,156 ("the '156 Patent") by the Mid-West Bay Isle pet home products:

a)   that the Bay Isle Pet Home products satisfy the <u>Gorham v. White</u> "ordinary observer / substantial similarity" test for infringement of the '156 Patent (other than the Bay Isle Model 1805 Litter Pan Cover, which is not alleged to infringe the '156 Patent);

b)   that the Bay Isle Pet Home products satisfy the "point of novelty" test for infringement of the '156 Patent; and

d)   in light of items (a) and (b) above, that the Bay Isle Pet Home products infringe the '156 Patent.

2)   On the issue of validity of the '156 Patent:

a)   that the '156 Patent is not invalid under 35 U.S.C. §102 for anticipation in view of the prior art; and

b)   that the '156 Patent is "Novel and thus is  not invalid under 35 U.S.C. §103 for obviousness in view of the prior art.

3)   That Simpson's claims are not banned or defeated by certain of Defendant's affirmative defenses, stated in the Answer, namely:

a)   Public use / on-sale bar.

        b)     Inequitable conduct.

        c)     Laches.

        d)     Estoppel.

        e)     Compliance with 35 U.S.C. §§ 101 and 112.

## B. The Context of the Present Motion

Simpson has filed a motion *in limine* to exclude Mid-West's proffered patent infringement/patent validity expert, Mr. Bret Smith, which motion is currently pending before the court.  Should the Court grant the motion *in limine*, the present motion for partial summary judgment may be simplified.  Accordingly, Simpson requests leave to supplement the present motion upon grant of the motion *in limine*.

It is also noted that Mid-West has filed a competing motion for summary judgment.  For reasons to be set out in a separate opposition to Mid-West's summary judgment motion, Mid-West's summary judgment motion should be denied, because it is premised on a legal position identified and asserted for the first time by Mid-West *after the close of discovery*.  The Mid-West motion hinges on a claim construction position never before disclosed in its interrogatory responses or in the reports or testimony of its proffered expert witness.  Simpson requested identification of Mid-West's position on this very topic during

discovery, and was provided a significantly different answer than the claim construction position Mid-West is now trying to take. Moreover, the statement of the law and legal analysis contained in Mid-West's summary judgment papers is just plain wrong, and if followed, would lead the Court to an incorrect understanding of the true state of the law of design patents. As such, and as will be pointed out in more detail plaintiff's opposition, the Mid-West summary judgment motion should be ordered denied outright.

### C. Current State of the Law and the <u>Egyptian Goddess</u> Appeal

One element of the current state of the law regarding design patent infringement may (or may not) change as a result of the <u>Egyptian Goddess, Inc. v. Swisa Inc.</u> *en banc* appeal presently under review by the Court of Appeals for the Federal Circuit (Case No. 06-1562). <u>Egyptian Goddess, Inc. v. Swisa, Inc.</u>, 256 Fed. Appx. 357 (Fed. Cir. 2007). The element of infringement analysis under review in the <u>Egyptian Goddess</u> case is the "point of novelty" test. By the present motion, Plaintiff Simpson seeks partial summary judgment of infringement under the law on this issue as it is today.

The current test for design patent infringement is two-fold. First, the Court must evaluate the accused product under the <u>Gorham</u> "ordinary observer" test, which states that "if in the eye of an ordinary observer, giving such attention as a

6

purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." Gorham Manufacturing Co. v. White, 81 U.S. 511, 528 (1871). This has been a valid test (or part of the test) for infringement of a design patent for more than 130 years. As a Supreme Court precedent, it is beyond the reach of the Court of Appeals for the Federal Circuit to overturn or modify the Gorham standard. So regardless of the outcome of the Egyptian Goddess *en banc* appeal, the Gorham test will remain intact. As such, granting partial summary judgment that the Mid-West Bay Isle Pet Home products satisfy the Gorham test for infringement is worthwhile and appropriate.

In the second part of an infringement analysis under the current state of the law, the Court must determine if the accused design appropriates the "point of novelty" that distinguishes the patented design from the prior art. Litton Sys., Inc. v. Whirlpool Corp., 728 F.2d 1423, 1444 (Fed. Cir. 1984). The "point of novelty" test is presently under EN BANC review by the Federal Circuit in Egyptian Goddess. In the event that the Federal Circuit upholds this test, granting summary judgment that the accused Mid-West Products satisfy the "point of novelty" test for infringement is worthwhile and appropriate.

7

The Egyptian Goddess *en banc* appeal is not expected to have any effect on the law of design patent validity.

## D. Patent Parlance

In considering the present motion, it is important to note that certain terms used in this brief and in the cited cases are terms of art in the field of patent law and have special meanings. For example, the term "novel" (or "novelty") has a special meaning in patent law. In patent parlance "novelty" refers to newness of an invention with respect to any *single* prior art reference, each prior art reference being considered in isolation. *See* RCA Corp. v. Applied Digital Data Sys., Inc., 730 F.2d 1440, 1444 (Fed. Cir. 1984). If the invention is different from what is shown in any single prior art reference, the invention is said to be "novel" or possess "novelty" over the prior art. This idea is often expressed as a test for patent validity, in that if a *single* prior art reference can be found which contains all of the features of the claimed invention, it is said that the claimed invention is "anticipated" by the single prior art reference and the claimed invention is therefore invalid as lacking novelty over that piece of prior art. Thus, novelty and anticipation are flip sides of the same coin. *See* Jamesbury Corp. v. Litton Ind. Prods., Inc., 756 F.2d 1556, 1560 (Fed Cir. 1985). The novelty requirement for United States patents is set forth in 35 U.S.C. §102.

8

On the other hand, the term "obviousness," in patent parlance, refers to invalidity of a claimed invention as measured against the teaching of multiple prior art references taken in combination. Thus, an invention can have "novelty" with respect to the prior art and yet in some instances be found "obvious" in view of a combination of prior art references. *See* Connell v. Sears Roebuck & Co., 722 F.2d 1542, 1548 (Fed. Cir. 1983). The nonobviousness requirement for United States patents is set forth in 35 U.S.C. §103.

### E. The Difference Between Utility Patents and Design Patents

In the United States, a patent is a grant by the federal government to an inventor of the right to exclude others from making, using, or selling his/her invention. 35 U.S.C. §§ 154, 163. The oft-cited reasons for allowing these federally-sanctioned monopolies are discussed in the Supreme Court case Aronson:

> "First, patent law seeks to foster and reward invention; second, it promotes disclosure of inventions, to stimulate further innovation and to permit the public to practice the invention once the patent expires; third, the stringent requirements for patent protection seek to assure that ideas in the public domain remain there for the free use of the public."

Aronson v. Quick Point Pencil Co., 440 U.S. 257, 262 (1979). In the United States, patents are of three basic varieties: utility patents (35 U.S.C. §101), design patents (35 U.S.C. §171), and plant patents (35 U.S.C. §161). These three types of patents vary in their requirements for issuance and maintenance, duration, types of

protection, and ultimate purpose.  The bulk of reported patent law jurisprudence relates to *utility* patents.  But because of key differences between utility and design patents, not all legal principles from utility patent precedents are directly applicable to design patent cases.  Therefore, it is important for the Court to have a clear understanding of both utility and design patents,[1] and the differences between the two.

## 1.    *Utility Patents*

In general, a utility patent protects the way an invention *works* (i.e., the functional or structural aspects of an invention).  Manual of Patent Examining Procedure § 1502.01, (8th ed., Rev. 6, 2007) ("MPEP").  Utility patents are granted for a term of twenty years[2] to "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof..."  35 U.S.C. §101.  There are several key statutory requirements that must be met in order to obtain a utility patent on a new invention: invented by the patentee (and therefore "*original*") (35 U.S.C. §102(f)), *novel*ty (§§101, 102(a),  (g)  and (e)), *useful* (§§101, 112), and *non-obvious* (§103).

A utility patent must have written claims.  35 U.S.C. §112.  Utility patent claims serve two key functions in defining the scope of the invention: first, for

---

[1]Plaintiff will forgo discussion of plant patents, as it is irrelevant to the case at bar.
[2] 35 U.S.C. § 154(a)(2).

determining whether the invention is patentable (original, novel, useful, and non-obvious); and second, for determining the scope of the legal rights created by the patent, as in cases of infringement.  <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 978 (Fed. Cir. 1995); 35 U.S.C. § 271(a).

A utility patent is also required to have a specification, which includes a written description of the invention capable of enabling a person skilled in the relevant art to make and use the invention, and disclosing any known best mode of practicing the invention.  35 U.S.C. §112.

### 2.    *Design Patents*

In general, a design patent protects the way an article *looks* (i.e., the ornamental aspects of an invention).  MPEP § 1502.01.  Design patents are granted for a term of fourteen years[3] to "[w]hoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefore…" 35 U.S.C. § 171.[4]  A design patent protects the "non-functional aspects of an ornamental design as shown in a patent."  <u>Arminak & Assocs. v. Saint-Gobain Calmar, Inc.</u>, 501 F.3d 1314, 1319 (Fed. Cir. 2007).

---

[3] 35 U.S.C. § 173.

[4] The purpose of the design patent statutes is to promote the decorative arts.  <u>Avia Group International, Inc. v. L.A. Gear California, Inc.</u>, 853 F.2d 1557, 1563 (Fed. Cir. 1988).

The design of an article consists of the visual characteristics or aspects displayed by the article; it is the appearance presented by the article which creates an impression through the eye upon the mind of the observer.  MPEP §§ 1502, ¶15.42.  "Design is inseparable from the article to which it is applied, and cannot exist alone merely as a scheme of ornamentation."  MPEP §§ 1502, ¶15.44. Therefore, a design may consist of "surface ornamentation, configuration, or a combination of both."  MPEP §§ 1502, ¶15.43; Gorham Mfg. Co. v. White, 81 U.S. 511, 525 (1871) ("The appearance may be the result of peculiarity of configuration, or of ornament alone, or of both conjointly…").  But, design patents "cannot include claims to the structural or functional aspects of the article".  37 C.F.R. § 1.153(a); Lee v. Dayton-Hudson Corp., 838 F.2d 1186, 1188 (Fed. Cir. 1988).   Moreover, if the design is entirely dictated by performance of the article, then it is functional and ineligible for design patent protection.  Arminak, 501 F.3d at 1319.   This fundamental component of design patent law is called the "ornamentality" requirement.  MPEP § 1504.

Design patent applications include only a single claim.  MPEP § 1504.05; 37 C.F.R. § 1.153.   The single claim is directed to the entire visual disclosure encompassed by the drawings or photographs in the application.  MPEP § 1503.02; 37 C.F.R. § 1.153.   In addition to the fundamental ornamentality requirement

discussed directly *supra*, design patents must also meet the requirements of originality (35 U.S.C. § 101), novelty (§§ 101, 102(a), (g) and (e)), nonobviousness (§103), enablement and best mode (§ 112) before the grant of a patent. *See generally*, MPEP § 1504.[5]  Note specifically that design patents do not have to meet the requirement of usefulness ("utility") embodied in 35 U.S.C. §§ 101 and 112, as this would be contrary to the requirement that the design be ornamental and *not functional*.  MPEP §§ 1502, 15.44; *Chisum on Patents*, § 23.03.  Note also that design patents do not have to meet the written description requirement of §112, since the drawings of the design patent provide the description of the invention.  In re Daniels, 144 F.3d 1452, 1456 (Fed. Cir. 1998).[6]

### 3.    *The Key Differences Between Utility and Design Patents*

So while design patents share some of the same statutory requirements as utility patents, the differences between the two types of patents dictate a different jurisprudential application of the statutory requirements.   The key differences between the two types of patents that affect the application of law include:

- The design patent claim is embodied in the drawings (MPEP § 1503.02); utility patent claims are written definitions of the invention (35 U.S.C. § 112).

---

[5] In particular: MPEP §§ 1504.01(d), 1504.02, 1504.03, 1504.04.

[6] "Although linguists distinguish between a drawing and a writing, the drawings of the design patent are viewed in terms of the 'written description' requirement of § 112."  In re Daniels, 144 F.3d at 1456.

- Design patent applications include only a single claim (37 C.F.R. § 1.153), while utility patent applications can have multiple claims.
- Design patents do not have to meet the requirement of usefulness ("utility") embodied in 35 U.S.C. §§ 101, 112; this would be contrary to the requirement that the design be ornamental and *not functional*. MPEP §§ 1502, ¶15.44; *Chisum on Patents*, § 23.03.
- Design patents do not have specifications. MPEP § 1503.01. They do not have to meet the written description requirement of § 112; the drawings of the design patent provide the description of the invention. In re Daniels, 144 F.3d 1452, 1456 (Fed. Cir. 1998).
- Maintenance fees are required for utility patents (37 C.F.R. § 1.20), while no maintenance fees are required for design patents.
- The term of a utility patent is 20 years measured from the U.S. filing date (35 U.S.C. § 154(a)(2)); while the term of a design patent is 14 years measured from the date of grant (35 U.S.C. § 173).

The major difference between design and utility applications lies in the comparative importance of the written description, the drawings, and the claim language. *Chisum on Patents*, § 23.04. For utility patents, the description and the claims are of primary importance and the drawings are secondary. *Id.* For design patents, the reverse is true: the description and claims are formal, and disclosure and definiteness are accomplished by the drawings. *Id.* The differences in and relative weight of descriptions, claims, and drawings in utility and design patents greatly impact the central issue of claim construction (i.e., *what* the patent covers), which is the critical first step to determining the issues of inventorship, invalidity and infringement.[7]

---

[7] See discussion of claim construction, *infra*.

## II. **PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW**

### A. The Standard for Summary Judgment

A court should grant summary judgment when "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate when, after viewing the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party, a court concludes that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007). A moving party is entitled to a judgment as a matter of law when the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 327 (1986) (applying Fed. R. Civ. P. 56 to both "claims and defenses" with no factual basis); Welding Servs. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007).

