# EXHIBIT A

(12) **United States Design Patent**   (10) Patent No.:      **US D483,156 S**
Simpson                                 (45) Date of Patent:  **  Dec. 2, 2003**

(54) **PET HOME**

(76) Inventor:  **Jeffrey M. Simpson**, 381 Oak Ridge
                Dr., Auburn, AL (US) 36380

(**) Term:      **14 Years**

(21) Appl. No.: **29/160,054**

(22) Filed:     **May 2, 2002**

(51) **LOC (7) Cl.** .................................................. **30-02**
(52) **U.S. Cl.** ........................................................ **D30/108**
(58) **Field of Search** ................................ D30/108–119,
                D30/161; 119/28.5, 165–170, 428–429,
                432, 453, 461, 463, 468–470, 474, 482,
                497–499, 531, 537, 725; D6/391

(56)            **References Cited**

        U.S. PATENT DOCUMENTS

        1,211,762 A  *  1/1917  Sawyer ........................ D6/391
        2,789,531 A  *  4/1957  Diefendorf .................. 119/461
        4,256,056 A  *  3/1981  Sou ............................. 119/497
        D382,374 S   *  8/1997  Burks .......................... D30/116
        5,960,744 A  * 10/1999  Rutman ....................... 119/498
        5,967,090 A  * 10/1999  Hui ............................. 119/497
        D427,730 S   *  7/2000  Powers et al. ............. D30/114
        6,354,245 B1 *  3/2002  Roddy et al. .............. 119/453

OTHER PUBLICATIONS

In the Company of Dogs catalog; Spring Preview 2001; p.
8; Delux Sport Utility Bicycle with bamboo and rattan
wrapped steel baskets for pets.*

* cited by examiner

*Primary Examiner*—Cathy Anne MacCormac
(74) *Attorney, Agent, or Firm*—Bradley Arant Rose &
White LLP

(57)            **CLAIM**

The ornamental design for a pet home, substantially as
shown and described.

                **DESCRIPTION**

FIG. 1 is a perspective view taken from the front and right
side, showing my new design;
FIG. 2 is a front view thereof;
FIG. 3 is a rear view thereof;
FIG. 4 is a top view thereof; and,
FIG. 5 is a side view thereof, the opposite side being a mirror
image.
The bottom and interior are not shown and not claimed.

                **1 Claim, 4 Drawing Sheets**







Fig. 1

**U.S. Patent**     Dec. 2, 2003     **Sheet 2 of 4**     **US D483,156 S**



*Fig. 2*



*Fig. 3*

**U.S. Patent**        Dec. 2, 2003        **Sheet 3 of 4**        US D483,156 S



Fig. 4



*Fig. 5*

# EXHIBIT B

# Bay Isle
### c o l l e c t i o n







## Model 1824
**Size:** 24 L x 20 W x 21 H"
   61 L x 51 W x 53 H cm
**Mesh:** 1 1/2 x 5"   3.8 x 12.7 cm
**Material:** Woven Polyethylene
   Over Black E-Coat Wire,
   Plastic Pan
**Wire Gauge:** 3, 6, 7, 9, 12
**Weight:** 20 lbs (23 w/ctn)
   9.1 kg (10.4 w.ctn)
* **Accessories:** all 24" / 61 cm
   QuietTime™ Beds



## Model 1830
**Size:** 30 L x 23 W x 24 H"
   76 L x 58 W x 61 H cm
**Mesh:** 1 1/2 x 5"   3.8 x 12.7 cm
**Material:** Woven Polyethylene
   Over Black E-Coat Wire,
   Plastic Pan
**Wire Gauge:** 3, 6, 7, 9, 12
**Weight:** 28 lbs (32 w/ctn)
   12.7 kg (14.5 w.ctn)
* **Accessories:** all 30" / 76 cm
   QuietTime™ Beds



## Model 1836
**Size:** 36 L x 23 W x 24 H"
   91 L x 58 W x 61 H cm
**Mesh:** 1 1/2 x 5"   3.8 x 12.7 cm
**Material:** Woven Polyethylene
   Over Black E-Coat Wire,
   Plastic Pan
**Wire Gauge:** 3, 6, 7, 9, 12
**Weight:** 31 lbs (36 w/ctn)
   14.5 kg (16.3 w.ctn)
* **Accessories:** all 36" / 91 cm
   QuietTime™ Beds



## Model 1842
**Size:** 42 L x 26 W x 28 H"
   107 L x 66 W x 71 H cm
**Mesh:** 1 1/2 x 7 7/8"   3.8 x 20 cm
**Material:** Woven Polyethylene
   Over Black E-Coat Wire,
   Plastic Pan
**Wire Gauge:** 3, 6, 7, 9
**Weight:** 43 lbs (48 w/ctn)
   19.5 kg (21.8 w.ctn)
* **Accessories:** all 42" / 107 cm
   QuietTime™ Beds







**Front Panel Opens For
Easy Access to Interior**

## Model 1805
*Hide-A-Way*

**Size:** 23 1/4 L x 17 1/4 W x 19 3/4 H"
   59 L x 44 W x 50 H cm
**Mesh:** 6 7/8 x 7 1/2"   17.5 x 19.1 cm
**Material:** Woven Polyethylene
   Over Black E-Coat Wire
**Weight:** 13 lbs (15 w/ctn)
   5.9 kg (6.8 w.ctn)



*For a Complete Listing of Accessories*

**Pet Beds • Crate Casters
Feed Bowls • Nameplate Kits . . .**

*– Come Visit Our Website*



PART# 5027 (75)    Made in China
P.O. Box 1031 Muncie, IN 47308 USA
800 428 8560 / www.midwesthomes4pets.com


**MidWest** ®
*Homes For Pets*

MWM 00018

# EXHIBIT C

# Design Analysis
## of
# United States Design Patent Number US D483,156 S

Expert Report of Professor Bret H. Smith, IDSA
AUGUST 17, 2007

# Report

In the United States District Court
For the Middle District of Alabama
Eastern Division

| | |
|---|---|
| Simpson Ventures, Inc.,<br>*Plaintiff,*<br>V.<br>Mid-West Metal Products<br>Company, Inc.,<br>*Defendant* | Civil Action File No.<br>406-cv-901-WKW-VPM |

## Expert Report of Professor Bret H. Smith, IDSA

### Introduction

My Name is Bret H. Smith. I am a full professor in the industrial design department at Auburn University where I have taught industrial design for over twenty-one years.

I have been retained in the above referenced lawsuit as an industrial design expert witness. I am being compensated for my work here at a rate of $180 an hour. I have no financial interest in the outcome of this case.

### Background and experience

I graduated Summa Cum Laude from Purdue University with B.S. degree in Industrial Technology. I have an M.A. in English, and an M. A. in Industrial Design, both from Purdue University (the Masters Degree is the terminal degree in industrial design).

As an industrial designer, I have worked on brand identity, commercial food equipment, medical equipment, consumer products, computer applications research, the habitation module of the international space station, hand tools, instrumentation, software interface design, and human factors. I have supervised industry projects for NASA, Martin Marietta Denver Aerospace, 3-M Company, IBM, Mead Imaging, Broan-Nutone and others. In addition to this, I have directed over $300,000 in research projects while at Auburn University.

I have served on the executive board and the board of directors of our professional society, the Industrial Designers Society of America (IDSA), and served as

the Southern District Vice President of IDSA. I have also served as a referee for *Innovation*, the only refereed journal of industrial design in the United States. I have lectured internationally on industrial design, human factors, and human behavior.

I have received special commendation from NASA for my contributions to design for the International Space Station, hold a Citation of Merit from NV Phillips, and am a life member of Phi Kappa Phi. A list of my publications during the last ten years, courses taught, and research conducted may be found in my *Vitae* located in the appendix. My most recent publications are listed on pages 7-9 of my *Vitae*.

### Patent Review

In reviewing U.S. Patent D 483,156 I have reviewed the patent document, the patents listed as prior art within the '156 patent, additional patent documents, on line resources, books on weaving, basketry and furniture, relevant sections of *Chisum on Patents*, assembled and photographed a Bay Isle cage, and spoken with those knowledgeable about animal behavior. A complete collection of these references is provided in the appendix.

I have received and reviewed Simpson Ventures' supplemental interrogatories. I understand that Simpson Ventures has responded but has objected to, interrogatories and requests for production of documents submitted by Mid-West Metal. I understand that Simpson Ventures' responses may not be complete. I thus reserve the right to review Simpson Ventures' complete responses upon submission and to revise or supplement my analysis accordingly.

1

# Design Analysis
## of
# United States Design Patent Number US D483,156 S

## Subject

This document provides an analysis of patent D 483,156, hereafter referred to as "'156," licensed to Simpson Ventures, Inc., hereafter referred to as "Simpson Ventures;" a comparison of that patent to prior art; and a comparison of the '156 patent to the Bay Isle design by Mid-West Metal Products Company Inc. The '156 patent is for a pet home. The top and the four sides are depicted in the patent drawings (Figures 1-5). The bottom of the cage is expressly disclaimed in patent '156. My evaluation will include a review of the functional and ornamental aspects of the design as well as relevant pieces of prior art. Throughout this report the words "wicker" and "rattan" will be used interchangeably to describe surfaces that are woven in texture.

## Verbal description of the '156 patent design

The pet house is rectangular in shape with rattan on all visible sides. It has four sides, and a top.

It is depicted as a rectangular structure with rattan

on the five visible surfaces. The top of the structure is completely covered by rattan (Figure 2).

The front side has a square door with a grid of bars. It latches on the right and opens to the left. The door is not covered by rattan (Figure 3). Rattan is present above and on both sides of the door.



Figure 2. Top view of patent '156



Figure 1. 3/4 view of the '156 patent.



Figure 3. Front view of patent '156.

2



Figure 4. Side view of pet house '156

The right and left sides are each composed of two parts (Figure 4). The top side piece, comprising approximately 7/8ths of the vertical height, has a rectangular opening, or window, above the horizontal center line. The window is created by the absence of the rattan material that leaves the bars of the frame exposed. A separate narrow piece is located at the bottom of both the right and left sides. This bottom side piece runs the entire length of each side and comprises a little over 1/8th of the vertical height of the side. It is covered with rattan.

The back of the structure is covered by rattan except for a small rectangular opening at the top of the back panel that serves as a handle (Figure 5). The opening is centered and unobstructed. The back has a latch at the bottom, presumably to secure the bottom tray.

The structure rests on the floor by means of four legs (Figure 5).



Figure 5. Back view of pet house '156

3

## Ornamental features:

Several ornamental elements are noteworthy. These elements are provided by specific choices in weave and method of construction (Figure 8), much in the same way that some patterns in rugs or fabric are dictated by choices in weaving method at specific points. In addition to this, the corner details provided by the method of fastening form part of the over all visual impression by providing a repetitive element that is consistent in size at each connection point.

### Front

The weave pattern on the front has a visual element in the center above the door (Figure 7) that is created by a change in the weave. This change in weave will be subsequently referred to as a "loose weave."
The front also has tight continuous coils that appear around the perimeter.



Visual element

Figure 6. 3/4 view of Patent '156



Continuous coils

Visual element

Fastener detail

Figure 7. Front view of Patent '156



Figure 8. Examples of various border weaves
Based on figures found in *Baskets and Basketry*, 1959 & 1972
See attached for more examples.

4

## Sides

In the ¾ view drawing (Figure 9), the right side also has decorative vertical accents above the window and in the narrower horizontal piece at the bottom of each side -- a loose weave pattern. In the case of the sides, the choice to stop the cane wrapping at the end of each side of the windows is also a decorative choice. Both the top and bottom pieces have tight continuous coils around the perimeter.

The proportion of the narrow bottom piece on the right and left sides and the visual separation that it creates (Figure 10) is a decorative element because of the proportions and spacing. As in the case of the front, the corner connections also provide a visual detail by providing a repetitive element that is consistent in size at each connection point.



Figure 9. 3/4 view of weave in patent '156.



Figure 10. Side view of patent '156.

## Functional features

The following are functional features: the rectangular shape, the door and latch, the windows, the handle slot, the legs, and the rattan surface.

### Rectangular shape:

The rectangular shape is a function of two require-ments: manufacturing and collapsibility. The rectangu-lar sides, top, and bottom are more easily suited to the production requirements of contemporary manufac-turing processes than are other shapes. Rectangular shapes are more easily measured, cut, joined, and transported than other shapes. From the drawings it also may be inferred that the cage is designed to be collapsible based upon the corner joining detail. If the object is designed to be collapsible, the rectangular shape better accommodates the collapsibility of a ridged cage.

### Door

The door provides egress and ingress for the pet. It is also a source of fresh air. The latch provides a way of keeping the pet in the cage if necessary.

### Windows

The windows provide a way for the animal to look out and observe its environment, something that is impor-tant for the psychological comfort of the animal. They are also a source of fresh air.

### Handle and catch

The handle on the back provides a hand hold at the back of the cage so that it can be more easily lifted (Figure 12). The catch at the bottom most likely serves to hold the bottom pan in place.

### Legs

The legs provide points of contact with the floor. Because floors frequently have uneven surfaces, it is easier for four distinct points to rest flat on the floor than the entire bottom surface of the cage. Also, the elevation allows for air circulation.

### Material choice

As a material choice, the rattan has several functional purposes. The rattan serves to provide cover—an area in which the pet can rest unobserved. According to Charles Hendrix, DVM, Professor of Veterinary Medi-cine at Auburn University and Vice President of the AVMA, dogs are den animals. The wicker reinforces the den quality of the space. The wicker is also an im-portant functional feature for cats. According to San-dra McCune, Sub-Department of Animal Behaviour, University of Cambridge, and Madingley, Cambridge CB3 8AA, UK, in *Environmental Enrichment Informa-tion Resources for Laboratory Animals: 1965 - 1995: Birds, Cats, Dogs, Farm Animals, Ferrets, Rabbits, and Rodents*, cats prefer resting places that are warm, dry, and protected on one, or even better, two sides.

If the weave of the rattan is loose, it will also allow the animal to see out through the weave without being observed. Because rattan is a woven material it has superior air circulation when compared with solid materials like sheet metal, wood, wood composites, or plastic. This is important to the needs of the animal for fresh air. If the rattan was made from a synthetic ma-terial, it would also retard the growth of mold. The rat-tan also provides a friendlier material finish; one that is more compatible with interior décor than wire pet cages or plastic pet carriers. In other words, the rattan allows it to perform the function of blending into the environment better than other materials.



Figure 11. 3/4 of view patent '156



Figure 12. Back view of pet house '156

6

## A person of ordinary skill

A person of ordinary skill in the relevant arts in the case of this design would be a person with a bachelor's degree in industrial design[1] and three or more years of experience. The designer would also have or be able to acquire knowledge in the design of products that require frame construction or wicker fabrication. The designer also would possess, or be able to acquire, a knowledge of the animal equivalent of human factors or ergonomics. (Ergonomics, according to the *Columbia Encyclopedia*, is "the engineering science concerned with the physical and psychological relationship between machines and the people who use them.") For the purposes of this analysis I will refer to this knowledge as "animal factors."

Alternatively, a person of ordinary skill might also be a someone with more than six years of practical experience designing objects for metal fabricators, furniture design, or store fixture design, or would have or be able to acquire substantial knowledge of metal fabrication, kinematics, and assembly. The person also would possess or be able to acquire skill in researching and understanding manufacturing processes, including wicker weaving, and a knowledge of animal factors, or be able to acquire such knowledge.

---

[1] According to the Industrial Designers Society of America, Industrial design (ID) is the professional service of creating and developing concepts and specifications that optimize the function, value and appearance of products and systems for the mutual benefit of both user and manufacturer.

Industrial designers develop these concepts and specifications through collection, analysis and synthesis of data guided by the special requirements of the client or manufacturer. They are trained to prepare clear and concise recommendations through drawings, models and verbal descriptions.

The industrial designer's unique contribution places emphasis on those aspects of the product or system that relate most directly to human characteristics, needs and interests. This contribution requires specialized understanding of visual, tactile, safety and convenience criteria, with concern for the user. Education and experience in anticipating psychological, physiological and sociological factors that influence and are perceived by the user are essential industrial design resources.

Industrial designers also maintain a practical concern for technical processes and requirements for manufacture; marketing opportunities and economic constraints; and distribution sales and servicing processes. They work to ensure that design recommendations use materials and technology effectively, and comply with all legal and regulatory requirements.

In addition to supplying concepts for products and systems, industrial designers are often retained for consultation on a variety of problems that have to do with a client's image. Such assignments include product and organization identity systems, development of communication systems, interior space planning and exhibit design, advertising devices and packaging and other related services. Their expertise is sought in a wide variety of administrative arenas to assist in developing industrial standards, regulatory guidelines and quality control procedures to improve manufacturing operations and products.

Industrial designers, as professionals, are guided by their awareness of obligations to fulfill contractual responsibilities to clients, to protect the public safety and well-being, to respect the environment and to observe ethical business practice.

www.idsa.org

## Prior art

At least three areas of prior art are relevant to this design. The first is the method of construction of the rattan pieces of the pet house. The second is the construction of pet cages in general. The third is the combination of metal and rattan-type materials.

## Method of construction of woven materials

While rattan was originally a term that was applied to objects constructed of specific materials (palm trees belonging to the genus *Calamus*, native to the tropical regions of Africa and India), it has come to be used as a term that describes objects made of woven, wood-like material. This type of weaving goes back at least 10,000 years with the oldest examples having been unearthed in Faiyum in upper Egypt. One of the oldest complete baskets can be found in the British Museum and has been dated at 3000 BC (Figure 13). More specifically, there are a number of examples of woven, or rattan, cages for pets.

Weaving decorative and utilitarian objects is as old as recorded history (Figure 14). The transition to mass produced woven objects did not come about until the 19th century, when the Thonet Company and others, began mass producing furniture with wicker components. Figure 15 shows the first widely mass produced wicker chair. It was designed by Thonet, and is designated chair number 14. It began distribution in the late 1850s. Figure 16 shows a wood and rattan partition which appeared in the 1904 Thonet furniture catalog. In addition to being strong and light weight, wicker is also an aesthetically pleasing material as Christopher Will points out in *International Basketry* published in 1978, "Even the simplest weave is an ornament, readily recognizable to the eye (pg.9).



Figure 13. Egyptian Basket, circa 3000 BC from collection of the British Museum.



Figure 15. Thonet Chair number 14, First produced in 1859. Still in production today, it has the distinction of being the longest running mass produced chair in history. This picture is take from the 1904 Thonet Catalog.



Figure 14. Basket from Egypt Probably 18th Dynasty, 1550-1300 BC from collection of the British Museum.



Figure 16. Thonet wood and rattan partition from the 1904 Thonet catalog.

The use of wicker or rattan for the construction of pet cages can be reliably traced back to the beginning of the last century. In the *Department of the Interior Ethnological Survey 1904*, a photograph of a "cage in which fowls are shut at night" depicts a woven cage with a securable front opening from Manila (www. bohol.ph/books/bi/). *See Figure 17.*

British patent number 26728, issued in 1913,  depicts a basket used for housing pigeons or poultry (Figure 18) that has woven wicker on all visible sides, and is rect-angular in shape. The sides and top have open areas or windows. The horizontal length is greater than the horizontal width or the vertical height. The windows are created by an absence of wicker, leaving the un-derlying frame as bars in the window. Another striking example of the use of wicker for a pet cage is shown in a posting on eBay on June 29, 2007. The cage is wicker on all sides with a door in front that swings open and is secured in place by a stick. The eBay description notes that the cage dates from the 1920s or 1930s (Figure 19). According to the seller, the wicker caged was purchased by his wife in the year 2000. She purchased the cage from an antique dealer. I have not been able to confirm the date of manufac-ture at this point; however, my grandmother owned a cage identical to the one shown in Figure 19 in the mid 1960s making this design at least forty years old.



Figure 17. Manilan bird cage. From the Department of Interior Ethological Survey, 1904.



Figure 18. Pigeon cage , British patent number 26728, issued in 1913.




Figure 19. Pet cage for sale on eBay. The seller dates it to the 1920s or 1930s. My grandmother owned a cage like this in the mid 1960s.

In 1935 U.S. patent number 2,016,005 was issued for a dog bed made of wicker (Figure 20). More recently, plate 28 in *Modern Basketry from the Start*, 1973, (Figure 21) shows the design for a wicker animal cage. The cage has a rectangular silhouette, is wicker on all visible sides and the horizontal length is greater than the horizontal width or the vertical height. The windows and bars are created by an absence of woven material.

Page 126 of *belorusskie rhudazhestvennye pronnyslys*, a Russian book on basketry published in 1985 (Figure 22), shows a wicker or rattan pet cage with windows and a door. It has a rectangular silhouette, is wicker on all visible sides and the horizontal length is greater than the horizontal width or the vertical height. The windows and bars are created by an absence of woven material.



Figure 20. Dog Bed. Patent 2,016,005, Issued 1935.



Figure 22. Rattan or wicker animal cage with windowed sides and door taken from page 126 of *belorusskie rhudazhestvennye pronnyslys*, 1985.



Figure 21. Wicker cage design, plate 28 in *Modern Basketry from the Start*, 1973,

10

Additional examples of wicker animal houses are located in the attachments at the end of this report. They include those found on page 13 of *Indian Basketry, fourth edition, 1909*; pages 140, 141 and 155 of *Art of the Basket: Traditional Basketry from Around the World*, September 2001; pages 60, 88, and 125 of *Baskets, A Schiffer Book for Collectors*, 1994; and excerpts from *The Complete Book of Baskets and Basketry* by Dorothy Wright, 1992. All of these examples are made of wicker and provide windows for the pet to look out of.

## General pet cage construction

There are numerous patents covering general pet cage construction. All of the cages discussed on this page have a rectangular silhouette, and the horizontal length is greater than the horizontal width or the vertical height.

A patent issued in 1885 (318,812) describes a folding stock shipping cage with framed construction and woven panels. See Figure 23. Patent number 2,892,562, issued in 1959 is for a foldable metal cage with metal wire door (Figure 24). It is constructed of bent wire and stands on four legs. Patent number 4,762,085, issued in 1988, is also for a folding metal cage with metal wire door though its method of folding is different from the previous one (Figure 25 top). In patent number 5,626,098, issued in 1997, the cage is also made of metal wire and is also collapsible. The door opens toward the top (Figure 25 bottom). Patent 6,192,834, issued in February 2001, is also for a metal collapsible cage. It has an inset door on the front that swings from right to left (Figure 26). In each case, these cages are rectangular in shape. This is a function of the material (metal) the desired performance, (durability and collapsibility). In order for the pivot points and hinges to work, the edges have to be parallel, and the overall shapes rectangular.



Figure 23. Patent number 318,812, 1885.



Figure 24. Patent number 2,892,562, 1959.



Figure 25. Patents number 4,762,085 (top) and 5,626,098 (shown on bottom)



Figure 26. Patent number 6,192,834, issued February 27, 2001.

More recent patents include plastic cages, typically designed for smaller pets or for specialty applications. Patent number 5,960,744, issued in 1999 is for a plastic expandable cage. It features a solid shell with window cut outs, and a door inset from the front edges, and hinged on the right (Figure 27). Though it is expandable, it is not collapsible beyond a certain point because of the material and design. It is not an efficient volume for packaging or shipping. Patent number 5,967,090, issued in 1999, depicts a folding plastic structure without distinct windows, but with molded plastic grill on the sides, on top and on the door (Figure 28). The grill allows the animal to look out and provides a means for air circulation. The door is inset from the front edges and hinged on the right.



Figure 27. Patent number 5,960,744, issued 1999.



Figure 28. Patent number, 5,967,090, issued 1999.

12

## Combined materials

Combining wicker and metal or wood has a long history. In the 1850s the Thonet brothers combined wood and wicker in a number of different ways. As early as 1904, wicker or rattan was being used to create flat panels secured to wood frames. See Figure 29. A more recent example of this technique is shown in *International Basketry for Weavers and Collectors*, originally published in 1973 in German; translated and published by Schiffer in 1985 (Figure 30). Examples of contemporary wicker and frame construction also are shown in patent 5,931,326 for container assembly, patented 1999 (Figure 31), and patent 6,230,915 for a rattan basket, patented May 15, 2001 (Figure 32).



Figure 29. Thonet wood and rattan partition from the 1904 Thonet catalog.



Figure 31. Container assembly. Patent 5,931,326, 1999



Figure 30. Wood framed partition with rattan weave. Image from *International Basketry for Weavers and Collectors*, published in by Schiffer, Translated in 1985 originally published in German in 1973.

13



Figure 32. Rattan basket. Patent 6,230,915. Issue May 15, 2001

The weave detail on both '326 and '915 is similar to
the weave depicted in the '156 patent. In addition to
some general similarities in the weave, all three de-
signs ('156, '326, and '915) are rectilinear in shape to
aid in production, shipping, and assembly.

14

Other examples of combined wicker and wood are shown in the figures on this page (Figures 33-35). It is important to note that the objects which are irregular in shape are not designed for contemporary methods of mass production. Additional examples may be found in the appendix.



Figure 33. Appalachian sleigh, 1986. Image take from *Appalachian White Oak Basketmaking: handing down the basket.*



Figure 35. Wicker and metal or wood construction. Images from *International Basketry for Weavers and Collectors*, published in by Schiffer, Translated in 1985 originally published in German in 1973.



Figure 34. Bermuda Carriage, circa 1920.

15

## Conclusions

### 1. Anticipation

Three pieces of art anticipate patent '156. See Figures 18, 36 and 37. My evaluation of designs that anticipate '156 is based upon *Chisum*, section 23.03 [5] which notes that "design anticipation requires a showing that a single prior art reference is 'identical in all material aspects' to the claimed invention."

Mr. Anders has argued that the only material features that distinguish the '156 patent from the prior art are that the '156 cage is wicker on all visible sides and, it is rectangular in shape with a rectilinear silhouette, whose horizontal length is greater than its horizontal width or vertical height. This is simply not the case. All of the pet cages depicted in Figures 18, 36 and 37 are wicker on all visible sides, rectangular in shape with a rectilinear silhouette, whose horizontal length is greater than its horizontal width or vertical height. All are made from wicker woven over a frame. All have windows that are created by an absence of wicker and make use of vertically spaced bars to maintain the structure and to keep the pet from getting out. All three cages have hinged, lockable doors. I do note that figure 18 has its door on the top, however, that is not a feature that Anders or Simpson Ventures has asserted as being material.

Accordingly the prior art clearly demonstrates the features Simpson Ventures now claims as novel. Moreover, under the Gorham test, an ordinary observer would view the over all designs as substantially the same.

### 2. Obviousness

In his patent evaluation for Simpson Ventures, Robert Anders asserts that the only point of novelty is the weave on all visible sides, " I observe that the design claimed in the '156 patent distinguishes from prior art in one respect: i.e., the point of novelty is a woven texture on all disclosed surfaces." As demonstrated in Figures 18, 36 and 37, those features are not novel or unique and therefore do not distinguish patent '156 from prior art.

Beyond that, as discussed earlier in this document, there are a number of pieces of prior art that, when combined, contribute to the design that is shown in patent '156. Rattan or wicker cages date back at least as far as the early 1900s (Figures 17-19 and 21-22). Moreover, patents for rectangular metal cages, both collapsible and fixed, have been issued for a number of designs over the past forty years (Figures 23-26).

A number of products combine wicker or rattan with rectangular frame pieces that are assembled to form containers. Two examples of this are patent '915 and patent '326 (Figures 31 and 32) discussed earlier in this report as well as the general technique of using woven material over a frame (Figures 29 and 30). The use of woven material has obvious design benefits because it allows air circulation, and it blends in with the environment more favorably than metal wire or plastic containers. It also provides cover for the pet which is important to its comfort. Moreover, a number of examples of wicker animal cages that predate the '156 patent have been cited in this report and in the attachments. Based upon this, I conclude that it would be obvious to a designer with ordinary skill in the art who had full knowledge of the prior art to combine wicker or rattan weave patterns to all surfaces of a rectangular cage structure for the purposes of providing the aesthetically pleasing pet containment structure and design that is the subject of the '156 patent. (Chisum 23.03 [6]).



Figure 36. Wicker cage design. , plate 28 in Modern Basketry from the start, 1973.



Figure 37. Rattan or wicker animal cage with windowed sides and door from page 126 of belorusskie rhuda-zhestvennye pronnyslys, 1985.

16

## Additional Issues of obviousness based on *KSR*

The recent Supreme Court ruling in the case of *KSR International Co. v. Teleflex Inc. et al.* (No. 04-1350) elaborates on several points that further address the issue of obviousness as it relates to the '156 patent.

## Uniting old elements

In writing the unanimous opinion for the Court, Justice Kennedy notes, "For over a half century, the Court has held that a 'patent for a combination which only unites old elements with no change in their respective functions ... obviously withdraws what is already known into the field of its monopoly and diminishes the resources available to skillful men.' This is the principle for declining to allow patents for what is obvious." Based on the points raised earlier in this section it is clear that the elements present in the '156 patent, woven texture on all visible sides, a lockable door on the front, windows that are created by an absence of woven texture, a rigid cage structure and a cage which is rectangular in shape and whose horizontal length is greater than its horizontal width or vertical height have all been present in earlier designs and are therefore obvious.

## Substitution of one element for another

Justice Kennedy went on to say, "The Court recognized that when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." Justice Kennedy further notes that in citing *Sakraida v. Ag Pro. Inc.*, the Court concluded that "when a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement the combination is obvious." In this case, the collapsing frame and wicker weave are a combination of old elements with each performing the function that it has previously performed; the wicker providing cover, air circulation, and an improved aesthetic, and the structural framework of the cage providing a structure that is rigid in operation but may be collapsed for shipping, storage or transportation. Thus the '156 patent is obvious.

## Predictable variation

The court also noted that in determining obviousness, it was important not to look too narrowly. "If a person of ordinary skill can implement a predictable variation, 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless the actual application is beyond his or her skill." Patents '326 and '915 (Figures 31 and 32) clearly show the application of a woven texture to a ridged frame in order to provide an aesthetically appealing surface with good circulation. This same technique would be obvious to a person skilled in the art (as described earlier in this report) to try as a method of providing cover, aesthetic finish, and air circulation for an animal cage. Beyond this, part of the design process involves product comparisons. Typically these include not only like products, but also an investigation of materials and processes from other fields that may have utility for the present design. This information is then used to create a variety of solutions based upon available technology, techniques, and methods. Patent '156 clearly demonstrates materials and techniques found in patents '326 and '915, both of which were patented prior to '156 and both of which would be recognized as having methods that would improve the pet cage.

## Fitting together of multiple patents

The Court further stated "Common sense teaches, however, that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle. Even if we disregard all of the previously noted ways in which the '156 patent is obvious and confine our examination to the teachings of prior patents, such as '562 (Figure 24), '834 (Figure 26), '085 and '098 (Figure 25), '744 (Figure 27), '090 (Figure 28), '326 (Figure 31), and '915 (Figure 32) we see that the '156 patent is, in fact, a combination of these features. It has a rigid collapsible frame (Figures 23 – 26), windows for the animal to view out (Figures 27 and 28) and a woven finish (Figures 31 and 32). Each of the above points serve to further emphasize that the '156 design is obvious to an ordinary person skilled in the art.

## 3. Analysis of infringement allegations

Based upon my review of *Chisum*, I understand there are two standards Simpson Ventures must meet in order to prove infringement. The first is satisfaction of the Gorham standard. The second is that it must demonstrate that the alleged points of novelty of the '156 design are present in Mid-West Metal's Bay Isle Collection.

### A. Points of novelty

With regard to "points of novelty," as explained in parts one and two of "conclusions," there are no points of novelty. Specifically, the only feature of the '156 patent design that Simpson Ventures has claimed as a "point of novelty" is "a woven texture on all disclosed surfaces." As already explained, this feature is in fact already present in the prior art. It thus cannot be a "point of novelty." In other words, this is not a feature that distinguishes the '156 patent design from the prior art because this feature has long been present in the prior art. Accordingly, there are no points of novelty presented by the '156 patent design.

The following analysis assumes that Simpson Ventures might now attempt to argue that *other* as-yet-unspec- ified features of the '156 patent design are somehow points of novelty. I do not know which, if any, Simpson Ventures might actually present. I do have several observations though on the following features that Simpson Ventures might possibly attempt to assert. However, it is important to note that I have not yet undertaken to evaluate whether any of these features are in fact novel. In other words, I express no opinion yet on whether any of these features in fact distinguish the '156 patent design from the prior art, or are already present in the prior art. I reserve any opinion on that point contingent on whether Simpson Ventures even attempts to assert such a position.

Having noted this, the only possible points of novelty of '156 design might be in the individual weave patterns chosen for the rattan. While these patterns are not new (see Figure 8 and appendix material), they may be used or combined in unique ways.

Nonetheless, a number of visual differences exist between patent '156 and the Bay Isle Collection.[2]

---

[2] There are some differences within the Bay Island Collection. These are generally differences of size and proportion with the exception of model 1805 which has some additional noteworthy differences that will be discussed later. The following observations hold true for all of the Bay Isle Collection models (1824, 1830, 1836, 1842 and 1805) when compared with the possible points of novelty in patent '156.

18

### 1. Material separation

There is a material separation that patent '156 shows at the bottom of the right and left sides of the cage (Figures 38 and 39). This separation forms a visual break that is distinct to the design in '156 when compared with the Bay Isle Collection (Figures 40 and 41). This feature makes the right and left sides of '156 a composition of two visually distinct pieces.



Figure 38. 3/4 view of patent '156



Figure 39. Side view of patent '156

19



Right and left
sides are
continuous

Figure 40. Right side view of Bay Isle Collection by Mid-West.



Right and left sides
are continuous

Figure 41. 3/4 view of Bay Isle Collection by Mid-West.

## 2. Edge wrapping

In the '156 design the edges are tightly wrapped (Figures 42 and 43). There is no functional purpose that requires this particular weave. It is thus a decorative choice. In the Bay Isle Collection the frame is clearly visible at the corner edges (Figures 44 and 45).



The corner edges tightly wrapped and without gaps.

The corner edges tightly wrapped and without gaps.

The corner edges tightly wrapped and without gaps.

Figure 42. 3/4 view of '156 patent.



The corner edges tightly wrapped and without gaps.

Figure 43. Right side view of '156 design.

21



The corner edges display an exposed frame.

Figure 44. 3/4 view of Bay Isle Collection by Mid-West.



The corner edges display an exposed frame.

The corner edges display an exposed frame.

Figure 45. Right side view of Bay Isle Collection by Mid-West.

22

### 3. Edge continuity

In the '156 design the decorative edges are tightly woven, continuous and uninterrupted (Figure 46). There is no functional purpose that requires this particular weave. It is thus a decorative choice. The Mid-West cage has prominent notches that are clearly visible along the top and bottom of both the right and left sides (Figure 47).



Continuous edges

Figure 46. Side view of pet house '156



Notches on the right and left sides create a distinctive difference between Bay Isle and '156

Figure 47. Right side view of Bay Isle Collection by Mid-West.

23

### 4. Weave pattern

In the '156 patent the weave pattern on the top and back is plain, but the sides and front have an ornamental detail consisting of a vertical loose weave as defined earlier in this analysis (Figure 48).

#### a. Absence of the '156 pattern

The Bay Isle Collection does not have this distinctive loose weave pattern anywhere -- whether on the front, above the side windows or on the bottom side pieces (Figure 49) .

#### b. Bay Isle's decorative pattern

The Bay Isle design has a decorative square weave pattern woven on the top, sides and back wicker panels of the cage (Figure 49). The '156 patent does not have such a square weave decorative pattern (Figure 48).



Top of the '156 patent.

Decorative weave

Decorative weave

Decorative weave

Wrapping

Decorative weave

Side of the '156 patent.

Figure 48  Patent '156 weave detail

24



Figure 49. Bay Isle Collection Decorative Weave

### 5. Edge gap

The '156 design has no gap where the corner edges meet (Figure 50). The Bay Isle Collection has a distinct gap where the corner edges meet (Figure 51).



Enlarged view

Corner Detail

Side view of pet house '156

Back view of pet house '156

Figure 50. Patent '156 corner detail

26



Corner detail

Enlarged view

Gap

Side of the Bay Isle design

Back of the bay isle design

Figure 51. Bay Isle Collection Decorative Weave

27

### 6. Top edge

The top view of the '156 design shows no gap where the top edges meet the sides (Figure 52 at top). The Bay Isle design has a gap where the top edges come in contact with the sides (Figure 52 at bottom).



Top View of pet house '156



Top view of the Bay Isle design.

Figure 52. Comparison of top views of the '156 patent and the Bay Isle design.

28

### 7. Window detail.

The '156 patent has tightly woven coils around the windows on the sides and around the handle on the back (Figure 53, top). The choice of tightly woven continuous coils is not dictated by function -- it is an aesthetic choice, The Bay Isle design has round coils woven above and below the side and back windows. The rounded coils do not stop at the edge of the windows, but continue clear across the side. The Bay Isle design does not have a handle on the back (Figure 53, bottom) The '156 patent does not have a window in the back (Figure 53 top).



Tightly woven, squared off coils around the perimeter of the side windows and the back handle

Side view of patent '156

Back view of patent '156

Rounded coils extend across the sides and back above and below the windows





Side of the Bay Isle design

Back of the bay isle design

Figure 53. Window detail of patent '156 and the Bay Isle design

### 8. Legs

While the concept of legs is functional, the style is possibly ornamental. The '156 design uses four clearly visible post-type legs (Figure 54, top). The Bay Isle design makes use of rubber feet that are not visible (Figure 54, bottom).



Side view of patent '156

Back view of patent '156

Legs

Side of the Bay Isle design

Back of the bay isle design

No legs

Figure 54. Leg detail of patent '156 and the Bay Isle design

### 9. Additional differences -- Bay Isle 1805

As mentioned earlier, the Bay Isle cage model 1805 has some additional differences when compared to the '156 patent.

#### a. Front opening

The '156 patent has a square front opening with a hinged door. The Bay Isle 1805 cage has an arched front opening and no door (Figure 55),

#### b. Two piece Front

The '156 patent has a single front panel with a hinged door. The Bay Isle 1805 has a two piece front panel (Figure 56).



Square front opening with door

Arched front opening No door

Figure 55. Bay Isle Collection Cage 1805.



'156 patent 3/4 view     One piece front

Bay Isle 1805     Two piece front

Figure 58. Bay Isle Collection Cage 1805 Front pieces.

31

### c. Windows

The '156 patent has windows on the sides. The Bay Isle
1805 does not have windows on the sides (Figure 57).



'156 patent 3/4 view

Window

Bay Isle 1805

No window

Figure 57. Window comparison

32

## B. The Gorham Standard

*Gorham Mfg. Co. V. White* (1872) instructs us that identify is tested through the eyes of an ordinary observer rather than an expert: "[I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other..." (quoted from *Chisum* 23.05[3]).

This speaks to the overall look of the '156 patent when compared with the Bay Isle Collection. Based upon my experience as a designer and my analysis of the '156 patent and the Bay Isle Collection, I believe that there are three prominent attributes that distinguish the two cage designs for the ordinary observer: the edges, the presence or absence of separate side pieces, and the weave detail.

The first two attributes (edges and the presence or absence of separate side pieces) are part of the overall shape recognition. These are visual cues that we use to distinguish one shape from another. In the case of the '156 patent, the edges are crisp, continuous, and straight. The sides are made up, visually, of two different pieces. This is reinforced visually by the square edge bindings (Figure 58, left). In the eyes of an ordinary observer, the Bay Isle design is strikingly different in comparison. It has separated edges with noticeable gaps, single piece sides, and prominent notches along the top and bottom of the sides (Figure

58, right).

The third attribute (the weave detail) is a key part of the overall impression of the two cages. The '156 patent makes use of a loose weave decorative element on the front and sides. This element is vertical in orientation. There is no weave pattern on the top. The Bay Isle collection uses a decorative square weave pattern on the top, back, and sides of the cage. The square decorative weave is clearly different than the decorative details of the '156 patent, and would present a clear and noticeable difference to an ordinary observer (Figure 58). Based on this analysis it is my opinion that an ordinary observer would not view the two designs as substantially the same.

There are some additional specific points of overall difference that apply to the 1805 Bay Isle design. Applying the Gorham standard there are the following additional substantial overall differences between the Bay Isle design and the '156 patent: the arched opening and absence of a door on the 1805 compared to the square opening and door on the '156 patent, the two-piece front of the 1805 compared to the one-piece front of the '156 patent, and the lack of windows on the sides of 1805 compared to the prominent side windows on the '156 patent. These points, taken together, present additional overall differences that would be clearly noticeable to the ordinary observer when comparing the 1805 Bay Isle design to the '156 patent (Figures 55-57).



Two separate pieces

'156 patent

Crisp, continuous, edges

Figure 58. Edge detail.

Notches

Bay Isle Design

Visual separate edges

Bret H. Smith, IDSA
Professor of Industrial Design
Auburn University

8·17·07

Date

33

# EXHIBIT H

Page 1

# IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF ALABAMA

### EASTERN DIVISION

SIMPSON VENTURES, INC.,

    Plaintiff/Counterclaimant,

vs.               CASE NO. 3:06cv901-WKW
          CASE NO. 3:07cv00048-WHA-CSC

MID-WEST METAL PRODUCTS,
COMPANY, INC.

    Defendant/Counterdefendant.


\* \* \* \* \* \* \* \* \* \*


    DEPOSITION OF BRET HUNTER SMITH, taken
pursuant to stipulation and notice before Mallory
M. Johnson, Certified Court Reporter and
Commissioner for the State of Alabama at Large,
at Auburn University, Department of Industrial
Design, 208 Wallace Center, 519 West Tach Avenue,
Auburn, Alabama, on Monday, April 28, 2008,
commencing at approximately 10:11 a.m.


\* \* \* \* \* \* \* \* \* \*

BRET HUNTER SMITH
APRIL 28, 2008

Page 2

```
 1                    APPEARANCES

 2    FOR THE PLAINTIFF/COUNTERCLAIMANT:

 3    Mr. Arthur Gardner
      Mr. Joe Staley
 4    GARDNER GROFF SANTOS & GREENWALD
      Attorneys at Law
 5    2018 Power Ferry Road, Suite 800
      Atlanta, Georgia  30339
 6
      FOR THE DEFENDANT/COUNTERDEFENDANT:
 7
      Mr. James H. Hinshaw
 8    BINGHAM McHALE
      Attorneys at Law
 9    2700 Market Tower
      10 West Market Street
10    Indianapolis, Indiana  46204

11    Mr. C. Steven Ball
      CARR ALLISON
12    Attorneys at Law
      100 Vestavia Parkway
13    Birmingham, Alabama  35216

14    ALSO PRESENT:

15    Mr. Jeff Simpson

16             * * * * * * * * * *

17              EXAMINATION INDEX

18    BRET HUNTER SMITH
         BY MR. GARDNER                    4
19
20              EXHIBIT INDEX

21    EXHIBIT NOS:

22    74   Drawing entitled Parry's    55-63,105-106
           Complete Specification      144-148
23
      75   Photograph entitled Circus  55-63,143-148
24         Cage in buff willow

25
```

Page 3

1    EXHIBITS continued:

2    76  Photograph of basket              55-63,105-107
                                           144-148
3
     77  U.S. Design Patent               58-73,82-86
4        US D483,156 S                    95

5    78  Design Analysis of U.S.          64-71,83-93
         Design patent US D483,156 S      123-136,143
6                                         156

7    79  Supplemental Expert Report       64,94-971,105
         By Professor Bret Smith          106-116,121
8
     80  Second Supplement Expert         74,94
9        Report by Professor Smith

10   81  Appendix Part 2 from             130
         Design Analysis by Prof. Smith
11
     82  Drawing of forks                 139-142
12

13             *  *  *  *  *  *  *  *  *  *  *

14                      STIPULATIONS

15          It is hereby stipulated and agreed by

16   and between counsel representing the parties that

17   the deposition of BRET SMITH is taken pursuant to

18   the Federal Rules of Civil Procedure and that

19   said deposition may be taken before Mallory M.

20   Johnson, Court Reporter and Commissioner for the

21   State of Alabama at Large, without the formality

22   of a commission; that objections to questions

23   other than objections as to the form of the

24   questions need not be made at this time but may

25   be reserved for a ruling at such time as the

Page 4

1    deposition may be offered in evidence or used for

2    any other purpose as provided for by the Federal

3    Rules of Civil Procedure.

4         It is further stipulated and agreed by

5    and between counsel representing the parties in

6    this case that said deposition may be introduced

7    at the trial of this case or used in any manner

8    by either party hereto provided for by the

9    Federal Rules of Civil Procedure.

10        * * * * * * * * * * *

11             MR. GARDNER:  The witness is to

12         be able to read and sign.

13             BRET HUNTER SMITH

14        The witness, having first been sworn to

15    speak the truth, the whole truth, and nothing but

16    the truth, testified as follows:

17             EXAMINATION

18   BY MR. GARDNER:

19   Q.  Mr. Smith, if you would, please state your

20       full name and address for the record.

21   A.  Bret Hunter Smith.  I live at 1812 Hillbrook

22       Circle in Auburn.

23   Q.  And I believe you've been deposed before,

24       correct?

25   A.  Yes.

Page 5

1    Q.   How many times?

2    A.   Once.

3    Q.   Once.   Just to kind of go over a few kind of

4         basic ideas, my name is Art Gardner.   I'm an

5         attorney for Simpson Ventures.   I'm going to

6         be asking the questions in this deposition.

7         And if you would, wait until I finish my

8         question before you begin to answer.   I speak

9         somewhat slowly at times, and sometimes

10        people have a tendency to start to answer

11        before I finish my question.   And if you will

12        wait until I finish the question, make sure

13        you understand it before you begin, we'll end

14        up with a clean record.

15             Also, if you will wait for a fraction of

16        a second or so for Mr. Hinshaw to perhaps

17        interject an objection, that will allow for a

18        clean record.   It's very important that we

19        don't speak at the same time.   The court

20        reporter has a hard time following that.   At

21        the same time, the court reporter needs for

22        your answers to be verbal, not nodding of

23        your head or shaking of your head or anything

24        like that.   So we need verbal answers for a

25        clean record.

Page 6

```
 1              Do you understand all that?
 2   A.   Yes, I do.
 3   Q.   Is there anything in your medical history
 4        that would keep you from giving accurate
 5        testimony here today?
 6   A.   No.
 7   Q.   And there's nothing that would affect your
 8        memory?
 9   A.   No.
10   Q.   All right.  If you would, describe for me
11        your understanding of how someone should go
12        about evaluating a product to see if it
13        infringes a design patent.
14   A.   Well, the first thing that you would do is --
15        is look at the functional elements of the
16        product and determine what those are.  You
17        also need to look at the ordinary observer
18        and whether or not they would confuse the
19        design elements, the ornamental elements of
20        the patent.  Then you also need to look at
21        prior art to determine whether the features
22        that are being claimed were -- can be found
23        in prior art.
24   Q.   Well, specifically what -- I mean, what is
25        the -- once you've got the product in front
```

Page 7

1          of you, is it your testimony that the first

2          thing you do is figure out what features are

3          functional, or do you first try to figure out

4          if the invention -- if the product looks

5          substantially similar or substantially the

6          same to what is shown in the patent?

7     A.   I -- I think that you're going to have to

8          look at all three of the things that we

9          talked about.  And regardless of the order,

10         you have to address each one individually.

11    Q.   And so, in your view, the order doesn't

12         matter?

13    A.   No, as long as you look at the entire scope

14         of it.

15    Q.   And what role does evaluating the

16         functionality play?

17    A.   It's my understanding that features which are

18         purely functional are not part of a design

19         patent.  In other words, they could not be

20         distinguishing features.

21    Q.   Well, is it true that design patents

22         sometimes show, in the drawings, functional

23         features?

24    A.   Yes.  Yes.

25    Q.   So do those functional features form part of

Page 8

1          the invention or not?

2     A.   It is my understanding that the design patent

3          cannot cover functional features; that is,

4          that it does not address purely functional

5          features.

6     Q.   Well, if a feature has both a function and an

7          ornamental aspect, can the ornamental aspect

8          nonetheless be part of the patented design?

9     A.   I want to make sure I understand. You're

10         saying that if something is both ornamental

11         and functional, is the ornamentality part of

12         the overall consideration of the design

13         patent or can it be, can you have sort of

14         dual roles being played by a part. And my

15         understanding is yes.

16    Q.   How do you -- how do you draw the line in

17         determining whether a feature is worthy of

18         design patent protection if it has both some

19         functional aspect and some ornamental aspect

20         to the feature?

21    A.   I think you have to look at the ornamental

22         choices that are made, things like, you know,

23         the -- an example would be a hinge, for

24         example, on a laptop computer can be made to

25         be a significant visual feature, or it can be

Page 9

1    made to essentially disappear.  So even

2    though it's forming a -- it's performing a

3    mechanical function, being able to open the

4    laptop, it, nonetheless, could be made a

5    visual feature of a laptop, which would make

6    it a design -- I mean a feature for a design

7    patent, the look of it, of how it's detailed.

8    Q.  And regarding the look of it, exactly what

9        are design patents supposed to protect?

10   A.  They are supposed to protect -- it's my

11       understanding they're supposed to protect the

12       ornamental features of a design that are --

13   Q.  Would --

14   A.  Go ahead.

15   Q.  Well, you were going to say something else.

16   A.  Those -- just to clarify, those ornamental

17       features that are distinct to that design, I

18       guess would be a better way to phrase it.  If

19       I'm using ornamental features of something,

20       say identical ornamental features to

21       something that came before, then that would

22       be prior art.

23   Q.  Well, would I be accurate in stating that a

24       design patent primarily protects how nice an

25       object looks?

Page 10

1  A.  It protects the unique look of an object.

2      I'm not trying to quibble, but nice is a

3      subjective term.  And I always -- when I talk

4      with my students, I talk about effective and

5      ineffective; but nice is, you know, do you

6      like the wallpaper in your kitchen, it's

7      nice.  So it -- I like to think more in terms

8      of, you know, features and uniqueness.

9  Q.  Well, how does a design patent differ from a

10     utility patent?

11 A.  It's my understanding that a utility patent

12     covers functional elements.

13 Q.  Well, is there any difference in how you

14     would go about evaluating a product for

15     infringement of a design patent versus a

16     utility patent?

17 A.  I haven't evaluated objects relative to

18     utility patents.

19 Q.  Is the answer you don't know?

20 A.  I don't -- I don't know.

21 Q.  I believe you testified in evaluating a

22     product for potential design patent

23     infringement, that you would look at the

24     functionality of any of the features of a

25     design, you look at the overall similarity,

Page 11

```
 1        and then you look at the points of novelty,

 2        or something along those lines.  Those -- do

 3        you know what the doctrine of equivalents is?

 4   A.   No.

 5   Q.   Do you know whether the doctrine of

 6        equivalents applies to the evaluation of

 7        infringement of a design patent?

 8   A.   No.

 9   Q.   Let's talk about what I'll refer to in

10        shorthand as the substantial similarity

11        portion of the test.  What's your

12        understanding of exactly how that test is

13        applied?

14   A.   When you're talking about substantial

15        similarity, are you talking about the Gorham

16        Standard?

17   Q.   If you want to refer to the Gorham Standard,

18        let's talk about your understanding of how

19        the Gorham Standard is applied.

20   A.   My understanding is that it deals with the

21        ordinary observer and whether or not the

22        ordinary observer, paying attention to such

23        detail as the ordinary observer would pay

24        attention to in purchasing a product, would

25        confuse one for the other.
```

Page 12

1    Q.   Is that ordinary observer different from
2         somebody skilled in the art?

3    A.   Yes.

4    Q.   How so?

5    A.   Somebody skilled in the art would deal with
6         somebody who had sufficient training or
7         knowledge to design the product.

8    Q.   So if you're applying the -- if you're
9         looking at the product from the perspective
10        of the ordinary observer, it's my under -- is
11        it your testimony that the ordinary observer,
12        you're supposed to -- scratch that.

13             In applying the Gorham Test --

14   A.   Okay.

15   Q.   -- using -- from the perspective of the
16        ordinary observer, I believe you testified
17        that the ordinary observer is supposed to
18        have used the amount of care in observing the
19        product that they usually would use in
20        purchasing such a product, correct?

21   A.   Yes.

22   Q.   In this case, how much care is that?

23   A.   I'm not sure I understand what you're asking
24        me.  In comparison to what?

25   Q.   Well, in the context of purchasing a wicker

Page 13

1        pet residence, such as the Bay Isle product

2        made by Mid-West Metal Products, how much

3        care would this theoretical ordinary observer

4        use in evaluating that product?

5    A.  There are -- I would say that it would be a

6        little bit more care than the person who

7        would be going to a big box retailer just to

8        buy a pet cage.  In other words, this

9        particular product is designed to blend in

10       with the decor.  So this is going to be

11       somebody who, in general, is going to look a

12       little more closely at fit and finish and

13       details than the sort of person who might pop

14       over to Target or Wal-Mart and just pick up a

15       dog cage.

16   Q.  What's the basis for that statement?  I mean,

17       where did you get that idea?

18   A.  Well, the wicker covering is designed -- it

19       has some functional purposes, and it has some

20       aesthetic purposes.  One of the aesthetic

21       purposes is that it -- it blends more nicely

22       with the decor.  In general, people who are

23       concerned at that level of detail are usually

24       paying more attention to things like fabric

25       covering, quality of furniture, that sort of

Page 14

1       thing.  They tend to be more conscious of

2       those kinds of decisions if we're talking

3       about sort of a price point.  This is a

4       higher price point than a typical cage; and

5       therefore, it has to have some added value

6       from a design and marketing point of view.

7              Having said that, I think that the

8       differences are such that the general cage

9       purchaser would also notice them, what I

10      would call the general cage purchaser, which

11      would be the price point below that.  That

12      might be the person that might pop over to

13      Petco or Wal-Mart or wherever.  I think

14      this -- the market is aimed at a little bit

15      more discriminating buyer based on the fit

16      and finish of the cages.

17  Q.  So is it your testimony that for the Bay Isle

18      products, the typical purchaser would exhibit

19      a little more care in the purchasing decision

20      than for a conventional wire kennel?

21  A.  Yes.

22  Q.  Is there anything like that stated in any of

23      your reports?

24  A.  No.  There is the general comment about the

25      purchaser and what they would see when they

Page 15

1        look at, you know, the two different designs,

2        the 156 design and the Bay Isle design.  And

3        I think that holds true.

4    Q.  But I'm correct that none of your reports --

5        either for the 156 patent or the 321 patent,

6        either the original reports or the

7        supplemental reports -- none of them mention

8        this idea that the purchaser of a Bay Isle

9        product might exhibit a little more care than

10       the conventional kennel purchaser, correct?

11   A.  That's correct.

12   Q.  Well, that brings up an interesting point.

13       Do you have any additional conclusions or

14       opinions that are presently not stated in

15       your reports that you would like to tell us

16       about?

17   A.  The only thing, I believe you have the second

18       supplemental on the 156, which is I think the

19       three-page.  And it adds two patents that I

20       found when I was looking at the 321 design.

21       There is one more patent that I simply --

22       that is in the 321 report and that I had

23       intended to put in the supplemental and just

24       didn't.  It's -- it concerns a basket, a

25       fold-down basket, I think.

BRET HUNTER SMITH
APRIL 28, 2008

Page 16

```
 1              Let's see.  I think I pulled a copy of
 2         that.
 3                   MR. HINSHAW:  Is this the Mo
 4              patent?
 5                   THE WITNESS:  The Mo patient.
 6                   MR. HINSHAW:  Or -- this is the
 7              patent that I sent you in the mail
 8              over the weekend?  It's called the Mo
 9              patent, M-O.  It's in the 321 report.
10                   THE WITNESS:  Yeah, it is in the
11              321 that it's referred to.  It's
12              referred to in the 321 report.
13                   MR. HINSHAW:  I don't think I
14              have it in here.  I think I left it
15              out in the car.
16     A.   There it is, that one.
17     Q.   So you're referring to U.S. patent number
18          5,282,542 issued to Mr. Mo, correct?
19     A.   Yes.
20     Q.   And does what I'll refer to as the 542 Mo
21          patent -- does the 542 Mo patent cause you to
22          change any of the opinions or conclusions
23          that you reach in your reports regarding the
24          156 patent?
25     A.   No.  It reinforces the edge treatment in
```

Page 17

```
 1        particular.  And if you look at this and
 2        invert it -- and I believe I talked about
 3        that in the 321 patent discussion.  But
 4        basically, you have the panel construction
 5        with pronounced edges, almost tubular-looking
 6        edges.  And that's an example of prior art
 7        that has that edge look that is in the 156
 8        patent.  So it's supporting.  It doesn't
 9        change the conclusion.
10   Q.   So it doesn't change any of the conclusions
11        or any of the opinions you've reached.  It
12        just only lends more support to your
13        position.  Is that your testimony?
14   A.   It lends more support.  It does show that the
15        edge treatment has been used in prior art,
16        that pronounced visual edges has been used in
17        prior art.
18   Q.   Well, does this 542 Mo patent cause you to
19        want to amend your written reports regarding
20        the 156 patent in any way?
21   A.   It -- it means that the edge treatment which
22        I talk about as a design feature of the 156,
23        that the edge, the square edge -- it means
24        for the -- visually, that pronounced edge
25        treatment, it means that that's been used
```

Page 18

1          before and it's, therefore, not unique to

2          that -- to the 156 patent.  It's in the prior

3          art.  But it -- so that's -- that's what it

4          means.

5     Q.   I'll ask the question another way because I

6          don't think you quite answered, which is

7          does -- do you need to amend any of your

8          findings or conclusions or opinions that are

9          stated in the written reports regarding the

10         156 patent in light of the 542 Mo patent?

11    A.   Yes.  It means that the edge treatment in the

12         156 isn't unique.  It has appeared in the

13         prior art.

14    Q.   So if I understand correctly, your testimony

15         is that you need to amend the written reports

16         that you've given regarding the 156 patent to

17         incorporate a mention of this 542 Mo patent

18         so as to describe that the edge treatments

19         were shown in the prior art; is that

20         correct?

21    A.   Yes.

22    Q.   And other than that, does the 542 Mo patent

23         cause you to want to make any other changes

24         in your opinions that are stated in the

25         written reports regarding the 156 patent?

Page 19

```
 1   A.   No.

 2   Q.   Other than the effect that the 542 Mo patent

 3        may have on your written opinions regarding

 4        the 156 reports, are there any other changes

 5        that you would like to make in your written

 6        reports at this time?

 7   A.   No.

 8   Q.   So, as far as you know, the reports are

 9        completely accurate, correct?

10   A.   Correct.

11   Q.   Going back to the -- the description of how

12        one should go about evaluating a product

13        design for potential design patent

14        infringement, please describe for me how the

15        so-called point of novelty or points of

16        novelty test is to be applied.  What is the

17        test and how is it applied?

18   A.   The points of novelty, it's my understanding

19        that in order to claim infringement, in order

20        to prove infringement, you have to show that

21        the points of novelty, those things which

22        make the device unique, have been

23        appropriated by another product, the product

24        that is said to be infringing.

25             And the points of novelty are points
```

Page 20

```
 1        which are novel in the light of prior art.
 2        In other words, if -- if I had another piece
 3        of prior art that had the exact same point,
 4        visual point on it, I guess I'll call it,
 5        then the -- that point would not be
 6        considered a point of novelty because it's
 7        found in the prior art.  So that is what you
 8        look at in the -- it's my understanding
 9        that's what you look at when you look at
10        points of novelty.
11   Q.   Is it legally permissible for there to be
12        more than one point of novelty in a claim
13        design?
14             MR. HINSHAW:  Objection.  Calls
15             for legal conclusion.
16   A.   I'm not -- and, you know, I'm not a patent
17        attorney, so I don't know that I can speak to
18        the legality issue.
19   Q.   What's your understanding?
20   A.   There -- my understanding is that a design
21        may have several points of novelty.
22   Q.   Well, let's talk about the word "novelty" for
23        a moment.  What does "novelty" mean to you in
24        regard to the point of novelty test?
25   A.   It should be something that represents a
```

Page 21

1    nontrivial advancement over the prior art.

2    That's my understanding.

3  Q.  Well, where did you get the idea that it has

4      to be a nontrivial advancement over the prior

5      art?

6  A.  From a combination of reading material in

7      Chisum and the KSR decision and the decision

8      in the Swissa case.

9  Q.  Does KSR talk about the point of novelty test

10     in any way?

11 A.  KSR talks about the combining of old elements

12     and the -- whether or not that is sufficient

13     to claim that something is a unique feature.

14 Q.  I'll make this easier.  Isn't it true that

15     the KSR decision that you're referring to

16     relates to a utility patent case, not a

17     design case?

18 A.  The -- I believe it was a utility patent that

19     was being discussed.

20 Q.  And isn't it true that in a utility patent

21     case, the question of whether something has

22     certain points of novelty is not part of the

23     test?

24 A.  Well, as I said before, I have not evaluated

25     utility patents as an expert witness; so I

Page 22

```
 1       really can't speak to that.

 2   Q.  But you have read the KSR decision, correct?

 3   A.  I have read the KSR decision.

 4   Q.  Isn't it true that the KSR decision doesn't

 5       mention the point of novelty test in any

 6       respect?

 7   A.  I don't recall.  I don't recall.

 8   Q.  How many times have you read the KSR?

 9   A.  Several times.

10   Q.  When was the last time?

11   A.  The last time would have been when I was

12       preparing the 321 evaluation, which would

13       have been several months ago, a couple of

14       months ago.

15   Q.  Now, you just prepared a supplemental report

16       on the 321 patent, correct?

17   A.  Unh-unh.

18   Q.  Did you reread the KSR decision just prior to

19       that?

20   A.  I did not prepare a supplemental report on

21       the 321.

22   Q.  Excuse me.  I misspoke.  You just this month

23       prepared a second supplemental report on the

24       156 patent; is that correct?

25   A.  That is correct.
```

Page 23

1   Q.   And in connection with that second

2        supplemental report, did you have occasion to

3        reread the KSR decision?

4   A.   No.

5   Q.   Now, am I correct that in your 156 reports

6        and the 321 reports, when you apply the point

7        of novelty test, you compare the individual

8        points of novelty against multiple patents;

9        is that correct?

10   A.   Are you asking did I look at multiple patents

11        relative to each of the individual points?

12   Q.   Let me -- let me -- I'll break it down in

13        smaller bits.  Simpson Ventures defined that

14        the patent invention had multiple points of

15        novelty, correct?

16   A.   Not initially.

17   Q.   But eventually.

18   A.   Subsequently, yes.

19   Q.   So for those points of novelty that were

20        subsequently identified by Simpson

21        Ventures --

22   A.   Yes.

23   Q.   -- do you understand that there were more

24        than one feature in at least some of those

25        points of novelty?

Page 24

1    A.    More than -- let me make sure I understand

2          what you're saying.   More than one feature in

3          each of the points that they were claiming?

4    Q.    Yes.

5    A.    Yes.

6    Q.    So if you're evaluating a so-called point of

7          novelty --

8    A.    Yes.

9    Q.    -- that may have, in itself, a combination of

10          features --

11    A.    Yes.

12    Q.    -- is it legally permissible to refer to

13          multiple prior art references to meet the

14          so-called point of novelty?

15                MR. HINSHAW:   Objection.   Calls

16          for legal conclusion.

17    A.    I'm not an attorney; I'm a product designer.

18    Q.    Isn't that, in fact, what you did in your

19          reports?   Isn't it correct that when you

20          analyzed the so-called points of novelty that

21          were asserted by Simpson Ventures, that in

22          analyzing each so-called point of novelty,

23          you relied on multiple references, multiple

24          prior art references, to meet these so-called

25          points of novelty, correct?

Page 25

```
 1   A.   We would have to take these a point at a time
 2        because each point was -- I looked at each of
 3        the claims as I went through, and I looked at
 4        the prior art as I went through, so I
 5        don't -- I don't think that a blanket answer
 6        is going to be an accurate one.
 7   Q.   Well, is it accurate to say in at least some
 8        instances in your reports, you combined
 9        multiple references to meet the claimed point
10        of novelty then being asserted?
11   A.   I looked at multiple references in looking to
12        whether -- in some cases in looking to
13        whether or not features were present in prior
14        art.
15   Q.   Okay.  And we'll get to the specifics of it
16        when we dig into your report later, but I
17        want to make sure I understand the rationale
18        that you were using before we do that.  So in
19        your reports, at least in some instances, you
20        relied on multiple reference in some
21        combination to compare that combination with
22        the asserted point of novelty, correct?
23   A.   I looked at multiple references in some cases
24        to determine whether or not a feature was
25        present in prior art.
```

Page 26

1   Q.   Well, I'm not just interested in whether you

2        looked at the feature, but whether you

3        actually relied on a combination of prior art

4        references to meet the so-called point of

5        novelty being asserted.  Because you may have

6        considered lots of references.  You may have

7        looked at hundreds of patents; but in the

8        end, in trying to determine whether this

9        particular -- a particular point of novelty

10       is found in the prior art, you relied on

11       certain of those references, correct?

12  A.   Yes.

13  Q.   And in some instances, you relied on a

14       combination of certain references to meet a

15       single point of novelty, correct?

16  A.   Yes.

17  Q.   And where did you get the idea that it would

18       be permissible or appropriate to rely on

19       multiple references to compare with a single

20       point of novelty?

21  A.   Well, as a designer, when you are looking at

22       what's available in the field as you're

23       developing a design, you look at a wide

24       variety of things.  And so it can be a

25       combination of characteristics, but it's

BRET HUNTER SMITH
APRIL 28, 2008

Page 27

```
 1        pre-existing.
 2   Q.   But in this instance, we're talking about
 3        your application of a legal test.
 4   A.   Right.
 5   Q.   So at some point, you came to the
 6        understanding that it was permissible or
 7        appropriate to combine multiple references in
 8        applying that legal test, correct?
 9   A.   Yes.
10   Q.   And where did you get the idea that applying
11        that particular legal test, the point of
12        novelty test, that it would be appropriate or
13        proper to combine references?
14   A.   I'm not sure.  I'm not sure.  I mean, I
15        understand the words you're using, but I'm
16        not sure what you're asking.
17   Q.   Well, did you get the idea that it would be
18        appropriate to combine references in applying
19        the point of novelty test from something that
20        Mr. Hinshaw told you?
21   A.   No.
22   Q.   Did you get the idea that it would be proper
23        or appropriate to combine references in
24        applying the point of novelty test from
25        something you read?
```

Page 28

1  A.  No.

2  Q.  Did you get the idea that it would be

3      appropriate or proper to combine references

4      in applying the point of novelty test from

5      something outside of your experience in

6      connection with this lawsuit?

7  A.  No.

8  Q.  Well, what is the source of your

9      understanding that it would be appropriate or

10     permissible to combine references in applying

11     the point of novelty test?

12  A.  I don't know that I can identify a source.

13  Q.  Are you aware of any court case that has

14     stated that that would be appropriate?

15  A.  No.

16  Q.  Are you aware of whether the Chisum

17     reference, the treatise that you referred to

18     in your expert reports, indicates in any

19     place that it would be appropriate to combine

20     references in applying the point of novelty

21     test?

22  A.  I don't recall.

23  Q.  Would I be correct in stating that you

24     don't -- you don't know anything about the

25     origins of the point of novelty test or,

BRET HUNTER SMITH
APRIL 28, 2008

Page 29

1        historically, the basis for it?

2    A.  I've read in the Chisum material; but if

3        you're asking can I repeat word for word at

4        this point, no, I cannot.

5    Q.  Well, do you understand what the Chisum

6        treatise is?

7    A.  It's my understanding that it's a collection

8        of cases and decisions that relate to

9        intellectual property.  And in particular,

10       the part that I read was related to design

11       patents.

12   Q.  What's your understanding of which would be

13       controlling, the statements in Chisum or the

14       statements in court cases?

15   A.  I don't understand your question.

16   Q.  I'll move on to something else.

17           Let's see.  Do you -- do you understand

18       that the word "novelty" in the point of

19       novelty test has any special meaning or

20       definition?

21   A.  I guess my understanding is that it would be

22       a point of distinction.

23   Q.  What did you do to go about figuring out what

24       the novelty portion of the point of novelty

25       test meant?

BRET HUNTER SMITH
APRIL 28, 2008

Page 30

```
 1   A.   I'm not sure -- I'm not sure I understand
 2        what you're asking.
 3   Q.   Well, before you got involved in this
 4        lawsuit, you had -- you had some
 5        understanding of the word "novelty," correct?
 6   A.   Yes.
 7   Q.   And you had some understanding of what that
 8        word meant, correct?
 9   A.   Yes.
10   Q.   One -- one possible item is -- one possible
11        definition of a novelty is an unusual
12        amusement, like a little toy.
13   A.   Right.
14   Q.   That's not the kind of novelty we're talking
15        about here, is it?
16   A.   No.
17   Q.   So what kind of novelty is involved in the
18        point of novelty test?
19   A.   It -- it should be something that -- that --
20        it would -- I guess I would call it a point
21        of newness.  It's something that is -- that
22        differs from the prior art, a point of
23        uniqueness.
24   Q.   How does -- how does that relate to the
25        concept of anticipation?
```

Page 31

 1    A.    Anticipation -- it's my understanding that
 2          anticipation is that -- that that would be
 3          finding something that came prior to the
 4          patent that would be considered identical to
 5          the patent.  So, for example, in the initial
 6          evaluation of the patent and in the initial
 7          claim that was being made about what was the
 8          unique feature -- that it was wicker on all
 9          sides and that it was longer than it was wide
10          or high -- there were several pieces of prior
11          art that fit that description.  And so within
12          the confines of that claim, it could be
13          said -- it's my understanding it could be
14          said to anticipate that.
15                In the subsequent claims that were made,
16          there were -- in the additional claims, there
17          were things that were being claimed that
18          meant that the three pieces that were cited
19          under anticipation didn't fit exactly with
20          the new claims; and, therefore, you would say
21          that they did not anticipate.
22    Q.    Is it your testimony that anticipating is a
23          way of evaluating points of novelty?
24    A.    My understanding of anticipation is that it's
25          more exact than that, that anticipation

Page 32

1    really is looking for an object that really

2    is -- I don't know that I -- that, really, is

3    essentially identical.

4    Q.    Identical in what respect?

5    A.    Identical in all unique respects, I guess I

6          would say.  In other words, it's not --

7          identical feature.  It's -- it's identical.

8          I don't know how to say it any differently.

9    Q.    So in order for a patent to be anticipated by

10         a prior art reference, you would have to have

11         a prior art reference that showed all of the

12         features that are shown in the patent,

13         correct?

14   A.    It's my --

15   Q.    Let me stop you to rephrase that.  I'm going

16         to rephrase that to clarify.

17   A.    Okay.

18   Q.    Isn't it true that in order for a patent to

19         be anticipated by prior art reference, the

20         claim invention of the patent has to be shown

21         in all material respects in that single prior

22         art reference?

23   A.    That's my understanding.

24   Q.    And that applies to both design patents and

25         utility patents, correct?

Page 33

1    A.    I can't speak to utility patents.

2    Q.    But it's your understanding that that

3          certainly is the way it works for design

4          patents, correct?

5    A.    That's my understanding.

6    Q.    We've just been talking about anticipation,

7          which I believe you testified requires a

8          single prior art reference.

9    A.    Yes.

10   Q.    Just to show -- a single prior art reference

11         that shows all the features of the claimed

12         invention.  Let's talk about obviousness.

13         What's your understanding of obviousness?

14   A.    My understanding of obviousness is that it

15         deals with a person skilled in the art and

16         whether or not a particular innovation or

17         feature would have been obvious to a person

18         of ordinary skill in the art of whatever the

19         object and design, whatever the design in

20         question is.

21   Q.    Would you agree with me that if no single

22         prior art reference shows all the features of

23         the claimed invention, that, nonetheless, the

24         invention might yet be invalid -- the claimed

25         invention might yet be invalid as obvious in

Page 34

1        light of a combination of prior art

2        references?

3    A.  Yes.  It -- you're saying that it would be an

4        object -- even though there isn't something

5        that directly anticipates it, that it could

6        be invalid as a -- in terms of patent because

7        of -- because a collection of features that

8        pre-exist in prior art made it obvious to a

9        person normally skilled in the arts or a

10       normal person skilled in the arts?  Is

11       that --

12   Q.  I'll break it down a little bit.

13   A.  I just want to make sure I heard you

14       correctly.

15   Q.  Let's assume that you got a design patent

16       that shows certain features, correct?

17   A.  Yes.  Yes.

18   Q.  And there's a prior art reference that's

19       similar, but it doesn't show all of the

20       features of the design patent.  So you would

21       agree with me that that prior art reference

22       does not anticipate, correct?

23   A.  Yes.

24   Q.  However, it's possible that that reference

25       could be combined with another reference and

Page 35

```
 1        the combination could show all of the
 2        features of the claimed invention and design
 3        patent and that combination might then be
 4        obvious, correct?
 5   A.   Yes.
 6   Q.   Now, in performing an obviousness analysis,
 7        do you have to use a primary reference?
 8        First of all, do you know what a primary
 9        reference is in context of obviousness?
10   A.   Well, my understanding of a primary
11        reference -- I'm trying to think how to
12        phrase it.
13            I don't know.  A primary reference might
14        be, you know, a cage.  Let's say there's a
15        cage, and it is modified -- it could be
16        modified or treated in such a way as to make
17        it different.  In doing that, you might use
18        techniques that you would find in a second --
19        secondary reference, so that you can have
20        primary and secondary references to a -- to a
21        particular patent.
22   Q.   Anything else you know about primary
23        references?
24   A.   Not that comes to mind.
25   Q.   Now, we'll still talking about a design
```

Page 36

1          patent infringement.

2     A.   Okay.

3     Q.   In comparing a product with a patented

4          design, is it necessary to consider each

5          figure of the design patent?

6     A.   Could you repeat the question?

7     Q.   I'll state it another way that might be

8          helpful.  In comparing product design with an

9          existing design patent, is it required or

10         necessary as part of that infringement review

11         to compare every figure of the patented

12         design with the accused product?

13    A.   I would certainly look at every figure.  I'm

14         not sure how to interpret the word

15         "necessary."  I think certainly you should

16         have -- you should thoroughly examine the

17         figures of the patent and how those relate to

18         the other product.

19    Q.   Well, what do you do if the -- if the

20         patented design has more than one embodiment?

21         First of all, do you understand what I mean

22         when I say more than one embodiment?

23    A.   Yes.  Yes.

24    Q.   What does that mean to you?

25    A.   Well, the example that I -- from what we've

Page 37

1    been talking about would be the 321 patent,

2    which showed -- it showed a design that had

3    diamonds on it and then it showed an

4    alternate embodiment that did not have a

5    diamond weave on it.  So your question was?

6    Q.  My question, then, is how does one go about

7        evaluating a patent that has more than one

8        embodiment for possible infringement by an

9        accused product?

10   A.  I think you have to look at the embodiments,

11       and you have to look at the accused product.

12   Q.  But what -- if you have one product and two

13       embodiments in the design patent, which

14       embodiment should be considered for design

15       infringement purposes?

16   A.  Well, my understanding is that both of them.

17   Q.  And how do you go about doing that?

18   A.  By comparing them to the product.

19   Q.  Do you compare them one at a time or do you

20       in some manner merge the two designs before

21       comparing it with the accused product?

22   A.  You mean do you look at them and said, okay,

23       here's embodiment one, here's the accused

24       product, here's embodiment two, here's the

25       accused product?

Page 38

1  Q.  I'll ask it another way.  If you have a

2      patent -- a design patent that has multiple

3      embodiments, like the 321 patent --

4  A.  Yes.

5  Q.  -- and you're trying to figure out whether a

6      product like the Bay Isle product infringes

7      that patent --

8  A.  Yes.  Yes.

9  Q.  -- do you have to, in effect, check it

10     twice?  You have to compare it -- compare the

11     accused product with one embodiment,

12     determine whether there's infringement or

13     not, and then compare that same product with

14     the other embodiment to determine whether

15     there's infringement or not?  Is that your

16     understanding?

17 A.  That's what I did.  I -- I compared each of

18     the embodiments against the accused product.

19 Q.  Now, prior to getting involved in this

20     lawsuit, had you --

21 A.  Yes.

22 Q.  -- had you had any contact or experience with

23     design patents or design patent law?

24 A.  No.  No, nothing in particular.  No.  I think

25     every industrial designer is aware of the

Page 39

1       concept of intellectual property and that

2       there are design patents and there are

3       utility patents.  And so beyond general

4       understanding, no.

5   Q.  What was your general understanding prior to

6       getting involved in this lawsuit?

7   A.  Design patents protect the -- I guess you can

8       call it individual features of the look.

9       Utility patents are directed at the

10      mechanical or the chemical or the formulaic

11      issues in a product.

12  Q.  Did you ever take any classes on design

13      patents or utility patents or patent law?

14  A.  No.

15  Q.  Ever attend any symposia relating to design

16      patents or patent law?

17  A.  No.

18  Q.  Did you ever -- did you ever talk to or work

19      with an examiner at the patent office

20      regarding any design patents?

21  A.  No.

22  Q.  Did you ever file any design patents

23      yourself?

24  A.  No.

25  Q.  Were you ever involved in any design patent

BRET HUNTER SMITH
APRIL 28, 2008

Page 40

1      filings?

2  A.   No.

3  Q.   Did you ever work with any lawyers in

4       connection with any design patent or utility

5       patent disputes prior to this case?

6  A.   No.

7  Q.   Did you ever study or note the differences

8       between design patents and utility patents

9       prior to this lawsuit?

10  A.  No, not beyond the terms that I just

11      mentioned.

12  Q.  Is it your understanding that if all of the

13      features of a claimed design, according to a

14      design patent, can be individually found in

15      the prior art, such as by combining the

16      number of prior art references, that that

17      inherently means the invention being claimed

18      is obvious and the patent is invalid?

19          MR. HINSHAW:  Can I have that

20      question read back, please?

21              (The court reporter read from

22                  the record.)

23          MR. HINSHAW:  Objection to form.

24  A.  Are you talking about within the same sort of

25      category of things, or are you talking about

Page 41

1        in general?

2    Q.   I'll ask it another way.  You're still

3        talking about obviousness.

4    A.   Okay.

5    Q.   And so if you have a design patent that shows

6        certain features and you have a number of

7        individual prior art references that show

8        those features, such as one patent shows one

9        of the features and a second patent shows

10       another feature and a third patent shows yet

11       a third feature and so on, does the mere fact

12       that each of the features in the design

13       patent can be found in a prior art reference

14       and combined that way -- does that

15       necessarily mean that the claimed invention

16       is obvious?

17            MR. HINSHAW:  Objection to form.

18   A.   My understanding is that prior art speaks to

19       the issue of obviousness and that it also --

20       it speaks to the issue of whether or not

21       someone who is an ordinary person skilled in

22       the art would have looked to those references

23       and -- and seen an obvious choice or an

24       obvious response in a particular design.  In

25       other words, would I have looked at wicker

Page 42

1           being used on pet cages in past design and
2           said that would be a good idea to try because
3           it's been done before; and in that sense, it
4           would be obvious.
5    Q.    Well, what I'm trying to figure out is are
6           there circumstances, in your mind -- in your
7           view, are there circumstances that would
8           cause a patent to not be invalid even though
9           each of the individual features of a claimed
10          design can be found in some prior art
11          references?
12   A.    I don't know.
13   Q.    Well, let's say that you had a design patent
14          and it showed four ornamental features.
15   A.    Okay.
16   Q.    Feature one, two, three, and four.
17   A.    Okay.
18   Q.    And you had -- you had four prior art
19          references, references A, B, C, and D.  And
20          reference A showed feature one and reference
21          B showed feature two and reference C showed
22          feature three and reference D showed feature
23          four.  So would you agree with me that all of
24          the features of the claimed invention
25          individually are shown in prior art?

Page 43

1   A.   In your example, yes.

2   Q.   Now, in my example, would it necessarily

3        follow that the invention that's being

4        claimed in that design patent is invalid as

5        obvious?

6   A.   I don't know that I can answer your question

7        because it is absent a context.

8   Q.   Well, isn't it true that in some instances

9        with exactly that factual scenario, where

10       there's four features in the claimed design

11       and four individual references that each

12       shows one of those features, that sometimes

13       such a patent would be valid and sometimes

14       such a patent would not be valid, correct?

15  A.   I don't know.  I can't speak to it because I

16       don't have the breadth of experience and

17       knowledge in the field, obviously, that you

18       have.  I'm not an attorney.

19  Q.   So if I understand your testimony, even

20       though the prior art might show all of the

21       features of the claimed invention, you don't

22       know how to determine whether that claimed

23       invention is obvious or not, correct?

24  A.   No, that's not correct.  What I said is in

25       the absence of a context, I can't answer your

BRET HUNTER SMITH
APRIL 28, 2008

Page 44

1      question.  In other words, what I'm saying is
2      I would need to look at the object
3      specifically.  I would need to look at -- I
4      can't answer that in the abstract is what I'm
5      saying.
6  Q.  Well, isn't it true that in some instances,
7      such a patent would be valid?
8  A.  I don't know.
9  Q.  Tell me about the KSR decision that you refer
10     to at multiple points in your written
11     reports.  Explain to me your understanding of
12     what the KSR decision is all about.
13 A.  Well, it looks at the issue of combining old
14     elements and -- or elements in existing
15     patents and whether -- or it also -- well, it
16     looks at whether or not that is, in and of
17     itself, sufficient grounds for a patent.  It
18     looks at whether or not -- well, that's one
19     of the major issues, whether or not you can
20     knit together pieces found in prior patents
21     and then claim that as, essentially, new.
22 Q.  Now, you testified that you read the KSR
23     decision several times, correct?
24 A.  Yes.
25 Q.  Are you aware that the KSR decision

BRET HUNTER SMITH
APRIL 28, 2008

Page 45

1      specifically states that a patented invention

2      can be a combination of old elements?

3   A.   Yes.

4   Q.   So isn't it true that a patented invention

5      can be a combination of old elements?

6           MR. HINSHAW:   Objection.   I'm

7        sorry.   I didn't say that very loud.

8        Objection.   Calls for a legal

9        conclusion.

10  A.   Would you repeat the question?

11          MR. GARDNER:   Read it back,

12       please.

13              (Court reporter read from the

14         record.)

15  Q.   Then I'll ask another question.   So based on

16     your understanding of KSR, isn't it correct

17     that a patented invention can be a

18     combination of old elements?

19  A.   That's my understanding.

20  Q.   Mr. Smith, one thing I failed to mention --

21     and I seem to do this every time -- is that

22     this is not a marathon session.   We've been

23     going for about an hour and half.   If at any

24     time during the deposition, you need to take

25     a break to use the restroom or catch your

Page 46

```
 1        breath or stretch your legs, just ask and
 2        we'll try to accommodate you.
 3              And on top of that, we're -- I guess
 4        it's 11:30 local time.  What time do you like
 5        to eat lunch?
 6    A.  If we're going to beat the crowds, now's the
 7        time to go or at 1:30 after everybody's been
 8        through.
 9              MR. HINSHAW:  I forget we're on
10              a college campus.
11              MR. GARDNER:  If it's all right
12              with you, why don't we take a break
13              for lunch.  And we'll come back in an
14              hour.
15                    (Lunch recess)
16    Q.  We're ready to go back on the record.
17        Mr. Smith, we were talking a little bit about
18        your views on the ordinary observer and the
19        care that that person might utilize in making
20        a purchase decision of the Mid-West product.
21    A.  Yes.
22    Q.  Do you have an understanding of where and how
23        the Mid-West products are sold?
24    A.  The distribution chain as such, no.  No, I
25        don't.
```

Page 47

1   Q.  Are the Mid-West products sold over the

2       internet?

3   A.  I believe I've seen them on the internet, but

4       I can't recall for sure.

5   Q.  Are they -- are they sold through catalogs?

6   A.  Again, I believe I've seen some pages in the

7       material I went through.  I'm not sure if

8       they were from the internet or catalog.  I'm

9       not sure if they were from online or from the

10      catalog.

11  Q.  Are the Bay Isle products from Mid-West sold

12      through small independent pet shops?

13  A.  I recall reading that that's -- something to

14      effect that that's where Mr. Simpson

15      originally saw -- or he saw it at Four Paws,

16      a local pet place.  He saw Bay Isle, I

17      believe.

18  Q.  So the answer is yes?

19  A.  So yes.

20  Q.  And, of course, the Mid-West Bay Isle

21      products are sold through big box pet stores,

22      correct?

23  A.  That's my understanding.

24  Q.  Are there differences in how much care

25      consumers would use in ordering off the

Page 48

1    internet versus ordering through a catalog

2    versus ordering -- or purchasing at an

3    independent pet store versus purchasing at a

4    big box pet store?

5  A.  I think it would depend on the products that

6    are being purchased.  Are you speaking

7    specifically about -- well, in general, the

8    trend in internet purchases is they do a lot

9    of comparison; that is, that they'll go to

10    one site and look at stuff, go to another

11    site and look at stuff.  So there's generally

12    a lot of comparing that goes on.  They don't

13    always -- they haven't always seen the

14    product in person.

15  Q.  Well, the question I have is are there

16    differences in how much care people would use

17    in purchasing the Mid-West Bay Isle product

18    depending upon whether they're purchasing

19    from a big box pet store, independent pet

20    store, through a catalog, or the internet?

21  A.  I think in all cases, they will spend some

22    time comparing because -- if for no other

23    reason than the price point is different than

24    what I would call an entry level pet cage.

25    So they will spend time comparing.  But

Page 49

1     beyond that, I can't speculate.

2  Q.  So you don't know if there would be any

3     differences in the amount of care used in

4     those different purchase environments,

5     correct?

6  A.  I think.  Yes.

7  Q.  So the answer is yes, that's correct, right?

8  A.  Yes.  But let me -- it's -- there may be

9     differences.  They may look.  But I would say

10     that there will be care exercised regardless

11     of the place of purchase because it is above

12     an entry-level product.  And, typically,

13     people pay more attention as you move above

14     an entry-level product.  I would call a

15     standard cage, for example, an entry-level

16     product.

17  Q.  Do you have a background in marketing?

18  A.  I have no degree in marketing.  I have no

19     classes specifically in marketing.  I have

20     worked with a number of marketing people, and

21     we do a number of industry projects where

22     there's a very heavy marketing focus.  And as

23     a product designer, one of the people you're

24     accountable for and need to understand -- or

25     accountable to and need to understand is the

BRET HUNTER SMITH
APRIL 28, 2008

Page 50

1       marketing group within a company.  And,

2       typically, I work with vice presidents or

3       marketing managers.

4  Q.   You've worked with marketing people; but

5       you've never worked in marketing yourself,

6       correct?

7  A.   That's correct.

8  Q.   Is it possible that despite this, as you say,

9       extra care that's being used in the purchase

10      decisions of a Mid-West Bay Isle product,

11      that consumers might actually get confused

12      between the Mid-West product and the Simpson

13      Ventures product in the marketplace?

14  A.   I don't think so because of the visual

15      differences.

16  Q.   Well, would you be surprised to learn that

17      there have been such incidents of confusion?

18  A.   I guess I would say I'd need to know more

19      about the confusion and the number of people

20      who were confused before I could respond to

21      that.

22  Q.   Well, what types of visual clues or cues are

23      present in the Mid-West product that would --

24      that would tend to avoid this kind of

25      confusion?

Page 51

1    A.    Well, the Mid-West product has a very

2          pronounced -- it has notches along the edges.

3          The -- the cage framework is exposed at the

4          edges in a very pronounced way.  There's a

5          substantial visual gap between the edges.

6          And I think that those are very strong visual

7          cues.  And -- oh, let's see.  There are

8          differences in the -- in the surface weave

9          pattern.

10              Really, there's almost, visually, kind

11         of an opposite approach in that from a design

12         point of view, we would say maybe that they

13         had emphasized the skeletal structure of the

14         cage because it's so visually obvious and

15         then, as I said before, the notches, as

16         opposed to the very continuous tight edge on

17         the 156 patent.

18   Q.    Well, when this mythical or hypothetical

19         casual observer first would observe the

20         Mid-West product and using the amount of care

21         that they would typically use in making a

22         purchasing decision, in your view, are these

23         visual cues that you just mentioned going to

24         jump out at the consumer before the overall

25         shape and the -- the extent of the wicker

Page 52

1          covering the product?

2    A.    Yes, I would say so.  You notice we -- we

3          notice things in part by edges.  And the

4          notches in the edge are really noticeable.

5          The -- depending on what level they see the

6          cage at, the gaps in the roof of the pet cage

7          are also really noticeable on the Mid-West

8          design.

9    Q.    So if I understand your testimony, the edge

10         treatments and the gaps and the visible

11         skeletal structure and the notches are the

12         features that are going to jump out at the

13         consumer first, correct?

14   A.    Yes.  Depending on the consumer, they also --

15         and again it depends on -- to some extent on

16         the consumer; but also the -- things like the

17         name plate on the front door of the cage

18         might be noticed, probably secondarily,

19         though, to the structure.

20   Q.    When we talked this morning about your

21         understanding of the test for design patent

22         infringement and you mentioned the Gorham

23         substantially the same or similarity test and

24         the point of novelty test, is there a

25         relationship between the point of novelty

BRET HUNTER SMITH
APRIL 28, 2008

Page 53

1          test and the Gorham Test?

2     A.   I'm not -- I don't know how to respond to

3          that.  Can you state it a different way?

4     Q.   Are you aware of any relationship of any sort

5          between the Gorham substantial similarity

6          test and the point of novelty test?

7     A.   It's my understanding that the Gorham Test

8          would -- at some level, you could say, it

9          would deal with overall impressions that the

10         average consumer might have who is taking

11         interest and reasonable care in purchase of a

12         product.

13    Q.   Now, are you aware of any other relationship

14         between the two tests?

15    A.   None that I could think of.

16    Q.   When you're evaluating a design patent to see

17         if it is infringed by some new product, how

18         do you figure out what the invention that's

19         being claimed is?

20    A.   The first thing I do is look at the document,

21         the patent document.

22    Q.   And what does that tell you?

23    A.   Well, in the case of a design patent, it has

24         the visuals; but also there can -- there can

25         be verbal claims associated with it.  I need

Page 54

1         to look -- but my recollection of the 156

2         patent was that it said "as shown," you know,

3         that the design as shown was what was being

4         claimed.

5    Q.   Is it possible in a design patent for the

6         claimed invention to encompass anything other

7         than what is shown in the drawings?

8    A.   It's my understanding that the drawings work

9         together with the claims.  And in the case of

10        the 156 patent, the claim was as shown.  And

11        so as a result, the drawings are what you

12        would refer to.  I don't know if -- as I said

13        at the beginning, I'm not an attorney; so in

14        terms of knowing, you know, all of the things

15        that have been granted design patents, I

16        can't speak to that.  I just can say that in

17        the case of the 156, the reference was to

18        what was shown.

19   Q.   Isn't it true that you don't know whether a

20        design patent is limited to what is shown in

21        the drawings or not?  Correct?

22   A.   My experience is that it's limited to the

23        drawings.  My understanding is it's limited

24        to the drawings in the claims.

25   Q.   So it's your testimony that the design patent

Page 55

```
 1          scope can encompass both what's shown in the
 2          drawings and a written description of sorts
 3          according to what's claimed, correct?
 4     A.   That's my understanding.
 5     Q.   And so with that understanding, the claimed
 6          invention can be more than what's shown in
 7          the drawings, correct?
 8     A.   That would seem to be correct.
 9                         (Exhibits 74, 75, and 76 were
10                          marked for identification.)
11     Q.   Mr. Smith, we're passing you what's been
12          marked for identification purposes as
13          Exhibits 74, 75, and 76.
14     A.   Yes.
15     Q.   And ask if you can identify what these are.
16     A.   Yes.   These are examples of prior art, and
17          they are all examples that I cited in my
18          reports.
19     Q.   And 74 is a depiction of some sort of a
20          bird cage; is that correct?
21     A.   Yes.
22     Q.   What is 75, Exhibit 75?
23     A.   Exhibit 75 is a wicker cage with wheels
24          that's being pulled by an elephant.
25     Q.   Is that a real elephant or --
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 56

1  A.  No.  It does not look to be.  It looks to be

2      a toy.

3  Q.  So the cage of Exhibit 75 is a toy or a

4      decoration; is that correct?

5  A.  It would -- yes.

6  Q.  It's not -- it's not intended or actually

7      used as an animal cage, is it?

8  A.  No, it is not.  It's -- it's a scaled, you

9      know, representation of an animal cage.

10  Q.  And what does Exhibit 76 depict?

11  A.  That's a bird cage.

12  Q.  These -- do these three products or cages on

13      Exhibits 74, 75, and 76 look the same to you;

14      or do they look different from one another?

15  A.  I don't -- I don't mean to be nitpicking

16      here, but that would depend upon what you

17      meant by the same.

18  Q.  Well, would you agree with me that they're

19      not identical with one another?

20  A.  Yes, I would agree that they're not

21      identical.

22  Q.  And that they have obvious or apparent visual

23      differences that readily stand out when you

24      look at the three of them?

25  A.  Yes.  They have visual differences and visual

BRET HUNTER SMITH
APRIL 28, 2008

Page 57

1    similarities.

2    Q.  But if a person were looking at these three,

3        they would quickly be able to discern that

4        they are three different things, correct?

5    A.  Yes.  Three different objects, yes.

6    Q.  I'm going to refer -- I'm going to pass you

7        what's previously been marked as Exhibit 2.

8    A.  Yes.

9    Q.  And ask if you recognize that.

10   A.  Yes.

11   Q.  And what is that, please?

12   A.  This looks to me to be the Bay Isle Mid-West

13       design, cage.

14   Q.  Does this product look to be the same or

15       identical -- let me rephrase that.  The Bay

16       Isle product by Mid-West of Exhibit 2 appear

17       identical to any of the three items we've

18       just looked at in Exhibits 74, 75, or 76?

19   A.  No, it does not appear identical to me.

20   Q.  Would you agree that they're -- that the bay

21       Isle product is visually readily different

22       from those three exhibits?

23   A.  I would agree that there's visual differences

24       and that there are also similarities.

25   Q.  What are the similarities?

BRET HUNTER SMITH
APRIL 28, 2008

Page 58

1    A.   Similarities would have to do with windows.

2         Similarities would have to do with they all

3         three have doors.  They all three make use of

4         wicker or a material that would appear to be

5         wicker, give that appearance, a woven

6         material.  And they all -- they all create

7         their windows by leaving an opening or a

8         space in the wicker.

9              MR. GARDNER:  All right.  Let's

10             put this in as 77.

11                  (Exhibit 77 was marked for

12                      identification.)

13   Q.   Let me pass you what's been marked as Exhibit

14        77 and ask if you recognize that.

15   A.   Yes.

16   Q.   What is that, sir?

17   A.   This is the 156 design or patent drawing.

18   Q.   Now, let's set the patent aside for a moment,

19        just off to one side.  And I would like for

20        you to take Exhibits 74, 75, 76, and Exhibit

21        2, and arrange them in a sequence of most

22        similar to what's shown in the 156 patent on

23        Exhibit 77 to least similar.

24   A.   Based upon?

25   Q.   Based upon your understanding of what's shown

BRET HUNTER SMITH
APRIL 28, 2008

Page 59

1       in the patent, Mr. Smith.

2    A.  Based upon my -- I want to make sure I

3       understand what you're asking.  Are you --

4    Q.  Well, first of all, you've studied --

5    A.  Yes.

6    Q.  -- the 156 patent, correct?

7    A.  I have, yes.

8    Q.  And you're familiar with what's shown in the

9       drawings.

10   A.  Yes.

11   Q.  So with your knowledge of what's shown in the

12      drawings in the 156 patent --

13   A.  Okay.

14   Q.  -- I would like you to take these four

15      references, which are Exhibit 74, 75, 76, and

16      Exhibit 2, and put them in some sort of an

17      order of most like what's shown in the patent

18      to least like what's shown in the patent.

19      Then we'll talk about that.

20   A.  Okay.

21   Q.  And it's not a speed test.  You can take a

22      while if you need to.  I trust that you're

23      familiar with all these documents and it

24      shouldn't take an hour or two.

25   A.  Well, I can address common qualities.  There

BRET HUNTER SMITH
APRIL 28, 2008

Page 60

1  are -- if you're comparing this drawing to

2  these, if we're comparing the drawings, then

3  it's not a straightforward process.  For

4  example, this proportionally and in point of

5  view is the closest to this (indicating.)

6  Q.  You're referring to --

7  A.  76.

8  Q.  The bird -- the cage of 76 or the Russian --

9  A.  In terms of the proportion and view angle of

10  it is closest to 77, if that's what you're

11  talking about.  If you're taking about, for

12  example -- if we're looking for the -- yeah.

13  If we're talking about the window placement,

14  for example, then these two would be the

15  closest in terms of looking at the

16  proportions for where the window is located.

17       MR. STALEY:  For the record to

18       be clear --

19       THE WITNESS:  I'm sorry.  74 and

20       number 2 -- I'm sorry -- compared to

21       the 156 patent, which is Exhibit 77.

22  A.  I think it would be fair to say that this

23  one, in both of those comparisons, that

24  number 75 is the least like in the sense of a

25  visual comparison.

Page 61

1    Q.    All right.  So having done a little bit of

2          thinking about it and talking through it, is

3          it your testimony that the cage of Exhibit 75

4          is the least like what's shown in the 156

5          patent --

6    A.    As the --

7    Q.    -- in comparison to Exhibit 74, 76, and

8          Exhibit 2?

9    A.    Yes.

10   Q.    All right.  So Exhibit 75 is the least like

11         what's shown in the patent.  What's next?

12   A.    It -- what's next depends on what specific

13         features you're comparing.  And part of

14         the -- part of it is the fact that if we're

15         looking -- I mean, if you're looking at

16         proportion, if you're looking at point of

17         view, for example, of the isometric drawing,

18         that's the closest match with the bird cage.

19         If you're -- or with 76.  Excuse me.  Number

20         76.

21   Q.    Well, you're familiar with all the drawings

22         in the patent, the 156 patent --

23   A.    Uh-huh.

24   Q.    -- Exhibit 77.  So taking into account what's

25         shown in all the drawings, which of these

Page 62

1         three references do you think is the least

2         like what's shown in the patent and

3         considering Exhibit 74, 76 --

4    A.   So you're saying looking at it from all

5         sides, from all points of view, which is the

6         least like?

7    Q.   Yeah.

8    A.   Is that your question?

9    Q.   Yes.

10   A.   It's not a clear call from this point of

11        view.  Figure 74 and 76 both have different

12        visual characteristics that are also

13        reflected in Exhibit 77.  For example, the

14        window placement on 74 is higher up and you

15        have more weave below.  The window on the 76,

16        on Exhibit 76, is basically centered or the

17        open area is basically centered.  76 is more

18        close in proportion to the Exhibit 77.  Okay?

19   Q.   Closer to the patent.

20   A.   Yes.  Yes, in proportion.

21   Q.   Talking about the overall shape?

22   A.   The overall shape and proportion, yeah.

23   Q.   So Exhibit 76, the Russian bird cage of

24        Exhibit 76 has an overall shape that is more

25        similar to what's shown in the patent than

BRET HUNTER SMITH
APRIL 28, 2008

Page 63

1          the bird cage of Exhibit 74.  Is that what

2          you mean?

3     A.   That's correct.

4     Q.   Do you view that Exhibit 74 and 76 are

5          roughly equally similar but in different ways

6          to what's shown in the 156 patent on Exhibit

7          77?

8     A.   Yes.  I think that would be fair to say.

9     Q.   And do you -- is it also your testimony that

10         Exhibits 74 and 76 are not as similar to the

11         patent as is the Bay Isle product of

12         Exhibit 2?

13    A.   If we are looking at all sides of it and all

14         of the characteristics, yes, that would be

15         correct.

16    Q.   Okay.  So then I think we have a sequence,

17         that as between Exhibits 74, 75, 76, and the

18         Bay Isle product of Exhibit 2, the one that

19         is most like what is shown in the patent is

20         the Bay Isle product of Exhibit 2, correct?

21    A.   Yes.

22    Q.   And the one that's the least like what is

23         shown in the patent is the cage of Exhibit

24         75, correct?

25    A.   Yes.

**BRET HUNTER SMITH**
**APRIL 28, 2008**

Page 64

1    Q.   And that the -- the cages of Exhibit 74 and

2         76 are somewhere in between?

3    A.   Yes.

4    Q.   They're not --

5    A.   I'm sorry.  I didn't mean to cut you off.

6         I'm sorry.  They are somewhere in between.

7              MR. GARDNER:   Let's take about a

8         five-minute break.

9                   (Brief recess)

10                  (Exhibits 78, 79, and 80 were

11                   marked for identification.)

12   Q.   Mr. Smith, we've passed you what's been

13        marked for identification purposes as

14        Exhibits 78, 79 and 80.  Can you identify

15        those, please?

16   A.   And 80?

17   Q.   Yes.

18   A.   These are the three reports that I've written

19        relative to the 156 patent.  The first was

20        the manual report and then two supplemental

21        reports.

22   Q.   And I believe that we've earlier -- this

23        morning we established that you don't have

24        any other opinions that are not -- regarding

25        the 156 patent that are not encompassed in

BRET HUNTER SMITH
APRIL 28, 2008

Page 65

1      these three documents except to the extent

2      that you would prefer to refer to the Mo

3      patent, correct?

4    A.   Right.  And that I may not have been clear,

5         but -- the edges, but also the fact that --

6         and I show this in the 321.  If you invert

7         the 542 Mo patent and enlarge it, you have

8         the basic -- basic structure of a wire frame

9         covering that is the 156.

10                MR. STALEY:  They appear to

11              be --

12   A.   It's just a little clearer.

13   Q.   Now, if you would, look at -- let's look at

14        pages 6 and 7.

15   A.   6 and 7?

16   Q.   Of the first report.

17   A.   Of the first report?

18   Q.   Which is Exhibit 78.

19   A.   Yes.  Okay.

20   Q.   And you see at the bottom of page 6 in

21        discussion of the material choice --

22   A.   Yes.

23   Q.   -- where you -- you make a statement that

24        according to Charles Hendricks, DVM,

25        professor of veterinary medicine at Auburn

BRET HUNTER SMITH
APRIL 28, 2008

Page 66

1    University.

2  A.  Yes.

3  Q.  You make some statements that apparently you

4       attribute to Mr. Hendricks.  Did you have

5       occasion to speak to Mr. Hendricks about this

6       matter?

7  A.  I had a very brief conversation where I asked

8       him about -- about dogs and cages and his,

9       you know, covering a cage or providing some

10      cover with the cage of a good thing.  And his

11      response was that dogs are den animals and

12      den animals like to have some cover.  So

13      there's a functional -- this is my -- this

14      last part is my wording.  So that, therefore,

15      there is a functional aspect to the covering

16      that's on the cage.

17 Q.  Okay.  But the statements here that the

18      wicker would reinforce the den quality --

19 A.  Den quality of the space.  He said that a

20      covering would reinforce the den quality of

21      the space.  I don't --

22 Q.  So that's --

23 A.  I don't believe that he specific -- I don't

24      recall if he specifically said wicker, but I

25      said a covering.  And I believe that -- that

Page 67

1    that's -- I don't -- I don't recall if I --

2    if I specifically went beyond that or not and

3    said a wicker.  I was trying to get an

4    opinion about -- one way or another about

5    whether or not having some cover or covering

6    surrounding the cage was -- was a good thing

7    or a -- or a bad thing with respect to the

8    function of the animal feeling safe and that

9    sort of thing.

10   Q.  So it was Dr. Hendricks' opinion that

11       covering the cage would improve the den

12       quality for a dog?

13   A.  Yes.

14   Q.  And did he indicate to you also that that

15       would be an important feature for cats?

16   A.  The -- the -- the statement about cats is

17       based on the source that's mentioned directly

18       after that, which talks specifically about

19       cats.  It's talking about in the context of

20       laboratory animals; but it also talks about

21       cat behavior and the fact that on at least

22       two sides, it's good if they have cover,

23       obviously, one side open so that they can

24       view, you know, what's going on; but

25       that's -- that is -- I've given you the full

BRET HUNTER SMITH
APRIL 28, 2008

Page 68

1         reference there for the publication.

2    Q.   Is that some research that you did?

3    A.   To find the publication?

4    Q.   Well, where did the -- I mean, how did you

5         come up with the idea that wicker would be an

6         important functional feature for cats?  And I

7         see that it's supported by the reference to a

8         specific publication, but --

9    A.   Well, yeah.  I was looking at -- I believe I

10        did just a general search on animal

11        behavior.  I was trying to see whether or not

12        I guess the human equivalent of privacy, you

13        know, was an issue.  And I came across this

14        reference relative to cats -- well, in a

15        larger -- you know, cats, dogs, farm animals,

16        ferrets, rabbits, and rodents.  But there was

17        a section that specifically addressed cats

18        and their environment.

19   Q.   Well, in this section here where you're

20        discussing what cats and dogs might prefer or

21        what would be beneficial for cats and dogs,

22        is this your opinion or the opinion of

23        Dr. Hendricks?

24   A.   The opinion of Dr. Hendricks relative to

25        dogs, the opinion of -- what's her name --

BRET HUNTER SMITH
APRIL 28, 2008

Page 69

1       Sandra McCune relative to cats.
2   Q.  Do you have any special training or education
3       in animal psychology or animal behavior or
4       animal factors?
5   A.  Other than what I've researched relative to
6       this project and working for a summer job
7       at -- doing construction work at a place
8       called Wolf Park in Battleground, Indiana,
9       no.  The director of Wolf Park is -- at that
10      time was a world famous zoologist.  So other
11      than casual conversation with him, no.
12  Q.  So you're not an expert in animal psychology?
13  A.  No, which is why I went looking to see what
14      they said.
15  Q.  And you're not an expert in animal factors or
16      animal ergonomics as such?
17  A.  Yeah.  Ergonomics, the ergo refers to man,
18      so -- which is why I kind of said animal
19      factors.  Other than, you know, looking at
20      basic dimensions and measures, which are -- I
21      ran across a number of things, none of
22      which -- but -- like this that talk about
23      what do animals -- you know, what should they
24      have, what do they like, that kind of thing,
25      no.  No.  I'm not -- that's not my field of

Page 70

1    expertise, which is why I wanted to check

2    outside.

3  Q.  So, for example, when we go further up the

4    page under the heading "Windows" and you make

5    the statement that the windows provide a way

6    for the animal to look out and observe its

7    environment, something that is important for

8    the psychological comfort of the animal, you

9    don't really know whether that's important

10    for the psychological comfort of the animal,

11    do you?

12  A.  That's -- that's something that came up, I

13    believe, in the laboratory animals book and

14    specifically when she was talking about

15    cats.  Cats prefer resting places that are

16    warm, dry, and protected on one or, even

17    better, two sides.  As I recall, she went on

18    to talk about the fact that they do need a

19    way to see out and what's going on.  And I --

20    again, that -- that's the basis for that

21    discussion and I guess some general

22    discussion that I recall from talking with

23    Dr. Klinghammer years ago when I was working

24    on his house and garage and other things.

25  Q.  But isn't it true that you don't know

BRET HUNTER SMITH
APRIL 28, 2008

Page 71

```
 1        yourself whether --
 2    A.  I am not an animal expert.
 3    Q.  Let me finish my question, please.
 4    A.  I'm sorry.  I'm sorry.
 5    Q.  You yourself don't know any more than anybody
 6        else whether it's important for the
 7        psychological comfort of animals that -- that
 8        windows be provided, correct?
 9    A.  I know according to Sandra McCune, it's
10        important; and she is an expert.  I'm not an
11        expert.  That's why I would go and check and
12        confer.
13    Q.  But isn't it possible that some other expert
14        in the field of animal psychology might have
15        a different view?
16    A.  I'm not an expert in animal psychology, so --
17    Q.  So you don't know that?
18    A.  -- I can't answer that one way or the other.
19    Q.  But you do have to admit that it's possible
20        that an expert in that field might have a
21        different view from Sandra McCune, correct?
22    A.  To the degree that anything is possible, yes.
23    Q.  Now, your -- your opinion of -- not opinion.
24        Your report of Exhibit 78 has numerous
25        mentions -- instances where you mention
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 72

 1          features that are important to animals or

 2          that are functional for animals.  You don't

 3          have any other basis for those statements

 4          except what you've read in that one book or

 5          from what you gathered from speaking with

 6          Mr. Hendricks, correct?

 7    A.    No.  I -- that's not correct.  I read a

 8          number of books about -- or skimmed a number

 9          of books, read some portions of books about

10          cats and dogs.  I -- I -- you know, if you

11          can point to specific statements, I can

12          answer more specifically; but I did do

13          background, kind of general reading on the

14          subject.

15    Q.    Well, let's look in particular at the

16          statement you make at the top of page 6.  You

17          argue that the rattan -- because rattan is a

18          woven material, it has superior air

19          circulation when compared with solid

20          materials like sheet metal, wood, composites

21          or plastics.  This is important to the needs

22          of the animal for fresh air.

23              Do you see that statement that you made?

24    A.    Yes.

25    Q.    If the product has windows and doors that are

Page 73

```
 1        open, how does the -- how does the open weave

 2        or loose weave of the wicker make any

 3        difference at all to the fresh air needs of

 4        the animal?

 5    A.  Well, it gives greater air circulation in the

 6        same way that if I put you in the -- out in

 7        the 80-degree sun and I made a tent out of

 8        wood and gave it a window and a door, you

 9        would be a whole lot warmer than if I used a

10        nylon that had an open mesh that let some

11        wind through and some air circulate.  So it

12        is a design issue.  It's not -- so it is a

13        design issue.

14    Q.  Are these -- are these residences typically

15        used in a home or outside?

16    A.  I would think that would depend on the owner.

17        I've seen -- I've seen owners put, you know,

18        their kennels out on the porch, you know.  So

19        I don't know.

20    Q.  Well, we're talking about the wicker-covered

21        residences.

22    A.  Uh-huh.

23    Q.  Either what's shown in the patent, the 156

24        patent, or the Bay Isle product of Exhibit 2.

25        Is it your understanding that most of the Bay
```

Page 74

```
 1        Isle products are used indoors?
 2   A.   I haven't read one way or the other or been
 3        informed one way or the other.  I would
 4        think, from a design point of view, that one
 5        of the reasons to purchase these would be for
 6        interior decor.  So I would think that it
 7        would tend to be used inside as opposed to
 8        outside the majority of the time.
 9   Q.   So it is your understanding that most of the
10        time, they're likely indoors?
11   A.   That would be -- yes.
12   Q.   Does that lessen or more -- strengthen your
13        argument that the loose-weave pattern
14        contributes to the fresh air needs of the
15        animal?
16   A.   I think the loose weave contributes to air
17        circulation, I guess I would say.  To air
18        circulating within the cage might be a better
19        way to say it.
20   Q.   Isn't it true for indoor use, it doesn't make
21        any difference on the Bay Isle product?
22   A.   On the Bay Isle product or the 156 product?
23   Q.   Either one.
24   A.   I would think it would make a difference the
25        same way that a clogged furnace filter gives
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 75

1    poorer air circulation than one that isn't.

2  Q.  In the circumstance of a clogged air --

3    furnace filter, does the air normally have a

4    path other than through the filter?

5  A.  No.

6  Q.  And the situation of the -- in the context of

7    the 156 patent, aren't there substantial

8    windows and a large open door?

9  A.  There are open windows.  There are open

10    windows and an open door.  And -- but if we

11    want to look at this architecturally, in the

12    case of the 156, those are at 90 degrees to

13    each other.  The windows go across so you can

14    get some cross-ventilation that way.  It will

15    improve the ventilation.

16    Is it possible for the animal to get air

17    without it?  Yes.  It's not a hermetically

18    sealed container.  Of course, the animal

19    could get air through the windows and the

20    doors.  It's just an added benefit to have

21    the loose weave of the rattan as opposed to a

22    flat surface material.

23  Q.  Have you made any calculation of how much

24    extra air would pass out through the side

25    panels?

Page 76

1  A.  No, I have not.  No, I did not.

2  Q.  Would you agree that it's -- the extra air

3      that might be received by the animal would be

4      a negligible amount?

5  A.  No, I would not.  And the reason I would not

6      is if you would compare this to, say, a

7      plastic animal cage with a wire front door

8      and with side windows, the -- the air quality

9      inside would be less than with an open weave.

10 Q.  How does it -- how does the open -- given

11     that the -- strike that.

12         Let's talk about wicker for a second.

13 A.  Okay.

14 Q.  Is there a difference between wicker and

15     rattan?

16 A.  Rattan -- the terms are, generally,

17     frequently used interchangeably.  Rattan

18     actually comes from a very specific plant,

19     and so there is -- and I think I referred to

20     it in the first report.  Yes, it comes from

21     palm trees belonging to the Calamus genus

22     that are native to tropical regions in

23     Africa.  That's the -- but like so many

24     terms, it broadly is used frequently to

25     describe furniture or articles, similar

BRET HUNTER SMITH
APRIL 28, 2008

Page 77

1          articles, that have a woven texture to them.

2              In other words, if you look at rattan

3          furniture, it's not always made with rattan

4          in the strictest sense.  The word has become

5          more generalized kind of like Kleenix.  You

6          know, it's being applied just to mean --

7          typically or frequently, it's applied to mean

8          a woven cover.

9     Q.   Well, how do you mean -- when you use -- in

10         your report, you use wicker --

11    A.   And rattan interchangeably.

12    Q.   -- and rattan somewhat interchangeably.

13    A.   Yes.  And I said I would be using them

14         interchangeably.

15    Q.   Now, you've seen -- in the marketplace,

16         you've seen furniture products where the

17         woven material is a very fine, reed-like

18         material that's perhaps a quarter to an

19         eighth of an inch diameter.

20    A.   Yes.

21    Q.   And then there are other products in the

22         marketplace where it's a split reed maybe a

23         half of an inch wide.

24    A.   Right.

25    Q.   Do you mean one or the other of those

BRET HUNTER SMITH
APRIL 28, 2008

Page 78

```
 1        products or both when you're referring to
 2        wicker and rattan?
 3   A.   Well, the problem is -- and the reason that I
 4        didn't make distinction is the problem is --
 5        for example, let's take your first example,
 6        the thin material.  You can get the same
 7        material -- let's say it's willow, a willow
 8        reed, which is used in basketry a lot.  You
 9        can get that same material, willow, in a very
10        thick reed.  So, you know, the distinctions
11        aren't necessarily related to size.  And in
12        this day and age with synthetic rattan,
13        they're not related to the material either.
14        It's become more of a term to describe
15        furniture or the like articles.
16   Q.   Does it -- does one or the other refer to a
17        whole reed product versus a split reed or a
18        split cane product?
19   A.   You mean rattan versus?
20   Q.   Well, you're using rattan and wicker
21        interchangeably.
22   A.   Right.  Right.
23   Q.   And does rattan sometimes, in the
24        marketplace, refer to a woven product where
25        the weave is of a fiber that's been split or
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 79

1          wide -- wide cane that's been split.

2     A.   That's been split?  Yes, sometimes in the

3          marketplace, it is used that way.  Sometimes

4          it isn't used that way.  It depends.

5     Q.   Now, in your reports --

6     A.   Yes.

7     Q.   -- when you say wicker or rattan, are you

8          referring to a whole reed product or a split

9          reed product?

10    A.   I'm referring more to the appearance of the

11         woven material; that is, that it's a woven

12         material.  And, you know, I'm -- in my

13         report, I'm essentially using the terms

14         interchangeably.  And I say that in the

15         report.

16    Q.   But when you use the terms, either wicker or

17         rattan, in your --

18    A.   Yes.

19    Q.   -- in your reports, do you mean to encompass

20         a wide split reed that might be a half of an

21         inch wide; or are you just referring to the

22         whole reed, small diameter?

23    A.   Well, rattan itself is split, so I'm not sure

24         I understand the distinction you're making.

25         Rattan itself can be a split.  Furniture

BRET HUNTER SMITH
APRIL 28, 2008

Page 80

```
 1        referred to as rattan can be made from a
 2        split material.  So I'm not sure I understand
 3        your distinction.
 4   Q.   Well, Mr. Smith, I'm not trying to make a
 5        distinction.  I'm trying to figure out what
 6        you meant by the terms in your report.
 7   A.   Yeah.
 8   Q.   I'm not trying to impose any particular
 9        definition on you.
10   A.   It's -- well, what I meant was just the use
11        of a woven material, the -- if we're talking
12        about -- let's go back to willow.  If we're
13        talking about willow, well, what that split
14        down from depends a whole lot on how the
15        willow is processed.  So if you take another
16        example, which would be oak baskets, which
17        are traditionally where things are split down
18        by hand, the distinction -- I don't -- I
19        don't see -- I mean, it's -- they're used
20        interchangeably.  They're used
21        interchangeably in catalogs.  They're used
22        interchangeably in this report.  The terms
23        are.
24   Q.   Well, when you use wicker or rattan, do you
25        mean to include woven fabrics like cotton?
```

Page 81

1   A.   No.

2   Q.   Do you mean to include woven split-oak

3        caning?

4   A.   That can -- yeah.  That would fall within

5        this.  That is a woven material used to

6        create a wicker or a, you know, rattan sort

7        of look.  It would also apply to synthetic

8        material.  That's a distinction that's also

9        in the marketplace, synthetic rattan, which

10       is kind of an oxymoron; but that's the way

11       the language has shifted in the marketplace.

12       So I did not make a distinction.

13  Q.   If you would, let's look at page 16 of your

14       report.

15  A.   16, yes.

16  Q.   And if you would read the last sentence out

17       loud.

18  A.   The last sentence?

19  Q.   The last sentence on page 16.

20  A.   On page 16.  Let me go back and find the

21       beginning.

22            Based upon this, I conclude that it

23       would be obvious to a designer with ordinary

24       skill in the art, by full knowledge of the

25       prior art, to combine wicker or rattan weave

BRET HUNTER SMITH
APRIL 28, 2008

Page 82

```
 1         patterns to all surfaces of a rectangular
 2         cage structure for the purposes of providing
 3         the aesthetically pleasing pet containment
 4         structure and design that is the subject of
 5         the 156 patent.
 6     Q.  Would you agree with me, then, that wicker is
 7         aesthetically pleasing when applied to a pet
 8         containment structure?
 9     A.  If it's done well, yes.
10     Q.  Would you agree with me that it's
11         aesthetically pleasing as shown in the 156
12         patent, which is Exhibit 77?
13     A.  Yes.
14     Q.  If you would look at page 17.
15     A.  Yes.
16     Q.  And on the second column, under the
17         "Predictable Variation" heading --
18     A.  Yes.
19     Q.  -- read the sentence that starts, Patents 326
20         and 915.
21     A.  Patents 326 and 915, Figures 31 and 32,
22         clearly show the application of a woven
23         texture to a rigid frame in order to provide
24         an aesthetically appealing surface with good
25         circulation.
```

Page 83

1    Q.   First of all, when you wrote rigid there, you
2         meant R-I-G-I-D, correct?
3    A.   Yes.  Yes.  It's just a typo.
4    Q.   You didn't really mean that it's ridged, it
5         has ridges like Ruffles?
6    A.   No, sir, I did not.  That's a typo.
7    Q.   And if we see that word "rigid" -- "ridged"
8         like that somewhere else in the document, it
9         probably means rigid?
10   A.   Yes.  Yes, sir.
11   Q.   And here you're stating again that the woven
12        texture provides an aesthetically appealing
13        surface.
14   A.   Yes.
15   Q.   And that was a wicker surface?
16   A.   It's a -- it's a -- it's a woven surface.
17        I -- the -- let's see.  It's a woven texture.
18        I don't recall that that -- whether or not --
19   Q.   If you look at pages 13 and 14 of Exhibit 78,
20        it shows you Figure 31 and Figure 32, which
21        are referred to in that sentence.
22   A.   Yes.
23   Q.   Figure 31 is either wicker or rattan; is that
24        correct?
25   A.   Yes.  It's woven, yes.

Page 84

1   Q.  Well, it's not woven out of cotton cloth.

2   A.  No, not cotton cloth.  Could it be cotton

3       cord?  I don't know.

4   Q.  Would you agree that what's shown in Figure

5       31 is either wicker or rattan?

6   A.  It has that appearance.

7   Q.  And the same for Figure 32?

8   A.  Yes.  It has that appearance.

9   Q.  So when you're making the statement what is

10      shown in Figures 31 and 32 provide an

11      aesthetically appealing surface, you're

12      referring to the wicker look, correct?

13  A.  Yes.

14  Q.  Now, if you would, at the tail end of that

15      paragraph --

16  A.  Wait.  We're back on?

17  Q.  17, please.

18  A.  17.  Okay.  Let me flip back.

19      Okay.  Back on 17.

20  Q.  We're still on page 17 of Exhibit 78.

21  A.  Yes.

22  Q.  And if you would, read the last sentence out

23      loud under that paragraph, Predictable

24      Variation.

25  A.  Oh, okay.  Patent 156 clearly demonstrates

Page 85

```
 1         materials and techniques found in patents 326

 2         and 915, both of which were patented prior to

 3         the 156 and both of which would be recognized

 4         as having methods that would improve the pet

 5         cage.

 6     Q.  What did you mean by they have methods that

 7         would improve the pet cage?

 8     A.  The idea of a framed structure with a

 9         covering that's a woven that would give the

10         appearance of wicker or rattan.

11     Q.  So what you meant by this language is that

12         putting wicker on the pet cage would improve

13         the pet cage; is that correct?

14     A.  Yes.

15     Q.  And am I correct that the way -- at least one

16         of the ways that it would improve the pet

17         cage is in its appearance?

18     A.  Yes.  The issue is -- well, that's also

19         something that has been shown in prior art;

20         that is, the idea of a wicker or woven cage.

21         So this wouldn't be the first time.  But if

22         you look at 326 and 915, those have an

23         underlying metal structure and there's a

24         wicker or a woven texture that's been applied

25         to them.  So the idea of using wicker in a
```

Page 86

```
 1        pet cage isn't -- isn't new.  Does that make
 2        sense?
 3   Q.   Well, independent of your opinion of whether
 4        wicker is new or not as applied to pet
 5        cages --
 6   A.   Yes.
 7   Q.   -- would you agree with me that applying
 8        wicker to a wire pet cage improves its
 9        appearance?
10   A.   Yes.
11   Q.   Now, looking at Exhibit 77 --
12   A.   Yes.
13   Q.   -- and the wicker-looking covering --
14   A.   Yes.
15   Q.   -- that's shown on the 156 patent --
16   A.   Yes.
17   Q.   -- would you agree with me that the
18        wicker-looking covering provides an
19        aesthetically pleasing appearance?
20   A.   Yes.
21   Q.   Would you agree with me that the
22        wicker-looking covering of the 156 patent is
23        at least partly ornamental?
24   A.   Yes.
25   Q.   Now, in your report, you make a distinction
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 87

```
 1        between the plain weave and various weave
 2        patterns.  Would you agree with me that even
 3        a plain weave wicker pattern applied to the
 4        structure of the 156 patent is ornamental?
 5   A.   Is ornamental?  It's -- it has an ornamental
 6        component.
 7   Q.   Well, independent of whether it might also
 8        have a function, I'm trying to figure out
 9        whether a plain weave as applied to a wire
10        pet cage can be ornamental.
11   A.   Yes.
12   Q.   Now, when -- when -- a moment ago when I
13        asked you whether a plain weave as applied to
14        the structure of the 156 patent is
15        ornamental, you seemed to qualify your
16        answer.  Is there a reason for that?
17   A.   Well, because the -- the material -- the
18        material itself has a functional purpose.  So
19        regardless of the weave, there's a functional
20        purpose, whether it's a plain weave or a
21        patterned weave.
22   Q.   What is the functional purpose of the --
23   A.   It's a --
24   Q.   Excuse me.
25   A.   I'm sorry.  I'm sorry.
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 88

```
 1   Q.   What is the functional purpose of the pattern

 2        that's shown on the surface of the 156 pet

 3        residence?

 4   A.   Okay.  I would explain it in this way.  When

 5        you're creating -- when you're using wicker

 6        or rattan or a woven product as a covering or

 7        even as a structural piece of another

 8        product, you have -- there are design choices

 9        that you can make:  the thickness of the

10        material, how the edges are finished.  Those

11        sorts of things become decorative choices.

12        So I would say that the choices, that it's --

13        it's -- there's the woven material and there

14        are the choices that are made in the weaving

15        of the material that are decorative or that

16        can be decorative.

17   Q.   I'll ask it another way.

18   A.   Okay.

19   Q.   Are there any aspects of the wicker covering

20        of the 156 patent that are functional?

21   A.   Okay.  The fact that it is wicker has a

22        functional component to it.  The functional

23        component has to do with air circulation

24        and -- and, also, the synthetic wickers are

25        good at retarding bacterial growth.  So there
```

BRET HUNTER SMITH
APRIL 28, 2008

```
 1        are some functional qualities that go with

 2        wicker.  So is there a functional purpose?

 3        Yes.  Is there a decorative component?  Yes.

 4    Q.  Well, I would like for you to look carefully

 5        now at the 156 patent.

 6    A.  Yes.

 7    Q.  Can you tell me what portion of the patent

 8        informs you that the covering is synthetic

 9        wicker?

10    A.  There is nothing that informs me that it's

11        synthetic wicker.  In some of the reading

12        that I did in various patents, they

13        mention -- actually mention both synthetic

14        and regular.  They did not make a distinction

15        between synthetic and regular wicker.  One of

16        the features or benefits that was mentioned

17        had to do with it was less likely to grow

18        mold, bacteria, that kind of thing.

19    Q.  Well, now, I'm going to -- for definitional

20        purposes, I'm going to talk about

21        synthetic resin -- synthetic wicker or resin

22        wicker and what I'll call natural wicker.

23    A.  Okay.

24    Q.  Do those terms make sense to you?

25    A.  Yes, they do.
```

Page 90

1    Q.   You understand kind of the difference?

2    A.   Yes, they do.

3    Q.   So the natural resin might be made from a

4         natural product, a plant product?

5    A.   A natural material would be, yes.  Yes.

6    Q.   In looking at the 156 patent, would you agree

7         with me that what's shown there can be a

8         natural wicker product?

9    A.   Yes.

10   Q.   It also can be a synthetic wicker product,

11        correct?

12   A.   Yes.

13   Q.   Could it also be a piece of molded plastic

14        panel that has a wicker pattern molded into

15        it to have that appearance?

16   A.   I think it would be almost impossible.

17   Q.   Well, do you agree with me that the 156

18        design patent covers how the thing looks and

19        not how it's made?  Correct?

20   A.   Yes.

21   Q.   So it's not limited to either synthetic

22        wicker or resin wicker or natural wicker,

23        correct?

24   A.   Yes.

25   Q.   So given that the patent covers both natural

BRET HUNTER SMITH
APRIL 28, 2008

Page 91

1       wicker and what you refer to as synthetic

2       wicker, how can you conclude that the wicker

3       that is shown in the patent has -- has some

4       functional attributes?

5    A.  It allows air circulation.  Poor air

6       circulation combined with animals, due to

7       dampness, produces mold and bacteria.

8    Q.  Any other functional aspect to the wicker

9       that you can think of?

10   A.  No, beyond the things stated earlier in the

11      report we talked about, the weave making it

12      possible to see -- to see out.  It would

13      be -- for example, if I made this -- this

14      shape out of plywood, it would be a lot less

15      light on the interior.  So the gaps, you

16      know, affect the interior quality.  But other

17      than that, no.

18   Q.  Are there other materials that could be

19      employed to provide air circulation and still

20      have some covering effect?

21   A.  Yes.

22   Q.  And what are those?

23   A.  Well, you could, for example, use screen.

24      You could -- it's possible that you could use

25      some fabrics depending on their weave.  There

Page 92

```
 1        are some -- the results would be somewhat
 2        different, but it would allow -- I mean, it
 3        could fulfill, you know, having some air
 4        circulation and some visibility in allowing
 5        light through and that kind of thing.
 6   Q.   Do you know whether those other -- other
 7        choices of material would be more expensive
 8        or less expensive?
 9   A.   I would -- I would want to do some pricing.
10        I can tell you some reasons from a design
11        point of view why I might not choose to use
12        them.
13   Q.   What are those?
14   A.   Well, the wire -- the screen, rather, would
15        have some attachment difficulties.  Anytime
16        you go from a small diameter to a much larger
17        diameter wire and you're trying to weld or
18        assemble those, it gets kind of tricky.  The
19        screen also would be more easily damaged, I
20        would think, generally, again depending on
21        how you did it.  So, you know, there are
22        reasons why that probably wouldn't -- and
23        aesthetically, also.  Again, for an indoor
24        cage that you want to get to match furniture
25        or furnishings or -- or seem more at home in
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 93

```
 1        that environment, wire and fabric are both

 2        probably not as effective as choices.

 3   Q.   When you say they're not as effective

 4        aesthetically, do you mean they don't look as

 5        good typically as the -- as the wicker?

 6   A.   I think, again, it's a hypothetical, and so

 7        it's hard to answer that in broad terms.  One

 8        of the problems with fabric would be that

 9        once you make that transition to fabric, that

10        it -- people perceive that material

11        differently.  They're going to -- you know,

12        they may be more inclined to look at matching

13        the fabric pattern of their sofa or their

14        drapes or whatever.  Now production costs go

15        up because you have to have different fabrics

16        on inventory.  Everything is more custom.  I

17        mean there are a lot of kind of pitfall

18        reasons to steer away from that.

19   Q.   Now, in looking at Exhibit 78 --

20   A.   Okay.

21   Q.   -- which was your first report regarding the

22        156 patent --

23   A.   Yes.

24   Q.   -- am I correct that according to this

25        report, there are no points of novelty in the
```

Page 94

1    156 patent?  Is that right?

2  A.  Yes.

3  Q.  And let's look at Exhibit 79, which is your

4    first supplemental report regarding the 156

5    patent.

6  A.  Yes.

7  Q.  Is it also correct that according to this

8    first supplemental report, Exhibit 79,

9    regarding the 156 patent -- that according to

10   this report, there are no points of novelty

11   regarding the -- in the 156 patent?  Isn't

12   that correct?

13 A.  Yes.

14 Q.  And looking at Exhibit 80, which is your

15   second supplemental report --

16 A.  Yes.

17 Q.  -- regarding the 156 patent --

18 A.  Yes.

19 Q.  -- is it also correct that in this report,

20   there's no identification of any points of

21   novelty of the 156 patent, correct?

22 A.  Yes.

23 Q.  So these three reports that you've issued

24   concerning the 156 patent individually and

25   collectively failed to identify even one

BRET HUNTER SMITH
APRIL 28, 2008

Page 95

1          point of novelty in the 156 patent; is that

2          correct?

3     A.    Outside of, you know, a weave pattern or

4          something like that, that is correct.

5     Q.   Is it your opinion as you sit here today that

6          there are, in fact, no points of novelty in

7          the 156 patent?

8     A.   Yes.

9     Q.   What's, in your understanding, the

10         significance of that?  If a court would agree

11         with you that the 156 patent has no point of

12         novelty at all, do you understand what that

13         would mean?

14    A.   My understanding is that -- my understanding

15         is that the conclusion would be that the

16         patent should not have been issued or that

17         it's not a valid patent.

18    Q.   Would you agree with me that if the patent

19         has no point of novelty or points of novelty,

20         that the patent has no enforceable scope?

21    A.   Yes.

22    Q.   Now, looking at Exhibit 77 --

23    A.   Yes.

24    Q.   -- let's take that to the logical extreme.

25         If we brought a product into this room that

BRET HUNTER SMITH
APRIL 29, 2008

Page 96

1    was made exactly like what's shown in the 156

2    patent and it had every feature down to

3    the tiniest detail, in fact was the model or

4    could have been the model that was used to

5    make the patent, is it your testimony that

6    such a product would not infringe the 156

7    patent?

8  A.  Could you repeat that?  I'm not quite sure

9    I'm following what you're saying.

10       MR. GARDNER:  Could you read

11       that one back?

12            (The court reporter read from

13               the record.)

14  A.  It is my testimony that there aren't points

15    of novelty; that is, that everything that is

16    found in 156 is present in prior art.

17  Q.  So based on that, no product, no matter what

18    it looked like, in your view, could infringe

19    the 156 patent, correct?

20  A.  Based upon that, the 156 patent isn't --

21    doesn't represent -- based upon this, the 156

22    design isn't a valid patent in -- as the

23    prior art all shows all of the features that

24    are present in the 156.  I'm not the judge,

25    and I don't rule on it, but that's my --

Page 97

1          those are my findings.

2     Q.   Now, you understand, of course, that the

3          point of novelty test is an infringement

4          test, not an invalidity test, correct?

5     A.   Yes.  Wait.  Say that again.  Point of

6          novelty test.

7     Q.   You understand, correct, that the point of

8          novelty test is an infringement test, not an

9          invalidity test, correct?

10    A.   Yes.

11    Q.   And you learned that from reading Chisum,

12         right?

13    A.   Yes.

14    Q.   So given that the point of novelty test is an

15         infringement test, isn't it true that if the

16         patent has no point of novelty at all --

17    A.   Yes.

18    Q.   -- no device can infringe the patent,

19         correct?

20    A.   That would be my understanding; but as I

21         stated earlier, I'm not a patent attorney.

22    Q.   Now, as I understand your reports, in the

23         first supplemental report of Exhibit 79, you

24         analyzed and addressed the points of novelty

25         that Mr. Anders raises in his report,

Page 98

1           correct?

2    A.    In the supplemental report, yes.

3    Q.    Let's go through those one at a time now.

4          For example, I think on page 2, you address

5          the first point of novelty.

6    A.    Yes.

7    Q.    And the point of novelty that you recited

8          there is the points of novelty include a pet

9          home in the shape of a rectangular volume;

10         the pet home having a woven outer texture

11         with the appearance of wicker or the like;

12         the woven texture appearing on the top, on

13         the nonwindow portions of the side and rear

14         and on a nondoor portion of the front seat;

15         the woven portion of the front substantially

16         framing a nonwoven door.  Do you see that

17         language?

18   A.    Yes. I do.

19   Q.    Now, do you agree with me that there's not a

20         single reference in prior art that shows

21         those features in combination?

22   A.    That shows them in combination together?

23         There is none that I have found so far, yes.

24   Q.    And so in your report, instead of relying on

25         a single reference that shows those features,

Page 99

1        instead, you point to several features that

2        you combined to address the claimed point of

3        novelty, correct?

4    A.   Yes.  The claimed point of novelty actually

5        includes several features.  So, yes, I looked

6        at several features.

7    Q.   And in connection with this particular point

8        of novelty, which references do you find are

9        necessary to combine to meet this claimed

10       point of novelty?

11   A.   Well, the big distinction that's made between

12       the earlier claim has to do with the nonwoven

13       door.  And Figure 4 and Figure 6 show

14       nonwoven doors or doors with large nonwoven

15       areas.  And then Figures 5 and 7 both have,

16       you know, fronts that are absent weaving.

17   Q.   Well, over pages 2 and 3, it looks like you

18       identify, it looks like, about seven

19       different references.

20   A.   Yes.

21   Q.   Which of those would you combine to meet the

22       definition of the point of novelty there at

23       the top of page 2?

24   A.   Well, my point in showing seven of them was

25       to show that it wasn't an isolated, a single

BRET HUNTER SMITH
APRIL 28, 2008

Page 100

1        piece of prior art.  The rectangular

2        structures can be seen certainly in the first

3        four figures.  The rectangular structure can

4        also be seen in Figure 7.  The open door can

5        be seen in Figure 4 and in Figure 6.

6        Having a window or largely open area can be

7        seen in Figure 5.  And the framing of a front

8        open area can be seen in Figure 7.

9    Q.  What's the minimal combination that you would

10       need to refute Mr. Anders' statement of the

11       point of novelty there at the top of page 2?

12   A.  Well, I'm not sure why I would choose a

13       minimum combination if all of these things

14       are in the prior art.  I don't understand

15       your question.

16   Q.  Well, do you agree with me that the statement

17       of the points of novelty there has multiple

18       features?

19   A.  Yes.

20   Q.  How many different references do you need at

21       a minimum to -- to meet that claimed point of

22       novelty?

23   A.  Well, part of the issue is that these

24       features occur not individually, but that

25       there are multiple instances of these

Page 101

1      features in the prior art.

2  Q.  So?

3  A.  So as somebody doing the background research

4      on the prior art, this is what I found that

5      applies to this.  So --

6  Q.  Let me explain what I'm getting at here,

7      because we're -- I'm not sure you're

8      following me.

9  A.  I'm not following you.  That's true.

10  Q.  If the point of novelty that's defined by

11      Mr. Anders has three features, A, B, and C --

12  A.  Yes.

13  Q.  -- all I'm asking you to do is to identify at

14      least one reference that shows A, at least

15      one reference that shows B, and at least one

16      reference that shows C.  They can all be the

17      same reference if you like.  But I'm not

18      asking you to identify two, three, or four

19      references that show feature A.  I want to

20      know the minimum number of references that

21      you would need to find all of the features in

22      the point of novelty.

23  A.  Well, Figures 1, 2, and 3 show rectangular

24      volume having a woven outer texture with the

25      appearance of wicker or the like, woven

BRET HUNTER SMITH
APRIL 28, 2008

Page 102

1    texture appearing on the top and nonwindow

2    portions -- nonwindow portions of the sides

3    and rear and on the nondoor portion of the

4    front.

5        Figure 4 is rectangular.  Figure 4 does

6    not appear to have windows, though we only

7    have a three-quarter view of it.  And there

8    is a framing around the door.  The door has

9    a -- is not woven.  So Figure 4 does that.

10        And -- and the Figure 6 also has a

11    nondoor portion on the front, that the woven

12    portion of the front is substantially framing

13    a nonwoven door.

14        So that's how those relate back to

15    Mr. Anders' claim.

16  Q.  So --

17  A.  And then looking at the prior art.

18  Q.  So in your view, you would use Figures 1, 2,

19      3, 4, and 6 in combination to the meet the

20      invention -- or the point of novelty --

21      excuse me -- mentioned at the top of page 2?

22  A.  In my view, I would use all of the figures I

23      used because they all relate to what was

24      claimed.  That's -- that's why they're all

25      here.

Page 103

```
 1    Q.   Not to put too fine a point on it, we're
 2         trying to figure out what's the minimum
 3         number, the minimum set, of prior art
 4         references that you would use to meet any --
 5         any of these points of novelty.  And we're --
 6         we're going to go through each one of them in
 7         detail, and you can take as long as you like
 8         to figure that out.
 9    A.   I think that the claims that are mentioned in
10         this -- in this first claim, I would say 1,
11         2, and 4.  All of those show the points being
12         addressed by that first claim.
13    Q.   All right.  Let's go on to page 4, in which
14         you address Mr. Anders' September 22
15         supplemental report.
16    A.   Yes.
17    Q.   And you see there, there's a heading, "Point
18         1, the Extent of the Wicker;" and then what
19         follows is a paragraph description of an
20         asserted point of novelty.
21    A.   Uh-huh.
22    Q.   Which -- which prior art references, as a
23         minimum set, would you use to find that all
24         the features of this point of novelty are in
25         the prior art?
```

Page 104

1    A.   Well, as I said before, I wouldn't use a

2         minimum set.

3    Q.   But I'm asking --

4    A.   I would use as many as it takes.

5    Q.   I'm asking --

6              MR. HINSHAW:   Let him finish his

7         answer, please.

8    A.   Personally, as someone going back and looking

9         at this, what I would want to do is show

10        where it's occurred.  And I wouldn't do that.

11        If there were more than one example, I would

12        use more than one example.

13   Q.   I'm not interested in using more than one

14        example.

15   A.   But you asked me what I would do.  That's

16        what I would do.

17   Q.   No.  I asked you to identify a minimum set,

18        minimum number of references that would meet

19        the asserted point of novelty.

20   A.   I misheard you.  I thought you said what

21        would I do.  And I wouldn't pick a minimum

22        set.

23   Q.   Okay.

24   A.   But if you're asking is there a minimum

25        set --

BRET HUNTER SMITH
APRIL 28, 2008

Page 105

1   Q.   Yes.

2   A.   I'm not trying to quibble.  I just want to

3        make sure I'm answering the question that you

4        asked.

5   Q.   What is the minimum set or the minimum number

6        of prior art references that you could apply

7        to meet the asserted point of novelty of

8        point one shown on page 4 of Exhibit 79?

9   A.   Again, I would say -- do you want me to refer

10       to the earlier exhibits?  Because I think we

11       looked at a number of these that are

12       incorporated into the -- I would say that the

13       pigeon cage design, which was Exhibit 40 --

14       74 -- excuse me -- and Exhibit 76, the

15       Russian cage design.  I don't think we have

16       an exhibit that's the -- the cage with the

17       wire door on the front of it, but the wicker

18       cage with the wire door.

19   Q.  Is the cage with the wire door, what appears

20       to be a wire door, is that -- is that the

21       thing that you show in Figure 4 on page 2?

22   A.   Yes, that's what that is.  And the -- the

23       issue -- and I show it in the figures, but

24       the issue of the top being substantially

25       wicker.  Again, Exhibit 76 appears to show

BRET HUNTER SMITH
APRIL 28, 2008

Page 106

1        that, but also the -- what would be Figure 7

2        shows that, that the top is substantially

3        wicker as well.   Figure 7 in the supplemental

4        report, Exhibit 79.

5   Q.   Do you need Figure 7, as well, or is that --

6   A.   It's covered by Figure 4 from Exhibit 79,

7        what looks to be a cage with a wire frame.

8   Q.   So right now I think you've identified that

9        as a minimum set of prior art references to

10       meet or address the asserted point of novelty

11       of point one, you would combine Exhibit 74

12       with Exhibit 76 and Figure 4, which is on

13       page 2 of Exhibit 79; is that right?

14  A.   Yes.

15  Q.   And how would -- what features would you

16       delete from any of these references?   How

17       would you do the combination?

18  A.   Well, the front opening substantially framed

19       by wicker is Figure 4, along with the top

20       being wicker.   It's Figure 4 of Exhibit 79.

21       And both Exhibit 74 and Exhibit 76 have

22       windows that are the absence -- provided by

23       the absence of wicker.

24  Q.   Does one of these three references have a

25       front whose majority does not have wicker?

BRET HUNTER SMITH
APRIL 28, 2008

Page 107

1    A.    A front whose majority does not have wicker?

2    Q.    Yeah.

3    A.    76 has a front whose majority does not have

4          wicker.

5    Q.    And your testimony is that most of the front

6          of Exhibit 76 is not wicker?

7    A.    Yes.  It's a -- yes.  And, again, one of the

8          reasons that I provide lots of examples of

9          the prior art is, you know, that's probably

10         more clearly demonstrated.  And I'm looking

11         to see if I referred to it earlier in what's

12         Figure 7.  It's a front that's absent wicker,

13         largely absent wicker.

14   Q.    Would you rather use a different reference

15         than Exhibit 76?

16   A.    I think Exhibit 7 would also work there, yes,

17         sir.

18               MR. HINSHAW:  Do you mean

19            Figure 7 or Exhibit 7?

20               THE WITNESS:  Figure 7.  Excuse

21            me.

22   A.    Figure 7 from Exhibit 79.

23   Q.    So you're going to strike Exhibit 76 and in

24         its place use Figure 7?

25   A.    That would probably be a clearer distinction.

Page 108

1    Q.   Figure 7 is found on page 3 of Exhibit 79,
2         correct?
3    A.   Yes.
4    Q.   All right.   So now the new lineup is Exhibit
5         74, Figure 7, and Figure 4 from the
6         supplemental report, right?
7    A.   Yes.
8    Q.   Are you going to use -- well, are you going
9         to use one of these three figures as the
10        starting point and then take features from
11        the other two and modify that starting point
12        to come up with a point -- the asserted point
13        of novelty?  And if so, which one?
14   A.   No.   I mean that's why I've broken it down in
15        the illustrations.
16   Q.   Is it your testimony that it would not be
17        appropriate to do it that way?
18   A.   It's my testimony that that's not the way I
19        would do it.
20   Q.   Well, how would you do it?
21   A.   The way that I did it in the report.
22   Q.   Well, now we're talking about -- we've
23        narrowed it down to we're going to use these
24        three references.
25   A.   Right.   I would show the features and the

Page 109

1          relationship between them for each of the

2          references that we've talked about.

3    Q.   Well, explain to me how these three

4          references, Exhibit 74, Figure 7, and Figure

5          4, show the asserted features of the point of

6          novelty.

7    A.   Well, as I explained, the -- what I'll call

8          the bird cage, which is Figure 4 on page 2 of

9          Exhibit 79, shows the substantially wicker

10         top, the wicker front, sides, back, the front

11         framed by having an open front door with a

12         nondoor portion substantially having wicker;

13         the -- the poultry cage, which is Figure 7 on

14         page 3, I believe, yes, of Exhibit 79 again

15         reflects an open area in front that's

16         substantially framed by wicker and has the

17         wicker top and sides and back that are

18         wicker.  And Exhibit 74 has wicker that's

19         rectangular volume, having top sides, rear

20         and front.  It has window and nonwindow

21         portions.

22              And that's how I would make the

23         connections.

24    Q.  Well, how -- which of those three references,

25         if any, show a front that has a door and a

Page 110

```
 1        nondoor portion of the front which has its

 2        outer surface substantially having wicker?

 3   A.   A door and nondoor portion -- let's see.

 4        Door and nondoor portion of the front has an

 5        outer surface substantially having wicker.

 6        That would be the Figure 4 on page 2 of

 7        Exhibit 79.

 8   Q.   All right.  So to kind of sum up, in your

 9        testimony, it would require three references

10        to -- to address or meet or find all of the

11        features of the asserted point one of the

12        points of novelty, correct?

13                  MR. HINSHAW:  Objection to form,

14             foundation.

15   A.   Would you repeat the question, please?

16   Q.   So according to your testimony, it would take

17        at least three references in combination in

18        some fashion to meet or address the asserted

19        point of novelty in point one, correct?

20   A.   Yes.

21                  MR. HINSHAW:  Art, it's 2:50.

22             We've been going for quite some time.

23             Are you at a break point?

24                  MR. GARDNER:  Sure.  That's

25             fine.
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 111

1           (Brief recess)

2    Q.   Now, we've -- Mr. Smith, we've just gone

3         through an examination of point one of the

4         asserted points of novelty that Mr. Anders

5         submitted in his September 22 supplemental

6         report.  And I'm going to move on to point

7         two, which I believe you addressed later in

8         your supplemental report, at page 8 of

9         Exhibit 79.

10   A.   Yes.

11   Q.   And you see there at the top of page 8,

12        there's the asserted second point of novelty,

13        being a pet home with a rectangular volume,

14        having a rectangular front, the front

15        including a see-through door that is

16        substantially framed by wicker.

17   A.   Yes.

18   Q.   How many references do you need at a minimum

19        to find this -- this asserted point of

20        novelty in the prior art?

21   A.   Figure 13, which is the same as -- Figure 13

22        on page 8, which is the same as Figure 4 on

23        page 2, has the rectangular volume or

24        rectangular front, the front including a

25        rectangular see-through door.  As I said

Page 112

1        before, in doing the research, you know, all

2        of the examples in Figure 14 also have

3        rectangular see-through doors.

4    Q.  Is Figure 13, which is shown there on page 8,

5        which you also referred to as on a different

6        figure number in connection with your earlier

7        examination --

8    A.  Right.

9    Q.  -- does Figure 13 show a product with an

10       arched or curved top?

11   A.  It looks like there's a slight curve to it.

12       It's a little hard to tell from the angle of

13       the photograph.

14   Q.  But do you believe it has an arched top?

15   A.  I think it's difficult to tell from the

16       photograph.

17   Q.  Well, do you need -- do you need another

18       prior art reference to combine with this

19       reference in order to find the -- the

20       rectangular volume as asserted in point two

21       of the asserted point of novelty?

22   A.  Well, as I said before, one of the reasons

23       that -- for example, Figure 14 shows a number

24       of rectangular volumes with doors, a

25       rectangular front and a see-through door;

BRET HUNTER SMITH
APRIL 28, 2008

Page 113

1       but -- so, again, I mean, part of my approach

2       to this was to show what I found as prior

3       art, not to show a minimum set of prior art.

4   Q.  Well, here this afternoon we're trying to

5       find out what's the minimum set, minimum

6       number, minimum collection of prior art

7       references that would be necessary to meet

8       the asserted points of novelty.  So with

9       regard to point two, is it your testimony

10      that you can meet that point of novelty with

11      one, or do you need two prior art references

12      to do so?

13  A.  The -- I would include something from Figure

14      14 just in case there's a question about

15      his -- is that an arched top or not from

16      Figure 13.

17  Q.  So if I understand your testimony, in order

18      to meet the asserted point two of the points

19      of novelty raised by Mr. Anders in his

20      September 22 report, you would combine

21      Figure 13 shown on page 8 with one of the

22      rectangular volumes shown in Figure 14 on

23      page 9 of your supplemental report of

24      Exhibit 79, correct?

25  A.  Yes.

BRET HUNTER SMITH
APRIL 28, 2008

Page 114

1   Q.   All right.  Let's go to page 10 of Exhibit 79

2        and let's -- the same inquiry with regard to

3        the asserted third point of novelty, point

4        three at the top of page 10, which is labeled

5        Distinct Panels.  And there I believe you

6        recited Mr. Anders' point of novelty being a

7        pet home with a rectangular volume, the pet

8        home having the appearance of being formed

9        from distinct individual panels having wicker

10       outer surfaces.  And I'll ask you in

11       connection with this point of novelty how

12       many reference would you need at a minimum to

13       meet this point of novelty

14            MR. HINSHAW:   I do have a

15            clarification question.  You directed

16            him to this report.  Are you asking

17            him to exclude the Mo patent that he

18            has?

19            MR. GARDNER:   No.  He can use

20            the Mo patent if that would be

21            helpful to him.  Thank you.

22   Q.   So I'll ask the question again.  In

23        connection with the third point of novelty

24        asserted by Mr. Anders in his September 22

25        report as recited at the top of page 10 of

BRET HUNTER SMITH
APRIL 28, 2008

Page 115

1      Exhibit 79, what's the minimum collection of

2      prior art references that you would need to

3      meet that point of novelty?

4                (Brief pause)

5   A.  Well, I would say that Figure 18 is a pet

6      home of a rectangular volume, and the Mo

7      patent or 326 or 915 shows the wicker panels

8      having wicker outer surfaces.  But actually,

9      if you turn -- if you turn patent 326 or 915

10     upside down, essentially, you have, you know,

11     a wicker covered frame.  Again, you know, my

12     approach would be to show all the prior art

13     that I found that relates.

14  Q.  But how many references -- which references

15     are you going to use, Mr. Smith?

16            MR. HINSHAW:  I'm going to

17        object to the form of the question.

18  A.  As I said before, I would use all the

19     references.  That's why I put them in there,

20     because they all relate to the claim that's

21     being made.  They're all prior art pieces

22     that relate to the claim that's being made,

23     as I explain in the text.

24  Q.  Well, if you would, humor me and tell me

25     which references you would use as a minimum

BRET HUNTER SMITH
APRIL 28, 2008

Page 116

```
 1          to meet the asserted third point of novelty
 2          at the top of page 10.
 3     A.   Well, again, I wouldn't use a minimum; but
 4          Figure 18, which is the 812 patent, and
 5          Figure -- the 326 patent from Figure 17.
 6     Q.   So you would combine the 326 patent from
 7          Figure 17 with the draw -- with Figure 18?
 8          Is that -- is that what you would do?
 9     A.   Well, the actual wording here -- well, yes.
10     Q.   Is the 326 patent a pet home?
11     A.   No, it is not.
12     Q.   Does Figure 18 depict a pet home?
13     A.   Yes.
14     Q.   So in connection with this third asserted
15          point of novelty, it is your testimony that
16          you would require at least two references,
17          correct?
18     A.   Yes.  I would use all the references I have,
19          yes.
20     Q.   Let's look at page 13 of your supplemental
21          report of Exhibit 79.
22     A.   Yes.
23     Q.   And you'll see at the top of the page,
24          there's a recitation of the fourth asserted
25          point of novelty that was asserted by
```

Page 117

1        Mr. Anders in his September 22 report,

2        correct?

3    A.  Yes.

4    Q.  And that fourth asserted point of novelty

5        being a pet home with a rectangular volume

6        and having a front, sides, a rear and a top;

7        the pet home further having a rectangular

8        window positioned in the upper half of each

9        side and in the upper half of the rear, the

10       nonwindow portions of the side and rear

11       having outer surfaces with wicker such that

12       the rectangular windows are surrounded by

13       wicker on all sides.  Do you see that?

14   A.  Yes.

15   Q.  At a minimum, which references would you

16       combine to meet that asserted point of

17       novelty?

18   A.  Well, the Figure 26, the pigeon cage.

19   Q.  Is it your testimony that Figure 26 shows all

20       of the features?

21   A.  Yes.  But, again, I would put all the figures

22       because part of the issue is prior art.

23   Q.  Are the windows of the Figure 26, which is

24       the Bridge patent number 26,728, are those

25       windows surrounded on all sides by wicker?

Page 118

1    A.    Yes.

2    Q.    How -- how so?

3    A.    At each edge, there's wicker.

4    Q.    Oh, you mean that the corner -- at the

5          corner?

6    A.    Yes.

7    Q.    Okay.  Does that patent show the other two

8          faces, the rear and -- rear side and the

9          other side?

10   A.    No.

11   Q.    Do you know whether the windows are formed in

12         or on the other two faces?

13   A.    Not from this illustration, no.

14   Q.    Does that fact make you want to combine this

15         reference with another reference to meet the

16         asserted point of novelty?

17   A.    Well, before doing that, I would want to go

18         back and read the claims on -- on the pigeon

19         patent.

20   Q.    Do you mean look at the rest of the drawings?

21   A.    No.  Well, the drawings in the claims; but I

22         mean, clearly, Figure 28 also does show

23         windows all around.  They're above the half

24         point.

25   Q.    So, in your view, does the Bridge patent

BRET HUNTER SMITH
APRIL 28, 2008

Page 119

1       number 26,728, which is shown in Figure 26,

2       by itself show all of the features of the

3       asserted?

4   A.   This drawing does not, no.  This drawing,

5       together with patent 065, which is in Figure

6       28, does.

7   Q.   Let's look at page 15.

8   A.   Okay.

9   Q.   Which is the fifth point of novelty asserted

10      by Mr. Anders in his September 22 report,

11      being a pet home with a rectangular volume,

12      having wicker outer surfaces over a majority

13      of the pet home, the pet home having the

14      appearance of being formed from individual

15      panels, the panels being configured such that

16      each panel extends substantially to the edge

17      of the adjacent panels, but no panel extends

18      beyond the adjacent panels.

19         How many prior art references would you

20      need at a minimum to meet this asserted point

21      of novelty?

22         MR. HINSHAW:  Again, for

23         clarification, are you including the

24         Mo patent in the question?

25         MR. GARDNER:  Sure.

Page 120

 1    A.   Well, I mean patent 326 or the Mo patent,

 2         both, if you turn them upside down, meet the

 3         description of the edges and the wicker.

 4    Q.   Would the 326 patent, if turned upside down,

 5         would that be a pet home, in your view?

 6    A.   I think it demonstrates prior art for that

 7         kind of configuration for a pet home, yes.

 8    Q.   But it -- are you aware of anybody selling

 9         boxes like this as pet homes that have

10         neither windows nor doors?

11    A.   No.

12    Q.   So isn't it accurate to say that the 326

13         patent, whether the structure of it as shown

14         in the patent or shown upside down, is not a

15         pet home?  Correct?

16    A.   It's not a pet home, that is correct.

17    Q.   So is there another prior art reference that

18         you would combine with the teachings of the

19         326 patent to achieve the asserted point of

20         novelty of point five?

21    A.   Well, Figure 32.

22    Q.   So you would agree with me that in connection

23         with this fifth asserted point of novelty, it

24         requires two references to meet the asserted

25         point of novelty, correct?

BRET HUNTER SMITH
APRIL 28, 2008

Page 121

1    A.   Yes.

2    Q.   Let's look at page 17 of your supplemental

3         report, Exhibit 79.  And at this page,

4         there's a discussion of the sixth point of

5         novelty, being a combination of the first

6         five points.

7    A.   Yes.

8    Q.   How many points of novelty -- scratch that.

9              How many prior art references are you

10        relying on in your report here to meet the

11        asserted sixth point of novelty, being a

12        combination of the first five points?

13   A.   Well, all of the points that -- the majority

14        of the points that have been asserted are

15        combinations of points.  And if you're asking

16        me -- I -- you know, Figure 35 shows prior

17        art, all of which deal with the points being

18        asserted in paragraphs three through seven.

19   Q.   Well, it looks like you're using seven or

20        eight prior art references.  Could -- could

21        you meet the same point of novelty, being

22        this combination point of novelty, with fewer

23        than the seven or eight references?

24   A.   Again, I see no reason why I would do that.

25        These are all prior art; and they all speak

Page 122

1    to the points that are being grouped together

2    in claim number six, which is basically a

3    combination of the points in paragraphs three

4    through seven.

5    Q.   Well, could you eliminate one or two of these

6         and -- these prior art references from the

7         discussion and still meet the claimed point

8         of novelty of point six, being the

9         combination of the prior five points of

10        novelty?

11   A.   I -- I would use all of the points.

12   Q.   Is it your testimony that all of the prior

13        art references are required to meet that

14        point of novelty?

15   A.   It's my testimony that all of the points that

16        are shown in Figure 35 demonstrate prior art

17        for the 156 patent and for the points that

18        are raised by Mr. Roberts.

19   Q.   Mr. Anders?

20   A.   Mr. Anderson.  Excuse me.

21   Q.   It's Mr. Anders.

22   A.   Anders.  That's a typo, I guess.

23   Q.   I'm sorry to belabor the point; but for the

24        moment, I'm not particularly interested in

25        whether you think that your approach was the

Page 123

```
 1        correct approach or not.  What I want to find

 2        out again is at this moment, what do you

 3        think is the minimum collection of prior art

 4        that would be required to meet the asserted

 5        sixth point of novelty.

 6                    (Brief pause)

 7   A.   I would say either the Russian bird cage or

 8        the -- what I guess I will call the elephant

 9        cart.  Either one of those could go, but I

10        would keep the rest.

11   Q.   So how many would that leave you with?

12   A.   Six.

13   Q.   So it would take at least six prior art

14        references to meet the asserted --

15   A.   The combination of claims asserted in point

16        six?

17   Q.   Yes.

18   A.   Yes.

19   Q.   Now looking at the report, your first

20        report --

21   A.   Yes.

22   Q.   -- of Exhibit 78.

23   A.   Yes.

24   Q.   Some 33 pages or so, correct?

25   A.   Yes.
```

Page 124

1   Q.  Did anyone other than you write any of the

2       words or prepare any of the figures --

3   A.  No.

4   Q.  -- that are mentioned in this report?

5   A.  I'm sorry.  No.

6   Q.  So this is 100 percent your work product,

7       correct?

8   A.  Yes.

9   Q.  Did you receive -- or prior to issuing this

10      report, what kind of contacts did you have

11      with Mr. Hinshaw or anyone else concerning

12      the drafting of the report?

13   A.  I believe there was a phone call at the

14      beginning and maybe one or two phone calls to

15      touch base before the draft, and I read the

16      material that he sent.  And that was it.

17   Q.  Did you do anything to investigate whether

18      additional materials were required?

19   A.  You mean did I search for additional

20      materials?

21   Q.  Yes.

22   A.  Yes.

23   Q.  Okay.  What kind of additional materials did

24      you search for?

25   A.  Well, I looked at -- I looked at cages.  I

BRET HUNTER SMITH
APRIL 28, 2008

Page 125

```
 1        looked at wicker construction and rattan
 2        construction.  Woven construction, I guess we
 3        could call it.  As I mentioned before, I
 4        spent some time over at the -- the vet school
 5        library.  I did -- did some research online.
 6        The majority of it was book stuff.
 7   Q.   Now, the report was drafted August 17th -- or
 8        it's dated August 17th --
 9   A.   August 17th.
10   Q.   -- 2007.  Is that when the report was
11        completed?
12   A.   That's when this report was completed, I
13        believe, yes.
14   Q.   And if you'll -- if you will, go to page 1,
15        under the section that's titled --
16   A.   Which one?
17   Q.   Page 1.
18   A.   Yes.
19   Q.   It's --
20   A.   Yes.
21   Q.   -- numbered page 1.
22   A.   Numbered page 1, yes.
23   Q.   Of Exhibit 78.  And if you would, read the
24        paragraph out loud that says "Patent Review"?
25   A.   Patent Review.  I'm reviewing U.S. patent
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 126

```
 1        D8 -- 483, 156.  I've reviewed the patent
 2        document, patents listed as prior art within
 3        the 156 document, additional patent
 4        documents, online resources -- I'm sorry --
 5        books on weaving, basketry, and furniture,
 6        relevant sections of Chisum On Patents,
 7        assembled and photographed the Bay Isle cage,
 8        and spoke with those knowledgeable about
 9        animal behavior.  A complete collection of
10        these references is provided in the appendix.
11   Q.   Were there other materials that you looked at
12        as part of your review besides what's listed
13        there in that paragraph?
14   A.   Not that I recall.
15   Q.   Now, when you -- it says there that you
16        reviewed relevant sections of Chisum On
17        Patents, correct?
18   A.   Yes.
19   Q.   Did you -- someone gave you a copy of
20        relevant sections of Chisum On Patents?
21   A.   Yes.  Yes.
22   Q.   But you didn't have -- scratch that.
23        Did you do anything to study patent law
24        besides reading those relevant sections of
25        Chisum On Patents?
```

Page 127

1  A.  No.

2  Q.  Did you have any discussions with anyone

3      about how design patent law worked prior to

4      putting together this written report?

5  A.  Mr. Hinshaw and I -- I had some general

6      discussions about it during the preliminary

7      phone calls, and that's -- that's it.

8  Q.  How extensive were those discussions

9      regarding design patent law?

10 A.  I'd say -- I don't recall the length.  Less

11     than -- less than 30 minutes, I would think.

12 Q.  Less than 30 minutes each or less than 30

13     minutes total?

14 A.  I'm trying to think.  Total?  Maybe total

15     time throughout this, probably about an hour.

16 Q.  Now, prior to issuing this report on August

17     the 17th, 2007 --

18 A.  Yes.

19 Q.  -- did you have occasion to speak with anyone

20     in person about design patent law?

21 A.  No.

22 Q.  So outside of your review of Chisum On

23     Patents and the one hour or so discussions

24     that you had with Mr. Hinshaw regarding

25     design patent law, did you have any other

Page 128

1        information that you received regarding

2        design patent law prior to putting together

3        this report?

4  A.   Not that I recall.  A copy of the KSR, I

5        think, maybe.  No.  That would have been in

6        the second report, so no.  Oh, it's in this

7        one.  So yes, KSR.

8  Q.   You're referring to the report of Exhibit 78?

9  A.   Yes.

10  Q.   And what page are you looking at now,

11       Mr. Smith?

12  A.   I'm looking at page 17.

13  Q.   And so there at the top of page 17, there's a

14       beginning of a discussion about a court case

15       from the Supreme Court styled as KSR

16       International Company versus Teleflex, Inc.

17  A.   Yes.

18  Q.   Had you read the KSR opinion as of the time

19       of the drafting of this report?

20  A.   I read the material relative to it that I

21       received from Mr. Hinshaw, and I would have

22       to look at the appendices material to tell

23       you exactly what that was, but it's all

24       material that was included in the appendices

25       that were furnished with this report.

BRET HUNTER SMITH
APRIL 28, 2008

Page 129

1           MR. GARDNER:  Off the record.

2              (Off-the-record discussion)

3           MR. GARDNER:  Let's go back on

4        the record.

5    Q.  Mr. Smith, I'm going to pass you what's been

6        produced to us as a copy of your appendix, or

7        appendices.

8    A.  Yes.

9    Q.  And I believe what's shown on the first page

10       of this four-inch or five-inch stack of paper

11       is kind of an overall table of contents of

12       your appendix, or appendices.

13   A.  It's what is on -- it's actually Appendix

14       Part 1, then the context -- contents of

15       Appendix Part 1; Appendix Part 2, then has

16       the contents of that volume -- what was

17       originally that volume; and then there should

18       be --

19           MR. HINSHAW:  Are you looking

20        for a third appendix?

21   Q.  I think it's the green.  That's the break

22       point.

23   A.  And then there's Appendix Part 3, which has

24       Mr. Anders' patent analysis.

25           MR. GARDNER:  Off the record.

Page 130

1               (Off-the-record discussion)

2               (Exhibit 81 was marked for

3                   identification.)

4    Q.   All right.   As much as I hate to do it, we're

5         going to make Appendix Part 2 an exhibit.

6         With some effort, we are passing you what's

7         now been marked as Exhibit --

8    A.   81.

9    Q.   -- 81.

10   A.   Okay.

11   Q.   And ask if you recognize this.

12   A.   Yes.

13   Q.   Is this one of the appendices to your initial

14        report of August 17th, 2007?

15   A.   Yes, it is.

16   Q.   Now, if you would, after the first page,

17        which is like a title or a table of contents

18        page, there appears to be a printout of a

19        court case from Westlaw.

20   A.   Yes.

21   Q.   Do you see that there?

22   A.   Yes.

23   Q.   Entitled KSR.   Is that the -- is this the

24        form --

25   A.   Yes.

BRET HUNTER SMITH
APRIL 28, 2008

Page 131

1    Q.   -- of this court case that you saw?

2    A.   Yes.

3    Q.   And after the court case, there appear to be

4         photocopied excerpts from treatises; in

5         particular, the Chisum On Patents treatise.

6         Do you see that?

7    A.   Yes.

8    Q.   Is this in the form that you got it, or did

9         you make notes on it?

10   A.   This is -- this is it.  This is it.

11   Q.   If you would, look at page 23-65 in the

12        Chisum section.

13             MR. HINSHAW:  I'm sorry.  What

14        was the reference?

15             MR. GARDNER:  23-65,

16        Mr. Hinshaw.

17   Q.   Do you see at page 23-65 where someone has

18        written by hand the words "sub parts."  Is

19        that your handwriting?

20   A.   Yes, that looks to be my handwriting.

21   Q.   And that wasn't on there when you got it,

22        correct?

23   A.   I do -- do not recall it being on there when

24        I got it.

25   Q.   What did you mean by "sub parts" when you

Page 132

```
 1        wrote that?
 2   A.   Well, it's divided into -- my understanding
 3        of the structure of it was that it's -- the
 4        six, which is not obvious, has been divided
 5        into subparts that are alphabetically
 6        labeled.  So there's a subpart A and a
 7        subpart B, C, D.
 8   Q.   If you would, flip back in the other
 9        direction to page 23-47.
10   A.   23-47?  Oh.  I was almost there with the
11        first flip.
12   Q.   Do you see the little arrow that's been
13        added?
14   A.   Yes.
15   Q.   Did you add that arrow?
16   A.   I believe I did.
17   Q.   Why did you add the arrow?
18   A.   Just to make sure that I went back and looked
19        carefully at this portion.
20   Q.   Were you asked to look at whether the
21        invention claimed in the 156 patent is
22        invalid -- strike that.
23            Were you asked to look at whether the
24        156 patent is invalid?
25   A.   No.  We had discussions about -- you know,
```

BRET HUNTER SMITH
APRIL 28, 2008

Page 133

1    in -- in the discussion, you know, there was

2    a discussion about novelty and the ordinary

3    observer; but the arrow was for me, to remind

4    me to go back and look through that very

5    carefully.

6  Q.  Am I correct that the arrow is there because

7    it involved the word "novelty"?

8  A.  Because it was at the start of a section and

9    I wanted to make sure that I read through

10   very carefully.  In other words, it was a

11   kind of a note to self, make sure you read

12   through this very carefully.  This is a lot

13   of material; and, as I mentioned at the

14   beginning when you asked me, this is the

15   first design patent case.  So I wanted to

16   make sure I was as thorough as I could be.

17 Q.  Let me see if I understand correctly.  When

18   you were first engaged to do this report,

19   were you asked only to look at the

20   infringement question and not the invalidity

21   question?

22 A.  No.  I was -- there is, in fact, a letter

23   that's also part of one of the appendices --

24   it's in the correspondence -- that lays out a

25   specific list of things that -- questions I

Page 134

1          need to make sure that I have looked at and
2          addressed.  And so I went through that list.
3    Q.    All right.  If you would, flip now to page
4          23-101.
5    A.    Yes.
6    Q.    You see there someone has written in the word
7          "obvious" and then underlined it?
8    A.    Yes.
9    Q.    Is that your writing?
10   A.    I honestly can't tell you.  That does not
11         look like my V, but the S looks similar.  I
12         don't remember.
13   Q.    Does this portion of Chisum look familiar?
14         Do you remember studying this portion?
15   A.    I read through all of -- I read through all
16         of Chisum, but it's -- it's a lot of material
17         to go through.  So I know I read it.  And
18         that's all I can say with certainty.
19   Q.    Well, do you --
20   A.    I would expect that I read it several times.
21   Q.    Well, are you aware that this portion of
22         Chisum on this page and the preceding page
23         has to do with the need for applying a
24         primary reference and then perhaps applying
25         secondary references to modify the primary

Page 135

1         reference?

2    A.   Yes.

3    Q.   And did you, in fact, read the passages in

4         Chisum that talk about primary references and

5         secondary references?

6    A.   I'm sure I did.

7    Q.   But your testimony earlier was correct; you

8         don't know what a primary reference is,

9         right?

10   A.   I'm not an attorney.  So when I had a

11        question about something, I would return to

12        this and under -- make sure that I felt I

13        understood it.  Occasionally, I would ask a

14        question of Mr. Hinshaw to check my

15        understanding.  And that's how I proceeded.

16   Q.   How much time do you think you spent studying

17        Chisum?

18   A.   I don't recall.

19   Q.   Well, do you think it was a handful of hours,

20        a half a week, a week?

21   A.   Certainly not a week; but I know I read it

22        several times, at least twice clear through

23        and then returned to individual passages on

24        other occasions.

25   Q.   Well, it looks like it's a couple hundred

BRET HUNTER SMITH
APRIL 28, 2008

Page 136

```
 1        pages of material.  How long would that take
 2        you to read?
 3   A.   At least four or five hours, I would think.
 4   Q.   So you think you may have spent more than ten
 5        hours or so studying Chisum?
 6   A.   Yeah.  I would say probably more than ten
 7        hours, less than 40 hours.
 8   Q.   Are you familiar with a case Gorham v. White?
 9   A.   I remember reading about it.
10   Q.   When was the first time you read about it?
11   A.   When I read the Chisum material.  I believe
12        it was around that time.
13   Q.   Did you -- prior to issuing your report of
14        August 17th, 2007, which is Exhibit 78 --
15   A.   Yes.
16   Q.   -- did you actually read the Gorham v. White
17        case itself?
18   A.   I believe so.  I don't recall specifically,
19        but I believe so, yes.
20   Q.   Why do you believe so?
21   A.   Well, I read through all of this material
22        prior to the first report.
23   Q.   Well, you would agree with me that the Chisum
24        materials that you were sent refer to
25        hundreds and hundreds of cases, correct?
```

Page 137

1   A.  Yes.

2   Q.  You didn't read all those individual cases,

3       did you?

4   A.  I read through -- I read through --

5   Q.  You read Chisum.  You didn't read the cases.

6   A.  No, no, no.  No.  No.  I did not go get, you

7       know, books out of the law library and read

8       the cases individually, no.

9   Q.  So --

10  A.  I read Chisum.

11  Q.  Correct.  So did you -- prior to issuing your

12      report of August 17, 2007, did you actually

13      read the Gorham v. White case itself separate

14      from what might be said about it in Chisum?

15  A.  I don't believe so.  If I did, that would be

16      in one of the appendices.  I don't believe it

17      is, but I -- that's as accurate an answer as

18      I can give you.  I don't recall.

19  Q.  Well, you believe that if you had read it

20      prior to issuing the report, that it would

21      have been included in the appendices or

22      mentioned in the report as one of the

23      materials that you reviewed, correct?

24  A.  Yes.  Yes.

25  Q.  So if it's not mentioned in the report or --

Page 138

1  A.  I did not put it in the appendices.

2  Q.  -- the appendices, you probably didn't review

3      it?

4  A.  No.  As you can see, I tried to include

5      everything in the appendices so that it was

6      all there.

7  Q.  Let's talk about the Gorham case for a minute

8      because -- first of all, do you understand

9      that Gorham v. White is still good law and

10     still controlling in the area of design

11     patent infringement?

12          MR. HINSHAW:  Object to form,

13          foundation.

14 A.  I'm not a patent attorney, so I can't -- I

15     can't answer, to be honest.  I've read it.

16 Q.  Is it your understanding that Gorham v. White

17     sets out a test for infringement that's

18     important to follow in determining whether

19     there's infringement of a design patent?

20 A.  It's my understanding it sets forth a test

21     for infringement, yes.

22 Q.  Do you recall the -- in the Gorham case, the

23     nature of the question that was presented to

24     the Supreme Court in terms of what was

25     accused of infringement?

Page 139

1   A.   I don't recall the specifics of it.

2                    (Exhibit 82 was marked for

3                         identification.)

4   Q.   I pass you what's been marked as Exhibit 82

5        and ask you if you've ever seen those figures

6        before.

7   A.   Yes.

8   Q.   What are they?

9   A.   They are the ends of utensils, silverware.

10  Q.   Do they have any relation to the Gorham v.

11       White case?

12  A.   I believe so.  I believe this was mentioned

13       in Anders.  I mean, this figure appeared in

14       Anders' discussion of the 321 patent.

15  Q.   What -- would you agree with the statement

16       that the Gorham v. White case stands for the

17       proposition that it's the overall appearance

18       of the object that's important, particularly

19       in the eyes of an ordinary observer, and that

20       fine details that can be observed and

21       discerned by experts in the field are less

22       important?

23  A.   I would agree that Gorham deals with the eyes

24       of an ordinary observer and, in this

25       particular case that -- I would agree that

Page 140

1           it's the eyes of an ordinary observer.

2      Q.   Well, are you aware that in the Gorham case,

3           there the defendant presented testimony from

4           experts in the field who identified numerous

5           fine details, differences between the accused

6           product and the patented product?

7      A.   As I said, I don't think I have read the full

8           Gorham case.  I don't believe that I have.

9           Or if I have, I don't recall having read the

10          entire case.

11     Q.   Well, when is the first time that you saw

12          the illustration that is before you in

13          Exhibit 82 of the various flatware patterns?

14     A.   I don't recall.  I do recall seeing it

15          as part of the Anders material; but I don't

16          recall, beyond that, if I had seen it prior

17          to that or not.

18     Q.   If I understand your testimony, you're not

19          sure that you've ever read the whole Gorham

20          opinion; is that correct?

21     A.   I don't recall, yes.

22     Q.   And you're not sure if you've seen the

23          flatware images in the Gorham opinion,

24          correct?

25     A.   I don't recall the first time that I saw

Page 141

1         this.

2    Q.   Well, do you have a specific recollection

3         today of having seen the Gorham images in the

4         Gorham decision?

5    A.   I -- I believe that they are part of the --

6         of Mr. Anders' discussion of the 321 patent.

7              MR. GARDNER:   Let's take a real

8              quick break so I can get reorganized

9              before we go on to a new topic.

10                  (Off-the-record discussion)

11                  (Brief recess)

12   Q.   What kinds of things did you do to get ready

13        for today's deposition, Mr. Smith?

14   A.   I read through my reports for the 156 and the

15        321, and I met with Mr. Hinshaw just for a

16        couple of hours on Saturday and maybe an

17        hour -- I don't know if it was two hours or

18        not on Sunday.

19   Q.   How much time would you say that you spent in

20        the last week or so getting ready for this

21        deposition?

22   A.   Probably about -- somewhere between 12 and 15

23        hours.  It's been a busy week.

24   Q.   Referring you again to Exhibit 82, during the

25        break, did you discuss this exhibit or the

BRET HUNTER SMITH
APRIL 28, 2008

Page 142

1    Gorham v. White case with Mr. Hinshaw?

2 A.  No.

3 Q.  Now, if the design on the far left of Exhibit

4    82 were a design patent, would the design

5    shown in the middle constitute infringement?

6        MR. HINSHAW:  Objection, form

7        and foundation.

8 A.  I would want to read back through the

9    arguments and have a context for making a

10    statement about it.

11 Q.  Well, in your view as an industrial designer,

12    does this -- the middle design look

13    substantially like the design on the far

14    left?

15 A.  The middle design most closely resembles the

16    design on the right.

17 Q.  Do you think somebody buying flatware would

18    be likely to confuse the middle design with

19    the one on the left?

20        MR. HINSHAW:  Objection, form

21        and foundation.

22 A.  As I said, I want to do the reading and the

23    background before making a statement one way

24    or the other.  And that would include looking

25    at other patterns available at the time and

Page 143

1           things of that nature.

2      Q.   So is your answer you don't know?

3      A.   I don't know.

4      Q.   Let's look at page 16 of your report --

5      A.   Okay.

6      Q.   -- identified as Exhibit 78.

7      A.   Okay.  Page 16?

8      Q.   Yes, please.  If you would read the first

9           paragraph out loud, please.

10     A.   Three pieces of art anticipate patent 156.

11          See Figures 18, 36, and 37.  My evaluation of

12          designs that anticipate 156 is based upon

13          Chisum section 23-03, Bracket 5, which notes

14          that design anticipation requires a showing

15          that a single prior art reference is

16          identical in all material aspects to the

17          claimed invention.

18     Q.   Isn't it true that this passage here

19          comprises a statement that the design in

20          Exhibit 75 is identical in all material

21          respects to the invention claimed in the 156

22          patent?

23     A.   Could you -- could you state that again?

24     Q.   Isn't it true that that paragraph you just

25          read --

Page 144

1    A.   Yes.

2    Q.   -- indicates that the design shown in

3         Exhibit 75 is identical in all material

4         respects and, therefore, anticipates the

5         design of the 156 patent?

6    A.   Based upon the material feature that

7         Mr. Anders claimed, yes.

8    Q.   And didn't you state also that the design

9         that's now shown in Exhibit 76 anticipates

10        the 156 patent?

11   A.   Again, based on the distinguishing feature

12        that Mr. Anders identified, yes.

13   Q.   And you also indicated that the design that's

14        shown in Exhibit 74 anticipates the 156

15        patent, correct?

16   A.   Yes.  And again based on Mr. Anders' feature,

17        yes.

18   Q.   Is it true that for a design patent to be

19        anticipated, there must be a showing that a

20        single prior art reference is identical in

21        all material respects to the claimed

22        invention?

23   A.   That's my understanding.

24   Q.   If you would, read the third paragraph on

25        that page out loud, the one that starts,

Page 145

1     Accordingly.

2  A.  Accordingly, the prior art clearly

3     demonstrates the features Simpson Ventures

4     now claims as novel.  Moreover, under the

5     Gorham Test, an ordinary observer would view

6     the overall designs as substantially the

7     same.

8  Q.  Which -- which designs were you referring to

9     there?  Were you referring to the designs on

10    74, 75, and 76?

11  A.  Yes.  Based on the material feature that

12    Mr. Anders identified, yes.

13  Q.  Is it true that those designs are

14    substantially the same under the Gorham Test

15    as what is shown in the 156 patent?

16  A.  Again, in light of the material feature

17    that's claimed to distinguish, yes.

18  Q.  Does the Gorham Test apply to a point of

19    novelty or the entire design shown in the

20    drawings of a patent?

21  A.  I'm sorry.  Could you -- could you state that

22    again?

23  Q.  Does the Gorham Test apply to a point of

24    novelty, or does it apply to the entire

25    design shown in the drawings of a design

BRET HUNTER SMITH
APRIL 28, 2008

Page 146

1    patent?

2  A.   My understanding is that the Gorham Test is

3       the ordinary observer test and that it

4       applies to the totality.

5  Q.   So if by this language in the third

6       paragraph, do you mean that under the

7       Gorham -- that you were -- if you mean by

8       this -- scratch that.

9           When you referred to the Gorham Test in

10      the third paragraph here --

11 A.   Yes.

12 Q.   -- were you referring to the entire design of

13      the Simpson Ventures 156 patent or just a

14      portion of it?

15 A.   I was referring to the -- say -- could you

16      repeat it, please?

17 Q.   In the third paragraph here, the one that

18      begins with the phrase, "Accordingly, the

19      prior art," in that paragraph, you refer to

20      the Gorham Test.

21 A.   Yes.

22 Q.   Were you applying the Gorham Test to the

23      entire design shown in the 156 patent

24      drawings or to merely a point of novelty?

25                  (Brief pause)

Page 147

1    A.    I'm sorry.  Say it one more time.

2    Q.    In the third paragraph, you -- you refer to

3          the Gorham Test.  And the question is, were

4          you applying the Gorham Test to the entire

5          design shown in the drawings of the 156

6          patent or only to a point of novelty asserted

7          by Mr. Anders?

8    A.    The -- I was applying it to -- well, the

9          description is there in the second paragraph,

10         that all of the pet cages depicted in Figures

11         18, 36, and 37 are wicker on all visible

12         sides, rectangular in shape, with a

13         rectilinear silhouette whose horizontal

14         length is greater than its horizontal width

15         or vertical height.  All are made from wicker

16         woven over a frame.  All have windows that

17         are created by an absence of wicker and make

18         use of vertically spaced bars to maintain the

19         structure and keep the pet from getting out.

20         All three cages have hinged, lockable doors.

21             I do note that Figure 18 has its door on

22         the top; however, that is not a feature that

23         Mr. Anders or Simpson Ventures has asserted

24         as being material.  So it's -- it's looking

25         at all of those things.

Page 148

1   Q.   So having said that, were you applying that

2        Gorham Test to an asserted point of novelty

3        or to the overall design shown in the patent

4        drawings?

5   A.   I would say that it's -- the application is

6        to the overall -- not concept but the overall

7        cage.   The -- it does identify specific

8        features in the discussion, however.

9   Q.   Well, so is it your testimony that that third

10       paragraph identifies that under the Gorham

11       Test, the design shown in the Simpson

12       Ventures 156 patent is substantially the same

13       as what is shown in Exhibit 74 and Exhibit 75

14       and Exhibit 76?

15  A.   No.   The anticipation -- or the conclusion

16       here was based upon the examination and the

17       claim made by Mr. Anders relative to the 156

18       patent.   As the claims and the discussion

19       expanded, then the subsequent discussion

20       within the paper deals with issues other than

21       anticipation.   So I would say that at this

22       point in time, I would -- I would not say

23       that the Figures 36, 37 and -- what was the

24       earlier figure -- 18 anticipate.

25  Q.   So that's the first paragraph.   So you're

Page 149

1  saying that the first paragraph in which you

2  argue that the three pieces of prior art

3  anticipate the 156 patent --

4 A. That's only so far as the --

5 Q. -- that's incorrect?

6 A. Well, so far as Mr. Anders' claim that was

7  made there, they do anticipate.  In light of

8  additional claims, then I would say that they

9  do not individually anticipate.  In other

10  words, in the first material that I read and

11  in his claim, that the only material feature

12  that distinguishes the 156 patent from the

13  prior art are that the 156 cages were drawn,

14  on all visible sides, rectangular in shape

15  and with a rectilinear silhouette whose

16  horizontal length is greater than its

17  horizontal width or vertical height.

18   Then as far as that statement goes, then

19  I would say that Figures 18, 36, and 37 do

20  anticipate the 156 patent.  Mr. Anders goes

21  on to make additional claims.  And those

22  I addressed in subsequent sections of the

23  report and in the supplemental section.

24 Q. Well, I'll try to make this easier on you.

25  I'll represent to you, Mr. Smith, that it

Page 150

1  appears that you have confused applying tests

2  to the entire patented design with evaluating

3  points of novelty.  You don't have to take my

4  representation as true, but that's -- I'll

5  represent that that's what it appears.  And

6  we're trying to figure out whether you still

7  view this language to be correct.  And it

8  appears in doing this, you have applied, for

9  example, an anticipation standard against a

10  point of novelty that Mr. Anders was

11  asserting and that you have applied the

12  Gorham Test for infringement to a point of

13  novelty that Mr. Anders was asserting.

14        And I'm asking you whether these three

15  paragraphs are in any way correct today or

16  whether this needs -- this section needs to

17  be rewritten because this is no longer your

18  opinion.

19  A.  I would revisit this section in light of

20  subsequent discussion.  So yes, I would go

21  back and revise this.

22  Q.  Am I correct that the first paragraph

23  incorrectly states that three pieces of prior

24  art anticipate the 156 patent?

25  A.  That -- that statement was made in light of

Page 151

1        Mr. Anders' claim as the material features

2        that distinguished the 156 patent from prior

3        art.  I would revisit -- in looking at all of

4        this as a totality, I would examine point one

5        thoroughly.

6   Q.   Isn't it true that those prior art references

7        do not anticipate the 156 patent?

8   A.   I do not believe that they do in light of the

9        expanded claim that Mr. Anders is making.  As

10       I said, those are addressed later -- or in

11       subsequent reports, but I would go back and

12       revisit this.

13  Q.   Isn't it true that the test for anticipation

14       is whether the features shown in the

15       drawings -- not what some expert says, but

16       the features shown in the drawings are

17       already shown in a single prior art

18       reference?  Isn't that true?

19            MR. HINSHAW:  Objection to form

20         and foundation.

21  A.   Could you repeat that one more time?

22  Q.   Isn't it true that the test for anticipation

23       of a design patent is whether the features

24       shown in the drawings of the design patent

25       are shown in a single prior art reference?

Page 152

1      Correct?

2              MR. HINSHAW:   Objection to form

3          and foundation.

4   A.   My understanding of anticipation is that

5        features are shown in the prior art, yes.

6   Q.   And that's measured -- anticipation is

7        measured against what's shown in the patent,

8        correct?

9   A.   That's my understanding.

10  Q.   So for anticipation, it doesn't matter how

11       Mr. Anders or anybody else might interpret or

12       assert points of novelty, correct?

13              MR. HINSHAW:  Objection to form

14          and foundation.

15  A.   Please say that one more time.

16  Q.   So the test for anticipation of a design

17       patent does not depend on the interpretation

18       of the patent by an expert or any assertion

19       of points of novelty, correct?

20              MR. HINSHAW:   Objection to form

21          and foundation.

22  Q.   Let me ask it another way.   Isn't it true

23       that to evaluate whether the 156 patent is

24       anticipated by a prior art reference, you

25       simply have to look at the 156 patent and the

BRET HUNTER SMITH
APRIL 28, 2008

Page 153

1        prior art reference, not Mr. Anders'

2        assertion of any points -- of any points of

3        novelty, correct?

4    A.  I -- I -- that is my understanding.

5    Q.  So if all we have to do to evaluate whether a

6        patent is anticipated is compare the patent

7        drawings with the prior art, isn't it true

8        that your first statement on page 16 is

9        incorrect?

10   A.  I do not believe that the designs in Figures

11       18, 36, and 37 could be said to fully

12       anticipate the 156 design.

13   Q.  So that first sentence is wrong, correct?

14   A.  Yes.

15   Q.  Now, we have the same sort of issue with

16       regard to your application of the Gorham Test

17       in the third paragraph of page 16.  And do

18       you agree with me that under the Gorham Test,

19       one should compare the patented design, which

20       is defined by the drawings in the design

21       patent, with another product to see whether

22       that product is substantially the same to an

23       ordinary observer?

24   A.  Say that again, please.

25                   (The court reporter read from

BRET HUNTER SMITH
APRIL 28, 2008

Page 154

1                        the record.)

2    Q.   Let me see if we can break this into smaller

3         pieces.

4    A.   Okay.

5    Q.   First of all, do you agree that the Gorham

6         Test is a test for infringement?

7    A.   The Gorham Test is the test of seeing whether

8         an ordinary observer would confuse the two

9         items.   That's my understanding.

10   Q.   So yes, you agree that it's an infringement

11        test?

12   A.   Yes.

13   Q.   Do you agree that it does not involve looking

14        at points of novelty?

15   A.   Doing an individual point-by-point

16        comparison, is that -- I'm trying to

17        understand.

18   Q.   Do you agree --

19   A.   Is that --

20   Q.   Do you agree that it does not involve any

21        assessment of the points of novelty?  I'll

22        represent to you that the Gorham case dates

23        to 1872 or thereabouts.  And the point of

24        novelty test was developed many, many years

25        after the Gorham case.

Page 155

1    A.   What -- what I was going to say is that my

2         understanding is that the Gorham Test --

3         really, when you're talking about the

4         ordinary observer, it goes to the overall

5         appearance or it doesn't mean that -- it

6         doesn't mean that the ordinary observer might

7         not notice a feature, but it would be the

8         overall impression for the ordinary observer.

9    Q.   And that's -- that was a test for

10        infringement that was developed a long time

11        ago, correct?  And under that test, the

12        Gorham Test, one would compare the drawings

13        of a design patent with another device to see

14        if that device infringes, correct?

15   A.   Would compare it with the drawings of another

16        product or with the other product?

17   Q.   The product.

18   A.   Okay.  My understanding is that the patent

19        drawings are the thing that you would compare

20        to.  That is, in my analysis, for example,

21        looking at the Bay Isle design, I looked only

22        at the 156 patent drawings because any

23        physical manifestation -- it's the drawings

24        themselves that are at issue.

25   Q.   All right.  So you understand that in the

BRET HUNTER SMITH
APRIL 28, 2008

Page 156

1      Gorham Test, you would look at the 156 patent

2      drawings, correct?

3   A.  Yes.

4   Q.  And to see whether -- under the Gorham Test,

5      the prior art that you pointed out in these

6      three paragraphs -- whether that prior art is

7      substantially the same, you would compare the

8      prior art with the drawings of the 156

9      patent, correct?

10  A.  That's my understanding.

11  Q.  So is any of these three prior art

12      references, which you identified as Figures

13      18, 36, and 37, in your report of Exhibit

14      78 -- are any of those references

15      substantially the same under the Gorham Test

16      as what's shown in the 156 patent drawings?

17  A.  I do not believe that they are.

18  Q.  So this last sentence in the -- in this third

19      paragraph in which you say, Moreover, under

20      the Gorham Test, an ordinary observer would

21      view the overall designs as substantially the

22      same, is incorrect, right?

23  A.  That's correct.

24          MR. GARDNER:  We can suspend the

25      deposition for today.  We will resume

BRET HUNTER SMITH
APRIL 28, 2008

Page 157

1          another time to be determined when

2          it's appropriate and convenient for

3          the witness and the parties.

4                  (The deposition recessed at

5                   5:05 p.m.)

6          * * * * * * * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 158

1                    REPORTER'S CERTIFICATE

2    STATE OF ALABAMA

3    MONTGOMERY COUNTY

4        I, Mallory M. Johnson, Certified Court

5    Reporter and Commissioner for the State of

6    Alabama at Large, hereby certify that on Monday,

7    April 28, 2008, I reported the deposition of BRET

8    SMITH, who was first duly sworn or affirmed to

9    speak the truth in the matter of the foregoing

10   cause, and that pages 4 through 157 contain a

11   true and accurate transcription of the

12   examination of said witness by counsel for the

13   parties set out herein.

14       I further certify that I am neither of kin

15   nor of counsel to any of the parties to said

16   cause, nor in any manner interested in the

17   results thereof.

18       This 12th day of May, 2008.

19

20                    _____

21                    MALLORY M. JOHNSON, CCR
                      Commissioner for the
                      State of Alabama at Large
22                    Alabama License 443, Expires 9/30/08
                      MY COMMISSION EXPIRES:  2/24/09

23

24

25

Page 159

1                    SIGNATURE OF WITNESS

2            I, BRET SMITH, hereby certify that I

3    have read the transcript of my deposition

4    consisting of pages 4 through 157, and except for

5    the corrections listed below, certify that it is

6    a true and correct transcription.

7

8    _____

     BRET SMITH
9

10   SWORN TO AND SUBSCRIBED before me
     this _____ day of _____, 2008.
11

12   _____

     NOTARY PUBLIC
13

14           *  *  *  *  *  *  *  *  *  *  *

15   Page    Line    Correction and reason therefor

16

17

18

19

20

21

22

23

24

25

# EXHIBIT J

In the United States District Court
For the Middle District of Alabama
Eastern Division

Simpson Ventures, Inc.,
*Plaintiff,*
V.
Mid-West Metal Products
Company, Inc.,
*Defendant*

Civil Action File No.
406-cv-901-WKW-VPM

## Second Supplemental Expert Report by Professor Bret H. Smith, IDSA

## Introduction

My Name is Bret H. Smith. I am a full professor in the Industrial Design department at Auburn University where I have taught industrial design for over twenty-one years.

I have been retained in the above referenced lawsuit as an industrial design expert witness. I am being compensated for my work here at a rate of $180 an hour. I have no financial interest in the outcome of this case.

I submitted a Review of U.S. Patent D 483,156 on August 17, 2007. Subsequently, I received and reviewed Simpson Ventures' Supplemental expert reports dated September 11 and September 22 of 2007, together with the Interrogatories dated September 27, 2007

after which I issued a Supplemental Report examining the additional claims as well as additional prior art.

Since the Supplemental Report, I have found two additional pieces of prior art. This prior art, patent 332,407 and patent 571,452, is the subject of this Second Supplemental Report.

Finally, I reserve the right to supplement the conclusions in this and previous reports to reflect any additional material that may come to light.

1

## Additional patents

In the course of my research I found two additional patents, patent 332,407 and patent 771,452, that are part of the prior art relating to the '156 patent. Patent 332,407 for a basket and skip was awarded in 1885. It describes a method of making baskets, skips and other similar articles stronger and more durable by using a wire metal frame in conjunction with a wicker or strand covering. See Figure 1. Patent 571,452 was awarded in 1896. It describes a method of reinforcing the top of a basket structure which can then be covered with a web of "any suitable material" (lines 84 & 85). See Figure 2.



Figure 1: Method of making baskets stronger. Patent 332,407, awarded in 1885.

Figure 2: Patent 571,452, awarded in 1896.

Enlargement added for clarity

As discussed in my initial and supplemental expert reports on the '156 patent, the '156 patent has several primary references. See Figure 3.

The '407 and '452 patents demonstrate the concept of weaving wicker onto a rectangular metal frame in or-

der to strengthen the wicker. These patents date from 1885 and 1896, respectively. Both of these patents clearly set forth the idea of using a wire or wooden rectangular frame which is then covered in wicker or another suitable material. These patents further demonstrate the obviousness of the '156 design.

Wicker enclosure design, plat 28 in *Modern Basketry from the Start*, 1973.





British Patent 20,728



Wicker enclosure from *American Basketry and Woodenware, A Collectors Guide*, 1974.

Wicker animal enclosure from page 126 of belorusskie rhudazhestvennye pronnyslys, 1985.



Figure 3: Primary references

April 22, 2008

Date

Bret H. Smith, IDSA
Professor of Industrial Design
Auburn University

3

# EXHIBIT K

# DEPOSITION OF:
# BRET SMITH

# IN THE MATTER OF: MID-WEST METALS V. SIMPSON VENTURES

## DATE TAKEN: JUNE 13, 2008

CONNOR+ASSOCIATES, INC.
1650 ONE AMERICAN SQUARE
BOX 82020
INDIANAPOLIS, IN  46282
(800) 554-3376
(317) 236-6022
WWW.CONNORREPORTING.COM

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION


SIMPSON VENTURES, INC.,
        Plaintiff,

vs.                    CASE NO. 3:06-cv-901-WKW

MID-WEST METAL PRODUCTS,
COMPANY, INC.
        Defendant.
_____/

MID-WEST METAL PRODUCTS
COMPANY, INC.,
        Counterclaimant,

vs.

SIMPSON VENTURES, INC.,
        Counterdefendant.



* * * * * * * * * *

        DEPOSITION OF BRET SMITH, taken pursuant

to notice before Mallory M. Johnson, Certified

Court Reporter and Commissioner for the State of

Alabama at Large, at the Industrial Designs

Building, Auburn University, 519 West Thach

Avenue, Auburn, Alabama, on Friday, June 13,

2008, commencing at approximately 8:44 a.m.

        * * * * * * * * * *

## Page 2

```
 1            APPEARANCES
 2  FOR THE PLAINTIFF:
 3  Mr. Arthur Gardner
    Mr. Joe Staley
 4  GARDNER GROFF SANTOS & GREENWALD
    Attorneys at Law
 5  2018 Power Ferry Road, Suite 800
    Atlanta, Georgia 30339
 6
    FOR THE DEFENDANT:
 7
    Mr. James H. Hinshaw
 8  BINGHAM MCHALE
    Attorneys at Law
 9  2700 Market Tower
    10 West Market Street
10  Indianapolis, Indiana 46204
11  ALSO PRESENT:
12  Mr. Jeff Simpson
    Ms. Jou Taing
13
14        * * * * * * * * * * *
15        EXAMINATION INDEX
16  BRET SMITH
       BY MR. GARDNER        4
17     BY MR. HINSHAW      187
       BY MR. GARDNER      189
18
19        EXHIBIT INDEX
20  EXHIBIT NUMBER:
21  1  Wire crate          94-96
22  2  Bay Isle Wicker crate    46,123-129
                            131-135,137
23                         141,147,188
24  3  Bay Isle model 1805   47,49,57,59
       wicker litter pan cover  69,85,169
25
```

## Page 3

```
 1  EXHIBIT INDEX continued:
 2  75  Closest visually to the    123-132,134
        design patent        135-137,141
 3                          147
 4  78  Report on the 156 patent   120,121
 5  79  November '07 report   121
 6  80  Second supplemental report  121,122
 7  83  321 patent           13-17,22,25
                            50,54,57-59
 8                          124,167
 9  84  156 patent           119-120
                            123-129,131
10                          132-135,137
                            141
11
    197-198 Reports of instances   114,115
12     of confusion between Simpson
       Ventures and Mid-West parts
13
    218  Second supplemental expert  187
14     report of Robert John Anders
15  235 Report on the 321 patent   7-11,14,15
                            19-120,168
16                          174-178,182
                            183
17
    236 Prosecution file history   36,40
18     of the 321 patent
19  237-241 Websites depicting the   70-78
       Mid-West wicker products
20
    242 Deposition excerpts      99,104
21
    243  Smith's curriculum vitae   162
22
23        * * * * * * * * * * *
24
25
```

## Page 4

```
 1  MR. HINSHAW:  She just asked about
 2     usual stipulations, and I don't
 3     really know what that means.
 4  MR. GARDNER:  Yeah, we don't really
 5     have any standing --
 6  MR. HINSHAW:  We don't really have the
 7     usual stipulations to agree to,
 8     so.
 9  MR. GARDNER:  We don't have any
10     standing stipulations in this case
11     other than, as is normal, the
12     witness can read and sign the
13     transcript within 30 days.
14        BRET SMITH
15     The witness, having first been sworn to
16  speak the truth, the whole truth and nothing but
17  the truth, testified as follows:
18        EXAMINATION
19  BY MR. GARDNER:
20  Q.  Mr. Smith, what types of things did you do to
21     prepare for today's deposition?
22  A.  I read over the reports that I'd written,
23     because it's been a little while, and met
24     with Mr. Hinshaw yesterday.  And we read some
25     of the -- the Chisum material and went back
```

## Page 5

```
 1     through things.
 2  Q.  Did you read any deposition transcripts?
 3  A.  Deposition -- other than I glanced through
 4     what I had been sent from my deposition.
 5  Q.  Have you read your -- your own deposition
 6     transcript front to back?
 7  A.  Yes.  Once.
 8  Q.  Is there anything in that transcript that you
 9     currently think looks inaccurate?
10  A.  There's one thing Dr. Klinghammer said as a
11     zoologist.  He is or was an ethologist, which
12     is an animal behaviorist.  That was in one
13     portion of the testimony.
14        There were a couple of things I thought
15     when I read back through I wasn't real clear
16     about or I wasn't sure that -- that I
17     answered clearly.  One had to do with -- I
18     think you asked about an invalidity, did I do
19     an invalidity analysis.  And I did -- and it
20     was kind of -- the opposite way of the way I
21     was thinking about it.  But I did an
22     obviousness analysis which is part of the --
23     you know, which is -- relates to the test of
24     validity of the patent.  So I did do that.
25        Let me see what else.  Oh, primary
```

Bret Smith
June 13, 2008

Page 6

1    reference. And, again, I thought, you know,
2    when I read over my answer, it didn't seem
3    quite as crisp; but primary reference is a
4    reference that's basically the same, and it's
5    a starting point when you look at a product
6    design and when you're looking at issues of
7    obviousness.
8    Q. Is that the understanding that you had at the
9        time of your last deposition?
10   A. It is. I just did not express it very well.
11   Q. Anything else about your prior deposition
12       transcript that is inaccurate?
13   A. Nothing -- I don't -- there's nothing that I
14       recall. I read through it once. And I -- I
15       would say that it was just a question of when
16       I read it, I didn't think my answers were
17       quite as clear as they needed to be.
18   Q. And other than looking at your own deposition
19       transcript, have you looked at any deposition
20       transcripts from any other witnesses in this
21       case?
22   A. No, I have not.
23   Q. Has anyone discussed with you the testimony
24       given by any other witnesses in this case?
25   A. No.

Page 7

1    Q. So you're not familiar with any -- any
2        testimony from any of the other witnesses in
3        this case?
4    A. No. No. We -- we talked about the case in
5        general, but I don't -- no, I don't recall
6        any specifics of testimony.
7        MR. GARDNER: Let's mark this, I think,
8            as #235. And James, I believe
9            #235 will be the same as Exhibit
10           #234, except it will be better
11           quality, more easily read.
12   Q. Mr. Smith, we've passed you what's been
13       marked as Exhibit #235.
14   A. Okay.
15   Q. And ask if you recognize this.
16   A. Yes, I do.
17   Q. Is this your report regarding the 321 patent?
18   A. Yes.
19   Q. Do you have any other reports regarding the
20       321 patent?
21   A. No.
22   Q. Does this report of Exhibit #235 contain all
23       of your opinions regarding the 321 patent?
24   A. Yes.
25   Q. Is there anything in the report that's

Page 8

1    inaccurate or incorrect or that you would
2        want to change at this time?
3    A. As I recall, there's one page that has some
4        of the figure numbers that are off. I'm
5        trying to find it. The -- I mean the
6        references in terms of the patent are
7        correct, but I think the figure numbers on
8        one of the pages for part of it were off. I
9        think it may have been page 27. Yeah, I
10       think at the bottom, the section that talks
11       about predictable variation. No, it's not.
12       527 is -- yeah. 527 is figure 65. 157 is
13       figure 68. And where it says figure 62, it's
14       figure 69. And figure 64 is -- I'm sorry.
15       Figure -- where it says figure 62, that's
16       figure 66. Where it says figure 62, that
17       should be figure 66. And where it says
18       figure 64, that should be figure 69.
19   Q. This is all on page 27 of Exhibit #235?
20   A. Yeah, this is all on page 27. I moved some
21       of the figures around so that it would read
22       better, and I just missed updating the figure
23       numbers.
24   Q. Mr. Smith, I'll politely remind you that in a
25       deposition, it's important that we do not

Page 9

1    speak at the same time so that the court
2        reporter can take down what we're each saying
3        and make a clean record. So if you'll
4        remember to wait until I finish my question
5        before you respond with your answer, that
6        will be most helpful to the reporter.
7    A. Okay. I will do my best.
8    Q. Thank you. Other than the figure number
9        corrections on page 27, are there any other
10       corrections that need to be made in this
11       report?
12   A. None that I can think of, no.
13   Q. Has Mid-West Metals or any of its attorneys
14       informed you that the company may want to
15       rely on a newly discovered prior art
16       reference in the form of a French movie
17       called Amelie?
18   A. Yes, just briefly.
19   Q. Have you seen the wicker -- or woven products
20       that are depicted in the movie?
21   A. Yes.
22   Q. Do those woven products or wicker products
23       cause you to want to amend or change this
24       opinion in any respect?
25   A. No. They reinforce the opinion, but they

## Page 10

1    don't -- they don't alter the opinion.
2    Q. Do they -- do they want -- cause you to want
3       to change your opinions with regard to the
4       156 patent?
5    A. No. Again, they reinforce the 156, the three
6       reports for the 156 patent. But they
7       don't -- they don't change.
8    Q. Do the images in the movie Amelie show
9       designs that were not previously discovered
10      in any of the prior art that you've looked
11      at?
12   A. No. It's -- the -- the cage that's depicted
13      in it is -- is largely -- I would say in
14      resemblance, it's close to the cage in
15      figure 35. It's squarer. It has a slightly
16      smaller door. But it's -- it doesn't have
17      really the cone shape that you have in
18      figure 35. But it's -- it's that sort of
19      a -- a cage.
20   Q. You're referring to figure 35 of page 15 of
21      Exhibit #235?
22   A. Yes, I am. Yes, I am. Oh, I'm sorry. You
23      asked about the deposition; and there was one
24      other thing that I noticed, and that was that
25      at some points in the deposition -- and I'm

## Page 11

1    not sure which of us started, but I -- I used
2    the term bird cage for figure 33, which I
3    forget what exhibit it was in that
4    discussion. But in Exhibit #235, it's
5    figure 33, and it could be a bird cage. It's
6    just, I would say, more properly termed an
7    animal cage of some kind. We don't know
8    really the scale from the -- from the photo,
9    so. That's -- that's the only other thing
10   that I can remember from the earlier
11   deposition. But the Amelie cage, as I said,
12   is similar to the cage in figure 35.
13   Q. So it's more the same?
14   A. Largely. It's a little squarer. It's a
15      little squarer. But it's in frame for
16      about -- I don't know, probably less than a
17      minute.
18   Q. Now, looking still at figure 33 on page 15 of
19      your report of Exhibit #235.
20   A. Yes.
21   Q. Would you agree that the opening in -- in
22      that animal enclosure is fairly small, such
23      that it would be appropriate for a bird or a
24      very small animal?
25   A. You're talking about figure 33?

## Page 12

1    Q. Yes, sir.
2    A. No. Because, I mean -- I don't know the --
3       the scale. When I was in high school, I
4       bought a spy glass from a catalog; and the
5       spy glass looked this big, but when I got it,
6       it was this big. So I don't know. I would
7       really have to see it in person to make some
8       kind of a judgment one way or another. It is
9       a smaller opening relative to the overall
10      size of the cage.
11   Q. Well, how is the opening sized in relation to
12      the thickness of the woven product, the
13      wicker-looking product?
14      MR. HINSHAW: Objection to form.
15   Q. Does that help you get an appreciation for
16      the scale of the opening?
17   A. No. Any -- anything that I might infer
18      from that would be an assumption since I
19      didn't take -- you know, I haven't seen
20      this in person. I don't know if those are
21      half-inch thick, you know, reeds or if
22      they're eighth-inch thick. You can't
23      really -- there isn't anything that I can
24      discern in the photograph that would tell you
25      scale.

## Page 13

1       MR. STALEY: Can we go off the record
2       real quick?
3       (Off-the-record discussion)
4    A. Just to be clear, those -- I mean, I would --
5       if -- those are things that, you know, would
6       make good illustrations for this, but your
7       question, as I understood it, was does it
8       substantially change your -- or does it alter
9       your opinion as discussed in this report. Is
10      that correct understanding?
11   Q. I asked you if it -- if it required you to
12      change your report or --
13   A. Right.
14   Q. -- or amend your report?
15   A. No. I mean, other than add it as another
16      example. No.
17   Q. I'd like you to refer now to Exhibit #83.
18   A. Okay.
19   Q. Which is the 321 patent.
20   A. Let me move my coffee cup. Okay.
21   Q. And flip through that, if you would, to
22      refamiliarize yourself with the patent.
23   A. Okay.
24   Q. Now, you -- do you agree with me that the 321
25      patent of Exhibit #83 shows two different

Page 14

1  embodiments?
2  A.  Yes, that's in -- the description of the
3  figures.
4  Q.  What's your understanding of the difference
5  between the two embodiments?
6  A.  Well, one embodiment has on the sides and the
7  top a double diamond -- what I call a double
8  diamond pattern in the -- in my report.  And
9  the other one, frankly -- and I think I
10  mentioned this in the report -- the other
11  embodiment, it's a little hard to tell from
12  these drawings whether it's meant to be a
13  plain woven surface or whether it's meant to
14  be what I think I called a variegated kind of
15  surface.  When I went back and looked, I
16  mean, I looked at the drawings here at -- on
17  campus and they were the same, so.  But when
18  I went -- and I think I referred to this in
19  this supplemental report -- or not in the
20  supplemental, in the -- in Exhibit #235 that
21  I went to the Public PAIR site and looked at
22  the drawings and there, there wasn't any
23  variegated pattern.  There were just -- it
24  was just a plain woven, you know, top, front,
25  side, back.  So, the analysis, I think, to

Page 15

1  the degree that it was possible to determine
2  from the drawings, I treated as a -- as a
3  plain woven.
4  Q.  Do you believe that the variegation, as you
5  describe it, in the printed images of
6  Exhibit #83 is a printing effect?
7  MR. HINSHAW:  Objection.  Foundation.
8  A.  I don't -- I don't know.  It could be any
9  number of things.  Having worked with
10  electronic files, the translation isn't
11  always clean, you know.  I don't know why it
12  has that look.  That's why I went to the --
13  the, you know, to see if I could find better
14  images.  My -- and I made a note of it, I
15  think, in the -- in the report.  I assume, or
16  I proceeded with the analysis as if those
17  were just plain woven panels.  You know, that
18  there wasn't a design, for example, like a
19  diamond, the double diamond design.
20  Q.  Are you aware of any indication that the
21  patent owner may have attempted to
22  intentionally have the patent issued with the
23  variegated effect that you see in
24  Exhibit #83?
25  A.  I'm not.

Page 16

1  Q.  If you would, turn to page 41 of your report
2  of Exhibit #235.
3  A.  Yes.
4  Q.  And you see there on the last photograph that
5  begins there, "Unlike."  Would you read that
6  first sentence out loud?
7  A.  Last paragraph on the -- okay.  On the
8  right-hand side.  Unlike the 321 design, the
9  decorative weave on model 1805, design is a
10  square weave pattern distinctly different
11  than that of the 321 patent.
12  Q.  Is that statement correct?
13  A.  Yes.
14  Q.  Is the weave pattern of the 1805 distinctly
15  different from what's patented in the 321
16  patent?
17  A.  The weave design is distinctively different
18  than the weave design shown on the drawings
19  in the 321 patent.  Yes.
20  Q.  Is the weave pattern of the 1805 Mid-West
21  product distinctly different from the first
22  embodiment of the 321 patent?
23  A.  The double -- what I call the double diamond
24  embodiment?
25  Q.  Yes, sir.

Page 17

1  A.  Yes.
2  Q.  Does it look substantially the same as that
3  first embodiment with the double diamond?
4  A.  No, it does not.
5  Q.  Is the weave pattern of the 1805 product
6  distinctly different from the second
7  embodiment, the one without the diamond
8  pattern?
9  A.  Yes.
10  Q.  Does the weave pattern of the 1805 look
11  substantially the same as the second
12  embodiment in the patent, the one without the
13  diamond?
14  A.  Does it look distinctively different, you
15  said?
16  Q.  No, I asked if it looked substantially the
17  same.
18  A.  No, it does not look substantially the same.
19  Q.  Now, looking at the -- well, in your view,
20  does the weave pattern make a big difference
21  in the infringement analysis?
22  A.  Yes, the weave pattern makes a difference.
23  It's part of the design.  This is a design
24  patent that deals with the appearance.  So
25  yes, it makes a difference.

BRET SMITH
JUNE 13, 2008

Page 18

1   Q. Well, looking at the weave patterns of
2       Exhibit #83 --
3   A. #83.
4   Q. -- which is the 321 design patent, and does
5       the weave pattern of the double diamond in
6       the first embodiment look substantially
7       different from the plain weave of the second
8       embodiment?
9   A. Yes, it looks different. It's a different --
10      it's a different pattern.
11  Q. Do you think that they look distinctively
12      different from one another?
13  A. They look different from one another. It
14      would be a noticeable difference.
15  Q. Would you agree with me that the 321 patent
16      covers products both with and without a
17      pattern in the weave?
18  A. No, I wouldn't, because the pattern is
19      specific. The double diamond pattern is a
20      specific pattern. So I would not agree that
21      it covers with or without a pattern. That
22      would -- no. I wouldn't say that at all.
23  Q. Does the -- does the patent cover a product
24      that has no pattern in the weave?
25  A. It covers -- yeah, I mean, the -- the

Page 19

1       variation that is the -- the variation does
2       not have a pattern in the weave, although
3       there are additional weaving details that
4       give it a specific look. And those are
5       things I talk about elsewhere in the -- in
6       Exhibit #235 in the expert report, how it
7       deals with the edges, how it deals with
8       vertical -- verticality, how it deals with --
9       those kinds of details also form part of its
10      appearance.
11  Q. Right now I'm focusing on the existence of
12      the double diamond or the lack of a double
13      diamond. Would you agree with me that the
14      321 patent would cover a product that has the
15      double diamond pattern as shown in the
16      patent?
17  A. If it also had the other weaving details,
18      yes. But -- but the double diamond isn't the
19      only weaving detail. It's not the only
20      design choice, the only appearance choice
21      that's in that drawing.
22  Q. Would you also agree with me that the patent
23      covers a product that does not include the
24      double diamond?
25  A. Again, I would not make a blanket statement

Page 20

1       like that because it depends upon the other
2       details; that is, the pattern over the main
3       part of the panel is one of the visual
4       details.
5   Q. Well, let's assume that the other details are
6       there, either identically or very close. And
7       the only -- the only feature we're focusing
8       on as a potential difference is the lack of
9       any diamond pattern on the side or the top.
10      Would that -- would that product be covered
11      by the patent?
12          MR. HINSHAW: Objection. Asked and
13      answered.
14  A. The only way that I can answer that any
15      differently is I would say if it had the
16      exact same weaving details --
17  Q. Well, let me stop you there. Let's say that
18      the product was exactly as shown in the
19      patent in all respects except it did not --
20      it did not have the double diamond.
21  A. So you're saying, for example, that if there
22      was a product that looked exactly like --
23      exactly like figure 7 down to the last
24      detail, would that product be covered by the
25      321 patent?

Page 21

1   Q. Yes.
2   A. Yes, if it looked exactly like figure 7 in
3       every detail.
4   Q. Now, let's flip that question around. If the
5       product looked exactly like the first
6       embodiment, down to every detail including
7       the double diamond pattern on some of the
8       panels, would you agree that that product is
9       covered by or infringes the 321 patent?
10  A. In both cases, assuming that the 321 patent
11      is in fact ultimately deemed valid, yes.
12  Q. So wouldn't you agree with me, then, that the
13      patent can cover products that either do have
14      the diamond pattern or do not, correct?
15  A. Not as a blanket statement. The other
16      details have to be there. You can't just say
17      the absence of a single detail.
18  Q. I understand the other details may make a
19      difference. But just focusing for a
20      moment on the diamond or lack of a diamond,
21      the patent potentially can cover products
22      that have it and don't have it, correct?
23  A. Again, as I keep saying, the other details
24      have to be there.
25  Q. I understand. I'm not quibbling about the

## Page 22

1    other details.
2    A. Okay.
3    Q. We're granting that you're asserting that the
4      other details have to be there.
5    A. Okay.
6    Q. And assuming that those other details are
7      there, or enough of them that a court would
8      find similarity.
9    A. Assuming the other details are there, then,
10     if the product had the double diamond
11     patent -- or the double diamond pattern or
12     the plain weave, then yes, the 321 -- I mean
13     that's what the 321 visually represents.
14   Q. So given that, it does cover both products
15     that have the double D pattern and no
16     pattern, correct?
17   A. That have -- that are -- yes. If -- you
18     know, if they are complete in the other
19     details.
20   Q. Do you believe that the -- the two
21     embodiments shown in the patent, in the 321
22     patent of Exhibit #83 constitute one
23     invention or two?
24       MR. STALEY: Objection. Foundation.
25   A. I think one invention.

## Page 23

1    Q. Do you believe that they constitute a single
2      inventive concept?
3    A. Well, the -- that's the -- the -- my
4      understanding is that is the language of the
5      patent, that one is another embodiment of
6      the -- you know, that figure 7 -- I think 7
7      through 12 is another embodiment of what was
8      shown in figures 1 through 6.
9    Q. So do I understand your answer to be that you
10     believe that the two embodiments shown in the
11     patent represent a single inventive concept?
12       MR. HINSHAW: Objection. Foundation.
13   A. One is another embodiment of the present
14     design. That's what it says.
15   Q. Is it two --
16   A. I don't know how else to answer that.
17   Q. Does the patent show two inventive concepts
18     or one?
19       MR. HINSHAW: Objection to foundation.
20   A. The patent description says that figures 7
21     through 12 are another embodiment of the
22     design shown in figures 1 through 6. So
23     that's how I would look at it.
24   Q. Does that mean that you believe that it's one
25     inventive concept or two?

## Page 24

1       MR. HINSHAW: Objection to foundation.
2         Asked and answered.
3    A. I don't know how else to answer other than
4      the way I've answered.
5    Q. I understand you may not understand or may
6      not be able to make a decision between
7      whether it's one concept or two. But is it
8      one or two?
9       MR. HINSHAW: Objection, foundation,
10        legal conclusion, and asked and
11        answered.
12      MR. GARDNER: Witness hasn't answered
13        yet. He's evaded pretty well.
14      MR. HINSHAW: No, he's answered. You
15        just don't like the answer.
16   A. It says it's an alternate. It's another
17     embodiment. I don't know how else to answer
18     you. That's what it says. That's the
19     language in the patent.
20   Q. Do you know whether it's one or two inventive
21     concepts disclosed in the patent?
22   A. It's another embodiment of the concept
23     disclosed in figures 1 through 6.
24   Q. Listen to my question very carefully. Do you
25     know whether the patent discloses one

## Page 25

1    inventive concept or two?
2    A. That's what I've already answered. It says
3      it's another embodiment of the design shown
4      in figures 1 through 6.
5    Q. Do you know whether it's one inventive
6      concept or two, or do you not know?
7    A. I know it's another embodiment. I know it's
8      another embodiment of figure 1 through 6.
9      That's what it says in the patent.
10   Q. So you don't know whether it's one inventive
11     concept or two, correct?
12       MR. HINSHAW: Objection, asked and
13        answered.
14   A. I've already answered that question.
15   Q. Is there a particular reason that you won't
16     answer?
17   A. No. I'm telling you my answer. Figure 7
18     through 12 says it in the patent. They are
19     another embodiment of figure -- figures 1
20     through 6 in Exhibit #83.
21   Q. So would I be correct in stating that you
22     believe that it's two inventive concepts
23     shown in the patent?
24       MR. HINSHAW: Objection. Asked and
25        foundation.

Page 26

1    A. No. I believe that 7 through 12 is another
2       embodiment.
3    Q. Do you believe that it's one inventive
4       concept shown in the patent?
5          MR. HINSHAW: Same objections.
6    A. I don't understand how else to answer your
7       question. There's a description, figures 1
8       through 6. Figures 7 through 12 are in
9       another embodiment. It says another
10      embodiment of the present design, so.
11   Q. Do you understand the difference between one
12      and two?
13   A. Yes, I do.
14   Q. Do you understand that I'm asking you to
15      identify whether there is one embodiment --
16      one inventive concept shown in this patent or
17      two? Do you understand that's what I'm
18      asking?
19   A. I understand that's what you're asking. I
20      don't understand --
21   Q. Do you understand that I'm asking you to make
22      a choice between one inventive concept or
23      two?
24          MR. HINSHAW: I'm going to object. Let
25          the witness answer your question.

Page 27

1          MR. GARDNER: He hasn't been answering.
2          He's been evading pretty well. I
3          want to know whether there's one
4          inventive concept or two. And he
5          won't answer.
6          MR. HINSHAW: You're not letting him
7          finish his testimony in
8          responding, or trying to respond
9          to your question repeatedly now.
10   A. It says it's another embodiment of the
11      present design. That's what it says.
12   Q. I'm not asking you to read the words of the
13      patent out to me. I'm asking you to tell me
14      in your opinion, is there one inventive
15      concept shown in this patent or two?
16          MR. HINSHAW: Same objections.
17   A. Under the description it says another
18      embodiment of the present design. So that
19      would be singular.
20   Q. So your testimony is that there's a single
21      inventive concept disclosed in the patent,
22      correct?
23          MR. HINSHAW: Same objections.
24   A. My testimony is that's what the description
25      says.

Page 28

1    Q. Mr. Smith, we can all read the patent. I'm
2       trying to find out whether you understand
3       that patent to disclose a single inventive
4       concept. Not what the words of the patent
5       say. You keep reading me the words out of
6       the patent. I want you to tell me whether
7       you believe that the words and the drawings
8       of this patent convey to you a single
9       inventive concept or two inventive concepts?
10          MR. HINSHAW: Same objections.
11   A. I don't know how else to answer you than the
12      way I've answered you.
13   Q. I'm not moving off this point. I'm entitled
14      to know whether you believe this is one or
15      two. It's a simple question.
16   A. It says another embodiment of --
17   Q. I'm not asking you what it says.
18          COURT REPORTER: One at a time.
19          MR. STALEY: Hang on a second. Let's
20          make a record. There is
21          absolutely no reason for you to
22          be yelling at this man. So please
23          lower your voice.
24          MR. GARDNER: The witness won't answer
25          a simple question.

Page 29

1          MR. STALEY: He has answered the best
2          he can.
3          MR. GARDNER: He's given answers, but
4          he has not answered a simple
5          question of how many inventive
6          concepts are in the patent. It's
7          either one or two. I'm asking him
8          one or two. He won't tell me
9          whether it's one or two. He won't
10         even --
11          MR. STALEY: Why are you yelling at me,
12          Art?
13          MR. GARDNER: If you want to go outside
14          and talk to him and counsel him
15          about whether he ought to say one
16          or two, fine.
17          MR. STALEY: I absolutely am not going
18          to do that.
19          MR. GARDNER: But I'm not leaving this
20          topic until we get an answer that
21          says he believes it's either one
22          or he believes it's two or he
23          believes it's some other number.
24          But I want to know the number
25          THE WITNESS: Mr. Gardner --

BRET SMITH
JUNE 13, 2008

## Page 30

1    MR. HINSHAW: Mr. Smith -- Mr. Smith.
2        Hang on. Hang on. You can ask
3        your question a thousand different
4        ways and repeat it, and you can
5        spend your whole time doing that,
6        if that's what you want to do.
7        But at some point, I'm going to
8        instruct the witness not to answer
9        because you're harassing him; and
10       it's unduly burdensome and
11       oppressive.
12   MR. GARDNER: I'm entitled to an
13       answer.
14   MR. STALEY: You've asked the question
15       and he's given you the best answer
16       that he can under the
17       circumstances, and despite my
18       objections over foundation, legal
19       conclusion, and that you've
20       already asked and answered it
21       repeatedly. I don't agree that
22       you should be shouting at this man
23       or shouting at me.
24   MR. GARDNER: I'm not shouting.
25   MR. STALEY: You are.

## Page 31

1    MR. GARDNER: I can shout. I'm not
2        shouting. I'm not happy, but I'm
3        not shouting.
4    MR. STALEY: I would suggest you move
5        on.
6    MR. GARDNER: If you want to shout,
7        I'll shout. I won't move on. I
8        want the answer.
9    MR. STALEY: All right. Then ask your
10       question, and we'll see how this
11       goes.
12   Q. How many inventive concepts are shown in this
13       patent?
14       MR. STALEY: Same objections.
15   A. It says what it says. It says -- it says
16       figure 7 is a perspective view of a litter
17       pan housing according to another embodiment
18       of the present design. That's the language.
19   Q. What number between 0 and 10 of inventive
20       concepts are shown in this patent?
21       MR. STALEY: Same objection.
22   A. It says the same of the present design.
23   Q. Is it one, sir?
24       MR. HINSHAW: Same objections.
25   A. The language says of the present design.

## Page 32

1    Q. I'm not interested in what the language says.
2        I'm not asking you to read it.
3    A. Well, isn't this about --
4    Q. Please. Please. I understand you want to
5        keep reading from the patent as your answer.
6        That's what you've been doing. And I'm
7        guessing from that that you don't know
8        whether the patent discloses a single
9        inventive concept or more than one. I'm
10       asking you to either tell us how many
11       inventive concepts it has or to say that you
12       don't know.
13   A. It says of the present design. There's no --
14       that's what it says.
15   Q. Do you know what an inventive concept is?
16   A. No.
17   Q. So if you don't know what an inventive
18       concept is, would I be correct in stating
19       that you don't know how many inventive
20       concepts are shown in the patent?
21   A. It says of the present design. It doesn't
22       say designs. It says of the present design.
23       That's what it says. I can't make it say
24       something it doesn't say. That's what's in
25       the patent.

## Page 33

1    Q. Again, sir, I'm not asking you to read from
2        the patent.
3    A. You're asking me what does the patent say.
4        That's what the patent says.
5    Q. I did not ask you what the patent says. Now,
6        we've established that you don't know what an
7        inventive concept is, correct?
8    A. No.
9    Q. Do you know what an inventive concept is?
10   A. In that specific phrase, no. I'm a designer.
11       I'm not a lawyer.
12   Q. So if you don't know what an inventive
13       concept is, you don't know how many of them
14       are in the patent, correct?
15   A. Well, if it -- there's no plural in the
16       statement in figure 7, so -- it says the
17       embodiment -- it's another embodiment of the
18       present design. I'm not sure what you're
19       asking beyond that.
20   Q. Are you presuming that there's one inventive
21       concept in the patent?
22   A. There's no plural in that sentence.
23   Q. So I'd be correct in stating that although
24       you're not completely sure what an inventive
25       concept is, you're presuming from the

BRET SMITH
JUNE 13, 2008

## Page 34

1    language of the patent itself that there must
2    be only one, correct?
3    A. It says the present -- it's another
4    embodiment of the present design.
5    Q. Isn't that correct that you're presuming that
6    there's only one?
7    A. That there's no plural there.
8    Q. So only one, right?
9        MR. STALEY: Objection. Asked and
10       answered. Same objections.
11       Foundation and legal conclusion.
12   A. Based on the language that's there, yes.
13   Q. Did you read the file histories of the 156
14   and the 321 patents?
15   A. I read -- I read through them. It wasn't the
16   main emphasis of my analysis. But I read
17   through them.
18   Q. How much time do you think you spent reading
19   each one of them?
20   A. I can't recall.
21   Q. Do you think it was a lot of time?
22   A. Reading the patent -- could you repeat the
23   question?
24   Q. Do you think you spent a lot of time reading
25   the file history of either the 156 patent or

## Page 35

1    the 321 patent?
2    A. No, I don't think I spent an extensive amount
3    of time.
4        MR. STALEY: Object to the question,
5        ask for a clarification. When
6        you're talking about file history,
7        are you talking about prior art
8        that was sited in the file history
9        or are you just talking about the
10       prosecution filings with the
11       USPTO?
12   Q. Mr. Smith, do you know what I mean when I say
13   file history?
14   A. My understanding is that that would be the
15   history of the prosecution of the patent.
16   But if you're asking did I read and reread
17   the correspondence, no, I did not reread or
18   spend an extensive amount of time on the
19   correspondence. I did look at the prior art
20   that was sited in the prosecution and that
21   sort of thing.
22   Q. What do you believe is the role of the
23   prosecution file history in analyzing a
24   patent for infringement?
25   A. I -- I don't know of a specific role.

## Page 36

1    Q. Do you know whether the prosecution file
2    history of a patent can have any impact on
3    the scope of the coverage of the patent?
4    A. My understanding is that in the -- the
5    process of -- of submitting and resubmitting
6    for a patent, sometimes the patent office
7    will give advice or will say -- for example,
8    I think I recall in the 156 patent it said
9    that you shouldn't show the bottom of the --
10   of the pet cage because it wasn't being
11   covered by the patent. So I know that things
12   like that can be part of that.
13   Q. And how does that affect the scope of the
14   patent?
15   A. How does it affect the scope?
16   Q. Yes, sir.
17   A. Well, with a design patent, since it's -- has
18   shown something like that would -- would
19   affect the -- what would be considered in the
20   design.
21   Q. Let's mark this. I'm passing you what's been
22   marked as Exhibit #236.
23   A. Okay.
24   Q. And ask you if you recall seeing this.
25   A. Yes.

## Page 37

1    Q. Do you recognize this to be the prosecution
2    file history of the 321 patent that was
3    attached to Mr. Anders' report?
4    A. Yes.
5    Q. Now, I'll represent to you, Mr. Smith, that
6    our firm has added page numbers in the lower
7    right for easier reference, page dash 1
8    through 112.
9        MR. STALEY: I'm not clear,
10       Mr. Gardner. Is your question is
11       this an accurate copy or is this
12       what purports to be the 321
13       prosecution history that was
14       attached to be Mr. Anders' report?
15       I mean, if you're asking him --
16   MR. GARDNER: Asking him.
17   MR. STALEY: -- to verify 112 pages and
18       whether or not that jibes with --
19       that's really not a fair question.
20   MR. GARDNER: I'm not asking him to
21       verify that all 112 pages are
22       there or that these are the same
23       112 pages that he saw; only that
24       it looks like the file history
25       that he saw attached to

Page 38

```
 1              Mr. Anders' report.
 2     Q. And you've indicated that it does look like
 3         it?
 4     A. It -- it appears to be, yes.
 5     Q. If you would, look at the document that
 6         begins on page 38 as part of this file
 7         history.
 8     A. Hang on.
 9     Q. It continues on for several pages. First of
10         all, do you recognize this as an office
11         action or office letter received from the
12         United States Patent and Trademark office?
13     A. That's -- yes, that's what it appears to be.
14     Q. Do you recall seeing this in your review of
15         the file history?
16     A. Not specifically. But I mean, in -- in exact
17         detail. But yes, I recall seeing it.
18     Q. Let's look at the third page of this --
19     A. Okay. So that would be 40.
20     Q. -- office action which is page 40.
21     A. 40. Okay.
22     Q. Do you see where the examiner has written at
23         the top there beginning with "This
24         application"?
25     A. Contains the following embodiments?
```

Page 39

```
 1     Q. Yeah. Would you read that out, and then the
 2         next paragraph that begins "Multiple
 3         embodiments."
 4     A. Multiple embodiments of a single inventive
 5         concept may include -- may be included in the
 6         same design application only if they're
 7         patentably indistinct. See In Re Rubinfield
 8         270 F.2d. Embodiments that are -- do you
 9         want me to read all the --
10     Q. Read the rest of the paragraph, please.
11     A. Okay. All right. Let me see. In Re
12         Rubinfield, 270 F.2d, 391, 123 USP -- looks
13         like a Q -- 210(CCPA 1959). Embodiments that
14         are patentably distinct from one another do
15         not constitute a single inventive concept and
16         thus may not be included in the same design
17         application. See In Re Platner,
18         P-L-A-T-N-E-R.
19     Q. That's enough from there. Would you agree
20         with me that the examiner apparently
21         considered that there were two embodiments in
22         this design patent application?
23     A. That appears to be from this, yes.
24     Q. Isn't that what the examiner indicated in
25         this office action letter?
```

Page 40

```
 1     A. Yes. Yes.
 2         COURT REPORTER: I'm sorry. Repeat your
 3         question. Is that what the examiner --
 4     Q. -- indicated in this office action letter?
 5         MR. HINSHAW: I would object. Document
 6         speaks for itself.
 7     Q. Isn't it also true that the examiner
 8         indicated that these multiple embodiments
 9         constituted a single inventive concept?
10         MR. HINSHAW: Objection. Document
11         speaks for itself.
12     A. What it -- it's a discussion of the
13         difference between multiple embodiments and
14         embodiments that are patentably distinct from
15         one another.
16     Q. What does it mean for embodiments to be
17         patentably distinct from one another?
18         MR. HINSHAW: Objection. Form and
19         foundation.
20     A. My understanding from this is that it would
21         require a separate -- if they were patentably
22         distinct from one another would require a
23         separate patent, or they could not be
24         included in the same application.
25     Q. If you would, still referring to page 40 of
```

Page 41

```
 1     Exhibit #236, does the next paragraph begin
 2         with the following language: The above
 3         identified embodiments are considered by the
 4         examiner to present overall appearances that
 5         are basically the same. Furthermore, the
 6         differences between the appearances of the
 7         embodiments are considered minor and
 8         patentably indistinct or are shown to be
 9         obvious in view of analogous prior art sited.
10         Did I read that, correctly?
11     A. Yes, you did.
12     Q. Do you agree with the examiner that the two
13         embodiments have basically the same overall
14         appearance?
15         MR. HINSHAW: Objection to form and
16         foundation.
17     A. I think that -- you're asking me if I agree
18         with their conclusion?
19     Q. Well, first of all, we'll break it up. Do
20         you agree that the examiner concluded that
21         the two embodiments had basically the same
22         overall appearances?
23     A. Yes.
24     Q. Do you believe that the two embodiments shown
25         in the 321 patent have basically the same
```

## Page 42

1    overall appearances?
2    A. The same overall appearance?
3    Q. Yes.
4    A. I think that the diamond -- I think that the
5      double diamond pattern is a noticeable
6      difference between the two.
7    Q. Can you agree with the statement that the --
8      the two embodiments have basically the same
9      overall appearance?
10   A. Yes.
11   Q. Do you see the next language where the
12     examiner indicates that the differences
13     between the appearances of the two
14     embodiments are considered minor?
15   A. I'm sorry. Where are you?
16   Q. In that same paragraph.
17   A. The very last sentence?
18   Q. No.
19   A. Okay.
20   Q. No. After the --
21   A. Oh, okay. It starts with "Furthermore"?
22   Q. The examiner indicates furthermore the
23     differences between the appearances of the
24     embodiments are considered minor. Do you see
25     that language?

## Page 43

1    A. Yes, I see that language.
2    Q. Do you believe that the differences between
3      the two embodiments are minor?
4          MR. HINSHAW: Objection to form.
5    A. I -- I believe that the differences would be
6      noticeable. That is, I believe that if -- if
7      you look at the -- if you look at the litter
8      pan cover and it was without the double
9      diamond -- that is, with a plain weave, and
10     there was one beside it that had the double
11     diamond, I believe that people would notice
12     the double diamond. People would notice that
13     one had it and one didn't. But beyond that,
14     no.
15   Q. So if I said that the differences between the
16     two embodiments shown in the 321 patent are
17     minor, you would not agree with that
18     statement, correct?
19         MR. HINSHAW: Objection, asked and
20             answered.
21   A. I would say that you would notice one being
22     plain and one having a double diamond.
23     That's what I would say.
24   Q. But would you agree that they're minor or
25     not?

## Page 44

1          MR. HINSHAW: Objection to form.
2    A. Minor in comparison, one to another? Is that
3      what you're asking?
4    Q. Yes. I understand that you've testified that
5      the differences between the two embodiments
6      shown in the 321 patent could be noticed.
7      What I'm asking you is whether you can agree
8      with the characterization that those
9      differences between the two embodiments are
10     minor.
11         MR. HINSHAW: My objection, to make it
12             clear, is I'm not clear from your
13             question whether you're asking him
14             about that comparison in the eyes
15             of an ordinary observer or if
16             you're asking him about that
17             comparison in the eyes of a person
18             of ordinary skill in art as an
19             industrial designer.
20   Q. Well, we'll take it in turn. We'll start
21     with your personal view as an industrial
22     designer; not some typical industrial
23     designer, but you personally, Mr. Smith. Can
24     you personally agree that in your view the
25     differences between the two embodiments shown

## Page 45

1      in the 321 patent are minor or not?
2    A. As an industrial designer, I would notice the
3      difference in pattern. I would notice that,
4      because it would be a clear decorative
5      choice. I would notice that.
6    Q. I understand that you might notice it. What
7      I'm asking you is whether you consider --
8      that difference that you consider noticeable,
9      do you also consider that difference to be
10     minor?
11   A. Assuming all other things are the same
12     between the two?
13   Q. Yes.
14   A. I would not consider it to be a major
15     difference between the two, assuming all
16     other things are equal.
17   Q. So --
18   A. Assuming all the other details are there,
19     visual details are there.
20   Q. So could you agree, then, that it's a minor
21     difference?
22   A. That's a -- as a designer, that's kind of a
23     charged sort of word. So I don't know that I
24     would apply that characterization to it as a
25     designer. I don't know that I would -- I

Page 46

1    would personally say it was a minor
2    difference. I certainly wouldn't say it was
3    a major difference.
4    Q. Would you agree that some designers might
5        consider it a minor difference?
6        MR. HINSHAW: Objection. Foundation.
7    A. It's possible.
8    Q. Now, let's talk about the ordinary consumer.
9        Would an ordinary consumer consider the
10       difference between those two embodiments to
11       be a minor difference?
12   A. I think -- I think they would perceive it as
13       a clear difference. But I think that they
14       might consider it a minor difference.
15   Q. And again, we're talking about --
16   A. Just the pattern or not the pattern.
17   Q. We're talking about the two embodiments shown
18       in the 321 patent, just to be clear.
19   A. Yes. Yes.
20   Q. So in your view, an ordinary consumer might
21       agree with the examiner that the difference
22       between those two embodiments is a minor
23       difference?
24   A. Yes.
25       MR. GARDNER: I'm going to take a short

Page 47

1        break for restroom and stretch
2        your legs and whatnot.
3            (Brief recess)
4    Q. Mr. Smith, referring now to Exhibit #2, which
5        we've placed in front of you, do you recall
6        that's the -- excuse me. That's the wrong
7        one.
8    A. Oh, yeah.
9    Q. #3, please. Exhibit #3.
10   A. Exhibit #3.
11   Q. Which is the next one?
12   A. Oh, I'm sorry.
13   Q. Do you recall that Exhibit #3 shows the
14       Bay Isle model 1805 wicker litter pan cover,
15       correct?
16   A. Yes.
17   Q. Now, first of all, looking at the second page
18       of this exhibit --
19   A. Pull it out.
20   Q. Yeah. Looking at the second page of this
21       exhibit, do you see what some people have
22       referred to as a hang tag hanging in the
23       opening?
24   A. Yes.
25   Q. Do you consider that the hang tag forms part

Page 48

1        of the product or is that part of the
2        packaging or is it something else?
3    A. I would consider it part of the branding. It
4        would be something that you'd want every
5        consumer to notice when they looked at the
6        product in this particular case.
7    Q. But the hang tag itself is not part of the
8        litter pan cover, is it? It's attached to it
9        but doesn't form part of the cover, correct?
10   A. Correct.
11   Q. So should the hang tag form part of the
12       analysis of whether this product, the 1805
13       litter pan cover infringes a patent or not?
14   A. I did not include it in my analysis. I'm
15       not -- it -- it would be part of the
16       branding. It would be something you would
17       want the consumer to notice as a way of
18       establishing your brand. That's how I would
19       approach it as a designer.
20   Q. But for purposes of evaluating whether the
21       model 1805 infringes the 321 patent, the hang
22       tag should not be considered, correct?
23   A. I -- as I said, I did not consider it to be
24       part of the -- the analysis.
25   Q. And not -- I'm sorry.

Page 49

1    A. For looking at -- in the comparison between
2        the two products.
3    Q. And not considering it was the correct thing
4        to do, correct?
5    A. In my approach, yes.
6    Q. Well, do you believe anybody else should
7        consider the hang tag in evaluating whether
8        there's an infringement or not?
9    A. I -- I don't know if somebody else would or
10       not. All I can say is that I did not
11       consider it.
12   Q. Well, do you -- do you yourself know whether
13       it would be appropriate in the infringement
14       analysis to consider that hang tag in
15       evaluating whether the product infringes a
16       patent?
17   A. I don't -- I don't know for certain from a --
18       I'm not a patent attorney, but I would not
19       consider it.
20   Q. Let's look at the third page of Exhibit #3.
21       And the third page shows what I think is the
22       side panel. Do you agree with that?
23   A. Yes.
24   Q. And on the side panel there in the woven
25       wicker there appears to be some squares or

BRET SMITH
JUNE 13, 2008

## Page 50

1    rectangles of a different weaving pattern.
2    Is that correct?
3    A. Yes.
4    Q. How would you describe those?
5    A. I think in my analysis I describe them as a
6       square weave. You're talking about the
7       four -- the four distinct -- you know, one in
8       each corner, those weaves, is that what
9       you're talking about?
10   Q. Well, the -- in the picture, do you agree
11      with me that there are four patches or
12      squares of woven area that appear different
13      than the other --
14   A. Yes.
15   Q. -- the rest of the panel?
16   A. Yes.
17   Q. And you refer to those individual squares as
18      a square weave?
19   A. I believe I did, yes.
20   Q. Now, looking at the design patent, the 321
21      design patent of Exhibit #83.
22   A. Yes. Was that in here? Yes.
23   Q. Do you believe that the square pattern shown
24      on the Bay Isle model 1805 litter pan cover
25      is a difference than from what's shown in the

## Page 51

1    321 design patent of Exhibit #83?
2    A. Yes. I believe it's a difference.
3    Q. Do you believe that it's a minor difference,
4       a major difference, or something in between?
5    A. I think it's a noticeable difference. And we
6       were talking about -- I think we were talking
7       about the 321 before the -- the break and
8       about plain versus the diamonds. And, you
9       know, I think the consumer would notice it
10      the same way you would notice a fabric
11      pattern on a sofa that you were purchasing.
12      That it would -- they would notice it. They
13      would pay attention to it. It might not be
14      the ultimate deciding factor, but they would
15      notice it.
16   Q. Well, would you agree with the statement that
17      it's not a major difference between what's
18      shown in the patent?
19   A. I think -- I think it's a noticeable
20      difference. I think it's a difference the
21      consumer will notice.
22   Q. Well, I understand that you think that it's
23      noticeable. And independent of whether you
24      think it's noticeable, do you yourself think
25      that it's a major difference between what's

## Page 52

1    shown in the 321 patent and what's shown in
2    the Bay Isle 1805 litter pan cover?
3       MR. SHAW: Again, for clarification,
4          you're asking him as an industrial
5          designer?
6       MR. GARDNER: I'm asking him
7          personally.
8       MR. HINSHAW: As an industrial designer
9          or as a consumer?
10      MR. GARDNER: In his own personal
11         view. What does he think.
12   A. I think it's a significant difference.
13   Q. Would you agree that it's not a major
14      difference?
15   A. No, I wouldn't agree with that from this -- I
16      wouldn't agree with that, no.
17   Q. So you think it's a major difference between
18      what's shown in the patent and what's shown
19      in the Bay Isle product?
20   A. I think it's a -- it's a noticeable
21      difference between the two.
22   Q. Let's -- let's assume for a moment that there
23      was an extremely minor difference. Not this
24      difference but an extremely minor
25      difference.

## Page 53

1    A. Yes.
2    Q. I think we can both agree that a person like
3       yourself, an industrial designer, could
4       notice even an extremely minor difference,
5       right?
6    A. Depending on the context, but yes.
7    Q. So what I want to keep distinct is the
8       question of whether the feature can be
9       noticed versus whether you as a designer
10      would consider it major, minor, significant
11      or however you might characterize it. So
12      isn't it true that you as an industrial
13      designer could notice major differences,
14      minor differences, very minor differences and
15      a whole range of differences, correct?
16   A. Depending on the context. Depending on the
17      context.
18   Q. But I -- but it is true in general that you
19      as a designer could notice both major
20      differences and minor differences, right?
21   A. Yes.
22   Q. So I'm not asking you whether the difference
23      in the weave pattern is noticeable or not.
24      I -- I'll grant you that you as a designer
25      may notice it, even if it's minor or very

BRET SMITH
JUNE 13, 2008

---

Page 54

1    minor. What I'm asking you is whether you
2    would agree with the statement that the
3    difference between the square weave pattern
4    in the 1805 Bay Isle product is a major
5    difference from what's shown in the 321
6    patent of Exhibit #83.
7    A. It's -- again, I think it's question,
8    perhaps, of wording. But I would not
9    consider it a minor difference. I would
10   consider it to be noticeable, and I would
11   consider it to have an influence on the
12   overall appearance. It's not -- it's not a
13   single controlling factor. But it is
14   noticeable, and it's significant.
15   Q. Well, I'm trying to narrow the focus here.
16   I'm trying to ask you whether you could agree
17   or whether you disagree with the statement
18   that the difference between the square weave
19   pattern of the model 1805 and what's shown in
20   the patent is a major difference.
21       MR. HINSHAW: Asked and answered.
22   A. Your scale is one or ten. And -- and I'm not
23   comfortable saying that it is -- I would -- I
24   would as an industrial designer, I would call
25   this a noticeable difference between the

---

Page 55

1    Bay Isle and the 321.
2    Q. If I made you choose between it being a major
3    difference or not being a major difference,
4    which would you choose?
5        MR. HINSHAW: Objection to form.
6    A. I would say that -- that's a -- that's not
7    how I would categorize it as a designer,
8    because -- I would not categorize it or
9    characterize it in that way. I would say
10   it's a noticeable clear difference. And
11   that's how I would categorize it as a
12   designer.
13   Q. Do you agree with the statement that it is a
14   major difference?
15   A. I would not -- I would not characterize it in
16   that way. I would say it's noticeable. It's
17   a clearly visible difference.
18   Q. So in your view, it's a noticeable, clearly
19   visible difference but not a major
20   difference, correct?
21   A. I -- I would not -- I wouldn't use -- I would
22   not use that dichotomy as major, not major.
23   I would say it's a noticeable difference.
24   Q. Well, given that you believe it's visible and
25   noticeable, the question is do you also

---

Page 56

1    believe that it's a major difference?
2        MR. HINSHAW: Asked and answered.
3    A. As I've said, that's -- as a designer, I
4    would describe this as clearly noticeable or
5    visible difference between the two. That's
6    how I would describe it as a designer.
7    Q. Well, would you agree with the statement that
8    it's a noticeable visible difference but a
9    minor difference?
10   A. No, because the word minor would tend to
11   generally be taken to trivialize it. And I
12   think it's a noticeable difference.
13   Q. But you don't personally think that it's a
14   major difference, do you?
15       MR. HINSHAW: Objection. Asked and
16       answered.
17   A. You've already asked me that. I would not --
18   I told you how I would characterize it as an
19   industrial designer.
20   Q. And that terminology, the answer that you
21   gave did not characterize it as a major
22   difference, correct?
23   A. I would not use those words, major or minor,
24   in the case of this.
25   Q. So in your view, it's neither a major nor a

---

Page 57

1    minor difference?
2    A. I would describe it as a noticeable, clearly
3    visible difference. That's how I would
4    describe it.
5    Q. Do you think other industrial designers would
6    view the difference between the square weave
7    pattern of the model 1805 and that which is
8    shown in the 321 patent, Exhibit #83, are a
9    major difference?
10   A. I can't speak to what other industrial
11   designers would say. I can tell you what my
12   opinion is as an industrial designer.
13   Q. What about a person of ordinary skill in the
14   art. Would that person think that the
15   difference between the square weave pattern
16   of the model 1805 Bay Isle product shown in
17   Exhibit #3 is a major difference as compared
18   to that which is shown in the design patent
19   of Exhibit #83?
20   A. I think they would notice it as a difference.
21   In other words, I think they would notice
22   that one was diamond or plain, the other
23   was -- had a square weave on it. I think
24   they would notice that.
25   Q. Do you believe that they would agree with the

---

BRET SMITH
JUNE 13, 2008

Page 58

1    statement that it's a major difference?
2    A.  I think they would see it as a difference,
3        not -- they would see it as a difference.
4        And the analogy would be kind of as I
5        discussed earlier, you know, sofa, finished
6        fabric, you know; you notice those things
7        when you make a purchase.
8    Q.  Isn't it true that at least some industrial
9        designers, in viewing the square weave
10       pattern of the 1805 and comparing that to
11       what's shown in the 321 patent, would
12       consider that pattern difference to be a
13       minor difference?
14   A.  I can't speak to what some industrial
15       designers would say.  I can tell you what I
16       would say.
17   Q.  Isn't it true that at least some consumers
18       would view the difference between the square
19       weave pattern of the Bay Isle product and
20       that which is shown in Exhibit #83, the 321
21       patent, as a minor difference?
22   A.  I would say I don't know about the
23       characterization of minor, but some consumers
24       might -- how can I say this.  It's a
25       difference that might have more impact on

Page 59

1    some consumers than another in making a
2    selection.
3    Q.  Well, let's assume for a moment that all --
4        we had a pool of 100 consumers or potential
5        consumers, and they all either noticed the
6        difference or someone pointed it out to them
7        so that all 100 of these consumers are now
8        aware of the difference between the square
9        weave pattern shown in the Bay Isle product
10       of Exhibit #3 and that which is shown in the
11       321 patent of Exhibit #83.  Are you with me
12       so far?
13   A.  Okay.
14   Q.  So we've got a pool of 100 consumers or
15       potential consumers.
16   A.  Right.
17   Q.  And they either were aware of the difference
18       or we have made them aware, so that all 100
19       are actually aware of this difference.
20   A.  Okay.
21   Q.  Do you understand that?
22   A.  Yes.
23   Q.  Isn't it true that at least some of those 100
24       consumers would consider the difference to be
25       a minor difference?

Page 60

1    A.  I think it's possible that some would
2        consider in that light.
3    Q.  Now, if you change the group of persons from
4        retail consumers to be industrial designers,
5        now you had a room full of 100 industrial
6        designers; and they're all aware of this
7        difference, either by having noticed it
8        themselves or someone's pointed it out to
9        them.  Isn't it true that at least some of
10       those industrial designers would consider the
11       difference between the square weave pattern
12       of the 1805 and that which is shown in the
13       design patent to be a minor difference?
14   A.  If you're talking about the -- if you're
15       talking about the industrial designers -- and
16       again, I can only speak for myself and from
17       my experience with other designers, most
18       designers are pretty pattern-conscious, so
19       they would certainly notice it.  And I would
20       think that they would consider it in general
21       to be a noticeable detail for the most part.
22       I can't -- since this is a hypothetical
23       group, I can't testify as to, you know,
24       whether some of these hypothetical industrial
25       designers might have another opinion.  But as

Page 61

1    I said, industrial designers as a whole are
2    pretty pattern-conscious.
3    Q.  Well, understanding that industrial designers
4        may be pattern-conscious, isn't it still true
5        that at least some of them would consider the
6        difference to be minor?
7    A.  Again, it's a hypothetical.  There's a --
8        surface detail is one of the details that --
9        that makes a difference in how an object
10       appears.  And so, industrial designers in
11       general would consider this to be a
12       difference.
13   Q.  Is it your testimony that none of the 100
14       would consider it minor?
15   A.  They're all hypothetical.  So I can't answer
16       that.
17   Q.  Well, you've been proffered as an expert, so
18       we're asking for your --
19   A.  I have told you --
20   Q.  We're asking for your opinion in that
21       situation whether any of those -- any of
22       those designers would consider the difference
23       to be minor.
24   A.  I don't think any design practitioner would
25       say that the choice of weave made no

BRET SMITH
JUNE 13, 2008

Page 62

1  difference, if that's what you mean by minor.
2  Industrial designers are trained to pay
3  attention to surface detail that impacts how
4  a product is perceived in it's sort of
5  totality, if you will. If I have a number 3
6  mold texture versus a number 0 mold texture,
7  that makes a significant difference in how a
8  part appears when it's done. And so
9  industrial designers would see that as
10  conscious choice and not an unimportant one,
11  because it affects how the object appears.
12  Q. My question is not whether it made no
13  difference. My question was simply whether
14  any of those designers would find it to be a
15  minor difference.
16  A. As I've said before, the word minor tends to
17  trivialize this. And I don't think any
18  designer would see it as a trivial choice.
19  Q. Do you equate minor, the word minor with the
20  word trivial?
21  A. I think it frequently is used that way, an
22  unimportant difference. And I don't think
23  that designers would -- that industrial
24  designers in general would see the choice of
25  a pattern which affects the appearance to be

Page 63

1  an unimportant difference. We're all about
2  making careful choices about things like
3  that.
4  Q. Well, what does the word "minor" mean to you?
5  A. Minor, in the sense that you're using it, I
6  would take to mean a choice that is not
7  important to the overall appearance.
8  Q. Have I defined it that way to you today?
9  A. No. In the context of the questions, that's
10  how I understood you to mean.
11  Q. Anything else you would like to add about
12  your understanding of the word minor today?
13  A. No.
14  Q. What do you understand the word major to mean
15  as it's been used today?
16  A. A -- in the context of the discussion, I
17  would say that -- I mean, I understood it to
18  be in the sense of a difference that would
19  completely separate one idea from another.
20  To return to the 321 patent, if the patent
21  examiner had considered it a major difference
22  then, to -- then both of the embodiments,
23  that couldn't have been covered by the same
24  patent.
25  Q. Let's move to a different topic now. Let's

Page 64

1  talk about the casual observer or ordinary
2  observer.
3  A. Okay.
4  Q. What's your understanding of who is the
5  appropriate or ordinary observer under
6  Gorham?
7  A. It's someone, an ordinary observer exercising
8  such care as one might exercise in the
9  purchase of whatever the product is, if they
10  would be deceived into purchasing one
11  supposing it to be the other.
12  Q. Now, in the context of a consumer product
13  like these wicker crates or wicker litter pan
14  covers, who is the purchaser that we should
15  be concerned with?
16  A. I think I mentioned this in the -- in the
17  last -- during the first part of the
18  deposition, that I think the average
19  purchaser of, you know, pet cages and the
20  like certainly would observe differences. I
21  think this particular group is probably the
22  next tier up because the products are of
23  higher price point, in that this group is
24  going to pay more attention to things like
25  their interior decor and matching things. So

Page 65

1  they are probably going to be a little more
2  detail-conscious than the ordinary observer.
3  But I think the ordinary observer would
4  notice a difference -- I think that the
5  ordinary purchaser, rather, of pet products
6  would notice differences as well.
7  Q. Well, let's try to narrow that down a little
8  bit. Do you believe that the appropriate
9  ordinary observer in this context is a retail
10  consumer?
11  A. Yes.
12      MR. HINSHAW: I'm sorry. Are we
13      talking about the litter pan
14      covers?
15      MR. GARDNER: Well, in either instance.
16  Q. Either the litter pan cover or the wicker
17  crates. Do you believe that the appropriate
18  ordinary observer is a retail consumer or
19  retail purchaser?
20  A. Yes.
21  Q. Do you believe that the buyer had a
22  distributor who orders the product from, say,
23  Mid-West to inventory it and then sell it to
24  pet stores is an inappropriate person to
25  select as an ordinary observer?

Page 66

1   A. I think that the ultimate purchaser will
2      exercise more control over it. So I would
3      still pick the ordinary -- you know, I would
4      pick the -- end purchaser over the
5      distributor.
6   Q. So the buyer -- the professional buyer at the
7      distributor is not the right person to use as
8      the --
9   A. I would not think so in this instance.
10  Q. What about a professional buyer at a pet
11     store or a chain of pet stores that buys from
12     a manufacturer or from a distributor to
13     inventory it at their pet stores so that
14     retail consumers could come buy it?
15  A. I would still think that the retail consumer
16     is the -- the ordinary observer.
17  Q. Am I correct that neither one of your reports
18     either regarding the 321 patent or the 156
19     patent actually defines who would be the
20     appropriate ordinary observer?
21  A. It defines it only by inference but, no, I
22     don't call out that it's the end purchaser in
23     those specific words.
24  Q. Now, in our previous examination of you --
25  A. Yes.

Page 67

1   Q. -- Mr. Smith, I believe we discussed that
2      that retail consumer can buy the Mid-West
3      wicker products, both the litter pan cover
4      and the wicker crates through a number of
5      sources. And those sources would include
6      small pet stores, big box pet store chains,
7      catalogs and online retailers. Do you agree
8      that a retail consumer can and does buy
9      Mid-West wicker products from those four
10     sources?
11  A. That's my understanding.
12  Q. Are you aware of any other sources that the
13     retail consumer might buy the Mid-West wicker
14     products from?
15  A. None that I can think of.
16  Q. Would you agree with me that as between those
17     four different channels of distribution, the
18     retail consumer does or might get different
19     amounts or levels of detail regarding the
20     Bay Isle wicker products in those different
21     scenarios?
22     MR. HINSHAW: Could I have that
23        question repeated, please.
24        (The court reporter read the
25        pending question.)

Page 68

1      MR. GARDNER: Let me rephrase that
2         because the way she read it back,
3         if I said it that way, then there
4         was an error in it.
5   Q. Would you agree that in those four different
6      channels of distribution, the amount of
7      detail conveyed to the consumer regarding the
8      appearance of the Bay Isle product is not
9      always the same?
10     MR. HINSHAW: Objection. Foundation.
11  A. I would say that the amount of detail that
12     you can get for any product within those
13     individual environments can vary.
14  Q. So I'm correct, then, in my statement that
15     there is or can be a variance.
16  A. There can be.
17  Q. Now, let's examine a couple of examples.
18  A. Okay.
19  Q. Am I correct that in some stores, the
20     Bay Isle product, whether it be the litter
21     pan cover or the wicker crate, is sometimes
22     set up as a display item to help promote the
23     sale of the product?
24  A. I can't testify to that one way or the other
25     because I haven't made a -- a survey of store

Page 69

1      displays. That was not part of the
2      examination that I undertook.
3   Q. Has anyone explained to you that that has or
4      sometimes does occur?
5   A. No. No one has explained that to me.
6   Q. Well, you would agree that in retailing, it
7      sometimes does occur that manufacturers
8      display their items in a retail store by
9      erecting the product or taking it out of the
10     box and putting it on or near a shelf so that
11     a consumer can see it?
12  A. In general in retail environments that --
13     that is a practice.
14  Q. So it wouldn't surprise you to learn that
15     that may have happened in connection with the
16     sale of Mid-West products in this suit?
17  A. No.
18  Q. Now, do you have an understanding that when
19     the Mid-West product is sold, it comes in a
20     box?
21  A. That's my understanding.
22  Q. And that the box has some information on the
23     outside of it depicting the product?
24  A. Yes.
25  Q. For example, if you would, look at Exhibit #3

BRET SMITH
JUNE 13, 2008

Page 70

1    which is what you've got in your hand.
2    A. Is that -- okay.
3    Q. And if you refer to the first page of
4       Exhibit #3, you'll see a depiction of both
5       the product and part of the box for the
6       product. Do you see that?
7    A. Yes, I do.
8    Q. So if the consumer were walking down the
9       aisle in a store, they might see the box with
10      as much detail as can be gleaned from the
11      image on the box, correct?
12   A. Yes.
13   Q. And if the product were also erected or set
14      up in the store, it might gather additional
15      detail information from -- from the product
16      itself, correct?
17   A. They might.
18   Q. Now, if the product were sold also through an
19      online retailer, do you expect that the
20      amount of detail that the consumer could
21      glean from a website would be the same, more
22      or less, from what a consumer might glean at
23      a store?
24         MR. HINSHAW: Objection. Foundation.
25   A. It could be any of those. Some websites are

Page 71

1    highly detailed in the information they
2    provide. Others are less so. It's -- it's
3    a -- there aren't any standards, per se.
4    Q. Mr. Smith, we're passing you what's been
5       marked as Exhibits #237, #238, #239, #240,
6       and #241, which I'll represent to you are
7       some websites that we randomly pulled and
8       printed out that depict the Mid-West wicker
9       products.
10   A. Okay.
11         MR. HINSHAW: And just so I'm clear,
12            these are printouts of websites,
13            correct?
14         MR. GARDNER: Printouts from website
15            pages, yeah. So you go to the
16            bottom of the page, you should be
17            able to reproduce the same image
18            by going to that site.
19         MR. HINSHAW: Well, we've all seen the
20            experience where you go into a
21            website, you see something on a
22            website and you say print it and
23            it says okay, let's make you a
24            printable version, which it prints
25            off.

Page 72

1         MR. GARDNER: This is not a printable
2            version. This is our printer's
3            attempt to print exactly what was
4            on the screen. And to that
5            extent, there's a little cutoff of
6            information on the right-hand side
7            of some of these exhibits where
8            the print spooler imperfectly
9            captures everything that is on the
10           screen.
11        MR. HINSHAW: I appreciate your
12           representation of what it is. But
13           we would defer to the actual
14           website and what's shown there.
15           But I understand these are all
16           paper printouts as best you could
17           make them. Is there a question
18           pending?
19        MR. GARDNER: I was letting the witness
20           review the documents, in which he
21           seems engrossed.
22   Q. First of all, have you yourself ever gone
23      online and looked at any source of either the
24      Mid-West product or the Simpson Ventures
25      product?

Page 73

1    A. I purchased two Simpson Ventures products.
2       One was the -- dog crate or pet -- pet
3       crate, and the other was the litter box
4       cover. And I did those online. And I -- I
5       believe at the very beginning, or when I
6       first received a call from Mr. Hinshaw, that
7       I went online for a few minutes and just
8       looked at, you know, the Bay Isle.
9    Q. When you looked at the Bay Isle line of
10      products online after being initially
11      contacted by Mr. Hinshaw, did you see images
12      and websites that looked somewhat similar to
13      what we put before you as Exhibits #237
14      through #241?
15   A. As I recall.
16        MR. HINSHAW: Could I have that
17           question read back, please?
18           (The court reporter read
19           previous question.)
20   A. I -- I think that --
21        MR. HINSHAW: You already answered.
22   Q. When you looked at the images online some
23      time ago yourself, did you see images that
24      were similar in size and appearance to those
25      which are in front of you now, in Exhibits

BRET SMITH
JUNE 13, 2008

Page 74

1    #237 through #241?
2    A. I think the site that I went to had clickable
3      enlargements, as I recall.
4    Q. So you would agree that some sites have
5      clickable enlargements and some might not,
6      correct?
7    A. In general. I don't know about these in
8      particular or about relative to these dog
9      crates.
10   Q. Well, if the images shown in Exhibits #237
11     through #241 are representative of what -- of
12     what consumers might see if they went online,
13     how much detail can be gleaned from these
14     images?
15   A. In all of the images you can see the etched
16     detail clearly. You can see the door detail
17     clearly. Windows, you can -- in all of these
18     images you can see the back window, the
19     Bay Isle. You can see the frame, and you can
20     see the weave.
21   Q. Can you see the square weave clearly in every
22     image?
23   A. Yes.
24   Q. Would you agree that it's hard to see in some
25     locations on some of the panels on these

Page 75

1      online sources?
2    A. In these printouts, it's -- I can see them in
3      every location.
4    Q. Would you agree with me that given the size
5      of the images overall and the relatively
6      small size of the square weave pattern as a
7      portion of those images that at least some
8      consumers might not notice the square weave
9      pattern that you're referring to?
10   A. I think -- I think they would all notice that
11     there's a -- that there are blocks where the
12     color is different and I think -- it's a
13     little hard to tell from these printouts what
14     the screen image itself would look like. But
15     all of them show a difference in -- I mean,
16     all of them show the squares, I guess I would
17     say.
18   Q. Well --
19   A. Is it -- go ahead.
20   Q. I'm sorry.
21   A. No. Go ahead.
22   Q. Do you have anything else?
23   A. No.
24       MR. GARDNER: Off the record.
25       (Off-the-record discussion)

Page 76

1    Q. Well, maybe I've been going about this the
2      hard way. I'm trying to figure out whether
3      you would agree that the size of the image
4      that the consumer is subjected to when making
5      the purchasing decision might have some
6      impact on the amount of detail that they can
7      glean about the product.
8    A. In this case specifically or in general?
9    Q. I'm talking about in this lawsuit
10     specifically, but --
11   A. I think that the features that have
12     identified and when I was just looking at
13     these and saying what you could see are
14     visible in all of the image sizes.
15   Q. I understand that you believe that you can
16     pick them out. But what I'm trying to figure
17     out is whether a consumer, when looking at
18     small images like these of Exhibits #237 to
19     #241 is going to have a harder time noticing
20     some of the fine details of the Mid-West
21     product as compared to seeing the product
22     full scale in a pet store.
23   A. I think that they would clearly notice the
24     edges. I think they would clearly notice
25     the -- that is the notches in the edges. I

Page 77

1      think they would clearly notice the corners,
2      the corner detail. I think they would
3      clearly notice the door and the windows. I
4      think those would be clear across the board.
5      They would see something in the -- in the
6      side panels these are all I think
7      three-quarter views where there's a
8      difference in coloration or texture. And
9      again, how much of that they would see would
10     depend on whether or not there was an
11     enlargement feature on multiple views. That
12     is how much of the -- whether they would see
13     specifically, you know, the number of strands
14     in the square weave. They'll notice the
15     square, the squares in these but -- in the
16     three- quarter views, even in the small views
17     you can see that there are squares that are
18     different color. But you can't -- you can't
19     in every case see that there's a -- what I've
20     called the square weave. That is, they might
21     not see the -- that in -- in some of the
22     smaller images. The site that I went to
23     had -- and many sites have multiple views as
24     well as enlargements, so.
25   Q. Well, maybe you misunderstood. I'm not

Page 78

1  trying to get you to agree that because the
2  images are small the consumer would be
3  prevented from seeing the features that you
4  have just discussed. You understand that?
5  A. Okay.
6  Q. I'm only trying to figure out whether you
7  could agree in principle that it's easier for
8  the consumer to -- to notice those features,
9  to see those features when the product is in
10 front of them full scale, versus looking at
11 small images on a computer screen.
12 A. It's a -- it's kind of an apples and oranges
13 thing, in that people online shop a little
14 differently usually. Typically for example,
15 if they go to one site and they don't have a
16 good visual, they'll use Google or some other
17 search engine to see if they can get better
18 visuals. Is it a little bit different
19 experience, if that's what you're asking,
20 yes, it is.
21 Q. I'm not asking if it's a different
22 experience.
23 A. Okay.
24 Q. I'm trying to figure out if a person goes to
25 a website like that on Exhibit #237 and those

Page 79

1  are the images that they see, wouldn't you
2  agree that -- that they would have an easier
3  time picking out the details of the product
4  from seeing it in person than from seeing
5  such a small image on the screen?
6  A. I think the details that I mentioned would be
7  clearly visible either way. In person or
8  on -- on the computer screen.
9  Q. I'm not trying to get you to admit that the
10 details are not visible on the computer
11 screen. That's not -- that's not my
12 question.
13 A. Okay.
14 Q. It's a simple issue of isn't it true that if
15 a consumer had the product in front of them
16 in a store, versus looking at a small image
17 on a computer screen that they would have an
18 easier time picking out all of the small
19 details of the product by looking at the
20 product in full size right in front of them,
21 versus looking at an image on a computer
22 screen?
23 A. In general I would say that would be true.
24 Q. And is the same also true for catalog sales
25 as compared to viewing the product in the

Page 80

1  store?
2  A. Depending on the catalog layout and the
3  detail. But in general it would probably
4  also be true.
5  Q. Well, am I correct that typically catalog
6  entries for a product such as this would be
7  fairly small and have a fairly small picture
8  of the product?
9    MR. HINSHAW: Objection. Foundation.
10 A. I haven't done a survey of, you know, all of
11 the pet supply catalogs. They certainly
12 would not be full size.
13 Q. Well, you get catalogs at your house?
14 A. Yes.
15 Q. And in the typical home products catalog that
16 you might get, isn't it true that the images
17 of the products are typically fairly small?
18 A. There are multiple images on a page. I think
19 we may be talking about semantics at this
20 point. But I think most catalogs that are
21 well done give you -- I mean, the whole
22 purpose is to give you sufficient detail to
23 make an intelligent purchase to attract you
24 to purchasing a particular product. So they
25 have a vested interest in trying to convey

Page 81

1  detail.
2  Q. You indicated that typical catalog normally
3  has multiple items on a page, right?
4  A. Typically.
5  Q. So --
6  A. Most of the ones I get.
7  Q. So it follows from that that the image would
8  be a fraction of a page typically, not a
9  whole page, right?
10 A. Would be a percentage of a page, yes.
11 Q. And that fraction of a page is typically
12 going to be substantially smaller than the
13 product would appear in person in a store,
14 correct?
15 A. It will typically be smaller than -- yes, it
16 will be smaller than the product appears
17 in -- in the store.
18 Q. So given that in the catalog, the typical
19 image of a product like the Mid-West Bay Isle
20 wicker cover or the Bay Isle wicker dog crate
21 would be much smaller in the catalog than the
22 actual product might be set up in a store,
23 can you agree with me that the average
24 consumer might have an easier time picking
25 out all of the details of the product in the

BRET SMITH
JUNE 13, 2008

Page 82

```
 1       store compared to catalogs?
 2    A.  Catalog, a good catalog, the products are
 3       photographed very carefully to show detail.
 4       In general -- I mean -- what I'm saying is
 5       that there usually is, if it's a well done
 6       catalog there usually is a fair amount of
 7       detail.  But yes, going and seeing the thing
 8       full size, you might notice other things.
 9    Q.  So you would agree with me that it's easier
10       to observe all of the details of the Mid-West
11       Bay Isle products, both the litter pan cover
12       and the wicker pet crate, by viewing the
13       product in person as compared to seeing a
14       small image of it in a catalog, right?
15    A.  In general.
16       MR. GARDNER:  Can I take a couple of
17          minutes?  I need to confer with
18          Mr. Simpson.
19       MR. HINSHAW:  Five.
20          (Brief recess)
21    Q.  Do you believe it less likely that retail
22       consumers could be confused as between the
23       designs of the Simpson Ventures 321 patent
24       and the Mid-West model 1805 litter pan cover
25       in the context of a pet store versus a
```

Page 83

```
 1       catalog?
 2       MR. HINSHAW:  Objection to the form.
 3          I'm confused by your question.
 4    Q.  All right.  Let's look -- we established
 5       earlier that there are at least four channels
 6       of outlet for this product, for the Bay Isle
 7       products.  And right now we're talking about
 8       the Bay Isle litter pan cover, the 1805.
 9       There's small independent pet shops.  There's
10       the big box pet store chains.  There's
11       catalog sales.  And there's online retailers.
12       So there's at least four -- four channels.
13       There may be something else but we've
14       identified four.  What I'm trying to figure
15       out is whether you would agree that it's less
16       likely that a consumer would be confused
17       between the patent design and the Bay Isle
18       1805 in the context of, say, a big box pet
19       store as compared to the other avenues.
20    A.  No.  I would not agree with that as a blanket
21       statement.
22    Q.  Do you agree that -- or do you believe that
23       all four channels have an equal chance or
24       likelihood of exhibiting some consumer
25       confusion as between those two designs?
```

Page 84

```
 1       MR. HINSHAW:  I'm going to object to
 2          the question because I think it's
 3          misleading in that it assumes he
 4          thinks there's a likelihood of the
 5          consumer having any confusion.
 6          And I don't believe that's his
 7          opinion or has been his testimony.
 8       MR. GARDNER:  Well, I'm not trying to
 9          trick him into agreeing that there
10          is a likelihood that people would
11          get confused.  But --
12    Q.  Because I believe your testimony is that
13       people would not be confused, right?
14    A.  Yes.
15    Q.  But do you believe that that likelihood that
16       people would not be confused is equal across
17       all four channels of distribution?
18    A.  The likelihood of not being confused, is that
19       what you said?
20    Q.  Yes.
21    A.  In general, yes.  But that's a -- that's a
22       generalized answer, realizing that how things
23       are displayed in any one of those
24       environments may be different on an
25       individual case-by-case basis.
```

Page 85

```
 1    Q.  Well, let's talk about the four channels as a
 2       lump again.  Do you believe that there is
 3       zero chance that consumers would be confused
 4       as between the patent design in the 321
 5       patent and the Bay Isle model 1805 as shown
 6       in Exhibit #3?
 7    A.  I believe the differences are clear in all of
 8       the distribution channels that you've
 9       mentioned.
10    Q.  Well, do you believe that there is a zero
11       percent chance or nearly zero percent chance
12       that people would be confused in any of those
13       venues?
14    A.  In general, I believe that the differences
15       are clear in all of those environments.
16    Q.  Well, I understand that you believe that the
17       differences are clear and that they're clear
18       in all of the environments.  What I'm trying
19       to figure out is, trying to get you to put
20       some estimation on -- on how many people are
21       going to be confused.  I understand that
22       you -- you certainly believe that a hundred
23       percent of the people are not going to be
24       confused as between the patent design and the
25       model 1805, correct?
```

BRET SMITH
JUNE 13, 2008

Page 86

1   A. Yes.
2   Q. Do you believe that nobody would ever be
3       confused between the patent design of the 321
4       patent and the model 1805?
5   A. Under the ordinary observer test you're
6       talking about?
7   Q. Yeah.
8   A. I think the differences are very clear.
9   Q. So if we had 100 consumers in a room and you
10      surveyed them regarding the patent design and
11      the -- the Bay Isle model 1805, do you
12      believe that 100 percent of them would not
13      have been confused as between those two
14      designs?
15  A. If we're talking about ordinary observers
16      exercising the care that one would exercise,
17      I think the differences would be clear to
18      them.
19  Q. So none of them would ever be confused using
20      the ordinary care that they usually use in
21      buying such products?
22  A. I think the differences are clear. Absolutes
23      are something that I'm always -- you know, it
24      may be possible to find someone somewhere
25      that would be -- that wouldn't be attentive.

Page 87

1       But in general I think the differences are
2       very clear.
3   Q. Do you agree that some people, maybe not many
4       but some people would be confused?
5   A. Not at -- I think if they're exercising a
6       level of care that you would generally
7       associate in a purchase of such a product
8       that they would see the differences from --
9       from -- between the Bay Isle and the Simpson
10      Venture Product.
11  Q. Well, I understand your testimony to be that
12      at least most of those ordinary observers
13      would -- would not be confused. But do you
14      believe that a small percentage would be
15      confused?
16      MR. HINSHAW: Object. I think it
17      mischaracterizes his testimony to
18      say only most would not. I think
19      he's pretty clear on his
20      testimony.
21      MR. GARDNER: Well, what I'm trying to
22      figure out is whether he believes
23      that most would be confused --
24      would not confused, or that all
25      would not be confused. And he

Page 88

1       said that -- that some people
2       might not use all the care they
3       should and would end up confused.
4       MR. HINSHAW: Are you arguing with me
5       about my objection or do you have
6       a question for him? I guess is
7       what I'm trying.
8       MR. GARDNER: I guess you engaged me in
9       an argument on your objection,
10      James. So, which is bad for me.
11      We shouldn't do that.
12  Q. As you sit here today, do you have a belief
13      that under the ordinary observer test, 100
14      percent of the ordinary observers would not
15      be confused as between the patent design and
16      the model 1805?
17  A. Under the ordinary observer test, which it's
18      my understanding says that they are
19      exercising the degree of care that one would
20      normally exercise in the purchase of such a
21      product, I am not saying that there might not
22      be a careless person, somebody who might be
23      inattentive. But I am saying that under the
24      analysis of the ordinary observer exercising
25      care, I think the differences would be very

Page 89

1       clear.
2   Q. So if I understand your testimony, 100
3       percent of the ordinary observers who are
4       using appropriate care would not be confused.
5       And if they're not using an appropriate level
6       of care, they -- then some people might be
7       confused. Is that right?
8   A. I guess the best way I can explain it is kind
9       of an analogy. When electric lawnmowers were
10      introduced and, in fact, up until the safety
11      measures were added, the kill bar and things
12      like that, there were a number of incidents
13      reported to the Consumer Product Safety
14      Commission of people picking up their
15      lawnmowers and using them to try and trim the
16      hedges. I would not characterize that person
17      as necessarily exercising, you know, normal
18      careful judgment. So I'm saying that there
19      are people out there who might be
20      inattentive. But my understanding of Gorham
21      is that we're talking about the person who
22      exercises the degree of care that a person
23      would normally exercise in the purchase of
24      that particular item. And I'm saying
25      that that group would see clear differences

## Page 90

1  between the Bay Isle and the 321 designs.
2  Q.  So -- so if a person is using the appropriate
3      amount of care in making their purchase
4      decision, in your view, they won't be
5      confused under the -- under the --
6  A.  I'm saying the -- I'm sorry.  I'm sorry.
7  Q.  Right.  If the person is using the correct
8      amount of care, the appropriate amount of
9      care in making their purchase decision, they
10     would not be confused between the Bay Isle
11     1805 and the patent design shown in the 321
12     patent, correct?
13 A.  I'm saying that the ordinary observer would
14     not be confused.
15 Q.  But you've tied that to them using the
16     correct amount of care, right?
17 A.  Well, that's the ordinary observer test.
18     That's my understanding.  I'm just wanting to
19     make sure we're talking about the same group
20     of people.
21 Q.  And so if a person -- or if a group of people
22     did not use that level of care, some of that
23     second group might be confused, correct?
24 A.  I would say that possibility exists but
25     that's -- that's -- as much as -- I mean,

## Page 91

1  I -- that possibility exists.
2  Q.  So the answer is yes?
3  A.  It's possible.
4  Q.  So if people are sloppy or careless in their
5      purchasing, they might make a mistake and be
6      confused, correct?
7  A.  I think it's unlikely but it's possible.
8      MR. GARDNER:  I've reached my pumpkin
9      hour.  It's time for a lunch
10     break.
11     (Lunch recess)
12 Q.  Mr. Smith, when the average retail consumer
13     is purchasing the product, the 1805 wicker
14     litter pan cover, are they always looking for
15     a wicker product when they end up making that
16     purchase decision?
17 A.  I don't know that I could answer that.  I
18     haven't -- I don't know that I could answer
19     that.
20 Q.  And your report indicates that they're a
21     little more careful or a little more
22     discriminating and your testimony in the
23     deposition has been to that effect; is that
24     correct?
25 A.  The -- yes, that in general people who are

## Page 92

1  paying the higher price point for an item, I
2  mean, there needs to be a reason for that and
3  generally they tend to be more attentive to
4  the quality issues and to details.
5  Q.  Am I correct that sometimes people have
6      purchased the Bay Isle wicker pet litter
7      cover, the model 1805 after initially
8      shopping for some other product?
9  A.  I don't know.
10 Q.  Do you think it's likely that sometimes
11     people go into a store and they're intending
12     to perhaps buy an inexpensive litter pan
13     cover, maybe a plastic litter pan cover and
14     then see the wicker product and say gee, I
15     think I'll get that and take it home?
16 A.  The -- it's a -- it's a noticeable difference
17     in price.  I would be surprised if that was a
18     regular occurrence.
19 Q.  Well, do you think that all of the sales or
20     most of the sales of a wicker litter pan
21     cover like the model 1805 occur as a result
22     of people going to a store or to a website
23     specifically to find that kind of a product?
24 A.  Again, I -- I don't have data on that one way
25     or the other.

## Page 93

1  Q.  So you don't know?
2  A.  No.
3  Q.  Is it possible that some of the purchases are
4      impulse purchases because people just happen
5      to see the product while they're shopping for
6      something else and like the way it looks and
7      decide to buy it?
8  A.  It's possible.
9  Q.  Now, is the same also true with respect to
10     the wicker pet crate, the Bay Isle wicker pet
11     crates, that some people who end up buying it
12     did not set out to buy a wicker pet crate but
13     they saw the wicker pet crate and liked it
14     and bought that instead?
15 A.  To the degree that anything is possible,
16     sure.
17 Q.  But you don't know whether that happens or
18     not?
19 A.  No, I don't.
20 Q.  And you wouldn't know whether that happens a
21     lot of time or just a little of the time?
22 A.  No, I -- no.
23 Q.  And you wouldn't know whether most of the
24     sales of the Bay Isle wicker pet crate occur
25     as a result of people specifically seeking

BRET SMITH
JUNE 13, 2008

## Page 94

1    out a wicker pet crate, correct?
2    A. I don't -- I don't have any information on
3        that, no.
4    Q. So you don't know that, correct?
5    A. Correct. I'm sorry.
6    Q. If you would look at Exhibit #1. Are you
7        familiar with Exhibit #1, what's shown in
8        Exhibit #1?
9    A. Specifically? I haven't, you know, examined
10       this specific kennel.
11   Q. Are you aware that Mid-West Metal Products
12       makes wire crates like -- like that shown in
13       Exhibit #1?
14   A. I am aware that Mid-West Metal makes wire
15       crates, yes.
16   Q. Are you aware that wire crates similar to
17       that shown in Exhibit #1 are fairly common in
18       the marketplace?
19   A. I found a number of patents for wire crates.
20       So I'm aware there are a number of wire
21       crates.
22   Q. Do you believe that a person who buys a
23       wicker pet crate like the Bay Isle product is
24       more discriminating or more careful in their
25       purchase than a person who buys a wire crate

## Page 95

1    like that shown in Exhibit #1?
2    A. Well, I would think that they would tend to
3        be more careful. I think that the
4        differences that I've outlined are -- would
5        be clear to the person who would purchase
6        this kind of crate. But I -- I do think that
7        because of the added expense, generally
8        people look for a reason why they should pay
9        more. So they tend to pay more attention to
10       the -- going from this price point to the
11       next price point. I would want to know what
12       I'm getting. So I would exam it more
13       carefully in general.
14   Q. Do you believe that the people who buy the
15       simple wire crates of Exhibit #1 are a
16       different group of consumers than the people
17       who buy the wicker crates like the Bay Isle
18       product?
19   A. I -- I think the questions for me is a little
20       too general. A different group of consumers.
21       There -- they would be willing or prepared or
22       able to spend more money because it's more
23       expensive. So, some people who purchased
24       this would probably not be in that group.
25   Q. Would you agree that some people might

## Page 96

1    purchase both?
2    A. That's possible.
3    Q. Do you know whether that has happened or not?
4    A. I do not.
5    Q. Do you know whether the wire crate like that
6        shown in -- strike that. Let me start over.
7        Do you know whether wire crates similar to
8        that shown in Exhibit #1 are sold side by
9        side with wicker crates like the Bay Isle
10       wicker crates?
11   A. Are you talking about like in a big box pet
12       store?
13   Q. Yes, sir.
14   A. No. As I said, I didn't do a survey of pet
15       stores as part of my analysis.
16   Q. Well, did you do any kind of surveys or
17       studies or polls or other analysis of -- that
18       would support your opinion that people
19       wouldn't be confused between the Bay Isle
20       products of Mid-West and the patents owned by
21       Simpson Ventures?
22   A. The -- if you will recall, when I was talking
23       about the features that I felt would be
24       noticeable, I talked about the fact that
25       among other things people pay attention to

## Page 97

1    the edges of products because that's one of
2    the ways that we define things. I've done a
3    lot of -- I have done research on that from
4    the standpoint of how the -- how perception
5    changes for people as they get older. And
6    one of the key issues has to do with
7    environmental discrimination. And one of the
8    issues has to do with visual acuity and the
9    reason that's important is because we pay
10   attention to the edges of things. It's part
11   of how we perceive shapes. So, it's -- those
12   are areas that would be paid attention to.
13   Q. But isn't it true that you did not conduct
14       any survey, poll, or study specific to this
15       case to determine whether consumers would or
16       would not be confused as between the Bay Isle
17       products and the Simpson Ventures patents?
18   A. That is true.
19   Q. Do you believe that you would be more
20       qualified or less qualified than someone who
21       is in the business of buying and selling
22       wicker pet crates to gauge whether consumers
23       are likely to be confused?
24   A. I would say that I would in general have more
25       consumer experience in all likelihood.

BRET SMITH
JUNE 13, 2008

Page 98

1  Q. Well, let's imagine a person who has been in
2     the field of merchandising products like this
3     for a number of years and is responsible for
4     buying the products from suppliers and then
5     putting them in their stores to try to get
6     consumers to buy them?
7  A. Okay.
8  Q. And has been doing that kind of work for,
9     say, ten years?
10 A. Okay.
11 Q. Would you think that you are as qualified as
12    that person to gauge whether consumers are
13    likely to be confused as between a particular
14    product and a patent?
15 A. Yes.
16 Q. You think you would be better qualified to
17    gauge confusion?
18 A. Yes.
19 Q. And why so?
20 A. Because as a product designer my focus is on
21    the product. That's not necessarily the
22    focus of the buyer.
23 Q. What is the focus of the buyer if it's not on
24    the product?
25 A. It depends upon the merchandising structure

Page 99

1     and that varies within -- both within market
2     segments but also within particular retail
3     environments. So there isn't a way to give
4     you a blanket answer to that question.
5  Q. Are you aware of whether there's been any
6     testimony in this litigation by any buyers
7     like that?
8  A. No.
9  Q. Has anybody mentioned to you whether there
10    might have been such testimony?
11 A. No.
12 Q. I'll pass you what's been marked as
13    Exhibit #242, and ask you to take a few
14    minutes and read these deposition excerpts.
15    MR. HINSHAW: You want him to read the
16       entire exhibit?
17    MR. GARDNER: Yes, I do. Off the
18       record.
19       (Off-the-record discussion)
20       (Brief pause)
21 A. Okay.
22 Q. Mr. Smith, you've taken a few minutes and
23    you've read the deposition transcript
24    excerpts contained in Exhibit #242, correct?
25 A. Yes.

Page 100

1  Q. I'll represent to you that Mr. Mantle
2     testified that -- in his deposition he is a
3     buyer for Pet Smart in Phoenix, Arizona. And
4     specifically he's the buyer who is
5     responsible or was responsible for purchasing
6     the model 1805 litter pan cover from
7     Mid-West.
8  A. Okay.
9  Q. Does the fact that a buyer from Pet Smart
10    such as Mr. Mantle considers that the average
11    consumer might be confused as between the
12    design of the 321 patent and the model 1805
13    give you any pause or concern about your
14    opinions?
15 A. No.
16 Q. Does -- is this the sort of information that
17    you as an expert should take into account in
18    formulating your opinions?
19 A. I think that an expert should look at and
20    make judgments about all of the evidence.
21    That's part of the process of being an
22    expert.
23 Q. Well, let's assume for a minute that there
24    were 100 buyers in this industry. And that
25    if you -- if there was a survey conducted,

Page 101

1     all 100 buyers would say that retail
2     consumers are going to be confused between
3     the patent design and the accused product.
4     Would that sort of information be something
5     that an expert should consider in formulating
6     his or her opinion regarding the likelihood
7     of infringement?
8     MR. HINSHAW: Improper hypothetical.
9        Lack of foundation.
10 A. You're saying if you surveyed 100 buyers and
11    if all 100 said that there could be some
12    confusion.
13 Q. Would be some confusion, actually.
14 A. The first thing I would want to know is what
15    their basis was and what their experience was
16    with actual consumers.
17 Q. Well, the buyers are not reporting instances
18    of actual confusion. Only that they -- they
19    would believe that if the product goes to
20    market there's a probability that consumers
21    would be confused as between the patent
22    design and the proposed design?
23 A. Right. And I would ask are the buyers
24    trained in evaluating consumers and users of
25    products and do they have a background in

## Page 102

1    that. That's what I would ask. Because
2    you're saying they haven't actually surveyed
3    or talked to any consumers. They don't know
4    it, they just suspect it. So I would want to
5    know the basis for their opinion.
6    Q. Do you believe that buyers at companies like
7        Pet Smart would have some understanding of
8        consumer preferences based on their
9        experience in selling products in their
10       stores?
11   A. My understanding from your -- from the
12      initial conversation was that their
13      experience was in buying products from the
14      stores.
15   Q. Do you understand that a buyer for a product
16       like these wicker crates typically is
17       responsible for -- for buying the item for
18       the purpose of carrying it in the store?
19   A. Yes.
20   Q. And they make decisions about whether to
21       carry a product based on their expectation
22       about how consumers are going to react to it?
23   A. I don't know what the structure is in -- for
24      example, I don't know -- in -- in Petco or
25      other stores what the buyer structure is and

## Page 103

1    what their priorities are. I do know that in
2    many industries the priorities of the buyer
3    are not necessarily what the consumer will
4    purchase. They may have to do with buy so
5    many of these from us and we'll discount so
6    many of those. So there are a lot of issues
7    that can enter into a buyer's decision to
8    acquire particular merchandise lines for the
9    retailer.
10   Q. So is it your testimony that the opinion of
11       someone like Mr. Mantle as a buyer can be
12       discounted because you don't know what his
13       other job responsibilities are?
14   A. It's my opinion that part of assessing it
15      would be to get answers to those questions
16      and to experience and to the structure of the
17      particular store chain that he's a buyer for.
18   Q. Do you --
19   A. That would all be a part of it.
20   Q. Do you intend now to ask Mid-West Metal
21       Products or their attorneys for more
22       information about Mr. Mantle to determine
23       whether you should consider his opinions in
24       reassessing your own?
25   A. Could you repeat the question?

## Page 104

1    Q. Do you intend to request additional
2        information from Mid-West Metal Products or
3        their attorneys to allow you to assess
4        whether you should pay any credence to
5        Mr. Mantle's opinions in reassessing your own
6        opinions?
7    A. I would have some follow-up questions
8       probably.
9    Q. If it turns out that Mr. Mantle has
10       substantial experience in marketing and
11       merchandising consumer products to consumers,
12       would -- would you give more credence to his
13       opinions that are contained in Exhibit #242?
14   A. Again, that depends. It depends on the kind
15      of experience and how closely it was
16      connected with actual consumer preferences
17      and an understanding of what's involved in
18      assessing that.
19   Q. So potentially yes?
20   A. Again, as I've said before, I guess you could
21      say anything's possible. I would want more
22      information. I really can't answer that in
23      the abstract.
24   Q. Now, if there was another buyer at Petco who
25       gave similar testimony with respect to the

## Page 105

1    Bay Isle wicker crates, would that have any
2    bearing on your opinions?
3    A. Again, I'd want more information.
4    Q. Has anyone told you that a Ms. Laurie Taylor
5        from Petco gave similar testimony that buyers
6        of the -- retail buyers of the Bay Isle
7        wicker crates might very well confuse that
8        product with the patented product in the 156
9        patent?
10       MR. HINSHAW: I'm going to object to
11       the question to the extent it
12       improperly characterizes
13       Ms. Taylor's testimony. It's
14       otherwise an improper hypothetical
15       and lacks foundation.
16   A. I'm not aware of having heard of or I can't
17      recall hearing of or reading testimony from
18      her.
19   Q. As you sit here today, do you intend to
20       obtain more information about Mr. Mantle's
21       testimony or Ms. Taylor's testimony to
22       re-evaluate your opinions?
23   A. I would certainly ask some follow-up
24      questions. I don't know at this point that
25      that would -- I don't know whether or not it

Page 106

1   would effect -- I mean, I -- I don't know
2   that that would make any changes in the
3   reports but I would certainly ask some
4   follow-up questions.
5   Q. As you sit here today, do you believe that
6   Mr. Mantle's opinions, that there would
7   likely be some confusion as between the
8   Bay Isle 1805 and the 321 patented design are
9   incorrect?
10       MR. HINSHAW: Objection. Form and
11           foundation.
12   A. Could you repeat the question?
13   Q. Well, you read the excerpt from Mr. Mantle's
14   deposition, correct?
15   A. Yes.
16   Q. And you agree there are some opinions
17   expressed in there by Mr. Mantle regarding
18   some possible confusion by retail consumers,
19   right?
20   A. Yes.
21   Q. Do you disagree with the opinions or
22   conclusions that he stated in his deposition?
23   A. In -- I -- I didn't see -- I would want to
24   know more. I did not see a reason or a
25   rationale for his opinions that would be tied

Page 107

1   to direct experience with consumers. So I
2   don't know the -- I mean, I would need to
3   know more.
4   Q. Any other reason why you disagree with his
5   opinions or conclusions?
6   A. What I said was I would simply need to know
7   more.
8   Q. Well, can you think of any reasons besides
9   the lack of a statement of experience with --
10   with consumers that would inform us of why
11   you disagree with the opinions or conclusions
12   of Mr. Mantle?
13   A. Nothing that comes to mind at present.
14   Q. So would be I be correct that if Mr. Mantle
15   has the appropriate experience, both in terms
16   of depth and nature with consumers, it's
17   possible that his conclusions and opinions
18   would be correct, right?
19   A. I don't know. He did not express that his
20   opinions were based on any actual experience.
21   In other words, it was all a hypothetical.
22   Q. I understand that it was -- he was not
23   expressing opinions about actual confusion
24   that he measured in the marketplace, only the
25   likelihood of confusion. We agree on that?

Page 108

1   A. That was my impression.
2   Q. So with that understanding, assuming that
3   Mr. Mantle has the appropriate experience in
4   dealing with consumers and consumer
5   marketing, his opinions and conclusions might
6   be correct, right?
7   A. They would certainly be -- if all of those
8   things were true, they would certainly be a
9   part of considering that question.
10   Q. So his opinions might be correct, right?
11   A. They would be -- they would be opinions to be
12   considered in part of answering that
13   question. That's part of answering that
14   question.
15   Q. Well, separate from whether you would agree
16   with them or whether you should consider his
17   opinions, isn't it true that if Mr. Mantle
18   has the appropriate experience in dealing
19   with consumers and marketing to consumers,
20   his opinions might be valid, correct?
21   A. Again, I would say as a designer, I would
22   look at that. And if his experience was
23   there and if it was demonstrated, than that
24   would be one of the factors that I would
25   consider in arriving at my opinion.

Page 109

1   Q. Well --
2   A. It would not be an exclusive necessarily.
3   Q. I understand that you as a proffered expert
4   have your opinion, but what I'm trying to
5   glean from you is whether you think that
6   there would be anything inherently wrong or
7   fundamentally flawed with Mr. Mantle's
8   opinions presuming that he has, or assuming
9   that he has the right kind of experience in
10   marketing to consumers?
11   A. And I -- as a -- as a designer I would have
12   to look at that specifically to answer your
13   question. I -- I can't answer that as a
14   hypothetical.
15   Q. Well, so you don't know?
16   A. As a hypothetical, I -- I don't -- it -- it
17   has to be answered in terms of looking at
18   specifics. It would be irresponsible to
19   answer it as a hypothetical.
20   Q. Well, he stated some opinions and
21   conclusions. That's not hypothetical.
22   A. No.
23   Q. The only issue is whether in your mind he has
24   the right kind of experience and background
25   for those opinions to be valid; is that

BRET SMITH
JUNE 13, 2008

## Page 110

1  right?
2  MR. HINSHAW:  That mischaracterizes his
3  testimony.  It's just not his
4  experience but the actual
5  experiences of the consumers.
6  He's testified to that repeatedly.
7  Q.  Is it your testimony that Mr. Mantle's
8  opinions and conclusions are valid or can be
9  valid in light of his own experience or does
10  it require that there have been actual
11  confusion by consumers?
12  A.  I need to know the basis for his conclusions.
13  That would include his background.  That
14  would include consumer experiences.  It's --
15  I don't know any other way to answer your
16  question.
17  Q.  So again I'll come back.  If he has the right
18  background, and the right experience dealing
19  with consumers and consumer issues, his
20  opinions could be valid and correct, right?
21  A.  That's a complete hypothetical.
22  Q.  Isn't that correct?
23  A.  I need -- I need to -- I -- I cannot as a
24  blanket sort of thing just sign off on a
25  hypothetical of someone else who may or may

## Page 111

1  not have experience, et cetera, et cetera.  I
2  need to know more.  That's part of doing a
3  thorough job in assessing things.
4  Q.  Well, I understand that you have your
5  opinion.  Mr. Mantle's expressed different
6  opinions that obviously differ from yours.
7  Can we agree about that?
8  A.  He's expressed -- my understanding was he
9  expressed an opinion that there might be
10  confusion.
11  Q.  Do you agree that there might be confusion?
12  MR. HINSHAW:  Objection.  Asked and
13  answered.
14  A.  From --
15  Q.  Do you agree -- do you agree with the
16  opinions and conclusions that Mr. Mantle
17  stated in this deposition excerpt?
18  A.  Are we back to the ordinary observer?  Are
19  you asking about the ordinary observer?
20  Q.  Sure.
21  A.  I think that the ordinary observer will see
22  clear differences between the 321 and the
23  Mid-West design.
24  Q.  So in your view there would be no confusion,
25  and when Mr. Mantle testified that some

## Page 112

1  consumers would be confused, he's incorrect,
2  right?
3  A.  With the evidence that I have at this point,
4  yes.
5  Q.  And so if Ms. Taylor testified similarly that
6  some consumers of the Bay Isle wicker pet
7  crate might confuse that with the patent
8  design in the 156 patent, she would be
9  incorrect also?
10  MR. HINSHAW:  Objection to
11  characterization of Ms. Taylor's
12  testimony.  Lack of foundation.
13  Improper hypothetical.
14  A.  Again, I've already -- I've already said in
15  both cases, I would want to know more about
16  their backgrounds and their experience.  I
17  have no way to evaluate what they're saying
18  based on what you've described or what I've
19  just read.
20  Q.  As a proffered expert, what use should you
21  make of any evidence that there might be of
22  actual consumer confusion in this design
23  patent infringement pattern?
24  A.  You -- as -- as an expert I would investigate
25  it, find out more about it.

## Page 113

1  Q.  Are you aware of whether there has been any
2  evidence of that?
3  A.  I am not aware at this point in time.  I
4  can't recall.
5  Q.  Has anyone at Mid-West Metal Products or any
6  of their attorneys told you that Simpson
7  Ventures claims to have experienced some
8  actual confusion by consumers?
9  A.  I believe that something to that effect might
10  have been in one of the documents that were
11  exchanged.
12  Q.  Do you mean that it may have been in an
13  interrogatory response?
14  A.  Yes.
15  MR. GARDNER:  Off the record.
16  (Off-the-record discussion)
17  Q.  Has anyone at Mid-West Metal Products or any
18  of their attorneys shared with you any
19  testimony regarding any actual confusion that
20  Simpson Ventures claims has occurred?
21  A.  Not that I can recall.
22  Q.  Is that the sort of information that you as a
23  proffered expert would consider important in
24  rendering your decisions, your opinions?
25  A.  It would certainly -- I mean, it would -- I

Page 114

1    would certainly look at it.
2    Q. Has anyone shared with you any documents that
3       would reflect any instances of consumer
4       confusion?
5    A. Not that I can recall.
6       MR. GARDNER: Let's go off the record.
7       (Brief recess)
8    Q. If I understand your testimony from a moment
9       ago, you have not been provided with any
10      deposition testimony transcript relating to
11      Simpson Ventures' allegations of actual
12      confusion by consumers, correct?
13   A. Correct.
14   Q. And you have not been provided with documents
15      relating to such, correct?
16   A. Correct.
17   Q. If you would, turn to Exhibits #197 and #198
18      in the book.
19   A. I'm sorry. #197 and #198?
20   Q. Yes, sir. You've read now Exhibits #197 and
21      #198. Do you agree that they purport to
22      relate to allegations of actual confusion by
23      consumers?
24   A. I don't know how they relate to allegations.
25      I know that -- that they seem to be reporting

Page 115

1    consumer -- two instances where a consumer
2    was confused.
3    Q. Do they seem to be reporting instances where
4       consumers were trying to get replacement
5       parts for a Mid-West product and contacted
6       Simpson Ventures?
7    A. Yes.
8    Q. Is that the sort of information that you as a
9       proffered expert should look at in
10      determining whether there's infringement in
11      these design infringement matters?
12   A. It's -- it's something that should --
13      examining considering it's part of looking at
14      ordinary observer, yes.
15   Q. Do you have any reason to believe that the
16      information contained in those two documents
17      of Exhibit #197 and #198 is incorrect?
18   A. That the people writing didn't, in fact, make
19      that confusion, is that what you're saying?
20      Do I have any reason to believe that these
21      aren't genuine?
22   Q. Correct.
23   A. No. Not -- not to my knowledge.
24   Q. If these are instances of genuine confusion
25      by consumers, what impact should that have or

Page 116

1    would have on your opinions?
2    A. I would need more information. I would need
3       to know how many have been sold, how many
4       times has this issue occurred. There's a lot
5       more information to ask about it or to -- I
6       mean, there are questions that need to be
7       answered before I can properly assess the
8       weight of two pieces of correspondence.
9    Q. But do you agree that the evidence actual
10      confusion should be considered by you as a
11      proffered expert?
12   A. Considered, yes. As I said earlier, you have
13      to -- you have to look at a whole picture
14      because there are people who try and trim
15      their hedges with lawnmowers, you know. So,
16      yeah, there's more information I would need
17      in order to -- to assign the proper value to
18      it.
19   Q. What additional information do you need?
20   A. I would need to know -- as I said before, I'd
21      need to know total units sold, how many
22      people have -- have written or -- or
23      contacted the company with similar issues.
24      In the case of these two people in
25      particular, I''d want to know maybe a little

Page 117

1    bit more about -- I mean, these are
2    individual cases. So I don't know if -- if -
3    - I don't know whether these people are less
4    than average care in purchasing kinds of
5    people or whether they would fall under the
6    Gorham ordinary observer. So I would need
7    more information.
8    Q. If it turns out that these two instances of
9       consumer confusion are the sort that you
10      should consider after further investigation,
11      but you only have two instances, what impact
12      would that have on your opinion regarding the
13      156 patent?
14   A. Regarding the 156 patent? Again, I would
15      think that, you know, how many have been sold
16      is -- is a very relevant part of that
17      question.
18   Q. Do you have an understanding of how many
19      units have been sold?
20   A. I don't.
21   Q. No one's told you how many units have been
22      sold?
23   A. Not that I can recall.
24   Q. It's not been contained in any of the
25      interrogatory responses that you've looked

BRET SMITH
JUNE 13, 2008

Page 118

1    at?
2    A. I don't recall specifically. One of the
3    reasons that you need more information I can
4    give you a very specific example. We just
5    finished a project for Dell, laptop
6    computers. And one of the things that they
7    struggle with is when someone calls in with a
8    computer problem, are they discerning whether
9    or not. You know -- are they calling us with
10   an actual computer problem, are these people
11   who are, you know -- is there a difference,
12   I'll put it that way, between college, what a
13   college student would consider a computer
14   problem and what would a businessman consider
15   a computer problem. There's -- there's more
16   information to be found out when you get
17   feedback like this. And so, as I -- as I
18   designer, I would find out more information.
19   Q. So let's assume that you've completed your
20   investigation into these two instances, and
21   you've determined that these are actual bona
22   fide instances where people who were being
23   careful were confused nonetheless. And that
24   there's only these two instances of confusion
25   out of, say, 50,000 units sold. What

Page 119

1    information -- what use should you as a
2    proffered expert make of that information?
3    A. Well, that's -- based on my experience,
4    that's remarkably -- that would be remarkably
5    low.
6    Q. So in your view, you would -- you would be
7    free to discount it or ignore it?
8    A. Well, by looking into it to begin with I
9    wouldn't be ignoring it.
10   Q. Well, you -- under those circumstances, would
11   you feel secure in not changing your opinion
12   regarding confusion?
13   A. Under circumstances, as I've said before,
14   it's a hypothetical and I -- I don't think
15   that -- you know. And I -- you know, I'm a
16   product designer instead of a astrophysicist
17   because I like putting my hands on the real
18   data and the real stuff. But yeah, under
19   those circumstances I would think that the
20   conclusions that I've drawn about the
21   ordinary observer would stand.
22   Q. Let's change gears for a minute and look at
23   the 156 patent which is Exhibit #84. It's
24   not in that book.
25   A. Okay.

Page 120

1    Q. This book.
2    A. Okay.
3    Q. Do you recall this patent?
4    A. Yes.
5    Q. What -- what prior art reference do you think
6    is the closest visually to what's shown in
7    the 156 patent?
8    A. Are you asking me for primary reference?
9    Q. I'm asking you to tell me which reference you
10   think among all of the references that you've
11   seen in this litigation, which reference
12   looks the most like what's shown in
13   Exhibit #84?
14   A. Um --
15   Q. And you can refer, study through any of your
16   reports that you need to.
17       MR. HINSHAW: Do you want to pull
18       those? Yeah.
19   Q. It's -- and his -- the 321 report in
20   Exhibit #235.
21   A. I've got #235.
22   Q. His 156 report--
23   A. I can --
24   Q. -- is #78. #78.
25       MR. HINSHAW: Go back this way.

Page 121

1    Q. Which is in this book. #78 is in this book?
2        MR. HINSHAW: Grab each of his reports
3        so --
4        MR. GARDNER: There's #78. #235 which
5        he's got in front of him is his
6        321 report.
7        MR. HINSHAW: Are you wanting --
8        these -- this #78 is your
9        August 7th report. #79 is your
10       November '07.
11   A. And it will probably be faster if I can find
12   it in the actual reports relating to the 156.
13   If -- well, primary references, there are --
14   Q. No. Let me stop. I'm sorry. I'm not asking
15   you what you believe is a primary reference
16   that you might combine with some other
17   references to make an obvious determination.
18   I'm asking you what you think is the closest
19   reference visually to what's shown in the 156
20   patent.
21       MR. HINSHAW: In his eyes?
22       MR. GARDNER: In his eyes.
23       MR. HINSHAW: As a professional
24       industrial designer, correct?
25       MR. GARDNER: Yeah.

BRET SMITH
JUNE 13, 2008

Page 122

1    A. I think -- let's see. We look at the second
2       supplemental report on page 3.
3          MR. HINSHAW: Which exhibit?
4          MR. GARDNER: #86.
5    A. Exhibit #80.
6    Q. #80?
7    A. Yeah, I think. Yeah. Exhibit #80. I would
8       say that it would be a draw between the
9       wicker enclosure from the modern basketry
10      from the start, the one that has the elephant
11      pulling it and the wicker animal enclosure
12      from page 126, that's on a -- that second one
13      to the lower right of -- in figure 3.
14   Q. So you think it's either the cart being
15      pulled by the elephant or the Bellaruski
16      wicker animal enclosure on the lower right
17      hand corner of page 3 of your second
18      supplemental report of Exhibit #80?
19   A. Yes. If I -- I mean, in answer to your
20      question, and I've stated before that's not
21      how I would think about it. But yes, in
22      answer to your question.
23   Q. Which one of those two in the final analysis
24      would you think is the closest to what's
25      shown in the patent, visually?

Page 123

1    A. I think they are both close. I wouldn't pick
2       a single one.
3    Q. I'm asking you to pick one.
4    A. They're very close in slightly different
5       ways.
6    Q. But on balance which do you think is closest?
7    A. On balance probably the -- probably the
8       wicker enclosure design, plate 28 in modern
9       basketry from the start.
10   Q. The one that's being pulled by the elephant?
11   A. Yes.
12   Q. If you would, flip to Exhibit #75. Let's
13      pull that out. Take it out of the -- and
14      let's take out Exhibit #2, if it's not
15      already out. I don't think --
16   A. Wait, wait, wait.
17         MR. HINSHAW: I think that's what you
18            intended to pull.
19         MR. GARDNER: He pulled out 74 instead
20            of #75. It looks like it.
21   A. Oh, I was reading the numbers from the other
22      side. Let's put it this way.
23   Q. All right. So we've got #75 out. And pull
24      out Exhibit #2.
25   A. Exhibit #2.

Page 124

1    Q. And we need one more thing, Exhibit #84 which
2       is right here all right. So since #84 is
3       loose and it's missing its staple, we've got
4       it in the book?
5          MR. HINSHAW: You got it on
6             Exhibit #83.
7          MR. GARDNER: Thank you, counselor.
8    Q. All right. So now I'd like for you to
9       consider three items: The design patent 156
10      of Exhibit #84, the Bay Isle wicker crate of
11      Exhibit #2 and what you indicated was the
12      closest visually to the design patent, that
13      being the design shown in Exhibit #75. So do
14      you have those three?
15   A. Yes.
16   Q. Now, in looking at the Mid-West Bay Isle
17      wicker crate of Exhibit #2, does that product
18      look more like the patent or more like the
19      prior art reference number #75?
20         MR. HINSHAW: Before you answer that,
21            while you're thinking about this,
22            I do want to make an objection on
23            the record to the extent you're
24            asking him to compare designs of
25            objects pursuant to a standard

Page 125

1       that has not yet been announced or
2       that he's ever considered. I do
3       object to that because there's no
4       proper foundation for that. But
5       you can go ahead and try and
6       answer his question.
7    Q. So mentally we'll put the design patent of
8       Exhibit #84 on one end of the spectrum and
9       we'll put the prior art reference of
10      Exhibit #75 at the other end of the spectrum.
11      Where in that spectrum does the Mid-West
12      product of Exhibit #2 fall?
13         MR. HINSHAW: I'm going to make a
14            continuing objection. All right.
15   A. You're saying Exhibit #75 is on one end of
16      the spectrum and #84 is on the other end of
17      the spectrum?
18   Q. Yes, sir.
19   A. I -- I mean, it falls somewhere in between.
20   Q. Would you agree with me that the Mid-West
21      Bay Isle product of Exhibit #2 visually looks
22      more like what's shown in the patent of
23      Exhibit #84 than what's shown in the prior
24      art reference of Exhibit #75?
25   A. As a designer, the way I would think about

Page 126

1    this is if we were looking at a family tree.
2    You know, this would be toward the root, and
3    each of these would be branches on the family
4    tree. Just -- that's how I would structure
5    it.
6         MR. HINSHAW: Would you make a record
7         of what exhibit numbers he's
8         referring to?
9    A. That #75 would be sort of the root of the
10   tree, or the trunk, rather; and that
11   Exhibit #2 and Exhibit #84 would be branches
12   in that tree.
13   Q. Isn't it true that the Bay Isle product of
14   Exhibit #2 visually looks closer to the
15   patent of Exhibit #84 than it does to the
16   prior art reference of Exhibit #75?
17   A. Well, prior art reference Exhibit #75 has
18   largely exposed vertical elements at the
19   corner, as does Exhibit #2. The 156 patent
20   does not have exposed corner elements.
21   The -- Exhibit #84, excuse me. Exhibit #75
22   tends to emphasize the -- the -- the base
23   visually with the weave. Exhibit #84 also
24   does that on the side view. And so as I
25   said, I would see them as branches on the

Page 127

1    tree.
2    Q. I understand you don't want to make the
3    comparison the way I'm asking you to make
4    it.
5    A. No.
6    Q. But I want you to -- I want you to tell me
7    whether the product shown in Exhibit #2 looks
8    more like the patent on Exhibit #84 or does
9    it look more like the prior art reference of
10   Exhibit #75.
11   A. Okay. I'm saying that's now how I would view
12   it as a designer.
13   Q. I understand that's not how you would
14   normally do it as a designer. But I'm asking
15   a question here and I'm entitled to an
16   answer. So if you would, please assess for
17   us whether the product of Exhibit #2, the
18   Bay Isle wicker crate looks more like what's
19   shown in the 156 patent of Exhibit #84 or
20   does it look more like what's shown in the
21   prior art reference of Exhibit #75.
22   A. Well, I would start by saying that Exhibit #2
23   doesn't look like -- I mean, your question
24   implies that -- that there is a -- is a
25   strong visual proximity of the two. And I

Page 128

1    disagree with that.
2    Q. I'm not asking you to agree that there's a
3    strong visual proximity. But if you had --
4    if you had the prior art reference on one
5    goal line of a football field visually and
6    you had the patent of Exhibit #84 on the
7    opposite goal line and you had to make an
8    assessment of visually where the product of
9    Exhibit #2 being the Bay Isle falls, isn't it
10   true that it would be on -- it would be
11   closer to the goal line of the patented
12   design than to the prior art reference?
13   A. It would probably be somewhere around the 60
14   yard line.
15   Q. So it would be closer -- it's -- you agree
16   with me, then -- you agree with me, then --
17        MR. HINSHAW: I don't understand what a
18        60 yard line is on a 100.
19   Q. You agree with me that the Bay Isle product
20   of Exhibit #2 is at least slightly closer
21   visually to the patent design of Exhibit #84
22   than it is to the prior art reference of
23   Exhibit #75, correct?
24   A. Ask your question again.
25        MR. GARDNER: Could you read it back,

Page 129

1    please?
2        (The court reporter read the
3        pending question.)
4    A. No, I don't think it's closer visually.
5    Q. Do you believe that it's closer to the prior
6    art reference than it is to the patent
7    design?
8    A. No. As I said before, I don't think it's
9    closer visually to one relative to the other.
10   Q. It's got --
11   A. Visually different. No, it does not have to
12   be. As an industrial designer I can tell you
13   it does not have to be. Everything is not
14   equidistant. Everything is not closer to
15   something than another. That's not the
16   product world.
17   Q. You can't -- so is it your testimony that you
18   can't tell me --
19   A. I'm saying I would not -- I'm sorry.
20   Q. Hold on. Left me ask my question. You can't
21   tell me whether the Bay Isle product of
22   Exhibit #2 is closer visually to either the
23   design of patent 156 as shown in Exhibit #84
24   or instead it's closer to what's shown in
25   Exhibit #75?

Page 130

1   A. No, I'm not saying I can't tell you. I am
2      saying I would not say that it is closer to
3      one than the other. That's what I'm saying.
4   Q. Then if you can tell me if it's closer to one
5      or the other, then tell me which one it's
6      closer to.
7   A. I would not say it was closer to either of
8      them.
9   Q. Would you say that it's equidistant, that
10     it's equally right in the middle. That it's
11     just as much like the prior art Exhibit #75
12     as it like the patent?
13  A. You're asking are they equidistant, is that
14     your question?
15  Q. Is that your -- is that how you would
16     characterize it?
17  A. No, I wouldn't characterize it on a
18     continual.
19  Q. Well, if we have -- if we have the patent
20     design on the one hand, you understand that?
21  A. I understand your question.
22  Q. And if we have the prior art reference on the
23     other hand, do you understand that?
24  A. Yes.
25  Q. Would you agree with me that if we were

Page 131

1      trying to evaluate some third object in
2      comparison to those two, that that object
3      would either be more like one of them or the
4      other or there's a third possibility that
5      it's equally like them both. There is no
6      fourth possibility, correct?
7   A. That's -- no. I would say that there's a
8      fourth possibility which is that they -- you
9      know, that both of these are related to this
10     in their own way.
11  Q. That's a different analysis than what we're
12     asking you to do though, isn't it?
13  A. You're asking me what the relationship is
14     between this, this and this. Between, #75,
15     Exhibit #2 and #84, right?
16  Q. Let me ask it another way. Let me ask it
17     another way. When we go to trial and the
18     jury looks at these three references, the
19     patent, the prior art reference of
20     Exhibit #75 and the Bay Isle product of
21     Exhibit #2, don't you think the jury is
22     likely to think that the Bay Isle product of
23     Exhibit #2 looks like a lot more like what's
24     shown in the patent than what's shown in
25     Exhibit #75?

Page 132

1      MR. HINSHAW: Objection, form and
2         foundation. Improper question.
3   A. It's possible.
4   Q. Don't you think most people would, in looking
5      at those three designs would think the
6      Bay Isle product of Exhibit #2 looks a lot
7      closer to what's shown in the patent of
8      Exhibit #84 than it does to the design of
9      Exhibit #75?
10     MR. HINSHAW: Objection, form and
11        foundation. It's entirely an
12        improper question.
13  A. That's possible.
14  Q. Is there any reason that you think that most
15     people might think that but you don't?
16     MR. HINSHAW: Same objections.
17  A. I didn't say that most people thought that.
18     I said it was possible.
19  Q. And my question was, since most people might
20     think that, why is it that you don't?
21     MR. HINSHAW: Objection. Form and
22        foundation.
23  A. That's a double hypothetical. I can't answer
24     that.
25  Q. Will you tell me which of the patent and the

Page 133

1      prior art reference the Mid-West product is
2      more visually similar to or will you not?
3      MR. HINSHAW: Objection. Asked and
4         answered.
5   A. I've already told you how I would look at it
6      as a designer.
7   Q. I'm not leaving this table until you tell me
8      which one it's closer to. It's either closer
9      to one, it's closer to the other, or it's in
10     the middle?
11     MR. HINSHAW: Objection, asked and
12        answered.
13  Q. I want to know.
14  A. It's not necessarily closer. That's a false
15     dichotomy.
16  Q. Do you refuse to answer?
17  A. I'm saying that the question presumes that
18     one is closer than the other. And I'm saying
19     that that's not necessarily true.
20  Q. Well, if they were numbers, one was -- the
21     patent were a 10 and the prior art reference
22     were a zero and we didn't know what the
23     number was of Exhibit #2, you could say that
24     it's closer or the other by figuring out what
25     the number is, right?

BRET SMITH
JUNE 13, 2008

## Page 134

1   A. It doesn't matter if you make them numbers or
2      pictures or goal lines or yard lines, that
3      is, as a designer, not -- your -- that's not
4      how I would answer. I mean, that's not how I
5      would frame -- that's not how I would view
6      these.
7   Q. I understand you don't want to view them that
8      way.
9   A. No. That's not how I would view them.
10  Q. And I understand that's not how you would
11     normally view them. But I'm asking you to
12     give us your best judgment of where on the
13     continuum that product of Exhibit #2 falls as
14     between Exhibit #84 the patent and the prior
15     art reference Exhibit #75. Surely you can
16     place it somewhere along that scale.
17        MR. HINSHAW: Same objections.
18  A. It's an inaccurate question.
19  Q. Well, let's have your answer and we'll deal
20     with whether the question is inaccurate.
21     Give us the answer. Tell us whether it's
22     closer to one or the other.
23        MR. HINSHAW: Same objections.
24        Continuing objections to this line
25        of questioning.

## Page 135

1   A. I've already told you. There are attributes
2      of this that can be seen in this. There are
3      attributes of this that can be seen in this
4      that aren't in this. It's not cut and dry
5      the way you're presenting it.
6   Q. Whether it's cut and dried or not, where does
7      Exhibit #2 fall as between Exhibit #75 and
8      Exhibit #84? Is it closer to one or is it
9      closer to the other?
10        MR. HINSHAW: Mr. Smith, are you going
11        to change your answer?
12        THE WITNESS: No.
13        MR. HINSHAW: Then this is a pointless
14        line of questioning. You've asked
15        it for the last 20 minutes.
16        MR. GARDNER: And I'm not moving off of
17        it.
18        MR. HINSHAW: Well, then, keep asking
19        it but he's going to keep giving
20        the same answer. If you want to
21        waste everybody's time with that,
22        then that's your choice.
23        MR. GARDNER: And we'll go to the court
24        and we'll come back.
25        MR. HINSHAW: That is your option.

## Page 136

1        MR. GARDNER: I'm not getting off of
2        it.
3        MR. HINSHAW: But this is a pointless
4        line of questioning. You're
5        wasting everybody's time. He's
6        not going to change his answer.
7        MR. GARDNER: I'm not wasting anybody's
8        time. The witness refuses --
9        refuses to cooperate and give an
10       answer other than to say I
11       wouldn't do it that way, I can't
12       answer.
13        MR. HINSHAW: Then your recourse is to
14        take it up to the judge. But to
15        continue to badger the witness and
16        waste our time with this line of
17        questioning is pointless.
18  Q. Do you refuse to give an answer? Do you
19     refuse to identify where as between these two
20     references Bay Isle product falls?
21        MR. HINSHAW: And I'm going to object
22        to that because he hasn't refused
23        to answer. He's answered. He
24        just hasn't given the answer that
25        you want, and he hasn't changed

## Page 137

1        the answer from what the answer is
2        that you want.
3   Q. It's a simple matter. There's the patent on
4      one end, and there's the prior art reference
5      on the other. Everybody in the room except
6      you can see that it would fall closer to the
7      patent. Is there any reason that you won't
8      agree that visually the Bay Isle product
9      looks closer to what's shown in the patent
10     than it does to that prior art reference?
11  A. I've already given you my answer.
12  Q. You don't -- do you believe honestly that the
13     Bay Isle product of Exhibit #2 does not look
14     closer visually to what's shown in the patent
15     than what's shown in the prior art reference
16     of Exhibit #75?
17  A. I've already given you my answer.
18  Q. Do you really believe that this reference --
19     this product, the Bay Isle product, doesn't
20     look a lot more like the patent than what's
21     shown in the prior art reference of
22     Exhibit #2?
23  A. I've already given you my answer.
24  Q. Will you answer the question, sir?
25  A. I have answered the question.

BRET SMITH
JUNE 13, 2008

---

Page 138

1  Q. And what is the answer?
2  A. I've told you. They each have different
3     attributes of Exhibit #75. That is,
4     Exhibit #2 and Exhibit #84 each have
5     different attributes to Exhibit #75 that I
6     would not rate them on a line.
7  Q. I understand you wouldn't normally rate them
8     on a line.
9  A. That's my answer.
10 Q. But we're asking you to do just that, and you
11    refuse to rate them on a line because you
12    wouldn't normally do that. We're asking you
13    to do that.
14 A. I'm saying --
15 Q. That's what we do. We ask witnesses to do
16    things they wouldn't normally do. We're
17    asking you to rate it on a line from one end
18    to the other.
19 A. I'm saying it's a faulty comparison.
20 Q. I understand you believe it's a faulty
21    comparison. We're asking you to make it
22    anyway. You can object later and say you
23    don't think it's a correct comparison. Your
24    lawyer may say it's a bad comparison. But we
25    want the comparison. We want to know is it

---

Page 139

1     closer to one or is it closer to the other
2     visually?
3        MR. HINSHAW: Same objections.
4  A. I've already given you my answer.
5        MR. GARDNER: Let's take a break. I
6        want to call my local counsel and
7        see if we can get a court on the
8        line.
9           (Brief recess)
10       MR. GARDNER: Mr. Hinshaw and I spoke
11       with Judge Watkins and explained
12       the situation to Judge Watkins.
13       And after hearing both sides,
14       Judge Watkins has ruled that for
15       now he considers that the witness
16       has answered as best he can or in
17       some manner. And that witness can
18       live with that answer. The judge
19       has also ruled that this line of
20       questioning is not improper. The
21       judge has indicated in response to
22       our protest that we would --
23       plaintiff, Simpson Ventures, would
24       be free to complain later if the
25       witness should attempt to give a

---

Page 140

1     different answer at a trial or
2     otherwise than the witness is
3     giving now. Do you have something
4     else to add to that, Mr. Hinshaw?
5        MR. HINSHAW: I guess I would just -- I
6        don't know that it deviates a
7        whole lot but I'd say in my own
8        words the judge agreed with us
9        that this -- the witness has
10       answered the line of questions as
11       best he can. And that it's time
12       to move on the line of questions.
13       The judge has said that he's not
14       restricting the line of questions
15       in that it somehow legal error to
16       ask these questions because it's a
17       standard or legal standard that
18       has not yet been adopted or
19       announced in the Egyptian Goddess
20       case. The judge did say that if
21       the Egyptian Goddess case comes
22       out with a -- such a standard or
23       any other standard, that we'd have
24       to revisit the issue or the facts
25       and the schedule at that time.

---

Page 141

1        MR. GARDNER: And the -- and look at
2        the question the judge further
3        indicated that if that is so, we
4        might have to look at the question
5        of whether the witness's answers
6        have been evasive. But that's an
7        issue for another day.
8           (Off-the-record discussion)
9  Q. We've been off the record for some time while
10    the lawyers conferred with the court. During
11    that time, Mr. Smith, has anything occurred
12    that would cause you to want to change your
13    answer regarding whether you can tell us if
14    the Bay Isle product of Exhibit #2 is closer
15    to the design patent of Exhibit #84 or in
16    fact is closer to the prior art reference of
17    Exhibit #75?
18 A. My answer hasn't changed.
19 Q. So as of now you can't tell us one way or the
20    other?
21 A. That is my answer.
22       MR. HINSHAW: His answer hasn't
23       changed.
24 Q. Now, regarding the 156 patent -- excuse me,
25    the 321 patent, if we went through a similar

---

Page 142

1  exercise, would you be able to tell me
2  whether the accused product is closer to the
3  321 patent or is closer to a prior art
4  reference?
5  A. Do you want me to look through the -- what --
6  what are you asking?
7  Q. Well, look through your report and find
8  whatever reference you think is most visually
9  similar to the 321 patent.
10  A. Well, it -- you're talking about of all of
11  the prior art in 321?
12  Q. Of all of the prior art that you're aware of,
13  what looks most visually like the 321 patent?
14  A. Well, again, I -- there are a number of
15  things that have attributes and I know you're
16  asking for the most. The -- if you're
17  talking about the edge lines, if I were
18  talking about the edge lines, for example,
19  then obviously, the 156 is the closest in
20  similarity to the way the edge treatment
21  and -- and wrappings and things like that are
22  done than on the 321. If you're looking at
23  doorways and you are ignoring edges and weave
24  patterns and a number of other things, then,
25  you know, there's some resemblance between

Page 143

1  the Bay Isle and the 321. There's also, you
2  know, in terms of the opening, the one shown
3  in figure 69 has an arched opening.
4  Q. Which prior art reference do you think is
5  overall the closest?
6  A. I think -- I think the -- as I said, I think
7  the -- the 156 and the 321 have a lot of
8  similarities. I think the model 1805 has an
9  arched opening and model 321 has an arched
10  opening. So there's some similarity there.
11  And that would be what I would say.
12  Q. Well, the model 1805 is not prior art to the
13  321 patent, is it?
14  A. Right. No.
15  Q. The 156 patent is prior art to the 321
16  patent, correct?
17  A. Yes.
18  Q. Do you think that the 156 patent is the
19  closest reference, the reference that is most
20  visually like what's shown in the 321 patent?
21  A. Yes.
22  Q. All right. So I think we've established that
23  in your view, the 156 patent is the prior art
24  reference that looks the most visually like
25  the 321 patent. If you put the 321 patent on

Page 144

1  one end and you put the 156 patent on the
2  other end, where in that continuum would the
3  Bay Isle 1805 fall? Would be it be closer to
4  the prior art 156 patent or would it be
5  closer to the 321 patent?
6  MR. HINSHAW: Same objections.
7  A. I think there are differences that make it
8  distinct from either of them. In other
9  words, I don't think that it has -- it has an
10  arched opening. The 321 has an arched
11  opening but the edges are completely
12  different. So --
13  Q. On balance can you say it's closer to one or
14  the other?
15  A. I would not.
16  Q. Are you able to say or --
17  A. I would -- I would not characterize it as
18  being closer to one than the other.
19  Q. Are you able to characterize it as closer to
20  one than the other?
21  A. I don't think it would be accurate to
22  characterize it to be closer to one than the
23  other.
24  Q. If you had to try to, could you characterize
25  it as closer to one than the other?

Page 145

1  MR. HINSHAW: Show a continuing
2  objection to this line of
3  questioning, please.
4  A. Your question to me boils down to, would I or
5  could I make a false characterization.
6  You're asking me to characterize something
7  that I said I would not characterize in that
8  way. So I don't know how else to answer your
9  question.
10  Q. Well, I'm asking you if you are physically
11  able to make -- to characterize model 1805 as
12  being visually closer to the 321 patent or
13  the 156 patent. Is that something that you
14  can actually do?
15  A. I'm saying it's different from both of them
16  and it's different in different ways from
17  both of them.
18  Q. I understand it may be different from both of
19  them. But can you say that it's more like
20  one than the other or are you not able to say
21  that it's more like one than the other?
22  A. I don't think it would be accurate to say
23  that it was more like one than the other.
24  Q. Well, let's assume that it's not -- let's put
25  aside whether it's accurate or not. Are you

BRET SMITH
JUNE 13, 2008

Page 146

1  able to -- to say that it is closer to one or
2  the other or not?
3  A. No, it differs from both of them and it
4  differs from both of them in important ways.
5  Q. So if I understand your testimony, you're not
6  able to say whether it's closer to one or the
7  other; is that correct?
8  A. I don't think it would be an accurate
9  statement to say that it's closer to one than
10 the other.
11 Q. And because of that, you're not able to say,
12 right?
13 A. It would not be accurate to say that it was
14 closer to one than another. That's -- that's
15 my answer.
16 Q. So you won't say, correct?
17     MR. HINSHAW: Objection. Asked and
18        answered. Mischaracterizes his
19        testimony.
20 A. It wouldn't be accurate to say.
21 Q. Am I correct that you won't say whether it's
22 closer to one or the other because in your
23 view it wouldn't be accurate to say that it's
24 closer to one than that other; is that right?
25 A. Yes. It's an inaccurate comparison. Yes.

Page 147

1  Q. So I'm correct?
2  A. That it's an inaccurate comparison, yes.
3  Q. And is that the same reason after all the
4  machinations we went through before, that you
5  were unable to say before whether the
6  Bay Isle product of Exhibit #2 was closer to
7  the 156 patent?
8     MR. HINSHAW: Objection. Asked and
9        answered. Repeatedly.
10 A. I've already answered that.
11 Q. Am I correct that the reason that you
12 couldn't answer before was that you believe
13 in regard to the 156 patent that it would be
14 inaccurate to say that it -- the Bay Isle
15 product was closer to the 156 patent or
16 Exhibit #75?
17     MR. HINSHAW: Objection. Asked and
18        answered.
19 A. I did answer before. You can have any answer
20 reread. My answer is my answer.
21 Q. If that kind of a test becomes the legal
22 standard, do you expect in the future to be
23 able to determine whether Bay Isle product
24 off Exhibit #2 would be closer to the prior
25 art or closer to the patent?

Page 148

1  A. If what kind of a test?
2  Q. This kind of test where you have the patent
3  on one side and a prior art reference on the
4  other side and the accused product is in the
5  middle.
6     MR. HINSHAW: Objection. Sorry.
7  Q. If that becomes the test or a test, a legal
8  test for infringement, do you expect in the
9  future to be able to perform that analysis
10 and determine whether the product is closer
11 to the prior art or closer to the patent?
12     MR. HINSHAW: Objection to form and
13        foundation.
14 A. I would look at the new requirements. And I
15 would evaluate the -- the -- I mean, I would
16 add that evaluation to my reports.
17 Q. So you expect to be able to do that in the
18 future, correct?
19 A. Since I don't know exactly what the context
20 is, I can only answer it the way I've
21 answered it.
22 Q. Do you recall a time before you were engaged
23 in this lawsuit?
24 A. Yes.
25 Q. And before you were engaged in this lawsuit,

Page 149

1  did you consider yourself an expert in patent
2  law?
3  A. No.
4  Q. Did you consider yourself an expert in design
5  patent matters at that time?
6  A. No. I'm not an attorney. I'm not a patent
7  attorney.
8  Q. Did you consider yourself an expert at that
9  time before you were engaged in this lawsuit
10 in evaluating a design patent to see if
11 there's infringement?
12 A. This is the first design patent that I have
13 evaluated.
14 Q. Before you were engaged in this litigation,
15 did you consider yourself an expert in
16 evaluating whether a design patent is valid
17 or not?
18 A. This is the first design patent I've
19 evaluated.
20 Q. So the answer would be no, at that time you
21 did not consider yourself an expert in this
22 area?
23 A. It's not -- this is my first -- yeah. This
24 is my first evaluation of a design patent.
25 Q. I understand this is your first evaluation of

## Page 150

1    design patent. But what I'm trying to figure
2    out is whether at the time you were engaged
3    you already considered yourself an expert in
4    design patent infringement matters?
5    A. No.
6    Q. Did you consider yourself an expert at that
7    time in evaluating the validity of design
8    patents?
9    A. No.
10   Q. And I believe from our previous deposition
11   you indicated that you don't have any
12   experience in doing infringement or validity
13   analysis in utility patents; is that correct?
14   A. That's correct.
15   Q. So at the time that you were engaged in this
16   case, you did not consider yourself an expert
17   in either design patent or utility patent
18   matters, correct?
19   A. Correct.
20   Q. Are you an expert today in analyzing products
21   to determine if they infringed design
22   patents?
23   A. I am still not an attorney. I'm an
24   industrial designer and I have done what I
25   consider to be a thorough investigation of

## Page 151

1    the 156 and the 321 patents. And that's as
2    far as, you know, I can claim at this point.
3    Q. Do you yourself consider yourself to be an
4    expert today in design patent and
5    infringement matters?
6    A. In all matters relating to design patent
7    infringement, is that what you're asking?
8    Q. In any matter relating to design pattern
9    infringement?
10   A. My expertise is in design and I'm applying
11   that to this -- these two particular patents.
12   And that's what I would claim. I -- I'm not
13   going to start a website and, you know,
14   proclaim myself an expert as a patent person.
15   Q. So if I understand your testimony, you
16   consider yourself to be a design expert,
17   right?
18   A. Yeah. I'm an industrial designer of product
19   expertise, yes.
20   Q. So you consider yourself to be an industrial
21   design expert, correct?
22   A. Yes.
23   Q. But you did not consider yourself at this
24   moment to be an expert in design patent
25   infringement questions, correct?

## Page 152

1    A. I don't consider my expertise in design
2    patents to extend beyond what I've examined
3    in the preparation of my reports.
4    Q. Well, let me ask you. Are you an
5    infringement expert or not?
6       MR. HINSHAW: Objection. Asked and
7       answered.
8    A. Beyond these cases? I mean, these are the
9    cases that I dealt with. So, that's all I
10   can claim expertise in. Or experience in at
11   this point.
12   Q. I understand that you've got experience now a
13   little bit from this case. But do you
14   believe that the experience you've gained in
15   this case renders you an expert in design
16   patent infringement matters?
17       MR. HINSHAW: Objection. To form and
18       foundation. Asked and answered.
19   A. Speaking in the abstract I wouldn't make that
20   claim.
21   Q. Why do you say speaking in the abstract?
22   A. Because the specifics I think I'm, you know,
23   versed in the I -- in the specifics
24   surrounding the 156 and the 321 patents.
25   Q. Do you mean by that that in general you're

## Page 153

1    not an expert in design patent matters?
2    A. I would not make a blanket statement like
3    that, yes.
4    Q. So I'm correcting that statement?
5    A. I would not make the statement that said I'm
6    an expert in all matters of design patents.
7    Q. Well, what areas of design patent
8    infringement are you an expert?
9    A. As I said, my expertise is -- is specific to
10   the investigation of the 156 and the 321
11   patents.
12   Q. Would I be correct that the only thing you
13   know about design patent infringement
14   standards is what you learned from either
15   Mr. Hinshaw or from the materials that
16   Mr. Hinshaw sent you?
17   A. I -- I think that would be an accurate
18   statement.
19   Q. Do you consider yourself today to be an
20   expert on the invalidity of design patents?
21   A. My answer is the same. I -- my area of
22   expertise would be confined to, you know, the
23   156 and the 321 examinations that I've
24   conducted. And that would -- that's all I
25   would claim.

BRET SMITH
JUNE 13, 2008

Page 154

1    Q. So would I be correct in stating that in
2      general you are not a design patent
3      invalidity expert, correct?
4    A. I -- I would not claim to be an expert beyond
5      what I have written in my reports.
6    Q. So my general statement is correct, right?
7    A. My statement is correct, yes. That's
8      all I would -- I wouldn't -- I wouldn't claim
9      anything beyond what I have written and done
10     and learned relative to the 156 and the 321
11     patent and the reports that I prepared.
12   Q. Well, aside from your involvement in this
13     case, in these two cases, do you otherwise
14     consider yourself an expert in the validity
15     or invalidity of design patents?
16   A. Beyond these cases, no.
17   Q. And would I be correct in stating that
18     everything you know about the validity or
19     invalidity of design patents you gleaned from
20     things that Mr. Hinshaw communicated to you
21     or information that he forwarded to you?
22   A. In general. I mean, I -- I -- I think I read
23     a few cases that were referred to in Chisum I
24     read online. You know, the full text of the
25     cases. But that's the extent of my

Page 155

1     background, yes.
2    Q. So in general I'm correct?
3    A. In general.
4    Q. So in general, you're not an expert for
5     design patent infringement or for design
6     patent invalidity but you have rendered an
7     expert report on both of these issues in this
8     case, correct?
9    A. Beyond this -- beyond the scope of this case,
10     and the issues that I've addressed, I would
11     not claim any expertise beyond that, beyond
12     what I've examined and read.
13       MR. HINSHAW: And just so we're clear,
14       you guys are talking about this
15       case.
16   Q. These cases?
17   A. These cases.
18       MR. GARDNER: Thank you, Mr. Hinshaw.
19   Q. How much time would you say you spent
20     studying to learn invalidity principles as it
21     applies to design patents for this case?
22   A. I don't -- that would be difficult to
23     estimate. I read -- I referred back. That
24     would be -- I don't know that I could give
25     you a figure.

Page 156

1    Q. Would you say that it's less than 20 hours?
2    A. No.
3    Q. Would you say that it's less than 40 hours?
4    A. That what's less than 40 hours?
5    Q. How much time you spent studying design
6     patent invalidity principles. Do you
7     understand what I'm getting at? Let me give
8     you a little preface.
9    A. Okay.
10   Q. Do you understand that in order to do the
11     work that you've done in your reports, you
12     first had to gain some knowledge of some --
13     some principles that you then applied to
14     make -- to do your analysis?
15   A. Yes.
16   Q. And those principles are design patent
17     infringement and design patent invalidity
18     primarily?
19   A. Yes.
20   Q. What I'm trying to figure out is how much
21     time you spent developing the knowledge that
22     you had regarding design patent infringement
23     and design patent invalidity so that you --
24     not how much time you spent on the case
25     overall.

Page 157

1    A. Right.
2    Q. But how much time you spent getting basic
3     knowledge?
4    A. Right.
5    Q. Okay. Does that clarify for you?
6    A. Yes. I -- the -- the two are kind of
7     intertwined. But yes, I understand what
8     you're asking.
9    Q. If you think those two issues are
10     intertwined, let me combine them. How much
11     time do you think you spent gaining basic
12     knowledge about design patent infringement
13     principles and design patent invalidity
14     principles for this case?
15   A. I would say more than 40 hours. Certainly
16     probably less than -- less than 100 hours,
17     but it was more than 40.
18   Q. Of these somewhere between 40 and 100 hours,
19     how much of that time was spent in reading
20     materials and how much of that time was spent
21     talking with or communicating with the
22     lawyers in the case?
23   A. The majority of the time was spent on reading
24     materials. Conversations were limited to a
25     question here or there to verify my

BRET SMITH
JUNE 13, 2008

Page 158

1    understanding.
2    Q. How many pages of materials do you think you
3       read?
4    A. It's all in the -- it's all in what y'all
5       have been carting around. I don't know.
6    Q. Would it -- would I be correct in stating
7       that, say, for a few court cases, that
8       everything that you read is in the
9       appendices?
10   A. Yes, that would be correct.
11   Q. I'm going to pass you what's previously been
12      marked as Exhibit #81. And it's -- I think
13      it's entitled appendix part two.
14   A. Yes.
15   Q. If you would, flip through that and estimate
16      for me how many pages of that you think
17      relate to your study of the principles of
18      design patent infringement and design patent
19      invalidity. I'm not looking for an exact
20      number. But is it 100 pages? 200 pages?
21   A. I don't --
22      MR. HINSHAW: It's marked 256 pages.
23      Are you --
24      MR. GARDNER: Off the record.
25      (Off-the-record discussion)

Page 159

1       MR. HINSHAW: You coming on a breaking
2       point?
3       MR. GARDNER: Yes, that's fine.
4       (Brief recess)
5    Q. Before we broke we were starting an
6       examination regarding Exhibit #81 and how
7       many pages of information were there and the
8       lawyers got into a little levity and whatnot.
9       Am I correct that there's 250 or so pages of
10      legal information that you studied contained
11      in that appendix?
12   A. Yes.
13   Q. Was -- was there any additional information
14      beyond that that you studied or was that
15      primarily it?
16   A. That's primarily it other than, as I said, to
17      read a few cases online.
18   Q. Is it your testimony that you studied that
19      information and those 256 pages for somewhere
20      between 40 and 100 hours?
21   A. Total, yes.
22   Q. Do you think that that is sufficient to
23      render you an expert in this case?
24   A. In this case, yes. Or these cases.
25   Q. In these cases. Now, outside of these cases,

Page 160

1    you consider yourself an expert in industrial
2    design, right?
3    A. Yes.
4    Q. Are you also an expert in merchandising or
5       marketing?
6    A. I've had experience through various projects
7       with those issues. So I would say I'm
8       certainly experienced.
9    Q. But do you consider yourself an expert in
10      merchandising and marketing?
11   A. I don't think I would characterize myself as
12      an expert. But as I said, I've had lots
13      of experience in that area through cases.
14      Through client.
15   Q. Now, you're a -- are you a full professor at
16      Auburn?
17   A. Yes.
18   Q. Tenured I assume?
19   A. Yes.
20   Q. Congratulations.
21   A. Thank you.
22   Q. As a tenured professor, are you required to
23      bring in any outside research or contract
24      money?
25   A. No, I am not. It certainly is a part of

Page 161

1    looking at annual performance, but it's not a
2    requirement.
3    Q. Do you have a -- do you have an outside fee
4       goal?
5    A. An outside fee goal?
6    Q. Do you as a tenured professor have a goal
7       that the school imposes on you of how much
8       money they would like for you to bring in?
9    A. No.
10   Q. Are you required by the University to share
11      any of your fees that you generated from
12      these cases with the University?
13   A. No.
14   Q. How much in fees have you earned, perhaps not
15      been paid yet, through today?
16   A. I would have to check last year's taxes. I'd
17      say somewhere around 30,000 I think would be
18      accurate, perhaps a little. 30 -- somewhere
19      between 30 and 40,000.
20   Q. Do you think that the total of the fees that
21      you either charged so far or will charge
22      through today is somewhere between 30 and
23      40,000?
24   A. That sounds right. I need to go back and
25      look through. But yeah, that sounds right.

Page 162

1   Q.  Could it be as much as 50,000?
2   A.  It's possible.
3   Q.  Is it possible that it might be as much as
4       60,000?
5   A.  I don't think that likely.  But I -- I don't
6       know how much additional time.
7   Q.  And let me take that back.  I'm sorry.  Let
8       me pass to you what's been marked as
9       Exhibit #243 and ask you if you recognize
10      that as your CV or curriculum vitae?
11  A.  Yes.
12  Q.  And this curriculum vitae of Exhibit #243 is
13      accurate as of the time that you submitted in
14      connection of one or more of your reports in
15      these litigation matters?
16  A.  Yes.  It may be missing a couple of lectures
17      or presentations.  But otherwise, yes.
18  Q.  Well, there's a -- the CV is 29 pages long,
19      right?
20  A.  Yes.
21  Q.  It mentions lots of activities and accolades
22      and accomplishments.  Am I correct that none
23      of those accomplishments or activities relate
24      to patents?
25  A.  Other than the listing of my current

Page 163

1       involvement in this case, that would be
2       correct.
3   Q.  Mr. Smith, under the Gorham test, what role
4       if any do purely functional features play?
5   A.  The Gorham test deals with the ordinary
6       observer.  So, the Gorham test is about how
7       the ordinary observer, whether or not
8       exercising such care as they would normally
9       exercise.  That's my understanding of the
10      Gorham statement.
11  Q.  Well, in performing the Gorham analysis, if
12      the patent that you're evaluating has a
13      purely functional feature, does that feature
14      get included in the comparison between the
15      patent design and the accused product?
16  A.  My understanding is that purely functional
17      features are not covered by design patents.
18  Q.  So would I be correct in stating, then, that
19      you believe that the purely functional
20      features would be excluded from the Gorham
21      analysis?
22  A.  My understanding is that the purely
23      functional features are not covered by a
24      design patent, and therefore would not be
25      patentable.  And that's -- that's my

Page 164

1       understanding.
2   Q.  So what do you do if there's a purely
3       functional feature shown in the patent
4       drawings, do you include that as part of the
5       comparison?
6   A.  That's part of the --
7   Q.  Under Gorham?
8   A.  That's part of the comparison under Gorham?
9       My understanding is that Gorham deals with
10      the ordinary observer and whether or not they
11      would be confused in viewing the -- the
12      patented product or -- that's my
13      understanding.
14  Q.  So do you know what should be done in a
15      situation -- under Gorham in a situation
16      where the patent shows a purely functional
17      feature in the drawings?
18  A.  Under Gorham?  As I said, my understanding is
19      that Gorham deals with how the ordinary
20      observer observes the design.  So my
21      understanding is that functionality is not
22      part of the patent.  In other words, it would
23      be excluded from a design patent.
24  Q.  Does that mean that under the Gorham test it
25      would be excluded from comparison?

Page 165

1   A.  I don't know how you could tell someone, an
2       ordinary observer to exclude something.  I'm
3       not -- I'm not sure how that would work.
4   Q.  So would it be correct, then, that you should
5       include as part of the design under
6       consideration a purely functional feature
7       shown in the patent and compare that with an
8       accused product under the Gorham test to see
9       if there's infringement?
10  A.  My understanding is that infringement is --
11      the issue of infringement is -- there are two
12      parts to it.  The first part is the ordinary
13      observer, the Gorham test.  And the second
14      part is the points of novelty test, in that
15      points of novelty cannot be purely
16      functional.  And the question is whether or
17      not -- under that whether or not they're --
18      the points of novelty have been appropriated
19      by the accused product.
20  Q.  I'm not -- at the moment I'm not asking you
21      about the point of novelty test.  I'm trying
22      to figure out what's your understanding of
23      how to treat -- if at all, a purely
24      functional feature that appears in the design
25      patent under the first test, the Gorham test?

## Page 166

1    A. I don't recall functionality being addressed
2      under the Gorham test.
3    Q. So would I be correct that it's your
4      understanding that one should ignore for the
5      moment the fact that there is a purely
6      functional feature shown in the patent
7      drawings and compare the patent drawings with
8      the accused product under the Gorham test?
9    A. My understanding of the Gorham test is it's
10      the eyes of the ordinary observer and it
11      doesn't make distinction beyond that.
12    Q. Well, let me ask you a different series of
13      questions. In a design patent, is it proper
14      for purely functional items to appear in the
15      patent?
16    A. I would say the -- if it is a functional item
17      it is not considered to be covered by the
18      patent. If it is a purely functional item.
19    Q. Now, let's back up for a second. Let's
20      consider that we have a product.
21    A. Okay.
22    Q. The product has a number of features. Would
23      you agree with me that the product which may
24      itself be functional can still be a subject
25      of a design patent for the ornamental aspects

## Page 167

1      that it contains?
2    A. That's my understanding.
3    Q. Okay. Even though the product could be
4      highly utilitarian?
5    A. Yes. That's my understanding.
6    Q. All right. Now, so we've got a product which
7      may or may not be utilitarian, but it's the
8      subject of a design patent for its ornamental
9      look. And within the drawings of that
10      patent, one can see a feature which is purely
11      functional.
12    A. Okay.
13    Q. Is it proper for that purely functional
14      feature to appear in the patent?
15        MR. HINSHAW: Objection to form. Calls
16        for a legal conclusion. Do you
17        want to ask him his understanding,
18        that's the way your question is
19        intended, then that's fine.
20    A. Are you asking my understanding?
21    Q. Yes, sir.
22    A. As I understand it, there might be some
23      elements that are functional.
24    Q. Now, looking at the 321 patent of
25      Exhibit #83.

## Page 168

1    A. Okay. Right here.
2    Q. Do you consider the arched doorway or opening
3      to be a purely functional feature, a purely
4      ornamental feature or a feature that is
5      partly functional and partly ornamental?
6    A. I would say that it could be considered both.
7    Q. So it's -- in your view the arched doorway is
8      partly functional, partly ornamental?
9    A. The -- yes. Yes.
10    Q. In looking at that patent, did you -- do you
11      see the threshold rod at the bottom of that
12      opening?
13    A. Yes.
14    Q. And do you observe that it does not appear to
15      have wicker wrapped around it?
16    A. Yes.
17    Q. Did you conclude in your report of
18      Exhibit #235 that that feature is an
19      ornamental feature?
20    A. Under ornamental features that's labeled in
21      the figure 14 of Exhibit #235.
22    Q. So in your report you considered that bare
23      wire threshold of the opening or doorway to
24      be a ornamental feature, correct?
25    A. Yes. I considered it a visual feature.

## Page 169

1    Q. Where did you or how did you come to the
2      conclusion that that feature is an ornamental
3      feature?
4    A. It's a -- it's a visual feature. I'm not
5      sure how else to answer that.
6    Q. If I told you that there were testimony in
7      these litigations that the reason that that
8      threshold wire is not wrapped in wicker is
9      for the safety of the cat, so that the cat's
10      claws would not get caught on the wicker as
11      it goes in and out of the enclosure, would
12      you tend to agree with that?
13    A. I would say that could be a possible reason.
14      I don't think cats usually walk with their
15      claws out. But I would say that could be a
16      possible reason.
17    Q. Now, looking at your 321 report, when you
18      compared the model 1805 Bay Isle litter pan
19      cover of Exhibit #3 with the patented product
20      shown in the 321 patent, did you compare the
21      Bay Isle product with each one of the two
22      embodiments and conclude separately that it
23      was different from the first embodiment and
24      then different from the second embodiment, or
25      did you lump the two embodiments together and

Page 170

1  then compare the Bay Isle 1805 with the
2  combined embodiments?
3  A. I looked at the embodiments individually. I
4  wrote it addressing both.
5  Q. Could you point out in the report what
6  portion or what language in the report would
7  inform a reader of which approach you used?
8  A. Well, each of the -- the figures addresses
9  them in turn. And, then, the text on page 5
10  talks about figures 1 through 6 and then it
11  talks about figures 7 through 12.
12  Q. Well, if you could point us to any
13  conclusions that you draw where you -- you
14  deal with the embodiments together or
15  separately, that would -- that would be
16  helpful. Can you identify such?
17  A. Conclusions?
18  Q. Perhaps if you look at page 41, it contains
19  your analysis under the Gorham standard. It
20  might be helpful. If I may?
21  A. Yes.
22  Q. At the end of the portions of the text on
23  page 41, the last two paragraphs seem to be
24  where you analyze what you see as differences
25  between the Bay Isle 1805 and the -- the

Page 171

1  weave patterns as shown in the 321 patent.
2  But I have to say I'm struggling to figure
3  out from this language whether you lumped the
4  two embodiments together or treated them
5  separately. And I'm hoping you can tell us
6  from the language what you intended.
7  A. Well, I talk about them each in turn. The
8  321 patent makes use of a diamond weave
9  pattern in the first embodiment and the
10  absence of a distinctive weave in the second
11  embodiment as discussed previously. The
12  decorative choices on the front are also part
13  of the distinct appearance, namely the
14  vertical elements on either side of the
15  entrance and the type edge weaving of the
16  panels. That would apply to both
17  embodiments. And unlike the 321 design, the
18  decorative weave on the model 1805 design is
19  a square weave pattern, distinctively
20  different than that of the 321 pattern --
21  patent as described above. I guess I could
22  have put that there. The front of the litter
23  box cover shows even more differences.
24  Q. From that language, do you -- do you consider
25  that you treated them in seriatim or in

Page 172

1  tandem?
2  MR. HINSHAW: Objection to form. Get a
3  dictionary.
4  Q. S-E-R-I-A-T-U-M. Means in sequence
5  basically. One after another.
6  A. I -- I discussed -- I discussed each of them
7  in turn early on, and then in the conclusions
8  sort of drew together those things. And I
9  guess I could have added a few words to make
10  sure that that was clear, but that was the
11  process. In other words, you know, they're
12  diagramed separately, they're discussed
13  separately, and then the conclusions apply to
14  both of them. And I guess I could have
15  written it twice.
16  Q. Is that what -- is that what you meant to say
17  is that you separately analyzed the Bay Isle
18  1805 product with the first embodiment and
19  then separately analyzed it in comparison to
20  the second embodiment?
21  A. I looked at both of them. I looked at both
22  of them. Because both were claimed in the,
23  you know -- it was -- it was this and this
24  configuration. So I looked at both
25  configurations.

Page 173

1  Q. Can you tell me whether you -- whether this
2  comparison that you made was separately or
3  was against the combined embodiments?
4  A. It addressed both embodiments.
5  Q. So combined?
6  MR. HINSHAW: Objection to form and
7  foundation. I think you're
8  mischaracterizing his testimony.
9  Are you asking him is his
10  conclusion -- did he mail these
11  together and analyze them as a
12  combined embodiment, the two
13  different embodiments? Because I
14  think he's made it clear he
15  didn't. I'm confused by your
16  question.
17  MR. GARDNER: I can't tell what he did
18  from his report. I'm trying to
19  find out what --
20  MR. HINSHAW: But I think he said he
21  analyzed them separately. He
22  viewed them separately. He
23  recognized there are two
24  embodiments, and his conclusion is
25  two different -- he analyzed them

BRET SMITH
JUNE 13, 2008

## Page 174

1 separately.
2 MR. GARDNER: What he said is he
3 described them separately.
4 THE WITNESS: I looked at each one of
5 them in turn.
6 MR. GARDNER: He looked at each
7 embodiment separately. But when
8 it came to actually doing the
9 comparison, which the comparison
10 is what's stated here on page 41,
11 it's not clear whether the
12 comparison was done as against the
13 combined embodiments or against
14 the embodiments separately.
15 That's what I'm trying to figure
16 out. That's simple -- that simple
17 thing.
18 A. Separately. Separately.
19 Q. Separately. Very good. That's all I needed
20 to know.
21 A. Sorry. I didn't understand.
22 Q. Am I correct that in your 321 report of
23 Exhibit #235, you do not identify any point
24 of novelty that may exist for the 321 patent,
25 correct?

## Page 175

1 A. That's correct.
2 Q. And as you sit here today, are you aware of
3 any point of novelty that the 321 patent may
4 have?
5 A. No. I mean, I did talk about the fact
6 that -- you know, considering the weaving and
7 how that emphasized or de-emphasized things.
8 But, no. That's --
9 Q. Is there -- is there any aspect of the 321
10 patent that you consider novel over the prior
11 art?
12 A. No.
13 Q. Now, last time we -- we went through some
14 lengthy -- last time. Previous deposition
15 date we examined you regarding your point of
16 novelty analysis with regard to the 156
17 report. Do you recall that?
18 A. Yes. Yes, I do.
19 Q. And at some length we were able to ascertain
20 that with regard to each point of novelty
21 that was asserted by Simpson Ventures, you
22 combined two or more prior art references to
23 meet that alleged point of novelty. You
24 recall that testimony?
25 A. I recall that discussion, yes.

## Page 176

1 Q. Am I correct that with respect to each of the
2 asserted points of novelty that Simpson
3 Ventures has raised concerning the 321
4 patent, your analysis and your report of
5 Exhibit #235 relies on multiple prior art
6 references for each asserted point of
7 novelty; is that correct?
8 MR. HINSHAW: Mr. Gardner, just clarify
9 when you use the word multiple,
10 that means one or more as in at
11 least two.
12 MR. GARDNER: No, multiple would be two
13 or more. One is not a multiple.
14 MR. HINSHAW: Right. I said at least
15 two.
16 MR. GARDNER: You said -- you said --
17 yeah, but, then, first you said
18 one or more and then at least two.
19 And those are two different
20 things.
21 MR. HINSHAW: All right. But at least
22 is what you mean by multiple.
23 MR. GARDNER: At least two, correct.
24 A. Well, the point 3 and the 156 patent, I mean
25 point 3 matches the 156 patent. The first

## Page 177

1 points had multiple -- had more than one.
2 Q. So, if I understand your testimony, out of
3 the four points of novelty that are asserted
4 by Simpson Ventures regarding the 321 patent,
5 three of them you believe have two or more
6 prior art references that are used in
7 combination to meet those points of novelty
8 and one of them you can meet with a
9 single reference; is that correct?
10 A. Yes.
11 Q. And would you agree with me also that there's
12 no single reference that shows all of the
13 points of novelty in combination?
14 A. Yes.
15 Q. Does the 321 patent contain a verbal
16 construction of the patent claim?
17 A. An ornamental design for a pet litter pan
18 housing is shown as described.
19 Q. Hold on. Let me stop you for a second. I
20 may have misstated my question. Let me start
21 that one over. Does your report -- your 321
22 report of Exhibit #235 contain a verbal
23 construction of the patent claim?
24 A. It contains a verbal description of the 321
25 patent.

Page 178

1  Q. Do you know what I mean when I say a verbal
2     construction of a patent claim?
3  A. My understanding is that ultimately the
4     verbal construction is something that the --
5     the court does.
6  Q. Is that something that is appropriate or
7     inappropriate for an expert to do in
8     analyzing a design patent?
9  A. Well, it's something that Mr. Anders did.
10 Q. Am I correct that it is something that you
11    did not do?
12 A. I addressed potential things that might be
13    potential points of novelty I think in this
14    report.
15 Q. Separate from whether you've addressed the
16    potential points of novelty, is there a
17    section or portion of this report of
18    Exhibit #235 that constitutes a verbal
19    construction of the patent claim?
20    MR. HINSHAW: I'm getting confused.
21       Are you -- I mean, are you asking
22       him about page 2, the verbal
23       description of the 321 patent
24       design on page 2 that goes on
25       for -- at least to page 10?

Page 179

1     MR. GARDNER: Well, I was trying to
2        figure out if the witness
3        considers any portion of his
4        report to be a verbal
5        construction. Now that you've
6        suggested to him that page 2 might
7        be such, he may in fact adopt that
8        as his verbal construction. I
9        don't know.
10    MR. HINSHAW: That was not my intent.
11       I was kind of in -- this 256 pages
12       or not.
13 A. Then I go through and describe what I
14    consider to be the ornamental features,
15    functional features. That really is
16    essentially the first -- the first quarter of
17    the report.
18 Q. Mr. Smith, do you consider that introduction
19    portion of your report from page 2, et cetera
20    to be your verbal construction of the claim
21    of the 321 patent?
22 A. I consider that to be my verbal description
23    of the 321 patent, yes.
24 Q. In looking at the 321 patent, is -- do you
25    believe that the arched doorway is a more

Page 180

1     significant or less significant ornamental
2     feature as compared to the -- the rectangular
3     feet?
4  A. I would describe them both as significant
5     features. I think -- I would say they're
6     both pronounced features.
7  Q. Are you -- are you able to say whether one is
8     more significant than the other from a design
9     standpoint?
10 A. It's possible that you would notice the
11    arched doorway before the feet.
12 Q. Is the rectangular shape of the feet
13    ornamental or functional?
14 A. The choice of -- of the shape of the feet is
15    an ornamental choice.
16 Q. Is the -- is the rectangular shape of the
17    unit overall an ornamental choice?
18 A. The rectangular shape overall has some --
19    some very functional aspects of mainly that
20    it -- it folds down and shifts well in a
21    small volume.
22 Q. And I believe you testified earlier that
23    you -- you ordered some of Mr. Simpson's or
24    Simpson Ventures products, specifically a
25    wicker crate and a wicker litter pan cover.

Page 181

1     Is that correct?
2  A. Yes.
3  Q. Why did you do that?
4  A. I wanted to just take a look at the products
5     and familiarize myself with them.
6  Q. What role does that or should that play in
7     evaluating the two patents for possible
8     infringement?
9  A. My understanding is none whatsoever. That
10    the -- it is the -- the patent and the
11    drawings, the drawings in the patent are the
12    issue.
13 Q. Then why order it?
14 A. To familiarize myself with it. Just as a
15    point of awareness.
16 Q. Do you believe that the arched opening in the
17    321 patent is the most distinctive visual
18    element on the front panel?
19    MR. HINSHAW: Can we go off record?
20       (Off-the-record discussion)
21    MR. HINSHAW: My apologies.
22    MR. GARDNER: Could you read the
23       question back, please? I believe
24       he answered, but you may not have
25       heard it because of the phone.

BRET SMITH
JUNE 13, 2008

## Page 182

1      (The court reporter read the
2          pending question.)
3    A. I think it's part of the distinctiveness of
4       the front panel. It's pronounced because of
5       the way it's wrapped as are the vertical
6       elements that are right beside it, which are
7       also a pronounced feature of the front.
8    Q. Now, looking at your report of Exhibit #235,
9       I see in numerous pages that you highlighted
10      the diamond patterns with white lines. Am I
11      correct in that?
12   A. Yes, that's correct.
13   Q. And you did that to make them more visible or
14      more noticeable?
15   A. To make sure that everyone understood what
16      exactly I was referring to when I said the
17      double diamond pattern.
18   Q. Did you feel it was necessary to do that
19      because the patterns are somewhat hard to see
20      in the drawings?
21   A. The drawings are a little hard to see, yes.
22   Q. In your report regarding the 321 patent of
23      Exhibit #235, do you conclude that wicker is
24      ornamental or functional?
25   A. It's -- it has aspects of both.

## Page 183

1    Q. So would you agree with me that wicker, as
2       applied to the structure shown in the 321
3       patent is at least partly ornamental?
4    A. The way in which it is applied involves
5       ornamental choices.
6    Q. Now, earlier, you identified the 156 patent
7       as the closest visually to the 321 patent.
8       Is it not correct that the patent office
9       considered the 156 patent in examining the
10      321 patent application?
11   A. I believe that they did.
12   Q. So isn't it correct that the patent office
13      considered it to be patentable over the 156
14      patent?
15   A. That would be my understanding.
16   Q. Do you believe the patent office was correct
17      in that?
18   A. Well, as I've said elsewhere in the report, I
19      think all of the points that are involved in
20      the design existed in one form or another in
21      the prior art, and that, therefore, I would
22      not have called -- I -- that -- they all
23      existed in prior art. And so they aren't
24      points of novelty.
25   Q. If you would look at page 25 of your 321

## Page 184

1       report of Exhibit #235.
2    A. Yes.
3    Q. You see there in figure 72 you make reference
4       to a Thonet chair number 14.
5    A. Yes.
6    Q. Isn't it true that the Thonet chair number 14
7       is really a cane bottomed chair, not a wicker
8       chair?
9    A. It uses the same kind of material as what
10      we've been describing as wicker. It has an
11      open pattern, and generally that's described
12      as caned.
13   Q. Do you understand the -- are you familiar
14      with cane bottomed chairs?
15   A. Yes.
16   Q. And do you understand that a caned bottom
17      chair typically is made from a flat material,
18      woven?
19   A. Yes.
20   Q. And that flat material would have, once
21      woven, a generally flat surface as opposed to
22      the undulating surface of wicker?
23   A. Yes.
24   Q. So do you think many people would consider a
25      cane bottom chair to be a wicker chair?

## Page 185

1    A. I think they would consider it to be an
2       example of a combination of woven material
3       and wooden structure.
4    Q. But it's not wicker, is it?
5    A. It's -- it's generally referred to as cane.
6    Q. Not wicker, right?
7    A. The same material that's used in caning is
8       also frequently used in baskets and other
9       sorts of items that would be described
10      frequently as wicker by people. So it's the
11      same basic -- it is a material that people
12      might describe in that way.
13   Q. Have you ever seen a Thonet chair number 14
14      described as a wicker chair?
15   A. I may have. I can't recall.
16   Q. Are you aware that sometimes a wire crate of
17      a certain size might cost more in a store
18      than a similarly sized Bay Isle wicker crate?
19      MR. HINSHAW: Could I have that read
20      back?
21          (The court reporter read the
22          pending question.)
23      MR. HINSHAW: Objection to form.
24   A. I'm not aware one way or the other.
25   Q. Would you agree with me that it's possible

BRET SMITH
JUNE 13, 2008

## Page 186

1     that some wire crates of a given size might
2     sell for more than a Bay Isle wicker crate of
3     the same size?
4     A.  To the degree that, you know, many things are
5     possible, yes.
6     Q.  Isn't it also true that some of your analysis
7     regarding the discriminating taste of
8     consumers is based on the idea that wicker
9     crates cost more than wire crates?
10    A.  Well, it would depend upon the specific
11    features of the crate.  It's conceivable that
12    you could have features in a wire crate that
13    would make the wire crate more expensive.
14    Those are --
15    Q.  Have you read the Amicus brief filed by the
16    Industrial Designer Society in connection
17    with the Egyptian Goddess case?
18    A.  No, I have not.
19    Q.  Are you familiar with the position taken by
20    the Industrial Designer Society in that
21    brief?
22    A.  No.
23    Q.  In your two reports -- well, your multiple
24    reports, this series of reports in the 156
25    case and the single report in the 321 patent

## Page 187

1     dispute, you cite to a large number of prior
2     art references.  Did you yourself search for
3     and find those prior art references?
4     A.  Many of them.
5     Q.  How many of them were provided to you?
6     A.  You can look in the appendix material that
7     was part of my report and see which ones were
8     from -- were provided by Bingham McHale or as
9     part of the material that Mr. Anders went
10    through.
11          MR. GARDNER:  I have no further
12          questions at this time.  Thank
13          you.
14          MR. HINSHAW:  Give me just one minute,
15          please.
16          EXAMINATION
17    BY MR. HINSHAW:
18    Q.  I do have just one line of questions.  If you
19    would look at Exhibit #218.
20    A.  Okay.
21    Q.  Do you recognize that as the second
22    supplemental expert report of Robert John
23    Anders?
24    A.  Yes, I do.
25    Q.  And if you would, take a look at the second

## Page 188

1     point of novelty that Mr. Anders has
2     proposed.  I believe it's paragraph 4.
3     A.  Do you want me to read it?
4     Q.  Do you see it?
5     A.  Yes, I do.
6     Q.  Would you read that out loud?
7     A.  The second point of novelty is the door slash
8     front panel configuration.  A pet home with a
9     rectangular volume and having a rectangular
10    front, the front including a rectangular
11    see-through door that is framed substantially
12    by wicker.
13    Q.  What does the phrase, door that is framed
14    substantially by wicker mean to you?
15    A.  Like a picture frame.  It's surrounded.  It
16    has wicker on all sides.
17    Q.  On all four sides?
18    A.  Yes.
19    Q.  Is that feature present in the Bay Isle
20    product that is shown in Exhibit #2?
21    A.  No, it is not.
22          MR. HINSHAW:  I have no further
23          questions.
24
25

## Page 189

1          EXAMINATION
2     BY MR. GARDNER:
3     Q.  Mr. Smith, what does the word substantially
4     mean to you?
5     A.  It would depend upon the context.
6     Q.  Well, let's look at this door over here to
7     this room.  See that the door has a border
8     around it?
9     A.  Yes.
10    Q.  And that border is actually a door frame,
11    correct?
12    A.  Yes.
13    Q.  And that door frame extends along one side,
14    over the top and down the other side, right?
15    A.  Yes.
16    Q.  Would you agree with me that that door frame
17    substantially frames the door?
18    A.  We're talking about -- a door frame, if
19    you -- if you look at a regular door frame in
20    a wood frame house, they have a lintel.  In
21    other words, it is surrounded.  It does
22    completely frame the door.  If you look at it
23    in the lumber yards, it -- it is completely a
24    door frame.  It has a top, a bottom and it
25    has -- it has top, sides and they connect

BRET SMITH

JUNE 13, 2008

## Page 190

1    around the bottom.  In other words -- but
2    when you use the term framed, it's typically
3    like a picture frame.  That is, it is
4    surrounded by.
5    **Q.  Do you understand that the phrase**
6    **substantially framed or substantially framing**
7    **means something short of completely framing?**
8    A.  I would understand his phrase to mean, in
9    essence, surrounded by wicker.  And that is,
10    in fact, what the patent drawing reflects.
11    **Q.  So you believe that the phrase substantially**
12    **framing or substantially framed by requires**
13    **that the door be completely framed on all**
14    **four sides by wicker.  Is that your**
15    **testimony?**
16    A.  Yes.  That is the description for the patent
17    drawings.  The patent drawings show wicker on
18    all four sides, substantially framed.
19        MR. GARDNER:  Nothing further.
20        MR. HINSHAW:  Thank you.  No further
21    questions.
22        (The deposition concluded
23        at 4:40 p.m.)
24        * * * * * * * * * * *
25    FURTHER DEPONENT SAITH NOT

## Page 191

1        REPORTER'S CERTIFICATE
2    STATE OF ALABAMA
3    MONTGOMERY COUNTY
4        I, Mallory M. Johnson, Certified Court
5    Reporter and Commissioner for the State of
6    Alabama at Large, hereby certify that on Friday,
7    June 13, 2008, I reported the deposition of BRET
8    SMITH, who was first duly sworn or affirmed to
9    speak the truth in the matter of the foregoing
10    cause, and that pages 4 through 190 contain a
11    true and accurate transcription of the
12    examination of said witness by counsel for the
13    parties set out herein.
14        I further certify that I am neither of kin
15    nor of counsel to any of the parties to said
16    cause, nor in any manner interested in the
17    results thereof.
18        This 25th day of June, 2008.
19
20
21    _____
22    MALLORY M. JOHNSON, COURT REPORTER
      And Commissioner for the
      State of Alabama at Large
23    Alabama License Number: 443
      Expires 09/30/08
24
25    MY COMMISSION EXPIRES:  2/24/09

## Page 192

1        SIGNATURE OF WITNESS
2        I, BRET SMITH, hereby certify that I
3    have read the transcript of my deposition
4    consisting of pages 4 through 190, and except for
5    the corrections listed below, it is a true and
6    correct transcription.
7
8
      _____
9    BRET SMITH
10
      SWORN TO AND SUBSCRIBED before me
11    this _____ day of _____, 2008.
12
13    _____
      NOTARY PUBLIC
14        * * * * * * * * * * *
15    Page  Line  Correction and reason therefor
16
17
18
19
20
21
22
23
24
25

Bret Smith
June 13, 2008

## A

able 24:6 71:17
  95:22 142:1
  144:16,19 145:11
  145:20 146:1,6
  146:11 147:23
  148:9,17 175:19
  180:7
absence 21:17
  171:10
absolutely 28:21
  29:17
Absolutes 86:22
abstract 104:23
  152:19,21
accolades 162:21
accomplishments
  162:22,23
account 100:17
accurate 37:11
  144:21 145:22,25
  146:8,13,20,23
  153:17 161:18
  162:13 191:11
accused 101:3
  142:2 148:4
  163:15 165:8,19
  166:8
acquire 103:8
action 38:11,20
  39:25 40:4
activities 162:21,23
actual 72:13 81:22
  101:16,18 104:16
  107:20,23 110:4
  110:10 112:22
  113:8,19 114:11
  114:22 116:9
  118:10,21 121:12
acuity 97:8
add 13:15 63:11
  140:4 148:16
added 37:6 89:11
  95:7 172:9
additional 19:3
  70:14 104:1
  116:19 159:13
  162:6
addressed 155:10
  166:1 173:4
  178:12,15
addresses 170:8
addressing 170:4

admit 79:9
adopt 179:7
adopted 140:18
advice 36:7
affect 36:13,15,19
affirmed 191:8
ago 73:23 114:9
agree 4:7 11:21
  13:24 18:15,20
  19:13,22 21:8,12
  30:21 39:19
  41:12,17,20 42:7
  43:17,24 44:7,24
  45:20 46:4,21
  49:22 50:10
  51:16 52:13,15
  52:16 53:2 54:2
  54:16 55:13 56:7
  57:25 67:7,16
  68:5 69:6 74:4,24
  75:4 76:3 78:1,7
  79:2 81:23 82:9
  83:15,20,22 87:3
  95:25 106:16
  107:25 108:15
  111:7,11,15,15
  114:21 116:9
  125:20 128:2,15
  128:16,19 130:25
  137:8 166:23
  169:12 177:11
  183:1 185:25
  189:16
agreed 140:8
agreeing 84:9
ahead 75:19,21
  125:5
aisle 70:9
Alabama 1:2,20,22
  191:2,6,22,23
allegations 114:11
  114:22,24
alleged 175:23
allow 104:3
alter 10:1 13:8
alternate 24:16
Amelie 9:17 10:8
  11:11
amend 9:23 13:14
Amicus 186:15
amount 35:2,18
  68:6,11 70:20
  76:6 82:6 90:3,8

90:8,16
amounts 67:19
analogous 41:9
analogy 58:4 89:9
analysis 5:19,22
  14:25 15:16
  17:21 34:16
  48:12,14,24
  49:14 50:5 88:24
  96:15,17 122:23
  131:11 148:9
  150:13 156:14
  163:11,21 170:19
  175:16 176:4
  186:6
analyze 170:24
  173:11
analyzed 172:17,19
  173:21,25
analyzing 35:23
  150:20 178:8
Anders 3:14 37:3
  37:14 38:1 178:9
  187:9,23 188:1
animal 5:12 11:7
  11:22,24 122:11
  122:16
announced 125:1
  140:19
annual 161:1
answer 6:2 9:5
  20:14 23:9,16
  24:3,15,17 25:16
  25:17 26:6,25
  27:5 28:11,24
  29:20 30:8,13,15
  31:8 32:5 56:20
  61:15 84:22 91:2
  91:17,18 99:4
  104:22 109:12,13
  109:19 110:15
  122:19,22 124:20
  125:6 127:16
  132:23 133:16
  134:4,19,21
  135:11,20 136:6
  136:10,12,18,23
  136:24 137:1,1
  137:11,17,23,24
  138:1,9 139:4,18
  140:1 141:13,18
  141:21,22 145:8
  146:15 147:12,19

147:19,20,20
148:20 149:20
153:21 169:5
answered 5:17
  20:13 24:2,4,11
  24:12,14 25:2,13
  25:14 28:12 29:1
  29:4 30:20 34:10
  43:20 54:21 56:2
  56:16 73:21
  109:17 111:13
  116:7 133:4,12
  136:23 137:25
  139:16 140:10
  146:18 147:9,10
  147:18 148:21
  152:7,18 181:24
answering 27:1
  108:12,13
answers 6:16 29:3
  103:15 141:5
anybody 49:6 99:9
anybody's 136:7
anything's 104:21
anyway 138:22
apologies 181:21
apparently 39:20
appear 50:12 81:13
  166:14 167:14
  168:14
appearance 17:24
  19:10,20 41:14
  42:2,9 54:12
  62:25 63:7 68:8
  73:24 171:13
appearances 2:1
  41:4,6,22 42:1,13
  42:23
appears 38:4,13
  39:23 49:25
  61:10 62:8,11
  81:16 165:24
appendices 158:9
appendix 158:13
  159:11 187:6
apples 78:12
application 38:24
  39:6,17,22 40:24
  183:10
applied 156:13
  183:2,4
applies 155:21
apply 45:24 171:16

172:13
applying 151:10
appreciate 72:11
appreciation 12:15
approach 48:19
  49:5 170:7
appropriate 11:23
  49:13 64:5 65:8
  65:17 66:20 89:4
  89:5 90:2,8
  107:15 108:3,18
  178:6
appropriated
  165:18
approximately 1:23
arched 143:3,9,9
  144:10,10 168:2
  168:7 179:25
  180:11 181:16
area 50:12 149:22
  153:21 160:13
areas 97:12 153:7
arguing 88:4
argument 88:9
Arizona 100:3
arriving 108:25
art 9:15 10:10
  29:12 35:7,19
  41:9 44:18 57:14
  120:5 124:19
  125:9,24 126:16
  126:17 127:9,21
  128:4,12,22
  129:6 130:11,22
  131:19 133:1,21
  134:15 137:4,10
  137:15,21 141:16
  142:3,11,12
  143:4,12,15,23
  144:4 147:25
  148:3,11 175:11
  175:22 176:5
  177:6 183:21,23
  187:2,3
Arthur 2:3
ascertain 175:19
aside 145:25
  154:12
asked 4:1 5:18
  10:23 13:11
  17:16 20:12 24:2
  24:10 25:12,24
  30:14,20 34:9

Page 2

43:19 54:21 56:2
56:15,17 111:12
133:3,11 135:14
146:17 147:8,17
152:6,18
asking 26:14,18,19
26:21 27:12,13
28:17 29:7 32:2
32:10 33:1,3,19
35:16 37:15,16
37:20 41:17 44:3
44:7,13,16 45:7
52:4,6 53:22 54:1
61:18,20 78:19
78:21 111:19
120:8,9 121:14
121:18 123:3
124:24 127:3,14
128:2 130:13
131:12,13 134:11
135:18 138:10,12
138:17,21 142:6
142:16 145:6,10
151:7 157:8
165:20 167:20
173:9 178:21
aspect 175:9
aspects 166:25
180:19 182:25
asserted 175:21
176:2,6 177:3
asserting 22:3
assess 104:3 116:7
127:16
assessing 103:14
104:18 111:3
assessment 128:8
assign 116:17
associate 87:7
assume 15:15 20:5
52:22 59:3
100:23 118:19
145:24 160:18
assumes 84:3
assuming 21:10
22:6,9 45:11,15
45:18 108:2
109:8
assumption 12:18
astrophysicist
119:16
Atlanta 2:5
attached 37:3,14,25

48:8
attempt 72:3
139:25
attempted 15:21
attention 51:13
62:3 64:24 95:9
96:25 97:10,12
attentive 86:25
92:3
attorney 49:18
149:6,7 150:23
attorneys 2:4,8
9:13 103:21
104:3 113:6,18
attract 80:23
attributes 135:1,3
138:3,5 142:15
Auburn 1:21,22
160:16
August 121:9
Avenue 1:22
avenues 83:19
average 64:18
81:23 91:12
100:10 117:4
aware 5:19 58:9
59:17,18,19 60:6
67:12 94:11,14
94:16,20 99:5
105:16 113:1,3
142:12 175:2
185:16,24
awareness 181:15
a.m 1:23

B
back 4:25 5:6,15
14:15,25 68:2
73:17 74:18
110:17 111:18
120:25 128:25
135:24 155:23
161:24 162:7
166:19 181:23
185:20
background 101:25
109:24 110:13,18
155:1
backgrounds
112:16
bad 88:10 138:24
badger 136:15
balance 123:6,7

144:13
bar 89:11
bare 168:22
base 126:22
based 34:12 102:8
102:21 107:20
112:18 119:3
186:8
basic 157:2,11
185:11
basically 6:4 41:5
41:13,21,25 42:8
172:5
basis 84:25 101:15
102:5 110:12
basketry 122:9
123:9
baskets 185:8
Bay 2:22,24 47:14
50:24 52:2,19
54:4 55:1 57:16
58:19 59:9 67:20
68:8,20 73:8,9
74:19 81:19,20
82:11 83:6,8,17
85:5 86:11 87:9
90:1,10 92:6
93:10,24 94:23
95:17 96:9,19
97:16 105:1,6
106:8 112:6
124:10,16 125:21
126:13 127:18
128:9,19 129:21
131:20,22 132:6
136:20 137:8,13
137:19 141:14
143:1 144:3
147:6,14,23
169:18,21 170:1
170:25 172:17
185:18 186:2
188:19
bearing 105:2
beginning 38:23
73:5
begins 16:5 38:6
39:2
behaviorist 5:12
belief 88:12
believe 7:8 15:4
22:20 23:1,10,24
25:22 26:1,3 28:7

28:14 35:22
41:24 43:2,5,6,11
49:6 50:19,23
51:2,3 55:24 56:1
57:25 65:8,17,21
67:1 73:5 76:15
82:21 83:22 84:6
84:12,15 85:2,7
85:10,14,16,22
86:2,12 87:14
94:22 95:14
97:19 101:19
102:6 106:5
113:9 115:15,20
121:15 129:5
137:12,18 138:20
147:12 150:10
152:14 163:19
177:5 179:25
180:22 181:16,23
183:11,16 188:2
190:11
believes 29:21,22
29:23 87:22
Bellaruski 122:15
best 9:7 29:1 30:15
72:16 89:8
134:12 139:16
140:11
better 7:10 8:22
15:13 78:17
98:16
beyond 33:19 43:13
152:2,8 154:4,9
154:16 155:9,9
155:11,11 159:14
166:11
big 12:5,6 17:20
67:6 83:10,18
96:11
Bingham 2:8 187:8
bird 11:2,5,23
bit 65:8 78:18
117:1 152:13
blanket 19:25
21:15 83:20 99:4
110:24 153:2
blocks 75:11
board 77:4
boils 145:4
bona 118:21
book 114:18 119:24
120:1 121:1,1

124:4
border 189:7,10
bottom 8:10 36:9
71:16 168:11
184:16,25 189:24
190:1
bottomed 184:7,14
bought 12:4 93:14
box 67:6 69:10,20
69:22 70:5,9,11
73:3 83:10,18
96:11 171:23
branches 126:3,11
126:25
brand 48:18
branding 48:3,16
break 41:19 47:1
51:7 91:10 139:5
breaking 159:1
BRET 1:17 2:16
4:14 191:7 192:2
192:8
brief 47:3 82:20
99:20 114:7
139:9 159:4
186:15,21
briefly 9:18
bring 160:23 161:8
broke 159:5
Building 1:21
burdensome 30:10
business 97:21
businessman
118:14
buy 66:14 67:2,8,13
92:12 93:7,12
95:14,17 98:6
103:4
buyer 65:21 66:6,6
66:10 98:22,23
100:3,4,9 102:15
102:25 103:2,11
103:17 104:24
buyers 99:6 100:24
101:1,10,17,23
102:6 105:5,6
buyer's 103:7
buying 86:21 93:11
97:21 98:4
102:13,17
buys 66:11 94:22
94:25

BRET SMITH
JUNE 13, 2008

**C**

cage 10:12,14,19
  11:2,5,7,11,12
  12:10 36:10
cages 64:19
call 14:7 16:23
  54:24 66:22 73:6
  139:6
called 9:17 14:14
  77:20 183:22
calling 118:9
calls 118:7 167:15
campus 14:17
cane 184:7,14,25
  185:5
caned 184:12,16
caning 185:7
captures 72:9
care 64:8 86:16,20
  87:6 88:2,19,25
  89:4,6,22 90:3,8
  90:9,16,22 117:4
  163:8
careful 63:2 89:18
  91:21 94:24 95:3
  118:23
carefully 24:24
  82:3 95:13
careless 88:22 91:4
carry 102:21
carrying 102:18
cart 122:14
carting 158:5
case 1:6 4:10 6:21
  6:24 7:3,4 48:6
  56:24 76:8 77:19
  97:15 116:24
  140:20,21 150:16
  152:13,15 154:13
  155:8,9,15,21
  156:24 157:14,22
  159:23,24 163:1
  186:17,25
cases 21:10 112:15
  117:2 152:8,9
  154:13,16,23,25
  155:16,17 158:7
  159:17,24,25,25
  160:13 161:12
case-by-case 84:25
casual 64:1
cat 169:9
catalog 12:4 79:24

80:2,5,15 81:2,18
  81:21 82:2,2,6,14
  83:1,11
catalogs 67:7 80:11
  80:13,20 82:1
categorize 55:7,8
  55:11
cats 169:14
cat's 169:9
caught 169:10
cause 9:23 10:2
  141:12 191:10,16
certain 49:17
  185:17
certainly 46:2
  60:19 64:20
  80:11 85:22
  105:23 106:3
  108:7,8 113:25
  114:1 157:15
  160:8,25
CERTIFICATE
  191:1
Certified 1:18
  191:4
certify 191:6,14
  192:2
cetera 111:1,1
  179:19
chain 66:11 103:17
chains 67:6 83:10
chair 184:4,6,7,8
  184:17,25,25
  185:13,14
chairs 184:14
chance 83:23 85:3
  85:11,11
change 8:2 9:23
  10:3,7 13:8,12
  60:3 119:22
  135:11 136:6
  141:12
changed 136:25
  141:18,23
changes 97:5 106:2
changing 119:11
channels 67:17
  68:6 83:5,12,23
  84:17 85:1,8
characterization
  44:8 45:24 58:23
  112:11 145:5
characterize 53:11

55:9,15 56:18,21
  89:16 130:16,17
  144:17,19,22,24
  145:6,7,11
  160:11
characterizes
  105:12
charge 161:21
charged 45:23
  161:21
check 161:16
Chisum 4:25
  154:23
choice 19:20,20
  26:22 45:5 61:25
  62:10,18,24 63:6
  135:22 180:14,15
  180:17
choices 63:2 171:12
  183:5
choose 55:2,4
circumstances
  30:17 119:10,13
  119:19
cite 187:1
claim 151:2,12
  152:10,20 153:25
  154:4,8 155:11
  177:16,23 178:2
  178:19 179:20
claimed 172:22
claims 113:7,20
clarification 35:5
  52:3
clarify 157:5 176:8
claws 169:10,15
clean 9:3 15:11
clear 5:15 6:17 13:4
  37:9 44:12,12
  45:4 46:13,18
  55:10 71:11 77:4
  85:7,15,17,17
  86:8,17,22 87:2
  87:19 89:1,25
  95:5 111:22
  155:13 172:10
  173:14 174:11
clearly 5:17 55:17
  55:18 56:4 57:2
  74:16,17,21
  76:23,24 77:1,3
  79:7
clickable 74:2,5

client 160:14
close 10:14 20:6
  123:1,4
closely 104:15
closer 126:1
  128:11,15,20
  129:4,5,9,14,22
  129:24 130:2,4,6
  130:7 132:7
  133:8,8,9,14,18
  133:24 134:22
  135:8,9 137:6,9
  137:14 139:1,1
  141:14,16 142:2
  142:3 144:3,5,13
  144:18,19,22,25
  145:12 146:1,6,9
  146:14,22,24
  147:6,15,24,25
  148:10,11
closest 3:2 120:6
  121:18 122:24
  123:6 124:12
  142:19 143:5,19
  183:7
coffee 13:20
college 118:12,13
color 75:12 77:18
coloration 77:8
combination 177:7
  177:13 185:2
combine 121:16
  157:10
combined 170:2
  173:3,5,12
  174:13 175:22
come 66:14 110:17
  135:24 169:1
comes 69:19 107:13
  140:21
comfortable 54:23
coming 159:1
commencing 1:23
Commission 89:14
  191:24
Commissioner 1:19
  191:5,22
common 94:17
communicated
  154:20
communicating
  157:21
companies 102:6

company 1:8,10
  9:14 116:23
compare 124:24
  165:7 166:7
  169:20 170:1
compared 57:17
  76:21 79:25 82:1
  82:13 83:19
  169:18 180:2
comparing 58:10
comparison 44:2
  44:14,17 49:1
  127:3 131:2
  138:19,21,23,24
  138:25 146:25
  147:2 163:14
  164:5,8,25
  172:19 173:2
  174:9,9,12
complain 139:24
complete 22:18
  110:21
completed 118:19
completely 33:24
  63:19 144:11
  189:22,23 190:7
  190:13
computer 78:11
  79:8,10,17,21
  118:8,10,13,15
computers 118:6
conceivable 186:11
concept 23:2,11,25
  24:7,22 25:1,6,11
  26:4,16,22 27:4
  27:15,21 28:4,9
  32:9,15,18 33:7,9
  33:13,21,25 39:5
  39:15 40:9
concepts 23:17
  24:21 25:22 28:9
  29:6 31:12,20
  32:11,20
concern 100:13
concerned 64:15
concerning 176:3
conclude 168:17
  169:22 182:23
concluded 41:20
  190:22
conclusion 24:10
  30:19 34:11
  41:18 167:16

169:2 173:10,24
**conclusions** 106:22
  107:5,11,17
  108:5 109:21
  110:8,12 111:16
  119:20 170:13,17
  172:7,13
**conduct** 97:13
**conducted** 100:25
  153:24
**cone** 10:17
**confer** 82:17
**conferred** 141:10
**configuration**
  172:24 188:8
**configurations**
  172:25
**confined** 153:22
**confuse** 105:7
  112:7
**confused** 82:22
  83:3,16 84:11,13
  84:16,18 85:3,12
  85:21,24 86:3,13
  86:19 87:4,13,15
  87:23,24,25 88:3
  88:15 89:4,7 90:5
  90:10,14,23 91:6
  96:19 97:16,23
  98:13 100:11
  101:2,21 112:1
  115:2 118:23
  164:11 173:15
  178:20
**confusion** 3:12
  83:25 84:5 98:17
  101:12,13,18
  106:7,18 107:23
  107:25 110:11
  111:10,11,24
  112:22 113:8,19
  114:4,12,22
  115:19,24 116:10
  117:9 118:24
  119:12
**Congratulations**
  160:20
**connect** 189:25
**connected** 104:16
**connection** 69:15
  162:14 186:16
**conscious** 62:10
**consider** 45:7,8,9

45:14 46:5,9,14
47:25 48:3,23
49:7,11,14,19
53:10 54:9,10,11
58:12 59:24 60:2
60:10,20 61:5,11
61:14,22 101:5
103:23 108:16,25
113:23 117:10
118:13,14 124:9
149:1,4,8,15,21
150:6,16,25
151:3,16,20,23
152:1 153:19
154:14 160:1,9
166:20 168:2
171:24 175:10
179:14,18,22
184:24 185:1
**consideration**
  165:6
**considered** 36:19
  39:21 41:3,7
  42:14,24 48:22
  63:21 108:12
  116:10,12 125:2
  150:3 166:17
  168:6,22,25
  183:9,13
**considering** 49:3
  108:9 115:13
  175:6
**considers** 100:10
  139:15 179:3
**consisting** 192:4
**constitute** 22:22
  23:1 39:15
**constituted** 40:9
**constitutes** 178:18
**construction**
  177:16,23 178:2
  178:4,19 179:5,8
  179:20
**consumer** 46:8,9,20
  48:5,17 51:9,21
  52:9 64:12 65:10
  65:18 66:15 67:2
  67:8,13,18 68:7
  69:11 70:8,20,22
  76:4,17 78:2,8
  79:15 81:24
  83:16,24 84:5
  89:13 91:12

97:25 100:11
102:8 103:3
104:11,16 108:4
110:14,19 112:22
114:3 115:1,1
117:9
**consumers** 58:17
  58:23 59:1,4,5,7
  59:14,15,24 60:4
  66:14 74:12 75:8
  82:22 85:3 86:9
  95:16,20 97:15
  97:22 98:6,12
  101:2,16,20,24
  102:3,22 104:11
  106:18 107:1,10
  107:16 108:4,19
  108:19 109:10
  110:5,11,19
  112:1,6 113:8
  114:12,23 115:4
  115:25 186:8
**contacted** 73:11
  115:5 116:23
**contain** 7:22
  177:15,22 191:10
**contained** 99:24
  104:13 115:16
  117:24 159:10
**contains** 38:25
  167:1 170:18
  177:24
**context** 53:6,16,17
  63:9,16 64:12
  65:9 82:25 83:18
  148:19 189:5
**continual** 130:18
**continue** 136:15
**continued** 3:1
**continues** 38:9
**continuing** 125:14
  134:24 145:1
**continuum** 134:13
  144:2
**contract** 160:23
**control** 66:2
**controlling** 54:13
**conversation**
  102:12
**Conversations**
  157:24
**convey** 28:8 80:25
**conveyed** 68:7

**cooperate** 136:9
**copy** 37:11
**corner** 50:8 77:2
  122:17 126:19,20
**corners** 77:1
**correcting** 153:4
**Correction** 192:15
**corrections** 9:9,10
  192:5
**correctly** 41:10
**correspondence**
  35:17,19 116:8
**cost** 185:17 186:9
**counsel** 29:14 139:6
  191:12,15
**counselor** 124:7
**Counterclaimant**
  1:11
**Counterdefendant**
  1:13
**COUNTY** 191:3
**couple** 5:14 68:17
  82:16 162:16
**court** 1:1,19 9:1
  22:7 28:18 40:2
  67:24 73:18
  129:2 135:23
  139:7 141:10
  158:7 178:5
  182:1 185:21
  191:4,21
**cover** 2:24 18:23
  19:14 21:13,21
  22:14 43:8 47:14
  48:8,9,13 50:24
  52:2 65:16 67:3
  68:21 73:4 81:20
  82:11,24 83:8
  91:14 92:7,13,13
  92:21 100:6
  169:19 171:23
  180:25
**coverage** 36:3
**covered** 20:10,24
  21:9 36:11 63:23
  163:17,23 166:17
**covers** 18:16,21,25
  19:23 64:14
  65:14
**crate** 2:21,22 68:21
  73:2,3 81:20
  82:12 93:10,12
  93:13,24 94:1,23

94:25 95:6 96:5
112:7 124:10,17
127:18 180:25
185:16,18 186:2
186:11,12,13
**crates** 64:13 65:17
  67:4 74:9 93:11
  94:12,15,16,19
  94:21 95:15,17
  96:7,9,10 97:22
  102:16 105:1,7
  186:1,9,9
**credence** 104:4,12
**crisp** 6:3
**cup** 13:20
**current** 162:25
**currently** 5:9
**curriculum** 3:21
  162:10,12
**cut** 135:4,6
**cutoff** 72:5
**CV** 162:10,18

---

**D**

**D** 22:15
**dash** 37:7
**data** 92:24 119:18
**date** 175:15
**day** 141:7 191:18
  192:11
**days** 4:13
**deal** 134:19 170:14
**dealing** 108:4,18
  110:18
**deals** 17:24 19:7,7
  19:8 163:5 164:9
  164:19
**dealt** 152:9
**deceived** 64:10
**decide** 93:7
**deciding** 51:14
**decision** 24:6 76:5
  90:4,9 91:16
  103:7
**decisions** 102:20
  113:24
**decor** 64:25
**decorative** 16:9
  45:4 171:12,18
**deemed** 21:11
**Defendant** 1:8 2:6
**defer** 72:13
**define** 97:2

defined 63:8
defines 66:19,21
degree 15:1 88:19
  89:22 93:15
  186:4
Dell 118:5
demonstrated
  108:23
depend 77:10
  186:10 189:5
Depending 53:6,8
  53:16 80:2
depends 20:1 98:25
  104:14,14
depict 71:8
depicted 9:20 10:12
depicting 3:19
  69:23
depiction 70:4
DEPONENT
  190:25
deposition 1:17
  3:20 4:21 5:2,3,4
  5:5 6:9,11,18,19
  8:25 10:23,25
  11:11 64:18
  91:23 99:14,23
  100:2 106:14,22
  111:17 114:10
  150:10 175:14
  190:22 191:7
  192:3
depth 107:16
describe 15:5 50:4
  50:5 56:4,6 57:2
  57:4 179:13
  180:4 185:12
described 112:18
  171:21 174:3
  177:18 184:11
  185:9,14
describing 184:10
description 14:2
  23:20 26:7 27:17
  27:24 177:24
  178:23 179:22
  190:16
designer 33:10
  44:19,22,23 45:2
  45:22,25 48:19
  52:5,8 53:3,9,13
  53:19,24 54:24
  55:7,12 56:3,6,19

57:12 62:18
98:20 108:21
109:11 118:18
119:16 121:24
125:25 127:12,14
129:12 133:6
134:3 150:24
151:18 186:16,20
designers 46:4 57:5
  57:11 58:9,15
  60:4,6,10,15,17
  60:18,25 61:1,3
  61:10,22 62:2,9
  62:14,23,24
designs 1:20 10:9
  32:22 82:23
  83:25 86:14 90:1
  124:24 132:5
despite 30:17
detail 19:19 20:24
  21:3,6,17 38:17
  60:21 61:8 62:3
  67:19 68:7,11
  70:10,15,20
  74:13,16,16 76:6
  77:2 80:3,22 81:1
  82:3,7
detailed 71:1
details 19:3,9,17
  20:2,4,5,16 21:16
  21:18,23 22:1,4,6
  22:9,19 45:18,19
  61:8 76:20 79:3,6
  79:10,19 81:25
  82:10 92:4
detail-conscious
  65:2
determination
  121:17
determine 15:1
  97:15 103:22
  147:23 148:10
  150:21
determined 118:21
determining 115:10
developing 156:21
deviates 140:6
de-emphasized
  175:7
diagramed 172:12
diamond 14:7,8
  15:19,19 16:23
  17:3,7,13 18:5,19

19:12,13,15,18
19:24 20:9,20
21:7,14,20,20
22:10,11 42:4,5
43:9,11,12,22
57:22 171:8
182:10,17
diamonds 51:8
dichotomy 55:22
  133:15
dictionary 172:3
differ 111:6
differences 41:6
  42:12,23 43:2,5
  43:15 44:5,9,25
  53:13,14,14,15
  53:20,20 64:20
  65:6 85:7,14,17
  86:8,17,22 87:1,8
  88:25 89:25 95:4
  111:22 144:7
  170:24 171:23
different 13:25
  16:10,15,17,21
  17:6,14 18:7,9,9
  18:10,12,13 30:3
  50:1,12 63:25
  67:17,18,20 68:5
  75:12 77:18
  78:18,21 84:24
  95:16,20 111:5
  123:4 129:11
  131:11 138:2,5
  140:1 144:12
  145:15,16,16,18
  166:12 169:23,24
  171:20 173:13,25
  176:19
differently 20:15
  78:14
differs 146:3,4
difficult 155:22
direct 107:1
disagree 54:17
  106:21 107:4,11
  128:1
discern 12:24
discerning 118:8
disclose 28:3
disclosed 24:21,23
  27:21
discloses 24:25 32:8
discount 103:5

119:7
discounted 103:12
discovered 9:15
  10:9
discriminating
  91:22 94:24
  186:7
discrimination 97:7
discussed 6:23 13:9
  58:5 67:1 78:4
  171:11 172:6,6
  172:12
discussion 11:4
  13:3 40:12 63:16
  75:25 99:19
  113:16 141:8
  158:25 175:25
  181:20
display 68:22 69:8
displayed 84:23
displays 69:1
dispute 187:1
distinct 39:14 40:14
  40:17,22 50:7
  53:7 144:8
  171:13
distinction 166:11
distinctive 171:10
  181:17
distinctively 16:17
  17:14 18:11
  171:19
distinctiveness
  182:3
distinctly 16:10,14
  16:21 17:6
distribution 67:17
  68:6 84:17 85:8
distributor 65:22
  66:5,7,12
DISTRICT 1:1,2
DIVISION 1:3
document 38:5
  40:5,10
documents 72:20
  113:10 114:2,14
  115:16
dog 73:2 74:8 81:20
doing 30:5 32:6
  98:8 111:2
  150:12 174:8
door 10:16 74:16
  77:3 188:7,11,13

189:6,7,10,13,16
189:17,18,19,22
189:24 190:13
doorway 168:2,7
  168:23 179:25
  180:11
doorways 142:23
double 14:7,7 15:19
  16:23,23 17:3
  18:5,19 19:12,12
  19:15,18,24
  20:20 21:7 22:10
  22:11,15 42:5
  43:8,10,12,22
  132:23 182:17
Dr 5:10
draw 122:8 170:13
drawing 19:21
  190:10
drawings 14:12,16
  14:22 15:2 16:18
  28:7 164:4,17
  166:7,7 167:9
  181:11,11 182:20
  182:21 190:17,17
drawn 119:20
drew 172:8
dried 135:6
dry 135:4
duly 191:8

E
earlier 11:10 58:5
  83:5 116:12
  180:22 183:6
early 172:7
earned 161:14
easier 37:7 78:7
  79:2,18 81:24
  82:9
easily 7:11
EASTERN 1:3
edge 142:17,18,20
  171:15
edges 19:7 76:24,25
  97:1,10 142:23
  144:11
effect 15:6,23 91:23
  106:1 113:9
Egyptian 140:19,21
  186:17
eighth-inch 12:22
either 20:6 21:13

Page 6

29:7,21 32:10
34:25 59:5,17
60:7 65:15,16
66:18 72:23 79:7
122:14 129:22
130:7 131:3
133:8 144:8
150:17 153:14
161:21 171:14
electric 89:9
electronic 15:10
element 181:18
elements 126:18,20
167:23 171:14
182:6
elephant 122:10,15
123:10
embodiment 14:6
14:11 16:22,24
17:3,7,12 18:6,8
21:6 23:5,7,13,21
24:17,22 25:3,7,8
25:19 26:2,9,10
26:15 27:10,18
28:16 31:17
33:17,17 34:4
169:23,24 171:9
171:11 172:18,20
173:12 174:7
embodiments 14:1
14:5 22:21 23:10
38:25 39:3,4,8,13
39:21 40:8,13,14
40:16 41:3,7,13
41:21,24 42:8,14
42:24 43:3,16
44:5,9,25 46:10
46:17,22 63:22
169:22,25 170:2
170:3,14 171:4
171:17 173:3,4
173:13,24 174:13
174:14
emphasis 34:16
emphasize 126:22
emphasized 175:7
enclosure 11:22
122:9,11,16
123:8 169:11
engaged 88:8
148:22,25 149:9
149:14 150:2,15
engine 78:17

engrossed 72:21
enlargement 77:11
enlargements 74:3
74:5 77:24
enter 103:7
entire 99:16
entirely 132:11
entitled 28:13
30:12 127:15
158:13
entrance 171:15
entries 80:6
environmental 97:7
environments
68:13 69:12
84:24 85:15,18
99:3
equal 45:16 83:23
84:16
equally 130:10
131:5
equate 62:19
equidistant 129:14
130:9,13
erected 70:13
erecting 69:9
error 68:4 140:15
essence 190:9
essentially 179:16
established 33:6
83:4 143:22
establishing 48:18
estimate 155:23
158:15
estimation 85:20
et 111:1,1 179:19
etched 74:15
ethologist 5:11
evaded 24:13
evading 27:2
evaluate 112:17
131:1 148:15
evaluated 149:13
149:19
evaluating 48:20
49:7,15 101:24
149:10,16 150:7
163:12 181:7
evaluation 148:16
149:24,25
evasive 141:6
Everybody 137:5
everybody's 135:21

136:5
evidence 100:20
112:3,21 113:2
116:9
exact 20:16 38:16
158:19
exactly 20:18,22,23
21:2,5 72:3
148:19 182:16
exam 95:12
examination 2:15
4:18 66:24 69:2
159:6 187:16
189:1 191:12
examinations
153:23
examine 68:17
examined 94:9
152:2 155:12
175:15
examiner 38:22
39:20,24 40:3,7
41:4,12,20 42:12
42:22 46:21
63:21
examining 115:13
183:9
example 13:16
15:18 20:21 36:7
69:25 78:14
102:24 118:4
142:18 185:2
examples 68:17
excerpt 106:13
111:17
excerpts 3:20 99:14
99:24
exchanged 113:11
exclude 165:2
excluded 163:20
164:23,25
exclusive 109:2
excuse 47:6 126:21
141:24
exercise 64:8 66:2
86:16 88:20
89:23 142:1
163:9
exercises 89:22
exercising 64:7
86:16 87:5 88:19
88:24 89:17
163:8

exhibiting 83:24
exhibits 71:5 72:7
73:13,25 74:10
76:18 114:17,20
exist 174:24
existed 183:20,23
existence 19:11
exists 90:24 91:1
expect 70:19
147:22 148:8,17
expectation 102:21
expense 95:7
expensive 95:23
186:13
experience 60:17
71:20 78:19,22
97:25 101:15
102:9,13 103:16
104:10,15 107:1
107:9,15,20
108:3,18,22
109:9,24 110:4,9
110:18 111:1
112:16 119:3
150:12 152:10,12
152:14 160:6,13
experienced 113:7
160:8
experiences 110:5
110:14
expert 3:13 19:6
61:17 100:17,19
100:22 101:5
109:3 112:20,24
113:23 115:9
116:11 119:2
149:1,4,8,15,21
150:3,6,16,20
151:4,14,16,21
151:24 152:5,15
153:1,6,8,20
154:3,4,14 155:4
155:7 159:23
160:1,4,9,12
178:7 187:22
expertise 151:10,19
152:1,10 153:9
153:22 155:11
Expires 191:23,24
explain 89:8
explained 69:3,5
139:11
exposed 126:18,20

express 6:10 107:19
expressed 106:17
111:5,8,9
expressing 107:23
extend 152:2
extends 189:13
extensive 35:2,18
extent 72:5 105:11
124:23 154:25
extremely 52:23,24
53:4
eyes 44:14,17
121:21,22 166:10

**F**

fabric 51:10 58:6
fact 21:11 89:10
96:24 100:9
115:18 141:16
166:5 175:5
179:7 190:10
factor 51:14 54:13
factors 108:24
facts 140:24
fair 37:19 82:6
fairly 11:22 80:7,7
80:17 94:17
fall 117:5 125:12
135:7 137:6
144:3
falls 125:19 128:9
134:13 136:20
false 133:14 145:5
familiar 7:1 94:7
184:13 186:19
familiarize 181:5
181:14
family 126:1,3
far 59:12 151:2
161:21
faster 121:11
faulty 138:19,20
feature 20:7 53:8
77:11 163:13,13
164:3,17 165:6
165:24 166:6
167:10,14 168:3
168:4,4,18,19,24
168:25 169:2,3,4
180:2 182:7
188:19
features 76:11 78:3
78:8,9 96:23

163:4,17,20,23
166:22 168:20
179:14,15 180:5
180:6 186:11,12
fee 161:3,5
feedback 118:17
feel 119:11 182:18
fees 161:11,14,20
feet 180:3,11,12,14
felt 96:23
Ferry 2:5
fide 118:22
field 98:2 128:5
figure 8:4,7,12,13
8:13,14,14,15,15
8:16,16,17,18,18
8:22 9:8 10:15,18
10:20 11:2,5,12
11:18,25 20:23
21:2 23:6 25:8,17
25:19 31:16
33:16 76:2,16
78:6,24 83:14
85:19 87:22
122:13 143:3
150:1 155:25
156:20 165:22
168:21 171:2
174:15 179:2
184:3
figures 8:21 14:3
23:8,20,22 24:23
25:4,19 26:7,8
170:8,10,11
figuring 133:24
file 3:17 34:13,25
35:6,8,13,23 36:1
37:2,24 38:6,15
filed 186:15
files 15:10
filings 35:10
final 122:23
find 8:5 15:13 22:8
28:2 62:14 86:24
92:23 112:25
118:18 121:11
142:7 173:19
187:3
fine 29:16 76:20
159:3 167:19
finish 9:4 27:7
finished 58:5 118:5
firm 37:6

first 4:15 16:6,21
17:3 18:6 21:5
38:9 41:19 47:17
64:17 70:3 72:22
73:6 101:14
149:12,18,23,24
149:25 156:12
165:12,25 169:23
171:9 172:18
176:17,25 179:16
179:16 191:8
Five 82:19
flat 184:17,20,21
flawed 109:7
flip 13:21 21:4
123:12 158:15
focus 54:15 98:20
98:22,23
focusing 19:11 20:7
21:19
folds 180:20
following 38:25
41:2
follows 4:17 81:7
follow-up 104:7
105:23 106:4
football 128:5
foregoing 191:9
forget 11:3
form 9:16 12:14
19:9 40:18 41:15
43:4 44:1 48:9,11
55:5 83:2 106:10
132:1,10,21
148:12 152:17
167:15 172:2
173:6 183:20
185:23
forms 47:25
formulating 100:18
101:5
forwarded 154:21
found 94:19 118:16
foundation 15:7
22:24 23:12,19
24:1,9 25:25
30:18 34:11
40:19 41:16 46:6
68:10 70:24 80:9
101:9 105:15
106:11 112:12
125:4 132:2,11
132:22 148:13

152:18 173:7
four 50:7,7,11 67:9
67:17 68:5 83:5
83:12,12,14,23
84:17 85:1 177:3
188:17 190:14,18
fourth 131:6,8
fraction 81:8,11
frame 11:15 74:19
134:5 188:15
189:10,13,16,18
189:19,20,22,24
190:3
framed 188:11,13
190:2,6,12,13,18
frames 189:17
framing 190:6,7,12
frankly 14:9
free 119:7 139:24
French 9:16
frequently 62:21
185:8,10
Friday 1:22 191:6
front 5:6 14:24
47:5 73:25 78:10
79:15,20 121:5
171:12,22 181:18
182:4,7 188:8,10
188:10
full 60:5 76:22
78:10 79:20
80:12 82:8
154:24 160:15
functional 163:4,13
163:16,19,23
164:3,16 165:6
165:16,24 166:6
166:14,16,18,24
167:11,13,23
168:3,5,8 179:15
180:13,19 182:24
functionality
164:21 166:1
fundamentally
109:7
further 117:10
141:2 187:11
188:22 190:19,20
190:25 191:14
furthermore 41:5
42:21,22
future 147:22
148:9,18

F.2d 39:8,12

### G

gain 156:12
gained 152:14
gaining 157:11
Gardner 2:3,4,16
2:17 4:4,9,19 7:7
24:12 27:1 28:24
29:3,13,19,25
30:12,24 31:1,6
37:10,16,20
46:25 52:6,10
65:15 68:1 71:14
72:1,19 75:24
82:16 84:8 87:21
88:8 91:8 99:17
113:15 114:6
121:4,22,25
122:4 123:19
124:7 128:25
135:16,23 136:1
136:7 139:5,10
141:1 155:18
158:24 159:3
173:17 174:2,6
176:8,12,16,23
179:1 181:22
187:11 189:2
190:19
gather 70:14
gauge 97:22 98:12
98:17
gears 119:22
gee 92:14
general 7:5 53:18
60:20 61:11
62:24 69:12 74:7
76:8 79:23 80:3
82:4,15 84:21
85:14 87:1 91:25
95:13,20 97:24
152:25 154:2,6
154:22 155:2,3,4
generalized 84:22
generally 56:11
87:6 92:3 95:7
184:11,21 185:5
generated 101:11
genuine 115:21,24
Georgia 2:5
getting 95:12 136:1
156:7 157:2

178:20
give 19:4 36:7
80:21,22 99:3
100:13 104:12
118:4 134:12,21
136:9,18 139:25
155:24 156:7
187:14
given 6:24 22:14
29:3 30:15 55:24
75:4 81:18
136:24 137:11,17
137:23 139:4
186:1
giving 135:19 140:3
glanced 5:3
glass 12:4,5
glean 70:21,22 76:7
109:5
gleaned 70:10
74:13 154:19
go 13:1 29:13 71:15
71:20 75:19,21
78:15 92:11
114:6 120:25
125:5 131:17
135:23 161:24
179:13 181:19
goal 128:5,7,11
134:2 161:4,5,6
Goddess 140:19,21
186:17
goes 31:11 78:24
101:19 169:11
178:24
going 26:24 29:17
30:7 46:25 64:24
65:1 71:18 76:1
76:19 81:12 82:7
84:1 85:21,23
92:22 95:10
101:2 102:22
105:10 125:13
135:10,19 136:6
136:21 151:13
158:11
good 13:6 78:16
82:2 174:19
Google 78:16
Gorham 64:6 89:20
117:6 163:3,5,6
163:10,11,20
164:7,8,9,15,18

Page 8

164:19,24 165:8
165:13,25 166:2
166:8,9 170:19
Grab 121:2
grant 53:24
granting 22:3
GREENWALD 2:4
GROFF 2:4
group 60:3,23
64:21,23 89:25
90:19,21,23
95:16,20,24
guess 75:16 88:6,8
89:8 104:20
140:5 171:21
172:9,14
guessing 32:7
guys 155:14

**H**

H 2:7
half-inch 12:21
hand 70:1 122:17
130:20,23
hands 119:17
hang 28:19 30:2,2
38:8 47:22,25
48:7,11,21 49:7
49:14
hanging 47:22
happen 93:4
happened 69:15
96:3
happens 93:17,20
happy 31:2
harassing 30:9
hard 14:11 74:24
75:13 76:2
182:19,21
harder 76:19
heard 105:16
181:25
hearing 105:17
139:13
hedges 89:16
116:15
help 12:15 68:22
helpful 9:6 170:16
170:20
high 12:3
higher 64:23 92:1
highlighted 182:9
highly 71:1 167:4

histories 34:13
history 3:17 34:25
35:6,8,13,15,23
36:2 37:2,13,24
38:7,15
Hold 129:20 177:19
home 80:15 92:15
188:8
honestly 137:12
hoping 171:5
hour 91:9
hours 156:1,3,4
157:15,16,18
159:20
house 80:13 189:20
housing 31:17
177:18
hundred 85:22
hypothetical 60:22
60:24 61:7,15
101:8 105:14
107:21 109:14,16
109:19,21 110:21
110:25 112:13
119:14 132:23

**I**

idea 63:19 186:8
identically 20:6
identified 41:3
76:12 83:14
183:6
identify 26:15
136:19 170:16
174:23
ignore 119:7 166:4
ignoring 119:9
142:23
illustrations 13:6
image 70:11 71:17
74:22 75:14 76:3
76:14 79:5,16,21
81:7,19 82:14
images 10:8 15:5
15:14 73:11,22
73:23 74:10,14
74:15,18 75:5,7
76:18 77:22 78:2
78:11 79:1 80:16
80:18
imagine 98:1
impact 36:2 58:25
76:6 115:25

117:11
impacts 62:3
imperfectly 72:8
implies 127:24
important 8:25
63:7 97:9 113:23
146:4
imposes 161:7
impression 108:1
improper 101:8
105:14 112:13
132:2,12 139:20
improperly 105:12
impulse 93:4
inaccurate 5:9 6:12
8:1 134:18,20
146:25 147:2,14
inappropriate
65:24 178:7
inattentive 88:23
89:20
incidents 89:12
include 19:23 39:5
48:14 67:5
110:13,14 164:4
165:5
included 39:5,16
40:24 163:14
including 21:6
188:10
incorrect 8:1 106:9
112:1,9 115:17
independent 51:23
83:9
INDEX 2:15,19 3:1
Indiana 2:10
Indianapolis 2:10
indicated 38:2
39:24 40:4,8 81:2
124:11 139:21
141:3 150:11
indicates 42:12,22
91:20
indication 15:20
indistinct 39:7 41:8
individual 50:17
68:13 84:25
117:2
individually 170:3
industrial 1:20
44:19,21,22 45:2
52:4,8 53:3,12
54:24 56:19 57:5

57:10,12 58:8,14
60:4,5,10,15,24
61:1,3,10 62:2,9
62:23 121:24
129:12 150:24
151:18,20 160:1
186:16,20
industries 103:2
industry 100:24
inexpensive 92:12
infer 12:17
inference 66:21
influence 54:11
inform 107:10
170:7
information 69:22
70:15 71:1 72:6
94:2 100:16
101:4 103:22
104:2,22 105:3
105:20 113:22
115:8,16 116:2,5
116:16,19 117:7
118:3,16,18
119:1,2 154:21
159:7,10,13,19
informed 9:14
infringed 150:21
infringement 17:21
35:24 49:8,13
101:7 112:23
115:10,11 148:8
149:11 150:4,12
151:5,7,9,25
152:5,16 153:8
153:13 155:5
156:17,22 157:12
158:18 165:9,10
165:11 181:8
infringes 21:9
48:13,21 49:15
inherently 109:6
initial 102:12
initially 73:10 92:7
instance 65:15 66:9
instances 3:11
101:17 114:3
115:1,3,24 117:8
117:11 118:20,22
118:24
instruct 30:8
intelligent 80:23
intend 103:20

104:1 105:19
intended 123:18
167:19 171:6
intending 92:11
intent 179:10
intentionally 15:22
interest 80:25
interested 32:1
191:16
interior 64:25
interrogatory
113:13 117:25
intertwined 157:7
157:10
introduced 89:10
introduction
179:18
invalidity 5:18,19
153:20 154:3,15
154:19 155:6,20
156:6,17,23
157:13 158:19
invention 22:23,25
inventive 23:2,11
23:17,25 24:20
25:1,5,10,22 26:3
26:16,22 27:4,14
27:21 28:3,9,9
29:5 31:12,19
32:9,11,15,17,19
33:7,9,12,20,24
39:4,15 40:9
inventory 65:23
66:13
investigate 112:24
investigation
117:10 118:20
150:25 153:10
involved 104:17
183:19
involvement 154:12
163:1
involves 183:4
irresponsible
109:18
Isle 2:22,24 47:14
50:24 52:2,19
54:4 55:1 57:16
58:19 59:9 67:20
68:8,20 73:8,9
74:19 81:19,20
82:11 83:6,8,17
85:5 86:11 87:9

90:1,10 92:6
93:10,24 94:23
95:17 96:9,19
97:16 105:1,6
106:8 112:6
124:10,16 125:21
126:13 127:18
128:9,19 129:21
131:20,22 132:6
136:20 137:8,13
137:19 141:14
143:1 144:3
147:6,14,23
169:18,21 170:1
170:25 172:17
185:18 186:2
188:19
issue 79:14 109:23
116:4 140:24
141:7 165:11
181:12
issued 15:22
issues 6:6 92:4 97:6
97:8 103:6
110:19 116:23
155:7,10 157:9
160:7
item 68:22 89:24
92:1 102:17
166:16,18
items 69:8 81:3
124:9 166:14
185:9
I''d 116:25

**J**

James 2:7 7:8
88:10
Jeff 2:12
jibes 37:18
job 103:13 111:3
Joe 2:3
John 3:14 187:22
Johnson 1:18 191:4
191:21
Jou 2:12
judge 136:14
139:11,12,14,18
139:21 140:8,13
140:20 141:2
judgment 12:8
89:18 134:12
judgments 100:20

June 1:22 191:7,18
jury 131:18,21

**K**

keep 21:23 28:5
32:5 53:7 135:18
135:19
kennel 94:10
key 97:6
kill 89:11
kin 191:14
kind 5:20 11:7 12:8
14:14 45:22 58:4
78:12 89:8 92:23
95:6 96:16 98:8
104:14 109:9,24
147:21 148:1,2
157:6 179:11
184:9
kinds 19:9 117:4
Klinghammer 5:10
knowledge 115:23
156:12,21 157:3
157:12

**L**

labeled 168:20
lack 19:12 20:8
21:20 101:9
107:9 112:12
lacks 105:15
language 23:4
24:19 31:18,25
32:1 34:1,12 41:2
42:11,25 43:1
170:6 171:3,6,24
laptop 118:5
large 1:20 187:1
191:6,22
largely 10:13 11:14
126:18
Laurie 105:4
law 2:4,8 149:2
lawnmowers 89:9
89:15 116:15
lawsuit 76:9 148:23
148:25 149:9
lawyer 33:11
138:24
lawyers 141:10
157:22 159:8
layout 80:2
learn 69:14 155:20

learned 153:14
154:10
leaving 29:19 133:7
lectures 162:16
Left 129:20
legal 24:10 30:18
34:11 140:15,17
147:21 148:7
159:10 167:16
legs 47:2
length 175:19
lengthy 175:14
letter 38:11 39:25
40:4
letting 27:6 72:19
let's 7:7 20:5,17
21:4 28:19 36:21
38:18 46:8 49:20
52:22,22 59:3
63:25,25 65:7
68:17 71:23 83:4
85:1 98:1 100:23
114:6 118:19
119:22 122:1
123:12,14,22
134:19 139:5
145:24,24 166:19
166:19 189:6
level 87:6 89:5
90:22
levels 67:19
levity 159:8
License 191:23
light 60:2 110:9
liked 93:13
likelihood 83:24
84:4,10,15,18
97:25 101:6
107:25
limited 157:24
line 73:9 128:5,7,11
128:14,18 134:24
135:14 136:4,16
138:6,8,11,17
139:8,19 140:10
140:12,14 145:2
187:18 192:15
lines 103:8 134:2,2
142:17,18 182:10
lintel 189:20
listed 192:5
Listen 24:24
listing 162:25

litigation 99:6
120:11 149:14
162:15
litigations 169:7
litter 2:24 31:16
43:7 47:14 48:8
48:13 50:24 52:2
64:13 65:13,16
67:3 68:20 73:3
82:11,24 83:8
91:14 92:6,12,13
92:20 100:6
169:18 171:22
177:17 180:25
little 4:23 11:14,15
14:11 65:1,7 72:5
75:13 78:13,18
91:21,21 93:21
95:19 116:25
152:13 156:8
159:8 161:18
182:21
live 139:18
local 139:6
location 75:3
locations 74:25
long 162:18
look 6:5 15:12 17:2
17:10,14,18 18:6
18:11,13 19:4
23:23 35:19 38:2
38:5,18 43:7,7
49:20 69:25
75:14 83:4 94:6
95:8 100:19
108:22 109:12
114:1 115:9
116:13 119:22
122:1 124:18
127:9,20,23
133:5 137:13,20
141:1,4 142:5,7
148:14 161:25
167:9 170:18
181:4 183:25
187:6,19,25
189:6,19,22
looked 6:19 10:10
12:5 14:15,16,21
17:16 20:22 21:2
21:5 48:5 72:23
73:8,9,12,22
117:25 170:3

172:21,21,24
174:4,6
looking 6:6,18
11:18 17:19 18:1
47:17,20 49:1
50:20 76:12,17
78:10 79:16,19
79:21 91:14
109:17 115:13
119:8 124:16
126:1 132:4
142:22 158:19
161:1 167:24
168:10 169:17
179:24 182:8
looks 5:9 18:9
37:24 39:12 93:6
120:12 123:20
125:21 126:14
127:7,18 131:18
131:23 132:6
137:9 142:13
143:24
loose 124:3
lot 34:21,24 93:21
97:3 103:6 116:4
131:23 132:6
137:20 140:7
143:7
lots 160:12 162:21
loud 16:6 188:6
low 119:5
lower 28:23 37:6
122:13,16
lumbar 189:23
lump 85:2 169:25
lumped 171:3
lunch 91:9,11

**M**

M 1:18 191:4,21
machinations 147:4
mail 173:10
main 20:2 34:16
major 45:14 46:3
51:4,17,25 52:13
52:17 53:10,13
53:19 54:4,20
55:2,3,14,19,22
55:22 56:1,14,21
56:23,25 57:9,17
58:1 63:14,21
majority 157:23

Page 10

making 59:1 63:2
  76:4 90:3,9 91:15
Mallory 1:18 191:4
  191:21
man 28:22 30:22
manner 139:17
  191:16
Mantle 100:1,10
  103:11,22 104:9
  106:17 107:12,14
  108:3,17 111:16
  111:25
Mantle's 104:5
  105:20 106:6,13
  109:7 110:7
  111:5
manufacturer
  66:12
manufacturers
  69:7
mark 7:7 36:21
marked 7:13 36:22
  71:5 99:12
  158:12,22 162:8
market 2:9,9 99:1
  101:20
marketing 104:10
  108:5,19 109:10
  160:5,10
marketplace 94:18
  107:24
matches 176:25
matching 64:25
material 4:25 184:9
  184:17,20 185:2
  185:7,11 187:6,9
materials 153:15
  157:20,24 158:2
matter 134:1 137:3
  151:8 191:9
matters 115:11
  149:5 150:4,18
  151:5,6 152:16
  153:1,6 162:15
McHale 2:8 187:8
mean 8:5 12:2 13:4
  13:15 14:16
  18:25 22:12
  23:24 35:12
  37:15 38:16
  40:16 62:1 63:4,6
  63:10,14,17
  75:15 80:21 82:4

90:25 92:2 106:1
  107:2 113:12,25
  116:6 117:1
  122:19 125:19
  127:23 134:4
  148:15 152:8,25
  154:22 164:24
  175:5 176:22,24
  178:1,21 188:14
  189:4 190:8
means 4:3 172:4
  176:10 190:7
meant 14:12,13
  172:16
measured 107:24
measures 89:11
meet 175:23 177:7
  177:8
mentally 125:7
mentioned 14:10
  64:16 79:6 85:9
  99:9
mentions 162:21
merchandise 103:8
merchandising
  98:2,25 104:11
  160:4,10
met 4:23
Metal 1:7,10 94:11
  94:14 103:20
  104:2 113:5,17
Metals 9:13
middle 1:2 130:10
  133:10 148:5
Mid-West 1:7,10
  3:12,19 9:13
  16:20 65:23 67:2
  67:9,13 69:16,19
  71:8 72:24 76:20
  81:19 82:10,24
  94:11,14 96:20
  100:7 103:20
  104:2 111:23
  113:5,17 115:5
  124:16 125:11,20
  133:1
mind 107:13
  109:23
minor 41:7 42:14
  42:24 43:3,17,24
  44:2,10 45:1,10
  45:20 46:1,5,11
  46:14,22 51:3

52:23,24 53:4,10
  53:14,14,20,25
  54:1,9 56:9,10,23
  57:1 58:13,21,23
  59:25 60:13 61:6
  61:14,23 62:1,15
  62:16,19,19 63:4
  63:5,12
minute 11:17
  100:23 119:22
  187:14
minutes 73:7 82:17
  99:14,22 135:15
mischaracterizes
  87:17 110:2
  146:18
mischaracterizing
  173:8
misleading 84:3
missed 8:22
missing 124:3
  162:16
misstated 177:20
mistake 91:5
misunderstood
  77:25
model 2:24 16:9
  47:14 48:21
  50:24 54:19 57:7
  57:16 82:24 85:5
  85:25 86:4,11
  88:16 92:7,21
  100:6,12 143:8,9
  143:12 145:11
  169:18 171:18
modern 122:9
  123:8
mold 62:6,6
moment 21:20
  52:22 59:3 114:8
  151:24 165:20
  166:5
money 95:22
  160:24 161:8
MONTGOMERY
  191:3
move 13:20 31:4,7
  63:25 140:12
moved 8:20
movie 9:16,20 10:8
moving 28:13
  135:16
multiple 39:2,4

40:8,13 77:11,23
  80:18 81:3 176:5
  176:9,12,13,22
  177:1 186:23

—— N ——
narrow 54:15 65:7
nature 107:16
near 69:10
nearly 85:11
necessarily 89:17
  98:21 103:3
  109:2 133:14,19
necessary 182:18
need 9:10 82:17
  107:2,6 110:12
  110:23,23 111:2
  116:2,2,6,16,19
  116:20,21 117:6
  118:3 120:16
  124:1 161:24
needed 6:17 174:19
needs 92:2
neither 56:25 66:17
  191:14
new 148:14
newly 9:15
normal 4:11 89:17
normally 81:2
  88:20 89:23
  127:14 134:11
  138:7,12,16
  163:8
NOTARY 192:13
notches 76:25
note 15:14
notice 1:18 43:11
  43:12,21 45:2,3,5
  45:6 48:5,17 51:9
  51:10,12,15,21
  53:4,13,19,25
  57:20,21,24 58:6
  60:19 65:4,6 75:8
  75:10 76:23,24
  77:1,3,14 78:8
  82:8 180:10
noticeable 18:14
  42:5 43:6 45:8
  51:5,19,23,24
  52:20 53:23
  54:10,14,25
  55:10,16,18,23
  55:25 56:4,8,12

57:2 60:21 92:16
  96:24 182:14
noticed 10:24 44:6
  53:9 59:5 60:7
noticing 76:19
novel 175:10
novelty 165:14,15
  165:18,21 174:24
  175:3,16,20,23
  176:2,7 177:3,7
  177:13 178:13,16
  183:24 188:1,7
November 3:5
  121:10
number 2:20 9:8
  15:9 29:23,24
  31:19 62:5,6 67:4
  77:13 89:12
  94:19,20 98:3
  124:19 133:23,25
  142:14,24 158:20
  166:22 184:4,6
  185:13 187:1
  191:23
numbers 8:4,7,23
  37:6 123:21
  126:7 133:20
  134:1
numerous 182:9

—— O ——
object 26:24 35:4
  40:5 61:9 62:11
  84:1 87:16
  105:10 125:3
  131:1,2 136:21
  138:22
objection 12:14
  15:7 20:12 22:24
  23:12,19 24:1,9
  25:12,24 31:21
  34:9 40:10,18
  41:15 43:4,19
  44:1,11 46:6 55:5
  56:15 68:10
  70:24 80:9 83:2
  88:5,9 106:10
  111:12 112:10
  124:22 125:14
  132:1,10,21
  133:3,11 145:2
  146:17 147:8,17
  148:6,12 152:6

152:17 167:15
172:2 173:6
185:23
objections 26:5
27:16,23 28:10
30:18 31:14,24
34:10 132:16
134:17,23,24
139:3 144:6
objects 124:25
observe 64:20
82:10 168:14
observer 44:15
64:1,2,5,7 65:2,3
65:9,18,25 66:16
66:20 86:5 88:13
88:17,24 90:13
90:17 111:18,19
111:21 115:14
117:6 119:21
163:6,7 164:10
164:20 165:2,13
166:10
observers 86:15
87:12 88:14 89:3
observes 164:20
obtain 105:20
obvious 41:9
121:17
obviously 111:6
142:19
obviousness 5:22
6:7
occur 69:4,7 92:21
93:24
occurred 113:20
116:4 141:11
occurrence 92:18
office 36:6 38:10,11
38:12,20 39:25
40:4 183:8,12,16
Off-the-record
13:3 75:25 99:19
113:16 141:8
158:25 181:20
Oh 5:25 10:22
42:21 47:8,12
123:21
okay 7:14 9:7 13:18
13:20,23 16:7
22:2,5 36:23
38:19,21 39:11
42:19,21 59:13

59:20 64:3 68:18
70:2 71:10,23
78:5,23 79:13
98:7,10 99:21
100:8 119:25
120:2 127:11
156:9 157:5
166:21 167:3,12
168:1 187:20
older 97:5
once 5:7 6:14
184:20
ones 81:6 187:7
one's 117:21
online 67:7 70:19
72:23 73:4,7,10
73:22 74:12 75:1
78:13 83:11
154:24 159:17
open 184:11
opening 11:21 12:9
12:11,16 47:23
143:2,3,9,10
144:10,11 168:2
168:12,23 181:16
opinion 9:24,25
10:1 13:9 27:14
57:12 60:25
61:20 84:7 96:18
101:6 102:5
103:10,14 108:25
109:4 111:5,9
117:12 119:11
opinions 7:23 10:3
100:14,18 103:23
104:5,6,13 105:2
105:22 106:6,16
106:21,25 107:5
107:11,17,20,23
108:5,10,11,17
108:20 109:8,20
109:25 110:8,20
111:6,16 113:24
116:1
opposed 184:21
opposite 5:20 128:7
oppressive 30:11
option 135:25
oranges 78:12
order 116:17
156:10 181:13
ordered 180:23
orders 65:22

ordinary 44:15,18
46:8,9,20 57:13
64:1,5,7 65:2,3,5
65:9,18,25 66:3
66:16,20 86:5,15
86:20 87:12
88:13,14,17,24
89:3 90:13,17
111:18,19,21
115:14 117:6
119:21 163:5,7
164:10,19 165:2
165:12 166:10
ornamental 166:25
167:8 168:4,5,8
168:19,20,24
169:2 177:17
179:14 180:1,13
180:15,17 182:24
183:3,5
ought 29:15
outlet 83:6
outlined 95:4
outside 29:13 69:23
159:25 160:23
161:3,5
overall 12:9 41:4
41:13,22 42:1,2,9
54:12 63:7 75:5
143:5 156:25
180:17,18
owned 96:20
owner 15:21

───────────
P
───────────
packaging 48:2
page 8:3,9,19,20
9:9 10:20 11:18
16:1 37:6,7 38:6
38:18,20 40:25
47:17,20 49:20
49:21 70:3 71:16
80:18 81:3,8,9,10
81:11 122:2,12
122:17 170:9,18
170:23 174:10
178:22,24,25
179:6,19 183:25
192:15
pages 8:8 37:17,21
37:23 38:9 71:15
158:2,16,20,20
158:22 159:7,9

159:19 162:18
179:11 182:9
191:10 192:4
paid 97:12 161:15
PAIR 14:21
pan 2:24 31:17 43:8
47:14 48:8,13
50:24 52:2 64:13
65:13,16 67:3
68:21 82:11,24
83:8 91:14 92:12
92:13,20 100:6
169:18 177:17
180:25
panel 20:3 49:22,24
50:15 181:18
182:4 188:8
panels 15:17 21:8
74:25 77:6
171:16
paper 72:16
paragraph 16:7
39:2,10 41:1
42:16 188:2
paragraphs 170:23
part 5:22 8:8 17:23
19:9 20:3 36:12
38:6 47:25 48:1,3
48:7,9,11,15,24
60:21 62:8 64:17
69:1 70:5 96:15
97:10 100:21
103:14,19 108:9
108:12,13 111:2
115:13 117:16
158:13 160:25
164:4,6,8,22
165:5,12,14
171:12 182:3
187:7,9
particular 25:15
48:6 64:21 74:8
80:24 89:24
98:13 99:2 103:8
103:17 116:25
151:11
parties 191:13,15
partly 168:5,5,8,8
183:3
parts 3:12 115:5
165:12
pass 99:12 158:11
162:8

passed 7:12
passing 36:21 71:4
patches 50:11
patentable 163:25
183:13
patentably 39:7,14
40:14,17,21 41:8
patented 16:15
105:8 106:8
128:11 164:12
169:19
patents 34:14 94:19
96:20 97:17
150:8,13,22
151:1,11 152:2
152:24 153:6,11
153:20 154:15,19
155:21 162:24
163:17 181:7
pattern 14:8,23
16:10,14,20 17:5
17:8,10,20,22
18:5,10,17,18,19
18:20,21,24 19:2
19:15 20:2,9 21:7
21:14 22:11,15
22:16 42:5 45:3
46:16,16 50:1,23
51:11 53:23 54:3
54:19 57:7,15
58:10,12,19 59:9
60:11 62:25 75:6
75:9 112:23
151:8 171:9,19
171:20 182:17
184:11
patterns 18:1
142:24 171:1
182:10,19
pattern-conscious
60:18 61:2,4
pause 99:20 100:13
pay 51:13 62:2
64:24 95:8,9
96:25 97:9 104:4
paying 92:1
pending 67:25
72:18 129:3
182:2 185:22
people 43:11,12
47:21 78:13
84:10,13,16
85:12,20,23 87:3

Page 12

87:4 88:1 89:6,14
89:19 90:20,21
91:4,25 92:5,11
92:22 93:4,11,25
95:8,14,16,23,25
96:18,25 97:5
115:18 116:14,22
116:24 117:3,5
118:10,22 132:4
132:15,17,19
184:24 185:10,11
perceive 46:12
97:11
perceived 62:4
percent 85:11,11
85:23 86:12
88:14 89:3
percentage 81:10
87:14
perception 97:4
perform 148:9
performance 161:1
performing 163:11
person 12:7,20
44:17 53:2 57:13
57:14 65:24 66:7
78:24 79:4,7
81:13 82:13
88:22 89:16,21
89:22 90:2,7,21
94:22,25 95:5
98:1,12 151:14
personal 44:21
52:10
personally 44:23,24
46:1 52:7 56:13
persons 60:3
perspective 31:16
pet 36:10 64:19
65:5,24 66:10,11
66:13 67:6,6 73:2
73:2 76:22 80:11
82:12,25 83:9,10
83:18 92:6 93:10
93:10,12,13,24
94:1,23 96:11,14
97:22 100:3,9
102:7 112:6
177:17 188:8
Petco 102:24
104:24 105:5
Phoenix 100:3
phone 181:25

photo 11:8
photograph 12:24
16:4
photographed 82:3
phrase 33:10
188:13 190:5,8
190:11
physically 145:10
pick 66:3,4 76:16
123:1,3
picking 79:3,18
81:24 89:14
picture 50:10 80:7
116:13 188:15
190:3
pictures 134:2
pieces 116:8
place 134:16
placed 47:5
plain 14:13,24 15:3
15:17 18:7 22:12
43:9,22 51:8
57:22
plaintiff 1:5 2:2
139:23
plastic 92:13
plate 123:8
Platner 39:17
play 163:4 181:6
please 28:22 32:4,4
39:10 47:9 67:23
73:17 127:16
129:1 145:3
181:23 187:15
plural 33:15,22
34:7
point 6:5 28:13
30:7 64:23 80:20
92:1 95:10,11
105:24 112:3
113:3 151:2
152:11 159:2
165:21 170:5,12
174:23 175:3,15
175:20,23 176:6
176:24,25 181:15
188:1,7
pointed 59:6 60:8
pointless 135:13
136:3,17
points 10:25 165:14
165:15,18 176:2
177:1,3,7,13

178:13,16 183:19
183:24
politely 8:24
poll 97:14
polls 96:17
pool 59:4,14
portion 5:13 75:7
170:6 178:17
179:3,19
portions 170:22
position 186:19
possibility 90:24
91:1 131:4,6,8
possible 15:1 46:7
60:1 86:24 91:3,7
93:3,8,15 96:2
104:21 106:18
107:17 132:3,13
132:18 162:2,3
169:13,16 180:10
181:7 185:25
186:5
potential 20:8 59:4
59:15 178:12,13
178:16
potentially 21:21
104:19
Power 2:5
practice 69:13
practitioner 61:24
predictable 8:11
preface 156:8
preferences 102:8
104:16
preparation 152:3
prepare 4:21
prepared 95:21
154:11
present 2:11 23:13
26:10 27:11,18
31:18,22,25
32:13,21,22
33:18 34:3,4 41:4
107:13 188:19
presentations
162:17
presenting 135:5
presumes 133:17
presuming 33:20
33:25 34:5 109:8
pretty 24:13 27:2
60:18 61:2 87:19
prevented 78:3

previous 66:24
73:19 150:10
175:14
previously 10:9
158:11 171:11
price 64:23 92:1,17
95:10,11
primarily 156:18
159:15,16
primary 5:25 6:3
120:8 121:13,15
principle 78:7
principles 155:20
156:6,13,16
157:13,14 158:17
print 71:22 72:3,8
printable 71:24
72:1
printed 15:5 71:8
printer's 72:2
printing 15:6
printouts 71:12,14
72:16 75:2,13
prints 71:24
prior 6:11 9:15
10:10 35:7,19
41:9 120:5
124:19 125:9,23
126:16,17 127:9
127:21 128:4,12
128:22 129:5
130:11,22 131:19
133:1,21 134:14
137:4,10,15,21
141:16 142:3,11
142:12 143:4,12
143:15,23 144:4
147:24 148:3,11
175:10,22 176:5
177:6 183:21,23
187:1,3
priorities 103:1,2
probability 101:20
probably 11:16
64:21 65:1 80:3
95:24 104:8
121:11 123:7,7
128:13 157:16
problem 118:8,10
118:14,15
proceeded 15:16
process 36:5 100:21
172:11

proclaim 151:14
products 1:7,10
3:19 9:19,22,22
18:16 21:13,21
22:14 49:2 64:22
65:5 67:3,9,14,20
69:16 71:9 73:1
73:10 80:15,17
82:2,11 83:7
86:21 94:11
96:20 97:1,17
98:2,4 101:25
102:9,13 103:21
104:2,11 113:5
113:17 150:20
180:24 181:4
professional 66:6
66:10 121:23
professor 160:15
160:22 161:6
proffered 61:17
109:3 112:20
113:23 115:9
116:11 119:2
project 118:5
projects 160:6
promote 68:22
pronounced 180:6
182:4,7
proper 116:17
125:4 166:13
167:13
properly 11:6
116:7
proposed 101:22
188:2
prosecution 3:17
35:10,15,20,23
36:1 37:1,13
protest 139:22
provide 71:2
provided 114:9,14
187:5,8
proximity 127:25
128:3
Public 14:21
192:13
pull 47:19 120:17
123:13,18,23
pulled 71:7 122:15
123:10,19
pulling 122:11
pumpkin 91:8

purchase 58:7 64:9
80:23 87:7 88:20
89:23 90:3,9
91:16 94:25 95:5
96:1 103:4
purchased 73:1
92:6 95:23
purchaser 64:14,19
65:5,19 66:1,4,22
purchases 93:3,4
purchasing 51:1
64:10 76:5 80:24
91:5,13 100:5
117:4
purely 163:4,13,16
163:19,22 164:2
164:16 165:6,15
165:23 166:5,14
166:18 167:10,13
168:3,3
purport 114:21
purports 37:12
purpose 80:22
102:18
purposes 48:20
pursuant 1:17
124:25
put 73:13 85:19
118:12 123:22
125:7,9 143:25
144:1 145:24
171:22
putting 69:10 98:5
119:17
P-L-A-T-N-E-R
39:18
p.m 190:23

_____
Q
qualified 97:20,20
98:11,16
quality 7:11 92:4
quarter 77:16
179:16
question 6:15 9:4
13:7 21:4 24:24
25:14 26:7,25
27:9 28:15,25
29:5 30:3,14
31:10 34:23 35:4
37:10,19 40:3
44:13 53:8 54:7
55:25 62:12,13

67:23,25 72:17
73:17,19 79:12
83:3 84:2 88:6
99:4 103:25
105:11 106:12
108:9,13,14
109:13 110:16
117:17 122:20,22
125:6 127:15,23
128:24 129:3,20
130:14,21 132:2
132:12,19 133:17
134:18,20 137:24
137:25 141:2,4
145:4,9 157:25
165:16 167:18
173:16 177:20
181:23 182:2
185:22
questioning 134:25
135:14 136:4,17
139:20 145:3
questions 63:9
95:19 103:15
104:7 105:24
106:4 116:6
140:10,12,14,16
151:25 166:13
187:12,18 188:23
190:21
quibbling 21:25
quick 13:2
quite 6:3,17

_____
R
raised 176:3
randomly 71:7
range 53:15
rate 138:6,7,11,17
rationale 106:25
reached 91:8
react 102:22
read 4:12,22,24 5:2
5:5,15 6:2,14,16
7:11 8:21 16:5
27:12 28:1 32:2
33:1 34:13,15,15
34:16 35:16 39:1
39:9,10 41:10
67:24 68:2 73:17
73:18 99:14,15
99:23 106:13
112:19 114:20

128:25 129:2
154:22,24 155:12
155:23 158:3,8
159:17 181:22
182:1 185:19,21
186:15 188:3,6
192:3
reader 170:7
reading 28:5 32:5
34:18,22,24
105:17 123:21
157:19,23
real 5:15 13:2
119:17,18
realizing 84:22
really 4:3,4,6 10:17
11:8 12:7,23
37:19 104:22
137:18 179:15
184:7
reason 25:15 28:21
92:2 95:8 97:9
106:24 107:4
115:15,20 132:14
137:7 147:3,11
169:7,13,16
192:15
reasons 107:8
118:3
reassessing 103:24
104:5
recall 6:14 7:5 8:3
34:20 36:8,24
38:14,17 47:5,13
73:15 74:3 96:22
105:17 113:4,21
114:5 117:23
118:2 120:3
148:22 166:1
175:17,24,25
185:15
received 38:11 73:6
recess 47:3 82:20
91:11 114:7
139:9 159:4
recognize 7:15 37:1
38:10 162:9
187:21
recognized 173:23
record 9:3 13:1
28:20 75:24
99:18 113:15
114:6 124:23

126:6 141:9
158:24 181:19
recourse 136:13
rectangles 50:1
rectangular 180:2
180:12,16,18
188:9,9,10
reeds 12:21
refamiliarize 13:22
refer 13:17 50:17
70:3 120:15
reference 6:1,3,4
9:16 37:7 120:5,8
120:9,11 121:15
121:19 124:19
125:9,24 126:16
126:17 127:9,21
128:4,12,22
129:6 130:22
131:19 133:1,21
134:15 137:4,10
137:15,18,21
141:16 142:4,8
143:4,19,19,24
148:3 177:9,12
184:3
references 8:6
120:10 121:13,17
131:18 136:20
175:22 176:6
177:6 187:2,3
referred 14:18
47:22 154:23
155:23 185:5
referring 10:20
40:25 47:4 75:9
126:8 182:16
reflect 114:3
reflects 190:10
refuse 133:16
136:18,19 138:11
refused 136:22
refuses 136:8,9
regard 10:3 147:13
175:16,20
regarding 7:17,19
7:23 66:18 67:19
68:7 86:10 101:6
106:17 113:19
117:12,14 119:12
141:13,24 156:22
159:6 175:15
177:4 182:22

186:7
regular 92:18
189:19
reinforce 9:25 10:5
relate 114:22,24
158:17 162:23
related 131:9
relates 5:23
relating 114:10,15
121:12 151:6,8
relation 12:11
relationship 131:13
relative 12:9 74:8
129:9 154:10
relatively 75:5
relevant 117:16
relies 176:5
rely 9:15
remarkably 119:4
119:4
remember 9:4
11:10
remind 8:24
render 159:23
rendered 155:6
rendering 113:24
renders 152:15
repeat 30:4 34:22
40:2 103:25
106:12
repeated 67:23
repeatedly 27:9
30:21 110:6
147:9
rephrase 68:1
replacement 115:4
report 3:4,5,6,14
3:15 7:17,22,25
9:11 11:19 13:9
13:12,14 14:8,10
14:19 15:15 16:1
19:6 37:3,14 38:1
91:20 120:19,22
121:6,9 122:2,18
142:7 155:7
168:17,22 169:17
170:5,6 173:18
174:22 175:17
176:4 177:21,22
178:14,17 179:4
179:17,19 182:8
182:22 183:18
184:1 186:25

187:7,22
reported 89:13
191:7
reporter 1:19 9:2,6
28:18 40:2 67:24
73:18 129:2
182:1 185:21
191:5,21
REPORTER'S
191:1
reporting 101:17
114:25 115:3
reports 3:11 4:22
7:19 10:6 66:17
106:3 120:16
121:2,12 148:16
152:3 154:5,11
156:11 162:14
186:23,24,24
represent 23:11
37:5 71:6 100:1
representation
72:12
representative
74:11
represents 22:13
reproduce 71:17
request 104:1
require 40:21,22
110:10
required 13:11
160:22 161:10
requirement 161:2
requirements
148:14
requires 190:12
reread 35:16,17
147:20
research 97:3
160:23
resemblance 10:14
142:25
respect 9:24 93:9
104:25 176:1
respects 20:19
respond 9:5 27:8
responding 27:8
response 113:13
139:21
responses 117:25
responsibilities
103:13
responsible 98:3

100:5,5 102:17
rest 39:10 50:15
restricting 140:14
restroom 47:1
resubmitting 36:5
result 92:21 93:25
results 191:17
retail 60:4 65:9,18
65:19 66:14,15
67:2,8,13,18 69:8
69:12 82:21
91:12 99:2 101:1
105:6 106:18
retailer 70:19
103:9
retailers 67:7 83:11
retailing 69:6
return 63:20
review 38:14 72:20
revisit 140:24
re-evaluate 105:22
right 13:13 19:11
31:9 34:8 37:7
39:11 53:5,20
59:16 66:7 79:20
81:3,9 82:14 83:4
83:7 84:13 89:7
90:7,16 101:23
106:19 107:18
108:6,10 109:9
109:24 110:1,17
110:18,20 112:22
122:13,16 123:23
124:2,2,8 125:14
130:10 131:15
133:25 143:14,22
146:12,24 151:17
154:6 157:1,4
160:2 161:24,25
162:19 167:6
168:1 176:14,21
182:6 185:6
189:14
right-hand 16:8
72:6
Road 2:5
Robert 3:14 187:22
rod 168:11
role 35:22,25 163:3
181:6
room 60:5 86:9
137:5 189:7
root 126:2,9

Rubinfield 39:7,12
ruled 139:14,19

_____
S
safety 89:10,13
169:9
SAITH 190:25
sale 68:23 69:16
sales 79:24 83:11
92:19,20 93:24
SANTOS 2:4
saw 37:23,25 93:13
saying 9:2 20:21
21:23 54:23
76:13 82:4 88:21
88:23 89:18,24
90:6,13 101:10
102:2 112:17
115:19 125:15
127:11,22 129:19
130:1,2,3 133:17
133:18 138:14,19
145:15
says 8:13,15,16,17
23:14,20 24:16
24:18 25:2,9,18
26:9 27:10,11,17
27:25 28:16,17
29:21 31:15,15
31:15,15,22,25
32:1,13,14,21,22
32:23 33:4,5,16
34:3 71:23 88:18
scale 11:8 12:3,16
12:25 54:22
76:22 78:10
134:16
scenarios 67:21
schedule 140:25
school 12:3 161:7
scope 36:3,13,15
155:9
screen 72:4,10
75:14 78:11 79:5
79:8,11,17,22
se 71:3
search 78:17 187:2
second 3:6,13 17:6
17:11 18:7 28:19
47:17,20 90:23
122:1,12,17
165:13 166:19
169:24 171:10

172:20 177:19
187:21,25 188:7
section 8:10 178:17
secure 119:11
see 5:25 12:7 15:13
15:23 16:4 31:10
38:22 39:7,11,17
42:11,24 43:1
47:21 58:2,3 62:9
62:18,24 69:11
70:4,6,9 71:21
73:11,23 74:12
74:15,16,18,19
74:20,21,24 75:2
76:13 77:5,9,12
77:17,19,21 78:9
78:17 79:1 87:8
89:25 92:14 93:5
106:23,24 111:21
122:1 126:25
137:6 139:7
149:10 165:8
167:10 168:11
170:24 182:9,19
182:21 184:3
187:7 188:4
189:7
seeing 36:24 38:14
38:17 76:21 78:3
79:4,4 82:7,13
seeking 93:25
seen 9:19 12:19
71:19 120:11
135:2,3 185:13
see-through 188:11
segments 99:2
select 65:25
selection 59:2
sell 65:23 186:2
selling 97:21 102:9
semantics 80:19
sense 63:5,18
sent 5:4 153:16
sentence 16:6 33:22
42:17
separate 40:21,23
63:19 108:15
178:15
separately 169:22
170:15 171:5
172:12,13,17,19
173:2,21,22
174:1,3,7,14,18

174:18,19
sequence 172:4
seriatim 171:25
series 166:12
186:24
set 68:22 70:13
81:22 93:12
191:13
shape 10:17 180:12
180:14,16,18
shapes 97:11
share 161:10
shared 113:18
114:2
shelf 69:10
shifts 180:20
shop 78:13
shopping 92:8 93:5
shops 83:9
short 46:25 190:7
shout 31:1,6,7
shouting 30:22,23
30:24 31:2,3
show 10:8 23:17
36:9 75:15,16
82:3 145:1
190:17
shown 16:18 19:15
20:18 22:21 23:8
23:10,22 25:3,23
26:4,16 27:15
31:12,20 32:20
36:18 41:8,24
43:16 44:6,25
46:17 50:23,25
51:18 52:1,1,18
52:18 54:5,19
57:8,16,18 58:11
58:20 59:9,10
60:12 72:14
74:10 85:5 90:11
94:7,12,17 95:1
96:6,8 120:6,12
121:19 122:25
124:13 125:22,23
127:7,19,20
129:23,24 131:24
131:24 132:7
137:9,14,15,21
143:2,20 164:3
165:7 166:6
169:20 171:1
177:18 183:2

Bret Smith
June 13, 2008

Page 15

188:20
shows 13:25 47:13
  49:21 164:16
  171:23 177:12
side 14:25 16:8
  20:9 49:22,24
  72:6 77:6 96:8,9
  123:22 126:24
  148:3,4 171:14
  189:13,14
sides 14:6 139:13
  188:16,17 189:25
  190:14,18
sign 4:12 110:24
SIGNATURE
  192:1
significant 52:12
  53:10 54:14 62:7
  180:1,1,4,8
similar 11:12 73:12
  73:24 94:16 96:7
  104:25 105:5
  116:23 133:2
  141:25 142:9
similarities 143:8
similarity 22:8
  142:20 143:10
similarly 112:5
  185:18
simple 28:15,25
  29:4 79:14 95:15
  137:3 174:16,16
simply 62:13 107:6
Simpson 1:5,13
  2:12 3:12 72:24
  73:1 82:18,23
  87:9 96:21 97:17
  113:6,20 114:11
  115:6 139:23
  175:21 176:2
  177:4 180:24
Simpson's 180:23
single 21:17 23:1
  23:11 27:20 28:3
  28:8 32:8 39:4,15
  40:9 54:13 123:2
  177:9,12 186:25
singular 27:19
sir 12:1 16:25 31:23
  33:1 36:16 96:13
  114:20 125:18
  137:24 167:21
sit 88:12 105:19

106:5 175:2
site 14:21 71:18
  74:2 77:22 78:15
sited 35:8,20 41:9
sites 74:4 77:23
situation 61:21
  139:12 164:15,15
size 12:10 73:24
  75:4,6 76:3 79:20
  80:12 82:8
  185:17 186:1,3
sized 12:11 185:18
sizes 76:14
skill 44:18 57:13
slash 188:7
slightly 10:15 123:4
  128:20
sloppy 91:4
small 11:22,24 67:6
  75:6 76:18 77:16
  78:2,11 79:5,16
  79:18 80:7,7,17
  82:14 83:9 87:14
  180:21
smaller 10:16 12:9
  77:22 81:12,15
  81:16,21
Smart 100:3,9
  102:7
Smith 1:17 2:16
  4:14,20 7:12 8:24
  28:1 30:1,1 35:12
  37:5 44:23 47:4
  67:1 71:4 91:12
  99:22 135:10
  141:11 163:3
  179:18 189:3
  191:8 192:2,8
Smith's 3:21
Society 186:16,20
sofa 51:11 58:5
sold 69:19 70:18
  96:8 116:3,21
  117:15,19,22
  118:25
somebody 49:9
  88:22
someone's 60:8
somewhat 73:12
  182:19
sorry 8:14 10:22
  40:2 42:15 47:12
  48:25 65:12

75:20 90:6,6 94:5
  114:19 121:14
  129:19 148:6
  162:7 174:21
sort 10:18 35:21
  45:23 62:4
  100:16 101:4
  110:24 113:22
  115:8 117:9
  126:9 172:8
sorts 185:9
sounds 161:24,25
source 72:23
sources 67:5,5,10
  67:12 75:1
speak 4:16 9:1
  57:10 58:14
  60:16 191:9
speaking 152:19,21
speaks 40:6,11
specific 18:19,20
  19:4 33:10 35:25
  66:23 94:10
  97:14 118:4
  153:9 186:10
specifically 38:16
  76:8,10 77:13
  92:23 93:25 94:9
  100:4 109:12
  118:2 180:24
specifics 7:6 109:18
  152:22,23
spectrum 125:8,10
  125:11,16,17
spend 30:5 35:18
  95:22
spent 34:18,24 35:2
  155:19 156:5,21
  156:24 157:2,11
  157:19,20,23
spoke 139:10
spooler 72:8
spy 12:4,5
square 16:10 50:6
  50:18,23 54:3,18
  57:6,15,23 58:9
  58:18 59:8 60:11
  74:21 75:6,8
  77:14,15,20
  171:19
squarer 10:15
  11:14,15
squares 49:25

50:12,17 75:16
  77:15,17
Staley 2:3 13:1
  22:24 28:19 29:1
  29:11,17 30:14
  30:25 31:4,9,14
  31:21 34:9 35:4
  37:9,17
stand 119:21
standard 124:25
  140:17,17,22,23
  147:22 170:19
standards 71:3
  153:14
standing 4:5,10
standpoint 97:4
  180:9
staple 124:3
start 44:20 96:6
  122:10 123:9
  127:22 151:13
  177:20
started 11:1
starting 6:5 159:5
starts 42:21
State 1:19 191:2,5
  191:22
stated 106:22
  109:20 111:17
  122:20 174:10
statement 16:12
  19:25 21:15
  33:16 42:7 43:18
  51:16 54:2,17
  55:13 56:7 58:1
  68:14 83:21
  107:9 146:9
  153:2,4,5,18
  154:6,7 163:10
States 1:1 38:12
stating 25:21 32:18
  33:23 154:1,17
  158:6 163:18
stipulations 4:2,7
  4:10
stop 20:17 121:14
  177:19
store 66:11 67:6
  68:25 69:8 70:9
  70:14,23 76:22
  79:16 80:1 81:13
  81:17,22 82:1,25
  83:10,19 92:11

92:22 96:12
  102:18 103:17
  185:17
stores 65:24 66:11
  66:13 67:6 68:19
  96:15 98:5
  102:10,14,25
strands 77:13
Street 2:9
stretch 47:1
strike 96:6
strong 127:25
  128:3
structure 98:25
  102:23,25 103:16
  126:4 183:2
  185:3
struggle 118:7
struggling 171:2
student 118:13
studied 159:10,14
  159:18
studies 96:17
study 97:14 120:15
  158:17
studying 155:20
  156:5
stuff 119:18
subject 166:24
  167:8
subjected 76:4
submitted 162:13
submitting 36:5
SUBSCRIBED
  192:10
substantial 104:10
substantially 13:8
  17:2,11,16,18
  18:6 81:12
  188:11,14 189:3
  189:17 190:6,6
  190:11,12,18
sufficient 80:22
  159:22
suggest 31:4
suggested 179:6
suit 69:16
Suite 2:5
supplemental 3:6
  3:13 14:19,20
  122:2,18 187:22
suppliers 98:4
supply 80:11

Page 16

support 96:18
supposing 64:11
sure 5:16 11:1
    33:18,24 90:19
    93:16 111:20
    165:3 169:5
    172:10 182:15
Surely 134:15
surface 14:13,15
    61:8 62:3 184:21
    184:22
surprise 69:14
surprised 92:17
surrounded 188:15
    189:21 190:4,9
surrounding
    152:24
survey 68:25 80:10
    96:14 97:14
    100:25
surveyed 86:10
    101:10 102:2
surveys 96:16
suspect 102:4
sworn 4:15 191:8
    192:10
S-E-R-I-A-T-U-M
    172:4

_____ T _____
table 133:7
tag 47:22,25 48:7
    48:11,22 49:7,14
Taing 2:12
take 9:2 12:19
    44:20 46:25 63:6
    82:16 92:15
    99:13 100:17
    123:13,14 136:14
    139:5 162:7
    181:4 187:25
taken 1:17 56:11
    99:22 186:19
talk 19:5 29:14
    46:8 64:1 85:1
    171:7 175:5
talked 7:4 96:24
    102:3
talking 11:25 35:6
    35:7,9 46:15,17
    50:6,9 51:6,6
    60:14,15 65:13
    76:9 80:19 83:7

86:6,15 89:21
90:19 96:11,22
142:10,17,18
155:14 157:21
189:18
talks 8:10 170:10
    170:11
tandem 172:1
taste 186:7
taxes 161:16
Taylor 105:4 112:5
Taylor's 105:13,21
    112:11
tell 12:24 14:11
    27:13 28:6 29:8
    32:10 57:11
    58:15 75:13
    120:9 127:6
    129:12,18,21
    130:1,4,5 132:25
    133:7 134:21
    141:13,19 142:1
    165:1 171:5
    173:1,17
telling 25:17
ten 54:22 98:9
tend 56:10 92:3
    95:2,9 169:12
tends 62:16 126:22
tenured 160:18,22
    161:6
term 11:2 190:2
termed 11:6
terminology 56:20
terms 8:6 107:15
    109:17 143:2
test 5:23 86:5 88:13
    88:17 90:17
    147:21 148:1,2,7
    148:7,8 163:3,5,6
    164:24 165:8,13
    165:14,21,25,25
    166:2,8,9
testified 4:17 44:4
    100:2 110:6
    111:25 112:5
    180:22
testify 60:23 68:24
testimony 5:13 6:23
    7:2,6 27:7,20,24
    61:13 84:7,12
    87:11,17,20 89:2
    91:22 99:6,10

103:10 104:25
105:5,13,17,21
105:21 110:3,7
112:12 113:19
114:8,10 129:17
146:5,19 151:15
159:18 169:6
173:8 175:24
177:2 190:15
text 154:24 170:9
    170:22
texture 62:6,6 77:8
Thach 1:21
Thank 9:8 124:7
    155:18 160:21
    187:12 190:20
therefor 192:15
thereof 191:17
thick 12:21,22
thickness 12:12
thing 5:10 10:24
    11:9 35:21 49:3
    78:13 82:7
    101:14 110:24
    124:1 153:12
    174:17
things 4:20 5:1,14
    13:5 15:9 19:5
    36:11 45:11,16
    58:6 63:2 64:24
    64:25 82:8 84:22
    89:11 96:25 97:2
    97:10 108:8
    111:3 118:6
    138:16 142:15,21
    142:24 154:20
    172:8 175:7
    176:20 178:12
    186:4
thinking 5:21
    124:21
thinks 84:4
third 38:18 49:20
    49:21 131:1,4
Thonet 184:4,6
    185:13
thorough 111:3
    150:25
thought 5:14 6:1
    132:17
thousand 30:3
three 10:5 77:16
    124:9,14 131:18

132:5 177:5
three-quarter 77:7
threshold 168:11
    168:23 169:8
tied 90:15 106:25
tier 64:22
time 6:9 8:2 9:1
    28:18 30:5 34:18
    34:21,24 35:3,18
    73:23 76:19 79:3
    79:18 81:24 91:9
    93:21,21 113:3
    135:21 136:5,8
    136:16 140:11,25
    141:9,11 148:22
    149:5,9,20 150:2
    150:7,15 155:19
    156:5,21,24
    157:2,11,19,20
    157:23 162:6,13
    175:13,14 187:12
times 116:4
today 63:8,12,15
    88:12 105:19
    106:5 150:20
    151:4 153:19
    161:15,22 175:2
today's 4:21
told 56:18 61:19
    105:4 113:6
    117:21 133:5
    135:1 138:2
    169:6
top 14:7,24 20:9
    38:23 189:14,24
    189:25
topic 29:20 63:25
total 116:21 159:21
    161:20
totality 62:5
Tower 2:9
Trademark 38:12
trained 62:2 101:24
transcript 4:13 5:6
    5:8 6:12,19 99:23
    114:10 192:3
transcription
    191:11 192:6
transcripts 5:2 6:20
translation 15:10
treat 165:23
treated 15:2 171:4
    171:25

treatment 142:20
tree 126:1,4,10,12
    127:1
trial 131:17 140:1
trick 84:9
trim 89:15 116:14
trivial 62:18,20
trivialize 56:11
    62:17
true 40:7 53:12,18
    58:8,17 59:23
    60:9 61:4 79:14
    79:23,24 80:4,16
    93:9 97:13,18
    108:8,17 126:13
    128:10 133:19
    184:6 186:6
    191:11 192:5
trunk 126:10
truth 4:16,16,17
    191:9
try 65:7 89:15 98:5
    116:14 125:5
    144:24
trying 8:5 27:8 28:2
    54:15,16 76:2,16
    78:1,6,24 79:9
    80:25 83:14 84:8
    85:18,19 87:21
    88:7 109:4 115:4
    131:1 150:1
    156:20 165:21
    173:18 174:15
    179:1
turn 16:1 44:20
    114:17 170:9
    171:7 172:7
    174:5
turns 104:9 117:8
twice 172:15
two 13:25 14:5
    22:20,23 23:10
    23:15,17,25 24:7
    24:8,20 25:1,6,11
    25:22 26:12,17
    26:23 27:4,15
    28:9,15 29:7,8,9
    29:16,22 39:21
    41:12,21,24 42:6
    42:8,13 43:3,16
    44:5,9,25 45:12
    45:15 46:10,17
    46:22 49:2 52:21

56:5 73:1 83:25
86:13 115:1,16
116:8,24 117:8
117:11 118:20,24
122:23 127:25
131:2 136:19
151:11 154:13
157:6,9 158:13
165:11 169:21,25
170:23 171:4
173:12,23,25
175:22 176:11,12
176:15,18,19,23
177:5 181:7
186:23
**type** 171:15
**types** 4:20
**typical** 44:22 80:15
81:2,18
**typically** 78:14
80:5,17 81:4,8,11
81:15 102:16
184:17 190:2

**U**

**ultimate** 51:14 66:1
**ultimately** 21:11
178:3
**Um** 120:14
**unable** 147:5
**understand** 21:18
21:25 23:9 24:5,5
26:6,11,14,17,19
26:20,21 28:2
32:4 44:4 45:6
51:22 59:21
63:14 72:15
76:15 78:4 85:16
85:21 87:11 89:2
102:15 107:22
109:3 111:4
114:8 127:2,13
128:17 130:20,21
130:23 134:7,10
138:7,20 145:18
146:5 149:25
151:15 152:12
156:7,10 157:7
167:22 174:21
177:2 184:13,16
190:5,8
**understanding** 6:8
13:10 14:4 23:4

35:14 36:4 40:20
61:3 63:12 64:4
67:11 69:18,21
88:18 89:20
90:18 102:7,11
104:17 108:2
111:8 117:18
158:1 163:9,16
163:22 164:1,9
164:13,18,21
165:10,22 166:4
166:9 167:2,5,17
167:20 178:3
181:9 183:15
**understood** 13:7
63:10,17 182:15
**undertook** 69:2
**undulating** 184:22
**unduly** 30:10
**unimportant** 62:10
62:22 63:1
**unit** 180:17
**United** 1:1 38:12
**units** 116:21 117:19
117:21 118:25
**University** 1:21
161:10,12
**updating** 8:22
**use** 55:21,22 56:23
66:7 78:16 86:20
88:2 90:22
112:20 119:1
171:8 176:9
190:2
**users** 101:24
**uses** 184:9
**USP** 39:12
**USPTO** 35:11
**usual** 4:2,7
**usually** 78:14 82:5
82:6 86:20
169:14
**utilitarian** 167:4,7
**utility** 150:13,17

**V**

**valid** 21:11 108:20
109:25 110:8,9
110:20 149:16
**validity** 5:24 150:7
150:12 154:14,18
**value** 116:17
**variance** 68:15

**variation** 8:11 19:1
19:1
**variegated** 14:14
14:23 15:23
**variegation** 15:4
**varies** 99:1
**various** 160:6
**vary** 68:13
**Venture** 87:10
**Ventures** 1:5,13
3:12 72:24 73:1
82:23 96:21
97:17 113:7,20
114:11 115:6
139:23 175:21
176:3 177:4
180:24
**venues** 85:13
**verbal** 177:15,22
177:24 178:1,4
178:18,22 179:4
179:8,20,22
**verify** 37:17,21
157:25
**versed** 152:23
**version** 71:24 72:2
**versus** 51:8 53:9
62:6 78:10 79:16
79:21 82:25
**vertical** 19:8
126:18 171:14
182:5
**verticality** 19:8
**vested** 80:25
**view** 17:19 31:16
41:9 44:21,24
46:20 52:11
55:18 56:25 57:6
58:18 90:4
111:24 119:6
126:24 127:11
134:5,7,9,11
143:23 146:23
168:7
**viewed** 173:22
**viewing** 58:9 79:25
82:12 164:11
**views** 77:7,11,16,16
77:23
**visible** 55:17,19,24
56:5,8 57:3 76:14
79:7,10 182:13
**visual** 20:3 45:19

78:16 97:8
127:25 128:3
168:25 169:4
181:17
**visually** 3:2 22:13
120:6 121:19
122:25 124:12
125:21 126:14,23
128:5,8,21 129:4
129:9,11,22
133:2 137:8,14
139:2 142:8,13
143:20,24 145:12
183:7
**visuals** 78:18
**vitae** 3:21 162:10
162:12
**voice** 28:23
**volume** 180:21
188:9
**vs** 1:6,12

**W**

**wait** 9:4 123:16,16
123:16
**walk** 169:14
**walking** 70:8
**want** 8:2 9:14,23
10:2,2 27:3 28:6
29:13,24 30:6
31:6,8 32:4 39:9
48:4,17 53:7
95:11 99:15
101:14 102:4
104:21 105:3
106:23 112:15
116:25 120:17
124:22 127:2,6,6
133:13 134:7
135:20 136:25
137:2 138:25,25
139:6 141:12
142:5 167:17
188:3
**wanted** 181:4
**wanting** 90:18
121:7
**wasn't** 5:15,16
14:22 15:18
34:15 36:10
**waste** 135:21
136:16
**wasting** 136:5,7

**Watkins** 139:11,12
139:14
**way** 5:20,20 12:8
20:14 24:4 28:12
48:17 51:10 55:9
55:16 62:21 63:8
68:2,3,24 76:2
79:7 89:8 92:24
93:6 99:3 110:15
112:17 118:12
120:25 123:22
125:25 127:3
131:10,16,17
134:8 135:5
136:11 141:19
142:20 145:8
148:20 167:18
182:5 183:4
185:12,24
**ways** 30:4 97:2
123:5 145:16
146:4
**weave** 16:9,10,14
16:17,18,20 17:5
17:10,20,22 18:1
18:5,7,17,24 19:2
22:12 43:9 50:6
50:18 53:23 54:3
54:18 57:6,15,23
58:9,19 59:9
60:11 61:25
74:20,21 75:6,8
77:14,20 126:23
142:23 171:1,8
171:10,18,19
**weaves** 50:8
**weaving** 19:3,17,19
20:16 50:1
171:15 175:6
**website** 70:21
71:14,21,22
72:14 78:25
92:22 151:13
**websites** 3:19 70:25
71:7,12 73:12
**weight** 116:8
**went** 4:25 14:15,18
14:21 15:12 73:7
74:2,12 77:22
141:25 147:4
175:13 187:9
**West** 1:21 2:9
**we'll** 31:10 41:19

44:20,20 103:5
125:7,9 134:19
135:23,24
we're 9:2 20:7 22:3
46:15,17 61:18
61:20 63:1 71:4
83:7 86:15 89:21
90:19 131:11
138:10,12,16,21
155:13 189:18
we've 7:12 33:6
47:5 59:14 71:19
83:13 123:23
124:3 141:9
143:22 167:6
184:10
whatnot 47:2 159:8
whatsoever 181:9
white 182:10
wicker 2:22,24 3:19
9:19,22 47:14
49:25 64:13,13
65:16 67:3,4,9,13
67:20 68:21 71:8
81:20,20 82:12
91:13,15 92:6,14
92:20 93:10,10
93:12,13,24 94:1
94:23 95:17 96:9
96:10 97:22
102:16 105:1,7
112:6 122:9,11
122:16 123:8
124:10,17 127:18
168:15 169:8,10
180:25,25 182:23
183:1 184:7,10
184:22,25 185:4
185:6,10,14,18
186:2,8 188:12
188:14,16 190:9
190:14,17
wicker-looking
12:13
willing 95:21
window 74:18
windows 74:17
77:3
wire 2:21 94:12,14
94:16,19,20,25
95:15 96:5,7
168:23 169:8
185:16 186:1,9

186:12,13
witness 4:12,15
24:12 26:25
28:24 29:25 30:8
72:19 135:12
136:8,15 139:15
139:17,25 140:2
140:9 174:4
179:2 191:12
192:1
witnesses 6:20,24
7:2 138:15
witness's 141:5
wood 189:20
wooden 185:3
word 45:23 56:10
62:16,19,20 63:4
63:12,14 176:9
189:3
wording 54:8
words 27:12 28:4,5
28:7 56:23 57:21
66:23 107:21
140:8 144:9
164:22 172:9,11
189:21 190:1
work 98:8 156:11
165:3
worked 15:9
world 129:16
wouldn't 18:18,22
21:12 46:2 52:15
52:16 55:21
69:14 79:1 86:25
93:20,23 96:19
119:9 123:1
130:17 136:11
138:7,12,16
146:20,23 152:19
154:8,8
woven 9:19,22
12:12 14:13,24
15:3,17 49:24
50:12 184:18,21
185:2
wrapped 168:15
169:8 182:5
wrappings 142:21
writing 115:18
written 4:22 38:22
116:22 154:5,9
172:15
wrong 47:6 109:6

wrote 170:4

Y

yard 128:14,18
134:2
yards 189:23
yeah 4:4 8:9,12,20
18:25 39:1 47:8
47:20 71:15 86:7
116:16 119:18
120:18 121:25
122:7,7 149:23
151:18 161:25
176:17
years 98:3,9
year's 161:16
yelling 28:22 29:11
yesterday 4:24
y'all 158:4

Z

zero 85:3,10,11
133:22
zoologist 5:11

#

#1 94:6,7,8,13,17
95:1,15 96:8
#197 114:17,19,20
115:17
#198 114:17,19,21
115:17
#2 47:4 123:14,24
123:25 124:11,17
125:12,21 126:11
126:14,19 127:7
127:17,22 128:9
128:20 129:22
131:15,21,23
132:6 133:23
134:13 135:7
137:13,22 138:4
141:14 147:6,24
188:20
#218 187:19
#234 7:10
#235 7:8,9,13,22
8:19 10:21 11:4
11:19 14:20 16:2
19:6 120:20,21
121:4 168:18,21
174:23 176:5
177:22 178:18

182:8,23 184:1
#236 36:22 41:1
#237 71:5 73:13
74:1,10 76:18
78:25
#238 71:5
#239 71:5
#240 71:5
#241 71:6 73:14
74:1,11 76:19
#242 99:13,24
104:13
#243 162:9,12
#3 47:9,9,10,13
49:20 57:17
59:10 69:25 70:4
85:6 169:19
#75 123:12,20,23
124:13,19 125:10
125:15,24 126:9
126:16,17,21
127:10,21 128:23
129:25 130:11
131:14,20,25
132:9 134:15
135:7 137:16
138:3,5 141:17
147:16
#78 120:24,24
121:1,4,8
#79 121:9
#80 122:5,6,7,18
#81 158:12 159:6
#83 13:17,25 15:6
15:24 18:2,3
22:22 25:20
50:21 51:1 54:6
57:8,19 58:20
59:11 124:6
167:25
#84 119:23 120:13
124:1,2,10 125:8
125:16,23 126:11
126:15,21,23
127:8,19 128:6
128:21 129:23
131:15 132:8
134:14 135:8
138:4 141:15
#86 122:4

0

0 31:19 62:6

07 3:5 121:10
09/30/08 191:23

1

1 2:21 23:8,22
24:23 25:4,8,19
26:7 37:7 152:23
170:10
10 2:9 31:19 133:21
178:25
100 59:4,7,14,18,23
60:5 61:13 86:9
86:12 88:13 89:2
100:24 101:1,10
101:11 128:18
157:16,18 158:20
159:20
112 37:8,17,21,23
114,115 3:11
119-120 3:9
12 23:7,21 25:18
26:1,8 170:11
120,121 3:4
121 3:5
121,122 3:6
123 39:12
123-129,131 3:9
123-132,134 3:2
124,167 3:8
126 122:12
13 1:22 191:7
13-17,22,25 3:7
131-135,137 2:22
132-135,137 3:10
135-137,141 3:2
14 168:21 184:4,6
185:13
141 3:10
141,147,188 2:23
147 3:3
15 10:20 11:18
156 3:4,9 10:4,5,6
34:13,25 36:8
66:18 105:8
112:8 117:13,14
119:23 120:7,22
121:12,19 124:9
126:19 127:19
129:23 141:24
142:19 143:7,15
143:18,23 144:1
144:4 145:13
147:7,13,15

151:1 152:24
153:10,23 154:10
175:16 176:24,25
183:6,9,13
186:24
**157** 8:12
**162** 3:21
**174-178,182** 3:16
**1805** 2:24 16:9,14
16:20 17:5,10
47:14 48:12,21
50:24 52:2 54:4
54:19 57:7,16
58:10 60:12
82:24 83:8,18
85:5,25 86:4,11
88:16 90:11
91:13 92:7,21
100:6,12 106:8
143:8,12 144:3
145:11 169:18
170:1,25 171:18
172:18
**183** 3:16
**187** 2:17 3:13
**189** 2:17
**19-120,168** 3:15
**190** 191:10 192:4
**1959** 39:13
**197-198** 3:11

**2**

**2** 2:22 178:22,24
179:6,19
**2/24/09** 191:24
**20** 135:15 156:1
**200** 158:20
**2008** 1:23 191:7,18
192:11
**2018** 2:5
**210(CCPA** 39:13
**218** 3:13
**235** 3:15
**236** 3:17
**237-241** 3:19
**242** 3:20
**243** 3:21
**25** 183:25
**25th** 191:18
**250** 159:9
**256** 158:22 159:19
179:11
**27** 8:9,19,20 9:9

**270** 39:8,12
**2700** 2:9
**28** 123:8
**29** 162:18

**3**

**3** 2:24 62:5 122:2
122:13,17 176:24
176:25
**3:06-cv-901-WKW**
1:6
**30** 4:13 161:18,19
161:22
**30,000** 161:17
**30339** 2:5
**33** 11:2,5,18,25
**35** 10:15,18,20
11:12
**36,40** 3:17
**38** 38:6
**391** 39:12

**4**

**4** 2:16 188:2 191:10
192:4
**4:40** 190:23
**40** 38:19,20,21
40:25 156:3,4
157:15,17,18
159:20
**40,000** 161:19,23
**41** 16:1 170:18,23
174:10
**443** 191:23
**46,123-129** 2:22
**46204** 2:10
**47,49,57,59** 2:24

**5**

**5** 170:9
**50,000** 118:25
162:1
**50,54,57-59** 3:7
**519** 1:21
**527** 8:12,12

**6**

**6** 23:8,22 24:23
25:4,8,20 26:8
170:10
**60** 128:13,18
**60,000** 162:4
**62** 8:13,15,16

**64** 8:14,18
**65** 8:12
**66** 8:16,17
**68** 8:13
**69** 8:14,18 143:3
**69,85,169** 2:24

**7**

**7** 20:23 21:2 23:6,6
23:20 25:17 26:1
26:8 31:16 33:16
170:11
**7th** 121:9
**7-11,14,15** 3:15
**70-78** 3:19
**72** 184:3
**74** 123:19
**75** 3:2
**78** 3:4
**79** 3:5

**8**

**8:44** 1:23
**80** 3:6
**800** 2:5
**83** 3:7
**84** 3:9

**9**

**94-96** 2:21
**99,104** 3:20

# EXHIBIT N

# In The Matter Of:

*Simpson Ventures vs.*
*Midwest Metal Products*

---

*Jeffrey Simpson*
*May 2, 2008*

---



1650 One American Square
Indianapolis, IN 46282

317†236†6022
317†236†6015(F)

*Original File 0502JEFFSIMPSON.TXT*
**Min-U-Script® with Word Index**

## Page 1

[1]
IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

[2]

SIMPSON VENTURES,

[3]
　　　　Plaintiff,　　　　)

[4]
　　　　　　　　　　　　) CASE NO:
　　　vs.　　　　　　　) 3:07cv00048 WHA-CSC

[5]
MID-WEST METAL PRODUCTS　　　)Demand for Jury

[6]
COMPANY, INC.,　　　　)Trial

[7]
　　　　Defendant.　　　)

[8]
MID-WEST METAL PRODUCTS

[9]
COMPANY, INC.,

[10]
　　　　Counterclaimant,

[11]
　　　vs.

[12]
SIMPSON VENTURES, INC.,

[13]
　　　　Counterdefendant.

[14]
DEPOSITION OF

[15]
JEFFREY MARK SIMPSON

[16]
May 2, 2008

[17]
8:35 a.m.

[18]
Suite 800, 100 Parkwood Point

[19]
2018 Powers Ferry Road
Atlanta, Georgia

[20]
Amanda Upton, CCR-B-1523

[21]

[22]

[23]

[24]

[25]

## Page 2

[1]　　　　INDEX TO EXHIBITS

[2]　Defendant's

[3]　　Exhibit　　　Description　　　　Page

[4]　#93　　　Color photo of porch
　　　　　　swing　　　　66

[5]
[6]　#94　　　Color photo of wicker
　　　　　　basket　　　　72

[7]　#95·　　　Multiple page document
　　　　　　of drawings or sketches　　93

[8]
[9]　#96　　　Document titled Required
　　　　　　product changes to the
[10]　　　　　sample provided to me on
　　　　　　1/21/2002　　　99

[11]　#97　　　Document titled Required
　　　　　　product changes to the
[12]　　　　　sample provided to me on
　　　　　　2/11/2002　　　111

[13]
[14]　#98　　　Quotation document　　113

[15]　#99　　　Letter from Jeff Simpson
　　　　　　to Craig Catlin dated
[16]　　　　　June 11, 2002　　　125

[17]　#100　　　Application for a design
　　　　　　patent dated May 2, 2002　129

[18]　#101　　　Declaration of prior
[19]　　　　　invention　　　130

[20]　#102　　　Document numbered
　　　　　　P000090 through P000095　146

[21]　#103　　　Document numbered P003007
　　　　　　through P003009　　　150

[22]
[23]　#104　　　Photo of Simpson Venture
　　　　　　product　　　165

[24]　#105　　　Three page document of
　　　　　　Simpson Ventures'
[25]　　　　　products　　　165

## Page 3

[1]

[2]　　　　INDEX TO EXHIBITS

[3]　Defendant's
　　Exhibit　　　Description　　　Page

[4]
[5]　#106　　　Photo of Simpson Venture
　　　　　　product　　　165

[6]　#107　　　Photo of Simpson Venture
　　　　　　product　　　165

[7]
[8]　#108　　　Photo of Simpson Venture
　　　　　　product　　　165

[9]　#109　　　Photo of Simpson Venture
　　　　　　product　　　165

[10]
[11]　#110　　　Photo of Simpson Venture
　　　　　　product　　　165

[12]　#111　　　Photo of Simpson Venture
　　　　　　product　　　165

[13]
[14]　#112　　　Email from Jeff Simpson
　　　　　　to John Smith T dated
[15]　　　　　February 14, 2002　　169

[16]　#113　　　Letter from Thomas Dean
　　　　　　to John Smith T dated
[17]　　　　　February 26, 2002　　170

[18]　#114　　　Document numbered P002986
　　　　　　through P002991　　171

[19]　#115　　　Document numbered P003010
　　　　　　through P003016　　172

[20]
[21]　#116　　　Document numbered P002802
　　　　　　through P002806　　173

[22]
[23]　　　(Photocopies of Exhibits 93 through 116
　have been attached to the original transcript.)

[24]

[25]

## Page 4

[1]　　　　APPEARANCES OF COUNSEL

[2]

[3]　On behalf of the Plaintiff:

[4]　　ARTHUR A. GARDNER, Esq.
　　JOSEPH W. STALEY, Esq.
[5]　　Gardner Groff Greenwald & Villanueva, PC
　　Suite 800, 100 Parkwood Point
[6]　　2018 Powers Ferry Road
　　Atlanta, Georgia 30339

[7]

[8]　On behalf of the Defendant:
　　Mid-West Metal Products Company, Inc.:

[9]
　　JAMES M. HINSHAW, Esq.
[10]　　J. NEAL BOWLING, Esq.
　　Bingham McHale, LLP
[11]　　2700 Market Tower
　　10 W. Market Street
[12]　　Indianapolis, Indiana 46204-4900

[13]

[14]
　Also Present:
[15]
　　Mr. James Wingate
[16]

[17]　　　　　- - -

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

05:32:24-05:33:04                                        Page 5

[1]     JEFFREY MARK SIMPSON,
[2]  having been first duly sworn, was examined and
[3]  testified as follows:
[4]      **EXAMINATION**
[5]      **BY-MR. HINSHAW:**
[6]  Q.  Good morning, Mr. Simpson.  We've met many
[7]  times off the record.  But on the record, my name is
[8]  James Hinshaw.
[9]      I'm one of the attorneys for Mid-West
[10]  Metals in this case.  I've brought here today with me
[11]  my associate Neal Bowling.
[12]      Would you please state your full name for
[13]  the record?
[14]  **A.  Jeffrey Mark Simpson.**
[15]  Q.  And where do you reside?
[16]  **A.  381 Oak Ridge Drive, Auburn, Alabama.**
[17]  Q.  What's your date of birth?
[18]  **A.  November 4th, 1959.**
[19]  Q.  Mr. Simpson, have you ever been deposed
[20]  before?
[21]  **A.  Yes.**
[22]  Q.  Have you ever given court testimony
[23]  before?
[24]  **A.  No.**
[25]  Q.  In the matters where you've been deposed

05:33:09-05:33:59                                        Page 6

[1]  before, how many times have you been deposed?
[2]  **A.  Once.**
[3]  Q.  Okay.  Well, just some basic ground rules,
[4]  you, of course, know that the court reporter here is
[5]  writing down everything that we say, right?
[6]  **A.  Yes.**
[7]  Q.  And in order to make the process go a
[8]  little more smoothly, let me go over some ground
[9]  rules.
[10]      First of all, if I ask a question that you
[11]  think calls for a yes or no answer, please say yes or
[12]  no as opposed to uh-huh or huh-uh or shaking your
[13]  head or nodding your head.  Those sometimes are
[14]  difficult to transcribe.  Okay?
[15]  **A.  Okay.**
[16]  Q.  If I ask a question that you don't
[17]  understand, please let me know, and I'll do my best
[18]  to rephrase it or restate it.  Okay?
[19]  **A.  Okay.**
[20]  Q.  If at any time you feel like you need to
[21]  take a break, just let me know.  I'll try to bring
[22]  the questioning to a stopping point.  All right?
[23]  **A.  Fine.**
[24]  Q.  Last, I sometimes speak slowly.  So let me
[25]  get my full question out before you start to answer.

05:34:03-05:35:17                                        Page 7

[1]  That helps, in fairness to you and me, in terms of
[2]  what we're talking about, but it also helps the court
[3]  reporter keep a clear record so we're not talking
[4]  over one another.  Okay?
[5]  **A.  Okay.**
[6]  Q.  Do you have any medical condition that
[7]  would interfere with your ability to recall?
[8]  **A.  No.**
[9]  Q.  Are you on any medications that would
[10]  interfere with your ability to recall?
[11]  **A.  No.**
[12]  Q.  In the one case where you've been deposed
[13]  before, can you give me a general description of what
[14]  that matter was?
[15]  **A.  A utility patent suit.**
[16]  Q.  Were you the inventor on that patent?
[17]  **A.  No.**
[18]  Q.  Were you being accused of infringing a
[19]  patent?
[20]  **A.  Yes.**
[21]  Q.  Personally or as part of a company?
[22]  **A.  Both.**
[23]  Q.  Who was the plaintiff in that case?
[24]  **A.  I don't recall specifically.**
[25]  Q.  Do you recall who the inventor was in that

05:35:21-05:37:08                                        Page 8

[1]  case?
[2]  **A.  Not specifically.**
[3]  Q.  What generally do you recall?
[4]  **A.  Yes.**
[5]  Q.  And what generally do you recall about the
[6]  plaintiff or inventor in that case?
[7]  **A.  I believe the plaintiff was affiliated**
[8]  **with or owner of dogramp.com.**
[9]  Q.  When was that lawsuit filed?
[10]  **A.  I don't recall specifically.**
[11]  Q.  How about generally?
[12]  **A.  I believe it would have been in 2004 or**
[13]  **2005.**
[14]  Q.  And was that lawsuit filed in Federal
[15]  Court?
[16]  **A.  I don't know.**
[17]  Q.  Do you know what state that lawsuit was
[18]  filed?
[19]  **A.  No.**
[20]  Q.  Is that case still pending?
[21]  **A.  No.**
[22]  Q.  It was resolved?
[23]  **A.  Yes.**
[24]  Q.  Did it go to trial?
[25]  **A.  No.**

05:37:08-05:38:52                                    Page 9

[1]  Q.  It was resolved by settlement?
[2]  A.  Could you define settlement, please?
[3]  Q.  Was it resolved by the Court dismissing
[4]  the case?
[5]  A.  No.
[6]  Q.  Did the parties reach an agreement to make
[7]  the case go away?
[8]  A.  Yes.
[9]  Q.  Were you represented by an attorney in
[10]  that case?
[11]  A.  Yes.
[12]  Q.  Who?
[13]  A.  I don't recall his name.
[14]  Q.  Where did that attorney -- where was that
[15]  attorney's offices?
[16]  A.  In Miami.
[17]  Q.  Of Florida?
[18]  A.  Yes.
[19]  Q.  Do you recall the name of the law firm of
[20]  that attorney?
[21]  A.  I believe Carr was in the name, C-a-r-r.
[22]  I believe.
[23]  Q.  Do you recall the name of the law firm for
[24]  the plaintiff in that case?
[25]  A.  No.

05:38:52-05:40:47                                   Page 10

[1]  Q.  Do you recall the name of the attorney for
[2]  the plaintiff in that case?
[3]  A.  No, I do not.
[4]  Q.  What were the nature of the allegations in
[5]  that case?
[6]  A.  Utility patent infringement.
[7]  Q.  So the plaintiff owned a patent and it was
[8]  a utility patent, correct?
[9]  A.  Correct.
[10]  Q.  And what was the nature of the invention
[11]  that was disclosed in that utility patent?
[12]  A.  Specifically I don't recall the claims.
[13]  Generally, the product was a telescoping pet ramp.
[14]  Q.  And in that case, the plaintiff alleged
[15]  that you were selling an infringing product?
[16]  A.  Yes.
[17]  Q.  And was Simpson Ventures also a named
[18]  defendant in that case?
[19]  A.  Not Simpson Ventures; Simpson & Company,
[20]  LLC.
[21]  Q.  Is that a predecessor company to Simpson
[22]  Ventures?
[23]  A.  Yes.
[24]  Q.  So you were sued personally.  Simpson &
[25]  Company, LLC were sued.  Were there any other

05:40:48-05:42:46                                   Page 11

[1]  defendants sued?
[2]  A.  Yes.
[3]  Q.  Who?
[4]  A.  Patrick Hoffman.  And I don't recall
[5]  specifically the name of his company as it was listed
[6]  on the suit.
[7]  Q.  What were the nature of the allegations
[8]  against Mr. Hoffman and his company?
[9]  A.  Patent infringement.
[10]  Q.  Was he also selling an infringing product
[11]  or was he a distributor?  What was his role in the
[12]  relationships at issue in that case?
[13]  A.  Your question implies that I was selling
[14]  an infringing product.  Would you mind rephrasing?
[15]  Q.  Did you file an answer in affirmative
[16]  defenses to the lawsuit?
[17]  A.  Did I personally?  No.
[18]  Q.  Did your company?
[19]  A.  I don't recall.
[20]  Q.  Well, did you assert any or have any
[21]  arguments to assert a defense to the allegations of
[22]  infringement?
[23]  A.  I believe so, yes.
[24]  Q.  And what were the nature of those
[25]  defenses?

05:42:46-05:44:32                                   Page 12

[1]  A.  Non-infringement.
[2]  Q.  Was your company selling the product that
[3]  was accused of infringing the patent?
[4]  A.  Define selling for me, please.
[5]  Q.  Well, what does selling mean to you?
[6]  A.  Invoicing for a particular item.
[7]  Q.  With regard to the accused product in that
[8]  case, what did you do -- what did you do with that
[9]  product?
[10]  A.  I assisted in the development of it and
[11]  the marketing of it.
[12]  Q.  So is it correct that you -- neither you
[13]  nor Simpson & Company actually sold the product?
[14]  A.  That is correct.
[15]  Q.  What was the product?
[16]  A.  Telescoping pet ramp.
[17]  Q.  And you asserted that it didn't infringe
[18]  the utility patent involved in that lawsuit?
[19]  A.  That is correct.
[20]  Q.  And the other gentleman's name, Mr.
[21]  Hoffman?
[22]  A.  Yes.
[23]  Q.  What was his role in relation to the
[24]  accused product?
[25]  A.  He also assisted in the development, the

Jeffrey Simpson
May 2, 2008

Case 3:06-cv-00901-WKW-WC     Document 73-8     Filed 08/13/2008     Page 1 of 66

Simpson Ventures vs.
Midwest Metal Products

Page 6 of 66

05:44:39-05:46:15                                    Page 13

[1]  marketing and the selling and delivery of that
[2]  product.  I provided documents on all of this.  It's
[3]  within the documents.
[4]  Q.  You've given those to your lawyer, Mr.
[5]  Gardner?
[6]  A.  Yes.
[7]  Q.  And is it your belief that that was given
[8]  to us in the document production?
[9]  A.  Yes, that's my belief.
[10]  Q.  You believe that was responsive to one of
[11]  our document requests?
[12]  A.  Yes.
[13]  Q.  Have you ever been accused, you or Simpson
[14]  Ventures or Simpson & Company ever been accused of
[15]  infringing any other patents?
[16]  A.  No.
[17]  Q.  The patent infringement case we've been
[18]  talking about with the telescoping dog ramp, you said
[19]  that was resolved by an agreement?
[20]  A.  Yes.
[21]  Q.  Did that agreement require the payment of
[22]  any money?
[23]  A.  No.
[24]  Q.  Are the terms of that agreement
[25]  confidential?

05:46:17-05:48:18                                    Page 14

[1]  A.  I don't know.
[2]  Q.  Was that dispute resolved by the forging
[3]  of some business relationship with the company or
[4]  person who was the plaintiff in that case?
[5]  A.  Not that I'm aware of.
[6]  Q.  What were the terms of the agreement to
[7]  resolve that dispute?
[8]  A.  Specifically, I don't know.
[9]  Q.  How about generally?
[10]  A.  Generally, the plaintiff dropped the suit.
[11]  Q.  And you paid no money to the plaintiff?
[12]  A.  No.
[13]  Q.  And your company paid no money to the
[14]  plaintiff?
[15]  A.  No.
[16]  Q.  And did Mr. Hoffman pay any money to the
[17]  plaintiff to your knowledge?
[18]  A.  No.  No.
[19]  Q.  Or did his company pay any money to the
[20]  plaintiff?
[21]  A.  No.
[22]       MR. HINSHAW:  Let's go off the record
[23]  briefly.
[24]       (Recess 8:50-8:51 a.m.)
[25]       MR. HINSHAW:  We briefly broke.  Mr. Jim

05:48:20-05:50:10                                    Page 15

[1]  Wingate, who is an officer in the pet division of
[2]  Mid-West Metal, has joined us.
[3]       BY MR. HINSHAW:
[4]  Q.  If I understand the allegations of this
[5]  other lawsuit correctly, both you and Mr. Hoffman
[6]  were accused of developing an infringing product?  At
[7]  least that was part of the allegations?
[8]  A.  I don't think that's correct.
[9]  Q.  How is that not correct?  I misunderstood
[10]  then.
[11]  A.  It's my belief to merely develop a product
[12]  doesn't infringe upon a patent.
[13]  Q.  Did you and Mr. Hoffman work together to
[14]  develop that product?
[15]  A.  Yes.
[16]  Q.  Was that in the context of some employment
[17]  relationship?
[18]  A.  No.
[19]  Q.  How was that relationship formed?
[20]  A.  He used to work for me, report to me at
[21]  Doskocil, and we're friends.
[22]  Q.  Where does he reside?
[23]  A.  I believe in Arlington, Texas.
[24]  Q.  When did you last communicate with him?
[25]  A.  Last February.

05:50:18-05:51:38                                    Page 16

[1]  Q.  What did you do to prepare for today's
[2]  deposition?
[3]  A.  I read -- or scanned all of the documents
[4]  that we provided as well as the interrogatory
[5]  responses.
[6]  Q.  Did you meet with your lawyers?
[7]  A.  Yes.
[8]  Q.  When?
[9]  A.  Late last afternoon.
[10]  Q.  For how long?
[11]  A.  Might have been an hour.
[12]  Q.  Who was present?
[13]  A.  Mr. Staley and Mr. Gardner.
[14]  Q.  Anybody else?
[15]  A.  No.
[16]  Q.  Part of that one hour meeting yesterday
[17]  afternoon, did you do -- did you have any other
[18]  meetings with your attorneys to prepare for the
[19]  deposition?
[20]  A.  No.
[21]  Q.  I think I'm remembering this correctly.
[22]  You've been present at each deposition that has
[23]  occurred so far in this case; is that correct?
[24]  A.  That is correct.
[25]  Q.  Starting about two weeks ago?

| 05:51:43-05:53:25 | Page 17 |
| --- | --- |

[1]  A.  Yes.
[2]  Q.  You said you reviewed all of the documents
[3]  that were produced in this case.  In that stack of
[4]  documents - or I think you said scanned them - did
[5]  you see anything about this lawsuit that dealt with
[6]  the telescoping pet ramp?
[7]  A.  Yes.
[8]  Q.  What do you recall seeing?
[9]  A.  A file folder with -- with I'm assuming
[10]  the file that I provided.
[11]  Q.  What was that?
[12]  A.  I -- I don't know.
[13]  Q.  You don't recall the file materials that
[14]  you produced to your attorneys relating to this?
[15]  A.  Not specifically, no.
[16]  Q.  Where were you born?
[17]  A.  Garden City, Kansas.
[18]  Q.  And did you go to high school in Kansas?
[19]  A.  Yes.
[20]  Q.  Same city?
[21]  A.  No.
[22]  Q.  What city?
[23]  A.  Dodge City, Kansas.
[24]  Q.  When did you graduate from high school?
[25]  A.  1977.

| 05:53:25-05:54:37 | Page 18 |
| --- | --- |

[1]  Q.  And did you go to college then?
[2]  A.  Yes.
[3]  Q.  Where did you go?
[4]  A.  To Dodge City Community College and Kansas
[5]  State University.
[6]  Q.  And when did you start and when did you
[7]  finish?
[8]  A.  I would have started in August or
[9]  September of 1977, and I completed in December 1982.
[10]  Q.  Did you obtain a degree?
[11]  A.  Yes.
[12]  Q.  What was your degree in?
[13]  A.  Mechanical engineering technology.
[14]  Q.  Any other degrees?
[15]  A.  No.
[16]  Q.  Did you go to graduate school after that?
[17]  A.  No.
[18]  Q.  What did you do -- have you served in the
[19]  military?
[20]  A.  No.
[21]  Q.  After you graduated from college, what was
[22]  your first job?
[23]  A.  Construction.
[24]  Q.  For how long?
[25]  A.  Two or three months.

| 05:54:38-05:56:49 | Page 19 |
| --- | --- |

[1]  Q.  Are you talking about construction of
[2]  buildings?
[3]  A.  Right.
[4]  Q.  And after that what did you do?
[5]  A.  Went to work for Dow Well, division of Dow
[6]  Chemical.
[7]  Q.  And what did you do for them?
[8]  A.  I was in their field engineering program.
[9]  Q.  From when until when?
[10]  A.  I believe it would have been from May two
[11]  thousand -- or excuse me, May of 1983 through I
[12]  believe October of 1983.
[13]  Q.  What did you do after that?
[14]  A.  Went to work for the Boeing Company.
[15]  Q.  What did you do for Boeing?
[16]  A.  I was a subcontract engineer.
[17]  Q.  How long did you work at Boeing?
[18]  A.  From about October 1983 until I believe
[19]  November of 1993.
[20]  Q.  Backing up, the affiliate of Dow Well that
[21]  you worked for, where did you reside at that time?
[22]  A.  Monahans, Texas.
[23]  Q.  And what kinds of things were you doing
[24]  for this division of Dow Well?
[25]  A.  Dow Well, division of Dow Chemical, was in

| 05:56:54-05:59:05 | Page 20 |
| --- | --- |

[1]  the oil well service company.  And I was in the
[2]  training program.  So I assisted in oil well
[3]  servicing activities.
[4]  Q.  What did you do when you first started
[5]  working at Boeing?
[6]  A.  I started out in subcontract engineering.
[7]  Q.  And what kinds of projects did you work
[8]  on?
[9]  A.  Primarily military contracts.
[10]  Q.  What was it that you were engineering?
[11]  A.  I wouldn't say I was engineering anything.
[12]  Q.  What would you say you were doing?
[13]  A.  I managed major development subcontracts
[14]  from a technical aspect.
[15]  Q.  Development of planes?
[16]  A.  In some cases components of airplanes.
[17]  Q.  Did any of those projects deal with
[18]  developing aesthetic or ornamental design?
[19]  A.  No.
[20]  Q.  Other than working on engineering projects
[21]  related to planes or components of planes, did you
[22]  work on any other kinds of projects while at Boeing?
[23]  A.  Yes.
[24]  Q.  What?
[25]  A.  Missiles.

[1]   Q.   Anything else?
[2]   A.   Not that I recall.
[3]   Q.   After Boeing what did you do?
[4]   A.   I went to work for the Coleman Company.
[5]   Q.   Where?
[6]   A.   In Wichita, Kansas.
[7]   Q.   From when until when?
[8]   A.   From the time I left Boeing until Cinco de
[9]   Mayo day 1995.
[10]  Q.   Why do you specifically recall May 5,
[11]  1995?
[12]  A.   I don't know that it was specifically May
[13]  5, 1995.
[14]  Q.   Oh, I thought that was what Cinco de Mayo
[15]  1995 meant.
[16]  A.   If you're telling me that's specifically
[17]  the day in 1995 that Cinco de Mayo day was on,
[18]  then --
[19]  Q.   Why do you specifically recall Cinco de
[20]  Mayo to be the day that you no longer worked for
[21]  Coleman?
[22]  A.   Because that's the day I got let go.
[23]  Q.   Was there a reason you were let go?
[24]  A.   There was not a reason given other than
[25]  they didn't require my services any longer.

[1]   Q.   Did you ever receive any evaluations that
[2]   indicated that there were problems?
[3]   A.   No.
[4]   Q.   No problems with quality, no problems with
[5]   getting along with other people?
[6]   A.   In terms of a evaluation?
[7]   Q.   Yeah.
[8]   A.   No.
[9]   Q.   What do you believe the reason is that
[10]  Coleman let you go?
[11]  A.   They were bringing in a new team.
[12]  Q.   What did you do at Coleman?
[13]  A.   I was a product manager in the marketing
[14]  department at Coleman.
[15]  Q.   What does that mean, a product manager?
[16]  A.   I was in charge of marketing aspects
[17]  associated with specific product lines.
[18]  Q.   So did that involve taking a product that
[19]  had already been developed by somebody else and
[20]  marketing it to the marketplace?
[21]  A.   That's correct.
[22]  Q.   So in that sense, you were not involved in
[23]  actually developing product?
[24]  A.   That is correct.
[25]  Q.   What kinds of products did you market?

[1]   A.   I was responsible for the -- I believe the
[2]   term used was thermal line which include -- included
[3]   coolers and jugs and the like as well as their boat
[4]   and canoe line.
[5]   Q.   Does Coleman sell any pet products to your
[6]   knowledge?
[7]   A.   At what time?
[8]   Q.   At that time.  At the time you worked
[9]   there.
[10]  A.   No.
[11]  Q.   And while at Coleman, did you do anything
[12]  to develop any new products?
[13]  A.   Could you be more specific?
[14]  Q.   Were you involved in any projects while
[15]  you were employed at Coleman where you were involved
[16]  in developing the design for any product?
[17]  A.   What do you mean in terms of developing
[18]  the design?
[19]  Q.   What does that mean to you?
[20]  A.   It's a very broad term.  I wouldn't know
[21]  specifically what it does mean to me.
[22]  Q.   Did you perform any engineering --
[23]  mechanical engineering functions while you were
[24]  employed at Coleman?
[25]  A.   No.

[1]   Q.   Did you work on any projects where you
[2]   provided input on the aesthetic or decorative look on
[3]   any product at Coleman?
[4]   A.   Where I provided?  No.
[5]   Q.   Were you part of a group or team that
[6]   talked about such things?
[7]   A.   Yes.
[8]   Q.   In any of those discussions, were pet
[9]   products ever discussed?
[10]  A.   No.
[11]  Q.   Were the use of wicker or rattan appearing
[12]  materials ever discussed?
[13]  A.   No.
[14]  Q.   After Cinco de Mayo of 1995, what did you
[15]  do next?
[16]  A.   I was unemployed for approximately I
[17]  believe around eleven months.
[18]  Q.   And what did you do during that period of
[19]  time?
[20]  A.   I looked for new employment, and I helped
[21]  care for my newborn son.
[22]  Q.   Where did you live at the time?
[23]  A.   Wichita, Kansas.
[24]  Q.   After eleven months you found a job?
[25]  A.   Yes.

| 06:06:23-06:09:00 | Page 25 |
|---|---|

[1] Q. And where was that?

[2] A. I went back to the Boeing Company.

[3] Q. From when until when?

[4] A. I believe it would have been from around

[5] April of 1996 until sometime later in that year.

[6] Q. What did you do for Boeing during that

[7] period of time?

[8] A. I don't recall specifically the name of

[9] the group. But the work had to do with obtaining

[10] subcontracts or contracts at Boeing Wichita for

[11] interior -- airplane interior contracts.

[12] Q. Was that a product design project?

[13] A. No.

[14] Q. Process of going and finding business?

[15] A. A portion of that, yes.

[16] Q. And were you still in Kansas at that time?

[17] A. Yes.

[18] Q. What did you do after that?

[19] A. After that I went to work for DP Fitness.

[20] Q. Where?

[21] A. In Opelika, Alabama.

[22] Q. What year?

[23] A. It would have been late 1996.

[24] Q. Did you have any connections to Opelika,

[25] Alabama?

| 06:09:01-06:10:07 | Page 26 |
|---|---|

[1] A. No.

[2] Q. How did you find a job in Opelika,

[3] Alabama?

[4] A. I don't recall specifically.

[5] Q. What does DP Fitness do?

[6] A. Today they do nothing.

[7] Q. What did they do at the time?

[8] A. Fitness equipment.

[9] Q. Is that like free weights or weightlifting

[10] machines, treadmills?

[11] A. Absolutely.

[12] Q. All of those?

[13] A. Yes.

[14] Q. And what did you do for them?

[15] A. I was a marketing manager.

[16] Q. Did you have any product development

[17] responsibilities for DP Fitness?

[18] A. Again, define product development

[19] responsibilities.

[20] Q. Were you involved in any mechanical

[21] engineering functions or responsibilities in

[22] designing any of this equipment?

[23] A. No.

[24] Q. Did you design the aesthetic qualities or

[25] decorative features of any of this fitness equipment?

| 06:10:12-06:12:12 | Page 27 |
|---|---|

[1] A. No.

[2] Q. Were you part of a team that discussed

[3] such things?

[4] A. Yes.

[5] Q. I'm not going to ask you if they sold any

[6] pet products. And I assume that there was no wicker

[7] or rattan appearing fitness equipment; is that

[8] correct?

[9] A. That is correct.

[10] Q. How long did you work at DP Fitness?

[11] A. I believe it was until the fall of 1997.

[12] Q. What happened in the fall of 1997 to your

[13] job at DP Fitness?

[14] A. The company entered bankruptcy and,

[15] therefore, they ultimately let everybody go.

[16] Q. What did you do next?

[17] A. Went to work for Doskocil Manufacturing

[18] Company, Incorporated.

[19] Q. How long were you at Doskocil?

[20] A. About two years.

[21] Q. Where did you reside at that time?

[22] A. In Arlington, Texas.

[23] Q. So from fall of '97 until fall of '99 you

[24] were at Doskocil?

[25] A. I believe so.

| 06:12:16-06:14:14 | Page 28 |
|---|---|

[1] Q. What did you do after you left Doskocil?

[2] A. I went to work for Fiskars Pottery. May I

[3] rephrase that?

[4] Q. Sure.

[5] A. I think it was just Fiskars in their

[6] pottery division. In other words, I don't think

[7] Fiskars Pottery was the name of the company.

[8] Q. Have you ever heard of American Designer

[9] Pottery?

[10] A. Yes.

[11] Q. Was that the company which owned Fiskars

[12] pottery?

[13] A. That was the company that was acquired by

[14] Fiskars.

[15] Q. Okay. When did you start working for

[16] Fiskars?

[17] A. At the time I left Doskocil, which would

[18] have been in the fall of 1999.

[19] Q. From when until when?

[20] A. From then until I think around July of

[21] 2001.

[22] Q. What kind of products did Fiskars sell?

[23] A. Flower pots.

[24] Q. Any pet products at that time?

[25] A. No.

| | |
|---|---|
| 06:14:15-06:16:12      Page 29 | 06:17:55-06:19:46      Page 31 |

**Page 29**

[1]  Q.  Any products that involved wicker or
[2]  rattan appearing materials?
[3]  A.  No.
[4]  Q.  Were you involved in any efforts to
[5]  improve the aesthetic or decorative features or
[6]  designs of any of their products?
[7]  A.  Yes.
[8]  Q.  What?
[9]  A.  I was part of a group that reviewed
[10]  decorative designs.
[11]  Q.  Of flower pots?
[12]  A.  Yes.
[13]  Q.  What was your -- what were your
[14]  responsibilities at Fiskar?  Is it Fiskar or Fiskars?
[15]  A.  I believe it's plural, Fiskars,
[16]  F-i-s-k-a-r-s.  I was director of marketing.
[17]  Q.  And would you describe what those duties
[18]  included?
[19]  A.  Marketing aspects of the flower pot
[20]  business.
[21]  Q.  What does that mean, marketing aspects?
[22]  A.  Pricing, promotion, defining -- defining
[23]  opportunities, working with the sales team.
[24]  Q.  What did you do after Fiskars?
[25]  A.  Went to work for GDA, LLC.

**Page 31**

[1]  December of 2001.
[2]  Q.  What happened at your job at GDA in
[3]  December of 2001?
[4]  A.  I left.
[5]  Q.  The company still existed at that time?
[6]  A.  Yes.
[7]  Q.  Why did you leave GDA?
[8]  A.  I felt I wasn't successful in that role,
[9]  and I didn't care for what was going on in the
[10]  company.
[11]  Q.  Well, let's back up.  What was GDA's line
[12]  of business at the time?
[13]  A.  Selling consumer products.
[14]  Q.  What kinds of consumer products?
[15]  A.  Sports goods, pet products, hardware home
[16]  center type products.
[17]  Q.  What were your job responsibilities at
[18]  GDA?
[19]  A.  Sales.
[20]  Q.  Could you elaborate on what that breaks
[21]  down into doing?
[22]  A.  Sales in pet products and sporting goods.
[23]  Q.  So what were your day-to-day
[24]  responsibilities in sales in pet products and
[25]  sporting goods?

| | |
|---|---|
| 06:16:17-06:17:42      Page 30 | 06:19:46-06:22:08      Page 32 |

**Page 30**

[1]  Q.  Where did you reside at that time?
[2]  A.  In Auburn, Alabama.
[3]  Q.  Did I ask you -- maybe I asked you this.
[4]  Where did you reside at the time you worked with
[5]  Fiskars?
[6]  A.  In Auburn, Alabama.
[7]  Q.  Why did you leave Fiskars?
[8]  A.  I was asked to leave.
[9]  Q.  Were any reasons given for why you were
[10]  asked to leave Fiskars?
[11]  A.  Yes.
[12]  Q.  What were those reasons?
[13]  A.  They no longer needed my services.
[14]  Q.  Were you given any reason that indicated
[15]  they were unhappy with the quality of your work?
[16]  A.  No.
[17]  Q.  Did they give you any reason to indicate
[18]  that they were unhappy with how you were interacting
[19]  with your co-workers?
[20]  A.  No.
[21]  Q.  You then went to work for GDA?
[22]  A.  Yes.
[23]  Q.  From when until when?
[24]  A.  From the July to August, I believe, time
[25]  frame of 2001 until late that year 2001, probably

**Page 32**

[1]  A.  Call on potential accounts and present or
[2]  sell pet products and sporting goods.
[3]  Q.  Would you please describe the line of pet
[4]  products that GDA was selling and that you were
[5]  responsible for selling?
[6]  A.  Pet beds, feeding and watering bowls, food
[7]  storage, I believe.
[8]  Q.  Anything else that you can recall?
[9]  A.  Could you repeat your initial question,
[10]  please?
[11]  Q.  What was the line of pet products that GDA
[12]  was selling at the time that you were there?
[13]  A.  The line of pet products that were theirs?
[14]  Q.  That they were selling.
[15]  A.  Could you be more specific in your
[16]  question?
[17]  Q.  What is it about my question that you
[18]  don't understand?
[19]  A.  Because there was another product that
[20]  wasn't theirs.
[21]  Q.  But they were selling it?
[22]  A.  When you say they, who do you mean?
[23]  Q.  GDA.
[24]  A.  I attempted to sell it.
[25]  Q.  And what was that pet product?

Min-U-Script®

Connor+Associates, Inc.



[1]   A.   A wicker kennel.

[2]   Q.   Was that wicker kennel part of their

[3]   product line when you first started working there?

[4]   A.   No.

[5]   Q.   Was it a wicker kennel that was developed

[6]   while you were working there?

[7]   A.   It was a wicker kennel that I developed

[8]   while I worked there.

[9]   Q.   Did anyone assist you in developing that

[10]  wicker kennel while you worked there?

[11]  A.   Define assist, please.

[12]  Q.   Did anyone participate in the development

[13]  of that wicker kennel while you worked there?

[14]  A.   Nobody contributed to the design of that

[15]  wicker kennel.

[16]  Q.   Describe for me -- well, first of all, who

[17]  else worked on that wicker kennel other than yourself

[18]  while you worked at GDA?

[19]  A.   What do you mean by worked on?

[20]  Q.   Well, you've talked about a wicker kennel

[21]  being developed while you worked at GDA, correct?

[22]  A.   I talked about a wicker kennel that I

[23]  developed while working for GDA.

[24]  Q.   And did anybody assist you in the

[25]  development of that wicker kennel?

[1]   A.   No.

[2]   Q.   Did you discuss that wicker kennel with

[3]   anybody else at GDA?

[4]   A.   Yes.

[5]   Q.   Who?

[6]   A.   Gary Kleijan.

[7]   Q.   Could you please spell that?

[8]   A.   I believe it's, K-l-e-i-j-a-n, and Dick

[9]   Allen and Julie Brandsford.

[10]  Q.   At the time did each of those three people

[11]  reside in or around Opelika or Auburn?

[12]  A.   No.

[13]  Q.   Where did they reside?

[14]  A.   In the greater Dallas/Fort Worth area.

[15]  Q.   When was the last time you had any contact

[16]  with Mr. Kleijan?

[17]  A.   I believe it would have been in late 2003

[18]  or sometime in 2004.

[19]  Q.   Where was Mr. Kleijan at that time?

[20]  A.   I don't know.

[21]  Q.   Your contact with him, was it by phone,

[22]  email, letter or what?

[23]  A.   By phone.

[24]  Q.   Did you call him or did he call you?

[25]  A.   I called him.

[1]   Q.   Do you still have that phone number?

[2]   A.   No.

[3]   Q.   Do you recall where -- the area code where

[4]   you were calling?

[5]   A.   Do I recall the area code?

[6]   Q.   Yeah.

[7]   A.   No.

[8]   Q.   Do you recall where you believed him to be

[9]   at the time you called him?

[10]  A.   I believe he would have been at his

[11]  personal residence.

[12]  Q.   And where was that located?

[13]  A.   I believe his house is in Mansfield,

[14]  Texas.

[15]  Q.   And that was the last contact you had with

[16]  him?

[17]  A.   Yes.

[18]  Q.   Why did you call him?

[19]  A.   I had heard that they were coming out with

[20]  a wicker kennel.

[21]  Q.   They being GDA?

[22]  A.   GDA or Richell USA.

[23]  Q.   Could you please spell Richell?

[24]  A.   I believe it's, R-i-c-h-e-l-l.

[25]  Q.   So tell me how that conversation went.

[1]   Tell me what you recall that you said to him and what

[2]   he said to you.

[3]   A.   Generally I called him to ask him if they

[4]   were coming out with a wicker kennel.

[5]   Q.   And what did he say?

[6]   A.   No.

[7]   Q.   Where had you heard that they were coming

[8]   out with a wicker kennel?

[9]   A.   I don't recall specifically.

[10]  Q.   Did that concern you when you heard that

[11]  they were coming out with a wicker kennel?

[12]  A.   Yes.

[13]  Q.   And why is that?

[14]  A.   Because the wicker kennel was my idea.

[15]  Q.   Did you say that to Mr. Kleijan at that

[16]  time?

[17]  A.   Yes.

[18]  Q.   What did he say?

[19]  A.   He said I had nothing to worry about.

[20]  Q.   Did he agree with you that it was your

[21]  idea?

[22]  A.   Yes.

[23]  Q.   He said that?

[24]  A.   Yes.

[25]  Q.   When was the last time -- and that's the

06:28:59-06:30:42                                    Page 37

[1]  last contact you had with Mr. Kleijan?

[2]  A.  I believe so.

[3]  Q.  Did you send him any emails about that --

[4]  A.  No.

[5]  Q.  -- or did you receive any emails from him

[6]  about that?

[7]  A.  Not what I recall.

[8]  Q.  Dick Allen, when was the last time you had

[9]  any communication with him?

[10]  A.  It would have been while I was employed at

[11]  GDA.  So in -- in December of 2001.

[12]  Q.  Julie Brandsford, when was the last time

[13]  you had any communication with her?

[14]  A.  I think it would have been late last year.

[15]  Q.  How was it that you had communication with

[16]  her?  Was it by telephone, in person, email, letter,

[17]  what?

[18]  A.  Telephone.

[19]  Q.  And did you call her or did she call you?

[20]  A.  I called her.

[21]  Q.  Where did you call her?

[22]  A.  Where was I at?

[23]  Q.  Where were you and where was she?

[24]  A.  I believe I was in my office.  And I

[25]  wouldn't know where she was at specifically.

06:30:45-06:32:04                                    Page 38

[1]  Q.  What city do you think she was in when you

[2]  called her?

[3]  A.  I assumed she was in the greater

[4]  Dallas/Fort Worth area.

[5]  Q.  Do you know who she was working for at

[6]  that time?

[7]  A.  She was not working at that time.

[8]  Q.  Why did you call her?

[9]  A.  I had heard that she was let go from

[10]  Richell USA.  And I wanted to call and offer

[11]  condolences or offer my support, whatever that means.

[12]  Q.  It wasn't to offer her a job?

[13]  A.  No.

[14]  Q.  It was just to say, hey, sorry, heard the

[15]  news?

[16]  A.  Right.

[17]  Q.  Did you talk about your wicker pet crate

[18]  at all at that time?

[19]  A.  No.

[20]  Q.  I think I understood your testimony that

[21]  while you were at GDA you talked to Gary Kleijan,

[22]  Dick Allen and Julie Brandsford about your wicker

[23]  kennel?

[24]  A.  Yes.

[25]  Q.  With regard to Mr. Kleijan, what did you

06:32:07-06:33:51                                    Page 39

[1]  talk to Mr. Kleijan about with regard to your wicker

[2]  kennel?

[3]  A.  I don't recall specifically.

[4]  Q.  What about generally?

[5]  A.  I would guess generally why I felt it was

[6]  a good idea.

[7]  Q.  And what did you tell him?

[8]  A.  I don't remember specifically.

[9]  Q.  Did he think it was not a good idea?

[10]  A.  No.

[11]  Q.  Did he think it was a good idea?

[12]  A.  I would guess yes.

[13]  Q.  Why would you guess yes?

[14]  A.  Well, if he didn't think it was a bad

[15]  idea, then it would be something north of that.

[16]  Q.  What was your -- was Mr. Kleijan your boss

[17]  at GDA?

[18]  A.  Yes.

[19]  Q.  What was his title?

[20]  A.  I believe that his title was president.

[21]  Q.  And did you have to go to Mr. Kleijan to

[22]  get approval to spend time working on your wicker

[23]  kennel?

[24]      MR. GARDNER:  Objection; foundation.

[25]  There's no foundation the witness was working on a

06:33:55-06:36:24                                    Page 40

[1]  wicker kennel at GDA.

[2]  A.  Could you restate the question, please?

[3]      BY MR. HINSHAW:

[4]  Q.  Did you have to go to Mr. Kleijan to get

[5]  approval to spend time to work on your wicker kennel?

[6]  A.  No.

[7]  Q.  Why were you discussing your wicker kennel

[8]  with Mr. Kleijan?

[9]  A.  To show him the idea.

[10]  Q.  What did you show him?

[11]  A.  To present the idea.

[12]  Q.  Did you show him any drawings?

[13]  A.  I would guess he saw my drawings, yes.

[14]  Q.  And what drawings did you show him?

[15]  A.  Drawings that I had prepared.

[16]  Q.  Would you describe the drawings that you

[17]  prepared?

[18]  A.  I would guess that I would have had

[19]  detailed panel drawings as well as an overall

[20]  assembled drawing.

[21]  Q.  Did any of those drawings depict the

[22]  visual appearance or ornamental features of your

[23]  wicker kennel?

[24]  A.  Could you be more specific?

[25]  Q.  Well, did they show the wicker as it was



| 06:36:26-06:38:24 | Page 41 | 06:40:39-06:42:14 | Page 43 |

**06:36:26-06:38:24** — Page 41

[1] applied or woven onto your kennel?

[2] A. No.

[3] Q. Did you show Mr. Kleijan any drawings that

[4] showed the wicker or the weave patterns that you

[5] wanted to use for your wicker kennel?

[6] A. Could you restate the question, please?

[7] MR. HINSHAW: Can I have it read back,

[8] please?

[9] (The record was read by the reporter.)

[10] A. The drawings would have shown the location

[11] of the wicker.

[12] BY MR. HINSHAW:

[13] Q. What do you mean by that?

[14] A. What I mean by that is that I wasn't

[15] capable of drawing every strand of wicker on my

[16] drawings. So the drawings would have shown those

[17] locations of each panel that were to be covered by

[18] wicker.

[19] Q. Why did you show those drawings to Mr.

[20] Kleijan?

[21] A. Because I was excited about the idea.

[22] Q. Did you prepare any of those drawings

[23] while you were working -- while you were working at

[24] GDA?

[25] A. Do you mean between the time frame of when

**06:40:39-06:42:14** — Page 43

[1] finding product for me to sell.

[2] Q. You discussed your wicker kennel drawings

[3] with him?

[4] A. Yes.

[5] Q. Did any of those drawings show or attempt

[6] to show the wicker as it was applied to the wicker --

[7] or, I'm sorry, as it was applied to the metal cage?

[8] A. Again, it would have -- those drawings

[9] would have shown the locations of the wicker to be

[10] applied.

[11] Q. Did any of those drawings show a weave

[12] pattern?

[13] A. Show a weave pattern?

[14] Q. Yeah.

[15] A. No. Describe a weave pattern? Yes.

[16] Q. How did it describe a weave pattern?

[17] A. I believe I would have had a note that

[18] said a weave pattern similar to outdoor wicker

[19] furniture.

[20] Q. What did Mr. Allen say about your idea?

[21] A. I don't recall specifically.

[22] Q. Do you recall generally?

[23] A. No.

[24] Q. Did he make any suggestions about how you

[25] might change certain features of your drawings?

| 06:38:27-06:40:37 | Page 42 | 06:42:21-06:44:16 | Page 44 |

**06:38:27-06:40:37** — Page 42

[1] I started GDA until I left in December of 2001?

[2] Q. Yes.

[3] A. Yes.

[4] Q. And did you prepare any of those drawings

[5] while you were at the facility of GDA or the offices

[6] of GDA?

[7] A. No.

[8] Q. Did you use any resources at GDA to help

[9] you in developing the design of your wicker kennel?

[10] A. Not that I recall.

[11] Q. You talked about your wicker kennel with

[12] Dick Allen; is that correct?

[13] A. That's correct.

[14] Q. What did you discuss with Mr. Allen?

[15] A. I would have discussed the drawings.

[16] Q. What was Dick Allen's job title at GDA?

[17] A. Specifically I don't recall.

[18] Q. What were his responsibilities to the best

[19] of your knowledge?

[20] A. Product development.

[21] Q. And did you report to him, did he report

[22] to you? What was the nature of your relationship

[23] with him?

[24] A. No, I did not report to him, nor did he

[25] report to me. He was responsible for developing or

**06:42:21-06:44:16** — Page 44

[1] A. No.

[2] Q. Did Mr. Kleijan ever make any suggestions

[3] about how you might change certain features of your

[4] drawings?

[5] A. No.

[6] Q. And then Julie Brandsford, you talked

[7] about your wicker pet kennel with her, right?

[8] A. I believe I would have.

[9] Q. Why do you believe you would have?

[10] A. Because she's a female.

[11] Q. And why was that important?

[12] A. I felt that it was probably more important

[13] to the woman of the house what an indoor containment

[14] device looked like than the male of the house.

[15] Q. Do you believe that women have more

[16] discriminating taste than men on indoor furniture,

[17] for example?

[18] A. Yes, I do.

[19] Q. Is that who you had in mind for who you

[20] would be selling these products to?

[21] A. Not solely, but certainly a portion.

[22] Q. Would it be fair to say primarily?

[23] A. Yeah, it would be fair to say.

[24] Q. What was Ms. Brandsford's reaction to what

[25] you told her or showed her?

Jeffrey Simpson
May 2, 2008

Case 3:06-cv-00901-WKW-WC    Document 73-8    Filed 08/13/2008

Simpson Ventures vs.
Mid-West Metal Products

Page 14 of 36

[1] A. I don't recall specifically.

[2] Q. How about generally?

[3] A. I think generally she liked the idea.

[4] Q. Do you recall, did you show her drawings?

[5] A. I don't believe I would have shown her

[6] drawings, no.

[7] Q. What would you have shown her?

[8] A. The sample.

[9] Q. A prototype?

[10] A. Yes.

[11] Q. Did she have any suggestions on any

[12] features that she thought you might change?

[13] A. Not that I recall.

[14] Q. Do you recall responding -- I'm sorry I

[15] don't have a copy of your interrogatory answers. Do

[16] you recall getting a set of interrogatories, written

[17] requests, for information from Mid-West Metal in this

[18] case?

[19] A. Yes.

[20] Q. And do you recall responding to those?

[21] A. Yes.

[22] Q. And in one of those you stated: With the

[23] help of GDA, LLC Mr. Simpson developed a first

[24] prototype design for a decorative pet home covered

[25] with a woven wicker look material. Is that an

[1] accurate statement?

[2] A. Could you please read that again, please?

[3] Q. Sure. With the help of GDA, LLC Mr.

[4] Simpson developed a first prototype design for a

[5] decorative pet home covered with a woven wicker look

[6] material. Is that an accurate statement?

[7] A. Yes.

[8] Q. What is it that GDA helped you with?

[9] A. They helped in having the prototype

[10] fabricated to my drawings.

[11] Q. How did they help do that?

[12] A. They would have sent my drawings to, I'm

[13] assuming, Alex Lau. And Alex Lau would have had a

[14] factory produce the first sample to my drawings.

[15] Q. Who is Alex Lau?

[16] A. He's the "A" in GDA.

[17] Q. How do you spell his last name?

[18] A. I'm guessing it's, L-a-u.

[19] Q. Does he reside over in China?

[20] A. If you're in --

[21] Q. Well, strike that. You said that GDA

[22] would have sent my drawings to Alex Lau. Where?

[23] A. I believe his offices were in Hong Kong.

[24] Q. Do you have still the drawings that you

[25] sent to -- or that GDA sent to Mr. Lau in Hong Kong?

[1] A. No.

[2] Q. Do you know what happened to those?

[3] A. No.

[4] Q. Did you keep copies of those?

[5] A. No, I did not.

[6] Q. It is from those drawings, though, that

[7] the appearance of the wicker would have been derived?

[8] A. Could you restate that, please?

[9] Q. Those drawings that were sent to Mr. Lau

[10] in Hong Kong, would those have shown how the wicker

[11] was to be applied to the metal structure of the pet

[12] crate?

[13] A. It would have shown where the wicker was

[14] to be applied with, again, a reference as to outdoor

[15] furniture.

[16] Q. And so, for example, those drawings would

[17] not have shown a diamond weave pattern?

[18] A. No.

[19] Q. They would not have shown using wicker

[20] coiled around the tubes around the perimeters of the

[21] side panels, for example?

[22] A. Could you state that again, please?

[23] Q. Would those drawings have shown wicker

[24] continuously coiled around the tubes or bars that

[25] formed the perimeters of the side panels, for

[1] example?

[2] A. Would it have shown it?

[3] Q. Yes.

[4] A. No.

[5] Q. Would it have described it?

[6] A. Yes.

[7] Q. Would those drawings have shown where

[8] the -- or described where the wicker was supposed to

[9] go on the front panel?

[10] A. Yes.

[11] Q. And what's your memory of what that

[12] description was?

[13] A. The wicker would have been applied in all

[14] locations where the door wasn't.

[15] Q. How about on the top panel, did you create

[16] a drawing to show how the wicker would be applied to

[17] the top panel or just a description?

[18] A. A description.

[19] Q. And how did you describe it?

[20] A. Again, showing where the wicker was to be

[21] applied.

[22] Q. And how did you describe your showing of

[23] where the wicker would be applied on the top panel?

[24] A. I'm assuming that it would have shown an

[25] area where the wicker was to be applied.

Page 49

[1] Q. You're assuming, but you don't recall?

[2] A. I recall providing details as to where the
[3] wicker was to be applied.

[4] Q. Do you recall if you described, showed or
[5] instructed Mr. Lau to have a diamond weave pattern
[6] put on the top of the wicker kennel crate?

[7] A. Could you repeat that for me, please?
[8]   (The record was read by the reporter.)

[9] A. No, I did not.

[10]   BY MR. HINSHAW:

[11] Q. The sample that was constructed -- or let
[12] me back up. So these drawings were sent by GDA over
[13] to Mr. Lau, right?

[14] A. I believe so, yes.

[15] Q. Who from GDA specifically sent those over
[16] to Mr. Lau to your knowledge?

[17] A. I believe it would be Dick Allen.

[18] Q. Do you know if Mr. Allen gave any
[19] instructions to Mr. Lau about how to apply the wicker
[20] or where to apply the wicker, what kind of ornamental
[21] features to use?

[22] A. Not that I'm aware of.

[23] Q. Were there any instructions about what the
[24] underlying metal structure was to be to form as the
[25] base for the wicker application?

Page 50

[1] A. Could you repeat that for me, please?

[2] Q. That was a poorly worded question. The
[3] crate had to have a metal -- or it had to have a
[4] structure, correct?

[5] A. Don't know that it had to.

[6] Q. In this case it did?

[7] A. Yes.

[8] Q. And describe that structure.

[9] A. Tubular metal and wire fronting.

[10] Q. And that was designed by you?

[11] A. Yes.

[12] Q. And were those drawings sent over to Mr.
[13] Lau at the same time as the drawings or the
[14] description or instructions about the application of
[15] the wicker?

[16] A. Yes.

[17] Q. How long did it take -- and the request
[18] was for them to create a sample or a prototype; is
[19] that correct?

[20] A. The request was for them to fabricate a
[21] sample, yes.

[22] Q. And did they?

[23] A. Yes.

[24] Q. How long did that take?

[25] A. I don't recall specifically.

Page 51

[1] Q. Was it six months?

[2] A. No.

[3] Q. Less?

[4] A. Yes.

[5] Q. More than one month?

[6] A. I would think it would have been a couple
[7] of weeks only because that's a typical turnaround
[8] time for factory samples.

[9] Q. Do you know who Mr. Lau took these
[10] drawings and descriptions to over in Hong Kong or
[11] China to have the sample constructed?

[12] A. No.

[13] Q. In addition to your drawings and your
[14] descriptions and instructions, did you send over to
[15] Mr. Lau any photographs, clips from magazines or
[16] books that had anything to do with the application of
[17] wicker to a metal crate?

[18] A. I didn't send anything over to Mr. Lau.

[19] Q. Do you know if Mr. Allen sent anything
[20] over to Mr. Lau that would have shown wicker
[21] application or weave patterns?

[22] A. I don't know.

[23] Q. Do you know if GDA is still in business
[24] today?

[25] A. Yes.

Page 52

[1] Q. You do know?

[2] A. Yes.

[3] Q. Are they?

[4] A. No.

[5] Q. When did they go out of business?

[6] A. I don't know.

[7] Q. More than a year ago?

[8] A. I don't know.

[9] Q. When you were at GDA, you said that they
[10] carried and sold pet products?

[11] A. Yes.

[12] Q. Other than this wicker kennel crate that
[13] you were working on, what were the pet products that
[14] they carried?

[15] A. As I stated earlier, I believe there were
[16] pet beds, feeding and watering bowls and I believe
[17] food storage.

[18] Q. Did they carry pet crates?

[19] A. No.

[20] Q. Did they carry any kind of kennel?

[21] A. The only reason I'm hesitating is I
[22] believe they may have had an outdoor doghouse, but I
[23] don't specifically recall. But I wouldn't define it
[24] as a kennel, no.

[25] Q. Well, just for my own -- what would you

[1]   define as a kennel?
[2]   A.   Generally I would define it as a
[3]   containment device.
[4]        MR. GARDNER: Is it possible to get a
[5]   short comfort break?  It's been about an hour and a
[6]   half.
[7]        MR. HINSHAW: Yeah.  Let's do that.
[8]        (Recess 10:05-10:20 a.m.)
[9]        MR. HINSHAW: Back on the record.
[10]       BY MR. HINSHAW:
[11]  Q.   Mr. Simpson, we were talking about GDA.
[12]  And you told me that the "A" in GDA was for Mr. Alex
[13]  Lau?
[14]  A.   That's correct.
[15]  Q.   Do you know what the "G" or the "D" are
[16]  for?
[17]  A.   Gary is the "G".
[18]  Q.   And that would be Gary?
[19]  A.   Kleijan.  "D" would be Dick Allen.  In
[20]  other words, Gary, Dick and Alex.
[21]  Q.   When was the last time you had any contact
[22]  with Mr. Alex Lau?
[23]  A.   The last time that I know of a contact
[24]  with Alex Lau would have been during the time in
[25]  which I was employed at Doskocil.

[1]   Q.   And that preceded your time at GDA,
[2]   correct?
[3]   A.   That's correct.
[4]   Q.   What was the contact at that time?
[5]   A.   Alex Lau was a sourcing agent for
[6]   Doskocil.
[7]   Q.   At GDA the product lines -- the pet
[8]   product lines you were talking about, did any of
[9]   those involve wicker or rattan or a similarly
[10]  appearing material?
[11]  A.   Not that I recall; other than, again, the
[12]  product that I developed.
[13]  Q.   In your employment relationship with GDA,
[14]  did you ever sign any employment contracts?
[15]  A.   No.
[16]  Q.   Handbooks?
[17]  A.   No.
[18]  Q.   Did you ever have any kind of an agreement
[19]  relating to who owns inventions that are developed
[20]  while working at GDA?
[21]  A.   Could you restate that for me, please?
[22]  Q.   While you were working at GDA, was there
[23]  any sort of agreement relating to who would own an
[24]  invention that was developed while you were working
[25]  at GDA?

[1]   A.   Yes.
[2]   Q.   And what were the terms of that?
[3]   A.   The terms of that were that I was the
[4]   inventor and owner of the wicker kennel concept.
[5]   Q.   Was that agreement reduced to writing?
[6]   A.   No.
[7]   Q.   It was a spoken agreement?
[8]   A.   Yes.
[9]   Q.   Between who and who?
[10]  A.   Gary Kleijan.
[11]  Q.   And yourself?
[12]  A.   That's correct.
[13]  Q.   So you had a specific discussion with Mr.
[14]  Kleijan about this very point?
[15]  A.   Yes.
[16]  Q.   And that was while you were at GDA?
[17]  A.   That's correct.
[18]  Q.   Did GDA want to claim ownership of your
[19]  wicker pet kennel?
[20]  A.   No.
[21]  Q.   How was it that this conversation came up
[22]  then?
[23]  A.   I don't recall specifically.
[24]  Q.   Did you initiate it?
[25]  A.   Yes.

[1]   Q.   Why?
[2]   A.   Because Gary thought we should present
[3]   that product to potential customers along with the
[4]   other GDA items, pet products.
[5]   Q.   And what was your reaction to that?
[6]   A.   I was okay with that as long as there was
[7]   an understanding as to ownership of the idea.
[8]   Q.   Did anybody else witness that discussion
[9]   between you and Gary?
[10]  A.   Witness the discussion?
[11]  Q.   Was anybody else present while you had the
[12]  discussion?
[13]  A.   No.
[14]  Q.   Was anybody on a telephone call or a
[15]  speakerphone while you were having the discussion?
[16]  A.   No.
[17]  Q.   Was it confirmed in writing by sending
[18]  email or a letter?
[19]  A.   No.
[20]  Q.   Have you ever been convicted of a crime?
[21]  A.   What do you define as a crime?
[22]  Q.   Have you ever been convicted of any crime?
[23]  A.   Yes.
[24]  Q.   What's that?
[25]  A.   Parking violations, speeding tickets and

| 07:23:33-07:25:01 | Page 57 |
|---|---|

[1]  petty theft.

[2]  Q.  Tell me about the petty theft conviction.

[3]  A.  I was at K-State, Kansas State University.

[4]  Would have been in 1981, I believe.  A stupid act on

[5]  my part.  I don't recall specifically the value, but

[6]  it was somewhere in the neighborhood of two dollars,

[7]  a book of used car values.

[8]  Q.  A book of used car values, is that what

[9]  you said?

[10]  A.  Yes.

[11]  Q.  And you took it from some store?

[12]  A.  That's correct.

[13]  Q.  What was the store?

[14]  A.  I believe it was a grocery store.

[15]  Q.  Why did you do that?

[16]  A.  I have no idea.

[17]  Q.  You were caught by the store owner or

[18]  manager?

[19]  A.  I believe it was a security guard.

[20]  Q.  Did you plead guilty?

[21]  A.  Yes.

[22]  Q.  Do you recall whether that was considered

[23]  a felony or a misdemeanor or what?

[24]  A.  It was, I believe, a misdemeanor.

[25]  Q.  What was the penalty?

| 07:25:12-07:27:02 | Page 58 |
|---|---|

[1]  A.  I don't recall specifically.

[2]  Q.  Did you do any jail time?

[3]  A.  No.

[4]  Q.  Have you ever been accused of committing

[5]  perjury or fraud?

[6]  A.  No.

[7]  Q.  Your company, Simpson Ventures, Inc., when

[8]  did you form that?

[9]  A.  It would have been January 1st of 2004 or

[10]  January 1st of 2003.  And I believe it was January

[11]  1st, 2004.

[12]  Q.  Prior to that, did you have ownership in a

[13]  company called Simpson & Company?

[14]  A.  LLC, yes.

[15]  Q.  LLC.  Does that entity still exist?

[16]  A.  No.  Under Alabama law you're allowed to

[17]  do I'll use the term a like kind exchange from an LLC

[18]  to a Subchapter S Corporation.  And that's what we

[19]  did.  So technically I believe Simpson & Company, LLC

[20]  no longer exists.

[21]  Q.  When was Simpson & Company, LLC formed?

[22]  A.  I believe in January of 2002.

[23]  Q.  And who were the owners of Simpson &

[24]  Company?

[25]  A.  In LLC's they're defined as members.  And

| 07:27:09-07:28:35 | Page 59 |
|---|---|

[1]  they were myself and my wife, Kathy Simpson.

[2]  Q.  Anyone else?

[3]  A.  No.

[4]  Q.  And was the ownership split 50/50?

[5]  A.  Yes.

[6]  Q.  Prior to Simpson & Company the LLC, was

[7]  there a predecessor entity to that?

[8]  A.  No.

[9]  Q.  Why did you form Simpson & Company, LLC?

[10]  A.  Because I didn't want to operate the

[11]  business as a sole proprietor.

[12]  Q.  And what was the business that you were

[13]  operating?

[14]  A.  Pet products company.

[15]  Q.  How long had you been a pet products

[16]  company before you formed Simpson & Co., LLC?

[17]  A.  I believe they were at the same time.

[18]  Q.  Simpson & Co., LLC became Simpson

[19]  Ventures, Inc., correct?

[20]  A.  That's correct.

[21]  Q.  And who are the shareholders who own

[22]  Simpson Ventures, Inc.?

[23]  A.  Myself and Kathy Simpson, my wife.

[24]  Q.  Anybody else?

[25]  A.  No.

| 07:28:35-07:29:54 | Page 60 |
|---|---|

[1]  Q.  And is the ownership split 50/50?

[2]  A.  Yes, it is.

[3]  Q.  You're an officer in Simpson Ventures,

[4]  Inc.?

[5]  A.  Yes.

[6]  Q.  President?

[7]  A.  I believe that's the way it's listed, yes.

[8]  Q.  Are there any other officers?

[9]  A.  Yes.

[10]  Q.  Who?

[11]  A.  My wife, Kathy Simpson.

[12]  Q.  Any other officers?

[13]  A.  No.

[14]  Q.  And what is the officer position that your

[15]  wife holds?

[16]  A.  I believe it's vice president and

[17]  treasurer.  If it's not that, it's whatever is

[18]  required by law.

[19]  Q.  And correct me if I'm wrong.  You were

[20]  here as well.  But when she testified the other day,

[21]  I think she said she maybe spent a total of thirty

[22]  days doing employee kinds of work for the company.

[23]  Is that accurate?

[24]  A.  I would think that would be accurate, yes.

[25]  Q.  How many employees did the company have

| 07:29:58-07:32:02 | Page 61 | 07:33:44-07:35:18 | Page 63 |

**Page 61**

[1]  under Simpson & Co., LLC when it first started?

[2]  A.  Technically zero.

[3]  Q.  You performed activities and

[4]  responsibilities for the company, correct?

[5]  A.  That's correct.

[6]  Q.  Your wife may have performed some employee

[7]  activities here and there?

[8]  A.  That is correct.

[9]  Q.  Before it became Simpson Ventures, Inc.,

[10]  how many employees did the company have?

[11]  A.  In the first year, 2002, I wasn't

[12]  identified as an employee.  All the income was

[13]  transferred to me personally through a -- what is I

[14]  believe a K-1.

[15]      And then I set up payroll within the

[16]  company in -- or on I believe January 1 of 2003.  So

[17]  I was the sole employee, if you will.

[18]  Q.  On the payroll?

[19]  A.  In -- when we started payroll in, again, I

[20]  believe it was January 2003.

[21]  Q.  And that's the way it remained until

[22]  Simpson Ventures, Inc. was formed?

[23]  A.  No.

[24]  Q.  How did it change?

[25]  A.  I added one employee -- I believe just one

**Page 63**

[1]  any, and pulls inventory from our warehouses, applies

[2]  labels, inserts or applies packing slips and readies

[3]  the product for shipment.

[4]  Q.  You said warehouses as in plural?

[5]  A.  Yes.

[6]  Q.  Would you describe your warehouse

[7]  facilities?

[8]  A.  Our primary facility has offices and

[9]  warehouse space.

[10]  Q.  And are there other warehouse facilities?

[11]  A.  Yes.

[12]  Q.  And would you describe those?

[13]  A.  The other warehouse is used solely for the

[14]  storage of product.

[15]  Q.  How big is that warehouse facility?

[16]  A.  The second one?

[17]  Q.  Yes, sir.

[18]  A.  I would guess it's around three thousand

[19]  square feet.

[20]  Q.  Do you have any employees that are

[21]  responsible for operating the warehouse?

[22]  A.  Yes.

[23]  Q.  Is that -- I forgot his name already.

[24]  A.  Crawford Hinkle.

[25]  Q.  Is that Mr. Hinkle?

| 07:32:11-07:33:43 | Page 62 | 07:35:18-07:37:42 | Page 64 |

**Page 62**

[1]  employee in 2003 aside from myself.

[2]  Q.  Was that Donna Belenchia?

[3]  A.  Yes, it was.

[4]  Q.  The LLC was then merged into or became the

[5]  Simpson Ventures, Inc., correct?

[6]  A.  That's correct.

[7]  Q.  How many employees did the corporation

[8]  have at that time?

[9]  A.  Well, certainly myself and Donna

[10]  Belenchia.  And I don't recall whether I had brought

[11]  on a part-time warehouse help at that time.  I don't

[12]  recall, again, whether I had brought on warehouse

[13]  help by that time.

[14]  Q.  Today how many employees does the company

[15]  have?

[16]  A.  Today the company has three employees.

[17]  Q.  And who are they?

[18]  A.  Myself, Donna Belenchia and Crawford

[19]  Hinkle.

[20]  Q.  And what does Mr. Hinkle do?

[21]  A.  He works part-time in the warehouse what

[22]  I'll describe as packing out.

[23]  Q.  And what is that activity?

[24]  A.  It's where he takes UPS or FedEx labels

[25]  along with associated packing slips, if there are

**Page 64**

[1]  A.  Yes, it is.

[2]  Q.  Anybody else?

[3]  A.  No.

[4]  Q.  Has there ever been a person who has been

[5]  an employee of either the LLC or the corporation who

[6]  is no longer an employee?

[7]  A.  Yes.

[8]  Q.  Who?

[9]  A.  Ryan Littenberry.

[10]  Q.  Anybody else?

[11]  A.  Yes.  Jonathan -- I don't remember

[12]  Jonathan's last name.

[13]  Q.  Anybody else?

[14]  A.  Yes.

[15]  Q.  How many people?

[16]  A.  All total?  I believe five.

[17]  Q.  Did all of those five people, did they

[18]  live in the Auburn or Opelika area?

[19]  A.  I believe so, yes.

[20]  Q.  Do you have their names in your payroll

[21]  records?

[22]  A.  Yes.

[23]  Q.  I'm going to ask you to take a look at

[24]  deposition Exhibit 84, please.  Have you seen that

[25]  before?

07:37:50-07:39:06                                    Page 65

[1]    A.   Yes, I have.
[2]    Q.   What is that?
[3]    A.   It's my design patent for my wicker kennel
[4]    design.
[5]    Q.   You're identified as the inventor,
[6]    correct?
[7]    A.   Yes, I am.
[8]    Q.   No one from GDA is identified as an
[9]    inventor, correct?
[10]   A.   That is correct.
[11]   Q.   The date is May 2nd of 2002 for when you
[12]   filed it, correct?
[13]   A.   That is correct.
[14]   Q.   The design that's shown here, would you
[15]   please tell me how you first came up with the idea
[16]   for this design?
[17]   A.   I first came up with the concept of the
[18]   overall design while sitting on a wicker porch swing,
[19]   specifically a resin rattan porch swing.
[20]   Q.   And what is it about that experience that
[21]   gave you this idea?
[22]   A.   Could you rephrase your question, please?
[23]   Q.   Let's try it this way.
[24]         MR. HINSHAW: Let's go ahead and mark
[25]   this. And I only have one color copy. Let's make

07:39:35-07:40:47                                    Page 66

[1]    that the deposition exhibit.
[2]         (Defendant's Exhibit-93 was marked for
[3]    identification.)
[4]         BY MR. HINSHAW:
[5]    Q.   The court reporter has handed to you
[6]    what's been marked as deposition Exhibit Number 93.
[7]    Do you recognize that?
[8]    A.   Yes, I do.
[9]    Q.   What is that?
[10]   A.   That's the porch swing that my son and I
[11]   bought for my wife for Mother's Day in May of 2001.
[12]   Q.   And is this the porch swing you were just
[13]   talking about that where you first had this idea?
[14]   A.   Yes, it is.
[15]   Q.   Well, first of all, what was the idea that
[16]   you had?
[17]   A.   A wicker kennel.
[18]   Q.   Anything more specific than that?
[19]   A.   Initially, no.
[20]   Q.   It was just the idea of making a kennel
[21]   out of wicker?
[22]   A.   Making a kennel with a covering of
[23]   specifically resin wicker or resin rattan.
[24]   Q.   What was it about the porch swing here in
[25]   Exhibit Number 93 that inspired that idea?

07:40:58-07:43:55                                    Page 67

[1]    A.   The decorative nature of the material.
[2]    Q.   Could you elaborate on what you mean by
[3]    that?
[4]    A.   Well, when I was at Doskocil, we had
[5]    worked -- we, the development team at Doskocil, had
[6]    worked on a concept for decorative indoor containment
[7]    based on my suggestion.
[8]         And that product concept was knockdown
[9]    furniture, for lack of a better term, an end table
[10]   that was designed to contain a pet.
[11]        A couple of prototypes were developed.
[12]   And they were fabricated of particle board or MDF
[13]   with an imitation wood covering or laminate.
[14]        Those products were never brought to
[15]   market because I felt that they -- that they wouldn't
[16]   work with people's decor.
[17]   Q.   Okay. But what I'm trying to figure out
[18]   here and you're sitting on your porch swing in
[19]   Exhibit 93, and the question was: How did this
[20]   inspire your idea?
[21]   A.   Because it gave me the idea that rattan,
[22]   from a decorative aspect, could fit in with many
[23]   different types of decor, and, secondly, that resin
[24]   rattan would be a good material to use because of the
[25]   environment.

07:43:56-07:45:28                                    Page 68

[1]    Q.   What do you mean by that?
[2]    A.   Well, dogs sometimes make messes.
[3]    Q.   So by environment you don't mean global
[4]    warming environment, you meant the context of what
[5]    pets do in their pet homes?
[6]    A.   You're right.
[7]    Q.   This swing in Exhibit 93, is that made out
[8]    of a resin wicker material?
[9]    A.   Yes, it is.
[10]   Q.   Tell me, do you make a distinction between
[11]   wicker and rattan?
[12]   A.   I don't really. In fact, I use them both.
[13]   Q.   Interchangeably?
[14]   A.   Yes.
[15]   Q.   And is it correct that - and I think I
[16]   just said this - but Exhibit 93 was made out of a
[17]   resin wicker material?
[18]   A.   That is correct.
[19]   Q.   In your eye, does it have any visual
[20]   difference than, say, natural wicker look?
[21]   A.   Does this specific one you meant have
[22]   difference?
[23]   Q.   Well, let's start there.
[24]   A.   Could you restate the question for me,
[25]   please?

| | |
|---|---|
| 07:45:28-07:46:36 Page 69 | 07:48:16-07:50:24 Page 71 |

**Page 69** (07:45:28-07:46:36)

[1] Q. Does the resin wicker that was used in
[2] your porch swing look substantially the same as
[3] natural wicker?
[4] A. I believe it does.
[5] Q. So you're sitting on this porch swing.
[6] And were you sitting there by yourself?
[7] A. I believe I was.
[8] Q. What were you doing?
[9] A. Relaxing.
[10] Q. Were there any pet product objects around
[11] you?
[12] A. No, I don't believe so.
[13] Q. Did you have a wire crate at your home at
[14] the time?
[15] A. No.
[16] Q. Where were you working at the time you had
[17] this idea?
[18] A. At GDA, LLC.
[19] Q. Was this on the weekend, in the evening?
[20] A. I'm assuming it would have been, yes, on
[21] the weekend or during an evening.
[22] Q. And so you're sitting on the porch swing
[23] and this idea just pops in your head or was there
[24] something that made you think about this?
[25] A. Popped into my head.

**Page 71** (07:48:16-07:50:24)

[1] that area.
[2] Q. Describe that.
[3] A. A small plastic injection molded pet
[4] carrier. It was probably a Pet Taxi manufactured by
[5] Doskocil in which we would use to transport our cat
[6] to and from the vet.
[7] Q. At the time you had this idea, do you
[8] recall the date generally when you had this idea?
[9] A. Again, it would have been after I started
[10] employment with GDA. I don't know specifically a
[11] date.
[12] Q. I believe in your interrogatory answers
[13] you had said at that time it was in September of
[14] 2001. Does that sound accurate?
[15] A. To the best of my knowledge. It could
[16] have been a little bit before that. I don't recall a
[17] specific date.
[18] Q. Did you have any other wicker objects in
[19] your house at the time you had this idea?
[20] A. I believe we would have, yes.
[21] Q. And what do you recall?
[22] A. We would have had at least one wicker
[23] basket.
[24] Q. Anything else?
[25] A. Not that I recall.

| | |
|---|---|
| 07:46:36-07:48:07 Page 70 | 07:50:24-07:51:40 Page 72 |

**Page 70** (07:46:36-07:48:07)

[1] Q. What did you do next?
[2] A. I believe I told my wife about it.
[3] Q. At the time did you guys -- did your
[4] family have a dog?
[5] A. No.
[6] Q. You had a cat?
[7] A. That's correct.
[8] Q. Mr. Herzher?
[9] A. You are correct.
[10] Q. Did you have any kind of wire crates for
[11] the cat?
[12] A. No.
[13] Q. Your wife testified the other day about
[14] you having a workshop or a work area in your house?
[15] A. That's correct.
[16] Q. Describe that for me.
[17] A. It's an area in the basement that's heated
[18] and cooled. It's probably eight feet by twenty-five
[19] feet with a eight foot workbench along one wall.
[20] Q. And is that generally how it was back when
[21] you had this idea?
[22] A. Yes.
[23] Q. And did you have any pet crates down in
[24] your work area?
[25] A. May have had a plastic carrier stored in

**Page 72** (07:50:24-07:51:40)

[1]     (Defendant's Exhibit-94 was marked for
[2] identification.)
[3]     BY MR. HINSHAW:
[4] Q. The court reporter has handed you what's
[5] been marked as Exhibit Number 94. Do you recognize
[6] that?
[7] A. Yes, I do.
[8] Q. What is that?
[9] A. It's a wicker or rattan basket.
[10] Q. And is that the basket that you had in
[11] your house around the time that you had this idea?
[12] A. I believe it is, yes.
[13] Q. Did that basket play any role in inspiring
[14] your idea?
[15] A. No.
[16] Q. You don't recall any other wicker objects
[17] being in your house around this time?
[18] A. As I said, there may have been additional
[19] wicker baskets, but I don't recall specifically.
[20] Q. Now, you started to tell me earlier
[21] about -- well, strike that. At the time you had this
[22] idea, was there a problem that you had identified and
[23] you were trying to address when you came up with this
[24] idea of putting wicker with the wire crate?
[25] A. Absolutely.

| 07:51:40-07:53:16 | Page 73 |
| --- | --- |

[1]    Q.   And what was that problem?

[2]    A.   The problem was the aesthetic quality of a

[3]    wire crate or plastic carrier when being used as

[4]    containment in a home.

[5]    Q.   Exactly what was that problem?

[6]    A.   Well, they don't look very good.

[7]    Q.   Well, when did you first identify that

[8]    problem?

[9]    A.   Again, when I was employed by Doskocil.

[10]   Q.   And when you were at Doskocil, there were

[11]   discussions about this problem?

[12]   A.   Yes.

[13]   Q.   Did those discussions incorporate or were

[14]   they based upon any studies or articles or market

[15]   surveys that had been done?

[16]   A.   No.

[17]   Q.   Just kind of common sense go looking at a

[18]   wire pet crate and thinking that's not very

[19]   aesthetically pleasing?

[20]   A.   I'm sorry.  Could you repeat that, please?

[21]   Q.   Was it just a commonsensical

[22]   acknowledgement that you look at a wire pet crate and

[23]   it's not very aesthetically pleasing?

[24]   A.   That was my commonsensical conclusion,

[25]   yes.

| 07:53:16-07:54:36 | Page 74 |
| --- | --- |

[1]    Q.   And others in your product development

[2]    team at Doskocil agreed?

[3]    A.   Well, I wasn't part of a product -- I

[4]    wasn't in product development at Doskocil.  Others

[5]    within Doskocil agreed, yes.

[6]    Q.   Who were the others within Doskocil that

[7]    agreed?

[8]    A.   I don't know specifically.

[9]    Q.   Do you know if other pet companies were

[10]   acknowledging the same problem with wire pet crates

[11]   at that time?

[12]   A.   Not to my knowledge.

[13]   Q.   Do you know of any efforts by any other

[14]   pet companies that would appear that they were

[15]   undertaking efforts to address that problem?

[16]        MR. GARDNER: Is your question now or at

[17]   the time?  It's unclear.

[18]        BY MR. HINSHAW:

[19]   Q.   At the time, were you aware of any other

[20]   pet companies who were making efforts to develop pet

[21]   crates in a way that made it appear that they were

[22]   trying to address this problem?

[23]   A.   No.

[24]   Q.   Looking back at that period of time, are

[25]   you aware of such efforts now?

| 07:54:40-07:56:13 | Page 75 |
| --- | --- |

[1]    A.   To develop pet crates?

[2]    Q.   Well, let's start there.  Yes.

[3]    A.   No.

[4]    Q.   Are you aware of efforts to make

[5]    aesthetically pleasing pet products during that

[6]    period of time?

[7]    A.   Yes.

[8]    Q.   Pet products that were intended to contain

[9]    pets or provide housing for pets?

[10]   A.   The only products that I was aware of at

[11]   that time were what I call crate covers.

[12]   Q.   Describe those.

[13]   A.   They were typically a fabric product that

[14]   was sewn inside each tube, typical wire crate sizes.

[15]   Q.   What was their purpose?

[16]   A.   I would think their purpose was to hide

[17]   the -- to hide the ugly wire crate.

[18]   Q.   So to make an aesthetically pleasing

[19]   crate?

[20]   A.   Well, that's in the eye of the beholder.

[21]   Q.   Well, at least it was an effort to do

[22]   that?

[23]   A.   A weak effort in my opinion.

[24]   Q.   But an effort?

[25]   A.   I would say so.

| 07:56:15-07:57:58 | Page 76 |
| --- | --- |

[1]    Q.   Do you recall ever seeing any crate covers

[2]    that had a pattern that resembled wicker?

[3]    A.   No.  They were typically paw prints.

[4]    Q.   And are you speaking of just Doskocil's

[5]    products or other companies?

[6]    A.   Doskocil did not have that product line.

[7]    And I don't believe I said that.

[8]    Q.   I didn't mean to suggest that you did.  So

[9]    the only pet crate covers that you can recall, at

[10]   least the designs of them, were paw prints?

[11]   A.   That's my recollection, yes.

[12]   Q.   When do you recall first seeing those?

[13]   A.   I think it would have -- I think it would

[14]   have had to have been during the time of my

[15]   employment at Doskocil.

[16]   Q.   I think you said that that was back in,

[17]   what, '97 to '99?  Did I get that right?

[18]   A.   Yes, I believe you're correct.

[19]   Q.   Well, coming forward to this moment in

[20]   time looking at Exhibit 93 when you had this idea,

[21]   were you actively working on trying to come up with

[22]   some solution to the problem of pet crates that are

[23]   not aesthetically pleasing?

[24]   A.   I'm sorry.  Say that one more time.

[25]   Q.   Do you want me to --

| | |
|---|---|
| 07:57:58-07:59:05     Page 77 | 08:00:54-08:02:06     Page 79 |

**Page 77**

[1]  A.  Yeah, please, if you don't mind.

[2]  Q.  Well, I don't want to call them -- there

[3]  was this problem perceived as far back as 1997 that

[4]  pet crates were not aesthetically pleasing, right?

[5]  A.  Well, I don't think -- it may not have

[6]  been in '97.  It was during my tenure at Doskocil

[7]  that I got the notion that, hey, you know, this just

[8]  can't be working in many households.

[9]  Q.  And you had seen pet crates made by

[10]  other companies -- or, I'm sorry, pet crate covers

[11]  made by other companies in an effort to address that

[12]  problem, correct?

[13]  A.  Again, I think in a weak effort, yes.

[14]  Q.  But an effort?

[15]  A.  An effort.

[16]  Q.  And so prior to you coming up with your

[17]  idea that you had while sitting on this swing in

[18]  Exhibit 93, were you actively working on coming up

[19]  with a solution for that problem?

[20]  A.  No.

[21]  Q.  No?

[22]  A.  No.

[23]  Q.  Just occurred to you?

[24]  A.  Yes.

[25]  Q.  Out of the blue?

**Page 78**

07:59:07-08:00:45

[1]  A.  Absolutely.

[2]  Q.  You hadn't done any kind of research or

[3]  looking through magazines, looking on the Internet,

[4]  looking at old books in the library, anything like

[5]  that?

[6]  A.  No.  Again, the only efforts were back at

[7]  Doskocil where there was two products that were

[8]  developed in an attempt to create and produce

[9]  decorative indoor containment.

[10]  Q.  Have you ever heard of the indoor

[11]  doghouse?

[12]  A.  The indoor doghouse?

[13]  Q.  Yes, sir.

[14]  A.  Is that a trademark?

[15]  Q.  I don't know.  Did you ever work on a

[16]  project while at Doskocil that was known internally

[17]  at Doskocil as the indoor doghouse?

[18]  A.  That may have been the name of the project

[19]  that I spoke of earlier.

[20]  Q.  And which project?

[21]  A.  The only project that I spoke of

[22]  specifically relative to Doskocil in that we were

[23]  trying to create decorative indoor containment.

[24]      And the product was -- the sample was

[25]  manufactured from particle board or MDF and it had a

**Page 79**

[1]  imitation wood lamination.

[2]  Q.  So the lamination was made to resemble

[3]  wood?

[4]  A.  Yes.

[5]  Q.  Could have been -- I mean, the lamination

[6]  could be modified to resemble anything, like wicker,

[7]  right?

[8]  A.  Or butterflies.

[9]  Q.  Okay.  While at Doskocil, did you ever

[10]  work on any project involving wicker or rattan or a

[11]  similar material?

[12]  A.  No.

[13]  Q.  I'm sorry?

[14]  A.  No.

[15]  Q.  Did you ever hear of the rotobox litter

[16]  pan while you were working at Doskocil?

[17]  A.  The rotobox?

[18]  Q.  Litter pan.

[19]  A.  I'm sorry.  If you'd repeat your question,

[20]  please, Jim.

[21]  Q.  Do you recall ever working on or hearing

[22]  about a project at Doskocil called the rotobox litter

[23]  pan?

[24]  A.  Was it a Doskocil project?

[25]  Q.  I can't answer that.  I don't know.

**Page 80**

08:02:12-08:03:40

[1]  A.  I can't say with a hundred percent of

[2]  assuredness.

[3]  Q.  The name doesn't ring a bell with you

[4]  today?

[5]  A.  The name does not ring a bell, but the

[6]  connotation does.

[7]  Q.  And what's the connotation?

[8]  A.  Of a rotating litter box.

[9]  Q.  So taking waste material --

[10]  A.  You did say rotobox, right?

[11]  Q.  That's -- yes.

[12]  A.  Okay.

[13]  Q.  And did that -- do you recall working on

[14]  such a project?

[15]  A.  Well, I remember such a project being

[16]  developed, yes.

[17]  Q.  Did that project involve wicker or rattan

[18]  or similar appearing materials at all?

[19]  A.  No.

[20]  Q.  Do you recall working on a project or a

[21]  series of projects at Doskocil that related to making

[22]  furniture specifically for cats so that that

[23]  furniture could be used in indoor living rooms and

[24]  family rooms?

[25]  A.  Yes.

| 08:03:40-08:06:17 | Page 81 |
|---|---|

[1] Q. And what were those projects?

[2] A. Yes, I recall those products.

[3] Q. And what were those?

[4] A. They were a line of I'll say whimsical cat

[5] furniture.

[6] Q. Could you elaborate on that, please?

[7] A. The only elaboration that comes to mind

[8] they looked like Looney Tunes kind of images or that

[9] you would see in a cartoon in terms of their overall

[10] forms and appearance.

[11] I believe there was a chair. There was a

[12] cat tower. And I believe there was a -- a bed with a

[13] headboard and footboard.

[14] Q. Were any of those rectangular or crate

[15] like structures?

[16] A. No.

[17] Q. Did any of them have doorways on them or

[18] door portals?

[19] A. I believe the cat tower did, yes.

[20] Q. And would you describe that?

[21] A. Well, I believe there was a cylindrically

[22] shaped -- oblong cylindrically shaped nook, if you

[23] will, in the cat tower that had, I believe, both ends

[24] open.

[25] Q. Was there a door portal that was

| 08:06:21-08:08:36 | Page 82 |
|---|---|

[1] essentially a rectangular shape with a half moon or

[2] curved top in any of these products that we've been

[3] talking about?

[4] A. The cat furniture products?

[5] Q. Start there.

[6] A. Don't -- don't believe so, no, not on the

[7] cat furniture.

[8] Q. How about the indoor doghouse?

[9] A. I don't recall specifically what the shape

[10] of the doorway was on that project.

[11] Q. And I recognize you don't remember the

[12] exact name. But what's the connotation of the

[13] rotobox litter pan?

[14] A. Well, the rotobox litter pan I believe had

[15] a -- had a door in it, a solid door, such that you

[16] could close that door and then rotate the device and

[17] it would sift out the solid waste.

[18] I would guess that the door was somewhat

[19] rectangular in shape, but I can't say with any

[20] assuredness.

[21] Q. Earlier you were describing two different

[22] prototypes of a -- I believe you called it a

[23] knockdown piece of furniture. It was --

[24] A. And that may have been the indoor doghouse

[25] that you spoke of earlier.

| 08:08:36-08:10:43 | Page 83 |
|---|---|

[1] Q. The people that you talked to at Doskocil

[2] about those projects and this concept of trying to

[3] make an aesthetically pleasing pet crate, okay, do

[4] you recall ever any discussions about alternative

[5] material choices, alternative ways to make such an

[6] aesthetically pleasing pet crate?

[7] A. No, I don't. That would have been close

[8] to the time when I left Doskocil.

[9] Q. When you were at Doskocil, were you ever

[10] involved in licensing intellectual property? And by

[11] that I mean negotiations, discussions, proposals,

[12] evaluating proposals, things like that.

[13] A. I don't believe so, no.

[14] Q. What did you do for Doskocil? Walk me

[15] through from start to finish.

[16] A. I was director of product marketing.

[17] Q. What were your responsibilities?

[18] A. Marketing responsibilities like pricing,

[19] promotion, positioning in terms of we had two brands,

[20] what brands would be allowed and what channels,

[21] defining opportunities in that looking at the

[22] marketplace at specific retailers or the market in

[23] general or in trying to define where there were

[24] openings.

[25] Q. Openings for what?

| 08:10:54-08:12:32 | Page 84 |
|---|---|

[1] A. New products.

[2] Q. While you were employed at Doskocil, did

[3] you ever order a competitor's pet crate or a pet

[4] product for purposes of evaluating it?

[5] A. No, I don't believe I would have.

[6] Q. Do you recall whether others at Doskocil

[7] did such?

[8] A. Yes, I believe they would have, yes.

[9] Q. How frequently?

[10] A. I wouldn't know.

[11] Q. Did it seem pretty frequent?

[12] A. I just don't have a recollection of the

[13] frequency.

[14] Q. Who were the people, as you perceived it,

[15] who were ordering competitor's pet products?

[16] A. I think it would have been the folks in

[17] the product development group.

[18] Q. And what was your understanding of their

[19] purpose in ordering competitor's pet products?

[20] A. To analyze the competition.

[21] Q. Did you think that there was anything

[22] inappropriate about that?

[23] A. Could you rephrase that?

[24] Q. Did you think there was anything

[25] inappropriate about your fellow employees at Doskocil

08:12:37-08:13:55                                          Page 85

[1]   ordering competitor's pet products to evaluate the
[2]   competition?
[3]   A.  I really wouldn't know what my feelings
[4]   were back then.
[5]   Q.   You have no recollection of whether you
[6]   thought that was an appropriate thing or
[7]   inappropriate thing or it was just done?
[8]   A.  It was just done.
[9]   Q.   Your company Simpson Ventures now is in
[10]  the pet product business?
[11]  A.  That's correct.
[12]  Q.   Have you ever ordered your competitor's
[13]  pet products?
[14]  A.  Yes.
[15]  Q.   For what purpose?
[16]  A.  How do you define competitors?
[17]  Q.   Well, you have a product line at Simpson
[18]  Ventures, correct?
[19]  A.  That's correct.
[20]  Q.   And I assume that you are also looking at
[21]  developing new products from time to time that you
[22]  don't currently offer?
[23]  A.  That's correct.
[24]  Q.   And so from time to time do you go out and
[25]  evaluate what's available in the marketplace from

08:13:58-08:15:53                                          Page 86

[1]   your competition?
[2]   A.  Yes.
[3]   Q.   Other pet product companies?
[4]   A.  Sure.
[5]   Q.   And do you sometimes order their products?
[6]   A.  Yes.
[7]   Q.   For what purpose?
[8]   A.  That depends on which purchase.
[9]   Q.   Well, why have you ordered your
[10]  competitor's pet products in the past at Simpson
[11]  Ventures?
[12]  A.  Well, one instance is to provide samples
[13]  to -- samples of the Mid-West product.
[14]  Q.   To whom?
[15]  A.  To my attorneys.
[16]  Q.   Any other instances?
[17]  A.  Of the Mid-West product?
[18]  Q.   No; of ordering your competitor's pet
[19]  products.
[20]  A.  Yes.
[21]  Q.   How frequently have you done that?
[22]  A.  I -- I don't know a frequency.
[23]  Q.   How many times have you done that?
[24]  A.  Maybe a half a dozen, I'm guessing.
[25]  Q.   Other than the ordering of the Mid-West

08:15:57-08:18:16                                          Page 87

[1]   wicker pet crate, tell me about these other half
[2]   dozen instances.
[3]   A.  Okay.  There would have been several
[4]   purchases of litter pans, both standard pans
[5]   available from Vanness, Stylette.
[6]   Q.   Could you please spell those?
[7]   A.  Vanness is V-a-n-and I think it's
[8]   another-n-e-s-s, Vanness Plastics.  They're one of
[9]   the big litter pan suppliers or manufacturers.
[10]  Stylette, S-t-y-l-e-t-t-e, I believe, and Petmate or
[11]  Doskocil.  That's, I think, Doskocil's brand.
[12]      I would have purchased those when sizing
[13]  or determining what the internal dimensions of our
[14]  decorative litter pan cover should be.
[15]      I have also purchased a Litter Maid,
[16]  L-i-t-t-e-r, M-a-i-d, automatic litter pan.  And I
[17]  believe one other.  And that was probably the
[18]  Doskocil automatic litter pan system.
[19]      And I would have purchased those two to
[20]  determine if I could make a universal, I'll call it,
[21]  litter pan cover for automatic litter pans.
[22]  Q.   So that evaluation was of a product that
[23]  you didn't presently offer, and you had ordered --
[24]  A.  Didn't present -- I'm sorry.
[25]  Q.   And you had ordered these litter pans from

08:18:19-08:20:37                                          Page 88

[1]   Doskocil and Litter Maid to help you evaluate whether
[2]   to create a new product?
[3]   A.  Whether to create a different product,
[4]   yes.  I think I stated that I ordered them - and
[5]   subsequently I think I returned a couple of them, the
[6]   automatic ones, because of their expense - again, to
[7]   size -- to size a decorative litter pan cover to
[8]   ensure that it housed or fit or accommodated the
[9]   popular basic litter pans on the market because I had
[10]  no interest in coming out with a litter pan.
[11]  Q.   Do you think it's pretty common practice
[12]  in the pet product industry to order competitor's
[13]  products for purposes of evaluating them?
[14]  A.  Yes.
[15]  Q.   Who did you work with at Doskocil?
[16]  A.  I worked for Mike Farmer.  Other folks
[17]  that I worked with were Gary Kleijan, Dick Allen,
[18]  Kevin Kolozvari.
[19]  Q.   Could you spell that last name, please, as
[20]  best as you can?
[21]  A.  I'll butcher it.  K-o-l-o-z-v-a-r-i.  Ann
[22]  McCullough, Julie Brandsford, Kevin Mitchell, Ken
[23]  Jordan, Pat Hoffman.  How far do you want me to go?
[24]  Q.   Several of those names sound like the
[25]  folks who are involved at GDA?

| 08:20:48-08:22:33 | Page 89 |
|---|---|

[1] A. They not only sound like it they are those
[2] same folks.
[3] Q. Did a group of you leave Doskocil at the
[4] same time and that group then formed GDA?
[5] A. No.
[6] Q. When did you stop working at Doskocil, the
[7] fall of 1999?
[8] A. Late fall, early winter. It was late in
[9] 1999, yes.
[10] Q. And what brought that about?
[11] A. We weren't happy in Dallas/Fort Worth, we
[12] as a family. We didn't care for Texas.
[13] Q. So more for personal reasons?
[14] A. Absolutely. All for personal reasons.
[15] Q. When you were at Doskocil, did you review
[16] any reports, studies, research, regarding what it is
[17] that consumers want in their pet crates?
[18] A. I don't specifically recall reviewing a
[19] study. I think there was a study accomplished by
[20] either Doskocil or Dog Loo. But I can't say -- I
[21] can't say that with a hundred percent assuredness,
[22] Jim.
[23] Q. Okay. What do you recall about whatever
[24] it was that this thing was?
[25] A. I'm guessing that it was a study done -

| 08:22:53-08:24:27 | Page 90 |
|---|---|

[1] and this is truly a guess - that Dog Loo would have
[2] done the study prior to the merger of Dog Loo and
[3] Doskocil.
[4] Q. What do you recall being the -- the point
[5] of the possible study being?
[6] A. I think -- I think it was probably about
[7] carriers, plastic carriers. But, again, I don't
[8] recall specifically.
[9] Q. Do you recall whether it had anything to
[10] do with the aesthetics, whether they were pleasing or
[11] displeasing, of the plastic pet carriers?
[12] A. I have no recollection.
[13] Q. Aside from that, do you recall any other
[14] discussions or possibly reviewing any research
[15] studies, reports, anything about what consumers want
[16] in the aesthetics of their pet crates?
[17] A. No.
[18] Q. Going back to this point in time, again,
[19] referencing Exhibit 93, when you had this idea of
[20] combining wicker to make a pet crate.
[21] A. Okay.
[22] Q. Right? All right. You said --
[23] A. Okay. When did you say? I'm sorry. At
[24] what time?
[25] Q. I didn't. At this point in time which I

| 08:24:29-08:25:39 | Page 91 |
|---|---|

[1] think you said in your interrogatories and your
[2] testimony today was around September of 2001. Okay?
[3] Does that sound accurate?
[4] A. Yes.
[5] Q. And I think you said earlier that you
[6] weren't actively working on some solution for this
[7] problem of coming up with an aesthetically pleasing
[8] dog crate -- or pet crate, correct?
[9] A. That's correct.
[10] Q. So am I correct that you hadn't been
[11] thinking of what other materials you might put on a
[12] pet crate to make it aesthetically pleasing?
[13] A. No, not actively, no.
[14] Q. And you hadn't experimented with anything?
[15] A. No.
[16] Q. And I think you were telling me that after
[17] you had this idea I asked you what did you do next
[18] and you said you talked to your wife?
[19] A. Uh-huh (affirmative).
[20] Q. What do you recall telling your wife?
[21] A. Well, I mean, specifically I can't recall
[22] verbatim.
[23] Q. What do you recall generally?
[24] A. I think generally I would have asked her
[25] about the idea and got her impression of the overall

| 08:25:41-08:26:59 | Page 92 |
|---|---|

[1] concept.
[2] Q. And what did she say?
[3] A. I recall her liking the idea.
[4] Q. Did she say anything else?
[5] A. Not that I recall.
[6] Q. How did you describe the idea to her at
[7] that time?
[8] A. As a general -- you know, in essence a
[9] form or a shape of a wire kennel covered with -- with
[10] resin rattan.
[11] Q. And at that time -- and I think you said
[12] you didn't have any wire kennels in your house. But
[13] at that time were you envisioning a rectangular wire
[14] kennel?
[15] A. Yes.
[16] Q. Pretty common in the marketplace at that
[17] time?
[18] A. Yes. And Doskocil had a line of wire
[19] kennels as well.
[20] Q. And were those collapsable?
[21] A. Yes.
[22] Q. And that feature too was a common feature
[23] of wire metal pet crates at that time?
[24] A. Collapsibility?
[25] Q. Yes, sir.

Jeffrey Simpson
May 2, 2008
Case 3:06-cv-00901-WKW-WC    Document 73-8    Filed 08/13/2008
Simpson Ventures vs.
Mid-West Metal Products
Page 26 of 60

| 08:26:59-08:28:29 | Page 93 |
| --- | --- |

[1]  A.  Yes.

[2]  Q.  What did you do next?

[3]  A.  You mean immediately next or --

[4]  Q.  Well, in terms of working on your idea to

[5]  take a wire pet crate and make it aesthetically

[6]  pleasing.

[7]  A.  I would have started preparing drawings.

[8]  Q.  Would you have done those yourself?

[9]  A.  Yes.

[10] Q.  Did anybody assist you with those?

[11] A.  No.

[12] Q.  And would you have started with basically

[13] drawing out the structure or shape of the crate?

[14] A.  I would have started by defining what the

[15] overall dimensions were and then drawing or sketching

[16] the details of the concept.

[17]      MR. GARDNER: Off the record.

[18]      (Off-the-record discussion.)

[19]      MR. HINSHAW: Go ahead and mark that as

[20] Exhibit 95.

[21]      (Defendant's Exhibit-95 was marked for

[22] identification.)

[23]      BY MR. HINSHAW:

[24] Q.  The court reporter has handed you what's

[25] been marked as deposition Exhibit Number 95.  It's

| 08:28:36-08:31:20 | Page 94 |
| --- | --- |

[1]  several pages in length.  If you want to thumb

[2]  through those.  Oh, I will tell you, just the heads

[3]  up, if you -- do you see the bates labels there --

[4]  A.  Yes, sir.

[5]  Q.  -- on this ending in 54?  Do you recognize

[6]  those?

[7]  A.  Yes.

[8]  Q.  When you come to between P000057 and

[9]  P000058, you see in the bottom right-hand corner of

[10] those drawings there appear to be page numbers like

[11] one of seven, three of seven, four of seven?

[12] A.  That's what appears to me as well.

[13] Q.  One of my questions is, do you see page

[14] five of seven anywhere in here?  But go ahead and

[15] take a look at the materials.

[16] A.  (Witness complies.)

[17] Q.  Mr. Simpson, what are these?

[18] A.  These are my drawings or sketches of a --

[19] framework components of a resin rattan pet home.

[20] Q.  And you prepared these back sometime in

[21] 2001 or do you recall?

[22] A.  2001?

[23] Q.  Yes, sir.

[24] A.  No.  These would have been prepared in

[25] 2002.

| 08:31:21-08:33:53 | Page 95 |
| --- | --- |

[1]  Q.  Why do you say that?

[2]  A.  Because this is a different mechanical

[3]  configuration than my first drawings.

[4]  Q.  How so?

[5]  A.  Primarily this mechanical configuration

[6]  collapsed or kd'd differently than the first.

[7]  Q.  How did the first one collapse?

[8]  A.  The first one collapsed in a -- I think

[9]  the general term used is a Z-fold.

[10] Q.  And how does this one collapse?

[11] A.  Do you have my assembly instructions that

[12] would show or I could try to explain?

[13] Q.  Just try to explain generally.

[14] A.  I'm using Exhibit 84 as an example.  So

[15] these drawings are reflective of this mechanical

[16] configuration shown in Figure 1 -- shown in all

[17] figures of Exhibit 84 wherein the front and the back

[18] panels would hinge about their lower edges and fold

[19] down.

[20]      The links at the upper corners would be

[21] disengaged at one upper edge.  That side panel

[22] adjacent to those disengaged links would then be

[23] folded down on top of the front and back panels that

[24] have previously been folded.

[25]      And then the remaining side and top -- the

| 08:33:57-08:35:26 | Page 96 |
| --- | --- |

[1]  side would come down next and the top would fold over

[2]  upside-down.

[3]  Q.  So this Exhibit 95 were your hand drawn

[4]  drawings that essentially correlate with the object

[5]  that's depicted in Exhibit 84?

[6]  A.  Essentially, yes.

[7]  Q.  And you said there was a previous set of

[8]  drawings where the collapsing feature was a different

[9]  feature, a Z-fold; is that correct?

[10] A.  That is correct.

[11] Q.  Do you know where those drawings are?

[12] A.  No, I do not.

[13] Q.  Have you seen them as you've been

[14] reviewing the materials that you've gathered and

[15] produced to your attorneys in this case?

[16] A.  I've only seen one sketch.  And it was

[17] a -- it was just a very minimal sketch that I think

[18] may -- I may have used it to determine what the

[19] links -- lengths of the different panels would be or

[20] the heights of the different panels would be in the

[21] Z-fold.

[22] Q.  You've looked for those drawings in the

[23] context of this lawsuit pursuant to our document

[24] request; is that correct?

[25] A.  Yes, I have.

---

**08:35:26-08:38:10**             Page 97

[1]    Q. Did you use at the time any kind of
[2] computer-aided drawing, CAD or otherwise?
[3]    A. No.
[4]    Q. On Exhibit 95 the question I had about the
[5] numbering of the pages of your drawings, do you have
[6] any idea of where Page 5 of 7 is?
[7]    A. Where Page 5 of 7 is?
[8]    Q. Yes, sir. You agree with me that it's
[9] missing, first of all?
[10]    A. Well, let me go through these again if you
[11] don't mind. Mr. Hinshaw, are you able to tell on the
[12] bates number 62, the top number that's been -- it
[13] looks like there's two sets of --
[14]    Q. I could not tell. I can tell that
[15] something has been scribbled out -- something that
[16] has been scribbled out looks like a number -- a slash
[17] and a number, but I can't say -- do you believe that
[18] that is Page 5 of 7?
[19]    A. I believe it could be Page 5 of 7.
[20]    Q. These drawings all reflect the basic
[21] structure of your pet crate; is that right?
[22]    A. That's correct.
[23]    Q. None of these drawings show the decorative
[24] features of your pet crate as depicted in Exhibit 84;
[25] is that correct?

---

**08:38:11-08:40:32**             Page 98

[1]    A. The decorative features?
[2]    Q. The decorative features that appear in
[3] your design patent 156.
[4]    A. Well, that depends on what you determine
[5] or define as decorative.
[6]    Q. Exhibit 95, do you see any wicker drawings
[7] or sketches here?
[8]    A. No.
[9]    Q. Do you see any weave patterns on any of
[10] the features depicted in Exhibit 95? Correct?
[11]    A. Let me double check because -- okay.
[12] Could you restate your question, please?
[13]      MR. HINSHAW: Read it back.
[14]      (The record was read by the reporter.)
[15]    A. No.
[16]      BY MR. HINSHAW:
[17]    Q. Did you personally ever prepare drawings
[18] that show the weave patterns of the wicker over your
[19] pet crate?
[20]    A. Could you repeat that last question,
[21] please?
[22]      (The record was read by the reporter.)
[23]    A. If your question is, did I ever try to
[24] replicate what this looks like via pen and ink
[25] drawing -- is that your question?

---

**08:40:34-09:38:46**             Page 99

[1]    Q. My question is pretty plain. Did you ever
[2] personally draw any wicker or weave patterns as they
[3] would appear on your pet crate?
[4]    A. Then I think the answer is, no, I didn't
[5] prepare any drawings of the wicker or weave patterns.
[6] I only indicated the location that that wicker or
[7] rattan should be located.
[8]      (Lunch recess 11:45-12:40 p.m.)
[9]      (Defendant's Exhibit-96 was marked for
[10] identification.)
[11]      BY MR. HINSHAW:
[12]    Q. Mr. Simpson, the court reporter has handed
[13] you what's been marked as Exhibit Number 96. Do you
[14] recognize that?
[15]    A. To answer your question, yes, I do, I do
[16] recognize it.
[17]    Q. What is that?
[18]    A. This would -- this would be a
[19] communication to my agent in Hong Kong relative to
[20] changes in the process of developing the wicker
[21] kennel.
[22]    Q. Your agent is Berne? Bernie or Berne?
[23]    A. Bernie.
[24]    Q. And who is Bernie?
[25]    A. Bernie Kelly is -- I believe his title is

---

**09:38:52-09:41:08**             Page 100

[1] vice president of Vigor International, Hong Kong.
[2]    Q. And is that the entity with whom Mr. Alex
[3] Lau was working to develop your prototype?
[4]    A. No.
[5]    Q. Okay. Who is Vigor International?
[6]    A. Vigor International is my sourcing company
[7] that I use in obtaining products from China.
[8]    Q. I'm sorry. What's Bernie's last name?
[9]    A. Kelly.
[10]    Q. Is Mr. Kelly, does he reside here in the
[11] United States or over in China or in Hong Kong?
[12]    A. Currently in the United States.
[13]    Q. Whereabouts?
[14]    A. In Columbus, Ohio.
[15]    Q. Did he play any role in the development of
[16] the wicker pet crate that's the subject of your 156
[17] patent?
[18]    A. The only role he played would have been to
[19] assist in finding a factory for the production of
[20] samples or manufacturing or production.
[21]    Q. And did he do that?
[22]    A. He and others within Vigor International,
[23] yes.
[24]    Q. Is it correct that Simpson Ventures
[25] doesn't actually operate a manufacturing facility

---

09:41:08-09:42:22                                      Page 101

[1]    here in the United States?
[2]    A.   That is correct.
[3]    Q.   So there are no employees in Alabama or
[4]    Georgia who are involved in making any of the
[5]    Simpson Venture product line?
[6]    A.   That is correct.
[7]    Q.   Including your wicker pet crates?
[8]    A.   That is correct.
[9]    Q.   That's all done over in China?
[10]   A.   Specifically on the wicker crates, yes.
[11]   Q.   Why did you set up that business model?
[12]   A.   Because I believe, number one, I didn't
[13]   think I could find anybody in the U.S. that wove
[14]   wicker.
[15]   Q.   Why is that?
[16]   A.   I don't know.
[17]   Q.   Do you think that that is a labor
[18]   intensive process?
[19]   A.   I know it's a labor intensive process.
[20]   Q.   Do you think that that would be very cost
[21]   effective or cost affordable to do that here in the
[22]   United States?
[23]   A.   I'm sorry, Mr. Hinshaw.  Could you repeat
[24]   that, please?
[25]         MR. HINSHAW: If you would, please.

09:42:22-09:43:40                                      Page 102

[1]          (The record was read by the reporter.)
[2]    A.   No, I do not.
[3]          BY MR. HINSHAW:
[4]    Q.   Going back to Exhibit 96, is that your
[5]    handwriting that appears on the first page of that
[6]    document?
[7]    A.   I believe it is, yes.
[8]    Q.   And your handwritten note says, sent to
[9]    Bernie on January 27, 2002?
[10]   A.   Yes.
[11]   Q.   And then below that someone has typed,
[12]   required product changes to the sample provided to me
[13]   on January 21, 2002.  Did I read that correctly?
[14]   A.   Yes, you did.
[15]   Q.   Did you type this document?
[16]   A.   Yes.
[17]   Q.   Okay.  So was a sample -- is it correct to
[18]   use the words sample and prototype interchangeably
[19]   here at this point in time?
[20]   A.   At this point in time I believe it is,
[21]   yes.
[22]   Q.   So this sample or prototype that was
[23]   provided to you on January 21 of 2002, was that the
[24]   first prototype?
[25]   A.   No.

09:43:40-09:45:11                                      Page 103

[1]    Q.   How many prototypes preceded this one that
[2]    was sent on January 21 of 2002?
[3]    A.   One.
[4]    Q.   And was that the first time that you had
[5]    seen a metal wire pet crate with wicker woven on it
[6]    when you saw that first prototype?
[7]    A.   Yes.
[8]    Q.   Describe for me what you recall seeing at
[9]    that time.
[10]   A.   I recall seeing a sample or prototype of a
[11]   wicker covered kennel that was built to my drawings,
[12]   my original drawings.
[13]   Q.   And by built to your original drawings
[14]   you're talking about the structural drawings much
[15]   like the predecessor to Exhibit Number 95?
[16]   A.   Structural drawings and the location of
[17]   the wicker.
[18]   Q.   Which you used words to describe where you
[19]   wanted the wicker to go?
[20]   A.   Words and/or I may have used lines - I
[21]   don't know - defining the area, not lines defining
[22]   each individual strand of rattan or wicker.
[23]   Q.   Well, you may have.  Tell me specifically
[24]   what you recall drawing in terms of the -- how the
[25]   wicker was supposed to look on your crate.  If you

09:45:18-09:46:57                                      Page 104

[1]    have --
[2]    A.   Could you repeat that for me, please?
[3]          (The record was read by the reporter.)
[4]          BY MR. HINSHAW:
[5]    Q.   If you have such a recollection.
[6]    A.   I don't have a specific recollection as to
[7]    how I defined that feature.
[8]    Q.   So this first prototype that you saw prior
[9]    to January 21 of 2002 --
[10]   A.   Yes.
[11]   Q.   -- how much earlier than January 21 of
[12]   2002 did you receive that first prototype?
[13]   A.   I would guess it would have been in the
[14]   late September to October time frame.
[15]   Q.   Of 2001?
[16]   A.   Yes, sir.
[17]   Q.   So you're sitting on your wicker porch
[18]   swing in September of 2001, you have this idea, and
[19]   by the end of September or early October you have the
[20]   prototype of it?
[21]   A.   Yes.
[22]   Q.   Do you recall the name of the company who
[23]   prepared that first prototype?
[24]   A.   No, I do not.  I would have not known
[25]   that.

09:46:57-09:48:35                                          Page 105

[1]    Q.   Because it was provided through Mr. Lau to
[2]  GDA to you?
[3]    A.   That is correct.
[4]    Q.   The visual appearance of that first
[5]  prototype, how did it compare to what ultimately
[6]  became your design patent in Exhibit 84?
[7]    A.   Very close.
[8]    Q.   What do you recall being different about
[9]  it?
[10]   A.   As I stated earlier, it was a -- again, I
[11]  used the colloquial term, I guess, a Z-fold. So
[12]  there would have been hinge points -- another two
[13]  sets of hinge points in the side wall of the product.
[14]  There's a picture of the Z-fold prototype in the
[15]  documents.
[16]   Q.   What do you recall seeing about a picture
[17]  of a Z-fold in the documents?
[18]   A.   I recall seeing a picture of the Z-fold in
[19]  the documents that I reviewed, that I provided as
[20]  part of the doc request.
[21]   Q.   I've seen a lot of documents and a lot of
[22]  pictures. So can you be a little more specific
[23]  than --
[24]   A.   I can't give you a bates number. I'm
[25]  sorry about that.

09:48:35-09:50:00                                          Page 106

[1]    Q.   I don't need a bates number. But can you
[2]  describe what you recall seeing in the documents?
[3]  What's it look like? How would I recognize it as
[4]  being the Z-fold?
[5]    A.   It would look very similar to this, and it
[6]  would have a joint about the midpoint of the side
[7]  panel. And the top would be -- would also have a
[8]  small section as -- or similar to the bottom section
[9]  in Exhibit 84 design.
[10]       MR. HINSHAW: Counselor, are you aware of
[11]  having provided such a document?
[12]       MR. GARDNER: I believe it has been
[13]  provided.
[14]   A.   I also believe that I refer to it on the
[15]  last page of Exhibit 96 as well as I believe it's
[16]  shown there as well. But I cannot tell
[17]  specifically --
[18]       BY MR. HINSHAW:
[19]   Q.   Under Paragraph 9?
[20]   A.   On the last page 3631 bates number.
[21]  Excuse me. POO3631 of Exhibit 96, the bottom photo.
[22]   Q.   Yes.
[23]   A.   The photo that shows the believed to be
[24]  Exhibit 94 wicker basket --
[25]   Q.   Yes.

09:50:04-09:51:26                                          Page 107

[1]    A.   -- there's -- there's two -- there's two
[2]  wicker kennels, I believe. And, again, this photo is
[3]  not very good.
[4]       But I believe there's two wicker kennels
[5]  shown in that photo of which that basket looks like
[6]  it's resting on both of them.
[7]       Based on my note there, I believe -- well,
[8]  I can't say specifically. But you'll note that in
[9]  the boxes it says, preferred color bleached rattan.
[10]      And I can tell that that points to the
[11]  basket which is reflective of what's shown in Exhibit
[12]  94. Then you see two other shapes below that.
[13]   Q.   Yes.
[14]   A.   And there's two other boxes it says,
[15]  sample I brought to China. And then the other box
[16]  says factory sample.
[17]   Q.   Which one would refer -- the verbiage in
[18]  these boxes, which one would refer to the first
[19]  prototype, this sample you brought to China or the
[20]  factory sample?
[21]   A.   I'm sorry. Say that again, please.
[22]   Q.   There are two -- under this Paragraph 10
[23]  there are two boxes -- there are three boxes. Two of
[24]  the boxes -- one says, sample I brought to China. Do
[25]  you think that refers to the very first prototype or

09:51:26-09:53:09                                          Page 108

[1]  do you think that that refers to the January --
[2]    A.   I think that refers to the very first
[3]  prototype. And I apologize for interrupting you.
[4]    Q.   No. You're fine. The factory sample you
[5]  think refers to this January 21, 2002 sample?
[6]    A.   That is correct.
[7]    Q.   So if we can figure out which of those
[8]  objects these boxes point to, that would help us
[9]  understand that.
[10]      Do you know what happened to that first
[11]  prototype? Do you know where it's located today?
[12]   A.   No, I do not.
[13]   Q.   Do you recall doing anything with it,
[14]  disposing of it, giving it away, putting it in a
[15]  storage?
[16]   A.   I don't remember specifically what I would
[17]  have done with it.
[18]   Q.   Do you recall whether that first prototype
[19]  had a diamond weave pattern on it?
[20]   A.   I don't believe it did, no.
[21]   Q.   Did this sample, the January 21, 2002
[22]  sample, have a diamond weave pattern on it?
[23]   A.   I don't believe it did.
[24]   Q.   In Paragraph 5 of this document, bates
[25]  label POO3628 -- do you see that?

09:53:15-09:54:59                                                    Page 109

[1]   A.   Yes.

[2]   Q.   What is shown in the photograph there?

[3]   A.   What is shown in the photograph is a --

[4]   can you see where it says Gorilla Tough, I believe?

[5]   Q.   Yes.

[6]   A.   Okay.   Then above that there's three

[7]   photos.

[8]   Q.   Okay.

[9]   A.   And then above that I think you'll see a

[10]  picture of a wire kennel.

[11]  Q.   And so what are you talking about here in

[12]  Paragraph 5?

[13]  A.   The -- I'm talking about the door latch.

[14]  Q.   And are you instructing Bernie or the

[15]  people over in China to use a door latch that is from

[16]  or the same as this Gorilla Tough wire pet crate?

[17]  A.   I'm instructing them to find an "off the

[18]  shelf" cam type door latch.

[19]  Q.   That's the same as or similar to this door

[20]  latch used by your competitor -- or to the

[21]  competitor?

[22]  A.   Yes.   And I'll go on to add that that

[23]  Gorilla Tough packaging that you see of the photo is

[24]  I believe of a Doctors Foster & Smith branded wire

[25]  kennel of which would have been one of those, if you

---

09:55:07-09:56:27                                                   Page 110

[1]   want to call it, a competitor sample that I would

[2]   have purchased.

[3]   Q.   In Paragraph 9 --

[4]   A.   And I'd like to go on to add that I ended

[5]   up ultimately not using a cam type door latch.

[6]   Q.   In Paragraph 9 on Page P003631, would you

[7]   read the last sentence of that paragraph?

[8]   A.   Also the diamond pattern on the side

[9]   panels should be the same size as the diamond pattern

[10]  on the back.

[11]  Q.   Panel, correct?

[12]  A.   Back panel, yes.

[13]  Q.   In your box, the second box there, what

[14]  does that say?

[15]  A.   Change to same diamond as on back panel.

[16]  Q.   So does that refresh your recollection

[17]  about whether this sample had the diamond weave

[18]  pattern?

[19]  A.   Yes, it does.

[20]  Q.   Does it change your recollection about

[21]  whether the prior prototype had the diamond weave

[22]  pattern?

[23]  A.   I don't -- I don't believe it did.   And,

[24]  again, if you look in the documents, maybe the photo

[25]  that I provided will give us an answer to that.

---

09:56:32-09:59:32                                                   Page 111

[1]   Q.   In this Paragraph 9 you say, side panel

[2]   windows should be lowered by point seven five

[3]   hundredths of an inch.   Why did you ask for that

[4]   change?

[5]   A.   I don't recall specifically.

[6]   Q.   In Paragraph 10 you talk about the PVC

[7]   wicker.   You said, PVC wicker should be the solid

[8]   type instead of the hollow type.   Why did you ask for

[9]   that change?

[10]  A.   I assume I asked for that change because I

[11]  would have felt the solid type to be more durable

[12]  than the hollow type.

[13]       (Defendant's Exhibit-97 was marked for

[14]  identification.)

[15]       BY MR. HINSHAW:

[16]  Q.   The court reporter has handed you what has

[17]  been marked as deposition Exhibit Number 97.   Would

[18]  you take a moment to take a look at that?

[19]  A.   (Witness complies.)

[20]  Q.   Have you seen this before?

[21]  A.   (No response.)

[22]  Q.   Is there a mixup in the documents, sir?

[23]  A.   Well, I'm just trying to understand it,

[24]  Mr. Hinshaw.   There seems to be some duplication of

[25]  pages or something.

---

09:59:32-10:01:18                                                   Page 112

[1]   Q.   Yeah, yeah, yeah.

[2]       MR. HINSHAW:  Can I see your sample there,

[3]   Art?

[4]       BY MR. HINSHAW:

[5]   Q.   Well, bates labels actually are in order,

[6]   so let's go with that.  Mr. Simpson, are you troubled

[7]   by or trying to figure out why bates label P003649

[8]   appears in the middle of this document?

[9]   A.   Well, that and it seems that -- that bates

[10]  numbers P003643 are the same --

[11]  Q.   Oh, I see what you mean.

[12]  A.   -- the same six pages as bates number

[13]  P0O3650 --

[14]  Q.   I believe you're correct.

[15]  A.   -- through P003655 inclusive.

[16]  Q.   Let's do this:  Take bates P0O3643 through

[17]  3648 and pull those apart.

[18]  A.   (Witness complies.)

[19]  Q.   And slide those, the remnant, back over

[20]  here.

[21]  A.   Okay.

[22]  Q.   Now, looking at corrected -- or the

[23]  modified Exhibit Number 97, do you recognize that

[24]  document?

[25]  A.   Yes.

10:01:18-10:02:55                                    Page 113

[1]    Q.   And what is that?

[2]    A.   Generally I believe it to be my direction
[3]    to Vigor International on the changes that I was
[4]    requesting to what I believed to be the second
[5]    prototype that Vigor provided, which would be, in
[6]    essence, the third prototype of the wicker kennel.

[7]    Q.   And that third prototype would have been
[8]    provided to you on or about February 11 of 2002?

[9]    A.   Well, if you'll capture those pages that
[10]   you -- I think there may be a --

[11]   Q.   A shipping document?

[12]   A.   Yeah.

[13]   Q.   Yeah.  I was going to ask you about that.
[14]   Let's do that.

[15]   A.   Do we want to reattach that back to the
[16]   back of this or identify it as a new exhibit?

[17]   Q.   Well, I had intended to identify it as a
[18]   new exhibit and ask you what is it.  So let's do
[19]   that.

[20]        (Defendant's Exhibit-98 was marked for
[21]   identification.)

[22]        BY MR. HINSHAW:

[23]   Q.   The court reporter's handed you what's
[24]   been marked as Exhibit Number 98.  What is that
[25]   document?

10:03:14-10:04:54                                    Page 114

[1]    A.   Well, I originally thought maybe it was a
[2]    shipping document.  It seems to be a quotation
[3]    document.

[4]    Q.   Yeah.  It doesn't seem to be a shipping
[5]    document for one of these prototypes, does it?

[6]    A.   No.  No, it does not.

[7]    Q.   Do you know what it is?

[8]    A.   I believe it's a quotation to me from
[9]    Sindy Tse from Vigor International.

[10]   Q.   And help me translate what the quote is
[11]   here.

[12]   A.   Yeah.

[13]   Q.   Can you decipher this?

[14]   A.   I'll do my best.  I'm assuming that it is
[15]   a quote for the small size wicker kennel as of
[16]   February the 9th, 2002.

[17]   Q.   And what was the quote?

[18]   A.   If you look the middle of the page to the
[19]   left-hand side, twenty-four dollars and sixty-seven
[20]   cents U.S.

[21]   Q.   And that's per unit; is that right?

[22]   A.   That would be per unit, yes.

[23]   Q.   Okay.  And there's handwriting on this
[24]   document.  Is that your handwriting?

[25]   A.   Yes, I believe it is.

10:04:55-10:06:52                                    Page 115

[1]    Q.   And what were you writing here?  I mean, I
[2]    can read what's written.  But what's the concept
[3]    behind what you're doing here?

[4]    A.   The only thing that I can gather from
[5]    this, Mr. Hinshaw, is that each one of those rows
[6]    would be reflective of a size.  So I'm assuming
[7]    starting at the top where you see thirty, twenty-two
[8]    and twenty-one --

[9]    Q.   Yes.

[10]   A.   -- that would be the small size.  And then
[11]   from that point down it would be medium, large and
[12]   extra large.

[13]   Q.   And were these the pricing points that you
[14]   would want to get from Vigor?

[15]   A.   I -- I do not know.  I can tell you those
[16]   are pricing levels that I'd like to get from Vigor
[17]   now.

[18]   Q.   Going back to Exhibit 97, you say at the
[19]   top, you only have a few additional changes and it
[20]   will be complete.  And what are you talking about,
[21]   will be complete?

[22]   A.   I'm assuming that -- that I mean I won't
[23]   be making any more changes.

[24]   Q.   And the changes that are reflected in this
[25]   document, were these the last set of changes that

10:06:55-10:10:19                                    Page 116

[1]    you, in fact, made?

[2]    A.   I wouldn't know, but I suspect not.

[3]    Q.   Do you have a recollection of making
[4]    additional changes in 2002?

[5]    A.   After this time.

[6]    Q.   After this time.  Thank you.

[7]    A.   I believe there would have been changes
[8]    after this.

[9]    Q.   In 2002?

[10]   A.   Yes, after -- certainly after February
[11]   11th, 2002.

[12]   Q.   What do you recall those changes being?

[13]   A.   I don't recall specifically what the
[14]   changes would have been.  But based on this document,
[15]   which is Exhibit 97, Paragraph 8, I say, lock/latch
[16]   must be changed from a keyed version to one that has
[17]   a permanent turn handle slash knob.

[18]        And then I go on to say down below the
[19]   photo:  The latch shown is a custom fabricated unit.
[20]   I will bring it with me.  Another option is to
[21]   contact SouthCo in their Hong Kong office and try to
[22]   locate the latch I provided a picture of in my prior
[23]   request.

[24]        There I'm referring back to that Gorilla
[25]   Tough.  SouthCo can be reached in Hong Kong at -- and

| | |
|---|---|
| **10:10:24-10:12:01**       Page 117 | **10:13:54-10:15:40**       Page 119 |

**Page 117**

[1]   I give the --

[2]   Q.   You provide the address?

[3]   A.   The other bit that makes me think -- and,

[4] again, I would have, I believe, procured some samples

[5] of those latches from SouthCo in the U.S. And they

[6] are probably part of what would be competitive

[7] samples.

[8]      And then also in the last page of Exhibit

[9]     97, the bates number P003648, Paragraph 9 I say:

[10] Vacuum formed pan needs to be per the specifications

[11] I sent Robert on January 29th, 2002. I'll bring a

[12] physical sample with me. This is a very easy vacuum

[13] forming job.

[14]   Q.   So was that a change that you believe was

[15] made after February 11, 2002?

[16]   A.   What change specifically are you --

[17]   Q.   Well, I thought we were talking about

[18] changes that you made after February 11 of 2002.

[19]   A.   Yeah. I'm not -- I'm not convinced that

[20] -- that a sample of a pan -- the vacuum formed pan

[21] had yet been provided. So I don't know that I could

[22] define that as a change.

[23]   Q.   Okay. So other than changes to the latch

[24] and a possible change to the pan, do you recall any

[25] other changes that were made to your prototype after

**Page 119**

[1]   A.   I ordered all four sizes in one of the

[2] finishes.

[3]   Q.   How long did it take you to sell -- how

[4] many units did that translate into?

[5]   A.   Well, again, in the documents should be a

[6] bill of lading along with the packing list from

[7] Vigor. But I would guess there would have been seven

[8] hundred units.

[9]   Q.   How long did it take you to sell that

[10] initial order?

[11]   A.   I don't recall specifically.

[12]   Q.   A month?

[13]   A.   (No response.)

[14]   Q.   A year?

[15]   A.   Oh, absolutely not a year. I -- the only

[16] reason I'm hesitating I'm trying to remember the

[17] total quantity of units that I sold in 2002.

[18]      I believe I started shipping product in

[19] mid August. So I believe I was shipping product in

[20] 2002 for four and a half months.

[21]   Q.   And by that you mean shipping out to

[22] consumers?

[23]   A.   That is -- consumers and customers.

[24]   Q.   And that would have been in August of 2002

[25] is when you started?

| | |
|---|---|
| **10:12:04-10:13:51**       Page 118 | **10:15:40-10:16:58**       Page 120 |

**Page 118**

[1]   February 11 of 2002?

[2]   A.   I don't recall any. But it wouldn't

[3] surprise me if there were some.

[4]   Q.   In Paragraph 4 you see that you still have

[5] a diamond wicker weave in this prototype, correct?

[6]   A.   Yeah. I do see that.

[7]   Q.   Who did you make your first order to

[8] purchase these wicker pet crates from the Chinese

[9] manufacturer?

[10]   A.   I never placed an order with a Chinese

[11] manufacturer.

[12]   Q.   Did you place it through Vigor?

[13]   A.   Yes.

[14]   Q.   When did you place your first order with

[15] Vigor for production quantity of these wicker pet

[16] crates?

[17]   A.   I believe, Mr. Hinshaw, it was in early

[18] May. And the document should reflect the exact date.

[19]   Q.   Do you recall what quantity you ordered?

[20]   A.   I believe it would have been a quantity to

[21] fill one either forty foot standard or one forty foot

[22] high cubed container. And it could have been for

[23] two. I'm not sure.

[24]   Q.   Did you order all of your different model

[25] sizes or just one particular model size at that time?

**Page 120**

[1]   A.   I believe so, yes.

[2]   Q.   And, again, do you have a recollection of

[3] how long it took you to deplete this inventory of

[4] your initial order?

[5]   A.   I would say, you know, around thirty to

[6] forty days.

[7]   Q.   Do you know the name of the manufacturing

[8] company in China who made that initial order?

[9]   A.   No, I do not.

[10]   Q.   Is it the same company in China today that

[11] you use?

[12]   A.   No, it is not.

[13]   Q.   What's the name of the company in China

[14] that you use today?

[15]   A.   I don't recall specifically.

[16]   Q.   Is the selection of that company something

[17] you typically leave to Vigor International to decide?

[18]   A.   Typically, yes.

[19]   Q.   Have there been instances where Vigor has

[20] recommended one company and you've overridden that

[21] and you said, no, let's go with a different company?

[22]   A.   For this specific product?

[23]   Q.   Yes, sir.

[24]   A.   No.

[25]   Q.   For other products you've done that?

10:17:04-10:18:56                                          Page 121

[1]   A.   Yes, after we've been in production with
[2]   that factory, yes.
[3]   Q.   How many different Chinese manufacturers,
[4]   as best you can recollect, have you used for
[5]   manufacturing the wicker pet crates?
[6]   A.   At least four.
[7]   Q.   How is it that you communicate to them
[8]   what it is they're supposed to produce?
[9]   A.   Communicate to the factory?
[10]  Q.   Manufacturing factory, yes.
[11]  A.   I communicate through Vigor International.
[12]  Q.   So does Vigor have some set of standard
[13]  drawings that they submit to the manufacturing
[14]  factory over in China?
[15]  A.   They would have had my drawings.
[16]  Q.   The drawings in Exhibit 95?
[17]  A.   I don't see any dates on these, so I can't
[18]  say specifically that it's these -- this set of
[19]  drawings.  But I'm assuming it would be during that
[20]  time frame.
[21]  Q.   How would the manufacturing company know
[22]  -- four different manufacturing companies in China
[23]  know what kind of wicker weave patterns, where to put
[24]  the wicker, how to weave it, what kind of patterns
[25]  you wanted, how would they know that?

10:19:08-10:20:29                                          Page 122

[1]   A.   Well, they would simply look at a sample
[2]   that was provided them and duplicate it.
[3]   Q.   So going off of a sample, a prototype, if
[4]   you will?
[5]   A.   Yes.
[6]   Q.   No drawings though?
[7]   A.   For subsequent factories, yes.
[8]   Q.   Well, I have yet to hear you identify a
[9]   set of drawings for me that show the wicker and how
[10]  you wanted the weave patterns on the wicker on a
[11]  crate.
[12]      Are you telling me that there was a set of
[13]  drawings that specifically showed that?
[14]  A.   What do you mean by specifically showed?
[15]  Q.   I mean exactly what I say.
[16]  A.   Well, again - and I think as I've stated
[17]  before - the initial drawings would have shown only
[18]  the areas in which to cover with wicker or resin
[19]  rattan.
[20]  Q.   So was it then left up to the factory to
[21]  decide whether to do a loose weave or a tight weave
[22]  or a diamond pattern or a square pattern or a plain
[23]  pattern or what?
[24]  A.   Well, I don't believe I ever told -- I
[25]  don't believe I ever indicated in my initial drawing

10:20:33-10:22:26                                          Page 123

[1]   set that a diamond pattern or a square pattern or any
[2]   other weave -- alternate weave pattern should be
[3]   included.
[4]      I would have told them to weave it like
[5]   all weather wicker outdoor furniture, similar to
[6]   what's in Exhibit 93.  I don't --
[7]   Q.   Did you give any instruction for the
[8]   factory over in China to weave the tubes around the
[9]   perimeters of the different panels with a continuous
[10]  coil of wicker?
[11]  A.   I don't know how else they would have done
[12]  it.  They have to be able to weave around the frame.
[13]  Q.   You told them to weave those tubes,
[14]  though?
[15]  A.   I gave them the area in which it was to be
[16]  woven.  I don't know how you'd go around a tube other
[17]  than to go around it.
[18]  Q.   But is it your testimony that you
[19]  instructed them to weave around the tube?
[20]  A.   That specifically?
[21]  Q.   Yes.
[22]  A.   No.  How else you go around the tube
[23]  but to weave around it?
[24]  Q.   Or they could have chosen to not weave
[25]  around the tube at all.

10:22:33-10:24:02                                          Page 124

[1]   A.   Then -- then it wouldn't have gone to the
[2]   area that I defined.
[3]   Q.   What was the area that you defined?
[4]   A.   That the entire panel be -- I'm assuming
[5]   that the entire panel be covered with resin rattan
[6]   except for in areas that I notated.
[7]   Q.   You're assuming, but you don't
[8]   specifically recall that?
[9]   A.   I don't specifically recall that.  But the
[10]  first sample came back per my instructions, so I have
[11]  to assume that they got it.
[12]  Q.   Do you recall the names of any of the four
[13]  manufacturing companies over in China who have made
[14]  your crate -- wicker pet crate?
[15]  A.   My only recollection, Mr. Hinshaw, is that
[16]  the first factory his name was Mr. Hong.
[17]  Q.   O-n-g?
[18]  A.   H-o-n-g.
[19]  Q.   H-o-n-g.  And were there circumstances
[20]  that came about that caused you to switch from one to
[21]  the second to the third to the fourth?
[22]  A.   Yes.
[23]  Q.   And what were those circumstances?
[24]  A.   I believe the second factory would have
[25]  been located and suggested by Fred Lynn.

| 10:24:09-10:26:23 | Page 125 | 10:28:35-10:30:32 | Page 127 |
|---|---|---|---|

**Page 125**

[1] Q. Who is that?

[2] A. Of Giant Prodigy - I think that's the name

[3] of his company - which has no affiliation with Vigor

[4] International.

[5]     I think you'll find that name in either

[6] the documents or the interrogatory responses as being

[7] one of the four factories in which I have -- or

[8] excuse me, not factories; one of the three -- excuse

[9] me, one of the three agents that I've purchased the

[10] wicker kennel from.

[11] Q. So am I correct that the changes amongst

[12] the factories is more as a result of you changing

[13] agents than it is of circumstances causing you to be

[14] more happy or more dissatisfied with the factories

[15] over in China?

[16] A. Certainly two of the factory changes were

[17] associated with the change in agents. I believe

[18] there have been at least two factories that have

[19] manufactured the product for Vigor International on

[20] my behalf.

[21]     (Defendant's Exhibit-99 was marked for

[22] identification.)

[23]     BY MR. HINSHAW:

[24] Q. The reporter is handing you what has been

[25] marked as deposition Exhibit Number 99. This is a

**Page 127**

[1] confirmation back to you that that's the one that you

[2] were -- no, I don't think it's the same sample.

[3] Q. So you think there was another sample

[4] after 97 that was then sent to Craig Catlin?

[5] A. Well, in this case the -- in this case I

[6] say, the sample is a prototype but representative of

[7] the production article.

[8]     So when I say sample here, based on what I

[9] told Mr. Catlin, I'm assuming that all the changes

[10] had been done. And based on the date of June 11th, I

[11] believe, there wasn't any changes after that of the

[12] initial configuration.

[13]     And I had sent him a large size. And I

[14] don't know for a fact -- I don't know for a fact, but

[15] I believe the sizes -- or, excuse me, the size that I

[16] worked on to get up to that production configuration

[17] was a small.

[18]     And the reason I say that, Mr. Hinshaw, is

[19] because of the Exhibit 98 quotation from Vigor

[20] International which only reflects an offer or a price

[21] for a small size.

[22] Q. Do you know what happened to this sample

[23] prototype that you sent to Mr. Catlin on June 11 of

[24] 2002?

[25] A. No, I don't know what happened to it.

| 10:26:24-10:28:32 | Page 126 | 10:30:34-10:32:11 | Page 128 |
|---|---|---|---|

**Page 126**

[1] letter from you to Craig Catlin dated June 11, 2002;

[2] is that right?

[3] A. Yes.

[4] Q. Would you read the language in the first

[5] paragraph?

[6] A. It says: I hope you had a successful

[7] APPMA show in Chicago. Please find enclosed your

[8] large indoor pet home sample. The sample is a

[9] prototype but representative of the production

[10] articles which will be in inventory very shortly.

[11] Q. The reference to the prototype here, do

[12] you believe that that would be the prototype sample

[13] that was --

[14] A. 97?

[15] Q. Yeah.

[16] A. (No response.)

[17] Q. Do you?

[18] A. I'm sorry. I didn't hear the final part

[19] of your question.

[20] Q. I thought my question was, do you believe

[21] that that prototype is referring to the prototype

[22] that is depicted in Exhibit 97?

[23] A. Okay. Well, I said 97.

[24] Q. You meant that was your answer?

[25] A. No, no. No, I didn't. I was looking for

**Page 128**

[1] Q. Do you have any -- in your possession, do

[2] you have any of the prototypes for your wicker pet

[3] crate?

[4] A. I don't believe I do.

[5] Q. You've looked for them in the context of

[6] this litigation?

[7] A. Yes.

[8] Q. And you've not found them?

[9] A. No.

[10] Q. Do you have any recollection of where --

[11] what happened to them?

[12] A. I believe after a time I would have

[13] disposed of them.

[14] Q. You believe you would have is a lot

[15] different than I did. Do you have a memory of

[16] disposing of them?

[17] A. Well, I could have disposed of them. I

[18] could have taken it back to China to the factory for

[19] a hands-on explanation of changes. And I could have

[20] sent a -- it to a potential customer as a -- as an

[21] example.

[22] Q. You could have. But do you have a memory

[23] -- other than this reference to Mr. Catlin, do you

[24] have a memory as to what you did with any of the

[25] prototypes?

---

10:32:12-10:34:10                                    Page 129

[1]   A.  No, I do not.
[2]       (Defendant's Exhibit-100 was marked for
[3]   identification.)
[4]   BY MR. HINSHAW:
[5]   Q.  The court reporter has handed to you
[6]   what's been marked as deposition Exhibit 100.  Do you
[7]   recognize that document?
[8]   A.  (No response.)
[9]   Q.  Is this your application for a patent
[10]  dated May 2nd, 2002?
[11]  A.  I believe it is, yes.
[12]  Q.  And is this the application for the design
[13]  patent that resulted in Exhibit Number 84?
[14]  A.  Yes, I believe it is.
[15]  Q.  And on bates label POO2788 is that your
[16]  signature?
[17]  A.  Yes, it is.
[18]  Q.  -- on the Combined Declaration and Power
[19]  of Attorney in the Patent Application?
[20]  A.  All I see is power of attorney.  You said
[21]  combined --
[22]  Q.  I'm sorry.  If you turn the page before
[23]  that.  This is actually Page 2 of 2.
[24]  A.  And I'm sorry.  Again your question.
[25]  Q.  That's your signature --

---

10:34:10-10:36:20                                    Page 130

[1]   A.  Yes, it is.
[2]   Q.  -- to that Combined Declaration and Power
[3]   of Attorney in Patent Application?
[4]   A.  Yes.
[5]   Q.  And this is, again, May 2 of 2002?
[6]   A.  Uh-huh (affirmative).
[7]   Q.  When had you finalized the decorative
[8]   design that became the subject of your patent
[9]   application?
[10]  A.  I believe I would have finalized all
[11]  aspects of the design, not just decorative, but all
[12]  aspects of the design prior to May 2nd, 2002.
[13]  Q.  How far prior to May 2nd, 2002?
[14]  A.  I don't recall in looking at the docs.
[15]  But it would certainly be between February 11th, 2002
[16]  and May 2nd of 2002 based on the date of Exhibit 97.
[17]      (Defendant's Exhibit-101 was marked for
[18]  identification.)
[19]  BY MR. HINSHAW:
[20]  Q.  The court reporter has handed to you what
[21]  has been marked as deposition Exhibit 101.  Is this
[22]  your signature on this Declaration of Prior
[23]  Invention?
[24]  A.  Is this, may I ask, one complete document?
[25]  Q.  Yes.  Because I intended to ask you the

---

10:36:23-10:38:00                                    Page 131

[1]   same question.  This is the way the document was
[2]   produced to us by your counsel.
[3]   A.  May I ask you is -- I would see this
[4]   Declaration of Prior Invention being -- of being two
[5]   pages because of Paragraphs 1 through 4 on the front
[6]   and 5 and 6 on the second page, bates number OO3530.
[7]   But these other two pages, are -- are those --
[8]   Q.  If you look at Paragraph 3 of your
[9]   declaration it says:  Attached hereto as Attachment
[10]  1, and forming a part of this Declaration, is a
[11]  redacted copy of a presentation including a
[12]  photograph of a sample device embodying the invention
[13]  of Application Serial No. 10/612,589.  Do you see
[14]  that language?
[15]  A.  Yes, I do.
[16]  Q.  Then is the photograph then what was
[17]  attached to your Declaration of Prior Invention,
[18]  bates label P003531?  Not intending to trick you and
[19]  think that 3532 was part of it.
[20]      That's the point of my question is I don't
[21]  know if that was supposed to be part of your
[22]  declaration or not.  But it certainly seems like
[23]  P3531 is specifically referenced in your declaration.
[24]  A.  I can't say with assuredness that bates
[25]  P003531 is the Attachment 1 as indicated in Paragraph

---

10:38:08-10:39:21                                    Page 132

[1]   3 because of the date of this document.
[2]   Q.  This document being dated February 22nd,
[3]   2005, right?
[4]       MR. GARDNER:  Well, let's clarify
[5]   something because I think that the witness may be
[6]   confused.
[7]       This declaration, I believe, does not --
[8]   does not relate itself to the issued design patent
[9]   but relates to some other patent application.
[10]      MR. HINSHAW:  It was submitted in a
[11]  different patent application.  That's correct.
[12]      BY MR. HINSHAW:
[13]  Q.  But the question is still the same.
[14]      MR. GARDNER:  Did you understand that?
[15]  A.  Well, I need it repeated so I -- I
[16]  understand.  But in looking at the dates here that my
[17]  guess was is this was a declaration that was included
[18]  as part of a utility patent application.  But I'm
[19]  not -- I completely haven't read through the
[20]  document, so I do not know that.
[21]      BY MR. HINSHAW:
[22]  Q.  I believe that that is correct, that this
[23]  declaration was submitted in a utility patent
[24]  application.
[25]  A.  Okay.

---

Jeffrey Simpson
May 2, 2008
Case 3:06-cv-00901-WKW-WC    Document 73-8    Filed 08/13/2008
Simpson Ventures vs.
Midland Crafts
Page 36 of 66

[1]  Q.  My question is still, is that photograph
[2]  intended to be the attachment to the two page
[3]  declaration?
[4]  A.  I can't imagine why it would be.
[5]  Q.  Why is that?
[6]  A.  Why wouldn't Figure 1 of Exhibit 84 be
[7]  attached?  Or, excuse me, not Figure 1 of 84 but --
[8]  because this patent hadn't issued yet at that time
[9]  frame.  This was July -- okay.  Well, it had.
[10]      It had already been issued.  So, you know,
[11]  why wouldn't the Figure 1 of Exhibit 84 design patent
[12]  been the attachment?  Let me read the document
[13]  completely before I fully answer.
[14]  Q.  Sure.
[15]      MR. GARDNER: Can we go off the record for
[16]  a second?
[17]      MR. HINSHAW: Sure.
[18]      (Off-the-record discussion.)
[19]      BY MR. HINSHAW:
[20]  Q.  Have you had a chance to read through
[21]  that?
[22]  A.  Yeah, I have.
[23]  Q.  Let's start with Page 3531.
[24]  A.  Okay.
[25]  Q.  What is that?

[1]  A.  This is a -- well, number one, I believe
[2]  this to be Attachment 1 to answer your previous
[3]  question, I believe.
[4]  Q.  Okay.
[5]  A.  This would have been a, in essence, sales
[6]  sheet, is the term I'll give it, showing the
[7]  configuration of the wicker kennel as shown in
[8]  Exhibit 84 design patent.
[9]  Q.  In your declaration, you make reference to
[10]  this being a redacted copy of a presentation?  What
[11]  was the presentation?
[12]  A.  Can you tell me what redacted means?
[13]  Q.  Well, my understanding of redacted means
[14]  is that you've got a document with some content and
[15]  some portion of the information has been redacted
[16]  or --
[17]  A.  Removed?
[18]  Q.  -- removed.
[19]  A.  I do not know what's been removed.  But I
[20]  can tell you that this document is in the documents.
[21]  So maybe you should look there and see if there's any
[22]  additional information.
[23]  Q.  What was the presentation that is being
[24]  referenced here, the redacted copy of the
[25]  presentation?

[1]  A.  Well, it's -- it's what I call a sales
[2]  sheet to be able to show a customer, or anyone for
[3]  that matter, and it's got features listed on it as
[4]  well.
[5]  Q.  In your declaration you said:  Conception
[6]  and construction of this sample device was completed
[7]  under my direction, and the sample device was in my
[8]  possession within the United States prior to April
[9]  30th of 2002.  Correct?
[10]  A.  Yes.
[11]  Q.  Is this the last of the protocols?
[12]  A.  Protocols?
[13]  Q.  I'm sorry.  Of the prototypes.
[14]  A.  I can't be sure.  I would -- I just -- I
[15]  can't be sure.
[16]  Q.  Do you believe it was?
[17]  A.  I -- I -- I don't know.
[18]  Q.  Do you agree with me that the crate that's
[19]  in this photograph has a diamond weave pattern on it?
[20]  A.  Yes, I do agree with you.
[21]  Q.  Do you recall to whom this presentation
[22]  was first made?
[23]  A.  Well, let me say that this document,
[24]  specifically bates POO3531 of Exhibit 101, isn't for
[25]  a specific customer.  In other words, it wasn't

[1]  prepared for just one customer in mind.
[2]  Q.  I understand.  Do you recall to whom this
[3]  presentation was first made?
[4]  A.  I would be guessing.  Would you like me to
[5]  speculate?
[6]  Q.  Give me your best guesstimate.
[7]  A.  My best guesstimate would be with Jeffers
[8]  in Dothan, Alabama.
[9]  Q.  And who is that?
[10]  A.  Jeffers Pet is a pet products cataloger
[11]  started by a veterinarian by the name of Dr. Jeffers.
[12]  Q.  Who are Theresa Perry and Ruth Jeffers?
[13]  A.  Ruth Jeffers is -- is Dr. Jeffers'
[14]  daughter and past State representative, I believe.
[15]  Theresa Perry, I believe her title would have been
[16]  merchant or buyer.
[17]  Q.  So she was with Jeffers Pet?
[18]  A.  She was with -- yes, she was.
[19]  Q.  And when do you recall that presentation
[20]  being made?
[21]  A.  I believe it would have been -- I believe
[22]  it would have been in -- I believe it would have been
[23]  in March or possibly April, maybe as early as
[24]  February.  But I don't --
[25]  Q.  Was your visual design of the crate

---

10:48:27-10:50:48                                             Page 137

[1]   completed at that time?

[2]   A.   Well, Mr. Hinshaw, when you say visual

[3]   design, the general appearance of a wicker kennel,

[4]   yes.

[5]         But the visual design would only be

[6]   complete when each and every component on exterior

[7]   surfaces that are shown in any of these figures of

[8]   Exhibit 84 were complete.

[9]   Q.   Were they?

[10]  A.   When I had my meeting with Jeffers Pet?

[11]  Q.   Yes, sir.

[12]  A.   I don't believe they were.

[13]  Q.   What do you recall had yet to be done?

[14]  A.   Possibly the latch.

[15]  Q.   Anything else?

[16]  A.   Not that I can recall.

[17]  Q.   And so would it be correct to say that

[18]  what you showed to the people at Jeffers Pet was

[19]  either the attachment to your declaration in Exhibit

[20]  Number 101 or the actual prototype itself or do you

[21]  recall?

[22]  A.   I don't recall.

[23]  Q.   Did you do any patent searches relating to

[24]  the decorative features of your design before you

[25]  finalized it?

---

10:50:51-10:52:19                                             Page 138

[1]   A.   The decorative features?

[2]   Q.   Yes, sir.

[3]   A.   Can you help me with that definition,

[4]   please?

[5]   Q.   Well, why don't you pull out Exhibit

[6]   Number 84.

[7]   A.   Okay.

[8]   Q.   Why don't you go through that and tell me

[9]   what features figure by figure are the decorative

[10]  features.

[11]  A.   Well, the overall appearance of the item,

[12]  a wicker kennel first and foremost is a decorative

[13]  feature.

[14]  Q.   What else?

[15]  A.   What else that relates to a potential

[16]  search that I would have done?

[17]  Q.   No.   My question at this point has moved

[18]  into going through Exhibit 84 figure by figure.   And

[19]  I'm asking you to please describe for me those

[20]  features that you believe are ornamental or

[21]  decorative.

[22]  A.   So you're interchanging the two, right,

[23]  ornamental or decorative?

[24]  Q.   Yes.

[25]  A.   Now, does this relate to the points of

---

10:52:27-10:53:45                                             Page 139

[1]   novelty that we've --

[2]   Q.   Not at this point.

[3]   A.   So this has no relationship to the points

[4]   of novelty that we've answered in our interrogatory

[5]   responses?

[6]   Q.   This is purely focused on the features of

[7]   your design that you think make it ornamental or

[8]   decorative.

[9]   A.   And in terms of or searching for -- as

[10]  simple as you put it?

[11]  Q.   Yes, sir.

[12]  A.   I think the fact that it's a wicker

[13]  kennel.   And the reason you can tell it's a kennel is

[14]  because you can see windows and doors.

[15]  Q.   Anything else?

[16]  A.   I think that's the overall decorativeness

[17]  of it.   It's a wicker kennel.

[18]  Q.   You don't believe that there are any other

[19]  features of the design that are ornamental or

[20]  decorative?

[21]  A.   Again, as it relates to the interrogatory

[22]  responses or --

[23]  Q.   Independent of the interrogatory

[24]  responses.   As I'm sitting here right now you and me

[25]  talking about this case, do you believe that there

---

10:53:48-10:55:27                                             Page 140

[1]   are no other features that are ornamental or

[2]   decorative?

[3]   A.   Well, you have to understand I'm a little

[4]   concerned about being tripped up here, Mr. Hinshaw.

[5]   Q.   I'm not trying to trip you up.

[6]   A.   I believe when a person sees my product

[7]   that they say, that's a wicker kennel.   And that

[8]   overall impression is what's decorative.

[9]   Q.   And so you don't identify and won't

[10]  identify any other features that you believe are

[11]  decorative or ornamental for me?

[12]  A.   For this specific question?   No, I don't

[13]  think it's necessary.

[14]  Q.   Well, whether it's necessary or not --

[15]  A.   I wouldn't know what to say, Mr. Hinshaw.

[16]  Q.   So you can't identify any other features

[17]  that you think are ornamental or decorative other

[18]  than its overall impression of being a wicker kennel

[19]  and I think you said with windows and doors?

[20]  A.   Right.

[21]  Q.   If you look at each of these figures in

[22]  Exhibit 84 figure by figure, are there features in

[23]  here that you believe exist because they are truly

[24]  functional?

[25]  A.   And does this relate to the interrogatory

---

10:55:31-10:56:59                                     Page 141

[1] responses that we provided?
[2] Q. It relates to the question I just asked
[3] you here in this deposition.
[4] A. Are you gonna compare it to the answers
[5] that I provided in the interrogatory --
[6] Q. I don't know what I'm going to do with it
[7] until I hear your answers, Mr. Simpson.
[8] A. Please. I apologize. I'm not trying to
[9] be difficult. I just -- I want to understand.
[10] Q. What I'm trying to understand is you're
[11] the inventor of --
[12] A. That is correct.
[13] Q. -- the design that is shown here in
[14] Exhibit 84?
[15] A. You're absolutely right.
[16] Q. And I am trying to figure out as the named
[17] inventor on this patent what features you believe
[18] exist because they are there purely for a functional
[19] or mechanical purpose.
[20] A. Okay. Well, certainly doors and windows
[21] are there as a functional feature just as they're
[22] present in other products.
[23]    The feet. I see links. I see screws. I
[24] see a latch on the front door. I see a tray keeper
[25] on the back.

10:57:11-11:20:30                                     Page 142

[1] Q. Anything else?
[2] A. No. May I use the rest room?
[3]    MR. HINSHAW: Yes, sir. Let's take a
[4] break.
[5]    (Recess 2:00-2:20 p.m.)
[6] A. May I ask a question first, please?
[7]    BY MR. HINSHAW:
[8] Q. Sure.
[9] A. Are you satisfied that I fully understood
[10] your question with respect to what is the design
[11] features or ornamental features of what's depicted in
[12] Exhibit 84 design patent?
[13] Q. Well, judging by your question to me,
[14] gosh, maybe I will want to rethink that. But let's
[15] come back to that.
[16] A. May I say something first, please?
[17] Q. Sure.
[18] A. Prior to this lawsuit or these lawsuits, I
[19] probably would have interchanged those two words,
[20] design or ornamental, and may not have. I can't say
[21] with a hundred percent assurances.
[22]    But if you're asking me what the specific
[23] ornamental features are of what's depicted in Exhibit
[24] 84, then I would like to elaborate because I believe
[25] I answered your question of what's the design

11:20:35-11:22:37                                     Page 143

[1] appearance.
[2] Q. Okay. Let's come back to that. Mr.
[3] Simpson, when did you first think you might want to
[4] explore obtaining patent protection for your
[5] ornamental design?
[6] A. I would guess that it would have been
[7] almost immediate. I think that would have just been
[8] a natural plan.
[9] Q. Immediate as of the moment you had the
[10] idea sitting on the porch swing?
[11] A. Pretty much, yes.
[12] Q. Did you do anything at that time to
[13] contact an attorney to evaluate whether or not you
[14] could obtain design protection -- to obtain design
[15] patent protection?
[16] A. No, I did not do that immediately.
[17] Q. When did you?
[18] A. I believe it would have been at a time
[19] where I had, I'll call it, all the bugs worked out
[20] and was close to the final design and all aspects
[21] thereof --
[22] Q. So it was sometime after --
[23] A. -- which includes the mechanical design
[24] and all those features.
[25] Q. I'm sorry. I didn't mean to interrupt

11:22:41-11:24:12                                     Page 144

[1] you.
[2] A. That's okay.
[3] Q. So that would have been sometime after the
[4] second or possibly third prototype?
[5] A. It would have been sometime at -- it would
[6] have been sometime prior to May 2nd, 2002, the filing
[7] date of Exhibit 84 patent.
[8] Q. But you can't be more specific than that?
[9] A. I recall I visited the attorney's offices
[10] in Birmingham.
[11] Q. And who was that?
[12] A. It was at Bradley Arant Rose & White, LLP.
[13] Q. Were those the first attorneys you
[14] approached to talk about obtaining a design patent
[15] protection?
[16] A. For this specific product, yes.
[17] Q. And who there did you contact?
[18] A. An individual by the name of John Smith T.
[19] And that's capital S-m-i-t-h-capital-T, I believe.
[20] Q. Just totally curious, did you ever inquire
[21] about how a man has the last name of T?
[22] A. Yeah. Yes, I did.
[23] Q. What did he tell you?
[24] A. That it was the way it had always been
[25] capitalized or -- you know, that's the way it always

[1] had been spelled along with the capitalization S and
[2] -- I mean, both ends of his last name had a capital
[3] letter. And I believe that's right. Does anybody
[4] know for sure?
[5]     Q.   I have seen it John Smith with the capital
[6] S and then a space and then a capital letter T.
[7]     A.   Oh, there's a space?
[8]     Q.   That's the way I've seen it.
[9]     A.   Oh, okay. I didn't recall the space. So
[10] I just -- Mr. Smith T was originally from Opelika.
[11] And so I just assumed it was, you know, a southern
[12] thing, you know.
[13]     Q.   Mr. Smith T was the first attorney that
[14] you approached to talk about obtaining design patent
[15] protection for your wicker pet crate; is that
[16] correct?
[17]     A.   That is correct.
[18]     Q.   Do you think that that was in 2001 or
[19] 2002?
[20]     A.   It would have been, I believe, in 2002.
[21]     Q.   Did you ever talk with Mr. Smith T about
[22] any other matters before you had talked to him about
[23] patent protection for your wicker pet crate?
[24]     A.   No.
[25]

[1]     (Defendant's Exhibit-102 was marked for
[2] identification.)
[3]     BY MR. HINSHAW:
[4]     Q.   The court reporter has handed you what has
[5] been marked as deposition Exhibit Number 102. Do you
[6] recognize these?
[7]     A.   (No response.)
[8]     Q.   Is this your handwriting?
[9]     A.   Let me check the remaining pages, please.
[10]     Q.   Is this your handwriting, Mr. Simpson?
[11]     A.   Yes, it is.
[12]     Q.   On Page P000091, the second page back from
[13] the front --
[14]     A.   Okay. One moment, please. Let me finish
[15] this last page.
[16]     Q.   Oh, I'm sorry. I thought that you were
[17] done.
[18]     A.   Okay. I'm sorry.
[19]     Q.   Okay. First of all, actually look at the
[20] first page, P000090.
[21]     A.   Okay.
[22]     Q.   Earlier you were talking about a design of
[23] your crate involved a rotation point that was higher
[24] up than the current design on the side panels.
[25]     A.   I talked about two additional rotation

[1] points on the side.
[2]     Q.   And that was part of the Z-fold?
[3]     A.   You're exactly right.
[4]     Q.   Is that what is being depicted here on the
[5] front?
[6]     A.   That is correct.
[7]     Q.   And on the next page, P000091, down where
[8] it says Dura-wicker isn't going to work,
[9] Rhino-wicker --
[10]     A.   Yes.
[11]     Q.   -- what is the difference between
[12] Dura-wicker and Rhino-wicker?
[13]     A.   They're just two different words.
[14]     Q.   Are they the same wicker, same material?
[15]     A.   I was actually looking for a -- I was
[16] considering trademarking the name of the resin rattan
[17] in this case.
[18]         And I have used and I believe I continue
[19] to use the name Rhino-wicker of which I have never
[20] trademarked nor do I believe I use a TM with.
[21]         I'm not a hundred percent sure about that.
[22] What I was trying to do, Mr. Hinshaw, is just state
[23] it in a way that would denote toughness.
[24]     Q.   So when you say Dura-wicker isn't going to
[25] work, you're referring to your name, the brand name,

[1] or that the material itself isn't going to work on
[2] your cage?
[3]     A.   Oh, no. It has nothing to do with the
[4] material. It's just that the word Dura hyphen wicker
[5] wasn't going to work. And it may have been on the
[6] basis of a trademark search. I don't know.
[7]     Q.   Your notes, as far as I can tell, are not
[8] dated. But there were a sequence -- it's almost a
[9] checklist, if you will, that you've --
[10]     A.   I don't think they're all of the same
[11] vintage.
[12]     Q.   Well, that's what I'm trying to figure.
[13] If you look on page P000093, it says email John Smith
[14] T.
[15]     A.   Yeah.
[16]     Q.   Does looking at any of this remind you of
[17] when you first contacted John Smith T to get the
[18] patent applied for?
[19]     A.   Well, the relationship I can make is that
[20] it's prior to the end of production of the first
[21] production lot certainly.
[22]     Q.   Page P000095 in the middle it says: Think
[23] of handles, question mark, question mark. Did I read
[24] that correctly?
[25]     A.   That's the way I read it.

| 11:32:03-11:33:41 | Page 149 |
|---|---|

[1] Q. What did you mean by that?

[2] A. I don't know.

[3] Q. Do you think you were referring to the
[4] handle on the crate?

[5] A. I would think it would apply to the crate,
[6] yes.

[7] Q. You understand what I mean by the handle
[8] on the crate. When you look at Exhibit 84, Figure 3,
[9] the rear panel, that's a handle, correct?

[10] A. Well, it's a handle and a window, yes.
[11] Its primary purpose is a handle. Its secondary
[12] purpose is a window.

[13] Q. A window for what?

[14] A. For ventilation, viewing, whatever.

[15] Q. It appears at the top of the crate, would
[16] it not?

[17] A. Yes.

[18] Q. So the animal would have to have its head
[19] stuck at the top of the crate to use that opening as
[20] a window, wouldn't it?

[21] A. I don't believe so, no.

[22] Q. No?

[23] A. I mean, he could view out the window and
[24] look at the upper part of the wall.

[25]

| 11:33:41-11:36:46 | Page 150 |
|---|---|

[1]     (Defendant's Exhibit-103 was marked for
[2] identification.)

[3]     BY MR. HINSHAW:

[4] Q. The court reporter has handed you what has
[5] been marked as deposition Exhibit Number 103. Are
[6] these your drawings and handwriting?

[7] A. Yes, they are.

[8] Q. When in the development process did you
[9] prepare these?

[10] A. (No response.)

[11] Q. Can you tell?

[12] A. I'm sorry. Please restate the question.

[13] Q. When in the development process did you
[14] prepare these?

[15] A. My guess is that these would be the
[16] precursor sketches and work product of the second
[17] mechanical configuration, the one after the Z-fold,
[18] which Exhibit 102 must have been some early work in
[19] development of the Z-fold drawings, figuring out
[20] dimensional relationships and what not.

[21] Q. In Exhibit 103 on Page 1 -- well, actually
[22] the third page, POO3009, in this base there's
[23] language in here that refers to this -- some tubing?

[24] A. Yes.

[25] Q. And I believe that's what depicted in the

| 11:36:56-11:39:21 | Page 151 |
|---|---|

[1] top there under base, correct? Those are tubes?

[2] A. As well as over in the folded detail --
[3] or, excuse me, folding detail to the right-hand side
[4] of the page.

[5] Q. Why did you use tubes in your design as
[6] opposed to wires?

[7] A. Because I couldn't figure out a way for it
[8] to fold using wires.

[9] Q. How does that choice impact on the ability
[10] to make it fold?

[11] A. Well, how much time do you have? I mean
[12] -- I'm sorry. With my knowledge of wire crates,
[13] primarily what I'll call a suitcase fold and a Z-fold
[14] wire crate, the active hinges are wrapped around the
[15] outermost portion of the panels.

[16]     And in a suitcase fold it goes from a
[17] rectangular shape and then it all falls to one side
[18] and then, in effect, what was the top and the side
[19] fold back on top of what was initially the bottom and
[20] one side.

[21] Q. Okay.

[22] A. And there wasn't clearance. There wasn't
[23] clearance to be able to do that folding feature when
[24] you wrap resin rattan around that panel.

[25] Q. Wrap resin rattan around what panel?

| 11:39:30-11:41:25 | Page 152 |
|---|---|

[1] A. Any one of them. Any one of them.

[2] Q. On the suitcase fold?

[3] A. On the suitcase fold. The same in my
[4] viewpoint applies to the Z-fold. So what I'm trying
[5] to explain, Mr. Hinshaw, is that I had to get the
[6] hinging mechanisms out at the ends of the panels and
[7] not internal to them.

[8]     Also I never was entirely impressed with,
[9] I'll call it, the rigidity of a wire kennel. I
[10] thought -- my own personal opinion is that they're --
[11] they can be a bit flimsy.

[12]     And I wanted a more robust, if you will,
[13] product. So I would say those are the two factors
[14] that drove me to the tubing design on the perimeter
[15] of the panels.

[16] Q. Are there different sizes of tubing you
[17] could have chosen, bigger or smaller, that still
[18] addressed those concerns?

[19] A. Which are smaller in diameter? I would
[20] say so, yes.

[21] Q. Could you have gone with a smaller tubing
[22] and still addressed your concerns?

[23] A. Well, I originally said half inch
[24] diameter.

[25] Q. What are you looking at?

| 11:41:27-11:45:06 | Page 153 |
| --- | --- |

[1] A. Excuse me. I'm looking at bates number
[2] POO3009 of Exhibit 103. Yeah. I could potentially
[3] have gone smaller. I don't -- I don't know.
[4] Q. How much smaller?
[5] A. I don't know.
[6] Q. So is it your testimony that to make the
[7] cage, the crate, that you designed you would have to
[8] have tubing, not wire?
[9] A. Yes. Because my drawings called for
[10] tubing.
[11] Q. Yeah. But did your drawings call for
[12] tubing because you couldn't use wire?
[13] A. I used wire in the design.
[14] Q. In the places where you used tubing in the
[15] design, could you have substituted wire?
[16] A. Could I have used wire? I don't know.
[17] Q. Was one of the reasons you used tubing was
[18] because of the look of sturdiness, robustness, that
[19] you talked about earlier?
[20] A. No, not necessarily the look of it; the
[21] effect of it, the fact that it would be more robust
[22] and sturdy; not the look of it.
[23] Q. Was one of the reasons you used tubing
[24] because of the look of it with wicker coiled around
[25] it?

| 11:45:06-11:47:24 | Page 154 |
| --- | --- |

[1] A. You would get that same look with wire.
[2] Q. If the wire were a large gauge?
[3] A. Even on small gauge wire the wicker is
[4] still coiled around the outer wire.
[5] Q. Is it correct that the size of the tubing,
[6] the diameter of the tubing, could be increased to
[7] have a more -- a more significant visual impact of
[8] the wicker coiled around it as opposed to a smaller
[9] diameter tubing with wicker coiled around it?
[10] A. If you're saying that the -- that the
[11] wicker wrapped around a larger diameter is more
[12] visible than that when it's wrapped around the small
[13] diameter, I would agree with you.
[14] Q. And that's true for wire or for tubing?
[15] A. I would believe so, yes.
[16] Q. Looking again at Exhibit 84, is it your
[17] testimony that nobody else contributed to the
[18] ornamental features of this design?
[19] A. Yes, that's correct.
[20] Q. Was there an overall look that you were
[21] trying for when you developed this design?
[22] A. The overall look would have been a
[23] decorative wicker kennel.
[24] Q. Were there any design principles that you
[25] followed in developing this design?

| 11:47:33-11:49:29 | Page 155 |
| --- | --- |

[1] A. I wanted them to be sized such that they
[2] were similar to existing containment devices by size.
[3] Q. And by existing containment devices you're
[4] talking about existing pet crates?
[5] A. Wire crates, plastic crates, plastic
[6] kennels, carriers and the like, yes.
[7] Q. Any other design principles that you
[8] followed in developing your design?
[9] A. I wanted it to look as good as it could.
[10] Q. Earlier I asked you if you had done any
[11] research after you came up with your idea when
[12] sitting on the porch swing.
[13] Before you finalized your design, did you
[14] do any research, look at any magazines, books,
[15] Internet, for different kinds of weave pattern or
[16] wicker designs?
[17] A. No.
[18] Q. Before you --
[19] A. Other than, you know, a color reference,
[20] which is shown as Exhibit 94.
[21] Q. Which I think was referenced in one of
[22] your --
[23] A. And, you know -- and the resin or all
[24] weather wicker, you know, weaving of Exhibit 93.
[25] Q. Was there anything about that weave

| 11:49:32-11:51:05 | Page 156 |
| --- | --- |

[1] pattern in Exhibit 93 in particular that you were
[2] trying to capture?
[3] A. No. I don't think -- I don't think the
[4] weave pattern changes the overall decorative
[5] appearance of the product.
[6] Q. Not at all?
[7] A. Not substantially, no.
[8] Q. Well, what do you mean substantial?
[9] A. I don't -- I don't think a consumer is
[10] going to care that it has a diamond pattern or not.
[11] And I would believe that they wouldn't even pick up
[12] on that.
[13] Q. So if you looked at Exhibit 93 and there
[14] were three large diamond patterns woven into it, you
[15] don't think that would be a significant
[16] ornamental difference?
[17] A. No. There's two in this one today.
[18] Q. And where are those?
[19] A. They're in the back rest from the
[20] right-hand side of the product that is shown in
[21] Exhibit 93.
[22] It's in the upper half of the back about
[23] one-third of the way over from the right side and the
[24] other is about two-thirds away over from the right
[25] side.

---

**11:51:05-11:53:18**                                    Page 157

[1]    Q.   And those are directly underneath the
[2]  white squares that sit at the top of the photo?
[3]    A.   Pretty much.
[4]    Q.   May I see that color photo?
[5]    A.   Uh-huh (affirmative).
[6]    Q.   Is that where you got the idea to put a
[7]  diamond wicker weave in your wicker pet crates?
[8]    A.   I believe it was, yes.
[9]    Q.   So you copied that feature from this porch
[10]  swing into your pet crates?
[11]    A.   Not exactly, no.
[12]    Q.   Well, how was it not exactly?
[13]    A.   You'll notice in the color picture of
[14]  Exhibit 93 that that's somewhat of a solid diamond.
[15]  And -- well, I can't tell from this.  But I believe
[16]  that what has been used in our product is just an
[17]  outline of a diamond.
[18]    Q.   And you think that's a significant
[19]  difference?
[20]    A.   Between a solid and just the outline?
[21]    Q.   Yes, sir.
[22]    A.   No, not to -- I don't think any of them is
[23]  significant over just the other portion of the
[24]  weaving -- or woven product.  I mean, you -- it's
[25]  barely discernable.

---

**11:53:21-11:54:36**                                    Page 158

[1]    Q.   In this particular photograph I would
[2]  agree.
[3]    A.   In that particular photograph and I think
[4]  in general.
[5]    Q.   Doesn't the discernability (SIC) of it
[6]  depend on how you do the weave pattern to highlight
[7]  it or --
[8]    A.   It's all the same colored material.  If it
[9]  was a different colored material in just that diamond
[10]  than the color of the material surrounding it, then
[11]  maybe it would be a discernable difference.  But I
[12]  don't believe it is.  It's just a very subtle little
[13]  accent.
[14]    Q.   Kind of like how men see colors in window
[15]  sixteen and women see colors in I think fifty-six
[16]  palate or so?
[17]    A.   I have never heard that.
[18]    Q.   You've never heard that?
[19]    A.   No, I had not.
[20]    Q.   Kind of in the eye of the beholder, isn't
[21]  it?  Before you finalized your design in Exhibit 84,
[22]  did you purchase any other -- strike that.  Before
[23]  you finalized your design in Exhibit 84, did you
[24]  purchase any wicker products?
[25]    A.   No, I don't believe I would have.  Well,

---

**11:54:41-11:55:47**                                    Page 159

[1]  let me back up, please.  Certainly purchased the --
[2]  you took my exhibit.  But certainly purchased the --
[3]    Q.   You had already purchased that?
[4]    A.   Yeah, certainly purchased the --
[5]    Q.   And you had already purchased the wicker
[6]  basket?
[7]    A.   Well, yeah, we had.  You're absolutely
[8]  correct.  We had ownership of it for -- how long I
[9]  don't know.
[10]    Q.   Other than those two objects --
[11]    A.   We may have other baskets in the house.
[12]       MR. GARDNER:  Mr. Hinshaw, if you can
[13]  clarify your question as to the time frame when you
[14]  asked him whether he had wicker in his --
[15]       BY MR. HINSHAW:
[16]    Q.   After you came up with your idea on the
[17]  porch swing and before you finalized your design, did
[18]  you purchase any other wicker objects?
[19]    A.   No.
[20]    Q.   After you had your idea on the porch swing
[21]  and before you finalized your design, did you go buy
[22]  any wire pet crates?
[23]    A.   Please - I'm sorry - if you'd state that
[24]  again, please.
[25]    Q.   Sure.  After you had your idea on the

---

**11:55:47-11:57:15**                                    Page 160

[1]  porch swing in September 2001 and before you
[2]  finalized your design that's reflected in Exhibit 84,
[3]  did you go out and purchase any wire pet crates?
[4]    A.   Well, I don't know what you mean by go out
[5]  and purchase.  But, yes, I did purchase at least one
[6]  wire crate from Doctors Fosters & Smith of which you
[7]  can see a representation of that package of that
[8]  product in --
[9]    Q.   That was the Gorilla Tough?
[10]    A.   Yes.  You can see a representation of that
[11]  product packaging on -- or in Exhibit 96, bates
[12]  number P003628.
[13]    Q.   Other than purchasing that wicker -- or,
[14]  I'm sorry, that metal crate, did you buy any other
[15]  metal crates before you finalized your design?
[16]    A.   I don't know why I would have.  So I don't
[17]  believe I did, no.
[18]    Q.   The metal crate that you did buy from Dr.
[19]  Fosters?
[20]    A.   Doctors Foster & Smith.
[21]    Q.   Did you attempt to weave any wicker or
[22]  resin wicker on it?
[23]    A.   No.
[24]    Q.   Why not?
[25]    A.   Have you ever seen people weaving resin

---

11:57:23-11:59:31                                   Page 161

[1] wicker?

[2] Q. No, I haven't.

[3] A. It's -- well, I would liken it to

[4] crocheting or knitting. You've got to know how to do

[5] it. And I didn't know how nor did I want to learn.

[6] Q. Have you learned since?

[7] A. No. But I've seen it done many times

[8] since.

[9] Q. After you had your idea while sitting on

[10] the porch swing in September of 2001 and finalizing

[11] your design as depicted in Exhibit 84, did you

[12] personally do any patent searches relating to the

[13] ornamental features of your design?

[14] A. I don't believe I did. You said relating

[15] to the ornamental features of my design. That's

[16] fairly specific.

[17]     I believe I had or asked Mr. Smith T to do

[18] a - I don't know how I would have phrased it to him -

[19] to do a patent search.

[20] Q. I'm going to hand you what's been marked

[21] as deposition Exhibit Number 4.

[22] A. Okay. Thank you.

[23] Q. Have you seen that before?

[24] A. Yes, I have.

[25] Q. What is that?

---

11:59:33-12:01:19                                   Page 162

[1] A. These are photographs of a medium pet

[2] residence wicker kennel of a Mr. Herzher's brand.

[3] This is part number 13301.

[4] Q. This design has a diamond weave pattern on

[5] it?

[6] A. It does.

[7] Q. On the sides and in the rear?

[8] A. And I stand corrected on my previous

[9] comment. I thought it was just an outline diamond.

[10] But it is, in fact, a solid filled in diamond very

[11] similar if not close -- it just looks to be larger.

[12] Q. Do all of the sizes of your wicker pet

[13] crates have a diamond on them like this?

[14] A. Yes.

[15] Q. Has that been the case since you first

[16] started selling these wicker covered pet crates back

[17] in May of 2002?

[18] A. I believe the diamond has been present in

[19] all production articles of which I started selling

[20] and invoicing for thereof in August of 2002.

[21] Q. Can you think of any wicker covered pet

[22] crates that you have sold to a consumer or a customer

[23] that did not have a diamond weave pattern on it?

[24] A. No.

[25] Q. The design pattern in Exhibit Number 84

---

12:01:24-12:03:25                                   Page 163

[1] does not have a diamond weave pattern in it; is that

[2] correct?

[3] A. That is correct.

[4] Q. Not in Figure 1, not in Figure 2, Figure

[5] 3, Figure 4 or Figure 5, does it?

[6] A. No, it does not.

[7] Q. Why not?

[8]     MR. GARDNER: I'm going to object on the

[9] basis that your question may call for revealing the

[10] attorney/client communications and instruct the

[11] witness that he may answer, if he can, without

[12] revealing anything that his counsel may have told him

[13] about the scope of a patent or whether to include a

[14] feature or not.

[15] A. I can't answer that question, Mr. Hinshaw.

[16]     BY MR. HINSHAW:

[17] Q. You can't answer that question without

[18] revealing privileged communications?

[19] A. That is correct.

[20] Q. So was the choice then looking at Exhibit

[21] 84 to use a plain weave with no diamond an ornamental

[22] choice?

[23] A. Do you mind repeating that for me, please?

[24]     (The record was read by the reporter.)

[25] A. No.

---

12:03:29-12:05:26                                   Page 164

[1]     BY MR. HINSHAW:

[2] Q. Well, does the presence of a diamond weave

[3] pattern serve a mechanical purpose?

[4] A. I couldn't think of one.

[5] Q. No. Neither could I. You have, in

[6] fact --

[7]     MR. GARDNER: It's ten after 3:00. And

[8] our plan is to continue until 4:00. My expectation

[9] is that this will not be the conclusion of the

[10] deposition but only the suspension of the deposition

[11] until a later time.

[12]     And as such it is our intention not to do

[13] any cross-examination or questioning of this witness

[14] today but to allow you to take the deposition until

[15] we have to quit and then we'll resume the deposition

[16] at a later time. Does that comport with your --

[17]     MR. HINSHAW: My plan is to continue to

[18] depose him until 4:00 o'clock or thereabouts. And I

[19] understand that the deposition would be continued at

[20] that time.

[21]     I understand that you do not intend to do

[22] any clarifying questions at that time but would

[23] rather reserve that right until the deposition is

[24] completed upon our return.

[25]     MR. GARDNER: That's correct.

---

| Page 165 | Page 167 |
|---|---|

**12:05:26-12:09:47**      Page 165

[1] (Defendant's Exhibits-104-111 were marked

[2] for identification.)

[3]     BY MR. HINSHAW:

[4] Q. Mr. Simpson, I've handed to you what the

[5] court reporter has marked as deposition Exhibits

[6] Number 104 through 111. Are all of these Simpson

[7] Venture products?

[8] A. Exhibit 104 shows one of our small pet

[9] residences in the dark brown finish, part number

[10] 13202 with my employee Donna Belenchia's dog Moonpie

[11] in it. And it is my product.

[12] Q. If you could just tell me -- I don't need

[13] to know all of the details. But just are these your

[14] -- are these Simpson Ventures' products?

[15] A. Okay. Exhibit 105 certainly at the top of

[16] bates page P0OOO2 up under A, finally a stylish

[17] alternative to wire and plastic crates, those two

[18] depictions are Simpson Ventures or Simpson & Company,

[19] LLC at the time. I'm not sure of the date of this

[20] catalog.

[21] Q. Same with 106, the decorative litter pan

[22] covers, Simpson Venture product?

[23] A. That is correct.

[24] Q. Same with Number 107, decorative litter

[25] pan cover, Simpson Venture product?

---

**12:09:47-12:10:45**      Page 166

[1] A. That is correct.

[2] Q. And Number 108, Simpson Venture litter pan

[3] cover?

[4] A. That's correct.

[5] Q. Number 109, Exhibit Number 109, that's a

[6] Simpson Venture product or series of products?

[7] A. That's correct.

[8] Q. And the decorative pet bed in Exhibit

[9] Number 110, that's a Simpson Venture trifecta of

[10] products?

[11] A. I guess. And I like your term.

[12] Q. Exhibit Number 111, is that a Simpson

[13] Ventures' product?

[14] A. Yes.

[15] Q. Each one of these products has a diamond

[16] weave pattern in it, does it not?

[17] A. Looks to be, yes.

[18] Q. And is it true that with all of your

[19] wicker woven pet product lines you use that diamond

[20] weave pattern?

[21] A. That's correct.

[22] Q. Is the reason for that because you are

[23] attempting to create a brand in the eyes of the

[24] consuming public?

[25] A. No.

---

**12:10:49-12:12:43**      Page 167

[1] Q. Why do you use the diamond weave pattern?

[2] A. I just started with it on the pet

[3] residence, and I've continued to use it on other

[4] resin rattan products.

[5] Q. If you would look at Exhibit 106 and 108,

[6] these are images of your decorative litter pan cover,

[7] correct?

[8] A. Yes, they are.

[9] Q. And you see along the bottom where --

[10] well, let's look at Exhibit Number 108. You write in

[11] a box, decorative, and you show the side panel of the

[12] litter pan cover?

[13] A. That's correct. And I stand corrected

[14] from my earlier comment relative to Rhino-wicker. It

[15] looks like I have TM'd it in the copy, and it looks

[16] like I continue to do that. And I apologize for that

[17] mistake.

[18] Q. In Exhibit 108, though, you in the box

[19] under decorative describe what you see there?

[20] A. It's a photo image of the side panel of

[21] either -- oh, in this case I think it happens to be a

[22] shot of the side panel of the pet residence.

[23] Q. And it highlights the diamond weave

[24] pattern, does it not?

[25] A. Well, it certainly shows the diamond weave

---

**12:12:44-12:14:36**      Page 168

[1] pattern. But if you look to Exhibit 109, 110 you'll

[2] see as well as Exhibit 107 that in those three

[3] exhibits that I continue to use the same word

[4] decorative above the photo element and the same copy

[5] points -- two bullet points below, one being

[6] Rhino-wicker won't absorb fluids or odors and the

[7] second bullet point being easily cleaned with soap

[8] and water.

[9] Q. Each of those products shown in there have

[10] the diamond weave pattern in them?

[11] A. Yes. Each of the product shots do, yes.

[12] Q. Wasn't the reason that you removed the

[13] diamond weave pattern from the design that is the

[14] subject of the 156 patent was because you wanted to

[15] obtain a longer duration of intellectual property for

[16] the brand image behind the diamond weave pattern as

[17] opposed to the fourteen year limitation of a design

[18] patent protection?

[19]     MR. GARDNER: Same objection as before;

[20] calls for potential disclosure of attorney/client

[21] privilege as to why you may pursue design patent

[22] protection versus trademark protection.

[23]     If you can answer the question without

[24] revealing anything your attorney may have told you,

[25] then do so.

---

**12:14:36-12:16:51**                                                      Page 169

[1]   A.  Do you mind repeating that back, please?
[2]       (The record was read by the reporter.)
[3]       BY MR. HINSHAW:
[4]   Q.  Wasn't the reason -- well, let's -- let's
[5]   try something else.
[6]       (Defendant's Exhibit-112 was marked for
[7]   identification.)
[8]       BY MR. HINSHAW:
[9]   Q.  This is an email to John Smith T from
[10]  yourself dated February 14, 2002, correct?
[11]  A.  This is an email -- at the bottom it's an
[12]  email from me to John Smith T.  And I see now there
[13]  is a space after the H and before the T.
[14]  Q.  So the answer to my question is yes?
[15]  A.  I'm sorry.  Mr. Hinshaw, please, do you
[16]  mind repeating that question?
[17]  Q.  This is an email from yourself to Mr. John
[18]  Smith T dated February 14th, 2002, correct?
[19]  A.  Yes, that's correct.
[20]  Q.  And it says:  I will forward via mail a CD
[21]  containing several views of the product by Monday.
[22]  Correct?
[23]  A.  It does say that, yes.
[24]  Q.  Do you happen to still have those views or
[25]  that CD?

---

**12:16:53-12:18:59**                                                      Page 170

[1]   A.  Not that I'm aware of.
[2]   Q.  And is it your understanding that the
[3]   slide jpg file that was attached is, in fact, POO3001
[4]   the same -- essentially the same photo we saw earlier
[5]   attached to your declaration?
[6]   A.  Yes.  I believe that to be what is
[7]   attached to the email to the best of my knowledge.
[8]       (Defendant's Exhibit-113 was marked for
[9]   identification.)
[10]      BY MR. HINSHAW:
[11]  Q.  The court reporter's handing you what's
[12]  been marked as deposition Exhibit 113.  Who is Thomas
[13]  Dean?
[14]  A.  Let me quickly read this, please.  And,
[15]  again - I'm sorry - your --
[16]  Q.  Who is Thomas Dean?
[17]  A.  I believe he is a -- a graphic artist that
[18]  prepares -- that prepares drawings appropriate for
[19]  inclusion in patents.
[20]  Q.  And did he do the drawings that were
[21]  submitted on the 156 patent?
[22]  A.  To my belief he is, yes.
[23]  Q.  And you had a chance to review that work
[24]  product and approve it?
[25]  A.  I'm sure I did to the best of my

---

**12:19:01-12:21:13**                                                      Page 171

[1]   knowledge.
[2]       (Defendant's Exhibit-114 was marked for
[3]   identification.)
[4]       BY MR. HINSHAW:
[5]   Q.  The court reporter is handing to you
[6]   what's been marked as deposition Exhibit 114.  Is
[7]   that your handwriting that appears on several pages
[8]   of this document?
[9]   A.  Well, yeah, it certainly is on the front.
[10]  My question is:  What is Monopril?
[11]  Q.  Well, let's just focus on the handwriting
[12]  for now.  Is that your handwriting that appears
[13]  throughout this document?
[14]  A.  (No response.)
[15]  Q.  Is that your handwriting?
[16]  A.  Yes, that is my handwriting.
[17]  Q.  And in each of these drawings there is a
[18]  diamond weave pattern, correct?
[19]  A.  Well, there certainly is on Page 3, which
[20]  is bates POO2988 of Exhibit 114, as well as bates
[21]  POO2990 and bates P002991 of that same Exhibit 114.
[22]  Q.  You did not ask Mr. Smith T or Mr. Tom
[23]  Dean to remove the diamond weave pattern here, did
[24]  you?
[25]  A.  In this document?

---

**12:21:18-12:23:32**                                                      Page 172

[1]   Q.  That's correct.
[2]   A.  That is correct.
[3]   Q.  And so do you see the what I call the fax
[4]   signature, these little fax dates?
[5]   A.  Yes, I do.
[6]   Q.  And those dates on both appear to be March
[7]   27 of 2002, correct?
[8]   A.  Yes.
[9]       (Defendant's Exhibit-115 was marked for
[10]  identification.)
[11]      BY MR. HINSHAW:
[12]  Q.  The court reporter is handing to you
[13]  what's been marked as deposition Exhibit Number 115.
[14]  If you turn -- or you can either look at the fax
[15]  signature or the date of the email on the second
[16]  page.  It appears that these are dated April 2nd,
[17]  2002, correct?
[18]  A.  That's correct.
[19]  Q.  In Mr. Tom Dean's email to John Smith T on
[20]  April 2 of 2002 he writes:  John, at Jeff Simpson's
[21]  request I have revised Figure 3.  Do you know what
[22]  revisions were made to Figure 3?
[23]  A.  From this document, no, I cannot discern
[24]  what -- let me just read on, if you don't mind,
[25]  please.

---

**12:23:57-12:25:59**                                                      Page 173

[1]        The only thing I can guess to, Mr.
[2]    Hinshaw, and it's a -- it's a guess, is that if you
[3]    go through the document as shown in Exhibit 114,
[4]    Figure 1 is a perspective view of the wicker kennel
[5]    as it is in Figure 1 of Exhibit 115.
[6]        Figure 2 in Exhibit 115 is a drawing of
[7]    the front face as it is in Figure 2 in Exhibit 114.
[8]    Figure 3 in Exhibit 115 is not shown in Exhibit 114.
[9]    Q.   Each of the figures in Exhibit 115, 1, 2,
[10]   3, 4 and 5 contain a diamond weave pattern, don't
[11]   they?
[12]   A.   No.
[13]   Q.   I'm sorry.  Figure 2 does not?
[14]   A.   That is correct.
[15]        (Defendant's Exhibit-116 was marked for
[16]   identification.)
[17]        BY MR. HINSHAW:
[18]   Q.   The court reporter has handed you what has
[19]   been marked as deposition Exhibit Number 116.  And
[20]   I'll represent to you that I could not find a date on
[21]   this document.
[22]        But I believe it to be the final
[23]   submission if you compare it to what was actually
[24]   submitted to the patent and trademark office in
[25]   Exhibit 84.  Do you agree?

**12:26:42-12:28:49**                                                      Page 174

[1]    A.   They look to be the same, Mr. Hinshaw.
[2]    Q.   Actually I just caught something.  There
[3]    is a difference at the bottom of Figure 3.
[4]    A.   Figure 3 of Exhibit 116 or --
[5]    Q.   Between the two.
[6]    A.   Yeah.  I do not believe they are the
[7]    documents that were submitted as part of the
[8]    application of Exhibit 84.
[9]    Q.   If you compare 116 to 100, deposition
[10]   Exhibit 116 to deposition Exhibit 100, which was the
[11]   application --
[12]   A.   Okay.  I'm comparing 116 to 100, right?
[13]   Q.   -- and if you look at bates P002783 in
[14]   100 --
[15]   A.   Okay.  I'm looking from 2783 on, right?
[16]   Q.   -- and my question is as simple as this:
[17]   There's no diamond weave pattern in this Exhibit 116
[18]   or Exhibit 100, correct?
[19]   A.   That is correct.
[20]   Q.   Was there any business reason for why the
[21]   diamond weave pattern was removed from the drawings?
[22]   A.   What do you define as a business reason?
[23]   Q.   A business reason for purposes of
[24]   protecting the assets and -- of your company
[25]   including goodwill.

**12:29:04-12:30:39**                                                      Page 175

[1]    A.   I don't believe I can answer that.
[2]    Q.   You don't believe that there was a
[3]    business reason for removing the diamond weave
[4]    pattern from the drawings that were submitted?
[5]    A.   No.  I don't believe I can answer that for
[6]    the possibility of divulging attorney/client
[7]    privilege.
[8]    Q.   Who was the attorney who advised you to
[9]    remove the diamond weave pattern?
[10]        MR. GARDNER: Objection.  Calls for the
[11]   witness to reveal whether or not an attorney did, in
[12]   fact, advise him to remove that which inherently
[13]   calls for the revealing of a communication from the
[14]   attorney to the client.  And I instruct the witness
[15]   not to answer that question.
[16]        BY MR. HINSHAW:
[17]   Q.   Did you speak with an attorney about
[18]   whether to remove the diamond weave pattern - and to
[19]   be clear - from the patent application?
[20]   A.   Again, I don't believe I can answer that.
[21]   Q.   To clarify, did you speak with an attorney
[22]   about that point?  I'm not asking you to tell me what
[23]   you discussed with that attorney.
[24]   A.   The answer is yes.
[25]   Q.   Who was that attorney?

**12:31:09-12:33:25**                                                      Page 176

[1]    A.   (No response.)
[2]    Q.   Do you not recall?
[3]    A.   Yes, I recall.
[4]    Q.   Who was that attorney?
[5]    A.   Mr. John Smith T.
[6]    Q.   When did you have that conversation?
[7]    A.   It would have been sometime between my
[8]    first contact with Mr. Smith T and the filing of the
[9]    156 patent as referenced in Exhibit 100.
[10]   Q.   Wasn't the reason that you removed the
[11]   diamond weave pattern from the patent application
[12]   because a design patent has a life of only fourteen
[13]   years of protection whereas trademark law would allow
[14]   a business to protect its intellectual property and
[15]   brand name recognition for a longer period of time?
[16]        MR. GARDNER: Instruct the witness to not
[17]   answer the question if answering the question would
[18]   reveal communication between your attorney and
[19]   yourself.  If you can answer otherwise, please do so.
[20]   A.   And your question again, Mr. Hinshaw,
[21]   please.
[22]        (The record was read by the reporter.)
[23]   A.   No.  That was not the reason.
[24]        BY MR. HINSHAW:
[25]   Q.   Have you ever conducted any surveys or

Page 177

12:33:27-12:36:11

[1] marketing research related to your wicker pet crates?
[2] A.  Marketing or related research relative to
[3] the wicker pet crate?  No, no formal research
[4] relative to the wicker pet crates other than Mr.
[5] Anders' reports.
[6] Q.  Have you engaged in any branding
[7] campaigns?
[8] A.  What do you define as a branding campaign?
[9] Q.  Have you made any efforts to identify a
[10] name, symbol, mark, image between the consuming
[11] public and Simpson Ventures' products?
[12] A.  Would you repeat that for me, please?
[13]     (The record was read by the reporter.)
[14] A.  Well, I think the answer would be yes.
[15] BY MR. HINSHAW:
[16] Q.  And does any of that branding campaign
[17] include the diamond weave pattern?
[18] A.  I'm interpreting branding campaign to mean
[19] the use of my Mr. Herzher's logo or my Paw Partner's
[20] logo.  And on that basis, no, the diamond pattern has
[21] not been part of that branding campaign.
[22] Q.  Has it been part of your Mr. Herzher's
[23] branding campaign?
[24] A.  No.  I think I just stated it hasn't been
[25] part of my Mr. Herzher's nor my Paw Partner's

Page 178

12:36:16-12:40:50

[1] branding campaign based on the assumption that that's
[2] -- that the branding campaign we're talking about is
[3] brand logos.
[4]     As you can see in figure or -- we got
[5] Exhibit 4 the last -- next to the last page you'll
[6] see the first representation of the Mr. Herzher's
[7] logo.
[8]     And I don't think we've introduced an
[9] exhibit today that shows the most -- yes, I think we
[10] have.  And then on Exhibit Number 109 you see a
[11] representation of the newer Mr. Herzher's brand logo
[12] in the upper left-hand corner.
[13]     MR. GARDNER:  Can we break for just a
[14] quick no pow-wow comfort break?
[15]     MR. HINSHAW:  Yes.
[16]     (Recess 3:40-3:42 p.m.)
[17] BY MR. HINSHAW:
[18] Q.  Mr. Simpson, if you would look at Exhibit
[19] Number 84.  Earlier today I asked you a question
[20] about what are the -- to take a look at this exhibit
[21] figure by figure and tell me what are the ornamental
[22] features of this drawing.
[23] A.  Okay.  Just to be clear, I think in the
[24] prior question earlier today you asked me what the
[25] decorative aspects or ornamental features of the

Page 179

12:40:50-12:42:43

[1] product as depicted in Exhibit 84.
[2]     And a few years ago I might have used
[3] those terms interchangeably.  And that's what
[4] prompted my clarification question to you.
[5] Q.  What do you see as the difference between
[6] those two?
[7] A.  I see ornamental aspect as -- as a term
[8] that's used when you're defining points of novelty.
[9] Q.  And decorative does not?
[10] A.  And decorative could.  And in my case in
[11] the earlier question today is a broader term.
[12] Q.  With that clarification in your mind,
[13] would you please design the ornamental features of
[14] your design figure by figure in Exhibit Number 84?
[15] A.  Well, first of all, I'd like to state that
[16] I'll attempt to -- I'll attempt to repeat the
[17] ornamental aspects as have been provided as part of
[18] interrogatory response as well as Anders' report.
[19]     I think the overall ornamental aspect is
[20] the general ornamental appearance of the product as
[21] shown in Figure 1 which shows rattan or wicker, the
[22] like, on -- in this case it shows it on the top what
[23] would be the right-hand side of the product and on
[24] the front.
[25]     It also shows that the top mostly has

Page 180

12:42:46-12:44:49

[1] wicker.  The sides have wicker surrounding a
[2] rectangular window, and the front has wicker
[3] substantially surrounding a rectangular door.
[4]     The door panel or the front panel is
[5] mostly door.  In other words, the area contained by
[6] the door is greater than the area contained by the
[7] wicker.
[8]     And that's not the case on the side
[9] panels.  The side panel windows take up less area
[10] than the area that's taken up by the woven appearing
[11] material.
[12]     The other ornamental aspects are is it
[13] appears it's in individual panels.  It also appears
[14] that there is no overhang such that the corners of
[15] the wicker kennel don't have anything protruding
[16] beyond them, for lack of a better phrase.
[17] Q.  Anything else?
[18] A.  But, again, I would ask that you refer to
[19] Mr. Anders' report for the exact ornamental
[20] appearances as we've put forth.
[21] Q.  You were describing Figure 1, I guess.  I
[22] would like you to look at each of the figures.  And I
[23] understand that you may want to defer to the
[24] interrogatory response, which I understand has been
[25] partly prepared by your attorneys, and you might want

12:44:50-12:46:46                                    Page 181

[1] to refer to Mr. Anders' report.
[2]     But what I'm most interested in is hearing
[3] you as the inventor and what you perceive to be the
[4] ornamental features of your design.
[5] A.  Another comment in Figure 1 is the fact
[6] that the windows are rectangular and they're in the
[7] upper half portion of the side view or the side of
[8] the product.
[9]     Figure 2 would relate to the extent of the
[10] wicker on the door panel substantially surrounding
[11] the door.  Again, the no overhang such that each
[12] panels come together such that there is no overhang
[13] of one panel to the other.
[14]     Figure 3 that there's a handle window or
[15] window in the upper half portion of the back panel,
[16] again, the overhang issue and the fact that there's
[17] substantially more -- or there's more wicker in that
[18] back panel than there is area covered by window.
[19]     The top view Figure 4 -- and in each of
[20] these cases, certainly in Figure 1, it's a pet home
[21] with all those ornamental aspects.
[22]     I think one could say or I certainly could
[23] that Figure 2 you could still tell that it's a pet
[24] home with those ornamental features.
[25]     Figure 3 because of my intimate knowledge

12:46:46-12:48:36                                    Page 182

[1] of the product, yeah, yeah, I could continue to say
[2] it's a pet home with those features.  Figure 4 to the
[3] extent of whether it's substantially all covered with
[4] wicker.
[5]     And that happens to be the top.  And I
[6] happen to know that it's the top of a pet home with
[7] the overall wicker appearance.
[8]     Figure 5 shows a side view of a pet home
[9] of which -- of which the side panel has a rectangular
[10] window in the upper portion of upper half of the side
[11] panel.  It shows that the product is made from
[12] individual panels.
[13]     And it shows that at least in this view
[14] that there is no overhang of those panels and that
[15] the -- the woven area in the side is -- takes up a
[16] greater area than the non-moving window portion of
[17] the side.
[18] Q.  Any other ornamental features?
[19] A.  That combination of all of that.
[20] Q.  Looking at Figure 5, for example, do you
[21] not consider it to be an ornamental feature, the
[22] continuous wicker coil wrapped around the tubes?
[23] A.  That in and of itself?
[24] Q.  Yes.
[25] A.  No.

12:48:37-12:50:15                                    Page 183

[1] Q.  Do you not consider it to be an ornamental
[2] feature to have the panel framed on all sides by the
[3] wicker coiled tubes?
[4] A.  No.
[5] Q.  Why not?
[6] A.  Number one, it's the overall ornamental
[7] appearance of the item and it's the shape of the
[8] window, its location and the fact that -- that
[9] substantially the remainder of it is covered in a
[10] woven looking material.
[11]     Now, you know, you might ask me if you
[12] start taking off that -- how far off do you -- well,
[13] I won't go there.
[14] Q.  Do you agree with me in looking at Figure
[15] 5 that there's a bottom piece that is separate from
[16] the top piece or the piece that includes the window?
[17] A.  Please ask that question again, Mr.
[18] Hinshaw.
[19] Q.  In looking at Figure 5, would you agree
[20] with me that there is a base piece that is separate
[21] from an upper top piece?
[22] A.  Yes.  There happens to be three pieces.
[23] Q.  The third being the lid, the side of the
[24] top panel?
[25] A.  It's actually the top, yes.

12:50:18-12:51:49                                    Page 184

[1] Q.  Okay.  Do you agree with me that the weave
[2] pattern in the base piece is different than the weave
[3] pattern that appears below the window?
[4] A.  No, I couldn't agree with you.
[5] Q.  Why not?
[6] A.  Because I think it has -- might have to do
[7] with respective viewing angle.  For example, do you
[8] see -- do you see -- in that lower portion do you see
[9] what looks to be double strands vertical?
[10] Q.  Do you?
[11] A.  Yes.  Can I point that out to you?
[12] Q.  Is that a different -- the question I'm
[13] asking you is, though, on that bottom base piece
[14] whether that weave pattern looks visually different
[15] than the weave pattern in the area below the window.
[16]     Is it your testimony that that does not
[17] look different to you?
[18] A.  No.  I didn't say that.  I said it looks
[19] different but I don't think it is different.  In
[20] other words, if you were viewing that actual panel,
[21] okay, you're going to get a slightly different
[22] impression as you view the top of that panel versus
[23] the bottom of the panel.
[24] Q.  And so if I understand what you're saying,
[25] that would be actually looking at your product like

---

**12:51:51-12:53:20**                                    Page 185

[1]    in Exhibit 4, for example?

[2]    A.   Yes.

[3]    Q.   Okay.

[4]    A.   Yes.  I get -- I get a different

[5]    impression as I move up.  It looks -- looks to be

[6]    courser on the bottom.  And then as you get more

[7]    straight in or perpendicular to your eyesight, okay,

[8]    or -- again, this looks courser.

[9]         But as I get up in here, you're not seeing

[10]   through the weave.  Okay.  The weave is -- you're not

[11]   able to see through that weave.  So it gives you an

[12]   impression that the weave is different and it

[13]   actually isn't.

[14]   Q.   But in Exhibit 84, Figure 5 you would

[15]   agree that is a visually different weave pattern

[16]   down below than what you see in the area below the

[17]   window?

[18]   A.   No, I wouldn't agree with that.  I would

[19]   say the visual impression of the weave is different.

[20]   But I don't believe that the weave pattern is

[21]   different.

[22]        I believe it's different looking visually

[23]   because of the angle as I have demonstrated in

[24]   Exhibit 4, the Page 2.

[25]   Q.   Looking at Exhibit 84, Figure 5 there is a

---

**12:53:25-12:54:35**                                    Page 186

[1]    gap between the side of the top panel and the top

[2]    edge of the side panel, correct?

[3]    A.   A gap between the top edge of the side

[4]    panel and the edge of the top panel, is that what you

[5]    said?

[6]    Q.   Yes.

[7]    A.   There is a gap there?

[8]    Q.   Yes.

[9]    A.   Yes, there is.

[10]   Q.   Was that an ornamental feature of your

[11]   design?

[12]   A.   An ornamental feature of my design was

[13]   such that that there was no overhang, which isn't

[14]   really reflected in this Figure 5.

[15]   Q.   That's not really my question.  I'm not

[16]   asking you about overhang.  I'm asking you about the

[17]   gap between the edge of the top panel and the top of

[18]   the side panel.  You see that gap there, correct?

[19]   A.   Yes, I do.

[20]   Q.   And is that an ornamental feature of your

[21]   design?

[22]   A.   In this specific view?

[23]   Q.   Yes, sir.

[24]   A.   No.

[25]   Q.   Why not?

---

**12:54:36-12:56:20**                                    Page 187

[1]    A.   Because you can't tell anything with

[2]    respect to how far out the edge of the top panel

[3]    protrudes or extends.

[4]    Q.   But regardless of how far that top panel

[5]    extends on a horizontal plane, there is, in fact, a

[6]    gap that is visible here as you look at Figure 5

[7]    between the top edge of the side panel and the side

[8]    edge of the top panel, correct?

[9]    A.   That's correct.

[10]   Q.   And is that an ornamental feature of your

[11]   design?

[12]   A.   No.

[13]   Q.   Why not?

[14]   A.   No, that's not an ornamental feature of

[15]   the design.

[16]   Q.   Don't have any explanation for it, why you

[17]   believe it's not an ornamental feature?

[18]   A.   No.  I guess I don't have an answer for

[19]   you as to why that's not an ornamental feature.

[20]   Q.   I'll hand you what's been marked as

[21]   deposition Exhibit Number 2.  Have you seen that

[22]   before?

[23]   A.   Yes, I have.

[24]   Q.   Those are a series of photos related to

[25]   the Mid-West Metal Bay Isle product, correct?

---

**12:56:26-12:57:37**                                    Page 188

[1]    A.   That is correct.

[2]    Q.   You agree with me that the design of that

[3]    product is different -- the visual design of that

[4]    product is different than the visual design of what

[5]    is depicted in Exhibit Number 84?

[6]    A.   No, I would not agree with you.

[7]    Q.   You believe they're identical?

[8]    A.   No.  But I think the general appearance,

[9]    the visual impression is the same, or we wouldn't be

[10]   here today.

[11]   Q.   Do you agree with me that they are not

[12]   identical?

[13]   A.   The visual impression?

[14]   Q.   That the visual features in those two

[15]   exhibits are not the same.

[16]   A.   As I stated before, I think the general

[17]   impression, the general visual impression of the two

[18]   products are the same.

[19]        Are there minute differences?  Are there

[20]   differences in the two products?  Yes.  And if you'd

[21]   like to go through those, we can do that.

[22]   Q.   What are those differences?

[23]   A.   Again, given that I believe the overall

[24]   impression of the two wicker kennels is the same, the

[25]   differences -- what page would you like to start on?

---

---

**12:57:41-12:59:32**                                                Page 189

[1]  Q.  Why don't you go figure by figure.

[2]  A.  They're not marked as figures.

[3]  Q.  Well, then start with Figure 1 of the

[4]  Exhibit 84 and compare that to Page 1 of Exhibit 2.

[5]  A.  Okay.  What I see on Page 1 of Exhibit 2 I

[6]  see two latches.  I see the latch as being a

[7]  different configuration than those depicted on any

[8]  page of Exhibit 84 that happens to show a portion of

[9]  the front, which just so happens to be the front page

[10]  of Exhibit 84, Figure 1, Figure 2.  And that's it.

[11]     I'm looking at Page 2 of Exhibit 2.  I

[12]  see -- you were only talking about the differences,

[13]  right?

[14]  Q.  That's correct.

[15]  A.  I see notches along the bottom portion of

[16]  the side panel as well as along the top portion or

[17]  edge of the side panel.  Those notches are

[18]  functional, and they're required for the assembly of

[19]  this product.

[20]     I see generally the same window in the

[21]  side panel of the product shown in Exhibit 2 which

[22]  happens to be a Mid-West Bay Isle product.

[23]     It's in the upper half.  It's generally

[24]  the same size and shape as that shown in Exhibit 84

[25]  design patent.

---

**12:59:32-13:00:57**                                                Page 190

[1]  Q.  In looking at Figure 5 of Exhibit Number

[2]  84 design patent and comparing that to Page 2 of

[3]  Exhibit 2, do you agree that there's a difference in

[4]  the weave pattern?

[5]  A.  In the general weave pattern?

[6]  Q.  In the weave pattern.

[7]  A.  Well, the general weave pattern is the

[8]  same.  Okay.  You'll notice there are two vertical

[9]  strands of resin rattan that run vertically about

[10]  every inch or so along the product.

[11]     Now -- and then that along with the

[12]  horizontal strands of resin rattan that are woven in

[13]  and out of -- or in front of and behind those

[14]  aforementioned double vertical strands, that's the

[15]  exact same weave pattern that is shown in either

[16]  Exhibit 84 or Exhibit 4.  When you compare these two

[17]  weave patterns, they're exactly the same.

[18]  Q.  Are you ignoring the square weave patterns

[19]  that appear in exhibit --

[20]  A.  I hadn't gotten to that part yet.

[21]  Q.  All right.

[22]  A.  Now, there is the differences being which

[23]  I think are indistinguishable in the overall general

[24]  appearance of this side panel.

[25]     There happens to be a square pattern

---

**13:01:01-13:02:38**                                                Page 191

[1]  that's different than the overall weave pattern of

[2]  the product in the remainder of the view.  Whereas in

[3]  Exhibit 4 the side panel has a diamond in the center

[4]  of that overall general weave pattern that happens to

[5]  be the same as the Bay Isle product as depicted in

[6]  Exhibit 2.

[7]  Q.  Excuse me for interrupting.  But am I

[8]  correct that you are now comparing Exhibit 2 to

[9]  Exhibit 4 when I was asking you to compare Exhibit 2

[10]  to Exhibit 84?

[11]  A.  You're correct.  And I apologize for that.

[12]  Q.  So if you look at Exhibit 84 at Figure 5,

[13]  please describe the differences you see.

[14]  A.  I see -- I see a graphic representation --

[15]  Figure 5 is a graphic representation of a look and a

[16]  weave -- an overall weave pattern that is the same as

[17]  what's shown in Exhibit 2 on page -- the second sheet

[18]  of Exhibit 2.  In terms of the general weave pattern

[19]  throughout that side panel with the exception of the

[20]  square areas is the same.

[21]  Q.  And that those square areas appear on Page

[22]  2 of Exhibit 2, correct?

[23]  A.  That's correct.

[24]  Q.  And the graphic representation in Figure 5

[25]  of Exhibit 84 earlier we talked about there being the

---

**13:02:44-13:04:14**                                                Page 192

[1]  appearance of two different weave patterns in the

[2]  lower base part of the panel and the area immediately

[3]  below the window, correct?

[4]  A.  That's not what I agreed to.

[5]  Q.  Well, whatever you said -- I thought that

[6]  you said that you agreed that there was the

[7]  appearance in this particular graphic representation

[8]  that appears in Figure 5 of Exhibit 84.

[9]  A.  Difference of what?

[10]  Q.  Two different weave patterns.

[11]  A.  No.  I think it's the same weave pattern.

[12]  Again, the appearance is different -- the appearance

[13]  of that weave pattern is different as your eye moves

[14]  up or down on an actual product.

[15]     So that would lead you to think it's a

[16]  different weave pattern.  But when you look very

[17]  closely at -- you see the vertical -- double vertical

[18]  strands of the resin rattan spaced again every inch

[19]  and a half or so across the -- what is the width of

[20]  that side panel in this Figure 5 of Exhibit 84.

[21]     And you also then can see how the

[22]  horizontal strands of that material, be it resin or

[23]  natural or whatever, weaves in and out of those

[24]  double vertical strands of resin rattan.  And I don't

[25]  think -- I don't think this shows that it's a

---

| | |
|---|---|
| 13:04:18-13:06:48                    Page 193 | 13:08:14-13:10:28                    Page 195 |

**Page 193**

[1] different weave pattern.

[2] Q. Page 2 of Exhibit 2 looking at the side

[3] panel there has a singular piece for the side panel,

[4] correct?

[5] A. That is correct.

[6] Q. Figure 5 of Exhibit 84 has - well, I think

[7] you said earlier three pieces - but specifically has

[8] the two piece side panel, correct?

[9] A. I may have been confused there, Mr.

[10] Hinshaw. Could you go back to that prior question --

[11] or could you read the prior question before this last

[12] one?

[13]     (The record was read by the reporter.)

[14] A. And your next question, Mr. Hinshaw.

[15]     BY MR. HINSHAW:

[16] Q. In looking at Figure 5 of Exhibit 84

[17] earlier you said that it has the three pieces

[18] clarifying a third piece being the top panel.

[19]     But other than the edge of the top panel,

[20] Figure 5 has a two piece side panel, correct?

[21] A. That is correct.

[22] Q. Do you believe that Mid-West Metal

[23] purposefully copied the design that is reflected in

[24] Exhibit 84?

[25] A. Yes.

**Page 195**

[1] disagreement?

[2] A. I don't know.

[3] Q. You were up in Indianapolis two weeks ago,

[4] and you heard several members of the Mid-West Metal

[5] design team testify in deposition, correct?

[6] A. That's correct.

[7] Q. And you heard them testify that they took

[8] efforts to not copy your design, correct?

[9] A. Well, yes, I certainly heard that.

[10] Q. Do you have reason to not believe that?

[11] A. I may not have reason to not believe that.

[12] But I don't believe that.

[13] Q. Why not?

[14] A. Because I think -- I think that's

[15] Mid-West's MO.

[16] Q. Do you believe David Clemmons to be an

[17] honest person?

[18] A. I don't know David Clemmons.

[19] Q. So you don't have any reason to believe

[20] that he would not be telling the truth?

[21] A. I don't have any reason to believe that he

[22] was -- that he would or wouldn't tell the truth.

[23] Q. Do you have any reason to believe that Stu

[24] Kerr would not be telling the truth?

[25] A. Again, I do not know Stu Kerr.

| | |
|---|---|
| 13:06:48-13:08:12                    Page 194 | 13:10:32-13:11:43                    Page 196 |

**Page 194**

[1] Q. Do you agree that there are -- that the

[2] two designs are not identical?

[3] A. Again, I think the overall general

[4] impression is that they're the same products. Are

[5] there differences in the detail design thereof, the

[6] mechanical design and everything else about it? Yes.

[7] Q. Do you agree that there's room for

[8] reasonable disagreement about the degree of

[9] similarity or the degree of differences?

[10] A. There's room for reasonable

[11] disagreement --

[12] Q. Reasonable disagreement.

[13] A. Do I believe there's room for reasonable

[14] -- I don't understand the question.

[15] Q. Do you believe that there's room for

[16] disagreement about the degree of differences or the

[17] degree of similarities between the 156 design and the

[18] design of the Bay Isle line?

[19] A. Do I believe that my opinion is different

[20] than Mid-West Metal's opinion? Is that the question?

[21] Q. Do you believe that there's room for

[22] reasonable disagreement?

[23] A. I don't know what reasonable disagreement

[24] is.

[25] Q. Do you believe that there's room for any

**Page 196**

[1] Q. So you don't have any reason to believe

[2] that he's not an honest person?

[3]     MR. GARDNER: Will there be more of this

[4] because this seems pointless?

[5]     MR. HINSHAW: You've made your objection.

[6]     BY MR. HINSHAW:

[7] Q. Do you have any reason to believe that Stu

[8] Kerr is not an honest person?

[9] A. I don't have any reason to believe that

[10] he's either honest or dishonest.

[11] Q. Do you have any reason to believe that Jim

[12] Wingate is not an honest person?

[13] A. Again, I don't have any reason to believe

[14] Mr. Wingate is honest or dishonest.

[15] Q. Do you have any reason to believe that Tom

[16] Swan is not an honest person?

[17] A. Again, I have no reason to believe whether

[18] Mr. Swan is honest or dishonest.

[19] Q. And Steve Smith, do you have any reason to

[20] believe he's not an honest person?

[21] A. I don't believe Mr. Smith has testified or

[22] has provided deposition.

[23] Q. But do you have any reason to believe that

[24] he's not an honest person?

[25] A. Again, I don't have any reason to believe

13:11:46-13:12:01                                          Page 197

[1]    **that he's honest or dishonest.**
[2]         **MR. HINSHAW:** We'll suspend the deposition
[3]    at this point until we reschedule it.
[4]         **MR. GARDNER:** Very good.
[5]         (Deposition adjourned at 4:15 p.m.)
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

                                                           Page 198

[1]              C E R T I F I C A T E
[2]
[3]
[4]    STATE OF GEORGIA:
[5]    COUNTY OF FULTON:
[6]
[7]              I hereby certify that the foregoing
[8]    transcript was taken down, as stated in the caption,
[9]    and the colloquies, questions, and answers were
[10]   reduced to typewriting under my direction; that the
[11]   transcript is a true and correct record of the
[12]   evidence given upon said proceeding.
[13]              I further certify that I am not a relative
[14]   or employee or attorney of any party, nor am I
[15]   financially interested in the outcome of this action.
[16]              This, the 11th day of May, 2008.
[17]
[18]
[19]
[20]              AMANDA UPTON, CCR-B-1523
[21]
[22]
[23]
[24]
[25]

## 1

**1** 61:16;95:16;131:5,10,
25;133:6,7,11;134:2;
150:21;163:4;173:4,5,9;
179:21;180:21;181:5,20;
189:3,4,5,10
**10** 107:22;111:6
**10/612,589** 131:13
**10:05-10:20** 53:8
**100** 129:6;174:9,10,12,
14,18;176:9
**101** 130:21;135:24;
137:20
**102** 146:5;150:18
**103** 150:5,21;153:2
**104** 165:6,8
**105** 165:15
**106** 165:21;167:5
**107** 165:24;168:2
**108** 166:2;167:5,10,18
**109** 166:5,5;168:1;178:10
**11** 113:8;117:15,18;118:1;
126:1;127:23
**11:45-12:40** 99:8
**110** 166:9;168:1
**111** 165:6;166:12
**113** 170:12
**114** 171:6,20,21;173:3,7,
8
**115** 172:13;173:5,6,8,9
**116** 173:19;174:4,9,10,
12,17
**11th** 116:11;127:10;
130:15
**13202** 165:10
**13301** 162:3
**14** 169:10
**14th** 169:18
**156** 98:3;100:16;168:14;
170:21;176:9;194:17
**1959** 5:18
**1977** 17:25;18:9
**1981** 57:4
**1982** 18:9
**1983** 19:11,12,18
**1993** 19:19
**1995** 21:9,11,13,15,17;
24:14
**1996** 25:5,23
**1997** 27:11,12;77:3
**1999** 28:18;89:7,9
**1st** 58:9,10,11

## 2

**2** 129:23,23;130:5;163:4;
172:20;173:6,7,9,13;
181:9,23;185:24;187:21;
189:4,5,10,11,11,21;
190:2,3;191:6,8,9,17,18,
22,22;193:2,2,2

**2:00-2:20** 142:5
**2001** 28:21;30:25,25;
31:1,3;37:11;42:1;66:11;
71:14;91:2;94:21,22;
104:15,18;145:18;160:1;
161:10
**2002** 58:22;61:11;65:11;
94:25;102:9,13,23;103:2;
104:9,12;108:5,21;113:8;
114:16;116:4,9,11;117:11,
15,18;118:1;119:17,20,24;
126:1;127:24;129:10;
130:5,12,13,15,16;135:9;
144:6;145:19,20;162:17,
20;169:10,18;172:7,17,20
**2003** 34:17;58:10;61:16,
20;62:1
**2004** 8:12;34:18;58:9,11
**2005** 8:13;132:3
**21** 102:13,23;103:2;104:9,
11;108:5,21
**22nd** 132:2
**27** 102:9;172:7
**2783** 174:15
**29th** 117:11
**2nd** 65:11;129:10;130:12,
13,16;144:6;172:16

## 3

**3** 131:8;132:1;149:8;
163:5;171:19;172:21,22;
173:8,10;174:3,4;181:14,
25
**3:00** 164:7
**3:40-3:42** 178:16
**30th** 135:9
**3531** 133:23
**3532** 131:19
**3631** 106:20
**3648** 112:17
**381** 5:16

## 4

**4** 118:4;131:5;161:21;
163:5;173:10;178:5;
181:19;182:2;185:1,24;
190:16;191:3,9
**4:00** 164:8,18
**4:15** 197:5
**4th** 5:18

## 5

**5** 21:10,13;97:6,7,8,18,19;
108:24;109:12;131:6;
163:5;173:10;182:8,20;
183:15,19;185:14,25;
186:14;187:6;190:1;
191:12,15,24;192:8,20;
193:6,16,20
**50/50** 59:4;60:1

## 6

**6** 131:6
**62** 97:12

## 7

**7** 97:6,7,18,19

## 8

**8** 116:15
**8:50-8:51** 14:24
**84** 64:24;95:14,17;96:5;
97:24;105:6;106:9;129:13;
133:6,7,11;134:8;137:8;
138:6,18;140:22;141:14;
142:12,24;144:7;149:8;
154:16;158:21,23;160:2;
161:11;162:25;163:21;
173:25;174:8;178:19;
179:1,14;185:14,25;188:5;
189:4,8,10,24;190:2,16;
191:10,12,25;192:8,20;
193:6,16,24

## 9

**9** 106:19;110:3,6;111:1;
117:9
**93** 66:6,25;67:19;68:7,16;
76:20;77:18;90:19;123:6;
155:24;156:1,13,21;
157:14
**94** 72:5;106:24;107:12;
155:20
**95** 93:20,25;96:3;97:4;
98:6,10;103:15;121:16
**96** 99:13;102:4;106:15,21;
160:11
**97** 27:23;76:17;77:6;
111:17;112:23;115:18;
116:15;117:9;126:14,22,
23;127:4;130:16
**98** 113:24;127:19
**99** 27:23;76:17;125:25
**9th** 114:16

## A

**ability** 7:7,10;151:9
**able** 97:11;123:12;135:2;
151:23;185:11
**above** 109:6,9;168:4
**absolutely** 119:15;
141:15;159:7;26:11;72:25;
78:1;89:14
**absorb** 168:6
**accent** 158:13
**accommodated** 88:8
**accomplished** 89:19

**accounts** 32:1
**accurate** 46:1,6;60:23,24;
71:14;91:3
**accused** 7:18;12:3,7,24;
13:13,14;15:6;58:4
**acknowledgement**
73:22
**acknowledging** 74:10
**acquired** 28:13
**across** 192:19
**act** 57:4
**active** 151:14
**actively** 76:21;77:18;91:6,
13
**activities** 20:3;61:3,7
**activity** 62:23
**actual** 137:20;184:20;
192:14
**actually** 12:13;22:23;
100:25;112:5;129:23;
146:19;147:15;150:21;
173:23;183:25;184:25;
185:13;174:2
**add** 109:22;110:4
**added** 61:25
**addition** 51:13
**additional** 72:18;115:19;
116:4;134:22;146:25
**address** 72:23;74:15,22;
77:11;117:2
**addressed** 152:18,22
**adjacent** 95:22
**adjourned** 197:5
**advise** 175:12
**advised** 175:8
**aesthetic** 20:18;24:2;
26:24;29:5;73:2
**aesthetically** 73:19,23;
75:5,18;76:23;77:4;83:3,6;
91:7,12;93:5
**aesthetics** 90:10,16
**affiliate** 19:20
**affiliated** 8:7
**affiliation** 125:3
**affirmative** 11:15;91:19;
130:6;157:5
**affordable** 101:21
**aforementioned** 190:14
**afternoon** 16:9,17
**again** 46:2;47:14,22;
54:11;61:19;62:12;88:6;
90:7,18;97:10;105:10;
107:2,21;110:24;117:4;
119:5;120:2;122:16;130:5;
154:16;159:24;170:15;
176:20;180:18;181:16;
183:17;185:8;192:18;
26:18;43:8;48:20;71:9;
73:9;77:13;78:6;129:24;
139:21;175:20;181:11;
188:23;192:12;194:3;
195:25;196:13,17,25
**against** 11:8

**agent** 54:5;99:19,22
**agents** 125:9,13,17
**ago** 16:25;52:7;179:2;
195:3
**agree** 36:20;97:8;135:18,
20;154:13;158:2;173:25;
183:14,19;184:1,4;185:15,
18;188:2,6,11;190:3;
194:1,7
**agreed** 74:2,5,7;192:4,6
**agreement** 9:6;13:19,21,
24;14:6;54:18,23;55:5,7
**ahead** 65:24;93:19;94:14
**airplane** 25:11
**airplanes** 20:16
**Alabama** 15:25;21,25;
26:3;30:2,6;58:16;101:3;
136:8
**Alex** 46:13,13,15,22;
53:12,20,22,24;54:5;100:2
**allegations** 10:4;11:7,21;
15:4,7
**alleged** 10:14
**Allen** 34:9;37:8;38:22;
42:12,14;43:20;49:17,18;
51:19;53:19;88:17
**Allen's** 42:16
**allow** 164:14;176:13
**allowed** 58:16;83:20
**almost** 143:7;148:8
**along** 22:5;56:3;62:25;
70:19;119:6;145:1;167:9;
189:15,16;190:10,11
**alternate** 123:2
**alternative** 83:4,5;165:17
**always** 144:24,25
**American** 28:8
**amongst** 125:11
**analyze** 84:20
**and/or** 103:20
**Anders'** 177:5;179:18;
180:19;181:1
**angle** 184:7;185:23
**animal** 149:18
**Ann** 88:21
**another-n-e-s-s** 87:8
**answered** 139:4;142:25
**apart** 112:17
**apologize** 108:3;141:8;
167:16;191:11
**appear** 74:14,21;94:10;
98:2;99:3;172:6;190:19;
191:21
**appearance** 42:2;47:7;
81:10;105:4;137:3;138:11;
143:1;156:5;179:20;182:7;
183:7;188:8;190:24;192:1,
7,12,12
**appearances** 180:20
**appearing** 24:11;27:7;
29:2;54:10;80:18;180:10
**appears** 94:12;102:5;
112:8;149:15;171:7,12;

172:16;180:13,13;184:3;
192:8
**application** 49:25;50:14;
51:16,21;129:9,12;130:9;
132:9,11,18,24;174:8,11;
175:19;176:11;129:19;
130:3;131:13
**applied** 41:1;43:6,7,10;
47:11,14;48:13,16,21,23,
25;49:3;148:18
**applies** 63:1,2;152:4
**apply** 49:19,20;149:5
**APPMA** 126:7
**approached** 144:14;
145:14
**appropriate** 85:6;170:18
**approval** 39:22;40:5
**approve** 170:24
**approximately** 24:16
**April** 25:5;135:8;136:23;
172:16,20
**Arant** 144:12
**area** 34:14;35:3,5;38:4;
48:25;64:18;70:14,17,24;
71:1;103:21;123:15;124:2,
3;180:5,6,9,10;181:18;
182:15,16;184:15;185:16;
192:2
**areas** 122:18;124:6;
191:20,21
**arguments** 11:21
**Arlington** 15:23;27:22
**around** 24:17;25:4;28:20;
34:11;47:20,20,24;63:18;
69:10;72:11,17;91:2;
120:5;123:8,12,16,17,19,
22,23,25;151:14,24,25;
153:24;154:4,8,9,11,12;
182:22
**Art** 112:3
**article** 127:7
**articles** 73:14;126:10;
162:19
**artist** 170:17
**aside** 62:1;90:13
**aspect** 20:14;67:22;
179:7,19
**aspects** 22:16;29:19,21;
130:11,12;143:20;178:25;
179:17;180:12;181:21
**assembled** 40:20
**assembly** 95:11;189:18
**assert** 11:20,21
**asserted** 12:17
**assets** 174:24
**assist** 33:9,11,24;93:10;
100:19
**assisted** 12:10,25;20:2
**associate** 5:11
**associated** 22:17;62:25;
125:17
**assume** 27:6;85:20;
111:10;124:11

**assumed** 38:3;145:11
**assuming** 17:9;46:13;
48:24;49:1;69:20;114:14;
115:6,22;121:19;124:4,7;
127:9
**assumption** 178:1
**assurances** 142:21
**assuredness** 80:2;82:20;
89:21;131:24
**attached** 131:17;133:7;
170:3,5,7;131:9
**attachment** 133:2,12;
137:19;131:9,25;134:2
**attempt** 43:5;78:8;160:21;
179:16,16
**attempted** 32:24
**attempting** 166:23
**attorney** 9:9,14,20;10:1;
129:20;143:13;145:13;
168:24;175:8,11,14,17,21,
23,25;176:4,18;129:19;
130:3
**attorney/client** 163:10;
168:20;175:6
**attorneys** 5:9;16:18;
17:14;86:15;96:15;144:13;
180:25
**attorney's** 9:15;144:9
**Auburn** 5:16;30:2,6;
34:11;64:18
**August** 18:8;30:24;
119:19,24;162:20
**automatic** 87:16,18,21;
88:6
**available** 85:25;87:5
**aware** 14:5;49:22;74:19,
25;75:4,10;106:10;170:1
**away** 9:7;108:14;156:24

**B**

**back** 25:2;31:11;41:7;
49:12;70:20;74:24;76:16;
77:3;78:6;85:4;90:18;
94:20;95:17,23;98:13;
102:4;110:10,15;112:19;
113:15,16;115:18;116:24;
124:10;127:1;128:18;
141:25;142:15;143:2;
146:12;151:19;156:19,22;
159:1;162:16;169:1;
181:15,18;193:10;53:9;
110:12
**Backing** 19:20
**bad** 39:14
**bankruptcy** 27:14
**barely** 157:25
**bars** 47:24
**base** 49:25;150:22;151:1;
183:20;184:2,13;192:2
**based** 67:7;73:14;116:14;
127:8,10;130:16;178:1;
107:7

**basement** 70:17
**basic** 6:3;88:9;97:20
**basically** 93:12
**basis** 148:6;163:9;177:20
**basket** 71:23;72:9,10,13;
106:24;107:5,11;159:6
**baskets** 72:19;159:11
**bates** 94:3;97:12;105:24;
106:1,20;108:24;112:5,7,
9,12,16;117:9;129:15;
131:6,18,24;135:24;153:1;
160:11;165:16;171:20,20,
21;174:13
**Bay** 187:25;189:22;191:5;
194:18
**became** 59:18;61:9;62:4;
105:6;130:8
**bed** 81:12;166:8
**beds** 32:6;52:16
**behalf** 125:20
**behind** 115:3;168:16;
190:13
**beholder** 75:20;158:20
**Belenchia** 62:2,10,18
**Belenchia's** 165:10
**belief** 13:7,9;15:11;
170:22
**bell** 80:3,5
**below** 102:11;107:12;
116:18;168:5;184:3,15;
185:16,16;192:3
**Berne** 99:22,22
**Bernie** 99:22,23,24,25;
102:9;109:14
**Bernie's** 100:8
**best** 6:17;42:18;71:15;
88:20;114:14;121:4;136:6,
7;170:7,25
**better** 67:9;180:16
**beyond** 180:16
**big** 63:15;87:9
**bigger** 152:17
**bill** 119:6
**Birmingham** 144:10
**birth** 5:17
**bit** 71:16;117:3;152:11
**bleached** 107:9
**blue** 77:25
**board** 67:12;78:25
**boat** 23:3
**Boeing** 19:14,15;17:20;5,
22;21:3,8;25:2,6,10
**book** 57:7,8
**books** 51:16;78:4;155:14
**born** 17:16
**boss** 39:16
**both** 15:5;68:12;81:23;
87:4;107:6;145:2;172:6;
7:22
**bottom** 94:9;106:8,21;
151:19;167:9;169:11;
174:3;183:15;184:13,23;
185:6;189:15

**bought** 66:11
**Bowling** 5:11
**bowls** 32:6;52:16
**box** 80:8;107:15;110:13,
13;167:11,18
**boxes** 107:9,14,18,23,23,
24;108:8
**Bradley** 144:12
**brand** 87:11;147:25;
162:2;166:23;168:16;
176:15;178:3,11
**branded** 109:24
**branding** 177:6,8,16,18,
21,23;178:1,2
**brands** 83:19,20
**Brandsford** 34:9;37:12;
38:22;44:6;88:22
**Brandsford's** 44:24
**break** 6:21;53:5;142:4;
178:13,14
**breaks** 31:20
**briefly** 14:23,25
**bring** 6:21;116:20;117:11
**bringing** 22:11
**broad** 23:20
**broader** 179:11
**broke** 14:25
**brought** 5:10;62:10,12;
67:14;89:10;107:15,19,24
**brown** 165:9
**bugs** 143:19
**buildings** 19:2
**built** 103:11,13
**bullet** 168:5,7
**business** 14:3;25:14;
29:20;31:12;51:23;52:5;
59:11,12;85:10;101:11;
174:20,22,23;175:3;
176:14
**butcher** 88:21
**butterflies** 79:8
**buy** 159:21;160:14,18
**buyer** 136:16
**BY-MR** 5:5

**C**

**CAD** 97:2
**cage** 43:7;148:2;153:7
**call** 34:24,24;35:18;37:19,
19,21;38:8,10;56:14;
75:11;77:2;87:20;110:1;
135:1;143:19;151:13;
152:9;153:11;163:9;172:3;
32:1
**called** 34:25;35:9;36:3;
37:20;38:2;58:13;79:22;
82:22;153:9
**calling** 35:4
**calls** 6:11;168:20;175:13,
10
**cam** 109:18;110:5
**came** 55:21;65:15,17;

72:23;124:10,20;155:11;
159:16
**campaign** 177:8,16,18,
21,23;178:1,2
**campaigns** 177:7
**can** 7:13;32:8;76:9;88:20;
97:14;105:22;106:1;
107:10;108:7;109:4;115:2,
4,15;116:25;121:4;134:20;
137:16;139:13,14;148:7,
19;152:11;159:12;160:7,
10;163:11;168:23;172:14;
173:1;175:1,5,20;176:19;
178:4;188:21;192:21;41:7;
112:2;114:13;133:15;
134:12;138:3;150:11;
162:21;178:13;184:11
**canoe** 23:4
**capable** 41:15
**capital** 144:19;145:2,5,6
**capitalization** 145:1
**capitalized** 144:25
**capture** 113:9;156:2
**car** 57:7,8
**care** 24:21;31:9;89:12;
156:10
**Carr** 9:21
**C-a-r-r** 9:21
**carried** 52:10,14
**carrier** 70:25;71:4;73:3
**carriers** 90:7,7,11;155:6
**carry** 52:18,20
**cartoon** 81:9
**case** 5:10;7:12,23;8:1,6,
20;9:4,7,10;24:9,25;5,14,
18;11:12;12:8;13:17;14:4;
16:23;17:3;45:18;50:6;
96:15;127:5,5;139:25;
147:17;162:15;167:21;
179:10,22;180:8
**cases** 20:16;181:20
**cat** 70:6,11;71:5;81:4,12,
19,23;82:4,7
**catalog** 165:20
**cataloger** 136:10
**Catlin** 126:1;127:4,9,23;
128:23
**cats** 80:22
**caught** 57:17;174:2
**caused** 124:20
**causing** 125:13
**CD** 169:20,25
**center** 31:16;191:3
**cents** 114:20
**certain** 43:25;44:3
**certainly** 44:21;62:9;
116:10;130:15;131:22;
141:20;148:21;159:2,4;
165:15;167:25;171:9,19;
181:20,22;195:9;125:16;
159:1
**chair** 81:11
**chance** 133:20;170:23

change 43:25;44:3;45:12;
61:24;110:20;111:4,9,10;
117:14,16,22,24;125:17;
110:15
changed 116:16
changes 99:20;102:12;
113:3;115:19,23,24,25;
116:4,7,12,14;117:18,23,
25;125:11,16;127:9,11;
128:19;156:4
changing 125:12
channels 83:20
charge 22:16
check 98:11;146:9
checklist 148:9
Chemical 19:6,25
Chicago 126:7
China 46:19;51:11;100:7,
11;101:9;107:15,19,24;
109:15;120:8,10,13;
121:14,22;123:8;124:13;
125:15;128:18
Chinese 118:8,10;121:3
choice 151:9;163:20,22
choices 83:5
chosen 123:24;152:17
Cinco 21:8,14,17,19;
24:14
circumstances 124:19,
23;125:13
city 17:20,22;38:1;17:17,
23;18:4
claim 55:18
claims 10:12
clarification 179:4,12
clarify 132:4;159:13;
175:21
clarifying 164:22;193:18
cleaned 168:7
clear 7:3;175:19;178:23
clearance 151:22,23
Clemmons 195:16,18
client 175:14
clips 51:15
close 82:16;83:7;105:7;
143:20;162:11
closely 192:17
Co 59:16,18;61:1
code 35:3,5
coil 123:10;182:22
coiled 47:20,24;153:24;
154:4,8,9;183:3
Coleman 21:4,21;22:10,
12,14;23:5,11,15,24;24:3
collapsable 92:20
collapse 95:7,10
collapsed 95:6,8
Collapsibility 92:24
collapsing 96:8
college 18:1,21,4
colloquial 105:11
color 65:25;107:9;155:19;
157:4,13;158:10

colored 158:8,9
colors 158:14,15
Columbus 100:14
combination 182:19
combined 129:21,18;
130:2
combining 90:20
comfort 53:5;178:14
coming 35:19;36:4,7,11;
76:19;77:16,18;80:17;97:7
comment 162:9;167:14;
181:5
committing 58:4
common 73:17;88:11;
92:16,22
commonsensical 73:21,
24
communicate 15:24;
121:7,11,9
communication 37:9,13,
15;99:19;175:13;176:18
communications 163:10,
18
Community 18:4
companies 74:9,14,20;
76:5;77:10,11;86:3;
121:22;124:13
company 7:21;10:21;
11:5,8,18;12:2;14:3,13,19;
20:1;27:14;28:7,11,13;
31:5,10;58:7,13;59:14,16;
60:22,25;61:4,10,16;
62:14,16;85:9;100:6;
104:22;120:8,10,13,16,20,
21;121:21;125:3;174:24;
10:19,25;12:13;13:14;
19:14;21:4;25:2;27:18;
58:13,19,21,24;59:6,9;
165:18
compare 105:5;141:4;
173:23;174:9;189:4;
190:16;191:9
comparing 174:12;190:2;
191:8
competition 84:20;85:2;
86:1
competitive 117:6
competitor 109:20,21;
110:1
competitors 85:16
competitor's 84:3,15,19;
85:1,12;86:10,18;88:12
complete 115:20,21;
130:24;137:6,8
completed 18:9;135:6;
137:1;164:24
completely 132:19;
133:13
complies 94:16;111:19;
112:18
component 137:6
components 20:16,21;
94:19

comport 164:16
computer-aided 97:2
concept 55:4;65:17;67:6,
8;83:2;92:1;93:16;115:2
Conception 135:5
concern 36:10
concerned 140:4
concerns 152:18,22
conclusion 73:24;164:9
condition 7:6
condolences 38:11
conducted 176:25
confidential 13:25
configuration 95:3,5,16;
127:12,16;134:7;150:17;
189:7
confirmation 127:1
confirmed 56:17
confused 132:6;193:9
connections 25:24
connotation 80:6,7;82:12
consider 182:21;183:1
considered 57:22
considering 147:16
constructed 49:11;51:11
construction 19:1;135:6;
18:23
consumer 31:13,14;
156:9;162:22
consumers 89:17;90:15;
119:22,23
consuming 166:24;
177:10
contact 34:15,21;35:15;
37:1;53:21,23;54:4;
116:21;143:13;144:17;
176:8
contacted 148:17
contain 67:10;75:8;
173:10
contained 180:5,6
container 118:22
containing 169:21
containment 44:13;53:3;
67:6;73:4;78:9,23;155:2,3
content 134:14
context 15:16;68:4;96:23;
128:5
continue 147:18;164:8,
17;167:16;168:3;182:1
continued 164:19;167:3
continuous 123:9;182:22
continuously 47:24
contracts 20:9;25:10,11;
54:14
contributed 33:14;154:17
conversation 35:25;
55:21;176:6
convicted 56:20,22
conviction 57:2
convinced 117:19
cooled 70:18
coolers 23:3

copied 157:9;193:23
copies 47:4
copy 45:15;65:25;131:11;
134:10,24;167:15;168:4;
195:8
corner 94:9;178:12
corners 95:20;180:14
corporation 62:7;64:5;
58:18
corrected 112:22;162:8;
167:13
correctly 15:5;16:21;
102:13;148:24
correlate 96:4
cost 101:20,21
counsel 131:2;163:12
Counselor 106:10
couple 51:6;67:11;88:5
course 6:4
courser 185:6,8
court 5:22;6:4;7:2;66:5;
72:4;93:24;99:12;111:16;
113:23;129:5;130:20;
146:4;150:4;165:5;170:11;
171:5;172:12;173:18;8:15;
9:3
cover 87:14,21;88:7;
122:18;165:25;166:3;
167:6,12
covered 41:17;45:24;
46:5;92:9;103:11;124:5;
162:16,21;181:18;182:3;
183:9
covering 66:22;67:13
covers 75:11;76:1,9;
77:10;165:22
co-workers 30:19
Craig 126:1;127:4
crate 38:17;47:12;49:6;
50:3;51:17;52:12;69:13;
72:24;73:3,18,22;75:11,
14,17,19;76:1,9;77:10;
81:14;83:3,6;84:3;87:1;
90:20;91:8,8,12;93:5,13;
97:21,24;98:19;99:3;
100:16;103:5,25;109:16;
122:11;124:14,14;128:3;
135:18;136:25;145:15,23;
146:23;149:4,5,8,15,19;
151:14;153:7;160:6,14,18;
177:3
crates 52:18;70:10,23;
74:10,21;75:1;76:22;77:4,
9;89:17;90:16;92:23;
101:7,10;118:8,16;121:5;
151:12;155:4,5,5;157:7,
10;159:22;160:3,15;
162:13,16,22;165:17;
177:1,4
Crawford 62:18;63:24
create 48:15;50:18;78:8,
23;88:2,3;166:23
crime 56:20,21,22

crocheting 161:4
cross-examination
164:13
cubed 118:22
curious 144:20
current 146:24
currently 85:22;100:12
curved 82:2
custom 116:19
customer 128:20;135:2,
25;136:1;162:22
customers 56:3;119:23
cylindrically 81:21,22

D

Dallas/Fort 34:14;38:4;
89:11
dark 165:9
date 5:17;65:11;71:8,11,
17;118:18;127:10;130:16;
132:1;144:7;165:19;
172:15;173:20
dated 126:1;129:10;
132:2;148:8;169:10,18;
172:16
dates 121:17;132:16;
172:4,6
daughter 136:14
David 195:16,18
day 21:9,17,17,20,22;
60:20;70:13;66:11
days 60:22;120:6
day-to-day 31:23
de 21:8,14,17,19;24:14
deal 20:17
dealt 17:5
Dean 170:13,16;171:23
Dean's 172:19
December 18:9;31:1,3;
37:11;42:1
decide 120:17;122:21
decipher 114:13
declaration 131:9,22,23;
132:7,17,23;133:3;134:9;
135:5;137:19;170:5;
129:18;130:2,22;131:4,10,
17
decor 67:16,23
decorative 24:2;26:25;
29:5,10;45:24;46:5;67:1,6,
22;78:9,23;87:14;88:7;
97:23;98:1,2,5;130:7,11;
137:24;138:1,9,12,21,23;
139:8,20;140:2,8,11,17;
154:23;156:4;165:21,24;
166:8;167:6,11,19;168:4;
178:25;179:9,10
decorativeness 139:16
defendant 10:18
defendants 11:1
Defendant's 66:2;72:1;
93:21;99:9;111:13;113:20;

125:21;129:2;130:17;
146:1;150:1;165:1;169:6;
170:8;171:2;172:9;173:15
**defense** 11:21
**defenses** 11:16,25
**defer** 180:23
**define** 9:2;26:18;52:23;
53:1,2;56:21;83:23;85:16;
98:5;117:22;174:22;177:8;
12:4;33:11
**defined** 58:25;104:7;
124:2,3
**defining** 29:22,22;83:21;
93:14;103:21,21;179:8
**definition** 138:3
**degree** 18:10,12;194:8,9,
16,17
**degrees** 18:14
**delivery** 13:1
**demonstrated** 185:23
**denote** 147:23
**department** 22:14
**depend** 158:6
**depends** 86:8;98:4
**depict** 40:21
**depicted** 96:5;97:24;
98:10;126:22;142:11,23;
147:4;150:25;161:11;
179:1;188:5;189:7;191:5
**depictions** 165:18
**deplete** 120:3
**depose** 164:18
**deposed** 5:19,25;6:1;
7:12
**deposition** 16:2,19,22;
64:24;66:1,6;93:25;
111:17;125:25;129:6;
130:21;141:3;146:5;150:5;
161:21;164:10,10,14,15,
19,23;165:5;170:12;171:6;
172:13;173:19;174:9,10;
187:21;195:5;196:22;
197:2,5
**derived** 47:7
**describe** 29:17;32:3;
40:16;43:16;48:19,22;
50:8;62:22;63:6,12;81:20;
92:6;103:18;106:2;138:19;
167:19;191:13;33:16;
43:15;70:16;71:2;75:12;
103:8
**described** 48:5,8;49:4
**describing** 82:21;180:21
**description** 7:13;48:12,
17,18;50:14
**descriptions** 51:10,14
**design** 20:18;23:16,18;
25:12;26:24;33:14;42:9;
45:24;46:4;65:3,4,14,16,
18,98:3;105:6;106:9;
129:12;130:8,11,12;132:8;
133:11;134:8;136:25;
137:3,5,24;139:7,19;

141:13;142:10,12,20,25;
143:5,14,14,20,23;144:7,
14;145:14;146:22,24;
151:5;152:14;153:13,15;
154:18,21,24,25;155:7,8,
13;158:21,23;159:17,21;
160:2,15;161:11,13,15;
162:4,25;168:13,17,21;
176:12;178:22;179:13,14;
181:4;186:11,12,21;
187:11,15;188:2,3,4;
189:25;190:2;193:23;
194:5,6,17,18;195:5,8
**designed** 50:10;67:10;
153:7
**Designer** 28:8
**designing** 26:22
**designs** 29:6,10;76:10;
155:16;194:2
**detail** 151:2,3;194:5
**detailed** 40:19
**details** 49:2;93:16;165:13
**determine** 87:20;96:18;
98:4
**determining** 87:13
**develop** 15:11,14;23:12;
74:20;75:1;100:3
**developed** 22:19;33:5,7,
21,23;45:23;46:4;54:12,
19,24;67:11;78:8;80:16;
154:21
**developing** 15:6;20:18;
22:23;23:16,17;33:9;42:9,
25;85:21;99:20;154:25;
155:8
**development** 12:10,25;
20:13;26:16,18;33:12,25;
45:22;96:11;74:1,4;84:17;
100:15;150:8,13,19;20:15
**device** 44:14;53:3;82:16;
131:12;135:6,7
**devices** 155:2,3
**diameter** 152:19,24;
154:6,9,11,13
**diamond** 47:17;49:5;
108:19,22;110:8,9,15,17,
21;118:5;122:22;123:1;
135:19;156:10,14;157:7,
14,17;158:9;162:4,9,10,
13,18,23;163:1,21;164:2;
166:15,19;167:1,23,25;
168:10,13,16;171:18,23;
173:10;174:17,21;175:3,9,
18;176:11;177:17,20;
191:3
**Dick** 34:8;37:8;38:22;
42:12,16;49:17;53:19,20;
88:17
**difference** 68:20,22;
147:11;156:16;157:19;
158:11;174:3;179:5;190:3;
192:9
**differences** 188:19,20,

22,25;189:12;190:22;
191:13;194:5,9,16
**different** 67:23;82:21;
88:3;95:2;96:8,19,20;
105:8;118:24;120:21;
121:3,22;123:9;128:15;
132:11;147:13;152:16;
155:15;158:9;184:2,12,14,
17,19,19,21;185:4,12,15,
19,21,22;188:3,4;189:7;
191:1;192:1,10,12,13,16;
193:1;194:19
**differently** 95:6
**difficult** 6:14;141:9
**dimensional** 150:20
**dimensions** 87:13;93:15
**direction** 113:2;135:7
**directly** 157:1
**director** 29:16;83:16
**disagreement** 194:8,11,
12,16,22,23;195:1
**discern** 172:23
**discernability** 158:5
**discernable** 157:25;
158:11
**disclosed** 10:11
**disclosure** 168:20
**discriminating** 44:16
**discuss** 34:2;42:14
**discussed** 24:9,12;27:2;
42:15;43:2;175:23
**discussing** 40:7
**discussion** 55:13;56:8,
10,12,15;93:18;133:18
**discussions** 24:8;73:11,
13;83:4,11;90:14
**disengaged** 95:21,22
**dishonest** 196:10,14,18;
197:1
**dismissing** 9:3
**displeasing** 90:11
**disposed** 128:13,17
**disposing** 108:14;128:16
**dispute** 14:2,7
**dissatisfied** 125:14
**distinction** 68:10
**distributor** 11:11
**division** 15:1;19:5,24,25;
28:6
**divulging** 175:6
**doc** 105:20
**docs** 130:14
**Doctors** 109:24;160:6,20
**document** 13:8,11;96:23;
102:6,15;106:11;108:24;
112:8,24;113:11,25;114:2,
3,5,24;115:25;116:14;
118:18;129:7;130:24;
131:1;132:1,2,20;133:12;
134:14,20;135:23;171:8,
13,25;172:23;173:3,21
**documents** 13:2,3;16:3;
17:2,4;105:15,17,19,21;

22,25;189:12;190:22;
191:13;194:5,9,16
106:2;110:24;111:22;
119:5;125:6;134:20;174:7
**Dodge** 17:23;18:4
**dog** 13:18;70:4;91:8;
165:10;89:20;90:1,2
**doghouse** 52:22;78:11,
12,17;82:8,24
**dogrampcom** 8:8
**dogs** 68:2
**dollars** 57:6;114:19
**done** 73:15;78:2;85:7,8;
86:21,23;89:25;90:2;93:8;
101:9;108:17;120:25;
123:11;127:10;137:13;
138:16;146:17;155:10;
161:7
**Donna** 62:2,9,18;165:10
**door** 48:14;81:18,25;
82:15,15,16,18;109:13,15,
18,19;110:5;141:24;180:3,
4,5,6;181:10,11
**doors** 139:14;140:19;
141:20
**doorway** 82:10
**doorways** 81:17
**Doskocil** 15:21;27:17,19,
24;28:1,17;53:25;54:6;
67:4,5;71:5;73:9,10;74:2,
4,5,6;76:6,15;77:6;78:7,
16,17,22;79:9,16,22,24;
80:21;83:1,8,9,14;84:2,6,
25;87:11,18;88:1,15;89:3,
6,15,20;90:3;92:18
**Doskocil's** 76:4;87:11
**Dothan** 136:8
**double** 98:11;184:9;
190:14;192:17,24
**Dow** 19:5,5,20,24,25,25
**down** 6:5;31:21;70:23;
95:19,23;96:1;115:11;
116:18;147:7;185:16;
192:14
**dozen** 86:24;87:2
**DP** 25:19;26:5,17;27:10,
13
**Dr** 136:11,13;160:18
**draw** 99:2
**drawing** 40:20;41:15;
48:16;93:13,15;97:2;
98:25;103:24;122:25;
173:6
**drawings** 40:12,13,14,16,
19,21;41:3,10,16,16,19;
22;42:4,15;43:2,5,8,11,25;
44:4;45:4,6;46:10,12,14,
22,24;47:6,9,16,23;48:7;
49:12;50:12,13;51:10,13;
93:7;94:10,18;95:3,15;
96:4,8,11,22;97:5,20,23;
98:6,17;99:5;103:11,12,
13,14,16;121:13,15,16,19;
122:6,9,13,17;150:6,19;
153:9,11;170:18,20;

171:17;174:21;175:4;
40:15
**drawn** 96:3
**Drive** 5:16
**dropped** 14:10
**drove** 152:14
**duly** 5:2
**duplicate** 122:2
**duplication** 111:24
**Dura** 148:4
**durable** 111:11
**duration** 168:15
**Dura-wicker** 147:8,12,24
**during** 24:18;25:6;53:24;
69:21;75:5;76:14;77:6;
121:19
**duties** 29:17

## E

**earlier** 52:15;72:20;78:19;
82:25;91:5;104:11;105:10;
153:19;167:14;170:4;
178:24;179:11;191:25;
193:7,17;82:21;146:22;
155:10;178:19
**early** 89:8;104:19;118:17;
136:23;150:18
**easily** 168:7
**easy** 117:12
**edge** 95:21;186:2,3,4,17;
187:2,7,8;189:17;193:19
**edges** 95:18
**effect** 151:18;153:21
**effective** 101:21
**effort** 75:21,23,24;77:11,
13,14,15
**efforts** 29:4;74:13,15,20,
25;75:4;78:6;177:9;195:8
**eight** 70:18,19
**either** 64:5;89:20;118:21;
125:5;137:19;167:21;
172:14;190:15;196:10
**elaborate** 31:20;67:2;
81:6;142:24
**elaboration** 81:7
**element** 168:4
**eleven** 24:17,24
**else** 16:14;21:1;22:19;
32:8;33:17;34:3;56:8,11;
59:2,24;64:2,10,13;71:24;
92:4;123:11,22;137:15;
138:14,15;139:15;142:1;
154:17;169:5;180:17;
194:6
**email** 34:22;37:16;56:18;
148:13;169:9,11,12,17;
170:7;172:15,19
**emails** 37:3,5
**embodying** 131:12
**employed** 23:15,24;
37:10;53:25;73:9;84:2
**employee** 60:22;61:6,12,

17,25;62:1;64:5,6;165:10
**employees** 60:25;61:10;
62:7,14,16;63:20;84:25;
101:3
**employment** 15:16;
24:20;54:13,14;71:10;
76:15
**enclosed** 126:7
**end** 67:9;104:19;148:20
**ended** 110:4
**ending** 94:5
**ends** 81:23;145:2;152:6
**engaged** 177:6
**engineer** 19:16
**engineering** 18:13;19:8;
20:6,10,11,20;23:22,23;
26:21
**ensure** 88:8
**entered** 27:14
**entire** 124:4,5
**entirely** 152:8
**entity** 58:15;59:7;100:2
**environment** 67:25;68:3,
4
**envisioning** 92:13
**equipment** 26:8,22,25;
27:7
**essence** 92:8;113:6;
134:5
**essentially** 82:1;96:4;
170:4;96:6
**evaluate** 85:1,25;88:1;
143:13
**evaluating** 83:12;84:4;
88:13
**evaluation** 22:6;87:22
**evaluations** 22:1
**even** 156:11;154:3
**evening** 69:19,21
**everybody** 27:15
**exact** 82:12;118:18;
180:19;190:15
**exactly** 122:15;147:3;
157:11,12;190:17;73:5
**EXAMINATION** 5:4
**examined** 5:2
**example** 44:17;47:16,21;
48:1;95:14;128:21;182:20;
184:7;185:1
**except** 124:6
**exception** 191:19
**exchange** 58:17
**excited** 41:21
**excuse** 19:11;125:8,8;
127:15;133:7;151:3;
106:21;153:1;191:7
**exhibit** 66:1;113:16,18;
159:2;178:9,20;190:19;
64:24;66:6,25;67:19;68:7,
16;72:5;76:20;77:18;
90:19;93:20,25;95:14,17;
96:3,5;97:4,24;98:6,10;
99:13;102:4;103:15;105:6;

106:9,15,21,24;107:11;
111:17;112:23;113:24;
115:18;116:15;117:8;
121:16;123:6;125:25;
126:22;127:19;129:6,13;
130:16,21;133:6,11;134:8;
135:24;137:8,19;138:5,18;
140:22;141:14;142:12,23;
144:7;146:5;149:8;150:5,
18,21;153:2;154:16;
155:20,24;156:1,13,21;
157:14;158:21,23;160:2,
11;161:11,21;162:25;
163:20;165:8,15;166:5,8,
12;167:5,10,18;168:1,2;
170:12;171:6,20,21;
172:13;173:3,5,6,7,8,8,9,
19,25;174:4,8,10,10,17,
18;176:9;178:5,10,18;
179:1,14;185:1,4,5;
187:21;188:5;189:4,4,5,8,
10,11,21,24;190:1,3,16,
16;191:3,6,8,9,9,10,12,17,
18,22,25;192:8,20;193:2,
6,16,24
**Exhibit-100** 129:2
**Exhibit-101** 130:17
**Exhibit-102** 146:1
**Exhibit-103** 150:1
**Exhibit-112** 169:6
**Exhibit-113** 170:8
**Exhibit-114** 171:2
**Exhibit-115** 172:9
**Exhibit-116** 173:15
**Exhibit-93** 66:2
**Exhibit-94** 72:1
**Exhibit-95** 93:21
**Exhibit-96** 99:9
**Exhibit-97** 111:13
**Exhibit-98** 113:20
**Exhibit-99** 125:21
**exhibits** 168:3;188:15;
165:5
**Exhibits-104-111** 165:1
**exist** 58:15;140:23;141:18
**existed** 31:5
**existing** 155:2,3,4
**exists** 58:20
**expectation** 164:8
**expense** 88:6
**experience** 65:20
**experimented** 91:14
**explain** 95:12,13;152:5
**explanation** 128:19;
187:16
**explore** 143:4
**extends** 187:3,5
**extent** 181:9;182:3
**exterior** 137:6
**extra** 115:12
**eye** 68:19;75:20;158:20;
192:13
**eyes** 166:23

**eyesight** 185:7

## F

**fabric** 75:13
**fabricate** 50:20
**fabricated** 46:10;67:12;
116:19
**face** 173:7
**facilities** 63:7,10
**facility** 42:5;63:8,15;
100:25
**fact** 68:12;116:1;127:14,
14;139:12;153:21;162:10;
164:6:170:3;175:12;181:5,
16;183:8;187:5
**factories** 122:7;125:7,8,
12,14,18
**factors** 152:13
**factory** 46:14;51:8;
100:19;107:16,20;108:4;
121:2,9,10,14;122:20;
123:8;124:16,24;125:16;
128:18
**fair** 44:22,23
**fairly** 161:16
**fairness** 7:1
**fall** 27:11,12,23,23;28:18;
89:7,8
**falls** 151:17
**family** 70:4;80:24;89:12
**far** 16:23;77:3;88:23;
130:13;148:7;183:12;
187:2,4
**Farmer** 88:16
**fax** 172:3,4,14
**feature** 92:22,22;96:8,9;
104:7;138:13;141:21;
151:23;157:9;163:14;
182:21;183:2;186:10,12,
20;187:10,14,17,19
**features** 26:25;29:5;
40:22;43:25;44:3;45:12;
49:21;97:24;98:1,2,10;
135:3;137:24;138:1,9,10,
20;139:6,19;140:1,10,16,
22;141:17;142:11,11,23;
143:24;154:18;161:13,15;
178:22,25;179:13;181:4,
24;182:2,18;188:14
**February** 15:25;113:8;
114:16;116:10;117:15,18;
118:1;130:15;132:2;
136:24;169:10,18
**Federal** 8:14
**FedEx** 62:24
**feeding** 32:6;52:16
**feel** 6:20
**feelings** 85:3
**feet** 63:19;70:18,19;
141:23
**fellow** 84:25
**felony** 57:23

**felt** 31:8;39:5;44:12;67:15;
111:11
**female** 44:10
**few** 115:19;179:2
**field** 19:8
**fifty-six** 158:15
**figure** 67:17;108:7;112:7;
138:9,9,18,18;140:22,22;
141:16;148:12;151:7;
178:4,21,21;179:14,14;
189:1,1;95:16;133:6,7,11;
149:8;163:4,4,4,5,5;
172:21,22;173:4,5,6,7,8,
13;174:3,4;179:21;180:21;
181:5,9,14,19,20,23,25;
182:8,20;183:14,19;
185:14,25;186:14;187:6;
189:3,10,10;190:11;191:12,
15,24;192:8,20;193:6,16,
20
**figures** 95:17;137:7;
140:21;173:9;180:22;
189:2
**figuring** 150:19
**file** 11:15;17:9,10,13;
170:3
**filed** 8:9,14,18;65:12
**filing** 144:6;176:8
**fill** 118:21
**filled** 162:10
**final** 126:18;143:20;
173:22
**finalized** 130:7,10;
137:25;155:13;158:21,23;
159:17,21;160:2,15
**finalizing** 161:10
**finally** 165:16
**find** 26:2;101:13;109:17;
125:5;126:7;173:20
**finding** 25:14;43:1;100:19
**fine** 108:4;6:23
**finish** 18:7;83:15;146:14;
165:9
**finishes** 119:2
**firm** 9:19,23
**first** 5:2;18:22;20:4;33:3,
16;45:23;46:4,14;61:1,11;
65:15,17;66:13,15;73:7;
76:12;95:3,6,7,8;97:9;
102:5,24;103:4,6;104:8,
12,23;105:4;107:18,25;
108:2,10,18;118:7,14;
124:10,16;126:4;135:22;
136:3;138:12;142:6,16;
143:3;144:13;145:13;
146:20;148:17,20;162:15;
176:8;178:6;179:15;6:10;
146:19
**Fiskar** 29:14,16
**Fiskars** 28:2,5,7,11,14,
16,22;29:14,15,24;30:5,7,
10
**F-i-s-k-a-r-s** 29:16

**fit** 67:22;88:8
**fitness** 26:25;27:7;25:19;
26:5,8,17;27:10,13
**five** 64:16,17;94:14;111:2
**flimsy** 152:11
**Florida** 9:17
**flower** 29:11,19;28:23
**fluids** 168:6
**focus** 171:11
**focused** 139:6
**fold** 95:18;96:1;151:8,10,
13,16,19;152:2,3
**folded** 95:23,24;151:2
**folder** 17:9
**folding** 151:3,23
**folks** 84:16;88:16,25;89:2
**followed** 154:25;155:8
**follows** 5:3
**food** 32:6;52:17
**foot** 70:19;118:21,21
**footboard** 81:13
**foremost** 138:12
**forging** 14:2
**forgot** 63:23
**form** 49:24;58:8;59:9;92:9
**formal** 177:3
**formed** 15:19;47:25;
58:21;59:16;61:22;89:4;
117:10,20
**forming** 117:13;131:10
**forms** 81:10
**forth** 180:20
**forty** 118:21,21;120:6
**forward** 76:19;169:20
**Foster** 109:24;160:20
**Fosters** 160:6,19
**found** 24:24;128:8
**foundation** 39:24,25
**four** 94:11;119:1,20;
121:6,22;124:12;125:7
**fourteen** 168:17;176:12
**fourth** 124:21
**frame** 30:25;41:25;
104:14;121:20;123:12;
133:9;159:13
**framed** 183:2
**framework** 94:1
**fraud** 58:5
**Fred** 124:25
**free** 26:9
**frequency** 84:13;86:22
**frequent** 84:11
**frequently** 84:9;86:21
**friends** 15:21
**front** 48:9;95:17,23;131:5;
141:24;146:13;147:5;
171:9;173:7;179:24;180:2,
4;189:9,9;190:13
**fronting** 50:9
**full** 5:12;6:25
**fully** 133:13;142:9
**functional** 140:24;141:18,
21;189:18

Jeffrey Simpson
May 2, 2008

Case 3:06-cv-00901-WKW-WC    Document 73-8    Filed 08/13/2008

Simpson Ventures vs.
Midwagmal Products
Page 58 of 56

functions 23:23;26:21
furniture 43:19;44:16;
47:15;67:9;80:22,23;81:5;
82:4,7,23;123:5

**G**

gap 186:1,3,7,17,18;
187:6
Garden 17:17
Gardner 13:5;16:13;
39:24;53:4;74:16;93:17;
106:12;132:4,14;133:15;
159:12;163:8;164:7,25;
168:19;175:10;176:16;
178:13;196:3;197:4
Gary 34:6;38:21;53:17,
18,20;55:10;56:2,9;88:17
gather 115:4
gathered 96:14
gauge 154:2,3
gave 49:18;65:21;67:21;
123:15
GDA 29:25;30:21;31:2,7,
18;32:4,11,23;33:18,21,
23;34:3;35:21,22;37:11;
38:21;39:17;40:1;41:24;
42:1,5,6,8,16;45:23;46:3,
8,16,21,25;49:12,15;
51:23;52:9;53:11,12;54:1,
7,13,20,22,25;55:16,18;
56:4;65:8;69:18;71:10;
88:25;89:4;105:2
GDA's 31:11
general 7:13;83:23;92:8;
95:9;137:3;158:4;179:20;
188:8,16,17;190:5,7,23;
191:4,18;194:3
generally 8:3,5,11;14:9;
39:4,5;43:22;45:2,3;70:20;
71:8;91:23,24;95:13;
189:20,23;10:13;14:10;
36:3;53:2;113:2
gentleman's 12:20
Georgia 101:4
Giant 125:2
given 5:22;13:4,7;21:24;
30:9,14;188:23
gives 185:11
giving 108:14
global 68:3
goes 151:16
gonna 141:4
good 39:6,9,11;67:24;
73:6;107:3;155:9;197:4;
5:6
goods 31:15,22,25;32:2
goodwill 174:25
Gorilla 109:4,16,23;
116:24;160:9
gosh 142:14
graduate 17:24;18:16
graduated 18:21

graphic 170:17;191:14,
15,24;192:7
greater 34:14;38:3;180:6;
182:16
grocery 57:14
ground 6:3,8
group 24:5;25:9;29:9;
84:17;89:3,4
guard 57:19
guess 39:5,12,13;40:13,
18;63:18;82:18;90:1;
104:13;105:11;119:7;
132:17;143:6;150:15;
166:11;173:1,2;180:21;
187:18
guessing 46:18;86:24;
89:25;136:4
guesstimate 136:6,7
guilty 57:20
guys 70:3

**H**

half 53:6;82:1;86:24;87:1;
119:20;152:23;156:22;
181:7,15;182:10;189:23;
192:19
hand 96:3;161:20;187:20
Handbooks 54:16
handed 66:5;72:4;93:24;
99:12;111:16;113:23;
129:5;130:20;146:4;150:4;
165:4;173:18
handing 125:24;170:11;
171:5;172:12
handle 116:17;149:4,7,9,
10,11;181:14
handles 148:23
hands-on 128:19
handwriting 102:5;
114:23,24;146:8,10;150:6;
171:7,11,12,15,16
handwritten 102:8
happen 169:24;182:6
happened 27:12;31:2;
47:2;108:10;127:22,25;
128:11
happens 167:21;182:5;
183:22;189:8,9,22;190:25;
191:4
happy 89:11;125:14
hardware 31:15
head 6:13,13;69:23,25;
149:18
headboard 81:13
heads 94:2
hear 79:15;122:8;126:18;
141:7
heard 28:8;35:19;36:7,10;
38:9,14;78:10;158:17,18;
195:4,7,9
hearing 79:21;181:2
heated 70:17

heights 96:20
help 42:8;45:23;46:3,11;
62:11,13;88:1;108:8;
114:10;138:3
helped 24:20;46:8,9
helps 7:1,2
hereto 131:9
Herzher 70:8
Herzher's 162:2;177:19,
22,25;178:6,11
hesitating 52:21;119:16
hey 38:14;77:7
hide 75:16,17
high 17:18,24;118:22
higher 146:23
highlight 158:6
highlights 167:23
hinge 95:18;105:12,13
hinges 151:14
hinging 152:6
Hinkle 62:19,20;63:24,25
Hinshaw 5:8;97:11;
101:23;111:24;115:5;
118:17;124:15;127:18;
137:2;140:4,15;147:22;
152:5;159:12;163:15;
169:15;173:2;174:1;
176:20;183:18;193:10,14;
5:5;14:22,25;15:3;40:3;
41:7,12;49:10;53:7,9,10;
65:24;66:4;72:3;74:18;
93:19,23;98:13,16;99:11;
101:25;102:3;104:4;
106:10,18;111:15;112:2,4;
113:22;125:23;129:4;
130:19;132:10,12,21;
133:17,19;142:3,7;146:3;
150:3;159:15;163:16;
164:1,17;165:3;169:3,8;
170:10;171:4;172:11;
173:17;175:16;176:24;
177:15;178:15,17;193:15;
196:5,6;197:2
Hoffman 11:4,8;12:21;
14:16;15:5,13;88:23
holds 60:15
hollow 111:8,12
home 31:15;45:24;46:5;
69:13;73:4;94:19;126:8;
181:20,24;182:2,6,8
homes 68:5
honest 195:17;196:2,8,
10,12,14,16,18,20,24;
197:1
Hong 46:23,25;47:10;
51:10;99:19;100:1,11;
116:21,25;124:16
H-o-n-g 124:18,19
hope 126:6
horizontal 187:5;190:12;
192:22
hour 16:11,16;53:5
house 35:13;44:13,14;

70:14;71:19;72:11,17;
92:12;159:11
housed 88:8
households 77:8
housing 75:9
huh-uh 6:12
hundred 80:1;89:21;
119:8;142:21;147:21
hundredths 111:3
hyphen 148:4

**I**

idea 36:14,21;39:6,9,11,
15;40:9,11;41:21;43:20;
45:3;56:7;57:16;65:15,21;
66:13,15,20,25;67:20,21;
69:17,23;70:21;71:7,8,19;
72:11,14,22,24;76:20;
77:17;90:19;91:17,25;
92:3,6;93:4;97:6;104:18;
143:10;155:11;157:6;
159:16,20,25;161:9
identical 188:7,12;194:2
identification 66:3;72:2;
93:22;99:10;111:14;
113:21;125:22;129:3;
130:18;146:2;150:2;165:2;
169:7;170:9;171:3;172:10;
173:16
identified 61:12;65:5,8;
72:22
identify 73:7;113:16,17;
122:8;140:9,10,16;177:9
ignoring 190:18
image 167:20;168:16;
177:10
images 81:8;167:6
imagine 133:4
imitation 67:13;79:1
immediate 143:7,9
immediately 93:3;
143:16;192:2
impact 151:9;154:7
implies 11:13
important 44:11,12
impressed 152:8
impression 91:25;140:8,
18;184:22;185:5,12,19;
188:9,13,17,17,24;194:4
improve 29:5
inappropriate 84:22,25;
85:7
Inc 58:7;59:19,22;60:4;
61:9,22;62:5
inch 111:3;152:23;190:10;
192:18
include 23:2;163:13;
177:17
included 23:2;29:18;
123:3;132:17
includes 143:23;183:16
including 131:11;174:25;

101:7
inclusion 170:19
inclusive 112:15
income 61:12
incorporate 73:13
Incorporated 27:18
increased 154:6
Independent 139:23
Indianapolis 195:3
indicate 30:17
indicated 22:2;30:14;
99:6;122:25;131:25
indistinguishable
190:23
individual 103:22;144:18;
180:13;182:12
indoor 44:13,16;67:6;
78:9,10,12,17,23;80:23;
82:8,24;126:8
industry 88:12
information 45:17;
134:15,22
infringe 12:17;15:12
infringement 10:6;11:9,
22;13:17
infringing 7:18;10:15;
11:10,14;12:3;13:15;15:6
inherently 175:12
initial 32:9;119:10;120:4,
8;122:17,25;127:12
initially 151:19;66:19
initiate 55:24
injection 71:3
ink 98:24
input 24:2
inquire 144:20
inserts 63:2
inside 75:14
inspire 67:20
inspired 66:25
inspiring 72:13
instance 86:12
instances 86:16;87:2;
120:19
instead 111:8
instruct 163:10;175:14;
176:16
instructed 49:5;123:19
instructing 109:14,17
instruction 123:7
instructions 49:19,23;
50:14;51:14;95:11;124:10
intellectual 83:10;168:15;
176:14
intend 164:21
intended 75:8;113:17;
130:25;133:2
intending 131:18
intensive 101:18,19
intention 164:12
interacting 30:18
interchangeably 102:18;
179:3;68:13

interchanged 142:19
interchanging 138:22
interest 88:10
interested 181:2
interfere 7:7,10
interior 25:11,11
internal 87:13;152:7
internally 78:16
International 100:1,5,6,
22;113:3;114:9;120:17;
121:11;125:4,19;127:20
Internet 78:3;155:15
interpreting 177:18
interrogatories 45:16;
91:1
interrogatory 16:4;45:15;
71:12;125:6;139:4,21,23;
140:25;141:5;179:18;
180:24
interrupt 143:25
interrupting 108:3;191:7
intimate 181:25
into 31:21;62:4;69:25;
119:4;138:18;156:14;
157:10
introduced 178:8
invention 10:10;54:24;
131:12;130:23;131:4,17
inventions 54:19
inventor 7:16,25;8:6;55:4;
65:5,9;141:11,17;181:3
inventory 63:1;120:3;
126:10
invoicing 162:20;12:6
involve 22:18;54:9;80:17
involved 12:18;22:22;
23:14,15;26:20;29:1,4;
83:10;88:25;101:4;146:23
involving 79:1
Isle 187:25;189:22;191:5;
194:18
issue 11:12;181:16
issued 132:8;133:8,10
item 12:6;138:11;183:7
items 56:4

**J**

jail 58:2
James 5:8
January 58:9,10,10,22;
61:16,20;102:9,13,23;
103:2;104:9,11;108:1,5,
21;117:11
Jeff 172:20
Jeffers 136:7,10,11,12,
13,17;137:10,18
Jeffers' 136:13
Jeffrey 5:14,1
Jim 14:25;79:20;89:22;
196:11
job 18:22;24:24;26:2;
27:3;31:2,17;38:12;

42:16;117:13
John 144:18;145:5;
148:13,17;169:9,12,17;
172:19,20;176:5
joined 15:2
joint 106:6
Jonathan 64:11
Jonathan's 64:12
Jordan 88:23
jpg 170:3
judging 142:13
jugs 23:3
Julie 34:9;37:12;38:22;
44:6;88:22
July 28:20;30:24;133:9
June 126:1;127:10,23

**K**

K-1 61:14
Kansas 17:17,18,23;18:4;
21:6;24:23;25:16;57:3
Kathy 59:1,23;60:11
kd'd 95:6
keep 7:3;47:4
keeper 141:24
Kelly 99:25;100:9,10
Ken 88:22
kennel 33:1,2,5,7,10,13,
15,17,20,22,25;34:2;
35:20;36:4,8,11,14;38:23;
39:2,23;40:1,5,7,23;41:1,
5;42:9,11;43:2;44:7;49:6;
52:12,20,24;53:1;55:4,19;
65:3;66:17,20,22;92:9,14;
99:21;103:11;109:10,25;
113:6;114:15;125:10;
134:7;137:3;138:12;
139:13,13,17;140:7,18;
152:9;154:23;162:2;173:4;
180:15
kennels 92:12,19;107:2,
4;155:6;188:24
Kerr 195:24,25;196:8
Kevin 88:18,22
keyed 116:16
kind 28:22;49:20;52:20;
54:18;58:17;70:10;73:17;
78:2;81:8;97:1;121:23,24;
158:14,20
kinds 19:23;20:7,22;
22:25;31:14;60:22;155:15
Kleijan 34:6,16,19;36:15;
37:1;38:21,25;39:1,16,21;
40:4,8;41:3,20;44:2;53:19;
55:10,14;88:17
K-l-e-i-j-a-n 34:8
knitting 161:4
knob 116:17
knockdown 67:8;82:23
knowledge 14:17;23:6;
42:19;49:16;71:15;74:12;
151:12;170:7;171:1;

181:25
known 78:16;104:24
Kolozvari 88:18
K-o-l-o-z-v-a-r-i 88:21
Kong 46:23,25;47:10;
51:10;99:19;100:1,11;
116:21,25
K-State 57:3

**L**

label 108:25;112:7;
129:15;131:18
labels 62:24;63:2;94:3;
112:5
labor 101:17,19
lack 67:9;180:16
lading 119:6
laminate 67:13
lamination 79:1,2,5
language 126:4;131:14;
150:23
large 115:11,12;126:8;
127:13;154:2;156:14
larger 154:11;162:11
last 15:24;16:9;34:15;
35:15;36:25;37:1,8,12,14;
46:17;53:21,23;64:12;
88:19;98:20;100:8;106:15,
20;110:7;115:25;117:8;
135:11;144:21;145:2;
146:15;178:5,5;193:11;
6:24;15:25
latch 109:13,15,18,20;
110:5;116:19,22;117:23;
137:14;141:24;189:6
latches 117:5;189:6
late 25:23;30:25;34:17;
37:14;89:8;104:14;16:9;
89:8
later 25:5;164:11,16
Lau 46:13,13,15,22,25;
47:9;49:5,13,16,19;50:13;
51:9,15,18,20;53:13,22,
24;54:5;100:3;105:1
L-a-u 46:18
law 9:19,23;58:16;60:18;
176:13
lawsuit 8:9,14,17;11:16;
12:18;15:5;17:5;96:23;
142:18
lawsuits 142:18
lawyer 13:4
lawyers 16:6
lead 192:15
learn 161:5
learned 161:16
least 15:7;71:22;75:21;
76:10;121:6;125:18;160:5;
182:13
leave 30:7,8,10;31:7;
89:3;120:17
left 21:8;28:1,17;31:4;

181:25
42:1;83:8;122:20
left-hand 114:19;178:12
length 94:1
lengths 96:19
less 180:9;51:3
letter 34:22;37:16;56:18;
126:1;145:3,6
levels 115:16
library 78:4
licensing 83:10
lid 183:23
life 176:12
liked 45:3
liken 161:3
liking 92:3
limitation 168:17
line 23:2,4;31:11;32:3,11,
13;33:3;76:6;81:4;85:17;
92:18;101:5;194:18
lines 22:17;54:7,8;103:20,
21;166:19
links 95:20,22;96:19;
141:23
list 119:6
listed 11:5;60:7;135:3
litigation 128:6
Littenberry 64:9
litter 79:15,22;80:8;82:13,
14;87:4,9,14,16,18,21,
25;88:7,9,10;165:21,24;
166:2;167:6,12;79:18;
87:15;88:1
L-i-t-t-e-r 87:16
little 6:8;71:16;105:22;
140:3;158:12;172:4
live 24:22;64:18
living 80:23
LLC 10:20,25;29:25;
45:23;46:3;58:14,15,17,
19,21;59:6,9,16,18;61:1;
62:4;64:5;69:18;165:19
LLC's 58:25
LLP 144:12
locate 116:22
located 35:12;99:7;
108:11;124:25
location 41:10;99:6;
103:16;183:8
locations 41:17;43:9;
48:14
lock/latch 116:15
logo 177:19,20;178:7,11
logos 178:3
long 16:10;18:24;19:17;
27:10,19;50:17,24;56:6;
59:15;119:3,9;120:3;159:8
longer 21:20,25;30:13;
58:20;64:6;168:15;176:15
Loo 89:20;90:1,3
look 24:2;45:25;46:5;
64:23;68:20;69:2;73:6,22;
94:15;103:25;106:3,5;
110:24;111:18;114:18;

122:1;131:8;134:21;
140:21;146:19;148:13;
149:8,24;153:18,20,22,24;
154:1,20,22;155:9,14;
167:5,10;168:1;172:14;
174:1,13;178:18,20;
180:22;184:17;187:6;
191:12,15;192:16
looked 24:20;44:14;81:8;
96:22;128:5;156:13
looking 73:17;76:20;78:3,
3,4;83:21;85:20;112:22;
126:25;130:14;132:16;
147:15;148:16;152:25;
153:1;163:20;174:15;
183:10,14,19;184:25;
185:22;189:11;190:1;
193:2,16;74:24;154:16;
182:20;185:25
looks 97:13,16;98:24;
107:5;162:11;167:15,15;
184:9,14,18;185:5,5,8;
166:17
Looney 81:8
loose 122:21
lot 105:21,21;128:14;
148:21
lower 95:18;184:8;192:2
lowered 111:2
Lunch 99:8
Lynn 124:25

**M**

machines 26:10
magazines 51:15;78:3;
155:14
Maid 87:15;88:1
M-a-i-d 87:16
mail 169:20
major 20:13
makes 117:3
making 66:20;74:20;
80:21;101:4;115:23;116:3;
66:22
male 44:14
man 144:21
managed 20:13
manager 22:13,15;26:15;
57:18
Mansfield 35:13
manufactured 71:4;
78:25;125:19
manufacturer 118:9,11
manufacturers 87:9;
121:3
manufacturing 100:20,
25;120:7;121:5,13,21,22;
124:13;27:17;121:10
many 5:6;6:1;60:25;
61:10;62:7,14;64:15;
67:22;77:8;86:23;103:1;
119:4;121:3;161:7

**March** 136:23;172:6
**mark** 65:24;93:19;148:23, 23;177:10;5:14,1
**marked** 66:2,6;72:1,5; 93:21,25;99:9,13;111:13, 17;113:20,24;125:21,25; 129:2,6;130:17,21;146:1, 5;150:1,5;161:20;165:1,5; 169:6;170:8,12;171:2,6; 172:9,13;173:15,19; 187:20;189:2
**market** 22:25;67:15; 73:14;83:22;88:9
**marketing** 12:11;13:1; 22:13,16,20;26:9;29:16, 21;83:16;177:1;29:19; 83:18;177:2
**marketplace** 22:20; 83:22;85:25;92:16
**material** 45:25;46:6; 54:10;67:1,24;68:8,17; 79:11;80:9;83:5;147:14; 148:1,4;158:8,9,10; 180:11;183:10;192:22
**materials** 17:13;24:12; 29:2;80:18;91:11;94:15; 96:14
**matter** 7:14;135:3
**matters** 5:25;145:22
**may** 52:22;61:6;72:18; 77:5;78:18;82:24;96:18, 18;103:20,23;113:10; 130:24;132:5;142:20; 148:5;159:11;163:9,11,12; 168:21,24;180:23;193:9; 195:11;19:10,11;21:10,12; 28:2;65:11;66:11;70:25; 118:18;129:10;130:5,12, 13,16;131:3;142:2,6,16; 144:6;157:4;162:17
**maybe** 30:3;60:21; 110:24;114:1;134:21; 136:23;142:14;158:11; 86:24
**Mayo** 21:9,14,17,20; 24:14
**McCullough** 88:22
**MDF** 67:12;78:25
**mean** 12:5;22:15;23:17, 19,21;29:21;32:22;33:19; 41:13,14,25;67:2;68:1,3; 76:8;79:5;83:11;91:21; 93:3;112:11;115:1,22; 119:21;122:14,15;143:25; 145:2;149:1,7,23;151:11; 156:8;157:24;160:4; 177:18
**means** 38:11;134:12,13
**meant** 21:15;68:4,21; 126:24
**mechanical** 23:23;26:20; 95:2,5,15;141:19;143:23; 150:17;164:3;194:6;18:13

**mechanisms** 152:6
**medical** 7:6
**medications** 7:9
**medium** 115:11;162:1
**meet** 16:6
**meeting** 16:16;137:10
**meetings** 16:18
**members** 58:25;195:4
**memory** 48:11;128:15,22, 24
**men** 44:16;158:14
**merchant** 136:16
**merely** 15:11
**merged** 62:4
**merger** 90:2
**messes** 68:2
**met** 5:6
**metal** 43:7;47:11;49:24; 50:3,9;51:17;92:23;103:5; 160:14,15,18;15:2;45:17; 187:25;193:22;195:4
**Metals** 5:10
**Metal's** 194:20
**Miami** 9:16
**mid** 119:19
**middle** 112:8;114:18; 148:22
**midpoint** 106:6
**Mid-West** 5:9;15:2;45:17; 86:13,17,25;187:25; 189:22;193:22;194:20; 195:4
**Mid-West's** 195:15
**might** 43:25;44:3;45:12; 91:11;143:3;179:2;180:25; 183:11;184:6;16:11
**Mike** 88:16
**military** 18:19;20:9
**mind** 11:14;44:19;77:1; 81:7;97:11;136:1;163:23; 169:1,16;172:24;179:12
**minimal** 96:17
**minute** 188:19
**misdemeanor** 57:23,24
**Missiles** 20:25
**missing** 97:9
**mistake** 167:17
**misunderstood** 15:9
**Mitchell** 88:22
**mixup** 111:22
**MO** 195:15
**model** 101:11;118:24,25
**modified** 79:6;112:23
**molded** 71:3
**moment** 76:19;111:18; 143:9;146:14
**Monahans** 19:22
**Monday** 169:21
**money** 13:22;14:11,13, 16,19
**Monopril** 171:10
**month** 51:5;119:12
**months** 18:25;24:17,24;

51:1;119:20
**moon** 82:1
**Moonpie** 165:10
**more** 6:8;23:13;32:15; 40:24;44:12,15;66:18; 76:24;89:13;105:22; 111:11;115:23;125:12,14, 14;144:8;152:12;153:21; 154:7,7,11;181:17,17; 185:6;196:3;51:5;52:7
**morning** 5:6
**most** 178:9;181:2
**mostly** 179:25;180:5
**Mother's** 66:11
**move** 185:5
**moved** 138:17
**moves** 192:13
**much** 103:14;104:11; 143:11;151:11;153:4; 157:3
**must** 116:16;150:18
**myself** 59:1;62:1,9;59:23; 62:18

## N

**name** 5:7,12;9:13,19,21, 23;10:1;11:5;12:20;25:8; 28:7;46:17;63:23;64:12; 78:18;80:3,5;82:12;88:19; 100:8;104:22;120:7,13; 124:16;125:2,5;136:11; 144:18,21;145:2;147:16, 19,25,25;176:15;177:10
**named** 10:17;141:16
**names** 64:20;88:24; 124:12
**natural** 68:20;69:3;143:8; 192:23
**nature** 10:4,10;11:7,24; 42:22;67:1
**Neal** 5:11
**necessarily** 153:20
**necessary** 140:13,14
**need** 6:20;106:1;132:15; 165:12
**needed** 30:13
**needs** 117:10
**negotiations** 83:11
**neighborhood** 57:6
**neither** 12:12;164:5
**new** 22:11;23:12;24:20; 85:21;88:2;113:16,18;84:1
**newborn** 24:21
**newer** 178:11
**news** 38:15
**next** 24:15;27:16;70:1; 91:17;93:2,3;96:1;147:7; 178:5;193:14
**nobody** 154:17;33:14
**nodding** 6:13
**None** 97:23
**Non-infringement** 12:1

**non-moving** 182:16
**nook** 81:22
**nor** 12:13;42:24;147:20; 161:5;177:25
**north** 39:15
**notated** 124:6
**notches** 189:15,17
**note** 43:17;102:8;107:7,8
**notes** 148:7
**notice** 157:13;190:8
**notion** 77:7
**novelty** 139:1,4;179:8
**November** 5:18;19:19
**number** 35:1;97:12,12, 16,17;101:12;105:24; 106:1,20;112:12;117:9; 131:6;134:1;153:1;160:12; 162:3;165:9;66:6,25;72:5; 93:25;99:13;103:15; 111:17;112:23;113:24; 125:25;129:13;137:20; 138:6;146:5;150:5;161:21; 162:25;165:6,24;166:2,5, 5,9,12;167:10;172:13; 173:19;178:10,19;179:14; 183:6;187:21;188:5;190:1
**numbering** 97:5
**numbers** 94:10;112:10

## O

**Oak** 5:16
**object** 96:4;163:8
**objection** 168:19;196:5; 39:24;175:10
**objects** 69:10;71:18; 72:16;108:8;159:10,18
**oblong** 81:22
**obtain** 18:10;143:14,14; 168:15
**obtaining** 25:9;100:7; 143:4;144:14;145:14
**occurred** 16:23;77:23
**o'clock** 164:18
**October** 19:12,18;104:14, 19
**odors** 168:6
**off** 5:7;14:22;109:17; 122:3;133:15;183:12,12; 93:17
**offer** 38:10,11,12;85:22; 87:23;127:20
**office** 37:24;116:21; 173:24
**officer** 15:1;60:3,14
**officers** 60:8,12
**offices** 9:15;42:5;46:23; 63:8;144:9
**Off-the-record** 93:18; 133:18
**Ohio** 100:14
**oil** 20:1,2
**old** 78:4

**Once** 6:2
**one** 5:9;7:4,12;13:10; 16:16;45:22;51:5;61:25, 25;63:16;65:8,25;68:21; 70:19;71:22;76:24;86:12; 87:8,17;94:11;95:7,8,10, 21;96:16;101:12;103:1; 107:17,18,24;109:25; 114:5;115:5;116:16; 118:21,21,25;119:1; 120:20;124:20;125:7,8,9; 127:1;130:24;134:1;136:1; 150:17;151:17,20;152:1,1; 153:17,23;155:21;156:17; 160:5;164:4;165:8;166:15; 168:5;181:13,22;183:6; 193:12;94:13;103:3; 146:14
**ones** 88:6
**one-third** 156:23
**O-n-g** 124:17
**only** 51:7;52:21;65:25; 75:10;76:9;78:6,21;81:7; 89:1;96:16;99:6;100:18; 115:4,19;119:15;122:17; 124:15;127:20;137:5; 164:10;173:1;176:12; 189:12
**onto** 41:1
**OO3530** 131:6
**Opelika** 25:21,24;26:2; 34:11;64:18;145:10
**open** 81:24
**opening** 149:19
**openings** 83:24,25
**operate** 59:10;100:25
**operating** 59:13;63:21
**opinion** 75:23;152:10; 194:19,20
**opportunities** 29:23; 83:21
**opposed** 6:12;151:6; 154:8;168:17
**option** 116:20
**order** 6:7;84:3;86:5;88:12; 112:5;118:7,10,14,24; 119:10;120:4,8
**ordered** 85:12;86:9; 87:23,25;88:4;118:19; 119:1
**ordering** 84:15,19;85:1; 86:18,25
**original** 103:12,13
**originally** 114:1;145:10; 152:23
**ornamental** 20:18;40:22; 49:20;138:20,23;139:7,19; 140:1,11,17;142:11,20,23; 143:5;154:18;156:16; 161:13,15;163:21;178:21, 25;179:7,13,17,19,20; 180:12,19;181:4,21,24; 182:18,21;183:1,6;186:10,

12,20;187:10,14,17,19
**others** 74:1,6;84:6;
100:22;74:4
**otherwise** 97:2;176:19
**out** 6:25;20:6;35:19;36:4,
8,11;52:5;62:22;66:21;
67:17;68:7,16;82:17;
85:24;88:10;93:13;97:15,
16;108:7;112:7;119:21;
138:5;141:16;143:19;
149:23;150:19;151:7;
152:6;160:3,4;184:11;
187:2;190:13;192:23;
77:25
**outdoor** 43:18;47:14;
52:22;123:5
**outer** 154:4
**outermost** 151:15
**outline** 157:17,20;162:9
**over** 6:8;7:4;46:19;49:12,
15;50:12;51:10,14,18,20;
96:1;98:18;100:11;101:9;
109:15;112:19;121:14;
123:8;124:13;125:15;
151:2;156:23,24;157:23
**overall** 40:19;65:18;81:9;
91:25;93:15;138:11;
139:16;140:8,18;154:20,
22;156:4;179:19;182:7;
183:6;188:23;190:23;
191:1,4,16;194:3
**overhang** 180:14;181:11,
12,16;182:14;186:13,16
**overridden** 120:20
**own** 52:25;54:23;59:21;
152:10
**owned** 10:7;28:11
**owner** 8:8;55:4;57:17
**owners** 58:23
**ownership** 55:18;56:7;
58:12;59:4;60:1;159:8
**owns** 54:19

# P

**P000057** 94:8
**P000058** 94:9
**P000090** 146:19
**P000091** 146:12
**P002783** 174:13
**P002991** 171:21
**P003531** 131:18,25
**P003628** 160:12
**P003631** 110:6
**P003643** 112:10
**P003648** 117:9
**P003649** 112:7
**P003655** 112:15
**P00OO95** 148:22
**P0OOO2** 165:16
**P0OOO93** 148:13
**P3531** 131:23
**package** 160:7

**packaging** 109:23;
160:11
**packing** 62:22,25;63:2;
119:6
**page** 94:10,13;102:5;
106:15,20;114:18;117:8;
129:22;131:6;133:22;
146:12,15,20;147:7;
148:13;150:22;151:4;
165:16;172:16;178:5;
188:25;189:8,9;191:17;
97:6,7,18,19;110:6;
129:23;133:23;146:12;
148:22;150:21;171:19;
185:24;189:4,5,11;190:2;
191:21;193:2
**pages** 94:1;97:5;111:25;
112:12;113:9;131:5,7;
146:9;171:7
**paid** 14:11,13
**palate** 158:16
**pan** 79:16,18,23;82:13,
14;87:9,14,16,18,21;88:7,
10;117:10,20,20,24;
165:21,25;166:2;167:6,12
**panel** 40:19;41:17;48:9,
15,17,23;95:21;106:7;
110:12,15;111:1;124:4,5;
149:9;151:24,25;167:11,
20,22;180:4,4,9;181:10,
13,15,18;182:9,11;183:2,
24;184:20,22,23;186:1,2,
4,4,17,18;187:2,4,7,8;
189:16,17,21;190:24;
191:3,19;192:2,20;193:3,
3,8,18,19,20;110:11
**panels** 47:21,25;95:18,
23;96:19,20;110:9;123:9;
146:24;151:15;152:6,15;
180:9,13;181:12;182:12,
14
**pans** 87:4,4,21,25;88:9
**paragraph** 110:7;126:5;
106:19;107:22;108:24;
109:12;110:3,6;111:1,6;
116:15;117:9;118:4;131:8,
25
**Paragraphs** 131:5
**Parking** 56:25
**part** 7:21;15:7;24:5;27:2;
29:9;33:2;57:5;74:3;
105:20;117:6;126:18;
131:10,19,21;132:18;
147:2;149:24;162:3;165:9;
174:7;177:21,22,25;
179:17;190:20;192:2;
16:16
**participate** 33:12
**particle** 67:12;78:25
**particular** 12:6;118:25;
156:1;158:1,3;192:7
**parties** 9:6
**partly** 180:25

**Partner's** 177:19,25
**part-time** 62:11,21
**past** 86:10;136:14
**Pat** 88:23
**patent** 7:15,16,19;10:6,7,
8,11;12:3,18;13:17;15:12;
65:3;98:3;100:17;105:6;
129:9,13;130:8;132:8,9,
11,18,23;133:8,11;134:8;
137:23;141:17;142:12;
143:4,15;144:7,14;145:14,
23;148:18;161:12,19;
163:13;168:14,18,21;
170:21;173:24;175:19;
176:9,11,12;189:25;190:2;
11:9;129:19;130:3
**patents** 13:15;170:19
**Patrick** 11:4
**pattern** 43:12,13,15,16,
18;47:17;49:5;76:2;
108:19,22;110:8,9,18,22;
122:22,22,23;123:1,1,2;
135:19;155:15;156:1,4,10;
158:6;162:4,23,25;163:1;
164:3;166:16,20;167:1,24;
168:1,10,13,16;171:18,23;
173:10;174:17,21;175:4,9,
18;176:11;177:17,20;
184:2,3,14,15;185:15,20;
190:4,5,6,7,15,25;191:1,4,
16,18;192:11,13,16;193:1
**patterns** 41:4;51:21;98:9,
18;99:2,5;121:23,24;
122:10;156:14;190:17,18;
192:1,10
**paw** 76:3,10;177:19,25
**pay** 14:16,19
**payment** 13:21
**payroll** 61:15,18,19;64:20
**pen** 98:24
**penalty** 57:25
**pending** 8:20
**people** 22:5;34:10;64:15,
17;83:1;84:14;109:15;
137:18;160:25
**people's** 67:16
**per** 114:21,22;117:10;
124:10
**perceive** 181:3
**perceived** 77:3;84:14
**percent** 80:1;89:21;
142:21;147:21
**perform** 23:22
**performed** 61:3,6
**perimeter** 152:14
**perimeters** 47:20,25;
123:9
**period** 24:18;25:7;74:24;
75:6;176:15
**perjury** 58:5
**permanent** 116:17
**perpendicular** 185:7
**Perry** 136:12,15

**person** 14:4;37:16;64:4;
140:6;195:17;196:2,8,12,
16,20,24
**personal** 35:11;89:13,14;
152:10
**personally** 10:24;11:17;
61:13;98:17;99:2;161:12;
7:21
**perspective** 173:4
**pet** 10:13;12:16;15:1;17:6;
23:5;24:8;27:6;28:24;
31:15,22,24;32:2,3,11,13,
25;38:17;44:7;45:24;46:5;
47:11;52:10,13,16,18;
54:7;55:19;56:4;59:15;
67:10;68:5;69:10;70:23;
71:3;73:18,22;74:9,10,14,
20,20;75:1,5;76:9,22;77:4,
9,10;83:3,6;84:3,3,15,19;
85:1,10,13;86:3,10,18;
87:1;88:12;89:17;90:11,
16,20;91:8,12;92:23;93:5;
94:19;97:21,24;98:19;
99:3;100:16;101:7;103:5;
109:16;118:8,15;121:5;
124:14;126:8;128:2;
136:10;145:15,23;155:4;
157:7,10;159:22;160:3;
162:1,12,16,21;165:8;
166:8,19;167:2,22;177:1,
3,4;181:20,23;182:2,6,8;
32:6;59:14;71:4;75:8;
136:10,17;137:10,18
**Petmate** 87:10
**pets** 68:5;75:9,9
**petty** 57:1,2
**phone** 34:21,23;35:1
**photo** 106:21,23;107:2,5;
109:23;110:24;116:19;
157:2,4;167:20;168:4;
170:4
**photograph** 109:2,3;
131:12,16;133:1;135:19;
158:1,3
**photographs** 51:15;
162:1
**photos** 109:7;187:24
**phrase** 180:16
**phrased** 161:18
**physical** 117:12
**pick** 156:11
**picture** 105:14,16,18;
109:10;116:22;157:13
**pictures** 105:22
**piece** 82:23;183:15,16,
16,20,21;184:2,13;193:3,
8,18,20
**pieces** 183:22;193:7,17
**place** 118:12,14
**placed** 118:10
**places** 153:14
**plain** 99:1;122:22;163:21
**plaintiff** 7:23;8:6,7;9:24;

**10:2,7,14;14:4,10,11,14,
17,20
**plan** 143:8;164:8,17
**plane** 187:5
**planes** 20:15,21,21
**plastic** 70:25;71:3;73:3;
90:7,11;155:5,5;165:17
**Plastics** 87:8
**play** 72:13;100:15
**played** 100:18
**plead** 57:20
**please** 5:12;6:11,17;9:2;
12:4;32:3,10;33:11;34:7;
35:23;40:2;41:6,8;46:2,7;
47:8,22,22;49:7;50:1;54:21;
64:24;65:15,22;68:25;
73:20;77:1;79:20;81:6;
87:6;88:19;98:12,21;
101:24,25;104:2;107:21;
138:4,19;142:6,16;146:9,
14;159:1,24;163:23;169:1,
15;170:14;172:25;176:19,
21;177:12;179:13;191:13;
126:7;141:8;150:12;
159:23;183:17
**pleasing** 73:19,23;75:5,
18;76:23;77:4;83:3,6;
90:10;91:7,12;93:6
**plural** 29:15;63:4
**pm** 99:8;142:5;178:16;
197:5
**point** 6:22;55:14;90:4,18,
25;102:19,20;108:8;111:2;
115:11;131:20;138:17;
139:2;146:23;168:7;
175:22;184:11;197:3
**pointless** 196:4
**points** 105:12,13;107:10;
115:13;138:25;139:3;
147:1;168:5,5;179:8
**POO2788** 129:15
**POO2988** 171:20
**POO2990** 171:21
**POO3001** 170:3
**POO3009** 150:22;153:2
**POO3531** 135:24
**POO3628** 118:25
**POO3631** 106:21
**POO3643** 112:16
**POO3650** 112:13
**POOOO91** 147:7
**poorly** 50:2
**Popped** 69:25
**pops** 69:25
**popular** 88:9
**porch** 65:18,19;66:10,12,
24;67:18;69:2,5,22;
104:17;143:10;155:12;
157:9;159:17,20;160:1;
161:10
**portal** 81:25
**portals** 81:18
**portion** 25:15;44:21;

134:15;151:15;157:23;
181:7,15;182:10,16;184:8;
189:8,15,16
**position** 60:14
**positioning** 83:19
**possession** 128:1;135:8
**possibility** 175:6
**possible** 53:4;90:5;
117:24
**possibly** 90:14;136:23;
144:4;137:14
**pot** 29:19
**potential** 32:1;56:3;
128:20;138:15;168:20
**potentially** 153:2
**pots** 28:23;29:11
**pottery** 28:6,12,2,7,9
**power** 129:20,18;130:2
**pow-wow** 178:14
**practice** 88:11
**preceded** 54:1;103:1
**precursor** 150:16
**predecessor** 10:21;59:7;
103:15
**preferred** 107:9
**prepare** 16:1,18;41:22;
42:4;98:17;99:5;150:9,14
**prepared** 40:15,17;94:20,
24;104:23;136:1;180:25
**prepares** 170:18,18
**preparing** 93:7
**presence** 164:2
**present** 16:12,22;32:1;
40:11;56:2,11;87:24;
141:22;162:18
**presentation** 131:11;
134:10,11,23,25;135:21;
136:3,19
**presently** 87:23
**president** 39:20;60:16;
100:1;60:6
**pretty** 84:11;88:11;99:1;
92:16;143:11;157:3
**previous** 96:7;134:2;
162:8
**previously** 95:24
**price** 127:20
**pricing** 83:18;115:13,16;
29:22
**primarily** 44:22;151:13;
20:9;95:5
**primary** 63:8;149:11
**principles** 154:24;155:7
**prints** 76:3,10
**prior** 77:16;90:2;104:8;
110:21;116:22;130:12,13;
135:8;144:6;148:20;
178:24;193:10,11;58:12;
59:6;130:22;131:4,17;
142:18
**privilege** 168:21;175:7
**privileged** 163:18
**probably** 30:25;44:12;

70:18;71:4;87:17;90:6;
117:6;142:19
**problem** 72:22;73:1,2,5,
8,11;74:10,15,22;76:22;
77:3,12,19;91:7
**problems** 22:2,4,4
**process** 6:7;99:20;
101:18,19;150:8,13;25:14
**procured** 117:4
**Prodigy** 125:2
**produce** 46:14;78:8;
121:8
**produced** 17:3,14;96:15;
131:2
**product** 10:13,15;11:10,
14;12:2,7,9,13,15,24;13:2;
15:6,11,14;22:13,15,17,
18,23;23:16;24:3;25:12;
26:16,18;32:19,25;33:3;
43:1;54:7,8,12;56:3;63:3,
14;67:8;69:10;74:1,3,4;
75:13;76:6;78:24;83:16;
84:4,17;85:10,17;86:3,13,
17;87:22;88:2,3,12;101:5;
102:12;105:13;119:18,19;
120:22;125:19;140:6;
144:16;150:16;152:13;
156:20;157:16,24;160:8,
11;165:11,22,25;166:6,13,
19;168:11;169:21;170:24;
179:1,20,23;181:8;182:1,
11;184:25;187:25;188:3,4;
189:19,21,22;190:10;
191:2,5;192:14;42:20
**production** 13:8;100:19,
20;118:15;121:1;126:9;
127:7,16;148:20,21;
162:19
**products** 22:25;23:5,12;
24:9;27:6;28:22,24;29:1,6;
31:13,14,15,16,22,24;
32:2,4,11,13;44:20;52:10,
13;56:4;59:14,15;67:14;
75:5,8,10;76:5;78:7;81:2;
82:2,4;84:1,15,19;85:1,13,
21;86:5,10,19;88:13;
100:7;120:25;136:10;
141:22;158:24;165:7,14;
166:6,10,15;167:4;168:9;
177:11;188:18,20;194:4
**program** 19:8;20:2
**project** 25:12;78:16,18,
20,21;79:12,20,22,24;80:14,
15,17,20;82:10
**projects** 20:7,17,20,22;
23:14;24:1;80:21;81:1;
83:2
**promotion** 29:22;83:19
**prompted** 179:4
**property** 83:10;168:15;
176:14
**proposals** 83:11,12
**proprietor** 59:11

**protect** 176:14
**protecting** 174:24
**protection** 143:4,14,15;
144:15;145:15,23;168:18,
22,22;176:13
**protocols** 135:11,12
**prototype** 45:9;24;46:4,9;
50:18;100:3;102:18,22,24;
103:6,10;104:8,12,20,23;
105:5,14;107:19,25;108:3,
11,18;110:21;113:5,6,7;
117:25;118:5;122:3;126:9,
11,12,21,21;127:6,23;
137:20;144:4
**prototypes** 67:11;82:22;
103:1;114:5;128:2,25;
135:13
**protrudes** 187:3
**protruding** 180:15
**provide** 75:9;86:12;117:2
**provided** 13:2;16:4;
17:10;24:2,4;102:12,23;
105:1,19;106:11,13;
110:25;113:5,8;116:22;
117:21;122:2;141:1,5;
179:17;196:22
**providing** 49:2
**public** 166:24;177:11
**pull** 112:17;138:5
**pulls** 63:1
**purchase** 86:8;118:8;
158:22,24;159:18;160:3,5,
5
**purchased** 87:12,15,19;
110:2;125:9;159:1,2,3,4,5
**purchases** 87:4
**purchasing** 160:13
**purely** 139:6;141:18
**purpose** 75:15,16;84:19;
85:15;86:7;141:19;149:11,
12;164:3
**purposefully** 193:23
**purposes** 84:4;88:13;
174:23
**pursuant** 96:23
**pursue** 168:21
**put** 49:6;91:11;121:23;
139:10;157:6;180:20
**putting** 72:24;108:14
**PVC** 111:6,7

**Q**

**qualities** 26:24
**quality** 22:4;30:15;73:2
**quantity** 118:15,19,20;
119:17
**quick** 178:14
**quickly** 170:14
**quit** 164:15
**quotation** 114:2,8;127:19
**quote** 114:10,15,17

**R**

**ramp** 10:13;12:16;13:18;
17:6
**rather** 164:23
**rattan** 24:11;27:7;29:2;
54:9;65:19;66:23;67:21,
24;68:11;72:9;79:10;
80:17;92:10;94:19;99:7;
103:22;107:9;122:19;
123:5;147:16;151:24,25;
167:4;179:21;190:9,12;
192:18,24
**reach** 9:6
**reached** 116:25
**reaction** 44:24;56:5
**read** 16:3;41:7,9;46:2;
49:8;98:14,22;102:1,13;
104:3;110:7;115:2;126:4;
132:19;133:12,20;148:23,
25;163:24;169:2;170:14;
172:24;176:22;177:13;
193:11,13;98:13
**readies** 63:2
**really** 68:12;85:3;186:14,
15
**rear** 149:9;162:7
**reason** 21:23,24;22:9;
30:14,17;52:21;119:16;
127:18;139:13;166:22;
168:12;169:4;174:20,22,
23;175:3;176:10,23;
195:10,11,19,21,23;196:1,
7,9,11,13,15,17,19,23,23;
**reasonable** 194:8,10,13,
22,23,12
**reasons** 30:9,12;89:13,
14;153:17,23
**reattach** 113:15
**recall** 7:7,10,24,25;8:3,5,
10,9:13,19,23;10:1,12;
11:4,19;17:8,13;21:2,10,
19;25:8;26:4;32:8;35:3,5,
8;36:1,9;37:7;39:3;42:10,
17;43:21,22;45:1,4,13,14,
16,20;49:1,2,4;50:25;
52:23;54:11;55:23;57:5,
22;58:1;62:10,12;71:8,16,
21,25;72:16,19;76:1,9,12;
79:21;80:13,20;81:2;82:9;
83:4;84:6;89:18,23;90:4,8,
9,13;91:20,21,23;92:3,5;
94:21;103:8,10,24;104:22;
105:8,16,18;106:2;108:13,
18;111:5;116:12,13;
117:24;118:2,19;119:11;
120:15;124:8,9,12;130:14;
135:21;136:2,19;137:3,
16,21,22;144:9;145:9;
176:2,3
**receive** 22:1;37:5;104:12
**recess** 99:8;14:24;53:8;

142:5;178:16
**recognition** 176:15
**recognize** 66:7;72:5;
82:11;94:5;99:14,16;
106:3;112:23;129:7;146:6
**recollect** 121:4
**recollection** 76:11;84:12;
85:5;90:12;104:5,6;
110:16,20;116:3;120:2;
124:15;128:10
**recommended** 120:20
**record** 5:7,13;7:3;14:22;
41:9;49:8;53:9;93:17;
98:14,22;102:1;104:3;
133:15;163:24;169:2;
176:22;177:13;193:13
**records** 64:21
**rectangular** 81:14;82:1,
19;92:13;151:17;180:2,3;
181:6;182:9
**redacted** 131:11;134:10,
12,13,15,24
**reduced** 55:5
**refer** 106:14;107:17,18;
180:18;181:1
**reference** 47:14;126:11;
128:23;134:9;155:19
**referenced** 131:23;
134:24;155:21;176:9
**referencing** 90:19
**referring** 116:24;126:21;
147:25;149:3
**refers** 107:25;108:1,2,5;
150:23
**reflect** 97:20;118:18
**reflected** 115:24;160:2;
186:14;193:23
**reflective** 95:15;107:11;
115:6
**reflects** 127:20
**refresh** 110:16
**regard** 12:7;38:25;39:1
**regarding** 89:16
**regardless** 187:4
**relate** 32:8;138:25;
140:25;181:9
**related** 20:21;80:21;
177:1,2;187:24
**relates** 132:9;138:15;
139:21;141:2
**relating** 17:14;54:19,23;
137:23;161:12,14
**relation** 12:23
**relationship** 14:3;15:17,
19;42:22;54:13;139:3;
148:19
**relationships** 11:12;
150:20
**relative** 78:22;99:19;
167:14;177:2,4
**Relaxing** 69:9
**remainder** 183:9;191:2
**remained** 61:21



remaining 95:25;146:9
remember 39:8;64:11;
80:15;82:11;108:16;
119:16
remembering 16:21
remind 148:16
remnant 112:19
remove 171:23;175:9,12,
18
removed 134:18,19;
168:12;174:21;176:10;
134:17
removing 175:3
repeat 32:9;49:7;50:1;
73:20;79:19;98:20;101:23;
104:2;177:12;179:16
repeated 132:15
repeating 163:23;169:1,
16
rephrase 6:18;28:3;
65:22;84:23
rephrasing 11:14
replicate 98:24
report 15:20;42:21,21,24,
25;179:18;180:19;181:1
reporter 6:4;7:3;41:9;
49:8;66:5;72:4;93:24;
98:14,22;99:12;102:1;
104:3;111:16;125:24;
129:5;130:20;146:4;150:4;
163:24;165:5;169:2;171:5;
172:12;173:18;176:22;
177:13;193:13
reporter's 113:23;170:11
reports 89:16;90:15;177:5
represent 173:20
representation 160:7,10;
178:6,11;191:14,15,24;
192:7
representative 126:9;
127:6;136:14
represented 9:9
request 50:17,20;96:24;
105:20;116:23;172:21
requesting 113:4
requests 13:11;45:17
require 13:21;21:25
required 60:18;102:12;
189:18
reschedule 197:3
research 78:2;89:16;
90:14;155:11,14;177:1,2,3
resemble 79:2,6
resembled 76:2
reserve 164:23
reside 5:15;15:22;19:21;
27:21;30:1,4;34:11,13;
46:19;100:10
residence 35:11;162:2;
167:3,22
residences 165:9
resin 65:19;66:23,23;
67:23;68:8,17;69:1;92:10;

94:19;122:18;124:5;
147:16;151:24,25;155:23;
160:22,25;167:4;190:9,12;
192:18,22,24
resolve 14:7
resolved 8:22;9:1,3;
13:19;14:2
resources 42:8
respect 142:10;187:2
respective 184:7
responding 45:14,20
response 111:21;119:13;
126:16;129:8;146:7;
150:10;171:14;176:1;
179:18;180:24
responses 16:5;125:6;
139:5,22,24;141:1
responsibilities 26:17,
19,21;29:14;31:17,24;
42:18;61:4;83:17,18
responsible 23:1;32:5;
42:25;63:21
responsive 13:10
rest 142:2;156:19
restate 6:18;40:2;41:6;
47:8;54:21;68:24;98:12;
150:12
resting 107:6
result 125:12
resulted 129:13
resume 164:15
retailers 83:22
rethink 142:14
return 164:24
returned 88:5
reveal 175:11;176:18
revealing 163:9,12,18;
168:24;175:13
review 89:15;170:23
reviewed 17:2;29:9;
105:19
reviewing 89:18;90:14;
96:14
revised 172:21
revisions 172:22
Rhino-wicker 147:9,12,
19;167:14;168:6
Richell 35:22,23;38:10
R-i-c-h-e-l-l 35:24
Ridge 5:16
right 6:5,22;44:7;49:13;
68:6;76:17;77:4;79:7;
80:10;90:22;97:21;114:21;
126:2;132:3;138:22;
139:24;141:15;145:3;
147:3;156:23,24;164:23;
174:12,15;189:13;190:21;
19:3;38:16;90:22;140:20
right-hand 94:9;151:3;
156:20;179:23
rigidity 152:9
ring 80:3,5
Robert 117:11

robust 152:12;153:21
robustness 153:18
role 11:11;12:23;31:8;
72:13;100:15,18
room 142:2;194:7,10,13,
15,21,25
rooms 80:23,24
Rose 144:12
rotate 82:16
rotating 80:8
rotation 146:23,25
rotobox 79:15,17,22;
80:10;82:13,14
rows 115:5
rules 6:3,9
run 190:9
Ruth 136:12,13
Ryan 64:9

                S

sales 29:23;31:24;134:5;
135:1;31:19,22
same 50:13;59:17;69:2;
74:10;89:2,4;109:16,19;
110:9,15;112:10,12;
120:10;127:2;131:1;
132:13;147:14,14;148:10;
152:3;154:1;158:8;168:3,
4;170:4,4;171:21;174:1;
188:9,15,18,24;189:20,24;
190:8,15,17;191:5,16,20;
192:11;194:4;17:20;
165:21,24;168:19
sample 45:8;46:14;49:11;
50:18,21;51:11;78:24;
102:12,17,18,22;103:10;
107:15,16,19,20,24;108:4,
5,21,22;110:1,17;112:2;
117:12,20;122:1,3;124:10;
126:8,8,12;127:2,3,6,8,22;
131:12;135:6,7
samples 51:8;86:12,13;
100:20;117:4,7
satisfied 142:9
saw 40:13;103:6;104:8;
170:4
saying 154:10;184:24
scanned 16:3;17:4
school 17:18,24;18:16
scope 163:13
screws 141:23
scribbled 97:15,16
search 138:16;148:6;
161:19
searches 137:23;161:12
searching 139:9
second 63:16;110:13;
113:4;124:21,24;131:6;
133:16;144:4;146:12;
150:16;168:7;172:15;
191:17
secondary 149:11

secondly 67:23
section 106:8,8
security 57:19
seeing 17:8;76:1,12;
103:8,10;105:16,18;106:2;
185:9
seem 84:11;114:4
seems 111:24;112:9;
114:2;131:22;196:4
sees 140:6
selection 120:16
sell 23:5;28:22;32:2,24;
43:1;119:3,9
selling 10:15;11:10,13;
12:2,4,5;13:1;32:4,5,12,
14,21;44:20;162:16,19;
31:13
send 37:3;51:14,18
sending 56:17
sense 22:22;73:17
sent 46:12,22,25,25;47:9;
49:12,15;50:12;51:19;
102:8;103:2;117:11;127:4,
13,23;128:20
sentence 110:7
separate 183:15,20
September 18:9;71:13;
91:2;104:14,18,19;160:1;
161:10
sequence 148:8
Serial 131:13
series 80:21;166:6;
187:24
serve 164:3
served 18:18
service 20:1
services 21:25;30:13
servicing 20:3
set 45:16;61:15;96:7;
101:11;115:25;121:12,18;
122:9,12;123:1
sets 97:13;105:13
settlement 9:1,2
seven 94:11,11,11,14;
111:2;119:7
several 87:3;94:1;169:21;
171:7;195:4;88:24
sewn 75:14
shaking 6:12
shape 82:1,9,19;92:9;
93:13;151:17;183:7;
189:24
shaped 81:22,22
shapes 107:12
shareholders 59:21
sheet 134:6;135:2;191:17
shelf 109:18
shipment 63:3
shipping 113:11;114:2,4;
119:18,19,21
short 53:5
shortly 126:10
shot 167:22

shots 168:11
show 40:9,10,12,14,25;
41:3,19;43:5,6,11;45:4;
48:16;95:12;97:23;98:18;
122:9;126:7;135:2;167:11;
189:8;43:13
showed 41:4;44:25;49:4;
122:13,14;137:18
showing 48:20,22;134:6
shown 41:10,16;43:9;
45:5,7;47:10,13,17,19,23;
48:2,7,24;51:20;65:14;
95:16,16;106:16;107:5,11;
109:2,3;116:19;122:17;
134:7;137:7;141:13;
155:20;156:20;168:9;
173:3,8;179:21;189:21,24;
190:15;191:17
shows 106:23;165:8;
167:25;178:9;179:21,22,
25;182:8,11,13;192:25
SIC 158:5
side 47:21,25;95:21,25;
96:1;105:13;106:6;110:8;
111:1;114:19;146:24;
147:1;151:3,17,18,20;
156:20,23,25;167:11,20,
22;179:23;180:8,9;181:7,
7;182:8,9,10,15,17;
183:23;186:1,2,3,18;
187:7,7;189:16,17,21;
190:24;191:3,19;192:20;
193:2,3,8,20
sides 162:7;180:1;183:2
sift 82:17
sign 54:14
signature 129:16,25;
130:22;172:4,15
significant 154:7;156:15;
157:18,23
similar 43:18;79:11;
80:18;106:5,8;109:19;
123:5;155:2;162:11
similarities 194:17
similarity 194:9
similarly 54:9
simple 139:10;174:16
simply 122:1
Simpson 5:6,14,19;
10:17,19,19,21,24;12:13;
13:13,14;45:23;46:4;
53:11;58:7,13,19,21,23;
59:1,6,9,16,18,18,22,23;
60:3,11;61:1,9,22;62:5;
85:9,17;86:10;94:17;
99:12;100:24;101:5;112:6;
141:7;143:3;146:10;165:4,
6,14,18,18,22,25;166:2,6,
9,12;177:11;178:15;5:1
Simpson's 172:20
Sindy 114:9
singular 193:3
sit 157:2

Jeffrey Simpson
May 2, 2008

Case 3:06-cv-00901-WKW-WC    Document 73-8    Filed 08/13/2008

Simpson Ventures vs.
Mid-America Products

Page 344 of 374

sitting 65:18;67:18;69:5,6,
22;77:17;104:17;139:24;
143:10;155:12;161:9
six 51:1;112:12
sixteen 158:15
sixty-seven 114:19
size 88:7,7;110:9;114:15;
115:6,10;118:25;127:13,
15,21;154:5;155:2;189:24
sized 155:1
sizes 75:14;118:25;119:1;
127:15;152:16;162:12
sizing 87:12
sketch 96:16,17
sketches 94:18;98:7;
150:16
sketching 93:15
slash 97:16;116:17
slide 112:19;170:3
slightly 184:21
slips 62:25;63:2
slowly 6:24
small 71:3;106:8;114:15;
115:10;127:17,21;154:3,
12;165:8
smaller 152:17,19,21;
153:3,4;154:8
Smith 109:24;144:18;
145:5,10,13,21;148:13,17;
160:6,20;161:17;169:9,12,
18;171:22;172:19;176:5,8;
196:19,21
S-m-i-t-h-capital-T
144:19
smoothly 6:8
soap 168:7
sold 12:13;27:5;52:10;
119:17;162:22
sole 59:11;61:17
solely 44:21;63:13
solid 82:15,17;111:7,11;
157:14,20;162:10
solution 76:22;77:19;91:6
somebody 22:19
someone 102:11
sometime 25:5;34:18;
94:20;143:22;144:3,5,6;
176:7
sometimes 6:13,24;68:2;
86:5
somewhat 82:18;157:14
somewhere 57:6
son 24:21;66:10
sorry 38:14;43:7;45:14;
73:20;76:24;77:10;79:13,
19;87:24;90:23;100:8;
101:23;105:25;107:21;
126:18;129:22,24;135:13;
143:25;146:16,18;150:12;
151:12;159:23;160:14;
169:15;170:15;173:13
sort 54:23
sound 71:14;88:24;89:1;

91:3
sourcing 54:5;100:6
SouthCo 116:21,25;
117:5
southern 145:11
space 63:9;145:6,7,9;
169:13
spaced 192:18
speak 6:24;175:17,21
speakerphone 56:15
speaking 76:4
specific 22:17;23:13;
32:15;40:24;55:13;66:18;
68:21;71:17;83:22;104:6;
105:22;120:22;135:25;
140:12;142:22;144:8,16;
161:16;186:22
specifically 7:24;8:2,10;
11:5;17:15;21:10,12,16,
19;23:21;25:8;26:4;36:9;
37:25;39:3,8;43:21;45:1;
49:15;50:25;52:23;55:23;
57:5;58:1;65:19;66:23;
71:10;72:19;74:8;78:22;
80:22;82:9;89:18;90:8;
91:21;103:23;106:17;
107:8;108:16;111:5;
116:13;117:16;119:11;
120:15;121:18;122:13,14;
123:20;124:8,9;131:23;
135:24;193:7;10:12;14:8;
42:17;101:10
specifications 117:10
speculate 136:5
speeding 56:25
spell 34:7;35:23;46:17;
87:6;88:19
spelled 145:1
spend 39:22;40:5
spent 60:21
split 59:4;60:11
spoke 78:19,21;82:25
spoken 55:7
sporting 31:22,25;32:2
Sports 31:15
square 63:19;122:22;
123:1;190:18,25;191:20,
21
squares 157:2
stack 17:3
Staley 16:13
stand 162:8;167:13
standard 87:4;118:21;
121:12
start 6:25;18:6;28:15;
68:23;75:2;83:15;133:22;
183:12;188:25;189:3;82:5
started 18:8;20:4,6;33:3;
42:1;61:1,19;71:9;72:20;
93:7,12,14;119:18,25;
136:11;162:16,19;167:2
starting 115:7;16:25
state 5:12;8:17;47:22;

147:22;159:23;179:15;
18:5;57:3;136:14
stated 45:22;52:15;88:4;
105:10;122:16;177:24;
188:16
statement 46:1,6
States 100:11,12;101:1,
22;135:8
Steve 196:19
still 8:20;25:16;31:5;35:1;
46:24;51:23;58:15;118:4;
132:13;133:1;152:17,22;
154:4;169:24;181:23
stop 89:6
stopping 6:22
storage 32:7;52:17;63:14;
108:15
store 57:11,13,14,17
stored 70:25
straight 185:7
strand 41:15;103:22
strands 184:9;190:9,12,
14;192:18,22,24
strike 46:21;72:21;158:22
structural 103:14,16
structure 47:11;49:24;
50:4,8;93:13;97:21
structures 81:15
Stu 195:23,25;196:7
stuck 149:19
studies 73:14;89:16;
90:15
study 89:19,19,25;90:2,5
stupid 57:4
sturdiness 153:18
sturdy 153:22
Stylette 87:5,10
S-t-y-l-e-t-t-e 87:10
stylish 165:16
Subchapter 58:18
subcontract 19:16;20:6
subcontracts 20:13;
25:10
subject 100:16;130:8;
168:14
submission 173:23
submit 121:13
submitted 132:10,23;
170:21;173:24;174:7;
175:4
subsequent 122:7
subsequently 88:5
substantial 156:8
substantially 69:2;156:7;
180:3;181:10,17;182:3;
183:9
substituted 153:15
subtle 158:12
successful 31:8;126:6
sued 10:24,25;11:1
suggest 76:8
suggested 124:25
suggestion 67:7

suggestions 43:24;44:2;
45:11
suit 7:15;11:6;14:10
suitcase 151:13,16;
152:2,3
suppliers 87:9
support 38:11
supposed 48:8;103:25;
121:8;131:21
sure 118:23;135:14,15;
145:4;147:21;165:19;
170:25;28:4;46:3;86:4;
133:14,17;142:8,17;
159:25
surfaces 137:7
surprise 118:3
surrounding 158:10;
180:1,3;181:10
surveys 73:15;176:25
suspect 116:2
suspend 197:2
suspension 164:10
Swan 196:16,18
swing 65:18,19;66:10,12,
24;67:18;68:7;69:2,5,22;
77:17;104:18;143:10;
155:12;157:10;159:17,20;
160:1;161:10
switch 124:20
sworn 5:2
symbol 177:10
system 87:18

## T

table 67:9
talk 38:17;39:1;111:6;
144:14;145:14,21
talked 24:6;33:20,22;
38:21;42:11;44:6;83:1;
91:18;145:22;146:25;
153:19;191:25
talking 7:2,3;13:18;19:1;
53:11;54:8;66:13;82:3;
103:14;109:11,13;115:20;
117:17;139:25;146:22;
155:4;178:2;189:12
taste 44:16
Taxi 71:4
team 22:11;24:5;27:2;
29:23;67:5;74:2;195:5
technical 20:14
technically 58:19;61:2
technology 18:2
telephone 37:16;56:14;
37:18
telescoping 10:13;13:18;
17:6;12:16
telling 21:16;91:16,20;
122:12;195:20,24
ten 164:7
tenure 77:6
term 23:2,20;58:17;67:9;

95:9;105:11;134:6;166:11;
179:7,11
terms 7:1;13:24;14:6;
22:6;23:17;55:2,3;81:9;
83:19;93:4;103:24;139:9;
179:3;191:18
testified 5:3;60:20;70:13;
196:21
testify 195:5,7
testimony 5:22;38:20;
91:2;123:18;153:6;154:17;
184:16
Texas 15:23;19:22;27:22;
35:14;89:12
theft 57:1,2
theirs 32:13,20
thereabouts 164:18
therefore 27:15
thereof 143:21;162:20;
194:5
Theresa 136:12,15
thermal 23:2
thinking 73:18;91:11
third 113:6,7;124:21;
144:4;150:22;183:23;
193:18
thirty 60:21;115:7;120:5
Thomas 170:12,16
though 47:6;122:6;
123:14;167:18;184:13
thought 21:14;45:12;56:2;
85:6;114:1;117:17;126:20;
146:16;152:10;162:9;
192:5
thousand 19:11;63:18
three 18:25;34:10;62:16;
63:18;94:11;107:23;109:6;
125:8,9;156:14;168:2;
183:22;193:7,17
throughout 171:13;
191:19
thumb 94:1
tickets 56:25
tight 122:21
times 5:7;6:1;86:23;161:7
title 39:19,20;42:16;99:25;
136:15
TM 147:20
TM'd 167:15
today 5:10;51:24;80:4;
91:2;108:11;120:10,14;
156:17;164:14;178:9,19,
24;179:11;188:10;26:6;
62:14,16
today's 16:1
together 15:13;181:12
told 44:25;53:12;70:2;
122:24;123:4,13;127:9;
163:12;168:24
Tom 171:22;172:19;
196:15
took 51:9;57:11;120:3;
159:2;195:7

Case 3:06-cv-00091-WKW-WC    Document 73-8    Filed 08/13/2008    Page 65 of 66

Simpson Ventures vs.    Jeffrey Simpson
Midwest Metal Products    May 2, 2008

top 48:15,17,23;49:6;82:2;
95:23,25;96:1;97:12;
106:7;115:7,19;149:15,19;
151:1,18,19;157:2;165:15;
179:22,25;181:19;182:5,6;
183:16,21,24,25;184:22;
186:1,1,3,4,17,17;187:2,4,
7,8;189:16;193:18,19
total 60:21;64:16;119:17
totally 144:20
Tough 109:4,16,23;
116:25;160:9
toughness 147:23
tower 81:12,19,23
trademark 78:14;148:6;
168:22;173:24;176:13
trademarked 147:20
trademarking 147:16
training 20:2
transcribe 6:14
transferred 61:13
translate 114:10;119:4
transport 71:5
tray 141:24
treadmills 26:10
treasurer 60:17
trial 8:24
trick 131:18
trifecta 166:9
trip 140:5
tripped 140:4
troubled 112:6
true 154:14;166:18
truly 90:1;140:23
truth 195:20,22,24
try 6:21;65:23;95:12,13;
98:23;116:21;169:5
trying 67:17;72:23;74:22;
76:21;78:23;83:2,23;
111:23;112:7;119:16;
140:5;141:8,10,16;147:22;
148:12;152:4;154:21;
156:2
Tse 114:9
tube 75:14;123:16,19,22,
25
tubes 47:20,24;123:8,13;
151:1,5;182:22;183:3
tubing 150:23;152:14,16,
21;153:8,10,12,14,17,23;
154:5,6,9,14
Tubular 50:9
Tunes 81:8
turn 116:17;129:22;
172:14
turnaround 51:7
twenty-five 70:18
twenty-four 114:19
twenty-one 115:8
twenty-two 115:7
two 16:25;19:10;27:20;
57:6;78:7;82:21;83:19;
87:19;97:13;105:12;107:1,

1,4,12,14,22,23;118:23;
125:16,18;131:4,7;133:2;
138:22;142:19;146:25;
147:13;152:13;156:17;
159:10;165:17;168:5;
174:5;179:6;188:14,17,20,
24;189:6;190:8,16;192:1;
193:8,20;194:2;195:3;
18:25;107:23;192:10
two-thirds 156:24
type 31:16;102:15;109:18;
110:5;111:8,8,11,12
typed 102:11
types 67:23
typical 51:7;75:14
typically 75:13;76:3;
120:17,18

U

ugly 75:17
ultimately 27:15;105:5;
110:5
unclear 74:17
under 61:1;107:22;135:7;
151:1;165:16;167:19;
58:16;106:19
underlying 49:24
underneath 157:1
understood 38:20;142:9
undertaking 74:15
unemployed 24:16
unhappy 30:15,18
unit 114:21,22;116:19
United 100:11,12;101:1,
22;135:8
units 119:4,8,17
universal 87:20
University 18:5;57:3
up 19:20;31:11;49:12;
55:21;61:15;65:15,17;
72:23;76:21;77:16,18;
91:7;94:3;101:11;110:5;
122:20;127:16;140:4,5;
146:24;155:11;156:11;
159:1,16;165:16;180:9,10;
182:15;185:5,9;192:14;
195:3
upon 15:12;73:14;164:24
upper 95:20,21;149:24;
156:22;178:12;181:7,15;
182:10,10;183:21;189:23
UPS 62:24
upside-down 96:2
USA 35:22;38:10
use 24:11;41:5;42:8;
49:21;58:17;67:24;68:12;
71:5;97:1;100:7;102:18;
109:15;120:11,14;142:2;
147:19,20;149:19;151:5;
153:12;163:21;166:19;
167:1,3;168:3;177:19
used 15:20;23:2;57:7,8;

63:13;69:1;73:3;80:23;
95:9;96:18;103:18,20;
105:11;109:20;121:4;
147:18;153:13,14,16,17,
23;157:16;179:2,8
using 47:19;95:14;110:5;
151:8
utility 7:15;10:8,11;12:18;
132:18,23;10:6

V

vacuum 117:12,20,10
value 57:5
values 57:7,8
V-a-n-and 87:7
Vanness 87:5,7,8
ventilation 149:14
Venture 101:5;165:7,22,
25;166:2,6,9
Ventures 10:17,19,22;
13:14;58:7;59:19,22;60:3;
61:9,22;62:5;85:9,18;
86:11;100:24;165:18
Ventures' 165:14;166:13;
177:11
verbatim 91:22
verbiage 107:17
version 116:16
versus 168:22;184:22
vertical 184:9;190:8,14;
192:17,17,24
vertically 190:9
vet 71:6
veterinarian 136:11
via 98:24;169:20
vice 60:16;100:1
view 149:23;173:4;181:7,
19;182:8,13;184:22;
186:22;191:2
viewing 149:14;184:7,20
viewpoint 152:4
views 169:21,24
Vigor 100:1,5,6,22;113:3,
5;114:9;115:14,16;118:12,
15;119:7;120:17,19;
121:11,12;125:3,19;
127:19
vintage 148:11
violations 56:25
visible 154:12;187:6
visited 144:9
visual 40:22;68:19;105:4;
136:25;137:2,5;154:7;
185:19;188:3,4,9,13,14,17
visually 184:14;185:15,22

W

Walk 83:14
wall 70:19;105:13;149:24
warehouse 62:11,12,21;
63:6,9,10,13,15,21

warehouses 63:1,4
warming 68:4
waste 80:9;82:17
water 168:8
watering 32:6;52:16
way 60:7;61:21;65:23;
74:21;131:1;144:24,25;
145:8;147:23;148:25;
151:7;156:23
ways 83:5
weak 75:23;77:13
weather 123:5;155:24
weave 41:4;43:11,13,15,
16,18;47:17;49:5;51:21;
98:9,18;99:2,5;108:19,22;
110:17,21;118:5;121:23,
24;122:10,21,21;123:2,2,
4,8,12,13,19,23,24;
135:19;155:15,25;156:4;
157:7;158:6;160:21;164:4,
23;163:1,21;164:2;166:16,
20;167:1,23,25;168:10,13,
16;171:18,23;173:10;
174:17,21;175:3,9,18;
176:11;177:17;184:12,14,
15;185:10,10,11,12,15,19,
20;190:4,5,6,7,15,17,18;
191:1,4,16,16,18;192:1,
10,11,13,16;193:1
weaves 192:23
weaving 155:24;157:24;
160:25
weekend 69:19,21
weeks 16:25;51:7;195:3
weightlifting 26:9
weights 26:9
weren't 89:11;91:6
what's 48:11;66:6;72:4;
80:7;82:12;85:25;93:24;
99:13;107:11;113:23;
115:2,2;123:6;129:6;
134:19;140:8;142:11,23,
25;161:20;170:11;171:6;
172:13;187:20;191:17;
5:17;56:24;100:8;106:3;
120:13
Whereabouts 100:13
whereas 176:13;191:2
wherein 95:17
whimsical 81:4
white 157:2;144:12
Wichita 21:6;24:23;25:10
wicker 24:11;27:6;29:1;
33:1,2,5,7,10,13,15,17,20,
22,25;34:2;35:20;36:4,8,
11,14;38:17,22;39:1,22;
40:1,5,7,23,25;41:4,5,11,
13,18;42:9,11;43:2,6,6,9,
18;44:7;45:25;46:5;47:7,
10,13,19,23;48:8,13,16,
20,23,25;49:3,6,19,20,25;
50:15;51:17,20;52:12;
54:9;55:4,19;65:3,18;

66:17,21,23;68:8,11,17,
20;69:1,3;71:18,22;72:9,
16,19,24;76:2;79:6,10;
80:17;87:1;90:20;98:6,18;
99:2,5,6,20;100:16;101:7,
10,14;103:5,11,17,19,22,
25;104:17;106:24;107:2,4;
111:7,7;113:6;114:15;
118:5,8,15;121:5,23,24;
122:9,10,18;123:5,10;
124:14;125:10;128:2;
134:7;137:3;138:12;
139:12,17;140:7,18;
145:15,23;147:14;148:4;
153:24;154:3,8,9,11,23;
155:16,24;157:7,7;158:24;
159:5,14,18;160:13,21,22;
161:1;162:2,12,16,21;
166:19;173:4;177:1,3,4;
179:21;180:1,1,2,7,15;
181:10,17;182:4,7,22;
183:3;188:24
width 192:19
wife 59:1,23;60:11,15;
61:6;66:11;70:2,13;91:18,
20
window 149:10,12,13,20,
23;158:14;180:2;181:14,
15,18;182:10,16;183:8,16;
184:3,15;185:17;189:20;
192:3
windows 111:2;139:14;
140:19;141:20;180:9;
181:6
Wingate 15:1;196:12,14
winter 89:8
wire 50:9;69:13;70:10;
72:24;73:3,18,22;74:10;
75:14,17;92:9,12,13,18,
23;93:5;103:5;109:10,16,
24;151:12,14;152:9;153:8,
12,13,15,16;154:1,2,3,4,
14;159:22;160:3,6;165:17;
155:5
wires 151:6,8
within 3:3;61:15;74:5,6;
100:22;135:8
without 163:11,17;168:23
witness 39:25;56:8;132:5;
163:11;164:13;175:11,14;
176:16;56:10;94:16;
111:19;112:18
woman 44:13
women 44:15;158:15
wood 67:13;79:1,3
word 148:4;168:3
worded 50:2
words 28:6;53:20;102:18;
103:18;135:25;142:19;
147:13;180:5;184:20;
103:20
work 15:13,20;19:5,14,17;
20:7,22;21:4;24:1;25:9,19;

Jeffrey Simpson
May 2, 2008

Case 3:06-cv-00901-WKW-WC    Document 73-8    Filed 08/13/2008

Simpson Ventures vs.
Midwest Tool Products

Page 346 of 68

27:10,17;28:2;29:25;
30:15,21;40:5;60:22;
67:16;70:14,24;78:15;
79:10;88:15;147:8,25;
148:1,5;150:16,18;170:23
**workbench** 70:19
**worked** 19:21;21:20;23:8;
30:4;33:8,10,13,17,18,19,
21;67:5,6;88:16,17;
127:16;143:19
**working** 20:5,20;28:15;
29:23;33:3,6,23;38:5,7;
39:22,25;41:23,23;52:13;
54:20,22,24;69:16;76:21;
77:8,18;79:16,21;80:13,
20;89:6;91:6;93:4;100:3
**works** 62:21
**workshop** 70:14
**worry** 36:19
**Worth** 34:14;38:4;89:11
**wove** 101:13
**woven** 41:1;45:25;46:5;
103:5;123:16;156:14;
157:24;166:19;180:10;
182:15;183:10;190:12
**wrap** 151:24,25
**wrapped** 151:14;154:11,
12;182:22
**write** 167:10
**writes** 172:20
**writing** 6:5;55:5;56:17;
115:1
**written** 45:16;115:2
**wrong** 60:19

## Y

**year** 25:5,22;30:25;37:14;
52:7;61:11;119:14,15;
168:17
**years** 27:20;176:13;179:2
**yesterday** 16:16

## Z

**zero** 61:2
**Z-fold** 95:9;96:9,21;
105:11,14,17,18;106:4;
147:2;150:17,19;151:13;
152:4

# EXHIBIT O



Free shipping on Orvis orders with the Orvis Rewards Visa.

• Free Shipping   • Low Intro APR   • No Annual Fee   • Reward Points

APPLY NOW!

ORVIS
100% Satisfaction Guaranteed

SEARCH

Enter keyword or Item #

**Dogs**

New for Fall 2007

Dog Beds

Gifts for Dogs & Owners

Dog Toys

Collars & Leashes

Dog Apparel

Gates & Crates
 Gates & Crates

Problem Solvers

Feed & Store

On the Road

Made for Walking

Just for Cats

For the Older Dog

Pet Memorials

Personalized

Gift Card

News, exclusive sale previews, and special events! Sign up now and save $10 on your $100 order today. Offer valid for new subscribers only.

Enter Email Address

Select an Interest



An Orvis Gift Card
or E-Gift Certificate
The perfect present.

Shipping Info
Gift Services
Order Form
Order Info & Services
Dog Stories
Store Locator
Corporate Sales
Orvis Site Map

Previous Item        Next Item



 
buttermilk  brown


LARGE VIEW    ALT VIEW

**Overall Rating:** ★★★★☆ 4 out of 5

2 of 2 (100%) customers would recommend this product to a friend.

READ ALL REVIEWS   WRITE A REVIEW

**Product Reviews:**   Choose a sort order

**Overall Rating:** ★★★★☆ 4 out of 5
December 3, 2002
By: M. Nelson

"At last, a great-looking dog crate that is functional too. Being able to secure the door to the inside of the crate is a terrific idea - gets it out of the way and prevents the dog from being shut out of the crate accidentally. Both dogs liked the crate immediately. Obviously they have good taste! "

*Was this review helpful to you?* Yes No (Report Inappropriate Review)

**Overall Rating:** ★★★★☆ 4 out of 5
September 14, 2002
By: L. Blew

## Durable Crate
Looks Like Wicker

A dog crate that provides the elegant look of rattan with the durability and practicality of long-lasting resin. This indoor durable dog crate features a removable rugged plastic pan for cleaning, and a wire door with spring-loaded door latch. In brown, buttermilk. Not a training device, nor recommended for pets with behavioral problems, especially chronic chewing. Washable khaki cotton/poly bolstered ¾" dog crate pad will add comfort to this crate.

*Shipped to contiguous 48 states only. Express shipping/gift wrap not available.*

BUY IT NOW:

**Select An Item**

- **$159.00** Small crate: 21"H x 24"L x 18"W (SI43RC-61)
- **$195.00** Medium crate: 24"H x 30"L x 21"W (SI43RC-62)
- **$245.00** Large crate: 27"H x 36"L x 24"W (SI43RC-63)
- **$298.00** X-large crate: 31"H x 42"L x 28"W (SI43RC-64)
- **$35.00** Small Pad: 22"L x 16"W (SI67LY-51)
- **$40.00** Medium Pad: 28"L x 19"W (SI67LY-52)
- **$45.00** Large Pad: 34"L x 22"W (SI67LY-53)
- **$50.00** X-Large Pad: 40"L x 26"W (SI67LY-54)

Buy Now and Enjoy No Payments for 90 Days on purchases over $250.   BillMeLater
View Disclosures

 LIVE CHAT: AGENT NOW AVAILABLE

SEND THIS PAGE TO A FRIEND



LIVE CHAT

- OR -

Copyright 2007
The Orvis Company, Inc.
Manchester, Vermont
Since 1856

"I have had so many compliments on my two durable crates. My dogs love them and they look so nice in my home. No more moving kennels...these fit into any decor. Easy to assemble and easy to clean."

*Was this review helpful to you?* <u>Yes</u> <u>No</u> *(Report Inappropriate Review)*

YOU MIGHT ALSO BE INTERESTED IN:



Personalized Feeder Rug



Wooly Chew Bone



Handmade Wooden Barrels



Willowemoc Dining Cushions

<u>Basket /Checkout</u> | <u>Catalog Quick Order</u>
<u>Privacy Policy</u> | <u>Order Status</u> | <u>100% Satisfaction Guarantee</u>

P 003806

9/7/2007 11:29 AM

of 2



indoor rattan pet home **Search**    Catalog Quick Order
*order by item number*

My Account
Wish List
(0 items) Cart
Checkout

100% SATISFACTION GUARANTEED.

**Shop**  **Bargain Cave**  **Outdoor Info**  **Retail Stores**  **About Us**  **Customer Service**  **Cabela's CLUB**

**Shop By Category**

Hunting
Archery
Shooting Gear

Optics
Electronics

Men's Hunting Clothing
Men's Casual Clothing
Women's Clothing
Kids' Clothing
Footwear

Fishing
Fly-Fishing
Boating

Camping
Auto & ATV

Food & Food Prep
Home & Pet
Gifts & Hobbies

Bargain Cave

Gift Cards & Certificates

**Shopping Tools**

Catalog Quick Order
Buyer's Guides
Comparison Charts
Sizing Charts
Shipping Info
Cabela's Live Help
Special Orders
Free Catalog

**Other Departments**

Gun Library
Boats & Boat Shops
Outdoor Adventures
Cabela's Travel Service
Trophy Properties
TAGS

Shop › Home & Pet › Dog Supplies › Kennels & Carriers › You are here: Indoor Rattan Pet Home

## Indoor Rattan Pet Home



CLICK TO ZOOM

**Overall Customer Rating:**
☆☆☆☆☆ **5 out of 5**

Read Reviews(1) | Write a Review

**Product Description**

Finally, a pet home that's made to look nice and compliment the decor of your home. The striking Rhino-wicker construction is impervious to fluids and odors and can be cleaned with a simple yet effective mixture of soap and water. The two-way door latches conveniently and won't interfere with other furnishings. Built in feet raise the home to protect your floor and promote airflow. A bottom pan provides further protection for your floor and cleans easily. Not designed for destructive dogs or dogs with excessive chewing habits. Interior wire frame for extra support.
**Color:** Brown.
**Available:**
- Small - 24" x 18" x 21"
- Medium - 30" x 21" x 24"
- Large - 36" x 24" x 27"
- Extra Large - 42" x 28" x 31"

Return to Search Results

**Indoor Rattan Pet Home**
Item:XH-618654
**$134.99 - $229.99**

Qty: 1

SIZE

Calculate Price

**Add to Wish List**    **Add to Cart**

**Item notes**
This item will ship directly from the manufacturer.

Please allow 3-5 weeks for delivery.

SOME RESTRICTIONS MAY APPLY

**Related Items**



**Petsafe™ Indoor Radio Fence®**
Reg Price:
$49.99~$79.99



**PetSafe Containment System Wire Break Detector Kit**
Reg Price:
$69.99



**Cabela's Gun Dog Remote Trainer GS-3500**
Sale Price:
$129.99



**SportDOG Brand™ In-Ground Pet Containment Fence**
Reg Price:
$199.99

Get Cabela's best sales & specials by e-mail   Enter E-mail Address   Go

P003807



Need Help?
click here for our
customer service

**1-800-237-4444**

Investor Relations | Careers | Free Catalog | Corporate Sales | Site Map | Track Your Order
Outdoor Adventures | Cabela's Travel Service | Trophy Properties | Cabela's TAGS

©1996-2007 Cabela's Inc. All Rights Reserved
Please read Cabela's Privacy Policy and Legal Notices.

  

World-Famous Quality • World's Largest Selection • Industry's Best Value • Unmatched Service

P 003808

9/10/2007 4:59 PM



HACKER SAFE
TESTED DAILY 10-SEP

DOCTORS
FOSTER and SMITH

HOME    HELP    CATALOG QUICK ORDER    MY ACCOUNT    SIGN IN

WELCOME, GUEST (Click here to sign in)

View Cart: 0 items | CHECKOUT
Wish List: 0 items

BIRD SUPPLIES    WILD BIRDS    SMALL PETS    FERRET STORE    REPTILES    ARTICLES

DOG SUPPLIES    CAT SUPPLIES    HORSE SUPPLIES    PHARMACY    FISH SUPPLIES    POND SUPPLIES

PET SUPPLIES: Products for your pet selected by our veterinarians

SEARCH for Products:

Enter item # or keyword

Entire site  

Free Pet Care Newsletters
View Samples ▸

Request A Free Catalog Online ▸

New Pet Supplies ▸

Sale Pet Supplies ▸

Clearance Outlet ▸

Catalog Quick Order ▸

Advantix Flea & Tick ▸

Prescription Heartgard At Our Pharmacy ▸

Gift Certificates ▸

Frequently Order Foods? ▸

Pet Health Library ▸

Become An Affiliate ▸

Business Partner Program ▸

Customer Service Help Desk ▸
1-800-381-7179





Dark Brown

articles about Cages

Plastic crate or wire cage?

Wire Cage Comparison Chart

Wire Cages: General FAQs

More...

### Rattan Pet Residence

* **The beauty of rattan - you won't hide this one!**

* **Built-in feet elevate home for comfort**

* **Won't absorb water, stains or odors**

The elegant look of rattan constructed in durable, woven resin looks good and lasts for years! This attractive indoor pet home is easily cleaned with soap and water, and won't absorb odors, water or stains. Its sturdy internal frame and door are made of steel wire to give it strength, and the door opens either in or out. The door has a spring-loaded locking latch and can also be secured open inside, out of the way of people and pets. Allows your pet to come and go as she wishes. A thick plastic floor pan removes for easy cleaning. Great for dogs of all ages, but not intended for puppies in the chewing stage. Assembly required. Please specify color of Dark Brown or Natural.

  LARGER VIEW     SEND TO A FRIEND

 MORE INFORMATION     READ TESTIMONIALS

STYLES - Click styles to view:



Natural

| Size | Measurement | Sampling of pet |
|------|-------------|-----------------|
| Small | 18" x 24" x 21" high | Fox Terrier, Pug, Maltese, Yorkie |
| Medium | 21" x 30" x 24" high | Welsh Terrier, Beagle, Westie |
| Large | 24" x 36" x 27" high | Basset, English Bulldog, Cocker |
| XLarge | 28" x 42" x 31" high | Collie, Retriever, Doberman |

Please click on **"More Information"** for construction details.

*Sorry, these items cannot ship postal.*

**Please note:** *If you wish to ship these items by express service, additional shipping charges will apply during checkout.*

TO ORDER

Rattan Pet Residence

| 9N-13630 | Small | $129.99 |
| --- | --- | --- |

Select Color: [ ]    Qty: [ ]    **Add to Cart**

| 9N-13631 | Medium | $159.99 |
| --- | --- | --- |

Select Color: [ ]    Qty: [ ]    **Add to Cart**

| 9N-13632 | Large | $199.99 |
| --- | --- | --- |

Select Color: [ ]    Qty: [ ]    **Add to Cart**

| 9N-13633 | XLarge | $249.99 |
| --- | --- | --- |

Select Color: [ ]    Qty: [ ]    **Add to Cart**

LIVE HELP

 **Need more help?**
Click here >

YOU MIGHT ALSO LIKE



DOCTORS FOSTER and SMITH
Thick Foam Crate Pads


DOCTORS FOSTER and SMITH
Gorilla Tough® Exercise Pen

**FREE Email Newsletters** - Sign up for pet care tips & secret sale alerts: Your Email ⊙

Pet Products for every pet: Dog Supplies | Cat Supplies | Horse Supplies | Fish & Aquarium Supplies | Bird Supplies
Reptile Supplies | Small Pet Supplies | Pond & Backyard Supplies | Wild Bird Supplies | Pet Pharmacy | Pet Care Articles

**Visit Our Family of Websites:**

LiveAquaria.com    eTropicals.com    PetEducation.com

**CUSTOMER SERVICE**
Ordering & Shipping Help
Track Your Order
Contact Us: 1-800-381-7179
Live Help
100% Satisfaction Guaranteed
Privacy & Security
Manage Your Email Subscriptions
How to Use this Site
Site Map

**ABOUT US**
Who We Are
Our History
Meet our Professional Services Staff
Our Doctors' Products
Visit Our Retail Store
Customer Comments
Reprint Policy
Employment Opportunities

**SHOPPING & SERVICES**
Send a Gift Certificate
Post Product Reviews!
Affiliate Program
Business Partner Program
Catered Pet® Service
Request a FREE Catalog
Tell a Friend About Us
Link to Us

**Foster & Smith, Inc.** - 2253 Air Park Road, P.O. Box 100 Rhinelander, Wisconsin 54501 - Copyright © 1997-2007, Foster & Smith, Inc. All rights reserved. Unauthorized use of any images, thumbnails, illustrations, descriptions, article content, sounds, or registered trademarks of Foster & Smith, Inc. is strictly prohibited under copyright law. Site content, including photography, descriptions, pricing, promotions, and availability are subject to change without notice. Orders containing multiple, heavy, or oversized items may require additional shipping fees. Race Foster & Marty Smith are both licensed Doctors of Veterinary Medicine and members of the Wisconsin Veterinary Medical Association.

Customer Testimonials by... http://www.... .com/...mental/customer_



# DOCTORS FOSTER and SMITH

HOME  HELP  CATALOG QUICK ORDER  MY ACCOUNT  SIGN IN

HACKER SAFE  TESTED DAILY 10-SEP

WELCOME, GUEST (Click here to sign in)

View Cart: 0 items | CHECKOUT
Wish List: 0 items

BIRD SUPPLIES    WILD BIRDS    SMALL PETS    FERRET STORE    REPTILES    ARTICLES

DOG SUPPLIES    CAT SUPPLIES    HORSE SUPPLIES    PHARMACY    FISH SUPPLIES    POND SUPPLIES

PET SUPPLIES: Products for your pet selected by our veterinarians

SEARCH for Products:

Enter item # or keyword

Entire site    GO

## DOG Categories:

**NEW PRODUCTS**
**SALE ITEMS**
**CLEARANCE PRODUCTS**
Allergy Care
Arthritis Care
Bark Control
Beds & Bedding
Behavior Control
Cages, Crates & Kennels
Clothing for Pets
Collars, Harnesses
  & Leads
Dental Care
Digestive Aids
Doors & Gates
Ear Care
Eye Care
Feeders & Waterers
Field Training
First Aid
Flea & Tick
Foods
Gifts for Pet Lovers
Grooming
Heartwormers - Prescription
Halloween
Holiday Preview
Housetraining &
  Incontinence
Indoor Control
Medications -
  Non-Prescription
Medications - Prescription
Nametags & Pet I.D.
Nutritional Supplements
Overweight Dogs
Pet Loss
Puppy Care
Rawhide
Sanitation & Lawn Care
Senior Dog Care
Shed Control
Skin & Coat Care
Small Dog Breeds
Stress Control
Toys
Training
Travel & Outdoors
Treats
Vaccines
Vitamins
Wormers
Yard Control

Customer Service
Help Desk ▸
1-800-381-7179

## Customers Testimonials about Rattan Pet Residence

| Testimonial By: | Testimonial: |
|---|---|
| Kelly Miller Fredericksburg, TX | We love this kennel for our Lab! It fits perfectly in our living room like a piece of furniture, which keeps her close to us at all times. This one is so much better looking than the big black metal one that is now in the garage. Thanks! |

Submit Your Review | Ask Customer Service

| Frances Gentile Grand Rapids, MI | The Rattan Pet Residence looks like it belongs in our living room; it's very elegant and well-made. The rubber feet are a must for hardwood floors. I liked the little card included in the crate, which indicated which breed size it's intended for - picturing a Boston Terrier! And that's exactly who will be using it! |

Submit Your Review | Ask Customer Service

FREE Email Newsletters - Sign up for pet care tips & secret sale alerts: Your Email    GO

Pet Products for every pet: Dog Supplies | Cat Supplies | Horse Supplies | Fish & Aquarium Supplies | Bird Supplies
Reptile Supplies | Small Pet Supplies | Pond & Backyard Supplies | Wild Bird Supplies | Pet Pharmacy | Pet Care Articles

**Visit Our Family of Websites:**

LiveAquaria.com    eTropicals.com    PetEducation.com

### CUSTOMER SERVICE
Ordering & Shipping Help
Track Your Order
Contact Us: 1-800-381-7179
Live Help
100% Satisfaction Guaranteed
Privacy & Security
Manage Your Email Subscriptions
How to Use this Site
Site Map

### ABOUT US
Who We Are
Our History
Meet our Professional Services Staff
Our Doctors' Products
Visit Our Retail Store
Customer Comments
Reprint Policy
Employment Opportunities

### SHOPPING & SERVICES
Send a Gift Certificate
Post Product Reviews!
Affiliate Program
Business Partner Program
Catered Pet® Service
Request a FREE Catalog
Tell a Friend About Us
Link to Us

Foster & Smith, Inc. - 2253 Air Park Road, P.O. Box 100 Rhinelander, Wisconsin 54501 - Copyright © 1997-2007, Foster & Smith, Inc. All rights reserved. Unauthorized use of any images, thumbnails, illustrations, descriptions, article content, sounds, or registered trademarks of Foster & Smith, Inc. is strictly prohibited under copyright law. Site content, including photography, descriptions, pricing, promotions, and availability are subject to change without notice. Orders containing multiple, heavy, or oversized items may require additional shipping fees. Race Foster & Marty Smith are both licensed Doctors of Veterinary Medicine and members of the Wisconsin Veterinary Medical Association.

P 003811

9/10/2007 5:01 PM



P 003812
9/10/2007 5:01 PM

http://www.amazon.com/Mr-Herzhers-Small-Pet-Residence/dp/B00G1E9SC

amazon.com

Search | Home & Garden ▸ |

Browse Brands & Products | Bestsellers | Cookware | Small Appliances | Tableware | Cook's Tools | Outlet

Your Amazon.com    Kitchen & Dining    See all 41 Product Categories

Your Account | ⬛ Cart | Your Lists ▾ | Help |

A9 | Web Search    GO

Join **Amazon Prime** and ship Two-Day for free and Overnight for $3.99. Already a member? Sign in.

Gift Certificates    GO



See larger image

Share your own customer images

## Mr. Herzher's Small Pet Residence - Dark Brown

Other products by Mr. Herzher's

★★★★☆ ▾ (6 customer reviews)

List Price: $139.99

Price: **$119.99** & this item ships for **FREE with Super Saver Shipping.** Details

You Save: $20.00 (14%)

**Availability:** In Stock. Ships from and sold by **Amazon.com.** Gift-wrap available.

**Want it delivered Wednesday, September 12?** Order it in the next 22 hours and 32 minutes, and choose **One-Day Shipping** at checkout. See details

**Ships in Original Packaging:**
This ships separately from other items in your order. The item ships in its original manufacturer's packaging and therefore the contents cannot be concealed. See Product details for more information

**2 used & new** available from $119.99

Quantity: | 1 ▸ |

Add to Shopping Cart    GO

or

Sign in to turn on 1-Click ordering.

**More Buying Choices**

A Pet Shoppe
Price: $119.99
In Stock

**2 used & new** from $119.99

| Add to Cart |

| Add to Wish List ▸ |

| Add to Shopping List |

| Add to Wedding Registry |

| Add to Baby Registry |

| Tell a friend |

## Better Together

Buy this item with Richell 94136 Freestanding Pet Gate with Wood Finish, Large by Richell USA today!

𝒫 003813

1 of 9

http://www.amazon.com/Mr-Herzhers-Small-Pet-Residence/dp/B000G1E9SC

**Total List Price:** ~~$288.99~~
**Buy Together Today: $236.88**

[Buy both now!]

## Product Features

- An indoor pet home you won't want to hide.
- Unique 2-way door opens in and out; Latches securely inside out of the way of pets and people.
- Rhino Wicker won't absorb fluids or odors; Easily cleaned with soap and water.
- Elevated base and feet protects flooring; Double tough pan is easily removed.
- Small size (24" long x 18" wide x 21" high) accomodates dogs up to 25 pounds.

## Product Details

**Product Dimensions:** 24 x 18 x 21 inches

**Shipping Weight:** 22.2 pounds (View shipping rates and policies)

**Shipping:** Currently, item can be shipped only within the U.S.

**Shipping Advisory:** This item must be shipped separately from other items in your order. Additional shipping charges will not apply.

**ASIN:** B000G1E9SC

**Item model number:** 13202

**Average Customer Review:** ☆☆☆☆☆ based on 6 reviews. (Write a review.)

**Amazon.com Sales Rank:** #34,470 in Kitchen & Dining (See Bestsellers in Kitchen & Dining)

Popular in these categories:

#13 in Home & Garden > Pet Supplies > Cats > Kennels, Carriers & Travel Accessories > **Kennels**

#49 in Home & Garden > Pet Supplies > Dogs > Kennels, Carriers & Travel Accessories > **Kennels**

## Product Description

**Product Description**

Mr. Herzher'sż Pet Residence ż Finally an Indoor Pet Home you won't want to hide ż comes in four sizes, Small, Medium, Large, and X-Large, providing a stylish den for pets of any size. Original features include the unique two-way door and a removable double-tough floor pan for easy cleaning.

http://www.amazon.com/Mr-Herzhers-Small-Pet-Residence/dp/B000G1E9SC

... Small Pet Residence – Dark Brown: Kitchen & Dining

## Important Information

**Directions**
Assembly required

## Customers Who Bought This Item Also Bought



Call Me Irresponsible ~ Michael Bublé
★★★★★ (172)  $10.99

› **Explore similar items:** Kitchen & Dining (1)  Music (1)

## Customers viewing this page may be interested in these Sponsored Links (What's this?)

Petsolutions
www.petsolutions.com    The best value in **Pet** Supplies Since 1950!

**Mr. Herzher's** Products
www.AllPetFurniture.com/mr-herzhers    Low Prices on All **Pet** Products by **Mr. Herzher's**. Free Shipping!

Wicker Crates at **Pet**-Buys
www.pet-buys.com    Top quality rhino wicker dog crates available in 2 colors from $119.99

See a problem with these advertisement? Let us know

## Tags customers associate with similar products (What's this?)

Click on a tag to find related items, discussions, and people.

furminator (43)      pet brush (28)      cat hair (11)
shedding (36)        pet care (22)        dog hair (11)
grooming tools (32)   dog brush (16)       grooming (10)
deshedding (28)      cat (8)

Search Products Tagged with

› See most
popular tags

Advertise on Amazon

http://www.amazon.com/Mr-Herzhers-Small-Pet-Residence/dp/B000G1E9SC

**Your tags:** Add your first tag

**Help others find this product - tag it for Amazon search**
No one has tagged this product for Amazon search yet. Why not be the first to suggest a search for which it should appear?

## Customers Who Viewed This Item Also Viewed



Mr. Herzher's Medium Pet Residence - Dark
$149.99



Midwest 1824 BayIsle Wicker-Style Dog Crate with Tan Woven Polyethylene Rattan in a Drop-Pin Pet Home
$82.44

Midwest 1830 BayIsle Wicker-Style Dog Crate with Tan Woven Polyethylene Rattan in a Drop-Pin Pet Home
$102.80



Mr. Herzher's Medium Pet Residence - Natural
$149.99



Mr. Herzher's Large Pet Residence - Dark Brown
★★★★★ (2)  $179.99

**› Explore similar items:** Kitchen & Dining (25)

## Rate this item to improve your recommendations

Sign in to rate this item
☐ I own it

## Customer Reviews

### 6 Reviews

5 star:     (5)
4 star:     (1)
3 star:     (0)
2 star:     (0)
1 star:     (0)

**Average Customer Review**
★★★★★ (6 customer reviews)

Share your thoughts with other customers:
Write your own review

http://www.amazon.com/Mr-Herzhers-Small-Pet-Residence/dp/B000G1E9SC

Most Recent Customer Reviews

★★★★★ **great crate**
This is a decorative crate, looks great with any decor. If you like to keep a crate in the house but do not want an ugly metal eye sore this is definetly a solution. **Read more**

Published 2 months ago by Patrycja Rogers

★★★★★ **Mr. Herzher's Small Pet Residence**
This is a great crate for small animals, and in my case my cat... The only downside I feel about this product is I wish it didn't cost as much as it did... **Read more**

Published 2 months ago by Chris J. Schnapp

★★★★★ **Worth the higher price**
I bought this crate for my new dog, and I just love it. It is a very good looking, well-made and easy to assemble product. **Read more**

Published 2 months ago by E. Paitrick

Search Customer Reviews

☑ Only search this product's reviews

› **See all 6 customer reviews...**

ADVERTISEMENT

---

Most Helpful Customer Reviews

3 of 3 people found the following review helpful:

★★★★★ **Great Alternative to Wire Crate**, February 21, 2007

By **MJack** (Tampa, FL) - See all my reviews

This product is a great alternative to a traditional wire crate. It is more pleasing to the eye than a wire crate, very sturdy and well-made. I would say though that the wicker does not look like true natural wicker. However, knowing that it will need to withstand cleaning it is close second. Other features that I like are: door allows you to latch it inward; bottom feet are rubberized to keep from scratching the floor and the bottom of the crate sits above the floor. Overall, I would say that this was a great buy.

☐ Comment | Was this review helpful to you? [Yes] [No]
(Report this)

2 of 2 people found the following review helpful:

★★★★★ **Cat House**, January 10, 2007

By **Dennis Palmer** (Hollister, CA) - See all my reviews
REAL NAME™

The "Small Pet Residence" which I purchased is great. My cat loves it and sleeps in it every night. Quality of construction is very good and it was very easy to assemble.

☐ Comment | Was this review helpful to you? [Yes] [No]
(Report this)

1 of 1 people found the following review helpful:

★★★★★ **Sturdy and attractive**, June 27, 2007

By **Carol S.** "It's Always Sunny" (Philly, PA) - See all my

P0038179

http://www.amazon.com/Mr-Herzhers-Small-Pet-Residence/dp/B000G1E9S(

... · DHIX BROWN: Kitchen & Dining

reviews

I love this crate, it was well worth the money. The only reason I didn't give it 5 stars is because the top doesn't open, but otherwise my dog loves it and it's very nice to look at instead of the usual ugly metal crates. It also has a removable pan for washing. I was worried about the puppy chewing on it, but she hasn't so far and it's been about a month.

Comment | Was this review helpful to you?    ( Yes )  ( No )
(Report this)

[ Write your own review ]

> **See all 6 customer reviews...**

## Customer Discussions Beta (What's this?)
New! Receive e-mail when new posts are made. Click the "Track it!" button on any discussion page.

**This product's forum** (0 discussions)

Discussion                                    Replies    Latest Post

No discussions yet

Ask questions, Share opinions, Gain insight

**Start a new discussion**

Topic:

## Product Information from the Amapedia Community Beta (What's this?)

**Be the first person to add an article about this item at Amapedia.com.** 

> See featured Amapedia.com articles



http://www.amazon.com/Mr-Herzhers-Small-Pet-Residence/dp/B000G1E9SC

Listmania!



Helluva ride for moviegoers.: A list by G.Villan

Pet Store: A list by K9Boss "K9Boss ATL"

 Dog Supplies: A list by Baddog

Create a Listmania! list

## Look for Similar Items by Category

Pet Supplies > Cats > Kennels, Carriers & Travel Accessories > Kennels

Pet Supplies > Dogs > Kennels, Carriers & Travel Accessories > Kennels

### Great Deals on Magazines



Visit our huge selection of magazine subscriptions often to see the latest special offers and bonuses. Check out magazines like *Country Living, O at Home,* and *Veranda.*

### Save with **Instant Rebates** in Grocery

Save today with instant rebates on your favorite brands--Orville Redenbacher's, Stacy's Pita Chips, Senseo coffee pods, and more than 20 more. Offers valid through September 30.

### Save an Extra 15%



Subscribe & Save

Get automatic reorders, free shipping, and an extra 15% discount on items you use frequently, including coffee, shampoo, and laundry detergent, with our new Subscribe & Save program.

Search Listmania!

Small Pet Residence – Dark Brown: Kitchen & Dining

> More Special Offers in Grocery

> More about Subscribe & Save

**Feedback**

▷ If you need help or have a question for Customer Service, **contact us**.

▷ Is there any other feedback you would like to provide? **Click here**

**Where's My Stuff?**

Track your recent orders.

View or change your orders in Your Account.

**Shipping & Returns**

See our shipping rates & policies.

Return an item (here's our Returns Policy).

**Search** Amazon.com ▸

amazon.com®

Amazon.com Home  |  Directory of All Stores

International Sites:  Canada  |  United Kingdom  |  Germany  |  Japan  |  France  |  China

Help  |  View Cart  |  Your Account  |  Sell Items  |  1-Click Settings

Investor Relations  |  Press Release  |  Careers at Amazon  |  Join Associates  |  Join Advantage  |  Join Honor System  |  Advertise With Us

**Need Help?**

Forgot your password? Click here.

Redeem or buy a gift certificate.

Visit our Help department.

http://www.amazon.com/Mr-Herzhers-Small-Pet-Residence/dp/B000G1E9S(

Conditions of Use | Privacy Notice © 1996-2007, Amazon.com, Inc. or its affiliates

... Small Pet Residence - Dark Brown: Kitchen & Dining    http://www.amazon.com/gp/product/customer-reviews/B000G1E9SC/ref=cm_cr_dp_all_top...

**amazon.com**

Search | Home & Garden ▼

Your Amazon.com | Kitchen & Dining | See all 41 Product Categories

Browse Brands & Products | Bestsellers | Cookware | Small Appliances | Tableware | Cook's Tools | Outlet

Your Account | 🛒 Cart | Your Lists ▼ | Help |

🎁 Gift Certificates

GO



See larger image

Share your own customer images

## Mr. Herzher's Small Pet Residence - Dark Brown

Other products by Mr. Herzher's

★★★☆ ▼ (6 customer reviews)

List Price: $139.99

Price: **$119.99** & this item ships for **FREE with Super Saver Shipping.** Details

You Save: $20.00 (14%)

**Availability:** In Stock. Ships from and sold by **Amazon.com.** Gift-wrap available.

**Want it delivered Wednesday, September 12?** Order it in the next 22 hours and 22 minutes, and choose **One-Day Shipping** at checkout. See details

**Ships in Original Packaging:**
This ships separately from other items in your order. The item ships in its original manufacturer's packaging and therefore the contents cannot be concealed. See Product details for more information

2 used & new available from $119.99

‹ Return to Product Overview

AꞐ | Web Search   GO

**Quantity:** | 1 ▼ |

🛒 Add to Shopping Cart

or

Sign in to turn on 1-Click ordering.

**More Buying Choices**

A Pet Shoppe
Price: **$119.99**
In Stock

Add to Cart

2 used & new from $119.99

Add to Wish List ▼

Add to Shopping List

Add to Wedding Registry

Add to Baby Registry

Tell a friend

## Customer Reviews

**Average Customer Review:** ★★★☆

Search Customer Reviews

1 of 5

... ...... . ...... ..... .. .... ... . ...... .... .... .. ......... - Dark Brown: Kitchen & Dining   http://www.amazon.com/gp/product/customer-reviews/B000G1E9SC/ref=cm_cr_dp_all_top:

**Number of Reviews:** 6
**Write an online review and share your thoughts with other customers.**

Show: | Newest First ▸ |

1-6 of 6

★★★★★ **great crate**, July 4, 2007

By **Patrycia Rogers "Pat"** - See all my reviews
REAL NAME™

This is a decorative crate, looks great with any decor. If you like to keep a crate in the house but do not want an ugly metal eye sore this is definitely a solution. It was very easy to put together. My dog absolutely loves it and so do we.

Comment | Was this review helpful to you? (Yes) | (No)   (Report this)

★★★★★ **Mr. Herzher's Small Pet Residence**, July 1, 2007

By **Chris J. Schnapp "infraredchris"** (Long Island) - See all my reviews
REAL NAME™

This is a great crate for small animals, and in my case my cat... The only downside I feel about this product is I wish it didn't cost as much as it did... Other than that, it's exactly what I was looking for...

Comment | Was this review helpful to you? (Yes) | (No)   (Report this)

1 of 1 people found the following review helpful:
★★★★☆ **Sturdy and attractive**, June 27, 2007

By **Carol S. "It's Always Sunny"** (Philly, PA) - See all my reviews

I love this crate, it was well worth the money. The only reason I didn't give it 5 stars is because the top doesn't open, but otherwise my dog loves it and it's very nice to look at instead of the usual ugly metal crates. It also has a removable pan for washing. I was worried about the puppy chewing on it, but she hasn't so far and it's been about a month.

Comment | Was this review helpful to you? (Yes) | (No)   (Report this)

P003823

2 of 5

http://www.amazon.com/gp/product/customer-reviews/B000G1E9SC/ref=cm_cr_dp_all_top...

★★★★★ **Worth the higher price**, June 14, 2007

By **E. Paitrick** (Fredericksburg, VA) - See all my reviews

REAL NAME™

I bought this crate for my new dog, and I just love it. It is a very good looking, well-made and easy to assemble product. I think it is worth the price because with a standard wire crate, you'll need to spend another $40 on a cover to create the den atmosphere. I wasn't sure of the size, but the Small just fits my 19 lb Corgi.

☐ Comment | Was this review helpful to you?    (Yes) (No)   (Report this)

---

3 of 3 people found the following review helpful:

★★★★★ **Great Alternative to Wire Crate**, February 21, 2007

By **MJack** (Tampa, FL) - See all my reviews

This product is a great alternative to a traditional wire crate. It is more pleasing to the eye than a wire crate, very sturdy and well-made. I would say though that the wicker does not look like true natural wicker. However, knowing that it will need to withstand cleaning it is close second. Other features that I like are: door allows you to latch it inward; bottom feet are rubberized to keep from scratching the floor and the bottom of the crate sits above the floor. Overall, I would say that this was a great buy.

Comment | Was this review helpful to you?    (Yes) (No)   (Report this)

---

2 of 2 people found the following review helpful:

★★★★★ **Cat House**, January 10, 2007

By **Dennis Palmer** (Hollister, CA) - See all my reviews

REAL NAME™

The "Small Pet Residence" which I purchased is great. My cat loves it and sleeps in it every night. Quality of construction is very good and it was very easy to assemble.

☐ Comment | Was this review helpful to you?    (Yes) (No)   (Report this)

P 003824

3 of 5

...Richell's Shinji Pet Residence - Dark Brown: Kitchen & Dining  http://www.amazon.com/gp/product/customer-reviews/B000G1E9SC/ref=cm_cr_dp_all_top...

1-6 of 6

‹ Return to Product Overview

**Feedback**
▲ If you need help or have a question for Customer Service, **contact us.**
▲ Is there any other feedback you would like to provide? **Click here**

**Where's My Stuff?**
Track your recent orders.
View or change your orders in Your Account.

**Shipping & Returns**
See our shipping rates & policies.
Return an item (here's our Returns Policy).

**Need Help?**
Forgot your password? Click here.
Redeem or buy a gift certificate.
Visit our Help department.

**Search** | Amazon.com | ▾ |

**Your Recent History** Learn more

**Recent Searches**
mr. herzhers

Customers who bought items in your Recent History also bought:



Richell 94136 Freestanding Pet Gate with Wood Finish, Large

▲ **View & edit Your Browsing History**

**amazon.com**®    Amazon.com Home | Directory of All Stores

Amazon.com: Customer Reviews - Dark Brown: Kitchen & Dining   http://www.amazon.com/gp/product/customer-reviews/B000G1E9SC/ref=cm_cr_dp_all_top..

International Sites: Canada | United Kingdom | Germany | Japan | France | China

Help | View Cart | Your Account | Sell Items | 1-Click Settings

Investor Relations | Press Release | Careers at Amazon | Join Associates | Join Advantage | Join Honor
System | Advertise With Us

Conditions of Use | Privacy Notice © 1996-2007, Amazon.com, Inc. or its affiliates

http://www.amazon.com/gp/product/customer-reviews/B000G16RBO/sr=1-3/qid=1894593...

**amazon.com**

Your Amazon.com | Home & Garden | See all 41 Product Categories

Browse Brands & Products | Your Account | Cart | Your Lists | Help | Outlet

Bestsellers | Bedding & Bath | Vacuums | Kitchen & Dining | Patio & Garden | Gift Certificates

Search | Home & Garden

**Mr. Herzher's Large Pet Residence - Dark Brown**

Other products by Mr. Herzher's
★★★★★ ☑ (2 customer reviews)

See larger image

Share your own customer images

**List Price:** ~~$219.99~~

**Price: $179.99** & this item ships for **FREE with Super Saver Shipping**. Details

**You Save:** $40.00 (18%)

**Availability:** In Stock. Ships from and sold by **Amazon.com**.

**Want it delivered Wednesday, September 12?** Order it in the next 23 hours and 51 minutes, and choose **One-Day Shipping** at checkout. See details

**Ships in Original Packaging:**
This ships separately from other items in your order. The item ships in its original manufacturer's packaging and therefore the contents cannot be concealed. See Product details for more information

2 used & new available from $179.99

< Return to Product Overview

**Customer Reviews**

Average Customer Review: ★★★★★
Number of Reviews: 2

**Web Search** GO

**Quantity:** 1

**Add to Shopping Cart**

or

Sign in to turn on 1-Click ordering.

**More Buying Choices**

A Pet Shoppe    Add to Cart
Price: $179.99
In Stock

2 used & new from $179.99

Add to Wish List
Add to Shopping List
Add to Wedding Registry
Add to Baby Registry

Tell a friend

**Search Customer Reviews**

... ... ... Large Pet Residence - Dark Brown: Home & Garden    http://www.amazon.com/gp/product/customer-reviews/B000G16RBO/sr=1-3/qid=1189459...

Write an online review and share your thoughts with other customers.

Show: | Newest First ▾ |

1-2 of 2

★★★★★ **Large Dog Crate**, September 7, 2007

By **Gary Boswell "Dog Lover"** (Clayton, CA United States) - See all my reviews

REAL NAME™

We purchased this dog crate when we remodeled our bedroom. Our dog was used to a wire crate and we weren't sure if she would like a more enclosed wicker crate. No problem what so ever and the wicker crate is much more attractive than a wire one. The quality is excellent and our Maddie is very happy in her new crate.

Comment | Was this review helpful to you? ( Yes )( No )   (Report this)

★★★★★ **Love this crate**, August 23, 2007

By **D. Northup** (San Diego, CA USA) - See all my reviews

REAL NAME™

I bought the large pet residence for my 4 month old already crate trained golden retriever. I am very pleased with it. It is a very attractive looking crate and sits right next to the bed as an over sized bedside table. The outer frame (so far) seems sturdy enough to hold an acrylic or glass top so I am able to put my lamp and clock, etc. right there but I shouldn't recommend doing this. This crate would fit anywhere in my home though so I'm thrilled. We even took it with us on vacation in our SUV instead of buying a collapsible travel crate. Two minor issues to note would be that in order to open and close the crate you will need to use two hands simultaneously and the bottom pan has many grooves so you need a thick pad in the bottom.

☐  Comment | Was this review helpful to you? ( Yes )( No )   (Report this)

1-2 of 2

˅  Return to Product Overview

P 003828

... ... ... Browne - Dirk Brown: Home & Garden    http://www.amazon.com/gp/product/customer-reviews/B000G16RBO/sr=1-3/qid=11894593...

## Feedback

▸ If you need help or have a question for Customer Service, **contact us**.

▸ Is there any other feedback you would like to provide? **Click here**

## Where's My Stuff?

Track your recent orders.

View or change your orders in Your Account.

## Shipping & Returns

See our shipping rates & policies.

Return an item (here's our Returns Policy).

Search | Amazon.com ▾

## Need Help?

Forgot your password? Click here.

Redeem or buy a gift certificate.

Visit our Help department.



## Your Recent History

Learn more

### Recently Viewed Products

Mr. Herzher's Small Pet Residence - Dark Brown by Mr. Herzher's

### Recent Searches

mr. herzhers

### Customers who bought items in your Recent History also bought:



Richell 94136 Freestanding Pet Gate with Wood Finish, Large

▸ **View & edit Your Browsing History**

**amazon.com®**    Amazon.com Home  |  Directory of All Stores

International Sites: Canada  |  United Kingdom  |  Germany  |  Japan  |  France  |  China

Help  |  View Cart  |  Your Account  |  Sell Items  |  1-Click Settings

P003829

http://www.amazon.com/gp/product/customer-reviews/B000G16RBO/sr=1-3/qid=11894593...

Dark Brown: Home & Garden

Investor Relations | Press Release | Careers at Amazon | Join Associates | Join Advantage | Join Honor
System | Advertise With Us
Conditions of Use | Privacy Notice © 1996-2007, Amazon.com, Inc. or its affiliates