The movant always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact. Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008) (citing

15

Celotex Corp. v. Catrett, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c))).  Once this burden is met, the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.  Fickling v. United States, 507 F.3d at 1304.

Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Amhil Enters. v. Wawa, Inc., 81 F.3d 1554, 1557-1558 (Fed. Cir. 1996); Nike Inc. v. Wolverine World Wide, 43 F.3d 644, 646 (Fed. Cir. 1994).  Certainly, patent infringement may be properly decided as a matter of law when no genuine issue of material fact exists, and no expert testimony is required to explain the nature of the patented invention or the accused product, or to assist in their comparison.  Amhil Enters. v. Wawa, Inc., 81 F.3d at 1557-58.  However, infringement analysis usually involves both issues of law and questions of fact; but even with mixed questions, summary judgment of noninfringement may still be proper.  Phonometrics, Inc. v. N. Telecom, 133 F.3d 1459, 1463 (Fed. Cir. 1998) (citing Nike v. Wolverine, 43 F.3d at 646).  A good faith dispute about the meaning and scope of asserted claims does not, in and of itself, create a genuine dispute to preclude summary judgment in patent cases.  Id.

**B. Claim Construction in a Design Patent Case**

In a *utility* patent infringement suit, it is mandatory that a court interpret or "construe" the patent claims as the first step in analyzing infringement (or validity). Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1323 (Fed. Cir. 2002). This is the case because the words of a utility patent claim define the scope of the patent's legal protection, and the court's claim construction therefore determines what the patent covers and does not cover.

In a *design* patent infringement suit, many courts also prepare a verbal claim construction as the first step in evaluating infringement or validity of the patent. However, interpreting in words what the *written* claims of a utility patent mean is quite different from trying to interpret in words what is graphically shown in the *drawings* of a design patent (the drawings constituting the "claim" of a design patent). Thus, some courts have found claim construction to be a difficult or even futile exercise in design patent cases, owing to the difficulty of trying to capture in words the exact scope of an ornamental design shown graphically in the patent drawings.

As a result, some courts have virtually dispensed with the initial step of verbally construing the design patent claim and have simply concluded that the patent claims (covers) the ornamental design as shown in the drawings, and that the drawings themselves best define the scope of the design covered by the patent.

*See* <u>Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.</u>, 491 F. Supp. 2d 871 (D. Minn. 2007)(citing <u>Nike, Inc. v. Meitac Int'l Ent. Co.</u>, No. 2:06-CV-0934, 2006 U.S. Dist. LEXIS 94662, at *4, 2006 WL 3883278 (D. Nev. Oct. 11, 2006)("In construing a design patent claim the scope of the claimed design encompasses its visual appearance as a whole, and in particular the visual impression it creates.")(internal citation omitted)); <u>Black & Decker (U.S.) v. Pro-Tech Power</u>, 1998 U.S. Dist. LEXIS 9162, at *6-7 (E.D. Va. 1998)("At the outset, the Court finds that the scope of the patent is its overall ornamental visual impression. A design patent is defined by what is shown in the design patent drawings … the illustration is its own best description")(internal citation omitted). *See also* <u>Contessa Food Prods., Inc. v. Conagra, Inc.</u>, 282 F.3d 1370, 1376 (Fed. Cir. 2002).

There are two primary dangers in seeking to force a verbal description to fit a pictorially defined invention, instead of simply relying on the drawings to define the scope of a claimed design. First, because of the inherent differences between drawings and words trying to describe drawings, it is almost inescapable that the scope of the verbal description would be different than the scope of the drawings. Second, in verbalizing the drawings, there is a tendency to focus on minor, hardly noticeable features (certainly, that is what any defendant will try to do), with the effect being that a court can lose sight of the fact that under the Gorham test, the

standard is *substantial similarity of the overall impression*. *See* <u>Durling v.</u>
<u>Spectrum Furniture Co.</u>, 101 F.3d 100, 104-05 (Fed. Cir. 1996)("The district
court's verbal description … does not evoke a visual image consonant with the
claimed design … As we have explained in the past, however, the focus … should
be on visual appearances rather than design concepts.").

### 1.    *The Court Should Adopt Plaintiff's Proposed Claim Construction*

Plaintiff Simpson respectfully submits that the `156 Patent should be
construed pictorially rather than verbally, to claim those <u>ornamenta</u>l features
shown in the drawings of the design patent, but not any functional features that are
depicted therein.  The following functional features are shown in the '156 Patent:

> a.  feet for supporting the pet home upon the floor;
>
> b.  a non-covered pivoting door on the front thereof to enable the
> pet to go into and out of the pet home;
>
> c.  a latch for securing the door in place for securing the pet in the
> pet home;
>
> d.  non-covered windows formed in the sides and the back;
>
> e. mechanical features along the edges and at the corners thereof
> for holding the structure together, including fasteners and links;
>
> f.  a tray or bottom pan;
>
> g.  a tray latch; and

h. a framework to which the woven wicker-look material is applied.

These functional components are not part of the ornamental design covered by the '156 patent. The net result is that the '156 Patent claims those (remaining) features of the patent drawings that are ornamental. <u>Thus, the '156 Patent claims the ornamental design as shown in the drawings, less the functional features listed in the immediately preceding section.</u> The Court is urged to construe the claim simply to be what is shown in the drawings, minus the above-noted features.

However, if the Court determines it necessary to verbally construe the claim of the '156 patent, Plaintiff's proposed construction would be the following:

I. <u>Overall Ornamental Silhouette</u>. The pet home has a three-dimensional rectangular volume, wherein the visible surfaces of the pet home substantially have an outer texture with the appearance of woven wicker or the like.

II. <u>Individual Ornamental Features</u>. The individual ornamental features shown in the '156 patent drawings include the following elements (note that in using the term "wicker" the Plaintiff is referring to an outer texture having the appearance of woven wicker or the like):

i. A pet home having a rectangular volume, with a top, sides, a rear, and a front.

a. The top has an outer surface substantially having wicker.

20

b.  The sides each have a rectangular window, and the non-window portion of each side has an outer surface substantially having wicker.

c.  The rear includes a rectangular window, and the non-window portion of the rear has an outer surface substantially having wicker.

d.  The front includes a rectangular door, and the non-door portion of the front has an outer surface substantially having wicker.

e.  The sides mostly have wicker.

f.  The rear mostly has wicker.

g.  The majority of the front does not have wicker.

ii.  The front of the pet home is rectangular and has a rectangular see-through door and the door is framed substantially by wicker.

iii.  The pet home has the appearance of being formed from distinct, individual panels that have wicker outer surfaces.

iv.  The individual panels of the pet home are configured such that each panel extends substantially to the edge of the adjacent panels, but no panel extends beyond the adjacent panels.

v.  The pet home has a rectangular window positioned in the upper half of each side and in the upper half of the rear, wherein the non-window portions of the sides and rear have outer surfaces with wicker such that the rectangular windows are surrounded by wicker on all sides.

**2.    *The  Defendant's (Expected) Competing Claim Construction Should be Ignored***

Plaintiff Simpson expects that Mid-West will oppose this motion and assert a different claim construction (presumably along the lines of that Mid-West proposed in their own summary judgment motion). However, Mid-West failed to identify that claim construction during discovery in this action. Simpson sought Mid-West's claim construction contentions during discovery and Mid-West provided answers detailing a particular claim construction theory. Mid-West's new claim construction theory is different from what it provided during discovery. As a result of this failure to disclose, Mid-West should be barred from introducing a new claim construction theory that is inconsistent with its discovery responses.

In addition, Mid-West's (expected) new claim construction theory is flawed and incorrect. First, Mid-West's new claim construction is improperly narrow. Second, Mid-West has attempted to define the scope of the '156 Patent by identifying features that *are not* present in the patent. For example, Mid-West proposes that the claim of the '156 Patent should include the language "there are no figures of shapes woven into or part of the wicker-like material." While, the '156 Patent doesn't show a gorilla sitting inside the pet home, or a tree branch sticking out of a window, the claim of the '156 Patent simply cannot be defined by what it <u>is not</u>. Third, it is legally flawed in that Mid-West seeks to include features that are functional (even features it admits are functional) in the claim construction.

For example, Mid-West argues in its summary judgment brief that the claim of the '156 Patent should include "peg-shaped legs for elevating the structure off the ground." *See* Mid-West's Motion for Summary Judgment, filed July 29, 2008, at page 37. Indeed, Mid-West even defines the feet by their <u>function</u> in their proposed claim (i.e. "<u>for elevating the structure off the ground</u>"). Furthermore, Mid-West also expressly alleges that the feet of the '156 Patent are functional in adopting the "expert" reports of Mr. Bret Smith. For example, Mr. Smith states that "the legs provide points of contact with the floor. Because floors frequently have uneven surfaces, it is easier for four distinct points to rest flat on the floor than the entire bottom surface of the cage. Also, the elevation allows for air circulation." *See* Export Report of Bret Smith on the '156 Patent, at page 6, **Exhibit C**. Since Mid-West has admitted that the feet are functional, the feet must be excluded from any proper claim construction. Similarly, Mid-West has included other functional features in their proposed claim construction such as the door latch, which Mr. Smith also concluded was a functional feature. *Id.* If permitted, Mid-West's claim construction would amount to legal error by incorporating functional aspects into a design patent. <u>Lee v. Dayton-Hudson Corp.</u>, 838 F.2d 1186, 1188 (Fed. Cir. 1988) ("It is the non-functional, design aspects that are pertinent to determinations of infringement."). Where a design

contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent.  Lee, 838 F.2d at 1188.

For the above reasons, the Court is urged to adopt a pictorially-focused claim construction that the '156 patent claims what is shown, less the functional features described above.  But if the Court feels that a more extensive verbal description of the claimed invention is required under the law, it is urged to adopt the description proposed above by Plaintiff Simpson.

### C. Plaintiff is Entitled to Summary Judgment of Design Patent Infringement as a Matter of Law

#### 1.    *The Standard for Design Patent Infringement*

"A design patent protects the nonfunctional aspects of an ornamental design as shown in the patent."  Arminak, 501 F.3d at 1319 (Fed. Cir. 2007) citing Elmer v. ICC Fabricating, Inc., 67 F.3d 1571, 1577 (Fed. Cir. 1995)).  The elements of design patent infringement are set forth at 35 U.S.C. § 289, which states:

> Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $ 250, recoverable in any United States district court having jurisdiction over the parties.

35 U.S.C. § 289.

"Similar to the infringement analysis of a utility patent, infringement of a design patent is evaluated in a two-step process. First, the court must construe the claims of the design patent to determine their meaning and scope." Arminak, 501 F.3d at 1319 (citing OddzOn v. Just Toys, 122 F.3d 1396, 1404-05 (Fed. Cir. 1997)). "Design patents typically are claimed as shown in drawings. Claim construction by a court is adapted accordingly." Arminak 501 F.3d at 1319 (citing Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., 162 F.3d 1113, 1116 (Fed. Cir. 1998)). As noted above the claim construction process is not identical for utility patents and design patents, because of the unique nature of design patents. Accordingly, the Arminak court ruled that "[t]he scope of the claim of a patented design 'encompasses its visual appearance as a whole, and in particular the visual impression it creates.' " Arminak 501 F.3d at 1319-1320 (quoting Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002)).

Second, the court must compare the construed claims to the accused design. Arminak 501 F.3d at 1320 (citing Elmer v. ICC, 67 F.3d at 1577). The comparison of the patented and accused designs involves two separate tests, both of which must be satisfied to find infringement: (1) the "ordinary observer" test; and (2) the

"point of novelty" test.  Bernhardt, L.L.C. v. Collezione Europa USA, Inc., 386 F.3d 1371, 1383 (Fed. Cir. 2004).

The "ordinary observer" test dates back to the nineteenth century, when it was articulated by the United States Supreme Court in Gorham v. White, which held that: "[I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." Gorham Manufacturing Co. v. White, 81 U.S. 511, 528 (1871); followed by Catalina Lighting, Inc. v. Lamps Plus Inc., 295 F.3d 1277, 1286 (Fed. Cir. 2002).

In a separate and distinct inquiry, the "point of novelty" test requires proof that the accused design appropriates the novelty which distinguishes the patented design from the prior art.  Id.; Contessa, 282 F.3d at 1377.  Both the ordinary observer test and the point of novelty test are factual inquiries.  Bernhardt, 386 F.3d at 1383.  The term "novelty" is a term of art in patent law.  In patent parlance, "novelty" is always equated with the "anticipation" standard, not the "obviousness" standard. As noted above, novelty and anticipation consider the content of a single prior art reference, whereas obviousness considers a

combination of prior art references.  *See* <u>RCA Corp. v. Applied Digital Data Sys.,</u>

<u>Inc.</u>, 730 F.2d 1440, 1444 (Fed. Cir. 1984).

    **2.**    ***Summary Judgment that Mid-West's Bay Isle Products Satisfy the*** <u>***Gorham***</u> ***Test for Infringement is Appropriate.***

The "ordinary observer" test for design patent infringement inquires as to whether a purchaser would find that the two designs are substantially the same, such that the purchaser would be confused between the two, or different enough that no such confusion between the patented design and accused product would occur.  Even if many differences may exist between the patented design and the accused product, the Supreme Court has held that infringement exists if an ordinary observer—viewing the accused product through casual observation rather than a critical eye—finds the accused product to be substantially the same as the patented design.

The Supreme Court in <u>Gorham v. White</u> explicitly rejected the notion of using a side-by-side comparison for discerning differences between a patented design and an accused product. The Supreme Court also rejected making the comparison between the patented design and the accused product from the perspective of an expert.  Instead, the proper focus is whether an ordinary observer would be confused.  <u>Gorham Manufacturing Co. v. White</u>, 81 U.S. 511, 528 (1871).

Plaintiff's evidence in support of summary judgment on the Gorham test is substantial and very compelling.  First, the Court can see for itself by simply looking at the '156 Patent and the accused products that the accused products look so like the patented design that ordinary observers are likely to be confused, buying one supposing it to be the other.  Second, there is third-party testimony from professional buyers of the Mid-West Bay Isle product (from one of Mid-West's largest resellers) that the ordinary observer (an ordinary retail consumer) would be confused between the patented design and the Mid-West Bay Isle products.  Third, Plaintiff Simpson has brought forth testimonial evidence demonstrating instances of actual confusion.  Specifically, instances where retail consumers contacted Simpson to try to get replacement parts for Mid-West Bay Isle products because the products look so similar in the marketplace, that even after the consumers had purchased the products, they contacted the wrong manufacturer, for parts.

On the other hand, Mid-West has come forward with no evidence to support its assertion that ordinary observers would not be confused.  Mid-West has produced no survey evidence that supports such a proposition and has no admissible opinion testimony from any expert on this issue.  (See Plaintiff's pending Motion in Limine to exclude Defendant's expert.)  Thus, as explained in

28

more detail in the next several paragraphs, Simpson has brought forward overwhelming, compelling, and uncontroverted evidence of a likelihood that ordinary observers would be confused under the <u>Gorham</u> test, while Mid-West has no evidence to the contrary and cannot muster an evidentiary dispute on this issue.

### i.    <u>Substantial Similarity under *Gorham* is Self-Evident</u>

Mid-West's accused Bay Isle products are so strikingly similar to the design of the '156 Patent that the Court should have no trouble concluding by visual examination that under <u>Gorham</u> the accused Mid-West Bay Isle products are substantially similar enough to the patented design that ordinary observers are likely to be confused.  In <u>Gorham</u>, the infringing products had numerous small detail differences from the patented Gorham design.  But those differences did not prevent the Supreme Court from concluding that the designs were so substantially similar in their overall appearances that ordinary observers were likely to be confused.  <u>Gorham</u>, 81 U.S. 511.  Below are images of the Gorham patented spoon design and the two infringing White designs at issue in that case.  Although there are many small differences, the Supreme Court held that the two designs did not have to be identical for the later design to infringe the earlier patented design.  Otherwise, as noted by the <u>Gorham</u> court, no one would ever infringe a design patent.

| GORHAM PATENT | differences | WHITE ACCUSED DESIGN (1867) |
|---|---|---|
|  | **Finishing point**: circular shaped fleur-de-lis in Gorham, pointed arc in White | |
| | **Interior lines**: slight taper out into scrolls in Gorham, dramatic space gap into scrolls in White | |
| | **Scroll orientation**: scrolls turn out in Gorham, turn in for White. | |
| | **External shape**: handle is at first concave, then gradually convex in Gorham, degree of concavity is greater for White. | |
| | **Outer rim**: beaded edge is interrupted at shoulder and tip at scrolls in Gorham, bead continues unbroken around scrolls in White. | |
| | **External bead**: next to depressed edge there is a second thin ridge formed by an internal line in Gorham, appears in broad part of handle but not in stem of handle in White. | |
| | **Starting point**: circular shaped surrounded by curved points in Gorham, single pointed arc in White | |



| GORHAM PATENT | differences | WHITE ACCUSED DESIGN (1868) |
|---|---|---|

**Finishing point**: circular shaped fleur-de-lis in Gorham, elliptical shape with oval detail in White.

**Interior lines**: slight taper out into scrolls in Gorham, dramatic space gap into scrolls in White

**Scroll orientation**: scrolls turn out in Gorham, turn in for White.

**External shape**: handle is at first concave, then gradually convex in Gorham, degree of concavity is greater for White.

**Outer rim**: beaded edge is interrupted at shoulder and tip at scrolls in Gorham, bead continues unbroken around scrolls in White.

**External bead**: next to depressed edge there is a second thin ridge formed by an internal line in Gorham, appears in broad part of handle but not in stem of handle in White.

**Starting point**: circular shaped surrounded by curved points in Gorham, single pointed arc in White

31

Likewise, in the case at hand, there is a <u>very strong</u> similarity between Mid-West's products and the Plaintiff's patented design. Below are images from the '156 Patent and images of the Mid-West Bay Isle products. While, there are some minor differences, clearly the overall appearances are very, very similar. There is no reason to wait for a trial on this issue, as no reasonable jury could conclude that an ordinary observer would not be confused.



| MID-WEST'S BAY ISLE PET CRATE | DRAWINGS FROM '156 PATENT |
|---|---|
| *oblique view* | *Fig. 1* |



|  |  |
|---|---|
| *front view* | *Fig. 2* |
| *back view* | *Fig. 3* |



| | |
|---|---|
| *top view* | *Fig. 4* |
| *side view* | *Fig. 5* |

In short, this case is much like <u>Gorham</u> in that there are only minor differences between the patented design and the accused product.  And just like in <u>Gorham</u>, the two designs are so alike that the ordinary observer would confuse one for the other.

### ii.    <u>Third Party Testimony Supporting: a Finding of</u> <u>Substantial Similarity</u>

One of the biggest retailers of Mid-West products is a company known as PetSmart, which operates a nationwide chain of "big-box" retail pet stores.  Two of PetSmart's employees were deposed during the discovery in this case and testified that consumers are likely to be confused between the patented design and the Mid-West Bay Isle products.  The two employees are/were professional buyers of pet products, such as those sold by Mid-West.  Indeed, these two employees were the buyers responsible for buying products from Mid-West.

Ms. Laurie Taylor, presently a Vice-President for PetSmart, testified that previously she was a professional buyer of pet products for PetSmart and that she became a buyer for PetSmart sometime around 2001.  *See* Deposition of Laurie Taylor ("Taylor Deposition"), at pages 6-11, **Exhibit D**.  In particular, she testified that she was the buyer for <u>containment</u>, including dog crates, for PetSmart.  *Id.* at

9.  Ms. Taylor further testified that given the amount of care that the average consumer uses in purchasing a product like the Bay Isle product, some consumers at least would confusingly think that the Bay Isle product and the patented product are the same.  *Id.* at 82-85, 126-128.  According to Ms. Taylor's testimony, if consumers were not able to do a side-by-side comparison they would even more likely be confused.  *Id.*  While Ms. Taylor was not able to say with certainty what *percentage* of consumers would likely be confused, her testimony is quite clear that she believed that at least some consumers would be confused and would buy the Mid-West product thinking it was the same as the Simpson Ventures design. *Id.* at 82-85, 97, 126-128.

Ms. Taylor further testified that *as a consumer she herself might be confused* between two designs, depending upon how much time she took to compare the two designs.  *Id.* at 97.  According to Ms. Taylor, the differences in the details between the patented design and the Mid-West design would be more apparent to the consumers if the two designs were compared side-by-side, but the differences in the details of the two designs might not be noticed by consumers if the designs were not compared on a side-by-side basis.  *See* Taylor Deposition, at pages 82-85. Of course, the test for infringement under <u>Gorham</u> does not permit a side-by-side comparison between the patented design and the accused product.  Thus, according

to Ms. Taylor's testimony, under the <u>Gorham</u> test at least some consumers would be likely to be confused between the patented design and the Bay Isle products sold by Mid-West.

Another of PetSmart's professional buyers for pet products, Greg Mantle, also testified in his deposition that he was a buyer for pet products for Pet Smart and had become a buyer for PetSmart in early 2003. *See* Deposition of Greg Mantle ("Mantle Deposition"), at pages 6-14, **Exhibit E**. While Mr. Mantle has not purchased Mid-West Bay Isle crates for PetSmart, he has purchased Mid-West Bay Isle litter pan covers which are fairly similar, but are the subject of a sister design patent infringement suit pending before Judge Albritton. When asked about the Bay Isle wicker crates that are accused infringement in this litigation, Mr. Mantle testified that the patented design and the Bay Isle wicker crates accused of infringement *have similar overall appearances*, stating that "there is a lot of general similarity. *Id.* at 55. Mr. Mantle testified that the patented design and the Bay Isle wicker crate design have the same or similar silhouette. *Id.* Mr. Mantle further testified that other than some detailed differences in the corners and elsewhere, as between the patented design and the Bay Isle wicker crates "the general shape and overall feel of it is very similar". *See* Mantle Deposition at pages 55-56.

When asked whether based on what he knows about consumers of pet products he thought that it is likely that at least some consumers purchasing the Bay Isle wicker crates could mistake that design for the patented design, Mr. Mantle testified "I would think so, yes". *Id.* at 56. Like Ms. Taylor, Mr. Mantle was unsure of the exact *percentage* of consumers that would be likely to be confused, but testified that at least some consumers would be confused. *Id.*

Mr. Mantle testified that unless the Bay Isle product and the patented design were side by side, he doubted that consumers would be able to distinguish one from the other, stating "you know, I don't see a whole lot of features to jump out at me as making one unique over the other." *Id.* at 56-57.

This testimony by a pair of professional buyers about the likelihood of confusion by retail consumers is quite compelling. These buyers are in an excellent position to assess the likelihood that retail consumers might be confused between the patented design and the design of the Mid-West Bay Isle product. As professional buyers of pet products, they are responsible for purchasing and marketing these types of products to consumers. Their experience in selecting pet products to market to retail consumers through the PetSmart stores gives these buyers for PetSmart a considerable understanding of the buying habits of the average consumer. Inasmuch as the average consumer is submitted to be the

relevant ordinary observer under <u>Gorham</u>, it is respectfully noted the testimony from these two PetSmart employees is highly probative. Moreover, since these are third-party witnesses and have no particular interest in the outcome of this litigation, their testimony is quite likely reliable.

### iii. <u>Simpson's Evidence of Actual Confusion</u>

In addition to the above, Simpson presents evidence demonstrating instances of actual consumer confusion between the patented design (as embodied in the commercial embodiment thereof sold by Simpson in the marketplace) and the Mid-West Bay Isle wicker crates. For example, on more than one occasion retail consumers have contacted Simpson Ventures about warranty or parts replacement issues concerning the Mid-West Bay Isle wicker crates. *See* Deposition of Donna Belenchia ("Belenchia Deposition"), at 69:3-74:11, **Exhibit F**. For example, in one recent instance, a consumer contacted Simpson Ventures to get a replacement panel to go on his or her wicker crate; the consumer believing that the wicker crate it had purchased came from Simpson Ventures. Ultimately, Simpson Ventures was able to ascertain that the wicker crate the consumer was calling about was actually a Mid-West Bay Isle product, thereby concluding that the Simpson Ventures replacement part would not fit. Belenchia Deposition at 69:3-74:11. Obviously, marketing information that goes with the sale of the Bay Isle product from Mid-

West tends to suppress such confusion, since once the retail consumer has the Bay Isle product in its hands, all the packaging and instructions and warranty information would indicate that the product comes from Mid-West. However, such advertising or marketing information can not negate the fact (and is legally irrelevant in a design patent analysis) that the two designs are similar enough to be likely to cause confusion.

### iv.    Mid-West has Effectively Admitted that the Mid-West Products Look Substantially the Same as the Patented Design

Based on a series of discovery responses it has provided, and legal positions it has taken, Mid-West has effectively admitted that the Mid-West Bay Isle wicker crates look substantially like the patented design. First of all, Mid-West has formally adopted the testimony and reports of their expert witness, Mr. Brett Smith, as Mid-West's position regarding its noninfringement and invalidity defenses. *See* Defendant's Supplementary Responses to Plaintiff's Interrogatories #8-13, dated June 2, 2008, **Exhibit G**. Thus, rather than answering Plaintiff's contention interrogatories directly, Mid-West has said that its proposed liability expert Mr. Brett Smith speaks for Mid-West on these matters. *Id.*

During his deposition, Mr. Smith testified that the three closest prior art references to the design patented in the'156 Patent look less like the patented design than the Mid-West Bay Isle products. *See* Deposition of Bret A. Smith,

April 28, 2008, ("First Smith Deposition"), at 69:3-74:11, 143:10-17, **Exhibit H**. Thus, according to Mr. Smith's testimony, it is the contention of Mid-West that the "Bay Isle" products accused of infringement look more like the patented design than does the closest prior art.

Mid-West most recently has taken the position (according to Mid-West's view of the law, which Plaintiff Simpson challenges *infra*.) that the KSR decision has done away with the need for a so-called "primary reference" in establishing a prima facie case of obviousness.  *See* Mid-West's Memorandum in Support of its Motion for Summary Judgment, at pages 63-66, 72.  Moreover, at pages 68-72, Mid-West further argues that even if KSR has not done away with the need for a so-called primary reference, many of the prior art references that Mid-West has come forward with, including the three that have been identified as the closest prior art, can be considered primary references.  *Id.* at 72.

However, Mid-West misstates the law here as discussed in greater detail below, in any design patent infringement matter, a primary reference is still required, and can only be applied against a design patent if the reference looks basically the same as what is shown in the patent.   Hupp v. Siroflex, 122 F. 3d 1456, 1462 (Fed. Cir. 1997)(citing In re Rosen, 673 F.2d 388, 391 (CCPA 1982). The net result of all this is that Mid-West is in the unenviable (and one would

surmise surprising to Mid-West) position of having taken the position that the three prior art references it considers to be the closest to the patented design can be considered as primary references AND, thus, has taken the position that it's Bay Isle product design is closer to the patented design than these purported primary references.    Since a primary reference is must have "basically the same" appearance as the design claimed in the patent, Mid-West has effectively stated that the admittedly closer design of its own products is substantially the same under <u>Gorham</u>, as the patented design shown in the '156 Patent.

### v.      **Mid-West Has No Evidence to Support Non-infringement under _Gorham_**

The evidence marshaled above by Plaintiff in support of summary judgment on the <u>Gorham</u> test is very strong.  It is self-evident that ordinary observers are likely to be confused, buying one supposing it to be the other.  The third-party testimony from professional buyers of the Mid-West Bay Isle products alone is sufficient to doom Mid-West's position on the <u>Gorham</u> test.  Simpson has brought forth some testimony evidence of instances of actual confusion.  In addition, the legal positions taken by Mid-West up to now are inconsistent with any assertion by Mid-West that the <u>Gorham</u> test is not satisfied.

In response to this overwhelming evidence, Mid-West has no response with contrary _evidence_.  Mid-West has no survey evidence to counter the testimony of

the PetSmart employees or the testimony of the Simpson employees or the striking similarity between Mid-West's products and the patented design. In the absence of survey evidence, Mid-West's legal arguments should not be effective to create an evidentiary dispute or to otherwise avoid the Court concluding that the Gorham test has been amply satisfied.

### vi.    Bret Smith's Testimony is Not Relevant

To the extent that Mid-West intends to rely on the testimony of Mr. Bret Smith, their purported expert, for the proposition that there is no likelihood that an ordinary observer would be confused, under Gorham, as between the Bay Isle products and the design of the '156 Patent, Plaintiff Simpson notes that a Daubert motion to exclude the testimony of Mr. Smith has been filed with this Court. That Motion in Limine under Dauber demonstrates that Mr. Smith is simply not an expert in patent infringement matters. Indeed, even Mr. Smith admits that he is not an expert in patent infringement matters and any opinion from Mr. Smith that Mid-West would proffer regarding infringement of the '156 Patent should be rejected by this Court.

### 3.    *Summary Judgment Under the Points of Novelty Test is Appropriate.*

As will be discussed and demonstrated *infra*, no prior art reference anticipates the claimed ornamental appearance of the '156 Patent. In fact, Mid-

West's expert witness agrees that no single reference anticipates the '156 Patent. *See* First Smith Deposition at 150:22-151:12, **Exhibit H**. As such, the '156 Patent <u>must</u> be found novel. Because the '156 Patent is novel over the prior art, it is axiomatic that at least one point of novelty exists (Plaintiff Simpson contends that in fact, multiple points of novelty exist). It simply cannot be concluded that <u>no</u> point of novelty exists for the '156 Patent if Mid-West is unable to identify any anticipatory (novelty-defeating) piece of prior art. Therefore, this Court should find that one or more points of novelty necessarily exist that distinguish the '156 Patent from any *single* prior art reference.

### i.       Mid-West has not Offered any Points of Novelty for Consideration

Despite the fact that it is clear that novelty exists in the '156 Patent—and therefore this Court should ultimately make a determination regarding the specific points of novelty that distinguish the '156 Patent from any single prior art reference—Defendant Mid-West has taken the (obviously incorrect) position that no point of novelty exists for the '156 Patent. For example, Defendant Mid-West has made it clear that it "does not concede, let alone contend, that <u>any</u> features depicted in the '156 Patent are in fact Points of Novelty—or 'the novelty which distinguishes the patented design from the prior art.'" *See* Defendant's Responses to Plaintiff's First Set of Interrogatories, at page 9, Response to #9, **Exhibit I.**

44

Additionally, Defendant Mid-West has adopted the testimony of Mr. Smith, who stated that "there are no points of novelty" in his expert report. *See* Export Report of Bret Smith on the '156 Patent, at page 18, **Exhibit C**. Indeed, at no point in this litigation has Mid-West proffered any other contentions regarding the points of novelty and therefore has failed to identify any points of novelty that distinguish the '156 Patent from the prior art. Any attempt by Mid-West at this point in the litigation to proffer a new theory on the points of novelty, or attempts to modify the point(s) on novelty put forth by Plaintiff Simpson Ventures, should be precluded.

> ii.      **The Court Should Adopt Simpson Ventures' Points of Novelty**

Since Defendant Mid-West has failed to identify any points of novelty that distinguish the '156 Patent from the prior art, the only points of novelty for consideration before this Court are those points set forth by Plaintiff Simpson. The points of novelty that Plaintiff Simpson contends distinguish the '156 Patent from the prior art are included in the following statement:

> *Plaintiff states that the point of novelty of the '156 patent, in comparison with the prior art known, includes the following numbered individual features. For conciseness, it should be understood that in using the term "wicker", the Plaintiff refers to an outer texture with the appearance of woven wicker (as the '156 patent is a design patent, the patent covers what can be seen in the drawings, and the drawings depict an outer texture with the appearance of woven wicker). For the convenience of the parties and*

the Court in considering and discussing the points of novelty, descriptive headings are provided below regarding each novel feature.

1.    _Extent of Wicker_

A pet home with a rectangular volume and having a top, sides, a rear, and a front, the top has an outer surface substantially having wicker, the sides each including a window and the non-window portion of each side has an outer surface substantially having wicker, the rear including a window and the non-window portion of the rear has an outer surface substantially having wicker, and the front includes a door and the non-door portion of the front has an outer surface substantially having wicker, wherein the sides and rear mostly have wicker, the majority of the front does not have wicker, and substantially the entire top has wicker.

2.    _Door/Front Panel Configuration_

A pet home with a rectangular volume and having a rectangular front, the front including a rectangular see-through door that is framed substantially by wicker.

3.    _Distinct Panels_

A pet home with a rectangular volume, the pet home having the appearance of being formed from distinct, individual panels having wicker outer surfaces.

4.    _Window Geometry & Placement_

A pet home with a rectangular volume and having a front, sides, a rear and a top, the pet home further having a rectangular window positioned in the upper half of each side and in the upper half of the rear, the non-window portions of the sides and rear having outer surfaces with wicker such that the rectangular windows are surrounded by wicker on all sides.

5.    _Panels Without Overhang_

A pet home with a rectangular volume and having wicker outer surfaces over a majority of the pet home, the pet home having the appearance of

*being formed from individual panels, the panels being configured such that each panel extends substantially to the edge of the adjacent panels, but no panel extends beyond the adjacent panels.*

6.    *Combination of Items 1-5*

*A pet home with a combination of the features as described in Items 1-5 above.*

Plaintiff Simpson recognizes the difficulty in putting into words what is shown in a picture (see claim construction discussion *supra*)—especially when the ornamental appearance must be compared to prior art references.  Therefore, while Plaintiff Simpson believes that the points of novelty identified above are truly representative of the distinguishing features in the '156 Patent, Simpson recognizes that the Court is free to adopt these proposed points of novelty or modify them as it sees fit.  However, Plaintiff Simpson urges this Court to adopt the points of novelty as described herein.

###        iii.    The Mid-West "Bay Isle" Line of Wicker Crates Incorporate All of the Points of Novelty

Assuming that this Court adopts the points of novelty proffered by Plaintiff Simpson, it is clear that Mid-West's Bay Isle line of wicker crates (models: 1824, 1830, 1836, and 1842) incorporate all of the points of novelty.  In fact, during discovery, Defendant Mid-West only asserted that its wicker pet crates lacked *two* of the points of novelty.  Specifically, Mid-West stated that "with regard to the

Points of Novelty…to the effect that the '156 Patented design has a front door "framed" substantially by wicker, the Bay Isle products in fact do not have such a feature." *See* Defendant's Supplementary Responses to Plaintiff's Interrogatories #8, dated June 2, 2008, **Exhibit G** (contending that Mid-West doesn't incorporate the second point of novelty). Additionally, Mr. Smith stated in his report that the Mid-West pet crates have side panels that "do not extend to the edge" of adjacent panels. *See* Second Supplement to Export Report of Bret Smith on the '156 Patent, at page 15, **Exhibit J.** (contending that Mid-West doesn't incorporate the fifth point of novelty). However, Mid-West and/or Mr. Smith have not disputed the remaining points of novelty identified by Plaintiff Simpson.[8] Therefore, Plaintiff Simpson need only address the two points of novelty that have been contested by Defendant Mid-West (the second and fifth points).

First, it is *clear* that the "Bay Isle" line of wicker pet crates encompasses the second point of novelty identified by Plaintiff Simpson in its entirety.

> *Door/Front Panel Configuration*
> *A pet home with a rectangular volume and having a rectangular front, the front including a rectangular see-through door that is framed substantially by wicker.*

---

[8] Defendant Mid-West arguably also implicitly denies their products incorporate point of novelty #6 as it is a combination of all other points.



| MID-WEST'S BAY ISLE PET CRATE | DRAWINGS FROM '156 PATENT |
|:---:|:---:|
| *front view* | *Fig. 2* |

As it can be seen in the photograph above, the front of the Mid-West crate incorporates a rectangular see-through door, and the door is framed *substantially* by wicker.  The term "substantially" is commonly used in the patent context and has been held by many courts to include <u>completely or less than completely of that which is specified</u>.  *See* Amhil Enterprises v. Wawa, Inc., 81 F.3d 1554 (Fed. Cir. 1996) ("same as or close to"); York Products, Inc. v. Central Tractor Farm and Family Center, 99 F.3d 1568 (Fed. Cir. 1996) (substantially means considerable in extent); Zodiac Pool Care, Inc., v. Hoffinger Industries, Inc., 206 F.3d 1408 (Fed.

Cir. 2000) ("substantially inward" means "mainly inward"); Ecolab, Inc. v. Envirochem, Inc., 264 F.3d 1358 (Fed. Cir. 2001) ("'substantially' is a descriptive term commonly used in patent claims to avoid a strict numerical boundary to the specified parameter"); LNP Engineering Plastics, Inc. v. Miller Waste Mills, Inc., 275 F.3d 1347 (Fed Cir. 2001) ("substantially" is "largely, but not necessarily wholly that which is specified").  Given that the term "substantially" encompasses less than completely, it is clear that the front of the Mid-West pet crates, as shown above, includes woven wicker that substantially frames the door (in fact, the woven wicker on the front of the Mid-West pet crates surrounds more than three-fourths of the door).  Moreover, Simpson's second point of novelty points to woven wicker[9] substantially framing the door, and indeed, the '156 Patent clearly shows woven wicker along three-fourths of the door.[10]  Regardless of how the novelty is defined *exactly*, the Mid-West Bay Isle pet crates incorporate almost identically the novel features actually shown in the front face of the '156 Patent is design.  Therefore, the evidence clearly supports a finding that Mid-West has appropriated the second point of novelty identified by Plaintiff Simpson.

---

[9] Note that the points of novelty identified by Plaintiff Simpson define the term "wicker" as "an outer texture with the appearance of woven wicker."

[10] Directly below the door of the '156 Patent is an uncovered bar just like the Mid-West crates.  The frame at the very bottom of the front panel in the '156 Patent is shown covered with a coiled wrapping—not woven wicker.

Second, it is *clear* that the "Bay Isle" line of wicker pet crates encompasses the fifth point of novelty identified by Plaintiff Simpson in its entirety.

> ### *Panels Without Overhang*
>
> *A pet home with a rectangular volume and having wicker outer surfaces over a majority of the pet home, the pet home having the appearance of being formed from individual panels, the panels being configured such that each panel extends substantially to the edge of the adjacent panels, but no panel extends beyond the adjacent panels.*

It appears that Mid-West only contests the language in the fifth point of novelty identified by Plaintiff Simpson that refers to "the panels being configured such that each panel extends substantially to the edge of the adjacent panels…." However, it is indisputable that the Mid-West crates include panels that extend <u>substantially</u> to the edge of adjacent panels (see below).

51



**MID-WEST'S BAY ISLE PET CRATE**

*oblique view* | *top view*

In fact, the panels in the Mid-West products do not extend *completely* to the edge

of adjacent panels only because the "Bay Isle" line of crates are made having a

drop pin that must be inserted at the corners between two adjacent panels.  Apart

from this functional structure, each panel in Mid-West's product extends

"substantially" (or "mainly" or "to a considerable extent" etc.) to adjacent panels

and appropriates the fifth point of novelty identified by Plaintiff Simpson.

The sixth point of novelty is the combination of the first five.  Since Mid-

West's products have the first five points, they also have the combination (the sixty

point).

Therefore, it can be seen that the "Bay Isle" line of wicker pet crates offered for sale by Defendant Mid-West *clearly* appropriates the novelty that distinguishes the '156 Patent from the prior art.

### iv.    Mid-West has No Competing Evidence to Support Non-infringement

It is expected that Mid-West will attempt to show that all of the points of novelty identified by Simpson Ventures are encompassed by the prior art.[11] However, as discussed below (see discussion regarding anticipation *infra*), in order to make a showing that a feature of, the patented design lacks novelty, Mid-West must demonstrate that a <u>single</u> prior art reference encompasses the particular point of novelty in its <u>entirety</u>.  Mid-West cannot possibly make such an evidentiary showing because no single prior art reference has been identified by Mid-West that encompasses any of Simpson's asserted points of novelty.  In fact, Mr. Smith has even admitted that not a single point of novelty identified by Plaintiff Simpson is found in a single prior art reference.  *See* First Smith Deposition, 150:22-151:12; 153:5-14, **Exhibit H**.  Therefore, no matter how many references Mid-West trots out before this Court, it cannot demonstrate that any of the points of novelty identified by Plaintiff Simpson are contained within the prior art—considering

---

[11] After all, this has been Mid-West's and/or Mr. Smith's contention throughout this litigation.

each reference <u>individually</u>.  Mid-West's lawyer arguments of obviousness are irrelevant to this point, since as detailed above, "novelty" and "obviousness" are distinct concepts in established patent parlance.

To the extent that Mid-West wishes to rely on their "expert" Mr. Bret Smith, Plaintiff Simpson again notes that it has filed a motion seeking the exclusion of Mr. Smith's testimony.  Mr. Smith has admitted that he is not an expert in design patent infringement[12] and his opinion to support Mid-West's contention that they do not infringe the '156 Patent should be rejected.

Considering the facts as set forth above, this Court should find that Plaintiff Simpson is entitled to summary judgment on the issues of infringement under both the <u>Gorham</u> test and the "point of novelty" test.

## D. Plaintiff is Entitled to Summary Judgment of Validity as a Matter of Law

### 1.    *The '156  Patent is Presumed Valid Under 35 U.S.C. § 282*

A patent shall be presumed valid.  35 U.S.C. § 282; *see* <u>KSR v. Teleflex</u>, 127 S. Ct. 1727, 1737 (2007).  The U.S. Patent Office employs an entire art unit of specially trained Patent Examiners whose job it is to examine design patent applications and determine their eligibility for patenting.  These professionals are

---

[12] *See* Deposition of Bret A. Smith, June 13, 2008, ("Second Smith Deposition"), at 150:1-5, 15-19; 151:10-14; 154:12-16, **Exhibit K**.

legally presumed to have done their job properly, and the Patent Office's grant of a patent is, by statute, accorded the deference due to a government agency. Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F. 2d 1367, 1375 (Fed. Cir. 1986).

The burden of establishing invalidity of a patent or any claim thereof rests on the party asserting invalidity, which in this case is Mid-West. A patent may be invalidated for anticipation (lacking novelty) under 35 U.S.C. § 102, or for obviousness under 35 U.S.C. § 103. *Id.; see* Adenta GmbH v. OrthoArm, Inc., 501 F.3d 1364, 1371 (Fed. Cir. 2007). Whether a patent is invalid is a question of law based on underlying questions of fact. Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1378 (Fed. Cir. 2005) (citing Netscape Communications Corp. v. Konrad, 295 F.3d 1315, 1321 (Fed. Cir. 2002)).

Overcoming the presumption of validity requires a showing of facts proved by clear and convincing evidence, even in a summary judgment context. Invitrogen v. Biocrest, 424 F.3d at 1378 (citing Connell v. Sears Roebuck & Co., 722 F.2d 1542, 1549 (Fed. Cir. 1983)).

### 2.    *The Standard for Design Patent Anticipation*

If every element of the claimed invention was disclosed in a single piece of prior art, either before the date of invention, 35 U.S.C. § 102(a), or more than one

year before the U.S. patent application was filed, 35 U.S.C. § 102(b), then that prior art "anticipates" the patent because novelty was lacking. Finisar Corp. v. DirecTV Group, Inc., 523 F.3d 1323, 1334 (Fed. Cir. 2008). Although § 102 refers to "the invention" generally, the anticipation inquiry proceeds on a claim-by-claim basis. *Id.*; *see* Hakim v. Cannon Avent Group, PLC, 479 F.3d 1313, 1319 (Fed. Cir. 2007). To anticipate a claim, a single prior art reference must expressly or inherently disclose each and every feature of the claimed invention. *Id.* (citing Celeritas Techs. v. Rockwell Int'l Corp., 150 F.3d 1354, 1361 (Fed. Cir. 1998)); *see also* SRI Int'l, Inc. v. Internet Sec. Sys., 511 F.3d 1186, 1192 (Fed. Cir. 2008). Even if multiple prior art references collectively disclose each element of the claimed invention, that is still not enough – the Federal Circuit has long held that "[a]nticipation requires the presence in a single prior art disclosure of all elements of a claimed invention arranged as in the claim." *Id.* at 1333-35 (citing Connell v. Sears, Roebuck & Co., 722 F.2d at 1548 (Fed. Cir. 1983), Soundscriber Corp. v. United States, 360 F.2d 954, 960 (Ct. Cl. 1966)) (emphasis added).

As with a utility patent, design patent anticipation requires a showing that a single prior art reference is "identical in all material respects" to the claimed invention. Hupp v. Siroflex of Am., Inc., 122 F.3d 1456, 1461 (Fed. Cir. 1997) (emphasis added). Because "that which infringes, if later, would anticipate, if

earlier," Peters v. Active Mfg. Co., 129 U.S. 530, 537 (1889), the design patent infringement test also applies to design patent anticipation. That test requires the court to first construe the claimed design, if appropriate, and then to compare the claimed design to the article. OddzOn, 122 F.3d at 1404 (Fed. Cir. 1997).

Thus, determining anticipation of a design patent is a two step process. First, the court must construe the claim of the design patent to determine its meaning and scope. Arminak, 501 F.3d at 1319 (citing OddzOn, 122 F.3d at 1404-05). In discussing claim construction *supra*, Plaintiff Simpson notes that only the non-functional aspects of an ornamental design as shown in the patent are properly construed as part of the patented design. Door-Master, 256 F.3d at 1312 (Fed. Cir. 2001) (citing Keystone Retaining Wall Sys., Inc. v. Westrock, Inc., 997 F.2d 1444, 1450 (Fed. Cir. 1993)). As demonstrated in great detail *supra*, this Court should adopt the claim construction proffered by Plaintiff Simpson.

Second, the court must compare the construed claims to the alleged anticipating design. Arminak, 501 F.3d at 1320 (citing Elmer v. ICC, 67 F.3d at 1577). In comparing the claimed design and the allegedly anticipating design, the fact finder must use both the "ordinary observer" test and the "point of novelty" test. Bernhardt, L.L.C. v. Collezione Europa USA, Inc., 386 F.3d 1371, 1383 (Fed. Cir. 2004). Both the ordinary observer test and point of novelty test are factual

inquiries.  Bernhardt, 386 F.3d at 1383.   In order for anticipation to be found "the two designs must be substantially the same."  Door-Master Corporation, 256 F.3d at 1313 (citing to Gorham, 81 U.S. at 528) (emphasis added).  Two designs are substantially the same if their resemblance would deceive an ordinary observer into purchasing one design thinking it to be the other.  *Id*.; *see also* Catalina Lighting, Inc. v. Lamps Plus Inc., 295 F.3d 1277, 1286 (Fed. Cir. 2002)).  As a separate and distinct inquiry, the point of novelty test requires the court to determine whether the allegedly anticipating reference incorporates the novelty that distinguished the patented invention over the prior art.  Catalina Lighting, Inc. at 1286-87; Contessa, 282 F.3d at 1377.   A defendant must establish these elements of anticipation by *clear and convincing evidence*.  Door-Master Corporation, 256 F.3d at 1314.

### i.        No Single Anticipatory Reference Has Been Identified by Mid-West

As a threshold matter, to avoid summary judgment of no invalidity for anticipation, Defendant Mid-West must at a minimum identify at least one reference that shows each and every feature of the design shown in the '156 Patent so that a proper anticipation inquiry can be conducted.  However, Mid-West has failed to identify a single reference that Mid-West contends anticipates Plaintiff

Simpson's patented design.[13]  Moreover, in reviewing the prior art references that have been identified by Mid-West, it is clear that Mid-West is simply unable to identify an anticipating reference because such a reference does not exist. (See discussion *infra*).   Regardless, because Mid-West has failed to identify any reference that Mid-West claims anticipates the '156 Patent, it is legally impossible for Mid-West to demonstrate anticipation by clear and convincing evidence. Therefore, Plaintiff Simpson Ventures is entitled to summary judgment that the '156 Patent is not invalid for anticipation.

**ii.**      **Defendant Has Not Presented Any Evidence to Support a Finding of Anticipation**

Even if Mid-West comes forward at this late juncture and attempts to single out one or more prior art references from the pool of references that Mid-West has identified throughout this litigation, it is clear that no reference can be said to anticipate the claim of the '156 Patent.  Indeed, Mid-West has not located a single reference that is "identical in all material aspects" or that is even "substantially the same" to the claimed ornamental invention as depicted in the '156 Patent.  For

---

[13] Simpson Ventures asked for such contention in Plaintiff's Interrogatory No. 13 and Mid-West has not identified any reference.  Defendant's purported expert, B. Smith, initially identified 3 references in his first report, but changed his mind during his deposition.  Defendant did not raise any anticipation argument in its summary judgment motion.  Connell v. Sears Roebuck & Co., 722 F.2d 1542, 1548 (Fed. Cir. 1983) ("…the need to determine obviousness presumes anticipation is lacking").

example, Defendants purported expert, Mr. Bret Smith, identified the following three references as the pieces of prior art that have the most similar appearances when compared to the claim of the '156 Patent:



| MID-WEST'S IDENTIFIED PRIOR ART | DRAWINGS FROM '156 PATENT |



It is clear from a visual examination that these references are not identical (or substantially identical) to the ornamental pet home design shown in the '156 patent. Quite to the contrary, it can be seen that these references encompass visual appearances that are completely and distinctly different from the '156 Patent. Indeed, even Mr. Smith had to agree during his deposition that these references in fact <u>do not anticipate</u> the '156 Patent. *See* First Smith Deposition, 150:22-151:12, **Exhibit H**. Additionally, Mr. Smith agreed that these references <u>are not substantially the same</u> as the '156 Patent. *Id.* at 153:5-14. Therefore, Mid-West has failed to present any evidence that could support a finding of patent anticipation, especially considering Mid-West's heavy burden of demonstrating

anticipation by a showing of clear and convincing evidence. Accordingly, Plaintiff Simpson is entitled to summary judgment that the '156 Patent is not invalid for anticipation.

### 3.    *The Standard for Design Patent Obviousness*

Section 103 prohibits the grant of a patent "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). The ultimate obviousness determination is a legal conclusion based on underlying findings of fact. In re Kotzab, 217 F.3d 1365, 1369 (Fed. Cir. 2000). To determine the question of obviousness, the court must consider:

(1) the scope and content of the prior art;

(2) the differences between the prior art and the claims;

(3) the level of ordinary skill in the art; *and*

(4) objective evidence of non-obviousness.

Riverwood Int'l Corp. v. The Mead Corp., 212 F.3d 1365, 1366 (Fed. Cir. 2000) (citing Graham v. John Deere Co., 383 U.S. 1, 17, (1966)). In the context of a design patent, obviousness is assessed according to "the designer of ordinary capabilities who designs articles of the type presented in that application." In re Nalbandian, 661 F.2d 1214, 1216 (C.C.P.A. 1981).

More specifically, the inquiry is whether one of ordinary skill would have combined the teaching of the several prior art references identified by the party challenging validity, to create the <u>same overall visual appearance</u> as the claimed design.  <u>In re Borden</u>, 90 F.3d 1570, 1574 (Fed. Cir. 1996).  However, in order to combine prior art designs, <u>as a threshold matter</u>, one must first find a single "primary" reference: "a something in existence, the design characteristics of which are basically the same as the claimed design."  <u>Durling v. Spectrum Furniture Co.</u>, 101 F.3d 100, 103 (Fed. Cir. 1996) (quoting <u>In re Rosen</u>, 673 F.2d 388, 391 (C.C.P.A. 1982)).  "In comparing the patented design to a prior art reference, the trial court judge may determine <u>almost instinctively</u> whether the two designs create basically the same visual impression."  <u>Durling</u>, 101 F.3d at 103 (emphasis added).  Once this primary reference is found, other references may be used to modify it to create a design that has the same overall visual appearance as the claimed design.  *Id.* (citing generally, <u>In re Harvey</u>, 12 F.3d 1061, 1063 (Fed. Cir. 1993)).  These secondary references may only be used to modify the primary reference if they are "so related [to the primary reference] that the appearance of certain ornamental features in one would suggest the application of those features to the other."  *Id.* (quoting <u>In re Borden</u>, 90 F.3d at 1575).

63

To the extent that Defendant Mid-West may argue that <u>KSR v. Teleflex</u> overturned the requirement for a primary reference in conducting an obviousness inquiry for design patents,[14] Mid-West is simply incorrect.  First, the Supreme Court in <u>KSR</u> merely held that the Federal Circuit's "TSM" test (Teaching, Suggestion, Motivation) cannot be applied as a rigid and mandatory formula when conducting an obviousness analysis, and in particular, when deciding whether motivation exists to combine two or more prior art references.  <u>KSR v. Teleflex</u>, 127 S. Ct. at 1741.  Instead, <u>KSR</u> pointed out that the motivation to combine two or more references is not required to be found in the prior art references themselves—but can be supported by other factors such as, design needs, market pressures, and/or common sense in certain circumstances (such as when a <u>utility</u> patent claims an innovation that is the combination of two known <u>devices</u> according to their established <u>functions</u>).  *Id*. at 1742.  Second, while it is clear that design patents and utility patents share many of the same statutory requirements for patentabilty—both must be novel under 35 U.S.C. § 102 and nonobvious under 35 U.S.C. § 103—design patents and utility patents ultimately utilize *different* tests for determining infringement and validity (for example, the infringement analysis of a utility patent does not take into consideration the <u>Gorham</u> test, nor the "point

---

[14] *See* Defendant Mid-West's Motion for Summary Judgment, Page 75, FN 28.

of novelty" test).   <u>KSR</u> did not in anyway analyze the unique inquiry for

obviousness pertaining strictly to design patents that requires the identification of a

primary reference that is "basically the same as the claimed design."  Rather, <u>KSR</u>

merely points out that <u>once prior art references have been identified</u>, the motivation

to combine the references cannot be rigidly limited to the TSM test.  The Supreme

Court's ruling in <u>KSR</u> does not affect (positively or negatively) the Federal

Circuit's long held requirement that a primary reference <u>must</u> first be identified

when examining a design patent for obviousness.  This is further supported by the

fact that the U.S. Patent and Trademark Office has updated its Manual of Patent

Examining Procedure (MPEP) to conform to the Supreme Court's holding in <u>KSR</u>

but did not modify the MPEP's requirement for a "primary" reference when

conducting an obviousness inquiry for a design patent as follows:

> As a whole, a design must be compared with <u>something in existence</u>, and not
> something brought into existence by selecting and combining features from
> prior art references. *In re Jennings*, 182 F.2d 207, 86 USPQ 68 (CCPA
> 1950).  The "<u>something in existence</u>" referred to in *Jennings* has been
> defined as "...a reference... the design characteristics of which are basically
> the same as the claimed design...." *In re Rosen*, 673 F.2d 388, 391, 213
> USPQ 347, 350 (CCPA 1982) (the primary reference did "...not give the
> same visual impression..." as the design claimed but had a "...different
> overall appearance and aesthetic appeal...".)  Hence, it is clear that "<u>design
> characteristics</u>" means overall visual appearance. This definition of "<u>design
> characteristics</u>" is reinforced in the decision of *In re Harvey,* 12 F.3d 1061,
> 1063, 29 USPQ2d 1206, 1208 (Fed. Cir. 1993), and is supported by the
> earlier decisions of *In re Yardley*, 493 F.2d 1389, 181 USPQ 331, 334
> (CCPA 1974) and *In re Leslie*, 547 F.2d 116, 192 USPQ 427, 431 (CCPA

1977). Specifically, in the *Yardley* decision, it was stated that "[t]he basic consideration in determining the patentability of designs over prior art is similarity of appearance." 493 F.2d at 1392-93, 181 USPQ at 334. Therefore, in order to support a holding of obviousness, a primary reference must be more than a design concept; it must have an appearance substantially the same as the claimed design. *In re Harvey,* 12 F.3d 1061, 29 USPQ2d 1206 (Fed. Cir. 1993). Absent such a reference, no holding of obviousness under 35 U.S.C. 103(a) can be made, whether based on a single reference alone or in view of modifications suggested by secondary prior art.

MPEP § 1504.03. Finally, and perhaps most persuasively, design patent decisions from other federal courts post-<u>KSR</u> have maintained the requirement that defendants attempting to invalidate a patent under 35 U.S.C. § 103 must "demonstrate that there is a single prior art reference, known as a primary reference, 'the design characteristics of which are basically the same as the claimed design.'" <u>Ashley Furniture Industries, Inc. v. Lifestyle Enterprise, Inc.</u>, 2008 U.S. Dist. LEXIS 16039 (W.D. Wis. 2008) ("To serve as a primary reference, the identified reference must create basically the same visual impression as the patented design") (quoting <u>Aero Products Int'l. Inc., v. Intex Recreation Corp.</u>, 466 F.3d 1000, 1015 (Fed. Cir. 2006); *see also,* <u>Titan Tire Corporation and The Goodyear Tire and Rubber Company v. Case New Holland, Inc.; CNH America LLC; and GPX International Tire Corporation</u>, 2007 U.S. Dist. LEXIS 74173 (S.D. Iowa October 2007) ("The first step in an obviousness analysis for a design patent requires a search of the prior art for a primary reference...and determine whether

there is a single reference that creates 'basically the same' visual impression."
(quoting <u>Durling v. Spectrum Furniture Co., Inc.</u>, 101 F.3d 100, 103 (Fed. Cir. 1996)).

Even if this Court somehow agrees with Defendant Mid-West that <u>KSR</u> alleviates a defendant's need to establish that a primary reference exists when attempting to establish obviousness of a design patent (which Plaintiff Simpson urges would be incorrect), <u>KSR</u> still requires that "obviousness grounds cannot be sustained by mere conclusory statements." *Id.* at 1741 (citing <u>In re Kahn</u>, 441 F.3d 977, 988 (CA Fed. 2006)). Rather, <u>KSR</u> points out that "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Id.* Additionally, a patent is not rendered obvious "merely by demonstrating that each of its elements was, independently, known in the prior art." *Id.* In fact, <u>KSR</u> recognizes that "inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of <u>necessity</u> will be combinations of what, in some sense, is already known. *Id.* (emphasis added).

### i.    <u>Mid-West Has Failed to Identify a Primary Reference</u>

As discussed above, Defendant Mid-West bears the burden of proof and must demonstrate the existence of a primary reference that creates basically the

same visual impression as the ornamental pet home claimed in the '156 Patent. However, Mid-West has failed to even identify a single reference it contends is a primary reference.[15]  Without identifying a primary reference, Mid-West cannot possibly meet its burden of establishing patent invalidity due to obviousness.

### ii.    <u>The Prior Art Fails to Reveal a Primary Reference</u>

Even if Defendant Mid-West now attempts to assert one or more references as "primary references," as required to prove design patent obviousness, it is clear from a review of all of the prior art references identified in discovery by Mid-West, that no such reference exists.

---

[15] Mid-West contends in its Motion for Summary Judgment that the prior art reveals "several clear primary references," but has yet to identify any particular reference(s) that would satisfy this requirement.  *See* Mid-West's Motion for Summary Judgment, pg. 75, FN 28.

| MID-WEST'S IDENTIFIED PRIOR ART | DRAWINGS FROM '156 PATENT |
|---|---|









 





In fact, all of the references identified by Mid-West have visual appearances that are substantially different than the ornamental design shown in the '156 Patent. No reasonable fact finder could decide that any of the prior art references identified

by Mid-West create the same visual impression as the '156 Patent—regardless of the claim construction that this Court adopts. No prior art reference looks anything like the ornamental design shown in the '156 Patent. Indeed, the prior art is vastly different than the claimed invention depicted in the '156 Patent. Therefore, it is legally impossible for Mid-West to meet its burden of proof on even this threshold issue of identifying a primary reference, and Mid-West certainly cannot establish by clear and convincing evidence that the design of the '156 Patent is obvious.

### iii.    <u>No Motivation to Combine Elements in the Prior Art Exists</u>

Even if this Court finds that a primary reference exists somewhere in the prior art that looks substantially the same as the claimed design shown in the '156 Patent (which Plaintiff Simpson urges *does not exist*), Mid-West must further demonstrate by clear and convincing evidence that a motivation existed at the time of Simpson's invention of the design of the '156 Patent to combine features from one or more secondary references to support a finding of obviousness. Mid-West cannot meet this heavy burden. Considering that most, if not all, patents are <u>by necessity</u> a combination of known elements or features, <u>KSR</u> noted that an obviousness analysis cannot be sustained by "mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."    <u>KSR</u>, 127 S.Ct. at 1741.

Furthermore, Mid-West cannot support a finding of obviousness by merely demonstrating that each element of the '156 Patent is shown in the prior art. *Id.* Mid-West must demonstrate by clear and convincing evidence <u>why</u> a person of ordinary skill in the art would have combined elements from the different references in a particular manner. Mid-West has not (and can not) identify any evidence sufficient to meet its burden of proof on this point.

Defendant Mid-West seems to be under the erroneous impression that the relevant inquiry is whether it would have been obvious to one of ordinary skill in the art to combine one or more of the references identified by Mid-West to create *any* pet home having wicker outer surfaces with windows and a door.[16] However, the relevant inquiry is <u>actually</u> whether one or ordinary skill in the art would have been motivated to combine a primary reference with one or more secondary references to arrive at the <u>exact same visual appearance</u> provided by the <u>claim</u> of the '156 Patent—not simply the general concept of covering a pet home in wicker. *See* <u>In re Borden</u>, 90 F.3d at 1574. It is important to note that Mid-West's Motion for Summary Judgment is <u>fatally flawed</u> because Mid-West fails to analyze the <u>claim</u> of the '156 Patent for obviousness as is indisputably required by the law (either the claim that Mid-West now proposes or the ornamental features identified

---

[16] *See* Mid-West's Motion for Summary Judgment, pg. 70.

by Simpson Ventures during discovery, but in any event <u>some</u> claimed design, must be compared element-by-element to the prior art).[17]  Instead, Mid-West has only attempted to introduce evidence to support their theory that the *general concept* of putting wicker on a pet home would be obvious—and even in this regard Mid-West has failed to offer any motivation for doing so.  More importantly, Mid-West has failed to proffer any evidence that would support Mid-West's contention that one of ordinary skill in the art would have been motivated to combine two or more references to arrive at the exact same visual appearance as shown and claimed by the '156 Patent.  Additionally, no evidence introduced by Mid-West supports the assertion that it would have been obvious for one of ordinary skill in the art to combine multiple prior art references to arrive at the same configuration/arrangement of visual elements as shown in the '156 Patent (especially considering elements such as the extent and placement of the wicker, the shapes of the door and windows, etc. that are undeniably part of the patented design).  In fact, Mid-West has failed to proffer any such evidence during the

_____

[17] Plaintiff Simpson Ventures will expand upon this argument in its Opposition to Mid-West's Motion for Summary Judgment, but the fact that Mid-West has failed to analyze the <u>claim</u> of the '156 Patent for both infringement and invalidity as required by case law is informative of Mid-West's lack of evidence to carry its burden of proof on the question of obviousness.

course of this litigation that could possibly meet Mid-West's burden of establishing

obviousness by clear and convincing evidence.

### iv.    <u>Secondary Considerations of Nonobviousness</u>

Even if Mid-West is able to overcome the hurdles of establishing the

existence of a primary reference, identifying secondary references relevant to the

patented design, and proving that one of ordinary skill in the art may have been

motivated to combine the purported primary reference with the one or more

secondary references to create a pet home having the same visual appearance as the

claim of the '156 Patent, this Court must also consider the secondary

considerations of nonobviousness as set forth by the Supreme Court in <u>Graham v.

John Deere, Co.</u>, 383 U.S. 1, 17 (1966).  The following secondary considerations

are relevant to a determination of obviousness; (1) the invention's commercial

success, (2) long felt but unresolved needs, (3) the failure of others, (4) skepticism

by experts, (5) praise by others, (6) teaching away by the prior art, (7) recognition

of a problem, (8) copying of the invention by competitors, and (9) other relevant

factors.  *See* <u>Graham</u>, 383 U.S. at 17; *see also* <u>Brown & Williamson Tobacco Corp.

v. Philip Morris, Inc.</u>, 229 F.3d 1120, 1129 (Fed. Cir. 2000) (citing <u>Environmental

Designs, Ltd. v. Union Oil Co. of Cal.</u>, 713 F.2d 693, 697-98 (Fed. Cir. 1983);

<u>Allen Archery, Inc. v. Browning Mfg. Co.</u>, 819 F.2d 1087, 1092 (Fed. Cir. 1987)

(considering copying, praise, unexpected results, and industry acceptance as indicators of nonobviousness); <u>Diversitech Corp. v. Century Steps, Inc.</u>, 850 F.2d 675, 679 (Fed. Cir. 1988) (considering copying as an indicator of nonobviousness)). The Court of Appeals for the Federal Circuit stated in <u>Stratoflex, Inc. v. Aeroquip Corp.</u>, 713 F.2d 1530, 1538, (Fed. Cir. 1983) that "evidence rising out of the so-called secondary considerations must always when present be considered en route to a determination of obviousness."

The evidence of secondary considerations in the instant case strongly supports a finding that the '156 Patent is nonobvious. First, the '156 Patent has been extremely successful in the marketplace—and such success was almost immediate. For example, Plaintiff Simpson Ventures sold over 9,000 units in the first 12 months that the product was offered for sale and has sold over 45,000 units in total. *See* Plaintiff's Supplementary Responses to Defendant's First Set of Interrogatories, at pages 16-17, **Exhibit L.** And Mid-West has sold 45,000 units of its infringing product. *See* Defendant's Responses to Plaintiff's First Set of Interrogatories, Response to #2, **Exhibit I**; *See* Defendant's Supplementary Responses to Plaintiff's Interrogatories #2, dated June 13, 2008, **Exhibit M**.

Second, it is apparent that there was a long felt need in the marketplace for a wire pet home that was aesthetically appealing.[18]  *See* Deposition of Jeff Simpson, May 2, 2008, ("First Simpson Deposition"), at 72:20-25, 73:1-6, **Exhibit N.** Despite the many attempts by Mid-West and others to market a pet home that was aesthetically pleasing, there is no prior art example of a pet home having the same (or even similar) visual appearance as the '156 Patent (see examples of attempts made by others below).

---

[18] Even Mid-West contends that there was a long felt need in the marketplace for an aesthetically pleasing wire pet home.  *See* Mid-West's Motion for Summary Judgment, pgs. 26-27.

## PRIOR ATTEMPTS TO CREATE AN AESTHETICALLY PLEASING PET HOME



In fact, all of the previous attempts are completely different designs that encompass wildly different visual appearances than the '156 Patent.

Third, the pet home that is the subject of the '156 Patent received laudatory praise in the marketplace, with numerous customers expressing their excitement that such an ornamental pet home was finally available. *See* **Exhibit O**. Finally, Mid-West copied Plaintiff's patented design and began selling the infringing "Bay Isle" product line almost immediately after Simpson Ventures brought their design to the market. *See* First Simpson Deposition, at 119:16-20, **Exhibit N**; **Exhibit P**. Several other infringers appears on the market. Simpson Ventures has been successful in halting other infringers (except for Mid-West) by asserting its patent rights. *See* 30(b)(6) Deposition of Simpson Ventures, at 164:3-10, **Exhibit Q**. Furthermore, Defendant Mid-West has had tremendous commercial success with the "Bay Isle" series of pet crates—Mid-West has sold over 45,000 units itself. *See* Defendant's Responses to Plaintiff's First Set of Interrogatories, Response to #2, **Exhibit I;** *See* Defendant's Supplementary Responses to Plaintiff's Interrogatories #2, dated June 13, 2008, **Exhibit M**.

### v.     Mid-West's Purported Expert Testimony Should Be Rejected

To the extent that Mid-West intends to rely on the testimony of Mr. Bret Smith, their purported expert, for the proposition that it would have been obvious

to combine two or more references to arrive at the same visual appearance claimed by the '156 Patent, Plaintiff Simpson notes that a motion to exclude the testimony of Mr. Smith has been filed with this Court demonstrating that Mr. Smith is simply not an expert in patent invalidity matters.  Indeed, even Mr. Smith admits that he is not an expert in patent validity matters,[19] and his opinion as to the obviousness of combining two or more references to meet the claimed visual appearance of the '156 Patent should be rejected by this Court.

Simply put, Defendant Mid-West has not demonstrated any evidence that would support a finding of patent invalidity due to obviousness—especially considering that Mid-West has the burden of demonstrating obviousness by a *clear and convincing standard*.  Therefore, Plaintiff Simpson in entitled to summary judgment that the '156 Patent is not obvious and is valid.

### E. Some of The Defendant's Affirmative Defenses Are Unsupported By Evidence.

It is well settled that the "burden of establishing an affirmative defense is on the party raising the defense."  Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d

---

[19] When asked: "Do you mean by that that in general you're not an expert in design patent matters?" Mr. Smith responded: "I would not make a blanket statement like that, yes."  *See* Second Smith Deposition, 152:25-153:3, **Exhibit K.**

1368, 1373 (Fed. Cir. 2005)(quoting <u>Jazz Photo Corp. v. ITC</u>, 264 F.3d 1094, 1102 (Fed. Cir. 2001)).  Since Mid-West has failed to develop or produce any evidence to support certain of its defenses, Simpson Ventures seeks a partial summary judgment ruling that those defenses do not bar or defeat Simpson Venture's claims.

### 1.    *Public Use/On-Sale Bar*

To sustain an invalidity determination under § 102(b) for a public use or sale, "the record must show that an embodiment of the patented invention was in public use [or on sale] as defined by the statute before the critical date."  <u>Adenta</u>, 501 F.3d at 1371 (Fed. Cir. 2007) (quoting <u>Motionless Keyboard Co. v. Microsoft Corp.</u>, 486 F.3d 1376, 1383 (Fed. Cir. 2007)).  Courts have held that the record must include *documentary evidence* showing that such embodiment was in either in public use or on sale prior to the critical date (i.e., the critical date being the day that is one year prior to the effective filing date of the patent application).  *See e.g.,* <u>Adenta</u>, 501 F.3d at 1371 (Fed. Cir. 2007)(citing <u>Finnigan Corp. v. Int'l Trade Comm'n</u>, 180 F.3d 1354, 1369 (Fed. Cir. 1999).

Defendant Mid-West has failed to proffer any evidence showing that Plaintiff's patented device was on sale prior to May 2, 2001, the critical date as defined by statute (i.e., one year prior to the Plaintiff's filing date of May 2, 2002).  Accordingly, the Court should grant summary judgment to Simpson Ventures on

the Defendant's affirmative defense that the patented device was on sale and/or in public use prior to the critical date.

### 2.    *Inequitable Conduct*

"Inequitable conduct resides in failure to disclose material information, or submission of false material information, with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence." Kingsdown Med. Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 872, (Fed. Cir. 1988), cert. denied, 490 U.S. 1067 (1989) (citing J. P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc., 747 F.2d 1553, 1559, (Fed. Cir. 1984), cert. denied, 474 U.S. 822 (1985)).

Defendant Mid-West has made no contentions or allegations as to how Plaintiff committed inequitable conduct, and has proffered no evidence on this matter. Accordingly, the Court should grant summary judgment to Simpson the Defendant's affirmative defense of inequitable conduct.

### 3.    *Laches*

To prevail on the affirmative defense of laches, the Defendant must proffer evidence that "the plaintiff delayed filing suit an unreasonable and inexcusable length of time after the plaintiff knew or reasonably should have known of its claim against the defendant; and . . . the delay resulted in material prejudice or

injury to the defendant." <u>Wanlass v. GE</u>, 148 F.3d 1334, 1337 (Fed. Cir. 1998) (quoting <u>Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.</u>, 60 F.3d 770, 773 (Fed. Cir. 1995)).

Here, Defendant Mid-West has failed to proffer any evidence of delay by the Plaintiff in bringing suit.  Moreover, the Defendant has failed to provide any evidence that it was materially prejudiced by any alleged delay.  Accordingly, the Court should grant summary judgment to Simpson Ventures the Defendant's affirmative defense of laches.

### 4. *Estoppel*

Defendant Mid-West has made no contentions or allegations as to why Plaintiff is estopped from bringing suit, and proffered no evidence on this matter. Accordingly, the Court should grant summary judgment to Simpson Ventures the Defendant's affirmative defense of estoppel.

### 5. *35 U.S.C. § 101 and § 112*

Defendant Mid-West has raised the affirmative defense that the '156 Patent is invalid for failing to meet the requirements of 35 U.S.C. § 101 and § 112. Notably, "the 'utility requirement' of 35 U.S.C. § 101 is not applicable to design inventions." <u>In re Finch</u>, 535 F.2d 70, 71 (CCPA 1976).  Here, the '156 Patent is indeed a design patent, and accordingly, the Court should grant summary judgment

to Simpson Ventures on the Defendant's affirmative defense (apparently for lack of utility) pursuant to 35 U.S.C. § 101.  Mid-West has not alleged any specific theory of invalidity under § 101.

Defendant Mid-West further sets forth the affirmative defense that the '156 Patent does not meet the requirements of 35 U.S.C. § 112.  However, Defendant fails to make any contentions as to how the requirements of 35 U.S.C. § 112 have not been met, or proffer any evidence on the matter.  Accordingly, the Court should grant summary judgment to Simpson Ventures on the Defendant's affirmative defense pursuant to 35 U.S.C. § 112.

## III.  <u>CONCLUSION</u>

For the above reasons, Simpson Ventures requests that the Court grant summary judgment to Plaintiff Simpson Ventures regarding infringement, validity, and certain of Defendant Mid-West's affirmative defenses.

Dated this 11th day of August, 2008.

Respectfully submitted,


/Arthur A. Gardner/
Arthur A. Gardner
Counsel for Simpson Ventures, Inc.
Georgia Bar No. 283,995
**Gardner, Groff,**
**Greenwald & Villanueva, PC**
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339
Telephone (770) 984-2300
Facsimile: (770) 984-0098
Email:  agardner@gardnergroff.com

Joseph W. Staley
Counsel for Simpson Ventures, Inc.
Georgia Bar No. 142,571
**Gardner, Groff,**
**Greenwald & Villanueva, PC**
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339
Telephone (770) 984-2300
Facsimile: (770) 984-0098
Email:  jstaley@gardnergroff.com

# CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2008, I electronically filed the foregoing PLAINTIFF SIMPSON VENTURES, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT, with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorney of record:

James M. Hinshaw
Bingham McHale LLP
2700 Market Tower
10 W. Market Street
Indianapolis, IN  46204-4900
(317) 635-8900
Pro Hac Vice

Brett A. Ross
Carr Allison
100 Vestavia Parkway
Birmingham, Alabama  35216
(205) 822-2006

***Attorneys for Defendant***

    /s/ Arthur A Gardner

Arthur A. Gardner
GA Bar No. 283,995
Email:  agardner@gardnergroff.com
GARDNER GROFF, GREENWALD
& VILLANUEVA, P.C.
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339
Tel:  (770) 984-2300
Fax:  (770) 984-0098
***Attorneys for Plaintiff***

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
<u>EASTERN DIVISION</u>

| | | |
|---|---|---|
| SIMPSON VENTURES, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MID-WEST METAL | ) | |
| PRODUCTS | ) | |
| COMPANY, INC. | ) | |
| Defendant. | ) | |
| _____ ) | | Case No. 06-cv-00901-WKW-VPM |
| | ) | |
| MID-WEST METAL | ) | |
| PRODUCTS | ) | |
| COMPANY, INC., | ) | |
| Counterclaimant, | ) | |
| v. | ) | |
| | ) | |
| SIMPSON VENTURES, INC., | ) | |
| Counterdefendant. | ) | |
| _____ ) | | |

<u>PLAINTIFF SIMPSON VENTURES, INC.'S
CORRECTED STATEMENT OF MATERIAL FACTS NOT GENUINELY
IN DISPUTE, FILED IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

COMES NOW the Plaintiff, Simpson Ventures, Inc. (hereinafter "Simpson")

and files this Statement of Material Facts Not Genuinely in Dispute, in Support of

its Motion for Partial Summary Judgment under FRCP 56(a).

## MATERIAL FACTS NOT GENUINELY IN DISPUTE

1.    Mr. Jeffrey Simpson conceived of a wicker pet residence that addressed a need for an indoor pet containment device that would look good inside the home and would blend with various interior decors.   The product he developed used a resin "wicker" that looked like natural wicker, but had the added benefits of being easy to clean and resistant to absorbing liquids and odors. *Exhibit N, Jeff Simpson Deposition at Page 65:17 – 68:2.*

2.    Mr. Simpson applied for a United States design patent for his wicker-look pet residence on June 3, 2002.   *Exhibit A, US Design Patent Number 483,156.*

3.    The United States Patent and Trademark Office ultimately allowed the patent application to issue as a United States design patent.   *Exhibit A, US Design Patent Number 483,156.*

4.    The Simpson patent application issued as United States Design Patent Number 483,156 (the '156 Patent) on December 3, 2003.   *Exhibit A, US Design Patent Number 483,156.*

5.    The '156 Patent is owned by Mr. Jeffrey Simpson, and is licensed to Simpson Ventures, Inc. *Exhibit N, Jeff Simpson Deposition at Page 55:3 – 55:4.*   In particular, Simpson Ventures holds an exclusive license with a right to sue for infringement and collect damages.   *Exhibit A, US Design Patent Number 483,156; Mid-West Metal's Summary Judgment Motion at Page 4.*

6.    Under 35 U.S.C. § 282 the '156 Patent is presumed valid and it has not been declared invalid by this or any other court.  *35 U.S.C. § 282.*

7.    The '156 Patent shows feet at the bottom of the pet home.  The feet function to support the pet home upon the floor.  *Exhibit A, US Design Patent Number 483,156; Exhibit N, Jeff Simpson Deposition at Page 141:20 – 25; Mid-West Metal's Summary Judgment Motion at Page 37; Exhibit C, Brett Smith Expert Report, pg. 6.*

8.    Mid-West's purported expert, Mr. Bret Smith, stated in his expert report that the feet are functional.  *Exhibit C, Brett Smith Expert Report, pg. 6.*

9.    The '156 Patent shows a non-covered pivoting door on the front of the pet home.  The door functions to enable the pet to go into and out of the pet home.  *Exhibit A, US Design Patent Number 483,156; Mid-West Metal's Summary Judgment Motion at Page 38; Exhibit C, Brett Smith Expert Report, pg. 6; Exhibit N, Jeff Simpson Deposition at Page 141:20 – 25.*

10.    Mid-West's purported expert, Mr. Bret Smith, stated in his expert report that the door is functional.  *Exhibit C, Brett Smith Expert Report, pg. 6.*

11.    The '156 Patent shows a latch associated with the non-covered pivoting door on the front of the pet home.  The latch functions to fasten the door in place to secure the pet in the pet home.  *Exhibit A, US Design Patent Number 483,156; Mid-West Metal's Summary Judgment Motion at Page 39,40; Exhibit C, Brett Smith Expert Report, pg. 6; Exhibit N, Jeff Simpson Deposition at Page 141:20 – 25.*

3

12.   Mid-West's purported expert, Mr. Bret Smith, stated in his expert report that the latch is functional. *Exhibit C, Brett Smith Expert Report, pg. 6.*

13.   The '156 Patent shows non-covered windows or openings located on the sides and back of the pet home.  The non-covered windows or openings function to enable the pet to see out of the pet home, to allow the pet owner to see into the pet home, and provide ventilation. *Exhibit A, US Design Patent Number 483,156; Mid-West Metal's Summary Judgment Motion at Page 40; Exhibit N, Jeff Simpson Deposition at Page 141:20 – 25.*

14.   Mid-West's purported expert, Mr. Bret Smith, stated in his expert report that the windows are functional. *Exhibit C, Brett Smith Expert Report, pg. 6.*

15.   The '156 Patent shows mechanical features along the edges and corners of the pet home, including fasteners and links.  The mechanical features function to hold the structure together. *Exhibit A, US Design Patent Number 483,156; Exhibit N, Jeff Simpson Deposition at Page 141:20 – 25.*

16.   The '156 Patent shows a tray or bottom pan along the lower part of the pet home.  The tray or bottom pan functions to collect dirt or debris. *Exhibit A, US Design Patent Number 483,156.*

17.   The '156 Patent shows a tray latch associated with the tray or bottom pan. The tray latch functions to secure the tray or bottom pan in place. *Exhibit A, US Design Patent Number 483,156; Exhibit N, Jeff Simpson Deposition at Page 141:20 – 25.*

18.   The '156 Patent shows a framework.  The framework provides structural rigidity for the pet home and provides a base to which the woven wicker-look material is applied.  *Exhibit A, US Design Patent Number 483,156; Exhibit N, Jeff Simpson Deposition at Page 94:18 – 99:7.*

19.   Simpson Ventures began marketing its wicker-look (wicker) pet residence according to the design shown in the '156 Patent in 2002.  *Exhibit Q, 30(b)(6) Deposition of Simpson Ventures at Page 38:17 – 21.*

20.   After being introduced to the market, the Simpson Ventures wicker pet residence garnered praise from consumers and resellers for the quality of its design and appearance.  *Exhibit O; Exhibit F, Donna Belenchia Deposition at Page  96:20 – 97:6.*

21.   Prior to the Simpson Ventures wicker pet residence being introduced to the market in August of 2002, there had not been an indoor pet containment device on the market having the appearance of wicker.  *Exhibit O.*

22.   By the summer of 2003, sales of the Simpson Ventures wicker pet residence had gone from zero sales to sales of approximately 950 units per month.  *Exhibit Q, 30(b)(6) Deposition of Simpson Ventures at Page 130:14 – 18, 38:17- 21.*

23.   After Simpson Ventures introduced its wicker pet residence, others entered the market for the first time with similar looking products.  To date, there have been several entities that have introduced wicker indoor pet containment devices with a similar appearance to that shown in the '156

Patent and similar to the Simpson Ventures wicker pet residence.  *Exhibit Q, 30(b)(6) Deposition of Simpson Ventures at Page 53:4-62:5.*

24. Simpson Ventures has asserted its intellectual property rights against at least some of these other entities that have marketed similar looking wicker pet residences.  Simpson Ventures has been successful in forcing all entities it has approached except for Mid-West to stop selling the similar looking wicker pet residences.  *Exhibit Q, 30(b)(6) Deposition of Simpson Ventures at Page 53:4-62:5.*

25. Prior to bringing its Bay Isle product to market, employees of Mid-West ordered at least two samples of the Simpson Ventures wicker pet residences.  Upon receiving the Simpson Ventures wicker pet residences, Mid-West employees inspected and evaluated the Simpson Ventures wicker pet residence.  *Exhibit I, Defendant Mid-West's First Response to Plaintiff's 1st Interrogatories, #17; Exhibit G, Defendant Mid-West's Supplemental Response to Plaintiff's Interrogatories, #17.*

26. Mid-West subsequently forwarded photos and/or a part of Simpson's pet home design to Mid-West's Chinese manufacturer.  *Deposition of Stew Kerr at Page 13:20 – 14:7, 16:5 – 13.*

27. After inspecting and evaluating the Simpson Ventures wicker pet residences, Mid-West began producing its "Bay Isle" line of wicker-look pet residences in a manufacturing facility in China.  *Exhibit I, Defendant Mid-West's First Response to Plaintiff's 1st Interrogatories, #17; Deposition of Stew Kerr at Page 23:14-27:9.*

28.  Sometime during the year 2003, Mid-West began importing and selling its Bay Isle line of wicker-look pet residences in the United States. *Exhibit I, Defendant Mid-West's First Response to Plaintiff's 1ˢᵗ Interrogatories, #2, #3, #17.*

29.  The Mid-West Bay Isle line of wicker-look pet residences have a box-like overall shape, with simulated woven wicker covering the top and most of the two sides and the back, the sides and the back having rectangular windows or openings that are not covered in simulated woven wicker, and a front having a see-through door that is framed on the top and two sides by simulated woven wicker. *Exhibit B*; *Mid-West Metal's Summary Judgment Motion at Page 19-21.*

30.  The '156 Patent shows a design of a wicker-look pet residence having a box-like overall shape, with simulated woven wicker covering the top and most of the two sides and the back, the sides and the back having rectangular windows or openings that are not covered in simulated woven wicker, and a front having a see-through door that is framed on the top and two sides by simulated woven wicker. *Exhibit A, US Design Patent Number 483,156.*

31.  Ms. Laurie Taylor is an employee of PetSmart, Inc., a reseller of the Mid-West Bay Isle wicker-look pet residence products. Ms. Taylor testified that she has substantial experience in marketing pet products to consumers. *Exhibit D, Deposition of Laurie Taylor at Page 7:9-22; Page 9:13-11:11; Page 19:1-7.*

32.   Ms. Taylor testified that at least some consumers would likely be confused between the Mid-West Bay Isle wicker-look pet residence and the design of the '156 Patent.  *Exhibit D, Deposition of Laurie Taylor at Page 125:18-128:15.*

33.   Ms. Taylor testified that consumers would be more likely to be confused between the Mid-West Bay Isle wicker-look pet residence and the design of the '156 Patent if they were not making a side-by-side comparison between the two designs.  *Exhibit D, Deposition of Laurie Taylor at Page 125:18-128:15.*

34.   Ms. Taylor further testified that as a consumer even she herself might be confused between two designs, depending upon how much time she took to compare the two designs.  *Exhibit D, Deposition of Laurie Taylor at Page 97:1 – 19.*

35.   Mr. Greg Mantle is an employee of PetSmart, Inc., a reseller of the Mid-West Bay Isle wicker pet residence products.  Mr. Mantle testified that he has substantial experience in marketing pet products to consumers.  *Exhibit E, Deposition of Greg Mantle at Page 11:8-12:18.*

36.   Mr. Mantle testified that at least some consumers would likely be confused between the Mid-West Bay Isle wicker-look pet residence and the design of the '156 Patent.  *Exhibit E, Deposition of Greg Mantle at Page 29:17-33:6*

37.   Mr. Mantle testified that consumers would be more likely to be confused between the Mid-West Bay Isle wicker-look pet residence and the design of

the '156 Patent if they were not making a side-by-side comparison between the two designs.  *Exhibit E, Deposition of Greg Mantle at Page 56:19-57:5*

38.  Mr. Mantle testified that the patented design and the Bay Isle wicker-look crates accused of infringement have similar overall appearances, stating that "there is a lot of general similarity".  *Exhibit E, Deposition of Greg Mantle at Page 55:14 - 20.*

39.  Mr. Mantle testified that the patented design and the Bay Isle wicker-look crate design have the same or similar silhouette.  *Exhibit E, Deposition of Greg Mantle at Page 55:14 - 20.*

40.  Mr. Mantle further testified that other than some detailed differences in the corners and elsewhere, as between the patented design and the Bay Isle wicker-look crates "the general shape and overall feel of it is very similar".  *Exhibit E, Deposition of Greg Mantle at Page 55:21 – 56:13.*

41.  When asked whether based on what he knows about consumers of pet products he thought that it is likely that at least some consumers purchasing the Bay Isle wicker-look crates could mistake that design for the patented design, Mr. Mantle testified "I would think so, yes".  *Exhibit E, Deposition of Greg Mantle at Page 56:8 - 13.*

42.  Mr. Mantle testified that unless the Bay Isle product and the patented design were side by side, he doubted that consumers would be able to distinguish one from the other, stating "you know, I don't see a whole lot of features to

jump out at me as making one unique over the other." *Exhibit E, Deposition of Greg Mantle at Page 56:19 – 57:10.*

43. Ms. Donna Belenchia testified that after Mid-West introduced its Bay Isle line of wicker-look pet residences, Simpson Ventures has experienced a number of instances of consumer confusion, such as consumers of the Mid-West Bay Isle product contacting Simpson Ventures for replacement parts or warranty issues. *Exhibit F, Donna Belenchia Deposition at Page 69:3 – 80:5.*

44. Mr. Jeffrey Simpson also testified that after Mid-West introduced its Bay Isle line of wicker-look pet residences, Simpson Ventures has experienced a number of instances of consumer confusion, such as consumers of the Mid-West Bay Isle product contacting Simpson Ventures for replacement parts or warranty issues. *Deposition of Jeffrey Simpson, June 9, 2008, at Page 58:18-21.*

45. At least one dealer affiliated with Simpson Ventures saw Mid-West's sales flyer announcing the introduction of the Bay Isle products and, apparently believing that Simpson Ventures may have started marketing its product through Mid-West, contacted Mr. Simpson to ask if he had decided to market his Pet Home through Mid-West. *Deposition of Jeffrey Simpson, June 9, 2008, at Page 66:3-14*

46. Mid-West has adopted as its legal position regarding its noninfringement and invalidity defenses by incorporating the testimony and reports of their proffered expert witness, Mr. Bret Smith. *Exhibit I, Defendant Mid-West's*

10

*First Response to Plaintiff's 1ˢᵗ Interrogatories; Exhibit G, Defendant Mid-West's Supplemental Response to Plaintiff's Interrogatories.*

47. Thus, rather than answering certain contention interrogatories directly, Mid-West has responded by incorporating the testimony and reports of its proposed liability expert Mr. Brett Smith.  *Exhibit I, Defendant Mid-West's First Response to Plaintiff's 1ˢᵗ Interrogatories; Exhibit G, Defendant Mid-West's Supplemental Response to Plaintiff's Interrogatories.*

48. As a result of incorporating by reference the reports and testimony of Mr. Bret Smith in its discovery responses, Mid-West has answered that on at least the issues for which Mr. Smith's reports and testimony has been incorporated by reference, Mr. Smith speaks for Mid-West.  *Exhibit I, Defendant Mid-West's First Response to Plaintiff's 1ˢᵗ Interrogatories; Exhibit G, Defendant Mid-West's Supplemental Response to Plaintiff's Interrogatories.*

49. During his deposition, Mr. Smith testified that the Mid-West Bay Isle products look more like the patented design than do the three prior art references he considered closest to the design patented in the'156 Patent. *Exhibit H, Bret Smith Deposition, April 28, 2008, at Page 59:14 – 63:21, 143:10 – 11.*  Thus, according to Mr. Smith's testimony and Mid-West's discovery responses, it is the contention of Mid-West that the Bay Isle products accused of infringement look more like the patented design than does the closest prior art reference. *Exhibit H, Bret Smith Deposition, April 28, 2008, at Page 59:14 – 63:21, 143:10 – 11.*

50.    Mid-West has come forward with no survey evidence to support its contention that, under <u>Gorham</u>, there is no likelihood of ordinary observers being confused between the patented design and the Bay Isle products. *Exhibit I, Defendant Mid-West's First Response to Plaintiff's 1ˢᵗ Interrogatories, #14.*

51.    Mid-West has failed to identify a single reference that Mid-West contends anticipates Plaintiff Simpson's patented design. *Exhibit G, Defendant Mid-West's Supplemental Response to Plaintiff's Interrogatories, #13.*

52.    There is no single prior art reference that, by itself, shows every feature of Plaintiff Simpson's patented design. *Exhibit H, Bret Smith Deposition, April 28, 2008, at Page 150:22 – 153:12.*

53.    During his deposition, Defendant's purported expert, Mr. Bret Smith, identified three prior references as the pieces of prior art that have the most similar appearances to the design shown in the '156 Patent. However, Mr. Smith then testified that none of designs in these three prior art references are substantially the same as that shown in the '156 Patent. *Exhibit H, Bret Smith Deposition, April 28, 2008, at Page 156:11 - 17.*

54.    The Mid-West Bay Isle design looks more like the patented design in the '156 Patent than does any single known prior art reference. *Exhibit H, Bret Smith Deposition, April 28, 2008, at Page 59:14 – 63:21.*

55.  Mid-West has not indentified any point, or points, of novelty that distinguish the '156 Patent from the prior art. *Exhibit I, Defendant Mid-West's First Response to Plaintiff's 1st Interrogatories, #9.*

56.  Simpson has identified six points of novelty that is contends distinguishes the '156 Patent from the known prior art. *Plaintiff's Second Supplemental Response to Defendant's Interrogatories, #11.*

57.  Mid-West has not identified any single prior art reference that encompasses one or more of the six points of novelty that have been identified by Simpson. *Exhibit H, Bret Smith Deposition, April 28, 2008, at Page 100:9 – 123:18.*

58.  Mid-West has not identified any single reference that it contends is a primary reference. *Mid-West Metal's Summary Judgment Motion at Page 75; Exhibit I, Defendant Mid-West's First Response to Plaintiff's 1st Interrogatories, #13; Exhibit G, Defendant Mid-West's Supplemental Response to Plaintiff's Interrogatories, #13.*

59.  No primary reference exists within the known prior art. *Mid-West Metal's Summary Judgment Motion at Page 75; Exhibit I, Defendant Mid-West's First Response to Plaintiff's 1st Interrogatories, #13; Exhibit G, Defendant Mid-West's Supplemental Response to Plaintiff's Interrogatories, #13.*

Dated this 12th day of August, 2008.

Respectfully submitted,


/Arthur A. Gardner/
Arthur A. Gardner
Counsel for Simpson Ventures, Inc.
Georgia Bar No. 283,995
**Gardner, Groff,**
**Greenwald & Villanueva, PC**
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339
Telephone (770) 984-2300
Facsimile: (770) 984-0098
Email:  agardner@gardnergroff.com

Joseph W. Staley
Counsel for Simpson Ventures, Inc.
Georgia Bar No. 142,571
**Gardner, Groff,**
**Greenwald & Villanueva, PC**
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339
Telephone (770) 984-2300
Facsimile: (770) 984-0098
Email:  jstaley@gardnergroff.com

# CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2008, I electronically filed the foregoing PLAINTIFF SIMPSON VENTURES, INC.'S CORRECTED STATEMENT OF MATERIAL FACTS NOT GENUINELY IN DISPUTE, with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorney of record:

James M. Hinshaw
Bingham McHale LLP
2700 Market Tower
10 W. Market Street
Indianapolis, IN  46204-4900
(317) 635-8900
Pro Hac Vice

Brett A. Ross
Carr Allison
100 Vestavia Parkway
Birmingham, Alabama  35216
(205) 822-2006

**_Attorneys for Defendant_**

\_\_/s/ Arthur A Gardner_____

Arthur A. Gardner
GA Bar No. 283,995
Email:  agardner@gardnergroff.com
GARDNER GROFF, GREENWALD
& VILLANUEVA, P.C.
2018 Powers Ferry Road, Suite 800
Atlanta, Georgia 30339
Tel:  (770) 984-2300
Fax:  (770) 984-0098
**_Attorneys for Plaintiff_**

15

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## <u>EASTERN DIVISION</u>

SIMPSON VENTURES, INC., )
               *Plaintiff*, )
v. )
                )
MID-WEST METAL )
PRODUCTS )
COMPANY, INC. )
               *Defendant*. )
_____)    Case No. 06-cv-00901-WKW-VPM
                )
MID-WEST METAL )
PRODUCTS )
COMPANY, INC., )
          *Counterclaimant*, )
v. )
                )
SIMPSON VENTURES, INC., )
         *Counterdefendant*. )
_____)

## <u>[PROPOSED] ORDER</u>

Plaintiff Simpson Ventures, Inc., having filed its Motion To Correct Memorandum and Statement of Material Facts In Support Of Motion For Partial Summary Judgment, and the Court being duly advised in the premises and having considered said Motion, now finds this Motion meritorious and hereby orders said Motion GRANTED.

IT IS, THEREFORE, ORDERED that Simpson Ventures, Inc., by counsel, be allowed to substitute the Corrected Memorandum and Statement

of Material Facts, for the originals of the same filed with the Court as Document Nos. 68 and 69 on August 11, 2008.

SO ORDERED, THIS _____ DAY OF August, 2008.

_____